MARK D. ROSENBAUM, SBN 59940
PETER J. ELIASBERG, SBN 189110
RANJANA NATARAJAN, SBN 230149
ACLU FOUNDATION OF
 SOUTHERN CALIFORNIA
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500
Facsimile: (213) 250-3919

Attorneys for Plaintiffs


PAUL BEACH, SBN 166265
DAVID D. LAWRENCE, SBN 123039
FRANSCELL, STRICKLAND,
 ROBERTS & LAWRENCE, P.C.
100 West Broadway, Suite 1200
Glendale, CA 91210-1219
Telephone: (818) 545-1925
Facsimile: (818) 545-1937

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, et al,<br><br>Plaintiffs,<br><br>v.<br><br>SHERMAN BLOCK, et al.,<br><br>Defendants. | Case No. Civ. 75-04111-DDP<br><br>**STIPULATION RE PARTIES' SETTLEMENT NEGOTIATIONS; [PROPOSED] ORDER THEREON** |

## PROCEDURAL HISTORY

1. On April 13, 2006, plaintiffs filed with the Court a Request for a Status Conference, seeking to establish a collaborative process to effectively address alleged systemic problems at Men's Central Jail. On April 26, 2006, the parties through counsel met and conferred on the issues raised by the plaintiffs' request. Subsequently, on May 8, 2006, the Court held a status conference at which the parties and the Court agreed to tour Men's Central Jail. On May 10, 2006, the Court toured Men's Central Jail, along with officials of the Los Angeles Sheriff's Department, the ACLU Jails Project Coordinator, and counsel for the parties.

2. On May 11, 2006, the Court held a status conference at which counsel for the parties agreed to meet and confer regarding the alleged systemic problems at Men's Central Jail raised by the plaintiffs. On May 23, 2006, the parties filed a joint status report with the Court. On May 25, 2006, the Court held another conference. On June 5, 2006, the parties filed another joint status report. On June 6, 2006, the Court held another conference and directed the parties to return to court on June 15, 2006 with persons with decision-making authority from the Sheriff's Department and a point-person from the ACLU to discuss and resolve the issues raised.

## STIPULATION

IT IS HEREBY STIPULATED, by and between the parties, that:

1. Plaintiffs have identified a number of conditions at Men's Central Jail for which Plaintiffs seek amelioration, including: (a) permanent reduction of cell populations of 6-men cells in Modules 2000-4000 to 4-men cells; (b) permanent reduction cell populations of 4-men cells in Modules 2000-4000 to 2-men cells; (c) permanent reduction of the density of Module 5000 and 9000 dormitories to no more than 64 beds each, and conversions of larger dormitories into multiple 64-bed dormitories if necessary; (d) use of dayrooms and/or multi-purpose rooms as

indoor recreation rooms to provide at least one hour of daily indoor recreation to all general population inmates, and equipment of indoor recreation rooms with televisions and appropriate exercise equipment; (e) provision of one hour of outdoor recreation to all general population inmates, three times a week; (f) provision of one hour of recreation, five days a week, with at least one hour of outdoor recreation each week, to inmates placed in disciplinary segregation; (g) expansion of visitation from four days per week to seven days per week; and (h) implementation of staff and inmate accountability measures and operational changes relating to inmate supervision and safety.

2. In order to determine the feasibility of the changes proposed in paragraph 1 above and the most effective, cost-efficient, and sustainable methods by which to make changes that are deemed feasible, the parties agree to convene a panel of experts, which shall be charged with determining the methods by which to ameliorate the above conditions and make any other improvements, including but not limited to population density reduction, increases in out-of-cell time, and enhancement of inmate supervision and safety.

3. The panel shall have its initial in-person meeting no later than the week of June 26, 2006. The panel shall produce a final, comprehensive, written plan containing immediate measures for improvement (within six months), intermediate measures (from 6 to 24 months), and long-term measures (2-6 years) to ameliorate conditions. The panel shall, as an initial step, assess the proper time frame for developing the final, comprehensive plan. Upon completion, the plan shall be submitted for review to the parties and the Court, and also to the County Board of Supervisors for its legislative or budgetary consideration. The final plan shall include, but is not limited to, recommendations on which the parties agreed and issues regarding which the parties were not able to reach agreement. Any panel members may include as an attachment to the report an explanation of additional recommendations on which the parties were not able to reach agreement.

