1   MARK D. ROSENBAUM, SBN 59940
    PETER ELIASBERG, SBN 189110
2   MELINDA BIRD, SBN 102236
    ACLU Foundation of Southern California
3   1313 W. 8th Street
    Los Angeles, California 90017
4   Telephone:  (213) 977-9500, x219
    Facsimile:  (213) 977-5297
5   E-mail: mbird@aclu-sc.org

6
    Margaret Winter
7   ACLU NATIONAL PRISON PROJECT
    915 15th Street NW, 7th Floor
8   Washington, D.C. 20005
    Telephone:  (202) 548-6605
9   Facsimile:  (202) 393-4931
    E-mail: mwinter@npp-aclu.org
10  *Not admitted in D.C.; practice limited to federal courts

11  Attorneys for Plaintiffs

12

13

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18  DENNIS RUTHERFORD, et al.,         )   Case No.  Civ. 75-04111-DDP
                                       )
19              Plaintiffs,            )
                                       )
20                                     )   **DECLARATIONS IN SUPPORT OF**
         vs.                           )   **PLAINTIFFS' EX PARTE**
21                                     )   **APPLICATION TO SHORTEN**
    LEROY BACA, as Sheriff of the County)  **TIME AND MOTION TO MODIFY**
22  of Los Angeles, MICHAEL D.         )   **ORDER RE: INMATE INTERVIEW**
    ANTONOVICH, YVONNE B. BURKE,       )
23  DON KNABE, GLORIA MOLINA,          )   Honorable Dean Pregerson
    ZEV YAROSLAVSKY, as Supervisors    )
24  of the County of Los Angeles, et al.,)  Date:
                                       )   Time:
25              Defendants.            )   Dept: 3
                                       )
26  _____)

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX OF DECLARATIONS

1. Declaration of Melinda Bird

   <u>Exhibit 1</u>:  Stipulation and Order, *Rutherford v. Block*, United States District Court Case No. CV75-4111-WPG, filed June 21, 1989

   <u>Exhibit 2</u>:  Letter from Melinda Bird to Paul Beach and Roger Granbo, dated June 2, 2008

   <u>Exhibit 3</u>:  Letter from Melinda Bird to Paul Beach, dated June 3, 2008

**Inmate Declarations Dated June 3, 2008:**

2. Declaration of Kenyatta Dasher

3. Declaration of Leonard Rocha

4. Declaration of Collier Ross

**Inmate Declarations Dated 2007:**

5. Declaration of Howard L. Burley, Jr.

6. Declaration of John Finn

7. Declaration of Brent Sherman

8. Declaration of Carlo Williams

# DECLARATION OF MELINDA BIRD

I, Melinda Bird, state and declare as follows:

1.     The facts set forth in this declaration are from my personal knowledge. If called as a witness, I could and would competently testify to them.

2.     I am Senior Counsel at the ACLU of Southern California and lead counsel in this case, *Rutherford v. Baca,* which concerns overcrowding and other constitutionally deficient conditions in the Los Angeles County Jail.

3.     As part of my responsibilities in *Rutherford*, I supervise Mary Tiedeman, our jail monitor, and the legal interns who work with us on the ACLU's Jail Project. Ms. Tiedeman, the interns and I visit the jail regularly to inspect conditions and interview jail inmates. We maintain a dedicated telephone line for jail complaints and accept collect calls in this line. Hundreds of jail inmates call this phone line every month and leave messages detailing their complaints. Family members and defense attorneys also call our office and speak directly with me, Ms. Tiedeman or our interns about the problems faced by inmates.

## 1989 Order re: Inmate Interviews

4.     I have reviewed the old files and orders in *Rutherford*. One is a stipulated order entered nineteen years ago on June 21, 1989 when Judge William Gray was presiding over the case. This order is Exhibit A to this declaration. This order is based on a stipulation that "counsel for the parties have found it useful to regularly conduct joint and separate interviews with inmates throughout the jail system," and provides that "none of the statements made during inmate interviews or discussions with Sheriff's staff will be used or made available for use in other litigation or for purposes other than the present litigation except by written stipulation or by order of this Court." Because so many things in this order are unclear to me, it has had a chilling effect on my work, since I am worried about being subjected to sanctions. For example, I am not clear what is meant by the phrase "to ma[ke] available for use in other litigation." If I file a declaration in *Rutherford*, this is a

1   matter of public record. The 1989 order does not require that statements from inmate

2   interviews be placed under seal. If another attorney takes judicial notice of these

3   declarations, properly filed in *Rutherford*, will I be subject to sanctions? I am also

4   unclear about what is meant by the phrase "statements made during inmate

5   interviews." Is this restricted only to interviews conducted inside the jail? Does the

6   restriction apply to the inmate's name and contact information, or just the inmate's

7   actual statements? Does the reference to use in other litigation refer only to criminal

8   proceedings, or to civil proceeding as well? The stipulation explains that "inmates

9   must feel confident that they can state facts and make statements without fear that the

10   discussions will be used in their criminal trial." However, the order is far broader. I

11   have no way to verify the parties' intent in this stipulation, since none of the attorneys

12   currently representing the parties in the *Rutherford* case were involved in this

13   stipulation. In fact, the attorney who negotiated this agreement for the plaintiffs left

14   the ACLU shortly thereafter. For the reasons that I explain below, this order is both

15   unfair and unworkable for class members in *Rutherford* and for us as their counsel.

16   ### Disability Issues in the Jail and the *Johnson* Lawsuit

17        5.    Through our regular monitoring work in *Rutherford*, by early 2007, my

18   staff and I identified significant problems with the treatment of inmates with

19   disabilities. We regularly received complaints from inmates with disabilities that we

20   submitted to the Sheriff's department. The responses from the Sheriff were

21   consistently inadequate. I discovered a pattern of similar complaints in our records

22   from past years. I learned from other public interest groups that assist people with

23   disabilities that they had also received complaints, primarily from the families of

24   inmates and from people who were recently released. My staff and I worked with

25   these other groups to try to resolve the problems, beginning with meetings with the

26   Sheriff in May 2007. After a year, we were still unable to obtain a commitment from

27   the Sheriff's department to resolve the problems, which are pervasive.

28        6.    Eventually, we joined with these groups to file a new lawsuit raising

1  claims under the Americans with Disabilities Act (ADA) as well as the U.S.

2  Constitution. We filed a new lawsuit because the *Rutherford* case does not include

3  any claims of disability discrimination. The new case, *Johnson v. Los Angeles*

4  *Sheriff's Department,* was filed in the Central District on May 29, 2008, and has been

5  assigned to the Honorable Phillip Gutierrez. This new ADA lawsuit seeks injunctive

6  relief for a class of similarly situated individuals, all of whom are also class members

7  in *Rutherford.* We have asked the County to stipulate to class certification. If there is

8  no agreement, we will file a motion for class certification within the next week in

9  *Johnson.* We intend to file a motion for a preliminary injunction at the same time.

10  We have also filed a notice that the *Johnson* case is formally related to *Rutherford*.

11       7.       By the Fall of 2007, I realized that the inmates' ADA claims could not be

12  addressed within the existing framework in *Rutherford* and would require a separate

13  lawsuit. In an effort to comply with the 1989 Order regarding statements in inmate

14  interviews, I tried to divide our jail work into two parts – our *Rutherford* monitoring

15  and our ADA work on the *Johnson* case. When we interviewed an inmate with a

16  disability in the jail as part of our *Rutherford* monitoring and he or she asked us for

17  further assistance, we did not pursue this as part of our ADA work. Instead, my staff

18  and I referred the inmate to one of our co-counsel in *Johnson*, and hoped that the

19  inmate is successful in making this connection. Then one of our *Johnson* co-counsel

20  tried to arrange an attorney visit to follow-up with the inmate. This process has been

21  both slow and uncertain, as it is very difficult for inmates to communicate with law

22  firms other than the ACLU. Most importantly, it is unfair to members of the

23  *Rutherford* class, as I explain below.

