# EXHIBIT
# 1

**REPORT ON MENTAL HEALTH ISSUES AT LOS ANGELES COUNTY JAIL**

by TERRY A. KUPERS, M.D., M.S.P., June 27, 2008

### I. Background

I am a board certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I have testified more than two dozen times in state and federal courts about the psychiatric effects of jail and prison conditions and the quality of correctional mental health treatment, and I have served as a consultant to the U.S. Department of Justice and Human Rights Watch. I am author of Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (Jossey-Bass/Wiley, 1998), co-editor of Prison Masculinities (Temple University Press, 2001), and a Contributing Editor of Correctional Mental Health Report. I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association. My c.v. and a list of forensic cases of the past four years are attached to this report as Exhibit A & B, respectively. I have been retained by the ACLU in this case. This report is preliminary in the sense that I expect to review more documents and conduct more tours of the facility as the need arises.

I testified in Rutherford v. Pitchess in 1978. In the intervening 30 years I have been retained in a few forensic cases involving the Los Angeles County Jail, but I had no further involvement in the Rutherford litigation until I was asked by plaintiff's counsel in March, 2008, to investigate the facility and write a report. I reviewed documents,

Exhibit 1
Page3

including declarations filed by 13 ex-prisoners[1] previously confined and released from the jail, declarations and clinical charts for 15 additional ex-prisoners, DOJ Reports, correspondence between the ACLU and Los Angeles County about Rutherford, the 4/12/06 declaration of Tony Bair, ACLU summaries of progress in the Rutherford litigation, and summaries of legal contacts with a number of prisoners.  On May 8 and 9 I toured the Los Angeles County Jail (Men's Central Jail or MCJ, Twin Towers 1 & 2 or TT1 & TT2, and Inmate Reception Center or IRC), talked with mental health and custody staff, and interviewed 18 prisoners in some depth in private, confidential settings.  I also interviewed several more prisoners in more casual, cell-front settings as I toured the units.  During my tour, Dr. David Kidwell, M.D., and Dr. Keith Markley, M.D., were kind enough to sit at computers with me and review clinical charts of the prisoners I was to interview.  In the interest of confidentiality, I have assigned each prisoner mentioned in this report a number, 0.1, 0.2, 0.3, etc.  Exhibit C contains the list of prisoner names and assigned numbers.

I appreciate the hospitality of both custody and mental health staff during my tour, the efficiency with which my tour and interviews were arranged, and the willingness of the director of mental health programs to meet with me and hear my feedback.

## II. There is a Very Large Number of Prisoners in Need of Mental Health Services

The number of prisoners nationwide suffering from serious mental illness has been expanding geometrically for several decades.  Deinstitutionalization began in earnest in the

---

[1] Throughout, I will use the generic term "prisoner" to refer to pre-trial detainees in jail, sentenced inmates in jail, and sentenced prisoners in a state prison facility.

Exhibit 1
Page4

1980's, as the state mental hospitals discharged large numbers of individuals suffering from serious mental illness.  There was an expectation, based on studies in community mental health indicating that treatment in the community was superior to hospital treatment, that resources would be transferred to community agencies where community mental health treatment and "wrap-around" services would be provided, and consequently individuals who at one time were left to vegetate in mental hospitals would attain a higher quality of life in supported residential programs (including halfway houses) in the community.  But the promise was never realized, as public mental health programs experienced successive budget cuts and housing became less affordable.

The population of individuals suffering from serious mental illness quickly became disproportionately represented among the homeless, and eventually among those behind bars.  In 1955, there were approximately 550,000 patients in state psychiatric hospitals and V.A. psychiatric units in the USA.  Today, the number of patients in mental hospitals (who are not there because of forensic status) is less than 60,000.  Meanwhile, according to a recent study from the Federal Bureau of Justice Statistics, there are upwards of a million individuals suffering from significant mental illness in our jails and prisons.  The Los Angeles County Jail has been described by many experts and commentators as the largest psychiatric hospital in the country.  In other words, "de-institutionalization" has become what many mental health experts now term "trans-institutionalization," as our society has transferred the population that once resided in psychiatric hospitals into the jails and prisons.

The reasons for the expanding prevalence of mental illness in correctional settings are complex, including shortcomings in our public mental health systems, the tendency for

Exhibit 1
Page5

post-Hinckley criminal courts to give relatively less weight to psychiatric testimony, the incarceration of large numbers of drug offenders including those with dual diagnoses (substance abuse and mental illness), and the growing tendency for local governments to incarcerate homeless people for a variety of minor crimes.

National epidemiological studies until recently had placed the prevalence of serious mental illness in jails and prisons between approximately 15% and 30%. The population in corrections has risen appreciably in recent decades (it is currently ten times what it was in the 1970s), and according to most experts and statisticians examining correctional systems, the percentage of prisoners with serious mental illness has also risen. Thus, the 2006 Special Report from the Federal Bureau of Prison Statistics, "Mental Health Problems of Prison and Jail Inmates," confirms that there are a huge and unprecedented number of individuals suffering from serious mental illness behind bars today, and concludes that 64% of jail inmates suffer from a significant mental health problem, as measured by a structured interview (not necessarily a clinician's diagnosis); and notes that the proportion of incarcerated individuals suffering from serious mental illness has actually been rising even as the incarcerated population multiplies.[2] The Bureau of Justice Statistics had placed the percentage of inmates suffering from a significant mental condition at 16% in its comparable 1999 study.[3] The 2006 Bureau of Justice Statistics Report

_____

[2] Mental Health Problems of Prison and Jail Inmates," U.S. Dept. of Justice, Bureau of Justice Statistics Special Report, can be found at http://www.ojp.usdoj.gov/bjs/pub/pdf/mhppji.pdf, September, 2006.

[3] Ditton, P. (1999) "Mental Health and Treatment of Inmates and Probationers," U.S. Dept. of Justice, Bureau of Justice Statistics Special Report.

Exhibit 1
Page6

continues that prisoners with mental health problems are twice as likely as other prisoners to have been homeless prior to incarceration.

Recent epidemiological studies are consistent with the Bureau of Justice Statistics' findings. For example, Traolach Brugha and colleagues found, in a national British study (the statistics are comparable in the USA, and the Brugha study was published in the <u>American Journal of Psychiatry</u>) that the prevalence of psychotic disorders is ten times as high in corrections as it is in the community at large.[4] A more recent research report concludes that among 320 randomly selected Iowa state prisoners, more than 90 percent met criteria for a current or lifetime psychiatric disorder, the most frequent being substance use disorders (90%), mood disorders (54%), psychotic disorders (35%), antisocial personality disorder (35%), and attention deficit hyperactivity disorder (22%).[5] In the Iowa study, thirty percent of the offenders were rated at risk for suicide. It is this expert's opinion, from a review of the epidemiological research, that the prevalence of mental illness is greater in jails than in prisons.

Considering the large proportion of jail prisoners with significant and serious mental illness, relatively few prisoners in the Los Angeles County Jail are receiving mental health treatment. By my calculations, only 11.8% of male prisoners in the Los Angeles County Jail are on the mental health caseload (on May 9, 2008, the male census in the jail was 17,687 per Inmate Reception Center Daily Inmate Statistics, and

---

[4] Brugha, T., Singleton, N., et al. (2005). "Psychosis in the Community and in Prisons: A Report from the British National Survey of Psychiatric Morbidity," American Journal of Psychiatry, 162,4, 774-780.

[5] "Frequency of Mental and Addictive Disorders Among 320 Men and Women Entering the Iowa Prison System: Use of the MINI-Plus," by Tracy D. Gunter, Stephan Arndt, and others. <u>Journal of the American Academy of Psychiatry & Law</u>, 36:27–34, 2008

Exhibit 1
Page7

the male mental health caseload was 2,088 per an oral report that afternoon by Dr. David Kidwell).  It is important to note that, of the 2,088 individuals reported on the mental health caseload, at least 350 are receiving only medications while being subjected to severe crowding or isolation and receiving no mental health programming - this is far from adequate mental health treatment.  I would estimate with a high degree of certainty that at least double the number on the current caseload need mental health treatment.  I base this partly on national figures for the prevalence of mental illness in jails, partly on the frequency of complaints about inadequate mental health care in general population and disciplinary housing units in the jail, and partly on the fact that it was so easy for me, in a two-day tour, to locate a significant number of prisoners who suffer from serious mental illness and yet have never been on the caseload or have been discharged from the caseload ("de-classed" or "de-classified) and transferred from mental health housing to general population, administrative segregation or disciplinary housing.

