MARK D. ROSENBAUM, SBN 59940
mrosenbaum@aclu-sc.org
PETER ELIASBERG, SBN 189110
peliasberg@aclu-sc.org,
MELINDA BIRD, SBN 102236
mbird@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN
   CALIFORNIA
1313 W. 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500, x219
Facsimile: (213) 977-5297

MARGARET WINTER
ACLU NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6605
Facsimile: (202) 393-4931
E-mail: mwinter@npp-aclu.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, et al, | ) Case No. Civ. 75-04111-DDP |
| Plaintiffs, | ) |
| vs. | ) **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO RE-OPEN DISCOVERY.** |
| LEROY BACA, as Sheriff of the County of Los Angeles, MICHAEL D. ANTONOVICH, YVONNE B. BURKE, DON KNABE, GLORIA MOLINA, ZEV YAROSLAVSKY, as Supervisors of the County of Los Angeles, et al., | ) Honorable Dean Pregerson <br> ) Date: July 6, 2009 <br> ) Time: 10:00 a.m. <br> ) Dept: 3 |
| Defendants. | ) |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND TO THE PRESENT MOTION .............................................2

    A. ACLU'S Role as Class Counsel.................................................................2

    B. Recent Evidence Regarding Treatment of People with Mental Illness in the Jail and   Report by Dr. Terry Kupers and Defendants' Response. .................2

    C. Defendant's Response to Kuper's Report and Other Complaints re: Jail Conditions......................................................................................................3

    D. Sheriff's Denial of Access to Documents and Data Needed for Ongoing Monitoring of Overcrowding and the Treatment of Detainees and Prisoners, Especially Those with Mental Illness............................................................5

III. PLAINTIFFS ARE ENTITLED TO DISCOVERY IN FURTHERANCE OF THEIR EFFORTS TO MONITOR CONDITIONS IN THE JAIL AND ENFORCE DEFENDANTS' COMPLIANCE WITH COURT ORDERS AND CONSTITUTIONAL MINIMUMS. ...................................................................6

CONCLUSION........................................................................................................9

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO RE-OPEN DISCOVERY

## I. INTRODUCTION

Plaintiffs seek to re-open discovery in this case because the ACLU cannot carry out its monitoring obligations to members of the class without access to basic information regarding jail operations and conditions of confinement. A major obstacle to meaningful progress in this case has been the defendants' refusal over the past three years to disclose the most basic documents regarding jail operations, procedures and other information essential to both effective monitoring and a cooperative effort to analyze the problems in the Los Angeles County Jail system ("Jail") and craft meaningful remedies. In pleadings and argument to this Court, defendants have claimed to be an open book, but as plaintiffs discuss in greater detail below, the reality is far different.

Although plaintiffs have tried to work around defendants' refusal to provide essential information regarding jail conditions, timely resolution of this dispute is critical. Conditions in the jail have not improved in any significant regard in the past three years. The Los Angeles Sheriffs' Department ("LASD") has not moved forward on plans to repair or replace Men's Central Jail, which was the subject of this Court's attention in 2006. Class members continue to file thousands of complaints about conditions that, if true, violate basic constitutional minimums. The parties have continued to meet regularly, but defendants dispute the bulk of these allegations, or alternatively, claim that they are powerless to affect a remedy.

With the facts in serious dispute, the parties are at an impasse. Since voluntary, cooperative efforts have failed, plaintiffs have no choice but to seek to reopen discovery to permit them to carry out their monitoring duties, verify the extent of the systemic problems at the Jail, and enable the parties or the Court to fashion further relief if this proves necessary.

/ / / /

1

## II. BACKGROUND TO THE PRESENT MOTION.

### A. ACLU's Role as Class Counsel.

The ACLU of Southern California ("ACLU-SC"), counsel for the certified class in this case, monitors conditions at in the Los Angeles County jails pursuant to a series of court-approved agreements with defendants. Under one such agreement, the County provides plaintiffs' counsel access to the Jail, and "upon request, relevant non-privileged data as to population, staff, violence, etc., so that relevant statistical information can be prepared and analyzed by both parties." *Rutherford v. Block,* Memorandum of Understanding; Court Approval Thereof, filed November 13, 1985, ¶ 4, page 5, lines 5-8, submitted as Exhibit 1 to Declaration of Melinda Bird ("Bird Decl."). This Order also authorized plaintiffs to employ experts to "provide an independent appraisal of conditions at the Central Jail," including mental health experts. *Id.,* ¶ 6, page 5, lines 22-24.

