MARK D. ROSENBAUM, SBN 59940
PETER ELIASBERG, SBN 189110
MELINDA BIRD, SBN 102236
ACLU Foundation of Southern California
1313 W. 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500, x219
Facsimile: (213) 977-5297
E-mail: mbird@aclu-sc.org

MARGARET WINTER
ACLU NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6605
Facsimile: (202) 393-4931
E-mail: mwinter@npp-aclu.org
*Not admitted in D.C.; practice limited to federal courts

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, et al,<br><br>Plaintiffs,<br><br>vs.<br><br>LEROY BACA, as Sheriff of the County of Los Angeles, MICHAEL D. ANTONOVICH, YVONNE B. BURKE, DON KNABE, GLORIA MOLINA, ZEV YAROSLAVSKY, as Supervisors of the County of Los Angeles, et al.,<br><br>Defendants. | Case No. Civ. 75-04111-DDP<br><br>**DECLARATION OF MARY TIEDEMAN IN SUPPORT OF PLAINTIFFS' MOTION TO REOPEN DISCOVERY**<br><br>Honorable Dean Pregerson<br><br>Date: July 6, 2009<br>Time: 10:00 a.m.<br>Dept: 3 |

# DECLARATION OF MARY TIEDEMAN

I, MARY TIEDEMAN, declare and affirm and would so testify from first hand knowledge if called as a witness:

1. I am Jails Project Coordinator for the ACLU Foundation of Southern California. My responsibilities include monitoring compliance with orders and directives relating to the *Rutherford v. Baca* case.

2. As Jails Project Coordinator, I oversee the Jails Project complaint processing, supervising anywhere from four to six interns at one time. Todd Weddle, another ACLU employee, the interns and I process approximately 4,500 complaints annually from County jail detainees, their families and advocates. We tour the L.A. county jails several times per week and I meet regularly with the staff of the Los Angeles Sheriff's Department ("LASD"), both at our monthly meetings and in smaller meetings on a routine basis. Additionally, I send LASD staff scores of emails every month to alert them to urgent problems, especially systemic issues, and to request immediate assistance for certain detainees when I conclude that the regular complaint process will be too slow. In the last year, these issues have covered problems relating to overcrowding, recreation, medical and mental health care services, the inmate complaint process, deputy misconduct, and disciplinary problems. Through this process, we have sometimes been able to gain improved conditions and services for certain individual cases, but I routinely document the same problems week after week, without any solution to the systemic problems.

3. The facility we receive the most complaints from is Men's Central Jail ("MCJ"). I regularly receive complaints from MCJ regarding the denial of needed medication and access to medical and mental health care; the denial of access to regular showers, linen exchange, telephones and outdoor recreation; excessive and retaliatory discipline; and an atmosphere of violence and abuse from deputies and

Declaration of Mary Tiedeman

other inmates. The inmates, family members, and advocates regularly complain about the lack of services and planning when people are released from the jail, which is often in the middle of the night. I also regularly observe overflowing toilets, generally unsanitary conditions and I have seen dead rats in the cells where inmates sleep.

4. During my weekly monitoring tours, I frequently encounter prisoners exhibiting symptoms of serious mental illness who appear to be receiving no treatment or wholly inadequate treatment. These problems are endemic of the entire jails system, but are most pronounced at MCJ. When I inquire about these inmates, I routinely discover that the jail has declassified these individuals, meaning their medications were abruptly stopped or they was transferred out of mental health housing units at the Twin Towers facility to MCJ. Subsequently, these inmates sometimes engage in psychotic behavior, but often they are just too disoriented and mentally ill to respond to deputies, so they are charged with insubordination and punished by transfer to solitary confinement in discipline cells. The discipline cells are completely windowless and dingy; the air is stagnant and stale; the conditions are filthy, often with a layer of grime and dust lining the floors. Almost every time I go to a segregation area, I find people in cells who report a long history of mental illness and who are rapidly deteriorating in that setting. I have repeatedly asked for information and reports regarding the numbers of people who are declassified from mental health housing into segregation but these requests have been ignored or denied.

