1  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
2  JUSTIN W. CLARK, State Bar No. 235477
   jclark@lbaclaw.com
3  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
4  Glendale, California 91210-1219
   Telephone No. (818) 545-1925
5  Facsimile No. (818) 545-1937

6  Attorneys for Defendants

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 DENNIS RUTHERFORD, et al.,        )  Case No. CV 75-04111 DDP
                                     )
12            Plaintiffs,            )  Honorable Dean D. Pregerson
                                     )
13                                   )  **DECLARATIONS OF SHERIFF**
                                     )  **LEROY BACA, DENNIS CONTE**
14    vs.                            )  **AND JUSTIN W. CLARK IN**
                                     )  **SUPPORT OF DEFENDANTS'**
15                                   )  **MOTION FOR ENFORCEMENT**
   SHERMAN BLOCK, et al.,            )  **OF 1989 ORDER;**
16                                   )
                                     )
17            Defendants.            )  [*Notice of Motion and Memorandum of*
                                     )  *Points and Authorities filed*
18 _____  )  *concurrently herewith*]

19

20

21

22

23

24

25

26

27

28

RUTHERFORD\Decl/Baca/Conte/Clark In Support of Mtn to Enforce 1989 Order

## DECLARATION OF SHERIFF LEROY D. BACA

I, Sheriff Leroy D. Baca, declare as follows:

1.      I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so.

2.      I am and since December 1998 have been the duly elected Sheriff of the County of Los Angeles and the head of the Los Angeles County Sheriff's Department ("LASD" or "Department"). I have been a member of the Department since August 1965.

### The Los Angeles County Sheriff's Department

3.      As this Court knows, the LASD is the largest sheriff's department in the nation, with over 18,000 budgeted sworn and professional staff. The LASD provides law enforcement services to 41 incorporated cities, 90 unincorporated communities, 9 community colleges, and hundreds of thousands of daily commuters of the Metropolitan Transit Authority and the Rapid Rail Transit District. Everyday, over 4 million people are directly within the jurisdiction of the Department.

4.      With respect to the judicial system, the LASD protects 58 Superior Courts and over 600 bench officers. The Department also manages the nation's largest local jail system, housing approximately 20,000 inmates each day. The Los Angeles County jail system is larger than the prison systems of at least 40 states.

### The History of the Department's Relationship with the ACLU

5.      I am informed and believe that the American Civil Liberties Union of Southern California ("ACLU") has filed a motion with this Court to modify a 1989 stipulation of the parties and order of this Court ("Order"). I strongly oppose the ACLU's request for the reasons set forth below, among others.

6.      The class action judgment for injunctive relief in this matter, entered in the 1970's, sets forth certain legal requirements in the custody environment. Some of these requirements were overturned by the Ninth Circuit Court of Appeals, and other portions of the judgment were thereafter overturned by the United States Supreme Court.

7.      Since entry of the judgment in this matter approximately 30 years ago, the Department has cooperated extensively with the ACLU in its efforts to monitor compliance with the judgment.  For example, the Department has allowed the ACLU almost unlimited access into all of its jail facilities, day or night, weekday or weekend.  The Department has also given the ACLU access to all of its jail staff, especially high ranking executives.  The Department has also given the ACLU access to documents and computer information.  The Department has also created office space in its custody operations facilities so that the ACLU can carry out its activities in the jails.  Importantly, at my instruction to my custody command staff and their subordinates, the Department has also extended the ACLU's vast access to the Department, its information, and its personnel far beyond the scope of the judgment in *Rutherford*, into almost every aspect of the custody environment.  Furthermore, for decades, the Department has agreed, without the need for court intervention, to compensate the ACLU every month so that it can carry out its activities.  The extensive working relationship that the Department and the ACLU have enjoyed has resulted in agreed upon changes in the custody environment without the need of costly and time consuming judicial intervention.

8.      As a result of my duties as Sheriff, as well as Director of Homeland Security-Mutual Aid for California Region I (which serves 13 million people), I am familiar with the custody operations of numerous other law enforcement agencies.  I know of no other law enforcement agency that has permitted a civil

rights organization access and cooperation similar to that which the Department has provided to the ACLU.

9.      The access and working relationship that the Department has fostered with the ACLU is consistent with and an extension of my management philosophy -- to incorporate innovative best practices using pro-active, progressive problem solving.  I firmly believe in a transparent agency, open to scrutiny from within and from the public.  As the leader of the Department, I am a strong proponent of civil rights and firmly believe that everyone's state and federal rights should be protected.  I have continued the Department's close working relationship with the ACLU because its presence in the jails can be an effective tool to obtain new ideas, different opinions, and an outside perspective on how the Department can improve its jail operations.  I believe that this relationship has also benefitted the ACLU, not just financially, but by giving it an opportunity to advocate on behalf of people and with respect to issues that it otherwise would not have encountered.

### Harm to the Department

10.      I strongly believe that if the Court were to grant the ACLU's Motion, then the longstanding cooperative working relationship enjoyed between the two organizations would be dramatically and forever changed.  The foundation of this relationship is trust.  On the one hand, the Department trusts that it can share information, favorable and unfavorable, with the ACLU in hopes of continually improving its jail system, and without the concern of it being used against the Department and its members in non-*Rutherford* litigation.  On the other hand, the ACLU trusts that it will be provided unprecedented access to a very large maximum security custody operation and timely, accurate information so that they can assist inmates regarding a variety of issues and improve the custody environment.

11.     The Department regularly asks its employees to deal directly with attorneys and legal representatives from the ACLU, without the employees having the benefit of counsel.  The Department's members readily participate in this dialogue because they know that the ACLU has not and will not bring suit against them.  Unlike typical civil suits against employees where the law imposes an obligation on the employer to indemnify the employee against the claim, in the custody environment, employees do not have a right to such indemnity.  *See*, Cal. Gov. Code § 844.6(d).  Moreover, many suits include claims for punitive damages, also which do not carry with them an obligation on the employer to indemnify the employee.  *See*, Cal. Gov. Code § 825(b).  Therefore, custody staff have a heightened concern against being named in civil actions.

