MARK D. ROSENBAUM, SBN 59940
mrosenbaum@aclu-sc.org
PETER ELIASBERG, SBN 189110
peliasberg@aclu-sc.org,
MELINDA BIRD, SBN 102236
mbird@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN
   CALIFORNIA
1313 W. 8th Street
Los Angeles, California 90017
Telephone:  (213) 977-9500, x219
Facsimile:  (213) 977-5297

MARGARET WINTER
ACLU NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6605
Facsimile:  (202) 393-4931
E-mail: mwinter@npp-aclu.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, et al, <br><br> Plaintiffs, <br><br> vs. <br><br> LEROY BACA, as Sheriff of the County of Los Angeles, MICHAEL D. ANTONOVICH, YVONNE B. BURKE, DON KNABE, GLORIA MOLINA, ZEV YAROSLAVSKY, as Supervisors of the County of Los Angeles, et al., <br><br> Defendants. | Case No.  Civ. 75-04111-DDP <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: PLAN FOR CLOSURE OF JAIL FACILITIES** <br><br> Honorable Dean Pregerson <br><br> Date:   August 3, 2009 <br> Time:   10:00 a.m. <br> Dept:   3 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION AND RELIEF REQUESTED. . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Proposed Closure of 1200 to 1600 beds at the Pitchess
            Detention  Center North Facility. . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Impact of Past Jail Facility Closures. . . . . . . . . . . . . . . . . . . . . . 4

      C.    Existing Overcrowding, Conditions of Confinement and the
            Denial of Adequate Mental Health Care. . . . . . . . . . . . . . . . . . . 6

III.  PLAINTIFFS HAVE MADE THE REQUISITE SHOWING FOR
      ISSUANCE OF A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . 12

      A.    Plaintiffs Are Likely to Succeed on the Merits. . . . . . . . . . . . . 12

      B.    Plaintiffs Are Likely to Suffer Irreparable Injury in the
            Absence of Preliminary Relief.  . . . . . . . . . . . . . . . . . . . . . . . . . 14

      C.    The Balance of Equities Is in Plaintiffs' Favor. . . . . . . . . . . . . 15

      D.    An Injunction is in the Public Interest. . . . . . . . . . . . . . . . . . . . 16

      E.    The Requested Relief Meets the Requirements of the PLRA. . . . . 18

IV.   PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND. . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1

## TABLE OF AUTHORITIES

2

**CASES** *Page(s)*

3

*American Trucking Association v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4

*Balla v. Idaho State Board of Corrections,*
    869 F.2d 461 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5

6

*Doty v. County of Lassen,*
    37 F.3d 540 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7

*GoTo.com, Inc. v. Walt Disney Co.,*
    202 F.3d 1199 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8

9

*Hoptowit v. Spellman,*
    753 F.2d 779 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10

*Hoptowit v. Ray,*
    682 F.2d 1237 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

11

12

*Jones v. City and County of San Francisco,*
    976 F. Supp. 896 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13

*Lopez v. Heckler,*
    713 F.2d 1432 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

14

15

*Lopez v. Heckler,*
    725 F.2d 1489 (9th Cir. 1984),
    vacated on other grounds, 469 U.S. 1082 . . . . . . . . . . . . . . . . . . . . . . . . . 12

16

17

*Nelson v. National Aeronatutics and Space Admin.,*
    530 F.3d 865 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18

*Orantes-Hernandez v. Smith,*
    541 F. Supp. 351 (C.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19

20

*People ex rel Van de Kamp v. Tahoe Regional Planning Agency,*
    766 F.2d 1319 (9th Cir.1985), *modified on other grounds* . . . . . . . . . . . . 19

21

*Rutherford v. Pitchess,*
    457 F. Supp. 114 (C.D. Cal 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

22

23

*Tanner Motor Livery, Ltd. v. Avis, Inc.,*
    316 F.2d 804 (9th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24

*Toussaint v. McCarthy,*
    597 F. Supp. 1397 (N.D. Cal. 1984), *aff'd in part and rev'd in part*
    *on other grounds*, 801 F.2d 1080 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . 13

25

26

*Toussaint v. Yockey,*
    722 F.2d 1490 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: PLAN FOR CLOSURE OF JAIL FACILITIES.**

## I.  INTRODUCTION AND RELIEF REQUESTED.

On June 26, 2009, Los Angeles County Sheriff Lee Baca announced his intention to close the North Facility at Pitchess Detention Center in Castaic, a county jail facility housing 1200 inmates, on July 1, 2009.  He cited County budget shortfalls as the reason for the planned closure.  Letter from Sheriff Lee Baca to Los Angeles Board of Supervisors, June 26, 2009.[1]  The day before the planned closure Sheriff Baca appeared at a hearing of the County Board of Supervisors and after a lengthy discussion agreed to the Board's request to delay the closure until September 1, 2009.

In the past, the Sheriff's Department has failed to anticipate and plan for the consequences of similar bed reductions, resulting in significant increases in violence, overcrowding, and the denial of fundamental rights such as access to medical and mental health care.  Without careful advance planning, the proposed closure of a jail facility and the reduction of 1200 beds are certain to have a disastrous impact on conditions in the remaining jail facilities and in the Inmate Reception Center.   The ripple effect on an already overcrowded system is likely to lead to further violations of existing Court Orders in this case, and to further deterioration in jail conditions that already violate constitutional minimums.  Sheriff Baca himself stated that "[a] reduction in jail beds could potentially result in an increase in inmate violence and a resultant increase in the use of force." Letter to Board of Supervisors, June 26, 2009 at 3.

