# EXHIBIT 4



**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

April 6, 2009

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
Los Angeles, CA 90012

**Chair**
Jarl Mohn

**President**
Douglas Mirell

Re: Treatment of Detainees with Mental Illness and Conditions in the Los Angeles County Jail

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

Dear Supervisors,

We have enclosed with this letter an advance copy of a report by Dr. Terry Kupers, a national expert on correctional mental health care, on the impact of conditions in the county jail system on people with mental illness. We plan to release this report to the public in the next few weeks. We would like an opportunity, along with family members of current and former detainees, to address the Board, and we will be contacting your staff to request that this issue be added to the agenda for the April 14 Board meeting.

Dr. Kupers' report was completed in June 2008 after interviews with scores of detainees and inmates and extensive review of medical records. We provided a copy of the report to Sheriff Baca and members of the Sheriff's Department, and to the County Department of Mental Health (DMH), but have never before released the report to the public. We had hoped to resolve the problems raised in the report and have been meeting with the Sheriff's Department on a monthly basis since August 2008. Unfortunately, we have not made any significant progress during these confidential meetings and feel obliged to make public our concerns.

In releasing this report, we want to underscore our appreciation for the efforts of the DMH staff who work in the jail. As Dr. Kupers observed in his report, they are in an almost impossible situation, given the gross lack of resources available to them for the treatment of the massive mentally ill population in the County's jail system. The changes which are so urgently needed, including the closing of MCJ, require action by the Board of Supervisors itself.

To resolve the problems outlined in Dr. Kupers' report, we call on the Board of Supervisors to take the following steps, which are discussed in more detail below:

1. Close Men's Central Jail.
2. Increase the number of treatment beds, meaningful programming and

Page 20

1313 WEST EIGHTH STREET LOS ANGELES CA 90017 t 213.977.9500 f 213.977.5299 ACLU-SC.ORG

out-of-cell time for inmates and detainees with mental illness.
3. Implement a comprehensive program of supervised pre-trial release for low-risk detainees, with a priority on those with mental illness.
4. Increase discharge planning and aftercare services for inmates with mental illness.
5. Release all of the reports from the Department of Justice regarding mental health treatment in the jail, and open this monitoring process to the federal court and the ACLU.

**1. Close Men's Central Jail (MCJ).**

Dr. Kupers' report describes the terrible conditions in MCJ, including the extreme overcrowding and lack of out-of-cell time, the enforced idleness and lack of the programming, excessive violence and over-use of discipline, which falls especially hard on inmates with mental illness. Dr. Kupers estimated that in addition to the 2000 male inmates on the mental health caseload, an additional 2000 also suffer from mental illness but receive no treatment; most are housed in MCJ. Kupers found that conditions at MCJ are "a predisposing factor in eventual mental disorders" even for people without mental illness before their incarceration. "It is intolerable to leave prisoners in harsh crowded conditions that we know cause psychiatric breakdown." Report on Mental Health Conditions in the Los Angeles County Jail, June 27, 2008, page 15.

The County has been on notice of these problems for many years. Study after study has confirmed that conditions in MCJ are grossly inadequate and put both inmates and deputies at risk of harm. The Sheriff's Department has been considering plans to rebuild or replace MCJ for more than four years. In 2006, as part of the "Rutherford Panel" process, ACLU experts worked with the CEO on alternative repair/rebuilding construction plans. Finally, on March 18, 2008, the CEO wrote to the Board with a plan to close half of MCJ within three years, but the Board never acted on this proposal. Now, another year has gone by with no progress.

There is now consensus from members of the CEO's staff and the Sheriff's Department as well as experts retained by the ACLU that "fixing" MCJ is not feasible or cost-effective. The only way to resolve the conditions at MCJ is to close the entire facility. There are no more reasons to delay. The Board must adopt and implement a closure plan immediately. The potential savings from such a closure should be used to pay for programs to reduce the jail population and the number of people with mental illness in the jail, including programs outlined below.

**2. Increase the number of treatment beds, meaningful programming and out-of-cell time for inmates and detainees with mental illness.**

Dr. Kupers found that although approximately 12% of the male inmates were in mental health treatment, at least that twice that number need care. Page 6. "There are more inmates in need than can be accommodated on the mental health caseload." Page 9. Dr. Kupers recommended an increase in jail mental health services, both in the number of treatment beds and the quality of care. Page 47-48. He recommended that the County create new treatment dorms in Pitchess and offer programming and mental health services outside of TTCF.



The Honorable Board of Supervisors                                                                                      Page 3
April 6, 2009

Dr. Kupers also found that, because of their mental illness, these inmates are unable to conform to jail rules and end up in solitary confinement in tiny, dark "discipline" cells. A timely article last week in the New Yorker magazine (March 30, 2009) noted how destructive solitary confinement is for any prisoner. Kupers found that placement in solitary discipline cells is especially devastating for those who already suffer from mental illness. Expanded treatment programs must address this dynamic and ensure that inmates are not subjected to discipline for behavior that results from their mental illness.

