# EXHIBIT
# 1

■ LASD HOME ▶   ■ DIVISION HOME ▶

## Pitchess Detention Center - North Facility   BACK



### Custody Operation Roster

**Jail Facilities:**

**Pitchess Detention Center**
- East Facility
- North Facility

**North County Correctional Facility**

**Mira Loma Detention Center**

**Men's Central Jail**

**Twin Towers**



**Capt. Ray Leyva**

29320 The Old Road
Castaic, CA 91384

Business Phone:
661-295-8840
(Inmate information is not available at the above phone number)

Inmate information is available 24 hours a day by calling (213) 473-6100.

★ click here for information regarding:
mailing, visiting hours, directions,and additional general information

Inmate Locator

Keefe Commissary

Inmate School

FAQ

Pitchess Detention Center North Facility is a maximum security complex capable of housing 1,500 inmates. The facility's current population is pre-sentenced and sentenced male inmates with security levels ranging from low to high. The inmate housing area consists of four individual concrete modules each containing four dormitory style living quarters, eight disciplinary cells, a multipurpose room, a medical center, a visiting center, and three security stations. Each dormitory has the capacity to house 96 inmates. The dormitories were designed with the intention of creating a safe and secure, self-contained living environment. Each dormitory has a sleeping area, dining area, which also doubles as a day-room, and restroom facilities. Each dormitory has access to an exercise yard.

Constructed in 1987 at a cost of $41,000,000.00, the facility originally operated under South Facility's command. Exactly four years later, North Facility experienced its first, of several, major operational changes. In October 1991, North Facility gained independence from South Facility when it was assigned a unit commander and operations staff, and became a separate unit. Since 1991, many operational changes have taken place. The most recent change occurred in November 2001, the date marking the curtailment of South Facility. As a result of the curtailment, North Facility immediately inherited control of the Ranch field operations, and the unit commander was given the task to plan and implement the reopening of South Facility. South Facility, then known as North Annex, reopened in the summer of 2002.

In October of 2007 North Annex once again became a separate unit. North Annex was re-opened with it's own Captain and command staff as South Facility.

North Facility offers inmates religious services, jail stores, school programs, substance abuse meetings, medical services, inmate services, and weekend and holiday visitation.

 back to top

# EXHIBIT
# 2



Los Angeles County
**Sheriff's Department**

# Inmate Reception Center Daily Inmate Statistics

**Monday**                                    **07/13/2009**

| BOOKINGS AND RELEASES 07/12/2009 | BOOKINGS | RELEASES | COURT RELEASES | TOTAL RELEASES | Difference Bookings/ Releases |
|---|---|---|---|---|---|
| MALES (INMATE RECEPTION CENTER) | 80 | 102 | 0 | 102 | 22 |
| FEMALES (CRDF RECEPTION CENTER) | 24 | 22 | 0 | 22 | -2 |
| TOTALS | 104 | 124 | 0 | 124 | |

**Community Based Alternatives To Custody Programs (CBAC)**

| PROGRAM | MALES | FEMALES | TOTAL |
|---|---|---|---|
| ELECTRONIC MONITORING | 254 | 18 | 272 |
| INVOLUNTARY ELECTRONIC MONITORING | 93 | 5 | 98 |
| WORK RELEASE | 325 | 39 | 364 |
| WEEKENDERS | 59 | 0 | 59 |
| INMATE STATION WORKERS | 147 | 0 | 147 |
| TOTAL | 878 | 62 | 940 |

**Federal Inmates at Mira Loma**

| CAPACITY | OCCUPIED |
|---|---|
| 1,452 | 1,177 |

**Inmate Count: 07/13/2009          Monday          at 0600 hrs**

| FACILITY | CAPACITY | UNAVAILABLE BEDS | FUNCTIONAL BEDS | AVAILABLE BEDS | OCCUPIED |
|---|---|---|---|---|---|
| PDC EAST FACILITY | 1,944 | 51 | 1,893 | 44 | 1,849 |
| PDC NORTH FACILITY | 1,624 | 416 | 1,208 | 44 | 1,164 |
| PDC SOUTH FACILITY | 1,536 | 90 | 1,446 | 155 | 1,291 |
| NORTH COUNTY CORRECTIONAL FACILITY | 4,295 | 12 | 4,283 | 319 | 3,964 |
| PDC TOTAL | 9,399 | 569 | 8,830 | 562 | 8,268 |
| CENTRAL JAIL | 5,188 | 155 | 5,033 | 399 | 4,634 |
| CENTRAL JAIL OUTPATIENT CLINIC | 569 | 0 | 569 | 115 | 454 |
| TWIN TOWERS CORRECTIONAL FACILITY-TOWER 1 | 2,838 | 310 | 2,528 | 265 | 2,263 |
| TWIN TOWERS CORRECTIONAL FACILITY-TOWER 2 | 1,867 | 244 | 1,623 | 111 | 1,512 |
| CJ-TTCF TOTAL | 10,462 | 709 | 9,753 | 890 | 8,863 |
| CENTURY REGIONAL DETENTION FACILITY (FEMALES) | 2,380 | 369 | 2,011 | 172 | 1,839 |
| FEMALES TOTAL EXCEPT CRDF RECEPTION CENTER | 2,380 | 369 | 2,011 | 172 | 1,839 |
| CORRECTIONAL TREATMENT CENTER (MSB) MALES | | | | | 130 |
| CORRECTIONAL TREATMENT CENTER (MSB) FEMALES | | | | | 16 |
| CORRECTIONAL TREATMENT CENTER TOTAL | 196 | 0 | 196 | 50 | 146 |
| LCMC JAIL WARDS MALE | | | | | 15 |
| LCMC JAIL WARDS FEMALE | | | | | 3 |
| LCMC JAIL WARD TOTAL | 40 | 0 | 40 | 22 | 18 |
| CTC & LCMC GRAND TOTAL | 236 | 0 | 236 | 72 | 164 |
| HOUSING TOTAL OF INMATES | 22,477 | 1,647 | 20,830 | 1,696 | 19,134 |
| INMATE RECEPTION CENTER | | | | | 268 |
| CRDF RECEPTION CENTER (FEMALES) | | | | | 3 |
| RECEPTION CENTERS TOTAL | | | | | 271 |

