# EXHIBIT
# 4

# DECLARATION OF TONI V. BAIR

I, Toni V. Bair, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am currently an adjunct professor in the Department of Criminal Justice at Weber State University in Ogden, Utah. I am a Corrections consultant and have testified as an expert witness regarding professional correctional management in five cases. A copy of my curriculum vitae is attached hereto as Exhibit 1.

3.     My background includes more than twenty-five years employments as a corrections professional in state prisons, adult jails and juvenile facilities. I have held the following positions in corrections: Assistant Commissioner, Regional Administrator, Warden, Deputy Warden, Unit Manager, Prison Investigator, Captain, Social Worker and Counselor. I opened the first Utah Department of Corrections Youthful Offender Prison. I have been Warden of Virginia's Maximum Security Mecklenburg Correctional Center as well as a Regional Administrator supervising eleven prisons in Virginia. I was Assistant Commissioner for the New York City Department of Corrections, one of the nation's largest urban jail systems, overseeing, among other responsibilities, the Corrections Department's compliance with court orders issued to the city's seventeen jails through the five boroughs.

4.     I recently participated in the drafting of the "Brief of Corrections Professionals In Support of Respondent" in the case before the United States Supreme Court, *Reginald Wilkinson, et al. v. Charles E. Austin, et al.*, No. 04-495.

5.     I have been asked by the ACLU of Southern California to offer an expert opinion regarding certain conditions and the operation of the Los Angeles Sheriff's Department (LASD) Men's Central Jail (MCJ). This request came after deadly riots in several jails in early February 2006, and a series of inmate-on-inmate murders that occurred between October 2003 and November 2005.

6.     In preparation for this declaration, I reviewed the cited reports as well as the following documents:

1          •   Seven *County of Los Angeles Sheriff's Department Log Sheet Report* forms

2         referencing the February 2006 disturbances at LASD jails;

3          •   Los Angeles County Sheriff's Department Men's Central Jail SHERIFF'S

4         CRITICAL ISSUES FORUM April 21, 2005 Captain John H. Clark;

5          •   Jails Project Report, ACLU of Southern California, June 2005.

6        I examined too an *IRC Classification SICS Security Level Assignment* document, an

7  *MCJ Central Jail Housing* document and a *MCJ Movement Central Worksheet*.

8        7.     On February 24, 2006, I conducted an inspection tour of MCJ. The tour lasted

9  approximately 2 ½ hours. I was accompanied by Jody Kent, ACLU Jails Project Coordinator

10  with monitoring responsibilities pursuant to the *Rutherford* orders. We were escorted on our tour

11  by Custody Assistant Crawford.

12        8.     Having conducted the inspection and reviewed the cited materials, I make the

13  following observations and conclusions based upon my professional experience and background.

14  I organize my conclusions and recommendations by subject matter, though the conditions

15  described are properly understood systemically, rather than as individual, unrelated problems.

16                                  **Living Conditions**

17  **Overcrowding**

18        9.     MCJ consists of cell blocks which house six-man cells on the bottom tier and

19  four-man cells on the top tier. The dimensions of the 6-man cells are 9.25' x 13.00' or 120.25

20  square feet. The inmate bunk beds cover a square foot area of 47.50 square feet (76" x 30").

21  This leaves an area of 72.75 square feet of unencumbered space for six inmates. Therefore, each

22  inmate has 12.12 square feet of unencumbered space to live in. The American Correctional

23  Association ("ACA") recommends that inmates should have 35 square feet of unencumbered

24  space to live in. The 4-man cells measure 9.25' x 9.25' resulting in 85.56 square feet. The bunk

25  beds cover an area of 31.6 square feet leaving an unencumbered living space available for four

26  inmates of 53.96 square feet, resulting in 13.49 square feet of unencumbered space per inmate.

27  This too falls far below the ACA standard of 35 square feet per inmate. The large majority of

28  inmates at MCJ spend 24 hours a day in their cells, with only a few exceptions that include visits

1   to court, three hours a week of exercise, attorney room visits, and appointments at the clinic. The

2   amount of unencumbered individual living space in the 6-man cells is just over a third of what is

3   recommended by the ACA, and in the case of 4-man cells, it is less than two-fifths of what is

4   recommended by the ACA.

5       10.     The cell blocks are in disrepair. I observed several leaking sinks and toilets.

6   Inmates used their towels and bedding to try and stay the flow of the leaking water. Several

7   inmates complained about the lack of hot water. In both instances, I was told that the

8   maintenance department was aware of the problems. In numerous cells, I observed large

9   quantities of paint peeling from the walls.

10      11.     I observed an inmate sleeping on the floor beneath another inmate because he was

11  disabled. He was unable to climb into his top bunk to which he had been assigned. I was told

12  that he had informed staff about the problem and the need for a wheelchair, but that nothing had

13  been done to correct the situation.

