# EXHIBIT
# 7

Westlaw.

11/23/07 LATIMES 2

**News**Room

Page 1

11/23/07 L.A. Times 2
2007 WLNR 23179320

Los Angeles Times
Copyright 2007 Los Angeles Times

November 23, 2007

Section: California

Sheriff wants a new jail, knows odds are against him
Baca says replacing the county's oldest penal facility would cost at least $500 million.
Stuart Pfeifer
Times Staff Writer

Infographic

**Sheriff** Lee Baca **wants** the county to tear down Men's Central **Jail** , the hub of Los Angeles County's overcrowded and violence-plagued **jail** system, and build a state-of-the-art facility in its place.

Baca conceded that his idea faces long **odds** because of its steep price tag -- he said it could cost between $500 million and $800 million -- and is just one among several proposals the county is considering as ways to upgrade and expand the nation's largest **jail** system.

There is little indication that the county Board of Supervisors will agree to undertaking such an expensive project, but Baca said he still believes the county needs a **new** central **jail** .

Since it opened just east of downtown 44 years ago, Men's Central **Jail** has been the scene of many of the **jail** system's most disturbing incidents, including nine inmate homicides in the last seven years. In 2004, an inmate roamed the **jail** unsupervised for hours before tracking down and killing an inmate who had testified against him.

Months after that killing, Merrick Bobb, the county's special counsel, wrote a report that described the **jail** as "nightmarish to manage" and suggested the department close it.

In 2006, after touring the facility at the request of the American Civil Liberties Union of Southern California, U.S. District Judge Dean D. Pregerson called conditions in the **jail** "inconsistent with basic human values."

Pregerson noted that the **Sheriff's** Department had crammed six inmates into cells designed to hold four and that most prisoners spent days at a time in their cells, leaving only

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

once a week to exercise on the roof.

The department responded by moving more than 2,000 inmates to other jail facilities, including the modern Twin Towers Correctional Facility across the street.

Even though Central Jail is more manageable with fewer inmates, deputies and sheriff's officials contend the jail is outdated. It was, they say, intended for drunk drivers and the like, not for the gang members and other violent criminals who make up the majority of its population.

One of the biggest concerns is the jail's design: Most of its cells were built in long, narrow hallways, making it impossible for guards to view inmates from a central booth. There are no video cameras. Instead, jailers make hourly walks down the hallways, peering into cells to make sure inmates are alive and well.

Later this month, the Board of Supervisors is expected to consider several options for the future of the county **jails**. Baca said he hopes the county can find the money to empty Men's Central **Jail** of its nearly 4,000 inmates for several years while building a **new** facility.

"The **jail** is the oldest in our system. It has outlived its time," Baca said. "The money part is critical. It's an ambitious project."

One alternative would be to refurbish the **jail** or build a **new** tower nearby to hold additional inmates, Baca said. Any construction would probably take place after the county reopens Sybil Brand Institute in Monterey Park in 2011 and a **new** women's **jail** in Castaic, also expected in 2011.

"We have a problem where we cannot tear down a **jail** easily without having another place to put the prisoners," Baca said.

The **sheriff** said plans to modernize and expand the **jail** system -- which holds about 19,000 inmates -- would allow him to increase the percentage of sentences that inmates serve. Since 2002, the department has been releasing inmates early because it lacks the resources to hold them.

He said a long-term plan to modernize the county **jails** could cost $1 billion and might not be possible without a bond measure, a loan that would require voter approval.

Supervisor Zev Yaroslavsky said he thinks the county should consider other alternatives to a **new** central **jail**.

"I believe any bond issue anywhere close to this magnitude for **new** county **jails** is unrealistic and doomed to failure until all other alternatives are exhausted," the supervisor said in a statement. "Those alternatives would include a more modest investment in existing facilities and improvements in the **sheriff's** management of the **jails**, both of which could lead to increased **jail** capacity without breaking the county treasury."

Supervisor Mike Antonovich said he would like the county to find a way to build a **new**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

central **jail**.

"People are sick and tired of inmates serving 86 minutes of **jail** time," Antonovich said. "We need a **new** facility. . . . What we need is a better prioritization of the funding that we have to meet the needs most vital to our community, to keep people behind bars and not released after a few minutes."

Melinda Bird, a lawyer with the ACLU, said conditions at Men's Central **Jail** have improved since her organization asked Pregerson to tour it and that a **new jail** may not be necessary.

"Every time I go over there, the inmates say thanks," Bird said. "The guys totally can see the difference."

--

stuart.pfeifer@latimes.com

PHOTO: IN CUSTODY: Inmates at the 44-year-old Men's Central **Jail** sit during an inspection. **Sheriff's** officials say the facility is outmoded and wasn't meant to hold gang members and other violent criminals.

PHOTOGRAPHER:Brian Vander Brug Los Angeles Times

GRAPHIC: MAP: Men's Central **Jail**, Los Angeles

CREDIT: Los Angeles Times

---- INDEX REFERENCES ----

COMPANY: LOS ANGELES TIMES

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Prisons (1PR87))

INDUSTRY:  (Construction (1CO11); Correctional Facilities (1CO72); Commercial Construction (1CO15))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); California (1CA98))

Language:  EN

OTHER INDEXING:  (ACLU; AMERICAN CIVIL LIBERTIES; BOARD OF SUPERVISORS; BRIAN VANDER BRUG LOS ANGELES TIMES; LOS ANGELES; LOS ANGELES TIMES; PHOTO; PHOTOGRAPHER; SHERIFFS DEPARTMENT; SUPERVISORS; SYBIL BRAND INSTITUTE; TWIN TOWERS CORRECTIONAL FACILITY) (Antonovich; Baca; Bird; Dean D. Pregerson; Lee Baca; Melinda Bird; Men; Merrick Bobb; Mike Antonovich; Pregerson; Zev Yaroslavsky)

KEYWORDS: BACA, LEE; LOS ANGELES COUNTY CENTRAL **JAIL**; PRISON CONSTRUCTION; OVERCROWDING

EDITION: Home Edition

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT
# 8





# County of Los Angeles
## Sheriff's Department Headquarters
### 4700 Ramona Boulevard
### Monterey Park, California 91754-2169

LEROY D. BACA, SHERIFF

May 8, 2007

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
Los Angeles, California  90012

Dear Supervisors:

## PROPOSED REOPENING OF PITCHESS DETENTION CENTER - SOUTH FACILITY
## STATUS OF INMATE RECEPTION CENTER OVERCROWDING

The Los Angeles County Sheriff's Department (Department), the American Civil Liberties Union (ACLU), the court appointed *Rutherford* Panel and your Board all share similar visions for the Department's custody operations.  These shared goals include a feasible jail management population plan, a streamlined Inmate Reception Center (IRC), a decrease in inmate percentage releases, and a more effective, efficient jail system.

These shared goals are not new ideas; however, achieving these goals are imperative to help the Department better serve the residents of Los Angeles County.  Many of these and other similar visions are stalled or were diverted over time due to circumstances that are beyond the Department's control, such as budget constraints, increased bookings, and greater oversight.  Our partnership with your Board and the Chief Administrative Office has netted significant results in tackling the vexing legal and operational challenges that face the largest local jail system in the country.  Even though great strides have been made, much work remains.

