# EXHIBIT
# 24



**County of Los Angeles**
**Sheriff's Department Headquarters**
**4700 Ramona Boulevard**
**Monterey Park, California 91754-2169**



LEROY D. BACA, SHERIFF

August 5, 2004

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
Los Angeles, California 90012

Dear Supervisors:

### RESPONSE TO A REQUEST FOR A
### SHERIFF'S DEPARTMENT'S CUSTODY MASTER PLAN

Over the course of the last three years, several jails have been closed due to budget curtailments; including, the Pitchess Detention Center - South Facility (PDC, South), Biscailuz Recovery Center and Century Regional Detention Facility (CRDF). Prior to this time, the Hall of Justice (HOJ) and Sybil Brand Institute for Women (SBI) had been closed due to structural issues related to the earthquake, land settling and significant repairs. Additionally, the Department was forced last fiscal year to close housing areas within all of the remaining jails, except Men's Central Jail (MCJ). The resulting loss of bed space has reduced a previously rated inmate capacity of 22,214 down to its current capacity of 17,500. To compound this situation further, we have recently moved approximately 750 inmates from MCJ that were inappropriately, but necessarily, housed in the various day-rooms (the location of one of our recent inmate homicides). What started out to be "temporary housing" in these day-rooms, became a "permanent arrangement" due to overcrowding. Those 750 day-room inmates were transferred to a closed building at North County Correctional Facility (NCCF), which continues to require overtime, as the personnel previously staffing this floor had been removed due to the downsizing requirements of the budget cuts.

With the potential for an estimated $50 million in "new money" that would result from the approval of the ½-cent sales tax measure (recently placed on the November ballot by the Board), Custody Operations and Correctional Services Division Chiefs began planning for the use of those projected dollars, yet unrealized, for improved jail operations. The movement of females inmates from Twin Towers Correctional Facility

*A Tradition of Service*

The Honorable Board of Supervisors      - 2 -                        August 5, 2004

(TTCF), a high security facility, to another jail requiring a lower level of security, became a major component of our planning.  A bi-product and secondary goal of the move would be an expansion of our current inmate housing, which would allow a higher overall capacity and, consequently, fewer "early releases."

Initially, four facilities (CRDF, PDC-South, SBI and MCJ) were studied for suitability to house the female inmate population.  None of the facilities would be capable of holding all of the females, as acute medical conditions would require continued housing at either Twin Towers Correctional Facility's Medical Services Building or the Los Angeles County Medical Center.  With that in mind, we began reviewing the pros and cons of each facility.  MCJ and SBI were quickly eliminated; SBI for its estimated $40 million infrastructure requirements (just to begin the movement process) and MCJ for the significant safety issues in segregating the females from the existing male population.

Following a thorough review of the CRDF and PDC-South options, it was decided CRDF was not only the most practical option, but also the most economical option available.  CRDF is available for immediate occupancy.  To do so, the Sheriff's Department would close Tower 2 of TTCF and utilize many of the existing staff to open CRDF.  The cost of opening CRDF would be accomplished with an $8 million increase to the Department's budget.

Opening PDC-South for female inmates is an inefficient and cost prohibitive option. PDC-South would require that at least two floors at TTCF remain open for the Department of Mental Health and other female inmates needing routine medical attention.  The Inmate Reception Center (IRC) will continue to operate in an inefficient manner by processing both male and female inmates and necessitate an additional 730 bus trips per year to and from PDC-South.  Lastly, the Department's long term plan is to use PDC-South for a revenue generating jail industries program.

The movement of violent inmates from MCJ to Tower 2 of TTCF becomes the next issue.  It is anticipated that additional monies will be needed, which shall be used for training "newly hired" personnel and security upgrades. The proposal, which would ultimately require approximately $23.4 million in additional money, would be implemented incrementally, floor by floor, until Tower 2 was completely filled. Although, personnel could be drafted from other facilities, the overall process to fully staff TTCF could take two to three years.

The Honorable Board of Supervisors        - 3 -                        August 5, 2004

| Facility Name | Associated Cost ($ millions) | Tab Identifier |
|---|---|---|
| CRDF | 8.0 | A |
| TTCF - Tower 2 | 23.4 | B |
| PDC - South | 21.0 | C |
| PDC - East | 4.7 | D |
| PDC - North | 2.5 | E |
| PDC - NCCF | 3.0 | F |
| Search Teams | 2.0 | G |
| Totals | 64.6 | — |

Should you have any further questions, please contact Chief John L. Scott at (213) 893-5001.

