MARK D. ROSENBAUM, SBN 59940
mrosenbaum@aclu-sc.org
PETER ELIASBERG, SBN 189110
peliasberg@aclu-sc.org,
MELINDA BIRD, SBN 102236
mbird@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA
1313 W. 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500, x219
Facsimile: (213) 977-5297

MARGARET WINTER
ACLU NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6605
Facsimile: (202) 393-4931
E-mail: mwinter@npp-aclu.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DENNIS RUTHERFORD, et al, <br><br>                    Plaintiffs, <br><br>         vs. <br><br> LEROY BACA, as Sheriff of the County of Los Angeles, MICHAEL D. ANTONOVICH, YVONNE B. BURKE, DON KNABE, GLORIA MOLINA, ZEV YAROSLAVSKY, as Supervisors of the County of Los Angeles, et al., <br><br>                    Defendants. | Case No. Civ. 75-04111-DDP <br><br> **REPLY RE: PLAINTIFFS' MOTION TO RE-OPEN DISCOVERY.** <br><br> Honorable Dean Pregerson <br><br> Date:   August 3, 2009 <br> Time:  10:00 a.m. <br> Dept:   3 |

**TABLE OF CONTENTS**

I.   PLAINTIFFS SEEK DISCOVERY ON ISSUES CLEARLY COVERED BY EXISTING ORDERS THIS CASE................................................................. 1

II.  PLAINTIFFS AMPLY MEET THE *LEAVITT* STANDARD........................ 4

III. DEFENDANTS' FEAR THAT REOPENING DISCOVERY MAY LEAD TO DISCOVERY ABUSES IS NOT A GROUND FOR FORECLOSING DISCOVERY. ............................................................................................... 7

CONCLUSION................................................................................................. 8

# REPLY RE: PLAINTIFFS' MOTION TO RE-OPEN DISCOVERY

## I. PLAINTIFFS SEEK DISCOVERY ON ISSUES CLEARLY COVERED BY EXISTING ORDERS IN THIS CASE

Defendants contend that Plaintiffs are not entitled to discovery because the relief in this case "do[es] not address mental health treatment." Defs. Opp'n at 6. That premise is simply incorrect.

The core issue addressed in the Court's 1978 memorandum opinion was overcrowding and its effects on conditions at the jail. Since this original judgment, the Court has entered additional remedial orders seeking to alleviate overcrowding and its attendant effects, including, specifically, its effects on treatment of detainees and prisoners with mental illness.

In 1985, the parties agreed to, and the Court approved, a definition of overcrowding as the point where the population of the jail "renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control" in the jail.[1] This functional test of overcrowding is consistent with the case law: overcrowding is not unconstitutional *per se*, but it can result in certain conditions, including the denial of other constitutionally required services that form the basis for a constitutional violation. *Toussaint v. Yockey*, 722 F.2d 1490, 1492 (9th Cir. 1984) (upholding preliminary injunction remedying overcrowding in prison's administrative segregation unit that resulted in increased violence and psychiatric problems); *see generally Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir. 1982).

As Plaintiffs discussed in their opening brief, the 1985 Order specifically contemplated that further discovery and relief would be necessary regarding mental

---

[1] Memorandum of Understanding; Court Approval Thereof, filed November 13, 1985 (Docket No. 463) ["1985 Order"], submitted as Ex. 1 to Decl. of Melinda Bird re: Motion to Re-Open Discovery, filed June 15, 2009.

health care. Pls. Mem. in Supp. of Mot. to Re-Open Disc. at 2. The Order stated, "Plaintiff's counsel will commence an analysis of conditions of confinement in the 9,000 floor dormitories," that "Plaintiff intends, at this time, to employ two experts [one psychologist and one statistician] to assist with the above-mentioned analysis," and that "tours of the Central Jail" would be conducted "by plaintiff's expert psychologist [and w]henever possible, tours of the Central Jail by plaintiff's expert psychologist shall be arranged and conducted so that an appropriate representative from the Sheriff's medical staff may attend." 1985 Order at 5.

An August 27, 1992 Order, moreover, explicitly provides that "The Sheriff shall work towards … providing constitutionally adequate health care to all inmates in his custody."[2] Pursuant to the 1992 Order, the parties jointly selected two experts to prepare a report on health and mental health services in the jail system; Defendants also agreed to fund the entire report. Supplemental Bird Decl. ¶ 5 and Ex. 2 (Report from Dr. Kim Marie Thornburn and Barbara Cotton, R.N., MHSA, dated December 11, 1992).

