# EXHIBIT 2



# THE COTTON GROUP

3744 MT. DIABLO BLVD., SUITE 200
P.O. BOX 1307
LAFAYETTE, CA 94549-1307

December 11, 1992

TO:    Fred Bennett, Assistant County Counsel
        Los Angeles County
        500 West Temple Street, Room 648
        Los Angeles, CA 90012

        Paul Hoffman
        Lise Anderson
        ACLU Foundation of So. California
        1616 Beverly Blvd.
        Los Angeles, CA 90026-9938

        Susan Weekly, Acting Medical Services Administrator
        Los Angeles Sheriff's Department
        441 Bauchet St., Room 6044
        Los Angeles, CA 90012

FR:    Kim Marie Thorburn, M.D.
        1924 Huea Place
        Honolulu, HI 96819

        Barbara L. Cotton, RN, MHSA
        The Cotton Group
        P.O. 1307
        Lafayette, CA 94549 - 1307

SBJ:   Report: Review of Los Angeles Sheriff's Department Inmate Health Services System

Enclosed please find your advance copy of the report of our review findings and recommendations for the Los Angeles Sheriff's Department Inmate Health Services system. A signed signature page will follow.

Please feel free to contact either of us should you have questions regarding the report.

REPORT
REVIEW OF LOS ANGELES COUNTY SHERIFF'S DEPARTMENT INMATES HEALTH SERVICES

EXECUTIVE SUMMARY

During the week of October 26 to 30, 1992, we inspected the Los Angeles County Sheriff's Medical Services at the Men's Central Jail (CJ), Sybil Brand Institute (SBI) Hall of Justice Jail (HOJJ), Biscaluz Correctional Center, Miraloma and the north county facilities. We conducted facility inspections, staff interviews, record reviews, policy and procedure reviews and observations of services rendered. Health services staff were cooperative and helpful. Such inspections can be disruptive of the usual activities of busy jail clinics and we are very appreciative of the large amount of time that several staff devoted to assisting us.

Our inspection and this report result from an agreement between plaintiff's attorneys (the American Civil Liberties Union of Southern California) and defendants' attorneys (County Counsel) in a long-standing litigation, Rutherford v. Block, involving conditions of incarceration at CJ and SBI. After discussion with staff from the Sheriff's Department, particularly acting Medical Services Administrator Susan Weekly, we understood our task to be an analysis of the existing health services and recommendations for improvements. Since the medical services at CJ and SBI represent components in a larger system, it was necessary to inspect the entire system to carry out our task.

The recommendations which are contained in the body of our report are based on various standards and practices. These include Title 15, the administrative rules of the California Board of Corrections; standards of jail health services of the National Commission on Correctional Health Care, The American Correctional Association and the California Medical Association; public health standards developed by the Centers for Disease Control and Prevention; legal standards; and a study on the use of restraints and seclusion by the American Psychiatric Association. Two fundamental premises underlie our recommendations: the need to protect the community's health and the maintenance of professional standards of practice.

From the outset, we acknowledge the enormity of the mandate to provide health services to inmates of Los Angeles County jails. The sheer numbers of inmates challenge effective organization and administration of health services, not to mention the constant movement and turnover. But the high rates of illness known to exist in incarcerated populations make it essential for the health of the community to meet the challenge.

Our evaluation and recommendations encompass a broad range of administrative and clinical issues relating to health services. We must start by emphasizing a recommendation to downsize the hospital at CJ and broaden the focus on licensure of the facility to improvements in all areas of health services. We are concerned that considerable effort over many years has been devoted to complying with Department of Health Services regulations for skilled nursing and acute psychiatric facilities, while neglecting glaring deficiencies in other areas. The regulations represent minimum standards for delivery of health care in hospitals and such standards of care should not be neglected. However, they cannot be the exclusive area of medical administrative focus.

The large numbers of inmates make information management a cornerstone to quality health services. There is an urgent need to automate in this area but, in the meanwhile, medical records must be unified and move with the inmate throughout the system. The quality of information in the records needs to be improved so that they serve as a communication tool about any inmate's health status in a large multi-provider system.

Medical screening on intake of inmates into the system is one of the most essential functions of any jail health service. Adequate intake screening protects the jail from communicable disease outbreaks, dangerous mentally ill inmates, unnecessary suicides and liability from missed diagnoses. The current medical intake system in the Los Angeles jails does not meet contemporary standards and is unable to fulfill these needs.

The health care facilities in the jails, especially CJ, SBI and HOJJ, are hostile to quality care. They lack space and privacy. Deficiencies in equipment and design make it nearly impossible to practice safe medicine. While it may not be possible to undertake major remodelling, serious attention must be given to means to correct these deficiencies.

Medication distribution is an area that is impacted by the huge numbers of inmates in this system. The current use of stock issue by nurses creates serious risks of errors and liability. These responsibilities should be turned over to the pharmacy according to contemporary standards of practice. Serious consideration should be given to the provision of over the counter medications through the commissary to free up nursing time for more meaningful patient care duties.

Certain communicable diseases, such as tuberculosis (TB), HIV and other sexually transmitted diseases, and hepatitis, are common in incarcerated populations. Correctional health services must have contemporary systems of identification, containment and treatment of these conditions. Lacking such systems, these overcrowded institutions can become breeding grounds to carry diseases such as TB into the community. More resources are clearly needed in this area for the Los Angeles County jails.

It is often said that CJ is the largest mental hospital in the world. Management of mentally ill inmates is challenging in any system and particularly so with the large numbers faced by the Los Angeles County jails. Use of therapeutic restraints as a treatment modality seems to be excessive and there needs to be better integration of mental health care with medical services.

Our findings and recommendations follow. The letter **A** following a recommendation denotes action which will be necessary to meet one of the California Medical Association's (CMA) essential standards for accreditation of health services. While the language of the recommendation may not always be directly related to the wording of a specific standard, the intended action of the recommendation supports conditions necessary to meet an essential accreditation standard. Recommendations have been prioritized. **P1** denotes highest level of priority requiring immediate corrective action; **P2** denotes corrective action required within 6 months; and, **P3** denotes action required within one year of acceptance of this report. The priority designation precedes each recommendation.

ISSUE: The current system of medical intake screening is inadequate to detect all inmates in need of health services and provide for appropriate disposition.

Medical intake screening in the Los Angeles County Jail system represents the terminal activity of the Intake and Reception Centers (IRCs) at Men's Central Jail (CJ) and Sybil Brand Institute (SBI). The medical screening is performed on cohorts of inmates who have been processed as a group through all the IRC activities (e.g., booking, property processing, showers, fingerprinting, etc.). At CJ, the cohorts are quite large (i.e., several tens of inmates).

The principle medical screening activity is a mini-film chest x-ray. This is performed on all men. However, if the older machine at SBI is not functioning, no TB screening of any sort is performed. A small portion of men have blood collected for syphilis serology. All women have blood collected.

