## DECLARATION OF JAMES AUSTIN

1. I am President and founder of the JFA Institute, an organization that works with state and local correctional institutions to improve safety, reduce overcrowding, and decrease spending.  The Institute helps correctional institutions meet these goals by providing population projections; classification and risk assessments; program and policy evaluations; staffing and bed capacity analysis; analysis of jail operations; proposals for conversion of existing facilities to new missions; and identifying programs offering alternatives to incarceration.  My organization has participated in a number of major jail master plans and assessments, including for Cook County, IL; Bexar County and Harris County, TX;  Marion County, OR; Berks County, PA; New York City; Davidson County, TN; Baltimore City and Montgomery County, MD;  and Washington DC.

2. Previous to founding the JFA Institute, I served as the Director of the Institute of Crime, Justice and Corrections at the George Washington University, and Executive Vice President for the National Council on Crime and Delinquency. I began my career in corrections with the Illinois Department of Corrections at Statesville and Joliet Penitentiaries.  My Ph.D. is in sociology from the University of California.

3. In 2007 I was appointed to the California Department of Corrections and Rehabilitation Expert Panel on Adult Offender Recidivism Reduction Programs.   I have served as the Chair of the National Policy Council for the American Society of Criminology.  The Western Society of Criminology has granted me its Paul Tappin award for outstanding contributions in the field of criminology.  The American Correctional Association has awarded me its Peter P. Lejin Research Award.  I have authored numerous publications and books on corrections, criminology, and incarceration policies.

1

4.     I have particular expertise in the field of prison and jail classification and risk assessment systems, which I use to assist state and local correctional agencies to attain rapid, safe and significant reductions in overcrowding.  I have successfully collaborated with local and state correctional systems around the country to help them reduce their prison and jail populations through reliance on community-based alternatives to incarceration, at considerable savings to the taxpayers and without risk to public safety. I am currently working in ten jurisdictions to help them reduce crowding and improve correctional facility conditions.

5.     I have conducted population studies of numerous large prison and jail systems, including state prison systems in Florida, Louisiana, Maryland, Mississippi, Pennsylvania, North Dakota and Puerto Rico, and large urban jails in Houston, Phoenix, Chicago, New York City, the District of Columbia, and San Antonio. I recently assisted Montgomery County, Maryland in developing and implementing a supervised pretrial program that has reduced the pretrial population.

6.     In California, I recently completed a comprehensive study for Santa Clara County and identified several options for the County to reduce its jail population; I am currently conducting a similar study for Marin County.

7.     State prison officials in Nevada, Mississippi, and Maryland recently retained me to help them halt the growth of their prison populations.  I helped these States develop and implement new sentencing and release policies, which have resulted not only in cessation in prison population growth but a gradual population reduction in their prison systems, for the first time in years.

8.     I have also collaborated with corrections officials in Ohio and Mississippi to dramatically reduce the inmate populations of their supermax facilities. Statistical studies in these states showed that violence and use of force

Austin Dec - Page 9

plummeted almost in direct proportion to the reduction in the use of supermax confinement.   Results of the Mississippi experience were recently published in a scholarly journal on behavior and corrections. Article attached as Exhibit 1.

9.   In recognition of the demonstrable successes of these efforts to reduce prison overcrowding, the State of California has joined the Plaintiffs in the Plata/Coleman  v. Scharzenegger litigation in retaining me to craft a prison population plan that would safely lower California's prison population, consistent with the three-judge court order in those cases.

10.   Much of my work has been accomplished by assessing, over a period of a few months, the flow of people being admitted and released from the correctional system.  This assessment has made it possible to identify low risk offenders who could be managed through alternative sanctions or community supervision without jeopardizing public safety, and at a very significant savings to the state.

11.   I have read the report of Dr. Terry Kupers and am aware of the Rutherford Plaintiffs' concerns that extreme overcrowding in Men's Central Jail, especially combined with gross deficiencies in the physical plant, exacerbates and even causes serious mental illness in the detainees.

12.   Dr. Kupers and I have worked together in Mississippi since 2007 in a successful effort to reduce such problems in the state's super max facility. Based on my experience I am confident that the extremely deleterious effects of overcrowding in MCJ, particularly on those with mental illness, can be greatly alleviated, and that changes that will reduce overcrowding at MCJ can be effectuated very rapidly, within 6 to 12 months.  I base this estimate in part on my experience working in Mississippi.  There, Dr. Kupers and I were able to collaborate closely with correctional officials to devise a plan that radically reduced overcrowding in the facility, ended

3

systemic patterns of deputy abuse and excessive force, and removed virtually all inmates with mental illness from the toxic conditions that existed previously.  My recommendations for how to achieve similar results in Los Angeles are included below.

13.  Avoiding a persistent jail crowding situation requires a comprehensive assessment of those factors that influence jail admissions, releases, and the resulting average length of stay. The policies and processes that can have a major impact on crowding are the "population drivers." I have the experience and technical capabilities to identify such factors, and identify those adjustments that can be made that will have significant impact on the current jail population without jeopardizing public safety.

14.  If provided access to some basic data regarding the jail population in Men's Central Jail as well as the entire jail system, I would be able within a period of 90 days to complete a study and, in consultation and collaboration with the County, provide a limited set of recommendations to would reduce the population of Men's Central Jail – and the overall LA County Jail population – over the course of several months.  Such a plan would result in a considerable savings to the County, without endangering public safety.

15.  The LA County Jail system holds approximately 18,500 people on any given day. The majority (67%) are in pretrial status. But a much larger number – approximately 175,000 -- are booked and released each year. This means that the average length of stay in the system is 40 days, well above other larger jail systems both nationally and in California. These preliminary data suggest that modest reforms in the pre-trial process would have a significantly positive impact on Men's Central Jail and the entire jail system.

16.  In order to complete the analysis and develop the population reduction plan, I would require only two data extract files created by the Los Angeles

4

Sheriff's Department (LASD).  The term "extract" means that certain data elements stored on the data system (like date of birth or gender) would be extracted from the LASD's large data base and used to create a separate data file for all releases.  Identifying personal information would not be included in these extract files.

