1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARK D. ROSENBAUM, SBN 59940
PETER J. ELIASBERG, SBN 189110
ACLU FOUNDATION OF
  SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297
E-mail: peliasberg@aclu-sc.org

MARGARET WINTER,* Pro Hac Vice
ERIC BALABAN
ACLU NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington D.C. 20005
Telephone: (202) 548-6609
Facsimile: (202) 393-4931
E-mail: dfathi@npp-aclu.org
*Not admitted in D.C.; practice limited to federal courts

Attorneys for Plaintiffs
(continued on next page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, et al,

          Plaintiffs,

      v.

LEROY BACA, as Sheriff of the
County of Los Angeles, et al.,

          Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. Civ. 75-04111-DDP

**SUPPLEMENT TO DECEMBER 15, 2009 DECLARATION OF DR. JAMES AUSTIN (Dkt. No. 205-2)**

MELINDA BIRD, SBN 102236
DISABILITY RIGHTS CALIFORNIA
3580 Wilshire Boulevard, Suite 902
Los Angeles, CA  90010
Telephone: (213) 355-3605
Facsimile: (213)427-87-67
E-mail: melinda.bird@disabilityrightsca.org

STACY W. HARRISON, SBN 175028
BINGHAM MCCUTCHEN LLP
1620 26th Street
4th Floor, Main Tower
Santa Monica, California 90404
Telephone: (310) 907-1000
Facsimile: (310) 907-2000
E-mail: stacy.harrison@bingham.com

1       In anticipation of the March 18-19 tour by the Court and the parties of the

2   Los Angeles County Jail with, among others, Dr. James Austin, Plaintiffs submit in

3   further support of Dr. Austin's credentials an additional exhibit (Exhibit 2 - an

4   article entitled "Reforming Mississippi's Prison System" by the JFA Institute) to

5   those attached to his December 15, 2009 Declaration (Dkt. No. 205-2).  Article

6   attached hereto.  Dr. Austin is the President of the JFA Institute.  *See*

7   www.jfa-associates.com/.  The article describes Mississippi's efforts to reduce its

8   prison population and work done by the JFA Institute in support of that effort.  The

9   article may also be found at website for the Pew Center for the States,

10  http://www.pewcenteronthestates.org/initiatives_detail.aspx?initiativeID=56957.

11  Dated:   February 19, 2010

12                                        Respectfully Submitted,

13                                        ACLU FOUNDATION OF
                                      SOUTHERN CALIFORNIA

14                                          ACLU NATIONAL PRISON
15                                          PROJECT

16                                          DISABILITY RIGHTS CALIFORNIA

17                                          BINGHAM MCCUTCHEN LLP

18

19                                        By:   s/ Peter Eliasberg
20                                            Peter Eliasberg
                                        Attorney for Plaintiffs

21

22

23

24

25

26

27

28

1

# EXHIBIT
# 2

# Reforming Mississippi's Prison System

Prepared by the JFA Institute
with assistance from the Mississippi Department of Corrections
for the
Public Safety Performance Project, the Pew Center on the States

Like many states, Mississippi has been struggling with an ever increasing prison population and the costs associated with that system.  But unlike most other states, Mississippi has recently enacted a series of sentencing reforms with bi-partisan support that have resulted in a fundamental shift in its prison population trends.  This paper describes how this occurred and the preliminary effects on the correctional system and public safety.

The Mississippi story provides several important lessons for other states seeking to curb their prison populations.  First, without leadership from the Executive and Legislative branches of state government reform is unlikely to occur. Second, reductions in the growth of prison populations can be most effectively achieved by modifying current sentencing laws and adjusting correctional practices that govern how long a person is imprisoned. Together the legislative and administrative reforms have resulted in Mississippi fundamentally modifying the projected prison population at a considerable savings to the state while maintaining public safety. These add up to some very substantial reforms for a law and order state with a conservative governor.

