# Annual Report on Conditions Inside
# Los Angeles County Jail

## 2008-2009

ACLU National Prison Project
ACLU of Southern California
**May 6, 2010**

**Principal Authors**

**Mary Tiedeman**
**Jails Project Coordinator, ACLU of Southern California**

**Daniel Ballon**
**Pro Bono Fellow, ACLU of Southern California**





# CONTENTS

EXECUTIVE SUMMARY ......................................................................................... 1

I.     METHODOLOGY ........................................................................................ 3

II.    VIOLENCE AND RETALIATION ................................................................. 9

     A.    Deputy Abuse............................................................................................. 10

     B.    Retaliation................................................................................................. 13

     C.    Failure to Protect the Safety and Well-Being of Prisoners ................................... 19

     D.    Recommendations: Eradicating the Culture of Violence..................................... 21

III.    MENTAL HEALTH CARE IN MEN'S CENTRAL JAIL ............................................... 24

     A.    Problems with Initial Mental Health Assessments and Access to Mental Health

          Care at MCJ ............................................................................................. 27

     B.    Overcrowded and Noxious Conditions at MCJ Exacerbate Mental Illness and

          Overwhelm the Facility's Very Limited Mental Health System ........................... 31

     C.    Problems with Confidentiality of Care .................................................. 34

     D.    Improper Disciplinary Measures Used on Prisoners

          with Mental Illness............................................................................... 35

     E.    Recommendations.................................................................................. 37

IV.    UNSAFE AND UNSANITARY FACILITIES AT MEN'S CENTRAL JAIL................. 40

     A.    Problems with Spatial Density........................................................... 40

     B.    Poor Living Conditions at MCJ are Exacerbated by Overcrowding ................... 45

          1.    Unsanitary Living Conditions................................................. 46

|  | 2. | Plumbing Problems ................................................................ | 48 |

|  | 3. | Lack of Access to Showers ..................................................... | 49 |

|  | 4. | Linen Exchange ..................................................................... | 52 |

| C. | Recommendations ............................................................................ | 54 |

| V. | DISCIPLINE AT MEN'S CENTRAL JAIL .................................................. | 55 |

| A. | LASD Disciplinary Policy and Actual Practice ...................................... | 55 |

|  | 1. | Disciplinary Policy ............................................................... | 55 |

|  | 2. | Defective Procedures ............................................................. | 55 |

| B. | Disciplinary Segregation ................................................................ | 58 |

|  | 1. | Solitary Confinement ............................................................. | 58 |

|  | 2. | Mental Disability and Discipline ............................................. | 60 |

| C. | Recommendations ............................................................................ | 61 |

| VI. | CONCLUSION ........................................................................................ | 63 |

# Acknowledgments

This report is a compilation of more than one year's worth of time, effort and dedication. As such, we have many people to thank for their part in completing it.

First, we would like to thank the thousands of prisoners who contacted the ACLU Jails Project to discuss their experiences at Men's Central Jail (MCJ). Their courage and willingness to share their stories, despite often having fears of retribution, guides and inspires our ability to advocate on their behalf. Likewise, we would like to thank the family members of prisoners, and other prisoner advocates, who have contacted, and continue to contact, the ACLU regarding problems at MCJ.

Second, we would like to thank the following individuals who contributed to this report by volunteering their time drafting sections of the report, obtaining declarations from prisoners, and assisting in monitoring conditions at MCJ: Alison Alliaga, Luke Bailey, Ronald Chatters III, Brian Civale, Aviva Lichman, Elizabeth Mueller, Kevin Primo, Mariana Ramirez, Elizabeth Steinfeld, and Julie Weiss. Their endless passion to protect and advocate for the rights of the prisoners at MCJ invigorates the work of the Jails Project. We also extend our gratitude to Eric Balaban, Melinda Bird, Peter Eliasberg, Gordon Smith, and Todd Weddle, for editing various drafts of the report. This work would not have been possible without their time, commitment, and effort.

Finally, we offer our thanks and appreciation to the Los Angeles Sheriff Department (LASD) personnel who regularly assist us during our visits to Men's Central Jail. Their valuable assistance in promptly responding to and addressing individual complaints regarding jail conditions has led to many positive improvements in the operations of the jail. We would especially like to thank the following LASD staff for their efforts to work collaboratively with us to improve the conditions at MCJ: Commanders Stephen Johnson, David Fender, Dennis Conte, and Robert Olmsted; MCJ Captain Daniel Cruz; Chiefs Dennis Burns and Alexander Yim; and Barbara Svos. We would also like to thank individuals from the Department of Mental Health for their assistance: Dr. Kathleen Daly, Dr. David Kidwell, Dr. Michael Maloney, Sharon Chiappe, and Joseph Salinas.

We truly hope the information and recommendations provided in this report, as well as the experiences of the prisoners at MCJ told herein, will lead to informed discussion and positive solutions to the problems in MCJ.

-Daniel Ballon, *Pro Bono Fellow* and Mary Tiedeman, *Jails Project Coordinator*

iii

## EXECUTIVE SUMMARY

More than 30 years ago the American Civil Liberties Union of Southern California sued Los Angeles County and its Sheriff's Department for subjecting inmates in the Men's Central Jail to cruel and unusual punishment. Today, many of the awful conditions targeted by the original lawsuit persist, together with an apparent culture of violence and fear, including prisoner-on-prisoner assaults and the use of excessive force by deputies. This violence, fueled in significant part by the overarching problem of chronic overcrowding in the cell blocks of Men's Central Jail, is one of the most compelling reasons why this aging, decrepit facility must have its population drastically reduced, or be closed.

The ACLU/SC currently works in partnership with the ACLU National Prison Project in Washington, D.C., as the court-appointed monitor for the Los Angeles County jails system – the largest such system in the United States, housing nearly 20,000 detainees and costing nearly $1 billion a year to operate. ACLU monitors visit the jail weekly to observe conditions, talk to prisoners and pursue complaints on their behalf. This report focuses on some of the major problem areas identified by our jail monitors from 2008-09 at the Men's Central Jail in particular, including the inadequate treatment of mentally ill detainees (who comprise a disproportionately high percentage of the jail population); grossly unsanitary conditions; and the disturbingly haphazard discipline meted out to those who violate jail rules.

Many of the most troubling complaints that the ACLU receives, however, involve allegations of pervasive physical abuse and violence. In the 12-month period covered by this report, we received scores of complaints about abuses ranging from direct assaults and deputy-orchestrated attacks by other prisoners, to verbal abuse and threats of physical harm, including threats for filing grievances. The stream of complaints alleging violence that we receive from prisoners and family members, and the shocking results of violence that our monitors have observed at Men's Central Jail -- from broken ribs and black eyes to severe head wounds that need to be stapled together -- are strikingly consistent.

The widely reported violence at Men's Central is particularly disturbing because the vast majority of people being held at the jail are simply awaiting trial. In other words, they are presumed innocent and have yet to get their day in court. In addition, a high percentage of these prisoners suffer from mental disabilities, and many are unable to control their own disturbed behaviors. A national expert found that abuse of prisoners by deputies at Men's Central is not only "very likely" but is disproportionately directed against prisoners with serious mental illness. The toxic living conditions at the jail further exacerbate mental illness among prisoners who suffer from it, as does the county's failure to identify and provide treatment to mentally ill prisoners housed there.

A key difficulty in assessing the true extent of violence in Men's Central Jail is the sheriff's refusal to share information with the ACLU regarding, for example, the number of use-of-force incidents it investigates, and the resolution of those investigations. This lack of transparency raises questions about the adequacy and independence of the Sheriff's Department's internal review process, and may even help encourage daily occurrences of violence within the jail.

1

This report also documents a persistent pattern of prisoners claiming that they have been retaliated against and/or harassed by jail staff for protesting the conditions of their confinement. Retaliation – along with countless threats of retaliation that prisoners report to our jails monitors – creates a chilling effect that deters prisoners from bringing forward grievances in the first place, or to report their complaints anonymously, which, of course, renders them virtually impossible to follow up. The issue of retaliation is therefore a serious one that strikes at the heart of the ACLU's ability to effectively perform its court-approved duties as a monitor of the county jail system.

Unsanitary and downright hazardous living conditions within the Men's Central Jail, where prisoners are housed in windowless cells and dorms plagued by poor ventilation, plumbing leakages and stoppages, and extreme temperatures, are also examined in this report. Many detainees report that their shower times are frequently cut short or skipped altogether for unspecified reasons. In addition, the space provided per prisoner in the jail falls shockingly short of nationally recognized standards. Some dormitories contain more than 140 prisoners, with tiered bunk beds that are jammed so closely together that it's almost impossible to move between the rows of beds.

As the ACLU has been emphasizing for years, overcrowding is in fact a common theme behind all major problems at Men's Central Jail, from the culture of violence to a lack of transparency, and from poor screening and treatment for the mentally disabled to unsanitary living conditions. Therefore, the ACLU urgently renews its call for the Sheriff's Department to radically reduce the population of its jail system through proven, low-risk alternatives to incarceration for pre-trial detainees, including electronic monitoring, supported housing and drug and mental-health treatment programs. By cutting down the overall number of prisoners in the nation's largest correctional system, the sheriff can ease overcrowding at Men's Central Jail or close this aging, costly, toxic facility once and for all.

I.   **METHODOLOGY**

The ACLU Foundation of Southern California ("ACLU") has monitored the conditions in the Los Angeles County Jails since 1985, pursuant to a series of court-approved agreements between the ACLU and the Los Angeles Sheriff's Department ("LASD"). Men's Central Jail ("MCJ") is part of the Los Angeles County Jail System.

With nearly 20,000 detainees and an operating cost of more than $1 billion per year, the Los Angeles County Jail System is the largest jail system in the United States and one of the largest and costliest jails systems in the world. The Jail System is operated by the Los Angeles County Sheriff's Department and is comprised of nine different facilities spread across the County: the Inmate Reception Center; Men's Central Jail; Twin Towers (Tower 1 and Tower 2); Century Regional Detention Facility; Mira Loma Detention Center; North County Correctional Facility; and the Pitchess Detention Center (East, North, and South facilities).

After male detainees are arrested, they are brought to the Inmate Reception Center for processing. There, each detainee undergoes an initial screening process with Sheriff's deputies to determine whether the detainee has medical or mental health needs, or any other need that will require special care while he or she remains in LASD custody. After the initial screening at the Inmate Reception Center, detainees are sent to one of the other six jail facilities where they will be held until they either make bail or their criminal case is resolved. Some of the jail facilities have very specific functions. Century Regional Detention Facility processes and houses the County's female prisoners. The Mira Loma Detention Center houses detainees who have pending immigration cases. Twin Tower 1 holds prisoners whom jail staff have determined are the most seriously mentally ill.

This report will focus on the conditions inside Men's Central Jail. MCJ is approximately 50 years old and had an average daily population in 2009 of 4,700-5,000 detainees, about 70-80% of whom are awaiting trial—as opposed to serving time for a criminal conviction—or are serving time for technical parole violations. It is the oldest and most decrepit of the jails in the County, and a vastly disproportionate number of the complaints the ACLU receives come from inmates at MCJ. The ACLU has been advocating for the closure of MCJ and/or for major reform in the jail for years.

More than 30 years ago, the ACLU sued the County of Los Angeles and the County Sheriff on behalf of the inmates in MCJ, challenging the conditions of their confinement as a violation of the Eight Amendment's prohibition of cruel and unusual punishment.[1] That case, *Rutherford v. Block*, remains active today. After a victory in *Rutherford* and several court orders ordering the County to bring the jail into compliance with basic constitutional minimums, several improvements were made.

During the 1980s, however, the Los Angeles County Jail population nearly tripled from 8,000 to more than 23,000 detainees, and conditions at MCJ became more horrific than ever. In 1985, the LASD and the ACLU entered into a court-approved agreement acknowledging that the dramatic increase in the jail population precluded the LASD from fully complying with the orders in *Rutherford*. As an alternative to contempt proceedings, the ACLU and the LASD agreed to work cooperatively towards developing a jail system that meets constitutional minimums, including entering an agreement granting the ACLU the right to monitor the LASD's compliance with the various *Rutherford* orders.

The agreement provides the ACLU with full access to all jail facilities to allow ACLU advocates to speak with prisoners and document jail conditions through first-hand observations.

---

[1] *Rutherford v. Block*, 457 F. Supp. 104 (C.D. Cal. 1978).

In carrying out its monitoring tasks, the ACLU's Jails Project processes individual prisoner complaints, regularly visits the jail facilities, and meets regularly with the LASD and Los Angeles County officials to discuss strategies for addressing systemic problems in the jail, including MCJ. Through these monitoring efforts, over the last 25 years the Jails Project has amassed thousands of records documenting the conditions inside the LA County Jails, including declarations from prisoners, notes from observations made during jail tours, and complaints received through the Jails Project intake system. This report is based on data from the last two years, 2008 and 2009.[2]

The Jails Project processes approximately 4,500 complaints annually from county jail prisoners, their families, and local advocates. Signs posted throughout common areas in the jails, including the hallways and health care clinics, notify prisoners that they may direct complaints about the conditions of confinement or access to medical services to the ACLU Jails Project. Prisoners make complaints to the ACLU during face-to-face interviews, via voice-mail messages, and by letter.  The Jails Project then reports these complaints daily to LASD staff.

Common complaints received through this process include:

- Denial of medication, medical and mental healthcare;[3]

---

[2] Although the Jails Project has maintained data regarding the conditions in the jail for decades, this report focuses on the conditions in the jail as reported by prisoners and as observed by the jails monitors over the years 2008-2009 to reflect the most current conditions within the jails.

[3] Medical complaints—complaints about denial of medication or access to medical care—comprise a substantial portion of the complaints received by the Jails Project. As with the other problems discussed in this report—complaints about access to mental health treatment, for example—problems with access to medical care are exacerbated by overcrowding in the jail. However, while it is important to understand the problems with access to medical care in the jail and while a significant portion of the ACLU's work involves advocating on behalf of prisoners who are not receiving adequate medical care, this report does not address the issue in depth as the topic is outside the scope of this report which focuses on problems with access to mental health care, the unsanitary conditions inside the jail, problems with violence and excessive discipline inside the jail, and the way these various problems interact with and exacerbate each other.

- Denial of access to showers, clean clothing, telephones, and outdoor recreation;
- Delayed mail
- Broken toilets, infestation of vermin, and filthy, unsanitary conditions;
- Excessive and punitive discipline, especially housing prisoners in small, dark, solitary cells;
- Classification problems
- Violence and abuse from deputies and other prisoners, especially against vulnerable prisoners, like those who have physical or mental disabilities.

Jails Project monitors also tour the jails on a regular basis. During these tours, the monitors inspect the conditions in the jails, check logs that record prisoner and staff activity, and interview prisoners.

The information in this report is gleaned from thousands of prisoner complaints the ACLU received and dozens of jail tours the monitors conducted in 2008 and 2009. It is also based on the observations of Dr. Terry Kupers, a nationally recognized expert in mental illness and mental health treatment in prisons and jails. In May 2008, the ACLU retained Dr. Kupers to tour MCJ and make findings regarding mental health services at MCJ and recommendations for remedial measures. Dr. Kupers subsequently produced a report of his findings and recommendations.[4] Together, these sources provide insight into the conditions that the prisoners inside Men's Central Jail endure every day. However, this report does not purport to provide a comprehensive portrait, as several limitations apply.

