# EXHIBIT B



GOVERNING's Public Great

An online community, hosted by Bill Bott and Ken Miller, for change agents dedicated to helping government increase its capacity to do more good.

# Mississippi's Corrections Reform

### How America's reddest state -- and most notorious prison -- became a model of corrections reform.

[John Buntin](#) | August 2010

In January 2002, Margaret Winter, an attorney with the American Civil Liberties Union's (ACLU) National Prison Project, received a letter from Willie Russell, an inmate on Mississippi's death row.

"I am on a hunger strike to the death," the letter began. In highly idiosyncratic language, the letter then described conditions at the facility where death row was housed, Unit 32.

Unit 32 was one of seven prisons located on Mississippi's fabled penal institution, Parchman Farm. As described by Russell, it was also a lot like hell. Inmates were locked in permanent solitary confinement. In the summer, the cells were ovens, with no fans or air circulation. Russell's was even worse: He was in a special "punishment" cell with a solid, unvented Plexiglas door. The cells were also sewers, thanks to a design flaw in cellblock toilets that often flushed excrement from one cell into the next. Prisoners were allowed outside -- to pace or sit alone in metal cages -- just two or three times a week. Inside was a perpetual dusk: One always-on light fixture provided inadequate light for reading but enough light to make it hard to sleep.

Then there were the bugs. The only way to avoid being eaten alive, Russell wrote, was to wrap himself in clothes like a mummy, which made the brutal Delta heat even more unbearable. Worst of all, though, was the noise. Psychotic inmates screamed through the night. Conditions were so bad, Russell continued, that some dozen-odd other inmates — about one-quarter of Mississippi's death row population -- had also joined the hunger strike.

"I had heard this sort of thing before," Winter says, "but I was gripped by the power of this letter. It was like something out of the Book of Genesis. It had a biblical grandeur to it. And I believed it." Winter hurriedly arranged a trip to Parchman Farm, where she met her correspondent for the first time. He was a giant of a man -- 6 feet 8 inches tall, 250 pounds. Though he was handcuffed, shackled, belly-chained and dressed in the distinctive, solid red jump suits worn by death row inmates, he clearly was a proud man, "fantastically imposing." But he already was visibly wasted by the hunger strike. His skin was ashen, his eyes bluish and dry.

"He didn't want false hope," she recalls. "He said he would stop if I would give him a solemn assurance that we could make changes — significant changes. He didn't want to be strung along." He'd rather die now instead.

Winter told him that if she could corroborate what he was saying, she felt certain they could change conditions such that he would want to continue living and fighting his death sentence. Russell accepted the offer and agreed to end the hunger strike. Seven months later, in July 2002, the ACLU filed suit against the Mississippi Department of Corrections (MDOC) on behalf of Russell, five other inmates and those similarly situated. The ACLU alleged that "defendants knowingly subject the death row prisoners to barbaric and inhumane conditions, which wantonly inflict unnecessary pain and constitute cruel and unusual punishment in violation of the Eighth and 14th amendments to the Constitution of the United States."

But where Winter saw a noble giant, Parchman Farm staff saw the 41-year-old Russell as something else -- a murderer with a history of violent crime. In 1987, while serving an armed robbery sentence, Russell was sent to a Jackson, Miss., hospital for medical care. Once there, he kidnapped a guard and escaped, leading police on a high-speed chase that ended with a crash. He was sent to Unit 24 at Parchman Farm, a medium-security prison. Two years later, Russell broke out of his cell and killed a prison guard with a homemade shank. For that, a jury sent Russell to death row. In 2000, Russell shot at a prison guard with a homemade "zip gun." Not surprisingly, prison officials had little sympathy for him.

Many of the measures Russell decried were there (or not there) for a reason. Plexiglas on the cell doors was necessary to prevent inmates from flinging feces and urine at prison guards. Screens were missing because inmates used them to make shanks.

"Basically they didn't think we were doing anything right, and we thought they were all wrong," says MDOC Deputy Commissioner of Institutions Emmitt Sparkman. And so the scene was set for a classic -- and wholly predictable-showdown, one pitting an idealistic civil liberties organization against a beleaguered corrections system.

Except that in the case of Mississippi, that's not what happened. Instead, in 2006, Sparkman's boss, MDOC Commissioner Christopher Epps, decided to do something very different: He invited the ACLU in. Shortly thereafter, Epps and Sparkman began a series of deeply counterintuitive reforms that risked their careers.

