# EXHIBIT C

# In The Matter Of:

*Jerry Presley vs*
*Christopher Epps*

*Proceedings*
*August 2, 2010*

*Alpha Reporting Corporation*
*236 Adams Avenue*
*Memphis, TN 38103*
*901-523-8974*



Original File 8541ln.txt
**Min-U-Script® with Word Index**

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 3                    EASTERN DIVISION
 4
 5
 6  JEFFERY PRESLEY, ET AL.,  )
 7            Plaintiffs,     )
 8                            )
 9  VS.                       )   NO. 4:05-CV-00148-JAD
10                            )
11  CHRISTOPHER EPPS,         )
12  ET AL.,                   )
13            Defendants.     )
14
15
16            BE IT REMEMBERED, that the
17  above-captioned cause came to be heard on this, the 2nd
18  day of August, 2010, before the Honorable Jerry Davis,
19  Judge presiding, when and where the following
20  proceedings were had to wit:
21
22
23
24
```

Page 2

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4
 5            MS. MARGARET WINTER
 6            American Civil Liberties Union Foundation,
 7            Inc.
 8            National Prison Project
 9            915 15th Street, Northwest, Seventh Floor
10            Washington, DC  20005
11            Phone:  (202) 393-4930
12
13            MR. ROBERT B. MCDUFF
14            Attorney at Law
15            767 North Congress Street
16            Jackson, Mississippi  39202
17            Phone:  (601) 969-0802
18
19            MR. STEPHEN F. HANLON
20            Holland & Knight
21            2099 Pennsylvania Avenue, Northwest
22            Suite 100
23            Washington, DC  20006-6801
24            Phone:  (101) 828-1871
```

Page 3

**ON BEHALF OF THE DEFENDANTS:**

MR. LEONARD CHARLTON VINCENT
Mississippi Department of Corrections
P.O. Box 38
Parchman, Mississippi  38738
Phone: (662) 745-6611

MR. JAMES MARSHALL NORRIS
Mississippi Department of Corrections
P.O. Box 38
Parchman, Mississippi  38738
Phone: (662) 745-6611

**COURT REPORTING FIRM:**

ALPHA REPORTING CORPORATION
Heather L. Deloach
236 Adams Avenue
Memphis, Tennessee 38103
Phone: (901) 523-8974

Page 4

```
                 I N D E X

WITNESS:                                       PAGE
EMITT SPARKMAN
    Direct Examination
       By Ms. Winter                            05
    Cross Examination
       By Mr. Vincent                           30
    Re-Direct Examination
       By Ms. Winter                            32






                                               PAGE
Court Reporter's Certificate ...............    41
```

Page 5

1  PROCEEDINGS
2  **THE COURT:** We're here in the case of
3  Presley versus Epps for a fairness hearing on the final
4  resolution of this case. Are the Plaintiffs ready to
5  proceed?
6  **MS. WINTER:** Yes, Your Honor.
7  **MR. VINCENT:** Yes, we are.
8  **THE COURT:** Ms. Winter, I believe I'll just
9  turn this over to you at this point.
10  **MS. WINTER:** Thank you. We'd like
11  permission to call Deputy Commissioner Sparkman as an
12  adverse witness.
13  **THE COURT:** Absolutely.
14  DEPUTY COMMISSIONER EMITT SPARKMAN,
15  having first been duly sworn, was examined and testified
16  as follows:
17  **DIRECT EXAMINATION**
18  **BY MS. WINTER:**
19  Q  Deputy Commissioner Sparkman, as you know
20  from the conversation that we just had, I want to ask
21  you about the objections that the class members have
22  filed to the proposed settlement of this case. And one
23  objector wanted to know why it would make sense for MDOC
24  after pouring a great deal of money into upgrading Unit

Page 6

1  32 would now think of moving death row into Unit 29,
2  which is at least the general belief that that's where
3  they're going to be moved, which he describes as an
4  older and less -- a worse shape facility.
5  And why isn't that money simply wasted so
6  that class members, death row in particular, will now --
7  the concern is that they will now be in a worse
8  situation than they were even before we brought the
9  lawsuit on behalf of the death row inmates.
10  A  Yes, ma'am. Well, first Unit 29 was
11  renovated in approximately the year 2000. It's a better
12  physical plant, division two, which is where we would
13  relocate death row and a small number of high risk
14  inmates. It was renovated -- the physical plant allows
15  a better viewing of the inmates. You don't have the
16  linear design. It's more of a design where a staff
17  person from the tower can see almost all of the cells in
18  its entirety.
19  Also, the ventilation system was updated in
20  2000 so it was a better ventilation system than it was
21  at Unit 29 -- I mean, Unit 32. But also when the
22  renovations were made and the money spent for Unit 32,
23  such as the lethal, non-lethal fencing, the surveillance
24  cameras, we didn't have 500 extra beds at East

