# 2010 Interim Report on Conditions Inside Los Angeles County Jail

ACLU National Prison Project
ACLU of Southern California

**September 9, 2010**

**Principal Authors**
**Mary Tiedeman**
**ACLU Foundation of Southern California, Jails Project Coordinator**

**Daniel Ballon**
**Jails Project Fellow, ACLU Foundation of Southern California**

**Melinda Bird**
**Disability Rights California**

**Peter Eliasberg**
**Managing Attorney, ACLU Foundation of Southern California**



## 2010 INTERIM REPORT ON CONDITIONS INSIDE
## LOS ANGELES COUNTY JAIL

### INTRODUCTION

The following is a summary of the ACLU's findings concerning violence, retaliation, and overcrowding in Men's Central Jail ("MCJ") during the first eight months of 2010.[1]   These findings are based on hundreds of complaints received through our Jails Project intake system, observations recorded during our monitoring visits, and prisoner declarations attached to this report. Overall, we found that the most serious problems we reported in our "Annual Report On Conditions Inside Los Angeles County Jail" ("2009 Annual Report")[2] continue:  a pattern of excessive force by deputies; retaliation by Sheriff's Department ("Department") employees against prisoners for communicating to the ACLU and other prisoners' advocates about the conditions of their confinement; lack of access to adequate mental health care; and severe overcrowding, particularly in the MCJ dorms.

This interim report also highlights findings from three investigative reports on the jail released in June and July 2010,[3] and from a state report on the jails that discusses overcrowding in MCJ, which the ACLU obtained in 2010.[4] Especially striking is the introduction to the July

---

[1] The inclusion of new findings on Deputy-on-Inmate Abuse, Continued Overcrowding in the Dorms at MCJ, and Retaliation against Inmates by LASD personnel in this report is not intended to suggest that other issues that we addressed in our 2009 Annual Report on Conditions at MCJ have been resolved.

[2] Filed with the Court on May 5, 2010 and available from http://www.aclu-sc.org/documents/view/259.

[3] One report was released by Merrick Bobb, who serves as special counsel to Sheriff Baca and has issued a series of semi-annual reviews of the Sheriff's Department for the past decade.   29th Semi-Annual Report by Special Counsel Merrick J. Bobb and staff of the Police Assessment Resource Center (PARC), July 2010, available from http://www.parc.info/client_files/LASD/29th%20Semiannual%20Report.pdf.  Another report was issued by Michael Gennaco, Chief Attorney for the Office of Investigative Review ("OIR"), a county agency that reviews the Sheriff's Department's internal review of use of force and death incidents.  OIR, Eighth Annual Report, June 2010, available from http://www.laoir.com/reports/oireightannualreportfinal.pdf.  OIR also issued a follow-up report on the jail, entitled "Deputy Vigilance in the Jails," July 19, 2010, available from http://www.laoir.com/reports/Deputy%20Vigilance%20in%20Jails.PDF.

[4] Letter from Magi Work, Field Representative, Facilities Standards and Operations Division, California Department of Corrections and Rehabilitation, Corrections Standards Authority ("CSA"), to Sheriff Leroy D. Baca (September 25, 2009) ("CSA Report").  This report was obtained from CSA in 2010 through a request under the California Public Records Act.

2010 report from Merrick Bobb, Special Counsel to Los Angeles County Sheriff Leroy Baca and director of the Police Assessment Resource Center, which states that "[t]he incidents we describe in this report follow long-standing serious lapses by the Men's Central Jail staff leading to death and serious injury to inmates. Some have concluded that the jail is beyond the possibility of redemption. We reiterate recommendations in earlier reports *that the facility should be shuttered and replaced*."(Emphasis added).[5]  Like Bobb's report, this interim report describes long-standing problems that point to the need for comprehensive reform of the jail system and closure of Men's Central Jail.

## I.      VIOLENCE, EXCESSIVE FORCE AND FAILURE TO PROTECT

The ACLU's 2009 Annual Report describes the pervasive pattern of violence that we observed in Men's Central Jail (MCJ) in 2009.[6]  During the first eight months of 2010, the violence has continued unabated. One aspect of the violence we discussed in our 2009 report was deputies' use of excessive and unjustified force, which continues to date: in the five-month period from March 10 through August 10, 2010, we received more than 70 complaints of excessive and/or unjustified force, or retaliation by deputies against prisoners, or both.   Twenty of the prisoners making these complaints have provided us with sworn written statements detailing their allegations.[7]

In 2010, prisoners continue to report that they are the target of unprovoked attacks by deputies, with multiple deputies often joining in the beatings.[8]  The injuries sustained by

---

[5]  Merrick Bobb and PARC, 29th Semi-Annual Report , page 3.

[6] 2009 Annual Report, pages  9-23.

