# DECLARATION OF PRISONER #12
# TIMOTHY GAINES

# DECLARATION OF TIMOTHY GAINES

I, Timothy Gaines, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been an inmate in the Los Angeles County Jail system since December 2009. I have been housed in Men's Central Jail this whole time. I am currently housed in Module 3300, Row C, cell 11. I have been in this module and on this row for the past two months, but I was moved to cell 11 from cell 12 just two weeks ago, right after the events I am about to describe took place. I am classified by the jail as a K-10 inmate, which means that I am in a one-man cell and need an escort when I am moved anywhere within the jail.

3. On June 29 and 30, Mary from the ACLU came to our row and asked us about jail conditions. I knew who she was because she identified herself to us. I saw her speak to the inmates in cells 11 and 13 as well. I was in cell 12 at the time – which is in between cells 11 and 13 – so I could see her speaking to the inmate in cell 11 for a long time, about one hour. The inmate in cell 11 is white, tall and bald. I think his name is Robert. I know the inmate who was in cell 11 at the time because he had been housed on the row for the entire time I had been there.

4. While Mary was speaking to Robert, I was speaking to Kevin, who is another ACLU representative. I told Kevin that deputies were scanning our wristbands without giving us showers and that they weren't giving us programs on weekends. I could hear Robert, in cell 11, say these same things to Mary.

5. On July 1, three deputies came to our row right after dinner. The deputies who came to our row are deputies Rodriguez, Newhouse, and Garcia. I know their names because they are the regular deputies on my row, and I have seen their nametags. Newhouse – who is a tall white guy – came over to my cell and the two cells next to me. He asked us about a stick. I was in cell 12 at the time, and he was asking me and the inmates in cells 11 and 13. We all told him we didn't have a stick. The deputies told us that the inmate in cell 6 had accused Robert – the inmate then in cell 11 – of having a stick. The deputies said that they suspected that Robert had used the stick to reach through the cell bars and turn on the TV that's in the row hallway. Only Robert had been

Page 106

accused by the inmate in cell 6, so I don't know why they spoke to all of us.  The inmate in cell 13 had also spoken to the ACLU the day before.  I don't know that inmate's name, but I recognize him because he's been next to me in the module for more than one month.

6.  Then the deputies told us to cuff up – which means that they put handcuffs on us.  They then escorted all three of us out of our cells.  Deputy Garcia was the one who escorted me.  I knew they were about to search our cells, so I told Deputy Garcia that I had a shaver under my pillow.  K-10 inmates are not allowed to keep shavers.

7.  I had gotten my shaver weeks before, on the day that I came back to jail late after going to court.  That day, because of how late it was, I was told to go to the holding tank where a group of new inmates was being admitted.  The trustees were handing out fish-kits, which are bags with hygiene products, to all the inmates.  The fish-kits have shavers in them. The trustees gave me a fish-kit too, along with the new inmates in the holding tank.  K-10s wear orange – while other inmates wear blue – so the trustees must have known I was a K-10 and they gave me a fish-kit anyway.  Then I put the shaver in my pocket and brought it back with me to my cell. A shaver is what you use to shave with. It has the plastic handle and the razor blade in it.

8.  After I told Garcia about the shaver under my pillow, the deputies brought me and the inmates from cells 11 and 13 to a caged shower area outside the module.

9.  We waited there for about 20 to 30 minutes while all three deputies searched our cells.  I heard Newhouse tell the inmate in cell 13 that he had found a shaver under the table in his cell. I also saw deputies throw one shaver into the trash can. I had already told Deputy Garcia about the shaver in my cell, and the deputies had gotten rid of my shaver by the time I returned to my cell. I know they had gotten rid of my shaver because it wasn't in my cell when I returned to my cell after the search. I didn't hear any deputy mention finding anything in Robert's cell. It is common practice to tell an inmate when you find something in his cell.

10. Then Newhouse told Robert – the inmate who was in cell 11 – that Robert was going to the hole.

11. Deputy Rodriguez then asked Newhouse what to do with me and the inmate from cell 13, since

DECLARATION OF TIMOTHY GAINES

we both had shavers in our cells.  Newhouse told him to write us up, or something like that.  Then Newhouse took Robert to the hole.   Garcia and Rodriguez took me and the inmate from cell 13 back to our cells, and that was the end of the search.  We were never written up for anything after that. I was never sent back to the hole, and neither was the inmate in cell 13.

12. Usually when deputies search our cells, they search all of the cells on the row.  The cells on our row go from number 3 to number 26.  There are 24 cells altogether.

13. The day after the search, a bunch of inmates from different modules were taken to medical.  Me and the inmate from cell 13 were in that group going to medical.  The deputy who escorted me was named Avitia.  I know this because I read his nametag.  He is a shorter, skinny guy with dark hair.  I remember he said, "This must be the snitch line," to me and inmate number 13.  I guess he was saying this because he knew that our row had been talking to the ACLU a few days before. It's pretty common for deputies to pick on guys who talk to the ACLU by searching our cells. They'll also pick on us for talking to the ACLU by turning the TVs off.  Whatever they want to do, they'll do.

14. I'm coming forward about what happened to Robert because this stuff happens a lot and nothing is being done to stop it.  He went to the hole for nothing, and that is not right.

15. I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20 day of July, 2010 in Los Angeles, California.


**TIMOTHY GAINES**

DECLARATION OF TIMOTHY GAINES

# DECLARATION OF PRISONER #13
# MATTHEW GJERSVOLD

**Declaration of Matthew Gjersvold**

I, Matthew Gjersvold, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I was taken into custody on March 12, 2010 and spent the first thirty-five days of my incarceration in Men's Central Jail, 3700 Baker row. On April 20th, 2010, I was transferred to Twin Towers Correctional Facility, 141 E-pod, which is designed to house inmates who have relatives in law enforcement or been former employees of a law enforcement agency. I am awaiting trial for allegedly possessing an assault weapon and committing vandalism.

