# DECLARATION OF MARY TIEDEMAN

# DECLARATION OF MARY TIEDEMAN

I, Mary Tiedeman, declare as follows:

If called as a witness in this matter, I could and would competently testify to the following matters, which I know of my personal knowledge.

1. From July 2006 until August 2010 I worked for the ACLU of Southern California as the Jails Project Coordinator. In this declaration, I have described some of my observations of prisoners in the Los Angeles County jail during the first seven months of 2010.

2. As Jails Project Coordinator for the ACLU Foundation of Southern California, my responsibilities included monitoring compliance with orders and directives relating to the *Rutherford* case. I also visited Men's Central Jail ("MCJ") once or twice per week and the other LA county jail facilities on a regular basis, especially if I received complaints from detainees.

3. The ACLU monitors conditions in the County Jail in several ways. Prisoners and their family members call and write to us with problems and complaints. First, we document these complaints in a database and prepare written complaints on behalf of each prisoner, which we them email to the Sheriff's Department or to the County Department of Mental Health. Second, we visit the different jail facilities on a regular basis. During these visits, we observe conditions and speak to detainees and prisoners. Since February 2008, I have prepared regular reports to the Sheriff's Department regarding the results of these on-site tours.

## MENTAL HEALTH ISSUES

4. I have reviewed and am familiar with the report on mental health issues prepared by Dr. Terry Kupers in 2008. As I monitored conditions in the LA jail in 2009 and through the first half of 2010, I saw very little improvement in the treatment of prisoners with mental illness in the jail. Those in MCJ especially, remained without any meaningful mental health treatment; at best, they were provided with medication, and even that was uncertain. In comparison, in the mental health modules in Tower One, prisoners have direct access to the central day rooms where they participate in therapy groups, interact with other staff and prisoners and meet individually with county mental health staff. Deputies assigned to these areas are supposed to receive special training in dealing with

prisoners with mental illness and, in my experience, are far less likely to impose discipline or punish prisoners for disability-related behavior.

5. However, the prisoners in Tower One go through a routine, constant process of "declassification," in which they are moved out of mental health housing and into general population at MCJ or one of the other jail facilities as soon as they stabilize. Once people are declassified and sent to MCJ, they can request brief, cell-front interviews with the Jail Mental Evaluation Team ("JMET"), but there are serious problems with this resource. Prisoners often told me that they feel unsafe speaking about their mental health histories in front of other prisoners. When JMET interviews them at cell front, their only choice is to talk about their mental health problems in public where others can hear them, or to deny they have issues. In addition, if they do decide to discuss their problems, the interviews are so fast that the prisoner cannot go into great detail, making it difficult to give the JMET representative a full understanding of the prisoner's current mental health situation. In 2008, Dr. Kupers recommended that JMET end the practice of cell-front interviews and instead offer private interviews, but the mental health staff have never agreed to this change. In addition, the only help the JMET staff person can offer in most cases is to send the prisoner to the high observation, suicide watch module on the 7th floor of Tower One for a temporary period. Prisoners have told me on many occasions that JMET actively discourages them from seeking help by warning that on the 7th floor, they will take your clothes away and leave you without even a mattress to sleep on. Although this is accurate, it does not encourage people to seek help with their mental problems.

6. The jail goes through this process of declassification from mental health housing because they do not have enough beds in Tower One to house everyone who needs treatment. The declassification process is a way to free up beds for new, incoming prisoners. However, the process has turned into a revolving door between Tower One and MCJ, because people who stabilize in Tower One then deteriorate and become suicidal in MCJ, and are returned to Tower one and back again. One example is individual whom I will call Prisoner A. In February 2010, I was contacted by his public defender, who stated that the prisoner had been in mental health housing in Twin Tower 1, but that he had just had been "declassified," and transferred to general population and was presently

2

housed in Men's Central Jail. The public defender described Prisoner A's long history of severe mental illness including the following: he had been diagnosed with schizophrenia and has been treated with psychotropic medication – Risperdal – for this incurable condition; he qualified for social security disability in the community based on mental illness; he had been found incompetent to stand trial previously and was sent to Patton State Mental Hospital, which recommended that he be retained for further treatment. In addition, he had been housed in mental health housing in Tower One during an earlier jail stay in 2008. I contacted jail staff regarding Prisoner A, asked that he be transferred back to mental health housing, and also filed a complaint on his behalf.

