The Los Angeles County
# Sheriff's Department

## 29th Semiannual Report

Special Counsel Merrick J. Bobb and Staff
and Police Assessment Resource Center (PARC)
July 2010

## Introduction and Executive Summary

This is the 29th Semiannual Report of Special Counsel to the Board of Supervisors, the Sheriff, and the general public concerning the Los Angeles County Sheriff's Department (LASD). Since 1993, these reports study important issues in contemporary policing as they impact upon the LASD. They deal in particular with aspects of policing that run the risk of liability or the deterioration of trust and confidence by the communities and persons served by the LASD.

The 2009 confrontation in Cambridge, Massachusetts between Professor Henry Louis Gates and Sgt. James Crowley generated a national conversation about the role race plays in policing, particularly whether police interpret frustration and anger by racial and ethnic minorities as threatening or potentially violent in circumstances where the police would not necessarily so interpret the same conduct by whites. If so, one might expect more charges of resistance, disturbing the peace, or interference against minority suspects. These charges are collectively and colloquially labeled "contempt of cop." This report will refer to those arrests as "discretionary" or "obstruction" charges.

The first two chapters of this report examine cases where a deputy arrests an individual on the sole charges of resisting arrest, delaying or obstructing a peace officer in his or her duties, or battery on a police officer without injury. We found disparities in the overrepresentation of blacks and Latinos, both adult and minor, in persons arrested on obstruction charges. Yet we compared the breakdown by race of obstruction arrests to that of all LASD arrests and found no notable difference, showing that the disproportion is not specific to this type of arrest.

We nonetheless were troubled by a seemingly overzealous use of such charges against blacks in the Lancaster area, where the proportion of blacks arrested on obstruction charges—64 percent—far exceeded the estimated 17 percent of blacks in the overall population. Palmdale and Carson stations raised some of these same concerns, but to a lesser degree. We also found:

- Among obstruction arrestees, white suspects were significantly less likely to be charged with felony obstruction, as compared to a similar misdemeanor

1

charge, than were African-Americans and Latinos. According to our review of court data, similarly small percentages of each racial group (about two or three percent) were ultimately convicted of the felony charge.  This may mean that felony charges against blacks are less likely to withstand prosecutorial scrutiny.

- Of all suspects arrested on obstruction charges, African-Americans and Latinos had a relatively large percentage of suspects who were minors—23 percent of arrested blacks and 19 percent of arrested Latinos —as compared to white suspects, only ten percent of whom were under 18. [1] [2]

- Overall, we found that deputies reported the use of force in approximately 31 percent of all obstruction arrests. The rate was higher, at about 50 percent, for arrestees charged with the more serious charges. Force was involved in the arrest of one quarter of those arrested with less serious charges. About 10 percent of the cases where deputies used force involved a suspect whose contemptuous but otherwise non-threatening behavior appeared to provide the primary reason for the initial escalation.

- African-Americans and Latinos were more likely to have force used against them during an obstruction arrest than were whites, and men were more likely to have force used against them than women.  Although we found examples of unnecessary or disproportionate force, we did not find a widespread pattern by LASD deputies to cover excessive force with questionable charges of resisting arrest. Nor did we find that LASD deputies regularly and systematically make arrests using force for verbal challenges and other expressions of anger or frustration by the detained individual, despite finding  the approximately 10 percent  in which  it seemed  to occur. In cases triggered by a verbal challenge by the suspect, the deputy appeared to escalate the encounter by prematurely taking action to physically place hands on or search the subject, or by issuing commands without explanation. To be sure, people should generally be courteous to the police and follow simple directions.  Nonetheless, officers

---

[1] The difference in proportion of minors between white and African-Americans is statistically significant, but differences between whites and Latinos and blacks and Latinos are not.
[2] The large variation in absolute numbers among minors who are persons of color and whites is notable: 57 African-American minors and 66 Latino minors who were arrested on an obstruction charge, compared with just 10 white minors.

2

should work to balance their personal safety needs with courtesy and a respect for the suspect's perception of the situation and make an effort to avoid or limit the use of force.

A further summary of our findings is set forth below.

The third chapter of the 29th Semiannual Report looks at hate crimes and the quality of the LASD investigations of them. The specialized unit devoted to hate crimes does an excellent job. The quality of investigation at the station level varied widely. The poor quality of investigation in the jails is unacceptable.

