# Office of Independent Review *Eighth* Annual Report



Michael J. Gennaco
*Chief Attorney*

Robert S. Miller
Benjamin Jones, Jr.
*Deputy Chief Attorneys*

Julie Ruhlin
Erica Broido
Cynthia L. Hernandez
Angelica Arias
*Attorneys*

Angie Calderon
Sylvia Newkirk-Ma
Maria Avery
*Professional Staff*

4900 South Eastern Ave.
Suite 204
City of Commerce
California 90040
Telephone: 323-890-5425
Fax: 323-869-0715
www.laoir.com

June 2010

PART ONE

# Custody Incidents and Concerns

The Sheriff's Department is responsible for managing the largest local jail system in the United States. Housing approximately 19,000 inmates daily requires a significant dedication of the Department's resources and personnel. The sheer volume of inmates, large number of inmates suffering from mental illness and physical combativeness make custodial facilities a potential tinderbox twenty-four hours a day, seven days a week. Force incidents between custody personnel and inmates, the potential for suicides, inmate-on-inmate violence, including inmate homicides, are a constant source of concern. As discussed below, OIR continues to closely monitor these critical incidents occurring in LASD jails and provide the Department with workable solutions aimed at improving safety for both its personnel and inmates alike.

## Jail Suicides: 2009 Update

In OIR's Seventh Annual Report, we noted a two-year decline in suicides in the County jails, from eight in 2006 to three in 2007 and only two in 2008. We congratulated the Department on its ongoing efforts to prevent inmate suicides while noting that the data points are too small for any meaningful analysis. Unfortunately, the number of completed suicides rose in 2009, with seven occurring in the County jails and one in a patrol station lockup. Again, with a daily inmate

1

2

population around 19,000, this increase may not be statistically significant. Nonetheless, jail managers are appropriately troubled by the upswing and continue their efforts to address issues raised by each incident. OIR continues to monitor these efforts. We report below on each of the suicides from 2009.

### Case

In this suicide, an issue was raised regarding the physical structure of the cells in which the inmate was housed. In this case, the inmate hanged himself by using a shower curtain rod at Men's Central Jail. This housing area is unique in that the inmates have showers in their cells. The inquiry into this inmate's medical history revealed no identifiable mental health issues or suicidal ideation or tendencies and thus it was not inappropriate to house the inmate alone in this housing area.[1] The Department determined that there were no violations of policy and no training issues related to this death.

### Case

In this suicide, concerns were raised regarding the completion of safety checks. The resulting Internal Affairs investigation has revealed that the requisite safety checks had not been completed for upwards of three hours and records of some checks may have been falsified. In addition, the investigation is reviewing whether deputies manning the housing area were allowed to leave the inmates unmonitored to go to the gym and go off-premises on a "chow run." The Internal Affairs investigation remains pending and OIR is monitoring those cases.

### Case

This suicide occurred in a patrol station lock-up rather than in one of the custodial facilities. In this case, the post death inquiry pointed to the desirability of improved electronic record-keeping to allow a greater degree of information sharing between the County's Department of Mental Health ("DMH") and LASD officials. The arrestee/inmate in this case had been a DMH patient with a history of suicide attempts during a prior incarceration. If the inmate had been booked at IRC, this information would have been available to the intake personnel, but could not be accessed by the deputies doing the medical and mental health screening at the station jail. Because the inmate did not disclose upon booking any mental health issues, and showed no obvious indications of

---

1   This was in the jail's MRSA module, where inmates either have or are particularly susceptible to Methicillin-resistant Staphylococcus aureus (aka "staph" infection), a bacterial infection that can spread rapidly in inmate populations and has been a concern in the jail for a number of years.

2

a need for mental health care, the inmate was not identified as someone who presented a heightened risk of suicide.  The Department has made efforts to close this communication gap, but has been unable to reach a resolution with DMH.

