

**LOS ANGELES COUNTY**
# Office of Independent Review

4900 SOUTH EASTERN AVENUE, SUITE 204
COMMERCE, CALIFORNIA 90040
TELEPHONE (323) 890-5425
www.laoir.com

MICHAEL J. GENNACO

BENJAMIN JONES
ROBERT MILLER
JULIE RUHLIN
CYNTHIA L. HERNANDEZ
ANGELICA A. ARIAS

July 19, 2010

Chair Gloria Molina
Supervisor Michael D. Antonovich
Supervisor Don Knabe
Supervisor Mark Ridley-Thomas
Supervisor Zev Yaroslavsky
Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
Los Angeles, California 90012

**RE: Deputy Vigilance in the Jails --
Praiseworthy Work and an Unfortunate Exception**

Dear Supervisors:

    This report reports on recent data collected by the Sheriff's Department at our request to tabulate the number of instances in which attempted suicides were thwarted by the vigilance of jail personnel.  This report also documents our independent review of significant deputy misconduct in the jails discovered as a result of a jail suicide when deputies deliberately devised and deployed ways to avoid their responsibilities to provide safety and security to those inmates.  The juxtaposition of these two findings is evidence that the majority of deputies assigned to custody assignments perform their responsibilities to provide safety and security to the inmates well.  The second finding shows, however, that unfortunately there are occasions when some deputies lose whatever sense of mission they may have had and devise schemes to intentionally avoid providing that safety and security to those they have been entrusted to protect.

### Attempted Suicides: A Tabulation

    In our most recent annual report, we noted that last year there was a significant uptick in suicides in the jails from the year previous. The data showed there were eight suicides in 2009 and only two suicides in 2008.  With over half the year gone in 2010, there have been two successful suicides.

    As a result of our discussion of in-custody suicides, we asked Custody Executives whether they could tabulate the number of attempted suicides prevented in the jails. They agreed to do so and provided the number of attempted suicides per jail and how

1

they were detected. The overall numbers show that from January 2010 to July 2010, there have been 76 suicide attempts that were prevented. The figures show that a significant number of those attempts were thwarted by vigilant deputy behavior, either through security checks, pill call, count, or searches. The suicide attempts at the Twin Towers facility account for over one third of all attempts, not surprisingly, considering that inmates who are receiving mental health treatment are housed there. While the suicide attempt data provides an important source of information relative to inmate behavior, it is also demonstrative of the vigilance of deputies who have prevented inmates from ending their own lives. Moreover, for purposes of context, the number of successful in-custody suicides pales in comparison to attempts that were successfully stopped. In recent discussions with the Sheriff, we agreed with his directive to Custody Executives to ensure that those deputies who have remained vigilant in their duties and successfully prevented a suicide be commended for that attention to their responsibilities.

### Deputy Malfeasance: A Stray from Mission

A deputy assigned to County jail was performing a mandated "inmate welfare check" in the very early morning hours on the short 12-cell row of inmates for which he was responsible. This part of his job consisted of a walk down the row twice per hour so the deputy could look into each cell and confirm that each inmate in the one-man cells was breathing and not in distress. The more rigorous twice-per-hour requirement for this row as opposed to the standard once-per-hour check required by state law was because the deputy was supervising a "discipline module," housing high security inmates who were being punished for not following jail rules. When the deputy looked into a cell near the beginning of the row, he noticed that the inmate was sitting on his bunk facing away from the bars in the same position he had been in the last time the deputy had checked. He looked closer and recognized that something was amiss. The inmate had a ligature around his neck attached to a grate in the back wall of the cell, suspending him in a partial sitting position just above the end of his bunk, with his hands bound. The deputy sought help immediately and medical staff was called. The inmate was cut down from the ligature and CPR was attempted but to no avail. The inmate was declared dead at the scene.

