# Exhibit A

RECEIVED
SEP 21 1993

FILED

SEP 17 1993

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALEJANDRO MADRID, et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. JAMES GOMEZ, Director, California Department of Corrections, et al., Defendants. | NO. C90-3094-TEH CLASS ACTION ORDER |

On request of the plaintiffs and through this Court's inherent powers, and it appearing to the satisfaction of the Court that this is a proper case for issuing a protective order, it is HEREBY ORDERED that defendants, their officers, agents, servants, employees, and all persons acting in concert or participation with them are enjoined and restrained from the following:

1. Threatening plaintiffs with punishment, penalty, or other reprisals, or imposing punishment, penalty, or other reprisals, for initiating and prosecuting the instant action.

2. Threatening other prisoners with punishment, penalty, or other reprisals, or imposing penalty, punishment, or

13

1    other reprisals, for lawfully assisting in prosecution of

2    the instant action in such respects, for example as by by

3    agreeing to present or presenting oral testimony on behalf

4    of plaintiffs in this Court or by providing written answers

5    to questionnaires, affidavits, documents lawfully in their

6    possession, or other information to plaintiff's counsel and

7    their employees.

8    3.    Reading drafts of court papers, affidavits, or other

9    legal documents enclosed in duly designated "Legal Mail"

10   from counsel for plaintiffs to plaintiffs, members of the

11   plaintiff class, and other prisoners (providing that such

12   restriction shall not prohibit correctional officers from

13   carrying out procedures, described in California Code of

14   Regulations, title 15, sections 3144, 3145, which ensure

15   against the enclosure of contraband and other prohibited

16   material).

17   4.    Unreasonably delaying delivery of or secreting mail

18   from plaintiffs and other prisoners to counsel for

19   plaintiffs, or from counsel for plaintiffs to plaintiffs and

20   other prisoners,

21   5.    No provision of this order shall be violated by any

22   artifice or indirection.

23   DATED: 9/17/93

24

25

26

27   Thelton Henderson, Chief Judge
     United States District Court

28

2

14

# Exhibit B

# DECLARATION OF MARY TIEDEMAN

1

## DECLARATION OF MARY TIEDEMAN

2      I, Mary Tiedeman, declare as follows:

3  If called as a witness in this matter, I could and would competently testify to the following matters,

4  which I know of my personal knowledge.

5     1.  From July 2006 until August 2010 I worked for the ACLU of Southern California as the Jails

6  Project Coordinator.  In this declaration, I have described some of my observations of prisoners in

7  the Los Angeles County jail during the first seven months of 2010.

8     2.  As Jails Project Coordinator for the ACLU Foundation of Southern California, my

9  responsibilities included monitoring compliance with orders and directives relating to the *Rutherford*

10  case.  I also visited Men's Central Jail ("MCJ") once or twice per week and the other LA county jail

11  facilities on a regular basis, especially if I received complaints from detainees.

12     3.  The ACLU monitors conditions in the County Jail in several ways.  Prisoners and their

13  family members call and write to us with problems and complaints.  First, we document these

14  complaints in a database and prepare written complaints on behalf of each prisoner, which we them

15  email to the Sheriff's Department or to the County Department of Mental Health.  Second, we visit

16  the different jail facilities on a regular basis. During these visits, we observe conditions and speak to

17  detainees and prisoners.  Since February 2008, I have prepared regular reports to the Sheriff's

18  Department regarding the results of these on-site tours.

19

## MENTAL HEALTH ISSUES

20     4.  I have reviewed and am familiar with the report on mental health issues prepared by Dr.

21  Terry Kupers in 2008. As I monitored conditions in the LA jail in 2009 and through the first half of

22  2010, I saw very little improvement in the treatment of prisoners with mental illness in the jail.

23  Those in MCJ especially, remained without any meaningful mental health treatment; at best, they

24  were provided with medication, and even that was uncertain. In comparison, in the mental health

25  modules in Tower One, prisoners have direct access to the central day rooms where they participate

26  in therapy groups, interact with other staff and prisoners and meet individually with county mental

27  health staff.  Deputies assigned to these areas are supposed to receive special training in dealing with

28

1

1   prisoners with mental illness and, in my experience, are far less likely to impose discipline or punish

2   prisoners for disability-related behavior.

3       5.   However, the prisoners in Tower One go through a routine, constant process of

4   "declassification," in which they are moved out of mental health housing and into general population

5   at MCJ or one of the other jail facilities as soon as they stabilize.  Once people are declassified and

6   sent to MCJ, they can request brief, cell-front interviews with the Jail Mental Evaluation Team

7   ("JMET"), but there are serious problems with this resource.  Prisoners often told me that they feel

8   unsafe speaking about their mental health histories in front of other prisoners.  When JMET

9   interviews them at cell front, their only choice is to talk about their mental health problems in public

10   where others can hear them, or to deny they have issues.  In addition, if they do decide to discuss

11   their problems, the interviews are so fast that the prisoner cannot go into great detail, making it

12   difficult to give the JMET representative a full understanding of the prisoner's current mental health

13   situation.  In 2008, Dr. Kupers recommended that JMET end the practice of cell-front interviews and

14   instead offer private interviews, but the mental health staff have never agreed to this change.  In

15   addition, the only help the JMET staff person can offer in most cases is to send the prisoner to the

16   high observation, suicide watch module on the 7th floor of Tower One for a temporary period.

17   Prisoners have told me on many occasions that JMET actively discourages them from seeking help

18   by warning that on the 7th floor, they will take your clothes away and leave you without even a

19   mattress to sleep on. Although this is accurate, it does not encourage people to seek help with their

20   mental problems.

21       6.   The jail goes through this process of declassification from mental health housing because

22   they do not have enough beds in Tower One to house everyone who needs treatment.  The

23   declassification process is a way to free up beds for new, incoming prisoners. However, the process

24   has turned into a revolving door between Tower One and MCJ, because people who stabilize in

25   Tower One then deteriorate and become suicidal in MCJ, and are returned to Tower one and back

26   again.  One example is individual whom I will call Prisoner A.  In February 2010, I was contacted by

27   his public defender, who stated that the prisoner had been in mental health housing in Twin Tower 1,

28   but that he had just had been "declassified," and transferred to general population and was presently

2

1   housed in Men's Central Jail. The public defender described Prisoner A's long history of severe

2   mental illness including the following: he had been diagnosed with schizophrenia and has been

3   treated with psychotropic medication – Risperdal – for this incurable condition; he qualified for

4   social security disability in the community based on mental illness; he had been found incompetent

5   to stand trial previously and was sent to Patton State Mental Hospital, which recommended that he

6   be retained for further treatment. In addition, he had been housed in mental health housing in Tower

7   One during an earlier jail stay in 2008. I contacted jail staff regarding Prisoner A, asked that he be

8   transferred back to mental health housing, and also filed a complaint on his behalf.

9       7.  I did not receive a response to my complaint or email, so on March 4, 2010, I visited Prisoner

10   A in the jail. He was agitated and very anxious, could not track or follow instructions and was

11   obviously not doing well. I was very concerned about his condition and his safety. He had been

12   seen by the JMET on February 26, but he had not been moved nor was he getting any mental health

13   treatment. I again contacted the jail staff about Prisoner A on March 4, and again received no reply,

14   so I sent a follow-up email on March 10. Finally, mental health staff at the jail informed me that he

15   had been moved out of mental health housing because they concluded that he did not "meet the

16   criteria" for mental health housing.

17      8.  By the end of March, I again followed up on Prisoner A and learned that he had been placed

18   on high observation on the suicide watch floor of Twin Tower One. I again contacted the jail and

19   asked that he be moved to mental health housing on a permanent basis. I received no response. I

20   was also concerned because an ACLU intern and his public defender had both tried to visit him in

21   the attorney visiting area on separate occasions the previous day, but each were told that he had

22   refused to see them. On April 8, I toured the jail and went directly to high observation suicide watch

23   module on the 7th floor of Tower One, where I met with Prisoner A who was still being housed there.

24   Prisoner A told me that he had not refused any visits the previous day and that the deputies did not

25   call him or inform him that he had visitors. In my experience, deputies will sometimes fail to call an

26   inmate for visits in retaliation for complaints or other conduct that the deputies consider to be

27   bothersome. Prisoner A also told me that he had not been allowed to shower for several days and

28   that the deputies refused to give him a mattress, even though his psychiatrist had approved him for

3

1   one. I asked the sergeant to check on the mattress and learned that he got one later on the day of my

2   visit. I also contacted the jail staff again, asking whether he would now be returned to mental health

3   housing on a permanent basis.

4      9.   Five days later, on April 13, I again contacted the jail about Prisoner A because I had not

5   received any response to my inquiry on April 8. I received a response that day that there were no

6   plans to move him to mental health housing. Later, I learned from Prisoner A's public defender that

7   he was soon found to be incompetent to stand trial and was eventually sent to Patton State Hospital

8   again. However, the public defender also stated that he spent the remainder of his jail stay bouncing

9   between MCJ in general population and the suicide observation unit on the 7th floor of Tower One.

10     10. As jail monitor, I am supposed to receive copies of death reports, including reports of both

11   homicides and suicides from the LASD. I received a report of a homicide in March 2010 regarding

12   a prisoner who I later learned had allegedly been killed by his cellmate. I will identify the victim as

13   Prisoner B. I checked the ACLU complaint database and found that he had contacted the jails

14   project in the past during previous periods of incarceration. In these earlier requests for assistance,

15   he had stated that he had a history of mental illness and was seeking mental health treatment. After I

16   received the death report, I followed up with the jail to determine where he was housed when he

17   died. A jail official told me that he had been housed in Twin Tower Two. Tower Two houses

18   prisoners who are considered to be high security, not those with mental illness; Twin Tower One is

19   the only facility that has housing specifically designed for prisoners who are classified as being

20   mentally ill.

21     11. I also received a call from the aunt of Prisoner B who gave me the phone number for his

22   mother. I spoke to her on several occasions and interviewed her at length. She told me that Prisoner

23   B had been diagnosed with schizophrenia and bipolar disorder and that he had been seeing a

24   psychiatrist for treatment in the community before he was arrested. She said that he had been in and

25   out of the jail before, that the mental health staff had previously identified his mental illness and kept

26   him in Tower One, where he could get treatment. According to his mom, this time, the jail staff

27   ignored his mental health history and did not contact his psychiatrist, and put him in Tower Two.

28     12. I was very concerned that Prisoner B had not been placed in mental health housing during

4

DECL. OF MARY TIEDEMAN

1  this stay in the jail, despite the fact that he had been found to require mental health treatment in the

2  past. In my experience, prisoners with mental illness are often at great risk when they are housed

3  with other, non-disabled prisoners in general population. Often, they talk too much, or ask too many

4  irritating questions, so that other prisoners find them to be annoying and might lash out at them. Dr.

