# Exhibit I

# DECLARATION OF PRISONER #39
# EEFROM JONES

**Declaration of Eefrom Jones**

I, Eefrom Jones, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am an inmate in the Los Angeles Jail. I have been here for two years and have spent the vast majority of the time in Men's Central Jail in a single-man cell.

3.      Since I have been at the county jail I have been getting psych medications. I take these because I have hallucinations and depression.

4.      On September 24 in the afternoon I was escorted to the attorney room for a visit with an individual my attorney sent to talk to me about my mental health because I have been found incompetent to stand trial. After the visit I was escorted back to my module by Deputy Navarro.

5.      When I went upstairs in my module (3500) Deputy Navarro followed me up there. I was making a left at the top of the stairs when Deputy Navarro grabbed me from behind. He yelled at me to stay down and don't move. Then he just started punching me and he was sitting on my side. I remember seeing a female deputy named Leos there, too. I know there were a lot more deputies because I could hear them and I saw other people, I just could not see their names.

6.      They hit me with a taser and pepper sprayed me in the face. I kept trying to tell them that I had asthma but they kept going.

7.      After they were done, they took me downstairs to the medical clinic at Men's Central Jail. They interviewed me on video here also. The next day they sent me to the hospital and that's when I found out my shoulder was broken.

8.      I went to court on October 7th. Then on October 10 the same Lt. who interviewed me the first time pulled me out to interview me again. I thought this was really weird and this made me scared because they had put me right back into the same hosuing area that the deputies who beat me up worked in. However, this time I thought I needed to speak up so I told the Lieutenant the deputies names - specifically Deputy Navarro.

9.      The Lt interviewing me (Lt. Rivera) told me that just for precautions they wanted

1  me to see the psychiatrist. So they sent me back, again, to 3500 to wait.

2       10.    The next thing I know, Deputy Navarro comes up to my cell and tells to cuff up

3  because I am going to the psych. This is about 15 minutes after my interview so I was really

4  worried about him escorting me after I had just told the Lieutenant that he beat me up.

5       11.    I went out of my cell with Deputy Navarro into the hallway. He told me to take

6  off all of my clothes. There were about 8 other deputies standing there also. Deputy Navarro

7  then started yelling at me that this is his floor and he would do whatever he wanted. He said

8  "don't worry, you'll be coming back. 9 times out of 10 they come back." He was talking about

9  how I was going to the Towers to see the psych.

10      12.    Then Deputy Navarro told em to bend over, totally naked. He flashed the

11  flashlight up my butt and all them started laughing. Then another deputy came over and stuck his

12  finger up there. I kept telling them this ain't right but they were just laughing. It was horrible.

13      13.    I am terrified to go back over to where those deputies are. In the 2 years I've been

14  here I haven't had problems with deputies. I told my psych that I would kill myself before I

15  would go back over there and let those guys kill me. What they did to me is horrible.

16

17      I declare under penalty of perjury of the laws of the State of California and the United

18  States that the foregoing is true and correct. Executed this 19th day of October, 2009 in Los

19  Angeles, California.

20                                     /s/

21                                  Eefrom Jones

22

23

24

25

26

27

28

1     Declaration of Eefrom Jones

2     I, Eefrom Jones _____, hereby declare:

3     1.    I make this declaration based on my own personal knowledge and if called to

4     testify I could and would do so competently as follows:

5     2.    I am an inmate in the Los Angeles Jail.

6 I have been here for two years and have spent

7 the vast majority of the time in Men's Central Jail

8 in a single-man cell.

9   3. Since I have been at the county jail I

10 have been getting psych medications. I take these

11 because I have hallucinations and depression.

12   4. On September 24 in the afternoon I was

13 escorted to the attorney room for a visit with

14 an individual my attorney sent to talk to me

15 about my mental health because I have been found

16 incompetent to stand trial. After the visit

17 I was escorted back to my module by Deputy

18 Navarro.

19   5. When I went upstairs in my module (3500)

20 Deputy Navarro followed me up there. I was

21 making a left at the top of the stairs when Deputy

22 Navarro grabbed me from behind. He yelled

23 at me to stay down and don't move. Then he

24 just started punching me and he was sitting on

25 my side. I remember seeing a female Deputy

26 named Leos there, too. I know there were a lot

27 more deputies because I could hear them and

28 I saw other people, I just could not see their names.

                    E. J.

6. They hit me with a taser and pepper sprayed me in the face. I kept trying to tell them that I had asthma but they kept going.

7. After they were done, they took me downstairs to the medical clinic at Men's Central Jail. They interviewed me on video here also. The next day they sent me to the hospital and that's when I found out my shoulder was broken.

8. I went to court on October 7th. Then on October 10 the same lt who interviewed me the first time pulled me out to interview me again. I thought this was really weird and this made me scared because they had put me right back into the same housing area that the deputies who beat me up worked in. However, this time I thought I needed to speak up so I told the Lieutant the deputies names - specifically Deputy Navarro.

9. The Lt interviewing me (Lt Rivera) told me that just for precautions they wanted me to see the psychiatrist. So they sent me back, again, to 3500 to wait.

10. The next thing I know, Deputy Navarro comes up to my cell and tells to cuff up because I am going to the psych. This was about 15 minutes after my interview so I was really worried about him escorting me after I had just told the Lieutenant that he beat me up.

11. I went out of my cell with Deputy Navarro

2

E. J.

1  into the hallway. He told me to take off all of my clothes.
2  There were about 8 other deputies standing there also.
3  Deputy Navarro then started yelling @ me that this is
4  his floor and he would do whatever he wanted. He said
5  "don't worry, you'll be coming back. 9 times out of
6  10 they come back". He was talking about how I was going
7  to the Towers to see the psych.
8    12. Then Deputy Navarro told me to bend over, totally
9  naked. He flashed the flashlight up my butt and all
10  them started laughing. Then another deputy came over
11  and stuck his finger up there. I kept telling them
12  this aint right but they were just laughing. It
13  was horrible.
14    13. I am terrified to go back over to where those deputies
15  are. In the 2 years I've been here I haven't had problems
16  with deputies. I told my psych that I would kill
17  myself before I would go back over there and let
18  those guys kill me. What they did to me is horrible.
19
20    I declare under penalty of perjury of the laws of the State of California and the United
21  States that the foregoing is true and correct. Executed this 19th day of October 2009 in Los
22  Angeles, California.

23    *Eefrom Jones*
24    Eefrom Jones
25
26
27
28

# Exhibit J

# DECLARATION OF PRISONER #7
# RUBEN BELTRAN

# DECLARATION OF RUBEN BELTRAN

I, RUBEN BELTRAN, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been an inmate in the Los Angeles County Jail for two years and seven months. I am currently housed in Module 2400 Row D Cell 5 at Men's Central Jail. I have been housed here for about a month; before that I was housed in Twin Towers Correctional Facility.

3.      On or about Friday, July 2, 2010, I filled out a complaint form in my module reporting that the module's inmates had not received day room recreation time in 11 days. We are supposed to be able to have time in the day room every day. I got the complaint form from the complaints box in our row and I put the complaint form in the complaints box after evening pill call.

4.      On or about the morning of Saturday, July 3, 2010, Deputy Britton and Deputy Farino, two deputies assigned to my module, told me and my cell mate to exit our cell. My cell mate and I exited our cell and Deputy Britton entered my cell and began to search it. My cell was the only cell in my row to be searched.

5.      Deputy Britton told me that the reason he was searching my cell was because I filed a complaint form on Friday, July 2, 2010. Deputy Britton told me I had no right to day room, meaning recreation time outside of my cell. Deputy Britton said my only rights in jail are food and clothing. Deputy Britton then said if I ever touched a complaint form again, he would "go old school on me," meaning physically assault me. Deputy Farino was standing with me and my cell mate outside the cell when Deputy Britton said this. When Deputy Britton told me I could return to my cell, I saw that Deputy Britton had taken all my books, periodicals, and religious material. That day, I wrote a letter to American Civil Liberties Union Jails Project to see if they could help me.

6.     On or about the morning of Wednesday, July 7, 2010, Deputy Farina and Deputy Patterson told the inmates of my row to line up to go the day room for recreation time. Deputy Pattterson is a deputy assigned to my module. The inmates and I lined up in the hallway of the module. Deputy Farina pulled me out of the line and told the other inmates to go down to the day room. When the other inmates had left the module, Deputy Farino entered my cell and began to take my personal property. The only other deputy there was Deputy Patterson, who stood outside of the cell with me; no sergeant was present. Deputy Farino said I was not allowed to go to the day room and I was not allowed to touch a complaint form. Deputy Farino took the pink paper receipt slips from my previous complaint forms. After he had finished searching my cell, Deputy Farino said, "If you stay in your cell for two weeks, I'll forget about this," or something like that. Then he and Deputy Patterson left and I returned to my cell.

7.     On or about the morning of Friday, July 9, 2010, the deputies of my module told me to go out into the module's hallway to attend my Buddhist meditation class. I lined up in the hallway with about 7 other inmates who were taking the class outside of the 2200 and 2400 modules, in the main hallway. Deputy Farino and two other deputies ordered us to face the wall and strip down to our boxers because they were conducting a search. There was no sergeant present when we stripped to our boxers.

