# EXHIBIT 1

1  TERRY SMERLING
2  GREATER WATTS JUSTICE CENTER
   1980 South Vermont Avenue
3  Los Angeles, California 90007
   Telephone: 732-0153 (213)

4

5  Attorney for Plaintiffs

FILED

DEC 3 1 1975

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  DENNIS RUTHERFORD, HAROLD TAYLOR,       )
12  RICHARD ORR, GREGORY ARMSTRONG,         )
    JACK JONES and WILLIAM ROBLES,          )
13  on behalf of themselves and all         )   No. CV 75- 4111 - WP6 (P)
    others similarly situated,              )
14                                          )
                    Plaintiffs,             )   AMENDED COMPLAINT
15                                          )   FOR DECLARATORY
         vs.                                )   AND INJUNCTIVE
16                                          )   RELIEF.
    PETER J. PITCHESS, as Sheriff of        )
17  the County of Los Angeles,              )   (Civil Rights Act)
    WILLIAM ANTHONY, as Assistant           )
18  Sheriff of the County of Los            )
    Angeles, JOHN KNOX, as Chief of         )
19  the Corrections Division of the         )
    Los Angeles County Sheriff's            )
20  Department, JAMES WHITE, as Commander)
    of the Los Angeles County Central       )
21  Jail, and EDWARD EDELMAN,               )
    KENNETH HAHN, JAMES HAYES,              )
22  PETER SCHABARUM and BAXTER WARD,        )
    as Supervisors of the County of        )
23  Los Angeles,                           )
                                           )
24                  Defendants.            )
                                           )
25  _____

26       Plaintiffs complain against the Defendants as follows:

27                        JURISDICTION

28       1.  This is a class action for a declaratory judgment

29  that Plaintiffs' constitutional rights are being violated by the

30  conditions of their confinement in the Los Angeles County Central

31  Jail and for a permanent injunction preventing Defendants from

32  continuing to violate sentenced and unsentenced prisoners' rights

-1-

24

**EXHIBIT 1**

while acting under color or law.

     2.   Jurisdiction is conferred on this Court under 28 U.S.C. §1343 providing for jurisdiction over claims arising under 42 U.S.C. §1983 and §1985, and 28 U.S.C. §2201 and §2202 relating to declaratory judgments.  The Court has pendent jurisdiction to adjudicate claims arising under California law.

PARTIES

     3.   Plaintiffs are residents of the United States and of the County of Los Angeles, State of California and are incarcerated at the Los Angeles County Central Jail, (hereinafter referred to as the "Central Jail" or the "Jail"), located at 441 Bauchet Street, Los Angeles, California.

     4.   Plaintiffs Dennis Rutherford, Harold Taylor, Gregory Armstrong and Williams Robles are charged with offenses under the law of California and are awaiting trial in the Supior or Municipal Courts for the County of Los Angeles, State of California.  In their criminal cases, bail has been set by a Judge of those courts.  Due to their indigency, they have been unable to make bail and are incarcerated at the Jail solely to insure their appearance at trial and for no other reason. Plaintiff Rutherford has been thus incarcerated since November 5, 1972; plaintiff Taylor has been thus incarcerated since December 17, 1973;  Plaintiff Armstrong has thus been incarcerated since October 5, 1975; and plaintiff Robles has thus been incarcerated since December 17, 1975.  Said plaintiffs are presumed innocent and are incarcerated solely to insure their presence at trial.

//
//

-2-

25

5.   Plaintiffs Richard Orr and Jack Jones are convicted and sentenced prisoners currently serving their sentences in the Jail.

6.   The Plaintiffs are representative of a class within the meaning of Rule 23, Federal Rules of Civil Procedure. The Plaintiffs represent two separate sub-classes, the first (hereinafter referred to as Class I), represented by Plaintiffs Rutherford, Taylor, Armstrong and Robles, consists of all unconvicted, pre-trial detainees incarcerated at the Los Angeles County Central Jail.   This class is   ongoing and includes pre-trial detainees incarcerated who are or will be in the future incarcerated at the Jail.   The second sub-class (hereinafter referred to as Class II) represented by Plaintiffs Orr and Jones, is an ongoing one and includes post-trial detainees, convicted and sentenced prisoners, who are or will in the future be incarcerated at the Los Angeles County Central   Jail to serve their sentences.   The classes are proper for the following reasons:

(a) The members of the classes are so numerous that joinder of all of them is impracticable;

(b) The members of the classes are readily indentifiable from the Defendants' records;

(c) There are questions of law and fact common to each class;

(d) The claims of the Plaintiffs are typical of the claims of their respective classes.

(e) The Defendants have acted or refused to act on grounds generally applicable to each class.

(f) The Plaintiffs will fairly and adequately protect the interests of the class.

//

//

26

-3-

7.   Defendant Peter J. Pitchess is, and at all times herein relevant has been, the Sheriff of the County of Los Angeles, California, and keeper of the Jail pursuant to California Government Code Section 26505 and Penal Code Sections 4000 and 4005, and as such is charged with the duty of maintaining and operating the Central Jail and promulgating and enforcing rules for the governance and safekeeping of prisoners incarcerated at the Central Jail and for the supervision of Deputy Sheriffs in the Los Angeles County Sheriff's Department.

8.   Defendant William Anthony is, and has been at all times herein relevant, an Assistant Sheriff in the Los Angeles County Sheriff's Department in charge of the Sheriff's Department Custody Division, and as such is responsible for maintaining and operating county jail facilities, including the Central Jail, and promulgating and enforcing rules for the care and treatment of prisoners at the Jail.

9.   Defendant John P. Knox is, and at all times relevant herein has been, the Chief of the Los Angele County Sheriff's Department Custody Division and as such is responsible for maintaining and operating County jail facilities, including the Central Jail, and for promulgating and enforcing rules for the care and treatment of prisoners at the Jail.

10.   Defendant James White is, and was at all times relevant herein, a Captain of the Los Angeles County Sheriff's Department and the county official directly responsible for the administration of the Central Jail.

//
//

-4-

27

11.   Defendants Edward Edelman, Kenneth Hahn, James Hayes, Peter F. Schabarum, and Baxter Ward are, and at all times relevant herein have been, Supervisors of the County of Los Angeles, California, and as such responsible for the maintenance and operation of the jails within said County, including the Central Jail, and are responsible for the welfare of the inmates of these jails and for the control of persons, including defendants named in paragraphs 7 through 10 herein assigned to operate said jails. Defendant Supervisors constitute the governing board of the County of Los Angeles and are responsible for the allocation of funds for all county purposes, maintenance of County jails not excluded.

12.   All the individual defendants as well as the County of Los Angeles shall hereinafter be referred to collectively as "defendants", which term shall be used to mean defendants and each of them, unless otherwise specified.

13.   Defendants and each of them are, and at all times herein mentioned have been, the agents, servants and employees of one another, and in doing the acts and maintaining the conditions herein complained of, are and have been acting within the course and scope of said agency and employment.

14.   In doing all the acts and omissions, and in maintaining the conditions, herein described, defendants, and each of them, separately and in concert, have been and are acting under color of the statutes, ordinances, regulations, custom and usuages of the State of California and the County of Los Angeles. Said acts and omissions were committed and conditions were maintained by defendants personally and through actions of their agents and subordinates, acting pursuant to instructions from defendants.

-5-

28

15.   Other agents, servants and employees of
defendant Pitchess, not specifically named herein, work at the
Central Jail and carry out the directions and policies of
defendant Pitchess.  These agents, servants and employees of
defendant Pitchess shall hereinafter be referred to as "officers"
the term by which they are referred to within the Jail.
Included within the scope of their employment is the care,
treatment and control of prisoners at the Jail.

## STATEMENT OF THE CASE

16.   Defendants deny plaintiffs adequate contact
with the general community by doing the following:

(a)   Opening, reading and censoring all prisoners'
mail to and from attorneys and others;

(b)   Limiting the time, frequency and duration
of prisoners' personal visits;

(c)   Prohibiting physical contact during prisoners'
personal visits and prohibiting conjugal visits;

(d)   Denying prisoners and their visitors privacy
and surveilling conversations during visits;

(e)   Requiring visitors to wait in line long periods
of time before visits and treating visitors in a rude manner;

(f)   Denying pretrial prisoners night visits;

(g)   Denying prisoners direct access to telephones
to make outgoing calls;

(h)   Prohibiting prisoners from receiving incoming
telephone calls; and

(i)   Prohibiting prisoners from receiving through
the mail or from visitors newspapers, magazines, books, reading
matter and other such forms of written communication from the
outside world.

-6-

29

17. Defendants deny plaintiffs the opportunity to personally consult with their attorneys in privacy. Attorney-client communications take place in an area, mislabeled the "attorney room," which often becomes crowded and which is simultaneously used by law enforcement officers, parole and probation officers, bailbondsmen and clergy. As a consequence, interviews between prisoners and attorneys lack adequate privacy, particularly during busy daytime hours; and conversations can be and overheard by others in the room.

18. Defendants deny pretrial prisoners access to an adequate law library, legal materials and adequate opportunity to communicate in person or by telephone with counsel and do not permit prisoners to receive from outside the Jail any legal material, unless by Court order.

19. Defendants deny plaintiffs adequate opportunity to physically exercise themselves, recreate and entertain themselves and thus subject plaintiffs to excruciating boredom. Pretrial prisoners are completely denied any opportunity to exercise or recreate outdoors, are allowed out of their cells for exercise only one hour perday, if at all, are only infrequently permitted the use of the day rooms and are totally without access to television, movies and live entertainment.

20. The Jail's reading library is inadequate, and pretrial prisoners have only indirect access to that library by a cart that comes through pretrial prisoners housing areas about once each two weeks.

//
//

-7-

30

21.   Defendants subject prisoners going to Court to a harsh, exhausting routine which jeopardizes their right to a fair trial.   On days they go to court prisoners are awakened between 3:45 a.m. and 4:00 a.m..   They then spend their days in crowded holding areas in the Jail, on buses to and from the Courts and in holding tanks at the courts.   During this time they are not provided adequate meals.   Prisoners are frequently returned to the Jail from court at 8:00 p.m. and even as late as after midnight, thereby getting little sleep before the next day's court appearance.

22.   Defendants routinely confiscate plaintiffs' personal belongings, including but not limited to correspondence and photographs.

23.   Defendants deny plaintiffs an adequate opportunity to obtain from family and friends or to purchase at the Jail commissary necessitites and amenities of life such as soap, toothbrush, toothpaste, comb deodorant, paper, pencils, and reading matter; and defendants fail to provide indigent prisoners with such items.

24.   Defendants deny plaintiffs adequate opportunity to bathe on a daily basis.   Pretrial prisoners in particular are herded into overcrowded shower areas where they must bathe: 10 men per shower head.

25.   Defendants deny plaintiffs sufficient time to eat their meals and provide pretrial prisoners with only spoons to eat their meals.

//

//

-8-

31

26.   Prisoner housing at the Jail consists of
cells designed for one, two, four or six men.  Lighting in all
cells is inadequate for reading and is controlled from outside
the cells by Jail officers.  The two, four and six men cells
are not furnished with any chairs, stools, tables or desk areas.
All areas occupied by prisoners are windowless and without a view
to the outside world.

27.   The physical conditions of plaintiffs' confine-
ment constitutes a health threat in that the Jail lacks proper
heating and ventilation and defendants fail to take adequate
measures to preserve sanitation and to prevent the spread of
contagious diseases.  Cells for pretrial prisoners, designed
for two, four or six men are overcrowded and frequently extra
prisoners are assigned to such cells and required to sleep on
the floor.  Toilets are located inside the cells, and prisoners
must eliminate body wastes in the immediate presence of their
cellmates.

28.   Both medical care and routine health care at
the Jail are, when available at all, inadequate, and usually
characterized by a callous disregard for the well-being of
prisoners and for the basic tenets of sound medical practice.
The standards of medical care at the Jail are well below those
generally accepted as adequate in Los Angeles County or the
State of California.  Defendants do not provide adequate preven-
tive and diagnostic medical services to prisoners upon admission
to the Jail.  All prisoners already in the Jail are unnecessarily
exposed to dangerous medical and/or contagious conditions that
new prisoners might possess; and consequently, their lives and
health are needlessly impaired.  Defendants seize all medicine,
drugs, pills, orthopedic appliances and some eyeglasses from

32

prisoners upon admission to the Jail, even though such medication or devices may be lawfully prescribed and necessary to maintain the prisoners' life and health during chronic illnesses, such as epilepsy; and as a result newly admitted prisoners often suffer seizures or great discomfort and other adverse effects resulting from sudden deprivations of such medication or devices. Prisoners who manage to get medication while in the Jail often receive inappropriate and inadequate substitutes for seized prescription medications.  Medication usually is distributed to prisoners at hours convenient to defendants and not to the medical needs of the prisoner, and prisoners often receive no medication at all when they are away from the Jail in Court.  Medical care when given is frequently grossly inadequate and inappropriate.

29.  Nursing personnel at the Jail are engaged in the unauthorized practice of medicine in violation of the law of California in that said nurses without adequate supervision make decisions whether to treat prisoners and/or whether to refer prisoners to a doctor.

30.  Many unconvicted prisoners admitted to the Jail are drug addicts, and suffer withdrawal symptoms shortly after admission to the Jail.  Defendants are well aware of this fact. Although they are required to do so by California Health and Safety Code §11222, Defendants make little or no attempt to provide prisoners under their care, whom they have reasonable cause to believe are addicted to controlled substances, with medical care necessary to ease symptoms of withdrawals from those substances.

//
//

33

31.  Psychologists or psychiatrists are not available to give routine care to prisoners.  Prisoners who are "diagnosed" as having psychological problems by Jail officers are "treated" with isolation.  Supervision of mentally disturbed prisoners is inadequate , and little or no medical or psychological treatment is provided for them.  No attempt is made to transfer mentally ill prisoners to more appropriate facilities.  As a result mentally disturbed prisoners often commit suicide in the Jail.

32.  Defendants' rules and regulations which govern operation of the Jail and the actions and practices of officers are not posted throughout the Jail and are not made available to all prisoners.  Those rules and regulations which are available to some inmates are printed solely in English; and Defendants' method of publishing is to post them in only some parts of the Jail.  Thus, many prisoners are ignorant of the Jail's rules and regulations; and in particular, Spanish-speaking prisoners are often totally unaware of their existence or content. Moreover, many of these "published" rules are unconstitutionally vague -- giving no adequate notice of the conduct they are intended to prevent -- and are selectively enforced by defendants. Other rules are enunciated by officers on an ad hoc basis, frequently after an "offense" has allegedly occurred.  These "rules" vary from officer to officer, according to his mood and/or feelings toward the prisoners involved.

33.  Defendants impose punishment upon prisoners for violations of Jail rules without notice, hearing or opportunity for prisoners to speak on their own behalf or otherwise contest the charges against them.  No standardized punishments exist for violation of either written or unwritten rules. Instead, penalties, like rules, are applied on an arbitrary

34

1   ad hoc basis.  Penalties are not necessarily limited to the

2   alleged offender.  Sometimes an entire housing area of pris-

3   oners is punished for an infraction allegedly committed by

4   one of their number.  Punishments include, but are not limited

5   to, withdrawal of privileges, forced labor and solitary confine-

6   ment.  All punishments may be levied for an indefinite period

7   of time.

8

9        34.  For purposes of discipline and so-called

10  administrative segregation, defendants place many prisoners in

11  abysmal housing areas known as "The Hole" and "Siberia" and

12  in other housing areas utilized for segregation and isolation.

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

29  //

30  //

31  //

32  //

35

35.   The defendants govern plaintiffs' lives with a reign of terror, the principal ingredient of which is a widespread pattern and practice of unprovoked assaults of prisoners by Jail officers.  Many Jail officers under defendants' supervision are inexperienced in corrections and psychologically unsuited for work as correctional officers because the Sheriff's Department is primarily an investigative and police agency and its employees, including Jail officers, receive little or no training in corrections.  Moreover, the most inexperienced officers are assigned to duty at the Jail.  Their inexperience and psychological unfitness often cause them to perform the acts or omissions complained of herein which result in harm to the plaintiffs as hereinafter elaborated.

36.   Defendants maintain or permit conditions in the Jail and follow practices which they know or have reason to know are deleterious to the physical and mental well-being of the prisoners for whose health they are responsible.  The brutality, and indifference perpetrated on prisoners by defendants and their employees and the resultant mental anguish suffered by plaintiffs ensure thatplaintiffs will suffer mental illness or severe distress as a result of confinement in the Jail.

37.   Defendants' treatment of unconvicted prisoners is incredibly egregious in view of the fact that convicted prisoners in the Jail, in other Los Angeles County jail facilities and in California and Federal prisons, are treated considerably better than unconvicted prisoners in the Jail.  Although the lives of   convicted prisoners are far from idyllic, convicts do not face the same oppressive confinement and boredom experienced by the Jail's unconvicted prisoners.  Convicts

36

1  generally live in superior housing and have daily opportunity to
2  exercise, recreate, entertain themselves and bathe.

3
4              FIRST CLAIM FOR RELIEF:   SUMMARY PUNISH-
5         MENT OF PRETRIAL PRISONERS WITHOUT DUE
6         PROCESS OF LAW.

7
8         38.   Plaintiffs incorporate by reference the allegations
9  contained in paragraphs 1 through 37, inclusive.

10
11        39.   Pretrial detainees are presumably innocent and
12  for the most part are confined in lieu of bail, which they are
13  too poor to afford, to ensure their attendance at trial.   Yet
14  defendants inflict upon these prisoners conditions, restrictions
15  and constraints which individually and in the aggregate constitute
16  summary punishment without even a semblance of due process of
17  law in contravention of 42 U.S.C. §1983 and the Fifth and
18  Fourteenth Amendments to the United States Constitution.

19
20             SECOND CLAIM FOR RELIEF:   DENIAL TO PRE-
21         TRIAL PRISONERS OF EQUAL PROTECTION OF LAW.

22
23        40.   Plaintiffs incorporate by reference the allegations
24  contained in paragraphs 1 through 37, inclusive.

25
26        41.   Most pretrial prisoners are detained only because
27  they are financially unable to post bail.   By contrast, wealthier
28  persons awaiting trial who can afford to post bail are not incar-
29  cerated or subjected to the conditions which these plaintiffs
30  experience.   Wealthier persons have, inter alia, unrestricted
31  access to counsel; the opportunity to do legal research and to
32  contact witnesses; the opportunity to obtain proper rest and

1  nutrition and to maintain their physical and emotional health
2  so that they can effectively assist in preparation of their
3  trials and appear as effective witnesses for themselves.
4  Defendants have denied and will continue to deny all these
5  rights to pretrial prisoners solely because of their poverty.
6
7       42.  Defendants, by committing the acts, omissions and
8  practices complained of in this claim for relief are depriving
9  pretrial prisoners of equal protection of the laws in violation
10 of 42 U.S.C. §1983 and the Fourteenth Amendment to the United
11 States Constitution.
12
13      THIRD CLAIM FOR RELIEF:  PRE-
14      JUDICE TO A FAIR TRIAL.
15
16      43.  Plaintiffs incorporate by reference the allegations
17 contained in paragraphs 1 through 37, inclusive.
18
19      44.  The physically and psychologically oppressive
20 conditions at the Jail impair unconvicted prisoners' mental and
21 physical health so that they cannot be effective witnesses for
22 themselves or assist in preparing their defenses, and upon
23 plaintiffs' information and belief, cause many unconvicted
24 prisoners to plead guilty to avoid further confinement in the
25 Jail.  Inadequate sleep, hours on buses going to and from court,
26 crowded holding tanks and very little food render many unconvicted
27 prisoners listless and unable to assist or understand their
28 defense.
29
30      45.  The conditions to which presumably innocent
31 prisoners awaiting trial are subjected in the Jail, as well as
32 the restrictions placed on their access to counsel and to the

-15-

38

1  courts undermine the integrity of the entire trial process and
2  infringe on unconvicted prisoners' rights to a fair trial
3  thereby depriving these prisoners of rights guaranteed them by
4  42 U.S.C. §1983 and the Fifth, Sixth, Seventh and Fourteenth
5  Amendments to the Constitution of the United States.

6
7                FOURTH CLAIM FOR RELIEF:   DENIAL OF
8                ACCESS TO COUNSEL AND TO THE COURTS.
9
10        46.  Plaintiffs incorporate by reference the allegations
11  contained in paragraphs 1 through 18, inclusive, and 21.
12
13
14        47.  Defendants restrict prisoners' access to courts
15  and to counsel and to the effective assistance of counsel by,
16  among other things:
17            (a)  Reading prisoner-attorney mail;
18            (b)  Reading and censoring prisoner mail to and from
19  courts;
20            (c)  Refusing to allow private attorney-prisoner
21  interviews in the attorney room;
22            (d)  Refusing to permit prisoners phone calls to
23  attorneys, investigators and witnesses;
24            (e)  Subjecting prisoners to an exhausting routine
25  on court days.
26
27        48.  Defendants further deny pretrial prisoners access
28  to the courts and their rights to assist counsel in preparing a
29  defense by making it impossible for prisoners to prepare legal
30  documents or assist counsel in legal research due to inaccessibi-
31  lity of law books or to locate and prepare witnesses due to the
32  restrictions on communications.

49.   Defendants' actions, practices, policies and
omissions in restricting and/or denying prisoners their
constitutionally protected rights of access to the courts and
to counsel and to petition for the redress of grievances deprive
plaintiffs of rights secured them by 42 U.S.C. §1983 and the
First, Fifth, Sixth and Fourteenth Amendments to the United
States Constitution.

FIFTH CLAIM FOR RELIEF:   DENIAL OF RIGHTS OF
EXPRESSION, COMMUNICATION AND ASSOCIATION.

50.   Plaintiffs incorporate by reference the alleg-
ations contained in paragraphs 1 through 16, inclusive, and 22.

51.   Defendants censor the flow of communication to
and from prisoners and effectively isolate prisoners from the
outside world in contravention of plaintiffs' rights guaranteed
them by 42 U.S.C. §1983 and the First, Fourth and Fourteenth
Amendments to the United States Constitution.

SIXTH CLAIM FOR RELIEF:   DENIAL OF DUE PROCESS
IN DISCIPLINARY AND ADMINISTRATIVE PROCEEDINGS.

52.   Plaintiffs incorporate by reference the
allegations contained in paragraphs 1 through 37, inclusive.

53.   Defendants mete out discipline to all prisoners
and in effect subject pretrial prisoners to punitive, high secur-
ity classification in a capricious manner without the rudiments
of fundamental fairness,  namely prior notice of what constitutes
a disciplinary infraction and what punishments attach, prior
notice of and opportunity for a prompt hearing before an
impartial tribunal at which hearing the accused may be repre-
sented by counsel or counsel substitute, confront adverse
witnesses, and present favorable evidence, and a reasoned
decision with

//

-17-

40

findings based on the evidence.   Defendants' failure to provide
these procedural protections denies plaintiffs due process
of law as guaranteed by 42 U.S.C. §1983 and the Fifth and
Fourteenth Amendments of the United States Constitution.

SEVENTH CLAIM FOR RELIEF:   CRUEL
AND   UNUSUAL   PUNISHMENT.

54.   Plaintiffs incorporate by reference the allegations
contained in paragraphs 1 through 37, inclusive.

55.   The conditions, restrictions and constraints,
individually and in the aggregate, suffered by prisoners at
the hands of defendants constitute cruel and unusual punishment
in contravention of plaintiffs' rights under 42 U.S.C. §1983
and the Eighth and Fourteenth Amendments to the United States
Constitution.

EIGHTH CLAIM FOR RELIEF:
INADEQUATE MEDICAL CARE.

56.   Plaintiffs incorporate by reference the allegations
contained in paragraphs 1 through 15, inclusive, and 28 through
31, inclusive.

57.   Defendants provide plaintiffs with inadequate,
superficial care in violation of plaintiffs' rights to due
process of law secured to them by 42 U.S.C. §1983 and the
Fifth and Fourteenth Amendments to the United States
Constitution.

/
/

41

NINTH CLAIM FOR RELIEF:  VIOLA-
TIONS OF CALIFORNIA LAW.

58.  Plaintiffs incorporate herein by reference
the allegations contained in paragraphs 1 through 16, inclusive,
22 and 28 through 31, inclusive.

59.  Defendants deny plaintiffs their right to make
two phone calls within three hours of booking guaranteed by Cal-
ifornia Penal Code §851.5.

60.  Defendants confiscate plaintiffs' personal
property without providing a receipt in violation of California
Penal Code §4003.

61.  Defendants fail to provide plaintiffs care and
treatment by a physician 24 hours per day and deny palintiffs
treatment by their private physicians in violation of California
Penal Code §4023.

62.  Jail nurses are engaged in the unauthorized prac-
tice of medicine, in violation of California Business and Profes-
sions Code, §§2141, 2392 and 2726.

63.  Defendants fail to provide prisoners who are
addicted to controlled substances with medical treatment necess-
ary to ease the symptoms of withdrawal in violation of Calif-
ornia Health and Safety Code §11222.

DECLARATORY JUDGMENT

64.  An actual and substantial controversy exists
between Plaintiffs and Defendants, in that Plaintiffs complain
that Defendants are violating and will continue to violate their
most fundamental rights under the United States Constitution and
the laws and statutes of the United States and California

-19-

42

and commit acts and omissions threatening Plaintiffs' lives and
health.  Defendants  have persisted in subjecting Plaintiffs to
unconstitutional and harmful conditions despite protests by
the Jail's prisoners.  Defendants may in the future make minor
changes in the Jail from time to time in response to protests,
but they will do nothing substantial to remedy the unconstitutional
and harmful conditions to which they subject Plaintiffs or to
change the policies and procedures.  Defendants deny that their
actions are illegal or unconstitutional or cause injuries to
Plaintiffs.

## INJUNCTIVE RELIEF

65.  All of the conditions and practices separately and
in the aggregate make incarceration in the Jail severe, punitive
and restrictive.  The Plaintiffs are now suffering and will
continue to suffer irreparable injury as a direct and proximate
result of the conditions and practices herein alleged and are with-
out a plain, speedy, adequate remedy at law in that:

    (a)  Money damages will not adequately compensate
Plaintiffs for denial of their Civil Rights or for time confined
in the Jail pursuant to pretrial detention under conditions that
could be successfully challenged in the Courts.

    (b)  Plaintiffs are psychologically and physically
harmed and damaged; and unconvicted prisoners are induced to
plead guilty to criminal charges pending against them in order
to avoid the conditions and practices herein described which
exist at the Jail.

    (c)  Money damages for Plaintiffs' injuries are
extremely difficult to calculate.

43

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray:

1.  That the Court certify this action as a class action.

2.  That the Court personally view the Los Angeles County Central Jail to gain assistance in rendering a ruling.

3.  That the Court enter judgment declaring that defendants, and each of them, through the individual and collective acts, practices, and omissions complained of herein, have subjected and are subjecting plaintiffs to:

a.  Summary punishment without due process of law in contravention of 42 U.S.C. §1983 and the Fifth and Fourteenth Amendments to the United States Constitution as enumerated in Plaintiffs' First Claim for Relief;

b.  Denial of equal protection of law in contravention of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution as enumerated in Plaintiffs' Second Claim for Relief;

c.  Prejudice to fair trial in contravention of 42 U.S.C. §1983 and the Fifth, Sixth, Seventh and Fourteenth Amendments to the United States Constitution as enumerated in Plaintiffs' Third Claim for Relief;

d.  Denial of access to counsel and the Courts in contravention of 42 U.S.C. §1983 and the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution as enumerated in plaintiffs' Fourth Claim for Relief;

e.  Denial of Rights of Expression, Communication and Association in contravention of 42 U.S.C. §1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution as enumerated in plaintiffs' Fifth Claim for Relief;

//

44

f.   Denial of due process in disciplinary and classification proceedings in contravention of 42 U.S.C. §1983 and the Fifth and Fourteenth Amendments to the United States Constitution as enumerated in plaintiffs' Seventh Claim for Relief;

g.   Cruel and unusual punishment in contravention of 42 U.S.C. §1983 and the Eight and Fourteenth Amendments to the United States Constitution as enumerated in plaintiffs' Seventh Claim for Relief;

h.   Denials of adequate medical care in contravention of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution as enumerated in plaintiffs' Eighth Claim for Relief;

i.   Violations of California Penal Code §§851.5, 4003, 4023, Business and Professions Code §§2141, 2392 and 2726 and Health and Safety Code §11222 as enumerated in plaintiffs' Ninth Claim for Relief;

4.   That the Court issue preliminary and permanent injunctions assuring that pretrial prisoners are accorded all of the rights and privileges of the innocent; and that all prisoners not be subjected to cruel and unusual punishment and not denied their other constitutional and statutory rights.  More specifically, the Plaintiffs should be assured by the plan, inter alia:

a.   That the prisoners be accorded essential preventive medical care and receive adequate and sound medical, psychiatric and dental health care;

b.   That prisoners addicted to controlled sub-

//
//
//
//

-22-

45

stances be accorded with reasonable medical care to ease the symptoms of withdrawal.

c.   That a regular recreational and exercise program, outside of the cells, be expanded and that all prisoners be allowed outdoors for sufficient periods to insure their continuous physical and mental well being;

d.   That the Jail and its prisoners living areas therein be kept in a safe and healthy condition, with proper heating, ventilation and provisions for sanitation;

e.   That pretrial prisoners be accorded private and adequate living space in one man cells with reasonable lighting and furnishings.

f.   That defendants be enjoined from placing pretrial prisoners in overcrowded cells and from requiring some pretrial prisoners to sleep on the floor.

g.   That all prisoners be provided suitable and sufficient time to eat in accordance with recognized nutritional needs and be provided with knife, fork and spoon as utensils.

h.   That education and vocational work programs be established;

i.   That the prisoners have continuous opportunity to talk and associate with each other, for legitimate purposes including but not limited to socializing.

j.   That the prisoners be entitled to receive through the United States Mail or from visitors and retain books, magazines, newspapers, law books and legal materials and be provided with direct access to adequate reading and law libraries;

k.   That visiting conditions be established which assure decency, comfort, privacy of conversations, conjugal rights, and visiting periods of adequate duration and frequency.

-23-

46

l.   That no limitations be placed on persons an inmate may see, communicate with and receive communications from;

m.   That no censorship be executed on incoming or outgoing mail, newspapers, books and periodicals; that the only control on incoming mail be for the inspection of contra-band such as drugs or weapons.

n.   That adequate phones be installed so that prisoners have access to them in order to make local, outgoing calls without charge and to receive incoming calls, and that such phones not be wiretapped or monitored in any manner;

o.   That a reasonable code of intra-jail behavior providing for inmates rights to be promulgated in English and Spanish and provided for each prisoner upon entry to the jail;

p.   That no discipline or classification of inmates be instituted without first affording them notice, the assistance of counsel and counsel substitute, the confrontation of accusers, the right to cross-examine adverse witnesses, a written decision containing reasons therefor and evidence relied upon, and hearing before an impartial tribunal;

q.   That prisoners be protected from unprovoked assaults by Jail officers;

r.   That defendants be enjoined from assigning inadequately trained, rookie officers to the Jail.

s.   That plaintiffs be assured of adequate opportunity to bathe every day;

t.   That all prisoners, including the indigent, have reasonable opportunity to obtain life necessities and amenities.

u.   That all prisoners have the opportunity to obtain adequate rest and sleep before and during times they appear in court and that all prisoners going to court not be awakened earlier than 6:00 a.m. and not be returned to the Jail later than 6:00 p.m.

-24-

47

v.   That prisoners have the opportunity to privately and confidentially communicate with their attorneys in a room provided by defendants for that purpose.

w.   That prisoners be allowed to retain in reasonable quantities their personal belongings, including, but not limited to, correspondence and photographs.

x.   That Jail living areas be humanized and provided with reasonable furnishings and windows to the outside world.

5.   That if a satisfactory plan cannot be submitted and implemented, the Defendants be enjoined and restrained from incarcerating or detaining any and all prisoners in the Jail and further enjoined from transferring prisoners to an alternative facility unless Defendants can provide evidence satisfactory to the Court that the alternative does not suffer from the conditions herein complained of and that it is accessible to visitors and counsel.

6.   That the Court retain jurisdiction over Defendants until such time that the Court is satisfied that the practices, policies, acts and omissions alleged herein no longer exist and will not reoccur.

7.   The the Court award reasonable attorneys' fees and costs of suit herein to plaintiffs.

8.   That the Court award such other relief as may be necessary and proper.

Respectfully submitted,

TERRY SMERLING

-25-

48

VERIFICATION

STATE OF CALIFORNIA    )
                       ) SS.
COUNTY OF LOS ANGELES  )

I, the undersigned, say:

I am a plaintiff in the above entitled action,
I have read the foregoing Amended Complaint for Declaratory
and Injunctive Relief and know the contents thereof and know the
same is true of my own knowledge except as to those matters
which are therein stated upon information or belief and as to
those matters that I believe them to be true.



DENNIS RUTHERFORD

Subscribed and sworn to me on
this day, December 31    ,1975

Notary Public in and for the
    State of California

OFFICIAL SEAL
TERRY SMERLING
Notary Public - California
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES JUNE 29, 1976

-26-

49.

VERIFICATION

STATE OF CALIFORNIA    )
                       ) SS.
COUNTY OF LOS ANGELES  )

I, the undersigned, say:

I am a plaintiff in the above entitled action;
I have read the foregoing Amended Complaint for Declaratory
and Injunctive Relief and know the contents thereof and know the
same is true of my own knowledge except as to those matters
which are therein stated upon information or belief and as to
those matters that I believe them to be true.


RICHARD ORR

Subscribed and sworn to me on
this day, December 3/  ,1975

Notary Public in and for the
State of California

OFFICIAL SEAL
TERRY SMERLING
Notary Public - California
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES JUNE 29, 1976

-27-

50.

VERIFICATION

STATE OF CALIFORNIA    )
                       ) SS.
COUNTY OF LOS ANGELES  )

I, the undersigned, say:

I am a plaintiff in the above entitled action;
I have read the foregoing Amended Complaint for Declaratory
and Injunctive Relief and know the contents thereof and know the
same is true of my own knowledge except as to those matters
which are therein stated upon information or belief and as to
those matters that I believe them to be true.

GREGORY ARMSTRONG

Subscribed and sworn to me on
this day, December 3|  ,1975

Notary Public in and for the
State of California

OFFICIAL SEAL
TERRY SMERLING
Notary Public - California
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES JUNE 20, 1976

-28-

51

## VERIFICATION

STATE OF CALIFORNIA )
                     ) SS.
COUNTY OF LOS ANGELES )

     I, the undersigned, say:

     I am a plaintiff in the above entitled action; I have read the foregoing Amended Complaint for Declaratory and Injunctive Relief and know the contents thereof and know the same is true of my own knowledge except as to those matters which are therein stated upon information or belief and as to those matters that I believe them to be true.

_____
JACK JONES

Subscribed and sworn to me on this day, December 3l ,1975

_____
Notary Public in and for the
   State of California

```
OFFICIAL SEAL
TERRY SMERLING
Notary Public - California
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
MY COMMISSION EXPIRES JUNE 29, 1976
```

-29-

52

AME, ADDRESS AND TELE~`NE NUMBER
F ATTORNEY(S)


TTORNEY(S) FOR

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| NIS RUTHERFORD et al | | CASE NUMBER |
| --- | --- | --- |
| PLAINTIFF(S) | | CV 75 4111 WPG (P) |
| vs | | |
| TER J. PITCHESS et al | | PROOF OF SERVICE |
| DEFENDANT(S) | | |

I, the undersigned, certify and declare that I am a citizen of the
ted States, over the age of 18 years, employed in the County of
: Angeles                          State of California, and not a party to the
ve-entitled cause. On _Decembar 3j_, 1975, I served a true
y of _Amended Complaint for Declaratory and Injunctive Relief_
| by personally delivering it to the person(s) indicated below in the
ner as provided in FRCivP 5(b); [XX] by depositing it in the United States
l in a sealed envelope with the postage thereon fully prepaid to the follow
: (List names and addresses for person(s) served. Attach additional sheets if necessary.)
iendants' Attorney       John Larson
                         County Counsel
                         647 Hall of Administration
                         500 West Temple Street
                         ~~Los Angeles, California~~
ce of Mailing: ~~Los Angeles, California~~
                         Los Angeles, CA 90012
cuted on _December 3j_, 1975 at _Los Angeles_, California.

### YOU ARE REQUIRED TO CHECK ALL APPLICABLE BOXES
### ·BEFORE PRESENTING TO THE COURT FOR FILING

[X] I hereby certify that I am a member of the Bar of the United States
District Court, Central District of California. *

[ ] I hereby certify that I am employed in the office of a member of the
Bar of this Court at whose direction the service was made. *

*Signature of person making service*
TERRY SMERLING

scribed and sworn to before me

_____
        (Date)                          *Document must be notarized only if neither
                                        of these certifications is applicable.*

ery Public in and for the County
te of California.

        (Seal)

### ACKNOWLEDGMENT OF SERVICE

_____ received a true copy of the within document c
_____, 19___

                                        _____
                                            (Signature)          · 53
                                        for:_____
                                            (Party served)

· 40 (5-73)              PROOF OF SERVICE

# EXHIBIT 2

TERRY SMERLING
FRED OKRAND
JILL JAKES
MARK D. ROSENBAUM
  ACLU Foundation of
  Southern California
633 South Shatto Place
Los Angeles, California 90005
(213) 487-1720
Attorneys for Plaintiffs

LODGED

LODGED
JUN 1 1977
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

JUN 1 107 CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

FILED
JUN 2 7 1977
CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, HAROLD TAYLOR,
and RICHARD ORR, et al.,

                    Plaintiffs,

        vs.

PETER J. PITCHESS, et al.,

                    Defendants.

NO. CV 75-4111-WPG

PRETRIAL CONFERENCE ORDER

        Following pretrial proceedings pursuant to Rule 16 of
the Federal Rules of Civil Procedure and Local Rule 9 of this
Court,

        IT IS ORDERED:

        I.   Nature of Action and Parties.

        1.   This is a class action seeking injunctive and
declaratory relief against the practices and conditions of
confinement at the Los Angeles County Central Jail (hereinafter
"Jail"), located at 441 Bauchet Street, Los Angeles, California.

-1-

397

**EXHIBIT 2**

2.  The issues are raised in the Second Amended Complaint for Declaratory and Injunctive Relief and the Answer to Second Amended Complaint and are discussed in detail in the parties' respective Memoranda of Contentions of Fact and Law.

3.  The plaintiff class is defined as all prisoners in the Jail since December 31, 1975 and contains two subclasses, the first defined as all pretrial detainees in the Jail since December 31, 1975, and the second defined as all sentenced prisoners in the Jail since December 31, 1975.  Unless otherwise indicated, hereinafter prisoners shall mean members of the plaintiff class; pretrial or unsentenced prisoners shall mean members of the pretrial detainee subclass, and sentenced prisoners shall mean members of the sentenced prisoner sublcass. The pretrial detainee subclass is represented by plaintiffs DENNIS RUTHERFORD, HAROLD TAYLOR and GREGORY ARMSTRONG; and the sentenced prisoner subclass is represented by plaintiffs RUTHERFORD, ARMSTRONG, RICHARD ORR and JACK JONES.

4.  The defendants, all sued in their official capacities, are PETER J. PITCHESS, as Sheriff of the County of Los Angeles, WILLIAM ANTHONY as Assistant Sheriff of the County of Los Angeles, WALTER HOWELL, as Chief of the Los Angeles County Sheriff's Department, Custody Division, PAUL MYRON as Captain of the Central Jail, JACK HOLT, JACK B. ROBBINS and ERNEST ZANSTER as Los Angeles County Sheriff's Department lieutenants assigned to the Jail, JAMES D. AUSTIN, LeROY K. JOHNSON, GERALD BOSWELL, RICHARD HENDERSHOT, JAMES CINDERELLI, DANNY CALHOUN, STEVEN CRAWFORD, JOHN FEHRN, STEVEN GAYHART,

398

1   ANTONIO SAMANIEGO, FREDERICK SYKES, JOHN WARGO and FREDERICK

2   WEISE, as Los Angeles County Sheriff's Department Officers

3   assigned to the Jail and as representative of a defendant class

4   defined as all Los Angeles County Sheriff's Department officers

5   below the rank of lieutenant assigned to the Jail, and

6   EDWARD EDELMAN, KENNETH HAHN, JAMES HAYES, PETER SCHABARUM and

7   BAXTER WARD, as members of the Los Angeles County Board of

8   Supervisors.

9

10            II.   Jurisdiction and Venue.

11

12       Federal jurisdiction and venue are invoked upon the

13   ground of claims arising under 42 U.S.C. §1983 to redress

14   deprivations of civil rights occurring within the Central

15   District of California and the ground of pendent jurisdiction

16   to adjudicate related claims arising under California law.

17

18           III.   Jurisdictional Facts.

19

20           A.   Admitted Facts

21

22       1.   All defendants to the extent they have acted herein

23   have done so under color of State Law.

24       2.   Plaintiffs are citizens and persons within the meaning

25   of 28 U.S.C. §1343(3).

26

27          B.   No Other Contentions of Fact.

28   ///

# IV.  Plaintiffs.

## A.  Admitted Facts.

1.  Plaintiffs DENNIS RUTHERFORD, HAROLD TAYLOR and GREGORY ARMSTRONG were charged with criminal offenses under California law and during the pendency of this action were incarcerated as unsentenced prisoners in the Jail awaiting trial in California courts in Los Angeles County.

2.  Plaintiff RUTHERFORD was a pretrial prisoner in the Jail from November 5, 1972 to January 23, 1976, held in lieu of bail, which ranged between $30,000 and $10,000.  He was a convicted prisoner in the Jail from June 3, 1976 to July, 1976.

3.  Plaintiff TAYLOR was a pretrial prisoner in the Jail from December 17, 1973 until August, 1976, held in lieu of $350,000 bail.

4.  Plaintiff ARMSTRONG was a pretrial prisoner in the Jail from October 4, 1975 to December 23, 1976, held in lieu of $50,000 bail.

5.  Plaintiffs JACK JONES, RICHARD ORR, ARMSTRONG and RUTHERFORD were sentenced prisoners in the Jail during the pendency of this action.

6.  On March 23, 1976, the Court certified this action as a class action within the meaning of Federal Rules of Civil Procedure, Rule 23(b)(2), on behalf of a class consisting of prisoners in the Jail since December 31, 1975, and two subclasses, the first consisting of all pretrial detainees in the Jail since December 31, 1975, and the second consisting of all sentenced

prisoners in the Jail since December 31, 1975.

7. Unsentenced prisoners are incarcerated because they did not post bail or otherwise secure their release pending trial, and they are entitled to a presumption of innocence in their criminal cases as provided by law. After their arraignment they are confined in the Jail by judicial order solely to insure their presence at trial.

B. Plaintiffs' Contentions of Fact.

1. Whether most unsentenced prisoners are indigent and are held in lieu of bail which they cannot afford to post.

C. Defendants' Contentions of Fact.

1. Whether the claims or defenses of the representative plaintiffs are not typical of the claims or defenses of the class in that the circumstances and treatment of plaintiffs are not typical of the circumstances and treatment of inmates generally.

2. Whether the representative parties cannot fairly and adequately protect the interests of the class and subclasses in that they have not raised all claims reasonably expected to be raised by the members of the class, including claims for damages; and in that the claims and positions reasonably expected to be raised by one subclass, sentenced prisoners, are in conflict with and incompatible with the claims of another subclass, unsentenced prisoners, and that to fully and completely press the claims of sentenced prisoners necessarily requires less than

401

-5-

fair advocacy of the claims of unsentenced prisoners; and the
conditions under which present prisoners are confined are vastly
different from the conditions under which the representative
plaintiffs were confined.

3. Whether all unsentenced prisoners are indigent.

V. Defendants.

A. Admitted Facts.

1. Defendant PETER J. PITCHESS is, and at all times
herein relevant has been, the duly elected Sheriff of the
County of Los Angeles, California and keeper of the Jail
pursuant to Government Code §26605 and Penal Code §§4000, 4005
and 4006, and as such is charged with the statutory duty of main-
taining and operating county jail facilities including the Jail.
He is the head of one of the largest police agencies in the world
and is the chief law enforcement officer in the County of
Los Angeles responsible for providing law enforcement to a popu-
lation in excess of seven million people living in an area in
excess of 4,000 square miles and consisting of over 5,000
sworn personnel, as well as being responsible for numerous
other difficult and intractable responsibilities, including the
service and enforcement of hundreds of thousands of civil processes,
serving as bailiff for one of the largest court systems in the
world. One of his responsibilities is the operation of one of
the largest detention systems in the world which consists of
seven major facilities and numerous minor facilities, and which



402

-6-

1   houses over 200,000 prisoners a year and has an average daily
2   population of over 9,000 inmates, a substantial portion of whom
3   are within the system less than ten days.  In the performance
4   of these duties, the Sheriff reasonably and necessarily
5   delegates responsibilities for operation of the detention
6   facilities to others and has little direct involvement in its
7   daily operation, policies and procedures.  In the furtherance of
8   the delegation of these responsibilities, responsibilities are
9   delegated to an undersheriff, two assistant sheriffs, eight
10  divisions headed by division chiefs, numerous inspectors and
11  hundreds of other supervisory personnel.

12       2.  Assistant Sheriff WILLIAM J. ANTHONY is charged with
13  the overall supervision of the Sheriff's Custody Division and
14  other divisions and is third in command of the Sheriff's
15  Department under the direct supervision of Undersheriff Sherman
16  Block, who is not a defendant in this action.  In the performan-
17  ce of his duties, Assistant Sheriff ANTHONY necessarily and reason-
18  ably delegates responsibilities for operation of the jails to a
19  division chief, four inspectors, who are not defendants in the
20  action, and numerous other subordinates not all of whom are
21  defendants in this action.  He has been delegated supervisory
22  responsibilities for maintaining and operating county jail
23  facilities, including the Jail.

24       3.  WALTER HOWELL is the Chief of the Custody Division
25  of the Sheriff's Department and as such is responsible for
26  supervision of all detention facilities within the Sheriff's
27  Department, including seven major facilities, numerous smaller
28  facilities, and the detention facilities at each of the Sheriff's

403

substations.  In the performance of his duties, Chief HOWELL
necessarily and reasonably delegates responsibilities to four
inspectors, who are not defendants herein, and numerous other
subordinates, not all of whom are defendants herein.  He has
been delegated supervisory responsibility for maintaining and
operating county jail facilities, including the Jail, and for
promulgating rules for the care and treatment of prisoners in
the jail.

4.  Defendant PAUL MYRON is Captain of Central Jail
and has been since approximately February of 1977.  He
replaces Captain Farrell, Captain White and Captain Wheatley,
who were former defendants in this action.  Pursuant to the
Federal Rules of Civil Procedure, Rule 25(d), Captain Myron has
been automatically substituted as defendant herein.  In the
performance of his duties, Captain MYRON reasonably and
necessarily delegates his responsibilities for the operation
of the jail to numerous subordinates, not all of whom are
defendants herein.  He has been delegated direct supervisory
responsibility for the administration of the Jail.

5.  JACK HOLT, JACK E. ROBBINS and ERNEST ZANSLER are
lieutenants of the Los Angeles County Sheriff's Department and
as such have been delegated supervisory responsibility with
regard to managing and administering the Jail.

6.  Deputy Sheriffs and defendants JAMES D. AUSTIN,
LEROY K. JOHNSON, GERALD BOSWELL, RICHARD HENDERSHOT, JAMES
CINDERELLI, DANNY CALHOUN, STEVEN CRAWFORD, JOHN WARGO are
currently Los Angeles County Sheriff's Department Officers
assigned to Central Jail.  As such, they carry out directives

404

-8-

1  and policies of the Jail and have been assigned specific

2  duties with regard to the everyday operations of the Jail and

3  the control of certain prisoners.

4      7.  Defendant JOHN FEHRN was and defendants and Deputy

5  Sheriffs STEVEN GAYHART, ANTONIO SAMANIEGO, FREDERICK SYKES and

6  FREDERICK WEISE are Los Angeles County Deputy Sheriffs.  All

7  said defendants were at the time of service of the Second

8  Amended Complaint, but not longer are, assigned to the Jail, and

9  as such carried out the directives and policies of the Jail and

10  were assigned specific duties with regard to the everyday

11  operations of the Jail and the control of certain prisoners.

12  Defendants FEHRN, SAMANIEGO, SYKES and WEISE were no longer

13  assigned to the Jail after the following dates in 1976,

14  respectively:  December 25, October 23, December 18 and December

15  18.

16      8.  Defendants EDWARD EDELMAN, KENNTH HAHN, JAMES

17  HAYES, PETER SCHABARUM and BAXTER WARD are and at all times

18  relevant herein have been the duly elected and acting members

19  of the Board of Supervisors of the County of Los Angeles.

20      9.  Defendants are all sued in their official capacities.

21

22          B.  Plaintiffs' Contentions of Fact.

23

24      1.  Whether defendants AUSTIN, JOHNSON, BOSWELL,

25  HENDERSHOT, CINDERELLI, CALHOUN, CRAWFORD, FEHRN, GAYHART,

26  SAMANIEGO, SYKES, WARGO and WEISE are representative of a class

27  within the meaning of Federal Rules of Civil Procedure, Rule

28  23(b)(1) consisting of all Los Angeles County Sheriff's Department

-9-

405

officers below the rank of lieutenant, assigned to the Jail.

2.   Whether the acts and omissions herein described were committed and conditions herein described were maintained by defendants personally and through actions of their agents, and subordinates, acting pursuant to defendants' instructions, directions, encouragement, and/or know acquiescence.

C.   Defendants' Contentions of Fact.

1.   Whether defendants EDELMAN, HAHN, HAYES, SCHABARUM and WARD have only limited supervisory responsibilities over the Sheriff of the County of Los Angeles which is shared with the State Attorney General of the State of California and cannot direct the performance of the Sheriff's duties.

2.   Whether at no time have defendants done any acts or omissions directly or personally which are illegal or enjoinable in this action.

3.   Whether all rules and policies promulgated by defendant HOWELL and/or MYRON that involve the plaintiff class are valid, legal and constitutional.

4.   Whether there is no present existing basis for injunctive relief as to defendants FEHRN, GAYHART, SAMANIEGO, SYKES and WEISE.

IV.   Jail Population.                              406

A.   Admitted Facts.

1.   The Jail's stated capacity established by the California Board of Corrections is 5548, consisting of 5098 non-

-10-

medical beds and 450 hospital beds.

2. The proportion of unsentenced prisoners, sentenced prisoners facing no additional criminal charges and prisoners sentenced under one or more convictions and awaiting trial on one or more additional criminal charges varies from time to time, but at the present are approximately 65% unsentenced, 22% sentenced facing no additional charges and 13% sentenced facing additional charges.

B. No Other Contentions of Fact.

V. Mail

A. Admitted Facts.

1. The stated written policy of the Sheriff's Department Custody Division and the Jail with regard to legal and non-legal mail is as set forth in pre-marked Exhibits Z (pp. 47-48), A (pp. 58-59), D (pp.1-2), E (pp. 1-2) and BO.

B. Plaintiffs' Contentions of Fact.

1. Whether notwithdranding the stated written policy out of the presence of prisoners, defendants open and sometimes read prisoners' legal mail to and from attorneys, courts and public officials.

2. Whether notwithstanding the stated written policy out of the presence of prisoners, defendants open and sometimes read and censor prisoners' incoming and outgoing mail, and

-11-



do not provide the affected prisoner or sender with notice of or opportunity to contest that censorship.

C.   Defendants' Contentions.

1.   Whether there are serious, compelling and legitimate institutional concerns preventing the introduction of contraband into the jail through the use of mail, and procedures designed to accomplish this in an expeditious manner compatible with prompt delivery of mail and minimalization of these concerns is appropriate and proper.

VI.   Telephone Calls.

A.   Admitted Facts.

1.   The stated written policy of the Sheriff's Department Custody Division and the Jail with regard to telephone calls by prisoners is as set forth in pre-marked Exhibits BN, Z (p.15), A (p.60), F and G.

2.   Six telephones are located on each floor of the original Central Jail facility adjacent to the inmate modules, in the hospital, and six telephones are located within each of the regular housing modules in the new addition to the jail and two telephones are located within each of the disciplinary/ segregation modules in the new addition to Central Jail.   Telephones are also located within the pro per law library and within the non pro per law library.

///

408

3. Defendants do not permit prisoners to receive incoming telephone calls except in emergencies or other unusual circumstances.

B. Plaintiffs' Contentions of Fact.

1. Whether notwithstanding the stated written policy defendants deny prisoners reasonable access to telephones to make outgoing calls, after the booking process is completed only allow prisoners to make phone calls from within the Jail through Court orders or infrequently granted permission from Jail officers, and limit the length of telephone calls to five minutes.

C. Defendants' Contentions.

1. Whether as defendants contend: Central Jail policy permits prisoners reasonable access to telephones to make outgoing calls; all inmates are entitled to at least two or more free telephone calls within the local dialing area when booked and before certain proceedings; additional calls are permitted at booking when appropriate; and the opportunity for telephone calls for emergency purposes may be requested at any time from the module officer, the senior deputy on the floor, or from the chaplain.

2. Whether as defendants contend: Inmates are permitted to use the telephones on a rotation basis throughout the day and night; and it is the Central Jail policy that the prisoners are given access to these phones as much as possible without inter-

409

fering with normal procedures and that each inmate receive a
fair opportunity to make telephone calls.

3.  Whether as defendants contend:  Incoming telephone
calls are not routinely permitted but are permitted only in
emergencies or unusual circumstances; and permitting incoming
telephone calls is not feasible in light of the number of inmates
detained, the arrangement of the jail and the administrative and
logistical problems of timely locating inmates.

VII.   Visitation.

A.  Admitted Facts.

1.  The stated written policy of the Sheriff's
Department Custody Division and the Jail with regard to prisoner
visitation is as set forth in pre-marked Exhibits A (pp. 60-61),
and B (pp. 29-30).

2.  Inmates are permitted daily visits with adults and
children between the hours of 8:30 a.m. and 8:30 p.m.  The number
of visits at Central Jail currently averages over 2,000 a day
and over 63,000 a month.

3.  Pretrial prisoners are allowed one daily 20 minute
visit, and sentenced prisoners are allowed one daily 60 minute
visit.

4.  Physical contact between prisoners and visitors is
not routinely permitted.

5.  Some sentenced prisoners confined at some of defendants'
detention camps, some Federal and California prisons, and some
jail facilities in other counties are permitted to have some

410

physical contact with their visitors.

B.   Plaintiffs' Contentions of Fact.

1.  Whether defendants deny prisoners reasonable opportunity to visit with family and friends.

2.  Whether most sentenced prisoners at Federal and California prisons and at jail facilities in Los Angeles County are permitted to have physical contact with their visitors, including embracing, kissing, holding hands and holding children.

C.   Defendants' Contentions of Fact.

1.  Whether as defendants contend:  To accommodate visitation, there is a large, modern, air-conditioned visiting area designed to accommodate approximately 228 visitors at a time; this visiting area is generally in constant use throughout the day; visiting areas are arranged in corridors designed to minimize noise between rows, and small privacy partitions are located between each visiting location to likewise reduce noise and provide some element of privacy;  visitors and the inmates they are visiting may view each other through large, clear glass panels and may speak over modern, well-maintained telephones; an area to sit and a shelf is provided on both the inmate and visitor side for convenience and comfort.  No direct supervision of each visitor or inmate during the visiting period is routinely done or required; a timing device connected to each visiting area

-15-

411

insures that each inmate receives his full allotment of time for
visiting; and inmates and visitors are not generally subjected
to searches before or after visits.

2.   Whether as defendants contend:   Contact visits are
not and cannot be permitted at Central Jail without causing
unacceptable risks of harm to inmates, visitors and personnel,
and unacceptable breaches of the facility's security; there are
no rooms or facilities within Central Jail that are feasible for
conversion to contact-type visits even if the security risks
were not present; and if a location for such visits could be
located and if the security risks were not present, the number
and frequency of visits permitted inmates would have to be consid-
erably diminished and embarrassing or other searches of visitors
and inmates would be required on at least a frequent or random
basis.

### VIII.   Reading Matter.

#### A.   Admitted Facts

1.   The stated written policy of the Sheriff's Department
Custody Division and the Jail with regard to prisoners' access
to and receipt of reading matter is as set forth in pre-marked
Exhibits BX, A (p.89), H, I, J and K.

2.   There is an extension of the Los Angeles County
Library located at the original Jail facility containing about
5000 volumes.

///

///

412

B.  Plaintiffs' Contentions of Fact.

1.  Whether defendants drastically limit prisoners' access to reading matter, including newspapers, magazines and books by failing to provide prisoners with an adequate selection of reading matter, by permitting prisoners only infrequent, indirect access to available reading matter, by prohibiting prisoners from receiving reading matter from visitors, and by prohibiting prisoners, from receiving reading matter through the mail.

C.  Defendants' Contentions of Fact.

1.  Whether as defendants contend:  Inmates at Central Jail have reasonable access to reading materials; paperback books, magazines and newspapers are sold in the modules from the jail commissary cart; the books so sold include best sellers and other books selected on the basis of popularity; at any one time, there are, in addition, about 50 library and other books within each module that may be exchanged between prisoners; and visitors may deliver books and magazines to inmates after visits.

2.  Whether as defendants contend:  The extension of the Los Angeles County Law Library located within the Jail is not large enough to permit all inmates direct access to it; and the system was designed to give inmates access to the library by means of a library cart which is taken to each row on the old side of the Jail about every ten days.

413

///

18.   Whether as defendants contend:  Although not yet fully operational, a new 12,000 volume extension of the County library system will be opened on the fourth floor of the new addition to the Jail; the structure of the new addition to the Central Jail and the way it was designed and the space available in the new library facilities will not feasibly permit inmates to visit the library directly; the books will be distributed from that library by means of a cart as is now the practice on the old side of the Jail; when this library is fully operational, the cart from each of the jail library facilities will visit each module approximately once a week; and in the meantime, the Jail librarian distributes free paperbacks, which need not be returned, to the inmates in the new addition to the Jail.

IX.   Recreation.

A.   Admitted Facts.

1.   Unsentenced prisoners who are not trusties do not presently have the opportunity for outdoor exercise and recreation.

2.   Only working trusties presently receive an opportunity for outdoor recreation.

3.   The Jail has been designed to permit at least two hours a day of freeway or dayroom time, one hour each on the day and evening shifts.

///
///

414

-18-

B.   Plaintiffs' Contentions of Fact.

1.   Whether defendants deny prisoners adequate opportunity to exercise and recreate outdoors.

2.   Whether defendants deny pretrial prisoners reasonable opportunity to divert themselves indoors in that pretrial prisoners are locked in their cells or infirmary wards or rooms at all times except when specified business, such as court appearances, medical care, meals, attorney interviews, personal visits, shower, chaplain consultations, and educational classes otherwise require, such prisoners are only infrequently allowed to use dayrooms adjacent to their cellblocks or infirmary wards or rooms, and said dayrooms are barren of recreational equipment, including televisions, radios, games and reading matter.

C.   Defendants' Contentions of Fact.

1. Whether as defendants contend:  Between approximately 15-30% of the pretrial inmates are transported to court each weekday, a process which usually takes 5-10 hours; about 40-50% of the entire Jail population, both sentenced and unsentenced, have a visit each day; a process which takes about an hour or more; and presently, 200 or so of the pretrial inmates are trusties who are involved in work assignments during the day and presently have access to dayrooms and television.

2.   Whether as defendants contend:  Throughout the day, most inmates whose classifications permit them to mix with other

-19-

415

1   inmates can go by request to such activities as school, bible

2   study, visits to the chaplain, and other activities; such inmates

3   could, if they desire, spend up to several hours a day at school;

4   and as indicate earlier, there are about 43 pay telephones

5   available to pretrial inmates for use throughout the day.

6      3.  Whether as defendants contend:  Because of the move

7   into the new addition and the new personnel involved, and the

8   difficulties of working out problems concerning the new policies

9   and the need to recruit and train additional personnel, this

10   practice has not yet been uniformly accomplished in every module;

11   and even at present, however, inmates in each module receive

12   about one hour a day of freeway time.

13      4.  Whether as defendants contend:  Only working

14   trusties at present receive an opportunity for outdoor

15   recreation; although the new jail addition includes a large

16   outdoor recreation area, defects in its construction and the

17   need to fix responsibility for such with the contractor; as well

18   as administrative and logistical problems associated with the

19   opening of the new addition to Central Jail and the need to

20   recruit and train additional personnel have precluded present use

21   of such facilities; when such problems are solved, it should be

22   possible to permit those inmates the opportunity for at least

23   one hour a week of outdoor exercise in addition to freeway time

24   and other recreational activities.

25      5.  Whether increased opportunities for freeway time and

26   outdoor recreation create increased risks of thefts of personal

27   property, tensions, and assaults which cannot be significantly

28   reduced even with substantial increases in supervising personnel.

416

6.   Whether as defendants contend:   The Jail is presently implementing a new classification system which is the result of several years of study and planning; present indications are that when fully implemented, such classification system may permit the classification of significant numbers of pretrial inmates as minimum security, low moderate security, moderate security, high moderate security, and only a small number as maximum security; present data suggests that when implemented, such a classification system may ideally permit those pretrial inmates classified as minimum security to qualify for dormitory housing and permit travel about the jail on an unescorted basis; those classified as low moderate to have relative free movement in cellblocks and open dayrooms, if possible; those classified as moderate to have constant access to the freeway, and possible access to the adjoining dayroom in the new modules and permit travel about the jail without escorts; those inmates classified as high moderate to have constant use of the freeway area; and those classified maximum have access to the freeway area on a limited basis and to require escorts; until the system is fully implemented and tested, no firm commitments can be made; and defendants hope to have sufficient data within six months.

7.   Whether as defendants contend:   All inmates, pretrial and sentenced, if they wish, may particpate in educational classes at Central Jail; classes are presently offered for over 170 hours a week and will be expanded in fiscal year 1977-78; classes are offered in General Educational Development Equivalency Certificates, health/science education, English and Spanish as a second language and vocational classes for sentenced

417

inmates; the courses are provided by the La Puente Independent

School District by qualified instructors; in 1974 over 17,400

inmates participated in these classes and the number has increased

this year and will increase further next year; in 1974 over 145,000

student hours of education were provided at Central Jail and the

number is increasing; between 7 and 12% of the entire pretrial

population participates in the educational program at any one

time; and counseling services are also provided.

X.   Housing

A.   Stipulated Facts.

1.   The cell designations, the number of men per cell,

the number of cells, the size of each cell in square feet, the

size of the adjoining freeway in square feet, the size of the

dayroom to which the cell area is assigned, and the square

footage per prisoner at rated capacity for all of the Jail's non

medical housing areas are as set forth in Schedule A, attached

hereto and incorporated herein by reference.

B.   Plaintiffs' Contentions of Fact.

1.   Whether defendants confine pretrial prisoners under

conditions lacking in privacy or sensitivity to basic human

needs; and as a rule, pretrial prisoners are housed in overcrowded

cells in which excess prisoners must sleep on the floor, some-

times without a mattress, whereas single cells, which afford a

modicum of privacy, are used only for sentenced trusties, for



418

discipline and administrative segregation or for prisoners exhibiting agitated behavior, and dormitories, which afford greater freedom of movement and living space, are used only for sentenced trusties.

2. Whether all one, two, four, six, eight and ten man cells contain one toilet, one wash basin and one fountain and a number of beds equivalent to their rated capacities.

3. Whether housing in the Jail's infirmary consists of the following:

     (a)  One 48-bed ward, 54 feet wide and 56.6 long;

     (b)  Six 10-bed wards, each 38 feet long and 19.5 feet wide;

     (c)  Two 8-bed wards, each 34 feet long and 19 feet wide;

     (d)  Four 5-bed wards, each 32.3 feet long and 11.6 feet wide; and

     (e)  122 one-bed rooms, each 12.4 feet long and 7.10 feet wide.

    C.  Defendants' Contentions of Fact.

1.  Whether most cells are equipped with toilet facilities, wash basins, fountains, desks, seats and beds, sufficient for the number of inmates for which it was designed and rated.

2.  Whether as defendants contend:  The recommended and actual practice of most jails is to install sanitary facilities

consisting of a toilet and wash basin in each cell; and the installation of such sanitary facilities in each cell results in significant custodial and medical benefits, has been approved by the State Board of Corrections, never found to present a health or sanitation problem by the Health Department, and does not present a significant medical liability.

### XI.  Views to the Outside.
#### A. Admitted Facts

1.  There are no windows and open areas through which prisoners may view the outside, and former windows on the old side of the Jail have been sealed.

#### B.  Plaintiffs' Contentions of Facts.

1. Whether defendants deny prisoners a reasonable view to the outside world and have covered over previously existing windows in the Jail without adequately exploring alternatives which accomodate both Jail security and prisoner needs.

#### C.  Defendants' Contentions of Fact.

1.  Whether reopening the former windows at Central Jail or attempting to create windows in the new addition to the Jail presents unacceptable security risks, is incompatible with the environmental control system in use at the Central Jail and fire code provisions, and presents a health hazard and is too costly in

420

1   light of the limited benefits to the inmates.

2       2. Whether, as defendants contend: The original Central

3   Jail facility, first occupied in 1963, was designed and built

4   with clearwindows in most cell blocks, all dayrooms and hospital

5   rooms; the Fire Department required that these windows be wired

6   glass and would not permit the use of other types of nonbreakable

7   window materials because, when heated, they tend to break and

8   create drafts that cause an increased fire hazard within a build-

9   ing such as Central Jail; the windows contained six inch by nine

10  inch panes housed in special security window frames designed to

11  prevent escapes, were of the type recommended as standard window

12  frames for maximum security institutions to provide reasonable

13  security against escape, and were located eight feet from the

14  nearest prisoner housing area; during the first six months of

15  operation of the Jail, at least one-third of these windows were

16  broken by inmates; the broken windows interferred with the

17  security of the facility, hampered the controlled air circulation

18  and were unsightly; various other nonbreakable transparent

19  materials were considered but were not approved by the Fire

20  Department, which contended they created unreasonable fire hazards;

21  allegedly tamper-proof stainless steel security screens of the

22  type generally used in mental institutions were then installed;

23  within a month after their installation, many of the screens were

24  destroyed and ripped by inmates and proved wholly unsatisfactory;

25  inmates were able to obtain hacksaw blades, weapons, narcotics,

26  and other contraband through the broken security screens with

27  the assistance of confederates outside the jail; and several

28  escapes and escape attempts occurred.

421



3.   Whether as defendants contend:  Next, fourteen-gauge steel plates were fixed to the inside of the windows using tamper-proof screws initially and later welding them in place; on numerous occasions, inmates were able to rip down and remove these steel plates; several escapes and escape attempts occurred; and bars were installed over the outside of the windows; nevertheless, inmates were able to saw through these bars and on several occasions, escape attempts continued.

4.   Whether as defendants contend:  When the determination to build the Jail was made, it was decided that the most helpful environment could be maintained by the use of an environmental control within the facility that would control the temperature of the air, its humidity, circulation, as well as provide cleaning and filtering; effective use of such a full environmental control system necessitated minimizing all effective leaks of air from the system; and because of the serious threat to the security of the facility presented by the window openings, and the inability to secure them and prevent air leaks, the contractor for the new addition to the jail installed precast concrete window enclosures over the existing window openings and the new jail was designed and built without windows.

5.   Whether as defendants contend:  There is no known method by which the existing building could be made secure if the windows were reopened; and moreover, the estimate costs of reopening these windows even if attempted is in excess of a million dollars and would still present security problems as well as create a health problem due to the inefficiency of the environmental control system in use in the jail.

422

XII.   Searches

A.   Admitted Facts.

1.   Defendants periodically search cellblocks, particularly those occupied by pretrial prisoners, sometimes in the absence of the prisoner-occupants.

2.   Searches of inmate property are necessary to maintain the security of the facility, prevent escapes, maintain order, and minimize the potential for injury to inmates and staff.

3.   The stated written policy of the Sheriff's Department Custody Division and the Jail with regard to searches of prisoners housing areas and property is as set forth in pre-marked Exhibits BR, BO, A (pp. 18, 31-32), CC and DD.

B.   Plaintiffs' Contentions of Fact.

1.   Whether notwithstanding the stated written policy defendants periodically and systematically ransack cells, particularly those occupied by pretrial prisoners, in the absence of the prisoner-occupants.

2.   Whether notwithstanding the stated written policy whether during these ransackings, commonly known as "shakedowns", officers first remove all prisoners to an adjacent dayroom and then tear apart cells, throw prisoners' property all over the cells and confiscate prisoner property without providing prisoners any receipt or notice of or opportunity to contest confiscation.

///

423

-27-

C.   Defendants' Contentions of Fact.

1. Whether cell searches are infrequently conducted at Central Jail.

2. Whether searches at Central Jail are conducted in accordance with procedures which are designed to minimize interference with prisoners and their property, prevent the loss or destruction of prisoner property, and maintain confidentiality of prisoners' legal materials.

XIII.   Meals

A.   Admitted Facts

1.   The length of meals in the dining hall within Module 1700-1750 provided to prisoners representing themselves in propriis personis is not at issue herein due to the judgment in Brown v. Pitchess, Los Angeles Superior Court, No. 24464.

B.   Plaintiffs' Contentions of Fact.

1.   Whether defendants deny prisoners, particularly pretrial detainees, sufficient time to eat their meals.

XIV.   Opportunity to Sleep.

A.   Admitted Facts

1.   Normal lights are on in prisoner housing areas from about 5:00 a.m. to about 10:00 p.m.; and lower wattage lights,

-28-

424

1  varying in intensity from cell area to cell area, are kept on

2  through the night.

4              B.  Plaintiffs' Contentions of Fact

6      1.  Whether defendants deny prisoners, particularly

7  petrial prisoners, sufficient opportunity to sleep in that

8  bright lights within the cells remain on from about 5:00 a.m. to

9  late evening daily, prisoners must stand for daily counts, and

10 the Jail's Officers make continuous noises with the intercom

11 system.

13             C.  Defendants' Contentions of Fact

15     1.  Whether dim, low-wattage night lights are necessary

16 to maintain security and prevent assaults.

18             XV.  Court Transportation

19             A.  Admitted Facts

21     1.  Each weekday the Sheriff transports between 700 and

22 1,000 inmates to 26 separate jurisdictional courts located over

23 the wide expanse of the County of Los Angeles.

24     2.  After breakfast and the opportunity to shave and do

25 other personal items, prisoners going to court are given an

26 opportunity to change into their own clothes for court.  They

27 are then processed for court, segregated into groups according

28 to the court they are going to and are loaded on appropriate

-29-

425

buses beginning at 7:00 a.m.; they are transported to the various

court facilities arriving there between 8:00 a.m. and 8:30 a.m.

as decided by the particular court.

3. Buses from courts generally begin returning in the

early afternoon between 12:00 p.m. and 4:00 p.m., bringing back

inmates who have already finished their court appearances.  On a

daily basis prisoners returning from court arrive at the Jail at

6:00 p.m. or later and are sometimes not returned to their

housing areas until 8:00 p.m. or later.

B.  Plaintiffs' Contentions of Fact.

1.  Whether defendant subject prisoners going to court to

a harsh, exhausitng routine which jeopardizes their right to a

fair trial.

2.  Whether on days they goto court, prisoners are

awakened before 5:00 a.m. and then spend their days in a series of

crowded holding tanks within the Jail and courthouses and on buses

taking them to and from the courts without being provided with

adequate meals.

3.  Whether prisoners returning from court frequently

do not reach their housing areas until 8:00 p.m. or later.

C.  Defendants' Contentions of Facts.

1.  Whether as defendants contend:  None of the defendants

have any control over the times that the judges of the various

courts require the Sheriff to have prisoners at the various courts



426

most courts require the Sheriff to have inmates at the court between 8:00 a.m. and 8:30 a.m. and sometimes keep the inmates in court well after 6:00 p.m.; and the Sheriff cannot retain custody of the inmates from the courts each day until the judges of the courts provide the Sheriff with valid commitment orders for the inmates.

    2.  Whether as defendants contend:  Several of the courts conduct night courts and require the Sheriff to bring inmates for such night courts; such night courts are held on Mondays; and when an inmate goes to night court, he is not transferred to court until 11:30 a.m. and may not be done with court until 9:00 p.m. or 10:00 p.m.

    3.  Whether inmates going to court are awakened at the same time as other inmates in the Jail, approximately 5:00 a.m.

    4.  Whether as defendants contend:  Additional transportation runs throughout the day are made between the courts and Central Jail as buses become available and as the need arises; the final pick up of prisoners at each court is made when the last prisoner at that court is finished and the commitment orders from that court are given to the Sheriff; although the times inmates are finished at each court varies from day to day depending on the number of inmates at the court and whether a particular judge has held a late court, the last inmate is done at most of the courts between 4:00 p.m. and 7:00 p.m.; except Mondays when some courts hold night court, most inmates on most days are returned to the Jail before 8:00 p.m.; on Mondays when some courts hold night court until as late as 9:00 p.m. or so at night, inmates who were not transported to such courts until 11:30 a.m.

427

1   may not get back to the Jail until 9:30 to 10:30 p.m.; and on

2   rare occasions because of unusual circumstances, such as an

3   equipment breakdown or other infrequent occurrences, an inmate

4   has not gotten back to the Jail until as late as 11:00 p.m.

5

6   XVI.  Prisoners' Property

7   A.  Admitted Facts

8

9   1.   The stated written policy of the Sheriff's

10  Department Custody Division and the Jail with regard to

11  prisoners' possession of property is as set forth in pre-marked

12  Exhibits Z (pp. 1,2,9,10,50-53), A (pp. 14, 71, 73-74), B (p.31),

13  AE, AO, AP, AQ, AR, AS, AT, AU and AV.

14  2.   A commissary cart visits each cell area and offers

15  for sale personal hygiene items, stationery, reading material,

16  candy and numerous other items.

17  3.   Items sold from the commissary cart are as set

18  forth in pre-marked Exhibit CQ.

19  4.   The Jail Chaplain is responsible for the dissemination

20  to indigent prisoners of their personal hygiene items,

21  stationery, stamps and other items.

22  5.   The stated written policy of the Sheriff's Department

23  Custody Division and the Jail with regard to providing indigent

24  prisoners with certain free items is as set forth in pre-marked

25  Exhibits A (p.87) and B (p.12).

26  ///

27  ///

28  ///

428

-32-

B.   Plaintiffs' Contentions of Fact.

1.   Whether defendants unduly restrict the items that prisoners may possess within the Jail and routinely confiscate prisoners' personal belongings including but not limited to, correspondence and photographs.

2.   Whether defendants deny prisoners an adequate opportunity to obtain from family and friends or to purchase at the Jail commissary necessities and amenities of life, such as soap, toothbrush, toothpaste, comb, deodorant, paper and pencils; and fail to provide indigent prisoners with such items.

3.   Whether defendants unduly restrict plaintiffs' opportunities to obtain fresh street clothing for their court appearances and as a consequence plaintiffs' clothing frequently becomes soiled, smelly and wrinkled during the course of a trial.

C.   Defendants' Contentions of Fact.

1.   Whether indigent inmates are provided personal hygiene items, stationery, stamps and other items within a few hours after submitting a written request therefor.

XVII.   Hygiene and Sanitation.

A.   Admitted Facts

1.   The stated written policy of the Sheriff's Department Custody Division and the Jail with regard to providing prisoners fresh Jail clothing is as set forth in

429

1  pre-marked Exhibits A (pp.64-65), B (p.43), AA and BS.

2      2.  The stated written policy of the Sheriff's Department

3  Custody Division and the Jail with regard to sanitation is as set

4  forth in pre-marked Exhibits CB, A (pp.25-27, 48, 70) and BD.

5      3.  Prisoners are required to clean and maintain their

6  own housing areas; a standard institutional issue of clothing

7  for inmates includes but is not limited to clean socks, clean

8  undergarments, clean outer garments; an inmante's undergarments

9  may be substituted for the institutional undergarments.

10

11              B.  Plaintiffs' Contentions of Facts.

12

13      1.  Whether the defendants deny prisoners, particularly

14  pretrial prisoners, reasonable facilities and materials with

15  which to launder their clothing, including undergarments.

16      2.  Whether defendants frequently deny prisoners,

17  particularly pretrial detainees, adequate opportunity to bathe.

18      3.  Whether defendants deny prisoners, particularly

19  pretrial prisoners, reasonable opportunities to obtain fresh

20  jail clothing and linens.

21      4.  Whether defendants fail to take adequate measures to

22  preserve sanitation and prevent the spread of contagious diseases,

23  thereby threatening the health of prisoners.

24

25              C.  Defendants' Contentions of Fact.

26

27      1.  Whether as defendants contend:  All inmates have

28  the opportunity for at least three showers a week; and hot and

430

cold running water and soap are available in all housing areas.

2.  Whether the Sheriff Department policy requires that each facility maintain a sufficient supply of clothing and bedding for normal and emergency requirements of the inmates.

3.  Whether as defendants contend:  Each inmate is provided one clean serviceable mattress, one clean sheet or mattress cover, one towel, one or more blankets depending upon climatic conditions; these items are freshly laundered and sanitized after each use and issued at the time of booking to each inmate; washable items such as sheets, mattress covers and towels are exchanged for clean replacements at least each week; and blankets are laundered or dry cleaned at least every three months or more often if necessary.

4.  Whether prisoners' jail outer garments are exchanged at least once a week or more frequently if work, climatic conditions or illness require.

5.  Whether inmates are provided with suitable footwear if the inmate's personal shoes are inappropriate for the facility or if no shoes were worn at the time of arrest.

6.  Whether as defendants contend:  All pretrial inmates are allowed one complete, non-institutional clothing exchange; exchanges consist of shoes, outer garments and a wrap (coat, sweater, etc.); and all additional clothing exchanges are handled by special request.

7.  Whether each housing area is equipped with hot and cold running water and inmates are provided with laundry soap.

8.  Whether as defendants contend:  The facility is and has been found by the Health Department and the State Board of

431

1  Corrections to be maintained in a clean and sanitary manner; floors

2  are swept and mopped daily; bars are dusted daily and washed

3  weekly; garbage and trash receptacles are emptied and sanitized

4  at least once a day; and toilets, urinals, sinks and basins are

5  cleaned daily.

6      9.  Whether in conjunction with the medical staff, the

7  facility has developed and implemented procedures for the treatment

8  of vermin within the housing areas.

9      10.  Whether staff are assigned to conduct weekly health

10 and maintain inspections of the facility.

11      11.  Whether prisoners are provided materials to clean

12 and maintain their own housing areas.

13

14          XVIII.   Temperature

15              A.   Admitted Facts.

16

17      1.  The Jail has a full environmental control system

18 which is designed to regulate temperature, humidity and

19 ventilation and to cleanse the air.

20

21              B.   Plaintiffs' Contentions of Fact.

22

23      1.  Whether defendants fail to maintain the Jail's

24 temperature control system in working order; and temperatures

25 within the Jail are frequently too hot or too cold, thereby causing

26 a threat to the health of prisoners.

27 ///

28 ///

## XIX.   Access to the Courts

### A.   Admitted Facts

1.   All sentenced prisoners have access to a law library found adequate in accordance with the decision brought on behalf of all Los Angeles County Jail sentenced inmates in the case of Bailey v. Pitchess, U.S.D.C. No. 72-1957-F

2.   Access to the courts for prisoners representing themselves in propriis personis is not an issue herein due to the judgment in Brown v. Pitchess, Los Angeles Superior Court No. C 24464.

3.   All pretrial inmates who are not pro pers have either a court-appointed lawyer or a private attorney.

4.   Public Defenders are empowered to and do occassionally upon the order of the court or upon request of the person involved represent persons who are not financially able to employ counsel in a proceeding of any nature relating to the nature or conditions of detention, of other restrictions prior to adjudications, of treatment, or of punishment resulting from criminal or juvenile proceedings.   See California Government Code §27706.

5.   Inmates are not precluded from seeking legal assis-tance from other inmates with whom they come into contact.

6.   Prisoners other than pro pers do not have access to typewriters.

### B.   Plaintiffs' Contentions of Fact

1.   Whether defendants deny pretrial prisoners access to

433

1  the courts by failing to provide such prisoners with reasonable

2  access to an adequate law library and other necessary materials,

3  such as writ forms, typewriters, typing papers, legal pads, and

4  pencils, by prohibiting prisoners from receiving law books and

5  legal materials from outside sources and by denying prisoners

6  reasonable opportunities to obtain assistance from other

7  prisoners who are relatively sophisticated in matters of law,

8  commonly known as "jailhouse lawyers."

9

10              C.   Defendants' Contentions of Fact

11

12         1.   Whether legal paper and supplies are sold from the

13  Jail commissary cart.

14         2.   Whether Habeas Corpus forms are provided to inmates.

15         3.   Whether inmates may receive law books and legal

16  materials from visitors and outside sources.

17

18              XX.   Jail Rules and Discipline

19              A.   Admitted Facts

20

21         1.   The stated written policy of the Sheriff's Department

22  Custody Division and the Jail regarding discipline is as set

23  forth in pre-marked Exhibits CF, Z (p.20), A (pp.75-84), B (p.38),

24  N, O, P, Q and R.

25         2.   During the Jail's disciplinary process accused

26  prisoners are not normally allowed to cross-examine or call

27  witnesses.

28  ///

434

-38-

## B.   Plaintiffs' Contentions of Fact

1.   Whether defendants' rules and regulations which govern operation of the Jail and the actions and practices of officers and prisoners are not posted throughout the Jail and are not made available to all prisoners; and many prisoners are ignorant of the Jail's rules and regulations.

2.   Whether many of the Jail's rules are unconstitutionally vague — giving no adequate notice of the conduct they are intended to prevent — and are selectively enforced by defendants; and other rules governing pretrial prisoners' conduct are petty and irksome and amount to excessive invasions of personal privacy.

3.   Whether some rules are enunciated by officers on an ad hoc basis, frequently after an "offense" has allegedly occurred; and these rules necessarily vary from officer to officer, according to his mood and/or feelings towards the prisoners involved.

4.   Whether standardized punishments exist for violation of Jail rules.

5.   Whether entire groups or housing areas of prisoners are punished for an infraction allegedly committed by one of their number.

6.   Whether punishment includes loss of privileges, forced labor and solitary confinement.

7.   Whether punishment may be levied for an indefinite period of time.

8.   Whether defendants impose punishment upon prisoners without adequate notice or fair hearing or opportunity for

435



1   prisoners to speak on their own behalf, confront their

2   accusers, or otherwise contest the charges against them.

3        9.   Whether for purposes of punishment defendants confine

4   prisoners not only in disciplinary isolation cells but also in

5   administrative segregation, protective custody, medical restraint

6   cells and medical isolation cells, without even the pretense of

7   due process.

8

9                    C.   Defendants' Contentions of Facts

10

11        1.   Whether as defendants contend:   The Central Jail

12   disciplinary procedures comply with the requirements of due

13   process and contain adequate safeguards against erroneous action;

14   printed rules are distributed to each inmate at the time of book-

15   ing into the facility; the rules are printed both in English and

16   Spanish; when an inmate is accused of violating a jail rule and

17   if disciplinary actions are initiated, the inmate receives both

18   oral and written notice of what he is accused of; the observing

19   officer often orally informs the inmate of what he is accused,

20   talks to the inmate, and conducts an appropriate investigation;

21   if the incident is minor, the officer may merely admonish the

22   inmate; if the observing officer believes that further action is

23   appropriate, the senior deputy is notified; the senior deputy

24   again advises the inmate of what he is accused of, interviews

25   him and listens to whatever defense he has and conducts an

26   investigation; if the senior deputy believes further action other

27   than admonishing is appropriate, the inmate is given a written

28   notice of what he is accused of which informs him in English and

-40-

436

1  Spanish of his potential punishment and that he will be given a

2  hearing before a disciplinary review board and an opportunity

3  to present a defense; the observing officer's version of the

4  facts are placed upon an inmate incident report by the senior

5  deputy and the inmate's version or defense is also recorded

6  thereon and the senior deputy makes a recommendation as to the

7  appropriate sanction, if any; the inmate incident report is then

8  forwarded to a sergeant who reviews the inmate incident report and

9  who may, if appropriate, talk to the inmate again, conduct a

10  further investigation, and has the discretion to overturn or

11  modify the recommended sanction; the inmate incident report is

12  then forwarded to the watch commander who has the discretion to

13  talk to the inmate, conduct an additonal or further investigation,

14  and to overturn or modify the recommendation for appropriate

15  sanction.

16      2.  Whether as defendants contend:  If the watch

17  commander agrees that some sanction involving loss of privileges

18  should occur, the inmate incident report is forwarded to the

19  disciplinary review board; the disciplinary review board has

20  the inmate brought before it and informs the inmate again of

21  what he is accused of and what the officers have said in their

22  report; the disciplinary review board determines that the inmate

23  is competent to present a defense and marks this determination on

24  the form given to the inmate; the inmate is given an opportunity to

25  present a defense and the matter is discussed with the inmate;

26  if the inmate indicates that there are other persons or evidence

27  that may clear him, the disciplinary review board conducts

28  further investigation; and the disciplinary review board makes a

437

-41-

determination as to whether the accusation is founded or unfounded and so indicates in writing on a form given to the inmate.

3.  Whether the inmate incident report, together with the findings, are forwarded to the facility commander who has the discretion to conduct a further investigation or overturn any decision.

4.  Whether as defendants contend:  The inmate may, in addition, send a sealed written letter of grievance to the facility commander; and the disciplinary review board follows a written standard of appropriate standardized punishments.

5.  Whether as defendants contend:  The disciplinary sanctions potentially available are not onerous; by state law, disciplinary reviews are limited to loss or privileges, and assignment of extra duties, (Minimum Jail Standards, Title 15, California Administrative Code, §1172, "Forms of Discipline"); state law prohibits disciplinary segregation for periods in excess of ten days without a finding and a new charge of viola- tion of the facility's rules and regulations; state law also prohibits the withholding of mail privileges except for violation of mail rules; even when an inmate is transferred to disciplinary segregation, the transfer is not onerous; as a practical matter, such disciplinary segregation transfers the inmate to a discipli- nary cell which is exactly the same as a regular housing cell and he loses visiting privileges and an opportunity to purchase items from the store; and he is permitted to retain legal materials.

///

///



438

XXI.   Classification

    A.   No Admitted Facts

    B.   Plaintiffs' Contentions of Fact

1.   Whether although there are considerable differences between living conditions and privileges available to prisoners in different parts of the Jail and there are enormous differences in the propensity for assaults and escapes posed by prisoners within the Jail, defendants make little or no attempt to classify prisoners, let alone classify prisoners in a manner that accords with due process of law.

2.   Whether as a result of defendants' failure to classify, pretrial prisoners are all treated as though they pose serious dangers to Jail security, and the general pretrial prisoner population is exposed to assault and bullying at the hands of the more violent of their number.

    C.   Defendants' Contentions of Fact.

1.   Whether as defendants contend:  The Central Jail is presently implementing a new classification system which is the result of several years of study and planning; such system was presented to the Court in its initial planning stages in the case of Dillard v. Pitchess; under this classification system, it is intended and hoped that all inmates, regardless of their status as sentenced or pretrial inmates, will be classified as minimum, low moderate, moderate, high moderate or maximum security inmates; the classification is based upon an objective point system which

gives weighted consideration to an inmate's current charge,
criminal history, amount of bail, employment status at the time
of arrest, residence within the County, family ties and other
matters; when the system becomes fully operative, inmates will
be so classified within a few days of their incarceration
at Central Jail; and this system is to begin operating May 23,
1977.

    2.  Whether as defendants contend:  Present indications
are that when fully implemented, such classification system
will permit the classification and housing of substantial
numbers of the pretrial inmates as minimum security, and as high
moderate security, as moderate security, and as high moderate
securityand only a small percentage as maximum security; present
data suggests that when implemented, such a classification system
may ideally permit those pretrial inmates classified as minimum
security to qualify for dormitory housing and permit travel
about the jail on an unescorted basis; those inmates classified
as low moderate to have relatively free movement in cell blocks,
and open day rooms, if possible; those inmates classified as
high moderate to be housed in cell blocks with constant access to
the freeway and scheduled dayroom time; and those inmates
classified as maximum security to be housed in cell blocks with
scheduled freeway time.

    XXII.  Supervision of Prisoners by Jail Officers

    A.  Admitted Facts

///

440

-44-

1.   The stated written policy of the Sheriff's Department Custody Division and the Jail regarding Jail Officers' supervision of prisoners is as set forth in pre-marked Exhibits Z (pp. 1,6), A (pp. 43, 51-53), and BM.

2.   The stated written policy of the Sheriff's Department Custody Division and the Jail with regard to training of Jail Officers is as set forth in pre-marked Exhibits CD, BZ, B and A (pp. 20-21).

3.   Most Sheriff's Academy graduates are placed in a jail facility as a first assignment.

B.   Plaintiffs' Contentions of Fact

1.   Whether defendants fail to provide adequate supervision of prisoners within housing areas; and consequently prisoners suffer beatings, assaults and threats from fellow prisoners, and commit suicides.

2.   Whether the Jail's Officers are too inexperienced and inadequately trained to supervise the lives of prisoners; and the Sheriff's Department Academy curriculum heavily emphasizes police work and only superficially touches correctional work within a Jail environment.

XXIII.   Brutality, Harassment and Abuse

A.   Admitted Facts

1.   The stated written policy of the Sheriff's Department Custody Division and the Jail regarding abuse of



441

-45-

prisoners is as set forth in pre-marked Exhibits B (p.7),

CR, BU (pp. 1-2, 6, 8-9), BH, Z (pp.3-5), A (pp.14-19), AE, AF,

AG and AK.

B.   Plaintiffs' Contentions of Fact

1.   Whether the defendant subject prisoners to a reign
of terror, theprincipal ingredients of which are a widespread
pattern and practice of threats, unprovoked assaults and verbal
abuse of prisoners by Jail Officers, a lack of due care for
prisoner safety at the hands of other prisoners, inadequate
officer supervision and a failure to vigorously classify
prisoners.

XXIV.   Other Issues - Scope of Bifurcation.

A.   The Problem

1. Plaintiffs wish to challenge three practices, travel
to and from the Los Aneles County - U.S.C. Medical Center, housing
conditions in the Jail's hospital and Jail Officers' alleged
obstruction of prisoners' access to medical personnel.

2.   Defendants contend that the Court's bifurcation of
the trial of this case between medical and non-medical issues
precludes plaintiffs from litigating said three issues because
defendants'defense would require expensive medical testimony
and proof.

///

442

-46-

B.   Plaintiffs' Contentions of Fact

1.   Whether housing in the Jail's infirmary, described in Plaintiffs' Contentions of Fact X - B - 3, supra, is punitive and inadequate.

2.   Whether prisoners taken to the Los Angeles County U.S.C. Medical Center suffer hardships and deprivations similar to those arising from court appearances - by being awakened early in the morning, spending long days in holding tanks at the Jail and the Medical Center, and frequently returning exhausted to the Jail in the evening.

3.   Whether Jail Officers deny prisoners access to medical personnel during sick call and at other times.

C.   Defendants' Contentions of Fact

1.   Defendants reserve additional legal or factual contentions regarding the proper scope of the bifurcation and the trial of said three issues for the Pretrial Conference.

XXV.   Comparison to Other Correctional Facilities

A.   No Admitted Facts

B.   Plaintiffs' Contentions of Fact

1.   Whether the policies, practices, and conditions which the defendants inflict on pretrial detainees are incredibly egregious in view of the fact that convicted prisoners in the

443

-47-

Jail itself, in other Los Angeles County jail facilities, and
in California state and federal prisons are treated considerably
better than the Jail's pretrial prisoners; although the lives of
convicted prisoners are far from idyllic, convicts do not face
the same oppressive confinement and boredom experienced by the
Jail's pretrial detainees; and convicts generally live in
superior housing and have daily opportunity to exercise, recreate,
entertain themselves indoors and outdoors; and almost universally
convicts are permitted to have physical contact with their
visitors.

XXVI.   Exhibits

A.   Plaintiffs

Plaintiffs' present list of exhibits, excluding
rebuttal and impeachment exhibits, is attached hereto as Schedule
B.

B.   Defendants

Defendants' present list of exhibits, excluding rebuttal
and impeachment exhibits, is attached hereto as Schedule C.

C.   Exchange of Exhibits

1.   All exhibits known to the parties have been exchanged
or will be exchanged as soon as is practicable and not later

444

than ten (10) days before trial without good cause.

2.   The parties will disclose to each other rebuttal and impeachment exhibits, including those discovered during trial, as soon as is practicable.

3.   The parties will file a statement of their respective positions on the admissibility of the other side's exhibits ten (10) days before trial or ten (10) days after receipt of copies of such exhibits whichever is later.

XXVII.   Contentions of Law

A.   Jurisdiction

The parties stipulate that jurisdiction is conferred upon this Court by 28 U.S.C. §1343 providing jurisdiction in District Courts over claims for redress of civil liberties arising under 42 U.S.C. §1983.

B.   All Other Contentions of Law

The parties' remaining extensive and voluminous contentions of law are set forth in their respective Memoranda of Contentions of Fact and Law, which, for purposes of convenience, are incorporated herein by reference as though fully set forth.

///
///
///
///

445



-49-

1   The foregoing admissions having been made by the

2   parties, and the parties having specified the foregoing issues

3   of fact and law remaining to be litigated, this order shall

4   supplement the pleadings and govern the course of the trial of

5   this cause, unless modified to prevent manifest injustice.

6

7   DATED:  June  2 7 , 1977.

8

9

10                                  WILLIAM P. GRAY
                                     DISTRICT COURT JUDGE

11

12   APPROVED AS TO FORM AND CONTENT:

13

14

15   TERRY SMERLING
     Attorney for Plaintiffs          DATED:  June  13  , 1977

16

17

18

19   FREDERICK R. BENNETT
     Attorney for Defendants          DATED:  June  13  , 1977.

20

21

22

23

24

25

26

27

28
                        -50-

                                                    446

## SCHEDULE A.

| Cell Designation | No. Men per Cell/Row | No. Cells | Size of Cell in Feet | Size of Adjoining Freeway in Feet | Size of Dayroom in Feet | Square Feet per Cell in Sq. | Cell Sq Feet per Man @ Rated Capacity | Sq Feet per Man Rated Capacity Including Freeway | Sq Feet per Man Rated Capacity Including Day and Freeway |
|---|---|---|---|---|---|---|---|---|---|
| 1200 A | 1 | 26 | 4.5x9.5x9 | 5'x125' | NONE-MESS | 42.75 | 42.75 | 66.78 | 66.78 |
| 1250 B | 1 | 24 | 4.5x9.5x9 | 5'x115' | FULL LINE | 42.75 | 42.75 | 66.7 | 66.7 |
| 1250 E | 1 | 16 | 4.5x9.5x9 | 5'x76' | LIBRARY | 42.75 | 42.75 | 66.5 | 66.5 |
| 1250 G | 1 | 8 | 4.5x9.5x9 | 10'x140' | CONSOLIDED | 42.75 | 42.75 | 92.75 | 92.75 |
| 2100 A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2100 B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2100 C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2100 D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 93.21 | 143.67 |
| 2200 A | 6 | 13 | 13x9x9.16 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2200 B | 6 | 13 | 13x9x9.16 | 5'x130' | 4'11"x33' | 117 | 19.5 | 27.83 | 44.65 |
| 2200 C | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2200 D | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2300 A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2300 B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2300 C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2300 D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 93.21 | 143.67 |
| 2400 A | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2400 B | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2400 C | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2400 D | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2500 A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2500 B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2500 C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2500 D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2600 A | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2600 B | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2600 C | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2600 D | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2700 A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2700 B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 2700 D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2700 C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 2800 A | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2800 B | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 2800 C | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2800 D | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |
| 2900 A | 10 | 7 | 9x22x9 | 9'x120' | 10'x9' | 198 | 19.8 | 35.22 | 36.38 |
| 2900 B | 8 | 7 | 9.25x19x9 | 5'x120' | 10'x9' | 175.75 | 21.97 | 32.68 | 34.13 |
| 2904 A | 1 | 4 | 5.08x8x7.8 | 9'x33' | NONE | 40.64 | 40.64 | 74.25 | 74.25 |
| 2904 | 1 | 2 | 5.08x13x7.8 | 9'x33' | NONE | 57.4 | 57.4 | 205.9 | 205.9 |
| 3100 A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3100 B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 4'11"x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3100 C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3100 D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 4'11"x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3200 A | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3200 B | 6 | 13 | 13x9x9.6 | 5'x130' | 4'11"x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3200 C | 4 | 13 | 9x9x11.5 | 5'x130' | 4'11"x32' | 81 | 20.25 | 32.75 | 57.98 |

P. 51

119

## SCHEDULE A

| Designation | Road | No. per cell | No. cells | Size of cell in feet | Size of adjoining freeway in feet | Size of adjoining feet | Square feet per cell | Sq. feet per cell rated capacity | Sq. feet remaining capacity additional freeway | Sq. feet remaining capacity incl. day room |
|---|---|---|---|---|---|---|---|---|---|---|
| 3200 | D | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3300 | A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3300 | B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3300 | C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3300 | D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3400 | A | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3400 | B | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3400 | C | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3400 | D | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3500 | A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3500 | B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3500 | C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3500 | D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3600 | A | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3600 | B | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3600 | C | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3600 | D | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3700 | A | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3700 | B | 1 | 26 | 4.5x9.5x9 | 8½'x124' | 411'x32' | 42.75 | 42.75 | 83.29 | 133.75 |
| 3700 | C | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3700 | D | 1 | 26 | 4.5x9.5x9 | 5'x124' | 411'x32' | 42.75 | 42.75 | 66.6 | 117.06 |
| 3800 | A | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3800 | B | 6 | 13 | 13x9x9.6 | 5'x130' | 411'x32' | 117 | 19.5 | 27.83 | 44.65 |
| 3800 | C | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3800 | D | 4 | 13 | 9x9x11.5 | 5'x130' | 411'x32' | 81 | 20.25 | 32.75 | 57.98 |
| 3823 | A | 2 | 14 | 9.5x5.16x9 | 5'x70' | NONE | 49.02 | 24.51 | 37.01 | 37.01 |
| 4800 | A | 6 | 13 | 10x14x12 | 6½'x160' | 28'6"x13' | 140 | 23.33 | 36.66 | 41.43 |
| 4800 | B | 6 | 12 | 10x14x12 | 6½'x160' | 28'6"x13' | 140 | 23.33 | 36.66 | 41.43 |
| 4800 | C | 4 | 13 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4800 | D | 4 | 12 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4400 | A | 6 | 13 | 10x14x12 | 6½'x160' | 28'6"x8' | 140 | 23.33 | 36.66 | 41.43 |
| 4400 | B | 6 | 12 | 10x14x12 | 6½'x160' | 28'6"x8' | 140 | 23.33 | 36.66 | 41.43 |
| 4400 | C | 4 | 13 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4400 | D | 4 | 12 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4500 | A | 1 | 10 | 4.5x9.5x9 | 10'x60' | 8'x9' | 42.75 | 42.75 | 102.75 | 110.85 |
| 4500 | B | 1 | 12 | 4.5x9.5x9 | 10'x60' | 8'x9' | 42.75 | 42.75 | 92.75 | 99.5 |
| 4500 | C | 1 | 10 | 4.5x9.5x9 | 5'x60' | 8'x9' | 42.75 | 42.75 | 102.75 | 110.85 |
| 4500 | D | 1 | 12 | 4.5x9.5x9 | 5'x60' | 8'x9' | 42.75 | 42.75 | 92.75 | 99.5 |
| 4600 | A | 1 | 10 | 4.5x9.5x9 | 10'x60' | 8'x9' | 42.75 | 42.75 | 102.75 | 110.85 |
| 4600 | B | 1 | 12 | 4.5x9.5x9 | 10'x60' | 8'x9' | 42.75 | 42.75 | 92.75 | 99.5 |
| 4600 | C | 1 | 10 | 4.5x9.5x9 | 5'x60' | 8'x9' | 42.75 | 42.75 | 102.75 | 110.85 |
| 4600 | D | 1 | 12 | 4.5x9.5x9 | 5'x60' | 8'x9' | 42.75 | 42.75 | 92.75 | 99.5 |
| 4700 | A | 6 | 13 | 10x14x12 | 6½'x160' | 28'6"x13' | 140 | 23.33 | 36.66 | 41.43 |
| 4700 | B | 6 | 12 | 10x14x12 | 6½'x160' | 28'6"x13' | 140 | 23.33 | 36.66 | 41.43 |
| 4700 | C | 4 | 13 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4700 | D | 4 | 12 | 10x10x12 | 5'x150' | 28'6"x13' | 100 | 25 | 39.42 | 44.57 |
| 4800 | A | 6 | 13 | 10x14x12 | 6½'x160' | 25'6"x13' | 140 | 23.33 | 36.66 | 41.43 |

P.52

448

120

**SCHEDULE A**

| CELL CONSTRUCTION | ROOM | NO. MEN PER CELL | NO. CELLS | SIZE OF CELLS IN FEET | SIZE OF ADJOINING FREEWAY FEET | SIZE OF DAYROOM IN FEET | SQUARE FEET PER CELL SQ. FEET | CELL SQ. FEET MAXIMUM RATED CAPACITY | SQ FEET PER MAN MINIMUM RATED CAPACITY INCLUDING FREEWAY | SQ FEET PER MAN RATED CAPACITY INCLUDING FREEWAY AND DAY ROOM | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4800 | B | 6 | 12 | 10×14×12 | 6 1/2×160' | 28'6"×13' | 140 | 23.33 | 36.66 | 21.43 | | | | | | |
| 4800 | C | 9 | 13 | 10×10×12 | 5'×150' | 28'6"×13' | 100 | 25 | 39.42 | 46.57 | | | | | | |
| 4800 | D | 4 | 12 | 10×10×12 | 5'×150' | 28'6"×13' | 100 | 25 | 39.42 | 46.57 | | | | | | |
| 5100 | — | 1 | 69 | 70×35×12 | NONE | ONE DAY | 2450 | 38.28 | | 44.13 | | | | | | |
| 5200 | — | 1 | 65 | 70×35×12 | NONE | ROOM | 2450 | 36.03 | | 45.68 | | | | | | |
| 5300 | — | 1 | 64 | 70×35×12 | NONE | SERVES ALL | 2450 | 38.28 | | 46.13 | | | | | | |
| 5400 | — | 1 | 68 | 70×35×12 | NONE | 80'×160×10 | 2550 | 36.03 | | 45.88 | | | | | | |
| 5500 | — | 1 | 62 | 70×35×12 | NONE | | 2450 | 39.52 | | 49.37 | | | | | | |
| 5550 | — | 1 | 62 | 70×35×12 | NONE | | 2450 | 39.52 | | 49.37 | | | | | | |
| 5600 | — | 1 | 64 | 70×35×12 | NONE | | 2450 | 38.28 | | 48.13 | | | | | | |
| 5700 | — | 1 | 68 | 70×35×12 | NONE | | 2450 | 36.03 | | 45.88 | | | | | | |
| 5800 | — | 1 | 64 | 70×35×12 | NONE | | 2450 | 38.28 | | 48.13 | | | | | | |
| 5900 | — | 1 | 68 | 70×35×12 | NONE | | 2450 | 36.03 | | 45.88 | | | | | | |
| 9100 | — | 1 | 41 | 70×35×12 | NONE | | 2450 | 59.76 | | 69.61 | | | | | | |
| 9200 | — | 1 | 41 | 70×35×12 | NONE | | 2450 | 59.76 | | 69.61 | | | | | | |
| 9300 | — | 1 | 42 | 70×35×12 | NONE | | 2450 | 58.33 | | 68.18 | | | | | | |
| 9400 | — | 1 | 36 | 70×35×12 | NONE | | 2450 | 68.06 | | 77.97 | | | | | | |

Prepared By

Approved By

P. 53

449

121

# EXHIBIT 3



RECEIVED
NOV 15 1985

INKLE, RODIGER AND SPRIG

NOV 1 3 1985

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, | No. CV 75-4111 WPG |
| Plaintiff, | MEMORANDUM OF UNDERSTANDING; COURT APPROVAL THEREOF |
| v | |
| SHERMAN BLOCK, et al., | |
| Defendants. | |

The parties to the above-entitled action, through their counsel of record, the undersigned, hereby enter this Memorandum of Understanding, and subject to the court's approval, agree as follows:

A.  Preamble

Plaintiff's counsel has received complaints alleging that the Sheriff is failing to comply with certain of the orders issued by the Honorable William P. Gray in Rutherford v. Block, CV 75-411 WPG.  The Sheriff acknowledges that current population levels at Men's Central Jail and throughout the County jail system have precluded him from fully complying with all of such

1.

**EXHIBIT 3**

orders.  However, counsel for the parties in <u>Rutherford</u> acknow-
ledge the Sheriff's good faith efforts to reduce population
levels and to comply with the orders of <u>Rutherford</u>.  Consequently,
counsel for the parties in <u>Rutherford</u> believe that contempt
proceedings for actions and events to date are neither necessary
nor likely to be productive.  Rather, counsel for the parties
believe that the cooperative effort contemplated herein is more
likely to result in appropriate remedies.

B.  Goals

Through the cooperative effort contemplated herein,
counsel for the parties seek to achieve the following goals:

1.  To limit the legal and factual areas of
disagreement.

2.  To limit the expenses inherent in resolving issues
of increasing inmate population and prisoners' rights.

3.  To resolve the issues, if possible without judicial
intervention.

4.  To bring any unresolved issues to the court for
resolution without need for contempt proceedings or the appoint-
ment of special masters.

5.  To agree upon a maximum population for Men's Central
Jail with appropriate staffing.

C.  Definition of Overcrowding

1.  The parties agree that the term "overcrowding" is
subject to several interpretations.  For the purpose of this
document, overcrowding at Men's Central Jail is defined as that

2.

point where the inmate population exceeds a number which:

    a.  Renders it impossible for the Sheriff to comply with the orders in <u>Rutherford v. Pitchess</u> as they now provide or as they may be modified by agreement of the parties and approved by the court.

    b.  Renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control.

2.  The parties further agree that overcrowding, as defined herein, is a function of both Central Jail's structure and its staff. In reaching Goal 5 set forth above, it is the parties' intent to determine the maximum number of inmates who can be confined in Central Jail under conditions of both present and maximum staffing. The parties recognize that the present inmate poipulation does not necessarily amount to overcrowding as defined herein if staffing is determined to be adequate. The present population might even be increased given the appropriate changes in staffing and procedures. However, the parties also recognize that at some point there are structural limitations to the maximum inmate population at Central Jail.

D.  Methodology

    In furtherance of the goals set forth above, the parties agree to the following:

1.  Plaintiff's counsel will be allowed continued access to the Central Jail subject to the discretion of the Commander of that facility.

///

3.

76T576T- PS 4-84

2.   Plaintiff's counsel will commence an analysis of the Sheriff's compliance with each of the Orders of the Supplemental Memorandum Opinion and Judgment filed February 15, 1979, specifically:

a.   Each prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep [plaintiff's analysis will include a review of the practice of using dayrooms for dormitories and the addition of an extra "bunk" in certain types of cells].

b.   Prisoners not excluded from roof exercise will be allowed not less than two and one-half hours of outdoor or other recreation per week.

c.   Television receiving sets shall be installed and reasonably maintained in each dayroom.

d.   That there is adequate seating provided for detainees placed in holding cells for processing to court.

e.   Detainees facing trial, after the first day of trial, will not be required to leave their beds earlier than 6:00 a.m., will not be confined to a holding cell for longer than thirty minutes, waiting time on the bus will not exceed thirty minutes, and will be returned to cells not later than 8:00 p.m.

f.   Inmates shall be allowed not less than fifteen minutes to complete each meal.

t.   Each inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those that he has been using.

4.

3.   Plaintiff's counsel will comme ~e an analysis of conditions of confinement in the 9,000 floor dormitories, including ventilation, access to indigent supplies, compliance with Rutherford orders, custody practices, classification, etc.

4.   The County will provide, upon request, relevant non-privileged data as to populations, staff, violence, etc., so that relevant statistical information can be prepared and analyzed by both parties.  The parties will keep each other regularly apprised of the progress and results of such analysis.

5.   The County may assign a member of the Los Angeles County Sheriff's Department to act as a liaison with plaintiff's counsel.

6.   Plaintiff intends, at this time, to employ two experts [one psychologist and one statistician] to assist with the above-mentioned analysis, and to request that those experts prepare written reports as part of this analysis.  County representatives, and their counsel, shall be allowed reasonable personal access to these experts and complete access to any reports, computer printouts, tables, exhibits, etc., that they may prepare.  It is plaintiff's intention to utilize these experts to gather information which will be shared with defendants and to provide an independent appraisal of conditions at the Central Jail.  Whenever possible, tours of Central Jail by plaintiff's expert psychologist shall be arranged and conducted so that an appropriate representative from the Sheriff's medical staff may attend.

7.   The parties agree that changes in the population at the Central Jail will impact upon the populations of the other

5.

1   facilities in the Los Angeles County Jail system, and the County
2   agrees to inform plaintiffs of changes in the use and capacities
3   of those other facilities which may occur as a result of any
4   proposed limitations on Central Jail's population.

5       8.   The parties will request an October 1985 Status
6   Conference with the Honorable William P. Gray.

7       9.   Counsel for the parties will meet regularly, not
8   less than monthly, to discuss the progress and anticipated
9   findings.  It is the parties' intent and desire to meet and
10  confer with regard to achieving the goals set forth in Paragraph
11  B above at least 30 days prior to seeking judicial relief.

12          IT IS SO AGREED:
13  DATED:  October 23, 1985      Respectfully submitted,

14                               DE WITT W. CLINTON, County Counsel

15
16                           By _____
                                FREDERICK R. BENNETT
17                              Principal Deputy

18  DATED:  October 7, 1985      _____
19                               JOHN E. HAGAR, JR.

20
21  DATED:  October 4, 1985      _____
22                               PAUL HOFFMAN

                                 Attorneys for Plaintiff
23

24
        Good cause appearing therefor, the foregoing is approved.
25

26                               _____
    DATED:  October ___, 1985
27                               WILLIAM P. GRAY
                                 United States District Court
28

                                    6.

# EXHIBIT 4

1  PAUL L. HOFFMAN
    LISE ANDERSON
2  ACLU Foundation of Southern California
    1616 Beverly Boulevard
3  Los Angeles, CA 90026

4  (213) 977-9500

5  Attorneys for Plaintiffs

6  DE WITT W. CLINTON
    County Counsel
7  FREDERICK R. BENNETT
    Assistant County Counsel
8  648 Hall of Administration
    500 W. Temple Street
9  Los Angeles, CA  90012

10  (213) 974-1903
    FAX (213) 626-2105

11  Attorneys for Defendants

12

13         UNITED STATES DISTRICT COURT

14     FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

16  DENNIS RUTHERFORD, *et al.*,    CASE NO. CV-75-4111 *WPG*

17         Plaintiffs,    Joint Status Report and
                       Proposed Order
18     v.

19  SHERMAN BLOCK, *et al.*,

20         Defendants

21

22     The present action was filed by the American Civil Liberties

23  Union Foundation of Southern California (ACLU) in 1975 invoking

24  jurisdiction under 28 U.S.C. §1343 for a claim under 42 U.S.C.

25  §§1983, 1985, and for injunctive and declaratory relief pursuant

26  to 28 U.S.C. §§2201, 2202, as a class action on behalf of all

27               - 1 -

28

FILED
CLERK, U.S. DISTRICT COURT
AUG 27 1992
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

**EXHIBIT 4**

1   present and future inmates challenging a wide range of conditions

2   of confinement at the Los Angeles County Men's Central Jail.

3

4      The class was certified and the matter proceeded to trial.

5   After trial, the United States District Court Judge William P.

6   Gray, filed a reported decision, *Rutherford v. Pitchess* (C.D. Cal.

7   1978) 457 F.Supp. 104 (Attachment 1[1]), and in an unreported

8   supplemental memorandum opinion filed February 15, 1981

9   (Attachment 2), and a Judgment dated February 15, 1979

10   (Attachment 3), imposing nine (9) orders at Mens' Central Jail

11   concerning (1) beds, (2) visitation, (3) outdoor recreation, (4)

12   indoor recreation, (5) restoration of windows, (6) processing for

13   court, (7) cell search procedures, (8) time for meals, and (9)

14   changes of clothing.  By order filed January 5, 1979, a separate

15   tenth (10th) order was filed approving and directing

16   implementation of a plan for the improvement of telephone

17   facilities in the jail.

18

19      Three of these orders, visitation, restoration of windows,

20   and search procedures, were appealed to the Ninth Circuit, which

21   reversed the order concerning restoration of windows (*Rutherford v.*

22   *Pitchess* (9th Cir. 1983) 710 F.2d 572) [Attachment 4]), and to the

23   United States Supreme Court, which reversed the visitation order

24

25

26     [1]  Referenced opinions are reproduced from the published
reports or from the Joint Appendix filed with the United

27   States Supreme Court in *Block v. Rutherford* (1984) 468 U.S. 576,
104 S.Ct. 3227, 82 L.Ed.2d 438.

28                  - 2 -

insofar as it required contact visitation, and the search
procedures order (*Block v. Rutherford* (1984)  468 U.S. 576, 104 S.Ct.
3227, 82 L.Ed.2d 438 [Attachment 5]).

The Sheriff has never been able to fully comply with one of
these orders concerning processing for court, and that provision
has been the subject of many motions for modification and
enforcement, and on December 16, 1987, District Court Judge Gray
approved a plan which ultimately lead to a jail population
management order discussed below, which suspended for at least
six months the orders concerning processing for court.  The court
processing orders remain suspended.

An unreported memorandum of understanding in other
litigation initiated by the ACLU, *ACLU v. Pitchess*, the Sheriff
agreed to work toward obtaining state licensure of the jails
health care delivery system, which has not yet been accomplished.
In 1984 and in 1991 the medical facilities at Men's Central Jail,
Sybil Brand Institute, and the Forensic Outpatient Unit (#7200)
in Central Jail were inspected by the state licensing agency.  In
May 1992 this agency issued reports detailing many areas in need
of improvement before licensing could occur.

Through 1985, none of the orders technically affected any
jails in the multi-facility Los Angeles County jail system except
Mens' Central Jail, although orders had been issued concerning
other jails in the system in litigation brought by the same

- 3 -

attorneys representing the class in the Central Jail litigation. Orders concerning the main Women's jail, Sybil Brand Institute, were obtained in a state court proceeding, *Inmates of Sybil Brand v. Pitchess* (1982) 130 Cal.App.3d 89, and concerning the Mens Hall of Justice Jail in *Dillard v. Pitchess* (C.D. Cal. 1975) 399 F.Supp. 1225, and by subsequent stipulated agreements approved by District Court Judge William P. Gray.  However, it was the Sheriff's practice to attempt to implement orders directed at any one facility system-wide, and discussions between the parties generally focused on the system rather than on any particular facility.

Beginning in 1985, the Sheriff began experiencing difficulty in complying with the various jail orders in the context of unprecedented and unexpected increases in the jail population. During the 1980's the jail system population almost tripled from about 8,000 to over 23,000.  As alternatives to contempt proceedings, the parties entered a number of memorandums of understanding, which are summarized in a letter to Los Angeles Municipal Court Judge Richard A. Paez, dated June 15, 1988 (attachment 5), and which ultimately lead to United States District Court Judge William P. Gray approved stipulated population limits at each of the jail facilities in the jail system (except the newest facility, the North County Correctional Facility, as to which there is only an understanding of the parties), and a Court imposed jail population management order which directs the Sheriff to "manage the jail system within those

- 4 -

1  capacities by discharging or citing inmates to court upon a

2  written promise to appear, according to priorities that he shall

3  establish."  (See Attachment 6).  Using this authority, the

4  Sheriff has generally managed the jail system within the

5  stipulated jail facility capacities by using a variety of

6  criteria for releasing or citing inmates to court as needed.

7

8  Since 1985, the ACLU has continued to monitor the Sheriff's

9  compliance with the various orders, and the parties have met

10 regularly since 1985.  During this time, the parties have been

11 able to agree to appropriate attorneys' fees for such monitoring

12 efforts which are periodically submitted to the District Court to

13 be ordered without hearing or objection, and to various plans for

14 dealing with periodic difficulties of compliance which have been

15 either reported to United States District Court Judge William P.

16 Gray orally in periodic status conferences, in periodic written

17 status reports, or submitted to him for modification orders.

18

19 Current meetings and discussions have largely centered on

20 the jail's health care delivery system.

21

22 This cooperative process has worked well for almost a

23 decade, with the parties meeting regularly, providing the court

24 with periodic status reports, and seeking United States District

25 Court intervention or approval as necessary.

26

27

28                                   - 5 -

To assist the District Court, the basic framework of existing court orders and modifications is as follows:

1.  **Beds.**  Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.  This order shall not preclude the defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only, if, in the defendants' judgment, such inmate or inmates require more secure housing than is provided in the available areas and the appropriate housing does not have a sufficient number of bunks. Further, this order shall not apply in the event of an emergency causing a sudden and unusual intake of prisoners, in which case full bedding shall be provided and the defendants will exercise their best efforts to provide bunks for all inmates as soon as possible.  (Attachment 2, 2/15/79 Judgement, para. 1).

2.  **Visitation by Children of Prisoners.**  Upon prior request from a prisoner, his minor children ~~over the age~~ over the age of twelve (12) years shall be permitted to visit him unaccompanied by an adult.  (*Id.*, para. 2).

3.  **Outdoor Recreation.**  All prisoners except those that are hospitalized, in disciplinary segregation, those under the jurisdiction of medical staff of the Forensic Mental Health Unit who such medical staff determine are

- 6 -

appropriate for roof recreation, and except for those high

security inmates who the Sheriff believes cannot safely be

permitted roof recreation shall be allowed not less than two

and one-half hours of outdoor exercise or other recreation

per week.  (*Id.*, para. 3).

    4.   **Indoor Recreation.**  Television sets shall be

installed and reasonably maintained in each day room.  (*Id.*,

para. 4).

    5.   **Telephones.**  Primarily collect and some pay

telephones shall be installed in each jail facility to

permit all inmates reasonable access to telephones.  (*Id.*,

para. 7, as modified).

    6.   **Time for Meals.**  An inmate shall be allowed not

less than fifteen minutes within which time to complete each

meal.  (*Id.*, para 9).

    7.   **Change of Clothing.**  Each inmate shall receive at

least twice each week clean outer garments, undergarments,

socks and a towel in exchange for those that he has been

using.

    8.   **Jail Population Management.**  The maximum inmate

population at each of the listed facilities, subject to

modification upon addition of new facilities, is set forth

- 7 -

below and the Sheriff shall "manage the jail system within those capacities by discharging or citing inmates to court upon a written promise to appear, according to priorities that he shall establish"  (Attachment 5):

| Jail Facility | Court Approved Capacity |
|---|---|
| Mens' Central Jail Permanent housing | 6,800 Normal - 7500 Emergency[2] |
| Inmate Reception Center | 700 Inmates[3] |
| Los Angeles Medical Center | 50 Inmates |
| Hall of Justice Jail | 1,800 Normal - 2100 Emergency |
| Biscailuz Center | 1,470 Inmates |
| North County Correctional Facility | 3,120 Normal - 3600 Emergency[4] |
| PHR-East | 1,786 Normal - 1800 Emergency |
| PHR-North | 1,600 Normal - 1650 Emergency |
| PHR-South | 1,900 Normal - 1950 Emergency |
| PHR-Ranch | 2,366 Inmates |
| Mira Loma Male Facility | 1,089 Inmates |
| Mira Loma Female Facility | 854 Inmates |

[2]  The normal agreed population limit is 6800 inmates. However, the parties and the Court have approved permitting this jail's population to temporarily exceed 6800 to as much as 7500 on occasion for short periods of time when necessary.  Similar normal and emergency capacities are identified for certain other facilities.

[3]  There is no prior court order concerning this capacity. However, this number reflects the average number of inmates being processed in the Inmate Reception Center at any one time, and the number of inmates in the Inmate Reception Center are reported on  the daily count sheets used by the parties to monitor the jail population.

[4]  Since this facility was built after the original inmate population capacity agreements were adopted, there has been no prior formal approval of these limits.

- 8 -

| | |
|---|---|
| Sybil Brand Institute for Women | 2,064 Normal – 2300 Emergency |
| **Total** | **25,599 Normal – 27,429 Emergency** |

9.  **Health care system.**  The Sheriff shall work
towards obtaining State licensure of all jail health care
facilities and providing constitutionally adequate health
care to all inmates in his custody, and in furtherance of
that effort:

A.    A joint Sheriff/ACLU team, including a
mutually acceptable outside expert, will visit mutually
acceptable jail medical care facilities such as Cook
County (Chicago), Illinois, and Riker's Island (New
York), for the purpose of identifying practical and
appropriate ways of providing adequate jail medical
care, and to provide a baseline for evaluation of the
Los Angeles County system.

B.    After the visit, the team will meet to
identify necessary improvements to the Los Angeles
County jail medical care system, and to prioritize
those improvements to be implemented over time,
(assuming that there are insufficient available
resources), and to establish a reasonable time frame
for implementation.

C.    During this process the Sheriff will continue
efforts to make short term improvements to meet the
most serious deficiencies identified in the most recent
State licensure inspection report.

- 10 -

10.  **Administrative Remedy.**  When any inmate has
information that he believes to disclose a violation of a
jail condition orders order, he may set forth that
information in writing to the Commander of the jail who
shall cause an investigation thereof to be made as soon as
reasonably practicable, and in any event within ten days
following receipt of such written statement.  Promptly
following the completion of the investigation the Commander
shall deliver a written reply to the inmate indicating what,
if any, action, has been taken concerning the inmate's
complaint and what, if any, action has been taken to prevent
violations of this judgment.  Absent unusual circumstances
indicating compelling reasons why following this procedure
would result in substantial prejudice to the inmate, no
petition for a judgment of contempt for violation of this
order shall be entertained by the court until the inmate
first complies with this administrative procedure.  In
considering any petition for contempt for violation of jail
condition orders order, the court shall take into account
the appropriateness of any action taken by the jail
Commander in response to information provided him in
accordance with this procedure.  (*Id.*, para 11).

11.  **Emergencies.**  In the event the Sheriff or his
authorized representatives have reasonable cause to believe
there exists facts showing a serious imminent threat to the
security of the jail or the safety of any persons therein

- 11 -

that would occur if any of the provisions of the *Rutherford* orders were enforced and there is insufficient time to seek a formal modification or exception to such provisions, the Sheriff may temporarily suspend such jail condition orders as may be necessary to overcome or reduce such threat for a period not exceeding five court days, provided he submits a statement in writing to this court setting forth what he has done and why he has done it. (*Id.*, para. 12).

IT IS SO STIPULATED:

Date: August 13, 1992

Frederick R. Bennett
Assistant County Counsel
Attorney for Defendants

Date: August 13, 1992

Paul Hoffman
Legal Director
ACLU Foundation of Southern Calif.
Attorney for the Plaintiff Class

IT IS SO APPROVED AND ORDERED:

Date: August 27, 1992

United States District Court Judge

I am the person and entitled to 8-27-92
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

- 12 -

# EXHIBIT 5

1  MAJOR A. LANGER, CA Bar No. 41440
   MICHEL F. MILLS, CA Bar No. 193002
2  PERONA, LANGER, BECK, LALLANDE & SERBIN
   A Professional Corporation
3  300 East San Antonio Drive
   Long Beach, California 90807-0948
4  (562) 426-6155 / Fax (562) 490-9823

5  Attorneys for Plaintiffs Juan Porras and
   Donald Grigsby Individually and on Behalf
6  of all Others Similarly Situated

7

8               UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                         CV04-1229 ABC  (RNBx)

11  JUAN PORRAS and DONALD GRIGSBY, )  CASE NO.
    Individually and on Behalf of  )
12  All Others Similarly Situated,  )
                                    )
13                                  )
              Plaintiffs,           )  CLASS ACTION COMPLAINT
14                                  )  AND REQUEST FOR JURY TRIAL
         v.                         )
15                                  )
                                    )
16  COUNTY OF LOS ANGELES, LOS      )
    ANGELES COUNTY SHERIFF'S        )
17  DEPARTMENT, Inclusive,          )
                                    )
18            Defendants.           )
                                    )
19

20

21

22

23

24

25

26

27

28

-1-

**EXHIBIT 5**

1

## TABLE OF ALLEGATIONS

2

3   I.   INTRODUCTION AND OVERVIEW OF THE ACTION . . . . . . . . . 2

4   II.  THE PARTIES . . . . . . . . . . . . . . . . . . . 3

5       A.  Plaintiffs . . . . . . . . . . . . . . . . 3

6       B.  Defendants . . . . . . . . . . . . . . . . 5

7  III. JURISDICTION AND VENUE . . . . . . . . . . . . . 6

8   IV.  GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION . . 7

9       A.  Defendants' Systemic Barriers To Medical, Dental
and Mental Health Care Violate Inmates' Rights
10         Under the Eighth and Fourteenth Amendments . . . . . 7

11            1.  Defendants Owe a Duty to Provide The Inmate
Population A System of Ready Access to Medical
12               Services That is Sufficient To Administer the
Needs of the Population's Members . . . . . . 7

13

14            2.  Defendants Breached Their Duties By Knowingly
and Deliberately Maintaining Barriers that
Deny and/or Delay Inmates' Access to Medical
15               Services . . . . . . . . . . . . . . . . 8

16            3.  Defendants Denied Juan Porras' Access to
Medical Services and Delayed Treatment
17               of His Serious Medical Condition . . . . . . 11

18            4.  Defendants Denied Donald Grigsby's
Access to Medical Services and Delayed
19               Treatment of His Serious Medical
Conditions . . . . . . . . . . . . . . . 14

20

21       B.  The Confinement Conditions At Defendants' Men's
Central Jail and Twin Towers Correctional Facility
Violate Inmates' Eighth and Fourteenth Amendment
22         Rights . . . . . . . . . . . . . . . . . 20

23

24   V.   FEDERAL CLASS ALLEGATIONS . . . . . . . . . . . . 23

24       A.  The Rule 23(b)(2) Injunctive Relief Non "Opt-Out"
25         Class . . . . . . . . . . . . . . . . . . 23

26       B.  Nominal Damages Non "Opt-Out" Class Pursuant to
Rule 23(b)(2), or Alternatively, an "Opt-Out"
27         Class Pursuant to Rule 23(b)(3) . . . . . . . 24

28

FIRST CAUSE OF ACTION
Plaintiffs' Individual Civil Rights Claims
[42 U.S.C.§ 1983] . . . . . . . . . . . . . . . . . . . 29

SECOND CAUSE OF ACTION
Plaintiffs' Injunctive Relief Civil Rights Class
[42 U.S.C. § 1983] . . . . . . . . . . . . . . . . . . 31

A.    Defendants fail to provide Class Members
      a health care system that met the constitutional
      minima . . . . . . . . . . . . . . . . . . . 33

B.    Defendants are deliberately indifferent to Class
      Members' legitimate health care needs . . . . . . . 35

THIRD CAUSE OF ACTION
Plaintiffs' Nominal Damages Civil Rights Class
[42 U.S.C. § 1983] . . . . . . . . . . . . . . . . . . 38

PRAYER . . . . . . . . . . . . . . . . . . . . . . . 39

VI.  DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . 42

2010-FEB-05 11:42   FROM-ABC LEGAL SERVICES            +2132530413         T-909   P.003   F-027

1     Plaintiffs Juan Porras and Donald Grigsby bring this action

2 individually and on behalf of all others similarly situated

3 (collectively "Plaintiffs") against the County of Los Angeles,

4 Los Angeles County Sheriff's Department (hereinafter "LASD"), and

5 they allege on information and belief, except as to allegations

6 that pertain to Plaintiffs and their counsel, as follows:

7

8    I.    <u>INTRODUCTION AND OVERVIEW OF THE ACTION</u>

9    1.  When the State, by imprisonment, prevents a person from

10 caring for himself, the Constitution imposes "a corresponding

11 duty to assume some responsibility for his safety and general

12 well being." <u>Helling v. McKinney</u>, 509 U.S. 25, 32, 113 S.Ct.

13 2475, 2480, 125 L.Ed.2d 22 (1993). "When the State by

14 affirmative exercise of its power so restrains an individual's

15 liberty that it renders him unable to care for himself, and at

16 the same time fails to provide for his basic human needs, e.g.,

17 food, clothing, shelter, medical care, and reasonable safety, it

18 transgresses the substantive limits set by the Eighth

19 Amendment.[1] <u>Id.</u> (citations omitted).

20    2.    Plaintiffs bring this civil rights class action

21 pursuant to Title 18 U.S.C. §§ 1983, 1988 and Rule 23 of the

22 Federal Rules of Civil Procedure on behalf of all inmates and

23 pretrial detainees (collectively "inmates") Defendants held in

24 custody at their Men's Central Jail, Twin Towers Correctional

25

26    [1]The Eighth Amendment states: "Excessive bail shall not be
required, nor excessive fines imposed, nor cruel and unusual

27 punishments inflicted." U.S. Const.Amend.VIII.  Although a pre-
trial detainee's challenge is evaluated under the Fourteenth

28 Amendment, the same standard applies to his claims.  <u>Von Collin v.</u>
<u>County of Ventura</u>, 189 F.R.D. 583, 594 (C.D.Cal.1999).

Facility ("Twin Towers") and LAC/USC Medical Center ("LCMC") since January 1991. Defendants' jail facilities fail to meet the constitutional minima in at least five critical areas. Beginning no later than January 1991 and continuing without interruption until the present, Defendants have and continue to:

   (1)   Deny inmates access to a system of ready health care;

   (2)   Confine inmates in unsanitary conditions by requiring them to live in soiled clothes for extended periods;

   (3)   Deny inmates their right to confer with counsel by telephone and the mails;

   (4)   Deny inmates a process that effectively investigates, tracks and/or resolves grievances relating to barriers to medical care; and,

   (5)   Coerce, intimidate, and retaliate against inmates who complain about the barriers to medical care.

   3.   Plaintiffs Porras, Grigsby and the inmate sub-classes, defined infra ¶ 69, have been and continue to be proximately harmed by these and other violations listed below. Plaintiffs seek three categories of relief pursuant to Title 18 U.S.C. §§ 1983 et seq.: (1) compensatory damages for their individual claims; (2) injunctive relief for present and future inmates; and (3) nominal damages for present and past inmates Defendants confined in unconstitutional facilities.

II.                          **THE PARTIES**

A.   **Plaintiffs**

   4.   Plaintiff Juan Cruz Porras is, and at all material times was, a resident of the State of California, County of Los Angeles. Defendants held Mr. Porras, at all material times, as a

-3-

1  pre-trial detainee at their Men's Central Jail, Twin Towers, and

2  LCMC, and they identified him by Booking No. 7782405.

3      5.    Mr. Porras suffers from several serious, painful and

4  potentially life threatening medical conditions requiring medical

5  care.  These include necrosis of the legs and partial paralysis

6  below the hips in addition to hepatitis B, high blood pressure,

7  broken ribs plus shoulder and knee injuries.  During his

8  incarceration he also suffered infection to spider bites he

9  received on his arm.  Mr. Porras remains incarcerated at the

10  Men's Central Jail as of the date of this Complaint.

11      6.  Plaintiff Donald Grigsby is, and at all times material

12  to this action was, a resident of the State of California, County

13  of Los Angeles.  Defendants held Mr. Grigsby, at all material

14  times, as a pre-trial detainee and post-conviction inmate at

15  their Men's Central Jail, Twin Towers, and LCMC, and they

16  identified him by Booking No. 7667129.

17      7.  Mr. Grigsby suffers from several serious conditions

18  requiring medical care including schizophrenia, diabetes, high

19  blood pressure and testicular atrophy.  Beginning in July 2003,

20  Mr. Grigsby experienced a recurrence of *testicular torsion* which

21  previously caused the amputation of his right and a one half of

22  his left testicle.  Testicular torsion is a serious and extremely

23  painful condition that requires immediate surgery.  Defendants

24  transferred Mr. Grigsby to the California Department of

25  Corrections, Wasco State Prison on or about November 24, 2003.

26      8.    Prior to commencing this action, Plaintiffs Porras,

27  Grigsby and Class Members, defined infra ¶ 69, exhausted all

28  available administrative remedies.  However, these remedies fail

-4-

1  to provide inmates compensatory or nominal damages and fail to

2  enjoin Defendants' unconstitutional confinement conditions

3  alleged herein.

4  **B.   Defendants**

5  9.   Defendants County of Los Angeles and Los Angeles County

6  Sheriff's Department were and currently are public entities, duly

7  organized and existing under the laws of the State of California.

8  10.   Plaintiffs are informed and believe, and thereon

9  allege, that in committing the acts alleged herein, each and

10  every defendant was the managing agent, agent, representative

11  and/or employee of each and every other Defendant and was working

12  within the course and scope of said agency, representation and/or

13  employment with the knowledge, consent, ratification and

14  authorization of each and every remaining Defendant and its

15  directors, officers and/or managing agent.

16  11.   All of the Defendants were acting together and in

17  concert, entering into agreements with each other, and working as

18  the principal, agent, or employee of the other remaining

19  Defendants and that each Defendant was aware of the acts of the

20  others and consented to and ratified such acts.

21  12.   Plaintiffs are further informed and believe, and based

22  thereon allege, that a unity of interest in ownership existed

23  between County of Los Angeles, LASD, the Los Angeles County

24  Sheriff, Los Angeles County Board of Supervisors, Men's Central

25  Jail, Twin Towers and LCMC such that any individuality and

26  separateness that purportedly existed ceased and each Defendant

27  became the alter ego of the others.  By and through this unity

28  each Defendant asserted control over the other.  Defendants

1  conducted business jointly as co-owners, joint venturers or

2  partners, and they have shared and inter-mingled joint management

3  and capital and have dealt with Plaintiffs jointly.  Defendants

4  share the same managers and officers, forms, offices, employees,

5  policy and procedure manuals, and operating manuals.

6      13.  At all material times, Defendants, and each of them,

7  established, designed, developed, conducted, maintained, and

8  otherwise operated jail facilities for the County of Los Angeles.

9      14.  At all times herein mentioned, defendants County of Los

10  Angeles, Los Angeles County Sheriff's Department, Los Angeles

11  County Sheriff Baca, and each of them, were responsible for the

12  hiring, training and supervision of their employees, agents,

13  servants and independent contractors.

14

15      III.                JURISDICTION AND VENUE

16      15.  This Court has federal question jurisdiction over this

17  action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1983.

18      16.  Venue is proper in the Central District of California

19  because the Defendants regularly conducted business in this

20  district and the underlying conduct occurred here.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

-6-

IV.     **GENERAL ALLEGATIONS APPLICABLE
TO ALL CAUSES OF ACTION**

A.     **Defendants' Systemic Barriers To Medical, Dental and
Mental Health Care Violate Inmates' Rights Under the
Eighth and Fourteenth Amendments.**

1.     **Defendants Owe a Duty to Provide The Inmate
Population A System of Ready Access to Medical
Services That is Sufficient To Administer the
Needs of the Population's Members.**

17.  The Eighth and Fourteenth Amendments to the United
States Constitution prohibit cruel and unusual punishment of
inmates and pretrial detainees. These Amendments impose on states
an obligation *to provide a system of ready access to adequate
medical care or services.*  This duty requires the State provide a
level of health care that meets the inmates' legitimate needs
including routine and emergency treatment for injuries, ills,
dental care, psychological and psychiatric care.

18.  A jail must meet six objective criteria to satisfy its
obligation to provide *a system of ready access* to physical,
dental and mental health care:

(1)  Inmates must be able to make their medical problems
known to medical staff;

(2)  They must receive reasonably speedy access to medical
care;

(3)  They must receive the treatment physicians or medical
staff prescribe;

(4)  The jail must provide inmates an adequate system for
responding to emergencies;

(5)  The jail must staff the facility with sufficient,
trained and supervised medical personnel; and

(6)  The facility must provide accurate, organized and
thorough medical records and have them available for
use during sick-call, examination and treatment.

-7-

19.   At all material times, Defendant Los Angeles County, by and through the LASD, has incarcerated inmates and pretrial detainees at the Men's Central Jail and at the Twin Towers.

20.   Approximately 200,000 inmates flow through Defendants' Men's Central Jail and Twin Towers each year.   The inmate population is older, sicker and in jail for longer periods of time.   Exhibit 1, *13th Semiannual Report by Special Counsel Merrick J. Bobb & Staff* dated December 2000 ("Thirteenth Report"), at p. 34, a true and correct copy of which is attached hereto and incorporated herein by this reference as Exhibit 1. Inmates' conditions encompass the full range of human illness and injury.   They include, *inter alia*, AIDS and HIV-positive status, cancer, heart conditions, kidney disease, diabetes, high blood pressure, prostate problems, seizures, autoimmune disease and infection. Id. at pp. 34, 38-41.   Approximately 6,500 inmates receive prescribed medications each day.   Id. at p. 34.

21.   Between at least January 1991 and the present, Defendants' Men's Central Jail and Twin Towers Correctional Facility failed to meet each of the six criteria listed, supra ¶ 18. Because of these failures, Defendants confined inmates in jails that failed to provide the constitutionally required *system of ready access to health care.*

2.   Defendants Breached Their Duties By Knowingly and Deliberately Maintaining Barriers that Deny and/or Delay Inmates' Access to Medical Services.

22.   Defendants have known for many years their jail facilities failed to provide the necessary *system of ready access.*   The Los Angles Board of Supervisors ordered a Special

-8-

1  Counsel to review the LASD's treatment of pre-trial detainees,

2  inmates and/or prisoners in its custody. The Special Counsel

3  reports its findings in *Semiannual Reports*. The County publishes

4  each *Report* on its web site, http://lacounty.info/bobb.htm, where

5  they are available for public review.

6      23.  The Special Counsel evaluated the medical care the LASD

7  provides and the treatment prisoners receive while in custody.

8  The Special Counsel's *Thirteenth Report* documented its findings

9  and disclosed the untoward treatment of the sick and injured held

10  in the County's jail facilities. Exhibit 1, pp. 34-55.

11      24.  The Special Counsel analyzed more than 3600 of 7181

12  *Inmate Complaint Forms* inmates submitted in 1999 alleging

13  barriers to and inadequate medical care. Exhibit 1, p. 33. The

14  *Thirteenth Report* documented systemic, institutionalized barriers

15  that delayed or denied inmates necessary medical, dental and

16  related services. Id. at 34-48. The *Thirteenth Report* confirmed

17  "serious delays in access to doctors and dentists; delays in

18  prescription renewals leading to medical lapses; interruptions in

19  medical treatments due to transfers of inmates within the jail;

20  and disconnections between diagnosis of a problem during an

21  initial screening and follow-up care." Id. pp. 34-35.

22      25.  These problems result from Defendants' chronic

23  understaffing of physicians, nurses and support staff, periodic

24  but persistent provision of substandard medical care by

25  physicians engaged by the LASD, and lapses of treatment and care

26  due to inadequate coordination, communication and logistics,

27  inadequate planning and oversight. Id. at pp. 36, 42-43, 49-50.

28

26.  Examples of the impact of Defendants' barriers include, but are not limited to, the following:

    Inmate denied access to physician for 3-1/2 weeks regarding request for MD consult for heart condition;

    Inmate denied access to doctor for approximately two months regarding heart and sinus problems and was not getting blood pressure check as prescribed;

    Inmate denied access to physician regarding medication for cancer and hepatitis B and C;

    Inmate denied access to physician for nine days regarding brain cancer;

    Inmate seeking treatment for bone cancer submitted earlier complaint; nurse told inmate to "sign-off" on previous complaint because inmate would see a doctor the following Monday; inmate still had not seen a doctor;

    Inmate denied access to physician for three weeks regarding "nephritic syndrome" and kidney problems;

    Inmate with blood in urine twice denied access to physician regarding previously diagnosed renal problems;

    Inmate denied access to physician for three weeks regarding chronic prostate problem; and,

    Inmate diagnosed with Hodgkin's disease and suffering pain denied access to physician for approximately a month and submitted three prior *Inmate Complaint forms*. Exhibit 1, *Thirteenth Report*, at pp. 39–42.

27.  The Special Counsel found the LASD rarely, if ever, disputed inmates' claims of denied or delayed access to medical care. Id. at p. 38 n.2.

28.  The Special Counsel confirmed unacceptable and systematic delays by the LASD in investigating inmate complaints of barriers to medical services and treatment.  Id. at 47-48.

29.  The Special Counsel also found the LASD's disposition of complaints regarding barriers to medical treatment was

-10-

1  inaccurate.  Id. at pp. 48-49.  The LASD habitually misrepresents

2  inmate complaints as "unfounded" or "unsubstantiated" when, in

3  fact, the complaint was legitimate.  Id.  The Special Counsel

4  pessimistically concluded:

> The foregoing discussion, combined with **our wider**
> **ongoing investigation of medical care that spans**
> **several years' worth of semiannual reports,**
> **demonstrates <u>a chronic, serious, deep, and difficult</u>**
> **<u>problem</u>.**  Nor are we in any way alone in sounding the
> alarm.  The County's own Department of Health Services
> has done so.  The ACLU has done so.  The United States
> Department of Justice has done so.  So have many
> inmates, their doctors, and their relatives and friends
> [¶] . . . Sadly, the pace of implementation is
> agonizingly slow.  Our last semiannual report
> summarized nine key recommendations that we have been
> advocating for a long while.  Id. at p. 50 (emphasis
> added).

13  30.  Beginning no later than January 1991 and continuing to

14  the present, Defendants, through their policies, procedures and

15  customs, have continually, systematically and unlawfully denied

16  inmates *a system of ready access* to medical services in violation

17  of their rights.  Defendants' continuing, systemic and unlawful

18  conduct in barring inmates' access to medical care tolled the

19  running of any applicable statutes of limitation.

21  3.  <u>Defendants Denied Juan Porras' Access to Medical</u>
    <u>Services and Delayed Treatment of His Serious</u>
22  <u>Medical Conditions.</u>

23  31.  Plaintiff Juan Porras suffers from necrosis in both

24  legs, partial paralysis below the hips from a prior back injury,

25  hepatitis B, high blood pressure, persistent nose bleeds, broken

26  ribs and as yet undiagnosed damage to his right knee and

27  shoulder.  Before entering Defendants custody in July 2003, Mr.

28  Porras' partial paralysis prevented him from walking without leg

-11-

1  braces and a walker.  These are serious conditions requiring

2  medical treatment.

3      32.  Before arriving at MCJ Los Angeles Police Officers took

4  Mr. Porras' walker and leg braces.  They ordered him to walk

5  without his braces or walker causing him to fall.  When he fell

6  Mr. Porras crashed against a toilet injuring his ribs, his right

7  knee and shoulder.  The rib injury caused and continues to cause

8  him difficulty breathing.  When the LAPD transferred him into

9  their custody, Defendants refused to treat his injuries.

10     33.  On July 30, 2003, deputies ordered other inmates to

11  pick Porras up by his arms to get him on and off the transfer bus

12  to MCJ.  Porras could not walk because he no longer had knee

13  braces and a walker.  The county refused to provide a handicapped

14  bus, or a wheelchair.  Upon arrival at MCJ, Defendants stood

15  Porras up, required him to walk and refused him any aid.  When he

16  could not stand, let alone walk, he fell to the concrete

17  sidewalk.  The staff eventually took him inside the jail on a

18  stretcher.

19     34.  At MCJ between July 30 and October 1, 2003, Mr. Porras

20  condition worsened.  The pain in his legs increased as did the

21  numbness.  His skin turned ever darker.  He lost all feeling in

22  his toes and feet except a persistent sensation of cold and pain.

23  Mr. Porras paralysis increased.  Where, before July 2003, he

24  could walk with braces and a walker, he can now barely move his

25  legs.  He experienced significant pain and difficulty breathing

26  from his rib injuries.  Mr. Porras spit-up and urinated blood.

27  He also experienced persistent nose bleeds.  Doctors and staff

28  denied him pain medication and treatment for his injuries.

1  Doctors at Twin Towers scheduled Porras to go to LCMC for

2  treatment, but as of the date of the filing of this Complaint

3  staff refuse to take him.

4      35.  One Doctor, named Coloni, actively barred Mr. Porras'

5  treatment.  She examined him, including his legs, and dismissed

6  his conditions saying: "You're old and have a lot of problems.

7  You'll just have to wait until you get out [of jail] for

8  treatment."  Porras continued seeking treatment, and Dr. Coloni

9  ordered that he be refused access to Doctor's Line.

10     36.  Porras continued trying to get the treatment he needed.

11 On October 1, 2003, two months after Defendants took him into

12 custody, a nurse circumvented Dr. Coloni's order by arranging

13 chest x-rays that confirmed Porras had three broken ribs.  The

14 doctors prescribed him mild pain medication (Motrin), but this

15 was inadequate to control his serious pain.  However, Defendants

16 did nothing to treat his necrotic legs.

17     37.  On October 11, 2003 Defendants retaliated against

18 Porras for his requests by taking away his wheelchair and sending

19 him to the segregation unit for 34 days.  Porras could not walk.

20 During those 34 days Defendants allowed him to shower only twice.

21 Defendants denied Porras drinking water since only scalding hot

22 water came out of the faucet in his segregation unit.

23     38.  Before deputies sent him to segregation spiders bit

24 Porras' arms.  The bites became infected, but when he complained,

25 doctors and nurses refused to treat him.  Without treatment the

26 infections worsened.  After nearly a month and while he was in

27 segregation a doctor came and ordered dressings and antibiotics

28 to control the serious infections.

39. During this time Porras continued complaining to deputies and staff about his necrotic legs, increasing paralysis and serious pain, nose bleeds and his other conditions. His legs have lost virtually all function. His legs remain black, cold, numb and painful. Doctors, nurses, and deputies refused and continue to refuse to treat Mr. Porras' necrotic legs, the condition causing the necrosis, his shoulder, and his knee despite his continuous requests for treatment.

40. Doctors, nurses, and deputies denied Porras high blood pressure medication from July 30, 2003 to mid-September.

41. Porras filed *Inmate Complaint Forms* documenting the foregoing. Defendants responded by providing Mr. Porras the chest x-ray and by returning his wheel chair. The Deputies failed to provide a written response to his complaints.

4.  **Defendants Denied Donald Grigsby's Access to Medical Services and Delayed Treatment of His Serious Medical Conditions**.

42. Grigsby suffers serious medical conditions requiring regular treatment for schizophrenia, diabetes, high blood pressure and testicular atrophy. Grigsby's diabetes and high blood pressure worsen critically when he suffers continuous, extreme and uncontrolled pain. Mr. Grigsby's testicular atrophy caused him severe pain on a daily basis. As a result of his diabetes, Defendants housed Grigsby in the Diabetic Ward of their Men's Central Jail where he had access to nursing staff. His diabetes puts him at serious risk of infection. When his blood sugar levels rise, his body's immune system fails and his healing processes virtually stop.

-14-

43. Beginning in early July 2003, Grigsby suffered a recurrence of *testicular torsion*. Testicular torsion is an extremely painful condition where the testicle dies unless immediately treated when its blood supply is cutoff. Before July 2003, Grigsby's right testicle and a portion of his left were surgically amputated to resolve testicular torsion. This left Mr. Grigsby with a remnant of his left testicle, but the remnant functioned sufficiently to produce the testosterone he needed.

44. However, the testicle remnant caused Grigsby serious and sometimes excruciating pain. Grigsby suffered this pain daily. The frequency and severity of this pain increased significantly in July 2003 to intolerable levels.

45. In early July 2003, Grigsby began reporting to guards and nurses in the Diabetic Ward that he was experiencing serious pain over and above what he ordinarily experienced. Every day, indeed several times each day, Grigsby asked to go on Doctor's Line for a physician's consult. Initially, the guards and nurses completely refused to let him go on Doctor's Line.

46. Guards and nurses eventually released Grigsby to Doctor's Line. Dr. Francis Green examined him and explained the increased pain resulted from testicular atrophy. Doctor Green explained the remnant would continue to atrophy with increasing pain. Dr. Green ordered Mr. Grigsby to be seen by a urology specialist at the USC Medical Center. Defendants transported Grigsby on July 29 to County General Hospital for the urology consult Dr. Green ordered. However, Grigsby spent the day in the hold tank, and Defendants eventually returned him to the Mens' Central Jail without ever being seen by the physician.

-15-

47.   Grigsby continued complaining about his testicular pain.  On August 6, 2003, Grigsby told the nursing staff about his condition, asked for pain medication and asked to be seen by a physician.  A nurse gave Grigsby some mild pain medication and told him to return if the pain failed to subside within the next couple of hours.  When it did not, he returned to the nurses station a few hours later.  A nurse named "Tess" called a physician who ordered Motrin and ice packs.  The doctor also ordered Grigsby to the Urology Doctor's Line.  Grigsby was given the ice packs and returned to his dorm.  Grigsby complained these measures were grossly inadequate to control his pain or to resolve the problem causing the pain.

48.   On August 7, Grigsby was released to the Doctor's Line where Dr. Green saw him again.  Grigsby explained his pain continued to increase as Doctor Green forecast, and Dr. Green recalled referring him to County USC.  Grigsby explained that, although Defendants sent him to USC on or about July 29, 2003, he was never seen. Defendants' staff rescheduled Grigsby's consultation for August 20, 2003.

49.   Grigsby asked Doctor Green to send him to the emergency room where he would be seen by a urologist at the hospital. Doctor Green refused, saying he had already done everything he could.  He further said the only way Grigsby would get to the hospital was if his attorney talked the judge into ordering that he be sent there.  Doctor Green scheduled another appointment one week later to see if Grigsby had been sent to the hospital.

50.   On August 8, 2003, at approximately 8:00 p.m., Grigsby complained to a male nurse about his searing pain in his testicle

-16-

1  remnant. The nurse told Grigsby he had just seen the doctor the
2  day before. The nurse said there was nothing he could do.
3  Grigsby then attempted to explain the situation to the
4  supervising nurse, Nurse Nettie Campbell. Nurse Campbell refused
5  to overrule the nurse and said there was no doctor there anyway.

6      51.  Between August 8 and August 14, Grigsby desperately
7  sought medication to control his pain and treatment that would
8  eliminate the condition. Defendants refused Grigsby appropriate
9  medication and denied him access to a doctor.

10     52.  On August 14, 2003, Defendants transported Grigsby to
11 the hospital. Doctors there conducted an ultrasound examination
12 that revealed his testicle remnant was not receiving blood flow.
13 The doctor who performed the ultrasound could not find the
14 remnant; and, when she finally did, she expressed concern that
15 the blood loss may be causing gangrene. This concern was
16 especially important because Grigsby had a history of gangrene
17 and because his diabetes increased the risk of infection. This
18 put Grigsby at risk of septic shock. Grigsby received no further
19 treatment before guards returned him to Men's Central Jail.

20     53.  The next day, August 15, Defendants returned Grigsby to
21 the hospital for a urologist consult. The nurse who took
22 Grigsby's history found his blood pressure dangerously high.
23 When Grigsby explained this resulted from the strain caused by
24 his pain, the nurse obtained a doctor's order and gave Grigsby a
25 morphine shot. Shortly thereafter Grigsby met with a urologist,
26 and they discussed the necessity of amputating the remnant.
27 Grigsby explained the results from the ultrasound taken the day
28 before, but the doctor said the results were not in Grigsby's

-17-

1  medical file.  Grigsby then met with a second urologist with whom

2  he also discussed amputation and the risks associated with the

3  surgery.  Grigsby told the doctor he wanted them to amputate the

4  testicle remnant.  The second doctor ordered some blood tests,

5  and he told Grigsby they would continue the consultation a few

6  minutes later after the test results came back from the lab.

7  Shortly after a nurse drew the blood, but before Grigsby could

8  discuss the results with the doctor, a deputy returned Grigsby to

9  the Men's Central Jail - leaving Grigsby's treatment unresolved.

10     54.  Grigsby's pain continued to worsen between August 16

11  and 19, 2003.  He returned to the hospital on August 20 where he

12  again consulted with a urologist who this time had the ultrasound

13  results.  The doctor confirmed the remnant was not getting blood

14  flow and was dead.  The doctor agreed Grigsby required surgery.

15     55.  However, while the doctors confirmed on August 20 that

16  Grigsby required surgery, and while the doctors knew Grigsby

17  required morphine to control his pain, the defendants forced

18  Grigsby to wait for the surgery until September 22.  When Grigsby

19  asked why he had to wait more than a month, the doctor said it

20  was the earliest they could schedule him in the operating room.

21  Grigsby returned to the Men's Central Jail to await his surgery.

22     56.  Although the doctors at the hospital agreed Grigsby

23  required surgery and morphine to control his pain, the doctors,

24  nurses and guards at Men's Central Jail indifferently refused to

25  give him medication strong enough to control his pain.

26     57.  Defendants' doctors finally amputated Grigsby's

27  testicle remnant on September 22, 2003, over a month after

28  doctors determined it needed to be removed.  Nevertheless, the

-18-

1  amputation of Grigsby's testicle remnant did not end his

2  suffering. Between September 22 and the time this Complaint was

3  filed, Defendants denied Grigsby adequate post-operative care.

4      58.  Specifically, Defendants failed to control Grigsby's

5  blood sugar and blood pressure to permit healing and prevent

6  infection.  Defendants' neglect facilitated a serious infection

7  of Grigsby's genitals.  This infection prevented the incision

8  from closing and healing.  Instead, Grigsby's scrotum remained

9  open.  The infection caused swelling that exposed the internal

10 sutures by pushing them out the scrotum through the incision.

11 The infection caused Grigsby searing pain that raised his blood

12 pressure to dangerously high levels.  Defendants ignored

13 Grigsby's repeated requests for treatment.  Grigsby tried

14 unsuccessfully to keep the incision clean, but the infection's

15 profuse discharge of blood and puss kept his underwear saturated.

16 These unsanitary conditions only made the infection worse.

17     59.  Defendants failed to clean, dress or even inspect

18 Grigsby's incision.  They failed to identify the onset of

19 infection or to administer antibiotics once it started.  They

20 failed to provide medication that would manage his pain at

21 tolerable levels.  They denied a physician's post operative

22 examination, consultation and supervision.  They failed to

23 exchange his dirty, puss soaked underwear for clean clothes.

24     60.  Between September 22 and October 14, Defendants denied

25 Grigsby access to a telephone, thus preventing him from advising

26 his counsel of his condition.  On October 14, Grigsby got a

27 message to his counsel who advised the County's counsel about the

28 situation.  Within hours Defendants cleaned and dressed his

-19-

1  wounds and sent him to County USC Hospital where he spent the
2  night receiving intravenous antibiotics and Vicodin to control
3  his pain. When he returned to the jail's Medical Services
4  Building the next day, Defendants stopped his pain medication,
5  antibiotics and stopped dressing his incision. Defendants later
6  resumed the antibiotics and dressings but did so irregularly.
7  Grigsby's infection, although subsided, continued as of the
8  filing of this complaint and his incision remained open.

9

10    B.    **The Confinement Conditions At Defendants' Men's Central
11          Jail and Twin Towers Correctional Facility Violate
          Inmates' Eighth and Fourteenth Amendment Rights.**

12        61.  Defendants refuse inmates necessary medical equipment.
13  Between July and September 2003, Grigsby could hardly walk
14  because of the pain from the above alleged testicle atrophy and
15  torsion.  Although Defendants verified and understood his
16  condition, they refused Grigsby the use of a wheelchair.  After
17  his September 22 surgery, Defendants continued to deny Grigsby
18  use of a wheelchair, except to go to court.  Defendants required
19  Grigsby to climb up and down stairs, causing his legs to rub
20  against his incision increasing the risk of infection and causing
21  more pain.  Likewise, Porras requires a wheelchair or knee braces
22  and a walker because of the paralysis below his hips.  Defendants
23  initially provided Porras a wheelchair but then took it away from
24  him when they placed him in segregation.

25        62.  Defendants deny inmates clean clothes.  Defendants
26  routinely confine inmates in unsanitary conditions by requiring
27  them to live in soiled clothes for weeks and sometimes months at
28  a time.  Defendants forced Grigsby to wear bloodstained and puss

saturated clothing for weeks.  On at least one occasion
Defendants forced Grigsby to wear the same clothing for over two
months.  Porras experienced the same problem.  On another
occasion following Defendants' security lock-down where they
stripped inmates in Grigsby's module, Defendants exchanged
Grigsby's dirty clothes with those of another inmate and forced
each man to wear the other's soiled clothes.

63.  Defendants fail to control poisonous spiders and other
vermin, causing inmates bites at unacceptable rates.

64.  Defendants deny inmates communication with their
counsel through the mail and telephones.  Defendants
systematically delay inmates' incoming legal mail thirty-days or
more before delivering it to the inmate.  Grigsby has experienced
unacceptable delays receiving legal mail.  Defendants return
inmates' legal mail without delivery.  On one occasion,
Defendants delivered Grigsby's legal mail but did so only after
they had opened it outside of his presence.  On another occasion,
Defendants returned Grigsby's legal mail after stamping it
"contents unacceptable."  Defendants also intercept and/or delay
inmates out-going legal mail. Guards use these tactics to prevent
inmates from using the mail to advise their counsel about jail
conditions and other legal matters.

65.  Defendants refuse inmates, including Porras and
Grigsby, use of the telephone for legal calls without
justification.  Guards stop inmates from calling their counsel by
confining the inmates and by taking their telephone privileges.
Defendants used this tactic to prevent Grigsby and Porras from
consulting with their counsel telephonically. Guards also

-21-

1  sabotage the telephones, leaving only one or two available for an
2  entire module.  This tactic causes long lines and limits inmates'
3  use of the remaining telephones.  Guards use these circumstances
4  to prevent inmates from using the telephones to advise their
5  counsel about jail conditions and other legal matters.

6          66.  Defendants deny inmates an effective grievance process.
7  The County requires inmates to voice grievances using *Inmate*
8  *Complaint Forms*. However, guards prevent inmates from recording
9  such grievances by keeping the *Inmate Complaint Forms* inside
10 their secure guard station where they are beyond the inmates'
11 reach.  This requires inmates to ask guards to provide a form
12 before they can prepare a complaint.  Guards routinely refuse
13 these requests.  Guards interrogate the inmate and demand the
14 inmate disclose the nature of his complaint and the identity of
15 the guard or staff member involved.  Guards threaten to retaliate
16 against inmates who insist on making the complaint.

17         67.  Guards do in fact retaliate against inmates who request
18 or submit *Inmate Complaint Forms*.  Guards strip inmates of their
19 privileges, put them in confinement, threaten and commit physical
20 violence against the inmate.  Guards ferment and manipulate
21 racial tensions to cause violence against inmates.  Defendants
22 retaliated against both Porras and Grigsby after they complained
23 about the barriers to medical care.  Defendants stripped both
24 Plaintiffs of their privileges, confined them and threatened them
25 with physical violence in retaliation for their complaints.

26         68.  Moreover, Defendants' procedures require inmates to
27 place their completed *Inmate Complaint Forms* into a purportedly
28 secure drop box. However, the drop boxes are maintained by

1  Defendants' line supervisors.  As a result, Defendants compromise
2  the inmate complaint system because the complaints are received
3  by personnel who are themselves the objects of criticism or have
4  responsibility for the person or circumstance being reported.
5  Deputies frequently destroy or "lose" the completed *Inmate*
6  *Complaint Forms*.  This tactic also prevents inmates from proving
7  the complaint was ever made.  When Defendants do respond to an
8  *Inmate Complaint Form*, they do so informally by releasing the
9  inmate to see a doctor.  This custom precludes meaningful record
10  keeping, oversight, investigation and reform.

11

12        V.              FEDERAL CLASS ALLEGATIONS

13        69.  Plaintiffs bring this action on behalf of all past and
14  future inmates held in Defendants' custody pursuant to Rule 23 of
15  the Federal Rules of Civil Procedure.  Plaintiffs assert their
16  civil rights claims in their individual capacities and on behalf
17  of all other similarly situated individuals defined as follows:
18        A.    The Rule 23(b)(2) Injunctive Relief Non "Opt-Out" Class:
19              Consisting of all persons who are presently and will in
20              the future be in Defendants' custody at the Men's
21              Cental Jail and the Twin Towers, who:
22        (1)   have or will have need for medical services, and
23              who, because of Defendants' unconstitutional
24              facilities, policies, procedures and customs are
25              or will be at substantial risk that Defendants
26              will deny them access to necessary medical
27              services;

28

-23-

1      (2)  are or will be confined in unsanitary, soiled

2          clothes and denied timely exchange of clothes;

3      (3)  are or will be effectively denied their right to

4          confer with counsel by telephone and the mails;

5      (4)  are or will be denied a process that effectively

6          resolves grievances relating to barriers to

7          medical care;

8      (5)  are or will be coerced, intimidated and/or

9          retaliated against for complaining about medical

10          conditions.

11   B.  **Nominal Damages Non "Opt-Out" Class Pursuant to Rule**

12      **23(b)(2), or Alternatively, an "Opt-Out" Class Pursuant**

13      **to Rule 23(b)(3)**:

14      Consisting of all persons Defendants incarcerated at

15      the Men's Central Jail and Twin Towers, between January

16      1991 and the present, whom Defendants confined in

17      conditions that violated the Fourth, Fifth, Eighth and

18      Fourteenth Amendments and who are entitled to recover

19      nominal damages as provided by 42 U.S.C. § 1983 and

20      _Monell v. New York City Dept. of Social Services_, 436

21      U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

22    70.  This class action is brought and may be maintained

23  pursuant to Rule 23 of the Federal Rules of Procedure with

24  respect to the Class Members' claims for injunctive relief and

25  for nominal damages. This action and these sub-classes satisfy

26  the Rule 23's numerosity, commonality, typicality, adequacy,

27  predominance and\or superiority requirements.

28

71.   The class satisfies Fed.R.Civ.P. 23(a)(1) because it is so numerous that joinder of all parties is impracticable. Approximately 200,000 inmates flow through Defendants' Men's Central Jail and Twin Towers with approximately two (2) million having been incarcerated since January 1991.

72.   Defendants' uniformly applied the practices herein described to all Class Members, thus satisfying the requirements of Fed.R.Civ.P. 23(a)(2).

73.   The common questions of law and\or fact shared by the Class Members include, but are not limited to:

A.   Does the Eighth Amendment require Defendants to provide the inmate population a system of ready access to medical services;

B.   Does the inmate population have serious medical needs;

C.   Does the Defendants' medical system meet the inmates populations' routine and emergency medical needs;

D.   Do Defendants maintain enough physicians to treat inmates' routine and emergency medical needs;

E.   Do Defendants maintain enough medical staff to treat inmates' routine and emergency medical needs;

F.   Are inmates unable to voice medical problems to the medical staff;

G.   Do Defendants deny inmates reasonably speedy access to medical care;

H.   Do Defendants deny inmates treatment prescribed by physicians or medical staff;

I.   Does the Defendants' medical system comply with the requirements of Title 15;

J.   Do Defendants provide accurate, organized and thorough medical records during sick-call, examination and treatment;

-25-

K.   Do Defendants provide timely and/or
sufficient medical attention for inmates'
serious medical needs;

L.   Do Defendants maintain barriers that deny or
delay inmates' access to medical, dental and
mental health care;

M.   Do Defendants conceal, or allow to be
concealed, the identities of physicians,
nurses and medical staff, thus precluding
complaints and reform;

N.   Do Defendants withhold *Inmate Complaint
Forms*;

O.   Do Defendants fail to investigate and
eliminate barriers to health care;

P.   Do Defendants know their barriers to medical,
dental and mental health care exist, and if
so, when did they acquire this knowledge;

Q.   Are Defendants deliberately indifferent to
the barriers to medical care at the Men's
Central Jail and Twin Towers;

R.   Do Defendants deny inmates access to their
counsel by the mail and telephone;

S.   Do Defendants deny inmates an effective
grievance procedure;

T.   Do Defendants coerce, intimidate and
retaliate against inmates who complain about
the barriers to medical care;

U.   Did the unconstitutional conditions result
from Defendants' official policies,
procedures or unofficial customs;

V.   Are inmates entitled to injunctive relief
pursuant to Federal Rule of Civil Procedure
§23(b)(2); and,

W.   Are Defendants liable for nominal damages
because of their unconstitutional conditions?

74.   Resolution of these common legal issues and proof of
these common facts will establish the right of each class member
to recover.   These common questions of law and fact predominate
over questions that may only affect individual members.

-26-

75. The plaintiffs' civil rights claims are typical of the claims of the Class Members he seeks to represent within the meaning of Rule 23(a)(3). Plaintiffs were held at the Men's Central Jail and Twin Towers facility as pre-trial and post-trial detainees, and each suffers from a serious medical condition that requires access to physicians and medical personnel. Plaintiffs repeatedly asked to see a doctor, but Defendants repeatedly denied them. These delays caused both to suffer unconscionable pain and suffering.

76. Defendants knew about Porras' injuries, knew he needed medical care for his injuries, knew he could not walk because of his paralysis and knew he needed pain medication to control his searing pain. Defendants nonetheless refused to grant him the access to physicians required under the Eighth and Fourteenth Amendments. Defendants' policies and customs institutionalized their deprivation of medical services and have caused Class Members injuries as a proximate result of the Constitutional violations herein alleged. Moreover, Plaintiff's entitlement to the relief prayed for is based on the same legal and factual theories as all other Class Members, thus satisfying Fed.R.Civ.P. 23(a)(3).

77. Defendants knew about Grigsby's testicular atrophy and torsion and the pain in his groin, knew he could lose blood flow and thus use of his testicular remnant, knew he needed medical care because of this potentially life threatening condition, and knew he needed strong medication to control his searing pain. Defendants nonetheless refused to grant him the access to physicians required under the Eighth and Fourteenth Amendments.

-27-

1 Defendants' policies and customs institutionalized their

2 deprivation of medical services and have caused Class Members

3 injuries as a proximate result of the Constitutional violations

4 herein alleged. Moreover, Plaintiff's entitlement to the relief

5 prayed for is based on the same legal and factual theories as all

6 other Class Members, thus satisfying Fed.R.Civ.P. 23(a)(3).

7     78. Plaintiffs will fairly and adequately protect the

8 interests of the class because both have no interests adverse to

9 the class and will vigorously litigate this suit through

10 attorneys who are experienced in class action litigation, thus

11 satisfying the requirements of Fed.R.Civ.P. 23(a)(4).

12     79. Certification of the Injunctive Relief and Nominal

13 Damages sub-classes is appropriate under Fed.R.Civ.P. 23(b)(2)

14 because Defendants have acted and/or refused to act on grounds

15 generally applicable to the sub-class members, thereby making

16 final injunctive relief appropriate to the class as a whole.

17     80. Alternatively, or in addition, certification of the

18 Nominal Damages sub-class is appropriate under Fed.R.Civ.P.

19 23(b)(3) because the questions of law or fact common to all sub-

20 class members predominate over questions of law or fact affecting

21 only individual members, thus making a class action superior to

22 any other method available for the fair and efficient

23 adjudication of the claims herein. Absent class action, it will

24 be highly unlikely the members of the nominal damages sub-class

25 would be able to protect their interests because the cost of

26 pursuing individual actions would exceed any expected recovery.

27 ///

28 ///

-28-

## FIRST CAUSE OF ACTION

**(By Juan Porras and Donald Grigsby, Individually,
For Deprivation of Civil Rights Under Color of State Law
[42 U.S.C. §1983 and §1988] Against All Defendants)**

81.  Plaintiffs re-allege paragraphs 1 through 80 above and incorporate them herein by reference as though set forth in full.

82.  At all times relevant herein, Defendants, and each of them, were duly appointed and acting law enforcement officers, acting under color of law, including the statutes, ordinances, regulations, policies, customs and usages of the County of Los Angeles, State of California.

83.  Defendants, and each of them, are liable to Plaintiffs pursuant to 42 U.S.C. §1983 and §1988 because Defendants violated their Eighth and Fourteenth Amendment Rights as follows:

A.  Defendants knowingly and intentionally denied and/or delayed Plaintiffs' medical care and treatment and were deliberately indifferent to their serious medical needs as alleged more fully, _supra_, ¶¶ 31-41 and 42-60;

B.  Defendants failed to properly train, supervise, monitor, investigate and/or take corrective action against their deputies, medical personnel and staff as alleged more fully, _supra_, ¶¶ 22-30;

C.  Defendants confined plaintiffs in unsanitary conditions by requiring them to live in soiled clothes for extended periods as alleged more fully, _supra_, ¶¶ 59-63;

D.  Defendants denied plaintiffs their right to confer with counsel by telephone and the mails as alleged more fully, _supra_, ¶¶ 64-65;

E.  Defendants denied Plaintiffs a process that effectively investigates, tracks and/or resolves grievances relating to barriers to medical care as alleged more fully, _supra_, ¶ 66-68; and,

F.  Defendants coerce, intimidate and retaliate against inmates who complain about the

-29-

barriers to medical care as alleged more fully, supra, ¶¶ 67-68.

84. Defendants, and each of them, have known about their systematic denial of necessary medical, dental and mental health treatment since no later than 1991. Defendants have known about their unsanitary confinement conditions, barriers to legal counsel and retaliation against inmates since no later than 1991. Despite this knowledge, these defendants have and continue to refuse to provide the medical care, sanitary conditions, access to counsel and to eliminate the retaliatory intimidation as required by the Constitution. Defendants, and each of them, ratified these violations and thereby endorsed them as the policy, procedure and/or custom of the County of Los Angeles.

85. As a legal and proximate result of said conduct, Defendants, and each of them, as alleged above, Plaintiffs suffered severe and unnecessary pain and anguish, emotional distress and mental suffering, and were injured in their health, strength, and activity by suffering injuries to their bodies, including disfigurement, all of which have caused and continue to cause them great mental and nervous pain and suffering. As a result of these injuries, Plaintiffs suffered general damages in a currently unknown amount according to proof at trial.

86. As a legal and proximate result of said conduct, Defendants, and each of them, Plaintiffs have employed and will employ in the future, physicians, surgeons, therapists, and others for examination, treatment and care, and thereby incurred and will incur medical and incidental expenses. As a result,

1  plaintiffs have suffered economic damages in a currently unknown
2  amount according to proof at trial.

3      87.  As a legal and proximate result of said conduct,
4  Defendants, and each of them, Plaintiffs were prevented from
5  attending their usual occupations.  Moreover, as a legal result
6  of the acts of Defendants, and each of them, Plaintiffs' present
7  and future earning capacity has been impaired.  As a result,
8  Plaintiffs have suffered economic damages in a currently unknown
9  amount according to proof at trial.

10     88.  As a legal and proximate result of said conduct,
11  Plaintiffs are legally entitled to all remedies provided by 42
12  U.S.C. §§ 1983 and 1988, including *inter alia*, compensatory
13  damages, attorneys fees and costs, and prejudgment interest
14  against each Defendant.

15
16                   SECOND CAUSE OF ACTION

17        (By Plaintiffs on Behalf of All Others Similarly
          Situated For Civil Rights Under Color of State Law
18              [42 U.S.C. §1983 and §1988] and
          Petition for Habeas Corpus [Cal.Penal Code § 1473]
19                   Against All Defendants)

20     89.  Plaintiffs re-allege paragraphs 1 through 88 above and
21  incorporate them herein by reference as though set forth in full.

22     90.  At all times relevant herein, Defendants, and each of
23  them, were duly appointed and acting law enforcement officers,
24  acting under color of law, including the statutes, ordinances,
25  regulations, policies, customs and usages of the County of Los
26  Angeles, State of California.

27     91.  Inmates confined in Defendants jail facilities have
28  legitimate and serious medical conditions. Exhibit 1 at pp. 34,

38-48.   Defendants, and each of them, must provide inmates and pre-trial detainees *ready access to medical services* as required by their Eighth and Fourteenth Amendment rights.

92.   Plaintiffs Porras and Grigsby seek to represent an Injunctive Relief sub-class, defined <u>supra</u> ¶ 69(A), consisting of all persons who are now presently, and who in the future will be, held in Defendants' custody at the Men's Cental Jail and the Twin Towers Correctional Facility who have or will have need for medical services, and who, because of Defendants' unconstitutional customs and practices, are or will be at substantial risk that Defendants will deny and/or delay their necessary medical services and will deny their rights to counsel.

93.   The members of the Injunctive Relief sub-class require the Court's active intervention and injunctive relief to raise Defendants' conduct to the constitutional minima to provide the protection guaranteed them by the Eighth and Fourteenth Amendments against cruel and unusual punishments.

94.   Defendant LASD presently has inmates in custody at its Men's Central Jail and its Twin Towers Correctional Facility. The LASD will continue to hold inmates and pre-trial detainees in its custody into the foreseeable future.   These inmates have, and will have, legitimate, serious needs for medical, dental and psychiatric services including the need for routine and emergency care, diagnosis and treatment of disease, illness and injury, prescription medication plus the need for medical equipment including wheel chairs, crutches, oxygen systems and other equipment. Exhibit 1, at pp. 34, 38-48.

95.  Defendants' past and present conduct vividly illustrates that, absent this Court's active intervention, present and future inmates will continue to suffer barriers to medical, mental and dental health care and will continue to suffer unconstitutional pain, injury and anguish.  Id.

96.  Beginning no later than January 1991 and continuing without interruption to the present, Defendants, and each of them, were deliberately indifferent to the legitimate medical needs of their inmates and pretrial detainees as alleged below.

A.  **Defendants fail to provide Class Members a health care system that met the constitutional minima.**

97.  Defendants fail to provide inmates and detainees with a system of ready access to medical care in violation of their Eighth and Fourteenth Amendment rights.  Defendants' health care system failed to satisfy constitutional minima as follows:

A.  Defendants' health care system is insufficient to address inmates' routine and emergency medical, dental and mental health needs;

B.  Defendants fail to maintain sufficient physicians to treat inmates' routine and emergency medical, dental and mental health care needs;

C.  Defendants fail to maintain sufficient nurses and support staff to treat inmates' routine and emergency medical needs;

D.  Defendants fail to provide sufficient hospital and operating room facilities to treat inmates' routine and emergency medical needs;

E.  Inmates were, and are, unable to make their medical, dental and mental health problems known to the medical staff;

-33-

F.  Defendants' nurses and other medical staff improperly bar inmates' access to physicians thereby denying them the opportunity to make their problems known to physicians;

G.  Defendants deny inmates reasonably speedy access to medical care;

H.  Defendants deny inmates treatment prescribed by physicians, nurses or medical staff;

I.  Defendants refuse to dress inmates and detainees' open wounds with clean bandages;

J.  Defendants deny inmates prescribed medication;

K.  Defendants deny inmates medication appropriate and/or sufficient to manage pain;

L.  Defendants fail to provide or maintain the facilities necessary to operate an adequate medical, dental and mental health system;

M.  Defendants fail to maintain a medical records system sufficient to provide accurate, organized and thorough medical records and failed to make such records available for use during sick-call, examination and treatment;

N.  Defendants fail to provide inmates timely and/or sufficient medical attention for their serious medical needs;

O.  Defendants deny inmates medical treatment and delay the treatment they do receive;

P.  As a result of Defendants' failure to provide an adequate system of ready access to medical, dental and mental health care, Defendants cause inmates to suffer infection at rates that exceed those of comparable populations;

Q.  Defendants fail to control the population of poisonous insects, and they cause inmates to suffer bites from such vermin at rates that exceed those of comparable populations;

R.  Defendants fail to segregate inmates into mental health or psychiatric wards where necessary;

-34-

S.   Defendants permit physicians, nurses and
     staff members to conceal their identities to
     preclude inmate complaints;

T.   Defendants preclude inmate complaints by
     hiding, failing to provide and/or destroying
     *Inmate Complaint Forms*;

U.   Defendants fail to document and investigate
     inmate allegations of barriers to medical
     care;

V.   Defendants fail to maintain sufficient
     medical equipment, i.e, wheelchairs, oxygen
     equipment, etc., to meet the inmate
     population's needs;

W.   Defendants unjustifiably deny inmates the use
     of medical equipment, i.e wheelchairs,
     crutches, braces, prosthetics, oxygen
     equipment, etc.;

X.   Defendants violate Title 15 by, *inter alia*,
     performing restricted medical procedures
     reserved for licensed medical professionals
     through unlicensed assistants; and,

Y.   Defendants violate Title 15 by, *inter alia*,
     failing to provide medical services to
     inmates having court appearances.

98.   Defendants' systemic deficiencies result from, *inter alia*, chronic understaffing, persistent provision of substandard medical care by physicians, lapses in treatment and inadequate supervision that condones a culture of cruelty and disregard within the medical staff. See, Exhibit 1, p. 26.

B.   **Defendants are deliberately indifferent to Class Members' legitimate health care needs.**

99.   Defendants, and each of them, are deliberately indifferent to their inmates' legitimate health care needs as alleged more fully below.

-35-

1   100. At all times material to this action Defendants, and

2   each of them, knew their inmates and detainees faced substantial

3   and higher risks of serious harm than they would face but for

4   Defendants' barriers to medical care.  Exhibit 1, pp. 34, 39-46.

5   101. Defendants have known since no later than January 1991

6   that their health care system failed to satisfy the objective

7   requirements of the Eighth and Fourteenth Amendments.  Defendants

8   developed their knowledge from several sources.  They received

9   thousands of *Inmate Complaint Forms* each year alleging denied,

10  delayed or inadequate medical treatment.  Exhibit 1, p. 38 n.2.

11  Defendants received complaints from friends and family members of

12  inmates and detainees similarly alleging inadequate medical

13  services.  Exhibit 1, p. 50.  Also, Defendants conducted audits,

14  budget and risk analyses, and reports by the Special Counsel and

15  the County's Department of Health Services.  Each of these

16  reports identified and reconfirmed the systemic failures and the

17  risks of harm to inmates unless Defendants eliminated the

18  systemic deficiencies. Id.

19  102. Inmates submitted thousands of *Inmate Complaint Forms*

20  alleging *denied, delayed and inadequate* access to medical care

21  since January 1991 that disclose an unbroken pattern of denied

22  access to health care.  These Complaint Forms reveal known but

23  unchecked misconduct by jail and medical staff.  The LASD

24  substantiated nearly all such complaints.  Exhibit 1, p. 38 n.2.

25  103. After no less than thirteen years of findings of

26  constitutional violations, Defendants have failed to eliminate

27  the foregoing deficiencies.  Each day these problems persist,

28

-36-

1  Defendants continue to violate inmates' Eighth and Fourteenth

2  Amendment rights.

3      104. By failing to fix these problems, Defendants have

4  ensured that members of the injunctive relief sub-class will endure

5  unnecessary pain, suffering, debilitating disease and even death.

6      105. Defendants published the *Thirteenth Report* at least two

7  years before Plaintiffs Porras and Grigsby developed their

8  conditions at issue in this action. Exhibit 1, passim. Plaintiffs

9  injuries resulted directly from Defendants' failure to reform their

10 jail and to meet the minimum standards required by the Eighth and

11 Fourteenth Amendments.

12     106. Defendants' failure to provide *a system of ready access*

13 to medical, dental and mental health care, after no less than

14 thirteen years of continuous complaints, demonstrates Defendants'

15 refusal to make those meaningful changes necessary to bring their

16 jail facilities up to the constitutional minima.

17     107. As a further legal and proximate result of said conduct,

18 Defendants, and each of them, pursuant to 42 U.S.C. §§ 1983, 1988

19 and California Penal Code § 1473(d), Plaintiffs and the Injunctive

20 Relief sub-class members are entitled to all remedies provided by

21 said legislation, including, but not limited to, injunctive relief,

22 attorneys fees and costs against Defendants, and each of them.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

-37-

## THIRD CAUSE OF ACTION

**(By Plaintiffs, on Behalf of All Others Similarly
Situated, For Deprivation of Civil Rights Under
Color of State Law [42 U.S.C. §1983 and §1988]
Against All Defendants)**

108. Plaintiffs re-allege paragraphs 1 through 107 above and incorporate them herein by reference as though set forth in full.

109. At all times relevant herein, Defendants, and each of them, were duly appointed and acting law enforcement officers, acting under color of law, including the statutes, ordinances, regulations, policies, customs and usages of the County of Los Angeles, State of California.

110. At all material times, inmates confined in Defendants' jail facilities had legitimate and serious medical conditions. Defendants, and each of them, were duty bound to provide inmates and detainees *ready access to medical services* as required by their Eighth and Fourteenth Amendment rights.

111. Plaintiffs seek to represent a Nominal Damages sub-class, defined <u>supra</u> ¶ 69(B), consisting of all persons Defendants incarcerated at the Men's Central Jail and Twin Towers, between January 1991 and the present, whose conditions of confinement violated the Eighth and Fourteenth Amendments. Plaintiffs seek to certify the Nominal Damages sub-class as a non opt-out class pursuant to F.R.C.P., Rule 23(b)(2). Alternatively, Plaintiffs seek to certify it as an opt-out sub-class pursuant to Rule 23(b)(3).

112. As alleged more fully, <u>supra</u> ¶¶ 17-68, Defendants have failed to provide a system of ready access to health care and have been deliberately indifferent to inmates' serious medical

-38-

1   needs since at least January 1991.  Moreover, Defendants have

2   forced inmates to live in soiled clothes, denied them an

3   effective grievance process and subjected them to violent

4   retaliation while denying them access to counsel.

5       113.  As a legal and proximate result of the foregoing,

6   Defendants confined Plaintiffs and Nominal Damages Class Members

7   in violation of their Eighth and Fourteenth Amendment rights.

8       114.  As a further legal and proximate result of said

9   conduct, Plaintiffs and sub-class members are entitled to all

10  remedies provided by 42 U.S.C. §§ 1983 and 1988 including nominal

11  damages for each day Defendants illegally confined each inmate,

12  attorneys fees and costs, and prejudgment interest against each

13  Defendant.

14      115.  Defendants' deliberate indifference to the class

15  members' serious medical, dental and mental health needs has

16  continued without interruption since at least January 1991.  As a

17  result of Defendants' continuing violations, any and all statutes

18  of limitations relating to sub-class members' civil rights

19  arising under 42 U.S.C. § 1983 have been tolled.

20

21      **WHEREFORE**, Plaintiffs demand on behalf of themselves and all

22  class members, the following:

23

24  **ON THE FIRST CAUSE OF ACTION:**

25      1.   For general and special damages, past and future

26  medical and related expenses, past and future loss of income and

27  earning capacity in an amount according to proof at the time of

28  trial;

**ON THE SECOND AND THIRD CAUSES OF ACTION:**

2. For an Order that the action be certified and maintained as a non opt-out class consisting of Injunctive Relief and Nominal Damages sub-classes;

3. Alternatively, for an Order that Nominal Damages sub-class be certified and maintained as an opt-out class;

**ON THE SECOND CAUSE OF ACTION:**

4. For an Order enjoining Defendants from unconstitutionally barring class members access to medical care pursuant to 42 U.S.C. § 1983 and California Penal Code § 1473(d);

5. For an Order enjoining Defendants from maintaining the unconstitutional conditions of confinement herein alleged pursuant to 42 U.S.C. § 1983 and Penal Code § 1473(d);

6. For an Order establishing a Compliance Schedule by which time Defendants must bring their health care system into compliance with the standards imposed by the Eighth and Fourteenth Amendments to the United States Constitution;

7. For an Order establishing a Compliance Schedule by which time Defendants must bring the confinement conditions into compliance with the standards imposed by the Eighth and Fourteenth Amendments to the United States Constitution;

8. For an Order establishing that a sanction be imposed against Defendants in the event they violate the Court's Compliance Schedule(s);

9. For an Order appointing a Trustee, funded by Defendants, responsible for monitoring Defendants' remedial efforts and reporting Defendants' remedial progress to the Court;

-40-

1      10:  For an Order appointing a Trustee, to be funded by

2  Defendants, to oversee distribute the class members' nominal

3  damages;

4

5  **ON THE THIRD CAUSE OF ACTION:**

6      11.  For nominal damages to each sub-class member for each

7  day of unconstitutional confinement according to proof at trial;

8

9  **ON ALL CAUSES OF ACTION:**

10      12.  For pre and post judgment interest;

11      13.  For costs of suit incurred herein;

12      14.  For attorneys fees and costs as provided by law and

13  according to proof; and,

14      15.  For such other and further relief as the Court may deem

15  just and proper.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## VI.                    DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a jury trial on all claims so triable in this action.


Dated: February __19__, 2004

_____

MAJOR A. LANGER, ESQ.
MICHEL F. MILLS, ESQ., Members of
PERONA, LANGER, BECK, LALLANDE
& SERBIN
A Professional Corporation

Attorneys for Plaintiffs
Juan Porras and Donald Grigsby,
Individually and on Behalf of all Others
Similarly Situated

-42-

*The Los Angeles County*

# Sheriff's Department

**13th Semiannual Report by**

**Special Counsel Merrick J. Bobb & Staff**

**December 2000**



# Special Counsel and Staff

**Special Counsel**

Merrick J. Bobb

**Staff**

Robert H. Aaronson

Linda Burrow

Mark J. Johnston

Nicolas H. Miller

Ilana B. Rubenstein

Susan R. Szabo

Julio A. Thompson

**Consulting Psychologist**

Dr. Zoltan Gross

**Consulting Sociologist**

William D. Darrough, Ph.D

California State University

**Technical Assistants, Paralegals, and Secretaries**

Beverly A. Meyer

Dawn Millner

Olga Gamez

Timothy Gould

Marcos V. Peixoto

**Graphic Design**

Corky Retson

Special Counsel appreciates and acknowledges the help and support provided by Morrison & Foerster LLP and Munger, Tolles & Olson.

# Contents

Introduction ......................................................... 1

1. Shootings and Other Use of Force ................. 5
   *Shootings* ....................................................... 5
   *Use of Force* .................................................. 16

2. Corruption Controls & Risk Management ...... 21
   *The Specialized Units Review* ...................... 22
   *Corruption Controls* .................................... 23
   *Conclusion* .................................................... 31

3. Medical Care in the Jails ............................... 33
   *Introduction* ................................................. 33
   *The Complaint and Resolution Process* ....... 36
   *Common Issues Raised in Complaints* ......... 37

4. Update on Sexual Harassment Issues ........... 57
   *Introduction* ................................................. 57
   *Observations from the Recent Investigation Files* ... 60
   *Conclusion* .................................................... 72

5. Racial Profiling .............................................. 75

6. Litigation ....................................................... 91

# Thirteenth Semiannual Report

## Introduction

This is the thirteenth report ordered by the Board of Supervisors to review the performance of the Los Angeles County Sheriff's Department (LASD). Our orders are to provide an independent perspective on the LASD, to report problems, and to assess progress in a forthright manner. We do not serve a public relations function—as much as we respect the genuine effort, hard work, and daily heroism of sworn personnel and civilians in the LASD, we do not tout accomplishments simply for their own sake, although we factor in the good as well as the negative in our critical analysis. Nonetheless, as our responsibilities over the last decade have exposed us to more law enforcement agencies, we remain impressed by how the LASD compares favorably to many others.

Without trying to minimize the problems in the LASD—and, as this Report demonstrates, there are some serious ones—we would not feel comfortable failing to note that we see the LASD moving toward the forefront of American law enforcement. When we are asked to cite model policies and procedures, we turn to the LASD policy manual and general orders. When police agencies develop an interest in a tracking system, they ask us to arrange a visit to the LASD to see the PPI. When law enforcement groups call for advice on how to structure thorough internal reviews of shootings and use of force, we share with them what the LASD has accomplished by implementing the Kolts recommendations.

Our focus in this Report is once again in part on problems and chronic difficulties challenging the LASD. Some are serious, and others seem intractable. They require focused attention, resources, and oversight. They require that we remain involved and vigilant. But it is important not to get so enmeshed in the LASD's problems and challenges that one forgets that the LASD is a source of pride to the County. Our Report discusses some of these areas of solid achievement, as well as problems.

Chapter One focuses on shootings and other serious uses of force, concluding that the LASD is doing a fine job in controlling the number of deputy-involved shootings, both in

1

general and particularly at the Century Station, where in the past we expressed great concern. At the time we did our last intensive study of Century in 1998, the LASD was adamant that the high crime rate and the ambient violence in Century's service area accounted for the high number of shootings by deputies, which, the LASD argued, would not drop until the crime rate came down.   Nonetheless, even though the external factors—crime rate, violence—have largely remained the same, the number of officer-involved shootings at Century has plummeted. Nationally, there are some cities (Detroit, for example) which consistently have substantially higher officer-involved shooting rates than others. The Century experience may be evidence that even in heavily crime-ridden cities, the number of police shootings can be powerfully impacted by management practices without compromising the safety of police officers.

In contrast to the good news regarding shootings, however, we see signs that the LASD's progress for several years running in reducing other uses of force is coming to a halt, or, at the very least, the trends are pointing in the wrong direction. There are more uses of force, driving up the ratio of force used per each 100 arrests.  The numbers are beginning to point to a possible Departmental step-down in vigilance with respect to use of force.  We disavow that we are hugely alarmed, but now is time to nip the problem in the bud.  This administration appears not to be as consistently and single-mindedly focused on keeping force in check as its predecessor, and our concerns are beginning to mount.  Chapter Two builds on those concerns.

Chapter Two discusses corruption controls and risk management, topics we broached in our last Report, written with the Los Angeles Police Department's Rampart scandal very much in mind.  Here again we are worried about the rust building up in the LASD's risk management machinery.  On one hand, we were pleased to find that the LASD had taken a hard look and shored up weaknesses regarding informants, intelligence-gathering, search warrants, and evidence handling.   On the other hand, we were dismayed that only slim progress has been made on our broader recommendations for reducing risks of corruption or scandal, particularly in key specialized units.

2

Chapter Three deals with medical care to inmates in the Los Angeles County Jails. To deepen our understanding, we evaluated more than half of the 7181 inmates complaint forms submitted in 1999 relating to medical services. Although we could have made do with a smaller sample, we wanted to get as wide a picture as possible. We also wanted to make certain that our conclusions were grounded in fact, especially since the sources of the complaints were inmates themselves. Because of skepticism within the LASD (and in the world at large) about the truth of what inmates have to say, we took particular care that we had objective corroboration of the substance of an inmate's complaint. Our review confirmed previously identified problems: serious delays in access to doctors and dentists; delays in prescription renewals, leading to medication lapses; interruptions in medical treatments due to transfers of inmates within the jail; and disconnections between diagnosis of a problem during an initial screening and follow-up care. At the same time, we saw the every-day heroism of the nursing staff. Although overwhelming volume does not excuse substandard performance, it would do disservice to the self-sacrificing and steadfast performance of the nurses to gloss over the difficulty of their jobs and how well they in general do it. The Chapter concludes with a largely pessimistic review of the status of our prior recommendations on improving medical care in both the short term and the long term.

Chapter Four is an update on sexual harassment issues. We reviewed approximately 75 sexual harassment investigations conducted by Internal Affairs over the past 18 months. As a group, LASD supervisors are responding more quickly and forcefully to reports of possible sexual harassment. Internal Affairs has largely eliminated the substantial former backlog of pending cases and reduced the average time to complete investigations. We saw evidence of improvement in the overall quality of the investigations themselves. Finally, we saw some preliminary signs that the LASD is beginning to correct its historical reluctance to impose appropriate discipline where violations of the LASD's sexual harassment policy are established.

Chapter Five is devoted to the difficult issue of racial profiling and the differential racial impact of law enforcement. It is very much to the credit of the Sheriff's Department and Lee

3

Baca that the LASD has begun to collect necessary data on the pedestrian and traffic stops. It is even more impressive that the LASD has done so voluntarily; not in response to litigation or the threat of litigation. We review the LASD's efforts and offer suggestions. We attempt to penetrate the thicket of painful issues surrounding race and law enforcement but we do not provide definitive answers. We do, however, suggest ways to think about the issue in advance of the data flowing in.

Chapter Six describes litigation. After seven years of declining numbers of excessive force suits, the trend reversed itself in fiscal year 1999-00, leading to an increase from 41 to 54 of such lawsuits filed and a jump from 70 to 93 of such lawsuits pending. We reviewed a sample of significant settlements, and we describe patterns and trends we noted. We will continue to keep our eye on litigation to see if the trend of more excessive force suits continues.

4

# 1. Shootings and Other Use of Force

This Chapter reviews shootings and other uses of force, concluding that the LASD has done a fine job controlling deputy-involved shootings, particularly in Region II and at the Century Station.[1]  Ironically, however, we see signs that the progress of the Block years in reducing other uses of force is coming to a halt, or, at the very least, the trends are pointing in the wrong direction: more uses of force, driving up the ratio of force per each 100 arrests. Here, in reverse to the case with shootings, Region II stands out as the biggest problem.

## I. Shootings

A key question for police reform is whether law enforcement can be more judicious and restrained in the use of force, with fewer shootings and serious injuries and greater trust and respect for law enforcement, without putting officers themselves at greater personal risk. In order to make this assessment, among other measures, since 1991 we have been tracking the number of persons killed or wounded by LASD deputies and the number of LASD deputies killed or wounded by suspects.  As the tables on the next pages demonstrate, the number of hit shooting incidents by LASD deputies has dropped substantially over the last decade.[2]

---

1   The County of Los Angeles is divided into three Field Operations Regions by the LASD.  Region I encompasses the northern part of the County, from the Antelope Valley to East Los Angeles and Temple City.  Region II is the western and southern ends of the County—from West Hollywood and Malibu to Carson, Lynwood, Lennox, and Lomita.  Century Station, located near Imperial and Alameda, is in Region II.  Region III covers the eastern end of the County, from the City of Industry, Lakewood, Norwalk, and Pico Rivera to Walnut and San Dimas.

2   As is also interesting to observe, the LAPD has experienced a similar drop.  Both of these law enforcement agencies produce similar numbers of shootings per each 1000 officers.  See Tables 1 and 2.  It is also interesting to compare the LASD to the other large urban law enforcement agencies on the basis of fatal police shootings per 100,000 residents.  According to figures calculated by a newspaper, Detroit led the nation at 0.92 fatalities per 100,000 residents.  Houston was second at 0.68.  New York was 0.39.  *Detroit Free-Press*, "Detroit cops are deadliest in U.S.," May 13, 2000.  Using 1999 figures and an estimated LASD resident population of 2.7 million, the LASD ratio is 0.37.  Los Angeles on an assumption of 3.8 million residents would be 0.38 for 1999.

| **1** | Los Angeles Police Department Officer-Involved Shootings 1996-99 | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Total # of OISs | # of Hits | # of Suspects Injured | # of Suspects Killed | # of Non Hits | # of Accidental Discharges | # of Animal Discharges | Other |
| 1996 | 122 | 54 | 27 | 27 | 29 | 11 | 29 | 1 |
| 1997 | 114 | 41 | 17 | 24 | 23 | 11 | 35 | 4 |
| 1998 | 98 | 23 | 10 | 13 | 12 | 13 | 45 | 5 |
| 1999 | 97 | 23 | 9 | 14 | 16 | 16 | 42 | 1 |

Source: Los Angeles Police Department as of November 8, 2000.

Case 2:75-cv-04111-DDP  Document 235-1  Filed 10/28/10  Page 160 of 248  Page ID
#:2636

**2**

## LASD Hit Shooting Incidents (Deputy intentionally fired at and hit a suspect)

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 (Jan-Sept) |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Incidents | 56 | 47 | 29 | 28 | 34 | 25 | 35 | 20 | 22 | 12 |
| Number of Suspects Wounded | 40 | 31 | 12 | 11 | 24 | 17 | 17 | 8 | 12 | 3 |
| Number of Suspects Killed | 23 | 18 | 22 | 17 | 10 | 14 | 20 | 11 | 10 | 9 |

## LASD Non-Hit Shooting Incidents (Deputy intentionally fired at a suspect but missed)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | NA | NA | 14 | 21 | 26 | 19 | 20 | 15 | 8 | 7 |

## Deputies Shot (Does not include accidental discharges)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number Wounded by Gunfire | 10 | 6 | 4 | 4 | 2 | 2 | 8 | 4 | 6 | 2 |
| Number Killed by Gunfire | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 |

## Incidents in Which a Deputy(s) was Shot

**1994**
06-18-94  CAR  #7918
09-10-94  CAR  #819B
11-29-94  SSB  #8518
12-10-94  WAL  #8647

**1995**
05-12-95  SSB    #9069
07-18-95  CSB-C  Geuvjehizian
11-24-95  NWK    #9804
12-26-95  CAR    #9885

**1996**
08-02-96  LCS  #10654
11-30-96  LKD  #11061

**1997**
01-05-97  LNX    #011171
05-14-97  LCS    #1072778
06-10-97  SEB***  #10B4850
08-14-97  PDC-E  York
09-03-97  LKD    #1132696
10-30-97  CEN    #1166136
12-09-97  ELA**  #11B4392

**1998**
01-15-98  SSB  #1193601
04-12-98  IDT  #SH1205611
04-25-98  PLM  #SH1208071
09-08-98  CEN  #SH1226479

**1999**
01-10-99  CEN**  #SH1240801
04-24-99  ELA    Monarrez
06-13-99  SCV    #SH1257917
09-19-99  WAL    Burton
11-21-99  TEM    #SH2001693

**2000** (Jan-Sept)
02-06-00  SEB  #SH2005203
09-05-00  NWK  Schaap

*** 3 deputies
** 2 deputies

NOTE. Source for 1991-1993 figures is Homicide Bureau.
Source for 1994-2000 figures is Force Review Committee database, Internal Affairs Bureau and Homicide Bureau.

**3**

## LASD Hit Shootings by Station

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Number of Incidents | 35 | 20 | 22* |
| Altadena Station | NA | NA | 0 |
| Carson Station | 1 | 0 | 2 |
| Century Station | 7 | 7 | 1 |
| Court Services Bureau | 1 | 1 | 0 |
| Crescenta Valley Station | NA | NA | 0 |
| East Los Angeles Station | 2 | 0 | 2 |
| Lakewood Station | 2 | 2 | 2 |
| Lancaster Station | 7 | 2 | 0 |
| Lennox Station | 1 | 2 | 4 |
| Lost Hills Station | NA | NA | 1 |
| Marina del Rey Station | NA | NA | 0 |
| Mira Loma Facility | 0 | 1 | 0 |
| Miscellaneous Units | 0 | 2 | 0 |
| Narcotics Bureau | 0 | 0 | 1 |
| Norwalk Station | 3 | 1 | 0 |
| Palmdale Station | 0 | 1 | 1 |
| Pico Rivera Station | 1 | 1 | 0 |
| Safe Streets Bureau | NA | NA | 1 |
| Santa Clarita Valley Station | NA | NA | 0 |
| Special Enforcement Bureau | 2 | 0 | 2 |
| Temple Station | 6 | 0 | 2 |
| | | | (1 off duty) |
| Walnut Station | 1 | 0 | 0 |
| West Hollywood Station | 1 | 0 | 2 |
| | | | |
| Number of Suspects Wounded | 17 | 18 | 12 |
| Number of Suspects Killed | 20 | 11 | 10 |

* In the Temple Station shooting (11-21-99), two suspects were wounded; in the SCV Station shooting (06-13-99), no suspects were killed or wounded but one deputy was hit by friendly fire.

## LASD Non-Hit Shootings by Station

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Number of Incidents | 20 | 16 | 8 |
| Carson Station | 1 | 0 | 1 |
| Century Station | 7 | 4 | 0 |
| Crescenta/Altadena Station | 0 | 1 | NA |
| East Los Angeles Station | 0 | 3 | 3 |
| Industry Station | 1 | 2 | NA |
| Inmate Reception Center | 1 | 0 | NA |
| Lakewood Station | 1 | 1 | NA |
| Lancaster Station | 1 | 0 | NA |
| Lennox Station | 4 | 2 | 1 |
| Men's Central Jail | 1 | 0 | NA |
| Narcotics Bureau | NA | NA | 1 |
| Norwalk Station | 0 | 1 | 1 |
| NORSAT | NA | NA | 0 |
| Palmdale Station | 1 | 0 | NA |
| Pico Rivera Station | NA | NA | 0 |
| Safe Streets Bureau | 0 | 1 | 1 |
| Special Enforcement Bureau | 1 | 0 | 0 |
| Temple Station | 1 | 0 | 0 |
| Walnut Station | 0 | 1 | NA |

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Incidents Resulting in Force/Shooting Roll-Out | 126 | 112 | 86 |

7

In 1991, there were 56 such incidents, leading to the death of 23 suspects. Ten deputies were wounded by gunfire, none were killed. In 1999, there were far fewer—22 hit shooting incidents, resulting in ten deaths. In that same year, six deputies were wounded; none were killed. Looking more closely at the patterns among the stations and field operations regions for 1997-1999, we note a substantial reduction in the number of shootings in Field Operations Region II in 1999. There was a similar reduction in shootings in Field Operations Region III in 1998 and a further modest reduction in 1999. Although Field Operations Region I achieved a very significant drop in 1998, its numbers crept up again in 1999. See Table 4.

| 4   LASD Total Hit and Non-Hit Shootings | | | |
| --- | --- | --- | --- |
|  | 1997 | 1998 | 1999 |
| Field Op Region I | 17 | 8 | 11 |
| Field Op Region II | 20 | 17 | 10 |
| Field Op Region III | 12 | 8 | 7 |

The statistics further demonstrate that Region II accounted for a declining percentage of the LASD's overall shootings.[3] During those same years, Field Operations Region II remained constant in terms of the percentage of all LASD arrests that took place in the region.[4] The ratio of total shootings to total arrests for the three years therefore revealed a declining percentage for Region II, from .00020 in 1997; to .00017 in 1998, to .00011 in 1999.

It is difficult to isolate from all the possible variables why it should be that a particular Region has fewer shootings in one year than another. Nonetheless, as demonstrated in this Chapter, leadership and oversight necessarily play an important, if not decisive, role. Accordingly, we credit the leadership in Region II with an effective job in gaining control of

3 In 1997, Field Operations Region II accounted for approximately 41 percent of all hit and non-hit shootings. In 1998, the percentage was 51.5. In 1999, it dropped to 35.7 percent.

4 In 1997, of a total of 97,801 arrests for all three regions, Region II accounted for 32.3 percent; 1998, of 101,813 arrests for all three regions, Region II accounted for 31.3 percent; and in 1999, of 94,324 total arrests, Region II accounted for 32.1 percent. We also want to note that the number of arrests in the three Field Operations Regions does not correspond to the total number of arrests by the LASD as a whole. We also note that pinning down the total number of arrests for 1997-99 was harder to do than we imagined it might be. According to data from CARS reports, in 1997, the LASD arrested 101,549 persons; in 1998, 105,302 persons; and, in 1999, 97,574 persons. But the number of arrests for 1997, 1998, and 1999 reported in the Department's *1999 Year In Review* was different. That study had the total arrests for 1997 at 98,706, 1998 at 98,782, and for 1999 at 90,943. As is further discussed in our Chapter on Corruption Controls, we cannot account for the difference in the figures. We note also that the differences in the two sets of numbers, particularly for 1998 and 1999, are not trivial - 9.4 percent for 1998; 9.3 percent for 1999.

shootings, and we therefore acknowledge the work of Chief Curtis Spears, Commanders Bill McSweeney and Gil Jurado, and the other commanders—Lee Kramer and (now Chief) Beth Dickenson—who have worked in recent years in Region II.

## Century Revisited

Even more interestingly, when we examine the stations within Region II, it is apparent that the drop in the number of shootings at the Century Station accounts for the lion's share of the Region's progress. But before turning to these findings, it is useful for a moment first to step back and put Century, which we had seen for a long time as the LASD's most troubled station, in the context of the rest of the Department.

The Century Station patrols approximately 14 square miles of the south Los Angeles area—nine square miles of unincorporated territory and about five square miles of the city of Lynwood. Century's service area has a population of 191,100. The crime rate per 10,000 population for the most serious crimes, Part I crimes, is high: 425.17 in 1998 and 419 in 1999, a drop of only one percent[5]. Century is often said to be one the busiest stations in the LASD. That is correct. The busiest of all by a wide margin is the Lakewood Station, with about 35,000 cases and nearly 12 percent of all reported incidents for the entire LASD. Century is next with approximately 25,000 cases handled in 1999 and roughly nine percent of all reported incidents for the entire LASD[6].

The Field Operations Region of which Century is a part—Field Operations Region II—

---

5  Part I crimes are generally the most serious crimes and crimes against persons—criminal homicide, forcible rape, robbery, aggravated assault, burglary, larceny theft, grand theft auto, and arson. Part II crimes, while serious, are generally somewhat less harmful —drunk driving, vandalism, weapons offenses, narcotics offences, gambling, disorderly conduct, and the like.

6  "Reported incidents" are the sum of Part I crimes, Part II crimes, and incidents that are noncriminal in nature (i.e., missing person reports, traffic accidents, suicides and attempted suicides, and the like). For the LASD as a whole, there were 300,959 reported incidents in 1999: 77,678 Part I crimes, 107,902 Part II crimes, and 115,379 noncriminal incidents. Of total reported incidents at Century in 1999, the breakdown was 8,007 Part I crimes, 9,460 Part II crimes, and 7,195 noncriminal incidents.

9

has a total service area of 81.23 square miles and a population of 585,700 persons. The Region as a whole had a 1998 crime rate of 402.70 per 10,000 population and a 1999 crime rate of 380.76. There was thus a five percent drop in the crime rate in the Region between those two years. The crime rate at Century was therefore higher than the Regional average for both years, and it dropped by the least amount—one percent—between 1998 and 1999.[7]

The LASD as a whole serves 3,152 square miles with a population estimated at 2.7 million. The Part I crime rate for the LASD service area as a whole was 433.82 in 1998 and 287.06 in 1999, a dramatic 34 percent drop[8]. Among the Part I crimes, the biggest drops percentage wise were with respect to aggravated assault (down 17 percent); burglary (down 15 percent); robbery (down 13 percent) and in criminal homicide and larceny theft (both down 11 percent).

As noted above, Part I crimes declined only one percent in the Century area from 1998 to 1999 as contrasted to the 34 percent Departmental drop. Within the Century area, the biggest drops percentage wise were in forcible rapes (down 28 percent); burglaries (down 21 percent) and criminal homicides (down 15 percent.)

With respect to shootings of suspects by deputies, Century had previously stood out as an anomaly: During 1995 and 1996, Century had three times as many shootings as any other station. We examined Century in detail in Chapter One of our **Ninth Semiannual Report.** As regards shootings, at least, the picture today is very different. See Table 5.

---

7  Century did not have the highest crime rate in the Region. West Hollywood had that dubious distinction, with a 1998 crime rate of 709.80 and a 1999 crime rate of 607.29. It must be kept in mind, however, these figures are based upon West Hollywood's permanent population base of 39,800. This base is probably far too small for accurate measurement, thereby driving up the apparent crime rate. It is estimated that the weekend population in West Hollywood is more like 100,000 people. If figured on that much larger population base, the crime rate in West Hollywood would be far more modest.

8  Coincidentally and interestingly, the drop was almost all in the contract cities area, where the crime rate dropped by 49 percent, as contrasted to the unincorporated areas, where the crime rate dropped three percent. The population in the contract cities is somewhat larger than in the unincorporated area—1.66 million in the contract cities; 1.05 million in the unincorporated areas. Also by way of comparison, the Part I crime rate for the City of Los Angeles in 1998 was 492 per 10,000. We do not have the 1999 figures. To put Century further in context, and putting aside the downtown area where the figures are distorted because of the extremely low permanent population base, the Southeast Station of the LAPD (which adjoins Century) had the City's highest Part I crime rate in 1998 at 693 per 10,000. The lowest crime rates in the City were in the area patrolled by the Northeast and Foothill LAPD stations, 359 and 360 per 10,000 respectively.

10

During 1997-99, Century accounted for a relatively stable percentage of the Region's arrests. In 1997, Century made 12,547 of the Region's 31,625 arrests, or 40 percent. In 1998, Century arrested 13,079 of the Region's 31,914 arrests, or 41 percent. In 1999, Century arrested 10,596 of the Region's 30,241 arrests, or 35 percent.[9] Thus, while remaining nearly as active a patrol station as measured by arrests, Century somehow managed over the three-year period to bring its total number of shootings down substantially. Again, the variables are many, but credit is due at least in part to station leadership—Captain Ken Brazile, Operations Lieutenant Jim Lopez, and all the other excellent lieutenants and sergeants—and to Region II management, particularly Chief Spears, and Commanders McSweeney and Kramer.

| 5 | Comparison of Century Shootings to Region II Total Shootings | | | |
|---|---|---|---|---|
| | | 1997 | 1998 | 1999 |
| | Century Station | 12 | 9 | 1 |
| | Region II | 20 | 17 | 10 |
| | Percentage Century to Region | 60% | 53% | 10% |

Although cause and effect are hard to figure out, it is worthwhile pondering why the number of shootings at Century declined so dramatically. At the time we did our study in 1998, the LASD was adamant that the high crime rate and the ambient violence in Century's service area was intractable and accounted for the differentially high number of shootings. Indeed, the LASD commissioned a study to explore whether four violence variables—criminal homicides, aggravated assaults, firearm seizures, and Part I crimes—correlated with the frequency of shootings. Although we found that the LASD's shooting study did not hold up to scrutiny, and the LASD itself conceded that the statistical correlation of the four violence variables to shootings was weak at best, it was nonetheless interesting to see just how far the Department was willing to go at that time to shift the inquiry to external factors rather than looking inward at management defects within the LASD. In essence, the Department argued

---

9   By way of further comparison, Century arrested a total of 12,977 in 1996 and 12,189 in 1997. *1997 Year in Review.* Again, there were disparities between the number of arrests reported in CARS reports and in the *1999 Year in Review.* The *Year in Review* reported a total of 12,770 arrests for the Century Station in 1998 and 10,443 for 1999.

that Century was fated to have more shootings, that the controlling factors were violence in
the community, and, inferentially, that the quality of management made little difference.

It is ironic, then, that the Century shootings have dropped so impressively even though
the external factors—crime rate, violence—have largely remained the same. What it suggests
to us is that the number of officer-involved shootings may indeed be subject to a meaningful
degree by management control. When cast against a national backdrop, where some cities in
some years have substantially higher officer-involved shooting rates than others (Washington
DC; Detroit), the Century experience may be evidence that the number of police shootings can
be powerfully impacted by management practices.

The leadership at the Century Station certainly believes this is so. Indeed, Century
management cites its crackdown on foot pursuits as a key step in managing shootings.
Management also points out that for the first time in recently memory, the Century Station
has a full complement of lieutenants and sergeants. Sergeants are spending much more time
out in the field. According the Century's Operations Lieutenant, the sergeants are rolling on
routine as well as "hot" calls. Whereas the deputies were at first resistant to having sergeants
showing up all the time, the Operations Lieutenant believes that the resentment has died down
and that the deputies are now expecting to see sergeants on their calls. Combined with other
concerted efforts described below to tighten up on questionable arrests and probable cause and
to change the standards for selection of training officers, the leadership at Century has tried to
run a far more carefully managed operation. They conclude that their efforts have paid off in
terms of the reduced number of shootings.

Before leaving the Century Station, however, we would be remiss if we failed to take into
account a possible counter-explanation to management's put forward by some deputy sheriffs
when we asked their views and theories about the drop in shootings at Century. Noting the
numerous personnel changes at the station at both the deputy and supervisorial levels, these
individuals suggested that good, aggressive, hard-working deputies were either being suppressed
by their supervisors and were less productive or were replaced by a "wimpier" or less hard-

12

**6**

## Century Station Part I Crimes, 1998 and 1999

| Part I Crimes | 1998 Reported Incidents | 1998 Total Arrests | 1999 Reported Incidents | 1999 Total Arrests |
|---|---|---|---|---|
| Criminal Homicide | 60 | 28 | 51 | 14 |
| Rape | 83 | 19 | 60 | 23 |
| Robbery | 1047 | 417 | 1027 | 289 |
| Aggravated Assault | 2043 | 911 | 2123 | 978 |
| Burglary | 1535 | 450 | 1214 | 426 |
| Larceny | 1762 | 245 | 1913 | 252 |
| Grand Theft Auto | 1458 | 394 | 1421 | 308 |
| Arson | 137 | 6 | 197 | 3 |
| **Total** | **8125** | **2470** | **8007** | **2293** |

**7**

## Century Station Part II Crimes, 1998 and 1999

| Part II Crimes | 1998 Reported Incidents | 1998 Total Arrests | 1999 Reported Incidents | 1999 Total Arrests |
|---|---|---|---|---|
| Forgery | 139 | 51 | 164 | 53 |
| Fraud;nsf checks | 49 | 19 | 73 | 8 |
| Felony sex crimes | 140 | 78 | 126 | 77 |
| Misdem. sex crimes | 75 | 35 | 87 | 34 |
| Nonaggravated assaults | 529 | 76 | 679 | 86 |
| Weapons laws | 520 | 377 | 350 | 257 |
| Family crimes | 20 | 4 | 19 | 5 |
| Narcotics | 2,980 | 2,739 | 1,947 | 1,691 |
| Liquor laws | 682 | 59 | 396 | 28 |
| Drunk/alcohol/drugs | 68 | 76 | 108 | 102 |
| Disorderly conduct | 163 | 33 | 138 | 15 |
| Varancy | 0 | 15 | 4 | 11 |
| Gambling | 3 | 23 | 4 | 5 |
| Drunk Driving | 194 | 217 | 161 | 176 |
| Vehicle laws | 3,534 | 3,165 | 3,144 | 2,822 |
| Vandalism | 708 | 127 | 695 | 109 |
| Warrants | 25 | 951 | 35 | 871 |
| Receiving stolen property | 109 | 260 | 69 | 160 |
| Federal offenses w/o money | 9 | 1 | 2 | 1 |
| Federal offenses with money | 40 | 0 | 16 | 0 |
| Felonies, misc. | 418 | 162 | 611 | 265 |
| Misdemeanors, misc. | 795 | 1,717 | 632 | 1,269 |
| **Total** | **11,200** | **10,185** | **9,460** | **8,045** |

Source: *1999 Year In Review*

13

working group.  While these persons did not suggest that the current deputies at Century were reluctant to fire their weapons if necessary, they suggested that less active and aggressive policing on the deputies' part might have reduced the occasions when a shooting might have occurred and thus brought down the overall number of shootings.

We decided to probe a little deeper into Century to see if we could shed some additional light on this issue by seeing if productivity, at least as measured by arrests, was down.  What we concluded was although there had indeed been a drop in arrests, particularly narcotics arrests, it turned out, perhaps ironically, to be a good thing and a mark of progress: The drop seemed to be traceable to Century leadership's being more vigilant in making sure there is really probable cause for the arrests.  To pinpoint where the drop in arrests came from, we studied the Department's *1999 Year in Review.*  Tables 6 and 7 compare the number of reported incidents in each Part I and Part II crime category with the number of arrests in each crime category for 1998 and 1999.

Based on the foregoing, it appears that with respect to Part I crimes, the drop in arrests, expressed as a percentage of reported incidents, was greatest with respect to criminal homicides and robberies, the same categories of Part I crimes experiencing the largest drop between 1998 and 1999.  The picture with regard to Part II crimes showed a very substantial drop in the absolute number of reported narcotics incidents in 1998 (2980) compared to 1999 (1947).  Similarly, there was a drop of note in weapons law violations, 520 in 1998; 350 in 1999.  Overall, there was a drop in reported incidents of Part II crimes of 15 percent between 1998 and 1999 and a drop in arrests of 21 percent between 1998 and 1999.  Of that, the largest single drop was with regard to reported incidents of narcotics violations.

We asked the Century Station management to account for this drop in narcotics arrests, and in particular whether they believed it reflected less activity on the part of the deputies.  They attributed it to better, more careful arrests that were standing up better in court.  In 1998, in connection with the court survey described at page four of our **Twelfth Semiannual Report,** the leadership at Century realized that as many as one in four arrests, particularly narcotics-

14

related arrests, were questionable: Prosecutors were either refusing to press forward on the cases or suppression motions were being brought successfully by defense counsel.

In response, management began substantially tightening up of supervision for probable cause. As noted earlier, sergeants have been rolling on routine as well as hot calls. The sergeants are putting pressure on deputies to justify stops, detentions, and searches of suspects, particularly those detentions where a suspect is placed in the back seat of a patrol car while the suspect's car is searched. Additionally, the leadership in the station is attempting to better manage the deputies's so-called "unallocated time." Whereas in the past some deputies would routinely defer routine paperwork and low-level radio calls (taking a burglary report, for example) in favor of "hunting"—running suspicious plates; making stops and searches—the deputies are now apparently being more actively directed in how to prioritize their activities and manage unallocated time.

Thus, in a strange way, the reasons put forward by management and the reasons put forward by deputies for the decrease in shootings at Century converged: management and supervision at Century were much tighter. The spin put on it from the perspective of some of the deputies was that this was a bad thing: hard-working, productive deputies were being suppressed by intolerant management. The spin from management's side was that this was a good thing: the station leadership was cracking down on questionable arrests and searches that would not stand up in court.

In conclusion, we cannot account for the dramatic drop in the number of shootings at Century based solely upon drops in the crime rate, drops in the numbers of reported incidents, drops in arrests, or ratios constructed from the foregoing. Therefore, and admittedly by process of elimination, we conclude that better management at the Regional and Century station levels is the most powerful explanation, particularly by first line supervisors—sergeants and lieutenants.

Ironically, however, when we look at other uses of force, the picture for Region II, and the Department as a whole, is less comforting.

## II. Use of Force

As we will demonstrate in this section, after many years of significant progress, there has been some erosion between 1998 and 1999. As shown in Table 8, there were slightly more force incidents in 1999 as compared to 1998. Somewhat more worrisome, though by no means alarming, was a Department-wide rise in the number of uses of force per each 100 arrests, from 1.01 in 1998 to 1.13 in 1999.[10] Somewhat more worrisome still, we forecast another Department-wide rise in the number of uses of force per 100 arrests in 2000. See Table 9. Paradoxically, given its enviable record on reducing the number of shootings, Region II presents the greatest concern in that regard.

When we looked at all patrol stations for the years 1997, 1998, and 1999, shown in Table 10, we found an overall increase in the uses of force per 100 arrests in each of those years successively for Field Operations Region I. Field Operations Region III had a successive overall *decrease* in uses of force per 100 arrests in each of those three years. Field Operations Region II rose overall, with 1997 being slightly higher than 1998, but 1999 being higher than either 1997 or 1998. For 1999, Field Operations Region II had the highest overall uses of force per 100 arrests at 1.42, as shown in the Table 10.

When we looked more deeply at the varying performances of the patrol stations within Region II, we found that each station experienced a rise in the ratio of force to 100 arrests (with the exception of the Lomita Station) over those three years. Thus, Region II tended to account for more of the downward trend that either of the other Field Operations Regions: Gains in Region III were more than offset by losses of ground in Regions I and II, in particular in II.

To get a sense whether these Region II trends are continuing in the year 2000, we looked at all the stations for the period January-August 2000[11] and compared their performance to

---

10   There was a rise in the most serious uses of force per each 100 arrests also: in 1998, there were 0.01 uses of force per 100 arrests that led to death or hospitalization of the suspect; in 1999, 0.02. Similarly, in 1998, there were 0.25 uses of force per 100 arrests that led to visible injury of the suspect; in 1999, 0.29.

11   August 2000 was the latest set of figures the LASD could give us as of mid-October 2000 when this section of this report was drafted.

16

January-August 1999.  See Table ll.

Each of the Region II stations in operation for both of those years reported fewer overall arrests in the equivalent period in 2000 as compared to 1999.  With the exception of the Lennox Station, each station by contrast reported more use of force incidents in the equivalent period in 2000 as compared to 1999.  And each of those stations reported a rise, therefore, in the ratio of use of force per 100 arrests.

When we aggregated the Region II stations and compared them as a whole with the aggre-gated statistics for Regions I and III stations for January-August 2000 as compared to January-August 1999, we found that arrests as a whole went down in Region II and force incidents went up, leading to an increase in the ratio of uses of force per 100 arrests.  In Region I, arrests went up but uses of force went down, leading to a drop in the ratio of uses of force per 100 arrests.  In Region III, arrests were up and uses of force were up, leading to an increase in the ratio.  Overall for the three Field Operations Regions, comparing January-August 1999 to January-August 2000, arrests went down, uses of force went up, and the ratio went up to 1.22.  If the trends hold, then the year 2000 will likely produce fewer arrests for the LASD as a whole, more uses of force, and a third year in a row of an increase in uses of force per 100 arrests.

As Table 11 demonstrates, there is further cause for concern in that the Region II stations of Carson, Century, Lennox, and West Hollywood all have use of force ratios in excess of 1.35 per 100 for 1999.  Those same stations will have even higher ratios in 2000 if trends continue.  No other stations in the rest of the LASD have use of force ratios that high with the exception of Palmdale and San Dimas[12].  There were months in 2000 when some of the Region II stations were in excess of 2.0 uses of force per 100 arrests, including Carson, Century, and West Hollywood.[13]

---

12  The Avalon Station also had a higher ratio, but it is so small with so few arrests that we believe the numbers are distorted when compared to other stations.

13.  The Lomita Station did also.  But as with Avalon, the smaller numbers it generates tend to magnify the statistical vari-ations.

17

**-8**

### LASD Force Statistics 1998-99

| | 1998 | 1999 |
|---|---|---|
| Force | 1918 | 1997 |
| Total Force Incidents | 1.01 | 1.13 |
| Total Force/100 arrests | 0.01 | 0.02 |
| Significant Force: Deaths and Hospitalizations/100 arrests | 0.25 | 0.29 |
| Significant Force: Visible injuries/100 arrests | 0.14 | 0.14 |
| Significant Force: Complaints of pain/100 arrests | 0.13 | 0.14 |
| Significant Force: no visible injury or complaint of pain/100 arrests | 0.27 | 0.24 |
| Less significant force | 0.20 | 0.30 |
| OC spray/100 arrests | | |

**9**

### LASD Force Statistics for Three Field Operations Regions: January-August 1999 vs. January-August 2000

| Field OP. Region I | Jan-Aug 1999 | Jan-Aug 2000 |
|---|---|---|
| Arrests | 24,280 | 25,263 |
| Force Incidents | 253 | 231 |
| Force Incidents/100 Arrests | 1.04 | 0.91 |

| Field OP. Region II | Jan-Aug 1999 | Jan-Aug 2000 |
|---|---|---|
| Arrests | 20,407 | 18,342 |
| Force Incidents | 273 | 319 |
| Force Incidents/100 Arrests | 1.34 | 1.74 |

| Field OP. Region III | Jan-Aug 1999 | Jan-Aug 2000 |
|---|---|---|
| Arrests | 20,132 | 20,592 |
| Force Incidents | 180 | 233 |
| Force Incidents/100 Arrests | 0.89 | 1.13 |

| Field OP. Region Totals | Jan-Aug 1999 | Jan-Aug 2000 |
|---|---|---|
| Arrests | 64,819 | 64,197 |
| Force Incidents | 706 | 783 |
| Force Incidents/100 Arrests | 1.09 | 1.22 |

Source: CARS reports.

18

**10**

## Force/100 Arrests All Patrol Stations 1997-1999

| Station | 1997 | 1998 | 1999 |
|---|---|---|---|
| Crescenta Valley | 1.37 | 1.35 | 0.55 |
| East LA | 0.62 | 0.67 | 1.03 |
| Lancaster | 0.99 | 1.16 | 0.93 |
| Lost Hills/Malibu | 0.68 | 0.63 | 1.00 |
| Santa Clarita | 1.36 | 1.10 | 1.33 |
| Temple | 0.94 | 1.05 | 1.08 |
| Palmdale | NA | 1.17 | 1.64 |
| Field OP. Region I Totals | 0.95* | 0.99* | 1.10* |
| Carson | 1.31 | 1.29 | 1.35 |
| Century | 0.88 | 0.94 | 1.40 |
| Lomita | 1.33 | 1.12 | 0.89 |
| Lennox | 1.13 | 0.86 | 1.82 |
| Marina del Rey | NA | NA | 1.34 |
| West Hollywood | 1.47 | 1.46 | 1.75 |
| Field OP. Region II Totals | 1.09* | 1.03* | 1.42* |
| Avalon | 3.09 | 3.35 | 2.29 |
| Industry | 1.17 | 1.18 | 0.69 |
| Lakewood | 1.45 | 1.47 | 1.27 |
| Norwalk | 0.81 | 0.71 | 0.90 |
| Pico Rivera | 0.78 | 0.68 | 0.47 |
| San Dimas | NA | NA | 1.40 |
| Walnut | 1.77 | 0.77 | 0.86 |
| Field OP. Region III Totals | 1.18* | 1.04* | 0.96* |

*Includes specialized units as well as patrol stations
Source: CARS reports.

**11**

## LASD Force Statistics for Region II Patrol Stations: January-August 1999 vs. January-August 2000

| Station | Jan-Aug 1999 | Jan-Aug 2000 |
|---|---|---|
| **Carson** | | |
| Arrests | 2557 | 2372 |
| Force Incidents | 38 | 47 |
| Force/100 Arrests | 1.49 | 1.98 |
| **Century** | | |
| Arrests | 7556 | 6377 |
| Force Incidents | 95 | 106 |
| Force/100 Arrests | 1.26 | 1.66 |
| **Lomita** | | |
| Arrests | 955 | 763 |
| Force Incidents | 10 | 18 |
| Force/100 Arrests | 1.05 | 2.36 |
| **Lennox** | | |
| Arrests | 3968 | 3247 |
| Force Incidents | 55 | 53 |
| Force/100 Arrests | 1.39 | 1.63 |
| **Marina del Rey** | | |
| Arrests | 153 | 466 |
| Force Incidents | 2 | 4 |
| Force/100 Arrests | 1.31 | 0.86 |
| **West Hollywood** | | |
| Arrests | 2336 | 2275 |
| Force Incidents | 273 | 319 |
| Force/100 Arrests | 1.34 | 1.74 |

When we put these statistics together with trends we note in our Chapter on Litigation regarding a rise in the number of force-related lawsuits received in fiscal year 1999-2000 over the prior fiscal year, and an increase in the total number of excessive force lawsuits pending at the end of fiscal 1999-2000 as compared to fiscal 1998-1999, we wonder whether the progress experienced during the Block years has come to a halt and that trends are beginning to reverse themselves.[14]

In our **Twelfth Semiannual Report** of June 2000, we included in pages 36-38 a long discussion of why we deplored the demise of Department-wide meetings, called SCIF, that were devoted to spotting and quickly eliminating worrisome trends in risk management. We advocated strongly for its return and urged that it should be reinstated in a manner that "encourages the willingness of all concerned to holding each other mutually accountable and responsible." *Id.* at 38. We once again, with more urgency, advocate a return to a monthly Department-wide SCIF-like process. The numbers are beginning to point to a step down in vigilance with respect to use of force. Again, we disavow that we are hugely alarmed. But now is the time to nip these problems in the bud, and the Sheriff and his senior executives should act quickly to do so. Our concerns that this administration is not as focused on keeping uses of force in check as the Block administration are beginning to mount.

---

14 We recognize that litigation statistics tend to deal with behavior in years past whereas the other statistics we rely upon in this Chapter relate to current activity. We concede, therefore, that we are looking at things that are not entirely equivalent. Nonetheless, we believe the litigation trend legitimately reinforces our concerns about trends overall.

# 2. Corruption Controls & Risk M{ }ement

We are concerned that key programs within the LASD to measure and manage risk of corruption and other misconduct have, to all appearances, been all but abandoned and fallen into disuse. Key reports that were the foundation for analysis of risk are no longer being routinely produced. As noted in Chapter One and, in all likelihood, as a result of the rust building up in the LASD risk management machinery, trends are beginning to show a reversal of progress that had been made in earlier years. This Chapter will describe why.

In the **Twelfth Semiannual Report**, we examined whether the LASD was adequately prepared to avert a scandal within the Sheriff's Department of the dimension of the LAPD's Rampart scandal or similar ones in the NYPD. In both those police departments, internal review and audit procedures, at the departmental and station or precinct levels, failed to detect patterns of police misconduct. Both scandals resulted from breakdowns in accountability among managers and supervisors and, from there, all the way up the chain of command.

In comparing the LASD to those two troubled departments, we concluded in our last semi-annual report that the LASD was in somewhat better shape: It had reduced its own corruption risks by its implementation of self-critical recommendations flowing from its own Big Spender scandal in the 1980's and its progress since **Kolts**. We nonetheless had concern in two areas: (i) the LASD's COPS teams were operating without adequate controls in high-risk activities, and (ii) the Department had not yet fully implemented several crucial recommendations left over from Big Spender or from study of similar scandals in other law enforcement agencies. In this Chapter, we return to the latter topic.[1]

In our investigation for this report, we followed up on the key recommendations we made in Chapter Two of our last **Semiannual Report**. On one hand, we were pleased to find that the LASD had taken a hard look and shored up weaknesses in procedures regarding informants, intelligence-gathering, search warrants, and evidence handling. On the other hand, we were dismayed that only slim progress had been made on our broader recommendations, even though

---

[1] We have not, as yet, re-audited the COPS teams. We will do so for an upcoming report.

21

Commanders McSweeney and Scaduto had completed a review of ethical and corruption issues, including our recommendations, and had prepared a useful list of proposals for the LASD to consider. Before turning to those unfulfilled recommendations, we will first highlight those areas in which there has been good progress.

## I. The Specialized Units Review

Since our **Twelfth Semiannual Report**, Commanders Soderberg and Sewards, with the hard work of Lt. Jim Whitten, completed a review of a selected group of specialized units, including the Asian Crimes Task Force, the COPS Bureau's "Hi Impact" teams at three selected stations, the Safe Streets Bureau's programs at five selected stations, and the Gang Enforcement Teams for selected areas and stations. The Specialized Unit Review also examined three station-based specialized units at the Lancaster, West Hollywood, and Pico Rivera Stations.

These various units were examined for compliance with Department policies and procedures in three areas: (i) use of informants; (ii) search warrants; and (iii) intelligence gathering. The Commanders also looked at a fourth area—the handling of money, narcotics, and firearms as evidence—in the Asian Crimes Task Force and the COPS Bureau.

The Specialized Units Review identified weaknesses in each of the areas and made a series of recommendations to address them. Responsibility for following up on implementation of the recommendations has devolved to Commanders Betkey and Sewards, and they are doing an effective job of doing so.

The net of the recommendations on informants is to generalize successful Narcotics Bureau policies and make them applicable to the Department as a whole; to standardize forms and proce-dures for informant management; to restrict or prohibit use of juvenile informants; to provide specialized training on use of informants for deputies, sergeants, and lieutenants; and to create special accounts in each of the field operations regions to facilitate non-narcotics investigations and informant payments.

22

The recommendations on search warrants require more precise articulation of probable cause, more clearly define the scope of permissible seizures, amend and reconcile conflicting Department policies, and shore up procedures for retention of search warrant documentation. Narcotics Bureau forms and checklists are mandated for use by the LASD as a whole, and random audits will assure compliance with search warrant procedures. Similarly, there are good recommendations regarding separation of intelligence and investigative functions, separation of gang intelligence records from organized crime records, more widespread training in the law regarding entry of records in the state's gang database, and quality control measures to improve gang intelligence field investigative reports and files. Evidence-handling procedures are tightened and conflicting policies reconciled.

As we had noted in our sidebar discussion at page 19 of our **Twelfth Semiannual Report**, the Narcotics Bureau had elaborated excellent procedures in the wake of Big Spender that were worthy of emulation throughout the LASD. The Specialized Unit Review team made good use of Narcotics Bureau expertise, including that of Lieutenants Whitten and Werner, and the resulting report and recommendations were well-conceived. The full implementation of the recommendations of the Specialized Unit Review team will substantially improve things in a nuts and bolts sense.

We only wish equivalent progress had been made on the overarching issues, including our recommendations on fighting corruption and Departmental safeguards.

## II. Corruption Controls

### A. Risk management

We made three key recommendations in our last report, none of which have been adopted. The first was to revive a flagging commitment at the highest executive levels to risk manage-ment by reinstating monthly Department-wide meetings where captains, commanders, chiefs, and the top executives review trends in all relevant risk categories, including shootings and other

use of force, citizen's complaints, and lawsuits. The LASD regularly did so during Sheriff Block's administration. The meetings were called SCIF (pronounced "Skiff"), an acronym that stood for Sheriff's Critical Incident Forum. SCIF was not uniformly popular, and the egos of some captains were publicly bruised in sessions where they were called to account for increases in risk parameters.

After the divisive campaign in which Lee Baca challenged Sherman Block, newly-elected Sheriff Baca wanted to establish an atmosphere of greater comradeship and mutual respect at all levels of his command staff and abolished the Department-wide SCIF, while nonetheless encouraging Chiefs to conduct mini-SCIFs on a regional or divisional basis. Although sympathetic to the Sheriff's goals of fortifying morale among the command staff, we nonetheless were sufficiently worried about shifting focus away from risk management that we strongly recommended reinstating a Department-wide SCIF "in a manner that encourages the willing consent of all concerned to holding each other mutually accountable and responsible." **Twelfth Semiannual Report, p. 38.**

The Department has repeatedly attempted to assure us that its commitment to risk management remains strong, with or without SCIF. We decided to test the contours of those assurances. We came away worried.

We focused on whether the LASD is paying adequate attention to risk management issues, with or without SCIF, by zeroing in on the monthly management reports that had provided the factual basis for the discussions at SCIF. We wanted to see if the reports were still being produced in an accurate, timely manner, and were being widely used by management on a voluntary, self-initiated basis, as contrasted to the somewhat more coercive use of the reports in the SCIF setting.

There are two principal monthly management reports in question—one is called the SCIF report, and the other is called the CARS report ("CARS" stands for Command Accountability Reporting System). CARS take data from the SCIF report and, among other things, constructs ratios and other measurements to compare and contrast performance between and among patrol

stations and other LASD units over time. The reports, if used actively, spot both favorable and unfavorable trends at a particular station, or group of stations, thereby allowing management to address them. Combined with the Personnel Performance Index, or PPI, the SCIF and CARS reports are powerful tools for early identification of possible problems and trends. The LASD's enviable reputation as the nation's leader in managing potential police misconduct and account- ability rests entirely on these Block-era innovations and the Department's active use of them.

To our shock, SCIF and CARS reports have fallen into disuse and have been all but aban- doned. The latest postings of SCIF and CARS data on the Sheriff's Intranet was nine months old: Nothing was available post-February 2000 when we had it checked in late November 2000. We investigated in a roundabout way to find out why there had been no postings. One answer, from the deputy in charge of producing the reports, as told to us by a reliable source, was that "no one was asking" for the data and therefore production of it on a timely basis had a low priority.[2] Another source very close to the matter was even more candid, telling us directly that the reports were now only produced upon request, and that apart from one captain and an occasional commander or chief, we were the only ones requesting, hence the delays in getting them to us.[3]

That admission coincided exactly with our own experience. When we asked for year-to-date and updated CARS and SCIF data, it incomprehensibly seemed to take a long time to get it.

---

[2] We hasten to add that we have been working with this deputy since he was assigned to the Risk Management Unit, and we respect his good work and responsiveness. Indeed, his expertise in producing the CARS and SCIF reports was so high (and apparently unique) that he took the responsibility with him when he was transferred to Headquarters Bureau. None of the criticisms of the Department for its lack of interest in the data should be laid at his feet. Indeed, his hard work and devotion to the apparently thankless job was exemplary, and we commend him for it. The burden of the job is being moved finally from his shoulders. We now understand that the job of preparing the reports will go to Management Information Services, or MIS. MIS is already over-burdened and consequently slow in getting out reports. Indeed, its staff has been slashed in recent years. Perhaps it was thus understandable, but yet troubling, that as of late November 2000, the most recent crime statistics we could find on the LASD's Intranet were for December 1999. The Year in Review for 1999 came out late in 2000. We respect MIS and its manager, Wendy Harn, who has always seemed to us to be sharp and responsive. But she clearly needs additional staff. The transfer of the SCIF and CARS responsibilities to MIS thus signals a further downgrading of the importance of the reports.

[3] When word got out in the Department in late November that we were concerned that no one was ordering or studying these reports, Assistant Sheriff Larry Waldie assured us that it wasn't so; in fact, he said, he had just ordered a set for himself.

z 5

Obviously, the LASD was cranking hard to enter and update the long-neglected data so that it could be produced for us. Equally obvious, no one else was requesting the data on a regular basis.

Further evidence that the SCIF and CARS data had become largely ornamental and not taken seriously was that the first batch of reports we got was wildly inaccurate. Many of the statistics and trend analysis flow from measuring a variety of criteria against the number of arrests. Use of force per 100 arrests is an example, and derivative statistical measures—hospitalizations and deaths per 100 arrests; use of pepper spray per 100 arrests; complaint of pain or injury by suspects per 100 arrests—all depend upon accurate arrest statistics.[4]

To our amazement, at least one station in Field Operations Region II had failed to report its arrests for April and June 2000, thereby throwing off all the statistics for the station, Region II, and the LASD as a whole that were based upon an accurate reflection of the number of arrests not only for those months but for the entire year. It meant that all the station-to-station or region-to-region statistics were essentially garbage. It fell to us to inform the LASD of this lapse when we discovered it in October. Obviously, since the previous April and again in June, no one had really looked at the numbers or given them any critical analysis—squaring, once again, with our information that no one except us was asking for the reports or apparently using or relying upon them. Upon learning from us of the errors, the LASD corrected the reports, and new data was produced. Combined with the admission that few in management was even asking for SCIF or CARS data, much less pounding the table for it and taking subordinates to task for errors they found in it, we were convinced that risk management in the LASD had largely withered on the vine.

---

4  As we noted in our Chapter on use of force, the LASD reported two sets of numbers for arrests which could not be reconciled and were substantially apart. From our conversations with MIS, we learned that in general the statistics in the *Year In Review* reports were likely the most reliable. The arrest numbers in those reports were consistently lower than in the CARS reports. This means that the ratios showed in CARS tend to understate statistics such as force per 100 arrests because in truth, there are fewer arrests than CARS reports. To be fair, the CARS numbers are rawer and more hastily assembled than the more precise numbers in the *Year in Review*. Because the difference in 1998 and 1999 in particular was large, the problem is not trivial, however.

Our chapter on use of force points to at least one of the consequences of this lack of atten-tion: trends regarding force are pointing in the wrong direction. Accordingly, we renew our call for a Department-wide recommitment to risk management. Enough time has now passed so that whatever bad taste was left in the mouth of the command staff by Sheriff Block's SCIF meetings should have long ago dissipated. Sheriff Baca, Undersheriff Stonich, and Assistant Sheriff Waldie have adequately demonstrated to the troops and command staff that they are behind them. Having restored morale, it is now imperative that they show themselves capable of taking the best that the Block administration had to offer and putting their own stamp on it. That means reviving SCIF and holding command staff strictly accountable, whether or not egos are bruised in the process. That means paying attention to SCIF and CARS reports and the underlying data. That means doing more than paying lip service to PPI and risk management. It means getting real control of force and corruption-related risk.

## B. Proactive Anti-Corruption Measures

The second recommendation that we made that has thus far not been adopted was the creation of a permanent anti-corruption unit that would include undercover officers to gather intelligence on corruption, excessive force, and search and seizure violations. While in the past it might have been adequate for the LASD to function passively—only responding to allegations of criminal behavior that somehow came to its attention—it is now necessary for the LASD affirmatively to use intelligence work to detect possible problems. We argued that the full panoply of law enforcement tools that are available for detection of criminal activity on the streets must become available for internal investigations, be it sting operations or other use of undercover officers.

Our recommendations were based in part upon the LAPD's review of national best practices for fighting corruption that was described in the March 1, 2000 Report of its Board of Inquiry into the Rampart Area scandal (BOI Report). The LAPD's Integrity Subcommittee considered the experience of four cities in the wake of major corruption scandals and the anti-corruption

policies and practices that were adopted:

*Several cities have experienced major corruption scandals, and all have taken aggressive steps to deal with such problems. In the early 1990's, New York City conducted a 22-month investigation into a major corruption scandal [the Mollen Commission report arising from the Michael Dowd case]. More recently, serious ethics and integrity breakdowns in two community stations led to an investigation and a comprehensive set of remedial actions by the Chicago Police Department. In Chicago's corruption incident, officers in specialized units were found guilty of criminal activity very similar to the officers accused in the Rampart incident. In the last several years, both the New Orleans and the Miami Police Department have experienced serious episodes of police corruption and malpractice.* BOI Report at 312.

The LAPD concluded that "the most dominant theme discerned from the lessons learned in all four departments was the importance of establishing aggressive anticorruption practices." *Id.*

To the credit of the Sheriff's Department, some of those recommended anticorruption practices were already in place, including having the PPI and the collection of SCIF and CARS data. (Parenthetically, then, it is even sadder, as described above, that the LASD is allowing these tools to become cobwebbed through disuse.) A key recommended practice, and one that we in turn advocated in the last semiannual report be adopted by the LASD, was targeted stings.

As the BOI Report put it, discussing the NYPD:

*The NYPD conducts over 1,000 stings annually in an effort to test their officers' integrity in the field. While command officers have the responsibility of ensuring integrity among their personnel and within their commands, internal affairs or public integrity divisions have the primary responsibility of rooting out corruption using gathered intelligence as well as random stings and drug testing procedures. In the NYPD, internal affairs [undercover officers] are used to provide intelligence on possible corrupt activities within commands and to check out rumors of corrupt or improper behavior. The clear lesson learned from all four of the departments studied is that constant vigilance is necessary to search for and find corrupt behavior.* Id.

The experience of the NYPD is indeed instructive, leading us to question the efficacy of random stings but reinforcing our recommendation of targeted stings. We reviewed the 1999 Annual Report of its Internal Affairs Bureau. The NYPD relied upon two sources of information to gather intelligence on possibly corrupt officers. The first source was sting operations.

The 1999 Internal Affairs Annual Report noted that the NYPD in the two years past had conducted integrity tests or stings on more than 1800 members. In 1998, there were only 41 integrity test failures; in 1999, only 53. The second source of intelligence on possible corruption came from what the NYPD termed "EDIT" arrests. These arrests targeted narcotics and vice cases where the defendants were actively debriefed to determine misconduct by police officers. These targeted efforts produced better results. In 1999, 498 EDIT arrests generated approximately 100 Internal Affairs logs, misconduct cases, or corruption-related referrals. NYPD Internal Affairs Bureau 1999 Annual Report, p. 21.

Earlier this year, the LASD's Internal Criminal Investigations Bureau (ICIB) formally proposed the creation of permanent teams to conduct both random and targeted stings. We were disappointed that the proposal was neither adopted nor, to our knowledge, revised or re-tooled if LASD leadership had deemed it to be too expensive or too ambitious or housed inappropriately at ICIB. We were further disappointed that a proposal for stings did not make the final list of immediate and long-term recommendations from the Anti-Corruption Task Force chaired by Commanders Scaduto and McSweeney, even though, as we noted earlier, the recommendations of that Task Force generally were excellent.

We therefore repeat, with additional urgency, our recommendation that the LASD establish teams to conduct stings in areas prone to corruption or police misconduct or malpractice, including exposure to money and drugs, excessive force, and Fourth Amendment violations. We also repeat, again with added urgency, other unadopted key related recommendations from the **Twelfth Semiannual Report:**

- Those individuals who apply for or take jobs with the Narcotics Bureau or any other unit where they are exposed to large amounts of money or drugs should

  (i)  waive any privacy rights that otherwise might apply to their financial status and financial affairs;

(ii) be required to submit and update complete financial disclosure information, including acquisition of substantial personal or real property;

(iii) be required to submit to regular monitoring of spending habits, credit card debts, and unusual purchases.

• There should be mandatory rotation from specialized units after reasonable time limits. We note that the LASD's Anti-Corruption Task Force picked up on this recommendation and itself urged that there be mandatory rotation of managers, supervisors, and team sergeants and a mandatory rotation program for specialized units. Anti-Corruption Task Force, Special Units Sub-Committee, long term recommendations nos. 6 and 7; Supervision Sub-Committee, recommendation 5.

• There should be clear standards for assignment to Narcotics or other specialized units that specifically test the applicant's honesty, integrity, and prior adherence to legal and Departmental norms. There should also be routine background investigations on applicants. Again, the LASD's Anti-Corruption Task Force apparently agreed with us and also recommended a background investigations unit to vet applicants for specialized units. The Task Force also recommended that selection for certain units—such as the Detective Division—be done at the divisional or higher level and that selection for other specialized units and details be reviewed at the Commander level. We agree. As we have argued for many years with respect to Field Training Officer selection, these positions should not be patronage for unit commanders to hand out but should be the result of Department-wide selection and assignment, based upon predetermined standards that eliminate candidates with imperfect records in important areas, including integrity and use of force.

## C. Inspections and Audits

Our third key recommendation was that the LASD revive its ability to conduct regular, department-wide unannounced audits. We further sought reactivation of special project teams

(called the "Magnificent Seven" by the *Los Angeles Times*) that under the prior administration had been used for long-term probes, audits, and analysis and performance reviews that regularly followed up on individuals identified as possibly problematic by the PPI.

In language echoing provisions of the recently-signed consent decree in *U.S. v. City of Los Angeles, et al.*, C.A.00-11769 GAF(RCx), (C.D.Calif.), we advocate that the LASD conduct regular, periodic audits of warrant applications and supporting affidavits; use of force reports; arrest, booking, and charging documentation and reports; stops and searches; informant packages; gang database entries, and related documentation to test adherence to policy and procedure. Again, the Anti-Corruption Task Force concurred in our recommendations and itself advocated establishing an Inspectional Services Unit. Special Units Sub-Committee, long term recommendation 2.

## Conclusion

As the foregoing discussion demonstrates, the LASD is running unacceptable risks by virtue of a dwindling commitment to risk management and a failure swiftly to adopt anti-corruption measures that have become standard procedure in other law enforcement agencies, either by voluntary adoption or through negotiated consent decrees. The LASD is otherwise in an enviable position. It responded well to **Kolts** and has, if it would only put it to good use, the best risk management program in the United States with the PPI, the SCIF process, and excellent underlying data and management reports. The LASD has not had a major scandal since Big Spender in the late 1980's. It studied and learned lessons from that scandal, even if it failed to adopt the best of its own recommendations that flowed from it. The LASD does not suffer from the blows to morale and reputation that the LAPD has suffered.

In other words, it is well-positioned, if it would only choose to do so, to vaccinate itself against a major scandal. Instead, it seems to have become overly complacent or forgotten how easily the contagion of scandal and misconduct can be transmitted to the unprotected. For what-

ever reasons, the LASD has relegated risk management and strict accountability for it, in the broader senses, to a low priority. It is nothing less than shocking that SCIF and the underlying management reports and information have gone by the boards. We strongly urge the LASD to give itself a strong booster shot of the vaccine it largely invented and patented. It should do so by taking the steps outlined in this Chapter and in our previous semiannual reports.

# 3. Medical Care in One Jails

Our semiannual reports have dealt at length with the problems of medical care to inmates in the Los Angeles County jails. We have set forth the problems and listed our recommendations repeatedly. It is dispiriting to find, as this Chapter will demonstrate, that acute problems persist. Notwithstanding the seriousness of the medical lapses described herein, we acknowledge incremental progress, albeit at a patience (and patients') wearying pace, on some issues. This Chapter will first describe our exhaustive review of medical services from the perspective of the inmates who receive—or fail to receive—medical care. Next we provide an update on the status of our prior recommendations for an overhaul of medical services.

## Introduction

To deepen our understanding of the difficulties and problems in providing medical services to inmates in Los Angeles County jails, we undertook to analyze more than 3600 of the 7181 inmate complaint forms submitted in 1999 relating to medical services. Our previous examinations of the topic were based upon a study of litigation on medical malpractice and failure to treat allegations; our review and critique of expert reports and opinions issued after inspections of the County's jail medical facilities; our interviews with a spectrum of physicians, psychiatrists, psychologists, nurses, academics, and health care professionals with experience in the Los Angeles County jails; our interviews with the jail's medical and nursing staff; our interviews with sworn and civilian administrators and managers in the LASD's custody operations; discussions with the County's Risk Management Inspector General; consultation with experts in jail medical issues from outside California; and what we learned at conferences and meetings on LA County jail medical issues.

It appeared that we had covered all the conceivable bases in order to form judgments on the quality of medical services with one uncomfortable exception: we had not spent enough time gathering data from inmates themselves and from those in close contact with them. To close the gap, we undertook to contact medical personnel in the Los Angeles area with patients who were in the jails to hear a range of views on the specific difficulties their patients were facing.

33

Similarly, we followed up on efforts initiated by relatives or friends of inmates to alert us to specific medical lapses. We reviewed correspondence between the LASD and persons who wrote to the Department to complain about the medical treatment of their patients, relatives, or friends.

These efforts gave us a sense, based largely on individual cases and anecdotes, of the frustrations and anger generated by lapses in the provision of care. Notwithstanding the poignancy of many of the stories we heard, we nevertheless felt uncomfortable generalizing from them. Inmates who had been treated with due professional attention obviously did not feel the urgency to speak or initiate contact as those who had a grievance to get off their chests.

It is thus important at the outset to emphasize that there are tens of thousands of individual contacts between inmates and medical staff in the jails each year, most of which go without a hitch. This chapter focuses on problems and it cites many examples of untoward—and sometimes heartbreaking—things that have happened to very ill individuals.

Keep in mind throughout, however, that providing medical services in the LA County jails is not a day at the beach. Recall that nearly 200,000 individuals flow in and out of the jails every year. The inmate population is older, sicker, and in jail for a longer period of time than in the past, in large part because of the impact of the three strikes law. Putting aside for the moment the difficulties in a jail setting of providing diagnosis and treatment of disease and injury, one cannot fail to appreciate the sheer volume of routine service provided to inmates. On any given day, an average of approximately 6500 inmates receive prescribed medications by licensed nurses throughout the jails. That adds up to over two million instances a year in which medication is dispensed. Although overwhelming volume does not excuse substandard performance, it does disservice to the heroic efforts of self-sacrificing and steadfast persons on the medical staff to fail to take account of the difficulty and complexity of their jobs. But as we have noted before, our obligation is to provide the Supervisors with a candid appraisal of the LASD's problems and its efforts to cure deficiencies. Our semiannual reports therefore give greater emphasis to describing shortcomings than to touting successes. That does not mean

that we fail to admire and appreciate jobs well done throughout the Department, from hard work to heroism.

To understand the problems in the provision of medical services from the inmate perspective, we decided to undertake an complete review of all the inmate complaints about medical service for a whole year and follow up to see how the LASD had responded to them. The LASD was somewhat slow in processing and completing its work on the complaints. For example, as of March 15, 2000, disposition data was entered for less than half—3,526—of the more than 7181 complaints recorded in 1999.

At the time of our **Twelfth Semiannual Report**, issued in June 2000, we reported in summary form on a preliminary look at approximately 25 percent of those inmate complaint forms then available to us. Since that time, we completed our review of another 25 percent. Our initial goal was to look at all 7181 complaints. We could not do so. The LASD had not completed processing on about half of the 1999 complaints at the time we launched our study in the spring of 2000. We opted therefore to look at every completed file available at that time.

Although we perhaps could have made the same points with a more restricted sample, and although a smaller sample could have been constructed that would have been statistically valid, we opted to look very broadly at more than 3500 complaints. Our principal motivation was to get as wide a picture as possible. Another was to make certain that our conclusions were well grounded in fact, especially since the sources of the complaints were inmates themselves. Because of skepticism within the LASD and in the world at large, warranted or not, about the truth of what inmates have to say, we wanted to take particular care that we had objective corroboration of the substance of an inmate complaint. We took two approaches to the data. First, we read and analyzed all of the 1999 medical complaints we received. Then we reviewed statistical and other information maintained by the Department regarding the complaints and their dispositions for corroboration or amplification.

Our review confirmed that problems identified in our earlier reports persisted at least into the first quarter of 2000, despite genuine efforts by the Department to address them. These include:

- Serious delays in access to doctors and dentists

- Delays in prescription renewals, leading to medication lapses

- Interruptions in medical treatments for transferred inmates

- Lapses and disconnections after an initial screening discloses a medical problem and follow up care.

Our review also confirmed our belief that these problems will continue until their systemic causes are addressed. As we have pointed out in previous semiannual reports and thus will not repeat here at length, the roots of these problems are chronic understaffing, periodic but persistent provision of substandard medical care by physicians engaged by the LASD, and lapses in treatment and care because of difficulties of coordination, communication, and logistics. Some issues, such as interruptions in treatment regimes for transferred inmates, may be addressed in the long term by the Department's new Jail Hospital Information System ("JHIS"); but even the most sophisticated data management system cannot ensure adequate delivery of medical services when there are not enough physicians and nurses or planning and oversight.

This Chapter will next, by way of background, outline the complaint and complaint resolution procedures. We then discuss in detail the problems and trends we identified in our review. Finally, we report on the current status of our prior recommendations.

## A. *The Complaint and Resolution Process*

According to Department representatives, Inmate Complaint Forms ("Complaint Forms") are available in each unit.[1]  At the end of each shift (i.e., every eight hours), a custody officer with supervisory duties collects Complaint Forms from boxes within each unit. The officer reviews the forms immediately after collection; any Complaint Form that mentions a medical issue is immediately assigned an identification number, and is copied and delivered to the

---

1   Inmates complained that Complaint Forms were not always accessible, and that inmates sometimes wait three to four days to get a Form. Others complained that the only way to get treatment was via complaint form.

facility's nursing manager. The Custody Division retains a copy of the Complaint Form, from which information about the Complaint is entered into FAST, a computerized database system.

The nursing manager triages the complaints, interviews the inmates, and handles the complaints if possible; otherwise, the inmate is referred to an MD, dentist, or nurse practitioner for further treatment or evaluation. Department policy requires the medical staff respond to emergency complaints (e.g., chest pains) within one hour; to urgent complaints (e.g., pain, bleeding, toothache) within 24 hours; and to routine complaints (e.g., reading glasses, diet requests, and other non-urgent medical conditions) within seven days.

After the inmate is seen, the findings and action taken in response to the complaint are noted on a "Medical Services Complaint Disposition Data Form" ("Disposition Form"), which is then attached to the Complaint Form. Inmates are informed of the findings and then asked to sign the Disposition Form acknowledging they received a response to their complaint. The Disposition Form identifies who in the LASD responded to the complaint and records whether the complaint is "founded" or "unfounded" and if the response was "timely" according to depart-ment guidelines. Objective information concerning the disposition, including type of complaint, general disposition, and timeliness, is entered into the computerized FAST system by Medical Services Unit staff.

## B. *Common Issues Raised in Complaints*

Although the specifics of medical complaints vary, a number of themes and issues emerged from our review, essentially confirming our previous concerns and conclusions regarding the state of jail medical services.

### 1. Delays in Access to Doctors, Dentists, and Specialists

The most frequent complaint—raised in more than half of the Complaint Forms we reviewed in detail—was that the inmate had requested medical treatment one or more times before, without success. Many inmates report that they had waited weeks, and sometimes

37

months, to see a doctor or dentist. In some cases, inmates report that nurses simply refused their requests to see a physician. However, in many cases inmates were "put on doctor's line" (signed up to see a physician or taken to wait for an examination), but were never called in, or were told that the physician had left before the inmate could been examined.

As we noted above, we wanted to proceed carefully in assessing the quality of medical care through an analysis of inmate complaints given that some will reflexively discount the accuracy or veracity of any complaints from those persons. LASD staff also point out that inmates sometimes—or even often—submit spurious complaints because they are bored and want a medical appointment as a change of pace or because they are simply looking to make trouble. For these reasons, we gave substantial weight only to those complaints where LASD staff confirmed in the Disposition Form that in fact the inmate did have unredressed medical needs.[2] The vast majority of the complaints we reviewed were corroborated in this way. Many involved serious and potentially life threatening situations. To be sure, we found a small number of complaints concerning rashes and colds, and an even smaller number for which the Disposition Form indicated the inmate's complaint was completely meritless. But that small group of complaints was more than matched by complaints concerning difficulty in gaining access to doctors or treatment for heart conditions, cancer, kidney disease, high blood pressure, prostate problems, seizures, and HIV-positive status.[3]   Following are illustrative examples of serious lapses:

2   We rarely—if ever—saw Disposition Forms in which the LASD disproved or seriously disputed the inmate's claim of having previously requested medical care and having been refused or overlooked or ignored. This tended to establish that the inmate's allegation was probably true, although by no means conclusively. It is possible that the inmates' claims of prior refusals of care were never investigated as such or that the investigator deemed it an adequate remedy in any event if the inmate was put on doctor's line.

3   For example, of the 3,600 complaints reviewed, 52 concerned heart problems, 93 concerned high blood pressure; 24, kidney infections or disease; 45, seizures; and 148, HIV or AIDS. Although not all complaints of serious medical problems allege delays in getting to physicians, a significant number do. In addition, a number of these same complaints also allege lack of access to medications.

- Had been requesting MD consult for more than 3-1/2 weeks regarding heart condition. In response, inmate was seen by MD five days later, given heart medications, and given follow-up cardiology appointment.

- Fourth complaint regarding heart medication and removal of stitches in foot. Referred to doctor.

- Has been trying to see doctor for about two months re heart and sinus problems. Has not been getting blood pressure check three times a week, as was prescribed. Inmate was place on doctor's line, and blood pressure was checked.

- Has been trying to see a doctor to get medicine for cancer and hepatitis B & C.

- Signed up to see doctor nine days ago for brain cancer, but had not been called.

- Inmate seeking treatment for bone cancer submitted earlier complaint; nurse told inmate to "sign off" on previous complaint because inmate would see a doctor the following Monday; inmate still had not seen doctor.

- Had been asking to see a doctor for three past weeks regarding "nephritic syndrome" and kidney problems.

- Went to sick call twice regarding already-diagnosed renal problems, was unable to see doctor either time. Has blood in urine.

- Told three weeks earlier he would be put on doctor's line for his chronic prostate problem, but still had not seen a doctor.

- Requesting to see a doctor regarding high blood pressure and shortness of breath; nurse kept putting off request.

- Requesting nurses to put him on doctor's line for six weeks regarding high blood pressure.

- Requesting to be put on doctor's line for about a month, and submitted three prior complaint forms; has Hodgkin's disease and is in pain.

- Has been trying to see doctor because feels sick and is HIV-positive.

- Requested doctor's appointment for past ten days for AIDS-related emergency.

In addition to cases in which inmates had previously been diagnosed with a serious condition, there were numerous complaints alleging symptoms that could indicate serious medical conditions, including rapid weight loss, seizures, and neurological problems, or pain:

- Requested doctor's appointment twice in two weeks for rapid weight loss and fatigue.

- Had been trying to see doctor for last three weeks; experiences seizures and has hit his head.

- Losing feeling in right hand, but unsuccessfully tried for two weeks to see a nurse.

- Turned down from doctor's line three days in a row. Needs to have staples removed from head to avoid infection. Also was not taken to orthopedic appointment at USC medical center.

- Signed up six times for medical treatment for hernia, but has not seen MD.

- Had signed up for MD line for three weeks, but no response; has abscess on arm. Response indicates doctor ordered medication after examination.

- Has been complaining of abdominal pain at sick call for two weeks. In response, the inmate was placed on MD line.

- Has been denied medical attention for over two weeks for excruciating pain in lower right side because of gallstones. Ten days after complaint made, inmate was finally seen by a physician, and was order transferred to Central Jail to schedule a gall bladder procedure.

- Requesting to see doctor for more than three months regarding burning, sore, watery eyes.

- Signed up for sick call for "several weeks" regarding lower back pain, but had not seen doctor.

- Went to sick call five times regarding kidney stone, but still hasn't seen a doctor.

40

- Had been requesting to see doctor for a week because had not had bowel movement in two weeks, and is diabetic; stomach and back are aching. In response, doctor evaluates inmate and prescribes medications for constipation.

- Requesting to see doctor for more than a week regarding earache with "draining pus."[4]

The complaints evidence a particularly serious deficit of dental resources. Of the complaints we reviewed, 647—about 20 percent—complained about access to dentists. There were literally hundreds of complaints of severe toothaches and painful abscesses that had been left untreated for weeks and, in some cases, even months in the face of repeated inmate requests for treatment. In most cases, dispositions note that the offending tooth was ultimately extracted. Examples of delays in dental care include:

- Asked to see doctor or dentist every day for eight days during sick call for bleeding, infected gums.

- Has been trying to see dentist for 1-1/2 months - bridge has fallen out and teeth exposed. Nerves hurt when exposed to cold. Disposition: Placed on dental line.

- Had submitted many request forms to see a dentist regarding exposed nerve in tooth.

- Trying to see dentist for more than four weeks. Disposition: antibiotics and pain medication prescribed, and referral to LCMC for difficult extraction.

- Made sick call line eight times to see dentist for bad toothache, with no success. Disposition: tooth extracted.

- Asked nurse two weeks earlier to put on dental line re toothache.

- Four trips to dental line did not result in treatment by DDS for bleeding gums. Duty officer told inmate that dental line takes up to a month.

---

4 In a number of cases, the Department's failure to promptly diagnose and treat these kinds of apparently non-urgent conditions have led to serious, permanent injuries, and even death. For example, in the Twelfth Semiannual Report, we described the facts in *Llamas v. County of Los Angeles*, where failure to treat an infected ear led ultimately to surgery and brain damage.

- Had been waiting three months to see dentist for painful wisdom tooth.

- Request for dental assistance unheeded for two weeks.

- Requested dental assistance for four weeks for abscessed tooth.

- Inmate has been waiting seven or eight weeks for broken tooth extraction.

- Six to seven weeks past due to see dentist re extraction; although tooth was medicated, tooth started to abscess for third time; complained to staff about 11 times.

The principle reasons for delays in access to doctors and dentists appears to be too few practitioners on staff, logistical difficulties, and efficiency problems. Several inmates complained that although they are put "on doctor's line," they left the clinic without having seen a doctor. Some inmates with serious medical conditions expressly reported that they were physically escorted to the doctor's line or had an appointment, but were not seen by a doctor. This confirms that there are too few physicians to meet the demand for medical treatment or that the physicians fail to allot sufficient time to their duties. For example,

- Diabetic inmate was escorted to doctor's line in response to complaint four days earlier, but never seen by MD.

- Scheduled to see doctor on Thurs re HIV-related symptoms, but not seen.

Some inmates reported that there was no sick call on weekends, and sometimes there was sick call only four days a week. Other inmates reported that during some weeks, only emergencies were addressed on sick call, and inmates with other problems were turned away.

## 2. Delays in Renewing Prescription Medicines

The next largest category of complaints concerns prescription medication (981 complaints). Prescriptions may not be renewed unless a physician examines the inmate and approves the refill. It appears that, at best, the current system requires inmates to initiate MD appointments for renewals (although a number of inmates expressed confusion concerning how

to obtain renewals). Nonetheless, even some diligent inmates who tried to anticipate their needs for renewals complained that they were stymied: They were refused appointments with physicians until after their medications had run out. Even after prescriptions had actually run out, some inmates reported serious delays in getting renewals.

We were particularly concerned with reports concerning difficulty obtaining HIV medication, the effectiveness of which can be destroyed by a lapse in taking it. We are also particularly concerned about lapses in psychiatric medications because of the danger not only to the inmate patient, but to other inmates and staff, as well. But even medications that treat non-life threatening conditions, such medications to treat pain and rashes, should be provided continuously, and as medically indicated. The complaints indicate that the bottleneck is the product of the dearth of physicians.

- Asked to see a doctor to renew prescription that had run out; inmate noted that he gets violent without medication. Was not seen by psychiatrist until six days later, when medication was ordered.

- Went to sick call to see doctor regarding HIV medication; two weeks later still had not seen a doctor.

- Inmate complained he had not been receiving medical or psychiatric medication for ten days.

- Has not received HIV medication in three weeks.

- Has not received HIV medication for two weeks.

- Has not received asthma medication for one week.

- Inmate complained of trouble getting prescription medication for "cryptococcal meningitis" related to HIV, because sometimes medication was out of stock, other times dosage was wrong. Claimed symptoms had returned, and nurses had not let him see the MD.

- Waiting four months for medication renewal.

- Has not been receiving medication for a month.

- Nurse at sick call told inmate to raise need for prescription renewal with pill call nurse; pill call nurse told inmate to raise issue with sick call nurse.

- Inmate's renewal of arthritis self-medication was overdue; difficulties renewing medication every time.

- Seizure medication not renewed.

- Inmate requested appointment with MD to renew back pain medication, but did not get to see MD.

- Inmate "lacking" psych medication for three weeks.

- Inmate told by RN that he could not see MD until his prescription expired.

- Psychiatric medication prescription expired, although inmate warned psychiatric assistant in advance the prescription was going to be up for renewal.

- Advised sick call nurse two weeks earlier that his pain medication was running low. Medication ran out.

3. **Interruptions in Treatment Regimes for Transferred Inmates**

Just under five percent of the inmate complaints reviewed (167) reported that their treatment regimes, such as prescription medications and special diet, were interrupted upon their transfer from one jail facility to another within the Los Angeles County jail system. As with inmates who complained about delays in seeing physicians, a good number of these inmates apparently suffered from serious or life-threatening conditions, such as cancer, heart disease, asthma, seizures, psychiatric conditions.

- Medication and chart did not accompany inmate upon transfer three days earlier; he needed his asthma medication.

- Since being transferred has not received his medications for high blood pressure or colon cancer. Nurses say they do not have his file. Disposition: Seen by nurse. Medical file found. Placed on MD line for follow up.

- Had not received ulcer medication since his transfer, and could not sleep because of severe pain. Had already submitted one complaint.

- Transferred from state prison with eye drops for glaucoma; eye drops taken away.

- Inmate transferred from Twin Towers did not receive seizure and psychiatric medications for three days. Disposition notes medical chart and record missing.

- Upon transfer from NCCF to MCJ inmate could not get prescription filled.

- Upon transfer to MCJ, psychiatric medication not administered; inmate suffered seizure.

- Medication not received after being moved to different floor.

- Inmate trying to get psychiatric medication, but told to wait because he moved cells.

## 4. Other Prescription Issues.

Inmates reported a number of miscellaneous complaints relating to prescriptions:

- Denied mid-day dose of medication for two days.

- Not getting full dose of heart medication. Original heart medication replaced because jail did not carry that prescription.

- Has not received medication prescribed seven days ago.

- Prescribed three medications, but none have been received.

- Missing medication for high blood pressure.

- Not receiving HIV medication because doctor on duty was from Tower II and did not "feel comfortable" prescribing HIV medication.

- Non-English-speaking inmate was refused medication at pill call because he was unable to answer nurse's questions.

- Not receiving medication for high blood pressure, heart condition, and seizures.

## 5. Disconnect Between Doctor's Orders Emanating From IRC Screening and Follow-up Treatment.

The Department has instituted a comprehensive screening program for incoming inmates, designed to systematically detect medical and psychiatric problems in all new inmates. Yet inmates complained that follow-up to initial diagnoses and orders is lacking. Inmate complaints also revealed a failure to deliver treatments prescribed to inmates examined by physicians outside the IRC context (such as medication, special diet, and even surgery). For example:

- An inmate complaint dated October 21 reported that the inmate needed psychiatric medication, and that he had tried to inform the staff and submitted prior complaints. The response confirmed that Medical Services screened the inmate at IRC one month earlier (on September 20, 1999) and referred him for psychiatric evaluation. Almost three weeks after he filed his complaint, the inmate finally saw a psychiatrist, who put the inmate on medication.

- Had submitted many complaint forms because was supposed to be on liquid diet. The inmate was referred to an MD, who "re-ordered" the diet.

- Inmate scheduled for hernia operation within one week, but after three and one-half weeks still had not been to surgery. His complaint was substantiated; new orders for surgery consultation were issued.

- Inmate had been diagnosed with hernia, and surgery prescribed, but no action taken. In response to complaint, inmate's chart was submitted to County Hospital for appointment.

- Had not received special diet ordered 3-1/2 weeks earlier. Response included special diet order.

- Soft diet had been ordered for inmate who had no teeth. Inmate had not received diet and had been "on MD line" for five weeks. Inquiry confirmed that diet had been ordered, and staff made second request.

- Blood test conducted two months earlier, but has not heard results, although has made many requests to see doctor. Disposition: lab results given to inmate, and medication prescribed.

- Was not taken to orthopedic appointment at USC medical center.

46

- Two MDs recommended radioactive iodine treatment, but five weeks passed since inmate had signed last consent form and no treatment had begun. Disposition: inmate was set for appointment at County Hospital.

- Inmate was scheduled for emergency medical surgery for "reverse colostomy" one month earlier, but nursing staff refused to authorize; advised inmate would have to wait until sent to State prison or release. Response to complaint indicates inmate seen by physician, and surgical appointment made for inmate at County Hospital.

## 6. Miscellaneous Issues

### a. *Delays in investigating complaints.*

Of those complaints for which dispositions had been entered into the computer as of the time we initiated our study in the spring of 2000, responses were indicated as timely for over 90 percent of those complaints. For purposes of analysis, we have assumed the accuracy of the finding of timeliness and did not attempt independently to verify them. We also assume that the standards for when treatment is "timely" meet with accepted medical criteria, again without independently so verifying. Yet even with these favorable assumptions, an estimate of over 500 delayed responses is high enough to give pause. Some delays are relatively short; others, however, stretched into weeks and even months. As a result, individuals experienced pain and declining health; sometimes, inmates were released without treatment.

Some of the worst were:

- On August 18, an inmate's tooth broke; his complaint was marked received by custody on August 19. However, the disposition form does not reflect any action until more than two months later (on October 29), when an "abscess" is noted. The disposition form indicates the inmate was not treated for another month (until November 27), making it more than three months between complaint and treatment.

- Inmate complaint dated 11/11/99 reported that inmate had been waiting since 9/16 for appointment at County Hospital regarding tumor. Disposition noted on 1/11/2000 that Department was unable to resolve complaint because inmate had since been released and Department was unable to find inmate name or number on computer.

47

- Inmate complaint dated 11/24 reported that inmate had requested psych consult three weeks earlier, with no response. Disposition noted on 1/11/00 that Department could not resolve inquiry because inmate was released and Department could not find the inmate's name.

- Complaint dated July 27 noted that psychiatric medication prescription expired. No response noted until August 17.

- Complaint submitted on August 24 that inmate had been requesting dentist for two weeks for severe toothache. Response on October 12 noted that inmate had been released prior to the LASD getting around to investigate the complaint.

b. *"Disposition Codes" do not convey whole story.*

We found that we could not rely wholly on the LASD's disposition of complaints as "unfounded" or "unsubstantiated." Even if an inmate was found to have requested to see doctors one or more times in the past without success, we found several examples where the complaint was deemed "unfounded" or "unsubstantiated" if the inmate was eventually put on doctor's line as a result of the complaint. Similarly, we could not rely upon a disposition of "unfounded" or "unsubstantiated" to mean that the alleged medical condition was found not to exist. There were instances where a complaint was held "unsubstantiated" despite care having been requested and given.

It appeared that the LASD was treating all inmate complaints as simply alleging a failure to provide treatment. The LASD deemed the complaint therefore to be unfounded or unsubstantiated if one of two results occurred: (i) some action was taken as a result of the complaint or (ii) the underlying medical condition complained of was spurious. In other words, even if an inmate with a legitimate medical condition had repeatedly requested treatment, the complaint would be deemed unfounded if he was put on the doctor's line, whether he ultimately got to see the doctor or not, and regardless of whether he had in fact repeatedly requested help. Although we can understand that with more than 7000 complaints a year, it is burdensome for LASD staff to exhaustively investigate each instance where delayed treatment is alleged, and although

48

we can appreciate that in a chronically understaffed and overwhelmed jail medical setting that it is simpler just to say "no harm/no foul" as long as some treatment is eventually ordered, we question whether the LASD is getting the benefit from a risk avoidance perspective by giving these complaints short shrift.

## C. The Nursing Staff

In cataloguing the complaints, we were struck that there were very few complaints about the nursing staff or their treatment of inmates. To be sure, some inmates appear to blame nurses for their lack of access to doctors. A small number complain that nurses were intentionally rude or refused to assist patients (e.g., threw pills on floor; refused to give inmates medicine). Where such issues are raised by complaints, the disposition indicates that the nurse in question was approached about the complaint and reminded to be professional in dealings with inmates. Although few in number, a few of the complaints about the nurses were sufficiently serious that we point them out:

- Nurses ignored his requests to see a doctor regarding his HIV-positive status.
- Nurses denied inmate's request to see doctor regarding "full-blown" AIDS, liver problem, and other ailments. Nurse dropped medication on floor and made inmate take the medication anyway.
- Nurse took away asthma inhaler; was rude. Inmate was prescribed another inhaler in response to his complaint.

These instances of poor performance notwithstanding, the nursing staff often performs heroically, and we acknowledge and appreciate their loyalty and dedication. The normally stressful position of nurse has been made even more stressful by chronic staff shortages. While there may be a handful of truly difficult nurses, the balance appear to be caring and committed, although overworked. We note that the LASD recently approved the hiring of an additional 77 nurses, one additional physician and one additional dentist. We understand that

some 38 nurse applicants are currently undergoing background checks. Nonetheless, even if all 77 nurses and the MD and dentist were hired tomorrow, the LASD would still be 106 positions short of its authorized strength of 861 positions. The burden of the shortfall rests on the already overworked shoulders of a dedicated nursing staff.

## D. Status of Prior Recommendations

The foregoing discussion, combined with our wider ongoing investigation of medical care that spans several years' worth of semiannual reports, demonstrates a chronic, serious, deep, and difficult problem. Nor are we in any way alone in sounding the alarm. The County's own Department of Health Services has done so. The ACLU has done so. The United States Department of Justice has done so. So have many inmates, their doctors, and their relatives and friends.

Through our dealings with the LASD since **Kolts**, we believe we have forged a consensus with the Department, at least in theory and general approach, about what needs to be done in the mid- and long-term. Sadly, the pace of implementation is agonizingly slow. Our last semiannual report summarized nine key recommendations that we have been advocating for a long while. We will now turn to that list and report on the current status.

1. *Immediately seek licensure as a Correctional Treatment Center for the Medical Services Building (MSB) at Twin Towers.* The LASD has to date only taken the first step in what will be a long march over rough terrain. The initial phase, approved by Sheriff Baca recently, is to call for a pre-survey of measures the Department will have to take in order just to be put in the ballpark to seek licensure. The license depends at least in part on ratios of medical staff to inmates. The Medical Services Building is currently understaffed and below those ratios. It has been estimated that it may take an initial outlay of $6- $6.5 million to hire staff and get ready to undergo the scrutiny and pass the tests that are preconditions to licensure. Money for

that has not been identified, much less earmarked. Once the license is obtained, it is estimated
that it will cost $4- $4.5 million per year to stay in compliance on the staffing ratios.
Accordingly, the end is nowhere in sight and the march has only barely begun.

2.  *Make certain that the jail medical and mental health services fully conform to California Title
15 standards and that adequate mechanisms for external monitoring and oversight are in place
to assure ongoing compliance.*  Apart from an occasional visit by the ACLU and a yearly pass
through by the State of California, where compliance issues are noted and the LASD promises to
do better, there apparently has not been an exhaustive independent look at Title 15 compliance
issues since the long-buried, never-issued, and now somewhat musty DHS study entitled
*Recommendations Concerning the Provision of Health and Mental Health Services in the Los
Angeles County Jail System.*

3.  *Seek IMQ jail accreditation for all the outpatient facilities in the Los Angeles County Jail
System in a structured and phased way.*  This recommendation is currently going nowhere.
It is frankly not a priority and will not even be broached until after the in-patient facility,
MSB, is licensed. As we argued in our **Twelfth Semiannual Report**, there are a number
of specific IMQ standards that should be adopted voluntarily as sensible risk management
steps to reduce potential liability while waiting for IMQ certification in general. **Twelfth
Semiannual Report**, p. 52. We continue to be convinced of the benefits and wisdom of
IMQ accreditation and we continue to strongly urge that it be sought.

4.  *Transfer emergency and specialty visits currently taking place at County USC Hospital or else-
where to MSB under a contract with a university hospital.*  The first step in this Long
March was to put out a Request for a Proposal (RFP) for a consultant to help the LASD find
yet another consultant who could then draft yet another RFP to solicit proposals to provide
those emergency and specialty services. Those who have been patiently holding their breath

may now exhale: The consultant to recommend another consultant to write the RFP has been identified. But since no money has been earmarked to pay Consultant A to identify Consultant B, Consultant A has not been asked to go forward.

5. *To the extent that recommendation no. 4 cannot be speedily accomplished, at least implement already drafted proposals for USC Medical School to use medical residents to staff the Inmate Reception Center (IRC).* Because of purported difficulties of long duration getting Sheriff Baca and USC President Sample in touch with each other to discuss them, these already drafted proposals are apparently hovering between desk and wastebasket in a state of suspended animation known in the LASD as "permanent hold." Never ones to let moss grow on the soles of their shoes, the quick-footed in the LASD's Medical Services Unit have devised an alternative plan: Have the as-yet-unidentified Consultant B include these IRC services in the RFP that will be drafted once Consultant A, who has been identified, is paid money so that Consultant A can go find someone to be Consultant B.

6. *Examine the feasibility of contracting all or part of the remainder of medical services to a university medical school.* This apparently will happen the moment that recommendations 3-5 above have been completed.

In this connection, it is interesting to note that the City of New York recently changed providers of medical services for Rikers Island, the huge New York City jail. The new contract price is approximately $105 million per year. There are fewer inmates in Rikers Island than in Los Angeles County jails. Rikers Island has an average daily population of about 13,500; LA County is closer to 20,000. Unlike LA County, with far-flung facilities in the north of the County as well as downtown, Rikers is a small island in the East River. Whereas LA County jails medicate approximately 6500 inmates daily, Rikers medicates about 4000. It is also the case that the staffing ratios at Rikers of medical personnel to inmates are significantly more favorable than in LA County. Medical services to inmates in LA County currently cost on the

order of $70 million yearly. Thus, it would likely cost more than the yearly $105 million that New Yorkers are currently paying for Rikers Island to buy equivalent staffing and services in County jails. Admittedly, this is a substantial additional amount of money over what LA County is currently paying. The question then becomes, is it worth it?

The inquiry to get an answer to the question is several-fold: First, on a purely dollars-and-cents cost/benefit analysis, how quickly, if ever, would the substantial cost of licensing MSB, coming up to IMQ accreditation standards on the out-patient facilities, and contracting out all or part of medical services to a highly reputable and competent university hospital be matched or exceeded by anticipated liability and other costs associated with maintaining the status quo or making small incremental changes? Second, even if the benefits do not outweigh these costs over time, what are the chances that the County's freedom of choice in this area will be undercut by injunctive or other judicially-ordered relief, either from privately-initiated or governmentally-initiated litigation? If those chances are substantial, what is the value to the County to be able to decide when and how much money to spend? How much is it worth to the County not to have to reallocate money, in a crisis mode, from priorities established by the Supervisors to priorities mandated by judicial decree? Third, even if all the foregoing risks are worth running in a purely economic calculation, are there other societal costs that are harder to put a number on but are just as real? What is the benefit to public health in general if the transmissible diseases of inmates are attended to in the controlled environment of a jail rather than largely ignored in the uncontrolled environment of the streets? How much crime and injury to future innocent victims could be avoided by dealing with serious mental illness or drug dependency while the inmate is in a custody setting?

Finally, but in the end more important than any of these other considerations, what are the moral and ethical implications? Regardless of how high or low the bar imposed by constitutional or statutory or common law standards, it is a fact that a seriously ill inmate cannot take herself to a doctor or show up at an emergency room or ask her brother to call 911 or summon other help. Jail is loss of freedom. And it makes no difference, and the freedom is equally lost,

whether you are there because you cannot make bail, or are awaiting trial, or have already been acquitted or had your case dismissed and are awaiting release, or have served your time and are waiting to be let out, or have been convicted and are waiting to go to the state penitentiary. Your freedom to take care of yourself is gone. The jailer decides if and when you can see a nurse or a doctor; if and when and how you get your prescribed medication; whether or not there is someone available to transport you to a specialist to get the radiation prescribed for your cancer.

How we treat those who are powerless and utterly dependent may be the ultimate measure of our moral worth as individuals or as a society, regardless whether those who have become powerless or dependent somehow may have brought it upon themselves because they committed, or have been accused of committing, crimes and got thrown in jail. This is not to say that MSB has to become the Mayo Clinic. But it surely does mean that the County jails should meet state licensure and IMQ jail accreditation standards at a minimum.

7. *Computerize medical records and inmate tracking so that inmates can get their medication, do not miss scheduled doctor's visits, are taken to the hospital when the doctor has so ordered, and so that one doctor or nurse is aware of what another has prescribed or ordered.* This too is coming along more slowly that we had hoped. The necessary wiring and preliminary work has been done only in MSB. The LASD is "getting ready" to do the same in the balance of Tower I and Tower II of the Twin Towers. The wiring is not complete at Men's Central Jail or the north County facilities. It will be at least until the end of 2001 before there can be a roll-out of computerized medical charts to those facilities.

8. *Address and resolve conflicts and ambiguities in the respective roles, power, authority, and precedence of Medical Services, DMH, and the Custody staff in a way that elevates health-related concerns so that the logistical and other custody needs, which seem often—if not invariably—to trump health needs, are subordinated appropriately.* Our frank appraisal is that in a practical sense this cannot occur until health professionals are in a more advantageous bargaining position. Where, as here, all the Medical Services staff are employees of the

54

LASD, and where, as here, Medical Services is part of Custody operations and run by sworn personnel, it is largely unavoidable that sworn custody personnel will wield final authority and call the shots. That is not to say that sworn staff is not able and competent—at various times, we have praised the efforts of John Anderson, Taylor Moorehead, Richard Moak, and others. Nor is it to say that it should never be the case that medical personnel report to sworn personnel. Nonetheless, we are pessimistic that there can be a serious reordering of priorities to the benefit of health-related issues under current circumstances.

9.  *Examine the feasibility of telemedicine as a way to avoid unnecessary transportation of inmates.*

We stated this recommendation as a long-term goal, and so it remains.

In sum, medical care in the jails remains a difficult, chronic, unresolved problem. We nonetheless look forward to working with Marc Klugman, the newly-appointed captain of Medical Services, on all the issues raised in this Chapter with the hope that we can report good progress in an upcoming report.

# 4. Update on Sexual Harassment Issues

## *Introduction*

Following a spate of costly legal settlements and troubling new allegations of employee misconduct in early 1999, the Board of Supervisors asked us to evaluate whether the LASD was effectively and vigorously enforcing its existing policies against sexual harassment, and whether it could reduce its exposure to civil liability.[1]  The **Eleventh Semiannual Report**, published just over a year ago, features a detailed discussion of the evidence we collected during our initial investigation of the record.  It also contains our preliminary analysis of the LASD's performance in addressing harassment-related concerns.

The **Eleventh Semiannual Report** focused primarily on cases that reflected the Department's *past*. Indeed, several of the cases we reviewed involved investigations conducted five or more years before and alleged misconduct that occurred even before that. In the rapidly evolving field of sexual harassment law and policy, such periods represent a virtual eternity.  By current standards, few five- or ten-year-old investigations would receive a passing grade.

For this Report, we accordingly decided to conduct an extensive review of more recent developments.[2]  The primary purpose of this Chapter is simply to share a number of observations that arose from our review of the latest round of sexual harassment

---

1  Between 1995 and mid-1999, the County had paid nearly $3 million to resolve what we called the eleven "Settled Cases."  As we observed last year, "[t]he number and dollar amount of these settlements have led some observers to conclude that the LASD [has] tolerated sexual harassment, mishandled employee's complaints, and, even where misconduct was found, meted out inappropriately light discipline, if any at all."  Indeed, our review of the Settled Cases confirmed that there was some basis for these conclusions. Notwithstanding the LASD's well-publicized "zero tolerance" policy, evidence from the Settled Cases established that sexual harassment had been overlooked or ignored by Department officials—if not accepted outright as an intractable part of workplace culture.

2  This report is based primarily on our recent review of approximately 75 sexual harassment investigations conducted by the IAB over the past 12 to 18 months.  Of these 75 investigations, 22 were launched before October 1, 1999, all of which are now completed.  The 53 remaining cases were filed between October 1, 1999 and September 30, 2000. Given the volume of paper at issue, we chose to focus our attention on 25 of the 75 recent cases, and to conduct a less detailed review of the remaining files.  Although we did not attempt to create a representative sample in any scientific sense, we are satisfied the 25 files designated for thorough review typify both the variety of claims received and the Department's expected treatment of them.

investigations by the Department's Internal Affairs Bureau ("IAB"). In doing so, we highlight a number of areas in which the LASD has made remarkable progress over the past 12 months. We also flag several areas of ongoing concern. We turn first to signs of improvement in several key performance areas.

First, LASD supervisors, as a group, are responding more quickly and forcefully to reports of possible sexual harassment. Indeed, the files describe numerous cases in which supervisors refer such allegations directly to the LASD's Career Development Bureau ("CDB") for intake, or to the IAB for investigation.[3]

Second, not only has the LASD eliminated its substantial former backlog of pending sexual harassment cases, it has also dramatically reduced the average time within which such investigations are typically completed. The Baca administration has consistently emphasized its commitment to timely investigations—with good reason, as we explain below. This message appears to have been successfully received.

Third, we saw evidence of noticeable improvement in the overall quality of the investigations themselves. Although several investigators would clearly benefit from additional training and practice in the art of investigation, the files we examined are— for the most part—thorough, organized, and well documented. They reflect a common interest in fairly balancing a variety of competing interests, and occasionally reveal flashes of extraordinary insight and attention to detail. Of course, such improvements are bound to affect the credibility of the entire process.

---

3  The CDB was created in 1999 to oversee the Department's management of equity, discrimination and harassment issues, as well as to oversee the County's affirmative action initiatives. Under the leadership of Commander Nancy Malone, the CDB includes the Office of the Ombudsperson, the Affirmative Action Compliance Unit/Career Resources Center, the Educational Development Coordinator's Office, and the Consent Decree Compliance Unit. The Office of the Ombudsperson serves as the Department's primary intake unit for employee complaints of discrimination and harassment. Before the CDB was created, this function was performed by the Ombudspersons/Career Resource Center ("OCRC").

Finally, it appears the Department has begun to correct its historic reluctance to impose appropriate standards of discipline where violations of Department policy are established. In sum, the men and women who were disciplined over the past 12 months for violating the LASD's sexual harassment policies received generally stiffer average penalties than those who were disciplined in previous years. Taken together, this and the other evidence we identify suggest that the LASD is continuing to evolve from the past practices we identified among the Settled Cases. In short, the Baca administration's continuing commitment to the reduction if not elimination of workplace harassment has begun to yield measurable results.

Our latest review also highlighted a number of additional areas that appear to require additional resources and attention. As an initial matter, the steady volume of credible complaints filed each year suggests that too many LASD employees remain unwilling or unable to conduct themselves professionally at work. Others apparently lack even the most rudimentary understanding of the types of conduct that existing LASD policies prohibit. Employees in each of these two groups would probably benefit from further education and training on this topic. In fact, improving available training opportunities would not only increase popular understanding of the issue, but also signal the Department's stiffening resolve in the fight against workplace harassment.

Finally, we identified repeated examples in which the Department's investigative resources were inefficiently allocated. For example, a number of investigations appear to have consumed disproportionate shares of time and other resources in light of the surrounding circumstances. Although we hesitate to criticize an investigation as having been "too thorough," overworking an especially simple or shaky case not only risks scarce resources, but undercuts general confidence in the entire enforcement process.

We turn now to a detailed discussion of our investigation and its findings.

# Observations from the Recent Investigation Files

### Supervisory Responses to Complaints of Harassment

When we addressed this issue in the **Eleventh Semiannual Report** a little more than a year ago, we suggested that LASD supervisors deserved a generally mixed review for their overall responsiveness to employee reports of sexual harassment on the job.

Typically, the eleven Settled Cases referenced numerous instances in which supervisors had minimized or ignored allegations of harassment at significant risk to the complaining employee, and, ultimately, the Department itself. In fact, we concluded that the failure of line supervisors to respond to allegations in a timely and thoughtful manner was often "the most significant factor" in leading individual complainants to pursue litigation.

*Many of the Settled Cases were brought by female deputies who had been with the LASD for several years. Some had experienced discrimination or harassment as rookies or early in their careers but decided against complaining; perhaps because they were trying to show that they were able to "just take it." Thus, harassing conduct was not brought to the attention of the supervisor until the Complainant's resilience was depleted and the situation became unbearable.[4]*

Yet the unhappy picture we drew from the Settled Cases was tempered to some extent by results from more recent IAB investigation files. As we noted in the **Eleventh Semiannual Report,**

*[e]arly evidence from current OCRC files we reviewed suggest that the supervisors are acting appropriately and are properly utilizing the resources of OCRC at an early stage. Our assessment cannot be complete, however, because it is too early to determine how many complaints of*

---

4  In several instances, the incident under investigation was less severe than one or more earlier violations that had not been reported. As we observed, at the time, "[t]his unfortunate situation may, in some odd and again ironic way, account for the reaction of the supervisor: Unaware that the incident complained of was simply the last straw in a series of instances, the supervisor may have been perplexed by the vehemence of the Complainant in light of the apparent triviality of the incident complained of in isolation. Tragically, this may have led the supervisor to judge the Complainant as weak or inappropriately sensitive, thereby generating misplaced sympathy by the supervisor for the harasser."

sexual harassment have arisen since the Settled Cases that might have been ignored by supervisors. That will not be known until the Complainants report them to OCRC or Internal Affairs or file lawsuits.

Fortunately, our latest reviews confirm the encouraging preliminary assessment we began to draw from the files of a year or so ago.

Specifically, we identified a variety of reports describing instances in which supervisors, upon receiving a report of possible harassment, took immediate steps to touch base with the complainant, or to launch the Department's formal response, or both. Although we doubt that any group of IAB case files would reflect a representative array of supervisory practices, the files we examined reflected well on LASD practices.[5] In many cases, supervisors responded to reports of possible harassment by notifying their superior. Alternatively, some supervisors reported the allegations directly to the Office of the Ombudsperson or the IAB. In most cases, the appropriate referrals were apparently made within a matter of days. Most referrals were confirmed in writing—usually by way of a memo to the supervisor's superior(s), or perhaps as a note on the standard CDB intake form.[6]

Notably, the 25 files we reviewed in greatest detail appear free from evidence of Department employees having been ignored, rebuffed, or discouraged by one or more supervisors as they sought relief from alleged sexual harassment or gender bias. Yet several files did contain evidence of a roughly converse situation—in which reluctant complainants try to prevent their supervisor from acting on their allegations. Such

5   It would not be unreasonable to expect that any random review of IAB investigation files would reflect a disproportionately high level of supervisory initiative in reporting allegations of workplace sexual harassment. Indeed, the IAB is unlikely to learn of any individual cases that are not initially launched by either the victim or a direct third-party witness. In many cases, such initial reports are made to a line supervisor, who, upon receiving the report, has three primary options: (1) notify his superior, (2) report the allegation to the CDB or IAB, or (3) do nothing. In the event the supervisor does nothing, the IAB may never learn of the charges. If the case is referred to the IAB, the supervisor's assistance will probably be noted.

6   The practice of drafting confirmatory memos has important consequences, as it becomes increasingly more difficult to hide or ignore a given case once it begins to develop a "paper trail."

"reluctant complainant" cases typically involve an employee who wants to discuss an issue in confidence, or "off the record." Some reluctant employees are merely unsure of their options; others may want some feedback about the relative severity of the conduct at issue. Some employees express concern about the effect a formal charge may have on their reputation. Surprisingly, many worry about possible harm to the harasser's career.[7]

Notably, among the IAB cases we reviewed, each reluctant complainant was told that while the matter would be treated with as much discretion as possible, LASD supervisors are required to disclose such allegations to designated authorities within the Department. This is an appropriate supervisor response. Indeed, allowing reluctant complaints to engineer their own cover-ups or frustrate reasonable investigation efforts may leave suspected harassers free to harm other employees. Should a later complainant discover that one or more supervisors were on notice about the possible misconduct yet did nothing about it, the Department may have been placed in a position of significant risk.

It is difficult to overstate the importance of appropriate supervisor responses to allegations of sexual harassment. Indeed, the overall quality of such responses affects individual cases and the general working environment on several different levels. As a matter of law, timely and appropriate supervisor responses can help protect the County from liability. Such responses can serve as evidence that the LASD has exercised reasonable care in combating workplace harassment and related misconduct. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998). As a matter of *human resource policy*, an established record of effective response encourages prompt and accurate reporting. Not surprisingly, this works to discourage harassment in the first instance. Finally, as a matter of common sense, an appropriate response from one's supervisor helps assure the complainant that her concerns will be

---

7 Three of the 25 cases we reviewed in detail contained evidence that the complaining employee was reluctant to pursue formal charges against the alleged harasser for fear that it might injure his career in a manner that was disproportionate to the nature of the conduct.

taken seriously. This is an especially effective way to establish the Departmen's commitment to protecting the basic rights of all its employees.

## Timely Investigation and Adjudication of Employee Complaints

The Department has also made significant improvement in the timeliness of its sexual harassment investigations. This is important for several reasons. First, laggardly investigations can be extremely frustrating to the parties who are directly involved. Not surprisingly, complainants are left to wonder if they were taken seriously, or whether the employer is willing to enforce its own policies.[8] Similarly, unexplained delays often send mixed messages to the subject and other would-be perpetrators, dramatically undercutting the employer's anti-harassment efforts.[9] Finally, timely investigations simply yield better results. Memories often fade with the passage of time. Evidence and witnesses can disappear. Regardless of the underlying causes, significant delays in investigating workplace misconduct can often affect the accuracy and credibility of the outcome.

LASD policy requires that most administrative investigations be completed within 90 days of the Department's discovery of the alleged misconduct.[10] Historically, however, this guideline was often ignored. In examining this issue a year ago, we noted that although

8   Of course, unnecessarily long investigations are especially unfair to those who are unjustly accused. At best, the subjects of such investigations are left to live and work under a cloud of suspicion for extended periods of time. Even where the subject is ultimately cleared, the mere duration of the investigation itself may cause some to conclude that the subject "got off on a technicality" or that "there must have been something there"—regardless of the result.

9   In fact, in mid-1999, the Department's Executive Risk Review Committee (the "ERR") refused to take any disciplinary action against two officers who were determined to have violated LASD policies in a case involving workplace sexual harassment based largely on unexplained delays in the IAB's investigation of the case. According to the ERR, such delay in the investigation and punishment of wrongdoing undermine the very purpose of corrective sanctions.

10  Section 3304 of the California Government Code prohibits punitive actions against public safety officers who have been charged with misconduct unless the agency for whom the officer works completes its investigation of the charges within one year of a public agency's discovery of misconduct by a person authorized to conduct investigations.

63

some sexual harassment investigations were completed within that time frame, it was not uncommon for them to take double that amount of time. Some took nearly a year to complete, and two took more than a year and a half. The LASD has conceded publicly that it took on average between 9 and 18 months to complete a sexual harassment investigation.

As of October 1999, the inventory of open IAB matters included at least four separate sexual harassment cases that had been under investigation for a full year or more. At that time, sexual harassment investigations took about three and a half months to complete, on average. Today, none of the IAB's open sexual harassment cases has been under investigation for even as long as six months. Moreover, the average LASD sexual harassment investigation is now completed in approximately 2.8 months—down 25 percent from a year ago, and comfortably within the 90-day limit. We applaud the Department for its progress in this area, and predict that it will yield significant dividends.

Having said this, however, we feel compelled to add at least one note of caution. Not unlike unnecessary delays, undue haste can also affect the quality of a complicated investigation. Although we found little evidence of this phenomenon in the files we reviewed, it is easy to imagine situations in which the pressure to meet an arbitrary deadline might tempt an otherwise careful investigator to cut corners needlessly. Although many sexual harassment investigations can easily be completed in 45 days—or less—the Department should take special care to maintain the overall quality of each investigation as the principal concern."

## Professional and Well-Documented Investigations

As we suggest above, speed alone is hardly determinative. One might naturally wonder whether marked decreases in the average completion time of IAB investigations may have come at the expense of quality. Fortunately, we found little evidence of such trade-offs among

11 Several reports have suggested the IAB has adopted an unwritten deadline of 45 days for the completion of sexual harassment investigations. In our view, a significant number of these investigations are too complex to be performed on that sort of timetable. Even where investigators enjoy relatively modest caseloads, it often takes several weeks simply to schedule various witness interviews. In the event a key witness is ill or out of town, investigators might be put to the unfortunate choice of foregoing the interview or incurring the cost of a "tardy" investigation.

64

the 25 cases we reviewed most thoroughly. Not surprisingly, the quality of the individual files we examined varied from one to another. This is probably the result of a range of factors, including the experience and skills of the assigned investigator, and the circumstances of the case itself. For the most part, however, the files we studied reflect relatively thorough and intelligent investigative work. Notably, we were able to identify a definite trend in the quality of the investigations—as a group, the latest files reflected significant improvements in quality. Although these improvements can fairly be traced to a combination of factors, the creation of specialized units within the IAB is perhaps primarily responsible.

Until recently, nearly all IAB investigators were seen as generalists; each investigator handled a wide range of cases, and, as a result, few were able to develop a particular area of expertise. In late 1998, however, the IAB was divided into several teams of investigators, each of which was assigned responsibility for an individual type of case. One such team, under the direction of Lt. Willa Glover, is responsible for investigating discrimination and sexual harassment cases. Sometimes referred to as the "Title VII team," it varies in size from five to ten investigators, each of whom maintains an active caseload of roughly three to five matters. Not long ago, many IAB investigators had caseloads that were three to five times larger, and which covered a wider array of substantive issues. Reducing average caseload size and encouraging substantive specialization appears to have had a noticeable effect on the quality of IAB investigations.

Like other internal inquiries in the LASD, investigations into allegations of sexual harassment typically follow the guidelines set forth in the Department's *Administrative Investigations Handbook*. First published in 1992, the *Handbook* presents a thorough blueprint for the investigative process—from the receipt of the initial allegation to the final resolution and imposition of discipline. The *Handbook* also contains an extensive collection of sample documents, including witness admonitions, notification letters and disposition worksheets. Nearly all the files we examined tracked the general procedures of the *Handbook*, and often borrowed extensively from its inventory of sample documents.

Among the most important documents in any IAB file is the disposition worksheet, which both sets forth the specific charges against each subject and provides a road map for the Department's case. Although the *Handbook* requires the Department's Advocacy Services unit to prepare disposition worksheets, we understand that they are often prepared by the IAB investigators themselves. Notably, the quality of the disposition worksheets we reviewed covered a much broader range than the files themselves—that is, while some of the worksheets were detailed and thorough, some were unacceptably poor.

As a general matter, investigation work requires a specific set of skills, which must be exercised and challenged on a regular basis. Chief among these are interviewing skills, and an ability to change the focus of an investigation in response to new developments.[12] A number of observers have suggested that IAB investigators have historically suffered from inadequate training. As a result, LASD investigators now typically receive 40 hours of general investigative training upon joining the IAB, and the members of Lt. Glover's special team receive additional training in discrimination- and harassment-related issues from the federal Equal Employment Opportunity Commission.

Finally, in reviewing the Settled Cases a year ago, we noticed a general reluctance to make credibility determinations among both unit commanders and IAB investigators. This compounded the difficulty of resolving a significant number of harassment allegations. As we observed at the time, a system *that effectively eliminates determinations of credibility in sexual harassment cases is out of touch with reality and with common practice. For instance, EEOC materials distributed by County Counsel to LASD personnel emphasize the critical role that credibility determinations play in sexual harassment cases.*

---

12 In the Eleventh Semiannual Report, we noted that a number of IAB investigations were marred by an apparent reluctance to expand the inquiry to include subjects and misconduct uncovered during the course of a pending investigation. We have not yet collected sufficient information to offer an opinion on whether the investigators in Lt. Glover's unit have been appropriately aggressive in expanding the focus of ongoing investigations to include additional subjects and charges. We intend to explore this topic more thoroughly in upcoming reports.

Of the 25 recent files we examined in detail, exactly five—or 20 percent—were left "unresolved." In four of the five cases, this result was caused by the IAB's unwillingness to determine which of two conflicting witnesses appeared more credible:

- In the first of these four cases, a female trainee claimed to have been repeatedly harassed and mistreated by a male deputy. The case investigator interviewed 19 witnesses on the record, and a charge for "performance to standards" was ultimately founded based on overwhelming evidence that the trainee was mistreated.[13] The trainee alleged that the mistreatment resulted from her earlier refusal to date the deputy, which the deputy allegedly proposed in several private conversations. Notwithstanding the overwhelming evidence of her mistreatment, however, the "sexual harassment" charge was left unresolved "because the allegation was on a one-on-one basis with an absence of witnesses and evidence to support either the subject or complainant."

- In the second case, a male former deputy alleged that a female LASD officer called his subsequent employer and made a series of false accusations against him in retaliation for his having filed a sexual harassment claim against her with the LASD. The retaliation charge was left unresolved "because the allegation was on a one-on-one basis with an absence of witnesses and evidence to support either the subject or complainant."

- The third case involved a female who alleged that a male deputy had touched her breasts repeatedly while the two of them rode in a crowded elevator. The deputy denied the charges, and no witnesses were able to corroborate the allegations. The case was left unresolved because it ultimately turned on a credibility determination between the female clerk and the male deputy.

- In the final case, a female phone operator alleged that a male volunteer had made a number of unwelcome sexual remarks to her, including a statement that he wanted to date her and visit her at her hotel. The volunteer denied the charges, and the case was left "unresolved" as there were no witnesses to corroborate either story.[14]

---

13  The deputy was ordered to undergo a two-day suspension for the founded "performance to standards" charge; however, this was reduced to a one-day suspension and ultimately waived in response to the deputy's grievance.

14  The investigation file for this case reveals that the operator made her allegations only after the Department denied her request to rescind her recent resignation from employment. She had resigned from the Department and she was unsuccessful in having her resignation rescinded so she could rejoin the Department.

Whether these cases should have been resolved by way of reasonable credibility determinations is a difficult question. In each of the four cases, however, the assigned investigator doggedly pursued a variety of leads before concluding that the case could not be resolved. Notably, several of the other matters we studied were resolved by weighing the credibility of two or more conflicting witnesses. In this area, too, we see evidence of significant progress.

## Discipline-Related Issues

Perhaps the most striking flaw to emerge from our review of the Settled Cases was the Department's general propensity toward lenient discipline in cases involving sexual harassment. Two principal components to this issue were identified. The first involves "undercharging," which refers to the practice of filing less serious formal charges than the facts of a particular case might allow. In a number of cases, for example, officers accused of behavior that might easily constitute sexual harassment were charged instead with "conduct toward others" or "performance to standards"—less serious offenses that carry lighter standard penalties than violations of the Department's "sexual harassment and retaliation" policy.[15] The second component arises involves the basic appellate rights available to employees determined to have engaged in misconduct. By relying on his right to appeal, a harasser can not only delay the ultimate imposition of discipline, but also exert pressure on the Department to reduce his recommended discipline in exchange for his agreement to forego further appeals.[16] As we noted at the time,

*[t]hese "settlements" not only result[ ] in lenient discipline, but also in tardy imposition of the discipline because of the passage of time between the initial complaint and the settlement of the matter. Ironically, the delay in itself increased the likelihood that the discipline would be made even more lenient. As time passes, the desire to exact an appropriate penalty wanes. In other instances, the Subject may have acted irreproachably in the interim, leading a seemingly compas-*

---

15   According to the Department's *Guidelines for Discipline*, the standard discipline imposed for violations of "conduct toward others" or "performance to standards" policies can range from a written reprimand to discharge, depending on the overall circumstances of the case. The standard discipline in sexual harassment cases, by contrast, ranges from a ten-day suspension to discharge, and cannot be reduced below a five-day suspension.

16   The various avenues by which subjects can argue for reduced discipline and appeal both the findings themselves and the discipline imposed as a result of those findings are detailed at pages 30-34 of the Eleventh Semiannual Report.

*sionate unit commander to conclude the Subject has learned his lesson and discipline is unnecessary. Whether or not such a determination is a just result in a given case, the failure to impose timely and appropriate discipline vitiates any effort to deter others, to make an example, or to show Complainants that sexual harassment will not go unpunished.*

Unfortunately, our latest review suggests that these same factors continue to affect the manner in which discipline typically is imposed. Specifically, a number of subjects found to have engaged in sexual harassment were able to negotiate more lenient discipline by threatening an appeal or grievance. Others managed at least to delay the process by which discipline was imposed. On the other hand, there appears to be some evidence that the once-common practice of undercharging is less prevalent today. On the whole, the Department has demonstrated an increasing willingness to mete out harsher discipline than it did just a few short years ago. As we noted above, 53 sexual harassment investigations were opened by the IAB from October 1, 1999 to September 30, 2000—42 of which were completed within that same one-year period. Approximately half these completed investigations (20 out of 42) resulted in founded charges against at least one LASD employee. Indeed, this pool of cases yielded a total of 30 individuals who were found to have engaged in some form of sexual harassment. Of course, circumstances of each subject's situation were different. As a result, the ERR initially recommended the discipline shown in Table 1 in those 30 cases.

A number of these recommendations for discipline, however, will be modified significantly before discipline is actually imposed. Of the 30 individuals at issue, nine have already succeeded in having their recommended discipline reduced,[17] and three others are awaiting decisions on recent grievances. Two additional employees still had the option of grieving their discipline as this article is written.[18] The following individuals are among those whose

17  In three of the eight cases, the "reduction" consisted of allowing the subject to resign in lieu of discharge. Whether this is a meaningful reduction is open to debate. Such trade-offs are certainly common in the private sector. Moreover, the Handbook expressly provides that a subject is free to resign "at any time during an investigation."

18  Each of these two employees received "letters of intent" from the Department in the closing days of October notifying them that they will be suspended for ten days, in one case, and removed from consideration for a bonus, in another. Employees have up to ten days following their receipt of such a letter of intent within which to file a formal grievance.

recommended discipline has been or may be reduced:

- A warehouse worker at the Men's Central Jail was determined to have repeatedly harassed a female co-worker and lied to his supervisor about the resulting investigation. He was allowed to resign in lieu of discharge.

- A female deputy who was found to have lifted up her shirt and exposed her chest to a male deputy in a stationhouse hallway is currently grieving her 30-day suspension.

| | |
|---|---|
| Discharge | 4 |
| Allowed to Retire | 2 |
| Demotion | 1 |
| Suspension, 30 days | 2 |
| Suspension, 15 days | 4 |
| Suspension, 10 days | 1 |
| Suspension, 5 days | 2 |
| Suspension, 3 days | 1 |
| Suspension, 2 days | 1 |
| Suspension, 1 day | 1 |
| Removal from Bonus | 1 |
| Written Reprimand | 10 |
| **Persons to be Disciplined** | **30** |

- A female deputy who was found to have made false statements in connection with a sexual harassment investigation grieved her 15-day suspension, which was ultimately changed to a written reprimand.

- A male civilian employee was allowed to resign in lieu of discharge following a determination that he had repeatedly harassed and touched a female employee in the Department's gym.

- A mid-level manager who engaged in unwanted sexual banter with a number of Department employees was able to have a 30-day suspension put on hold by filing a grievance.

- A male sergeant who was determined to have touched and otherwise harassed a number of female employees was suspended for 25 days in lieu of demotion after grieving the initial discipline that was imposed.

To date, only 16 of the 30 subjects at issue were actually disciplined to the degree the ERR initially recommended—nine of whom received nothing more than written reprimands from the ERR to begin with. See Table 2. As this data demonstrates, the problem of bargaining-down discipline that we identified a year ago continues to exist.[19]

On the other hand, we also note that the Department has lately meted out significant discipline to individuals found to have violated one or more of the Department's sexual

---

19  We should emphasized that the handful of cases currently in the "grievance pipeline" may yet result in the imposition of significant discipline for the subjects at issue.

harassment policies.  Consider the following examples:

| | |
|---|---|
| Discharge | 1 |
| Allowed to Retire | 2 |
| Suspension, 15 days | 1 |
| Suspension, 3 days | 1 |
| Suspension, 2 days | 1 |
| Suspension, 1 day | 1 |
| Written Reprimand | 9 |
| **Original Discipline Imposed** | 16 |

- A male custody assistant was forced to resign after he inappropriately grabbed a female colleague in a chokehold and made a number of sexually suggestive comments.

- A male deputy was suspended for 25 days after making a series of sexually suggestive comments to a female court clerk.

- A male sergeant was demoted after he called a female employee a "bitch" and repeatedly initiated discussions with her about women's breasts.

- A male lieutenant was suspended for 15 days for kissing a female colleague at a reception following an off-duty training conference.

- A male deputy was suspended for five days for telling sexually related stories to a female communications trainee and touching her leg while riding in a patrol car.

Of course, whether the discipline imposed in any of these cases is appropriate requires a thorough review the facts and circumstances of each case.  But news of these and other disciplinary action is likely to have received significant attention among Department employees.  Hopefully, this sends a serious message to potential victims and would-be perpetrators alike.


*Conclusion*

In sum, our review of a sample of recently completed sexual harassment investigation files suggests that the LASD is making continued progress in its attempts to eradicate sexual harassment from within its ranks.  In particular, there have been noticeable improvements in the timeliness of the Department's investigations.  The creation of a special team to investigate allegations of discrimination and harassment has led increasing thorough and professional investigations.  Although a number of subjects were able to negotiate significantly reduced punishments after having been found responsible for sexual harassment, a number of

71

perpetrators received harsher discipline, which helps to communicate the general message that sexual harassment will no longer be tolerated within the Department.

Of course, there is room for improvement. Certainly, there is a need for continuing education, and to the extent that some employees feel they are "above the law," they must be dissuaded of this view.

Tables Three and Four display the current breakdown of the LASD by gender and ethnicity.

We look forward to re-examining the Department's record of progress in this area in future reports.

**3** Los Angeles County Sheriff's Department Breakdown of Sworn Personnel by Division, Sex, and Ethnicity as of September 30, 2000

| Division | Total | Male | | Female | | Caucasian | | African-American | | Latino | | Native American | | Asian | | Filipino | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive | 99 | 79 | 79.8% | 20 | 20.2% | 59 | 59.6% | 6 | 6.1% | 24 | 24.2% | 0 | 0.0% | 9 | 9.1% | 1 | 1.0% | 0 | 0.0% |
| Office of Admin Services | 5 | 4 | 80.0% | 1 | 20.0% | 3 | 60.0% | 1 | 20.0% | 1 | 20.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Court Services | 1504 | 1196 | 79.5% | 308 | 20.5% | 746 | 49.6% | 291 | 19.3% | 396 | 26.3% | 3 | 0.2% | 54 | 3.6% | 13 | 0.9% | 1 | 1.0% |
| Custody | 2036 | 1688 | 82.9% | 348 | 17.1% | 1050 | 51.6% | 166 | 8.2% | 698 | 34.3% | 2 | 0.1% | 93 | 4.6% | 27 | 1.3% | 0 | 0.0% |
| Correctional Services | 278 | 223 | 80.2% | 55 | 19.8% | 119 | 42.8% | 26 | 9.4% | 117 | 42.1% | 1 | 0.4% | 12 | 4.3% | 3 | 1.1% | 0 | 0.0% |
| Detective | 560 | 470 | 83.9% | 90 | 16.1% | 376 | 67.1% | 39 | 7.0% | 136 | 24.3% | 0 | 0.0% | 9 | 1.6% | 0 | 0.0% | 0 | 0.0% |
| Personnel & Training | 442 | 334 | 75.6% | 108 | 24.4% | 249 | 56.3% | 54 | 12.2% | 116 | 26.2% | 0 | 0.0% | 21 | 4.8% | 2 | 0.5% | 0 | 0.0% |
| Technical Services | 88 | 78 | 88.5% | 10 | 11.4% | 71 | 80.7% | 3 | 3.4% | 11 | 12.5% | 0 | 0.0% | 3 | 3.4% | 0 | 0.0% | 0 | 0.0% |
| Field Ops Reg I | 1219 | 1121 | 92.0% | 98 | 8.0% | 881 | 72.3% | 39 | 3.2% | 264 | 21.7% | 2 | 0.2% | 23 | 1.9% | 10 | 0.8% | 0 | 0.0% |
| Field Ops Reg II | 1421 | 1278 | 89.9% | 143 | 10.1% | 751 | 52.9% | 242 | 17.0% | 355 | 25.0% | 3 | 0.2% | 56 | 3.9% | 14 | 1.0% | 0 | 0.0% |
| Field Ops Reg III | 1174 | 1059 | 90.2% | 115 | 9.8% | 819 | 69.8% | 45 | 3.8% | 265 | 22.6% | 3 | 0.3% | 32 | 2.7% | 10 | 0.9% | 0 | 0.0% |
| Total | 8826 | 7530 | | 1296 | | 5124 | | 912 | | 2383 | | 14 | | 312 | | 80 | | 1 | |

**4**

## Los Angeles County Sheriff's Department Breakdown of Sworn Personnel by Sex, Rank, and Ethnicity as of December 30, 2000

| Class | Total | Male | | Female | |
|---|---|---|---|---|---|
| Sheriff, U/C | 1 | 1 | 100.0% | | |
| Undersheriff, U/C | 1 | 1 | 100.0% | | |
| Assistant Sheriff, U/C | 2 | 2 | 100.0% | | |
| Div. Chief, Sheriff, U/C | 8 | 7 | 87.5% | 1 | 12.5% |
| Commander | 24 | 22 | 91.7% | 2 | 8.3% |
| Captain | 63 | 56 | 88.3% | 7 | 11.1% |
| Lieutenant | 311 | 276 | 88.7% | 35 | 11.3% |
| Sergeant | 976 | 839 | 86.0% | 137 | 14.0% |
| Deputy Sheriff IV | 23 | 23 | 100.0% | 0 | |
| Deputy Sheriff | 7209 | 6140 | 85.2% | 1069 | 14.8% |
| Dep. Sheriff Trainee | 208 | 163 | 78.4% | 45 | 21.6% |
| Totals: | 8826 | 7530 | | 1296 | |

| Class | Caucasian | | | African-American | | | Latino | | |
|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | % | Male | Female | % | Male | Female | % |
| Sheriff, U/C | 0 | 0 | 0% | 0 | 0 | 0.0% | 1 | 0 | 100.0% |
| Undersheriff, U/C | 1 | 0 | 100.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Assistant Sheriff, U/C | 2 | 0 | 100.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Div. Chief, Sheriff, U/C | 5 | 1 | 87.5% | 1 | 0 | 12.5% | 0 | 0 | 25.0% |
| Commander | 14 | 2 | 66.7% | 1 | 0 | 4.2% | 6 | 0 | 11.1% |
| Captain | 38 | 6 | 69.8% | 7 | 1 | 12.7% | 7 | 0 | 10.0% |
| Lieutenant | 225 | 24 | 80.1% | 17 | 7 | 7.7% | 27 | 4 | 15.3% |
| Sergeant | 627 | 92 | 73.7% | 60 | 23 | 8.5% | 129 | 20 | 17.4% |
| Deputy Sheriff IV | 15 | 0 | 65.2% | 4 | 0 | 17.4% | 4 | 0 | 29.1% |
| Deputy Sheriff | 3520 | 457 | 55.2% | 558 | 212 | 10.7% | 1731 | 357 | 41.8% |
| Dep. Sheriff Trainee | 60 | 14 | 45.2% | 12 | 9 | 10.1% | 66 | 21 | |
| Totals: | 4578 | 596 | | 660 | 252 | | 1971 | 412 | |

| Class | Native American | | | Asian | | | Filipino | | |
|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | % | Male | Female | % | Male | Female | % |
| Sheriff, U/C | 0 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Undersheriff, U/C | 0 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Assistant Sheriff, U/C | 0 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Div. Chief, Sheriff, U/C | 0 | 0 | 0.0% | 0 | 0 | 0.0% | 0 | 0 | 0.0% |
| Commander | 0 | 0 | 0.0% | 1 | 0 | 4.2% | 0 | 0 | 0.0% |
| Captain | 0 | 0 | 0.0% | 6 | 0 | 6.3% | 1 | 0 | 3.0% |
| Lieutenant | 1 | 0 | 1.0% | 6 | 0 | 1.9% | 1 | 0 | 1.0% |
| Sergeant | 0 | 0 | 0.0% | 21 | 2 | 2.4% | 0 | 0 | 0.0% |
| Deputy Sheriff IV | 0 | 0 | 0.0% | 0 | 0 | 0.0% | | | |
| Deputy Sheriff | 12 | 1 | 2.0% | 250 | 24 | 3.8% | 68 | 8 | 1.1% |
| Dep. Sheriff Trainee | 0 | 0 | 0.0% | 3 | 1 | 1.9% | 2 | 0 | 1.0% |
| Totals: | 13 | 1 | | 285 | 27 | | 72 | 8 | |

| Class | Other | | |
|---|---|---|---|
| | Male | Female | % |
| Sheriff, U/C | 0 | 0 | 0.0% |
| Undersheriff, U/C | 0 | 0 | 0.0% |
| Assistant Sheriff, U/C | 0 | 0 | 0.0% |
| Div. Chief, Sheriff, U/C | 0 | 0 | 0.0% |
| Commander | 0 | 0 | 0.0% |
| Captain | 0 | 0 | 0.0% |
| Lieutenant | 0 | 0 | 0.0% |
| Sergeant | 0 | 0 | 0.0% |
| Deputy Sheriff IV | 0 | 0 | 0.0% |
| Deputy Sheriff | 1 | 0 | 0.1% |
| Dep. Sheriff Trainee | 0 | 0 | 0.0% |
| Totals: | 1 | 0 | |

# 5. Racial Profiling

On a national scale, the disparate impact of our criminal justice system on racial and ethnic minorities raises difficult societal questions about the cumulative effect of the way law enforcement, prosecutors, courts, and juries go about their jobs.[1] Those differences show up also in Los Angeles County.[2] One of our most important duties as Special Counsel to the Board of Supervisors is to consider whether the practices of the LASD pose a risk of potential liability.

Equally important duties are to recommend measures that will help quantify the scope of that risk and ultimately reduce or eliminate it. In recent years, old disparities in the impact of our criminal justice system have garnered fresh attention, and some of these practices present liability risk. The issue in the context of law enforcement activity is usually called "racial profiling." It focuses on whether traffic and pedestrian stops, and the searches of cars or individuals which follow, are discriminatory in their impact.

It would be foolish and unwarranted to leap from the mere fact that we are discussing this issue to a conclusion that we have found evidence or even believe, in the abstract, that LASD officers routinely engage in racial profiling. As we wish to stress throughout this Chapter, the question whether there is a disparate racial or ethnic impact in traffic and pedestrian stops by the LASD is entirely an open one. Moreover, the meaning and import of any such patterns, even

---

[1] Whatever their cause, racial disparities are stark throughout the criminal justice system. A recent Justice Department study showed that 70 percent of the defendants facing the death penalty are black or Latino. As of the end of 1998, approximately 43 percent of all persons on Death Row in the United States were African-American men. *Capital Punishment 1998*, United States Department of Justice, Bureau of Justice Statistics (December 1999) (revised January 6, 2000) NCJ 179012. Black males comprise 49 percent of persons in prison. *Correctional Populations in the United States 1997*, United States Department of Justice, Bureau of Justice Statistics (November 2000). Black males comprise 42 percent of persons in local jails Id. Nine percent of all black adults over the age of 18 are in prison, jail, probation or parole, as contrasted to two percent of all white adults. Id. At current levels of incarceration, newborn black males in this country have greater than a 1 in 4 chance of going to prison during their lifetimes, while Latinos have a 1 in 6 chance, and white males a 1 in 23 chance of serving prison time. *Lifetime Likelihood of Going to State or Federal Prison*, United States Department of Justice, Bureau of Justice Statistics (March 1997) NCJ160092.

[2] For example, the California Attorney General reports that blacks comprised 24 percent of adult and juvenile arrests reported in 1999 for Los Angeles County. *Criminal Justice Statistical Center, California Criminal Justice Project,* Attorney General of the State of California (1999). Yet blacks constitute only 10 percent of the population of the County. *County of Los Angeles Statistical Data,* www.co.la.ca.us/statistics/htm. A recent snapshot of the demographics of the 19,899 inmates in the Los Angeles County Jail system also makes the point. The percentage of inmates who are black stood at 35.5 percent. Black men represented nearly 30 percent; black females. 5.6 percent. Latinos were 45 percent, and whites were 16 percent. *LASD Racial Demographics for All Custody Division,* October 31, 2000.

if found, would merit further greater study and reflection. There can be valid reasons accounting for the disparities that do not derive from race-based discrimination, much less racial animus. But given the increasing litigation and potential exposure that has arisen regarding racial profiling issues, it would likewise be foolish for the County to wait until it is sued to probe whether these patterns exist and need to be addressed.[3]

As we demonstrate below, it is very much to the credit of the Sheriff's Department that Lee Baca has taken the first steps to do so. It is even more impressive that the LASD did it voluntarily; not in response to litigation or the threat of litigation. But it is also the case, as we argue below, that the LASD's would be in even better shape if it collected somewhat more data. In that regard, we advocate that the LASD consider and adopt measures that the San Diego and Sacramento Police Departments have already put into effect voluntarily and, interestingly, that the LAPD will initiate pursuant to the recent consent decree entered into with the Department of Justice. To do so will bring the LASD to its usual position at the forefront of law enforcement in California, in company on this issue with police departments in San Francisco, San Diego, Sacramento, and San Jose, as well as the CHP. It will also put the LASD in line with seven states that now require all their law enforcement agencies to collect similar data. In order to put the LASD's voluntary data collection efforts in context, it is useful to discuss racial profiling in greater detail.

The term "racial profiling" has been used loosely, and it lacks a universally accepted definition. The core notion focuses on the untoward, undesirable, and illegal consequences when police officers use race or ethnicity as a deciding factor in focusing suspicion. But to be precise, not everything that implicates the race of a suspect is racial profiling. It is not racial profiling to focus suspicion on an individual who has been described to the police as having committed a crime when an element of that description is the racial or ethnic identity of the individual. Nor is it racial profiling when the conduct of a black or Latino individual being

---

3    Litigation over racial profiling is proliferating. See, e.g., *United States v. State of New Jersey, et al.*, Civil 99-5970 (MLC), (D.N.J. 1999); *Wilkins v. Maryland State Police*, MJG 93- 468 (D.Md. 1993).

observed by the police gives rise to a legally sufficient basis for a stop or detention without regard to the individual's race or ethnicity. Yet on the other hand, it is racial profiling when mere stereotypes (i.e., a black man driving a BMW is a mismatch and thus grounds for the police to check it out), loose generalizations (a black man does not belong in this predominately white neighborhood and should be checked out), or even when known statistical correlations are used as a basis of focusing suspicion on a given individual (more black than white teenagers are arrested for street drug crimes therefore that specific black teenager in this high drug crime area should be checked out).

More generally, enforcement of certain laws may, in the aggregate, produce a disparate impact: Across a relevant mixed population, the proportion of blacks or Latinos stopped by law enforcement, or ticketed, or arrested, or frisked, or searched, may turn out to be higher than it is reasonable to expect, and, even more tellingly, there may be a dearth of convincing reasons, apart from the person's race or ethnicity, that adequately can explain or account for the stops. That kind of law enforcement activity produces a high level of "false positives" that falls more heavily on racial and ethnic minorities. The greater the level of generality employed to isolate particular individuals, the greater the number of persons who will be targeted repeatedly (the same black guy stopped again and again on his way home from work late at night) or erroneously (the correlation between having a busted tail light and having illegal drugs in the car is so weak that many innocent people will be stopped).

Dragnets are crude devices; they entangle porpoises even as they troll for tuna. The farther one moves toward generalities—let's pick up anything that swims in the hopes of catching tuna—the greater the chances that the net will ensnare many other species of fish and marine life. Whereas any police decision to detain an individual who is not visibly engaged in a crime may stir feelings of indignity and resentment, it is even more corrosive (and potentially explosive) when by virtue of wide sweeps the persons stopped believe it is because of their race or ethnicity alone, or because their race or ethnicity is too closely intertwined with an overbroad, over-generalized search: hence, the shorthand term "driving while black or brown."

77

Pretext stops add to the complexity of the question. In the traffic context, it is virtually impossible to drive any length of time without committing a vehicle code violation of some kind. Thus, the police have a high degree of choice about whom to pull over. It does not violate the Fourth Amendment when a police officer uses the "pretext" of a traffic or vehicle code violation to stop a motorist as long as probable cause exists to believe those laws have been violated, regardless of the subjective intent of the police officer in making the stop. *Whren v. United States*, 517 U.S. 806 (1996). We would venture, however, that the correlation between many "pretexts" and the underlying suspicion motivating the stop is often weak; a drug interdiction program using busted tail lights and minor traffic violations as "pretexts" for a stop will likely yield too few drug violators to justify the proliferation of stops and the inconvenience engendered. It is especially problematical when the "pretext" is so widely shared in the relevant population—there are so many illegal lane changes or rolling stops—that the police officer can pick and choose whom to stop, based on race or ethnicity or any other factor, legal or illicit, with relative impunity.

That does not, of course, mean that there must always be a one-to-one correlation between persons stopped by the police and persons found to have committed a crime. Nor does it mean that every time there is legal justification for a frisk or a pat-down, a weapon or contraband must be found. Neither does it mean that a sobriety check point—where scores of people, all of whom happen to be passing by the checkpoint, are stopped and inconvenienced without individualized suspicion—is necessarily unlawful or wrong even if the "hit rate" of persons found inebriated is low. Perhaps such stops can be rationalized on the grounds that drunk drivers pose an immediate, palpable, high risk of injury to other drivers.[4] The elimination of that risk is the immediate and predominant goal of the police; it is not that the checkpoint is being used pretextually to stop persons who may have committed other crimes or for purposes other than catching drunk drivers. Tacit consent to the checkpoint by those stopped, therefore,

---

4   The Supreme Court recently reiterated this rationale in *City of Indianapolis v. Edmond*, ___ U.S. ___ (2000), 2000 Daily Journal D.A.R. p. 12567.

might be easier to obtain or assume: We drivers agree you may stop us briefly for our own personal safety in order to take drunk drivers off the very road we are travelling because we know and understand that the stop won't be used as a ploy to conduct a fishing expedition for possible criminal activity and that we will be on our way as soon as you see we're not drunk.

A harder case, however, is where the motivation for a dragnet-like approach is crime suppression rather than an attempt to solve a specific, given crime or to eliminate an immediate threat to safety like the drunk driver. Assume that a given neighborhood, predominantly black, is experiencing an uptick in gun-related crime, with a predominance of black victims and black perpetrators. The police perceive that the area has become saturated with guns. They decide, therefore, to deploy massively to the area, to stop and search lots of cars, and to stop and frisk lots of individuals, with the goal of seizing as many guns as possible and making as many arrests for illegal possession of concealed weapons as possible. And if other contraband—drugs, for example—is found, arrests will also be made. Additionally, the police embark on a program of rigid enforcement of a wide variety of laws relating to otherwise petty or relatively trivial offenses that are often overlooked or not worth the effort to process— breaking a window, drinking beer from an open container on the corner, jumping turnstiles on the Metro. People detained for these offenses are then searched for contraband or weapons and arrested for those more serious offenses if the search produces a "hit." At the station house, they are then later questioned about criminals or other, more serious criminal activity of which they may be aware.

The net of all this police activity it is that in this predominantly black neighborhood, blacks—particularly young black males—are "tossed" and arrested in substantial numbers, and without the police having necessarily run afoul of the Fourth Amendment. Thus, even if each individual arrest seems to be properly grounded in probable cause and each stop grounded in articulable, reasonable, individualized suspicion—however pretextual or flimsy—it nonetheless happens that black male pedestrians and drivers are rousted repeatedly and unceremoniously and perceive themselves singled out by race. The number of "false positives" not only creates

widespread inconvenience, it appears to validate a suspicion that people are being stopped because they are black. Unlike the example of the sobriety checkpoint, there is not tacit consent on the part of those stopped.  At the same time, however, the massive police presence, and the increased likelihood of being caught with a gun and arrested, as well as the number of guns seized, all taken together, produce the intended effect—gun-related crime plummets.  In this example, the minor offenses and the pretextual traffic and pedestrian stops are essentially surrogates for better, more particularized suspicion.  The correlations may be weak, and thus the overbreadth significant, but in the end the crime suppression goal is achieved.

Whether the residents of the neighborhood in question accept the crime suppression program is another question, and one that is hard to gauge.  But it is clear that tolerance and forgiveness for serious police error, even if the result of negligence or recklessness rather than intentional misconduct, will predictably be low, as perhaps exemplified by the Diallo and Dorismond shootings in New York.  Whatever goodwill the police may have banked will disappear, and generalized discontent and anger flowing from knowledge that the criminal justice system as a whole impinges disparately on blacks will be focused with laser-like heat and intensity on the specific controversial shooting.  Even so, these may not be the hardest cases of all.

In the absence of a search for a particular criminal, or a targeted crime suppression effort, it becomes an even more difficult and complex a societal problem when the cumulative results and *compounded* consequences of uncoordinated, discrete, individual decisions by police officers about whom to stop and whom to search, over time, fall more heavily on racial and ethnic minorities.  Thus, even if almost all police officers were to make decisions about whom to stop without intentionally or even consciously acting in a discriminatory fashion, it is still possible that the few who do use race improperly, combined with the prevalence of stereotyping and generalization that is simply "in the air," whether in society in general or around the police in particular, over time, will produce disparate results.  So too when the targets of law enforcement are disproportionately those who are poor and where there is a significant overlap

in poverty and being black or Latino. Individual snowflakes falling slightly off vertical due to a barely perceptible breeze are trivial in isolation, but over time produce high drifts on one side of the road. Studies are beginning to validate that such a cumulative effect is taking place. What to do about it is another question.

For example, the Attorney General of the state of New York determined after a review of some 175,000 stops by the police in New York City that blacks were stopped six times more often than whites. *The New York City Police Department's "Stop & Frisk" Practices ("NYPD Stop and Frisk Practices")*, Office of New York State Attorney General Eliot Spitzer, Civil Rights Bureau (December 1, 1999), pp. 88 *et seq.* The report can be found on the Internet at http://www.oag.state.ny.us/press/reports/stop_frisk/stop_frisk.html. Whereas blacks constituted one-fourth of New York City's residents, blacks constituted half of the individuals stopped. *Id.*

Not all stops led to an arrest, however. The Attorney General then sought to discover if similar racial disparities existed when one examined just the stops that had resulted in arrests. They did: There were more "false positives" among blacks than among whites. The NYPD stopped 9.5 blacks to generate one arrest of a black person whereas it stopped only 7.9 whites to generate one arrest of a white person. *Id.* at 111.

It can be argued that looking solely to the differing proportions of the population that are stopped or arrested is overly simplistic: It might be the case that crimes are committed by blacks and Latinos in greater numbers than their proportion of the overall population, or it might be that the precinct in question is so heavily black or Latino that general population statistics, based upon the city as a whole, are essentially meaningless. In order to refine the analysis and take these arguments into account, the New York Attorney General tested whether the differing racial make-up of precincts, or the differing crime rates in precincts, explained the disparate rates at which minorities and whites were stopped. Yet even after accounting for the effect of the differing crime rates, it nonetheless was the case that blacks were stopped 23 percent more often than whites and Latinos were stopped 39 percent more often than whites across all crime categories. *Id.* at x. The results were similar after accounting for different

81

population mixes in different precincts. Indeed, blacks and Latinos were "significantly more likely than whites to be 'stopped' after controlling for race-specific precinct crime rates and precinct population composition by race." *Id.* at 121.[5]

New York's experience generally comports with a very recent study by the San Diego Police Department which, on September 21, 2000 issued its *Vehicle Stop Study Mid-Year Report ("SDPD Stop Study")*. The study can be found on the Internet at http://www.sannet.gov/police/general-info/pdfs/stoprpt.pdf. San Diego started collecting data on traffic stops in January 2000. Officers fill out a paper form collecting the data set forth in footnote six below.[6] The form is a 4x6-inch card that is filled out in the field. "Completing the form for each stop takes less than 20 seconds." *SDPD Stop Study*, Preface, p. 5. During the first six months of data collection, the SDPD documented 91,522 stops. San Diego found that "both Hispanic and African American drivers [were] over-represented in vehicle stops in comparison to the characteristics of San Diego's driving-age resident population." *Id.*, Executive Summary, p. 8.

---

5   Studies in New Jersey of stops on the New Jersey Turnpike reached similar results: 13.5 percent of the individuals using the New Jersey Turnpike were African-American, and African-Americans comprised 15 percent of the drivers who sped on that Turnpike. Blacks, however, constituted 35 percent of the drivers stopped on the Turnpike and 73.2 percent of those arrested. Report of Dr. John Lamberth, Plaintiff's Expert, *Revised Statistical Analysis of the Incidence of Police Stops and Arrests of Black Drivers/Travelers on the New Jersey Turnpike Between Exits or Interchanges 1 and 3 from the Years 1988 Through 1991*, filed in connection with *State v. Pedro Soto*, 734 A.2d 350 (N.J. Super. Ct. Law. Div. 1996).

6   The San Diego PD collects for every vehicle stop:
   Date and time of the stop;
   Division where the stop occurred;
   Primary reason for the stop (moving violation; equipment violation; radio
   call/ citizen contact; officer observation/knowledge; supplemental information on the suspect, etc.);
   Driver's sex and age;
   Driver's race;
   Action taken (citation, written warning, verbal warning, field interrogation, other);
   Whether the driver was arrested;
   Whether the driver was searched, and if so:
   • Type of search (vehicle, driver, passengers);
   • Basis for search (visible contraband, contraband odor, canine alert, consent search; 4th Amendment waiver; search incident to arrest, inventory search prior to impound, observed evidence related to criminal activity, other);
   • Whether a Consent Search Form was obtained;
   • Whether contraband was found;
   • Whether property was seized.

82

More interesting was the observation that "the vehicle stop data also indicate that, once stopped, Hispanic and African American drivers are substantially more likely to experience searches and arrests than Asian or White drivers." *Id.*[7]  Less than two percent of vehicle stops resulted in arrests.  About six percent resulted in searches.  Vehicles were most often searched, followed by drivers and then passengers.  Less than ten percent of the searches resulted in seizures of contraband or property. *Id.*, Preliminary Observations, paragraph 4, p. 11.

Importantly, the San Diego report stressed its preliminary nature and emphasized that it did not purport to explain why the disparities occurred.  "Numerous hypotheses could be offered, ranging from intentional police discrimination to unintentional stereotyping to the unintended consequences of police deployment practices to actual differences in gang involvement by race/ethnicity, and so on." *Id.*, at p. 8.  Rather than speculating about why, the authors of the report urged further analysis to get at the real answers. *Id.*

Because the implication of these studies is difficult to assess and, if looked at only cursorily, potentially inflammatory, it is not surprising that leaders in law enforcement diverge in their views concerning the wisdom of compiling statistics from which similar studies can be made.[8]  Despite the risk that the answers might be uncomfortable, many cities in California have decided to collect such data: as noted earlier, San Diego, San Jose, Sacramento, and San Francisco, to name four of the five four largest cities in the state, along with the California Highway Patrol with its more than 6500 plus sworn employees.

---

7  If stopped, Latinos had a 10.6 percent chance of being searched; blacks a 10.2 percent chance; Asians and Pacific Islanders, a 3.4 percent chance, and whites, a 3.0 percent chance.  If inventory searches of impounded vehicles were not counted, blacks had a 5.8 percent chance of being searched; Latinos, 2.8 percent; Asians/Pacific Islanders, 2.0 percent; whites, 1.5 percent.  If stopped, blacks had a 3.0 percent chance of being arrested; Latinos, 2.7 percent; whites, 1.3 percent; Asian/Pacific Islander, 0.9 percent. *Id.*

8  Respected academics, including Professor Sam Walker of the University of Nebraska at Omaha, have also raised questions about how to interpret the data once collected and what is the appropriate benchmark to do so. Walker, Samuel (2000)(draft). "*Searching for the Denominator: Problems with Police Traffic Stop Data and an Early Warning System Solution.*" The challenge is to identify the right base against which to measure the disparate impact of traffic stops on minorities.  Whereas it is relatively easy to do so on a controlled access Interstate highway, it is tougher— although doable— in a large metropolitan area.  The US Department of Justice is in the forefront in attempts to do so.

The Los Angeles County Sheriff's Department, until recently, also did not keeping track. But that has now changed. On May 1, 2000, Assistant Sheriff Waldie and the Chiefs of the LASD's three field operations regions promulgated Field Operations Directive 00-04 which requires the Department to record and track all significant public contacts and activity. For purposes of the Directive, those contacts and activities are defined as:

- calls for service;

- self-initiated activity that results in arrest or citation;

- self-initiated activity which is enforcement/investigative in nature, but does not result in arrest or citation; and

- self-initiated activity, which is not enforcement/investigative in nature, but

- results in Department personnel taking some form of constructive action, i.e., requesting a tow struck for a stranded motorist.

For purposes of the Directive, each such incident must be logged and shall include "the name, sex, race, age/D.O.B. of the involved person, reason for the contact and a brief description of the action taken by deputies." New codes have been developed for traffic stops and pedestrian stops respectively. Captains at the various patrol stations in the LASD are given responsibility for "developing and implementing training and review processes to ensure strict compliance"

with the Directive.

By taking the action it has, the Sheriff's Department joins other law enforcement agencies that have had the courage to face facts directly, and Sheriff Baca deserves praise for it. In particular, the Sheriff's actions are especially worthy of recognition because the LASD will collect data both on pedestrian stops as well as traffic stops. To be sure, the Directive has only been policy for a few months, and it is far too early to draw any conclusions from any resulting statistics or data to date. Because it is in its inception, however, we wanted to see how the program was working thus far and to offer any observations we had while practices and habits

84

are still being formed. We do so fully cognizant that the LASD is taking an important step. Our suggestions and observations, then, should not be interpreted negatively as they are not criticisms.

The Field Direcive as currently drafted is ambiguous in at least one crucial aspect: Do LASD deputies need to report searches, frisks and pat-downs, whether consensual or not, which they perform in the wake of a pedestrian or traffic stop? Does the factual and legal basis for any such search need to be noted? If a search was done, does the officer need to record what, if anything, was found? A commander with whom we spoke was confident that the Field Directive covered searches. But we then interviewed three patrol captains—one from each of the three field operations regions—and they told us that they did not interpret the Directive to require separate notation of searches and that their logs showed that searches did not appear to be reported.

As a matter of best practice, they should be, and thus we recommend that the LASD clarify existing policy and resolve the ambiguity that currently exists in favor of an explicit reporting requirement. By way of example, the Sacramento Police Department (SPD) has clear guide-lines in this regard. The SPD'S July 2000 General Order 210.08 requires recording of search data, including the legal and factual basis for the search and the results of the search.[9]

---

9   SPD employs a Scantron form which has 17 different variables for the officer to fill in. The form is set up so that it can be filled out quickly after each stop by darkening an appropriate box in each category. The 17 categories and related choices are:

- Time of stop, with choices for am or pm and the hour and minute of the stop;
- Date of stop, with choices for date, month, and year;
- Reason for stop; with choices for:
  - Hazardous violation of the Vehicle Code
  - Violation of the Penal Code
  - Violation of a city ordinance
  - Call for service
  - Preexisting knowledge or information
  - Equipment or registration violation
  - Special detail (i.e., DUI checkpoint; narcotic suppression detail)
  - Other
- Race and gender of the driver

*(continued next page)*

The Consent Decree recently negotiated between the United States Department of Justice and the City of Los Angeles will require the LAPD to complete written or electronic reports each time an officer conducts a motor vehicle stop or a pedestrian stop.[10] The NYPD has also recently begun using two-sided forms that "require officers to provide more detailed explanations for the decision to stop and search a citizen on the street." *New York Times*, Jan. 5, 2001.

We strongly recommend, therefore, that the Sheriff's Department collect the same detailed search information as the SPD, the San Diego PD, and the LAPD. We further recommend that the address of the person stopped, as well as the place where the stop took place, be recorded. The LASD's service area includes large swaths of unincorporated territory in Los Angeles County and more than 40 contract cities. Much of the LASD's patrol area abuts other urban aggregations, be it the City of Los Angeles, Beverly Hills, Glendale, or Pasadena. The LASD stops drivers who live in Los Angeles, tourists from other states, and other people who happen to find themselves in an LASD patrol area. Where someone lives becomes

9  *(continued)*
- Driver's date of birth
- Driver's license no. and state
- Yes or no to whether the driver was asked to exit the car
- The number of passengers
- Was a search done, with choices for the driver, passenger, or the vehicle or no.
- Search authority, with choices for consent, Terry cursory (reasonable grounds to believe that the person may be armed and dangerous), incident to arrest, parole/probation, or tow inventory.
- What was discovered or seized, with choices for weapons, drugs, cash, the vehicle, alcohol, other property, or nothing
- the result of the stop, with choices for citation, arrest, etc.
- the stop location, by precinct
- the vehicle license plate and state
- the duration of the stop in total minutes
- the officer's badge number and the badge number of a secondary officer, if applicable
- whether the radio car was equipped with a video camera or not.

10  Like the SPD form, the LAPD will be required to note whether :
- the driver was required to exit the vehicle;
- whether a pat-down or frisk was conducted;
- whether a consensual search was requested and whether permission was given or denied;
- the source of authority for any warrantless search;
- what was searched; and
- what was discovered, if anything.

important in calculating the pool of persons at risk of being stopped by the LASD. It is thus important, and bears upon the relevancy of data, to be precise in this regard.

In recommending such data collection, we are cognizant that there are both risks and rewards to doing so. If the data reveals patterns similar to those in New York or San Diego, the LASD leaves itself open to arguments that it is simply creating bad publicity for itself, for use by persons with a political or ideological axe to grind or seeking a shocking headline. The contrary view, which we submit is the better one, is that lack of knowledge is a dangerous thing, and that a willful lack of knowledge, an attitude of "lets not ask because we don't want to find out," is far more dangerous still.

For one, facts are only facts; what they mean is often in dispute. As noted earlier, it is foolish and far too simplistic to leap to conclusions of racial animus or bias, or illegality, just because differential patterns emerge on racial or ethnic grounds. Second, forewarned is fore-armed: If the LASD should discover that its officers are lax or less than precise in assessing probable cause or reasonable suspicion to stop or to search, better to know it and institute remedial training than face the risk of ongoing liability." Third, the tracking of the data—and the inclusion of its results in a law enforcement agency's early warning system, like the LASD's PPI—will allow the agency to spot patterns or identify particular officers whose conduct may require attention, counseling, or re-training before they become a public liability.

It continues to surprise us how often we hear repeated the thoroughly discredited argument has that collecting data is "only putting evidence in the plaintiff's hands." As lawyers, we can appreciate that the more facts one has to explain away, the harder the job is for defense counsel. In the short run, without the data, an individual case in question might even be dismissed or settle cheaper than it otherwise would, letting the lawyer appear to be a hero to the client.

11  The experience at the Century Station is noteworthy in this regard. As a result of a survey conducted by Lt. Jim Lopez, it was discovered that there were possible problems with seizures that were leading to an unusual number of successful suppression motions or declinations to prosecute. Armed with the data, Lt. Lopez was able to tighten procedures on searches and seizures, thereby improving the chances for successful prosecutions while at the same time lowering risk of liability for Fourth Amendment violations.

But as lawyers we also appreciate how ultimately specious such arguments are, and how in the long run the client is poorly served by the lawyer who advocates not collecting data. Clients who are ostriches with their head in the sand do not win lawsuits. More importantly, they lack the information to manage risk. In the business of law enforcement, people do the same things in the same ways in repetitive fashion day in and day out, year in and year out. New training and techniques may cause variations in how things are done, but the basic job— patrolling, responding to calls, making stops, questioning people, performing searches, making arrests, being on the lookout—do not change. Accordingly, law enforcement is a business that is paradoxically particularly vulnerable to loss and yet particularly easy to fix. It is vulnerable because if one officer is engaging in a risky pattern that may give rise to litigation, it's likely that many, many officers are doing the same thing. By the same token, if the risk can be analyzed and managed, the results can drop risk substantially. An example was the Century and Lennox stations' disproportionate number of officer-involved shootings. When our criticisms forced the LASD to analyze the problem, it turned out that there was a common pattern of partners splitting from each other and engaging in foot pursuits. When the LASD finally recognized the pattern and engaged in some retraining, the number of shootings dropped substantially, as noted elsewhere in this Report.

The same should occur if it should turn out to be the case that race and ethnicity are improperly entering into decisions about whom to stop or search. The way to avoid liability is not to be an ostrich. Rather, it is to look around and respond sensibly to problems that need to be addressed. Collecting data is the first step. We are pleased that Sheriff Baca has done so, and we hope the recommendations in this Chapter are adopted by the LASD in order to make the data even more useful and reliable.

Before leaving this subject, it is important to focus on the impact of data collection on the deputies who will be called upon to record the information. The necessity to collect the data cannot help but be perceived by deputies as an additional and unwelcome paperwork burden. Even if, as in San Diego, it takes no more than 20 seconds to complete a form, or,

88

as in Sacramento, the form is set up so that it can be rapidly filled out and fed into a scanner, there is no denying that the departments are asking officers to do something additional. There naturally will be grumbling about the added burden.

But it is more than just that. Deputies and line police officers also ask themselves what's in it for them? Is data collection simply another capitulation to appease the segment of the public that is angry and cop-hating to begin with? To create more opportunities to sue police officers? Will officers have to start defensively keeping track of whom they stop? If, by the end of the month, the percentage of blacks that they have stopped is more than the proportion of blacks to the overall population, should they start pulling over more whites to bring the percentage down? Or will they simply quit making stops? Will they simply "drive and waive?"

These arguments and fears have a familiar ring. We heard them immediately after the **Kolts Report** with respect to recording uses of force, making sure all citizens' complaints were written down and tracked, and initiating the PPI—the LASD's sophisticated early warning system. Although it was not borne out by arrest statistics, we constantly heard some deputies say, in a petulant tone, that if the consequences of doing their jobs was greater susceptibility to being sued, or disciplined by their superiors, or scrutinized from the outside, or subject to bogus complaints from citizens seeking revenge, then their response would be a reluctance to do their jobs. Better to be a mediocre cop who simply responds to the radio calls that cannot be avoided rather than an active enforcer of the law who engages in the rough and tumble and confronts the criminal element.

These arguments and attitudes did not seem to abate until the LASD's management let it be known that it would neither tolerate officers who failed to do their sworn duty nor unfair and baseless attempts by the public to smear the reputation of good officers. The ultimate answer to the question "what's in it for me?" when asked by a deputy sheriff being asked to record data on traffic and pedestrian stops should be: Everything. If you do your job well and professionally, and adhere strictly to legal and constitutional requirements, you will find that the Department will strongly back you when times get rough and similarly will reward you when

it is time to do so. The LASD leadership must both "talk and walk" this message. Some deputies are already too quick to see themselves as victims or to interpret events to match their freewheeling, corrosive cynicism about management. It is vitally important, in an area as inflammatory as data collection and race, that management stack the tinder carefully, lest unintended victims get scorched.

6 Litigation

After seven years of declining numbers of excessive force lawsuits, the trend reversed itself in fiscal year 1999-00, leading to an increase from 41 to 54 lawsuits filed and a jump from 70 to 93 in lawsuits pending. The number of all active lawsuits pending at the end of the fiscal year increased from 354 to 435, with the largest jump—from 247 to 341—in police malpractice suits. In all, the Department received 282 new lawsuits and 1028 new claims. See Table One.

Force-related judgments and settlements for fiscal year 1999-00 stood at about $4.6 million out of a total of $7.3 million paid for all LASD lawsuits and claims. Of this total, $4 million represented a settlement in the widely-publicized 1992 Donald Scott case which resulted in a shooting at a Ventura County ranch during the service of a narcotics search warrant. The controversial 1997 Golden shooting, from the Century Station, settled for $275,000. See Tables Two and Three.

As is our practice, we reviewed a significant sample of settlements. We did not note any usual new patterns or trends, although we continued to see recurrent themes. In custody cases, we again saw substantial payments for over-detention of inmates; failure to provide medical care and prescribed medication; and failure to protect inmates.

In the latter connection, there were two significant settlements last Spring—one for $60,000 and the other for $100,000—both arising from similar fact patterns within a similar time frame at Men's Central Jail (MCJ). In the first case, the plaintiff alleged that on June 15, 1997, a deputy called him a child molester in front of other inmates, causing him to be physically assaulted by other inmates. In the second case, an inmate's mother alleged that the LASD has failed to segregate her son who had been charged with sex offenses, and that on July 11, 1997, as a result, her son was beaten and strangled to death.

At least two cases with similar allegations are pending. One alleges a beating in October 1997 after deputies at MCJ assertedly informed inmates that the plaintiff was charged with child molestation. A second case, filed by a pro per plaintiff, alleges that

## LASD Litigation Activity, Fiscal Years 1992-2000

| | FY 92-93 | FY 93-94 | FY 94-95 | FY 95-96 | FY 96-97 | FY 97-98 | FY 98-99 | FY 99-00 |
|---|---|---|---|---|---|---|---|---|
| New Force Related Suits Served | 88 | 55 | 79 | 83 | 61 | 54 | 41 | 54 |
| Total Docket of Excessive Force Suits | 381 | 222 | 190 | 132 | 108 | 84 | 70 | 93 |
| Lawsuits Terminated | | | | | | | | |
| *Lawsuits Dismissed* | 79 | 90 | 60 | 42 | 39 | 27 | 20 | 24 |
| *Verdicts Won* | 22 | 9 | 10 | 6 | 3 | 6 | 1 | 1 |
| Verdicts Against LASD | 3 | 7 | 3 | 5 | 2 | 1 | 2 | 2 |
| Settlements | 70 | 81 | 103 | 82 | 41 | 45 | 32 | 13 |

## Lawsuits Terminated Fiscal Year 1999-2000

| | Dismissed | Settled | Verdicts Won | Verdicts Against | Totals |
|---|---|---|---|---|---|
| Police Malpractice | 83 | 55 | 9 | 1 | 148 |
| Medical Malpractice | 7 | 29 | 1 | 3 | 40 |
| Traffic | 17 | 5 | 0 | 1 | 22 |
| General Negligence | 4 | 1 | 0 | 1 | 6 |
| Personnel | 6 | 3 | 5 | 1 | 15 |
| Writs | 5 | 0 | 1 | 1 | 7 |
| Total | 122 | 93 | 16 | 7 | 238 |

## Activity Lawsuits by Category

| | 7/1/98 | 7/1/99 | 7/1/00 |
|---|---|---|---|
| Police Malpractice | 224 | 247 | 341 |
| Traffic | 47 | 43 | 37 |
| General Negligence | 7 | 8 | 3 |
| Personnel | 19 | 22 | 16 |
| Medical Malpractice | 22 | 28 | 25 |
| Writs | 8 | 6 | 13 |
| Total | 327 | 354 | 435 |

**2**

## Fiscal Year 1999-2000 Department Financial Summary

| | Department Funded | Contract City Funded | MTA Liability Funded | Totals |
|---|---|---|---|---|
| **Lawsuits** | | | | |
| Police Liability | $5,490,950.00 | $391,476.00 | $0.00 | $5,882,426.00 |
| *(Portion of Total for Alleged Excessive Force)* | $4,230,250.00 | $345,400.00 | $0.00 | $4,575,650.00 |
| Personnel Issues | $193,400.00 | $0.00 | $0.00 | $193,400.00 |
| Auto Liability | $390,585.00 | $51,492.00 | $0.00 | $442,077.00 |
| Medical Liability | $139,500.00 | $0.00 | $0.00 | $139,500.00 |
| General Liability | $1,282.00 | $0.00 | $0.00 | $1,282.00 |
| Writs | $0.00 | $0.00 | $0.00 | $0.00 |
| **Lawsuit Total** | **$6,215,717.00** | **$442,968.00** | **$0.00** | **$6,658,685.00** |
| | | | | |
| **Claims** | | | | |
| Police Liability | $704,206.00 | $17,738.00 | $237.00 | $722,181.00 |
| *(Portion of Total for Over Detentions)* | $120,725.00 | $0.00 | $0.00 | $120,725.00 |
| Personnel Issues | $0.00 | $0.00 | $0.00 | $0.00 |
| Auto Liability | $82,442.00 | $18,521.00 | $0.00 | $100,963.00 |
| Medical Liability | $0.00 | $0.00 | $0.00 | $139,500.00 |
| General Liability | $146.00 | $0.00 | $150.00 | $296.00 |
| **Claim Total** | **$786,794.00** | **$36,259.00** | **$387.00** | **$823,440.00** |
| | | | | |
| **Incurred Claims/ Lawsuits Liability Total** | $7,002,511.00 | $479,227.00 | $387.00 | $7,367,899.00 |
| | | | | |
| FY 1998/99 Total | $5,298,092.00 | $27,926,889.00 | | $33,224,981.00 |
| FY 1997/98 Total | $6,006,592.00 | $2,856,734.00 | | $8,863,326.00 |
| FY 1996/97 Total | $9,900,000.00 | $2,600,000.00 | | $12,500,000.00 |

**3**

## Force-Related Judgments and Settlements

| Fiscal Years | 1995-96 | 1996-97 | 1997-98 | 1998-99 | 1999-00 |
|---|---|---|---|---|---|
| | $17 million* | $3.72 million | $1.62 million | $27 million** | $4.6 million*** |

\*   Includes $7.5 million for Darren Thompson paid over three years.

\*\*   Includes approximately $20 million for 1989 *Talamavaio* case.

\*\*\*   Includes $4 million for *Scott* and $275,000 for *Anthony Goden*.

in November 1996, while at MCJ, deputies divulged that the plaintiff had been charged with child molestation. He further alleges that he was then assaulted by five inmates. We have no views on the merits of the two pending cases. We have some concern, however, at the similarity of the allegations in the four cases and that they all are alleged to have occurred within a relatively short time frame—between November 1996 and October 1997. Most striking is that the two settled cases allege incidents that were less than a month apart. We do not know whether the personnel involved in the four cases have been identified, whether they overlap, or whether they worked the same shifts or areas within MJC, and we are curious whether the LASD has explored these questions.

Another noteworthy case which settled for $100,000 involved a combination of an over-detention and a failure to provide medications that occurred in 1997. Due to a mistaken assignment of two booking numbers, an inmate was over-detained for 38 days during which he apparently requested but was not provided with his HIV medications. As we described at length in our **Tenth Semiannual Report**, the LASD has shown itself responsive to our concerns about provision of medication to persons living with AIDS and HIV, and we would not expect a repetition of the fact pattern described above, with a failure to provide necessary, life-sustaining medication to such persons. Over-detentions, however, still occur, although the numbers have dropped two fiscal years in a row, as shown in Table 4.

**4**

**Inmate Over Detentions**

| Fiscal Years | FY 95-96 | FY 96-97 | FY 97-98 | FY 98-99 | FY 99-00 |
|---|---|---|---|---|---|
| Over-detentions | 301 | 339 | 712 | 495 | 267 |