# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JUAN PORRAS, et al.,

           Plaintiffs,

      v.

COUNTY OF LOS ANGELES, et al.,

          Defendants.

No. CV 04-1229 RGK (RNBx)

ORDER RE:

DEFINITION OF CLASS

Priority    X
Send        X
Enter       X
Closed     ___
JS-5/JS-6   ___
JS-2/JS-3   ___
Scan Only   ___

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)

     On March 24, 2005, the Court certified a Rule 23(b)(2) according to the following definition:

     . . . the instant order hereby certifies a class consisting of present and future pretrial detainees and post-conviction inmates who have been or will deprived of constitutionally inadequate medical care while they are or will be in Defendants' custody in the Men's Central Jail and Twin Towers facilities.

<u>See</u> Order Denying, in part, and Granting, in part, Plaintiffs' Motion for Class Certification, March 24, 2005 at 31-32.

     It has come to the Court's attention that it has adopted an improper definition of Plaintiffs' class. "A class definition is inadequate if a court must make a determination of the merits of individual claims to determine whether a particular person is a member of the class." 5 James Wm. Moore, et al., Moore's Federal Practice § 23.21 (Matthew Bender 2005). The Court's class definition is inadequate because it rests on whether a detainee or

1

EXHIBIT 6

1  inmate has been "deprived of constitutionally inadequate medical

2  care," a determination that turns on the merits of an inmate's

3  particular claim.  Thus, the Court adopts the following definition

4  of Plaintiffs' class:

5         The instant order certifies a class consisting of present and
          future pretrial detainees and post-conviction inmates who have
6         sought or will seek medical care while they are or will be in
          Defendants' custody in the Men's Central Jail and Twin Towers
7         facilities.

8  Since the Court has not ordered that notice be provided to the

9  members of Plaintiff's class, see Fed. R. Civ. P. 23(c)(2)(A), this

10  slightly different definition should not affect further litigation.

11        This order does not alter the Court previous order certifying

12  Plaintiffs' class in any other respect.

13

14        IT IS SO ORDERED.

15        DATED: August 2ᐯ, 2005.

16                                      _____
17                                      R. GARY KLAUSNER
                                        United States District Judge
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

1  MAJOR A. LANGER, CA Bar No. 41440
2  MICHEL F. MILLS, CA Bar No. 193002
   PERONA, LANGER, BECK, LALLANDE & SERBIN
3  A Professional Corporation
   300 East San Antonio Drive
   Long Beach, California 90807-0948
4  (562) 426-6155 / Fax (562) 490-9823

5  Attorneys for Plaintiffs Juan Porras and
   Donald Grigsby Individually and on Behalf
6  of all Others Similarly Situated

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 JUAN PORRAS and DONALD GRIGSBY, ) CASE NO.  CV 04-01229-WJR
   Individually and on Behalf of   )              (RNBx)
12 All Others Similarly Situated,   )
                                    )
13                                  )
                                    )
14            Plaintiffs,           )
                                    ) DECLARATION OF JUAN PORRAS IN
15        v.                        ) SUPPORT OF PLAINTIFFS' MOTION
                                    ) FOR CLASS CERTIFICATION
16 COUNTY OF LOS ANGELES, LOS       )
   ANGELES COUNTY SHERIFF'S         )
17 DEPARTMENT, Inclusive,           )
                                    )
18            Defendants.           )
                                    )
19 ─────────────────────────────────)

20

21

22

23

24

25

26

27

28

                        -1-

**EXHIBIT 7**

## DECLARATION OF JUAN PORRAS

I, JUAN PORRAS declare as follows:

1.   My name is Juan Cruz Porras and, at all material times, I was a resident of the State of California, County of Los Angeles and defendants held me, at all material times, as a pre-trial detainee at their Men's Central Jail, Twin Towers, and LCMC, and they identified me by Booking No. 7782405.

2.   I suffer from "drop foot" in both legs, partial paralysis below the hips from a prior spinal cord injury, hepatitis B, renal failure, high blood pressure, persistent nose bleeds, and serious chronic back pain due to the spinal cord injury.  When I entered the jail in July 2003, I had as yet undiagnosed broken ribs and damage to my right knee and shoulder. My foot drop (partial paralysis) prevented me from walking without leg braces and a walker.  I also had a prescription from my doctor for a special "restricted" diet due to my health problems.  These are serious conditions for which I require medical treatment.

3.   Before arriving at the Men's Central Jail (MCJ) Los Angeles Police Officers took my walker and leg braces.  They ordered me to walk without my braces or walker, causing me to fall.  When I fell, I crashed against a toilet injuring my ribs, right knee and shoulder.  The rib injury caused and continues to cause me difficulty breathing.  When the LAPD transferred me into their custody, Defendants refused to treat my injuries.

4.  On or about July 30, 2003, deputies ordered other inmates to pick me up by my arms to get me on and off the

-2-

1  transfer bus to MCJ.  I could not walk because I no longer had
2  knee braces and a walker.  The County refused to provide a
3  handicapped bus, or a wheelchair.  Upon arrival at MCJ,
4  Defendants stood me up, required me to walk and refused me any
5  aid.  Because I could not stand, let alone walk without my braces
6  or walker, I fell to the concrete sidewalk.  The County's staff
7  eventually took me inside the jail on a stretcher.

8      5.  At MCJ between July 30 and October 1, 2003, my condition
9  worsened.  The pain in my legs increased and so did the numbness.
10 The skin on my legs turned ever darker.  I lost all feeling in my
11 toes and feet except a persistent sensation of cold and pain.  My
12 paralysis increased.  Where, before July 2003, I could walk with
13 braces and a walker, I could now barely move my legs.  I
14 experienced significant pain and difficulty breathing from my rib
15 injuries.  I spit-up and urinated blood.  I also experienced
16 persistent nose bleeds.  Doctors and staff at the jail denied me
17 pain medication and treatment for my injuries.  Doctors at Twin
18 Towers scheduled me to go to LCMC for treatment, but as of the
19 date of the filing of my Complaint staff refuse to take me.  The
20 doctors at Twin Towers ordered me a wheelchair.

21     6.  A doctor named Zolnoni actively barred my treatment.
22 She examined me, including my legs, and dismissed my conditions
23 saying: "You're old and have a lot of problems.  You'll just have
24 to wait until you get out [of jail] for treatment."  I continued
25 seeking treatment, and Dr. Zolnoni ordered that I be refused
26 access to Doctor's Line.

27     7.  In August 2003 I began vomiting blood as a result of my
28 rib injury.  Two other inmates reported my condition to deputy

-3-

1  Moore, who attempted to get me to see a doctor. However, when
2  Moore spoke with the supervising nurse, Nurse Campbell, she said
3  both Dr. Zolnoni and Nurse Johnson were on vacation and I would
4  have to wait until they returned to be seen.

5      8.  Later in August 2003 I suffered a convulsion attack,
6  which caused me to lose bowel control. Nurse Campbell was called
7  to the scene but only provided me with a cup of orange juice.
8  She explained that there was nothing else she could do because
9  the doctor was on vacation. This vacation also caused me to have
10  to wait to receive my needed blood pressure medication.

11      9.  I suffered from nose bleeds every morning from September
12  2003 through January 2004, without proper treatment.

13      10.  I continued trying to get the treatment I needed. On
14  October 1, 2003, four months after Defendants took me into
15  custody, a nurse recognized my serious need and circumvented Dr.
16  Zolnoni's order by arranging chest x-rays. These x-rays
17  confirmed that I had three broken ribs. The doctors prescribed
18  me mild pain medication (Motrin), but this was inadequate to
19  control my serious pain. However, Defendants did nothing to
20  treat the worsening condition in my legs or to provide medication
21  to effectively control my pain.

22      11.  On October 11, 2003 Defendants retaliated against me
23  for my requests for medical care. Dr. Zolnoni ordered Deputy
24  Clark to take my wheelchair and replace it with a walker. I told
25  the deputy I could not use the walker because of my rib and
26  shoulder injuries. The guard took the wheelchair anyway. A few
27  days later Dr. Zolnoni allowed me to use a wheelchair to access
28  the law library and court, but for no other use. Shortly

thereafter, Deputy Saldivar again replaced my wheelchair with a walker. I repeated what I had told Deputy Clark that I could not use a walker because of my rib and shoulder injuries.

12. I also understand doctor Zoloni caused the deputies to send me to the segregation unit where I stayed for 34 days. I could not walk, and they refused me a wheelchair. During those 34 days the guards and nurses forced me to wear the same dirty cloths and allowed me to shower only three times. They effectively denied me drinking water because the water faucet in my unit provided only scalding hot water. They refused to feed me my special, restricted diet.

13. Before deputies sent me to segregation, spiders bit my legs. The bites became infected, but when I complained, doctors and nurses refused to treat me. Without treatment the infections worsened. After nearly a month and while I was in segregation Dr. Buenaventura ordered dressings and antibiotics to control the serious infections.

14. During this time I continued complaining to deputies and staff about my legs (the increasing blackness, paralysis and serious pain), my injured shoulder, ribs and knee, plus my nose bleeds and my other conditions. My legs eventually lost virtually all function. My legs remained black, cold, numb and painful. Doctors, nurses, and deputies refused to treat my conditions.

15. In November 2003 I showed Nurse Wetlessin a bag of bloody tissue, but she ignored me. I continued to bleed daily, suffering headaches and dizziness.

-5-

16.  Doctors, nurses, and deputies denied me high blood pressure medication from July 30, 2003 to mid-September.

17.  I filed *Inmate Complaint Forms* documenting the foregoing.  Defendants responded by providing me a chest x-ray and by returning my wheel chair.  However, the Deputies failed to provide a written response to my complaints.

18.  In March of 2004, after nearly nine months of requests, I was finally sent to Los Angeles County Medical Center and was seen by a cardiovascular doctor and an orthopaedic doctor.  I was ordered to be rescheduled for possible surgery on my left knee and left shoulder.  They also ordered that I be given therapy at the Men's Central Jail upon my return and receive braces to help me walk.  Despite these doctors' orders.  Defendants never rescheduled me for a surgery consultation at LCMC, nor did they provide me with therapy or braces upon my return to MCJ.

19.  Defendants released me on April 16, 2004.  On May 29, 2004, I was admitted to Pacifica Hospital of the Valley to be treated for the health problems the Men's Central Jail medical staff refused to treat.  I suffered from severe internal bleeding and was admitted to the Intensive Care Unit for two weeks, and then was transferred to a regular unit for an additional two weeks.  I was administered four pints of blood and 12 liters of potassium via I.V.  I was discharged from Pacifica on June 2, 2004.

20.  As of July 20, 2004, Dr. Fidel Lara at Pacifica Hospital continues to treat me as an outpatient because my hepatitis, my anemia and my high blood pressure were not dealt

-6-

1   with properly while I was at MCJ and my condition upon release

2   from jail was dangerously poor.

3

4        I declare under penalty of perjury under the laws of the

5   State of California and the United States of America that the

6   foregoing is true and correct.

7

8

9   Dated: October 21 , 2004

10

11

12   JUAN CRUZ PORRAS

-7-

# EXHIBIT 8

COPY

MAJOR A. LANGER, CA Bar No. 41440
MICHEL F. MILLS, CA Bar No. 193002
PERONA, LANGER, BECK, LALLANDE & SERBIN
A Professional Corporation
300 East San Antonio Drive
Long Beach, California 90807-0948
(562) 426-6155 / Fax (562) 490-9823

Attorneys for Plaintiffs Juan Porras and
Donald Grigsby Individually and on Behalf
of all Others Similarly Situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN PORRAS and DONALD GRIGSBY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, Inclusive, <br><br> Defendants. | CASE NO.  CV 04-01229-WJR <br>               (RNBx) <br><br><br> DECLARATION OF PHILLIP SCHWEITZER IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

-1-

**EXHIBIT 8**

## DECLARATION OF PHILLIP SCHWEITZER

I PHILLIP SCHWEITZER, declare as follows:

1.   My name is Phillip Schweitzer and, at all material times, I am resident of the State of California, County of Los Angeles and, at all material times, the above captioned Defendants confined me as a pre-trial detainee at their Men's Central Jail, Twin Towers, and LCMC, and they identified me by Booking No. 7675435.

2.   I am a stroke and cancer survivor. I am paralyzed and permanently confined to a wheelchair. As a result of these conditions, and before I was incarcerated in the Los Angeles County Jail, my doctors conducted several operations to remove portions of several organs.  To compensate for my lost tissue and to maintain the integrity of my abdominal cavity, my doctors installed a mylar "mesh" to hold my organs together.

3.   Beginning on or about May 29, 2003, while in the custody of the above captioned Defendants at their Men's Central Jail, a Deputy named Espinoza grabbed the bottom of the wheels of my wheelchair flipping me out and throwing me to the ground. This occurred several times and at different locations within the jail.

4.   The first time I hit my head, neck and shoulder against the wall.  During the fall I felt my abdominal mesh tear.  I also re-injured a hernia causing.  These cause me excruciating pain. On this occasion Deputy Espinoza poured grape jelly on me while I laid on the floor, paralyzed and unable to move.  Deputies Leon and Margolis were also present.  Throughout the episode and after

-2-

1  I told the guards I was seriously hurt and needed medical
2  attention.  Espinoza said I could lay there until I rotted.  He
3  and the other deputies left me there, refusing assistance, from
4  breakfast to lunch.

5      5.   After that incident, I suffered uncontrollable pain
6  that significantly restricted my ability to move.  Approximately
7  10 to 14 days later, the guards finally let me see a doctor named
8  Zoloni.  She prescribed over-the-counter Tylenol, but I told her
9  my injuries were more serious than that.  She said that was all I
10  would get, but I never did receive it.

11      6.   Deputy Espinoza and other deputies whose names I do not
12  know seemed to delight in flipping me from my chair to the
13  ground, and he did so regularly.  Each time he worsened my
14  injuries.  The guards refused me medical treatment for the
15  injuries Espinoza and the other deputies caused.

16      7.   I complained about needing my medication, but the
17  guards put me in the whole (administrative segregation).  They
18  took my wheelchair even though I am a paraplegic.  They let me
19  use the chair only when I went to and from court.  They forced me
20  to crawl across the floor and to sleep there too.  The guards and
21  nurses refused me access to the telephone to contact a lawyer,
22  and prevented me from sending legal mail.

23      8.   On or about September 30, 2003, the guards proceeded to
24  transport me in a handicap van.  In doing so, they handcuffed me
25  to the van's wheelchair lift.  The guards then dropped me to the
26  ground from the wheelchair lift while my arm was still handcuffed
27  to the lift.  I felt my abdominal mesh rip even more.  The fall
28  worsened my hernia.  Both caused excruciating pain.  Once again,

-3-

1  the guards refused me medical treatment for these injuries.  I

2  believe these deputies, especially Espinoza, were trying to

3  seriously injure me, if not actually kill me.

4      9.   At all material times during my confinement, Defendants

5  denied me the prescription medications my civilian doctor had

6  ordered for my post-cancer and post-stroke conditions.  They also

7  denied me dental care when they refused to repair four broken

8  teeth.

9      10.  After I was released from custody, I returned to my

10  physician, Dr. Easton, who confirmed the mesh was ripped away

11  from its attachments I was in jail.  The mesh has wrapped around

12  my small intestine, and this caused part of my difficulty in

13  moving around.  The doctor also confirmed the re-injury of my

14  hernia.

15      11.  I was scheduled for surgery on September 9, 2004.

16  However, I was forced to delay the procedure.  My mobility

17  problems have hampered my ability to travel to parole

18  appointments.  As a result of this, I may be forced to return to

19  jail.  This matter will be resolved at a parol hearing on October

20  21, 2004.  If I accepted the surgery, I would not be able to make

21  my court appearance or return to the jail if that is ordered.  I

22  am particularly afraid that, should I be ordered to return to the

23  jail, the County will again make me the guards' personal punching

24  bag.

25  ///

26  ///

27  ///

28

-4-

1
2      I declare under penalty of perjury under the laws of the
3  State of California and the United States of America that the
4  foregoing is true and correct.
5
6  Dated: October 21 , 2004
7
8                                          _____
9                                          Phillip Schweitzer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 9



COPY

1  MAJOR A. LANGER, CA Bar No. 41440
   MICHEL F. MILLS, CA Bar No. 193002
2  PERONA, LANGER, BECK, LALLANDE & SERBIN
   A Professional Corporation
3  300 East San Antonio Drive
   Long Beach, California 90807-0948
4  (562) 426-6155 / Fax (562) 490-9823

5  Attorneys for Plaintiffs Juan Porras and
   Donald Grigsby Individually and on Behalf
6  of all Others Similarly Situated

7

8

9                  UNITED STATES DISTRICT COURT

10               CENTRAL DISTRICT OF CALIFORNIA

11 JUAN PORRAS and DONALD GRIGSBY, )
   Individually and on Behalf of  ) CASE NO.  CV 04-01229-WJR
12 All Others Similarly Situated,  )
                                   )              (RNBx)
13                                 )
                                   )
14         Plaintiffs,             )
                                   )
15    v.                           )
                                   ) DECLARATION OF GASTON MURPHY IN
                                   ) SUPPORT OF PLAINTIFFS' MOTION
16 COUNTY OF LOS ANGELES, LOS      ) FOR CLASS CERTIFICATION
   ANGELES COUNTY SHERIFF'S        )
17 DEPARTMENT, Inclusive,          )
                                   )
18                                 )
           Defendants.             )
19                                 )
                                   )
20

21

22

23

24

25

26

                        -1-

**EXHIBIT 9**

# DECLARATION OF GASTON MURPHY

I GASTON MURPHY, declare as follows:

1.  My name is Gaston Murphy and, at all material times, I am resident of the State of California, County of Los Angeles and, at all material times, the above captioned Defendants confined me as a pre-trial detainee at their Men's Central Jail, Wayside/Max ("a.k.a. Pitches") Detention Center.   They identified me by Booking No. 8233741.

2.  I am a diabetic and require daily medication and a special diet of evening snacks to control my blood sugar levels. Defendants often failed to give me the medication at all.  When they did give it to me, they failed to do so at the times I needed to maintain the medication schedule. On at least one occasion, Defendants refused me the medication over a four-day stretch.  I complained to guards and nurses who ran the sick-call every day, but they ignored me.  This caused my blood sugar to race out of control and caused my heart to flutter.  I eventually stabilized when Defendants resumed my medication.

3.  During this time, I was confined with a cell-mate named Robert Walton at Wayside. We were confined in what is called a medical tank where we had access to nurses in addition to the guards.  Mr. Walton suffered an earache in late May 2002.  It was obvious to anyone who saw him that Mr. Walton was suffering extremely serious pain in his ear.  I observed Mr. Walton ask the guards and nurses to see a doctor about his ear every day for more than a month.

I also asked the guards and nurses to get him to the doctor and to give him medication to control his pain.  They always

-2-

1 | refused.   I saw Mr. Walton's condition worsen and observed puss
2 | draining from his ear.   I also saw Mr. Walton attempt to control
3 | the drainage with tissue.

4 |     4.   I never saw the guards or nurses release Mr. Walton to
5 | see the doctor before I was released in late June.   I did see Mr.
6 | Walton suffer needlessly for approximately a month.

8 |     I declare under penalty of perjury under the laws of the
9 | State of California and the United States of America that the
10 | foregoing is true and correct.

12 | Dated: October 22, 2004

Gaston Murphy

-3-

# EXHIBIT 10

1 | MAJOR A. LANGER, CA Bar No. 41440
MICHEL F. MILLS, CA Bar No. 193002
2 | **PERONA, LANGER, BECK, LALLANDE & SERBIN**
A Professional Corporation
3 | 300 East San Antonio Drive
Long Beach, California 90807-0948
4 | (562) 426-6155 / Fax (562) 490-9823

5 | Shawn Khorrami, Esq. CA. Bar. No. 180411
**LAW OFFICES OF SHAWN KHORRAMI**
6 | 14550 Haynes Street, 3rd Floor
Van Nuys, CA 91411
7 | 818-947-5111
818-947-5121 Fax
8 |
Attorneys for Plaintiffs Juan Porras and
9 | Donald Grigsby Individually and on Behalf
of all Others Similarly Situated

10 |

11 |

12 | UNITED STATES DISTRICT COURT

13 | CENTRAL DISTRICT OF CALIFORNIA

14 |

15 | JUAN PORRAS and DONALD GRIGSBY, ) CASE NO. CV-04-1229 WJR (RNBx)
Individually and on Behalf of )
16 | All Others Similarly Situated, )
)
17 | Plaintiffs, ) DECLARATION OF JEFFERY DESSAINT
) IN SUPPORT OF PLAINTIFFS'
18 | v. ) MOTION FOR CLASS CERTIFICATION
)
19 | )
COUNTY OF LOS ANGELES, LOS )
20 | ANGELES COUNTY SHERIFF'S )
DEPARTMENT, Inclusive, )
21 | )
Defendants. )
22 | _____ )

23 |

24 |

25 |

26 |

27 |

28 |

-1-

**EXHIBIT 10**

# DECLARATION OF JEFFERY DESSAINT

I, JEFFERY DESSAINT declare as follows:

1. My name is Jeffery Dessaint and, at all material times, I was a resident of the State of California, County of Los Angeles. I have personal knowledge of the following facts and if called as a witness, I could and would testify competently as to the truth of these matters.

2. In December 2002, a hit-and-run driver ran over me while I was walking. I suffered a closed-head injury and severely broken left leg. I remained in a coma for fourteen days after the collision. My doctors were forced to open my skull to relive the pressure on my brain and to implant metal bars in my leg. I changed doctors when complications arose that stopped my leg from healing. In June 2003, I saw my new doctors, Shuller and Johnson, at the Los Angeles County Medical Center ("LCMC"). These doctors performed a bone graft. They also stabilized the fracture by surgically installing an external fixator. This mechanical device consists of a twelve-inch steel frame, suspended above my leg, holding four, five-inch pins that are bored through my skin and into my left tibia, fibula and foot. Because the external fixator penetrates my skin and mounts into the bones in my leg and foot, I am extremely susceptible to infection and the pins must be thoroughly cleaned every day. I was scheduled for Dr. Shuller to evaluate my leg's progress on January 3, 2005, and to consider removing the fixator.

3. On or about December 3, 2004, the Los Angeles Sheriff's Department ("LASD") arrested me on an alleged possession of narcotic controlled substance. Defendants have since confined me

-2-

1  as a pre-trial detainee at their Men's Central Jail, Twin Towers,

2  and LCMC where they identified me by Booking No. 8373435.  I am

3  now in Defendants' custody.

4      4.    At the time of my arrest, the external fixator remained

5  pinned to my leg.  Also, I had active prescriptions for, and was

6  taking, the following medications.  Levaquin (antibiotic);

7  Dylantin 300mg (grand mal seizures); Clodipin .5mg (anxiety and

8  flashbacks); and Vicodin 750mg (pain).

9      5.    Soon after my arrest, the LASD brought me to the

10 thirteenth floor of LCMC for a medical evaluation.  Fortunately,

11 this is the same hospital where my surgical team performed the

12 bone graft and installed the fixator.  A female Asian doctor

13 evaluated my leg and reviewed my medical records.  She

14 complemented me on how clean I had kept it and noted the absence

15 of infection. She asked what prescriptions I was taking, and I

16 listed the medications stated above.

17     6.    This doctor then scheduled two appointments.  I was

18 supposed to return to see her for a follow-up on December 20,

19 2004, and I was supposed to see Doctor Shuller on January 5, to

20 examine my leg.  She gave me a prescription for Levaquin and

21 Dylantin.  She handed me what she thought would be enough pills

22 to get me through the remainder of my in-processing.  She said I

23 would start receiving my prescriptions after I completed in

24 processing.  This doctor and her staff also gave me a wheelchair.

25 The doctor also told me that, once I completed in-processing, I

26 should be assigned to the Medical Services Bureau because my pins

27 were open wounds and because any other assignment would subject

28 me to an undue risk of infection.

-3-

7.   I remained in LCMC's jail ward for approximately one
and a half hours before moving to the hold tank for an additional
thirty minutes or so.  Defendants then transported me to their
Twin Towers Correctional Facility, Inmate Reception Center where
I was forced to lie on and sleep on the floor for from that
Friday to the following Monday.  I waited with at least eighty
other inmates to see one doctor who was supposed to evaluate our
medical condition as part of Defendants' in-processing.  Many of
the inmates in my immediate vicinity had staff infections, but
the guards and nurses ignored my request to be moved.

8.   I have reviewed an August 8, 2004 Los Angeles Times
Article called "Inmates Forced to Sleep on Floor." I experienced
the conditions it discusses.  The article's discussion of the
conditions on "Thursday afternoon," appearing on page B-8, are
virtually identical to my personal experience. It seems as if the
article discusses my personal experience.  The defendants did not
provide Pill Call, Doctor's Line or any other medical services
for those of us housed on the floor.

9.   If these conditions have changed since I was arrested
and in-processed through Defendants jail in December 2002, it is
only because they have worsened.  At that time, I was just
emerging from the surgery and underlying injuries I described
above in paragraph 2.  Defendants brought me to their Twin Towers
for in-processing where I was forced to wait in the hallway for
three days with scores of other inmates.  I was more fortunate
than other inmates because I had the benefit of sleeping on a
gurney.  The other inmates, however, were forced to sleep on the

-4-

1  floor without a bed or cot, even though many of them also

2  suffered serious injuries.

3      10.  When I in-processed for my present stay, December 2004,

4  I told the deputies I needed my Dylantin to prevent/control my

5  seizures.  They said I had to wait to see the processing doctor.

6      11.  I waited to see the IRC doctor for more than a day.  An

7  African-American male doctor examined me on Saturday, December 4.

8  I am not sure, but I think his name was Dr. Green.  He saw the

9  prescription orders I received at LCMC.  He asked what my problem

10  was.  I told him I need Dylantin to control my grand mal

11  seizures.  We discussed the dose I needed, and I told him I take

12  one 300mg. pill at night.  I also told him I needed my Levoquil

13  because of the infection risk to my leg.  I said I took the

14  Clodipin for anxiety and flashbacks.  I told the doctor that my

15  leg was hurting and starting to feel hot, and that the doctor at

16  LCMC had scheduled me for two appointments.  The doctor finished

17  with me and the guards returned me to my spot on the floor.

18      12.  Later that night I received a Dylantin and another pill

19  I believe was Levoquil.  Otherwise, and except for the

20  prescriptions I received from the Asian doctor at LCMC, I did not

21  receive my prescriptions during the four days I spent on the

22  floor before I was assigned to a housing unit.

23      13.  The next day a female psychiatrist evaluated me as part

24  of the in-processing.  I told her about my history, including my

25  closed-head injury, seizures, anxiety attacks and flashbacks.  I

26  told her I took Clodipin .5 once a day to control my anxiety and

27  flashbacks and took the Dylantin to control the seizures.  I told

28  the psychiatrist that I was not receiving my Colodopin

-5-

1  prescription. She refused to give me the Colodopin prescription,

2  saying I could not receive it there at IRC or at the Men's

3  Central Jail. However, she said I could get it the Colodopin if

4  I was assigned into the psychiatric ward. She persistently asked

5  whether I was suicidal and whether I wanted to hurt myself or

6  someone else. She repeated these questions at least five to

7  seven times while also telling me that I could only get the

8  Colonodine in the psychiatric ward.

9      14. The psychiatrist completed her examination and returned

10  me to my spot on the floor without resolving my complaints about

11  the medications. Later that day I asked a passing nurse about my

12  prescriptions, particularly the Dylantin. She said she would

13  check on them but never returned. I remained on the floor until

14  Monday, December 6. I did not receive any of my medications

15  during that time.

16      15. Defendants moved me into a holding tank just before

17  they moved me to my permanent housing unit. I continued

18  complaining about not receiving my medications. Eventually, a

19  nurse brought a Dylantin pill.

20      16. The defendants eventually assigned me to a housing unit

21  in the 8000 block of the Men's Central Jail. I told the guards

22  and nurses that, because of the external fixator and according to

23  the doctor at LCMC, I was in danger if they put me in any housing

24  unit other than MSB. The guards and nurses ignored me. They

25  made matters worse by housing me in a unit next to where

26  Defendants house inmates with staff infections. There are no

27  barriers to separate them from us, and the infected inmates walk

28  right past my cell when they walk to the nurses or guards'

1   stations. This same nurses' station sarcastically posts a large

2   sign warning inmates that a person has a 90% chance of

3   contracting a staff infection if he is in that location with an

4   open wound.

5       17. I stopped receiving my medications, except for the

6   Dylantin, once I transferred into the 8000 Unit. I frequently

7   complained about this situation to the guards and nurses, but

8   they ignored me. I started going on Doctor's Line and telling

9   the staff doctor, named Zonloni, that I was not getting my

10   prescriptions. She just yelled at me and called the guard to

11   take me back to my cell.

12       18. On December 10, Defendants returned me to LCMC for the

13   appointment the LCMC doctor had scheduled. The doctor and I

14   discussed the condition of my leg and my problems getting my

15   prescriptions. She wrote an order re-prescribing my medications,

16   and she directed her nurse to give me an antibiotic pill. She

17   also scheduled me for an appointment to see Doctor Shuller on

18   January 5, 2005 so he could evaluate whether to remove the

19   external fixator. The doctor did not give me a copy of the order,

20   but she showed it and read it to me once she finished writing it.

21       19. The next day, December 11, I watched as Defendants

22   refused to give a wheel-chair bound, African-American inmate

23   named Kevin Brooks the medications he was prescribed. An Asian

24   nurse told him they had run out of his medication. Kevin did not

25   believe this story, and he complained loudly. A doctor arrived

26   with a guard shortly thereafter, and he gave Kevin his

27   medication. However, the guards de-classified Kevin because he

28   protested their refusal to give him prescribed medications.

-7-

1  Deputy Clark threatened me and the other inmates who witnessed

2  the incident, saying: You make waives in here, we get rid of

3  you."

4      20.  On December 12, I returned to Doctor's Line and told

5  Dr. Zoloni that I was still not getting my medications and the

6  nurses were not checking my pins.  I saw that she had the order

7  for my January 5th appointment with Dr. Shuller. She confirmed

8  the appointment was set.  She refused to order antibiotics,

9  because I already had an existing order.  Dr. Zoloni ordered the

10  guard to take me a way without examining my leg and the

11  infection.

