PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
JUSTIN W. CLARK, State Bar No. 235477
jclark@lbaclaw.com
MATTHEW P. ALLEN, State Bar No. 265118
mpa@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
A Professional Corporation
100 West Broadway, Suite 1200
Glendale, California 91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, et al.,

          Plaintiffs,

   vs.

SHERMAN BLOCK, et al.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 75-04111 DDP

Honorable Dean D. Pregerson

**DECLARATION OF JUSTIN W.
CLARK AND SUPPORTING
EXHIBITS FILED IN SUPPORT
OF DEFENDANTS' PORTIONS OF
PLAINTIFFS' MOTION TO
COMPEL PRODUCTION OF
DOCUMENTS**

///
///
///

## DECLARATION OF JUSTIN W. CLARK

I, JUSTIN W. CLARK, declare as follows:

1.      I am an attorney at law, duly authorized to practice before this Court and I am an associate in the law firm of Lawrence Beach Allen & Choi, A Professional Corporation, attorneys of record for Defendants Sherman Block, et al., in the above-entitled action.  I have personal knowledge of the facts stated herein, except those stated upon information and belief and as to those matters, I believe them to be true.  If called to testify to the matters herein, I could and would competently do so.

2.      Attached hereto as Exhibit "1" is a true and correct copy of the Judgment in this case.

3.      Attached hereto as Exhibit "2" is a true and correct copy of the Plaintiffs' Post Trial Brief.

4.      Attached hereto as Exhibit "3" is a true and correct copy of the Memorandum of Decision, issued July 25, 1978 in this case.

5.      Attached hereto as Exhibit "4" is a true and correct copy of a Supplemental Memorandum of Decision, issued February 15, 1979 in this case.

6.      Attached hereto as Exhibit "5" is a true and correct copy of a Memorandum of Points and Authorities in Support of Appointment of Monitor from this case.

7.      Attached hereto as Exhibit "6" is at true and correct copy of Plaintiffs' Status report, filed December 17, 1984 in *ACLU et al. v. Pitchess et al.*, LASC Case No. C 275653.  Defendants are in the process of locating and obtaining any available Court files from this action and at this time, Defendants only have limited documents from this case

8.      In preparing Defendants' portions of this Motion, I reviewed at least a 1000 pages of court records from the history of this action going back to 1976 and other than the pleadings, I was unable to locate any more than passing

2

references to medical or mental health issues.

9.     As of October 5, 2010, the County jail population was approximately 15, 800 inmates including both males and females.  The inmate population of Men's Central Jail was approximately 4,000 inmates.

10.     During the parties meet and confer discussions, I raised concerns regarding the exposure to liability based on the production of inmate medical and mental health records without releases.  I proposed that Plaintiffs agree to indemnify Defendants to address this concern and, not surprisingly (and frankly, understandably), Plaintiffs declined.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on October 6, 2010 at Glendale, California.


___s/ Justin W. Clark___
Justin W. Clark

RUTHERFORD\CLARK DECL.

# EXHIBIT 1

ENTERED

FEB 16 1979

CLERK, U. S. DISTRICT COURT
'TRAL DISTRICT OF CALIFORNIA
DEP'

FILED

FEB 15 1979

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, HAROLD TAYLOR, and RICHARD ORR, et al., | CASE NO. CV 75-4111-WPG |
| Plaintiffs, | |
| v. | |
| PETER J. PITCHESS, et al., | JUDGMENT |
| Defendants. | |

In this action, the plaintiffs, on behalf of inmates of the Los Angeles County Central Jail, challenge certain policies and practices of the defendant administrators of the jail and the living conditions under which the inmates are maintained. The matter has been tried and briefed, and the court has made findings of fact and conclusions of law in the form of a Memorandum of Decision filed on July 25, 1978, and a Supplemental Memorandum of Decision that is being filed contemporaneously herewith. In accordance with such findings, the court renders this judgment.

1097

Docketed
Mld copy Ptys
Mld Notice Ptys
JS-6

FEB 15 1979

MICROFILMED

FEB 22 1979

EXHIBIT "B"

EXHIBIT 1

20

IT IS ORDERED AS FOLLOWS:

1.  Beds.  Every prisoner kept overnight in the jail
will be accorded a mattress and a bed or bunk upon which to sleep.

This order shall not preclude the defendants
from permitting inmates to be housed with full bedding but without
a bunk, for one night only, if, in the defendants' judgment, such
inmate or inmates require more secure housing than is provided
in the available areas and the appropriate housing does not have
a sufficient number of bunks.  Further, this order shall not
apply in the event of an emergency causing a sudden and unusual
intake of prisoners, in which case full bedding shall be provided
and the defendants will exercise their best efforts to provide
bunks for all inmates as soon as possible.

2.  Visitation.

(a)  Visits By Children Of Prisoners.  Upon prior
request from a prisoner, his minor children over the age of
twelve (12) years shall be permitted to visit him unaccompanied
by an adult.

(b)  Contact Visits.  Commencing not more than
ninety days following the date of this order, the defendants will
make available a contact visit once each week to each pre-trial
detainee that has been held in the jail for one month or more,
and concerning whom there is no indication of drug or escape
propensities; provided, however, that no more than fifteen
hundred such visits need be allowed in any one week.  In the
event that the number of requested visits in any week exceeds
fifteen hundred, or such higher number as the Sheriff voluntarily
undertakes to accommodate, a reasonable system of rotation or

-2-

1098

**EXHIBIT "B"**

21

1    other priorities may be maintained.  The lengths of such visits

2    shall remain in the discretion of the Sheriff.

3         3.  <u>Outdoor Recreation</u>.  All prisoners except those

4    that are hospitalized, in disciplinary segregation, those under

5    the jurisdiction of the medical staff of the Forensic Mental

6    Health Unit who such medical staff determine are inappropriate

7    for roof recreation, and except for those high security inmates

8    who the Sheriff believes cannot safely be permitted roof recrea-

9    tion shall be allowed not less than two and one-half hours of

10    outdoor exercise or other recreation per week.  Within sixty

11    days following the date of this order, the Sheriff shall report

12    to the court the number of inmates under the jurisdiction of the

13    Forensic Mental Health Unit and the number of high security

14    inmates included in the roof recreation program and the nature

15    of alternative recreation provided for high security inmates not

16    allowed roof recreation.

17         4.  <u>Indoor Recreation</u>.  Television receiving sets

18    shall be installed and reasonably maintained in each day room.

19         5.  <u>Restoration Of Windows</u>.  Within ninety days

20    following the filing of this order, transparent windows shall be

21    restored in each portion of the jail from which they previously

22    have been removed.

23         6.  <u>Processing For Court</u>.  As soon as practical, but

24    not more than four months from the date of this order,

25         (a) each detainee placed in a holding cell will be

26    given a chair or a bench upon which to sit;

27         (b) on each day of trial after the first day a

28    detainee will not be required to leave his bed earlier than

1099

EXHIBIT "B"

1  6:00 A.M., and will not be confined in a holding cell for longer

2  than thirty minutes, either before leaving for court or following

3  his return; and his waiting time on a bus at the jail will not

4  exceed thirty minutes; and he will be returned to his cell not

5  later than 8:00 P.M.

6          Within four months from the date of this order,

7  the Sheriff shall report his progress in this regard to the court

8  and the reasons, if any, for his inability to comply in all

9  respects. At that time, the court will review this portion of

10  this order as to whether there is any justification for modifi-

11  cation thereof.

12          7. Telephones. On January 5, 1979, a separate order

13  was filed approving and directing implementation of a plan for

14  the improvement of telephone facilities in the jail. Accordingly,

15  no further order is indicated on this subject at this time.

16          8. Cell Searches. Inmates that are in the general

17  area when a "shakedown" inspection of their cells is undertaken

18  shall be permitted to be sufficiently proximate to their respec-

19  tive cells that they may observe the process and respond to such

20  questions or make such requests as circumstances may indicate.

21          9. Time For Meals. An inmate shall be allowed not

22  less than fifteen minutes within which time to complete each meal.

23          10. Change Of Clothing. Effective not more than sixty

24  days following the filing of this order, each inmate shall receive

25  at least twice each week clean outer garments, undergarments,

26  socks and a towel in exchange for those that he has been using.

27          11. Injunctive Relief. When any inmate has information

28  that he believes to disclose a violation of this order, he may

-4-

1100

EXHIBIT "B"

23

1   set forth that information in writing to the Commander of the

2   jail who shall cause an investigation thereof to be made as soon

3   as reasonably practicable, and in any event within ten days

4   following receipt of such written statement.  Promptly following

5   the completion of the investigation the Commander shall deliver

6   a written reply to the inmate indicating the results thereof and

7   what, if any, action has been taken concerning the inmate's

8   complaint and what, if any, action has been taken to prevent

9   violations of this judgment.  Absent unusual circumstances

10  indicating compelling reasons why following this procedure would

11  result in substantial prejudice to the inmate, no petition for

12  a judgment of contempt for violation of this order shall be

13  entertained by the court until the inmate first complies with

14  this administrative procedure.  In considering any petition for

15  contempt for violation of this order, the court shall take into

16  account the appropriateness of any action taken by the jail

17  Commander in response to information provided him in accordance

18  with this procedure.

19          12.  Emergencies.  In the event that the Sheriff or

20  his authorized representatives have reasonable cause to believe

21  that there exist facts showing a serious imminent threat to the

22  security of the jail or the safety of any persons therein that

23  would occur if any of the provisions of this decision were

24  enforced and there is insufficient time to seek a formal modifi-

25  cation or exception to such provisions, the Sheriff may temporarily

26  suspend such of the provisions of this decision as may be

27  necessary to overcome or reduce such threat for a period not

28  exceeding five court days, provided he submits a statement in

-5-

1107

EXHIBIT "B"

1  writing to this court setting forth what he has done and why he

2  has done it.

3        13.  Posting Of This Judgment.  The defendants and

4  their successors in interest shall cause this judgment to be

5  posted permanently and conspicuously in each prisoner housing

6  area in the jail for the period of one year; thereafter, the

7  defendants and their successors in interest shall permanently

8  and conspicuously post this judgment in each of the jail's law

9  libraries.

10       14.  Counsel for the plaintiffs shall recover his costs

11  incurred in this action.

12

13  DATED:  February 15, 1979.

14

15

16                              WILLIAM P. GRAY
                                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28
                                                    1102

                              -6-

                                        EXHIBIT "B"          25

1    writing to this court setting forth what he has done and why he

2    has done it.

3            13.   Posting Of This Judgment.   The defendants and

4    their successors in interest shall cause this judgment to be

5    posted permanently and conspicuously in each prisoner housing

6    area in the jail for the period of one year; thereafter, the

7    defendants and their successors in interest shall permanently

8    and conspicuously post this judgment in each of the jail's law

9    libraries.

10           14.   Counsel for the plaintiffs shall recover his costs

11   incurred in this action.

12

13   DATED:   February 15, 1979.

14

15

16                              WILLIAM P. GRAY
                                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

1102

-6-

EXHIBIT "B"

26

# EXHIBIT 2

1  TERRY SMERLING
   FRED OKRAND
2  JILL JAKES
   MARK D. ROSENBAUM
3    ACLU Foundation of
     Southern California
4    633 South Shatto Place
     Los Angeles, California 90005
5    (213) 487-1720
   Attorneys for Plaintiffs
6



7

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11  DENNIS RUTHERFORD, HAROLD TAYLOR,  )   NO. CV 75-4111-WPG
    and RICHARD ORR, et al.,           )
12                                      )
                                        )
13                Plaintiffs,           )
                                        )
14       vs.                            )   PLAINTIFFS' POST TRIAL
                                        )        BRIEF.
15  PETER J. PITCHESS, et al.,          )
                                        )
16                Defendants.           )
    _____)

17

18

19

20

21

22

23

24

25

26

27

28                                          546

EXHIBIT 2

# TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES ............................................ iv

I.     OPENING STATEMENT .................................. 1

II.    DEFENDANTS' SOLE COGNIZABLE INTEREST
IN CONFINING PRETRIAL DETAINEES IS TO
GUARANTEE THEIR PRESENCE AT TRIAL, AND
ALL DEFENDANTS' RESTRICTIONS ON SUCH
DETAINEES MUST BE ESSENTIAL TO THAT
INTEREST ............................................ 2

III.   TREATMENT AND CONDITIONS FOR
PRETRIAL PRISONERS INFERIOR TO THOSE
EXPERIENCED BY SENTENCED STATE
PRISONERS VIOLATE DUE PROCESS AND
EQUAL PROTECTION OF LAW ............................ 3

    A.   Confinement Of Pretrial
Prisoners Under Conditions Inferior
To Those Experienced By Convicted
Prisoners Constitutes Punishment
Without Due Process Of Law ...................... 3

    B.   Confinement Of Pretrial
Prisoners Under Conditions Harsher
And More Restrictive Than Conditions
Of Sentenced Confinement Violates
Equal Protection Of Law ........................ 6

IV.   THIS COURT HAS BROAD EQUITABLE
POWER TO REMEDY CONSTITUTIONAL
DEPRIVATIONS SUFFERED BY THE
PLAINTIFF CLASS .................................... 7

V.     VISITATION .......................................... 16

    A.   Material Facts .............................. 16

    B.   Law ........................................ 17

       1.   Contact Visitation ..................... 17

       2.   Length of Detainees'
Visitation ............................. 28

       3.   Visitation by Juveniles ................ 28

    C.   Remedy ..................................... 28

547

i

| | | | |
|---|---|---|---|
| VI. | OUTDOOR RECREATION | | 31 |
| | A. | Material Facts | 31 |
| | B. | Law | 32 |
| | C. | Remedy | 37 |
| VII. | INDOOR RECREATION | | 38 |
| | A. | Material Facts | 38 |
| | B. | Law | 38 |
| | C. | Remedy | 41 |
| VIII. | OVERCROWDED, INADEQUATE HOUSING | | 42 |
| | A. | Material Facts | 42 |
| | B. | Law | 45 |
| | C. | Remedy | 51 |
| IX. | WINDOWS | | 52 |
| | A. | Material Facts | 52 |
| | B. | Law | 52 |
| | C. | Remedy | 56 |
| X. | CELL SEARCHES | | 56 |
| | A. | Material Facts | 56 |
| | B. | Law | 56 |
| | C. | Remedy | 58 |
| XI. | PERSONAL HYGIENE ITEMS | | 59 |
| | A. | Material Facts | 59 |
| | B. | Law | 60 |
| | C. | Remedy | 60 |
| XII. | LAUNDRY | | 61 |
| | A. | Material Facts | 61 |
| | B. | Law | 62 |
| | C. | Remedy | 63 |

548

XIII.     TRANSPORTATION TO COURT AND THE
          COUNTY HOSPITAL                          64

          A.   Material Facts                      64

          B.   Law                                 66

          C.   Remedy                              67

XIV.      LAW LIBRARY FOR PRETRIAL DETAINEES        68

          A.   Material Facts                      68

          B.   Law                                 70

               1.   Access to the Courts           70

               2.   Discrimination on the
                    Basis of Wealth                75

               3.   Discrimination Vis-a-Vis
                    Sentenced Prisoners            75

          C.   Remedy                              76

XV.       JAIL RULES                               76

          A.   Problem                             76

          B.   Remedy                              78

XVI.      ADMINISTRATIVE SEGREGATION               79

          A.   Material Facts                      79

          B.   Law                                 81

               1.   Conditions                     81

               2.   Procedural Due Process         83

          C.   Remedy                              85

XVII.     OFFICER MISCONDUCT                       87

          A.   Problem                             87

          B.   Law                                 96

          C.   Remedy                              97

XVIII.    CONCLUSION                               98

549

TABLE OF AUTHORITIES CITED

| CASES | PAGE |
|---|---|
| AHRENS v. THOMAS<br>434 F.Supp. 873 (W.D. Mo. 1977) | 4, 6, 11, 14, 27,<br>28, 30, 32, 46,50,<br>60, 96 |
| AIKENS v. LASH<br>371 F.Supp. 482 (N.D. Ind. 1974) | 82 |
| ALBERTI v. SHERIFF OF HARRIS COUNTY<br>406 F.Supp. 649 (S.D. Tex. 1975) | 62, 96 |
| AMBROSE v. MALCOLM<br>414 F.Supp. 485 (S.D.N.Y. 1976) | 45 |
| AMBROSE v. MALCOLM<br>76 C. 190 (S.D.N.Y. May 5, 1976) | 18 |
| ANDERSON v. NOSSER<br>438 F.2d 183 (5th Cir.1971) | 3 |
| BAILEY v. PITCHESS<br>CV-72-1957-F (C.D. Cal. December 9, 1975)<br>(Appendix G) | 68, 69 |
| BARNES v. GOVERNMENT OF VIRGIN ISLANDS<br>415 F.Supp. 1218 (D.V.I. 1976) | 33 |
| BATTLE v. ANDERSON<br>376 F.Supp. 402 (E.D. Okla. 1972) | 33 |
| BAY COUNTY JAIL INMATES v. BAY COUNTY BOARD<br>OF COMMISSIONERS<br>Civ. Action No. 74-10056<br>(E.D. Mich. August 29, 1974) | 18 |
| BONNER v. COUGHLIN<br>517 F.wd 1311 (7th Cir.1975) | 57 |
| BOUNDS v. SMITH<br>- U.S. -  52 L.Ed.2d 72 (1977) | 70, 74, 75 |
| BROWN v. PITCHESS<br>L.A.S.C. C-24464<br>(July 25, 1977) (Appendix F) | 57, 58 |
| CAMPBELL v. McGRUDER<br>416 F.Supp. 100 (D.D.C. 1975) | 18, 27, 32 |

CAMPBELL v. McGRUDER
416 F.Supp. 106 (D.D.C. 1975)                          46

CAMPBELL v. McGRUDER
46 F.Supp. 111 (D.D.C. 1975)                          11, 14, 15, 29

CARDAROPLI v. NORTON
523 F.2d 993 (2d Cir. 1975)                           84

CONKLIN v. HANCOCK
334 F.Supp. 1119 (D.N.H. 1971)                        32

CRUZ v. HAUCK
475 F.2d 475 (5th Cir.1973)                           70, 72

CRUZ v. HAUCK
515 F.2d 322 (5th Cir.1975)
cert.denied 424 U.S. 917                              73

DAVIS v. LINDSAY
321 F.Supp. 1134 (S.D.N.Y. 1970)                      22

DETAINEES OF BROOKLYN HOUSE OF DETENTION
FOR MEN v. MALCOLM
520 F.2d 392 (2nd Cir.1975)                           9, 10, 47, 48

DETAINEES OF BROOKLYN HOUSE OF DETENTION
FOR MEN v. MALCOLM
421 F.Supp. 832 (E.D.N.Y. 1976)                       18, 23

DILLARD v. PITCHESS
399 F.Supp. 1225 (C.D. Cal. 1975)                     2, 12, 13, 16,19,
                                                      21, 24, 25, 26,31,
                                                      45, 55, 64, 66

DURAN v. ELROD
542 F.2d 998 (7th Cir.1976)                           3, 47

EX PARTE HULL
312 U.S. 546 (1941)                                   73

FARETTA v. CALIFORNIA
422 U.S. 806 (1975)                                   75

FEELEY v. SAMPSON
No. 75-171 (D.N.H. September 14, 1976)                19

FISHER v. GEARY
- F. Supp. -, No. C-76-2208 RFP (SJ)
(N.D.Cal. September 29, 1977) (Appendix A)            18, 21, 28, 31

FORTS v. MALCOLM
426 F.Supp. 464 (S.D.N.Y. 1977)                       17

GAGLIE v. ULIBARRI
507 F.2d 721 (9th Cir.1974)                    72

GATES v. COLLIER
390 F.Supp. 482 (N.D. Miss.1975)               46

GIAMPETRUZZI v. MALCOLM
406 F.Supp. 826 (S.D.N.Y. 1975)                57, 58, 81, 82,
                                               83, 84

GILMORE v. LYNCH
319 F.Supp. 105 (N.D. Cal.1971)
aff'd sub nom. YOUNGER v. GILMORE
401 U.S. 914                                    70, 71, 75

GOODWIN v. OSWALD
462 F.2d 1237 (2d Cir.1972)                     22

HAMILTON v. LANDRIEU
351 F.Supp. 549 (E.D.La. 1972)                  33, 34, 53, 62,
                                                66

HAMILTON v. LOVE
328 F.Supp. 1182 (E.D. Ark.1971)                4

HECHT v. BOWLES
321 U.S. 321 (1944)                             7

HODGES v. KLEIN
412 F.Supp. 896 (D.N.J. 1976)                   57

HOLMES v. U.S.
541 F.2d 1243 (7th Cir.1976)                    84

INMATES OF D.C. JAIL v. JACKSON
416 F.Supp. 119 (D.D.C. 1975)                   32, 46

INMATES OF HENRY COUNTY JAIL v. PARHAM
430 F.Supp. 304 (N.D. Ga.1976)                  33, 60, 62

INMATES OF SAN DIEGO COUNTY JAIL IN
CELLBLOCK 3B v. DUFFY
528 F.2d 954 (9th Cir.1975)                     2, 19, 21

INMATES OF SUFFOLK COUNTY JAIL v. EISENSTADT
360 F.Supp. 676 (D. Mass.1973)                  3, 4, 5, 47

INMATES OF SUFFOLK COUNTY JAIL v. EISENSTADT
494 F.2d 1196 (1st Cir.1974) cert.denied sub
nom. HALL v. INMATES, ETC., 419 U.S. 977        3, 10, 13, 15,
                                                29

INMATES OF SUFFOLK COUNTY JAIL v. EISENSTADT
518 F.2d 1241 (1st Cir.1975)                    10

vi

INMATES OF SYBIL BRAND INSTITUTE FOR WOMEN
v. COUNTY OF LOS ANGELES
L.A.S.C. C-50506 (February 18, 1977)
(Appendix B)                                        18, 28

JOHNSON v. ANDERSON
370 F.Supp. 1373 (D. Del.1973)                      82

JOHNSON v. LARK
365 F.Supp. 289 (E.D.Mo. 1973)                      47

JONES v. WITTENBERG
323 F.Supp. 93 (N.D. Ohio 1971)                     3, 4, 6

JONES v. METZGER
456 F.2d 854 (9th Cir.1972)                         3

KNELL v. BENSINGER
489 F.2d 1014 (7th Cir.1973)                        82

MANICONE v. CLEARY
74 C.575 (E.D.N.Y. June 30, 1975)                   18

MARTINEZ-RODRIGUEZ v. JIMINEZ
409 F.Supp. 582 (D.P.R. 1976)                       46, 50, 60, 62

McDONNELL v. WOLFF
483 F.2d 1059 (8th Cir.1973)                        71, 72

MEAD v. PARKER
464 F.2d 1108 (9th Cir.1972)                        75

MILLER v. CARSON
392 F.Supp. 515 (M.D. Fla. 1975)                    53

MILLER v. CARSON
401 F.Supp. 835 (M.D. Fla. 1975)                    6, 18, 23, 32,
                                                    50, 96

MITCHELL v. UNTREINER
421 F.Supp. 886 (N.D. Fla. 1976)                    6, 11, 14, 18,
                                                    27, 29, 30, 32,
                                                    50, 53, 60

MOORE v. JANING
427 F.Supp. 567 (D. Neb.1976)                       4, 46

MORGAN v. SPROAT
432 F.Supp. 1130 (S.D.Miss.1977)                    33, 53

NADEAU v. HELGEMORE
423 F.Supp. 1250 (D.N.H. 1976)                      33, 82

NEWMAN v. ALABAMA
559 F.2d 283 (5th Cir.1977)                         10, 46, 50, 97

553

NORAK v. BETO
453 F.2d 661 (5th Cir.1971) cert.denied
409 U.S. 968 (1972)                                    71

PALMA v. TREUCHLINGER
72 C.1653 (E.D.N.Y. July 11, 1975 and
February 13, 1976)                                     18

PALMIGIANO v. GARRAHY
- F.Supp. -, Civil Action No. 74-172
(D.R.I. August 10, 1977) (Appendix E)                  46, 96

PELL v. PROCUNIER
417 U.S. 817 (1974)                                    19, 20, 21, 24

PROCUNIER v. MARTINEZ
416 U.S. 396 (1974)                                    21

PUGH v. LOCKE
406 F.Supp. 318 (M.D. Ala. 1976)                       10, 14, 46, 50

RHEM v. MALCOLM
371 F.Supp. 594 (S.D.N.Y. 1974)                        11, 17, 22, 23,
                                                       24, 29, 26, 39,
                                                       53

RHEM v. MALCOLM
507 F.2d 333 (2d Cir.1974)                             2, 4, 6, 7, 15,
                                                       17, 19, 21, 27,
                                                       28, 29, 34, 35,
                                                       39, 53, 97

RHEM v. MALCOLM
377 F.Supp. 995 (S.D.N.Y. 1975)                        10, 11

RHEM v. MALCOLM
389 F.Supp. 964 (S.D.N.Y. 1975)                        11, 14, 30

RHEM v. MALCOLM
396 F.Supp. 1195 (S.D.N.Y. 1975)                       17, 27, 29, 33,
                                                       34, 39, 40

RHEM v. MALCOLM
527 F.2d 1041 (2d Cir.1975)                            11, 17, 21, 29,
                                                       39

RHEM v. MALCOLM
432 F.Supp. 769 (S.D.N.Y. 1977)                        27, 34, 36, 37,
                                                       53, 54, 55

SOSTRE v. McGINNIS
442 F.2d 178 (2d Cir.1971)                             71

SWANN v. CHARLOTTE-MECKLENBURG BOARD OF
EDUCATION
402 U.S. 1 (1971)                                      7, 8

554

SPAIN v. PROCUNIER
408 F.Supp. 534 (N.D. Cal.1976)                    33,  82

SWEET v. SOUTH CAROLINA DEPARTMENT
OF CORRECTIONS
529 F.2d 854 (4th Cir.1975)                        75

TAYLOR v. STERRETT
344 F.Supp. 411 (N.D. Tex.1972)
aff'd in part, remanded in part,
499 F.2d 367 (5th Cir.1974)                        47

U.S. EX REL TYRREL v. SPEAKER
535 F.2d 823 (3rd Cir.1976)                        2,  4

U.S. EX REL WOLFISH
428 F.Supp. 333 (S.D.N.Y. 1977)                    47,  48,  49,  50

WOLFF v. McDONNELL
418 U.S. 539 (1974)                                70,  71,  75


OTHER AUTHORITY

CALIFORNIA MINIMUM JAIL STANDARDS                  35,  47,  50

TITLE 15, CALIFORNIA ADMINISTRATIVE CODE           60,  62

555

1  TERRY SMERLING
2  FRED OKRAND
   JILL JAKES
   MARK D. ROSENBAUM
3    ACLU FOUNDATION OF
     SOUTHERN CALIFORNIA
4    633 So. Shatto Place
     Los Angeles, nalifornia 90005
5    (213)  48701720

6  Attorneys for Plaintiffs

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11 DENNIS RUTHERFORD, HAROLD TAYLOR, )
   and RICHARD ORR, et al.,          )
12                                   )
                                     )
13              Plaintiffs,          )   NO. CV 75-4111-WPG
                                     )
14        v.                         )
                                     )
15 PETER J. PITCHESS, et al.,        )
                                     )
16              Defendants.          )
   ──────────────────────────────────)

17

18

19                       I

20              OPENING STATEMENT

21        Plaintiffs have two purposes in submitting this brief:

22 To provide the Court with specific confinement standards distilled

23 from case law and with regard to court transportation and

24 officer abuse (Pretrial Conference Order §§ XV and XXIII), to

25 argue the facts, which are particularly subtle as to the latter issue.

26        For the sake of brevity plaintiffs have tried not to

27 belabor those points of law to which the Court subscribed in

28 /

                          1.                        556

Dillard v. Pitchess, 399 F.Supp. 1225 (C.D. Cal.1975).

Since plaintiffs could not afford to purchase a copy of the reporters' transcript, testimony of witnesses is cited by surname and date.

Pursuant to the stipulation and order reached in open Court on August 5, 1977, whereby the Court will judicially notice the conditions and practices at defendants' other jail facilities absent any objection from defendants, at trial, plaintiffs cite such conditions and practices as Dillard, 399 F.Supp. at _____.


II.

DEFENDANTS' SOLE COGNIZABLE INTEREST IN
CONFINING PRETRIAL DETAINEES IS TO
GUARANTEE THEIR PRESENCE AT TRIAL, AND
ALL DEFENDANTS' RESTRICTIONS ON SUCH
DETAINEES MUST BE ESSENTIAL TO THAT
INTEREST.


As this Court is well aware, federal courts have unanimously held that the purpose of pretrial confinement is narrow, namely to guarantee presence at trial without imposition of punishment, and that restraints on pretrial prisoners must be the minimum necessary to accomplish that purpose. Five United States Courts of Appeals have expressly embraced these propositions. Inmates of San Diego County Jail in Cellblock 3B v. Duffy, 528 F.2d 954 (9th Cir.1975); Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974); U.S. ex rel Tyrrel v. Speaker, 535 F.2d 823 (3d Cir.1976);

2.

557

Anderson v. Nosser, 438 F.2d 183 (5th Cir.1971); Duran v. Elrod, 542 F.2d 998 (7th Cir.1976).  In addition, two other U.S. Courts of Appeals have implicitly approved these doctrines.  Jones v. Metzger, 456 F.2d 854 (8th Cir.1972), aff'g sub nom. Jones v. Wittenberg, 323 F.Supp. 93 (N.D. Ohio 1971); Inmates of Suffolk County Jail v. Eisenstadt, 494 F.2d 1196 (1st Cir.1974), cert. denied sub nom.  Hall v. Inmates of Suffolk County Jail, 419 U.S. 977 (1974), aff'g 360 F.Supp. 676 (D.Mass. 1973).


