1 | PAUL B. BEACH, State Bar No. 166265
pbeach@lbaclaw.com
2 | JUSTIN W. CLARK, State Bar No. 235477
jclark@lbaclaw.com
3 | LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
4 | Glendale, California 91210-1219
Telephone No. (818) 545-1925
5 | Facsimile No. (818) 545-1937

6 | Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, et al., | Case No. CV 75-04111 DDP |
| Plaintiffs, | Honorable Dean D. Pregerson |
| vs. | **DECLARATIONS OF CHIEF DENNIS BURNS AND PAUL B. BEACH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF ORDER RE PURPORTED RETALIATION** |
| SHERMAN BLOCK, et al., | |
| Defendants. | *[Opposition Memorandum Of Points And Authorities And Evidentiary Objections Filed Concurrently Herewith]* |
| | Date: November 29, 2010<br>Time: 10:00 a.m.<br>Crtrm: 3 |

21 ///
22 ///
23 ///

1

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

# DECLARATION OF CHIEF DENNIS BURNS

I, Chief Dennis Burns, declare as follows:

1. I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so.

2. I am a sworn peace officer of the Los Angeles County Sheriff's Department ("LASD" or "Department") and have been employed by the LASD for more than 36 years. I am presently assigned as the Chief of the Custody Operations Division which, along with the Correctional Services Division, is responsible for the operation of the Los Angeles County jails. My prior work assignments include the position of Captain of the LASD's Internal Affairs Bureau ("IAB"), which is responsible for conducting administrative investigations against Department members who have engaged in misconduct in the form of violating the Department's policies and procedures. During my law enforcement career, I have reviewed and/or participated in hundreds of investigations.

## Introduction

3. I am informed and believe that in this matter the ACLU has asked this Court to enter an order prohibiting members of the Sheriff's Department from retaliating against inmates who have spoken or cooperated with the ACLU, as well as additional relief. Before addressing the many reasons that the proposed order is unnecessary and would harm the Department, it is imperative that the Court know that every allegation of retaliation at issue in this Motion that the Department has investigated has been determined to be **without merit**. As set forth in greater detail below, the Department takes allegations of retaliation and other deputy misconduct extremely seriously and such claims are always thoroughly investigated. Here, none of the Department's investigations have

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

revealed any retaliation against inmates. In addition, even if the Department had found that Department personnel had retaliated against inmates, an order from the Court would be unnecessary because the Department already has a variety of means of addressing and responding to claims of retaliation and other deputy misconduct.

### The Department Does Not Condone, And Specifically Prohibits, Retaliation Against Inmates

4. First and foremost, the Department in no way, shape, or form condones retaliation against inmates for any reason. In fact, the opposite is true: the Department specifically prohibits its members from retaliating against inmates. Moreover, as explained below, the Department dedicates significant resources and efforts to prevent, investigate and, if necessary, punish Department members for improper treatment of inmates.

### The Department Goes To Great Lengths To Prevent Retaliation Against Inmates

5. The Department exercises great care to prevent retaliation against inmates. Those efforts begin before Department members are hired and continue throughout the course of employment.

   a) Recruitment – The LASD works very hard to recruit honest, compassionate, and hard-working people who were capable of learning, following instruction, and using good judgment. The LASD has criteria and a process that is designed and implemented to recruit these types of people. The LASD also does extensive screening of applicants that includes, without limitation, an extensive background check that includes a criminal history check, motor vehicle check, credit check, employment check, and reference check. The screening employed by the LASD for its applicants is at least as rigorous as that required to obtain a top secret security clearance with a government agency. In addition, the LASD subjects its applicants to a variety of written and oral exams. While no organization

or system is perfect, my experience is that the LASD's recruitment efforts help supply the Department with personnel who were ready, willing and able to help the Department achieve its goals, including that of protecting LASD inmates;

b) Academy Training – Those entry-level LASD candidates who meet the criteria of the recruiting process are required to attend and successfully complete a full-time 19-week Academy School before they become a deputy and work in the LASD's jail facilities. The Academy operated by the LASD is approved by the Commission on Peace Officer Standards and Training ("POST"), as required by the State of California. Other law enforcement agencies also send their officers to the LASD Academy. At the Academy, candidates receive extensive training regarding the LASD's policies and practices, as well as well-established law enforcement techniques. This schooling includes how to interact with inmates and that inmates are allowed to exercise their rights without being subjected to retaliation;

