# DECLARATION OF ESTHER LIM

**Declaration of Esther Lim**

I, Esther Lim, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am the Jails Project Coordinator for the ACLU of Southern California ("ACLU/SC").

3.      I am submitting this declaration to describe a savage beating of a prisoner by two Los Angeles Sheriff's ("LASD") deputies, which I witnessed in the Twin Towers Correctional Facility ("TTCF") on January 24, 2011.

4.      In brief, I saw two deputies, Ochoa and Hirsch, beat and taser an African-American prisoner, James Parker, multiple times while he was lying on the ground, not moving or resisting in any way for what seemed to me to be about two minutes.  During the beating, the deputies repeatedly shouted, "Stop resisting!" and "Stop fighting!" while the prisoner lay limp on the floor.

5.      The deputies and the prisoner were no more than about ten feet away from me and I was able to see what happened.

6.      The following day, Tuesday, January 25, 2011, a false account of the incident appeared in the official LASD daily Inmate Reception Center ("IRC") Division Log.

Monday, January 24, 2011-1700 hours

7.      On Monday, January 24, 2011, I was at TTCF's Module 142's Attorney Room located on the right hand side of the fourth floor at approximately 1700 hours.

8.      I was there to speak to a prisoner named Christopher Brown, booking number 1365261.

9.      I was seated at the third phone booth, which is phone booth number five, in the Attorney Room.  There is a label with the booth's number posted above the booth.

10.      There are a total of seven, separate phone booths; the phone booths being numbered sequentially higher until the last telephone booth, number seven.  Telephone booth number seven is the closest to the wall located to the right, when facing the prisoner and the

1   furthest away from elevators.  The diagram, which is attached hereto as Exhibit 1, shows the

2   placement of telephone booths number four through seven.  Phone booths one through three are

3   not pictured in the diagram, but they would be to the left of booths four through seven on the

4   diagram.

5        11.     Each phone booth has a large window that is approximately three and a half feet

6   in height and two feet in length.  There is a small, metal table for the attorney and a stool.  These

7   furnishings are the same for the prisoner who sits on the opposite side of the attorney with the

8   window partition in between.  There is also a phone that is located on the right hand side of the

9   window.  Exhibit 1 shows the area, located on the left hand side of the diagram, where the

10  prisoners (Attorney Room - Inmates) and where the attorneys sit (Attorney Room - Visitors).

11       12.     I was sitting in telephone booth number five as shown in Exhibit 1.  E1 on the

12  attached diagram shows my location.  As I sat facing Mr. Brown, who was sitting in the seat that

13  is marked as B1 on the attached diagram, the wall was to my right.

14       13.     The wall, which is approximately six feet in length, has two, large, side-by-side

15  windows that looks out to the Staging Area.  The wall is labeled in Exhibit 1.  The Staging Area

16  contains the Outdoor Recreation Area and other shared areas.  Exhibit 1 displays what the

17  Staging Area looks like, in addition to other key areas.  One would need to walk through the

18  Staging Area to get to the different pods or housing areas of the module as indicated in Exhibit 1.

19  Both windows are approximately three and a half feet in height and three feet in length.  All

20  measurements are approximations, but I used a ruler on my clipboard to measure the wall and

21  windows.

22       14.     At approximately 1730 hours, while I was speaking to Mr. Brown, I heard noises

23  like people scuffling around, sounds of fists hitting a body, thuds against the wall and other

24  noises that sounded like a fight.  My location when I was speaking to Mr. Brown is marked in

25  Exhibit 1 as E1.

26       15.     As I stood up to see what was causing the noise, Mr. Brown stood up as well.  I

27  walked over to the window on the wall, as indicated in Exhibit 1 as E2 and looked to my left.  I

28  saw Deputies Ochoa and Hirsch punching an African-American prisoner, whom I later learned

Page 4

1   was James Parker, whose booking number is 2540169.  Mr. Parker was identified to me by Mr.

