# Exhibit 1

**Declaration of Mani Sadri**

I, Mani Sadri, hereby declare:

1.   I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.   I am thirty-~~four~~ *five* years old.  I have been at Men's Central Jail ("MCJ") since July 2010.  I am currently housed in Module 3500, Row *B*, Cell *19*.  My booking number is 2388924.

3.   On or about Friday, January 28, 2011, after the morning pill call, I was in my cell.

4.   A deputy came to my cell and said that I had a pass.  ~~I don't the name of the deputy, but~~ *His name is Deputy Carbajal.* He is Hispanic, tall and bald.  He handcuffed me with my hands behind me and waist-cuffed me, which means that I have chains around my waist and wrist.

5.   *Deputy Carbajal* He escorted me down the stairs to the first floor of the module.  There was a nurse standing in front of the control booth on the first floor of the module.

6.   The nurse told the *Carbajal* Deputy that she needed to share some medical information with me regarding test results and that it was a confidential and private matter.  I had taken a court-ordered medical exam approximately at the end of November 2010 and this was the exam that the nurse was referring to.

7.   The nurse asked the *Carbajal* Deputy if there was a room where she and I could go to talk in private.

8.   The *Carbajal* Deputy told her that the conversation needed to be done in front of him.

9.   The *Carbajal* Deputy walked approximately fifteen feet away from where the nurse and I were standing.

10.   The nurse gave me a letter that was from the Los Angeles Sheriff's Department's headquarters as there was a seal on top of the letter.

11.   She told me that I needed to take the letter she was going to provide me after the conversation; and that I was to take the letter to court with me in March 2011 and give it to the judge.

12.   After she reviewed the letter's contents with me, she told the *Carbajal* Deputy that I needed to sign a form indicating that she had this conversation with me.

3

13.     The Deputy Carbajal M.S said that he couldn't release me from my handcuffs.  I wasn't able to sign the form.  The nurse then said that she would write down in her notes that I couldn't sign the form because I was handcuffed.

14.     As she was writing, I told her that I had seizures and other medical issues, but I wasn't getting treated for them at MCJ.  I also expressed to her that I was afraid of Deputy Ibarra who had threatened me in the past.  I also told her that I had complained to the ACLU and that they were aware of this.  I saw her write down Deputy Ibarra's name in her notes.

15.     When I told the nurse that I was afraid of Deputy Ibarra because he had threatened me in the past, I was referring to an incident that occurred in December of 2010.  In December, I had written an inmate complaint form against Deputy Ibarra for not allowing me to go to the showers, not giving me some of my meals and not placing me on the doctor's list when I request to be placed on the list for my medical issues.  I also had an opportunity to speak to a sergeant about the same complaints as well.  I don't know the name of the sergeant, but he is White, short, wears glasses and has a moustache.

16.     The sergeant was walking my row in December of 2010 and I asked him if I could speak with him.  Deputy Ibarra was walking the row with him and he walked two cells down from where I was housed and stayed there until the sergeant finished talking to me.

17.     After I finished speaking to the sergeant, he said he would "look into it."

18.     After submitting the complaint and talking to the sergeant about Deputy Ibarra; Deputy Ibarra treated me even more unfairly than before, by again, not letting me take showers, not giving me my food and not allowing me to be placed on the doctor's list.

19.     After the nurse left, the Hispanic, tall and bald deputy Deputy Carbajal M.S then walked me back up to my row.

20.     As we got up the stairs, in front of the second floor of the module's control booth, right before the shower area, the Deputy Carbajal M.S said to me, "Let me see your letter."  I told him, "I'm sorry, but this is confidential.  I can't let you see it."  He told me, "Shut up and give it to me.  You know I can just beat you up."

21.     I told him, "I know you can, but there is no need.  There's no reason for it."

2

4

22.   *Deputy Carbajal M.S* He then told me, "If you contact the ACLU one more time or if I see any letters being sent there, I can open up your cell and say that it was a mistake. I'll have inmates come into your cell and have them finish you. Do your time. Don't complain to anyone if you want to make it out of here alive."

23.   After he said this to me, he escorted me to my cell, uncuffed me and I was placed back in my cell.

24.   I knew that ~~this deputy~~ *Deputy Carbajal M.S* had seen one of my letters that I sent to the ACLU because in late December, before going to court, I gave him a letter that needed to sent to the ACLU. I wrote "ACLU" on the envelope. We are supposed to give the module deputies our outgoing mail and the deputies will then process them and forward them to the appropriate area.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this *M.S* 12th Day of April *M.S*, 2011 in Los Angeles, California.

*[signature]*

Mani Sadri ⟋ by looking at his name badge

*M.S* 25. I found out Deputy Carbajal's name when he escorted me from Medical back to my module, 3500, last week in the afternoon. As we were walking back, I told him that I wanted to talk to a sergeant. I wanted to talk to a sergeant about the incident I described above and because I feared for my life. Deputy Carbajal said, "He's not going to speak to you; He's not your sergeant." He then said, "You better not tell anyone what happened or I'm going to open your cell and have the other inmates finish you. I'm also going to tell them about your case. Who do you think they're going to believe? If someone asks me how your cell got open, I'm going to tell them that I accidentally opened it. *M.S*

3

5

1                                 **Declaration of Mani Sadri**

2     I, Mani Sadri, hereby declare:

3        1.     I make this declaration based on my own personal knowledge and if called to

4 testify I could and would do so competently as follows:

5        2.     I am thirty-five years old. I have been at Men's Central Jail ("MCJ") since July

6 2010. I am currently housed in Module 3500, Row B, Cell 19. My booking number is 2388924.

7        3.     On or about Friday, January 28, 2011, after the morning pill call, I was in my cell.

8        4.     A deputy came to my cell and said that I had a pass. His name is Deputy Carbajal.

9 He is Hispanic, tall and bald. He handcuffed me with my hands behind me and waist-cuffed me,

10 which means that I have chains around my waist and wrist.

11        5.     Deputy Carbajal escorted me down the stairs to the first floor of the module.

