# I.   Annual Report

# Annual Report on Conditions Inside Los Angeles County Jail

## 2011

## ACLU National Prison Project
## ACLU of Southern California

**September 28, 2011**

**Principal Authors**

**Sarah Liebowitz**
**ACLU Foundation of Southern California, Jails Project**

**Peter Eliasberg**
**Legal Director, ACLU Foundation of Southern California**

**Margaret Winter**
**Associate Director, ACLU National Prison Project**

**Esther Lim**
**ACLU Foundation of Southern California, Jails Project Coordinator**




# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ - 1 -

II.  METHODOLOGY ............................................................................................. - 3 -

II.  ANALYSIS ........................................................................................................ - 4 -

  A.   Violence in the Los Angeles County Jails ............................................. - 4 -

  B.   Reports of Deputy-on-Inmate Violence .............................................. - 12 -

    1.   Reports by Civilian Witnesses ..................................................... - 13 -

    2.   Reports by Inmate Victims ........................................................... - 16 -

    3.   Reports by Inmate Eyewitnesses ................................................ - 20 -

  C.   Pitting Inmates Against Other Inmates ............................................... - 22 -

  D.   Threats of Violence ................................................................................. - 23 -

  E.   Deputy Gangs Foment Violence Against Inmates and Against  Other Deputies ...... - 24 -

  F.   Cover-ups .................................................................................................. - 24 -

    1.   Civilian Accounts of Deputies Covering Up Deputy-on-Inmate  Attacks .............. - 25 -

    2.   Inmate Accounts of Deputies Attempting to Cover Up Deputy-on- Inmate Attacks ......... - 27 -

    3.   The LASD's Transparently False Denials That There is a Problem  Of Deputy-on-Inmate Violence ......... - 29 -

III.  CONCLUSION ................................................................................................ - 32 -

IV.  ENDNOTES ..................................................................................................... - 33 -

000004

# I.    INTRODUCTION

*"To this day, recalling the beating brings tears to my eyes, and I cannot finish talking about it without taking a few moments to compose myself."*
-- Chaplain Paulino Juarez, describing a 2009 beating by deputies of an inmate in Men's Central Jail.

*"I was so shocked that despite the deputies seeing me watch them beat up the inmate, they continued to kick and beat him. It was like they didn't even care that there was a witness"*
-- Chaplain Doe, describing a 2011 beating by deputies of an inmate in Men's Central Jail.

*"To an astonishing extent, unchecked violence, both deputy-on-inmate and inmate-upon-inmate, permeates Men's Central Jail and Twin Towers jails, which are components of the Los Angeles County Jails, managed by the Los Angeles County Sheriff's Department under the leadership of Sheriff Leroy Baca. … The voluminous evidence I have reviewed cries out for an independent, far-reaching, and in-depth investigation by the Federal Government.  The problem can no longer be ignored."*
-- Thomas Parker, former Assistant Special Agent in Charge of the FBI's Los Angeles Field Office.

To be an inmate in the Los Angeles County jails is to fear deputy attacks.  In the past year, deputies have assaulted scores of non-resisting inmates, according to reports from jail chaplains, civilians, and inmates.  Deputies have attacked inmates for complaining about property missing from their cells.[1]  They have beaten inmates for asking for medical treatment,[2] for the nature of their alleged offenses,[3] and for the color of their skin.[4]  They have beaten inmates in wheelchairs.[5]  They have beaten an inmate, paraded him naked down a jail module, and placed him in a cell to be sexually assaulted.[6]  Many attacks are unprovoked.  Nearly all go unpunished: these acts of violence are covered up by a department that refuses to acknowledge the pervasiveness of deputy violence in the jail system.

Deputies act with such impunity that in the past year even civilians have begun coming forward with eyewitness accounts of deputies beating non-resisting inmates in the jails.[7]  These civilian accounts support the 72 inmate declarations describing deputy-on-inmate beatings and

000005

deputy-instigated inmate-on-inmate violence and deputy threats of assaults against inmates that the ACLU/SC has collected in the past year, as well as the myriad inmate declarations the ACLU/SC has collected over the years.[8]

The violence that takes place in the Los Angeles County jails is far from normal.  These are not average jails with isolated or sporadic incidents of deputy misbehavior.  Thomas Parker, a former FBI agent and Assistant Special Agent in Charge of the Bureau's Los Angeles Field Office, reviewed inmate, former inmate, chaplain and civilian declarations, reports, correspondence, media articles, and legal filings, as well as interviewing some former prisoners and civilian witnesses, and found:  "Of all the jails I have had the occasion to visit, tour, or conduct investigations within, domestically and internationally, I have never experienced any facility exhibiting the volume and repetitive patterns of violence, misfeasance, and malfeasance impacting the Los Angeles County Jail system…."[9]  "There is at least a two decade history of corruption within the ranks of the LASD.  In most of those cases, lower level deputies and civilian employees were prosecuted, but no one at the command level responsible for those employees appears to have been held accountable and appropriately punished for failure to properly supervise and manage their subordinate personnel and resources.  In my opinion, this has provided the 'seedbed' for continued lax supervision, violence, and corruption within LASD and the county jails it administers," Mr. Parker concluded.[10]

The Kolts Commission "made various recommendations for reform within the LASD to then-Sheriff Sherman Block and the Board of Supervisors, which, if implemented back then, have seemingly not survived over the past two decades, since excessive use of force, especially in the jails, is still common place in 2011." [11]

Mr. Parker's conclusion is based on his extensive experience with investigations into malfeasance by law enforcement agencies, including in jails and prisons throughout the country. He oversaw the FBI investigation into the high-profile Rodney King beating, studying Los Angeles police officers' use of excessive force.  He played the same role in a major FBI investigation into corruption in the LASD Narcotics Division.  In the words of Mr. Parker: "The misfeasance and malfeasance of LASD described in this report, and in the litigation for which it has been prepared, should not be allowed to continue nor to perpetuate itself, as it has apparently done over the past two decades and perhaps longer.  To allow this to continue would be nothing short of criminal."[12]

## II.    METHODOLOGY

The ACLU Foundation of Southern California ("ACLU/SC") received several thousand complaints from prisoners in the Los Angeles County Jail system in the past year.  The ACLU/SC receives these complaints as a result of its monitoring role in the jails: Pursuant to a series of court-approved agreements between the ACLU/SC and the Los Angeles Sheriff's Department ("LASD"), the ACLU/SC has monitored conditions in the county jails since 1985. The ACLU/SC has far greater access to jail facilities than the general public, allowing ACLU/SC's representatives to speak with inmates and observe jail conditions first-hand.

As part of their monitoring efforts, representatives from the ACLU/SC's Jails Project regularly visit the jail facilities and process inmate complaints. In addition, inmates and family members of inmates frequently write letters and make phone calls to the ACLU/SC to make complaints about scores of issues, including deputy on inmate assaults.  Signs posted in common areas of the jail facilities tell inmates that they may contact the ACLU/SC's Jails Project with complaints about jail conditions.  Over the years, the ACLU/SC has collected thousands of reports about jail conditions; including prisoner declarations; observations from jail tours; and complaints in the form of letters, phone calls, or face-to-face interviews. The Jails Project processes approximately 4,500 complaints about jail conditions annually from inmates.

The information in this report comes from the thousands of complaints the ACLU/SC received in the past year, in addition to the dozens of jail tours and face-to-face interviews with inmates ACLU/SC representatives conducted.  Civilian eyewitnesses – including jail chaplains, a volunteer tutor to jail inmates, and the ACLU/SC's Jails Project Coordinator have also provided first-hand reports about violence in the jails.

The report's findings are also based on the observations of two experts: Thomas Parker, former Assistant Special Agent in Charge of the FBI's Los Angeles Field Office,[13] and Toni V. Bair, who in his 25 years as a corrections professional has served both as a prison warden and as the Assistant Commissioner for one of the nation's largest urban jail systems.[14]

The incidents of violence chronicled in this report are by no means the only acts of excessive force that occurred in the jails in the past year.  Deputies retaliate against inmates who report incidents of deputy-on-inmate violence,[15] and many of them are too fearful to report acts of violence.[16]

- 3 -

000007

## II.    ANALYSIS

### A.    Violence in the Los Angeles County Jails

Deputy violence against inmates is routine in the Los Angeles County jails.  Deputies slam inmates' heads into walls and windows.[17]  They push inmates to the ground and then begin kicking them with boot-clad feet.[18]  They shoot unresisting inmates with Tasers.[19]  They use other inmates to carry out gruesome attacks on their behalf: In one case, inmates sexually assaulted another inmate with a broomstick.  In another instance, other inmates simultaneously raped an inmate and held his head in a flushing toilet.  Both assaults took place with the apparent cooperation of LASD employees.[20]

This year alone, inmates suffered a shocking litany of severe injuries at the hands of deputies, including a fractured jaw,[21] a broken collarbone,[22] eye wounds so severe that they required surgery,[23] broken blood vessels,[24] and long-lasting dizzy spells.[25]  One former inmate, who is now a drug treatment counselor, witnessed multiple deputies beat another inmate so severely that he "let out the most awful scream I have ever heard in my life," the memory of which still causes the counselor to "shiver."[26]

Scores of inmates – along with jail chaplains, a volunteer jail tutor, and the ACLU/SC's Jails Project Coordinator – reported their first-person accounts of deputy violence to the ACLU/SC in the past year, showing that violence in the jails continues unabated.[27]  In the words of one inmate who was severely beaten by deputies, and then placed in a cell where he would be subjected to attacks from other inmates: "I understand I pled guilty to a crime and I needed to serve my sentence, but I did not sign up to being beaten by deputies.  Nor did I sign up to have deputies arrange to have me beaten and sexually assaulted by other inmates."[28]

The staggering scope of the problem is illustrated by the 72 sworn statements about deputy abuse that are being submitted to the Court today, which are briefly described below:

- declaration of Mr. I, dated July 12, 2011, ¶¶ 3-10 (custody assistant kicked, hit, and elbowed inmate);[29]

- declaration of Mr. J, dated January 28, 2011, ¶¶ 16-23 (deputy slapped inmate across face with shoe and kicked inmate in the testicles);

- declaration of Mr. Q, dated July 5, 2011, ¶¶ 20-25 (deputy punched inmate in the eye);

000008

- declaration of Scott Budnick, dated March 30, 2011, ¶¶ 10-16, ¶ 18, ¶ 21, ¶ 23 (volunteer tutor witnessed five deputy-on-inmate beatings in Men's Central Jail);

- declaration of Mr. XX, dated April 12, 2011, ¶ 6 (deputy forcefully pushed inmate, causing him to fall);

- declaration of Mr. OOO, dated April 11, 2011, ¶¶ 9-12 (deputy punched inmate, demanding to know what inmate's alleged crime was; a deputy then threatened to turn the inmate over to gang members);

- declaration of Mr. QQQ, dated April 19, 2011, ¶¶ 5-7 (deputy kicked inmate's leg and hit his head);

- declaration of Mr. KK, dated April 19, 2011, ¶¶ 13-15, ¶¶ 30-34 (deputy punched inmate's face and repeatedly kicked his face, jaw, and back of his head, causing a fractured jaw, serious eye injuries that required surgery, and lacerations requiring stitches);

- declaration of Mr. X, dated April 12, 2011, ¶¶ 5-9, ¶ 12, ¶¶ 15-19 (deputy punched inmate's head and torso; deputies later punched and kicked inmate's head and body);

- declaration of Mr. P, dated April 12, 2011, ¶¶ 4-10 (deputy slapped and punched inmate in the face and head before pushing inmate to the ground, sitting on top of him and hitting him; other deputies joined the attack, with one bashing the inmate's ankle with a flashlight);

- declaration of Robert Powell, dated May 11, 2011, ¶¶ 12-20 (deputy repeatedly slammed inmate's head into the wall and left inmate outside in the cold for hours);

- declaration of Mr. HH, dated April 11, 2011, ¶¶ 9-13, ¶¶ 16-29, (inmate witnessed inmates brutally attack another inmate – including sexually assaulting him with a broomstick – with the apparent assistance of an LASD employee);

- declaration of Evans Tutt, dated May 5, 2010, ¶¶ 4-6 (deputies made racial slurs against inmate before hitting, kicking, and using a Taser on him);

- declaration of Mr. PP, dated April 12, 2011, ¶¶ 3-4, ¶ 10 (deputy slammed inmate to the ground and threatened inmate; another deputy punched and hit inmate);

- declaration of Mr. PPP, dated July 5, 2011, ¶¶ 6-19, ¶¶ 22-24 (deputies slammed inmate's head against wall, punched inmate's head, and threw inmate to the ground; an LASD employee apparently let other inmates repeatedly punch inmate's face);

