# II. Civilian Eyewitness Declarations

# DECLARATION OF CIVILIAN WITNESS
# SCOTT BUDNICK

000047

# DECLARATION OF SCOTT BUDNICK

I, Scott Budnick, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I work in film production at Warner Bros. Studio.

3.    I am writing this declaration to describe numerous incidents I witnessed in Men's Central Jail ("MCJ") between 2007-2010 during which one or more Los Angeles County Sheriff's ("LASD") personnel physically abused inmates who did nothing to provoke the abuse or where deputies continued to taser, kick or beat inmates when they were not threatening or resisting the deputies.

4.    In 2004, I became involved as a writing teacher for a non-profit organization which provides writing classes to the youth who are in the Los Angeles County Juvenile Hall system.

5.    Through this teaching opportunity, I mentored and taught many youth who later transitioned into the Los Angeles County Jail System ("LACJS") upon the youth's turning eighteen years old.

6.    Zev Yaroslavsky of the Los Angeles County Board of Supervisors awarded me with the Los Angeles Volunteer Award in his district, District 3, for the work I had done with youth in, I believe, 2006.  That same year, I approached Zev's justice deputy, Joseph Charney, and asked if he could help me gain access to the jails so I could continue to mentor and teach the youth who were now in the LACJS.  He agreed to help me, and I was approved to be a non-escort volunteer with the LACJS.  As a non-escort volunteer, I was able to move around most of the jail without having LASD personnel escort me.

7.    During my orientation in what I believe to have been late in 2006, I was in a room with approximately forty volunteers.  The deputies conducting the orientation told us that we were going to hear the deputies cursing at the inmates

1   and that we were going to hear and see things that we were not accustomed to

2   hearing and seeing, such as deputies using force against the inmates.  They told us

3   that deputies sometimes needed to speak and act this way with inmates because

4   this was the only way that the inmates could be taught to comply with jail rules.

5        8.    During my time at MCJ from late 2006-2010, I have seen

6   approximately five incidents of deputies abusing inmates and heard one incident

7   of an inmate being beaten by deputies.  I have been at MCJ approximately twice a

8   month between 2006 and 2008.

9        9.    I have gone into MCJ much less frequently since 2008 because I

10  became so disgusted with what I saw there and have primarily tried to work with

11  juveniles who are in Twin Towers or other jail facilities outside MCJ.

12       10.   The first time I observed abuse in MCJ was sometime in 2007 -- I

13  believe it was fairly early in the year.  I was going up to what is now the Hospital

14  Ward; it used to be the floor that housed minors.  When the elevator doors opened,

15  I saw approximately seven deputies directly in front of the elevator doors.  I

16  believe one of them was a sergeant because he had stripes on his shirt.  I saw two

17  of the deputies tasering a big, African-American inmate who was lying on the

18  ground motionless, approximately three to five times.

19       11.   I did not report this incident because I saw that a sergeant was

20  present, so I assumed that the sergeant was or would handle the matter

21  appropriately.  I was also new to the jail and didn't know the ramifications of

22  reporting an incident like this.

23       12.   Shortly thereafter, I did talk to a young white deputy in one of the

24  modules that housed minors and told him what I saw.  This deputy said to me,

25  "Yeah, we fuck these guys up all the time."

26       13.   The second time I witnessed abuse in MCJ was in or about November

27  2008.  I was teaching a writing class in MCJ and was standing next to the door of

28  the classroom waiting for the youth to come to class.  The classroom is the first

000049

1  room you see once you get off the escalator and enter the main hallway to get to
2  all the modules on the floor.

3      14.    While I was standing there, I saw a group of inmates walking in a
4  straight line with approximately 6-7 deputies around them.  I saw one of the
5  deputies, a big, White deputy stop an older, African-American inmate.  He ordered
6  the inmate get out of the line and then strip searched him naked in the middle of
7  the hallway in the view of me and others who were in the hallway.  I'm not sure
8  why he was pulled out of the line.  I think it might have been because he didn't
9  have his hands in his pockets, but I am certain that the inmate did not attack or
10  threaten the deputies.

11      15.    I then saw the White deputy grab the inmate's head and smash his
12  head into the wall, hard.  It was so hard that I could hear an audible crack when the
13  deputy slammed his head against the wall.

14      16.    At no point did I see the inmate do anything to any of the other
15  prisoners or the deputy; in fact, the inmate was very respectful to the deputy.

16      17.    After I saw this, I quickly went back inside the classroom.

17      18.    The third time I observed deputy on inmate abuse was, I believe, in
18  December 2008.  Again I was right outside the classroom where I taught my
19  writing class in MCJ waiting for students to come to the class and I saw an inmate,
20  who was young and Hispanic walking down the hallway.  There were
21  approximately three deputies who stopped him and strip searched him.  I saw one
22  of the deputies, who was young and also appeared Hispanic, grab the inmate's
23  hand and arm and twist his arm up behind his back, forcefully.  I then saw the
24  deputy push the inmate to the ground.  I could not see any reason why the deputies
25  were doing this because the inmate did not do anything to the deputies, did not
26  threaten them or break any rules.

27      19.    After I saw this, I went inside the Chaplains' office and mentioned it
28  to some of the chaplains who were there.  The group of chaplains in the office,

3

1  who were from various denominations, advised me against reporting this incident.

2  They said the LASD had a practice of kicking people out of the jails and if I

3  reported the incident then I wouldn't be able to work with the students any longer.

4  They also told me that they were scared to report any of the incidents of abuse that

5  they had seen because they were afraid to lose their jobs.

6      20.    I was also hesitant to report what I had observed to LASD because I

7  had personally spoken with another jails chaplain.  He told me that he had been

8  kicked out of the LACJS because he was a "whistleblower" who had reported to

9  LASD and others incidents of abuse that he had seen in the jails.

10      21.    The fourth incident that I witnessed was in or about July 2009 on the

11  4000 floor of MCJ.  It was similar to the incident that I observed taking place in or

12  about November 2008.  I was going to visit a module when  I saw a Hispanic

13  inmate who appeared to be in his late 30's to early 40's getting off the escalator.

14  He seemed to be confused about where he was supposed to go and asked one of

15  the deputies where Module 4600 was.  There were approximately four deputies

16  near the inmate.  The deputies started to poke fun at him and asked him if he had

17  mental issues since he did not seem to know how to find his module.  I then saw

18  two of the deputies grab the inmate's hand and arm and forcefully twist the

19  inmate's arm up behind his back.  I then saw the deputies grab the inmate's head,

20  place it on the wall and twist the inmate's face hard up against the wall.

21      21.    The inmate was not fighting with the deputies, but was compliant.

22      22.    I reported this incident to Sergeant Renfro when I walked into his

23  office.  The conversation was brief, in which I told Sergeant Renfro what I had

24  seen and heard.  Sergeant Renfro was attentive and respectful and said that he

25  "would get into this immediately."  However, I have never heard from Sergeant

26  Renfro about the outcome of his investigation, nor did any LASD personnel ever

27  contact me to interview me or otherwise speak with me about the incident that I

28  had reported.

000051

23.     The fifth incident that I witnessed occurred in late 2009.  I was going to Module 3600 to see one of my students and saw that the module door was cracked opened.  Usually the door is closed and I have to be buzzed in to enter.  I opened the door and when I turned to the "chow hall", I saw three deputies, one who was White and two who appeared Latino, kicking, punching and beating up an inmate, who was skinny and African-American.  When I first saw the deputies punching the inmate he was standing.  He quickly fell to the ground due to the blows.  I then saw the deputies kicking and beating the inmate when he was on the ground.  I could hear the deputies yelling, "Stop resisting!" over and over again, yet I could see from the inmate's legs that he was not moving or resisting.  There was no one in the chow hall except the three deputies and the inmate who was getting beat up by the deputies.

24.     I have repeatedly had chaplains of all faiths who work in the jails tell me that it is common practice for deputies to yell, "Stop fighting!" and "Stop resisting!" at inmates who are not fighting or resisting while the deputies are beating them.  They have also told me that deputies think they can continue to abuse inmates as long as they yell, "Stop fighting!" and "Stop resisting!"

25.     In the beginning of 2010, I was in Module 1750 and as I was talking to an inmate, who was handcuffed in the shower area, I could hear another inmate getting beat up in the adjacent row.  I could clearly hear the sounds of boots and flashlights hitting a body repeatedly.  I could also hear the inmate screaming, "Get off of me!"

