# DECLARATION OF CURRENT PRISONER MR. AA JASON GRAYSON

000359

# DECLARATION OF JASON GRAYSON

I, Jason Grayson, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am writing this declaration to describe the beating of inmate William Tillman that I witnessed. I saw Deputy Moorman smash Mr. Tillman's head against a wall and then watched Custody Assistant ("C.A.") Perez and Deputy Ibarra pepper-spray and tase him. Mr. Tillman did not attack the deputies before they assaulted him.

3. I am a propria persona ("pro per") inmate in Men's Central Jail ("MCJ"). I am housed in Module 2500, Row B, Cell 22. My booking number is 2015568. I have been incarcerated in MCJ since August 11, 2009.

4. I've been pro per for the past eleven months. On my way to the library, attorney room or medical clinic, Mr. Tillman and I have regularly exchanged hellos' and head nods to greet one another. However, I did not know Mr. Tillman's name until after the incident of March 25, 2011.

5. On or about March 25, 2011, a working deputy opened up cells fifteen through twenty-six to allow us to go work in the law library. Law library for cells fifteen through twenty-six, on this day, was from 10:30 am until noon.

6. The other pro per inmates and I went directly into the law library without an escort.

7. About an hour into our law library time, I used the phone along the wall, located within the library. Money was deposited into my pro per phone account so I wanted to make sure the company, who is in charge of the pro per phone lines, received it.

8. If you're looking at the phone, while using it, and turn your head to the right, there is a window that provides a clear view of the main entrance of

1

1  Module 2500/2700. A diagram of the view I had while I was using the phone is
2  attached as Exhibit 1. The window is approximately three by three feet. The
3  window is part of a booth that contains a computer, typewriter, a sheet that has the
4  status of our phone accounts, and a drop box for pro per forms. A diagram of the
5  law library that shows the location of the phone, the window and computers inside
6  the law library is attached as Exhibit 2.

7      9.    The incident involving Mr. Tillman occurred near the main entrance
8  of Module 2500/2700.

9      10.    As I was receiving confirmation about my pro per phone account,
10 inmate Brian Alexik, who was standing near the glass window inside the law
11 library, called out my name and signaled his hand towards the window. I looked
12 over and saw Mr. Tillman facing the wall, surrounded by three deputies. I put the
13 phone down and walked over to the window.

14     11.    As I approached the window, I could see Deputy Ibarra and
15 Moorman, and Custody Assistant ("C.A.") Perez, forming a semi-circle around
16 Mr. Tillman. There were two or three inmates already at the window by the time I
17 got there. I don't remember their names, but I was able to see over them since I
18 am 6'3" and they were all no taller than 5'10".

19     12.    Mr. Tillman was facing the wall, hands to his sides when all of a
20 sudden Deputy Moorman grabbed Mr. Tillman's head and viciously slammed it
21 against the concrete wall. Mr. Tillman's knee buckled and he fell to the floor. I did
22 not see Mr. Tillman do anything aggressive towards the deputies like cocking his
23 fist, swing at them or the like before Deputy Moorman attacked him.

24     13.    Once Mr. Tillman hit the floor, all three deputies converged on him.

25     14.    I briefly lost sight of Mr. Tillman because of his size compared to the
26 deputies involved. I'm 6'3" and I would say Mr. Tillman is about 5'4," skinny,
27 and weighs about 130 lbs. Deputy Ibarra appears Hispanic, has a stocky build,
28 looks like weighs about 185 lbs. and is approximately 5'10". C.A. Perez looks

2

000361

1  Hispanic, has an athletic body, weighs about 180 lbs., and stands about 5'8".
2  Deputy Moorman is like 5'10," with a buff body type and weighs about 180 lbs.

3       16.   I then saw Deputy Ibarra pepper spray Mr. Tillman's face while
4  Deputy Moorman held his face to the floor with his hands and had his knee on his
5  back. C.A. Perez then pulled out his taser and shot the taser's hooks onto Mr.
6  Tillman's back. Mr. Tillman's body shook each time he was tased, and I believe
7  C.A. Perez tased him three to five times.

