# DECLARATION OF CURRENT PRISONER MR. MM SHAWN MEYERS

000479

1    **Declaration of Shawn Meyers**

2    I, Shawn Meyers, hereby declare:

3        1.      I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5        2.      I am fifty-three years old. I have been at Men's Central Jail ("MCJ") since

6    *December 2008*. I've been housed in Module 7200, Cell 7176 since _2010 SM_. My

7    booking number is 1727226.

8    <u>Friday, January 21, 2011</u>

9        3.      On Friday, January 21, 2011, I had a visit in the MCJ's Attorney Room from the

10   ACLU of Southern California's Jails Project Coordinator, Esther Lim. This was approximately

11   the fifth time that I met with Ms. Lim in the Attorney Room. We had been speaking about

12   Deputy Johnson in Module 2700, in addition to things I have seen in the jail that I believe violate

13   Title 15.

14       4.      On this day, as Ms. Lim and I were talking, I saw Deputy Hinton, who is the Legal

15   Deputy and the deputy assigned to pass out the prisoners' legal mail, walk from the front of the

16   Attorney Room to the back of the Attorney Room where we were sitting. He walked past us and

17   then walked approximately *four to six feet* away from us and stood there with his

18   back towards us. He was standing there for approximately _five SM_ minutes then

19   walked away.

20   <u>Monday, January 24, 2011</u>

21       5.      On Monday, January 24, 2011 at approximately 4:30 in the afternoon, I was in the

22   Law Library on the 2000 floor of MCJ. I was in the Law Library because I am a pro per prisoner,

23   a prisoner who represents himself on his own criminal case. Pro per prisoners are supposed to

24   get two hours of Law Library time a day, but lately we've only been getting an hour and a half.

25       6.      After I had finished writing up a motion for my case, I played a game of dominoes

26   with another prisoner named Reginald Ford at approximately 5:45 in the evening, while waiting

27   for the deputies to let us out of the library. I have seen other prisoners play dominoes while they

28   wait for the deputies to let them out of the Law Library.

7.      At approximately six o'clock in the evening, I left the Law Library on the 2000

floor of MCJ. I went down the elevator to the first floor of the jail near the gated Control Room.

8.      There is a desk in the hallway directly across from the gated Control Room and

Deputies Johnson and Hinton were standing there.

9.      Deputy Hinton, said to me, "Myers, over here." I wheeled over to him and

Deputy Johnson. I use a wheelchair because *I have spinal injuries and I can't walk* . He asked me,

"Where's your dominoes?" Deputy Johnson looked at me, crossed his arms and smirked.

10.     Deputy Hinton then put on a pair of latex gloves in an attempt to search through

my belongings. I carry some of my belongings and legal paperwork in a bag that is strapped onto

the back of my wheelchair.

11.     When Deputy Hinton put on the latex gloves, Deputy Johnson walked away. At

first, I wasn't sure what he was referencing to when he asked me where my dominoes were.

12.     I told Deputy Hinton, "They're [dominoes] in my bag." Deputy Hinton then said

to me, "Oh, now you all of a sudden have your dominoes. Here they are. You were playing

dominoes before you left the law library. That's against pro per rules." I asked him, "Where

does it say that playing dominoes is against the rules?"

13.     Deputy Hinton then said to me, "I just took away your fucking pro per status and

the other dude's [Ford] *other inmate I was playing dominoes with* status. This is retaliation for you having the ACLU in on us. You know

when the ACLU lady and you were sitting for two hours in the Attorney Room talking about

Johnson, what's going on with Johnson and the stuff that's going on in 7200."

14.     I asked him, "Are you serious? Well, you better write me up and we'll be going

to Court on Thursday so I'll be telling the judge that and I'll be asking the ACLU to be in court

too."

15.     Deputy Hinton then told me, "Get the fuck out of here."

16.     I wheeled away from Deputy Hinton and went up the elevator to my module.

17.     When I got to my cell, I had to wait for a deputy to open up my cell door to get in.

Deputy Johnson came over and said to me as he was opening my door, "So you like getting

searched?" I told him, "Doesn't bother me. It's your house." I then wheeled in my cell and

2

1   Deputy Johnson closed the door.

2                                    Tuesday, January 25, 2011

3            18.     On Tuesday, January 25, 2011 at approximately 7:30 in the evening, I went to the

4   Law Library.  My wristband, that contains a bar code and identifying information was scanned.  I

5   was informed by Prisoners Reginald Ford and Willie Mays that my pro per status had been taken.

6   They told me that Deputy Hinton came down to the law library and was telling all the prisoners

7   in the law library about my cases and why I was in the law library.  Mr. Ford and Mays told me

8   that Deputy Hinton told them that my pro per status was taken away because "He talked to the

9   ACLU."  Mr. Ford and Mays also said that Deputy Hinton told them that "He's in the law library

10   so that he can represent himself on misdemeanors."

11                                   Thursday, January 27, 2011

12           19.     On Thursday, January 27, 2011 at approximately 12 o'clock in the afternoon, I

13   went to the law library.  Deputy Hinton was inside the law library, but didn't say anything to me.

14                                    Sunday, January 30, 2011

15           20.     On Sunday, January 30, 2011 at approximately 10:30 in the morning, I was on the

16   eighth floor for a visit from a friend.  I spoke to her for approximately thirty-five minutes before

17   the phones, with which we were communicating, shut off, indicating that our visit was over.

18           21.     I exited the visiting area and wheeled over towards the elevators to go back to my

19   housing area.  As I was wheeling through the area, I noticed that the day room door was open, but

20   there was no one in the day room.  I didn't see any prisoners or deputies.

21           22.     I pushed the elevator button to go down.  The elevator door opened and I entered

22   the elevator.  I am in a wheelchair so typically when I am alone in an elevator, I will wheel

23   myself in towards the back wall then turn left so that I am next to the elevator's control panel and

24   facing forward.

25           23.     I proceeded to do what I described above.  I wheeled myself in, facing the back

26   wall, but I was closer to the railing that is attached to the left wall of the elevator, if you are

27   facing the back wall of the elevator.  Before I could turn left, two deputies entered the elevator

28   and one of them said to me, "Don't turn around and face the wall."  Deputies typically give this

000482

1    command to prisoners when we are in the elevator with them.  Prisoners who are physically able

2    are supposed to face the back of the elevator and those in wheelchairs are to face the wall in their

3    chairs.

4         24.    One of the deputies told me as he was standing behind me, "Don't you know it's

5    not nice to be fucking with us and talking to the ACLU?"

6         25.    One of the deputies then pushed the right side of my body and chair and slammed

7    me against the left wall of the elevator.  My left shoulder and rib area was slammed up against

8    the handrail that is attached to the left wall of the elevator.

9         26.    I told the deputies, "Well, Johnson could do better than that."  I made this

10   comment to them because I was scared and I feared for my life due to a prior

11   incident I had with Deputy Johnson when he slammed me against the wall in

12   my cell while I was in my wheelchair. I thought by saying this I could convey to the

13   deputies that Deputy Johnson had won, hoping they wouldn't hurt me further.
         27.    One of the deputies then said to me, "That's your warning."  One of them then

14   pressed the number two button and both deputies exited out of the elevator.  When I turned my

15   wheelchair around, they were gone and I saw that the number two button was pressed.

16        28.    I then rode the elevator to my module and entered my cell.

17        I declare under penalty of perjury of the laws of the State of California and the United

18   States that the foregoing is true and correct.  Executed this 4th day of February, 2011 in Los

19   Angeles, California.

20

21                                            Shawn Meyers

22

23

24

25

26

27

28

                                          4

# DECLARATION OF CURRENT PRISONER MR. NN DAMEON MILLER

000484

# DECLARATION OF DAMEON MILLER

I, Dameon Miller, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been an inmate in the Los Angeles County Jails for sixteen months.

3.    From January to December of 2010, I was primarily housed at Men's Central Jail (MSJ) as a level 8 inmate.

4.    I briefly stayed at North County Correction Facility (NCCF) in October, 2010. I was in my dorm at NCCF when another inmate started acting up, talking loud and behaving agitated. I told him to "chill out," and he got mad that I said that. We got into a verbal and physical altercation with each other. Deputies told us we were going to the hole. I saw the deputies' badges as they spoke to me. Deputies R. Clarke (last three digits of badge number 722) and C. Azizian (last three digits of badge number 562) handcuffed me and placed me up against the wall. Deputy Clarke smushed my head into the wall and later shoved me back onto my bunk. He said, "This is my house," and, "I'll fuck you up." Deputy Azizian socked me rapidly in the ribs with one hand for 15-20 seconds while I was handcuffed and facing the wall. I ended up with bruises on my right and left sides along my ribs.

5.    After spending seven days in the hole at NCCF, I transferred to MCJ. During the week before Christmas while I was at MCJ, I put in a written complaint about NCCF Deputies Clarke and Azizian.

6.    Some of the deputies at MCJ were aware I complained about NCCF deputies. I was at MCJ for one week when I received a clinic pass without even requesting one. While walking to the clinic, an African-American MCJ deputy told me the clinic pass was a fake pass and that they were going to take me back to NCCF because of my complaint about the deputies. Deputies stopped me at the clinic and told that they were taking me back to NCCF, just like the deputy said was going to happen.

7.    Deputies transported me to NCCF and put me in the hole immediately without any reason. Deputy Clarke said to me, "I told you you'd be back." My wife tried to visit me, but when she arrived she said the deputies told her that I was unavailable and was "talking to someone" instead of telling her that I was in the hole.

8.   In the hole at NCCF, another inmate told me that the only way out was to say I was going to kill myself because NCCF doesn't have a mental health clinic and has to transfer its inmates to MCJ to see a clinician.  Two days after being at NCCF, I told deputies that I wanted to kill myself to get out.

9.   Deputies transported me back to MCJ after my suicide threat and put me in the hole for level 7/8 inmates.  After three weeks, Mushburn, a lieutenant or sergeant because he had higher ranking patches on his shirt, came by and said that I had "boosted up a level" to level 9 which means I have to be handcuffed and escorted everywhere just like the K-10 inmates.  The deputy said my level boosted up because of the NCCF complaint and that he would not approve of me going back down a level even though I would be able to request that from other deputies.

10.   I have been a level 9 inmate for three months now.

11.   I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20th day of May, 2011 in Los Angeles, California.

**Dameon Miller**

# DECLARATION OF DAMEON MILLER

I, Dameon Miller, hereby declare:

1.   I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.   I have been an inmate in the Los Angeles County Jails for sixteen months.

3.   From January to December of 2010, I was primarily housed at Men's Central Jail (MSJ) as a level 8 inmate.

4.   I briefly stayed at North County Correction Facility (NCCF) in October, 2010. I was in my dorm at NCCF when another inmate started acting up, talking loud and behaving agitated. I told him to "chill out," and he got mad that I said that. We got into a verbal and physical altercation with each other. Deputies told us we were going to the hole and escorted us there. I saw the deputies' badges as they spoke to me. Deputies R. Clarke (last three digits of badge number 722) and C. Azizian (last three digits of badge number 562) handcuffed me and placed me up against the wall. Deputy Clarke smushed my head into the wall and later shoved me back onto my bunk in the hole. He said, "This is my house," and, "I'll fuck you up." Deputy Azizian socked me rapidly in the ribs with one hand for 15-20 seconds while I was handcuffed and facing the wall. I ended up with bruises on my right and left sides along my ribs.

5.   After spending seven days in the hole at NCCF, I transferred to MCJ. During the week before Christmas while I was at MCJ, I put in a written complaint about NCCF Deputies Clarke and Azizian.Some of the deputies at MCJ were aware I complained about NCCF deputies. I was at MCJ for one week when I received a clinic pass without even requesting one. While walking to the clinic, an African-American MCJ deputy told me the clinic pass was a fake pass and that they were going to take me back to NCCF because of my complaint about the deputies. Deputies stopped me at the clinic and told that they were taking me back to NCCF, just like the deputy said was going to happen.

6.   Deputies transported me to NCCF and put me in the hole immediately without any reason. Deputy Clarke said to me, "I told you you'd be back." My wife tried to visit me, but when she arrived she said the deputies told her that I was unavailable and was "talking to someone" instead of telling her that I was in the hole.

7.    In the hole at NCCF, another inmate told me that the only way out was to say I was going to kill myself because NCCF doesn't have a mental health clinic and has to transfer its inmates to MCJ to see a clinician.  Two days after being at NCCF, I told deputies that I wanted to kill myself to get out.

8.    Deputies transported me back to MCJ after my suicide threat and put me in the hole for level 7/8 inmates.  After three weeks, Mushburn, a lieutenant or sergeant because he had higher ranking patches on his shirt, came by and said that I had "boosted up a level" to level 9 which means I have to be handcuffed and escorted everywhere just like the K-10 inmates.   The deputy said my level boosted up because of the NCCF complaint and that he would not approve of me going back down a level even though I would be able to request that from other deputies.

9.    I have been a level 9 inmate for six months now.

10.   I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 20th day of May, 2011 in Los Angeles, California.


_____
                  /s/
**Dameon Miller**

# DECLARATION OF CURRENT PRISONER MR. OO STEVEN MOORE

000489

### Declaration of Steven Moore

I, Steven Moore, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I have been an inmate in the Los Angeles County Jails System since June 1, 2010. I am currently housed in Twin Towers Correctional Facility (TTCF) Module 131, Pod F. Pod F does not have individual cells, so I do not have a cell number. My booking number is 2353616. I was previously housed in Men's Central Jail (MCJ) Module 2800, Row B, Cell 5.