1      4.   The panel shall make reports of its progress to the Court, the parties, and the County Board of Supervisors every thirty days, starting with thirty days from the date of entry of this Order. The progress reports shall indicate areas of agreement between the parties, areas of disagreement, and topics of the panel's discussions. Within 60 days of the entry of this Order, the panel shall prepare a report to the Court, the parties and the County Board of Supervisors regarding the panel members' recommendations for immediate improvement measures. This report shall indicate areas and issues on which the panel was not able to reach agreement, and shall include as an attachment to the report any panel member's explanation of the additional recommendations on which the parties were not able to reach agreement.

    5.   The panel shall be composed of the following persons: (a) Jody Kent, Jails Project Coordinator at the ACLU of Southern California; (b) David Bogard and no more than three other representatives from the firm of Pultizer/Bogard & Associates, LLC; (c) no more than six representatives from the Los Angeles County Sheriff's Department and the Los Angeles County Chief Administrative Office. At least 2 of the 6 shall be from the Los Angeles County Chief Administrative Office and one member shall be Sharon Harper. The panel members recognize that the continuity of their leadership is critical to the success of this initiative. Therefore, the panel members shall not have others substitute in their place. Nothing shall prevent panel members from being assisted by other personnel.

    6.   Pulitzer/Bogard & Associates, LLC is a criminal justice planning and consulting firm, with extensive experience relating to jail systems. Based on tours of Men's Central Jail and review of relevant documents, the firm of Pulitzer/Bogard has made an Outline Of An Illustrative Plan For Remedial Measures For The Los Angeles County Men's Central Jail, attached hereto as Exhibit 1. Defendants shall compensate the firm of Pulitzer/Bogard & Associates, LLC in the amount of $20,000, for services rendered as participants on the panel for the sixty-day period.

7. Nothing in this stipulation shall be construed as an admission of liability by Defendants.

Dated: June 15, 2006

Respectfully Submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

By: *Mark Rosenbaum*
Mark D. Rosenbaum
Attorney for Plaintiffs

FRANSCELL, STRICKLAND,
ROBERTS & LAWRENCE

By: *[signature]*
Paul Beach
Attorney for Defendants

**IT IS SO ORDERED.**

Dated: 6-15-06

*[signature]*
Hon. Dean P. Pregerson
United States District Judge

-5-

# Outline Of An Illustrative Plan For Remedial Measures For The Los Angeles County Men's Central Jail
**June 14, 2006**

## Background

Within the past two weeks, the American Civil Liberties Association of Southern California (ACLU-SC) has retained the firm of Pulitzer/Bogard & Associates, LLC (P/BA)[1] to assist in the review of operations of the Los Angeles County Men's Central Jail (MCJ). On June 6-7, 2006, P/BA staff toured the MCJ to develop a better sense of current conditions and some of the contextual issues that underpin the *Rutherford* litigation.

A review of numerous documents, coupled with the facility tours and discussions with staff of ACLU-SC, has provided P/BA with only a preliminary understanding of the facility, its massive and complex operations, and the range of challenges faced by the Los Angeles Sheriff's Department (LASD) in operating the facility safely, efficiently, and effectively. What is clear, is that there are a range of concerns that have been identified in various court documents and by the Judge, relative to such issues as (1) the extreme crowding of more than 6,000 inmates in MCJ, (2) the lack of out of cell time as a means to mitigate the impact of crowding, and (3) safety and supervision concerns that negatively impact on inmates and staff assigned to the MCJ. The gravity of these concerns is clearly apparent to us after only spending a short amount of time on this effort.

The largest jail in the United States cannot be fixed cheaply or quickly. What is truly required is the development and implementation of a comprehensive Master Plan for the facility and its operations to permanently resolve the unabated issues identified in the *Rutherford* litigation. We recognize that the development of a Master Plan as neither a goal nor a destination. It is the essential road map for ensuring that the entire territory related to the outstanding issues of the litigation is covered and that all identified remedies are sound and acceptable to all parties.

However, while we believe that the development of comprehensive, long-term solutions to the problems that are inherent in the MCJ is the proper course of action, there are nevertheless numerous activities that we believe can proceed immediately and in the near future to mitigate some of the key concerns. As such, this remedial outline identifies a series of illustrative measures that, if adopted by the County of Los Angeles Board of Supervisors and LASD, would

---

[1] Pulitzer/Bogard & Associates, LLC is a New York based criminal justice planning and consulting firm. P/BA as a firm, and its staff as individuals, has experience with jail systems throughout the country including those in Harris County, TX (Houston), Philadelphia PA, Washington DC, Suffolk County, MA (Boston), Suffolk and Nassau Counties (NY), Alachua County, FL (Gainesville), Arlington County, VA, and New York City. The firm's principals and associates offer substantial consulting and hands-on correctional experience to its consulting assignments.