24       8.       In the course of our monitoring interviews inside the jail pursuant to the

25  *Rutherford* case, we have encountered inmates with disabilities who are putative class

26  members in the *Johnson* case. We interviewed these people at cell front and filed

27  complaints on their behalf. When no changes or improvements occurred in response

28  to these complaints, they asked for additional help, including filing litigation. Also,

1    my staff and I observed conditions that adversely affected these and other inmates

2    with disabilities.  I have submitted a sample of three of these statements from 2007 in

3    support of our request to modify the 1989 Order.  The statements we obtained are

4    highly relevant to the claims in the *Johnson* case.  However, the 1989 Order seems to

5    bar us from submitting this information from *Rutherford* class members to the court in

6    the *Johnson* case.  At the same time, the 1989 Order seems to allow us to submit

7    statements that we obtain from former class members after they have been released in

8    another case, such as *Johnson*.  As an example, I have also submitted a declaration

9    from John Finn, also obtained in 2007.  I assume that we can use this statement in

10   *Johnson* because we did not interview him in the jail but only after his release.  When

11   both groups of clients have asked us to use their statements in litigation, it seems

12   unfair to allow one to proceed but not the other.

13        9.        The 1989 Order imposes a real burden on *Rutherford* class members, a

14   disadvantaged group of people who already have very few means to express their

15   concerns and complaints.  The ACLU's monitoring is sometimes the only way that

16   inmates are able to contact the outside world.  Most cannot afford prepaid calls and

17   must make collect calls, which we accept.  However, other law firms, including our

18   co-counsel in *Johnson,* are not set up to accept collect calls from inmates they do not

19   know.  Many inmates have only limited access to telephones.  There are very few

20   telephones in the Inmate Reception Center, where we have seen many problems with

21   architectural access.  Many telephones are mounted too high for inmates to reach from

22   a wheelchair.  Some inmates in Men's Central Jail have access to telephones only

23   during their 15 minutes of shower time, which may be in the very early morning when

24   law offices are closed.  Some inmates are in discipline, where they are denied access

25   to phones or visitation and sometimes, to paper and pencils to write a letter. Some

26   inmates are illiterate and cannot write.  Mail delivery has been very slow and

27   unreliable in recent months, with delays of a month or more as a common occurrence.

28   Finally, some of the inmates about whom we are the most concerned are too sick to

**005**

Declaration of Melinda Bird

4

1    make the effort to call or contact a law firm, and may be confined to the Correctional

2    Treatment Center.

3         10.   I am especially concerned about the prospective impact of the 1989

4    Order as the *Johnson* litigation moves forward.  Because of turnover in the jail

5    population, we constantly see new inmates with disabilities and receive complaints

6    from them.  Their situations may be relevant to the upcoming class certification.

7    Some may even need emergency relief in the form of a Temporary Restraining Order

8    in the *Johnson* case.  Referring these inmates to other counsel in *Johnson* to comply

9    with the 1989 Order may cause needless delays, which could also imperil the inmates.

10         11.   The 1989 Order will hinder our ability to update the court with our

11   observations of any changes and improvements, or to take new declarations from

12   inmates about conditions.  If the County submits opposition declarations regarding

13   conditions in the jail and inmates provide us with statements that contradict or explain

14   the County's claims, the 1989 Order could prevent us from disclosing this to the court.

15   For example, on Tuesday, June 3, my staff went to Men's Central Jail to interview

16   inmates.  When they went to 6050, a "medical step-down" area of the jail where many

17   inmates with disabilities are housed, they encountered a number of people who had

18   heard about the ADA case and wanted to share their experiences.  We were forced to

19   tell them that at present, we are barred from helping them submit their statements to

20   the Court.

21         12.   For all these reasons, the 1989 Order places me and my staff in an ethical

22   and moral quandary regarding our obligations to inmates in the jail.  On the one hand,

23   I am counsel to the class of all jail inmates in *Rutherford* and have a duty to act

24   competently, diligently and to take effective action regarding the problems they report

25   to me.  This includes an obligation to raise viable claims on their behalf.   On the other

26   hand, I must also attempt to comply with the restrictions in the 1989 order, which

27   operates as a "gag order," preventing me from raising these same claims in another

28   lawsuit where it would be most effective.

**Notice to Opposing Counsel of Ex Parte Application and Motion to Modify**

13.     After the *Johnson* case was filed on May 29, 2008, we began work on motions for a preliminary injunction and for class certification.  My staff also visited the jail on Friday, May 30, 2008 and reported that the inmates were aware of the new ADA lawsuit and eager to participate and provide statements about their treatment. However, we could not offer these statements in the new ADA cases because of the 1989 order.  After this occurred, I concluded that we would have to seek a modification to the 1989 Order to permit us to use inmate statements from our *Rutherford* monitoring in the *Johnson* ADA case.  Otherwise, we could not effectively represent these clients and respond to their requests.

14.     On the next regular workday, Monday, June 2, I called the office of Paul Beach, who represents the county defendants in *Rutherford* and in the *Johnson* ADA case.  I left a message explaining my concern with the 1989 Order and asked him to call me.  I also sent Mr. Beach a letter by fax and by e-mail.  On Tuesday, June 3, I left a second message with Mr. Beach's office and sent a second letter to him. These letters are attached to this declaration as Exhibits B and C.

15.     Today, I spoke with Mr. Beach about our *ex parte* application to shorten time.  He stated that he would oppose a request to shorten time. He proposed a meet and confer next Tuesday, June 10, and a regularly noticed motion thereafter if we could not agree.  I explained that time is of the essence because of the inmates we have interviewed in the jail have asked us to present their stories to the Court in the *Johnson* case.  I also explained that this created an ethical and legal conflict for us, since we are counsel in both cases.  Finally, I informed Mr. Beach that the legal team in *Johnson* would be filing motions in that case shortly and that  we needed a decision regarding the use of the *Rutherford* statements by June 16, 2008.  Mr. Beach observed that since he would be busy preparing his opposition to the *Johnson* motions, this was another reason to oppose a motion on shortened time in *Rutherford*.  He also suggested that I could resolve my ethical conflicts by withdrawing as counsel in

1 | *Johnson.*

2 | 16.    Mr. Beach and I also discussed our underlying motion to modify the

3 | inmate interview order.  I began by explaining that we did not seek to use the

4 | statements of Sheriff's staff in other litigation, and that we were taking a very

5 | moderate position by seeking only to use inmate statements in one other case: the

6 | *Johnson* ADA case.  Mr. Beach stated that even as to inmate statements, the 1989

7 | Order represented a fair balancing of our interests, that the Sheriff's Department

8 | provided the ACLU with "unprecedented" access to tour and inspect the jails, and that

9 | the ACLU's agreement not to use statements from class members in other litigation

10 | was a necessary pre-condition to this access.  Mr. Beach suggested that if we

11 | continued to press to modify the 1989 order, that we "might not like the results."

12 | When I asked him to clarify this statement, he indicated that the Sheriff's Department

13 | might decide to limit the ACLU's access to inmates in the jail if inmate statements

14 | could be used in other litigation.

16 | I declare under penalty of perjury under the laws of the State of California that

17 | the foregoing is true and correct to the best of my knowledge.  Executed this fourth

18 | day of June 2008 in Los Angeles, California.

Melinda Bird

**008**

EXHIBIT A
TO DECLARATION
OF MELINDA BIRD

DUPLICATE

1   DE WITT W. CLINTON, County Counsel
    FREDERICK R. BENNETT, Assistant County Counsel
2   648 Hall of Administration
    500 West Temple Street
3   Los Angeles, California  90012

4   (213) 974-1903

5   Attorneys for Plaintiffs

6

7                    UNITED STATES DISTRICT COURT

8            FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10

11  DENNIS RUTHERFORD,                    )   CASE NO.   CV 75-4111-WPG
                                          )
12                  Plaintiff,            )   STIPULATION AND ORDER
                                          )
13          v.                            )
                                          )
14  SHERMAN BLOCK, et al.,                )
                                          )
15                  Defendants.           )
    _____)

16

17          To measure compliance with the Court's orders in this

18  case and to develop appropriate methods to minimize the impact

19  of jail overcrowding, the counsel for parties have found it

20  useful to regularly conduct joint and separate interviews with

21  inmates throughout the jail system, and to permit discussions

22  between counsel for the plaintiff and Sheriff's staff,

23  frequently without counsel for the Sheriff being present.