### III. Crowding and lack of programming are a serious hazard

The prison and jail population in the USA has climbed to well over 2 million, and it keeps on growing.  This represents a multiplication by ten from the jail and prison population of the 1970s when the Rutherford litigation commenced.  Already by the 1970s there was convincing research showing that jail and prison crowding caused increased rates of violence, psychiatric breakdown and suicide in correctional facilities.[6]

---

[6] Paulus PB,  McCain G and Cox VC,  (1978), Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding, <u>Environmental Psychology and Nonverbal Behavior,</u> 3, 107-117; Thornberry T and Call J, (1983),

Exhibit 1
Page8

One had only to tour a jail or prison to understand how violence and madness were bred by the crowding.  Consider a dormitory that was built for a small number but had to be expanded to house 150 prisoners in bunk beds lined up in rows as in the Los Angeles County Men's Central Jail.  A prisoner cannot move more than a few feet away from a neighbor, and lines form at the pay telephones and the urinals.  Likewise, when four men are crowded into the small cells I observed, there is barely enough room for one man to get off of his bunk and head for the urinal.  In the cells I viewed, there are no chairs and no desks, so sitting or lying on one's bunk are the only options.  With tough men crowded into small spaces and forced to lie on their bunks or wait in lines (see Declaration of Tony Bair regarding the long lines he observed during his tours), altercations are practically inevitable.  For example, there is the wait to talk on the phone.  The next prisoner in line begins to harass the prisoner on the phone, saying he's been on too long, the man on the phone turns and takes a swing at the other, and there's a fight.  Irritability mounts, tempers flare.  Some men get into fights or curse an officer and are ticketed and sentenced to a stint in disciplinary segregation.  As the men become angrier, their confusion and symptoms of serious mental illness mount.  (In general, as an individual prone to psychosis becomes angrier, his thinking becomes more regressed and irrational, and therefore subjecting prisoners prone to psychosis to conditions that exacerbate irritability and anger has the effect of worsening their mental illness, often precipitating a state of acute decompensation or "breakdown.")  Others retreat into their bunks where they remain all day.  If they are prone to depression, the self-imposed isolation within the crowded space worsens their condition and leads to

Constitutional Challenges to Prison Overcrowding: the scientific evidence of harmful effects. Hastings Law Journal, 35, 313-353.

Exhibit 1
Page9

thoughts of self-harm.  Of course, open expressions of rage and frequent eruptions of violence tend to push individuals prone to psychiatric breakdown over the edge.  Some prisoners with mental illness, especially if they are not provided adequate treatment, have trouble controlling their temper and other impulses on account of their mental illness, and they get into trouble repeatedly.  Others suffering from mental illness become preferred victims of the violence.  The more violence, the more madness, and the crowding exacerbates both.

I provided a declaration in Rutherford v. Pitchess on October 23, 1978.  Since I wrote that declaration, on account of the Rutherford litigation as well as the DOJ intervention, there have been many improvements at the Los Angeles County Jail.  The Twin Towers were constructed.  The mental health staff has been enlarged.  There is a greater array of mental health services, and a significant number of mental health housing units.  But in the same thirty years, there seem to have been very few changes in the architecture of the Men's Central Jail.  Most cells are still windowless.  The men are taken to recreation much less frequently than required (many said they are lucky to get to recreation once per month, even though they are entitled to go a minimum of three times per week - and this problem pre-dated the construction that was going on in the rooftop recreation area when I toured MCJ.)  On the day I toured the MCF there was severe crowding in every area, but the Medical Disability/Stepdown area, 6050, was especially poignant.  Men in wheelchairs, on crutches, and otherwise disabled were stuffed like sardines into long interconnecting, dark rooms with far too many bunk beds for them to be able to walk around.  There were no desks and I did not see chairs.

Exhibit 1
Page 10

The cells were dark and clearly, if one man wanted to move between the row of bunks, the other men would have to actively get out of his way for him to pass.

Then, in crowded facilities where rehabilitation programs are sparse or non-existent, as in the Los Angeles County Jail, and prisoners are relatively idle, the worst traumas and abuses are experienced by prisoners suffering from mental illness.  It is not difficult to figure out the reasons for this unfortunate dynamic.  Consider the jail rapist's options in selecting a potential victim.  He wants to choose his victim well, the wrong choice might lead to lethal retaliation.  If he rapes a gang member, or even a prisoner with friends, he will be forever vulnerable to deadly retaliation.  But if he selects a prisoner with significant mental illness, a loner who would not likely have friends who might retaliate, he is more likely to get away with the rape and avoid retaliation.  Thus prisoners with serious mental illness, especially if they are not provided a relatively safe and therapeutic treatment program, are prone to victimization by other prisoners.[7]  And of course the repeated traumas they are forced to endure in jail make prisoners' mental disorders and their prognoses far more dire.[8]

Crowding makes it more difficult to perform mental health and health assessments.  It is very difficult to adequately assess the 13,000 prisoners who enter the jail each month.  And the massive crowding means there are more inmates in need than can be accommodated on the mental health caseload.  Of course, if a prisoner with serious mental illness is inadequately assessed and discontinued from the mental health

---

[7] Human Rights Watch  (2001)  No Escape: male rape in U.S. prisons.  Human Rights Watch, New York.

[8] Kupers  T., (2005), Posttraumatic Stress Disorder (PTSD) in Prisoners, in  Managing Special Populations in Jails and Prisons, (ed. Stan  Stojkovic)  Civic Research Institute, Kingston, New Jersey

Exhibit 1
Page11

caseload, he is left to his own devices to survive or be victimized in the general population, or to run afoul of the disciplinary system and be consigned to punitive segregation. Prisoners with mental illness are not known for their ability to follow rules, neither the formal rules of the jail nor the unwritten laws of the male "code." They tend to get into trouble in both regards. Either they are caught by security staff breaking rules or they get into a fight or curse an officer, and they are sent to segregation as punishment, where their psychiatric condition is likely to deteriorate. Or, in general population, they are victimized by other prisoners.

I was stunned by the degree of overcrowding I witnessed when I toured the Los Angeles County Jail on May 8 & 9, 2008. I had testified about severe overcrowding in Men's Central Jail in Rutherford v. Pitchess in 1978. Since that time the Twin Towers were built and the capacity of the jail greatly enlarged. But the population has also risen geometrically, and the massive overcrowding becomes quite obvious as soon as one enters Men's Central Jail. The research literature on crowding in correctional institutions, and the standards developed by the American Correctional Association and other agencies, distinguish between "social density" and "spatial density." Social density is the number of individuals in a room or area, and spatial density is the square footage provided per individual. The standards published by the American Correctional Association mandate that there be 35 square feet of "unencumbered space" (meaning not occupied by beds or furniture) for each prisoner.[9] Tony Bair performed calculations on all size cells and dorms at MCJ and found the jail to be very far beneath the standard. Crowding can take two forms: too many individuals in a given size area and too little

---

[9] ACA Standards for Adult Local Detention Facilities, 3rd Edition, 2006 Supplement

Exhibit 1
Page12

space per individual. If a man is alone in a cell there is no social density crowding, but the 2-man and 4-man cells and the dormitories in Men's Central Jail (MCJ) absolutely constitute severe overcrowding both in terms of social and spatial density.

When 150 or more prisoners are crowded into a room that has little space beyond what is taken up by the row upon row of bunks beds they sleep in, there is little room for men to move without bumping into each other, and it is impossible for the officer assigned to supervise the dormitories to actually see what is going on. Indeed, when I toured two adjacent dormitories on May 8, 9300 and 9400, I entered the officer's booth and talked to the officer responsible, by herself, for supervising the 153 prisoners in 9400 as well as the 147 prisoners in 9300. Looking out into the dormitories through the window in her control booth, it is impossible to see prisoners in the lower bunks beyond the second or third nearest rows of bunks. With so many prisoners milling about, idle, it would not be possible for her to see that, for example, a beating or rape was occurring in a lower bunk beyond the few rows she is able to visualize from her control booth (and there is no video monitoring of any other areas). Again, there is almost no furniture aside from the bunk beds.

I observed the cells in 2600 that currently house two or four prisoners. It is difficult for more than one man at a time to be out of his bunk, and in many of the cells the lack of furnishings, e.g. there are no desks nor chairs, makes lying in a bunk all day the only option. There is a cafeteria in MCJ, but I understand it is not being used, and therefore the men have to actually eat their meals in their cells, mostly on their bunks.

I understand that the Sheriff has stated that overcrowding is a totality of circumstances. And I understand that some changes have occurred at MCJ since Tony

Exhibit 1
Page13

Bair provided his declaration, for example cells that previously held six men now contain four, and cells that held four men now contain two.  But the men remain in their cells nearly 24 hours per day, they eat meals in their cells, there is no furniture except a bunk, and there is almost nothing in the way of programming or mental health treatment.  In addition, I have not yet mentioned other destructive conditions at MCJ.  Consider lighting, for example.  There is a double problem, the fixtures do not provide sufficient light for reading, and then lights are left on all night, interfering with sleep. There are still no windows in the cells, and this means the natural light humans need to regulate their natural diurnal rhythms are not available.  One prisoner solemnly confided that he would give anything just to see a bird - in other words, there is a natural craving for some contact with the natural world, and living for years in a windowless cell is very noxious, from a psychiatric perspective.  With the crowding there is a slower response than otherwise to disrepair, and I saw several cells where the lights were broken or dysfunctional and the occupants were in the dark.  Officers reported that a work order had been sent, but days had passed.   The noise is very loud because of the overcrowding, and the older architecture means the acoustics exacerbate the noise problem. Thus, the totality of circumstances certainly serve to magnify the toxic effects of the overcrowding.