Since the Court-facilitated settlement meetings between the parties in 2006 and early 2007, plaintiffs have continued to meet regularly with the Sheriff's staff to discuss a range of pressing systemic problems, especially regarding conditions at Men's Central Jail ("MCJ"). However, efforts to renovate or close MCJ have been stalled for more than a year. Although the ACLU is often able to assist individual detainees through its monitoring and advocacy, underlying conditions in the Jail remain unchanged. Declarations of Mary Tiedeman, ¶2; Melinda Bird, ¶5, submitted concurrently in support of this motion.

### B. Recent Evidence Regarding Treatment of People with Mental Illness in the Jail and Report by Dr. Terry Kupers and Defendants' Response.

During its weekly monitoring tours, especially at MCJ, the ACLU-SC frequently encounters prisoners exhibiting symptoms of serious mental illness who appear to be receiving no treatment or wholly inadequate treatment.[1] Tiedeman

---

[1] Sheriff Baca himself has repeatedly described the jail as the largest mental health facility in the nation. Bird Decl., Exhibits 5 and 6.

Decl., ¶ 4. These problems were so pressing that in May 2008, plaintiffs retained Dr. Terry Kupers, a nationally recognized expert in mental illness and mental health treatment in prisons and jails, who toured the Jail, interviewed class members and prepared a report and recommendations. Report of Dr. Terry Kupers, dated June 27, 2008, Exhibit 1 to Declaration of Margaret Winters.

Dr. Kupers found an extremely high incidence of serious mental illness in MCJ: he estimated that some twenty-four per cent of the men in MCJ have serious mental illness, although only half that number receives any treatment. *See* Kupers Report at 5-6. He found that, due to the relative shortage in mental health treatment resources, defendants engage in a pattern of inappropriately down-grading diagnoses of mental illness, removing individuals with serious mental illness from mental health housing and treatment programs, and discharging them to general population, where they face severe overcrowding, almost no mental health treatment, very little out-of-cell time "and in too many cases victimization by other prisoners and/or significant abuse at the hands of custody staff." Kupers Report at 23-33, 44.

Dr. Kupers also found that once in general population, many seriously mentally ill prisoners and detainees end up in disciplinary segregation, where the extra harsh conditions and isolation predictably exacerbates their psychiatric disorders and suicidality. Kupers Report at 33- 40. He found evidence that it is "very likely" that there is an unacceptably high incidence of custodial abuse at MCJ, disproportionately directed against the seriously mentally ill prisoners. Kupers Report at 40-43. He concluded that the overcrowding in the Jail is so grossly excessive, the other conditions of confinement in the Jail so harsh, and the denial of basic mental health care so extreme, as to create a toxic environment likely to cause psychiatric breakdown even in individuals who do not have previous symptoms of mental illness. Kupers Report at 16.

### C. **Defendant's Response to Kupers' Report and Other Complaints re: Jail Conditions.**

Dr. Kupers' primary recommendation to remedy the grossly inappropriate and harmful treatment of the mentally ill prisoners at the County Jail was to

"significantly decrease the population of Los Angeles County Jail," since

> [M]assive crowding in the jail makes it extremely difficult for mental health staff to diagnose and treat all prisoners in need of their services, it makes the conditions severely noxious for anyone suffering from mental illness who is not in mental health housing, and it increases violence, suicides and psychiatric breakdowns. This is a huge issue, and requires thoughtful planning *vis a vis* remedy.

Kupers Report at 45. Dr. Kupers suggested that diversion and early release to treatment programs would go far to resolve the problem, and proposed a number of other urgently-needed remedial measures. *Id.* at 45-50.