5. I encountered an example of this a couple of weeks ago. A family member of an inmate contacted me and reported that the inmate had been in mental health housing for months before he was abruptly declassified to MCJ. When I contacted the jail mental health staff, he was in solitary confinement, without phone or visiting access to his family, no out of cell time and could not see the light of day. The jail mental health staff reported that the inmate continued to receive his medications and

that someone from the jail mental health evaluation team ("JMET") saw him a couple of times. It is my experience, however, that the JMET teams conduct the vast majority of their follow up with inmates in non-confidential interviews, usually at cell front. After our complaints, mental health did move this inmate back to mental health housing so our advocacy was effective. However, this individual inmate is unique in that he had a family advocate that could alert us as to his condition. There are many more just like him with no one able to alert us as to his or her conditions. Without access to information about when and how often this happens, I cannot appropriately monitor this problem.

6. I have reviewed the report prepared by Dr. Terry Kupers based on his interviews with detainees and prisoners in the jail in 2008. I had spoken to almost all of the people identified in his report and was personally familiar with their situations. Dr. Kupers' report accurately describes conditions in the jail in 2008. These conditions have not changed in any significant regard since his report. I conclude this based on my regular visits to the jail, talks with detainees and their families, discussions with jail mental health staff and review of detainee complaints. An example of this would be the non-confidential cell front interviews mentioned above, which continue to this day. In fact, one of the detainees Dr. Kupers interviewed in May 2008 has since returned to jail from the state mental hospital after being restored to competency. Despite our complaints, he is currently decompensating in general population without any access to mental health programming.

7. Todd Weddle and I visit county jail facilities every week but we are able to see only a fraction of the cells and housing areas. The Los Angeles County jail system is huge, with hundreds of modules, units and dormitories in seven facilities stretched across the entire county. We cannot effectively monitor conditions in the jails with tours and visits alone – we also need to see the reports, investigations and data surveys that the Sheriff's staff themselves prepare. I know that the Sheriff's staff

Declaration of Mary Tiedeman

prepares their own internal reports and investigations. Different Sheriff's staff members mention to me that these exist. For example, I know the Department conducts internal Title 15 audits, monitoring tours, and each facility Captain routinely reviews use of force packets.

8. During our monthly meetings, the Department has repeatedly told me that they surveyed inmates in response to our complaints regarding several problems, including unequal and excessive discipline. However, they will not give us any documents about what they find, whether they find these problems on an ongoing basis as well, or what kind of steps they are taking to remedy the problems.

9. It is hard for me to do my job without access to basic documents about the jail. From conversations I have had with Department personnel, I know LASD has orders dictating policies and procedures at all of the jail facilities in their custody manual. Despite repeated requests, we have never been permitted to see this manual. Over the years, I have occasionally been able to obtain a random policy here and there by asking someone in the Department with whom I have a positive working relationship or by repeatedly sending email requests for weeks at a time. I do not, however, have a whole, complete picture of all the policies dictating practice in the jails.

10. For example, we have received regular complaints from the inmates at Century Regional Detention Facility about being strip searched outside when they return from court. The women report having to wait partially clothed in freezing temperatures in plain view of male jail staff. I have requested a copy of the policy surrounding this procedure numerous times in order to better understand in which conditions the Department conducts outside strip searches and who has to approve them. However, the Department has completely ignored these repeated requests.

11. Another example of a document that I need for my monitoring is the housing plan for each facility. Inmates are housed by classification level by the Central

Declaration of Mary Tiedeman

Housing Unit. Facilities constantly change the locations in which different groups of inmates are housed. I know from my experience monitoring which groups of detainees are especially vulnerable or prone to abuse and I make a point to monitor them more closely. I have asked for a copy of the current housing plan for all of the jail facilities. However, the department refuses to provide me with this basic document whenever it is updated. Without a housing plan, it is just luck that I stumble on problems. For example, at MCJ, I just happened to tour a discipline row where detainees are denied basic privileges such as access to outdoor recreation, telephone calls and visiting. As I interviewed people, I discovered that half of the people in the row not been charged with a discipline infraction and were placed there because the jail did not have anywhere else to house them. However, the deputies were treating everyone on the row the same and were denying them visiting, recreation, and phone access. This problem continued for more than a month, despite my constant complaints. Without access to a housing plan, I have no way of knowing if the same problem is occurring in other facilities, even though I have not happened upon it. Having access to a housing plan would have enabled me to spot this problem at MCJ and any other facility and monitor it for more effectively than I am now.

I declare under penalty of perjury under the Laws of California that the foregoing is true and correct to the best of my knowledge and belief. Executed this 15th day of June, 2009 in Los Angeles, California.

*/s/ Mary Tiedeman*
Mary Tiedeman

Declaration of Mary Tiedeman