12.     For the last two decades, the Department has continually relied upon the ACLU's agreement and this Court's Order.  The Department and the ACLU agreed that in exchange for unprecedented, virtually unlimited access to the Department, the ACLU would refrain from initiating new civil litigation against the Department with regard to its jail operations.  Of course, nothing in the parties' agreement and the resulting Order prevents or precludes the ACLU from discharging its legal responsibilities to its clients in *Rutherford*.  Similarly, nothing prevents any inmate in the Los Angeles County jail from bringing and fully litigating any grievances against the Department--which is their constitutional right--with counsel other than the ACLU.

13.     If this Court were to now change 20 years of precedent and permit the ACLU to use information that it obtained during monitoring activities in *Rutherford* as a basis for new litigation against the Department and its employees, then I would have to reevaluate whether to continue to require the Department's members to interact with the ACLU more than that which is required by law.  Also, in most circumstances, I would feel a need to afford Department members concurrent access to legal counsel to protect their and the Department's legal

rights.  I cannot and will not allow attorneys from the ACLU to take unfair advantage of the Department or its members.

14.    Of course, regardless of the Court's ruling, I will continue to instruct my subordinates to allow the ACLU access to the jails to perform their legitimate *Rutherford* responsibilities, and the Department will comply with all outstanding orders of the Court.  However, I believe that a ruling herein adverse to the Department would require me to review whether the Department will continue its tradition of voluntarily accommodating and interacting with the ACLU about numerous non-*Rutherford* custody issues, as well as whether it is in the best interest of the Department to pursue legal recourse to narrow the pending *Rutherford* litigation and the scope of the monitoring opportunities the ACLU has undertaken as a result thereof.

15.    In summary, I strongly believe that the ACLU should be required to abide by their agreement, the terms of which have been followed and reasonably relied upon by the Department for decades.  If this Court is going to now modify its Order, then I believe that, at the very least, the Court should grant the Department the following appropriate relief:

- First, the Court should strictly and swiftly enforce the terms of the parties' agreement and this Court's Order up to the date the Court's Order is changed.  Specifically, the ACLU should be forbidden from using any and all information that they have gathered since the inception of the Order in any non-*Rutherford* litigation including, without limitation, the recently filed litigation *P. Johnson, et al. v. Los Angeles County Sheriff's Department, et. al.*, U.S.D.C. Case No. CV 08-3515 DDP (JTLx);

- Second, the ACLU should be recused from acting as counsel in any litigation against the Department concerning the jail system unless and until they can affirmatively prove to the satisfaction of the Court and the

Department that they can handle the matter without using information that they obtained as a result of the Order;

- Third, if there is any reason to believe that the ACLU has already violated the terms of the Order -- and based on the papers filed by the ACLU to date in the *Johnson* matter -- it appears that there is proof of this fact, then this Court should enter an order to show cause why the ACLU and its representatives should not be held in contempt of court and appropriate relief imposed; and,

- Finally, the Court should appoint a new, neutral court monitor to enforce the remaining operative portions of the judgment in this matter and return the ACLU to its original limited role in this litigation, that of counsel for the plaintiff class.

## Purported Concerns Raised By The ACLU's New Counsel, Ms. Bird

16.    I am informed and believe that Plaintiffs' counsel, Ms. Bird, asserts that she has certain concerns if she and her office are not permitted to act as counsel in the new *Johnson* matter.  Ms. Bird's concerns appear to be without merit.

17.    First, there is no question that any inmates who want to bring a claim related to a purported disability are entitled to and will have legal representation. In fact, there are already **three** other law firms (in addition to Ms. Bird's office) who are counsel in the *Johnson* matter.  Moreover, one of these firms, the Disability Rights Legal Center, recently brought and negotiated a class action settlement for injunctive relief on behalf of hearing impaired inmates in the Los Angeles County jails.  *See, Valenzuela v. County of Los Angeles*, U.S.D.C. Case No. CV 02-9092 ABC (JWJx).  One of the other firms, the Hadsell firm, has also represented inmates in disability class action matters against law enforcement agencies (i.e., *Pierce, et al. v. County of Orange*, United States District Court Case No. CV 01-00981 ABC (MLGx)).  Finally, the third set of counsel, Heller

1  Ehrman LLP, is a very large law firm with more than a dozen offices worldwide

2  and 650 attorneys (*see*, www.hewm.com).

3       18.    During the decades that the parties have been bound by the Order in

4  *Rutherford*, there is an established pattern in Los Angeles County of inmates

5  being able to bring claims against the Department (whether individually or on a

6  class basis).  Many of these suits are without merit and have been dismissed

7  without much public attention; unfortunately, some of these cases have had merit

8  and have been settled or otherwise resolved.  The Court can and should take

9  judicial notice of the numerous state and federal lawsuits brought by inmates

10  against the Department during the 30 year tenure of this Court's Order.  These

11  cases show that inmates can and do bring litigation against the Department

12  without the involvement of the ACLU.

13       19.    Second, Ms. Bird claims that assistance for the unspecified needs of

14  unspecified inmates might be delayed unless her office is counsel in the *Johnson*

15  matter.  Ms. Bird presents no proof in support of her assertion.  Additionally,

16  regardless of whether the ACLU is counsel in the *Johnson* matter, they still can

17  and should bring to the Department's attention any and all immediate needs of

18  any disabled inmates so those needs can be promptly addressed.  If the ACLU

19  believes their concerns have not been resolved satisfactorily, they can and should

20  contact a high-ranking LASD official including, but not limited to, the Chiefs of

21  Correctional Services Division (Chief Alex Yim) or the Custody Operations

22  Division (Chief Dennis Burns.)

23       20.    Third, Ms. Bird claims that she and her firm must be counsel in the

24  *Johnson* matter because she fears that inmates may be retaliated against for

25  pursuing their legal rights.  Ms. Bird's assertion is disturbing because it is my

26  understanding that during all of the regular meetings between the Department and

27  the ACLU, neither Ms. Bird nor any other person associated with the ACLU has

28  ever advised the Department that any inmate has ever been retaliated against for

utilizing the ACLU.  Of course, retaliation against inmates would be against Department policy and would be promptly investigated and, if substantiated, severely punished.  However, it is disingenuous of the ACLU to now claim that retaliation has occurred but for them to have never informed the Department of such allegations.