Plaintiffs have filed this motion for a preliminary injunction to preserve the status quo until the Court and the parties have an opportunity to review Defendants' closure plans and assess the impact of any new facility closure or bed reduction on conditions in other facilities.  Plaintiffs seek an order that before Defendants close

_____

[1] This letter is Exhibit A to the Declaration of Elizabeth Mueller (Mueller Decl."), submitted in support of this motion.

1

these beds, they file an Overcrowding Impact Statement, describing Defendants'
plan to manage the closure of the North Facility, and the criteria for the release or
transfer of detainees upon closure of the North facility  Plaintiffs also request that
upon closing the North facility Defendants be required to provide a weekly inmate
census  for each dormitory and module in each of the County's jail facility, to enable
Plaintiffs to identify any new overcrowding.

If the County is prepared to absorb a reduction of 1200 beds, the first beds it
chooses for closure should be in Men's Central Jail ("MCJ") -- a facility twenty
years older than the North Facility at Pitchess, and so grossly outdated and deficient
that even Sheriff Baca has admitted it should be closed.   This Court invested
considerable time in settlement meetings between the parties in 2006 and early 2007
regarding the deplorable conditions at the MCJ, and by mid-2007 the County
publicly agreed either to renovate or close MCJ.  No progress has been made since
then, and the Sheriff has now concluded that renovation is simply not feasible, and
called for the full or partial closure of MCJ.[2]  To address this issue, Plaintiffs request
that a report on the proposed closure address the feasibility of bed closures and
census reductions at MCJ as an alternative to closure of the North Facility, as well
as the feasibility of using the North facility to house detainees currently housed at
other Jail facilities, including MCJ.

---

[2] See, e.g., Exhibits 6 and 7 to Mueller Decl.  Exhibit 6 is an article from the Los
Angeles Times, "JAILS MAY CLOSE, SHERIFF WARNS," published on February
24, 2009, available from 2009 WLNR 3545663.  The article reports that Sheriff
Baca "threatened to close the Men's Central Jail and perhaps a second detention
facility" due to budget cuts.  The article notes that Baca stated "if a jail has to
close… it will be the aging Men's Central facility, which over the years has
experienced outbreaks of violence…. [and] is outdated and extremely difficult to
patrol." Exhibit 7 is an article from the Los Angeles Times, "SHERIFF WANTS A
NEW JAIL, KNOWS ODDS ARE AGAINST HIM," published on November 23,
2007, available from 2007 WLNR 23179320.  The article reports that "Sheriff Lee
Baca wants the county to tear down Men's Central Jail," because it is the oldest jail
in the system and "has outlived its time." The article states that "deputies and
sheriff's officials contend the jail is outdated."

1   Plaintiffs seek simply to preserve the status quo while they review the

2   Defendants' plans for the closure.  It may be that Defendants do in fact have realistic

3   plans to accommodate a 1200-bed reduction, while also obeying this Court's orders

4   and meeting basic constitutional standards: for example, Sheriff Baca has stated that

5   he would "explore adjusting the bail schedule for non-violent offenders in an

6   attempt to further relieve jail overcrowding" (Baca's letter of June 26, 2009, Ex. 4 to

7   Mueller Decl.).   If, however, Defendants' Overcrowding Impact Statement suggests

8   that Defendants do not have a viable plan to avoid significant injury to the inmates

9   from the facility closure, Plaintiffs may seek additional relief from the Court.

**II. STATEMENT OF FACTS**

  A. **Proposed Closure of 1200 to 1600 beds at the Pitchess Detention Center North Facility.**

  Sheriff Baca's June 26, 2009 letter explains that new budget cuts of $25 million "will require the Department to close 1600 jail beds at the Pitchess Detention Center North Facility and redeploy 187 sworn and custody assistant personnel throughout the Department to directly impact and drastically reduce overtime posts.  This move will also lower inmate-related expenditures for food, drugs and personal supplies." June 26, 2009 Letter at 3. [3]  Baca also warns that "[f]urther jail closures may be necessary." *Id.* at 4.  The budget curtailment of $25 million represents one percent of the Sheriff's overall budget of $2.5 billion annually.

  Sheriff Baca spoke at a hearing before the Board of Supervisors on June 30, 2009, the day before North Facility was scheduled to be closed.  After a lengthy discussion, Sheriff Baca agreed to wait until September 1 before closing any facilities. [4]  That same day, Plaintiffs' counsel met with Sheriff's Department representatives and requested a copy of their plan for the closures.  Declaration of Melinda Bird ("Bird Decl."), ¶ 2.  The Department refused, and reiterated this

---

[3] The maximum capacity of the North Facility is 1600 people but it currently houses 1100 inmates.  Decl. of Mary Tiedeman, ¶ 3.

1  position in response to a subsequent letter asking for reconsideration of that decision

2  and release of the closure plan.  *Id.*,¶ 3.