However, the burden of this increased expense should not fall on the County Department of Mental Health (DMH), which already devotes $30 million from its limited budget to jail mental health services. As we discuss below, a more cost-effective alternative is to re-program custody funding to expand diversion programs and alternatives to detention for detainees with mental illness.

### 3. Implement a comprehensive program of supervised pre-trial release for low-risk detainees, with a priority on those with mental illness.

The County spends more than $140 per night - a total of $4200 per month - for an inmate with mental illness in jail. This is far more than cost of community-based residential programs or supported housing. Adopting a comprehensive pre-trial release program for these inmates will reduce the extreme overcrowding in the jails and save millions of dollars for the County without any risk to public safety. Many low-risk detainees remain in jail for months simply because they are too poor to make bail. The County has some alternatives to incarceration but these focus on sentenced inmates, who make up a small portion of the inmate census. DMH also has programs but again, these reach only a fraction of those who pass through the jail each month.

Implementing a pre-trial release program will involve several steps: setting appropriate screening criteria for release and diversion; authorizing the Sheriff to impose electronic monitoring or other supervision terms for pre-trial detainees without requiring an additional court order; identifying appropriate supervision programs - both residential and non-residential- and directing additional funding to the new programs. A successful program will require leadership by the Board and cooperation between DMH, the Sheriff's Department and the Probation Department. The cost of incarcerating inmates with mental illness is so high that these alternative programs can be funded with the savings from the custody budget.

### 4. Increase discharge planning and aftercare services for inmates with mental illness.

Dr. Kupers recommended that the County improve and expand its discharge and aftercare services. Report, page 49. In 2005, a County Task force concluded that "the Sheriff is the largest discharger of at-risk and homeless persons" from a County institution. Since then, DMH and the Sheriff's Department have created several small aftercare programs but these reach only a fraction of those who are released. Moreover, inmates who have been prescribed psychotropic medication in the jail are not given a "bridge supply" when they are released, so that many



Page 22

The Honorable Board of Supervisors                                                                 Page 4
April 6, 2009

decompensate before they can obtain more medication.

More generally, DMH's community-based services do not reach all those in need. Recently, a USC researcher found that "76% of the male inmates with severe mental illness in [the Los Angeles County] jail were receiving their acute psychiatric inpatient treatment in the criminal justice system and not in the mental health system." H.R. Lamb, "Treatment Prospects for Persons with Severe Mental Illness in an Urban County Jail (2007). This and other studies have found that people with mental illness are also much more likely to be re-arrested. A comprehensive aftercare program linked to supported housing and treatment would reduce the high rate of recidivism and the number of people with mental illness in custody.

**5. Release all of the reports from the Department of Justice regarding mental health treatment in the jail, and open this monitoring process to the federal court and the ACLU.**

The Department of Justice has been investigating problems with the treatment of inmates with mental illness in the LA Jails since 1996. However, the monitoring reports have never been released to the public, the ACLU or the federal district court.

The conditions in the jail are a matter of keen public interest. Transparency and oversight are key to accountability. If the Department of Justice reports demonstrate that the problems identified by Dr. Kupers are being addressed, it is in the County's interest to release them. If the reports confirm Dr. Kupers' findings, the public has a right to know the extent of the problem and that the Board is taking it seriously. Finally, because these mental health issues are so inextricably entwined with the over-crowding issues before the federal court in the Rutherford case, the federal court and the ACLU should have access to the reports as well.

We look forward to discussing these matters with you at your earliest convenience.

Sincerely,

*Melinda Bird*                                    /S/

Melinda Bird                                      Margaret Winter
Senior Counsel                                    Associate Director
ACLU of Southern California                       National Prison Project of the ACLU Foundation

/S/
Mark Rosenbaum
Director of Litigation
ACLU of Southern California



LIBERTY | JUSTICE | EQUALITY

Page 23

# EXHIBIT 5

RECEIVED NOV 15 1985
INKLE, RUDIGER AND SPRIGG


NOV 13 1985
CLERK U.S.
CENTRAL DIST.
BY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, | ) No. CV 75-4111 WPG |
| Plaintiff, | ) MEMORANDUM OF UNDERSTANDING; ) COURT APPROVAL THEREOF |
| v | ) |
| SHERMAN BLOCK, et al., | ) |
| Defendants. | ) |

The parties to the above-entitled action, through their counsel of record, the undersigned, hereby enter this Memorandum of Understanding, and subject to the court's approval, agree as follows:

A. Preamble

Plaintiff's counsel has received complaints alleging that the Sheriff is failing to comply with certain of the orders issued by the Honorable William P. Gray in <u>Rutherford v. Block</u>, CV 75-411 WPG. The Sheriff acknowledges that current population levels at Men's Central Jail and throughout the County jail system have precluded him from fully complying with all of such

1.

orders. However, counsel for the parties in <u>Rutherford</u> acknowledge the Sheriff's good faith efforts to reduce population levels and to comply with the orders of <u>Rutherford</u>. Consequently, counsel for the parties in <u>Rutherford</u> believe that contempt proceedings for actions and events to date are neither necessary nor likely to be productive. Rather, counsel for the parties believe that the cooperative effort contemplated herein is more likely to result in appropriate remedies.