| | |
|---|---|
| MALE TOTAL | 17,544 |
| FEMALE TOTAL | 1,861 |
| GRAND TOTAL | 19,405 |

Capacity: Total number beds at each facility.

Unavailable: Beds not available for use.

Functional Beds: Current number of beds available for use at each facility.

Available: Beds available in each housing module at the facility.

Revised 04-02-09

# EXHIBIT
# 3

## DECLARATION OF JODY KENT

I, Jody Kent, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am the Jails Project Coordinator at the American Civil Liberties Union of Southern California ("ACLU-SC"). I have held this position since August 2003. As counsel for plaintiffs in <u>Rutherford v. Pitchess</u>, CV 75-4111 (C.D. Cal.), ACLU-SC monitors jail conditions at Mens Central Jail ("MCJ") and other Los Angeles County jails through its Jails Project.

**ACLU-SC's Jails Project: Monitoring Los Angeles County Jails**

3.     As part of the Jails Project's activities, I field complaints from inmates via phone messages and letters daily, and during jail visits several times each week. We file over 400 complaints each month from inmates at seven county jails about living conditions, medical services, and similar issues. We process the complaints by logging them into an internal database, sending the information to the Custody Support Services Division of the County of Los Angeles Sheriff's Department ("Sheriff's Department") within one or two days, and following up with the Sheriff's Department, and with inmates when possible, to ensure that the complaints are responded to appropriately.

4.     Almost half of the complaints we receive each month come from inmates at MCJ, and the remaining complaints come from inmates at six other County jails housing the remaining 13,000 inmates. All of the County jails have posted written notices advising inmates to call the ACLU-SC for issues relating to "beds, change of clothing, food, meals, gay inmate classification, recreation, showers, telephones, overcrowding, fish kits, store, protective custody, religious services, mail, and other similar issues that may arise."

5.     As Jails Project Coordinator, I oversee the Jails Project complaint processing, supervising anywhere from four to six interns at one time. Along with

1

my interns, I also regularly tour MCJ, as well as the Twin Towers facility in downtown Los Angeles and Pitchess Detention Center in Castaic, to speak directly to inmates regarding jail conditions. The Jails Project also processes the complaints of inmates with whom we directly speak at these jails. Each year the Jails Project processes approximately 4,500 complaints on behalf of inmates in the county jails.

6.      Approximately eighty percent of the complaints the Jails Project receives relate to medical and mental health services. Inmates call the Jails Project in order to access medical/mental health screening and treatment, often after having waited several weeks or even months without receiving these much-needed services. We receive many complaints about medical and mental health services because inmates know that the Jails Project will successfully expedite medical and mental health attention. After filing a complaint with the Jails Project, an inmate is likely to see medical staff within a week to ten days, while he or she otherwise might wait over two weeks or up to a month. Inmates perceive unmet medical and mental health needs to be immediate and dire, for obvious reasons, so they complain about these issues with great frequency.

7.      Overcrowding is a systemic problem that causes inmates many problems and tensions. When I have inquired with inmates about its effects, they make comments that clearly show that overcrowding has a profound effect on their daily lives. For example, inmates complain that they are rushed in and out of showers, without getting enough time to shower. They are very aware of being packed into tiny cells, and this overcrowding creates tensions for them every day, which sometimes result in arguments among cell-mates about who will get the most toilet paper, who will get a bottom bunk, and who will have to sleep closest to the toilet.

8.      The Jails Project also advocates with the Sheriff's Department and with the County of Los Angeles Board of Supervisors regarding jail conditions in

2

1  Sheriff's Department facilities.  Based on regular tours and communications with

2  jail officials, I gather information about jail policies that need reform or revision

3  and communicate this information, along with recommendations, to the Sheriff's

4  Department.

5      9.      I regularly meet with Sheriff's Department officials, including

6  Commander Dennis Conte, Lieutenant Casey Bald and Captain John Clark, to

7  discuss facility-wide and county-wide jail conditions issues and to give

8  recommendations on jail policies and procedures.  In my discussions, I point out

9  the jails' violations of <u>Rutherford</u> orders, Title 15 of the California Code of

10  Regulations, which are state regulations governing jail conditions for county jails,

11  and I discuss topics relating to inmate complaints.  In the last year, our discussions

12  have covered problems relating to overcrowding, recreation, the inmate complaint

13  process, know your rights materials, inmate voting rights, excessive force

14  allegations, and discipline of inmates.  MCJ is one of the facilities that I regularly

15  discuss with the Sheriff's Department.