14      12.     The density of the population is evident throughout the facility, not just in

15  individual cells. I observed inmates crowded everywhere: in the hallways, on the stairs, in

16  waiting rooms and in laundry rooms.

17      13.     Upwards of 100 inmates are placed unsupervised in laundry rooms, showers and

18  day rooms while they are being processed into their respective cells. They are asked by staff

19  what tier and cell to which they are assigned. I did not observe a staff member checking a roster

20  or computer printout for verification. This practice raises obvious security concerns.

21  **Recreation**

22      14.     Problems of overcrowding are compounded by recreation practices. Beyond

23  health purposes, correctional facilities rely upon recreation for much needed stress reduction.

24  All day rooms have been closed for inmate recreation. Inmates are locked in their overcrowded

25  cells nearly twenty-four hours per day.

26      15.     My understanding from discussion with Ms. Kent is that as much as 15% of all

27  inmates do not receive three hours of physical recreation per week. In fact, I am told that many

28  within this number do not receive *any* physical recreation during the week. ACA Standards

3

1    recommend that, ". . . all inmates . . . participate in leisure time activities outside the cell or

2    room on a daily basis." (3-ALDF-5C-02).  In addition, 3-ALDF-2E-01 requires that all inmates

3    are offered at least one hour of recreation daily.

4        16.    When I toured the recreation yard on the roof, I observed approximately twenty

5    inmates without any supervision present.  Inside a sally port and up the stairs, I observed one

6    Deputy manning a control booth.  He stated that his responsibilities did not include supervising

7    the yard.  At the other side of the yard, I observed a Deputy sitting at a desk and supervising

8    inmate recreating in individual, locked cages.

9        17.    During my tour I did not see any televisions turned on in any of the cell blocks.

10   **Fire Safety**

11       18.    In the course of my inspection, I checked fire boxes for documentation that they

12   were inspected on a shift basis as per policy?  I was unable to find a single fire box which

13   complied with policy.  I noted several inspection sheets which had been filled out in advance.

14   The policy is that a supervisor also must sign off on the sheets to ensure that they are in fact filled

15   out on each shift.  In most cases, there was a supervisor's signature, but there did not appear to be

16   any corrective action as result of the violations.

17                                   **Security and Safety**

18   **Classification/Supervision**

19       19.    Inmates with different classifications were frequently in the same vicinity.  In

20   addition, inmates waiting for a medical appointment or a court transfer were passed by inmates

21   from a higher classification.  These practices pose unacceptably high risks to inmate injury.

22       20.    For example during the investigation of the Raul Tinajero murder (4/20/2004) it

23   was determined that another inmate (Pineda) was allowed to enter a court line undetected.  He

24   was able to enter a floor and cell block although his wrist ID indicated that he was a "keepaway"

25   from that floor and cell block.  As a result, he was able to enter the cell of his intended victim

26   unchallenged and murder him.  As far as I could determine, this scenario could repeat itself as

27   during my visit to MCJ inmates were frequently not supervised or challenged as they moved

28   about.

1    21.    As we were leaving the facility, I noticed that there was a very short inmate (less

2 than 5 feet tall) facing the wall with his hands cuffed behind him. He was between an inmate on

3 his right who had on an orange jumpsuit and one on his left who had on a blue jumpsuit. The

4 small inmate in question was wearing a red jumpsuit which identified him as a juvenile. This

5 line had just returned from court. When juveniles are placed in an adult jail, they are supposed to

6 be separated by sight and sound from the adult inmates. There were adult inmates in the

7 immediate vicinity of this juvenile inmate and there was no staff supervising this line or the other

8 inmates who were placed against the wall.

9    22.    In fact, during the entire tour, I did not observe any Deputy or Custody Assistant

10 (CA) in any cell block or dormitory supervising the inmate population.

11    23.    On three separate occasions, I observed long inmate lines going from one point to

12 another without any apparent supervision. In every instance, where there was mass inmate

13 movement, I did not observe anything close to adequate supervision.   Inmates (frequently

14 numbering more than 100) could have created a disturbance, rioted and taken hostages. On no

15 occasion did I observe more than two security staff supervising a line movement. The three

16 instances where no security was apparent are as follows:

17    24.    First, I noted a long line of new arrivals, exceeding 100 inmates, walking up the

18 escalator with no Deputy or CA present. Moments later, an inmate came running up the stairs

19 and asked Ms. Kent and me where he was supposed to be. The CA who was escorting us looked

20 at a slip of paper which the inmate had and pointed him in the direction of his appropriate

21 destination.