This correspondence serves two purposes: (1) to provide your Board with an update as to what action is being taken to address the overcrowding problem at IRC, and (2) to recommend the full reopening of Pitchess Detention Center (PDC) - South Facility as a mechanism to further relieve the significant stress placed on IRC's inmate processing operation.

*A Tradition of Service*

The Honorable Board of Supervisors        -2-                    May 8, 2007

## INMATE RECEPTION CENTER OVERCROWDING

Recently, litigation, initiated by the ACLU, has centered around jail overcrowding affecting IRC. In addition, it has been difficult for the Department to adjust inmate housing locations and rectify other areas of concern to effectively comply with the *Rutherford* Decision. As such, the Department has identified a number of areas for improvement, which are divided into two categories: current enhancements, and enhancements slated to occur between May 2007 and July 2007.

Current Enhancements

IRC is reexamining and reconfiguring inmate movement patterns and establishing more efficient methods of inmate movement within the facility. It is no longer receiving inmates at random for DNA collection and warrant checks. These events have been placed into a single process which occurs when the inmate is prepared for release. Additionally, IRC has partnered with Correctional Services Division, Transportation Bureau to improve the Direct Busing Program. Once fully implemented, Direct Busing will allow inmates to be transported from PDC, directly to court, and then returned directly to PDC from court. This will reduce the number of inmates that must pass through IRC. Since this is a new program, the bus routes, the units involved, and the logistics behind the program are being closely monitored and adjusted to improve efficiency.

Furthermore, IRC is striving to improve the cleanliness of its holding cells by power washing them once a week and having inmate workers clean each cell when they are unoccupied. Additionally, while the cells are being cleaned, the toilets and sinks are checked to ensure that they are in working condition before the cell is populated. At the direction of the Federal Court, IRC has limited the number of inmates that can be held in the majority of its cells to 20 per cell at any given time. The number cannot exceed 20 without the watch commander's approval, and only under exigent circumstances, for short periods of time.

In an effort to alleviate as much overcrowding as possible, IRC's professional staff continually review inmate court cases to determine bail amounts, so that if the bail has changed and an inmate is eligible for release via a promise to appear citation, that process can be completed in a timely manner.

The Department is also working in conjunction with Sacramento legislators to change current State law to allow the courts to directly sentence people to an Electronic Monitoring Program. Once the law is changed, judges throughout the County will have the ability to directly sentence an inmate to the Electronic Monitoring Program, thus creating more available beds for more serious offenders.

The Honorable Board of Supervisors         -3-                        May 8, 2007

IRC is striving to enroll more inmates into Community Based Alternatives to Custody
(CBAC) Programs. These programs include, but are not limited to, work release, work
furlough, inmate station workers, and electronic monitoring. Other CBAC programs are
also in the developmental stages by IRC personnel. It is believed that additional
improvements and inmate assignments to these programs will increase the number of
available beds for serious offenders. The Department has already realized some
success by more than doubling the number of CBAC participants, since the beginning
of February 2007, from 805 to 1,633 inmates.

Finally, the ACLU, through the *Rutherford* Panel discussion process, requested that
inmates who are temporarily detained in IRC's clinic overflow area be issued modified
indigent kits for personal hygiene. The facility's response to this request involved
working with members of the Inmate Services Unit. As of April 27, 2007, all inmates
who are temporarily detained in these housing locations began receiving inmate
indigent kits upon their arrival at this processing location.

May 2007 - July 2007 Enhancements

On May 8, 2007, IRC began partial implementation of a program to issue inmates long
sleeve thermal undershirts. The program is expected to be fully implemented in June
2007. The long sleeve thermal undershirts are currently being purchased; however, the
program cannot be fully implemented until the shirts are delivered. This program began
due to a complaint brought forward by the ACLU that some of the facility's holding cells
are too cold. The temperature in these areas is automatically set between 72 and 74
degrees Fahrenheit. A recent climate control check of the cells and areas of concern
revealed that the temperature was indeed between 72 and 74 degrees Fahrenheit.
Some inmates find this temperature range uncomfortable, therefore, these inmates will
be afforded the opportunity to wear long sleeve thermal undershirts.

Another area of focus involves quality assurance measures that are being developed to
ensure accurate inmate location records and that the Department is in compliance with
the mandates of the Federal Court, with regard to how long an inmate is detained within
IRC. Scanning devices are currently utilized to note the length of time an inmate is
assigned at the facility, and these quality assurance improvements will better serve their
medical and housing needs.

The reestablishment of the Custody Housing Unit North (CHU North) unit will improve
security level housing and inmate safety by ensuring appropriate classifications of
inmates are assigned together, particularly at PDC. CHU North will be responsible for
housing all inmates at the PDC complex in a timely manner, as well as adjusting the
PDC housing matrix to correspond with the needs of IRC and Men's Central Jail, due to
the ever changing demographics of the inmate population.

The Honorable Board of Supervisors       -4-                        May 8, 2007

## REINSTITUTE FULL OPERATING CAPACITY AT PDC SOUTH FACILITY

In November 2001, PDC South Facility (South Facility) was closed due to budget curtailments. Since that time, South Facility has been partially reopened to provide educational opportunities and various programs to the inmate population. However, instituting full operating capacity at South Facility would effectively aid in relieving overburdened jail facilities.

After the reconfiguration of South Facility to implement inmate programs, the projected bed space is estimated at 1,716 beds. Specifically, as of April 30, 2007, approximately 762 beds were utilized, which included beds for inmates that participated in programming opportunities at South Facility. Operating the complex at full capacity would provide approximately 954 additional beds in a barracks/dormitory style setting. This additional bed space would relieve overcrowding at the other custody facilities, and afford the Department added flexibility to address and resolve *Rutherford* issues raised by the ACLU and other inmate advocacy organizations, while avoiding decreases in incarceration times due to overcrowding.

As a result of the Board's ongoing support, South Facility had 234 beds and 16 positions funded in Fiscal Year (FY) 2004-05 and 50 positions funded in FY 2006-07, due to the reduction in inmate populations at Men's Central Jail as a result of the *Rutherford* mandates. The full reopening of South Facility would require adequate custody and administrative staffing, including appropriate supervision and management (a dedicated captain) as recommended by Crout and Sida Criminal Justice Consultants, at an estimated cost of $14.6 million for 109 positions and renovation. An additional $2.7 million would be required for medical services personnel and equipment as outlined in the following section.

Medical Services Bureau

The Department's Medical Services Bureau is in need of additional funding to supply proper staffing levels at South Facility. In order to adequately operate the jail, additional personnel would need to be recruited, hired, and trained. These individuals include 25 civilian medical personnel. The total estimate for onetime expenses and employee salaries is $2.7 million. A 24-hour on-site nursing staff will be utilized to accommodate the medical needs of the inmates who are housed at South Facility. Another 24-hour on-site medical clinic is located at the North County Correctional Facility (NCCF). However, additional personnel are required and time delays may occur when transporting inmates from South Facility to NCCF. Due to the proposed large inmate population at South Facility, it is imperative that a 24-hour medical clinic is on-site.