Sincerely,

LEROY D. BACA
SHERIFF

## Re-configuring Twin Towers Correctional Facility - Tower 2

With the opening of the Century Regional Detention Facility, Twin Towers Correctional Facility - Tower 2 would be closed. The best use of Tower 2 would be to re-open the tower to the most problematic and highest security level male inmates in our jail system, currently housed at MCJ. In order to accomplish this goal, many of the cell doors throughout Tower 2 would need to be retrofitted at a cost of approximately $7,000.

Staffing for the re-opening of Tower 2 would require 173 Deputies and 70 Custody Assistants at a cost of $19.1 million. 10 supervisory personnel are also needed to re-open Tower 2 at a cost of $1.1 million. This option would introduce an additional 1,730 beds into the jail system. An additional $3.2 million is required for food and medical services provided to the inmates. The grand total cost for re-opening Tower 2 would be $23.4 million.

### Re-opening the Century Regional Detention Facility

With the numerous budgetary curtailments in recent years, the Sheriff's Department's Custody Operations and Correctional Services Divisions have coordinated the placement of inmate security levels and classifications in the most cost efficient manner possible, re-configuring the housing at each of the facilities. In an effort to increase the manageability of the inmate population and align the population with infrastructure of the various county jails, the Sheriff's Department proposes re-opening the Century Regional Detention Facility (CRDF) as the first in a series of changes to the Custody Operation.

With the identification of an approved funding source, the Sheriff's Department would relocate female inmates to CRDF and close Tower 2 of the Twin Towers Correctional Facility (TTCF). CRDF was designed and built on the direct supervision model which is conducive to a medium security level inmate and the application of a variety of inmate programs. During closure of SBI many programs were curtailed. With the re-opening of CRDF, all current programs, plus many of those curtailed (ceramics, cosmetology, academics, hospital food services, office occupations, etc.), could be re-instituted.

By re-opening CRDF, the Department would be able to bifurcate the function of processing inmates from the Inmate Reception Center (IRC). Currently, male and female inmates are processed in the same area of IRC which creates liability concerns and disrupts the work flow function of steadily processing only one sex at a time. Moving the processing function of female inmates to CRDF, would increase the processing efficiency for both sets of inmates at their respective locations.

CRDF would be a self-contained facility for female inmates. Most medical services would be provided at the facility, and only the most chronically ill female inmates would need to be monitored at the Los Angeles County Medical Center (LCMC) jail ward or the Medical Services Building at Twin Towers Correctional Facility. Additionally, all mental health services programs would be maintained at CRDF, including the constant supervision of those inmates requiring individual confinement.

The cost of re-opening CDRF is less than other options the Department has explored. With the closure of Tower 2 at TTCF, most personnel costs can be moved to CRDF from TTCF. The total cost associated by moving the female inmates to CRDF is estimated to be an additional $8 million per year. Included in this amount are command staff, an inmate processing function ("Inmate Reception Center" for females), increased medical services, and transportation costs. The Department of Mental Health is analyzing their increased costs of operating at CRDF. The costs of re-opening CRDF specifically covers the housing of the female inmates. The costs of moving the male inmates to TTCF is a separate plan addressed under a subsequent tab.

Additionally, the re-opening of CRDF would be the first step to increasing the percentage time served due to the increased number of available beds, thereby reducing the number of early releases. This benefit would only be realized, however, once additional

**RE-OPENING CRDF**                   - 2 -

reconfiguration steps are taken throughout Custody Operation which would increase the overall jail capacity.

Budget cuts over the past few years have left the Custody Operation with insufficient resources to properly manage the jail operation. Given the wide-range of inmate classifications and security levels, the Sheriff's Department has found that certain facilities are more conducive to housing particular inmates. Twin Towers Correctional Facility was built to house high security and problematic inmates and, therefore, the housing of female inmates at TTCF is a mismatch of the targeted population and infrastructure. A more efficient and effective match is to move the female inmates to CRDF.