The constitutional standard for health care referenced in the 1992 Order requires Defendants to provide adequate care for serious medical, mental health and dental needs. *See Hoptowit*, 682 F.2d at 1252-53; *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("In accordance with the other courts of appeals that have examined this issue, we now hold that the requirements for mental health care are the same as those for physical health care needs."). The constitutional standard for a

/ / / /

/ / / /

---

[2] Joint Status Report and Proposed Order, filed August 27, 1992 (Docket No. 564), Exhibit C to Decl. of Justin W. Clark, filed June 22, 2009, at Bates stamp page 36. Defendants themselves proposed this language, which the District Court approved and entered as an Order. *See* Supp. Bird Decl. filed July 26, 2009, ¶ 5 and Ex. 1 (letter from County Counsel dated August 11, 1992 proposing additions to draft of 1992 Order).

minimally adequate prison mental health care delivery system includes the following components:

> (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

*Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n. 10 (E.D.Cal. 1995).

Thus, the orders in this case explicitly contemplate remedial action to address deficiencies in mental health treatment caused by overcrowding. Even if they did not, however, the Court would nevertheless have the inherent authority to modify the injunctive relief in this case to account for changed circumstances and effectuate the basic purpose of the original decree. *See Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 859 (9th Cir. 2004) ("There is no dispute but that a sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.") (internal citation omitted). "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need," and consent to an injunction entered by the court is "not an abandonment of the right to exact revisions in the future, if revision should become necessary in adaptation to events to be." *United States v. Swift and Co.*, 286 U.S. 106, 114-15 (1932).[3] The right to seek modification of existing relief based on

---

[3] Indeed, the Court has a duty to modify the relief in this case if it finds that the existing relief has not achieved its principle purpose. *See United States v. United*

3

changed circumstances has been codified in Fed. R. Civ. P. 60(b), and that right is fully applicable to litigants in institutional reform litigation. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992) (stating in a jail case that courts must take a "flexible approach" in determining whether to grant a party's motion to modify injunctive relief pursuant to Rule 60.)

## II. PLAINTIFFS AMPLY MEET THE *LEAVITT* STANDARD

Defendants argue that Plaintiffs have not met the test for post-judgment discovery set forth in *Cal. Dep. Of Soc. Services v. Leavitt*, 523 F.3d 1025 (9th Cir. 2008). Defs. Opp'n to Pls.' Mot. to Re-Open Disc. at 3. Their reliance on *Leavitt* is seriously misplaced, since the decision plainly supports Plaintiffs' entitlement to discovery in this case.

In *Leavitt*, the plaintiffs asserted that the defendants had failed to comply with a judgment and moved to enforce, requesting discovery regarding defendants' compliance. 523 F.3d at 1030. The Ninth Circuit reversed the district court's denial of the discovery motion, holding that "the kind and amount of evidence of noncompliance required to justify discovery is, necessarily, considerably less than that needed to show actual noncompliance. If significant questions regarding noncompliance have been raised, appropriate discovery should be granted." *Id*. at 1034. Further, "a movant who requested permission to engage in discovery as part of a motion to enforce a judgment need only show on appeal that the request <u>might have generated information that could raise significant questions</u> concerning compliance." *Id.* (emphasis added). The "significant questions" standard is so lenient that the Court may consider not only admissible evidence but also assertions

---

*Shoe Machinery Corp.*, 391 U.S. 244, 251 (1968). In *United Shoe,* an existing injunction failed to eliminate the illegal monopoly it was designed to dissolve. The Court stated, "if after 10 years it were shown that the decree had not achieved the adequate relief to which the Government is entitled in [this] case, it would have been the duty of the court to modify the decree so as to assure the complete extirpation of the illegal monopoly." *Id*. "[T]he time has come to prescribe other,

4

of counsel in determining whether the threshold has been met. *See id.* at 1035 (relying in part on what plaintiffs' counsel reported to the Court regarding noncompliance).

      The Kupers Report[4] amply satisfies the minimal standard established in *Leavitt*. *See* Pls. Mem. in Supp. of Mot. to Re-Open Disc. at 3-6. The report provides powerful evidence that overcrowding at the jail, particularly at Men's Central Jail, aggravates the systemic deficiencies in the jail's mental health program, and exacerbates the conditions of the seriously mentally ill prisoners housed there.[5] Dr. Kupers found that, despite very large numbers of seriously mentally ill prisoners entering the jail, and in part due to the relative shortage in mental health treatment resources, Defendants engaged in a pattern of inappropriately down-grading diagnoses of mental illness, or had simply failed to identify and diagnose mentally ill prisoners who had long psychiatric histories, or displayed mental health symptoms. *See* Kupers Report at 25-35. As a result, Defendants removed individuals with serious mental illness from mental health housing and treatment programs, and discharged them to general population at the Men's Central Jail, or to administrative