The inmates are provided with information about health services at the jails and are asked a series of questions about their health focusing particularly on symptoms of communicable diseases, mental illnesses and chronic illnesses. This information is provided to the entire cohort by audiotape at CJ and videotape at SBI. Some cohorts may hear the tape more than once. The reviewers question the effectiveness and appropriateness of some of the terminology used in the script for the tapes. Information provided to inmates in this manner must be presented in simplistic language which is easily understandable by individuals of varying ethnic and educational backgrounds.

After the tape is played the men are asked to strip in front of a nurse who observes them for injuries and other marks. The procedure requires them to milk their penises to observe for discharge although this is inconsistently done. The men are asked to report medical conditions, especially those noted on the tape. Any inmate reporting a medical problem is held back by the nurse to obtain further information and to start a patient database. If the inmate is in need of immediate medical attention, he will be taken to the clinic (often by the IRC nurse).

The procedure is similar for women except that there is not a routine observational examination.

If the inmates do not claim any health problems, there is no record of the medical intake screening and no medical record is opened until there is a health services encounter at the request of the inmate at some later time. No routine health assessment is completed on inmates in the jail system.

There is also a mental health worker assigned to the IRCs during the busy shifts (evenings and nights) and on call at other times. This professional evaluates inmates who appear mentally ill. They may be referred by custody staff who note the inmate's behavior at some point in the intake process (most often in the holding cells) or by nursing staff. The mental health worker also evaluates all inmates coming in from mental facilities like Patton Hospital or Metropolitan. The worker determines whether or not the inmate needs admission to the jail's mental ward.

If an inmate appears to need prompt medical attention during IRC processing, the custody staff may bypass processing and bring the inmate directly to the medical processing area. In addition, when inmates are bought from satellite stations and police lockups, an Officer-Inmate Questionnaire Medical Screening Form is completed and provided to IRC booking staff when the inmate is delivered to IRC. The forms are now being sent to health services via IRC nursing staff but, health services staff are not using them. This form complies with Title 15 requirements for medical intake screening.

An abbreviated screening consisting of the health services information and questioning is repeated on cohorts of inmates when they are transferred to other Los Angeles jail facilities. Since no medical programming is provided for inmates with chronic illnesses at facilities other than CJ and SBI, the main purpose of intake screening at Hall of Justice, Miraloma and north county facilities is to exclude inmates with medical conditions.

RECOMMENDATIONS:

P1  1) The officer-Inmate Questionnaire Medical Screening Form should be performed on all inmates and should be permanently filed either in the medical record or for those inmates who do not start a medical record, in the institutional file. Medical intake by IRC nursing staff and mental health workers can then be individualized for those inmates with immediate health needs detected by the Medical Screening Form rather than questioning large cohorts of inmates. **A**

P2  2) A patient database and vital signs (minimum health assessment) should be completed by qualified health services staff (i.e., physician, mid-level provider or registered nurse with certified physical

1

Exhibit 2
Page 18

assessment training) on all inmates who remain in the system beyond the time when most pretrial inmates are released after arraignment (probably two weeks). This database should be repeated at a minimum interval (e.g., 3 months [CMA/NCCHC standards]) on returnees. Medical problems detected during health assessment should have appropriate follow up. A

DISCUSSION: Medical intake screening is the pivotal activity of corrections health services. There are several objectives: identifying and segregating inmates with medical conditions that might endanger the population, identifying pre-existing conditions, identifying inmates in need of immediate or ongoing medical treatment, and provision of baseline health information on inmates in custody. Therefore, medical intake screening performs both a public health and individual care function.

There must be a record of medical intake screening on all inmates. The Officer-Inmate Questionnaire Medical Screening Form now in partial use fulfills this requirement but, there is not currently a standard filing procedure. Furthermore, the form is not used by health services staff to make interventions based on medical intake screening information.

Effective medical intake screening must aggressively seek out health problems. The current mass screening method of asking questions in large groups probably discourages self reporting. The one-on-one Officer-Inmate Questionnaire does not guarantee reporting but, is likely to improve it.

Health care staff in intake should receive and review the screening forms before the inmates leave IRC. They can then concentrate their resources on inmates with health problems identified on the form.

Health assessments are performed on inmates who remain in the system beyond the time of most pretrial releases because self reporting is insufficient to identify all health problems in the inmate population. Almost all other entry into correctional health services (e.g., intake screening, sick call) relies on self reporting of medical problems. Quite often the demand on correctional health services creates a system in which the "squeaky wheel gets the grease", i.e., the inmates who can work the system best get the most health services attention. Quiet mentally ill or developmentally disabled inmates are examples of people who could have serious health problems that are entirely missed by a self reporting system.

The recommendations for recording medical intake screening and health assessments are based on all correctional health services standards (e.g., National Commission on Correctional Health Care, American Correctional Association, American Public Health Association, California Medical Association) and Title 15.


ISSUE: The current system for identification and management of communicable diseases does not ensure control of transmission, particularly of tuberculosis (TB).

The only routine screening for communicable disease is mini-film chest x-rays in the IRC. There is no routine TB skin testing for evidence of TB infection. There are also problems when the radiology machines are not functioning. Apparently, the system tries to insure that the IRC at CJ always has a functioning machine which sometimes means that parts are removed from the machine at SBI to make repairs. This leaves SBI with no radiology machine until new parts can be obtained from a European vendor. During such periods, no TB screening is performed on women being admitted to SBI.

According to the medical director, the number of active TB cases identified by mini-films chest x-rays has been steadily increasing since 1989. There were 250 cases diagnosed in 1991. Active TB disease is treated. Two nurses from the county TB program are assigned to the jail to enroll identified TB cases and ensure follow up treatment upon release into the community.

Syphilis serology is performed on all women entering SBI. One cohort of men entering CJ is periodically asked to volunteer to have blood drawn for syphilis serology. (This procedure apparently varies depending on the staff working in IRC. By some manner, a small fraction of men are asked to volunteer to have blood drawn.)

All women have vaginal secretions tested for gonorrhea. There is no routine testing for chlamydia.

There is no routine testing for HIV. Tests are performed on request, for medical diagnostic reasons and most frequently, because of court orders. The jail was part of the Centers for Disease Control sentinel HIV seroprevalence program and continues to test a consecutive sample of 1000 entering inmates each October. In 1991, the seropositive rate in the sample was lower than the previous two years. Based on the seroprevalence data, the medical director estimates that jail medical services identifies approximately one tenth of the HIV-infected inmates.

Facilities at CJ and SBI which are designed for medical isolation are substandard and inadequate. We were informed that design of isolation rooms in these facilities permits ventilatory exchange to the outside and that this has been measured. However, there are no ante- or other rooms for containment of contaminated protective clothing and waste. Sinks are rare and generally located at great distances from isolation rooms. At CJ, some TB suspect cases must be isolated in 6000 unit rooms because of lack of space on the wards. These rooms in 6000 do not have ventilation to the outside or negative air flow.