17.  The Sheriff's Department has already confirmed that these and other relevant data elements are being stored on its data system and can readily be extracted.  A very brief description of the data files is as follows (the precise data file elements that are needed are in Appendix A):

a.  Data File #1:  LA County Jail Admissions and Releases for the last calendar year (over 200,000 cases).

b.  The first data file would show all people admitted and released from the jail in the past 12 months. This file would be used to evaluate the flow of persons through the jail system: the date and reason for admission, the date and reason for release, the average length of stay, and each detainee's prior criminal record, risk assessment, and demographics. From this data file we can accurately calculate how long people are staying in the Jail and for what reasons.  We can also use this file to simulate alternative booking and release policies that would lower the 19,000 jail population and thus the population at Men's Central Jail.

c.  Data File #2:  The Current Jail Population (about 19,000).

d.  This file --also known as a "snapshot" file -- is used to show the status, attributes and location of the daily population that must be housed and managed. From this file I can estimate the custody levels of the jail population and how they are housed by relevant attributes. I can also look specifically at the population of Men's Central Jail and assess how long they have been in custody, their classification or risk levels, current offenses, prior record, legal status, and demographics.

5

18.   The proposed study and recommendations would take approximately 90 days to complete and would consist of the following two phases of work.

19.   Phase 1: Comprehensive Analysis of Jail Population (45 days)

20.   In Phase 1, we would use the data extract files described above to carry out a statistical analysis of the attributes of the LA County jail population from three perspectives:  jail admissions, jail releases, and the current jail population. This analysis would help us understand the number and kinds of persons being admitted and released from the jail each year, the kinds of charges that are resulting in their incarceration, and how people exit the jail. Once we better understanding the attributes of the LA Jail population we can compare it to the population of other large city and county jail systems. The analysis will also identify possible target populations that might be reduced in the jail population if they qualify for alternative programs and court policies.   We would especially focus on the population of Men's Central Jail, but in order to reduce that population, we need a systemic assessment of the entire jail population to see what remedies exist either to reduce admissions or to moderately reduce the length of stay for low risk detainees and sentenced inmates.

21.   At the end of Phase 1, we would brief the CEO, LASD and ACLU on the various opportunities to control the extent of crowding within the LASD.

22.   Phase 2: Identification of the Most Feasible and Effective Population Control Alternative Programs and Policies (45 Days)

23.   Phase 2 would consist of an assessment of the possible alternatives to the practices that are producing the current average daily jail population of 19,000. For each alternative policy identified in Phase 1, we would take small samples of each target population and conduct case studies to see what factors are preventing the release of these detainees.  For example, one target group might be persons charged with non-violent crimes in minimum

Austin Dec - Page 13

1    custody who have been in custody for more than two weeks. A more careful

2    analysis might show that court processing, holds, lack of a treatment

3    programs or other factors are preventing a more timely release from

4    custody.  (This type of analysis is helping Harris County's Pretrial Services

5    agency develop a new process of working with the court to expand the use

6    of supervised release.)  From these case studies we would be able to

7    estimate the impact on the jail population and the related cost savings from

8    implementing alternative policies.

9    24.   At the end of this phase of the study, the LASD, CEO and ACLU would

10         meet for a full briefing on each of the possible alternatives.  For each

11         alternative reviewed, we would provide the estimated impact on the current

12         jail population.  The goal would be for the Sheriff's Department, the County

13         and the ACLU to try to reach agreement on how best to pursue population

14         control mechanisms.

15   25.   By going through the process of creating extract data files and conducting

16         this analysis, it will be possible to repeat this kind of analysis on a regular

17         basis, helping the County avoid overcrowding in the future.

18   26.   Based on my experience in other jurisdictions, I am confident that the

19         proposals made here are completely feasible and realistic.  We achieved far-

20         reaching reforms in less than a year in Mississippi's supermax through

21         improved classification, which resulted not only in the reduction by 80-90

22         percent of the population in administrative segregation but also in enormous

23         reduction in institutional violence,  better conditions for security staff and

24         the general prison population, and significant financial savings to the

25   //

26   //

27   //

28   //

7

1

2        department of corrections.  With the Sheriff's cooperation, equally far-

3        reaching reforms can be achieved in a similar period of time in Los Angeles

4        County.

5   I declare under penalty of perjury under the Laws of California that the foregoing

6   is true and correct to the best of my knowledge and belief.

7   Executed this 10th day of December, 2009 in Los Angeles, California.

8

9

10  James Austin, Ph.D.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Appendix A

Data Elements for the Extract Files

File #1:  Last calendar year of all inmates released from the County Jail System

Inmate ID Number
Inmate's Legal name
DOB
Gender
Race/Ethnicity
Admission Date and Time
Law Enforcement/Correctional Agency admitting inmate
Facility admitted to
Admission Type (pretrial, sentenced, CDCR parolee)
Legal Status at admission (pretrial release, probation, parole)
Primary Charge/Offense at admission
If multiple offenses or charges list up to 5 other charges or offenses
Custody level and factors at admission
Release date and time
Facility released from
Type of release (bail, OR, transfer to CDCR, sentenced)
If sentenced to jail, date that inmate became sentenced
If sentenced to jail, sentence length
Custody level and factors at release (for short termers, this will be the same as item 13)
Early Release (Y/N)
If early released, amount of time granted
Primary Charge/Offense at release
If multiple offenses or charges list up to 5 other charges or offenses at release


File #2:  The current jail population --also known as a "snapshot" file.

Inmate ID Number
Inmate's legal name
DOB
Gender
Race/Ethnicity
Admission Date and Time
Law Enforcement/Correctional Agency admitting inmate
Facility admitted to
Admission Type (pretrial, sentenced, CDCR parolee)
Legal Status at admission (pretrial release, probation, parole)
Primary Charge/Offense at admission
If multiple offenses or charges list up to 5 other charges or offenses
Custody level and factors at admission
Current Custody level and factors
Current Facility location
Current housing unit and cell location
Special management flags (e.g., PC, Gang, Juvenile, etc.)
Current legal Status at admission (pretrial release, probation, parole)
If sentenced to jail, sentence length
Current Primary Charge/Offense at admission
If multiple current offenses or charges list up to 5 other charges or offenses