One common thread connecting the reforms is the corrections commissioner, Chris Epps. Appointed by a Democratic governor in 2002, Commissioner Epps was given little chance to retain his job when Governor Haley Barbour was elected. But Commissioner Epps met with Governor Barbour, presented a plan for effectively managing the Mississippi Department of Corrections ("DOC"), and was retained. The commissioner personally promoted the parole eligibility changes this year in the Legislature, where he knows every lawmaker by his or her first name.

While budget concerns were certainly a key catalyst for legislative passage of the parole eligibility expansion, Governor Barbour and other state leaders acknowledged that they viewed it as smart policy as well. As Governor Barbour's former spokesman, Pete Smith, stated:

> "The majority of inmates have a release date - meaning at some point in the future, they will return to society.  This legislation was more about re-entry than it was budget concerns.  By focusing on inmates convicted of nonviolent crimes and having no violent crimes in their criminal history, we created a mechanism to transition - with parole board approval - a population of inmates back into society."[1]

---

[1] Personal Interview, via email, July 10, 2008.

Austin Dec, Exhibit 2, Page 2

**The Impetus for Sentencing Reform**

Like many states, Mississippi adopted truth-in-sentencing laws in the mid-1990s requiring inmates to serve at least 85% of their sentence before release consideration. But unlike other states that limited the 85% rule to persons convicted of violent crimes, the 1995 legislation in Mississippi required *all* offenders to serve at least 85% of their sentence.[2] Prior to the 1995 change, prisoners were required to serve out their sentence less good time credits. And most prisoners were eligible for discretionary parole release after serving one-quarter to one-third of their sentence and flat-time release after serving 50% of their sentence. Parole grant rates (the chance that an inmate will receive parole release on his or her first eligibility date) under this sentencing structure averaged 50%. Under the new sentencing structure passed in 1995, grant rates declined – 26% for men, 32% for women – and offenders began serving a substantially longer percentage of the imposed sentence.

As a result, Mississippi's prison population has more than doubled since 1994, from 11,250 to 22,800 by 2007. The state's incarceration rate in 1994 was about 400 per 100,000 resident population and had increased to approximately 735 per 100,000 residents population by 2007 – the second highest rate in the United States. In 1994, the DOC budget was $109.6 million. By 2007, the prison budget was $327 million, and the three state prisons were at 99% of capacity.

In recent years, a few legislators and Commissioner Epps have fought to allow certain offenders to reduce the incarceration portion of their sentence by accumulating good time credits. In 1999, new legislation allowed trusties, inmates given certain privileges based on prior good behavior, to earn 10 days of good time for every 30 days served (Trusty Earned Time).[3] In 2001, the state reinstated parole eligibility retroactive to January 1, 2000 for first time non-violent offenders except for those convicted of sale or manufacture of drugs or offenses with enhanced penalties.[4] Additionally in 2004, new legislation increased the trusty earned time allowance for certain offenders to 30 days credit for every 30 days in trusty status.[5] This legislation, however, made most drug offenders ineligible for any type of trusty time. However, these reforms were insufficient to stem the growing tide of prisoners.

**Legislative Reforms Since 2007**

In 2008, lawmakers took a dramatic step by approving a bill, SB 2136, that permits all nonviolent offenders to once again become eligible for parole after serving 25% of their sentence.[6] The basic intent of this reform was to modestly reduce the amount of time a prisoner is incarcerated. Underpinning this reform was the fact that both in Mississippi and elsewhere there is little if any statistical relationship between how long a person is

---

[2] Miss. Code Ann. §§ 47-7-3, 47-5-138 and § 47-5-139 (June 30, 1995).
[3] Miss. Code Ann. § 47-5-138.1 (April 15, 1999).
[4] Miss. Code Ann. § 47-7-3 (July 1, 2001).
[5] Miss. Code Ann. § 47-5-138.1 (April 28, 2004).
[6] Miss. Code Ann. § 47-7-3 (April 7, 2008).

Austin Dec, Exhibit 2, Page 3

imprisoned and recidivism rates. This means that prisoners serving 6, 12, 24, or 36 months have similar recidivism rates.[7] So any reform that serves to modestly reduce the period of imprisonment will not negatively impact recidivism rates. However, a modest decline in the length of stay will have a dramatic impact on the size of the prison population.