First, there are several barriers to prisoners' ability to raise complaints with the ACLU Jails Project.  Prisoners must pay to call the Jails Project to lodge a complaint using calling cards they purchase while inside the jail. Calls from the jail are exorbitantly expensive—the cost of the average seventeen-minute call is $5.20 and the cost for the first minute of a collect local call can be as much as $3.54. Many prisoners cannot afford the fee or choose to save the money they do

---

[4] *See* Report of Dr. Terry Kupers, M.D., "Report on Mental Health Issues at Los Angeles County Jail" [hereinafter Kupers Report], *available at* http://www.aclu-sc.org/documents/view/173.

have to call family members or to purchases necessities, such as hygiene supplies, from the commissary within the jail.

Even though many prisoners do write letters to the ACLU Jails Project, numerous prisoners have told us that there is a widespread belief among the prisoner population that they will face retaliation by LASD staff if they complain to the ACLU, and that their letters will not reach the ACLU, which likely reduces the volume of written complaints the ACLU receives. The prisoners and their families also regularly report delays in the mail or missing letters, which also may reduce the number of complaints the ACLU receives from inside the jail.

Second, the report is based in large part on prisoner allegations and the observations of the jail monitors. While the Sheriff's Department is generally cooperative in responding to and following up on reports and complaints the Jails Project makes on behalf of prisoners, the Department has also consistently refused to provide the ACLU with comprehensive documentation verifying (or refuting) complaints, making it difficult to confirm the complaints we receive, or the adequacy of the LASD's investigation and response. This is true even in situations, including many of those documented in this report, when jails monitors are able to observe and confirm the accuracy of prisoner complaints.

Moreover, the LASD has refused to provide the ACLU with the complaints prisoners file through the Jail's grievance system, which processes thousands more complaints per year than the Jails Project receives. As of the publication of this report, however, the LASD refuses to share information with the ACLU regarding the number of complaints received annually, the bases for those complaints, and the resolution reached. Thus, the ACLU lacks access to a plentiful source of data for studying the conditions within the jail.

Despite these limitations, this report does provide a valuable view of the conditions in the Los Angeles County Jails, particularly Men's Central Jail, and we hope that it will serve as a useful tool to help advocates, legislators, and community members alike to understand conditions in the jail, and to make informed decisions about the operations of the jail and our criminal justice system, which drives the overcrowding that plagues the jail.

## II.     VIOLENCE AND RETALIATION

Institutional violence continues to be a significant problem in Men's Central Jail.  The type of incidents reported range from prisoner-on-prisoner fights to deputies using excessive force. One of the difficulties in assessing the full extent of the violence in MCJ, and in evaluating the LASD's efforts to address it, is the department's refusal to share information with the ACLU concerning the number of use of force incidents it investigates; its methods for investigating allegations of deputy abuse; the resolution of internal investigations; and subsequent remedial measures to prevent future violence from occurring. This lack of transparency and accountability creates a cloud around the operations of the jail, as the Jails Project consistently receives complaints from prisoners and family members alleging serious physical and verbal abuse at the hands of the deputies in the jail, as well as cool indifference from LASD officials when prisoners complain about the abuse.

There are considerable challenges involved in minimizing the violence in MCJ. The last few decades of court intervention demonstrate that jail violence is a function of its culture, the understaffing and inadequate training of deputies, overcrowding, prisoner idleness, the ineffectiveness of LASD management and internal review and staff disciplinary mechanisms, and the politics that excuse the mistreatment of prisoners. The ACLU continues to receive numerous, credible reports that MCJ continues to be plagued by: (1) incidents of deputy abuse, including excessive use of force; (2) retaliation for lodging grievance or complaints; and (3) deputies' failure to protect the safety and well-being of prisoners; all of which are exacerbated by the persistent overcrowding in the jail.

### A.      Deputy Abuse

Many of the most troubling complaints the Jails Project receive involve allegations of serious physical abuse of prisoners at the hand of deputies. While the jail monitors understand the sensitive nature of allegations of abuse against law enforcement officers and are diligent in investigating allegations of abuse so as not to pursue frivolous complaints, the monitors also cannot ignore the persistent pattern of abuse at MCJ that they hear about from prisoners and their ethical duty to advocate on behalf of the prisoners apparently suffering at the hands of what may be a few rogue deputies.

Most of the allegations of abuse involve verbal abuse and unjustifiable disrespect. Prisoners report that deputies constantly curse at them and yell at them, even when unprovoked. Some report being called "nigger" or "faggot," or being mocked because of a physical disability or mental illness.[5] However, many other complaints of abuse involve allegations of physical abuse resulting in serious bodily harm.

The Los Angeles Sheriff's Department, like all other law enforcement entities within the state of California, is bound by state standards codified in Title 15 of the California Code of Regulations, which require officers to use force only when "reasonably necessary to subdue an attacker, overcome resistance, effect custody, or to gain compliance with a lawful order . . . ."[6]

---

[5] *See e.g.*, declarations of Prisoner 27, July 1, 2009, at ¶ 7 ("The deputies abuse me saying things like, 'shut up, you are a fucking fagot [sic].'"); Prisoner 10, July 14, 2009, at ¶ 6 (called a "nigger piece of shit" by deputies searching his cell). Note: Because of an apparent widespread fear of retaliatory action, prisoners are often reluctant to file complaints. Thus, to preserve the privacy and confidences of our clients, the names of the prisoners in the following anecdotes have been removed and citations to declarations will refer to prisoners by numbers. A cross-referencing key matching the names of prisoners with the information cited in this report is on file with the ACLU-SC.

[6] 15 Cal. Code of Reg. § 4034.2 (c) ("Force shall be used only when reasonably necessary to subdue an attacker, overcome resistance, effect custody, or to gain compliance with a lawful order. . . Employees may use reasonable force as required in the performance of their duties . . ."); 15 Cal. Code of Reg. § 4034.1(b) (defining "reasonable force" as "[t]he amount of force that

Despite the command to use force only in narrow circumstances, when "reasonably necessary," however, in the last two years the ACLU Jails Project has documented several instances of deputies apparently using excessive force on prisoners, both in terms of when they use force and how much force is then applied. Consider a few examples:

- Prisoner 32 reported that he had been assaulted by deputies "multiple times."[7] On one occasion, he recalled, approximately 10-15 deputies entered his cell and started hitting him. "They dropped me to the floor and started to kick my head," he reported. "They hit me with their flashlights over and over again. They used their flashlights like a bat, like I was a baseball or something. The deputies said I was trying to assault one of them, but even after they had me on the floor with my hands behind my back they kept hitting me. They tased me several times. One of the deputies later told me, 'Man, I was trying to kill you.'"[8] This prisoner reported that after the beating he could not walk for 2 weeks, and even though he needed stitches, he refused medical care because the deputies had warned him not to go to the clinic. "Even though I needed stitches, the deputies told me not to go to the clinic. They said that if I went to the clinic they would beat me up even worse when I got back. The clinic tried calling me in over and over for about a week, and I refused every time. I refused medical care because the deputies told me to. I refused stitches. I refused a tetanus shot. I refused everything."[9]

- Prisoner 33 reported that on May 13, 2009, he was beaten up by a group of deputies, even though he had done nothing to justify the beating.[10] "At some point during my tier time," he recalled, "[one of the deputies] told me that the deputies needed to talk to me. He took me to the front of the module, grabbed my hands, leaned up to my ear and said, 'Who's the fucking punk now? . . .' I kept telling him that I didn't want any problems. He said, 'It's too late now.' The first blow I felt was to the right side of my temple. When I went down, I received a crushing blow to the top of my head. After going down, all I can remember is trying to crawl away. Then a door flew open and a bunch more deputies came in. I thought they were going to make the other stop, but they all joined in. As I began to lose consciousness, I looked down and saw a pool of blood. . . . At the very end, when I was already on the floor and barely conscious, the deputies ripped my pants almost completely off and tasered me."[11] This prisoner explained, "I can't think of a single thing I could have done to deserve this beating. I

---

an objective, trained, and competent Correctional Peace Officer, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.").

[7] Declaration of Prisoner 32, October 23, 2009, at ¶ 4.
[8] *Id.* at ¶¶ 4-5.
[9] *Id.* at ¶ 7.
[10] Declaration of Prisoner 33, October 7, 2009, at ¶ 5.
[11] *Id.*

admit I've been disrespectful at times, but nothing that deserves me nearly losing my life."[12]

- Prisoner 10 reported being beaten up by deputies and then being threatened should he report the abuse.[13] "I was coming back from seeing my lawyer," the prisoner reported, "[when] a few deputies surrounded me. I told them I didn't want problems but they started kicking me and hitting me. They bruised my nose and forehead, split my lip and sprained my arm. After they finished beating me they told me, 'You tell anybody about this and we'll kill you, you nigger bitch.' They told me to tell the doctor that I fell and I told them I would. When I went to the nurse she asked how I got hurt and I said I fell. . . . Since that beating I started having seizures and migraines. I never had either of these problems before I got to Men's Central."[14]

- Prisoner 34 reported that he was beaten up by a group of deputies because of his alleged connection to a gang the deputies did not like. The gang was implicated in the death of a LASD staff member. Even though this particular prisoner had no connection to the deputy's death, deputies smashed his wrist where he had a tattoo of the gang's name, breaking it in several places.  The deputies also injured his face and legs.[15]  The prisoner and the ACLU formally reported this incident to the Department, but have received no response other than the investigation reference number.

In each of these incidents, there was no apparent justification for the use of force, and if the circumstances did justify using force, the degree of force used appears to be clearly disproportionate to the degree of danger justifying it.  Equally troubling, however, is the LASD's lack of transparency regarding the investigations prompted by these allegations, which the ACLU has provided to the LASD.[16]

The ACLU commonly relays allegations of physical abuse to LASD staff (when prisoners request this sharing of information) to facilitate internal policing and to protect the prisoners in the jail. LASD staff has previously agreed to provide the ACLU with periodic updates regarding the status of these investigations. However, it has become common practice

---

[12] *Id.* at ¶ 6.
[13] Declaration of Prisoner 10, July 14, 2009, at ¶ 9.
[14] *Id.*
[15] Complaint of Prisoner 34, send to LASD staff on March 12, 2009 (on file with the ACLU-SC).
[16] Letter from Mark Rosenbaum, Chief Counsel, ACLU-SC, to Sheriff Leroy Baca, Sheriff, Los Angeles County (Oct. 28, 2009) (on file with the ACLU-SC).

for the LASD to update the ACLU only when the ACLU demands the information. Furthermore, the limited nature of the information the LASD provides—whether the investigation is "active," "closed" because the accusations were deemed "unfounded," or referred for further review— gives little assurance about the adequacy and independence of the internal review process and suggests that greater measures to ensure accountability should be taken.

The LASD has, for years, refused to disclose to the ACLU information about how it reviews use of force incidents—what criteria it uses to assess the "reasonableness" of the force used, whether the reviewing body is independent from the LASD, whether the documentation of use of force incidents is adequate enough to facilitate meaningful review—and this failure to disclose only deepens suspicions about deputies' exercise of their discretion to determine when and how to use force. This lack of transparency and accountability may only serve to reinforce a culture within the LASD that allows abuse of prisoners to go relatively unchecked since, in the end, there is apparently no independent source for weighing the prisoner's word against the deputy's.

### B.     Retaliation

At least since the inception of the ACLU's monitoring efforts, there has been a persistent pattern of prisoners' claiming that they have been retaliated against and harassed by jail staff for communicating with the ACLU or otherwise challenging the conditions of their confinement.  In many instances, prisoners have told us that deputies have made it clear that prisoners who file grievances or communicate in any way with the ACLU will be punished. Staff have also subjected prisoners to practices that coerce them into not cooperating or communicating with the

ACLU.[17]

Numerous prisoners report that LASD deputies have threatened and retailed against them for filing grievances and for talking to the ACLU. Consider just a few complaints we have received from prisoners that illustrate the culture of fear that permeates Los Angeles County jail facilities:

- On March 2, 2009, during a routine walk-through by the ACLU, Prisoner 35 complained that deputies had not been giving him showers and that he needed medical attention.[18] A few days later, a deputy escorted Prisoner 35 to another module where he ordered him to stand against a wall.[19] A second deputy referenced Prisoner 35's complaint to the ACLU about access to showers and stated, "We can fix that," as he slapped Prisoner 35 on the back of the head.[20] The deputy then proceeded to kick Prisoner 35's feet from under him, until he fell on the floor.[21] While Prisoner 25 was on the ground, both deputies kicked and punched him in the back and one deputy then hit him in the face and jaw with a flashlight several times.[22] During the beating one of the deputies exclaimed, "you f***ing whiners, tell this to the ACLU, I dare you."[23] Following the violent beating, Prisoner 35 was hospitalized for a few days and received stitches on both sides of his face. [24]

- Prisoner 36 is a 29-year old man who has developmental disabilities and has severe diabetes. On or about May 14, 2009 Prisoner 36 was returning to his cell from pill call when a deputy told him he needed permission to return to his cell even though other prisoners were freely returning to their cells.[25] Prisoner 36 complied with the deputy's request and faced the wall. [26] The deputy told Prisoner 36 that if he turned around he would slap him. [27] The deputy grabbed Prisoner 36's hands together and slapped him five times on the right side of the head.[28] After the incident, Prisoner 36 contacted his mother about the incident. Prisoner's mother lodged a complaint to

---

[17] Declarations of Prisoner 35, June 16, 2009, at ¶¶ 3, 5-6,9; Prisoner 14, June 10, 2009, at ¶¶ 5-6; *see also*, declaration of T. Weddle, at ¶ 14 (describing how deputy escorts do not provide prisoners space and privacy during prisoners' contact with the ACLU).
[18] Declaration of Prisoner 35, June 16, 2009, at ¶3
[19] *Id.* at ¶4
[20] *Id.* at ¶5.
[21] *Id.* at ¶6.
[22] *Id.*
[23] *Id.*
[24] *Id.* at ¶8.
[25] Declaration of Prisoner 36, June 26, 2009, at ¶2.
[26] *Id.* at ¶3.
[27] *Id.*
[28] *Id.* at ¶4.

the ACLU regarding his mistreatment.[29] The next morning, a deputy removed Prisoner 36 from his cell telling him that the nurse wanted to see him, asked him why he reported the incident and removed his sheets, blanket, and food. [30] Some hours later, another deputy came to Prisoner 36's cell accompanied by another prisoner. The deputy ordered Prisoner 36's bunkmate to leave the cell, and left Prisoner 36 in the cell with the prisoner.[31] The prisoner beat Prisoner 36, punching him numerous times on the face and head.[32] After the beating, Prisoner 36 was taken to a room from where deputies conducted a videotaped interview.[33] During the interview the deputies asked Prisoner 36, "What have you told Mary from the ACLU?" referring to the ACLU Jails Project Coordinator.[34] LASD has declined to hand over the videotaped interview.