Epps didn't just take on Parchman Farm. He also challenged Mississippi's commitment to a punitive penal code that had doubled the state's inmate population and tripled its corrections budget in 10 years time.

In early 2008, Epps and his old colleague Sen. Willie Simmons teamed up to pass legislation that amended the state's truth in sentencing law, making nonviolent offenders eligible for parole after serving 25 percent of their sentences. More impressive still, they persuaded Epps' boss, Republican presidential hopeful Gov. Haley Barbour, to sign it. Since then, the state has quietly released more than 3,000 convicted felons. Moreover, Mississippi has accomplished this feat without the kinds of high-profile crimes that have embarrassed would-be corrections reformers in other states, such as Colorado and Illinois. As a result, America's reddest state — and most notorious prison -- has become an unlikely model for reforming overcrowded prison systems.

What Mississippi's experience demonstrates, says Adam Gelb, director of the Pew Charitable Trusts' Public Safety Performance Project, is that "state leaders from both parties are finding that there are large numbers of lower-risk offenders who can be held accountable in ways that are more effective and a lot less expensive than a $29,000-a-year taxpayer-funded prison cell."

Its experience also shows how that can be done without jeopardizing public safety or political careers.

Mississippi's penal system — and the struggle to reform it — is inextricably bound up with one institution: Parchman Farm, which opened in 1904, is a 16,000-acre plantation in the Yazoo-Mississippi Delta. Its inmates, originally almost entirely black men, spent their days in fields, supervised largely by other prisoners, the dreaded "trusty-shooters," who were distinguished from the regular inmates by the vertical stripes of their prison uniforms and the Winchester rifles they carried. For the state, it was a strikingly profitable arrangement. According to historian William Banks Taylor, in fiscal 1905, the prison's first full year of operations, Parchman earned the state $185,000-more than $4.6 million in 2009 dollars. By 1913, Parchman's profit margin had soared to $937,000, making it one of the state's primary revenue sources. But to critics, Parchman was nothing more than slavery reincarnated.

In 1972, federal Judge William Keady ruled that conditions at Parchman violated the U.S. Constitution's First, Eighth and 14th amendments, as well as numerous provisions of the state's penal code. The old "cages" were burned; the inmates were moved into hastily built barracks, surrounded by chain-linked fences topped with barbed wire. Black and white inmates were integrated; African-American staff members were hired — one of them was a fifth-grade science teacher named Christopher Epps.

Epps, 49, grew up in a family of educators. Initially he set out to follow in their footsteps, earning an undergraduate degree in elementary education, which got him a job teaching math and science. In 1982, after he'd been teaching for three years, Epps got a call asking if he'd like to work at a new medium-security facility, Unit 29.

Epps was startled by the call. He'd filled out an application at a Mississippi Valley State University career day years earlier but never expected to hear back. "I don't want to work up there," Epps replied, explaining that he'd taken a job as a teacher.

But the MDOC persisted, telling Epps they could work around that. Epps relented and agreed to go to work at Unit 29 as a correctional officer on the third watch, from 4 p.m. to midnight. For three years, he held down both jobs, even persevering through a stint on the graveyard shift.

In 1985, he decided to become a full-time corrections officer. Epps rose quickly. In 1988, Gov. Ray Mabus appointed him deputy superintendent of Parchman, where he was responsible for security and running day-to-day prison operations. In September 1990, he opened a new facility: Unit 32.

Prior to Unit 32's opening, Parchman only had 56 "lock down" cells for troublesome or violent prisoners. Unit 32 addressed that shortcoming. It consisted of five buildings, each two stories high and consisting of 200 single-prisoner cells suitable for the most difficult inmates. (One hundred additional beds were later added to Building E when it was converted to a two-beds-per-cell facility.)

By 2007, Mississippi had filled Unit 32 with roughly 1,000 inmates, about 5 percent of the state's total prison population.

What went wrong? Soon after Unit 32 opened, state policymakers made two major changes in policy, both of them in keeping with trends sweeping states nationwide. The first dramatically expanded and decentralized the state correctional system. The second involved the passage of one of the nation's toughest "truth in sentencing laws." Together, the two measures put Mississippi on a path to a corrections catastrophe.

Simmons was one of the few who saw it coming. Today he heads Mississippi's Senate Corrections Committee. However, he started out in the corrections world, working as the head of Parchman's prisoner re-entry program. By 1990, he was the state's deputy commissioner of corrections. One of

Simmons' responsibilities was to assess the system's future needs. To help with this task, the state hired the JFA Institute, which provides technical assistance to states through the U.S. Justice Department's Corrections Options Training and Technical Assistance program. At the time, Mississippi had 11,250 inmates in the state system at a cost of $109.6 million per year. The JFA study that Simmons received predicted that by 2001, the inmate population would rise to more than 21,000.