Page 7

1  Mississippi Correctional Facility, which brings that
2  population from a 1000 to 1500 which gave us the
3  opportunity to provide services to more of our mentally
4  ill inmates. Especially our severely mentally ill
5  inmates.
6  Also, Wilkinson County Correctional Facility
7  was a 1000 bed facility was -- the mission was to
8  provide for medium security and close custody in a
9  protected custody population about half and half. With
10  the changes over the years and the cost per day for MDOC
11  facilities, the privates had never been receptive really
12  to housing close custody inmates. Recently they've been
13  receptive to that, which Wilkinson is an air-conditioned
14  facility.
15  So we saw an opportunity there to
16  renegotiate with a renewed contract. Also, the private
17  facilities have been not receptive at all to housing
18  Hepatitis C offenders or inmates with the HIV virus.
19  When we would approach them about that, they were not
20  willing at all. We've been successful recently and I
21  guess you could say the changing of the times whether
22  it's the economy or whatever that they were receptive to
23  placing a cap on those offenders with those type medical
24  illnesses where they can be housed at the facility.

Page 8

1  So then you get into 32, when we look at the
2  staffing cost and the operations annual cost for Unit
3  32, we basically -- and I was one of the persons heavily
4  involved in that and looked at even though we spent a
5  great deal of money on Unit 32, the operations cost
6  annually, the savings by moving inmates to the private
7  facilities and Unit 29 actually would save the state a
8  considerable amount of money.
9  And I haven't gotten my figures in front of
10  me, but I want to say it's approximately eight million a
11  year by closing Unit 32 and moving those inmates to
12  different areas and in my opinion would be able to offer
13  them more quality services.
14  Q  Just if you could draw it out a little bit
15  more. Why are the operational cost so heavy at Unit
16  32?
17  A  Well, to give you an example, at Unit 29 you
18  can have one tower officer for 80 inmates. Basically
19  when you take an inmate out of his cell, he's going
20  approximately 50 to 75 feet and he can be at his
21  recreation area that we've got designated. Whereas, at
22  Unit 32 if he's in the -- he's going to have to go
23  through stairs, several doors, a considerable amount it
24  takes I would say at least double the time to move an

Page 9

1 inmate from his cell to a recreation yard.
2 The towers don't allow for monitoring the
3 cells. Basically all you're looking is down the walkway
4 to the cells. So it's not as safe an environment as you
5 would -- at Unit 29 where even though you can't see
6 every cell, you have a viewing of most of the cells.
7 It's more of an open environment to where I would say
8 Unit 32 is a com -- a linear design usually is more
9 compact and the word I'd use is claustrophobic, a
10 feeling for staff and inmates.
11 Q So the change to Unit 29 a couple of the
12 advantages I take it for the prisoners themselves would
13 be easier access to exercise which means that we could
14 expect fewer lapses in yard call, would that be
15 correct?
16 A Yes, ma'am. Because you would be able to
17 escort them easier. From my observations the
18 ventilation system provides -- even though it's not
19 air-conditioned -- the way the air pulls from the
20 ceiling, the large ceiling fan brings more air. You
21 know, it's not -- like I said it's not air-conditioned
22 but it still is better ventilation.
23 The food serving area is more adjacent.
24 It's in -- you have two zones in a building and the food

Page 10

1 warming carts and the preparation area is right in the
2 middle of that building so that makes -- to me it's
3 going to be a quality -- food service will be better.
4 Q You mentioned safety that you expect it to
5 be safer in Unit 29 because of the sight lines. There
6 have been questions raised by all of the security
7 cameras that were purchased, the extra security cameras
8 were purchased for unit 32, will those cameras be moved
9 to 29?
10 A At this time we don't project on moving the
11 cameras. You know, they were bought and designed for
12 the Unit 32 physical plant. So I'm not even sure that
13 would be possible to relocate them and what the cost
14 would be.
15 Q What about the hand-held cameras that seems
16 to be an important part of the picture?
17 A Yes, ma'am. They already have the hand-held
18 cameras, and I believe it was approximately two years
19 ago we revised our use of force plans. And any planned
20 use of force requires a hand-held cameras. Not only at
21 32 but that's a system-wide program that has to be
22 done.
23 Q And will it remain policy when these men
24 move over to Unit 29 that unplanned use of force -- or

Page 11

1 let me put it this way. That it is considered the norm
2 that every use of force will be captured on a hand-held
3 camera and that it would only be the rare exception that
4 a use of force would not be able to be captured at least
5 on a hand-held camera --
6 A It's system wide. It's not just Unit 32.
7 It has to be audio and visual. For planned use of force
8 it has to be videoed with audio.
9 Q Now, truly a very, very major question that
10 the class members have, is what will happen to the
11 package of guarantees that they had as -- when they
12 resided at Unit 32 once they are transferred. Ice three
13 times a day, a fan supplied by the State from May
14 through September, all of that package of guarantees to
15 maintain constitutionally adequate conditions. Will
16 that bundle of guarantees go with them to the unit
17 they're transferred to?
18 A For those -- those inmates that are
19 long-term segregation and death row, I think it's been
20 demonstrated that it's been a successful program at Unit
21 32. It's my intent to continue those services at Unit
22 29, at the building that they will be housed at. We've
23 implemented it system wide. That's a program that we
24 require, the same opportunities for long-term seg for