[7] We have not yet been able to interview all the prisoners who have complained to us about deputy abuse or retaliation.  Other prisoners who complained have been unwilling to submit declarations because they fear retaliation by the deputies.

[8] *See, e.g.*, declaration of Prisoner 3, dated  July 14, 2010, ¶ 5-7 (beaten for no reason, suffered brain injury); Prisoner 11, dated July 26, 2010, ¶ 4-11 (beaten for requesting a lower bunk, hospitalized for injuries to head, knee); Prisoner 13, dated July 7, 2010, ¶ 6-8 (beaten because he overslept, suffered fractured wrist); Prisoner 1, dated June 15, 2010, ¶¶ 5-6 (beaten in head by seven deputies for asking if he could have a new pair of shoes); Prisoner 4, dated July 10, 2010,  ¶¶ 4-5 (beaten until unconscious while in handcuffs); Prisoner 2, dated July 26, 2010, ¶ 4 (beaten until unconscious by multiple deputies for no reason, required surgery and suffered blunt head trauma); Prisoner 9,

prisoners in these incidents are often so serious and life-threatening[9] that it is inconceivable that the amount of force used could be justified, even assuming there was some provocation or cause.[10]  Prisoners describe beatings that occur frequently in some of the worst housing units, known as modules.[11]  After a beating, deputies often claim that the prisoners were the attackers, even those who were handcuffed and in waist chains and cowering from incoming blows.

Statements from prisoners or recently released former prisoners given in 2010 include the following:

> Prisoner 1 asked a deputy for new jail shoes to replace his earlier pair, which was damaged.[12]  In response, the deputy ordered the prisoner to strip, get down on his knees, and cross his ankles.  Before the prisoner could comply, the deputy punched him in the right temple with a closed fist so forcefully as to draw blood.  Another deputy approached the prisoner and hit him in the head with his fist.  A group of seven deputies assembled to violently kick, knee, and step on the prisoner.[13]  Afterwards, Prisoner 1 was charged with assaulting an officer and placed in solitary confinement as punishment.[14]  A second prisoner came forward to offer independent corroboration of these facts.[15]

---

dated June 27, 2010, ¶¶ 6-7 (numerous deputies beat prisoner after he told deputies who were taunting and threw a sandwich at another prisoner with signs of mental illness to stop picking on that prisoner); Prisoner 15, dated June 30, 2010, ¶ 4-10 (beaten with flashlights while handcuffed, as often as twice per day); Prisoner 17,  dated July 15, 2010, ¶ 6-12 (deputy slammed his face into metal pole for no reason); Prisoner 19, dated August 24, 2010, ¶¶ 3-18 (prisoner was on his way to a parole hearing when he beaten by five deputies with flashlights and batons so badly that his left leg remains paralyzed four months after the beating); Prisoner 21, dated September 1, 2010 ¶¶ 7-24 (multiple deputies beat prisoner and spray his face with mace after he yelled out "Hey who was that" to another prisoner who had called out his nickname).

[9]  *See, e.g.*, Declarations of Prisoner 3 ¶ 3 (injuries resulting from beating include swollen artery in the brain); Prisoner 2 ¶ 4 (beaten until unconscious by multiple deputies, required surgery and suffered blunt head trauma); Prisoner 4, ¶¶ 5-7 (prisoner knocked unconscious and suffers fracture in his face from beating by deputies; one deputy states to him after he regains consciousness "I tried to kill you, you are lucky you are still breathing."); Mary Tiedeman ¶ 25.

[10]  *See, e.g.*, Declaration of Prisoner 10, dated June 30, 2010, ¶¶ 7-14 (prisoner who has contraband beaten with flashlights, maced and pepper sprayed, rather than being placed in isolation until he turns over contraband)

[11]  *See. e.g.*, decl. of Prisoner 15, dated June 30, 2010 (beaten daily while he was housed in 3500 module; beatings stopped when he was moved to 1750 module); Prisoner 11  ¶¶ 4, 13 (beaten in 3000 modules; did not feel safe to talk about assaults until he returned from hospital and was sent to 7000 module).

[12]  Declaration of Prisoner 1  ¶¶ 5.

[13]  Declaration of Prisoner 1 ¶¶ 5-9, 13.

[14]  *Id.* ¶¶ 5-9, 13.