3.      I began my law enforcement career in 1992 working as a police reserve until 1994. From 1994 to 1996, I held a position within the Long Beach Police Department jail division. In 1996, I was hired by the Long Beach Police Department to serve as a police officer, and continued to do so with the department all the way through 2008. During my tenure as an officer, I was not involved in an excessive force complaint nor did I participate in any officer involved shootings. On three separate occasions I received administrative complaints that totaled twenty-four days of suspension from duty. I was fired in 2008, from the department for conducting personal business on city time.

4.      On May 28, 2010, at approximately 1 pm, I was in module 141 E-pod when Deputy Van Du and custody assistant Dominguez called for a head count. When hearing this, all inmates within the module immediately find a seat at the tables located on the bottom tier and wait until the deputy is finished counting. On this day, I did not hear Deputy Van Du's initial instructions because I was sleeping in my cell on the top tier. I was taking Flexiril (and still am) for my degenerated disk caused by carrying a gun belt for all those years, and the drug has induced a pattern of deep sleep at various times throughout the day.

5.      According to what other inmates have told me, Deputy Van Du noticed I was missing, and some inmates told him that I had an attorney visit since they assumed he wasn't going to check the attorney room. As he heads towards the attorney room, an inmate ran to my cell, woke me up, and I rushed to a table.

6.     As soon as I found a seat, inmates warned me that he looked pissed. At that moment, Deputy Van Du came inside the module yelling, "I'm having a bad day!" and asked me "Where were you?" I replied, "I apologize, I over slept." Deputy Van Du made me get up from my seat and ordered me to get in front of the stairs and face its support beam. I complied and as I was about two feet from the stairs, I noticed in my peripheral vision that he was approaching me fast. All of a sudden Deputy Van Du forcefully pushed me with two hands from behind. I'm 6'2", about 240 lbs, and he's 5'10" weighing approximately 50 lbs less than me. He took a running start and used tremendous strength to knock me off balance causing me to fly towards the stairs. Luckily, I was able to protect my head by using my forearms to absorb most of the impact, though my head did lightly hit the metal steps.

7.     Then Deputy Van Du made me get up and spread my legs to apply handcuffs. He started kicking the insides of my feet repeatedly, I guess because he felt I should have been spreading my legs further apart. Then, he angrily pulled my arms up from behind and secured the cuffs tightly on my wrist.

8.     Deputy Van Du escorted me to my cell on the top tier and asked me again to spread my legs for him to take off the cuffs. He violently pulled the cuffs down, which made me fall backwards with my wrist, again, bracing my fall. As soon as my wrist hit the concrete floor, I felt a sharp pain shoot up from my wrist to my elbow. The deputy ferociously picked me up, unlocked the handcuffs and had me sit down on a table in my cell. While I sat there, he ransacked my cell and threw several of my belongings, such as towels, blankets and food, all throughout the top tier. After he had finished tearing the cell apart, he slammed the metal door shut and yelled, "You're on lockdown!" The inmates had witnessed the entire ordeal since they remained sitting at the table waiting for Deputy Van Du to finish count.

9.     The next day, at about 5 pm, deputy Van Du noticed that I was hanging out in the day room. He asks, "What are you doing out of your cell?" I told him that my door opened earlier that day and that I thought it was okay to hang out in the dayroom. He said it was my responsibility to make staff aware of my lockdown status, which I hadn't done. He ordered me back to my cell, and the door remained shut for the rest of the day.

2

10. The following morning, May 30th, I was told by fellow inmates that Deputy Albert asked them why I had not reported for count, and if there was a reason I was standing behind the locked cell door while everyone else's cell door was open. According to several inmates, an inmate told Deputy Albert what had happened with me. Then, Deputy Albert asked the inmate, "Who put him in there?" Once he heard Deputy Van Du was involved, he shook his head and ordered staff to open my cell and notified them that I was no longer on lockdown.

11. On June 2nd, my request to see a physician was granted, and x-rays were taken of my left hand at the Twin Tower II medical ward. The following day, I was taken to LCMC where a doctor told me that x-rays showed that I had fractured my left wrist. A cast was placed from the wrist all the way up to my elbows.  I had no pain in my wrist prior to Deputy Van Du's jerking me to the ground when I was in handcuffs, so I am sure that fall is what broke my wrist.

12. I've written to Internal Affairs about what happened as well as filing an inmate complaint form but I have not heard back from either of them.

13. Prior to this run-in with Deputy Van Du, I've never had a problem with him. I keep conversations with all deputies at a bare minimum, and stay out of their way as much as possible. In observing Deputy Van Du's interactions with inmates these past four months, I noticed that he constantly seems angry and his tone of voice is invariably harsh. His demeanor and physique reminds me of several officers I worked with who were using HGH. I would notice that HGH users would be quick to lose their temper and have unnatural looking muscles bulging out of their shirts. Deputy Van Du has an enormous, unnatural looking upper body and scrawny legs. While I have never seen Van Du take HGH, my belief that he is an HGH user is based on repeatedly observing users of HGH, participating in an 80 hour Drug Recognition Expert Seminar in 1999, plus Advanced Officer Training Courses mandated once every quarter by the state of California.

3

1   I declare under penalty of perjury of the laws of the State of California and the United States that

2   the foregoing is true and correct.  Executed this 7th day of July, 2010 in Los Angeles, California.

3                                                                           /s/

4                                                                   Matthew Gjersvold

4

**Declaration of Matthew Gjersvold**

I, Matthew Gjersvold, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I was taken into custody on March 12, 2010 and spent the first thirty-five days of my incarceration in Men's Central Jail, 3700 Baker row. On April 20th, 2010, I was transferred to Twin Towers Correctional Facility, 141 E-pod, which is designed to house inmates who have relatives in law enforcement or been former employees of a law enforcement agency. I am awaiting trial for allegedly possessing an assault weapon and committing vandalism.

3.      I began my law enforcement career in 1992 working as a police reserve until 1994. From 1994 to 1996, I held a position within the Long Beach Police Department jail division. In 1996, I was hired by the Long Beach Police Department to serve as a police officer, and continued to do so with the department all the way through 2008. During my tenure as an officer, I was not involved in an excessive force complaint nor did I participate in any officer involved shootings. On three separate occasions I received administrative complaints that totaled twenty-four days of suspension from duty. I was fired in 2008, from the department for conducting personal business on city time.