7. I did not receive a response to my complaint or email, so on March 4, 2010, I visited Prisoner A in the jail. He was agitated and very anxious, could not track or follow instructions and was obviously not doing well. I was very concerned about his condition and his safety. He had been seen by the JMET on February 26, but he had not been moved nor was he getting any mental health treatment. I again contacted the jail staff about Prisoner A on March 4, and again received no reply, so I sent a follow-up email on March 10. Finally, mental health staff at the jail informed me that he had been moved out of mental health housing because they concluded that he did not "meet the criteria" for mental health housing.

8. By the end of March, I again followed up on Prisoner A and learned that he had been placed on high observation on the suicide watch floor of Twin Tower One. I again contacted the jail and asked that he be moved to mental health housing on a permanent basis. I received no response. I was also concerned because an ACLU intern and his public defender had both tried to visit him in the attorney visiting area on separate occasions the previous day, but each were told that he had refused to see them. On April 8, I toured the jail and went directly to high observation suicide watch module on the 7th floor of Tower One, where I met with Prisoner A who was still being housed there. Prisoner A told me that he had not refused any visits the previous day and that the deputies did not call him or inform him that he had visitors. In my experience, deputies will sometimes fail to call an inmate for visits in retaliation for complaints or other conduct that the deputies consider to be bothersome. Prisoner A also told me that he had not been allowed to shower for several days and that the deputies refused to give him a mattress, even though his psychiatrist had approved him for

3

one. I asked the sergeant to check on the mattress and learned that he got one later on the day of my visit. I also contacted the jail staff again, asking whether he would now be returned to mental health housing on a permanent basis.

9. Five days later, on April 13, I again contacted the jail about Prisoner A because I had not received any response to my inquiry on April 8. I received a response that day that there were no plans to move him to mental health housing. Later, I learned from Prisoner A's public defender that he was soon found to be incompetent to stand trial and was eventually sent to Patton State Hospital again. However, the public defender also stated that he spent the remainder of his jail stay bouncing between MCJ in general population and the suicide observation unit on the 7th floor of Tower One.

10. As jail monitor, I am supposed to receive copies of death reports, including reports of both homicides and suicides from the LASD. I received a report of a homicide in March 2010 regarding a prisoner who I later learned had allegedly been killed by his cellmate. I will identify the victim as Prisoner B. I checked the ACLU complaint database and found that he had contacted the jails project in the past during previous periods of incarceration. In these earlier requests for assistance, he had stated that he had a history of mental illness and was seeking mental health treatment. After I received the death report, I followed up with the jail to determine where he was housed when he died. A jail official told me that he had been housed in Twin Tower Two. Tower Two houses prisoners who are considered to be high security, not those with mental illness; Twin Tower One is the only facility that has housing specifically designed for prisoners who are classified as being mentally ill.

11. I also received a call from the aunt of Prisoner B who gave me the phone number for his mother. I spoke to her on several occasions and interviewed her at length. She told me that Prisoner B had been diagnosed with schizophrenia and bipolar disorder and that he had been seeing a psychiatrist for treatment in the community before he was arrested. She said that he had been in and out of the jail before, that the mental health staff had previously identified his mental illness and kept him in Tower One, where he could get treatment. According to his mom, this time, the jail staff ignored his mental health history and did not contact his psychiatrist, and put him in Tower Two.

12. I was very concerned that Prisoner B had not been placed in mental health housing during

4

this stay in the jail, despite the fact that he had been found to require mental health treatment in the past. In my experience, prisoners with mental illness are often at great risk when they are housed with other, non-disabled prisoners in general population. Often, they talk too much, or ask too many irritating questions, so that other prisoners find them to be annoying and might lash out at them. Dr. Terry Kupers talked about this problem in his report on the jail. Nonetheless, in 2010, we have continued to see inmates with mental illness similar to Prisoner B who were housed in general population where they are at great risk of injury from other prisoners.

13. In addition, because Prisoner B was housed in a high security general population housing area, Prisoner B did not have access to mental health treatment prior to his death. Both Prisoner A (described above) and Prisoner B had been housed in the jail on earlier occasions, in which their mental illness was identified and treated in mental health housing. However, it is my experience that the jail frequently fails to pay attention to a new inmate's status during previous stays in the jail. This is a problem both with the initial screening, and with the problematic practice of constantly "declassifying" prisoners out of mental health housing and into general population units where they have no access to mental health treatment.