This report documents ongoing concerns about the safety and security of inmates in the jails, particularly in Men's Central jail. Last month, our colleagues in the Office of Independent Review detailed increases in suicides and highlighted a disturbing case where one inmate murdered another in circumstances where the LASD should never have housed the two individuals together in the same cell. A recent *Los Angeles Times* articles discussed a current scandal in the LASD where deputies are alleged to have gamed the system to avoid walking the rows on a regular basis to check on the safety and security of inmates.

The incidents we describe in this report therefore follow long-standing serious lapses by the jail staff leading to death and serious injury to inmates. Some have concluded that Men's Central is beyond the possibility of redemption. We reiterate recommendations in earlier reports that the facility should be shuttered and replaced.

## Chapters 1 and 2

Chapters 1 and 2 further the dialogue on obstruction arrests from the perspective of the LASD. The topic has recently been the subject of investigations by two newspapers, a police auditor,  the author of an issues brief, and by a blue-ribbon panel in the Gates/Crowley matter.

3

were not able to make a credibility assessment based on the information provided. Finally, it was not clear, in every case, at what point the decision to arrest was made or what that decision was based on. Because several suspects escalated their resistance while being patted down, escorted somewhere, or restrained, it was difficult to distinguish which behavior ultimately resulted in the arrest. **We recommend that the LASD follow Seattle's example and require officers to explicitly explain what action was being obstructed or resisted as part of their report. We also encourage supervisors to critically review cases where the suspect is described as exhibiting a particular stance or making movements that can be open to interpretation, particularly when there is no other physical resistance.**

Even given these constraints, there were arrests that we interpreted as having a significant contempt-of-cop component, as we have noted earlier.

## Chapter 3

Hard times breed hard attitudes, and the fear of joblessness and insecurity makes for scapegoating and blame, which in turn gives rise to crimes of hate. In today's Los Angeles, as in the nation at large, there are instances of hatred which become criminal when the perpetrator goes beyond mere speech, targets a victim, and takes action motivated by bias. A hate crime involves two victims: the specific individual targeted and the group to which the victim belongs. An assault upon a Muslim because of his religion or ethnicity is also an assault on all Muslims.

Enforcement of laws against hate crimes requires a thorough understanding of the distinction between speech and action, the patience to investigate situations where the perpetrator leaves few clues,  and an acknowledgment that hate crimes are among the more difficult a prosecutor can undertake. Yet enforcement must be vigorous because the consequences of unbridled hatred, left unchecked, are horrifying.

Against this backdrop, we evaluate in this report the performance of the LASD in handling hate crimes on the streets and in the jails. Some hate crimes are investigated at the Department level by the LASD's Hate Crimes Task Force

(HCTF).  More than half of hate crimes and incidents, however, are investigated at the level of individual patrol stations or jail units. HCTF is a model of its kind and does a professional and thorough job. Its two detectives are known by name across many communities and praised for their investigatory acumen and sensitivity to victims and to the victim's community. At the patrol station level, the quality of investigation varies considerably, from poor to acceptable to very good at the West Hollywood Station.

While there was significant room for improvement of station level investigations, the jails were far worse. Indeed, investigation of hate crimes in the jails is shameful and reflective of an unwillingness or inability to recognize hate crimes as such, making it even more difficult for the LASD to provide a safe environment to all inmates at all times. A particularly troubling example illustrates the point.

In April 2009, according to an LASD report, Victim, a physically and mentally disabled male inmate, was sitting on his bunk. Suspect #1 allegedly approached him unprovoked and punched Victim in the face and head 4-7 times. Victim reportedly curled into a fetal position to protect himself and was punched 10-12 more times in the head, 5-6 times in the kidneys. Suspect popped off his prosthetic leg and beat Victim's head with the metal foot. When Victim tried to escape under his bunk, Suspect #1 began to move the bunk. At this point, Suspect #2 reportedly came over to help Suspect #1, moving the bunk and trying to break Victim's arm on the edge of the bunk. Several other inmates joined in on the attack, allegedly saying "Gotta fuck up the blue eyed devil."

*The next day,* Victim was sitting on the floor, facing the wall, rocking back and forth with a blanket over him. Suspect #3 came from behind and placed a chokehold on the victim. According to the report, the Victim could be heard gasping for breath. While maintaining the hold, Suspect # 3 punched Victim over ten times in the face. The report reads, "After the choking incident, [Victim] banged on the door. When Deputies finally arrived, Victim said that he needed to be moved from the cell." Victim was not moved out until the next day. A deputy notes, "I believe that the primary motivation for the [assault] was due to [Victim's] disability." It is disturbing that the investigation then comes to a dead end. After some initial interviews, the detective simply abandoned the case. Ultimately, after repeated

11

inquiries by us as to the status of the case and why it was abandoned, the case was closed in April 2010 for an asserted lack of evidence. As a result, the case never was brought to the District Attorney's office for filing.