### Case

In this suicide, issues were also raised regarding the completion of safety checks.  The resultinginvestigation determined, however, that the time gaps between required checks were minimal and resulted in no more than a several minute delay in responding to the inmate's cell, where he was still alive at the time deputies arrived.

Here, the inmate tore the cover from his mattress to fashion a noose.  This was particularly disturbing because the inmate was housed in a mental health observation area, where inmates are given special blankets and mattresses that are designed and marketed as "suicide prevention" items.  A very timely inquiry by Custody Support Services ("CSS") staff revealed that the Department has recently switched to a different manufacturer, who sold these items at a substantially lower price than the previous provider.  In addition, CSS in its regular review of all attempted suicides, had noticed that a handful of other inmates had torn their so-called "suicide prevention" blankets or mattresses in efforts to take their own lives.  In these cases, deputies or other staff had intervened and prevented the suicides.  CSS staff immediately notified its chain of command of the problem and researched various brands of prevention items.  CSS staff discovered that many of the products marketed as "safety" or "suicide prevention" items were, in fact, relatively easy for a motivated inmate to tear apart.  This factor, coupled with the large number of blankets and mattresses that needed to be replaced and the unfortunate but usual bureaucratic delays, prevented immediate corrective action.  The Department does appear committed to making this important change once a suitable supplier is identified.  We are hopeful that the bureaucracy and institutional delays do not defeat the good will of those leading this initiative.

### Case

This suicide presented an issue regarding the Jail Mental Health Evaluation Teams ("JMET") and the way in which Custody interfaces with DMH, which provides mental health services in the jail.  The inmate in this case told custody staff he was thinking of killing himself.  The conscientious deputy immediately sent the inmate to IRC to talk to a mental health clinician.  A nurse interviewed him and determined he was not suicidal and should be returned to general population housing, but also requested a follow-up by JMET.  There was a regrettable delay in communicating that request, and JMET never met with the inmate, who

3

hanged himself three days later.  We understand that the DMH mechanism for treating inmates easily could be overwhelmed by the number of inmates who claim to be suicidal in an attempt to manipulate their housing assignments.  Thus, DMH must carefully screen inmates before admitting them to the high observation portion of the jail.  Nonetheless, the breakdown in communication systems in this case is symptomatic of the ongoing need for the LASD and DMH to find creative ways to improve and streamline their working relationship.

### Case

In this suicide, the inmate also hanged himself by using a shower curtain rod at Men's Central jail.  This suicide occurred in the same housing area as in the case referenced above, where the inmates have showers in their cells.  The after death inquiry revealed no identifiable mental health issues or suicidal ideation or tendencies with regard to this inmate and thus there were no issues regarding his housing assignment.  The Department determined that there were no violations of policy and no training issues related to this death.

However, and unfortunately, in the seven months between this suicide and the other one involving a shower curtain rod, no corrective action had been implemented to address the ease with which inmates can use the shower rods to hang themselves.  In an effort to address the instrumentality used in both suicides, the Department committed to examining what types of shower stalls and rods other county jails and state prisons are using.  The Department continues to research alternatives to the existing shower rods, though it is proving difficult to find a product that is suitably durable for the correctional setting while at the same time being incapable of supporting a person's weight or being used as some type of weapon.

Fortunately, the Department is not dominated by the fatalistic belief that since a determined inmate will find some way to kill himself while in custody, it is fruitless to work too hard to eliminate potential instrumentalities.  While it is true that inmates continue to be very creative in finding ways to end their lives, it is the responsibility of the Department to react to and learn from each suicide and continue to find ways to reduce the likelihood of a successful subsequent suicide.  We are hopeful that the Department will continue to press this matter and are confident it can devise a solution.  It is important however, that the persons tasked with finding solutions are supported by the Division, so that the fix is in place before another inmate takes advantage of the shower rods in this housing area to attempt to end his life.