This case was one of the eight successful suicides that occurred last calendar year. As we stated in our most recent annual report, each of these events has its own particular tragic circumstances and every jail suicide can point to potential system flaws in inmate care, screening, housing, or security measures. They can also reveal individualized employee failures to comply with systems designed to mitigate the likelihood of a suicide attempt being successful. For this reason, as part of their oversight responsibility, OIR attorneys roll out to the scene of every jail suicide. Moreover, as we have reported in the past, we also recommended that the Department's Internal Affairs Bureau expand its roll out protocol to include jail suicides. The Internal Affairs Bureau agreed to do so and expanded its roll out criteria and, after several years of implementation, the Department has reaped benefits from the real-time assessment of potential administrative issues. This means that, in addition to the Homicide Bureau investigation of the death itself, there is a

parallel Internal Affairs investigation and review as well. In this case, the resulting IAB investigations proved to be particularly revealing. [1]

In this case, the inmate's limbs were already quite stiff when he was removed from his cell for life-saving efforts. This observation raised immediate questions about whether the welfare check logs maintained by the discipline module deputy that night were accurate. Further investigation and interviews revealed that the hand written entries documenting half-hourly checks of the entire row were not at all accurate and many of them had been filled in by the discipline module deputy long after the appropriate check time.

Because of this and other anomalies, the Department's Custody executives had the Internal Affairs review stepped up to an immediate formal Internal Affairs Investigation. The investigation eventually revealed that the discipline module deputy had performed only two of his required inmate welfare checks in the six hours prior to the discovery of the suicide and had performed no checks for the last hour and forty minutes before he discovered the inmate hanging in his cell. Each of the row checks that the deputy had performed had been accomplished in less than 35 seconds, calling into question the thoroughness of the few row checks that the deputy had undertaken. Jail rules specific to the discipline module require the constant presence of at least one deputy on the row or in the booth adjacent to the row, but during his shift, the deputy had left on one occasion to go to the staff gym to work out and shower and on another to go outside of the facility entirely for a "chow run" to a nearby restaurant. The investigation revealed that the module deputy was away from the module for an estimated total of three hours during the first five and a half hours of his shift.

The investigation further revealed that the discipline module deputy's immediate supervisor, the floor sergeant, condoned the chow run, though he may have presumed that

---

[1] There were other significant issues presented to jail authorities that were learned by the resulting Homicide investigation into this suicide. For example, as noted above, the inmate's hands were bound with the same ligature made from torn linens. The autopsy also showed internal bruising from injuries incurred before the hanging. These were cause for concern and scrutiny but other evidence, including fellow inmates and a deputy who noted the inmate's depressed state strongly pointed to suicide as the cause of death. Moreover, as a result of a breakdown of the notification protocols between the Coroner's office and the Sheriff's Homicide Bureau, no one from Homicide was present when the autopsy was performed, a significant divergence from ordinary procedures. Additionally, the investigation revealed that the Coroner's office inadvertently released all the ligatures to the family instead of retaining them as evidence for Homicide investigators. Finally, as a result of the despondency noticed by a custody deputy, a day before the suicide, the inmate was placed on a list so that he could be visited by a specially trained mental health team but the team had not yet received the notice at the time of the suicide. All of these issues call out for systemic study and potential reform; and to varying degrees of speed and efficacy, the Sheriff's Department has been responding to them.

3

the deputy had arranged for a substitute to patrol the module. The deputy in fact had not. The floor sergeant had visited the discipline module once during the shift and had even done a brief check down the row, but he had failed to notice that the module deputy had failed to perform his welfare checks for long periods of time.

The discipline module deputy admitted to investigators that he had faked the hand-written records of some of his row checks, but internal investigators discovered even more concerning information in the early hours of the investigation. Contained in the module booth was a single photocopied sheet of paper. It was covered with bar codes[2], each labeled with the name of one of the rows of jail cells on that floor of the jail, including the discipline row. The meaning of the sheet of paper was obvious to anyone who knew the basic procedure for performing inmate welfare checks in the jail. Since 2007, these checks have been documented through the use of hand held bar code scanners. Permanent bar code plaques are mounted at each end of every cell row in the facility. Module deputies are supposed to scan each of the plaques as they walk the rows performing their checks. The scanner's memory records each bar code and the time interval between scans, in essence, precisely when a deputy performs the row checks as well as how quickly they are performed. Rather than the "old school" handwritten log entries that have been used to document welfare checks for years and were sometimes subject to being filled in after the fact and inaccurately, the scanning system was promoted as an effective way to ensure in real time that the welfare checks were, in actuality, being timely conducted. More importantly, the scanning system was seen as an effective deterrent to any "after the fact" efforts to doctor welfare check logs after something "bad" such as a suicide had occurred.