5  Terry Kupers talked about this problem in his report on the jail. Nonetheless, in 2010, we have

6  continued to see inmates with mental illness similar to Prisoner B who were housed in general

7  population where they are at great risk of injury from other prisoners.

8      13. In addition, because Prisoner B was housed in a high security general population housing

9  area, Prisoner B did not have access to mental health treatment prior to his death. Both Prisoner A

10  (described above) and Prisoner B had been housed in the jail on earlier occasions, in which their

11  mental illness was identified and treated in mental health housing. However, it is my experience that

12  the jail frequently fails to pay attention to a new inmate's status during previous stays in the jail.

13  This is a problem both with the initial screening, and with the problematic practice of constantly

14  "declassifying" prisoners out of mental health housing and into general population units where they

15  have no access to mental health treatment.

16      14. In addition to the report of the death of Prisoner B, I received several reports of suicides in

17  2010. I received one report of a suicide on February 23, 2010. This prisoner had just been

18  sentenced to an extensive prison term. The period after sentencing is a high risk time for suicides,

19  because prisoners are shocked and despairing and have not yet adjusted to the reality of their

20  situation. I received another report of a suicide on July 16, 2010. I contacted jail officials about his

21  housing area and learned that the prisoner committed suicide while he was still being processed

22  through booking, and that he had not been assigned to a housing area. I am aware of studies and

23  research regarding risk of suicide in jails that indicate that the period of highest risk of suicide is the

24  first 24 hours of incarceration.

25      15. In both these cases, the jail should have been on notice that the prisoner was at high risk of a

26  suicide attempt and taken precautions to ensure this prisoner's safety. I have found that when I

27  identify prisoners who show signs of emotional distress, the jail mental health and custody staff are

28  willing to follow-up. For example, in June 2010, I conducted a monitoring tour of MCJ and visited

5

1    3200B.  In my report to the jail on this visit, I stated: "We met several inmates in 3200B who were

2    declassified from MH housing and were not adjusting well in GP" because they not only receive no

3    mental health treatment, "they do not get out of their cells everyday like they did before, nor do they

4    see any sunlight."  When I asked that mental health staff make special walk-throughs during the next

5    few weeks to ensure these inmates are ok, the chief psychiatrist was appreciative and agreed to do

6    so.   However, the ACLU is able to visit only a small proportion of the jail population, so our

7    monitoring is not the answer to this problem.  The Jail has failed to be proactive and does not

8    systematically identify situations such as these that indicate a heightened risk for suicide, for

9    example, by following up on everyone who has been declassified from the mental health module to

10   make sure they are not in discipline or distress.  This was one of Dr. Kupers' recommendations in

11   2008.

12       16. The issue of suicides is also mentioned in the 8th Annual Report of the Office of Independent

13   Review, which was released in June 2010.  In that report, OIR reviewed the circumstances

14   surrounding the suicide death of John Horton in April 2009, a young man who had just turned

15   twenty.  Horton was confined in a small, dark discipline cell in Men's Central Jail when he hung

16   himself.  OIR investigated and discovered that the deputy in charge of that discipline module had left

17   his post for more than three hours, and falsified the electronic logs to conceal his absence.  As a

18   result, he did not conduct the required safety checks twice per hour.  OIR did not directly attribute

19   the death to the deputies' absence, however.

20       17. I happened to tour the discipline row where Mr. Horton had been confined a few days after

21   his death.  Another prisoner passed a letter to me describing the days before Horton's death and what

22   happened afterwards.  A true copy of this letter is attached to my declaration as Exhibit 1.  The letter

23   describes how Horton showed obvious signs of suicidality, including fashioning a noose and hanging

24   it from the light in an obvious place where deputies and other inmates could see it.  The letter states

25   that he talked to himself for hours and that the deputies teased him and ignored his suicidal behavior,

26   rather than seeking mental health assistance for him. In my experience, this unfortunately is very

27   typical of how many deputies treat prisoners in MCJ who show symptoms of mental illness. As with

28   the letter from the prisoner housed next to Mr. Horton, in my experience other prisoners are often the

6

1  ones who complain to the ACLU about the deputies' inhumane treatment of mentally ill prisoners.

2  **EXCESSIVE FORCE, FAILURE TO PROTECT AND RETALIATION**

3  18.  There is a pervasive climate of fear and violence in the jail.  In my monitoring, I often have

4  seen many prisoners who bear the marks of recent beatings, as black eyes, head injuries, broken

5  bones, etc.  However, many of these prisoners are afraid to speak to me about it.  When they agree to

6  talk, they state that they were beaten by deputies but many then insist on absolute confidentiality and

7  will not allow me to disclose their names to the jail in order to file a complaint.  They are too fearful

8  about retaliation to proceed.

9  19. On the few occasions when prisoners are willing to disclose their names and the details of the

10  excessive force against them, I have provided this information to the Department and asked for an

11  investigation.  Unfortunately, the response from the jail has been very frustrating and discouraging

12  because the Department almost always denies that there is a problem and assumes that the prisoner is

13  lying.  Apparently, the investigator asks the deputy what happened, the deputy denies any use of

14  force and claims that the prisoner was the attacker.  If the investigations go any further, neither the

15  ACLU nor the prisoners are told about the outcome.

16  20. In 2010, we have also received a number of complaints that deputy's target certain prisoners

17  for retaliation by leaving cell doors open to let inmates attack one another.  Only deputies can open

18  or close cell doors, so it seems that they must have some role in the attacks that have been reported

19  to us.  In addition, for the first time this year, we have had reports from multiple sources that

20  deputies at MCJ stage "cock-fights" between prisoners during the late night shifts.

21  21. Deputy retaliation against prisoners who even speak the ACLU has increased steadily over

22  the last two years.  On virtually every monitoring visit to the jail, we encounter several prisoners

23  who refuse to talk to us, explaining that they fear retaliation if deputies see or suspect them of

24  speaking with the ACLU.  Four years ago, ACLU staff members frequently spoke to prisoners about

25  their complaints at cell front.  As incidents of retaliation increased last year, the ACLU monitors

26  reduced cell-front interviews and instead began arranging to speak to prisoners individually in the

27  attorney interview rooms at the jail.  In 2010, retaliation has continued to increase, so that even

28  speaking to an ACLU staff person in the attorney room now carries the risk of retaliation.  The

7

DECL. OF MARY TIEDEMAN

1   deputies openly disparage the ACLU and warn prisoners of the consequences if they complain; other

2   prisoners observe these interactions, which make them even more fearful of speaking up.

3       22. One common form of retaliation for filing complaints is for a deputy to deny the entire row

4   access to showers or TV.  Showers are important to the prisoners in MCJ because in many modules,

5   the telephones are located in or adjacent to the showers, so the only time prisoners can call their

6   families or loved ones is during the shower time.  Television is important because it is the only

7   distraction for prisoners.  If an entire row is denied television because one inmate complained to the

8   ACLU, this creates dangerous situation for the complainant, who must face the anger and resentment

9   of the others in his row.

10      23. Some inmates are subjected to retaliatory searches (which involve the destruction of their

11  personal property), following encounters with the ACLU.  The jail conducts regular searches of

12  every cell, but generally a row at a time.  The retaliatory searches are directed only at the prisoners

13  who complained or spoke the ACLU.  If fewer than 3 cells are involved, the deputies do not require

14  a sergeant's presence. Prisoners also report that during these retaliatory searches, deputies will tear

15  up their family photos and toss all their food in the garbage, food that they (or their relatives) have

16  purchased at great expense from the jail commissary.

17      24. As described in the ACLU's 2009 Annual Report, MCJ adopted a "no retaliation" policy last

18  year in response to our complaints.  However, this policy has had no apparent effect, since we do not

19  see a decrease in the complaints of retaliation. One reason is that the Department has not posted the

20  policy publicly throughout MCJ, so prisoners are not aware of it or how to invoke its protections.  I

21  have repeatedly asked jail officers and others in the Department to post the policy but they have

22  refused.

23      25.  In my experience, some of the injuries that prisoners sustain from beatings and use of force

24  by deputies are life-threatening. Over the course of my monitoring work, I have interviewed a

25  number of prisoners who were hospitalized for many days as a result of deputy beatings.  Just this

26  summer, I interviewed a prisoner who had been beaten by deputies in May 2010.  In later follow-up,

27  our jails project staff confirmed that his injuries included a collapsed lung, two fractures to his spine,

28  fractured ribs on both sides, a broken tooth and head trauma so severe that it has caused brain

8

1  damage and temporary memory loss.  As of the end of June 2010, this prisoner still suffered from

2  blurred vision, intense back pain and facial scarring as a result of the assault.

3       I declare under penalty of perjury that the foregoing is true and correct and that this

4  declaration was signed this 9th day of September, 2010, at Los Angeles, California.

5

6  MARY TIEDEMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

# EXHIBIT
# 1

**NOTE:** THIS HAS BEEN CARBON COPIED AND WILL BE MAILED TO OTHER AGENCIES. AN ADMINISTRATIVE COMPLAINT WAS FILED 4·6·09 REGARDING THESE MATTERS.

## TO THOSE WHO ARE REALLY CONCERNED    3·29·09

### LAST NIGHT MY NEIGHBOR TOOK HIS OWN LIFE??

I DO NOT KNOW EXACTLY HOW BUT HE WAS VERY "STIFF" WHEN THE DEPUTIES PULLED HIM OUT OF HIS CELL. HE APPEARED TO HAVE BEEN DEAD FOR AWHILE. AND I AM NOT SURPRISED. NEGLIGENCE IS RAMPANT HERE. MY NEIGHBOR, JOHN HORTON, WAS NOT AN ENIGMA. HE HAD AND DISPLAYED "OBVIOUS SIGNS" OF MENTAL HEALTH ISSUES. INCLUDING BUT NOT LIMITED TO:

- THE FEW TIMES THEY RAN SHOWERS HE REFUSE TO TAKE ONE. HE WOULD ALWAYS REFUSE HIS "MEDS."
- HE HAD PILES OF TRASH AND OLD FOOD TRAYS STACKED IN FRONT OF HIS CELL. TRASH WAS EVERYWHERE. INSIDE AND SOMETIMES OUTSIDE HIS CELL.
- HE WOULD HAVE OPEN FOOD CONTAINERS (CEREAL, COOKIES, ETC.) LAYED OUT OVER HIS BED THROUGHOUT THE DAY.
- HE WOULD TALK TO HIMSELF 'AUDIBLY' FOR HOURS. (SEVERAL DEPUTIES WOULD COME TO HIS CELL DOOR AND TEASE HIM. ILLUMINATE THEIR FLASH LIGHTS ON HIM 'PLAY FULLY' AND JOKE ABOUT HIM.)
- HE WAS NOT EATING. MANY TIMES HE WOULD PUSH PORTIONS OF HIS FOOD UNDER HIS DOOR TO FEED THE MICE.
- ON SEVERAL OCCASIONS MR. HORTON HAD WHAT OBVIOUSLY APPEARED TO BE A HANG MENS "NOOSE" AFIXED TO THE BACK OF HIS CELL LIGHT. EVEN WHILE DEPUTIES LOOKED ON. I SEEN IT. THEY SEEN IT. MR. HORTON HAS VISIBLY STOOD IN HIS CELL AND/OR

NOTE: DEPUTY ▨▨▨▨ BROUGHT ME BACK FROM THE LAW LIBRARY
AFTER 6PM. THESE 'ITEMS' WERE VISIBLE. DEPUTY ▨▨▨▨
DID NO MORE "WALKS" AFTER 6PM. HE WAS SUPPOSE TO BRING
ME A DINNER TRAY BUT HE NEVER RETURNED. THE NIGHTMAN
② GAVE ME A SACK LUNCH FOR DINNER. DEPUTIES ARE NOT
DOING THEIR "WALKS".