8.     The other inmates and I stripped and faced the wall, and piled our clothes behind us. Each of us had our clothes directly behind us so it was clear whose clothes belonged to whom. Deputy Farino approached me from behind and placed handcuffs on me. I knew it was Deputy Farino because I could recognize his voice. He then showed me a razor tied to a plastic disposable razor handle. Deputy Farino asked me why I had a razor in my pocket. The razor was not mine, and I realized then that Deputy Farino had set me up with a razor. Deputy Farino then led me to a nearby bench and ordered me to sit down. Then, after about a minute, Senior Deputy Sanchez came and asked me why I had a shank in my pocket. I know this was Senior Deputy Sanchez because I saw his name and rank on the tag on his uniform that

2

DECLARATION OF RUBEN BELTRAN

day.

9.      I explained to Senior Deputy Sanchez that Deputy Farino had planted the shank on me during the search. I told him about the incident with Deputy Britton and Depty Farino on Saturday, July 3, 2010 and the incident with Deputy Farino on Wednesday, July 7, 2010 and that I thought he had planted a shank on me in retaliation for filing a complaint. Senior Deputy Sanchez listened to me and then said, "This is not going to go far," or something like that. I don't know what he meant by that.

10.     I was placed in disciplinary administrative segregation for having a weapon in jail and I was sentenced to 29 days. I think that there is a video surveillance camera in the hallway where the strip search occurred because I have seen a camera in that hallway. I asked my temporary public defender to find video footage of the morning of Friday, July 9, 2010.

11.     I have filed about 10 complaints before to the jails' complaint boxes, but I never heard responses from the deputies about them and this is the first time I was retaliated against for complaining. I have never been put in disciplinary segregation before or administratively charged.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July 19, 2010 in Los Angeles, California.

_____

**RUBEN BELTRAN**

3
DECLARATION OF RUBEN BELTRAN

# DECLARATION OF RUBEN BELTRAN

I, RUBEN BELTRAN, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been an inmate in the Los Angeles County Jail for two years and seven months. I am currently housed in Module 2400 Row D Cell 5 at Men's Central Jail. I have been housed here for about a month; before that I was housed in Twin Towers Correctional Facility.

3.      On or about Friday, July 2, 2010, I filled out a complaint form in my module reporting that the module's inmates had not received day room recreation time in 11 days. We are supposed to be able to have time in the day room every day. I got the complaint form from the complaints box in our row and I put the complaint form in the complaints box after evening pill call.

4.      On or about the morning of Saturday, July 3, 2010, Deputy Britton and Deputy Farino, two deputies assigned to my module, told me and my cell mate to exit our cell. My cell mate and I exited our cell and Deputy Britton entered my cell and began to search it. My cell was the only cell in my row to be searched.

5.      Deputy Britton told me that the reason he was searching my cell was because I filed a complaint form on Friday, July 2, 2010. Deputy Britton told me I had no right to day room, meaning recreation time outside of my cell. Deputy Britton said my only rights in jail are food and clothing. Deputy Britton then said if I ever touched a complaint form again, he would "go old school on me," meaning physically assault me. Deputy Farino was standing with me and my cell mate outside the cell when Deputy Britton said this. When Deputy Britton told me I could return to my cell, I saw that Deputy Britton had taken all my books, periodicals, and religious material. That day, I wrote a letter to American Civil Liberties Union Jails Project to see if they could help me.

DECLARATION OF RUBEN BELTRAN

6.     On or about the morning of Wednesday, July 7, 2010, Deputy Farina and Deputy Patterson told the inmates of my row to line up to go the day room for recreation time. Deputy Pattterson is a deputy assigned to my module. The inmates and I lined up in the hallway of the module. Deputy Farina pulled me out of the line and told the other inmates to go down to the day room. When the other inmates had left the module, Deputy Farino entered my cell and began to take my personal property. The only other deputy there was Deputy Patterson, who stood outside of the cell with me; no sergeant was present. Deputy Farino said I was not allowed to go to the day room and I was not allowed to touch a complaint form. Deputy Farino took the pink paper receipt slips from my previous complaint forms. After he had finished searching my cell, Deputy Farino said, "If you stay in your cell for two weeks, I'll forget about this," or something like that. Then he and Deputy Patterson left and I returned to my cell.

7.     On or about the morning of Friday, July 9, 2010, the deputies of my module told me to go out into the module's hallway to attend my Buddhist meditation class. I lined up in the hallway with about 20 other inmates who were taking the class outside of the 2200 and 2400 modules, in the main hallway. Deputy Farino and two other deputies ordered us to face the wall and strip down to our boxers because they were conducting a search. There was no sergeant present when we stripped to our boxers.

8.     The other inmates and I stripped and faced the wall, and piled our clothes behind us. Each of us had our clothes directly behind us so it was clear whose clothes belonged to whom. Deputy Farino approached me from behind and placed handcuffs on me. I knew it was Deputy Farino because I could recognize his voice. He then showed me a razor tied to a plastic disposable razor handle. Deputy Farino asked me why I had a razor in my pocket. The razor was not mine, and I realized then that Deputy Farino had set me up with a razor. Deputy Farino then led me to a nearby bench and ordered me to sit down. Then, after about a minute, Senior Deputy Sanchez came and asked me why I had a shank in my pocket. I know this was Senior Deputy Sanchez because I saw his name and rank on the tag on his uniform that

DECLARATION OF RUBEN BELTRAN

85

day.

9.      I explained to Senior Deputy Sanchez that Deputy Farino had planted the shank on me during the search. I told him about the incident with Deputy Britton and Depty Farino on Saturday, July 3, 2010 and the incident with Deputy Farino on Wednesday, July 7, 2010 and that I thought he had planted a shank on me in retaliation for filing a complaint. Senior Deputy Sanchez listened to me and then said, "This is not going to go far," or something like that. I don't know what he meant by that.

10.      I was placed in disciplinary administrative segregation for having a weapon in jail and I was sentenced to 29 days. I think that there is a video surveillance camera in the hallway where the strip search occurred because I have seen a camera in that hallway. I asked my ~~temporary~~ public defender to find video footage of the morning of Friday, July 9, 2010.

11.  I have filed about 10 complaints before to the jails' complaint boxes, but I never heard responses from the deputies about them and this is the first time I was retaliated against for complaining. I have never been put in disciplinary segregation before or administratively charged.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed July ~~21~~ 19, 2010 in Los Angeles, California.

_____

**RUBEN BELTRAN**

3
DECLARATION OF RUBEN BELTRAN

86

# Exhibit K

# DECLARATION OF PRISONER #11
# ANTONIO CANDELARIO

# DECLARATION OF ANTONIO CANDELARIO

I, Antonio Candelario, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been an inmate in the Los Angeles County Jail System since April 2010. I am currently housed in Men's Central Jail. I was originally put in jail for a parole violation related to a police harassment charge, and I am still in jail because deputies planted drugs on me and then charged me with possession.

3. I have been in and out of the Los Angeles jails for approximately the past decade. I have had problems with the deputies in jail since I was processed at the Inmate Reception Center (IRC) for my first stay in jail in 1998 or 1999. At the IRC, a deputy told me to put my face against the wall, but the wall was packed with people standing shoulder to shoulder. When I told the deputy that I couldn't face the wall because there were too many people, he punched me in the face. Two additional deputies joined in, and the three of them punched and kicked me for several minutes. Ever since that incident, I have been designated as K-10. K-10 is the highest security level. I have also been a target for deputy abuse ever since that first incident because the deputies can see in my record that I have a history of run-ins with deputies.

4. I have been assaulted by deputies approximately 4 times since that first incident a decade ago. The most recent incident occurred in April. On or about Wednesday April 17, I filed a request with the jail to be switched from the top bunk to the bottom bunk in a cell because I am disabled (I have a torn ligament in my knee from a previous officer assault in Salina State Prison), and it is easier for me to get into a lower bunk. About two days later, I asked Deputy Gonzalez if I was being given a lower bunk like I requested. Deputy Gonzalez told me to "shut the fuck up," and said that they would "get to it when we'll get to it." I know Deputy Gonzalez because he regularly worked in my module. He is tall, white, and slightly overweight. I believe that Deputy Gonzalez must have talked to the other deputies who worked in my unit because about two days later, two deputies (one was a short, Hispanic male, with a medium build and short hair, and the other was a heavyset, tall Hispanic male) opened up my cell and told me that I had a pass. I assumed I was being moved to a lower bunk, so I limped out of the cell and

1    down the hallway. When I was far enough down the hallway that I was not directly in front of any cells,
2    one of the deputies cuffed my hands behind my back and asked me why I was limping. I told him that
3    my limp was from getting beaten up in prison several years ago. Then, out of nowhere, the short
4    Hispanic deputy began hitting me in the face with his open hand and started yelling, "What's up now.
5    Get crazy now. Mother fucker." The heavyset Hispanic deputy then joined in, and began hitting me in
6    the back of the head with his open hand. I believe they were using open hands instead of fists because
7    they didn't want to leave too many bruises. About 30 seconds after the first two deputies started hitting
8    me, a third deputy joined in. Because I was being hit by the first two deputies, I could not see what the
9    third deputy looked like. I remained on my feet for about a minute total until I fell to the ground. Once I
10   hit the ground, the deputies started kicking me and punching me with closed fists in places that would be
11   covered with clothes when I was dressed – like my back and sides.