12      21.  I returned to Doctor Zoloni a week later, on or about

13  Wednesday, December 15.  She immediately recognized me and

14  refused to examine me.  I tried telling the about the infection,

15  but she told me to shut-up, that she was the doctor.  When she

16  asked why I was not on Levoquin, I reminded her that she had

17  taken me off of it. She told the nurse to give me a 1000mg

18  antibiotic then, and then to follow-up with a 500mg. pill for a

19  week. I asked Dr. Zoloni to continue the prescription because my

20  private doctor had me on an antibiotic for about a year.  She got

21  mad at me and again told me to shut-up, that she was the doctor.

22  She told the guard I needed to be de-classified because I was

23  faking and harassing her.

24      22.  I started receiving this antibiotic on or about

25  December 12, and I received it through December 19th.

26  Fortunately, the medication seemed to work.  I felt better and

27  the infection seemed to be improving. However, this changed

28  almost immediately once the prescription stopped.

23. My leg and foot started showing signs of serious infection in and around the fixator's pins. My foot had turned red and became shiny and swollen. It was also hot to the touch. However, the guards and nurses told me that Doctor Zoloni had refused to see me on Doctor's Line. I tried to get the guards and nurses to look at my leg, but they just refused and ignored me.

24. When it came time for my January 5th appointment, the guards refused to take me, saying there were not enough vehicles for all the inmates who needed to go to LCMC. I tried to discuss my condition and the fact that I was denied my appointment with the medical staff. I was now sweating very hard but with cold chills. Some nurses said they would take me down stairs to the infirmary. Other nurses said they would get my medication. None of this ever happened.

25. The next day, Thursday, January 6, I tried to go on Doctor's Line. I left my module at round 7 a.m. for my doctor's visit until lunch time, missing both breakfast and lunch. However, the trustees returned the inmates' passes for Doctors' Line, again saying the computers were down. The nurses came out saying we all needed to be rescheduled. Deputy Moore returned us to our module without, and I was not examined, despite my condition. When I asked Deputy Moore about my medications, she said go to your cell and that she would get a nurse. I returned to my cell, but the nurse never arrived.

26. Later, a young Latina nurse said she could give me a couple of 4x4 bandages to cover-up the infection. None of these nurses examined my leg, the pins or the infection. If they had

-9-

1  looked at it, they would have seen it was dark, very red, hot to

2  the touch, swollen and draining green and yellow puss.  The

3  chills and sweating continued to worsen through the night. J D
                                                      *at different times*

4      28.  Several deputies were standing around, including

5  Espinoza, Fam, Rehawk, Moore and Contrares, watching as I tried

6  to get medical attention.  Without any provocation, Deputy

7  Espinoza announced, "They should just chop your leg off to save

8  the County money."

9      29.  I tried again to get the treatment and medications I

10  needed that night, during Thursday evening pill call.  I told the

11  nurse about my condition and asked for my medications.  She

12  denied my request, saying my prescriptions had expired.  I tried

13  to show her the infection in my leg and foot, but she just

14  ignored me.  I did not receive any medications that night.

15      30.  My leg hurt terribly Thursday night as I went to bed. A

16  few hours later, I was awakened by sudden pain and the sensation

17  that my leg and bed were wet. I looked down and saw the infection

18  burst through my skin on the inside of my foot, near the ankle.

19  While the drainage from my leg had previously saturated my

20  bandages, this was new and totally shocking.  Green and yellow

21  puss poured from my leg like blood might pour from a deep cut. It

22  totally saturated the new bandages and the bootie over my foot. I

23  wrapped it in toilet paper, to absorb the drainage.

24      31.  I summoned the guard, Deputy Rehawk, who took me to the

25  head nurse working the graveyard shift at approximately 10:30p.m.

26  I tried to tell the nurse what had happened.  But, she told me to

27  "shut-up," and "don't be a doctor trying to diagnose yourself."

28  This nurse was initially mean and abusive.  She was standing away

1   from me at the time, and, because the lights were dimmed, she

2   could not see me very well.

3       32.   This nurse's attitude changed dramatically when she

4   pulled me into the light where she could see my leg.   The first

5   thing she said when she saw my leg in the light was:

6       "My God.   That don't look good.   I'm gonna tell you the

7       truth.   You might lose that leg, and the reason is

8       because you're in here [the Jail]."

9   The nurse examined my leg, took my blood pressure and then called

10  a doctor to whom she reported my vital signs.   Then she gave me

11  three types of Levoquin, two big red capsules, and one big white

12  one.   She told me I was supposed to take three in the morning,

13  two in the afternoon and one in the evening.

14      33.   The nurse said she needed to make sure I did not have a

15  reaction to what she gave me, so she sat with me for about forty-

16  five (45) minutes.   As she sat with me, she leaned over real

17  close, and said in very low voice:

18      "I'm gonna deny it if anyone ever asks if I said this,

19      but you need to start making waives.   If you don't look

20      better by Friday, you demand to see a doctor.

21      Truthfully, you're probably gonna lose that leg."

22  After that, she returned me to my bunk when my pain subsided

23  after giving me a Doctor's Line pass for the next day.   From the

24  time I entered the Inmate Reception Center until this nurse

25  treated me, no medical personnel examined or cleaned my leg.

26      34.   The next morning, I returned to the morning pill call

27  and attempted to access the Doctor's Line.   The nurse made me

28  wait while she checked on my prescriptions.   She returned saying,

1  I had no prescriptions, except for Tylenol. I showed her the new
2  bandages the Supervising Nurse applied the night before.  By now
3  they were completely saturated with green and yellow puss.  The
4  nurse did not even bat an eye before saying, "Mr. Dessaint, there
5  is nothing I can do, we have no computer."  I started to argue
6  with her that I needed to see the doctor, but she just kept
7  saying the computers were down.  I asked her what they did before
8  computers were invented?  I tried to insist that they have me
9  examined by a doctor and that I get my medications, at least my
10  antibiotics.  I also told the nurse I needed them to clean my
11  leg.  She refused, but handed me packets of clean bandages, tape
12  and iodine.  The only thing she said was to ask if I was allergic
13  to iodine.

14      34.  About that same time, I caught Deputy Caterez'
15  attention as he passed by.  I explained the situation and showed
16  him my infection.  I said I was not trying to make problems, but
17  I needed my antibiotics and treatment for my leg.  The deputy
18  told me to wait as he spoke to the nurse.  He returned, and after
19  exchanging some small talk, said "It's not looking good. What are
20  you trying to get from her."  I said my antibiotics and
21  treatment.  The nurse returned while we were still talking and
22  said, "Guess what. . . I have your antibiotics!"  After that she
23  gave me three pills.

24      35.  I said I still needed to see a doctor about my leg.
25  She put me on Doctor's Line, but again I was denied the
26  examination I needed. I have not yet seen a doctor regarding my
27  leg or any of my other conditions.

28

1    37.  Defendants have been very sporadic when providing my

2  medications.  I have not received my Colodopins or the Levoquil

3  since entering Defendants' custody. They had given me the anti-

4  seizure medication, Dylantin, from when I transferred into the

5  8000 Unit until January 7, 2005, ~~but~~ *J D* I have still not seen a doctor.

6    38.  In addition to all of this, Defendants have forced me

7  to wear dirty cloths.  I have not received a change of clean

8  cloths for more than three *four J D* weeks, before they changed our cloths a few

   days ago.

9    I declare under penalty of perjury under the laws of the *J D*

10  State of California and the United States of America that the

11  foregoing is true and correct.

12

13

14  Dated: January *24*, 2005

15

16                          JEFFERY DESSAINT

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 11

1 | MAJOR A. LANGER, CA Bar No. 41440
MICHEL F. MILLS, CA Bar No. 193002
2 | PERONA, LANGER, BECK, LALLANDE & SERBIN
A Professional Corporation
3 | 300 East San Antonio Drive
Long Beach, California 90807-0948
4 | (562) 426-6155 / Fax (562) 490-9823

5 | Shawn Khorrami, Esq. CA. Bar. No. 180411
LAW OFFICES OF SHAWN KHORRAMI
6 | 14550 Haynes Street, 3rd Floor
Van Nuys, CA 91411
7 | 818-947-5111
818-947-5121 Fax
8 |
Attorneys for Plaintiffs Juan Porras and
9 | Donald Grigsby Individually and on Behalf
of all Others Similarly Situated
10 |

11 |

12 |                    UNITED STATES DISTRICT COURT

13 |                   CENTRAL DISTRICT OF CALIFORNIA

14 |

JUAN PORRAS and DONALD GRIGSBY, ) CASE NO. CV-04-1229 WJR (RNBx)
15 | Individually and on Behalf of        )
All Others Similarly Situated,        )
16 |                                     )
                                       )
17 |          Plaintiffs,               ) DECLARATION OF EDWARD LEANDRY
                                       ) IN SUPPORT OF PLAINTIFFS'
18 |     v.                             ) MOTION FOR CLASS CERTIFICATION
                                       )
19 |                                    )
COUNTY OF LOS ANGELES, LOS            )
20 | ANGELES COUNTY SHERIFF'S           )
DEPARTMENT, Inclusive,                )
21 |                                    )
          Defendants.                  )
22 | _____ )

23 |

24 |

25 |

26 |

27 |

28 |

-1-

**EXHIBIT 11**

### DECLARATION OF EDWARD LEANDRY

I, EDWARD LEANDRY, declare as follows:

1. My name is Edward Leandry and, at all material times, I was a resident of the State of California, County of Los Angeles. I have personal knowledge of the following facts and if called as a witness, I could and would testify competently to the truth of these matters.

2. On or about July 6, 2004, I was arrested and entered the custody of the Los Angeles Sheriff's Department ("LASD") on a charge of assault on a police officer. Defendants have since confined me as a pre-trial detainee at their Men's Central Jail and Twin Towers Correctional Facility, where they identify me by booking number 8189289.

3. At the time I was placed in custody of the LASD, and at all material times herein, I suffered bipolar disorder for which I require medication including, but not limited to, Zyprexa. I informed officers immediately of this upon entering Defendants' custody.

4. Once I was in the custody of Defendants, I informed them of my condition and my medication needs, and requested to see a doctor right away. I was sent to be interviewed by a psychiatrist in the "psych ward." The psychiatrist asked me several questions, not about my condition or medication needs, but about my criminal case. I had been advised by my criminal attorney that I was not to speak with anyone, and so I had to refuse to provide such information to the psychiatric doctor. The psychiatric doctor then told me that I seemed to be all right and that I did not need any medication.

5.   I have requested several times since this visit to return to the doctor for my medication needs.  I have been seen but have either been told that I do not require the medication or that the medication is too expensive for me to receive.  I have four court orders that state I am required to have my medication for bipolar disorder, but Defendants continue to refuse to provide it to me.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: January 24, 2005

EDWARD, LEANDRY

-3-

# EXHIBIT 12

1    MICHEL F. MILLS, CA Bar No. 193002
     PERONA, LANGER, BECK, LALLANDE & SERBIN
2    A Professional Corporation
     300 East San Antonio Drive
3    Long Beach, California 90807-0948
     (562) 426-6155 / Fax (562) 490-9823
4
     Attorneys for Plaintiffs Juan Porras and
5    Donald Grigsby Individually and on Behalf
     of all Others Similarly Situated
6

7

8                UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11   JUAN PORRAS and DONALD GRIGSBY, ) CASE NO. CV-04-1229 WJR (RNBx)
     Individually and on Behalf of    )
12   All Others Similarly Situated,     )
                             )
13                          )
            Plaintiffs,     ) DECLARATION OF CHRISTIAN NAJERA
14                        ) IN SUPPORT OF PLAINTIFFS'
        v.                ) MOTION FOR CLASS CERTIFICATION
15                        )

16   COUNTY OF LOS ANGELES, LOS      )
     ANGELES COUNTY SHERIFF'S       )
17   DEPARTMENT, Inclusive,        )
                             )
18           Defendants.     )
19   ───────────────────────────── )

20

21

22

23

24

25

26

27

28

**EXHIBIT 12**

DECLARATION OF CHRISTIAN NAJERA

I, Christian Najera, declare as follows:

1.    I have personal knowledge of the foregoing facts and if called as a witness, I could and would testify competently as to the truth of the matters set forth therein.

2.    At all times material to this action, I was a resident of the State of California, County of Los Angeles.  Defendants County of Los Angeles and Los Angeles County Sheriff's Department ("Defendants") held me, at all material times, as a pre-trial detainee and post-conviction inmate at their Men's Central Jail and Twin Towers Correctional Facility. Defendants identified me by Booking No. 7990547.

3.    The Los Angeles Police Department arrested me on February 1, 2003 for failure to stop, PC 2800.2(A)VC [Evading]. I surrendered without resistance, but the LAPD proceeded to use their tazer devices on me while I had my hands in the air.  While I was being physically constrained, the LAPD beat and again stunned me with their tazer devices until I lost consciousness. Unable to make the $500,000 bond set in that case, Defendants housed me in the maximum security section of Twin Towers, section K-10, TT-132-B-15.  When I was transferred to the Sheriff's Department's custody, a group of deputies secreted me into a black, windowless room where they savagely beat me, again while I was handcuffed and defenseless.  As a result of this incident, I suffered physical injuries to my back and shoulder requiring medical attention.

4.    I repeatedly sought medical attention for these injuries from the Los Angeles County Sheriff's deputies and

2

1   nurses.  Being confined in the K-10 section restricts my ability

2   to make these requests and to submit Inmate Complaint Forms.  I

3   did, nonetheless, make them orally and in writing to the best of

4   my ability.  I have copies of some, but not all, of my written

5   requests and Complaints.

6        5.   Beginning no later than February 24, 2004, I requested

7   access to see a physician and to receive an MRI for my back and

8   shoulder injuries.  I told Defendants this injury interfered with

9   my sleep and daily activities, such as showering.  A true and

10  correct copy of my February 24, 2004 Complaint is attached as

11  Exhibit 1, and incorporated herein by this reference.  Defendants

12  ignored my request, and I repeated it on March 10 and March 27,

13  2004.  A true and correct copy of my March 10 and March 27, 2004

14  Complaints are attached as Exhibits 2 and 3, respectively, and

15  incorporated herein by this reference.  I repeated my request for

16  care and submitted another Complaint that I was being denied care

17  on May 10, 2004.  A true and correct copy of my May 10, 2004

18  Complaint is attached as Exhibit 4, and incorporated herein by

19  this reference.  Defendants continued to ignore me.

20       6.   On June 5, 2004, I wrote another Complaint to

21  Defendants.  I explained my history of ignored requests for care

22  and further explained that I required access to a physician and

23  an MRI to document the injuries I suffered when the Deputies beat

24  me.  A true and correct copy of my June 5, 2004 Complaint is

25  attached as Exhibit 5, and incorporated herein by this reference.

26       7.   For by back and shoulder injuries I require Robaxin and

27  Ibuprofen medication daily.  In addition to my back and shoulder

28  injuries, I require daily medication to treat mental health

3

problems, seizures and nightmares.  For these conditions, I have
a prescription to receive Depakote, Seroquel, Remeron and
Neurontin.  On July 6 and 12, 2004, Nurse Jackson refused to give
my prescribed medication.  I described the circumstances of Nurse
Jackson's refusal in my Complaint dated July 29, 2004, a true and
correct copy of which is attached hereto as Exhibit 6 and
incorporated herein by reference.

8.  I have seen Defendants refuse other inmates access to
medical care for serious conditions.  I am housed in close
proximity to inmate Raffi Kostanian, Booking No. 8132599.  Since
at least early August 2004, I have observed Kostanian suffer from
obvious and extreme pain.  He told me he suffered excruciating
pain in his stomach and back.  He also told me his stool
contained blood.  I have watched and heard Kostanian ask guards
and the pill call nurses for access to see a physician for his
problems.  I have also watched and heard them callously, and
sometimes mockingly, refuse his request.  This struck me as
cruel, so I also asked the guards and nurses to get him treated.
The refused my requests on Kostanian's behalf.

9.  Defendants also kept me from seeing a doctor when I
became sick and developed a serious ear infection on or about
September 18, 2004.  My ear began swelling and hurting.  I
immediately sought medical care for my chest congestion and ear
ache.  Defendants refused my request until I was permitted to
contact a legal associate on the outside who contacted Defendants
to complain.  Defendants still refused me access to a physician,
but they did start giving me ear drops during pill call.  I told
the guards and nurses that the drops were totally ineffective,

4

1 that the pain in my ear was extreme, and that my ear was now

2 draining blood. I also complained that I was losing hearing in

3 my ear.

4  10. In addition to the verbal complaints and requests I

5 made to the deputies and nurses about my ear, I also submitted

6 two written complaints on September 24 and October 4, 2004. I

7 have attached true and correct copies of my September 24 and

8 October 4, 2004 Complaints as Exhibits 7 and 8 respectively, and

9 incorporate them herein by this reference. As of the date I

10 signed this Declaration, Defendants have still refused me access

11 to a doctor for this condition.

12  11. Defendants maintain another illegal condition at the

13 jail that is very much related to the denial of medical care.

14 Defendants hold inmates confined in the K-10 cell block who

15 return from court in small cells exposed to some type of fumes.

16 Defendants confine these inmates in shackles for periods between

17 three to five hours. When Defendants have confined me there, I

18 have suffered bad headaches, eventually becoming sick and very

19 dizzy. My symptoms last a long time after Defendants eventually

20 return me to my housing unit. The other K-10 inmates experience

21 the same symptoms and problems. Defendants refuse to give us

22 medical treatment for these conditions or to correct the problems

23 with the holding cell.

24  12. On or about September 8, 2004, ten inmates from the K-

25 10 unit, including myself, signed a Complaint about the holding

26 cell problems. We made three requests: (1) hourly custodial

27 escort to the housing unit to limit exposure in the holding cell;

28 (2) reasonable limits on the time Defendants confine inmates in

5

1   shackles while in the holding cells (because three to five hours

2   is not reasonable); and (3) resolution of the toxic contamination

3   of the court returnee holding cells to prevent further illness.

4   A true and correct copy of the September 8, 2004 group Complaint

5   is attached as Exhibit 9, and incorporated herein by this

6   reference.  Defendants ignored our September 8 Complaint, which I

7   reiterated on September 28, 2004.  A true and correct copy of my

8   September 28, 2004 Complaint is attached as Exhibit 10, and

9   incorporated herein by this reference.

10        13.   Besides denying me access to medical services,

11  Defendants routinely interfere with my legal mail.  Sometimes

12  Defendants intercept my legal mail, and thereby preclude me from

13  ever receiving its contents.  I only learn about this when I am

14  told to expect documents that never arrive or when I learn

15  documents were previously sent that I never received.  I also

16  receive legal mail the Defendants previously and illegally opened

17  out of my presence.  Sometimes, when this happens, I learn some

18  of the contents of my legal mail are removed and missing when I

19  receive it.  This happened on or about September 16, 2004, and

20  Exhibit 11 is a true and correct copy of my written complaint

21  incorporated by this reference.

22        14.   Defendants have also confiscated my privileged legal

23  papers, including my copies of pleadings, investigation

24  materials, and correspondence with my counsel.

25        15.   I have also been subjected to Defendants' use of racial

26  violence to coerce inmates.  Most recently, Defendants attempted

27  to provoke a race riot between Mexican and Caucasian inmates.

28  Deputies Hiyte and Walker used inmate trustee Johnson to

1  fabricate fictitious reasons to unjustifiably search the cells of
2  only Mexican and Caucasian inmates, and then later lock only
3  those inmates back in their disheveled cells.  Inmate Johnson and
4  these deputies are African American.  Defendants use these
5  searches as pretexts to destroy the inmates possessions and to
6  confiscate their legal materials.  The Deputies' intent to start
7  a race riot was obvious because they told each ethnic group the
8  other was responsible for the "search" and subsequent
9  destruction.

10      I declare under penalty of perjury under the laws of the
11  State of California that the foregoing is true and correct.
12      Executed this _12_ day of January ____, 2005, at Los
13  Angeles, California.

14

15  Christian Najera

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# EXHIBIT 13

MAJOR A. LANGER, CA Bar No. 41440
MICHEL F. MILLS, CA Bar No. 193002
**PERONA, LANGER, BECK, LALLANDE & SERBIN**
A Professional Corporation
300 East San Antonio Drive
Long Beach, California 90807-0948
(562) 426-6155 / Fax (562) 490-9823

Shawn Khorrami, Esq. CA. Bar No. 180411
**LAW OFFICES OF SHAWN KHORRAMI**
14550 Haynes Street, 3rd Floor
Van Nuys, CA 91411
818-947-5111
818-947-5121 Fax

Attorneys for Plaintiffs Juan Porras and
Donald Grigsby Individually and on Behalf
of all Others Similarly Situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN PORRAS and DONALD GRIGSBY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, Inclusive, <br><br> Defendants. | CASE NO. CV-04-1229 WJR (RNBx) <br><br> DECLARATION OF LAWRENCE JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

-1-

**EXHIBIT 13**

DECLARATION OF LAWRENCE JACKSON

I, LAWRENCE JACKSON, declare as follows:

1.   My name is Lawrence Jackson and, at all material times,
I was a resident of the State of California, County of Los
Angeles.  I have personal knowledge of the following facts and if
called as a witness, I could and would testify competently to the
truth of these matters.

2.   On or about June 22, 2004, I was arrested and entered
the custody of the Los Angeles Sheriff's Department ("LASD") on a
charge of assault with a deadly weapon.  Defendants have since
confined me as a pre-trial detainee at their Men's Central Jail
and Twin Towers Correctional Facility, where they identify me by
booking number 8173099.

3.   At all material times I have suffered from the
following serious medical conditions: Hepatitis C virus, coronary
artery disease, diabetes myelitis, hypertension, and bipolar
disorder.  At the time of my incarceration, I was prescribed, and
took, the following medications: Lotensin 10mg. (blood pressure);
Insulin 20mg. regular/35 m.p.h. [a.m. units] and 20mg. regular/20
m.p.h. [p.m. units] (diabetes); Plavix (blood thinner for
hypertension and CAD).

4.   After I entered the LASD's custody, but before I was
taken to Twin Towers for in-processing, Sheriff's deputies
brought me to Torrance Memorial Medical Center for treatment of a
deep abscess on my left leg.  Dr. Michael Tarnay took my medical
history and treated the abscess by cutting it open and letting it
drain.  Dr. Tarnay gave me a written prescription for Bactrim and
Rifampin.  I have attached a true and correct copy of the written

-2-

1  prescription Dr. Tarnay gave me and incorporated it by this
2  reference as Exhibit A.  Dr. Tarnay said he wanted to conduct
3  some blood tests and drew some blood for that purpose.  However,
4  he did not receive the results before he discharged me.  Dr.
5  Tarnay never told me that my leg abscess resulted from a
6  staphylococcus aureus infection.  At approximately 7:00 that
7  evening, Dr. Tarnay returned me to the custody of the LASD.  The
8  deputies took me to the Inmate Reception Center ("IRC") at the
9  Twin Towers Correctional Facility.  However, it was my
10 understanding from Dr. Tarnay that I was supposed to be taken to
11 the Los Angeles County Medical Center ("LCMC") because of the
12 open wound where he lanced the abscess.

13      5.   Dr. Tarnay instructed the deputies to ensure that I was
14 "rushed" through inmate reception to make sure that I received
15 the medical attention and prescriptions I required.
16 Nevertheless, Defendants housed me on the floor of the inmate
17 reception center for two days without a bed or a cot.  During
18 this time, I was evaluated by an African-American physician named
19 Green, x-rayed for tuberculosis and evaluated by a psychiatric
20 doctor.  Although I am a diabetic and require the battery of
21 insulin shots I described above, while in Defendants' custody I
22 did not receive my first insulin shot until June 23, 2004,
23 approximately 24 hours after I came into their custody.

24      6.   While I waited in the IRC line, Defendants housed us
25 like cattle, with inmates so tightly jam-packed that we sat
26 shoulder to shoulder on the floor and could not move around.
27 Defendants put me with inmates who had open wounds and other who
28 had active staff infections.  The guards asked whether there was

-3-

1  anyone in our group that had open wounds and many of us, myself

2  included, raised our hands and answered affirmatively. I would

3  estimate Defendants put between 30 and 40 inmates in my holding

4  cell which measured approximately 15 feet by 30 feet. It was so

5  crowded the inmates could not move over to the toilet facility

6  and were forced to urinate and defecate on the floor. On top of

7  that, Defendants failed to provide us any toilet paper.

8      7.  I actually saw Dr. Green twice during my in-processing.

9  When I first arrived, he conducted a very quick triage in which

10  he measured my blood sugar and asked which medications I was on.

11  My blood sugar was considerably out of balance and I received an

12  insulin shot as a returned to my spot on the floor. Several

13  hours later I saw Dr. Green again and gave him my full medical

14  history. We discussed my Hepatitis C, my coronary artery

15  disease, hypertension, diabetes myelitis, diabetes retinopathy,

16  and bipolar disorder.

17      8.  I told Dr. Green about all of the medications that I

18  was supposed to take, and I told him that I had not received them

19  since entering the Defendants' custody except for the insulin

20  shot. I also told Dr. Green that my endocrinologist had

21  recommended a liver biopsy. Dr. Green asked why I had not

22  undergone an angioplasty, and I explained that my doctor and I

23  decided that Plavix was the better course for me.

24      9.  Dr. Green started me on a prescription for Emeron for

25  my coronary artery disease, but he refused me any treatment for

26  my Hepatitis C and my other conditions. I asked Dr. Green about

27  being housed in the Medical Services Bureau ("MSB") (the jail's

28  hospital wing) and he said he would try to expedite the process

1  but "there's a lot of sick people ahead of you." He also

2  scheduled me to see an opthamologist to evaluate my retinopathy.

3  I did not receive any more medications while I completed my in-

4  processing before I was eventually transferred to MSB. I stayed

5  in MSB for approximately a week and then Defendants transferred

6  me to the 8000 block of the Men's Central Jail ("MCJ"). During

7  this time, Defendants failed to control my diabetes. They are

8  supposed to check my blood sugar every 20 minutes, but they did

9  not. They would just walk by my bed, write notes on their clip

10 boards and then leave without testing my blood. Defendants'

11 nurses did check my blood sugar, but at very irregular intervals,

12 and certainly not every 20 minutes. When Defendants transferred

13 me to the MCJ's 8000 Unit, my blood sugar exceeded 600, where a

14 200 level is considered dangerously high. The nurses at the MCJ

15 checked my blood sugar once a week at best.

16      10.    They did, however, check my blood sugar when I first

17 transferred over from MSB. There they found my blood sugar was

18 dangerously high and administered an IV to stabilize my

19 condition. They also gave me sugar cubes to correct the

20 imbalance. The medical staff never sent me to the hospital to

21 control my sugar level, even though it was at a dangerous level.

22 This process began my first interaction with a doctor named

23 Zolnoni. She ordered my insulin count to be raised (thereby

24 reducing my blood sugar count) and attempted to treat me with an

25 IV and sugar cubes. However, Dr. Zolnoni significantly

26 overcompensated and, as a result, my blood sugar dropped

27 dangerously low to a range between 34 and 60. During this time,

28

1 the medical staff never sent me to the hospital, even though my
2 life was at significant risk.

3    11.    While I was at MSB, I complained about having
4 significant dental problems with two teeth.  They eventually
5 pulled one tooth just before I transferred to MCJ.  However, I
6 continued asking the medical staff for treatment of my second
7 tooth.  I also complained that I was not receiving the
8 medications that either Dr. Tarnay, Dr. Green, or my private
9 physicians had ordered.  I also complained that Defendants were
10 not treating my Hepatitis C, my bipolar or any of my other
11 problems.

12    12.    At first, the Defendants allowed me access to Dr.
13 Zolnoni through the doctor's line.  She refused to provide me
14 anything.  Regarding my tooth, she refused to address my problem
15 because I had already had one tooth pulled.  Eventually, I was
16 forced to obtain an order for dental treatment from the judge in
17 my criminal case.  However, Dr. Zolnoni refused to act.  Dr.
18 Zolnoni also began refusing me access to doctor's line.  Dr.
19 Zolnoni herself told me there was nothing she would do for and
20 not to come back.  The nurses told me they were instructed not to
21 allow me onto doctor's line.  My toothache grew worse and became
22 so bad that I could not eat.  Eventually Nurse Woods walked me in
23 to see Dr. Zolnoni.  During this time, I began suffering
24 excruciating pain in and around my liver.  Dr. Zolnoni completely
25 dismissed me, saying "you don't even know where your liver is."
26 I showed her and, for a moment, she seemed to accept that I was
27 telling the truth.  However, she did not act.  Approximately two
28 weeks later, I again complained to Nurse Woods that my condition

-6-

1  was worsening and she brought me to the dentist. The dentist

2  said "this better be the last tooth." Then she examined me,

3  stopped and said there was nothing she could do because it was

4  abscessed.

5       13.  My conditions steadily worsened. My liver was causing

6  me uncontrollable pain. My diabetes was unstable, and I could

7  feel that my blood sugar was ranging all over the map. To make

8  matters worse, my toothache prevented me from eating. Although

9  Dr. Zolnoni did not want to see me, I eventually convinced the

10  nurses to permit me access to doctor's line. Dr. Zolnoni was

11  totally dismissive and said, in broken English:

12       Mr. Jackson, the County is paying for your medications,
   over $150 per month. That's way too much money for the

13       County to be spending on you. Your Plavix alone is
   costing $75 per month. You've had Hepatitis C for so

14       long there's nothing we can do about it.

15  I tried to tell her that my endocrinologist said I needed a liver

16  biopsy and that there were treatments available. She responded:

17  "You can wait to go to state [sic] or to go home." While I was

18  sitting there, I saw an order for me to visit an opthamologist at

19  LCMC. My diabetes had deteriorated so badly that diabetes

20  retinopathy was impairing my vision. Dr. Green had told me

21  during in-processing that he would schedule me for an appointment

22  with an opthamologist. When I pointed to the order in front of

23  Dr. Zolnoni and asked for details about the appointment, she

24  said: "Go away. Go away. You're finished. Next? Guard, get

25  him out of here." I have not had my Plavix prescription since

26  that appointment, which I believe was on or about November 15th.

27  After that, I complained to Head Nurse Bee that I needed

28  treatment for my Hepatitis C and my other conditions. She said:

-7-

1  "We know about you and your Hepatitis C.  As soon as we see a
2  court order, we'll send you to LCMC."  I responded saying that I
3  had already obtained two court orders.  Ms. Bee responded: "Mr.
4  Jackson, I haven't seen the order."