## III.

TREATMENT AND CONDITIONS FOR PRETRIAL PRISONERS INFERIOR TO THOSE EXPERIENCED BY SENTENCED STATE PRISONERS VIOLATE DUE PROCESS AND EQUAL PROTECTION OF LAW.

A.  Confinement Of Pretrial Prisoners Under Conditions Inferior To Those Experienced By Convicted Prisoners Constitutes Punishment Without Due Process of Law.

In several crucial aspects, including outdoor exercise, indoor recreation and contact visitation, pretrial detainees at the Jail are treated more severely than convicted prisoners in state prison and in other jail facilities operated by defendants.  Under such circumstances it is readily apparent that pretrial prisoners are not only experiencing punishment but a punishment more severe than that experienced by prisoners serving sentences for their crimes.

3.

558

1        Such adverse consequences of pretrial confinement are

2  prescribed by the Constitution as punishment without due process

3  of law.  Rhem v. Malcolm, supra, 507 F.2d at 336; U.S. ex rel

4  Tyrrel v. Speaker, supra, 535 F.2d at 827; Hamilton v. Love, 328

5  F.Supp. 1182, 1191 (E.D. Ark. 1971); Inmates of Suffolk County

6  Jail v. Eisenstadt, supra, at 686; Jones v. Wittenberg, supra,

7  323 F.Supp. at 100; Moore v. Janing, 427 F.Supp. 567, 571 (D.Neb.

8  1976); Ahrens v. Thomas, 434 F.Supp. 873, 898 (W.D.Mo.1977).

9        In this regard, the words of District Judge Arthur

10  Garrity are particularly poignant.

12         "'Punishment' cannot be justified without

13        a judicially-determined finding of guilt; in

14        other words, pretrial detainees may not

15        be 'punished' for crimes charged against

16        them but not yet proved against them.  If

17        a pretrial detainee is incarcerated in worse

18        circumstances than the convict who is being

19        'punished', it is difficult to say that the

20        detainee is not also being punished.  'It is

21        clear that the conditions for pretrial

22        detention must not only be equal to, but

23        superior to, those permitted for prisoners

24        serving sentences for the crimes they have

25        committed against society.'  (Citations

26        omitted)  Thus the first test of the consti-

27        tutional sufficiency of incarceration at the

28        Charles Street Jail rests on a comparison

559

1    between the quality of that incarceration

2    and the quality of the type of incarceration

3    which the state designates 'punishment' in a

4    correctional facility for convicts.

5                  *   *   *   *

6        "Convicts in Massachusetts penal and

7    correctional institutions are cared for and

8    treated much better than inmates at the Charles

9    Street Jail.  With respect to cell space,

10   sanitation, food, medical care, educational

11   programs and recreation, there is really no

12   comparison . . . Prisoners awaiting trial, to

13   whom the science of penology and programs or

14   rehabilitation are not technically applicable

15   may not constitutionally be made the orphans of

16   criminal jurisprudence whose degradation may be

17   ignored because they are merely charged with

18   criminal offenses rather than found guilty of them."

19   In mates of Suffolk County Jail v. Eisenstadt,

20   supra, 360 F.Supp. at 686, 688 (Footnotes omitted).

21       Plaintiffs submit that Judge Garrity's logic is

22   inexorable and that as to outdoor exercise, indoor recreation,

23   contact visitation and other conditions for detainees the superior

24   treatment of convicts is determinative.

25   ///

26   ///

27   ///

28   ///

560

B.   <u>Confinement Of Pretrial Prisoners Under</u>
<u>Conditions Harsher And More Restrictive Than</u>
<u>Conditions Of Sentenced Confinement Violates</u>
<u>Equal Protection Of Law.</u>

Similarly, inferior conditions of confinement for pre-
trial prisoners violate equal protection of law under a traditional
equal protection analysis requiring the defendants to show a
"rational basis" for their discrimination.  Since there can be no
cognizable justification for treating pretrial prisoners worse
than convicts, such inferior confinement conditions deny plaintiffs
equal protection as a matter of law. <u>Rhem v. Malcolm</u>, <u>supra</u>, 507
F.2d at 336, 338; <u>Jones v. Wittenberg</u>, <u>supra</u>, 323 F.Supp. at 100;
<u>Miller v. Carson</u>, 401 F.Supp. 835, 893-894 (M.D. Fla. 1975);
<u>Mitchell v. Untreiner</u>, 421 F.Supp. 886, 895 (N.D. Fla. 1976);
<u>Ahrens v. Thomas</u>, <u>supra</u>, at 898.

> "Because the rights of detainees rather than
> of convicted defendants are involved, the
> district judge did not have to decide whether
> conditions at the Tombs were so bad as to be
> 'cruel and unusual punishment' even for con-
> victed felons.  It is enough if the concededly
> 'very uncomfortable' conditions for detainees
> ... compare so unfavorably with those
> accorded by the state to convicted defendants
> elsewhere as to deny equal protection of the
> laws.  For it must always be remembered that
> detainees are not, as yet, guilty of anything."

6.

561

1   Rhem v. Malcolm, supra, 507 F.2d at 338.

2

3

4   IV.

5   THIS COURT HAS BROAD EQUITABLE POWER TO REMEDY

6   CONSTITUTIONAL DEPRIVATIONS SUFFERED BY THE

7   PLAINTIFF CLASS.

8

9   Federal courts have broad, flexible powers to remedy

10  violations of constitutional rights.  Hecht Co. v. Bowles, 321

11  U.S. 321, 329-330 (1944).  In language peculiarly applicable to

12  the fluid situation present in the instant case, the Supreme Court

13  has stated in the context of school integration:

14      ".... a school desegregation case does not

15      differ fundamentally from other cases

16      involving the framing of equitable remedies

17      to repair the denial of a constitutional right.

18      The task is to correct, by a balancing of the

19      individual and collective interests, the

20      condition that offends the Constitution.

21      *      *      *      *      *

22      ".... In devising remedies when legally

23      imposed segregation has been established, it

24      is the responsibility of local authorities

25      and district courts to see to it that future

26      school construction and abandonment are not

27      used and do not serve to perpetuate or re-

28      establish the dual system.  When necessary,

7.

1   district courts should retain jurisdiction

2   to assure that these responsibilities are carried

3   out." Swann v. Charlotte-Mecklenburg Board of Education,

4   402 U.S. U.S. 1., at 15-16, 21 (Emphasis Added).

5       Restated, the Court has the broad power present in school

6   desegregation cases to correct unconstitutional jail conditions

7   and to exercise control over future jail construction and the

8   transfer of prisoner populations so as to prevent constitutional

9   deprivations.

10      These broad, equitable powers and the ingenuity of the

11  Court are sharply challenged by the circumstances of the instant

12  case, particularly those under defendants' control including the

13  decision to close the Hall of Justice Jail to pretrial detainees.[1]

14  The recent enlargement of the Central Jail, the subsequent closure

15  of Biscailluz Center (Howell, 8/4), the phasing out of Wayside

16  Max as a detention facility for "Status 1" (unsentenced)

17  prisoners (Giger, 9/13)   and the plan to replace the Central Jail

18  with satellite jails (Lonergan, 9/22).   In fashioning a remedy this

19  Court must realistically balance the legitimate interests of

20  defendants and the plaintiff class, always keeping in mind the

21  peculiarities of Los Angeles County and the direction (and mis-

22  direction) of defendants' overall jail program.  As the Second

23  Circuit Court stated in one of several bitterly disputed cases

24  arising from pretrial confinement conditions in New York City

25  jails:

26  _____

27  1.  Except for gay prisoners, pursuant to the stipulated order in

28  Dillard entered on or about February 5, 1976.

563

8.

1    "Finally, the City maintains that on

2    balance the conditions here complained of

3    are not so constitutionally offensive as to

4    compel the City, given its limited jail

5    facilities and financial resources, to build

6    additional facilities to house the prisoners

7    in Brooklyn and Queens and elsewhere.

8    Inadequate resources or finances can never

9    be an excuse for depriving detainees of their

10   constitutional rights (citations).

11   On the other hand, as the above authorities

12   indicate, this Court is hardly in the position

13   to order the City to raise the necessary funds

14   to build additional facilities.  We can,

15   however, order the release of persons held under

16   conditions which deprive them of rights guaranteed

17   by the Constitution unless the conditions are

18   corrected within a reasonable time.

19      For a solution of the problem, we conclude

20   that this proceeding should be remanded to the

21   district court to consider a proper remedy

22   equitable to both the City and the detainees,

23   keeping in mind the financial crisis facing the

24   City and the practical considerations necessary

25   to prevent the detainees from being transferred

26   to distant facilities.  Both parties should have

27   an opportunity to make suggestions with the

28   understanding that the City must act with

564

9.

1      reasonable promptness to provide facilities

2      for pretrial detainees consistent with their

3      constitutional rights.  Inaction of course will

4      not be tolerated nor will the present

5      conditions be condoned."  <u>Detainees of</u>

6      <u>Brooklyn House of Detention for Men v. Malcolm</u>,

7      520 F.2d 392, 399 (2nd Cir.1975), (Emphasis

8      added).

9      The case law on unconstitutional jail conditions is

10 replete with examples of federal courts taking flexible approaches

11 tailored to the peculiarities of a given situation yet calculated

12 to provide eventual compliance with the Constitution.  See,

13 <u>inter alia</u>:

14      <u>Inmates of Suffolk County Jail v. Eisenstadt</u>,

15      494 F.2d 1196 (1st Cir. 1974) <u>cert.denied</u> <u>sub</u> <u>nom</u>;

16      <u>Hall v. Inmates of Suffolk County Jail</u>,

17      419 U.S. 977 - Trial court may order intra-

18      state transfer of prisoners to another facility

19      which was not the subject of litigation.

20      <u>Inmates of Suffolk County Jail v. Eisenstadt</u>,

21      518 F.2d 1241 (1st Cir. 1975) - Trial court may

22      order defendants to continue an O.R. release program

23      so as to reduce jail population.

24      <u>Pugh v. Locke</u>, 406 F.Supp. 318, 335 (M.D.

25      Ala. 1976 (per Johnson, j.), <u>aff'd in relevant</u>

26      <u>part</u> 559 F.2d 283 (5th Cir. 1977) - Court orders

27      defendants to establish community based facilities

28      to house inmates identified as appropriate for such

565

facilities.

Ahrens v. Thomas, 434 F. Supp. 873, 901, 909

(W.D. Mo. 1977) - Court issues minimum standards

for a new jail replacing old jail challenged in

litigation and retains jurisdiction to approve

plans for the new jail.

Mitchell v. Untreiner, 421 F.Supp. 886, 899,

902 (N.D. Fla. 1976) - Defendants ordered to

report quarterly to the court re construction

of a new facility, and court retains jurisdiction.

Campbell v. McGruder, 416 F.Supp. 111, 117-118

(D.D.C. 1975) - Defendants ordered to submit

to court plans to increase use of other

facilities and to selectively release prisoners

in the event of overcrowding.


An especially useful model is the patient efforts of

Judge Morris Lasker in the protracted litigation against the

Tombs Jail in New York City. Rhem v. Malcolm, 371 F.Supp. 594

(S.D.N.Y. 1974) aff'd 507 F.2d 333 (2nd Cir. 1974), and 377 F.Supp.

995 (S.D.N.Y. 1975) and 389 F.Supp. 964 (S.D.N.Y. 1975) aff'd

527 F.2d 1041 (2nd Cir. 1975). After finding that the Tombs was

unconstitutional in numerous respects (371 F.Supp. 594), Judge

Lasker ordered the Tombs population transferred to the Rikers

Island House of Detention for Men (HDM) (377 F.Supp. 995) and

later ruled that as to certain conditions including recreation

and visitation, which were not "inextricably related to the

physical conditions of the Tombs", the court had jurisdiction to

1   enforce on behalf of the population transferred to H.D.M.

2   those standards established when the prisoners were housed

3   at the Tombs.  The judge reasoned that the real issue was the

4   rights of pretrial population and that the issue was not moot

5   as long as conditions continued (389 F.Supp. 964).  The defen-

6   dants appealed and Judge Lasker's  orders as to H.D.M. were

7   affirmed (527 F.2d 1041).

8        In the instant case the variables crucial to the

9   formulation of relief are:(1) Defendants' plan to contruct a series

567

1   of satellite jails, (2)  Defendants' failure to utilize

2   Biscailluz Center and (3)  Defendants' ineffective utilization of

3   other facilities in the county jail system.  Each of these

4   variables bears heavily on the Court's ability to remedy uncon-

5   stitutional conditions faced by prisoners in the Central Jail,

6   not the least of which are overcrowding, inadequate outdoor excercise and

7   indoor recreation and non-contact visitation.  Thus, the Court should

8   exercise authority over these variables to assure eventual and

9   complete compliance with the Constitution.

10       The Court should order defendants to house lower security

11   pretrial prisoners at Biscailluz Center,(B.C.), a facility far more

12   humane than the Central Jail (Dillard, 399 F.Supp. at 1321).

13   Within the Central Jail there are more than enough prisoners suit-

14   able to fill the 554 unused beds at B.C. (Exhibit 2, Jail

15   Statistics Report).  Lt. Giger testified that pretrial

16   detainees classified minimum and low moderate, who comprise a

17   substantial portion of the pretrial population could safely be

18   housed at B.C. (9/13).[2]

19

20   2.
     After initially estimating for all classifications percentage

21   figures totalling only 60%, Lt. Giger admitted that he was unable

22   to accurately state the number or percentage of prisoners in each

23   classification (9/13).  At any given time the number of prisoners

24   in each classification could be determined by comparing the classi-

25   fication memo (Exhibit EO) with the count sheets (Exhibits 2 and 9)

26   Whatever the figures, they exaggerate the number of prisoners requir-

27   ing high classifications because prisoners in any classification but

28   maximum may be considered for minimum security trusty  status if they

29   agree to work (Giger 9/13).

568

1   The transfer of pretrial prisoners at Central Jail to B.C. is an

2   inexpensive, efficacious means of guaranteeing that at least some

3   of the plaintiff class will be housed under minimally acceptable

4   conditions; and as noted above there is ample authority for such

5   transfer.  See, Inmates of Suffolk County Jail v. Eisenstadt,

6   supra; Rhem v. Malcolm, supra; and Campbell v. McGruder, supra.

7        The court should exercise authority over defendants'

8   planned construction of satellite jails so as to assure that at

9   long last the conditions of confinement for the plaintiff class will

10  catch up with the law.  In Dillard, the Sheriff's Department succ-

11  eeded in avoiding an order requiring substantial improvements in

12  conditions of pretrial confinement at the Hall of Justice Jail

13  (HOJJ) by pleading structural obstacles to those improvements.[3]

14  The plaintiff class's attorney did not object to the Court's

15  acceptance of the defendants' plea or the resulting order to

16  close HOJJ in reliance on the Court's statement that

17       "The Court is aware that, even with the full

18       cooperation anticipated from the defendants,

19       many of the things that must be done in order

20       to implement these findings and conclusions will

21       take a considerable amount of time. Some cannot

22       be accomplished fully until the Hall of Justice

23       jail is supplanted as a place of detention for

24       pretrial prisoners . . . ."

25       Dillard, 399 F.Supp. at 1241. (Emphasis added).

26  _____

27  3.  See Defendants' Return to Court's Memorandum Decision, Plan and

28  Schedule, filed in Dillard on or about October 31, 1975.

                    13.                        569

1  Now in the instant case defendants' again make the same plea that

2  the structure of the Central Jail     renders impossible certain

3  forms of relief, including daily exercise, contact visitations and

4  exterior windows. Plain and simple, defendants should not be

5  allowed to continue to duck relief by moving pretrial detainees

6  from facility to facility with vague and unfulfilled promises

7  that constitutional pretrial detention is just around the corner.

8  Rather, just as other district courts have done this Court should

9  push defendants to comply with the minimum constitutional require-

10  ments of pretrial detention is their planned "supplanting"

11  facilities.  See, Ahrens  v. Thomas, supra, Mitchell v. Untreiner,

12  supra; Pugh v. Locke, supra; Rhem v. Malcolm, supra; 389 F.Supp.

13  968; and Campbell v. McGruder, supra. Indeed, without such relief,

14  the Court, defendants and pretrial detainees face a third round,

15  consisting of multiple suits against the satellite jails, wherein

16  for a third time defendants may  plead that they are at the mercy

17  of architecture.

18       Lastly, the Court should order defendants to submit

19  a plan and reports to assure that available space in the jail

20  system is being effectively utilized  so as to avoid crowding of

21  the Central Jail and provide Central Jail prisoners with greater

22  opportunities for outdoor exercise and indoor recreation.  As

23  reflected in Exhibit 2, the jail system is consistently under

24  capacity by between 2000 and 3000 inmates.  While prisoners in

25  the Central Jail are jammed together with 20 square feet or less

26  of living space  (Pretrial Conference Order, § X, A, 1 and

27  Schedule A thereto ) and the opportunity to go outdoors only

28  once a week ( Holt,    9/21), vastly more humane facilities,

14.

570

1  such as Wayside Maximum and Minimum, Mira Loma and Detention

2  Camps are underutilized  to the tune of about 500 or more

3  prisoners (Exhibit 2  ).   As noted above other courts have

4  required jail officials to make effective  use bedspace in

5  other facilities not initially subject to litigation.  See,

6  Inmates of Suffolk County Jail v. Eisenstadt, supra, 494 F.2d

7  1196; Campbell v. McGruder, supra, 416 F.Supp. 111.

8          References to these three variables, the satellite

9  jails, Biscailluz Center, and utilization of the entire jail

10  system, will repeatedly be made in the sections below.  In

11  essence, it is hoped that the Court will apply its equitable

12  powers in a manner eliminating the need for further litigation.

13  To quote the Second Circuit in Rhem v. Malcolm, supra, 507 F.2d

14  333 at 341:

15              "(T)he district judge should not allow

16              another trial on the merits of plaintiffs'

17              claim or countenance any significant delay

18              in fashioning another decree.  Four years

19              after ugly riots caused by conditions at the

20              Tombs, the time has come to end this litigation."

21

22  /

23  /

24  /

25  /

26  /

27  /

28  /

571

V

## VISITATION

(Pretrial Conference Order §VII)


A.  MATERIAL FACTS


The evidence is undisputed that defendants deny pretrial prisoner physical contact with their visitors (Pretrial Conference Order, § VII, A, 4).  In contrast sentenced prisoners in some of defendants' other jail facilities (Dillard v. Pitchess, supra, at 1240;  Howell, 8/4), in other counties' jail facilities (Pretrial Conference Order § VII, A, 5)[4] in California State Prisons including Chino's Reception Center West (Pierce, 8/10) and in federal prisons (Creek, 8/10), and pretrial detainees in federal facilities (Lumpkin Deposition; Creek, 8/10) are all permitted physical contact with their visitors including kissing and hugging, at the beginning and end of visits and holding hands and children during the course of visits.

The Jail's detainees suffer discrimination with regard to length of visits.  While the Jail's sentenced prisoners are allowed one daily 60 minute visit, detainees are allowed only one daily 20 minute visit (Pretrial Conference Order, § VII, A, 3).  Visiting facilities at the Jail are more than adequate to permit

[4].  The Court may take judicial notice of the fact that contact visitation is permitted at Orange County's Lacy and Musick facilities.

16.

572

all prisoners one daily 60 minute visit.  The visiting screens have a capacity of at least 250 (244 in the main visitation areas and 8 to 12 in the hospital area (Myron,8/3) and are open 12 hours a day, from 8:30 a.m. to 8:30 p.m. (Pretrial Conference Order, §VII,A,2). Thus, assuming 100% efficiency the visiting screens could accomodate 3000 one hour visits per day (12 hours x 250 visits/hour); and allowing 15 minutes for processing between visits--5 minutes to empty the screens and 10 minutes to refill the screens (Robbins,8/4), the screens can accomodate well more than 2000 one hour visits per day (3000 visitation hours $\div$ (one hour + 1/4 hour)= 2400 one hour visits/day.

Lastly, persons under 18, including children of detainees, may not visit at the Jail unless accompanied by an adult (Ex. B, Bulletin No. 25; Myron 8/2).

### B. LAW

1.  Contact Visitation

A burgeoning number of courts have held that the prohibition against physical contact during visits is an excessive restriction on the liberties of pretrial prisoners and/or a violation of equal protection of law vis-a-vis sentenced prisoners in state prisons or county jails. See, inter alia:

Rhem v. Malcolm, 527 F.2d 1041, 1043 (2nd 1975) aff'g 396 F.Supp. 1195, 1199 - 1200, 1202 (SDNY 1975).

In the Second Circuit see also Rhem v. Malcolm, 507 F.2d 333, 338-339 (2nd Cir. 1974); aff'g

573

*Rhem v. Malcolm*, 371 F.Supp. 594, 626 (SDNY 1974);

*Forts v. Malcolm*, 426 F.Supp. 464, 468 (SDNY 1977);

*Detainees of Brooklyn House of Detention v. Malcolm*, 421 F.Supp. 832 (EDNY 1976);

*Manicone v. Cleary*, 74 C. 575 (EDNY June 30, 1975);[5]

*Palma v. Treuchlinger*, 72 C. 1653 (EDNY July 11, 1975 and February 13, 1976);[6]

*Ambrose v. Malcolm*, 76 C. 190 (SDNY, May 5, 1976)[7]

*Fisher v. Geary*, ___ F.Supp.___, No. C-76-2208 RFP (SJ) (ND Cal. September 29, 1977), a copy of which is attached hereto as Appendix A;

*Inmates of Sybil Brand Institute for Women v. County of Los Angeles*, L.A.S.C. C-50506 (February 18, 1977)(Per Judge George M. Dell), a copy of which is attached hereto as Appendix B;

*Campbell v. McGruder*, 416 F.Supp. 100, 105 (D.D.C. 1975);

*Miller v. Carson*, 401 F.Supp. 835, 893-895 (M.D. Fla. 1975);

*Mitchell v. Untreiner*, 421 F.Supp. 886, 902 (N.D. Fla. 1976);

*Bay County Jail Inmates v. Bay County Board of Commissioners*, Civ. Action No. 74-10056 (E.D. Mich. August 29, 1974), at 17-20.[8]

---

5. Cited in *Detainees of Brooklyn House of Detention v. Malcolm*, supra, 421 F.Supp. at 833.

6. *Ibid.*

7. *Ibid.*

8. *Ibid.*

574

1    <u>Feeley v. Sampson</u>, No. 75-171 (DNH September

2    14, 1976).

3

4        This Court's previous adherence to the above proposition

5    in <u>Dillard v. Pitchess</u>, <u>supra</u>, at 1240, was tacitly approved by

6    the Ninth Circuit in <u>Inmates of San Diego County Jail v. Duffy</u>,

7    578 F.2d 954, 956 (9th Civ. 1975), which also cited <u>Rhem v.</u>

8    <u>Malcolm</u>, <u>supra</u>, 507 F.2d 333, with approval.

9        <u>Pell v. Procunier</u>, 417 U.S. 817 (1974), does not stand

10   for the proposition that correctional officials have the

11   discretion to deny pretrial detainees contact visitation.  In <u>Pell</u>

12   the Supreme Court held only that as long as there was an alterna-

13   tive avenue of communication with the press, convicts did not have

14   the right to conduct face-to-face interviews with reporters.  The

15   Court expressly noted the special relationship between the con-

16   victed prisoners and correctional authorities.

17            "We would find the availability of such

18            alternatives unimpressive if they were

19            submitted as justification for governmental

20            restriction of personal communication among

21            members of the general public.  <u>We have</u>

22            <u>recognized, however, that 'the relation-</u>

23            <u>ship of state prisoners and the state offi-</u>

24            <u>cers who supervise their confinement is far</u>

25            <u>more intimate than that of a State and</u>

26            <u>a private citizen</u>' and the internal problems

27            of state prisons involve issues peculiarly within

28            state authority and expertise.'

575

19.

1    * * * *

2       "In this case the restriction takes the

3    form of limiting visitation to individuals

4    who have either a personal or professional

5    relationship to the inmate – family, friends

6    or prior acquaintance, legal counsel and

7    clergy.  In the judgment of the state correc-

8    tions officials, this visitation policy will

9    permit inmates to have personal contact with

10   those persons who aid in their <u>rehabilitation</u>,

11   while keeping visitation at a manageable level

12   that will not compromise institutional security.

13   Such considerations are peculiarly within the

14   province and professional expertise of correc-

15   tions officials, and, in the absence of sub-

16   stantial evidence in the record to indicate

17   that the officials have exaggerated their

18   response to these considerations, courts should

19   ordinarily defer to their expertise and

20   judgment in such matters."

21      <u>Id</u>. 417 U.S. at 825-827. (Emphasis added).

22      The distinction between pretrial detainees and convicts

23   is crucial on this issue.  Pretrial detainees are persons who have

24   retained their interest in liberty but who are restrained only to

25   the extent necessary to assure their presence at trial and to

26   protect institutional security.  The distinction in status between

27   pretrial detainees and convicts explains how the Second Circuit

28   had no trouble in reaffirming pretrial detainees' right to physi-

576

cal contact during visits in Rhem v. Malcolm, 527 F.2d 1041

(2nd Cir. 1975), almost a year and a half after the U.S. Supreme

Court announced its decision in Pell v. Procunier, supra.

As Judge Peckham stated in Fisher v. Geary, supra,

(Appendix A), in response to the defendants' therein reliance

on Pell,

"Deference to prison administrators is

appropriate, but abdication of the judicial

role as guardian of constitutional rights is

not.  It must be remembered that the instant

case involves presumptively innocent pretrial

detainees rather than convicted prisoners.

To accord jail officials the same latitude

in dealing with detainees as prison officials

have in dealing with prisoners would be to

sacrifice constitutional rights to geometric

symmetry.  The Court of Appeals for the

Ninth Circuit recognized this in Inmates of

San Diego County Jail in Cell Block 3b v. Duffy,

[supra], finding the deference rationale in

Procunier v. Martinez, [416 U.S. 396, 404-406

(1974), inapplicable to a case involving

detainees, and remanded the case for reconsideration

in light of Dillard v. Pitchess, 399 F. Supp.

1225 (C.D. Cal. 1975) and Rhem v. Malcolm, 507

F.2d 333 (2d Cir. 1974).  Thus, the rationale

in Rhem and Dillard must control the decision

of the court." Slip Opinion 6-7 (footnotes

21.

omitted).

For the same reasons Sweet v. South Carolina Departmental of Corrections, 529 F.2d 854 (4th Cir. 1975), mentioned by the Court on September 23, 1977, is inapposite to contact visitation for pretrial detainees.

In Rhem v. Malcolm, supra, 371 F.Supp. 594, Judge Lasker carefully considered arguments against contact visitation virtually identical with these presented herein, including claims that such visits would increase the flow of contraband and increase escape attempts (371 F.Supp. at 605-606). He concluded:

> "There is no doubt that the Department's
> administrators genuinely believe that
> allowing contact visits will pose a threat
> to institutional security.  It is natural
> that those who are responsible for operations
> and who bear the brunt of the public's
> criticism if things go wrong will in good
> faith come to such a conclusion.  Nevertheless,
> constitutional rights cannot be denied  on
> the basis of  dire predictions  not supported
> by the evidence. Goodwin v. Oswald, 462 F.2d
> 1237, 1244-1245 (2d Cir. 1972); Davis v. Lindsay,
> 321 F.Supp. 1134 (SDNY 1970).  Although we
> recognize that the Department is closest to the
> situation, we find the evidence to establish
> that the increase in risk caused by contact
> visits will be marginal and controllable. In
> the circumstances, the dictates of due process

22.

1     and equal protection require that a system of

2     contact visiting be introduced at MHD, including

3     liberalization of visiting days and hours, at

4     least for all detainees who, by classification,

5     are shown not to require maximum security custody."

6     371 F. Supp. at 625-626 (emphasis added).

7

8     Accord, Detainees of Brooklyn House of Detention v.

9  Malcolm, supra, 421 F.Supp. 832 at 835 (Bramwell, j)(". . . con-

10  cern for safety factors does not necessarily preclude contact

11  visits"); Miller v. Carson, supra, 401 F.Supp. at 893-895.

12     At the hearing on September 23, the Court indicated

13  its tentative conclusion that contact visitation was not

14  constitutionally required for the Jail's pretrial detainees

15  based upon the following considerations:

16

17     (1)  The Jail has 2000 visits per day;

18     (2)  The Jail's prisoner turnover is greater

19          than at San Diego's MCC or in California

20          prisons.

21     (3)  The resulting necessity of new construction;

22          and

23     (4)  The resulting necessity of additional staff.

24  Plaintiffs wish to comment on these considerations point by

25  point.

26     First, the fact of 2000 daily visits does not lead

27  to the conclusion that contact visits would proceed at the same

28  rate.  There is no evidence indicating the percentage of visits

received by sentenced or partially sentenced inmates,[9] who have
no constitutional right to contact visitation.   Pell v. Procunier,
supra.  Assuming that maximum and high moderate security prisoners
receive visits at the same rate as other prisoners most of the
30 percent of the pretrial prisoners who fall in these two
categories (Giger  9/2) [10] would not qualify for contact visits
under a suitable classification scheme to screen prisoners for
such visitation. Rhem v. Malcolm, supra, 371 F.Supp. 594 at 626.[11]
Lastly, due to the accompanying need for searches, defendants could
make contact visits optional for those otherwise

9.  Within the daily Inmate Court Sheets, (Exh. 2), status 3 and
status 2 inmates, respectively.

10.  Lt. Giger testified that about 5% fall into maximum security
and about 25% fall into high moderate. Cf. footnote 2, p.12, supra.

11.  Corrections expert Donald Goff testified in Rhem v. Malcolm,
supra, 371 F.Supp. 594 at 617, that at most 20 to 40 percent of
the Tombs' population required maximum security confinement.