c) Custody Training – Those candidates who successfully complete the Academy are then assigned to a custody facility. When they report to their assigned facility, new deputies are first required to take and pass a 80-hour jail operations course, which includes more-detailed law enforcement training specific to the custody environment. This training includes, without limitation, how to follow the LASD's policies and practices applicable to custody facilities, including how to allow inmates to raise and resolve complaints that they may have during the custody environment. After this course, each new deputy was then assigned a training deputy for a period of approximately 12 weeks. In addition, Sergeants and Lieutenants assigned to a custody facility are also required to attend and complete a two-week POST approved Supervisor's School, which covers how supervisor personnel should operate in the custody environment. These same supervisor personnel are also afforded a 40 hour Custody Incident Command School, which specifically focuses on how to respond to emergencies in the custody environment;

        d)     In-Service Training – LASD personnel are also required to complete at least 24 hours of in-service training (i.e., on the job training) per year. This training may include, without limitation, such subjects as the inmate complaint process, how to interact with inmates, how to provide emergency medical care to inmates, when to use force against inmates, how to use only that force which is necessary, and how to identify inmates with conditions (such as mental problems) that may pose a threat to other inmates, staff or the inmate himself;

        e)     Supervision – The LASD, which is the largest Sheriff's Department in the world, also has a management structure that organizes responsibilities and personnel so that the Department's policies are successfully implemented. This structure includes layers of direct supervision, so that every deputy is supervised by a higher-ranking member of the Department, and that those supervisors are overseen by other higher-ranking Department members, and so on, up to Sheriff Baca. These supervisor personnel also receive annual management training.

     6.     The Department also has in place a variety of policies and procedures that govern the conduct of Department personnel. Once such policy specifically prohibits and is designed to prevent retaliation against inmates. Attached hereto as Exhibit "A" is a true and correct copy of a Custody Division Manual policy regarding the treatment of inmates. Specifically, in this policy, it states that "[i]nmates shall not be subjected to discipline when making inquiries, or express dissatisfaction in a civil manner, regarding the conditions of confinement…"

## The Department Investigates And Holds Department Members Accountable For Retaliation Against Inmates.

     7.     The Department also investigates and, if corrective action needs to be taken, punishes Department members for retaliation against inmates. This process can occur in three different ways, depending upon the nature and severity

1  of the accusation. If the suspected wrongdoing by LASD personnel is relatively
2  minor, then the accusation will be investigated and addressed at the unit level.
3  Here, this means that the Captain of MCJ, Dan Cruz, a 31-year member of the
4  Department, will personally supervise and review the investigation and take any
5  and all necessary corrective action against the subject Department member. If
6  the suspected wrongdoing is of a more serious nature, then the matter will be
7  referred directly to the LASD's Internal Affairs Bureau ("IAB") for investigation.
8  IAB, which is staffed by trained and experienced supervisors, will conduct a
9  thorough investigation (including interviewing all key witnesses, including the
10 purported victim and involved Department personnel). If it is determined that the
11 involved Department personnel violated any Department policy, then appropriate
12 discipline (including, if appropriate, termination) will be imposed. Finally, if the
13 alleged misconduct conduct rises to the level of criminal activity, the matter will
14 also be referred to the Department's Internal Criminal Investigations Bureau
15 ("ICIB"), which specifically investigates criminal activity by law enforcement.
16 A complete criminal investigation will be conducted and if it reveals criminal
17 wrongdoing, then the results of the investigation will be referred to criminal
18 prosecutors for their determination whether to file criminal charges.

**In Addition To The Department's Internal Policies And Procedures Designed To Prevent, Investigate, And Punish Retaliation Against Inmates, There Are Multiple Independent Outside Resources Which Monitor The Department, Its Members, And Its Investigations**

23     8. Asked this court knows, Sheriff Baca is dedicated to running a
24 transparent law enforcement agency. As part of this mission, the Department has
25 entered into arrangements with multiple outside entities that monitor the
26 Department's operations and its members. These organizations are independent
27 and the Department cannot and does not control their scrutiny of the Department.
28 For example:

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

a) <u>Merrick Bobb and the Police Assessment Resource Center Recruitment ("PARC")</u> – For approximately 16 years, Mr. Bobb, who is the President and founding director of PARC (a project The Vera Institute developed and launched in Los Angeles), has monitored the Department. Mr. Bobb is one of the original members of The Kolts Commission, and is a nationally known monitor of law enforcement agencies. PARC regularly publishes public reports assessing the operations of the Department. (*See*, www.parc.info/)

b) <u>Michael J. Gennaco and the Office of Independent Review ("OIR")</u> – Mr. Gennaco is a well-respected attorney and served as Chief of the Civil Rights section of the Office of the United States Attorney. In that capacity, Mr. Gennaco oversaw prosecutions of peace officers for civil rights violations from various departments, including the LASD. Prior to working in Los Angeles, Mr. Gennaco served for ten years as a trial lawyer with the Civil Rights Division in Washington, D.C. Mr. Gennaco now heads OIR, which is a civilian oversight group that was created in 2001 to monitor the Department and provide legal advice to ensure that allegations of officer misconduct involving the Department are investigated in thorough, fair, and effective ways. OIR regularly produces public reports in accordance with its mission. (*See*, www.laoir.com)

c) <u>Various Federal And State Agencies</u> – The Department is also under the jurisdiction of and regularly inspected by both federal and state agencies. These organizations visit and review the Department's custody operations to ensure that they are in compliance with all federal, state, and local laws and regulations.

d) <u>The ACLU</u> – As this Court knows, since entry of the judgment in this matter approximately 30 years ago, the Department has cooperated extensively with the ACLU in its efforts to monitor compliance with the judgment. For example, the Department has allowed the ACLU almost unlimited access into all of its jail facilities, day or night, weekday or weekend. The

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

Department has also given the ACLU access to all of its jail staff, especially high ranking executives (including myself). The Department has also given the ACLU access to documents and computer information. The Department has also created office space in its custody operations facilities so that the ACLU can carry out its activities in the jails. Importantly, the Department has also extended the ACLU's vast access to the Department, its information, and its personnel far beyond the scope of the judgment in *Rutherford*, into almost every aspect of the custody environment. Furthermore, for decades, the Department has agreed, without the need for court intervention, to compensate the ACLU every month so that it can carry out its activities. The extensive working relationship that the Department and the ACLU have enjoyed has resulted in agreed upon changes in the custody environment without the need of costly and time consuming judicial intervention. I know of no other law enforcement agency that has permitted a civil rights organization access and cooperation similar to that which the Department has provided to the ACLU. While I strongly disagree with the accusations asserted by the ACLU in the subject Motion, the ACLU cannot credibly dispute that it enjoys unprecedented access and transparency in Los Angeles County.

### Inmates Have Multiple Avenues Of Relief If They Feel That They Have Been Subject To Retaliation By Department Members

9. Inmates who feel that they have been mistreated while incarcerated in the Los Angeles County jails have several means of obtaining relief. For example:

a) <u>Access to Staff and Supervisors</u> – If an inmate believes that he or she has been mistreated by a Department member, that inmate has access to other Department members, including supervisors who are assigned to every floor at MCJ. Also, if an inmate has been accused of conduct that could subject him to discipline, he will receive an administrative hearing before a neural supervisor who was not involved in the incident that gave rise to the proposed

discipline.

b) <u>Inmate Complaint Forms</u> – Similarly, inmates who wish to make a formal complaint with the Department about the conduct of deputies may complete and turn in an inmate complaint form. These complaint forms are available in every housing location. Inmates may also ask jail staff for blank copies of the form. Once inmates complete these forms, they may deposit them in locked boxes that are also located in each housing area. Only supervisors have keys to these lockboxes, and only supervisors investigate inmate complaints. Additionally, inmates who are unhappy with the Department's response to their complaint may appeal the decision.

c) <u>Ombudsman</u> – In accordance with the County Code, the County also has an Office of the Ombudsman, which is a neutral third-party that is specifically trained and devoted to hearing and responding to complaints about the Department.

d) <u>Government Code Tort Claim</u> – Furthermore, inmates may also file a tort claim against the Department pursuant to the California Government Code.

e) <u>Civil Lawsuit</u> – Finally, inmates who believe that their rights have been violated by the Department or its members may also pursue civil litigation in either federal or state court.