2   Brown when I visited him during my ACLU walk-through of TTCF, Module 142, Pod F on

3   Tuesday, January 25, 2011.

4         16.   As I stood at the spot marked as E2 on the attached diagram, I could see Mr.

5   Parker, who was in the spot marked as P-2, lying face down on the ground positioned in the way

6   the black figure on the attached diagram is positioned, i.e., with his feet pointed towards the

7   water fountain.  Deputies Ochoa and Hirsch were next to Mr. Parker in the spots on the diagram

8   that are marked with two X's.

9         17.   Mr. Parker was lying on his stomach and he appeared to be unconscious as he was

10   not moving.

11         18.   I saw both Deputies Hirsch and Ochoa simultaneously punching Mr. Parker about

12   three to four times and kneeing Mr. Parker about two to three times.  I heard both deputies yell,

13   "Stop fighting!" and "Stop resisting!".

14         19.   Even though the deputies were yelling, "Stop fighting!" and "Stop resisting!", Mr.

15   Parker was not trying to kick, hit or otherwise fight with the deputies.  He was lying on the

16   ground motionless, doing nothing.  I thought he looked unconscious as he was not moving or

17   making any sounds.

18         20.   I also saw Deputy Ochoa placing the taser gun on Mr. Parker's leg approximately

19   three to four times and approximately two to three times onto his back area.  I could hear the

20   shocks that the taser gun made when it was being utilized on Mr. Parker.  Deputy Ochoa

21   continued yelling, "Stop fighting!" and "Stop resisting!" as he was tasing Mr. Parker.

22         21.   Mr. Parker looked like he was a mannequin that was being used as a punching bag

23   as he was not showing any sort of movement.  I thought he was knocked out or perhaps even

24   dead.

25         22.   Approximately one minute after I saw Deputies Ochoa and Hirsch beating Mr.

26   Parker, I observed Deputy Ochoa bring his left index finger to his lips, showing this motion to

27   Deputy Hirsch, who was yelling, "Stop resisting!" and "Stop fighting!" about three to four times.

28         23.   After Deputy Ochoa brought his finger to his lips, Deputy Hirsch yelled, "Stop

3

Page 5

resisting!" and "Stop fighting!" once more to Mr. Parker, who was still not moving or making noise.

24.     During the course of the time that I was watching the deputies beat Mr. Parker, I heard both deputies yelling, "Stop resisting!" and "Stop fighting!" to Mr. Parker more than five times each.  While the deputies were yelling this out, it sounded like the deputies were reading from a script.

25.     Approximately thirty seconds after I saw Deputy Ochoa bring his left index finger to his lips, I hit my right palm against the window approximately three times so that I could get the deputies' attention.  They did not look over in my direction.

26.     The approximately two minutes that I was watching the deputies beat and tase Mr. Parker, it appeared that he was unconscious as he was not moving.  He was not fighting with the deputies.  He was just lying there, making no movements or sound.

27.     At the end of the two minutes of my observation of this incident, I heard over the public announcement speaker, "Stay in your seat."

28.     At that point, I walked over to my seat where Mr. Brown was sitting across from me and I asked him who the deputies were.  He told me that they were Deputies Hirsch and Ochoa.  Mr. Brown said he knew the deputies' names because both deputies work on his module.  I was in the spot marked as E1 while I was talking with Mr. Brown and he was in the spot marked as B1.

29.     After speaking briefly with Mr. Brown, I walked back over to the window and saw Deputies Hirsch and Ochoa in a kneeling position over Mr. Parker and approximately five seconds later, Deputy Ochoa looked at me and using his index finger, signaled that I needed to move away from the window.

30.     I stood at the window for approximately three or four seconds more and then I walked back over to telephone booth number five and I could see Mr. Brown lying on the ground in the Attorney Room on the prisoner's side, in the prone position with his head away from the window.