12 There was a nurse standing in front of the control booth on the first floor of the module.

13        6.     The nurse told Deputy Carbajal that she needed to share some medical

14 information with me regarding test results and that it was a confidential and private matter. I had

15 taken a court-ordered medical exam approximately at the end of November 2010 and this was the

16 exam that the nurse was referring to.

17        7.     The nurse asked Deputy Carbajal if there was a room where she and I could go to

18 talk in private.

19        8.     Deputy Carbajal told her that the conversation needed to be done in front of him.

20        9.     Deputy Carbajal walked approximately fifteen feet away from where the nurse

21 and I were standing.

22       10.     The nurse gave me a letter that was from the Los Angeles Sheriff's Department's

23 headquarters as there was a seal on top of the letter.

24       11.     She told me that I needed to take the letter she was going to provide me after the

25 conversation; and that I was to take the letter to court with me in March 2011 and give it to the

26 judge.

27       12.     After she reviewed the letter's contents with me, she told the Deputy Carbajal

28 that I needed to sign a form indicating that she had this conversation with me.

1      13.    Deputy Carbajal said that he couldn't release me from my handcuffs. I wasn't

2  able to sign the form. The nurse then said that she would write down in her notes that I couldn't

3  sign the form because I was handcuffed.

4      14.    As she was writing, I told her that I had seizures and other medical issues, but I

5  wasn't getting treated for them at MCJ. I also expressed to her that I was afraid of Deputy Ibarra

6  who had threatened me in the past. I also told her that I had complained to the ACLU and that

7  they were aware of this. I saw her write down Deputy Ibarra's name in her notes.

8      15.    When I told the nurse that I was afraid of Deputy Ibarra because he had threatened

9  me in the past, I was referring to an incident that occurred in December of 2010. In December, I

10  had written an inmate complaint form against Deputy Ibarra for not allowing me to go to the

11  showers, not giving me some of my meals and not placing me on the doctor's list when I request

12  to be placed on the list for my medical issues. I also had an opportunity to speak to a sergeant

13  about the same complaints as well. I don't know the name of the sergeant, but he is White, short,

14  wears glasses and has a moustache.

15      16.    The sergeant was walking my row in December of 2010 and I asked him if I could

16  speak with him. Deputy Ibarra was walking the row with him and he walked two cells down

17  from where I was housed and stayed there until the sergeant finished talking to me.

18      17.    After I finished speaking to the sergeant, he said he would "look into it."

19      18.    After submitting the complaint and talking to the sergeant about Deputy Ibarra;

20  Deputy Ibarra treated me even more unfairly than before, by again, not letting me take showers,

21  not giving me my food and not allowing me to be placed on the doctor's list.

22      19.    After the nurse left, Deputy Carbajal then walked me back up to my row.

23      20.    As we got up the stairs, in front of the second floor of the module's control booth,

24  right before the shower area, Deputy Carbajal said to me, "Let me see your letter." I told him,

25  "I'm sorry, but this is confidential. I can't let you see it." He told me, "Shut up and give it to

26  me. You know I can just beat you up."

27      21.    I told him, "I know you can, but there is no need. There's no reason for it."

28      22.    Deputy Carbajal then told me, "If you contact the ACLU one more time or if I see

2

1  any letters being sent there, I can open up your cell and say that it was a mistake. I'll have

2  inmates come into your cell and have them finish you. Do your time. Don't complain to anyone

3  if you want to make it out of here alive."

4      23.    After he said this to me, he escorted me to my cell, uncuffed me and I was placed

5  back in my cell.

6      24.    I knew that Deputy Carbajal had seen one of my letters that I sent to the ACLU

7  because in late December, before going to court, I gave him a letter that needed to sent to the

8  ACLU. I wrote "ACLU" on the envelope. We are supposed to give the module deputies our

9  outgoing mail and the deputies will then process them and forward them to the appropriate area.

10      25.    I found out Deputy Carbajal's name by looking at his name badge when he

11  escorted me from Medical back to my module, 3500, last week in the afternoon. As we were

12  walking back, I told him that I wanted to talk to a sergeant. I wanted to talk to a sergeant about

13  the incident I described above and because I feared for my life. Deputy Carbajal said, "He's not

14  going to speak to you. He's not your sergeant." He then said, "You better not tell anyone what

15  happened or I'm going to open your cell and have the other inmates finish you. I'm also going to

16  tell them about your case. Who do you think they're going to believe? If someone asks me how

17  your cell got open, I'm going to tell them that I accidentally opened it."

18      I declare under penalty of perjury of the laws of the State of California and the United

19  States that the foregoing is true and correct. Executed this 12th day of April, 2011 in Los

20  Angeles, California.

21                                        /s/

22                                    Mani Sadri

23

24

25

26

27

28

3

# Exhibit 2

# DECLARATION OF MICHAEL CAMPBELL

I, Michael Campbell, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been an inmate in the LA County jails for the past 13 months, and I am currently housed at the Twin Towers Correctional Facility ("TTCF") in Module 132, Pod E, Cell 3. I am 60 years old, and 5 feet, 10 inches tall. My booking number is 2376955.

3.      I am submitting this declaration to describe retaliation I have faced from Los Angeles County sheriff's deputies after speaking with and submitting a declaration to the American Civil Liberties Union ("ACLU") about my own experience of assault by a deputy in jail.

4.      I spoke with Ms. Esther Lim from the ACLU Jails Project in early April 2011. On April 20, 2011, I signed a declaration reporting that Deputy Vasquez had assaulted me, and that I had suffered pain to my back and neck, and injuries to my temple and forehead as a result.

5.      Since filing and signing the declaration with the ACLU, I believe I and the other inmates in my pod have faced retaliation from deputies for my cooperation with the ACLU. Shortly after Ms. Lim's visits, Deputy Banuelos – whom I had never spoken to before – told me he was going to make my life miserable. Deputy Banuelos is Hispanic, taller than 6 feet, about 200 pounds, bald, and looks to be in his mid-30s.

6.      I also believe that he has directed other deputies to make life difficult for me and other men in my pod.

7.      I do not know for certain if the deputies' actions following my declaration are retaliation or not, but my living conditions started to change for the worse several days after I spoke with the ACLU, and shortly after Deputy

1

9

1    Banuelos told me he was going to make my life miserable.

2    8.    I cannot help but think that my cooperation with the ACLU had
3    something to do with the changes. It's like when you have a stream flowing
4    steadily, and you have a rock thrown into that stream that interrupts the flow.
5    Things were flowing just fine before I spoke with the ACLU and provided my
6    declaration, and, now, it seems like a rock has changed that.