- declaration of Mr. H, dated August 2, 2011, ¶¶ 4-7, ¶¶ 10-12 (deputy shoved inmate against wall and roughly twisted hands and arm before slamming inmate to the floor; on the floor, several deputies punched and kicked inmate; inmate suffered a bruised eye,

bruised ribs, and lacerated tongue);

- declaration of Mr. Y, dated August 19, 2011, ¶¶ 17-23 (deputy pepper-sprayed non-resisting inmate, then punched him and held him in a chokehold; more deputies joined in the attack, punching and kicking the inmate);

- declaration of Mr. AAA, dated August 9, 2011, ¶¶ 6-7, ¶¶ 9-10, ¶¶ 12-14 (deputy slammed inmate against the wall for accidentally crossing a line; deputy stepped on inmate's fingers, causing bruises; deputy choked inmate and pulled on his handcuffed arms);

- declaration of Mr. BBB, dated June 22, 2011, ¶¶ 7-9 (deputy asked inmate why he was in jail before repeatedly punching his head, face, and ribs; another deputy kicked his ribs);

- declaration of Mr. OO, dated August 16, 2011, ¶¶ 6-10 (inmate heard deputies beating another inmate in the laundry room near his cell; Mr. OO stated that, "I will never forget this incident because the inmate's terror and pain were so obvious in his screams"; he later saw a seemingly unconscious inmate, who was bleeding from his head);

- declaration of Mr. R, dated August 16, 2011, ¶¶ 6-14 (deputy caused inmate's bad shoulder to dislocate from its socket);

- declaration of Gordon Grbavac, dated June 15, 2011, ¶¶ 9-11, 16 (deputies attacked inmate, repeatedly slamming his head and cheek into a window, causing blood to flow; deputy pressed his key into inmate's arms, leaving puncture wounds);

- declaration of Mr. GG, dated June 23, 2011, ¶¶ 5-8 (after wheelchair-bound inmate complained about jail conditions, deputies pulled him off his bed and kicked and kneed his ribs, back, and neck; they then shot pepper spray into his face; they caused him to fall out of his wheelchair);

- declaration of Mr. HHH, dated June 22, 2011, ¶¶ 6-8, ¶¶ 12-14 (deputy dragged inmate by the neck, kicked his ribs several times, and threatened further attacks; deputy punched inmate in the face, and deputies repeatedly punched and kicked his body);

- declaration of Cedric Smith, dated August 20, 2011, ¶ 7, ¶¶ 17-18 (deputy punched inmate's neck, slamming him into the wall; deputy kicked inmate's feet, despite the fact that inmate had just had his toenail surgically removed; in 2004, deputies brutally attacked inmate, punching his face and kicking his stomach, causing him to defecate; the 2004 attack left the inmate with a severe stomach hernia and a scar over his eye);

- declaration of Mr. C, dated July 13, 2011, ¶ 6, ¶ 9 (deputy angrily pushed toiletries onto inmate after inmate complained to the ACLU/SC about lack of medical treatment; deputy hit inmate's back, near wounds inmate had already suffered);

- declaration of Christopher Brown, dated February 2, 2011, ¶¶ 8-11, ¶¶ 14-15, ¶¶ 17-21 (inmate witnessed two deputies punching a non-resisting inmate who fell to the floor, apparently unconscious; deputies then kneed and punched the motionless inmate in the

000010

face and head; deputies then repeatedly shot the inmate with a Taser);

- declaration of Mr. K, dated April 20, 2011, ¶¶ 10-14 (deputy pushed inmate's back, which was injured, and punched inmate's head; inmate suffered extensive bruising and pain in his head, neck, and back);

- declaration of Mr. M, dated July 27, 2011, ¶¶ 5-8 (deputy pushed a tray of food from inmate's hands; a deputy then slammed his face against a wall, before several deputies hit him on his face, head, and legs; inmate had a catheter, and the kicks to his legs caused tremendous pain, and led him to bleed from his penis);

- declaration of Mr. S, dated November 24, 2010, ¶¶ 20-24 (deputies hit, kicked, and kneed inmate, and shot pepper spray in his face; inmate required stitches on his eyelid, and suffered extensive bruising);

- declaration of Mr. V, dated November 8, 2010, ¶¶ 5-14 (a deputy placed an inmate – who was in protective custody – in the general population tank, where inmate was viciously attacked by other inmates; inmate suffered contusions on his head, a busted lip, blurry vision, a swollen ear, and severe emotional trauma);

- declaration of Mr. W, dated June 7, 2011, ¶¶ 18-21 (deputies slammed a handcuffed inmate to the ground, causing his head to crash into the ground; deputies then repeatedly punched his head and sprayed pepper spray into his eyes, triggering the inmate's asthma);

- declaration of Mr. LLL, dated May 18, 2011, ¶¶ 13-15 (deputies placed inmate – who had previously been in protective custody, in the general population, where he was attacked by other inmates);

- declaration of Mr. LL, dated July 28, 2011; ¶ 36, ¶ 43, ¶¶ 46-50, ¶ 61, ¶¶ 72-75 (on several occasions, deputies placed inmate who was in protective custody with inmates from the general population, who attacked him; inmate heard another protective custody inmate being beaten);

- declaration of Mr. GGG, dated August 1, 2011, ¶¶ 16-19, ¶¶ 21-23, ¶¶ 45-51 (deputy forcibly searched inmate's buttocks with a flashlight, placing the flashlight half an inch into inmate's rectum; inmate's rectum later bled and became painful, which he attributed to the flashlight; inmate witnessed deputies take away another inmate and apparently attack him; that inmate suffered extensive injuries);

- declaration of Mr. FFF, dated April 20, 2011, ¶ 10 (inmate repeatedly told the custody assistant that other inmates were threatening to stab him and asked the custody assistant to move him to protective custody; the custody assistant not only told him that he wouldn't be moved to protective custody, but also that he would moved closer to the front where he'd be an easier target);

- declaration of Mr. YY, dated July 22, 2011, ¶¶ 6-11 (deputy attacked inmate after inmate woke up late for the morning count);

- 7 -

- declaration of Mr. RR, dated July 13, 2011, ¶¶ 5-13 (when inmate refused to discuss his legal case with a deputy, the deputy kicked the inmate in the lower back with his boot-clad foot, and then repeatedly kicked him in the lower back and near his kidneys, causing intense pain; the deputy punched the inmate's head and yanked his leg, causing his knee to pop out of position);

- declaration of Mr. NN, dated May 20, 2011, ¶ 4 (deputy smashed inmate's head into the wall after inmate fought with another inmate; deputy also hit inmate repeatedly in the ribs);

- declaration of Mr. MM, dated February 24, 2011, ¶¶ 24-26 (deputies attacked wheelchair-bound inmate after inmate spoke to an ACLU/SC representative; deputies slammed inmate against the wall of an elevator, and then threatened him);

- declaration of Mr. WW, dated July 12, 2011, ¶¶ 4-9 (deputy dug her nails into inmate's skin, leaving marks; another deputy hit and kicked inmate in the legs and buttocks);

- declaration of Mr. RRR, dated June 30, 2011, ¶¶ 6-9 (deputy placed inmate in a chokehold before slamming him to the ground, knocking the inmate unconscious);

- declaration of Mr. U, dated August 15, 2011, ¶¶ 5-7 (deputy punched inmate in the neck before aiming pepper spray in his face; deputies slammed inmate to the ground and began punching, kicking, and hitting him with what felt like flashlights; deputies then choked inmate);

- declaration of Mr. DD, dated August 4, 2011, ¶¶ 14-20 (deputy kicked inmate's ankles and strained his shoulders; at some point, inmate lost consciousness; he awoke in the hospital with a broken nose, severe cuts to his eyes and ears, and a chipped tooth);

- declaration of Mr. JJJ, dated August 26, 2011, ¶¶ 10-11 (deputy took away inmate's hearing aid, then grabbed and shoved him to the floor, which resulted in a black eye);

- declaration of Mr. FF, dated July 8, 2011, ¶¶ 9-11 (deputy smashed inmate's face against the wall, breaking his glasses, and punched inmate in the head);

- declaration of Mr. VVV, dated May 18, 2011b, ¶¶ 9-25 (deputies placed a protective custody inmate in a general population housing despite the inmate's telling them that he cannot be in general population because he'll be seriously injured or killed; shortly after, other inmates beat Mr. VVV);

- declaration of Mr. Y, dated August 19, 2011, ¶ 2, ¶ 22 (deputies beat, choked, pepper sprayed and yelled, "Stop resisting!", even though he wasn't fighting or resisting the deputies);

- declaration of Mr. II, dated August 19, 2011, ¶¶ 7-15 (inmate witnessed deputies slam a non-resisting inmate's head against a wall, beat and shoot him with a Taser);

- declaration of Mr. SSS, dated August 2, 2011, ¶¶ 8-10 (deputies beat, kicked and yelled at him to "Stop resisting! Stop pulling away!" even though he wasn't resisting the deputies and was handcuffed from behind; the inmate ended up going to the hospital for a broken collarbone and other injuries);

- declaration of Mr. T, dated August 23, 2011, ¶ 5 (even before completing the reception process at the Inmate Reception Center, deputies pushed his face against a wall and repeatedly punched him);

- declaration of Mr. JJ, dated August 19, 2011, ¶¶ 10-18 (deputies stomped on inmate's hand, kicked and punched his body, used a Taser gun on him, and shot pepper spray in his face);

- declaration of Mr. SS, dated July 12, 2011, ¶¶ 6-8 (inmate witnessed seven or eight deputies beating up a non-resisting inmate);

- declaration of Mr. EEE, dated April 12, 2011, ¶¶ 20-25 (deputy repeatedly threatened inmate not to complain about jail conditions);

- declaration of Cameron Saul, dated June 22, 2011, ¶¶ 8-9, ¶ 24 (deputies told inmates to "handle" problem inmates, and directed them to make up stories about how those inmates were injured; inmate witnessed numerous deputies beat a non-resisting inmate with their flashlights, during which Saul heard a "horrible cracking sound");

- declaration of Mr. QQQ, dated April 19, 2011, ¶¶ 6-7 (deputy kicked inmate's leg, repeatedly hit inmate's head, and placed inmate in a chokehold);

- declaration of Mr. F, dated September 9, 2011, ¶¶ 7- 13 (deputies grabbed inmate's windpipe, slammed him to the ground, and repeatedly punched and kicked his body – including his teeth; deputies aimed pepper spray into inmate's face);

- declaration of Mr. CCC, dated September 9, 2011, ¶¶ 8-17 (deputy grabbed inmate's neck and repeatedly slammed his head into a metal bar; deputy then repeatedly smashed inmate's face into a wall and punched his ribs);

- declaration of Mr. CC, dated August 26, 2011, ¶ 6-16 (inmate witnessed deputy grab a non-resisting inmate and kick his legs; numerous deputies then joined the attack, kicking, punching and hitting the inmate with flashlights; after the attack, the inmate victim had blood on the side of his face);

- declaration of Mr. O, dated August 26, 2011, ¶¶ 10-13 (deputy slammed inmate against a wall while searching his cell; the impact caused the inmate's prosthetic eye to pop out);

- 9 -

- declaration of Mr. B, dated April 12, 2011, ¶¶ 8-24 (numerous deputies attacked inmate after he protested a deputy's decision not to give him dinner; inmate suffered numerous injuries, including a fractured nose);

- declaration of Juan Pablo Reyes, dated September 12, 2011, ¶¶ 5-12 (deputies attacked inmate causing numerous injuries including a broken eye socket: made him strip; paraded him naked down the hall in front of other inmates; placed him in a cell with known gang members who beat and sexually assaulted him, while deputies refused Reyes's pleas to be taken out of the cell);

- declaration of Mario Rocha, ¶¶ 14-15, ¶¶ 20-24 (witnessed deputies forcefully slamming an inmate into the wall as they twisted his arm and yelled, "You think you're hard, motherfucker?" and "You don't run shit"; he also witnessed deputies kicking an older, white male, who appeared to be mentally ill, all over his body and head);

- declaration of Mr. A, dated August 19, 2011, ¶¶ 12-13 (inmate witnessed deputies slamming another inmate's head against the wall before they beat, kicked and shot him with a Taser, all the while the inmate was not resisting or combative);

- declaration of Chaplain Doe, dated, August 15, 2011, ¶ 8 (jails chaplain witnessed deputies beating up a non-combative inmate who yelled, "Stop! Help me! Help!"  Despite the inmate's plea for the deputies to stop beating him, the deputies continued to kick and beat him);

- declaration of Mr. AA, dated August 19, 2011, ¶¶ 12-18 (inmate witnessed a deputy slam another inmate's head against the wall.  He then saw several other deputies beating, kicking and shooting the inmate with a Taser who wasn't fighting or resisting the deputies);

- declaration of Mr. DD, dated August 4, 2011, ¶¶ 16-19 (deputies beat inmate so badly that he lost consciousness and woke up at a hospital with blood all over his chest);