\ \ \

\ \ \

\ \ \

\ \ \

000052

1    26.    The inmate with whom I had been talking told me that two deputies

2    and one sergeant on Module 1750 were the ones doing the beating.  It is my

3    understanding that one of the deputies was later disciplined for what he did in

4    another incident and that the other deputy is on a medical leave.  I also understand

5    that the sergeant now works in the Courts.

6         I declare under penalty of perjury of the laws of the State of California and

7    the United States that the foregoing is true and correct to the best of my

8    knowledge and belief.  Executed March 30, 2011 in Los Angeles, California.

9

10    _____

11    Scott Budnick

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

# DECLARATION OF CIVILIAN WITNESS CHAPLAIN DOE

000054

**Declaration of Chaplain Doe**

I, Chaplain Doe, hereby declare:

1.      I make this declaration based on my own person knowledge and if called to testify I could and would do so competently as follows:

2.      I am a Chaplain and I have been ministering at Men's Central Jail ("MCJ") since 2005.  I am at MCJ at least twice a week on Tuesdays and Wednesdays and work primarily on the 3000 Module.  I used to work in the 4700 Module to preside over the morning services before the module closed down.  I also work on the 2000 Module with the inmates who are allowed to have the blue chaplain visit slips so that they can leave their housing units to meet with chaplains.

<u>Deputy on Inmate Violence</u>

3.      On February 9, 2011, at approximately 8:30 a.m., I was walking towards the chaplains' office located on the 3000 floor of MCJ.

4.      It must have been around the time for Pill Call because I saw several inmates next to the Module 3100/3300 entrance area, standing in line in front of a window.  The medical staff dispenses the inmates' medication through the window.  I also saw several deputies standing across from the window, watching the inmates get their medication.

5.      Once I got to the chaplains' office, I was in the process of filling up the cart with some Christian literature and Bibles to pass out during my walk through of the modules, when I heard the sounds of deputies running past the chaplains' office and heard the sounds of keys jangling.  I knew by these sounds that there was a fight that was occurring in the hallway.  I've been a chaplain at the jails for a long time and you learn that when you hear running and keys jangling, a fight is occurring.

6.      I walked out of the dutch door and looked to the left down the

1

hallway and I saw about 15-20 feet away from me, 4-5 deputies kicking an African-American inmate who was lying on the ground, face down with his head towards the wall and his feet closest to me.  I was able to see all of the inmate's body.  A diagram of the chaplains' offices, the hallway, and where I saw the beating occurring is attached hereto as Exhibit 1.The spot where the inmate was lying is marked with an "X" and the spot where I was standing is marked with a "G".  I was able to see the inmate's hands and it looked like his hands were behind his back.  I wasn't able to see if he was handcuffed or not.

7.     I saw one deputy holding onto the inmate's legs and feet and another deputy with his knee across the inmate's neck, while the other deputies were kicking his torso and legs.  During the entire time that I was watching, I didn't see the inmate's arms or hands move from behind his back and I saw the deputy had his knee across the inmate's neck during the entire time that I was watching.

8.     While the deputies were kicking the inmate, I could see that he was not fighting with the deputies, but he was yelling out, "Stop!  Help me!  Help!"  The deputies continued to kick him, even though he was not fighting with them and was yelling out for someone to help him.

9.     Then one of the deputies who were kicking the inmate, another Hispanic deputy, looked at me and yelled, "Chaplain!  Go inside!"

10.    I didn't go into the chaplains' office; instead I remained where I was and continued to watch the deputies kick the inmate.  I didn't go inside because I had heard too many inmates tell me about beatings that the deputies had inflicted on them and I wanted to observe what was happening with my own eyes.

11.    I saw Deputy Perez, who appeared to be Hispanic, sitting at the deputy's desk located several feet away from the chaplains' office, to the right, run past me.  As he did so, he yelled at me, "Chaplain!  Go inside!"  I saw Deputy Perez run over to where the other deputies were kicking the inmate.  I knew that it

2

000056

1  was Deputy Perez because a couple of days after the beating, I saw him again and

2  I asked him his name.  He told me that it was "Perez" and I also saw his name tag.

3          12.     I wasn't able to see anything after that because I went inside the

4  chaplains' office.  At that point I had been watching the deputies kick the inmate,

5  non-stop for approximately 2-3 minutes before I turned around to go inside the

6  office.  As I was going into the office, I saw Sergeant Jones walking down the

7  hallway that joins the chaplains' office and the Sergeant's office, which is located

8  behind the chaplains' office.  When I saw him, I said to him, "That's not right."

9  He didn't say anything to me and walked outside to the hallway where the

10  deputies were kicking the inmate.  I also saw Brothers Paulino and Duca by the

11  Catholic Chaplains' office listening to the inmate getting beat up.  The spot where

12  they were standing is marked with a "PD".

13          13.     I could still hear the thumping sounds of the deputies kicking the

14  inmate and heard the inmate still yelling for help.  Eventually the inmate stopped

15  yelling for help.  Yet I still continued to hear the deputies kicking for another

16  minute.

17          14.     I was so horrified by what I saw and I could only imagine the pain

18  that the inmate was feeling.  I was so sickened that the deputies were beating up

19  this inmate, who wasn't even resisting and was just yelling for help over and over

20  again.  He didn't have a chance with so many deputies surrounding him, kicking

21  and beating him.  I was so shocked that the despite the deputies seeing me watch

22  them beat up the inmate, they continued to kick and beat him.  It was like they

23  didn't even care that there was a witness.  I was afraid that if I had tried to stop the

24  beating or even just yell at the deputies to stop, they would come over and hurt

25  me.

26          15.     Despite the deputies and Sergeant Jones' knowing and seeing that I

27  was a witness to this beating, no one from the Los Angeles Sheriff's Department

28

000057

("LASD") or the Office of Independent Review ("OIR") contacted or interviewed me about what I saw. It was almost as if no one cared to find out the truth of what happened.

15.  I don't know what happened to the inmate and didn't know how badly injured he was because the deputies told me to stay inside the chaplains' office.

<u>Deputy Locking a Chaplain Inside the MCJ Module</u>

16.  On or about July 20, 2011, Chaplain Julio Gonzalez and I were walking on the upper tier of Module 3500 speaking with inmates and handing out religious literature. Chaplain Gonzalez was pushing the cart that carried the literature and I was standing in front of the individual cells to speak with inmates.

17.  Sometimes while I am speaking with inmates, Chaplain Gonzalez goes ahead of me to hand out literature and we are temporarily separated while inside the module. July 20 was not any different and Chaplain Gonzalez moved on with the cart while I continued to speak with an inmate in the last row upstairs, which I believe is Row D.

18.  While I was speaking with an inmate, Deputy Ibarra walked down the row and walked past me. Deputy Ibarra appears to be Hispanic, about 5'6" and has short hair. I have also heard from other inmates and chaplains that he has a twin brother, but the brother works the afternoon shift and Deputy Ibarra primarily works in the morning.

19.  I told the inmate to whom I was speaking to that I expected Deputy Ibarra to lock me in the module because every time that I've completed my walks, Deputy Ibarra has kept me and other chaplains who accompany me locked in the module and makes us wait more than 15 minutes to get out, even though we have called for him to open the door to the module or even when inmates try to help us by yelling to the deputies to open the door.

4

000058

20.     As I had feared, Deputy Ibarra walked to the end of the row, walked through the door and slammed the door shut.  However, the latch didn't catch and the door bounced opened again.

21.     About 20-25 minutes after Chaplain Gonzalez and I separated, I heard someone calling "Chaplain!  Chaplain!"

22.     I was not expecting anyone to call me by my first name, so I thought that maybe the inmates were calling for another man on the module.

23.     When I left my row, I saw Chaplain Gonzalez behind the gate on Row C and he told me, "Go tell the deputy to unlock me! Go tell them to get me out of here! I've been here for a while."  He told me that he had been locked in for at least 25 minutes.

24.     I went downstairs and found Deputy Ibarra, who was reading a newspaper.  I told him "Hey! You locked Chaplain Julio up there!"  Rather than getting up immediately to unlock Chaplain Gonzalez, Deputy Ibarra just looked at me and continued to read the newspaper.

25.     I went about halfway up the stairs and I happened to pass by the control booth.  I was surprised to see another deputy in the control booth as Deputy Ibarra had told me earlier in the day that he did not have too much man power, which I took to mean that he might have been alone on the module.