8       18.   When I saw his body motionless, moving only with each taser jolt
9  shaking him violently, I felt sick to my stomach. In my mind, I kept saying, "This
10 is wrong." I was disgusted, I stepped away from the window and went back to the
11 phone booth.

12       19.   Just before we were released to go back into our cells, I was able to
13 look through the window again, as well as glance on my way out of the library
14 where the assault took place. I saw a pool of blood in the immediate vicinity of
15 where Mr. Tillman's body had been lying. There were also blood spots splattered
16 on the wall, in the same spot where Deputy Moorman slammed Mr. Tillman's
17 head.

18       I declare under penalty of perjury of the laws of the State of California and
19 the United States that the foregoing is true and correct to the best of my
20 knowledge and belief. Executed this 19th day of August, 2011, in Los Angeles,
21 California.

                                                    Jason Grayson





# DECLARATION OF CURRENT PRISONER MR. BB JASON GREEN

000365

**Declaration of Jason Green**

I, Jason Green, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am thirty-nine years old and I have been at Men's Central Jail ("MCJ") since August 2009. I am currently housed in Module 1700, Row B, Cell 26. My booking number is 2051708

March 18, 2011

3. On March 18, 2011, Deputy Hernandez (#691) transferred me from my cell to the showers at approximately 6am to 6:30 am.

4. While I was being escorted to the showers, Deputy Hernandez was told over the radio, which I heard, that I was being given a pass to go to medical.

5. Deputy Hernandez tried to negotiate with me, telling me to refuse my medical pass. I don't think Deputy Hernandez wanted to grant me the pass because he would have needed to take me back to my cell, uncuff me to allow me to get dressed, re-cuff me and then escort me to the Medical area at MCJ.

6. As Deputy Hernandez placed me into the showers and uncuffed me, I told Deputy Hernandez that I needed to go to my medical appointment. I told him that I wasn't going to refuse my medical pass.

7. Deputy Hernandez said to me, "Well, that's how it works around here. You either get your shower or your medical pass, which one do you want?" I felt like Deputy Hernandez was trying to force me to choose between the two.

8. I said to Deputy Hernandez, "Sir, I need my shower, but I'm not going to refuse my medical treatment."

9. Deputy Hernandez appeared to be upset and he said to me, "You're already in the shower anyway, so that's what you're going to get."

10. I was then escorted back to my cell after I showered and I asked a deputy for a complaint form. I don't know the name of the deputy, but he was heavy set, with dark hair and

000366


appeared to be either White or Hispanic and approximately six feet and an inch tall. I am approximately five feet and eleven inches tall.

11. This deputy said loudly, "Why? So you can snitch to the ACLU?"

12. I recently had a visit from the ACLU in MCJ's Attorney Room on 03/11/2011.

13. The deputy didn't give me a complaint form.

14. I had repeatedly asked for a complaint form from multiple deputies who were working on my module so that I could write a complaint about Deputy Hernandez not allowing me to go to my medical appointment and they did not give me a form. I was not escorted to MCJ Medical for my medical appointment either.

15. Approximately two to three hours later, I woke up from my nap due to what sounded like a verbal confrontation that was taking place in front of my cell among Deputy Hernandez, Deputy Felix, the other deputy that I described above and a female nurse, who was Asian, around her mid-30's to 40's with dark hair.

16. I could hear her yelling my name and I said, "Yes. Yes." She asked me why I didn't go to medical and asked if I had refused my medical pass. I told her that I had not refused my medical pass.

17. Deputy Felix interrupted our conversation and said, "Yes, you did" and looked at me with a look that made me feel like he was trying to get me to say that I had refused my medical pass to this nurse.

18. I was very persistent with the nurse and the deputies that I hadn't refused my pass and that I wanted to go to medical. The nurse specifically asked me if I wanted to go to medical and I told her yes.

19. Deputy Felix again interrupted and said to the nurse, "He's not going anywhere. He should have stated that earlier." The nurse said to Deputy Felix, "Sir, I have paperwork from the ACLU stating that he needs to see a doctor." Deputy Felix told her, "I don't care what you have or what it says. If you don't like it, write my name on it. Write me up. I don't give a shit."