3.    I make this declaration to describe a beating by deputies of a fellow inmate that I heard occur in the laundry room when I was at MCJ. I also saw deputies remove the inmate from the laundry room after the beating.

4.    In October or November 2010, I woke up at about six in the morning because I heard someone screaming. I believe that it was about six in the morning because there was a pill call announcement near the time that I woke up and there is always a pill call announcement at six in the morning. I will never forget this incident because the inmate's terror and pain were so obvious in his screams.

5.    I could tell that the screams and the shouting were coming from the laundry room. The laundry room is about fifty feet long and fifteen feet wide. The laundry room has no cameras. My cell's position allowed me to clearly see the entrance to the laundry room, but I could not see into the laundry room itself. A diagram is attached as Exhibit A to show the placement of my cell and the laundry room in which the beating occurred. As indicated in Exhibit A, my cell is marked by "Steven Moore" and my sight-line to the entrance of the laundry room, which is indicated by "Laundry Room," was not obstructed by any solid walls. The dividing walls between my cell and the laundry room entrance were made of only bars.

6.    During the beating, I heard voices inside the laundry room yelling, "Stop fighting!" and I heard another voice yelling back, "I'm not doing anything!"

000490

1    Although I did not hear any of the deputies requesting back-up and no

2    announcement was made over the loudspeaker, I saw many deputies enter the

3    laundry room as the beating went on.

4         7.    I heard thuds that sounded to me like someone punching or kicking a

5    body. I also heard a hollow sound like a bowling ball being dropped on the floor

6    that bounced four times, which I believe was the sound of the inmate's head

7    hitting the floor repeatedly.

8         8.    The person stopped screaming after a couple minutes and all the

9    sounds I had heard that sounded like punches and kicks stopped also. A few

10   minutes after this, I saw the deputies carrying an inmate out of the laundry room.

11   The inmate looked to be unconscious. I know he was an inmate because he was

12   dressed in the blue inmate clothes they give us. The inmate looked like an African

13   American. His head was bleeding.

14        9.    After the deputies removed the inmate, I heard someone yelling, "Get

15   this cleaned up now!" I saw deputies moving quickly out of the laundry room and

16   returning quickly with cleaning supplies. I have indicated this movement of

17   deputies on Exhibit A by labeling "Deputies" and including an line with arrows on

18   both sides to show that deputies were moving both into and out of the laundry

19   room. Overall, I estimate that fifteen to twenty deputies came in and out of the

20   laundry room during the beating and cleanup.

21        10.   I did not see the inmate who was beaten again after he was dragged

22   out of the laundry room.

23        11.   From the time that I awoke to the end of the incident, I continuously

24   watched the entrance to the laundry room. I only saw deputies and one inmate (the

25   one who was beaten) enter or leave the laundry during this time. The entrance I

26   was watching was the only way to enter the laundry room. I recognized Deputy

27   Roberts as one of the deputies involved in this beating. I know Deputy Roberts by

28   sight because he worked in my area of the jail. Deputy Roberts looks like an

1  African-American. He is about five feet, eight inches tall. He has a shaved head

2  and he has an average physique, unlike most deputies who are in excellent

3  physical condition. I also know that a sergeant was at the beating because one of

4  the individuals who entered the laundry room had stripes on his uniform.

5      I declare under penalty of perjury of the laws of the State of California and

6  the United States that the foregoing is true and correct.  Executed this 16th day of

7  August, 2011 in Los Angeles, California.

8

9  Steven Moore

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

000492



# DECLARATION OF CURRENT PRISONER MR. PP WAYMON MOORE

000494

1                        **Declaration of ~~Wayman~~ Moore**

Waymon

2       I, ~~Wayman~~ Moore, hereby declare:

3       1.      I make this declaration based on my own personal knowledge and if called to

4       testify I could and would do so competently as follows:

5       2.      On Sunday December 14, 2010, I was incarcerated at the Pitchess Detention

6       Center ("Pitchess") on the 700 floor. At approximately 4 p.m. that afternoon, I was walking

7       outside my dorm toward the bathroom, with a roll of toilet paper in my hand. I was laughing at a

8       joke another inmate had made to me regarding a female deputy who had passed by our dorm

9       earlier in the day (the female deputy was not in our presence or in our dorm at this time).

10      3.      Deputy Meyers saw me laughing and ordered me to approach him. When I

11      approached him, in a non-threatening manner, he slapped the toilet paper out of my hand,

12      grabbed me hard with both his hands and spun me around to face the wall. He did not order me

13      to turn around and face the wall before he grabbed me. He then performed a full search on my

14      body by patting me down and checking my pockets, then he grabbed a hold of my neck, piercing

15      my skin with his nails. Another deputy was beside us during this incident; he was tall, Hispanic,

16      of skinny build, dark skinned, with brown eyes, and had short black hair. Deputy Meyers asked

17      me why I was laughing at his deputy and abruptly took me into an adjacent day-room. The male

18      Hispanic deputy followed as well. In the day-room Deputy Meyers then grabbed me again by the

19      neck and slammed me with much force to the ground. He and the male Hispanic deputy then

20      took out their batons and started gesturing it towards me, as if they were going to beat me with it.
        They both said they were going to "Fuck [me] up." I was afraid of being beat up badly.

21      4.      At that point I requested to see a sergeant, but Deputy Meyers refused my request,

22      using vulgar terms. I was in a lot of pain and feeling very fearful at this point. I could feel the nail

23      marks Deputy Meyers engraved on my neck. I wasn't sure what the two deputies were going to

24      do to me. Deputy Meyers then walked out of the room, leaving the door open. He walked back

25      into the previous room in which I was housed, and told the other inmates that if he were them he

26      would "fuck [me] up," for because of me the other inmates would not be getting any

27

28

000495

1    programming activities. I then called out to Deputy Meyers, again requesting to speak with the

2    sergeant on duty. Deputy Meyers instead closed the day-room door on me. As I began to walk

3    around the day-room floor, both deputies began taunting me by shining the laser-pointer that is

4    attached to their tasers at me. Deputy Meyers then walked back into the room, and again grabbed

5    me by the neck, choking me, and slammed me hard against the wall. Deputy Meyers then walked

6    out the room.

7        5.    A female deputy then entered and handcuffed me, then walked me to a facility on

8    the floor known as "the hole," which is a cell that inmates are taken to for disciplinary reasons.

9    The deputy was Hispanic, short, had long dark hair, and was dark skinned. With us in the hole

10   were also one sergeant, a lieutenant, and two male deputies. I was videotaped while being walked

11   to the hole. I know this because I saw the video camera being held by the lieutenant (it is

12   common practice for lieutenants to videotape inmates as they are being taken to the hole). The

13   lieutenant was an older male. A couple of hours later, I was taken to the nurse's facility, where I

14   was examined by the nurse, who made note of the marks on my neck and other parts of my body.

15   I know this because every time she saw a mark on me she wrote something down on her chart.

16       6.    Later on that night, I was sent to Men's Central Jail ("MCJ"). I was put on suicide

17   watch and was sent to see a psychologist working at the facility. I explained to the psychologist

18   what happened at Pitchess and told her I was in fear for my life from the deputies there. She

19   declassed me (meaning she took me off suicide watch) and I spent two days at MCJ. I was then

20   sent back to Pitchess.

21       7.    While I was being booked back in at Pitchess, I informed the staff that I was in

22   fear for my life from the deputies who were on my floor, and asked them to let me speak to a

23   sergeant. They ignored my concerns, as I was housed on the exact same floor where the previous

24   incident took place (the original place where Deputy Meyers first grabbed a hold of my neck),

25   and with the same deputies working on staff. After being taken here, I was then sent straight to

26   the hole. I was again videotaped by a lieutenant (a different one from the previous incident), and

27

28

1   there were four or five deputies along with us. The deputies were verbally abusing me and

2   threatening me with violence. One of the deputies who was verbally abusing me was a Hispanic

3   male, who was husky, dark skinned, and had short dark hair

4       8.      While in the hole, I kept insisting that I was "in fear for my life," and pleaded with

5   them to let me speak with a sergeant. I did not speak to one, but that same night, I was sent back

6   to MCJ, and was forced to see the same psychologist. She told me "you're back here again," and

7   asked me why I was back. I told her how I was sent back to Pitchess and was put on the same

8   floor with the same deputies, and that I was still in fear for my life from the deputies at Pitchess.

9   She declassed me again and I was sent to a dorm on the 5000 floor at MCJ. I spent the night in

10  this dorm. The next day, I was taken out of my cell to be sent back to Pitchess. I was taken to the

11  waiting area where inmates are held before being put on a bus that takes inmates where they are

12  supposed to go. I told the deputies around me about the incident that took place at Pitchess, and

13  how I was still in fear for my life from the deputies at Pitchess. I pleaded with them to let me

14  speak to a sergeant. I was finally able to speak to a sergeant. He was either Hispanic or

15  Caucasian, of medium build, was short, and had straight black hair. He told me that nothing can

16  be done from preventing me from going back to Pitchess, but he told me that he would contact

17  the proper authorities at Pitchess and try to see what he can do about the situation. I was then

18  taken by bus and sent back to Pitchess, and sent straight to the hole (the same place I was in the

19  previous day).

20      9.      Deputy C. Azizian (badge number 562) was assigned to watch the floor in which

21  my cell was on during the night. In the middle of the night, as I was asleep, Deputy Azizian

22  walked in my room and took my mattress and all my linen. He threw them in the hall outside my

23  room, stepped all over them and kicked them, and began taunting me and cussing me out. I felt

24  extremely helpless when this happened. I felt like I was being abused and mocked. Since the

25  metal I was sleeping on was so cold, I curled up into a ball to try to stay warm. I hardly slept and

26  shivered the entire night.

27

28

1      10.    At about 5:30 a.m., Deputy Azizian was leaving his shift. He opened the door to

2   my room electronically and demanded that I pick up all my stuff that he had taken from me off

3   the floor. I was hesitant at first because I was afraid of being attacked by the Deputy; he had

4   stepped on my mattress and linen and kicked them around, making me think that he was prone to

5   attacking me.  I decided it would be better if I listened to his demands. About a minute after

6   Deputy Azizian told me to pick up my stuff, I walked out my room to get them. When I went to

7   go pick them up, Deputy Azizian violently attacked me; he beat me, punched me in my left rib,

8   and hit me with some sort of object on my left eye (I did not see what he hit me with). The hit on

9   my left eye dazed me. While still dazed, Deputy Azizian picked me off the floor and took me to a

10  room referred to as "the dungeon." The dungeon is an extremely dim room with one window that

11  inmates can't reach to see out of, and is isolated from all the other rooms. I requested to see a

12  sergeant or a nurse, but my request was ignored. I was left in this room, handcuffed, for

13  approximately 24 hours, deprived of food, water, and linen. I was feeling weak, battered, and was

14  shivering throughout this entire time. At about 3:30 a.m. the next day, a Lieutenant Lopez walked

15  into my room and noticed me still handcuffed, with a hugely swollen left eye. He ordered the

16  deputies who were around to get me food and water. I was handcuffed for so long that I still have

17  marks on each wrist. I was then taken during the day time to get X-rays and to get my scratches,

18  bruises, and swollen left eye checked by the medical staff. The next day, I was sent back to MCJ,

19  and put in the 2400 housing unit.

20

21      I declare under penalty of perjury of the laws of the State of California and the United

22  States that the foregoing is true and correct.  Executed this 8th day of April, 2011 in Los Angeles,

23  California.

24      _____

25      ~~Wayman~~ Moore

26      Waymon  w m

27

28                          4

000498

**Declaration of Waymon Moore**

1

2       I, Waymon Moore, hereby declare:

3       1.      I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5       2.      On Sunday December 14, 2010, I was incarcerated at the Pitchess Detention

6    Center ("Pitchess") on the 700 floor. At approximately 4 p.m. that afternoon, I was walking

7    outside my dorm toward the bathroom, with a roll of toilet paper in my hand. I was laughing at a

8    joke another inmate had made to me regarding a female deputy who had passed by our dorm

9    earlier in the day (the female deputy was not in our presence or in our dorm at this time).

10      3.      Deputy Meyers saw me laughing and ordered me to approach him. When I

11   approached him, in a non-threatening manner, he slapped the toilet paper out of my hand,

12   grabbed me hard with both his hands and spun me around to face the wall. He did not order me

13   to turn around and face the wall before he grabbed me. He then performed a full search on my

14   body by patting me down and checking my pockets, then he grabbed a hold of my neck, piercing

15   my skin with his nails. Another deputy was beside us during this incident; he was tall, Hispanic,

16   of skinny build, dark skinned, with brown eyes, and had short black hair. Deputy Meyers asked

17   me why I was laughing at his deputy and abruptly took me into an adjacent day-room. The male

18   Hispanic deputy followed as well. In the day-room Deputy Meyers then grabbed me again by the

19   neck and slammed me with much force to the ground. He and the male Hispanic deputy then

20   took out their batons and started gesturing it towards me, as if they were going to beat me with it.