---

*Pulitzer/Bogard & Associates, LLC*  1

[EXHIBIT ONE]

allow the MCJ to operate far more safely and effectively than is presently the case. This outline sets forth both interim steps that can mitigate some of the concerns that are endemic to MCJ, either because of the limitations imposed by the physical plant or because of operating approaches and prerogatives adopted by the LASD, as well as proposed long-term solutions.

We say this plan is *illustrative* for several reasons. First, we cannot claim to have developed any true, in-depth expertise about the MCJ and how to fix it after such a short period of time and without the benefit of LASD data about the operations, staffing, and incidents. Second, we do not propose this as something to be imposed on the County—rather we offer this to illustrate what can be done and to initiate a dialogue, with LASD and others, concerning short and long term amelioration of critical conditions in the jail. Third, we maintain that there are other measures that could or should be taken and consequently, we do not wish to waive opportunities to identify other issues that impact on these categories of concerns once we learn more about the MCJ and have an opportunity for dialogue with LASD staff. Despite terming them "illustrative," we believe that our suggestions and recommendations are reasonable, have merit and are representative of the considerable expertise and experience of our firm and staff combined with the background information and first-hand observations we have made to date.

We also believe that the current efforts of the LASD relative to the recent awarding of a contract to a firm to develop a security audit of the Los Angeles County jails and a soon-to-be completed Facilities Master plan must be carefully scrutinized and considered in this process. These two reports should add considerably to the knowledge base about the jail system in general and MCJ in particular.

This outline plan is divided into three phases, an immediate one (within 6 months) during which immediate measures can be taken to address serious concerns at MCJ, a second phase (6-24 months) during which long-term plans are being developed and additional measures taken to address operational and physical deficiencies, and a third phase (2-6 years) of implementation of long-term plans. The measures set forth under each must be viewed as part of a continuum of improvements to MCJ, and, as such, each phase is divided into the same three topics as follows:

>    I. CROWDING/POPULATION DENSITY REDUCTION OPTIONS
>    II. OUT OF CELL TIME- CROWDING MITIGATION
>    III. INMATE SUPERVISION/SAFETY ENHANCEMENTS

We recommend that a panel of representatives of the County and the ACLU-SC be convened as soon as possible to consider this outline plan as well as other potential initiatives designed to remedy the many serious operational and physical plant deficiencies that have been well-documented in the past and that

---

*Pulitzer/Bogard & Associates, LLC*                                                      2

we have observed most recently. It is our recommendation that the membership of this panel be limited to five-seven individuals, selected by the parties, who have significant expertise in jails and/or L.A. County budgeting and finance. The County's representatives should be decision-makers, or persons who can quickly access those who can make decisions. And, we suggest that attorneys for the parties not participate on the panel so that there can be a free and open exchange of ideas at all times, unencumbered by the objections and legal technical issues that counsel might reasonably be expected to raise. The panel should receive its charge from the Court, and then be permitted to do its work, with periodic status reports submitted to counsel and the Court. Only if the panel cannot achieve consensus should a mediator be called in, and that should be an infrequent event.[2]

We are prepared to participate on such a panel, and to initiate work during the week of June 26, 2006.

---

[2] Two principals of our firm previously participated on a Federal Court appointed committee that operated in precisely this manner in Michigan in *Hadix v. Johnson*. Over the course of some ten years, the committee was able to efficiently resolve myriad long-standing disagreements between the parties, develop a master plan, and successfully oversee the implementation of virtually all issues as set forth in a consent decree that called for a complete operational and physical rehabilitation of a 5,000-bed prison.