24          To be effective, the interviews must be candid and

25  open.  The inmates must feel confident that they can state

26  facts and make statements without fear that the discussions

27  will be used in their criminal trial.  The Sheriff's staff must

28  be confident that they can state facts and their views openly

010

1   and candidly without concern that their statements will be used

2   in other litigation.   In this fashion, counsel for the parties

3   and the parties have been able to work cooperatively toward

4   solutions to the complex and difficult issues involved in this

5   litigation in a non-adversarial manner and without need to

6   involve the Court in most dispute resolutions.

7        Accordingly, and for good cause, the parties

8   stipulate that none of the statements made during

9   inmate interviews or in discussions with Sheriff's staff will

10  be used or made available for use in other litigation or for

11  purposes other than the present litigation except by written

12  stipulation or by order of this Court.

13         IT IS SO STIPULATED.

14

15  DATED:  June 14, 1989    ACLU FOUNDATION OF SOUTHERN CALIFORNIA

16                  By:_____

17                      JOHN HAGAR, Esq
                      Counsel for Plaintiff

18

19  DATED:  June 14, 1989    DE WITT W. CLINTON, County Counsel

20                  By:_____

21                      FREDERICK R. BENNETT
                      Assistant County Counsel
                      Counsel for Defendants

22

23        GOOD CAUSE APPEARING THEREFOR, it is so ordered.

24

25  DATED:  June 21, 1989           WILLIAM P. GRAY

26                  _____
                      WILLIAM P. GRAY
                      United States District Court Judge

27

28

-2-

011

EXHIBIT B
TO DECLARATION
OF MELINDA BIRD



**LIBERTY | JUSTICE | EQUALITY**

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Celeste Durant

**Development Director**
Lindsay Rachelefsky

**Field Director**
Susanne Savage

**Director of Finance &
Administration**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

**Director of Program Support**
Elizabeth Schroeder

June 2, 2008

Paul Beach
Lawrence, Beach, Allen and Choi
100 West Broadway, Suite 1200
Glendale, CA 91210-1219

Roger Granbo
Office of County Counsel
County of Los Angeles
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles CA 90012

           *Re:*    *Rutherford v. Baca (Case No. CV 75-04111 DDP)*

Dear Paul and Roger,

As you may recall, a 1989 stipulation in this case provides that "none of the statements made during inmate interviews or discussions with the Sheriff's staff will be used or made available for use in other litigation." I've attached a copy of the stipulation for your review. Although the stipulation refers to the danger that inmate statements will be used in criminal proceedings, it is limited in this way. The stipulation provides that it can be modified by stipulation of the parties or by court order.

I would like to ask you to modify the order and allow us to use statements we obtain during our *Rutherford* monitoring in *Johnson v Baca*, CV 08-03515 PGG, the new ADA case in which we are counsel. What we propose is a limited modification, applicable only to use of these statements in the *Johnson* case. I am making this request because the 1989 stipulation has created an moral and ethical dilemma for us. On the one hand, we have an obligation as class counsel to assist the inmates and class members whom we interview in the jail to the best of our ability. However, the 1989 stipulation prevents us from doing this with regard to inmates' claims under the Americans with Disabilities Act, since these are not part of the *Rutherford* litigation. We are open to discussing a possible compromise, such as a modification allowing us to use one type of statement or interview, but not another.

If you cannot agree to modify the stipulation, then I will have no choice but to file

Paul Beach and Roger Granbo                                              Page 2
June 2, 2008

an *ex parte* application with Judge Pregerson to modify the stipulated order.  I plan to file this
application on Wednesday, June 4, 2008.  I would appreciate hearing back from you regarding
this request by close of business on Tuesday, June 3, 2008.

I am sorry to add to your workload with this request, but given the need for relief in *Johnson*, we
cannot delay in attempting to resolve the ethical and moral dilemma that the stipulation creates
for us.

Sincerely,

*Melinda Bird*

Melinda Bird                          Mark Rosenbaum



LIBERTY | JUSTICE | EQUALITY

014

EXHIBIT C
TO DECLARATION
OF MELINDA BIRD



LIBERTY | JUSTICE | EQUALITY

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Celeste Durant

**Development Director**
Lindsay Rachelefsky

**Field Director**
Susanne Savage

**Director of Finance &
Administration**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

**Director of Program Support**
Elizabeth Schroeder

June 3, 2008

Paul Beach
Lawrence, Beach, Allen and Choi
100 West Broadway, Suite 1200
Glendale, CA 91210-1219

   *Re:* ***Rutherford v. Baca (Case No. CV 75-04111 DDP)***

Dear Paul,

I am following up on my letter of yesterday and my telephone messages for you left yesterday and today.  As I stated in my letter yesterday, we would like to modify the 1989 Order re inmate interviews to permit statements from inmates and jail staff obtained in jail interviews as part of *Rutherford* monitoring to be used in the *Johnson* ADA case.  I have not heard back from you as to whether you can stipulate to such a modification.  If I do not hear from you by tomorrow morning, I will assume that you can not agree and proceed with a noticed motion, which we will file tomorrow.

To avoid prejudice to our clients, we need to shorten time to hear this motion so that it will be decided by June 16 or 17.  Are you able to stipulate to a shortened briefing schedule for this motion? I am happy to discuss any schedule, as long as we provide our papers to the Court in advance of June 16.  I look forward to discussing this with you.

Sincerely,

*Melinda Bird*

Melinda Bird

CC:  Justin Clark, Lawrence, Beach, Allen and Choi

   Roger Granbo, Office of County Counsel
   County of Los Angeles
   648 Kenneth Hahn Hall of Administration
   500 West Temple Street
   Los Angeles CA 90012

### Declaration of Kenyatta Dasher

I, the undersigned, hereby declare that, if called as a witness, I would testify competently and from first-hand knowledge as follows:

1. I am a disabled inmate in the 6050 row of Men's Central Jail in Los Angeles. I suffer from a broken foot that was broken during my arrest. I currently have six pins in my foot. I cannot walk on my foot so I rely on crutches to help me walk.

2. I would like my voice to be heard in the ADA case. As a disabled inmate, I understand the challenges that all disabled inmates face in the county jail. We are forced to walk with our laundry and linens during linen exchange, a heavy burden for the inmates in 6050, many of which can barely walk. There is no grab bar on the toilet, and as a result I have fallen twice, leading to further injuries. There is a curb on the shower which is difficult to step over with my disability, and as you know the shower is a slippery area. It is hard to depend on other inmates for help, as there is so much turnover and it is hard to form relationships.

3. I feel like I carry a special burden and I have it worse than the blues (General Population Inmates.)  It is nearly impossible to file complaints, as nine out of ten times the deputies brush you off or tear up complaints. The ACLU is vital in having our inmate voices be heard. It is extremely difficult to be heard in jail, and we are very willing to speak to anyone that could help us.

4. I have many more problems here. The doctor ordered me to have physical therapy on my foot which I have never received. We must walk to the roof, a daunting task considering my disability. If a deputy sees an inmate walking too well, that inmate is further declassified. After we speak with the ACLU, the deputies are aggressive and mean. The deputies are not sensitive to our special needs in 6050.

5. I am very happy to be sharing my story in order to help myself and other inmates in the county jail.

**Declaration of Kenyatta Dasher**

1    I declare under penalty of perjury that the foregoing is true and correct.

2  Executed on ____ at Los Angeles, California.

3

4
　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　Kenyatta Dasher

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

**Declaration of Kenyatta Dasher**

DECLARATION OF Kenyatta Dasher

I, the undersigned, hereby declare

that, if called as a witness, I would testify competently and from

first hand knowledge as follows:

I am a disabled inmate in the 6050 row of Men's Central Jail in Los Angeles. I suffer from a broken foot that was broken during my arrest. I currently have six pins in my foot. I cannot walk on my foot so I rely on crutches to help me walk.

I would like my voice to be heard in the ADA case. As a disabled inmate, I understand the challenges that all disabled inmates face in the county jail. We are forced to walk with our laundry and linens during linen exchange, a heavy burden for the inmates in 6050, many of which can barely walk. There is no grab bar on the toilet, and as a result I have fallen twice, leading to further injuries. There is a curb on the shower which is difficult to step over with my disability, and as you know the shower is a slippery area. It is hard to depend on other inmates for help, as there is so much turnover and it is hard to form

relationships.