Conditions at MCJ today are eerily similar to the conditions in 1978 when I submitted a declaration in Rutherford.  In that declaration, I wrote that "... many of these mentally disordered prisoners are receiving psychotropic medications; prisoners in this module are rarely seen by psychiatrists or by mental health technicians and do not receive individual or group psychotherapy; prisoners in this module are managed by deputy sheriffs who have no training in handling psychiatric patients; most of the

Exhibit 1
Page14

prisoners in this module receive no opportunity to exercise indoors or outdoors; most of the prisoners in this module are locked alone in their one-man cells almost all the time, including meals...." I offered similar observations about the multiple-occupancy cells and dormitories. It is stunning how unchanged the conditions are in the Men's Central Jail, and how the men therein are still relegated to idleness in a cell and still lack adequate mental health treatment. Further in that declaration I wrote: "I conclude that high security prisoners are confined under conditions extremely detrimental to their mental health." Further, I wrote: "Based upon the above-described facts, I conclude that conditions in the Jail are extremely detrimental to the mental health of inmates and are a likely predisposing factor in eventual mental disorders of persons incarcerated under the conditions I have assumed." It cannot be emphasized enough that those conditions, including severe overcrowding, forced idleness and lack of adequate mental health care, are very much the same today.

Obviously the crowding makes the facility more dangerous. The standards published by the American Correctional Association are clear: "Medium-security inmates housed in multiple-occupancy cells/room require direct supervision."[10] But the cells throughout MCJ do not permit "direct supervision." I have already mentioned the lack of visibility from the officers booth outside the large dormitories at MCJ. Another example, where cells are arranged along a corridor and the officer has no desk inside the corridor space, he or she must enter through the gate and walk along the corridor to view the prisoners. In his declaration, corrections expert Tony Bair pointed out severe overcrowding, cells in disrepair, "inmates with different classifications were frequently in

---

[10] ACA Standards for Adult Local Detention Facilities, 3rd Edition, 2006 Supplement

Exhibit 1
Page15

the same vicinity" (p. 4), long lines of inmates waiting for transfer into and out of cells and dormitories, long delays in visiting, relatively little supervision of inmates, and various other conditions that he feels pose a serious concern about security in the Los Angeles County Jail.  Obviously all of these harsh conditions bear even more negatively on prisoners suffering from mental illness, who are more prone to decompensate under harsh conditions and are more prone to be victimized.

I also toured one Administrative Segregation Unit in MCJ, 2904.  I was struck by the small cells - approximately 5'X6' (I measured with my foot, I had no tape measure with me).  This is very far beneath the minimum standard of the ACA for a single jail cell. There are no windows in these cells, and some even have solid doors that close over the bars.  I was told by officers that the solid doors are never closed when a prisoner is in the cell, and I was told by prisoners that they are closed.  One wonders why, if the doors are never closed, they remain on the cells.  In any case, if the solid door were to be closed with a prisoner in the cell, the sense of claustrophobia and isolation would be very severe and confinement in such a cell would constitute unacceptably toxic conditions with resulting suffering as well as serious psychiatric harm.  When the prisoners in these cells, who have very little in the way of amenities, are taken to recreation, they are placed alone in a cage-like structure that permits very little large muscle exercise.  They are permitted to shower, but otherwise they have almost no time out of their cell.  Thus, these cells constitute severe spatial density crowding that is well beneath minimum standards.

Throughout the Men's Central Jail the cells and dormitories violate minimum standards in terms of both social and spatial density.  The ACA standards include a provision for compensatory out-of-cell time for jail prisoners confined in substandard cells

Exhibit 1
Page16

or dormitories.  For example, the ACA Standards for Adult Local Detention Facilities, 3rd Edition, Supplement 2006, requires 35 square feet of unencumbered space per prisoner, but alters the requirement depending on how much time the prisoner spends in his cell or dormitory:  "When confinement exceeds ten hours per day, there is at least 70 square feet of total floor space per occupant."  In other words, the more time the prisoner is confined to his cell or dormitory, the more square feet of space are required per prisoner. Thus the ACA standards essentially suggest a possible partial remedy for crowding: compensatory out-of-cell time.

I am citing the ACA standards merely to provide a frame of reference.  In general, the ACA standards are consistent with what we know from research on crowding - for example, they cover spatial and social density, and they reflect that if an individual is confined in a very small space the negative effects can be somewhat ameliorated by time spent outside the space.  But much more important than any standards is the fact that, in human terms, it is intolerable to leave prisoners in harsh, crowded conditions that we know cause psychiatric breakdown.  It is even more intolerable to systematically de-classify a significant number of prisoners known to suffer from serious mental illness and condemn them to the hardships of crowded and noxious conditions that are well-known to exacerbate mental illness and substantially increase the risk of suicide.

But it is obvious throughout the Men's Central Jail, and this applies to Twin Tower high security units as well, that quite the opposite practice is the rule, and the prisoners have almost no out-of-cell activities except for a few hours per week in the rooftop recreation area - and prisoners universally tell me that they may or may not get their time in recreation, depending on the availability of staff to move them.  Most only get to

Exhibit 1
Page17

recreation once per month.  They never get to the day room, even though they are supposed to be in the day room every other day, nor do they ever get to the cafeteria. Thus, according to minimum standards and all we know from research on jail conditions, the general population areas of the Men's Central Jail are massively overcrowded, and the prisoners are almost entirely idle - a combination of toxic conditions that is guaranteed to predictably increase the prevalence of violence, psychiatric breakdown and self-harm.

The same conditions that worsen psychiatric disorders also affect the staff and make treatment problematic.  After all, the staff, both custody and mental health staff, spend quite a lot of time in the crowded conditions.  Their irritability is enlarged by the noise and the crowding, and, on average, staff tend to become increasingly insensitive to prisoner concerns when they have to interact with masses of prisoners each day. Officers become impatient, and are prone to gruffness, which leads to prisoners feeling disrespected and becoming angry.  Then, the prisoner's anger causes the officers to punish them, often for rather minor infractions, and the prisoners become more resentful.  It is in this unfortunate mix that excessive force and other abuses become more frequent occurrences.

Meanwhile, the large number of prisoners crowded into every space makes it difficult-if-not-impossible for over-extended mental health staff to provide adequate attention to the prisoners' psychiatric needs.  Cell-front interviews become commonplace.  Quite a few of the prisoners I interviewed at MCJ complained that it was very difficult to get the psychiatrist to see them, there were long waits, and then when they did get to see mental health staff, the mental health staff visited them at their cell-front or talked with them for only a few minutes somewhere in the unit where they

Exhibit 1
Page18

are housed.  And lengthy individual or group psychotherapy sessions become unimaginable.  Psychotropic medications are not very effective when the patient is in an overcrowded and stressful situation with little or no meaningful activity.  The clinician has little if any opportunity to develop a therapeutic relationship or even educate the patient about the illness and the need for medications.  This makes patient non-compliance all the more frequent.  Yet this is precisely the situation in the massively overcrowded Los Angeles Jail.

It should be mentioned that toxic conditions are better tolerated for short periods of time when a person knows they will soon be released or transferred to a setting with less toxic conditions.  Traditionally jails are a locus of short terms of detention, pre-trial and for sentences less than a year.  But if  the prisoners I interviewed and those whose records I reviewed are at all representative, there are  many prisoners who remain in the jail for years on end.  There are many reasons for this, including long periods of waiting for trial and long periods of waiting for a transfer to a forensic psychiatric hospital.  But the effect of the long stays in the Los Angeles County Jail is that the toxic conditions, including massive overcrowding, a lack of meaningful programming, and stints in punitive segregation, are all magnified, creating a virtual breeding ground for psychiatric breakdown and self-harm.

In this discussion of crowding and other harsh conditions I have focused on MCJ.  But Twin Towers housing units are also affected.  For example, the high security units in Twin Towers II are designed for direct supervision.  The intent was to have the men remain in their cells for 8 hours at night, and then to be out of their cells, in the day room, recreation areas and other activities, 16 hours per day.  But the harsh reality at

Exhibit 1
Page19

present is the men remain in their cells, idle, for as many as 22 hours per day. Even in the K-7, K-8 and K-9 security level units in Twin Tower 2, the men are in their cells 22 hours per day. Therefore, even if, technically, the cells meet the space requirements of the ACA standards, in practice, with the men remaining in them more than 10 hours per day, they violate the standards. The more important point is that crowding makes the conditions very harsh, even in the Twin Towers, and this has very detrimental effects on prisoners with mental illness.

## IV. The Mental Health Programs Have Very Positive Features

The mental health programs in place in Twin Towers I are impressive in many regards. There is an array of services, including inpatient beds in the Forensic Inpatient Program (FIP), crisis intervention/observation capabilities in TT1, a step-down or subacute mental health unit, and mental health housing that is divided by geographic service areas. There is an attempt to do pre-release planning and link with mental health providers in the community. There is an attempt at collaboration between mental health staff and custody staff, and it appears that a certain number of custody staff do receive training on mental health issues (but it also appears that a significant number of untrained custody staff interact with prisoners in mental health treatment housing, and there are reports of insensitivity and abuse).