Plaintiffs have had repeated discussions with defendants, urging them to implement Dr. Kupers' recommendations. Bird Decl., ¶¶ 19-20. Defendants dispute his findings, claiming that monitors from the U.S. Department of Justice give the jail a clean bill of health for its treatment of mentally ill detainees, but refusing to produce these reports even under seal. *Id.*

Meanwhile, however, the ACLU's ongoing monitoring shows that there has been no meaningful improvement in conditions in MCJ since Dr. Kupers' report. Detainees, especially those with pre-existing mental illness, continue to suffer significant harm from the toxic conditions and the grossly inadequate mental health care at MCJ.[2] *See* Tiedeman Dec., ¶¶ 4-6. Despite the 1200 bed reduction in the population at MCJ on 2006, most detainees are still locked in their windowless cells for 22 to 23 hours per day, or crowded cattle-style in dorms with hundreds of other prisoners. The five thousand class members who remain confined in MCJ continue to file complaints with the ACLU-SC regarding fundamental violations of their rights, including:

- the denial of needed medication, medical and mental health care, and discharge planning when they leave the jail;

4

- the denial of access to showers, clean clothing, telephones and outdoor recreation;
- excessive and punitive discipline in small, dark, solitary cells;
- broken toilets, rats, and filthy, unsanitary conditions;
- an atmosphere of pervasive violence and abuse from deputies and other inmates.

Plaintiffs have raised these issues with defendants in regular meetings and communications. *See, e.g.,* Exhibit 4 to Bird Decl. (Letter to Sheriff Baca, July 24, 2008). Although the parties have resolved some individual complaints, there has been no systemic change in the underlying conditions. The parties have been unable to reach agreement regarding either the extent of the problems at MCJ or the necessary remedial measures.

### D. Sheriff's Denial of Access to Documents and Data Needed for Ongoing Monitoring of Overcrowding and the Treatment of Detainees and Prisoners, Especially Those with Mental Illness.

Plaintiffs have asked defendants to produce a variety of documents and other information relevant to determining the nature and scope of the problems affecting all detainees and prisoners, especially those with mental illness. These documents are essential for the parties to work together cooperatively to develop a meaningful remedy. Yet defendants have refused to produce these materials. *See* Bird Decl., ¶¶ 7-15 (requests during 2006-2007), ¶ 16, ¶¶ 22-28 (requests during 2008), ¶¶ 30-31 (requests during 2009). The documents they refuse to produce include such basic materials as the following:

- the custody manual governing all jail procedures and the implementing unit orders specific to each jail facility;

---

[2] Indeed, in March 2009, a twenty-two year old detainee in MCJ committed suicide after prolonged detention in solitary confinement in a discipline module. Declaration of Margaret Winter, ¶¶ 5-8.

- reports on the discipline of detainees and placement in solitary confinement, especially as to those detainees with a history of mental illness;
- reports on the extent that detainees are offered out-of-cell time, since this also has a disproportionate impact on inmates with mental illness;
- reports regarding use of force in overcrowded areas of the jail;
- reports validating the inmate classification system and evaluating the adequacy of deputy staffing levels;
- reports on the status of mental health care in the jail;
- complaints from class members regarding jail conditions and the resolution by the Sheriff's Department.

*Id.*

Defendants' position is that (1) plaintiffs do not need these documents because they already have broad access to the Jail facilities and because defendants voluntarily comply with many of plaintiffs' requests for documents; and (2) plaintiffs are not entitled to any formal discovery because the case is in its post-judgment phase. Bird Decl., ¶¶ 7, 10.

It is quite true that defendants provide the ACLU with physical access to jail facilities and provide some categories of documents as part of their monitoring. Unfortunately, the categories of documents defendants refuse to disclose – such as policies and procedures and unit orders -- are the very documents crucial to analyzing the root causes of systemic problems and developing systemic solutions. Tiedeman Decl., ¶¶ 7 – 10. Defendants' second contention – that plaintiffs are not entitled to any formal discovery is addressed in Point III, below.

### III. PLAINTIFFS ARE ENTITLED TO DISCOVERY IN FURTHERANCE OF THEIR EFFORTS TO MONITOR CONDITIONS IN THE JAIL AND ENFORCE DEFENDANTS' COMPLIANCE WITH COURT ORDERS AND CONSTITUTIONAL MINIMUMS.

The issue before the Court is whether plaintiffs are entitled to any discovery whatsoever. Defendants have taken the position that plaintiffs should be granted no

post-judgment discovery. Plaintiffs ask the Court to decide the threshold question of their right to discovery, and believe that the parties can subsequently negotiate a discovery schedule, returning to the Court for guidance in specific disputed areas only if agreement cannot be reached.