21.    Finally, the assertions, expressly or by implication, by Ms. Bird that the Department is indifferent to or ignoring its legal obligations to disabled inmates are untrue.  There is no doubt that some of the Department's custody facilities are outdated.  Many were built long before laws such as the Americans With Disabilities Act were enacted. All of the facilities suffer from extensive use. That, however, does not mean that the Department does not believe that inmates who are disabled cannot and should not be reasonably accommodated within the necessary security safety and security concerns of the custody environment.  I have instructed my custody executives to promptly investigate the ACLU's accusations and, if required by law, make appropriate changes so that disabled inmates' rights are protected.  I have asked my personnel to work cooperatively with the ACLU in this endeavor.  The reality, however, is that such a process takes time.  Unfortunately, I have been advised that regardless of the Department's efforts, the ACLU has insisted that any joint agreement must take the form of a court entered consent decree, which I believe is unnecessary, unwarranted, and will only complicate and slow progress, at a much increased expense to all parties.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June _20_, 2008, at Monterey Park, California.

_Leroy Baca_
Sheriff Leroy D. Baca

9

**DECLARATION OF DENNIS CONTE**

I, Dennis Conte, declare as follows:

1.    I have personal knowledge of the facts stated herein, except those stated upon information and belief and as to those matters, I believe them to be true.  If called upon to testify to the matters herein, I could and would competently do so.

2.    I am a sworn officer of the Los Angeles County Sheriff's Department ("LASD"), and I have been so for the past 12 years.  I have been a sworn law enforcement officer for more than 40 years.  I am presently a Commander of the Custody Operations Division and have been in this assignment since 2004.  The Custody Operations Division is responsible for the operation and management of all Los Angeles County jail ("LACJ") custody facilities.

3.    As a commander in the Custody Operations Division, part of my regular duties have included acting as a liaison between the LASD and the American Civil Liberties Union of Southern California ("ACLU").  This function is primarily related to the relationship between the LASD and the ACLU that developed out of the Judgment in this case.  Through this relationship, the LASD and the ACLU work cooperatively to try and resolve issues related to the Judgment and the operation of the LACJ system without the need for Court intervention.  As the Court is well aware, the ACLU monitors compliance with the Judgment and is compensated by the LASD for these services.

4.     Representatives of the ACLU, including counsel, social workers, and interns, regularly visit all LACJ facilities in connection with their representation of Plaintiffs in this case and their role as jail monitor.  Pursuant to longstanding agreements between the parties, the ACLU is granted unprecedented access to all LASD custody facilities and they are permitted to interview LASD personnel without the presence of LASD legal counsel.  The ACLU's access also includes virtually unlimited access to LASD personnel, inmates, and a wealth of

information regarding the operation of the LACJ system as well as information specific to individual inmates.  For example, during their visits, representatives of the ACLU regularly interview LASD personnel and request information about specific areas of a particular facility or specific inmates.  In most cases, taking applicable legal privileges into consideration (such as HIPPA), representatives of the ACLU are generally provided with the information they request.  In fact, the LASD strives to provide the ACLU with as much information as possible.

5.      In addition to the ACLU's regular visits to LASD custody facilities, the LASD communicates with the ACLU's Jails Project Coordinator ("JPC") and other ACLU representatives almost daily regarding issues that the ACLU identifies and brings to the LASD's attention.  I regularly have telephone conferences and exchange emails with representatives of the ACLU all without the involvement of the LASD's legal counsel.  Further, the LASD meets with the ACLU on a regular basis to discuss issues the ACLU believes require attention. Further still, the LASD receives weekly reports from the ACLU regarding their visits to LASD custody facilities and after follow-up investigation is completed, the LASD prepares and sends the ACLU a response to their report.   Such discussions and meetings are possible because I know that the ACLU cannot use the information I provide them or the information they obtain from other LASD sources in new litigation.  Without that protection, the open exchange of information and dialogue between the ACLU and the LASD would not be possible.

6.      As stated above, when representatives of the ACLU visit LASD custody facilities, they are granted nearly unrestricted access to inmates and LASD personnel.  ACLU representatives regularly make inquires of LASD personnel regarding the operation of the subject facility, the provision of services to inmates, and the status of various requests that the ACLU has made on behalf of inmates.  All of these interviews take place outside the presence of counsel for

11

the LASD.  The LASD allows such interviews of its personnel to go forward based on the LASD's understanding and reliance that ACLU cannot use the information they are provided against the LASD in other litigation.  LASD personnel, including myself, absolutely rely on the fact that the ACLU is barred from using information in other cases when I provide representatives of the ACLU with information.  If the ACLU is permitted to bring suit against the LASD in non-*Rutherford* litigation, I firmly believe that the current free exchange of information between the LASD and the ACLU will be greatly hampered.

7.     The operation of the LACJ system is extremely complicated and it simply cannot be understood by observation alone.  For this reason, representatives of the ACLU regularly interview LASD personnel to obtain further information on a variety of issues some of which are not even within the scope of the Judgment. Quite frankly, representatives of the ACLU could not possibly have the depth of understanding they currently posses of how the LACJ system operates without relying on information they have obtained through interviews of LASD personnel.  While the ACLU has most certainly gained knowledge based on the tours of and visits to custody facilities, there can be little doubt that a large percentage of the information the ACLU has regarding the LACJ system has come from interviews of LASD personnel.

8.     During my tenure as a Commander in the Custody Operations Division, I have worked with two ACLU JPCs.  When I first came into my present assignment, the JPC was Ms. Jody Kent.  Ms. Kent was the JPC until approximately June, 2006 when she was replaced by the current JPC, Ms. Mary Tiedeman.  When Ms. Tiedeman assumed this position, she was not at all familiar with custody operations generally or the LACJ system.  To my knowledge, she had no prior experience working in or monitoring a custody environment.  After years of interviewing LASD personnel and being provided with information about the operation of the LACJ system, Ms. Tiedeman now possesses a

12

1   comprehensive volume of information regarding the entire Los Angeles County
2   jail system that she simply did not have before her position as JPC.  The reason
3   Ms. Tiedeman knows what she knows is that, in response to questions, LASD
4   personnel have explained the system to her.  All of these explanations were
5   provided to Ms. Tiedeman in reliance on the confidentiality provided by the long
6   standing agreements between the ACLU and the LASD.