3        **B. <u>Impact of Past Jail Facility Closures.</u>**

4        The Sheriff's Department has closed jail facilities in the recent past without

5  adequate planning for the displaced jail population, with disastrous results.  In 2006,

6  when the census at MCJ was reduced by 1200 beds, the Department's lack of

7  planning led to a back-up in the Inmate Reception Center, so that detainees were

8  packed into holding cells for days and even weeks at a time without beds, food,

9  access to telephones or medical care.  Plaintiffs filed a motion for a temporary

10  restraining order.  On October 27, 2006, the Court issued an Order to Show Cause

11  Re: Issuance of Preliminary Injunction and Temporary Restraining Order (Docket

12  No. 102).  Sheriff Baca directly attributed the problems in the Inmate Reception

13  Center to the earlier reduction in beds:

14        The Federal Court recently ordered the removal of 1,200 beds from the

15        Men's Central Jail (MCJ).  The order caused the processing of male

16        inmates in the Inmate Reception Center (IRC) to slow down

17        considerably while inmates awaited appropriate housing.  Inmates

18        could only be moved out of IRC after bed space became available at

19        MCJ and Twin Towers Correctional Facility (TTCF).

20  Letter from Sheriff Baca to Board of Supervisors, Feb. 13, 2007, Ex. 10 to Mueller

21  Decl.

22        This Court issued a TRO, which alleviated the most egregious problems at

23  Inmate Reception Center, and the Sheriff's Department opened additional jail beds

24  at Twin Towers and Pitchess, relieving the immediate overcrowding.

25        In February 2007, however, a decision by the County Board of Supervisors to

26  terminate overtime staffing for the Sheriff's department led the Sheriff to close 600

27  beds at the South Facility (also known as the "North Annex") at Pitchess Detention

28

[4] *See*, Exhibits 1 and 2 to Mueller Decl.

1   Center.  The result was a predictable exacerbation of overcrowding at the Inmate

2   Reception Center, and ongoing violations of the Court's October 2006 TRO.[5]

3   Plaintiffs filed a new motion for contempt (Docket Nos. 130-132.)  The Department

4   agreed to re-open the 600 beds at Pitchess, relieving the crisis for the time being.

5          Earlier facility closures have also resulted in increased overcrowding,

6   violence and riots.  Between 2002 and 2004, the Sheriff closed three jail

7   facilities and portions of all the remaining facilities other than MCJ.[6] Floor-

8   sleeping increased dramatically and there were several in-custody murders.

9   In February 2006, riots and disturbances broke out throughout the County

10  jails.  Declaration of Jody Kent, ¶¶ 14, 55, dated April 12, 2006, Ex. 3 to

11  Decl. of Mary Tiedeman.  Sheriff Baca told the press that "the increasing

12  violence at the North County Facility is attributable to his decision a few

13  years ago to close jails and concentrate inmates in the remaining jail facilities

14  – a move he said was caused by more than $150 million in budget cuts."  Los

15  Angeles Times, "Sheriff Blames Lack of Staff for Jail Riot," Los Angeles

16  Times, February 6, 2006, Ex. 16 to Mueller Decl.

17         Overcrowding and violence are not the inevitable result of facility

18  closures.  The Sheriff has managed to control the inmate census by using the

19  authority for early release of sentenced inmates conferred by earlier Orders in

20  this case.  *See, e.g.,* Ex. 6 to Bird Decl., *Jail Management Plan and Order filed*

---

22  [5] The Sheriff warned that eliminating overtime would exacerbate overcrowding:

23  Court-imposed mandates, including indoor and outdoor recreation
     programs, supervised facility cleaning crews, overflow cells at Twin

24  Towers Correctional facility to accommodate Inmate Reception Center
     medical evaluations, and operating the North Annex at full capacity to

25  relieve overcrowding at Men's Central Jail cannot continue, putting the
     Department at risk of Federal Court intervention.

26

27  Letter from Sheriff Lee Baca to Los Angeles County Board of Supervisors,
    February 22, 2007, Ex. 9 to Mueller Decl.

28  [6] Letter from Sheriff Baca to Board of Supervisors re: Custody Plan, August 5,
    2004, Ex. 24 to Mueller Decl.

1    May 27, 1988.  However, sentenced inmates make up only a small portion of

2    the jail population.  The Sheriff has failed to utilize other effective options to

3    manage the jail population that he has at his disposal, such as releasing non-

4    violent pre-trial detainees to the community using electronic monitoring.

5    With planning, the Sheriff could use these options to manage a facility closure

6    without increasing overcrowding, as Plaintiffs discuss more fully below in

7    Section III.D., *supra.*

8    ## C. Existing Overcrowding, Conditions of Confinement and the Denial of

9    ## Adequate Mental Health Care.

10   Since the Court-facilitated settlement meetings between the parties in 2006

11   and early 2007, the Defendants have made no progress on plans to renovate or close

12   Men's Central Jail and conditions there remain appalling.  According to the ACLU's

13   jail monitor, conditions are not materially improved from those described in

14   Plaintiffs' 2006 submissions to the Court. *Compare,* Declaration of Mary Tiedeman,

15   dated July 13, 2009 to Declaration of Jody Kent, dated April 12, 2006.  Despite the

16   1200-bed reduction in the population at that facility in 2006, most detainees are still

17   locked in their windowless cells for more than 22 hours per day, or crowded cattle-

18   style in dormitories with hundreds of other prisoners.  Tiedeman Decl., ¶¶ 9-16.