B. <u>Goals</u>

Through the cooperative effort contemplated herein, counsel for the parties seek to achieve the following goals:

1. To limit the legal and factual areas of disagreement.

2. To limit the expenses inherent in resolving issues of increasing inmate population and prisoners' rights.

3. To resolve the issues, if possible without judicial intervention.

4. To bring any unresolved issues to the court for resolution without need for contempt proceedings or the appointment of special masters.

5. To agree upon a maximum population for Men's Central Jail with appropriate staffing.

C. <u>Definition of Overcrowding</u>

1. The parties agree that the term "overcrowding" is subject to several interpretations. For the purpose of this document, overcrowding at Men's Central Jail is defined as that

point where the inmate population exceeds a number which:

    a. Renders it impossible for the Sheriff to comply with the orders in <u>Rutherford v. Pitchess</u> as they now provide or as they may be modified by agreement of the parties and approved by the court.

    b. Renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control.

2. The parties further agree that overcrowding, as defined herein, is a function of both Central Jail's structure and its staff. In reaching Goal 5 set forth above, it is the parties' intent to determine the maximum number of inmates who can be confined in Central Jail under conditions of both present and maximum staffing. The parties recognize that the present inmate poipulation does not necessarily amount to overcrowding as defined herein if staffing is determined to be adequate. The present population might even be increased given the appropriate changes in staffing and procedures. However, the parties also recognize that at some point there are structural limitations to the maximum inmate population at Central Jail.

D. <u>Methodology</u>

In furtherance of the goals set forth above, the parties agree to the following:

1. Plaintiff's counsel will be allowed continued access to the Central Jail subject to the discretion of the Commander of that facility.

///

3.

Page 26

2. Plaintiff's counsel will commence an analysis of the Sheriff's compliance with each of the Orders of the Supplemental Memorandum Opinion and Judgment filed February 15, 1979, specifically:

    a. Each prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep [plaintiff's analysis will include a review of the practice of using dayrooms for dormitories and the addition of an extra "bunk" in certain types of cells].

    b. Prisoners not excluded from roof exercise will be allowed not less than two and one-half hours of outdoor or other recreation per week.

    c. Television receiving sets shall be installed and reasonably maintained in each dayroom.

    d. That there is adequate seating provided for detainees placed in holding cells for processing to court.

    e. Detainees facing trial, after the first day of trial, will not be required to leave their beds earlier than 6:00 a.m., will not be confined to a holding cell for longer than thirty minutes, waiting time on the bus will not exceed thirty minutes, and will be returned to cells not later than 8:00 p.m.

    f. Inmates shall be allowed not less than fifteen minutes to complete each meal.

    t. Each inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those that he has been using.

4.

3. Plaintiff's counsel will commence an analysis of conditions of confinement in the 9,000 floor dormitories, including ventilation, access to indigent supplies, compliance with <u>Rutherford</u> orders, custody practices, classification, etc.

4. The County will provide, upon request, relevant non-privileged data as to populations, staff, violence, etc., so that relevant statistical information can be prepared and analyzed by both parties. The parties will keep each other regularly apprised of the progress and results of such analysis.

5. The County may assign a member of the Los Angeles County Sheriff's Department to act as a liaison with plaintiff's counsel.

6. Plaintiff intends, at this time, to employ two experts [one psychologist and one statistician] to assist with the above-mentioned analysis, and to request that those experts prepare written reports as part of this analysis. County representatives, and their counsel, shall be allowed reasonable personal access to these experts and complete access to any reports, computer printouts, tables, exhibits, etc., that they may prepare. It is plaintiff's intention to utilize these experts to gather information which will be shared with defendants and to provide an independent appraisal of conditions at the Central Jail. Whenever possible, tours of Central Jail by plaintiff's expert psychologist shall be arranged and conducted so that an appropriate representative from the Sheriff's medical staff may attend.

7. The parties agree that changes in the population at the Central Jail will impact upon the populations of the other

5.

facilities in the Los Angeles County Jail system, and the County agrees to inform plaintiffs of changes in the use and capacities of those other facilities which may occur as a result of any proposed limitations on Central Jail's population.

8. The parties will request an October 1985 Status Conference with the Honorable William P. Gray.

9. Counsel for the parties will meet regularly, not less than monthly, to discuss the progress and anticipated findings. It is the parties' intent and desire to meet and confer with regard to achieving the goals set forth in Paragraph B above at least 30 days prior to seeking judicisl relief.

IT IS SO AGREED:

DATED: October 2$\check{}$, 1985     Respectfully submitted,

DE WITT W. CLINTON, County Counsel

By _____
FREDERICK R. BENNETT
Principal Deputy

DATED: October 7, 1985     _____
JOHN H. HAGAR, JR.

DATED: October 4, 1985     _____
PAUL HOFFMAN

Attorneys for Plaintiff

Good cause appearing therefor, the foregoing is approved.

DATED: ~~October~~ November 5, 1985     _____
WILLIAM P. GRAY
United States District Court

6.