16      10.     The Jails Project also spearheads a Los Angeles County Jails Task

17  Force, which is a coalition of approximately twenty five to thirty organizations

18  that work with inmates or formerly incarcerated persons to discuss issues related

19  to the jails.  This task force has created a forum in which inmate advocates and

20  Sheriff's Department officials discuss together issues such as access to medical

21  care, inmate services and programs, and overcrowding.

22      11.     As Jails Project Coordinator, I have toured numerous County jails

23  across the country, including several jails in Cook County, Illinois; one jail in

24  Rikers Island, New York; the Suffolk County House of Correction in Suffolk

25  County, Massachusetts; several jails in San Francisco County, California; and two

26  jails in Philadelphia County, Pennsylvania.  I have also spoken to jail

27  administrators, advocates for inmates, and oversight agencies related to the jails I

28  have toured.  On these tours, I have paid particular attention to policies relating to

3

classification, medical services, overcrowding, inmate-to-staff ratios, and physical design. Based on my tours, I have brought recommendations for policy changes to the Sheriff's Department, at least one of which has been implemented.

12.     In 2005, the Jails Project brought Los Angeles County Supervisor Zev Yaroslovsky to tour MCJ. Following Supervisor Yaroslavsky's tour, the Jails Project produced a confidential report entitled "ACLU-SC Jails Project Report for the Honorable Zev Yarosolovsky, Supervisor of the Third District," which we presented to the Supervisor and the Sheriff's Department.

13.     Supervisor Yaroslavsky asked the Jails Project to produce a "blueprint" of recommended changes in Los Angeles County jails, in light of our assessment of the jails. In July 2005, the Jails Project produced a report entitled "Blueprint For The Los Angeles County Jails," which we submitted to the Supervisor and to the Sheriff's Department. A copy of that Blueprint is attached as Exh. 1. The Blueprint contained a number of recommendations based on the Jails Project's monitoring and advocacy efforts. I have discussed these recommendations on jail policies and procedures with members of the Board of Supervisors and the Sheriff's Department.

**February 2006 Riots And Aftermath**

14.     In February 2006, a number of riots broke out in the County jails, resulting in inmate-on-inmate assaults, hundreds of inmate injuries, and two inmate deaths. In response to the riots, I advocated with the Sheriff's Department to reduce the population at MCJ immediately, overhaul the inmate classification system, increase access to educational and rehabilitation programs, and provide alternatives to 24-hour lockdown. In late February 2006, we brought a jails expert named Tony Bair on a tour of MCJ. I accompanied Mr. Bair on his tour, and what he saw on that date was fairly typical of MCJ activities.

15.     In light of the February riots, in late March 2006, the Sheriff's Department produced a "Jail Housing And Security Plan" concerning the housing

4

1   and classification of County jail inmates and security measures in County jails.

2   See Jail Housing And Security Plan, attached as Exh. 2. In that Plan, the Sheriff's

3   Department states that its highest priority is to add high-security beds to County

4   jails in a timely and effective manner. The Plan contains a provision to consider

5   refurbishing MCJ dormitories into high-security individual cells. It does not

6   contain any provisions to address overcrowding at MCJ directly.

7       16.   In March 2006, after the riots, three of Supervisor Antonovich's staff

8   members accompanied me on a tour of MCJ. During the tour, I identified a

9   number of safety concerns and noted our recommendations for improvement.

10  Since then, I have initiated follow-up discussions with the Supervsisor's staff

11  regarding our recommendations.

12      17.   In March 2006, the Los Angeles County Board of Supervisors also

13  considered a plan to terminate contracts with the state of California, under which

14  the County holds approximately three thousand state inmates in County jails in

15  return for approximately 27 million dollars a year from the state. The Sheriff's

16  Department has indicated that upon terminating the state contract, it would

17  backfill the empty beds with misdemeanants. The Sheriff's Department has not

18  discussed whether those beds could be kept open or used in a manner to relieve the

19  severe overcrowding at MCJ.

20      18.   In April 2006, the Sheriff's Department made some changes to the

21  inmate classification system for the County jails. Presently, I am in discussions

22  with the Sheriff's Department regarding additional changes that are needed for the

23  classification system to function more effectively.

24      19.   This declaration addresses overcrowding and related problems,

25  including inadequate outdoor exercise and no indoor exercise, which continue to

26  plague MCJ.

27  **Background: Men's Central Jail**

28      20.   Men's Central Jail (MCJ) is located at 441 Bauchet Street, in Los

5

Angeles, California. MCJ was constructed in two phases. <u>See</u>

http://www.lasd.org/divisions/custody/mcj/index.html. In phase one, which was

completed in 1963, a 585,150 square foot structure, which was designed to house

3,322 inmates, was erected. <u>Id</u>. This portion of the building, which is three stories

high, is referred to as the "old side." In phase two, which was completed in 1976,

another 350,000 square feet were added. <u>Id</u>. This portion of the building, which is

four stories high, is referred to as the "new side."

**MCJ's Population**

21.    As described by the Sheriff's Department, "Men's Central Jail

currently houses the majority of Los Angeles County's high risk, high security

inmates, and it ranks as the largest jail in the free world. The average annual

operational budget is 52 million dollars, with an annual inmate food budget of 6

million dollars, and an annual inmate medical maintenance cost of approximately

94 million dollars. The average housing cost per inmate is $53.45 per day." See

http://www.lasd.org/divisions/custody/mcj/index.html.