22    25.    Second, I observed approximately 120 inmates wearing blue jumpsuits returning

23 from visiting to a module housing sex offenders, who must be separated from general population

24 inmates, once more without any noticeable staff supervision. The line came up the stairs, wound

25 through a hallway and down a corridor to the inmates' modules, again without any noticeable

26 staff supervision. My understanding is that blue jumpsuits are worn by both general population

27 and sex offenders. Therefore, it is possible there were general population inmates also walking

28 in this line who could have gone directly into the sex offenders' modules without being noticed.

5

1    These sex offenders are separated for their safety. Therefore it is imperative that they are
2    appropriately supervised.

3         26.    Third, as we were going down the escalators from the third floor, I observed a
4    long line of inmates coming up from the second floor with no staff supervision.

5         27.    At another point of my inspection, I observed many inmates sitting on benches
6    awaiting medical appointments. I did not see any Deputies or CA's who appeared to be
7    specifically supervising these inmates.

8         28.    In all but one instance, the control rooms in the cell blocks and dorms were
9    supervised by CA's, not Deputies. The design of control rooms is such that staff who operate
10   them have little if any direct observation of the cells, the day rooms or the showers.

11        29.    In cell block 2400, I observed more than 100 inmates in a small room with
12   benches, adjacent to the 2401 dayroom, prior to their being placed in their assigned cells. This
13   was the same room where an inmate was beaten to death in November 2005. Once again, there
14   was no staff supervising these inmates.

15        30.    While at cell block 2400, a Deputy came by, opened the unlocked door and asked
16   who was assigned to a particular tier? Several inmates responded and he took them to the tier
17   where a CA asked to which cell they were assigned and then opened the cell for the inmate to
18   enter. I did not observe that either the Deputy or the CA had any log, printout or other document
19   which would indicate that a particular inmate was actually assigned to a specific cell.

20        31.    At cell block 2401, I observed a day room filled with inmates. I asked how long
21   they had been there and was told two to three days. I counted twenty beds in the room. Though I
22   did not count the inmates, it appeared to me that there were more than twenty inmates in the
23   room.

24        32.    At cell block 2200/2400, I observed approximately forty inmates placed in what
25   appeared to be a laundry room prior to their being placed in their assigned cell. Once more, they
26   were unsupervised, and the door was neither locked nor even closed. This unit houses
27   approximately 500 inmates. I observed only one Deputy and two CA's present, both of whom
28   were in control rooms.

33.     At the far end of the recreation yard control booth, a CA was assigned to observe the 9500 dorm, which usually holds approximately 230 inmates. The tiered bunk beds in this dorm were stacked together such that you could not walk between the beds or at the head of the beds. The bunk beds were placed side by side, touching each other with the bunk heads of one row touching the heads of another row. In order for an inmate to reach his bunk bed, he must crawl over a bar which is approximately 2 ½ feet off the floor. An inmate cannot access his bed from the sides. With the beds packed so closely together (and with bedding hanging down from the top bunk), it is impossible to see into the dorm beyond the first row of double bunks. As I have more generally pointed out, placing a CA in the control room for that dorm is not an adequate security measure.

34.     Even in the segregation cell block, it was typically impossible to see clearly into the individual cells. The lights in the individual six-man cells had been totally or partially covered by the inmates. Clothing and foods were placed on the bars. Though I was told by a lieutenant and a Senior Deputy that the fronts of cells had to be uncovered at all times, I never observed enforcement of this sensible security restriction. Inmates were never told to remove the barriers they constructed. In one instance, I noticed a Deputy cuffing and removing an inmate for court, as he walked by two cells with clothing and bedding barriers placed over the front of the cell, nothing was said or done to correct this obvious violation of security.

35.     In the general population cell blocks, the cell lighting was better in some instances. Still, several cells were totally dark as we walked through the catwalk.

36.     In almost every sally port area immediately adjacent to the control room and the doorway leading to the cell blocks proper, I observed trash, bedding, clothing and other debris piled up.

37.     State Law and Departmental Policy require hourly security checks in all jails. For the most part, I found that these checks were documented in the Uniform Daily Activity Logs. However, the documentation always took place at the top of the hour. Inmates, therefore, soon recognize the regularity of these checks and can accomplish what they choose over a predictable period. Security checks should be staggered to accomplish maximum effectiveness.

## Programs

**Visitation**

38.     Visitors experience excessively long  periods of waiting for their fifteen-minute visitation.  I was informed by the front desk Deputy that visitors begin to line up at 6:00 a.m. for their fifteen minute visits. The starting time for visits is 10:30 a.m.  At 11:50 a.m., when I observed the visiting area, few visits were actually taking place other than those occurring in isolation cubicles for segregation inmates.  A lengthy and inefficient waiting process for visiting increases tensions in a correctional facility.