The Honorable Board of Supervisors        -5-                         May 8, 2007

Correctional Services Division, Transportation Bureau

Correctional Services Division, Transportation Bureau (CST) would be affected by the reopening of South Facility. On a daily basis, CST transports between 1,200 and 1,400 inmates from the Department's custody facilities to court.

Based on an average total inmate population count of 20,000 inmates, CST transports between 6 and 7 percent of the total inmate population each day. The addition of the 954 beds would result in a proportionate increase in the number of inmates that would need to be transported from PDC. The Department estimates that an additional 57 to 67 inmates would be transported from South Facility per day.

Therefore, the full reopening of the jail will not substantially affect IRC in regards to the court process. In fact, it will afford IRC and the CHU more options as they work to find housing assignments for new inmates.

As always, the Sheriff's Department, is driven by the challenge to improve efficiency and enhance its ability to manage the inmate population. The Department continues to take a proactive stance on providing the highest quality of service in law enforcement and correctional security. If you have any additional questions or concerns, you may contact Custody Operations Division Chief Sammy L. Jones at (213) 893-5001, or Correctional Services Division Acting Chief Alexander R. Yim at (213) 893-5018.

Sincerely,

LEROY D. BACA
SHERIFF

EXHIBIT
9





# County of Los Angeles
### Sheriff's Department Headquarters
#### 4700 Ramona Boulevard
#### Monterey Park, California 91754-2169

LEROY D. BACA, SHERIFF

February 22, 2007

Mr. David E. Janssen
Chief Administrative Officer
County of Los Angeles
713 Kenneth Hahn Hall of Administration
Los Angeles, California  90012

Dear Mr. Janssen:

### CUSTODY OVERTIME FUNDING REQUEST

The Los Angeles County Sheriff's Department (Department) has faced formidable challenges during the past few years managing an increasingly violent jail population. A rise in inmate assaults and disturbances, coupled with compliance to Federal Court mandates, Title 15, California Corrections Standards Authority, the Rutherford Panel, and demands from the American Civil Liberties Union have stretched custody facility staffing models to critically low levels, prompting the Department to add additional post positions to the jails.

Custody Operations and Correctional Services Division managers, in an effort to comply with the Court's orders and provide for a safe and secure jail environment, created approximately 285 additional unfunded post positions, filled on an overtime basis, at seven custody facilities. The creation of the additional post positions occurred over the course of time to address the jail's looming issues, including the possibility of a Federal Court consent decree and additional court-ordered mandates that may potentially have long-term, negative implications for the County.

The recently completed Crout and Sida draft audit of Men's Central Jail, Twin Towers Correctional Facility, and the Inmate Reception Center suggested staffing increases of 478 positions above the current budgeted level for just these three facilities alone to mitigate safety and security issues caused by the current use and design of these jails. Although the Department utilized significantly fewer post positions than what is being recommended by the audit, the results have been significant.  Custody Division achieved a decrease of 369 inmate on inmate assaults from calendar year 2005 (2,527)

*A Tradition of Service*

Mr. David E. Janssen                              - 2 -                              February 22, 2007

to 2006 (2,158), a 15 percent reduction. During the same time period, jail homicides decreased from 6 murders to 3, a 50 percent reduction, and inmate on staff assaults decreased from 301 to 255, a 15 percent reduction.

The creation of the additional post positions has also allowed custody personnel to be proactive in their approach in managing an increasingly tense, racially divisive jail population by intervening and quelling a multitude of inmate disputes that may have otherwise grown into larger jail disturbances. It is evident that these positions have served to create a safer jail environment for both staff and inmates alike.

In Fiscal Year 2006-07, the Department's overtime expenditure is projected to be approximately $209 million. The added post positions have been funded solely with overtime, a costly endeavor that is not accounted for in the Department's current overtime budget. To meet the Department's obligation to present a balanced budget, the staffing of these 285 critical post positions was halted on February 15, 2007. Without these positions, court-imposed mandates, including indoor and outdoor recreation programs, supervised facility cleaning crews, overflow cells at Twin Towers Correctional Facility to accommodate Inmate Reception Center medical evaluations, and operating the North Annex at full capacity to alleviate overcrowding at Men's Central Jail cannot continue, putting the Department at risk of Federal Court intervention.

To continue to staff the 285 post positions and maintain maximum bed capacity and critical jail programs throughout the remainder of this Fiscal Year, the Department is requesting $12.8 million in additional overtime funding. In addition, to legitimize the 285 post positions in Fiscal Year 2007-08, the Department is requesting $35.4 million in additional funding.

Thank you again for your continued support in recognizing our challenges and for your consideration of our custody overtime funding request. Should you have any questions, please contact me at (323) 526-5000 or Assistant Sheriff Paul K. Tanaka at (323) 526-5065.

Sincerely,

LEROY D. BACA
SHERIFF

# EXHIBIT
# 10



**County of Los Angeles**
Sheriff's Department Headquarters
4700 Ramona Boulevard
Monterey Park, California 91754-2169



LEROY D. BACA, SHERIFF

February 13, 2007

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
Los Angeles, California  90012

Dear Supervisors:

### SHERIFF'S DEPARTMENT CENTRALIZED HOUSING AND CLASSIFICATION QUARTERLY UPDATE

On January 17, 2006, the Board of Supervisors requested that the Los Angeles County Sheriff's Department (Department) provide quarterly updates on the new centralized classification and housing system for inmates, including implementation and adherence of new protocols and policies, the timeliness and accuracy of reclassifications, and ongoing staff training.

Since the last quarterly update report to your Board on October 17, 2006, the Department has continued the implementation of a centralized housing policy based upon inmate security levels.  Assessing appropriate inmate security levels is critical in determining suitable housing for inmates.  Although security level housing for general population inmates has been implemented at all facilities, housing areas that have inmates with special needs, such as mental illness, are being scrutinized to determine how to address security level issues while providing appropriate services for those inmates.  Many of the solutions are innovative and specific to the particular housing location.  The Centralized Housing Unit is directly involved in addressing these special areas, with the goal that security level be the primary consideration in all housing locations.

Inmate security levels can be changed for a variety of reasons after the inmates are assigned to housing (dropped charges, additional charges/warrants, sentencing, discipline, etc.).  The Centralized Housing Unit audits assigned housing areas each day for inmates whose security levels do not match their housing locations, and arrangements are made to have these inmates moved to appropriate housing locations.

*A Tradition of Service*

The Honorable Board of Supervisors     -2-           February 13, 2007

Due to the constantly changing demographics of the inmate population, the Centralized Housing Unit reviews and adjusts the Department's master housing plan to facilitate the maximum usage of available bed space.