To open CRDF as a facility for women would require a complete management and supervisory team equating to $3.2 million; 154 Deputies for $13.8 million; and 157 Custody Assistants for $8.6 million. A complement of professional staff would equate to $800,000 in costs. Some of these costs, including $4 million in Medical Services costs, will be absorbed by moving staff and services to CRDF from TTCF Tower 2; however, an $8 million increase to the Department's operational budget will be required to fully open CRDF.

## **Fully Opening Pitchess Detention Center - East Facility**

Pitchess Detention Center, East Facility is a partially opened jail. Opening the remaining portion of the jail would equate to 760 additional beds. To accomplish this increase, the Sheriff's Department would need 28 Deputies and 15 Custody Assistants. The cost of these additional personnel would be $3.3 million. An additional $1.4 million is required for food and medical services provided to the inmates. The grand total cost for re-opening East Facility is $4.7 million.

**Pitchess Detention Center - North County Correctional Facility, Building 500**

Pitchess Detention Center, North County Correctional Facility - Building 500 was closed as part of the Department's budget curtailments last fiscal year. However, Building 500 was re-opened early in 2004 to reduce inmates sleeping on the floor and in the dayrooms at MCJ. The opening of Building 500 was accomplished utilizing overtime dollars; therefore, no increase in bed capacity would be realized. Currently, the NCCF is spending $4.2 million per year in overtime to have Building 500 open. In order to eliminate the current overtime being spent, the Sheriff's Department would need 28 Deputies and 10 Custody Assistants. The cost would be $3 million.

## Fully Opening Pitchess Detention Center - North Facility

Pitchess Detention Center, North Facility is a partially opened jail. Opening the remaining portion of the jail would equate to 400 additional beds. To accomplish this increase, the Sheriff's Department would need 13 Deputies and 10 Custody Assistants. The cost of these additional personnel would be $1.7 million. An additional $800,000 is required for food and medical services provided to the inmates. The grand total cost for fully opening North Facility is $2.5 million.

## Fully Opening Pitchess Detention Center - South Facility

Pitchess Detention Center - South Facility is currently a partially opened facility housing inmate workers. The facility is a series of barrack-style buildings. Although the facility is not currently equipped to house female inmates without significant modifications, it is an extremely practical alternative to the housing of male inmates, particularly of a low to medium level.

Male inmates were previously housed at the South Facility, therefore, preparing the facility for full usage would require little in the way of changes, as compared to the work required to convert the facility for the housing of female inmates. South Facility is considered a "well facility" meaning the inmates housed there would have to be free of significant medical issues. Inmates with a significant illness or injury, would have to be transferred to the North County Correctional Facility.

The full opening of South Facility for regular inmate housing would equate to 1,450 additional bed spaces, requiring an additional 186 personnel including a Captain, management team, and line personnel. The cost for these personnel is $16.6 million, with an additional $1.7 million in service and supply costs required. An additional $2.7 million is required for food and medical services provided to the inmates. The grand total cost for re-opening South Facility is $21 million.

The long-term plan is to utilize South Facility for a revenue generating jail industries program. This plan is still being fully developed; nonetheless, as a program orientated facility, the inmate count for housing would be significantly less as would the number of necessary personnel required to run the facility. South Facility would be the last facility to re-open due to the development of the jail industry program.

Movement of Women Inmates

The main concept of this project is to move the female inmates from Twin Towers Correctional Facility (TTCF) to another facility of lower security and to allow high security inmates from Men's Central Jail (MCJ) to be re-located at TTCF. Traditionally, female inmates require less security than male inmates. Since TTCF is a high-security building, it is more reasonable to have higher security inmates housed within it by placing the females in a lower security facility. The only issues preventing such a move in the past has been budgetary constraints.

## Option #1 – Century Regional Detention Facility (CRDF)

**PROS:**
- TTCF Tower 2 could be used for the intended purpose of housing high-security inmates.
- IRC function for women. All females will be booked and processed at CRDF, reducing liability concerns. Increased efficiency for IRC enabling booking process to move more rapidly reducing chronic daily back-log.
- CRDF would not require an inspection by the Board of Corrections or have to comply with current Title 24 standards prior to the movement of female inmates.
- Housing for "lock-down" Mental Observation inmates at CRDF.
- Medical Clinic included in infrastructure of the facility.
- A version of the "Miracle Program" could be formulated.
- TTCF Tower 2 could be opened on a floor-by-floor basis as funding and staffing become available.
- Significant cost will be absorbed by closing TTCF Tower 2 and transferring the existing staff to CRDF.
- CRDF can be re-opened by transferring the existing TTCF Tower 2 medical and security staff for approximately $8 million a year.
- Minimal adjustment for Court Services Transportation.
- Increases bed-space, thus decreasing the amount of inmates that are released early.
- Can house a female inmate population up to 2,200.