---

and if necessary more definitive, means to achieve the result." *Id.* at 252.
[4] *See* Decl. of Margaret Winter, Apr. 14, 2009, Ex. 1 (Report of Terry A. Kupers, M.D., M.S.P.) ["Kupers Report"].
[5] *See e.g.,* Kupers Report at report page 9 ("[I]n crowded facilities where rehabilitation programs are sparse or non-existent, as in the Los Angeles County Jail, and prisoners are relatively idle, the worst traumas and abuses are experienced by prisoners suffering from mental illness."); *id.* at 9 ("Crowding makes it more difficult to perform mental health and health assessments. It is very difficult to adequately assess the 13,000 prisoners who enter the jail each month. And the massive crowding means there are more inmates in need than can be accommodated on the mental health caseload."); *id.* at 16 ("[T]he general population areas of the Men's Central Jail are massively overcrowded, and the prisoners are almost entirely idle – a combination of toxic conditions that is guaranteed to predictably increase the prevalence of violence, psychiatric breakdown and self-harm."); *id.* at 16-17 (discussing long waits to see mental health staff and inadequacy of treatment sessions; "Psychotropic medications are not very effective when the patient is in an overcrowded and stressful situation with little or no meaningful activity.").

or disciplinary segregation.  These units are severely overcrowded, and do not have adequate mental health staff.  There is almost no mental health treatment available for prisoners housed in these units, no structured mental health programming or psychosocial rehabilitation services are offered, there is very little out-of-cell time, "and in too many cases victimization by other prisoners and/or significant abuse at the hands of custody staff." *Id.* at 14, 23-33, 44.  Dr. Kupers found that Defendants' practice of inappropriately housing seriously mentally ill prisoners and detainees in these conditions exacerbates their psychiatric disorders and suicidality.  *Id.* at 33-40.

Dr. Kupers also found that the Defendants had defied court orders requiring that mentally ill prisoners be maintained on their psychotropic medications, had failed to prescribe appropriate medications, and had not adequately addressed medication non-compliance by mentally ill prisoners.  *See id.* at 27-33.  In addition, Dr. Kupers found that medical records were difficult to navigate, even for the jail's mental health staff, the charts he reviewed did not have treatment plans, and these and other "inadequacies in charting have actually become an obstacle to adequate mental health treatment."  *Id*. at 25.

The thirty-four declarations that Plaintiffs recently submitted from class members, documenting their experiences in the jail,[6] provide additional weighty evidence of Defendants' noncompliance and lay to rest any possible doubt that Plaintiffs have met the *Leavitt* standard for reopening discovery.  The declarations describe the denial of needed medication, medical and mental health care, and discharge planning; the denial of access to showers, clean clothing, telephones and outdoor recreation; excessive and punitive discipline in small, dark, solitary cells; broken toilets, rats and other filthy conditions; and pervasive violence and abuse

---

[6] *See,* Declarations From Class Members In Support Of Plaintiffs' Motion For Preliminary Injunction Re: Plan For Closure Of Jail Facilities (Docket No. 181), filed July 13, 2009.

6

from deputies and other inmates.  All of these unconstitutional conditions are attributable to overcrowding and demonstrate a violation of the Judgment and subsequent orders that is more than sufficient to justify re-opening discovery.[7]

### III.  DEFENDANTS' FEAR THAT REOPENING DISCOVERY MAY LEAD TO DISCOVERY ABUSES IS NOT A GROUND FOR FORECLOSING DISCOVERY

Defendants object to what they call a "blanket order," and ask that discovery be limited to "non-privileged" materials. Defs. Opp'n at 6-7.  Discovery is, of course, always subject to and limited by valid claims of privilege.  *See* Fed. R. Civ. P. 26(b)(1).

Defendants state that they have cooperated fully with Plaintiffs' requests for documents and information, but qualify this statement with the disclaimer that they have provided "non-privileged documents." Defs. Opp'n at 8.  In practice, Defendants deem few documents to be non-privileged and they have refused to provide most of the documents that Plaintiffs have requested.  *See* Pls. Mem. in Supp. of Mot. to Re-Open Disc. at 5-6.  Since Defendants refuse to provide a privilege log or any explanation for the basis for these claims, it has been impossible to resolve these disputes informally.   Defendants should be required to explain the bases for their objections to producing the documents that plaintiffs have requested already. Once the parties have narrowed their differences, they can present any remaining dispute to the magistrate judge for resolution.

/ / /

/ / /

---

[7] Defendants also rely on *H.K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1122 (6th Cir. 1976).  Defs. Opp. at 3.  *H.K. Porter Co.*, which addresses discovery designed to show that a judgment should be reopened based on fraud upon the court under Fed. R. Civ. P. 60, is simply inapposite.  As the court noted, unique considerations apply to such proceedings because relief based upon fraud upsets the finality of judgments.  *Id*. at 1118.

7

## CONCLUSION

Based on the foregoing, Plaintiffs request that the Court issue an Order granting Plaintiffs' request to re-open discovery.

DATED: July 24, 2009                    Respectfully submitted,

ACLU National Prison Project
ACLU Foundation of Southern California

  /s/ Melinda Bird

BY:  Melinda Bird
Attorney for Plaintiffs

8