We received contradictory information about the administration of aerosolized pentamidine which should be delivered in a well-ventilated space to prevent staff exposure to the medication and also to possible respiratory infection when the patient coughs from the treatment. Nursing staff on the ward said that the drug was administered in the patient's room. The medical director claimed that it was administered in the sputum collection room located on unit 8100.

The medical director and physician assigned to the infectious disease ward claimed that inmates who are potentially exposed to cases of active TB disease are skin tested. The only evidence of skin testing from our selected medical record review was for diagnostic purposes.

RECOMMENDATIONS:

P1   1) Screening for TB must include skin testing with a Mantoux PPD for TB infection. This test should be placed on all inmates as they enter the jails through IRC and read in 48 to 72 hours. If a routine site for administration of the test (e.g., left forearm) is established health care staff at receiving facilities can read the test based on the time that the inmate came through IRC. **A** (within 14 days)

P1   2) Inmates with TB infection should be evaluated for HIV infection once they are counselled and give consent for the test. TB infection should be provided prophylactic therapy according to standard guidelines. They should be enrolled in the county TB program for follow up prophylaxis and control once released. **A**

P1   3) Staff and inmates exposed to inmates with active TB should be skin tested with Mantoux PPD. The Centers for Disease Control method of concentric circle testing (e.g., testing the most likely exposed first. If any of those are positive then test the next most likely exposed and so on.) should be employed. Once intake PPDs are implemented such case-finding tests can be placed once, six weeks after exposure on all inmates who are still in the system. **A**

P1   4) LA jail should consider purchase and installation of currently available modular isolation units. (Modular safety booths for sputum collection and aerosolized pentamidine are also available and could possibly be considered for treatment areas in the jail where this specialized space is not available.)

P1   5) If isolation is continued at CJ, there must be meticulous attention to infection control techniques. Nurses and other health care staff caring for isolation cases must be monitored regularly to ensure handwashing (or cleansing with disinfectant) after leaving isolation cases each time. There must be improvement in segregating contaminated clothing and waste. Designated clean and soiled utility rooms should be provided. This recommendation is necessary because the environment is entirely hostile to safe isolation. **A**

P1   6) No respiratory isolation case, such as a TB-suspect inmate, should be isolated in a room that does not have proper ventilation. **A**

P1   7) Ventilation systems in rooms used for AFB isolation should be tested monthly to insure appropriate air flow pressure and air exchanges are being maintained. **A**

P1   8) There should be aggressive case-finding of HIV infection. The current standard for case-finding is voluntary testing but there should be universal AIDS education programs which encourage testing by anyone who has had risky behaviors. Diagnosis of HIV infection can then be followed up with early intervention therapies so community linkage is important. **A**

DISCUSSION: There is an epidemic of TB in the United States and one of the foci of the epidemic is the nation's jails and prisons. Evidence of the epidemic in LA is the increasing number of TB cases diagnosed in the jail in the past three years. The close quarters and overcrowding in jails and prisons as well as the high rate of immune suppression due to HIV infection among inmates mean that TB is readily communicated in the jail and prison setting.

The LA jail system has a method to identify active TB cases on admission through the use of mini-film x-rays. Identified cases are then isolated in the jails, most often in rooms that ventilate to the outside but, sometimes in single cells without external ventilation. Isolation of active cases is only one piece of TB control programs. Containment of infection through institutional isolation, even in "ideal" environments, is not effective in 100% of cases (witness the outbreaks from prisoner index cases in New York hospitals). Nor is a diagnostic test like mini-film chest x-rays 100% sensitive.

There is no procedure in place to track the transmission of TB infection in the facilities. This is an essential element of TB control programs. Such a program requires knowledge about the baseline rate of TB infection in the facilities (i.e., PPDs on intake) and testing of exposed individuals. Another method includes periodic studies (i.e., skin testing designated groups of inmates) to see if there is a significant rate of conversions from negative tests on intake and positive tests during the study. Without systems to track TB infection, LA jails cannot be sure that isolation is effective.

Furthermore, jail populations are people at high risk for co-infection with TB bacillus and HIV. Such people must be identified and treated early to prevent the progression of TB infection to active disease as immune suppression advances with the progression of HIV infection. Likewise, HIV infected inmates must be adequately protected from contracting TB infection in the jail setting.

Jails represent a gathering place of populations of concern to public health officials and who are otherwise hard to access in the community. There is some acknowledgement of this in the current arrangement which assigns two TB program nurses to the LA jails. Expansion of this program would undoubtedly be an important means of controlling the TB epidemic in LA County. The same applies to HIV diagnosis and treatment.

ISSUE: The health care facilities are substandard and poorly organized.

Health care facilities, especially in CJ and SBI, are too crowded and afford no privacy. The clinics in all facilities do not provide individual spaces for nurses to talk to patients. Sensitive information from patients is sought within the hearing of other inmates and staff. This situation is most shocking at CJ where several inmates may be sitting on one side of a table facing health care staff on the other side of the table. The health care staff collect information and provide care to the inmate facing directly opposite who is actually further away than the adjacent staff.

The plans for the new Twin Towers facility show the same model for the clinic: a large room without privacy.

At CJ, there are sometimes more doctors than examination rooms. Therefore, some doctors hold their clinics in an area where other inmates are waiting and listening to the entire encounter. At the Hall of Justice Jail (HOJJ), doctors clinic, including the psychiatrist, is held in the same room where nurses do sick call and patients wait to be seen.

There is inadequate examination equipment in the physicians clinics. There is only one examination table in the doctors clinic at CJ and yet there may be up to five doctors holding clinic at one time. While the doctors clinic was being observed during the inspection, one patient was taken to the examination table during many patient encounters. This patient moaned and yelled while he was on the examination table with the doctor within hearing of 10 to 20 waiting patients.

There is no examination table in the segregation unit (1200 and 1250) where a doctor holds clinic. The room for this clinic appears to be a cleaning and utility room.

The examination table in HOJJ is in the same room where the doctors hold clinic, the nurses screen patients and patients wait. There is a privacy screen that can be pulled in front of it.

At North Facility in north county, the examination table was in a room separate from the clinic behind two licked doors. It was covered with papers, supplies and dust.

Handwashing sinks were not available in rooms with examination tables nor in other rooms where doctors see patients. They were also not readily accessible in areas where nurses conduct sick call. The sinks in the clinics are located at the medication preparation areas while other medication preparation and distribution areas (e.g., pill windows at CJ and HOJJ) have no sinks. Sinks are located solely in the areas of the nurses stations and treatment preparation areas of the hospital wards in CJ. These areas are quite distant from some patient rooms. There are also inadequate numbers and placements of sinks shown in the plans of the new Twin Towers clinics and other patient care areas.