Austin Dec - Page 16

# EXHIBIT
# 1

# BEYOND SUPERMAX ADMINISTRATIVE SEGREGATION

## Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs

TERRY A. KUPERS
*Wright Institute*

THERESA DRONET
*Wexford Health Sources*

MARGARET WINTER
*National Prison Project of the American Civil Liberties Union*

JAMES AUSTIN
*JFA Institute*

LAWRENCE KELLY
*Mississippi Department of Corrections*

WILLIAM CARTIER
*Wexford Health Sources*

TIMOTHY J. MORRIS
*Mississippi Department of Corrections*

STEPHEN F. HANLON
*Holland & Knight, LLP*

EMMITT L. SPARKMAN
*Mississippi Department of Corrections*

PARVEEN KUMAR
*Wexford Health Sources*

LEONARD C. VINCENT
JIM NORRIS
*Mississippi Department of Corrections*

KIM NAGEL
JENNIFER MCBRIDE
*Wexford Health Sources*

CRIMINAL JUSTICE AND BEHAVIOR, Vol. XX No. X, Month XXXX xx-xx
DOI: 10.1177/0093854809341938
© 2009 International Association for Correctional and Forensic Psychology

Litigation in Mississippi required the Department of Corrections to ameliorate substandard conditions at the supermaximum Unit 32 of Mississippi State Penitentiary at Parchman, remove prisoners with serious mental illness from administrative segregation and provide them with adequate treatment, and reexamine the entire classification system. Pursuant to two federal consent decrees, the Department of Corrections greatly reduced the population in administrative segregation and established a step-down mental health treatment unit for the prisoners excluded from administrative segregation. This article describes and discusses not only the process of enacting the changes but also the outcomes, including the large reductions in rates of misconduct, violence, and use of force.

*Keywords:*    supermaximum security; administrative segregation; classification; use of force; mental health step-down unit

Between the 1970s and the 1990s, the prison population in the United States multiplied several times over, and prisoners who were suffering from serious mental illness (SMI) grew to a greater proportion of the prison population (U.S. Bureau of Justice Statistics, 2006). Meanwhile, and predictably (based on the crowding), correctional facilities experienced a sharp rise in rates of misbehavior and violence. In response to what many perceived as unmanageable prisons, departments of correction increasingly turned to lockdown and administrative segregation as the way to manage the rising rates of violence and misbehavior. Sections of prisons and even entire newly constructed facilities were dedicated to administrative segregation. The supermaximum security prison thus emerged (Riveland, 1999; Scharff-Smith, 2006).

In administrative segregation units and supermaximum security facilities, prisoners are confined to their cells, by themselves or with cellmates, nearly 24 hours per day. They eat meals in their cells, and their out-of-cell activities are limited to solitary trips to a small yard for recreation (several hours per week) and to relatively rare, noncontact visits with family and friends.

Immediately following the advent of the supermaximum security prison in the early 1990s, litigation challenged the constitutionality of the conditions (*Jones 'El v. Berge*, 2001; *Madrid v. Gomez*, 1995). The argument of plaintiffs was that the extreme isolation and idleness caused unnecessary pain, suffering, and serious psychiatric harm. The courts concurred and so ordered amelioration of some of the harshest conditions, as well as the removal of prisoners with SMI from long-term administrative segregation. Cohen (2008) provides a comprehensive history of this litigation. By the late 1990s, some states began to realize that supermaximum security and other forms of long-term administrative segregation were expensive. It also became apparent that a disproportionate number of prison suicides were occurring among prisoners in administrative segregation and that recidivism rates were rising. Furthermore, it had never actually been proved that the advent of supermaximum security units diminished the prison and postrelease rates of misconduct and violence (Briggs, Sundt, & Castellano, 2003).

Clinical research supported the notion that many prisoners suffering from SMI were being consigned to long-term administrative segregation (Rhodes, 2004), that the idleness and isolation tended to make psychiatric conditions and prognoses worse (Grassian & Friedman, 1986; Hodgins & Cote, 1991), and that providing treatment to prisoners with SMI resulted in their involvement in far fewer disciplinary infractions (Condelli, Dvoskin, & Holanchock, 1994). Several states—including Virginia, Maryland, Ohio, and Michigan—converted facilities that had been dedicated to administrative segregation, utilizing the buildings for other purposes.

AUTHORS' NOTE: *Address correspondence to Terry A. Kupers, MD, MSP, Wright Institute, 2728 Durant Avenue, Berkeley, CA 94704; e-mail: kupers@igc.org.*

Beginning in 2002, advocates of prisoners' rights brought litigation aimed at improving the plight of prisoners in Unit 32 at Mississippi State Penitentiary, Parchman (*Presley v. Epps*, 2007; *Russell v. Johnson*, 2003). A 1,000-cell supermaximum security facility, Unit 32 contained the state's death row, plus a large number of cells for administrative segregation. In other states, this type of litigation leads to endless court battles and little change; in Mississippi, however, the adversarial relationship, at some point, shifted to a mostly collaborative one. As a result, the litigation was amicably settled, and the monitoring of the required changes commenced. The Mississippi Department of Corrections (MDOC) changed course after a few court hearings, instituting the changes in classification and the mental health programming that the plaintiff class had been demanding. There are legal, organizational, and programmatic aspects to the changes that ensued. The subsequent decreases in rates of violence, disciplinary infractions, and use of force were substantial.

## CONDITIONS AT UNIT 32 BEFORE LITIGATION

Beginning in the early 1990s, prisoners at Unit 32 described a harsh environment: severe isolation, unrelieved idleness and monotony, little access to exercise, stench, and filth. The toilet in every cell had a "ping-pong" mechanism: Whenever it was flushed, it pushed the waste in the bowl into the bowl in the adjoining cell. Infestations of mosquitoes and other stinging insects forced prisoners to keep their windows closed and their bodies completely covered, even in the hottest weather—and the temperatures in the cells during the long Delta summers were extreme. The light was too dim for reading and writing. Medical, dental, and mental health care was inadequate. Psychotic prisoners started fires, flooded the tiers, smeared feces, and screamed, often all night. Prisoners were moved into cells that had been smeared from floor to ceiling with excrement from previous, psychotic tenants. Takedown teams extracted prisoners from their cells and subdued them with pepper spray, adding to the toxic environment caused by fire and flooding. Many prisoners stayed in Unit 32 for the duration of their sentences, some for life. In January 2002, the prisoners on Mississippi's death row went on a hunger strike to protest the conditions of their confinement.