One of several champions for the changes in the Legislature was Sen. Willie Simmons of Cleveland, chairman of the Senate Corrections Committee. Prior to his election in 1992, Simmons was a Pre-release Counselor and Deputy Director of Corrections. Despite the bipartisan support that SB 2136 ultimately received, Sen. Simmons said many of his colleagues were wary of being viewed as soft on crime when first asked to support the measure.

"Anything that puts them in that light is not good politics for them," Sen. Simmons said. "But the corrections budget just kept growing, and every year, it was taking away from everything else across the board. So the timing was right, and we were able to convince people to go along with it."[8]

While there was some opposition, Sen. Simmons said it was "very unusual" that legislators did not receive more criticism for the new policy. "It just shows it was important and that something needed to be done."[9]

Commissioner Epps was a key player in drumming up votes for the new law, in part by reassuring lawmakers during committee testimony that public safety would not be put at risk. "He made a point of telling them that these are not the offenders you're afraid of, they are the ones you're mad at, and for them there are other alternatives," recalled Deputy Corrections Commissioner Emmitt Sparkman. "He said, 'We're not going to put people out on the street who are a threat to public safety,' and he was very persuasive."[10]

Governor Barbour, for one, was convinced. And not just by the predicted savings the bill would deliver for his economically stressed state. As his spokesman, Pete Smith said, "To release inmates solely based on cost would not be prudent. The driving force behind this bill was a practical matter of good policy."[11]

At the time the bill was passed, it was estimated that the new law would impact approximately 4,500 inmates, or about 25% of the 22,800 total population. A unique feature of SB 2136 was that it was applied retroactively in order to have an immediate impact on the prison population and to ensure equity in the sentencing process. About 3,000 inmates or 12% of the total population had already met their time-served requirement and were immediately eligible for parole consideration. This created a

---

[7] Langan, Dr. Patrick A., and Dr. David J. Levin, *Recidivism of Prisoners Released in 1994,* U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: June 2002).
[8] Personal Interview, via telephone, July 9, 2008.
[9] Personal Interview, via telephone, July 9, 2008.
[10] Personal Interview, via telephone, July 3, 2008.
[11] Personal Interview, via email, July 10, 2008.

Austin Dec, Exhibit 2, Page 4

situation where the parole board, with a new chairwoman, had to quickly increase its capacity to conduct hearings and begin processing cases.

One wild card was whether the parole board would continue its past low parole grant rates – 26% for men, 32% for women — or perhaps even reduce that rate out of caution. A further and related complication was that the parole board had no parole risk instrument that could be applied to the cases to determine which persons were best suited for release.  To assist the state, the Bureau of Justice Assistance provided immediate technical assistance through the JFA Institute to design and implement a parole risk instrument. Case managers were quickly trained in the new instrument and began screening the cases prior to parole consideration.

As noted above, the affected inmates are those who have never been convicted of a violent crime.  Through August 2009, about 3,100 prisoners had been paroled due to the new law.  The mean sentence length of these people is 7 years with a median (the more typical) sentence length of 5 years.  Using the median sentence length, prior to the law these prisoners would be eligible for release at 85% or after serving about 4.25 years. With the new law, the same prisoners are eligible after serving 25% or 1.25 years. This is a difference of 3 years of imprisonment.  But bear in mind that it only impacts the parole eligibility date and does not guarantee a prison release. If the parole board maintains its historical low grant rates of 26-32%, only a minority of the affected prisoners would benefit from the new law.

The JFA Institute also provided various forecasts for the state to estimate the impact of the new law.  Prior to 2008, the JFA Institute estimated that the prison population would grow to nearly 28,000 if the bill was not passed. Various scenarios were modeled by the JFA Institute based on different parole grant rates.  If the Board retained its grant rate at the 26-32% level, the reduction in time served resulting from the earlier parole eligibility would keep the population flat and allow Mississippi to avoid building and operating an additional 5,000 prison beds over the next 10 years.