These are just two of the most egregious examples of complaints the ACLU has received that describe a wide variety of retaliatory acts taken against prisoners who filed grievances or complaints against the LASD. However, examples like these abound in the stories collected through the work of the Jails Project. Consider the following:

- Prisoner 37 reported that he was assaulted by a group of deputies after inmates in his module complained to the ACLU about infrequent shower access.[35] He reported that deputies held him down while he was handcuffed and broke both his ankles by striking them repeatedly with their flashlights.[36]

- Prisoner 38 reported he was assaulted by a group of deputies after he and other inmates on his row complained about not receiving showers for weeks.[37] He spent days in the hospital because deputies broke his leg and he required surgery on his knee. The beating had such a silencing effect on the rest of the tier that when the jail monitors visited the row a few days after the beating, many inmates refused to talk to them. The few who did spoke in hushed tones so that deputies would not hear them. They reported that they thought Prisoner 38 had been beaten to death and they did not want the same thing to happen to them.

- Prisoner 39 reported that he was beaten by a group of deputies who tased and pepper-

---

[29] *Id.*
[30] *Id.* at ¶5.
[31] *Id.* at ¶ 6.
[32] *Id.*
[33] *Id.* at ¶9.
[34] *Id.* at ¶10.
[35] Declaration of Prisoner 37, October 21, 2009.
[36] *Id.* at ¶¶ 7-8.
[37] Declaration of Prisoner 38, October 26, 2009.

sprayed him and broke his shoulder.[38] Furthermore, he also claims that 15 minutes after reporting one of the deputy's names to an investigating Lieutenant, that same deputy escorted him to the hallway, yelled at him for complaining, and then forced him to strip naked while he and several other deputies laughed at him.[39]

Moreover, more common than allegations of physical abuse in retaliation for complaints, the Jails Project receives countless complaints of *threats* of retaliation. Even when those threats do not materialize into actual physical harm to the prisoners, they do succeed in instilling a great sense of fear in the prisoners about the consequences should they complain about the conditions of their confinement. Actions like these account for the widespread fear of retaliation the jails monitors consistently observe.

In the recent case of *Brodheim v. Cry*, the United States Court of Appeals for the Ninth Circuit Court recognized that officers' mere threats against prisoners may have as powerful a chilling effect on their willingness to make complaints about their living conditions as does actual physical abuse.[40] Indeed, this is exactly what the jail monitors have observed in their advocacy. In the experience of the jail monitors, both retaliatory actions like those described above and threats of retaliation deter prisoners from bringing grievances forward.  Such retaliatory action, and the fear of retaliation, also hinders the ACLU from advocating on prisoners' behalf. As a result of their fear of retaliatory action, prisoners frequently refuse to communicate with the ACLU and ask that their complaints be reported anonymously, or not at all.

One Jails Project monitor described a recent experience he had when he visited a housing

---

[38] Declaration of Prisoner 39, October 19, 2009.
[39] *Id.* at ¶¶ 8-12.
[40] *Brodheim v. Cry*, 584 F. 3d 1262, 1271 (9th Cir. 2009) (noting that the chilling effect of a threat on a prisoner's ability to petition the government for redress of grievances "lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat.").

unit he had visited some weeks earlier.[41] On his first walk-through, prisoners were willing to speak to him regarding an assault that had taken place on their row. On a subsequent visit, however, the monitor reported that the prisoners "looked genuinely afraid to speak" to him. "[A]lmost all the detainees looked genuinely afraid to speak to me as I approached their cell fronts," he noted, "Their eyes darted back and forth from me to the escort to the sergeant.  Some of them bowed and showed their heads and said they did not have anything to say.  Other detainees whispered that things had gotten bad since my visit and asked what I was doing to protect them."[42]

Other prisoners and their families also report they have been subject to threats, harassment, or harm because of their involvement in ACLU monitoring and their contact with the Jails Project monitors. Prisoners report being confronted by prison officials about their participation in ACLU litigation and monitoring; placed or retained in segregation for their participation; denied opportunities to take a shower; denied visits from family members and use of the telephone, among other things.[43] One ACLU advocate described a complaint he received from a prisoner claiming he was denied access to see a dentist, even though he had a broken tooth and was in severe pain: "[D]eputies told him that was the price he would have to pay for

_____

[41] Declaration of T. Weddle at ¶ 15.

[42] *Id.*

[43] *See* ACLU Report to LASD at ¶ 8 (Mar. 4, 2009) (on file with the ACLU-SC) (describing how deputies tamper and destroy prisoners' personal property and legal documents, and threaten prisoners with abuse or other punitive actions for communicating with the ACLU) ("Many of the prisoners said they feared retaliation for talking to the ACLU.  They said they were worried that the deputies in the dorms would turn off their program or throw away their property after the ACLU representatives left the facility."); ACLU Report to LASD at ¶ 7 (Jun. 4, 2009) ("[Prisoner] reports that he had been retaliated against for appealing out regarding the incident involving deputies and another prisoner. Prisoner reports that he has been in contact with the mother of the prisoner and the ACLU and the deputies are aware of this.  Prisoner reports that the afternoon/night shift deputies are threatening him to stay quiet or he will receive similar treatment.").

speaking to the ACLU."[44]

While on a recent routine walk-through, the jail monitor noted that a prisoner was so afraid to come to the bars to speak that he hung back in his cell, shaking and crying. The monitor had to act as if she were inspecting the floor and ceiling as she interviewed the prisoner because he did not want it to look like he was talking to her.[45]

Retaliatory action of this kind interferes with the ACLU's monitoring role. The ACLU has made several efforts to resolve the matter informally,[46] but these efforts have largely failed in light of LASD's view that "there simply is no history of retaliation against prisoners by Department members."[47] In the summer of 2009, in response to ACLU advocacy efforts, MCJ adopted a policy prohibiting jail staff from questioning prisoners about any of their contacts with the ACLU, or retaliating against prisoners on account of their contacts with the ACLU.[48] However, this policy has been largely ineffective because prisoners are not aware it exists—the policy is not posted anywhere in the jail, nor are prisoners informed of the policy when they enter the jail—and, as a result, they do not file formal grievances when retaliatory action is taken

---

[44] Declaration of T. Weddle at ¶ 19.

[45] M. Tiedeman, Jails Coordinator, ACLU-SC, notes from June 23, 2009, jail visit (on file with the ACLU-SC).

[46] Letter from M. Bird, Senior Counsel, American Civil Liberties Union, to R. Granbo, Office of County Counsel, and P. Beach, Lawrence, Beach, Allen & Choi (June 19, 2009) (on file with the ACLU-SC) ("[A]s you know, we have raised the issue of retaliation against detainees who complain to the ACLU on many occasions in our monthly meetings with the Department. Many, many class members tell us that they are too fearful to speak with us or to file complaints because of what will happen to them if they do so. These allegations of retaliation make it almost impossible for our staff to effectively monitor conditions in the jail. For example, we have been forced to reduce our jail-front contact with class members because they report that if they speak to us, deputies harass and intimidate them after we leave the jail.").

[47] Letter from P. Beach, Lawrence, Beach, Allen & Choi to M. Bird, Senior Counsel, American Civil Liberties Union (Jul. 12, 2009)(on file with the ACLU-SC)("[I]n fact, as has been explained to you on various occasions, there simply is no history of retaliation against prisoners by Department members. Your repeated assertions (vague and ambiguous) do not make it true.").

[48] Los Angeles County Sheriff's Department, Custody Division Men's Central Jail, Unit Order: 5-12-010, Subject: Retaliation Against Inmates Who Make Complaints to the ACLU or Other Inmate Advocacy Groups.

against them, or when they are the recipient of retaliatory threats.

### C.      Failure to Protect the Safety and Well-Being of Prisoners

Correctional officers have a constitutional duty to protect prisoners from violence at the hands of other prisoners.  In 1994, the United States Supreme Court held that a correctional official may be liable for failing to protect the safety and well-being of prisoners "if he knows that prisoners face a substantial risk of serious harm and disregard[s] that risk by failing to take reasonable measures to abate it."[49] Under this decision, LASD personnel may violate the Eighth and Fourteenth Amendments by making housing decisions that place specific prisoners at risk and create situations in which individual prisoners are subject to violence at the hands of other prisoners.

Combining prisoners of notably different security levels in the same cell or dorm is one way in which the LASD increases the risk of prisoner-on-prisoner violence.[50]  The classification system at Los Angeles County Jail utilizes "individual risk factors to predict how a given prisoner will behave" when in custody with other prisoners.[51] Assigning prisoners to housing by security level minimizes the risk of violence because it provides a system that separates prisoners who pose a risk to other prisoners.[52]  For instance, a prisoner testifying against another prisoner

---

[49] *Id.* at 847.
[50] Megan Garvey, *An Urgent Appeal For Jail Safety*, L.A. TIMES, Feb. 15, 2006 *available at* http://articles.latimes.com/2006/feb/15/local/me-jails15. The practice of mixing security levels was deemed "not permissible" under any circumstances in a 2005 confidential report to the Los Angeles County Board of Supervisors that raises numerous safety concerns about the jails' use of security classifications. However, this practice continues to happen every day. For example, mixing prisoners of different security levels occurs every day during courtline, when prisoners are transferred to and from the courthouse.
[51] POLICE ASSESSMENT RESOURCE CENTER; THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, 22ND SEMIANNUAL REPORT, at 7 (2006).
[52] *Id.* at 12.

will receive a K-2 designation, while the prisoner he is testifying against will be made a K-3, a designation that tells staff he is to be kept away from all K-2s, and vice versa.[53]

Despite this apparently clear-cut system for protecting the well-being of the prisoners in its custody, the Jails Project receives numerous complaints alleging that deputies have carelessly, or even purposefully, placed them in harm's way. For example, in 2008, following an argument with a deputy, Prisoner 14, a 56-year old registered sex offender, was sent to a general population unit with a card identifying him as a registered sex offender.[54] Upon entering the unit, a deputy handed the card to a prisoner and instructed the prisoner to "take care of it."[55]  On February 15, 2008, prisoners stabbed Prisoner 14 under the eye and hit him so hard in the head that he had a bowel movement.[56]  Even though deputies were present during this beating, they did not intervene.[57]

Not long after he returned to Men's Central Jail, deputies called Prisoner 14 to the chapel and told him that the incident had been reported to the ACLU.[58] Deputies then demanded that Prisoner 14 sign a paper for the ACLU stating that nothing had happened, warning him that if he did not sign the paper he would be put in the "hole."[59]

Other prisoners have provided similar accounts of being set up by LASD personnel to be attacked by other prisoners. For example, in the four months Prisoner 12 has been in MCJ, deputies have placed him in situations where he was at heightened risk of being attacked by other prisoners.[60]  On one occasion, deputies sent prisoners into Prisoner 12's cell to "discipline"

---

[53] *Id.*
[54] Declaration of Prisoner 14, at ¶7.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] Declaration of Prisoner 12, at ¶ 5.

him.[61]  This "discipline" consisted of prisoners hitting him on the face, head and sides.[62]

Prisoner 12 rolled himself into a ball to protect himself from the blows.[63]  Nonetheless, he

suffered nose bleeds, busted lips, a chipped tooth, and cuts and bruises from these beatings.[64]

### D.  Recommendations: Eradicating the Culture of Violence

The regulation of violence is, by itself, insufficient to prevent abuse.  Prison conditions

can and do breed violence.  Many prisoners suffer from mental illnesses that inhibit their ability

to control their own behavior.  When these and other prisoners are left idle in overcrowded,

antiquated facilities with inadequate mental health services and custodial staff, violence is likely,

if not inevitable.[65] In order to curb the violence at the LA County Jail, the ACLU proposes the

following recommendations:

- **Reduce Crowding**.  Crowding fuels violence by pushing deputies to rely on physical force as a means of control rather than communication; making it difficult to classify and assign prisoners safely; making it hard for deputies to see inmate on inmate violence in the dorms; and presenting a significant obstacle to identifying prisoners with mental illness. Vital services are undermined or made operationally impossible, and there are problems with excessive noise, heat, and tension.  Thus, the ACLU urges LASD to work with corrections administrators to set and meet reasonable limits on the number of prisoners that MCJ can safely house.

- **Incorporate a direct supervision model.**  Recognizing that the control of violence depends not only on executing accepted policies for regulating the use and supervision of force, but also on the overall management of the facility, some localities have adopted the direct supervision model.  Within a direct supervision jail model, prisoners cells are arranged in a "pod" around a common area, usually called a "dayroom."  There is no secure control booth for the supervision officer, and there are no physical barriers between the officer and the prisoners.  The officer is stationed in the pod with the prisoners and moves about the pod, interacting with prisoners to manage their behavior.

---

[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] For more on the connection between overcrowding and violence see Katherine Beckett & Theodore Sasson, *The Politics of Injustice* 177 (2004); Alexis M. Durham, *Crisis and Reform: Current Issues in American Punishmen*t 48-49 (1994); Craig Haney, *Reforming Punishment: Psychological Limits to the Pains of Imprisonment* 202, 205 (2005).

There is evidence that this model provides reasonable assurance to prisoners that they will be treated fairly and not fall victim to acts of violence.  In a study by the National Institute of Corrections, those who run direct supervision facilities gave their own facilities higher safety ratings and concluded that prisoners appear to feel safer in direct supervision facilities and seem neither to have nor need weapons to protect themselves.[66] Another study reported that using the direct supervision model reduced violent incidents by 30 to 90 percent.[67] While this design seemingly places officers at the mercy of prisoners, it enables officers to form relationships with prisoners and "recognize and respond to trouble before it escalates into violence."[68] Under this model, "negotiation and communication become more important staff skills than brute strength." [69]

- **Use force and non-lethal weaponry only as a last resort**. The LASD should dramatically reduce the use of non-lethal weapons, restraints, and physical force by using non-forceful responses whenever possible, restricting the use of weaponry to qualified staff, and eliminating the use of restraints except when necessary to prevent serious injury to self or others. Training and supervision must emphasize that force can only be considered after non-physical responses to conflict have been exhausted. LASD must train its personnel to learn how to distinguish between situations that require physical force and those that do not. Training should also equip LASD personnel with the tools to determine what amount of force - if any - is required and when force is no longer necessary. Instruction should be backed up by a clear use-of-force hierarchy that prescribes specific kinds and degrees of force in response to a limited set of specific actions and situations, and it should outline de-escalation techniques to prevent the use of force.

- **Provide deputies with specific training on dealing with inmates with mental illness**. Deputies should also be trained on the handling of prisoners with mental illness to make it

---

[66] Jay Farbstein and Richard Wener, *A Comparison of "Direct" and "Indirect" Supervision Correctional Facilities*, National Institute of Corrections, June 1, 1989 *available at* http://www.nicic.org/pubs/pre/007807.pdf (last visited on February 9, 2010).

[67] Richard Wener, F.W. Frazier and Jay Farbstein *Direct Supervision of Correctional Institutions* (1987) *reprinted in* National Institute of Corrections, Podular, Direct Supervision Jails: Information Packet (1993) *available at* http://www.nicic.org/Library/015527 (last visited on February 9, 2010); *see also*, John J. Gibbons and Nicholas de B. Katzenbach, *Prison Reform: Commission on Safety and Abuse in America's Prisons: Confronting Confinement* 22 J.L. & POLITICS 385,430 (2006) ("[C]olonel David Parrish, Commander of the jails in Hillsborough County, Florida, agrees: 'Direct supervision is recognized by progressive jail administrators as the most practical way to build and operate a detention facility. They are more staff efficient, cost-effective, and safer than traditional jails,' he told the Commission.").

[68] Richard Wener, F.W. Frazier and Jay Farbstein *Direct Supervision of Correctional Institutions* (1987) *reprinted in* National Institute of Corrections, Podular, Direct Supervision Jails: Information Packet (1993) *available at* http://www.nicic.org/Library/015527 (last visited on February 9, 2010).