"I said, 'No way,'" Simmons recalls. "Mississippi can't afford 21,000 inmates." But he did believe that the inmate population would grow. So after he was elected to the Legislature in 1992, Simmons joined the effort to expand the prison system by building a network of private jails, as well as regional jails run by clusters of counties. These facilities would house medium security inmates at lower cost than Parchman. They also would create jobs across the state and new patronage possibilities for the elected sheriffs who would run them. But the construction of new prison facilities across the state had an unintended consequence.

"There's the old saying in the movies, 'If you build it, they will come,'" Simmons says. "Well, we built the beds, so the inmates came." But while the build-out provided the beds, it was the Legislature that filled them.

In 1995, two years after lawmakers signed off on the expansion, Sen. Robert Smith introduced one of the nation's most stringent "truth in sentencing" laws. Similar laws in other states generally sought to force felons convicted of violent crimes to serve their full sentences. Smith's bill went further: It required all convicted felons to serve at least 85 percent of their prison sentence.

The effect of Smith's bill on the state penal system was immediate -- and catastrophic. Previously inmates had served their sentences, minus good time credits. That reduced the time served by most inmates to 55 percent of their stated sentences. Smith's bill ended the old system of earned time, and sent the number of inmates and the correctional system's cost soaring. By 2007, the state's prison population jumped to 22,800 inmates -- more than what Simmons predicted Mississippi could never afford -- and the state corrections budget had risen to $327 million per year. Moreover, despite the prison system's vast expansion, some 1,000 inmates ended up in one place -- Unit 32. As the ACLU began its investigation into conditions there, it wanted to know why.

Prison discussions generally focus on hardware -- number of beds, size of staff, types of facilities and dollars necessary to run it all. But while they're less visible, prisons' operating systems are arguably even more important. At the heart of every prison operating system is a classification system that determines what type of facility inmates entering the system should go to: minimum, medium or maximum security. A good correctional classification system allows inmates to move from one custody level to another based on behavior. Inmates who follow the rules in a maximum-security facility might move to a medium-security prison. Those who behave poorly might move in the opposite direction. That was how a classification system was supposed to work. But something seemingly went wrong at Unit 32. No one appeared to leave.

To understand why, the ACLU turned to JFA Institute founder James Austin. It was a good choice: Austin's firm designed Mississippi's classification system. When Winter sent him the reports she collected as part of the discovery process, Austin was stunned. MDOC staff members were misusing the forms that Austin and a colleague developed a decade earlier; they were systematically overscoring inmates. As a result, inmates who had never misbehaved in the system or who needed protective custody, not punishment, were being sent to Unit 32. By Austin's reckoning, only about 20 percent of the inmates at Unit 32 were actually supposed to be there. Some 800 inmates had been swept into Mississippi's most notorious maximum-security prison due to a bureaucratic snafu.

In August 2002, one month after the ACLU filed a lawsuit targeting the conditions on death row, Gov. Ronnie Musgrove appointed Epps commissioner of corrections. That same month, a team of ACLU attorneys and experts got their first look inside Unit 32. It was "a soul-searing experience," Winter recalls. The conditions in Russell's modified, "special management" cell, wrote psychiatrist Terry Kupers, were enough to "cause intense anxiety and rage, psychiatric breakdown and in a large proportion of cases, suicide."

The following year, Judge Jerry Davis handed down an injunction ordering the MDOC to improve conditions in Building B. In 2005, the ACLU filed a complaint seeking to extend that relief to all of Unit 32. Then in April 2006, Commissioner Epps did something unexpected: He agreed to enter into a consent decree. And that December, Epps did something even more surprising. At a meeting with ACLU expert witness Austin, Epps directed Sparkman to form a task force that would work with Austin to develop an entirely new classification system for the state correctional system. Evidence for the need to radically change was not far away. In the summer of 2007, Unit 32 went from hellhole to war zone as violence exploded with the growth in rival gangs among the prison population.

To restore order, Epps made key personnel changes and reached out to the National Institute of Corrections for technical advice. In short order, a team from Connecticut, a prison system with well regarded gang intervention programs, arrived to assess the situation. After a week at Parchman, the group presented its report to Epps. Its recommendations were surprising.