Page 12

1 inmates to participate in the high risk incentive
2 program. We're going to continue that. I mean you
3 can't argue with the success of that program.
4 Q So the class members who are -- who are in
5 the high risk incentive program no matter what facility
6 they may be transferred to they will still have the
7 benefit of that same program?
8 A As long as they're involved in that program,
9 you know. If they violate it, they wouldn't receive the
10 same privileges if they were removed from the program.
11 But that would be -- they would have to do something to
12 be removed from the program, some kind of serious rule
13 violation.
14 Q There were a number of objections about
15 medical and mental health care and a lot of the
16 complaints the majority of them said we are not right
17 now getting adequate medical or mental health care. And
18 I am -- don't think it makes sense to go into that in
19 great detail since part of the agreement is that we will
20 be bringing experts to actively monitor medical and
21 mental health care. And it's understood, or at least
22 that is our position, that the care is currently
23 inadequate and we intend together with MDOC to bring it
24 up to par over the next year. Is that your

Page 13

1 understanding, too?
2     MR. VINCENT: I think I'm going to have to
3 object to the form of that the question because it may
4 be asking for a legal interpretation. If it's a legal
5 interpretation, then we will object to it. We will
6 object to him saying what they're doing -- what they
7 presume to do --
8     THE COURT: To the extent that it is a legal
9 determination, I will agree with you. But I think it's
10 okay for Mr. Sparkman to state his understanding of
11 where they're going with the medical and the mental.
12 A   I can specifically state that as an agency
13 and personally that MDOC intends to provide quality
14 medical and mental health care to all offenders.
15 Q   And that over the next year Plaintiffs are
16 going to be working with the department to bring about
17 what at least Plaintiffs believe are needed
18 improvements?
19 A   Yes, ma'am.
20 Q   In trying to understand the current numbers,
21 of the previous Unit 32 population say as of January 1,
22 2010, it is our understanding, correct me if I'm wrong,
23 when we entered into this attentive agreement with you,
24 one of the main incentives for us was that we understood

Page 14

1 that what was going to happen to this population, these
2 class members, is that the great majority of them were
3 going to be transferred to facilities that were air
4 conditioned. Not death row but the great majority of
5 the others. And looking at the figures that we have
6 today that seems to me that that projection is holding
7 true; is that accurate?
8 A   Yes, ma'am. And we -- if I could just kind
9 of describe to you the population at Unit 32 now and
10 what we -- if that will we okay and tell you what we --
11 Q   Please.
12 A   We have about 120 --
13 Q   May I interrupt you?
14     MS. WINTER: Are you all able to hear
15 everything?
16     INMATES: Yes.
17 A   We have about 120 inmates remaining at Unit
18 32 presently, and I think it's a breakdown of probably
19 about 60, a few more than 60, that would fall under the
20 category of the death row offenders and the high risk
21 incentive tier. Of course, those are offenders are
22 projected for transfer to Unit 29 at an undetermined
23 date right now. The remaining offenders are -- there's
24 approximately give or take a few less than 50 that are

Page 15

1 long-term segregation. They are projected to go to the
2 Wilkinson County Correctional Facility which is
3 air-conditioned.
4     The other 14 to 16 offenders are short --
5 short-term segregation offenders. They don't qualify
6 for long-term segregation but for whatever reason after
7 completing their disciplinary detention time refused to
8 accept general population assignment. So I think it's
9 safe to say other than the small number of high risk
10 incentive and the death row, the remaining offenders,
11 the majority of them, will be going to Wilkinson County
12 Correctional Facility which a air-conditioned facility.
13     A large number of the other offenders that
14 met the, even by our definition and I think even by the
15 Plaintiff's definition, not necessarily were severely
16 mentally ill but had some kind of mental health issues,
17 we transferred them to East Mississippi Correctional
18 Facility so the majority of -- a large number went
19 there --
20 Q   And that facility is air conditioned?
21 A   Yes, ma'am. That's what I was going --
22 Q   And I think I missed this. What is the
23 population that is going to Marshall County?
24 A   The population at Marshall presently what

Page 16

1 I'm looking at for Marshall and based on what our --
2 what our long-term segregation needs are right now.
3 There could be a possibility that we might have to move
4 approximately 50 inmates long-term segregation if the
5 population grew. Right now what would be housed at
6 Marshall would be general population, close custody
7 inmates, so they wouldn't be in the long-term
8 segregation status.
9     If the population exceeded what I needed at
10 Wilkinson and East Mississippi the healthy or the ones
11 that didn't require mental health treatment, there could
12 be a small population of long-term segregation at
13 Marshall.
14 Q   And Marshall is air conditioned; is it
15 not?
16 A   No, ma'am, it's not.
17 Q   It's not?
18 A   No, ma'am.
19 Q   And Leakesville?
20 A   Leakesville houses 50, a capacity of 50.
21 Right now I think it's got about 45 long-term
22 segregation which are primarily our high-profile gang
23 leaders, our most assaulted inmates. It's not
24 air-conditioned. Then we have a small number of inmates