Prisoner 2 lined up in a row with other prisoners for pill call when a deputy approached him, restrained him, and asked him, "What's your fucking problem?"  The prisoner did not know why he was singled out, and he responded that there was no problem; the deputy punched the prisoner on the right side of his face and said, "Don't respond!"[16]  Another deputy approached the prisoner, stated "what's your fucking problem," and struck the prisoner in the head. Shortly thereafter, after pill call was over, the two deputies beat the prisoner until he lost consciousness.  When he awoke, he was on the floor.  More deputies had surrounded him, yelling "stop fighting," striking him in the head while one shoved his face into the concrete floor.  Later, this prisoner was taken by ambulance to county hospital, where he required surgery to his ear and was found blunt head trauma, and a chipped tooth.  When he returned to the jail, he was charged with fighting with deputies and placed in discipline for 29 days with a loss of recreational, phone, and visiting privileges.[17]

Prisoner 3 was walking in line to church when a deputy gave him an order.  Although the prisoner complied immediately, deputies threatened him and struck him in the neck. He turned, the deputies yelled "he's fighting," and seven other deputies ran over and began beating him so badly that he required hospitalization.  The deputies fractured this prisoner's nose, caused a torn ligament in his ankle.  As a result of the beating Prisoner 3 had to go to the hospital for a CAT scan and continued monitoring because an artery in his brain swelled with blood.[18]   The prisoner "is scared to go to church now for the fear that I will see the same deputies" who attacked him.[19]

Prisoner 4 was beaten while handcuffed for simply calling out "Law library!", a common practice to remind deputies that prisoners farther down the row are waiting to access to the law library time at the appropriate hour.[20]  For no apparent reason other than his displeasure with Prisoner 4's calling out "Law Library", one deputy became annoyed, dragged Prisoner 4 to the wall of the law library and slammed his face into the door frame, causing him to black out.  When the prisoner regained consciousness, he was being kicked in the head and punched in the face by two deputies. They yelled at him to "stop resisting" even though he was handcuffed the entire time. Afterward, one of the

---

[15] Decl. of Prisoner 8, ¶ 4 – 10.  Deputies "seemed almost proud of what they did to Jimmie. … It was almost like a gang beating."  *Id.*, ¶ 11, 12.

[16] Declaration of Prisoner 2, ¶¶ 3-4.

[17] *Id.*, ¶¶ 4-5, 8, 14.

[18] Declaration of Prisoner 3 ¶¶ 3.

[19] *Id.* ¶¶ 4-8.

[20] Declaration of Prisoner 4 ¶ 4.

deputies remarked, "I tried to kill you. You are lucky you are still breathing."[21]   A second prisoner came forward to offer independent corroboration of these facts.[22]

The jail also has a duty to protect prisoners from assaults by other prisoners, a duty that it has not carried out on many occasions in the past.[23]   In 2010, the ACLU has continued to receive reports from prisoners who have not been adequately protected from assaults by fellow prisoners by Department staff.   Of particular note, disabled prisoners have been housed in general population without appropriate protections,[24] and have been beaten as a result.   Additionally, the ACLU has gathered the following testimonials, among others, from prisoners who were beaten by fellow prisoners at the Jail:

> Prisoner 6 was housed in general population in spring 2010 when an article about his case appeared in the <u>Los Angeles Times</u>, and another prisoner brought a copy of the article into his dorm.  Other prisoners beat him so severely that he was hospitalized and diagnosed with a broken eye socket and brain damage.[25]  When he recovered and was returned to the jail, he asked to be placed in protective supervision.  However, jail officials mocked Prisoner 6 and refused to move him.[26]  After he was placed in general population, "[t]he other inmates in 3400, where I was moved, knew about my case and beat me up the same day.  I was knocked unconscious and woke up the next morning in a pool of my blood."  He again required hospitalization for his injuries.[27]

> Prisoner 18 has also requested protective custody because he is a gang drop-out and other prisoners believe he is a "snitch."  He was instead placed in general population, where other prisoners have attacked him, most recently using an improvised knife, or "shank" to cut his face and cause permanent scarring.[28]

---

[21] *Id.* ¶¶ 4-5.

[22] Decl. of Prisoner 14 ¶¶ 12-17.

[23] ACLU 2009 Annual Report , pages 19-21.

[24] Declarations of Prisoner 16, ¶¶ 16-17(deputies encourage prisoners who "regulate" inmates with mental illness housed in general population). *See also* Merrick Bobb, 29th Semi-Annual Report, page 139 (prisoner with disabilities beaten and tortured when housed in general population).

[25] Declaration of Prisoner 6  ¶¶ 3-6.

[26] *Id.*, ¶¶ 9.

[27] *Id.*  ¶¶ 10-11.

[28] Declaration of Prisoner 18 ¶¶ 3-11.