4.      On May 28, 2010, at approximately 1 pm, I was in module 141 E-pod when Deputy Van Du and custody assistant Dominguez called for a head count. When hearing this, all inmates within the module immediately find a seat at the tables located on the bottom tier and wait until the deputy is finished counting. On this day, I did not hear Deputy Van Du's initial instructions because I was sleeping in my cell on the top tier. I was taking Flexiril (and still am) for my degenerated disk caused by carrying a gun belt for all those years, and the drug has induced a pattern of deep sleep at various times throughout the day.

5.      According to what other inmates have told me, Deputy Van Du noticed I was missing, and some inmates told him that I had an attorney visit since they assumed he wasn't going to check the attorney room. As he heads towards the attorney room, an inmate ran to my cell, woke me up, and I rushed to a table.



6.    As soon as I found a seat, inmates warned me that he looked pissed. At that moment, Deputy Van Du came inside the module yelling, "I'm having a bad day!" and asked me "Where were you?" I replied, "I apologize, I over slept." Deputy Van Du made me get up from my seat and ordered me to get in front of the stairs and face its support beam. I complied and as I was about two feet from the stairs, I noticed in my peripheral vision that he was approaching me fast. All of a sudden Deputy Van Du forcefully pushed me with two hands from behind. I'm 6'2", about 240 lbs, and he's 5'10" weighing approximately 50 lbs less than me. He took a running start and used tremendous strength to knock me off balance causing me to fly towards the stairs. Luckily, I was able to protect my head by using my forearms to absorb most of the impact, though my head did lightly hit the metal steps.

7.    Then Deputy Van Du made me get up and spread my legs to apply handcuffs. He started kicking the insides of my feet repeatedly, I guess because he felt I should have been spreading my legs further apart. Then, he angrily pulled my arms up from behind and secured the cuffs tightly on my wrist.

8.    Deputy Van Du escorted me to my cell on the top tier and asked me again to spread my legs for him to take off the cuffs. He violently pulled the cuffs down, which made me fall backwards with my wrist, again, bracing my fall. As soon as my wrist hit the concrete floor, I felt a sharp pain shoot up from my wrist to my elbow. The deputy ferociously picked me up, unlocked the handcuffs and had me sit down on a table in my cell. While I sat there, he ransacked my cell and threw several of my belongings, such as towels, blankets and food, all throughout the top tier. After he had finished tearing the cell apart, he slammed the metal door shut and yelled, "You're on lockdown!" The inmates had witnessed the entire ordeal since they remained sitting at the table waiting for Deputy Van Du to finish count.

9.    The next day, at about 5 pm, deputy Van Du noticed that I was hanging out in the day room. He asks, "What are you doing out of your cell?" I told him that my door opened earlier that day and that I thought it was okay to hang out in the dayroom. He said it was my responsibility to make staff aware of my lockdown status, which I hadn't done. He ordered me back to my cell, and the door remained shut for the rest of the day.

10.     The following morning, May 30th, I was told by fellow inmates that Deputy Albert asked them why I had not reported for count, and if there was a reason I was standing behind the locked cell door while everyone else's cell door was open. According to several inmates, an inmate told Deputy Albert what had happened with me. Then, Deputy Albert asked the inmate, "Who put him in there?" Once he heard Deputy Van Du was involved, he shook his head and ordered staff to open my cell and notified them that I was no longer on lockdown.

11.     On June 2nd, my request to see a physician was granted, and x-rays were taken of my left hand at the Twin Tower II medical ward. The following day, I was taken to LCMC where a doctor told me that x-rays showed that I had fractured my left wrist. A cast was placed from the wrist all the way up to my elbows.  I had no pain in my wrist prior to Deputy Van Du's jerking me to the ground when I was in handcuffs, so I am sure that fall is what broke my wrist.

12.     I've written to Internal Affairs about what happened as well as filing an inmate complaint form but I have not heard back from either of them.

13.     Prior to this run-in with Deputy Van Du, I've never had a problem with him. I keep conversations with all deputies at a bare minimum, and stay out of their way as much as possible. In observing Deputy Van Du's interactions with inmates these past four months, I noticed that he constantly seems angry and his tone of voice is invariably harsh. His demeanor and physique reminds me of several officers I worked with who were using HGH. I would notice that HGH users would be quick to lose their temper and have unnatural looking muscles bulging out of their shirts. Deputy Van Du has an enormous, unnatural looking upper body and scrawny legs. While I have never seen Van Du take HGH, my belief that he is an HGH user is based on repeatedly observing users of HGH, participating in an 80 hour Drug Recognition Expert Seminar in 1999, plus Advanced Officer Training Courses mandated once every quarter by the state of California.

3

1    I declare under penalty of perjury of the laws of the State of California and the United States that

2    the foregoing is true and correct.  Executed this 7th day of July, 2010 in Los Angeles, California.

3

4                                 Matthew Gjersvold

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# DECLARATION OF PRISONER #14
# DREQUINN JOHNSON

# DECLARATION OF DREQUINN JOHNSON

I, DREQUINN JOHNSON, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been in Los Angeles County Jail for about two-and-a-half years, since on or about March 5, 2008. Since I have been here, I have witnessed more than 70 beatings of inmates by deputies. I have also seen or heard about senior deputies, like Deputy Casto, Deputy Diaz, and Deputy Maqui, involved in these beatings.

3.      In about mid-October of 2008, I was housed in Men's Central Jail's module 2700, which is the pro-per module. A pro-per inmate is an inmate who represents himself in his criminal case.

4.      On the day of the incident that occurred around mid-October of 2008, I was given a legal pass to go to the legal visits room. Deputy Cinderelli handcuffed me. The legal visits room is a room for inmates to have confidential meetings with attorneys or private investigators about the inmate's criminal case. Since I am pro-per, I was going to the legal visits room to speak to my private investigator, who was working on my criminal case. I was not handcuffed or otherwise restrained when I went down to the legal visits room.

5.      On the day of the incident, Deputy Cinderelli and Deputy Grant approached me while I was in the hallway going to the legal visits room. I knew who Deputy Cinderelli was because Deputy Cinderelli was assigned to my module at the time. I knew who Deputy Grant was because I had seen Deputy Grant in the jails and I saw his name badge. I also knew Deputy Grant was a new deputy because I had heard Deputy Cinderelli call Deputy Grant a "rookie."