14. In addition to the report of the death of Prisoner B, I received several reports of suicides in 2010. I received one report of a suicide on February 23, 2010. This prisoner had just been sentenced to an extensive prison term. The period after sentencing is a high risk time for suicides, because prisoners are shocked and despairing and have not yet adjusted to the reality of their situation. I received another report of a suicide on July 16, 2010. I contacted jail officials about his housing area and learned that the prisoner committed suicide while he was still being processed through booking, and that he had not been assigned to a housing area. I am aware of studies and research regarding risk of suicide in jails that indicate that the period of highest risk of suicide is the first 24 hours of incarceration.

15. In both these cases, the jail should have been on notice that the prisoner was at high risk of a suicide attempt and taken precautions to ensure this prisoner's safety. I have found that when I identify prisoners who show signs of emotional distress, the jail mental health and custody staff are willing to follow-up. For example, in June 2010, I conducted a monitoring tour of MCJ and visited

5

1  3200B.  In my report to the jail on this visit, I stated: "We met several inmates in 3200B who were
2  declassified from MH housing and were not adjusting well in GP" because they not only receive no
3  mental health treatment, "they do not get out of their cells everyday like they did before, nor do they
4  see any sunlight."  When I asked that mental health staff make special walk-throughs during the next
5  few weeks to ensure these inmates are ok, the chief psychiatrist was appreciative and agreed to do
6  so.  However, the ACLU is able to visit only a small proportion of the jail population, so our
7  monitoring is not the answer to this problem.  The Jail has failed to be proactive and does not
8  systematically identify situations such as these that indicate a heightened risk for suicide, for
9  example, by following up on everyone who has been declassified from the mental health module to
10 make sure they are not in discipline or distress.  This was one of Dr. Kupers' recommendations in
11 2008.

   16.  The issue of suicides is also mentioned in the 8th Annual Report of the Office of Independent Review, which was released in June 2010.  In that report, OIR reviewed the circumstances surrounding the suicide death of John Horton in April 2009, a young man who had just turned twenty.  Horton was confined in a small, dark discipline cell in Men's Central Jail when he hung himself.  OIR investigated and discovered that the deputy in charge of that discipline module had left his post for more than three hours, and falsified the electronic logs to conceal his absence.  As a result, he did not conduct the required safety checks twice per hour.  OIR did not directly attribute the death to the deputies' absence, however.

   17.  I happened to tour the discipline row where Mr. Horton had been confined a few days after his death.  Another prisoner passed a letter to me describing the days before Horton's death and what happened afterwards.  A true copy of this letter is attached to my declaration as Exhibit 1.  The letter describes how Horton showed obvious signs of suicidality, including fashioning a noose and hanging it from the light in an obvious place where deputies and other inmates could see it.  The letter states that he talked to himself for hours and that the deputies teased him and ignored his suicidal behavior, rather than seeking mental health assistance for him. In my experience, this unfortunately is very typical of how many deputies treat prisoners in MCJ who show symptoms of mental illness. As with the letter from the prisoner housed next to Mr. Horton, in my experience other prisoners are often the

1  ones who complain to the ACLU about the deputies' inhumane treatment of mentally ill prisoners.

## EXCESSIVE FORCE, FAILURE TO PROTECT AND RETALIATION

18. There is a pervasive climate of fear and violence in the jail. In my monitoring, I often have seen many prisoners who bear the marks of recent beatings, as black eyes, head injuries, broken bones, etc. However, many of these prisoners are afraid to speak to me about it. When they agree to talk, they state that they were beaten by deputies but many then insist on absolute confidentiality and will not allow me to disclose their names to the jail in order to file a complaint. They are too fearful about retaliation to proceed.

19. On the few occasions when prisoners are willing to disclose their names and the details of the excessive force against them, I have provided this information to the Department and asked for an investigation. Unfortunately, the response from the jail has been very frustrating and discouraging because the Department almost always denies that there is a problem and assumes that the prisoner is lying. Apparently, the investigator asks the deputy what happened, the deputy denies any use of force and claims that the prisoner was the attacker. If the investigations go any further, neither the ACLU nor the prisoners are told about the outcome.