Terribly disturbing is that the victim was brutally treated over two days without a deputy noticing until the victim banged on the door. We might understand if this attack occurred over a few minutes, but undetected, vicious attacks over the course of two days reflects an inability of the jailers in this instance to keep inmates safe such that brutal beatings can go on for a long while without staff even noticing. It may even be worse than that: The recent *LA Times* articles on "Scannergate" suggest that a group of deputies at Men's Central purposely tricked the system to make it appear that they regularly checked on the status of inmates when they did not.

Ironically, racial and ethnic tension in the jails is so much part of the daily routine that it seems to take on an air of normalcy, such that the jailers appear not to perceive violence arising out of those tensions as hate crimes. When, as in the incident cited above, a physically and mentally disabled white inmate is attacked and called a blue eyed devil, it is deemed not worthy of further investigation.

We urge immediate attention to these failures in the jails. Certainly, if an inmate murdered another inmate, there would be an investigation and prosecution. Where an inmate is beaten by another inmate out of bias and animus, there should similarly be an investigation and prosecution. Likewise, when a green light is given to Latinos to do violence to blacks or vice versa, these hate crimes should be punished.

Outside of the jails, we studied in detail hate crimes at the five patrol stations generating the greatest number of hate crimes— Lakewood, Lancaster, Norwalk, Santa Clarita, and West Hollywood. We then randomly selected ten investigations from each of the stations and HCTF for detailed scrutiny.

Of the 56 hate crimes that occurred in these five stations, over one-third (37 percent) of underlying offenses for a hate crime were charges of vandalism. If the offense was violent, it was more likely to be aggravated assault (12 percent), such

12

as assault with a deadly weapon, than a simple assault (5 percent), such as a fistfight. HCTF posited that the large number of vandalism cases was due to the large audience an offender can reach through the act: The offender often uses vandalism to make a broad general statement usually against a class of people. Whites and Latinos were the primary perpetrators of the most violent offense: aggravated assault. Blacks are more likely than whites or Latinos to be victims in the top three charges—aggravated assault, criminal threats, and vandalism.

Hate crimes motivated by race, ethnicity, or national origin (61 percent), or sexual orientation (24 percent) comprised the majority of hate crime cases (85 percent). Religious discrimination made up another 14 percent. Over half (57 percent) of all sexual orientation-motivated hate crimes occurred in West Hollywood. Nearly a quarter (24 percent) of religion-motivated cases—mostly anti-Semitic—occurred in Santa Clarita.

The majority of filed cases we surveyed (76 percent) resulted in a guilty conviction for an underlying criminal act. According to a query of Los Angeles Superior Court records, only three of those cases (10 percent) were actually filed with a hate crime charge. The rest were filed solely for the underlying crime; assault with a deadly weapon constituted the majority of these charges (62 percent). Of those filed with a hate crime charge, only one (3 percent) actually resulted in a conviction. We are concerned that so few of the cases investigated as hate crimes actually resulted in a hate crime charge and conviction.

In addition to examining how the LASD investigates hate crimes, we evaluated an excellent program devised by Chiefs Tyler and Rhambo to prevent them. The Share Tolerance Program, created and instituted by the Chiefs, combats hate crimes proactively in Los Angeles County. The program's mission—to develop leadership about tolerance among high school students—is conveyed through a combination of a uniformed deputy sheriff, a facilitator, a film, and a trailer. When led by an experienced presenter, this program is an exceptionally effective way to share the values of tolerance. We commend the two Chiefs for this outstanding program.

Page 184

The following chart tracks the types of weapons used to perpetrate hate crimes in a jail setting. While the majority of hate crimes utilized fists and other body parts (60 percent), a large percentage (40 percent) involved improvised weapons such as shanks, makeshift knives such as a razor blade attached to a broken toothbrush or other type of handle, a broken broomstick, urine, strips of bed linen, bottles, and even prosthetic limbs.



*Figure 3.16: Weapons Used in Hate Crimes*

**B.      Analysis of Jail Hate Crime Files and Investigations**

Nearly a quarter (22 percent) of jail hate crime case files contained only an incident report—nothing else.[99] There was nearly an even split between those reports that had a Case Closure Report (52 percent) and those that did not (47 percent). Not one report had a Case Activity Log; JIU informed us that while many of the cases do have Case Activity Logs, they were not included in the files we were given. Why we were given incomplete files remains an open question. We have not independently audited JIU's assertion that Case Activity Logs actually exist, even though they were not in the files given to us, as they should have been. We were troubled by the flip and arrogant manner of one JIU sergeant toward one of our

---

[99] It is important to note that in the following data, 61 percent of the cases occurred before the restructuring in June 2007.