4

### Case

**In this suicide, the inmate used long tube socks purchased through inmate services to make a noose and successfully hanged himself. Unfortunately, this problem was not unpredictable. We reported last year:**

> *Custody Support Services recently began reviewing all attempted suicides in an effort to spot trends and patterns in connection with these incidents. An attempt suicide can reveal the same issues in inmate care, screening, and security measures as a completed one, and warrants the same type of scrutiny. By looking beyond completed suicides to all attempts, the Department broadens its view and can more quickly identify what may become more serious problems in the future. For example, CSS recently noticed that some inmates were using tube socks to fashion nooses and has initiated a move to replace them with shorter socks that cannot be used as readily for this purpose. No inmate, to our knowledge, has used tube socks in a completed suicide, so the issue would not have been raised absent this proactive approach to reviewing attempted suicides.*

**The effort to replace inmates' socks that we reported on last year stalled, at least in part because of concerns that different socks would complicate laundry operations. Unfortunately, we can no longer report that socks have never been used in a completed suicide.**

**The socks the inmate used here used were not the Department-issued socks, but a pair the inmate purchased through an approved vendor. The Department no longer allows its outside vendor to sell long (knee-high) tube socks to inmates, however it continues to issue mid/lower calf tube socks as part of the inmate uniform. With the exception of inmate workers, who regularly wear high boots while performing various cleaning and maintenance tasks, we have not been persuaded why inmates need these mid-length socks and continue to encourage the Department to move to shorter, ankle-length socks.[2]**

**This suicide also revealed weaknesses in the processing and follow-up mental health care of inmates once classified as suicidal. Here, the inmate had attempted suicide approximately five months before his eventual completed suicide and had spent some time in custody under the supervision of Department of Mental Health personnel. However, the inmate was declassified shortly after his attempted suicide and remained in custody without any further outward indication that he was suffering from mental health problems. Nonetheless, there was no evidence of any ongoing evaluation conducted by mental health staff members.**

---

2   It has been suggested that the longer socks provide greater warmth to inmates when the cell temperature drops. Without more evidence of this being an issue, we continue to advocate switching to shorter socks.

5

**This is not unusual, or, as far as we know, contrary to DMH policy. We understand that the sheer number of inmates moving in and out of mental health housing at the jail makes meaningful follow-up care difficult, if not impossible, for the finite DMH staff working at the jails. That being said, we have in the past recommended that the Department work with DMH to find some way to address the treatment and care of inmates declassified from mental health housing and will continue to press this issue.**

### Case

**In this suicide, the inmate hanged himself from a bunk that had been temporarily placed in a cell to create additional housing. The bunk provided a more convenient anchor to tie a noose than a regular fixed bunk. As a result of gaining knowledge from this suicide, the Department removed these moveable bunks.**

# Reviewing Inmate Deaths

Custody continues to convene very prompt inmate Death Reviews, which continue to make for more substantive, meaningful reviews. Indeed, two of the 2009 suicides occurred on one day, and within three days of an inmate homicide (discussed later in this Section), and Custody held its Death Review just four days after the suicides in an effort to quickly address the issues presented. In addition, we also remain impressed with the increased vigor with which Custody Support Services identifies issues in preparation for the death review and the more candid discussions that emanate from the death reviews themselves. Unfortunately, while the Department is quick to identify and discuss needed reforms, as noted here, actual change often comes more slowly, if at all. The issue with the tube socks discussed above is an excellent example of this dynamic.

In the past year, OIR worked with Custody to plug this significant hole in an otherwise robust system for reviewing inmate deaths by developing a mechanism for following up on issues identified during the pre-death review inquiry and the death review itself. Custody Support Services has long had a system for documenting and following through on tasks that are its responsibility to complete—typically those dealing with policy, documentation, facilities or equipment, and training issues. OIR has asked for years to be included on the distribution list for these memos, and has at various times received assurances that we would be, yet we have never consistently been provided these follow-up memos. We will continue to press for inclusion as a means of ensuring that we can more regularly monitor the Department's progress on these issues.