That being said, the presence of photocopied replicas of the jail bar codes in the module was an immediate red flag that pointed to a deliberate effort to circumvent the scanning system entirely. Investigators looked for additional bar code sheets and found them. They also examined the downloaded scanner records for that night and found that one of the "completed" discipline module row checks had been scanned in by a deputy from another module on the floor. When interviewed, this deputy admitted using a bar code cheat sheet he had received from a work partner and blithely explained how the fraudulent row scanning was accomplished from the comfort of his desk without having to actually walk the rows. He also stated that he had accidentally scanned the wrong bar code while scanning his own cheat sheet in order to fake his own row checks. That explained why this deputy's identification number appeared as someone who had performed a row check for the discipline module.

Investigators learned that jail authorities had previously suspected that some module deputies might be cheating with the bar codes, but as a result of this

---

[2]These bar codes are similar to the bar codes fond on grocery products which are scanned by employees at checkout to calculate the prices of the products.

4

investigation, the Department now had concrete proof.[3] After some strategizing and conferring with jail authorities and with OIR, Internal Affairs investigators attempted to gauge the full extent of habitual row check scanner fraud throughout the facility. They searched computer memories for digital copies of the bar codes as well as e-mailed copies of the bar code sheets. This search yielded several jail employees who were then interviewed as spin off investigations. Two of these deputies admitted to sharing the cheat sheets with other deputies in the jail and one deputy claimed to know who had developed the cheat sheet to begin with, but he declined to name the cheat sheet inventor. The investigation stopped there until Internal Affairs investigators met with the Custody Operations Chief, who refused to accept the impasse. Investigators were instructed to re-interview the subject and apprise him of the consequences of insubordination and any failure to fully cooperate in internal investigations as well as the Department's expectations that he tell the complete truth. During the subsequent interview, the deputy did reveal the cheat sheet inventor's identity.

When the inventor deputy was interviewed by Internal Affairs, he candidly explained how he had created the cheat sheet system. He found that the scanner contained the data necessary to identify each unique bar code. He found widely available bar code replication software, brought it into the jail, programmed in the bar code identifiers for the desired bar codes and printed out perfect replicas. By arranging them all on one sheet of paper, he could provide an effortless way for deputies to scan the "beginning" and "end" of each row without leaving their seats. Because of this convenience, investigators found that deputies who engaged in fraudulent scanning often tended to pause only momentarily between scans. As a result, the deputies that were using the cheat sheet created a telltale pattern in the scanner memory download records that investigators used along with other corroborative evidence such as the presence of cheat sheets and statements by other deputies in order to build a strong evidentiary case against the offending deputies.

By the end of the inquiry, jail authorities had initiated four separate internal investigations related to the scanner cheating phenomenon. A total of ten subjects were deemed founded for their fraudulent scanner activities and were disciplined. Two deputies -- the discipline module deputy who had not regularly checked on the welfare of the inmate who committed suicide and the cheat sheet inventor deputy -- were discharged. Three deputies received high level suspensions and four deputies and one custody assistant received medium level suspensions. Additionally, the floor sergeant who had failed to adequately supervise the discipline module deputy was deemed founded for failure to supervise and received the maximum suspension available under County ordinance.

In addition to discipline and individual accountability, Custody authorities recognized that this severe defect in the system needed to be addressed in other ways.

---

[3] There have also been other problems with misuse of the scanner system. For example, jail authorities have learned that deputies have downloaded messages into the scanners and used them to transmit messages to one another.