SQUATTING 'ATOP' HIS SINK WITH PLASTIC? TIES
AROUND HIS WRIST, LOOKING DIRECTLY AT THE
NOOSE (SEVERAL DEPUTIES OBSERVED THESE
'ITEMS' AND "BEHAVIOR" UPON BRINGING ME
BACK OR TAKING ME TO THE LAW-LIBRARY) THE
SAME TIME(S) I'VE NOTICED THEM (SEE NOTE
ABOVE)

THESE WERE PROBABLY JUST OF A "FEW" OBVIOUS
SIGNS HE DISPLAYED THAT I WAS ABLE TO OBSER-
VE "GOING AND COMING" FROM LAW-LIBRARY OR
SHOWER. NO TELLING WHAT OTHER BEHAVIOR
PATTERNS HE EXHIBITED TO DEPUTIES THROUGH
OUT THE COURSE OF THREE (3) SHIFTS DURING
HIS STAY HERE. BUT I HAVE HEARD DEPUTIES
CALL HIM "CRAZY" NUMEROUS TIMES. AND AS I
WRITE THIS REPORT I AM TOTALLY AWARE OF THE
HEARTLESSNESS OF MANAGEMENT HERE. AT PRESENT
A CROWD OF "SENIOR" DEPUTIES ARE STANDING IN
FRONT OF (NOW DECEASED "MR HORTON"S) CELL
SMILING AND LAUGHING AS IF THEY ARE THE
CELEBRANTS AT A "LYNCH" PARTY.

A HUMAN BEING IN LOS ANGELES COUNTY JAIL HAS
NO RIGHTS THAT THE SHERIFFS FEEL BOUND TO
RESPECT.

MR. HORTONS LIFE COULD HAVE DEFINITELY BEEN SAVED.
THAT IS, IF THE LASD, HAD ANY RESPECT FOR
"INMATES LIVES." BUT THEY DON'T.

THIS IS THE TYPE OF NEGLECT, DELIBERATE INDIFF-

NOTE:

I HAVE EVEN WENT ON SUICIDAL WATCH TO GET OUT OF THIS HOLE. IT IS STRUCTURALLY DEPRESSIVE AND MENTALLY UNHEALTHY. THIS IS NOT A SAFE PLACE. IF I HAVE NOTED THESE "SIGNS" HOW COULD DEPUTIES BE BLIND TO THEM?

③ ERENCE AND CALLOUSNESS I HAVE WELL DOCUM-ENTED IN THE LAST YEAR.

ON MAY 27, 08 i FILED A GROUP COMPLAINT WITH OTHER INMATES ABOUT JAIL CONDITIONS AND SUBMITTED IT TO MELINDA BYRD, ACLU.

ON MANY OCCASIONS IN 2008 i HAVE TRIED TO CALL PEOPLES ATTENTION TO A SYSTEM THAT IS TOTALLY OUT OF CONTROL.

ON JANUARY 20, 2009 ME AND SEVERAL OTHER DECLARANTS FILED COMPLAINTS WITH THE COURTS (DEPT. 100 / CCB) AND WITH '6' OTHER AGENCIES (INCLUDING THE ACLU) REGARDING DEPUTIES BEHAVIOR AT MCJ.

THE DEPUTIES HAVE NO RESPECT FOR HUMAN LIFE, ESPECIALLY "INMATES LIFE".

NOW, MAY BE SUICIDES HAVE BECOME ALL TOO COMMON AROUND HERE AND THE CIRCUMSTAN-CIAL ISSUES OF NEGLECT GO UNREPORTED AND UNHEARD OF BECAUSE A) DEAD BODIES DON'T TALK B) MOST INMATES ARE AFRAID AND RELUCTANT TO WRITE CERTAIN COMPLAINTS AND C) STAFF/DEPUTIES HAVE PRE-REHEARSED SCRIPTS ON HOW TO COVER-UP, EXPLAIN AWAY AND MINIMIZE THE LOST OF A LIFE by SUICIDE. JOHN HORTONS LIFE COULD HAVE BEEN SAVED!! BUT WHO REALLY CARES?

JUST MOMENTS AGO I HEARD THE LIGHT CHATTER OF DEPUTIES "CHOREOGRAPHING" THEIR VERSION OF EVENTS... "I JUST WALKED... THE SGT CAME

| NOTE: | SADLY, THE STAFF ARE ALMOST GUARANTEED SPECIAL 'SAFE-GAURDS' BECAUSE RACIAL AND JAIL POLITICS prevent inmates FROM SPEAKING OUT. MOST INMATES FOLLOWING THIS FALSE HONOR CODE WILL ALMOST ALWAYS SAY "I DIDNT HEAR OR SEE ANYTHING" LYING THROUGH THEIR TEETH! |

④

AND HE WALKED... AND YEAH THE GUY LOOKED AS THOUGH HE WAS SITTING UP TALK-ING TO HIMSELF... ETC... ETC... THAT "GUY" (MR. HORTON) WAS "STIFF AS A BOARD" WHEN THEY PULLED HIM OUT OF THAT CELL. EVEN THE PARAMEDIC (HE WAS DRESSED IN WHAT APPEARED TO BE A FIREMEN SUIT?) ASKED THE DEPUTY: "HOW LONG WAS HE IN THERE? HIS BODY IS VERY STIFF"

WHEN THEY PULLED HIM FROM THE CELL I JUST KNEW HE WAS DEAD! BUT I KNOW IF STAFF HAD'VE LISTENED WHEN I TOLD THEM "HE NEEDS HELP" THIS TRAJEDY COULD HAVE BEEN AVOIDED. BUT I KNOW THE "MAGICIANS" ARE GONNA MAKE THIS ALL APPEAR LIKE A "REGULAR DEATH" WHERE THEY WERE JUST DOING THEIR JOBS AND JOHN HORTON AT THE "OPPORTUNE TIME" TOOK HIS OWN LIFE. I DISAGREE: THE LASD IS COMPLICIT THROUGH NEGLECT AND COLD-HEARTED COMPLACENCY. WHO CAN STOP THEM? THE DRESS REHEARSAL STARTED THE SECOND MR. HORTONS 'STIFF BODY' WAS YANKED OUT THE CELL. THE MOMENT THEY BEGAN TO THINK OF WAYS TO "COVER UP" THIS INCIDENT IS THE SAME INSTANT IT WENT FROM A SUICIDE TO A NEGLIGENT HOMICIDE. AND IF EVERYBODY IS PLAYING THEIR 'ROLES' CORRECT-LY ACLU WILL BE WALKING WITH THEIR CLIP BOARDS SOON ASKING IF "ANYBODY SEEN ANYTHING." IF ONLY MR. HORTON COULD TELL HIS STORY!

# Exhibit C

# DECLARATION OF PRISONER #8
# MARIO LOVE

# DECLARATION OF MARIO LOVE

I, Mario Love, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in the custody of the Los Angeles County Sheriff's Department for three weeks. I am currently housed in Men's Central Jail in module 2600.

3. In early June I witnessed a bunch of sheriff's deputies beat Jimmie Knott. I know Jimmie because I met him on the roof during recreation hours and since then we have played on the same basketball team. The beating happened last week between 8 and 10 in the morning when we were lined up in the hallway outside module 2600 for our second Hepatitis shot.

4. It started when a deputy asked Jimmie Knott to tuck in his shirt. I heard Jimmie ask, "If I tuck in my shirt, can I get some shoes?" Jimmie explained to the deputy that his were torn and he needed new ones. Then I heard the deputy accuse Jimmie of being a "smart ass" and saw multiple deputies pull him out of line. Next they made Jimmie strip down to his boxers and get down on his knees by the wall. They told him to put his hands behind his back.

5. I could see that Jimmie did what they asked and put his hands behind his back, but the deputies started to hit him anyway. The deputies beat him with flashlights and fists and kicked him repeatedly. Each time they hit him, I could see Jimmie lunge forward in visible pain. He tried to keep his hands back, but each time he did he gave the deputies an open target. His natural instinct was to protect himself just like anyone else would. After the first few kicks and punches, I saw Jimmie fall onto his side and curl into a ball on the ground. It was nearly impossible for him to keep his hands back while taking all that abuse.

6. One of the first blows came from an officer named Sanchez. I'm sure it was him because I glanced at his nametag as they took us out of our cells for the shots. I remembered his name because I noted that he had more stripes on his uniform than a deputy. I have also seen him enough times around the module to recognize him. Sanchez is around 5'8" and weighs about 200 pounds. He's Hispanic, bald, and has a stocky build.

7. The number of deputies involved in the beating started out small, but once it began, more ran out

1
DECLARATION OF MARIO LOVE

from the other modules and joined in.  I saw deputies come out from both 2600 (my module) and the 2900 module because it was right next to mine.  I believe that deputies ran out from module 2400 as well, but that was on the other side from me so I can't be certain.  One of the deputies must have radioed something in, because about six to ten deputies all came out at the same time. It was like they were responding to an alarm, and I know about that because I've been in the California Department of Corrections.  I've seen the deputies respond to alarms before and it looked just like that.  Their response was coordinated.

8.  Once these deputies arrived, they joined in with the others in beating Jimmie with flashlights and closed fists.  They hit him all over his back, chest, and legs.  They kept yelling for him to put his hands behind his back and he kept screaming "I am!  I'm trying!"