12       5. I started yelling to the sergeant that I was getting beaten up. I have gotten beaten up by deputies
13   before, so I knew that this was the best thing I could do to try to stop it. I hoped that the sergeant would
14   come over, and that everyone in the area would hear what was going on. Once I started yelling, though,
15   the heavyset Hispanic deputy grabbed my injured leg and pulled me around a corner so that people on the
16   cell row wouldn't be able to hear me as well. When the deputy pulled my leg, I felt something in my
17   knee tear even more.

18       6. The yelling must have worried the third deputy that had joined in after the beating started because
19   he stopped assaulting me after I was dragged around the corner. The two remaining deputies kept
20   kicking me and punching me for what felt like anywhere from five to ten minutes. Eventually, the
21   deputies stopped assaulting me, and told me to get up. But because I was in so much pain, I simply
22   remained lying on the floor. The two remaining deputies then dragged me back to my cell and locked me
23   in. They forgot to take off my handcuffs, though, so a few minutes later they came back and took off my
24   cuffs. When they came back, I was able to read their name tags. The short Hispanic deputy was Deputy
25   Luviano and the tall Hispanic deputy was Deputy Rodriguez.

26       7. Thirty minutes after the deputies took my handcuffs off, a nurse came by to hand out medication.
27   I told her that I had just been beaten up by the deputies and that I needed to see a doctor.

28       8. Thirty minutes after that, Deputy Luviano, Deputy Rodriguez, and about four other deputies

2

DECLARATION OF ANTONIO CANDELARIO

1    showed up at my cell. Deputy Luviano was wearing plastic gloves. He asked me if I wanted to make a
2    complaint with the sergeant. I told him that I did, but that I was not going to leave my cell because the
3    last time I did they beat me up. Deputy Luviano told me that the sergeant wasn't going to come up to
4    talk to me and that if I wanted to talk to him, I had to get out of my cell. When I kept refusing to leave
5    my cell, Deputy Luviano told me that if I didn't come out, they were going to come in to get me.

6       9.  I agreed to go with them because I was afraid they were all going to come into my cell and beat
7    me up again. I cuffed up and exited my cell. Once I got out of the cell, Luviano told me that he was
8    going to search me, and asked me if I had anything in my pockets. I told them that I of course didn't
9    have anything in my pockets because they just finished beating me up. I hadn't done anything but lie on
10   my cell floor in pain since they beat me up.

11      10. Luviano stuck his hand directly into my right pocket and pulled out a small sack of white
12   substance. I started yelling that Deputy Luviano was framing me with drugs so that everyone could hear
13   what was going on and I demanded to be taken down to the sergeant.

14      11. Deputy Rodriguez took me down to the sergeant. I was still yelling hysterically about having been
15   beaten up and framed with dope. The sergeant, his name tag said his name was Sergeant Walker, told me
16   to the "shut the fuck up," and said, "I've been listening to you for the last 10 minutes." He then said, "Do
17   you know why we're doing this? Because we're evil, wicked, and corrupt." While the Sergeant was
18   telling me this, Deputy Rodriguez was wiping the blood out of my ear. I told Rodriguez to stop wiping
19   my ear because it hurt and the sergeant told Rodriguez to take me away and asked Rodriguez who was
20   going to do the paper work.

21      12. to my surprise, they then sent me to the hole, which is where you go if you're being disciplined. I
22   was in the hole for a few hours until I got a pass to go to the clinic. I was scared for my safety so I didn't
23   tell the doctors in the clinic why I was bruised and bloody, but they could see that I was injured so they
24   sent me to L.C.M.C. (Los Angeles County Medical Center). I stayed overnight at L.C.M.C. where the
25   doctors monitored my condition. They also inspected my injured knee.

26      13. The next day, when I got back to Men's Central Jail, I went straight to floor 7000, the medical
27   floor. Once I was there, I felt safe enough to start talking about what happened to me so I contacted the
28   ACLU and Internal Affairs to tell them what happened.

14. I am still waiting to see a doctor for my injured knee, and I'm waiting to go to court for the dope charge that they framed me with.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 26th day of July, 2010 in Los Angeles, California.

_____

**Antonio Candelario**

# DECLARATION OF ANTONIO CANDELARIO

I, Antonio Candelario, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been an inmate in the Los Angeles County Jail System since April 2010. I am currently housed in Men's Central Jail. I was originally put in jail for a parole violation related to a police harassment charge, and I am still in jail because deputies planted drugs on me and then charged me with possession.

3. I have been in and out of the Los Angeles jails for approximately the past decade. I have had problems with the deputies in jail since I was processed at the Inmate Reception Center (IRC) for my first stay in jail in 1998 or 1999. At the IRC, a deputy told me to put my face against the wall, but the wall was packed with people standing shoulder to shoulder. When I told the deputy that I couldn't face the wall because there were too many people, he punched me in the face. Two additional deputies joined in, and the three of them punched and kicked me for several minutes. Ever since that incident, I have been designated as K-10. K-10 is the highest security level. I have also been a target for deputy abuse ever since that first incident because the deputies can see in my record that I have a history of run-ins with deputies.

4. I have been assaulted by deputies approximately 4 times since that first incident a decade ago. The most recent incident occurred in April. On or about Wednesday April 17, I filed a request with the jail to be switched from the top bunk to the bottom bunk in my cell because I am disabled (I have a torn ligament in my knee from a previous officer assault in Salina State Prison), and it is easier for me to get into a lower bunk. About two days later, I asked Deputy Gonzalez if I was being given a lower bunk like I requested. Deputy Gonzalez told me to "shut the fuck up," and said that they would "get to it when we'll get to it." I know Deputy Gonzalez because he regularly worked in my module. He is tall, white, and slightly overweight. I believe that Deputy Gonzalez must have talked to the other deputies who worked in my unit because about two days later, two deputies (one was a short, Hispanic male, with a medium build and short hair, and the other was a heavyset, tall Hispanic male) opened up my cell and told me that I had a pass. I assumed I was being moved to a lower bunk, so I limped out of the cell and

1
DECLARATION OF ANTONIO CANDELARIO

1   down the hallway.  When I was far enough down the hallway that I was not directly in front of any cells,
2   one of the deputies cuffed my hands behind my back and asked me why I was limping.  I told him that
3   my limp was from getting beaten up in prison several years ago.  Then, out of nowhere, the short
4   Hispanic deputy began hitting me in the face with his open hand and started yelling, "What's up now.
5   Get crazy now. Mother fucker."  The heavyset Hispanic deputy then joined in, and began hitting me in
6   the back of the head with his open hand.  I believe they were using open hands instead of fists because
7   they didn't want to leave too many bruises.  About 30 seconds after the first two deputies started hitting
8   me, a third deputy joined in.  Because I was being hit by the first two deputies, I could not see what the
9   third deputy looked like.  I remained on my feet for about a minute total until I fell to the ground.  Once I
10  hit the ground, the deputies started kicking me and punching me with closed fists in places that would be
11  covered with clothes when I was dressed – like my back and sides.

    5.   I started yelling to the sergeant that I was getting beaten up.  I have gotten beaten up by deputies
12
13  before, so I knew that this was the best thing I could do to try to stop it.  I hoped that the sergeant would
14  come over, and that everyone in the area would hear what was going on.  Once I started yelling, though,
15  the heavyset Hispanic deputy grabbed my injured leg and pulled me around a corner so that people on the
16  cell row wouldn't be able to hear me as well.  When the deputy pulled my leg, I felt something in my
17  knee tear even more.

    6.   The yelling must have worried the third deputy that had joined in after the beating started because
18
19  he stopped assaulting me after I was dragged around the corner.  The two remaining deputies kept
20  kicking me and punching me for what felt like anywhere from five to ten minutes.  Eventually, the
21  deputies stopped assaulting me, and told me to get up.  But because I was in so much pain, I simply
22  remained lying on the floor.  The two remaining deputies then dragged me back to my cell and locked me
23  in.  They forgot to take off my handcuffs, though, so a few minutes later they came back and took off my
24  cuffs.  When they came back, I was able to read their name tags.  The short Hispanic deputy was Deputy
25  Luviano and the tall Hispanic deputy was Deputy Rodriguez.

    7.   Thirty minutes after the deputies took my handcuffs off, a nurse came by to hand out medication.
26
27  I told her that I had just been beaten up by the deputies and that I needed to see a doctor.

28  8.   Thirty minutes after that, Deputy Luviano, Deputy Rodriguez, and about four other deputies

2<br>DECLARATION OF ANTONIO CANDELARIO



showed up at my cell. Deputy Luviano was wearing plastic gloves. He asked me if I wanted to make a complaint with the sergeant. I told him that I did, but that I was not going to leave my cell because the last time I did they beat me up. Deputy Luviano told me that the sergeant wasn't going to come up to talk to me and that if I wanted to talk to him, I had to get out of my cell. When I kept refusing to leave my cell, Deputy Luviano told me that if I didn't come out, they were going to come in to get me.