5      14.   During these efforts, I was unfortunately involved in
6  a jailhouse fight during which I broke a knuckle on my hand.  The
7  nurses sent me to LCMC to be seen by an orthopedist.  I was
8  eventually treated by a doctor whose name, I believe, was Kim.  I
9  told Dr. Kim that I was not receiving the medications I was
10 supposed to and that I was concerned that my Hepatitis C had
11 taken a grave turn for the worse.  Dr. Kim scheduled an
12 appointment for me at LCMC for their doctors to evaluate my
13 condition.  She told me that she scheduled the appointment for
14 December 16th.  However, when I returned for a follow-up visit
15 with Dr. Kim approximately 8 weeks later, I had still not been
16 seen for my Hepatitis and other conditions.  She recognized this
17 from my chart, and she wrote another order for my examination.

18     15.   As of the date I signed this declaration, I have still
19 not been evaluated or treated for my Hepatitis, my coronary
20 artery disease, hypertension or bipolar.  Defendants' medical
21 staff stabilized my blood sugar at 300, which is 100 - 200 units
22 higher than is safe.  Doing this makes me very tired, foggy-
23 headed and lackadaisical.  I believe they do this to keep me from
24 complaining about my medical needs.  Nevertheless, I continue to
25 try.

26     16.   During every pill call, I tell the nurses I need
27 treatment for my condition.  The nurses stopped allowing me
28 access to Dr. Zolnoni during the first week of October 2004, when

-8-

1  I asked about my liver treatment when she sent me to LCMC

2  regarding my knuckle.   Since then, the nurses reject my daily

3  requests by either ignoring me or by saying "if the doctor wants

4  to see you, she'll see you.'  As of the date I signed this

5  declaration, I have obtained five court orders for treatment: two

6  orders for dentistry and three orders for treatment of my

7  Hepatitis and other conditions.  I have attached true and correct

8  copies of these orders and included them herein as Exhibit B.

9

10     I declare under penalty of perjury under the laws of the

11  State of California and the United States of America that the

12  foregoing is true and correct.

13

14  Dated: January _24_, 2005

15

16                                LAWRENCE JACKSON

17

18

19

20

21

22

23

24

25

26

27

28

-9-

# EXHIBIT 14

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION          ARNOLD SCHWARZENEGGER, GOVERNOR

**CORRECTIONS STANDARDS AUTHORITY**
**600 Bercut Drive**
**Sacramento, CA 95814**



September 25, 2009

Sheriff Leroy D. Baca
Los Angeles County Sheriff's Department
4700 Ramona Boulevard
Monterey Park CA 91754

<u>Custody Operations and Correctional Services Divisions</u>
<u>Biennial Inspection - Penal Code § 6031</u>

Dear Sheriff Baca:

During June 2009, the Corrections Standards Authority (CSA) completed the 2008-2010 biennial inspection of the Los Angeles County Sheriff's facilities under command of the Custody Operations and Correctional Services Divisions. This inspection was preceded by preliminary on-site visits in May 19, 2009 to plan the inspection process with Custody Support Services and conduct a pre-inspection briefing with the Chiefs and Commanders of the facilities.

**Scope of Inspection**

The inspection assessed compliance with adult and juvenile regulations in Titles 15 and 24, Minimum Standards for Local Detention Facilities, California Code of Regulations (CCR). It consisted of a "walk-through" of each physical plant, review of policies and procedures governing operations, and staff/inmate interviews. Additionally, we met with health care, inmate program and food services staff. As in past inspections, we interviewed over 50 administrators, managers, supervisory and line staff associated with the facilities.

The following facilities were included in the inspection: Inmate Reception Center (IRC); Men's Central Jail (CJ); Twin Towers Correctional Facility (TTCF); Century Regional Detention Facility (CRDF); CRDF Type I Booking Center (CRDF-Booking); East Facility; North Facility; North Annex-South Facility; and, North County Correctional Facility (NCCF). We did <u>not</u> include the Correctional Treatment Center in the Medical Services Building or the jail unit at Los Angeles County Medical Center (LCMC).[1]

We want to express our appreciation to Chiefs Dennis Burns and Alexander Yim for their support and availability throughout the inspections. Additionally, Commanders and Custody Support Services staff participated in an exit conference on June 12, 2009, at the close of our on-site

---

[1] Biscailuz Recovery Center was closed in June 2002 due to budget constraints. Also in response to budget cuts, Pitchess South Facility was only partially operational as the "North Annex" and the Type II Century Regional Detention Facility housed less than 250 program inmates from Biscailuz.

**EXHIBIT 14**

Sheriff Baca — 2 — September 25, 2009

review. Commanders, facility captains and/or lieutenants were actively involved in the inspection of their facilities and assured us that advance preparations were completed as requested. We want to particularly thank Deputy Jason from Custody Support Services for his coordination and involvement throughout the inspections. Due to the efforts of Deputy Ford, most facilities were prepared for our on-site review and the inspection process proceeded smoothly.

The complete CSA inspection report is enclosed and consists of:
- This transmittal letter, which summarizes the inspection process and our findings;
- A "procedures" checklist that outlines applicable Title 15 sections for <u>adults</u> in custody, and provides more detailed comments related to the regulations (consolidated checklist presents all facilities on one document);
- Facility-specific documents, which provide:
  - Summary information sheets identifying each facility and listing areas of non-compliance;
  - The "physical plant evaluations" outlining requirements for design (Title 24, CCR); and,
  - The "living area space evaluations," which summarize the physical plant configuration for the detention area in each jail and provide comments related to establishing the Board Rated Capacity (BRC).

<u>As discussed during the exit conference, we appreciate the Chiefs' commitment to provide facility commanders and captains with a copy of the report.</u> We recommend continuing the practice of maintaining a permanent historical file of all inspections.

## Health and Fire Inspections

To obtain an overall view of jail conditions, the CSA report should be reviewed in conjunction with inspections that are statutorily required by the fire authority and the health department. Attachment A provides dates for the most recent reports, which were completed in 2004 or 2005. Several facilities do have current inspections on file. IRC, CRDF, CRDF Type I, NCCF, and Pitchess East are current with their fire report. The remaining facilities are due for a fire inspection and all facilities are due for the annual health inspection.

Prior to January 1, 2005 annual fire inspections were required of all jails (Health and Safety Code § 13146.1). Effective in 2005, statute was amended to require the inspections every two years. In Los Angeles County, the local fire authority completes these inspections. Several facilities do not have a fire clearance for this inspection cycle, see attached schedule.

Health and Safety Code (HSC) § 101045 requires the local health officer to conduct at least annual inspections of all places of detention. Their inspection includes evaluations of medical/mental health services (MMH), environmental health and nutrition.

Our office has received current medical/mental reports for all facilities except Pitchess North and CRDF Type II. Additionally, our office has not received current nutrition reports for NCCF, Twin Towers, CJ, and Pitchess East. Once the department receives the reports and addresses any issues, please forward a copy of the reports to CSA so our records can be updated and reflect compliance.

Sheriff Baca                          - 3 -                    September 25, 2009

**Corrections Standards Authority Inspection**

We consider the jails are operated under command of the Custody Operations and Correctional Services Divisions as a system.[2]   A number of areas that relate to the entire system are summarized below, followed by discussions of individual facilities.

Staffing/Compliance Officers:  Regulations require hourly safety checks that include staffs' direct visual observation of inmates.[3]  It is recognized that significant hiring has occurred since the last inspection cycle, LASD continues to grapple with the overall staff coverage for this enormous system. Documentation and staff reports confirm the checks are being done for the most part. NCCF will be *out of compliance* with hourly checks because staff often performs a visual check from the control station or bar fronts. Further, it is understood that there have been some isolated incidents where direct visual checks were not being performed at **CJ**.  This inspector does not believe these isolated incidents warrant a non compliance issue for the entire facility. While the CSA found the department in compliance with safety checks during this inspection cycle (with the exception of NCCF), it is anticipated that the safety check procedure may be in jeopardy if staffing levels are reduced.

Staffing levels will continue to be one of the major challenges facing the detention system as the economic crisis in this state continues. The span of control continues to be lacking. During the last inspection cycle the ratio of sergeants to line staff was 1:25, this inspection cycle revealed 1:18, which is definitely an improvement. Also, as indicated above, significant hiring has occurred since the last inspection cycle which has allowed the reduction of overtime time by approximately 37 %. The 2007 overtime cost was $46,802,405 and the 2008 overtime cost was approximately $28,917,716. Unfortunately, CSA continues to have concerns about overall staffing. Based on the challenges of continued hiring and maintaining qualified staff, the inadequate span of control for supervision, and the inability to provide inmates' services (exercise and hourly checks), we found the department to be out of compliance regarding staff, *Title 15 Section 1027-Number of Personnel.*

Training:  The Department has gained compliance in all areas of the regulations this inspection cycle. It was anticipated that the department would gain compliance with the training requirements once the STC funding was restored in the State budget.  Training is essential to ensure that staff can perform their jobs as expected and is an important defense in the event of litigation.

Crowding:  While populations are generally lower than previous inspections, crowding in excess of the Rated Capacity (RC) continues throughout the system. Men's Central Jail was ordered by the federal court to eliminate hundreds of beds at the facility due to an ACLU complaint. Where this has helped the crowding condition at Men's Central Jail in some of the housing locations, crowding continues to plague all facilities with some operating at nearly double their rated capacity.  As noted in previous reports. system crowding is a complex, long-standing problem for which there are no easy resolutions: however. the reopening of CRDF and South facilities for full

---

[2] The Sheriff's Station Jails and the Court Holding Facilities, under command of the Patrol and Court Services Divisions. will also be inspected in 2007. with reports provided under separate cover.
[3] Audio and video monitoring can supplement. but not replace direct visual observation.

Sheriff Baca                                    - 4 -                          September 25, 2009

operation appears to have addressed the immediate urgency for relief.   Although crowding contributes to overall cleanliness and maintenance problems, during this inspection most facilities appeared to be clean and orderly.

Attachment B outlines the Rated Capacity (RC) and the population for each facility at the time of our inspection.  The "Living Area Space Evaluation" for each facility discusses RC calculations in greater detail and is included in the full inspection report.

<u>Juveniles:</u>

Per department policy juveniles are not held in the adult jail system.

<u>Health Care Services:</u>

The on-site visit revealed that medical staff coverage continues to be a systemic problem within LASD's Correctional system.   The limited coverage of medical staff at the Pitchess compound continues to be a concern and it remains critical that assessments and reviews of medical services throughout the LASD correctional system are performed.   Pitchess Compound-currently there is medical coverage 24 hours a day at NCCF and South facilities.  East and North continue to be dependent on medical staff at NCCF after 1400 hours until 0600 hours the next morning. With over 7600 inmates at the Pitchess compound, it is critical that there is adequate medical staff assigned. As indicated during the last inspection, to further complicate the situation, in the event an inmate needs medical attention after 1400 hours and before 0600 hours, uniformed staff is responsible for taking the inmate out of a secure environment to the NCCF facility where the on-duty medical staff is assigned. This is a dangerous and staff intensive approach to provide medical services. It continues to be highly recommended that the medical staff become *mobile* during these after hour situations.  Each facility has medical offices, exam rooms, computers, etc. that enable the staff to provide medical services at each facility location. It is apparent there is a philosophy of "convenience" when dealing with medical issues across the system. Further, uniformed staff is required to transport inmates to the nearest hospital nightly (often multiple trips each night) because of the lack of medical services at the facility. At times, a transport to the hospital requires two uniformed staff, this further compounds the issue of lack of staff at the facilities. Finally, if an inmate is seen at a hospital and cleared by hospital doctors, the inmate must be transported back to the IRC for yet another medical clearance prior to the inmates return back to their assigned housing facility.  The policy to return already medically cleared inmates back to the IRC for another clearance is yet another practice that contributes to the crowding of the IRC facility. Constantly moving inmates for medical treatment is staff intensive and certainly not efficient. While it is understandable that staff continue to adapt to staffing shortages in order to get the job done, it is clearly dangerous and costly.  Once again, as indicated in the last inspection report, *LASD must recognize that security is paramount and operations must revolve around the safety and security of the correctional system, not medical services.*

It is evident that there are staff shortages for mental health personnel.  Mental health staff continues to work within the confines of the court ordered DOJ requirements, which unfortunately often conflicts with Title 15 California Code of Regulations. See further detail regarding mental health conditions under the Twin Towers section of this report.

Sheriff Baca                           - 5 -                    September 25, 2009

<u>Intake Services:</u>  In January 2005, the IRC assumed operational responsibility for TTCF housing units 231 and 232.  While there is still lingering questions as to how 231 and 232 housing is used at the IRC, great improvements have been identified at this facility.  It was identified that inmates are moving well through the IRC system.  Typically inmates are housed within 4 to 12 hours.  Although some delays continue at the medical screening of the process, it is recognized that delays have improved greatly since the last inspection cycle.  Medical screening is a very critical component of the booking process and adequate placement of inmates in need of medical treatment is equally important.  However, the housing units (231/232) continue to be crowded above rated capacity due to medical placements.  It was explained to me that only inmates that need acute care are held in 231 and 232 units.  After visiting the unit it was determined that some inmates were held in those units for minor medical conditions.  Once again, as indicated in the last inspection cycle report, inmates should be housed as soon as possible after delivered to the IRC.  Since the IRC is an intake facility, minimum services (outside of medical) are available for the inmates held in 231 and 232 units.  Further, all facilities with the exceptions of East and North have complete medical services.

Finally, the Chiefs' command staff and medical staff's commitment to improvements at the IRC should be recognized.  While there is room to shore up some lingering issues, the overall improvement of operations at the IRC is remarkable.  The work of all levels of staff is commendable for these improvements in such a massive system.

<u>Classification:</u> The department has been using the North Point classification system (developed outside of California).  All classification is completed by staff at the IRC and CRDF (females).  During the on site inspection it was identified that there are several available beds in the system and many other units operating crowded.  As indicated during the last inspection cycle, staff advised that the available beds were for a different classification and that they had no inmates at that classification to occupy the beds.  It continues to be a recommendation, with a system as large as Los Angeles, the classification of beds should be fluid.  By changing the classifications of beds when warranted, more beds can be occupied throughout the system.  One other area of concern is LASD's ability to *prove* an inmate has been classified.  There is clearly an in depth process that takes place when an inmate is classified, however the inmate is not required to sign for his or her classification information identified.  Although this is not a compliance issue, and staff was able to produce classification records for random inmates, having an inmate sign for their specific classification information would eliminate any question as to whether an inmate had been classified appropriately.

<u>Discipline:</u>  LASD has a sound discipline policy, however the procedure for discipline is lacking. Several steps must be taken in a disciplinary process within certain timelines as identified in the regulation.  After a review of the F.A.S.T system, it was identified that the entire disciplinary process integrity is based solely on staff's data entry into this system.  With the exception of South, North and Men's Central facilities, documentation could not be provided that ensured the process was occurring and inmates were noticed accordingly during a disciplinary process.  In an effort to find out how the disciplinary process was performed several inmates were interviewed. Inmates at Men's Central facility provided all their copies of the disciplinary process which reflected appropriate timeframes and notifications required by regulations.  Even though there is not an inmate signature required for any step of the process, the inmates were able to produce

Sheriff Baca                              - 6 -                      September 25, 2009

adequate paperwork that confirmed policy was being practiced. The inmates at South and North facility also provided the paperwork necessary for compliance to be determined. These facilities developed a half sheet with the required questions and timeframes required by regulation with the inmate's signature. Unfortunately, when inmates were interviewed at the remaining facilities we received conflicting information and limited documentation was available outside of the F.A.S.T. system and that system often times was not complete. Just as unfortunate, is that this inspector was left to depend on inmates providing information to determine compliance at the other facilities because valid documentation was not available from the department. Equally alarming is the dependence on inmates to determine if department policy is followed. If the inmates chose not to produce the required paperwork at Men's Central the facility would have been out of compliance also. It is dangerous business to depend solely on inmates to determine compliance with any policy or regulation as they may or may not be truthful and forthcoming. It is highly recommended that practice is consistent with policy and documentation is available to confirm policy is practiced. It is very dangerous to impose discipline and have a process that does not include the inmate's signature. When the inmate signs the paperwork for the discipline process, that notifies the inmate of the charges against him/her, allows the inmate to represent themselves during action, and affords the inmate the ability to appeal. With an inmate signature there is no question that all requirements were afforded to the inmate. Staff felt that inmates would refuse to sign the discipline form and therefore would be a waste of time to request the inmate's signature. Throughout California inmates consistently sign their discipline forms and on the occasion when they refuse it is merely documented on the form that the inmate refused to sign and the date and time are notated. Regulation does not require or state inmates must sign the paperwork; however, it is the department's responsibility to demonstrate all elements of the regulation are met. It is also recommended that the department develop one procedure for the discipline process of inmates in the LASD system. One procedure is conducive for staff consistencies when the same policy and procedure is applied at all facilities. Although the disciplinary process is considered a system concern, only East, NCCF, TTCF, and CRDF will be found out of compliance with *Title 15 Section 1081 Plan for Inmate Discipline and Title 15 Section 1084 Disciplinary Records.*

Grievances: Since the last inspection LASD developed a new form for grievances and modified the grievance policy based on an ACLU action. After reviewing over a hundred grievances it was clear that there are some significant concerns with the form and policy and procedure regarding how an inmate files a grievance. The new form developed is essentially a three purpose form. The form is used for complaints regarding confinement and services, request for service and complaints against personnel. Ideally grievances should be a distinct process by which any inmate may appeal and resolve grievances relating to any conditions of confinement, including but not limited to: medical care, classification actions, disciplinary actions; program participation; telephone, mail and visiting procedures; food, clothing and bedding. Such policies and procedures shall include:

  1) a grievance form or instructions for registering a grievance;
  2) resolution of the grievance at the lowest appropriate staff level;
  3) appeal to the next level of review;
  4) written reasons for denial of grievance at each level of review which acts on the grievance;
  5) provisions for response within a reasonable time limit; and,

Sheriff Baca                                    - 7 -                            September 25, 2009

6) provisions for resolving questions of jurisdiction within the facility[4].

While the newly developed form could serve the purpose of a grievance form, it is time consuming, confusing, staff typically does not fill the form out correctly, and inmates do not complete the form by indicating if it is a grievance/complaint or a request for services. Clearly grievances are handled differently than requests for service and the inmate should make the determination if they are grieving services or requesting services. Further, complaints against staff conduct should be handled differently than both a grievance and inmate requests. After interviewing staff and understanding some history behind the ACLU's complaints about the grievance system, inmates alleged that staff was discarding inmate grievances regularly. Statistical data that was reviewed revealed that over 16,000 inmate grievances were logged the last inspection visit (2007) and 3839 ACLU complaints (2007) logged (which typically fall under the inmate grievance category). LASD exceeds regulations by providing inmates opportunity to complain about conditions of confinement by offering the ACLU complaint process in addition to the grievance process. It is clear by the sheer numbers of complaints and the availability to complain that it is not a typical practice for LASD to purposely discard grievances. What's more unfortunate is that the new grievance form and policy were designed to protect the inmates' best interest rather than to protect both the inmates and the LASD's best interest, by improving the integrity of the process overall and ensuring services. Outside of the form being confusing (for the inmate and staff), attempting to serve three (3) different purposes, and staffs resistance to its use (time consuming), the steps and dissemination of the form are alarming. The policy is designed for the inmate to fill out the triplicate form, sign it, retain the pink copy and place the yellow and white copy of the form in a locked repository in the housing unit (so the inmate has proof of their grievance). A Sergeant is required to retrieve the grievance/complaint/request forms from those repositories each shift. Concerns of the process begin when the inmate fills out the grievance/complaint/request form, signs it and deposits it. There is question as to what purpose the inmate signature serves at this point. This does not prevent grievances from being lost or discarded. The inmate could easily fill out the grievance, sign it and keep his/her pink copy and throw the yellow and white copy in the garbage. The inmate could then produce his/ her copy and allege the department staff is discarding the grievances. If a signature is required it must be useful and preserve the integrity of the process. Typically in a jail setting grievances are a triplicate form, it is filled out and signed by the inmate then given to a staff person who reviews it, discusses the grievance with the inmate, takes care of the inmates grievance immediately and signs it and gives the pink copy to the inmate or signs it and gives the inmate their pink and the formal process begins with the yellow and white copy forwarded to appropriate personnel. The signatures of the inmate and the staff hold all parties accountable and resolution of the complaint imminent.

Currently policy does not allow grievances to be handled at the lowest appropriate staff level because Sergeants are required to collect all grievances and there was no evidence that an appeals process occurs, which both are requirements of the regulation. Additionally, there is no clear evidence of what an inmate is grieving and what they are requesting. Typically inmates are filling the form out and not indicating if it is a request or a grievance. After reviewing the sampling of grievances, often, this inspector could not determine if the inmate was filing a grievance or a request. The sergeant makes the determination and handles it accordingly.

---

[4] Title 15 Section 1073 Inmate Grievance Procedure

Sheriff Baca                              - 8 -                         September 25, 2009

It is strongly recommended that the department review/revise the grievance policy and procedure and include practitioners during the revision process. A critical component to any procedure is that the staff understands why they are performing certain duties. During my inspection, staff (all levels) complained at every facility about the form and procedure for inmate grievances. Staff concern was somewhat alarming because during my tenure as the LASD Field Representative LASD staff is typically very proud of their work and operations and quickly defends their good practices. Their response was clearly out of the norm and a clear indication that the policy and procedure needs to be reviewed; including modifying the form, how grievances are processed, and allowing the line level staff to get involved with the inmates' complaints and request process. The department was found out of compliance with *Title 15 Section 1073-Grievance Procedure*

<u>Policies and Procedures:</u>   Custody Support Services Division continues to maintain all correctional departmental policy. This was a massive effort and we want to reinforce the importance of maintaining this document. Additionally, we support the Department's continued plan to review each facility's Unit Orders for consistency with CDM. *We recommend that whenever there are areas that do not require a unique approach at the facility, that a CDM policy be established for the Division overall.* There are policy sections that need to be developed for the CDM in order to be in compliance will all regulations. Many of the policy deficiencies would fall under the CDM because all facilities should be operating consistently in those identified areas of the title 15 Regulations.

<u>Programs:</u>  Outstanding Programming continues throughout the LASD Correctional system. The Department continues to offer over 60 different programs to eligible inmates. Thousands of inmates are receiving educational or vocational services in addition to social services provided at the department. All of the programs are administered through the Correctional Services Division. Jail Enterprises works closely with Custody Division and the Hacienda La Puente Unified School District, which facilitates vocational training programs by providing classrooms and inmate security. Most shops have State of California vocational credentialed instructors who teach the students core competencies in their specific areas of expertise. The vocational training programs afford students the chance to learn marketable job skills which can lead them to successful re-entry back into the community.  Program staff was interviewed during the inspection and the importance of data collection was discussed. The department is collecting key data to demonstrate program effectiveness. It is recommended that data is collected in a manner which demonstrates the effects directly related to recidivism. We applaud the department and the Custody and Programs Division for their commitment and dedication to the impressive programming that is offered throughout the correctional system.

<u>Systems for Internal Monitoring:</u>  The Divisions have impressive internal monitoring systems for tracking and responding to department needs.  These systems include the comprehensive Command Inspections that have been implemented for several years.  The Sheriff's Critical Information Forum (SCIF) also provides a forum for managers and administrators to identify Division trends and respond to problems.

Sheriff Baca                          - 9 -                      September 25, 2009

The Uniform Daily Activity Logs (UDAL) are maintained by each housing unit and are an invaluable system for tracking key activities associated with Title 15 compliance and unit operations. The document was recently updated and modified.

The IRC continues to use a bar code tracking system to better account for the length of time it takes to process inmates through intake procedures. This is the third inspection during which the Department has been able to generate reports on the length of time prisoners are in IRC. This capability should continue to be refined, as the importance of monitoring and managing intake is especially critical in a system this large.

The Facility Automated Statistical Tracking (FAST) system continues to be an excellent management tool that provides the Divisions with opportunities to track and utilize inmate complaints for gathering information and making management decisions. The system also tracks use of the "safety chair" and we accessed that database during this inspection. It is recommended that the inmate disciplinary process in the F.A.S.T system be reviewed. After reviewing many disciplinary actions in the F.A.S.T. system it was identified that all fields are not being used or data entry is not complete. It may be helpful in gaining compliance with the disciplinary process if a single page can be printed for each disciplinary action that includes an inmate sign off section.

*All* facilities are out of compliance in the following policy and procedure areas:

*Title 15 § 1027 Number of Personnel:* See content in letter and checklist.

*Title 15 § 1044 Incident Reports:* See comments in the checklist.

*Title 15 § 1063 Correspondence:* Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:* See comments in the checklist.

Compliance issues that are specific to each facility are outlined below. Additionally, there are non-compliance areas identified in the health inspection reports that are under review by the Department and not listed in this section. Please refer to the health inspection checklists for additional recommendations and discussion.

### Inmate Reception Center (IRC)

The on-site inspection occurred June 4, 2009. The IRC is identified as a Type II facility that serves as the intake facility for males only. This designation also recognizes that IRC functions as the intake area for the entire system and is more consistent with how the CSA looks at intake areas in other counties. In making the decision to inspect the IRC as a Type II facility, we recognize that programs and services typically included in a Type II are provided upon transfer to the housing facility (e.g., exercise, visiting, correspondence, disciplinary processes, etc.).[5] At the time of the inspection, housing units 231 and 232 that fall under the IRC were holding inmates over the rated capacity (336) at 383 and 49 inmates were pending processing (in holding cells). These numbers of inmates at the IRC reflect a massive improvement in processing inmates and housing inmates in a timely manner. The current number of inmates waiting processing or housing during our site visit compared to the number of inmates (1200) in the 2006-2008 inspection cycle is a clear statement that operational changes have been made to improve the system at the IRC.

Although the overall processing of inmates has vastly improved, it is still contended that inmates need to be medically screened and cleared in a more expeditious manner.

*Sobering Cells*- Provided the sober cells are only used for inmates under the influence that requires protection such as a sobering cell, the department is in compliance with this regulation. In the event the department uses the sobering cells for regular holding cells, the department would be out of compliance with this regulation.

The facility staff is keeping thorough and complete records, which is a considerable improvement since the last inspection. Captain Cooper and designated staff participated in the inspection process. Additionally, the staff was well prepared and organized for the on site visit. Documentation was readily available and staff answered questions and offered clarification during our review.

There were no areas of non-compliance specific to this facility.

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:* See content in letter and checklist.

*Title 15 § 1044 Incident Reports:* See comments in the checklist.

*Title 15 § 1063 Correspondence:* Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:* See comments in the checklist.

---

[5] We also considered identifying IRC as a 96-hour Type I facility; however, that designation is typically for smaller facilities that "stand alone" and did not as clearly recognize IRC as the intake area for the entire system.

Sheriff Baca                         - 11 -                         September 25, 2009

## Central Jail

The on-site inspection occurred on June 11, 2009.  The facility housed 4,373 inmates at the time of inspection.  While the population is well under the rated capacity (RC), many housing units are still operating over their identified RC.[6]  With the cell and shower renovations, the RC went from 5,236 to 5,108 total capacity.   A steam cleaning program has been initiated since the 2005-2006 inspection and it is proving to be very successful. Although CJ is a very old facility, it appears to be well maintained and extraordinarily clean since past inspections.  It is recommended that one system is used for the documentation of outdoor recreation; there is no need for duplication of documentation which creates additional work for staff.

Several inmates were interviewed during the inspection. The inmates were well aware of the inmate rules, disciplinary process and forms available for requests for service. There is a clear and distinct process at Men's Central when dealing with inmate discipline. It is recommended that the department review this process and consider applying it at all facilities to remedy the deficiencies that exist at other facilities.

The staff was well prepared and organized for the on site visit. Captain Cruz and designated staff participated in the inspection process.  Documentation was readily available and staff answered questions and offered clarification during our review.

There were no areas of non-compliance specific to this facility.

**System wide Title 15 Regulation non compliance areas:**

*Title 15 § 1027 Number of Personnel:* See content in letter and checklist.

*Title 15 § 1044 Incident Reports:*  See comments in the checklist.

*Title 15 § 1063 Correspondence:*  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:*  See comments in the checklist.

Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24, Section 470A.2.8 Dormitories*:  Dormitory capacity exceeded.
*Title 24, Section 8227 Multiple Cells*:  These were authorized in early regulations and are applied to some areas of the facility.  Rated capacities are exceeded.

---

[6] There is also a court-established capacity, which we understand to be under 6,800 and the facility continues to be monitored by the American Civil Liberties Union (ACLU).

Letter 2009 LASD Baca Inspection LTR- 9/30/09

Sheriff Baca                            - 12 -                        September 25, 2009

## Twin Towers Correctional Facility (TTCF)

The on-site inspection occurred on June 11, 2009. The facility housed 3,875 inmates at the time of the inspection, which is up from the last inspection when 3,463 inmates were housed. The two towers are operating well over their rated capacity.

A continued concern is whether Tower I should be included in the CSA inspection process. The tower typically holds mental health inmates, it is not operated like a typical correctional facility where Title 15 regulations apply (regulations are often not met at this facility). The operation of this facility is typical of a public mental health facility opposed to a correctional facility. Because the department is under a court order not to use safety cells, inmates are regularly cuffed and shackled in their housing unit wearing only a safety garment. Inmates are held in their cells under these conditions for hours or days at a time, which violates the requirements of *Title 15 Section 1058 – Use of Restraints Devices.* Several inmates were shackled and cuffed to the table in the dayroom area for their dayroom time, unable to move freely in the area.