In Dillard, Mr. Goff similarly testified that 30 to 35%
of the pretrial population would need maximum security. Dillard
R.T. 342.

580

eligible thereby further reducing the frequency of such visits.

Second, the rapid turnover of pretrial prisoners at the jail would be greatly diminished as an obstacle to contact visitation by the procedure of delaying such visitation pending a classification determination that each prisoner is a reasonable risk for contact visitations. Obviously such delays pending classification would effectively eliminate short term detainees from contact visitation.[12]  It should be noted that the detainees who would most benefit from a contact visitation program, namely accused felons, spend extended periods of time in custody pending trial.[13]  The practice of delaying contact visitation pending classification would serve to protect defendants' legitimate interest in identifying persons unsuitable for contact visitation while at the same time preserve contact visitation for longer term detainees, who have the greatest need.

A classification system similar to that urged by plaintiffs is presently in use in California prisons.  At the

_____

[12]  Mr. Goff testified that such classification could take two to three weeks.  Dillard R.T. 336.

[13]  Lt. Giger testified that very few accused misdemeants remain in custody for appreciable periods of time.  Plaintiffs request this Court to take judicial notice of the fact that in Los Angeles County defendants in felony prosecutions spend on the average of about 250 days in custody pending trial.  See Los Angeles Times, October 21, 1977, p.3.

581

1   Reception Centers in Chino, newly sentenced convicts are classi-

2   fied according to security risk within seven to ten days of their

3   arrival; those classified as medium security are housed in

4   Reception Center West where contact visitation is routine; and those

5   classified as "close security" and those awaiting classification

6   are housed in Reception Center Central, where visitation is con-

7   ducted at  a screen (Pierce, 8/10).

8          Third, the expense of new construction to accomodate

9   contact visitation is not a cognizable justification for withholding

10  this constitutionally mandated right.   Dillard v. Pitchess, supra,

11  399 F.Supp. at 1234-1235:

12              "This court is fully mindful that the correction

13               of the deficiencies in the facilities for the

14               handling of pre-trial prisoners that will be

15               required as a result of this litigation will be

16               very expensive to a county that, like virtually

17               all other governmental bodies, already is con-

18               fronted with monumental fiscal problems.  This

19               is necessarily a matter of considerable concern.

20               However, if public safety and the effective enforce-

21               ment of the criminal laws are deemed to require the

22               pre-trial incarceration of selected defendants, the

23               public must be prepared to pay the cost of keeping

24               them under the reasonably humane conditions

25               that their constitutional rights demand."

26  Moreover, the expense of such new construction alleged by defen-

27  dants, $6,000,000 (Lonergan   9/22) defies credibility particularly

28  since Biscailluz Center lies fallow.

582

Fourth, for similar reasons, the expense of additional staff is not a cognizable justification for denying contact visitation.  Certainly the fact that the Federal Bureau of Prisons and the California Department of Corrections have been able to staff contact visitation facilities holds out the hope that defendants can do the same.

It is also anticipated that defendants will argue that whatever the constitutional merit of contact visitation in other smaller and more isolated jails such visitation is impossible in a large jail located in the heart of Los Angeles.[14]  Similar arguments were made in the Rhem v. Malcolm cases with regard to exercise facilities and expressly rejected by the Second Circuit and by the District Court. Id. 507 F.2d. 333, at 340; 396 F. Supp. 1195 at 1198; 432 F.Supp. 769, at 782 (1977).  To paraphrase the Second Circuit:

An unconstitutional visitation booth is

no less objectionable because it sits in

Central Los Angeles rather than in  Sybil

---

[14] Such argument ignores the fact that contact visitation orders have been made against jails in large metropolitan areas, e.g.

New York City - Rhem v. Malcolm, supra;

Washington, D.C. - Campbell v. McGruder, supra; 416 F.Supp.100

Greater Kansas City - Ahrens v. Thomas, supra;

Jacksonville, Fla. - Miller v. Carson, supra.

583

27.

Brand Institute for Women[15] or in

Santa Clara[16]. See Rhem v. Malcolm,

supra, 527 F.2d 1041, at 1043.

## 2.   Length of Detainees' Visitation

The discrimination against detainees as to the length of visits (20 minutes as opposed to 60 minutes for sentenced prisoners) is a straight forward violation of equal protection of law. Rhem v. Malcolm, supra, 507 F.2d at 338; Mitchell v. Untreiner, supra, 421 F.Supp. at 895; Ahrens v. Thomas, supra, 434 F.Supp. at 898. Moreover, defendants' ability to provide sentenced prisoners daily one hour visits belies any notion that a limitation of 20 minutes on visits is the sort of necessary incident of detention tolerated by the Fourteenth Amendment's proscriptions against summary punishment and wealth discrimination. See Section II, supra.

## 3.   Visitation by Juveniles

Defendants' prohibition against visitation by unaccompanied juveniles is a patently excessive restraint on the liberty of detainees. See Section II, supra.

### C.   Remedy

Plaintiffs suggest that this Court order the following steps be taken by defendants to improve visitation for the pretrial detainee population.

---

15.  See Inmates of Sybil Brand v. County of Los Angeles, supra, (Appendix B).

16.  See Fisher v. Geary, supra, (Appendix A).

(1)   Creation of a more vigorous classification
system re risk arising from visitation.  See
Rhem v. Malcolm, supra,  371 F.Supp. 594 at 626,
aff'd 507 F.2d 333, at 338-339; 396 F. Supp.
1195, 1201, 1202, aff'd  527 F.2d 1041. As noted
above in Section V-B, under such a classification
system high risk detainees and detainers awaiting
classification would be denied contact
visitation.

2.   Reopening of Biscailluz Center as a jail
for low risk detainees.  See e.g., Campbell v.
McGruder, supra, 416 F.Supp 111 at 117-118.
(Sheriff ordered to submit plan to increase
use of other facilities); Inmates of Suffolk
County Jail v. Eisenstadt, supra, 494 F.2d
1196 (trial court may order intra-state
transfers of prisoners).  From defendants'
perspective, housing low risk detainees at
Biscailluz Center has the added advantage of
protecting such detainees from the alleged
risk of extortion of gang members (See Longergan,  9/22).

29.

585

3.   Provision of contact visitation facilities
in defendants' new satellite jails.  See e.g.,
Rhem v. Malcolm, supra, 389 F.Supp. 964, at
966-968 (trial court has jurisdiction over
visitation in new facility to which plaintiff class
of prisoners are transferred after trial), Ahrens
v. Thomas, supra, at 901, 909 (trial court asserts
jurisdiction to approve plans for a new jail
replacing old jail under litigation) Mitchell
v. Untreiner, supra, at 899, 962 (sheriff ordered
to report quarterly to court re construction of
new facilities; court refrains jurisdiction).
In several respects defendants have defended
their practices at the Jail as the result
of the time lag between initiation and
construction of new jail facilities (Lonergan,
9/22).  The time is now to guarantee that the
new jail facilities which will supplant the
Central Jail are constructed in a manner similar
to the federal M.C.C.'s to accomodate contact
visitation.  Otherwise, structural impediments to
such visitation will continue to be a fait
accompli.

586

(4)   Presentation of a plan to allow eligible

pretrial detainees optional contact visitation

at the Central Jail with a reasonable frequency

each week. See e.g., Fisher v. Geary, supra,

(Appendix A), Slip Opinion p. 9.


(5)   Expansion of detainees visits to one hour

daily.

(6)   Allowance of visitation by unaccompanied

juveniles.


VI

OUTDOOR RECREATION

(Pretrial Conference Order § IX, B, 1)

A. Material Facts

Defendants' new roof recreation program provides that

prisoners be permitted on the roof in groups of about 130 for

a 2-1/2 hour period once each 6-8 days pursuant to a rigid

schedule (Holt,9/21; Myron 8/3; Exhibit DZ).  The recreation

equipment provided in each area is listed in Exhibit DN.  Due to

poles spaced evenly throughout the roof area on the new side of the

jail prisoners will not be able to play team sports, such as half

court basketball (Myron, 8/3).  In contrast sentenced inmates

in defendants' other facilities (Dillard,  399 F.Supp. 1230-1232)

Howell, 8/4) and in state prison (Creek, 810 ) enjoy daily

opportunities to exercise for long periods of time.


The exercise opportunities of maximum security

detainees will be treated separately below.

587

31.

B. Law

Defendants' outdoor exercise plan has three fatal deficiencies: (1) prisoners are allowed only 2-1/2 hours of outdoor recreation per week, (2) prisoners unable to attend their modules's recreation period, for example, due to court appearances or clinic appointments at the County Hospital, simply miss their opportunity for exercise, and (3) the facilities on the two roof areas are inadequate to provide prisoners a real opportunity to exercise.

The minimum standard of exercise for pretrial and sentenced prisoners dictated by due process and equal protection of law as to the former and the prohibition against cruel and unusual punishment as to the latter is one hour per day five days per week.  See, inter alia:

Campbell v. McGruder, 416 F.Supp. 100, 105 (D.D.C. 1975)(1 hour daily for pretrial detainees);

Inmates of D.C. Jail v. Jackson, 416 F.Supp. 119, 124 (D.D.C. 1975)(1 hour daily for sentenced prisoners);

Ahrens v. Thomas, supra, 434 F.Supp. at 903 (W.D. Mo.) (daily for pretrial prisoners);

Miller v. Carson, supra, 401 F.Supp. at 891-893 (M.D. Fla.) (daily for pretrial prisoners);

Mitchell v. Untreiner, supra, 421 F.Supp. at 901 (N.S. Fla). (1 Hour daily for pretrial prisoners);

Conklin v. Hancock, 334 F.Supp. 1119, 1122 (D.N.H 1971)(1 hour daily for pretrial prisoners);

588

1   Rhem v. Malcolm, supra, 396 F.Supp. at

2   1202 and 432 F.Supp. 769 (SDNY 1977)

3   (1 hour per day 5 days per week for pretrial

4   prisoners);

5   Battle v. Anderson, 376 F.Supp. 402, 432

6   (E.D. Okla. 1974)(daily for reasonable

7   time for sentenced prisoners);

8   Barnes v. Government of Virgin Islands,

9   415 F.Supp. 1218, 1233 (D.V.I. 1976)

10  (1 hour per day, 5 days per week for

11  sentenced and pretrial prisoners).

12  Hamilton v.Landrieu,  351 F.Supp. 549,

13  550, (E.D. La. 1972)(1 hour per day 5

14  days per week for pretrial prisoners);

15  Spain v. Procunier, 408 F.Supp. 534,

16  547 (N.D. Cal. 1976)(1 hour per day

17  5 days per week for notorious sentenced

18  prisoners in San Quentin's Adjustment

19  Center);

20  Nadeau v. Helgemore, 423 F.Supp. 1250,

21  1275 (D.N.H. 1976)(1 hour per day

22  5 days per week for sentenced prisoners

23  in protective custody);

24  Morgan v. Sproat, 432 F.Supp. 1130, 1140

25  (S.D. Miss. 1977)(1 hour daily for juveniles);

26  Inmates of Henry County Jail v. Parham,

27  430 F.Supp. 304, 309 (N.D. Ga. 1976)

28  (Consent Decree: 4 hours daily)

589

1    Defendants cannot be heard to argue that this standard
2  of one hour per day five days per week, does not apply to the
3  Central Jail due to its urban locations (see, e.g., Holt, 9/21).
4  Aside from the facts that several of the above cited cases arose
5  in metropolitan areas[17] and an identical argument was vigorously
6  advanced by the financially strapped city of New York with regard
7  to the Tombs jail located in the heart of Manhattan yet expressly
8  rejected in Rhem v. Malcolm, supra, 507 F.2d 333, at 340, 396
9  F.Supp. 1195, at 1198 and 432 F.Supp. 769, at 782, such argument
10  amounts to nothing more than a plea of fiscal impossibility. As the
11  Second Circuit has noted:

12         "The financial woes of the City of New
13         York are obvious to all who live or work
14         here, including federal judges.  And on the
15         agenda of City priorities, which includes
16         supply of such essential services as police
17         and fire protection, provision of welfare,
18         care of the ill, collection of garbage, and
19         maintenance of the transit system, it is
20         not surprising that the housing of those
21         confined in jail is not at the top of the list.

22  17.
23         See cases cited in footnote 14 at p.27, supra, and
24         Hamilton v. Landrieu, supra,(New Orleans), all requiring
25         at least one hour per day five days per week in metro-
26         politan jails.

27
28

34.

590

But pre-trial detainees are people,
not out-casts, who are presumed to
be innocent of any crime and who have
rights guaranteed by the Constitution,
as do we all.  When a district court
is presented with a claim of violation
of those rights, its proper function
is to decide the case before it, what-
ever sympathy it may have for those
who must manage a great metropolis beset
by grievous problems."

Rhem v. Malcolm, supra, 507 F.2d. 333,
at 341-342.

Any recreation program must spread exercise time evenly
over a weekly period otherwise many prisoners who suffer the
misfortune of a court appearance, a clinic appointment at L.C.M.C.
or even an attorney visit will simply go without outdoor exercise
conceivably for weeks on end.  Moreover, those prisoners who
are able to exercise once a week will not receive adequate relief
from the modules' oppressive claustrophobic environment.  An
adequate exercise program must provide prisoners frequent diversion
from their daily routine.  Even the Minimum Jail Standards, §1153,
attached hereto as Appendix C, require a minimum of three hours
of exercise "distributed over a period of seven days."

Lastly, exercise facilities must provide prisoners
real, as opposed to theoretical, opportunities to exercise.  The
cases enumerated above call for exercise time, not merely time

35.

591

1   outdoors.   For example in <u>Rhem v. Malcolm,</u> <u>supra,</u> Judge Lasker

2   carefully considered the capacity of exercise facilities and the

3   demand therefor in adjudicating the inadequacy of exercise

4   opportunities at the Tombs (371 F.Supp. 594, at 611, 432 F.Supp.

5   769, at 781-785), concluding that

6

7            "Without more reliable information,

8       then,  as to actual experience of inmate use

9       of active recreational facilities in comparable

10      institutions, and the intended capacity of

11      [The Tombs] as a facility, the C94 plan

12      [presented by the defendants] for outdoor

13      exercise cannot be approved." 432 F.Supp.

14      at 785 (Footnote omitted).

15

16  Plaintiffs seriously question the adequacy of the roof recreation

17  facilities.   In view of the newness of the Jail's exercise

18  program and the nonexistence of outdoor exercise during the

19  pendency of this action,[18] it would be equitable to place the

20  burden on defendants to convince the Court that the facilities

21  are in fact adequate.

22

23

24

25

26  ─────────────────────────────────
    18.  The exercise program was scheduled to begin September 26,

27  after the conclusion of the trial. (Holt, 9/21).

28

                          36.                              592

C. Remedy

Plaintiffs suggest that the Court order the following steps be taken by defendants to assure that prisoners receive a meaningful opportunity to exercise outdoors one hour per day five days per week.

1. Reopening of Biscailluz Center as a jail for low risk detainees. See § V-C supra;

2. Reducing the Central Jail's population through more effective utilization of unused bed space in Wayside Minimum and Maximum, Mira Loma and the Detentnion Camps as well as Biscalluz Center, thereby increasing opportunities to use the Jail's roof areas and lessening demand for facilities. See Rhem v. Malcolm, supra, 432 F. Supp. 769, at 785;

3. Reporting to the Court on greater and more frequent utilization of the Central Jail's roof areas to provide prisoners exercise 1 hour per day 5 days per week;

4. Reporting to the Court on ownership and possible use of land surrounding the Jail as an exercise area for some or all prisoners;

5. Submitting a plan for outdoor exercise at least one hour per day five days per week in the Satellite jails.

37.

593

VII

INDOOR RECREATION

A. Material Facts

Despite recent improvements in freeway and dayroom time, only pretrial detainees who have agreed to work and consequently receive a minimum security classification (Giger, 9/13) are confined under the least restrictive alternatives demanded by due process and equal protection of law. Only minimum security trusties have open door freeway time and access to dayrooms equipped with television, generally throughout the day (Giger, 9/13, Exhibit EO). In contrast the vast majority of pretrial prisoners, classified as low moderate, moderate and high moderate, receive only 2 to 8 hours of freeway and dayroom, depending on the predilections of their module officers (Giger, 9/13, Exhibit EO). Although defendants have announced their intention of placing televisions in each dayroom, there is no evidence in the record that this laudable goal has in fact been achieved.

Detainees suffer discrimination regarding the opportunity to view movies.  The majority of detainees are not allowed to watch movies whereas sentenced and pretrial trustees are allowed to see a weekly movie (Robbins, 8/14).

As with outdoor exercise, the recreation conditions for maximum security detainees will be treated separately below.

B.   Law

The leading and most thoughtful cases on indoor recreation again stem from the Rhem v. Malcolm litigation in New

594

1  York City.   Judge Lasker began by ordering the defendants to provide

2  pretrial detainees elective time out of their cells, denoted

3  "optional lock-out" (371 F.Supp. 594, at 628 <u>aff'd</u>, 507 F.2d 333

4  at 339).   Subsequently, with regard to HDM, to which the Tombs

5  population had been transferred, he ordered that all detainees,

6  except those identified by a classification system as posing

7  unsuitable risk, be allowed out of their cells at all times except

8  during a sleeping period not longer than 8 hours, and other

9  reasonable periods to conduct necessary jail activities such as

10  meals, counts, courtlines and cleaning, and further ordered that

11  the defendants carry the burden of establishing the legitimacy of

12  such classification system,  396 F.Supp. 1195, at 1201, <u>aff'd</u>

13  527 F.2d. 1041, at 1043.

14

15        "2. Right to Leave Calls

16       "(a) Within sixty days of the entry of this

17          judgment, defendants shall permit plaintiffs

18          to leave their cells at all times except for

19          such reasonable periods as may be necessary

20          to conduct counts of the population, clean the

21          institution, arrange for court appearances,

22          provide meals to inmates and provide a quiet

23          sleeping period of no longer than eight hours,

24          starting no earlier than 9:30 p.m.

25       "(b) Defendants, upon establishing the classi-

26          fication system referred to in Paragraph 1 of

27          this judgment, may impose a more restrictive lock-

28          in schedule upon selected detainees in instances

595

1           where defendants can establish, based

2           upon said classification system, that

3           implementation of subparagraph (a) of

4           this paragraph would jeopardize insti-

5           tutional security."

6       Under these standards, defendants' program of freeway

7 and dayroom time is extremely parsimonious.  Only minimum security

8 trusties, who number approximately 500 (Giger, 9/2), achieve the

9 level of freedom of movement required in Rhem. Indeed, defendants'

10 classification system is highly questionable: since prisoners

11 in any classification except maximum may gain minimum security

12 trusty status by agreeing to work (Lt. Giger, 9/13), the sole

13 criterion determining whether a detainee will be housed under the

14 minimum necessary restraints is his willingness to perform labor!

15       For reasons similar to these advanced in Section VI

16 B, supra, regarding defendants' exercise program, defendants should

17 also carry the burden of showing the effectiveness of the brand

18 new freeway and dayroom program inaugurated during  the trial

19 and the adequacy of recreational facilities and materials, including

20 televisions,made available to detainees.  In this regard, it

21 certainly appears to plaintiffs that the two dayrooms per module

22 on the old side of the Jail and the one small dayroom per cell

23 row on the new side of the Jail are grossly inadequate to accomodate

24 detainees' recreational needs.

25       Defendants' discriminatory refusal to allow the general

26 detainee population attendance of movies is a violation of equal

27 protection of law as well as a violation  of the Fourteenth Amendment

28 proscriptions against summary punishment without due process of

596

law and wealth, discrimination.  See Section III, B, _supra_.

C. Remedy

Plaintiffs suggest that defendants be ordered to take the following steps to remedy detainees' indoor recreation needs:

1.  Reopening of Biscailluz Center so as to avail minimum and low moderate security detainees of greater recreational opportunities and freedom of movement and to decrease demand on Central Jail dayrooms and facilities.

2.  Reducing the Central Jail's propulation through more effective use of available bed space in the jail system thereby increasing opportunities to use the Jail's resources.  See § VI, C, (2) _supra_.

3.  Reporting to the Court on greater freeway time and if need be the physical separation of upper rows of cells (C and D rows) from lower rows (A and B rows). [19]

---

19. See Myron, 8/3, to the effect that prisoners will "row hop" without a barrier.

597

41.

4.   Reporting to the Court on greater
and more frequent access to dayrooms.

5.   Reporting to the Court on prisoner
use of dayrooms and size of and
facilities within dayrooms.

6.   Submitting a plan for detainee
access to dayrooms 16 hours per day in
the Satellite Jails.

7.   Granting detainees the opportunity
to view weekly movies.

VIII

OVERCROWDED, INADEQUATE HOUSING.

A.   Material Facts.

The pertinent facts regarding the Jail's housing
conditions are undisputed.  Cell sizes, rated capacities and
square footage per prisoner are set forth in Schedule A to the
Pretrial Conference Order, § X,A,1.     As reflected in that
Schedule, which for the Court's convenience is attached hereto
as Appendix D, and in the following table, the majority of
the Jail's prisoners are confined in multiple occupancy cells
containing only 19.5, 19.8, 20.25, 21.97, 23.33 or 25 square
feet per prisoner - occupant at rated capacity:

/

598

42.

### 19.5 Square Feet Per Prisoner

16 Rows: 2200 A & B, 2400 A & B, 2600 A & B,

2800 A & B, 3200 A & B, 3400 A & B

3600 A & B and 3800 A & B

Capacity Each Row: 78 (6 men/cell x 13 cells)

Total number of prisoners:

1248 (16 rows x 78 men/row)


### 19.8 Square Feet Per Prisoner

1 Row:  2900 A

Capacity: 70 ( 10 men/cell x 7 cells)


### 20.25 Square Feet Per Prisoner

16 Rows: 2200 C & D, 2400 C & D

2600 C & D, 2800 C & D, 3200 C & D

3400 C & D, 3600 C & D,

3800 C & D.

Capacity Each Row: 52 (4 Men/cell x 13 cells/row)

Total Number of Prisoners: 832 (16 Rows x 52 men/row)


### 21.97 Square Feet Per Prisoner

1 Row: 2900 B

Capacity: 56  (8 Men/Cell x 7 cells)

43.

599

### 23.33 Square Feet Per Prisoner

8 Rows, 4300 A & B, 4400 A & B

4700 A & B, 4800 A & B

Capacity "A" Rows: 78 (6 men/cell x 13 cell/row)

Capacity "B" Rows: 72 (6 men/cell x 12 cell/row)

Total Number of Prisoners: 600 (4 rows x 78 men/row

+ 4 rows x 72 men/row)


### 25 Square Feet Per Prisoner

8 Rows: 4300 C & D, 4400 C & D,

4700 C & D, 4800 C & D

Capacity "C" Rows: 52 (4 men/cell x 13 cells/row)

Capacity "D" Rows: 48 (4 men/cell x 12 cells/row)

Total No. of Prisoners: 400 (4 rows x 52 men/row

+ 4 rows x 48 men/row).


In other words, at rated capacity, 3206 prisoners out of a total of 5098[20] live and sleep in 25 square feet or less. Moreover it must be noted that a considerable portion of these square footages are occupied by bunks and cell fixtures.

The vast bulk of the prisoners confined under these conditions of 25 square feet or less are pretrial detainees (Exhibits 2 and EO, [Annex B]; Giger, 9/13).

---

[20.] The Jail has 5098 non-medical beds (Pretrial Conference Order & IV, A, 1). By Court order housing conditions in the hospital wing of the Jail are not presently in issue.

1      Up through the trial herein, defendants filled the

2  multiple occupancy cells above rated capacity, thus forcing

3  men to sleep on the floor and diminishing living space even further.

4  However, in view of the Court's remarks on September 23 re the

5  need for beds for all prisoners, this brief will not argue the issue

6  of floor sleepers but rather will focus only on Jail housing under

7  rated capacity conditions.

8      Most of the Jail's sentenced trustees and pretrial

9  trustees, who are required to work, live in housing that is

10  50% to 100% more spacious yet still overcrowded: dormitories

11  containing between 36.03 and 39.52 square feet per prisoner; and 42.75

12  square foot single cells in module 2300 (Exhibit EO; Pretrial

13  Conference Order, Schedule A).

14      Sentenced prisoners at Wayside Minimum and Maximum

15  live in considerably more spacious quarters as did prisoners at

16  Biscailluz Center prior to its closing (Dillard, 399 F.Supp. 1231-

17  1232).

18      Lastly, the furnishings of the cells do not include

19  lockers within which prisoners can store their personal property.

20

21      B. Law

22      Although the federal courts are not in total agreement

23  as to the minimum amount of floor space that is acceptable for

24  pretrial detention, no reported decisions found by plaintiffs'

25  attorney have accepted any less than 40 square feet per pretrial

26  or sentenced prisoner as minimally acceptable; and many courts have

27  insisted on considerably more living space. See inter alia:

28      Ambrose v. Malcolm, 414 F.Supp. 485, 494 (S.D.,

601

N.Y., 1976) (75 square feet).

Martinez-Rodriguez v. Jiminez, 409 F.Supp.
582, 587 (D.P.R. (1976) stay denied 537
F.2d 1 (2nd Cir. 1976) (70 square feet);

Ahrens v. Thomas, supra, 434 F.Supp at 901
(W.D. Mo.) (70 square feet).

Newman v. Alabama, 559 F.2d,283, at 288 (5th Cir. 1977)
affirming Pugh v. Locke, supra, 406 F.
Supp. at 334 (M.D. Ala.) (60 square feet
for sentenced prisoners).

Palmigiano v. Garrahy, ___ F.Supp. ___,
Civil Action No. 74-172 (D.R.I.,
August 10, 1977) Order 4(a)(7) and 4(a)(8) (75
square feet in dormitories, and 60 square feet
in cells for sentenced prisoners) a copy of which
Order is attached hereto as Appendix E (Opinion
is not attached because it is 101 pages long);

Gates v. Collier, 390 F.Supp. 482, 486
(N.D. Miss. 1975) (50 square feet for
sentenced prisoners);

Campbell v. McGruder, 416 F. Supp.
106 and Inmates of D.C. Jail v. Jackson
416 F.Supp. 119, 124 (D.D.C. 1976) (48
square feet for pretrial and sentenced
prisoners).

Moore v. Janing, supra., 427 F.Supp. at
572 (D.Neb.) (40 square feet per detainee
not enough).

602

U.S. ex rel. Wolfish v. U.S., 428 F.Supp.

333, 336, 339 (SDNY 1977)(Frankel, j.)

(123 square feet not enough for two

prisoners).

Inmates of Suffolk County Jail v. Eisenstadt,

supra, 360 F.Supp. at 679, 691 (D.Mass.)

(88 square feet not enough for two prisoners).

Detainees of Brooklyn House of Detention for

Men v. Malcolm., 520 F.2d 392 (2d Cir. 1975)

(40 square feet not enough for two prisoners).

Duran v. Elrod, supra, 542 F.2d at 1001

(7th Cir.) (Implication that 40 square feet

not enough for two prisoners);

Johnson v. Lark, 365 F.Supp. 289, 304

(E.D. Mo. 1973)(40 square feet not enough

for two prisoners).

Taylor v. Sterrett, 344 F.Supp. 411, 422 (N.D.

Tex., 1972) aff'd in part, remanded in part,

499 F.2d 367 (5th Cir., 1974) (40 square feet). [21]

---

[21].
    Even the California Minimum Jail Standards, Section 1081(d),
provide that dormitories should contain a minimum of 40 square
feet of floor space in the sleeping area.  However, by virtue
of the Minimum Jail Standards' grandfather clause, Section 1015,
the Jail is exempted from this "requirement."

603

1      The rationale of these cases was eloquently stated by

2   the Second Circuit in Detainees of Brooklyn House of Detention

3   for Men v. Malcolm, supra, 520 F.2d at 397:

4              "In providing for [pretrial detainees']

5              detention, correctional institutions

6              must be more than mere depositories

7              for human baggage . . . ."

8

9      In the instant case the evidence is abundant that the

10  human compression of detainees is intolerably punitive and

11  violative of the due process and equal protection clauses of

12  the Fourteenth Amendment.  No court in any reported case that

13  plaintiffs' attorneys could find has ever upheld 20 square feet

14  of living space as constitutionally acceptable.  Plaintiffs would

15  hope that the dry data on congestion at the Jail in conjunction

16  with views of the facility would lead the Court to similarly

17  conclude that the Jail is greatly overcrowded by a factor

18  of two or more.  As Judge Frankel noted in U.S. ex rel. Wolfish

19  v. U.S. supra, 428 F.Supp. at 339:

20           "Given the evolving legal standards

21           of minimum decency defined in cases cited

22           above, the judgment of a lay judge must

23           control the conflicting views of psychiatrists

24           and psychologists, no matter how the opinions

25           are added or multiplied.  A court is

26           not required, after all, to litigate

27           over and over again general propositions

28           about matters of  human experience that

604

1        are either self evident or readily demon-

2        strable once for all.  We do not take evi-

3        dence repeatedly that members of the species,

4        often enough to serve as universals, respond

5        unhappily to foul odors, social stigma,

6        humiliation, and denials of minimal privacy.

7        So, here, he who walks slowly and observes

8        can read the uncontradicted evidence of

9        circumstances that the law has now come

10        to denounce as less than the constitutional

11        minimum for the confinement of fellow human

12        beings."