**The Inmate Declarations That Have Been Provided To The Department By The ACLU Have Been Thoroughly Investigated And Deemed To Be Unfounded**

10. In early 2009, the Department began to receive sporadic reports from the ACLU regarding allegations of retaliation against inmates by Department personnel. In several cases, the inmate declarations submitted by the ACLU in support of Plaintiffs' Motion for injunctive relief overlap with previously raised allegations of retaliation that are now more than a year old. For

the retaliation claims that were provided to the Department in the past so that an investigation could be conducted, the Department has completed its investigation and has not found any retaliation. This includes the following inmate's claims:

1) Dayshaun Rushing;

2) Emmanuel Benson;

3) Antonio Rodriguez;

4) Michael Holguin;

5) Eefrom Jones.

11. Plaintiffs' Motion also includes declarations from the following inmates:

1) Robert Dragusica (two declarations);

2) Mario Love;

3) Ruben Beltran;

4) Antonio Candelario;

5) Timothy Gaines.

For these inmates, the ACLU did not provide their declarations to the Department before the Motion for injunctive relief was filed. For these inmates, just as for inmates listed in Paragraph 10 (for whom investigations have already been completed), the Department will conduct a thorough investigation and if any retaliation is found, the Department will take appropriate corrective action. While the Department's investigation into these inmates' claims has not been completed, it bears mention that several of these inmates are not even in County jail custody at this time and have been released to other agencies.

12. In general, when the ACLU raised allegations of retaliation, the specific complaints failed to provide any specific details and in most cases, the allegations were not brought to the Department's attention until months after the alleged incidents. In response to the ACLU's allegations, the Department requested more specific details so that the subject claims could be thoroughly

investigated. Obviously, without certain information (such as an inmate's name and the facts of the alleged incident), it would be impossible for the Department to conduct a proper investigation. In fact, in many of the situations where the ACLU raised allegations of retaliation, they failed to provide even this most basic information. In some cases, the ACLU refused to provide even the names of the inmates who were making the claims of retaliation. Even when information was provided, in most cases, the information was still extremely vague and stale.

13. As stated above, each time the Department received a retaliation complaint from the ACLU, a thorough investigation was conducted using all necessary resources at the Department's disposal. These investigations were and are extremely costly and required Department resources to be diverted away from other criminal investigations. Thus far, the Department has spent tens of thousands of dollars investigating the ACLU's claims of retaliation. **Importantly, with respect to each claim of retaliation raised by the ACLU, the Department's investigation concluded that each and every one of the retaliation complaints raised by the ACLU was unfounded.** As an additional level of review, the OIR reviewed the Department's investigations and concurred with the Department's determination that the retaliation claims were without merit.

14. While the retaliation claims raised by the ACLU were deemed unfounded, unfortunately, the details of those investigations (such as the names of personnel alleged involved) cannot be disclosed pursuant to restrictions imposed on the Department by various provisions of California law. Specifically, California Penal Code §§ 832.5 et seq. and California Evidence Code §§ 1040 et seq. prohibit the Department from disclosing information contained in a law enforcement officer's personnel file. The protected information includes much of what Plaintiffs' proposed order would require the Department to produce, such as discipline charges and prior claims of

misconduct. Quite frankly, given that none of the ACLU's retaliation complaints had any merit, it would be in the Department's interests to disclose the results of the retaliation investigations; however, pursuant to the authorities above, the Department cannot legally disclose the information. Even disclosure pursuant to Court order would expose the Department to litigation by Department personnel.

15. In addition to the above authorities, the Peace Officer Bill of Rights, California Government Code §§ 3300 through 3312 ("POBR") grants peace officers further protections and rights that limit the Department's ability to discuss or disclose information related to investigations into deputy misconduct. While such investigations might not appear to fit the mold of a criminal investigation, that is exactly what they are. Without going into specifics, many of the retaliation complaints allege serious criminal offenses like assault and rape. When the Department investigates this type of criminal allegation, investigated deputies are treated, for all intensive purposes, as criminal suspects. Pursuant to POBR, deputies who are the subject of criminal investigations have specifically delineated rights and procedural safeguards that further prevent the Department from disclosing specific details of the Department's investigations into the ACLU's retaliation complaints.

16. Because of the above referenced authorities, the Department cannot legally disclose the results of the retaliation investigations; however, I can state unequivocally that of the retaliation claims the Department has investigated, all of them have been deemed unfounded.

17. As explained above, pursuant to California law, the Department cannot disclose information related to criminal / retaliation investigations that could result in punitive actions taken against Department personnel. While the Department cannot release investigative records or provide specific details regarding the retaliation investigations that have been completed, several of the subject retaliation claims are indicative of the types of allegations raised by the

ACLU. To the extent possible, some basic information regarding these claims is detailed below.