31.     At this time, I got up from my seat, gathered my belongings and walked over to

4

1   the elevator and took the elevator down to the first floor.

2         32.     When the elevator doors opened to the first floor, I saw approximately three to

3   four deputies who were about to take the elevator up.

4         33.     I then left the Twin Towers 1 Visiting Area and exited TTCF.

5                         Tuesday, January 25, 2011-0930 hours

6         34.     On Tuesday, January 25, 2011 at approximately 0930 hours, I was checking my

7   ACLU/SC email account.  Every morning, I receive the IRC Division Count, the IRC Division

8   Log, the Custody Division 0600 Count, the IRC Processing Time and the IRC Clinic Processing

9   Time reports.

10        35.     Daily, I review each of the logs, reports and counts, print and file them in their

11  respective areas and place them in the appropriate binders.

12        36.     I reviewed the IRC Division Log for Monday, January 24, 2011, a true and correct

13  copy of which is attached hereto as Exhibit 2.  I reviewed the 1645 hours log entry entitled,

14  "Significant Use of Force-TTCF."

15        37.     There were approximately five paragraphs detailing the account of an altercation

16  between two unnamed deputies and Inmate James Parker, booking number 2540169.

17        38.     I noticed that the log stated the incident occurred at 1645 hours, which is

18  approximately forty-five minutes earlier than when I observed the beating at approximately 1730

19  hours.

20        39.     In paragraph two, of the description of the incident on the Division Log, it states

21  that "Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his

22  attack."  I observed both Deputies Ochoa and Hirsch kneeling over Mr. Parker, attacking,

23  punching and kneeing him while he was on the ground.  I also saw Mr. Parker being non-

24  combative as he was not moving, not resisting and was not fighting.  He looked limp as if he

25  might be  unconscious as he was not making any movements or sounds while Deputies Ochoa

26  and Hirsch were beating him.  Mr. Parker was not attacking any of the deputies as paragraph two

27  alleges.

28        40.     In paragraph three, it states that, "Inmate Parker continued his attack as the second

Page 7

deputy utilized his taser, striking him in the mid-back area.  Inmate Parker continued punching the first deputy.  The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring.  Inmate Parker then stopped fighting and was handcuffed without further incident."

41.   I did observe Deputy Ochoa tasing Mr. Parker's back and rib area approximately two to three times and Deputy Ochoa tasing Mr. Parker's leg approximately three to four times.  However, the statement in paragraph three that Mr. Parker did not stop fighting until the deputies had tased Mr. Parker four to five times is false.   Parker was not fighting or resisting at any time when I observed him, including while Deputy Ochoa tased him multiple times in the back and leg.

42.   During the entire time I was observing Mr. Parker, including the time during which he was repeatedly punched, kneed and tased, he was not striking or attacking Deputies Ochoa and Hirsch.  In fact, Mr. Parker was motionless during the whole time that he was lying on the ground and Deputies Ochoa and Hirsch were punching, kneeing and tasing him.  As I said above, I thought he was unconscious or perhaps dead, while he was being beaten and tased, because he was not moving at all.

43.   During the time I observed Mr. Parker on the ground and Deputies Ochoa and Hirsch kneeing, punching and tasing him, I heard the deputies repeat, "Stop resisting!" and "Stop fighting!" more than five times each.  However, Mr. Parker was not resisting, nor was he fighting with the deputies.

Tuesday, January 25, 2011-1555 hours

44.   On Tuesday, January 25, 2011 at approximately 1535 hours, I telephoned TTCF's Watch Commander/Lieutenant Bodenstedt and informed him that ACLU/SC Staff Attorney Jessica Price and I were going to do an ACLU walk through at approximately 1555 hours that day.

45.   Price and I arrived at the TTCF Control Room at approximately 1555 hours and Sergeant Geary met us at approximately 1600 hours.