7    9.    What I perceive as retaliation from the deputies for my cooperation
8    with the ACLU can best be measured by comparing my living conditions in my
9    pod prior to submitting my declaration to my living conditions after submitting
10   my declaration.

11   10.    Prior to my declaration, there were dayroom sleepers within my pod,
12   and I and the other men in my pod had access to television after the evening count
13   up to 11 p.m. because of the dayroom sleepers. Dayroom sleepers are beds located
14   within the dayroom reserved for inmates who are considered low security risks.
15   As long as there are dayroom sleepers within the pod, other inmates within the
16   pod have access to three hours of television. Now, deputies have removed the
17   dayroom sleepers, and whenever we want access to the television, the deputies tell
18   us that the television is broken.

19   11.    Prior to my declaration, the evening searches of cells within my pod
20   were fairly infrequent, occurring maybe two or three times a week. Now, the
21   frequency of searches of our cells has increased, with deputies conducting a
22   search almost every night.

23   12.    The deputies have also been specifically targeting me during
24   searches. Prior to talking with the ACLU and signing a declaration, deputies never
25   looked through my documents or disturbed my personal items within my cell.
26   Now, they are searching my personal items about once a week. Recently, on or
27   about July 26, deputies conducted a search of my cell, and, when I returned after
28   being ordered out, my legal documents were strewn all over the floor. Deputies

2

had also smashed and scattered my commissary items, which I had purchased with the little money I have. Since I am a pro per inmate, it is my understanding that deputies are not allowed to take or look at my legal documents, which they clearly did during this particular search.

13.    Prior to my declaration, Deputy Juarez would sometimes leave lights on all night – averaging about once a week – making it difficult for me and other inmates to get to sleep. However, since the declaration, the number of times that she leaves the light has increased, with the lights remaining on whenever she is scheduled to work, about five or six times a week.

14.    Since signing and submitting my declaration, it is taking much longer for deputies to fix the toilets in my pod. Prior to my contact with the ACLU, when I had problems with the toilets on two or three occasions, deputies would fill out a work order and the problem would be fixed the following day. Now, however, jail staff have taken anywhere from several days to more than a week to fix toilets in my pod.

15.    What the ACLU and those who have never been inmates in the county jails need to understand is that what I perceive as retaliation is not comprised of big, drastic events. The retaliation occurs with small, subtle changes that can make a difference for the jail experience of inmates like me whose lives are ruled by and who rely on the regularity and rigidity of jail schedules and practices. Things that seem relatively trivial outside the jails – like access to a television – are small luxuries for inmates like me, because our freedom and access to comforts are severely restricted. Consequently, when sheriff's deputies deprive us of these conveniences, the effect is a major one for inmates like me.

16.    While the changes instituted by deputies after I submitted and signed my declaration may seem small to someone outside the jails system, the changes are significant enough to make me think first before saying anything critical about the administration of the jails. It makes me more hesitant to speak up, though I am

3

1   nonetheless speaking up now because what the deputies are doing to me is wrong.

2       I declare under penalty of perjury of the laws of the State of California and

3   the United States that the foregoing is true and correct to the best of my

4   knowledge and belief. Executed this __/__ day of August 2011 in Los Angeles,

5   California.

6

7

8                                               Michael Campbell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# DECLARATION OF MICHAEL CAMPBELL

I, Michael Campbell, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I have been an inmate in the LA County jails for the past 13 months, and I am currently housed at the Twin Towers Correctional Facility ("TTCF") in Module 132, Pod E, Cell 3. I am 60 years old, and 5 feet, 10 inches tall. My booking number is 2376955.

3.     I am submitting this declaration to describe retaliation I have faced from Los Angeles County sheriff's deputies after speaking with and submitting a declaration to the American Civil Liberties Union ("ACLU") about my own experience of assault by a deputy in jail.

4.     I spoke with Ms. Esther Lim from the ACLU Jails Project in early April 2011. On April 20, 2011, I signed a declaration reporting that Deputy Vasquez had assaulted me, and that I had suffered pain to my back and neck, and injuries to my temple and forehead as a result.

5.     Since filing and signing the declaration with the ACLU, I believe I and the other inmates in my pod have faced retaliation from deputies for my cooperation with the ACLU. Shortly after Ms. Lim's visits, Deputy Banuelos – whom I had never spoken to before – told me he was going to make my life miserable. Deputy Banuelos is Hispanic, taller than 6 feet, about 200 pounds, bald, and looks to be in his mid-30s.

6.     I also believe that he has directed other deputies to make life difficult for me and other men in my pod.

7.     I do not know for certain if the deputies' actions following my declaration are retaliation or not, but my living conditions started to change for the worse several days after I spoke with the ACLU, and shortly after Deputy

1

1   Banuelos told me he was going to make my life miserable.

2       8.    I cannot help but think that my cooperation with the ACLU had

3   something to do with the changes. It's like when you have a stream flowing

4   steadily, and you have a rock thrown into that stream that interrupts the flow.

5   Things were flowing just fine before I spoke with the ACLU and provided my

6   declaration, and, now, it seems like a rock has changed that.

7       9.    What I perceive as retaliation from the deputies for my cooperation

8   with the ACLU can best be measured by comparing my living conditions in my

9   pod prior to submitting my declaration to my living conditions after submitting

10   my declaration.

11       10.   Prior to my declaration, there were dayroom sleepers within my pod,

12   and I and the other men in my pod had access to television after the evening count

13   up to 11 p.m. because of the dayroom sleepers. Dayroom sleepers are beds located

14   within the dayroom reserved for inmates who are considered low security risks.

15   As long as there are dayroom sleepers within the pod, other inmates within the

16   pod have access to three hours of television. Now, deputies have removed the

17   dayroom sleepers, and whenever we want access to the television, the deputies tell

18   us that the television is broken.