- declaration of Paulino Juarez, dated September 3, 2011, ¶¶ 4-13 (jails chaplain witnessed deputies stomping, punching, kicking and beating an inmate, not knowing that Juarez was watching; it wasn't until one of the deputies saw Juarez when they stopped the attack against the inmate, who wasn't fighting or resisting the deputies);

- declaration of Esther Lim, dated February 4, 2011, ¶ 4 (ACLU/SC's Jails Project Coordinator witnessed two deputies beating and shooting an inmate repeatedly with a Taser; inmate appeared to be unconscious while they nonetheless yelled, "Stop fighting! Stop resisting!");

- declaration of Mr. QQ, dated August 19, 2011, ¶ 3 (inmate witnessed deputies forcefully slamming an inmate's head against a wall before kicking, shooting a Taser and pepper spraying a non-resisting inmate);

- declaration of Mr. VV, dated November 16, 2010, ¶¶ 6-15 (deputies pointed inmate out to other deputies and said, "dead man walking" and "that's the guy" after he told LASD that an inmate told him he had killed another inmate at Men's Central Jail);

- declaration of Mr. TTT, dated September 23, 2011, ¶¶ 8-11 (deputy yells "You're one of those! You like little girls!" to inmate charged as sex offender in the presence of another inmate who later attacked, punched and kicked him all over his body);

- declaration of Jonni A., dated September 22, 2011, ¶6 (deputy threw juvenile into a metal gate, then the deputy hit him in the thigh with either a baton or a flashlight; he also witnessed a deputy open two locked gates to get at another juvenile who was handcuffed, so that the deputy could punch him hard in the stomach);

- declaration of Mr. MMM, dated August 22, 2011, ¶¶ 8-12 (deputies kicked, punched and hit him with flashlights, though he was handcuffed from behind and not resisting or fighting with the deputies; he passed out during the beating and didn't wake up until he was at the hospital);

- declaration of Mr. DDD, dated August 22, 2011, ¶ 12, ¶ 17 (witnessed deputies beating an inmate who was handcuffed; an hour later, the same deputies who beat the inmate said, "You better not say anything."  A couple of days later, a couple of the deputies punched him in the back of the head several times); and

- declaration of Mr. III, dated August 22, 2011, ¶ 2, ¶ 50 (deputies slammed the inmate's head against a wall, which he later received 35 stitches on his forehead; the deputies then beat, kicked and shot him with a Taser, even though he wasn't fighting or resisting the deputies).

For years, the ACLU/SC has shed light on violent deputies in the Los Angeles County jail system.[30]  But this year is a watershed: it marks the first time that civilian witnesses have come forward to the ACLU/SC with reports of deputy violence against non-resisting inmates.  Their experiences suggest that the culture of deputy violence in the Jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even in non-secluded areas.

Further evidence of the culture of violence within the jails came from an unlikely source this year: LASD deputies.  Several deputies shed light on the deputy gangs that thrive inside the jails. They describe colleagues who treat acts of deputy-on-inmate violence as badges of honor, and spur each other on to commit violent assaults.[31]  One deputy came forward out of fear that deputy gangs were ruining the LASD's integrity.[32]  Unchecked violence has even led deputies to attack each other.  Two deputies filed a lawsuit this year against other deputies for beating them at a holiday party, and against Sheriff Lee Baca for fostering a culture of violence in the LASD.[33] These accounts speak to deputy violence run amok.

Violence in the jails is so rampant that Thomas Parker, a 24-year veteran of the FBI, who served as Assistant Special Agent in Charge of the FBI's Los Angeles Field Office until his retirement from government service, and who is an expert in investigating corruption in law

000015

enforcement agencies, deemed the LA County jails the most violence-plagued of the dozens of jails and prisons he has studied nationally and internationally.  "There is a prevalent and long-term pattern of such unchecked violence, and it has become the accepted practice in jail operations, along with systemic institutional actions to cover it up," said Mr. Parker, who oversaw the FBI investigations into the Rodney King beating and corruption in the LASD Narcotics Division.[34]

In Mr. Parker's opinion, the body of evidence demonstrates that Sheriff Baca and other LASD officials have "essentially abdicated their responsibilities to provide a safe, secure, and corruption-free incarceration environment within the Los Angeles County Jail System."[35]  The result, Parker concluded, is a pattern of inmates "suffering severe injuries, maiming, and death, some caused by fellow inmates, but most often at the hands of, or with the acquiescence or assistance of, the deputy sheriffs who are their keepers."[36]  Toni V. Bair, a corrections professional with 25 years experience concurred, finding that "there are far too many reports of staff-on-inmate assaults in LA County Jails to ignore the strong probability that rogue deputies in the LASD jails are routinely assaulting prisoners."  In Mr. Bair's expert opinion, "the myriad accounts of staff-on-prisoner assaults that have been reported and documented as well as the numerous prisoner hospital visits over the years is prima facie evidence of systemic staff-on-prisoner abuse by rogue deputies of the LASD jail systems."[37]

The LASD denies the veracity of reports of deputy-on-inmate violence.  But according to Mr. Parker, LASD's position "defies logic,"[38] and is simply untenable in light of the sheer number of inmate reports, their consistency, and the corroboration supplied by third-party accounts.

In the words of Mr. Parker, there is an "inattentive and inadequate supervision, a virtually autonomous staff of deputies managing the inmate population by their own arbitrary and often violent whims, widespread violations and lack of enforcement of the Jails' own rules and policies, discipline so lax it is bordering on being nonexistent, and inculcation of fear in inmates through intimidation and physical and verbal abuse…  These conditions have existed for years without any meaningful remediation and continue to exist virtually unchecked today."[39]

## B.    Reports of Deputy-on-Inmate Violence

In the past year, deputies have attacked scores of non-resisting Los Angeles County jail

000016

inmates.  The ACLU/SC received reports of hundreds of incidents, including descriptions of attacks so severe that inmates required multiple surgeries, suffered long-lasting injuries, and experienced psychological trauma.  Today, the ACLU/SC is filing, with the federal court in *Rutherford v. Baca*, 72 sworn declarations from civilian eyewitnesses, former prisoners, and current prisoners who have witnessed deputy-on-inmate assaults, and threats of violence, been assaulted by deputies, or both, at the same time it is publishing this report.

### 1.    Reports by Civilian Witnesses

Inmates have reported deputy attacks to the ACLU/SC for decades, and the ACLU/SC and the ACLU National Prison Project have repeatedly called attention to the problem of violence in the jails, most recently in Court filings including the 2009 Annual, 2010 Interim Reports and the 2011 Supplemental Filing in Support for Motion of Protective Order.[40]  The ACLU/SC has not been alone in reporting this longstanding problem of deputy abuse in the LASD.  Indeed, as far back as 1997 the United States Department of Justice concluded: "Inmates who are mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custody staff."[41]

But this year, for the first time, civilians also came forward.  Four of them – two jail chaplains, a volunteer tutor, and an ACLU/SC employee – reported witnessing deputies attack non-resisting inmates.  Their accounts demonstrate that deputies feel such a sense of impunity that they are unafraid to assault inmates even in areas where they know they may be observed by civilians.

Two jail chaplains were eyewitnesses to attacks in which multiple deputies punched and kicked unresisting Men's Central Jail inmates for minutes on end, even as the inmates begged them to stop.  In one case, deputies yelled "Stop fighting" and "Stop resisting" as they pummeled the inmate, even though the inmate was lying face-down on the floor, motionless.  In both cases, the LASD brushed aside the chaplains' complaints about the attacks.  It seemed to both chaplains that the LASD did not want to know the truth.[42]

Chaplains occupy a unique, independent role in the jails: Their sole job is to minister to inmates.  They have no stake in exaggerating or misreporting the details of violent encounters.  These beatings – and the LASD's lack of concern about them – left both chaplains traumatized.  "To this day, recalling the beating brings tears to my eyes, and I cannot finish talking about it

- 13 -

without taking a few moments to compose myself," said Chaplain Paulino Juarez, who described a beating he witnessed on the 3000 floor in Men's Central Jail in 2009.[43]  Chaplain Doe, meanwhile, felt "sickened" about a beating he witnessed in MCJ in 2011.  "It was almost as if no one cared to find out the truth of what happened," he said.[44]

Chaplain Juarez was visiting inmates on their row as part of his ministry in 2009 when he heard the sounds of someone being beaten.  When he walked towards the noises, he saw three deputies in a hallway pounding the face and body of an inmate who stood with his back to the wall.  The inmate appeared to be handcuffed; he was not raising his hands to protect himself, nor resisting in any way.  The deputies punched the inmate until he collapsed face-first to the ground, at which point they began showering his body and head with kicks.  Until this point, the inmate had implored the deputies to stop.  But on the ground, he fell silent.  He seemed unconscious to Chaplain Juarez, but deputies continued to attack him.  One deputy placed his knee on the inmate's back and began punching him.  Then the kicks resumed.[45]

A deputy finally noticed that Chaplain Juarez was watching the attack.  He "froze and had a nervous and surprised look on his face," Chaplain Juarez said.  "Then he began making signs to the others with his hands, motioning them to stop the beating."  A call had gone out to other deputies, and two more entered the hallway and began to kick the motionless inmate.  One deputy stomped on the inmate's back.  But those deputies who had noticed Juarez motioned to the others, apparently to alert them to his presence.[46]

The whole beating took about three minutes, according to Chaplain Juarez.  At the end, there was a puddle of blood about two feet in diameter around the inmate's head. Chaplain Juarez was left "shaking because I was overwhelmed with fear and apprehension."  He worried deputies would harm him.  Several eyed him in a threatening way.  Some said "rat," and "motherfucker" when he passed them over the next few days in the jail.[47]

Chaplain Juarez wrote a detailed report of the incident, which he gave to a sergeant and the archdiocese, and he gave an interview to the LASD.  The LASD's investigation was substandard and unprofessional.[48]  Two years passed before he heard anything from the LASD about the beating.  In a June 2011 meeting among employees of the archdiocese and personnel from the Office of Independent Review (OIR), Chaplain Juarez was told that the case had been resolved internally, and that news of the beating had never reached Sheriff Lee Baca.

After the meeting with OIR, a representative of Sheriff Baca's office contacted the Catholic chaplains to set up a meeting with the Sheriff.  In a July 2011, Sheriff Baca told Chaplain Juarez

- 14 -

000018

that the report Chaplain Juarez had written and delivered to the LASD was not included in the LASD's file on the incident.  The file that Sheriff Baca read aloud from described Chaplain Juarez as "exaggerating" about the details of the beating.  The description of the attack in the LASD file that Sheriff Baca read aloud from seemed to describe an entirely distinct incident from the one Chaplain Juarez witnessed: The inmate was schizophrenic, the file said, and deputies had to strike him a few times with their fists to get him in his cell.  According to Chaplain Juarez, Sheriff Baca seemed unconcerned, stating simply that "[p]unches are allowed in my department but kicks are not allowed."[49]

"I have lost faith and trust in the LASD," Chaplain Juarez said.  "They clearly did not take my testimony seriously, and they attempted to cover up what really happened."[50]

Chaplain Doe witnessed a disturbingly similar incident in February 2011.  Walking towards the chaplain's office on the third floor of Men's Central Jail, he saw four or five deputies repeatedly kicking an inmate.  The inmate was lying motionless, face-down on the ground.  His hands appeared to be tucked behind his back; they remained there throughout the attack.  The inmate pleaded with the deputies to stop, yelling, "Help me."[51]

After Chaplain Doe had watched the deputies continuously kick the inert inmate for between two and three minutes, he followed the deputies' orders to leave the scene.  "I was afraid that if I had tried to stop the beating or even just yell at the deputies to stop, they would come over and hurt me."  Chaplain Doe told a nearby sergeant that the attack was "not right."  Although Chaplain Doe could no longer see the beating at this point, he could still hear the "thumping" sounds of the deputies kicking the inmate, and the inmate's cries for help.  Eventually the inmate fell silent, although the kicks continued for about another minute.[52]

Neither LASD nor OIR ever questioned Chaplain Doe about the incident even though a sergeant and numerous deputies were aware that he was an eyewitness to the beating.  "I was so shocked that despite the deputies seeing me watch them beat up the inmate, they continued to kick and beat him," Chaplain Doe said.  "It was like they didn't even care that there was a witness."[53]

Other civilians also reported witnessing violent deputy-on-inmate attacks.