26.     The deputy in the control booth looked like he was just waking up from a nap, as he looked shaken up when I saw him from the stairs.  I then went back and told Deputy Ibarra that there was another deputy available.

27.     When Deputy Ibarra finally did get around to releasing Chaplain Gonzalez, Chaplain Gonzalez told Deputy Ibarra that what he did was not nice and asked him why he locked him up.  Deputy Ibarra replied, "It's just a habit."

28.     After Chaplain Gonzalez was locked up, Chaplain Gonzalez and I went to Ed Walsh, the senior Protestant chaplain, to explain what happened.  Mr.

000059

1  Walsh went with the two of us to speak with the watch commander, whose name I
2  do not recall.

3      29.    We waited about 20 minutes for the watch commander and when we
4  finally saw him, we explained to him what had just happened.

5      30.    Rather than reprimand Deputy Ibarra and apologize for his actions,
6  the watch commander seemed to cover for him and said "Maybe he had a bad
7  day." I told the watch commander "You can't have a bad day every day," but the
8  commander seemed intent on protecting his deputy rather than addressing the
9  problem.

10          Searches of the Chaplain's Office

11     31.    In March or April of 2011, as another chaplain and I were coming
12 back from visiting with inmates on the 3500 module, deputies approached us and
13 told us to leave the literature cart outside of our office. I didn't know why they
14 told us to do that. It was the first time it had ever happened to us, but I think they
15 wanted us to leave our cart there so that they could search it.

16     32.    Around the same time, I arrived at the chaplain's office one morning
17 and found that the office had been searched.

18     33.    I saw papers everywhere, files that are typically locked were
19 unlocked and opened and books that are usually neatly lined up and placed in the
20 shelves were pulled out and out of place.

21     34.    I usually am the chaplain who cleans up the offices and puts things in
22 order, so I knew that our office had been searched because the office is never this
23 messy. Whenever I leave the office, I make sure that all the cabinets are locked
24 and I keep the keys in a secret place in the office that only a few of the chaplains
25 know.

26         Deputy Searching Chaplains' Literature Cart

27     35.    On June 8, 2011, at about 10 a.m., I was on Module 3300 by myself
28

6

000060

1    with the literature cart and I told Deputy Moorman that I wanted to take some
2    boxes of literature up to the upper tier.  I took a box of literature off of the cart and
3    went upstairs.  The trustees on the module were also around to help me take the
4    boxes upstairs.

5        36.    When I came back down to get more boxes, I saw Deputy Moorman
6    taking out books and searching through the boxes that were on the cart and it
7    appeared that he had been searching through them while I was gone.  Deputy
8    Moorman never told me that he was going to search the boxes or even ask me.

9        37.    I asked him what he was doing and he said to me, "I'm doing what
10   I'm supposed to be doing.  I got my rules and you got your rules.  This is my
11   territory.  I do whatever I want to do."

12       38.    I told Deputy Moorman that he needed to ask me before he searched
13   through my boxes.  I didn't want him or any other deputies searching through the
14   boxes without me or another chaplain present.  I was afraid that the deputies might
15   put something in the boxes and say that I put it there.

16       39.    I saw his name on his nametag and I wrote it down.  I then told him
17   that I was going to talk to his sergeant and he yelled at me, "Go tell my sergeant.
18   Get out of here!"

19       40.    I was so embarrassed because Deputy Moorman was yelling at me in
20   front of the trustees and I'm sure that the inmates on the module heard him yelling
21   at me as well.

22       41.    I saw Deputy Moorman walk out of the module and saw him walk
23   over to a sergeant, whom I later found out was Sergeant Smurgerm and a group of
24   deputies.  I walked out of the module after him and I saw Sergeant Smurgerm and
25   the deputies standing around, laughing and joking.  I parked the literature cart
26   halfway into the hallway.

27       42.    I heard Deputy Moorman tell Sergeant Smurgerm that he threw out a
28

000061

1    chaplain out of the module.  I asked the sergeant if I could talk to him and he said

2    sure.

3         43.    I saw Chaplain Paulino and asked him if he could accompany me and

4    be a witness as I wanted to talk to the sergeant about what had happened.  He

5    agreed and we walked over to the sergeant's office.

6         44.    I told Sergeant Smurgerm what had happened and he told me that

7    Deputy Moorman should not have gone through my boxes or searched them

8    without my permission and without me being present.  He then asked me if I

9    wanted to go back to the module.

10        45.    I told him that I felt very angry, embarassed and discouraged.  I told

11   him that I didn't want to go back to the module, but that I was going to go home.

12                        Complaint Forms Not Being Filed

13        46.    In January or February of 2011, I had given Sergeant Grubb several

14   complaint forms that inmates had given me.  The inmates told me they were

15   giving them to me because if they put the complaint forms in the locked box, the

16   deputies will either throw away the forms or not address the content of the

17   complaints.

18        47.    I gave the complaint forms to Sergeant Grubb and he would tell me

19   that he'd handle them or when he'd see me a couple of days later, he would tell

20   me, "You know that complaint you gave me?  Yeah, I took care of it."

21        48.    A few months later, I saw the inmates who had given me the

22   complaint forms and I'd ask them where they've been because I hadn't seen them

23   since they gave me the complaint forms.  The inmates would tell me that they

24   went to the "hole" or to the disciplinary unit or that they were beaten up by

25   deputies and then taken to the "hole."

26        49.    Soon after, Sergeant Grubb would ignore me whereas before, he

27   would greet me whenever he would see me.

28

000062

50.   Also, during my walks of the different modules, I would notice that the complaint box didn't have any blank complaint forms.  The inmates would complain to me that they can't fill out a complaint form because the boxes never had blank complaint forms by them.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this _15th_ day of _August_ 2011 in _Los Angeles_, California.

9



Pill Call
Window

I
I
I
I
X

Bench

Entrance to
3100/3300

Bench

Catholic's
Office

Protestant's
Office

PD          Door ⟶ G

Sgt.'s Office

Supplies

Deputies'
Desk

MCJ-3000 FLOOR



000064

# DECLARATION OF CIVILIAN WITNESS
# PAULINO JUAREZ

000065

**Declaration of Paulino Juarez**

I, Paulino Juarez, hereby declare:

1.     I am a Deacon in the Catholic Church and a Chaplain of the Office of Restorative Justice for the Archdiocese of Los Angeles.  My ministery consists of visiting inmates at Men's Central Jail ("MCJ") and being their spiritual advisor. I have done this for about 14 years. What follows is my eyewitness account of a cruel, unjust, and horrific beating inflicted on an apparently handcuffed and defenseless inmate by the several Los Angeles Sheriff's deputies. I will also relate how the Los Angeles Sheriff Department ("LASD") failed to conduct a full and thorough investigation of this incident or punish those responsible.

BEATING IN FEBRUARY OF 2009

2.     In the early morning of Wednesday February 11, 2009 I was at MCJ to walk the rows and talk to inmates as I usually do.  I asked Sergeant Barbosa if I could walk the rows in Module 3700 earlier than usual.  I usually walk 3700 and talk with inmates in the afternoon, but I needed to leave the jail early that day.  It was about 10:30 in the morning when I asked him to let me into 3700.   He said it was fine.  So I walked to door marked Y on the diagram attached as Exhibit 1, which depicts the area around Modules 3500 and 3700. I got the attention of the deputy in the booth who opened the doors for me to allow me to enter 3700 Abel row.  As soon as I walked into the row, the door shut behind me. I began talking to one of the inmates, Ernesto Carrillo, whose cell was closest to where I had entered on the Abel row in 3700.

3.     A few minutes after I began my conversation with Mr. Carrillo, I heard thumps and gasps, which sounded like someone being beaten. I stopped talking to Mr. Carrillo, walked to the door marked PJ on the attached diagram, and looked to where I heard the sounds.

4.     What I saw shocked me. I saw three deputies beating up an inmate whom I believe was handcuffed. The inmate was African-American, about 5'11

1  tall and of a thin build. He was standing with his back against the wall while three

2  deputies, Ramirez, Aguilar, and another one whose name I do not know, pounded

3  his face and body with punches. At the time, I recognized the deputies, but did not

4  know their names, two of which I later learned.

5       5.     While they were hitting him, the deputies kept shouting "Stop

6  fighting!  Stop resisting!"