20. The nurse said to Deputy Felix, "Don't worry. I will."

21. Deputy Felix then verbally threatened me, saying "You have to come out to the

1 showers again" and Deputy Hernandez said to me, "I can make it that you slip in the shower
2 next time and need serious medical attention." I didn't respond to this comment. I also was not
3 disruptive or disrespectful from the start to the end of this situation.

<div style="text-align:center;">March 20, 2011</div>

22. On March 20, Deputy Frazier came to my cell and told me that I needed to go to the disciplinary module for 15 days. He said that Deputies Felix and Hernandez had written me up for being disruptive and causing problems a couple of days ago. He said that he would talk to his sergeant and see if I had to go to the disciplinary module for 15 days or if I could stay in my cell without privileges, like no phones and no visits. I don't know the name of the sergeant whom Deputy Frazier talked to.

23. After an hour, Deputy Frazier came back and said that his sergeant was going to allow me to stay in my cell without privileges. I asked Deputy Frazier if he could bring me copies of the write up and about the disposition of the write up and he told me that he would. As of March 31, 2011, I have not received copies of either.

<div style="text-align:center;">March 22, 2011</div>



24. On March 22, three deputies and a Custody Assistant ("CA") ~~Castillos~~ Contreras came to my cell. CA ~~Castillos~~ Contreras told me that I needed to "roll up my stuff" because I was going to the disciplinary module. Rolling up your stuff means gather your belongings.

25. I told CA ~~Castillos~~ Contreras that Deputy Frazier and a sergeant had said that I didn't need to go to the disciplinary module and that I could stay in my cell for 15 days without privileges.

26. CA ~~Castillos~~ Contreras got on his radio and recapped what I had just told him. I heard the voice on the radio, whom CA ~~Castillos~~ Contreras told me later belonged to Sergeant Roberts, say that I needed to go the disciplinary module.

27. I told CA ~~Castillos~~ Contreras that this process should be done properly because I hadn't received copies of the write up, the disposition and the sergeant had not interviewed me. Nor had I been allowed to participate in Sergeant's Court. Sergeant's Court is a type of hearing between the sergeant and the inmate who's being written up and at the end the sergeant is supposed to decide and tell the inmate whether the inmate is guilty of the write up.

<div style="text-align:center;">3</div>

28. CA ~~Castillos~~ Contreras S.O. told me, "Don't give us a hard time. You don't have to pack all your stuff, since you'll be right back in your cell."

29. When CA ~~Castillos~~ Contreras S.O. and the other three deputies escorted me to the disciplinary module, I asked CA ~~Castillos~~ Contreras S.O. which sergeant had told him to tell me to go to the disciplinary module. He told me that Sergeant Roberts was the one.

30. As of March 31, 2011, I haven't received copies of my write up or the disposition of my write up. I also have never participated in Sergeant's Court or even talked to a sergeant about my write up.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 11th S.O. day of April, 2011 in Los Angeles, California.

_Jason Green_
Jason Green

4

**Declaration of Jason Green**

I, Jason Green, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am thirty-nine years old and I have been at Men's Central Jail ("MCJ") since August 2009. I am currently housed in Module 1700, Row B, Cell 26. My booking number is 2051708

<u>March 18, 2011</u>

3. On March 18, 2011, Deputy Hernandez (#691) transferred me from my cell to the showers at approximately 6am to 6:30 am.

4. While I was being escorted to the showers, Deputy Hernandez was told over the radio, which I heard, that I was being given a pass to go to medical.

5. Deputy Hernandez tried to negotiate with me, telling me to refuse my medical pass. I don't think Deputy Hernandez wanted to grant me the pass because he would have needed to take me back to my cell, uncuff me to allow me to get dressed, re-cuff me and then escort me to the Medical area at MCJ.

6. As Deputy Hernandez placed me into the showers and uncuffed me, I told Deputy Hernandez that I needed to go to my medical appointment. I told him that I wasn't going to refuse my medical pass.

7. Deputy Hernandez said to me, "Well, that's how it works around here. You either get your shower or your medical pass, which one do you want?" I felt like Deputy Hernandez was trying to force me to choose between the two.