21   They both said they were going to "fuck [me] up." I was afraid of being beat up badly.

22      4.      At that point I requested to see a sergeant, but Deputy Meyers refused my request,

23   using vulgar terms. I was in a lot of pain and feeling very fearful at this point. I could feel the nail

24   marks Deputy Meyers engraved on my neck. I wasn't sure what the two deputies were going to

25   do to me. Deputy Meyers then walked out of the room, leaving the door open. He walked back

26   into the previous room in which I was housed, and told the other inmates that if he were them he

27

28

1    would "fuck [me] up," for because of me the other inmates would not be getting any

2    programming activities. I then called out to Deputy Meyers, again requesting to speak with the

3    sergeant on duty. Deputy Meyers instead closed the day-room door on me. As I began to walk

4    around the day-room floor, both deputies began taunting me by shining the laser-pointer that is

5    attached to their tasers at me. Deputy Meyers then walked back into the room, and again grabbed

6    me by the neck, choking me, and slammed me hard against the wall. Deputy Meyers then walked

7    out the room.

8          5.      A female deputy then entered and handcuffed me, then walked me to a facility on

9    the floor known as "the hole," which is a cell that inmates are taken to for disciplinary reasons.

10    The deputy was Hispanic, short, had long dark hair, and was dark skinned. With us in the hole

11    were also one sergeant, a lieutenant, and two male deputies. I was videotaped while being walked

12    to the hole. I know this because I saw the video camera being held by the lieutenant (it is

13    common practice for lieutenants to videotape inmates as they are being taken to the hole). The

14    lieutenant was an older male. A couple of hours later, I was taken to the nurse's facility, where I

15    was examined by the nurse, who made note of the marks on my neck and other parts of my body.

16    I know this because every time she saw a mark on me she wrote something down on her chart.

17          6.      Later on that night, I was sent to Men's Central Jail ("MCJ"). I was put on suicide

18    watch and was sent to see a psychologist working at the facility. I explained to the psychologist

19    what happened at Pitchess and told her I was in fear for my life from the deputies there. She

20    declassed me (meaning she took me off suicide watch) and I spent two days at MCJ. I was then

21    sent back to Pitchess.

22          7.      While I was being booked back in at Pitchess, I informed the staff that I was in

23    fear for my life from the deputies who were on my floor, and asked them to let me speak to a

24    sergeant. They ignored my concerns, as I was housed on the exact same floor where the previous

25    incident took place (the original place where Deputy Meyers first grabbed a hold of my neck),

26    and with the same deputies working on staff. After being taken here, I was then sent straight to

27

28

1   the hole. I was again videotaped by a lieutenant (a different one from the previous incident), and

2   there were four or five deputies along with us. The deputies were verbally abusing me and

3   threatening me with violence. One of the deputies who was verbally abusing me was a Hispanic

4   male, who was husky, dark skinned, and had short dark hair

5           8.      While in the hole, I kept insisting that I was "in fear for my life," and pleaded with

6   them to let me speak with a sergeant. I did not speak to one, but that same night, I was sent back

7   to MCJ, and was forced to see the same psychologist. She told me "you're back here again," and

8   asked me why I was back. I told her how I was sent back to Pitchess and was put on the same

9   floor with the same deputies, and that I was still in fear for my life from the deputies at Pitchess.

10  She declassed me again and I was sent to a dorm on the 5000 floor at MCJ. I spent the night in

11  this dorm. The next day, I was taken out of my cell to be sent back to Pitchess. I was taken to the

12  waiting area where inmates are held before being put on a bus that takes inmates where they are

13  supposed to go. I told the deputies around me about the incident that took place at Pitchess, and

14  how I was still in fear for my life from the deputies at Pitchess. I pleaded with them to let me

15  speak to a sergeant. I was finally able to speak to a sergeant. He was either Hispanic or

16  Caucasian, of medium build, was short, and had straight black hair. He told me that nothing can

17  be done from preventing me from going back to Pitchess, but he told me that he would contact

18  the proper authorities at Pitchess and try to see what he can do about the situation. I was then

19  taken by bus and sent back to Pitchess, and sent straight to the hole (the same place I was in the

20  previous day).

21          9.      Deputy C. Azizian (badge number 562) was assigned to watch the floor in which

22  my cell was on during the night. In the middle of the night, as I was asleep, Deputy Azizian

23  walked in my room and took my mattress and all my linen. He threw them in the hall outside my

24  room, stepped all over them and kicked them, and began taunting me and cussing me out. I felt

25  extremely helpless when this happened. I felt like I was being abused and mocked. Since the

26  metal I was sleeping on was so cold, I curled up into a ball to try to stay warm. I hardly slept and

27

28                                          3

000501

1   shivered the entire night.

2       10.     At about 5:30 a.m., Deputy Azizian was leaving his shift. He opened the door to

3   my room electronically and demanded that I pick up all my stuff that he had taken from me off

4   the floor. I was hesitant at first because I was afraid of being attacked by the Deputy; he had

5   stepped on my mattress and linen and kicked them around, making me think that he was prone to

6   attacking me.  I decided it would be better if I listened to his demands. About a minute after

7   Deputy Azizian told me to pick up my stuff, I walked out my room to get them. When I went to

8   go pick them up, Deputy Azizian violently attacked me; he beat me, punched me in my left rib,

9   and hit me with some sort of object on my left eye (I did not see what he hit me with). The hit on

10  my left eye dazed me. While still dazed, Deputy Azizian picked me off the floor and took me to a

11  room referred to as "the dungeon." The dungeon is an extremely dim room with one window that

12  inmates can't reach to see out of, and is isolated from all the other rooms. I requested to see a

13  sergeant or a nurse, but my request was ignored. I was left in this room, handcuffed, for

14  approximately 24 hours, deprived of food, water, and linen. I was feeling weak, battered, and was

15  shivering throughout this entire time. At about 3:30 a.m. the next day, a Lieutenant Lopez walked

16  into my room and noticed me still handcuffed, with a hugely swollen left eye. He ordered the

17  deputies who were around to get me food and water. I was handcuffed for so long that I still have

18  marks on each wrist. I was then taken during the day time to get X-rays and to get my scratches,

19  bruises, and swollen left eye checked by the medical staff. The next day, I was sent back to MCJ,

20  and put in the 2400 housing unit.

21

22       I declare under penalty of perjury of the laws of the State of California and the United

23  States that the foregoing is true and correct.  Executed this 12th day of April, 2011 in Los

24  Angeles, California.

25                                                    _____/s/_____

26                                                    Waymon Moore

27

28                                        4

# DECLARATION OF CURRENT PRISONER MR. QQ FLOYD NELSON

000503

# DECLARATION OF FLOYD NELSON

I, Floyd Nelson, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am a propria persona ("pro per") inmate in Men's Central Jail ("MCJ"). I am housed in Module 2500, Row B, Cell 18. My booking number is 1544050. I have been incarcerated in MCJ since July 19, 2010.

3.      I am writing this declaration as an eyewitness to the unmerciful, deputy assault committed against inmate, William Tillman (# 1983134) on or about March 25, 2011. I watched Deputy Moorman slam Mr. Tillman's head ~~on~~ being *fh* against a concrete wall and then saw Tillman ~~be pepper~~-sprayed and tased by Deputy Ibarra and Custody Assistant ("C.A.") Perez, respectively. Mr. Tillman did not make any provoking movements, towards the deputies, that would warrant physical restraint or a brutal attack.

4.      In January or February 2011, Module 2500/2700 deputies were cycled out, and new deputies were cycled in. And with the new deputies, significant problems with law the library arose until they were transferred out of the pro per module on or about July 2011.

5.      As a pro per inmate, the most important thing to me is that I am given one and a half hours of law library time everyday. For the majority of the time, the new group of deputies, which includes deputies Moorman and Ibarra, did not respect the inmates' right to law library time. For example, sometimes we would get thirty minutes of law library because the deputies weren't keeping up with the schedule. Law library runs from 6am until ~~11pm~~ 10:30 pm *fh*, everyday. Every hour and a half, a new group of inmates is up for library. If the deputies allow a group an additional amount of time, that time is taken away from the group that is about to come in. For the most part, I rarely received my full hour and a half.

1

1    6.    There were even times, when no one received library time.

2    7.    Other inmates and I had to complain constantly to deputies Ibarra,

3    Moorman and C.A. Perez to try to get us ~~out~~ our law library time. One of the most

4    vocal inmates is Mr. Tillman. Because of his proximity to the control booth, he's

5    in cell 3, other inmates and I would ask him to shout and remind the deputies that

6    a group's law time was up and that they should start taking them out, so a new

7    group could cycle in.

8    8.    There were times when Deputy Ibarra would respond to Mr.

9    Tillman's complaint by saying something like, "This is my program. I run it the

10   way I want to. Shut the fuck up!" ~~Other~~ times, if there wasn't a response, Deputy

11   Ibarra would walk pass by the complainers, stare at us and not say a word.

12   9.    On or about March 25, 2011, during my law library time, I had gotten

13   up from my work table to go use the phone. To start a phone call cost $3.19. So

14   instead of just going straight for the phones and using it, I went to the window to

15   see whether I had enough funds to place a call, but also looking outside the library

16   for any movement by the deputies and the inmates. At the window, there is a sheet

17   that informs each pro per how much money they have in their pro per phone

18   account. By observing the movements outside the library, I can determine whether

19   or not our group's time is almost up. As I was doing this, I saw Mr. Tillman facing

20   the wall, near the main entrance of Module 2500/2700. The window view from

21   inside the law library is attached as Exhibit 1. A diagram of the law library is

22   attached as Exhibit 2.

23   10.   As Mr. Tillman was facing the wall, I saw his mouth move while he

24   was glancing back at Deputy Moorman, who was behind him. I thought nothing of

25   it, inmates are constantly being told to face the wall. I glanced back to the pro per

26   phone account sheet. Seconds later, when I look back outside the library, I saw

27   Mr. Tillman surrounded by Deputy Ibarra and C.A. Perez as well. When I saw a

28   semi-circle around Mr. Tillman, I knew something was going on so I started to

2

1    pay attention.

2         11.    I saw ~~deputies~~ Ibarra and Moorman mouth moving, as well as Mr. *[handwritten: the Deputy]* *[handwritten: The]* *[handwritten: 's]* *[handwritten: The]*

3    Tillman's. From inside the library, you can hear some noise can be heard made by

4    inmates on the row or the deputies in the hallway, but it is not decipherable. I *[handwritten: The]*

5    could not hear what Mr. Tillman and ~~the~~ deputies ~~or C.A.~~ were saying. *[handwritten: Deputy Moorman The to one another.]* *[handwritten: x]*

6         12.    While Mr. Tillman was facing the wall, with one hand ~~to his side~~ and *[handwritten: in pocket The]*

7    the other holding a bag containing what appeared to be legal documents, Deputy

8    Moorman suddenly grabbed Mr. Tillman's head and slammed it into the concrete

9    wall. Mr. Tillman did not put his hands up, and perhaps could not because of how

10   quick it happened, to brace the impact of the collision.

11        13.    Immediately, Mr. Tillman fell to the ground. Deputy Moorman

12   forced his knee up into Mr. Tillman's back, handcuffed Mr. Tillman's hands

13   behind his back, and proceeded to throw punches to the back of Mr. Tillman's

14   head and side of his face.

15        14.    Deputy Ibarra kicked Mr. Tillman's legs and the side of his body

16   while Deputy Moorman continued to punch him.

17        15.    Mr. Tillman was motionless and was not resisting.

18        16.    With all the commotion, I lost sight of Mr. Tillman. I knew where his

19   body was lying, but all I could see was aggressive movement towards him by the

20   deputies. Mr. Tillman is 5'6, skinny and weighs about 130 lbs. Deputy Ibarra is

21   about 5'8'' about 200 lbs with a stocky build. Deputy Moorman is Caucasian,

22   about 5'10'' and appears to weigh 180 lbs. C.A. Perez is about 6'0'' weighs close

23   to 230 lbs and appears Hispanic. *[handwritten: The Ibarra, I saw Deputy Ibarra administer Moorman and pepper spray to the face of Mr. Tillman The]*

24        17.    When Deputy ~~Ibarra~~ backed off Mr. Tillman, I saw C.A. Perez with a *[handwritten: then]*

25   taser. C.A. Perez shot its hooks towards Mr. Tillman's back. Mr. Tillman's body

26   shook violently.

27        18.    After Mr. Tillman was tased, twenty or so deputies came running in.

28   By this time, deputies Ibarra and Moorman, and C.A. Perez, were surrounding Mr.

3   *[handwritten: The]*

1   Tillman, no longer assaulting him.  When I saw the deputies burst in, I walked

2   away from the window. I didn't want them to know that I had witnessed this

3   assault because I was afraid I would lose my pro per status. When Deputy

4   Moorman and Ibarra started working the pro per module, inmates' pro per statuses

5   were being taken away. I was not asked any questions by MCJ staff about this

6   event. No one came into the library to ask us if we had seen anything. There were

7   about ~~eight~~ of us in the library when the deputies were attacking Mr. Tillman.