*Pulitzer/Bogard & Associates, LLC*   3

# PHASE I- Immediate Remedial Measures (within 6 months)

## I. CROWDING/POPULATION DENSITY REDUCTION OPTIONS

1. Move 1800 high security inmates out of MCJ into Twin Towers.

2. Reduce the number of inmates held pursuant a contract with the state by 500.

3. The impact of these measures would be to allow for the following crowding/population density reduction measures:

    a. Convert Level 2000-4000 6-man cells into 4-man cells;[3]
    b. Convert Level 2000-4000 4-man cells into 2-man cells;[4]
    c. Convert Level 2900 12-man cells to 6-man cells;[5]
    d. Reduce the density of Level 5000 and 9000 dormitories presently housing 80-130 inmates to 64 beds each[6] (the ACA standard for maximum dormitory size) and convert the 250-man dormitory to two, 64-bed dormitories.

    The impact of beds saved by implementing steps a-c (density reduction in multiple occupancy cells) would be 1,313 beds. The impact of reducing the density in dormitories would be 810 fewer beds/inmates. The total bed reduction at MCJ would be 2,123. We also recommend that in lieu of using dayrooms for temporary housing, one single cell module of 104 beds be identified as a location for inmates awaiting a more permanent placement at MCJ, consistent with their classification.

4. As the first step in a long term strategy to reform MCJ's physical plant and design driven operations, the County should develop and issue a Request For Proposals to retain a qualified architectural firm initially to develop a cost benefit analysis relative to the complete renovation of MCJ as a contemporary jail facility meeting state and national standards and best practices (including direct supervision) versus the replacement of the facility entirely. This study can be completed within six months, with a decision by the Board of Supervisors immediately thereafter so that

---

[3] Cells would still be significantly short of national standards for unencumbered space for inmates (American Correctional Standards 4-ALDF-1A-10 requires 25 unencumbered square feet per occupant in multiple occupancy cells, unless inmates are locked in for more than 10 hours a day, in which case 35 square feet are required per occupant). As an *interim* measure, however, these reductions would be a modest improvement over current conditions. We have not necessarily tied all recommendations to ACA standards, given the interim nature of the first two phases of this Outline Plan; we have, however, referenced a few selected such standards as necessary.
[4] Id.
[5] Id.
[6] ACA Standards (4-ALDF-1A-10) limits dormitories to 64.

---

*Pulitzer/Bogard & Associates, LLC*     4

designs may be completed to allow for the phasing out of MCJ in its current configuration within five-six years.

5. Consider the implications of the Sheriff's recently announced plan for increased arrests and the elimination of early release. Insure that this plan be dealt with in a manner that will not compromise the integrity of plans to remedy unsafe and unhealthful conditions at MCJ.

## II. OUT OF CELL TIME- CROWDING MITIGATION

1. The LASD should equip MCJ dayrooms/unused multipurpose spaces within modules with TVs and appropriate exercise equipment for indoor recreation/out of cell activity by inmates. With population reduction measures in place as per I above, if used on two shifts a day for groups of 20-30 inmates, this would allow for 1.5-2 hours of indoor recreation daily for most inmates.[7] This would require posting one deputy in/or adjacent to the dayroom during each recreation period.[8]

2. We recognize the logistical difficulties posed by the current MCJ design relative to LASD having to move inmates to the roof for recreation.[9] Nevertheless, with the population reductions described above, we believe that it is of the utmost importance to explore all possible means to stretch the Title 15 mandated three hours per week of outdoor recreation to as many as three, one hour sessions per week per inmate, in lieu of the current three hours in one block. This would further mitigate the impact of crowding and would increase the chances that inmates would not miss out on a full week of recreation if they miss a scheduled recreation period due to a visit, court appearance, or an operations related cancellation.

3. With the recommended population reduction, it is recommended that all MCJ inmates held in disciplinary segregation status be afforded an opportunity to receive for at least one hour a day/five days a week of

---

[7] We note that a 2000 Fire Safety Report commissioned by the Plaintiffs identified air-handling system problems in some dayrooms. We would suggest that these deficiencies be corrected, although we contend that if the spaces have been used for the past six years for temporary housing, they can certainly be used for the types of activities described here as a means of increasing out of cell activity time.

[8] We recognize that this recommendation and perhaps others related to recreation and enhanced inmate supervision may result in a need for additional staff. However, the staffing implications of these initiatives may be mitigated by the proposed population reductions. Moreover, as we have not yet requested or been provided access to detailed staffing figures for MCJ, we cannot reasonably say at this juncture whether additional staff will be required.

[9] More contemporary hi-rise jails, including the Twin Towers facility, employ a "porch design," with outdoor recreation on each floor adjacent to living modules and requiring no escorts and minimal supervision.