I feel like I carry a special burden, and I have it worse than the blues (General Population Inmates). It is nearly impossible to file complaints, as nine out of ten times the deputies brush you off or tear up complaints. The ACLU is vital in having our inmate voices be heard. It is extremely difficult to be heard in jail, and we are very willing to speak to anyone that could help us.

I have many more problems here. The doctor ordered me to have physical therapy on my foot which I have never received. We must walk to the roof, a daunting task considering my disability. If a deputy sees an inmate walking too well, that inmate is further declassified. After we speak with the ACLU, the deputies are aggressive and mean. The deputies are not sensitive to our special needs in 6050.

I am very happy to be sharing my story in order to help myself and other inmates in the county jail.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on ___6/3/08___ at Los Angeles, California.

Signature: ___Kenyatta Dasher___

Print Name: ___Kenyatta Dasher___

**Declaration of Leonard Rocha**

I, the undersigned, hereby declare that, if called as a witness, I would testify competently and from first-hand knowledge as follows:

1.     I am a disabled inmate in the 6050 row of Men's Central Jail. I suffer from gunshot wound [sic] to scrotum, pelvis, and left foot. As a result, I experience numbness in my left leg. I am unable to walk on my own and due to the fact that my personal wheelchair was taken away I am forced to use a walker.

2.     I read about the ADA case in the newspaper and as a disabled inmate I would like to have my voice heard. It is almost impossible to access roof time because in order to do so I must use the escalator. This is not possible for me because I have to use a walker. Accordingly, I have not been outside since my last court visit which was a month ago. This essentially confines me to only travelling to and from the medical clinic. Other difficulties I face occur in the shower facilities, with the toliets [sic], as well as the sink. Due to a lack of grab bars in the shower, by the toliet [sic], and near the sink I have slipped multiple times. The plastic chair that we are provided is of no help because it slides around while I am trying to shower. I am forced to use sheets to tie the chair legs together to keep still.

3.     I have tried to use the jail complaint system in regards to these issues, but it consistently leads to retaliation by deputies. For example, after filing a complaint I have experienced the phones being turned off, mail being re-routed, and verbal threats. The ACLU seems to be my only outlet for complaints, but even this process has led to retaliation. However, it is helpful to have the ACLU monitor the jails because it limits retaliation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2008 at Los Angeles, California.

/s/
Leonard Rocha

DECLARATION OF Leonard Rocha

I, the undersigned, hereby declare

that, if called as a witness, I would testify competently and from

first hand knowledge as follows:

I am a disabled inmate on the 6050 row in Men's Central Jail. I suffer from gun shot wound to Scrotum, pelvis, and left foot. As a result, I experience numbness in my left leg. I am unable to walk on my own and due to the fact that my personal wheelchair was taken away I am forced to use a walker. I read about the ADA case in the newspaper and as a disabled inmate I would like to have my voice heard. It is almost impossible to access roof time because in order to do so I must use the esclator. This is not possible for me because I have to use a walker. Accordingly, I have not been outside since my last court visit which was a month ago. This essentially confines me to only travelling to and from the medical clinic. Other difficulties I face occur in the shower facilities, with the toliets, as well as

022

the sink. Due to a lack of grabbers in the shower, by the toilets, and near the sink I have slipped multiple times. The plastic chair that we are provided is of no help because it slides around while I am trying to shower.

I have tried to use the jail complaint system in regards to these issues, but it consistently leads to retaliation by deputies. For example, after filing a complaint I have experienced the phones being turned off, mail being re-routed, and verbal threats. The ACLU seems to be my only outlet for complaints, but even this process has led to retaliation. However, it is helpful to have the ACLU monitor the jails because it limits retaliation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 6/3/08 at Los Angeles, California.

Signature: _Leonard Roohit_

Print Name: _LEONARD Roohit_

(note in left margin) to be I am forced to use sheets to tie the chair legs together to keep

023

### Declaration of Collier Ross

I, the undersigned, hereby declare that, if called as a witness, I would testify competently and from first-hand knowledge as follows:

1.      I am an inmate at Men's Central Jail in 6050.  I have been in the county jail for approximately 90 days.  I was in a wheelchair & now I use a walker.

2.      The  conditions in this place are horrible.  There is mildew on our toilets and showers.  There is no way to move around in 6050 with your walker.  I have to hop around in the cell.

3.      Another thing I see in the jail is the way the deputies treat the inmates. I have seen them drag inmates out of the cells without their crutches.  The inmates are in severe pain when the deputies do this.

4.      I am very concerned that what I tell the ACLU may not end up in court.  It is very difficult to contact the outside world when I am in here.  I can call my family collect, but the only people many inmates can call is the ACLU.  Also, the mail is extremely slow.  It is very difficult to get information out because of how slow the mail is.

5.      Another problem in the jail is the complaint system.  The complaint system makes me laugh because it is such a joke.  The only way we can file a grievance that will be addressed is with the ACLU because they actually file them.

6.      It is just so terrible in here and it bothers me that we may have a very difficult time having our voices heard in the ADA case that I read about in the paper.  The ACLU is the way that I can contact the outside world about these horrible conditions.

7.      Another thing I would like to add is that we cannot go to school in here.  We get very little reading material and only go outside a couple times per month.  We do not have a TV in 6050.  It is like living in hell.

8.     I really hope that the ACLU keeps coming in to where we live and checking on things because that is the best way things get done around here. Things are horrible in this jail.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2008 at Los Angeles, California.

/s/
Collier Ross

DECLARATION OF Collier Ross

I, the undersigned, hereby declare
that, if called as a witness, I would testify competently and from
first hand knowledge as follows:

1. I am an inmate at Men's Central Jail in 6050. I have been In the county jail for approximately 90 days. I was in a wheelchair now use a walker

2. The conditions in this place are horrible. There is mildew on our toilets and showers. There is no way to move around in 6050 with your walker. I have to hop around in the cell.

3. Another thing I see in the jail is the way the deputies treat the inmates. I have seen them drag inmates out of the cells without their crutches. The inmates are in severe pain when the deputies do this.

4. I am very concerned that what I tell the ACLU may not end up in court. It is very difficult to contact the outside world when I am in here. I can call my family collect, but the only people many inmates can call is the ACLU. Also, the mail is extremely slow. It is very difficult to get information out because of how slow the mail is.

5. Another problem in the jail is the complaint system. The complaint system makes me laugh because it is such a joke. The only way we can file a grievance that will be addressed is with the ACLU because they actually file them.

6. It is just so terrible in here and it bothers me that we may have a very difficult time having our voices heard

in the ADA case that I read about in the paper. The ACLU is the way that I can contact the outside world about these horrible conditions.

7. Another thing I would like to add is that we cannot go to school in here. We get very little reading material and only go outside a couple times per month. We do not have a TV in 6050. It is like living in hell.

8. I really hope that the ACLU keeps coming in to where we live and checking on things because that is the best way things get done around here. Things are horrible in this jail.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3, 2008 at Los Angeles, California.

Signature: Collin Ross

Print Name: COLLIER ROSS

**Declaration of Howard L. Burley, Jr.**

I, Howard Burley, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am a 26 year-old man. I am 63, 273 lbs. In August 2002, I had a car accident. As a result of this accident, my right leg was amputated above the knee. My left leg has one rod from my ankle to my hip. I also have multiple pins and screws in my left leg. Since I got out of the hospital in November 2002, I have used a wheelchair exclusively. Before I turned myself in for 180 days on a possession of a firearm charge, I was going to start physical therapy. When I arrived at the IRC on February 5, 2007, it took approximately 2 ½ days to get from IRC to 8100 MCJ, which is the wheelchair dorm. I was in 8100 for approximately 2 ½ month, until April 23rd, 2007. During those 2 ½ months, the jail tried to declass me twice from the wheelchair, so that I could not walk and bring me back up to 8100. On April 23, the deputies just brought me down to 6050 in my wheelchair told me to get out, then they left. I have now been in in 6050 for 37 days. I cannot move in my housing area so I have to crawl on the ground to get to the shower or the toilet. I cannot come out for pill call, so the nurse comes up to my cell and gives me my high blood pressure medication. I am usually the only inmate the medical staff does this for. I have fallen two times since I've been in 6050. The first time was because I fell from the top bunk. The jail has since assigned me to a bottom bunk. The other time I fell was because my hand slipped on the bar I was holding when I was trying to go the bathroom. I received x-rays of my injuries from this, approximately 10 days after it happened. I have not heard the results from these x-rays. I cannot go to visits because I cannot move without a wheelchair. The one time, Mothers Day, the jail gave me a wheelchair so I could visit my Mom. I took the wheelchair to the visiting area, but because visiting for people with wheelchairs is on 8100, the deputies told me to leave. Then, they told my Mom that I was being punished and that is why I could not see her. The doctors do a "triage" or declass every week or so for the inmates in 6050. I have never seen the doctor for this. Trustees always take me in a wheelchair and sit me in the mess hall while the doctor sees other inmates. Everyday I try to get on doctors line but I have never seen a

1  doctor.  I have also placed a complaint regarding being in 6050 on 4/23 or 4/24, but I have not

2  received a response.  It is ridiculous that they have declassed me and do not allow me use of a

3  wheelchair.  It is very undignified for me to have to crawl around on the ground to get to the

4  bathroom.  I don't have any balance in my leg and can't walk using crutches.