The Jail Mental Evaluation Teams (JMET) are excellent in concept, are designed to provide assessment and crisis intervention to prisoners who are not in mental health housing, and involve admirable collaboration between mental health and

Exhibit 1
Page20

custody staff.  But as I will report later, there are inadequacies in the work of the JMET teams. The JMET teams provide counseling in the non-mental health housing units (they conduct rounds only in the administrative segregation and disciplinary housing units), but I could find no progress notes in the clinical charts I reviewed for such counseling, and the prisoners outside the mental health housing units almost universally report they receive no counseling.

The experts from DOJ (the U.S. Dept. of Justice) report continuing progress in correcting previously reported inadequacies in mental health services within the jail, including increased mental health staffing.  And the mental health staff seem to be conscientious and interested in improving mental health treatment within the jail.  In short, there are many very positive aspects of the mental health program at Los Angeles County Jail.

## V. Mental Health Treatment, While Robust in Twin Tower 1 Mental Health Housing Units, is Inadequate in Other Areas of the Jail

Before visiting the jail on May 8 and 9, 2008, I had reviewed many documents reflecting the presence in the Men's Central Jail and Tower I & II disciplinary housing and administrative segregation units of many prisoners suffering from serious mental illness who are either not receiving needed mental health treatment or are receiving inadequate treatment.  For example, in their March 13, 2003 DOJ Expert's Report, Drs. Metzner and Dvoskin note on p. 9, "Based on information obtained from the mental health staff and reports from inmates, it is uncontroverted that the only form of mental

Exhibit 1
Page21

health treatment available in the pill call modules (in TT 1) involves the use of psychotropic medications.  Other mental health interventions were not available, despite a number of inmates needing such interventions.  While psychotherapy is not necessarily required for every inmate on a pill call module, it must be available when it is indicated by clinical judgment. "  I am aware that Drs. Metzner and Dvoskin have returned to the LA County Jail after writing their 2003 Report, but I have not been able to review subsequent Reports.  I assume that there have been some improvements, but nevertheless my findings during my tour and interviews with prisoners in May, 2208, are equivalent to the complaints lodged by the DOJ experts in their 2003 Report.  I conclude there have been improvements, and the Sheriff's Department and Department of Mental Health have added capable staff and tried to comply with the DOJ experts' recommendations, but still the problems have not been resolved and are ongoing.

Also prior to my tour I reviewed notes from the ACLU to the Facility Captains about their findings during weekly jail visits.  As reflected in the ACLU notes, inmates repeatedly complained about not receiving the medications they had been taking in the community, waiting for many days or weeks to see the psychiatrist, being unable to get to see the mental health staff, and having jail mental health staff discontinue medications they had been taking with good results in the community.  I am aware that prisoners' complaints are sometimes exaggerated or distorted and that Jail Mental Health staff have explanations for some of these complaints.  But the sheer volume of the complaints recorded by the ACLU, and the uniformity of complaints emanating from multiple informants who have no contact with each other, certainly reflect ongoing serious problems.  The declarations of former prisoners are entirely consistent with the

Exhibit 1
Page22

patterns I discovered and will report here, and in many cases the former prisoners'

reports were corroborated by their clinical charts.  Further, these complaints were

entirely consistent with what I discovered during interviews with prisoners, where I had

an opportunity to assess credibility, check verbal reports against chart notes, and

perform mental status examinations of my own.  In other words, there was impressive

internal consistency in all the sources of information upon which I relied in forming my

opinions.

Mental health treatment outside of the mental health housing units in TT1 is

provided by Dr Markley and the JMET teams.  These teams are composed of one or

more mental health counselors, a psychiatrist and a custody officer.  The custody

officers I met who serve on these teams seemed compassionate, and I was told that

they have received training regarding mental health issues.  However, there seems to

be very little mental health training for most other officers, and given the fact that

officers work over-time in most assignments, this means that prisoners with mental

illness outside of Tower 1 are often guarded by officers with little or no training in mental

health.

Coverage by the JMET teams is uneven at best.  Quite a few prisoners in

general population, administrative segregation and disciplinary housing told me that a

member of the JMET team has been sympathetic on occasional short visits at cell-front

or in an office on the unit.  But the great majority of prisoners I interviewed complained

that they have requested that mental health staff see them on multiple occasions and

had to wait weeks or months to be seen, or they were never seen.  Their reports are

corroborated by the declarations of previously incarcerated inmates I reviewed.  The

Exhibit 1
Page23

majority complained that the psychiatrist spends, at best, a few minutes with them and does not listen to their concerns about side effects from the medications they are prescribed.  Quite a few of the prisoners told me they have never seen a JMET team in the many months they have resided in the jail.  It is my understanding that the JMET team conducts rounds only in administrative segregation and disciplinary housing units. The 2003 DOJ Expert Report mentions there are approximately 1,500 prisoners in segregation at any time.  This is simply too many prisoners for the JMET team to adequately assess and treat.  Then, the fact that they are required to round on so many prisoners means that general population prisoners will receive less attention.  This might explain why so many prisoners in non-mental health housing told me they had great difficulty accessing  mental health services.

I asked to observe a JMET team in action on 3100 Unit in Men's Central Jail.  A custody officer and Laura Bastianelli, R.N., did walk down the hall in front of the single cells, keeping their distance from the prisoners, and speaking with each prisoner who wanted to talk to them.  The entire rounds lasted several minutes, and the nurse reported that she had noted one prisoner who will need to be followed.  I then walked down the same row of cells and was informed by the prisoners that they had never seen Ms. Bastianelli before, and usually an officer comes by alone and asks if they want to be seen by mental health.  The purpose of the JMET team's rounds seems to be to identify new cases or exacerbations in known cases that require mental health treatment, but then the team has nothing to offer in the way of treatment except transfer to the FIP or mental health housing in Twin Tower I if the prisoner's condition is very serious (a danger to self, others or unable to care for self in the jail), or to request a psychiatric

Exhibit 1
Page24

evaluation in the non-mental health housing unit.  I was told repeatedly by prisoners that there is nothing available in the way of mental health treatment except the prescription of psychiatric medications.  This is far from adequate mental health treatment.

While I did not perform a rigorous review of clinical charts, the time I spent with Drs. Kidwell and Markley looking at the digital charts for prisoners I interviewed convinced me that there are deficiencies.  Drs. Kidwell and Markley had some difficulty navigating through the charts, and were unable to find for me treatment plans for most of the patients.  This means that if a mental health clinician attempts to review the chart in preparation for an intervention with a prisoner on the mental health caseload, he or she would not be able to find an adequate treatment plan and would not be able to utilize the chart to track important clinical events during the patient's jail tenure. Obviously, the more crowded the jail, the more patients the clinician needs to see, on average, and the less time the clinician has to find needed information in the chart.  As a result of problems in the charts, the quality of mental health treatment suffers.  In other words, while electronic charting is a fine idea in theory, in practice at the Los Angeles County Jail inadequacies in charting have actually become an obstacle to adequate mental health treatment.

## VI.  There is a Pattern of Failure to Diagnose and Inappropriately Down-grading the Diagnoses of Prisoners who Cannot be Accommodated in Mental Health Housing

Exhibit 1
Page25

I discovered several patterns in the under-diagnosing and inadequate treatment of prisoners in the general population, administrative segregation and disciplinary housing units in Men's Central Jail and Twin Towers. Some individuals were simply not diagnosed at all in spite of the fact they complained of significant psychiatric history and/or symptoms and requested mental health services. Some individuals with a long history of serious mental illness were "un-diagnosed." For example, I saw several cases where the diagnosis of Schizophrenia that a man had carried through several psychiatric hospitalizations and that had earned him SSI total disability benefits in the community was down-graded when he entered the LA County Jail to "no axis I diagnosis" (the multi-axial diagnostic formulation in the <u>Diagnostic and Statistical Manual of Psychiatric Disorders</u> or <u>DSM IV</u> lists most serious mental disorders on Axis I and personality disorders on Axis II), a personality disorder, an "adjustment disorder," or "malingering" (the exaggeration or feigning of symptoms to attain secondary gain). In other words, the individual who had a long history of serious mental illness is deemed to suffer from nothing more than a personality disorder or substance abuse, or to be faking, so there is no mental illness worthy of mental health treatment. And in some cases the individual was identified as suffering from a serious mental illness but the mental health team concluded that the mental illness was not sufficiently symptomatic at this time to warrant mental health housing (thus I discovered individuals who had been declared incompetent by the court and were awaiting transfer to a state psychiatric hospital, but were housed in general population or disciplinary housing with no mental health treatment or treatment limited to medications).