Federal Rule of Civil Procedure 26(b) provides, "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." In the Ninth Circuit, defendants have a heavy burden to show why discovery should be denied. *See, e.g., Blankenship v. Hearst Corporation*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied."); *see also Hogan v. Robinson*, 2006 WL 1049979 (E.D. Cal. 2006) ("The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections," *quoting Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D.Cal. 1998)).

Plaintiffs seek discovery regarding current conditions and procedures within the jail in order to carry out their legitimate monitoring duties and to confirm whether the existing remedies adequately safeguard the constitutional rights of the plaintiff class. Nothing in the Federal Rules limits discovery to a pre-judgment phase of a case, and the courts have not interpreted Rule 26 to restrict discovery to pre-trial proceedings. Discovery is routinely available in post-judgment cases where the remedy is not yet final and litigation is ongoing. *See Palmer v. Rice*, 231 F.R.D. 21, 26 (D.D.C. 2005) (granting discovery nine years after approval of consent decree and fifteen years after decision in case; under Fed. R. Civ. P. 26, "plaintiffs are entitled to the requested discovery because it is relevant to plaintiffs' original complaint and their claims of discrimination [after the consent decree]."); *Rolland v. Cellucci*, 151 F.Supp.2d 145, 157-58 (D. Mass. 2001) (plaintiffs' post-judgment discovery was appropriate, and provided an appropriate background to the court's

1  consideration of motion for post-judgment relief).

2  Similarly, in prison conditions litigation in which defendants have moved to
3  terminate a consent decree or injunction pursuant to the Prison Litigation Reform
4  Act, courts routinely hold that plaintiffs are entitled to discovery and evidentiary
5  hearings. *See Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000) (reversing district
6  court's refusal to grant an evidentiary hearing on current conditions at prison on
7  defendants' motion for termination of a long-standing prison consent decree); *Loyd
8  v. Alabama Dept. of Corrections*, 176 F.3d 1336, 1342 (11th Cir. 1999) (abuse of
9  discretion for district court to refuse to conduct evidentiary hearing concerning
10 current conditions at prison and scope of prospective relief to be terminated); *Gates
11 v. Gomez*, 60 F.3d 925, 932 (9th Cir. 1995) (post-judgment litigation and findings by
12 the Court on disputed issues subsequent to evidentiary hearing and expert
13 testimony); *Ginest v. Bd. of County Comm'rs of Carbon County, Wyoming*, 295
14 F.Supp.2d 1274, 1277 (D. Wyoming 2004) (granted discovery); *Ruiz v. Johnson*, 37
15 F. Supp. 2d 855 (S.D. Tex. 1999) (holding that plaintiffs were entitled to further
16 discovery despite defendants' position that litigation was years old and plaintiffs
17 were entitled to no further discovery); *and see* Winter Decl., ¶¶ 9-12 (describing
18 post-judgment discovery in *Graves v Arpaio*, a jail conditions case in Arizona).

19 Post-judgment discovery is so routine in cases involving ongoing prospective
20 relief or disputes regarding implementation of a settlement agreement, that it is often
21 noted without comment or further discussion in the reported decisions. *See, e.g.,*
22 S*harp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *Rodriguez v. IBP,* 243 F.3d
23 1221, 1230 (10th Cir. 2001); *In Re Intel Securities Litigation,* 596 F.Supp. 226, 228
24 (N.D. Cal., 1984); *U.S. v. Scharringhausen*, 226 F.R.D. 406, 407 (S.D. Cal. 2005).
25 *See also,* Bird Decl., ¶ 29 (discovery conducted 8 years after entry of judgment in
26 *Emily Q. v Bonta,* CV 98-4181 AHM (AJWx), pending before the Honorable A.
27 Howard Matz in the Central District).
   / / / / /
28

**CONCLUSION**

The Court need not at this time reach the issue of whether any particular material that plaintiffs may seek is discoverable: plaintiffs' sole request to the Court at this time is to decide the threshold issue of their right to discovery during this post-judgment remedial phase of the case.  The parties can then negotiate a discovery schedule, returning to the Court for assistance only if they cannot reach an agreement in a specific disputed area.

Based on the foregoing, the plaintiffs request that the Court issue an order granting plaintiffs' request to re-open discovery.

DATED: June 15, 2009          Respectfully submitted,

ACLU National Prison Project
ACLU Foundation of Southern California

By: *Melinda Bird*

Melinda Bird
Attorney for Plaintiffs