7       9.      Despite the fact that there are many other civil rights groups in the
8   United States, no other group enjoys the type of unfettered access to a jail system
9   that the ACLU has to the LACJ.  The only reason this access can be granted is
10  that LASD personnel know that the ACLU cannot use the information they obtain
11  in non-*Rutherford* litigation.  If that protection is not enforced, I firmly believe
12  that the result would be a fundamental change in the nature of the working
13  relationship between the LASD and the ACLU.
14  ///
15  ///
16  ///

13

1    I declare under penalty of perjury under the laws of the United States of

2   America and the State of California that the foregoing is true and correct.

3    Executed on June 22, 2009, at Los Angeles, California.

4

5

6                                    Dennis Conte

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUTHERFORD\Conte Declaration

14

TOTAL P.001

## DECLARATION OF JUSTIN W. CLARK

I, JUSTIN W. CLARK, declare as follows:

1.     I am an attorney at law, duly authorized to practice before this Court and I am an associate in the law firm of Lawrence Beach Allen & Choi, A Professional Corporation, attorneys of record for Defendants Sherman Block, et. al. in the above-entitled action.  I have personal knowledge of the facts stated herein, except those stated upon information and belief and as to those matters, I believe them to be true.  If called to testify to the matters herein, I could and would competently do so.

2.     Counsel for the parties met and conferred regarding the issues raised in this motion on May 7, 2009 during a telephone conference between myself, Paul Beach, and counsel for the ACLU, Melinda Bird.  In addition, counsel for the parties have discussed the issues raised in this Motion on a number of occasions in this case as well as in connection with the *Johnson* matter.  In addition, this Motion is also brought pursuant to the Court's June 8, 2009 Order in *Johnson*.

3.     In response to this Motion, I expect that the ACLU will argue that they must represent plaintiffs in *Johnson*; otherwise, inmates in the Los Angeles County jail ("LACJ") will have no access to legal counsel and will not be able to bring their ADA claims.  This is just not true and this likely contention ignores the fact that many inmates bring suit against the LASD based on any number of issues and the ACLU is not involved in any of those cases.  I have represented the LASD in many cases in the last five years and in my experience, there are many civil rights attorneys who regularly bring suit (sometimes successfully) against the LASD and the County of Los Angeles based on purported violations of inmate's rights in the LACJ system.  Attorneys working for the ACLU are not the only advocates who can bring claims on behalf of inmates and there is absolutely no reason why the ACLU must be involved in *Johnson*.  Other counsel in that case, such as the Disabilities Rights Legal Center, are more than capable of handling that case without the

Rutherfor - Clark Decl re Mtn to Enforce 1989 Order

1   involvement of the ACLU or the inherent problems associated with that
2   involvement.  Further, there is nothing in the 1989 Order that prohibits inmates from
3   bringing claims against the LASD using counsel other than the ACLU.

4        4.       Attached hereto as Exhibit "A" is a true and correct copy of the 1989
5   Stipulation and Order at issue in this Motion.

6        5.       Attached hereto as Exhibit "B" is a true and correct copy of the
7   Judgment in this case entered on February 15, 1979.

8        6.       Attached hereto as Exhibit "C" is a true and correct copy of a 1992
9   Joint Status Report and Proposed Order which details some of the history of the
10  working relationship between the ACLU and LASD.

11       7.       Attached hereto as Exhibit "D" is a true and correct copy of a letter sent
12  to Ramona Ripston, Executive Director of the ACLU, from Los Angeles County
13  Sheriff Leroy Baca.  This letter references the longstanding agreement between the
14  ACLU and the LASD whereby "the ACLU monitors the Los Angeles County jaisl
15  and receives compensation thereto.  The agreement also provides that the ACLU
16  will not file suit against the County with regard to jail matters nor be entitled to
17  additional attorneys fees above the compensation already paid to the ACLU on a
18  monthly basis."

19  ///
20  ///
21  ///
22
23
24
25
26
27
28

1         8.     Filed in support of this Motion is a declaration from Los Angeles

2 County Sheriff Leroy Baca. This declaration was prepared and signed following the

3 ACLU's initial filing of a motion to modify the 1989 Order. As a result, it includes

4 references to former plaintiffs' counsel in *Johnson* (the Hadsell Stormer firm and

5 Heller Ehrman) who have since been replaced as counsel in that matter.

6        I declare under penalty of perjury under the laws of the United States of

7 America and the State of California that the foregoing is true and correct.

8        Executed on June 22, 2009 at Glendale, California.

9

10                              _____

11                   Justin W. Clark

Rutherfor - Clark Decl re Mtn to Enforce 1989 Order

1    DE WITT W. CLINTON, County Counsel
2    FREDERICK R. BENNETT, Assistant County Counsel
    648 Hall of Administration
    500 West Temple Street
3    Los Angeles, California  90012

4    (213) 974-1903

5    Attorneys for Plaintiffs

6

7            UNITED STATES DISTRICT COURT

8       FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10

11   DENNIS RUTHERFORD,        )    CASE NO.  CV 75-4111-WPG

12         Plaintiff,    )    STIPULATION AND ORDER
                     )
13         v.             )
                     )
14   SHERMAN BLOCK, et al.,     )
                     )
15        Defendants.    )

16

17        To measure compliance with the Court's orders in this

18 case and to develop appropriate methods to minimize the impact

19 of jail overcrowding, the counsel for parties have found it

20 useful to regularly conduct joint and separate interviews with

21 inmates throughout the jail system, and to permit discussions

22 between counsel for the plaintiff and Sheriff's staff,

23 frequently without counsel for the Sheriff being present.