19   The physical structure of the jail is still intolerable, with inmates confined in

20   excessively small cells or in severely overcrowded dormitories. *Id.*

21   A corrections expert who toured MCJ in 2006 described conditions in the

22   dormitories that remain unchanged today:

23   At the far end of the recreation yard control booth, a [custody assistant]

24   was assigned to observe the 9500 dorm, which usually holds

25   approximately 230 inmates.  The tiered bunk beds in this dorm were

26   stacked together such that you could not walk between the beds or at

27   the head of the beds.  The bunk beds were placed side by side, touching

28   each other, with the bunk heads of one row touching the heads of

1  another row.  In order for an inmate to reach his bunk bed, he must
2  crawl over a bar which is approximately 2 ½ feet off the floor.  An
3  inmate cannot access his bed from the sides.  With the beds packed so
4  closely together (and with bedding hanging down from the top bunk), it
5  is impossible to see into the dorm beyond the first row of double
6  bunks....  [P]lacing a CA in the control room for that dorm is not an
7  adequate security measure.

8  Declaration of Tony Bair, ¶ 33, dated April 12, 2006, Ex. 4 to Tiedeman Decl.

9      In such cramped and overcrowded conditions, violence is pervasive and Jail

10  staff cannot provide even basic sanitation, minimal out-of-cell time, or medical and

11  mental health care.  Submitted in support of this motion are more than 30

12  declarations describing conditions in MCJ and other jail facilities over the past 18

13  months.  They describe fundamental violations of constitutional rights,[7] including:

14  • broken plumbing, moldy showers, vermin, limited access to clean clothes and

15     linens, and filthy, unsanitary conditions; [8]

16  • limited access to showers, which is a particular problem because of the

17  _____

18  [7] These and the following footnotes discuss only declarations from class members
    obtained in April, June and July 2009.  Plaintiffs have also submitted class member
19  declarations from December 2007 and 2008 that describe the same or similar
    problems and conditions, demonstrating that conditions have neither changed nor
20  improved.
21  [8] *See, e.g.,* decls of Bryan Jones, ¶ 5 (blood and feces on the walls in cells in mental
22  health housing); Alphonso Hawkins, ¶ 9 (food trays were filthy, cells flooded with
    water); Gary Green, ¶ 7 (no sheets for bed; "No one cleans when someone leaves;
23  they just put more people in there."); Michael Serrato, ¶ 4 (toilets backed up,
    overflowing ); Heriberto Rodriquez, ¶ 3 (black mold in showers); Carlos Ortiz, ¶¶ 3,
24  4, 6 (vermin because everyone must eat in their cells, no cleaning supplies, mold in
    showers, clothing exchange once per week, underwear and towels are stained and
25  dirty); Michael Serrato, ¶ 3 (infestation of mice in every module, also roaches);
26  Monte Stone, ¶ 5 (no cleaning supplies).  *Accord,* Tiedeman Decl., ¶ 12, 13.
27

28

1      increased risk of staphylococcus aureus ("staph") infections in the jail; [9]

2   •   long delays in or denial of mail and telephones;[10]

3   •   inadequate out-of-cell time and outdoor recreation,[11]

4   •   the denial of needed medication, medical and mental health care, the absence

5      of discharge planning when they leave the jail,[12] and

6   •   pervasive violence, abuse and retaliation from deputies as well as other

7   _____

8   [9]*See, e.g.,* decls of James Barker, ¶6 (allowed only a minute to shower); Demario
   Green, ¶¶ 3-4 (out of cell every three days to shower and use the telephone);

9   Ishmael Mizrahi, ¶ 3 ("I usually get a shower once a week or whenever the guards

10  feel like it"); Jesse Mejia, ¶ 9 (showers are "dirty and crowded," also dangerous
   "because there is so much agitation because of the long lines and people get violent"

11  while waiting for the shower).  *See also* Tiedeman Decl., ¶ 11 (frequently, inmates
   do not get the required shower schedule, which is every other day, or every day for

12  inmates with drug-resistant staph infection (methicillin-resistant staphylococcus

13  aureus, "MRSA")).

14  [10]*See, e.g.,* decls of Ishmael Mizrahi, ¶ 3 ("I am not receiving mail and phone calls
   are virtually impossible. The last time I used the phone was a week ago."); Heriberto

15  Rodriquez, ¶¶ 8, 15 (only allowed telephone call at 6:30 am, too early to speak to

16  anyone; more than a month to get mail); Demario Green, ¶ 6 (more than a month to
   receive mail); Michael Serrato, ¶ ¶ 6, 14 (more than a month to get mail, legal mail

17  is opened, complaints are not confidential).  *Accord,* Tiedeman Decl., ¶¶ 9-10, 15-

18  16.

19  [11] *See, e.g.,* decls of Demond Little, ¶ 8 (outdoor roof time is 4-5 am, once per week;
   cannot attend church because it conflicts with pill call); Gary Green, ¶ 10; Carlos

20  Ortiz, ¶ 17-18 (no TV, no roof time); Heriberto Rodriquez, ¶¶ 5-8 (only allowed
   outdoors on the roof once per week at 6:30 am, denied access to Sunday religious

21  services, no TV, no newspapers, cut off from the world); Jesse Mejia, ¶ 8 (outdoor

22  time on the roof is 4-5 am, once per week, too cold and early to get up).

23  [12] *See, e.g.,* decls of Demond Little, ¶¶ 2-5; James Barker, ¶¶ 3-4; Demario Green,
   ¶¶ 7-8; Carlos Ortiz, ¶¶ 9-12;  Alphonso Hawkins, ¶¶ 6-8; Bryan Jones, ¶5, ¶7;

24  Ishmael Mizrahi, ¶ 6; Michael Serrato, ¶ 8-11; Lorie M., ¶¶ 5-12; Jesse Mejia, ¶¶ 2-

25  7; Monte Stone, ¶¶ 3-5. *Accord,* Tiedeman Decl., ¶ 8.