22.    MCJ houses both pre-sentenced and sentenced inmates. A sizable

portion of MCJ inmates participate in criminal court proceedings during their stay

at MCJ. Approximately two-thirds of MCJ inmates stay at the facility for at least

six months, and many stay for much longer while fighting their criminal cases.

23.    According to a March 2006 report provided by the Sheriff's

Department, there are approximately 5,380 high security and 11,141 low-to-

medium security male inmates in the County jails. <u>See</u> Exh. 2. High security

inmates are those inmates who are security levels eight and nine. Low to medium

security inmates are those inmates who are security levels one through seven.

According to the Sheriff's Department, 1,895 of those high security inmates are

housed at MCJ, even though MCJ has only 1,699 high security beds available.

**MCJ: Housing Of Inmates**

24.    The "old side" of MCJ houses inmates on two floors, in linear

6

modules.  These modules are compiled of four rows of cells, which hold either one inmate, four inmates, or six inmates, depending on the module.  The cells are side by side in a long line, extending from the front of the module, where the control booth is located, to the back.  The cells are accessible by a long hallway, referred to as a "freeway," that runs outside of the cells.  There are four rows in each module, two upstairs and two downstairs. The general population modules usually hold approximately 260 inmates each.  The rows downstairs are composed of thirteen cells, holding six inmates each.  The rows upstairs are composed of thirteen smaller cells, holding four inmates each.

25.    The "new side" of MCJ houses inmates on two floors in more recently designed linear modules, where the control booth runs along the center of the module.  This allows for some visibility into the cells on each row.

26.    There are two floors where inmates are housed in dormitories.  Most "dorms" at MCJ are large rooms with rows of bunks.  Near the front of most dorms is a bathroom, which consists of several showers, sinks, and toilets.  Telephones are also located at the front.  A control booth, which is also located at the front of the dorm, is long enough to provide visibility into two dorms.

27.    There is a central building located between the "old side" and "new side" that is composed of the 6000, 7000, and 8000 floors.  On the 6000 floor, inmates with missing limbs or other serious injuries are housed.  On the 7000 floor, pro per inmates are housed.  The 8000 floor houses juveniles, inmates with staph infection, and "step down" housing for inmates with medical needs (such as inmates in wheelchairs, diabetics, etc.).  The 6000, 7000, and 8000 floors also contain some 2-person cells containing bunk beds and a toilet/sink; some also have showers.  These cells have solid doors with a small window at the top.  There are also small dorms, holding ten or twelve inmates in wheelchairs on the 8000 floor, that contain toilets, showers, and wheelchair-accessible beds.

28.    MCJ contains several dayrooms in each linear module.  Dayrooms are

7

large rooms with tables, phones, a toilet, and sometimes bunk beds. These dayrooms were built not to serve as housing, but as rooms where inmates could engage in indoor exercise by watching television, playing cards, talking on the phone, or participating in other recreational activities. Most of the dayrooms are used for purposes other than indoor recreation. Some dayrooms are used to hold inmates as "temporary overflow" housing, others are used as holding areas for inmates who are being transported in and out of modules, and others are used by trustee inmates for meal preparation or other activities. No dayrooms are used for indoor exercise and recreation for the general population.

29.     Inmates at MCJ have no access to sunlight except on the roof during periods of outdoor exercise, as described below. Inmates cannot see outside from their housing areas, and no sunlight comes in. The American Correctional Association ("ACA") standards for Adult Local Detention Facilities are widely accepted as industry-wide standards for effective administration of jails. ACA standards provide that "Inmates in the general population who are confined in their rooms/cells for 10 or more hours daily have access to natural light by means of an opening or window of at least three square feet." See American Correctional Association, "Performance-Based Standards For Adult Local Detention Facilities," (4th ed., 2004), attached as Exh. 3 (4-ALDF-1A-16).

**Overcrowding, Inmate-to-Staff Ratios, and Related Problems**

30.     MCJ has a long history of overcrowding. In years past, the facility made inmates sleep on the floors because of inadequate bedspace. Even after the fall of 2005, when floor sleepers were effectively eliminated by this Court's order, MCJ continues to have overcrowding problems, with cells housing more inmates than they were designed to accommodate. Cells big enough for three inmates house six inmates, and cells big enough for two inmates house four inmates.

31.     ACA standards provide that jail cells for four to six inmates be significantly larger than those at MCJ. See Exh. 3 (4-ALDF-1A-10 provides:

8

1   "Multiple-occupancy rooms/cells house between 2 and 64 occupants and provide

2   25 square feet of unencumbered space per occupant. When confinement exceeds

3   10 hours per day, at least 35 square feet of unencumbered space is provided for

4   each occupant"). When cells are overcrowded in this manner, tensions among

5   inmates within each cell increase significantly.

6       32.    In addition to overcrowded cells, inmates are also densely packed into

7   dormitories. Dormitories contain over a hundred and sometimes up to two

8   hundred-fifty inmates, with bunk beds that are often separated by only inches.

9       33.    The California Board of Corrections, which inspects county jails and

10   determines their compliance with Title 15 of the California Code of Regulations,

11   has recommended that MCJ hold only 5,236 inmates. According to the Sheriff's

12   Department documents, MCJ can hold 6,800 inmates. See

13   http://www.lasd.org/divisions/custody/mcj/index.html. Nevertheless, Sheriff's

14   Department officials have agreed on numerous occasions that MCJ is overcrowded

15   and exceeds its capacity. According to the Sheriff's Department, it is unable to

16   decrease the number of inmates at MCJ because no other facilities have adequate

17   staff to house additional inmates.