**Libraries**

39.     I visited a very small general library, which was totally inadequate given the size of the inmate population.  I was informed by the civilian librarian that he occasionally puts books on a two-wheel dolly and tours the jail to see if inmates want a book to read.  As inmates are locked in their cells nearly 24 hours a day, books should be taken to inmates on a daily basis. ACA Standard 3-ALDF-5E-01 requires library services for all inmates.  Occasionally taking a 2-wheel dolly with books around to some of the inmate population does not meet this important programmatic standard.

40.     I was informed that the law library is very small and inadequate, and that only *pro per* inmates are permitted access.  If true, this situation should also be corrected.

**Social Workers/Counselors/Case Workers**

41.     I did not encounter any social workers, case managers, psychologists, or clergy during my tour.  I understand that there are some mental health staff and chaplains available to the inmate population.  It concerns me, however, that there are no social workers or case managers present in the jails to provide inmates with resources that they need, such as information about their court cases, contact with their family, and the ability to file complaints with someone other than custody staff and the ACLU.  In many other correctional facilities, case managers are assigned to inmates upon their intake.  These case workers identify special needs of those inmates in their caseload and provide regular visits to the inmates while they are in custody to ensure those needs are met.  For example, if an inmate had a drug addiction problem, the case

1   manager will enroll the inmate in drug education classes while he is in custody.  If an inmate is

2   homeless, a case manager will provide resources to help the inmate find housing upon release.

3   This practice is beneficial to both inmates and custody staff who should not be burdened with

4   individual case management of the inmates.

**February 2006 Disturbances/Riots**

6          42.      The twenty-five different riots/major disturbances which occurred at five separate

7   Los Angeles County jails during the first two weeks of February 2006 raise major concerns.

8   Many apparently began simultaneously, suggesting coordinated planning.  I believe that the

9   overcrowding, lack of appropriate staff supervision and lack of recreation and meaningful

10  activities I have described exacerbate tension and in such conditions, violence can be expected.

11  It seems clearly that a major investigation into the root causes, is essential and urgent, and should

12  be conducted by an outside body.

**Recommendations**

14          43.      My principal recommendations are as follows:

15          1.      Immediately reduce the population at MCJ.  At a minimum, reduce all 6-

16  man cells to four inmates (three would be ideal) and all 4-man cells to two inmates.  In addition,

17  the dormitories are overcrowded and need to be thinned down to the point that security staff can

18  walk down aisles where beds are separated and not positioned touching each other.  As beds are

19  now configured, security staffs are not able to provide proper hourly security checks and ensure

20  that the inmates are alive and well.

21          2.      Immediately discontinue the use of day rooms for overflow inmate

22  housing.

23          3.      Immediately allocate fifty additional security staff to MCJ.  Additional

24  staff should follow after recommendation #4 is implemented.

25          4.      Reevaluate staffing patterns and post orders.  Consider the Unit

26  Management Team paradigm for implementation at MCJ.

27          5.      Discontinue the practice of placing unsupervised inmate groups in

28  unsecured showers, day rooms, and laundry rooms while awaiting cell assignments.

6.    Verify through inmate picture IDs and computer printouts the cells to which inmates are assigned, rather than asking the inmates where they are assigned.

7.    Assign sufficient staff to supervise and monitor inmate line movements.

8.    Begin utilizing the day rooms for indoor recreation.

9.    Turn on the televisions in the modules during the morning, hours and late afternoon and evenings.

10.    Remedy the length of time it takes to initiate the visiting process.

11.    Greatly increase a civilian presence in the jail in the areas of a general library, law library, education al opportunities, individual case management, substance abuse programs, religious services and volunteers, etc.

12.    Jails are correctional facilities and should be operated and supervised by trained correctional staff. The LA County Sheriff's department's practice of hiring Deputy Sheriffs, sending them to a Law Enforcement Academy, and then assigning them to a Jail until there is an opening in the Patrol Division, in inappropriate. Law Enforcement and Corrections are two separate professions. Prisons and Jails normally utilize a formal corrections training academies for training of Jail and Prison personnel. All the LASD staffs get is on-the-job training from fellow CA's and Deputies who have been through the Law Enforcement Academy but not a Corrections Academy. They do not receive any professional correctional training.

13.    One of the problems the correction's profession faces today is that many jails are operated by county sheriffs who by nature and profession are sworn law enforcement officers. Most of them have never been trained in the filed of Corrections. I strongly recommend that the Sheriff recruit and hire trained Correctional personnel to operate the Jails. In addition, the Sheriff should immediately institute correctional training at his academy if he is going to continue the inadvisable practice of recruiting individuals to become police officers and then assign them to the Jails until a vacancy in the Patrol Division occurs.

43.    I reserve the right to amend my opinion if additional information or documents are provided to me.

1    I declare under a penalty of perjury of the laws of the State of California and the United

2  States that the foregoing is true and correct.  Executed this 12th day of April 2006 in Eden, Utah.

3

4  _____
   Toni V. Bair

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11