The Federal Court recently ordered the removal of 1,200 beds from the Men's Central Jail (MCJ).  This order caused the processing of male inmates in the Inmate Reception Center (IRC) to slow down considerably while inmates awaited appropriate housing. Inmates could only be moved out of IRC after bed space became available at MCJ and Twin Towers Correctional Facility (TTCF).  This bed space was created by transporting inmates to Pitchess Detention Center (PDC) facilities for housing.  However, special inmate handling categories, the need for medical and psychiatric care, and the geographic requirements of certain courthouses severely limited the number of inmates that qualified for housing at PDC.  The resulting housing shortfall created significant time delays for inmates awaiting assignment from IRC to permanent jail housing locations.

On October 27, 2006, Federal Court Judge Dean Pregerson issued an injunction against the Department requiring that inmates remain in IRC holding cells for no more than 24 hours.  The Centralized Housing Unit is determined to find solutions to comply with this order, including implementation of the following:

- The development of a comprehensive inmate location scanning system to document the actual amount of time inmates spend in IRC.

- The identification of a disproportionate number of vacant beds at PDC facilities, which resulted in the redeployment of Medical Services Bureau personnel to the PDC North Annex Facility to provide an increased level of inmate medical care.  This redeployment allowed the Department to move approximately 300 inmates who were on prescribed medication from MCJ and TTCF to PDC for permanent housing.

- Greater proficiency at identifying appropriate housing options for the inmate jail population, allowing for increased efficiency in housing alternatives.

The Centralized Housing Unit remains a critical component in responding to inmate housing challenges, and is committed to continuously looking for new and innovative ways to manage the jail environment.

The Honorable Board of Supervisors         -3-                    February 13, 2007

If you have any questions or concerns, please feel free to call Chief Marc Klugman,
Correctional Services Division, at (213) 893-5017.

Sincerely,

LEROY D. BACA
SHERIFF

# EXHIBIT
# 11

Westlaw.

NewsRoom

12/24/06 LATIMES 1

Page 1

12/24/06 **L.A.** Times 1
2006 WLNR 22452210

Los Angeles Times
Copyright 2006 Los Angeles Times

December 24, 2006

Section: Main News

A TIMES INVESTIGATION
Healthcare suffers at L.A. jails
Scott Glover
Matt Lait
Times Staff Writers
Times Staff Writers

The Los Angeles County Jail system lacks enough doctors, nurses and other medical workers to meet the most basic needs of inmates, resulting in long delays in treatment for conditions ranging from hernias to heart disease.

Breakdowns in medical care, including treatment errors by physicians and nurses, have contributed to the deaths of at least 14 inmates since 1999, a Times investigation found.

Understaffing has contributed to an array of medical problems in the nation's largest jail system, a review of court files, autopsy reports, jail records and other documents shows.

Broken bones have gone untreated. Illnesses have been overlooked. Inmates have waited days, or weeks, for exams they're supposed to receive within 24 hours of making a request. Twenty percent of inmates who ask to see a doctor are released from jail without ever being examined, officials acknowledge.

In a confidential report, a consultant said an additional 720 jail medical workers were needed to meet minimum state treatment standards. At the time, the work force stood at about 980.

"The county incurs significant liability for continuing a system of care that clearly is not working," the consultant said in the 2004 report to the Los Angeles County Board of Supervisors.

Spurred by those findings, officials began to bolster the ranks of doctors and nurses. But the system remains several hundred medical workers short.

Jody Kent, a court-sanctioned monitor who for three years walked the county's cellblocks

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

documenting complaints for the American Civil Liberties Union, said she frequently saw inmates suffering.

She said inmates showed her what seemed to be gaping wounds from staph infections, broken bones and bulging hernias.

"I basically saw grown men crying because they were in such pain," Kent said.

Sheriff's Lt. Stephen Smith, who oversees the jail system's medical services bureau, said tending to sick prisoners is fraught with complications. He said some inmates conceal medical problems from their jailers, while others feign illness. Thousands are mentally ill.

"We face unique challenges, and we do the best we can," Smith said. "These are difficult, angry, messed-up people. We try to treat people with the respect, not that they necessarily deserve, but that human decency demands."

Smith cited recent improvements in the quality of care: Medical records have been computerized, allowing for better tracking of doctors' orders, and distribution of prescription drugs has been automated, reducing medication errors. He said the department plans to launch a "telemedicine" program that will expand the reach of doctors by allowing them to remotely diagnose and treat inmates via computer and teleconference.

Smith acknowledged, however, that staffing shortages still exist and "bad outcomes" occur.

Deterioration, death

Pamela Wimberley was serving a 30-day sentence for forging a prescription. On the morning of Feb. 10, 2003, she awoke in her cell in the Twin Towers jail downtown with a headache and fever. A nurse who examined her noted that Wimberley's blood pressure was up and her pulse was racing.

A doctor was informed over the phone, and he noted that Wimberley was diabetic and at risk of developing a respiratory infection. He ordered blood and urine tests to determine if that's what she had.

The order was never put in writing, however, and the tests were never done.

Instead, Wimberley was given a pain reliever and sent back to her cell.

The next morning, she saw a doctor -- the same one who had ordered the blood and urine tests. But the doctor did not check to see if the tests had been done. Rather, the physician concluded that Wimberley was suffering from a viral infection of the nose, throat and sinuses. She was given cough medicine and sent back to her cell.

Three days later Wimberley was seen by the medical staff again. Now she was experiencing chills, had a sore throat and had laryngitis. Though these symptoms can be signs of a bacterial infection, she was not placed on antibiotics. She was merely encouraged to drink lots of fluids.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

On Feb. 15, five days after she initially complained, Wimberley's condition deteriorated. She had chest pains and difficulty breathing. Her pulse rate was high, her blood pressure low.

She was taken by ambulance to County-USC Medical Center in septic shock from bacterial pneumonia that had been ravaging her lungs. It was too late: Wimberley, 38, died two days later.

In response to a wrongful death lawsuit filed by her husband, county lawyers concluded that the treatment errors, including the failure to conduct blood and urine tests, "resulted in a missed opportunity to diagnose and treat Ms. Wimberley's condition, and are directly responsible for the results observed here."

The county settled the case for $150,000. The unidentified doctor who failed to follow up on the tests was suspended for three days.

Alan Wimberley said he felt frustrated and helpless as his wife tried to deal with her illness behind bars. He said she would call home in tears, complaining that no one would help.

"I was like, 'Honey, you're in jail,' " said Wimberley, an electrician from the Antelope Valley. " 'What can I do?' "

'I need my medicine'

An average of about 200,000 people enter the county jails each year. On most nights, the population hovers around 18,000, with more than a third requiring medical care. Many are in fragile health because of drug abuse, homelessness or chronic illness. For some, the only time they see a doctor is when they're behind bars.

The county Sheriff's Department, which runs the jails, is required by state law to provide basic medical care to all inmates -- 90% of whom have not been convicted of the charges against them.

It is a constant struggle.

When inmates are booked, they are questioned to determine if they are physically or mentally ill. About half require additional screening or treatment before being assigned to a cell. If inmates develop medical problems later, there are daily "sick calls" in which they can sign up to see a nurse in clinics throughout the sprawling system.