**CONS:**
- While the existing TTCF Tower 2 staff could be transferred to CRDF, additional staffing comprised of a Captain, Lieutenants, Sergeants, and Bonus Deputies will be required.
- A storage area for inmate property needs to be created.

**Option #2 – Pitchess Detention Facility – South Facility**

**PROS:**
- South Facility is an open barrack setting jail.
- The transfer of female inmates re-opens a long-term partially curtailed facility.
- TTCF Tower 2 could be used for the intended purpose of housing high-security inmates.
- Increases bed-space, thus decreasing the amount of inmates that are released early.

**CONS:**
- South Facility would have to be a "well jail" because sick female inmates could not be taken to NCCF.
- One floor or two floors at TTCF would remain open for initial booking of female inmates at IRC, Mental Observation inmates and south county court inmates.
- Mental Observation inmates could not be housed at South Facility.
- All female inmates claiming mental/health issues would still need to be housed at TTCF.
- All females would continue to be booked at IRC and transported daily to South Facility. Additional transportation cost in moving females daily to and from court. There would be an increased busing cost of $1 million a year.
- There would need to be facility retrofitting in order to house female inmates. (partitions, bathrooms, shower stalls, etc.). Costs to be determined.
- Additional transportation cost in moving females daily to and from court.
- Medical Service Bureau cost would be approximately $10 million a year for a general clinic. Inmates would still need to be transferred to Medical Services Bureau.
- Staffing cost to operate South Facility for women would be approximately $16.6 million a year. This would be in addition to the approximately $1.7 Million a year needed to re-open the curtailed module at PDC – North facility for the displaced laundry and ranch workers.
- Less staffing available from TTCF, as one or two floors would remain operational.
- Inmate workers will need to be relocated, adversely effecting Jail Enterprise and Morressy hearings.
- PDC – South can only house 1,450 inmates. Currently, there are in excess of 1,900 female inmates in custody. If the early release program was terminated, then the population would swell to in excess of 2,200.

## Implementation of Special Search Teams

To further increase the safety and security of all jail facilities within the Custody Operation, and enhance the newly implemented *Title 15 Compliance Officer Program*, the concept of implementing special search teams is being explored. As envisioned, these teams would be split into two geographical units. The North Team would conduct random searches at facilities in northern Los Angeles County, specifically at the Pitchess Detention Center (North, East, South and North County Correctional Facility), while the South Team would be responsible for facilities in the Los Angeles basin (Men's Central Jail, Twin Towers Correctional Facility and the Century Regional Detention Facility).

These teams, each staffed by eight deputy sheriffs, one bonus deputy and one sergeant, would operate on a division-wide basis, and not be restricted to any one facility. They would coordinate their efforts with personnel from the affected units, thereby, ensuring maximum benefit from their search efforts. The teams would conduct both random searches of inmate housing areas, as well as cell-specific searches based on information that has been obtained regarding possible contraband (weapons, drugs, pruno, etc.). Both teams would fall under the supervision of a Division lieutenant assigned to Custody Support Services. The approximate cost of these teams would be $2 million.

### Increase in Time Served

The Sheriff's Department currently employs a procedure referred to as "Percentage Release Time" or "Early Release." The procedure is designed to lessen the inmate overcrowding situation by releasing inmates after they have served only a percentage of their court imposed sentence. With each new bed opened, the percentage time that each inmate serves will increase and early releases will be commensurately reduced. When all of the Department's jails are fully opened, the percentage time will near 100% of their court imposed sentence; restoring this portion of the criminal justice system to its previous state.