4

Exhibit 2
Page 21

Space for other functions such as medication preparation is also inadequate. Three nurses were observed trying to pour doses of medication simultaneously from a single-person work station in the clinic at CJ.

At CJ, the doctors and dentists space is unused for much of the day. At SBI, a single cell observation area with 12 rooms adjacent the clinic was used only for contaminated waste storage.

The facilities appeared dirty. This was especially notable in the hospital at CJ. It did not appear that terminal cleaning was practiced when patients were discharged from rooms before the next patient was placed in the room. Dried excrement was noted on the walls of some of the rooms of the mental ward (7100).

RECOMMENDATIONS:

P1    1) Since it is inadequate, health care space must be optimized. It must be rearranged to permit more privacy of health care encounters, such as with the use of screens and dividers. Ample equipment must be provided to encourage hands-on examination when they are indicated. Equipment must be readily accessible. Space should be made convertible so that it can be used during all hours, especially on days and evenings. Health care uses should be found for unused space. A

P2    2) More handwashing facilities are essential. Plumbing renovations in existing facilities should add sinks wherever possible and new facilities must ensure adequate sinks in all patient care, treatment and medication preparation areas. Waterless disinfectants must be available in all health care areas, including clinics.

P1    3) New patients should not be placed in rooms that have not undergone terminal cleaning. Cleaning schedules must be developed for all patient care areas.

DISCUSSION: The crowding and lack of privacy in the health care areas are serious disincentives to seek and receive care. For example, it is hard to imagine that inmates are going to be very truthful about sexual and disease histories when intimate questions about sexually transmitted diseases are loudly asked of them in hearing of many other people. Such conditions for delivery of health services fly in the face of the fundamentals of health care professionalism. They must be extremely demoralizing for staff and risk pushing them into hardened, depersonalized attitudes. Likewise, they must be a serious impedance to recruitment of quality staff.

The inaccessibility of adequate examination equipment is a serious interference to carrying out examinations. While many complaints handled by jail physicians may not meed examination, failure to carry out a needed examination can lead to serious and avoidable liability. Such conditions also impede professionalism.

Many studies have demonstrated that transmission of communicable diseases in health care settings occurs most frequently through the failure of health care providers to wash hands between patient encounters and at other frequent intervals. The lack of sinks in the health care facilities makes handwashing difficult because work must be interrupted to walk great distances to a sink. Waterless disinfectants are being supplied on the hospital wards of CJ but, these only serve as a substitute to breaking between each patient to wash hands. Frequent handwashing is still necessary, especially after "dirty" procedures and treatments.

An inadequately cleansed and disinfected environment can also contribute to disease transmission, especially in sick and immune-compromised individuals. It can also lead to poor patient and staff morale. There should be no shortage of janitorial labor in a jail, although supervision is sometimes a problem.

ISSUE: There is fragmentation between mental health and medical services.

Identified seriously mentally ill inmates are placed in special housing. At CJ, ward 7100 with 46 beds is for admission of mentally ill men. New patients have to sometimes sit for many hours chained to a bench while awaiting another patient discharge for a room. This ward is run by jail medical services with a county mental health psychiatrist who prescribes medication. Most of the treatment is medication and physical restraints.

Adjacent to 7100 is a forensic inpatient unit run by county mental health. It houses both men and women, patients who meet 5150 criteria and who are considered too dangerous for admission into another county mental health facility. The staff are all from county mental health and treatment consists of medication, counselling, groups and other programs.

Other mentally ill women in need of hospitalization are admitted to the infirmary at SBI. They will be followed by a psychiatrist from county mental health and treatment consists mostly of medication and restraints.

5

Exhibit 2
Page 22

At CJ, there are three housing units which are reserved for seriously mentally ill men who are outpatients under the care of county mental health staff. Unit 4300 holds 300+. Units 4500 and 4600 hold 40 each. Mental health workers from county mental health staff make rounds in these units five days per week. Some of the inmates in 4300 go to the forensic inpatient unit for day treatment programs. Jail medical services staff distribute medication and provide sick call in the housing units.

Suicidal inmates may be placed on suicide watch in 4300, 4500 and 4600. This consists of placing the inmates in cells which are easily observed from deputy control stations. Deputies assigned to the units have no special training.

The average length of stay in units 4300, 4500 and 4600 is two weeks. Once the inmates are sent to general population, their only follow up by county mental health staff is a medication monitoring by a psychiatrist.

Women with serious mental illness are housed in units 4000, 5000, 5100 and 5200. These units comprise approximately 140 beds. The treatment programs are run by county mental health staff and medication is distributed by jail medical services staff. Suicidal women housed in these units are checked by deputies every 15 minutes.

There is a psychiatrist (county mental health) line for women in general population at SBI two days per week.

A new mental health program has recently been opened at Biscailuz Correctional Center. It is an intensive treatment program run by county mental health staff intended to achieve early release for seriously mentally ill inmates. There has been difficulty filling the program beds because of the low security of the facility and the need for program inmates to be physically healthy.

As a result of the mental health program at Biscaluz, jail medical services staffing has been increased at the facility to include 24 hour nursing staff coverage. Their responsibility to the program is to respond to medical emergencies. (Medications are distributed by psychiatric nurses of county mental health staff.) If an inmate in the program develops an ongoing medical problem that requires maintenance medication other than psychiatric medications, he or she will be returned to CJ or SBI.

There are also county mental health workers assigned to Miraloma. The rest of the medical services at this facility are contracted to a private company.

There is no 24 hour onsite coverage by a psychiatrist. Acute psychiatric emergencies after regular working hours are cared for by the oncall physician at CJ. The only 24 hour county mental health coverage consists of county mental health workers assigned to the IRCs at CJ and SBI.

Records of care by county mental health staff are separate from the medical records of jail medical services. The only mental health information in the jail medical records relates to medications (i.e., medication orders and records of medication administration).

RECOMMENDATIONS:

P1  1) There must be better integration of mental health care and medical services. Regular meetings should be held between key county mental health and medical services staff. Case conferences should include staff from both agencies.

P2  2) Medical services staff at Biscailuz should be scaled back to on scheduled and call out patient services delivery. The need for their services is not great enough to justify an allocation of staff away from much busier services. There are psychiatric nurses in the program who can handle medication issues and medical services staff could respond from nearby SBI during times when medical services are closed at Biscaluz. There is also a close paramedic station.

P1  3) There should be 24 hour onsite psychiatrist coverage assigned to CJ.

P2  4) Medical records should be integrated with both jail medical services and county mental health records.

DISCUSSION: Care of severely mentally ill inmates is one of the great challenges for jail management. It requires coordination of all programs to ensure adequate and compassionate care, to diminish the possibility of harm to the sick inmates or others, and to protect against liability. All staff, from deputies to mental health professionals, have responsibilities in caring for severely mentally ill inmates.