## THE LITIGATION

In July 2002, the National Prison Project of the ACLU (American Civil Liberties Union), the ACLU of Mississippi, and the law firm of Holland & Knight filed suit on behalf of the death row prisoners. In May 2003, U.S. magistrate judge Jerry Davis entered an opinion and injunction granting the relief that plaintiffs had requested (*Russell v. Johnson*, 2003). The Fifth Circuit issued a decision, for the most part, upholding Judge Davis's injunction (*Gates v. Cook*, 2004).

Meanwhile conditions in the rest of Unit 32 continued to deteriorate. In 2005, the prisoners filed a new suit to extend the remedies ordered in the death row case to all of Unit 32 (*Presley v. Epps*, 2005). The new case, however, addressed additional, more complex correctional issues. The most severe problems stemmed from the classification system, which effectively assigned most of the 1,000-man population in Unit 32 to permanent

administrative segregation. A negotiated consent decree in *Presley v. Epps* incorporated all the relief upheld by the Fifth Circuit in the death row case, including the exclusion of administrative segregation for prisoners suffering from SMI. The parties added provisions on excessive force, procedural due process, and classification.

Plaintiffs retained a classification expert, Dr. James Austin, to carry out an objective analysis of the Unit 32 population, which concluded that nearly 80% of the unit's population did not belong in administrative segregation and should thus be transferred to general population. In December 2006, the parties met and agreed to collaborate to reform the classification system within a 12-month period. MDOC Commissioner Christopher Epps promptly established a classification task force under the direction of Deputy Commissioner Emmitt Sparkman to work closely with Dr. Austin and key Department of Corrections officials.

Meanwhile, progress on the mental health issues was slow. Addressing the mental health issues was essential to fully addressing the classification issues. Prisoners with untreated mental illness became more disturbed in administrative segregation; their illness led them to misbehave; security staff sprayed them with chemicals; and their mental health further deteriorated. This cycle of psychosis, disturbed behavior, use of force, further clinical deterioration, and increasingly psychotic behaviors put severe pressure on, not just prisoners with SMI, but everyone who lived and worked in Unit 32.

In April 2007, Judge Davis held an evidentiary hearing on the mental health issues. At the end of 6 hours of testimony, the judge called the lawyers into chambers. He advised them, in the most urgent terms, to make every effort to come up with a joint plan to remedy the situation. He said that he feared Unit 32 was a tinderbox about to explode.

A few weeks later, Unit 32 did explode. At the end of May 2007 and continuing into August, there was an outburst of gang warfare in which many inmates were stabbed and some died. One may wonder how prisoners in a segregation unit can attack one another. Athough prisoners were mostly confined to their cells, some worked as tier tenders and had unsupervised access to the front of other cells; as such, there were occasions when cell doors were accidentally left ajar, and prisoners had sufficient access to one another to permit violence.

Then came an extraordinary development: Commissioner Epps and Deputy Commissioner Sparkman decided, even in the face of this deep crisis in security, to go forward and implement the recommendations of the classification task force. Deputy Commissioner Sparkman left his home in Jackson to live at Parchman for months, overseeing the release of several hundred carefully selected men into general population, walking among them, speaking and interacting with them, getting to know their histories, showing his staff at the prison that these men were not so dangerous that they needed to be in administrative segregation.

These were remarkable acts of courage—and they worked. Within a few months, a striking transformation of Unit 32 had taken place. In accordance with Dr. Austin's recommendations—and following a procedure to be described below—more than three fourths of the unit's population had been reclassified from administrative segregation to general population. Program and recreation areas were constructed. General population housing areas were created in housing areas that had previously been used to lock down prisoners. The prisoners in these housing areas could spend several hours per day out of their cells. Education and general mental health services were expanded. A dining hall was constructed, and for the first time, prisoners could eat meals together. In November 2007,

the parties entered into a far-reaching supplemental consent decree with the MDOC on classification, mental health, and use of force (*Presley v. Epps*, 2007).

## REVISION OF CLASSIFICATION AND SECURITY PROCEDURES

Before 2002, the MDOC used a subjective prisoner classification system, placing inmates in facilities and custody levels based solely on the subjective judgment of staff, as guided by agency policies. The MDOC decided to implement an objective prisoner classification system in 2002, consisting of an initial classification process and a reclassification process that, in theory, would allow prisoners to lower their custody levels if their conduct was good. The system was fully automated, which allowed for a comprehensive analysis of how prisoners were being classified and what factors were used to determine custody levels.

But the system had some serious design flaws that fostered overclassification and, in particular, increased the number of prisoners assigned to Unit 32. Dr. Austin found that prisoners were transferred directly from reception to Unit 32 even if they had not engaged in serious misconduct in prison; that redundancies in scoring resulted in overclassification; that some of the scoring items had never been validated among the MDOC population; that classification staff were making scoring errors; that some prisoners who simply required protection were being transferred to Unit 32; that a large number of prisoners were being retained in Unit 32 even though they had no serious misconduct reports for years; that required reassessments were not being done; and that the caseload for case managers was so large that they could not have adequate contact with prisoners.

Given these findings, Dr. Austin recommended a number of reforms. The first step was to develop more objective criteria for placement at Unit 32. Deputy Commissioner Sparkman worked with Dr. Austin to establish the criteria and implement the new system. The criteria that were finally adopted mandate that prisoners in Mississippi may be held in administrative segregation only if they have committed serious infractions, are active high-level members of a gang, or have prior escapes or escape attempts from a secure facility. The only permissible subjective basis for overriding these criteria is a finding by the commissioner (or the commissioner's designee) that housing the inmate in the general population would pose an unacceptable risk to the safety of staff and other prisoners.

When the classification staff employed the new criteria and reviewed all the prisoners in Unit 32, they discovered that nearly 80% of the population in administrative segregation did not meet the new criteria. Over the following 6 months, the number of prisoners assigned to administrative segregation at Unit 32 dropped from 1,000 to fewer than 150. Death-sentenced prisoners remained in segregation.

Criteria were also established, as modeled on a process in the Ohio Department of Corrections, that would allow the majority of prisoners to be released from administrative segregation within 12 months. The MDOC created a process that mandated a 90-day review for all prisoners in administrative segregation and a written case plan for each prisoner specifying what he must do to gain release from administrative segregation.