Finally, this past year there have been two other legislative amendments.  One allows the Commissioner to award additional meritorious earned time (MET) after the person reaches the prior 180-day limit.[12] MET moves up both the parole eligibility date and the offender's release date.  The second reform expands the department's authority to allow persons convicted of most drug crimes to be placed under house arrest with electronic monitoring.[13]  While not reducing the prisoner's length of sentence or incarceration, it does allow the department to place a greater number of prisoners under house arrest status rather than in a correctional facility.

**Results to Date**

The major impact of these recent reforms has been the elimination of the projected increase in the prison population. As shown in Figure 1, a few months after the 2008

---

[12] Miss. Code Ann. § 47-5-142 (March 9, 2009).
[13] Miss. Code Ann. § 47-5-1003 (April 7, 2009).

4

Austin Dec, Exhibit 2, Page 5

legislation went into effect the projected growth was eliminated and Mississippi's prison population actually has steadily declined.

This decline in 2008 and through 2009 was largely produced by the Parole Board hearing a larger number of cases each month due to SB 2136 and in particular the fact that the law was retroactive to the existing prisoner population (see Figure 2). But equally important was the fact that the Board modestly increased its parole grant rate (Figure 2). This was due in part to the new parole risk instrument that was helping the Board assess each case.

The increases in parole hearings and the grant rate were expediting parole releases, which in turn began a surge in the parole population (see Figure 3).  In anticipation of the surge in the parole population, the DOC reallocated its existing parole resources to meet the demand in supervision.  But ultimately the state will need to alter how long parolees are supervised. Currently, the DOC is exploring the method adopted successfully by Nevada where parolees and now probationers continue to receive the same good time credits they were receiving as a prisoner.

How has this impacted parole revocations? Despite the increase in the parole population, the rate of parole revocations has not changed. There has been an uptick in the number of parole revocations as one would expect given the growth in the parole population. But the rate of revocations per 1,000 has remained constant.

The Department of Corrections is also tracking those prisoners who have benefited from SB 2136.  Through August 2009, 3,076 prisoners had been released under the law.  Their median sentence was 5 years and they served approximately 2.5 years before being released or about 50% of their sentence. The 50% time served is about midway between the 25% new parole eligibility and the 85% old eligibility, which reflects the fact that the bill was made retroactive, but also that not all prisoners are being released at their earliest date of eligibility. The median amount of time between the old parole eligibility date and the actual (new) parole release date is 13 months, which is a reflection of how time served is being reduced for many of these people.

Of the nearly 3,100 prisoners who have been released, 121 (or 4%) had been returned to custody. Of the 121 returnees, all but five were returned for technical parole violations. Of the five returned for new crimes, four were returned for burglary crimes and one for a DUI. This initial recidivism rate of 0.2% (return for a new offense) in the first year is a fraction of the national rate of 10.4%.[14]  These results are encouraging, but should not come as a surprise considering that any reform that modestly reduces the length of stay in prison should not be expected to increase recidivism.

All of these new trends have resulted in the JFA Institute modifying the official population projection.  As shown in Figure 4, the long-term estimate is now flat rather than increasing to nearly 28,000 by the year 2017.  The reason the prison population is not expected to continue to decline is due to the fact that the new laws do not impact all

---

[14] *Recidivism of Prisoners Released in 1994,* p. 3.

Austin Dec, Exhibit 2, Page 6

offenders.  There is still a significant percentage of the prison population who must serve a substantial portion of their sentence, which in some cases is the full term.  This is creating a "stacking effect" in the prison population and restricting further population reductions. Under this scenario, the effects of SB 2136 and expanded meritorious good time will have a diminishing effect.  This can be seen in Figure 2, where the number of parole hearings and the grant rate have begun to decline.   Nevertheless, both the immediate and long-term effects of the Mississippi reforms have averted a major prison crowding crisis both now and for the future, and have done so while maintaining public safety.



Figures 1 through 4 based on original analysis produced for this report by James Austin, JFA Institute, November, 2009.  Original data provided by the Mississippi Department of Corrections.

6



Figure 2. Mississippi Parole Hearings and Parole Grant Rate 2007-2009



Figure 3.  Mississippi Parole Population, Revocations  and Revocation Rate 2007-2009

7



Austin Dec, Exhibit 2, Page 9