[69] *Id.*

more likely that confrontations with mentally ill prisoners will be avoided, or short-circuited before they lead to violence.

- **Use a classification system that has been validated**.  Validation is a well-accepted process by which a classification system is tested and reviewed to ensure that prisoners are being evaluated based on neutral and objective criteria which ensure that they are appropriately housed.  Many organizations, including the National Institute of Corrections (NIC), an arm of the U.S. Department of Justice, validate classification systems of jails and prisons around the country.  The LASD should have its classification system validated by one of these outside organizations.

- **The Sheriff Should ask the NIC for a Technical Assistance Audit of Staffing and Security Practices at the Jail**.  The NIC also provides technical assistance to prisons and jails around the country on their operations, including staffing and security operations.  This technical assistance includes on-site expert assessments of operations and conditions, and results in an audit report that provides recommendations to correct deficiencies.  The NIC provides these services free of charge if requested by the official in charge of the facility.  In this case, that would be Sheriff Baca.  Given the serious allegations of understaffing, excessive force, and overcrowding raised by the ACLU, both through their monitoring efforts and in this report, the Sheriff should request technical assistance from the NIC so that operations in the jail can be assessed by an objective expert, and conditions can be improved.

### III.   MENTAL HEALTH CARE IN MEN'S CENTRAL JAIL

*"[I]t seems like there is no way to get [mental health] treatment while in MCJ. I feel like I don't have any way to get the help I need. I am a citizen, and I deserve to be treated like one*."[70]

**Prisoners receiving treatment for mental illness in the Los Angeles Jail System: 11.8%[71]**

**Prisoners receiving medication for mental illness in MCJ: 7.7%[72]**

**Prisoners who need mental health treatment according to national statistics: 23.6%[73]**

The Los Angeles Sheriff's Department is obligated under the U.S. Constitution to treat prisoners' serious mental health needs.  Mental health treatment must "entail more than segregation and close supervision" of the prisoners.[74]  There are six components of a minimally adequate prison mental health care delivery system:  (1) a systematic program for screening and evaluating prisoners to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill prisoners; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise prisoners at risk for suicide.[75]

---

[70] Declaration of Prisoner 1, June 10, 2009, at ¶ 11.

[71] Kupers Report, *supra* note 4, at 5-6. Note: These figures are up to date as of spring 2008 as they are based on estimates provided Dr. Terry Kupers relying on information from his April 2008 tour of MCJ. More recent, updated figures are not currently available as the LASD continues to refuse to provide the ACLU with documentation of the number of prisoners in the Los Angeles County Jail System who are currently on the mental health caseload.

[72] *See Id.* at 6.

[73] *See Id.*

[74] *Balla v. Idaho State Bd. of Corr.,* 595 F. Supp. 1558, 1577 (D. Idaho 1984).

[75] *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995).

The Constitution requires that prisons maintain a "systematic program" to screen and evaluate prisoners in order to identify those needing mental health treatment.[76]  A proactive mental health evaluation system is necessary in part because prisoners who are severely mentally ill are generally not capable of initiating the communication and making their needs known to staff.[77]

Treatment requires trained qualified mental health professionals, "employed in sufficient numbers to identify and treat in an individualized manner" prisoners with serious mental disorders.[78] "[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment."[79] "[A] basic program for the identification, treatment and supervision of prisoners with suicidal tendencies" is also a necessary component of any mental health treatment program.[80]

The mental health care treatment the LASD provides the prisoners in its custody— particularly those in MCJ—falls short of these minimum constitutional requirements in several respects. In May 2008, the ACLU retained Dr. Terry Kupers, a nationally recognized expert in mental illness and mental health treatment in prisons and jails, to tour Men's Central Jail and make findings and recommendations for remedial measures.  Dr. Kupers spent two days touring the jail, meeting with staff and prisoners, and reviewing records.  He produced a report of his findings and recommendations, which the ACLU provided to the LASD in July 2008. This

---

[76] *Balla*, 595 F. Supp. at 1577;

[77] *Madrid v. Gomez,* 889 F. Supp. 1146, 1259 (N.D. Cal. 1995); *Coleman*, 912 F. Supp at 1305.

[78] *Balla*, 595 F. Supp. at 1577.

[79] *Balla.,* 595 F. Supp. at 1577 ("Wholesale prescription of psychotropic drugs is an unacceptable means of dealing with psychiatric disorders. . . . [T]he prescription of these drugs cannot supplant the necessity of psychiatric counseling.").

[80] *Id.* at 1577. *Accord Coleman*, 912 F. Supp. at 1298 n.10 (*citing Balla*, 595 F. Supp. at 1577);

report, as well our observations in the months after the report was issued, demonstrates the need for systemic reform in the mental health care provided at MCJ.

Dr. Kupers found that, despite very large numbers of seriously mentally ill prisoners entering the jail, and in part due to the relative shortage in mental health treatment resources, the LASD engaged in a pattern of inappropriately down-grading diagnoses of mental illness (or "declassifying" them from the mental health caseload), or simply failing to identify and diagnose mentally ill prisoners who had long psychiatric histories, or displayed mental health symptoms.[81] Dr. Kupers found that mental health staff all too often placed "too much emphasis on current symptomatology . . . . If the individual is not grossly disturbed the moment he is assessed, possibly in reception, he is too often declared to be malingering."[82]

As a result, mentally ill prisoners remain housed in general population at the Men's Central Jail, or in administrative or disciplinary segregation units at MCJ. These units are severely overcrowded, and do not have adequate mental health staff.[83]  The only mental health treatment available in these units is medication; there are no structured mental health programming or psychosocial rehabilitation services offered; inmates receive very little out-of-cell time; "and in too many cases [there is] victimization by other prisoners and/or significant abuse at the hands of custody staff."[84]

Dr. Kupers found that LASD's practice of inappropriately housing seriously mentally ill prisoners and detainees in these conditions worsens their psychiatric disorders and increases their likelihood of attempting suicide.[85] In particular, Dr. Kupers found that the jail's practice of inappropriately housing seriously mentally ill prisoners and detainees in disciplinary segregation

---

[81] *See id.* at 25-35.
[82] *Id.* at 32.
[83] *Id.* at 21-23.
[84] *Id.* at 14, 23-33, 44.
[85] *Id.* at 33- 40.

subjects them to extra harsh conditions and isolation that predictably exacerbates their psychiatric disorders.[86]  He also found evidence that it is "very likely" that there is an unacceptably high incidence of custodial abuse at MCJ, disproportionately directed against the seriously mentally ill prisoners.[87] Dr. Kupers concluded that the overcrowding in MCJ is so excessive, the other conditions of confinement in the jail so harsh, and the denial of basic mental health care so extreme, as to create a toxic environment likely to cause psychiatric breakdown, even in some individuals who do not have previous symptoms of mental illness.

Dr. Kupers also found that there were serious problems with the very limited mental health services that MCJ prisoners did receive. Dr. Kupers concluded that jail staff had failed to prescribe appropriate medications, and had not adequately addressed medication non-compliance by mentally ill prisoners.[88] Dr. Kupers also noted that medical records were difficult to navigate, even for the jail's mental health staff; the charts he reviewed did not contain treatment plans; and these and other "inadequacies in charting have actually become an obstacle to adequate mental health treatment."[89]

The County of Los Angeles, including the LASD, has failed to remedy many of the serious systemic problems identified by Dr. Kupers in the two years since he issued his report. The remainder of this section discusses the ongoing problems with MCJ's mental health system, as well as recommendations for improving mental health services.

**A.    Problems with Initial Mental Health Assessments and Access to Mental Health Care at MCJ**

Mentally ill prisoners who have been previously diagnosed and treated while in the community, or while they were incarcerated in the state prison system, or during previous stays

---

[86] *Id.*
[87] *Id.* at 40-43.
[88] *See id.* at 27-33.
[89] *Id.* at 25.

at the LA jail, continue to report that they have been denied treatment at MCJ. For example, one prisoner reported that he had not been able to secure psychiatric treatment or even psychiatric medications during his 15 month stay at MCJ, even though he had been diagnosed with bipolar disorder several years earlier and had filed numerous complaints with jail staff communicating this information.[90] Another prisoner reported having to wait three months after intake before he saw a psychiatrist, even though he had a 20-year history of bipolar disorder and paranoid schizophrenia that could be confirmed by state agencies.[91] He described his experience waiting for psychiatric treatment: "When I don't take my medication I become homicidal and I can't sleep and I start shaking. I'm trying to control my thoughts and my anger because I don't want to hurt anybody while I'm here."[92]

Yet another prisoner reported that even though he had an outside diagnosis of anxiety and depression, he had to wait several weeks and file approximately ten complaints with deputies before he was allowed to see a psychiatrist.[93] However, even after he was allowed to see a psychiatrist he was declassified, or "declassed" four times because he was not presenting symptoms. That is, he was removed from the mental health caseload and denied the medications that stabilized him, forcing him to undergo the process of waiting to see a psychiatrist and seeking a diagnosis and medication all over again before receiving treatment for conditions that had been diagnosed outside the jail.[94]

---

[90] Declaration of Prisoner 2, June 22, 2009, at ¶¶ 3, 9.
[91] Declaration of Prisoner 3, July 14, 2009, at ¶¶ 4-5.
[92] *Id.* at ¶ 5.
[93] Declaration of Prisoner 4, June 24, 2009, at ¶¶ 3-4.
[94] *Id. See also* declaration of Prisoner 5, June 22, 2009, at ¶¶ 4-6 (20 years with a diagnosis of schizophrenia, on SSI and receiving treatment from County Mental Health Services before arrest, did not receive psychotropic medications for 3 months, doctors told him he did not "fit the criteria" of a mentally ill patient).

Furthermore, many prisoners report providing the intake staff at the jails with information about their specific diagnoses and prescriptions, as well as contact information to obtain psychiatric records, only then to be classified into the general population within the jail and denied adequate treatment because the intake staff concluded that they did not currently present severe mental illness symptoms.[95] For example, one prisoner who had been diagnosed with paranoid schizophrenia in the community—and had even been hospitalized for his condition— reported that he was unable to convince the psychiatrists he spoke to upon entering MCJ of his need for the same medication he was on before his arrest, even though he was evaluated by mental health staff twice and had informed them of his prior diagnosis and hospitalization.[96] He explained, "Both times I told them about my condition and they haven't prescribed my medication. Without my medication, I am paranoid, my thoughts are racing, I pace in my cell, I put tissue in my ears to try to block out the voices."[97]

The deficiency of this symptomatology-based approach to psychological evaluation is only exacerbated by the cursory nature of the initial mental health assessment prisoners receive at the Jail.  Dr. Kupers noted that an accurate diagnosis requires spending significant time with the patient, and most of the diagnoses reached outside the jail are the product of lengthy evaluations. By contrast, the psychological assessments conducted during the jail intake process are far more cursory and thus far more likely to be inaccurate. For example, one prisoner who had been diagnosed with severe mental illness as a teenager reported that his psychiatric evaluation took only 45 seconds: "The doctor here told me that I was trying to play the system

_____

[95] Declarations of Prisoner 6, June 25, 2009, at ¶ 3; Prisoner 7, June 25, 2009, at ¶ 4
[96] Declaration of Prisoner 8, July 23, 2009, at ¶¶ 3-4.
[97] *Id.*

and that I wasn't sick. He diagnosed me after 45 seconds. . . . [He] took me off all of my

medication which I had previously been on."[98]

One disturbing consequence of the inadequacy of the initial mental health evaluations at

MCJ is that many prisoners feel the only way to get psychiatric attention is to act out in some

way.  For example, one prisoner explains:

> When I first came into jail, I was on a breathing machine in the hospital. I was
> placed in a medical ward and despite my requests for mental health treatment, I
> was ignored. I finally broke a window during an episode while feeling suicidal.
> After breaking the window, I finally saw a psych, but I was also punished for
> breaking the window. When I was in LA county jails previously, I received
> mental health treatment. I've been in the Tarzana Mental Health Center, and when
> I was in prison, I was classed EOP [Enhanced Outpatient Program]. I told the
> psych that I was EOP, but I was still de-classed from the Towers. I have been
> receiving mental health treatment since I was 9 years old.[99]

In this instance, and many others, the property damage and the disciplinary action may

both have been avoided if the prisoner had been more thoroughly screened when he entered jail.

His long record of mental health treatment, particularly treatment within Los Angeles County

jails and state prisons, should have flagged him for quicker attention and a thorough assessment

of his mental health condition and need for mental health treatment

Likewise, prisoners who view the mechanisms for requesting psychiatric help as broken

or ineffective feel the need to engage in extreme actions such as suicide attempts or violence

against others as the only way to obtain a response from mental health staff.[100] One prisoner

expressed this sentiment: "The hole has been the best place for me. Generally, the hole is the

---

[98] Declaration of Prisoner 9, June 10, 2009, at ¶¶ 4-5.  Another prisoner who had been diagnosed
with bipolar disorder and schizophrenia 7 years before his arrest described a similar experience
with the JMET walkthroughs: "When I finally saw the psych, we spoke for 1 or 2 minutes. The
psych talked to me really fast and it felt like she was just trying to get rid of me." Declaration of
Prisoner 10, July 21, 2009, at ¶¶ 3-5.
[99] Declaration of Prisoner 1, June 10, 2009, at ¶¶ 2-3.
[100] For example, one prisoner gave a chilling description of his experience: "The deputies ignore
my mental health conditions and it seems to me that they will not give me my medication until I
seriously hurt myself." Declaration of Prisoner 11, June 18, 2009, at ¶ 5.

only place where I get my special medication and diet. . . . The only place where I get

appropriate medical treatment is in discipline. I'm tempted to earn discipline time just so I can

stay in the hole."[101]

### B.     Overcrowded and Noxious Conditions at MCJ Exacerbate Mental Illness and Overwhelm the Facility's Very Limited Mental Health System

In his report, Dr. Kupers noted that the noxious, overcrowded conditions inside MCJ

exacerbate mental illness for those prisoners who are prone to mental health problems and can

produce symptoms of mental illness in prisoners who were previously healthy.[102] Dr. Kupers

described the overcrowded jails and their effect on a prisoner's mental health:

> Consider a dormitory that was built for a small number but had to be expanded to house 150 prisoners in bunk beds lined up in rows . . . . A prisoner cannot move more than a few feet away from a neighbor, and lines form at the pay telephones and urinals. Likewise, when four men are crowded into the small [four-man] cells I observed, there is barely enough room for one man to get off his bunk and head for the urinal. In most cells . . . there are no chairs and no desks, so sitting or lying on one's bunk are the only options. With tough men crowded into small spaces and forced to lie on their bunks or wait in lines . . . altercations are inevitable. . . . Irritability mounts, tempers flare. Some men get into fights or curse an officer and are ticketed and sentenced to a stint in disciplinary segregation. As the men become angrier, their confusion and symptoms of serious mental illness mount.[103]

Dr. Kupers also observed other "destructive" conditions of MCJ.[104] Prisoners spend

nearly 24 hours per day in their cells or packed into overcrowded dormitories. They eat their

meals there and because of a lack of programming have little opportunity to leave their cells or

dorms other than for the 3 hours per week of recreation time. The lighting in their cells is

insufficient for reading in the day.  The practice of leaving some lights on all night interferes

with sleep.[105] The vast majority of the cells are windowless so prisoners have little awareness of