"They said, 'Commissioner, you've got to get them something,'" recalls Epps. "'You've got these guys locked up in a cell, 80 square feet, with Plexi on the door. It's not air-conditioned. So when they shout out or hurt someone, what can you do?'"

After consulting with Sparkman, Epps decided the MDOC would try a different — and deeply counterintuitive -- approach. It would respond to the worst outbreak of prison violence in recent history by loosening the controls on Unit 32. The inmates would be given a chance to return to the general prison population by displaying good behavior. Unit 32 would have group dining, recreational activities and even classes.

After all, says Sparkman, "What have we got to lose?"

A partial answer to that question, as Sparkman very well knew, might include their jobs. In fall 2007, incumbent Barbour was up for re-election, and incumbent governors tend to not react well to press reports about out-of-control prison systems. Also at stake: their staff's support. Indeed, Parchman correctional officers were so alarmed when they heard about Epps' plans that they threatened a work slowdown. To quell the uproar and demonstrate that reform was feasible, Sparkman moved back to Parchman in July 2007. There, he made a point of walking the yard and cellblocks, talking with staff and inmates alike, and modeling how corrections officers should interact with inmates.

Sparkman moved gradually, introducing one small group of inmates to new liberties and rules at a time. "Basically you gauged [success] by incidents," Sparkman says. "You brought a group out and they went for a few days, and if there weren't assaults and staff abuse or staff assaults, you brought out another."

At first, Sparkman slept "with one eye open." But the process went far more smoothly than he thought. At the same time, other pleasant surprises emerged. Most inmates quickly embraced the new rules. Physical takedowns and the use of immobilizing gas by prison staff plummeted. The number of incidents involving prisoner-on-prisoner violence (and the smaller category of prisoner-on-staff violence) also fell by 70 percent. Those who didn't embrace the new rules were far easier to

identify. These inmates were now dispersed to other facilities or in some instances, turned over to the federal prison system.

By November, the change in attitudes and operations at Unit 32 was palpable. So was the improvement in relations between the MDOC and ACLU. In November, the MDOC entered into a supplemental consent decree with the group, this one focused on classification, mental illnesses and use of force. Austin and Kupers, who had first come to Unit 32 as expert witnesses for the plaintiffs, now effectively became consultants to the MDOC in improving conditions. It was clear that the effort to reform Unit 32 was on the cusp of becoming a major success. But instead of pausing to savor Unit 32's transformation, Epps pushed for something even more ambitious, changing the 1995 "truth in sentencing law" that had doubled Mississippi's incarceration rate and tripled its costs.

For help in the statehouse, Epps turned to Simmons, who introduced SB 2136, which made nonviolent offenders eligible for parole after serving 25 percent of their sentences. One of the law's unusual features was that it was retroactive: As written, some 3,000 inmates -- 12 percent of the state's prison population -- would become eligible for parole immediately, if the governor signed the bill -- which he did in April 2009.

Of course, eligibility for parole does not automatically result in inmates being granted parole. Those decisions resided with a state Parole Board, whose members were appointed by the governor. To ensure that the board increased its rate of parole, Epps turned once again to Austin, who developed a parole "risk instrument" based on a generation of peer-reviewed research about which inmates are likely to recidivate and which aren't. Previously parole members had relied mainly on their guts. With the new instrument in place, the parole grant rate soared, from roughly 30 percent to more than half. As the result of the new law, between April 2009 and August 2009, 3,100 inmates were reduced early, with virtually no public notice and no controversy. Had the state Legislature not passed the bill that raised the parole rate, Austin estimates that state lawmakers would have had to add another 5,000 beds to the prison system over the course of the next decade, at a cost of around $200 million.

Today Unit 32 is but a shadow of its former self. Fifty-seven inmates remain there on death row, including Russell, whose attorney is now fighting his conviction on the grounds that he was mentally ill when he killed Correctional Officer Argentra Cotton. Another 63 inmates are locked down in long- or short-term administrative segregation. But not for long. In early June, the ACLU and MDOC announced an agreement that would terminate the consent decree. As part of that agreement, Unit 32 will be shut down entirely.

For Winter, the decision vindicated years of litigation. She now hopes to bring Mississippi-style corrections reform to a new target: the Men's Central Jail in Los Angeles County. With 5,000 inmates, it's the largest jail in the world.

"If Mississippi could safely lower its supermax prison population by 85 percent, there's simply no reason why Los Angeles County can't safely reduce its jail population to a fraction of what it is today."

This article was printed from: http://www.governing.com/mississippi-correction-reform.html