**Page 17**

1   that are in a high risk incentive program at Leakesville
2   that have graduated from the what I call typical long --
3   term segregation and participating in the high risk
4   incentive but couldn't be released back into the general
5   population either because of -- primarily because of
6   their violent history in prison where they've assaulted
7   staff or inmates and caused serious bodily injury.
8       MR. WINTER: Judge Davis, would it be
9   appropriate to -- well, I guess we may want to have
10  cross-examination before the class members are heard
11  from?
12      THE COURT: Yeah, if there's anything from
13  Mr. Vincent.
14      MR. VINCENT: No, Your Honor. We don't have
15  any questions at this time.
16      MS. WINTER: May I consult with my --
17      THE COURT: Absolutely. I have a couple of
18  questions I'd like to ask Mr. Sparkman, too, but I'll
19  wait.
20      BY MS. WINTER:
21  Q   Commissioner Sparkman, is -- I know that
22  you're doing work on Unit 29 to secure, you know, to
23  raise the security, perimeter security. Is there any --
24  are there any -- is there any work that's currently

**Page 18**

1   being done on Unit 29 other than that that would have an
2   affect on the class members' lives, the death row and
3   the high risk incentive tier prisoners?
4   A   Well, the main -- the main thing and the
5   reason that I'm -- I personally am not going to
6   recommend them move to the commissioner until, number
7   one, the death row offenders and a large number of our
8   high risk incentive inmates have televisions. At Unit
9   32 we we have whey they can -- an antenna to their cells
10  to where they can connect. I want that in place, which
11  we're in the negotiations right now with an antenna --
12  I don't want to say antenna -- a telecommunications
13  company to provide that system.
14      We also have to construct the individual
15  recreation yards that have -- so they can provide the
16  exercise outside cell five days a week. Now, we've
17  already got the large recreation yards for those inmates
18  that qualify for the -- in the high risk incentive
19  program where they can do congregate recreation. But we
20  don't have the sufficient number of individual
21  recreation yards that we have to construct so we have to
22  do that.
23      So I think that's mainly what we're looking
24  at but I don't want -- I don't want to make that move

**Page 19**

1   until I can provide the services that we're already
2   providing at Unit 32. Until I can be assured -- assured
3   that they can provide those same services at the same
4   level or higher level at Unit 29, I'm not going to allow
5   them to be transferred.
6   Q   So the access to television reception and
7   channels and so forth will be at least equivalent if not
8   better --
9   A   Yes, ma'am.
10  Q   -- than what they had before?
11  A   Yes, ma'am.
12  Q   A minor but evidently important issue that
13  has been raised is the placement of the television.
14  Will there be a shelf to put the television on? I mean,
15  has that been thought where in the cells the televisions
16  will actually be located?
17  A   I believe those cells -- the bunk I think
18  there is a way to do that. If it's -- if it's not, then
19  I have a means of purchasing those through a basically
20  frame work that's been designed by our Mississippi
21  Prison Industries that, you know, I'd do that. Like I
22  said, we're going to do it at the same level of services
23  that we have at Unit 32 when I move to Unit 29. I'm not
24  taking away.

**Page 20**

1   Q   So before they move in, there will be some
2   way to mount the television either a shelf or some
3   other --
4   A   Yes, ma'am.
5       MS. WINTER: Okay. Thank you.
6       THE COURT: Commissioner.
7       THE WITNESS: Yes, Your Honor.
8       THE COURT: Fairly obviously when we had
9   this case originally and I signed constitutional
10  violations and we've made some changes.
11      THE WITNESS: Yes, sir.
12      THE COURT: With the approval of the Court
13  of Appeals and quite frankly with the approval of I
14  think of the prison administration. I do want to
15  compliment particularly you going down in the unit
16  yourself and seeing how things really were. Is there
17  any part of this that you want to step back and say
18  we've gone too far?
19      THE WITNESS: No, sir, Your Honor. I mean,
20  was I hesitant, concerned when we changed -- basically
21  in our operations I've been doing this for going on 36
22  years and the lock up philosophy is what I live by. I
23  mean, until somebody saw a change in behavior, you kept
24  them locked up. I came to realize in 2007, we had to do

### Page 21

1 something different. I wasn't sure what it was. And
2 when we implemented that program, I think if anyone came
3 to Unit 32 right now and went to our high risk incentive
4 tier -- but it did happen every once in a while you had
5 some problems there -- but it's probably the cleanest,
6 the most orderly housing unit we've got.
7     And it's demonstrated by the majority of the
8 inmates that graduate from long-term segregation. They
9 successfully integrate into the general population. And
10 I -- you know, I've been contacted by several other
11 states for us to look at the program we've implemented
12 in Mississippi.
13     **THE COURT:** I guess what I'm trying to say
14 is, with the benefit of hindsight now, the changes that
15 have been made through the institution, the institution
16 of this lawsuit and with the Court, have been positive
17 for the corrections in the Mississippi Department of
18 Corrections?
19     **THE WITNESS:** Yes, sir. In my -- in my
20 personal opinion without a doubt. I mean, it's --
21     **THE COURT:** So to try to ease any concerns
22 that an inmate class may have, would it be -- if you
23 step back from what you're doing, that would be going in
24 the wrong direction.