Even worse, the ACLU has had a growing number of reports that deputies intentionally place prisoners in danger of violence at the hands of fellow prisoners by opening cells doors to allow members of opposite gangs to attack one another and by encouraging prisoners to beat up other prisoners to keep them in line.[29]  Examples include the following:

> Prisoner 18 was locked in his cell when two prisoners from his former gang came to his cell front.  They were housed in a different module and could only have gained access to the hall outside the cell with the knowledge and cooperation of jail deputies.  The two prisoners yelled out to open Prisoner 18's cell, and the cell door popped open.[30]  Only deputies in the control booth have the ability to open a cell door in this way.  The two other prisoners beat Prisoner 18 severely, and then left.   After they were gone, deputies came to Prisoner 18's cell, but refused his request to complain to a sergeant.[31]

> Prisoner 5 observed another prisoner walking without a deputy escort in handcuffs to his cell in an adjacent row.  The door to another cell opened, the prisoner in that cell ran out, and began striking the handcuffed prisoner with his fists on his back and head.[32] The victim almost fell to the floor, and could not defend himself because he was wearing handcuffs. When the assailant was finished, he calmly walked back to his cell while the victim staggered back into his own cell room. Only a deputy could have opened the assailant's cell door, and deputies can also see down the row from the deputy booth.[33]

In the past, when prisoners and the ACLU have filed complaints with the Sheriff's Department regarding excessive force and violence against prisoners, and dereliction of duty by deputies, the Department's response has been a flat denial, an assumption that deputies are credible and routine skepticism about prisoners' credibility.[34]

---

[29] Declaration of Prisoner 5, June 25, 2010, ¶¶ 13 (deputies open cell doors and allow inmates the opportunity to attack others); Declaration of Prisoner 16, ¶ 17 (deputy told him to "regulate" cell mate, meaning he should beat him up); Prisoned 20, dated June 21, 2010, ¶¶ 6-8.

[30] Declaration of Prisoner 18 ¶¶ 3-6.

[31] Id ¶¶ 6-10

[32] Declaration of Prisoner 5,  ¶¶ 14-15.

[33] Id. ¶¶ 13, 15-16.

[34] Declaration of Mary Tiedeman, August 9, 2010, ¶ 19; Prisoner 2, ¶14 (when he complained to sergeant about assault, response was "deputies would not beat you up for no reason.").  See also, Bobb, 13th Semi-Annual report (2000) ("skepticism within the LASD (and in the world at large) about the truth of what inmates have to say"), available from http://www.parc.info/client_files/LASD/13th%20Semiannual%20Report.pdf .

However, a new report by the Office of Independent Review ("OIR"), a county watchdog agency, raises profound questions about deputy credibility and accountability in the jail.[35]  OIR found that a score of MCJ deputies were falsifying the official logs in which safety checks are electronically recorded.  Deputies had conspired to create fraudulent safety check records in dozens of modules over a period of months, so that they could leave their posts for extended periods of time without being detected.[36]  In one instance discussed at greater length below, a very young prisoner who was housed in solitary confinement in a high security discipline cell and had exhibited numerous signs of despondency and suicide ideation was left unattended for more than three hours, during which time he was able to commit suicide.

Merrick Bobb's report contains similar criticisms regarding deputies' failure to protect prisoners.  Bobb reviewed reports of hate crimes in the jail, in which prisoners attacked other prisoners based on racial bias or anti-gay sentiments and found a "lack of officer response in the incidents themselves. According to the files, it appears that several of the incidents occurred because officers simply were not around—sometimes for hours or days.  …  As one sergeant told us, this is not simply a hate crime issue, but a general issue."[37]  Bobb discusses one incident in which a prisoner with disabilities was housed in general population and subjected to beating and torture in his cell by his cellmates for two days, and another in which a white prisoner was tied up, beaten and tortured for more than a day by his Latino cellmates.[38]  With respect to the beating and torture of the inmate with disabilities, Bobb concluded that there was "an inability of the jailers in this instance to keep inmates safe such that brutal beatings can go on for a long while without staff even noticing."[39]  Although Bobb was reviewing incidents that occurred between 2006 and 2009, the ACLU has found that in the

---

[35] OIR, Deputy Vigilance in the Jails, pages 4-5.

[36] Id.  Only two of the ten deputies involved in scheme to falsify safety check logs were discharged from service as a result of their actions.  Id. at page 5.

[37] Bobb, 29th Semi-Annual Report, page 139.

[38] Id. at pages 140-42.

[39] Id. at page 12.

first half of 2010, this pattern of dereliction of duty continues in which deputies fail to take obvious steps to protect prisoners from harm.

## II.    RETALIATION

In 2010, the ACLU has continued to receive a steady stream of reports from prisoners who have experienced retaliation and intimidation for communicating problems about the conditions of their confinement to the ACLU or other prisoner advocates. [40]  Some of the retaliation involves the denial of showers or television by deputies who openly state that this is "because you were talking to the ACLU" or otherwise complained about jail conditions.[41] Deputies subjected some prisoners to repeated searches (which involve the destruction of their personal property and family photographs), following every encounter with the ACLU.[42] Deputies retaliate against other prisoners by beating them; in some of these cases deputies plant drugs or contraband on the prisoner as a pretext for the excessive force.[43]  The deputies openly disparage the ACLU and warn prisoners of the consequences if they complain; other prisoners observe these interactions, which make them even more fearful of speaking up.