6.      I was classified as a level eight at the time, which means I did not need a deputy escort to go to the legal visits room. Deputy Cinderelli and Deputy Grant escorted me to a gate, where there was a booth with deputies inside. Deputy Cinderelli said to Deputy Grant loud enough so I could hear him clearly, "This is training, this is when you get your first force," or something like that.

7.      Over my time in the jails, I have come to understand that "force" is short for, "Use of force against an inmate." I had heard deputies ask each other, "Have you ever gotten a force?" or something like that. I had heard deputies say that having a "force" meant the deputy had guts and the

1  deputy was really part of the brotherhood of deputies. I have also heard deputies brag to inmates that the
2  deputy had a "force."

3       8.      When Deputy Cinderalli said to Deputy Grant that Deputy Grant would get Deputy
4  Grant's first "force," I was scared. Then Deputy Cinderelli shoved me against the wall of the hallway
5  face first. It hurt a lot because Deputy Cinderalli shoved me very hard. At this point, we were still outside
6  the gate and in sight of the deputies in the booth. I asked Deputy Cenderelli, "What are you doing?" or
7  something like that. Then Deputy Cinderelli started beating me with his fists and I fell to the ground. I
8  was not resisting. Deputy Grant began to hit me with his fists too. Then I saw deputies in the booth run
9  out of the booth toward me. There were about six deputies from the booth. The deputies from the booth
10  and Deputies Cindereeli and Grant used their fists and feet to punch and kick me while I was on the
11  ground. I recognized Deputy Gomez as one of the deputies from the booth; Deputy Erinskin was there
12  too. The deputies Tasered me at least twice in the right arm. I could hear my arm burning from the Taser
13  and I was in a lot of pain. I begged the deputies to stop hurting me. I could not defend myself because I
14  was handcuffed.

15       9.      After the incident, I could not see out of my left eye for a long time, maybe two weeks.
16  The deputies who beat me took me to the medical unit. Then a deputy who was not one of the deputies
17  that beat me earlier took me to a room and videotaped me and asked me what happened. I said I did not
18  remember. I said I did not remember because I was afraid that the deputies would hurt me again if I told
19  the truth. After the incident, my back was in pain and the right side of my body was swollen. I still have
20  scars on my right arm from the deputies' Taser.

21       10.     The same day as the day of the incident, I was reclassified as a K-10 and transferred to a
22  different module. A K-10 inmate is an inmate who needs to be escorted by a deputy at all times outside
23  the inmate's cell. I am still pro-per but now it is harder for me to work on my case because I must have a
24  deputy escort, which makes things like going to the law library harder.

25       11.     I am currently housed in 1750 D Row at Men's Central Jail and I have been housed there
26  for about two years. In my cell, I am able to hear sounds from 1750 B Row, but I am not able to see 1750
27  B Row.

28       12.     On or about June 15, 2010, at some time between 4 p.m. and 5 p.m., I entered the D Row

showers. I suddenly heard loud shouting coming from the direction of B Row. I could hear a male voice screaming, "Stop! Stop! Stop!" or something like that, very loudly, like the man was in pain. Then I heard Deputy Chavez shout, "Shut the fuck up," or something like that, and other similar phrases.

13. I know the person shouting was Deputy Chavez because Deputy Chavez is a deputy that has been permanently assigned to the 1750 module. I have spoken to Deputy Chavez and I know Deputy Chavez's voice since I had been in that module for about two years. I have heard Deputy Chavez threaten inmates before.

14. I also heard Deputy Chavez shout, "I'm gonna kill you," or something like that. The shouting and screaming lasted for about 10 minutes. I returned to my cell and the other inmates and I talked about the shouting we had heard and asked one another what had happened and who had been beaten.

15. The following day, on or about June 16, 2010, at about 2 p.m. my private investigator pulled me out for a legal visit. I am pro-per and I have a private investigator who works on my criminal case.

16. When I entered the legal visits room, I sat down. In the seat next to mine, I saw an inmate I know as Joseph. I know Joseph because we are both pro-per and I have seen him in the law library before. Joseph and I have the same private investigator.

17. When I saw Joseph at about 2 p.m. on June 16, 2010, Joseph had a black eye, Joseph's head looked swollen, and Joseph's face had cut marks on it. When I asked Joseph what had happened, Joseph could barely talk, like his jaw was broken.

18. Joseph said that the previous night, on or about June 15, 2010, at least two deputies had been talking to Joseph about Joseph's visits to the law library. Joseph said one of the deputies pushed Joseph to the floor of the row's shower and started kicking and stomping Joseph until Joseph passed out. Joseph also said he requested medical attention from the deputies after the incident, but the deputies did not take him to the clinic. I think Joseph is the man I heard screaming on or about June 15, 2010.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 23rd day of June, 2010 in Los Angeles, California.

1

2          **DREQUINN JOHNSON**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF DREQUINN JOHNSON

I, DREQUINN JOHNSON, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in Los Angeles County Jail for about two-and-a-half years, since on or about March 5, 2008. Since I have been here, I have witnessed more than 70 beatings of inmates by deputies. I have also seen or heard about senior deputies, like Deputy Casto, Deputy Diaz, and Deputy Maqui, involved in these beatings.

3. In about mid-October of 2008, I was housed in Men's Central Jail's module 2700, which is the pro-per module. A pro-per inmate is an inmate who represents himself in his criminal case.

4. On the day of the incident that occurred around mid-October of 2008, I was given a legal pass to go to the legal visits room. The legal visits room is a room for inmates to have confidential meetings with attorneys or private investigators about the inmate's criminal case. Since I am pro-per, I was going to the legal visits room to speak to my private investigator, who was working on my criminal case. I was not handcuffed or otherwise restrained when I went down to the legal visits room.