20. In 2010, we have also received a number of complaints that deputy's target certain prisoners for retaliation by leaving cell doors open to let inmates attack one another. Only deputies can open or close cell doors, so it seems that they must have some role in the attacks that have been reported to us. In addition, for the first time this year, we have had reports from multiple sources that deputies at MCJ stage "cock-fights" between prisoners during the late night shifts.

21. Deputy retaliation against prisoners who even speak the ACLU has increased steadily over the last two years. On virtually every monitoring visit to the jail, we encounter several prisoners who refuse to talk to us, explaining that they fear retaliation if deputies see or suspect them of speaking with the ACLU. Four years ago, ACLU staff members frequently spoke to prisoners about their complaints at cell front. As incidents of retaliation increased last year, the ACLU monitors reduced cell-front interviews and instead began arranging to speak to prisoners individually in the attorney interview rooms at the jail. In 2010, retaliation has continued to increase, so that even speaking to an ACLU staff person in the attorney room now carries the risk of retaliation. The

7

deputies openly disparage the ACLU and warn prisoners of the consequences if they complain; other prisoners observe these interactions, which make them even more fearful of speaking up.

22. One common form of retaliation for filing complaints is for a deputy to deny the entire row access to showers or TV. Showers are important to the prisoners in MCJ because in many modules, the telephones are located in or adjacent to the showers, so the only time prisoners can call their families or loved ones is during the shower time. Television is important because it is the only distraction for prisoners. If an entire row is denied television because one inmate complained to the ACLU, this creates dangerous situation for the complainant, who must face the anger and resentment of the others in his row.

23. Some inmates are subjected to retaliatory searches (which involve the destruction of their personal property), following encounters with the ACLU. The jail conducts regular searches of every cell, but generally a row at a time. The retaliatory searches are directed only at the prisoners who complained or spoke the ACLU. If fewer than 3 cells are involved, the deputies do not require a sergeant's presence. Prisoners also report that during these retaliatory searches, deputies will tear up their family photos and toss all their food in the garbage, food that they (or their relatives) have purchased at great expense from the jail commissary.

24. As described in the ACLU's 2009 Annual Report, MCJ adopted a "no retaliation" policy last year in response to our complaints. However, this policy has had no apparent effect, since we do not see a decrease in the complaints of retaliation. One reason is that the Department has not posted the policy publicly throughout MCJ, so prisoners are not aware of it or how to invoke its protections. I have repeatedly asked jail officers and others in the Department to post the policy but they have refused.

25. In my experience, some of the injuries that prisoners sustain from beatings and use of force by deputies are life-threatening. Over the course of my monitoring work, I have interviewed a number of prisoners who were hospitalized for many days as a result of deputy beatings. Just this summer, I interviewed a prisoner who had been beaten by deputies in May 2010. In later follow-up, our jails project staff confirmed that his injuries included a collapsed lung, two fractures to his spine, fractured ribs on both sides, a broken tooth and head trauma so severe that it has caused brain

1 damage and temporary memory loss. As of the end of June 2010, this prisoner still suffered from
2 blurred vision, intense back pain and facial scarring as a result of the assault.
3  I declare under penalty of perjury that the foregoing is true and correct and that this
4 declaration was signed this 9th day of September, 2010, at Los Angeles, California.

*[signature]*
MARY TIEDEMAN

# EXHIBIT 1

<u>NOTE:</u> THIS HAS BEEN CARBON COPIED AND WILL BE MAILED TO OTHER AGENCIES. AN ADMINISTRATIVE COMPLAINT WAS FILED 4·6·09 REGARDING THESE MATTERS.

<u>To THOSE WHO ARE REALLY CONCERNED</u>     3·29·09

<u>LAST NIGHT</u> MY NEIGHBOR TOOK HIS OWN LIFE??
I DO NOT KNOW EXACTLY HOW BUT HE WAS VERY "STIFF" WHEN THE DEPUTIES PULLED HIM OUT OF HIS CELL. HE APPEARED TO HAVE <u>BEEN DEAD FOR AWHILE</u>. AND I AM NOT SURPRISED. NEGLIGENCE IS RAMPANT HERE. MY NEIGHBOR, JOHN HORTON, WAS NOT AN ENIGMA. HE HAD AND DISPLAYED "OBVIOUS SIGNS" OF MENTAL HEALTH ISSUES. INCLUDING BUT NOT LIMITED TO:

- THE FEW TIMES THEY RAN SHOWERS HE REFUSE TO TAKE ONE. HE WOULD ALWAYS REFUSE HIS "MEDS."
- HE HAD PILES OF TRASH AND OLD FOOD TRAYS STACKED IN FRONT OF HIS CELL. TRASH WAS EVERYWHERE. INSIDE AND SOMETIMES OUTSIDE HIS CELL.
- HE WOULD HAVE OPEN FOOD CONTAINERS (CEREAL, COOKIES, ETC.) LAYED OUT OVER HIS BED THROUGHOUT THE DAY.
- HE WOULD TALK TO HIMSELF 'AUDIBLY' FOR HOURS. (SEVERAL DEPUTIES WOULD COME TO HIS CELL DOOR AND TEASE HIM. ILLUMINATE THEIR FLASHLIGHTS ON HIM 'PLAYFULLY' AND JOKE ABOUT HIM.)
- HE WAS NOT EATING. MANY TIMES HE WOULD PUSH PORTIONS OF HIS FOOD UNDER HIS DOOR TO FEED THE MICE.
- ON SEVERAL OCCASIONS MR. HORTON HAD WHAT OBVIOUSLY APPEARED TO BE A HANG MENS "NOOSE" AFIXED TO THE BACK OF HIS CELL LIGHT. EVEN WHILE DEPUTIES LOOKED ON. I SEEN IT. THEY SEEN IT.
- MR. HORTON HAS VISIBLY STOOD IN HIS CELL AND/OR

Page 173

NOTE: DEPUTY ▬▬▬ BROUGHT ME BACK FROM THE LAW LIBRARY AFTER 6PM. THESE 'ITEMS' WERE VISIBLE. DEPUTY ▬▬▬ DID NO MORE 'WALKS' AFTER 6PM. HE WAS SUPPOSE TO BRING ME A DINNER TRAY BUT HE NEVER RETURNED. THE NIGHTMAN GAVE ME A SACK LUNCH FOR DINNER. DEPUTIES ARE NOT DOING THEIR "WALKS."

(2) SQUATTING 'ATOP' HIS SINK WITH PLASTIC? TIES AROUND HIS WRIST, LOOKING DIRECTLY AT THE NOOSE. (SEVERAL DEPUTIES OBSERVED THESE 'ITEMS' AND "BEHAVIOR" UPON BRINGING ME BACK OF TAKING ME TO THE LAW-LIBRARY.) THE SAME TIME(S) I'VE NOTICED THEM (SEE NOTE ABOVE)

THESE WERE PROBABLY JUST OF A "FEW" OBVIOUS SIGNS HE DISPLAYED THAT I WAS ABLE TO OBSERVE "GOING AND COMING" FROM LAW-LIBRARY OR SHOWER. NO TELLING WHAT OTHER BEHAVIOR PATTERNS HE EXHIBITED TO DEPUTIES THROUGHOUT THE COURSE OF THREE (3) SHIFTS DURING HIS STAY HERE. BUT I HAVE HEARD DEPUTIES CALL HIM "CRAZY" NUMEROUS TIMES. AND AS I WRITE THIS REPORT I AM TOTALLY AWARE OF THE HEARTLESSNESS OF MANAGEMENT HERE. AT PRESENT A CROWD OF "SENIOR" DEPUTIES ARE STANDING IN FRONT OF (NOW DECEASED "MR HORTON"S) CELL SMILING AND LAUGHING AS IF THEY ARE THE CELEBRANTS AT A "LYNCH" PARTY.

A HUMAN BEING IN LOS ANGELES COUNTY JAIL HAS NO RIGHTS THAT THE SHERIFF'S FEEL BOUND TO RESPECT.

MR. HORTONS LIFE COULD HAVE DEFINITELY BEEN SAVED. THAT IS, IF THE LASD, HAD ANY RESPECT FOR "INMATES LIVES." BUT THEY DON'T.

THIS IS THE TYPE OF NEGLECT, DELIBERATE INDIFF-

NOTE: I HAVE EVEN WENT ON SUICIDAL WATCH TO GET OUT OF THIS HOLE. IT IS STRUCTURALLY DEPRESSIVE AND MENTALLY UNHEALTHY. THIS IS NOT A SAFE PLACE. IF I HAVE NOTED THESE "SIGNS" HOW COULD DEPUTIES BE BLIND TO THEM?