138

staff members and toward the issue of hate crimes in jail. This is one of the few instances in the many years of our monitoring where LASD staff has failed to be courteous and informative.

A majority of JIU reports (57 percent) had neither hard copy photographs in the file nor mentioned photographs having been booked as evidence. Thirty percent of files noted that photographs had been stored as evidence and did not actually have copies in the file itself. Only 13 percent actually had photographs in the file. JIU maintained that it is not standard practice to take photographs in the majority of jail investigations, unless there is a major injury that the District Attorney will likely want evidence of later on. We recommend that any case receiving a hate crime statistical code have photographs taken where there are relevant visible injuries.

In the majority of cases motivated by race (56 percent), the hate crime appeared to have a gang nexus. For example, according to investigative reports, several cases involved Latino inmates attacking African-American cellmates based on Southsider gang orders to attack African-American inmates on sight. We are hopeful that the proposed additions to the Hate Crime Field Office Directive—mentioned above—to track gang-related activity and hate crimes will enable more systematic knowledge of gang-motivated hate crimes in the jails.

In many of the jail hate crime cases, we were frustrated by the lack of officer response in the incidents themselves. According to the files, it appears that several of the incidents occurred because officers simply were not around—sometimes for hours or days. They apparently did not notice a hate crime occurring or were not swift enough to stop it. As one sergeant told us, this is not simply a hate crime issue, but a general issue. We agree and have a substantial concern that there is inadequate deputy coverage in the jails, which presents opportunities for untoward incidents, be they hate crimes or other misconduct. We also wonder why a large number of hate crime victims chose to waive prosecution, despite initial indications in the case file that they were willing to identify suspects and testify.

Page 186

According to an October 2009 investigative report, a gay inmate ("Victim") entered a dormitory at Twin Towers where he felt other inmates recognized him as someone who had been in a gay housing unit in state prison. He immediately approached the officer window and asked to be transferred to another dorm. The officer told Victim to wait for the dorm door to open. As Victim walked to the door, several Latino gang members attacked Victim with kicks, punches, and a broken broomstick. We wonder if the assault and hate crime would have been avoided had Custody responded more quickly to the inmate's plight. We also wonder whether the inmate was misclassified and placed in the wrong dorm to begin with. The investigative report did not indicate the length of time it took to rescue the inmate. The case was investigated as a hate crime and presented to the District Attorney's Office for assault with a deadly weapon—though not as a hate crime. It was rejected for filing but deferred for revocation of a parole that the defendant was then on.

In another incident, according to the investigatory file, on an early morning in May 2006, white male Victim was sleeping when Latino male Suspect #1 woke him asking for coffee. When Victim refused, Suspect began punching Victim, calling him a "stupid fucking white boy." Three other Latino inmates joined in, tearing Victim's linens into strips and tying his legs and hands to his bed. About an hour later, the four suspects reportedly pulled Victim to the floor near the toilet and took turns beating him, calling him "white piece of shit," urinating on him and saying, "You'll never make it out of this cell alive." Suspect #2 cut up Victim's feet with a razor as others beat Victim. They also exhorted money from Victim. According to the file, the assault continued throughout the day, until a deputy happened to enter the module for another inmate and Victim ran out asking for help. A medical examination corroborated the injuries—Victim had trouble walking, bruises on his knees and the bottom of his feet, swelling to his back, rib cage and neck, hemorrhaging and bruising from his eyes, and burn marks from being tied up. According to the report, the Victim positively identified the suspects.

We are greatly concerned that, according to the investigatory files, an inmate may have been brutally beaten for hours by four other inmates and no officer

Page 187

discovered it until the inmate approached for help. We may understand if this attack occurred over a few minutes, but an undetected, vicious attack over the course of a day—if it occurred as described in the report—is inexcusable. We also wonder why the victim was not desirous of prosecution when he so readily identified his suspects—something jail victims are not always willing to do for fear of retaliation. The Case Closure Report indicates that the District Attorney's Office rejected the case for filing.