5

Page 202

The corrective actions fell into two categories, immediate fixes and longer term fixes. The immediate fixes included a modification to the scanner software to make it more secure and replacing all of the bar code plaques with new bar codes. Additionally, the captain launched a series of briefings to make it clear to all that further cheating would not be tolerated and reissued a unit order to clear up any ambiguity over deputy responsibilities to attend to their inmate welfare checks or arrange for relief when it was necessary to leave the module. Jail staff was also required to review and sign a document reiterating all policies concerning the use of the scanner.

Jail authorities also set about to design a longer term solution to the problems revealed by the suicide –failure to do timely row checks and failure to supervise those doing the checks. Jail managers have focused their systemic remedial action on the floor sergeant role. Computer screens have been placed in each floor sergeant office that allows the sergeant to monitor the use of the scanner by jail staff in real time. The sergeants have been encouraged to "walk the floor" more frequently and are now required to perform periodic audits of scanner record printouts to look for telltale patterns indicating corner cutting or possible fraudulent activity. We believe this focus on the supervisors is appropriate and will provide the most durable solutions. OIR has requested that the jail conduct its first analysis of the row check computer record audits. We look forward to reviewing the results of that audit and will continue to monitor the reforms with interest.

The scanner cheating cases demonstrate a disappointing lapse in integrity on the part of the involved deputies. Their actions were overt and premeditated and demonstrated wholesale failure on the deputies' part to recognize one of the most important responsibilities of a custody deputy, namely to diligently watch over and provide safety and security for the inmates under his or her supervision.[4] The fact that this wholesale abdication of their responsibilities may have made it more facile for an inmate to commit suicide only demonstrates the real consequences that potentially exist when deputies decide to abdicate their responsibilities as the inmate's "custodians."

It was particularly unfortunate that most of the offending deputies were at the beginning of their law enforcement careers. Nevertheless, the Department's decisive reaction to this potentially massive system failure was commendable. The Department turned over all rocks necessary to evaluate the breadth of the problem and to fashion meaningful corrective actions. The custody system is now able to use the scanner technology with greater confidence and jail supervisors have more tools to help manage their staffs and to enforce the rules that keep the Department in compliance with State mandates. This is unlikely to be the last time that the unintended consequences of technological innovation cause problems for the custody system. This unfortunate episode provides a path for the Department to follow when it needs to react to similar future challenges.

---

[4] The longstanding jail Unit Order on "Safety, Security and Fire Prevention Checks," for instance, begins, "[t]he primary objective of all personnel assigned to [the] Jail is to ensure the safety and security of all inmates housed at [the] Jail."

The two phenomena detailed in this report are consistent with our review of LASD behavior in our nine years as its independent oversight entity, evidence of a majority of deputies doing their job with a sense of purpose and unfortunately, the development, at times, of a sub environment in which an outlier culture can fester and cause deputies to lose their way and sense of mission. It is incumbent on LASD, through effective supervision, to keep all deputies on a path consistent with the core values of the organization.

Please contact us if you have any further questions about the matters covered herein.

Very truly yours,

MICHAEL J. GENNACO
Chief Attorney
Office of Independent Review

ROBERT MILLER
Deputy Chief Attorney
Office of Independent Review

cc: Carl Gallucci, Justice Deputy, Supervisor Don Knabe
Anna Pembedjian, Justice Deputy, Supervisor Michael D. Antonovich
Randi S. Tahara, Board Deputy, Supervisor Mark Ridley-Thomas
Vicky Santana, Justice Deputy, Supervisor Gloria Molina
Joseph P. Charney, Justice Deputy, Supervisor Zev Yaroslavsky
Richard Fajardo, Justice Deputy, Supervisor Mark Ridley-Thomas

Andrea Sheridan Ordin, County Counsel, Office of the County Counsel

William T Fujioka, Chief Executive Officer

Leroy D. Baca, Sheriff, Los Angeles County Sheriff's Department
Larry L. Waldie, Undersheriff, Los Angeles County Sheriff's Department
Dennis H. Burns, Chief, Custody Operations Divison