9.  This went on for about thirty seconds to a minute before another deputy told us to turn and face the wall and sit down with our heads between our legs.  We sat Indian-style with our heads down so that we couldn't see what was happening.  A deputy even told us, "If I see any eyeballs you guys are next."  But I could still hear the beating going on.  I don't know how long we sat like that, but after a while we couldn't hear Jimmie's screams anymore.

10. We stayed facing the wall until they called us in for our shot.  They must've taken Jimmie away at some point, but we weren't allowed to turn around, so I didn't see what they did with him. Since that day, no one has seen him.  It's like he disappeared.  There have been rumors that Jimmie's in the hospital with a punctured lung and cracked ribs, but no one knows for sure.

11. The deputies seemed almost proud of what they did to Jimmie.  Right after the beating, one of the deputies was talking to another deputy about how he had hurt his arm.  He was standing right behind me while I sat next to the wall, so I heard him say that he caught his arm on another deputy while trying to uppercut Jimmie.  He was basically bragging about it.  I think it was Deputy Valencia and another inmate told me this when we talked about the incident later.  I can definitely recognize that deputy by looks, because while we were sitting there against the wall I raised my hand to ask if I could leave.  My back was hurting, and I just wanted to get out of there. He didn't let me go, but I looked up at this time and saw him.  Deputy Valencia is young, between 22 and 28, with a slim build.  He is white-looking with a possible Hispanic mix and around 155-

2

DECLARATION OF MARIO LOVE

165 pounds.

12. A couple weeks later, when they took us in to the Attorney Room the first day I spoke with the ACLU, something strange happened. While the ACLU was waiting to talk to Gerardo Diaz and me, the deputies pulled us aside for a good ten minutes. They asked us about our cases and what we're in jail for, but I know they're not allowed to do that so I didn't answer. The whole interrogation was intimidating. It was like a scare tactic, like they were trying to manipulate us. I've been called in to the Attorney Room before, and that was the first time I had been pulled aside like that. The ACLU called both Gerardo Diaz and me in at the same time, so I think that made the deputies suspicious that we might be talking about what happened with Jimmie.

13. I was scared to talk to the ACLU about what happened. I'm afraid that the deputies will beat me too if they find out what I'm doing. But what the deputies did just wasn't right. I know if that happened to me, I'd want someone to know about it. It wasn't just a couple of slaps, it was completely over-the-top. It was like a gang beating. And I've been in a gang, but I've never seen anything that extreme before. The deputies were like a pack of wolves.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed June 29, 2010 in Los Angeles, California.


**MARIO LOVE**

3
DECLARATION OF MARIO LOVE

# Exhibit D

# DECLARATION OF PRISONER #5a
# ROBERT DRAGUSICA

# DECLARATION OF ROBERT DRAGUSICA

I, ROBERT DRAGUSICA, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am inmate at Men's Central Jail, where I have been for about 11 months. I previously completed a declaration on conditions and violence at the jail, which I signed on June 25, 2010.  From the time I first spoke to the ACLU in the attorney room regarding that declaration, to when I spoke to the ACLU on my row a few weeks later, I have been repeatedly intimidated and questioned by deputies about my interactions with the ACLU.  Additionally, I believe very strongly that the deputies retaliated against me for coming forward, when they claimed on July 1st that I had contraband in my cell and put me in the hole for 29 days.

3.    I have seen a lot of things in this jail during my time here and, about four months ago, I told the chaplain, who I regularly speak to, that I saw some pretty nasty stuff. But I was afraid to come forward because the kind of power the deputies have over you is very scary. After a few more months, I decided I needed to do something, so I wrote to the ACLU and told the chaplain I was ready to talk. This was in early June 2010.

4.    The ACLU visitor, who identified herself as Lisa, came on a Wednesday. She interviewed me about a variety of problems at the jail. She told me she would come back the next Friday – two days later – to complete my statement.

5.    That Friday I got an attorney pass. The deputy working the module yelled down the tier something along the lines, "Hey Dragusica, you got a pass, ACLU," and some other derogatory remark about the ACLU. There were three deputies there to cuff me up. I felt very intimidated with so many deputies there, because that was not normally how they did things when I had other attorney visits. Usually, just one deputy will escort one or two K10 inmates if they have a pass.  It is a very rare occasion when multiple deputies come to escort one inmate.  That just doesn't happen.  Because I was scared, I told them that I was just talking to the ACLU because of medical. However, I felt intimidated, so I just refused the pass and said I would take care of medical myself.

6.    The next Tuesday, my gate was popped again for a pass. Five people from the Sheriff's

1   Department were there. As they were taking me to the end of the row, they asked, "What's this about?" I

2   told them I have medical problems and I said, "You know me, Perez; I don't complain." Perez works in

3   the module as a custody assistant. But again, I felt intimidated with so many sheriffs there, which isn't

4   normal, so I refused the pass again.

5          7.    Over the next few days the deputies started walking by my cell. They would make

6   comments about the ACLU and ask out loud, "Who's talking to ACLU?" I heard the inmate in cell 6 say

7   something and then the word "ACLU," and then I heard Deputy Luviano say, "I wonder who that was,"

8   in a sarcastic voice.

9          8.    I saw the chaplain on Thursday and told him the issues I'd been having with my passes.

10   The next day, Friday, I took the pass when I got it because I felt better after having told the chaplain, and

11   also because it was a Friday and there were fewer regularly assigned deputies working the module that

12   day.

13          9.    When I talked to Lisa, I told her that I was worried that the jail would plant a weapon on

14   me. I have heard about deputies planting a razor or other weapons on inmates before so they could put

15   them in discipline. I asked her to make a record that I was worried about getting set up since I was

16   talking to the ACLU about jail conditions. After I signed the declaration, I told Lisa that there were

17   issues on the row and that it would be good if they could walk the row. Lisa said she would see about

18   having someone from the ACLU walk the row.

19         10.    The next Tuesday, June 29, and Wednesday, June 30, the ACLU came to my row. On

20   Tuesday I spoke to Mary from the ACLU at the cell front. I saw [a] deputy walk the row behind Mary

21   when I was talking to her. As soon as the ACLU left that day, the deputies immediately turned off the

22   TVs. They have been using the TVs as a form of control in the jail. They make us choose between

23   showers or TV.

24         11.    On June 30, I also talked to the ACLU when they came to my row. This was in [the]

25   morning. After they left, I searched my cell to make sure there weren't any problems in there because I

26   was worried the jail would plant a weapon in my cell. I have heard about them doing that to inmates

27   before. After the ACLU left, some other inmates asked for showers and I heard the deputy say, "No

28   because you were talking to the ACLU."

2

DECLARATION OF ROBERT DRAGUSICA

12.     The next day, the TV was off the first shift and into the second. After about 7 or so – it was after dinner clean-up, so I am estimating – people again started asking for TVs. People were getting grumpy.  Some inmates had fashioned a stick like object made out of materials from the jail, such as the paper we have available on the tier.  It was not hard but we thought we could use it to turn on the TV. We were passing it down the row, from the back to the front.  I passed it down the row, too.  But no one seemed to want to use it.  Since we didn't want to use the stick, I and other inmates asked one of the inmate workers -- we called him Guero – to turn on the TV. He did so, begrudgingly.  My experience is that inmate workers are between a rock and hard place. Meanwhile, the inmate in cell 6 had gotten hold of a jail-made stick that the inmates were going to try to use to turn on the TV.

13.     Right then Newhouse, who is a regular deputy on the tier, walked by the front of the row, outside the gates. From his reaction, it seemed like the guy in cell 6 thought Newhouse saw him, so he crumpled the stick and threw it on the tier.  He could do that because the stick was made out of paper and could easily be bent.  He had put the crumpled stick in a plastic lunch bag.  Deputy Rodriguez was talking to some inmate at the end of the row at that time as well. Deputy Rodriguez was doing row walks at that time.

14.     Then about five minutes later, Deputies Newhouse and Rodriguez, and another custody assistant returned to the row. They came directly to my cell. They asked how the TV got turned back on. They then said they were going to do a search. They took me, I was in cell 11, [and those in] cell 12 and cell 13 out of our cells and down to the showers. The showers are out in front of the tier, outside the deputy booth, but inside the module.

15.     They then trashed our cells doing a search of each of them. I could hear them ripping up our stuff.

16.     I then saw the deputies come off the tier and Deputy Rodriguez had two razors in his hand. The deputies told the other two inmates to go back to the row and did not appear to give them any discipline.  I know it is standard practice in the jail that if you get charge with a possible disciplinary infraction, K10s are sent directly to hole, module 3301, so these inmates would have been sent to 3301 if they were going to be given discipline. He did, however, tell me to go to the hole. Deputy Newhouse was the one who told me to go the hole.

3

DECLARATION OF ROBERT DRAGUSICA

17.   I asked why. He said it was because of the contraband in my cell. I asked what contraband was he talking about. He said, "that stick." And I said, "you didn't see a stick in my cell; it was balled up on the front of the tier."

18.   Rodriguez then entered the area by the hole in 3301 where we were standing and Newhouse went over to him. I heard Newhouse say something and then, "Razor, then?" Newhouse then took me to my cell in 3301, where I am still currently housed.

19.   About two days later, on a Saturday, a senior and another deputy came to my cell and told me I was in the hole for a razor blade. I was really stressing out because I did not have a razor and I did not want to get an "add charge," which is what they call an additional case. I was really outraged because this was exactly what I had been worried about when I gave the declaration about problems in the jail.

20.   I was not allowed to appeal the decision to put me in the hole. I haven't been sent to the hole during this entire incarceration, which has been since August of last year, so I didn't know how it worked. In fact, I've been in discipline I believe just once, and that was 11 years ago in 1999. I have since learned that I was supposed to appeal the disciplinary sentence to a supervisor immediately. Even if I'd known the procedure, it is very difficult to get a hold of Sheriff's people in the hole and the Senior who gave me my sentence just shoved the paper in my tray slot and immediately walked away after he told me my sentence. Furthermore, I didn't see a deputy walk my row until hours later, let alone a Supervisor. I very rarely have seen supervisors, such as Sergeants or Lieutenants in the hole. .

21.   I am now housed in the K10 discipline area, which is called 3301. Being in the hole is awful. The room is tiny and it has a solid cell door so it is very isolating and extremely dark. The only time we are even allowed out is to shower every other day, and if we get passes for the attorney room or medical. We don't go outside, get visits or the phone. It's extremely depressing and very cut off from other people. It makes me feel like anything could happen in there and no one would know.