9. I agreed to go with them because I was afraid they were all going to come into my cell and beat me up again. I cuffed up and exited my cell. Once I got out of the cell, Luviano told me that he was going to search me, and asked me if I had anything in my pockets. I told them that I of course didn't have anything in my pockets because they just finished beating me up. I *C.A.* hadn't done anything but lie on my cell floor in pain since they beat me up.

10. Luviano stuck his hand directly into my right pocket and pulled out a small sack of white substance. I started yelling that Deputy Luviano was framing me with drugs so that everyone could hear what was going on and I demanded to be taken down to the sergeant.

11. Deputy Rodriguez took me down to the sergeant. I was still yelling hysterically about having been beaten up and framed with dope. The sergeant, his name tag said his name was Sergeant Walker, told me to the "shut the fuck up," and said, "I've been listening to you for the last 10 *minutes C.A.* ~~months~~." He then said, "Do you know why we're doing this? Because we're evil, wicked, and corrupt." While the Sergeant was telling me this, Deputy Rodriguez was wiping the blood out of my ear. I told Rodriguez to stop wiping my ear because it hurt and the sergeant told Rodriguez to take me away and asked Rodriguez who was going to do the paper work.

12. to my surprise, they then sent me to the hole, which is where you go if you're being disciplined. I was in the hole for a few hours until I got a pass to go to the clinic. I was scared for my safety so I didn't tell the doctors in the clinic why I was bruised and bloody, but they could see that I was injured so they sent me to L.C.M.C. (Los Angeles County Medical Center). I stayed overnight at L.C.M.C. where the doctors monitored my condition. They also inspected my injured knee.

13. The next day, when I got back to Men's Central Jail, I went straight to floor 7000, the medical floor. Once I was there, I felt safe enough to start talking about what happened to me so I contacted the ACLU and Internal Affairs to tell them what happened.

94

14. I am still waiting to see a doctor for my injured knee, and I'm waiting to go to court for the dope charge that they framed me with.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 26 CA. 23rd day of July, 2010 in Los Angeles, California.

*Antonio Candelario*

**Antonio Candelario**

4
DECLARATION OF ANTONIO CANDELARIO

95

# Exhibit L

# DECLARATION OF PRISONER #12
## TIMOTHY GAINES

# DECLARATION OF TIMOTHY GAINES

I, Timothy Gaines, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been an inmate in the Los Angeles County Jail system since December 2009. I have been housed in Men's Central Jail this whole time. I am currently housed in Module 3300, Row C, cell 11. I have been in this module and on this row for the past two months, but I was moved to cell 11 from cell 12 just two weeks ago, right after the events I am about to describe took place. I am classified by the jail as a K-10 inmate, which means that I am in a one-man cell and need an escort when I am moved anywhere within the jail.

3. On June 29 and 30, Mary from the ACLU came to our row and asked us about jail conditions. I knew who she was because she identified herself to us. I saw her speak to the inmates in cells 11 and 13 as well. I was in cell 12 at the time – which is in between cells 11 and 13 – so I could see her speaking to the inmate in cell 11 for a long time, about one hour. The inmate in cell 11 is white, tall and bald. I think his name is Robert. I know the inmate who was in cell 11 at the time because he had been housed on the row for the entire time I had been there.

4. While Mary was speaking to Robert, I was speaking to Kevin, who is another ACLU representative. I told Kevin that deputies were scanning our wristbands without giving us showers and that they weren't giving us programs on weekends. I could hear Robert, in cell 11, say these same things to Mary.

5. On July 1, three deputies came to our row right after dinner. The deputies who came to our row are deputies Rodriguez, Newhouse, and Garcia. I know their names because they are the regular deputies on my row, and I have seen their nametags. Newhouse – who is a tall white guy – came over to my cell and the two cells next to me. He asked us about a stick. I was in cell 12 at the time, and he was asking me and the inmates in cells 11 and 13. We all told him we didn't have a stick. The deputies told us that the inmate in cell 6 had accused Robert – the inmate then in cell 11 – of having a stick. The deputies said that they suspected that Robert had used the stick to reach through the cell bars and turn on the TV that's in the row hallway. Only Robert had been

1
DECLARATION OF TIMOTHY GAINES

accused by the inmate in cell 6, so I don't know why they spoke to all of us.  The inmate in cell 13 had also spoken to the ACLU the day before.  I don't know that inmate's name, but I recognize him because he's been next to me in the module for more than one month.

6. Then the deputies told us to cuff up – which means that they put handcuffs on us.  They then escorted all three of us out of our cells.  Deputy Garcia was the one who escorted me.  I knew they were about to search our cells, so I told Deputy Garcia that I had a shaver under my pillow.  K-10 inmates are not allowed to keep shavers.

7. I had gotten my shaver weeks before, on the day that I came back to jail late after going to court.  That day, because of how late it was, I was told to go to the holding tank where a group of new inmates was being admitted.  The trustees were handing out fish-kits, which are bags with hygiene products, to all the inmates.  The fish-kits have shavers in them.  The trustees gave me a fish-kit too, along with the new inmates in the holding tank.  K-10s wear orange – while other inmates wear blue – so the trustees must have known I was a K-10 and they gave me a fish-kit anyway.  Then I put the shaver in my pocket and brought it back with me to my cell.  A shaver is what you use to shave with. It has the plastic handle and the razor blade in it.

8. After I told Garcia about the shaver under my pillow, the deputies brought me and the inmates from cells 11 and 13 to a caged shower area outside the module.

9. We waited there for about 20 to 30 minutes while all three deputies searched our cells.  I heard Newhouse tell the inmate in cell 13 that he had found a shaver under the table in his cell. I also saw deputies throw one shaver into the trash can.  I had already told Deputy Garcia about the shaver in my cell, and the deputies had gotten rid of my shaver by the time I returned to my cell.  I know they had gotten rid of my shaver because it wasn't in my cell when I returned to my cell after the search. I didn't hear any deputy mention finding anything in Robert's cell. It is common practice to tell an inmate when you find something in his cell.

10. Then Newhouse told Robert – the inmate who was in cell 11 – that Robert was going to the hole.

11. Deputy Rodriguez then asked Newhouse what to do with me and the inmate from cell 13, since

DECLARATION OF TIMOTHY GAINES

98

we both had shavers in our cells.  Newhouse told him to write us up, or something like that.  Then Newhouse took Robert to the hole.   Garcia and Rodriguez took me and the inmate from cell 13 back to our cells, and that was the end of the search.  We were never written up for anything after that. I was never sent back to the hole, and neither was the inmate in cell 13.

12. Usually when deputies search our cells, they search all of the cells on the row.  The cells on our row go from number 3 to number 26.  There are 24 cells altogether.

13. The day after the search, a bunch of inmates from different modules were taken to medical.  Me and the inmate from cell 13 were in that group going to medical.  The deputy who escorted me was named Avitia.  I know this because I read his nametag.  He is a shorter, skinny guy with dark hair.  I remember he said, "This must be the snitch line," to me and inmate number 13.  I guess he was saying this because he knew that our row had been talking to the ACLU a few days before. It's pretty common for deputies to pick on guys who talk to the ACLU by searching our cells. They'll also pick on us for talking to the ACLU by turning the TVs off. Whatever they want to do, they'll do.

14. I'm coming forward about what happened to Robert because this stuff happens a lot and nothing is being done to stop it.  He went to the hole for nothing, and that is not right.

15. I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20 day of July, 2010 in Los Angeles, California.


_____

**TIMOTHY GAINES**

# Exhibit M

# DECLARATION OF PRISONER #5
## ROBERT DRAGUSICA

# DECLARATION OF ROBERT DRAGUSICA

I, ROBERT DRAGUSICA, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been an inmate in the Los Angeles County Jail for about 10 months. I am currently housed in 3300 C Row Cell 11. I am a K-10 inmate. I was classified as a K-10 inmate by the jail. Deputies say that inmates classified as K-10 are dangerous and must be kept away from other inmates. I must be escorted by a deputy whenever I am not in my cell. I am the only inmate in my cell because I am a K-10 inmate.

3.      I have personally witnessed about five incidents of deputies beating inmates, and I have heard about, through other inmates, around 20 incidents of deputies beating inmates during my time at the jail.

4.      About seven months ago, I was housed in 3500 D row. One day, I was in my cell and I saw an inmate called Gumby enter our module. A row is a long hallway with about 20 cells with inmates with the same classification. A module is a group of rows in the same area with inmates with the same classification.

5.      I did not personally know Gumby, but I had heard about Gumby from other inmates. Gumby was not an inmate housed in our module. Gumby was not wearing handcuffs when Gumby entered my module. This was unheard of because 3500 D Row is a K-10 module, meaning inmates cannot enter without a deputy escort and handcuffs. For an inmate to enter a module, a deputy must open the module door with a key that only deputies have. So, Gumby could not have entered our module without a deputy's opening the module door for him. Gumby was wearing a blue jumpsuit and all the K-10 inmates wear an orange jumpsuit, so it was obvious Gumby did not belong in our module.

6.      I saw Gumby give a bunch of toilet paper to an inmate in a cell, cell 6, a few cells away from my cell. The inmate's name was Rascal.