One housing unit at Tower I houses inmates that are not classified under a typical correctional classification system. Due to the nature of the mental health program, inmates are classified by their zip code. Typically, inmates are classified based on charges, criminal sophistication, criminal background, gang affiliation, etc. Therefore, Twin Towers I is out of compliance with *Title 15 § 1050 Classification.*

Inmates are moved about the facility at mental health staff's direction. After interviewing uniformed staff that works in the facility it became very clear uniform staff is present only for security measures. Further, there is no evidence that regular outdoor exercise is occurring. Staff clearly articulated that it is the mental health staff's decision whether inmates get recreation (when it will not interfere with mental health programming), which violates the requirements of *Title 15 § 1065 Exercise and Recreation.*

The staff implied they cannot perform Title 15 requirements without the permission or approval of the mental health staff.   There is question whether inmates are housed at Tower I as Administrative Segregation and if inmates are afforded due process regarding disciplinary situations. With custody powerless with the decision making process of this population, several Title 15 regulations are at question. *LASD must recognize that security and safety is paramount and operations must revolve around the safety and security of the correctional system, not mental health services.* While it is understood that there is a need to handle mental health inmates differently and that the department is under a DOJ court order, Title 15 and Title 24 regulations should not be ignored. Custody Operations must be actively involved in the day to day operations of the facility. Once again, the sheriff is ultimately responsible for these inmates, thus making it paramount that custody operates the facility with the help of mental health staff and services.

Staff at this facility was somewhat unfamiliar with the inspection process and some of the facility decisions makers were not available or did not have the basic knowledge of the overall operation during the on site inspection. Regarding use of restraints and use of force, there was a general disconnect as to how restraints are used and the period of time in which restraints are applied (this is outside restraints used at Tower I).  It is strongly recommended that staff is trained and familiar with

Sheriff Baca — 13 —   September 25, 2009

Title 15 requirements and how they relate to everyday operations. More specific, Sergeants, Lieutenants and Captains (facility decision makers) should have a general knowledge of Title 15 and how is applies to facility operations.

**We found the facility out of compliance with the following regulations:**

*Title 15 § 1050 Classification:* See comments in the body of letter.

*Title 15 § 1058 Use of Restraint Devices:*  See comments in the body of letter.

*Title 15 § 1065 Exercise and Recreation:*  See comments in the body of the letter.

*Title 15 § 1081 Plan for Inmate Discipline:* See comments in the body of letter

*Title 15 § 1084 Discipline Records:*  See comments in the body of the letter

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:* See content in letter and checklist.

*Title 15 § 1044 Incident Reports:* See comments in the checklist.

*Title 15 § 1063 Correspondence:*  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:* See comments in the checklist.


Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24, Section 470A.2.6 Single Occupancy Cells*:  Single occupancy cells are doubled.
*Title 24, Section 470A.2.8 Dormitories:*  Dormitory capacity is exceeded.
*Title 24, Section 470A.2.9 Dayrooms:*  Dayrooms capacity is exceeded.
*Title 24, Sections 470A.3.1, 3.2 and 3.4 Toilets-Urinals, Washbasins and Showers:*  Plumbing ratios are exceeded due to crowding beyond RC.

## Century Regional Detention Facility (CRDF-II)[7]

---

[7] The Century Type I Booking Center was separated from the Century Regional Detention Facility (Type II) during the 1998-2000 inspection.  This was done because juveniles are occasionally brought into the Type I Booking Center for photographing and printing, prior to being held in non-secure detention in the nearby Century (Patrol) Station Jail. Other than minors transferred to adult court as 707.1 and some exceptions for using an intoxalizer. WIC 207.1 prohibits minors from entering a Type II jail.  If statute is modified in the future, consideration can be given to recombining the facilities, but their separation has no known impact on operations.  The Century Type I Booking Center is under the Custody Division command structure, while the Century Station Jail is within the Patrol Division.

Sheriff Baca                              - 14 -                        September 25, 2009

The on-site inspection occurred on June 3, 2009. On March 26, 2006, CRDF opened up as a female facility. The RC at CRDF is 1,588. At the time of our inspection, the facility housed 1,777 inmates which is down from the last inspection cycle when 2,137 female inmates were housed.

CRDF is designed to where typically inmates have access to the recreation yard most of the day. However, there are a few housing areas that do not have continuous or free access; therefore staff is required to move inmates to the recreation yard. There are times when there is not enough staff available to ensure inmates go the outdoor yard. The facility is out of compliance with *Title 15 § 1065 Exercise and Recreation.*

As mentioned previously in this letter the disciplinary process is a system issue that needs to be addressed. CRDF could not provide documentation that demonstrates due process for the inmate during a disciplinary action. The facility is out of compliance with *Title 15 Section 1081 Plan for Inmate Discipline and Title 15 Section 1084 Disciplinary Records.*

Staff was well prepared for the on site visit. Captain Fogarty and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

**We found the facility out of compliance with the following regulations:**

*Title 15 § 1032 Fire Suppression and Preplanning*

*Title 15 § 1065 Exercise and Recreation*

*Title 15 § 1081 Plan for Inmate Discipline*

*Title 15 § 1084 Disciplinary Records*

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:*  See content in letter and checklist.

*Title 15 § 1044 Incident Reports:*  See comments in the checklist.

*Title 15 § 1063 Correspondence:*  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:*  See comments in the checklist.

Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24 Section 470A.2.6 Single Occupancy Cells.* Exceeds Capacity.
*Title 24 Section 470A.2.7 Double Occupancy Cells.* Exceeds Capacity.
*Title 24, Section 470A.2.8 Dormitories:*  Dormitory capacity is exceeded.
*Title 24, Section 470A.2.9 Dayrooms:*  Dayrooms capacity is exceeded.

Sheriff Baca                                    - 15 -                        September 25, 2009

Title 24, Sections 470A.3.1, 3.2 and 3.4 Toilets-Urinals, Washbasins and Showers:  Plumbing ratios are exceeded due to crowding beyond RC.

## Century Type I Booking (CRDF-I)

The on-site inspection occurred on April 23, 2007.  There are two single/double occupancy housing areas in this Type I facility, in addition to holding and detox/sobering cells in the intake area.  The RC for the housing area is 80. The facility was operating over rated capacity at the time of the inspection

The facility staff has created a sober cell log that is kept separately for the purpose of review, which is an improvement since the last inspection. Unfortunately, the log is not regularly reviewed to ensure policy and regulation is met and that the form is properly filled out. While there is great improvement, there is not enough consistency with the documentation to determine compliance. The facility is out of compliance with *Title 15 § 1056 Use of Sobering Cells.*

Staff was well prepared for the on site visit. Captain Fogarty and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

**We found the facility out of compliance with the following regulation:**

*Title 15 § 1056 Use of Sobering Cell.*

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:*  See content in letter and checklist.

*Title 15 § 1044 Incident Reports:*  See comments in the checklist.

Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24 Section 470A.2.6 Single Occupancy Cells:*  Exceeds Capacity.

## Peter Pitchess East Facility (East)

The on-site inspection occurred on June 8, 2009.  The facility housed 1,861 inmates at the time of inspection, in excess of the rated capacity of 926.  The facility is triple bunked.  Through added staff (OT), the facility is providing exercise and recreation for all inmates. The department has made a decision to integrate inmate population for better management and offering of services. This type of classification has defused the situation of concentrated gang power in specific housing units. Thus far the new approach has been successful. Although the facility is old, it appeared to be clean and in good order the day of our inspection.

Inmate disciplinary documentation was lacking and compliance could not be determined during this inspection; see comments previously mentioned in this letter. Several inmates were

Sheriff Baca — 16 — September 25, 2009

interviewed and a few out of several interviewed understood the disciplinary process, the other inmates claimed their discipline was handled incorrectly. The facility is out of compliance with *Title 15 Section 1081 Plan for Inmate Discipline and Title 15 Section 1084 Disciplinary Records.*

Staff was well prepared for the on site visit. Commander Rodriguez and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

**We found the facility out of compliance with the following regulation:**

*Title 15 § 1081 Plan for Inmate Discipline*

*Title 15 § 1084 Disciplinary Records*

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:* See content in letter and checklist.

*Title 15 § 1044 Incident Reports:* See comments in the checklist.

*Title 15 § 1063 Correspondence:* Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:* See comments in the checklist.

Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24, Section 470A.2.8 Dormitories:* Dormitory capacity is exceeded.
*Title 24, Section 470A.3.4 Showers:* Shower ratio is exceeded.

### Peter Pitchess North Facility (North)

The on-site inspection occurred on June 9, 2009. The facility housed 1,176 inmates at the time of inspection, in excess of the 768 BRC. See comments under the medical heading of this report for further comment on medical services at the facility. Although the facility is old, it appeared to be clean and in good order the day of our inspection. Several inmates were interviewed during the inspection. The inmates were well aware of the inmate rules, disciplinary process and forms available for requests for service.

Staff was well prepared for the on site visit. Commander Rodriguez, Captain Leva and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

**We found the facility out of compliance with the following regulations:**

Sheriff Baca                                    - 17 -                            September 25, 2009

*Title 15 § 1032 Fire Suppression Preplanning:*  A current fire inspection is not on file at CSA.

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:*  See content in letter and checklist.

*Title 15 § 1044 Incident Reports:*  See comments in the checklist.

*Title 15 § 1063 Correspondence:*  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:*  See comments in the checklist.

Physical Plant  (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24, Section 8227 Multiple Cells:*  These were authorized in early regulations and are only applied to some areas of the facility.
*Title 24, Sections 470A.3.1, 3.2 and 3.4 Toilets-Urinals, Washbasins and Showers:*  Plumbing ratios are exceeded due to crowding beyond RC.

### Peter Pitchess South Facility

The on-site inspection occurred on June 9, 2009.  At the time of the inspection, the South Facility housed 1445, in excess of the RC of 846.  See comments under the medical heading of this report for further comment on medical services at the facility.  This facility is at full operation since the last inspection cycle. Many improvements to facility have occurred since our last inspection. We toured the new barber shop and library of the facility. Several programs are built in to this facility, meaning certain housing areas represent a particular program. The Merit Program, Military Program and Bridges to Recovery Program are a few offered at this facility.

The facility staff created a half sheet to document the disciplinary process for inmates at the facility. The half sheet addresses concerns with inmate discipline as it lists all their rights and the inmates sign the form. This is one example the department should review and consider and apply at all facilities.

Although the facility is old, it appeared to be clean and in good order the day of our inspection.

Staff was well prepared for the on site visit. Commander Rodriguez, Captain Golden and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

There were no areas of non-compliance specific to this facility.

**System wide areas of Title 15 Regulation non compliance:**

*Title 15 § 1027 Number of Personnel:*  See content in letter and checklist.

*Title 15 § 1044 Incident Reports:*  See comments in the checklist.

*Title 15 § 1063 Correspondence:*  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

*Title 15 § 1073 Grievance:*  See comments in the checklist.

Physical Plant  (See Physical Plant and Living Area Space Evaluations for further discussion.):
*Title 24, Section 8227 Multiple Cells*:  These were authorized in early regulations and are only applied to some areas of the facility.
*Title 24, Sections 470A.3.1, 3.2 and 3.4 Toilets-Urinals, Washbasins and Showers*:  Plumbing ratios are exceeded due to crowding beyond RC.

### North County Correctional Facility (NCCF)

The on-site inspection occurred on June 9, 2009.  The facility housed 3,899 inmates at the time of inspection, in excess of the BRC of 2,208 inmates.  See comments under the medical heading of this report for further comment on facility operations.  See comments under the medical heading of this report for comment on facility operation.  The facility was well maintained and in order the day of our inspection.

Inmate disciplinary documentation was lacking and compliance could not be determined during this inspection, see comments previously mentioned in this letter.  Several inmates were interviewed and a few out of several interviewed understood the disciplinary process, the other inmates claimed their discipline was handled incorrectly. While all inmates interviewed had their copy of the initial discipline notice, documentation for the remainder of the process could not be provided. The facility is out of compliance with *Title 15 Section 1081 Plan for Inmate Discipline and Title 15 Section 1084 Disciplinary Records.*

Review of the outdoor recreation and exercise log revealed lack of consistent documentation for inmates going to the outdoor recreation area. Staff explained this as a staffing issue and at times there is not enough staff to operate the recreation yard. The facility is out of compliance with *Title 15 Section 1065 Exercise and Recreation.*

The design of this facility is different in reference to how the control station and housing units are designed. It is a new generation type facility; however, the module unit's facade is barred. The control station is an open area outside of the barred front module.  While touring the facility staff was asked how hourly checks were conducted in each housing area. It was determined that hourly safety checks are conducted from the bar fronts rather than making entry into the housing area and in each cell within the modular unit. While this type of hourly check may meet the regulation for a dormitory setting where all areas of the unit is in plain view with no blinds spots, it does not meet the regulation for this type of housing unit. Staff *can not* visibly see all areas of the unit. Captain Johnson participated during the on site inspection and made it very clear this issue would be addressed immediately once it was determined how the hourly checks were currently being performed. We do not anticipate this to be a problem at the next cycled inspection. The facility is out of compliance with *Title 15 Section 1027 Number of Personnel-Hourly Safety Checks.*

Sheriff Baca                          - 19 -                          September 25, 2009

Staff was well prepared for the on site visit. Commander Rodriguez, Captain Johnson and designated staff participated throughout the inspection. Documentation was readily available and staff answered questions and offered clarification during our review.

**We found the facility out of compliance with the following regulations:**

_Title 15 § 1027 Number of Personnel_

_Title 15 § 1065 Recreation and Exercise_

_Title 15 § 1081 Plan for Inmate Discipline_

_Title 15 § 1084 Disciplinary Records_

**System wide areas of Title 15 Regulation non compliance:**

_Title 15 § 1027 Number of Personnel:_  See content in letter and checklist.

_Title 15 § 1044 Incident Reports:_  See comments in the checklist.

_Title 15 § 1063 Correspondence:_  Two elements of the regulation need to be developed in the department policy. See comments in the checklist.

_Title 15 § 1073 Grievance:_  See comments in the checklist.

Physical Plant (See Physical Plant and Living Area Space Evaluations for further discussion.):
_Title 24, Section 470A.2.8 Dormitories:_  Dormitory capacity is exceeded.
_Title 24, Section 470A.2.9 Dayrooms:_  Dayrooms capacity is exceeded.
_Title 24, Sections 470A.3.1, 3.2 and 3.4 Toilets-Urinals, Washbasins and Showers:_  Plumbing ratios are exceeded due to crowding beyond RC.

**Compliance Plan:**

It is our understanding that the response to the recommendations and areas of non-compliance noted in this report will be coordinated through Custody Support Services Unit, as has been done in previous inspections.  Please provide us with this response, including the response to the most recent health inspection[§] by December 15, 2009.

This concludes our inspection report.  Thank you for the cooperation and assistance of your staff throughout the inspection process. Chiefs Yim and Burns are actively involved in the inspection process and the improvements of the system overall reflect their continued dedication and commitment to the operation of efficient and effective facilities. Although there are some areas of operation that need to be addressed, the massive system is an impressive one. Overall your staff

---

[§] Include all three sections of the health inspection: environmental health, nutrition and medical/mental health.

Sheriff Baca                          - 20 -                          September 25, 2009

demonstrated the utmost respect and professionalism during our visit. I look forward to working with your staff in the future. Please contact me to discuss any questions or when we can be of assistance.

Sincerely,

Magi Work, Field Representative
Facilities Standards and Operations Division
(916-327-3967; E-mail: magi.work@cdcr.ca.gov)

cc:     Chief Alexander Yim, Correctional Services Division
        Chief Dennis Burns, Custody Operations Division
        Chair, Board of Supervisors, Los Angeles County*
        County Administrator, Los Angeles County*
        Presiding Judge, Los Angeles County*
        Grand Jury Foreman, Los Angeles County*

        *Letter only; copies of this inspection are available upon request.

## Attachment A

## Local Fire and Health Department Inspections
### (As of 8/25/2009)
## Los Angeles County Sheriff's Department
## Custody Operations and Correctional Services Divisions Detention Facilities

| BOC Code | Facility Name | Inspection Date |
|---|---|---|

**1320   LA Central Jail**
Fire and Life Safety.................................. 9/18/2008
Health-Medical/MMH............................ 3/17/2009
Health-Environmental ............................. 9/5/2008
Health-Nutrition ..................................... 6/10/2005

**1325   LA Twin Towers Correctional Facility**
Fire and Life Safety................................ 8/22/2008
Health-Medical/MMH............................ 3/12/2009
Health-Environmental ............................ 11/2/2008
Health-Nutrition ..................................... 7/27/2006

**1330   LA Inmate Reception Center**
Fire and Life Safety   (clearance withheld)... 6/21/2008
Health-Medical/MMH............................ 9/16/2008
Health-Environmental ............................. 9/16/2008
Health-Nutrition ..................................... 6/29/2006

**1395   LA North County Correctional Facility**
Fire and Life Safety................................ 6/18/2009
Health-Medical/MMH............................ 8/12/2008
Health-Environmental ............................ 2/25/2009
Health-Nutrition   (no inspection report).... 6/13/2006

**1400   LA Pitchess East Facility**
Fire and Life Safety................................ 6/16/2009
Health-Medical/MMH............................ 3/10/2009
Health-Environmental ............................ 9/17/2008
Health-Nutrition ..................................... 8/14/2006

## Attachment A
## Page 2 of 2

| BOC Code | Facility Name | Inspection Date |
|---|---|---|
| 1410 | **LA Pitchess South Facility (North Annex)** | |
| | Fire and Life Safety | 6/15/2009 |
| | Health-Medical/MMH | 8/21/2008 |
| | Health-Environmental | 8/21/2008 |
| | Health-Nutrition | 8/21/2008 |
| 1415 | **LA Pitchess North Facility** | |
| | Fire and Life Safety (no inspection report) | 12/8/2006 |
| | Health-Medical/MMH | 7/3/2007 |
| | Health-Environmental | 8/28/2007 |
| | Health-Nutrition | 8/15/2006 |
| 1445 | **LA Century Reg. Detention Facility** | |
| | Fire and Life Safety | 2/16/2005 |
| | Health-Medical/MMH | 12/20/2007 |
| | Health-Environmental | 9/10/2007 |
| | Health-Nutrition | 5/19/2005 |
| 1530 | **LA Century Type I Booking Center** | |
| | Fire and Life Safety | 4/4/2007 |
| | Health-Medical/MMH | 9/30/2008 |
| | Health-Environmental | 9/30/2008 |
| | Health-Nutrition | 1/1/2007* |

Red indicates inspections that are not current.

\* This facility may not require a nutrition inspection

# Attachment B
## Rated Capacity and Facility Population
## June 2009 CSA Inspection
### Los Angeles County Sheriff's Department
### Custody Operations and Correctional Services Divisions Detention Facilities

| Facility | RC[i] | MMH & Discipline Beds[ii] | 2004-2006 Inspection Date | Population on Inspection Date |
|---|---|---|---|---|
| Inmate Reception Center[iii] | 336 | 0 | June 4, 2009 | 512 |
| Central Jail | 5,108 | 638 | June 4, 2009 | 4373 |
| Twin Towers[iv] | 2,244 | 292 | June 4, 2009 | 3875 |
| Century (Type II) | 1,588 | 0 | June 4, 2009 | 1777 |
| Century (Type I Booking Ctr.) | 80 | 0 | June 4, 2009 | 34 |
| Pitchess – East | 926 | Not Reported | June 4, 2009 | 1844 |
| Pitchess–North | 768 | Not Reported | June 4, 2009 | 1158 |
| Pitchess – South [v] | 846 | Not Reported | June 4, 2009 | 1364 |
| North County (NCCF) | 2,208 | Not Reported | June 4, 2009 | 3,952 |

[i] Rated Capacity (BRC) is primarily based on Title 24 physical plant regulations that were in effect at the time a facility was designed. The oldest LASD facilities are evaluated against the "1963" Board of Corrections (BOC) regulations, the earliest available for such purposes. The CSA (formerly BOC) may evaluate systems to increase rated capacities based upon later regulations that are "less restrictive" than those in place at the time of design; however, higher capacities can only be established when departments also meet applicable operational regulations and can demonstrate that they are sufficiently staffed on an ongoing basis to safely operate their facilities at the higher rating. It is recognized that the BRC is not a "constitutionally based" maximum. On a case-by-case basis, courts have deviated from the RC to establish a different and generally higher operating capacities. This occurred in some LASD facilities during past litigation (e.g., CJ has a court established capacity that we understand is approximately 6,800).

[ii] Medical, Mental Health and disciplinary beds are excluded from the RC pursuant to Title 15, Section 1006, which defines rated capacity as "...the number of inmate occupants of which a facility's single and double occupancy cells or dormitories, except those dedicated for health care or disciplinary isolation housing, were planned and designed inconformity to the standards and requirements contained herein and in Title 24." MMH and disciplinary beds are excluded because they are not designed or available for general population housing.

[iii] Effective 1/8/05, IRC assumed operation of the TTCF Units 231/232 to provide a bunk for inmates whose processing is delayed. At the 2005 inspection, we identified the IRC as a "Type II" facility because it is the intake area for the entire detention system. This was done with the recognition that many of the Type II operational requirements (e. g., visiting, exercise, programs) will be met by the housing facility after processing.

[iv] One hundred ninety-six beds are in the Correctional Treatment Center (CTC) in the Medical Services Building and TTCF has 96 disciplinary beds. While other units in TTCF are used for inmates with varying levels of mental health needs, they are designed to housing standards and are essentially available for general population housing. To date, they have been included in the BRC. The RC does not include the inmates or the beds in the locked unit at the LA County Medical Center (LCMC). In 2005 the TTCF RC was changed from 2,628 to 2,244 to adjust for the housing unitstransferred to IRC management.

[v] The RC was reduced from 910 to 846 to delete 64 beds when Dorms 41 and 42 were converted to dining.

1320

**Corrections Standards Authority**
**Adult Detention Facility**
**Inspection Cycle Information**

| | | | | |
|---|---|---|---|---|
| CSA Code: | 1320 | Inspection Cycle: | 08/10 |
| County: | Los Angeles | Inspection Date: | 6/11/2009 |
| City: | Countywide | Field Representative: | Work, Magi |

### A. Description

| | | | |
|---|---|---|---|
| Department: | Los Angeles Sheriff's Department-Custody Operations | Department #: | 1084 |
| Administrator: | Lee Baca, Sheriff | Phone #: | (323) 526-5541 |
| Address: | 4700 Ramona Blvd. | FAX #: | (323) 267-6000 |
| | Monterey Park, CA 91754 | Email: | ldbaca@lasd.org |
| Admin Desig.: | Sam Jones, Chief of Detention | Phone #: | (213) 893-5001 |
| Address: | Custody Operations Division | FAX #: | (213) 473-6058 |
| | Los Angeles, CA 90012 | Email: | s1jones@lasd.org |
| Facility: | LA Central Jail | Type: | IIJ |
| Facility Address: | 441 Bauchet Street | Phone #'s: | (213) 974-4916 |
| City, State  Zip: | Los angeles, CA 90012 | | (213) 974-4921 |
| Mailing Address: | | Fax #'s: | (213) 974-0746 |
| Manager: | Daniel Cruz | Phone # | (213) 974-4911 |
| Title: | Captain | Email: | dscruz@lasd.org |

### B. Physical Plant

| | | | |
|---|---|---|---|
| Year Facility Completed: | 1963 | Applicable Standards: | 1963 |
| Year Last Remodeled: | 1976 | | |
| Date of Anticipated Opening: | | | |

### C. Lawsuit Information

Court-ordered Population Cap (if applicable):

### D. Population Information

| Rated Capacity | | Non-Rated Special Use Beds | | Avg. Daily Population | |
|---|---|---|---|---|---|
| Total RC: | 5108 | Medical/Mental Health: | 602 | # Males: | |
| Total # of Beds: | 5758 | Disciplinary: | 36 | # Females: | |
| | | Other Beds: | 0 | | |
| Total Capacity: | 5746 | Total NRC: | 638 | Total ADP: | 0 |

### E. Local Inspections And Dates

| Inspection Type | Date | Inspection Type | Date |
|---|---|---|---|
| Fire and Life Safety | 9/18/2008 | Health-Environmental | 8/5/2008 |
| Health-Medical/MMH | 3/17/2009 | Health-Nutrition | 6/10/2005 |

## CORRECTIONS STANDARDS AUTHORITY - 2008-2010 BIENNIAL INSPECTION REPORT - TITLE 15 PROCEDURES
## LOS ANGELES SHERIFF'S DEPARTMENT CUSTODY OPERATIONS AND CORRECTIONAL SERVICES DIVISION FACILITIES[1]

| | | | |
|---|---|---|---|
| FACILITY: L.A. Inmate Reception Center (IRC) | TYPE: IIJ[2] | CSA #: 1330 | DATE: June 4, 2009 |
| PERSONS INTERVIEWED: Sgt. Shiela Martins, Lt. Margarito Robles, and Captain Gerald Cooper | | | |
| FACILITY: L.A. Central Jail (CJ) | TYPE: IIJ | CSA #: 1320 | DATE: June 11, 2009 |
| PERSONS INTERVIEWED: Sgt. Melinda Berry, Sgt. Michael Austin, Lt. Patrick Davoren, Lt. Jeff Enfield, and Captain Daniel Cruz | | | |
| FACILITY: L.A. Twin Towers Correctional Facility (TTCF) | TYPE: IIJ | CSA #: 1325 | DATE: June 11, 2009 |
| PERSONS INTERVIEWED: Deputy Christina Shilinga, Sgt. David Do, and Lt Holly Perez | | | |
| FACILITY: L.A. Century Regional Detention Facility (CRDF-II) | TYPE: II | CSA #: 1445 | DATE: June 3, 2009 |
| PERSONS INTERVIEWED: Deputy Janet Barragan, Lt. Roger Ross, and Acting Captain Bruce Fogarty | | | |
| FACILITY: L.A. Century Type I Booking (CRDF-I) | TYPE: IJ | CSA #: 1530 | DATE: June 3, 2009 |
| PERSONS INTERVIEWED: Deputy Janet Barragan, sgt. Greg Key, Lt. Roger Ross, and Acting Captain Bruce Fogarty | | | |
| FACILITY: L.A. Peter Pitchess East Facility (East) | TYPE: II | CSA #: 1400 | DATE: June 8, 2009 |
| PERSONS INTERVIEWED: Sgt. Valerie Silgero, Lt. Carlos Marquez, and Commander Ronald Rodriquez | | | |
| FACILITY: L.A. Peter Pitchess North Facility (North) | TYPE: II | CSA #: 1415 | DATE: June 8, 2009 |
| PERSONS INTERVIEWED: Lt. Clay Portier, Captain Ray Leva, and Commander Ronald Rodriquez | | | |
| FACILITY: L.A. Peter Pitchess South | TYPE: II | CSA #: 1410 | DATE: June 9, 2009 |
| PERSONS INTERVIEWED: Sgt. Robert Klein and Captain Bondell Golden | | | |
| FACILITY: L.A. North County Correctional Facility (NCCF) | TYPE: II | CSA #: 1395 | DATE: June 9, 2009 |
| PERSONS INTERVIEWED: Deputy David Judge, Sgt. James Lawrence, Lt. Victor Lopez, And Captain Gregory Johnson | | | |
| FIELD REPRESENTATIVE: Magi Work | | | |

[1] Biscailuz Recovery Center (BOC # 1340) was closed in June 2002 due to budget constraints; Pitchess South Facility (BOC # 1410) was partially operational as the "North Annex" at the time of the inspection, and Century Regional Detention Facility (Type II) was also partially operational, housing programs from Biscailuz.

[2] In 2005 the BOC changed the facility designation from a temporary holding to a Type II facility to reflect that it is an intake area for the other facilities in the system; it now provides beds in Units 231-232 for prisoners when processing is delayed.

A353 Type 2&3 PRO.doc (R/05)

-1-

**TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES**

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1020  CORRECTIONS OFFICER CORE COURSE[1]** <br><br> In addition to provisions of Penal Code Section 831.5, all custodial personnel have completed the "Corrections Officer Core Course" as described in Section 179 of Title 15, CCR. Custodial personnel may substitute 832.3 PC training and the "Corrections Officer Basic Academy Supplemental Core Course" as described in Section 180, Title 15, CCR as an alternative. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Department participates in the Standards and Training for Corrections (STC) program. All jail staff has been Core trained. See notes below with respect to annual training. <br> NCCF: 05-000/00 |
| **1021  JAIL SUPERVISORY TRAINING** <br><br> All supervisory custodial personnel have attended the STC or POST supervisory training. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| All supervisory custodial personnel have completed the "Corrections Officer Core Course" identified in Section 1020. *(The intent is that core training be completed prior to assuming supervisory responsibilities.)* | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| **1023  JAIL MANAGEMENT TRAINING** <br><br> All jail management personnel have completed either the POST or the STC management course specified in Section 182, Title 15, CCR. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| **1025  CONTINUING PROFESSIONAL TRAINING** <br><br> With the exception of any year that a core training module is completed, all facility/system administrators, managers, supervisors and custody personnel complete the annual required training specified in Section 184, Title 15, CCR. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | For purposes of this inspection, compliance reflects review of STC documentation. |
| **1027  NUMBER OF PERSONNEL** <br> There are sufficient personnel on duty at all times | NO | NO | NO | NO | NO | NO | NO | NO | NO | South Facility at the Pitchess compound has been fully re-opened since the last inspection cycle, which requires |

[1] For STC participating agencies, consistency with training sections 1020, 1021, 1023 & 1025 is annually assessed by the STC Division. Unless otherwise indicated, the regulatory intent is for training to occur within one year from the date of assignment.