13

14        Plaintiffs anticipate that defendants' principal defense

15 of the Jail's crowded living conditions is its rated capacity

16 set by the Board of Corrections.  Aside from the fact that the

17 Board of Corrections is a powerless body and as such is unlikely

18 to demand more of the state's jailers than they are willing to volunteer,

19 blind adherence to rated capacities would lead to absurd

20 results.  If rated capacities were the bellwether of constitu-

21 tional confinement the act of a mere administrative body, such

22 as the Board of Corrections,could render constitutional the

23 packing of prisoners like sardines; and prisoners in New York

24 might each be entitled as a matter of constitutional law to

25 75 square feet of living space whereas prisoners in California

26 /

27 /

28 /

605

49.

would be entitled only to 25 square feet.[22]   In essence such a
doctrine asks the federal courts to delegate to jail designers,
who are often closely associated with correctional administra-
tors, the responsibility for adjudicating constitutional
questions.  As the Fifth Circuit noted in Newman v. Alabama, supra,
559 F.2d at 288, in rejecting design standards as a consti-
tutional standard for living space in a prison environment:

> "Those who design prisons are
> not vested with either the duty
> or the power to prescribe consti-
> tutional standards as to prison
> spaces."

See also, Martinez-Rodriguez v. Jiminez, supra, 409 F.Supp. 586,
596 (although rated capacity is 350, jail ordered to reduce popu-
lation to 250), and U.S. ex rel Wolfish v. U.S., supra, 428 F.
Supp. at 339 (despite absence of rated capacity jail held to be
overcrowded).

Lastly, several courts have held that prisoners are
entitled to a storage place within their cells for their personal
belongings.  See:

> Mitchell v. Untreiner, supra, 421 F.Supp. at 898.
>
> Ahrens v. Thomas, supra, 434 F.Supp. at 902;
>
> Pugh v. Locke, supra, 406 F.Supp. at 334;
>
> Miller v. Carson, supra, 401 F.Supp. at 872.

Lockers for the Jail's detainees would be particularly beneficial
in view of the crowding at the Jail and frequent "shakedowns" of
prisoners' cells. See §X,    infra.

---

22. Pursuant to Minimum Jail Standards §1081(b).

606

6.   Providing detainees cell lockers
in which to store their personal
belongings.

IX
WINDOWS

A. Material Facts

Although psychologists recommend windows in a penal
institution (Welch, 9/13) and the benefits to prisoners are
obvious, defendants covered the exterior windows on the old side
of Jail and built the new side without windows (Welch, 9/13 and
affidavit).

Plaintiffs are not satisfied that defendants conducted an
objective, vigorous investigation of a secure method to break
up the Jail's claustrophobic environment with windows.  Rather
defendants proceeded rapidly to rid themselves of an inconvenience.
For example, defendants apparently did not consider a
means of keeping prisoners away from windows so as to avoid
breakage and attempted escapes. (Welch 9/13).

Windows are certainly not unusual in penal institutions.
Defendants' own facilities including Wayside Maximum and
Biscailluz Center, have windows as do the Federal Bureau of Pri-
son's Metropolitan Correction Centers (Lampkin Deposition, p.20)

B. Law

Several federal courts have held that exterior windows
are essential to affording pretrial detainees a minimally



C. Remedy

Plaintiffs suggest that the Court order defendants to do the following to remedy crowding at the Jail and to improve cell conditions:

    1.  Reopening of Biscailluz Center and use of its 554 beds.

    2.  Reducing the Central Jail's population by more effectively utilizing bed space at Wayside Minimum and Maximum, Mira Loma and the Detention Camps.

    3.  Reporting to the Court on more expanded and quicker release of detainees on their own recognizence.

    4.  Reducing the population of all multiple occupancy cellblocks to 50% of rated capacity thereby increasing living space to between 39 and 50 square feet per prisoner.  This would be nothing more than an interim measure pending the availability of alternative facilities such as Satellite jails.

    5.  Reporting to the Court on living space in the Satellite jails.


607

acceptable living environment.  See:

> Rhem v. Malcolm, supra, 371 F.Supp. at 627
>
> aff'd 507 F.2d at 337, 339.
>
> Hamilton v. Landrieu, supra, 351 F.Supp. at
> 554.
>
> Miller v. Carson, 392 F.Supp. 515, 521,
> (M.D. Fla. 1975);
>
> Mitchell v. Untreiner, supra, 421 F.Supp.
> at 898;
>
> Morgan v. Sproat, supra, 432 F. Supp. at 1138,
> 1140.

   In rejecting New York City's plan to place in the Tombs
thick glass windows which could distort detainees' view of the
outside world, Judge Lasker discussed the constitutional
necessity of windows in a pretrial detention facility:

> "MHD [Tombs] may be unique in another
> respect: Its "windows" were designed
> so that inmates cannot see outside[23]
> (Tr. at 1592)  As indicated in the 1974
> opinion, the windows are made of translu-
> scent glass, with the result that
> inmates cannot see  human activity outside
> the building or even look at the sky.
> 371 F.Supp. at 610.  Various experts
> testified at the 1973 trial as to
> the deleterious and disorienting psycho-
> logical effects of being so cut off from

609

_____
23.  Judge Lasker obviously was not familiar with the Central Jail.

53.

1
2
3
4
5
6

observation of the outside world.
Moreover, the 1973 record established
that clear security glass was available
and that the City had no policy objec-
tions to its use. 371 F.Supp. at 610."

7
8
9
10
11
12
13
14
15
16
17

"In light of this record, we agree with
the view of William Nagel, a nationally
recognized correctional expert and author
of The New Red Barn: A Survey of American
Jails, that C94 represents an  extraordinari-
ly minimal response" to the finding that
the detainees'  inability to see the sun,
sky or outside world  is a constitutional
deprivation. (Tr. at 1588); 371 F.Supp. at
627." Rhem v. Malcolm, supra, 432 F.Supp.
at 778.

18
19
20

And he proceeded to conclude:

21
22
23
24
25
26
27
28

"[W]e find that the C94 proposal would
not remedy the defects in the physical
environment of MDH sufficiently to
permit its use as a facility for the pre-
trial detention of a general population
. . . . inmates would have . . . .
virtually no relief from the inability
to see the outside world, except that

610

1       provided by exercise periods on the

2       roof."

3       Id. at 779.

4

5       This Court indicated a similar conclusion in Dillard,

6   399 F.Supp. at 1229, where the Court described HOJJ's windowless

7   environment as follows:

8           "Corridors not normally available

9       to prisoners separate the modules from the

10      walls and windows that outline the building.

11      The windows, therefore, are at least several

12      yards away from the cells.  They are made

13      of relatively small panes of opaque glass,

14      a few of which can be opened for ventilation

15      purposes but are hinged in such manner as to

16      afford minimal outside view to a person

17      standing next to them and none at all from

18      the cells."

19

20  The irony is that the Jail's detainees are worse off than those

21  at HOJJ:  the  Jail   has absolutely no window whereas

22  HOJJ at least had some.

23          In short, the absence of windows is a major defect

24  causing the Jail to be far more claustrophobic than necessary

25  to the narrow purpose of pretrial detention.  See § II, supra.

26

27  /

28  /

611

C. Remedy

Plaintiffs suggest that the Court order defendants to take the following steps to remedy the absence of windows for the plaintiff class:

> (1) Report to the Court on the actual, as opposed to loosely estimated, cost of restoring windows to the Jail;
>
> (2) Report to the Court on the placement of windows in defendants' satellite jail facilities.

X

CELL SEARCHES

A. Material Facts.

The manner of cell searches poses another example of a sharp conflict in the testimony of prisoners and Jail Officers. Assuming that the Court finds as it tentatively indicated at the hearing on September 23, 1977, that the searches fall somewhere in between, not quite as bad or good as testified to, the crucial facts are that with some regularity deputies do abuse detainees' property and that detainees are placed in an adjacent dayroom and are not allowed to watch the searches of their cells. (Myron, 8/2).

B. Law.

Since even convicts retain to some extent the protection of the Fourth Amendment against unreasonable searches and seizures,

612

Bonner v. Coughlin, 517 F.2d 1311, 1317 (7th Cir.1975) (per Judge, now Justice, Stevens), Hodges v. Klein, 412 F.Supp. 896, 899 (D.N.J. 1976), it follows a fortiori that pretrial detainees also retain that protection.

At least two courts have struck down search practices similar to those here at issue. In Giampetruzzi v. Malcolm, 406 F.Supp. 826 (S.D.N.Y. 1975), the court held that the practice of requiring maximum security, high risk prisoners to turn their backs during searches of their cells was an unnecessary abridgment of privacy.

"Nothing in the record justifies the present requirement that the inmate stand with his back to the cell while the search is conducted, a practice which constitutes not only an invasion of privacy but an unnecessary aggravation of the terms of confinement." Id. at 844-845.

In the instant case, defendants have even less justification for the manner in which they search prisoners' cells. Defendants' practices are applicable to all prisoners, not just "high powers", and prisoners are removed a significant distance away from their cells where they are no longer able to ask or respond to questions.

In the context of searches of the cells, lockers and property of prisoners representing themselves in propriis personis, the Los Angeles County Superior Court in Brown v. Pitchess, C-24464 (July 25, 1977), a copy of which is attached hereto as Appendix F , similarly enjoined defendants as follows:

"7.   Defendants, their successors in interest,

513

57.

agents, subordinates, representatives, and
employees, and all persons in active concert
and participation with them are hereby
permanently enjoined from searching and
inspecting pro pers' personal legal materials,
cells, or lockers within the pro per law
library out of the presence and observation
of the affected pro pers unless defendants
have an emergent need to locate the
contraband sought, such as weapons and keys,
and the affected pro per is not present and
not readily available to witness the search,
for example, because he is in court or at
the Los Angeles County U.S.C. Medical Center."

The Giampetruzzi-Brown remedy of observation by prisoners
is a simple but practical solution to the problem of abusive cell
searches.  Presumably, deputies will be constrained to be more
careful with inmates' property; inmates will be available to answer
deputies' questions; and inmates will have the names of offending
deputies in the event a complaint to a superior officer is appropriate.

C.   Remedy

Plaintiffs suggest that the Court order defendants to do
the following to remedy the problem of abusive cell searches:

(1)  Permit prisoner-occupants to be present and
watch searches of their cells;

(2)  Carefully instruct deputies on the proper
manner of cell searches; and

58.

614

(3) Guarantee the presence of at least

a sergeant during all searches.


XI

PERSONAL HYGIENE ITEMS

A. Material Facts.

A reasonable view of the evidence on the distribution of personal hygiene items is that it may take indigent prisoners days or weeks to obtain these items and that even prisoners with money may have to wait two days until the Commissary cart reaches their module.

Senior Deputy Boswell testified that from time to time the Jail runs out of personal hygiene items for one week or more and that during these times indigent prisoners are unable to get these items (Boswell Deposition, 5-8). The indigent prisoners who testified on this subject complained of long delays before receiving hygiene items.  See DeJean, 8/23 (3 weeks); Johnson, 8/12 (2 weeks). Similarly, Nurse Schenck testified that sometimes indigent prisoners in the hospital would go weeks without such items (8/12).  Deputy Boswell admitted that even when available prisoners may have to wait two days before receiving the items (Boswell deposition, 9).  It should be obvious that even when working as designed the defendants' system of distributing hygiene items to indigents is cumbersome: prisoners hand "kites" to their module officers, who deliver the kites to the chaplain officers, who in turn call the prisoners to

/

/

615

the chaplain's office for distribution.  It is entirely unclear why the chaplains are involved at all.  More affluent prisoners who are booked into Jail on Saturday after commissary have to wait until Monday to purchase hygiene items  (DePaul, 9/2).

B.  Law

The courts have required at minimum distribution of hygiene items within 24 hours of booking.  See, inter alia:

Ahrens v. Thomas, supra, 434 F.Supp. at 902 (free to all at admission);

Mitchell v. Untreiner, supra, 421 F.Supp. at 897 (within 24 hours of admission);

Martinez-Rodriguez v. Jiminez, supra, 409 F.Supp. at 596 (within 24 hours of admission);

Inmates of Henry County Jail v. Parham, supra, 430 F.Supp. at 307 (consent decree:  free to all at admission);

Accord:  Minimum Jail Standards, §1203 (inmates held more than 24 hours).

C.  Remedy

Plaintiffs suggest that the Court order defendants to do the following to afford all prisoners a reasonable opportunity to obtain personal hygiene items:

(1)  Distribute hygiene items to indigent inmates within 24 hours of booking;

(2)  Operate the Jail Commissary seven days per week.

///

///

///

616

XII.

LAUNDRY

A. Material Facts.

There is quite a disparity between the testimony of prisoners and Jail Officers as to the frequency of clothing, towel and bedding exchanges. Prisoners testified such exchanges were infrequent, weeks or months apart, while officers testified that they occurred on a weekly basis like clockwork.

A reasonable interpretation of the evidence is that clothing and towel exchanges are often less frequent than once a week. Prisoners' testimony must be considered in light of Captain Myron's testimony that the Jail attempts to conduct exchanges weekly and that there has been a problem maintaining pants sizes (8/2) and in light of the clothing order of unprecedented size made on the eve of trial (Torres, 9/21; Myron, 8/2).

In any event the following Jail policies are clear from the record:

(1) Fresh clothing and towels are distributed only once a week (Exhibit A, p.61; Myron, 8/2; Torres, 9/21);

(2) Prisoners are provided with only one set of underwear and must launder their own underwear (Torres, 9/21);

(3) Cell toilets and small sinks in the cells are the only laundry facilities available to most prisoners (Myron, 8/2).

///

61.

617

B.   Law

Federal court orders have ranged between requiring clothing exchanges daily to twice a week.  See, inter alia:

Alberti v. Sheriff of Harris County, 406 F.Supp. 649, 677 (S.D. Tex. 1975) (daily);

Mitchell v. Untreiner, supra, 421 F.Supp. at 898 (daily);

Martinez-Rodriguez v. Jiminez, supra, 409 F.Supp. at 596 (twice a week);

Hamilton v. Landrieu, 351 F.Supp. 549, 553 (E.D.La.1972) (twice a week);

Inmates of Henry County Jail v. Parham, supra, 430 F. Supp. at 307, 308 (clean uniforms three times a week, laundry twice a week).

Accord:  Minimum Jail Standards, §1201 (exchange of undergarments and socks twice a week).

Allowing pretrial prisoners to exchange their clothing only once a week is inherently punitive and epitomizes the very sort of excessive restraint on detainees' liberties proscribed by due process and equal protection of law.  See Section II, supra.  In fact, forcing a prisoner to live and sleep in the same clothing for a week straight is the type of practice one would expect to find in solitary confinement areas of a state prison.

Of course, the above makes the dubious assumption that clothing and towels are in fact exchanged in accordance with Jail policy.  The actual practice of irregular exchanges is far worse and begs for the Court's attention.

///

618

C.   Remedy

Plaintiffs suggest that the Court order defendants to do the following to afford prisoners reasonably clean clothing and linen:

> (1)   Provide clothing exchanges at least
> twice a week;
>
> (2)   Provide prisoners with two sets of underwear
> and outer garments;
>
> (3)   Provide prisoners with daily access to
> laundry facilities, including washers and dryers,
> or in the alternative provide daily clothing and
> linen exchanges.

63.

619

XIII

TRANSPORTATION TO COURT AND

THE COUNTY HOSPITAL

(Pretrial Conference Order §§ XV
and XXIV, B,2).


A. Material Facts


On days they attend court, prisoners are subject to a grueling routine resembling that which this court condemned in Dillard, 399 F.Supp. at 1236-1237. They are awakened early in the morning, between 3:00 a.m., (Contreras, 8/12) and 4:30 a.m. (Martinez 9/2; Johnson, 8/12), quickly bathe, dress and eat, and begin to arrive in the Inmate Reception Center (IRC) between 5:00 and 5:15 a.m. (Costa, 8/11). Within the IRC they are placed in holding tanks, which defendants concede do not contain seats for all prisoners and which become rather crowded (Cf. Krukow, 8/15[as many as 55 prisoners per tank] and Costa, 8/11 [on Mondays standing room only] with Sweeney, 8/10 and Johnson, 8/12). It is not unusual for prisoners to remain in the IRC tanks for 1-1/2 hours (Costa, 8/11) and even longer (Johnson,8/12, Sweeney,8/11). The process of boarding buses begins at 5:45 a.m. (Costa, 8/11) and ends between 6:30 a.m. (Costa, 8/11) and 7:10 a.m. (Barrackman, 8/11). The buses eventually leave the Jail between 7:20 and 7:30 a.m. (Barrackman, 8/11). After spending the entire day in Courtrooms and adjacent holding tanks, many prisoners are returned to the Jail after 6:00 p.m. (Exhibit CU-II) only to face more long delays before being allowed to return to their housing areas and eat and bathe (Cf. Myron, 8/2 [prisoners returning after 5:30 p.m. could wait two hours] and Pretrial Conference Order §§XV,

620

A. 3 [prisoners sometimes return to their housing at 8:00 p.m. or later] with Sweeney, 8/10 and Johnson 8/12).

There is a great deal of fat in defendants' court transportation procedures. Defendants cannot justify any of the following: awakening prisoners at 4:30 a.m., not to mention earlier, in order to get them to court by 8:30 a.m. (Barrackman, 8/11); making prisoners report to the IRC between 5:15 and 5:45 a.m. (Costa 8/11) when Court buses leave the Jail between 7:20 and 7:30 a.m.; forcing prisoners to languish in court holding tanks and buses for two hours or more from the time court closes in the evening until they are dropped off at the Jail (Exhibit  13  ) and then forcing prisoners to languish in IRC holding tanks another two hours or more before being allowed to return to their modules.

The defendants' procedure for transporting prisoners from Wayside to the Jail the night before court appearance is even more calloused. Some of the Jail's prisoners are transferred to Wayside Max between court appearances (Johnson 8/12; DeJean, 8/23; Krukow, 8/5; Giger, 9/13; Cf. Exhibits 2 and 9). These prisoners are bused back to the Central Jail the night before their Court appearances, arrive at the Jail in the early a.m. hours (Johnson, 8/12; Krukow, 8/5) and consequently receive very little, if any, sleep before appearing in court.[24]

The defendants' method of transporting prisoners to the County Hospital (LCMC) for clinic appointments is also quite punitive. Such prisoners, who presumably are

---

24. The Court did not permit inmate DeJean to testify about his experiences in being returned from Wayside Maximum on nights before his Court appearances.

621

65

1  ill, leave the Jail for LCMC  sometime in the morning (Barker

2  Deposition p. 18; Schenck, 8/11, Taylor, 8/30) and often do not

3  return to the Jail until 10:00 p.m. or later (Pellman,

4  Deposition pp.11-14; Schenck, 8/11; Taylor, 8/30)

5

6  B. Law

7      The above described transportation procedures (Jail-to-

8  Court, Wayside-to-Jail-to-Court and Jail-to LCMC) are similar to

9  and in some respects worse than the Court transportation procedure

10  described and appropriately censured in Dillard.

11

12           " For a man to be subjected to

13      such a procedure for just one day, while

14      he is undergoing the emotional strain

15      inherent in attending his own trial or

16      other court proceeding, would likely

17      bring him to a condition approaching physical

18      and nervous exhaustion by early afternoon.

19      To require it of him on successive days is

20      intolerable, for his ability to be of

21      assistance to his attorney or otherwise

22      conduct himself to his best advantage must

23      necessarily be affected. Certainly, due

24      process of law requires that a defendant not

25      be denied the opportunity for a reasonable

26      night's sleep before each day of his trial."

27      Id. at 1237. (Emphasis added)

28  /

In the present case, the facts are that a member of the plaintiff class going to court for days in succession and going from Wayside to court is deprived of "a reasonable night's sleep before each day of his trial," and that a prisoner subjected to transportation to court or to LCMC "for just one day. . . would likely [be brought] to a condition approaching physical and nervous exhaustion by early afternoon."

C. Remedy

Plaintiffs suggest that the court order defendants to take the following steps to remedy the deficiencies in defendants' inter-facility transportation procedures:

1. Return each prisoner going to court to his Module within 12 hours of his departure from that module;

2. Return each prisoner to the Jail not more than two hours after his court appearance is completed;

3. Transport all plaintiff class members from Wayside to the Jail at least one day in advance of a court appearance and at a reasonable hour not later than 8:00 p.m.

4. Return each prisoner to the Jail not more than two hours after his clinic appoint-

67.

623

ment at LCMC is completed;

5.   Report to the court on specific
schedule for transporting prisoners from
each satellite jail to courts and LCMC
clinic appointments.

XIV

LAW LIBRARY FOR PRETRIAL

DETAINEES

(Pretrial Conference Order, § XIX, B, 1)

A.   Material Facts

Detainees are denied reasonable access to an
adequate law library.  The Jail contains three law libraries, in
descending order of comprehensiveness: The pro per law library
reserved for criminal defendants with court ordered in propria
persona status, the second floor law library and the small law
library within the third floor reading library (Vila, 8/5).  The
pro per law library is not here at issue (Pretrial conference order,
§ XIX, A,2).

The second floor law library, resulted from Judge
Ferguson's orders in Bailey v. Pitchess, CV 72-1957-F. See stipulated
judgment, dated on or after December 9, 1975, a copy of
which is attached hereto as Appendix G   ).   Sentenced prisoners
have free access to the second floor law library
on weekdays from 6:30 to 9:30 p.m. (Vila, 8/ 5).

624

1  In contrast pretrial prisoners' access to that law library
2  is subject to Sergeant Vila's discretion. Vila testified that
3  when determining whether to grant a detainee's request for
4  access to the second floor library he applied three criteria,
5  literacy, legitimacy of need and past behavior (8/5). Detainees'
6  requests to use the second floor law library for civil litiga-
7  tion are "probably" denied (Vila, 8/5) presumably because
8  civil litigation is not a legitimate need. When he receives
9  a court order requiring that a detainee have access to the
10  second floor library for civil litigation, Vila calls the judge
11  to convince him/her to change the order (8/5). The three
12  criteria are not applied to sentenced prisoners' requests (Vila,8/5).
13  Detainees are not informed of the existence of the second floor
14  law library (Exhibit 8, photos of signs posted in pretrial
15  modules indicating law library is on the third floor).

16      The third floor law library is one of the smaller
17  "branch" libraries ordered in Bailey (See stipulated Judgment
18  § 7 and Exhibit B, thereto, Appendix __G__ ). Although at
19  first he expressed ignorance about a third floor law library,
20  Sergeant Vila eventually recalled its existence but not its
21  content (8/5). Cf. Exhibit 12. Detainees are encouraged to use
22  this library (Exhibit 8).[25]

---

24  [25]  Plaintiffs question whether the signs depicted in Exhibit 8
25  are actually posted (DeJean, 8/28).

27  /
28  /

625

B. Law

    1. Access to the Courts

    In the absence of an adequate alternative source of legal assistance prisoners are entitled to use an adequate law library to effectuate their right of access to the courts. Bounds v. Smith ___ U.S. ___, 52 L.Ed.2d 72, 83 (1977); Gilmore v. Lynch, 319 F.Supp. 105 (N.D. Cal. 1971, aff'd sub nom. Younger v. Gilmore, 401 U.S. 914. Prisoners' right of access to the courts is applicable not only to habeas corpus petitions but also civil actions to vindicate violations of constitutional rights.  Wolff v. McDonnell, 418 U.S. 539 (1974).

> "The right of access to the courts upon which Johnson v. Avery was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act has less importance in our constitutional scheme than does the Great Writ.
> Id. at 579 (emphasis added).

Thus, it must follow that prisoners have the right to use law books to pursue civil rights actions when the state has failed to provide them adequate professional assistance in that regard. Cruz v. Hauck, 515 F.2d 322, 332 (5th Cir. 1975) cert. den.

626

424 U.S. 917. As the three judge court stated in Gilmore v. Lynch, supra, 319 F.Supp. at 110:

> "'Access to the courts,' then, is a
> larger concept than that put forward
> by the State. It encompasses all the
> means a defendant or petitioner might
> require to get a fair hearing from the
> judiciary on all charges brought against
> him or grievances alleged by him."

As noted above, jailers may prohibit or impede prisoners' access to law books if it can be shown that prisoners have an adequate alternative means of getting their grievances before the courts. The burden belongs to the jailers to make such showing that available alternatives are in fact effective and reasonable. Wolff v. McDonnel, supra, aff'g McDonnell v. Wolff, 483 F.2d 1059; 1065 (8th Cir. 1973); Sostre v. McGinnis, 442 F.2d 178, 201 (2nd Cir. 1971); Novak v. Beto, 453 F.2d 661, 664 )5th Cir. 1971); cert. denied 409 U.S. 968 (1972).

> "The burden is on the defendants to demonstrate that
> they are providing a reasonable alternative
> (citations omitted). In meeting this burden, the
> defendants must produce evidence establishing in
> specific terms what the need is for legal assistance,
> and must show that the state is reasonably meeting

627

71.

1         that need."

2            McDonnell v. Wolfe, supra at 1065 (Emphasis

3            included).

4        "(A)s the Court of Appeals suggested, the District

5        Court will assess the adequacy of legal assistance

6        under the reasonable alternative standard of Avery."

7            Wolff v. McDonnell, supra, 418 U.S. at 580

8            (Emphasis added).

9

10       The mere fact that a detainee is represented by

11  counsel in his criminal prosecution does not by itself satisfy

12  the jailer's burden of establishing the existence of adequate

13  alternative services of assistance. Cruz v. Hauck, supra,

14  515 F.2d at 332.

15       In assessing the adequacy of alternative sources

16  of assistance, the Ninth Circuit has taken a practical approach.

17  In Gaglie v. Ulibarri, 507 F.2d 721 (9th Cir. 1974), the court

18  noted that the local public defender's office carried a heavy

19  case load and that to attract the attention of the public

20  defender's office a prisoner must clearly state his grievances.

21       "Due to the heavy case loads of public defenders'

22       offices, it is doubtful that the Public

23       Defender's Office would be adequately equipped to

24       provide research assistance to prisoners on an

25       effective scale.  Certainly, a prisoner would

26       have to have a reasonable understanding as to why

27       he is approaching the Public Defender's Office."

28           Id.   507 F. 2d at 722.

628

Accord: <u>Cruz v. Hauck</u>, 475 F.2d 475, 477 (5th Cir. 1973).

> "(T)he waning altruism of a public
> defender representing a client with
> an apparently frivolous appeal may not
> be used to limit the petitioner's good
> faith prosecution of an appeal."

Sergeant Vila's use of his three criteria to determine whether a detainee may use the second floor library exemplifies a practice long repudiated by the Supreme Court. In <u>Ex Parte Hull</u>, 312 U.S. 546 (1941) the Court struck down a prison regulation permitting prison staff to screen all prisoner drafted documents intended for courts and refer back to prisoners improperly drawn documents, holding:

> "The regulation is invalid.
> The considerations that prompted its
> formulation are not without merit, but
> the state and its officers may not abridge
> or impair petitioner's right to apply to
> a federal court for a writ of habeas corpus.
> Whether a petition for writ of habeas
> corpus addressed to a federal court is
> properly drawn and what allegations it must
> contain are questions for that court alone
> to determine" <u>Id</u>. at 549

Sergeant Vila's practice of screening detainees' need for use of a law library is equally invalid. Moreover, his criteria are grossly inappropriate. His rejection of civil

629

litigation as a legitimate need runs directly counter to

detainees' constitionally guaranteed right to pursue civil

litigation protecting their civil rights.  His use of

"competency" as a criterion essentially disenfranchises those

with greatest need.  As the Supreme Court stated in Bounds v.

Smith, supra, 52 L.Ed.2d at 82:

> "We reject the State's claim that
>
> inmates are  ill-equipped to use
>
> the tools of the trade of the legal
>
> profession,  making libraries use-
>
> less in assuring meaningful access.
>
> Brief for Petitioners, at 17.  In
>
> the first place, the claim is incon-
>
> sistent with the State's representa-
>
> tions on its LEAA grant application,
>
> [citation omitted] and
>
> with its argument that access is
>
> adequately protected by allowing
>
> inmates to help each other with
>
> legal problems.  More importantly,
>
> this Court's experience indicates
>
> that pro se petitioners are capable
>
> of using law books to file cases
>
> raising claims that are serious
>
> and legitimate even if ultimately
>
> unsuccessful.  Finally, we note
>
> that if petitioners had any doubts
>
> about the efficacy of libraries,

630

the District Court's initial decision
left them free to choose another means
of assuring access." (Emphasis added).

Thus under current circumstances, the Jail's
detainees are entitled to unrestricted, reasonable access to
the second floor law library in order to, inter alia, research
violations of their civil rights, monitor the actions and
of their criminal attorneys and investigate potential self
representation in their criminal actions. See Faretta v. Califor-
nia, 422 U.S. 806 (1975).

      2.  Discrimination on the Basis of

        Wealth.

Defendants' restrictions on detainees' access to
the second floor law library amounts to a denial of access
to the courts on the basis of wealth.  On the one hand affluent
detainees may have attorneys or purchase and possess their own
law books (Exhibit BX); and, of course, persons free on bail
may do likewise, or go to a public law library.  On the other
hand, indigent detainees are essentially cut off from legal assistance.
Such a dichotomy, based on wealth is invidious discrimination
in violation of equal protection of law and should be
enjoined on this ground as well.  Gilmore v. Lynch, supra, at 111;
Mead v. Parker, 464 F.2d 1108, 1110-111 (9th Cir. 1972).

      3.  Discrimination vis-a-vis Sentenced

        Prisoners

631

Defendants' practice of closely restricting detainees' access to the second floor library while granting sentenced prisoners free access to that library denies detainees equal protection of law.  See § III, B, supra.

## C. Remedy

Plaintiffs suggest that the court order the defendants to do the following to remedy  deprivations of detainees' access to the courts.

1.  Provide detainees access to the second floor law library on request or in the alternative present to the court a program to assure detainees access to the courts by other means.

2.  Report to the court on programs and resources to assure that detainees held in planned satellite jails shall have access to the courts.

### XV.

### JAIL RULES

(Pretrial Conference Order, §XX,B,1)

A. Problem

The Jail rules and regulations that are distributed (Exhibit CN) and allegedly posted in the modules (Exhibit 5) are deficient in three principal respects:  they excessively invade

632

76

detainees' liberties, they are vague and they omit crucial information.