18. On July 1, 2009, Plaintiffs' counsel, Melinda Bird, brought an allegation of retaliation to the Department's attention involving an inmate named Matthew Schubert . While the ACLU did not submit a declaration from Mr. Schubert, his claim is referenced in Plaintiffs' Exhibit "P" in a letter from Ms. Bird to Assistant Sheriff Cavanaugh. According to Inmate Schubert's claim, in the summer of 2007, he was drugged by another inmate and then sodomized by Department personnel. Immediately after Mr. Schubert's allegations were brought to the Department's attention, an ICIB investigation was initiated and closed due to a lack of probable cause. Pursuant to Department protocol, an IAB investigation was then opened and during the initial phase of the investigation, it became very clear that Inmate Schubert is mentally ill and that his allegation of being raped was highly suspect. Specifically, when he was interviewed by ICIB, Inmate Schubert informed the investigating officer that *he only knew what happened to him by conferring with the CIA* and that he personally had no recollection of the incident. Inmate Schubert later acknowledged lying about having been raped by Department personnel. Further, ICIB investigators discovered that Inmate Schubert made several written threats against the CIA. Unfortunately, it is not uncommon for inmates to make false charges such as this in order to manipulate deputies, obtain financial gain, or similar reasons.

19. In terms of the balance of the inmate declarations submitted by the ACLU, the majority of the complaints are simply not credible for many reasons. These reasons include conflicting statements by the inmate (such as differing versions of statements regarding the personnel involved and other details of the incidents), the lack of any corroborating witnesses or evidence (like evidence of physical injuries), and in many cases, the inmate simply admits he was not telling the truth. For example, many of the inmate declarants admit that their claims are

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

false when they are interviewed and further, when the complete details of an incident are examined (which inmate declarants tend to leave out), it is usually the case that the inmate was violating a jail rule or policy when they claim Department personnel retaliated against them. Not surprisingly, inmates fail to include in their version of events that they were breaking the rules. Thus, while an inmate may claim they were retaliated against for speaking with the ACLU, the truth of matter is usually that they violated a jail rule or policy and were searched or disciplined based on that violation – not for speaking with the ACLU.

20. In one particularly troubling case, the Department's investigation revealed that a group of inmates were manufacturing claims of retaliation and excessive force against deputies as part of efforts to file a lawsuit. In that case, despite the inmates' declarations and statements to the ACLU, there were no injury reports, no independent witnesses, and the investigators actually recovered a written communication between the subject inmates regarding their plan to falsely claim that they were subjected to excessive force.

21. As stated above, several of the retaliation claims in support of the ACLU' Motion are from many months ago and have previously been brought to the Department's attention. With respect to those claims, the Department's investigation deemed those claims unfounded. Some of the claims, however, are new and with respect to the new claims, the Department is conducting investigations. If any retaliation claim (new or otherwise) is deemed founded, then the Department can and would impose discipline on Department personnel. If the circumstance warranted, the Department would even go so far as to terminate the responsible deputy and recommend that criminal charges be filed.

22. While Plaintiffs' claims of retaliation are simply not true (and thus, there is no reason for the Court to enter the order Plaintiffs seek), a further justification for the Court to deny this Motion is the negative impact that the ACLU's proposed order would have on the operation of the County jail system.

1  Several portions of the ACLU's proposed order are particularly problematic. As
2  an overarching concern, the proposed order would drastically inhibit the
3  Department's ability to operate and manage the jails in a safe and secure manner.
4  By limiting the Department's ability to discipline inmates and conduct searches,
5  the proposed order would essentially put the ACLU and the Court in the position
6  of determining when and where it is appropriate to discipline or search an inmate.
7  This oversight would, in turn, basically amount to the ACLU and the Court
8  running, or at the very least, significantly interfering with, the operation of the jail
9  system. Considering the sheer size and complexity of the County jail system,
10 with all due respect to the ACLU and the Court, Department personnel are in the
11 best position to determine when and where an inmate can and should be searched
12 and disciplined. While the ACLU may have good intentions, if the Court grants
13 Plaintiffs' Motion, the result would detrimentally impact the Department's ability
14 to effectively manage a large and violent jail population.