46.   I asked to enter Module 142 and Sergeant Geary escorted us there.

47.     I asked to enter Pod F and she stated that she needed to find a deputy.  I did not see any module deputies around.

48.     Sergeant Geary yelled out, "Deputy Ochoa!" and asked that he assist her.  I immediately recognized Deputy Ochoa as the deputy whom I saw beating and tasing Mr. Parker on Monday, January 24, 2011.  I also saw his name on the name tag on his uniform.

49.     Ms. Price and I entered Module 142, Pod F and I spoke to several prisoners there about various complaints and Title 15 infractions.  I also saw Ms. Price speaking to prisoners.

50.     While speaking to the prisoners, I saw Deputy Ochoa staring at me in an aggressive manner through the window that separates the pod from the deputies' area.

51.     While in Pod F, I spoke to Mr. Brown as he is currently housed there and asked him if anything happened after I had left the Attorney Room on Monday, January 24, 2011 and he told me that he was interviewed by two sergeants.  I asked him if I could call him out to the Attorney Room the next day, Wednesday, January 26, 2011 to talk about it.  Mr. Brown told me that I could.

52.     I also asked him if he knew the name of the prisoner whom Deputy Ochoa and Hirsch had beaten on Monday, January 24, 2011.   He said that it was Parker.  He did not know where Mr. Parker  was or where he was housed.  While I was speaking to Mr. Brown, I saw Deputy Ochoa again staring at me aggressively.

53.     After speaking to Mr. Brown, Ms. Price and I left Pod F and were escorted to the TTCF Control Room by Sergeant Geary at approximately 1645 hours.  Ms. Price and I then exited TTCF.

Wednesday, January 26, 2011-0920 hours

54.     On Wednesday, January 26, 2011 at approximately 0920 hours, Ms. Price and I met with Mr. Brown in the Attorney Room on Module 142.

55.     I sat in telephone booth number 5 and Ms. Price sat on the stool in telephone booth number four.  I asked Mr. Brown if we could take his declaration of what he saw on Monday, January 24, 2011  when he was in the Attorney Room with me.  He said yes.  I wrote down what he told me he had seen and heard.

7

56. After taking the declaration for the January 24th incident, I asked if we could take his declaration about the interview that LASD personnel had done with him on the same day. He said yes. I wrote down what he told me he had been asked, seen and heard.

57. Ms. Price and I left the Attorney Room and went down to the Tower 1 Attorney Visiting Area's deputies' desk. I told Deputy Velasquez that Ms. Price and I would like to see Mr. Parker. Deputy Velasquez told us that Mr. Parker was housed in T211, which is the Disciplinary Module and that we needed to go the TTCF Tower 2's Attorney Visiting Area and submit a request to see Mr. Parker there.

58. At approximately 1010 hours, Ms. Price and I arrived at the Attorney Visiting Area's deputies' desk in TTCF Tower 2 to visit Mr. Parker. After an approximately fifteen minute delay, Deputy Shroyer told us that we needed to go to the TTCF Tower 1's Attorney Room as Mr. Parker would be escorted from Tower 2 to Tower 1. The fifteen minute delay was due to the deputies not having a current ACLU Clearance list.

59. At approximately 1030 hours, Deputy Shroyer told Ms. Price and me that Mr. Parker was in the "hole" and because the deputy's partner that was assigned to T221 where Mr. Parker was located, was not available at that time, Mr. Parker would not be able to be escorted to TTCF Tower 1 until the partner returned. Deputy Shroyer told us to go back to TTCF Tower 1 and wait for authorization to see Mr. Parker.

60. Ms. Price and I walked back over to the Tower 1's Attorney Room's deputies' desk and Deputy Velasquez told us at approximately 1035 hours that the module deputy's partner was not there so we needed to wait before Ms. Price and I could visit Mr. Parker.

61. At approximately 1100 hours, Deputy Velasquez stated that Ms. Price and I could go up to Module 171 or the seventh floor's Attorney Room to see Mr. Parker.