19       11.   Prior to my declaration, the evening searches of cells within my pod

20   were fairly infrequent, occurring maybe two or three times a week. Now, the

21   frequency of searches of our cells has increased, with deputies conducting a

22   search almost every night.

23       12.   The deputies have also been specifically targeting me during

24   searches. Prior to talking with the ACLU and signing a declaration, deputies never

25   looked through my documents or disturbed my personal items within my cell.

26   Now, they are searching my personal items about once a week. Recently, on or

27   about July 26, deputies conducted a search of my cell, and, when I returned after

28   being ordered out, my legal documents were strewn all over the floor. Deputies

2

1    had also smashed and scattered my commissary items, which I had purchased with
2    the little money I have. Since I am a pro per inmate, it is my understanding that
3    deputies are not allowed to take or look at my legal documents, which they clearly
4    did during this particular search.

5        13.    Prior to my declaration, Deputy Juarez would sometimes leave lights
6    on all night – averaging about once a week – making it difficult for me and other
7    inmates to get to sleep. However, since the declaration, the number of times that
8    she leaves the light has increased, with the lights remaining on whenever she is
9    scheduled to work, about five or six times a week.

10       14.    Since signing and submitting my declaration, it is taking much longer
11   for deputies to fix the toilets in my pod. Prior to my contact with the ACLU, when
12   I had problems with the toilets on two or three occasions, deputies would fill out a
13   work order and the problem would be fixed the following day. Now, however, jail
14   staff have taken anywhere from several days to more than a week to fix toilets in
15   my pod.

16       15.    What the ACLU and those who have never been inmates in the
17   county jails need to understand is that what I perceive as retaliation is not
18   comprised of big, drastic events. The retaliation occurs with small, subtle changes
19   that can make a difference for the jail experience of inmates like me whose lives
20   are ruled by and who rely on the regularity and rigidity of jail schedules and
21   practices. Things that seem relatively trivial outside the jails – like access to a
22   television – are small luxuries for inmates like me, because our freedom and
23   access to comforts are severely restricted. Consequently, when sheriff's deputies
24   deprive us of these conveniences, the effect is a major one for inmates like me.

25       16.    While the changes instituted by deputies after I submitted and signed
26   my declaration may seem small to someone outside the jails system, the changes
27   are significant enough to make me think first before saying anything critical about
28   the administration of the jails. It makes me more hesitant to speak up, though I am

3

1  nonetheless speaking up now because what the deputies are doing to me is wrong.

2      I declare under penalty of perjury of the laws of the State of California and

3  the United States that the foregoing is true and correct to the best of my

4  knowledge and belief.   Executed this 1 day of August 2011 in Los Angeles,

5  California.

6

7                                        _____ /s/ _____

8                                        Michael Campbell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit 3

**Declaration of Jason Green**

I, Jason Green, hereby declare:

1.   I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.   I am thirty-nine years old and I have been at Men's Central Jail ("MCJ") since August 2009. I am currently housed in Module 1700, Row B, Cell 26. My booking number is 2051708

<u>March 18, 2011</u>

3.   On March 18, 2011, Deputy Hernandez (#691) transferred me from my cell to the showers at approximately 6am to 6:30 am.

4.   While I was being escorted to the showers, Deputy Hernandez was told over the radio, which I heard, that I was being given a pass to go to medical.

5.   Deputy Hernandez tried to negotiate with me, telling me to refuse my medical pass. I don't think Deputy Hernandez wanted to grant me the pass because he would have needed to take me back to my cell, uncuff me to allow me to get dressed, re-cuff me and then escort me to the Medical area at MCJ.

6.   As Deputy Hernandez placed me into the showers and uncuffed me, I told Deputy Hernandez that I needed to go to my medical appointment. I told him that I wasn't going to refuse my medical pass.

7.   Deputy Hernandez said to me, "Well, that's how it works around here. You either get your shower or your medical pass, which one do you want?" I felt like Deputy Hernandez was trying to force me to choose between the two.

8.   I said to Deputy Hernandez, "Sir, I need my shower, but I'm not going to refuse my medical treatment."

9.   Deputy Hernandez appeared to be upset and he said to me, "You're already in the shower anyway, so that's what you're going to get."

10.   I was then escorted back to my cell after I showered and I asked a deputy for a complaint form. I don't know the name of the deputy, but he was heavy set, with dark hair and

1     appeared to be either White or Hispanic and approximately six feet and an inch tall. I am

2     approximately five feet and eleven inches tall.

3         11.    This deputy said loudly, "Why? So you can snitch to the ACLU?"

4         12.    I recently had a visit from the ACLU in MCJ's Attorney Room on *03/11/2011*.

5         13.    The deputy didn't give me a complaint form.

6         14.    I had repeatedly asked for a complaint form from multiple deputies who were

7     working on my module so that I could write a complaint about Deputy Hernandez not allowing

8     me to go to my medical appointment and they did not give me a form. I was not escorted to MCJ

9     Medical for my medical appointment either.

10        15.    Approximately two to three hours later, I woke up from my nap due to what

11    sounded like a verbal confrontation that was taking place in front of my cell among Deputy

12    Hernandez, Deputy Felix, the other deputy that I described above and a female nurse, who was

13    Asian, around her mid-30's to 40's with dark hair.

14        16.    I could hear her yelling my name and I said, "Yes. Yes." She asked me why I

15    didn't go to medical and asked if I had refused my medical pass. I told her that I had not refused

16    my medical pass.

17        17.    Deputy Felix interrupted our conversation and said, "Yes, you did" and looked at

18    me with a look that made me feel like he was trying to get me *to* say that I had refused my medical

19    pass to this nurse.

20        18.    I was very persistent with the nurse and the deputies that I hadn't refused my pass

21    and that I wanted to go to medical. The nurse specifically asked me if I wanted to go to medical

22    and I told her yes.

23        19.    Deputy Felix again interrupted and said to the nurse, "He's not going anywhere.

24    He should have stated that earlier." The nurse said to Deputy Felix, "Sir, I have paperwork from

25    the ACLU stating that he needs to see a doctor." Deputy Felix told her, "I don't care what you

26    have or what it says. If you don't like it, write my name on it. Write me up. I don't give a shit."