Esther Lim, the ACLU/SC's Jails Project Coordinator, witnessed the "savage beating" of an immobile, seemingly unconscious inmate in the Twin Towers Correctional Facility on January 24, 2011.  At the time, Ms. Lim was meeting with another inmate in the facility's attorney room.  When she heard what sounded like a fight in the Staging Area, she looked through the windows

- 15 -

dividing the attorney room and the Staging Area and saw the attack in progress.  She saw two deputies repeatedly punch and knee an inmate who lay face-down on the floor.  The inmate was inert, so still that he looked like "a mannequin that was being used as a punching bag."[54]  But the deputies persisted in their attack, with one of them shocking the inmate again and again with a Taser gun.  Although the inmate never moved from his spot on the ground, the deputies repeatedly yelled, "Stop fighting!" and "Stop resisting!"[55]

The beatings Ms. Lim and Chaplains Juarez and Doe witnessed were not isolated incidents.  Scott Budnick, who volunteers in the Jails as a longtime mentor of young inmates, has witnessed similar attacks.  Over the course of three years, he saw four deputy-on-inmate beatings at Men's Central Jail, and heard one more.[56]  The attacks included the following:

- In early 2007, Mr. Budnick witnessed approximately seven deputies using a Taser gun repeatedly on an inmate who was lying on the ground motionless.  When he told a deputy what he had seen, the deputy replied, "Yeah, we fuck these guys up all the time."[57]

- In 2008, while waiting outside the classroom where he taught inmates, he saw a deputy pull an inmate out of a line, strip search him in full view of numerous people, and then smash his head into the wall with such force that Mr. Budnick heard a loud crack.  The inmate had not attacked or threatened the deputy before the attack.[58]

- In 2009, Mr. Budnick saw several deputies taunt, strip search, and forcefully twist the face and arm of an inmate who asked for directions to a module.[59]

- In 2009, Mr. Budnick witnessed three deputies kicking and punching an inmate.  When their blows felled the inmate, they continued attacking him while he lay on the floor.  While the deputies repeatedly yelled, "Stop resisting!" Budnick could see that the inmate was not moving.[60]

The attacks Ms. Lim and Mr. Budnick witnessed did not occur deep in the recesses of the jails.  Ms. Lim watched deputies beat an inmate from the attorney room, a space specifically designed for civilian visitors, while Mr. Budnick saw a number of attacks just outside the classroom where he tutored inmates.[61] In these cases, deputies knew civilians might be present, and apparently felt that they could act with impunity.

## 2.    Reports by Inmate Victims

In addition to civilian witnesses, scores of inmates reported being attacked by deputies in the past year.  Some deputies reportedly acted alone.  Others ganged up, with numerous deputies attacking a single inmate.  Some beatings resulted in injuries so severe that inmates required

000020

surgery and extensive hospital stays.  Others left minimal physical marks, but caused lingering psychological trauma.  Some attacks were preceded by verbal exchanges between deputies and inmates, while others apparently occurred because deputies disliked an inmate's tattoo, race, or appearance.

But there were common threads among the attacks.  The striking similarities suggest that there is a deep-seated pattern to deputy-on-inmate attacks, which the department allows to continue.

Some incidents began with several deputies attacking one inmate.  Oftentimes numerous other deputies would arrive, sometimes in response to a radio alert about the incident.[62]  Many inmates reported that these newly arriving deputies displayed no consideration for the physical state of the inmate in question: Even if an inmate was lying motionless on the ground, the new deputies would proceed to join in the attack on the inmate.[63]  In many cases, deputies continuously yelled, "Stop fighting," or "Stop resisting," while beating non-resisting inmates,[64] in an apparent attempt to falsely blame the inmates for the attacks.[65]

Similar reports came from inmates and eyewitnesses in different facilities within the LA County jail system, reporting different incidents in different spans of time.  It would have been virtually impossible for them to know the details of each other's beatings.  These commonalities add greatly to the credibility of the accounts.[66]

Consider a few examples of attacks in which inmates suffered severe injuries:

- Deputies punched inmate Juan Pablo Reyes over and over again in the ribs, back, mouth, and eyes, breaking his eye socket and leaving his body badly bruised.  When Reyes fell to the ground, deputies kicked him with their steel-toed boots, ignoring his cries.  They did not stop there.  The deputies ordered him to strip.  They then forced him to walk naked up and down the hallway of a housing module, in full view of other inmates.  One deputy yelled "gay boy walking."  As he walked, Reyes cried.  The deputies laughed.  They then placed him in a cell with inmates who beat and sexually assaulted him.  The deputies ignored Mr. Reyes's repeated pleas to be taken out of the cell.[67]

- Deputies beat Mr. KK so violently that he suffered a fractured jaw and required eye surgery and stitches in his ear.  The incident began after deputies searched all the cells on Mr. KK's row, and Mr. KK noticed that some of his property was missing, including items he had just purchased from the commissary.  After asking to speak with a sergeant about the missing property, Mr. KK reported that a deputy shoved him hard against a wall, slapped his ear, punched his face several times, and threw him to the ground.  With Mr. KK on the ground, the deputy kicked him roughly ten times in the face, jaw, and back of his head, causing a large pool of Mr. KK's blood to form on the floor.  The deputy then kicked Mr. KK's ear three times, an experience Mr. KK described as more painful than when he was hit by a car.[68]

000021

- Inmate Mr. P reported suffering extensive, long-lasting injuries after a deputy noticed his gang tattoo and violently beat him.  The deputy noticed Mr. P's tattoo after Mr. P took a shower, and the deputy began smacking the back of Mr. P's  head and taunting him.  When Mr. P turned to look at the deputy, the deputy punched his left cheek, tackled him to the ground, sat on top of Mr. P, and began swinging at his face and neck.  Approximately eight other deputies rushed to join the deputy who instigated the attack.  One deputy bashed Mr. P's leg with a flashlight, causing wounds.  They then flipped Mr. P onto his stomach and stunned him four times with a Taser gun.  When the attack was over, the deputies cautioned Mr. P not to tell the nurses "anything funny," in an attempt to cover up their actions.  Due to the severity of his injuries – which included numerous broken blood vessels in his eyes – Mr. P was taken to the hospital and spent one week in the jail's medical ward.  He continues to suffer dizzy spells.[69]

Several inmates reported that after committing minor infractions they were the victim of beatings, wholly out of proportion to the inmates' actions.  Consider several examples:

- Inmate Mr. QQQ suffered severe injuries from a deputy beating after the deputy noticed Mr. QQQ making pruno (a form of alcohol that inmates make) with the inmate in the adjacent cell.  After Mr. QQQ denied having pruno in his cell (which he still maintains he did not have), the deputy ordered Mr. QQQ to solitary confinement.  After handcuffing Mr. QQQ, the deputy kicked him, hit his head with a closed fist, and placed him in a chokehold.[70]

- After a deputy noticed that inmate Robert Powell had "cheeked" his sleep medication – placing it in his cheek so he could take the medication later, rather than swallowing it right away – the deputy slammed Powell's head against a cement wall and left him in the outdoor recreation area for five to six hours.  At the time, Powell was 58 years old and suffering from the flu.[71]

- A deputy at the Pitchess Detention Center who saw inmate Mr. PP laughing over a joke about a not-present female deputy slammed Mr. PP onto the ground and said he would "fuck him up."  Another deputy joined in, and the two taunted Mr. PP by pointing their Taser guns at him and again slamming him into the ground.  While Mr. PP was in solitary confinement, a deputy took his mattress and blankets and left his cell in disarray.  The next morning, that deputy attacked Mr. PP, punching his ribs and hitting his eye.[72]

- After inmate Mr. DD showed a deputy at Men's Central Jail his middle finger, the deputy savagely beat him.  Mr. DD reported that the deputy used his boots to kick Mr. DD's ankles, and that he painfully contorted Mr. DD's shoulders. Mr. DD blacked out during the attack, and woke up in the hospital with severe lacerations, a broken nose, and contusions on his head. Mr. DD reported that he was later told that he could be charged with assaulting a deputy, since the deputy had a scratch on his hand. Mr. DD said that he had not received such a charge.[73]

- After inmate Mr. PPP tried to push out of his cell an inmate who was bothering him by talking loudly, a deputy slammed Mr. PPP's head against the wall numerous times.  That

deputy, along with another deputy, then proceeded to punch Mr. PPP's head, neck, and back.  Mr. PPP's bruises took two weeks to heal. [74]

- A Men's Central Jail deputy attacked inmate Mr. JJ after Mr. JJ had said the deputy "didn't have a date since high school."  The deputy slammed Mr. JJ to the ground, and, with another deputy, searched Mr. JJ's property and threw his belongings in the toilet. The deputy stomped on Mr. JJ's hand with his boot, shattering his knuckle, and the deputies kicked Mr. JJ's body.  The deputies used a Taser on Mr. JJ, who suffers from epilepsy, and shot pepper spray into his face.  Mr. JJ suffered extensive bruises, and required surgery on the shattered knuckle in his hand.[75]

Still other inmates reported being the victim of deputy violence due to the nature of their alleged crimes or their race.

- Inmate Mr. I had a wristband that identified him as a sexual offender.  He reported that a custody assistant asked whom Mr. I had committed his alleged crime against, and then proceeded to kick Mr. I in the buttocks.  Later that day, Mr. I reported that the custody assistant threw him to the ground and began elbowing and kicking him, while calling Mr. I a coward.  The attack left Mr. I with welts and bruises that lasted for weeks.  Ever since, he reported, he has been terrified of LASD deputies.[76]

- After inmate Mr. PPP – who is African-American – got into a verbal altercation with a Hispanic inmate, several deputies attacked him.  Mr. PPP reported that one of the deputies, who was Hispanic, told him, "You come into my house thinking you can beat on my race?"  Mr. PPP interpreted the comment to mean that the deputy "wasn't going to protect me as an African-American; he was going to protect the Hispanic inmate…."[77]

- After repeatedly slamming inmate Mr. CCC's head and face into a metal bar and a wall, a deputy yelled, "I hate you motherfucking monkeys.  Damn nigger!"[78]

- Inmate Mr. FF, who is African-American, heard one deputy say to another deputy about Mr. FF: "this nigger can't fucking listen and face the wall."  Mr. FF reported that a deputy then smashed Mr. FF's face into the wall.[79]

- Inmate Mr. CC witnessed a deputy grab a non-resisting African-American inmate, kick his legs, and yell, "All you blacks! When you mess with my trustees, this is what's going to happen to you."  Numerous deputies then joined the attack, and began kicking, punching and hitting the inmate with flashlights.[80]

- Deputies made racial slurs while attacking inmate Evans Tutt, including calling Tutt a "fucking nigger."  After the beating, a deputy repeated the slur and threatened to harm Tutt more severely.[81]

- 19 -

000023

### 3.  Reports by Inmate Eyewitnesses

Independent inmate eyewitnesses to beatings bolster the reliability of reports by victims of deputy-on-inmate violence in the jails.  In four deputy-on-inmate attacks this year, inmate witnesses provided independent confirmation of the beatings.[82]  These eyewitnesses corroborated numerous details, including the identities of the attackers, the types of force deputies used, and the victims' injuries.  LASD officials have repeatedly alleged that many inmate complaints are mere exaggerations or fabrications.[83]  These eyewitness accounts show otherwise.

Deputies slammed Mr. III's head into a cement wall, leaving him with a concussion and a gash that took 35 stitches to close.  They punched his face and head, and kicked his ribs.  They aimed pepper spray into his eyes before shooting Taser probes into his back.  Four witnesses watched the whole assault.[84]

The confrontation began because deputies thought Mr. III had called them "gay."  When Mr. III repeatedly denied the accusation, a deputy yelled to the row of pro per inmates – who serve as their own legal representatives – "Y'all pro pers think you can get away with anything. We the 3000 boys," -- a reference to the gang-like group of deputies in Men's Central Jail.[85]  "That shit ends now!" the deputy continued, as Mr. III stood one foot away from a cement wall.  Suddenly, the deputy grabbed Mr. III's head, slamming his face into the wall.  Blood poured down, pooling on the ground.  Mr. III passed out.

When Mr. III regained consciousness, one deputy was sitting on his back, punching his face and head.  Another was kicking Mr. III's ribs.  Although Mr. III was motionless, the deputies yelled, "Stop resisting."[86]  Mr. III pleaded with them to stop.[87]  A deputy shot him with pepper spray.  Another sunk three Taser probes into his flesh.

Two of the deputies stood roughly 6 feet tall, and weighed about 200 pounds.  The custody assistant was slightly shorter, and weighed about 180 pounds.  Mr. III, meanwhile, was 5 feet 7 inches and weighed just 135 pounds.  A sergeant accused him of assaulting the deputies, but, as the ambulance technician on the scene pointed out, the deputies showed no signs of injury.

Mr. III spent two days in the hospital and four days in the jail's medical unit.  The deep cut in his forehead took 35 stitches to close.[88] After returning to his row, another deputy threatened him, saying: "The ACLU ain't going to be watching me forever."[89]

Inmate Mr. U was returning to his cell when deputies attacked him, slamming him to the ground, shooting pepper spray in his eyes, and repeatedly pummeling his body with blows.