7       6.     I believe the inmate was handcuffed, and that the handcuffs were

8  attached to a chain strung around his waist for two reasons.  First, I have never

9  seen inmates from either 3500 or 3700 outside the module without being escorted

10  by deputies and without being handcuffed with their cuffs attached to a waist

11  chain.  Also, I never saw the inmate raise his hands to protect his face, even as the

12  deputies were punching him in the face.  Because it is so natural to try to block

13  your face if you are being punched, I believe he could not raise his hands to

14  protect himself because he was cuffed with the cuffs chained to his waist.

15       7.     The inmate  was not raising his hands to block the punches, nor was

16  he resisting in any way.  He was doing  nothing to avoid the deputies' blows

17  besides turning to his side and letting them hit his back or ribs. At various points, I

18  heard the inmate cry out, "Please stop!" "I am doing nothing wrong, please stop!"

19       8.     The beating occurred between the entrance to the module and the

20  door to the trustee dorm.  The area where the beating was occuring was well-lit.  I

21  was about ten or fifteen  feet away from the site of the beating.  I watched the

22  beating as I was standing inside the module near the door where I had entered.

23  The spot where I was standing watching the deputies beat the inmate is marked

24  with my initials PJ on Exhibit 1.  The spot where the inmate was standing is

25  marked with an X.  The approximate location of the three deputies as they

26  punched the inmate is marked with three black circles.  The door I was standing at

27  is made up of vertical and horizontal of bars that allow you to see clearly through

28  the door, as is the other door I looked through to see the beating, which is marked

1  with a Z.   It was dark where I was standing, and the deputies had their backs to
2  me as they were attacking the inmate.

3       9.    Since I witnessed the beating, they have put up plastic sheets over
4  some of the bars that I was looking through to see the beating and increased the
5  amount of light in and around the area where I was standing watching the beating.

6      10.   The deputies continued punching the inmate for another minute until
7  he finally collapsed face first onto the floor. I heard a loud thump as his head hit
8  the floor.  The orientation of the inmate's body after he fell is marked with a stick
9  figure drawing on the attached diagram.  After the inmate had fallen to the floor,
10  the deputies showered his body and head with kicks from their boots.  The
11  inmate's body lay limp and merely absorbed their blows.  After the inmate hit the
12  ground, he yelled "stop" one or two more times and then he went silent.  At that
13  point, I thought he was unconscious.  Yet the deputies continued to yell "Stop
14  fighting!"

15      11.   A few seconds after the inmate fell, one deputy knelt down with one
16  knee on the inmate's back, the foot of his other leg on the ground next to the
17  inmate, and began punching the inmate on the back of his head and neck, while
18  the other two deputies stood and watched.

19      12.   After another minute or so, the deputy who was punching the inmate
20  paused for a second, and the other deputies begain kicking him again.  A couple of
21  seconds later, the deputy who was kneeling on the inmate turned his head and
22  noticed me standing at the gate with my hands clutching the bars.  I was frozen
23  with shock from what I had been watching.

24      13.   When we made eye contact, the deputy also froze and had a nervous
25  and surprised look on his face. Then he began making signs to the others with his
26  hands, motioning them to stop the beating.

27      14.   Another deputy who was inside the control booth kept shouting
28  "Code Four! Code Four!" which another deputy later told me is their signal that a

000068

1    deputy is involved in a fight.

2        15.    A few seconds passed before the other two deputies caught on and

3    stopped kicking the inmate.  They froze also.

4        16.    Then almost immediately, two more deputies entered the hallway

5    through the door marked Y on the attached diagram, and one of them started

6    kicking the inmate who was still lying limp on the floor.  The other deputy who

7    had just come in lifted his boot up and stomped the inmate two or three times hard

8    on his back, even though the inmate was not moving or saying anything.  While

9    these two deputies were kicking and stomping the inmate, the three deputies who

10   had started the assault were signaling with their hands, presumably to make the

11   two deputies notice me and stop attacking the inmate.  Then, the two deputies who

12   had just come in froze.

13       17.    Presumably as a result of the Code Four call, Senior Gesky came

14   through the already open  main entrance door marked as Y on Exhibit 1 along with

15   a huge group of deputies who stopped at the entrance.  Gesky opened the door

16   marked Z, then came directly to the door where I was standing and opened it to let

17   me out.

18       18.    I walked slowly out towards the door marked Y, pushing my cart,

19   which had Bibles, books, paper and pencils on it.  As I was walking, I looked over

20   at the inmate – still lying on the ground and not moving – and saw a large pool of

21   blood.  The pool of blood looked to be a about two feet in diameter in the area

22   around his head and shoulders.

23       19.    As I was leaving, Gesky looked very angry and yelled out "Check if

24   he has HIV."

25       20.    From when I started watching until the end, the beating seemed like it

26   lasted about three minutes. I stood there and watched the whole thing, holding on

27   tightly to the bars of the door to the row in utter disbelief of what I was seeing. I

28   didn't know what else to do.  I was completely paralyzed by shock and fear.  I

4

000069

1  couldn't believe that the deputies, who are supposed to be there to protect the

2  inmates and prevent violence, were acting in such a blatantly criminal manner.

3       21.   As I was leaving the module the group of deputies parted to let me

4  pass.  None of them said anything to me, but a number of them looked at me in a

5  in way that made me feel afraid.   The last person I remember passing in the

6  hallway was Sergeant Barbosa, who was walking towards the module from his

7  office.   I noticed he looked nervous. I told him "Some of your guys are in big

8  trouble," and I walked away.

9       22.   When I saw Mr. Carillo a couple of weeks later when I next walked

10  the 3700 Abel row, he told me that deputies had carried the inmate out on a

11  stretcher.  But, I did not see the body carried away.  Mr. Carillo also told me the

12  inmate looked as if he might have been dead.

13  THE SHAM INVESTIGATION

14       23.   After leaving the module, I walked back to the chaplain's office.  I

15  was shaking because I was overwhelmed with fear and apprehension.  I was very

16  scared that some of the deputies who knew I had seen them would do something

17  bad to me.

18       24.   When I got to the office I told one of my colleagues what I had seen

19  and that I needed to leave the jails as fast as possible.  I went home and tried to

20  calm down, but I was still terribly shaken up.

21       25.   Eventually, I called my supervisor, Father George, and left him a

22  message saying it was an emergency and that I needed to talk with him as soon as

23  possible.  He called me back that night, and I explained to him what I had seen.

24  He told me to write up a report of what I had seen.

25       26.   The day after the beating, I returned to MCJ and spoke with Sergeant

26  Barbosa.  I  told him that I was going to write up a report and give it to both him

27  and the Archdiocese.  Barbosa told me that a deputy had said to him that the

28  beating occurred because the inmate had spit on one of the deputies.  But Barbosa

000070

1 said he did not believe it, and I told him I did not believe it either.  I said I never

2 heard the deputies say anything like "don't spit on me" or "why did you do that to

3 me?"   Barbosa also asked me how many deputies had participated, and I told him

4 that it was originally three but two more had joined in.  I remember telling him

5 that if this incident had occurred on the streets, the perpetrators would have been

6 charged with assault with intent to kill.

7      27.    For days after I remained badly shaken up.  I was having a terrible

8 time sleeping.

9      28.    When I went to the jails over the next few days deputies looked at me

10 in a  manner that made me feel threatened.   Some said things like "Rat" and

11 "Motherfucker" after I had passed by, but never directly to my face.

12      29.    I worked on the report for a number of days. While I was still

13 working on it,  I showed it to a colleague, who urged me to go speak with a

14 psychologist.

15      30.    When I finally finished the report, I brought it to Sergeant Barbosa in

16 his office.  I told him that I hoped the deputies' reports of the incident were

17 similar.  I said that because I was trying to convey that if their reports were

18 different from mine, then they would not be telling the truth.  A copy of the report

19 I gave to Sergeant Barbosa is attached as Exhibit 2.

20      31.    Sergeant Barbosa told me that they would need to do a video

21 interview of me. When he told me I was going to be interviewed, I become even

22 more afraid.  Once I had seen what five deputies would do to a non-resisting and

23 apparently handcuffed and helpless inmate, I was afraid about what they or others

24 in the sheriff's department might do to me.

25      32.    A couple of days after I turned in my report, I received a telephone

26 call from someone in LASD telling me to come to a Lieutenant's office the next

27 day for the interview.  After getting the call, I contacted the Archdiocese to

28 arrange for a lawyer to come to the interview with me.