8. I said to Deputy Hernandez, "Sir, I need my shower, but I'm not going to refuse my medical treatment."

9. Deputy Hernandez appeared to be upset and he said to me, "You're already in the shower anyway, so that's what you're going to get."

10. I was then escorted back to my cell after I showered and I asked a deputy for a complaint form. I don't know the name of the deputy, but he was heavy set, with dark hair and

appeared to be either White or Hispanic and approximately six feet and an inch tall. I am approximately five feet and eleven inches tall.

11. This deputy said loudly, "Why? So you can snitch to the ACLU?"

12. I recently had a visit from the ACLU in MCJ's Attorney Room on 03/11/2011.

13. The deputy didn't give me a complaint form.

14. I had repeatedly asked for a complaint form from multiple deputies who were working on my module so that I could write a complaint about Deputy Hernandez not allowing me to go to my medical appointment and they did not give me a form. I was not escorted to MCJ Medical for my medical appointment either.

15. Approximately two to three hours later, I woke up from my nap due to what sounded like a verbal confrontation that was taking place in front of my cell among Deputy Hernandez, Deputy Felix, the other deputy that I described above and a female nurse, who was Asian, around her mid-30's to 40's with dark hair.

16. I could hear her yelling my name and I said, "Yes. Yes." She asked me why I didn't go to medical and asked if I had refused my medical pass. I told her that I had not refused my medical pass.

17. Deputy Felix interrupted our conversation and said, "Yes, you did" and looked at me with a look that made me feel like he was trying to get me to say that I had refused my medical pass to this nurse.

18. I was very persistent with the nurse and the deputies that I hadn't refused my pass and that I wanted to go to medical. The nurse specifically asked me if I wanted to go to medical and I told her yes.

19. Deputy Felix again interrupted and said to the nurse, "He's not going anywhere. He should have stated that earlier." The nurse said to Deputy Felix, "Sir, I have paperwork from the ACLU stating that he needs to see a doctor." Deputy Felix told her, "I don't care what you have or what it says. If you don't like it, write my name on it. Write me up. I don't give a shit."

20. The nurse said to Deputy Felix, "Don't worry. I will."

21. Deputy Felix then verbally threatened me, saying "You have to come out to the

2

showers again" and Deputy Hernandez said to me, "I can make it that you slip in the shower next time and need serious medical attention." I didn't respond to this comment. I also was not disruptive or disrespectful from the start to the end of this situation.

### March 20, 2011

22. On March 20, Deputy Frazier came to my cell and told me that I needed to go to the disciplinary module for 15 days. He said that Deputies Felix and Hernandez had written me up for being disruptive and causing problems a couple of days ago. He said that he would talk to his sergeant and see if I had to go to the disciplinary module for 15 days or if I could stay in my cell without privileges, like no phones and no visits. I don't know the name of the sergeant whom Deputy Frazier talked to.

23. After an hour, Deputy Frazier came back and said that his sergeant was going to allow me to stay in my cell without privileges. I asked Deputy Frazier if he could bring me copies of the write up and about the disposition of the write up and he told me that he would. As of March 31, 2011, I have not received copies of either.

### March 22, 2011

24. On March 22, three deputies and a Custody Assistant ("CA") Castillos came to my cell. CA Castillos told me that I needed to "roll up my stuff" because I was going to the disciplinary module. Rolling up your stuff means gather your belongings.

25. I told CA Castillos that Deputy Frazier and a sergeant had said that I didn't need to go to the disciplinary module and that I could stay in my cell for 15 days without privileges.

26. CA Castillos got on his radio and recapped what I had just told him. I heard the voice on the radio, whom CA Castillos told me later belonged to Sergeant Roberts, say that I needed to go the disciplinary module.

27. I told CA Castillos that this process should be done properly because I hadn't received copies of the write up, the disposition and the sergeant had not interviewed me. Nor had I been allowed to participate in Sergeant's Court. Sergeant's Court is a type of hearing between the sergeant and the inmate who's being written up and at the end the sergeant is supposed to decide and tell the inmate whether the inmate is guilty of the write up.