8       19.      While twenty or so deputies were in the hallway of Module

9   2500/2700, my group was escorted back to our cells. I could not see Mr. Tillman

10  as I was headed back to my cell because the deputies were surrounding his body.

11  But I did see an empty gurney.

12      I declare under penalty of perjury of the laws of the State of California and

13  the United States that the foregoing is true and correct to the best of my

14  knowledge and belief.  Executed this 19th day of August, 2011, in Los Angeles,

15  California.

16

17                                          _____

18                                          Floyd Nelson

19

20

21

22

23

24

25

26

27

28

000507

pillar

window 3

2'

window 2

2'

10-15 feet

3'

hallway

window 1

2'

Exhibit 1

LAW LIBRARY

pool

000508



**Diagram of Law Library in 2500-2700, Men's Central**

Computers

Bathroom area

Bookshelves

Pillar

Phones

Bookshelves

10-15 ft

Door

Door          Window

Computers

000509

# DECLARATION OF FLOYD NELSON

I, Floyd Nelson, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am a propria persona ("pro per") inmate in Men's Central Jail ("MCJ"). I am housed in Module 2500, Row B, Cell 18. My booking number is 1544050. I have been incarcerated in MCJ since July 19, 2010.

3.     I am writing this declaration as an eyewitness to the unmerciful, deputy assault committed against inmate, William Tillman (# 1983134) on or about March 25, 2011. I watched Deputy Moorman slam Mr. Tillman's head on against a concrete wall and then saw Tillman being pepper-sprayed and tased by Deputy Ibarra and Custody Assistant ("C.A.") Perez, respectively. Mr. Tillman did not make any provoking movements, towards the deputies, that would warrant physical restraint or a brutal attack.

4.     In January or February 2011, Module 2500/2700 deputies were cycled out, and new deputies were cycled in. And with the new deputies, significant problems with law the library arose until they were transferred out of the pro per module on or about July 2011.

5.     As a pro per inmate, the most important thing to me is that I am given one and a half hours of law library time everyday. For the majority of the time, the new group of deputies, which includes deputies Moorman and Ibarra, did not respect the inmates' right to law library time. For example, sometimes we would get thirty minutes of law library because the deputies weren't keeping up with the schedule. Law library runs from 6am until 10:30 pm, everyday. Every hour and a half, a new group of inmates is up for library. If the deputies allow a group an additional amount of time, that time is taken away from the group that is about to come in. For the most part, I rarely received my full hour and a half.

1

000510

1        6.      There were even times, when no one received library time.

2        7.      Other inmates and I had to complain constantly to deputies Ibarra,

3    Moorman and C.A. Perez to try to get us our law library time. One of the most

4    vocal inmates is Mr. Tillman. Because of his proximity to the control booth, he's

5    in cell 3, other inmates and I would ask him to shout and remind the deputies that

6    a group's law time was up and that they should start taking them out, so a new

7    group could cycle in.

8        8.      There were times when Deputy Ibarra would respond to Mr.

9    Tillman's complaint by saying something like, "This is my program. I run it the

10   way I want to. Other times, he would say, "Shut the fuck up!" Other times, if there

11   wasn't a response, Deputy Ibarra would walk pass by the complainers, stare at us

12   and not say a word.

13       9.      On or about March 25, 2011, during my law library time, I had gotten

14   up from my work table to go use the phone. To start a phone call cost $3.19. So

15   instead of just going straight for the phones and using it, I went to the window to

16   see whether I had enough funds to place a call, but also looking outside the library

17   for any movement by the deputies and the inmates. At the window, there is a sheet

18   that informs each pro per how much money they have in their pro per phone

19   account. By observing the movements outside the library, I can determine whether

20   or not our group's time is almost up. As I was doing this, I saw Mr. Tillman facing

21   the wall, near the main entrance of Module 2500/2700. The window view from

22   inside the law library is attached as Exhibit 1. A diagram of the law library is

23   attached as Exhibit 2.

24       10.     As Mr. Tillman was facing the wall, I saw his mouth move while he

25   was glancing back at Deputy Moorman, who was behind him. I thought nothing of

26   it, inmates are constantly being told to face the wall. I glanced back to the pro per

27   phone account sheet. Seconds later, when I look back outside the library, I saw

28   Mr. Tillman surrounded by Deputy Ibarra and C.A. Perez as well. When I saw a

000511

1  semi-circle around Mr. Tillman, I knew something was going on so I started to

2  pay attention.

3      11.   I saw Deputy Moorman's mouth moving, as well as Mr. Tillman's.

4  From inside the library, you can hear some noise can be heard made by inmates on

5  the row or the deputies in the hallway, but it is not decipherable. I could not hear

6  what Mr. Tillman and Deputy Moorman were saying to one another.

7      12.   While Mr. Tillman was facing the wall, with one hand in his pocket

8  and the other holding a bag containing what appeared to be legal documents,

9  Deputy Moorman suddenly grabbed Mr. Tillman's head and slammed it into the

10  concrete wall. Mr. Tillman did not put his hands up, and perhaps could not

11  because of how quick it happened, to brace the impact of the collision.

12      13.   Immediately, Mr. Tillman fell to the ground. Deputy Moorman

13  forced his knee up into Mr. Tillman's back, handcuffed Mr. Tillman's hands

14  behind his back, and proceeded to throw punches to the back of Mr. Tillman's

15  head and side of his face.

16      14.   Deputy Ibarra kicked Mr. Tillman's legs and the side of his body

17  while Deputy Moorman continued to punch him.

18      15.   Mr. Tillman was motionless and was not resisting.

19      16.   With all the commotion, I lost sight of Mr. Tillman. I knew where his

20  body was lying, but all I could see was aggressive movement towards him by the

21  deputies. Mr. Tillman is 5'6, skinny and weighs about 130 lbs. Deputy Ibarra is

22  about 5'8'' about 200 lbs with a stocky build. Deputy Moorman is Caucasian,

23  about 5'10'' and appears to weigh 180 lbs. C.A. Perez is about 6'0'' weighs close

24  to 230 lbs and appears Hispanic.

25      17.   When Deputy Moorman and Ibarra backed off Mr. Tillman, I saw

26  Deputy Ibarra administer pepper spray to the face of Mr. Tillman.  I then saw C.A.

27  Perez with a taser. C.A. Perez shot its hooks towards Mr. Tillman's back. Mr.

28  Tillman's body shook violently.

3

18.     After Mr. Tillman was tased, twenty or so deputies came running in. By this time, deputies Ibarra and Moorman, and C.A. Perez, were surrounding Mr. Tillman, no longer assaulting him.  When I saw the deputies burst in, I walked away from the window. I didn't want them to know that I had witnessed this assault because I was afraid I would lose my pro per status. When Deputy Moorman and Ibarra started working the pro per module, inmates' pro per statuses were being taken away. I was not asked any questions by MCJ staff about this event. No one came into the library to ask us if we had seen anything. There were about eight of us in the library when the deputies were attacking Mr. Tillman.

19.     While twenty or so deputies were in the hallway of Module 2500/2700, my group was escorted back to our cells. I could not see Mr. Tillman as I was headed back to my cell because the deputies were surrounding his body. But I did see an empty gurney.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 19th day of August, 2011, in Los Angeles, California.


_____/s/_____
Floyd Nelson

000513

LAW LIBRARY

Exhibit 1

pillar

window 3

Window 2

2'

2'

2'

3'

10-15 feet

Window 1

hallway

beds

000514

Exhibit 2



Computers

Bathroom area

Bookshelves

Pillar

Phones

**Diagram of Law Library in 2500-2700, Men's Central**

10-15 ft

Bookshelves

Door

Door        Window

Computers

000515

# DECLARATION OF CURRENT PRISONER MR. RR KEITH NICHOLS

000516

**Declaration of Keith Nichols**

I, Keith Nichols, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I was an inmate in the Los Angeles County Jails System in August of 2010 following an arrest on May 12, 2010 and placement in Men's Central Jail on May 15, 2010. I have been housed in Twin Towers Correctional Facility (TTCF) Module 131 D Pod since March 16, 2011. My booking number is 2669830.

3.    I am making this declaration to describe a beating I received from a deputy at the Men's Central Jail (MCJ), my physical limitations due to this beating, and the inadequate medical care I have received while in jail. The beating I will describe happened on a Friday in August of 2010 while I was housed in MCJ Module 2200 Row B Cell 12.

4.    On that Friday in August 2010, I was returning to my cell after a visit with my mom. I had come in from the hallway and I was in area outside of the 2200 wing and the 2000 wing. A diagram depicting the area where I was beaten and the positions of the individuals I describe in this declaration is attached as Exhibit A.

5.    When I was walking through the area between the wings, a white male deputy asked me what I was in jail for. This deputy was about six feet tall. He had black hair. I refused to discuss my case with the deputy. I told him that he could talk to my lawyer if he wanted to talk about my case.

6.    As soon as I told the deputy that I would not discuss my case, he told me to "face (my) black ass to the wall." I heard the deputy yell at other inmates to hurry up and get back to their cells. I saw a Custody Assistant (CA) was in the hallway too. The CA looked to me like he was a Hispanic person, about five feet eight inches, and heavy set. I think his name was Rodriguez.

7.    I was facing the wall, so I could not see what the deputy was doing,

000517

1   but eventually he stopped yelling at inmates to get back to their cells.

2       8.    The deputy returned to me and pushed me to the ground. I ended up

3   on the ground under the mural of the County Sheriff Bulldog, which is a bulldog

4   dressed like a marine that is on the wall in the area between the two wings.

5       9.    While I was on the ground, the deputy kicked me with full force in

6   the lower back on the left side with what felt like a steel-toed boot because the toe

7   of the boot was much harder that the toe on a regular boot. The pain was as bad as

8   anything that I can imagine. The deputy kicked me at least five times on my spine

9   in my lower back and near my kidneys. To draw a comparison, I was hit by a car

10   in 2006. During that accident, my left leg became entangled in the car's wheel and

11   broke in two places and my knee was severely dislocated. The deputy's kick was

12   as painful than that car accident. I would rank the pain from the kick as a 10 on a

13   scale of pain with 1 being minimum pain and 10 being excruciating pain. I am still

14   on pain medication to this day for this injury and I still suffer physical limitations

15   due to the injury which I detail below.

16       10.    After being kicked, I was on the ground trying to shield myself from

17   additional kicks. At this time, other deputies completely surrounded me in a way

18   that blocked anyone from seeing what they were doing to me. These deputies came

19   on their own without the deputy who was beating me having called for their help. I

20   was not able to see these deputies' faces because my head was near the ground and

21   I was shielding my face while I was being kicked, but I did see five sets of feet

22   standing in a line between me and the nurse's station as indicated on Exhibit A.

23       11.    A fellow inmate, Jose Alvarez, told me that he saw the deputy kicking

24   me because he had been at the nurse's station when the deputy started to beat me.

25   The nurse's station and Mr. Alvarez's approximate position are indicated on

26   Exhibit A. Mr. Alvarez told me that once the other deputies saw he was there, Mr.

27   Alvarez was told not to stand around and to return to his cell by a deputy.

28       12.    The deputy who had been kicking me punched me in the back of the

000518

1    head. The blow made a knot on my head that is still there today. After the beating,

2    I had a dizzy feeling and I still suffer headaches which I will explain below in the

3    section about the physical consequences of the beating.

4         13.    Next, the deputy grabbed a hold of my leg and yanked it, popping my

5    knee out of position. My leg is unusually sensitive due to breaking my hip when I

6    was three years old and due to a car accident I mentioned above that dislocated my

7    knee severely and broke my leg. When my knee popped out of position, the sound
     was audible. My whole knee cap swelled

8         14.    The deputies who had been watching the beating picked me off the

9    ground and took me to the hospital in TTCF. A nurse helped me and took an x-ray,

10   but I never saw a doctor.

11        15.    When I came back from the hospital, the CA I saw in the hallway

12   when the beating started closed my cell door too quickly and caught me in the

13   door. The cell doors open by turning a lever to open or close the door and the lever

14   is next to the cell door. The CA stood right next to me so he could easily see when

15   to close the door without trapping me. He left me stuck in the door for about ten

16   seconds and laughed at me. Then, he opened the cell door enough that he could

17   push me into the cell. I did not get hurt from this shove because I caught myself

18   before falling down.

19        16.    No one from the Sheriff's Department interviewed me about this

20   beating. I was not written up or disciplined either. As far as I know, no record of

21   any kind exists about my beating. I wanted to make a complaint, but no one on the

22   jail's staff would give me the forms to make a complaint. I asked the deputies if I

23   could see a sargent, but the deputies would not let me.

24

25   Physical Repercussions Resulting From This Beating

26

27        17.    As a result of this beating, I suffer various physical repercussions. I

28   experience regular pain in my back and knee. The pain affects my ability to get to

3

000519

sleep. The pain in my back is not constant, but when it hurts, it is an 8 on the pain scale I described above. It feels like someone has hit my back with a hammer. It is a shooting pain.

18.     I have difficulty walking. I cannot crouch because my knee does not bend far enough to let me do that. As a result, when I need to reach an item under my bed, for example, I must slide my left leg out to the side (keeping it straight the whole time) and balance on my other foot. This is quite difficult, so I will usually ask other people to reach things for me.

19.     When I get my pain medication, I can sit without pain. However, without medication, I cannot sit for even an hour.