---

*Pulitzer/Bogard & Associates, LLC* 5

exercise outside their cells, including one hour a week of outdoor recreation.[10]

4. The LASD should expand opportunities for families and significant others to visit inmates. We propose expanding the days available for visitation from 4 days to 7 days per week, and expanding each visitation period from 15 minutes to 30-minutes (4 times per week). If adopted, this proposed change would provide greater flexibility in the schedule and thereby reduce the unreasonably long waiting periods for visitors that has been previously documented and routinely observed. This modification also ensures that inmates are not forced to miss visits as a result of unscheduled court appearances, medical appointments and conflicts created by the dynamics of facility operations.

5. The LASD should purchase and place a few legal research kiosks in dayrooms or other spaces on the module so all inmates have access to law library services. This cost of providing the opportunity for additional access to legal research services to benefit the inmates is available from the Inmate Welfare Fund. The option if acceptable is not designed to eliminate or reduce the "Pro-Per's" housing arrangements made available for inmates who are committed to litigate via self-representation.

### III. INMATE SUPERVISION/SAFETY ENHANCEMENTS

1. We recommend continuing the implementation and refinements of the centralized inmate classification system, including the Northpointe Classification tools. The LASD should attempt to validate the current Northpointe scoring system relative to the LA jails population to insure that, as currently configured, it is adequately and consistently predicting behavior and risks as intended in this system. The process should also include a formal reclassification instrument, so that inmates can be reclassified after a certain period of time based on actual behavior or in the event of changes to their status as a result of legal changes or incidents (e.g., identifying, controlling and militating the effects of the activities of security threat groups such as gangs, etc).

2. We proposed an Enhanced Inmate Supervision Model for use at the MCJ to promote greater accountability and encourage more positive and consistent interactions between staff and inmates. This initiative provides opportunities to improve staff awareness of problems and commits them to taking actions that encourages their ownership of solutions. The Enhanced Inmate Supervision Model would include:

---

[10] American Correctional Association Standards 4-ALDF-2A-64 requires five days a week of one hour of daily out of cell exercise unless security or safety conditions dictate otherwise.

*Pulitzer/Bogard & Associates, LLC* 6

- Assignment of deputies to specific rows (75-80 inmates) within the housing modules;
- Make deputies responsible for all aspects of inmate management during their shift for their particular rows, including all Title 15 requirements (showers, security rounds, etc.) plus receiving inmate complaint forms, ensuring access to dayrooms, documenting maintenance work orders, ensuring cleanliness and adherence to sanitation rules, accountability for linen and clothing exchange, and distributing hygiene supplies (including razors);
- Require security rounds to be documented in all areas at 30-minute increments in lieu of 60 minutes;
- Review and sign-off on deputies' performance and accountability for their assigned areas by sergeants each shift.

3. Enhance fire safety at MCJ by instituting the following measures[11]:

    - Conducting and documenting quarterly fire/partial evacuation drills for each area of the building (horizontal movement from modules to separate smoke zones only);
    - Implement the use of fireproof containers for each inmate to maintain in their cell and in which all property must fit;
    - Relocate wheelchair-bound inmates to another facility since they are most vulnerable in a fire, earthquake or other emergency where there is a need to evacuate them, given the identified inadequacies in the MCJ;
    - Install and/or change filters to ensure ventilation ducts do not build up debris and cause fires.

4. In 1993, 30% of contraband razor incidents at Twin Towers[12] involved loose razor blades or altered razors. As such, we recommend that LASD change the method for razor distribution, accounting and disposal at the MCJ. In lieu of allowing inmates to purchase razors from commissary and maintain these potentially lethal weapons in their cells, razors should be distributed and collected by deputies under a rigorous system of controls. In addition to enhancing staff and inmate safety, this measure would also address bloodborne pathogen control issues, and occupational safety and health concerns.

5. Institute maintenance improvements at MCJ including a plan and commitment to:

---

[11] We have identified only a few critical fire safety measures here based on our recent tour of the MCJ. We would hope that the panel would receive and have available a full status report relative to the measures taken by the LASD in response to the recommendations made by the ACLU-SC's fire safety expert, Michael Madden, in 2000.

[12] We are not privy to comparable or more recent data from the FAST system pertaining to MCJ, but we have no reason to believe the statistics would be appreciably different.