5      I declare under penalty of perjury of the laws of the State of California and the United

6  States that the foregoing is true and correct.  Executed this 30th day of May, 2007 in Los

7  Angeles, California.

8                                          /s/
                                    _____
                                    Howard L. Burley, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**Declaration of** Howard Burley

I, Howard Burley , hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am a 26 year-old man. I am 6'3, 273 lbs. In August 2002 I had a car accident. As a result of this accident, my right leg was amputated above the knee. My left leg has one rod from my ankle to my hip. I also have multiple pins and screws in my left leg. Since I got out of the hospital in November 2002, I have used a wheelchair exclusively. Before I turned myself in for 180 days on a possession of a firearm charge, I was going to start physical therapy. When I arrived @ IRC on Feb 5, 2007, it took apex 2½ days to get from IRC to 8100 MCJ, which is the wheelchair dorm. I was in 8100 for apex 2½ months, until April 23rd, 2007. During those 2½ months, the jail tried to reclassime twice from the wheelchair dorm. Then deputies would bring me down to 6050 (step down housing) in my wheelchair, see that I could not walk and bring me back up to 8100. On April 23, the deputies just brought me down to 6050 in my wheelch: told me to get out, then they left. I have now been in 6050 for 37 days. I cannot move in my housing area so I have to crawl

on the ground to get to the shower or the
toilet. I cannot come out for pill call, so
the nurse comes up to my cell and gives me
my high blood pressure medication. I am
usually the only inmate the medical staff sees.
This for. I have fallen two times since I've been
in 6050. The first time was b/c I fell from the
top bunk. The jail has since assigned
me to a bottom bunk. The other time I fell was
because my hand slipped on the bar I was holding
when I was trying to go to the bathroom. I received
x-rays of my injuries from this, approximately
10 days after it happened. I have not heard
the results from these x-rays. I cannot go
to visits because I cannot move w/o a wheelchair.
The one time, Mothers Day, the jail gave me
a wheelchair so I could visit my mom. I took
the wheelchair to the visiting area, but b/c visiting
for people w/ jail is on 8/00, the deputies told
me to leave. Then, they told my mom that
was being punished and that is why I could
not see her. The doctors do a "triage" or
declass every wk or so for the inmates in
6050. I have never seen the doctor for this.
Trustees always take me in a wheelchair and
sit me in the mess hall while the doctor
sees other inmates. Everyday I try to get on
doctors line but I have never seen a doctor.
I have also placed a complaint regarding

being in 6050 on 4/23 or 4/24 but I have not received a response. It is malicious that they have declassed me and do not allow me use of a wheelchair. It is very undignified for me to have to crawl around on the ground to get to the bathroom. I don't have any balance on my leg and I can't walk using crutches.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 4th day of ~~April, 2007~~ in Los Angeles, California.

ALSO 30th May 2007

Printed name: HoWARD L. Burley, Jr

032

# DECLARATION OF JOHN FINN

I, John Finn, declare and affirm and would so testify from first-hand knowledge if called as a witness in this matter:

1. I am a college professor at a university in Orange County, California and am 63 years old. Together with my wife of forty years, I own a home in Orange County where we have lived for the past eighteen years. I did two combat tours in Viet Nam as a MACV infantry officer with the ARVN rangers and was highly decorated. After an honorable discharge, I was a successful businessman for many years, including serving as senior vice president for a Fortune 500 construction company. In 1989, after retirement from the construction industry, I decided to change careers and returned to graduate school for a Masters Degree in Education. I began teaching in LAUSD at Jordan High School in South Central Los Angeles. In 2003, I left Jordan High and began teaching college.

2. I was arrested in my home at 7:00 a.m. on Wednesday, February 28, 2007 and taken to a Los Angeles County jail facility – the Inmate Reception Center (IRC). I had no idea what I was being charged with or why I was arrested. Eventually, I learned that the charges stemmed from my time teaching with Los Angeles Unified School District (LAUSD) that happened more than four years ago. At Jordan High School, I taught computer classes in which parents and students learned how to take apart and rebuild computer systems, printers and fax machines for school and home use. I had been charged with not keeping proper records and theft of school property in between 2000 and when I retired. This property consisted of old monitors and other pieces of obsolete technology equipment that were useful only as cannibalized parts for the computer repair classes that I taught. This salvage equipment was donated to LAUSD for use in the schools and churches in the community of Watts. The charges were baseless and all but one less significant charge has been dropped in lieu of an expensive court trial. However, I remained in jail for almost one month before my family and lawyer were able to resolve the charges and arrange my release.

Declaration of John Finn                    - 1 -

033

3. Before this experience, I was never charged with a crime or arrested. Nothing - not even my experience with continued, extensive combat in Viet Nam - could have prepared me for the negative experiences that I endured during that month in the appalling L.A. jails. During the first few days at the IRC, I, and the other men around me, were packed into overcrowded, filthy, windowless cells, left naked in the showers for hours without deputy supervision and given little or no food. We were denied medical care and essential medication for critical conditions, access to telephones, or the most basic sanitary amenities. What I saw was shocking and should be deeply distressing to any American who believes that the legal system should work the way the American founding fathers intended it when they designed the Constitution.

4. I fought for my country and believe in the American way. What I have seen while in jail has made me lose my faith in my county and my belief that there is any fairness or legal protection for its citizens. A basic principle of our justice system is that everyone is presumed innocent until proven guilty. Yet in the jail, we were treated as if we were violent, convicted criminals. We were treated like animals or worse.

5. However, my concern is not so much with what happened to me but to all others who follow in the system. With the help of my wife, family, and attorney, I made it through a total nightmare. I am more concerned for the other men, also presumed innocent and unconvicted, whom I saw there. Many were mentally ill and unable to care for themselves, and suffered even more as result.

6. After I arrived at the IRC at 8:30 a.m. on the morning of February 28, I was placed in a series of overcrowded rooms, each filthy and contaminated with old food and trash. The decaying food and rotted trash was 4 to 5 inches thick on the floors and must have been accumulating for at least a week. There were at least 60 to 70 men locked up in each room. The deputies would open the door occasionally to force another man in the already congested cell. They were insensitive to the overcrowded conditions in the cell and would not answer questions or offer help in any way. There

Declaration of John Finn                    -2-

034

1   were no working telephones or clocks, so we could not contact anyone and did not
2   even know what time it was or what the process was for communicating with family
3   to let them know where we were or a contact a legal advisor to receive the basic
4   advice or get defense help.

5        7. I saw several major, violent fights during the intake process. For example, I
6   was moved into a holding cell packed full with men who were primarily Latino and
7   Black. The deputies placed another man in the cell and left him. The other men, who
8   were apparently from a rival gang, attacked and beat him into unconsciousness, then,
9   threw him into a corner where he lay on the floor, senseless, injured and bleeding. We
10  called to the deputies, but none responded. An hour later, he was still lying on the
11  floor, with no medical help or attention from the deputies. Later, when I was moved
12  to another cell, I saw several other fights between rival Blacks and Hispanics, again
13  with no intervention or attention from the deputies. Convicted and hardened criminals
14  returning from sentencing to the State Prison were combined with individuals like
15  myself who had not even been arraigned. One inmate just walked up to another and
16  punched him in the face for a past street grievance, then other men started fighting
17  also in the small, overcrowded and dangerous cells as a defensive measure for what
18  they saw.