Exhibit 1
Page26

The following is an example of a prisoner with a serious mental illness who had

not been diagnosed when I interviewed him:

> Prisoner 0.3.  This Caucasian man is 46 years old, well-groomed and articulate.  He was arrested on March 7, 2008.  He describes periods of severe depression alternating with periods of hyper-activity with racing thoughts and very little need for sleep.  The highs and lows each last for periods of weeks or longer.  He had been in jail a year earlier, and when he was in the community he was homeless and had an alcohol problem.  He has also been prescribed strong psychiatric medications in the community, but he inconsistently complied with the treatment.  He volunteers: "I drink to turn my head off."  He has been in mental health housing in TT2 during prior stints in jail.  Until a year ago he had a wife and five-year-old child, but she left him.  He knows he has cycles, getting depressed and then manic, and that he needs help.  He has held good jobs in the past.  He describes a cyclic pattern where he works frenetically during periods when he is "high," then he is reprimanded for something slight, he becomes very depressed, and he loses the job.  He has a sister with Bipolar Disorder, and he has been diagnosed Bipolar in the community, although he did not appear to have received medication based on this diagnosis.  He seems coherent upon mental status exam, but exhibits somewhat pressured speech and hypo-manic affect.  He told me he was seen very briefly by the psychiatrist and prescribed some medications.  In fact, when he was evaluated at intake no mental health treatment was recommended, in spite of a court order requiring that he receive the medications he had been prescribed in the community.  Evidently he was only seen by a psychiatrist in Men's Central Jail after the ACLU intervened and requested he be seen.  On his electronic chart for 5/6/08 there is the diagnosis Borderline Personality Disorder, rule out Substance-Induced Mood Disorder, and a later note diagnosing only alcohol abuse.  It is noted in the chart in 2007, during a previous admission, that he had been on major psychotropic medications in the community.  He received no post-release planning or help when he left the jail a year earlier.  He is currently prescribed Remeron (an anti-depressant) and Benadryl (an antihistamine used as a sleep aide).  He will be homeless and will not receive Medi-Cal benefits after he is released, so he will require comprehensive planning for aftercare following his release from jail.  I understand that the usual practice at the jail does not include providing medications for prisoners upon their release with the exception of a "bridge prescription" when the individual is going to another institution.  Because this man is not in TT 1, he would

Exhibit 1
Page27

ordinarily not receive adequate aftercare planning.  But he needs comprehensive discharge/aftercare planning.

This man is clearly suffering from Bipolar Disorder, which is not diagnosed in the jail, and he is not being prescribed the medications he needs.  In effect, an opportunity is being missed to develop a therapeutic relationship with this man while he is in jail (his release date is August, 2008), properly diagnose his serious mental illness, and begin a mood-stabilizing medication such as Lithium or Depakote.  Once he sees the benefits of complying with treatment, it would be much more likely he could comply with treatment after being released from jail, and, one hopes, remain clean and sober while seeking steady employment and a place to live.  This, in fact, is his stated wish, but he has been unable to get the mental health team to provide adequate treatment.  In any case, his serious mental illness is not currently diagnosed and he is not receiving adequate treatment.  The lack of treatment while he is subject to the harsh conditions in the overcrowded Men's Central Jail is very likely to worsen his condition and his eventual prognosis.

The following is an example of a prisoner whose diagnosis has been inappropriately downgraded:

> Prisoner 0.14.  This 34 year old African American man, who was booked into the jail on October 27, 2006, is in Tower I discipline (he says he is in "the hole").  Usually he is housed in Tower 2 or MCJ, on K-9 status.  Custody staff told the ACLU that they have requested that he be transferred from general population to mental health housing, without success.  His disciplinary cell has a solid door with lexsan over the bars.  His disciplinary infractions involve speaking disrespectfully or not following orders, though he has evidenced some violent behavior.  He was found to be incompetent to stand trial (IST) by the court and committed to Patton State Hospital in 2007 for restoration of

Exhibit 1
Page28

competence. He currently has a hold from Atascadero State Hospital and had been waiting to be transferred for more than 6 months at the time of our interview. His chart review indicates that he was de-classed from mental health housing because his blood levels showed he was not taking his prescribed Depakote (a mood stabilizer - he was also prescribed the anti-psychotic agent, Seroquel), and then his diagnosis was downgraded from a serious mental illness on Axis I to a personality disorder on Axis II. He reported he has been diagnosed and treated in the community for Bipolar Disorder and Paranoid Schizophrenia. He told me he had been on SSI since 1993 when he was discharged from CYA, he has been found incompetent to stand trial in the past, he was on the EOP level of mental health treatment in prison (the highest level of mental health treatment outside of the inpatient unit), and he was at Atascadero State Hospital as an MDO (Mentally Disordered Offender, a status that requires a DMH and CDCR psychiatrist to declare that the individual suffers from an ongoing serious mental illness). He told me that he knew that he needed mood-stabilizing and anti-psychotic medications, but he said that they made him groggy and that he did not take them because he felt that he must stay alert to protect himself and avoid trouble from other inmates while in jail. He believes that the racial tensions in the jail create hostile situations, and a prisoner taking psychiatric medications is in grave danger of attack. On mental status examination he currently exhibits obvious signs of active psychosis, including auditory hallucinations, a belief that people in other places hear us talking, that some unknown person is talking about him, and "I can feel them touching me right now, they make me do things." He exhibits a flat, bizarre stare and is very concrete. When he does not receive the medications he needs he has trouble controlling his temper, gets into fights, and winds up in disciplinary housing, where his psychiatric problems worsen. He reports that "some of the officers are OK," but others threaten and abuse the prisoners, most often mentally ill prisoners. He would like to take medications, but he feels he needs to be in mental health housing for it to be safe to do so. He is frightened that in general population, without his medications, he will be picked on, or will get into a fight and hurt someone. Currently he is prescribed some medications. He told me he is afraid of the court line holding tank, "there are too may

Exhibit 1
Page29

> people there and it would set me up to hurt someone and get in trouble." Because of this fear, he refuses to go to court.

Prisoner 0.14 clearly suffers from a chronic psychotic disorder combined with a mood disorder, and requires more intensive mental health treatment than he is receiving. He does fail to comply with medications while housed in general population, but his explanation for this - that being on medications puts him at risk of assault - makes some sense. Many prisoners in this and other jails have told me that psychiatric medications slow them down and make them vulnerable to attack and less able to defend themselves. His fear of being in the court line holding tank is well-founded. The cell utilized for prisoners awaiting transportation to court is a small room and very crowded. Prisoners are waked at 2AM or 3AM and placed in the crowded cell for hours to get on a bus for court. Prisoners with serious mental illness are mixed in this holding tank with prisoners who do not suffer from mental illness, and the jail-issue clothing worn by prisoners with serious mental illness identify them as psychiatric patients. This is equivalent to forcing them to wear a bull's eye on their back saying "victimize me." They are very vulnerable to attack from other prisoners who stigmatize them on account of their mental illness. Instead of being mixed in a crowded holding cell, prisoners like this man with serious mental illness need comprehensive mental health intervention and more attention to their very valid concerns about safety.

Exhibit 1
Page30

In any case, medication non-compliance does not justify a downward shift in a patient's diagnosis. In fact, medication non-compliance is a prominent part of the picture for individuals suffering from serious mental illness such as Schizophrenia and Bipolar Disorder, and non-compliance is the most frequent precursor to exacerbations of serious mental illness and re-admissions to psychiatric hospitals. There is substantial clinical research indicating that non-compliance is most likely when an individual is seen briefly by different clinicians, and is much less likely when a good therapeutic relationship is established with one or a few trusted clinicians who spend sufficient time with the patient to educate him about the importance of complying with the treatment.   This man has a long, documented history of serious mental illness. It might be the case that his temper outbursts, which usually occur when he is not receiving adequate mental health treatment, make him a risk in mental health housing. But mental health staff assure me that they have the capability within mental health housing to manage prisoners with serious mental illness who pose a security risk. This man definitely needs to be properly diagnosed and given the more intensive mental health treatment that is only available in mental health housing.

The following is an example of a prisoner who has been diagnosed correctly but has not been monitored nor treated adequately:

> Prisoner 0.15. This large, balding, 39 year old Latino man
> reports he has been in some form of lock-up since his teen

Exhibit 1
Page31

years.  He was transferred to the jail from a state hospital on 11/13/07.  He has repeatedly been found incompetent to stand trial.  He is currently on administrative segregation status, in a single cell, with mental health treatment.  He thinks his diagnosis is Schizoaffective Disorder of Bipolar Disorder.  He believes the officers "have it out for me."  He had been on SSI total disability on psychiatric grounds since 1999.  He has been hospitalized at Patton State, Atascadero and Metropolitan State. He is taking several medications, including anti-psychotic and mood-stabilizing agents.  While he was in administrative segregation his medications were discontinued for a week by the psychiatrist, and he "broke down."  He told the nurse he was hearing voices, seeing things, feeling panicked, and was suicidal.  Now he remains in an administrative segregation cell by himself, takes his medications, but the only treatment he receives is brief visits at his cell-front by the mental health staff - when he will not really talk about anything important because the conversation can be overheard.  On his electronic chart there is the history of past psychiatric hospitalizations, and there are varied diagnoses, but it is noted that he suffers from a serious mental illness and there is no plan to de-class him.

When I spoke to Dr. Markley and Dr. Kidwell about prisoners who have a psychiatric history and a diagnosis such as Schizophrenia or Bipolar Disorder, they assured me that individuals with a bona fide serious mental illness in their target population will be in mental health housing throughout their jail term, even if they are in remission (i.e. not currently symptomatic) while being prescribed medications.  In fact, in my interviews I discovered prisoners who fit this description, who I concluded from my review of their record, history and mental status examination, suffer from one of these serious mental illnesses, and yet they had been "de-classed" and transferred to general population, administrative segregation or disciplinary housing.  In most cases, their diagnoses had also been downgraded.  In a few cases they were, meanwhile, on a hold to be sent to Atascadero or Patton because of competency issues.