24        To be effective, the interviews must be candid and

25 open.  The inmates must feel confident that they can state

26 facts and make statements without fear that the discussions

27 will be used in their criminal trial.  The Sheriff's staff must

28 be confident that they can state facts and their views openly



EXHIBIT "A"

1  and candidly without concern that their statements will be used
2  in other litigation.   In this fashion, counsel for the parties
3  and the parties have been able to work cooperatively toward
4  solutions to the complex and difficult issues involved in this
5  litigation in a non-adversarial manner and without need to
6  involve the Court in most dispute resolutions.

7      Accordingly, and for good cause, the parties
8  stipulate that none of the statements made during
9  inmate interviews or in discussions with Sheriff's staff will
10  be used or made available for use in other litigation or for
11  purposes other than the present litigation except by written
12  stipulation or by order of this Court.

13      IT IS SO STIPULATED.

14  DATED:  June 14, 1989      ACLU FOUNDATION OF SOUTHERN CALIFORNIA
15
16                            By: _____
                                  JOHN HAGAR, Esq.
17                                Counsel for Plaintiff
18

19  DATED:  June 14, 1989      DE WITT W. CLINTON, County Counsel
20                            By: _____
21                                FREDERICK R. BENNETT
                                  Assistant County Counsel
22                                Counsel for Defendants

23      GOOD CAUSE APPEARING THEREFOR, it is so ordered.
24
25  DATED:  June 21, 1989      _____
                                WILLIAM P. GRAY
26                              WILLIAM P. GRAY
                                United States District Court Judge
27
28

                            -2-

19

EXHIBIT "A"

ENTERED

FILED

FEB 16 1979

FEB 15 1979

CLERK, U. S. DISTRICT COURT
TRAL DISTRICT OF CALIFORNIA
DEP'

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD,
HAROLD TAYLOR, and
RICHARD ORR, et al.,

        Plaintiffs,

  v.

PETER J. PITCHESS,
et al.,

        Defendants.

CASE NO. CV 75-4111-WPG

JUDGMENT

       In this action, the plaintiffs, on behalf of inmates of the Los Angeles County Central Jail, challenge certain policies and practices of the defendant administrators of the jail and the living conditions under which the inmates are maintained. The matter has been tried and briefed, and the court has made findings of fact and conclusions of law in the form of a Memorandum of Decision filed on July 25, 1978, and a Supplemental Memorandum of Decision that is being filed contemporaneously herewith. In accordance with such findings, the court renders this judgment.

1097

FEB 15 1979

____ Docketed
____ Mld copy Ptys
____ Mld Notice Ptys
____ JS-6

MICROFILMED

FEB 22 1979

**EXHIBIT "B"**

20

IT IS ORDERED AS FOLLOWS:

1.   Beds.  Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.

This order shall not preclude the defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only, if, in the defendants' judgment, such inmate or inmates require more secure housing than is provided in the available areas and the appropriate housing does not have a sufficient number of bunks.  Further, this order shall not apply in the event of an emergency causing a sudden and unusual intake of prisoners, in which case full bedding shall be provided and the defendants will exercise their best efforts to provide bunks for all inmates as soon as possible.

2.   Visitation.

(a)   Visits By Children Of Prisoners.  Upon prior request from a prisoner, his minor children over the age of twelve (12) years shall be permitted to visit him unaccompanied by an adult.

(b)   Contact Visits.  Commencing not more than ninety days following the date of this order, the defendants will make available a contact visit once each week to each pre-trial detainee that has been held in the jail for one month or more, and concerning whom there is no indication of drug or escape propensities; provided, however, that no more than fifteen hundred such visits need be allowed in any one week.  In the event that the number of requested visits in any week exceeds fifteen hundred, or such higher number as the Sheriff voluntarily undertakes to accommodate, a reasonable system of rotation or

-2-

1098

EXHIBIT "B"

other priorities may be maintained.  The lengths of such visits shall remain in the discretion of the Sheriff.

3. _Outdoor Recreation_.  All prisoners except those that are hospitalized, in disciplinary segregation, those under the jurisdiction of the medical staff of the Forensic Mental Health Unit who such medical staff determine are inappropriate for roof recreation, and except for those high security inmates who the Sheriff believes cannot safely be permitted roof recreation shall be allowed not less than two and one-half hours of outdoor exercise or other recreation per week.  Within sixty days following the date of this order, the Sheriff shall report to the court the number of inmates under the jurisdiction of the Forensic Mental Health Unit and the number of high security inmates included in the roof recreation program and the nature of alternative recreation provided for high security inmates not allowed roof recreation.

4. _Indoor Recreation_.  Television receiving sets shall be installed and reasonably maintained in each day room.

5. _Restoration Of Windows_.  Within ninety days following the filing of this order, transparent windows shall be restored in each portion of the jail from which they previously have been removed.

6. _Processing For Court_.  As soon as practical, but not more than four months from the date of this order,

(a) each detainee placed in a holding cell will be given a chair or a bench upon which to sit;

(b) on each day of trial after the first day a detainee will not be required to leave his bed earlier than

-3-

1099

6:00 A.M., and will not be confined in a holding cell for longer
than thirty minutes, either before leaving for court or following
his return; and his waiting time on a bus at the jail will not
exceed thirty minutes; and he will be returned to his cell not
later than 8:00 P.M.

Within four months from the date of this order,
the Sheriff shall report his progress in this regard to the court
and the reasons, if any, for his inability to comply in all
respects.  At that time, the court will review this portion of
this order as to whether there is any justification for modifi-
cation thereof.

7.  Telephones.  On January 5, 1979, a separate order
was filed approving and directing implementation of a plan for
the improvement of telephone facilities in the jail.  Accordingly,
no further order is indicated on this subject at this time.

8.  Cell Searches.  Inmates that are in the general
area when a "shakedown" inspection of their cells is undertaken
shall be permitted to be sufficiently proximate to their respec-
tive cells that they may observe the process and respond to such
questions or make such requests as circumstances may indicate.

9.  Time For Meals.  An inmate shall be allowed not
less than fifteen minutes within which time to complete each meal.

10.  Change Of Clothing.  Effective not more than sixty
days following the filing of this order, each inmate shall receive
at least twice each week clean outer garments, undergarments,
socks and a towel in exchange for those that he has been using.