26

27

28

1    inmates.[13]

2    One detainee's description of his experience in a large dormitory in Men's
3    Central Jail is typical:

4    There are no tables to eat meals. I have to eat in my bed, at the same
5    place I sleep at night. I see a lot of inmates with MRSA and other staph
6    infections because of how dirty everything is. There are only 5 toilets
7    and 5 sinks for the 120 people in my dorm. The ventilation is very poor
8    and there is very little space for the 120 people. All of the beds are
9    pushed very close together.   It is so cramped that illnesses spread
10   really quickly. The doctors say there are too many people to see, so I
11   feel like I'm placed on the back burner. . . . I only get outside really
12   early in the morning, between 4-5 a.m. I have to choose between going
13   outside and sleeping past 4 a.m.  I get outside so early that I don't really
14   get to see the sun.

15   Declaration of Demond Little, ¶¶ 7-8.

16   The conditions in MCJ are especially damaging for thousands of inmates with
17   mental illnesses, such as Mr. Little, who has a life-long history of mental illness and
18   who appears to be receiving no treatment or wholly inadequate treatment. Little
19   Decl., ¶¶ 3-5.  These problems have been so pressing that Plaintiffs retained Terry
20   Kupers, M.D., a nationally recognized expert in mental illness and mental health
21   treatment in prisons and jails, who toured the Jail, interviewed class members and

22   _____

23   [13] *See, e.g.,* decls. of Demond Little, ¶¶ 6-11 ("The deputies don't respect any
     inmates. They just treat us like bodies and are quick to put their hands on us. The
24   deputies will put charges on inmates that get beaten up in order to cover their own
     tracks. . . . I shouldn't have to face the resentment that the deputies have."); Carlos
25   Ortiz, ¶¶ 19-24; Heriberto Rodriquez, ¶6, ¶9; Bryan Jones, ¶ 6, ¶8; Ishmael Mizrahi,
     ¶¶ 7-11; Michael Serrato, ¶ 7; Monte Stone, ¶6 (retaliation for complaints).  Both
26   former jail warden Tony Bair and mental health expert Dr. Kupers explain how
27   overcrowding leads to violence by creating serious additional tensions and

28

1  prepared a report and recommendations.  Report of Terry Kupers, M.D., dated June

2  27, 2008, Exhibit 1 to Declaration of Margaret Winters, filed June 15, 2009 in

3  support of Plaintiffs' Motion to Re-Open Discovery (Dkt. No. 161).

4       Dr. Kupers' report focuses on the heavy impact of the extreme overcrowding

5  at MCJ.  *See, e.g.,* Kupers Report at 10 ("On the day [in April 2008] I toured the

6  MCF there was severe crowding in every area, but the Medical Disability/Stepdown

7  area, 6050, was especially poignant.  Men in wheelchairs, on crutches, and

8  otherwise disabled were stuffed like sardines into long interconnecting, dark rooms

9  with far too many bunk beds for them to be able to walk around."); *id.* at 11 ("[I]n

10  crowded facilities where rehabilitation programs are sparse or non-existent, as in the

11  Los Angeles County Jail, and prisoners are relatively idle, the worst traumas and

12  abuses are experienced by prisoners suffering from mental illness."); *id.* at 11

13  ("Crowding  makes it more difficult to perform mental health and health

14  assessments.  It is very difficult to adequately assess the 13,000 prisoners who enter

15  the jail each month.  And massive crowding means that there are more inmates in

16  need than can be accommodated on the mental health caseload."); *id.* at 16 ("[T]he

17  general population areas of the Men's Central Jail are massively overcrowded, and

18  the prisoners are almost entirely idle – a combination of toxic conditions that is

19  guaranteed to predictably increase the prevalence of violence, psychiatric

20  breakdown and self-harm."); *id.* at 23 ("I was told repeatedly by prisoners that there

21  is nothing available in the way of mental health treatment except the prescription of

22  psychiatric medications.  This is far from adequate mental health treatment.").

23       The ACLU's ongoing monitoring discloses that there has been no meaningful

24  improvement in the overcrowded conditions in MCJ since Dr. Kupers' 2008 report.

25  Detainees, especially those with mental illnesses, continue to suffer significant harm

26  from the toxic conditions and the grossly inadequate mental health care at MCJ.  *See*

27

28  exacerbates already existing tensions among inmates and between inmates and staff.
   Bair Dec., ¶ 42; Kupers Rpt. at 6-8.

declarations cited in note 12, *infra,* and decl. of Demond Little, ¶ ("There are a lot of people other than me that also have mental health problems, but it seems like there is no way to get treatment while in CJ. I feel like I don't have any way to get the help I need.").  Indeed, in March 2009, a twenty-two year old detainee in MCJ committed suicide after prolonged detention in solitary confinement in a discipline module.  Declaration of Margaret Winter, ¶¶ 5-8 (Docket No. 161).

Dr. Kupers' primary recommendation to remedy the grossly inappropriate and harmful treatment of the mentally ill prisoners was to "significantly decrease the population of Los Angeles County Jail," since

> [M]assive crowding in the jail makes it extremely difficult for
> mental health staff to diagnose and treat all prisoners in need of their
> services, it makes the conditions severely noxious for anyone
> suffering from mental illness who is not in mental health housing,
> and it increases violence, suicides and psychiatric breakdowns.  This
> is a huge issue, and requires thoughtful planning *vis a vis* remedy.