18       34.    Overcrowding at MCJ persists for two main reasons. First, the

19   Sheriff's Department has decided that using three-person cells to house six

20   inmates, and two-person cells to house four inmates is the most cost effective way

21   to hold 6,000 inmates in LA County given the current housing options. Second,

22   according to Sheriff's Department staff, the MCJ population spikes regularly

23   because MCJ receives approximately 700 general population inmates daily from

24   the Inmate Reception Center, which processes every inmate in Los Angeles

25   County. Each day, the Sheriff's Department transfers inmates from MCJ to

26   Pitchess Detention Center in Castaic in order to accommodate the additional

27   inmates from IRC. Since IRC does not send inmates to Pitchess directly, MCJ is

28   left with the daily burden of accommodating additional inmates and moving

9

1  inmates within and out of the facility.  In addition, on weekends, few inmates are
2  transported from MCJ to Pitchess, causing MCJ to retain an ever-increasing
3  number of inmates.  Finally, in the summers, when arrests increase, MCJ's inmate
4  population also increases.

5       35.     Overcrowding impacts almost every aspect of life at MCJ, from
6  access to medical care and showers to increased risk of riots and assaults.  First,
7  the overcrowding problem at MCJ is especially troubling because of the changed
8  composition of the inmate population.  MCJ's physical structure was designed to
9  house two-thirds sentenced misdemeanants and one-third alleged felons awaiting
10  trial.  See PARC, 5th Semiannual Report at 4 (February 1996), available online at
11  http://www.parc.info/pubs/pdf/sheriffreport5.pdf (last visited April 11, 2006).
12  Today the population of MCJ is nowhere close to its intended composition.  Fully
13  71% of MCJ inmates are awaiting trial for serious offenses.  Id.  This drastic
14  change in population requires greater security measures.  Overcrowding of inmates
15  at MCJ, which has always carried a greater threat of violence, poses an even
16  greater threat to safety now because a greater percentage of the inmates are alleged
17  felons rather than misdemeanants.

18       36.     Second, in substantial part due to overcrowding, MCJ suffers from
19  dangerously high inmate-to-staff ratios.  High inmate-to-staff ratios result in
20  dangerous conditions for both inmates and deputies.  For example, on numerous
21  occasions, I have observed two or three deputies who are walking lines of
22  approximately 70-100 inmates during transfers to/from court or other jail facilities.
23  Sometimes these lines can reach over 200 inmates, and the inmates are not
24  handcuffed or restrained in any manner.  In such a situation, the inmate-to-staff
25  ratio is 1 to 35, or even 1 to 100, which is so high that deputies are unlikely to be
26  able to successfully prevent or end any violence that erupts.  Such high ratios
27  subject both inmates and deputies to greater risk of violence.

28       37.     Deputies have communicated to me that they feel personally unsafe in

1  such situations because of the extremely high inmate-to-staff ratios at MCJ.

2  Assaults on staff by inmates rose 54% between 2000 and 2003. See PARC, 17th

3  Semiannual Report at 8 (November 2003), available online at

4  http://www.parc.info/pubs/pdf/17threport.pdf (last visited April 11, 2006). This

5  increase occurred in substantial part because staff members were subject to

6  dangerous circumstances without adequate support, as a result of overcrowding.

7      38.   The ACA standards provide that jails should have annual staffing

8  analyses, presumably to prevent inappropriate inmate-to-staff ratios. See Exh. 3

9  (4-ALDF-2A-14 provides: "A comprehensive staffing analysis is conducted

10  annually. The staffing analysis is used to determine staffing needs and plans").

11  Jails Project staff are informed and believe that the Sheriff's Department do not

12  conduct annual staffing reviews and do not update their staffing plans

13  appropriately.

14      39.   The deputies at MCJ work hard under grueling conditions. They

15  perform difficult work and deserve respect for their efforts. Because of the high

16  inmate-to-staff ratios, they are forced to do overtime hours, causing them stress,

17  exhaustion, and even personal problems. They also have low morale because they

18  hear about tempting alternative job opportunities that do not require them to work

19  in the dangerous and filthy conditions at MCJ where they are constantly

20  outnumbered and at risk.

21      40.   Third, overcrowding and the resulting high inmate-to-staff ratios lead

22  to significant and persistent shortfalls in MCJ's compliance with legal

23  requirements. For example, inmates sometimes complain that they are not

24  receiving showers or clothing exchange regularly. In response to such complaints,

25  the Jails Project follows up with the deputy who runs the module (called the

26  module officer) directly and checks the module's Unit Daily Activity Logs, where

27  all activities in the module must be documented, to determine whether showers,

28  meals, clothing, and medications have been provided as required by state

regulations.  When we find that state legal requirements have not been met, we discuss these issues immediately with MCJ staff to rectify these problems.

41.   Deputies report that high inmate-to-staff ratios make effective execution of their required duties very difficult and sometimes next to impossible. In some modules, two to three deputies are responsible for a housing area for 250 to 500 inmates.  Because of overcrowding and high inmate-to-staff ratios, deputies report that they do not have adequate time to complete all of their duties such as showers, delivery of clothing exchange, pill call, meal distribution, and so on.  As a result, legal requirements are not met.