Inmates requiring constant attention, such as kidney dialysis patients, are housed in a 200-bed mini-hospital known as the Correctional Treatment Center in Twin Towers. Urgent cases are transferred to a **jail** ward at County-USC or to other area hospitals.

"Today's **jail** population is older and sicker than it was a decade ago," Smith said. "The **healthcare** system is broken on the outside, and we see that in here."

The volume of inmates, coupled with a shortage of doctors and nurses, has resulted in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

a backlog of hundreds of inmates waiting to be examined.

"I could have every doctor in the county of Los Angeles here, and it still wouldn't be enough," said Sander Peck, chief physician in the jail system. "I don't know what 'enough' would be."

A terminally ill inmate, Cynthia Barella, 48, was so desperate to see a doctor that she bashed her head against her cell wall, inflicting a bloody injury that could not be ignored, records show. Barella, who suffered from hepatitis, cirrhosis and other ailments, was then taken to a hospital, where she died the next day.

The difficulty getting medical care is illustrated in more than 10,000 confidential complaints filed by inmates from 2000 to 2005.

The records, reviewed by The Times, portray an overwhelmed system in which inmates literally beg to be seen for problems ranging from rashes to life-threatening illnesses. "I feel myself becoming unglued, anxiety attacks, unstable," wrote one woman who said her medication had run out two weeks earlier.

"Please," her hand-scrawled note read, "I need my medicine. Please."

Another woman complained that she had gone 11 days without her medication for Huntington's disease, a neurological disorder characterized by involuntary muscle movement.

"My motor control is going; my speech and memory are disintegrating daily," she wrote in September 2001. "Help me!"

The complaint form indicates that the woman told medical workers about her condition at the Inmate Reception Center in the Twin Towers complex on Sept. 7 and was prescribed Motrin. For the two weeks that she remained in custody, she was given no follow-up care, sheriff's documents show.

In another case, a male inmate complained that he had been vomiting bile and traces of blood, and losing weight for weeks, but that his requests to see a doctor had been ignored.

"This is well known by staff and inmates," he wrote. "I don't know what it's going to take to get proper medical attention, short of expiring." Several days after complaining, the inmate was prescribed ulcer medication.

Scores of female inmates complained of being unable to get medication for vaginal infections.

"I have a yeast infection or some kind of female infection, and I would like some medical attention," wrote one woman, who said she'd been complaining about the problem for weeks. "The discharge is getting worse, and I feel nasty and unclean. Please help me."

'No street criminal'

The case of Jerone Woods illustrates how errors, oversights and inaction have contributed to inmate deaths.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Woods, 55, entered the jail in September 1999 to serve time for drunk driving. He had told authorities he had diabetes, high cholesterol and hypertension, for which he was taking Pindolol. The drug controls high blood pressure by decreasing the force and rate of heart contractions. He brought his medications with him. But in keeping with jail policy, they were taken away to be stored and returned upon his release -- medications for inmates are supplied by the jail pharmacy.

Policy requires that inmates 55 or older be given an enhanced medical screening, including chest X-rays, lab tests and an electrocardiogram. When Woods was seen by a nurse at the Inmate Reception Center, the nurse erred by indicating on a form that he was not 55 or older.

Then came a second mistake: The nurse did not document that Woods had been taking Pindolol. Suddenly stopping the drug can trigger a heart attack. When the doctor briefly examined Woods a couple of hours later, jail records note, the inmate's blood pressure was "dangerously high." The doctor ordered that it be checked daily.

Because the doctor was relying on the nurse's form, he failed to order Pindolol.

Woods was transferred to a cell in Men's Central Jail. When he awoke the next morning, no one checked his blood pressure. He was assigned latrine duty, mopping bathroom floors, wiping toilets and cleaning sinks. At about 1:15 p.m., Woods had a heart attack. He was taken to a hospital, where he died an hour later.

A doctor and two nurses, whom sheriff's officials declined to identify, were punished for their treatment of Woods. The doctor was suspended for 10 days; one nurse received a five-day suspension, the other a one-day punishment.

County lawyers found that the failure to prescribe Pindolol and to monitor Woods' blood pressure "fell below the standard of care and may have directly contributed to Jerone Woods' ... death." The county settled a wrongful death suit by his widow, Joyce, agreeing to pay her $850,000.

In a recent interview, she said her husband worked more than two decades in the aircraft parts business, didn't miss church on Sundays and raised a nephew as his own when the boy's mother died.

"He was no street criminal," she said. "They took away a good man."

Errors found

Artemio Barcenas-Jimenez was **jailed** in 2003 after **suffering** a skull fracture in a drunk-driving accident. A passenger in his car was killed in the crash, and Barcenas-Jimenez was charged with murder.

He complained of head discomfort and nausea.

"My head feels big," he told a nurse.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

12/24/06 LATIMES 1                                                                                    Page 6

The nurse ignored the complaint, sheriff's disciplinary records show. After learning
that Barcenas-Jimenez was having difficulty breathing, a doctor also failed to exam him.

He died two days later from blunt-force trauma complicated by diabetes, the coroner said.
He was 34.

The nurse was suspended for seven days, the doctor for four, for ignoring the inmate's
complaints.

In 2005, Louis Laskey was in a communal shower in Men's Central when he collapsed and
began convulsing in view of 40 other inmates. As his face turned red, then blue, fellow
inmates frantically shouted, "Man down!" in an attempt to get help. It took deputies
up to 20 minutes to respond, the inmates said. Laskey, it turned out, had suffered a
heart attack. He died later that day at age 49.

Two deputies were suspended 15 days for being slow to come to the inmate's aid.

Available records indicate that no disciplinary action was taken after the death of Henry
Torres, a 32-year-old drug offender. Moments before his arrest in 2000, he tried to hide
some evidence by swallowing it. Over the next two months, he complained to jail officials
that something felt stuck in his throat.

Torres' mother, Yvonne Benavides, said her son would call from jail and complain that
he couldn't breathe. He told her nurses gave him aspirin and cough syrup but wouldn't
let him see a doctor.

Four times the inmate appeared before a judge as his drug case moved through the courts;
four times the judges ordered that medical workers take care of his problem.

They X-rayed Torres' neck and found nothing. They X-rayed his chest and found nothing.

The fourth order, signed Dec. 26 by Superior Court Judge Michael Cowell, ordered an
"endoscopy to observe obstruction in throat & any other appropriate testing and/or
treatment."

None was conducted. On Jan. 1, 2001, Torres was found dead in his cell. The coroner
concluded that he choked to death on a plastic syringe cap lodged in his throat.

The county settled a wrongful death suit for $250,000.

Longtime shortages

County supervisors and sheriff's officials have known for years that there were not enough
doctors and nurses in the jails. In 2001, a deputy described the shortages in a memo
submitted to the supervisors. A San Francisco consultant, Rebecca Craig, was hired to
study the problem.

Craig's conclusions -- submitted to the county's top lawyer in April 2004 -- called for
significant increases. More than 520 new doctors, nurses and pharmacists were needed,
she wrote. An additional 200 clerks and other support staff were also necessary so nurses

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and doctors could spend more time treating patients and less doing paperwork.