# EXHIBIT
# 25

Westlaw.                                                    NewsRoom
1/31/03 LATIMES 1                                          Page 1

1/31/03 L.A. Times 1
2003 WLNR 15186618

Los Angeles Times
Copyright 2003 Los Angeles Times

January 31, 2003

Section: California Metro

California
Jails See Outbreak of Skin Infections
Charles Ornstein
Jane E. Allen
Times Staff Writers
Times Staff Writers

A painful skin infection not treatable with most common antibiotics is spreading through the Los Angeles County jail system, affecting more than 1,000 inmates in the last year and causing at least 57 hospitalizations.

Federal health officials believe that the outbreak of drug-resistant Staphylococcus aureus, commonly called staph, is the largest of its kind in any of the nation's correctional systems. By comparison, a similar outbreak in Mississippi prisons in 1999-2000 infected 59 inmates.

For months, the Los Angeles infections were misdiagnosed as spider bites and jail officials brought in exterminators. Now sure of the staph cluster, jail doctors are using more powerful drugs to treat all skin lesions and stepping up hygiene measures.

"The problem at the jail is not under control yet," said Dr. Jonathan Fielding, the county's public health director. More than 100 infections have been reported this month.

Staph infections are believed to be spread by skin-to-skin contact or shared personal items in the county's jails, officials said Thursday. The infection causes grotesque boils, deep skin abscesses and widespread surrounding inflammation.

Similar outbreaks of the same strain have been found elsewhere in the Los Angeles area since the summer -- among gay men, members of a sports team and newborns in a hospital's nursery. Some inmates are entering the jails with infections picked up in the community and are spreading the staph behind bars, doctors said.

The problem is believed to be more widespread and difficult to control in jails because

·

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

hygiene is poor, inmates are in close contact, and laundry is not cleaned often enough, health officials said. Those same factors also explain why jails are incubators for other diseases.

Most of the 57 inmates hospitalized in the first eight months of 2002 had aggressive skin infections that required intravenous antibiotics or the surgical removal of tissue. Some of the infections spread into bones and blood, but no one is believed to have died, said Dr. Elizabeth A. Bancroft, a medical epidemiologist with the Los Angeles County Department of Health Services.

Since inmates and officials first blamed spider bites, jail doctors didn't contact the county health department until June, five months after they started tracking the outbreak.

"We spent a considerable amount of time screening all of our facilities, making sure that pest control measures were in place and actually trying to capture a specimen so we would have some idea what we were dealing with," said Dr. John H. Clark, the Sheriff's Department's chief medical officer.

The jail sent four or five spiders to the county entomologist, or bug specialist. "As it turns out, they were non-biting spiders," Clark said.

Clark said the confirmed staph cases represent a small fraction of the 165,000 people who spent time in the county jail facilities last year. About 20,000 stay there at any given time.

Although 928 inmates tested positive for drug-resistant staph in 2002, more may have been infected because jail staff did not routinely culture skin sores until after the health department got involved in June.

The American Civil Liberties Union of Southern California has received dozens of calls recently from inmates who complained about having "spider bites." Ben Wizner, a staff attorney with the group, attributed the staph outbreak to "too many inmates, not enough doctors."

Because the men's central jail is chronically overcrowded, he said, many inmates stay in cramped dormitories with their mattresses touching.

In addition, he said, inmates are sometimes forced to wait days or weeks for medical attention. Clark acknowledged that medical staffing has not kept pace with increases in inmate numbers.

To control the outbreak, federal and county health authorities recommend improved access to showers and clean laundry for inmates, and jail officials said they are taking such steps. In addition, medical staff are draining abscesses and administering two powerful antibiotics in tandem. Inmates are being told to seek help if they develop skin sores.

But that may not be enough. According to data from the jail, 9% of infected inmates

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

reported sores within five days of booking, meaning that they probably came in contact with the bacteria before they were incarcerated.

"Control is not as easy as saying, 'We'll take care of everyone today and give them antibiotics,' " said Bancroft, who is leading the health investigation. "Every day, you have people coming in from the outside."

Health officials said they don't have the luxury of closing the jails in the way that cruise ships were taken out of operation recently to disinfect them of a gastrointestinal virus. "When you have 20,000 people who sleep in your jails ... it would be very, very difficult to do something like that," Bancroft said.

Staph is a common skin organism -- many people carry it without ill effect -- and it typically causes infection when it enters a skin opening. But the resistant strain seen in and out of jail in Los Angeles County may break through intact skin, health officials said.