Fragmentation of responsibilities, such as exists in the care of mentally ill inmates in the LA jails, risks a breakdown in services. The risk is increased by the fact that the patients themselves cannot be counted on to be responsible for their care. The fragmentation increases the possibility of losing patients to follow up and of errors.

Communication is the key to coordination. Medical records are the principle means of communication in multi-provider health care systems. Maintenance of separate records by mental health and medical services is further breakdown of coordination of services to severely mentally ill inmates. All health care professionals must be sensitive to the privacy issues involved in mental health care.

CJ is sometimes known as the largest mental health hospital in the world. Many of the calls to the on-call physician involve severely mentally ill inmates. There should be a psychiatrist available onsite to respond at all times.

The program at Biscailuz, at the time that we evaluated it with its many empty beds, seemed to be a misallocation of resources, albeit an excellent idea. This is particularly true of medical services staff who seemed to have very little to do except to respond to minor medical complaints and await medical emergencies.

ISSUE: Therapeutic restraints are used too much.

Therapeutic restraint is a common modality of intervention on unit 7100 at CJ and in the infirmary at SBI. Inmates with self-injuring and suicidal behaviors, agitation due to drugs or drug withdrawal syndromes or due to mental illness are restrained with leather restraints for hours to days.

It is not unusual to have one quarter to one third of the patients in 7100 on close observation due to restraints or recent release from restraints. The procedure requires every 15 minute check by deputies and hourly checks for medical complications by nurses.

The medical director says that restraints are more commonly instituted during evenings and nights when there is no psychiatrist available. They are ordered by the on-call physician. The procedure requires review by the psychiatrist within 24 hours. The order for discontinuation of restraints must come from a physician, usually the psychiatrist.

Review of records revealed that restraints do not seem to be used as a component of a total care plan. Rather, they are solely used as a means of control.

RECOMMENDATION:

P1   1) There should be a systematic review of all episodes of therapeutic restraints.

P1   2) Therapeutic restraints applied for control of violent or destructive behavior should be in place only as long as it takes to control behavior. Restraint beyond this period should be continued only as part of a treatment plan which is communicated to the patient.

P1   3) Seclusion in safe cells should be an option to therapeutic restraints.

P1   4) Since the majority of therapeutic restraints seem to be ordered after hours by non-psychiatrist physicians, the frequent use of this control modality further argues for 24 hour onsite psychiatric coverage.

P1   5) All physicians who take call at the jail should have some training and experience in the use of medications for psychiatric emergencies.

DISCUSSION: Therapeutic restraints are a risky treatment modality. Recognizing this, the procedures call for frequent checks of inmates in restraints. The checks are time-consuming, especially with the large numbers of restrained patients at any given time on unit 7100, and they divert staff time from other vital duties.

Even under the closest supervision, restraints can result in deaths, usually asphyxial, and other medical complications, often ischemic injuries. There is also the risk that restraints are used as a punitive, rather than therapeutic, intervention.

Both restraints and seclusion are controversial treatment modalities. Their use is diminishing in most psychiatric treatment settings. Besides questions about humaneness, this situation is usually complicated in jails and prisons by referral of violent behavior that is not due to psychiatric illness.

There should be procedures which include clear indications for the use of therapeutic restraints. Restraint use can then be measured according to these indications through retrospective review. Because of the risk of and controversy about restraint use, its review should be part of any quality improvement program.

ISSUE: the current medication distribution system is fragmented, cumbersome and extraordinarily time intensive for nursing staff.

The current medication delivery system utilizes a varied centralized, decentralized, unit dose (pharmacy prepared), bulk stock and limited self administered (prepared by pharmacy) approach. Statistics provided by County staff indicate a daily average of 6,109 pill call contacts in the LA Jail system. This does not include the number of over the counter medications distributed during nurses' sick call. An extraordinary amount of nursing hours are currently being spent in the process of preparing, distributing and administering medications to inmates in this system. A large portion of these medications are over the counter drugs (OTC), i.e., tylenol, foot powder, maalox, cough syrup, chlortrimeton, sudafed, antifungal and benadryl creams and denture powder, distributed during nurses' sick call. The administration of OTC medications is not documented in this system, therefore, the nurse's role is simply to hand out requested medication. The remaining medications are prescribed or legend drugs administered by nursing staff in the inpatient units via unit dose and in the remaining areas of the jail from bulk stock at centralized pill windows or from carts taken to specified living units (e.g., pill modules, 2200 and 2400 units). Work areas for the task of setting up medications for pill call are inadequate in terms of space allocation and location (e.g., in the main clinic area of the Central Jail and SBI the preparation areas are small, used by more than one nurse at the same time and in the main stream of a noisy clinic with numerous other functions and staff present creating an environment conducive to distraction and error). Some observed practices appear to be inappropriate use of licensed personnel and at cross purpose with contemporary community practice, for example, nurses were observed opening manufacturer's unit dose packages into paper drinking cups to speed up pill call and nurses currently spend time prior to sick call preparing OTC medications for distribution, e.g., pouring antifungal foot powder into medication envelopes.

RECOMMENDATIONS:

P1   1) An approved formulary of over the counter medications should be made available to inmates through the commissary system. These medications could be made available for purchase with procedures put in place to insure availability to indigent inmates, or you may want to consider making them available free of charge as the system will still gain by freeing up nursing staff for other more appropriate tasks.

P2   2) Provide all prescribed medications in unit dose format such as blister packs or bingo cards for nursing staff to administer. A

DISCUSSION:

Many jail systems are adopting the use of the blister pack or bingo card pharmacy prepared unit dose approach for dispensing prescribed medications. This is a modification of the traditional hospital unit dose approach which can be used effectively in the jail environment as it is comparatively less expensive than other unit dose packaging; the pharmacy can use generic bulk purchased drugs in the cards; the packaging equipment is simple and inexpensive; the unused, unopened portion of the card may be returned to the pharmacy for reuse; the cards can be stored and/or carried to the pill call site in a compact form not requiring expensive and bulky medication carts; the packs are easily opened for administration of the drug; and, nurses can administer using just the card and the medication administration record since each card is contains a printed prescription label for each inmate.

While this system would increase the role the pharmacy must take in the system, it is an appropriate role consistent with accepted community practice. Much of the packaging may be done by pharmacy technicians under the supervision of the pharmacist. Dilantin, antibiotics as well as other frequently prescribed medications may be prepackaged in the card form thereby necessitating only the creation and application of the individual prescription label when the order is received by the pharmacy.

Both of these recommendations will result in reducing the amount of nursing staff time spent distributing and administering medication facilitating a redirection of time for direct patient care, screening, quality assurance activities and other important functions; remove nurses from the inappropriate and illegal role of dispensing medications; provide an accountable, safe system of providing medication to inmates which meets contemporary standards of pharmacy and nursing practice.