The changes that the MDOC adopted were not limited to Unit 32. The new classification system is expected to dramatically decrease the number of women in maximum custody and to increase the proportion of the statewide male population in minimum custody.

### A STEP-DOWN UNIT FOR PRISONERS WITH SMI

As required by the *Presley v. Epps* consent decree, mental health staff worked in close collaboration with custody staff to develop an intermediate-level treatment program, or step-down unit, for prisoners with SMI (Lovell, Allen, Johnson, & Jemelka, 2001; O'Connor, Lovell, & Brown, 2002). Prisoners who require an intermediate level of mental health treatment—equivalent to halfway house or day treatment in the community—are candidates for the step-down unit, which is jointly administered by Wexford Health Sources, the health and mental health contractor, and the MDOC.

Wexford and MDOC opted to keep the step-down mental health treatment unit inside Unit 32 but to move prisoners with SMI from administrative segregation status into congregate activities in program phases, at a pace that would not jeopardize safety in the facility (Adams & Ferrandino, 2008). Prisoners who require inpatient psychiatric services are transferred to an inpatient psychiatric unit at another facility—namely, the East Mississippi Correctional Facility.

The step-down unit was developed to treat prisoners who have to remain segregated for the time being and open-population prisoners (i.e., general-population prisoners) with SMI. The unit occupies two tiers, each containing 16 cells: an upper tier, housing segregated prisoners, and a lower tier, which is reserved for prisoners who have proved, by exhibiting appropriate behavior, that they can get along in an open unit. In fact, the step-down unit provides, for many prisoners, the portal for leaving administrative segregation. The program fosters movement from the closed tier to the open tier.

The target population is patients who have the most serious and intractable symptoms of mental illness and who experience the greatest impairment in functioning. The main criterion for admission to the step-down unit is a diagnosis that qualifies as a SMI. In addition, prisoners with other diagnoses, such as severe generalized anxiety disorder and posttraumatic stress disorder, qualify if there is significant disability. Any psychiatric disorder characterized by repetitive self-harm also qualifies a prisoner for admission. Preference for admission is given to motivated prisoners.

Prisoners begin in the closed or segregated tier, progress through the open tier, and then graduate and transfer from the step-down unit to general population. Treatment in the step-down unit is modeled on the assertive community treatment approach (Drake et al., 1998; Marx, Stein, & Test, 2003; Scott & Dixon, 1995). The idea is to deliver intensive mental health services to the place where the patients live and work and for staff working as a team to be assertive in gaining the patients' cooperation in the treatment. A positive psychology approach is employed, removing the focus from mental illness and, instead, focusing on "persons' intact faculties, ambitions, positive life experiences, and strengths of character, and how those buffer against disorder" (Duckworth, Steen, & Seligman, 2005, p. 631).

Prisoners earn passage to each successive phase. In the first phase, they learn about their illnesses and are educated about how to appropriately cope with anger, impulses, and anxiety. An incentive plan rewards appropriate behaviors, with incrementally more time alone in an activity room where they can access media equipment, use a library of educational materials and fiction, and use drawing and writing materials.

Group treatment and psychoeducation permit interconnectedness among prisoners who must remain separated for the time being. A group of four prisoners meet weekly for group treatment. The original plan for this group treatment was to construct therapeutic cubicles

in which the prisoners would sit during the sessions while remaining in the same room. However, the staff decided that it would be more practical, humane, and therapeutic to not use cubicles but rather keep group participants in ankle restraints attached to secure bolts in the floor. This was the minimum restraint that custody staff would allow. If animosities escalate, participants in the group cannot reach one another. In fact, the prisoners in the program have never lunged at anyone, but at their level of security, the ankle-to-floor restraints are required.

The next phase of treatment involves congregate, peer-facilitated programming. This phase takes place on the open-custody tier and lasts several months. Prisoners move about and enjoy congregate activities free of cuffs and ankle restraints. Topics addressed include domestic violence, mentorship, accountability, and moral reasoning.

The step-down unit employs a collaborative treatment team approach. The Risk Assessment Team includes mental health staff and key security personnel who come together on a weekly basis to work on quality care as well as security. Of course, confidentiality is an issue, and custody staff who work on the unit must agree to respect the prisoners' confidentiality to a reasonable extent while attending to security needs. In general, custody staff and mental health staff attend to the delicate balance between confidentiality and security concerns.

Staff selection and training are critical elements of an effective program. In April 2008, before the step-down unit could be officially implemented, a comprehensive mental health training curriculum was expressly designed for correctional officers. The administration approved a plan to require that any officer working on the step-down unit undergo training on mental health issues. The intensive training is conducted by trained and experienced mental health staff and veteran MDOC correctional officers. Completion of the mental health training is considered an honor and is thus celebrated in a ceremony where officer graduates are given a special uniform patch and awarded the title *correctional mental health manager*.

Prisoners remain in the step-down unit an average of 3 to 6 months. They are considered ready for discharge from the program when their treatment plans have been accomplished and their conditions have become stable. After being discharged, a prisoner may be readmitted if he experiences a relapse. If he is discharged for lack of compliance or behavioral issues, he may be considered for readmission following intensive individual treatment with mental health staff.

## CHANGES IN THE FACILITY AND IN THE BEHAVIOR OF PARTICIPANTS

### SERIOUS MISCONDUCT AND USE OF FORCE

After a large proportion of prisoners were transferred to general population within Unit 32 (necessitating the physical conversion of pods and buildings), the number of incidents requiring use of force plummeted (e.g., spraying a prisoner with immobilizing gas or taking down a recalcitrant prisoner). Monthly statistics showed an almost 70% drop in serious incidents, both prisoner-on-staff and prisoner-on-prisoner. Figure 1 reflects this development. Toward the end of 2006, the number of serious incidents began to decline, and they reached a nadir by January 2008. In the same period, incidents requiring the staff's use of force also significantly declined (see Figure 2).

8   CRIMINAL JUSTICE AND BEHAVIOR



**Figure 1:   Serious Incidents at Unit 32, 2006–2008**



**Figure 2:   Use of Force at Unit 32, 2007–2008**

From 2006 through 2008, the population of Unit 32 also varied, from a high of approximately 990 in August 2006 to a low of fewer than 600 by October 2008. (By this time, the census included administrative segregation and general population.) For various reasons, the MDOC transferred some of the prisoners who had been reclassified to general population out of Unit 32. January 2008 became the first time that the population dipped lower than 800. Thus, the sharp reduction in rates of serious incidents and use of force that occurred between late 2006 and January 2008 took place while the total population in Unit 32 remained relatively constant.