---

[101] Declaration of Prisoner 9, June 10, 2009, at ¶¶ 4, 8.
[102] Kupers Report, *supra* note 4, at 7, 33-40.
[103] *Id.* at 7.
[104] *Id.* at 12.
[105] *Id.*

what time of day it is, and because of the older architecture and acoustics of the jail the noise level is very high.[106]

Dr. Kupers explained that subjecting individuals who have, or are prone to, mental illness to these overcrowded conditions and to this degree of idleness has the effect of fostering or worsening their mental illnesses.[107] Some men become irritable and angry and act out aggressively against other inmates or deputies; others retreat to their bunks where they remain all day. "If they are prone to depression, the self-imposed isolation within the crowded space worsens their condition and leads to thoughts of self-harm."[108]

This effect is one that the jail monitors have observed in their work at MCJ as well. For example, one prisoner suffering from schizophrenia described his experience living in a 4-man cell. He explained to the jail monitors that living in cramped quarters aggravated his condition, that he felt he was around too many people, and that he wanted to be in a cell with fewer people and more space: "When I am around too many people I scream and sometimes pee on the sides of the toilet. Cellmates generally get angry at me and they don't understand my conditions. This gets me in trouble and it forces me to fight. I get into it with them because I try to force them to understand me."[109] "The jails are noisy," he said, "It is like an amusement park. When it is too noisy it makes me feel as if someone is out to get me. It makes me feel paranoid like my cell is about to open up and someone will come and get me."[110] Another prisoner suffering from bipolar disorder and depression echoed a similar sentiment: "I feel like the jail conditions made me

_____

[106] *Id.*
[107] *Id*. at 7, 37.
[108] *Id.* at 7-8.
[109] Declaration of Prisoner 12, July 16, 2009, at ¶ 4.
[110] *Id.* at ¶ 6.

worse. In particular, I have always felt claustrophobic and being closed in was just too much. I just couldn't deal with it."[111]

Moreover, Dr. Kupers found that the conditions in disciplinary segregation were even more toxic than those in the jail's general population units.[112] There is a disproportionate number of prisoners with serious mental illness in disciplinary segregation units, which tends to amplify the already chaotic atmosphere there.[113] Prisoners suffering from mental illness often shout or cry at night, making it difficult for others to sleep.[114] Others act out against deputies, increasing the level of tension between the officers and the prisoners in the unit.[115] In disciplinary housing, unlike in housing for the general population, prisoners are housed in single-man cells. This increases social isolation, which, for prisoners with severe mental illness, often causes them to "suffer a great deal of pain and mental deterioration . . . ."[116]

The result is an endless cycle of psychiatric distress within the jail. Conditions in the jail, which are largely the result of overcrowding, exacerbate the mental illness of prisoners prone to mental health problems and cause previously healthy prisoners to begin experiencing and displaying psychiatric symptoms. The large number of prisoners needing mental health treatment overwhelms the limited resources of the jail's mental health care system and results in many prisoners receiving inadequate treatment, at best, and many other prisoners receiving no treatment at all. The lack of adequate mental health treatment for those prisoners then leads to many of them acting out and/or being placed in disciplinary segregation, where their mental

---

[111] Declaration of Prisoner 10, July 21, 2009, at ¶ 3.
[112] Kupers Report, *supra* note 4, at 33-40.
[113] *Id.* at 34.
[114] *See Id.*
[115] *Id.*
[116] *Id.* at 36.

health may further deteriorate. This, in turn, contributes to the toxic conditions in those units and throughout the jail.

###    C.    Problems with Confidentiality of Care

The lack of confidentiality at MCJ for mental health interviews and treatment is another major barrier to adequate mental health care for prisoners. At MCJ, mental health evaluations often take place at prisoners' cells during unit walkthroughs conducted by the Jails Mental Evaluation Teams (JMET). Each JMET unit consists of one deputy sheriff and one Department of Mental Health clinician. The teams are tasked with providing outreach mental health services to prisoners and identifying prisoners who develop new mental health symptoms while in jail. To meet this goal, JMET units periodically walk through the jails asking prisoners whether they are experiencing any psychological distress. Despite the good intentions of the JMET teams and the Department of Mental Health staff, however, the lack of confidentiality for their cell-side assessments of prisoners impedes these efforts.

Many prisoners feel concerned about candidly relaying their mental health issues within earshot of both other prisoners and deputies in their housing location because doing so could jeopardize their personal safety. This concern often leads prisoners to self-censor rather than risk putting themselves in danger of bodily harm. The confidentiality of the mental health walkthroughs at MCJ are further compromised by the presence of deputies alongside the mental health personnel. One prisoner explained, "I told the clinician that I was concerned about the deputy standing so close. He told me not to worry about the deputy, and that the deputy could stand there. I saw the deputy making mocking expressions while other prisoners reported complaints…. After the mental health guy walked the row, he pulled me down to the end of the tier. I was still within earshot of the deputy and all the other prisoners on the tier. When I got

34

down there, the mental health person started asking me why it had to be secret. He had an attitude that minimized all of my concerns."[117]

The experience of this prisoner tallies with the experience of the jail monitors, who have observed numerous JMET walkthroughs. One monitor described an assessment she observed:

> The JMET nurse had the prisoner sign a release of information to allow me to be present during the interview.  She did not, however, do this for the deputy.  The deputy sat within 2 feet of the interview and listened to the entire conversation. The nurse stated that this deputy was bound by confidentiality, just the same as she was bound.  She did not, however, explain this to the prisoners until I asked her to do so.  She stated that she would never interview prisoners in private without a deputy standing over them.[118]

By keeping deputies present during the evaluation and refusing to acknowledge concerns a prisoners has about the deputy's presence, the mental health staff greatly limit the effectiveness of their evaluations and, as a result, the effectiveness of the mental health treatment they can provide.

### D.    Improper Disciplinary Measures Used on Prisoners with Mental Illness

Mentally ill prisoners may be more likely to have conflicts with deputies, particularly those deputies who lack training on how to interact with prisoners with mental illness. Prisoners with mental illness can seem insubordinate, unresponsive to deputy commands, and even prone to violence. Untrained deputies naturally respond to these behaviors by disciplining prisoners, which can result in their being placed in solitary confinement or "the hole."[119] Dr. Kupers notes

---

[117] Declaration of Prisoner 13, July 17, 2009, at ¶¶ 6-7.

[118] ACLU Jails Project, JMET tour notes, July 11, 2007 (on file with the ACLU-SC).

[119] Kupers Report, *supra* note 4, at 33-34. "[A]disproportionate number of prisoners with serious mental illness predictably wind up in punitive segregation."

this form of punishment is particularly dangerous to people with mental illness because the isolation can lead to mental health deterioration and even suicide attempts.[120]

The apparent lack of appropriate mental health training for deputies at MCJ also manifests itself in their mocking or ignoring prisoners' requests for psychiatric help. One prisoner explains: "The guards mock prisoners with mental health problems. I saw two inmates complaining of mental health problems get beaten up and dragged out. The guards that did the beating were at work the next day."[121]

Another prisoner describes a similar experience: "The deputies ignore my mental health conditions and it seems to me that they will not give me my medication until I seriously hurt myself. When I was in psych review they made me live in a cell with my own excrements. The mental health personnel treat me like they think I am joking about having mental health issues."[122]

The widespread perception held by prisoners that deputies and other staff do not take requests for mental health care seriously impedes the effectiveness of self reporting because prisoners believe that requesting to see a psychiatrist is ineffective and will invite abuse. As Dr. Kupers reports, "Multiple prisoners have told me about abuses they have undergone or witnessed, and most say it is disproportionately directed at prisoners with serious mental illness."[123] This is particularly problematic because the prisoners in MCJ are constantly locked in their cells with little contact with anyone other than Sheriff's deputies. Thus, one of the most common ways to access treatment is to request it from deputies.

---

[120] *Id.* at 39. "[T]here has been a substantial amount of research into the harmful effects of isolated confinement, especially if the prisoner thus confined suffers from a serious mental illness, or is vulnerable to mental illness."
[121] Declaration of Prisoner 1, June 10, 2009, at ¶ 5.
[122] Declaration of Prisoner 11, June 18, 2009, at ¶ 5.
[123] Kupers Report, *supra* note 4, at 41.

### E.     Recommendations

Over the last several years, both the LASD and DMH staff have been cooperative in addressing the mental health needs of individual prisoners when we have brought these concerns to their attention (for example, by sending mental health staff to speak with individual prisoners who complain they are in distress and in need of mental health services). LASD has also added 175 mental health beds in the Twin Towers Correctional Facility (TTCF), the facility within the L.A. County Jails system that Dr. Kupers notes is best-equipped for the treatment of mentally ill prisoners. This expansion will allow more prisoners with severe mental illness to move from MCJ to TTCF, where they can receive the continuous, intensive treatment they require. For those prisoners with mental health needs that are not housed in Twin Towers, however, many systemic issues with mental health care in MCJ remain to be addressed. Larger reforms are necessary for MCJ to improve the treatment of prisoners with mental illnesses.

Because of overcrowding and understaffing, prisoners with serious mental illness housed at MCJ lack access to adequate mental health treatment. The overcrowded and decrepit conditions of the jail, the oldest facility in the Los Angeles County Jail System, exacerbate mental illness in prisoners with who are mentally ill and often lead to prisoners who were previously healthy displaying psychiatric symptoms. This, in turn, increases the level of chaos in the jail and leads to the disproportionate victimization of prisoners with mental illness and to excessive discipline being levied against prisoners for behavior consistent with the mental illness that they otherwise cannot control.

These conditions are harmful to the prisoners of MCJ, the deputies who staff the jail, and the communities that prisoners are sent back to when they are released, but by adopting the recommendations set out below, recommendations which are cost-effective and which have been

proven in numerous other jurisdictions, many of these problems can be alleviated and significant

progress can be made. These reforms include:

- **LASD must reduce the population at MCJ to alleviate the overcrowding and toxic living conditions that plague the facility and endanger mentally ill prisoners. The LASD should also move prisoners with mental illness to other jail facilities (e.g. North County Correctional Facility) where prisoners are not constantly locked down and where prisoners have access to more programming options.** Massive overcrowding in MCJ makes it extremely difficult for mental health staff to diagnose and treat all prisoners in need of their services; it makes the conditions severely noxious for anyone suffering from mental illness; and it increases violence, suicide attempts and psychiatric breakdowns. This problem can be solved, in part, by taking measures to reduce the prison population in MCJ by moving prisoners with mental illness to other facilities within the Los Angeles County Jail System, particularly North County Correctional Facility. This facility is newer than MCJ, less crowded, and offers more programming options than can be offered at the crowded MCJ. It currently offers no mental health treatment to prisoners; thus, all prisoners with mental illness are forced to remain in Twin Towers or MCJ. However, mental health services can be expanded to cover the North County facility so that the duty of providing mental health treatment to the thousands of mentally ill prisoners within the Los Angeles County Jail System does not fall disproportionally on the already overwhelmed mental health staff at MCJ.

- **LASD should ensure the continuity of care for prisoners in MCJ who have been diagnosed as mentally ill before they were arrested by having them timely assessed by a psychiatrist and continuing their confirmed medications until they are fully assessed.** Given the sheer number of prisoners who enter the Los Angeles County Jail system every year, it is difficult to perform a complete and adequate screening for mental illness for every prisoner who enters the system. However, LASD cannot disregard its obligation to treat its mentally ill prisoners.  It is critical that LASD ensures the continuity of care for newly admitted prisoners who have previously been diagnosed and treated for mental illness.  All newly admitted prisoners must be adequately assessed at booking, and receive an initial mental health assessment Any newly arrived prisoner with a mental health diagnosis on initial screen should be referred to a provider, who should then assess and diagnose them. All prisoners who report current medications should also be referred to a provider.  Mental health staff should immediately get a release allowing them access to the prisoner's medical records and confirm the prisoner's current medications.  Then the patient should be seen by a provider to ensure continuity of medications. The medications should continue to be provided until the diagnosis and treatment history is either denied or confirmed. The provider should document a rationale for any change in diagnosis.

- **LASD should expand the accessibility of mental health care for prisoners at MCJ by improving JMET walkthroughs, augmenting JMET walkthroughs with a reliable system allowing prisoners to file written health care requests that can be assessed in a confidential setting, and hiring an adequate number of mental health staff and psychiatrists for the facility.**   Once a prisoner goes through initial classification and is deemed not to need mental health treatment—regardless of whether that diagnosis is correct—it is very difficult for that

38

prisoner thereafter to access the mental health care system in MCJ. Cell-front interviews are often ineffective for mental health screening because the lack of confidentiality significantly deters prisoners from requesting help. Furthermore, because of the limited resources at their disposal, the LASD and DMH lack the staff necessary to conduct a thorough follow-up assessment of the thousands of prisoners who enter from the Los Angeles Jails System every year. To ensure that prisoners missed by the initial screening are not deprived of mental health care, more opportunities must be created within MCJ for prisoners to receive mental health treatment by expanding JMET walkthroughs and augmenting these walkthroughs with a process by which prisoners can file confidential written requests for medical assistance. These written requests can then become part of a reliable system by which prisoners can be assessed by a provider in a confidential setting without fear of being overheard by other prisoners or by custody staff.

IV.     **UNSAFE AND UNSANITARY FACILITIES AT MEN'S CENTRAL JAIL**

> *"Conditions in the jail are awful.  The jail is dirty.  In my row the floor is littered with trash such as socks, paper, and water from the showers. They don't clean the showers. There is black mildew built up in the corners.  The row is so dirty that we have a rodent problem.  Mice generally come out at night.  Although 2100 has a bad rodent problem, 2900 (where I was housed before) has a rodent problem so bad that one time a mouse fell on my face. When I was in 2900, I would see 1-2 mice running around my cell.  In 2100, there is usually one mouse running around.  There are also cockroaches.  They come from behind the sink and hide in the pipes on the bed frames.  At night the cockroaches come out."[124]*

Despite more than thirty years of joint efforts by the ACLU and the LASD to alleviate overcrowding and improve conditions in the Los Angeles County jail system, MCJ remains shockingly overcrowded, unsafe, and unsanitary.  Although the Court has handed down multiple orders over the years admonishing the Sheriff's Department to decrease overcrowding and remedy physical conditions inside the jails, the Jails Project monitors still see countless problems every time they enter MCJ. This section provides a glimpse into the unsafe and unsanitary conditions that the Jails Project monitors have encountered over the past two years in MCJ and offers recommendations on how to improve living conditions and programming in the jail.

A.     **Problems with Spatial Density**

> *"My cell is small and cramped and I have very limited movement.  There is no window and the lights are always dim.  This makes it very hard to keep my mood up . . . . I feel so claustrophobic in my cell that I usually stand up against the bars to feel like I'm in a wider space and breathe more easily. Sometimes I stand at the bars for hours and hours without sitting down."[125]*

The national standards published by the American Correctional Association (ACA) recommend that each prisoner should be provided a minimum of 35 square feet of

_____

[124] Declaration of Prisoner 14, July 9, 2009, at ¶ 3.
[125] Declaration of Prisoner 16, July 15, 2008, at ¶¶ 1, 3.