### Page 22

1     **THE WITNESS:** Yes, sir, Your Honor. And to
2 add to show you that I think our commitment and how we
3 feel that it's successful as an agent as a department is
4 I didn't have to implement these programs at South
5 Mississippi Correctional institution. I mean, I didn't
6 have to have the Court or, you know, the Plaintiffs sue
7 us to implement those programs at South Mississippi.
8     We implemented them because they worked at
9 Unit 32. The things -- some of the things that we've
10 done when we started transferring to East Mississippi
11 and they started talking doing mental health groups.
12 And they said we're going to construct cages, which, you
13 know, there was nothing to prevent them. I said don't
14 do that. We've shown it successful to put a hook in the
15 floor to where you can restrain inmates from hurting
16 each other. It's been successful. And they said, hey,
17 it's been successful. We're not going to change that.
18     I mean, so once we see it works, me
19 personally I'm not going backwards and I don't think as
20 an agency and I think the commissioner I'm close enough
21 to know that he has no intention of going backward. We
22 plan on going forward.
23     **THE COURT:** Well, you know, it's hard for
24 the Court to stay oblivious to things that happened with

### Page 23

1 the legislature and particular the cuts in the budget
2 and the things that I had measured. The things that I
3 have read are that the commissioner as well as you think
4 that what has been done is successful and it's -- and in
5 the long run assisted y'all in bringing some of the cost
6 down.
7     **THE WITNESS:** Absolutely, Your Honor. And
8 the fact that, you know, 32, 35 years ago it would have
9 been inconceivable to close 32. But what we've been
10 able to do with incentives and changing the way we
11 operate, we're able to reduce -- and I keep using --
12 because I believe it's an eight million dollar figure
13 that we're able to save in staffing. Because any time
14 you increase your lock-up population, your staffing cost
15 are going to increase.
16     Plus you can't put a dollar on the stress
17 factor it puts on staff and offenders in that
18 environment. And then you look at the long-term cost on
19 what we're now preparing those inmates to reintegrate
20 into society, in which that's our ultimate goal is we
21 want them to be able to successfully transition back
22 into the community. Many of them -- I think 90
23 something percent of them will transition back into the
24 community.

### Page 24

1     **THE COURT:** I'm not going to -- I think my
2 comments I've made throughout this litigation and I
3 really got in and got to find out what was going on with
4 death row in Unit 32. Also horrified. I mean, things
5 seem to be -- it scared me. I thought it was a tender
6 box where people could end up being killed, but I see a
7 whole different mindset. And it's encouraging to me as
8 a citizen besides being presiding Judge in this, it has
9 been encouraging to me. Ms. Winter, do you have any
10 questions based on the Court's inquiries?
11     **MS. WINTER:** No, Your Honor.
12     **THE COURT:** Thank you, Commissioner. You
13 may step down.
14     **MS. WINTER:** Would it be possible while the
15 Commissioner is still on the stand -- I don't know if
16 this is appropriate or not -- to ask the class members
17 who are present in the courtroom at Parchman whether
18 they have any particular questions.
19     **THE COURT:** Sure. I don't have any problem
20 with that. They're free if they have any questions for
21 Commissioner Sparkman they may. If you'll just identify
22 yourself and go to a microphone where we can hear you,
23 we'd be glad if any of you have any questions based on
24 Commissioner Sparkman's testimony.

Page 25

1  MR. DAVIS: I would like to. My name is
2  Jeffrey Davis.
3      THE COURT: Yes, sir Mr. Davis.
4      MR. DAVIS: The concerns that I have are
5  during this -- in this lawsuit we received additional
6  screens on the outside of the windows at 32.
7      THE COURT: Right.
8      MR. DAVIS: My understanding is that they
9  have not been applied to the building 29. Those were a
10 blessing.
11     THE COURT: Yes, sir.
12     MR. DAVIS: And I would like -- you know, I
13 would like to think that they will be added. If they're
14 not, that they will be at the building we're transferred
15 to.
16     THE COURT: Let me -- let's ask Commissioner
17 Sparkman.
18     MR. SPARKMAN: The windows at Unit 29 are
19 different and I'm not aware of any window problems as
20 far as with the screens. But if there were problems and
21 we had to add additional, we would do whatever it takes.
22 We just had entomologist.
23     THE COURT: Entomologist.
24     MR. SPARKMAN: Entomologist. I can't say