One prisoner's account of the animosity some deputies display toward the ACLU reflects the wide range of the Sheriff's Department's retaliatory behavior.

---

[40] *See, e.g.*, declarations of Prisoner 7, dated July 19, 2010, ¶ 5 (retaliation for filing internal complaint and complaining to ACLU); Prisoner 12, dated July 20, 2010, ¶ 13 (retaliation for complaints re denial of showers); Prisoner 1, dated June 25, 2010, ¶ 11 (deputies who beat him threatened him with further violence if he complained); Prisoner 8, dated June 29, 2010, ¶ 13 (fearful that the deputies will beat him if they find out he is speaking to ACLU); Prisoner 15, dated June 30, 2010, ¶¶ 11, 12 (afraid to complain or speak to ACLU re beatings by deputies because "deputies would take it out on me even more," but sister complained on his behalf); .   See also, declaration of Mary Tiedeman, ¶ 21.

[41] Regarding the retaliatory denial of showers and television, see, declarations of Prisoner 5a, dated July 16, 2010, ¶¶ 10-11; Prisoner 12, dated July 20, 2010, ¶ 13; Mary Tiedeman, ¶ 22.

[42] Regarding retaliatory searches, see declarations of Prisoner 7, dated July 19, 2010, ¶ 5 (retaliatory searches for filing internal complaint and complaining to ACLU); Prisoner 5a, ¶ 15 ("could hear the deputies ripping up our stuff during a search); Mary Tiedeman, ¶ 23.

[43] Regarding beatings and planted contraband and weapons, see declarations of Prisoner 7, ¶¶ 4-9; Prisoner 11, ¶¶ 8-11;  Prisoner 5a, dated July 18, 2010, ¶ 22-23;  Prisoner 7, dated July 19, 2010, ¶ 5 (retaliation for filing internal complaint and complaining to ACLU)..

Prisoner 5[44] spoke to the ACLU about multiple incidents of deputy beatings and excessive force in late June 2010.  Soon afterwards, he was intimidated and questioned by deputies, who specifically mentioned the ACLU.  Twice when ACLU monitors attempted to conduct follow-up interviews, so many deputies approached him to escort him to the meetings that he was afraid to leave his cell and refused the interview.  On subsequent days, deputies began walking past his cell, asking aloud "Who's talking to ACLU?"[45] When the prisoner was finally able to meet with the ACLU again, he signed a declaration describing instances of beatings and excessive force, the denial of showers or television, deputies allowing prisoners to attack others and setting up fights between prisoners, and deputies planting contraband and weapons on prisoners.[46]  He told the monitor that he was afraid that deputies would also plant a weapon in his cell.[47] The following week, deputies searched this prisoner's cell and reported that they had found contraband in the cell and sentenced him to a month in discipline, which is solitary confinement in a small, dark cell.  The circumstances surrounding discovery of the contraband makes it obvious that the contraband was planted in retaliation for his repeatedly talking with the ACLU.[48]  The prisoner was not allowed to appeal the decision.[49] Deputies continue to warn him not to talk to the ACLU.[50]

The efforts by deputies to discourage prisoners from speaking to the ACLU, as well as pervasive climate of uncurbed violence, significantly hinder the ACLU's ability to monitor conditions in the jail.  On virtually every monitoring visit to the jail, we encounter several prisoners who refuse to talk to us, explaining that they fear retaliation if deputies see or suspect them of speaking with the ACLU.[51]  Three years ago, ACLU staff members frequently spoke to prisoners about their complaints at cell front.  As incidents of retaliation increased in the last two years, the ACLU monitors reduced cell-front interviews and instead began arranging to speak to

[44] This prisoner submitted two declarations, one (Prisoner 5) discusses the deputy on inmate abuse he has witnessed. The other (Prisoner 5a) discusses the retaliation he endured for repeatedly speaking with the ACLU.

[45] Declaration of Prisoner 5a, dated July 16, 2010, ¶¶ 5-7.

[46] Declaration of Prisoner 5, dated June 25, 2010, ¶¶ 5-19.

[47] Declaration of Prisoner 5a, dated July 16, 2010, ¶ 9.

[48] Id., ¶¶ 17-22 (deputies were heard discussing change in accusation from possession of a stick to possession of a razor; charges were later changed to possession of a shaver and creating a disturbance).

[49] Id., ¶ 20.

[50] Id., ¶ 24.

[51] Tiedeman Declaration, ¶ 18.

prisoners individually in the attorney interview rooms at the jail.[52]  In 2010, retaliation has continued to increase, so that even speaking to an ACLU staff person in the attorney room now carries the risk of retaliation. [53]

In the ACLU's 2009 Annual Report, we explained that the Department had implemented a policy against retaliation in MCJ, expressly forbidding deputies from retaliating in any way against prisoners for communicating with the ACLU or any other advocacy group.  However, our observations during the last eight months suggest that this policy has been largely ineffective, both at reducing the number of retaliation complaints we receive, and at alleviating the fear of retaliation we observe.