5. On the day of the incident, Deputy Cinderelli and Deputy Grant approached me while I was in the hallway going to the legal visits room. *Deputy Cinderelli handcuffed me. DJ* I knew who Deputy Cinderelli was because Deputy Cinderelli was assigned to my module at the time. I knew who Deputy Grant was because I had seen Deputy Grant in the jails and I saw his name badge. I also knew Deputy Grant was a new deputy because I had heard other inmates say Deputy Grant was a rookie. *Deputy Cinderelli call Deputy Grant a "rookie". DJ*

6. I was classified as a level eight at the time, which means I did not need a deputy escort to go to the legal visits room. Deputy Cinderelli and Deputy Grant escorted me to a gate, where there was a booth with deputies inside. Deputy Cinderelli said to Deputy Grant loud enough so I could hear him clearly, "This is training, this is when you get your first force," or something like that.

7. Over my time in the jails, I have come to understand that "force" is short for, "Use of force against an inmate." I had heard deputies ask each other, "Have you ever gotten a force?" or something like that. I had heard deputies say that having a "force" meant the deputy had guts and the deputy was really part of the brotherhood of deputies. I have also heard deputies brag to inmates that the

1   deputy had a "force."

2       8.      When Deputy Cinderalli said to Deputy Grant that Deputy Grant would get Deputy

3   Grant's first "force," I was scared. Then Deputy Cinderelli shoved me against the wall of the hallway

4   face first. It hurt a lot because Deputy Cinderalli shoved me very hard. At this point, we were still outside

5   the gate and in sight of the deputies in the booth. I asked Deputy Cenderelli, "What are you doing?" or

6   something like that. Then Deputy Cinderelli started beating me with his fists and I fell to the ground. I

7   was not resisting. Deputy Grant began to ~~me~~ hit me with his fists too. Then I saw deputies in the booth

8   run out of the booth toward me. There were about six deputies from the booth. The deputies from the

9   booth and Deputies Cindereeli and Grant used their fists and feet to punch and kick me while I was on

10  the ground. ~~I could not see who was hitting me where because I was trying to cover my head from the~~ *I recognized Deputy Gomez as one of the deputies from the booth. Deputy Erinshin was there too. DJ*

11  ~~blows.~~ The deputies Tasered me at least twice in the right arm. I could hear my arm burning from the

12  Taser and I was in a lot of pain. I begged the deputies to stop hurting me. *I could not defend myself because I was handcuffed. DJ*

13      9.      After the incident, I could not see out of my left eye for a long time, maybe two weeks.

14  The deputies who beat me took me to the medical unit. Then a deputy who was not one of the deputies

15  that beat me earlier took me to a room and videotaped me and asked me what happened. I said I did not

16  remember. I said I did not remember because I was afraid that the deputies would hurt me again if I told

17  the truth. After the incident, my back was in pain and the right side of my body was swollen. I still have

18  scars on my right arm from the deputies' Taser.

19      10.     The same day as the day of the incident, I was reclassified as a K-10 and transferred to a

20  different module. A K-10 inmate is an inmate who needs to be escorted by a deputy at all times outside

21  the inmate's cell. I am still pro-per but now it is harder for me to work on my case because I must have a

22  deputy escort, which makes things like going to the law library harder.

23      11.     I am currently housed in 1750 ~~B~~ *B DJ* Row at Men's Central Jail and I have been housed there

24  for about ~~a year~~ *2 DJ*. In my cell, I am able to hear sounds from 1750 ~~B~~ *B DJ* Row, but I am not able to see 1750 *B DJ*

25  Row.

26      12.     On or about June 15, 2010, at some time between 4 p.m. and 5 p.m., I entered the ~~B~~ *B DJ* Row

27  showers. I suddenly heard loud shouting coming from the direction of ~~B~~ *B DJ* Row. I could hear a male

28  voice screaming, "Stop! Stop! Stop!" or something like that, very loudly, like the man was in pain. Then

1   I heard Deputy Chavez shout, "Shut the fuck up," or something like that, and other similar phrases.

2   13.   I know the person shouting was Deputy Chavez ~~shouting~~ because Deputy Chavez is a
    module DJ
3   deputy that has been permanently assigned to the 1750 ~~row~~. I have spoken to Deputy Chavez and I know

4   Deputy Chavez's voice since I had been in that module for about two years. I have heard Deputy Chavez

5   threaten inmates before.

6   14.   I also heard Deputy Chavez shout, "I'm gonna kill you," or something like that. The

7   shouting and screaming lasted for about 10 minutes. I returned to my cell and the other inmates and I

8   talked about the shouting we had heard and asked one another what had happened and who had been

9   beaten.

10   15.   The following day, on or about June 16, 2010, at about 2 p.m. my private investigator

11   pulled me out for a legal visit. I am pro-per and I have a private investigator who works on my criminal

12   case.

13   16.   When I entered the legal visits room, I sat down. In the seat next to mine, I saw an inmate

14   I know as Joseph. I know Joseph because we are both pro-per and I have seen him in the law library

15   before. Joseph and I have the same private investigator.

16   17.   When I saw Joseph at about 2 p.m. on June 16, 2010, Joseph had a black eye, Joseph's

17   head looked swollen, and Joseph's face had cut marks on it. When I asked Joseph what had happened,

18   Joseph could barely talk, like his jaw was broken.

19   18.   Joseph said that the previous night, on or about June 15, 2010, at least two deputies had

20   been talking to Joseph about Joseph's visits to the law library. Joseph said one of the deputies pushed

21   Joseph to the floor of the row's shower and started kicking and stomping Joseph until Joseph passed out.

22   Joseph also said he requested medical attention from the deputies after the incident, but the deputies did

23   not take him to the clinic. I think Joseph is the man I heard screaming on or about June 15, 2010.

24   I declare under penalty of perjury of the laws of the State of California and the United States that
    23rd  DJ
25   the foregoing is true and correct. Executed this ~~21st~~ day of June, 2010 in Los Angeles, California.

26

27   _____

28   **DREQUINN JOHNSON**

3  DJ
DECLARATION OF DREQUINN JOHNSON

# DECLARATION OF PRISONER #15
# WALTER MORALES

# DECLARATION OF WALTER MORALES

I, Walter Morales, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in the custody of the Los Angeles County Sheriff's Department since late May.  Since then, I have been housed at Men's Central Jail.  I am eighteen years old and this is my first time in jail.