③ ERENCE AND CALLOUSNESS I HAVE WELL DOCUMENTED IN THE LAST YEAR.

ON MAY 27, 08 I FILED A GROUP COMPLAINT WITH OTHER INMATES ABOUT JAIL CONDITIONS AND SUBMITTED IT TO MELINDA BYRD, ACLU.

ON MANY OCCASIONS IN 2008 I HAVE TRIED TO CALL PEOPLES ATTENTION TO A SYSTEM THAT IS TOTALLY OUT OF CONTROL.

ON JANUARY 20, 2009 ME AND SEVERAL OTHER DECLARANTS FILED COMPLAINTS WITH THE COURTS (DEPT. 100/CCB) AND WITH '6' OTHER AGENCIES (INCLUDING THE ACLU) REGARDING DEPUTIES BEHAVIOR AT MCJ.

THE DEPUTIES HAVE NO RESPECT FOR HUMAN LIFE, ESPECIALLY "INMATES LIFE".

NOW, MAY BE SUICIDES HAVE BECOME ALL TOO COMMON AROUND HERE AND THE CIRCUMSTANCIAL ISSUES OF NEGLECT GO UNREPORTED AND UNHEARD OF BECAUSE A) DEAD BODIES DON'T TALK B) MOST INMATES ARE AFRAID AND RELUNCTANT TO WRITE CERTAIN COMPLAINTS AND C) STAFF/DEPUTIES HAVE PRE-REHEARSED SCRIPTS ON HOW TO COVER-UP, EXPLAIN AWAY AND MINIMIZE THE LOST OF A LIFE by SUICIDE. JOHN HORTONS LIFE COULD HAVE BEEN SAVED!! BUT WHO REALLY CARES?

JUST MOMENTS AGO I HEARD THE LIGHT CHATTER OF DEPUTIES "CHOREOGRAPHING" THEIR VERSION OF EVENTS... " I JUST WALKED... THE SGT CAME

Page 175

NOTE:

NOTE: Sadly, the staff are almost guaranteed special 'safe-gaurds' because racial and jail politics prevent inmates from speaking out. Most inmates following this false honor code will almost always say "I didn't hear or see anything." Lying through their teeth!

(4)

AND HE WALKED... AND YEAH THE GUY LOOKED AS THOUGH HE WAS SITTING UP TALKING TO HIMSELF... ETC... ETC...
THAT "GUY" (MR. HORTON) WAS "STIFF AS A BOARD" WHEN THEY PULLED HIM OUT OF THAT CELL. EVEN THE PARAMEDIC (HE WAS DRESSED IN WHAT APPEARED TO BE A FIREMEN SUIT?) ASKED THE DEPUTY: "HOW LONG WAS HE IN THERE? HIS BODY IS <u>VERY</u> STIFF".
WHEN THEY PULLED HIM FROM THE CELL I JUST KNEW HE WAS DEAD! BUT I KNOW IF STAFF HAD'VE LISTENED WHEN I TOLD THEM "HE NEEDS HELP" THIS TRAGEDY COULD HAVE BEEN AVOIDED.
BUT I KNOW THE "MAGICIANS" ARE GONNA MAKE THIS ALL APPEAR LIKE A "REGULAR DEATH" WHERE THEY WERE JUST DOING THEIR JOBS AND JOHN HORTON AT THE "OPPORTUNE TIME" TOOK HIS OWN LIFE. I DISAGREE: THE LASD IS COMPLICIT THROUGH NEGLECT AND COLD-HEARTED COMPLACENCY. WHO CAN STOP THEM? THE DRESS REHEARSAL STARTED THE SECOND MR. HORTON'S 'STIFF BODY' WAS YANKED OUT THE CELL. THE MOMENT THEY BEGAN TO THINK OF WAYS TO "COVER UP" THIS INCIDENT IS THE SAME INSTANT IT WENT FROM A SUICIDE TO A NEGLIGENT HOMICIDE. AND IF EVERYBODY IS PLAYING THEIR 'ROLES' CORRECTLY ACLU WILL BE WALKING WITH THEIR CLIP BOARDS SOON ASKING IF "ANY BODY SEEN ANYTHING." IF ONLY MR. HORTON COULD TELL HIS STORY!