Another case shows the extent to which a victim purportedly was beaten in Men's Central Jail without any interference by Department personnel and seemingly with no other repercussions. In April 2009, according to the report, Victim, a physically and mentally disabled male, was sitting on his bunk. Suspect #1 allegedly approached him unprovoked and punched Victim in the face and head 4-7 times. Victim reportedly curled into a fetal position to protect himself and was punched 10-12 more times in the head, 5-6 times in the kidneys. Then Suspect popped off his prosthetic leg and beat Victim's head with the metal foot. When Victim tried to escape under his bunk, Suspect #1 began to move the bunk. At this point, Suspect #2 reportedly came over to help Suspect #1, moving the bunk and trying to break Victim's arm on the edge of the bunk. Several other inmates joined in on the attack, allegedly saying "Gotta fuck up the blue eyed devil. *The next day,* Victim was sitting on the floor, facing the wall, rocking back and forth with a blanket over him. Suspect #3 came from behind and placed a chokehold on the victim. According to the report, the Victim could be heard gasping for breath. While maintaining the hold, Suspect #3 punched Victim over ten times in the face. The report reads, "After the choking incident, [Victim] banged on the door. When Deputies finally arrived, Victim said that he needed to be moved from the cell." Victim was not moved out until the next day. An officer notes, "I believe that the primary motivation for the [assault] was due to [Victim's] disability." What we find shocking is that at this point, the case's investigation comes to a dead end. After some initial interviews, it seems the detective—incidentally the same detective discussed earlier in this chapter—simply abandoned this case. The case was never brought to the District Attorney's office for filing, despite known suspects and much testimony on record. After we inquired several times about this case's disposition, we were told it was finally closed on April 30, 2010, exactly a

141

year after its occurrence, due to insufficient evidence to file. It seems to us that the JIU simply let the case fall through the cracks.

In light of these cases, we strongly recommend better accountability and supervision of jail hate crime investigations. We are pleased to hear that as of October 2009, Sergeant Christian Reddington of JIU has instituted his own electronic program to track the intake of cases, including hate crime cases. Sergeant Reddington says he is now tracking the case number, assigned investigator, type of crime, suspect and victim names, date the case was assigned to JIU, date it was closed, and any case disposition information or LARCIS tracking code. We encourage the Sergeant also to track the number of victims and suspects thought to be involved, motivation, types of weapons used, and charges. This information is not systematically compiled at this time. **In addition, for some period, we think that hate crime investigations themselves should be monitored more closely by HCTF for comprehensiveness.**

It seems JIU only learns about an incident if a facility or court sends JIU a report. Otherwise, JIU likely will not find out about it. As a result, according to a knowledgeable source at JIU, some of the reports we sought to obtain, though known to JIU, were not obtainable because they were never sent to JIU or not sent in a timely manner. We recommend that the Department remind facilities and courts consistently to send hate crime reports to JIU for investigation.

**It is critical that JIU begin more accountable and systematic recording and investigation of hate crime cases. Now that there is a database internal to JIU tracking some of this information, it is essential that it continues to be utilized and monitored, and a systematic record of hate crimes be developed.**

Finally, jail personnel have argued to us that what constitutes a hate crime on the streets is not a hate crime in the jails; the jail is simply a world in of itself. Since nearly all jail attacks arise out of some sort of racial or gang-related animus, the argument goes, not all of these attacks can be labeled as hate crimes. In fact, according to this line of thought, the very study of hate crimes within the jail is misguided because nearly all crimes within the jail spawn from the hate-filled dynamics of inmates.

We respectfully disagree with these arguments. The very fact that crimes arise out of racial hate shows a clear racial animus at work. In such a case, an investigation of a hate crime, and a hate crime charge enhancing the underlying criminal misconduct, is appropriate. As a Department detective told us, it is dangerous to approach a jail crime with the premise that hate crimes, as defined on the streets, rarely occur in the jails. A detective with that understanding "isn't going to investigate the crime as a possible hate crime if [they] are already under the idea that there aren't hate crimes in jail. [Hate crimes] are harder to investigate because of the unwritten rules inside the jail. It is hard to get an inmate to testify against another inmate because they are in that world. If you have a remote belief [that the case] may be racially motivated and that is the sole motivating factor, it definitely should be looked at as a hate crime until proven otherwise. Every crime that occurs on the street can occur within the jails. It is totally wrong [to think] that it is a hate crime on the street but not in the jail." We note that there is no official definition of hate crimes that excludes crimes of that nature in the jail setting. Therefore, unless written to the contrary, we will continue to assume that hate crimes, wherever committed—be it in the jail or on the street—are hate crimes, including those described in this report and provided to us with a hate crime statistical code.

Page 190