22.   A few days later, when Newhouse came back, I asked what was going on. He said he'd check, then he came back a bit later and said I was in for a shaver. This is different than a razor -- a razor is when the blade is removed and is considered more dangerous because the razor has been altered and can be used as a weapon. A shaver is what you call the entire object that you use to shave; it includes the plastic along with the razor. Earlier this week I spoke to Mary from the ACLU when she came to visit

1   me in the hole. I am still in the hole and am not due to be released until the end of July. I am not exactly

2   sure of my release date, but I came in on 7/1 and they gave me 29 days, so I think it's 7/29. Mary told

3   me she had looked on the sheet in the deputy's office and it said that I was in the hole for a "disturbance."

4   It isn't clear to me why the jail even says they gave me 29 days in the hole but I think it is retaliation for

5   speaking with the ACLU about conditions in the jail.

6       23.     I think this is retaliation. I've never ever had a problem with the deputies in here before. I

7   don't think the deputies ever liked me because I don't play politics with the other inmates – which I

8   believe benefits the deputies to do power trips, because they can pit inmates against each other. In any

9   case, I've never had any problems before I started talking about problems with the jail to the ACLU.

10      24.     Another example of this intimidation happened two nights ago. I got a late pass to

11   medical, which is strange, actually, to get a pass that late. It may have been because I refused to sign that

12   I'd seen the doctor when I didn't see one. When I was returning from the clinic, Deputy Newhouse asked

13   me if I was talking to the ACLU. He said, "Why are you talking to those people?" I told him it was for

14   medical and he said something to the effect of, "Dude, just don't talk to those people, man. They're

15   pieces of shit."

16      25.     I will take a polygraph test about what happened regarding this situation if the three

17   deputies involved agree to do so as well.

18      26.     I am very worried about what will happen after this. I am worried they'll make up more

19   razors or put me in a dangerous situation, where I could get hurt. For example, yesterday after I spoke to

20   Mary again in the attorney room, they have since moved three active gang members in the cells next to

21   me and I am worried they'll open the gates and I'll get beat up. I am not active; I am ad-seg K10. I am

22   not violent and don't use weapons. I have a drug problem. This is really scary to me; they do this just for

23   complaining.

        I declare under penalty of perjury of the laws of the State of California and the United States that

24   the foregoing is true and correct. Executed this 16th day of July, 2010 in Los Angeles, California.

25

26

27                          
                            _____/s/_____

28                          **ROBERT DRAGUSICA**


                                    5
                    DECLARATION OF ROBERT DRAGUSICA

39

# DECLARATION OF ROBERT DRAGUSICA

I, ROBERT DRAGUSICA, hereby declare:

    1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

    2.    I am inmate at Men's Central Jail, where I have been for about 11 months. I previously completed a declaration on conditions and violence at the jail, which I signed on June 25, 2010.  From the time I first spoke to the ACLU in the attorney room regarding that declaration, to when I spoke to the ACLU on my row a few weeks later, I have been repeatedly intimidated and questioned by deputies about my interactions with the ACLU.  Additionally, I believe very strongly that the deputies retaliated against me for coming forward, when they claimed on July 1st that I had contraband in my cell and put me in the hole for 29 days.

    3.    I have seen a lot of things in this jail during my time here and, about four months ago, I told the chaplain, who I regularly speak to, that I saw some pretty nasty stuff. But I was afraid to come forward because the kind of power the deputies have over you is very scary. After a few more months, I decided I needed to do something, so I wrote to the ACLU and told the chaplain I was ready to talk. This was in early June 2010.

    4.    The ACLU visitor, who identified herself as Lisa, came on a Wednesday. She interviewed me about a variety of problems at the jail. She told me she would come back the next Friday – two days later – to complete my statement.

    5.    That Friday I got an attorney pass. The deputy working the module yelled down the tier something along the lines, "Hey Dragusica, you got a pass, ACLU," and some other derogatory remark about the ACLU. There were three deputies there to cuff me up. I felt very intimidated with so many deputies there, because that was not normally how they did things when I had other attorney visits. Usually, just one deputy will escort one or two K10 inmates if they have a pass.  It is a very rare occasion when multiple deputies come to escort one inmate.  That just doesn't happen.  Because I was scared, I told them that I was just talking to the ACLU because of medical. However, I felt intimidated, so I just refused the pass and said I would take care of medical myself.

    6.    The next Tuesday, my gate was popped again for a pass. Five people from the Sheriff's

*Robert F. Dragusica*

1
DECLARATION OF ROBERT DRAGUSICA

1    Department were there. As they were taking me to the end of the row, they asked, "What's this about?" I

2    told them I have medical problems and I said, "You know me, Perez; I don't complain." Perez works in

3    the module as a custody assistant. But again, I felt intimidated with so many sheriffs there, which isn't

4    normal, so I refused the pass again.

5         7.    Over the next few days the deputies started walking by my cell. They would make

6    comments about the ACLU and ask out loud, "Who's talking to ACLU?" I heard the inmate in cell 6 say

7    something and then the word "ACLU," and then I heard Deputy Luviano say, "I wonder who that was,"

8    in a sarcastic voice.

9         8.    I saw the chaplain on Thursday and told him the issues I'd been having with my passes.

10   The next day, Friday, I took the pass when I got it because I felt better after having told the chaplain, and

11   also because it was a Friday and there were fewer regularly assigned deputies working the module that

12   day.

13        9.    When I talked to Lisa, I told her that I was worried that the jail would plant a weapon on

14   me. I have heard about deputies planting a razor or other weapons on inmates before so they could put

15   them in discipline. I asked her to make a record that I was worried about getting set up since I was

16   talking to the ACLU about jail conditions. After I signed the declaration, I told Lisa that there were

17   issues on the row and that it would be good if they could walk the row. Lisa said she would see about

18   having someone from the ACLU walk the row.

19        10.   The next Tuesday, June 29, and Wednesday, June 30, the ACLU came to my row. On

20   Tuesday I spoke to Mary from the ACLU at the cell front. I saw [a] deputy walk the row behind Mary

21   when I was talking to her. As soon as the ACLU left that day, the deputies immediately turned off the

22   TVs. They have been using the TVs as a form of control in the jail. They make us choose between

23   showers or TV.

24        11.   On June 30, I also talked to the ACLU when they came to my row. This was in [the]

25   morning. After they left, I searched my cell to make sure there weren't any problems in there because I

26   was worried the jail would plant a weapon in my cell. I have heard about them doing that to inmates

27   before. After the ACLU left, some other inmates asked for showers and I heard the deputy say, "No

28   ~~talking to the ACLU.~~" because you were talking to the ACLU. (R.D)

2
DECLARATION OF ROBERT DRAGUSICA

*Robert F. Dragusica*

41

12.     The next day, the TV was off the first shift and into the second. After about 7 or so – it was after dinner clean-up, so I am estimating – people again started asking for TVs. People were getting grumpy. Some inmates had fashioned a stick like object made out of materials from the jail, such as the ~~plastic bags our canteen/store arrives in~~ paper. We have available on the tier. (R.D) It was not hard but we thought we could use it to turn on the TV. We were passing it down the row, from the back to the front. I passed it down the row, too. But no one seemed to want to use it. Since we didn't want to use the stick, I and other inmates asked one of the inmate workers – we called him Guero – to turn on the TV. He did so, begrudgingly. My experience is that inmate workers are between a rock and hard place. Meanwhile, the inmate in cell 6 had gotten hold of a jail-made stick that the inmates were going to try to use to turn on the TV.

13.     Right then Newhouse, who is a regular deputy on the tier, walked by the front of the row, outside the gates. From his reaction, it seemed like the guy in cell 6 thought Newhouse saw him, so he crumpled the stick and threw it on the tier. He could do that because the stick was made out of ~~plastic~~ (R.D) paper and could easily be bent. He had put the crumpled stick in a plastic lunch bag (R.D) Deputy Rodriguez was talking to some inmate at the end of the row at that time as well. Deputy Rodriguez was doing row walks at that time.

14.     Then about five minutes later, Deputies Newhouse and Rodriguez, and another custody assistant returned to the row. They came directly to my cell. They asked how the TV got turned back on. They then said they were going to do a search. They took me, I was in cell 11, [and those in] cell 12 and cell 13 out of our cells and down to the showers. The showers are out in front of the tier, outside the deputy booth, but inside the module.

15.     They then trashed our cells doing a search of each of them. I could hear them ripping up our stuff.

16.     I then saw the deputies come off the tier and Deputy Rodriguez had two razors in his hand. The deputies told the other two inmates to go back to the row and did not appear to give them any discipline. I know it is standard practice in the jail that if you get charge with a possible disciplinary infraction, K10s are sent directly to hole, module 3301, so these inmates would have been sent to 3301 if they were going to be given discipline. He did, however, tell me to go to the hole. Deputy Newhouse was the one who told me to go the hole.

17.     I asked why. He said it was because of the contraband in my cell. I asked what contraband

Robert F. Dragusica

3
DECLARATION OF ROBERT DRAGUSICA

42

1  was he talking about. He said, "that stick." And I said, "you didn't see a stick in my cell; it was balled up
2  on the front of the tier."

3     18.   Rodriguez then entered the area by the hole in 3301 where we were standing and
4  Newhouse went over to him. I heard Newhouse say something and then, "Razor, then?" Newhouse then
5  took me to my cell in 3301, where I am still currently housed.

6     19.   About two days later, on a Saturday, a senior and another deputy came to my cell and told
7  me I was in the hole for a razor blade. I was really stressing out because I did not have a razor and I did
8  not want to get an "add charge," which is what they call an additional case. I was really outraged because
9  this was exactly what I had been worried about when I gave the declaration about problems in the jail.

10    20.   I was not allowed to appeal the decision to put me in the hole. I haven't been sent to the
11 hole during this entire incarceration, which has been since August of last year, so I didn't know how it
12 worked. In fact, I've been in discipline I believe just once, and that was 11 years ago in 1999. I have
13 since learned that I was supposed to appeal the disciplinary sentence to a supervisor immediately. Even
14 if I'd known the procedure, it is very difficult to get a hold of Sheriff's people in the hole and the Senior
15 who gave me my sentence just shoved the paper in my tray slot and immediately walked away after he
16 told me my sentence. Furthermore, I didn't see a deputy walk my row until hours later, let alone a
17 Supervisor. I very rarely have seen supervisors, such as Sergeants or Lieutenants in the hole. .

18    21.   I am now housed in the K10 discipline area, which is called 3301. Being in the hole is
19 awful. The room is tiny and it has a solid cell door so it is very isolating and extremely dark. The only
20 time we are even allowed out is to shower every other day, and if we get passes for the attorney room or
21 medical. We don't go outside, get visits or the phone. It's extremely depressing and very cut off from
22 other people. It makes me feel like anything could happen in there and no one would know.