7.      I heard Rascal say, "Hold this for me." Before Rascal could respond, I saw about two or three deputies run into the module and into the cell of the inmate. I could hear the deputies shouting and ripping the inmate's cell apart. I saw a deputy leave the cell with a bunch of toilet paper in one hand and

1
DECLARATION OF ROBERT DRAGUSICA

1  a sharpened toothbrush in another hand. Later, I heard that inmate was given administrative sentencing

2  and was put in solitary confinement.

3      8.      I have heard about such incidents before. Other inmates have said to me that Deputy Rico,

4  Deputy Bearer, Deputy Luviano, and Deputy Rodriguez sometimes ask inmates in protective custody to

5  set up other inmates. Other inmates say these deputies do this by giving an inmate a razor or sharpened

6  toothbrush and allowing the inmate access to other inmates the deputies have personal problems with.

7  Other inmates say the deputies tell the inmates to hand other inmates the sharp objects. Other inmates say

8  that the deputies watch the inmates do this and when the inmates the deputies have problems with hold

9  the sharpened objects, which are often wrapped in toilet paper, the deputies come out and arrest the

10  inmate who is holding the sharpened object.

11     9.      One day, about two months ago, I heard an inmate being beaten by deputies in the shower

12  in my module. I was only a few cells away from the showers, but I cannot see inside the showers from

13  my cell. I heard the inmate being slapped and I heard the inmate crying, "Why are you hitting me?"

14  Almost right after the incident, I saw Deputy Rico and about three other deputies talking in my module.

15     10.     I recognize Deputy Rico because Deputy Rico is assigned to my module.

16     11.     I heard a deputy say that the deputies had gone too far in the beating earlier that day. I

17  heard Deputy Rico ask one of the other deputies to punch him in the face. I heard Deputy Rico say,

18  "Make it look real," or something like that. I saw the other deputy punch Deputy Rico in the eye. I then

19  saw the deputies high-give one another and laugh. I think Deputy Rico asked another deputy to punch

20  him because Deputy Rico wanted to be able to say that the inmate in the shower had hit Deputy Rico, and

21  then the deputies would have been justified in beating the inmate.

22     12.     After the incident, I heard from other inmates that there were five deputies who beat the

23  inmate in the shower and that the inmate was moved to a different module.

24     13.     I have also heard of deputies opening the cells of enemy inmates at the same time without

25  deputy escorts. Inmates may be enemies if the inmates are from rival gangs. I have heard of deputies

26  calling these incidents, "accidents." I have also heard inmates bragging to other inmates that deputies tell

27  inmates that the deputies will give inmates 35 seconds to beat other inmates outside of inmates' cells by

28  opening cell doors. Only deputies can open cell doors. Inmates cannot open cell doors. I have witnessed

1  about ten incidents of cell doors opening and inmates getting beaten during my time at the jail.

2      14.    About two weeks ago, I saw an inmate called Joe Ordinez return to his module. I do not

3  know if Ordinez is the inmate's name, but I have heard the inmate called this and I know Ordinez is

4  housed in 3300 A Row. I am housed in 3300 C Row, Cell 11 and from my cell I can see into 3300 A

5  Row because of my height. 3300 A Row, where Ordinez is housed, is also a K-10 module, meaning

6  inmates cannot be outside of inmates' cells unescorted or without handcuffs.

7      15.    I saw Ordinez walking back to his own cell. Ordinez was handcuffed but Ordinez did not

8  have a deputy escort. I saw the door on a cell on 3300 A Row that was not Ordinez's open and an inmate

9  run out of the cell and beat Ordinez. The inmate who ran out of the inmate's cell was unescorted, and he

10  was not wearing handcuffs. The inmate hit Ordinez a few times with his fists in Ordinez's back and head.

11  Ordinez almost fell to the floor, and Ordinez could not defend himself because he was wearing handcuffs

12  and the other inmate was not. The inmate who beat Ordinez then calmly walked back to his cell.

13      16.    Ordinez staggered back into his own cell room. No deputies showed up after the incident

14  or stopped Ordinez from being beaten, even though I think deputies can see everything in the row from

15  the booth.

16      17.    On or about Thursday, June 10, 2010, during the night, I heard Deputy Bearer tell an

17  inmate in my module that the inmate was talking too loud. I heard Deputy Bearer say, "You better shut

18  up or I'm gonna slap the shit out of you."

19      18.    I know the person who said this was Deputy Bearer because Deputy Bearer is assigned to

20  my module, and I have talked to him before. I recognized the voice of the inmate Deputy Bearer was

21  speaking to as an inmate in 3300 C Row Cell 8. I do not know the Inmate in Cell 8's name but I can

22  recognize the Inmate in Cell 8 because I have seen the Inmate in Cell 8 before. I could hear Deputy

23  Bearer and the inmate talking because I am in the same row, in Cell 11.

24      19.    The next day, at about 3 p.m., I was in my cell when I saw the Inmate in Cell 8 return to

25  the module escorted by Deputy Bearer. Before the Inmate in Cell 8 got to the inmate's cell, I saw Deputy

26  Bearer snatch him by his waist chain and tighten the waist chain and wrist chains. Then I saw Deputy

27  Bearer slap the Inmate in Cell 8's face so hard that the inmate's head snapped back. I saw Deputy Bearer

28  tighten the chains on the Inmate on Cell 8 even tighter and then push the inmate into the showers so the

1  | inmate fell. The Inmate in Cell 8 sat in the showers for about four hours with his chains on very tight.

2  | 20.    In the day room in module 3100, there is a very large mattress that is about 15 feet by 20
3  | feet. I think it is a wrestling mattress where deputies watch inmates wrestle and fight without inmates'
4  | handcuffs on. I have heard about these fighting matches from other inmates and I have seen the mattress
5  | in the dayroom.

6  | 21.    Even though inmates are supposed to get showers every other day, the inmates in my
7  | module do not get showers that often. This is because in my module, deputies often ask inmates to
8  | choose between showers and television. The deputy will ask an inmate, "Program or shower?" If the
9  | inmate says, "Shower," the deputy will turn off the television for all the inmates in the row. This makes
10 | other inmates very mad because the other inmates want to watch television. Inmates are pressured to
11 | refuse showers so that the other inmates in the row are not mad. The deputies manipulate the inmates into
12 | refusing showers so the deputies will not have to give us showers.

13 | 22.    There are also no complaint forms for the complaint box in my module.

14 | I declare under penalty of perjury of the laws of the State of California and the United States that
15 | the foregoing is true and correct. Executed this 25th day of June, 2010 in Los Angeles, California.

16 |
17 |
18 |                              _____
                                **ROBERT DRAGUSICA**
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

## DECLARATION OF ROBERT DRAGUSICA

I, ROBERT DRAGUSICA, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been an inmate in the Los Angeles County Jail for about 10 months. I am currently housed in 3300 C Row Cell 11. I am a K-10 inmate. I was classified as a K-10 inmate by the jail. Deputies say that inmates classified as K-10 are dangerous and must be kept away from other inmates. I must be escorted by a deputy whenever I am not in my cell. I am the only inmate in my cell because I am a K-10 inmate.

3.      I have personally witnessed about five incidents of deputies beating inmates, and I have heard about, through other inmates, around 20 incidents of deputies beating inmates during my time at the jail.

4.      About seven months ago, I was housed in 3500 D row. One day, I was in my cell and I saw an inmate called ~~Rascal~~ *Gumby R.D.* enter our module. A row is a long hallway with about 20 cells with inmates with the same classification. A module is a group of rows in the same area with inmates with the same classification.

5.      I did not personally know ~~Rascal~~ *Gumby R.D.*, but I had heard about ~~Rascal~~ *Gumby R.D.* from other inmates. ~~Rascal~~ *Gumby R.D.* was not an inmate housed in our module. ~~Rascal~~ *Gumby* was not wearing handcuffs when ~~Rascal~~ *Gumby* entered my module. This was unheard of because 3500 D Row is a K-10 module, meaning inmates cannot enter without a deputy escort and handcuffs. For an inmate to enter a module, a deputy must open the module door with a key that only deputies have. So, ~~Rascal~~ *Gumby R.D.* could not have entered our module without a deputy's opening the module door for him. ~~Rascal~~ *Gumby R.D.* was wearing a blue jumpsuit and all the K-10 inmates wear an orange jumpsuit, so it was obvious ~~Rascal~~ *Gumby R.D.* did not belong in our module.

6.      I saw ~~Rascal~~ *Gumby R.D.* give a bunch of toilet paper to an inmate in a cell *cell 6 R.D.* a few cells away from my cell. ~~I do not remember the inmate's name.~~ *The inmate's name was Rascal.*

7.      I heard ~~Rascal~~ *Gumby R.D.* say, "Hold this for me." Before the ~~inmate a few cells away~~ *Rascal R.D.* could respond, I saw about two or three deputies rush into the module and into the cell of the inmate. I could hear the deputies shouting and ripping the inmate's cell apart. I saw a deputy leave the cell with a bunch of toilet

1  paper in one hand and a sharpened toothbrush in another hand. Later, I heard that inmate was given

2  administrative sentencing and was put in solitary confinement.