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| (whenever there is an inmate in custody) to ensure the implementation and operation of all programs and activities required by these regulations. | | | | | | | | | | additional staffing. The span of control regarding supervisors and line staff was reported at (1:18) Overall, the facilities reported staffing levels with minimum vacancies. Overall, overtime was decreased by approximately 35% since the last inspection cycle. While the span of control has improved since the last inspection cycle (1:25), overtime has decreased, and low staff vacancies were reported, staffing levels are still a concern. IRC: Operation of TTCF units 231-232 was transferred to IRC in January 2005 to provide relief for IRC crowding and processing delays. CJ: This facility has reduced their number of OT hours significantly. Unfortunately many of the Title 15 positions were eliminated in order to reduce overtime. Uniformed staff vacancies were not reported. TTCF: Uniformed staff vacancies were not reported. CRDF-II & I: March 2006 CRDF was re-opened as a female facility. EAST, NORTH, AND SOUTH : continues to transport an excessive number of inmates to the NCCF facility or hospital for medical services, which takes staff away from the operations of the facility NCCF: Hourly checks are not being performed according to regulations. |
| There is a written plan that includes the documentation of hourly safety checks. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | NO | Custody Detention Manual (CDM) 4-11/030 & 020; 5-14/100.00. Reviewed "Title 15 Uniform Daily Activity Logs" (UDAL). For the most part staff is entering the housing units to provide direct observation of the inmates at the time of the check. IRC: Still have their Title 15 positions and hourly's are documented in the UDAL and monitored by supervisors. CJ: 3-07-010- see notes in body of letter TTCF: 5-03-070; 5-08-140 & 141; 5-030-03; Electronic checkpoints installed in Tower I (6th and 7th floors), Tower II, (242) and CTC |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| There is at least one employee on duty at all times with the ability to respond to any inmate in the event of an emergency (male and/or female; PC § 4021). | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CRDF I & II: 3-08-040 / EAST: 3-01-080 / NORTH & N. ANNEX: 3-75-130 / NCCF: 07-075/10-see notes in body of letter |
| A staffing plan is available which indicates personnel assigned and their duties. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 3-01/020.00 |
| Inadequacies in the staffing plan are reported, in writing, with recommendations to the local jurisdiction having fiscal responsibility. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Reviewed schedules. |
| | | | | | | | | | | Budget process. |
| 1029   POLICY AND PROCEDURES MANUAL [4] There is a published manual of policies and procedures for the facility that addresses applicable regulations and includes: | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | There is a Department Manual of Policies and Procedures (MPP) and a comprehensive Custody Division Manual (CDM). Both are maintained and available on the intranet. Command inspections meet the requirement for an annual security review, as required by this regulation. Facilities maintain unit orders pertaining to their operations. The Custody Services Division continues to review unit orders for consistency with the CDM. |
| Table of organization, including channels of communications. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 2-03/000.00 |
| Inspections and operations reviews by the facility administrator/manager. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 3-06/020.00 Facility Inspections |
| Use of force. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-09/430.00 |
| Use of restraint equipment. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-03/130.00 |
| Screening newly received inmates for release per Penal Code Sections 849(b)(2) and 853.6, and any other such processes as the administrator is empowered to use for release; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |

---

[1] Procedures related to security and emergency response may be in a separate manual to ensure confidentiality by limiting general access.

# TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Security and control, including: <br>(b) Physical counts of inmates; <br>(c) Searches of the facility and inmates; and, <br>(d) Contraband control and key control. <br>At least annually the facility administrator reviews, evaluates and documents internal and external security measures. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM: <br>Key Control-3-06/120.00 <br>Contraband/Searches- 5-08/010.00 <br>Counts- 5-05/010.00 <br>Admin Annual Review- 7-05/000.00 |
| Emergency procedures, including: <br>(e) Fire suppression pre-plan as required by Section 1032 of these regulations; <br>(f) Escape, disturbances, and the taking of hostages; <br>(g) Civil disturbance; <br>(h) Natural disasters; <br>(i) Periodic testing of emergency equipment; and, <br>Storage, issue and use of weapons, ammunition, chemical agents, and security devices. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 3-14/050.00 |
| Suicide prevention; and, | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| Segregation of inmates. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM-5-02/040.00 |
| The manual is available to all employees. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Computer access, Intranet. |
| The manual is updated annually. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 1-02/000.00; requires continuous review of policies and facility unit orders. <br>IRC: 1-02-002 <br>TTCF: Unit orders appear to be current and maintained. <br>CJ: Unit orders pertaining to emergency procedures <br>CRDF II & I: Program procedures reflect the current operation. The Booking Station has separate unit orders. <br>NCCF: Unit orders appear to be current and maintained. |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1032   FIRE SUPPRESSION PREPLANNING**<br><br>Pursuant to Penal Code Section 6031.1, there is a fire suppression pre-plan that has been developed in consultation with the responsible fire authority and includes: | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 3-14/000, 3-13/050 & 060 - emergency procedures include fire prevention and other emergencies<br>IRC: 4-09/000; 4-01 through 4-15 Emergency Procedures<br>CJ: 3-07-020; 3-13-020, 040, 060; 3-14-010, 020 & 030<br>TTCF: 3-13-020; 021; 3-13-100; 3-14-010; 3-07-020; 3-08-050; Emergency Procedures Workbook; training bulletins; emergency shut-off video<br>CRDF I & II: 3-13-010, 030; 3-14-010<br>EAST: 4-01-020, 060; 070;<br>NORTH & SOUTH 3-07-010;<br>NCCF: 08-060/00; Building Emergency Coordinator Manual |
| Monthly fire and life safety inspections by facility staff with a two-year retention of the inspection record; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | UDAL documents daily inspections by module staff.<br>IRC: Documented in "Fire Book" in the logistics office<br>CJ: UDAL<br>TTCF: Training staff does monthly fire drills that include inspection of key areas; records reviewed with the training staff.<br>EAST: Training Deputy maintains.<br>NORTH & N. ANNEX: Fire drills by staff<br>NCCF: Security checklist for each shift; fire drills with training staff |
| Annual fire prevention inspections as required by Health and Safety Code Section 13146.1(a) and (b); | NO | Yes | Yes | NO | Yes | Yes | NO | Yes | Yes | Current Fire inspections were not provided for the noted facilities during the on site visit.<br><br>North Facility and Century Type II.<br>It is assumed these identified facilities need to be inspected.<br><br>IRC-fire clearance withheld pending corrections. |
| An evacuation plan; and. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Included in above policy references |

**TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES**

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1040 POPULATION ACCOUNTING** The facility maintains an inmate demographics accounting system, which reflects the monthly average daily population of sentenced and unsentenced inmates by categories of male, female, and juvenile. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | NCCF: 07-105/01 Population accounting is tracked by IRC. |
| The Jail Profile Survey information is provided to the CSA. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Correctional Services Division reports data to the CSA. |
| **1041 INMATE RECORDS** There are written policies and procedures for the maintenance of appropriate individual inmate records which include intake information, personal property receipts, commitment papers, court orders, reports of disciplinary action taken, medical orders issued by the responsible physician and staff response, when appropriate, and non-medical information regarding disabilities and other limitations. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-09/010-Discipline; CDM 4-12/000 Specifies separation of MMH from custody records; MPP 02-09/050 identifies IRC roles in maintaining records. There are numerous cites in CDM and Unit Orders regarding documentation requirements, location and retention. |
| **1044 INCIDENT REPORTS** There are written policies and procedures for the maintenance of written records of all incidents that result in physical harm, or serious threat of physical harm, to an employee, inmate or other person. Such records include names of persons involved, a description of the incident, actions taken, and date and time of the occurrence. | NO | NO | NO | NO | NO | NO | NO | NO | NO | CDM: 7-29/000; 7-34/000; 7-52/000; and 4-07-010. The term "incident report" is typically associated with inmate discipline. Per the regulation, policy needs to be developed to address this regulation, specific to incident reports. Not all incidents deem discipline therefore; the section in the CDM does not address this regulation. |
| Written record is prepared by appropriate staff and submitted within 24 hours of the incident. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | IRC: 5-08/006.00 & 5-08/007 CRDF I & II: 4-2-010 & 011 EAST: 4-01-05. NORTH & N. ANNEX: 5-24-190 NCCF: 02-010/000 Report & Routing Procedures |
| **1045 PUBLIC INFORMATION PLAN** The facility has suitable written policies and procedures for the dissemination of information to the public, government agencies and news media. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Policy developed during the inspection. Practice indicates all information required is available. Reviewed information at all facilities. |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 15, CCR, Minimum Standards for Local Detention Facilities is available for review by the public and inmates. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| Facility rules and procedures affecting inmates as specified in this section are available to the public and inmates. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| **1046  DEATH IN CUSTODY** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM-4-10/050.00 |
| Written policy and procedures assure that there is a review of each in-custody death. The review team includes the facility administrator and/or manager; the health administrator; the responsible physician; and other health care and supervision staff who are relevant to the incident. | | | | | | | | | | |
| When a minor dies in a facility, the administrator of the facility provides the Corrections Standards Authority with a copy of the death in custody report that is submitted to the Attorney General under Government Code Section 12525, within 10 days of the death. | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Minors are no longer held in the LASD detention facilities. |
| **1050  CLASSIFICATION PLAN** | Yes | Yes | NO | Yes | Yes | Yes | Yes | Yes | Yes | CDM- 5-01/010.00, 1-01/000.00 |
| The facility has a written classification plan designed to properly assign inmates to housing units and activities. | | | | | | | | | | TTCF is classifying by zip code. |
| Includes receiving screening performed at intake by trained personnel. | Yes | N/A | NO | N/A | Yes | N/A | N/A | N/A | N/A | |
| Includes maintenance of a record of each inmate's classification level, housing restrictions and housing assignments. | Yes | N/A | Yes | N/A | Yes | N/A | N/A | N/A | N/A | Maintenance of records is apparent. The classification plan/policy needs to address the maintenance of records. |
| The facility has an actively functioning classification system and/or classification committee as specified. | Yes | Yes | NO | Yes | Yes | Yes | Yes | Yes | Yes | TTCF is not using the department classification plan. There are areas of the facility where inmates are classified according to their zip code. This is done so when the inmates are released they can participate in services in the community they live in. |

A353 (Type 2&3 PRO doc (8/05)

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1051  COMMUNICABLE DISEASES**<br><br>All inmates with suspected communicable diseases are segregated until a medical evaluation can be completed. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 4-08/000; 5-03/030; referred to medical staff in the IRC when identified at booking and to facility medical staff when identified elsewhere. The Divisions continue to work closely with DHS to respond to MRSA concerns.<br>IRC: 5-11/005<br>CJ: 5-08-040<br>TTCF: 5-09-300; 3-06-030<br>CRDF I & II: 5-09-10<br>EAST: Transfer to NCCF<br>NORTH & N. ANNEX: Transfer to NCCF<br>NCCF: 07-170/10 |
| In absence of medically trained personnel at the time of intake into the facility, an inquiry is made to determine if the inmate has or has had any communicable diseases, or has observable symptoms of communicable diseases, including but not limited to tuberculosis or other airborne diseases, or other special medical problems identified by the health authority. | Yes | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | Medical staff is on site at IRC 24 hours/day and screen inmates with suspected communicable diseases or other medical concerns. |
| Inmate's response is noted on booking form and/or screening device. | Yes | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | |
| **1052  MENTALLY DISORDERED INMATES**<br><br>There are written policies and procedures for the identification and evaluation of all mentally disordered inmates. An evaluation by health care staff occurs within 24 hours of identification or at the next daily sick call, whichever is earlier. Segregation is used only to protect the safety of the inmate or others. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM: 5-01/050; 5-03/030; 4-05/000; MH staff at IRC 24 hours/day where ID typically occurs; MH observation at TTCF, with higher levels of care in the CTC.<br>IRC: 2-05/002.10<br>CJ: 5-08-040<br>TTCF: 5-08-020, -070 & -090, 5-018-300; 5-17-030<br>CRDF I & II: Would not be held.<br>EAST: 3-4-020; transferred to NCCF<br>NORTH & N. ANNEX: 5-08-140; transferred to NCCF<br>NCCF: 07-170/35<br><br>Would be referred to medical for evaluation; typically taken to CJ, TTCF or CTC. |

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| There are provisions for transfer of such inmates to a medical facility for diagnosis, treatment, and evaluation of such suspected mental disorder, pursuant to Section 1209, Title 15, CCR. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Transferred to the CTC for evaluation and treatment decisions |
| **1053   ADMINISTRATIVE SEGREGATION** <br><br> There are written policies and procedures which provide for administrative segregation of inmates who are determined to be prone to: escape; assault staff or other inmates; disrupt operations of the jail; or, are likely to need protection from other inmates. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM 5-2/040.00 <br> IRC: 8-39/000 & 8-40/00; distinctions in holding cell use; Ad-Seg technically does not apply here-separation, while it holding, is provided. <br> CJ: 5-17/000 – Class. & Housing <br> TTCF: 5-17/010, 011, 012 & .300; 5-04-320 |
| The administrative segregation consists of separate and secure housing with no deprivation of privileges other than those necessary to obtain the objective of protecting inmates and staff. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | N/a | Yes | |
| **1055   USE OF SAFETY CELL** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | There is one safety cell in the Medical Services Building CTC, which is provisionally licensed under the State DHS and not inspected by the CSA. Although this cell was required for licensure, we were advised that it is not used. The text of this regulation was deleted from this checklist. |
| **1056   USE OF SOBERING CELL** <br><br> A sobering cell, specified in Title 24, Section 2-470A.2.4, is used only for holding inmates who are a threat to their own safety or the safety of others due to their state of intoxication. There are written policies and procedures for managing the sobering cell, including handling both males and females. | Yes | N/A | N/A | N/A | NO | N/A | N/A | N/A | N/A | Sobering/detox cells are at IRC and the CRDF Type I Booking facility. Policies are consistent with regulation however, CRDF Type I is now keeping a separate log for supervision review, unfortunately the log is not filled out completely and checks are not routinely documented. CSA was able to review logs for inmates that were held in the sober cell while under the influence at the IRC and all logs reviewed looked complete and well maintained, with a supervisor signing off on the *completed log.* |
| Intermittent direct visual observation of inmates in sobering cells conducted no less than every half hour. | Yes | N/A | N/A | N/A | NO | N/A | N/A | N/A | N/A | CRDF Type I- The log was sporadically filled out, not enough documentation to verify compliance |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| An evaluation by a medical staff person or by custody staff, pursuant to written medical procedures in accordance with Section 1213 of these regulations, occurs whenever any inmate is retained in a sobering cell for more than six hours. | Yes | N/A | N/A | N/A | NO | N/A | N/A | N/A | N/A | CRDF Type I- The log was sporadically filled out, not enough documentation to verify compliance |
| Such inmates are removed from the sobering cell when they are able to continue with processing. | Yes | N/A | N/A | N/A | NO | N/A | N/A | N/A | N/A | CRDF Type I- The log was sporadically filled out, not enough documentation to verify compliance |
| 1057   DEVELOPMENTALLY DISABLED INMATES<br><br>There are written procedures for identification and evaluation of all developmentally disabled inmates.  Any special housing is initiated when it is determined to be necessary pursuant to Section 1050, CCR. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Health Services Policy 205 governs the system.  Inmates are identified during the initial IRC intake and evaluated by MMH staff.  If inmates are suspected of being DD at the housing facility, they are referred to health services for evaluation.  There is a law enforcement liaison with the So. Central LA Regional Facility at TTCF. |
| A contact to the regional center occurs within 24 hours when an inmate is suspected or confirmed to be developmentally disabled. | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Would typically occur at IRC. |

A353 Type 2&3 PRO.doc (8/05)

**TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES**

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1058   USE OF RESTRAINT DEVICES**<br><br>Restraints are used only to hold inmates who display behavior that results in the destruction of property or reveals intent to cause physical harm to self or others. | Yes | N/A | Yes | Yes | N/A | N/A | N/A | N/A | Yes | This regulation applies to the long-term use of restraints, not restraints used for transport or to gain immediate control of a situation. CJ, TTCF, CRDF II, and NCCF facilities use the Pro-Straint safety chair. Tower I regularly shackles and cuffs inmates, then places the inmate in a cell. This practice is used because the department does not use safety cells, due to a court order. There is question as to how long an inmate is held in this manner.<br><br>Tower I- Many inmates were in safety smocks along with being cuffed and shackled or cuffed to a table in Tower I during our site visit. Many inmates are cuffed to the table for their dayroom time.<br><br>Twin Towers did not have any prostraint chair applications since the last inspection cycle. After inquiring about "no" prostraint chair applications it was determined that inmates are restrained with cuffs and shackles for behavioral reasons but there is not documentation that reflects how long an inmate was restrained. After a brief review of the use of force files, I could not determine how long inmates are in restraints. The staff assured me restraints are only applied for a short period time, it is critical that documentation supports the practice. This may be a system concern and will be closely reviewed the next inspection cycle. |
| Restraints are not used as discipline or as a substitute for treatment. | Yes | N/A | Yes | Yes | N/A | N/A | N/A | N/A | Yes | CDM Policy 5-03/130.5 governs the use of the safety chair (restraint) for the system and limits its use to two (2) hours, with the possibility of removing the inmate from the chair for 30 minutes before returning for another period of time, up to 2 hours. The policy does not appear to conflict with the regulation, although the question does arise as to why an inmate, who demonstrates bizarre behavior would be allowed to be released for 30 minutes and then returned to |
| There are written polices and procedures for the use of restraint devices including acceptable restraint devices; signs or symptoms which should result in immediate medical/mental health referral; availability of CPR equipment; protective housing of restrained persons; provisions for hydration and sanitation needs; and exercising of extremities. | Yes | N/A | NO | Yes | N/A | N/A | N/A | N/A | Yes | |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Inmates are placed in restraints only with approval of the facility manager, watch commander, or if delegated, a physician. | Yes | N/A | Yes | Yes | N/A | N/A | N/A | N/A | Yes | the chair. It appears the policy is written to avoid additional documentation that is required when an inmate is restrained for an excess of two hours. Although we did not find this happening in the documentation we reviewed, it is an area of policy that should be addressed by the decision makers of the department.<br><br>Tower I- see note above.<br><br>IRC- was the only facility that used the restraint chair since the last inspection cycle. The logs were consistent with policy and regulations with thorough documentation. |
| All inmates in restraints are housed alone or in a specified area for restrained inmates. | Yes | N/A | Yes | Yes | N/A | N/A | N/A | N/A | Yes | TTCF: At Tower I inmates are often placed in restraints and a safety smock then placed in a regular cell (because |
| Direct visual observation is conducted and logged at least twice every 30 minutes. | Yes | N/A | NO | Yes | N/A | N/A | N/A | N/A | Yes | they can not use a safety cell). It is anticipated inmates are |
| Continued retention in such restraints is reviewed every two hours. | Yes | N/A | NO | N/A | N/A | N/A | N/A | N/A | N/A | held in restraints for long periods of time at Tower I, due to mental health issues. |
| A medical opinion on placement and retention shall be secured as soon as possible but no later than four hours from the time of placement. | Yes | N/A | Yes | N/A | N/A | N/A | N/A | N/A | Yes | CRDF II. Safety chair used, documentation reviewed revealed all applications were within the 2-hour policy time period. Logs were thorough and complete. |
| Medical review for continued retention in restraint devices occurs at a minimum of every six hours. | Yes | N/A | Yes | N/A | N/A | N/A | N/A | N/A | N/A | |
| A mental health consultation is secured as soon as possible, but no later than eight hours from the time of placement. | Yes | N/A | Yes | N/A | N/A | N/A | N/A | N/A | N/A | |
| **1059  USE OF REASONABLE FORCE TO COLLECT DNA SPECIMENS, SAMPLES, IMPRESSIONS**<br><br>Pursuant to Penal Code Section 296, policy and procedures describe the use of reasonable force to collect blood specimens, saliva samples, or thumb/palm print impressions from individuals who are required to provide them, but refuse written or oral requests to do so. Policies and procedures address: | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | This process is performed at the IRC. IRC Unit Order 9.78. |

P:\Adult 1\t.efst\tvc.\1320\\LASD Type II PRO.doc 04/27/09

A353 Type 2&3 PRO.doc (8/05)

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| The use of reasonable force is preceded by documented efforts to secure voluntary compliance, including advisement of the legal obligation to provide the specimen, sample or impression, and the consequences of failing to do so. | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| Supervisory authorization is obtained prior to use of reasonable force. | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | |
| If the use of reasonable force includes cell extraction, the extraction is audio- and video-taped and retained by the department, as required by statute. (Consult with counsel statutes applicable to your Department.) | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Number 05-13 Court Services Division |
| The facility administrator reports any use of reasonable force to the Corrections Standards Authority within 10 days of the incident, in the format prescribed by the Authority. | Yes | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Field Operations Directive 05-01- issue date 12/20/2008 effective date 1/1/2009 |
| **1061   INMATE EDUCATION PROGRAM**<br>Facility administrator has planned and requested an inmate education program from appropriate public officials. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM: 5-13/130: Provided through La Puente Unified School District.<br>CJ: 5-23-050<br>TTCF: 5-23-020<br>CRDF II: 5-23-020<br>EAST: 5-23-020: Work and school placement; Dorm 320 converted to classroom; requesting additional classes<br>NORTH & N. ANNEX: 5-03-050; school dorm in North plus vocational program at the Annex<br>NCCF: 07-175/65 |
| Voluntary academic and/or vocational education is available to sentenced and pretrial inmates. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| **1062   VISITING**<br>Facility administrator has developed and implemented policies and procedures for inmate visiting. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM: 5-10/010.00<br>CJ: 5-15-000<br>TTCF: 5-15-010: 5-30-030<br>CRDF-II: 5-15-010<br>EAST: 3-10-010<br>NORTH & N. ANNEX: 5-15-010<br>NCCF: 07-140/00 |

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Visitation procedures include provisions for visitation by minor children of the inmate. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| (TYPE II ONLY) All inmates in Type II facilities are allowed at least two visits totaling at least one hour per week. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | IRC: The IRC has operated TTCF Units 231-232 since January 2005; it is the intake area for the remaining Type II facilities; access to visiting occurs upon transfer to permanent housing. |
| (TYPE III ONLY) Inmates in Type III facilities are allowed at least one visit totaling at least one hour per week. | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | With the closure of Biscailuz, there are no Type III sentenced facilities |
| (Type I Only) The plan includes a schedule that assures non-sentenced detainees will be afforded a visit no later than the calendar day following arrest. | N/A | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | CRDF-I: With this exception, all other stations are operated by Patrol Services. Visits would be made available upon request. |
| 1063   CORRESPONDENCE The facility administrator has developed written policies and procedures for inmate correspondence. The policy and procedures provide that: | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | MPP 5-03/190; CDM 5-06/070.00; 5-06/080; policies correspond to requirements in regulation; frequent inmate movement and system size complicate timely delivery. Inmate mail for basin facilities is processed and distributed through the IRC and at Pitchess for the ranch facilities. IRC: Mail would go to the housing facility. CJ: 5-10-000 TTCF: 5-10-010 CRDF I & II: 5-10-010- EAST: 5-01-030 NORTH & N. ANNEX: 5-10-010 NCCF: 07-175/06 |
| There is no limitation placed on the volume of mail an inmate may send or receive. | N/A | NO | NO | NO | NO | NO | NO | NO | NO | These two elements of the Correspondence regulation needs to be addressed in policy. |
| Mail may be read where there is a valid security reason and the facility manager approves. | N/A | NO | NO | NO | NO | NO | NO | NO | NO | |

## TITLE 15 PROCEDURES – L.A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Confidential correspondence with officials, the Corrections Standards Authority, the facility administrator and/or manager is permitted. Confidential mail searches for contraband, cash, checks, or money orders are conducted in the presence of the inmate. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-06/080 |
| Inmates without funds are permitted at least two postage-paid letters each week to family and friends, and unlimited postage-paid correspondence with his/her attorney and the courts. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 13/090.00 Personal Care items; requires stamps for indigent. |
| **1064   LIBRARY SERVICES**<br><br>The facility has developed and implemented written policies and procedures for inmate library service which include access to legal reference materials, current information on community services and resources, religious, educational and recreational reading material. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-13/150; 5-13/160<br>CJ: 5-23-060 & 061<br>TTCF: 5-23-030<br>CRDF I & II: 5-23-030<br>EAST: 5-23-070 & -060<br>NORTH & N. ANNEX: 5-23-060<br>NCCF: 7-175/40, 41 & 45 |
| **1065   EXERCISE AND RECREATION**<br><br>There are written policies and procedures regarding exercise and recreation | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM 5-13-120- All facilities need to develop "one" method for documenting outdoor recreation. After reviewing several different documents at the facilities we were able to determine recreation is occurring within the regulation at some facilities. Some facilities use the UDAL's (sporadically), some use roof logs, some facilities generate a separate report that is given to the Captain.<br>CJ: 5-23-041 & 042:<br><br>TTCF: 5-23-010- Twin Towers I is not receiving the required weekly hours of outdoor recreation. See inspection letter for further comment.<br>CRDF I & II: 5-23-090; access to yard from dayrooms There are a few housing units that do not have access to the exercise yard.<br>EAST: 5-01-020;<br>NORTH &SOUTH: 5-23-010<br>NCCF: 07-175-55; inmates are not regularly getting out to the exercise yard due to minimum staff. |

# TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| An exercise and recreation program is available to inmates in an area designed for recreation. | N/A | Yes | NO | NO | N/A | Yes | Yes | Yes | NO | See note above for Twin Towers, CRDF & NCCF. |
| The program allows a minimum of three hours of exercise distributed over a period of seven days. | N/A | Yes | NO | NO | N/A | Yes | Yes | Yes | NO | See note above for Twin Towers, CRDF & NCCF. |
| (Type I Only) Table games and/or television are available to inmates. | N/A | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | |
| 1066   BOOKS, NEWSPAPERS, AND PERIODICALS    There are written policies and procedures which permit inmates to purchase, receive and read any book, newspaper, or periodical accepted by the United States Post Office except for specified types of publications. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 7-02/00; 5-06/030.00 CJ: 5-10-00; 521001 TTCF: 5-21-310; 5/11-300 CRDF I & II: 5-10-010 EAST: 5-01-030; 5-01-050 NORTH & N. ANNEX: 5-10-010 NCCF: 7-175/05 & 7-175/50 |
| (Type I Only) There is a written plan to make available a daily newspaper in general circulation, including a non-English language publication, to assure reasonable access to interested inmates. | N/A | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | Review next inspection cycle. |
| 1067   ACCESS TO TELEPHONE    There are written policies and procedures that allow reasonable access to a telephone beyond those telephone calls required by Section 851.5 PC. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-13/020 CJ: 5-13-020 IRC: 5-12/003 TTCF: 5-13-010 CRDF I & II: 5-13-010 EAST: 3-01-070 NORTH & N. ANNEX: 5-23-090 NCCF: 7-175-60 |

A353 Type 2&3 PRO.doc (R/05)

T:\Adult X\ycle\Proc.1\321#\LASD Type II PRO-6-07/27/09

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1068   ACCESS TO COURTS**<br>There are written policies and procedures to ensure that inmates have access to the courts.  Such access shall consist of the following: | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-10/030<br>CJ: 5-23-061; 5-15-040<br>TTCF: 4-08-010; 5-17-040; 5-15-020; 5-10-010<br>CRDF I: 5-15-010<br>EAST: 5-02-010, 020, 110; 3-10-010<br>NORTH & N. ANNEX: 5-15-020<br>NCCF: 06-020/94 |
| Unlimited mail as provided in Section 1063(f) of these regulations. | N/A | Yes | | | Yes | Yes | Yes | Yes | Yes | 5-06/080.00 Confidential Legal/ Correspondence |
| Confidential consultation with attorneys. | N/A | Yes | | | Yes | Yes | Yes | Yes | Yes | |
| **1069   INMATE ORIENTATION**<br>There are written policies and procedures for the implementation of a program reasonably understandable to inmates designed to orient a newly received inmate at the time of placement in a living area, covering areas specified in this section of the regulations. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | IRC: Video shown and rules posted; orientation continued at housing facilities to varying degrees.<br>CJ: 5-23-070; In Cell 40 in Spanish and English<br>TTCF: 5-17-020; orientation video<br>CRDF I &II: 5-23-040; form used in the Type I<br>EAST: 5-01-100; card and video<br>NORTH & N. ANNEX: 5-23-030; video shown daily<br>NCCF: Orientation video shown daily |
| **1070   INDIVIDUAL/FAMILY SERVICE PROGRAMS**<br>The facility has written policies and procedures to facilitate cooperation with appropriate public or private agencies for individual and/or family social service programs for inmates.  Such a program utilizes available community services and resources either by establishing a resource guide or actual service delivery. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 2-00/040. Inmate Support Services<br>The Custody Transition Unit is physically housed at IRC to facilitate interaction with families and social services programs.  There are varying programs offered at each of the facilities and the Department is expanding program opportunities under the direction of the Operational Bureau of the Corrections Services Division.<br>EAST:  Programs include "Beat the Street" drug recovery<br>NORTH & N. ANNEX:  Expanding nursery and bicycle repair; ongoing laundry vocational program<br>NCCF: 03-005/00 – 3-010/05; food services, SATCU; vocational programs |

## TITLE 15 PROCEDURES – L.A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1071   VOTING**<br><br>Facility has written policies and procedures whereby the county registrar allows qualified voters to vote in local, state, and federal elections pursuant to the elections code. | N/A | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | CDM 5-13/140.00<br>TTCF: 5-24-310<br>CRDF I: Workers held for Compton & Century stations<br>CRDF-II: 5-23-100<br>5-02-130<br>NORTH & N. ANNEX: 5-24-040<br>NCCF: 07-175.45 |
| **1072   RELIGIOUS OBSERVANCES**<br><br>Facility has written policies and procedures to provide opportunities for inmates to participate in religious services and counseling on a voluntary basis. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM 5-13/100<br>CJ: 5-23-020<br>TTCF: 5-23-050<br>EAST: 5-03-010<br>CRDF I: No inmate workers currently held.<br>CRDF-II: 5-23-060<br>NORTH & N. ANNEX: 5-23-025<br>NCCF: 07-066/00 |
| **1073   INMATE GRIEVANCE PROCEDURE**<br><br>Any inmate may appeal and resolve grievances relating to any condition of confinement. Provision is made for resolving questions of jurisdiction within the facility. There are written policies and procedures that address the following: | NO | NO | NO | NO | N/A | NO | NO | NO | NO | MPP 5-12.010; CDM 5-12.010, .020 & .030<br>Facilities have well-developed procedures for processing and monitoring inmate complaints. Reviewed reports from the Division Facility Automated Statistical Tracking (F.A.S.T.) system, which allows management reports & comparison among facilities.<br><br>There is a significant problem with the definition of an inmate grievance and an inmate request. See comments in body of letter<br>IRC: Inmate complaints forwarded to the housing facility<br>CJ: 5-12-000<br>TTCF: 5-12-300<br>CRDF-II & I: 5-22-020<br>EAST: 3-01-020<br>NORTH & N. ANNEX: 5-12-010<br>NCCF: 07-175/35 & 7-035/00 |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| There is a grievance form or instructions for registering a grievance. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | |
| Grievances are resolved at lowest appropriate staff level. | NO | NO | NO | NO | NO | NO | NO | NO | NO | This element of the regulation needs to be addressed in policy. |
| There is provision for appeal to next level of review. Policy requires written reasons for denial at each level of review. Provision is made for response in a reasonable time limit. | NO | NO | NO | NO | NO | NO | NO | NO | NO | No evidence of an appeals process- see notes in body of letter. |
| **1080. RULES AND DISCIPLINARY PENALTIES** Facility has established rules and disciplinary penalties to guide inmate conduct. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM 5-09/000- see notes in body of letter. IRC: Incident reports would accompany inmate to housing facility for any disciplinary followup CJ: 5-22-00 TTCF: 5-22-010 CRDF II: 5-22-10; CRDF-I: No discipline administered EAST: 3-05-010 - 040 NORTH & N. ANNEX: 5-22-010 NCCF: 07-045/00 |
| Rules are written and posted in housing units and booking area or issued to each inmate. Verbal instructions are provided for inmates with disabilities that limit their ability to read. Illiterate inmates and others unable to read English, or material is provided in an understandable form. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | IRC: Posted in booking area |
| **1081 PLAN FOR INMATE DISCIPLINE** The facility administrator has developed and implemented written policies and procedures for inmate discipline, which address the following. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM5-09/030.00 IRC: Discipline is not administered CJ: 5-22-000 TTCF: 5-22-010 & 011; 4-01-010 CRDF II: CRDF-I: No inmate workers; no discipline administered EAST: 5-22-000 NORTH & N. ANNEX: 5-22-010 NCCF: 07-045/00 |

## TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| A designated subordinate, not involved in the charges, acts on all formal charges. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM- 5-09/040. |
| Minor acts of non-conformance or minor violations are handled informally by staff. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing informal handling of discipline. |
| When there is loss of privileges, there is written documentation and a policy of review and appeal to the supervisor. | N/A | Yes | NO | NO | N/A | NO | Yes | NO | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing an appeals process for discipline. |
| Major violations and repetitive minor violations being handled as major violations are referred to the disciplinary officer in writing by the staff member observing the act(s). | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing progressive discipline. |
| Inmate is informed of charges in writing. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing formal notification. |
| A disciplinary hearing is held no sooner than 24 hours after the report has been submitted to the disciplinary officer and the inmate served with a copy of charges. The inmate may waive the 24-hour limitation. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing timeframes for discipline. |
| Violation(s) acted on no later than 72 hours from the time the inmate is informed of the charge(s) in writing unless waived by the inmate or for good cause. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing timeframes for discipline. |
| The inmate is permitted to appear on his/her behalf at the time of the disciplinary proceedings. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040- policy sound but no evidence that practice is allowing timeframes for discipline. |
| The facility manager or designee reviews all disciplinary actions taken. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM- 5-09/040 |
| The inmate is advised in writing of the action taken in the disciplinary proceedings. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | CDM- 5-09/040 |
| Pending the disciplinary proceedings, the inmate may be removed from the general population or program for specified reasons. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM- 5-09/040 |
| **1082    FORMS OF DISCIPLINE** | | | | | | | | | | |
| The degree of punitive actions taken by the disciplinary officer is directly related to the severity of the rule infractions as specified in this section. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM- 5-09/040 |

P:\Adult Y:\cldt\tue\A1320\LASD\Type II PRO4-6-07/27/09

A353 Type 2&3 PRO3.doc (8/05)

# TITLE 15 PROCEDURES – L.A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| **1083   LIMITATIONS ON DISCIPLINARY ACTIONS** | | | | | | | | | | |
| No inmate is continued on disciplinary isolation status beyond 30 consecutive days without review by facility manager. Part of this review includes consultation with health care staff. Such reviews continue at least every fifteen days thereafter until isolation status has ended. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/050.00 |
| Disciplinary isolation cells have the minimum furnishings and space specified in Title 24, Section 2-470A.2. Inmates are issued clothing and bedding as specified in Articles 12 and 13 of these regulations. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | N/A | Yes | CDM-5-09/050.00 |
| Disciplinary cell occupants who destroy bedding and/or clothing may be deprived of such articles. The decision to deprive inmates of such articles is reviewed by the facility manager or designee every 24 hours. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | N/A | Yes | CDM-5-09/050.00 |
| No inmates exercise the right of punishment over other inmates per Section 4019.5 PC. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/050.00 |
| A safety cell, as specified in Section 1055 of these regulations, or any restraint device is not used for disciplinary purposes. | N/A | N/A | N/A | Yes | N/A | N/A | N/A | N/A | N/A | CDM-5-09/050.00 |
| No inmate is deprived of implements necessary to maintain an acceptable level of hygiene as specified in Section 1265. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/050.00 |
| Food is not withheld as a disciplinary measure. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/060.00 |
| Disciplinary isolation diet described in Section 1247 of these regulations is only utilized for major violations of institution rules. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/060.00 |
| The facility manager approves the initial placement on the disciplinary isolation diet and ensures that medical staff is notified. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/060.00 |
| In consultation with medical staff, the facility manager approves any continuation of the diet every 72 hours after the initial placement. | N/A | Yes | Yes | Yes | N/A | Yes | Yes | Yes | Yes | CDM-5-09/060.00 |
| Correspondence privileges are not withheld except where correspondence regulations have been violated. Decision to withhold correspondence privilege is reviewed every 72 hours. | N/A | Yes | Yes | N/A | N/A | Yes | Yes | Yes | Yes | CDM-5-09/050.00 |

TITLE 15 PROCEDURES – L. A. SHERIFF'S DEPARTMENT CUSTODY OPERATIONS & CORRECTIONAL SERVICES DIVISION FACILITIES.

| TITLE 15 SECTION | IRC | CJ | TTCF | CRDF-II | CRDF-I | EAST | NORTH | SOUTH | NCCF | P/P REFERENCE – COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| Access to courts and legal counsel is not suspended as a disciplinary measure. | N/A | Yes | Yes | N/A | N/A | Yes | Yes | Yes | Yes | CDM.-5-09/050.00. |
| 1084  DISCIPLINARY RECORDS  A record of all disciplinary infractions and punishment administered per Section 4019.5 PC. is maintained. | N/A | Yes | NO | NO | N/A | NO | Yes | Yes | NO | Records are maintained in the I.R.T.S. automated system. However, after reviewing the system some elements of the process are not documented in I.R.T.S. See notes in body of letter.  TTCF. 4-01-010 |

I"\Adult.X\ycld\\proc.1\32\0+LASD Type II PRO-6-07/27/09

AJ53 Type 2&3 PRO.doc (8/05)

PHYSICAL PLANT EVALUATION
CORRECTIONS STANDARDS AUTHORITY - BIENNIAL INSPECTION
ADULT TYPE I, II, III AND IV FACILITIES

APPLICABLE REGULATIONS: PRE-73; 4/73
Title 24, California Code of Regulations (CCR)

CSA Code: 1320

| FACILITY NAME: Los Angeles Sheriff's Department Central Jail | | | | FACILITY TYPE: I/J |
|---|---|---|---|---|
| APPLICABLE REGULATIONS (Check All That Apply): | PRE-73: X | Post 4/73: | OTHER: 1963 | |
| FIELD REPRESENTATIVE: Magi Work | | | DATE: June 11, 2009 | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Holding Cells (2.2)<br><br>Contain 10 square feet of floor per inmate | X | | | Three holding cells adjacent to receiving area. Does not include court holding area. |
| Capacity not to exceed ten (10) persons<br>4-73: C apacity limitation deleted | X | | | |
| Sufficient fixed benches to accommodate cell capacity | X | | | |
| Toilet accessible | X | | | |
| Water fountain accessible | X | | | |
| Wash basin accessible | X | | | |
| 3.12 Weapons Locker (3.12)<br><br>External to the security area and equipped with individual compartments, locks and keys | X | | | |
| Detoxification Cells (2.4) | | | X | Handled at IRC. No cells of this type in this facility; detail of this regulation deleted from this checklist. |
| Shower-Delousing Room (3.4)<br><br>Available in booking/reception | | | X | At IRC. |
| Secure Vault or Storage Space (2.1)<br><br>Available for inmate valuables | | | X | At IRC. |
| Telephone (2.1)<br><br>Available for inmate use per Penal Code § 851.5 | | | X | Not a booking facility. Inmate phones throughout the facility. |
| Single Occupancy Cells (2.6)<br><br>Maximum capacity of one inmate. | X | | | |
| A minimum width of 6 feet, length of 7.5 feet and height of 8 feet<br>4-73: M inimum width of 6 feet, length 8 feet and height of 8 feet, OR clear floor area of 43 square feet | X | | | Some are "over-under" cells meeting 1996 regulations. |
| Contain toilet and washbasin and drinking fountain | X | | | |
| Contain a bunk capable of accommodati6ng a standard 30" X 76" mattress | X | | | 25" X 76" given a variance. |

| Location | Cell Type | Applicable Standards | # Cells | EACH CELL # Beds | EACH CELL BRC | Total BRC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1800 | Closed; converted to a law library; BRC of 40 inmates was deleted from the facility BRC at 1998-00 inspection. | | | | | | | | | | | |

**ADDITION – "NEW SIDE"**

2nd FLOOR This area appeared cluttered with inmate property and issue items, the Captain stated a decision was made to allow inmates unlimited property in their cells. This is a dangerous proposition as it impedes staff's ability to visually supervise inmates when there is so much clutter around the barred façade where deputies look in to the cell June 2009, MW.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4300 Upper | Multiple | 1963 | 25 | 4 | 4 | 100 | 9.0 X 9.0 X 12.0 | 1 | | 1 | 1 | |
| 4300 Lower | Multiple | 1963 | 25 | 6 | 6 | 150 | 9.5 X 13.5 X 9.0 | 1 | | 1 | 1 | |
| 4400 Upper | Multiple | 1963 | 25 | 4 | 4 | 100 | 9.0 X 9.0 X 12.0 | 1 | | 1 | 1 | |
| 4400 Lower | Multiple | 1963 | 25 | 6 | 6 | 150 | 9.5 X 13.5 X 9.0 | 1 | | 1 | 1 | |
| 4500 | Single | 1963 | 44 | 1 | 1 | 44 | 4.5 X 9.5 X 9.0 | 1 | | 1 | 1 | |
| | Notes: Upper and Lower | | | | | | | | | | | |
| 4600 | Single | 1963 | 44 | 1 | 1 | 44 | 4.5 X 9.5 X 9.0 | 1 | | 1 | 1 | |
| | Notes: Upper and Lower; Closed at 2005 inspection due to budget constraints; occasionally used for overflow. | | | | | | | | | | | |
| 4700 Upper | Multiple | 1963 | 25 | 4 | 4 | 100 | 9.0 X 9.0 X 12.0 | 1 | | 1 | 1 | |
| 4700 Lower | Multiple | 1963 | 25 | 6 | 6 | 150 | 9.5 X 13.5 X 9.0 | 1 | | 1 | 1 | |
| 4800 Upper | Multiple | 1963 | 25 | 4 | 4 | 100 | 9.0 X 9.0 X 12.0 | 1 | | 1 | 1 | |
| 4800 Lower | Multiple | 1963 | 25 | 6 | 6 | 150 | 9.5 X 13.5 X 9.0 | 1 | | 1 | 1 | |

**3rd FLOOR**

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Notes: Historical BOC files note that there is sufficient airspace and plumbing fixtures to support the indicated BRC and identify a floor capacity of 652 inmates | | | | | | | | | | | |
| 5100 | Dorm | 1963 | 1 | 104 | 64 | 64 | | | | | | |
| 5200 | Dorm | 1963 | 1 | 102 | 68 | 68 | | | | | | |
| 5300 | Dorm | 1963 | 1 | 110 | 64 | 64 | | | | | | |
| 5400 | Dorm | 1963 | 1 | 106 | 68 | 68 | | | | | | |
| 5500 | Dorm | 1963 | 1 | 112 | 62 | 62 | | | | | | |
| Mez. 5550 | Dorm | 1963 | 1 | 120 | 62 | 62 | | | | | | |
| 5600 | Dorm | 1963 | 1 | 122 | 64 | 64 | | | | | | |
| 5700 | Dorm | 1963 | 1 | 106 | 68 | 68 | | | | | | |
| 5800 | Dorm | 1963 | 1 | 117 | 64 | 64 | | | | | | |
| 5900 | Dorm | 1963 | 1 | 113 | 68 | 68 | | | | | | |

*T = Toilets; U = Urinals; W = Wash Basins; F = Fountains; S = Showers in unit: If "Total BRC" appears in brackets ( ). it is not part of the facility's rated capacity.  "+" indicates that capacity includes prorated air space from adjacent areas.

P:\Adult.\Cycle\Living.\1320 LASD Central Jail LAS;8/17/09          - 2 -          A360 LAS Adult.dot (9/98)

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Dayrooms (2.9)** <br><br> Available for inmates in single cells, multiple cells and dormitories <br> 4-73: 2 5 square feet dayroom space per inmate in Type II and III facilities and inmate workers in Type I | X | | | The amount of required dayroom space is not specified in 1963 regulations. At best, the facility minimally meets the intent of the dayroom requirement. Out of cell time is also provided on the deck/tier, in front of cells. |
| **Exercise Area (2.10)** <br><br> Available in Type II and III facilities <br> 4-73: M inimum of 30 feet X 50 feet X 15 feet | X | | | |
| **Program Space -Type II and III (2.11)** <br><br> Available in Type II and III facilities <br><br> 4-73: S ufficient area and furnishing s to meet needs | X | | | |
| **Dining Facilities (2.17)** <br><br> 15 square feet per person served (in facilities for 100 persons or more) <br> 4-73: T oilets, washbasins and showers are not in the same room or not in view of inmates dining | X | | | |
| **Visiting (2.18)** <br><br> Visiting area | X | | | |
| 4-73: C ontact visits are permitted in minimum security facilities | X | | | |
| **Attorney Interview Space (2.26)** <br><br> Provide for confidential attorney consultation | X | | | |
| **Janitor Closet (2.20)** <br><br> Located in security areas, lockable, containing a mop sink | X | | | |
| **Storage Space (2.21)** <br><br> Adequate space available | X | | | |
| **Audio or Video Monitoring System (2.22)** <br><br> Located in all inmate housing units and capable of alerting staff in a central control | X | | | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Fire Alarm System [102(2)6]<br><br>Recommended in Pre-73 facilities<br>4-73: A utomatic fire alarm system is required | X | | | |
| Emergency Power (2.24)<br><br>Recommended in Pre-73 facilities<br>4-73: R equired; to provide minimal lighting, communication s and alarm systems | X | | | |

**CORRECTIONS STANDARDS AUTHORITY - BIENNIAL INSPECTION**
**ADULT DETENTION FACILITY**
**LIVING AREA SPACE EVALUATION**

CSA Code: 1320

| FACILITY: Los Angeles Sheriff's Department Central Jail | TYPE: IIJ | BRC: 5108 |
|---|---|---|
| FIELD REPRESENTATIVE: Magi Work | | DATE: June 11, 2009 |

| | ROOMS | | | | | | EACH ROOM | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | Cell Type | Applicable Standards | # Cells | EACH CELL # Beds | BRC | Total BRC | DIMENSIONS (L x W x H) | FIXTURES* T | U | W | F | S | |

Notes: Board Rated Capacity (BRC) was originally determined by calculating all available air space in each module (500 cubic feet per inmate). In older part of the jail, each wing, consisting of the main floor and "mezzanine" contains 130,500 square feet.

The Board of Corrections historically rated the facility at a 5276 BRC. This figure includes an apparent over-count of 40 rated beds that has been continued over the years, as correcting the error added more confusion than benefit. Prior to the 1998-2000 inspection, housing unit 1800 was permanently converted to a law library. Since this was a clear modification to the physical plant, these 40 beds were deducted from the BRC at the 1998-2000 inspection, establishing the BRC at 5236.

At the 2004-2006 inspection department staff reported the total number of available beds at 5, 861.

Due to the conversion of cells to additional shower areas the total single cell count has been reduced. The single cell count in the "Old Side" of CJ is now 784 from its original 832. All rows of 3000, 2100, and 2300 floors have been or are under construction to convert select single cells into shower areas. The mezzanine in the "Old Side" is also under construction to convert select "multiple occupancy cells" to additional showers. The multiple cell number has reduced from 208 cells to 200 cells on the rows for all of floor 3000. The Main multiple occupancy cell count is reduced from 208 cells to 200 cells on the rows for all of 3000 floor. Module 2900 "A" row count is 62, "B" row count is 72. All areas under construction must be verified at the next inspection cycle when construction is complete. MW 4/07

**"OLD SIDE"**

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000-3000 | Single | 1963 | 784 | 1 | 784 | 784+ | 4.5 X 9.5 X 9.0 | 1 | | 1 | 1 | |
| Mezzanine | Multiple | 1963 | 200 | 4 | 4 | 800+ | 9.0 X 9.0 X 11.5 | 1 | | 1 | | |
| Main | Multiple | 1963 | 200 | 6 | 6 | 1200+ | 13.0 X 9.0 X 19.6 | 1 | | 1 | | |
| 2900 | Multiple | 1963 | 7 | 6-10 | 8 | 56+ | 9.3 X 19.0 X 9.0 | 1 | | 1 | | |
| 2904 | Single | 1963 | 4 | 1 | 4 | (4)+ | 5.1 X 8.0 X 7.1 | 1 | | 1 | | |
| 2094 | Multiple | 1963 | 2 | 2 | 2 | (4)+ | 5.1 X 11.4 X 7.1 | 1 | | 1 | | |
| 2nd Main | Multiple | 1963 | 7 | 10 | 10 | 70+ | 9.0 X 22.0 X 9.0 | 1 | | 1 | | |
| 3rd Mezzanine | Multiple | 1963 | 14 | 2 | 2 | (28)+ | 9.5 X 5.2 X 9.0 | 1 | | 1 | | |

Notes: 2904, 2094 and 3rd Mezzanine are disciplinary isolation cells (excluded from the BRC).

**1ST FLOOR – MAIN FLOOR "OLD SIDE"**

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1700 | Single | 1963 | 50 | 1 | 1 | 52+ | 4.5 X 9.5 X 9.0 | 1 | | 1 | 1 | |
| 1750 | Single | 1963 | 76 | 1 | 1 | 48÷ | 4.5 X 9.5 X 9.0 | 1 | | 1 | 1 | |

Notes: High security modules. Showers at the end of each module. Verify number of cells 2008-2010 inspection cycle. department is reporting 83 cells in 1750 opposed to 76. MW 4/07

*T = Toilets; U = Urinals: W = Wash Basins: F = Fountains: S = Showers in unit: If "Total BRC" appears in brackets ( ). it is not part of the facility's rated capacity. "+" indicates that capacity includes prorated air space from adjacent areas.

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Multiple Occupancy Cells (8227)<br><br>A capacity of more than 2 persons<br>4-73: C apacity between 4-16 inmates | X | | | |
| A minimum of 500 cubic feet of air space per inmate<br>4-73: M inimum of 25 square feet floor space per inmate | | X | | Capacity exceeded due to crowding. |
| Toilet and washbasin<br>4-73: 1 :8 ratio | X | | | Based on BOC file notes, it appears this facility was granted a variance to plumbing ratios at some time in the past. |
| Drinking fountain | X | | | |
| Contain a bunk capable of accommodating a standard 30" X 76" mattress | X | | | |
| Safety Cells (2.5) | | | X | No cells of this type in this facility; detail of this regulation deleted from this checklist. |
| Dormitory (2.8)<br><br>Capacity of 4-50 inmates<br>4-73: C apacity limitation deleted | X | | | Later regulations re-established a maximum dorm capacity at 64 inmates. |
| 500 cubic feet of air space per inmate<br>4-73: 4 0 square feet per inmate | | X | | Dormitory capacity exceeded due to crowding. |
| A least 10 foot ceilings if double bunked | X | | | |
| 4-73: T oilet and Washbasin ratio at 1:8 ratio | X | | | Based on BOC file notes, it appears this facility was granted a variance to plumbing ratios at some time in the past. |
| 4-73: D rinking fountain | X | | | |
| Showers (3.4)<br><br>4-73: Available at 1:16 ratio | | X | | A cell on several tiers has been converted to additional showers. 1963 standards require 1:15 ratio, which evolved to 1:16 and was set at 1:20 in 1994 standards. Count not verified at inspection. Based on BOC file notes, it appears this facility was granted a variance to plumbing ratios at some time in the past. However dorm capacity is crowed. |
| Lighting (3.6)<br><br>4-73: Sufficient to permit easy reading | | | X | 1963 standards. |
| 4-73: N ight lighting is sufficient to allow good supervision | | | X | 1963 standards. |
| Comfortable Living Environment (102(c)6<br><br>4-73: A comfortable living environment is maintained through an adequate heating and cooling system | | | X | 1963 standards. |

| Location | ROOMS | | | | | | EACH ROOM | | | | | |
| | Cell Type | Applicable Standards | # Cells | EACH CELL | | Total BRC | DIMENSIONS (L x W x H) | FIXTURES* | | | | |
| | | | | # Beds | BRC | | | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**4th FLOOR**

Notes:  BOC files indicate a variance was granted to exceed plumbing fixture ratios.  It is not clear if this variance only addressed the 4th floor.  See discussion related to 9500.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | Dimensions | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9100 | Dorm | 1963 | 1 | 140 | 80 | 80 | 40,204 cubic feet | | | | | |
| 9200 | Dorm | 1963 | 1 | 140 | 80 | 80 | | | | | | |
| 9300 | Dorm | 1963 | 1 | 160 | 87 | 87 | 43,757 cubic feet | | | | | |
| 9400 | Dorm | 1963 | 1 | 160 | 71 | 71 | 35,720 cubic feet | | | | | |
| 9500 | Dorm | 1963 | 1 | 250 | 0 | 0 | | | | | | |

Notes:  5/17/96 BOC file notes indicate that the conversion of Dorm 9500 from dayroom to dorm space came to BOC attention during the 94-95 Inspection Cycle.  In an attempt to establish a rated capacity, BOC archive files were reviewed and the county measured the space.  Conclusions were:  Conversion of 9500 from dayroom to dorm space is part of a crowding problem.  While 1963 regulations identify a need for dayroom space, those regulations do not specify the amount required.  In theory, the jail could identify one square foot and call it dayroom.  This would not be reasonable.  The clearer test would be one of reasonableness, given the circumstances.  The 1963 regulations do not provide much space per prisoner, when compared to more current regulations.  All dorms are beyond the rated capacity of even the 1963 standards.  The BOC concluded that it would be unreasonable to promote the idea that there is usable space available in the dorms for dayrooms.  The better decision would be that 9500 should have remained dayroom and consequently was not rated for housing.  Consequently, Dorm 9500 is not included in the Board Rated Capacity.

**MEDICAL HOUSING**

Notes:  Sheltered housing areas for inmates requiring medical services are on three floors of Central Jail.  These areas have not historically been noted on the BOC Living Area Space Evaluation because they are nonrated space.  Ten beds in this area were converted to housing juvenile boys in 2003/2004. Juveniles are no longer held at this facility according to policy, June 2009, MW.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | BRC | Total BRC | Dimensions | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6000 | 1963 | Multiple | | 95 | | | | | | | | |
| 7000 | 1963 | Multiple | | 204 | | | | | | | | |
| 8000 | 1963 | Multiple | | 336 | | | | | | | | |
| 8200-MRSA Housing | 1963 | Multiple | | Included in the above 336 total | | | | | | | | |

*T = Toilets; U = Urinals; W = Wash Basins; F = Fountains; S = Showers in unit:  If "Total BRC" appears in brackets ( ), it is not part of the facility's rated capacity.  "+" indicates that capacity includes prorated air space from adjacent areas.

P:\Adult\Cycle\Living\1370 LASD Central Jail LAS:8/17/09                    - 3 -                                        A360 LAS Adult.dot (9/08)

# EXHIBIT 15

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DION STARR,                                    )
)
        Plaintiff,                   )
)
    v.                                      )
)
)
COUNTY OF LOS ANGELES, LOS          )
ANGELES COUNTY SHERIFF'S            )   CASE NO. CV 08-00508 GW (SHx)
DEPARTMENT, SHERIFF LEROY           )
BACA, IN HIS INDIVIDUAL             )   [Hon. George H. Wu]
CAPACITY, DEPUTY MAYBET             )
BUGARIN, DEPUTY JOSE                )   DECLARATION OF
GARIBAY, SGT. MICHAEL INGE,         )   GEORGE SULLIVAN
LT. ALFRED GONZALEZ, CAPT.          )
JOHN CLARK                          )
)
        Defendants.                  )
_____ )

I, George Sullivan, declare that if called as an expert witness in this case, I would competently testify to the following:

## I. Introduction

1.    I have been retained as a Corrections Consultant and available Expert Witness in the above captioned Case. Attorneys for Plaintiff have asked me to carefully study documents provided to me and, on the basis of those documents and my over 54 years' experience in the corrections profession, to express my opinions with respect to issues of concern in the above cited Case.

**EXHIBIT 15**

2.     Attached EXHIBIT A lists the documents and publications which I
own or have received and studied and which I deem relevant to matters in
this Case.  As the basis for formulation of my opinions expressed herein, I
have relied upon the documents and publications listed in EXHIBIT A, and
on my education, training and over 54 years' work experience in the
corrections profession.

## II. Witness' Background, Experience and Qualifications

1.     In both Federal and State Courts I have been accepted as an expert
in the management and operations of correctional facilities and jails. After
graduating from high school in May 1949, I served 4 years with the U.S.
Navy during and in the Korean War. My career in Corrections began on
April 3, 1955 as a Correctional Officer at the Oregon State Penitentiary
(OSP).  Between October 10, 1955 and December 26, 1962 (7+ years), I
served at OSP as an Inmate Counselor with a caseload of 525+ inmates,
including 75-100 women inmates, writing Case History Summaries and
Progress Reports and managing the housing/custody/classification/work
assignments/self-improvement programs and counseling needs of my
caseload. During those 7+ years I attended Willamette University, Salem,
Oregon as a work/study student majoring in sociology/psychology. I
graduated on June 3, 1962, receiving a Bachelor of Arts Degree.

2.     At OSP between December 26, 1962 and July 5, 1967 (4 years, 6
months) I served as Deputy Warden in charge of Inmate Treatment
Programs and Chairman of the Classification Committee. The Penitentiary
Women's Unit was assigned under the authority and supervision of my
office. During 1964 a 200 bed Women's Correctional Facility was newly
constructed just outside the walls of the Oregon State Penitentiary. I was
assigned to bring the new institution into operational existence in 1965, and
it remained under my authority and supervision to July 1966 when its first
full time female Superintendent was selected and assigned.

3.     On July 5, 1967 I was transferred to the Oregon State Correctional
Institution (OSCI) as Assistant Superintendent in charge of Inmate
Treatment Programs and Chairman of the Classification Committee: I held

that position until August 16, 1969 (2+ years). On August 16, 1969 I was
appointed Superintendent/Warden of the Oregon State Correctional
Institution and held that position until December 31, 1984 (15 years, 4
months), when I retired from Oregon Corrections after 30 years service.
Between January 7, 1985 and October 1, 1987 (2 years, 9 months) I
served as Warden of the Penitentiary of New Mexico. From February 13,
1989 to January 20, 1994 (5 years), I served with the Colorado Department
of Corrections as Deputy Director in charge of Statewide Prison
Operations, (20-correctional facilities); Statewide Parole Services;
Statewide Community Corrections Programs; Inmate Classification System;
Religious Programs and Food Service Operations, all of which included
women inmates.

4. Attached as EXHIBIT C is my Curriculum Vitae/Personal History
Résumé. The last four pages of EXHIBIT C are a listing of the 178 adult
correctional facilities I have toured/audited throughout my career. In
October 1978 I was trained as a "consultant/examiner" "Auditor" to conduct
audits of jails and adult correctional facilities, measuring the facilities' levels
and quality of compliance with the Manual of Standards for Adult
Correctional Institutions[1] (prisons) and/or the Manual of Standards for Adult
Local Detention Facilities [2](jails). The Standards contained in these
Manuals are commonly referred to as "ACA Standards". These Manuals of
Standards are maintained current through biennial promulgation of a
Standards Supplement.[3]  In conducting those audits, I represented the
American Correctional Association and the Commission on Accreditation
for Corrections.

5. By use of an (*) those last 4 pages of EXHIBIT C also identify the 106
county, state and federal penitentiaries and correctional facilities of the
United States and federal correctional institutions of Canada which I have
Audited. Sixty (60) of those audits were formal "Accreditation Audits"

---

[1] See EXHIBIT A, Reference Item #1 & #2.

[2] See EXHIBIT A, Reference Item #3.

[3] See EXHIBIT A, Reference Item #4 &#5.

requiring written Audit Reports to the Commission on Accreditation for Corrections. Such audits were conducted by teams of 2, 3, or 4, selected corrections professionals who served as "Visiting Committees". I served as Chairman of those Visiting Committees in 58 of those 60 audits.

6.     An audit is a comprehensive, intrusive analysis of an institution's Policies; Procedures; Practices; Staff Training Programs; Physical Plant Conditions; Programs providing Medical Care, Food Services, Religious Services, Education, Vocational Training, Visiting/Mail; Productive Work; Institution Security Operations including the institution's Segregation Units and Use of Force practices; and Quality of Life Conditions for inmates and staff. All such are measured against requirements of established national, professional Correctional Standards. Standards presented within the various Manuals of Standards are promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections. The Standards are considered by the Corrections Profession to be "state-of-the-art correctional practices and guidelines for improvement". Obviously, they are not presented as defining nor establishing "constitutional minima" for detention/correctional institution or jail operations. The Federal Bureau of Prisons, most U.S. States and Correctional Services of Canada Operations cite 3rd Edition January 1990 ACA Standards and 4th Edition January 2003 ACA Standards as References, as relevant, in their Policies/Procedures.

7. I have been a Professional/Gold Card Member of the American Correctional Association for the past 47 years. I have worked closely with the American Correctional Association and the Commission on Accreditation for Corrections as Standards for Adult Correctional Institutions have evolved and matured. I served on a Task Force which developed an "Accreditation Facility Performance Inventory" questionnaire to assess changes in Institution conditions, or improved working conditions and quality of life for staff and inmates, as a result of involvement in the Accreditation process.

8. I served on a Commission on Accreditation/American Correctional

Association Special Task Force to develop Accreditation procedures for Maximum Security Correctional Facilities, at the then Maximum Security United States Penitentiary, Marion, Illinois.

9. An American Correctional Association publication titled PROTECTIVE CUSTODY was developed by a Task Force of nationally recognized corrections professionals. I was privileged to serve on that Task Force as Coordinator of Research and Data for the Western United States.