1. <u>Excessive invasion</u>. Rule No. 9 requires prisoners to call Jail personnel "Mr.", "officer", "Deputy", or "M'am". Defendants have no legitimate interest in requiring these modes of address particularly since detainees are called "Blue" (Testimony of numerous officers). Rule No. 11, forbidding all financial transaction between inmates, and Rule No. 14, forbidding all exchange of property between inmates, are overly intrusive because personal hygiene items are difficult to obtain, the commissary  cart does not visit the modules on Sunday, and prisoners' right to exchange reading matter is guaranteed by the First Amendment.[26]

2. <u>Vagueness</u>. Rule 3 fails to define "contraband", and Rule 8 does not define "indecent language" or "excessive noise."

3. <u>Omissions</u>. The new Jail rules (Exhibits CN and 5) fail to mention several Jail infractions which were listed in the former Jail rules and which remain disciplinary offenses (Exhibit 4, Robbins, 8/4; White, 8/4), including the following rules found within Exhibit 4: A-8, inmates must be silent when travelling outside of their modules; A-14 inmates must not enter other prisoners' cells; and A-18, "tatooing and ear-piercing is trictly forbidden." The new Jail rules do not state the manner in which prisoners may complain to the Jail Commander,

_____
26. Captain Myron testified that this rule could be interpreted as prohibiting the trading or passing of reading matter (8/2).

633

Captain Myron.  Lastly, the rules omit any mention of the
second floor law library facility and the means by which
pretrial prisoners may obtain access to that library.

B. Remedy

Plaintiffs suggest that the Court order defendants
to submit a new set of Jail rules which reflect the following:

1.  A full and reasonable discription of all
offenses which may lead to discipline;

2.  Deletions of the rule requiring a specified
mode of address to     Jail personnel and the
rule forbidding monetary or non-monetary exchanges
of property, including reading matter, between
prisoners;

3.  A statement of the manner in which prisoners
may complain about their treatment in the
Jail; and

4.  A description of the second floor law
library and the means by which prisoners may
use that library.

634

70

XVI.

ADMINISTRATIVE SEGREGATION

(Pretrial Conference Order, §XX, B,

8 and 9)

A. Material Facts

Two categories of pretrial prisoners suffer de
facto punishment by virtue of their administrative segregation -
high security prisoners in modules 1700-1750 and 2904 and homo-
sexuals in module 4600. A substantial number of pretrial
detainees (status 1) fall into these two categories. See
Exhibits 2 and 9 (court sheets). For example, during the month
of July 1977, the numbers of detainees (status 1) prisoners
in those modules ranged as follows:

        1700 - between 32 and 40

        1750 - between 48 and 57

        2904 - between 1 and 3

        4600 - between 23 and 31

Deprivation suffered by high security detainees
in 1700-1750 and 2904 include:

1.  No outdoor exercise (Exhibit DZ; Talaganis,
8/5);

2.  Limited indoor recreation, consisting solely of
freeway time varying between 1/2 hour per day to
1-1/2 hours per shift depending on classification

79.

(Talaganis, 8/5); Myron, 8/3);

3.  No dayroom or television except for
two trustees per row         (Talaganis,
8/5; Myron, 8/3);

4.  Lockdown, including in-cell feeding
(Talaganis 8/5);

5.  No movies (Talaganis, 8/5);

6.  No library privileges (Talaganis, 8/5);

7.  No educational programs (Talaganis, 8/5);

8.  Deputy escorts whenever they leave
their module (Talaganis 8/5; Exhibit EO);

9.  Uncertain access to religious ceremonies
(cf. Lewis, 8/21;   Cowie,9/11; Glenn, 9/22),

Deprivations suffered by homosexual prisoners in
Module 4600 include:

1.  Limited dayroom time (Vila, 8/5);

2.  Deputy escorts whenever they leave their
module (Robbins, 8/15; Exhibit EO).

These deprivations are imposed on high security prisoners
and homosexual prisoners without written notice, a hearing at
which the prisoner may speak and present witnesses and evidence,
an opportunity to confront accusers and evidence, a written
decision, a written record of hearing proceedings, review by
the facility commander within 24 hours and thereafter periodic

80.

636

1  review by the commander every 30 days. (Talaganis, 8/5, Vila,

2  8/5).

3      B. Law

4      1. Conditions

5

6      In Giampetruzzi v. Malcolm, supra, 406 F. Supp.

7  836, the court held that deprivations in New York City's version

8  of administrative segregation, known as Cellblock IB, were

9  excessive when applied to pretrial prisoners, even though such

10  prisoners were considered high security risks.  More particularly,

11  the Court held that high risk detainees are entitled to be con-

12  fined under the least restrictive alternatives.

13      "The defendants argue that the differences

14      in conditions are justified on the basis of

15      the security requirements of General Order

16      33 which specifies that the purpose of ad-

17      ministrative segregation is to keep indivi-

18      duals segregated from individuals in the

19      general inmate population at large. " Legiti-

20      mate though that goal may be, it cannot justify

21      the restrictions of movement and limitations

22      placed on the plaintiffs during lockout.

23

24      The failure to house plaintiffs under the

25      least restrictive means necessary to

26      accomplishing the purpose of administrative

27      segregation violates the rights guaranteed

28      IB inmates under the due process clause...."

637

406 F.Supp. at 840-841.

The Court went on to hold that high risk detainees are entitled to the following:

    a.  Access to a dayroom, Id. at 841;

    b.  Meals in a dining room, Id. at 841;

    c.  Recreational equipment, Id. at 841;

    d.  Movies, Id. at 841;

    e.  Equivalent religious services, Id. at 843-844;

    f.  Equal visitation privileges, Id. at 845; and

    g.  Equivalent educational programs, Id. at 841-842

    h.  Equal exercise time, Id. at 846.

In this last regard, the district courts in Spain v. Procunier, supra, 408 F. Supp. at 547 (N.D. Cal.) and Nadeau v. Helgemore, supra, 423 F.Supp. at 1275 (D.N.H.) have held that high security inmates in state prisons are entitled to a minimum of one hour per day five days per week of outdoor recreation. Spain is particularly poignant on this issue since it dealt with conditions in San Quentin's Adjustment Center experienced by the infamous San Quentin Six.

Moreover, prisoners in punitive confinement, like all prisoners, are entitled to access to law books. Knell v. Bensinger, 489 F.2d 1014 (7th Cir. 1973); Johnson v. Anderson 370 F.Supp. 1373, 1375 (D.Del.1973); Aikens v. Lash, 371 F.Supp. F.Supp. 482, 498 (N.D. Ind. 1974).

/

638

82.

Confinement in Modules 1700-1750 and 2904 is materially indistinguishable from the conditions invalidated in Giampetruzzi, and such confinement is excessive as to pre-trial detainees and should be enjoined.

## 2. Procedural Due Process

In Giampetruzzi v. Malcolm, supra, Judge Lasker also held that jail officials must provide suspected security risk prisoners with an administrative hearing that accords with due process of law. The material deprivations in Giampetruzzi included lack of access to a dayroom, in-cell feeding, greater surveillance, less exercise and recreation, lockdown and lack of religious services. The Court held that despite the jail officials' good faith, the conditions of confinement amounted to grievous loss, which could only be imposed in accordance with due proccess of law.

> "There may be good reasons why IB inmates are the second class citizens of the detention system, but that they are, there can be no doubt. Consequently, . . .' the marked changes in the inmate's status which accompany the designation creates a "grievous loss" and may not be imposed in the absence of rudimentary due process.'" (Citations omitted)

Id. 406 F.Supp. at 848.

639

83.

The Court proceeded to hold that the IB prisoners in administra-
tive segregation were entitled to the following procedural
safeguards:

>    1.  A written notice stating the reasons
>    for segregation, the evidence relied upon
>    and an outline of the procedure to contest
>    that decision;
>    2.  Within 48 hours of a written request, a
>    hearing at which the inmate can personally
>    speak in his own behalf and present witnesses
>    and documentary evidence subject to reasonable
>    limitations;
>    3.  An impartial hearing officer;
>    4.  A written record of the proceeding, such as
>    handwritten notes;
>    5.  Confrontation and cross-examination of
>    witnesses where required for the hearing
>    officer to determine the facts;
>    6.  A written decision stating the reasons and
>    evidence supporting administrative segregation
>    provided within 24 hours of the decision;
>    7.  Review by the warden within 24 hours; and
>    8.  Review of the administrative segregation
>    classification every 30 days by the warden.

Id.  406  F.Supp. at 848-849.  Accord: Cardaropli v. Norton,
523 F.2d. 993, 995-999 ((2nd Cir. 1975); and Holmes v. U.S.
Board of Parole, 541 F.2d. 1243, 1249-153, (7th Cir. 1976).

Defendants' administrative segregation "procedures"

640

84.

do not meet these standards.  Detainees placed in 1700-1750,
2904 and 4600 are given no written notice or written decision
stating the reasons for their placement in special housing.
They obtain no real opportunity to dispute the determination
that they require maximum security confinement, and the
decision to place them in such confinement is not reviewed by the
facility commander.  As a result detainees may spend months
in maximum security confinement without ever knowing the
reasons or having a chance to contest the appropriateness of
that confinement.

C. Remedy

Plaintiffs suggest that the Court order the defen-
dants to take the following steps to remedy the plight of maximum
security detainees in modules 1700-1750, 2904 and 4600:

1.  Provide detainees in modules 1700-1750 with:

a. outdoor recreation one hour per day five
days per week.

b. dayrooms and freeway time 16 hours per day;

c. television;

d. movies;

e. library privileges including access to law
books;

f. equivalent education programs;

g. equivalent religious ceremonies.

2. Provide detainee in module 4600 with:

a.  outdoor recreation one hour per day
5 day/week.

641

b. dayroom and freeway time 16 hours/day.

3. Establish a procedure for classifying detainees
to Modules 1700-1750, 2904 and 4600 to include:

a. written notice

b. hearing within 48 hours with opportunity
to confront accusers and evidence and present
witnesses and evidence,

c. written record of the hearing,

d. written decision after the hearing,

e. review by the Jail Commander within
24 hours, and

f. Regular review by the Jail Commander every
30 days.

/
/
/
/

86.

642

XVII.

OFFICER MISCONDUCT

(Pretrial Conference Order §XXIII)

A.   The Problem

The evidence is abundant that the defendants who are higher echelon members of the Sheriff's Department, lieutenant through Sheriff, do not exert effective control over the actions of the Jail officers.

Although they strongly disagree, plaintiffs can under- stand and respect the Court's expression of reluctance to sustain the testimony of prisoners over that of police officers and the Court's resulting conclusion that it could make "no categorical judgment" as to the truth in altercation situations within the Jail (Remark of the Court on September 23, 1977). However, the evidence is ample, if not categorical, that Jail officers commonly ignore alleged Jail policies and that the testimony of many officers was ludicrous and fabricated. In the following paragraphs plaintiffs will refer to parts of the record which should raise serious questions in the Court's mind as to the existence or nonexistence of regulated authority in the Jail and the need for the Court to step in with equitable relief.

First of all, during the hearing on September 23, the Court indicated that it concluded that group punishment did occur within the Jail, that officers have abused the module PA systems. that during cell "shakedowns" officers mishandled prisoners' property and to some extent messed up cells, and that at least some of the prisoner witnesses were telling the truth about beatings they had witnessed. These four forms of misconduct

group punishment, PA abuse, abuse of prisoners' property and ex-
cessive force   are clearly proscribed . by the Jail's stated policies.
See, Myron, 8/3 and Robbins, 8/4 (mass discipline); Myron, 8/3
(PA abuse); Myron, 8/2, Robbins, 8/4 and Exhibit BO (cell search
procedure); and Exhibits A, p.12, Z, p.5, and DA (excessive force).

The obvious question arises: if these abuses do occur[27]
why is it Deputy Pageler is the only officer to be disciplined dur-
ing the pendency of this class action?[28] (Answers to Plaintiffs'
Interrogatories 270-271).

The answer lies in the loyal fraternity among the Jail's
officers and the supervising officers' failure to control misconduct.

The prevailing credo among the Jail's officers is thou
shalt not "snitch" on a brother officer.  It is extremely signifi-
cant that among the 40 officers below the rank of sergeant who
testified, only two, Weise (9/14) and Dougherty (9/1), ever reported
a fellow officer to a superior for misconduct or questionable
conduct.  The case in point is Deputy Pageler's abuse of the
module PA system from time to time over a period of five months. Not
one deputy testified he heard Pageler abuse the PA although Pageler
made no effort to conceal his actions from fellow deputees (Page-
ler, 9/2) and officers, varying in rank from Captain to Deputy I,
are  continually present in the modules (Myron, 8/3; Robbins, 8/4
and numerous deputies).  Pageler was finally turned in by inmate

[27] Plaintiffs wish to remind the Court that plaintiffs were allowed to
have only 14 witnesses testify to Jail conditions and practices and
several of these were required to limit their testimony.
[28] The Amended Complaint, rendering this action a class action, was
filed on December 31, 1975.

88.

544

Jon Reynolds (Pageler, 9/2) who is unusually articulate for a
prisoner and who managed to send a letter to the grand jury and to
the Captain about Pageler's misconduct (Reynolds, 8/11; Hampton
8/30; Pageler, 9/2).

The laissez-faire attitude of the Jail officers is
exemplified by the testimony of senior Deputy Parks who testified
that he has witnessed about six instances of possible excessive
force but only once took any action and that was only to counsel
a deputy, who as it turns out, was later, during 1975, discharged
for brutality on inmates (9/14).  Senior Deputy Parks also testi-
fied that he has overheard deputees engaging in "horseplay" on
the module PA systems and "sometimes" told the deputees to "knock
it off" but never reported the incidents to a superior officer
(9/14).

One deputy, Briscoe, was candid enough to admit that a
deputy who testifies against fellow deputies would be known as a
"snitch", which is "not exactly a term of endearment" (9/14).

The short of it is, that supervisory officers cannot
reasonably and in good faith rely on front line deputies to assist
in the enforcement of Jail policies against their brother officers.
Instead, supervising officers must, themselves, personally tour
the Jail and effectively enforce Jail policies that protect prisoners
from abuse.

However, in light of the repeated breaches of Jail policy
with regard to group punishment, PA abuse, disruptive cell shake-
downs and excessive force, all of which should at least occassionally
come to the attention of supervising officers touring security
areas of the Jail, and only one instance of officer discipline since

645

January 1, 1976 (Interrogatories 270-271), the Court can only con-
clude that supervising officers do not in fact spend adequate time
"inside security" or that they simply tolerate such misconduct.

In this regard, although plaintiffs do not question
Captain Myron's ability or his good intentions, it would appear that
he sometimes confuses stated policy with actual practice. For
example, he testified that a prisoner could be without a mattress
under only two circumstances: it was stolen from him or he
destroyed it (8/2). The evidence is clearly contrary. See, e.g.,
Reynolds, 8/11; Sweeney, 8/10, c.f. Costa Deposition, 6-8, Thomas
Deposition, 5-6, Barker Deposition, 8.) His predecessor Captain
(now Inspector) White seems to have made a similar mistake as to
freeway and dayroom time for detainees. Ex-Captain White testified
that during his tenure, which ended in January, 1977, "blues" had
two hours per day of freeway time pursuant to his order (Exhibit
AM) and also had use of dayrooms in their modules (8/4). Again,
the evidence is clearly contrary. See, e.g., Sweeney, 8/10;
Reynolds, 8/11; Thomas Deposition 9 (No dayroom); and Myron, 8/2
(dayroom only since May, 1977).

Even when investigations of deputies' actions are
conducted, the biases of the investigating officer prevent the im-
position of discipline. Sergeant Kosina testified that since 1972
he has investigated between 25 and 50 allegations of excessive
force but concluded that discipline was appropriate in only
one instance (9/1). Lieutenant Shaw similarly testified that
in the "dozen " times he has investigated allegations of excessive
force not one complaint was well founded (9/14).

Secondly, the testimony of Jail deputies appears

646

90.

orchestrated.  The uniformity of the officers' testimony is quite
striking.  No deputy, with the exception of Parks, admitted to
ever observing a fellow deputy using excessive force. Out of the
42 officers who testified during the defense case and who were
asked only four deputies - Parks (9/14), Weise (9/14), McSweeney
(9/14) and Dougherty (9/1) - could recall seeing a fellow deputy
engaging in misconduct towards prisoners; and three of those
gentlemen testified on the same day - September 14.  Only deputy
Parks admits to ever hearing a fellow deputy using profanity over
the module PA system.

        Initially most deputies went  to the ludicrous extreme
of denying they ever heard a fellow deputy use profanity.  Of the
17 deputies who testifeid on August 31 and September 1 and 2, only
five testified they had heard such profanity from their fellow
deputies   Phillips, 9/1 (5 times in 7 months); Kosina  9/1
(25 times in 12 years), Milkey, 9/1 (1 or 2 times in 31 months);
Engebretson, 9/1 (unstated); and Ortiz, 8/31 (10 times in 20 months)-
and four of these people testified on one day - September 1.  After
an eleven day break in the trial, from September 2 to September 13,
deputies became somewhat more willing to admit occasionally hearing
a fellow deputy utter some cuss words after provocation from inmates.
Of course, the officers were not reluctant to state that prisoners
use profanity towards deputies all the time.  See, e.g., Zuniga,
  9/13  and Wardo, 9/14.

        The point of this brief summary of the officers' uniformity is
twofold: it illustrates the contortions officers will go through
to portray themselves sinless  and protect the Sheriff's Department,
and it reveals an enormous amount of control over testimony.

647

When the Court considers officers' versions of various incidents and practices, the ability and apparent willingness of officers to collaborate should be kept in mind.  In this regard, the record contains a second honest statement of Deputy Briscoe, that prior to the trial he and his fellow deputies talked about the inmate Allah incident "to get their stories together" (9/14).

By contrast, the inmates who testified did not have the opportunity to synthesize their testimony because they generally were held in different modules and during different time periods and because they have nothing in common with one another except the regrettable experience of confinement in the Jail.

Thirdly, the testimony of Jail officers was patently absurd in several respects.  This brief has already summarized the absence of profanity and deputy misconduct and the failure to hear Deputy Pageler and others abusing the module PA system as recounted  by the officer witnesses.

Other absurdities placed into the record by defendants offered some moments of amusement during the trial:

1.  Deputy Mc Entire's concern that inmate
Harris, victim of extended interrogation
in a wheelchair (Schenck, 8/12), would succeed
in framing him with a charge of brutality
although Mc Entire  knew of no other deputies
disciplined for that offense (Mc Entire ,9/1);

2.  Deputy Mc Entire's  explanation  that
his nickname in the Jail is the "White Tornado"
because he is known for searching inmates' cells

648

rapidly and for leaving inmates'

property "a little messy" (9/1);

3.   Deputy Mc Entire's denial that he

ever harassed a psychotic inmate by making

animal sounds as testified by Nurse

Schenek (8/12) followed by Deputy Engerbret-

sen's testimony, which was substantially

as follows:

Q.   Have you ever heard a fellow deputy

abusing the jail PA system?

A.   No.

Q.   You've never heard a fellow deputy

making noises over the PA?

A.   What kind of noises?

Q.   How about animal noises?

A.   Yes.

Q.   Which deputy?

A.   Deputy McEntire.

Q.   What kind of noises?

A.   Barking.

4.   The court's notation for the record

that while demonstrating the cell

search position Mr. Bennett was

breathing heavily;

5.   Exhibit EC____ , a memorandum asserting

649

that "the allegations made by the
plaintiffs in the Rutherford case are
totally unfounded and based on hearsay
and on a couple of inmates who are
troublemakers and instigate
a lot of ill feelings", signed by inmate
Jeff Miller, who testified that he saw
an inmate assaulted by three deputies,
that when he was a pretrial prisoner he
received no freeway or dayroom time,
that he was a reluctant witness because
it was "very difficult" for him to
return to the Central Jail after being
confined at Wayside and that merely
hearing he was going back to the Central
Jail to testify made him "very anxious"
(8/23);

6.   The disagreement of deputies Briscoe
and Mittel  partners in some questionable
episodes in the Jail (DeJean, 8/23, Newman,
8/30), as to whether they were friends
outside the Jail, Briscoe testifying that
they were (9/14) and Mittel testifying
that they were not and had never socialized
(9/14);

7.  Deputy Faulkner's inability to

§50

94.

1    recall his fight with a short, little

2    black man with a large Afro on A-row of

3    Module 3800, occurring about a week after

4    June 7 (De Jean, 8/23),

5    then subsequently, while describing his

6    version of an incident with inmate Gerald

7    Malone on D-row of module 3800 occurring

8    on June 9, twice inadvertently mentioning

9    the name Le Baron Matthews (Falukner,

10    9/13), who turned out to be the inmate

11    assaulted on A-row (Matthews, 9/22);

13    B. Inmate Gerald Malone's unexplained

14    attempt to run away on the third floor

15    of the Jail (Tierney, 9/13) after not

16    being hit by officers in Module 3800

17    (Faulkner, 9/13; Howell, 9/2; Cf. Reynolds,

18    8/11).

20    9. The Jail's grievance system whereby a

21    prisoner who wishes to complain about

22    mistreatment from a deputy submits his

23    written complaint to the offending deputy.

24    (Myron, 8/3).

26    All of the above - the absolute mutual loyalty of

27 deputies to the exclusion of prisoner welfare, the failure of

28 defendants to govern the Jail and defendants' crude machinations

651

1   to prevent the Court from intruding on their operations – points

2   to the necessity of an equitable decree which will impose the

3   rule of law on the Jail, require persons in responsible positions

4   to exerise their authority, and provide prisoners a mechanism that

5   will give voice to their grievances.  Otherwise, plaintiffs fear

6   that, unchecked, abuse at the hands of officers will increase

7   rather than diminish.

8

9        B. Law

10

11        The problem of officers' persistent failure to abide

12   by stated Jail policy can best be improved through this Court's

13   appointment of an ombudsman to act as an impartial liason between

14   prisoners and the Jail administration.  Several federal courts

15   have resorted to this or similar remedies to rectify comparable

16   problems in other correctional facilities.  See, _inter alia_:

17

18        _Palmigiano v. Garrahy_, supra, (Appendix E   )

19        Slip Opinion p. 79 (Human Rights Committee);

20        _Alberti v. Sheriff of Harris County_, _supra_,

21        406 F.Supp. at 678 (ombudsman);

22        _Miller v. Carson_, _supra_, 401 F.Supp. at

23        898-899 (ombudsman);

24        _Hamilton v. Landrieu_, _supra_, 351 F.Supp. at

25        552 (ombudsman);

26        _Ahrens v. Thomas_, _supra_, 434 F.Supp at 904-

27        905 (panel of three to inspect and make

28        recommendations);

652

1    <u>Newman v. Alabama</u>, <u>supra</u>, at 288-290

2    (one monitor for each prison facility in

3    state);

4    <u>Rhem v. Malcolm</u>, <u>supra</u>, 507 F.2d at 340

5    (Tacit approval of ombudsman in appropriate

6    case).

7

8       Such an ombudsman should have reasonable access to the

9    Jail upon short notice and should have direct access to prisoners

10   tohear their complaints and views.  Only with such power can

11   an ombudsman effectively monitor defendants' compliance or non-

12   compliance with the Court's order and defendants' own  stated

13   policies.

14

15      C. <u>Remedy</u>

16       Plaintiffs suggest that the Court order the following

17   to alleviate and control officers' abuse of prisoners and failure

18   to comply with Jail procedures:

19

20      1.  An impartial ombudsman with authority to

21      inspect the Jail on request and to speak

22      directly with inmates and authority to make

23      recommendations to the Court;

24

25      2.  A report from defendants on methods of more

26      closely supervising deputies within the Jail

27      and particularly within the modules;

28

653

97.

3.   The permanent posting within every dormitory
and cell row of a notice stating in substance
that prisoners may refer their grievances
to the American Civil Liberties Union Foundation
of Southern California, The Greater Watts Justice
Center, The National Lawyers Guild and other
stated organizations.

4.   A permanent posting within each dormitory
and cell row to the effect that all prisoners
may register their complaints to the Captain
directly by a sealed letter.

5.   The permanent posting of this Court's
Judgment within every dormitory and cell
row.

CONCLUSION

For those reasons, plaintiffs pray for the relief
described herein.

Dated: October 31, 1977

Respectfully submitted,
TERRY SMERLING
FRED OKRAND
JILL JAKES
MARK D. ROSENBAUM

By _____
Terry Smerling

654

98.

## PROOF OF SERVICE BY MAIL

I, the undersigned, certify that I am a citizen of the United States, a resident of the State of California, County of Los Angeles, over the age of 18, and not a party to the within-entitled action; my business address is 633 South Shatto Place, Los Angeles, California 90005.

On October 31, 1977 I served the within

PLAINTIFFS' POST TRIAL BRIEF

on the interested parties in said action or their attorneys by depositing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, in a United States Post Office facility regularly maintained by the Government of the United States at Los Angeles, California, addressed to each of said parties or their attorneys as follows:

  FREDERICK BENNETT
  Deputy County Counsel
  648 Hall of Administration
  500 West Temple Street
  Los Angeles, California 90012

I am employed by Terry Smerling a member of the bar of this Court and a member of the State Bar of California, at whose direction the service was made.

Executed at Los Angeles, California on October 31, 1977.



CATHY ANDERSON

655

# EXHIBIT 3

FILED
4:30
JUL 25 1978

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____
DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, HAROLD TAYLOR, and RICHARD ORR, et al., | CASE NO. CV 75-4111-WPG |
| Plaintiffs, | |
| v. | |
| PETER J. PITCHESS, et al., | MEMORANDUM OF DECISION |
| Defendants. | |

        This action seeks injunctive and declaratory relief,

on constitutional grounds under 42 U.S.C. § 1983, against

certain practices and conditions of confinement at the Los

Angeles County Central Jail (the "jail").  The court previously

has established the plaintiff class as consisting of all

prisoners in the jail since December 31, 1975.  The court finds

that the class is so numerous that joinder is impracticable;

that the questions of law and fact and the claims presented by

the class representatives are common to the class; and that the

outstandingly competent representation provided the named

EXHIBIT 3  198

plaintiffs by Terry Smerling, Esq., of the ACLU Foundation of Southern California, will adequately protect the interests of the class as a whole.

The defendants are the Sheriff of Los Angeles County, some of his subordinates that are concerned with the administration of the jail, and the members of the County Board of Supervisors.

Trial of this case involved about seventeen days of testimony, the receipt of many exhibits, and the submission of thoroughly prepared pre-trial and post-trial briefs. In addition, with the prior agreement of counsel, the court made unannounced visits to the jail on September 23, 1977, and June 12, 1978.

The plaintiffs have challenged the constitutionality of many aspects of the housing and treatment of inmates at the jail. In this memorandum, I shall undertake to resolve these issues, bearing in mind, as best I can, the dilemma that confronts every federal judge before whom a case such as this is litigated. On the one hand, we are reminded that ". . . courts are ill equipped to deal with the increasingly urgent problems of prison [and presumably "jail"] administration and reform", Procunier v. Martinez, 416 U.S. 396, 405 (1974), and that considerations of institutional security should be left to the expertise of state correctional officials unless they "have exaggerated their response to these considerations." Pell v. Procunier, 417 U.S. 817, 827 (1974).

On the other hand, these same decisions go on to

-2-

484

state that "[c]ourts cannot, of course, abdicate their con-
stitutional responsibility to delineate and protect fundamental
liberties." Pell v. Procunier, 417 U.S. at 827, and that:

> ". . . a policy of judicial restraint cannot
>
> encompass any failure to take cognizance of
>
> valid constitutional claims whether arising
>
> in a federal or state institution.  When a
>
> prison regulation or practice offends a
>
> fundamental constitutional guarantee, federal
>
> courts will discharge their duty to protect
>
> constitutional rights." Procunier v. Martinez,
>
> 416 U.S. at 405 (1974).

Every inmate in a penal institution, by the very fact
of his incarceration, necessarily is deprived of some of the
constitutional rights that otherwise would be his to enjoy.
Price v. Johnston, 334 U.S. 266, 285 (1948).  But he retains
those rights ". . . that are not inconsistent with his status
as a prisoner or with the legitimate penological objectives
of the corrections system." Pell v. Procunier, 417 U.S. at
822.  Of course, institutional security and order and the
physical safety of jail personnel and inmates are necessarily
paramount objectives of any jail administrator. If those were
the only considerations, there would be no occasion for a
court to "second guess" the expertise of the Sheriff in pur-
suing such objectives.  The problem, then, in each of the
issues here concerned is to determine the point at which the
implementation of the goals of security and order and safety

-3-

must be balanced by the need to preserve for the inmate all of
the constitutional rights that the fact of his incarceration
will permit.

Issues of this nature have been brought to federal
courts with increasing frequency during the past several years,
and the task of accomplishing this balancing process is always
difficult.  Most courts are sympathetically mindful of the
problems of the "jailer" and desire to defer to his experience
and expertise to all appropriate extent.  On the other hand,
as Judge Frankel said in United States ex rel Wolfish, et al.
v. Levi, 439 F. Supp. 114, 141 (S.D. N.Y. 1977), ". . . the
court is not free to blink away the common awareness that zeal
for security is among the most common varieties of official
excess."

So, in considering whether a prisoner is being denied
his due process rights under the Fifth or Fourteenth Amend-
ments, his First Amendment rights, or the right, accorded by
the Eighth Amendment, to be free of conditions that constitute
cruel and unusual punishment, the courts must seek to determine
what is reasonable under the circumstances at hand.  In
Rochin v. California,  342 U.S. 165, 170 (1952), Justice
Frankfurter delivered a wise admonition to courts engaged in
making these determinations:

> "The vague contours of the Due Process
> Clause do not leave judges at large.  We may
> not draw on our merely personal and private
> notions and disregard the limits that bind

-4-

486

judges in their judicial function.   Even
though the concept of due process of law
is not final and fixed, these limits are
derived from considerations that are fused
in the whole nature of our judicial process."