15      23.    Plaintiffs' Motion is also problematic to the extent it requires
16 information regarding retaliation complaints to be tracked in the Facilities
17 Automated Statistical Tracking system ("FAST") and to the extent it requires the
18 disclosure of information about retaliation investigations to the ACLU. First, the
19 FAST system was not designed to properly track information about deputy
20 misconduct. Second, as stated above, various provisions of California law strictly
21 limit the disclosure of information related to complaints of misconduct and
22 discipline associated therewith against law enforcement officers. With respect to
23 the disclosure and tracking requirements, if the Court granted Plaintiffs' Motion,
24 the Department would be required to violate California law and the rights of
25 deputy personnel. Third, to the extent the ACLU seeks disclosure of the results
26 of the Department's investigations, if the Court grants Plaintiffs' Motion, the
27 result would essentially put theACLU in an oversight role regarding the
28

Department's supervision and management of its employees, which would further frustrate the efficient and safe operation of the County jail system.

24. In addition to the above concerns, granting Plaintiffs' Motion would also have a disastrous impact on the provision of medical care to inmates. As this Court knows, given the size of the County jail system, the provision of adequate medical care to inmates is a massive task. The proposed order would allow inmates to manipulate and control the delivery of health care services by mandating that inmates be given an immediate medical exam if they complain about retaliation. In a normal circumstance in jail, just as it is outside of the custody environment, when an inmate requests to see a doctor, barring a medical emergency, that inmate is seen in the order in which they requested services. If the Court granted Plaintiffs' Motion, inmates would be empowered to jump to the front of the line by alleging retaliation. By the terms of the proposed order, the Department would be required to provide a medical exam to any inmate that made such a complaint and in turn, delay medical treatment for inmates who had previously requested it.

25. In addition to allowing inmates to abuse the medical treatment system, the proposed order would cause deputies to hesitate in performing their duties for fear of an inmate claiming retaliation against them. This, in turn, would place inmates and Department personnel in significant danger. Basically, the proposed order would allow inmates to manipulate, influence, and in some cases, control the operation of various aspects of the County jail system. These paramount concerns should give the Court significant pause before entering any order such as the one requested by the ACLU.

26. As always, the Department welcomes the Court's involvement in reaching a fair, informal resolution of the issues raised by the ACLU in the instant Motion. And as Department personnel have informed the Court on many occasions, it stands ready, willing, and able to consider, and if appropriate, make

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

1 changes to Department policies and procedures that will improve the County jail
2 system. Despite this willingness, I firmly believe that first, the proposed order is
3 not justified and second, if the Court entered the order, there would be significant
4 negative consequences, both foreseen and unforeseen.
5 ///
6 ///
7 ///

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 5 day of November, 2010 at Los Angeles, California.

_____
Dennis Burns

## DECLARATION OF PAUL B. BEACH

I, Paul B. Beach, declare as follows:

1. I am an attorney at law, duly authorized to practice before this Court and I am a member of the law firm of Lawrence Beach Allen & Choi, PC, attorneys of record for Defendants Sherman Block, et al. (collectively, "Defendants") in the above-entitled action. I have personal knowledge of the facts stated herein, except those stated upon information and belief and, as to those matters, I believe them to be true. If called to testify to the matters herein, I could and would competently do so.

2. I submit the following Declaration in support of Defendants' evidentiary objections to the declarations submitted by current and former Los Angeles County jail inmates in connection with Plaintiffs' Motion for Protective Order ("Motion").

3. In support of their Motion, Plaintiffs submitted declarations from numerous current and former inmates of the Los Angeles County jail system. However, Plaintiffs **never** disclosed to Defendants in this litigation, as required under Rule 26 of the Federal Rules of Civil Procedure, the identities or any other information about these inmates who now submit declarations in support of Plaintiffs' Motion.

///
///
///

RUTHERFORD\Opp 2 Mtn for Injunctive Relief Order re Retal

4.	As a result, Defendants have been substantially prejudiced in defending against Plaintiffs' claims as well as opposing the instant Motion. For instance, Plaintiffs have impeded Defendants from substantively investigating the allegations made by the undisclosed inmates. If Defendants had known the identity of these inmates, they could have, at the very least, investigated the circumstances of each inmate's incarceration and their claims relating to retaliation for purposes of opposing Plaintiffs' instant Motion. Consequently, Defendants have been severely hindered in their efforts to effectively respond to the wild accusations being made by Plaintiffs in their Motion.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on November 8, 2010, at Glendale, California.

_/s/ Paul B. Beach_
Paul B. Beach