62. Ms. Price and I went inside the elevator and went up to the seventh floor to Module 171's Attorney Room and walked to the left after exiting the elevator.

63. There was a delay in being able to communicate with Mr. Parker because the telephones were shut off, meaning Mr. Parker and I could not hear each other on the phone. Another prisoner was in the telephone next to Mr. Parker and I tried to communicate with him

8

1   via the telephone and this telephone was also shut off.

2          64.    I told the deputy who escorted Mr. Parker to the Attorney Room that I couldn't

3   hear Mr. Parker because the phone was broken and he told me to press the intercom button.

4          65.    I pressed the intercom button that is in the Attorney Room, which is used to

5   communicate with the deputies inside the module's control room.  No one answered when I

6   pressed it.  I pressed the button an additional three more times and all three times, no one

7   answered.

8          66.    Ms. Price stated that she would go down to the Tower 1's Attorney Room's

9   deputies' desk to alert them about the phones.

10          67.    When Ms. Price returned to the Attorney Room, Mr. Parker and I tried the phones

11   again and we were then able to hear each other.

12          68.    I spoke to Mr. Parker and asked him if he was the prisoner who was involved in

13   the beating incident that had occurred on Monday, January 24, 2011 and he told me that he was.

14   I asked him for his name and he told me that his name was James Parker.  I verified this

15   information to the wristband that was fastened on his wrist, which contains the prisoner's name,

16   booking number and other information.

17          69.    I told him I was from the ACLU/SC's Jails Project and I asked if he wanted to

18   talk to me about what had happened.

19          70.    I asked him to show me the injuries he sustained from the incident and he showed

20   me his left eye, which was swollen half way shut.  He also showed me the stitches he received

21   over his left eyebrow.  Using a ruler that is on my clipboard, I measured the area that was closed

22   with stitches.  It was approximately two centimeters long.  Mr. Parker also said that his left cheek

23   was swollen and that he felt like he had a gash inside his right cheek.  Due to the reflection from

24   the overhead lights, I was not able to see anything inside his mouth, which was dark and I did not

25   have a flashlight.  He stated that he had a lot of pain on the back of his neck, face, shoulder and

26   said that his left rib area was hurting as well.  He stated that he felt like one of his ribs were

27   loose.

28          71.    I asked him if he was taking any medication for the pain and he said that he was

9

1   given Motrin.

2   <u>Friday, January 28, 2011</u>

3         72.     On Friday, January 28, 2011, I visited Mr. Parker.

4         73.     Mr. Parker told me that on Tuesday, January 25, 2011, when he was brought to

5   Module 142 from the Los Angeles County Medical Center ("LCMC"), a male nurse told him that

6   he needed to get the stitches he received the night before, over his left eyebrow, removed.  He

7   didn't know the name of the male nurse, but said he was chunky, Mexican and was Mr. Parker's

8   height, which is five feet nine inches.  He also said the male nurse had shoulder length, bushy

9   hair.

10         74.     Mr. Parker said that he told the male nurse that the doctor at LCMC, who was an

11   Asian woman said that Mr. Parker was not going to have his stitches taken out until Tuesday,

12   February 1, 2011.

13         75.     He told the male nurse that he was not going to get the stitches removed and he

14   was going to follow the LCMC's doctor's orders.

15         76.     Mr. Parker stated that he was approached by another nurse at a later time, on the

16   same day, who also told him that he needed to remove his stitches.  Mr. Parker told this nurse

17   that he was not going to remove his stitches because the doctor at LCMC said the stitches were

18   going to be removed on Tuesday, February 1, 2011.

19         77.     Mr. Parker stated that he was again approached by the nursing staff on

20   Wednesday, January 26, 2011; Thursday, January 27, 2011; and today, Friday, January 28, 2011

21   to remove his stitches.