27        20.    The nurse said to Deputy Felix, "Don't worry. I will."

28        21.    Deputy Felix then verbally threatened me, saying "You have to come out to the

2

1  showers again" and Deputy Hernandez said to me, "I can make it that you slip in the shower

2  next time and need serious medical attention." I didn't respond to this comment. I also was not

3  disruptive or disrespectful from the start to the end of this situation.

March 20, 2011

5      22.    On March 20, Deputy Frazier came to my cell and told me that I needed to go to

6  the disciplinary module for 15 days. He said that Deputies Felix and Hernandez had written me

7  up for being disruptive and causing problems a couple of days ago. He said that he would talk to

8  his sergeant and see if I had to go to the disciplinary module for 15 days or if I could stay in my

9  cell without privileges, like no phones and no visits. I don't know the name of the sergeant

10  whom Deputy Frazier talked to.

11      23.    After an hour, Deputy Frazier came back and said that his sergeant was going to

12  allow me to stay in my cell without privileges. I asked Deputy Frazier if he could bring me

13  copies of the write up and about the disposition of the write up and he told me that he would. As

14  of March 31, 2011, I have not received copies of either.

March 22, 2011

16      24.    On March 22, three deputies and a Custody Assistant ("CA") ~~Castillos~~ Contreras came to

17  my cell. CA ~~Castillos~~ Contreras told me that I needed to "roll up my stuff" because I was going to the

18  disciplinary module. Rolling up your stuff means gather your belongings.

19      25.    I told CA ~~Castillos~~ Contreras that Deputy Frazier and a sergeant had said that I didn't need

20  to go to the disciplinary module and that I could stay in my cell for 15 days without privileges.

21      26.    CA ~~Castillos~~ Contreras got on his radio and recapped what I had just told him. I heard the

22  voice on the radio, whom CA ~~Castillos~~ Contreras told me later belonged to Sergeant Roberts, say that I

23  needed to go the disciplinary module.

24      27.    I told CA ~~Castillos~~ Contreras that this process should be done properly because I hadn't

25  received copies of the write up, the disposition and the sergeant had not interviewed me. Nor had

26  I been allowed to participate in Sergeant's Court. Sergeant's Court is a type of hearing between

27  the sergeant and the inmate who's being written up and at the end the sergeant is supposed to

28  decide and tell the inmate whether the inmate is guilty of the write up.

3

1    28.    CA ~~Castillos~~ *Contreras S.G.* told me, "Don't give us a hard time.  You don't have to pack all your

2    stuff, since you'll be right back in your cell."

3    29.    When CA ~~Castillos~~ *Contreras S.G.* and the other three deputies escorted me to the disciplinary

4    module, I asked CA ~~Castillos~~ *Contreras S.G.* which sergeant had told him to tell me to go to the disciplinary

5    module.  He told me that Sergeant Roberts was the one.

6    30.    As of March 31, 2011, I haven't received copies of my write up or the disposition

7    of my write up.  I also have never participated in Sergeant's Court or even talked to a sergeant

8    about my write up.

9    I declare under penalty of perjury of the laws of the State of California and the United

10   States that the foregoing is true and correct.  Executed this 11th day of April, 2011 in Los

11   Angeles, California.

12

13   Jason Green

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## Declaration of Jason Green

I, Jason Green, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am thirty-nine years old and I have been at Men's Central Jail ("MCJ") since August 2009. I am currently housed in Module 1700, Row B, Cell 26. My booking number is 2051708

### March 18, 2011

3.     On March 18, 2011, Deputy Hernandez (#691) transferred me from my cell to the showers at approximately 6am to 6:30 am.

4.     While I was being escorted to the showers, Deputy Hernandez was told over the radio, which I heard, that I was being given a pass to go to medical.

5.     Deputy Hernandez tried to negotiate with me, telling me to refuse my medical pass. I don't think Deputy Hernandez wanted to grant me the pass because he would have needed to take me back to my cell, uncuff me to allow me to get dressed, re-cuff me and then escort me to the Medical area at MCJ.

6.     As Deputy Hernandez placed me into the showers and uncuffed me, I told Deputy Hernandez that I needed to go to my medical appointment. I told him that I wasn't going to refuse my medical pass.

7.     Deputy Hernandez said to me, "Well, that's how it works around here. You either get your shower or your medical pass, which one do you want?" I felt like Deputy Hernandez was trying to force me to choose between the two.

8.     I said to Deputy Hernandez, "Sir, I need my shower, but I'm not going to refuse my medical treatment."

9.     Deputy Hernandez appeared to be upset and he said to me, "You're already in the shower anyway, so that's what you're going to get."

10.     I was then escorted back to my cell after I showered and I asked a deputy for a complaint form. I don't know the name of the deputy, but he was heavy set, with dark hair and

21

1    appeared to be either White or Hispanic and approximately six feet and an inch tall. I am

2    approximately five feet and eleven inches tall.

3        11.    This deputy said loudly, "Why? So you can snitch to the ACLU?"

4        12.    I recently had a visit from the ACLU in MCJ's Attorney Room on 03/11/2011.

5        13.    The deputy didn't give me a complaint form.

6        14.    I had repeatedly asked for a complaint form from multiple deputies who were

7    working on my module so that I could write a complaint about Deputy Hernandez not allowing

8    me to go to my medical appointment and they did not give me a form. I was not escorted to MCJ

9    Medical for my medical appointment either.

10       15.    Approximately two to three hours later, I woke up from my nap due to what

11   sounded like a verbal confrontation that was taking place in front of my cell among Deputy

12   Hernandez, Deputy Felix, the other deputy that I described above and a female nurse, who was

13   Asian, around her mid-30's to 40's with dark hair.

14       16.    I could hear her yelling my name and I said, "Yes. Yes." She asked me why I

15   didn't go to medical and asked if I had refused my medical pass. I told her that I had not refused

16   my medical pass.

17       17.    Deputy Felix interrupted our conversation and said, "Yes, you did" and looked at

18   me with a look that made me feel like he was trying to get me to say that I had refused my

19   medical pass to this nurse.