000024

While Mr. U was walking towards his cell, his hands cuffed behind him, a deputy ordered him to move more quickly before punching the back of Mr. U's neck.  When Mr. U responded with an expletive, the deputy forced Mr. U to the wall, pinning Mr. U's neck.  Although Mr. U did not fight back, the deputy yelled, "Stop resisting motherfucker."  Another deputy slammed Mr. U to the ground.  With his hands cuffed, he could not break his fall.[90]  More deputies arrived; with pepper spray in his eyes, Mr. U could not see how many.  He felt kicks, punches, and hard blows that seemed to come from flashlights.  After picking him up, deputies again slammed Mr. U to the ground.

Throughout the attack, Mr. U, who has asthma, worried that he would lose consciousness.  Two eyewitnesses saw him bleeding profusely.  They heard Mr. U say that he could not breathe.[91]  The attack over, Mr. U was sent to the hospital.  He had contusions on his head, required stitches on his elbow, suffered hearing loss in one ear, and continues to have headaches.

Inmate Mr. SS witnessed deputies attack inmate Mr. RRR in Men's Central Jail in February 2011, while they were in a line of inmates headed to court.  Interviewed independently, the two men gave similar descriptions of the incident, in which a deputy grabbed Mr. RRR and body-slammed him to the floor, rendering him unconscious.  Mr. SS was able to fill in gaps in Mr. RRR's timeline, providing details about the kicks and punches that deputies continued to deliver to Mr. RRR's motionless body.[92]

The incident began when a deputy roughly shoved Mr. RRR against the wall, and Mr. RRR said, "You didn't have to do me like that."  The deputy, Mr. RRR said, then placed him in a "really painful" chokehold.  Even though Mr. RRR put his hands in the air in a show of non-resistance, the deputy slammed him to the floor.  Mr. RRR blacked out.[93]

Mr. SS was several spots in front of Mr. RRR in line, when he heard a deputy yell, "What did you say?!" and "Are you stupid or something!?"  A deputy instructed all the inmates in line to face the wall, but Mr. SS snuck a few glances over his shoulder.  He saw Mr. RRR lying face-down on the ground being punched and kicked by seven or eight deputies.  The attack lasted between 10 and 20 seconds.  Throughout, Mr. SS said, Mr. RRR never resisted.[94]  When he regained consciousness, Mr. RRR said he was in a caged area in the jail.  When the deputy who attacked him approached, Mr. RRR simply agreed with everything the deputy said to him about the incident.  "I did not want him to hurt me anymore," he recalled.[95]

## C.      Pitting Inmates Against Other Inmates

Deputies repeatedly pit inmates against other inmates, using them as pawns to carry out acts of violence.[96]  Deputies sometimes instigate violence between inmates by allowing inmates from rival gangs to have physical access to each other (for example, by opening up their cell doors from the deputy control booth), or by fomenting discord (for example, by mentioning an inmate's gang affiliation to inmates from a rival gang).  Mr. Parker found that that this is likely a way for deputies to inflict violence on inmates "without getting their own hands dirty."[97]  Consider a few examples:

- After severely beating inmate Juan Pablo Reyes, deputies placed him in a cell with inmates who would unleash a nightmarish litany of attacks on Reyes, punching, hitting and sexually assaulting him off and on for a day.  The cell contained two gang members who likely viewed Reyes as an enemy.[98]  Prior to placing Reyes in the cell, deputies had also publicly referred to him as "gay," and had paraded him naked in front of these inmates.  Thus, Reyes said, the inmates proceeded to beat him up for gang-related reasons, because they thought he was gay, or because the deputies' humiliating behavior gave them license.  The inmates began attacking Reyes in the morning.  Throughout, deputies ignored Reyes' pleas and his battered appearance.  When night fell, the two inmates began sexually assaulting Reyes.  The third inmate in the cell helped mask Reyes' cries for help by repeatedly flushing the toilet.  At one point, Reyes' cellmates stuck his head in the toilet and flushed while entering him from behind.  Reyes lost consciousness several times.  Eventually, the two inmates fell asleep, but they resumed their attacks at 5 the next morning.  Deputies continued to ignore Reyes' cries.  The cell door opened at 7 a.m., at which point a third gang member entered and tried to beat Reyes.  Reyes, however, managed to escape, yelling for help and running to the laundry room where a chaplain found him.  At the hospital, Reyes could barely walk.  He felt extreme pain in his face and ribs.  He had a broken eye socket from when he was attacked by deputies.  His buttocks were sore.  Rather than receive the necessary surgery on his eye, jail officials released Reyes earlier than he expected from the jail.  He cannot afford the surgery on his own.[99]

- Inmate Mr. HH witnessed four inmates beat up and sexually assault another inmate, after an LASD custody assistant opened the door to the victim's cell.  Mr. HH saw that the door to the cell adjacent to his – which housed an inmate named Mr. UUU – was open.  Only LASD employees have access to the cell door controls in MCJ.  Mr. HH saw two inmate trustees enter Mr. UUU's cell, begin punching Mr. UUU, and then drag him to the back of the cell.  Mr. HH then heard Mr. UUU scream for three to four minutes.  Later that day, Mr. HH heard an inmate say that one of the trustees was going to sexually assault Mr. UUU with a broomstick.  He then saw the same trustees reenter Mr. UUU's cell, along with two other trustees.  One of the trustees was carrying a broomstick.  Mr. HH then heard Mr. UUU screaming for about five minutes, and saw blood on the end of the broomstick.  After the trustees left, Mr. UUU yelled, "My butt is bleeding!" and was

- 22 -

later taken to the medical unit.  Mr. HH later saw Mr. UUU in the medical unit, with blood on his boxer shorts.[100]

- While transporting inmate Mr. QQQ to solitary confinement, a deputy told inmates from other gangs that Mr. QQQ was a member of a rival gang.[101]

- A deputy yelled at Mr. TTT, who was charged as a sexual offender, "You're one of those! You like little girls!" in the presence of another inmate who later attacked, punched and kicked him all over his body.[102]

- Deputies would regularly encourage inmates to inflict violence on inmates who were causing problems in module 5100 of Men's Central Jail, said Cameron Saul, a former inmate who now works as a drug treatment counselor.  Saul served as a "house mouse" – a liaison between inmates and deputies – for part of his time in Men's Central Jail, and reported to the deputies about inmates who were stealing from other inmates, abusing other inmates, or causing other problems.  On several occasions, deputies told Saul that inmates should "handle the problem," and that Saul should line up at least two inmates to say that the problem-causing inmate had "slipped in the shower," in case that inmate complained following the attack.  Saul later witnessed other inmates take so-called problem inmates to the back of the module and attack them, without deputy intervention.[103]

## D.    Threats of Violence

In addition to acts of physical violence, deputies terrorize inmates by verbally threatening them with violence.[104]  Consider these examples:

- While housed in the Twin Towers Correctional Facility, Mr. OOO was repeatedly threatened by deputies.  Mr. OOO's criminal case had received extensive negative media coverage. When he was transferred to Men's Central Jail, deputies repeatedly asked him what he was in jail for, and punched his ribs until he answered.  They then called Mr. OOO a "piece of shit," told him he would not receive basic necessities such as food, and said they would turn him over "to the Southsiders," which Mr. OOO understood as a threat to turn him over to the Southsiders gang.  A deputy threatened him not to complain about the incident, or the deputy would "go in your cell and beat you up personally." On another occasion, a module officer refused to give him a blanket, saying he did not "give them to murderers." Another deputy told him, "So you're [Mr. OOO].  I can't wait to get you to my floor."[105]

- A Men's Central Jail deputy refused to take inmate Mr. BB to his medical appointment, since the deputy would have had to escort Mr. BB.  When Mr. BB insisted, the deputy threatened him with injury and wrote him up for a disciplinary infraction.[106]

- Gordon Grbavac told the sergeant that two deputies had repeatedly rammed his head into a window.  The sergeant left to get a video camera, and while the sergeant was gone, the two deputies said to him, "Are you fucking kidding?  You motherfucker.  You better

- 23 -

change your story or we're going to show you what we do to fat asses. You better say that you did this to yourself." After which Mr. Grbavac told the sergeant that he did it to himself.[107]

## E.    Deputy Gangs Foment Violence Against Inmates and Against Other Deputies

This year, deputies have come forward publicly with reports that deputy gangs thrive inside the jails and foment deputy-on-inmate violence. They paint a picture of LASD deputies who treat acts of deputy-on-inmate violence as badges of honor, and demand such violence as rites of entry to their gangs. According to deputy reports, deputies instill in their members the idea that devotion to the group – rather than their professional responsibilities – is of the utmost importance.[108]

Two LASD deputies have filed a lawsuit alleging that they were beaten by a gang of deputies who call themselves "the 3000 Boys," named for the 3000 level of Men's Central Jail, where its members work. The lawsuit alleges that the LASD cultivates "gang-like activity" among jail deputies, fomenting violence against and between inmates, and against other deputies.[109] The deputies allege that the LASD is "grossly inadequate" in "disciplining and controlling…deputies, particularly with respect to illegal acts and acts of excessive force."[110]

Los Angeles County Sheriff Lee Baca has maintained that these gangs pose no problems, dismissing their attack on other deputies as the "drunkenness of a few bad apples." Asked whether there is a problem of deputy gangs bullying their colleagues, he said that cops "know how to take care of themselves," and that they need to "man up and say, 'I'm not a wimp.'"[111] Thomas Parker found that Sheriff Baca and other top LASD officials turn a blind eye to the gang-like behavior of some deputies, thus "implying tacit approval of unprofessional conduct in the lower ranks."[112]

## F.    Cover-ups

The LASD brushes aside most inmate reports of violence. The department's apparent indifference to such complaints, Mr. Parker concluded, gives deputies a sense of unchecked autonomy in the way they perform their jobs.[113] "Incidents of deputy-on-inmate violence, after

- 24 -

no or only nominal investigation by LASD, are routinely reported by deputies as unprovoked inmate-on-deputy assaults. If an inmate complains of being beaten or injured by jail deputies, those complaints are almost universally declared unfounded."[114]  "Most of these complaints get 'resolved' at the lowest levels in the LASD.  Proper reporting procedures seem to be routinely ignored."[115]

The LASD's policies and practices of investigating use-of-force incidents are "grossly substandard," Mr. Bair concluded.  Rather than the current system – which often consists of the attacking deputies' supervisor interviewing the inmate victim, sometimes with one or more of the assaulting deputies present – all reports of excessive force should be reviewed by an independent department to guard against cover-ups, Mr. Bair said.  The practice of having the attacking deputies present during the interview of an inmate involved in a force incident "is highly likely to intimidate the prisoner and affect his testimony," Mr. Bair found.  Furthermore, the LASD has demonstrated a lack of interest in interviewing civilians who have witnessed deputy-on-inmate attacks.  This failure, Mr. Bair said, "renders the results of that investigation incomplete, useless, and unprofessional."[116]

This year, the LASD's cover-ups of deputy violence have begun to unravel, thanks in large part to the civilian eye-witnesses who have come forward to give the ACLU/SC their accounts of deputy-on-inmate violence.

### 1.    Civilian Accounts of Deputies Covering Up Deputy-on-Inmate Attacks

For years, the ACLU/SC has received reports of deputies falsely accusing inmates of resisting or fighting back as an apparent means of justifying their violent attacks on these inmates.  According to Toni V. Bair, a corrections professional with 25 years of experience, including in prisons and large urban jails: "In my professional experience, rogue security staff typically use these statements, 'Stop fighting' or 'Stop resisting,' to justify their illegal Use of Force against prisoners."[117]  This year, the ACLU/SC has received, from outside civilian sources, powerful confirmation of these reports.

While witnessing the "savage beating" of a Twin Towers inmate by two deputies in January 2011, ACLU/SC's Jails Project Coordinator Esther Lim saw and heard each of the deputies repeatedly shout "Stop resisting!" and "Stop fighting!" while the inmate was lying

000029

completely immobile and unresisting on the floor.[118]  The deputies' false claims carried over into the official LASD Inmate Reception Center Division log, where the deputies reported that the inmate repeatedly resisted and fought back. While Ms. Lim witnessed the deputies kneeling over the immobile inmate as they attacked him, the log contained the fabricated report that the inmate, James Parker, and a deputy "went to the ground as Inmate Parker continued his attack." While Ms. Lim saw a deputy shock Parker with a Taser after he was completely immobile and apparently unconscious,[119] the log falsely reported that the inmate ceased resisting only after deputies used a Taser on him multiple times.[120]

The incident that Ms. Lim witnessed occurred in a part of the Twin Towers Correctional Facility that is easily visible to civilians.  Ms. Lim was in the Attorney Room, where attorneys meet with their inmate clients every day.[121]  The fact that deputies are beating inmates in areas visible to civilians further suggests "that the culture of deputy violence in the Jails has become so hardened and pervasive that deputies feel emboldened to carry out their attacks even in non-secluded areas," said Mr. Parker.[122]

Similarly, Scott Budnick saw three deputies repeatedly kick and punch an inmate, causing the inmate to fall to the ground.  The deputies continued kicking and punching the inmate while repeatedly yelling, "Stop resisting!"  Mr. Budnick reported that the inmate was not even moving, much less resisting.[123]

Several chaplains cautioned Mr. Budnick not to report one incident of abuse that he witnessed in late 2008, telling him that the LASD "had a practice of kicking people out of the jails" and that if he reported the incident, he would no longer be allowed to volunteer in the jails.[124]  The chaplains said that they refrained from reporting incidents of abuse out of fear of losing their jobs.[125]  When even chaplains refrain from reporting acts of violence for fear of retaliatory action from deputies, LASD officials have clearly communicated the message that they do not want acts of deputy-on-inmate violence brought to light.  As corrections expert Toni V. Bair explained: "if civilians fear reporting possible illegal activities by LASD personnel, it undermines the quality and validity of any investigation conducted by LASD into the Use of Force incidents."[126]

Several civilians also said that they were afraid to intervene in the deputy-on-inmate attacks they witnessed, because they were scared that if they tried to stop the attacks, deputies would assault them.[127]  That civilians fear physical abuse by deputies is deeply troubling, Mr.