33.     Some time before the interview, a lawyer for the Archdiocese called me to tell me that he had contacted the LASD and that he had been told that I would not be permitted to bring a lawyer.

34.     When I went to the interview, I was interviewed by an African-American lieutenant with a French sounding last name. Sergeant Barbosa was there also, and he filmed the interview.

35.     The lieutenant asked me about the beating, and I told him what I had seen.  The lieutenant also asked some other random personal questions such as what country I was from that had nothing to do with the beating. When I asked him why they were asking me such questions, they said it didn't matter.

36.     The interview lasted about 20 minutes. At the end of the interview, the lieutenant assured me that he would contact me to keep me up to date on the investigation.  He also apologized for what I had seen and promised me there would be a thorough investigation.

37.     A few days later, I told Father George that I was worried about the inmate.  Shortly thereafter, Father George told me he had spoken with LASD Lieutenant Daboren, who informed him the inmate had been released a few days after the beating.

38.     It wasn't until more than two years later that I heard anything about the beating from an official of the LASD.  During those two years, no one  from LASD did any kind of follow up interview.  Nor did anyone from Office of Independent Review (OIR) ever interview me.

39.     In the meantime, I kept insisting to my boss, Father George, that something had to be done. I also continued working at MCJ and saw the same deputies who beat up the inmate on a regular basis.  They are still working in MCJ.  From what I can tell, they were not suspended much less terminated.

40.     In June 2011, Father George managed to schedule a meeting with the OIR to discuss the beating.  I met with Michael Gennaco and Walter Katz of OIR

1   at their offices in Commerce on or about June 24, 2011.  Father George and

2   another colleague from the Archdiocese were also there with me.  During the

3   meeting, Father George told Mr. Gennaco that I wanted to know what happened

4   with  the investigation of the beating.  Mr. Gennaco and Mr. Katz told us that the

5   case had been resolved internally and that Sheriff Baca had not been informed

6   about the beating.

7        41.     During interview I told Mr. Gennaco and Mr. Katz about another

8   inmate I knew about, Juan Pablo Reyes, who had told me that he had been beaten

9   by the deputies, put in a cell naked, and then raped by inmates in the cell.  Mr.

10  Gennaco appeared to know nothing about incident based on the expression on his

11  face when I mentioned the incident, and he asked me all sorts of questions about

12  it.  He promised that he and OIR would continue doing investigations, and he said

13  he was interested in meeting with us regularly so that we could  keep him

14  informed about what we knew.

15       42.     Shortly thereafter, a colleague told me that Father George had been

16  contacted by the office of Sheriff Lee Baca.  My colleague told me Sheriff Baca

17  wanted to schedule a meeting with Father George and me.

18       43.     On or about July 26, 2011,  I met with Sheriff Baca at his office in

19  Monterrey Park.  Also at the meeting were Captain Ornelas, Michael Gennaco and

20  Walter Katz of OIR, Cecil W. Rhambo, the Assistant Sheriff, along with Father

21  George and Patty, another colleague from the Archdiocese who works in the jails.

22       44.     The first thing Sheriff Baca mentioned was the beating I had

23  witnessed.  He asked for the file of the investigation, and Mr. Gennaco handed a

24  folder to him.  Sheriff Baca asked me what had happened and asked me for the

25  report I had written about the incident.   I told him I did not have it, but said I

26  assumed it was in the file.   Sheriff Baca looked in the folder, which appeared to

27  contain about 10 sheets of paper, and said "your  report is not in here."

28       45.     Then I explained to him what I had seen of the beating.  When I

8

1    finished Sheriff Baca began to read from a paper that was in the folder, which

2    sounded liked the findings of the investigation.  He said that it had been

3    determined that the prisoner was schizophrenic and that deputies had to strike him

4    a couple of times with their fists to get him into his cell. He also said, appearing to

5    read from the findings, that the inmate had reported that he had been run over by a

6    truck before coming to MCJ and that his bruises were the result of the accident,

7    not from being beaten.

8         46.    Another part of the paper that Sheriff Baca read from said that the

9    chaplain who had witnessed the incident was "exaggerating." I also remember his

10   reading that after the incident the inmate had been escorted to the clinic by Deputy

11   Cortez.

12        47.    During the meeting Sheriff Baca stated,  "This happened two years

13   ago and I'm only finding out about it now?"

14        48.    Still, all Sheriff Baca said about my account of the beating was that

15   "Punches are allowed but kicks are not allowed in my department." He told

16   Assistant Sheriff Rhambo to "check up on that." Then the meeting went on to

17   discuss other matters.

18        49.    I have lost faith and trust in the LASD. They clearly did not take my

19   testimony seriously, and they attempted to cover up what really happened. I cannot

20   understand why my report of the incident was not in the investigation folder.

21        50.    The conclusions that Sheriff Baca read also make no sense.  First, I

22   never heard the deputies attempt to persuade or even verbally threaten the inmate

23   to get him to go into his cell.  Second, the inmate's cell was in the  upper tier, so

24   the report's claim that they needed to punch him to get him to go into his cell

25   makes no sense because they were not even close to the stairs to the upper tier,

26   much less on the upper tier when they were beating him.  Third, I cannot

27   understand how punching an inmate – much less kicking and stomping on him --

28   could ever be necessary to get him to go into his cell.  Also, if the inmate was

schizophrenic, then why was he in MCJ instead of Twin Towers, where inmates with mental illness are supposed to be housed?  Finally, given how badly the inmate had been beaten, and the fact that he was lying motionless on the floor in a pool of blood when I left, I found the idea that he had been "escorted to the clinic" by Deputy Cortez very hard to believe.

51.    Witnessing that barbaric beating has had a very profound effect on me.  To this day, recalling the beating brings tears to my eyes, and I cannot finish talking about it without taking a few moments to compose myself.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed September 3, 2011 in Los Angeles, California.

Paulino Juarez

000075



000076

Catholic Chaplains' Office
Men's Central Jail, Los Angeles, CA
February 18, 2009

My name is Paulino Juarez-Ramirez. I am a Catholic chaplain and a member of
the Office of Restorative Justice of the Archdiocese of Los Angeles. I have been a
chaplain at Men's Central Jail since July of 1998.

On February 11, 2009, I asked permission of Sergeant Barbosa to visit all of
the rows in the 3700 module. He called the module and they said that I could visit.
I arrived at the module and I entered Able row and began talking with an inmate
housed in A-3. Five minutes later, I could hear someone yelling. I walked to the
gate and from there I observed that someone was being beaten. I observed that at
no time did the inmate fight back or resist. He was thrown to the ground and was
kicked by two deputies. A third one was kneeling on the inmate's back and, with
his fist, was hitting his neck, the back of his head and his jaws beneath his ears.
While they were beating him the deputies kept shouting "stop fighting, stop
fighting". The inmate never did try to fight back, but kept shouting "Please stop;
please stop. I am not fighting." As I continued to observe, I saw that these blows
continued for almost two minutes. Finally, one of the deputies turned and saw me
inside of Able row. He froze. But the others continued kicking the inmate. And
they kept saying, "Stop fighting, stop fighting" while they continued beating him,
until the deputy who had seen me stopped them. They immediately opened the
outside door and a group of deputies came running in (that group had not seen me).
At this point I did not hear anything more from the inmate and assumed he was
unconscious. Two of the deputies in the front of the group then came in and started
kicking the inmate in his ribs, while he was still lying on the floor. One of the
deputies gave him two last blows, stomping on his spinal column.

Finally, the deputy who had seen me stopped them. Then all of them saw me
within the bars and suddenly became totally silent. Senior Geske was part of the
group that entered later, and walked toward me, opened Able gate, and asked me to
leave. I did so slowly; I looked again at the inmate, who was not moving at all. I
could see blood on the floor. I left the module and in the hallway of 3000 I met
approximately 20 deputies coming toward 3700, followed by Sergeant Barbosa.

At that time I felt helpless, sad, upset, angry, and anguished, wondering what
the final and lasting effects would be on that inmate, who had been the victim of
torture so cruel and inhumane. I was thinking of the deputies and I felt that I had
witnessed a crime and I was afraid. When I arrived at the Chaplains' office, I met
one of my fellow chaplains and told this person about what I had seen. That day I

did not want to talk to the Sergeant about the incident. During the night I could hardly sleep. The next day I went to Sergeant Barbosa's office and explained everything that I had witnessed and that, in my opinion, there had been no justification. It was a flagrant injustice against this helpless person and I asked Sergeant Barbosa to put a stop to these kinds of attacks. Sergeant Barbosa asked me how many deputies had participated. I told him that there were three in the beginning and two deputies later joined in - a total of five. He told me that in their report the deputies had admitted participating in the beating, but he did not share any more details of that report. Also, the Sergeant told me that the incident started because the inmate had spit on a deputy, but the Sergeant added that he did not believe it, and neither do I.