3

28. CA Castillos told me, "Don't give us a hard time. You don't have to pack all your stuff, since you'll be right back in your cell."

29. When CA Castillos and the other three deputies escorted me to the disciplinary module, I asked CA Castillos which sergeant had told him to tell me to go to the disciplinary module. He told me that Sergeant Roberts was the one.

30. As of March 31, 2011, I haven't received copies of my write up or the disposition of my write up. I also have never participated in Sergeant's Court or even talked to a sergeant about my write up.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 11th day of April, 2011 in Los Angeles, California.

/s/
Jason Green

4

# DECLARATION OF CURRENT PRISONER MR. CC KENNETH GRIFFIN

000374

## Declaration of Kenneth Griffin

I, Kenneth Griffin, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 52 years and I am currently housed at Men's Central Jail ("MCJ") in Module 3400, Row B, Cell 10. My booking number is 2688697.

3. On July 20, 2011, I was housed in the same module, row and cell and my cell mate at the time was Arthur Townsend.

4. Deputies called us out of our cell for evening pill call and we both stepped out of our cell to get in line.

5. As we walked out of our row's gate, I heard Mr. Townsend say, "What are you looking at?" I think he said this to another inmate, but I wasn't sure.

6. When we walked out of the module, we got in line to get our medication. I saw a short, stocky deputy, grab Mr. Townsend out of line and had him interlace his fingers behind him and face the wall. I saw Mr. Townsend doing exactly what the deputy told him to do. The deputy began kicking his legs to spread them open like he was going to search Mr. Townsend.

7. I heard the deputy ask Mr. Townsend who he was talking to and I heard Mr. Townsend say, "I wasn't talking to you."

8. I then saw the deputy pull down on Mr. Townsend's arms and then the deputy said out loud, "All you Blacks! When you mess with my trustees, this is what's going to happen to you."

9. The deputy then punched Mr. Townsend on his side. I heard Mr. Townsend yell out, "Ow! I didn't do anything. I wasn't talking to you." Mr. Townsend hadn't done anything aggressive towards the deputy before the deputy punched him.

10. At this point, the deputies who were standing around the pill line area

1 | and deputies from the other modules came out and ran over to where the deputy
2 | and Mr. Townsend were. There were more than 10 deputies running over; it
3 | looked like bees flying out of a hive.
4 |     11.   I then saw these deputies punching, kicking and hitting Mr.
5 | Townsend with flashlights. I don't know exactly how many times they were
6 | kicking, punching and hitting him with flashlights as there were so many deputies
7 | surrounding Mr. Townsend and beating him up.
8 |     12.   About a minute into the beating, one of the deputies yelled out to me
9 | and the other inmates who were outside waiting to get their medication,
10 | "Everybody get down! Put your face on the floor!" We all complied.
11 |     13.   The deputies must have sprayed Mr. Townsend with pepper spray
12 | because I could smell it and I could hear other inmates coughing
13 |     14.   About a minute later, the deputies told the inmates to go inside the
14 | laundry room, so we all went inside the laundry room that is in our module.
15 |     15.   A few minutes later, the deputies told us to come back out to get our
16 | medication and I saw trustees in the area where Mr. Townsend was beat up,
17 | cleaning the floor and the walls. I could see that there was some blood on the
18 | ground.
19 |     16.   I then saw Mr. Townsend sitting on a bench with blood on the side of
20 | his face. I don't know if he was conscious or not because he was sitting on the
21 | bench with his eyes closed and his head down close to his chest, like he was
22 | sleeping. He was only wearing his boxers.
23 |     17.   I don't know what happened to him after that because after I got my
24 | medication, I went back into the module.
25 |     18.   I haven't seen Mr. Townsend since the deputies beat him up as he
26 | \ \ \
27 | \ \ \
28 | \ \ \

000376

1 | never returned to my module, row or cell.

2 |     I declare under penalty of perjury of the laws of the State of California and
3 | the United States that the foregoing is true and correct. Executed this 26th
4 | day of August, 2011 in Los Angeles, California.
5 | KG

                                                                */s/ Kenneth Griffin* KG

6 |                                                      Kenneth Griffin

3

000377