20.     I cannot run. If I attempt to run, my kneecap pops in and out of position. I cannot perform sit-ups, push-ups, or squats.

21.     I suffer headaches and dizziness most days. I do not experience a headache without dizziness or dizziness without a headache. These symptoms always come together. The headache's pain centers in the knot on the back of my head that I have had since the deputy punched my head. The pain is so bad that it makes me cry at night and stops me from sleeping. My dizziness feels like the feeling I get after spinning around in a circle quickly.

Lack of access to pain medication and medical care

22.     I am allowed to self-regulate my use of my pain medication so I keep my medication with me and take it when I feel it is necessary. Since I am not getting my medication from the nurse at pill call, I need to pay attention to how much of the medicine I have left and request more medication when I will run out.

23.     I generally get my medication refilled at the start of a month. By three weeks into the month, I will run out of medication. I am careful to request pain medication before I run out.

4

24.    The process to get more pain medication requires that first I put my name on the list to see a nurse. When I request a nurse, I will usually be able to see a nurse the next day. Then, the nurse makes a request to the doctor to refill my prescription.  The doctor will not visit me. Instead, the doctor is told of my prescription refill request. The doctor approves or disapproves the request, but even if the doctor approves the request, the doctor does not refill my prescription until the beginning of the next month. As a result, I have to go about eight to ten days without pain medication since I usually run out after three weeks. This same process happens every month. In the meantime, the pain in my knee and back is constant and disabling. I am unable to do any of my normal activities and I have trouble sleeping during the eight to ten day period when I am without my medication.

25.    As a result, I go to pill call to ask the nurses if they can help me every day, but the nurses will never give me medication or help me to get my prescription refilled sooner.

26.    I have requested four times to see my medical records and the results of my x-ray after the beating, but I have never been allowed to see any of this information. I requested this information by telephone on Sept. 21, 2010; Oct. 13, 2010; Dec. 14, 2010; and January 10, 2011. In each case, I have called the front desk at TTCF and asked to speak to a watch commander. The person who answers the phone told me each time that there was no sergeant available and they would take a message and return my call. No one has ever returned my call.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this July 13, 2011, in Los Angeles, California.

Keith Nichols

5



**Declaration of Keith Nichols**

I, Keith Nichols, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I was an inmate in the Los Angeles County Jails System in August of 2010 following an arrest on May 12, 2010 and placement in Men's Central Jail on May 15, 2010. I have been housed in Twin Towers Correctional Facility (TTCF) Module 131 D Pod since March 16, 2011. My booking number is 2669830.

3.      I am making this declaration to describe a beating I received from a deputy at the Men's Central Jail (MCJ), my physical limitations due to this beating, and the inadequate medical care I have received while in jail. The beating I will describe happened on a Friday in August of 2010 while I was housed in MCJ Module 2200 Row B Cell 12.

4.      On that Friday in August 2010, I was returning to my cell after a visit with my mom. I had come in from the hallway and I was in area outside of the 2200 wing and the 2000 wing. A diagram depicting the area where I was beaten and the positions of the individuals I describe in this declaration is attached as Exhibit A.

5.      When I was walking through the area between the wings, a white male deputy asked me what I was in jail for. This deputy was about six feet tall. He had black hair. I refused to discuss my case with the deputy. I told him that he could talk to my lawyer if he wanted to talk about my case.

6.      As soon as I told the deputy that I would not discuss my case, he told me to "face (my) black ass to the wall." I heard the deputy yell at other inmates to hurry up and get back to their cells. I saw a Custody Assistant (CA) was in the hallway too. The CA looked to me like he was a Hispanic person, about five feet eight inches, and heavy set. I think his name was Rodriguez.

7.      I was facing the wall, so I could not see what the deputy was doing,

000523

1   but eventually he stopped yelling at inmates to get back to their cells.

2       8.      The deputy returned to me and pushed me to the ground. I ended up

3   on the ground under the mural of the County Sheriff Bulldog, which is a bulldog

4   dressed like a marine that is on the wall in the area between the two wings.

5       9.      While I was on the ground, the deputy kicked me with full force in

6   the lower back on the left side with what felt like a steel-toed boot because the toe

7   of the boot was much harder that the toe on a regular boot. The pain was as bad as

8   anything that I can imagine. The deputy kicked me at least five times on my spine

9   in my lower back and near my kidneys. To draw a comparison, I was hit by a car

10  in 2006. During that accident, my left leg became entangled in the car's wheel and

11  broke in two places and my knee was severely dislocated. The deputy's kick was

12  as painful than that car accident. I would rank the pain from the kick as a 10 on a

13  scale of pain with 1 being minimum pain and 10 being excruciating pain. I am still

14  on pain medication to this day for this injury and I still suffer physical limitations

15  due to the injury which I detail below.

16      10.     After being kicked, I was on the ground trying to shield myself from

17  additional kicks. At this time, other deputies completely surrounded me in a way

18  that blocked anyone from seeing what they were doing to me. These deputies came

19  on their own without the deputy who was beating me having called for their help. I

20  was not able to see these deputies' faces because my head was near the ground and

21  I was shielding my face while I was being kicked, but I did see five sets of feet

22  standing in a line between me and the nurse's station as indicated on Exhibit A.

23      11.     A fellow inmate, Jose Alvarez, told me that he saw the deputy kicking

24  me because he had been at the nurse's station when the deputy started to beat me.

25  The nurse's station and Mr. Alvarez's approximate position are indicated on

26  Exhibit A. Mr. Alvarez told me that once the other deputies saw he was there, Mr.

27  Alvarez was told not to stand around and to return to his cell by a deputy.

28      12.     The deputy who had been kicking me punched me in the back of the

1  head. The blow made a knot on my head that is still there today. After the beating,

2  I had a dizzy feeling and I still suffer headaches which I will explain below in the

3  section about the physical consequences of the beating.

4        13.    Next, the deputy grabbed a hold of my leg and yanked it, popping my

5  knee out of position. My leg is unusually sensitive due to breaking my hip when I

6  was three years old and due to a car accident I mentioned above that dislocated my

7  knee severely and broke my leg. When my knee popped out of position, the sound

8  was audible. My whole kneecap swelled.

9        14.    The deputies who had been watching the beating picked me off the

10  ground and took me to the hospital in TTCF. A nurse helped me and took an x-ray,

11  but I never saw a doctor.

12        15.    When I came back from the hospital, the CA I saw in the hallway

13  when the beating started closed my cell door too quickly and caught me in the

14  door. The cell doors open by turning a lever to open or close the door and the lever

15  is next to the cell door. The CA stood right next to me so he could easily see when

16  to close the door without trapping me. He left me stuck in the door for about ten

17  seconds and laughed at me. Then, he opened the cell door enough that he could

18  push me into the cell. I did not get hurt from this shove because I caught myself

19  before falling down.

20        16.    No one from the Sheriff's Department interviewed me about this

21  beating. I was not written up or disciplined either. As far as I know, no record of

22  any kind exists about my beating. I wanted to make a complaint, but no one on the

23  jail's staff would give me the forms to make a complaint. I asked the deputies if I

24  could see a sargent, but the deputies would not let me.

25  / / /

26  Physical Repercussions Resulting From This Beating

27  / / /

28        17.    As a result of this beating, I suffer various physical repercussions. I

000525

experience regular pain in my back and knee. The pain affects my ability to get to sleep. The pain in my back is not constant, but when it hurts, it is an 8 on the pain scale I described above. It feels like someone has hit my back with a hammer. It is a shooting pain.

18.    I have difficulty walking. I cannot crouch because my knee does not bend far enough to let me do that. As a result, when I need to reach an item under my bed, for example, I must slide my left leg out to the side (keeping it straight the whole time) and balance on my other foot. This is quite difficult, so I will usually ask other people to reach things for me.

19.    When I get my pain medication, I can sit without pain. However, without medication, I cannot sit for even an hour.

20.    I cannot run. If I attempt to run, my kneecap pops in and out of position. I cannot perform sit-ups, push-ups, or squats.

21.    I suffer headaches and dizziness most days. I do not experience a headache without dizziness or dizziness without a headache. These symptoms always come together. The headache's pain centers in the knot on the back of my head that I have had since the deputy punched my head. The pain is so bad that it makes me cry at night and stops me from sleeping. My dizziness feels like the feeling I get after spinning around in a circle quickly.

/ / /

Lack of access to pain medication and medical care

/ / /

22.    I am allowed to self-regulate my use of my pain medication so I keep my pain medication with me and take it when I feel it is necessary. Since I am not getting my medication from the nurse at pill call, I need to pay attention to how much of the medicine I have left and request more medication when I will run out.

23.    I generally get my medication refilled at the start of a month. By three weeks into the month, I will run out of medication. I am careful to request

1    pain medication before I run out.

2         24.    The process to get more pain medication requires that first I put my

3    name on the list to see a nurse. When I request a nurse, I will usually be able to see

4    a nurse the next day. Then, the nurse makes a request to the doctor to refill my

5    prescription.  The doctor will not visit me. Instead, the doctor is told of my

6    prescription refill request. The doctor approves or disapproves the request, but

7    even if the doctor approves the request, the doctor does not refill my prescription

8    until the beginning of the next month. As a result, I have to go about eight to ten

9    days without pain medication since I usually run out after three weeks. This same

10   process happens every month. In the meantime, the pain in my knee and back is

11   constant and disabling. I am unable to do any of my normal activities and I have

12   trouble sleeping during the eight to ten day period when I am without my

13   medication.

14        25.    As a result, I go to pill call to ask the nurses if they can help me every

15   day, but the nurses will never give me medication or help me to get my

16   prescription refilled sooner.

17        26.    I have requested four times to see my medical records and the results

18   of my x-ray after the beating, but I have never been allowed to see any of this

19   information. I requested this information by telephone on Sept. 21, 2010; Oct. 13,

20   2010; Dec. 14, 2010; and January 10, 2011. In each case, I have called the front

21   desk at TTCF and asked to speak to a watch commander. The person who answers

22   the phone told me each time that there was no sergeant available and they would

23   take a message and return my call. No one has ever returned my call.

24        I declare under penalty of perjury of the laws of the State of California and

25   the United States that the foregoing is true and correct.  Executed this July 13,

26   2011, in Los Angeles, California.

27                                   _____/s/_____

28                                   Keith Nichols



# DECLARATION OF CURRENT PRISONER MR. SS
# FRED NOWDEN

000529

## Declaration of Fred Nowden

I, Fred Nowden, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am 36 years old. I was arrested on November 19, 2009 and am currently living in Men's Central Jail ("MCJ") Module 2500, cell number 7. My booking number is 2136136.

3.    On or about February 18, 2011 I witnessed seven or eight deputies beating another inmate, Garry Crumpton.

4.    That day, I was walking from the dormitory to the "tank" with other inmates on 2000 floor. The tank is where they house all the inmates waiting to see the judge in court. A bald Asian male deputy and a Hispanic male deputy were leading us to the tank. Inmate Garry Crumpton, who is my friend and also lived on the 2000 floor, was walking 2 or 3 people behind me. While we were walking in line, I was talking to Mr. Crumpton and another inmate directly behind me when the next thing I heard was one of the deputies yelling, "what did you say?!" "are you stupid or something!?" I'm not sure which deputy yelled this.

5.    I was curious to see who the deputy was yelling at so I turned my head over my shoulder. A short white deputy who was standing five feet away from me instructed me and the other inmates in the line to turn and face the wall. The deputies keeping us in line carried metal bars in front of them to discourage any of us from turning around.

6.    I was able to sneak a couple peaks over my shoulder and saw Garry Crumpton lying on his stomach on the floor with both arms spread out above his head, in surrender. One of the deputies had a flashlight pushing on the back of Garry Crumpton's neck, pinning him down. Crumpton was not resisting to the seven or eight deputies who were violently punching and kicking him all over his body. Garry was just lying there absorbing the blows, while the deputies kept

yelling, "stop resisting!"

7.      The beating seemed to last for about 10 to 20 seconds. The last glance I took over my shoulder, I saw Mr. Crumpton shaking on the floor after most of the deputies beating him up were gone. Then the short white deputy who told us to turn and face the wall told me to get into another line and we continued to walk to the tank.

8.      I don't know what happened to Mr. Crumpton after the beating. I think he went to the hospital because I saw him a couple days later with a soft brace around his neck.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed July 12, 2011 in Los Angeles, California.

Fred Nowden

2

000531

# DECLARATION OF CURRENT PRISONER MR. UU DORIAN PAZ

000532

### Declaration of Dorian Paz

I, Dorian Paz, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am twenty six years old and I have been in Men's Central Jail (MCJ) for approximately four months, since July of 2010.  I am currently housed in Module 2300, Row C, Cell 18.  My booking number is 2395286.

3.    Approximately two months ago, a black inmate died in the 2400 module.

4.    I was originally supposed to be in Protective Custody as soon as I got to MCJ because I am a Southsider Gang dropout and I was waiting to be confirmed by OSJ to be in Protective Custody.  They denied my confirmation because they said that I didn't meet the criteria to be in Protective Custody so they put me on the mainline or with general population onto Module 2700, one day before the inmate was killed on Module 2400.