---

*Pulitzer/Bogard & Associates, LLC*                                                       7

- Fix toilet leaks fixed within 24 hours or install replacement fixtures: these leaks were observed throughout the MCJ and present unacceptable health risks due to bodily wastes on the cell floor and safety risks due to the increased potential for inmates to slip in an already very crowded space;
- Replace light bulbs in cells within 24 hours or install replacement fixtures: likewise, we observed numerous fixtures in cells that were either broken or contained burned out bulbs, with the low light and visibility conditions making it impossible for inmates to read or groom, and presenting significant obstacles to officers' observation of activities occurring in the cells.

## PHASE II- Long Term Planning (6-24 Months)

### I. CROWDING/POPULATION DENSITY REDUCTION OPTIONS

1. The Board of Supervisors should approve and fund implementation of the MCJ Replacement Master Plan, and authorize the design and construction of the renovated MCJ or its replacement.

2. The Board of Supervisors should fund a comprehensive plan to study population projections and evaluate alternatives to incarceration/diversion opportunities. This plan should address any long-term population management planning associated with the Sheriff's recently announced proposal for increased arrests and the elimination of early release. [13]

3. Move eligible inmates directly from the IRC to the Pitchess facility instead of maintaining them for lengthy periods at MCJ. This initiative may impact the entire system so coordination with all appropriate stakeholders should occur to ensure that arrangements are made to prevent delays in access to medical care or disposition of court documentation.

4. Fund and address all integration issues involving the capabilities of the Automated Jail Information System to interface with Trial Court Information System. Staff at the Inmate Reception Center must sort hundred of court release documents received manually each business day

---

[13] Funding opportunities for planning and programming for alternatives and diversion of special populations from jail, including the mentally ill and homeless, are potentially available from numerous sources. Possible Federal sources include: SAMHSA (Substance Abuse Mental Health Services Administration); TCE--Targeted Capacity for Substance Abuse and Mental Illness--Co-occurring Disorders; TCE--Targeted Capacity for Substance Abuse and Mental Illness and Homelessness; Reentry Grants (jointly sponsored by SAMHSA, HUD, and Labor); MIOTCRA (Mentally Ill Offender Treatment and Crime Reduction Act); and, other California based sources are as well.

*Pulitzer/Bogard & Associates, LLC*  8

because the two information systems do not interface. This problem has system-wide implications that are associated with many of the reported delays that result in detaining inmates beyond their court-ordered release or transfer.

## II. OUT OF CELL TIME- CROWDING MITIGATION

1. Expand inmate programming opportunities and use MCJ dining halls to meet space needs for such activities.

2. To further mitigate the difficulties inherent in providing visits to the MCJ population, we recommend that the LASD explore other forms of non-contact visits, including the potential use of video visitation. The prime objectives would be to increase the number of weekly opportunities for inmates and their families to maintain contact, and limit the long waits that visitors experience.

## III. INMATE SUPERVISION/SAFETY ENHANCEMENTS

1. Procure and implement an automated system of documenting security rounds. This system would involve a series of proximity readers or bar code readers for each module/row and would automatically provide Title 15 documentation as well as reports to supervisors or missed or delayed rounds.

2. Given the size of the MCJ, even with the recommended interim capacity reductions, the facility should be divided into semi-autonomous management units to enhance service delivery, inmate supervision, and accountability. Each management unit would be under the direction of a lieutenant, with multiple sergeants assigned to each shift and civilian case managers working as part of a team.

3. Install a reasonable number of digital surveillance cameras throughout the MCJ to afford incident recording capability for disciplinary and prosecution purposes, allow supervisors to view myriad areas of the facility, and serve as a deterrent to inmate misbehavior.

4. Reevaluate all K-10 designations for inmates and develop clearer guidelines for the criteria associated with the use of this designation. Develop a housing plan for K-10 inmates.

5. Implement viable recommendations raised in the systemwide Security Audit report.

6. Implement additional sanitation enhancements:
   - Develop and implement a housekeeping plan; including control of hazardous materials
   - Develop and implement a sanitation Inspection system
   - Re-evaluate inmate personal property limits
   - Increase accountability for linen/clothing exchange
   - Reduce the amount of food items that inmates may maintain in their cells so as to reduce opportunities for them to manufacture 'Pruno'.

## PHASE III- Implementation of Long-Term Plans (2-6 years)

Phase III entails the implementation of the numerous longer-term initiatives that were studies and planned in Phase I and II. The panel can and should play an active role in overseeing and monitoring the implementation of all such activities necessary to carry out the Master Plan for improving the MCJ