19       8. I spent all day being moved from one crowded cell to another. The deputies
20  did not give us any food or potable water for some 12 hours. In most of the holding
21  cells, there was a non-functioning fountain attached to the toilet, and the water just
22  dribbled out and did not shoot up in order to be of any benefit in drinking. In other
23  cells, neither the fountain nor the toilet worked. The cells lacked the common
24  necessity of toilet paper. Often, it was virtually impossible even to get near the toilet
25  areas because of the many bodies sleeping on the floor that blocked the route.

26       9. I am a seriously ill diabetic with Type II diabetes. I am under the constant
27  care of the Veterans Administration (VA) because my diabetes is a service connected
28  medical condition and was a direct result of exposure in Viet Nam to Dioxin, which

Declaration of John Finn                    - 3 -

035

was used as a defoliant under the common name of Agent Orange. My doctors at the VA have enrolled me in a special controlled study for Agent Orange survivors. My special VA medical team has prescribed unique combination of medications that I must take on a highly regulated basis twice per day at 8 AM and 8 PM. This regimen consists of Glipizide (5 MG), Lovastation (40 MG), Simvastatin (80 MG), Atenol (20 MG), Aspirin (81 MG) and a very custom vitamin for a liver condition. Taking this medication precisely as prescribed is critical to my health and survival. To be able to control my diabetes and high blood pressure, I must also eat a very individual diet, consisting of four to five small, regular meals each day. By the end of the first day at the IRC, I was very definitely beginning to feel the beginnings of diabetic shock. Throughout this process, I told the deputies and their supervisors about my medical condition and needs but they were indifferent and seemed to care less for me, or anyone else who had special medical requirements.

10. It was during this time period when I was getting weak from lack of food and medication that I also observed other inmates suffering from some of the same symptoms. While I was waiting, at least two men went into seizures and fell out of their chairs in the processing area. The response time was very slow but eventually a medical team did arrive and the men were taken to a different location. I spoke with other detainees who confirmed that men frequently have seizures while at the IRC during the slow and tedious multi-day processing period.

11. I continually asked for access to a working telephone so that I could contact my wife to let her know where I was and my medical condition and to have her contact my attorney or someone to post bail. I wanted to find out what I was being charged with, as I had no idea (and did not learn of my charges for a full five days after my arrest.) However, the deputies told me that I could not have access to a telephone as long as I was in the IRC and until I had a bed assignment.

12. By 5:00 p.m., we were moved to a small room near the shower area. The deputies ordered us to strip naked and took our street clothes. There were about 50 of

us, naked in a small confined room.  The deputies made us wait, naked, for about an
hour, then they finally moved us to the shower room.  They left us in the showers for
more than 3 hours; we were all packed naked together with no supervision.  Deputies
would come and go, including female deputies, and we were just exposed there in
plain view.  They gave us each one towel, but it was too small to offer any warmth or
decent coverage.  The shower water was cold, which made us that much more
uncomfortable, but the most humiliating part was being left without clothing for so
long.  We were there for so long that at a number of the men tried to sleep on the cold,
wet floor.

13.    After we left the showers, the deputies gave us jail clothing and our first
food for more than 12 hours.  This consisted of two pieces of bread, a piece of meat
that was labeled baloney and a small carton of a drink that was nothing more than 29
grams of pure sugar in water.  Although I was desperately thirsty, I did not dare take
the drink for medical reasons because I knew that it easily could have thrown me into
diabetic shock.  For a diabetic such as myself who had gone without food or drink for
more than 12 hours, the drink they gave me could potentially have been deadly.

14.  For the rest of the night, I was moved from one cell area to another.  Around
4:30 a.m. on March 1 – more than 24 hours after I was arrested - I was finally taken
up to the medical area.  The nurse checked my vital signs.  My blood sugar was 350,
as compared to my normal range of 100 to 125.  I was also hypertensive, with the
highest blood pressure reading in my life.  I explained that I immediately needed my
prescribed medication, but still was given nothing.  The deputies told me it would be a
few more hours before I could be seen.

15.  After waiting another two hours, I finally saw another medical staff person
with no name tag (I don't know if he was a medical doctor or just a nurse practitioner)
at about 6:30 a.m. that morning of March 1, 2007.  He appeared to be from the former
Soviet Union and spoke English so poorly that I could hardly understand him, nor
could he easily understand my critical medical needs.  I tried to explain that I needed

1   to take very special prescribed medication in exceedingly exact amounts at least twice
2   per day.  I notified him that I had gone for more than 24 hours without any of my
3   needed medication and this was going to have serious medical consequences.  Even
4   after this hasty examination, the staff did not immediately give me the medication that
5   I needed.  Finally, at about 10 a.m. on Thursday, March 1, I was moved to the medical
6   ward at the IRC.  There, after more than 30 hours in the IRC, I was placed in a cell
7   with a bed and mattress where I could lie down.  However, the deputies would not
8   give me any personal hygiene supplies so I still could not brush my teeth, wash or
9   shave.

10      16.  I met a number of people in the IRC medical ward who were there because of
11  problems with diabetes.  I would estimate that 60% of the people in the medical ward
12  were insulin-dependent Type I diabetics or had serious Type II diabetes.  A number
13  were being treated for diabetic shock that had developed while they were being
14  processed through the IRC.  Based on my experience with this disease, I was surprised
15  and concerned that they were kept in the IRC and were not immediately moved to a
16  regular hospital.

17      17.  The next morning, Friday, March 2, 2007, was my arraignment.  Almost
18  everyone else with whom I talked told me they were in jail for four days or more
19  before they ever went to court for their first arraignment, so I considered myself to be
20  lucky to have a timely hearing.  The deputies woke me at 4 a.m. and took me out
21  before I could get any food or my diabetes medication.  Despite the early wake-up, I
22  waited all day in crowded and dangerous holding cells again, since my case was not
23  called until after 4:30 that afternoon.  By the time I came to court, I was exhausted
24  from lack of sleep and extremely miserable.  My blood sugar and blood pressure were
25  unstable from the erratic medications, which also made me feel bad and shaky.  I had
26  been unable to wash, shave, or brush my teeth for more than two days.  I also felt like
27  I was beginning to look like a criminal.  My wife and daughter were totally shocked
28  when they saw me in such terrible and unkempt physical condition.  They were

Declaration of John Finn                  - 6 -

especially concerned because they know that I am someone for whom hygiene and cleanliness are important elements of health and personal appearance. From my time in the military and in the business world, having a clean-cut appearance has been very important to my self-respect. Being dirty, unshaven and unsanitary definitely affected my state of mind and mental attitude as I prepared for my court hearing.

18. At the hearing, I had an appointed public defender, but she had absolutely no details about my charges nor could she advise me on any legal matters. She suggested that I plead not guilty and that I should consider hiring a private attorney at a cost of $15,000 of more. Then my arraignment was continued for a week.

19. After court, the deputies took me to Men's Central Jail (MCJ). Once again, I waited for many hours in overcrowded and unsanitary holding cells. The deputies finally placed me in a cell at MCJ at 11 pm Friday night. Once I was at MCJ, I still did not get my medication, nor did I get a shower or any personal hygiene supplies. As a result, I spent another day without brushing my teeth or washing up. I was exhausted, dirty, frustrated and very weak from the lack of food and medication. In addition to going without regular food, I had not had my medication for that entire day while I was being moved around to and from court. This is a major medical problem, because pill consistency is critical with this special diabetes medication. My VA doctors specifically instructed me that I should never start and stop medicine in an inconsistent manner and that the timing of medicine consumptions was vital to my well-being. If you do stop taking required medicine it can be very difficult to stabilize your blood sugar again; the process can take weeks or even months. It took the VA more than a year to stabilize my blood sugar; stopping and starting can destroy the careful balancing that my medical doctors had built up over time to get me to be stabilized.