Exhibit 1
Page32

It is important to note that serious mental illnesses are, mostly, lifetime conditions that pursue a waxing and waning course. An individual suffering from Schizophrenia might go into remission, especially if he is properly medicated and treated, but he does not then become cured of Schizophrenia. It is a condition that could erupt in an acute psychotic decompensation (breakdown) at any time, and typically does so periodically. In this regard, it is troubling that the target population for mental health housing at the Los Angeles County Jail seems to include only those with current symptomatology. Thus, as prisoners have their life-long diagnoses downgraded from Schizophrenia to personality disorder or malingering, it is noted that there are no current signs of a psychotic process and no current risk of suicide. But this does not mean the person no longer suffers from Schizophrenia, nor that he no longer poses a risk of suicide. In fact, if such a person is subjected to the harsh conditions I have described at Men's Central Jail, it is very likely that he will suffer a breakdown or become suicidal.

The diagnosis of serious mental illness involves a comprehensive review of current signs and symptoms as well as past history, clinical records, and so forth. It is striking how indifferent mental health staff are to evidence of serious mental illness by history - past hospitalizations, Social Security Disability benefits, or even competency evaluations. After all, a psychiatrist or psychologist providing a competency evaluation spends much more time with an individual than the psychiatrist at the jail, and often psychological assessment (testing) is completed, containing valuable information for any clinician subsequently performing a mental health examination. I cannot understand why the mental health clinicians at the jail consistently ignore all of this

Exhibit 1
Page33

clinical material and look only at current symptoms as they opine that individuals who are not acutely psychotic or suicidal at the moment they happen to examine them suffer from no serious mental illness or are "only malingering."  Again, one of the main purposes for performing adequate psychiatric assessment in jails is to identify prisoners who would likely suffer serious emotional problems if subjected to harsh jail conditions, so they can be diverted into some form of mental health treatment.  To conclude that someone with a serious mental illness is not especially symptomatic at one point in time and then deny him mental health services is entirely contrary to the purpose of mental health assessment in jail.

In the Los Angeles County Jail, prisoners who are inappropriately "un-diagnosed" and "de-classed" because they do not appear obviously psychotic or suicidal at the time of one examination are at very high risk of decompensation or self-harm when they are subjected to harsh conditions such as severe overcrowding or isolation in disciplinary housing.  This is why individuals who have a history of serious mental illness require some degree of special housing and ongoing mental health treatment.  There is too much emphasis on current symptomatology on the part of mental health staff, too hasty conclusions about malingering, and too little consideration of the total clinical picture, including past psychiatric hospitalizations, court proceedings, previous responsiveness to psychiatric medications, suicide attempts, etc.  Then, if the individual is not grossly disturbed at the moment he is assessed, possibly in reception, he is too often declared to be malingering or suffer only from a personality disorder.  The diagnosis of serious mental illness requires a more comprehensive view of the entire clinical picture, and the individual suffering from serious mental illness requires a

Exhibit 1
Page34

more rigorous treatment plan that includes protection from stressful condition such as crowded units and disciplinary segregation.

It is my understanding that North County Jail, and other outlying units will not receive prisoners with serious mental illness who are on medications.   But there are many more programs at the North County Jail and other facilities, so, in effect, prisoners with serious mental illness are denied access to the programs that would foster their rehabilitation.  In the final section of this report, I will recommend changes in policy that permit more prisoners with serious mental illness to participate in programs.

It is one thing to have too many individuals requiring mental health treatment and be unable to satisfy their needs, it is quite another to erroneously diagnose individuals requiring mental health treatment so that it will not appear as if the mental health resources are deficient.  In the final section of this report, I will recommend that rigorous and correct diagnosing be performed, but then the mental health staff would have to declare that there are simply too many prisoners with serious mental illness for the available mental health resources.  That way, the problem would not be "disappeared" by inappropriate un-diagnosing and de-classing, but rather the county administration would be in a position to develop a plan for supplying adequate mental health services to the population that needs them.


## VII. Disciplinary Housing Exacerbates Mental Illness and Suicidality

I know from my tour, from the clinical literature, and from my interviews with prisoners at Los Angeles County Jail and other correctional facilities, that a disproportionate number of prisoners with serious mental illness predictably wind up in

Exhibit 1
Page35

punitive segregation. For some, it is a matter of their mental illness leading to irrational acts and rule violations; for others it is a matter of losing control of their emotions and getting into altercations; and for still others it is a matter of breaking down only after being consigned to segregation for a lengthy period of time. I am often asked whether prisoners with serious mental illness are selectively sent to punitive segregation, or do the harsh conditions of isolation and idleness cause psychiatric decompensation in a vulnerable sub-population of prisoners? Of course, both mechanisms are in play. The result is that whenever I tour the segregation area of a correctional facility, I discover a very large proportion of prisoners confined therein to be exhibiting the signs and symptoms of serious mental illness.

Of course, the presence of prisoners with serious mental illness in segregation units heightens the noise level and the overall chaos. Prisoners who are not suffering from serious mental illness tell me it is extremely difficult to sleep in a unit where several prisoners with serious mental illness are up all night shouting and crying. And when a prisoner with serious mental illness spits or flings excrement at an officer and the officers sprays an immobilizing agent on that disturbed/disruptive individual, the prisoners in neighboring cells experience the effects of the gas that wafts into their cells even though they have done nothing to provoke an assault by the officers. In other words, the disproportionate placement of prisoners with serious mental illness in segregation units tends to exacerbate the general level of pandemonium.

Many prisoners at the Los Angeles County Jail with serious mental illness, who do not receive adequate treatment, are eventually consigned to

Exhibit 1
Page36

terms in segregation.  As I have already mentioned, the disciplinary segregation

cells are very small and have no windows.  I will offer one example:

> Prisoner 0.12.  This 51 year old African American, balding man
> was interviewed while housed in TT2, Unit 152, a mental health
> housing unit.  He has been in the jail since 5/19/07.  He had
> been receiving SSI disability since age 18, and had been
> hospitalized at both Camarillo State Hospital (since closed) and
> Metropolitan State Hospital prior to the current booking.  He had
> also been adjudged MDO (Mentally Disordered Offender) after a
> previous prison term and hospitalized at Atascadero State
> Hospital.  When he was arrested this time he was not taking his
> psychiatric medications.  He has also resided in a halfway
> house in the community, and has been homeless.  Upon
> booking, he was placed in general population and immediately
> was in disciplinary trouble.  He says he was roughed up by
> officers.  He eventually was transferred to the 7th floor inpatient
> mental health unit, and was started on Prolixin Decanoate, a
> depot (long-lasting) injection form of an older anti-psychotic
> medication.  His mental status is consistent with a chronic
> psychotic disorder, probably Schizophrenia.  He reports that
> when he is in general population he gets into trouble.  He has
> been sent to "the hole" (disciplinary housing) three times during
> this stint in the jail, each time for 30 days.  He describes
> worsening psychiatric symptoms when he is in "the hole,"
> including talking to himself, severe insomnia, inappropriate
> crying, seeing visions coming out of the walls, and being
> incapable of knowing whether the visions were real or imagined.
> JMET came to see him when he was in segregation, but only at
> cell-front, and even though he knew his condition was
> deteriorating and he needed medications, he did not want to talk
> to them because other prisoners in nearby cells would hear the
> conversation, as would officers passing by.  On his clinical chart
> the diagnosis is deferred and a recent note contains a treatment
> plan to watch him for a while after he decided to discontinue
> medications, and then "de-class" him or remove him once again
> from mental health housing.  This man obviously suffers from
> chronic serious mental illness, tends to non-comply with
> treatment, but also tends to get locked up in segregation when
> off his medications and not in treatment, and then deteriorate
> further in disciplinary segregation.  Yet the current plan is to de-
> class him once again.

Exhibit 1
Page37

It has been known for as long as segregated housing has been practiced in jails and prisons that human beings, especially those prone to mental illness, suffer a great deal of pain and mental deterioration in segregation. This is especially the case for prisoners who suffer from mental illness. Thus, in 1890, the U.S. Supreme Court found that "[a] considerable number of prisoners fell, after even a short confinement [in isolated confinement], into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."[11]

Human beings require some degree of social interaction and productive activity to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside one's mind and are transformed into unfocused and irrational thoughts. Without social interactions, individuals have no way to test the reality of their fantasies, and thus there is a tendency toward paranoia and an inability to control the rage that mounts with each perceived insult. An example from everyday life in the community: I walk into a room, two people are talking and lower their voices as I enter. I have the momentary fantasy they were talking about me and that's why they lowered their voices when I walked in; I approach them and their friendly greetings disabuse me of what I now can judge to be an erroneous and paranoid

---

11 In re Medley, 134 U.S. 160, 168 [1890].

Exhibit 1
Page38

fantasy on my part. This kind of reality testing goes on in everyone's daily life. We have suspicions, negative thoughts and fears, and our subsequent interactions with others permit us to test their reality. Prisoners in isolated confinement have no opportunity to "check out" their possibly paranoid projections with a sympathetic person, and they multiply and go untested. This is merely one example of the debilitating effects of isolated confinement.