11.  Injunctive Relief.  When any inmate has information
that he believes to disclose a violation of this order, he may

-4-

1100

EXHIBIT "B"

23

1  set forth that information in writing to the Commander of the

2  jail who shall cause an investigation thereof to be made as soon

3  as reasonably practicable, and in any event within ten days

4  following receipt of such written statement.  Promptly following

5  the completion of the investigation the Commander shall deliver

6  a written reply to the inmate indicating the results thereof and

7  what, if any, action has been taken concerning the inmate's

8  complaint and what, if any, action has been taken to prevent

9  violations of this judgment.  Absent unusual circumstances

10  indicating compelling reasons why following this procedure would

11  result in substantial prejudice to the inmate, no petition for

12  a judgment of contempt for violation of this order shall be

13  entertained by the court until the inmate first complies with

14  this administrative procedure.  In considering any petition for

15  contempt for violation of this order, the court shall take into

16  account the appropriateness of any action taken by the jail

17  Commander in response to information provided him in accordance

18  with this procedure.

19       12.  _Emergencies_.  In the event that the Sheriff or

20  his authorized representatives have reasonable cause to believe

21  that there exist facts showing a serious imminent threat to the

22  security of the jail or the safety of any persons therein that

23  would occur if any of the provisions of this decision were

24  enforced and there is insufficient time to seek a formal modifi-

25  cation or exception to such provisions, the Sheriff may temporarily

26  suspend such of the provisions of this decision as may be

27  necessary to overcome or reduce such threat for a period not

28  exceeding five court days, provided he submits a statement in

1107

EXHIBIT "B"

24

writing to this court setting forth what he has done and why he has done it.

13. _Posting Of This Judgment_. The defendants and their successors in interest shall cause this judgment to be posted permanently and conspicuously in each prisoner housing area in the jail for the period of one year; thereafter, the defendants and their successors in interest shall permanently and conspicuously post this judgment in each of the jail's law libraries.

14. Counsel for the plaintiffs shall recover his costs incurred in this action.

DATED: February 15, 1979.

_____
WILLIAM P. GRAY
United States District Judge

1102

-6-

EXHIBIT "B"

25

1 | writing to this court setting forth what he has done and why he

2 | has done it.

3 |      13.  <u>Posting Of This Judgment</u>.  The defendants and

4 | their successors in interest shall cause this judgment to be

5 | posted permanently and conspicuously in each prisoner housing

6 | area in the jail for the period of one year; thereafter, the

7 | defendants and their successors in interest shall permanently

8 | and conspicuously post this judgment in each of the jail's law

9 | libraries.

10 |      14.  Counsel for the plaintiffs shall recover his costs

11 | incurred in this action.

13 | DATED:  February 15, 1979.

15 | _William P. Gray_

16 |         WILLIAM P. GRAY
       United States District Judge

1102

-6-

26

PAUL L. HOFFMAN
LISE ANDERSON
ACLU Foundation of Southern California
1616 Beverly Boulevard
Los Angeles, CA 90026

(213) 977-9500

Attorneys for Plaintiffs

DE WITT W. CLINTON
County Counsel
FREDERICK R. BENNETT
Assistant County Counsel
648 Hall of Administration
500 W. Temple Street
Los Angeles, CA  90012

(213) 974-1903
FAX (213) 626-2105

Attorneys for Defendants



FILED
CLERK, U.S. DISTRICT COURT

AUG 27 1992

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

LOCATION  *Missing from Archives*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, *et al.,*<br><br>           Plaintiffs,<br><br>   v.<br><br>SHERMAN BLOCK, *et al.,*<br><br>        Defendants | CASE NO. CV-75-4111 *WPG*<br><br>Joint Status Report and<br>Proposed Order |

The present action was filed by the American Civil Liberties Union Foundation of Southern California (ACLU) in 1975 invoking jurisdiction under 28 U.S.C. §1343 for a claim under 42 U.S.C. §§1983, 1985, and for injunctive and declaratory relief pursuant to 28 U.S.C. §§2201, 2202, as a class action on behalf of all

- 1 -

27

**EXHIBIT "C"**

present and future inmates challenging a wide range of conditions of confinement at the Los Angeles County Men's Central Jail.

The class was certified and the matter proceeded to trial. After trial, the United States District Court Judge William P. Gray, filed a reported decision, *Rutherford v. Pitchess* (C.D. Cal. 1978) 457 F.Supp. 104 (Attachment 1[1]), and in an unreported supplemental memorandum opinion filed February 15, 1981 (Attachment 2), and a Judgment dated February 15, 1979 (Attachment 3), imposing nine (9) orders at Mens' Central Jail concerning (1) beds, (2) visitation, (3) outdoor recreation, (4) indoor recreation, (5) restoration of windows, (6) processing for court, (7) cell search procedures, (8) time for meals, and (9) changes of clothing.  By order filed January 5, 1979, a separate tenth (10th) order was filed approving and directing implementation of a plan for the improvement of telephone facilities in the jail.

Three of these orders, visitation, restoration of windows, and search procedures, were appealed to the Ninth Circuit, which reversed the order concerning restoration of windows (*Rutherford v. Pitchess* (9th Cir. 1983) 710 F.2d 572) [Attachment 4]), and to the United States Supreme Court, which reversed the visitation order

---

[1]  Referenced opinions are reproduced from the published reports or from the Joint Appendix filed with the United States Supreme Court in *Block v. Rutherford* (1984) 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438.

– 2 –

28

insofar as it required contact visitation, and the search

procedures order (*Block v. Rutherford* (1984)  468 U.S. 576,  104 S.Ct.

3227, 82 L.Ed.2d 438 [Attachment 5]).


The Sheriff has never been able to fully comply with one of

these orders concerning processing for court, and that provision

has been the subject of many motions for modification and

enforcement, and on December 16, 1987, District Court Judge Gray

approved a plan which ultimately lead to a jail population

management order discussed below, which suspended for at least

six months the orders concerning processing for court.   The court

processing orders remain suspended.