Kupers Report at 45.  Dr. Kupers suggested that diversion and early release to treatment programs would go far to resolve the problem, and proposed a number of other urgently-needed remedial measures. *Id.* at 45-50.

The parties and the Court have defined overcrowding as the point where the population of the jail "renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control" in the jail.  Memorandum of Understanding; Court Approval Thereof, filed November 13, 1985 (Docket No. 463), Ex. 5 to Bird Decl.  The Sheriff's present inability to provide "adequate security and control" in the jails is conclusive evidence of overcrowding, even before any new bed closures.  Defendants cannot close jail facilities without a plan to ensure that the conditions at MCJ and the remaining facilities do not get even worse.

//

//

### III.   PLAINTIFFS HAVE MADE THE REQUISITE SHOWING FOR ISSUANCE OF A PRELIMINARY INJUNCTION.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 129 S.Ct. 365, 375 (2008); *see also Stormans, Inc. v. Selecky*, --- F.3d ---, 2009 WL 1941550 (9th Cir. Jul. 8, 2009) at *13 (restating the *Winter* standard); *American Trucking Ass'n. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing the *Winter* standard).  Plaintiffs have made the requisite showing for issuance of the requested preliminary injunction.

In addition, "it is hornbook law that '[t]he general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action after a full hearing.'"  *Lopez v. Heckler*, 725 F.2d 1489, 1509 (9th Cir. 1984), vacated on other grounds, 469 U.S. 1082 (1984) citing 7 J. Moore & J. Lucas, Moore's Federal Practice ¶ 65.04[1] at 65-36 (2d ed. 1983).  Here, a preliminary injunction will preserve the status quo until the Court and the parties can assess the impact of a closure. *GoTo.com, Inc. v. Walt Disney Co*. 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963)) (status quo is the "last uncontested status which preceded the pending controversy").  Preserving the status quo at this stage will promote judicial economy and an orderly resolution of this issue, by obviating the need for emergency motion to re-open beds at a later point after a closure has already occurred.

### A.   <u>Plaintiffs Are Likely to Succeed on the Merits.</u>

The core issue addressed in the Court's 1978 memorandum opinion was overcrowding and its effects on conditions at the jail.  Although overcrowding is not, in and of itself, a violation of the Eighth Amendment, "[i]t can, under certain circumstances, result in specific effects which can form the basis for an Eighth Amendment violation."  *Hoptowit v. Ray*, 682 F.2d 1237, 1248-49 (9th Cir. 1982).  "Overcrowding can cause increased violence, it may dilute other constitutionally

required services such that they fall below the minimum Eighth Amendment standards, and it may reach a level at which the shelter of the inmates is unfit for human habitation." *Id.* (citation omitted).

In *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461 (9th Cir. 1989), the Ninth Circuit affirmed the district court's refusal to modify a prison population cap, where the district court had found that "overcrowding clearly brings on many problems, including idleness, frustration, stress, discomfort, edginess, and fear. … [and] it is one of the principal causes of the effect of violence, fights, stabbings, and of course, extreme management problems." *Id*. at 471-72 (brackets and ellipsis in original). *See also Toussaint v. Yockey*, 722 F.2d 1490, 1492 (9th Cir. 1984) (crowding is unconstitutional when it "engenders violence, tension and psychiatric problems"); *Jones v. City and County of San Francisco*, 976 F. Supp. 896, 907-08 (N.D. Cal. 1997) (jail overcrowding subjected class of pretrial detainees to punishment in violation of Fourteenth Amendment).

Unquestionably, "[a] sanitary environment is a basic human need that a penal institution must provide for all inmates." *Toussaint v. McCarthy*, 597 F.Supp. 1397, 1411 (N.D. Cal. 1984), *aff'd in part and rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986). *See also Hoptowit v. Spellman*, 753 F.2d 779, 783 (citing "the adequate sanitation required by the Eighth Amendment" and holding that vermin infestation, "properly considered in light of unsanitary conditions such as standing water, flooded toilets and sinks, and dank air, is an unnecessary and wanton infliction of pain proscribed by the Eighth Amendment"). When sanitation problems exist in a correctional facility, failure to provide cleaning supplies "deprives inmates of tools necessary to maintain minimally sanitary cells, seriously threatens their health, and amounts to a violation of the Eighth Amendment." *Id.* at 784. The lack of adequate ventilation and air flow can also "undermine[] the health of inmates and the sanitation of the [facility]" and "violate[] the minimum requirements of the Eighth Amendment." *Hoptowit*, 753 F.2d at 784.

Here, class members have described conditions at MCJ – broken plumbing, lack of cleanliness, denial of cleaning supplies, insect and vermin infestations that

1  result because inmates must eat in their cells, poor ventilation in overcrowded

2  dormitories – that already create an environment which violates minimum

3  constitutional standards, even before the additional overcrowding that may result

4  from new bed closures.

5         The inadequate medical and mental health care that results from

6  overcrowding also violates constitutional minimums.  "The Eighth Amendment

7  requires that prison officials provide a system of ready access to adequate medical

8  care.  Prison officials show deliberate indifference to serious medical needs if

9  prisoners are unable to make their medical problems known to the medical staff."