42.   For example, deputies have reported that it is not uncommon for a deputy to begin one activity, such as taking inmates to showers, and then be ordered to supervise another activity, such as the delivery of clothing for exchange, simultaneously.  In such a situation, the first duty is discontinued, unfinished.  A deputy may then have to accommodate a nurse arriving to administer pill call and sick call, in which case both showers and clothing exchange may remain unfinished.  As a result of overcrowding and high inmate-to-staff ratios, deputies are not able to meet the legal requirements for showers, clothing exchange, and medication, depriving inmates of rights guaranteed by state regulations and by Court orders in the Rutherford case.

43.   Overcrowding also creates a filthy physical environment for the inmates and staff.  Since staff are not able adequately supervise all daily activities such as meal distribution due to high inmate-to-staff ratios, it is not uncommon to find rotting fruit on the floors of the hallway and liquids splattered against the walls.  In addition, as a result of greater toilet use necessitated by overcrowding, toilets in the cell frequently leak onto the floor.

44.   Overcrowding also causes the Sheriff's Department to keep MCJ inmates locked down in their cells nearly 24 hours a day, which deprives inmates of much-needed exercise and recreation.  Because of overcrowding and high

1  inmate-to-staff ratios, the Sheriff's Department has decided that it would be unsafe

2  to allow inmates to roam the areas of their module outside their cells or have

3  indoor recreation in dayrooms. For security reasons, the Sheriff's Department

4  requires all inmates to stay in their cells at all times other than medical visits, visits

5  to court, legal and family visitation, and outdoor exercise. Inmates eat all meals

6  and use the restroom in their small, cramped cells. As a result, most inmates at

7  MCJ are locked down in their cells for almost 165 out of 168 hours each week.

8      45.   Confining inmates to their cells for virtually every hour of the week

9  has severe consequences of increasing tensions among inmates without providing

10  any avenues for stress relief or productive activity. In the aftermath of the recent

11  riots, Jails Project staff interviewed inmates to determine what was needed to

12  alleviate tension in the jails. Inmates uniformly responded that they needed to get

13  out of their cells more often. One inmate wished to sign up for a GED class even

14  though he already had a high school diploma, just to get relief from the crowded

15  and tense environment in his cell.

16      46.   Of all the County jails I have toured across the country, MCJ is the

17  only facility where general population inmates are both severely overcrowded and

18  locked down in cells virtually 24 hours a day. In my experience, these

19  circumstances are unique to MCJ.

20      47.   Overcrowding prevents the Sheriff's Department from providing

21  opportunities for inmates to leave their cells. First, numerous dayrooms

22  throughout the facility could be used for indoor recreation. The Sheriff's

23  Department, however, uses them as temporary overflow housing for inmates who

24  do not yet have assigned cells. As a result, inmates have no opportunities to watch

25  television, play games, or otherwise unwind outside of their cells. Second, those

26  dayrooms could be used as classrooms for educational programming. It is widely

27  accepted that educational programs reduce tensions between inmates and provide

28  opportunities for positive inmate interactions. Because the dayrooms are not

1   available for use as classrooms or indoor recreation, however, inmates are locked

2   down virtually 24 hours a day.

3       48.   Finally, last but certainly not least, overcrowding exacerbates security

4   problems and creates opportunities for assaults, riots, use-of-force incidents, and

5   even murders.  The ACA standards provide that jail staff should be able to see or

6   hear at all times what is occurring in the cells.  See Exh. 3 (4-ALDF-2A-03

7   provides: "Correctional offices posts are located in or immediately adjacent to

8   inmate living areas to permit officers to see or hear and respond promptly to

9   emergency situations").  Overcrowding and MCJ's physical structure make this

10  nearly impossible, if not outright impossible.

11      49.   In MCJ's linear modules, deputies cannot adequately see the rows

12  that they are monitoring from their control booths.  Entry and exit of inmates into

13  their cells is barely visible from control booths, and deputies cannot see into the

14  cells at all from control booths.  This is in stark contrast to the physical design of

15  newer facilities, which are designed to allow "direct supervision," which means

16  that deputies work inside the housing units and have full vision of dayrooms and

17  cells and personal interaction with inmates at all times.  The ACA standards

18  recommends direct supervision design.  See Exh. 3 (4-ALDF-2A-18 provides:

19  "Physical plant designs facilitate continuous personal contact and interaction

20  between staff and inmates in housing units").

21      50.   To conduct safety checks, MCJ module officers walk along each row

22  of cells.  These officers cannot see into any cell until they are standing directly in

23  front of each cell.  While walking along the rows with deputies, I have heard

24  inmates at the front of the row call back to the rest of their row to alert them that a

25  deputy is coming.  As a result, inmates can easily hide contraband or stop illegal

26  activity before the deputy arrives.  With overcrowding of cells, the propensity for

27  hiding contraband or illegal activity is especially high.

28      51.   Because deputies cannot see all of the cells from their control booths,

14

significant danger results to both inmates and staff. Deputies have reported that while they are conducting security checks of the cells, inmates have thrown urine, excrement, or other bodily fluids, or even heavy and dangerous objects, through the cell bars and onto the row at deputies. Because deputies have limited visibility of the cells, they cannot prevent such acts. In addition, inmates have reported that inmates attack each other physically or sexually without the deputies learning of the assaults. Since the deputies cannot see the cells at all times, inmates are able to instigate and carry out such attacks without fear that deputies will see and stop them. These problems are exacerbated by overcrowding, which escalates tensions between inmates and between inmates and deputies.