County supervisors did not respond to inquiries from The Times about medical conditions within the jails or about the consultant's report.

Since 2005, the county has allocated about $20 million to hire 280 more nurses and 13 more doctors, officials said. The Sheriff's Department, however, has been unable to fill nearly 100 of those positions, in part because of competition from private hospitals and clinics.

Nearly 100 other nursing jobs have candidates but won't be filled until background checks are completed, a process that can take months. More than 150 clerical and other support positions remain unfilled.

Smith, the sheriff's lieutenant, said officials have made **healthcare** in the **jails** their top priority in budget requests and have secured steady but modest increases in funding in the last two years. That is the best that can be hoped for, he said, since inmates are not a political constituency.

"This is an underserved population for a reason," he said.

Fatal complications

Gustavo Ortega, a 50-year-old insulin-dependent diabetic, was arrested March 1, 2004, for drinking in public.

After complications arose from his diabetes, he was taken to County-USC, where part of his right foot was amputated.

When he completed his sentence eight days later, he was given a pair of crutches and escorted to the lobby of the Inmate Reception Center in downtown Los Angeles.

But jailers failed to give Ortega his diabetes medication. Instead of going home, he curled up on a bench in the lobby-- and stayed there, apparently unnoticed, for three days.

Ortega's family learned that he was no longer in custody when his brother tried to visit him a day after his release. The family spent the next two days searching skid row and homeless shelters for him.

When deputies finally noticed Ortega in the jail lobby, he was pale, disoriented and bleeding from his mouth. Yet deputies waited nearly four hours before calling paramedics, county claim records show. Ortega died a short time later of coronary artery disease, with diabetes, chronic renal failure and hypertension listed as contributing factors.

Ortega's family sued the county. Going to trial, county lawyers said, would be risky.

"Experts will be critical of the jail personnel's failure to provide Mr. Ortega with diabetic medications ... and [their] delay to summon medical assistance," county lawyers wrote in a settlement memo.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

County lawyers are seeking approval to settle the case for $700,000.

scott.glover@latimes.com

matt.lait@latimes.com

*

Times staff writer Jack Leonard and researcher Maloy Moore contributed to this report.

PHOTO: TREATMENT: Dr. Weider Show, left, confers with nurse Alfredo Vilgera after the inmate at right had an EKG at the Inmate Reception Center.

PHOTO: AGE: An inmate awaits a nurse. "Today's jail population is older and sicker than ... a decade ago," an official says.

PHOTOGRAPHER: Brian Vander Brug Los Angeles Times

PHOTO: DATA: Inmates gèt health interviews at the reception center. Officials concede 20% of inmates who ask to see a doctor are released from jail without ever being examined.

PHOTOGRAPHER: Brian Vander Brug Los Angeles Times

PHOTO: LAPSE: Failure to prescribe a drug Jerone Woods had been on at the time he entered jail may have abetted his death, lawyers said.

PHOTO: TRAGEDY: Without his diabetes medication when released, Gustavo Ortega curled up in a lobby for three days, apparently unnoticed.

PHOTO: DESPERATE: An ill Pamela Wimberley would call home in tears complaining that no one would help, her husband recalled.

PHOTO: STRETCHED THIN: Nurse La Wanda Laster at work. Jails are hundreds short of a medical staffing goal.

PHOTOGRAPHER: Brian Vander Brug Los Angeles Times

---- INDEX REFERENCES ----

COMPANY: MASISA SA (OLD); MASISA SA

NEWS SUBJECT:  (HR & Labor Management (1HR87); Violent Crime (1VI27); Legal (1LE33); Business Management (1BU42); Social Issues (1SO05); Judicial (1JU36); Labor Unions (1LA31); Health & Family (1HE30); General Interest Diabetes (1GE92); Crime (1CR87); Criminal Law (1CR79); Prisons (1PR87))

INDUSTRY: (**Healthcare** Services (1HE13); Bacterial (1BA64); **Healthcare** Service Providers

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1HE78); Infectious Diseases (1IN99); Hospital (1HO39); Hospital Administration
(1HO60); **Healthcare** (1HE06); Nursing (1NU59); **Healthcare** Practice Specialties (1HE49))

REGION:   (North America (1NO39); California (1CA98); Americas (1AM92); USA (1US73))

Language:   EN

OTHER INDEXING:   (AMERICAN CIVIL LIBERTIES UNION; CORRECTIONAL TREATMENT CENTER; INMATE
RECEPTION CENTER; JERONE WOODS; LASKEY; LOUIS LASKEY; MEDICAL CENTER; SHERIFF; SHERIFFS
DEPARTMENT; SUPERIOR COURT; TIMES; WOODS)   (Alan Wimberley; Alfredo Vilgera; Artemio
Barcenas; Barella; Craig; Cynthia Barella; Fatal; Gustavo Ortega; Henry Torres; Jack
Leonard; Jody Kent; Joyce; Kent; Longtime; Maloy Moore; Michael Cowell; Moments; Ortega;
Pamela Wimberley; Pindolol; Rebecca Craig; Sander Peck; Smith; Spurred; Stephen Smith;
Torres; Twenty; Understaffing; Urgent; Weider Show; Wimberley; Yvonne Benavides)

KEYWORDS: LOS ANGELES COUNTY; PRISONS; PRISONERS; HEALTH; MEDICAL CARE; HEALTH WORKERS

EDITION: Home Edition

Word Count: 3582
12/24/06 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT
# 12

Westlaw.

**News**Room

12/17/06 LATIMES 1

Page 1

12/17/06 L.A. Times 1
2006 WLNR 21899601

Los Angeles Times
Copyright 2006 Los Angeles Times

December 17, 2006

Section: Main News

A TIMES INVESTIGATION
In jail and in danger
Stuart Pfeifer
Robin Fields
Times Staff Writers
Times Staff Writers

Infobox (text included here) Infographic Table

On a Tuesday in October 2003, Ki Hong entered Men's Central Jail in downtown Los Angeles to serve a five-day sentence for soliciting a prostitute.

He didn't survive two hours.

Three members of a Korean gang instantly spotted Hong, 34, who authorities allege was a member of a rival gang. The trio had broad freedom to roam the jail because sheriff's deputies had given them jobs as inmate workers -- jobs for which they, awaiting trial on murder charges, should have been ineligible.

They let themselves into Hong's dormitory using a guard's control button. Then they stabbed Hong repeatedly, strangled him with bed linen and hid his body in a trash bin.

Since 2000, 14 inmates have been slain in jails run by the Los Angeles County Sheriff's Department, including four this year. Hundreds more have been injured in jail violence.

Taxpayers, who pay more than $500 million a year to operate the jails, paid an additional $6 million since 2004 to compensate inmates and their survivors for errors, negligence and brutality. In addition, a tentative $2.8-million settlement is awaiting county approval.

A Times review found that:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

\* The Sheriff's Department has failed to protect vulnerable inmates from predators, despite repeated calls for action by jail experts. Last year, deputies placed Chadwick Cochran, a low-level offender with a long history of mental illness, in an unsupervised holding cell with violent gang members. They punched and stomped him to death.