Like other methicillin-resistant staph outbreaks, it doesn't respond to the cheapest and most frequently used antibiotics, such as penicillin and erythromycin. The only drugs that work against it are Bactrim, rifampin, clindamycin, the new and very expensive antibiotic Zyvox, and intravenous vancomycin for the worst cases.

Authorities said they are uncertain whether inmates with other chronic illnesses are more likely to contract the staph infections. The jail outbreak is affecting men and women, and their average age is 35.

Dr. Matthew Kuehnert, a medical epidemiologist with the U.S. Centers for Disease Control and Prevention, said his agency has limited knowledge of resistant staph outbreaks outside of hospital settings because there is no requirement that they be reported.

In addition to helping with the Mississippi outbreak, the CDC also has assisted authorities in Georgia, Texas and now California in dealing with resistant staph in prisons and jails, which he said is particularly difficult to control.

Some hygienic precautions that are routine in a hospital can't be followed in jails. Replacing bar soap with plastic soap dispensers poses a security risk, and jails won't use paper towels instead of cloth towels because inmates could use them to stuff toilets.

---- INDEX REFERENCES ----

COMPANY: CAPITAL DEVELOPMENT CORP; CONSTRUCTION SARL; HEALTH DEVELOPMENT SERVICES (CANADA)

NEWS SUBJECT: (Legal (1LE33); Health & Family (1HE30); Judicial (1JU36); Prisons (1PR87))

INDUSTRY: (Infectious Diseases (1IN99); Pharmaceuticals & Biotechnology (1PH13); Bacterial (1BA64); Healthcare (1HE06); Healthcare Policy (1HE46); Drugs (1DR89);

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Infection Control & Epidemiology (1IN02); Antibiotics (1AN81); Public Health (1PU63))

REGION:  (Americas (1AM92); North America (1NO39); Mississippi (1MI74); USA (1US73); California (1CA98))

Language:  EN

OTHER INDEXING:  (AMERICAN CIVIL LIBERTIES; CDC; HEALTH SERVICES; SHERIFFS DEPARTMENT) (Bancroft; Ben Wizner; California; California Jails; Clark; Elizabeth A. Bancroft; John H. Clark; Jonathan Fielding; Matthew Kuehnert)

KEYWORDS: LOS ANGELES COUNTY; PRISONS; INFECTIONS; EPIDEMICS; HEALTH

EDITION: Home Edition

Word Count: 1275
1/31/03 LATIMES 1
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT
# 26

Westlaw.

5/30/02 LATIMES 1

**News**Room

Page 1

5/30/02 L.A. Times 1
2002 WLNR 12414999

Los Angeles Times
Copyright 2002 Los Angeles Times

May 30, 2002

Section: California Metro

**Baca     Says** He Will     **Release     400     Inmates**
Safety: Sheriff calls the action necessary because of looming budget cutbacks. A chorus
of criticism greets his plan.
ANNA GORMAN
TIMES STAFF WRITER

The Los Angeles County Sheriff's Department   **said** Wednesday it will   **release** jail
**inmates** being held on bail amounts of $25,000 or less beginning Friday to cope with
budget cutbacks.

About **400** **inmates** who are accused of committing misdemeanor crimes such as burglary,
vandalism and battery will be **released** on a written promise to appear in court, sheriff's
officials **said** .   **Inmates** facing domestic violence charges, crimes against children
or probation violations will remain in custody. The action by Sheriff Lee **Baca** is
reminiscent of ones taken by his predecessor, the late Sherman Block, during similar
budget spats with the county Board of Supervisors in the 1990s.

"We have no choice," Al Scaduto, chief of correctional services for the Sheriff's
Department, **said** Wednesday. "If we don't have the funds to operate these facilities,
we have no options."

The move was met with strong reactions from supervisors, prosecutors and judges.

"This action suggests that his lowest priority is keeping these prisoners in jail," **said**
Supervisor Zev Yaroslavsky. "I can't believe he is serious, and if he is, he'll have
to deal with his constituency.

"There are 100 things he could do before **releasing** prisoners ... like selling his
airplane, canceling the training program for upper management and a host of others,"
Yaroslavsky **said**.