ISSUE: The manner in which medical records are maintained, transfer of medical information between and among LA jail facilities and the lack of an adequate patient data and tracking system contribute to delays, a lack of continuity of care and follow up, and inadequate documentation of patient conditions and services provided.

The medical records lack a standardized format of organization and documentation. There is no separation of record contents. Some medical providers use the S (subjective) O (objective) A (assessment) P (plan) format of documentation, others do not. Nurses notes do not consistently reflect assessment findings and clinical intervention; there seems to be a focus on documenting inmate movement (e.g, in court) and clerical documentation (e.g., "doctor saw pt", "orders noted", "yellow tail to pharmacy"). The current method and level of documentation does not adequately record the patient's condition, care and treatment while in this system. The lack of a standardized and organized chart format makes data retrieval difficult and time-consuming.

The medical record is not transferred with the inmate to various jail sites within the LA system, consequently the same inmate may have a medical record at several of the facilities at the same time. When an inmate is being transferred from CJ or SBI to another LA system facility, the transfer list is forwarded to medical records the night before the transfer. If the record can be located, a copy of pertinent information, e.g., order sheet, is faxed to the receiving facility. The receiving facility starts a new record or continues a previous record if one exists. Each facility maintains inactive files onsite for up to three years then transfers records to archive storage. Generally, no attempt is made to retrieve archive records on inmates returning to the system.

Health services does not at this time have any capability for tracking inmate/patients other than the custody data system. The operation and maintenance of the custody data system and the inmate classification process are totally autonomous from the health services delivery process. The only input health services has to the custody classification, movement process is putting a "medical hold" on an inmate which holds the inmate at the Central Jail until the hold is removed. There are important aspects of an inmate's medical and/or mental conditions the knowledge of which would be useful to custody that do not require holding the inmate at Central Jail, e.g., individuals with chronic illness whose condition is stable on maintenance medication. Health services and custody are currently operating in parallel tracks rather than collaborative tracks.

Inpatient and outpatient medical record documentation are currently mixed together in the outpatient record.

RECOMMENDATIONS:

P2   1) The medical records committee should define an approved, standardized chart organizational format and determine what form of documentation will be used (e.g., SOAP).

P2   2) Written policies and procedures should be developed which define organization of content, minimum expectations relative to documentation by all health care workers and a quality management process.
A
P2   3) Medical records in-service programs for all health care workers should be part of initial orientation and continuing education requirements for staff. Such training should include: orientation to the LA records system; approved format and documentation methods; approved abbreviations; legal aspects; inmate rights to medical records; and, confidentiality of medical records.

P2   4) All forms currently being used should be evaluated by the Medical Records Committee to determine appropriateness, effectiveness and efficiency to this health services delivery setting.

P2   5) The use of a modified problem list should be considered.

P1   6) Nurses should be instructed to utilize accepted community nursing practices relative to documenting patient assessment and intervention and notating transcribed physician orders.

P1   7) The medical record should follow the inmate throughout the system, versus establishing and maintaining a different medical record at each facility to which the inmate is admitted. Medical records or nursing staff receiving the daily transfer list should pull the records of inmates being transferred, facsimile urgently needed information to the receiving facility (e.g., current orders and other documentation necessary to insure continuity of treatment/care) and put the medical record in transport bag or container for pick up and delivery by the medical runner who currently delivers medical supplies six days per week to all facilities. Using this method, the record should be received by any facility within 24 to 48 hours of transfer. All inactive records, i.e., inmates are no longer in custody, should be maintained at the central intake facilities (i.e., Central Jail for men and Sybil Brand for women). A

P3   8) Custody and health services need to develop a collaborative process for entering medical and mental

health information into the classification system. There should be other options for health services staff to be assured that receiving facilities are alerted to medical / mental health needs beyond the current "medical hold". For example, a stable diabetic maintained on an oral medication does not need to be held at the central jail, but does need to be assured that the receiving facility will continue his medication. The request for proposal for a medical management and patient information data system should specify the need for linkage to existing custody data bases in identified fields where there is a need for two way sharing of information.

P2    9) The inpatient record should be maintained in a separate, stand alone section (i.e., separate forms: progress notes, physician orders, nurses notes, vital sign, medication and treatment records, etc) of the general medical record. A

P1    10) The entire medical record should not be taken out to inmate living areas for medication administration. Medications may be administered and documented on the medication administration record (MAR) which is commonly placed in a three ring binder separated by living unit and alphabetized by inmate name.

DISCUSSION:

The primary purpose of the medical record, regardless of the treatment setting, is to serve as a communication tool for the health services treatment team. To meet this purpose it is essential that records be current, complete, provide factual information and be maintained in an organized, standardized manner to insure ready access and retrieval of information necessary for providing continuity of care and treatment. Secondarily the medical record serves as legal documentation of the care and treatment rendered. If the record meets the intent of its primary communication purpose, it will meet the intent of its legal role. Records which are maintained in an unorganized, non-standardized format lead to staff inefficiencies, duplication of services, lack of continuity of services and a non-commitment of staff to attempt to retrieve medical record information.

The lack of a unified medical record which follows the inmate throughout the jail system has the potential for interrupting the continuity of care and treatment; requires unnecessary duplication of records, staff effort and records storage space.

Developing a collaborative system for sharing inmate information for classification has the potential for reducing the length of time inmates are held at the central jail and thereby assist in staying within the court imposed population caps.

Separation of inpatient and outpatient record documentation provides more clarity and capability to retrieve chart data.

All recommendations regarding medical records have been made in accordance with contemporary medical records practices and local and national correctional health standards.


ISSUE: The appropriateness of utilization and licensure designation of inpatient beds at the Central Jail should be re-evaluated.

A significant amount of this system's health services resources are being focused on the current and on-going effort to license the inpatient areas of the Central Jail (248 beds in Units 7100, 8000, and 8100) and Sybil Brand (28 beds) as skilled nursing beds under Title 22 Health Facility Licensing regulations. SNF licensure is currently being sought for the following units:

7100 Unit: 46 beds which house inmates with mental health and/or related medical problems and detoxification; suicidal individuals who do not qualify for the Forensic Inpatient Program. This unit houses inmates in restraints not meeting admission criteria for FIP.

Staff: Days - 6; evenings - 5; nights - 4 (one non-licensed staff per shift, the remaining are a mix of registered nurses and licensed vocational nurses). Mental health provides daily rounds by psychiatrist to 7100 unit.

8000 Unit: 88 medical beds in multiple occupancy dorms and single room configuration. This unit houses individuals who are insulin dependent diabetics, HIV positive, tuberculosis requiring isolation, receiving dialysis, paraplegic and/or have mobility deficits. Many of the individuals housed on this unit are here for the convenience of staff and to provide the capability of being able to locate them for care and treatment versus a need for 24 hour skilled nursing care.
Staffing: Days - 5; evening 3-4; nights - 3 (one non-licensed on days, the remainder are a mix of registered

nurses and licensed vocational nurses). Physician sick call is provided on the unit 6 days per week.