Austin Dec - Page 24



**Figure 3:   Rates of Serious Incidents and Use of Force per 100 Inmates**

In early 2008, when the population dipped beneath 800, a calculation of the rate of serious incidents and use of force (i.e., the ratio of events to 100 prisoners) reflected occasional spikes (see Figure 3). The prisoners remaining in administrative segregation subsequent to the transfer of a majority of prisoners to general population were a relatively more disruptive subpopulation; as such, with the reduced population, repeated disciplinary infractions by a few individuals register as a larger spike on the graph. Even so, the raw number of serious incidents remained relatively low throughout.

Developments reported in this article did not occur under entirely controlled conditions in a laboratory. The results would have been more impressive had the total population in Unit 32 been kept constant subsequent to the revision of the classification system and the establishment of the step-down unit. But the MDOC had to maintain operations and could not permit outcome research to determine practices regarding institutional housing.

In reviewing changes at one unit, one must take into account changes that occur at other units and at other state facilities that may be counterproductive. In some states, compliance with a court's consent decree to downsize a supermaximum security unit or to exclude prisoners with SMI from isolated confinement has resulted in the transfer of this population to some form of segregation at a different facility not under the court's jurisdiction (e.g., *Jones 'El v. Berge*, 2001). In the MDOC, recent statewide figures reflect that this kind of nutshell game has not occurred. As noted above, by February 2009, the number of prisoners in administrative segregation at Unit 32 had decreased from just over 900 to below 100 (an additional 70 to 80 prisoners remain on segregation status on death row). Meanwhile, as of March 2009, the statewide number in administrative segregation (outside of death row) is 181. The population of MDOC is approximately 21,000, which means that about 1% of the entire prison system is housed in long-term administrative segregation. Most states have at least 3% of their prisoner population in administrative segregation at any given time (Austin & McGinnis, 2004). Thus, the percentage of MDOC prisoners in administrative segregation is relatively low, and it did not rise in other units or institutions when the percentage of prisoners on administrative segregation status at Unit 32 was vastly reduced.

Austin Dec - Page 25

**TABLE 1:   Rule Violation Reports Before, During, and After Participation in the Step-Down Unit**

|  | Rule Violation Reports | |
| --- | --- | --- |
| Period | n | M |
| Six months before step-down unit | 203 | 4.7 |
| While in step-down unit | 50 | 1.2 |
| Six months after step-down unit | 27 | 0.6 |

### OUTCOMES IN PRISONERS WITH SMI

Prisoners, custody staff, and mental health staff provide positive assessments of the step-down unit. Of course, prisoners with SMI had been heavily overrepresented in the earlier serious disciplinary incidents, and it is obvious to mental health and custody staff that participation in the step-down unit has helped to keep this group out of trouble.

One reflection of this outcome lies in the number of rule violation reports (RVRs), or tickets, that participants in the step-down program acquired as they went through the process—that is, before participating in the program, while participating in the program, and after being discharged from the program. A recent compilation (February 12, 2009) reflected that 43 prisoners with SMI had completed the step-down unit program and had been discharged. A search of their disciplinary records revealed that in the 6 months before their admission to the program, this group received 253 RVRs, an average of 4.7 RVRs per prisoner; while in the program (for an average stay of 6 months), they received 50 RVRs, an average of 1.2 per prisoner; and in the 6 months after they completed the program, they accounted for 30 RVRs, for an average 0.6 per prisoner (for overview, see Table 1).

Prisoners have been writing to request transfer into the program, and the program has proved to be an effective point of entry into mental health treatment for previously non-compliant prisoners with SMI. Prisoners in the program report that they expect to be treated with respect and not be inappropriately punished or otherwise abused.

Recently, the step-down unit successfully graduated most of the Security Threat Group leadership who were participants. One former leader has been granted Open C custody (essentially, general population privileges); two other leaders graduated with honors. One of these prisoners will be released from prison in the near future and plans on lecturing youth on "going straight in life."

### DISCUSSION

The results of this series of events at Unit 32 contradict some widespread assumptions about supermax administrative segregation. The popularity of supermaximum security units is premised on the assumption that the dangerous prisoners confined therein cannot program safely at any lower level of security and that violence and misconduct in the prisons cannot be controlled without keeping a growing number of dangerous prisoners in long-term administrative segregation. An extrapolation of this assumption suggests that releasing the majority of prisoners from supermax to general population will result in increases in the rates of violence, serious disciplinary incidents, and use of force. The fall

in these rates, following the transfer of a majority of prisoners out of administrative segregation at Unit 32, contradicts that assumption.

Of course, the MDOC classification system was flawed before the developments described here were initiated. Could that mean that the men consigned to administrative segregation at Unit 32 were simply not the most dangerous in the MDOC and that, because of a uniquely flawed classification system in the MDOC, the results of changes at Unit 32 cannot be generalized to other correctional settings? The number of prisoners in administrative segregation throughout the MDOC remains relatively low today. Most of the prisoners who were released from administrative segregation remain in general population, thus making it unlikely that the placement of the wrong group of prisoners in supermax security explains the reported findings. Also, attorneys and experts in the Mississippi lawsuits who have taken part in investigations and litigation in other states report that it is not unusual for supermaximum security units to contain a significant proportion of prisoners who are not especially prone to violence. Classification systems in many other departments of correction contain flaws equivalent to those in the earlier MDOC system. Furthermore, among the approximately 800 prisoners transferred from administrative segregation to general population, many had been convicted of violent crimes and had been assaultive earlier in their prison careers; however, when they were transferred out of administrative segregation, most of them did not proceed to get into trouble.