"unencumbered space" (space not occupied by furniture).[126]  The ACA further recommends that prisoners who spend more than ten hours per day locked in their cells or dormitories should have at least 70 square feet of total floor space per person.[127]  The spatial density at MCJ—the space provided per prisoner in a room or area—falls shockingly short of these nationally recognized standards.[128]

In June 2008, Dr. Kupers concluded that "the cells and dormitories [throughout the jail] violate minimum standards in terms of . . . spatial density."[129]  Since then, the LASD has taken steps to ease overcrowding by reducing the capacity of the old six-men and four-men cells to four-men and two-men, respectively.  Even with such changes, however, Dr. Kupers' 2008 conclusion that the LASD is violating the ACA standards still holds true today.  In every cell and dormitory in MCJ, prisoners are crammed into tight quarters, with very little space of their own, as the following table illustrates.

|  | 1-Man Cells (1700 B) | 2-Man Cells (2400 C) | 4-Man Cells (2200 A) |
|---|---|---|---|
| Cell Dimension | 4.5' x 9.5' | 9' x 9' | 13' x 9' |
| Square Footage | 42.75 sq. feet | 81 sq. feet | 117 sq. feet |
| Encumbered Space | 15.83 sq. feet | 15.83 sq. feet | 31.66 sq. feet |
| Unencumbered Space (Total) | 26.92 sq. feet | 65.17 sq. feet | 85.34 sq. feet |
| Unencumbered Space Per Prisoner | 26.92 sq. feet | 32.56 sq. feet | 21.34 sq. feet |
| ACA Recommendation for Unencumbered Space Per Prisoner | 35 sq. feet | 35 sq. feet | 35 sq. feet |

---

[126] *See* ACA Standards for Adult Local Detention Facilities, 3rd Edition, Supplement 2006.
[127] *Id.; see also* Kupers Report, *supra* note 4, at 10-15.  Dr. Kupers notes that the ACA's shifting space recommendations are premised on the fact "that if an individual is confined in a very small space the negative effects can be somewhat ameliorated by the time spent outside the space."
[128] While it is important to remember that these figures do not establish the constitutional minimum requirements for the amount of space allotted to prisoners, they do provide a good starting point for defining impermissible "overcrowding."
[129] Kupers' Report, *supra* note 4, at 14.

Similar overcrowding occurs in the jail's numerous dormitories, as well. The California Department of Corrections and Rehabilitation's Corrections Standards Authority (CSA) establishes a rated capacity for every jail facility or prison in the state of California. The rated capacity refers to the number of occupants for which a facility, or a particular part of a facility (i.e. a dormitory or cell), was planned and designed in conformity with the standards and requirements of Title 15 and Title 24.[130] The CSA's rated capacity for the dormitories at MCJ ranges from 62-80 occupants, depending on the particular dorm;[131] the actual number of beds in the dormitories at MCJ, however, ranges from 110 in the least occupied dorm, to 160 in the most highly occupied dorm, almost twice the rated capacity of 64 and 87, respectively. Even when, as has occurred in the past, the LASD can reduce the number of prisoners in the dorms so that 10, or even 20, beds are empty, the problem of overcrowding is not substantially alleviated because the empty bunks continue to encumber the living space of the remaining prisoners.

This data illustrates, objectively, the severe overcrowding that occurs in MCJ. What this data cannot illustrate, however, are the devastating, subjectively experienced effects of crowding prisoners into such small cells and dormitories.  Research indicates that overcrowding leads to "increased rates of violence, psychiatric breakdown and suicide in correctional facilities,"[132] as

---

[130] 15 Cal. Code Reg. ¶ 1006.

[131] Letter from Magi Work, Field Representative, Facilities Standards and Operations Division, California Department of Corrections and Rehabilitation Corrections Standards Authority, to Sheriff Leroy D. Baca (September 25, 2009) (on file with the ACLU-SC).

[132] *Id.* at 6. *See also id.* at 7 ("With tough men crowded into small spaces and forced to lie on their bunks . . . altercations are practically inevitable."); 7-8 ("Others retreat into their bunks where they remain all day.  If they are prone to depression, the self-imposed isolation with the crowded space worsens their condition and leads to thoughts of self-harm."); 16 (stating the conditions at MCJ are "a combination of toxic conditions that [are] guaranteed to predictably increase the prevalence of violence, psychiatric breakdown and self-harm").

well as illness complaints, disciplinary infractions, and recidivism.[133] The prisoners at MCJ

endure the effects of this crowding daily. One prisoner explained, "The dorm I lived in was

overcrowded. At a population of 100 we were fine, but when we were at capacity, 140 people, it

would be really hot. We'd have no ventilation and that caused staph infections to proliferate

throughout the dorm. . . . Fights would take place frequently []. There are a lot of hidden corners

of the dorm, completely out of view of what we called the bubble, also known as that place

where deputies were able to supervise us from. In these hidden corners we had organized fights. .

. . This would take place out of the view of the deputies."[134]

    The one-man cells, used to segregate prisoners as punishment or for their own protection

(such as when an inmate requires protective custody), are so small that a prisoner standing with

his arms outstretched can easily touch both walls at once.[135]  In the four-man cells, it is difficult

for more than a couple of men to be out of their bunks at the same time without bumping into

each other.[136]  In the dormitories that contain upwards of 230 prisoners, the tiered bunk beds are

stacked so closely together that there is barely room to move between the rows of beds, and the

_____

[133] Craig Haney, *The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions*, 22 WASH. U.J.L. & POL'Y 265 (2006).
[134] Complaint of Prisoner 20, filed with the ACLU-SC on October 20, 2009 (on file). Another prisoner reiterated this sentiment: "The dormitory I was housed in was filled with about 150 men. . . . There was a lot of tension in that giant dorm." Complaint of Prisoner 30, filed October 14, 2009 (on file with the ACLU-SC).
[135] *See e.g,*, declarations of Prisoner 16, July 15, 2008, at ¶¶1-3, 5 ("The only furniture in my cell is a stool and a bunk, but since the cell is so small, I have to squeeze by the stool to get to the toilet and stand on top of the stool to get to my bunk.  I feel so claustrophobic in my cell . . . .I eat all my meals in [] either sitting on my bed or on a stool.  I haven't sat down at a table to eat in eight years."); Prisoner 31, July 23, 2009, at ¶ 3 ("My cell is very small. I can take about five steps from the bars in front to the toilet and sink in the back. I can take about two steps from the bottom of the bed to the wall on the side because the width of the cell is much smaller than the length. My cell has a bed, a toilet, and a sink but not desk or chair. The only places I can sit all day are the bed or the toilet.").
[136] *See e.g.*, declaration of Prisoner 21, July 10, 2009, at ¶ 3 ("There is no room to walk around and there are no tables or seats, so you can either walk from your bed to the sink and back or just sit in bed.").

heads of one row of beds are usually touching the feet of the next row of beds so that there is only open space on two sides of each bunk row. As a result, often the only available way that prisoners have to get to their beds is by jumping over the head or foot of the bed or jumping over another prisoner.

The prisoners in dormitories spend nearly all of their time on their beds because there are no tables and chairs. Even though the ACA recommends that prisons provide one toilet and one washbasin for every 12 prisoners,[137] overcrowding in the dorms often cause the jail to exceed the one-to-twelve ratio. One prisoner reports: "There are no tables to eat meals. I have to eat in my bed, at the same place I sleep at night . . . . There are only 5 toilets and 5 sinks for the 120 people in my dorm. The ventilation is very poor and there is very little space for the 120 people. All of the beds are pushed very close together. It is so cramped that illnesses spread really quickly."[138]

Similarly, overcrowding has negative effects on the jail staff's ability to carry out their custodial duties, as overcrowding makes it more difficult for staff to carry out their duties for such large numbers of prisoners. In overcrowded conditions, jail staff cannot provide adequate attention to prisoners to ensure that they receive medical and mental health attention; frequent showers; changes of clothing; and other services; or that plumbing and other physical plant problems are identified and repaired. Moreover, as Dr. Kupers notes, jail staff "become increasingly insensitive to [prisoners'] concerns when they have to interact with masses of [prisoners] each day."[139] Thus, overcrowding can easily be identified as a direct cause of many of the problems with the jail conditions identified in this report.

---

[137] *See* AMERICAN CORRECTIONAL ASSOCIATION, PERFORMANCE-BASED STANDARDS FOR ADULT LOCAL DETENTION FACILITIES (4th ed. 2004).
[138] Declaration of Prisoner 1, June 29, 2009, at ¶ 7.
[139] Kupers Report, *supra* note 4, at 16.

**B.      Poor Living Conditions at MCJ are Exacerbated by Overcrowding**

The living conditions within MCJ are hazardous and unsanitary. Prisoners at MCJ are housed in cramped cells or dorms. The cells and dorms are often filthy.  It is not uncommon for prisoners to report clogged toilets leaking waste water onto floors, rotting fruit and other trash on the floors of the hallways; or rats and vermin scurrying around their cells.[140]  The shower areas are also filthy and moldy.  Cells and dorms are windowless, and are plagued with poor ventilation and extreme temperatures.[141]  These unsanitary and overcrowded conditions are of particular concern due to the risk of communicable diseases, such as staph infections, in the jail.

Many of the problems with the living conditions at MCJ are caused and exacerbated by overcrowding.  In some units, two or three deputies are responsible for a housing area of 250 to 500 prisoners.  High prisoner-to-staff ratios make it difficult and sometimes impossible for deputies to carry out their duties, such as providing prisoners access to showers, handling clothing exchange, and distributing meals. Deputies often must carry out multiple orders at the same time, causing them to discontinue one activity to begin another.  Prisoners' shower times might be cut short so the deputy can supervise laundry exchange, which then may be discontinued so the deputy can escort nursing staff during pill call.  Thus, it is easy to see how, as a result of overcrowding and high prisoner-to-staff ratios, deputies may not be able to complete

---

[140] *See, e.g.,* Declarations of Prisoner 9, June 24, 2009, at ¶ 5 (blood and feces on the walls in cells in mental health housing); Prisoner 5, June 22, 2009, at ¶ 9 (food trays were filthy, cells flooded with water); Prisoner 14, July 09, 2009, at ¶¶3-4 (infestation of mice in every module, also roaches, toilets backed up, overflowing); Prisoner 15, July 09, 2009, at ¶¶ 3-4 (vermin because everyone must eat in their cells, no cleaning supplies); Prisoner 16, July 15, 2008, at ¶6 (floor smells, roaches).

[141] For instance, on April 29, 2009, the ACLU visited Dorm 8030 in MCJ to investigate a complaint received from a prisoner on April 9, 2009, that the dorm was extremely hot with no noticeable moving air.  Twenty days after the initial complaint, there was still no change.  The ACLU complained that with approximately 60 men housed in this dorm, the high temperatures, mixed with the lack of moving air, is of great concern.

their duties and meet the legal requirements of providing sanitary living conditions, showers, and

clothing exchange to prisoners, despite the deputies' bests efforts. The following sections outline

in more detail specific problems with conditions in MCJ.

### 1.    Unsanitary Living Conditions

>    *"The conditions I live in at jail are gross.  The deputies don't give us*
> *cleaning supplies.  Instead, we have to use the small bar of soap that we also*
> *use to wash ourselves [to clean the dorm] . . . .The showers in my dorm are*
> *moldy and gross.  There is black stuff on the bottom of the shower and I really*
> *don't like to touch it . . . .I have seen roaches on the floor.  This is gross.  It's so*
> *dirty in here and I don't want to touch anything.  It makes me all clenched*
> *up."[142]*

Although the courts have been clear that prisoners should not be forced to live in

disgusting and degrading conditions that may contribute to the spread infectious diseases, the

Jails Project monitors continue to see unsanitary conditions at MCJ day after day, year after year.

Prisoners regularly complain to both jail staff and the Jails Project monitors about the unsanitary

conditions in their cells, dorms, and showers.  These complaints paint a bleak picture of the

living conditions in MCJ.  One prisoner remembered being placed in a cell that obviously had

not been cleaned before his arrival, as he noted there were blood and feces on the walls.[143] Other

prisoners report sleeping on mattresses that are coated in a thick layer of dust, living in cells

where rats and roaches scurry around at night, and walking around piles of rotting fruit and other

trash on the floors of the hallways.[144]  The showers are similarly filthy, with clogged drains,

---

[142] Declaration of Prisoner 15, July 9, 2009, at ¶¶ 3-7.
[143] Declaration of Prisoner 9, June 24, 2009, at ¶ 5 ("[T]here were feces and blood on the walls.
It seemed like it was 1492.").
[144] *See, e.g.,* declaration of Prisoner 17, July 09, 2009, at ¶ 6 ("There are frequently mice running
around . . . I had to block the bottom of my door prevent the mice from coming in."). *See also*
declarations of Prisoner 9, June 24, 2009, at ¶ 5 (blood and feces on the walls in cells in mental
health housing); Prisoner 5, June 22, 2009, at ¶ 9 (food trays were filthy, cells flooded with
water); Prisoner 14, July 09, 2009, at ¶¶3-4 (infestation of mice in every module, also roaches,
toilets backed up, overflowing); Prisoner 15, July 09. 2009, at ¶¶ 3-4 (vermin because everyone

floors blackened by visible mold, and dirty plastic sheets sometimes used as shower curtains.[145] The Jails Project monitors have corroborated these prisoner reports during their walkthroughs at MCJ.

These unsanitary conditions are exacerbated by the overcrowding at MCJ. One prisoner described his experience: "The dorm I lived in was overcrowded. At a population of 100 we were fine, but when we were at capacity, 140 people, it would be really hot [and] we'd have no ventilation . . . . Someone would develop a staph infection every two or three weeks. Most staph cases were from people coming into the dorm with it. Mats were never cleaned and the person who slept there before might have had staph."[146]

Although jail policy dictates that prisoners will be provided cleaning supplies if they request them, prisoners regularly report to the Jails Project that deputies refuse to give out cleaning supplies, even after multiple requests.  For instance, one prisoner reports, "We are responsible for cleaning our own cells but they don't give us supplies to clean. Instead we have to ask trustees to give us soap and we keep our old towels and use them to clean up. I'm worried about the cleanliness because one of my cellmates has a staph infection on his leg."[147]

As a result, prisoners are forced to try and clean their cells in any way that they can.  For example, one prisoner reports having to use the same bar of soap he uses in the shower to clean

must eat in their cells, no cleaning supplies); Prisoner 16, July 15, 2008, at ¶6 (floor smells, roaches).

[145] *See, e.g.,* declarations of Prisoner 18, July 09, 2009, at ¶ 3 ("The showers are really dirty; I can see mold growing on them. I have to be really careful what I touch, because the showers are rarely cleaned. I cleaned the showers myself last time, and between cleanings it is usually a couple of months. I am worried about catching staph infections, because many prisoners have them."); Prisoner 15, July 09, 2009, at ¶4 (mold in showers); Prisoner 1, June 29, 2009, at ¶7 (showers are "very dirty" and "don't get disinfected," get showers once every 3 days); Prisoner 19, June 18, 2009, at ¶ 9 (showers are "dirty and crowded," also dangerous "because there is so much agitation because of the long lines and people get violent" while waiting for the shower); Prisoner 7, June 25, 2009, at ¶ 5 (no cleaning supplies).

[146] Complaint of Prisoner 20, filed with the ACLU-SC on October 20, 2009 (on file).

[147] Declaration of Prisoner 21, July 19, 2009, at ¶ 5.

his body with to also clean his cell because jail staff failed to give him any other cleaning

supplies or disinfectant.[148] Other prisoners report that they wish the jail commissary sold

cleaning supplies because they would be willing to spend their own money to make their spaces

more sanitary and livable.