Page 26

1  it.
2      THE COURT: The bug guy.
3      MR. SPARKMAN: The bug guy came up from the
4  State for that region. He gave accolades for our
5  mosquito eradication program. He said, of course,
6  eradicating mosquitoes in the Delta was impossible, but
7  he said we were doing the program the right way. It was
8  complimentary that we were using an outside consultant
9  to help us. He made some suggestions but I -- and, you
10 know, one of the things that we -- since I've returned
11 to Parchman as superintendent, I've made a lot of -- put
12 a lot of emphasis on our eradication program, but
13 Whatever we need to do if it's identified a problem and
14 an extra screen needs -- but they are a different design
15 than they were at 32. I'm not sure at this time I could
16 say that it's necessary. But if it was, I would
17 entertain that.
18     MR. DAVIS: Also from my understanding the
19 electrical wall sockets over next to the cell door
20 whereas the bed is against the wall. Are we going to be
21 provided with electrical -- if we had a plug in there,
22 there's no way that the TV or radio can reach the bed,
23 you know. It would reach to the toilet. You see what
24 I'm saying? The cords are not that long, you see what

Page 27

1  I'm saying?
2      MR. SPARKMAN: I understand but I don't
3  think that it would have to reach the bed. I mean you
4  could watch --
5      MR. DAVIS: I mean, closer. I mean, I'm
6  just -- I haven't been there so I really --
7      MR. SPARKMAN: You know, we'll look at --
8  I'm not sure we could relocate the electrical socket but
9  that could go into where if it needed a TV stand or a
10 radio stand to where we would locate those in close
11 proximity to the electrical plug. You know, we'll
12 look -- that's one of the things when we start looking
13 at how we're going to --
14     THE COURT: They really are not going to try
15 to make things worse for you is my understanding.
16     MR. SPARKMAN: That's correct.
17     THE COURT: Okay.
18     MS. WINTER: Could I ask a follow-up
19 question before we move on?
20     THE COURT: Sure.
21     MS. WINTER: The question, Mr. Davis's
22 question actually did worry me a little bit. Because
23 it's not like the fans, the State supplied fans, are
24 these big powerful fans. They're modest little fans.

Page 28

1  Even at a distance -- the cells, of course, are small.
2  I haven't seen the cells so I don't know. But it would
3  worry me if the fan were not able to be put right close
4  to the bed. It offers little enough relief. And I'm
5  hoping if that turns out to be an issue, that MDOC would
6  address that so that the fan would be a real -- excuse
7  me -- a real help and not just had a fig leaf.
8      MR. VINCENT: We'll stipulate to the Court
9  if that becomes a problem, people been living in unit 29
10 for several years and none of this has been a problem.
11 But if it becomes a problem, I'll stipulate to the Court
12 that the MDOC will take care of that problem. If we
13 can't, we will notify Plaintiffs' Counsel and the Court
14 and take suggestions.
15     THE COURT: I would think, you know, a short
16 extension cord may be all that's required. I think
17 these are matters that I would expect that the MDOC will
18 take care of.
19     MS. WINTER: I don't mean to knit pick but
20 these fans are such a big issue.
21     THE COURT: I understand. You're not knit
22 picking. The small things that you're talking about are
23 big things to these people that are sitting in the
24 courtroom in Parchman.

Page 29

MS. WINTER: Right.

THE COURT: And the Court understands that as does Mr. Sparkman. I mean, it's real easy for us to sit in air conditioning at this time, but to have that fan to where it does some good, that's obviously key to these individuals and I appreciate that.

MS. WINTER: Thank you. So I didn't mean to interrupt. You all you should continue with anyone else that has --

THE COURT: Any other questions from any of the inmates.

MR. JORDAN: Mr. Sparkman, this is Richard Jordan here. I understand you can't give us any dates of the move or anything. But one thing that concerns several people that I've talked to is visitation days. Will our visitation days be basically the same after the move? I ask this because people have to plan ahead and take time off, you know, from work.

MR. SPARKMAN: My intent is for the visitation day to stay the same. And if it were I would give enough notice that you would be able to notify your visitors that they could alter their schedule. But my intent is for it to stay the same.

MR. JORDAN: Just so we have enough

Page 30

notice.

THE COURT: Okay. Anybody else? Thank you gentlemen. The Court has read all of the objections that came in. And don't think that I don't understand your concerns, but I hope you all agree that through the work of your attorneys and the MDOC personnel, things have changed over the last years. And I truly hope that you can feel at least a little bit better about the way you're being housed and taken care of. Ms. Winter?

MS. WINTER: We have nothing further. Thank you.

MR. VINCENT: Very briefly Your Honor.

THE COURT: Okay.

MR. VINCENT: May it please the Court I just want to get on the record so when I send in my bill they will know I was here.