There are two reasons for the policy's ineffectiveness.  First, the Department has failed to demonstrate an assertive, no-tolerance stance against retaliation within its own ranks. The ACLU monitors regularly bring reports of fear of retaliation to the attention of the Department. Typically, the Department will request disclosure of the prisoner's name without taking measures to protect him from further retaliation, assume that the deputies are being truthful when they deny any allegations of retaliation or abuse, and assert that supervisors regularly brief the deputies on the anti-retaliation policy.

Second, prisoners are unlikely to assert their rights under the no-retaliation policy because they are entirely unaware of its existence. Since the policy was adopted over one year ago, we have asked the Department to post the policy throughout MCJ as a prophylactic measure. The Department has refused to post the policy or notify prisoners of the policy upon their arrival into the jail, so prisoners are unaware of the no-retaliation policy.[54]  As a result, they often do not file formal grievances when retaliatory action is taken. Meanwhile, prisoners are

---

[52] *Id.*,  ¶ 21.

[53] *Id.   See also* declarations of Prisoner 8, ¶ 12 (deputies interrogate him for ten minutes about his criminal case when he has an interview with the ACLU in the attorney room); Prisoner 5a ¶ 24 (deputies make disparaging comments about the ACLU and tell prisoner not to talk with ACLU representatives).

[54] Tiedeman Decl, ¶ 24.

chilled from bringing complaints to advocates and jail officials out of fear of retaliation, unaware that a policy has been set in place to address the cause of that fear.

### III.    MENTAL HEALTH TREATMENT

The many problems with the treatment of prisoners with mental illness in Men's Central Jail were described in a comprehensive report by Dr. Terry Kupers, a nationally renowned psychiatrist with national expertise in correctional settings,[55] and in the ACLU's 2009 Annual Report.[56]   Both reports contained recommendations for improving this treatment so that it meets minimal constitutional standards.  However, the ACLU has observed no improvement in treatment of prisoners with mentally illness in the first part of 2010.

Specifically, a core problem is that the number of prisoners with mental illness is far greater than the resources and housing available in Tower One of the Twin Tower Correction Facility, which is the site of the Jail's mental health treatment unit.  In the mental health modules in Tower One, prisoners have direct access to the central day rooms where they participate in therapy groups, interact with other staff and prisoners and meet individually with county mental health staff.  Deputies receive special training in dealing with prisoners with mental illness and, in our experience, are far less likely to impose discipline or punish prisoners for disability-related behavior.[57]   However, there are not enough beds in Tower One to accommodate all those who need mental health treatment, so the prisoners in mental health housing go through a weekly process of "declassification," in which they are moved out of mental health housing and into general population at Men's Central Jail as soon staff determine that they are stable enough to be discharged.  In MCJ, they have little or no access to mental health treatment; at best they are

---

[55] Dr. Terry Kupers, Report on Mental Health Issues at the Los Angeles County Jail, June 27, 2008, available from http://www.aclu-sc.org/documents/view/173.

[56] 2009 Annual Report at pages 27-25.

[57] Tiedeman Decl., ¶ 4; Kupers Report, 2008, page 18.

provided with medication and can request brief, cell-front interviews with the Jail Mental Evaluation Team.[58]

Many prisoners with mental illness cannot function without the treatment provided in Tower One, so they rapidly deteriorate in Men's Central Jail and become symptomatic, suicidal, and/or violent.  Moreover the overcrowding, lack of access to recreation, and other conditions in Men's Central Jail also contribute to their destabilization.[59]  Some cycle back and forth between MCJ and the high observation suicide watch module in Tower One, while others less fortunate end up in disciplinary segregation, in small solitary confinement cells.  There, they are vulnerable to abuse from other prisoners and deputies alike. Recent examples of prisoners with mental illness who were not given proper treatment include the following:

> Prisoner "A" was booked into the jail in early 2010 and placed in mental health housing. He has a long history of mental illness, qualified for social security disability based on mental illness when in the community, was housed in mental health housing in Tower One during a previous jail stay, and had been found incompetent to stand trial and committed to Patton State Hospital, which held him over for additional treatment.[60]  He was soon declassified and sent to general population in MCJ.  ACLU monitors requested a reevaluation with no success, but he soon attempted suicide and was sent to high observation suicide watch on the 7th floor of Tower One.  When he stabilized, he was sent back to general population in MCJ despite objections from the ACLU, where he cycled back and forth to the seventh floor until he was finally sent back to Patton State Mental Hospital based on a finding of incompetency.[61]

> Prisoner B had been diagnosed with schizophrenia and bipolar disorder in the community and was seeing a psychiatrist for treatment.[62]  During a previous jail stay, staff had recognized that he had a mental illness and he was placed in mental health housing in Tower One; he had also contacted the ACLU at this time regarding his need for mental health treatment.[63]  However, when he was booked into the jail in early 2010, he was

---

[58] Tiedeman Decl, ¶ 5; Kupers Report, 2008, page 19, 21-22.