3. When I was first taken into Men's Central Jail I was housed in Baker 18 in module 3500.  This was a one-man cell in the high-security section of the jail because I am classified as a K-10 inmate.  During my time living there, I was beaten by deputies several times -- often more than once a day -- for about a week.

4. The beatings started on my second day here at Men's Central.  I was woken up in the morning by a deputy hitting my leg with a flashlight.  I heard him say "get down," so I came down off the bunk.  This first guy was Caucasian and had a pretty stocky build.  He had a little bit of hair on the top of his head and buzzed short on the sides.

5. After I got down from my bunk, I saw three or four more deputies grouped outside my cell.  At first they looked around the hallway.  It seemed like they were checking to see if any other inmates on the row were watching or awake, but then they didn't seem to care and came in my cell.  I remember hearing the cell door open and seeing them all come in at once.

6. I heard one of them ask me what I was in jail for.  I'm in jail because I am charged with shooting at deputies.  I did not know about it at the time but I have since learned that my case was in the news.  I can't think of any other reason why the deputies would do this.  I never did anything to them.  I was just minding my own business.

7. They started beating me all over my chest, legs, and face with closed fists and flashlights.  One of their flashlights cut me in such a way that it has left a visible scar above my left eye.  I was screaming out in pain, but one of the deputies just told me to "shut up."

8. These beatings happened routinely while I was in module 3500.  There were the morning beatings that happened like that first one I described.  Then there were the later beatings with the second

shift of deputies. Deputies would switch shifts at 2:00 pm, so I was beaten by two different groups of deputies each day.

9. The evening beatings happened after every time I visited the nurse. I visited the nurse every day between 6:30 and 7:30 pm to treat a dog bite on my leg that I had from before I was arrested. Because I'm a K-10, I have to be escorted to the nurse by deputies and I am always in chains and handcuffs. They would tie the chains on me so tight that I have a scar on the side of my stomach from them cutting into my skin.

10. After I would see the nurse, the deputies would take me to the side of the hallway outside my cell and beat me up. I didn't do anything to provoke them. Because of the chains and handcuffs, I could barely move as it was. There was always more than one of them, usually around three or four. Each time they used their fists and flashlights and hit me all over my body, including my face. After the beating, they would walk me to my cell and I'd just go to sleep. I knew once I woke up it would happen all over again.

11. I'm pretty sure that the other inmates on my hall knew what was going on. I don't think they could see the beatings, but I'm sure they could hear them. After I'd come back from the nurse one of them would ask me, "They beat you up again?" and I'd answer, "Yeah." They would ask if I was all right, and I'd just say "yeah." I really didn't want to talk about it too much. I was afraid the deputies would take it out on me even more if I talked about it or complained to other inmates.

12. These beatings happened routinely every day for about a week until they moved me downstairs to Charlie Row 1750. I don't know why I was transferred, but I'm glad I was. I figure that the beatings would've kept happening if I wasn't, because one of the deputies told me I was lucky I was getting transferred. I never complained about these beatings to anyone. A few days after I was transferred from 3500 to 1750, someone from the ACLU came to my cell and asked if I would talk about these beatings. She said she knew about what happened because the inmates who were housed next to me in 3500 told her about me. I was scared to talk to the ACLU about what happened but I decided to do so because I wanted to tell somebody about what happened. I didn't tell anyone before because I did not know what would happen. I think my sister may have

1    called the ACLU to report what happened because I told her about the beatings on the phone. I

2    did not know she was going to call and I did not ask her to call.

3

4

5

6

7        I declare under penalty of perjury of the laws of the State of California and the United States that

8    the foregoing is true and correct. Executed June 30, 2010 in Los Angeles, California.

9

10

11

12                                **WALTER MORALES**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF WALTER MORALES

I, Walter Morales, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in the custody of the Los Angeles County Sheriff's Department since late May. Since then, I have been housed at Men's Central Jail. I am eighteen years old and this is my first time in jail.

3. When I was first taken into Men's Central Jail I was housed in Baker 18 in module 3500. This was a one-man cell in the high-security section of the jail because I am classified as a K-10 inmate. During my time living there, I was beaten by deputies several times – often more than once a day -- for about a week.

4. The beatings started on my second day here at Men's Central. I was woken up in the morning by a deputy hitting my leg with a flashlight. I heard him say "get down," so I came down off the bunk. This first guy was Caucasian and had a pretty stocky build. He had a little bit of hair on the top of his head and buzzed short on the sides.

5. After I got down from my bunk, I saw three or four more deputies grouped outside my cell. At first they looked around the hallway. It seemed like they were checking to see if any other inmates on the row were watching or awake, but then they didn't seem to care and came in my cell. I remember hearing the cell door open and seeing them all come in at once.

6. I heard one of them ask me what I was in jail for. I'm in jail because I am charged with shooting at deputies. I did not know about it at the time but I have since learned that my case was in the news. I can't think of any other reason why the deputies would do this. I never did anything to them. I was just minding my own business.

7. They started beating me all over my chest, legs, and face with closed fists and flashlights. One of their flashlights cut me in such a way that it has left a visible scar above my left eye. I was screaming out in pain, but one of the deputies just told me to "shut up."

8. These beatings happened routinely while I was in module 3500. There were the morning beatings that happened like that first one I described. Then there were the later beatings with the second

1
DECLARATION OF WALTER MORALES

1    shift of deputies.  Deputies would switch shifts at 2:00 pm, so I was beaten by two different

2    groups of deputies each day.

9.   The evening beatings happened after every time I visited the nurse.  I visited the nurse every day

4    between 6:30 and 7:30 pm to treat a dog bite on my leg that I had from before I was arrested.

5    Because I'm a K-10, I have to be escorted to the nurse by deputies and I am always in chains and

6    handcuffs.  They would tie the chains on me so tight that I have a scar on the side of my stomach

7    from them cutting into my skin.

10.  After I would see the nurse, the deputies would take me to the side of the hallway outside my cell

9    and beat me up.  I didn't do anything to provoke them.  Because of the chains and handcuffs, I

10   could barely move as it was.  There was always more than one of them, usually around three or

11   four.  Each time they used their fists and flashlights and hit me all over my body, including my

12   face.  After the beating, they would walk me to my cell and I'd just go to sleep.  I knew once I

13   woke up it would happen all over again.