23    22.   A few days later, when Newhouse came back, I asked what was going on. He said he'd
24 check, then he came back a bit later and said I was in for a shaver. This is different than a razor – a razor
25 is when the blade is removed and is considered more dangerous because the razor has been altered and
26 can be used as a weapon. A shaver is what you call the entire object that you use to shave; it includes the
27 plastic along with the razor. Earlier this week I spoke to Mary from the ACLU when she came to visit
28 me in the hole. I am still in the hole and am not due to be released until the last the end of July. I am not

*(R.D.)*

*Robert F. Dragusica*

4
DECLARATION OF ROBERT DRAGUSICA

43

*Robert F. Dragusica*

1  exactly sure of my release date, but I came in on 7/1 + they gave me 29 days,
2  so I think it's 7/29. Mary told me she looked on the sheet in the deputy office + it
3  said I was in the hole for a "disturbance." It isn't clear to me why the jail would
4  say they gave me 29 days but I think it's retaliation for speaking
5  with the ACLU about conditions in the jail.
6  23. I think this is retaliation. I've never had a problem with the deputies
7  in here before. I don't think the deputies ever liked me because I don't play
8  politics of the other inmates — which I believe benefits the deputies to do power
9  trips, because they can pit inmates against each other. In any case, I've never
10  had any problems before I started talking about problems w/ the jail to ACLU
11  24. Another example of this intimidation happened two nights ago. I got a
12  late pass to medical, which is strange, actually, to get a pass that late. It
13  may have been because I refused to sign that I'd seen the doctor when I didn't
14  see one. When I was returning from the clinic, Deputy Newhouse asked me if I was
15  talking to the ACLU. He said, "Why are you talking to those people?" I told him
16  it was for medical + he said something to the effect of, "Dude, just don't
17  talk to those people, man. They're pieces of shit."
18  25. I will take a polygraph test about what happened regarding this
19  situation if the 3 deputies involved agree to do so as well.
20  26. I am very worried about what will happen after this. I'm worried they'll
21  make up more charges or put me in a dangerous situation, where I could
22  get hurt. For example, yesterday after I spoke to Mary again in the
23  attorney room, they have since moved three active gang members in the cells
   and I am worried they'll open the optics and I'll get beat up.
24  next to me. I am not active; I am ad-seg K10. I am not violent + don't use weapons.
25  I have a drug problem. This is very scary to me; they do this just for complaining.
26  I declare under penalty of perjury of the laws of the state of California and the
27  United States that the foregoing is true and correct. Executed this 16th day of July, 2010
28  in Los Angeles, California. *Robert F. Dragusica   Robert F. Dragusica*

(R. D)

# Exhibit E

# DECLARATION OF PRISONER #35 DAYSHAUN RUSHING

### Declaration of Daysuan Rushing

I, Daysuan Rushing, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am an inmate at Men's Central Jail. I have been housed here for approximately one year. During that time I have witnessed and experienced many retaliatory acts by the deputies here when inmates complain.

3.      On March 2, 2009, I was housed in 3301 module when an ACLU representative, Mary, walked down my row. I knew who she was because I had spoken to her before about complaints I had in county jail. When she came to my cell to ask me how things were going I told her that the deputies had not been giving us showers and that I needed to see the doctor for a medical issue.

4.      I went to court a day or so later and I returned back on the early bus, which was around 1 in the afternoon. An officer, whose name I do not remember escorted me up to module 3301. I was waistchained, meaning my hands are chained to my sides. When we walked up to 3301, Officer Zuniga was sitting at the desk. My escorting officer put me up against the wall, with my nose on the wall. He told Officer Zuniga to rack my cell door. Zuniga replied "hold on Rushing" He then started putting on gloves and asked if I had any contraband. I told him I had a peanut butter sandwich in my sock. Zuniga proceeded to search me, but by the way he was pulling on my clothes, I knew I was in trouble.

5.      Zuniga said to me "you don't like my program" and I asked him what program is that? He then asked me why I don't like his shower program. I asked him what did he mean by that. The he told me that "we can fix that" and he slapped the back of my head with his open hand. I called

Declaration of Daysuan Rushing

46

him a punk and then he slapped me again.  I was wearing glasses at the time so I turned my head up against the wall.  The whole time the other deputy, the one who escorted me, was just standing there.

6. Next Zuniga kicked my legs out from under me and I was spread eagle up on the wall, still waist chained.  He kicked me again and I lost my balance and fell.  Then Zuniga just started punching me in the back.  Then the other officer joined in and they both started kicking me.  My face was sideways on the ground so I could tell that Zuniga was still kicking me.  He then smacked the flashlight across my face.  The flashlight hit me on my face.  Then he hit me in the jaw with the flashlight.  Then they hit me in the knees.  The deputies have technique where they hit inmates on their elbows and knees so it makes you limp around.  I have witnessed them do this to other inmates and I have also experienced it.  In fact, my legs are still swollen from them hitting my legs.  While I was down on the ground they also sprayed me in the face.  While I was down on the ground Zuniga said "you fucking whiners, tell this to the ACLU, I dare you"

7. The deputies then grabbed me by my pants and threw me off the stairs down out of 3301 towards 3300/3100.  Down there were a whole bunch of deputies.  It was weird, it was like they were clapping or something.  Then Deputy Ruiz, who also works on that floor and who I have dealt with before, came up and sprayed me in the face.  I was bleeding all over the place.

8. They put me on a gurney and I went to the hospital.  I had to have stitches on both sides of face.  I was there for a few days and they sent me back to 3301.  I was really freaked out that they sent me back to the same spot.  I stayed there for a night and then Sgt Barbosa came and escorted me to the clinic at MCJ.  At the clinic they were worried about my head they said, so I was transferred to the 7000FL, which is the hospital floor at CJ.  While I was up there, my face mostly healed - visually at least - and then the jail moved me down to 1750.  I was really worried to go there because I knew

Declaration of Daysuan Rushing

Deputy Ruiz used to work there. He had just been moved, I was relieved to hear from deputies and other inmates, because he beat up some Avenues gang members a few days earlier.

9. Retaliation happens all the time around this jail. Most of these deputies are really young and they think they can do whatever they want, at least that's what their behavior seems like. I and others are more fearful of the deputies than other inmates. It is fear and intimidation that they use around here.

10. When I was on the clinic a Sergeant came to interview me with a video camera. He asked me about what happened to me. I have complained about the incident to the jail and they told me that Internal Affairs has the complaint. However, I have never spoken to anyone from there about it.

11. I went back to court another time a week or so later and when I was there my attorney took pictures of my injuries.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 16th day of June, 2009 in Los Angeles, California.

_____/s/_____

Daysuan Rushing

Declaration of Daysuan Rushing

DECLARATION OF Daysuan Rusting

I, Daysaan Rusting                , state and declare as follows:

1.    The facts set forth in this declaration are from my personal knowledge. If called as a witness, I could and would competently testify to them.

2.    I am an inmate at Men's Central Jail. I have been housed here for approximately one year. During that time I have witnessed and experienced many retaliatory acts by the deputies here when inmates complain.

3. On March 2, 2009 I was housed in 3301 module. When an ACLU representative, Mary, walked down my row. I knew who she was because I had spoken to her before about complaints I had in county jail. When she came to my cell to ask me how things were going I told here that the deputies had not been giving us showers and that I needed to see the doctor for a medical issue.

4. ~~xxxxxxxxxxxxxxx~~ and I returned back on the early bus, which was around 1 in the afternoon. An officer, whose name I do not remember escorted me up to module 3301. I was waistchained, meaning my hands are chained to my sides. When we walked up to 3301, officer Zuniga was sitting at the desk. My escorting officer put me up against the wall, with my nose on the wall. He told officer Zuniga to rack my cell door. Zuniga replied "hold on Rusting" He then started putting on gloves and asked me if I had any contraband. I told him I had a peanut butter sandwich in my sock. Zuniga proceeded to search me, but by the way he was pulling on my clothes, I knew I was in trouble.

*I went to court a day or so later*

Dannu Rustin

5. Zuniga said to me "You don't like my program" and I asked him what program is that? He then asked me why I don't like his starver program. I asked him what did he mean by that. Then he told me that "we can fix that" and he slapped the back of my head with his open hand. I called him a punk and then he slapped me again. I was wearing glasses at the time so I turned my head up against the wall. This whole time the other deputy, the one who escorted me, was just standing there.

6. Next Zuniga kicked my legs out from under me and I was spread eagle up on the wall, still waist chained. He kicked me again and I lost my balance and fell. Then Zuniga just started punching me in the back. Then the other officer joined in and they both started kicking me. My face was sideways on the ground so I could tell that Zuniga was still kicking me. He then smacked the flashlight across my face. The flashlight hit me on my face. Then he hit me in the jaw with the flashlight. Then they hit me in the knees. The deputies have a technique where they hit inmates on their elbows & knees so it makes you limp around. I have witnessed them do this to other inmates and I have also experienced it. In fact, my legs are still swollen from them hitting my legs. While I was down on the ground they also sprayed me in the face. While I was down on the ground Zuniga said "you fucking whiners, tell this to the ACLU, I dare you"

7. The deputies then grabbed me by my pants and threw me off the stairs down onto 3301 towards 3300/3100.

Dennnie Rushing

50

1  Down there were a whole Bunch of Deputies. It was weird,
2  It was like they were clapping or something. Then Deputy
3  Ruit, who also works on that floor and who I have
4  dealt with before, came up and sprayed me in the
5  face. I was bleeding all over the place.
6  8. They put me on a gurney and I went to the hospital.
7  I had to have stitches on both sides of face. I was
8  there for a few days and they sent me back to 3301. I
9  was really freaked out that they sent me back to
10  the same spot. I stayed there for a night and then
11  Sgt Barbosa came and escorted me to the clinic at
12  MCJ. At the clinic they were worried about my head
13  they said, so I was transferred to the 7000 FL, which
14  is the hospital floor at CJ. While I was up there, my
15  face mostly healed - visually at least - and then
16  the jail moved me down to 170. I was really worried
17  to go there because I knew Deputy Ruit used to
18  work there. He had just been moved, I was relieved
19  to hear from deputies and other inmates, because
20  he beat up some Avenues gang member a few days
21  earlier.
22  9. Retaliation happens all the time around this
23  jail. Most of these deputies are really young and
24  they think they can do whatever they want, at least
25  thats what their behavior seems like. I and other
26  are more fearful of the deputies than other inmates. It
27  is fear and intimidation that they use around
28  here.

Donnie Rushing

10. When I was on the ~~clinic~~ DR a seargent came to interview me with a videocamera. He asked me about what happened to me. I have comp kined about the incident to the jail and they told me that Internal Affairs has the complaint. However, I have never spoken to anyone from them about it.

11. I went back to court another time a week or so later and when I was there my attorney took pictures of my injuries.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 16th day of June, 2009 in Los Angeles, California.