3       8.    I have heard about such incidents before. Other inmates have said to me that _Deputy

4  Rico, Deputy Bearer, Deputy Luviano, and Deputy Rodriguez sometimes ask inmates in protective

5  custody to set up other inmates. Other inmates say these deputies do this by giving an inmate a razor or

6  sharpened toothbrush and allowing the inmate access to other inmates the deputies have personal

7  problems with. Other inmates say the deputies tell the inmates to hand other inmates the sharp objects.

8  Other inmates say that the deputies watch the inmates do this and when the inmates the deputies have

9  problems with hold the sharpened objects, which are often wrapped in toilet paper, the deputies come out

10  and arrest the inmate who is holding the sharpened object.

11       9.    One day, about two months ago, I heard an inmate being beaten by deputies in the shower

12  in my module. I was only a few cells away from the showers, but I cannot see inside the showers from

13  my cell. I heard the inmate being slapped and I heard the inmate crying, "Why are you hitting me?"

14  Almost right after the incident, I saw Deputy Rico and about three other deputies talking in my module.

15       10.    I recognize Deputy Rico because Deputy Rico is assigned to my module.

16       11.    I heard a deputy say that the deputies had gone too far in the beating earlier that day. I

17  heard Deputy Rico ask one of the other deputies to punch him in the face. I heard Deputy Rico say,

18  "Make it look real," or something like that. I saw the other deputy punch Deputy Rico in the eye. I then

19  saw the deputies high-give one another and laugh. I think Deputy Rico asked another deputy to punch

20  him because Deputy Rico wanted to be able to say that the inmate in the shower had hit Deputy Rico, and

21  then the deputies would have been justified in beating the inmate.

22       12.    After the incident, I heard from other inmates that there were five deputies who beat the

23  inmate in the shower and that the inmate was moved to a different module.

24       13.    I have also heard of deputies opening the cells of enemy inmates at the same time without

25  deputy escorts. Inmates may be enemies if the inmates are from rival gangs. I have heard of deputies

26  calling these incidents, "accidents." I have also heard inmates bragging to other inmates that deputies tell

27  inmates that the deputies will give inmates 35 seconds to beat other inmates outside of inmates' cells by

28  opening cell doors. Only deputies can open cell doors. Inmates cannot open cell doors. I have witnessed

1    about ten incidents of cell doors opening and inmates getting beaten during my time at the jail.

2         14.    About two weeks ago, I saw an inmate called Archenez return to his module. I do not

3    know if Archenez is the inmate's name, but I have heard the inmate called this and I know Archenez is

4    housed in 3300 A Row. I am housed in 3300 C Row, Cell 11 and from my cell I can see into 3300 A

5    Row because of my height. 3300 A Row, where Archenez is housed, is also a K-10 module, meaning

6    inmates cannot be outside of inmates' cells unescorted or without handcuffs.

7         15.    I saw Archenez walking back to Archenez's own cell. Archenez was handcuffed but

8    Archenez did not have a deputy escort. I saw the door on a cell on 3300 A Row that was not Archenez's

9    open and an inmate run out of the cell and beat Archenez. The inmate who ran out of the inmate's cell

10    was unescorted, and he was not wearing handcuffs. The inmate hit Archenez a few times with his fists in

11    Archenez's back and head. Archenez almost fell to the floor, and Archenez could not defend himself

12    because he was wearing handcuffs and the other inmate was not. The inmate who beat Archenez then

13    calmly walked back to his cell.

14         16.    Archenez staggered back into Archenez's own cell room. No deputies showed up after the

15    incident or stopped Archenez from being beaten, even though I think deputies can see everything in the

16    row from the booth.

17         17.    On or about Thursday, June 10, 2010, during the night, I heard Deputy Bearer tell an

18    inmate in my module that the inmate was talking too loud. I heard Deputy Bearer say, "You better shut

19    up or I'm gonna slap the shit out of you."

20         18.    I know the person who said this was Deputy Bearer because Deputy Bearer is assigned to

21    my module, and I have talked to him before. I recognized the voice of the inmate Deputy Bearer was

22    speaking to as an inmate in 3300 C Row Cell 8. I do not know the Inmate in Cell 8's name but I can

23    recognize the Inmate in Cell 8 because I have seen the Inmate in Cell 8 before. I could hear Deputy

24    Bearer and the inmate talking because I am in the same row, in Cell 11.

25         19.    The next day, at about 3 p.m., I was in my cell when I saw the Inmate in Cell 8 return to

26    the module escorted by Deputy Bearer. Before the Inmate in Cell 8 got to the inmate's cell, I saw Deputy

27    Bearer snatch the by his waist chain and tighten the waist chain and wrist chains. Then I saw Deputy

28    Bearer slap the Inmate in Cell 8's face so hard that the inmate's head snapped back. I saw Deputy Bearer

1  tighten the chains on the Inmate on Cell 8 even tighter and then push the inmate into the showers so the

2  inmate fell. The Inmate in Cell 8 sat in the showers for about four hours with his chains on very tight.

3      20.    In the day room in module 3100, there is a very large mattress that is about 15 feet by 20

4  feet. I think it is a wrestling mattress where deputies watch inmates wrestle and fight without inmates'

5  handcuffs on. I have heard about these fighting matches from other inmates and I have seen the mattress

6  in the dayroom.

7      21.    Even though inmates are supposed to get showers every other day,  the inmates in my

8  module do not get showers that often. This is because in my module, deputies often ask inmates to

9  choose between showers and television. The deputy will ask an inmate, "Program or shower?" If the

10  inmate says, "Shower," the deputy will turn off the television for all the inmates in the row. This makes

11  other inmates very mad because the other inmates want to watch television. Inmates are pressured to

12  refuse showers so that the other inmates in the row are not mad. The deputies manipulate the inmates into

13  refusing showers so the deputies will not have to give us showers.

14      22.    There are also no complaint forms for the complaint box in my module.

15      I declare under penalty of perjury of the laws of the State of California and the United States that

16  the foregoing is true and correct. Executed this 25th day of June, 2010 in Los Angeles, California.

**ROBERT DRAGUSICA**

# Exhibit N



**LIBERTY | JUSTICE | EQUALITY**

June 19, 2009

Roger Granbo, Office of County Counsel
County of Los Angeles
648 Kenneth Hahn Hall of Administration
500 West Temple Street

Paul B. Beach
Lawrence, Beach, Allen & Choi
100 West Broadway, Suite 1200
Glendale, CA 91210
Re: Rutherford v. Baca

Re: *Rutherford v Baca*

Dear Roger and Paul,

We have just obtained credible and very disturbing information from two class members who state that they were subjected to physical abuse by deputies in retaliation for their complaints to the ACLU, and that they were questioned regarding their communications with the ACLU in the course of the Department's investigation of the force incident. The two class members are Daysuan Rushing, who was beaten by deputies following a complaint to the ACLU on March 2, 2009 and Emmanuel Benson, who was beaten by deputies shortly after the ACLU filed a complaint on his behalf on May 28, 2009.  According to Mr. Rushing, he was beaten very severely and pepper-sprayed while in waist-chains by a deputy who made statements that he knew that Rushing had complained about the denial of showers and said, among other statements, "Tell this to the ACLU, I dare you." Mr. Rushing was in such fear for his life that he was not willing to allow us to reveal this information to the Department while he was still in the jail.  Regarding Mr. Benson, after he was beaten, he was video-taped by a deputy who asked him "What did you say to Mary from the ACLU?"  Both clients are now in state prison.

As you know, we have raised the issue of retaliation against detainees who complain to the ACLU on many occasions in our monthly meetings with the Department.  Many, many class members tell us that they are too fearful to speak with us or to file complaints because of what will happen to them if they do so. These allegations of retaliation make it almost impossible for our staff to effectively monitor conditions in the jail.  For example, we have been forced to reduce our jail-front contact with class members because they report that if they speak to us, deputies harass and intimidate them after we leave the jail.  The pre-existing level of retaliation is unacceptable and must be stopped.  However,

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

Roger Granbo & Paul Beach                                      Page 2
June 19, 2009

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

these new charges of retaliatory beatings and physical abuse, by deputies who expressly mention the ACLU, represent an extremely serious escalation of the intimidation and retaliation against our class members.

We request that the Department take affirmative steps to address this situation. For now, we are willing to agree to limit these new measures to Men's Central Jail (MCJ). However, we intend to continue to monitor to verify the existence of similar problems at other facilities. At a minimum, we request that the Department immediately inform all staff at MCJ that they are prohibited from (1) questioning any detainee or prisoner about any of his or her contacts with the ACLU, or (2) threatening, harassing, or otherwise retaliating against any detainee or prisoner on account of his contacts with the ACLU.