10. As the Manual of Standards for Adult Correctional Institutions progressed from its First Edition Publication to the Second Edition, I served on the Resource Committee to advance the Manual. I was assigned to submit recommendations for revision/updating of five (5) chapters of the Manual: Chapters on Food Services, Sanitation and Hygiene, Medical and Health Care Services, Inmate Rights, Inmate Rules and Discipline. My recommendations were all adopted and those five (5) Chapters were published in the 2nd Edition and have, with very minor changes, continued into the current 2003 4th Edition.

11. I have also served as a Professional Corrections Consultant and Expert Witness, conducting operational reviews of jails and correctional facilities on behalf of the United States Department of Justice, Civil Rights Division; Law Enforcement Assistance Administration; the National Institute of Corrections; several State and County Departments of Corrections; private correctional corporations; private attorneys and law firms; and at the requests of Executives having Facility oversight authority. Consequently, I am familiar with and have personal knowledge and experience with Federal, State, County, City and private correctional facilities, throughout the United States and into British Columbia, Canada.

12. I consider myself competent to render opinions as to the duties, responsibilities, policies and operations required of Correctional Facilities and Jails, such as the Los Angeles County Jail, Los Angeles, California.


**III. Documents, Experience, Knowledge Bases for Opinions**

1.     My opinions in this case are formed on the bases of my education, knowledge, training, research, lecturing, audits of jails, correctional facilities and penitentiaries, careful review/study of documents and references listed in EXHIBIT A, relevant laws, and my over 54 years' career experiences in corrections operations and management.

## IV. Exhibits

1.     I do not currently plan the use of any Exhibits in Deposition or at Trial in this Case.

## VI. Highlighted, Relevant, Salient Factors of The Case

1.     As listed in Exhibit A, I have received and studied hundreds of pages and many documents provided to me for review.  These documents include incident reports provided by LASD staff and taken after Mr. Starr's stabbing on January 27, 2006; depositions of Deputies Maybet Bugarin, Jose Garibay, Dep. Solano, Dep. Montez, Dep. Magadan, Dep. Christina Martinez, Sgt. Michael Inge, Lt. Alfred Gonzalez, Capt. John Clark, Dion Starr and exhibits thereto; pertinent policies and procedures, central jail training bulletins, and orders; data of major disturbances at the MCJ, data of inmate on inmate assaults at MCJ between March 2003 through February 1, 2006; data analysis of the watch commander's daily activity log for the period of January 2004 through June 2006, regarding inmate on inmate major assaults at MCJ; volumes of Death Reviews including incident reports and investigations related to inmates who have been killed in the County Jail between June 2002 and February 27, 2006, due to failure to provide reasonable security; insufficient monitoring; supervisors' failures to train and supervise; data of inmate on inmate assaults, data of major incident , and  data analysis of Watch Commander Log inmate on inmate violence for time periods pertinent to this incident.

2.     I have reviewed documents regarding William S. McNamera, numerous documents regarding the death of  Ramon Gavira; page excerpts from the U.S. Department of Justice, Civil Rights Division, Office of the Assistant Attorney General, Washington, DC 20035 "CRIPA

Investigation Of Mental Health Services in the Los Angeles County Jail";
page excerpts from "Memorandum Of Agreement Between The United
States And Los Angeles County, California Regarding Mental Health
Services At The Los Angeles County Jail"; many reports from Semiannual
reports from Special Counsel Merrick J. Bobb and from Sheriff Baca's
attorneys; the Office of Independent Review; and Staff Police Assessment
Resource Center (PARC), involving inmate on inmate violence and lax
discipline January 1, 2004 through June 1, 2007.

3.      I have also reviewed reports from the Special Counsel to Los Angeles
County on inmate on inmate violence; racial riots; classification problems in
the jails and lax discipline November 1, 2003 through December 1, 2007;
and a series of reports of civil cases settled by the County of Los Angeles
obtained from the County's public reports of settlements of inmate on
inmate violence; pertinent Commission on Police Officers Standard
Training (POST); Office of Independent Review (OIR) reports pertinent to
these issues; an August 2004 Report of the County of Los Angeles District
Attorney regarding inmate on inmate violence due to lapses of security at
the county jail; Minutes of the Countywide Criminal Justice Coordination
Committee 2-15-06;  Los Angeles Times Newspaper Articles; and a
number of other reports as referenced herein, involving supervisors and
deputies.


## V. Brief Summary of Relevant Facts In This Case
## County, LASD and Sheriff Baca's Duties

1.      The County of Los Angeles and the Los Angeles County Sheriff's
Department are the public entities ultimately responsible for the operation
of the County's jail.  The Sheriff of Los Angeles County (Sheriff Leroy D.
"Lee" Baca), is charged, by California law, as the Executive Manager over
all of the County's Detention Facilities.  The responsibility for managing and
operating a County Jail in California is clearly placed, by law, upon the
County Sheriff, on behalf of the County.   The Sheriff is required by statute
to take charge of and keep the County Jail and prisoners of the Jail, and is

answerable for the prisoners' safekeeping.  (See Cal. Government Code, Section 26605, 26610, and Penal Code Section 4006.)  The Sheriff has *sole and exclusive statutory duty,* which mandates his responsibility for the Los Angeles County Jails.  The Sheriff cannot pass off or otherwise delegate his statutory duties or responsibilities.

2.     The Sheriff can and needs to delegate assignments and activities to subordinate staff for the efficient and effective management of the County's Detention Units.  In making such delegations of assignments and activities, the Sheriff, nevertheless, cannot delegate his responsibility for performance.  He has a duty and responsibility to supervise his Executive Managers, Commanders, and Deputies and to ensure that they are: (a) supervising their charge area; (b) learning of and monitoring existing problems; (c) fixing or curing existing problems; and (d) assuring that they are reporting back all significant issues in the operations of the Detention Facilities.  He is responsible: (e) to ensure training takes place; (f) ensuring LASD compliance with resolving the problems and conditions in the jail causing constitutional violations as set forth and described in the Department of Justice DOJ 1997, findings under their authority under the CRIPA federal law; (g) LASD compliance with the Memorandum of Agreement (MOA); and ensuring allegations of misconduct by deputies are investigated to comply with his law enforcement obligation.

## VI.  Brief Summary Incident of the Attack of Dion Starr in his Cell

1.     Deputy Garibay was on duty on January 27, 2006 in housing module 2400, Row B, Cell 9.  His duties were first and foremost providing inmates security and ensuring inmates don't harm others, themselves or deputies. To fulfill his duty to provide security, he had to conduct hourly row checks of cells and inmates, filling out Title 15 book to report any occurrences in the module or a row, watch (visually) and listen to the inmates.  His duty was also to open the row's entrance security gate and individual cell doors from his location in the control booth, and to know who is walking in and out of the row and/or cells.

2.     Deputy Garibay was aware of the incident in November 2005, when
an inmate (Chadwick Shane Cochran) was killed in this same module 2400
by being stomped to death by Hispanic gang members.  He knew this to be
a major incident of which custody staff was aware.

3.     Sometime in the morning hours he was in the gate control booth cage
and apparently, without checking the wristband identification bands, he
opened the row and allowed three or more inmates into the row and
although from his duty position he was able to look down the entire row and
see what was going on: he testified "at the immediate moment I was not
looking down the row at the trustees."  He stated although he was solely
responsible for Row B, that he did not supervise the inmates he let into the
row, he did not recall how many trustees he allowed into Row B or how
long the inmates were unsupervised in Row B before the incident
happened.  It appears that he left his post unattended after opening the
Row B gate and the cell gates where Starr was located as he stated he had
no knowledge of how the attack on Starr occurred "because when the
incident occurred he was not physically there."

4.     Mr. Starr who was in cell #8 (with Kelly, an African American and two
Hispanics - one Sandoval) stated that he saw the Hispanic gang members
gather in front of his cell door talking in Spanish to the Hispanics in his cell
and in the cell next to his.  Then the cell 7, 8 and 9 gates began to open
and the three Hispanics in the Row rushed into his cell saying, "Mayate,
mayate," (meaning "nigger" in Spanish), and "kill them, kill them," as Starr
immediately began screaming "help" and "deputy, they're killing us, help,...
deputy."  Starr was overcome by about 5 Hispanics and others who joined
from cells 8 and 10.  Although he covered his face and head, he was
stabbed in the head, back, face and torso 23 times (medical records).  His
cell mate Kelly was also stabbed many times in the head and neck area.
During a period of five to seven minutes Starr continued crying out for help
and trying to protect himself.

5.      Deputy Garibay stated that he heard somebody yell "help" or "deputy" he called for "415" and within seconds deputies responded to the hallway and began to take control of the situation.  Immediately the inmates were ordered to get down on the ground, or handcuffed, and all inmates immediately complied and did not defy officers.  Starr was apparently already laying on the ground, handcuffed, lying face down on the floor.  He was very injured and in pain, and one of his Hispanic attackers was very close to him still trying to kick him.  Starr began to move away from him and wanted to get up to avoid being kicked, when suddenly Deputy Bugarin said "nigger I told you to stay down" as she kicked him directly on his nose.

6.      Deputy Garibay stated his duty was to open the gates and he was the Row B control booth deputy.  Because Garibay was the person who opened the gates to the row and cells, was the person in charge, his duty was to prepare a report of what he observed and heard.  He did not, nor did he recall reporting to anybody what he did and observed of the attempted murder.  The incident report and injury report was prepared by a deputy Christina Martinez who was not present at the time of the incident as was Garibay.  He was aware B Row was a crime scene because somebody had been stabbed and the area should have been protected to properly collect evidence and take pictures and take the names of witnesses.  However none of this was done.

### Sgt. Inge, Floor Sergeant on Duty

1.      Sgt. Inge was the 2000 Floor Sgt. on duty at the time of the attempted murder of Mr. Starr.  He responded to the crime scene and although he was on duty during the stabbing incident, he did not approve the incident report for accuracy- it was approved by Sgt Lam who was not on duty at time of incident.  Sgt. Inge directed the deputies speak to the inmates involved in the attack and conduct investigation, but he took no action to investigate if this was an attempted murder.

2.      Sgt. Inge did not take any action to determine who opened the cell gates and testified that he would not necessarily have wanted to know who

opened gates. He never saw or reviewed the report of the stabbing incident. He should have been responsible for approving from February 27, 2007, the date of the incident and reviewed it for the first time at his deposition August 27, 2008.

3.     Sgt. Inge stated that he has nothing to do how trustees are selected for a particular module and knew nothing about a policy that trustees should not be inside a row when cell gates are opened. This conflicts with LASD policy and the testimony of Capt Clark which requires the selection of inmate workers (trustees) to be approved in writing in the Daily Activity Log (UDAL) by the sergeant on duty because of security issues, which policies resulted from prior incidents. He was aware that each inmate wears a wristband which tells the deputy the inmate's housing location and deputies can compare a wristband to computer or log. He confirmed that if a deputy allows a person who is not a trustee to go into a row where he is not living, that would be against the LASD rules, policies and procedures.

4.     Sgt. Inge was present when deputies got control of this incident, and when Dep. Bugarin took control of Mr. Starr. Mr. Starr states that Sgt. Inge and all the deputies present saw Dep. Bugarin kick him in the face. Sgt. Inge did not investigate Mr. Starr's complaint. Although this incident happened in his watch, he never questioned Starr about this incident. He stated that it was his duty to investigate a deputy who is accused of kicking an inmate in the face and nose while handcuffed, a serious charge as it is a crime and it would be dereliction of duty not to investigate. He also knew of ongoing concern at LASD about problems with deputies not reporting things so that their other deputy friends do not get into trouble.

5.     Sgt. Inge learned about inmate on inmate attacks "through casual conversations by people who worked [at the jail]." 247:11-13. However, he never received any information from Sheriff Baca or other supervisors informing him of incidents of ongoing racial violence at jail or the killings at the jail. Before he started working as a Sergeant at the jail he did not receive any information on what was occurring in the jail concerning inmate on inmate violence; nor did he know whose responsibility it would be to

provide him, as an incoming sergeant, information about violence at the 2000 floor re: inmate on inmate violence and how to curb and prevent it and he never asked for any information.

6.      Although Mr. Starr had not committed any crime, after he returned to the jail from the hospital, Sgt. Inge allowed him to be sent to the isolation module, and subsequently failed to comply with Mr. Starr's right to due process.  Mr. Starr frequently requested to be removed from isolation, but was left there for three months.  During this time period, Mr. Starr continued complaining to others that Deputy Bugarin had kicked his nose.  Sgt. Inge, who was Bugarin's supervisor during this incident, failed to take any action in this regard, omitting and ignoring Starr's right not to be in isolation and to be heard in his grievance against Bugarin.

## Lt. Gonzalez, Watch Commander on Duty

1.      Lt. Gonzalez the Watch Commander was present at the jail when Plaintiff was attacked.  As W/C he reviewed reports as they came in to make sure that the sergeants and deputies were doing their jobs: to hold his subordinates accountable he would require witness/deputies to document their observations and properly fill out the reports involving inmate attacks.

2.      Lt. Gonzalez reviewed and signed the incident report of the attack on Starr, and he further documented in the watch commander's log that the incident required hospitalization of inmates.  He knew this required reporting to Capt. Clark, but the record is void of any such reporting compliance.

3.      Lt. Gonzalez did not inquire into why Garibay did not report the attempted murder in the Title 15 log; he did not inquire into Sgt. Inge's failure to discuss the incident with Dep. Garibay; he did not inquire into Sgt. Inge's failure to discuss the incident with Mr. Starr; he did not inquire into Sgt. Inge's failure to determine why the row gates were opened with three inmates in the row, of which only one was a designated trustee, a second

lived in a different housing area, and a third went unidentified; or, Sgt. Inge's failure to monitor or supervise the security lapses of Dep. Garibay that allowed the armed attackers to enter the row and Plaintiff's cell.

4.      Nor did Lt. Gonzalez determine if Sgt. Inge had approved the selection of trustees; did not review the Title 15 log to ensure the incident was properly recorded.  When he approved the incident report, he knew Mr. Starr had been stabbed on multiple occasions and was desirous of prosecution and had identified the perpetrator, but Lt. Gonzalez did not follow up with the Jail Investigative Unit nor request an interview of Mr. Starr to determine if the crime of attempted murder should be prosecuted.

5.      Lt. Gonzalez knew of ongoing racial tensions at this facility as he had been employed there for years when other inmates had been killed due to security failures by deputies and sergeants who had permitted unauthorized inmates to enter, unmonitored, through the many gate checkpoints in 2000 floor, in modules 2400 and other modules in 2000, and through the row gates onto the cell gates.  (Prior death reviews: Tinajero, Cochran, did not receive any communications from Sheriff BACA or anyone from LASD re: racial, inmate on inmate violence, or any training sessions organized by LASD.

## Captain John Clark, Facility Commander

1.      Captain John Clark was the Facility Commander at the jail when Plaintiff was attacked.  His duties included to know of problems in the facility and to ensure that his subordinate lieutenants and sergeants are taking appropriate corrective action in situations caused by lapses in security.  His duties included talking to them about the policies and procedures and making sure that safety of deputies and the inmates was a paramount concern of subordinate lieutenants and sergeants when they were walking the floors and doing their supervisory duties.  The sergeants were to do shift training with their people on a variety of policies, including Title 15 deputies.

2.     In this case of the attempted murder of Starr, Capt Clark could not
recall what he did regarding the supervisory performance of Lt. Gonzalez
and Sgt. Inge or the security lapses caused by Garibay, although he signed
the incident report and the injury report prepared by Christina Martinez.  He
testified that the Title 15 logs must identify significant incidents within a
module, such as an attempted murder with significant injuries, or an inmate
taken to the hospital.  He should be called/advised by Lt. Gonzalez and he
would have to report the incident to his commander. He had previously
counseled Lt. Gonzalez that his responsibilities were not being met, but
that report was purged after a year.

3.     Contrary to Sgt. Inge, both Lt. Gonzalez and Capt. Clark testified that
an inmate selected to be a trustee had to be screened for security
classification level and approved in writing by the Sergeant.  An inmate
accused of murder could not be a trustee.  This policy change went into
effect in 2005 (Exh. 56 - Minutes of the County criminal Justice Committee
of February 15, 2006), and Sgt. Inge was not aware of the policy.  Yet, one
of the trustees noted in the Title 15 logs as a trustee was inmate Gascon,
who was charged with murder .Sgt. Inge was required to sign the Title 15
log approving inmate trustee workers for his shift, but he did not.

4.     Part of Capt. Clark's duty was to attend death reviews for incidents,
such as an inmate being murdered at his facility.  The death reviews were
attended by upper command staff and many other LASD and OIR
representatives to determine what had happened, whether any policies or
procedures were violated and what, if any, corrective measures were to be
taken to avoid future repeats of incidents.  He would also review the
homicide investigations of the murders.  Some of his other duties were to
review Government Code claims of injuries or deaths occurring at the jail,
and any lawsuit complaints, and to investigate and take corrective
measures for meritorious claims.

5.     At the time he became captain of the facility, he met with his
predecessor and with his superiors and became informed of  the facility

history.  The following is a brief summary of a few examples of the cases
from which Capt. Clark had notice of the ongoing monitoring and ongoing
supervisory problems at the jail, and the issues raised in the investigations
of these cases.[4]

6.      Capt. Clark and Lt. Gonzalez agree that the importance of being
informed of incidents of violence and inmate on inmate violence in their
facility, provides the supervisors with notice of ongoing facility problems
requiring corrective intervention.  The following killings over a period of
years, for example, provided them and Sheriff Baca notice that corrective
measures in lapses of supervision and monitoring of inmates was ongoing
and unremedied.

**Internal Notices of LASD Failures of Lapses of Security, Failure to
Supervise and Investigate:**

**July 2002, Ramon Gavira (2000 Floor)** , is a precursor beating and death
at the MCJ 2000 Floor. Mr. Gavira, was arrested for DUI, on July 6, 2002,
and in LASD custody on July 9, 2002.  Although  intake screening at LASD
ordered he be placed in a pill module to receive medication, treatment and
psychotherapy,  Instead, he was housed in 2000 floor.  On  July 11, 2002,
he had a court appearance and was ordered released from custody, but for
unknown reasons, he was again taken to the 2000 floor.  His body was
discovered late that night in an isolation cell (2700-26) hanging.  According
to forensic evidence on autopsy, he had been  severely beaten over
approximately two days before his death, had three broken ribs, severe
bruising throughout his body.  The homicide investigation interviewed
inmate witnesses who specifically reported seeing deputy Anel Manriquez
using excessive force on Gavira and being present before he allegedly
committed suicide, as well as two unidentified trustees were in the row. It
was disputed whether he committed suicide or was murdered.  (Of note, on
August 13, 2002, forty (40) top LASD and COUNTY employees attended
Gavira's Death Review, including the Office of Independent Review (OIR),

---

[4] These are discussed in greater depth below.

Messrs. Gennaco and Jones. No investigation of the deputy alleged misconducted or the cause of the severe beating was investigated. However, the December 2007, OIR's public report stated that it first was asked to investigate the Gavira matter after May 2006.

**The Hong Murder – October 2003 – (location 2000 Floor):** On October 21 2003, inmate Ki Hong ("Hong") was killed by three inmates who entered the dayroom where Hong was housed. Inmate Hong was stabbed, beaten and strangled to death approximately 1½ hours after he arrived at his housing in Men's Central Jail. (OIR Homicide Report, p. 14). Inmates Lee and Cho allegedly killed him while inmate Chung acted as lookout and while the other 57 inmates housed in the dayroom undoubtedly looked on. This was the first of five inmate-on-inmate killings that occurred in the jail system over a six month period. Four of the killings occurred in the Men's Central Jail, and one in the Inmate Reception Center next door. Numerous violations were noted:

**Reported Violations:**

- Inmate Lee was not eligible to be an Inmate Worker and should have been removed from that status when information that he was a suspected drug dealer was discovered. (Id. at 4)
- Inmate workers Lee, Chung and Cho were not supervised or accounted for following their early morning work shift. (Id. at 5, 15.)
- The control panel providing access to the dayroom was not properly secured. It is unclear whether the door covering the control panel was left open or closed. However, even if closed, the panel is vulnerable to a persistent inmate.(Id at 5, 16.)
- Adequate safety checks were not made of the inmates housed in the dayroom. (Id. at 5, 17).
- An inadequate evening inmate wristband count was performed. (Id. at 5, 18).
  Of note, this investigation revealed that inmates in the 2000 Floor were reporting large amounts of money going in and out of their inmate accounts, that drugs were being sold on that Floor and that supervisors were trying to discover the identity of the employee that was bringing the drugs to these inmates.

**The Prendergast Murder – December 2003:** Inmate Prendergast was beaten periodically over several hours from about 6:00 p.m. December 6, 2003, to early next morning by inmates Newell and Ferman, two of his three cellmates. (OIR Homicide Report, p. 18). Newell and Ferman had been drinking "pruno" before they attacked and had shown irritation when Prendergast exhibited strange behavior and talked to himself. Numerous violations were noted:

**Reported Violations:**

- The evening wristband count was not properly conducted. (OIR Homicide Report, Id. at 6, 19.)
- Custody personnel did not search the cell row frequently enough. (Id.);
- Custody personnel misrepresented events in their reports;
- The crime scene should have been preserved after homicide bureau was called in. (Id. at 7, 20)
- Suspect inmate Newell should not have been released from jail without notice to homicide bureau. (Id. at 7, 21)

**The Alvarado Murder – December 2003:** On December 9, 2003, inmate Mario Alvarado, aka Victor Cortez, was killed in a holding cell at Custody Line Inmate Reception Center ("IRC"). (OIR Homicide Report, p. 21). He had previously been housed at the Men's Central Jail ("MCJ") and was awaiting transfer to the Pitchess Detention Center ("PDC"). A short time after he arrived at the IRC Custody Line holding cell, which contained 40 inmates, he was attacked by one or more other inmates, who punched and kicked him until he lost consciousness and continued to beat him afterward. Two Transportation Services Bureau ("TSB") deputies failed to see Alvarado's dead body because it was partially concealed under clothes and trash behind a three-foot privacy wall in a toilet area. Apparently, they called out his name from the list, but when Alvarado did not respond, they apparently assumed he had never been placed in the cell. Approximately seven hours after his assault, and killing, a worker inmate cleaning the cell discovered his body and notified IRC deputies. **Reported Violations:**

- Hourly safety checks were not performed or documented at IRC (Id. at 7, 22);
- Due to failures to accurately account for inmate Alvarado's movement from MCJ to the Custody Line IRC Holding Cell where Alvarado's assault occurred, Alvarado's body was not found until seven hours after he was assaulted (Id. at 8, 24); and,
- Placing high numbers of inmates inside the Custody Line IRC Holding Cell where Alvarado was assaulted may have blocked the deputies' view of the assault (Id. at 8, 26).

**Beating of Jose Beas - December 13, 2003 (2000 Floor):** Beas was beaten in his cell in module 2600 and left with brain damage and in a coma; again, lapses of monitoring and security were contributing factors. Inmates Ahmad Burrell, Rory Fontanelle, and Aaron Cunningham were attacked over a three day period, sustaining serious injuries, Burrell was attacked in his housing dorm twenty-four (24) times, resulting in serious and permanent injuries.

**The Faye Murder – January 2004 (2000 Floor):** On January 12, 2004, inmate Kristopher Faye was stabbed to death by several inmates with jail-made knives on the lower tier of his module after he lowered himself down from the upper tier balcony and attempted to use the phones. (OIR Homicide Report, p. 27). Faye was black; the alleged attackers were Hispanic. Fighting ensued between the two racial groups which resulted in a racial disturbance.

**Reported Violations:**
- Allowing all cell gates in the module to remain open increased the danger of violence and was in violation of LASD policy (Id. at 9, 27);
- The use of O.C. spray to quell the disturbance was a use of force that required reporting (Id. at 9, 28); and,
- Inmates of high and low security designation were improperly mixed in the Module (Id. at 9, 28).

**The Tinajero Murder – April 2004 (2000 Floor):** On April 20, 2004, **inmate Raul Tinajero was killed in** his cell in the Men's Central Jail,

allegedly by inmate Santiago Pineda. Based on the investigative report,
fourteen (14) LASD employees were found to have violated various LASD
policies and were disciplined. (Office of Independent Review Report on the
Los Angeles County Jail Homicides ("OIR Homicide Report"), Fall 2004, p.
29).

**Reported Violations:**

- Due to monitoring failures, Pineda was able to improperly leave his
  cell without being detected (Id. at 10, 31);
- Due to monitoring failures and inadequate procedures with regard to
  the escorting of inmates, Pineda was able to enter Tinajero's cell
  unchallenged (Id. at 11, 33);
- There was insufficient monitoring of Tinajero's cell during the five
  hours that Pineda was in the cell (Id. at 11, 34);
- There was inadequate follow up when Pineda was found in a
  restricted area, in particular the failure to write a disciplinary report
  against Pineda and on two prior occasions, allegations of inmate
  misconduct against Pineda were inadequately addressed (Id. at 11,
  35);
- The Training Sergeant at Central Jail was unfamiliar with the most
  basic of LASD policies (Id. at 12, 37);
- On at least two occasions, Pineda was designated as an inmate
  worker (Id. at 13, 38); and,
- Insufficient attention to the subsequent housing of inmates involved
  with these proceedings. (Id.)

6.    Capt. Clark agrees that in "Tinajero case there were similar lapses of
security which were the moving force of inmates reaching Mr. Tinajero and
killing him" (Clark Deposition  p. 212:7-12.)

7.    Capt. Clark agrees that  these lapses in security resulted in lapse of
reasonable security to inmates which caused the killing of Tinajero.  He
also agrees that it is the duty of lieutenants and sergeants to make sure
that staff is complying with OIR recommendations and policies.  He agreed
that he needs to know the recommendations and policies to stop continued
lapses of failure of deputies to provide reasonable security to inmates.  He

agrees that these cases indicate insufficient monitoring and of deputies
failing to keep their eyes open and supervise activities going on during their
particular watch. Another problem Capt. Clark identified was that inmates
were not being properly disciplined for wrongful conduct so that they don't
continue committing wrongful conduct. That is what happened in this case.

8.      As in Hong and Tinajero, here, Sgt. Inge was not familiar with basic
policies and procedures in his floor . (For example, Sgt. Inge did not know
the policies regarding selection of inmate workers, the fact that he was
mandated to approve such selection and to document his approval in the
Title 15 logs.) Capt. Clark testified that it is a custody captain's job to know
of problems to make sure sergeants and lieutenants are taking appropriate
corrective action in lapses of security.

**McNamera Beating- June 7, 2005**: a deputy (Timothy Schultz) was
assigned to a staff station to monitor and supervise four housing units,
each of which was holding 70 inmates. He admitted to abandoning his
assigned post (as had his colleague in the adjacent module), during which
time a number of violent Hispanic jail gang members repeatedly attacked
Sean McNamera over an extended period of time directly in front of
Schultz's empty observation station, in full view of approximately 65 other
pre-trial detainees. Shultz could have  called for a back-up or a prowler to
replace him, but did not do so. McNamera suffered permanent brain
damage and multiple other injuries and is totally disabled. As in this case
there was no administrative investigation into why the deputy caused this
lapse in security, and his sergeant and lieutenant never questioned Schultz
or reported how or why the deputies had abandoned their posts.

**Cochran Murder-  November 16, 2005: (2000 Floor)**:  Mr. Cochran was
found in 2400 day room, three months and two weeks prior to Mr. Starr (the
same module as Mr. Starr's attempted murder on February 27, 2006).
Cochran, a mentally ill inmate was left unattended in a locked day room
with violent Hispanic gang members classified as "high risk", deputies
responsible for the safety and security of these inmates failed to check his
red wristband identification.

It was found that again deputies abandoned their supervision responsibilities leaving the inmates locked behind a windowless door for over 20 minutes while Cochran was beaten with feet, fists, and trays. The deputy control booth was 10 feet from this room, and Cochran and other inmates were screaming for help. The deputy booth, against policy, was abandoned, and the Floor Sergeant had failed to train and to monitor her subordinates.

9.     Capt. Clark agreed it was LASD policy that a module officer has to be in the cage. He stated that the practice and requirement is "there is always somebody in the cage." There are other prior incidents of monitoring failures of deputies and sergeants in the 2000 floor, of which Capt. Clark would have known. Clark knew that half of the killings in the Men's Central Jail (MCJ) occurred in the 2000 floor. (Depo Capt. Clark p. 248; 249:20-24.) However, he did not know why and he never requested an external investigator on lapses of security in 2000 floor.

10.    Capt. Clark also knew that the general issue throughout all these killings was a lapse of security – "a personal lapse of somebody not doing what they were supposed to do - they were derelict in performing their duties." As of 2005 he was aware of the racial tension at MCJ.

11.    Lt. Gonzalez approved the Incident Report in the Starr matter, and he documented it in his Watch Commander Log, but he took no further action to determine how another lapse of security had occurred under his watch, and in the very module where just two months prior the jail had another killing (Cochran) also due to deputies and sergeants failing to provide reasonable security to the inmates. Lt. Gonzalez was informed about prior similar incidents.

## Review of Past Warnings of Repetitive Serious Constitutional Violations and Lax and Lapses in Supervision

1.     I have reviewed many formal evaluations of operations of the Sheriff's Department presented to the County of Los Angeles, L.A.S.D. and Sheriff Baca, which, in my opinion, support my conclusion that the County, LASD, Sheriff Baca, Captain Clark and Lt. Gonzalez have permitted and condoned and ratified practices of deputies by:

- tolerating and condoning a pattern of lax discipline that results in continued incidents of inmate on inmate attacks, physical abuse and mistreatment of inmates; and,
- tolerating and condoning a pattern of lax discipline that results in physical abuse/mistreatment of inmates.

### 1997, DOJ'S CRIPA Report Established That the Jail Violates the Inmates Constitutional Rights[5]

**(A)** A Report by the U.S. Department of Justice, Civil Rights Division, Washington, DC, entitled: "Regarding CRIPA, Civil Rights of Incarcerated Persons Act, Investigation of Mental Health Services in the Los Angeles County Jail"dated September 5, 1997. This report began with investigations in August 1996, by the DOJ Civil Rights Division into the conditions at MCJ because inmates were complaining about mental health and "access to medication."