Accordingly, I have sought to determine the issues
here presented in light of the body of law that has developed
by the decisions of other courts confronted with similar pro-
blems.   In doing so, I have been impressed by Chief Justice
Warren's observation in Trop v. Dulles, 356 U.S. 86, 100-101
(1958), that ". . . the words of the [Eighth] Amendment are
not precise, and that their scope is not static.   The Amend-
ment must draw its meaning from the evolving standards of
decency that mark the progress of a maturing society."   I
hope also to take heed of an equally pertinent comment by
Justice (then Judge) Blackmun that in considering problems of
the type here concerned, ". . . broad and idealistic concepts
of dignity, civilized standards, humanity, and decency are
useful and usable."   Jackson v. Bishop, 404 F.2d 571, 579
(8th Cir. 1968).

One further consideration must be taken into account.
Most of the inmates at the jail are pre-trial prisoners.   They
are there, not to receive punishment for their misdeeds, for
their guilt has not yet been established.   They are there
because it has been deemed necessary to incarcerate them to
insure their presence at trial.   Thus, they are entitled to
the least restrictive alternatives consistent with the purpose

-5-

487

1    of their incarceration.  Brenneman v. Madigan, 343 F. Supp.

2    128, 138 (N.D. Cal. 1972).

3            We now deal with the specific complaints.

4            Inadequacy of Cell Space.  The jail normally confines

5    more than five thousand inmates, a majority of whom occupy

6    cells designed to hold four, six or eight men.  The plaintiffs

7    complain that these cells are so impermissibly small that they

8    contain less than 25 square feet of floor space for each man,

9    and that the larger part of this space is taken up by the bunks

10   and toilet.  The plaintiffs point out that such cell space is

11   far less than the 40 square feet per inmate prescribed as a

12   minimum by the California Minimum Jail Standards, 15 Cal. Adm.

13   Code § 1081(d), and that several published judicial opinions

14   have considered comparable, or even larger, space to be con-

15   stitutionally inadequate.  See, e.g., Detainees of Brooklyn

16   H. of Det. for Men v. Malcolm, 520 F.2d 392, 398 (2d Cir. 1975)

17   (20 square feet); Moore v. Janing, 427 F. Supp. 567, 572

18   (D. Neb. 1976) (20 square feet); Inmates of Suffolk County Jail

19   v. Eisenstadt, 360 F. Supp. 676, 679 (D. Mass. 1973); aff'd on

20   other grounds, 494 F.2d 1196 (1st Cir. 1974), cert denied

21   419 U.S. 977 (1974); aff'd on other grounds, 518 F.2d 1241

22   (1st Cir. 1975) (44 square feet).  In Gates v. Collier, 390

23   F. Supp. 482, 486 (N.D. Miss. 1975), aff'd on other grounds,

24   525 F.2d 965 (5th Cir. 1976), Chief Judge Keady stated that

25   "[w]e know from the undisputed evidence that generally

26   accepted correctional standards require a minimum of 50 square

27   feet of living area for each prison inmate."

-6-

488

Both from the testimony at the trial and from my personal inspection of the cell rows in the course of the September 23, 1977 visit, it is apparent to the court that the multiple occupancy cells in both the "old" and new sections of the jail and the general atmosphere in which they are located present poor examples of the civilized standards and concepts of dignity, humanity and decency to which Justice Blackmun made reference in Jackson v. Bishop, supra.  The cells are much like those in the Hall of Justice Jail, as I pointed out in Dillard v. Pitchess, 399 F. Supp. 1225, 1231 (C.D. Cal. 1975), a case in which the living conditions there were held to be intolerable.  However, the opinion in that decision made a significant comparison.  Hall of Justice inmates were confined in their cells almost constantly.  By contrast,

> ". . . inmates at the Central Jail have several
> advantages not available to Hall of Justice
> prisoners, the most important of which are
> that they take their meals in a dining room
> and have daily use of shower rooms located
> at the ends of the cell modules.  Also, one
> of several day rooms is frequently available
> to Central Jail prisoners, where they may sit
> at tables and play games or write or talk.  A
> chapel that will accommodate several hundred
> inmates is used for the presentation of occa-
> sional shows or musical entertainment, as well

-7-

489

as regular church services."

The cells of the Central Jail are, indeed, small, but in view of the frequent and substantial periods of time that the inmates are allowed to be out of their cells, I am not able to conclude that the matter of the limited number of square feet of sleeping space per man presents a constitutional issue that requires immediate action.  Matters discussed later in this memorandum present problems that may require substantial modifications in the system of allocating prisoners among the penal facilities of Los Angeles County.  It is expected that any such adjustment ". . . will take into appropriate account the increasingly enlightened standards with respect to the living space that should be accorded each inmate."  See, Stewart v. Gates, ___ F. Supp. ___, ___ (C.D. Cal. 1978).

The evidence at the trial disclosed the fact that from time to time a particular module becomes so crowded that there are more inmates than bunks.  As a result, the "overflow" men are obliged to sleep on mattresses on the concrete floor of the cell or of the walkway that fronts a row of cells.  As was indicated earlier in open court, I find this to be intolerable. "If the public, through its judicial and penal system, finds it necessary to incarcerate a person, basic concepts of decency, as well as reasonable respect for constitutional rights, require that he be provided a bed."  Stewart v. Gates, supra, at page ___.  An order to such effect will be included in the judgment that will implement this memorandum.

Visitation.  The plaintiffs complain that an inmate at

-8-

490

the jail is separated from his visitor by a transparent glass partition and must use a "telephone" for voice communication. The defendants respond by emphasizing that to permit contact visits would increase the risks of physical harm, escape and importation of drugs and other contraband.  They point out that the measures that would have to be taken to guard against such risks, including strip searches and greatly increased supervision, would make it impossible for the jail to accommodate the more than two thousand visits per day that are now being accorded.

It is evident that to allow unrestricted contact visitation would add greatly to the Sheriff's security problems and reduce the numbers of allowable visits.  On the other hand, it is equally obvious that the ability of a man to embrace his wife and his children from time to time during the weeks or months while he is awaiting trial is a matter of great importance to him.  The problem that confronts us here was well expressed by Judge Lasker in Rhem v. Malcolm, 371 F. Supp. 594, 605 (S.D. N.Y. 1974); aff'd  507 F.2d 333 (2d Cir. 1974):

> "There can be no doubt that the necessity
> of assuring security must be balanced against
> the right to humane treatment of prisoners,
> and that if contact visits are incompatible
> with that need they must be sacrificed.  The
> critical question is whether the two can coexist."

It seems to me that a reasonable balance can be struck between these two valid considerations of security and

-9-

491

prisoners' rights.  Under the classification process that the Sheriff has established and is now implementing, within two weeks after an inmate arrives at the jail, the staff has learned enough about him to make a tentative evaluation as to whether he presents a security threat from the standpoints of being escape prone or drug oriented or otherwise, and he is classified accordingly.  It is my understanding that a sub-stantial proportion of the inmates are given a low risk classi-fication in these respects.  As to them, the dangers to security would appear not to be sufficient to justify depriving them of all physical contact with their loved ones, bearing in mind the supervision and post-visit searches that the custodial staff would administer.

In order that the additional processing not overburden the prison staff and thus curtail the total number of visits that it could reasonably handle, a qualified inmate might be limited in the number of contact visits that he might receive. At the outset, one visit per week might be appropriate, subject to modification in light of experience.

The evidence at trial indicated that most of the inmates remain at the jail less than one week.  By restricting the contact visits to those who have been in the jail for two weeks and have received other than a high risk classification, and by imposing limits upon the frequency of their visits, it would appear that the numbers of such visits would be reason-ably manageable.

Counsel for the defendants has advised that Biscailuz

-10-

492

1  Center probably will be fully reactivated shortly as a place

2  of pretrial detention.  In such event, it is assumed that it

3  will house a substantial number of low risk inmates that

4  otherwise would be kept in the Central Jail.  If this occurs,

5  it will further ease the problem of according contact visits

6  in the Central Jail, and the court would expect that this type

7  of visitation would be established at Biscailuz Center.

8       This court is hopeful that the above described

9  tentative proposal can enhance considerably the goal of

10  treating the inmates with reasonable humanity without unduly

11  increasing the problems of security.  Any order implementing

12  these comments concerning the allowance of contact visits will

13  be withheld pending a further opportunity for the parties to

14  express their views and suggestions.  A hearing for that

15  purpose will be scheduled shortly after the filing of this

16  memorandum.

17

18       Under the present arrangement, 228 visitors are accom-

19  modated at one time in separate "telephone" cubicles and are

20  allowed to remain twenty minutes.  The defendants point out that

21  the visiting facilities are in use twelve hours per day through-

22  out the week; that 63,000 visitors are accommodated each month;

23  and that logistical problems necessitate the twenty-minute

24  limitation in order to accommodate the large numbers of weekly

25  visits that are desired.  The plaintiffs urge that this is too

26  short a time and they seek to show that hour long visits could

27  be accomplished without reducing the numbers of people that

28  could be served.

493

It is evident that the Sheriff and his staff fully recognize the value of visitation, and they are to be commended for the attention and effort that they devote to accommodating such a large number of people.  I am unable to conclude that whether individual visitors should stay only twenty minutes or could be allowed more time raises a constitutional issue that requires the court to second guess the Sheriff in this matter.

Under present regulations, individuals under eighteen years of age are not admitted to the jail to visit an inmate unless they are accompanied by an adult.  This means that a teenage person that is fully capable of coming to the jail alone would be unable to visit his or her father unless the mother or some other friend would be available to come along, a situation that, unfortunately, is not always the case.  The reluctance of the Sheriff to open the jail to unaccompanied visits by children under any and all circumstances is under-standable.  Nonetheless, inmates should be permitted, upon prior request, to receive unaccompanied visits from their minor children.

Outdoor Recreation.  Except for the corridors, or freeways, that front the rows of cells, the only areas avail-able for physical exercise are portions of the roof of both the original jail and the new addition.  Under schedules worked out by custodial personnel, prisoners are allowed two and one-half hours per week, at most, for recreation on the roof, in groups of about 130.  This is considerably less than the daily outdoor exercise of one hour that several federal

-12-

494

courts have required as a minimum.  See, e.g., Mitchell v.
Untreiner,  421 F. Supp. 886, 901 (N.D. Fla. 1976); Campbell
v. McGruder, 416 F. Supp. 100, 105 (D. D.C. 1975); Conklin v.
Hancock,  334 F. Supp. 1119, 1122 (D. N.H. 1971).

Neither citation of legal authorities nor testimony
of experts is needed in order to convince this court of the
importance of regular outdoor exercise to the physical health
and emotional well being of the men (particularly the young
men) that make up the jail population.  Clearly, they should
have at least an hour for such purpose each day.  The defen-
dants do not challenge this.  However, they understandably
point out that the limited size of the rooftop areas available,
the succession of complex routines that occur within the jail
each day, and the logistical problems of controlling and
moving large numbers of prisoners back and forth to the roof,
limit substantially the opportunity for outdoor recreation.

The rooftop program was newly inaugurated at the
time of trial, and the jail officials have had insufficient
opportunity to assess the extent to which it reasonably can
be expanded.  Under all of the circumstances, including the
defendants' apparent good faith desire to provide for adequate
recreation, I am of the view that one hour per day should be
considered a goal, rather than a constitutionally mandated
minimum.  The court will retain jurisdiction in order to
assess the progress toward such goal.  In the meantime, all
prisoners, including those considered "high power" and those
in administrative segregation, must be allowed not less than

-13-

two and one-half hours of roof recreation per week.

The roof of the new portion of the jail provides a reasonably large open expanse.  But the defendants have substantially ruined it as a place for basketball and other team sports by installing upright lengths of steel pipe every twenty-seven feet throughout the floor surface.  These uprights support steel "eye-beams" that, along with the eighteen feet high perimeter wall, support the heavy wire screen that covers the entire area.  The top of the wall on two sides is about eighty feet above the ground that abuts it; on the third side the roof of the Inmate Reception Center is about thirty feet below the top of the wall.

Custodial personnel assert that the screen is necessary in order to counteract the risk of someone from the outside throwing a weapon over the wall and into the recreation area, and to prevent escape over the wall with the aid of a jail-made "grappling hook" and line or a suddenly formed human pyramid.

Here is one instance in which it seems to me that the concern for security has resulted in an exaggerated response. If the jail authorities were to put their minds to the matter, I am sure that they could find ways to remove all or most of those posts that so seriously diminish the adequacy of the roof for physical exercise, and still keep the escape and assault risks under reasonable control.  Such study and consequent readjustment will be required.

Indoor Recreation.  The plaintiffs complain that inmates are allowed insufficient time to use the day rooms or

-14-

496

to "stretch their legs" by walking back and forth along the walkways ("freeways") that extend across the front of each row of cells. The defendants refer to a new program that began at about the time of trial under which all inmates, other than those of maximum security classification, have considerably increased use of the day rooms and freeways. Maximum security inmates are given access to the freeway on a limited basis. Inasmuch as they are considered generally to be assault prone, they are not allowed in the day rooms and are escorted whenever they must be in areas where other people are present. The defendants appear to be heading voluntarily and appropriately in the direction of allowing as much day room and freeway time as scheduling problems and reasonable security considerations will allow. Therefore, no order in this respect is presently indicated.

The day rooms once had television sets, but as they became inoperative because of internal malfunction or vandalism they were removed and not restored. Without implying any endorsement of the quality of most of the daytime television programs, it is obvious that people that are confined derive considerable recreational value from them. The jail authorities have agreed to reestablish television in the day rooms promptly. They should do so.

The plaintiffs complain of unconstitutional discrimi-nation because inmates that agree to work, and thus become trusties, are given more privileges than are other prisoners. They may enter and leave their cells at will, have virtually

-15-

497

unrestricted access to a day room and many other areas of
the jail, and may attend weekly movies.  I do not find such
discrimination improper.  Many menial chores must be performed
regularly if the jail is to operate.  In order to induce
inmates to work at these tasks, the Sheriff is entitled to
"hold out the carrot" of certain privileges that from a
practical standpoint could not, or constitutionally need not,
be accorded the general jail population.  This is all that has
occurred here.

   Windows.  A prisoner does not catch even a glimpse
of the outside world throughout his entire time of confinement
in the jail, other than the portion of the sky that he can see
during his limited recreational periods on the roof.  Thus,
a man may go for many months without even seeing a bush or a
tree or any human activity outside the jail.  This was not
always so.  When the building was constructed, in about 1963,
it contained perimeter windows of transparent "unbreakable"
glass.  Thus, prisoners in the exterior cells or mess halls or
day rooms had a bit of sunlight and outside view.  However,
within a short period of time, inmates succeeded in destroying
several of these "unbreakable" windows, either through vandal-
ism or in fruitless escape attempts.  The defendants responded
by replacing all of the windows with solid sheets of steel.

   In Rhem v. Malcolm, 432 F. Supp. 769, 778 (S.D. N.Y.
1977), Judge Lasker held that to confine inmates so that they
cannot see "the sun, sky or outside world" is a constitutional
deprivation.  This court agrees.  Of course, as is recognized

-16-

498

at the outset of this memorandum, constitutional rights must be limited by the reasonable requirements of security.  But the conclusion is inescapable that this is another example of the response being more extreme than the danger against which it was directed.

Based upon visual observation, the lowest bank of windows is about twenty feet above the ground, and those of the next floor are about ten feet higher.  In parts of the jail, the windows are immediately accessible to a person standing on the floor.  In other places, they are much harder to reach.  For example, along the upper tiers of the cells, a person would need considerable agility, dexterity and time in order to traverse the four-foot wide and very deep gap between the walkway and the wall in which the windows are set, maintain himself in a position to try to break a window, succeed in such attempt, and get through the opening.

I do not claim expertise in assessing the extent of the ingenuity of a prisoner determined to try to escape, nor am I aware of all of the appropriate means of frustrating such attempts.  But when consideration is given to the vigilance and care with which inmates are watched and supervised, the heights of the windows above the ground, the possibility of satisfactory fire resistant unbreakable glass being available,* and, in any event, the ability to bar and/or screen windows,

---

* Witnesses for the defendants insisted that such glass does not exist, but I am not convinced as to the completeness of the search or the enthusiasm with which it was made.

-17-

499

1   this court is simply unable to conclude that the need to guard

2   against occasional benighted escape attempts warrants depriving

3   all inmates of any view of the outside world.   To liken the

4   jail, in its present condition, to one of those infamous

5   dungeons of medieval days would be unfair, because the jail is

6   well ventilated and reasonably well lighted.   But the action

7   in sealing up the place was a step in the wrong direction.

8       Processing For Court.   On each court day, between 700

9   and 1,000 inmates are transported by bus to twenty-six courts

10  scattered throughout the broad expanse of Los Angeles County.

11  These prisoners are awakened at about 4:20 a.m., and, after

12  being given breakfast, they are escorted to the Inmate Recep-

13  tion Center located in the same building complex as is the jail.

14  Most of the men arrive there at about 5:30 a.m. and are dis-

15  tributed promptly among the more than thirty holding cells,

16  each of which holds inmates bound for a particular court.

17      The holding cells are about fourteen feet by fourteen

18  feet in linear dimension, and the only furnishing is a toilet.

19  The early arrivals in the cell are able to lie or sit on the

20  concrete floor, but as more men are added this becomes

21  increasingly difficult and finally impossible.   On the morning

22  of my visit, I counted about twenty-eight men in several of the

23  cells, a condition of "standing room only."   One cell, number

24  21, became jammed with so many occupants that I could not count

25  them.   Finally, one of the deputies came and directed that

26  about one-half of the men move to an adjacent cell that had

27  been cleared.   Twenty-two men responded to that order, and

-18-

500

1    thereafter I was able to count at least thirty-two remaining

2    occupants.   The place still was excessively crowded.

3            The men remain in the holding cell for about an hour,

4    and then, at about 6:15 a.m., the chaining process begins.

5    The inmates from a particular holding cell form a line in

6    the adjacent corridor.   There they are handcuffed, and then

7    the handcuffs of each four men are connected with a chain.

8    The line thereupon moves gradually to the nearby parking lot

9    and the men board the bus in such manner that two men of each

10   group of four are seated immediately in front of the other two,

11   with the connecting chain passing over the back of the seat

12   that separates them.   A little more than an hour after the

13   start of the boarding process, the buses begin to roll, and

14   the time of the ensuing trip ranges from a few minutes to more

15   than an hour, depending upon the destination and traffic

16   conditions.

17

18           At the end of the court day, between 4:00 and 7:00 p.m.

19   (sometimes much earlier), the reverse process begins.   After

20   the return bus ride, a shakedown examination, another substan-

21   tial wait in a holding cell, and the evening meal, the men

22   finally are returned to their cells, usually by about 8:00 p.m.,

23   but sometimes considerably later.

24           Any procedure involving the transportation to court

25   of a group of detainees that present varied security risks is

26   necessarily a demeaning experience for the prisoners.   This is

27   one of the regrettable but unavoidable consequences of the

28   need for pre-trial detention.   But, bearing this in mind, I

                            -19-                        501

1   find the above described process to be constitutionally

2   intolerable in two respects.

3        The first glaring problem is the holding cells.  The

4   sight of from twenty to fifty-four men being crammed into a

5   fourteen-foot cell is a repelling experience in any society

6   that takes pride in its high concepts of human dignity.  The

7   closest comparison that I can draw to such a spectacle is

8   that of an overcrowded pig pen.  If the defendants find it

9   necessary to detain an inmate in a holding cell before placing

10  him on a bus, or after his return, they must at least give

11  him a place to sit on a bench or a chair.

12       This requirement clearly will create a difficult

13  problem for the defendants, as well as for the court.  It is

14  obvious that the forthcoming order will reduce greatly the

15  numbers of men that the present holding cells can contain, and

16  it is doubtful that the Inmate Reception Center, as presently

17  constructed, has space available for additional cells.  On the

18  one hand, considerations of constitutional rights and basic

19  decency require that these dehumanizing conditions of holding

20  cell detention be changed immediately.  On the other hand, the

21  Sheriff has been ordered by competent judicial authority (both

22  state and federal) to move large numbers of prisoners back and

23  forth to the various courts every day, and I cannot reasonably

24  stop the present process in its tracks.  The defendants must be

25  given a minimum reasonable time within which to propose a

26  solution that will make prisoners available to the courts and

27  still treat them as human beings.

502

The second constitutional problem perceived in the present system for getting inmates to court is even more difficult. For a man to be subjected to the above described process that begins at 4:20 a.m. and ends at 8:00 p.m., or later, is inherently an exhausting and emotionally draining experience. To go through it once is bad enough; but to be obliged to repeat it for several successive days, or even weeks, while he is a defendant on trial, is believed to be constitutionally intolerable. Due process can hardly be accorded a defendant that is so worn out by the above described procedure that he lacks the alertness to help his attorney or to try to "put his best foot forward" in the presence of the trier of fact. The defendants in this case will be required to modify substantially the present procedure in order to avoid subjecting inmates on trial to such daily trauma.

It is true that most of the inmates go to court in custody only once or twice, because their cases are dismissed, or non-custodial sentences are imposed, or they are granted bail, or they plead guilty and are returned to court only for sentencing. But it is largely the fact that the Sheriff must transport so many men such long distances one or two times that makes it difficult for him to deal more reasonably with the prisoners that are undergoing trial.

As is indicated earlier in this memorandum, to be subjected even once or twice to the present process of busing large numbers of prisoners back and forth to outlying courts

-21-                                    503

is emotionally draining and dehumanizing.  Nonetheless,
defendants in custody must be brought before the court, and
if this is the only reasonable procedure, with respect to
prisoners not then undergoing trial, it scarcely can be
challenged as unconstitutional.  But the inherent need to
haul so many men so far for purposes other than trial is far
from evident, and if a reasonable and more humane alternative
is available, the constitutional rights of the inmates entitle
them to it.

On the morning that I was present to view the process,
thirty-two large and obviously very expensive six-wheel buses,
each controlled by two deputy sheriffs and filled with inmates,
left the parking lot.  From casual conversation, it appeared
evident that most of these men were scheduled for arraignment
or for other purposes not requiring the presence of witnesses.
It is not readily apparent why all judicial processes involving
defendants in custody, other than trial and sentencing after
trial, could not be performed in courtrooms constructed with-
in, or immediately adjacent to, the Central Jail.[*]   To the
extent that locally assigned judges could not properly handle
such calendars, it would be far less expensive and cumbersome
for the Sheriff to transport one or more judges from an out-
lying courthouse to the jail than to bus a large number of
prisoners to any such outlying court.  One possibility worth
considering is to establish and operate a system of closed

---

[*]  A large unoccupied portion of one floor apparently could
provide space for several modest courtrooms.

-22-

504

circuit television as a means of conducting non-trial judicial
procedures.  This alternative would appear to be less expensive
and far less arduous than busing many hundreds of prisoners
all over the county every day.  And, finally, if the govern-
mental bodies of Los Angeles County remain determined that
all phases of the criminal process shall continue to be handled
in the outlying areas, they will be obliged to house their
prisoners much closer to the respective courthouses.

Once the large "non-trial proportion of inmates that
make up the laborious collection and distribution program are
eliminated therefrom, the court days can begin for prisoners
currently on trial at a much more reasonable hour; the use
of holding cells can be substantially reduced or perhaps even
eliminated; and most of the large and expensive buses would not
be needed.  A reasonable time will be accorded the defendants
within which to propose plans that will permit the processing
of detainees going to court in a manner more closely in
harmony with that in which a civilized society should deal
with its prisoners.

However, as a matter of due process, no such delay
can be tolerated with respect to inmates currently on trial.
Beginning forthwith, on each day of trial after the first day,
such inmates will be required to leave their beds not earlier
than 6:00 a.m.; they will not be confined in holding cells,
either before leaving for court or following their return;
their waiting time on the buses at the jail will not exceed
thirty minutes; and they will be returned to their cells not

-23-

1    later than 8:00 p.m.   An order to such effect will so provide.

2    _Telephones_.   Evidence at the trial disclosed that the

3    numbers of pay telephones in the cell blocks are insufficient

4    to accommodate within a reasonable time inmates desiring to

5    make calls.   The public need to keep a person in custody

6    pending trial does not justify cutting off his access to the

7    outside world.   He must be allowed to communicate by telephone

8    with members of his family, or with anyone else he chooses,

9    at all reasonable times.   O'Bryan v. County of Saginaw,

10   Michigan,   437 F. Supp. 582, 599 (E.D. Mich. 1977).

11   The defendants oppose any thought of increasing

12   telephone access at the jail by pointing to the relatively

13   high incidence of coin cheating or fraudulent reference to

14   credit cards attributable to telephones presently there.

15   Reasonable supervision and monitoring by the jail authorities

16   should be able to limit somewhat this abuse, and the telephone

17   company has or can find ways of forestalling "credit card"

18   calls from a particular telephone.   In any event, occasional

19   abuse cannot justify an "across the board" denial or limitation

20   of telephone access.

21

22   An adequate number of telephones should be sufficient-

23   ly proximate to the modules that each of the inmates desiring

24   to use them may make at least one call per day.   The defendants

25   will be required to propose plans for the appropriate numbers

26   and locations of additional telephones.

27   _Cell Searches_.   Jail authorities conduct "shakedown"

28   inspections or the cells at irregular intervals in search of

-24-

contraband or other items not allowed in the cells, such as
food or excessive clothing or reading material.  The defendants
insist that these searches are accomplished with minimum
disruption of the inmates' possessions.  The plaintiffs paint
quite a different picture.  They contend that their property
is left in disarray; that items are unnecessarily removed and
destroyed; and that valuable property is taken without a
receipt being given.  In United States ex rel Wolfish v. Levi,
439 F. Supp. 114, 149 (S.D. N.Y. 1977), Judge Frankel said,
with respect to the identical problem:

> "Allowing inmates to observe from
> a reasonable distance the searching of
> their rooms would go far to eliminate
> these grounds of complaint.  An officer
> viewed by the owner is more likely to
> fulfill the stated duty to put things
> back as they were.  The claim of stolen
> property is far less likely to be made,
> the grounds for suspicion, or ostensible
> suspicion, being largely obviated.  Having
> one's things searched is no pleasure in
> the best of circumstances.  Being denied
> the right even to watch the invasion is a
> blunt oppression."

This court agrees.  Future shakedowns should be made while the
respective inmates remain outside their cells but near enough
to observe the process and raise or answer any relevant inquiry.

-25-

507

Time For Meals.  One of the grievances most frequently expressed by inmates that testified at the trial was that they were given insufficient time within which to eat their meals in the dining halls.  The same contention was made before this court in the trial of the case of Stewart v. Gates, ___ F. Supp. ___ (C.D. Cal. 1978), which involved the Orange County Jail.  The comments made in that in that decision are equally applicable here and are incorporated accordingly:

> "The court is sympathetic with the security
> concerns of the jail administrators when
> large numbers of inmates are congregated
> in a limited space in the presence of a
> relatively few unarmed deputies, which is
> what occurs during the serving of meals,
> and I agree that such instances should not
> be prolonged more than necessary.  However,
> mealtime is an important occasion to a
> prisoner, and he should be entitled to savor
> his food, along with a bit of conversation,
> rather than be obliged to eat in a hurried
> atmosphere.  An inmate should be allowed
> not less than fifteen minutes at the meal
> table, and an order will be issued accor-
> dingly."  (___ F. Supp. ___ at ___).

Clothing And Laundry.  Under California law, as implemented by the Sheriff's Department Custody Division Manual, an inmate's mattress cover, towel, socks, undergarments

-26-

508

and outergarments are required to be exchanged for clean items at least once each week.  As of the time of trial, this had not been occurring with regularity.  Inmates reported having worn the same denim pants and shirts for as much as a month or more, and such testimony was eloquently confirmed by the appearance of their garments.  Some inmates have washed their clothing in the toilet or while taking a shower and have dried the items as best they could.  The defendants assured the court that the shortgage of clothing for exchange was due to a temporary logistics problem that soon would be corrected.  The court is willing to assume that this is so.

However, a once per week change of clothing for prisoners has been held to be completely inadequate in a growing number of federal cases.  See, for example:

Alberti v. Sheriff of Harris County, Texas, 406 F. Supp. 649, 677 (S.D. Tex. 1975) (daily exchange required);

Mitchell v. Untreiner, 421 F. Supp. 886, 898 (N.D. Fla. 1976) (daily exchange required);

Martinez Rodriguez v. Jimenez, 409 F. Supp. 582, 596 (D. P.R. 1976), aff'd on other grounds, 537 F.2d 1 (1st Cir. 1976); 551 F.2d 877 (1st Cir. 1977) (semi-weekly access to laundry required);

Hamilton v. Landrieu, 351 F. Supp. 549, 553 (E.D. La. 1972) (uniform laundry twice a week);

Inmates of Henry Cty. Jail v. Parham, 430 F. Supp. 304, 307, 308 (N.D. Ga. 1976) (laundry twice

-27-

a week; clean uniform three times per week).

An inmate must be permitted at least twice per week to receive clean outergarments, undergarments, socks and a towel in exchange for those that he has been using.  An order will be made to that effect.

Law Library For Pre-Trial Detainees.  Pre-trial detainees representing themselves ("pro pers") have regular use of an adequate law library in the jail.  Another law library, on the second floor, is available to sentenced prisoners. A third law library, purportedly quite inferior to the other two, may be used by pre-trial prisoners with appointed or retained counsel.  If they desire to use the second floor library, they must seek the permission of the Legal Sergeant.