22         78.     Mr. Parker said that the female nurse today was more adamant about getting his

23   stitches removed.  He didn't know the nurse's name, but said she was Filipino, five feet two

24   inches or five feet four inches in height and had short hair.

25   \ \ \

26   \ \ \

27   \ \ \

28   \ \ \

1    79.    He again denied this nurse and didn't allow her to remove his stitches.

2        I declare under penalty of perjury of the laws of the State of California and the United

3  States that the foregoing is true and correct.  Executed this 4th day of February, 2011 in Los

4  Angeles, California.

5

6                                                        Esther Lim

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        11





Staging Area – Module 142

**COUNTY OF LOS ANGELES**
**SHERIFF'S DEPARTMENT**
**LOG SHEET REPORT**

*02/04/2011*

Detail or Station: <u>CUSTODY DIVISION</u>

Day: Monday
January 24, 2010

**0530    WATCH COMMANDER'S REVIEW - LT. CHAVEZ**

**1330    WATCH COMMANDER'S REVIEW - CMDR. RUIZ/ LT. MURPHY**

**1450    ACLU VISIT- TTCF**

Sgt. Johnson Reports, American Civil Liberties Union (ACLU) representatives Esther Lim, Theodore Livingston Young, Alexandra Leigh Howard and Hannah Zoe Weilbacher, visited Twin Towers Correctional Facility.  They were escorted by Sergeant Brad Gray (#277068) and spoke with inmates housed in Modules 132 A and B Pod, 141 A Pod and 172 D Pod.

The ACLU representatives completed their interviews within approximately two-hours and forty-minutes.  All comments made to Sergeant Gray regarding the visit were favorable.

Custody Division Operations Log entry completed by IRC Watch Deputy Paterno (#488650) at 1450 hours. (GAP)

**1645    SIGNIFICANT USE OF FORCE- TTCF**

Sgt. Johnson, Twin Towers Correctional Facility, reports at approximately 1645 hours this date, Two deputies escorted Inmate James Parker, booking #2540169, to the ABC Outdoor Recreation Area pending transfer to discipline Module 121 for possession of contraband in his cell.

Upon notifying Inmate Parker of his discipline status, Inmate Parker punched one of the deputies with his right hand, striking him on the left side of his face.  Inmate Parker then charged at the deputy and continued to punch him in the torso area.  The deputy gave commands for Inmate Parker to stop fighting and then punched him on the top of the head with his right hand.  As Inmate Parker continued his attack, the deputy punched him an additional four-to-five times in the upper-torso area.  Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his attack.

The second deputy observed Inmate Parker punching the first deputy and gave verbal commands for him to stop fighting.  As the second deputy went to assist, Inmate Parker punched him in the left rib area and continued his attack on the first deputy.  The first deputy

Page 15

O2/04/2011

## COUNTY OF LOS ANGELES
## SHERIFF'S DEPARTMENT
## LOG SHEET REPORT

Day: Monday

Detail or Station: <u>CUSTODY DIVISION</u>                    January 24, 2010

kneed Inmate Parker one time in the face in self-defense. Inmate Parker continued his attack as the second deputy utilized his taser, striking him in the mid-back area. Inmate Parker continued punching the first deputy. The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring. Inmate Parker then stopped fighting and was handcuffed without further incident.

The first deputy sustained a swollen right-hand and redness and swelling to the left side of his face. The first deputy was treated for his injuries at U.S. Healthworks. The second deputy did not sustained any injuries.

Inmate Parker sustained a 2 cm. laceration on his left eyebrow and swelling to the left side of his head. The taser darts did not penetrate his skin. He was escorted to the Tower One Clinic for examination and treatment and then transferred to L.C.M.C. for additonal treatment. (AB)

**2130    WATCH COMMANDER'S REVIEW - LT. MURPHY/ LT. SAUNDERS**

**2358    WATCH COMMANDER'S REVIEW - LT. CHAVEZ**

**2359    LOG CLEARANCE**

No further entries. (AB)