20       18.    I was very persistent with the nurse and the deputies that I hadn't refused my pass

21   and that I wanted to go to medical. The nurse specifically asked me if I wanted to go to medical

22   and I told her yes.

23       19.    Deputy Felix again interrupted and said to the nurse, "He's not going anywhere.

24   He should have stated that earlier." The nurse said to Deputy Felix, "Sir, I have paperwork from

25   the ACLU stating that he needs to see a doctor." Deputy Felix told her, "I don't care what you

26   have or what it says. If you don't like it, write my name on it. Write me up. I don't give a shit."

27       20.    The nurse said to Deputy Felix, "Don't worry. I will."

28       21.    Deputy Felix then verbally threatened me, saying "You have to come out to the

2

22

1   showers again" and Deputy Hernandez said to me, "I can make it that you slip in the shower

2   next time and need serious medical attention." I didn't respond to this comment. I also was not

3   disruptive or disrespectful from the start to the end of this situation.

<u>March 20, 2011</u>

5       22.     On March 20, Deputy Frazier came to my cell and told me that I needed to go to

6   the disciplinary module for 15 days. He said that Deputies Felix and Hernandez had written me

7   up for being disruptive and causing problems a couple of days ago. He said that he would talk to

8   his sergeant and see if I had to go to the disciplinary module for 15 days or if I could stay in my

9   cell without privileges, like no phones and no visits. I don't know the name of the sergeant

10  whom Deputy Frazier talked to.

11      23.     After an hour, Deputy Frazier came back and said that his sergeant was going to

12  allow me to stay in my cell without privileges. I asked Deputy Frazier if he could bring me

13  copies of the write up and about the disposition of the write up and he told me that he would. As

14  of March 31, 2011, I have not received copies of either.

<u>March 22, 2011</u>

16      24.     On March 22, three deputies and a Custody Assistant ("CA") Castillos came to

17  my cell. CA Castillos told me that I needed to "roll up my stuff" because I was going to the

18  disciplinary module. Rolling up your stuff means gather your belongings.

19      25.     I told CA Castillos that Deputy Frazier and a sergeant had said that I didn't need

20  to go to the disciplinary module and that I could stay in my cell for 15 days without privileges.

21      26.     CA Castillos got on his radio and recapped what I had just told him. I heard the

22  voice on the radio, whom CA Castillos told me later belonged to Sergeant Roberts, say that I

23  needed to go the disciplinary module.

24      27.     I told CA Castillos that this process should be done properly because I hadn't

25  received copies of the write up, the disposition and the sergeant had not interviewed me. Nor had

26  I been allowed to participate in Sergeant's Court. Sergeant's Court is a type of hearing between

27  the sergeant and the inmate who's being written up and at the end the sergeant is supposed to

28  decide and tell the inmate whether the inmate is guilty of the write up.

3

28.    CA Castillos told me, "Don't give us a hard time. You don't have to pack all your stuff, since you'll be right back in your cell."

29.    When CA Castillos and the other three deputies escorted me to the disciplinary module, I asked CA Castillos which sergeant had told him to tell me to go to the disciplinary module. He told me that Sergeant Roberts was the one.

30.    As of March 31, 2011, I haven't received copies of my write up or the disposition of my write up. I also have never participated in Sergeant's Court or even talked to a sergeant about my write up.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 11th day of April, 2011 in Los Angeles, California.

_____/s/_____

Jason Green

4

# Exhibit 4

**Declaration of James Bowman**

I, James Bowman, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     On January 16, 2011, I was housed at Twin Towers Correctional Facility on the 5th floor, Pod-F.

3.     It was still the morning. I had already eaten breakfast and went back to my cell to sleep. While in my cell partially asleep, I heard the deputies walk into our pod and tell all the inmates to get out of the pod. I got out of bed and out of my cell, and proceeded out of the pod along with the other inmates. We made our way to the control room and into the main area where access to all the pods on our floor is available; it is also the room where the attorney room window on our floor peers into. We entered a recreation room that can be seen on the right side of the floor from where the attorney room peers into.

4.     There were approximately 10 deputies in the room with all the inmates. We were lined up, single file, and made to face the wall for approximately 20 minutes. I cannot recall if we were strip searched. All the inmates, including myself, stood there quiet. I was wondering to myself how big a mess was being made in our pod, as this incident has happened on many previous occasions, where we were made to line up in the same room while the deputies destroyed and made a mess of our property in our pod. Also, since the ACLU had come in the previous week, I knew we would be facing some sort of retaliation from the deputies, because we normally faced some sort of consequence (like being moved from the pod into a housing area having property like glasses taken away or destroyed, where an inmate shouldn't be, being de-classed into general population, or even violence) after speaking with the ACLU. I had spoken with the ACLU the previous week.

5.     After about 20 minutes, a deputy yelled through the door for us to come back in. We walked single file back into the main area and into the control room and into our pods. Upon entering the pod, I noticed the whole pod in complete disarray. Every inmates' property was thrown all over the place, our food and milk/juice cartons were thrown all over the floor, the floor was sticky and wet from all the liquid that was thrown everywhere, my glasses were

1   missing, and my Bible was destroyed as it was thrown in the pile of liquid on the floor. I felt

2   devastated, especially seeing my religious material on the floor in a mess. I looked back at the

3   deputies in the control room outside our pod and they were all laughing. The deputies were not

4   regulars on our floor so I could not get their names.  I felt helpless and that this was done in

5   retaliation from talking to the ACLU. I was also worried that I would be sent to general population, since they my floor housemates suffering from psychiatric problems.

6.   Exactly a week later, on January 23, 2011, the exact same incident took place, in

7   which we were removed from our cells, only to be brought back into our pod to see everything in

8   complete disarray. It is difficult for me to make a complaint or speak to the ACLU when I know I

9   could possibly face this type of retaliation from the deputies.

11   I declare under penalty of perjury of the laws of the State of California and the United

12   States that the foregoing is true and correct.  Executed this 12th day of April, 2011 in Los

13   Angeles, California.

James Bowman

2

**Declaration of James Bowman**

I, James Bowman, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    On January 16, 2011, I was housed at Twin Towers Correctional Facility on the 5th floor, Pod-F.