- 26 -

Bair said.  "I have never experienced or heard of staff, volunteers or citizens going into a correctional facility and being afraid for their own safety at the hands of staff," he said.[128]

### 2.     Inmate Accounts of Deputies Attempting to Cover Up Deputy-on-Inmate Attacks

In the past year, the ACLU/SC has continued to receive numerous reports from inmates that deputies attacked them while falsely claiming that the inmate they beat was actively resisting them.[129]  On many occasions, deputies threatened the inmates with severe consequences for reporting the deputies' misbehavior.  Consider these examples:

- Deputies threatened inmate Mr. OOO not to report their physical and verbal assault on him, with one deputy saying that if Mr. OOO complained the deputy would "go in your cell and beat you up personally."[130]

- Inmate Mr. VV was threatened by deputies after reporting what he knew about an inmate-on-inmate killing. Though Mr. VV said nothing about the rumors that deputies allowed the killing to happen, one deputy called him a "dead man walking" in front of other inmates.[131]

- Two deputies verbally and physically assaulted Mr. MM in an elevator for his interactions with ACLU/SC's representatives.  The deputies slammed Mr. MM, who is in a wheelchair, against the wall, and said, "That's your warning."[132]

- After overhearing inmate Mr. EEE complain about being threatened by another deputy, a deputy warned Mr. EEE not to complain any more to ACLU, saying, "Don't complain to anyone if you want to make it out of here alive."[133]

- When inmate Gordon Grbavac told a sergeant that two deputies had assaulted him by repeatedly slamming his head into a window, the deputies threatened him with more violence if he did not lie about the cause of his injuries.  "I was extremely scared and felt very threatened," said Mr. Grbavac, who is the superintendent of the California Builders Group Incorporated in Culver City and was released after spending only about a week in jail with the charges against him dismissed.  "I thought that the deputies might kill me if I didn't do what he said.  So I told them that I would tell the sergeant that I did [the injuries] to myself."  When the sergeant interviewed Grbavac about the attack, the sergeant allowed the two deputies to be present.[134]

LASD's cover-ups of deputy violence often take the particularly insidious form of following up unprovoked beatings with the pressing of criminal charges against the deputies' inmate victims.  Thus, the inmates are victimized twice: first, by savage beatings that leave them with

- 27 -

lasting physical and psychic injuries; second, by criminal prosecutions that may well result in lengthy prison sentences, because the odds are low of an inmate's winning an acquittal against the sworn testimony of deputy witnesses.  A criminal conviction of the inmate for his "assault" on the deputy—in reality, the deputy's assault on the inmate—results in a complete immunization of the deputy assailants and the Department for civil liability for injuries inflicted in the assault.

This year, the ACLU/SC has learned of the following examples of this ploy:

- Cameron Saul, a drug treatment counselor who, from 2007 to 2009, was an inmate in Men's Central jail, witnessed deputies savagely beat inmate Mr. WWW in the area in the module in MCJ where gay inmates are housed.  A deputy who frequently made homophobic comments grabbed Mr. WWW out of a line of inmates, and pushed him to the ground, at which point the deputy was joined by four or five other deputies.  Although Mr. WWW was not resisting, the deputies beat him with their flashlights.  Saul heard a cracking sound, followed by Mr. WWW's uttering "the most awful scream I have ever heard in my life."  Saul later learned from Mr. WWW's lawyer that Mr. WWW had been charged with assaulting a deputy.[135]

- James Parker, whom ACLU/SC's Jails Project Coordinator Esther Lim witnessed being brutally beaten and tasered by deputies Ochoa and Hirsch was subsequently charged with battery against a peace officer and resisting a peace officer.

- After deputies beat Mr. B so severely that he suffered a fractured nose, bruised kidneys and ribs, a two-centimeter gash on his forehead, and a swollen right eye, he was charged with battery against a peace officer and resisting a peace officer.  Mr. B did not assault or batter a deputy.  He was attacked after protesting a deputy's decision to deny him dinner.[136]

- Evans Tutt was severely beaten on the 3000 floor in Men's Central by numerous deputies, including three who have been identified as having gotten in a brawl with other jail deputies at a Christmas party in 2010.  Deputies broke Tutt's nose in multiple places, injured his ribs, head, face, knee and leg, chipped his tooth, left bruises throughout his body.  They then wrote false reports that prompted the county district attorney to file criminal charges against him for resisting a peace officer.[137]

000032

3.      The LASD's Transparently False Denials That There is a Problem
        Of Deputy-on-Inmate Violence

Despite overwhelming evidence of a longstanding, deeply-rooted, and pervasive culture of deputy-on-inmate violence, department officials continue their stubborn refusal to acknowledge the problem.  They reject any possibility of wrongdoing by deputies.[138]  They say that the inmates lie.[139]  They attack the credibility of civilian witnesses.[140]  They deem every retaliation claim the ACLU/SC has brought to their attention to be unfounded.[141]

The LASD's stance that all reports of abuse are lies or mere exaggeration defies common sense.  "With a jail population as large as LASD has, and the plethora of reported complaints substantiated by sworn victim declarations, sworn witness declarations, hospital or medical treatment records, photographs and videos of victim's injuries, for the LASD, after going through the motions of investigating itself, to make determinations that almost all of those complaints are unfounded is incredible," Mr. Parker concluded, after reviewing complaints of deputy-on-inmate violence and personally interviewing some witnesses and former prisoners who were victims.[142]  "In my opinion…there are certainly a reasonable percentage of such complaints which are valid, and certainly supported by the mathematical law of averages – while the LASD is wanting us to believe that they are purportedly the exception."[143]  Mr. Bair concurred, concluding that "the myriad accounts of staff-on-prisoner assaults that have been reported and documented as well as the numerous prisoner hospital visits over the years is prima facie evidence of systemic staff-on-prisoner abuse by rogue deputies of the LASD jail systems."[144]

The LASD has made every effort to discredit and dismiss those who call attention to deputy-on-inmate attacks.  An LASD report that Sheriff Baca read aloud at a meeting with Chaplain Paulino Juarez brushed aside Chaplain Juarez's detailed report about a beating he witnessed, saying he was merely "exaggerating."[145]  After ACLU/SC's Jails Project Coordinator Esther Lim witnessed two deputies beating an inmate, LASD spokesman Steve Whitmore responded by questioning Lim's motives in an *LA Weekly* article.[146]  Former federal prosecutor and Columbia University law professor Daniel Richman denounced the LASD's response, saying, "It is odd, and indeed troubling, when a law enforcement spokesman publicly disparages the credibility of a potential prosecution witness."[147]

- 29 -

000033

The LASD, however, continues to respond to reports of abuse by attacking the ACLU/SC, rather than by investigating the accounts.  Mr. Whitmore told *LA Weekly* in May that "the sheriff supports the ACLU in spirit – we just have a problem with their exaggerations and overstatements."[148]  The department, however, has never revealed any details of its investigations in response to dozens of sworn witness statements submitted by the ACLU/SC, and it has never offered any evidence whatever to back up its claim that either the ACLU/SC or other witness accounts are exaggerated or false.  The department recently cut off the ACLU/SC's access to two modules in Men's Central Jail, for the first time in more than two decades, after the ACLU/SC submitted reports in federal court detailing violence and retaliation against inmates in the facility.

Even when non- ACLU/SC civilians have reported witnessing deputy-on-inmate violence, the LASD has made minimal or no effort to investigate.  Although LASD officials knew that two chaplains witnessed beatings, in one case they did not even interview the chaplain, and in the other, they brushed off the chaplain's detailed report of what he had observed.[149]  In the case of Chaplain Paulino Juarez, the LASD failed even to place the written report the chaplain wrote into the official file on the use of force incident.  After civilian Scott Budnick reported an incident to a sergeant, the sergeant pledged to "get into this immediately."  Yet no one from the LASD ever interviewed Mr. Budnick about what he had observed, nor did he ever hear back from the sergeant – or anyone else at the LASD or OIR – about the investigation the department was allegedly conducting.[150]

Other striking evidence has come to light over the past year of a widespread pattern of deputy abuses and cover-ups.  Many deputies have been repeatedly used fake scanner codes to avoid making the required rounds of cells to check on inmate safety.  The scheme only came to light after the body of an inmate who committed suicide went unnoticed in a Men's Central Jail cell for hours.  The day of the suicide, the deputy in charge of inmates' safety in that area of the jail went on a "chow run" and to use the gym instead of making his assigned rounds.  According to the OIR report, this was not an isolated incident: two deputies were fired, and eight disciplined, following the inmate's death.[151]

Deputies have been using the same fake bar-code scheme to give the false appearance that they are carrying out their duties to provide the inmates with certain basic rights, such as access to showers,[152] or visits to the law library for inmates representing themselves in their criminal cases.[153]

000034

Recently, deputies improperly restricted the ACLU/SC's Jails Project Coordinator's access to the inmates, and then made a bogus entry in the log reporting that she had visited with inmates, when in fact LASD personnel had refused to allow her entry, and she had left the facility without speaking to a single prisoner.[154]

When inmates complain about mistreatment, deputies respond with punishment: strip searches, body cavity searches, destructive cell shake-downs, or confiscation of their belongings.[155]  Inmates tell the ACLU/SC that there is widespread fear of reporting misdeeds to the ACLU/SC, since deputies regularly retaliate against those who lodge complaints.[156]

The substantial evidence of deputy fraud, misdeeds, and corruption, the LASD's stubborn habit of turning a blind eye to this evidence, and its rote repetition of the mantra that inmates are merely fabricating or exaggerating deputy violence, thoroughly discredit the department's claim that its investigations of force incidents are trustworthy.

## III.   CONCLUSION

The level of deputy violence in the Los Angeles County Jail systems is "astonishing,"[157] concluded Thomas Parker, who oversaw the FBI investigation into the Rodney King attack. Many of the beatings that routinely occur in the jails are "far more severe than the King beating."[158]   The violence is not the work of a few rogue deputies, but systemic:  indeed, according to Parker, the problem is "significantly more systemic" than the infamous LAPD Rampart Division corruption scandal.  It has continued unchecked for decades.  Gang-like groups of deputies have been operating in the LASD at least since the 1980s, and perhaps since the early 1970s, and these "deputy gangs" continue to operate today, "seemingly with impunity, right under the eyes of all levels of the current management of LASD," Mr. Parker concluded.[159] Corrections expert and former prison official Toni V. Bair concurs that "Sheriff Baca is either unwilling or unable to control the systemic abuse that permeates his LA County Jail system."[160] Far-reaching remedial measures are required. The long-standing and pervasive culture of deputy hyper-violence in Los Angeles County jails—a culture apparently condoned at the highest levels -cries out for swift and thorough investigation and intervention by the federal government. "Since the LASD appears totally incapable and lacking in motivation to correct these problems, it remains for the federal government and the courts to do so.  The problem can no longer be ignored."[161]

# IV.   ENDNOTES

1 Declaration of Mr. KK, dated, April 9, 2011, ¶¶ 5-16.

2 Declaration of Mr. V, dated, June 7, 2011, ¶¶ 13-22.

3 Declarations of Mr. OOO, dated April 11, 2011, ¶¶ 9-10; Mr. BBB, dated June 22, 2011, ¶¶ 7-10; Mr. I, dated July 12, 2011, ¶¶ 3-5.

4 Declarations Mr. RR, dated July 13, 2011, ¶ 5-13; Mr. MMM, dated August 22, 2011, ¶¶ 6-12;. CC, dated August 26, 2011Mr. CCC, dated September 9, 2011, ¶¶13 18; Evans Tutt, dated May 5, 2010, ¶¶ 4-5; Mr. PPP, dated July 5, 2011, ¶ 13; Mr. FF, dated July 8, 2011, ¶ 9.