Since the inmate was under control at the time, the question for me was, "What was the purpose of the deputies' continuing beating this man without compassion or mercy?" I think that, if a situation of this magnitude had occurred in streets, the perpetrators would without any doubt be charged with assault with intent to kill.

Since that day I have felt afraid while walking the 3000 hallway, because I see the look in the eyes of the deputies, as they know I was a witness to the whole affair. I wonder what they are thinking of me, and especially what they might do about it and what may happen in the future. Sincerely, since I did not do anything wrong, I am afraid of retaliation. I am now seeing a psychotherapist to assist me to process this disagreeable experience. I feel the support of my chaplain colleagues, my spiritual director and my pastor, who all know about the incident. Another point is that in the past I had been informed by various inmates that they had seen other inmates being beaten by deputies without any reason. And now from my own experience I know this to be true.

This atmosphere of violence without justification causes in the minds and hearts of the inmates in this facility, especially those who suffer such unspeakable aggression, to harbor rancor, anger, hatred and resentment. This could play itself out in the streets with acts of aggression toward citizens and especially toward law enforcement officers.

Therefore, my petition as Chaplain in this institution is that this inexplicable and excessive use of force cease and, when restraint is necessary, the deputies adhere to their basic core values of respect, integrity, common sense, human decency and fairness.

# DECLARATION OF CIVILIAN WITNESS ESTHER LIM

000079

**Declaration of Esther Lim**

I, Esther Lim, hereby declare:

1.       I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.       I am the Jails Project Coordinator for the ACLU of Southern California ("ACLU/SC").

3.       I am submitting this declaration to describe a savage beating of a prisoner by two Los Angeles Sheriff's ("LASD") deputies, which I witnessed in the Twin Towers Correctional Facility ("TTCF") on January 24, 2011.

4.       In brief, I saw two deputies, Ochoa and Hirsch, beat and taser an African-American prisoner, James Parker, multiple times while he was lying on the ground, not moving or resisting in any way for what seemed to me to be about two minutes.  During the beating, the deputies repeatedly shouted, "Stop resisting!" and "Stop fighting!" while the prisoner lay limp on the floor.

5.       The deputies and the prisoner were no more than about ten feet away from me and I was able to see what happened.

6.       The following day, Tuesday, January 25, 2011, a false account of the incident appeared in the official LASD daily Inmate Reception Center ("IRC") Division Log.

<u>Monday, January 24, 2011-1700 hours</u>

7.       On Monday, January 24, 2011, I was at TTCF's Module 142's Attorney Room located on the right hand side of the fourth floor at approximately 1700 hours.

8.       I was there to speak to a prisoner named Christopher Brown, booking number 1365261.

9.       I was seated at the third phone booth, which is phone booth number five, in the Attorney Room.  There is a label with the booth's number posted above the booth.

10.      There are a total of seven, separate phone booths; the phone booths being numbered sequentially higher until the last telephone booth, number seven.  Telephone booth number seven is the closest to the wall located to the right, when facing the prisoner and the

1   furthest away from elevators.  The diagram, which is attached hereto as Exhibit 1, shows the

2   placement of telephone booths number four through seven.  Phone booths one through three are

3   not pictured in the diagram, but they would be to the left of booths four through seven on the

4   diagram.

5         11.     Each phone booth has a large window that is approximately three and a half feet

6   in height and two feet in length.  There is a small, metal table for the attorney and a stool.  These

7   furnishings are the same for the prisoner who sits on the opposite side of the attorney with the

8   window partition in between.  There is also a phone that is located on the right hand side of the

9   window.  Exhibit 1 shows the area, located on the left hand side of the diagram, where the

10   prisoners (Attorney Room - Inmates) and where the attorneys sit (Attorney Room - Visitors).

11         12.     I was sitting in telephone booth number five as shown in Exhibit 1.  E1 on the

12   attached diagram shows my location.  As I sat facing Mr. Brown, who was sitting in the seat that

13   is marked as B1 on the attached diagram, the wall was to my right.

14         13.     The wall, which is approximately six feet in length, has two, large, side-by-side

15   windows that looks out to the Staging Area.  The wall is labeled in Exhibit 1.  The Staging Area

16   contains the Outdoor Recreation Area and other shared areas.  Exhibit 1 displays what the

17   Staging Area looks like, in addition to other key areas.  One would need to walk through the

18   Staging Area to get to the different pods or housing areas of the module as indicated in Exhibit 1.

19   Both windows are approximately three and a half feet in height and three feet in length.  All

20   measurements are approximations, but I used a ruler on my clipboard to measure the wall and

21   windows.

22         14.     At approximately 1730 hours, while I was speaking to Mr. Brown, I heard noises

23   like people scuffling around, sounds of fists hitting a body, thuds against the wall and other

24   noises that sounded like a fight.  My location when I was speaking to Mr. Brown is marked in

25   Exhibit 1 as E1.

26         15.     As I stood up to see what was causing the noise, Mr. Brown stood up as well.  I

27   walked over to the window on the wall, as indicated in Exhibit 1 as E2 and looked to my left.  I

28   saw Deputies Ochoa and Hirsch punching an African-American prisoner, whom I later learned

000081

1    was James Parker, whose booking number is 2540169.  Mr. Parker was identified to me by Mr.

2    Brown when I visited him during my ACLU walk-through of TTCF, Module 142, Pod F on

3    Tuesday, January 25, 2011.

4         16.     As I stood at the spot marked as E2 on the attached diagram, I could see Mr.

5    Parker, who was in the spot marked as P-2, lying face down on the ground positioned in the way

6    the black figure on the attached diagram is positioned, i.e., with his feet pointed towards the

7    water fountain.  Deputies Ochoa and Hirsch were next to Mr. Parker in the spots on the diagram

8    that are marked with two X's.

9         17.     Mr. Parker was lying on his stomach and he appeared to be unconscious as he was

10   not moving.

11        18.     I saw both Deputies Hirsch and Ochoa simultaneously punching Mr. Parker about

12   three to four times and kneeing Mr. Parker about two to three times.  I heard both deputies yell,

13   "Stop fighting!" and "Stop resisting!".

14        19.     Even though the deputies were yelling, "Stop fighting!" and "Stop resisting!", Mr.

15   Parker was not trying to kick, hit or otherwise fight with the deputies.  He was lying on the

16   ground motionless, doing nothing.  I thought he looked unconscious as he was not moving or

17   making any sounds.

18        20.     I also saw Deputy Ochoa placing the taser gun on Mr. Parker's leg approximately

19   three to four times and approximately two to three times onto his back area.  I could hear the

20   shocks that the taser gun made when it was being utilized on Mr. Parker.  Deputy Ochoa

21   continued yelling, "Stop fighting!" and "Stop resisting!" as he was tasing Mr. Parker.

22        21.     Mr. Parker looked like he was a mannequin that was being used as a punching bag

23   as he was not showing any sort of movement.  I thought he was knocked out or perhaps even

24   dead.

25        22.     Approximately one minute after I saw Deputies Ochoa and Hirsch beating Mr.

26   Parker, I observed Deputy Ochoa bring his left index finger to his lips, showing this motion to

27   Deputy Hirsch, who was yelling, "Stop resisting!" and "Stop fighting!" about three to four times.

28        23.     After Deputy Ochoa brought his finger to his lips, Deputy Hirsch yelled, "Stop

000082

1  resisting!" and "Stop fighting!" once more to Mr. Parker, who was still not moving or making

2  noise.

3        24.     During the course of the time that I was watching the deputies beat Mr. Parker, I

4  heard both deputies yelling, "Stop resisting!" and "Stop fighting!" to Mr. Parker more than five

5  times each.  While the deputies were yelling this out, it sounded like the deputies were reading

6  from a script.

7        25.     Approximately thirty seconds after I saw Deputy Ochoa bring his left index finger

8  to his lips, I hit my right palm against the window approximately three times so that I could get

9  the deputies' attention.  They did not look over in my direction.

10        26.     The approximately two minutes that I was watching the deputies beat and tase Mr.