5.    When I was on the mainline, in Module 2700, a day after the inmate was killed, an inmate that I knew when I served time at Soledad State Prison in 2002, was placed in the cell on the right side of me, named Gilbert Calderon.

6.    I asked him why he was in there and he told me that he killed the black inmate that died in Module 2400.  He told me that he and another inmate, whose name I don't know beat him, cut him with a razor blade, sliced him, choked him and placed him under the bunk.

7.    He was moved out of this cell about a half hour to an hour after he had got there and as soon as he left, I told this information to the deputy that was working on Module 2700.  I don't remember his name.  He was Hispanic, short with shaven hair.

8.    Approximately one hour later, another deputy, who is White, tall and bald, escorted me to OSJ and I told the deputy at OSJ what I knew.  After I spoke to them, I was placed on Module 2100.

9.    Two days later, I was brought out of my cell at or around 11 o'clock in the evening to midnight and was escorted to a room on the 2000 floor by one of the night shift deputies.  In the room, there were two Homicide Sheriff detectives and they asked me what had

000533

1  happened, so I told them what I told the deputy and OSJ about what Calderon told me.  I also told

2  them that I was supposed to be in Protective Custody, but OSJ put me with the general

3  population.  I asked them to place me in Protective Custody, which they did two days later.

4          10.     About two days after I told the detectives the story and on the day I was placed in

5  Protective Custody, Deputy Dred brought me out of my cell in the morning.  He asked me, "what

6  do you know?" and I told him.  He asked me, "who else did you talk to?" and I told him that I

7  spoke to OSJ.  I told him that I had also heard from other inmates that the "deputies let it

8  happen" referring to the inmate's death on Module 2400.  I explained to him that I didn't know

9  anything about and that Calderon did not mention any of that when he was telling me what had

10  happened.  I also told him that I don't want anyone messing with me since I only told OSJ and

11  the other deputies about what Calderon told me and nothing about deputies being involved

12  because I didn't know anything about it.

13         11.     Deputy Dred then said to me, "all right, all right.  I'll make sure that no one

14  messes with you."

15         12.     At my last court date about two weeks ago, before I entered the courtroom, as I

16  was walking through the corridor, escorted by an officer, to get to the courtroom door, a group of

17  six or more deputies were in that area.  I heard one of them say, "that's a dead man walking" to

18  me when I passed by.  My co-defendent, Luis Banuelos also heard the deputies make this

19  comment to me, since he was walking behind me.  I have not been able to see the names of these

20  deputies because everyone knows that when you're walking, you don't look around, you just look

21  straight ahead.

22         13.     I don't know why the deputies are targeting me, because I did not say anything to

23  the deputies or the detectives about me knowing anything about the inmate's death except that

24  Calderon did it because he told me that he did.  I have heard from other inmates that deputies

25  were involved and that "they let it happen", but I don't know this to be true and because I don't, I

26  never said anything about it.

27         14.     I fear for my life, especially when I have to go to court because of the same group

28                                                        2

1   of deputies that watch me.

2       15.   My co-defendant, Banuelos, on or around Thursday, November 11, 2010 told me

3   that when we were walking out of the visiting room in the morning, he saw deputies pointing me

4   out to the other deputies saying, "that's the guy." I don't know who the deputies are.

5       16.   Also, when I was on court line two weeks ago, a few Protective Custody inmates

6   and I were walking towards the elevator and we saw several non-Protective Custody inmates

7   coming out of the elevator unescorted. From what I know, non-Protective Custody inmates are

8   not supposed to be around Protective Custody inmates. I then saw a group of deputies in another

9   elevator just waiting around near this area. I always feel like I'm being set up.

10      17.   When I was at court a week after the Homicide Sheriff detectives talked to me, I

11  was the last inmate to leave the court holding tank, even though ~~I was~~ my hearing was finished

12  early. I saw all the other inmates being escorted out of the court holding tank except me.

13

14      I declare under penalty of perjury of the laws of the State of California and the United

15  States that the foregoing is true and correct. Executed this 16th day of November, 2010 in Los

16  Angeles, California.

17

18  Dorian Paz

19

20

21

22

23

24

25

26

27

28                               3

## Declaration of Dorian Paz

I, Dorian Paz, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am twenty six years old and I have been in Men's Central Jail (MCF) for approximately four months, since July of 2010.  I am currently housed in Module 2300, Row C, Cell 18.  My booking number is 2395286.

3.      Approximately two months ago, a black inmate died in the 2400 module.

4.      I was originally supposed to be in Protective Custody as soon as I got to MCJ because I am a Southsider Gang dropout and I was waiting to be confirmed by OSJ to be in Protective Custody.  They denied my confirmation because they said that I didn't meet the criteria to be in Protective Custody so they put me on the mainline or with general population onto Module 2700, one day before the inmate was killed on Module 2400.

5.      When I was on the mainline, in Module 2700, a day after the inmate was killed, an inmate that I knew when I served time at Soledad State Prison in 2002, was placed in the cell on the right side of me, named Gilbert Calderon.

6.      I asked him why he was in there and he told me that he killed the black inmate that died in Module 2400.  He told me that he and another inmate, whose name I don't know beat him, cut him with a razor blade, sliced him, choked him and placed him under the bunk.

7.      He was moved out of this cell about a half hour to an hour after he had got there and as soon as he left, I told this information to the deputy that was working on Module 2700.  I don't remember his name.  He was Hispanic, short with shaven hair.

8.      Approximately one hour later, another deputy, who is White, tall and bald, escorted me to OSJ and I told the deputy at OSJ what I knew.  After I spoke to them, I was placed on Module 2100.

9.      Two days later, I was brought out of my cell at or around 11 o'clock in the evening to midnight and was escorted to a room on the 2000 floor by one of the night shift deputies.  In the room, there were two Homicide Sheriff detectives and they asked me what had

1   happened, so I told them what I told the deputy and OSJ about what Calderon told me.  I also told

2   them that I was supposed to be in Protective Custody, but OSJ put me with the general

3   population.  I asked them to place me in Protective Custody, which they did two days later.

4       10.   About two days after I told the detectives the story and on the day I was placed in

5   Protective Custody, Deputy Dred brought me out of my cell in the morning.  He asked me, "what

6   do you know?" and I told him.  He asked me, "who else did you talk to?" and I told him that I

7   spoke to OSJ.  I told him that I had also heard from other inmates that the "deputies let it

8   happen" referring to the inmate's death on Module 2400.  I explained to him that I didn't know

9   anything about and that Calderon did not mention any of that when he was telling me what had

10  happened.  I also told him that I don't want anyone messing with me since I only told OSJ and

11  the other deputies about what Calderon told me and nothing about deputies being involved

12  because I didn't know anything about it.

13      11.   Deputy Dred then said to me, "all right, all right.  I'll make sure that no one

14  messes with you."

15      12.   At my last court date about two weeks ago, before I entered the courtroom, as I

16  was walking through the corridor, escorted by an officer, to get to the courtroom door, a group of

17  six or more deputies were in that area.  I heard one of them say, "that's a dead man walking" to

18  me when I passed by.  My co-defendent, Luis Banuelos also heard the deputies make this

19  comment to me, since he was walking behind me.  I have not been able to see the names of these

20  deputies because everyone knows that when you're walking, you don't look around, you just look

21  straight ahead.

22      13.   I don't know why the deputies are targeting me, because I did not say anything to

23  the deputies or the detectives about me knowing anything about the inmate's death except that

24  Calderon did it because he told me that he did.  I have heard from other inmates that deputies

25  were involved and that "they let it happen", but I don't know this to be true and because I don't, I

26  never said anything about it.

27      14.   I fear for my life, especially when I have to go to court because of the same group

28                                        2

1 of deputies that watch me.

2   15. My co-defendent, Banuelos, on or around Thursday, November 11, 2010 told me

3 that when we were walking out of the visiting room in the morning, he saw deputies pointing me

4 out to the other deputies saying, "that's the guy." I don't know who the deputies are.

5   16. Also, when I was on court line two weeks ago, a few Protective Custody inmates

6 and I were walking towards the elevator and we saw several non-Protective Custody inmates

7 coming out of the elevator unescorted. From what I know, non-Protective Custody inmates are

8 not supposed to be around Protective Custody inmates. I then saw a group of deputies in another

9 elevator just waiting around near this area. I always feel like I'm being set up.

10   17. When I was at court a week after the Homicide Sheriff detectives talked to me, I

11 was the last inmate to leave the court holding tank, even though I was my hearing was finished

12 early. I saw all the other inmates being escorted out of the court holding tank except me.

13

14   I declare under penalty of perjury of the laws of the State of California and the United

15 States that the foregoing is true and correct. Executed this ____ day of November, 2010 in Los

16 Angeles, California.

17              _____/s/_____

18              Dorian Paz

19

20

21

22

23

24

25

26

27

28            3

**Bates #'s 000539 - 000545 Intentionally Omitted**

# DECLARATION OF CURRENT PRISONER MR. VV RAUL PEDROZA

000546

**Declaration of Raul Pedroza**

I, Raul Pedroza, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently as follows:

2.    I have been an inmate of the Los Angeles County Jail System since February 15, 2008. I am currently housed in Men's Central Jail ("MCJ"),  Module 1751, Row, Cell 3.

3.    Before I was moved to my current location, I was housed on Module 1750, Denver Row, Cell 2. This is where the following incident occurred.

4.    On or about June 10, 2011 I was standing by the bars to my cell. I placed both my hands between separate vertical bars and began to call out to the deputies to release me so that I could go to the law library. I am a *pro per* inmate and I need law library access to conduct my trial. I would call out "Law library on D Row" every 10 to 15 minutes to remind the deputies that I was scheduled for the law library that day. As I will show below, the deputies have a habit of not taking me and other pro per inmates to the law library when they should. Usually when I call out for law library time I do so in a voice that's loud enough for them to hear me bust still respectful and never obnoxious or demanding. I only call out for law library time once or twice every 10 to 15 minutes, if after the third time they don't take us I give up and wait until another day to go to the law library.

5.    After the 2nd time I called out, the door began to open to the side. My cell door is a sliding door made up of vertical and horizontal steel bars. When the door began to move my arm was still in between one of the vertical bars. My right arm got caught as the door was sliding open. I called out "Hey!" in a loud voice because it was very painful. On a scale of one to ten I would rate the pain an 8.  The whole thing lasted three or four seconds before someone stopped the door and closed it again.

6.    The incident occurred on a Friday night but I was not taken to a hospital until Monday evening. My girlfriend had to call the jail and the ACLU to get them to treat me. The door left a very large bruise on my arm, right above the elbow that has since healed.

7.    The deputies control who opens the cell doors from a booth at the entrance to

1   module between Row D and Row C . In the entire time I have been here I have not seen the

2   deputies open up a cell unless an inmate is handcuffed. At the time I was not handcuffed; I was

3   just resting my arms on the bars.  I believe that whoever opened the door did so to get me to stop

4   complaining.

5   G-ROW

6          8.     I spoke with Eloy Aguirre, an  intern from the American Civil Liberties Union

7   ("ACLU") about the incident with my arm on or about June 29, 2011. We spoke in the Attorney

8   Room of MCJ and Deputy Avitia was working in the Attorney Room that day. After I had

9   finished speaking with Mr. Aguirre, I walked by Avitia and he said "The ACLU think they can

10  do whatever they want." The following Thursday, on July 7, 2011, I was placed on Row G where

11  I am still housed. G-Row is known among the inmates as the place where deputies send inmates

12  that complain. I asked Senior Zagorski why I had been placed in Row G and all he told me was

13  that it was "For my own protection and ours." I don't need any protection: I have not been

14  written up and I have not been violent towards anyone in MCJ. It has been my experience that

15  this is a standard excuse that the deputies use to justify anything.

16         9.     Row G is a "hard cell" instead of having a door that's made up of vertical and

17  horizontal bars, there is a plexiglass door that is enclosed in a metal case that has small peepholes

18  throughout its surface . You can only see through the little holes in the metal.

19         10.    The conditions in Row G are horrible. The row is very hot and there is no

20  ventilation. I see giant rats all the time and I am forced to rip off a piece of my shirt to hang my

21  canteen along the wall just to keep it away from the rats. We are handed food in plastic bags and

22  often those bags drip fruit juice or other liquids. The trustees don't sweep or mop around here

23  and this leaves sticky food residue on the floors that invites more rats to come. Furthermore, we

24  throw all our trash away through an opening to our cell door. We are not allowed trash bags so

25  the trash just gets thrown on the ground. Since the trustees don't sweep around here, the trash

26  just festers there and encourages more rats to come to our row.

27         11.    Also, the toilet in my cell leaks and I have to use a cup to collect the water or else

28  my cell will be flooded with toilet water. I complained about the toilet and I was told someone

000548

1   would come in and replace it but it hasn't happened yet. I do not want to keep complaining

2   because there is only one other cell on Row G. That one has a bunk bed on the bottom, closer to

3   the floor. I fear that if I keep complaining, I will just be switched to that cell. Since that bunk bed

4   is on the bottom, I will be much closer to the rats and they will be able to climb up to my bed. In

5   my current cell, the floor is flooded but since the bunk bed is on top, I can at least sleep well

6   knowing the rats cannot get to me.