20. The deputies at MCJ again woke me at 4 a.m. on Saturday to take me to Wayside and I had no way of notifying my wife and attorney of the move since they both planned to visit me at MCJ and wasted time trying to locate me. Once again, I

Apr 12 2007 11:03AM   HP LASERJET FAX                                        p.9

1  did not get my medication while I was being moved between facilities.  Upon arrival

2  at Wayside later that afternoon, I immediately asked to see a doctor to get medication

3  for my diabetes and other conditions.  However, it still took another 12 hours to get

4  any medication.  The deputies at Wayside took me to the medical ward on Sunday,

5  where I saw a nurse who ordered some sort of diabetes medication.  Much later that

6  day, my medication finally arrived, but not in the correct dosage or right type.

7      21.  Even after I arrived at Wayside, I still could not get personal hygiene

8  supplies.  It took me until the following Thursday, when I was able to pay for them

9  from the prison store.  In total, I had to wait more than a week after my arrest to get a

10  toothbrush, toothpaste, razor, and soap from the jail commissary.

11      22.  Conditions at Wayside were also very poor and overcrowded, including the

12  lack of proper medical care.  My treating medical doctors at the VA have emphasized

13  to me that the correct dosages of Glipizide and my other medications are critical.

14  Taking too high a dosage of this diabetes and heart medication can cause permanent

15  liver damage and may be fatal.  At Wayside, we had "pill call" three times per day.

16  The medical staff consisted mostly of people from other countries with limited

17  English skills or medical knowledge.  They were overworked and could not handle the

18  number of inmates in the overcrowded jail who required special medical attention on a

19  daily basis.  The medical staff consistently gave me almost three times the dosage that

20  I should be taking.  They would wake us at 4 a.m. for pill call and give me two pills of

21  Glipizide (unknown dosage), then at 8 a.m. they would give me two more pills, than at

22  4 p.m. they would give me another two pills.  Fortunately, I keep track of my

23  medication, so I avoided a dangerous overdose.  I knew enough not to take all the

24  medication they gave me and threw the extra pills in the toilet.  But many other people

25  there were not so aware -- they just took whatever the staff gave them and suffered the

26  consequences.  I never did get the other medications that I should have been taking --

27  only the Glipizide and aspirin.

28      23.  Another major problem is access to a telephone, even to call our attorneys.

Declaration of John Finn                     - 8 -

1   We had only a few telephones in our dorm at Wayside. These were turned on for only
2   a couple hours per day, despite the fact that there were more than 70 people in the
3   dorm. If one person talked for a long time, other detainees could not even get to the
4   phone. In addition, the collect charges for telephone calls were exorbitant. A single,
5   local call could cost $3.50 for just a minimum connection charge and then about .50
6   cents per minute thereafter for an average cost of about $10.00 for a five minute
7   conversation. Many of the detainees are poor and some are homeless. They cannot
8   pay these charges. Even an average inmate with minimum wage job can not afford to
9   pay these excessive telephone charges to speak to his family, his attorney or to talk to
10  witnesses to prepare a proper defense.

11      24. In addition, I could not meet confidentially with my attorney when he came to
12  visit. We did not have access to an attorney visiting area and he had to meet me in the
13  regular inmate visitation area, where he was sitting right next to other visitors with no
14  privacy, children all around, etc. In addition, he had more than 800 pages of
15  documents that we needed to go over together regarding my charges, but the deputies
16  would not let him pass these to me to review. I needed paper to write notes but again,
17  they would not let my attorney give me paper or a pencil. I had to buy these required
18  items from the commissary at highly inflated prices. It was very difficult to work with
19  my lawyer to prepare my case under these restrictive circumstances.

20      25. Finally, the food was unhealthy, especially for someone like me with diabetes
21  who requires a special low sugar diet. We would often have peanut better and jelly
22  sandwiches for breakfast and for lunch. The alternative was a baloney sandwich,
23  which was also neither nutritious nor healthy. The dinner was often unrecognizable
24  mush.

25      26. During the next few weeks, I was transported back and forth from Wayside
26  to court for different hearing dates. Finally, all the charges but one were dropped and
27  I was released on March 28, 2007. The release process from court also imposes a
28  terrible hardship on detainees and their families. The judge ordered my immediate

Declaration of John Finn                    - 9 -

1   release at 11 a.m. The deputies took me to a small holding cell where we waited for
2   the rest of the day as the room slowly filled up until there were from 50 to 75 people
3   in a very small area. Then they called my name around 5:30 PM and discharged me
4   out a back door of the court building directly onto the street. I was dressed in a thin
5   white jumpsuit no heavier than a tee-shirt and had no money, no food, no I.D., nothing
6   to survive the elements or get myself home. There was no pay phone nearby to call
7   anyone, even if I had the money to do so. It was also freezing cold and windy. My
8   clothes and ID were all at the IRC, which is a long walk away and was not always
9   open to visitors after 7 PM. Fortunately, my wife and daughter had been in court with
10  me. After I was ordered released, they were told to "go to the side door on Spring
11  Street" between 3 p.m. and 9 p.m. and wait for me. They waited for hours on an
12  unshielded street until I was released. It was a hardship for them as well and
13  potentially dangerous if they had been forced to wait until after dark. Outside this
14  back door to the courthouse, there were a whole group of family members standing
15  outside waiting, just like my family. Nobody had any communication with the court
16  or the Sheriff's department so they did not know what to expect or when their loved
17  one might be released. This release method works a real hardship on a person with no
18  family support system or someone who cannot easily get back to the IRC for his
19  clothes and ID. If someone without family or friends (or the means to contact them) is
20  released with no identification or money after the IRC closes, how is he expected to
21  survive on the streets until morning?

22      27.   Most of the men I met in jail were Latino or Black and were in jail for
23  minor, non-violent offenses, the most frequent being drug possession or violation of
24  parole or probation. Many of the men I encountered were also destitute and homeless.
25  They described to me how they had been picked up on parole/probation sweeps,
26  where police would stop people downtown or in South Los Angeles for no known or
27  supportable legal reason and ask then if they are on parole or probation. If they said
28  yes, the police would search and find some small pretext for arrest. One man

Declaration of John Finn                    - 10 -

described how he and a group of extended family members were at a child's christening, which was celebrated in the back yard of the child's family. The police came, asked if anyone was on parole or probation, searched the house and everyone present, found no drugs, but then arrested the adults on parole because a weapon was found in the house.

28. I am very concerned that the inhumane and unfair treatment that these men experience in the jails will turn them against the whole legal and justice system and cause them to lose respect for law enforcement. Instead of making them more likely to obey the law, their experience will make them angry and suspicious of the Sheriff and all law enforcement personnel. I am concerned that many detainees will come to believe that their situation is hopeless and that there is no chance for justice. These beliefs will make them more, not less, likely to commit other crimes.

29. In addition, at least a quarter of the men I saw showed obvious signs of mental illness. Many seemed to be suffering from a complete mental breakdown. Some were babbling to themselves or delusional, or not really cognizant of what was happening around them or why they were in this situation. They did not appear to be getting any mental health treatment and were treated very badly by the deputies. These helpless victims of society had a very difficult time because they could not understand or begin to follow the deputies' orders. I saw one man at Wayside who was obviously schizophrenic. He kept screaming at night and looking under his bed for something. The deputies shot him repeatedly with a tazer and then put him into solitary confinement. I saw other instances where the same thing happened - men who were clearly mentally ill were singled out, shot repeatedly with tazer guns until they were screaming in pain and left on the floor of the jail in agony. These men were punished for no apparent reason and certainly could not respond to normal directions even if they could understand what was required.

30. Overall, I was very upset with the disrespectful attitudes of many of the deputies, especially toward the inmates who were mentally ill. As an Army Captain

1  assigned as a Military Advisor to the South Vietnamese Army in the 1960's, I saw

2  how the South Vietnamese treated their captured North Vietnamese prisoners of war.

3  They respected the prisoners' mental and physical needs and treated them as humans,

4  not animals. I never saw them treat their prisoners with the total disregard of decency

5  and normal human rights that I saw displayed by the deputies in the jail.

6      31. In addition, **I** saw no arrangements for inmates with disabilities, such as those

7  who used wheelchairs. I saw a number of inmates with wheelchairs in the IRC, at

8  MCJ and at Wayside. I never once saw a toilet that was big enough to accommodate a

9  wheelchair, or one that had grab bars.