Productive activities serve as a basis for testing the reality of imagined thoughts, for maintaining a sense of one's worth or self-esteem, and for testing the wisdom of acting out inner impulses, and they provide a necessary outlet for physical and psychological energy. Where productive activities are severely restricted, the resulting idleness multiplies the effects of social isolation.

Prisoners in segregation do what they can to cope. Many pace relentlessly. Those who can read books and write letters. But many prisoners are illiterate. Evidence is accruing that illiterate prisoners fare less well than others in isolated confinement. This makes sense; if one is alone in a cell nearly 24 hours per day and cannot even read the newspaper or write a letter, the sense of unreality and isolation grows. Prisoners prone to or suffering from mental illness have even more difficulty concentrating than do others, and many, on account of anxiety or hallucinations or obsessions or despair, find it impossible to read or write while restricted to a cell.

In the context of near-total isolation and idleness, psychiatric symptoms emerge in previously healthy prisoners. For example, a prisoner may feel

Exhibit 1
Page39

overwhelmed by a strange sense of anxiety.  The walls may seem to be moving in on him (it is impressive how many prisoners in isolated confinement independently report this experience).  He may begin to suffer from panic attacks wherein he cannot breathe and he thinks his heart is beating so fast he is going to die.  Almost all prisoners in segregation tell me that they have trouble focusing on any task, their memory is poor, they have trouble sleeping, they get very anxious, and they fear they will not be able to control their rage.  Other researchers report these symptoms in a large majority of prisoners in isolated confinement.[12]  The prisoner may find himself disobeying an order or inexplicably screaming at an officer, when really all he wants is for the officer to stop and interact with him a little longer than it takes for a food tray to be slid through the slot in his cell door.  Many prisoners in isolated confinement tell me it is extremely difficult for them to contain their mounting rage, and they fear losing their temper with an officer and being given a ticket that will result in a longer seg term.

Social psychologist Craig Haney has conducted research with a large number of prisoners in isolated confinement.  He randomly selected prisoners and found very high prevalence rates for a large list of emotional symptoms.  Over 80% of the prisoners reported massive anxiety.  Likewise, over 80% of the prisoners complained of headaches, troubled sleep, and lethargy.  Over half complained of nightmares, heart palpitations, violent fantasies, depression or

---

12 Haney, Craig, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency, 49,124,127, 2003.

Exhibit 1
Page40

despair, and fear of impending nervous breakdown.  Complaints of obsessive ruminations, confused thought processes, oversensitivity to stimuli (a strong startle reaction), irrational anger and social withdrawal were widespread.[13]

Psychiatrist Stuart Grassian examined prisoners during their stay in segregated, near-solitary confinement units and concluded that these units, like the sensory deprivation environments that were studied by psychologists in the 1960s, often induce psychosis, especially in prisoners who have histories of mental illness or a predisposition to psychiatric breakdown.[14]

I will not review all of the research literature here, but there has been a substantial amount of research into the harmful effects of isolated confinement, especially if the prisoner thus confined suffers from a serious mental illness or is vulnerable to mental illness.  In their amicus brief in <u>Wilkinson v. Austin</u>, leading mental health experts summarize the clinical and research literature about the effects of prolonged isolated confinement and conclude:  "No study of the effects of solitary or supermax-like confinement that lasted longer than 60 days failed to find evidence of negative psychological effects" (p. 4).

It has been my experience, from tours and well over a thousand clinical interviews with prisoners in isolated confinement units in ten states, that the conditions that cause emotional distress in relatively healthy prisoners cause psychotic breakdowns, severe affective disorders and suicide crises in prisoners

---

13 Haney, Craig, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency, 49,124,127, 2003.

14.  Grassian, Stuart, "Psychopathological Effects of Solitary Confinement," American Journal of Psychiatry, 140, 11, 1450-1454, 1983.

Exhibit 1
Page41

who have histories of serious mental illness, as well as in a certain number of prisoners who never suffered a breakdown in the past but are prone to break down when the stress and trauma become exceptionally severe. When an average individual who is placed in isolated confinement develops massive free-floating anxiety, hyper-responsiveness, paranoid ideas, confusion, perceptual distortions, motor excitement and so forth, and becomes frightened he will not be able to control his aggressive fantasies, just imagine how difficult it would be for someone who is prone to paranoid psychosis or suicidal despair to remain balanced. Dr. Grassian's last reported psychiatric symptom, the rapid reduction of symptoms upon termination of isolation, may or may not occur – in my clinical experience, once an individual crosses a line into psychosis or depressive despair, it is very possible that removal from the harsh conditions of isolated confinement will not be sufficient to bring him back to a normal mental state.

Obviously, placing a prisoner with a mental illness in a segregation cell has very negative effects on his mental health. Yet, when prisoners with mental illness are miss-diagnosed, inappropriately un-diagnosed, inadequately treated and relegated to general population in an overcrowded and otherwise harsh environment such as MCJ, they are quite likely to run afoul of the disciplinary system and wind up in segregation. This pattern is reflected clearly in many of the declarations I reviewed and the stories of prisoners I interviewed.

**VIII. Abuse on the Part of Custody Staff is a Big Problem**

Exhibit 1
Page42

It is always difficult to prove that custodial abuse has occurred, since it so often becomes a matter of "his word against his word," and custody staff very rarely testify against each other. But at the Los Angeles County Jail the claims by prisoners are so widespread, and the reports of abuse so consistent among multiple reporters, that it seems very likely there is an unacceptably high incidence of custodial abuse. Multiple prisoners have told me about abuse they have undergone or witnessed, and most say it is disproportionately directed at prisoners with serious mental illness. Of course, to the extent this problem exists, it is made worse by inappropriate un-diagnosing and consignment of prisoners suffering from serious mental illness to general population housing. Of course, to the extent there is abuse by custody staff, mental health staff suffer consequences. First, they know about the abuse and feel in a bind about reporting. Then, the abuse worsens the condition of their patients.

I will present one example of several I could cite from my interviews.

> Prisoner 0.7. This 47 year old man has been in jail since February, 2007, he reports it is his first jail term. Although the diagnoses in this man's chart include malingering, he relates a long history of psychiatric treatment, beginning with a suicide attempt at age 18 which led to his placement in Louisiana state hospital, he has been in and out of state psychiatric hospitals, and he was for 20 years on SSI for psychiatric disability in the community. He evidences tremors of the arm and tongue, possible signs of tardive dyskinesia. He says he is not taking psychiatric medications now, and has not been prescribed psychiatric medications since being booked, but he had been on at least two different anti-psychotic agents prior to his arrest. His symptoms include severe insomnia, crying inappropriately, anxiety, agitation, and obsessive thoughts. On mental status examination he is very depressed, cries uncontrollably and exhibits impressive psychomotor retardation and a sense of hopelessness - clear signs of Major Depressive Disorder. The bruises on

Exhibit 1
Page43

his face are prominent and one wonders about recent beatings. He is very vulnerable to and fearful of deputy abuse and seems unable, on account of psychiatric disability, to function in a regular custody environment. However, he does NOT want to go to the 7th floor mental health program because he has had some bad experiences with custody staff there. (He reports that he was beaten in TT1, and Internal Affairs investigated.) He needs more intensive mental health intervention than he currently receives.

According to this man's 7/3/07) declaration: "I asked for psych medications but I did not get them... I was moved to Wayside for a couple of months. I saw a mental health person there and again asked for meds. I need the psych meds for depression and suicide. I still did not get any medication even though I asked for it at sick call.... Since I've been at MCJ I have gone to suicide watch in the Twin Towers two times. When I'm there they take away my clothes, took away my mattress,... I usually stay there about one week. I have been on psych meds since my mid-20's. In about 2000, I was in Atascadero for about a year and a half.... Every day at sick call I ask the staff for medication but I still don't get any... Since I don't have my meds I can't sleep and I am really depressed." A 7/14/07 Log Sheet Report verifies that this man tried to hang himself with a jail-issued t-shirt. According to ACLU notes, he has never received psychiatric medications since being arrested.

In this man's chart the diagnosis is "malingering," he is not given medication, but there are notes reflecting the possibility of mental retardation. While many prisoners with serious mental illness are retained in mental health housing and receive adequate treatment, many others, including Prisoner 0.7, are "de-classed" and left to the crowded conditions, where they get into trouble and are at disproportionate risk of disciplinary confinement. I am fairly certain this man has been beaten by custody staff.

Following my May 8/May9 tour of the jail I reported my concerns about six prisoners, Prisoners 0.3, 0.7, 0.9, 0.13, 0.14 and 0.18 to ACLU attorneys. Ms. Mary Tiedeman of the ACLU sent a Memo to Dr. Kidwell on

Exhibit 1
Page44

May 13, 2008, reporting my concerns about these 6 prisoners.  I have discussed Prisoners 0.3, 0.7, 0.13 and 0.14 in this Report.  For the sake of completeness, I will quote from that Memo about the additional two prisoners:

> "Prisoner # 0.9 suffers from a combination of functional mental illness, developmental disability and possibly organic brain disorder.  His behavior is regressed and inappropriate.  He is intermittently prone to self-harm.  In his chart, the diagnoses ASPD and malingering are listed, but they do not adequately reflect the severity of his psychiatric disability.  He cannot program in general population on account of psychiatric disability, he needs to be in a mental health program and not in isolated confinement.