An unreported memorandum of understanding in other

litigation initiated by the ACLU, *ACLU v. Pitchess*, the Sheriff

agreed to work toward obtaining state licensure of the jails

health care delivery system, which has not yet been accomplished.

In 1984 and in 1991 the medical facilities at Men's Central Jail,

Sybil Brand Institute, and the Forensic Outpatient Unit (#7200)

in Central Jail were inspected by the state licensing agency.   In

May 1992 this agency issued reports detailing many areas in need

of improvement before licensing could occur.


Through 1985, none of the orders technically affected any

jails in the multi-facility Los Angeles County jail system except

Mens' Central Jail, although orders had been issued concerning

other jails in the system in litigation brought by the same

- 3 -

29

**EXHIBIT "C"**

attorneys representing the class in the Central Jail litigation. Orders concerning the main Women's jail, Sybil Brand Institute, were obtained in a state court proceeding, *Inmates of Sybil Brand v. Pitchess* (1982) 130 Cal.App.3d 89, and concerning the Mens Hall of Justice Jail in *Dillard v. Pitchess* (C.D. Cal. 1975) 399 F.Supp. 1225, and by subsequent stipulated agreements approved by District Court Judge William P. Gray.   However, it was the Sheriff's practice to attempt to implement orders directed at any one facility system-wide, and discussions between the parties generally focused on the system rather than on any particular facility.

Beginning in 1985, the Sheriff began experiencing difficulty in complying with the various jail orders in the context of unprecedented and unexpected increases in the jail population. During the 1980's the jail system population almost tripled from about 8,000 to over 23,000.   As alternatives to contempt proceedings, the parties entered a number of memorandums of understanding, which are summarized in a letter to Los Angeles Municipal Court Judge Richard A. Paez, dated June 15, 1988 (attachment 5), and which ultimately lead to United States District Court Judge William P. Gray approved stipulated population limits at each of the jail facilities in the jail system (except the newest facility, the North County Correctional Facility, as to which there is only an understanding of the parties), and a Court imposed jail population management order which directs the Sheriff to "manage the jail system within those

- 4 -

1   capacities by discharging or citing inmates to court upon a
2   written promise to appear, according to priorities that he shall
3   establish." (See Attachment 6). Using this authority, the
4   Sheriff has generally managed the jail system within the
5   stipulated jail facility capacities by using a variety of
6   criteria for releasing or citing inmates to court as needed.

8        Since 1985, the ACLU has continued to monitor the Sheriff's
9   compliance with the various orders, and the parties have met
10  regularly since 1985.  During this time, the parties have been
11  able to agree to appropriate attorneys' fees for such monitoring
12  efforts which are periodically submitted to the District Court to
13  be ordered without hearing or objection, and to various plans for
14  dealing with periodic difficulties of compliance which have been
15  either reported to United States District Court Judge William P.
16  Gray orally in periodic status conferences, in periodic written
17  status reports, or submitted to him for modification orders.

19       Current meetings and discussions have largely centered on
20  the jail's health care delivery system.

22       This cooperative process has worked well for almost a
23  decade, with the parties meeting regularly, providing the court
24  with periodic status reports, and seeking United States District
25  Court intervention or approval as necessary.

- 5 -

31

**EXHIBIT "C"**

To assist the District Court, the basic framework of existing court orders and modifications is as follows:

1.   **Beds.**  Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.  This order shall not preclude the defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only, if, in the defendants' judgment, such inmate or inmates require more secure housing than is provided in the available areas and the appropriate housing does not have a sufficient number of bunks. Further, this order shall not apply in the event of an emergency causing a sudden and unusual intake of prisoners, in which case full bedding shall be provided and the defendants will exercise their best efforts to provide bunks for all inmates as soon as possible.  (Attachment 2, 2/15/79 Judgement, para. 1).

2.   **Visitation by Children of Prisoners.**  Upon prior request from a prisoner, his minor children ▮▮▮▮▮▮▮ over the age of twelve (12) years shall be permitted to visit him unaccompanied by an adult.  (*Id.*, para. 2).

3.   **Outdoor Recreation.**  All prisoners except those that are hospitalized, in disciplinary segregation, those under the jurisdiction of medical staff of the Forensic Mental Health Unit who such medical staff determine are

- 6 -

32

**EXHIBIT "C"**

appropriate for roof recreation, and except for those high security inmates who the Sheriff believes cannot safely be permitted roof recreation shall be allowed not less than two and one-half hours of outdoor exercise or other recreation per week. (*Id.*, para. 3).

4. **Indoor Recreation.** Television sets shall be installed and reasonably maintained in each day room. (*Id.*, para. 4).

5. **Telephones.** Primarily collect and some pay telephones shall be installed in each jail facility to permit all inmates reasonable access to telephones. (*Id.*, para. 7, as modified).

6. **Time for Meals.** An inmate shall be allowed not less than fifteen minutes within which time to complete each meal. (*Id.*, para 9).

7. **Change of Clothing.** Each inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those that he has been using.

8. **Jail Population Management.** The maximum inmate population at each of the listed facilities, subject to modification upon addition of new facilities, is set forth

- 7 -

33

**EXHIBIT "C"**

1   below and the Sheriff shall "manage the jail system within

2   those capacities by discharging or citing inmates to court

3   upon a written promise to appear, according to priorities

4   that he shall establish" (Attachment 5):

| Jail Facility | Court Approved Capacity |
|---|---|
| Mens' Central Jail Permanent housing | 6,800 Normal - 7500 Emergency[2] |
| Inmate Reception Center | 700 Inmates[3] |
| Los Angeles Medical Center | 50 Inmates |
| Hall of Justice Jail | 1,800 Normal - 2100 Emergency |
| Biscailuz Center | 1,470 Inmates |
| North County Correctional Facility | 3,120 Normal - 3600 Emergency[4] |
| PHR-East | 1,786 Normal - 1800 Emergency |
| PHR-North | 1,600 Normal - 1650 Emergency |
| PHR-South | 1,900 Normal - 1950 Emergency |
| PHR-Ranch | 2,366 Inmates |
| Mira Loma Male Facility | 1,089 Inmates |
| Mira Loma Female Facility | 854 Inmates |

[2]  The normal agreed population limit is 6800 inmates.
However, the parties and the Court have approved permitting
this jail's population to temporarily exceed 6800 to as much
as 7500 on occasion for short periods of time when
necessary.  Similar normal and emergency capacities are
identified for certain other facilities.