10  *Hoptowit*, 682 F.2d at 1253.  *See also Doty v. County of Lassen*, 37 F.3d 540, 546

11  (9th Cir. 1994) ("[T]he requirements for mental health care are the same as those for

12  physical health care needs.").    Declarations submitted by class members show that

13  the Defendants have not remedied the serious systemic deficiencies in the jail's

14  mental health care system identified by Dr. Kupers in his 2008 report, and that

15  Plaintiffs' serious medical needs have gone unmet as a result of overcrowding at the

jail.

16  **B.  <u>Plaintiffs Are Likely to Suffer Irreparable Injury in the Absence of</u>**

17  **<u>Preliminary Relief.</u>**

18         "[C]onstitutional violations cannot be adequately remedied through damages

19  and therefore generally constitute irreparable harm."  *Nelson v. Nat'l Aeronatutics*

20  *and Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008).   Here, the risk of irreparable

21  injury to class members is very great. As with past closures, there is a great risk that

22  detainees will back up for days or even weeks in the Inmate Reception Center, in

23  violation of this Court's earlier orders.  The risk is likewise great that inmates will be

24  crowded into double and triple bunks in dayrooms, religious chapels, and common

25  areas in housing modules in the remaining facilities, further reducing already

26  minimal out-of- cell time.  Dayrooms and common areas in every jail facility are

27  already filled with double and triple bunks that exceed the design capacity.

28  Dormitories in MCJ house as many as 230 detainees (Barr Decl., ¶ 33), far more than

the maximum of 64 inmates permitted in state regulations.  Crowding more inmates

1  into these already overcrowded facilities will increase tensions and make it even
2  more difficult to provide security and appropriate medical and mental health care.

3      It is also significant that the North Facility, which the Sheriff plans to close,
4  has dayrooms and outside yards for recreation and exercise.  Tiedeman Decl., ¶ 2
5  and Ex. 1 (description of North Facility on LASD website).  In MCJ, on the other
6  hand, which was built in 1963 and is twenty years older than the North Facility, all
7  cells are windowless and prisoners have only limited access to a dayroom; instead of
8  an exercise yard, inmates are allowed up on a small walled roof area once per
9  week.[14] The fire and life safety, plumbing, ventilation, evacuation and seismic safety
10 systems at MCJ are dilapidated and in constant disrepair. Decl. of Toni Bair, ¶¶ 10,
11 18.  *See also,* Tiedeman Decl., ¶ 7, 12 -14 (problems with plumbing, temperature,
12 rats, safety).

13     In 2006, when the Sheriff closed 1200 beds at MCJ without adequate
14 planning, the result was overcrowding at the Inmate Reception Center, which was so
15 severe that this Court granted equitable relief.  Rather than subjecting class members
16 once again to the risk of irreparable harm, this Court should require Defendants to
17 take the minimal step of producing a statement on the impact of the proposed
18 closing on overcrowding and conditions in the remaining facilities.

19     **C.  The Balance of Equities Is in Plaintiffs' Favor.**

20     The proposed Order filed with this motion requires Defendants to prepare an
21 Overcrowding Impact Report detailing the impact that closure of the North facility
22 will have on overcrowding at other jail facilities. No undue burden could be entailed
23 in preparing such a report; indeed, basic prudence in the administration of the Jail
24 would seem to require such a report.

25     Plaintiffs have also requested that the report address the feasibility of bed
26 closures and census reductions at Men's Central Jail as an alternative to closure of

27
28     [14] The North Facility houses inmates with a classification level of general
population medium security, the same level as many of the inmates housed at Men's
Central Jail. Tiedeman Decl., ¶ 4.

the North Facility.  According to Defendants, they already have a plan to manage the closure of the North facility and have determined that this will not result in increased crowding at other facilities.  If true, then preparing the requested report will not be burdensome, nor will a planned closure be delayed.  In fact, to expedite this matter, Defendants could provide a statement and their closure plan immediately, without waiting for the hearing on this motion on August 3, 2009.

Plaintiffs have further requested that Defendants produce a census of the inmates in each dormitory and module, and to provide this to Plaintiffs on a weekly basis in the future.  Without this information, Plaintiffs will not  be able to identify problems if they develop.  Tiedeman Decl., ¶ 3.  This request should impose no burden on Defendants since facility commanders already receive such reports. *Id.*

Defendants themselves have stated that they have not yet made a final decision to close the North facility, and "any potential closure most certainly is not imminent."  Ex. 2, Bird Decl.(July 12, 2009 letter from Paul Beach to Melinda Bird).  Therefore, requiring the Defendants to submit their report before the North facility is closed should not burden them at all.  Under the timeline in the proposed Order Plaintiffs have filed with this Memorandum, Defendants have ample time to prepare and file the report before the Sheriff appears before the Board on September 1, 2009.

**D.  <u>An Injunction is in the Public Interest.</u>**

"The public interest is a factor to be strongly considered" in granting a preliminary injunction.  *Lopez v. Heckler,* 713 F.2d 1432, 1436 (9th Cir. 1983).  The Ninth Circuit has cautioned that the "government must be concerned not only with the public fisc but also with the public weal," adding that "[o]ur society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges. . . ."  *Id.* at 1437. Here, it is in the public interest to protect the legal rights of the Plaintiff class, who are poor and disadvantaged.