52.     Deputies' lack of visibility into all of the cells is especially dangerous during instances when several cells are opened at one time, such as for daily showers. At such times, deputies and inmates have reported that one group of inmates will gather toward the front of the row, preventing the module officer from seeing the inmates behind them. This provides an opportunity for inmates to attack one another, either further back on the row or in one of the open cells. By the time the module officer becomes aware of the disturbance, assaults may have taken place already, requiring use of force by deputies.

53.     Similar visibility problems exist in the dormitories, which are also overcrowded. ACA standards set occupancy limitations for dormitories based on available square footage per inmate, which MCJ dorms do not meet. See Exh. 3 (4-ALDF-1A-10). As in modules, dormitory overcrowding combines with visibility problems in dormitories to result in increased chance of inmate assaults and use-of-force incidents.

54.     Overcrowding exacerbates visibility problems and makes it virtually impossible to prevent inmate assaults and disturbances. With more inmates, the risks of inmate misbehavior are greater, and the consequences can be more deadly. Further, once a disturbance begins, it is extremely difficult to control. If verbal

1  commands do not make the inmates stop fighting, the module officer must wait for
2  other deputies to provide assistance because it is far too dangerous for the module
3  officer to attempt to stop a disturbance without assistance. Safety problems
4  caused by overcrowding have dangerous results. A deputy reported to me that
5  MCJ leads all County jails in use of force incidents.
6      55.   Although overcrowding has persisted for years, recent riots have
7  shown that overcrowding has reached a critically dangerous point. Despite the
8  recent riots, the Sheriff's Department has not undertaken adequate measures to
9  appropriately reduce the number of inmates at MCJ. The Sheriff's Department
10  created a "Jail Housing and Security Plan" in March 2006 to address housing and
11  security problems in the jails. As part of this plan, the Sheriff's Department would
12  create additional high-security individual cells at MCJ and re-distribute inmates
13  throughout the County jail system. No commitment has been made, however, to
14  eliminate overcrowding at MCJ by permanently reducing the number of beds in
15  the facility. In addition, while the Sheriff's Department plans to undertake an
16  independent audit of jail security and staffing issues, there is no guarantee that the
17  recommendations of such an audit will be implemented. What is lacking is
18  accountability for the Sheriff's Department and the County in this process.
19  **MCJ: Inmate Exercise**
20      56.   One very serious aspect of overcrowding is a persistent failure to
21  provide adequate indoor and outdoor exercise to MCJ inmates. According to Title
22  15 of the California Code of Regulations, inmates at MCJ are entitled to three
23  hours each week of exercise. A significant percent of inmates receive outdoor
24  exercise, and virtually no inmates receive indoor exercise.
25      57.   Inmates at MCJ are locked down in their housing areas throughout
26  the day, with the exception of outdoor exercise and very few other activities. Most
27  inmates are allowed to leave their housing areas only for trips to court, family and
28  attorney visits, visits to the clinic, pill call, showers, and outdoor exercise.

16

Inmates housed in linear modules spend every other hour of the week locked down in their small, cramped cells without any opportunity for indoor exercise or recreation in the dayrooms. Outdoor exercise is therefore very important.

58.    MCJ has roof areas which are used for outdoor exercise. Each module is scheduled for three hours a week, and all three hours are provided in one day. The majority of inmates at MCJ receive their three hours of weekly exercise at a location known as the 9000-floor roof, on the fourth floor of the "new side" building. The roof, which is approximately one hundred square yards, is divided into two sections by a wire fence. On one side there are basketball hoops, a wall for handball, several phones, and toilets. This is where general population inmates receive their exercise. In this area inmates play basketball or handball, walk laps around the court, talk on the phone, or just sit and enjoy the sunshine.

59.    On the other side of the fence there is a row of twelve one-person cages that each have an exercise bar and a telephone. These cages are about as wide as the average inmate's wingspan, approximately 8 to 10 feet tall, and made of thick metal wiring. They do not meet ACA standards. See Exh. 3 (4-ALDF-5C-04 provides: "The minimum space requirements for outdoor covered/enclosed exercise areas for segregation units are as follow: . . . Individual yard modules – 180 square feet of unencumbered space"). Inmates classified as "keep aways," such as high profile inmates, maximum security inmates, and juveniles, receive outdoor exercise in these cages.

60.    General population inmates from the 2000 floor and 3000 floor receive their three hours a week of exercise in an area known as the 3000-floor roof. This is a fenced in roof area just larger than one full size basketball court. This roof also has phones and toilets along the walls. Since there are only general population inmates allowed to exercise in this area, there are no cages on this roof. There is just a large open area where inmates participate in activities to those on the 9000-floor roof.

**ACLU Efforts to Improve Access to Exercise**

61.    Each week, the ACLU-SC receives a set of reports from MCJ staff that document deficiencies in providing weekly exercise to inmates, and the reasons for the deficiencies.  The first page of the report, titled "MCJ Roof Exception Report," provides daily summaries of any circumstances where inmates did not receive their weekly three hours of exercise.  The second page of the report, titled the "MCJ Weekly Roof Tracking Sheet," provides a chart to identify which modules received their weekly three hours of exercise.  The final five pages of the report, titled the "MCJ Weekly Roof Log," provide detailed documentation of the modules and the number of inmates who received their weekly three hours of exercise, with reasons for why inmates missed their weekly exercise.