\* The department has had increasing difficulty maintaining order at its eight jail facilities. More than 30 major disturbances involving large numbers of inmates erupted this year. Riots left two dead and at least 100 injured. After widespread rioting in 2000, the violence subsided briefly. But the number of disturbances has risen from 47 in 2001 to 112 this year, records show.

\* Disciplinary action against sheriff's employees whose lapses contributed to **inmate** deaths or injuries is often softened or rescinded on appeal. In one case in 2003, a deputy was suspended five **days** for failing to notice that two **inmates**, drunk on **jail**-brewed alcohol, had beaten their mentally ill cellmate to death. A supervisor overturned the suspension over the objections of the department's internal affairs monitor.

The Hong case cost the **county** $800,000 in legal claims and prompted sanctions against a dozen **jail** employees. Yet similar failures played a role in at least seven **inmate** deaths over the next two years.

In the most notorious case, an **inmate** wandered unescorted through Men's Central **Jail** for several hours, finally finding a witness who had testified against him in a murder case and strangling him in his cell.

Sheriff Lee Baca says his department has done its best to contain an ever-more-explosive **inmate** population.

"It's remarkable there's not more violence in the context of the **county jail** demographics," he said in an interview. "It could be 10 to 100 times worse if it wasn't for the **managers** and deputies in the **Los Angeles County Jail**. We'll never be singled out for the murders we have prevented."

Baca said his department has taken steps to reduce **jail** violence in recent months. A centralized team now screens arriving **inmates** to separate the vulnerable from the violent. Many Latino gang members are held apart from the general population to avoid clashes with outnumbered black **inmates**.

The sheriff also said his department has inadequate resources to staff the **jails** properly and renovate unsafe facilities.

Civil rights attorney Hermez Moreno, who represented the family of the slain witness, 20-year-old Raul Tinajero, said the department's shortcomings came down to **management**, not money.

Tinajero's killer was allowed out of his cell by pretending to have a **court** appearance. The deputy responsible for checking his ID number against the list of **inmates** with **court** appearances apparently did not do so.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The $1.25 million paid earlier this year to settle a lawsuit filed by Tinajero's relatives was the second-largest payout for an **inmate** death in **county** history.

"How much money would it have taken for one guy to look at the wristband of the guy who killed Tinajero?" Moreno said. "The answer is no amount of money. The answer is accountability and appropriate training."

Comparing **jails**

In the **Los Angeles County Jail** system -- the nation's largest -- about 3,300 uniformed employees watch over an **inmate** population that averages more than 18,000.

The New York City Department of Correction, which oversees about 5,000 fewer **inmates**, has three times as many uniformed guards.

At least one in five **Los Angeles County inmates** is a gang member. Nearly 90% are awaiting trial on felony charges.

Almost two-thirds of the **jail** killings since 2000 have taken place in Men's Central **Jail**, an aging 4,800-bed behemoth just north of Union Station.

Dilapidated, understaffed and chronically **overcrowded**, the **cellblocks** at "CJ" are a nightmare of poor sightlines and dark corners. During an internal affairs review, sheriff's personnel conceded that they rarely entered the bunk-lined dormitory where Hong was murdered. Instead, they monitored **inmates** by peeking through its sole small window.

**Inmates** routinely walk CJ's halls unaccompanied by staffers. Pairs of deputies guard lines of 100 **inmates** or more as they shuffle through the **jail**.

Assessing the conditions in February as part of ongoing civil rights litigation, former Virginia prison Warden Toni V. Bair wrote that "in every instance where there was a mass **inmate** movement I did not observe anything **close** to adequate supervision.... **Inmates**, frequently numbering 100 or more, could have created a disturbance, rioted and taken hostages."

**Jail management** experts such as Bair acknowledge the sheriff's challenges but say his agency has not done enough to safeguard the most likely targets of violence.

The Sheriff's Department is well aware of who the most vulnerable are: informants, child molesters, the mentally ill, the elderly and African Americans, who are outnumbered by Latino **inmates**. Yet time and again, these **inmates** have been victimized.

In May 2003, sheriff's deputies placed a defendant in a courthouse holding cell with Martin Davis, a witness in his criminal trial, even though the men's security classifications mandated that they be kept apart.

Spotting Davis **sleeping** on the **floor**, the defendant, Joseph Allen, kicked him repeatedly until a deputy intervened. Davis emerged from a coma after more than a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

week and sued the **county**, receiving a $375,000 settlement.

Seven months after the Davis assault, Jose Beas, an accused child molester, was placed with 80 other **inmates** in a dorm at Men's Central **Jail** even though a special **order** had been entered into the **jail** system's computer to segregate him for his protection. Beas, 41, was beaten severely.

The Board of Supervisors is scheduled to vote Tuesday on a settlement paying his family $2.8 million for his lifelong care.

In a November 2004 report to the supervisors, Merrick Bobb, who monitors the sheriff for the board, urged the Sheriff's Department not to house the most dangerous inmates -- given security ratings of 8 or 9 -- with lower-risk inmates. He based his recommendation on the circumstances surrounding five jail homicides between October 2003 and April 2004.

The department did not follow Bobb's advice until early this year. By then, there had been three more slayings. In two of them, assailants classified as higher-level risks killed lower-level offenders.

Sean Anthony Thompson, 38, was killed in his cell at Men's Central Jail in February, 2 1/2 months after Undersheriff Larry Waldie assured the supervisors that plans were underway to separate level 8 and 9 inmates from others. Thompson was a Level 6. Three of his four attackers were Level 8.

Marc Klugman, chief of the sheriff's correctional services division, said the agency moved as quickly as possible. "It was a pretty massive sea change. It was not something we could just do overnight," he said.

Within weeks of Thompson's slaying, the Sheriff's Department was putting all Level 9 inmates in one-man cells and segregating Level 8s from the rest of the jail population.

The department moved more swiftly on recommendations to tighten policies on inmate workers, who handle such tasks as distributing meals and cleaning cells and common areas.

Deputies used to choose the workers informally. One of Hong's attackers kept his job -- and, thus, access to Hong -- even after deputies received a tip that he was dealing drugs inside the jail.

After Hong's killing, the Sheriff's Department required supervisors to approve all inmate workers.

Yet in practice, the selection process has remained casual. Inmates sometimes pass deputies makeshift resumes through their cell bars, listing as "references" other officers for whom they have worked.

Baca rejected the notion that if his agency followed its own rules better, it could avert at least some attacks.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

"The problems in the jails, in my opinion, are 100% bred by the prisoners," Baca said. "They're going to commit crimes in the jails. They just find a new victim population."

They did not have to look far to find Stephen Prendergast.

On Dec. 6, 2003, two of Prendergast's cellmates at Men's Central Jail attacked him, apparently angry that he was acting strangely and talking to himself.

Prendergast, 33, awaiting trial on an arson charge, had spent several months in a state mental hospital before being sent to the Los Angeles County jails.

He was transferred into the general population at Men's Central Jail after refusing to take medication for schizophrenia at Twin Towers' mental health unit.