A commander from the Sheriff's Department called the Superior Court on Wednesday
afternoon to inform the judges of the plan. In a letter to the court, **Baca** cited the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

county board's proposed budget that would cut $100 million from the department this year.

Supervising Criminal Judge Dan Oki wrote to fellow judges that the court is researching whether the sheriff has the legal authority to **release inmates** once bail has been set.

Scaduto **said** state law gives the Sheriff's Department the right to **release inmates** awaiting trial for misdemeanors.

In his letter, **Baca** also wrote that he will soon be forced to close the Century Regional Detention Center in Lynwood, which houses as many as 2,000 **inmates** daily. The Sheriff's Department has to make room for those **inmates** elsewhere by **releasing** defendants with bails lower than $25,000.

Dist. Atty. Steve Cooley responded Wednesday by urging his deputy district attorneys to go to court and request higher bails for defendants who they believe should remain in custody. Cooley **said** he believes it is likely that many of the **released** defendants will either become fugitives or will commit new crimes.

Cooley **said** he empathizes with **Baca's** budget problems, but that he doesn't believe **releasing inmates** is the best response. Cooley **said** the Sheriff's Department should not arbitrarily disregard judges' decisions on bail. "That's not the way it's supposed to work," Cooley **said**.

**Baca** urged prosecutors not to ask for higher bails than usual, and he **said** he would begin the early **release** of **inmates** who have been convicted and are already serving time. Those **inmates** would be **released** based on completion of a percentage of their sentence.

"While these proposals may appear to jeopardize public safety and compromise the legal system, my Department must find a way to provide those services that are mandated by law and contractual agreements," Baca wrote.

The policy could cause problems with some prosecutions if defendants fail to show up for trial, said Mary McGuire, spokeswoman for the Los Angeles city attorney's office.

"But we will make every to effort to ensure that those who need to be in custody are kept in custody, even if it means requesting bail in excess of $25,000," she **said**.

Sgt. John A. Pasquariello, spokesman for the Los Angeles Police Department, **said** the **inmates'** **release** will not require any special deployment of law enforcement officers.

"We are convinced the sheriff will not **release** anyone violent or under the influence of drugs or alcohol," he **said**.

"It is a concern any time **inmates** are **released**, but, given the guidelines under which they will be **released**, we are not anticipating any problems," he **said**.

The announcement caught county supervisors by surprise. Supervisor Yvonne Brathwaite Burke **said** that if **Baca** does **release** the **inmates**, "he has to bear responsibility for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the crimes that these people commit."

Burke added that there are responsible ways to manage with the budget. "I think this
is very irresponsible," she **said**. "It does not increase his credibility during this budget
process."

In recent weeks, **Baca** has launched an all-out public relations battle to protect his
resources and gather public support, including packing a recent supervisors' meeting
with hundreds of deputies.

Sheriff's officials have **said** they plan to cut staffing and eliminate task forces on
hate crimes.

They have also told key specialized units--including the family crimes and narcotics
bureaus, among others--that they would probably have to reassign deputies to patrol jobs
if the budget is cut.

This is not the first time the Sheriff's Department has planned to **release inmates** because
of budget constraints.

In March 1995, then-Sheriff Sherman Block announced the **release** of about 3,000 **inmates**
because of budget constraints.

The **inmates released** then were serving sentences for misdemeanors and "low-grade"
felonies, such as drunk driving and burglary.

Block had repeatedly threatened to make such early **releases** and to close jails during
budget skirmishes with the Board of Supervisors.

*

Times staff writers Steve Berry, Garrett Therolf and Beth Shuster contributed to this
report.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Prisons (1PR87); Police (1PO98))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39); California (1CA98))

Language:  EN

OTHER INDEXING:  (BOARD OF SUPERVISORS; CENTURY REGIONAL DETENTION CENTER; DEPARTMENT;
LOS ANGELES POLICE DEPARTMENT; SHERIFFS DEPARTMENT; SUPERIOR COURT)  (Al Scaduto; Baca;
Beth Shuster; Block; Brathwaite Burke; Burke; Cooley; Dan Oki; Garrett Therolf; John
A. Pasquariello; Mary McGuire; Scaduto; Sheriff; Sheriff Lee Baca; Steve Berry; Steve
Cooley; Supervising Criminal; Supervisor Zev Yaroslavsky; Yaroslavsky)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.