8100 Unit: 112 medical beds providing 24 hour nursing care to inmates with cardiac, orthopedic, post operative, dialysis, communicable diseases and high security inmates with medical conditions. The unit provides single and multiple occupancy rooms. It is reported that all single rooms are externally vented, however, no recent testing for negative air flow and number of air exchanges per hour has been done.

Staffing: days - 5 licensed and one non-licensed attendant; evenings - 4 licensed and 1 non-licensed; nights 3 licensed and one non-licensed.

The licensure level being sought for the Forensic Inpatient Program, 35 beds located in unit 7200 at Central Jail is that of Acute Psychiatric Hospital.

Two issues arise when analyzing this situation: 1. the appropriateness of seeking the Skilled Nursing and Acute Psychiatric Hospital level of licensure in this setting, and 2. the appropriateness of utilization of the beds now designated as inpatient.

Skilled Nursing Facility Licensure:

There is questionable benefit to licensing the inpatient beds in this facility as Skilled Nursing Facility beds. The SNF licensing regulations were developed for institutions which typically care for a geriatric, non-ambulatory population with long average lengths of stay in the facility. The regulations are extremely restrictive relative to physical plant, staffing and program requirements to meet the treatment and safety needs of this population. By contrast, inmate/patients in the jail setting are typically younger, ambulatory and have relatively short lengths of stay. The Correctional Treatment Center regulations have been developed to recognize these differences in patient populations without sacrificing quality of care. Opting for CTC licensure of the number of beds deemed necessary to provide a 24 hour skilled nursing care setting has the potential for reallocating staff to areas of highest need. Licensed nursing hours per patient per patient day are decreased from 2.8 (SNF) to 2.5 (CTC). It should be recognized, however, that current staffing levels for all of these units fall well below either SNF or CTC requirements. For example, the required licensed nursing staffing level for the 8100 unit is 39 and 34.9 per twenty four hour period (if fully occupied), SNF and CTC, respectively, versus current level of 12 licensed staff per 24 hour period.

Acute Psychiatric Hospital Licensure:

The draft Correctional Treatment Center regulations provide for the licensure of an Acute Mental Care Program. The definition of acute mental health care stated " include, but are not limited to: 1) admission for involuntary evaluation and/or treatment, 2) involuntary medication (except for emergency stabilization pending transfer), 3) treatment of acute levels of severe mental disorder, and 4) clinical restraint and seclusion" (section 79757, draft 3, March 1992). Staffing is based on actual patient census. The following staff are required for 31 - 40 beds / 24 hour period: Psychiatrist, clinical psychologist or clinical social worker - 4; registered nurse or licensed vocational nurse or psychiatric technician - 8; licensed mental health professional or mental health worker - 10, for a total of 22 staff. Additionally a clinical director and nursing services program director are required. Current staffing for the FIP is one psychiatrist, 5 social worker/psychiatric social workers/psychologist and 19 nursing staff.

Bed Utilization:

Currently a significant number of beds on 8000 and 8100 and perhaps 25% to 30% of 7100 are being utilized to house inmates who do not require around the clock skilled nursing observation and care, e.g., stabilized insulin dependent diabetics, HIV positive inmates without complications, individuals with casts or splints and paraplegics. These individuals would be living independently in their homes, however, due to the nature of the jail environment and population, require a physically protective environment while incarcerated. Also many inmates, e.g., insulin dependent diabetics, are housed in the inpatient areas for staff convenience in accessing and locating individuals in order to provide treatment.

Many findings reflected in the DHS licensing audit report point to inadequacies in the treatment environment (e.g., lack of handwashing facilities, appropriate separation of clean and dirty areas and adequate staff workspace) and staff performance (e.g., unacceptable nursing practice relative to infection control; carrying out physician orders; development of care and treatment plans; and documentation of nursing assessment and intervention). These cited practice deficiencies call to question the level of clinical supervision, staff expectation, orientation and training and the adequacy of staffing levels.

RECOMMENDATIONS:

P2   1) The licensure effort should be reassessed in terms of the category of licensure being sought as well as the number of beds and units to be licensed. A system of inpatient resources should be established providing a continuum of treatment settings to allow utilization appropriate to the level of acuity and service need and maximization of staff, i.e., licensed SNF or CTC unit > sheltered living > outpatient general population. The findings of the acuity study currently underway should be used in the determination of the number of each category of bed required.

P2   2) Sheltered Living units should be established where supervision is provided by custody, health services are provided on an as needed outpatient delivery basis and the physical protection / separation needs of these inmates are met.

P2   3) Strict admission and discharge criteria should be developed and followed. Regularly scheduled utilization review should be conducted to insure appropriate utilization of treatment beds.

P1   4) Admission to and discharge from inpatient treatment units must be sole provence of the medical authority. A

P2   5) Areas designated for licensure (whether SNF or CTC) should be physically upgraded to meet standards of cleanliness, maintenance and provide adequate staff support space (e.g., handwashing facilities in treatment areas, separation of clean and dirty areas/functions and administrative work areas) to enable staff to provide services in a safe manner consistent with community practice.

P2   6) The licensure category being sought for the Forensic Inpatient Program should be analyzed by mental health and medical administration to determine the most appropriate category for this facility, i.e., Acute Psychiatric Hospital versus Correctional Treatment Center - Acute Mental Health Program.

P1   7) All inpatient mental health beds should be staffed and managed by county mental health.


ISSUE:  the current utilization and allocation of licensed nursing staff does not maximize their professional skills or meet the areas of greatest service need within the system.

Potential savings in nursing hours could be realized by making over the counter medications available through commissary. The current nurse's sick call conducted in all facilities consists primarily of passing out over the counter medication upon request of the inmate.

Currently there are nine nursing positions and one medical records clerk position assigned to Biscailuz Center.

Creation of sheltered living units to replace some of the inpatient units at CJ removes the need for posted nursing positions on these units. Nursing and medical provider services are provided on a scheduled and on call outpatient basis to the sheltered living units.

Repositioning/reallocation of these staff positions should go to staffing the licensed care units at the levels specified by regulation and enhancing nursing coverage in IRC for more definitive front end assessment and treatment of new bookings.

RECOMMENDATIONS:

P1   1) Remove posted nursing and medical clerk positions from Biscailuz Center and replace with scheduled and on call outpatient service provision.

P2   2) Reassign posted nursing positions saved from creating sheltered living units to licensed care units to assist in meeting staffing requirements as dictated by licensure regulations.

P2   3) Shift additional nursing and physician hours to IRC to provide more front end, definitive assessment and treatment rather than placing inmates on medical hold and referring to central clinic.