Prisoners who remain in administrative segregation at Unit 32 have relatively serious misconduct records; as such, the residual administrative segregation population at Unit 32 is a difficult population to manage and treat (Cohen, 2006). Even so, Unit 32 today has relatively low rates of serious incidents and use of force. Many factors must be considered if we are to understand this phenomenon. Because the classification system was revised and the review process permitted prisoners in administrative segregation to earn their way to general population, they must have felt as though they were being treated with fairness and that they had greater hope for gaining freedom—all of which must have helped them control their tempers and their behavior. In addition, in the course of the litigation, the MDOC administration focused greater attention on the professionalism of custody staff, and a subgroup of custody staff received training in mental health. These changes, plus the reduction in crowding as the population of Unit 32 declined, all played into a greater sense of fairness and calm within the facility (Haney, 2008). The overall result is far fewer prisoners in need of administrative segregation.

There was a sharp decrease in the number of RVRs accumulated by prisoners with SMI after they were transferred to the step-down unit, which strongly supports a conclusion that prisoners with SMI tend to suffer psychiatric deterioration and get into disciplinary trouble in supermax administrative segregation; as such, they fare much better in treatment programs (Condelli et al., 1994; Lovell, Johnson, & Cain, 2007; Metzner & Dvoskin, 2006). Clearly, the changed management of prisoners with SMI played a part in reducing the number of serious incidents and use of force at Unit 32.

Of course, this is a preliminary report of the outcome of changes in classification and mental health treatment at Unit 32. Problems remain and monitoring is ongoing, but the problems encountered are less generalized, and a collaborative approach to their resolution is much more the standard operating procedure. For example, on a recent monitoring tour, plaintiffs' attorneys and experts heard allegations from prisoners regarding excessive force—specifically, the inappropriate use of immobilizing gas. These allegations were reported to the

superintendent and deputy commissioner, and a procedure was put into place to investigate allegations as well as make absolutely clear to staff and prisoners that inappropriate use of force by officers will not be tolerated. Another problem being addressed involves delays in accomplishing warranted transfers and other rewards for successful completion of phases in the step-down unit.

Tough issues remain. The monitor and plaintiffs' attorneys would like to see more amenities and freedoms for prisoners in the step-down unit. An even more thorny issue is the management of prisoners in the step-down unit who break rules or commit assaults. Should they be ejected from the treatment program? And, if so, where can they go and receive the treatment they need? As we write, the parties are discussing the housing and mental health treatment of prisoners whose misconduct results in their ejection from the step-down unit. Meanwhile, much has been accomplished at Unit 32.

## DEBATING ADMINISTRATIVE SEGREGATION

There is an ongoing national debate about the need for evermore severe restrictions and harsher punishments in corrections (Cohen, 2006; Scharff-Smith, 2006). Mounting prison violence was a major part of the rationale for transferring so many prisoners into some form of segregation. But does long-term administrative segregation actually improve the situation? The big problem with locking prisoners down is that the majority of them must be eventually released (Kupers, 2008). The results of changes at Unit 32 support the notion that, on average, long-term administrative segregation—especially if prisoners perceive it as being unfair and indefinite—will in many cases exacerbate misconduct and psychiatric dysfunction.

The developments described here also illustrate something about the effect of litigation on corrections. When litigation is brought, the state too often believes that it has to defend its policies and practices, and it is slow or resistant in responding to consent decrees and court orders. But when the parties to the litigation reach an amicable negotiated settlement, as memorialized by the court in a consent decree, then a more collaborative approach to effecting change becomes possible (Cohen & Aungst, 1997). In Mississippi, the administration of the Department of Corrections eventually welcomed the changes demanded by the plaintiffs in a series of class-action lawsuits, which cleared the way for the changes to be put into effect in an atmosphere of strong collaboration. As such, there are at least two levels of collaboration: The expert witnesses in the litigation essentially became consultants to the MDOC, and within the MDOC, there was greatly improved collaboration between custody and mental health staff in effecting the agreed-on changes. The writing of this article is just one of many products of that collaboration.

In this kind of collaborative process, it becomes possible to devise management and treatment strategies for prisoners who might otherwise be considered incorrigible. Hans Toch points out that the older notion that a prisoner's misbehavior is due to either badness or madness misses the fact that for many prisoners, there is both madness and badness— that is, the disturbed/disruptive prisoner (in Toch & Adams, 2002). In fact, effective strategies have been devised to intervene with disturbed/disruptive prisoners (Jones, 2004; Toch & Adams, 2002; Toch & Kupers, 2007). Outcome studies reflect that such methods work (Jones, 2004; Lovell et al. 2001).

The assumption that a large number of prisoners are beyond help and will never change their unacceptable behaviors, when coupled with the practice of locking them in segregation and punishing them harshly, predictably leads to worse behavior problems on the part of those locked away. Alternatively, when custody and mental health experts put their heads together, devise creative approaches to the management and treatment of some of the most difficult cases, and give prisoners clear and incremental requirements to win greater freedom, great strides are made.

# REFERENCES

Adams, K., & Ferrandino, J. (2008). Managing mentally ill inmates in prisons. *Criminal Justice and Behavior, 35*, 913-927.

Austin, J., & McGinnis K. (2004). *Classification of high risk and special management prisoners: A national assessment of current practices*. Washington, DC: National Institute of Corrections.

Briggs, C. S., Sundt, J. L., & Castellano, T. C. (2003). The effect of supermaximum security prisons on aggregate levels of institutional violence. *Criminology, 41,* 301-306.

Cohen, F. (2006). Isolation in penal settings: The isolation–restraint paradigm. *Washington University Journal of Law & Policy, 22,* 295.

Cohen, F. (2008) *The mentally disordered inmate and the law* (2nd ed.). Kingston, NJ: Civic Research Institute.

Cohen, F., & Aungst, S. (1997). Prison mental health care: Dispute resolution and monitoring in Ohio. *Criminal Law Bulletin, 33*, 299-327.

Condelli, W. S., Dvoskin, J. A., & Holanchock, H. (1994). Intermediate care programs for inmates with psychiatric disorders. *Bulletin of the American Academy of Psychiatry and the Law, 22,* 63-70.

Drake, R., McHugo, G., Clark, R., Teague, G., Xie, H., Miles, K., et al. (1998). Assertive community treatment for patients with co-occurring severe mental illness and substance abuse disorder: A clinical trial. *American Journal of Orthopsychiatry, 68,* 201-215.

Duckworth, A., Steen, T., & Seligman, M. (2005). Positive psychology in clinical practice. *Annual Review of Clinical Psychology, 1,* 629-651.

Gates v. Cook, 376 F.3d 323 (5th Cir. 2004).