### 2.       Plumbing Problems

> *"On my row there are also plumbing problems.  The toilets are plugged up.  The water overflows.  There are holes [in the toilet] . . . where the water is supposed to drain out.  It doesn't work well and makes the floor dirty.  Since I've been here I haven't seen anyone clean the drain holes on the tiers."[149]*

Plumbing leakages and stoppages are common in the jails. Prisoners report plumbing

problems to the Jails Project on a nearly daily basis.  Many prisoners, for example, report being

forced to shower in standing water as the grates that block the drains are often clogged.[150]  One

noted, "When they do offer us showers I choose not to go because . . . I saw the shower was

flooded and I was worried about getting infections in my feet."[151]  Numerous other prisoners

have echoed these complaints.[152] One prisoner offers a vivid description, "Before we even enter

the shower room, it's already flooded, with pubic hair floating around. Dirty water covers my

entire foot and I can see mold all over the place. I'm better off taking a shower in my cell using

the sink."[153] Another prisoner reported observing various cells flooding every day during his stay

---

[148] Declaration of Prisoner 7, June 25, 2009, at ¶ 5. *See also* declaration of Prisoner 22, July 16, 2009, at ¶ 6 ("The row is very dirty. All I have to clean my cell is the half bar of hand soap I'm given to wash up in the sink. The tier is never mopped and only swept a couple of times.").
[149] Declaration of Prisoner 14, July 9, 2009, at ¶ 4.
[150] ACLU Findings for week of March 23-April 3, 2009, reported by M. Bird, M. Tiedeman, and T. Weddle to the Commanders on April 28, 2009.
[151] Declaration of Prisoner 21, July 10, 2009, ¶ at 4.
[152] *See, e.g.*, declaration of Prisoner 23, June 18, 2009, at ¶ 5 (jails showers are filthy, forced to shower in standing water due to clogged shower drain).
[153] Declaration of Prisoner 24, October 13, 2009, ¶ at 3.

at MCJ.[154] Due to the frequent clogs and overflows, many dormitories reek of stale urine and feces, making the crowded quarters even more uncomfortable.[155]

Prisoners often do not receive mops and other cleaning supplies in a timely manner when toilets start overflowing. Prisoners sometimes have to use their towels and bedding to try and stay the flow of the leaking water. For example, on April 29, 2009, prisoners on 3500-D at MCJ reported that three cells had been flooded with raw sewage.[156] The prisoners occupying the cells were not moved, despite the flooding. For four days, the prisoners were forced either to stay on top of their bunks to avoid getting wet, or walk through the sewage to use the bathroom, stretch their legs, or get food. Although the plumbing had been fixed by the time the Jails Project monitors arrived, the cells had yet to be cleaned and the trustees were called to clean the cells only after the monitors complained.

When prisoners complain about plumbing problems during ACLU walk-throughs, the Jails Project monitors immediately alert the deputies staffing the unit of where the problem occurred and send a written request to LASD facilities management. Facilities management requests normally receive faster resolution than other complaints filed by the Jails Project on behalf of prisoners, yet much work remains to be done in this area to ensure that plumbing problems do not jeopardize the health and safety of the men at MCJ in the future.

### 3. Lack of Access to Showers

*"It's very easy to go over a week with no shower in here . . . . It seems like they just don't have enough deputies to get all these prisoners the showers we need to avoid Staph [infections] . . . . If they won't let me out to take a*

---

[154] Declaration of Prisoner 5, June 22, 2009, at ¶ 9 ("The conditions in the jail are not good . . . . The cells have been flooding every day.").

[155] Declaration of M. Tiedeman, July 13, 2009, at ¶7 ("I have been in those dorms when the toilets are so clogged up that the entire dorm reeks of stale urine and feces. The air is extremely stagnant and the entire room feels extremely claustrophobic.").

[156] ACLU Findings for the Weeks of April 27-May 15, 2009, sent by M. Bird, M. Tiedeman, and T. Weddle to Commanders on May 27, 2009 (on file with the ACLU-SC).

*shower for a while, I take a 'bird bath.' That's when I stand in front of my sink and splash water all over my body. I use the splashed water to wash the floor of my cell too. But nothing seems to be working. I feel like I'm stuck in an environment where it's impossible to keep clean."*[157]

Prisoners repeatedly complain to the Jails Project monitors that they do not receive showers regularly, often reporting that they have not received showers in a week or more.[158] When interviewed by the monitors, many prisoners smell bad and have matted hair despite their best efforts to clean themselves using hand soap and water from their sinks.[159]  Infrequent access to showers is a particularly problematic result of overcrowding, as it can lead to the spread of dangerous communicable diseases and infections in the jails.

The LASD is bound by Title 15 of the California Code of Regulation.[160] Under Title 15, prisoners are entitled to have access to showers "at least every other day or more often if possible."[161] The Department has gone even further, requiring that prisoners be given daily access to showers[162] in order to stop the spread of infections through the Jail, including methicillin-resistant *Staphylococcus aureus* ("MRSA"), a potentially fatal pathogen that kills more people per year than AIDS.[163] However, prisoners often report that they either do not

---

[157] Declaration of Prisoner 25, June 23, 2008, at ¶¶ 6, 9.

[158] S*ee, e.g.,* declarations of Prisoner 26, July 01, 2009, at ¶¶ 3-4 ("I get a shower every three days. I get pretty dirty in that three days.  The deputies give us showers when they feel like it. When we are on lockdown, it takes a week to get a shower, so I have to wash myself in the sink."); Prisoner 27, July 01, 2009, at ¶ 3 ("I usually get a shower once a week or whenever the guards feel like it"); M. Tiedeman, July 13, 2009, at ¶ 11 (frequently, prisoners do not get the required shower schedule, which is every other day, or every day for prisoners with drug-resistant staph infection, or MRSA).

[159] Declaration of M. Tiedeman, July 13, 2009, at ¶11.

[160] 15 Cal. Code of Reg. §§ 1004-1282 (minimum standards for local detention facilities).

[161] *Id.* at § 1266.

[162] Letter from Sheriff Baca to the Los Angeles County Board of Supervisors, dated September 1, 2004, regarding a "Response to Issues Related to MRSA."  The document is available at: http://file.lacounty.gov/bc/q3_2004/cms1_021695.htm#P-6_0 (last visited July 13, 2009).  The letter notes that "the availability of daily showers for all prisoners" was a corrective action taken by the Sheriff's Department to address the ongoing MRSA outbreak.

[163] Maryn McKenna, Superbug: The Fatal Menace of MRSA, (Free Press 2010) at 47.

receive showers regularly or are rushed in and out of showers so quickly that they do not get enough time to clean themselves thoroughly. This problem is compounded by many prisoners' only being offered time to shower at the same time they are offered the use of a telephone. Prisoners therefore often have to decide whether they want to use their few minutes in the shower room to wash, or attempt to make a phone call to their loved ones.[164]   One prisoner describes his experience: "It's very easy to go over a week with no shower in here because if [the deputies] skip your [shower] day for some reason, you go four days without a shower.  If they skip it again, it's been six days."[165] Another prisoner describes a similar experience:

> Nobody gets a shower on days that we have court.  We also don't get showers if the deputies decide to search our cells during shower time.  We miss showers all the time.  At the end of June 2008, I did not shower for five days.  I showered on June 16th, and I was supposed to shower again June 18th.  Since I had court on June 18th, I missed my shower for another two days.  Then on my fourth day without a shower, the deputies decided to do a cell search at 6:30 A.M., so I didn't get a shower that day either.  The fifth day without a shower was a scheduled no-shower day for me.  So even though I had missed my last few showers, I had to wait . . . .[166]

Prisoners tell us that when they are taken to the shower, they often do not receive enough time to shower thoroughly. One prisoner noted that he was only given one minute to shower every two to three days.[167]  Other prisoners report that deputies cram 15-30 people into the shower room with two bars of soap, then shut the water off after a few minutes, even if some of

---

[164] Declaration of Prisoner 16, July 15, 2008, at ¶¶ 18-19, 23 ("I am supposed to get a shower every other day for 15 minutes, but this does not always happen . . . .I literally have to stand in the shower and choose whether I am going to wash or make a phone call . . . . I try to wash as much as I can in 5 minutes.  Then I try to use the rest of the time to talk on the phone and hope that the deputy won't cut me off.").

[165] Declaration of Prisoner 25, June 23, 2008, at ¶¶ 5-6, 9 ("At the time, it was very hard for me to keep myself clean to prevent the [staph] infection from coming back. I was housed in 3100 and we would often go over a week without a shower . . . . It's especially hard to get showers for guys in the one-man cells because they have to take us out one at a time. It seems like they just don't have enough deputies to get all these prisoners the showers we need to avoid Staph . . . .I try my best to keep my cell clean. I wipe down the bars of my cell.").

[166] Declaration of Prisoner 16, July 15, 2008, at ¶¶ 18-19.

[167] Declaration of Prisoner 28, June 29, 2009, at ¶ 6.

the prisoners did not get under the shower head and others did not rinse off the soap. For example, one prisoner reports, "There are usually 10-18 people in the shower at one time. . . . Only one shower head works. We have to rotate so one prisoner only gets a few seconds in the shower head that works. The bottom of the shower, from 8 to 12 inches from the floor had a black fungus that ringed around the shower."[168] Between showers, prisoners often attempt to give themselves "bird baths" by splashing water on themselves from the sinks in their cells, lathering up with their hand soap, and then waiting to dry.[169]

The LASD also fails to keep accurate documentation on prisoners' access to showers. When prisoners complain about problems getting showers, the Jails Project monitors check the Uniform Daily Activity Log (UDAL) where deputies are required to document many of the activities that occur in the unit, such as how often prisoners shower or receive mail. The monitors have frequently found that the information in these logs is questionable or inaccurate. For example, entire rows of men and other jail staff will report that the rows are not receiving showers, but the log will indicate that showers have been offered every day. The monitors have also found that staff have sometimes pre-logged activities in the UDAL as having happened at future dates and times.

### 4.    Linen Exchange

*"I only get my clothing exchanged one time every week.  That means I wear the same undershirt, underwear, and outer shirt all week.  I wash my clothes in the sink with that same bar of soap [that I use to wash myself].  Also, when the clothes are given to me, they have brown stains on them so I don't think they are even clean.  The underwear and towels are especially bad.  The outer clothes are probably stained too, but since the material is brown anyway, I can't really tell."[170]*

---

[168] Declaration of Prisoner 29, July 16, 2009, ¶ 2.
[169] *See, e.g.,* declaration of Prisoner 25, June 23, 2008, at ¶¶ 5-6, 9.
[170] Declaration of Prisoner 15, July 9, 2009, at ¶ 4.

Under *Rutherford*, prisoners are supposed to receive a change of clothing in exchange for the clothing they had been wearing at least twice per week.[171] This change of clothing is supposed to include clean outer garments, undergarments, socks, and a towel at least once per week. Under Title 15 of the California Code, prisoners are supposed to receive a change of outergarments at least once per week and a change of undergarments at least twice per week.[172] However, it appears this regular exchange of clothing often does not occur at MCJ. Prisoners frequently complain to the Jails Project monitors that they do not receive regular changes of clothing and sometimes have to wear dirty clothing for extended periods of time.

Prisoners also complain that the clothing handed out during linen exchange is stained and dirty. For instance, one prisoner noted, "Over the last month, I also noticed that the laundry I've been getting seems dirty—like they didn't wash it. Now I've got Staph again and I think it's because of the dirty blankets and laundry."[173]

As a result of the irregular clothing exchanges and the dirty clothing provided during clothing exchange, prisoners regularly report that they resort to cleaning their clothing in their sinks with hand soap. "I wash my clothes in the sink," one prisoner reports, "and I know it takes a whole day for those to dry."[174] Such reports are not isolated examples. Prisoners complain about irregular clothing exchange, the provision of stained garments, and the need to wash clothing in sinks to the Jails Project monitors every week.

Prisoners similarly report that the type of clothing and linen provided is inappropriate given the extreme temperatures in the jail. The Jails Project monitors report that there is clearly a problem at MCJ with the regulation of temperatures in the cellblocks and dorms. When the

---

[171] *Rutherford*, 457 F. Supp. at 116-17.

[172] 15 Cal. Code of Reg., § 1262 ("[O]utergarments . . . shall be exchanged at least once each week. Undergarments and socks shall be exchanged twice each week.").

[173] Declaration of Prisoner 25, June 28, 2008, at ¶ 11.

[174] Declaration of Prisoner 16, July 15, 2008, at ¶ 11.

jails monitors walk through cellblocks and dormitories in MCJ, they often report that the temperatures are extremely hot and muggy or extremely cold.  To combat the cold, many prisoners knowingly risk punishment for possession of contraband by using the dirty blankets left over when another prisoner leaves the cell or dorm.

### C.    Recommendations

- **The LASD needs to substantially depopulate the prisoner population in MCJ in order to allow more effective management of programming in the jail.** The LASD needs to combat the rampant overcrowding at MCJ by decreasing the prisoner population and relying on cost-effective, low-risk alternatives to incarceration for pre-trial detainees such as electronic monitoring, supported housing, and drug and mental-health treatment programs. These measures would lower the prisoner-to-staff ratio, allowing the LASD to more effectively manage the programming at MCJ, and would have the effect of improving the delivery of programming and services to prisoners—including access to showers, and delivery of clothing exchange—thus improving the overall sanitary conditions in the jail.

- **The LASD needs to ensure that the jails are sanitary by establishing a protocol for regular cleaning.**  Cells should be fully cleaned before new prisoners arrive.  Jail staff should inform prisoners that they have a right to obtain materials needed to clean their cells and dormitories, as well as hygiene items they need to maintain personal cleanliness.  The distribution of cleaning and hygiene supplies should be logged by deputies and countersigned by prisoners.  Hallways and shower rooms should be regularly cleaned, including the drains, so that trash and water do not accumulate and establish a breeding ground for mold and vermin.  All cleaning should be logged in the UDAL by deputies and this practice reviewed by shift commanders to safeguard against false reporting.

- **The LASD needs to ensure that prisoners receive regular showers.**  Prisoners need to receive regular showers for a full 15 minutes.  When prisoners miss the normal scheduled shower time due to a court appearance, attorney visit, cell search, or for any other reason, the LASD needs to ensure that the prisoners receive off-schedule showers to make up for the one that was missed.  All showers should be logged in the UDAL electronically by scanning the wristbands of all prisoners when they are offered a shower. This practice would safeguard against false reporting.

- **The LASD needs to ensure that prisoners receive changes of clean clothing and bed linens regularly.**  Prisoners need to receive changes of clean clothing at least twice per week, and new bed linens at least once per week.  LASD needs to ensure that prisoners receive changes of clothing or bed linens off-schedule if this is necessary to ensure that they do not have soiled clothing or bedding. All clothing exchanges should be logged in the UDAL electronically by scanning the wristbands of prisoners when they receive clean clothing.