**CROSS EXAMINATION**
**BY MR. VINCENT:**

I think this has already been explained but just out of abundance of caution. When these changes were made as a result of the Court order, did you make any changes to the policies and procedures -- having to do with the people at Unit 32 -- did you change the policies and procedures with Unit 32 consistent with

Page 31

what the Court order said?

A  Yes.

Q  And so those policies and procedures will they follow the people wherever they are and those policies and procedures will they be the same depending on where they are?

A  That's correct.

Q  I didn't ask that very -- maybe you can explain that better.

A  One of the things that we identified was that inmates in long-term seg that they -- after a period of time they qualify for the high risk incentive program. The level of services we offer that will follow them as far as --

Q  And you were asked a question about Unit 32 the money that has been spent on it. Do you have any idea how much money was spent on 32 to bring it up to the standards that it is today as a result of this lawsuit?

A  I haven't got any exact numbers, but I would say it's probably in my opinion -- and, again, I'm not -- it's probably less than the 8 million that we'll save in the first year.

Q  So -- so in a year's time, you would have

Page 32

made back whatever money that had been spent on it?

A  And that's not counting the -- the staff. The stress of the staff and the way it -- and the potential for problems in the design.

Q  And without getting into any specifics, are there any plans to maybe do anything with Unit 32?

A  We have no plans to do anything with 32.

MR. VINCENT: Thank you. No further questions, Your Honor.

MS. WINTER: Could I ask one follow-up?

THE COURT: Yes, you may.

**RE-DIRECT EXAMINATION**
**BY MS. WINTER:**

Q  The question is about classification and questions in response during this discussion has so far focused specifically on the high risk incentive tier, but it's my understanding, correct me if I'm wrong, that it's your -- the efforts that MDOC has made to enable class members to work their way up into less restrictive environments goes considerably beyond the high risk incentive program and that it's my understanding that you intend to keep those programs and policies in place so that we don't revert to the days when basically you didn't have any hope?

Page 33

**A   Our intent is to keep the policies and procedures that are in place for segregation, criteria for placement in segregation, removal from segregation will stay in places as they are.**

MS. WINTER: Okay. Thank you. Was there anything else from any of you?

MR. HARPER: Yeah, I'd like to say something about -- Roy Harper -- I'd like to say something about the duration of long-term segregation during the present case was determined to be 60 days. And it seems like the administration doesn't feel like that's long-term because we more recently got a couple of RVRs where relatively minor things two cigarettes and an extension cord. And they sent me all the way back to Phase I. So I had to do two -- two and a half more years of administrative segregation per those issues.

My point is long term segregation is 60 days. Is something that's minor as cigarettes and an extension cord does that warrant two and a half years of long-term segregation?

MR. SPARKMAN: Well, long-term segregation is not 60 days. Long-term segregation is, you know, after 60 days you would be placed in long-term segregation. And speaking to that matter, I believe you

Page 34

can -- I think the phase -- and I haven't got the policy in front of me -- I think it's six months is the minimum for each phase I believe up to the phase three.

But, Roy, like in your situation, yes, they reduced you to Phase I, but once you wrote me and identified what the issue was, I intervened and had you placed back in Phase II. So I mean you have a -- I think that demonstrated that as an agency that -- not to say that things like that are going to happen where staff takes corrective action but there is a way to grieve that informally and formally to where it can be addressed if I -- like in that case I felt like it was excessive.

I felt like some action needed to be taken because it is an incentive program. You are expected to comply with the rules and regulations, but at the same time, when it's excessive, there is a remedy to intervene in that behalf. And I'll continue as a superintendent to look at that situation and also as deputy commissioner whereas if an in mate informally corresponds with me or contacts me or formally through the administrative remedy program, we'd look at that on a case by case basis and see was the action justified in reducing from one phase to the other or the length of

Page 35

time that they remained in that phase.

I think I've demonstrated that even the time in a phase I've intervened and had them recommended for promotion to the next phase. So there is -- I guess what I'm saying there is a mechanism for offenders to formally and informally submit grievances when they feel like the action is unjustified and also that the administration has the authority to intervene in those matters.

MS. WINTER: Do you have any follow-up, Mr. Harper?

MR. HARPER: No. I think that's it.

MS. WINTER: Okay. Thank you.

THE COURT: Thank you. Has the parties prepared an order for the Court in this matter?

MR. VINCENT: Mr. Norris didn't do it, Your Honor. No, Your Honor, we have not.

THE COURT: I think it will be appropriate that y'all present me a final order. I do specifically find that in this case that the corrections and the problems that the court identified in its original opinion have been addressed satisfactorily by the --

MR. VINCENT: Your Honor, I apologize, I did it and gave it to Mr. Norris. No. Mr. Norris did

Page 36

actually do one, Your Honor.

THE COURT: Has met the goals that the Court has outlined in its opinion. And at this point the Court sees no further need for the continuance of this litigation and that it should be closed. And I do -- you know, I feel little bit like a broken record in this case because I have commended both sides every chance I've gotten because I have personally seen and I think -- I don't know if the Plaintiffs' attorneys know how much time I've actually spent at Parchman myself.