[59] Kupers Report, 2008, at pages 7, 33-40.

[60] Tiedeman Decl, ¶ 6.

[61] Id. ¶¶ 7-9.

[62] Id., ¶ 11.

[63] Id., ¶ 10.

placed in a high security two-man cell in Tower Two, with a cellmate who previously been convicted of murder.  Prisoner B was found dead in his cell on March 4, 2010, apparently murdered by this cell mate.[64]

An inevitable consequence of the inadequate mental health treatment is suicides and suicide attempts.[65]  The new annual report from OIR includes an analysis of the dramatic increase in suicides in the jail in 2009.[66]  Among other findings, OIR noted "weaknesses in the processing and follow-up mental health care of inmates" after they are transferred out of Tower One.  In one case, the prisoner had attempted suicide and was then "declassified [out of mental health housing] after his attempted suicide … [with] no evidence of any ongoing evaluation conducted by mental health staff members."[67]  He then committed suicide while housed in general population.

> [This] is not unusual, or, as far as we know, contrary to DMH policy. We understand that the sheer number of inmates moving in and out of mental health housing at the jail makes meaningful follow-up difficult, if not impossible, for the finite staff working at the jails.  That being said, we have in the past recommended that the Department work with DMH to find some way to address the treatment and care of inmates declassified from mental health housing and will continue to press this issue. [68]

Despite OIR's work and recommendations, the ACLU has seen no improvement in this area.  For example, the ACLU's review of jail suicide reports for the first half of 2010 indicate that jail staff are not sufficiently alert to circumstances that pose a high risk of suicide. One suicide victim had just been sentenced to state prison, while another had just been booked and was in the Inmate Reception Center and in the process of being transferred to regular housing.[69]  Both of these are high risk periods when prisoners should be carefully monitored, but apparently

---

[64] Id., ¶ 10-11.

[65] Kupers Report, page 34.

[66] OIR, 8th Annual Report, page 6.

[67] Id. page 5.

[68] Id., page 6.

[69] Tiedeman Decl., ¶¶ 14-15.

these prisoners were not.  In the past six months, when ACLU staff has alerted jail staff when they identify prisoners in general population who appear to be at risk of suicide attempts, the custody staff has been cooperative.  However, as OIR has reported, the jail does not have a routine system of mental health follow-up for prisoners who pose a suicide risk, such as those who have been declassified, or are returning from sentencing.[70]

The failure of deputies to make regular safety checks has also contributed to suicides at the jail.  OIR also issued a second report with additional follow-up regarding the suicide of John Horton, a young man who killed himself while housed in disciplinary segregation in MCJ in April 2009.  When ACLU monitors walked this disciplinary segregation row shortly after the suicide, another prisoner passed them a note describing the circumstances of this young man's death, including the fact that his body was rigid when he was found, and that he had been showing clear signs of mental illness for many days before his death.[71]  The OIR report found that the deputy on duty, who was required to conduct safety checks every 30 minutes on a discipline row, had left his post for more than 3 hours and falsified the electronic logs to cover his absence.[72]  OIR also found that a request had been made for a mental health evaluation for this prisoner the day before his death, but JMET staff had not received or acted on the request.[73]

OIR's investigation and its identification of the deputy's failure to conduct safety checks and the absence of a timely JMET team evaluation was thorough and commendable.  However, this young man's death raises additional issues.  The letter from the prisoner in the cell next to the suicide victim stated that he showed symptoms of mental illness and obvious suicidality that had continued for many days and that deputies came to his cell door and teased him and made

---

[70] *Id.*

[71]  Statement of detainee witness re the death of JohnHorton, available from: http://www.aclu-sc.org/documents/view/177.   The ACLU provided this letter to the jail and called for a full investigation.

[72] OIR, <u>Deputy Vigilance in the Jails</u>, page 4.

[73] Id., page 3, footnote 1.

jokes about him, calling him "crazy."[74] Similarly, a recent statement from a prisoner in MCJ and describes how deputies denied requests from a prisoner to see a psychiatrist, mocked prisoners who stated that they were suicidal, and encouraged other prisoners to beat them.[75]  Moreover, OIR reported that there were bruises on this young man's body, suggesting that he might have been beaten by deputies and then placed in discipline, as have so many of the other prisoners whose accounts are included in this report.  Prisoners with mental illness are especially vulnerable to physical and psychological abuse from deputies and other prisoners.  Mr. Horton's death may be another example of the jail's failure to protect prisoners from harm, including the risk of suicide.