11.  I'm pretty sure that the other inmates on my hall knew what was going on.  I don't think they

15   could see the beatings, but I'm sure they could hear them.  After I'd come back from the nurse

16   one of them would ask me, "They beat you up again?" and I'd answer, "Yeah."  They would ask

17   if I was all right, and I'd just say "yeah."  I really didn't want to talk about it too much.  I was

18   afraid the deputies would take it out on me even more if I talked about it or complained to other

19   inmates.

12.  These beatings happened routinely every day for about a week until they moved me downstairs to

21   Charlie Row 1750.  I don't know why I was transferred, but I'm glad I was.  I figure that the

22   beatings would've kept happening if I wasn't, because one of the deputies told me I was lucky I

23   was getting transferred.  I never complained about these beatings to anyone.  A few days after I

24   was transferred from 3500 to 1750, someone from the ACLU came to my cell and asked if I

25   would talk about these beatings.  She said she knew about what happened because the inmates

26   who were housed next to me in 3500 told her about me.  I was scared to talk to the ACLU about

27   what happened but I decided to do so because  i wanted to tell somebody

28   about what happened.  I didn't tell anyone  x W.M

W.M

1  before because I did not know what would happen.
2  I think my sister may have called the ACCU to
3  report what happened because I told her about the beatings

4   I declare under penalty of perjury of the laws of the State of California and the United States that

30 X W.M

5  the foregoing is true and correct. Executed June 29, 2010 in Los Angeles, California.

X W.M
on the
phone. I
did not know
she was going
to call and
I did not
ask her to
call.

X W.M

X *Walter Morales*

**WALTER MORALES**

3
DECLARATION OF WALTER MORALES

Page 132

# DECLARATION OF PRISONER #16
# GARY SANCHEZ

# DECLARATION OF GARY SANCHEZ

I, GARY SANCHEZ, hereby declare:

      1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

      2.     I have been an inmate in the Los Angeles County Jail for about five months, since about February of 2010. I am a resident of El Monte, California, where I was attending school before I was put in jail. I am pleading not guilty to armed robbery.

      3.     I was diagnosed with Type II Diabetes at a state prison, but I began to refuse diabetes medication on about February 20, 2010. I am refusing medication because I don't like the side effects of the diabetes medication I am given. When I take the diabetes medication, I feel tightness in my chest. I also refuse medication in order to avoid pill call. Pill call occurs daily; during pill call, inmates line up against a wall in their row to receive medication from a nurse. During pill call, inmates can also speak to the nurse about the medical issues they have. I want to avoid pill call because deputies often use pill call as a way to humiliate inmates.

      4.     On about February 26, 2010, I was housed in Pitchess Detention Center Wayside, Module 1922 Cell 9. At about 2:45 a.m. of February 26, 2010, the deputies popped open the cell doors of all the cells in my row because it was time for pill call. The row's inmates began to line up against the wall of the row, but I did not line up with them because I had already told the nurse on previous days' pill calls that I was refusing medication. A deputy noticed I did not leave my cell and came to the entrance of my cell and told me to "step up," or line up for roll call. I did so reluctantly because I did not want medication.

      5.     When I got to the nurse, I told her that I was refusing medication, and she asked me to sign a refusal form. After the nurse left, two deputies told me to, "Step out, and face the wall," while they told the other inmates to return to their cells. I do not remember what those two deputies looked like, because it was dark, or what their names were, because I was facing the wall and could not see their name badges.

      6.     I stepped out of the line and faced the wall of the row. One of the deputies slapped me, hard, with an open palm, on both sides of my rib cage while I was facing the wall. He said, "You have to

*G.S.*

comply when we tell you to comply. If you make this a habit, we're going to make this a habit." The deputy then told me to return to my cell, and I did.

7.      In about March of 2010, I was transferred over to Men's Central Jail because my module in Wayside was closed due to budget cuts. At about 6:30 a.m. almost every day, pill call occurs. After inmates have spoken to the nurse, the deputies in the morning shift often tell the inmates to, "Go to the laundry room and face the wall until your feet fucking hurt," or something like that, before the inmates can return to their cell. The morning shift deputies in my module are Deputy Patterson and Deputy Sinclair. Deputy Patterson is bald, about six foot fives inches, and white. Deputy Sinclair is white, has spiky hair, and about five feet nine inches.

8.      Many of the inmates stand for two to three hours before the deputies give them permission to return to their cells. Inmates often need to use the toilet while they are standing in the laundry room, so they ask the deputies if they can use the toilet in their cells. The deputies usually say, "No," and tell the inmates to remain standing and facing the wall in the laundry room. I have seen a number of inmates urinate or defecate on themselves in the laundry room while waiting for permission to return to their cells after pill call. During the first two or three months of my time at Men's Central Jail, the deputies told me to attend pill call even though I refused medication. I was a part of pill call for my first few months at Men's Central Jail and I often had to stand in the laundry room for two or three hours until the deputies told me I could return to my cell.

9.      I think the deputies make inmates stand facing the wall and wait in the laundry room after pill call because the deputies want to humiliate and break down the inmates. This is one of the reasons I refuse medication; I want to stay in my cell instead of attending pill call because the deputies have made pill call a torturous experience.

10.      In March of 2010, I was housed in Module 2200 Row B Cell 7 of Men's Central Jail. I was returning back to my module from a visit to the doctor, whom I had told I was refusing my medication. Deputy Patterson and a Hispanic deputy whose name I do not know were at the gate of my module and they asked me for my pass so that I could enter my module. Inmates are given passes to go the legal visits room. A pass is a piece of paper, and each paper has two copies with the same information on it, and the paper should be folded in half and torn, with one half for the inmate and one half for the

G.S.

1    deputy.

2        11.    I only had one half of my pass, so I showed the deputies my pass. Deputy Patterson asked

3    me where the other half of my pass was and I told him I did not know. Then, Deputy Patterson said, "Put

4    your face on the wall," or something like that, so I faced the wall. The deputy pushed his hand against the

5    back of my head until the right side of my face was against the wall, and he whispered into my ear, "Next

6    time, I'm gonna whup your ass," or something like that. Then he pushed me with so much force I almost

7    fell. I went back to my cell after that.