Dennie Rishure
6-1 JUNE-16-90009

3

# Exhibit F

# DECLARATION OF PRISONER #36
## EMMANUEL BENSON

# DECLARATION OF EMMANUEL BENSON

I, EMMAMUEL BENSON, declare and state as follows:

1.      I am an inmate currently housed at Lancaster State Prison County of Los Angeles, located at Lancaster, California. I have been housed here for approximately two weeks since June 11, 2009. On or about January 12, 2009, I was arrested and housed at Men's Central Jail located in Los Angeles, California.

2.      On or about May 14, 2009, at approximately 8:00 pm I was in line for pill call. I received my medication and started returning to my cell. At the same time, other inmates were receiving their medication and returning to their cells. On my way back to my cell, Deputy Wingens told me that I needed permission to return to my cell even though other inmates were freely returning to their cells.

3.      I complied with Deputy Wingens request and faced the wall. Deputy Wingens then threatened me by saying that if I turned around that he would "slap me." At that point I turned out to ask why I was being singled out and detained while others inmates freely returned to their cells.

4.      Deputy Wingens then grabbed my hands with one hand and slapped me five times on the right side of my head. After that, Deputy Wingens took me back to my cell. I then called my mother and aunt to report the incident. After I fell asleep that evening, I as awaken by Depity Wingens partner and taken to a doctor.

5.      The next morning, at approximately 4:00 am, Deputy Lee removed me from my cell, telling me that the nurse wanted to see me, and asked me why did I report the incident. I told Deputy Lee about the incident the prior day. He then left me in my cell without sending me to the nurse. Before Deputy Lee left, he removed my sheets, blankets, food, claiming that this was punishment for talking to a trustee.

6.      At approximately 8:00 a.m. that morning, Deputy Enriquez opened my cell door. Inmate "E-bone" was waiting outside my cell door, entered my cell, and told my bunk mate to leave the cell.

7.      "E-bone" then attacked me and punched me twice on the right side of my face. I asked why he was attacking me, and "E-bone" responded Deputy Wingens. Deputy Wingens told "E-bone" that I reported the incident in which Deputy Wingens assaulted me. I did not request medical treatment for fear of retaliation.

1
DECLARATION OF EMMANUEL BENSON

1    8.    At approximately 7:00 p.m. that same day, deputies told me that the had given my "store

2    bag" containing food and other items I ordered, to "E-bone" in cell 16. .8054. Deputies refused to return

3    it to me.

4    9.    Approximately a few days later, I was moved to Twin Towers. The same day, I was

5    interviewed which was recorded by videotape, by a Sergeant in a suit and deputies.

6    10.    They asked why I had contacted Mary at the ACLU and why I had reported the incident

7    with Deputy Wingens. I explained the incident. They further asked why I had contacted Mary at the

8    ACLU.

9

10    I declare under penalty of perjury of the laws of the State of California that the foregoing is true

11    and correct and that this Declaration was executed on June 26, 2009.

12

13

14                                         _____/s/_____

15                                         **EMMANUEL BENSON**

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Emmanuel Benson, declare and state as follows:

1. I am an inmate currently housed at Lancaster State Prison County of Los Angeles, located in Lancaster, California. I have been housed here for approximately two weeks since June 11, 2009.

On or about January 12, 2009 I was arrested and housed at Men's Central Jail located in Los Angeles, CA.

2. On or about May 14, 2009 at approximately 8:00 p.m., I was in line for pill call. I received my medication and started returning to my cell. At the same time, other inmates were receiving their medication and returning to their cells. On my way back to my cell, Deputy Wingems told me that I needed permission to return to my cell even though other inmates were freely returning to their cells.

3. I complied with Deputy Wingems request and faced the wall. Deputy Wingems then threatened me by saying that if I turned around that he would "slap me" and ~~[struck through]~~ At that point I turned out to ask why I was being singled out and detained while other inmates freely returned to their cells.

56

4. Deputy Wingems then grabbed my hands with one hand and slapped me five times on the right side of my head. After that, Deputy Wingems took me back to my cell. I then called my mother and aunt to report the incident. After I fell asleep that evening, I was awoken by Deputy Wingems partner and taken to a doctor.

5. The next morning, at approximately 4:00 a.m., Deputy Lee removed me from my cell, telling me that the nurse wanted to see me, and asked me why did I report the incident. I told Deputy Lee about the incident the prior day. He then left me in my cell without sending me to the nurse. Before Deputy Lee left, he removed my sheets, blanket, food, claiming that this was punishment for talking to a trustee.

6. At approximately 8:00 a.m. that morning, Deputy Enriquez opened my cell door. Inmate "E-bone" was waiting outside my cell door, entered my cell, and told my bunkmate to leave the cell.

7. "E-bone" then attacked me and punched me twice on the right side of my face. I asked why he was attacking me, and "E-bone" responded that it was in retaliation for reporting Deputy Wingems. Deputy Wingems told "E-bone" that I reported the incident in which Deputy Wingems assaulted me. I did not request medical treatment for fear of additional retaliation.

57

8. At approximately 7:00 p.m. that same day, deputies told me that they had given my "Steve bag" containing food and other items I ordered, to "E-bone" in cell No. 8054. Deputies refused to return it to me.

9. Approximately a few days later, I was moved to Twin Towers. The same day, I was interviewed which was recorded by video tape, by a Seargant in a suit and two deputies.

10. They asked why I had contacted Mary at the ACLU and why I had reported the incident with Deputy Wingems. I explained the incident. They further asked what I had contacted Mary at the ACLU.

11.

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct and that this Declaration was executed on June 26, 2009.

3

4

5    *Emmanue Benson*
     Emmanuel Benson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit G

# DECLARATION OF PRISONER #37
## ANTONIO RODRIGUEZ

# DECLARATION OF ANTONIO RODRIGUEZ

I, ANTONIO RODRIGUEZ, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been an inmate at Men's Central Jail for 6 years. On September 1st, 2009, inmate Justin Castro and I were attacked by a group of deputies at Men's Central Jail. I was beat so badly I ended up in the hospital with fractured ribs and both of my legs broken.

3.    The incident began when me, inmate Castro, and 2 other inmates were returning from the law library back to our cells. When we came back to the module, there were around 10 deputies there to pick us up. There had never been that many of them before. I felt like something was wrong.

4.    One of the deputies asked if I was ready. I said, "Yes." He asked if I was sure I was ready. He then asked inmate Castro the same thing. The deputy had a flashlight in his hand. He was hitting the palm of his hand with it. He asked Castro again if he was ready. The previous day inmate Castro had been involved in an altercation with that deputy.

5.    We turned the corner to come into the module and there were now a total of 15-20 deputies present. There was also a Sergeant there. Deputy Avalos told us to spread out for the search. We listened to him since the deputies normally search us like this when we come back from law library.

6.    After they searched us, inmate Castro and I were escorted, handcuffed, upstairs into the 3301 corridor by 6-8 deputies. One of the deputies told us to face the wall. I figured it was for another search, so I did. Then Deputy Rodriguez asked another Deputy Rodriguez if he was ready to earn his ink. The second Deputy Rodriguez said he was. He then hit me with his flashlight on the back of the head. I fell to the ground. Deputies Alvarez and Rodriguez jumped on inmate Castro.

7.    Deputy Ortega held my legs in his arms. I heard Deputy Avalos tell him to break my legs. Deputy Ortega then hit my ankle with his flashlight. He was using his flashlight like a baseball bat. The first hit felt really bad, but after he hit me a few times I couldn't really feel it anymore. I could feel blood coming out though.

8.    The deputies turned me on my back and started stomping on me. Deputy Ortega grabbed my second leg and hit it with his flashlight, breaking it. The deputies yelled at me to get up, but I couldn't

1   because my legs were broken. Then they hit me in again the back of the head with a flashlight.

2       9.      Deputy Ortega asked another deputy if he was keeping watch for the Sergeant. The other

3   deputy said, "Yes," and told Deputy Ortega to "get the towels" because a Sergeant was coming. The

4   deputies came back with a stack of wet towels. They mopped up the blood on the floor and wiped the

5   blood off my face. Deputy Ortega asked me, "You're not going to tell anyone, right? Southsiders don't

6   tell."

7       10.      When the Sergeant arrived, he told me to stand up, but I couldn't so he had the deputies

8   put me in a gurney and take me down to the hospital. At the hospital, the ER doctor asked me if I had

9   tried to stab a deputy. He told me that he had heard that inmate Castro and I had allegedly tried to assault

10  a deputy with a weapon. It was the first time I had heard this. The deputies said they had found a weapon

11  that Castro had pulled out of his waistband, even though we had been handcuffed at the waist the whole

12  time and searched right before the alleged assault took place.

13      11.      I still have not seen the weapon we supposedly had, but I have looked at the deputies'

14  reports from that day. Deputy Avalos' report said he heard what sounded like a shank hit the floor and

15  that when I appeared to turn around to try and grab it he was in fear for his life, even though I was

16  handcuffed at the waistband the whole time. Another report said that a deputy pushed Castro to the wall

17  and that a shank fell and hit the ground. The reports say that force was used and that we were pepper

18  sprayed, but don't mention our broken legs and never say that our handcuffs were taken off (because they

19  were on the whole time).

20      12.      After the incident, my pro per status was taken away because I allegedly orchestrated an

21  attack on a deputy. My cell was searched and my glasses were broken. Once the deputies started finding

22  out that the ACLU and other people were getting involved, they started harassing me. I was supposed to

23  get a pair of orthopedic shoes. My family paid for them and the vendor sent them directly to the jail, just

24  like the policy requires. Deputy Nicholas told me that he has my shoes but that I can't have them because

25  of the September 1st incident with the deputies. He said it would be a safety risk for the jails. I need those

26  shoes because I have 2 broken ankles and can't walk in regular shoes.

27      13.      The deputies are mad at me for talking to the ACLU about the incident and for getting my

28  own attorneys involved in the case. They ask me, "Why'd you go this route?" Deputy Ortega and others

told me that I "better not cry like a bitch to anyone" and that I better not talk to Internal Affairs or anyone else about what happened. When I was in the hospital, Deputy Avalos showed up and said he was working overtime to keep on eye on us. He told me that if I said anything about what happened the deputies would have to make their own reports and add charges to me.

14. I don't understand why the deputies did this, even though this time I hadn't broken any rules, and then tell me not to tell others about it. It was excessive what they did. My ankle was shattered in 16 places. The doctors say I'll probably have problems with them my whole life and that I'll probably be in constant pain. The deputies have beaten us up before and I've never said anything. I've gotten a chipped tooth and a fractured eye socket and have been shocked with a taser several times, and there's no report about that. I would have taken the beating just like before, but when they broke my legs I made up my mind to talk about it. If I continue to stay quiet like I have all these years it's going to happen to other people. I'm just trying to avoid this happening to other people.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 21st day of October, 2009 in Los Angeles, California.