Because of the seriousness of these allegations and their impact on our ability to monitor conditions in the jail, we request that your clients enter into a stipulation and proposed order for approval by the Federal Court that provides as follows:

> (1) Defendants shall develop and disseminate a unit order for Men's Central Jail to all employees of the Sheriff's Department, prohibiting staff from questioning detainees and prisoners about their communications with any representatives from the ACLU in this case. The unit order shall also prohibit staff from using force, verbally threatening, intimidating, or otherwise retaliating against detainees and prisoners due to their communications with the ACLU. The unit order shall define retaliation to include verbal harassment and intimidation, verbal threats, a reduction in programming, such as a reduction in or denial of visiting, showers, or out-of-cell time, or the imposition of excessive and/or unjustified discipline or more frequent cell searches, following the filing of a complaint  The unit order shall also state that all allegations made by detainees and prisoners at MCJ that they were retaliated against for communicating with the ACLU shall be forwarded to class counsel and thoroughly investigated.



LIBERTY | JUSTICE | EQUALITY



LIBERTY | JUSTICE | EQUALITY

Roger Granbo & Paul Beach                                                                 Page 3
June 19, 2009

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

(2) Defendants shall provide a draft of this unit order to class counsel to review and approve before it is released in final form.
(3) Defendants shall also post this Stipulated Order and the unit order in all housing areas, and distribute it to all detainees and prisoners in segregation.
(4) Defendants shall provide plaintiffs' counsel with copies of all allegations made by detainees and prisoners that they were retaliated against for communicating with the ACLU within seven days of receiving such an allegation. Defendants shall provide the ACLU with all materials regarding the Sheriff's Department's investigation of such allegations, including videotapes and investigation reports from internal affairs and the Office of Independent Review.

We specifically request that the Department immediately provide plaintiffs' counsel with copies of all video tapes, investigation reports and all other documents regarding its investigation of the two incidents identified above regarding Mr. Rushing and Mr. Benson. As described in the stipulation above, we also request copies of all investigation reports regarding all other allegations of retaliation against class members as a result of their communication with the ACLU that have been received to date and that are received in the future.

If your clients are not willing to agree to the requested stipulation and unit order and to provide us with materials regarding the Department's investigations, we will have no choice but seek relief from Judge Pregerson, and to provide the Court with supporting evidence including a sworn declaration from Mr. Rushing (attached for your reference).

By this letter, we are providing you notice that if the parties are unable to agree to the reasonable measures described above to protect our class members from retaliation, we are prepared to file a motion within the next two weeks requesting a protective order from the federal court. In such a motion, we will request the remedies described above and may also seek additional measures if we deem these necessary. By this letter, we are also offering you the advance notice and



LIBERTY | JUSTICE | EQUALITY

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

Roger Granbo & Paul Beach                                          Page 4
June 19, 2009

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &**
**Manheim Family Attorney**
**for First Amendment Rights**
Peter J. Eliasberg

opportunity for a conference of counsel required by Local Rule 7-3, although we are unable to wait a full 20 days before filing because of the imminent threat to our class members.

We look forward to your prompt response and sincerely hope that we will be able to resolve this issue. We are both available to discuss this with you at greater length at your earliest convenience.

Sincerely,

*Melinda Bird*              /S/                    /S/

Melinda Bird            Mark Rosenbaum          Margaret Winter
Senior Counsel          Legal Director          Deputy Director
ACLU-SC                 ACLU-SC                 National Prison Project

CC:   Assistant Sheriff Marvin Cavanaugh
      Chief Alexander Yim
      Chief Dennis Burns

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

# Exhibit O

## Los Angeles County Sheriff's Department

| CUSTODY DIVISION<br>MEN'S CENTRAL JAIL | Unit Order: 5-12-010 |
|---|---|
| | Effective Date: 06-20-09<br>Revision Date: 11-02-09 |

| Subject:  Retaliation Against Inmates Who Make Complaints to the ACLU or Other Inmate Advocacy Groups. |
|---|
| Reference: |

**PURPOSE OF ORDER:**

The purpose of this order is to establish operational procedures to prevent/prohibit retaliation practices against inmates who make complaints or speak to the American Civil Liberties Union (ACLU) or any other inmate advocacy group.

**SCOPE OF ORDER:**

This order will apply to all sworn and civilian personnel assigned to Men's Central Jail.

**ORDER:**

All inmates who are confined at this facility shall have the right to submit a written or verbal complaint, and speak to the American Civil Liberties Union (ACLU) or any other inmate advocacy group without any type of interference from staff.

All personnel assigned to Men's Central Jail are strictly prohibited from the following:

1. Questioning any inmate about any of his contacts with the ACLU or other inmate advocacy group and/or;

2. Threatening, harassing, or otherwise retaliating against any inmate on account of his contacts with the ACLU or any other inmate advocacy group.

Any Department member found to be engaging in these types of practices will be disciplined and may potentially be prosecuted. Under the Rutherford v. Baca agreement with the Federal Court, the ACLU has an absolute right to question and interview inmates about jail practices. We have a legal and moral obligation to allow the inmate complaint process to proceed unencumbered and without interference. Sergeants and lieutenants shall ensure compliance without exception.

Approved
Date: 11-02-09

**1 OF 1**

113

# Exhibit P



**LIBERTY | JUSTICE | EQUALITY**

July 1, 2009

Assistant Sheriff Marvin O. Cavanaugh
Los Angeles County Sheriff's Department
4700 Ramona Blvd.
Monterey Park, Ca 91754

**Chair**
Jarl Mohn

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Operating Officer**
Heather Carrigan

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Chief Financial Officer**
Brenda Maull

**Legal Director**
Mark D. Rosenbaum

**Assistant Legal Director**
Catherine E. Lhamon

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

Re: Rutherford v. Baca

Dear Assistant Sheriff Cavanaugh,

Late this afternoon, we learned of another allegation of retaliation from a detainee in Men's Central Jail, Matthew Schubert, Booking No. 1783737. I apologize for contacting you so late in the day but my intern just returned from interviewing the client at the jail and I did not want to wait until tomorrow to forward this information to you.

In the attached declaration, our client states that he was raped when he was in the jail two years ago. He states that the deputy who raped him is still working in the jail, that he sees this deputy and that the deputy harasses and retaliates against him. While he does not disclose the names of the deputies in the declaration, he provided them to us privately. He identified the alleged rapist as Deputy Nava and gave us permission to release this information to you. During the rape, he was held down by a second deputy, Deputy Martinez. He told us that he has not seen Deputy Martinez during this current incarceration. He did not report the rape when it occurred because he was afraid. Mr. Schubert also describes other forms of retaliation and harassment.

I would like to request that the Department investigate Mr. Schubert's situation and report back to us at your earliest convenience with the results of your investigation. I also ask that you take steps to ensure that Mr. Schubert is no longer in contact with Deputy Nava. Mr. Schubert is classified K-6-G so I would appreciate it if your staff would consult with Mr. Schubert about alternative housing that might be safer for him before moving him.

More generally, at our meeting yesterday, Paul Beach stated that the Department would move inmates who report who report to the ACLU that they fear harassment and retaliation by deputies, so that they are not in regular contact with the deputies against whom they made a report. This was the first time we had received such an assurance from the Department. This commitment will be very helpful to our ability to persuade clients to permit us to share their statements with you.

Assistant Sheriff Marvin Cavanaugh                                                Page 2
July 1, 2009

Offering detainees such protection is not only necessary to ensure the safety of *Rutherford* class members, but is also vital to the Sheriff's ability to effectively operate its facilities. While we agree that such relief is necessary to protect inmates from retaliation and harassment, we understand that moving inmates based on their requests must be exercised with prudence.

In our meeting yesterday, you stated that you had directed that a unit order regarding retaliation be developed and that an e-mail had been sent to MCJ employees. We greatly appreciate these steps, which were included in the letter that we sent on June 19. I would appreciate it if you would provide us with a copy of the Unit Order and the e-mail, so that we can inform our clients that it has been issued. However, we also request that the Department post a notice in public areas in the jail informing inmates that they should report retaliation and abuse and the protections they can expect if they do so. The posted order should state that LASD staff are prohibited from questioning any inmate about his contact with the ACLU, or threatening, harassing, or otherwise retaliating against any inmate because he has filed complaints with the Department or with the ACLU.

From our perspective, informing inmates of their rights is a crucial part of this process. As Mr. Schubert's declaration explains, inmates have come to expect retaliation when they speak to the ACLU, so our attempts to encourage people to come forward are ineffective. Posting these orders publicly will put inmates and deputies on notice that retaliatory action is unacceptable.

Sincerely,


Melinda Bird
Senior Counsel


CC:     Paul Beach, Esq.
        Roger Granbo, County Counsel

CC:     Chief Alexander Yim
        Chief Dennis Burns
        Commander Robert Olmstead



115

# Exhibit Q



LIBERTY | JUSTICE | EQUALITY

October 28, 2009

**VIA EXPRESS MAIL AND E-MAIL**

**Chair**
Stephen Rohde

**President**
Douglas Mirell

**Chairs Emeriti**
Danny Goldberg
Allan K. Jonas
Burt Lancaster*
Irving Lichtenstein, MD*
Jarl Mohn
Laurie Ostrow*
Stanley K. Sheinbaum
*deceased

**Chief Executive Officer**
Ramona Ripston

**Chief Counsel**
Mark D. Rosenbaum

**Chief Operating Officer**
Heather Carrigan

**Chief Financial Officer**
Brenda Maull

**Communications Director**
Gordon Smith

**Development Director**
Tracy Rice

**Legal Director**
Hector O. Villagra

**Managing Attorney &
Manheim Family Attorney
for First Amendment Rights**
Peter J. Eliasberg

Sheriff Leroy Baca
Los Angeles County Sheriff's Department Headquarters
4700 Ramona Boulevard
Monterey Park, CA 91754-2169

Dear Sheriff Baca:

We are writing to request a personal meeting with you to discuss a series of grave allegations that have come to light through our monitoring of the conditions at Men's Central Jail (MCJ). We have documented a persistent and increasing number of retaliation incidents when inmates have complained about conditions in the jail. Attached are copies of new declarations from inmates describing acts of retaliation and deputy misconduct, as well as some additional declarations that are already under investigation by Department staff.