**(B)** It found "unconstitutional conditions exist at the Los Angeles County Jail," including abuse of mentally ill inmates by sheriff's deputies working in the jail; abuse by correctional staff; abuse by other inmates; and **does not adequately investigate allegations of such abuse when it occurs**." For example it reports that "Two female deputies" had beaten an inmate, but despite the evidence no investigation was done.

### The CRIPA Report Leads to Baca Agreeing to and Signing the "Memorandum of Agreement"(MOA)

**(C)** The follow-up document to the U.S. Department of Justice' CRIPA Report entitled: "Memorandum of Agreement Between the United States

---

[5] The CRIPA Report is available upon request.

and Los Angeles County Regarding Mental Health Services at the Los
Angeles County Jail"("MOA") was developed under threat of a lawsuit by
the DOJ. County, and Baca personally, signed the agreement to address
the violations of constitutional rights of inmates and agreed to the MOA with
the DOJ. The MOA states at ¶43: Allegations of abuse of mentally ill
inmates or inmates in mental health housing **shall be promptly and
thoroughly investigated**."

**(D)** Following are a few Examples of Summary Information reported to The
County, LASD and Sheriff Baca by Los Angeles County Special Counsel
Merrick J. Bobb; Office of Independent Review; and by Staff Police
Assessment Resource Center (PARC).
http://www.parc.info/los_angeles_county_sheriffs_department.chtml )

**The Los Angeles County Sheriff's Department, 18th Semiannual
Report (August 2004):** describes an increasing level of inmate violence in
the jails (p. 27). The rate of disturbances found to be troublingly high in
2003 remained so through March of 2004. (Id.)

•**Report by the District Attorney of the County of Los Angeles (August
2004):** The District Attorney reported that the inmate workers in the housing
modules are selected by deputies assigned to the module in which they are
housed.  Although there were standardized qualifications/restrictions
placed upon the inmates, the unit policy is seldom, if ever, utilized, resulting
in no uniformity in selection process of module inmate workers (trustees).
The result was that in "most cases the module inmate worker makes
"recommendations" to be affected by influential inmates housed upon the
module row, thus rendering the inmate worker selected more answerable to
the demands of the inmate leaders than ….to the deputies in charge of the
module."
•     that  housing module workers be selected in the County Jail System;
•     standards and procedures be adopted to identify dangerous inmates
       and preclude them from being inmate workers;
•     that the housing module inmate workers be housed with the inmate
       workers in the "9000 floor";

- all inmate workers be escorted to and from work;
- that inmate workers be clothed in green jumpsuit like any other inmate worker.

On February 15, 2006, the LASD reported that it had accomplished changes in policy in 2005, which included the following:  that inmate workers must be screened and approved by the floor sergeant;

- screening consist of reviewing the inmate's current security level and discipline history in jail;
- disqualifying factors were prior assaults, serious acts of insubordination; and a security level 8 and 9;
- this information must be logged daily;
- variations from guidelines required Watch Commander approval at the permanent rank of Sergeant or above;
- Unit Commanders have discretion to make the criteria more restrictive but not less restrictive;
- Inmate workers cannot be used as messengers of sensitive inmate information.

**The Los Angeles County Sheriff's Department, 21st Semiannual Report (March 2006):** In 2002-2003, the Department had nearly 100% untrained and undervalued staff, resulting in a lackluster training program for custody deputies

The Office of Independent Review Public Report on Los Angeles County Jail Homicides, Reported a String of Inmate on Inmate Murders, Due to Lapses or Lack of Monitoring and Lack of Supervision (PublicRpt-LACOJail-Homicides-Fall04pdf) ttp://www.laoir.com/Reports.html – which reported the string of killings  (as described above), which also gave notice of ongoing security lapses.

1.     I have reviewed reports by Office of Independent Review: Oversight Report 1st Quarter 2007, (IAB-Master-Chart-1stQt2007.pdf), dating pre this incident and after this incident.  These reports continue to give notice to LASD, Sheriff Baca and the County of Los Angeles, of deputies

abandoning their posts, failing to properly classify, failing to monitor, falling asleep, not following procedures, failing to conduct timely security checks, deputies left inmates unsupervised, including deputy use of excessive force, and deputies encouraging inmate on inmate fights.

2.      I reviewed the results of a summary of the inmate on inmate major incidents of violence at MCJ produced in discovery in this case.  Of note, Capt. Clark reported in his deposition that he and LASD knew that half the killings at the MCJ occurred in the 2000 Floor, but he did not know why.

3.      **Review of Data:** This history, findings and reports, coupled with Facility Automated Statistical Tracking System (FAST) data tracking inmate major incidents of assaults for the time period of March 23, 2003 through February 1, 2006 at MCJ, reveals that of the total number of jail-wide incidents, 24% occurred in the 2000 floor; coupled with Capt. Clark's testimony that he knew that 50% of the killings occurred in the 2000 floor; the Watch Commander's Daily Activity Log for the time period January 2004 through June 2006, referencing inmate major assaults at MCJ, reveal that 33% of the total were occurring in the 2000 floor; is particularly troubling as the records, reports and investigative findings indicate that the problems are endemic, repetitive and remain unabated.

## VII.  SUMMARY OF OPINIONS

1.      Based upon my experience in doing audits of many state and county custody facilities, on behalf of either private or government entities, this is a staggeringly unacceptable number.  And when viewed from the perspective that in the incidents of *Gavira, McNamera,* and in this case, the incident was not reported at all, the gravity of the continuing failures of the supervisors at the MCJ in Los Angeles County to enforce the policies, procedures, orders, and findings of government agencies, the District Attorney, and including their own investigative bodies, is shocking, and clearly shows deliberate indifference to the safety and welfare of the jail detainees.

2.     Los Angeles County, LASD and Sheriff Baca had been informed and placed on notice of continuing conditions which directly contributed to the severe beating and stabbing of Mr. Starr.   Language within the excerpted and cited paragraphs of the various Reports, which directly describe continuing lapses of security and failures to investigate and take appropriate action to train, supervise, reprimand or discipline not only line staff, but more importantly, the sergeants, lieutenants and captains working in the jails, has been underscored to highlight direct relevance to this case concerning Mr. Starr.

3.     The reports by Special Counsel Merrick Bobb, of his attorneys at OIR, and PARC, gave the County, LASD and Sheriff Baca clear notice of reported endemic, ongoing violations, practices, policies, of the existence of conditions which created potential violations by his staff, and which led to inmate-on-inmate violence, resulting in many murders and brutal beatings. The reports gave him notice that the incidents resulting in deaths and brutal beatings, which included gang related killings and beatings, many times occurred due to deputies abandonment of their assigned positions, failure of deputies to timely monitor, and the failure of supervisors to supervise their deputies and to take corrective measures.

4.     These ongoing and unabated problems reveal that the County, LASD and Sheriff  have a custom of tolerating inmate on inmate violence, caused by lax supervision; a failure to train line personnel in reasonable security procedures and a practice of not investigating; not disciplining deputies and supervisors; not ensuring training regarding corrective measures are enforced.   Most troubling, despite these explicit warnings and notices, Sgt. Inge, Lt. Gonzalez and Capt. Clark all testified in deposition that the Sheriff did not undertake any actions before this case to direct his facility supervisors or lieutenants to target the ongoing patterns and practices stated above.

5.     The County, LASD and Sheriff's failures to investigate, institute new policies and procedures, to ensure compliance with corrective measures, or

to discipline condones, ratifies and encourages the ongoing violations and
dereliction of duty and wrongful conduct to go unabated, and results in the
dereliction of the entity's duties and responsibilities. Sheriff Baca, is the
policy maker for the County and LASD: he has the responsibility to take
corrective and remedial actions, and to ensure that his staff is following his
directives.

6.      The failures of Lt. Gonzalez and Capt. Clark to investigate the Starr
incident; to take corrective measures, and to discipline Deputy Garibay and
Sgt. Inge for dereliction of duty for not knowing the most basic policies and
procedures regarding inmate security, which in this case resulted in yet
another beating and stabbing of an African American man, demonstrates a
disregard for the security and safety of inmates which they were mandated
by law to protect and keep safe. By their failure to take such minimal
measures they are the link which allows the inmate on inmate violence at
LASD to continue. Their failure to discipline Dep. Bugarin for not reporting
the use of force and for using excessive force when an inmate was
handcuffed on the floor, further reflects their failure to supervise their
subordinates. This is most troubling, considering that both learned of this
incident through the chain of command, and both knew of the ongoing
history of inmate on inmate violence particularly in the 2000 Floor, and both
failed to take any action to investigate this incident.

I declare under penalty of perjury, under the laws of the United States, that
the foregoing is correct and based upon my personal review and
knowledge of the facts stated herein.

Executed on October 15, 2009, in Salem, Oregon.

/S/George Earl Sullivan
George Earl Sullivan

# EXHIBIT 16

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES--GENERAL

Case No. CV 06-7812-PA(RCx)                          Date: May 21, 2009

Title: Julio Alvarado v. William Bratton, et al.
===============================================================
**DOCKET ENTRY**

===============================================================
**HON. ROSALYN M. CHAPMAN**, UNITED STATES MAGISTRATE JUDGE

Jake Yerke                              None
Deputy Clerk                            Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:        ATTORNEYS PRESENT FOR DEFENDANT:
None Present                            None Present

**PROCEEDINGS:   (IN CHAMBERS) ORDER GRANTING PLAINTIFF'S MOTION TO
COMPEL PRODUCTION OF DOCUMENTS AND FOR SANCTIONS**

    On May 1, 2009, plaintiff filed a notice of motion and
motion to compel County defendants' further responses to requests
for production of documents and for sanctions with the supporting
declaration of Samantha Koerner, a Joint Stipulation, the second
supporting declaration of Samantha Koerner with exhibits, and the
opposing declaration of Scott E. Caron with exhibits, and on
May 13, 2009, the parties filed their supplemental memoranda.[1]
This matter is decided in Chambers without oral argument,
pursuant to Local Rule 7-15.

_____

    [1]   In their supplemental memorandum, County defendants
request the Court stay consideration of plaintiff's motion to
compel.  See Defendants' Supplemental Memorandum at 2:7-11 ("It
would be a waste of judicial resources, as well as a waste of the
parties' time, to hold the hearing on the motion if all claims
against the County are dismissed shortly thereafter.  [¶]   The
substance of the motion for summary judgment also justifies
staying the hearing on the motion to compel.").   County
defendants' request for a stay is not properly raised in a
supplemental memorandum, and must be brought by a properly
noticed motion under Local Rule 7.  Thus, the Court declines to
consider it.

**EXHIBIT 16**

### BACKGROUND

On December 8, 2006, plaintiff Julio Alvarado filed a
purported class action civil rights complaint against the City of
Los Angeles, its Police Department ("LAPD") and Police Chief
("Bratton") (collectively "City defendants"), as well as the
County of Los Angeles, its Sheriff's Department ("LASD"), Sheriff
("Baca") and other Sheriff's Department employees (collectively
"County defendants").  City defendants answered the complaint,
and County defendants filed a motion to dismiss.  On May 2, 2007,
Judge Anderson granted County defendants' motion to dismiss, and
on May 21, 2007, Judgment was entered dismissing the action
against all defendants.

The plaintiff appealed the Judgment to the Ninth Circuit
Court of Appeals, which in an unpublished decision filed
November 6, 2008, reversed and remanded the matter, holding
plaintiff's "complaint states an actionable due process
violation.  [Plaintiff] alleges that he was arrested due to
mistaken identification and detained because Defendants failed to
perform simple identification checks that would have immediately
made clear that he was not the person wanted. . . .  [Plaintiff]
alleges that he repeatedly told police that he was not the
subject of the warrant."  Regarding municipal liability, the
Ninth Circuit held that plaintiff, "by alleging that the failure
to check his identity at the police station and the jail were
pursuant to official policy or custom, and that Defendants
maintain such policies despite the frequency of mistaken identity
arrests and their possession of technology that would make it
possible to recognize identity mistakes within minutes[,]"
"easily satisfie[d] th[e] minimal burden" of alleging defendants
have "customs or policies that evince a 'deliberate indifference'
to constitutional rights, and that these policies were the
'moving force behind the constitutional violation.'"

On February 24, 2009, plaintiff, proceeding solely as an
individual, filed a First Amended Complaint ("FAC") against City
defendants and County defendants (adding additional deputy
sheriffs), setting forth the following causes of action:  (1 & 2)
Under 42 U.S.C. § 1983 for violations of the Fourth and
Fourteenth Amendments against all defendants; (3) for wrongful
arrest and detention under the California Constitution against
all defendants; (4) for violation of California Civil Code § 52.1
against defendants City, LAPD, County and LASD; (5) for false
imprisonment against defendants City, LAPD, County and LASD; and

2

(6) for injunctive relief against defendants City, LAPD, Bratton, County, LASD and Baca. The plaintiff alleges the following facts common to all causes of action: He was arrested on November 5, 2005, by LAPD officers on a misdemeanor warrant. FAC ¶ 28. Subsequently, LAPD officers concluded he was the subject of another misdemeanor warrant in the name of Antonio Gavino and a felony warrant in the name of Walfre Hernandez. FAC ¶¶ 28-30. On or about November 7, 2005, plaintiff was transferred to defendant LASD's custody and appeared before the Los Angeles County Superior Court on his misdemeanor warrant, and he would have been released from custody that date if LASD has informed the court he was not the subject of the Gavino and Hernandez warrants. FAC ¶¶ 34-37. On November 8, 2005, plaintiff appeared before the Los Angeles County Superior Court, which released him on the Gavino and Hernandez warrants. FAC ¶¶ 37-38. At all times, City defendants and County defendants were aware, or reasonably should have been aware, that plaintiff was not the person named in the Gavino misdemeanor warrant and the Hernandez felony warrant; however, defendants did nothing about plaintiff being held in custody on these warrants. FAC ¶¶ 30-35. City defendants and County defendants have official policies or practices causing or permitting the type of wrongful incarceration plaintiff suffered. FAC ¶ 41. Plaintiff seeks monetary damages and declaratory and injunctive relief, as well as attorney's fees and costs.

City defendants answered the First Amended Complaint, and County defendants filed a motion to dismiss, which Judge Anderson denied on March 23, 2009, "except for Plaintiff's cause of action for injunctive relief." On April 6, 2009, County defendants filed their answer to the First Amended Complaint.

## DISCUSSION

### I

Rule 26(b)(1) permits discovery in civil actions of "any nonprivileged matter that is relevant to any party's claim or defense. . . ." Fed. R. Civ. P. 26(b)(1). "'Generally, the purpose of discovery is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute.'" Moon v. SCP Pool Corp., 232 F.R.D. 633, 636 (C.D. Cal. 2005) (quoting Oakes v. Halvorsen Marine Ltd., 179 F.R.D. 281, 283 (C.D. Cal. 1998)). "Toward this end, Rule 26(b) is liberally interpreted to permit wide-ranging discovery

of information even though the information may not be admissible at the trial." Id. (citing Jones v. Commander, Kansas Army Ammunitions Plant, 147 F.R.D. 248, 250 (D. Kan. 1993)). The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections. Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975); Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 104 (D. N.J. 1990).

Rule 34, which is one of the discovery tools available to litigants in the federal courts, Keith H. v. Long Beach Unified School Dist., 228 F.R.D. 652, 655 (C.D. Cal. 2005), provides for the serving by a party upon any other party of written requests for the responding party "to produce and permit the requesting party . . . to inspect . . . [and] copy . . . any designated documents or electronically stored information" that is "in the responding party's possession, custody or control." Fed. R. Civ. P. 34(a)(1)(A). A document request may "specify the form or forms in which electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C).

The discovery dispute before the Court involves document request nos. 25 and 27. Specifically, Request no. 25 seeks:

> AJIS DATA for prisoners released from the custody of the Los Angeles County Sheriff's Department at any time from January 1, 2003, through September 30, 2006, where the prisoner's release code was "WDEF" [wrong defendant].[2] The AJIS DATA should be produced as a Microsoft Access file on either a DVD or CD-ROM.

Jt. Stip. at 7:2-6 (footnote added). Request no. 27 seeks "[t]he disputed Warrant Log Book(s) for 2003, 2004, 2005, 2006, 2007 and 2008." Id. at 7:24-25. In response to both requests, County defendants raised the official information privilege and made numerous objections, including relevancy, "vague, ambiguous and overbroad," third party privacy rights, and "unduly burdensome

---

[2] See Declaration of Scott E. Caron ("Caron Decl.") ¶ 4, Exh. J ¶ 5 ("'WDEF' refers to a 'wrong defendant' release – releases are classified as 'WDEF' when it is learned that the wrong person is in custody.").

//
and oppressive[.]"[3]

        The Court finds no merit to County defendants' objections.
Comparing the information plaintiff seeks in Request no. 25 with
the information plaintiff seeks in Request no. 27 could assist
plaintiff in showing County defendants have "customs or policies
that evince a 'deliberate indifference' to constitutional rights
[to be free from wrongful arrest and incarceration], and that
these policies were the 'moving force behind the constitutional
violation.'"  In other words, comparing the information
responsive to Request nos. 25 and 27 could assist plaintiff in
showing municipal liability based on County defendants' customs
and policies for determining whether the person named on a
warrant is the person in custody or whether the wrong defendant
is being held.  Thus, the Court finds Request nos. 25 and 27 seek
relevant information, and County defendants' relevancy objections
are overruled.[4]  See Surfvivor Media, Inc. v. Survivor Prods.,
406 F.3d 625, 635 (9th Cir. 2005) ("Relevant information for
purposes of discovery is information 'reasonably calculated to
lead to the discovery of admissible evidence.'" (citation
omitted)).  In making this determination, the Court has
considered, and determined to be without merit, County
defendants' objection that the requests are too broad, thereby
seeking information that is not relevant, because they seek
information both prior to, and subsequent to, plaintiff's 2005
arrest and incarceration.  See, e.g., Henry v. County of Shasta,
132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that

---

        [3]  Since County defendants do not address all of their
objections in the Joint Stipulation, the Court deems County
defendants to have abandoned those objections they do not
address, Cardenas v. Dorel Juvenile Group, Inc., 230 F.R.D. 611,
632 (D. Kan. 2005), and does not discuss the abandoned
objections.

        [4]  Nevertheless, as County defendants aptly note, Jt. Stip.
at 12:17-21, since Request no. 27 seeks information for the years
2003 through 2008 and Request no. 25 seeks information only for
the years 2003 through 2006, plaintiff would be unable to
compare, and draw any relevant conclusions from, the 2007 and
2008 information responsive to Request no. 27.  Thus, Request no.
27 should be limited to the same years as Request no. 25, the
years 2003 through 2006.

post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry."), amended on denial of rehearing by 137 F.3d 1372 (9th Cir. 1998), cert. denied sub nom. Pope v. Henry, 525 U.S. 819 (1998); Thomas v. Baca, 514 F. Supp. 2d 1201, 1210 (C.D. Cal. 2007) (same).  Thus, the Court finds Request no. 25 and Request no. 27, as limited to the years 2003 through 2006, seek information relevant to plaintiff's claims.

County defendants also make boilerplate objections of "unduly burdensome and oppressive" and "vague, ambiguous and overbroad" to plaintiff's document requests.  However, such boilerplate objections are improper -- "especially when a party [such as here] fails to submit any evidentiary declarations supporting such objections."  A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 188 (C.D. Cal. 2006); Paulson v. Case Corp., 168 F.R.D. 285, 289 (C.D. Cal. 1996); see also McLeod, Alexander, Powel & Apfel, P.C. v. Quarles, 894 F.2d 1482, 1485 (5th Cir. 1990) (objections that document requests are overly broad, burdensome, oppressive, and irrelevant are insufficient to meet objecting party's burden of explaining why discovery requests are objectionable); Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1559 (11th Cir. 1985) (conclusory recitations of expense and burdensomeness are not sufficiently specific to demonstrate why requested discovery is objectionable).  Moreover, County defendants' boilerplate objections are somewhat similar to their relevancy objections in that they are based, in large part, on the time periods included in plaintiff's requests, see Jt. Stip. at 17-18, and, as determined above, information for years before and after 2005 is relevant.  Thus, the Court finds there is no merit to these boilerplate objections.

Questions of evidentiary privilege arising in the course of the adjudication of federal rights are governed by the principles of federal common law.  United States v. Zolin, 491 U.S. 554, 562, 109 S. Ct. 2619, 2625, 105 L. Ed. 2d 469 (1989); Fed. R. Evid. 501.  This is true even where a complaint contains both federal and pendant state law claims.  Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.10 (9th Cir. 1992); Keith H., 228 F.R.D. at 656.  Federal common law "ordinarily recognize[s] a constitutionally-based right of privacy that can be raised in response to discovery requests."  Soto v. City of Concord, 162 F.R.D. 603, 616 (N.D. Cal. 1995); Breed v. United States

6

Dist. Ct. for the N. Dist. of Cal., 542 F.2d 1114, 1116 (9th Cir.
1976); Johnson ex rel. Johnson v. Thompson, 971 F.2d 1487, 1497
(10th Cir. 1992), cert. denied, 507 U.S. 910 (1993).
"Resolution of a privacy objection . . . requires a balancing of
the need for the information sought against the privacy right
asserted[,]" Soto, 162 F.R.D. at 616; Johnson ex rel. Johnson,
971 F.2d at 1497, and any privacy objection also "must be
evaluated against the backdrop of the strong public interest in
uncovering civil rights violations. . . ." Soto, 162 F.R.D. at
621.  "A carefully drafted protective order [can] minimize the
impact of th[e] disclosure."  Soto, 162 F.R.D. at 616; Kelly v.
City of San Jose, 114 F.R.D. 653, 662 (N.D. Cal. 1987).

     Federal common law similarly recognizes a qualified
privilege for official information.  Kerr v. United States
District Court for the N. Dist. of Cal., 511 F.2d 192, 198 (9th
Cir. 1975), affirmed by, 426 U.S. 394 (1976); Soto, 162 F.R.D. at
613.  "To determine whether the information sought is privileged,
courts must weigh the potential benefits of disclosure against
the potential disadvantages.  If the latter is greater, the
privilege bars discovery."  Sanchez v. City of Santa Ana,
936 F.2d 1027, 1033-34 (9th Cir.), cert. denied, 502 U.S. 957
(1991); Soto, 162 F.R.D. at 613.  Moreover, this balancing test
has been moderately preweighted in favor of disclosure.  Soto,
162 F.R.D. at 613; Miller v. Pancucci, 141 F.R.D. 292, 299 (C.D.
Cal. 1992).  Here, County defendants rely on a declaration dated
November 3, 2006, by Lt. Paul Drake of the LASD to support their
claim of official information privilege.  See Caron Decl. ¶ 4,
Exh. J.  However, Lt. Drake's declaration does not meet the
threshold requirements of Soto in that Lt. Drake does not
"address how disclosure, under a carefully crafted protective
order, would create a substantial risk of harm to significant
government interests."[5]  Soto, 162 F.R.D. at 614; Chism v. County

---

     [5]  Instead, Lt. Drake opines that "[w]hile a protective
order from the court is to be taken with the utmost seriousness
and complied with by the parties at all times, there are
individuals in society who do not adhere to these requirements.
In a circumstance where individuals make improper use of the
information in disregard of the court's order, the damages to the
LASD, its personnel, the subject non-party inmates, and society
is irreparable, and Defendants will have no meaningful recourse
whatsoever, after the fact, once this very sensitive information
has been disclosed."  Caron Decl. ¶ 4, Exh J ¶ 9.  This opinion

*of San Bernardino*, 159 F.R.D. 531, 535 (C.D. Cal. 1994). This is a glaring omission since subsequent to Lt. Drake making his declaration, Judge Nagle, in *Reyes v. City of Glendale*, case no. CV 05-0253-CAS(MANx), ordered LASD to provide plaintiff's counsel with AJIS Data and warrant log books for the two year period of January 1, 2003, to December 31, 2004, and crafted a protective order covering those documents.[6] *See* Koerner Decl. II ¶¶ 17-18, Exh. G. Since County defendants have neither argued nor shown that their disclosure of LASD's 2003 and 2004 documents to plaintiff in *Reyes* "create[d] a substantial risk of harm to significant government interests," defendants have not met their burden to invoke the official information privilege. *Soto*, 162 F.R.D. at 613-16, 620-21; *Chism*, 159 F.R.D. at 534-35.

Nevertheless, some sort of protective order should be attached to County defendants' production of documents responsive to Request nos. 25 and 27 since these requests indisputably implicate significant privacy rights of inmates who are not parties to this litigation. Yet, due to the lack of cooperation between the parties, who apparently agree that a protective order is desirable, *see*, e.g., Jt. Stip. at 5:13-14 ("Defendants have requested the same protective order that was issued in *Reyes*. . . ."); Jt. Stip. at 13:17-18 ("[P]laintiff has offered to agree to a protective order."), no proposed protective order has been presented to the Court for approval.

## II

Rule 37(a) provides that if a motion compelling discovery is granted:

> the court must, after giving an opportunity to be
> heard, require the party . . . whose conduct
> necessitated the motion, the party or attorney advising

---

is sheer speculation, without any foundational facts to support it; thus, it is entitled to no weight by the Court.

[6] The protective order in *Reyes* limited the use of these documents to the *Reyes* case. *See* Second Declaration of Samantha Koerner ("Koerner Decl. II") ¶ 18, Exh. G. However, in the interests of justice, speed and economy, Fed. R. Civ. P. 1, this Court now modifies the protective order in *Reyes* to permit plaintiff to use the *Reyes* discovery, i.e., LASD's 2003 and 2004 AJIS Data and warrant log books, in this litigation.

that conduct, or both to pay the movant's reasonable
expenses incurred in making the motion, including
attorney's fees. But the court must not order this
payment if: (i) the movant filed the motion before
attempting in good faith to obtain the disclosure or
discovery without court action; (ii) the opposing
party's nondisclosure, response, or objection was
substantially justified; or (iii) other circumstances
make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A).

Plaintiff seeks monetary sanctions against County defendants
in the amount of $3,675.00, and has provided the declaration of
Samantha Koerner to support this request. In her declaration,
Ms. Koerner states she spent 12.25 hours "meeting with defense
counsel . . . and in assisting in the preparation" of the Joint
Stipulation. Declaration of Samantha Koerner attached to Notice
of Motion ¶ 6. Ms. Koerner also states she has "been awarded
fees for her services in excess of $300.00/hr." Id. ¶ 5.
However, Ms. Koerner does **not** state either her hourly rate of pay
or billable hourly rate as an associate attorney with the offices
of Messrs. Mann and Cook, and the Court infers from Ms. Koerner's
omission of this information that these rates are less than
$300.00 per hour. Based on the nature of the pending discovery
dispute, the Court finds a reasonable hourly rate for Ms.
Koerner's work is $150.00 per hour, and further finds 12.25 hours
to be a reasonable number of hours on this matter. Accordingly,
the Court awards attorney's fees to plaintiff in the amount of
$1,837.50.[7]

### III

The Court is distressed by the uncivil and offensive manner
in which County defendants' counsel refers to plaintiff's counsel
in the Joint Stipulation. See, e.g., Jt. Stip. at 4:23-24
("Plaintiff's contention that Defendants produced no documents
prior to Plaintiff's service of a joint discovery stipulation is
an absolute lie."); Jt. Stip. at 5:6-7 ("Plaintiff's [counsel's]
lie . . . is simply an attempt to manipulate the Court into
ruling in [plaintiff's] favor."). The parties are admonished

---

[7] There is no merit to County defendants' cross-request for
sanctions against plaintiff.

that in the future this Court will strike sua sponte any document that refers in an offensive manner to the opposing counsel or party, including documents containing abusive correspondence as exhibits.  Moreover, the parties must become familiar with this district court's Civility and Professionalism Guidelines, which are found on the district court's website at http://www.cacd.uscourts.gov/cacd/AttyAdm.nsf/366772ea8f17d2cc882 5716500670366/f8fb3292453bd42d882567c80058c22a?OpenDocument.

The Court would like to take this opportunity to address the parties and their counsel to stress that:

> [t]he discovery system depends absolutely on good faith and common sense from counsel.  The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process.  The whole system of [c]ivil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percentage of discovery transactions.  That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests.

In re Convergent Technologies Securities Litigation, 108 F.R.D. 328, 331 (N.D. Cal. 1985).  It is for the parties' benefit that counsel cooperate in the discovery process, and the Court expects that of all counsel.

**ORDER**

1.  Plaintiff's motion to compel County defendants' responses to Request nos. 25 and 27 **IS GRANTED**, and County defendants shall respond to these requests, limiting Request no. 27 to the years 2003 through 2006, no later than twenty (20) days from the date of this Order.

A.  The Court modifies the protective order in Reyes v. City of Glendale, case no. CV 05-0253-CAS(MANx), to permit the use in

10

this litigation of LASD's AJIS Data and warrant log books for the
years 2003 and 2004.  Plaintiff shall advise County defendants in
writing, no later than ten (10) days from the date of this Order,
whether his counsel still have possession, custody and control of
these documents.  If so, County defendants need not provide these
documents to plaintiff.  However, if not, County defendants shall
produce these documents to plaintiff in Microsoft Access file on
either a DVD or CD-ROM, within twenty (20) days from the date of
this Order.

     B.   If County defendants maintain in electronic format the
documents responsive to Request nos. 25 and 27 (as limited), they
shall produce the responsive documents to plaintiff in Microsoft
Access file on either a DVD or CD-ROM.  However, if County
defendants maintain the responsive documents in non-electronic
format, they need not produce them to plaintiff in Microsoft
Access file on either a DVD or CD-ROM.

     C.   The documents County defendants produce to plaintiff in
response to Request no. 25 and Request no. 27, as limited, shall
be deemed confidential and shall not be shown to plaintiff or any
non-party.  Moreover, if attached to documents filed with the
Clerk, these documents must be filed under seal, pursuant to
Local Rule 79-5.  At the conclusion of the litigation (entry of
final judgment, appellate decision, or dismissal pursuant to a
stipulation by the parties), plaintiff shall return these
documents, and any copies, to County defendants; however, if
copies of the documents have counsel's notes on them, they may be
destroyed, and a certification of destruction shall be provided
County defendants within 45 days of the conclusion of the
litigation.

     2.   Plaintiff's motion for sanctions **IS GRANTED** in the
amount of $1,837.50, and County defendants, and their counsel,
separately and severally, shall pay this amount to plaintiff, no
later than twenty (20) days from the date of this Order.

case067\06-7812.1
5/20/09                          Initials of Deputy Clerk_JY_

11