This jail official testified that the second floor library is relatively small and quite fully utilized by sentenced prisoners, and that he grants requests from others only if the applicant ". . . seems sincere and able to make use of it, rather than someone who is looking to use it just as an excuse to get out of their module for a while."  He estimates that of the forty to fifty-five inmates that use the library each night, about fifteen are pre-trial prisoners who are there pursuant to permission.

The plaintiffs contend that the pre-trial detainees are entitled to unrestricted reasonable access to the second floor library.  I am not able to agree.  These inmates have counsel representing them in the pending proceedings, and they can supplement or second guess the work of their counsel with

-28-

510

the help of the limited library available to them.   If they
can show a legitimate reason why more exhaustive research by
them is necessary, they are accorded the use of the larger
library.   If they are refused a request for more extensive
library facilities in order to prepare litigation challenging
conditions at the jail, their attorneys can help with such
litigation or at least assist them in gaining access to the
better library.   In addition, the jail has an arrangement
with Southwestern University under which its law students,
supervised by law professors, provide legal assistance to
inmates regarding civil matters.

In light of all of these circumstances, plus the
constant availability of "jailhouse lawyers", it is concluded
that the "access to the courts" provided to inmates at the
jail is fully in compliance with the requirements expressed in
Gilmore v. Lynch, 319 F. Supp. 105 (N.D. Cal. 1970), aff'd
sub nom., Younger v. Gilmore, 404 U.S. 15 (1971), and in
Bounds v. Smith, 430 U.S. 817 (1977).

Brutality, Harrassment And Abuse.   The plaintiffs
contend that the deputy sheriffs on duty at the jail regularly
use excessive force in enforcing their orders, commit unpro-
voked assaults, inflict verbal abuse upon the prisoners, and
generally conduct a "reign of terror" at the jail.   Much of
the trial was devoted to hearing testimony of alleged victims
of, or witnesses to, such improper conduct, and to hearing the
deputies' versions of such incidents.

Controversies of this kind are extremely difficult to

511

resolve.   On the one hand, the deputies have a most difficult job.   Their obligation is to maintain control and enforce discipline under circumstances in which the use of some force occasionally is needed on a snap judgment basis.   And yet, the deputies are obliged to treat inmates with reasonable courtesy despite the vilification frequently directed toward them and the constant threat of physical harm under which they work. When they respond reasonably to situations that require immediate action, they must be upheld even though reflection in the calmness of the courtroom might lead to the conclusion that a softer response would have been preferable.

On the other hand, it is well known that there are such things as "badge happy" and sadistic custodial officers. And the courts, as well as jail administrators, have an obliga- tion to protect inmates against them.

After evaluating the evidence as best I could, it seems clear that there is no "reign of terror" at the jail that requires court intervention.   It is obvious that in some instances the deputies used excessive force upon an inmate that they believed to have been "out of line".   But for the most part, the deputies that testified at the trial and those that I observed in the course of my visits to the jail impressed me as having an enlightened attitude concerning their obliga- tion to be respectful of the sensibilities of their prisoners.

However, the record at trial did disclose that the inmates frequently were annoyed by excessive and sometimes insulting use of the loudspeakers by the deputies in charge of

-30-

512

the modules.  It is noisy enough in the modules without the

deputies making unnecessary announcements or subjecting the

inmates to uncalled for monologues.  Such conduct is contrary

to directives by the Sheriff, but it nonetheless is recommended

that he give a renewed and emphatic reminder to all module

deputies that misuse of the "intercom" will not be tolerated.

Cost Of Compliance.  This court is well aware that

compliance with portions of this decision will require some

capital expenditures and increased operational costs.  The

court regrets this and is fully sympathetic with the budgetary

problems faced by the County of Los Angeles, particularly in

the present atmosphere of Proposition 13.  Unfortunately,

however, these budgetary problems cannot be used to defeat the

changes mandated by this decision.

If state authorities, on behalf of the public, author-

itatively determine that it is necessary to incarcerate a

person in the county jail, such determination carries with it

the obligation to pay the cost of maintaining that person in

harmony with such of his constitutional rights as are consis-

tent with incarceration.  In other words, he must be housed

and fed and clothed and otherwise treated as a human being.

In the judgment of the court, the requirements of this decision

go no farther, and they must be enforced accordingly.

Implementing Judgment.  Some of the actions envisaged

by this memorandum of decision will require a reasonable

amount of time for planning and preparation.  The court would

prefer to prepare the judgment implementing this memorandum

-31-

513

1  after consultation with counsel in order that the time schedules

2  contained therein may take into appropriate account the prob-

3  lems that will be involved.  Accordingly, a judgment will be

4  withheld pending further hearing scheduled for Monday, August

5  14, 1978, at 2:00 p.m.

6

7  DATED:  July 25 , 1978.

8

9

10                                WILLIAM P. GRAY
                         United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

514

# EXHIBIT 4

FILED

FEB 1 5 1979

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD,          )
HAROLD TAYLOR, and          )
RICHARD ORR, et al.,        )    CASE NO. CV 75-4111-WPG
                            )
            Plaintiffs,     )
                            )
     v.                     )    SUPPLEMENTAL MEMORANDUM
                            )         OF DECISION
PETER J. PITCHESS,          )    _____
et al.,                     )
                            )
            Defendants.     )
_____)

          On July 25, 1978, this court issued a Memorandum of

Decision in which it concluded, from the evidence at trial, that

specific corrective action would be required concerning certain

conditions and policies at the Los Angeles County Central Jail.

The Memorandum expressed a reluctance to impose specific

requirements with regard to other conditions and policies without

further consideration.  For this reason, no order was issued, and

additional evidentiary hearings were held, followed by further

briefing.

          In the meantime, the defendant Sheriff has adopted

EXHIBIT 4   (264)        1087

1  and has begun to implement, even without an order, most of the

2  changes proposed by the court.  Such action provides further

3  manifestation of the good faith of the Sheriff and his principal

4  assistants.  They and their counsel, like the attorney for the

5  plaintiffs, have displayed throughout this litigation a willingness

6  to work out reasonable solutions to the problems involved in these

7  proceedings.  The attitude thus displayed by the jail authorities

8  has been a strong reminder to the court that it should defer to

9  the expertise of the "jailer" to all appropriate extent.

10  As stated in my earlier Memorandum, this court is

11  aware that ". . . [t]he problem . . . in each of the issues here

12  concerned is to determine the point at which the implementation

13  of the goals of security and order and safety must be balanced

14  by the need to preserve for the inmate all of the constitutional

15  rights that the fact of his incarceration will permit."  In

16  resolving the remaining issues in this Memorandum, I have sought

17  to apply the test of whether the challenged conditions or

18  restrictions are reasonably necessary to the maintenance of

19  security, order and safety in the institution, or whether they

20  constitute an exaggerated response by the custodial officials to

21  these considerations.  This test was ably expounded in the case

22  of Feeley v. Sampson, 570 F.2d 364 (1st Cir. 1978).  Theoreti-

23  cally, it is less burdensome upon the custodial authority than

24  the "strict scrutiny" standard, under which a state must

25  justify every restriction imposed upon an inmate as being based

26  upon a "compelling interest," and must show that there is no

27  feasible "less restrictive alternative."  See, Campbell v. McGruder,

28  580 F.2d 521 (D.C. Cir. 1978).  However, at least for purposes of

-2-

1088

1   this case, applications of the two tests involve differences
2   only as to starting points, and the results are substantially the
3   same whichever path of analysis is followed.  We are dealing
4   with pre-trial detainees, men who have not been convicted and
5   thus still are entitled to as much benefit from the presumption
6   of innocence as may be accorded them, granted the need to confine
7   them to insure their presence at trial.  "Any restriction or
8   condition that is not reasonably related to this sole stated
9   purpose of confinement would deprive a detainee of liberty or
10  property without due process, in contravention of the Fourteenth
11  Amendment."  See, Campbell v. McGruder, 580 F.2d 521, 528 (D.C.
12  Cir. 1978), quoting from Duran v. Elrod, 542 F.2d 998, 999-1000
13  (7th Cir. 1976).  Under such circumstances, if jail security
14  and order can be protected by less restrictive means, the
15  conditions and practices challenged here must be deemed unreason-
16  able as an exaggerated response.

17          Hence, in undertaking to decide these remaining
18  issues, the court is again confronted with the question of what
19  is reasonable.  This question involves consideration of, inter
20  alia: the constitutional rights of the inmates; the need to
21  preserve security, order and safety in the jail; the understandable
22  propensity of the Sheriff to favor the latter consideration when
23  the two are not fully harmonious; and the duty of the court to
24  give appropriate deference to the expertise of the Sheriff and
25  still fulfill its above-mentioned constitutional responsibility.

26          Contact Visits.  Testimony at the supplemental hearing
27  reaffirmed the court's awareness of how important it is to a
28  prisoner that he be able to have contact visits from time to time

-3-

1089

1  with persons that are emotionally close to him.  Such testimony

2  also demonstrated clearly the great burden that would be imposed

3  upon the jail authorities and the public if such contact visits

4  were to be accorded all or most of the five thousand prisoners

5  at the jail.  Expensive construction would be required in order

6  to create a new, large and secure visiting area that would be

7  insulated from the jail and from the outside by separate sally

8  ports.  The processing of visitors would have to include careful

9  identification, sometimes including interviews, personal searches

10  and the checking of hand-carried articles.  Prisoners necessarily

11  would be strip-searched upon leaving the visiting area.  Sub-

12  stantially increased numbers of guards would be required for

13  visual surveillance and supervision.

14         This complicated, expensive, and time-consuming

15  process, coupled with the fact that contact visits are inherently

16  more protracted than those that can be terminated simply by

17  cutting off the telephones, inevitably would reduce far below

18  the present level of two thousand per day the numbers of visits

19  that could be accommodated.

20         A further problem that is of great concern to the

21  jail authorities is the fact that the establishment of any program

22  of contact visits does increase the importation of narcotics into

23  a jail, despite all safeguards and precautions.  The Sheriff also

24  is concerned about the increased possibility of the introduction

25  of weapons and of escape attempts with the taking of hostages.

26         From the foregoing summary, it is apparent that many

27  factors strongly militate against the allowing of contact visits.

28  Most of the pre-trial detainees remain at the jail only for a few

-4-

1090

1  days or weeks, and I cannot conclude that their hardship in being

2  unable to embrace their loved ones for such a limited period of

3  time renders unreasonable the unwillingness of the Sheriff to

4  accommodate them in this respect.  The impracticability of such

5  accommodation is so great that this deprivation must be considered

6  to be one of the inconveniences that necessarily stem from the

7  need for incarceration.

8         However, the foregoing discussion does not solve

9  the entire problem.  In Campbell v. McGruder, 580 F.2d 521, 532

10  (D.C. Cir. 1978), Chief Judge Bazelon said, in writing the

11  opinion for the court:  "[T]he responsibilities of the jail

12  increase as the period of the detainee's incarceration grows

13  longer.  Conditions that might be tolerable for ten days, might

14  be unacceptable if imposed for a month or longer."  I believe

15  this statement to be pertinent here.  Unfortunately, considerations

16  of public safety make it necessary that some accused (but not yet

17  convicted) defendants be obliged to remain in custody for many

18  months pending trial.  I have become convinced that in such

19  instances the factors that make it impracticable to provide

20  contact visits for large numbers of men with stays of short

21  duration are much less compelling.  On the contrary, I believe

22  that if a man is incarcerated in the jail for more than a few

23  weeks, principles of basic human decency require that all reason-

24  able attempts be made to permit him to kiss his wife or his

25  girlfriend and to hug his children once in a while during this

26  long, difficult and inherently depressing period in his life.

27         By the time that a man has been held for a month,

28  quite a bit is known about him, due to the investigative and

-5-

1091

1   classification process that has been conducted, and the oppor-

2   tunity to observe his day to day conduct.  If contact visits were

3   to be limited to men who have been in uninterrupted custody for

4   a month or more and who are not determined to be drug oriented

5   or escape risks, the number of prisoners eligible for such

6   treatment would be reduced greatly, and by placing a maximum limit

7   upon the total number of contact visits per week, the scope,

8   burden and dangers of the program would be substantially

9   diminished.

10          Such a curtailment in the number of contact visits

11  would mean that the massive construction that would be required

12  in order to facilitate such visits for the entire jail population

13  could be avoided.  Modest alteration within the jail presumably

14  could provide appropriate space, or the Sheriff might choose to

15  establish a facility for such visits outside the jail and trans-

16  port the inmates back and forth.

17          An order will be issued requiring the defendants

18  to make available a contact visit once each week to each pre-trial

19  detainee that has been held at the jail for one month or more

20  and concerning whom there is no indication of drug or escape

21  propensities; provided, however, that no more than fifteen

22  hundred such visits need be allowed in any one week.  In the

23  event that the number of requested visits in any week exceeds

24  fifteen hundred, or such higher number as the Sheriff voluntarily

25  undertakes to accommodate, a reasonable system of rotation or

26  other priorities may be maintained.  The lengths of such visits

27  shall remain in the discretion of the Sheriff.

28          Rooftop Recreation.  In my earlier Memorandum, I

1092

1    expressed the lament that the defendants have ". . . substantially

2    ruined [the roof] as a place for basketball and other team sports

3    by installing upright lengths of steel pipe every twenty-seven

4    feet throughout the floor surface."  Counsel for the defendants,

5    in his brief, referred to such comment as an instance in which

6    "The Court has wandered off on a lark of its own . . . ."  Upon

7    further reflection, I am forced to the conclusion that counsel

8    is right and that no corrective order is appropriate.  I am still

9    convinced that "[i]f the jail authorities were to put their minds

10   to the matter, . . . they could find ways to remove all or most

11   of those posts that so seriously diminish the adequacy of the

12   roof for physical exercise, and still keep the escape and assault

13   risks under reasonable control."  However, I suppose that whether

14   the roof conditions permit the inmates to play full-court basket-

15   ball or unnecessarily restrict them to "half-court" is a matter

16   that does not rise to constitutional dimensions.

17        Restoration Of Windows.  Evidence at the supple-

18   mental hearing has in no sense altered my conviction that the

19   windows must be restored in the original portion of the jail.

20   The right of the inmates not to be deprived of all view of the

21   outside world far outweighs the inferred danger of serious escape

22   attempts or contraband importation through holes that might be

23   made in the "unbreakable" glass available for installation.

24        From the testimony at the supplemental hearing, it

25   appears that an agile inmate wielding a heavy metal instrument

26   could break the best available glass by giving it from thirty

27   to forty heavy blows.  The noise created by such activity would

28   reach a decibel count of between 100 and 120, which is roughly

-7-

1093

equivalent to the sound of a nearby jet aircraft beginning its takeoff.

Alternatively, an inmate with a propane torch, or a cell-made substitute therefor, could penetrate the best "security proof" glass and, in about four to eight minutes, make a hole large enough for a person to squeeze through. A by-product of such effort would be a large quantity of black pungent smoke.

Beyond doubt, the jail is ably administered, a fact that militates heavily against an inmate having access to an iron bar or a torch. It also seems reasonable to assume that the noise or the smoke created by any such benighted venture would attract the attention of an alert guard well before a significant breach could be accomplished. Also, if a hole were to be made in a window, I have no doubt whatever of the resourcefulness of the jail authorities in being able to prevent narcotics or other contraband from being passed through the opening pending permanent restoration.

The replacing of the windows with sheet steel clearly was an exaggerated response to a remote danger and was in deroga-tion of the legitimate interests of the detainees. The windows must be restored promptly.

Cell Searches. In my earlier Memorandum, I expressed the conclusion that ". . . shakedowns should be made while the respective inmates remain outside their cells but near enough to observe the process and raise or answer any relevant inquiry." This conclusion now is reaffirmed, particularly in light of the subsequent demonstration of four alternative methods of cell search presented by the Sheriff. Method A involved searching

-8-

1094

1  all of the cells in a row while the inmates remained in the day

2  room, which is the manner in which searches currently are con-

3  ducted.  In Method C, the men occupying a particular cell were

4  brought from the day room and stood outside their cell while it

5  was being searched.  When such search was completed, the men

6  were locked in their cell and the remaining cells were searched

7  successively in the same manner.  Methods B and D are so unsatis-

8  factory and expensive that no further comment concerning them is

9  indicated.

10         According to the statistics reported by the defen-

11  dants, Methods A and C take substantially the same amount of time,

12  and C is slightly more expensive, due to the need to utilize a

13  few more deputies to escort the prisoners and to insure against

14  assault upon the deputies that are engaged in searching the cell.

15         At the invitation of counsel for the defendants, I

16  asked two "experienced" inmates whose cell was being searched

17  which method they preferred.  The ready responses were that they

18  preferred to be present so that they could see what was going on,

19  and in order that they might seek to explain why certain ques-

20  tioned items should not be removed.  Coincidentally, while I was

21  watching the search of that very cell, one of the deputies

22  started to remove a magazine as not being sufficiently current

23  and thus in violation of regulations designed to minimize fire

24  danger by preventing accumulation of old periodicals.  Upon being

25  asked to reconsider, the deputy found that it was not as old as

26  he had thought and left it.  The same deputy started to discard

27  another magazine on the ground that it lacked a cover.  The

28  inmate urged him to riffle the pages a bit; he did; the cover

-9-

1095

1  thereupon appeared; and the magazine stayed in the cell.

2         These are small matters; but they are important to

3  the detainees, and their legitimate interests in protecting their

4  meager possessions outweigh the small increase in the burden

5  upon the defendants.

6         Implementing Judgment.  I believe that my Memorandum

7  of July 25, 1978, and this Memorandum cover all of the matters

8  concerning which affirmative action is deemed by the court to

9  be required.  A judgment containing such orders will be filed

10 contemporaneously herewith.  In all other respects, I find that

11 the issues raised by the plaintiffs (apart from the medical issues,

12 which are involved in separate pending proceedings) do not merit

13 court intervention at this time.

14        This Memorandum and the Memorandum of July 25, 1978,

15 shall constitute findings of fact and conclusions of law, as

16 provided in Rule 52(a) of the Federal Rules of Civil Procedure.

17

18 DATED: February 15, 1979.

19

20                    _____

21                         WILLIAM P. GRAY
                    United States District Judge

22

1096

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD,            )    No. CV-75-4111-WPG
HAROLD TAYLOR and             )
RICHARD ORR, et al.,          )    MEMORANDUM OF POINTS AND
                              )    AUTHORITIES IN SUPPORT OF
        Plaintiffs,           )    APPOINTMENT OF MONITOR
                              )
vs.                           )
                              )
PETER J. PITCHESS,            )
et al.,                       )
                              )
        Defendants.           )
_____)

I.

STATEMENT OF THE ISSUE

At the last contempt hearing on May 18, 1981, the
Court indicated its willingness to consider plaintiffs'
arguments in favor of the appointment of a monitor to observe
and gauge defendants' compliance with the judgment herein.
The instant memorandum presents those arguments and is
divided into basic sections -- one pertaining to the Court's
authority to appoint a monitor and a second stating reasons

///
///
///
///
///
///
///

1.

EXHIBIT 5

1   why the appointment of a monitor in this case would be

2   appropriate.  As will be elaborated below, the law imbues

3   this Court with broad authority to appoint a monitor; thus,

4   the real question becomes whether such appointment would be

5   appropriate in the context of plaintiffs' showing during the

6   course of the contempt proceedings.

7

8                          II.

9        THE COURT HAS BROAD AUTHORITY TO APPOINT
         A MONITOR TO INSURE COMPLIANCE WITH ITS
10       JUDGMENT.

11

12  A.   The Court has Inherent Equitable Power to Appoint a
         Monitor.
13

14       The broadest and most clearly established source of

15  authority for the appointment of a monitor stems from the

16  courts' inherent equitable powers.  The lead case in this

17  regard is Ex Parte Peterson, 253 U.S. 300, 312-313, 64 L.Ed.

18  919 64 S.Ct. 543 (1920), where in approving the appointment

19  of an auditor to simplify issues for trial, the Supreme Court

20  stated:

21            "Courts have (at least in the absence

22        of legislation to the contrary) inherent

23        power to provide themselves with

24        appropriate instruments required for the

25        performance of their duties.  This power

26        includes authority to appoint persons

27        unconnected with the court to aid judges

28        in the performance of specific judicial

                          2.

1        duties, as they may arise in the progress

2        of a cause." Id. 253 U.S. at 312.

3        The enactment of Federal Rules of Civil Procedure

4 Rule 53 in no way limited such equitable authority. Schwimmer

5 v. United States, 232 F.2d 855, 865 (8th Cir. 1956)

6 cert.denied, 352 U.S. 833; Kaufman, "Masters in the Federal

7 Courts: Rule 53," 58 Columbia L.Rev. 452, 462 n. 43 (1958).

8        This inherent equitable power has been repeatedly

9 relied upon by federal courts appointing monitors in

10 litigation challenging conditions of confinement. See e.g.,

11 Jordan v. Wolke, 75 F.R.D. 696, 701 (E.D. Wis. 1977); and

12 Powell v. Ward, 487 F.Supp. 917, 935 (S.D.N.Y. 1980).

13

14 B.   Federal Rule of Civil Procedure 70 Empowers This Court
       To Appoint A Master.

15

16        Although not often cited, Federal Rules of Civil

17 Procedure, Rule 70 authorizes the appointment of a post-

18 judgment monitor. The langauge of that rule, itself,

19 strongly suggests such power.

20        "If a judgment directs a party to

21        execute a conveyance of land or to

22        deliver deeds or other documents or to

23        perform any other specific act and the

24        party fails to comply within the time

25        specified, the court may direct the act

26        to be done at the cost of the disobedient

27        party by some other person appointed by

28        the court and the act when so done has

3.

like affect as if done by the
party, . . ." Id.

In United States v. Manning, 215 F.Supp. 272, 293
(W.D. La. 1963) (3 judge court) Rule 70 was interpreted as
authorizing the appointment of referees to supervise
elections; and in Clarke v. Chicago, Burlington & Quincey
Railroad, 62 F.2d 440 (10th Cir. 1932) cert.denied 296 U.S.
629 (1933), Equity Rule 8, the predecessor of Rule 70, was
interpreted to authorize the appointment of a contractor to
abate a nuisance.

Thus, it would appear that Rule 70 similarly
authorizes the appointment of a monitor to insure compliance
with the court's orders.


C.   Federal Rule of Civil Procedure 53 Has Also Been Cited As
     A Source Of Authority For Appointment Of Monitors.

Although by its text Federal Rule of Civil Procedure
53 would appear to be limited to trial situations, federal
courts have referred to that rule in appointing masters to
monitor compliance with decrees aimed at conditions in
institutions.  See, inter alia, Palmigiano v. Garrahy, 443
F.Supp. 956, 989 (DRI 1977) (prison); Powell v. Ward, supra,
487 F.Supp. at 935 (jail); Jordan v. Wolke, supra, 75 F.R.D.
at 701 (jail); Gary v. State of Louisiana, 601 F.2d 240, 244-5
(5th Cir. 1979) (institutions for the mentally retarded).


D.   Monitors Are Commonly  Appointed In Litigation Challenging
     Conditions Of Confinement.

4.

In view of the difficulties of assuring compliance
with decrees altering conditions and practices within
custodial institutions, federal courts frequently resort to
the appointment of monitors to check on such compliance.  The
rationale of such appointments was succinctly and candidly
stated by District Judge Don J. Young in Jones v. Wittenberg,
73 F.R.D. 82, 85 (N.D. Ohio 1976) as follows:

> "There is an ancient saying, 'Quis
> custodiet ipso custodes?'  'Who is
> guarding the guards?' which is pecularily
> applicable to this kind of litigation.
> The answer to the question is, 'Nobody.'
> The experience of this and other courts
> has demonstrated that it is not enough to
> make an order, no matter how detailed and
> explicit.  Unless somebody checks the
> order against the defendants'
> performance, they do not perform.  When
> someone watches them, they squirm, but
> they comply, or get out of the way for
> someone else to do so.  Thus, rather than
> using the classical, simple, and entirely
> appropriate remedy of sending the
> defendants to jail with the keys in their
> pockets, this Court will undertake to
> monitor the defendants' future
> performance of its order."

///

5.

1    Significant prisoners' rights cases where monitors

2  have been appointed to gauge compliance with court orders

3  include the following:

4    Jones v. Wittenburg, supra (Lucas County [Ohio]

5    Jail, population 200);

6    Jordan v. Wolke, supra, (Milwaukee [Wisconsin]

7    County Jail, population 315);

8    Hamilton v. Landrieu, 351 F.Supp. 549 (ED La.

9    1972) (Orleans Parish Prison [New Orleans, La.],

10    population 900);

11    Powell v. Ward, supra, Bedford Hills [New York

12    State] Correctional Facility, population 380);

13    Inmates of Attica Correctional Facility v.

14    Rockefeller, 453 F.2d 12, 25 (2d Cir. 1971)

15    (Attica, population 2000);

16    Morales v. Turman, 364 F.Supp. 166, 179 (E.D. Tex.

17    1973) (Texas Youth Council's Mountain View School

18    for Boys, Maximum Capacity 480);

19    Alberti v. Sheriff of Harris County, Texas, 406

20    F.Supp. 649, 678 (S.D. Tex.  1975) (Harris County

21    Detention Facilities, population 2,500);

22    Owens-El v. Robinson, 457 F.Supp. 984, 992-3 (W.D.

23    Pa. 1978) (Allegheny County [Pa.] Jail, average

24    population 429);

25    Lightfoot v. Walker, 486 F.Supp. 504, 528-9

26    (S.D.Ill. 1980) (Menard [Ill.] State Correctional

27    Center, population 2,650);

28  ///

6.

Taylor v. Perini, 413 F.Supp. 189, 193-4 (N.D.

Ohio 1976) (Marion [Ohio] Correctional

Institution, maximum capacity 1,418);

Gates v. Collier, 501 F.2d 1291, 1321 (5th Cir.

1974) (Mississippi State Peniteniary at Parchman,

population 1,900);

Miller v. Carson, 563 F.2d 741, 753 (5th Cir.

1977) (Duval County [Jackson, Florida] Jail,

stated capacity 432);

Newman v. Alabama, 559 F.2d 283, 289-90 (5th Cir.

1977), cert.denied 438 U.S. 915 (1978) (Alabama

State Prison System, population 5,000);

Palmigiano v. Garrahy, supra, 443 F.Supp. at 989

(Rhode Island Adult Correctional Institutions,

population 650).

Plaintiffs submit that the above precedents are

highly persuasive as to the propriety and efficacy of the

appointment of a monitor herein particularly in view of the

scope and significance of the Court's orders and the truly

enormous number of inmates affected, i.e. more than 5,000.


III.

APPOINTMENT OF A MONITOR IN THE INSTANT
CASE WOULD BE HIGHLY APPROPRIATE IN LIGHT
OF DEFENDANTS' HISTORY OF NONCOMPLIANCE
WITH THE JUDGMENT AND RESULTING BENEFITS
TO THE COURT AND COUNSEL


Defendants' resistance to and half-hearted

attempts at compliance, fully demonstrated in the record of

7.

1    the contempt proceedings, and future time savings to the

2    Court and counsel for both sides heavily militate in favor

3    of appointment of a monitor in the instant case.

4         First, at the time the contempt proceedings were

5    initiated, defendants were guilty of numerous, serious

6    violations of the judgment. See Plaintiffs' Brief

7    Summarizing Evidence re Contempt, filed March 23, 1981, pp.

8    34-39. During a conference telephone call on April 20,

9    1981, the Court noted that defendants had been out of

10    compliance regarding provision of beds and bedding and

11    clothing exchanges and that quite possibly trusties have

12    been monopolizing the telephones.

13         Defendants' non-compliance is epitomized by the

14    manner in which some prisoners were processed from the jail

15    to Wayside Honor Rancho -- a practice the Court described as

16    "insensitive". Under that practice, some inmates being

17    transferred to Wayside were held through the night in the

18    IRC holding tanks without any bedding until 4 a.m., at which

19    time they were boarded on buses and transported to Wayside.

20    Such practice was in clear violation of paragraph 1 of the

21    judgment regarding beds and bedding and only terminated

22    sometime in late 1980 after it was brought to the Court's

23    attention by testimony from inmates Michael Goodman (9/4/80)

24    and Richard Pedroza (9/3/80).

25         Moreover, and most revealing as to defendants'

26    intentions, indoor recreation was virtually nonexistent in

27    the jail at the time of the initiation of the contempt

28    proceedings notwithstanding testimony at the original trial

1   by the jail's then-commander Paul Myron and the then --

2   classification lieutenant Larry Giger that the Sheriff's

3   Department was about to launch a new classification program

4   whereby inmates would obtain vastly increased access to

5   dayrooms and freeways.  As the Court will recall, in May,

6   1980, in response to plaintiffs' allegations regarding

7   conditions in the jail, defendants scurried to create an

8   indoor recreation program.

9        Without belaboring the evidence, with which the

10  court is thoroughly familiar, defendants seemingly lost

11  interest in compliance with the judgment and in reforms

12  promised at the original trial once the Court's scrutiny was

13  removed from the case; and conditions in the jail did not

14  markedly improve until last year largely, if not almost

15  completely, due to the coercive effect of the contempt

16  proceedings and plaintiffs' motion to modify the judgment,

17  filed May 9, 1980.

18       Defendants' past track record creates the obvious

19  inference that they will once again backslide when judicial

20  attention is withdrawn.  Defendants understandably do not

21  like the intrusions which drive from this litigation, yet

22  such intrusions obviously produce salutary results.

23       During the course of the contempt proceedings,

24  plaintiffs' counsel repeatedly asked witnesses from the

25  Sheriff's Department whether the bringing of the contempt

26  proceedings was a factor in the alteration of Sheriff's

27  Department policy during the past year -- a question which

28  ///

9.

was uniformly answered in the negative.  The major purpose of such questioning was to determine defendants' incentives in improving jail practices during the course of the past year.  Defendants' repeated denials that the contempt proceedings had any impact on decisions to improve jail conditions and practices defies all credibility and in fact illustrates the necessity for further monitoring of their compliance.  If the defendants cannot be candid enough to admit the obvious fact that the contempt proceedings were a motivating factor, can they be expected to live comfortably and comply in good faith with the judgment?