3.    It was still the morning. I had already eaten breakfast and went back to my cell to sleep. While in my cell partially asleep, I heard the deputies walk into our pod and tell all the inmates to get out of the pod. I got out of bed and out of my cell, and proceeded out of the pod along with the other inmates. We made our way to the control room and into the main area where access to all the pods on our floor is available; it is also the room where the attorney room window on our floor peers into. We entered a recreation room that can be seen on the right side of the floor from where the attorney room peers into.

4.    There were approximately 10 deputies in the room with all the inmates. We were lined up, single file, and made to face the wall for approximately 20 minutes. I cannot recall if we were strip searched. All the inmates, including myself, stood there quiet. I was wondering to myself how big a mess was being made in our pod, as this incident has happened on many previous occasions, where we were made to line up in the same room while the deputies destroyed and made a mess of our property in our pod. Also, since the ACLU had come in the previous week, I knew we would be facing some sort of retaliation from the deputies, because we normally faced some sort of consequence (like being moved from the pod into a housing area where an inmate shouldn't be, having property like glasses taken away or destroyed, being de-classed into general population, or even violence) after speaking with the ACLU. I had spoken with the ACLU the previous week.

5.    After about 20 minutes, a deputy yelled through the door for us to come back in. We walked single file back into the main area and into the control room and into our pods. Upon entering the pod, I noticed the whole pod in complete disarray. Every inmates' property was thrown all over the place, our food and milk/juice cartons were thrown all over the floor, the

floor was sticky and wet from all the liquid that was thrown everywhere, and my Bible was destroyed as it was thrown in the pile of liquid on the floor. I felt devastated, especially seeing my religious material on the floor in a mess. I looked back at the deputies in the control room outside our pod and they were all laughing. The deputies were not regulars on our floor so I could not get their names. I felt helpless and that this was done in retaliation from talking to the ACLU. I was also worried that I would be sent to general population, since my floor houses inmates suffering from psychiatric problems.

6.     Exactly a week later, on January 23, 2011, the exact same incident took place, in which we were removed from our cells, only to be brought back into our pod to see everything in complete disarray. It is difficult for me to make a complaint or speak to the ACLU when I know I could possibly face this type of retaliation from the deputies.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 12th day of April, 2011 in Los Angeles, California.

/s/

James Bowman

2

28

# Exhibit 5

1
**Declaration of Jon Bobier**

2 I, Jon Bobier, hereby declare:

3     1.     I make this declaration based on my own personal knowledge and if called on to

4 testify I could and would do so competently as follows:

5     2.     I have been an inmate in the Los Angeles County Jail System since July 2010. I

6 am currently housed in cell #8239, 8200 block - the medical ward of Men's Central Jail for

7 inmates with open wounds    MY BOOKING # is 242.125†

8     3.     I have a prolapsed intestine due to a severe beating at the hands of the Los

9 Angeles Police Department when I was arrested on July 24, 2010. Because of the beating, my

10 intestine protrudes three to four inches from my anus. I require access to clean water to clean my

11 exposed intestine. My medical condition prevents me from walking long distances and requires

12 me to use a wheelchair.

13     4.     When I was first brought to Men's Central Jail I was housed in the 7000 floor.

14 This is the ambulatory floor, meant for inmates who are recovering from surgery or who have to

15 use crutches or walkers. While I was there, I had to use water from a communal toilet to clean my

16 exposed intestine. I was afraid that if I kept cleaning myself with communal toilet water this

17 would worsen my medical condition. I repeatedly asked the deputies if I could be switched to

18 medical housing. I believed my being placed on 7000 block was a mistake. However, my

19 complaints to the deputies did not yield any results.

20     5.     On March 14, 2011 I filed a complaint with the A.C.L.U. regarding the Sheriff

21 department's refusal to house me in a cell with an accessible sink and toilet in order properly to

22 treat my medical condition. After my complaint was processed by the A.C.L.U., I was moved to

23 the 8200 block of Men's Central Jail, the medical ward for inmates with open wounds.

24     6.     On or about April 11, 2010 Deputy Bryant, a chubby white male 5' 8" tall

25 weighing around 180 lbs with light-colored balding hair, came into my cell. Deputy Bryant told

26 me that I had been declassified from the medical ward back to the 7000 floor. He spoke to me in

27 an normal manner and there was no indication that he was angry at me. I asked if this had been a

28 mistake and showed Deputy Bryant a letter from the A.C.L.U. regarding the complaint I filed

1  about my medical condition. After I showed Deputy Bryant the letter he suddenly became very

2  angry and pushed down from a shelf several plastic bottles of shampoo and assorted toiletries.

3  The bottles hit me and it hurt pretty badly but I did not suffer any injuries.

4       7.     Deputy Bryant, then escorted me out of 8200 block. We took the elevator down to

5  7000 floor. We exited the elevator to the area in front of the control booth. This is a large open

6  room that is connected to several hallways that lead to different housing sections. Three deputies

7  stepped out of the control booth and Bryant told the other deputies that I was a troublemaker.

8  Bryant said: "You're a complainer, huh? You like to complain?" I believe he was referring to my

9  complaint to the A.C.L.U. about my housing section.

10       8.     I got out of my wheelchair and sat down on a bench attached to the wall. The

11  deputies began to search through all my belongings; they went through all my papers and my

12  photographs. The deputies claimed that I did not need a wheelchair and when I showed them my

13  Disability Placement Program Verification form (which says I have a mobility impairment and

14  require a wheelchair) one of the deputes said: "That A.D.A (American Disabilities Act) doc

15  doesn't mean crap to me." One of the deputies took away the wheelchair to someplace that I

16  wasn't able to see.

17       9.     While I was waiting, deputy Holland came up to me and began yelling at me.

18  Deputy Holland is 6'2" tall, buff, white, weights around 240 pounds, and has a short, G.I.-style

19  haircut. He called me a "troublemaker" and said that I liked to complain. Deputy Holland then

20  told deputy Bryant to leave. Bryant replied "Can't I just stay and watch a little longer?" After

21  Bryant left, Holland walked me to my new cell. He told me repeatedly to "hurry up" but because

22  of my condition I can't move very fast. Before we reached the hallway that would take me to my

23  new cell, I asked Holland if I could go back to pick up my belongings. Holland got frustrated said

24  "Shut up and move!" and hit me in my lower back. It was an upward strike; I don't recall if it

25  was an open-handed slap or a punch. It did hurt, though. I have a bullet wound in my upper back

26  and a bullet lodged in the back of my neck from 1992; the blow landed between those two

27  wounds and was extremely painful. It felt like someone stabbed me. On a ten point scale, I would

28  give it an 8; the blow knocked the wind out of me.