5 Declarations of Mr. MM, dated, February 4, 2011, ¶¶ 22-25; Mr. GG, dated June 23, 2011, ¶¶ 2-3; Mr. Q, dated July 5, 2011, ¶ 3; Mr. C, dated July 13, 2011, ¶¶ 8-9; Mr. J, dated January 28, 2011, ¶ 13, 29.

6 Declaration of Juan Pablo Reyes, dated September 12, 2011.

7 Declarations of Esther Lim, dated February 4, 2011; Scott Budnick, dated March 30, 2011; Paulino Juarez, dated September 3, 2011; Chaplain Doe, dated August 15, 2011.

8 *See* MARY TIEDEMAN & DANIEL BALLON, ANNUAL REPORT ON THE CONDITIONS INSIDE LOS ANGELES COUNTY JAIL, 2008-2009 (2010), filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 226); MARY TIEDEMAN ET AL., 2010 INTERIM REPORT ON CONDITIONS INSIDE LOS ANGELES COUNTY JAIL (2010), filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 217).

9 Executive Summary of declaration of Thomas Parker, dated September 26, 2011, page 4; Declaration of Thomas Parker, , ¶ 172.

10 *Id., ¶* 189.

11 *Id., ¶* 194.

12 *Id., ¶* 202.

13 Declaration of Thomas Parker, dated, September 26, 2011.

14 Declaration of Tony V. Bair, dated September 27, 2011, ¶ 2.

15 Declarations of Mr. Z, dated August 23, 2011, ¶¶ 13-29; Mr. DDD, dated August 22, 2011, ¶¶ 12-22; Mr. NN, dated May 20, 2011, ¶¶ 5-10; Mr. PP, dated April 12, 2011, ¶¶ 8-10.

16 This report is limited in scope: It focuses on deputy-on-inmate violence in the jails. The ACLU receives scores of other inmate complaints about the Department's failure to protect prisoners from violence at the hands of other prisonersas well as reports of inadequate medical treatment and the failure to provide showers, mail, and other basic services.

17 Declarations of Mr. A, August 19, 2011, dated ¶ 12; Scott Budnick, dated March 30, 2011, ¶ 15; Robert Powell, dated May 11, 2011, ¶¶13-14; Mr. H, dated August 2, 2011, ¶ 5; Mr. AA, dated August 19, 2011, ¶12; Mr. QQ, dated August 19, 2011, ¶ 3, ¶12; Gordon Grbavac, dated June 15, 2011, ¶10; Mario Rocha, dated September 13, ¶ 37; Mr. MMM, dated August 22, 2011, ¶ 11; Mr. CCC, dated September 9, 2011, ¶ 12; Mr. T, dated August 23, 2011, ¶ 5; Mr. M, dated July 27, 2011, ¶ 6; Mr. CC, dated August 26, 2011, ¶11; Mr. HHH, dated June 22, 2011, ¶ 37, ¶ 45; Mr. III, dated August 22, 2011, ¶ 36; Mr. PPP, dated July 5, 2011, ¶¶ 6-7, ¶ 12; Mr. FF, dated July 8, 2011, ¶ 9; Mr. II, dated August 19, 2011, ¶ 7; Mr. NN, dated May 20, 2011, ¶ 4.

18 . Declarations of Mr. H, dated August 2, 2011, ¶ 5; Mr. I, dated July 12, 2011, ¶ 5; Mr. J, dated January 28, 2011, ¶¶16; Mr. S, dated November 24, 2011, ¶ 21; Chaplain Doe., dated August 15,

2011, ¶ 6; Mr. RR, dated July 13, 2011, ¶ 9; Mr. SS, dated July 12, 2011, ¶ 6; Cedric Smith, dated August 20, 2011, ¶ 17; Mr. JJ, dated August 19, 2011, ¶ 12; Mario Rocha, dated August 13, ¶ 21; Mr. F, dated September 9, 2011, ¶ 10; Paulino Juarez, dated September 3, 2011, ¶ 10, ¶ 16; Mr. X, dated April 12, 2011, ¶ 16; Mr. SSS, dated August 2, 2011, ¶ 9; Mr. Y, August 19, 2011, ¶ 22; Scott Budnick, dated March 30, 2011, ¶ 23; Mr. QQ, dated August 19, 2011, ¶ 14; Mr. BBB, dated June 22, 2011, ¶ 9; Mr. HHH, dated June 22, 2011, ¶ 12, ¶ 37; Evans Tutt, dated May 5, 2010, ¶ 4; Mr. GG, dated June 23, 2011, ¶ 7; Mr. KK, dated April 19, 2011, ¶ 14.

[19] Declarations of Esther Lim, dated February 4, 2011, ¶ 20; Christopher Brown, dated February 2, 2011, ¶ 17; Scott Budnick, dated March 30, 2011, ¶ 10; Mr. P, dated April 12, 2011, ¶ 6; Mr. A, dated August 19, 2011, ¶ 13; Mr. AA, dated August 19, 2011, ¶ 16; Mr. JJ, dated August 19, 2011, ¶¶ 14-15; Mr. QQ, dated August 19, 2011, ¶ 17; Cameron Saul, dated June 22, 2011, ¶ 24; Mr. III, dated August 22, 2011, ¶ 43; Evans Tutt, dated May 5, 2010, ¶ 4.

[20] Declarations of Mr. HH, dated April 11, 2011; Juan Pablo Reyes, dated September 12, 2011.

[21] Declaration of Mr. KK, dated April 19, 2011, ¶ 30.

[22] Declaration of Mr. SSS, dated August 2, 2011, ¶ 20.

[23] Declarations of Mr. X, dated April 12, 2011, ¶ 28; Mr. KK, dated April 19, 2011

[24] Declarations of Mr. Y, dated August 19, 2011, ¶ 28; Mr. P, dated April 12, 2011, ¶ 10; Mr. GGG, dated August 1, 2011, ¶ 51.

[25] Declaration of Mr. P, dated April 12, 2011, ¶ 10.

[26] Declaration of Cameron Saul, dated, June 22, 2011, ¶24.

[27] Declarations of Paulino Juarez, dated September 3, 2011; Chaplain Doe, dated, August 15, 2011; Scott Budnick, dated, March 30, 3011; Esther Lim, dated, February 4, 2011.

[28] Declaration of Juan Pablo Reyes, dated September 12, 2011, ¶ 17.

[29] Aliases are used for those declarants who are currently inmates in the LA County jails to protect them from retaliation by LASD personnel.

[30] *See* Mary Tiedeman & Daniel Ballon, Annual Report on the Conditions Inside Los Angeles County Jail, 2008-2009 (2010), *filed in* Rutherford v. Baca, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 226); Mary Tiedeman et al., 2010 Interim Report on Conditions Inside Los Angeles County Jail (2010), filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 217).

[31] Carolyn Costello, *The Gang Behind the Badge* (pts. 1-5) KTLA News, May 4, 2011, *available at* http://www.ktla.com/news/landing/ktla-the-gang-behind-the-badge,0,4021055.story; Chris Vogel, *Men's County Jail Visitor Viciously Beaten by Guards*, L.A. Weekly, May 19, 2011, *available at* http://www.laweekly.com/2011-05-26/news/men-s-county-jail-visitor-viciously-beaten-by-guards/.

[32] Carolyn Costello, *The Gang Behind the Badge* (pts. 1-5) KTLA News, May 4, 2011, *available at* http://www.ktla.com/news/landing/ktla-the-gang-behind-the-badge,0,4021055.story.

[33] Robert Faturechi & Andrew Blankstein, *L.A. County Sheriff's Department Fosters 'Gang-Like Activity' Among Jail Deputies, Suit Alleges*, L.A. Times, May 5, 2011, *available at* http://articles.latimes.com/2011/may/05/local/la-me-deputies-lawsuit-20110505.

[34] Declaration of Thomas Parker, dated September 26, 2011, ¶ 4.

[35] *Id.,* ¶ 2.

[36] *Id.*

[37] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 40.

[38] Declaration of Thomas Parker, dated September 26, 2011, ¶ 187.

[39] *Id.*, ¶ 5.

[40] *See* MARY TIEDEMAN & DANIEL BALLON, ANNUAL REPORT ON THE CONDITIONS INSIDE LOS ANGELES COUNTY JAIL, 2008-2009 (2010), filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 226); MARY TIEDEMAN ET AL., 2010 INTERIM REPORT ON CONDITIONS INSIDE LOS ANGELES COUNTY JAIL (2010), filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 217); PLAINTIFF'S SUPPLEMENTAL FILING IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND EX PARTE APPLICATION TO VACATE SUBMISSION FOR A PROTECTIVE ORDER; DECLARATIONS IN SUPPORT (2011), filed in *Rutherford v. Baca*, CV 75-04111-DDP (No. 274).

[41] Declaration of Peter Eliasberg, dated September 27, 2011, ¶ 2 and Exhibit 1 (Findings Letter of United States Department of Justice re: Los Angeles County Jails)

[42] Declarations of Chaplain Doe, dated August 15, 2011, ¶ 15; Paulino Juarez, dated September 3, 2011, ¶ 38, ¶ 49.

[43] Declaration of Paulino Juarez, dated September 3, 2011, ¶ 51.

[44] Declaration of Chaplain Doe, dated August 15, 2011, ¶ 15.

[45] Declaration of Paulino Juarez, dated September 3, 2011, ¶ 11.

[46] *Id.,* ¶ 13.

[47] *Id.,* ¶ 28.

[48] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 23.

[49] Declaration of Paulino Juarez, dated, ¶ 48.

[50] *Id.,* ¶ 49.

[51] Declaration of Chaplain Doe, dated, ¶ 8.

[52] *Id.,* ¶ 13.

[53] *Id.,* ¶ 15.

[54] Declaration of Esther Lim, dated February 4, 2011, ¶ 21.

[55] *Id.,* ¶ 19.

[56] Declaration of Scott Budnick, dated, March 30, 2011.

[57] Id., ¶ 12.

[58] *Id.,* ¶ 15.

[59] *Id.,* ¶ 18

[60] *Id.,* ¶ 23.

[61] Declarations of Esther Lim, dated February 4, 2011, ¶ 7; Scott Budnick, dated March 30, 2011, ¶ 13.

[62] Declarations of Mr. KK, dated April 19, 2011 ¶¶ 15-16; Paulino Juarez, dated August 24, 2011, ¶¶ 13-15; Mr. B, dated April 12, 2011, ¶¶ 11-15.

[63] See, e.g., Declarations of Mr. H, dated August 2, 2011, ¶¶ 6-7; Mr. U, dated August 15, 2011, ¶ 6-7; Chaplain Doe, dated August 15, 2011, ¶¶6-8, ¶¶ 12-13; Mr. Y, dated August 19, 2011, ¶¶ 22-23; Mr. CC, dated August 26, 2011, ¶¶ 10-12; Mr. P, dated April 12, 2011, ¶¶ 5-6; Cameron Saul, dated June 22, 2011 ¶ 24; Mr. HHH, dated June 22, 2011, ¶ 12.

[64] Declarations of Mr. F, dated September 9, 2011, ¶ 12; Mr. U, dated August 15, 2011, ¶ 5; Mr. Y, dated August 19, 2011, ¶ 22; Paulino Juarez, dated August 24, 2011, ¶¶ 4-9; Mr. II, dated August 19, 2011, ¶¶ 14-15; Mr. JJ, dated August 19, 2011, ¶¶ 13-15; Mr. OO, dated August 16, 2011, ¶ 6; Mr. SS, dated July 12, 2011, ¶ 6 Mr. PPP, dated July 5, 2011, ¶¶ 9-10; Esther Lim, dated February 4, 2011, ¶¶ 18-19; Scott Budnick, dated March 30, 2011, ¶¶ 18-19; Christopher Brown, dated February 2, 2011, ¶ 17; Mr. SSS dated August 2, 2011, ¶ 10; Mr. HHH, dated June 22, 2011, ¶ 12.

[65] Declaration of Toni V. Bair, dated September 27, 2011, ¶ 35.

[66] Declaration of Thomas Parker, dated September 26, 2011, ¶ 175.

[67] Declaration of Juan Pablo Reyes, dated September 12, 2011, ¶¶ 10-11.

[68] Declaration of Mr. KK, dated April 19, 2011, ¶ 15.

[69] Declaration of Mr. P, dated April 12, 2011, ¶ 10.

[70] Declaration of Mr. QQQ, dated April 19, 2011, ¶ 7.

[71] Declaration of Robert Powell, dated May 11, 2011, ¶ 3, 15.

[72] Declaration of Mr. PP, dated April 12, 2011, ¶ 10.

[73] Declaration of Mr. DD, dated August 4, 2011, ¶ 28.