11  Parker, it appeared that he was unconscious as he was not moving.  He was not fighting with the

12  deputies.  He was just lying there, making no movements or sound.

13        27.     At the end of the two minutes of my observation of this incident, I heard over the

14  public announcement speaker, "Stay in your seat."

15        28.     At that point, I walked over to my seat where Mr. Brown was sitting across from

16  me and I asked him who the deputies were.  He told me that they were Deputies Hirsch and

17  Ochoa.  Mr. Brown said he knew the deputies' names because both deputies work on his module.

18  I was in the spot marked as E1 while I was talking with Mr. Brown and he was in the spot

19  marked as B1.

20        29.     After speaking briefly with Mr. Brown, I walked back over to the window and

21  saw Deputies Hirsch and Ochoa in a kneeling position over Mr. Parker and approximately five

22  seconds later, Deputy Ochoa looked at me and using his index finger, signaled that I needed to

23  move away from the window.

24        30.     I stood at the window for approximately three or four seconds more and then I

25  walked back over to telephone booth number five and I could see Mr. Brown lying on the ground

26  in the Attorney Room on the prisoner's side, in the prone position with his head away from the

27  window.

28        31.     At this time, I got up from my seat, gathered my belongings and walked over to

4

1    the elevator and took the elevator down to the first floor.

2        32.    When the elevator doors opened to the first floor, I saw approximately three to

3    four deputies who were about to take the elevator up.

4        33.    I then left the Twin Towers 1 Visiting Area and exited TTCF.

5                        Tuesday, January 25, 2011-0930 hours

6        34.    On Tuesday, January 25, 2011 at approximately 0930 hours, I was checking my

7    ACLU/SC email account.  Every morning, I receive the IRC Division Count, the IRC Division

8    Log, the Custody Division 0600 Count, the IRC Processing Time and the IRC Clinic Processing

9    Time reports.

10       35.    Daily, I review each of the logs, reports and counts, print and file them in their

11   respective areas and place them in the appropriate binders.

12       36.    I reviewed the IRC Division Log for Monday, January 24, 2011, a true and correct

13   copy of which is attached hereto as Exhibit 2.  I reviewed the 1645 hours log entry entitled,

14   "Significant Use of Force-TTCF."

15       37.    There were approximately five paragraphs detailing the account of an altercation

16   between two unnamed deputies and Inmate James Parker, booking number 2540169.

17       38.    I noticed that the log stated the incident occurred at 1645 hours, which is

18   approximately forty-five minutes earlier than when I observed the beating at approximately 1730

19   hours.

20       39.    In paragraph two, of the description of the incident on the Division Log, it states

21   that "Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his

22   attack."  I observed both Deputies Ochoa and Hirsch kneeling over Mr. Parker, attacking,

23   punching and kneeing him while he was on the ground.  I also saw Mr. Parker being non-

24   combative as he was not moving, not resisting and was not fighting.  He looked limp as if he

25   might be  unconscious as he was not making any movements or sounds while Deputies Ochoa

26   and Hirsch were beating him.  Mr. Parker was not attacking any of the deputies as paragraph two

27   alleges.

28       40.    In paragraph three, it states that, "Inmate Parker continued his attack as the second

                                      5

1  deputy utilized his taser, striking him in the mid-back area.  Inmate Parker continued punching

2  the first deputy.  The second deputy then dry-stunned Inmate Parker three times in the back area

3  and one time in the right hamstring.  Inmate Parker then stopped fighting and was handcuffed

4  without further incident."

5         41.     I did observe Deputy Ochoa tasing Mr. Parker's back and rib area approximately

6  two to three times and Deputy Ochoa tasing Mr. Parker's leg approximately three to four times.

7  However, the statement in paragraph three that Mr. Parker did not stop fighting until the deputies

8  had tased Mr. Parker four to five times is false.   Parker was not fighting or resisting at any time

9  when I observed him, including while Deputy Ochoa tased him multiple times in the back and

10  leg.

11         42.     During the entire time I was observing Mr. Parker, including the time during

12  which he was repeatedly punched, kneed and tased, he was not striking or attacking Deputies

13  Ochoa and Hirsch.  In fact, Mr. Parker was motionless during the whole time that he was lying

14  on the ground and Deputies Ochoa and Hirsch were punching, kneeing and tasing him.  As I said

15  above, I thought he was unconscious or perhaps dead, while he was being beaten and tased,

16  because he was not moving at all.

17         43.     During the time I observed Mr. Parker on the ground and Deputies Ochoa and

18  Hirsch kneeing, punching and tasing him, I heard the deputies repeat, "Stop resisting!" and "Stop

19  fighting!" more than five times each.  However, Mr. Parker was not resisting, nor was he fighting

20  with the deputies.

21  Tuesday, January 25, 2011-1555 hours

22         44.     On Tuesday, January 25, 2011 at approximately 1535 hours, I telephoned TTCF's

23  Watch Commander/Lieutenant Bodenstedt and informed him that ACLU/SC Staff Attorney

24  Jessica Price and I were going to do an ACLU walk through at approximately 1555 hours that

25  day.

26         45.     Price and I arrived at the TTCF Control Room at approximately 1555 hours and

27  Sergeant Geary met us at approximately 1600 hours.

28         46.     I asked to enter Module 142 and Sergeant Geary escorted us there.

6

47.    I asked to enter Pod F and she stated that she needed to find a deputy.  I did not see any module deputies around.

48.    Sergeant Geary yelled out, "Deputy Ochoa!" and asked that he assist her.  I immediately recognized Deputy Ochoa as the deputy whom I saw beating and tasing Mr. Parker on Monday, January 24, 2011.  I also saw his name on the name tag on his uniform.

49.    Ms. Price and I entered Module 142, Pod F and I spoke to several prisoners there about various complaints and Title 15 infractions.  I also saw Ms. Price speaking to prisoners.

50.    While speaking to the prisoners, I saw Deputy Ochoa staring at me in an aggressive manner through the window that separates the pod from the deputies' area.

51.    While in Pod F, I spoke to Mr. Brown as he is currently housed there and asked him if anything happened after I had left the Attorney Room on Monday, January 24, 2011 and he told me that he was interviewed by two sergeants.  I asked him if I could call him out to the Attorney Room the next day, Wednesday, January 26, 2011 to talk about it.  Mr. Brown told me that I could.

52.    I also asked him if he knew the name of the prisoner whom Deputy Ochoa and Hirsch had beaten on Monday, January 24, 2011.   He said that it was Parker.  He did not know where Mr. Parker  was or where he was housed.  While I was speaking to Mr. Brown, I saw Deputy Ochoa again staring at me aggressively.

53.    After speaking to Mr. Brown, Ms. Price and I left Pod F and were escorted to the TTCF Control Room by Sergeant Geary at approximately 1645 hours.  Ms. Price and I then exited TTCF.

<u>Wednesday, January 26, 2011-0920 hours</u>

54.    On Wednesday, January 26, 2011 at approximately 0920 hours, Ms. Price and I met with Mr. Brown in the Attorney Room on Module 142.

55.    I sat in telephone booth number 5 and Ms. Price sat on the stool in telephone booth number four.  I asked Mr. Brown if we could take his declaration of what he saw on Monday, January 24, 2011  when he was in the Attorney Room with me.  He said yes.  I wrote down what he told me he had seen and heard.

7

56.     After taking the declaration for the January 24th incident, I asked if we could take his declaration about the interview that LASD personnel had done with him on the same day. He said yes. I wrote down what he told me he had been asked, seen and heard.

57.     Ms. Price and I left the Attorney Room and went down to the Tower 1 Attorney Visiting Area's deputies' desk. I told Deputy Velasquez that Ms. Price and I would like to see Mr. Parker. Deputy Velasquez told us that Mr. Parker was housed in T211, which is the Disciplinary Module and that we needed to go the TTCF Tower 2's Attorney Visiting Area and submit a request to see Mr. Parker there.

58.     At approximately 1010 hours, Ms. Price and I arrived at the Attorney Visiting Area's deputies' desk in TTCF Tower 2 to visit Mr. Parker. After an approximately fifteen minute delay, Deputy Shroyer told us that we needed to go to the TTCF Tower 1's Attorney Room as Mr. Parker would be escorted from Tower 2 to Tower 1. The fifteen minute delay was due to the deputies not having a current ACLU Clearance list.