7       12.     Whereas on Module 1750 I was allowed two days per week for family visits and

8   law library access, here on Row G I only have Thursdays at 1pm to receive personal visits or go

9   to the law library. As a result, every Thursday I have to choose between seeing my mother or

10  going to the law library.

11      13.     I was never told why I was placed on Row G. I believe it may have been because

12  of all of the complaints I have filed, both internal jail complaints and complaints to the ACLU. It

13  seems strange that they put me here especially because my alleged co-conspirator is three cells

14  away from me. In the three years that I have been here I have never been placed in a cell near

15  him. My being on Row G is also strange because various deputies who walk this row are always

16  surprised to see me here. Deputies Rivera, Gonzalez, and Castro were surprised when they saw

17  me here. They would ask, "What are you doing here?" and I'd respond, "You tell me."

18      14.     For the foregoing reasons, I believe I was placed on Row G as punishment for

19  filing complaints and for speaking with the ACLU.

20  LAW LIBRARY ISSUES

21      15.     Since I am a *pro per* inmate, I require access to the law library to conduct my legal

22  work. At Row G and in my old row, Denver Row, getting the deputies to take us to the law

23  library has always been an issue. They do all they can to avoid taking us to the library. We are

24  supposed to be able to go to the law library every day. When I was on Denver Row, most of the

25  time we only went to the law library three times a week. On weekends it was rare for the deputies

26  to take us to the law library. Here on Row G I only go to the law library 4 times per week, even

27  though we are supposed to go every day.

28      16.     Once I overheard a veteran deputy, Deputy Gonzalez who is 5'7" and Hispanic,

1  teach Custodial Assistant ("CA") Quintana,  how to punch in our numbers into their scanners.

2  The deputies are supposed to scan our wristbands when they take us to the law library . However,

3  many times the deputies will walk down the row and instead of taking us to the law library they

4  will punch in our booking numbers into their scanners. Four to five months ago, I was in the law

5  library and CA Quintana was about to scan my wristband. Before he could scan it, Deputy

6  Gonzales said "Don't worry about that. I'll show you how to avoid all that." CA Quintana

7  typically doesn't deal with the pro per inmates as much as the other deputies.

8         I declare under penalty of perjury of the laws of the State of California and the United

9  States that the foregoing is true and correct.  Executed this September 9, 2011 in Los Angeles,

10  California.

11                                        _____/s/_____

12                                        Raul Pedroza

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000550

1                             **Declaration of Raul Pedroza**

2       I, Raul Pedroza, hereby declare:

3           1.      I make this declaration based on my own personal knowledge and if called on to

4 testify I could and would do so competently as follows:

5           2.      I have been an inmate of the Los Angeles County Jail System since February 15,

6 2008. I am currently housed in Men's Central Jail ("MCJ"), Module 1751, Row, Cell 3.

7           3.      Before I was moved to my current location, I was housed on Module 1750,

8 Denver Row, Cell 2. This is where the following incident occurred.

9           4.      On or about June 10, 2011 I was standing by the bars to my cell. I placed both my

10 hands between separate vertical bars and began to call out to the deputies to release me so that I

11 could go to the law library. I am a *pro per* inmate and I need law library access to conduct my

12 trial. I would call out "Law library on D Row" every 10 to 15 minutes to remind the deputies that

13 I was scheduled for the law library that day. As I will show below, the deputies have a habit of

14 not taking me and other pro per inmates to the law library when they should. Usually when I call

15 out for law library time I do so in a voice that's loud enough for them to hear me bust still

16 respectful and never obnoxious or demanding. I only call out for law library time once or twice

17 every 10 to 15 minutes, if after the third time they don't take us I give up and wait until another

18 day to go to the law library.   R.I.P

19           5.      After the 2nd time I called out, the door began to open to the side. My cell door

20 is a sliding door made up of vertical and horizontal steel bars. When the door began to move my

21 arm was still in between one of the vertical bars. My right arm got caught as the door was sliding

22 open. I called out "Hey!" in a loud voice because it was very painful. On a scale of one to ten I

23 would rate the pain an 8. The whole thing lasted three or four seconds before someone stopped

24 the door and closed it again.

25           6.      The incident occurred on a Friday night but I was not taken to a hospital until

26 Monday evening. My girlfriend had to call the jail and the ACLU to get them to treat me. The

27 door left a very large bruise on my arm, right above the elbow that has since healed.

28           7.      The deputies control who opens the cell doors from a booth at the entrance to

1   module between Row D and Row C . In the entire time I have been here I have not seen the

2   deputies open up a cell unless an inmate is handcuffed. At the time I was not handcuffed; I was

3   just resting my arms on the bars.  I believe that whoever opened the door did so to get me to stop

4   complaining.

5   <u>G-ROW</u>

6           8.      I spoke with Eloy Aguirre, an  intern from the American Civil Liberties Union

7   ("ACLU") about the incident with my arm on or about June 29, 2011. We spoke in the Attorney

8   Room of MCJ and Deputy Avitia was working in the Attorney Room that day. After I had

9   finished speaking with Mr. Aguirre, I walked by Avitia and he said "The ACLU think they can

10  do whatever they want." The following Thursday, on July 7, 2011, I was placed on Row G where

11  I am still housed. G-Row is known among the inmates as the place where deputies send inmates

12  that complain. I asked Senior Zagorski why I had been placed in Row G and all he told me was

13  that it was "For my own protection and ours." I don't need any protection: I have not been

14  written up and I have not been violent towards anyone in MCJ. It has been my experience that

15  this is a standard excuse that the deputies use to justify anything.

16          9.      Row G is a "hard cell" instead of having a door that's made up of vertical and

17  horizontal bars, there is a plexiglass door that is enclosed in a metal case that has small peepholes

18  throughout its surface . You can only see through the little holes in the metal.

19          10.     The conditions in Row G are horrible. The row is very hot and there is no

20  ventilation. I see giant rats all the time and I am forced to rip off a piece of my shirt to hang my

21  canteen along the wall just to keep it away from the rats. We are handed food in plastic bags and

22  often those bags drip fruit juice or other liquids. The trustees don't sweep or mop around here

23  and this leaves sticky food residue on the floors that invites more rats to come. Furthermore, we

24  throw all our trash away through an opening to our cell door. We are not allowed trash bags so

25  the trash just gets thrown on the ground. Since the trustees don't sweep around here, the trash

26  just festers there and encourages more rats to come to our row.

27          11.     Also, the toilet in my cell leaks and I have to use a cup to collect the water or else

28  my cell will be flooded with toilet water. I complained about the toilet and I was told someone

2

1   would come in and replace it but it hasn't happened yet. I do not want to keep complaining

2   because there is only one other cell on Row G. That one has a bunk bed on the bottom, closer to

3   the floor. I fear that if I keep complaining, I will just be switched to that cell. Since that bunk bed

4   is on the bottom, I will be much closer to the rats and they will be able to climb up to my bed. In

5   my current cell, the floor is flooded but since the bunk bed is on top, I can at least sleep well

6   knowing the rats cannot get to me.

7        12.    Whereas on Module 1750 I was allowed two days per week for family visits and

8   law library access, here on Row G I only have Thursdays at 1pm to receive personal visits or go

9   to the law library. As a result, every Thursday I have to choose between seeing my mother or

10   going to the law library.

11        13.    I was never told why I was placed on Row G. I believe it may have been because

12   of all of the complaints I have filed, both internal jail complaints and complaints to the ACLU. It

13   seems strange that they put me here especially because my alleged co-conspirator is three cells

14   away from me. In the three years that I have been here I have never been placed in a cell near

15   him. My being on Row G is also strange because various deputies who walk this row are always

16   surprised to see me here. Deputies Rivera, Gonzalez, and Castro were surprised when they saw

17   me here. They ~~said things like~~ *R.I.P* would ask: "what are you doing here?" and I'd

18   respond, "you tell me." *R.I.P*     14.    For the foregoing reasons, I believe I was placed on Row G as punishment for

19   filing complaints and for speaking with the ACLU.

20   <u>LAW LIBRARY ISSUES</u>

21        15.    Since I am a *pro per* inmate, I require access to the law library to conduct my legal

22   work. At Row G and in my old row, Denver Row, getting the deputies to take us to the law

23   library has always been an issue. They do all they can to avoid taking us to the library. We are

24   supposed to be able to go to the law library every day. When I was on Denver Row, most of the

25   time we only went to the law library three times a week. On weekends it was rare for the deputies

26   to take us to the law library. Here on Row G I only go to the law library 4 *R.I.P* times per week, *R.I.P*

27   even though we are supposed to go everyday.     16.    Once I overheard a veteran deputy, Deputy Gonzalez who is 5'7" and Hispanic,

28   teach Custodial ~~Assistant~~ Assistant *R.I.P* ("CA") Quintana, how to punch in our numbers into their scanners. The

1    deputies are supposed to scan our wristbands when they take us to the law library . However,

2    many times the deputies will walk down the row and instead of taking us to the law library they

3    will punch in our booking numbers into their scanners. ~~On or about~~ *R.Z.P Four to five months ago* I was in the law

4    library and CA Quintana was about to scan my wristband. Before he could scan it, Deputy *I heard*

5    Gonzales said "Don't worry about that. I'll show you how to avoid all that." *CA Quintana*

6    *typically doesn't deal with the pro per inmates*

7    *as much as the other deputies. R·Z·P*

8         I declare under penalty of perjury of the laws of the State of California and the United *R·Z·P*

9    States that the foregoing is true and correct. Executed this *September 9, 2011 R·Z·P* in Los Angeles,

10   California.

11                                                  *Raul Pedroza*

12                                                  Raul Pedroza

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# DECLARATION OF CURRENT PRISONER MR. WW ANTHONY PENMIK

000555

# DECLARATION OF ANTHONY PENMIK

I, Anthony Penmik, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am twenty-five years old.  I was placed in Module 141, Pod C, Cell 13 of Twin Towers Correctional Facility ("TTCF") on January 23, 2011 and was still there on Friday, July 15, 2011.  My booking number is 2618407.

**Deputy on Inmate violence**

3.      In March 2011 at around 10 pm, I heard two inmates in cell 15 messing around by talking loudly, clapping and banging on the doors. Soon after, two deputies came into my cell that I was sharing with another inmate. One deputy was a female, around 5'9" with short blond hair, skinny, and in her thirties. The other deputy was a Mexican male, 5'9", mid-twenties, with black hair and a stout build.

4.      The female deputy said to us, "Get the fuck out of bed before I make you" and told us to get up and face the wall. She didn't say why she was there doing this to us, so I can only assume that she thought we were the ones messing around. She put handcuffs on both of us behind our backs, took us into the day room, and made us sit and face the table with our heads down.

5.      She stuck her nails in my neck, and you can still see the marks her nails made. As she held me down by my neck, I saw that she was also holding my cellmate by his neck. I said to her, "Why are you talking like you're on your period?"  She said, "Lay the fuck down before I whack you with the light!"

6.      She called me "retarded" and said I didn't know any better and, "If you get a head coma and die, I'm going to leave you."

7.      The male deputy then came in and kicked me once in my left leg and once in my butt, and hit me in the leg with a flashlight. I had bruises on my leg

1

000556

1  from this incident.

2      8.     The female deputy left the room, and we waited with the male deputy

3  for two or three minutes. Out of the corner of my eye, I saw the female deputy

4  searching our cell.

5      9.     When I returned to my cell, I had items missing, such as a photo of

6  my sister and niece, and letters from my family.

7      10.    Our mattress, blankets and sheets were also gone. I slept without

8  anything to cover me up that night.  It was so cold.

9  **Meals**

10     15.    The trustees serve the food, and if they don't like you, they can mess

11  with your meals by giving a lesser quantity or taking items.

12     16.    We are supposed to get a protein shake with our meal, and almost

13  every time, there is no shake with my meal.

14     17.    I asked Deputy D.S. about it and he said he would tell the p.m. shift

15  deputy, Deputy Leo. Deputy Leo said it's up to the trustees. I also complained to

16  the nurse and she said that it's not up to her; it's up to the trustees.

17     18.    Not only have I gotten my meals without the protein shake, there

18  were three or four times when I only got one teaspoon of the main food, such as

19  pork and beans. On those days, I would get really hungry in the middle of the

20  night.

21  \\\

22  \\\

23  \\\

24  \\\

25  \\\

26  \\\

27  \\\

28  \\\

2

19.     There were two or three times when the milk tasted rotten. Around June 1, 2011, I noticed that the milk served with my meal had an expiration date of May 29, 2011. I had already drunk the milk when I noticed it, and I threw up five minutes later.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed this 15th day of July, 2011 in Los Angeles, California.


ANHMONY PENMIK

Anthony Penmik

3

000558

# DECLARATION OF ANTHONY PENMIK

I, Anthony Penmik, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am twenty-five years old.  I was placed in Module 141, Pod C, Cell 13 of Twin Towers Correctional Facility ("TTCF") on January 23, 2011 and was still there on Tuesday, July 12, 2011.  My booking number is 2618407.

**Deputy on Inmate violence**

3.      In March 2011 at around 10 pm, I heard two inmates in cell 15 messing around by talking loudly, clapping and banging on the doors. Soon after, two deputies came into my cell that I was sharing with another inmate. One deputy was a female, around 5'9" with short blond hair, skinny, and in her thirties. The other deputy was a Mexican male, 5'9", mid-twenties, with black hair and a stout build.