10      I declare under penalty of perjury and the laws of the State of California that the

11  foregoing is true and correct and that this declaration was executed this 12th day of

12  April, 2007 in Orange County, California.

13

14             Signature:

15

16          **John Finn**

       Signature on File with original document

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of John Finn          - 12 -

### Declaration of Brent Sherman

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am an inmate in the Mens [sic] Central Jail. I have been here since June 2007, when I was arrested for petty theft. I am 51 yrs old.

3.      I have a bunch of medical problems. I have Ankylosing Sponylitis and ~~Myaethenia Gravis. I have very weak muscles and I need to take Prednisone to~~ keep up my strength.

4.      I have not always gotten my medication in jail because I have a really hard time getting to see the doctor. Because of this, I am now using a wheelchair. When I was arrested I was using my walker and was able to function better.

5.      Not getting my medications have caused me a lot of pain and problems. There have been times when I have not been able to pull myself off the toilet because I am so weak. This is very embarrassing. I also have a very difficult time transferring in the showers they have here. The bench they have is not adequate and I need help a lot of the time from other inmates. When I am at home I take baths because showers are too hard for me.

6.      Another problem I've had because of my medical issues has been getting to roof for recreation. The roof is very far from my dorm and I have to wheel myself all the way there. I am unable to do this because my arms are too weak so I have to grab on to the inmate in front of me and be pulled. If the inmates didn't pull me, I couldn't go because I am too weak.

7.      I don't understand why am [sic] being denied appropriate care. When I got my medications at the beging [sic] of my incarceration, I was doing okay, but now that these medications have stopped I have really deteriorated. I have had to complain and that got a few results but I am always worried about getting my medications and getting to the doctor.

Declaration of Brent Sherman

1        8.     Another problem I have is that the jail does not give me another meal

2    or more food and I have very bad stomach pains when I finally do occasionally get

3    medications.  The facility is also way too cold and many of the inmates get sick and

4    can't do what they need to do because the cold is hard on their bones.

5        I declare under penalty of perjury of the laws of the State of California and

6    the United States that the foregoing is true and correct.  Executed this 28th day of

7    September, 2007 in Los Angeles, California.

8

9                                                /s/

                                     Brent Sherman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Declaration of Brent Sherman**          -2-

Declaration of **Brent Sherman**

1

2   I, **Brent Sherman** , hereby declare:

3   1. I make this declaration based on my own personal knowledge and if called to

4   testify I could and would do so competently as follows:

5   2. I am an inmate in the Mens Central Jail. I

6   have been here since June 2007, when I was arrested

7   for petty theft. I am 51 yrs old.

8   3. I have a bunch of medical problems. I have

9   ankylosing spondylitis and myasthenia gravis.

10   I have very weak muscles and I need to take

11   prednisone to keep up my strength.

12   4. I have not always gotten my medication

13   in jail because I have a really hard time getting

14   to see the doctor. Because of this, I am now

15   using a wheelchair. When I was arrested I was

16   using my walker and was able to function better.

17   5. Not getting my medications have caused

18   me a lot of pain and problems. There have

19   been times when I have not been able to

20   pull myself off the toilet because I am so weak.

21   This is very embarrassing. I also have a very

22   difficult time transferring in the showers they

23   have here. The bench they have is not adequate

24   and I need help a lot of the time from other

25   inmates. When I am at home I take baths because

26   showers are too hard for me.

27   6. Another problem I've had because of my medical

28   issues has been getting to roof for recreation.

047

1  The roy is very far from my dorm and I have to
2  wheel myself all the way there. I am unable to
3  do this because my arms are too weak so I have
4  to grab on to the inmate in front of me and be
5  pulled. If the inmates didn't pull me, I couldn't
6  go because I am too weak.
7  9. I don't understand why am being denied
8  appropriate care. When I got my medications
9  at the begining of my incarceration, I was doing
10 okay, but now these medications have stopped
11 I have really deteriorated. I have had to
12 complain and that got a few results but I
13 am always worried about getting my medications
14 and getting to the doctor.
15 10. Another problem I have is that the jail does not
16 give me another meal or more food and I have
17 very bad stomach pains when I finally do occasionaly
18 get medications. The facility is also way too cold
19 and many of the inmates get sick and can't
20 do what they need to do because the cold
21 is hard on their bones.
22
23
24   I declare under penalty of perjury of the laws of the State of California and the United
25 States that the foregoing is true and correct. Executed this 28 th day of September 2007 in Los
26 Angeles, California.
27
28  _____

### Declaration of Carlo Williams

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am currently an inmate in the L.A. county Men's Central Jail. I have been in the custody of the Sheriff's Department since Feb 2007 [sic].

3.    In 1973 I was in a car accident that left me without my right leg above the knee.

4.    When I am on the streets I either use a wheelchair or crutches. I had broken my prostesis [sic] at the time of my arrest and was in the process of getting it fixed so I was arrested with crutches.

5.    I have nerve damage on my right hand where my fingers were severed so it is somewhat painful to use crutches. I also have nerve damage under my left armpit and so it has been recommeded [sic] by doctors in prison that I use a wheelchair.

6.    The medical care in the county jail is terrible. About 1 month ago I had the stomach flu and was puking all over the place. I kept asking the nurse to get to the doctor and she wouldn't do anything but put me on the list to wait. I finally got to see the doctor after the other inmates told the deputies I could not eat.

7.    I had been in the area/dorm where a person gets a wheelchair for about 3 weeks when I was declassed. I guess I am okay being housed with a crutches [sic]. I know that people in the wheelchair dorm don't get commisary [sic] so I know some people don't want to be in that dorm because they can't buy anything.

8.    The crutches the jail gives me are difficult to walk on because my entire body weight is supported by a little piece of plastic. I break it about every other day. I have fallen in the past, in fact, I slipped and fell the other night because of the water on floor [sic].

9.    Sometimes when I go to the criminal courts building downtown I have to wait in rooms with the general population. When I wait in those rooms, the

1   deputies take away my crutches and I have to hop around on one foot because
2   sometimes I need to go to the bathroom.
3       I declare under penalty of perjury of the laws of the State of California and
4   the United States that the foregoing is true and correct.  Executed this 25th day of
5   July, 2007 in Los Angeles, California.

6
7                                                           /s/
                                                    Carlo Williams
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Declaration of Carlo Williams**                    -2-

1   **Declaration of** Carlo Williams

2   I, Carlo Williams _____, hereby declare:

3   1.   I make this declaration based on my own personal knowledge and if called to

4   testify I could and would do so competently as follows:

5   2.   I am currently an inmate in the LA County

6   Men's central Jail. I have been in the custody of

7   the sheriffs Department since Feb 2007.

8   3. In 1973 I was in a car accident that left me

9   without my right leg above the knee.

10   4. When I am on the streets I either use a

11   wheelchair or crutches. I had Broken my prostesis

12   at the time of my arrest and was in the process of

13   getting it fixed so I was arrested with crutches.

14   5. I have nerve damage on my right hand

15   where my fingers were severed so it is somewhat

16   painful to use crutches. I also have nerv damage

17   under my left armpit and so it has been recommended

18   by doctors in prison that I use a wheelchair.

19   6. The medical care in the county jail is terrible.

20   About 1 month ago I had the stomach flu and was

21   puking all over the place. I kept asking the nurse to

22   get to the doctor and she wouldn't do anything but

23   put me on the list to wait. I finally got to see

24   the doctor after the other inmates told the deputies

25   I could not eat.

26   7. I had been in the wheelchair dorm where a person gets a

27   wheelchair for about 3 weeks when I was declassed.

28   I guess I am okay being housed with a crutches.

051

1  I know that people in the wheelchair dorm don't get commissary
2  so I know some people don't want to be in that dorm
3  because they can't buy anything.
4  8. The crutches the jail gives me are difficult to
5  walk on because my entire body weight is supported by
6  a little piece of plastic. I break it about every other day.
7  I have fallen in the past, in fact, I slipped and fell the
8  other night because of the water on floor.
9  9. Sometimes when I go to the criminal courts
10 building downtown I have to wait in rooms with
11 the general population. When I wait in those rooms,
12 the deputies take away my crutches and I have to
13 hop around on one foot because sometimes I need to
14 go to the bathroom.

I declare under penalty of perjury of the laws of the State of California and the United
States that the foregoing is true and correct. Executed this 25 th day of July, 2007 in Los
Angeles, California.

_Carlo Williams_
CARLO WILLIAMS

052