> "Prisoner # 0.18 has a history of very serious early traumas.  He has an extensive history of self-harm.  Diagnoses in his chart range from Psychosis NOS and Mood Disorder NOS to "Cluster B."  He wants to talk to someone about his severe anxiety and emotional turmoil, he poses a significant risk of self-harm, and he needs more intensive mental health treatment than he currently receives.  At present, he is locked in his cell 22 hours per day in Tower 2.  He needs to be moved back to mental health housing where he can have greater access to programming.  Pain related to a neuropathy is not adequately treated.

## X. Summary:  Crowding and Inadequate Mental Health Care, a Toxic Combination

Serious mental illnesses such as Schizophrenia or Bipolar Disorder typically exhibit a waxing and waning course over a lifetime that includes periodic acute episodes alternating with periods of relative stability when the individuals comply with treatment, including the proper medication regimen.  Research shows that the longer an individual's acute psychotic or depressive episode is left untreated, the worse his prognosis.  Research also shows that early detection of serious mental illness, removal of the individual suffering from mental illness from the noxious and traumatizing

Exhibit 1
Page45

environment, and intensive comprehensive treatment greatly improve prognoses. Mental health clinicians in the community work hard to detect serious mental illness early and provide people vulnerable to serious mental illness a sheltered and therapeutic environment, and the standards in correctional mental health require the same commitment.  Clinicians are required to try their best to provide intensive treatment, including but not limited to medications, and to protect the individual from repeated traumas – all this in the hope of improving his or her condition and prognosis. Conversely, and tragically, if the individual is left untreated or inadequately treated in a situation that is extremely stressful and traumatic, the psychosis or depression worsens and the prognosis becomes more grave.

While mental health services at Los Angeles County Jail have improved in recent years in many regards, there are large gaps in services, the jail has become massively overcrowded, and there is disturbing evidence of custodial abuse of prisoners with serious mental illness.  A major problem is the large number of prisoners entering the jail who suffer from serious mental disorders and the relative shortage in mental health treatment resources.  The large census in the facility, and resultant crowding and idleness at every level, further exacerbate the problems.  A very frequent occurrence is the discharge of prisoners with serious mental illness from the mental health housing units in the Twin Towers and their transfer to general population, disciplinary housing or administrative segregation at Central Men's Jail or elsewhere, where there is severe crowding, almost no mental health treatment aside from psychotropic medications, very little out-of-cell time and almost no programming, and in too many cases victimization by other prisoners and/or significant abuse at the hands of custody staff.

Exhibit 1
Page46

It is very difficult for prisoners in non-mental health housing to get mental health treatment, and the treatment that exists is limited almost exclusively to medications. Then, in the absence of needed mental health treatment, a disproportionate number in this population find their way into disciplinary housing, where the enhanced isolation and idleness lead to even more exacerbation of their psychiatric disorder and disability. The JMET team attempts to identify psychiatrically impaired prisoners outside the mental health housing units, but their rounds are not adequate to the overwhelming task, prisoners report great difficulty attaining their services, and they provide very little ongoing mental health treatment. There are many reports of abuse by custody staff, and independent reports from many prisoners that the abuse is disproportionately directed at prisoners suffering from mental illness.

## XI. Recommendations for Remedy

1. Significantly decrease the population of Los Angeles County Jail. Massive crowding in the jail makes it extremely difficult for mental health staff to diagnose and treat all prisoners in need of their services, it makes the conditions extremely noxious for anyone suffering from mental illness who is not in mental health housing, and it increases violence, suicides and psychiatric breakdowns. This is a huge issue, and requires thoughtful planning vis a vis remedy. Diversion and early release to treatment programs would help a lot. For prisoners with serious mental illness, diversion as an alternative to jail time makes a lot of sense, and the individuals can be diverted to mental health treatment settings in the community. The Sheriff also has the authority to release other prisoners in order to improve the crowding, and he should do so because

Exhibit 1
Page47

the reduction of crowding in general (i.e. involving early release of prisoners who do not necessarily suffer from mental illness) would have the effect of making conditions in the jail much more endurable for the remaining prisoners suffering from mental illness. Other interventions are needed, but fall beyond the scope of this report.

2. The dreadful idleness and lack of programming must be addressed. Prisoners need to be involved in programs and spend a significant amount of their day-time hours out of their cells, in day rooms, in the cafeteria, etc.

3. Attend to other harsh conditions discussed in this report, including lighting, a lack of desks and chairs in cells and dormitories, a relative lack of direct supervision, and noise levels. Open day rooms and cafeterias for use by all prisoners except those in segregation. Provide mandated recreation opportunities.

4. Remove prisoners with mental illness from overcrowded, toxic settings. Create more housing dedicated to providing treatment and safety to prisoners with serious mental illness. An outpatient service for prisoners who do not meet criteria for mental health housing is acceptable, but placing this group of prisoners in harms way in overcrowded, unsafe conditions such as those that prevail in general population at MCJ today is entirely unacceptable. When the crowding, idleness and other harmful conditions are ameliorated, outpatient mental health services can be located in MCJ - but careful thought needs to be given to the possibility of separating housing for prisoners on the mental health caseload from those who are not on caseload. In other words, even in less toxic conditions, stop mixing populations, i.e. those with mental illness and those who suffer from no significant mental illness.

Exhibit 1
Page48

5.  Exclude prisoners with serious mental illness from administrative segregation and disciplinary housing, where the isolation and idleness predictably exacerbate their psychiatric disorder and disability.  They need to be in mental health housing.

6. Mental Health services need to be expanded greatly, especially in non-mental health housing areas.  To effect a remedy of the inadequacies in mental health services, the following things must be done, at a minimum:

   a. Halt the inappropriate down-grading of diagnoses

   b. Give serious consideration to pre-existing psychiatric histories and current court psychiatric assessments

   c. Make mental health treatment accessible to prisoners in all areas of the jail

   d. Provide consistent follow-up to Crisis Intervention and stays in TT1 with ongoing mental health treatment wherever the prisoner is transferred

   e. Improve JMET interventions.  There needs to be more comprehensive outpatient mental health services in general population, administrative segregation and disciplinary housing units, including private, confidential psychotherapy, both individual and group, as appropriate, and psychiatric rehabilitation modalities must be made available to all prisoners with mental illness, whether or not they reside in mental health housing.  Either the number of mental health clinicians on the JMET teams must be

Exhibit 1
Page49

expanded accordingly, or a new organization of outpatient mental health services must be devised.

f. Halt cell-front interviews except for very brief contacts during rounds. If a prisoner is in need of an extended visit with a mental health clinician, that prisoner must be removed from his cell and taken to a private office where a confidential contact can occur.

g. Provide a range of mental health services at North County Jail so that prisoners with mental illness can be treated there and at the same time take part in programs that are only available there.

h. Provide sufficient staff and the right setting to permit meaningful therapeutic relationships between mental health clinicians and prisoner/patients. The quality of the relationship is what makes mental health treatment effective. There is no substitute for taking time to talk to patients about their problems, and this is true in all settings, from the intensity of suicide observation and 5150 status to the outpatient treatment of a prisoner in general population.

i. The bottom line is more services, meaning more staffing. This might seem a large expense in these times of budget constraints, but services offered in the jail would diminish the need for services elsewhere

7. Provide more substance abuse treatment in groups in mental health housing as well as general population, administrative segregation and disciplinary housing

Exhibit 1
Page50

8. Provide more comprehensive post-release planning, including housing, medication (currently medications are not provided), arranging disability and other benefits, and social services.  This requires contact between prisoners and service providers in the community while the prisoners are still in the jail.  This approach is already being enacted in the regional mental health housing units at Twin Towers 1, but needs to be expanded to include all necessary services for all prisoners with mental illness.  Costs would be minimal compared to savings in terms of re-admissions to the jail

9.  Training of staff must be enhanced.  All officers, not only those working in TT1, must be required to undergo intensive training in working with prisoners with mental illness.  Training in gender sensitivity, multicultural sensitivity, and so forth should be included in the package.

10.  Take all effective steps to halt custodial abuse.  The remedy includes zero tolerance from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff.  Staff members must be required to report abuse by other staff members, and must be disciplined if they fail to do so.  This includes mental health staff, who must be required to report custodial abuse and must be protected from retaliation when they do so.  The reporting procedure must be entirely confidential and protection from retaliation must be guaranteed.  Use of a neutral ombudsman for this purpose, rather than relying on

Exhibit 1
Page51

Sheriff's deputies in an internal investigatory role, might prove useful.  This should all be part of a "zero tolerance" edict on the part of jail administration.

11. In terms of future planning, prioritize constructing more mental health beds/cells, not high security and disciplinary housing beds.

12.  More robust monitoring is needed.  Both the DOJ and the ACLU have been involved in monitoring the Los Angeles County Jail for many years, yet deficiencies and abuses continue.  A court-appointed monitor or Master should be appointed, and collaborate closely with the Court while monitoring the conditions and mental health services at the Los Angeles County Jail.


Respectfully submitted,


Terry A. Kupers, M.D., M.S.P.

Exhibit 1
Page52