[3]  There is no prior court order concerning this capacity.
However, this number reflects the average number of inmates
being processed in the Inmate Reception Center at any one
time, and the number of inmates in the Inmate Reception
Center are reported on  the daily count sheets used by the
parties to monitor the jail population.

[4]  Since this facility was built after the original inmate
population capacity agreements were adopted, there has been
no prior formal approval of these limits.

- 8 -

34

EXHIBIT "C"

| Sybil Brand Institute for Women | 2,064 Normal — 2300 Emergency |
|---|---|
| Total | 25,599 Normal — 27,429 Emergency |

**EXHIBIT "C"**

9.   **Health care system.**   The Sheriff shall work towards obtaining State licensure of all jail health care facilities and providing constitutionally adequate health care to all inmates in his custody, and in furtherance of that effort:

A.   A joint Sheriff/ACLU team, including a mutually acceptable outside expert, will visit mutually acceptable jail medical care facilities such as Cook County (Chicago), Illinois, and Riker's Island (New York), for the purpose of identifying practical and appropriate ways of providing adequate jail medical care, and to provide a baseline for evaluation of the Los Angeles County system.

B.   After the visit, the team will meet to identify necessary improvements to the Los Angeles County jail medical care system, and to prioritize those improvements to be implemented over time, (assuming that there are insufficient available resources), and to establish a reasonable time frame for implementation.

C.   During this process the Sheriff will continue efforts to make short term improvements to meet the most serious deficiencies identified in the most recent State licensure inspection report.

**EXHIBIT "C"**

10.  **Administrative Remedy.**  When any inmate has information that he believes to disclose a violation of a jail condition orders order, he may set forth that information in writing to the Commander of the jail who shall cause an investigation thereof to be made as soon as reasonably practicable, and in any event within ten days following receipt of such written statement.  Promptly following the completion of the investigation the Commander shall deliver a written reply to the inmate indicating what, if any, action, has been taken concerning the inmate's complaint and what, if any, action has been taken to prevent violations of this judgment.  Absent unusual circumstances indicating compelling reasons why following this procedure would result in substantial prejudice to the inmate, no petition for a judgment of contempt for violation of this order shall be entertained by the court until the inmate first complies with this administrative procedure.  In considering any petition for contempt for violation of jail condition orders order, the court shall take into account the appropriateness of any action taken by the jail Commander in response to information provided him in accordance with this procedure.  (*Id.*, para 11).

11.  **Emergencies.**  In the event the Sheriff or his authorized representatives have reasonable cause to believe there exists facts showing a serious imminent threat to the security of the jail or the safety of any persons therein

- 11 -

37

**EXHIBIT "C"**

that would occur if any of the provisions of the *Rutherford*
orders were enforced and there is insufficient time to seek
a formal modification or exception to such provisions, the
Sheriff may temporarily suspend such jail condition orders
as may be necessary to overcome or reduce such threat for a
period not exceeding five court days, provided he submits a
statement in writing to this court setting forth what he has
done and why he has done it.   (*Id.*, para. 12).


IT IS SO STIPULATED:

Date: _August 13, 1992_____   _____
                                  Frederick R. Bennett
                                  Assistant County Counsel
                                  Attorney for Defendants

Date: _August 13, 1992_____   _____
                                  Paul Hoffman
                                  Legal Director
                                  ACLU Foundation of Southern Calif.
                                  Attorney for the Plaintiff Class


IT IS SO APPROVED AND ORDERED:

Date: _August 27, 1992_____   _____
                                  United States District Court Judge


- 12 -

38

**EXHIBIT "C"**





# County of Los Angeles
## Sheriff's Department Headquarters
### 4700 Ramona Boulevard
### Monterey Park, California 91754-2169

LEROY D. BACA, SHERIFF

June 20, 2008

Ramona Ripston, Executive Director
ACLU
1313 West 8th Street
Los Angeles, California 90017

Dear Ms. Ripston:

### ACLU REQUEST TO MODIFY COURT ORDER IN RUTHERFORD LITIGATION TO BECOME PLAINTIFF'S ATTORNEYS IN *JOHNSON v. LOS ANGELES COUNTY SHERIFF'S DEPARTMENT # CV08-3515 DDP*

I have been informed that the ACLU has filed a motion to become plaintiff's counsel in a lawsuit against the Los Angeles County Sheriff's Department alleging Americans With Disabilities Act violations in the jails. As you know, the Los Angeles County jail system is the subject of a long-standing court order in the *Rutherford v. Baca* case. Also, you are aware that I have been most proactive in providing the ACLU access into the jail system above and beyond the mandates in the *Rutherford* court order. This attempt to join the *Johnson* lawsuit is in contravention to our long-standing agreement.

Under our agreement, the ACLU monitors the Los Angeles County jails and receives compensation thereto. The agreement also provides that the ACLU will not file suit against the County with regard to jail matters nor be entitled to additional attorneys fees above the compensation already paid to the ACLU on a monthly basis.

If the court grants your request, it is very likely that the Sheriff's Department will no longer be legally able to accommodate the ACLU above and beyond the strict mandates of the court order. Attached please find my Declaration which will be filed in opposition to the ACLU's request to become plaintiff's lawyers in addition to the three other law firms already representing plaintiffs in the *Johnson* matter.

*A Tradition of Service*

**EXHIBIT "D"**

39

Ramona Ripston, Executive Director                     -2-                     June 20, 2008

If you wish to reconsider the request to modify the Rutherford order, please contact me to discuss this at (323) 526-5000.

Sincerely,

LEROY D. BACA
SHERIFF

40

**EXHIBIT "D"**

Ramona Ripston, Executive Director          - 3 -                    June 20, 2008


LDB:PIY:mss
(Legal Advisory Unit)

c:     Paul B. Beach, Esq.
       Roger H. Granbo, Assistant County Counsel

**EXHIBIT "D"**