Plaintiffs have long urged Defendants to relieve overcrowding in the jail by reducing the Jail population through a combination of approaches that include (a)

1    alternatives to detention such as supervised pre-trial release and electronic

2    monitoring, (b) reduced length of stay through more efficient court processing, and

3    (c) discharge planning to reduce the County's recidivism/re-arrest rate of more than

4    80%.  Ex. 3 and 4 to Bird Decl. These approaches have been highly successful in

5    other jurisdictions, most notably New York City, which went from the largest jail

6    system in the nation, at 22,000 inmates, to only 13,000 in less than seven years. *Id.*

7    New York closed a number of jail facilities in the process and instead created strong

8    programs for pre-trial diversion and close supervision and monitoring in the

9    community.  Thirty years ago, Judge Gray suggested various means by which the

10   Sheriff could reduce the jail population by cooperating with the court system to

11   streamline court processing.  *Rutherford v. Pitchess*, 457 F.Supp. 104, 114 (C.D.

12   Cal. 1978)   Plaintiffs fully support reducing the jail population through these

13   means, which will resolve the pressing problem of overcrowding.[15]

14        The Sheriff already relies on a 1988 Order from this Court for his program of

15   early release of prisoners convicted of misdemeanors and sentenced to the jail for a

16   year or less. Ex. 7 to Bird Decl.  However, sentenced prisoners make up a very small

17   percentage of the jail population.  In 2008, the Sheriff began a program that allows

18   the release of sentenced prisoners with electronic monitoring.  The Department has

19   been slow to implement this program, which still includes only a few hundred

20   sentenced prisoners.

21        This Court's 1988 Order authorizes a far better alternative to control the jail

22   population than early release of convicted prisoners:  expanded pretrial release of

23   detainees charged with non-violent crimes.  The 1988 Order is the basis for the

24   Sheriff's present policy of holding only detainees whose bail is set at more than

25   _____

26   [15] Defendants have retained the Vera Institute for Justice to conduct a population
     management study evaluating these options, but their recommendations are not

27   expected until 2011. Bird Decl., ¶ 5.  However, Defendants can and should involve
     the Vera Institute now for suggestions about ways to address the threatened closure

28   in a more responsible manner.

$25,000.  In his June 26, 2009 letter, Sheriff Baca stated that he would "explore adjusting the bail schedule for non-violent offenders in an attempt to further relieve jail overcrowding."  Ex. 4 to Mueller Decl.

The 1988 Order permits far wider use of pre-trial release than the Sheriff presently utilizes, and Plaintiffs have offered many times to negotiate an updated revision of this release order.  For example, the Sheriff could release pre-trial detainees with electronic monitoring, or limit the number of non-violent parole violators who are awaiting parole revocation hearings.  The County Defendants could also expand other programs operated by the probation department that allow supervised pre-trial release.   Instead of threatening to close an entire facility and violating multiple orders in this case, the Sheriff could instead expedite efforts to free up more bed space by shortening length of stay, releasing pre-trial detainees on electronic monitoring and providing better discharge planning, especially to inmates with mental illness. The public's interest is well-served by requiring the Sheriff to prepare and file a report to address the planned jail closure, thus ensuring that the Sheriff manages the prisoner population to ease overcrowding and preserve public safety.

**E.  The Requested Relief Meets the Requirements of the PLRA.**

Under the Prison Litigation Reform Act ("PLRA"), the Court must find that an order such as this is narrowly drawn, extends no further than necessary to correct the harm that the Court has found requires preliminary relief, and is the least intrusive means necessary to correct that harm.  18 U.S.C. § 3626(a). Here, the proposed Order meets all these criteria.  It is modest in scope and does not seek to stop the bed closures, only to ensure that the Court and the parties considered the impact on overcrowding at the remaining facilities.  Requiring a statement from Defendants respects their autonomy and is the least intrusive relief that addresses the need. The proposed Order fully complies with the PLRA.

//

//

**IV.    PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND.**

This Court has the discretion to issue a preliminary injunction without requiring Plaintiffs to post bond.  *People ex rel Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir.1985), *modified on other grounds*, 775 F.2d 998 (9th Cir. 1985).  Exercise of that discretion is particularly appropriate where an action is brought by a class of indigent plaintiffs.  *Orantes-Hernandez v. Smith,* 541 F.Supp. 351, 386 n. 42 (C.D. Cal. 1982).  Here, too, no bond should be required as this case has been brought by a class of indigent plaintiffs.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction order restraining Defendants from closing any beds at the North facility at Pitchess Detention Center or at any other jail facility until they submit an Overcrowding Impact Statement to the Court and to Plaintiffs, and allow Plaintiffs fourteen days from their receipt of this statement to file a motion requesting whatever additional relief from this Court they deem necessary.  Specifically, the Overcrowding Impact Statement should address the feasibility of bed closures and census reductions at Men's Central Jail as an alternative to closure of the North Facility, as well as the feasibility of using the North Facility to house detainees currently housed at other Jail facilities, including Men's Central Jail.  The report should also include the criteria to be used by Defendants for the release of detainees currently housed at the North facility who will not be transferred to other facilities after the North facility is closed, and a census of the inmates in each

//

//

dormitory and module in every jail facility, which will also be provided to Plaintiffs on a weekly basis in the future.

DATED: July 13, 2009                    Respectfully submitted,

                                        ACLU National Prison Project
                                        ACLU Foundation of Southern California


                                          /s/ Melinda Bird

                                        BY:  Melinda Bird
                                        Attorney for Plaintiffs