62.    These logs are created by Sheriff's Department deputies who are responsible for transferring inmates from their modules to the roof for exercise. They are submitted to a sergeant who compiles the weekly logs and writes the "MCJ Roof Exception Report."  The reports are submitted to the MCJ Legal Unit, which then faxes a copy to the Jails Project.

63.    Each week, Jails Project staff or interns enter data from the MCJ Roof Reports into a database in order to track whether inmates are receiving their weekly three hours of exercise.  Every deficiency documented in an MCJ report is entered into the database.  We then analyze the data to determine which modules are missing exercise and why.  Through our data analysis, we have determined that in 2005, at least fifteen percent of inmates were not provided access to their weekly exercise.

64.    The Jails Project has been tracking inmates' access to recreation at MCJ for over three years.  Three years ago, one of the most common complaints that the Jails Project received from inmates at MCJ was that they did not receive their weekly three hours of exercise.  In response, we filed individual complaints with the Sheriff's Department on behalf of inmates with exercise complaints.  We

18

1    also began checking the Unit Daily Activity Logs in modules where complaints

2    were fielded to see if documentation showed that inmates had received their

3    weekly three hours of exercise.

4        65.    Through our follow-up, we determined that many modules were not

5    given access to weekly three hours of exercise. We found that one persistent

6    cause of this problem is that staff are called away to other tasks, because of

7    overcrowding and the high inmate-to-staff ratios. Therefore, we met several times

8    with jail administrators to address the issue. As a result of these meetings, the

9    Sheriff's Department created an exercise schedule and centralized supervision of

10   exercise by a sergeant who collects data to ensure that inmates are receiving

11   exercise. In addition, deputies responsible for transporting inmates to the roof for

12   exercise were asked to document the reason that any module missed its three hours

13   a week of exercise. This led to the creation of the "MCJ Roof Exception Reports."

14       66.    Since August 2004, the Jails Project has received these weekly

15   reports documenting deficiencies in exercise and the underlying reasons. An

16   analysis of these reports shows that staff shortages resulting from high inmate-to-

17   staff ratios are a primary reason that inmates do not receive their weekly outdoor

18   exercise. When there is a major search, disturbance, or lock down in the facility,

19   for example, the "roof crew" deputies are often pulled away from their duties of

20   escorting inmates to exercise and sent to locations where additional staff is

21   needed. This occurs at least once and often more than twice a week, every week

22   of the year. This has an overwhelming, consistent effect of depriving inmates of

23   access to outdoor exercise.

24       67.    In addition, inmates are sometimes made to choose between visitation

25   and outdoor exercise. Because the scheduling of these two activities overlap,

26   inmates often forego outdoor exercise in order to have visitation with family.

27       68.    Since fall 2005, the Jails Project has identified another problem with

28   the exercise schedule for MCJ inmates. There are not enough opportunities for

1 | every "keep away" inmate at MCJ to receive exercise in a cage on the roof. "Keep

2 | away" inmates are all those inmates housed in single-person cells who require

3 | handcuffs and an escort when they leave their cells. These inmates may be

4 | protective custody inmates, maximum security inmates due to factors such as gang

5 | involvement in prison and particular charges, or high profile inmates such as

6 | celebrities.

7 |     69.    Once the Jails Project brought this problem to the attention of jail

8 | administrators, the schedule was extended so that inmates now receive exercise on

9 | Saturdays and Sundays to accommodate more inmates. Nevertheless, there are

10 | still not enough time slots in the schedule for every "keep away" inmate at MCJ.

11 | **Ongoing Problems With MCJ Inmate Exercise**

12 |     70.    At this time, numerous problems persist with respect to inmate

13 | exercise. First, the Sheriff's Department continues to be unable to provide

14 | outdoor exercise to every inmate because of high inmate-to-staff ratios. Second,

15 | MCJ does not have adequate cages to provide outdoor exercise to "keep away"

16 | inmates. Third, the Sheriff's Department limits each inmate to outdoor exercise

17 | once a week, rather than spreading out three hours on three different days.

18 |     71.    Fourth, MCJ does not have any open dayrooms for indoor exercise

19 | and recreation, so no alternatives to outdoor exercise exist for general population

20 | inmates. This is in contrast to ACA standards. See Exh. 3 (4-ALDF-5C-01

21 | provides: "Inmates have access to exercise opportunities and equipment, including

22 | at least one hour daily of physical exercise outside the cell, and outdoors, when

23 | weather permits"). Virtually every module has dayrooms which could be used for

24 | indoor exercise and recreation. Instead, these dayrooms are used for temporary

25 | overflow housing of inmates. Closed messhalls on several floors also could be

26 | used for indoor recreation. At this time, however, no indoor exercise is provided.

27 |     72.    Overcrowding and its related harms deprive inmates of rights

28 | guaranteed by state regulations and by this court's orders and make it almost

20

1  impossible for jail staff to ensure a safe environment for everyone.  Under these

2  circumstances, the Sheriff's Department must take steps to end overcrowding at

3  MCJ and make a sensible long-term plan for the use of this facility.

4       I declare under penalty of perjury of the laws of the State of California and

5  the United States that the foregoing is true and correct.  Executed this 12th day of

6  April, 2006 in Los Angeles, California.

7

8  Jody Kent

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28