Prendergast's cellmates started assaulting him at 6 p.m. and continued for several hours, a sheriff's investigation found.

Two hours into it, a deputy came around to check on the cell. He did not notice that Prendergast had been beaten or that his cellmates were drinking a homemade jail brew called pruno. The assault continued. When Prendergast cried out, other inmates on the row yelled to cover up the sound.

It wasn't until almost 8 a.m. the following day that another deputy realized Prendergast was injured. He was taken to the hospital, where he died from severe brain trauma. The county paid his family $262,500 to settle their wrongful death lawsuit.

Little punishment

Anthony Fernandez lives in the garage of his mother's Pico Rivera home. He struggles with his balance. His speech is halting and sometimes slurred. In April 2004, while Fernandez was serving a six-month sentence for carrying a concealed weapon, four inmates who thought he stole from them dragged him to the back of his dormitory at Pitchess Detention Center's North Facility and beat him senseless.

Fernandez, 21, suffered extensive neurological damage and may never be able to live independently. His assailants had 20 minutes to attack him undetected because the deputy assigned to watch his dorm left her post unattended, assuming her replacement was on his way.

It was a costly error. The county agreed to pay $750,000 to settle a lawsuit by Fernandez's family.

The Sheriff's Department handed down a stiff penalty too, demoting the deputy to custody assistant, a lower-paying civilian position. But after the deputy objected, she was reinstated and given a 30-day suspension instead.

The agency has followed a similar pattern in dozens of other instances in which employees' lapses played a role in inmate deaths and injuries, records show. Depart-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment officials initially took disciplinary action against eight deputies, two cus-
tody assistants and two sergeants for mistakes and inattention in the Tinajero
killing, doling out a combined 72 days of suspensions.

But their supervisors reduced the punishments imposed on nine of the 12, dropping
suspensions to written reprimands in three cases. A five-day suspension for the
deputy who apparently failed to check the ID of Tinajero's killer was dropped en-
tirely after he appealed.

Department executives slashed the discipline imposed in the Hong case by two-
thirds. Just one employee served a suspension longer than five days.

Correctional Services Chief Klugman said punishments are often eased after deputies
promise to learn from their mistakes.

Jail experts and attorneys said the department lacks the will to hold employees ac-
countable. The pattern of imposing, then rescinding, punishments sends a message
that negligent or abusive officers have little to fear, they contend.

"They know nothing is going to happen," said Moreno, the civil rights attorney.

Michael Gennaco, chief attorney for the sheriff's Office of Independent Review, ac-
knowledged that disciplinary action is sometimes watered down without justifica-
tion. But he said misconduct by deputies is investigated more thoroughly and pu-
nished more harshly than under previous sheriffs.

**Jail** employees' use of significant **force** rose 60% between 2000 and 2005, department
records show. Incidents resulting in hospitalization or verifiable injury to **in-
mates** almost doubled in that time, from 186 to 339.

Gennaco said many uses of **force** are appropriate reactions to **inmate** behavior.
Still, he acknowledged, the Sheriff's Department has a reputation for parking **prob-
lem** officers in the **jails**. Some incidents stem not from **problem** deputies but from
questionable practices passed down over the years.

On Nov. 16, 2005, Chadwick Cochran was placed in an unmonitored television room in
Men's Central **Jail** with about 30 other offenders.

Two gang members apparently mistook him for a police informant and pummeled him
with their hands and feet as well as plastic dinner trays. As Cochran lay motion-
less on the **floor**, the pair took turns jumping off steel benches and stomping on
his head.

The officers who left Cochran unsupervised were not disciplined. What they had done
was so common at the **jail** that internal investigators decided it wouldn't be fair
to punish them.

"The informal practice of placing **inmates** in television rooms was well-established,
if misguided," a report released by Gennaco's office concluded. "This made it dif-
ficult to hold people accountable for following it."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Despite strides made by the Sheriff's Department this year, violence is commonplace in the L.A. County jails. In the last six weeks, two more inmates have been slain. A 51-year-old mentally ill man was killed in his cell by a younger, stronger cell-mate, and an inmate was beaten to death by gang members.

Baca said his department continues searching for ways to bring the violence under control.

"I'm certainly of the belief that we can always do better," he said. "I don't think any death in the **jail** is acceptable."

stuart.pfeifer@latimes.com

robin.fields@latimes.com

*

(BEGIN TEXT OF INFOBOX)

530

**Inmate** disturbances in **jails** run by the **Los Angeles County** Sheriff's Department since 2000.

$6 million

Money **Los Angeles County** has spent to compensate **inmates** and their survivors for negligence, errors and violence since 2004.

18,000 +

Average number of **inmates** held daily in **jails** operated by the **Los Angeles County** Sheriff's Department.

*

(BEGIN TEXT OF INFOBOX)

**Jail** violence

**Inmate** disturbances in **Los Angeles County jails** are up sharply this year. Major disturbances are **described** as involving a majority of **inmates** in affected areas and may lead to serious injuries; minor disturbances involve smaller groups and may result in minor or no injuries; riots are classified as violent disruptions that put the safety of the staff and **inmates** in serious jeopardy.

| Incident type | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006* | Riot | 1 |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 3 Major | 78 | 19 | 26 | 31 | 26 | 28 | 34 |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT
# 13

*The Los Angeles County*

# Sheriff's Department

**22nd Semiannual Report**

by Special Counsel Merrick J. Bobb and Staff

and Police Assessment Resource Center (PARC)

August 2006



the Sheriff and his command staff must respond to equally urgent yet conflicting demands for improvement of the jails.

The LASD cannot do everything at the same time. This Report does not evaluate the LASD's efforts to reduce overcrowding, improve basic conditions, or curtail early releases. Nor does it focus on the ultimate long-term solution to these problems, which is to build a series of small, modern jails in which inmates can be secured in cells rather than dorms, and to phase out the use of Men's Central Jail while reserving the dorms at the Pitchess Detention Center to house low security inmates. So long as the jails continue to confine dangerous inmates in overcrowded cells and dorms with little to occupy their time, inmates will fight and occasionally riot, and jail managers will continually struggle to control this violence.

Chapter Three of this Report analyzes current use of force trends through the lens of CARS data, which paint a mixed picture. On one hand, in 2005, a smaller percentage of all arrests involved force than in previous years. On the other hand, whereas in 2000 less than half of all force incidents involved significant force, that number has been consistently above 50 percent since then. In 2005, the percentage of force incidents involving significant force reached 57 percent, the highest proportion since we began reporting on these issues in 1998 and 1999. Also climbing is the frequency with which LASD uses of force cause visible and verifiable injuries.

We are not saying that the LASD has become brutal or less restrained with regard to use of force. In fact, the whole number force incidents resulting in hospitalization or death has fallen from a high of 19 in 2000 to 11 last year. We are, however, calling attention to significant force issues that, if left alone, may have costly consequences to the County in terms of litigation exposure and to the LASD in terms of reputation and public image.

We are pleased to report a welcome drop in accidental discharges from a high of 26 in 1996 to only two in 2005. It is also good to report that for the

4