DISCUSSION:

There are presently 9 nursing staff positions assigned to Biscailuz Correctional Center. This is a well facility with security levels of 4 and 5 where inmates can have no chronic medical problems. This staff should be reassigned to other areas of greater need. Daily nurse's sick call and on call emergency response could be provided by staff whose primary assignment is Sybil Brand (additional to current SBI staff). Nursing services

should be provided on a scheduled and on call basis versus posted positions.  Over the counter medications would be available to inmates through the commissary thereby greatly reducing the nurse's sick call which currently averages around 550 encounters (most for OTC).  Currently an average of 7 inmates receive prescribed medications on any given day.  This is a well facility, inmates requiring prescribed medications should be able to meet the criteria for self administration.  These positions could be used more effectively in other areas of the system, i.e., designated inpatient units and intake.

The current practice for inmates stating medical problems at the time of intake in the IRCs is for the nurse on duty to interview, start a database and then refer for later follow up (i.e., to be seen in nurses clinic or physician evaluation).  No definitive action is taken in the IRC screening area.  "Medical hold" is used frequently to insure that the inmate will remain in the facility to receive the follow up referral.  This appears to add to the congestion and overload in the main clinic as well as add to the backlog of inmates who cannot be moved out to the outlying jails.  The assignment of a physician or mid-level provider to this area during the high utilization periods to take immediate referrals from the screening nurse after a database has been established has the potential of providing more efficient front end evaluation and treatment and reducing transfer delays due "medical holds".

ISSUE: The reorganization of medical services within the reporting and administrative organizational structure of the Sheriff's Department should be re-evaluated.

The organizational location of the medical services unit has recently been relegated from a direct reporting relationship to one of the Under Sheriffs to a position under the authority of and reporting to the Chief of Detentions.

RECOMMENDATION:

P1      1) Re-establish the former organizational and reporting structure. A

DISCUSSION:

The necessity for health services delivery systems to retain autonomy within the corrections environment is paramount to providing services which meet constitutional mandates, local and national correctional health services standards and applicable community standards of service.  Any move which places the health services program under the direct control of the custody administration threatens the program's autonomy. The need to be sensitive to maintaining medical autonomy is particularly important in systems in which health services management and clinical staff are employees of the sheriff's department.  The trend throughout the country is to move in the direction of providing more autonomy for inmate health services delivery programs, removing them from the direct control of the warden, chief of detention or other custody administrative entity.  This trend has been furthered by recent court mandates.

This autonomy issue became a point of concern to the reviewers who observed health services staff attitudes and actions which appeared to reflect more of a custody mode of dealing with inmates in the health services setting than a professional health services mode.

ISSUE: Written policies and procedures do not reflect regularly scheduled review, revision and approval by responsible administrative and clinical authority; current organization and content of policies and procedures do not recognize need for separate and distinct policies and procedures for inpatient and outpatient services; and, do not meet contemporary jail health services standards for timeliness of review and approval and separation.

Several of the manuals reviewed had policy and procedures on which the last documented review was dated in the early 1980s by an administrator who is longer with the system. There is no separation of inpatient unit policy and procedure from outpatient.

RECOMMENDATIONS:

P2      1) All written policies and procedures must be reviewed, revised as necessary and approved by the administrative and clinical authorities at a minimum of annually. All such reviews are to documented with signature of reviewer and date on the written policy and procedure. A

P2      2) A separate inpatient policy and procedure manual should be developed for the system's general inpatient program as well as by individualized inpatient treatment unit where specific, specialized policies and procedures may need to exist.  A

DISCUSSION:

The purpose of written policy and procedure for jail health services is manifold: they articulate the program's mission and standard of care and staff expectation; serve as an orientation tool and a day to day resource for staff; insure continuity and consistency of service delivery; and, legal documentation of the program's standard of care and/or service delivery.  To meet these objectives, it is essential that all written policy and procedures be current, accurate, consistent with legal requirements of the jurisdiction, readily accessible by staff and reflect actual practice.  In addition, all staff must be knowledgeable of and committed to carrying out defined, written policy and procedure.

Inpatient licensing requirements and state and national jail standards require separate policy and procedure addressing the management, clinical operation and nursing care procedures for inpatient programs.

ISSUE:  Initial and continuing educational efforts need to address the overlapping responsibilities and roles of custody and health services staff in the provision of inmate health services.

One officer being interviewed about the officer's expected role in a mandown medical emergency situation stated that the officer's time was spent getting a nurse to respond. He also indicated that since most of the inmates in the particular living area were HIV positive and it would be unlikely the officer would initiate CPR in that situation.  He also indicated he did not feel the mouth shields which are issued to officers are adequate to protect them during mouth to mouth procedures.  Officers assigned primary observation duties in the mental health outpatient units have received no specialized training to prepare them for this post.  Officers were observed in the general clinic area standing or sitting next to the nurse while the nurse was interviewing the inmate regarding suicidal intent.

RECOMMENDATIONS:

P2  1) Initial orientation of officers to the jail setting need to address the unique relationship, roles and responsibilities of custody and health services staff in the provision of inmate health services. Initial and continuing educational programs need to stress signs and symptom recognition of medical and mental health conditions common within the jail population, emergency situations, resources and appropriate response; and, inmate treatment and privacy rights.  Officers assigned to specialized medical and or mental health areas of the jail should receive additional orientation and continuing training to prepare them to function as part of an integrated custody / health services team. **A**

P2  2) Health services staff should also receive initial orientation and training in the overlapping roles and responsibilities of custody and health services staff in the provision of health services as well as security issues and privacy / confidentiality concerns in the jail setting. **A**

DISCUSSION:  The provision of health services in a corrections setting is a unique and challenging task necessitating a collaborative effort by custody and health services staff.  While autonomy of the custody and health services mission must be maintained, clearly a unified team approach is necessary to assure access to necessary services. Since officers provide first line supervision and observation of inmates, they serve as the first line of referral of inmates into the health services delivery system.  It is essential, therefore, they have an understanding of that role and basic education in recognizing conditions requiring referral to health services staff. Conversely, it is essential that health services staff also recognize the importance of officer observation and referral within this setting to be able to effectively and appropriately respond to officer requests.  All national jail health services standards recognize the need for initial orientation and continuing training for custody staff in medical emergency response and signs and symptom recognition of medical and mental health conditions common to the jail population.

14

Exhibit 2
Page 31

The preceding report has been developed jointly by the correctional medical and health services consultants selected by the American Civil Liberties Union of Southern California, the Los Angeles County Counsel and Sheriff's Department.

_____
Kim Marie Thorburn, MD
1924 Huea Place
Honolulu, HI 96819

_____
Barbara L. Cotton, RN, MHSA
The Cotton Group
P.O. Box 1307
Lafayette, CA 94549-1307

_____
Date

_____
Date