Grassian, S., & Friedman, N. (1986). Effects of sensory deprivation in psychiatric seclusion and solitary confinement. *International Journal of Law and Psychiatry, 8,* 49-65.

Haney, C. (2008). A culture of harm: Taming the dynamics of cruelty in supermax prisons. *Criminal Justice and Behavior, 35,* 956-984.

Hodgins, S., & Cote, G. (1991). The mental health of penitentiary inmates in isolation. *Canadian Journal of Criminology, 33,* 175-182.

Jones, D. (Ed.). (2004). *Working with dangerous people: The psychotherapy of violence*. Oxon, UK: Radcliffe Medical Press.

Jones 'El v. Berge, 164 F. Supp. 2d 1096 (W.D. Wis. 2001).

Kupers, T. (2008). What to do with the survivors? Coping with the long-term effects of isolated confinement. *Criminal Justice and Behavior, 35,* 1005-1016.

Lovell, D., Allen, D., Johnson, C., & Jemelka, R. (2001). Evaluating the effectiveness of residential treatment for prisoners with mental illness. *Criminal Justice and Behavior, 28,* 83-104.

Lovell, D., Johnson, C., & Cain, K. C. (2007). Recidivism of supermax prisoners in Washington State. *Crime & Delinquency, 53*, 633-656.

Madrid v. Gomez, 889 F Supp. 1146 (N.D. Calif., 1995).

Marx, A., Stein, L., & Test, M. (2003). *Assertive community treatment (ACT) implementation resource kit*. Washington, DC: U.S. Substance Abuse and Mental Health Services Administration.

Metzner, J., & Dvoskin, J. (2006). An overview of correctional psychiatry. *Psychiatric clinics of North America, 29,* 761-772.

O'Connor, F., Lovell, D., & Brown, L. (2002). Implementing residential treatment for prison inmates with mental illness. *Archives of Psychiatric Nursing, 15*, 232-238.

Presley v. Epps, No. 4:05CV148-JAD, N.D. Mississippi (2005 and 2007).

Rhodes, L. (2004). *Total confinement: Madness and reason in maximum security*. Berkeley: University of California Press.

Riveland, C. (1999). *Supermax prisons: Overview and general considerations*. Washington, DC: U.S. Department of Justice, National Institute of Corrections.

Russell v. Johnson Civil No. 1:02CV261-D-D; consolidated with Gates v. Cook No. Civil No. 4:71CV6-JAD (N.D. Mississippi, 2003).

Scharff-Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. In M. Tonry (Ed.), *Crime and justice* (Vol. 34, pp. 441-528). Chicago: University of Chicago Press.

Scott, J. E., & Dixon, L. B. (1995). Assertive community treatment and case management for schizophrenia. *Schizophrenia Bulletin, 21,* 657-668.

Toch, H., & Adams, K. (2002) *Acting out: Maladaptive behavior in confinement.* Washington, DC: American Psychological Association.

Toch, H., & Kupers, T. (2007). Violence in prison: Revisited. *Journal of Offender Rehabilitation, 45*(3/4), 1-28.

U.S. Bureau of Justice Statistics. (2006). *Special report: Mental health problems of prison and jail inmates.* Washington, DC: U.S. Department of Justice. Retrieved June 18, 2009, from http://www.ojp.usdoj.gov/bjs/pub/pdf/mhppji.pdf

**Terry A. Kupers**, MD, MSP, is institute professor at the Wright Institute and practices psychiatry in Oakland, California. He serves as contributing editor of *Correctional Mental Health Report.*

**Theresa Dronet**, PhD, is associate director of mental health programs for Wexford Health Sources. She has also worked as a clinician in private practice and in the Office of Public Health in Louisiana.

**Margaret Winter** is associate director of the National Prison Project of the American Civil Liberties Union. She has argued before the U.S. Supreme Court and represented prisoners in class-action cases challenging conditions of confinement in prisons and jails around the nation. She served as a consultant to the Commissioner of the Mississippi Department of Corrections' task force on HIV-positive inmates' access to programs.

**James Austin**, PhD, has been president of the JFA Institute since 2003. Before that, he was the director of the Institute of Crime, Justice, and Corrections at George Washington University and an executive vice president for the National Council on Crime and Delinquency.

**Lawrence Kelly** is superintendent of the Mississippi State Penitentiary at Parchman. He is a 27-year veteran of corrections and holds a bachelor of science in criminal justice. He is also a recipient of the Heroism Award, Criminal Justice Professional of the Year Award and the Commissioner's Distinguished Service Award.

**William Cartier**, PhD, is psychologist and director of the Step-Down Unit at Unit 32. He is a neuropsychologist with an extensive background in behavioral science and addiction.

**Timothy J. Morris** is warden at Unit 32. He holds a bachelor of science in criminal justice. He has been with the Mississippi Department of Corrections since 1989 and is a member of the North American Association of Wardens and Superintendents.

**Stephen F. Hanlon** is a partner in Holland & Knight, LLP, managing the firm's Community Services Team. He has a long history in public interest and civil rights law, including housing, employment and AIDS discrimination, death penalty litigation, prisoner rights, and a constitutional challenge to nonconsensual medical experimentation.

**Emmitt L. Sparkman** is deputy commissioner for institutions of the Mississippi Department of Corrections. His corrections career spans 34 years, beginning as a correctional officer in Texas.

**Parveen Kumar**, MD, has been the chief psychiatrist for Wexford Health Sources in the state of Mississippi since 2006. He has also worked at the Mississippi State Hospital and the Veterans Administration Hospital in Jackson, Mississippi.

**Leonard C. Vincent** is general counsel for the Mississippi Department of Corrections. He has been in that position for 33 years and has served as an educator, psychometrist, and warden.

**Jim Norris** is a senior attorney with the Mississippi Department of Corrections, with 30 years of experience in correctional litigation.

**Kim Nagel**, MD, is a staff psychiatrist at Mississippi State Penitentiary. He trained in psychiatry at the University of Colorado and was assistant clinical professor of psychiatry there from 1983 to 2003. He has coauthored three books on sleep disorders and has written about psychopharmacology, mood disorders, and substance abuse.

**Jennifer McBride** is assistant regional mental health director and training ambassador for Wexford Health Sources in the state of Mississippi. She is also a doctoral student at Delta State University, Cleveland, Mississippi.