V.     **DISCIPLINE AT MEN'S CENTRAL JAIL**

A.     **LASD Disciplinary Policy and Actual Practice**

1.     *Disciplinary Policy*

Under the LASD disciplinary policy, when a prisoner is involved in an incident rising to the level of a violation of jail rules, the deputy responding to the incident must fill out a report documenting the incident.[175]  Once a sergeant approves the report, a copy is given to the accused prisoner. According to the LASD disciplinary policy, the accused prisoner is then taken to pre-disciplinary housing.  Within 72 hours, the prisoner should have a hearing with the Disciplinary Review Board ("DRB" a.k.a. "Sergeant's Court") where a sergeant reviews the charges and either approves or rejects them. According to LASD policy, if a prisoner is not taken before the Sergeant's Court within 72 hours of the initial incident, the prisoner cannot be put on discipline.[176]

At his hearing, the prisoner is entitled to speak freely regarding the alleged incident.  If the sergeant approves discipline, the prisoner is moved to a disciplinary housing unit for however long the Sergeant deems appropriate.  The prisoner must receive a copy of the disciplinary sentence in writing.[177]  After 30 days, the sergeant should review the prisoner's disciplinary sentence and should continue to review it every 15 days thereafter.

2.     *Defective Procedures*

In our monitoring of the conditions at MCJ we have found that the LASD follows the disciplinary policy haphazardly.  The DRB, or Sergeant's Court, is usually little more than a

---

[175] Los Angeles County Sheriff's Department, Custody Division Men's Central Jail, Unit Order: 5-22-000, Subject: Inmate Discipline [hereinafter Inmate Discipline], at Section IV (on file with the ACLU-SC).
[176] Attached to this report in Appendix A are examples of a notice of violation and a notice of action.  Attached at Appendix B is a copy of the current disciplinary policy for MCJ.
[177] Inmate Discipline, *supra* note 175, at Section IV.

quick interview—if that—by a sergeant with the prisoner in his cell. Prisoners have very little or no opportunity to speak on their own behalf, and are rarely informed of this right. The DRBs have often rubber stamped disciplinary charges without proper consideration of the evidence. For example, our monitors witnessed one incident in January of 2009 when a prisoner was given a notice of violation for his failure to stop using the bathroom immediately when deputies in his dorm began to count.[178] The prisoner reported that he had a bladder problem that made him urinate frequently. The Sergeant conducting the DRB noted that nursing personnel confirmed that the prisoner had signed up for Nurse Clinic and was seen by a nurse for a urination problem. Yet, despite this clear evidence of his medical condition, the jail concluded that the prisoner did not have any urinary tract issues and sentenced him to 20 days in solitary confinement.[179]

We also routinely hear complaints from prisoners that jail staff fail to inform prisoners of the basis of the charges against them or, in many cases, fail to provide them with written notice of their charges.  While the Sheriff's staff expends time preparing detailed narratives explaining the factual basis for the discipline, they often do not provide a copy of this report to the prisoner.

Furthermore, we have witnessed serious problems with deputies' imposing collective punishment on groups of prisoners for acts that only one or two of them have allegedly committed. For example, one prisoner reported an instance when a deputy turned off the phones for an entire row because one prisoner was "being smart" with a nurse.[180] The prisoner explained that this kind of group punishment is common on that particular row: "[I]f someone messes up, everyone has to pay. If someone talks during count or misses pill call, the deputies punish us by

---

[178] ACLU Findings for the Dates of January 12-January 23, 2009, sent by M. Bird, M. Tiedeman, and T. Weddle to LASD Commanders.
[179] *Id.*
[180] Declaration of Prisoner 24, October 13, 2009, at ¶ 5.

turning off the phones for the whole row."[181] Another prisoner reported a similar experience on the row where he was housed: "When one prisoner messes up, whether it be something minor, or something major like a fight, we all get punished, the whole row. This is the deputies' way to build tension between all of us. They want us to police ourselves so they don't have to. For example, if one guy does something wrong, instead of following protocol by writing the guy up or putting him in the hole, we would all get punished."[182]

   While MCJ officially has changed its policy on collective punishment to prohibit the practice of disciplining whole rows of cells for acts only a few prisoners committed, our jails monitors continue to uncover ongoing problems.  The monitors have, on numerous occasions, witnessed deputies threaten entire rows of prisoners to restrict phone privileges, out-of-cell time, and shower time because one prisoner refuses to follow orders. And, in our experience, these are not empty threats. For example, in April, 2009, jail staff gave all the prisoners on a 20-person row 10 days of lockdown for an incident involving three individual prisoners.[183]  After our advocacy, the jail rescinded the lockdown, but the incident demonstrates a continuing need for ongoing monitoring to ensure that the deputies abide by the policy forbidding collective punishment.

   These instances of group discipline or discipline without adequate individualized notice or adequate opportunity to appeal the charges are very problematic for prisoners whose disciplinary records are later used against them when they apply for parole or are sentenced for their crimes. Parole officers reviewing applications look to jail disciplinary records to determine

---

[181] *Id.*
[182] Declaration of Prisoner 40, October 7, 2009, at ¶ 6; s*ee also* declaration of Prisoner 29, July 16, 2009, at ¶ 7 (reporting that "[c]ommon punishment is turning off the phones or not passing out the mail.").
[183] ACLU Findings for the Weeks of April 6-April 17, 2009, sent by M. Bird, M. Tiedeman, and T. Weddle to Commanders on April 29, 2009.

whether a prisoner is eligible for parole based on good behavior. Likewise, judges issuing sentences for prisoners look to disciplinary records in assessing whether a prisoner poses a danger to the community and therefore deserves a harsher sentence.

### B.        Disciplinary Segregation

#### 1.        Solitary Confinement

The disciplinary segregation cells at MCJ present some of the harshest living conditions for prisoners of any area in the jail. These cells are extraordinarily small and some have a closed or solid front, making communication with deputies, nurses, and mental health professionals all but impossible.  The high security discipline cells are five feet in width and nine and a half feet in length, with 47.5 square feet of floor area.  The regular discipline cells are even smaller, nine feet and seven inches in length and four feet in width, with 38.8 square feet of floor area.  Each cell includes a washbasin and a toilet, to minimize the prisoner's movement out of the cell, making usable floor space much smaller than the noted square footage. The cells have poor lighting, making reading difficult, and prisoners are only allowed one Bible and legal papers; they are not allowed any other reading material. Furthermore, prisoners in disciplinary segregation are confined to their cells 24 hours a day, 7 days a week—they do not receive any outdoor recreation or time outside their cell except for showers every other day.[184]

These conditions result in extreme isolation and sensory deprivation.  While the conditions of disciplinary segregation are, in part, intended to be punitive, these extreme deprivations of basic human needs are cruel and unnecessary and, as discussed below, especially problematic for prisoners with mental disabilities.

_____

[184] However, as discussed in Section IV.B.3, *supra*, relying on deputies to provide access to showers is a persistent problem at MCJ.  The Jails project regularly receives complaints from prisoners in discipline about infrequent showers.

Moreover, through our monitoring of the jail, we have spoken with prisoners who report that they have stayed in disciplinary segregation for months or longer for minor offenses. For example, one prisoner reports being sentenced to the hole for 90 days for having contraband in his cell, specifically, extra linens, apples, and extra bread.[185] While in the hole he received five more months of discipline for possession of a razor since the punishment is doubled for violations that occur while a prisoner is housed in the hole. Later, this same prisoner was given an additional 20 days of discipline for covering the light in his cell with a piece of paper. "I only covered it because sometimes the deputies don't turn off the light at night," he explained, "and I just wanted to sleep."[186] In total, this prisoner was in discipline for almost 11 months, without receiving recreation time or visitors.[187]

Through our advocacy, MCJ has agreed to change its disciplinary policy to provide for a mandatory Unit-level review of all disciplinary sentences of more than 30 days. After 30 days, the prisoner is supposed to be evaluated by medical and mental health staff to ensure that his placement in disciplinary segregation is not medically contraindicated. This review is supposed to continue every 15 days until the disciplinary sentence has ended. However, through our monitoring we discovered that jail staff often flout the new disciplinary policy by finding loopholes to get around the Unit-level review requirement. Our monitors have witnessed, on several occasions, deputies sentence someone to 30 days in discipline, then let the prisoner spend the 30 days in the hole, then let him out for one day so as not to trigger the Unit-level review, and then put the person back in the hole to complete the disciplinary sentence they originally intended.

---

[185] Declaration of Prisoner 31, July 23, 2009, at ¶ 11.
[186] *Id.* at ¶13.
[187] *Id.*

59

### 2.      *Mental Disability and Discipline*

Many prisoners in disciplinary segregation have serious mental health issues, highlighting the woefully inadequate mental health treatment at MCJ.  Through our monitoring, we have found many prisoners in disciplinary segregation who have been "declassified" from mental health housing.[188] That is, they have been transferred from the mental health unit at Twin Towers to general population units after staff concluded they no longer needed the more intensive treatment they were receiving in the mental health unit. Consequently, these prisoners with serious mental health issues often end up in disciplinary housing for behavior that is potentially a product of their mental illness. For example, we found one prisoner with a long history of mental health problems (who had previously received treatment in jail, the community, and in prison) housed in disciplinary segregation because he could not quickly follow orders—a typical symptom of his diagnosed illness.[189]  The deputy responding to the incident thought this prisoner had failed to respond because he was on drugs, and the prisoner was placed in the hole based on the deputies' incident report.

Deputies understandably have difficulty distinguishing between behaviors that are truly insubordinate or those that are mental health related, and this problem highlights the importance of ongoing, clear communication between custody and mental health staff.  The County's own policy requires a review by mental health staff before discipline can be imposed on prisoners housed in mental health housing in Tower 1.[190] This review does not occur for prisoners on the mental health caseload outside of Tower 1, however, or for prisoners with mental illness who

---

[188] Declassifying refers to the process by which prisoners who were initially classified as having certain special housing requirements, based on needs such as mental health needs or physical disabilities, are "declassified" and placed with the general jail population where they no longer have access to the services they require.

[189] ACLU Findings for the Dates of September 14-25, 2009, sent by M. Tiedeman, and T. Weddle to Commanders on October 1, 2009 (on file with the ACLU-SC).

[190] *See* Inmate Discipline, *supra* note 175, at Section IX.

have been recently declassified or who are not identified as having mental illness.   For example, in April 2009 we met with a prisoner with a long history of bipolar disorder who was placed in disciplinary segregation in MCJ after he was declassified from mental health housing in Twin Towers just days before.[191]   We found him in a dark, dreary cell. He reported to us that he was bipolar, had schizophrenia, and felt very unstable in his current housing. After we complained about this issue, the jail transferred him back to mental health housing, but had we not come across him he likely would have remained in disciplinary housing despite his obvious need for mental health treatment.

This failure to classify prisoners properly is also a problem at Sergeant's Court.   When a prisoner at Sergeant's Court says that he has a mental illness, the prisoner is entitled to request assistance with his hearing.[192]   However, in our experience, prisoners are rarely informed of this right—we have never heard of such assistance actually provided at a Sergeant's Court.

This cycle of needless of suffering must be stopped and can be by implementing a number of key reforms.

### C.    Recommendations

- **Mental Health Staff  Must Be Involved in the Disciplinary Process for Mentally Ill Prisoners**. By reason of their illness, mentally ill prisoners are more prone to violate disciplinary rules than other prisoners.[193]   However, mentally ill prisoners at MCJ are more likely to be punished than treated when they violate rules as a result of their illness.  The LASD should implement a policy ensuring that mentally ill prisoners who allegedly violate disciplinary rules are referred to a mental health provider for an assessment, and that those prisoners who are not on the mental health caseload who engage in behavior subject to discipline that may be the product of mental illness are also referred to a provider.   This is especially true for mentally ill prisoners who are housed at MCJ since these prisoners are on the mental health caseload but are not housed in the mental health housing in Tower 1 of Twin Towers. The unique needs of these prisoners are often overlooked by mental health staff during the disciplinary process. Mental health staff must also be involved in the

---

[191] ACLU Findings from October 23, 2009, jail walk-through (on file with the ACLU-SC).
[192] *See* Inmate Discipline, *supra* note 175, at Section VII.
[193]  Kupers Report, *supra* note 4, at 10.

61

disciplinary process to ensure that mentally ill prisoners are not punished for behaviors that are solely a product of their mental illness, and that the disciplinary sanction is consistent with the prisoner's treatment needs.

- **The Jail Should Commission an Independent Audit of its Disciplinary Practices**. The LASD's disciplinary policies exist only on paper. Time and again, the ACLU monitors have found that jail staff circumvent, or ignore, the disciplinary policies, with no known repercussions or oversight. As a result, the Jail's disciplinary system denies prisoners their basic due process rights because the limited number of disciplinary cells are not reserved for the most dangerous offenders based on institutional conduct, and some prisoners may face longer sentences as a result of unfounded disciplinary charges. Many other prison and jail systems have commissioned independent audits of their disciplinary systems to ensure that their disciplinary policies are actually followed, that punishment is proportionate to the offense, and that long-term segregation is reserved for those very few prisoners who cannot safely be managed in the general population. The National Institute of Corrections, in particular, has done this work. The LASD should commission an independent audit of its disciplinary practices.

- **The LASD Should Maintain Accurate Statistics on its Disciplinary System**. Although there is a review process for disciplinary charges, the ACLU has found this process is nothing more than a rubber stamp, which often ignores evidence that clearly shows the charged prisoner is not guilty. The LASD would be able to identify particular hearing officers who are failing to carry out their duty to assess the evidence if the department kept active statistics on dispositions by officer. Also, the LASD should keep accurate statistics on the actual lengths of stay of prisoners in segregation to ensure that its rule requiring 30-day reviews is being followed.

## VI.   <u>CONCLUSION</u>

As this report has described in detail, there are significant and pervasive problems with the conditions in MCJ that negatively affect the health and well-being of the prison population there and the surrounding community. One of the most significant of these problems is the apparent culture of violence and retaliation that persists in the jail, a culture fueled by severe overcrowding and understaffing; living conditions that add to the level of chaos in the jail and tension between prisoners and deputies; and a lack of transparency and accountability when Sheriff's staff are accused of using excessive force to subdue prisoners. In an aging and decrepit facility, this culture leaves vulnerable those most susceptible to violence and victimization—like prisoners with mental illness, for example—and it is the community if Los Angeles that pays the price, both in terms of taxpayer dollars to fund a jail system housing constant re-offenders and in terms of the societal costs absorbed by releasing back into the community men who have not been prepared to successfully re-enter society.

Prisoners at MCJ are disconnected from jobs, their government benefits, and their social support networks, with little to no rehabilitative services offered to help assure their successful re-entry into the community when they are finally released from jail. Then, while in jail, they must endure grossly unsanitary conditions; a lack of access to adequate, comprehensive mental health services; and a climate of fear of abuse and retaliation at the hand of their custodians. The result is that prisoners often leave the jail in a worse mental and emotional condition than when they came in, and it is the community of Los Angeles that suffers because of it, in the form of increased homelessness, mental health costs, and recidivism.

This report has called for many of the same reforms the ACLU has been demanding for years: close down Men's Central Jail; significantly decrease the jail population to decrease the

overcrowding and improve conditions; and develop cost-effective alternatives to incarceration that reduce crime and increase public safety. The current system creates a revolving door for the men of our community from the jails to the street, with no meaningful effort to equip them for successful re-integration into society. At the immense cost to taxpayers of over $1 billion per year, this system is too expensive—and too ineffective---to sustain.

We hope the information and recommendations provided in this report will lead to informed discussion and positive solutions to the problems in MCJ, solutions which would include the depopulation and eventual closure of MCJ.