I have spent over the course of my 26-year career an awful lot of time at all the units. So when you talk about Unit 29, when you talk about Unit 32 and all, I have a very vivid mental picture of all of those places. And the changes that have been made over the last few years to me -- I don't want to start sounding like a preacher up here -- but it just restored my faith in human beings really.

I mean, I can understand how guards and inmates both can get frustrated at one another. I wouldn't want to be in the location they have. But I think people of good will can disagree, but then they can go about fighting and correcting the problem. And I think that the institution of this lawsuit has helped

Page 37

bring about some much needed changes and a much -- and in the final analysis a change of approach.

And I'm quite happy to endorse MDOC to other states and say, you know, little ole Mississippi can face these problems and make these some changes. There's no reason why you can't, too. And I just want to commend everybody that's been involved in this litigation including the inmates that helped originally bring it and the ones that have taken the interest of showing up here today. The Court appreciates that and I wish you all the best.

**MR. VINCENT:** Thank you, Your Honor.

**THE COURT:** Is there anything further?

**UNIDENTIFIED INMATE:** Your Honor, could I say something?

**THE COURT:** Yes, you may.

**UNIDENTIFIED INMATE:** I'd like to thank Counsel on both sides. Not only ACLU but also the attorneys for MDOC. Mr. Sparkman and Mr. Epps. They've done actually the best to handle all of these problems. There is some small, you know, minor things. Nobody is going to be completely satisfied with everything. But as you said, they've done their best and things have changed so much that there is some hope. There's been

Page 38

hope given where there wasn't before.

**THE COURT:** Well, thank you very much. That makes me feel like all of the work that's been done by everybody involved in this has paid off and the whole idea was for things to be better at Parchman and Judge Katty, even though he's deceased, would be smiling right now. So I'd like to think that up there somewhere Judge Katty has got a smile on his face. Thank you.

**UNIDENTIFIED INMATE:** Thank you, Your Honor.

**THE COURT:** You're welcome. Yes, sir, Mr. Davis.

**MR. DAVIS:** Mr. Sparkman, this has to do about visitation. Not so much related to the lawsuit, but there's a problem with policy on people that work -- my mother's sister used to work as a nurse at SMCI, and for that reason she is not allowed to visit me up here. My brother-in-law who has been married to my sister for 36 years is an officer at SMCI. He is not allowed to visit me anymore since December of 2007. I just -- I don't understand the principle behind a policy that restricts visitation like that?

**MR. SPARKMAN:** Jeffrey, I think you're misinterpreting the policy because that is in effect for non-immediate family. But for immediate family if fall

Page 39

under the definition of immediate family, they would be even if they were ex-employees unless there was some reason they were terminated for cause that they wouldn't be able to visit. But if they left in good standing and they're currently employed, if they're immediate family, you can write me and I will look at that. And unless there's some reason that I can justify, then they would be allowed to visit.

**MR. DAVIS:** According to the SOP -- and I think that's what the visitation is going by -- it does not classify aunts, uncles and in-laws, brother-in-law or sister-in-law as immediate family. Your office did denied them.

**MR. SPARKMAN:** And if they're not -- because I haven't got the policy -- but it does restrict only to immediate family.

**THE COURT:** Won't you try write Mr. Sparkman a note and see if there's anything he might be able to do to help you.

**MR. DAVIS:** I will. Thank you.

**THE COURT:** Ms. Winter, yes, ma'am.

**MS. WINTER:** Your Honor, I have a copy of the order of dismissal without prejudice signed by all parties. Should I hand it out?

Page 40

**THE COURT:** Yes. If you would, please. The Court has signed the Dismissal Without Prejudice. And with nothing further being brought before the Court today, we stand adjourned.

Page 41

1   C E R T I F I C A T E
2
3   STATE OF MISSISSIPPI:
    COUNTY OF LEE:
4
            I, HEATHER DELOACH, Court Reporter, and
5   Notary Public, Lee County, Mississippi, CERTIFY:

6           The foregoing proceedings were taken before
    me at the time and place stated in the foregoing styled
7   cause with the appearances as noted.

8           Being a Court Reporter, I then reported the
    proceeding in Stenotype, and the foregoing pages contain
9   a true and correct transcript of my said Stenotype notes
    then and there taken.
10
            I am not in the employ of and am not
11  related to any of the parties or their counsel, and I
    have no interest in the matter involved.
12
            I further certify that in order for this
13  document to be considered a true and correct copy, it
    must bear my original signature and that any
14  reproduction in whole or in part of this document is not
    authorized and not to be considered authentic.
15
16  Witness my signature this the
            day of                      , 2010.
17
18
19
20              HEATHER DELOACH, COURT REPORTER
21
22  Notary Public at Large
    For the State of Mississippi
23  My Commission Expires:
    April 18, 2014
24