## IV.   OVERCROWDING AND GENERAL LIVING CONDITIONS

In every single visit to Men's Central Jail in the first half of 2010, the ACLU noted and reported the same problems with physical conditions and overcrowding that have plagued the facility for many years, including plumbing problems (e.g. leaky pipes, broken toilets that had not been repaired); temperature problems (either too hot or too cold); denial of access to showers (e.g. not being offered showers, not being given a reasonable amount of time to shower);[76] denial of access to outdoor recreation (i.e. roof) time;  and denial of access to fresh clothing and linens.

One particular problem area continues to be the dormitories in MCJ.  In our 2009 Annual Report, we noted that all of the dormitories in MCJ housed more than 100 men each, with one

---

[74] Statement of prisoner witness re the death of Robert Horton, available from: http://www.aclu-sc.org/documents/view/177.

[75] Declaration of Prisoner 16, dated June 20, 2010, ¶¶12-18; see also Declaration of Prisoner 9 ¶¶ 6-7 (describing how he observed numerous deputies taunting an prisoner with obvious signs of mental illness and one deputy threw a sandwich at the prisoner's head)..

[76] The ACLU has always monitored the denial of showers, outdoor recreation and linen changes using daily logs which were manually filled in by deputies.  The Department has now instituted new electronic logs which have proven to be vulnerable to falsified entries.  OIR, Deputy Vigilance in the Jails, pages 4-5.  In addition, deputies have begun refusing to allow the ACLU to review the electronic logs to monitor compliance with state regulations regarding prisoners' rights. The deputies have stated that they don't how to access the electronic logs from their stations within each module, or that the computer systems were down.  They subsequently denied the ACLU's request to see more than a few days worth of log entries

housing more than 160 men.[77]  The ACLU recently obtained a 2009 report from the State of California's Correctional Standard's Authority that confirms that the dormitories in MCJ are consistently near twice their rated capacity;[78] those capacities range from 64 for the dorm with the lowest rated capacity, to 87 for the dorm with the highest rated capacity.[79]  In April 2010, the Department made a commitment to the federal court to address the issue of crowding in the MCJ dorms.  Beginning in late June 2010, the Department reduced the number of prisoners in four of the 15 dorms – 5100, 5200, 5300 and 5400 -- by approximately 20 people each.[80]

While we applaud this effort, it is grossly insufficient for three reasons.  First, the CSA report documented that in mid-2009 these dorms were housing from 34 to 44 more men than they were designed to hold according to their rated capacity.  Thus, even with the reduction of 20 beds, these four dorms remained overcrowded, housing from 132% to 140% of their rated capacity.  Second, the reductions occurred in only 4 of the 15 dorms, many of which were and remain at almost *twice* their rated capacity.  Third, we continue to have serious concerns about the lack of a lasting solution to overcrowding in the dorms.  The Department achieved the reduction noted above by simply shifting prisoners to other housing locations throughout the jail system, with no systemic plan to address the chronic overcrowding in the MCJ dorms and maintain the recent reduction. Indeed, the Department has confirmed to us that the only reason the recent changes have been possible is because the overall population counts in the jail are

---

[77] 2009 Annual Report at page 42.

[78] One of the trustees' dormitories, 9500, was housing 225 prisoners in June 2009.  That dormitory was originally a dayroom.  The CSA report states that the conversion of 9500 from a dayroom to a dormitory was "part of a crowding problem."  Letter from Magi Work, Field Representative, Facilities Standards and Operations Division, California Department of Corrections and Rehabilitation Corrections Standards Authority, to Sheriff Leroy D. Baca (September 25, 2009) ("CSA Report") at Attachment B.  The Board of Corrections did not provide a rated housing capacity for 9500, concluding that 9500 "should have remained [a] dayroom."  *Id.*

[79] CSA Report at Attachment B.

[80] The Department also removed the empty bunks from the dorms, freeing up some space for the prisoners to walk around.

down.  As soon as there is an influx of individuals coming into the jail, the dorm populations will balloon once again.

An equally serious cause for concern is the Department's refusal to provide the ACLU direct access to the census in the dorms.  Since May 2010, Department officials have either denied our requests for jail housing counts, including the number of prisoners in each dorm, or have altogether failed to respond to our requests. Thus, to determine the degree of overcrowding, ACLU monitors have had to inspect the dorms and seek verbal confirmation of the census, or conduct their own hand count.  However, this information is readily available to jail staff (each facility prepares count sheets summarizing census information on a daily basis and e-mails it to command staff) and could easily be provided electronically to the ACLU with little effort from the Department.  As a result, it has become difficult for the ACLU to monitor what progress, if any, is being made in the dorms.  The Department's refusal to cooperate by providing counts of the census in each dorm reflects a deeper resistance to meaningful change in the facility.

**Mary Tiedeman**

**Daniel Ballon**

**Melinda Bird**

**Peter Eliasberg**