8        12.    On about June 22, 2010, I was housed in Module 2200 Row B Cell 7 of Men's Central Jail

9    with three other inmates. One of the other inmates in my cell is called Marcos Hernandez, and he is

10   Hispanic. Marcos Hernandez is extremely troubled; he often talks about committing suicide and he is

11   extremely depressed. Marcos Hernandez often asks the deputies if he can see a psychiatrist. But the

12   deputies deny his requests. I know this because I have seen Marcos Hernandez ask the deputies for a

13   psychiatrist, and the deputies say no.

14       13.    Several times a week, a female deputy walks around the rows with a psych technician and

15   they are supposed to ask inmates for mental health concerns. The female deputy is Hispanic, and looks to

16   be about 40 years old. I do not know her name because she wears a jacket so that it covers her name

17   badge. When inmates try to ask her what her name is, she responds, "Why do you need to know that?"

18       14.    On a number of occasions, I have heard the female deputy mock Marcos Hernandez when

19   he says he is suicidal and needs psychiatric help. She often says, "You weren't successful," to Marcos

20   Hernandez.

21       15.    Marcos Hernandez was talking about killing himself on about June 22, 2010. At about

22   6:30 p.m. of that day, pill call occurred and the cell doors in my row popped open. Inmates began to line

23   up to receive medication. I was in my cell because I was refusing medication.

24       16.    Marcos Hernandez walked out of our cell with a strip of bed linen around his neck. In the

25   hall of the row, he began to tighten the cloth around his neck and shouted, "I'm feeling suicidal." Mr.

26   Gonzalez walked over to Marcos Hernandez, grabbed him, and pushed him towards our cell. Mr.

27   Gonzalez is a custody assistant and wears a dark green uniform. Mr. Gonzalez then pushed Marcos

28   Hernandez into the bars of the entrance to our cell, shoving his face between the bars.

G.S.

17.     Mr. Gonzalez then turned to me and said, "You better talk to your cell mate and make him stop doing this shit. Go ahead and regulate him," or something like that. Then he said, "Every time he comes out, we're gonna take it out on your ass." I think Mr. Gonzalez meant that I should beat Marcos Hernandez, because I have heard other inmates say that Mr. Gonzalez has told them to "regulate" their cell mates by beating them. I told Mr. Gonzalez that Marcos Hernandez needed psychiatric help, but Mr. Gonzalez ignored me and left.

18.     It's very hard for inmates to get psychiatric help in jail and I think many inmates think the only way they can get help is by attempting to commit suicide or by seriously hurting themselves. During pill call, I have seen one inmate show a nurse a razor in order to get her attention so he could get psychiatric help. But that inmate was not taken to see the psychiatrist; instead, the deputies threw him the hole, or administrative disciplinary confinement.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 29th day of June, 2010 in Los Angeles, California.

G.S.

_Gary Sanchez_

**GARY SANCHEZ**

# DECLARATION OF PRISONER #17
# SANTIAGO SANCHEZ

**DECLARATION OF SANTIAGO SANCHEZ**

I, Santiago Sanchez, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I was housed in Men's Central Jail between June 24, 2010 and July 8, 2010.

3. On Saturday, June 26, 2010, I received a visit from my girlfriend, Viviana, and my mother.  I spoke with them in the visitation room for the allotted 15 minutes.

4. During the visit, I was sitting on the third stool from the end of the row, with the deputy standing at the end of the row.  There were two inmates between me and the deputy, and the deputy was at least four feet away from me.  I had seen him in the jail earlier that week but I had never learned his name.  He was black, taller than I am, with a skinny build and a bald head.  He appeared to be in his 30s.

5. Jail protocol during visits is that all of the inmates receiving visits during a particular time slot enter and leave the visitation room at the same time, so when the time for my visit had run out, I waited on the stool for about one minute because the other inmates had not yet gotten up to leave the room.  When the other inmates began standing up, I stood up and began to walk towards the door.

6. The deputy who had been standing next to me during my visit followed me for a second as I walked towards the door.  Suddenly the deputy grabbed me from behind by my shirt- one of his hands grabbed the back of my neck with the other at my lower back.  In one motion he swung me against a large steel electrical pole that was flush against the wall.  When my chin hit the pole, I involuntarily grunted in pain, like "ooh".  In response, the deputy mocked me by imitating the sound I had made, but in a higher pitch, and he said "my bad".

7. Then he quickly restrained me by forcefully twisting both of my hands behind my back and applying pressure, so that my fingers were pressed between the top of my shoulder blades.  This position was really painful.  While using one of his hands to restrain my hands behind me, the deputy put his other hand on the back of my head, and slammed my head down so the right side of my face smacked the metal counter in the visitation room.

8.  He continued to restrain me so I was bent forward at my waist with my arms twisted up behind my back. I had not said anything at all to the deputy at that point, and I did not know why he had hurt me or why he was restraining me. During my visit I did not notice him listening to my conversation, or looking at me. When he slammed my head down, I asked him, "What are you doing this for? What did I do?"

9.  Then he started yelling at me. From behind me he yelled, "If you don't want your clothes I can put you in some raggedy ass shit!" I had no idea what the deputy was referring to, so I didn't respond.

10. Then the deputy yelled at me, "Did you just fart on me?" Of course I hadn't farted on him, so I told him, "No, I didn't fart on you."

11. The deputy continued to verbally harass me while he restrained me, like he was trying to stir something up to give him a reason to restrain me. I knew I should shut up, so I answered his questions only with "Yes, sir" and "No, sir." When he was done talking to me, he stopped restraining me and he let me walk out. I think he just wanted an excuse to push somebody around.

12. The whole incident lasted only about two minutes, but the right side of my cheek, chin, and neck were in pain and bruised for three days from where the deputy had slammed me against the metal pole.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July 15, 2010 in Castaic, California.

**Santiago Sanchez**

2
DECLARATION OF SANTIAGO SANCHEZ

# DECLARATION OF PRISONER #18
# DONALD SHORTS