_____/s/_____

**ANTONIO RODRIGUEZ**



Declaration of _____ Antonio Rodriguez

1

2    I, _____ Antonio Rodriguez _____, hereby declare:

3        1.    I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5        2.    I have been an inmate of men's central Jail for

6    4 years. On September, 1st, 2009, inmate Castro and I were attacked

7    by a group of deputies at Men's Central Jail. I was beat so badly I

8    ended up in the hospital with fractured ribs and both of my legs broken.

9    3.) The incident began when me, inmate Castro, and 2 other inmates were

10   returning from law library back to our cells. When we came back to the

11   module, there were around 10 deputies there to pick us up. There had never

12   been that many of them before. I felt like something was wrong.

13   4. One of the deputies asked if I was ready. I said, "Yes." He asked if

14   I was sure I was ready. He then asked inmate Castro the same thing.

15   The deputy had a flashlight in his hand. He was hitting the palm of his hand

16   with it. He asked Castro again if he was ready. The previous day inmate

17   Castro had been involved in an altercation with that deputy.

18   5.) We turned the corner to come into the module and there were now a

19   total of 15-20 deputies present. There was also a Sergeant there. Deputy

20   Avalos told us to spread out for the search. We listened to him since

21   the deputies normally search us like this when we come back from

22   law library.

23   6. After they searched us, inmate Castro and I were escorted, handcuffed, upstairs into

24   the 3301 corridor by 6-8 deputies. One of the deputies told us to face the wall.

25   I figured it was for another search, so I did. Then Deputy Rodriguez asked another

26   Deputy Rodriguez if he was ready to earn his ink. The second Deputy Rodriguez

27   said he was. He then hit me with his flashlight on the back of the head. I

28   fell to the ground. Deputies Alvarez and Rodriguez jumped on inmate Castro.

7.) Deputy Ortega held my legs in his arms. I heard Deputy Avalos tell
him to break my legs. Deputy Ortega then hit my ankle with his
flashlight. He was using his flashlight like a baseball bat. The

64

1  first hit felt really bad, but after he hit me a few times I couldn't really feel it
2  anymore. I could feel blood coming out though.

8)  The deputies turned me on my back and started stomping on me. Deputy Ortega grabbed
4  my second leg and hit it with his flashlight, breaking it. The deputies yelled at me
5  to get up, but I couldn't because my legs were broken. Then they hit me again in the
6  back of the head with a flashlight.

9)  Deputy Ortega asked another deputy if he was keeping watch for the Sergeant. The
8  other deputy said, "Yes," and told Deputy Ortega to "get the towels" because
9  a Sergeant was coming. The deputies came back with a stack of wet towels. They
10  mopped up the blood on the floor and wiped the blood off my face. Deputy
11  Ortega asked me, "You're not going to tell anyone, right? Southsiders don't
12  tell."

13  10) When the Sergeant arrived, he told me to stand up, but I couldn't so he had the
14  deputies put me on a gurney and take me down to the hospital. At the hospital,
15  the ER doctor asked me if I had tried to stab a deputy. He told me that
16  he had heard that inmate Castro and I had allegedly tried to assault a
17  deputy weapon. It was the first time I had heard this. The deputies said they
18  had found a weapon that Castro had pulled out of his waistband, even though we
19  had been handcuffed at the waist the whole time and searched right before
20  the alleged assault took place.

21  11) I still have not seen the weapon we supposedly had, but I have looked at the
22  deputies' reports from that day. Deputy Avalos' report said he heard what
23  sounded like a shank hit the floor and that when I appeared to turn
24  around to try and grab it he was in fear for his life, even though
25  I was handcuffed at the waistband the whole time. Another report
26  said that a deputy pushed Castro to the wall and that a shank
27  fell and hit the ground. The reports say that force was used
28  and that we were pepper sprayed, but don't mention our broken legs
   and never say that our handcuffs were taken off (because
   they were on the whole time).

65

(12) After the incident, my proper status was taken away because I allegedly orchestrated an attack on a deputy. My cell was searched and my glasses were broken. Once deputies started finding out that the ACLU and other people were getting involved, they started harassing me. I was supposed to get a pair of ortho pedic shoes. My family paid for them and the vendor sent them directly to the jail, just like policy requires. Deputy Nicholas told me that he has my shoes but that I can't have them because of the September 1st incident with the deputies. He said it would be a safety risk for the jails. I need those shoes because I have 2 broken ankles and can't walk in regular shoes.

(13) The deputies are mad at me for talking to the ~~AGGA~~ ACLU about the incident and for getting my own attorneys involved in the case. They ask me, "Why'd you go this route?" Deputy Ortega and others told me that I "better not cry like a bitch to anyone" and that I better not talk to Internal Affairs or anyone else about what happened. When I was in the hospital, Deputy Avalos showed up and said he was working overtime to keep an eye on us. He told me that if I said anything about what happened, the deputies would have to make their own reports and add charges to me.

(14) I don't understand why the deputies did this, even though this time I hadn't broken any rules, and then tell me not to tell others about it. It was excessive what they did. My ankle was stabbed in the places. The doctors say I'll probably have

#3

Ann Tam

problems with then my whole life and that I'd probably be in constant pain. The deputies have beaten us up before and I've never said anything. I've gotten a chipped tooth and a fractured eye socket and have been shocked with a taser several times, and there's no report about that. I would have taken the beating just like before, but when they broke my legs I made up my mind to talk about it. If I continue to stay quiet like I have all these years it's going to happen to other people. I'm just trying to avoid this happening to other people.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 21 day of OCT., 2009 in Los Angeles, California.

3-4

# Exhibit H

# DECLARATION OF PRISONER #38
# MICHAEL HOLGUIN

# DECLARATION OF MICHAEL HOLGUIN

I, MICHAEL HOLGUIN, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am a 29 year-old construction worker from Walnut, CA.  I have been in jail for approximately three and a half weeks.  Up until one week ago I had spent the entire time in Men's Central Jail on a K10 FISH row.  The jail normally classifies me as a K-1 because my dad is a police officer.

3.     During the time I was on the K10 FISH row (3500Charlie) I never got a shower.  One Saturday, a Sgt walked by our row and asked how things were going.  We all told him that we were not getting showers.  The same Sgt. came back the next Saturday and asked us about showers.  We all told him that we still had not gotten any showers.  He said that he was going to come back the next day and check to see if we were getting a shower during the time the log said we were getting showers.  This was on Saturday Oct 17.

4.     The next day, Sunday October 18, the deputies all of a sudden started running showers.  They gave showers to the even cells.  I was in 22, so I was toward the back of the row.  When they got to my cell, they opened my gate and I walked down the row by myself, un-handcuffed.

5.     When I got right in front of the shower the deputy told me to take it back.  I asked "why" because I had not gotten a shower in weeks.  The deputy said "you wanna know why, I'll tell you why.  Turn around" I turned around and he came out and put me in handcuffs.

6.     After that it is a little fuzzy but I remember Deputy Lascano punching me in the face.  I remember being pepper sprayed in the face and hearing keys.  After it was over Deputy Rico said to me "that's why you don't say why, just do what you're told."

7.     They beat me up so bad I was at the county hospital for about 3 days.  I have stitches on my eye, staples in my head, they broke my right leg, and I had to have surgery on my left knee.

8.     When I came back from the hospital some deputy gave me a piece of paper that said I have 29 days in the hole for attacking a deputy.  I don't think that makes any sense.  I was handcuffed when they attacked me – there was no way I could do anything to them.  I'm just a guy trying to get

1   through jail on my way to state prison, where I am waiting to do a 16-month sentence.  I don't want any

2   problems in here.  I just keep my head down and stay out of the way.

3         9.    There is no reason why they did this to me.  They were supposed to be giving us showers

4   and those deputies just attacked me without reason.

5

6        I declare under penalty of perjury of the laws of the State of California and the United States that

7   the foregoing is true and correct. Executed this 26th day of October, 2009 in Los Angeles, California.

8

9                       _____/s/_____

10                      MICHAEL HOLGUIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2
DECLARATION OF MICHAEL HOLGUIN

70

Declaration of Michael Holguin

I, Michael Holguin ____, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am a 29 year-old construction worker from Walnut, CA. I have been in jail for approximately three and a half weeks. Up until one week ago I had spent the entire time in Men's Central Jail on a K10 FISH row. The jail normally classifies me as a K-1 because my dad is a police officer.

3.    During the time I was on the K10 FISH row (3506 Charlie) I never got a SHOWER. One Saturday, a Sgt walked by our row and asked how things were going. We all told ~~them~~ him that we were not getting SHOWERS. The same Sgt. came back the next Saturday and asked us about SHOWERS. We all told him that we still had not gotten any SHOWERS. He said that he was going to come back the next day and check to see if we were getting a SHOWER during the time the log said we were getting SHOWERS. This was on Saturday Oct 17th.

4.    The next day, SUNDAY October 18, the deputies all of a sudden started running SHOWERS. They gave SHOWERS to the even cells. I was in 22, so I was toward the back

MH

of the Row. When they got to my cell, they opened my gate and I walked down the row by myself, unhandcuffed.

5. When I got right in front of the storage the deputy told me to take it back. I asked "why" because I had not gotten a storage in weeks. The deputy said "you wanna know why, I'll tell you why. Turn around" I turned around and he came out and put me in handcuffs.

6. After that it is a little fuzzy but I remember Deputy Cascano punching me in the face. I remember being pepper sprayed in the face + hearing keys. After it was over Deputy Rico said to me "thats why you don't say why, just do what you're told"

7. They beat me up so bad I was at the County Hospital for about 3 days. I have stiches on my eye, staples in my head, they broke my right leg and I had to have surgery on my left knee.

8. When I came back from the Hospital some deputy gave me a piece of paper that said I have 29 days in the hole for attacking a deputy. I don't think that makes any sense. I was handcuffed when they attacked me — there was no way I could do anything to them. I'm just a guy trying to get through jail on my way to state prison, where I

2

MH

72

1  I am waiting to do a 16 month sentence. I don't
2  want any problems in here. I just keep my
3  head down and stay out of the way.
4  9. Theres no reason why they did this to
5  me. They were supposed to be giving us stitches
6  and those deputies just attacked me without
7  reason.

M H

18  I declare under penalty of perjury of the laws of the State of California and the United
19  States that the foregoing is true and correct. Executed this 26th day of October, 2009 in Los
20  Angeles, California.

Michael Holguin
Michael Holguin

3

M H