These complaints of retaliation came to our attention last year and since then, we have tried to work collaboratively with your Department to respond. The Department created a system whereby complaints that we report are tracked and investigated by a designated Sergeant. Over the course of about a month, we submitted more than 15 complaints to the Department for investigation.

However, our joint efforts have not been adequate to address the problem of retaliation and excessive force, which has continued to worsen despite the creation of the reporting process.

Below are a few recent examples of retaliation for complaining that our clients have reported to us during the past two months. Copies of declarations from these inmates are attached to this letter:

- Antonio Rodriguez (BN # 8349982) reports that he was assaulted by a group of deputies on September 1 after inmates in his module (3100/3300) complained to the ACLU about infrequent showers access. He reports that deputies held him down while he was handcuffed and broke both his ankles by striking them repeatedly with their flashlights. We reported this issue to the Department via the process we negotiated during our monthly meetings and the Department has assured us that this incident is being

Sheriff Leroy Baca
October 28, 2009

Page 2

investigated. However, since we reported the situation, Mr. Rodriguez states that deputies have continued to verbally harass him and have threatened him on several occasions should he continue to complain about the beating.

- Michael Holguin (BN # 2083113) reports he was assaulted by a group of deputies on October 18th after he and other inmates on his row (3500C) complained about not receiving showers for weeks. Mr. Holguin spent days in the hospital because deputies broke his leg and he required surgery on his knee. When we visited with him on October 26, Mr. Holguin still had staples in his head. The beating had such a silencing effect on the rest of the tier that when Mary Tiedeman visited the row a couple of days after the beating, many inmates refused to talk to her. The few who did spoke in hushed tones so as to not be heard by the deputies. They reported that they thought Mr. Holguin had been beaten to death and they did not want the same thing to happen to them.

- Eefrom Jones (BN # 1008241) reports that he was beaten by a group of deputies who tased and pepper-sprayed him and broke his shoulder. This incident occurred on September 24, also on 3500C. Furthermore, he also claims that 15 minutes after reporting one of the deputy's names to an investigating Lieutenant, that same deputy escorted him to the hallway, yelled at him for complaining, and then forced him to strip naked while he and several other deputies laughed at him.

We request that the Department make every effort to ensure that these inmates are not subjected to additional retaliation or injury, and that their safety is protected. We have made this request every time we have submitted declarations regarding deputy misconduct, as the inmates who agree to cooperate with us have already been injured and are very fearful of another violent incident. We note harassment and deputy retaliation has continued and worsened for several of the new people submitting declarations and for at least one person whose statement we provided to the Department earlier this year. Eric White (BN # 1837058) reported that he was severely beaten by a group of deputies in May 2009 on the 2000FL of MCJ. As a result of this incident, Mr. White had to be hospitalized for fractured vertebrae and a shattered shoulder. Afterward, the incident was reportedly turned over to Internal Affairs for investigation. Mr. White states that after reporting the incident and cooperating with the investigation, the last four months of his life have "been nothing but terror." Mr. White reports that deputies regularly harass him for reporting the incident. We would appreciate it if your staff will review the effectiveness of the Department's efforts to ensure the safety of inmate witnesses and provide us with an update on additional efforts that can be taken.

We would also like to discuss the timing and independence of the investigations into these complaints by Rutherford class members. The investigation process is very slow. Many of these investigations have been pending for months without any report back to us on the outcome or the process. If our clients are to have any confidence in the process, prompt results are critical. The Department also assures us that the investigations are very thorough, but we have serious concerns about the impartiality of the investigation in the one case on which we have been



ACLU
AMERICAN CIVIL LIBERTIES UNION
of SOUTHERN CALIFORNIA
FOUNDATION

LIBERTY | JUSTICE | EQUALITY

Sheriff Leroy Baca                                                    Page 3
October 28, 2009

briefed.  In this case (D.Rushing), the Department concluded that charges were unfounded after
interviewing the deputy, who denied any retaliatory statements.  Neither the inmate nor his
attorney was interviewed and there was apparently no assessment of whether the deputy's use of
force was excessive.   We would like to discuss whether these investigations can be referred to an
independent entity, rather than being investigated internally.

We encourage you to share this letter with your staff and counsel.  It is imperative that we meet
promptly.  We are ready to meet at your earliest convenience and await confirmation of a date
and time when you are available for a meeting.


Sincerely,


Mark Rosenbaum              _____/s/_____      _____/s/_____
Mark Rosenbaum              Margaret Winter          Melinda Bird
ACLU-SC                     ACLU National Prison Project  Disability Rights California



# Exhibit R

# DECLARATION OF LISA MA

I, LISA MA, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am an intern with the America Civil Liberties Union of Southern California's Jails Project. I have been an intern with the Jails Project since Tuesday, June 1, 2010. I graduated from Duke University with a Bachelor's degree in political science in May 2010 and I will be attending Harvard Law School in September 2010.

3.      On Wednesday, June 16, 2010, at approximately 1:30 p.m., I entered the legal visits room at Men's Central Jail and requested a legal visit with Robert Dragusica (Booking Number 1320442). I requested to visit him because his name was on a list of inmates to visit maintained by the Jails Project. On the list, the reason for the visit was entered as, "spoke to buddhist chaplain and said in the past couple of days he's witnessed a couple of staff on inmate assaults and he's 'had enough' and wants to talk." I do not remember how long I waited for the deputies to bring Robert Dragusica down from his module, but I waited for more than 30 minutes. I know this because I was able to talk to at least one other inmate before Robert Dragusica arrived. Robert Dragusica is a K-10 inmate, meaning that he must be escorted by deputies to the legal visits room and he wears an orange jumpsuit.

4.      When I spoke to Robert Dragusica in the legal visits room, he told me about the incidents of deputy-on-inmate or inmate-on-inmate violence he had witnessed in his module. He named Deputy Bearer and Deputy Rico as two deputies who were assigned to his module who assaulted inmates. I took a declaration from him and explained I would return on Friday, June 18, 2010 to speak with him again about his declaration. Robert Dragusica said that he knew the



1
DECLARATION OF LISA MA

deputies of his module, would find out about his talking to ACLU about their conduct and he was worried the deputies would retaliate against him.

5.      On or about Friday, June 18, 2010 at approximately 2 p.m., I requested a legal visit with Robert Dragusica in the legal visits room at Men's Central Jail. I waited for approximately 40 minutes before the deputy at the legal visits room told me that Robert Dragusica had refused my legal visit. I asked him why and he said he did not know.

6.      On Friday, June 25, 2010, I returned to the legal visits room at Men's Central Jail and requested a legal visit with Robert Dragusica. After about at least 30 minutes, Robert Dragusica sat down and I spoke to him through the phone. Robert Dragusica began to talk about medical issues he had with his back, until the deputies that escorted him to the legal visits room were out of earshot. Then Robert Dragusica told me that after he returned from his legal visit with me on Wednesday, June 16, 2010, the deputies of his module asked him what he was talking to ACLU about. Robert Dragusica said that he told the deputies he was discussing medical issues with the ACLU, but the deputies did not believe him and continued to harass him verbally, asking him questions about his legal visits with the ACLU. Robert Dragusica said that on Friday, June 18, 2010, the same deputies who inquired about the Wednesday, June 16, 2010 visit told him that ACLU was visiting him. Robert Dragusica said that he felt pressured to deny the legal visit so that the deputies would not retaliate against him. Robert Dragusica said that he told the deputies he was refusing the legal visit.

7.      During my legal visit with Robert Dragusica on Friday, June 25, 2010, Robert Dragusica expressed fear that the deputies would retaliate against him for talking to the ACLU. Robert Dragusica said he was certain the deputies would plant a razor on him and "ad-charge" him, meaning the deputies would accuse him of possessing contraband and put him in

2

DECLARATION OF LISA MA

disciplinary administrative segregation. Robert Dragusica asked me to write down, for the record, that he does not have any weapons of any sort and that he was afraid he would be framed by the deputies.

8.      At approximately 4:00 p.m. on Friday, June 25, 2010, I returned to the American Civil Liberties Union office and entered into the Inmate/ Jails Intake database Robert Dragusica's name, booking number, and the following note:

9.      "Inmate would like to state, for the record, that he has never possessed any weapons and never intends to. Inmate reports that he is afraid deputies will attempt to frame him by placing weapons on him, because of he has been speaking to ACLU. He would like it on the record that he believes deputies will attempt to frame him in retaliation."

10.     The record number of this entry is 48774.

11.     I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 14th day of July, 2010 in Los Angeles, California.

LISA MA