Second, certain deficiencies in management contributing significantly to defendants' unwillingness or inability to comply with the judgment came to light during the course of the contempt proceedings.  As summarized in Plaintiffs' Brief Summarizing Evidence re Contempt, pp. 41 - 48, these deficiencies include:

1.   A lack of management control over facility operations exemplified by fraudulent entries in the 2,000, 3,000, and 4,000 Control Logs and Lt. Bryan's ignorance of roof recreation practices;

2.   Confusing and inconsistent regulations, exemplified by the contradiction between purported oral policy and written regulations governing "slow eaters"

///

///

///

///

10.

tables and the procedure for obtaining access to telephones

and contradictory testimony regarding the role of Control

Logs in recording roof times;

3.   A severe shortage of deputies whereby the

jail command, alone, is 50 to 55 deputies short;

4.   A ludicrous grievance procedure that requires

inmates to submit grievance forms to their module officer

and fails to generate any meaningful inmate feedback to

officers in management positions; and

5.   A resentment of the Court's intervention,

demonstrated by Captain Ciulik's memo on dangers posed by

the Court ordered roof exercise program -- dangers, which

were illusory according to the testimony of roof officers

Henley and Garcia on May 15, 1981.

The existence of such management problems and

deficiencies which have yet to be corrected all but

guarantees repeated future breaches of the judgment --

unless defendants are subjected to scrutiny from the

outside.

Third, as demonstrated by the length and volume of

the contempt proceedings, which were heard on twelve different

days and which occupied enormous amounts of time of all

counsel and the defendants, themselves, as well as the Court,

contempt -- the only remedy readily available to plaintiffs

-- is enormously inefficient, expensive and cumbersome.  By

///

///

///

11.

1  contrast, the remedy of a monitor would be much less

2  consumptive of the Court's and counsel's time and most

3  likely the defendants' time as well and correspondingly less

4  expensive.

5       Fourth, the sanctity of the judicial process would

6  be served by appointment of a monitor.  During the contempt

7  proceedings, the Court heard a familiar, yet disturbing

8  conflict between the testimony of inmates and jail officers

9  regarding lengths of meals and access to telephones.  This

10  conflict, as yet unresolved, raises serious questions of

11  defendants' full compliance particularly in light of

12  defendants' previous resistance to allowing inmates adequate

13  time to eat their meals and reasonable access to telephones.

14  Plaintiffs, the public at large and the Court are all

15  entitled to assurances that court orders are obeyed by

16  public officers and cause actual changes in daily

17  institutional practices.  Plaintiffs submit that in the

18  instant context, the appointment of a monitor would be the

19  the best means of providing those assurances.

20       Lastly, a sizable amount of study has been done on

21  the effectiveness of monitors as opposed to other means of

22  assuring compliance with court orders.  These studies have

23  concluded that monitors are the most efficient and effective

24  means of obtaining compliance with injunctive orders.  See,

25  Special Project, "The Remedial Process in Institutional

26  Reform  Litigation," 78 Columbia L.Rev. 784, 828 (1978); N.

27  Harris and D. Spiller, After Decision: Implementation of

28  Judicial Decrees in Correctional Settings, 306 (1977); Note,

12.

1   "The Wyatt Case: Implementation of a Judicial Decree

2   Ordering Institutional Change," 84 Yale L.J. 1338-1362, 1378-

3   9 (1975); Harris, "The Title VII Administrator, A Case Study

4   in Judicial Flexibility," 60 Cornell L.Rev. 53, 62-70

5   (1974).

6

7                              IV.

8           A MONITOR SHOULD HAVE THE POWER TO MAKE
            UNANNOUNCED INSPECTIONS OF THE JAIL AND
9           HAVE FREE ACCESS TO JAIL PERSONNEL AND
            PRISONERS
10

11

12          Any monitor appointed in the instant case should

13   have the ability to freely obtain information.  Therefore,

14   that monitor's authority should include the power to make

15   unannounced inspections of the facility, the power of

16   unlimited access to certain, specified physical facilities

17   and records, and the power to confidentially interview jail

18   personnel and prisoners.  Such powers are typically given to

19   monitors.  See, e.g. Palmigiano v. Garrahy, supra, 443 F.Supp.

20   at 989; Jones v. Wittenberg, supra, 73 F.R.D. at 85 - 87.

21

22                              V.

23                          CONCLUSION

24

25          For the above stated reasons, plaintiffs request

26   that the Court appoint a monitor to observe and ensure

27   defendants' compliance with the judgment herein, said

28   ///

                              13.

1   monitor to have free access to information, facilities and

2   records.

3

4                          Respectfully submitted,

5

6                          TERRY SMERLING

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              14.

## PROOF OF SERVICE BY MAIL

I, the undersigned certify that I am a citizen of the United States, a resident of the State of California, County of Los Angeles, over the age of 18, and not a party to the within entitled action; my business address is 633 South Shatto Place, Los Angeles, California 90005.

On June 3 , 1981     I served the within MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPOINTMENT OF MONITOR

on the interested parties in said action or their attorneys by depositing a true copy thereof, enclosed in a sealed envelope, with postage thereon fully prepaid, in a United States Post Office facility regularly maintained by the Government of the United States at Los Angeles, California, addressed to each of said parties or their attorneys as follows:

Frederick Bennett
Deputy County Counsel
648 Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

I am employed by TERRY SMERLING a member of the bar of this Court and a member of the State Bar of California, at whose direction the service was made.

Executed at Los Angeles, California on June 3 , 1981.

RICHARD KATO

# EXHIBIT 6

1
2
3

JOHN H. HAGAR, JR.
444 Lincoln Blvd., Suite 319
Marina Del Rey, CA 90291
(213) 396-3498

4
5
6

FRED OKRAND
ACLU Foundation of
  Southern California
633 South Shatto Place
Los Angeles, California 90005
(213) 487-1720

7

Attorneys for Plaintiffs

8

9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12
13
14
15
16

DENNIS RUTHERFORD, et al.        )    NO.  CV 75-4111-WPG
                                 )
      Plaintiffs,                )    **PLAINTIFFS' STATUS REPORT**
                                 )
      vs.                        )
                                 )
PETER J. PITCHESS, et al.        )
                                 )
      Defendants.                )
_____)

17
18
19
20
21
22

      On November 1, 1984 the Court ordered the parties to show cause
in writing no later than December 17, 1984 why this case should not
be dismissed pursuant to Local Rule 12, for lack of prosecution.
This Status Report addresses the actions taken by the parties during
1984.

23
24

**INTRODUCTION**

25
26
27
28

      1.  This is a class action concerning the adequacy of medical
care provided to pre-trial detainees confined at the Los Angeles
County Mens Central Jail.  The custody aspects of this lawsuit have

(1)

EXHIBIT 6

1  already been litigated and plaintiffs' counsel are active in

2  monitoring ongoing compliance with this Court's Orders.

3      2.  After the commencement of this litigation, the ACLU

4  Foundation of Southern California filed a Writ of Mandate action

5  entitled ACLU et al. v. Pitchess et al., LASC Case No. C 275653,

6  filed March 9, 1979.  Petitioners sought a writ compelling the

7  County of Los Angeles to seek licensure under California Health and

8  Safety Code, sections 1250 et seq., for the health care facilities

9  (hospitals) within the Mens Central Jail and the Sybil Brand

10  Institute for Women, and a writ compelling the State of California

11  to commence the licensure process.

12      3.  On March 24, 1980 a judgement was granted to petitioners in

13  that the County respondents were ordered to apply for licensure.

14  The Los Angeles County Superior Court retained jurisdiction over the

15  processing of the license.

16      4.  The County respondents promptly applied for licensure.

17  They encountered numerous and untimely problems, including delays

18  and a lack of diligence by those State of California respondents

19  responsible for licensure.

20

21          THE PRESENT STATUS OF ACLU v. PITCHESS

22

23      5.  In February of 1984 petitioners' counsel (the same

24  individuals who are plaintiffs' counsel in this action) sought a

25  Modification of the Writ of Mandate so that the State of California

26  would be compelled to complete its licensure decision within 90 days

27  (Exhibit 1).

28      6.  Shortly thereafter attorneys for State respondents agreed

(2)

to commence a pre-licensure inspection of both the Central Jail and the Sybil Brand Institute for Women. That pre-licensure inspection began during March 1984.

7. By May 24, 1984 the pre-licensure inspection was completed and a conference held at the Sybil Brand Auditorium concerning the findings of that pre-licensure inspection. That this licensure process has been taken very seriously by the County respondents is evident in the Exit Conference Agenda and the attached Roster (Exhibit 2).

8. Several hundred "deficiencies" were detected in the County's operation of the health care facilities at the Central Jail and Sybil Brand. (However, those numbers are somewhat misleading in that many categories of deficiencies were duplicative, e.g., if one area was deemed deficient, then automatically, several other deficiencies were noted, thus solving one problem would solve several deficiencies). Prior to licensure, the County has the responsibility of resolving each deficiency.

9. Counsel for petitioners has been provided with a complete copy of the pre-licensure inspection reports for both Sybil Brand and the Central Jail. The deficiencies can be categorized as follows:

A. Structural aspects of the jail hospitals. The State of California has consistently refused to develop a licensure category for correctional health care (however, now, with the success of this action, the California Board of Corrections is seeking legislative additions to Section 1250 relating to correctional health care standards). Thus the County has been found deficient for such things as not having doors leading outside, a requirement under the

1    regulations promulgated to support Section 1250 et seq.  "Waivers"

2    are being obtained to eliminate these types of deficencies, other

3    structural problems have been corrected.

4         B.  Procedural aspects of health care.  The County needs more

5    documentation of certain procedures, e.g. if different disciplines

6    of medical care practitioners meet within the jail to discuss a

7    common problem, those meeting must be documented; individualized

8    care plans for mentally disturbed inmates require more

9    documentation; etc.

10        C.  Staff.  Certain deficiencies indicate the need for

11   additional health care staff, especially nurses, within the Central

12   Jail.

13        10.  Since the Conference of May 24th the County Respondents

14   have addressed the structural and procedural deficiencies.  Counsel

15   for petitioners has reviewed each such correction and has found them

16   adequate.  The more important problem, additional staff, is now

17   being negotiated between the Sheriff's Department and the General

18   Accounting Office of Los Angeles County, and a final decision

19   concerning this element of licensure will not be known until January

20   1985.

21        11.  Counsel for plaintiffs believes that this state court

22   licensure action is a more effective long term solution to the

23   health care needs of pre-trial detainees than the continuation of

24   this Federal Court action for the following reasons:

25        A.  The standard of care mandated by California Health and

26   Safety Code, Sections 1250 et seq. is higher than the constitutional

27   minimum standard.  Compare, California Health and Safety Code,

28   Sections 1250 et seq. to Bounds v. Smith, 430 U.S. 817 (1977);

(4)

Rhodes v. Chapman, 452 U.S. 337, 346 (1981).

B.  Recent decisions may have precluded this Court from ordering the County of Los Angeles to comply with State laws and regulations. See, Pennhurst State School v. Halderman et al., 44 CCH S. Ct. Bull, pp B884, 84 Daily Journal D.A.R. 437.

C.  State licensure will provide for periodic State inspections of the health care facilities within the Central Jail, thus on-going compliance will be effectuated through an existing agency as well as through periodic reviews by counsel for petitioners.

D.  Licensure will provide detailed standards concerning many aspects of health care, details which if litigated, would essentially become a battle of experts, and even if resolved, would not provide the flexibility over time that licensure may provide. An example is "nursing ratio," a term which essentially means the number of hours a nurse spends with a specific patient during a twenty-four hour period.  Section 1250 and its regulations mandate an approximate 2.5 nursing ratio for "skilled nursing facilities" (most of the Central Jail hospital is a skilled nursing facility, however a portion has been designated an Acute Care Psychiatric Unit).  There should be enough nurses within the Central Jail to provide 2.5 hours of individual care for each patient within any twenty-four period.  Presently, the nursing ratio at the Central Jail is .7, thus the need for an increased budget and additional nurses mandated by licensure.  (The 2.5 standard is somewhat misleading in that, again, State nursing ratios are presently calculated using the non-correctional setting as a model.  The Central Jail infirmary holds several categories of patients, e.g.,

(5)

1   an inmate with a broken arm, who in the non-correctional setting

2   would require limited out-patient care, but who in the jail

3   environment requires separate housing.  Thus the 2.5 figure may be

4   too high for certain areas of the Central Jail hospital.  What is

5   important in this context is that licensure applies approved

6   professional medical standards, guidelines which would have to be

7   litigated if this Federal Court action is to proceed, and would have

8   to be amended if practices change.)

9       12.  Licensure will not resolve every health problem within the

10   Central Jail.  In particular two issues, the screening of new

11   prisoners in the Inmate Reception Center and care for those inmates

12   who begin to "act out" a mental problem, will require constant

13   attention by both the defendants in this action and counsel for the

14   inmates at the Central Jail.  These areas have been monitored during

15   1984.  At present, a video program concerning Jail services,

16   including health services, is being prepared so that inmates in

17   classification modules can be repeatedly instructed what to do about

18   sick call, pill call, etc.  With the re-opening of the Hall of

19   Justice to certain categories of pre-trial detainees, inmates

20   classified as "Softs" were moved to HOJJ and Module 2100 in the

21   Central Jail designated as an Module to confine inmates exhibiting

22   psychological difficulties.  In addition, Modules 4500 and 4600 are

23   also used to confine and treat inmates with psychological problems.

24   Thus, a three tier psychological placement system now exists with

25   the Central Jail, a definite improvement over the system which

26   existed when this litigation was filed.  Counsel for plaintiffs is

27   provided unlimited access to these modules, and periodically tours

28   them without prior notice (last tour was November 21, 1984).

1

2

3

## CONCLUSION

Because of the above action concerning <u>ACLU</u> v. <u>Pitchess</u>, plaintiffs contend that this action should be dismissed for lack of prosecution pursuant to Rule 12 of the Local Rules.  However, because of the implementation of licensure, plaintiffs do suggest a Status Conference in early 1985 to discuss the dismissal, without prejudice, of the remaining medical portion of <u>Rutherford</u> <u>et</u> <u>al</u>. v. <u>Pitchess</u> <u>et</u> <u>al</u>.

DATED:  December 5, 1984

FRED OKRAND
JOHN H. HAGAR, JR.

By: _____
John H. Hagar, Jr.
Attorneys for Plaintiffs

EXHIBIT 2.

1  JOHN H. HAGAR, JR.
   444 Lincoln Blvd., Suite 319
2  Marina Del Rey, CA 90291
   (213) 396-3498
3
   FRED OKRAND
4  ACLU Foundation of
      Southern California
5  633 South Shatto Place
   Los Angeles, California 90005
6  (213) 487-1720

7  Attorneys for Petitioners.

8
                   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                       FOR THE COUNTY OF LOS ANGELES
10

11  AMERICAN CIVIL LIBERTIES UNION  )   Case No.  C 275653
12  OF SOUTHERN CALIFORNIA, Inc.,   )
    et al.,                         )   POINTS AND AUTHORITIES
13                                  )   IN SUPPORT OF MODIFICATION
        Petitioners,               )    OF PEREMPTORY WRIT OF MANDATE;
14                                  )   DECLARATION OF JOHN H. HAGAR;
    vs.                             )   EXHIBITS
15                                  )
    PETER J. PITCHESS, et al.,      )
16                                  )   Department: 85
        Respondents.               )    Date:  February 2, 1984
17  _____ )    Time:  9 a.m.

18

19
                            INTRODUCTION
20

21
        On March 9, 1979 the American Civil Liberties Union of Southern
22
    California, the Unitarian Universalist Service Committee, and Joyce
23
    Fisk, an individual and taxpayer, petitioned this Court for a Writ
24
    of Mandate and Declaratory Relief.  There were two groups of named
25
    respondents, those county employees responsible for the operation of
26
    the Los Angeles County Men's Central Jail and the Sybil Brand
27
    Institute for Women, and the state employees responsible for the
28

                               (1)

1   licensure of health facilities pursuant to the mandates of Health

2   and Safety Codes, sections 1250 et seq.

3       Both the county and the state respondents filed answers to the

4   petition for writ of mandate and declaratory relief on or about

5   February 14, 1980.  The petitioners filed replications to those

6   answers a few days later, and on March 24, 1980, a judgement was

7   granted to petitioners in that the county respondents were commanded

8   to apply to the California Department of Health, pursuant to Health

9   and Safety Code, sections 1250 et seq. for licensure of the health

10  facilities at the Los Angeles County Men's Central Jail and the

11  Sybil Brand Institute for Women within thirty (30) days.  The

12  Court's judgement retained jurisdiction to supervise both the Order,

13  and the processing and disposition of the county respondents

14  application for licensure.

15      On April 4, 1980, the writ of mandate under the seal of this

16  Court was issued.  Since that date, County respondents have

17  encountered numerous and untimely roadblocks in the process of

18  licensure application; delays, lack of diligence, and a systematic

19  failure to promptly and properly evaluate the applications by the

20  State respondents.  This continuing controversy now requires the

21  continued intervention of this Court, and a command to the State

22  respondents to determine, in a timely manner, after more than three

23  and one half years of review, whether the Los Angeles County Men's

24  Central Jail or the Sybil Brand Institute for Women should be

25  granted or denied a license pursuant to Health and Safety Code,

26  sections 1250 et. seq.

27

28

THE SYSTEMATIC FAILURE OF THE STATE'S LICENSING PROCESS

As explained in the attached declaration of John H. Hagar, Jr., and the Answer to Interrogatory No. 1 of those interrogatories referenced in the declaration, the County respondents began on March 10, 1983, a series of steps to apply for licensure under the guidelines of Health and Safety Code, sections 1250 et seq.

A review of these attachments indicates the sequence of events which have transpired during the lengthy time period since the judgement on this matter.  A series of time consuming delays and reversals have seriously hampered the efforts to effectuate this licensure process.  Of particular concern is the continual change of State personnel assigned to this project (See the entry for January 5, 1982, the entry for October 25, 1982, and the entry for November 1, 1982); the failure of the employees of the State respondents to return telephone calls and letters on a timely basis (see the entries for January, February, and March 1982, and the entry for March 25, 1982); and the reversals in policy after the licensure process was well under way (see the entry for April 29, 1982 and the entry for May 18, 1982 - all the more a problem because the employees of the State respondents appear to be stating that a Certificate of Exemption is not appropriate because this Court's order did not define a specific date by which the County respondents much be licensed).  Additional delay occurred because of changes in fee requirements (See the entry of July 12, 1982).

It is interesting to compare these delays with the contentions of the State respondents during the initial stages of this litigation.

On pages four and five of their Answer of February 11, 1980, the
State respondents argue that no actual controversy has arisen
between the petitioners and the licensor respondents because an
application for license had not yet been received.   The State
respondents go on to argue that the action is premature against the
State respondents until an "application is submitted, and State
licensor respondents fail to act within a reasonable time."  More
than three and one half years have passed and the State respondents
have failed to act.   One of their reasons for not acting was that
this Court did not set a specific date for compliance in its initial
order.   Meanwhile, the inmates at both institutions continue to
suffer harm because of the delays of the State respondent.   It is
now appropriate for this Court to command the State respondents to
act on the license request by the County within ninety (90) days.


                    THE RELIEF REQUESTED


     A petition for a Writ of Mandate is proper to compel a public
official to act.   King v. Martin (1971) 21 Cal.App.3rd 791, 795-796,
98 Cal.Rptr. 711 (welfare rights hearings);   Walker v. Los Angeles
County (1961) 55 Cal.2d 626, 639, 12 Cal.Rptr. 671, 361 P.2d. 247;
Le Page v. Oakland (1970) 13 Cal.App.3d 689, 692, 91 Cal.Rptr. 806
(charter duties); Wenke v. Hitchcock (1972) 6 Cal.3d 746, 751, 100
Cal.Rptr. 290, 493 P.2d. 1154; Miller v. Greiner (1964) 60 Cal.2d
827, 830, 36 Cal.Rptr. 737, 389 P.2d. 129 (elections); Farley v.
Healey (1967) 67 Cal.2d 325, 62 Cal.Rptr. 26, 431 P.2d. 650, Gayle
v. Hamm (1972) 25 Cal.App.3d. 250, 254-255, 101 Cal.Rptr. 628

1    (initiatives).

2        The California courts have further ordered a public official to

3    exercise his reasonable discretion in the appropriate circumstances.

4    Ballard v. Anderson (1971) 4 Cal.3d. 873, 884-885, 95 Cal.Rptr. 1,

5    484 P.2d. 1345; Hollman v. Warren (1948) 32 Cal.2d. 351, 356, 19

6    P.2d. 562.

7        Petitioners are requesting that this Court exercise its

8    continuing jurisdiction concerning this controversy and order the

9    State respondents to grant or deny the requested licensure of the

10   health care facilities within the Los Angeles County Men's Central

11   Jail and the Sybil Brand Institute for Women.  Petitioners are not

12   at this time demanding that licensure be granted, or that it be

13   denied, they only seek an order compelling the State respondents to

14   act, as their post judgement delays are not reasonable.

15   Petitioners, at this time,  do not demand that the State respondents

16   act in a particular manner, only that they exercise their mandated

17   discretion within the next ninety days, after more than three and

18   one-half years of evaluation of the County respondents' licensure

19   application.

20

21   Dated:  January 3, 1984

22

23

24                        Fred Okrand
                          John H. Hagar, Jr.
25

26                        By
                          John H. Hagar, Jr.
27                        Attorneys for Plaintiffs

28


                              (5)

DECLARATION

I, JOHN H. HAGAR, JR. DO HEREBY DECLARE AS FOLLOWS:

1.   I am one of the attorneys for the Petitioners in this matter and have personal knowledge of the facts set forth herein.  If I was called as a witness, I would be competent to testify hereto.

2.   I am also one of the attorneys for the plaintiffs in Dennis Rutherford et al. v. Peter J. Pitchess et al., a class action lawsuit concerning conditions of custody in the Los Angeles County Central Jail.   That action, CV 75-4111-WPG, was bifurcated and although the custody aspects of that case have been litigated, the medical case has not.   In July of 1983 I served upon the defendants Interrogatories and Requests For Production of Documents.

3.   Interrogatory No 1. requested all available information relative to the status of the licensure of the Los Angeles County Men's Central Jail pursuant to this Court's Writ of Mandate of April 4, 1980.   A complete and correct copies of the Answer to Interrogatory No. 1 is attached to this Declaration as Exhibit Number 1, and complete and correct copies of the attachments provided in response to that Interrogatory are attached to this Declaration as Exhibit Number 2.

4.   Attachments 23-30 were obtained as a response to a Request for Production of Documents and are relative to this matter in that:

A.   Attachment No. 23. relates to the entry dated July 12, 1982.

B.   Attachment No. 24. relates to the entry dated August 28, 1982.

C.   Attachment No. 25. relates to the entry dated October 15,

1   1982.

2      D.   Attachment No. 26. relates to the entry dated December 7,

3   1982.

4      E.   Attachment No. 27. relates to the entry dated March 14,

5   1983.

6      F.   Attachments No. 28-30 relate to events which occurred

7   after the last entries in the chronological log provided by the

8   County as a response to the above mentioned interrogatories.

9      4.   As the exhibits clearly document, although more than three

10  and one-half years have transpired since this Court's Judgement on

11  this matter, there is at present no indication that the State

12  respondents intend to exercise their discretion concerning the

13  licensure application as mandated by Health and Safety Code, section

14  1250 et seq.

15  I declare under penalty of perjury that the foregoing is true and

16  correct.

17

18  Executed this  3rd day of January, 1984 at Santa Monica,

19  California.

20

21                      John H. Hagar, Jr.

22

23

24

25

26

27

28

                                7

                               15

EXHIBIT 1.

LICENSE SURVEY EXIT CONFERENCE

MAY 24, 1984

AGENDA

I.    INTRODUCTION                              – W. KERN

II.   EVENTS LEADING TO APPLICATION
      FOR LICENSURE                             – P. HICKOK

III.  LICENSURE PROCESS TO THE                  – W. KERN/
      POINT OF SURVEY                             D. ESTES

IV.   SURVEY PROCESS AND MAJOR FINDINGS

      A.  STATE LICENSING AND
          CERTIFICATION DIVISION                – L. KEESE

      B.  STATE FIRE MARSHAL'S OFFICE           – L. DEGNAN

V.    MAJOR ISSUES AND PLAN OF ACTION           – W. KERN

VI.   DISCUSSION                                – ATTENDEES

VII.  ADJOURN

LICENSURE AND CERTIFICATION
SURVEY EXIT CONFERENCE

THURSDAY, MAY 24, 1984

ROSTER


Al Alvarez, District Administrator
California State Department of
 Health Services
Licensing and Certification Division
(714) 558-4001

Jane E. Armstrong, R.N.
Office of Quality Assurance
Los Angeles County Department of
 Health Services
(213) 974-8141

Gladys H. Ashby, Captain
Sybil Brand Institute for Women
Los Angeles County Sheriff's Department
(213) 267-2601

Kelsea K. Baggett, Director of Nursing
Medical Services
Los Angeles County Sheriff's Department
(213) 974-4947

Charles J. Baker, M.D., Medical Director
Probation Health Services
Los Angeles County Department of
 Health Services
(213) 226-8723

Ronald C. Black, Captain
Men's Central Jail
Los Angeles County Sheriff's Department
(213) 974-4911

Peter Chen, Director
Forensic Inpatient Program
Los Angeles County Department of
 Mental Health
(213) 974-9613

Robert Cook, Lieutenant
Sybil Brand Institute for Women
Los Angeles County Sheriff's Department
(213) 267-2603

LICENSURE ROSTER

Page 2

Lloyd "Skip" Degnan, General Plan Reviewer
California State Fire Marshal's Office
(213) 620-2126

Dianna Estes, R.N., Executive Assistant
Medical Services
Los Angeles County Sheriff's Department
(213) 974-5013

Thomas T. Flaherty, Assistant Nursing Director
Medical Services
Los Angeles County Sheriff's Department
(213) 974-4947

Sonja Hagen, Supervising Staff Nurse II, Sheriff
Medical Services
Los Angeles County Sheriff's Department
(213) 267-2661

John Hager, Attorney
American Civil Liberties Union
(213) 396-3498

Jerry L. Harper, Assistant Sheriff
Los Angeles County Sheriff's Department
(213) 974-4125

Mike Henry, Chief Analyst
Chief Administrative Office
(213) 974-1138

Phil Hickok, Deputy County Counsel
Los Angeles County Counsel
(213) 974-1821

Sally Higa, Senior Staff Nurse
Medical Services
Los Angeles County Sheriff's Department
(213) 974-4496

Linn Keese, Supervisor
California State Department of
 Health Services
Licensing and Certification Division
(714) 558-4001

LICENSURE ROSTER

Page 3


Harvey D. Kern, Administrator
Office of Quality Assurance
Los Angeles County Department
 of Health Services
(213) 974-8141

William H. Kern, Acting Director
Medical Services
Los Angeles County Sheriff's Department
(213) 974-5045

Walter N. King, Acting Associate Director
Medical Services
Los Angeles County Sheriff's Department
(213) 974-4941

Richard Kushi, Director
Forensic Outpatient Program
Los Angeles County Department
 of Mental Health
(213) 974-8066

Norma Lammers, Executive Director
California State Board of Corrections
(916) 445-5073

Michael Langgle, Sergeant
Custody Division
Los Angeles County Sheriff's Department
(213) 974-4715

Robert Lowe, Chief, Food Services
Custody Division
Los Angeles County Sheriff's Department
(213) 974-4187

Jerome Lubin
Planning, Evaluation and Management
 Information Division
Los Angeles County Department of
 Health Services
(213) 974-7944

LICENSURE ROSTER

Page 4


Pete Malone, Deputy State Fire Marshal III
California State Fire Marshal' Office
(213) 620-2126

Richard Odenthal, Lieutenant
Men's Central Jail
Los Angeles County Sheriff's Department
(213) 974-5058

Roberto Quiroz, Acting Assistant
 Director - Programs
Los Angeles County Department of
 Mental Health
(213) 738-4603

Fred Ramirez, Principal Analyst
Chief Administrative Office
(213) 974-1417

Roger Schock, M.D.
Program Services Bureau
Los Angeles County Department of
 Mental Health
(213) 738-4851

Jack L. Smith
Office of Quality Assurance
Los Angeles County Department of
 Health Services
(213) 974-8141

David Stone, Chief Fiscal Officer
Fiscal Services Bureau
Los Angeles County Sheriff's Department
(213) 974-4701

David Stothers, Lieutenant
Medical Liaison Unit, Men's Central Jail
Los Angeles County Sheriff's Department
(213) 974-5038

LICENSURE ROSTER

Page 5

Armon H. Toomajian, M.D., Chief Physician
Medical Services
Los Angeles County Sheriff's Department
(213) 974-0149

Thelma Tsunokai, R.N.
Probation Health Services
Los Angeles County Department of
 Health Services

John Waller, Assistant Nursing Director
Medical Services
Los Angeles County Sheriff's Department
(213) 974-4947

PROOF OF SERVICE BY MAIL

John H. Hagar, Jr. declares:

I am over the age of 18 years, not a party to this action, a member of the bar of this Court, and employed in Los Angeles County, California.

On December 6, 1984 I deposited in the mail at Los Angeles, a copy of the attached PLAINTIFFS' STATUS REPORT in a sealed envelope, with postage fully prepaid, addressed to:

PHILLIP H. HICKOK
Deputy County Counsel
Office of the County Counsel
648 Hall of Administration
Los Angeles, CA 90012


I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 6, 1984 at Santa Monica, California.


John H. Hagar, Jr.