2

10.     After that, Holland took me to my new cell in 7000 block. I was left in that cell for twenty-four hours. No one came in to check up on me even though I have a severe medical condition. I did not call out for treatment because I was afraid of running into the guards again. Someone finally came in the next day and took me downstairs to the clinic for treatment. Nurse Haggerty was working down there at the time and she was surprised that I had been in 7000 block. She said there was no reason for that to have happened. She spoke to the doctor and had me transferred back to 8200 block.

11.     I did not file a formal complaint with the Sheriff because this incident seemed minor in comparison to other incidents of violence that go on here. Violence is such an ordinary thing here that I felt it should not be reported. It's very common for deputies to retaliate against inmates; they are very vindictive.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 13th day of July 2011 in Los Angeles, California.

Jon Bobier

3

**Declaration of Jon Bobier**

I, Jon Bobier, hereby declare:

1.   I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently as follows:

2.   I have been an inmate in the Los Angeles County Jail System since July 2010. I am currently housed in cell #8239, 8200 block - the medical ward of Men's Central Jail for inmates with open wounds. My booking number is 2421251.

3.   I have a prolapsed intestine due to a severe beating at the hands of the Los Angeles Police Department when I was arrested on July 24, 2010. Because of the beating, my intestine protrudes three to four inches from my anus. I require access to clean water to clean my exposed intestine. My medical condition prevents me from walking long distances and requires me to use a wheelchair.

4.   When I was first brought to Men's Central Jail I was housed in the 7000 floor. This is the ambulatory floor, meant for inmates who are recovering from surgery or who have to use crutches or walkers. While I was there, I had to use water from a communal toilet to clean my exposed intestine. I was afraid that if I kept cleaning myself with communal toilet water this would worsen my medical condition. I repeatedly asked the deputies if I could be switched to medical housing. I believed my being placed on 7000 block was a mistake. However, my complaints to the deputies did not yield any results.

5.   On March 14, 2011 I filed a complaint with the A.C.L.U. regarding the Sheriff department's refusal to house me in a cell with an accessible sink and toilet in order properly to treat my medical condition. After my complaint was processed by the A.C.L.U., I was moved to the 8200 block of Men's Central Jail, the medical ward for inmates with open wounds.

6.   On or about April 11, 2010 Deputy Bryant, a chubby white male 5' 8" tall weighing around 180 lbs with light-colored balding hair, came into my cell. Deputy Bryant told me that I had been declassified from the medical ward back to the 7000 floor. He spoke to me in an normal manner and there was no indication that he was angry at me. I asked if this had been a mistake and showed Deputy Bryant a letter from the A.C.L.U. regarding the complaint I filed

1  about my medical condition. After I showed Deputy Bryant the letter he suddenly became very
2  angry and pushed down from a shelf several plastic bottles of shampoo and assorted toiletries.
3  The bottles hit me and it hurt pretty badly but I did not suffer any injuries.

4       7.     Deputy Bryant, then escorted me out of 8200 block. We took the elevator down to
5  7000 floor. We exited the elevator to the area in front of the control booth. This is a large open
6  room that is connected to several hallways that lead to different housing sections. Three deputies
7  stepped out of the control booth and Bryant told the other deputies that I was a troublemaker.
8  Bryant said: "You're a complainer, huh? You like to complain?" I believe he was referring to my
9  complaint to the A.C.L.U. about my housing section.

10       8.     I got out of my wheelchair and sat down on a bench attached to the wall. The
11  deputies began to search through all my belongings; they went through all my papers and my
12  photographs. The deputies claimed that I did not need a wheelchair and when I showed them my
13  Disability Placement Program Verification form (which says I have a mobility impairment and
14  require a wheelchair) one of the deputes said: "That A.D.A (American Disabilities Act) doc
15  doesn't mean crap to me." One of the deputies took away the wheelchair to someplace that I
16  wasn't able to see.

17       9.     While I was waiting, deputy Holland came up to me and began yelling at me.
18  Deputy Holland is 6'2" tall, buff, white, weights around 240 pounds, and has a short, G.I.-style
19  haircut. He called me a "troublemaker" and said that I liked to complain. Deputy Holland then
20  told deputy Bryant to leave. Bryant replied "Can't I just stay and watch a little longer?" After
21  Bryant left, Holland walked me to my new cell. He told me repeatedly to "hurry up" but because
22  of my condition I can't move very fast.  Before we reached the hallway that would take me to my
23  new cell, I asked Holland if I could go back to pick up my belongings. Holland got frustrated said
24  "Shut up and move!" and hit me in my lower back. It was an upward strike; I don't recall if it
25  was an open-handed slap or a punch. It did hurt, though. I have a bullet wound in my upper back
26  and a bullet lodged in the back of my neck from 1992; the blow landed between those two
27  wounds and was extremely painful. It felt like someone stabbed me. On a ten point scale, I would
28  give it an 8; the blow knocked the wind out of me.

2

10.    After that, Holland took me to my new cell in 7000 block. I was left in that cell for twenty-four hours. No one came in to check up on me even though I have a severe medical condition. I did not call out for treatment because I was afraid of running into the guards again. Someone finally came in the next day and took me downstairs to the clinic for treatment. Nurse Haggerty was working down there at the time and she was surprised that I had been in 7000 block. She said there was no reason for that to have happened. She spoke to the doctor and had me transferred back to 8200 block.

11.    I did not file a formal complaint with the Sheriff because this incident seemed minor in comparison to other incidents of violence that go on here. Violence is such an ordinary thing here that I felt it should not be reported. It's very common for deputies to retaliate against inmates; they are very vindictive.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 13th day of July, 2011 in Los Angeles, California.

_____\s_____

Jon Bobier

3