[74] Declaration of Mr. PPP, dated July 5, 2011, ¶ 33.

[75] Declaration of Mr. JJ, dated August 19, 2011, ¶ 22.

[76] Declaration of Mr. I, dated July 12, 2011, ¶ 10.

[77] Declaration of Mr. PPP, dated July 5, 2011, ¶ 13.

[78] Declaration of Mr. CCC, dated September 9, 2011, ¶ 13.

[79] Declaration of Mr. FF, dated July 8, 2011, ¶ 9.

[80] Declaration of Mr. CC, dated August 26, 2011, ¶ 8.

[81] Declaration of Evans Tutt, dated May 5, 2010, ¶ 4.

[82] In addition, to the three incidents described in this section, which were corroborated by eyewitnesses, Mr. GGG was an eyewitness to the beating of Mr. DD, described on page 8 above. Declaration of Mr. GGG, dated August 1, 2011, ¶¶ 45-51.

[83] *See* Declaration of Chief Dennis Burns, dated November 5, 2010, ¶¶ 3, 13, 20, filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 245). *See also* Frank Stoltze, *ACLU: LA County Jail Guards Perpetuate Violence*, SOUTHERN CALIFORNIA PUBLIC RADIO, May 5 2010, *available at* http://www.scpr.org/news/2010/05/05/14828/aclu-says-la-county-jail-guard-perpetuate-violence/; Robert Faturechi, *Inmates Allege Serious Abuse by LA County Prison Guards*, L.A. TIMES, May 6, 2010, *available at* http://articles.latimes.com/2010/may/06/local/la-me-aclu-jail-20100506.

[84] Declarations of Mr. II, dated August 19, 2011; Mr. QQ, dated August 19, 2011; Mr. AA, dated August 19, 2011; Mr. A, dated August 19, 2011.

[85] Declarations of Mr. III, dated August 22, 2011, ¶ 30; Mr. II, dated August 19, 2011, ¶ 5.

[86] Declaration of Mr. II, dated August 19, 2011, ¶ 14.

[87] *Id.,* ¶ 13.

[88] *Id.* ¶ 2, 50 and Exhibits 1, 2.

[89] Declaration of Mr. III, dated August 22, 2011, ¶ 54.

[90] Declarations of Mr. U, dated August 15, 2011, ¶¶ 3-6; Mr. Z, dated, August 23, 2011, ¶ 7.

[91] Declarations of Mr. DDD, dated August 22, 2011, ¶ 8; Mr. Z, dated August 23, 2011, ¶ 10.

[92] Declarations of Mr. SS, dated July 12, 2011, ¶ 6.

[93] Declaration of Mr. RRR, dated June 30, 2011, ¶ 6.

[94] Declarations of Mr. SS, dated July 12, 2011, ¶ 6.

[95] Declaration of Mr. RRR, dated June 30, 2011, ¶ 8

[96] As examples, see declarations of Mr. BBB, dated June 22, 2011, ¶ 12-21; Mr. V, dated November 8, 2010, ¶ 5-14; Mr. FFF, dated April 20, 2011, ¶ 11-19; Mr. HH, dated April 11, 2011, ¶¶ 8-17; Juan Pablo Reyes, dated September 12, 2011, ¶¶ 9-12; Cameron Saul, dated June 22, 2011, ¶¶ 8-9; Mr. PPP, dated July 5, 2011, ¶¶ 20-24; Mr. QQQ, dated April 19, 2011, ¶ 8; Mr. EEE, dated April 12, 2011, ¶ 22; Mr. OOO, dated April 11, 2011, ¶ 11; Mr. LL, dated July 28, 2011, ¶¶ 70-72; Mr. TTT, dated, September 23, 2011, ¶ 8.

[97] Declaration of Thomas Parker, dated September 26, 2011, ¶ 198.

000040

[98] Although Juan Pablo Reyes is not a gang member, he is considered a Paisa, or someone who comes from south of the United States-Mexico border.  The gang these two inmates belonged to view Paisas as enemies.

[99] Declaration of Juan Pablo Reyes, dated September 12, 2011, ¶ 14.

[100] Declaration of Mr. HH, dated April 11, 2011, ¶ 20.

[101] Declaration of Mr. QQQ, dated April 19, 2011, ¶ 8.

[102] Declaration of Mr. TTT, dated September 23, 2011, ¶¶ 8-11.

[103] Declaration of Cameron Saul, dated June 22, 2011, ¶ 8.

[104] Declarations of Mr. WW, dated July 15, 2011, ¶¶ 5-6; Mr. EEE, dated April 12, 2011, ¶ 22; Mr. VV, dated November 16, 2011, ¶ 12; Mr. NN, dated May 20, 2011, ¶ 4; Mr. W, dated June 7, 2011, ¶ 29; Mr. FFF, dated April 20, 2011, ¶10; Mr. HHH, dated May 20, 2011, ¶ 11; Mr. III, dated August 22, 2011, ¶ 33; Mr. LLL , dated May 18, 2011, ¶ 5; Mr. OOO, dated April 11, 2011, ¶ 11; Gordon Grbavac, dated June 15, 2011, ¶ 13.

[105] Declaration of Mr. OOO, dated April 11, 2011, ¶ 5.

[106] Declaration of Mr. BB, dated April 11, 2011, ¶ 22.

[107] Declaration of Gordon Grbavac, dated June 15, 2011, ¶¶ 12-13.

[108] Carolyn Costello, *The Gang Behind the Badge* (pt. 3) KTLA NEWS, May 4, 2011, *available at* http://www.ktla.com/videobeta/?watchId=a186be8a-79e8-4595-9d03-0bbe390975da.

[109] Robert Faturechi & Andrew Blankstein, *L.A. County Sheriff's Department Fosters 'Gang-Like Activity' Among Jail Deputies, Suit Alleges*, L.A. TIMES, May 5, 2011, *available at* http://articles.latimes.com/2011/may/05/local/la-me-deputies-lawsuit-20110505.

[110] *Vasquez v. Baca*, CV 11-03849-PSG-PJW filed May 4, 2011 (Complaint)

[111] Carolyn Costello, *The Gang Behind the Badge* (pt. 3) KTLA NEWS, May 4, 2011, *available at* http://www.ktla.com/videobeta/?watchId=a186be8a-79e8-4595-9d03-0bbe390975da.

[112] Declaration of Thomas Parker, dated September 26, 2011, ¶ 192.

[113] *Id.*, ¶ 8, 184.

[114] *Id.*, ¶ 8, 183.

[115] *Id.*

[116] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 23.

[117] *Id.*, ¶ 35.

[118] Declaration of Esther Lim, dated February 4, 2011, ¶¶ 18-19.

[119] *Id.*, ¶¶ 20-21.

[120] *Id.*, ¶¶ 40-41.

[121] *Id.*, ¶ 7.

[122] Declaration of Thomas Parker, dated September 26, 2011, ¶ 12, ¶ 193.

[123] Declaration of Scott Budnick, dated March 30, 2011, ¶¶ 23-24.

[124] *Id.*, ¶ 19.

[125] Id.

[126] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 24.

[127] Declarations of Scott Budnick, dated March 30, 2011, ¶ 19; Paulino Juarez, dated September 3, 2011, ¶ 23; Chaplain Doe, dated August 15, 2011, ¶ 14.

[128] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 25.

[129] Declarations of Mr. F, dated September 9, 2011, ¶ 12; Mr. U, dated August 15, 2011, ¶ 5; Mr. Y, dated August 19, 2011, ¶ 22; Mr. II, dated August 19, 2011, ¶ 14-15; Mr. JJ, dated August 19, 2011, ¶ 13-15; Mr. OO, dated August 16, 2011, ¶ 6; Mr. SS, dated July 12, 2011, ¶ 6; Mr. PPP,

dated July 5, 2011, ¶ 9-10; Christopher Brown, dated February 2, 2011, ¶¶ 17-18; Mr. SSS. dated August 2, 2011, ¶ 10; Mr. HHH, dated June 22, 2011, ¶ 12.

[130] Declaration of Mr. OOO, dated April 11, 2011, ¶ 12.

[131] Declaration of Mr. VV, dated November 16, 2011, ¶ 12.

[132] Declaration of Mr. MM, dated February 4, 2011, ¶ 27.

[133] Declaration of Mr. EEE, dated, April 12, 2011, ¶ 22.

[134] Declaration of Gordon Grbavac, dated, June 15, 2011, ¶ 14.

[135] Declaration of Cameron Saul, dated, June 22, 2011, ¶ 26.

[136] Declaration of Mr. B, dated April 12, 2011, ¶ 24.

[137] Declaration of Evans Tutt, dated May 5, 2010, ¶ 6.

[138] Carolyn Costello, *The Gang Behind the Badge* (pt. 4) KTLA NEWS, May 4, 2011, *available at* http://www.ktla.com/videobeta/?watchId=53592a86-dc74-4336-9cb3-323ea72e02d5.

[139] *See* Declaration of Chief Dennis Burns, dated November 5, 2010, ¶¶ 18-20, filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 245).

[140] *See* Chris Vogel, *Men's County Jail Visitor Viciously Beaten by Guards,* L.A. WEEKLY, May 19, 2011, *available at* http://www.laweekly.com/2011-05-26/news/men-s-county-jail-visitor-viciously-beaten-by-guards/3/; Robert Faturechi, *FBI Investigates Alleged Beating of Inmate by L.A. County Deputies*, L.A. TIMES, June 14, 2011, *available at* http://articles.latimes.com/2011/jun/14/local/la-me-jail-fbi-probe-20110614.

[141] *See* Declaration of Chief Dennis Burns, dated November 5, 2010, ¶¶ 3, 13, filed in *Rutherford v. Baca*, CV 75-04111-DDP, 2006 WL 3065781 (C.D. Cal. 2006) (No. 245).

[142] Declaration of Thomas Parker, dated September 26, 2011, ¶ 187.

[143] *Id.*

[144] Declaration of Tony V. Bair, dated September 27, 2011, ¶ 40.

[145] Declaration of Paulino Juarez, dated September 3, 2011, ¶ 46.

[146] *See* Chris Vogel, *Men's County Jail Visitor Viciously Beaten by Guards,* L.A. WEEKLY, May 19, 2011, *available at* http://www.laweekly.com/2011-05-26/news/men-s-county-jail-visitor-viciously-beaten-by-guards/3/.

[147] *Id.*

[148] Chris Vogel, *Men's County Jail Visitor Viciously Beaten by Guards*, L.A. WEEKLY, May 19, 2011, *available at* http://www.laweekly.com/2011-05-26/news/men-s-county-jail-visitor-viciously-beaten-by-guards/4/.

[149] Declarations of Paulino Juarez, dated September 3, 2011, ¶ 23.

[150] Declaration of Scott Budnick, dated March 30, 2011, ¶ 22.

[151] Richard Winton, *L.A. County Sheriff's Deputies Thwarted Bar Code System to Avoid Doing Jail Rounds*, L.A. TIMES, July 22, 2010, *available at* http://articles.latimes.com/2010/jul/22/local/la-me-0722-scannergate-20100722.

[152] Declaration of Alexander Fuentes, dated March 17, 2011.

[153] Declaration of Mr. VV, dated September 9, 2011, ¶ 6.

[154] Declaration of Esther Lim, dated June 29, 2011.

[155] Declarations of Mr. Z, dated August 23, 2011, ¶¶ 13-35; Mr. EE, dated April 12, 2011, ¶¶ 3-5; Mr. EEE, dated April 12, 2011, ¶ 15; Mr. KK, dated April 19, 2011, ¶¶ 6-15; Mr. NN, dated May 20, 2011, ¶¶ 5-10; Mr. PP dated April 12, 2011, ¶ 4; Mr. I, dated July 12, 2011, ¶ 10.

[156] Declarations of Mr. C, dated July 7, 2011, ¶ 7; Mr. D, dated April 12, 2011, ¶¶ 4-6; Mr. L, dated August 1, 2011, ¶¶ 3-16; Mr. EEE, dated April 12, 2011; Mario Rocha, dated September 13, 2011, ¶¶ 29-35; Mr. VV, dated September 9, 2011, ¶¶ 8-14; Mr. U, dated August 15, 2011, ¶

000042

23; Mr. HHH, dated June 22, 2011, ¶¶ 40-67; Mr. III, dated August 22, 2011, ¶ 54.; Mr. BB, dated April 11, 2011, ¶¶ 11-30; Mr. MM, dated, ¶; Mr. JJJ, dated August 26, 2011, ¶¶ 3-4.

[157] Declaration of Thomas Parker, dated September 26, 2011, ¶ 11.

[158] *Id.*, ¶ 14.

[159] *Id.*, ¶ 7, ¶ 182.

[160] Declaration of Toni V. Bair, dated September 27, ¶ 43.

[161] Declaration of Thomas Parker, dated September 26, 2011, ¶ 15.

000043