59.     At approximately 1030 hours, Deputy Shroyer told Ms. Price and me that Mr. Parker was in the "hole" and because the deputy's partner that was assigned to T221 where Mr. Parker was located, was not available at that time, Mr. Parker would not be able to be escorted to TTCF Tower 1 until the partner returned. Deputy Shroyer told us to go back to TTCF Tower 1 and wait for authorization to see Mr. Parker.

60.     Ms. Price and I walked back over to the Tower 1's Attorney Room's deputies' desk and Deputy Velasquez told us at approximately 1035 hours that the module deputy's partner was not there so we needed to wait before Ms. Price and I could visit Mr. Parker.

61.     At approximately 1100 hours, Deputy Velasquez stated that Ms. Price and I could go up to Module 171 or the seventh floor's Attorney Room to see Mr. Parker.

62.     Ms. Price and I went inside the elevator and went up to the seventh floor to Module 171's Attorney Room and walked to the left after exiting the elevator.

63.     There was a delay in being able to communicate with Mr. Parker because the telephones were shut off, meaning Mr. Parker and I could not hear each other on the phone. Another prisoner was in the telephone next to Mr. Parker and I tried to communicate with him

000087

1    via the telephone and this telephone was also shut off.

2    64.    I told the deputy who escorted Mr. Parker to the Attorney Room that I couldn't

3    hear Mr. Parker because the phone was broken and he told me to press the intercom button.

4    65.    I pressed the intercom button that is in the Attorney Room, which is used to

5    communicate with the deputies inside the module's control room.  No one answered when I

6    pressed it.  I pressed the button an additional three more times and all three times, no one

7    answered.

8    66.    Ms. Price stated that she would go down to the Tower 1's Attorney Room's

9    deputies' desk to alert them about the phones.

10   67.    When Ms. Price returned to the Attorney Room, Mr. Parker and I tried the phones

11   again and we were then able to hear each other.

12   68.    I spoke to Mr. Parker and asked him if he was the prisoner who was involved in

13   the beating incident that had occurred on Monday, January 24, 2011 and he told me that he was.

14   I asked him for his name and he told me that his name was James Parker.  I verified this

15   information to the wristband that was fastened on his wrist, which contains the prisoner's name,

16   booking number and other information.

17   69.    I told him I was from the ACLU/SC's Jails Project and I asked if he wanted to

18   talk to me about what had happened.

19   70.    I asked him to show me the injuries he sustained from the incident and he showed

20   me his left eye, which was swollen half way shut.  He also showed me the stitches he received

21   over his left eyebrow.  Using a ruler that is on my clipboard, I measured the area that was closed

22   with stitches.  It was approximately two centimeters long.  Mr. Parker also said that his left cheek

23   was swollen and that he felt like he had a gash inside his right cheek.  Due to the reflection from

24   the overhead lights, I was not able to see anything inside his mouth, which was dark and I did not

25   have a flashlight.  He stated that he had a lot of pain on the back of his neck, face, shoulder and

26   said that his left rib area was hurting as well.  He stated that he felt like one of his ribs were

27   loose.

28   71.    I asked him if he was taking any medication for the pain and he said that he was

9

1    given Motrin.

2                        Friday, January 28, 2011

3        72.    On Friday, January 28, 2011, I visited Mr. Parker.

4        73.    Mr. Parker told me that on Tuesday, January 25, 2011, when he was brought to

5    Module 142 from the Los Angeles County Medical Center ("LCMC"), a male nurse told him that

6    he needed to get the stitches he received the night before, over his left eyebrow, removed.  He

7    didn't know the name of the male nurse, but said he was chunky, Mexican and was Mr. Parker's

8    height, which is five feet nine inches.  He also said the male nurse had shoulder length, bushy

9    hair.

10       74.    Mr. Parker said that he told the male nurse that the doctor at LCMC, who was an

11   Asian woman said that Mr. Parker was not going to have his stitches taken out until Tuesday,

12   February 1, 2011.

13       75.    He told the male nurse that he was not going to get the stitches removed and he

14   was going to follow the LCMC's doctor's orders.

15       76.    Mr. Parker stated that he was approached by another nurse at a later time, on the

16   same day, who also told him that he needed to remove his stitches.  Mr. Parker told this nurse

17   that he was not going to remove his stitches because the doctor at LCMC said the stitches were

18   going to be removed on Tuesday, February 1, 2011.

19       77.    Mr. Parker stated that he was again approached by the nursing staff on

20   Wednesday, January 26, 2011; Thursday, January 27, 2011; and today, Friday, January 28, 2011

21   to remove his stitches.

22       78.    Mr. Parker said that the female nurse today was more adamant about getting his

23   stitches removed.  He didn't know the nurse's name, but said she was Filipino, five feet two

24   inches or five feet four inches in height and had short hair.

25   \ \ \

26   \ \ \

27   \ \ \

28   \ \ \

000089

79.     He again denied this nurse and didn't allow her to remove his stitches.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 4th day of February, 2011 in Los Angeles, California.

Esther Lim

11

000090





000091

**COUNTY OF LOS ANGELES**
**SHERIFF'S DEPARTMENT**
**LOG SHEET REPORT**

02/04/2011

Day: Monday
Detail or Station: <u>CUSTODY DIVISION</u>          January 24, 2010


**0530**   **WATCH COMMANDER'S REVIEW - LT. CHAVEZ**


**1330**   **WATCH COMMANDER'S REVIEW - CMDR. RUIZ/ LT. MURPHY**


**1450**   **ACLU VISIT- TTCF**

Sgt. Johnson Reports, American Civil Liberties Union (ACLU) representatives Esther Lim, Theodore Livingston Young, Alexandra Leigh Howard and Hannah Zoe Weilbacher, visited Twin Towers Correctional Facility. They were escorted by Sergeant Brad Gray (#277068) and spoke with inmates housed in Modules 132 A and B Pod, 141 A Pod and 172 D Pod.

The ACLU representatives completed their interviews within approximately two-hours and forty-minutes. All comments made to Sergeant Gray regarding the visit were favorable.

Custody Division Operations Log entry completed by IRC Watch Deputy Paterno (#488650) at 1450 hours. (GAP)


**1645**   **SIGNIFICANT USE OF FORCE- TTCF**

Sgt. Johnson, Twin Towers Correctional Facility, reports at approximately 1645 hours this date, Two deputies escorted Inmate James Parker, booking #2540169, to the ABC Outdoor Recreation Area pending transfer to discipline Module 121 for possession of contraband in his cell.

Upon notifying Inmate Parker of his discipline status, Inmate Parker punched one of the deputies with his right hand, striking him on the left side of his face. Inmate Parker then charged at the deputy and continued to punch him in the torso area. The deputy gave commands for Inmate Parker to stop fighting and then punched him on the top of the head with his right hand. As Inmate Parker continued his attack, the deputy punched him an additional four-to-five times in the upper-torso area. Both Inmate Parker and the deputy went to the ground as Inmate Parker continued his attack.

The second deputy observed Inmate Parker punching the first deputy and gave verbal commands for him to stop fighting. As the second deputy went to assist, Inmate Parker punched him in the left rib area and continued his attack on the first deputy. The first deputy

000092

$0 \propto /0 \, 4/\partial \, \theta \, / /$

## COUNTY OF LOS ANGELES
## SHERIFF'S DEPARTMENT
## LOG SHEET REPORT

Day: Monday

Detail or Station: <u>CUSTODY DIVISION</u>                                        January 24, 2010

kneed Inmate Parker one time in the face in self-defense.  Inmate Parker continued his attack as the second deputy utilized his taser, striking him in the mid-back area.  Inmate Parker continued punching the first deputy.  The second deputy then dry-stunned Inmate Parker three times in the back area and one time in the right hamstring.  Inmate Parker then stopped fighting and was handcuffed without further incident.

The first deputy sustained a swollen right-hand and redness and swelling to the left side of his face. The first deputy was treated for his injuries at U.S. Healthworks.  The second deputy did not sustained any injuries.

Inmate Parker sustained a 2 cm. laceration on his left eyebrow and swelling to the left side of his head.  The taser darts did not penetrate his skin.  He was escorted to the Tower One Clinic for examination and treatment and then transferred to L.C.M.C. for additonal treatment.  (AB)


2130    **WATCH COMMANDER'S REVIEW - LT. MURPHY/ LT. SAUNDERS**


2358    **WATCH COMMANDER'S REVIEW - LT. CHAVEZ**


2359    **LOG CLEARANCE**


No further entries.   (AB)