4.      The female deputy said to us, "Get the fuck out of bed before I make you" and told us to get up and face the wall. She didn't say why she was there doing this to us, so I can only assume that she thought we were the ones messing around. She put handcuffs on both of us behind our backs, took us into the day room, and made us sit and face the table with our heads down.

5.      She stuck her nails in my neck, and you can still see the marks her nails made. As she held me down by my neck, I saw that she was also holding my cellmate by his neck. I said to her, "Why are you talking like you're on your period?"  She said, "Lay the fuck down before I whack you with the light!"

6.      She called me "retarded" and said I didn't know any better and, "If you get a head coma and die, I'm going to leave you."

7.      The male deputy then came in and kicked me once in my left leg and once in my butt, and hit me in the leg with a flashlight. I had bruises on my leg

1

1 | from this incident.

2 |      8.    The female deputy left the room, and we waited with the male deputy

3 | for two or three minutes. Out of the corner of my eye, I saw the female deputy

4 | searching our cell.

5 |      9.    When I returned to my cell, I had items missing, such as a photo of

6 | my sister and niece, and letters from my family.

7 |     10.    Our mattress, blankets and sheets were also gone. I slept without

8 | anything to cover me up that night.  It was so cold.

9 | **Meals**

10 |     15.    The trustees serve the food, and if they don't like you, they can mess

11 | with your meals by giving a lesser quantity or taking items.

12 |     16.    We are supposed to get a protein shake with our meal, and almost

13 | every time, there is no shake with my meal.

14 |     17.    I asked Deputy D.S. about it and he said he would tell the p.m. shift

15 | deputy, Deputy Leo. Deputy Leo said it's up to the trustees. I also complained to

16 | the nurse and she said that it's not up to her; it's up to the trustees.

17 |     18.    Not only have I gotten my meals without the protein shake, there

18 | were three or four times when I only got one teaspoon of the main food, such as

19 | pork and beans. On those days, I would get really hungry in the middle of the

20 | night.

21 | \\\

22 | \\\

23 | \\\

24 | \\\

25 | \\\

26 | \\\

27 | \\\

28 | \\\

2

000560

1     19.    There were two or three times when the milk tasted rotten. Around

2    June 1, 2011, I noticed that the milk served with my meal had an expiration date

3    of May 29, 2011. I had already drunk the milk when I noticed it, and I threw up

4    five minutes later.

5     I declare under penalty of perjury of the laws of the State of California and

6    the United States that the foregoing is true and correct to the best of my

7    knowledge and belief.  Executed this 12th day of July, 2011 in Los Angeles,

8    California.

9

10                  _____/s/_____

11                  Anthony Penmik

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000561

# DECLARATION OF CURRENT PRISONER MR. XX DARRELL RAULS

000562

1          **Declaration of Darrell Rauls**

2          I, Darrell Rauls, hereby declare:

3          1.      I make this declaration based on my own personal knowledge and if called to

4     testify I could and would do so competently as follows:

5          2.      I was housed at the Parker Center Jail, B-row, in Los Angeles at the time of this

6     incident.

7          3.      On November 2, 2010, between 7:30 a.m. and 8:30 a.m., I was ~~making my way~~

8     ~~onto~~ on a bus heading to the Criminal Courts Building ("CCB") That morning, I was having an

9     adverse reaction to the blood pressure medicine that I was taking; I suffer from high blood

10    pressure and take medicine for it every morning. While waiting right outside the bus and while

11    still waist-chained to other inmates, I told a Deputy Stevenson about how I was feeling. Deputy

12    Stevenson got angry with me, for no apparent reason, and had another deputy take me out of the

13    chain and place me in a seat toward the front of the bus, across from the caging area. The other

14    deputy was a Hispanic man of short build, chubby, and was assigned to be Deputy Stevenson's

15    partner for the day. After dropping the last two inmates off at the Traffic Court ~~on Hill Street~~

16    ("Traffic Court"), I was left on the bus alone with Deputy Stevenson and the other deputy. I did

17    not know where the bus was taking me.

18        5. 4.   As soon as we left the Traffic Court, Deputy Stevenson began to shout profanities

19    and obscene remarks at me. He said things like "fuck you" and "I'm going to put my dick in your

20    ass" when he got the chance. I was shocked and taken aback at the way he was acting. I did not

21    know what provoked him to lash out at me the way he did. I thought to myself that I did not

22    disrespect him in any way to receive such verbal abuse.

23        6. 5.   I ended up being driven back to the Parker Center Jail. We pulled into the parking

24    ~~area~~ there, where the other deputy got off the bus. Deputy Stevenson approached my seat and

25    began to punch my ribs and upper body, all while I was still seated. While still in pain from this

26    beating, he grabbed me with force by the ~~right~~ left sleeve of my shirt and raised me to my feet. He

27

28
                                                                                        000563

1   then pushed me in front of him, ordering me to get off the bus. When approaching the raised

2   portion that leads down to the driver's seating area, Deputy Stevenson pushed me from behind,

3   making me fall off this raised portion inside the bus. I fell onto my right shoulder, and I still feel

4   the pain from that fall to this day. During this incident, I also lost my glasses that I had in one of

5   my jacket pockets.

6       16.   On the morning of November 22nd, 2010, I had another court date at CCB. While

7   in the ~~busing~~ bus bay of CCB, I saw Deputy Stevenson there. The ~~busing~~ bus bay is a special lot at the

8   CCB where buses ~~holding~~ and other vehicles inmates enter to drop off and pick up inmates after their court

9   hearings. The bay is underneath the building. I was being led off the ~~bus~~ van I rode in by Deputy Arias; he was

10   not the same deputy described from the previous incident. While being led, I told Deputy Arias

11   that I did not want to get out of the van while Deputy Stevenson was in the vicinity. He ignored

12   me, and instead ~~grabbed me by my right sleeve and~~ laughed and directed me to start walking. I was forced to

13   walk by Deputy Stevenson.  When we saw one another, I asked Deputy Stevenson if he

14   remembered seeing any glasses left on the bus. Deputy Stevenson replied "No, but I remember

15   kicking your ass." I was embarrassed and shocked by his comments; I was surprised that he

16   would incriminate himself in front of other deputies and inmates. In order to get him to admit to

17   the incident again, I asked him "did you really put your hands on me?" Deputy Stevenson

18   responded that he had. I could tell by his voice that he was openly disclosing this because he

19   wanted to brag in front of the other deputies and inmates that he had beat me. Deputies Medina (the driver

20   and Runkle (who works at CCB) were also present during this encounter. of my van)

21       I declare under penalty of perjury of the laws of the State of California and the United

22   States that the foregoing is true and correct.  Executed this 12th day of April, 2011 in Los Angeles,

23   California.

24                            _Darrell A. Rauls_

25                            Darrell Rauls

26

27

28                            2

| | |
|---|---|
| 1 | **Declaration of Darrell Rauls** |
| 2 | I, Darrell Rauls, hereby declare: |
| 3 | 1. I make this declaration based on my own personal knowledge and if called to |
| 4 | testify I could and would do so competently as follows: |
| 5 | 2. I was housed at the Parker Center Jail, B-row, in Los Angeles at the time of this |
| 6 | incident. |
| 7 | 3. On November 2, 2010, between 7:30 a.m. and 8:30 a.m., I was making my way on |
| 8 | a bus heading to the Criminal Courts Building ("CCB") from the Parker Center Jail. That |
| 9 | morning, I was having an adverse reaction to the blood pressure medicine that I was taking; I |
| 10 | suffer from high blood pressure and take medicine for it every morning. While waiting right |
| 11 | outside the bus at CCB, and while still waist-chained to other inmates, I told a Deputy Stevenson |
| 12 | about how I was feeling. Deputy Stevenson got angry with me, for no apparent reason, and had |
| 13 | another deputy take me out of the chain and place me in a seat toward the front of the bus, across |
| 14 | from the caging area. The other deputy was a Hispanic man of short build, chubby, and was |
| 15 | assigned to be Deputy Stevenson's partner for the day. |
| 16 | 4. The bus then went to the Traffic Court on Hill Street ("Traffic Court"). After |
| 17 | dropping the last two inmates off at the Traffic Court, I was left on the bus alone with Deputy |
| 18 | Stevenson and the other deputy. I did not know where the bus was taking me. |
| 19 | 5. As soon as we left the Traffic Court, Deputy Stevenson began to shout profanities |
| 20 | and obscene remarks at me. He said things like "fuck you" and "I'm going to put my dick in your |
| 21 | ass" when he got the chance. I was shocked and taken aback at the way he was acting. I did not |
| 22 | know what provoked him to lash out at me the way he did. I thought to myself that I did not |
| 23 | disrespect him in any way to receive such verbal abuse. |
| 24 | 6. I ended up being driven back to the Parker Center Jail. We pulled into the rear |
| 25 | parking area, where the other deputy got off the bus. Deputy Stevenson approached my seat and |
| 26 | began to punch my ribs and upper body, all while I was still seated. While still in pain from this |
| 27 | |
| 28 | |

000565

1   beating, he grabbed me with force by the left sleeve of my shirt and raised me to my feet. He then

2   pushed me in front of him, ordering me to get off the bus. When approaching the raised portion

3   that leads down to the driver's seating area, Deputy Stevenson pushed me from behind, making

4   me fall off this raised portion inside the bus. I fell onto my right shoulder, and I still feel the pain

5   from that fall to this day. During this incident, I also lost my glasses that I had in one of my

6   jacket pockets.

7       7.      On the morning of November 22nd, 2010, I had another court date at CCB. While

8   in the bus bay of CCB, I saw Deputy Stevenson there. The bus bay is a special lot at the CCB

9   where buses and other vehicles holding inmates enter to drop off and pick up inmates after their

10   court hearings. The bay is underneath the building. I was being led off the van I rode in by

11   Deputy Arias; he was not the same deputy described from the previous incident. While being led,

12   I told Deputy Arias that I did not want to get out of the van while Deputy Stevenson was in the

13   vicinity. He ignored me, and instead laughed and directed me to start walking. I was forced to

14   walk by Deputy Stevenson.  When we saw one another, I asked Deputy Stevenson if he

15   remembered seeing any glasses left on the bus. Deputy Stevenson replied "No, but I remember

16   kicking your ass." I was embarrassed and shocked by his comments; I was surprised that he

17   would incriminate himself in front of other deputies and inmates. In order to get him to admit to

18   the incident again, I asked him "did you really put your hands on me?" Deputy Stevenson

19   responded that he had. I could tell by his voice that he was openly disclosing this because he

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27

28                                  2

000566

1    wanted to brag in front of the other deputies and inmates that he had beat me. Deputies Medina

2    (the driver of my van) and Runkle (who works at CCB) were also present during this encounter.

3

4         I declare under penalty of perjury of the laws of the State of California and the United

5    States that the foregoing is true and correct.  Executed this 12th day of April, 2011 in Los

6    Angeles, California.

7                                        _____/s/_____

8                                        Darrell Rauls

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                              3

# DECLARATION OF CURRENT PRISONER MR. YY RONALD REEVES

000568

## Declaration of Ronald Reeves

I, Ronald Reeves, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I have been an inmate in the Los Angeles County Jails for 16 months.

3.     I have been housed in Men's Central Jail (MCJ) for the past four months in Module 5500.  My booking number is 2278963

4.     Before MCJ, I was housed at Twin Towers (TT) for approximately nine months and North County Correctional Facility (NCCF) for three months.

5.     On February 11, 2011, at 4 a.m. in MCJ, I did not wake up on time for "count."  Count is when inmates are to stop what they are doing and stand up in their cells as deputies walk by.  MCJ does count three times daily, two times at night and once in the morning.  TT and NCCF count only once per day.

6.     Because I was still sleeping when the 4 a.m. count was announced, deputy Walker (African-American, appears 30's-40s, heavy-set, light-skinned, 5'9" or slightly taller) came by my cell and dragged me out of bed.

7.     My bed was on the lower bunk right next to a metal stool.

8.     Deputy Walker dragged me out of bed by my shoulders without trying to wake me up or warn me in any way.  I hit the metal stool and fell onto the floor.  He continued to drag me and ran my face across the bottom of the stool where there is a sharp, jagged edge

9.     I asked him, "Why'd you do that?" and "What the hell is this about?" from the floor because it was my immediate reaction to being dragged  and struck in the face.

10.     I tried to push myself up from the floor to get up but Walker knocked me back down.  I was able to stand up without being knocked down on the second try.

11.     I was bleeding a lot and a puddle of blood formed on the floor after

000569

1  this incident occurred.

2      12.  I used a towel to control the bleeding and waited in my cell for 20-30

3  minutes until I could be escorted to TT emergency care.

4      13.  I ended up with an approximately 4-6" cut on the left side of my chin

5  down to the middle of my throat that required 40 stitches to close up. My stitches

6  were removed a week after the incident.

7      14.  I have a visible scar on my chin and throat from the cut.

8      I declare under penalty of perjury of the laws of the State of California and

9  the United States that the foregoing is true and correct.  Executed this 22nd day of

10  July, 2011  in Los Angeles, California.

11

12                                                  Ronald Reeves

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



2

000570