# DECLARATION OF CURRENT PRISONER MR. JJJ PAUL TIWANA

000668

**Declaration of Paul Tiwana**

I, Paul Tiwana, hereby declare:

1.       I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently as follows:

2.       I am 42 years old. I am currently housed at Twin Towers Correctional Facility ("TTCF") 141, Pod A, Cell 16.  I have been an inmate in the Los Angeles County Jail System since July 2010. My booking number is 2599165.

3.       Module 141, Pod A is the area for the blind and deaf inmates. I was in an accident twelve years ago that left me completely deaf. I am now able to speak after going through speech therapy, but I need a hearing aid to understand what people are saying. Because I can read and write and translate for the other inmates who are deaf and blind, the disabled inmates ask me to help them file their complaints with the ACLU and the Los Angeles Sheriff's Department using the Inmate Complaint Forms.

4.       The deputies use scare tactics like threatening to take our phone and TTY phones or TV time away if we file any complaints. Deputy Mosley, one of the main deputies that has harassed me ever since I came to jail, told me to "stop doing complaint forms and I'll stop coming after you." Deputy Mosley and all the other deputies could harass the inmate who actually submits the complaint form, but they choose to harass me, the person who helps them with their complaints. This has kept me in serious fright and fear for my life to the point where I've stopped complaining or saying anything to the ACLU out of fear of retaliation by the officers.

5.       When the deputies let us use the phone, they often turn off the phones on purpose while we are in the middle of our calls. I know they turn off our phones because Deputy Mosley has threatened me to "stop filling out complaint forms and I'll stop shutting off your phone." They also make us wait to use the phones for hours,  or stop us from using the phones completely. One time the

1  deputy even chained me to the chair next to the phones and did not let me go until
2  six to eight hours later. I was not able to use the bathroom for those six to eight
3  hours.

4        6.     If we choose to go to the outdoor recreation area instead of staying
5  inside, the deputies will tell us to cough and squat for no reason. In other words,
6  we have to take our pants off, squat, and cough while they touch our private areas.
7  It is very uncomfortable and humiliating and they often do it when we're
8  completely non-threatening: either sitting in our cells, walking to outdoor
9  recreation, or anytime they want to humiliate us.

10        7.     The deputies also search our cells while we are outside and throw
11  away our belongings like medical records, journals, and hearing aids. I never want
12  to go to outdoor rec because when I return to my cell, my belongings are either
13  missing or tampered with.

14        8.     Most recently, a couple months ago, I came back to my cell to find
15  that my water canteen and shampoo bottle had been taken. As a result, I am afraid
16  to go to the outdoor recreation area, even though I very much want to get out of
17  my pod, see the sun, and move around. We have a right to outdoor recreation time
18  while in jail, but my fear of reprisals is so strong that I give up that right to protect
19  myself from being humiliated and to protect my property. Other inmates have told
20  me that they too skip outdoor recreation to avoid having to cough and squat and to
21  make sure the deputies don't take their property.

22        9.     The deputies threw me into the "hole" or the disciplinary unit three
23  times in the four months since I've been in jail. The three times I went to the hole
24  all happened after I'd help the other inmates write and file their complaints with
25  the  ACLU and the LASD Complaint Forms, or helping the other inmates
26  understand their rights. They could send the inmate actually filing the complaint,
27  but they choose to send me. I am always the person they send to the hole.

28        10.    On or about March 13, 2011, I was randomly called out of my cell by

000670

1   Deputy J. Little who strip searched me. I was hesitant to come out of my cell and

2   had no idea why I was being searched. When I came out, Deputy J. Little ripped

3   off my shirt. My hearing aid, address book, and phone card were all in the front

4   left pocket of my jail shirt. My Starkey digital hearing aid is valued at

5   approximately $3,000. I told the officer not to take my shirt because my hearing

6   aid was in the pocket. He said, "I don't give a fuck about your hearing aid" and

7   crumpled my shirt in his hands along with all my belongings. Deputy J. Little

8   never returned my hearing aid.

9        11.    I was extremely upset that Deputy J. Little took my hearing aid. I told

10  the deputies to "please give me back my hearing aid." I'll admit I was being a

11  little boisterous in demand of my hearing aid. I cannot hear without it. The

12  deputies, of course, got upset because I was becoming boisterous with them.

13  Deputy Diaz grabbed me by the neck, told me to "turn around and take it back into

14  the house" and shoved me to the ground. I hit the ground hard on my right cheek

15  which left me with a black eye.

16       12.    I went to the Los Angeles County Medical Center + USC ("LCMC")

17  to have my eye examined. The doctor said I had hematoma under my eye. A

18  hematoma is a collection of blood around a blood vessel as a result of

19  hemorrhaging.

20       13.    On March 19, 2011 I filed a complaint with the Los Angeles Sheriff's

21  Department about Deputy J. Little taking my hearing aid and never returning it to

22  me. I never got a response from the Sheriff's department.

23       14.    Ever since I've been in jail I've filed seven complaints about seven

24  different incidents. I have attached true copies of the 7 complaints as Exhibit A to

25  this declaration.  I only received a response on the complaint made on February

26  22, 2011 demanding my protective eye wear. The complaint was denied, even

27  though my doctor ordered me to wear it at all times. I've never received a response

28  about my hearing aid being taken away, my mail never being delivered, or about

000671

1  the deputies' not allowing me to use the phones.

2       I declare under penalty of perjury of the laws of the State of California and

3  the United States that the foregoing is true and correct.  Executed this 26th day

4  of August , 2011 in Los Angeles, California.

5

6  Paul Tiwana

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000672

COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM
### Instructions:

Fill out the portion below as completely as possible.  Place an "X" in the appropriate box.  Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box.  Some of the choices may or may not apply to you or your facility.

## Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| TWANA PAUL | 2571165 | TTF | 141A | 1/11/11 |

## I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff** regarding: _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist** regarding: _____

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

**Inmate Services**

☐ **Chaplain:**
Religious Preference _____

Language _____

☐ **Education Representative**   ☐ **V.A. Representative**

☒ **Other:** _____

## REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.

☐ Becoming an inmate station worker.

☐ Attending school while in custody.

☐ Attending substance abuse treatment while in custody.

☒ Other: _____

☐ Voter Information

## REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☒ Other: _____

## I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☐ Other: _____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

## I HAVE THE FOLLOWING REQUEST / COMPLAINT:
(If this is a complaint, include dates, times, and names of persons involved.  Attach additional pages if needed.)

_____

141A _____

_____

_____

-------------------- **FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE** --------------------

Assigned To:   ☐ Medical Services   ☐ Dental   ☐ Mental Health   ☐ Food Services   ☐ Inmate Services   ☐ CTU

| Name Of Individual Receiving Request / Complaint | Employee # | Date |
|---|---|---|
| | | |

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM

### Instructions:

Fill out the portion below as completely as possible.  Place an "X" in the appropriate box.  Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box.  Some of the choices may or may not apply to you or your facility.

### Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| TIWANA PAUL | 2597165 | TTCF | A-141 | 2-__-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff regarding:** _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or
other: _____

☐ **Dentist regarding:** _____

**Inmate Services**
☐ Chaplain:
Religious Preference _____
Language _____
☐ Education Representative   ☐ V.A. Representative

☒ Other:
Medical
_____

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.
☐ Becoming an inmate station worker.
☐ Attending school while in custody.
☐ Attending substance abuse treatment while in custody.
☒ Other: _____
☐ Voter Information _____

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☐ Other: _____

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☒ Other: _____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:
(If this is a complaint, include dates, times, and names of persons involved.  Attach additional pages if needed.)

_____

------------------------FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE------------------------

Assigned To:  ☐ Medical Services   ☐ Dental   ☐ Mental Health   ☐ Food Services   ☐ Inmate Services   ☐ CTU

| Name Of Individual Receiving Request / Complaint | Employee # | Date |
|---|---|---|
| | | |

COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM

### Instructions:

Fill out the portion below as completely as possible. Place an "X" in the appropriate box. Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box. Some of the choices may or may not apply to you or your facility.

## Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
|  | 2397165 | TTCF | 141-A | 3-19-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff regarding:** _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist regarding:** _____

**Inmate Services**

☐ **Chaplain:**
Religious Preference _____

Language _____

☐ **Education Representative**   ☐ **V.A. Representative**

☒ **Other:** _____

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.

☐ Becoming an inmate station worker.

☐ Attending school while in custody.

☐ Attending substance abuse treatment while in custody.

☒ Other: _____

☐ Voter Information

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☐ Other: _____

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☐ Other: _____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:

(If this is a complaint, include dates, times, and names of persons involved. Attach additional pages if needed.)

_____

----------------------------FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE----------------------------

Assigned To:   ☐ Medical Services   ☐ Dental   ☐ Mental Health   ☐ Food Services   ☐ Inmate Services   ☐ CTU

| Name Of Individual Receiving Request / Complaint | Employee # | Date |
|---|---|---|
|  |  |  |

000675

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM

### Instructions:

Fill out the portion below as completely as possible.  Place an "X" in the appropriate box.  Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box.  Some of the choices may or may not apply to you or your facility.

## Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| TUWARA PAUL | 2599165 | TTCF | 141-A-16 | 5-23-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff** regarding: _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist** regarding: _____

**Inmate Services**

☐ **Chaplain:**
Religious Preference _____

Language _____

☐ **Education Representative**   ☐ **V.A. Representative**

☒ **Other:**
MAIL Room

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.
☐ Becoming an inmate station worker.

☐ Attending school while in custody.
☐ Attending substance abuse treatment while in custody.

☐ Other: Mail
☐ Voter Information

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☒ Other: Explicit Mail rules

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☐ Other: _____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:
(If this is a complaint, include dates, times, and names of persons involved. Attach additional pages if needed.)

Los Angeles County Jail Mail Room STAFF continue to send mail from my house back to the sender. The pictures inside the mail are of my wife and are not nude or suggestive. However, the wife is "skimpy" wearing _____ suits and cute clothing dresses. Mail Room STAFF continue to return mail to writers of acceptable Photos, letters, etc. I would like to have my wife and friends letters. I would like _____ AND I am All of my _____ mail. Thank You.

-------------------------FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE-------------------------

☐   ☐   ☐   000676   ☐

*ADA Compliance*

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM

### Instructions:

Fill out the portion below as completely as possible. Place an "X" in the appropriate box. Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box. Some of the choices may or may not apply to you or your facility.

### Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| TIWANA, PAUL | 2579165 | TTCF | A POD 164 | 6-10-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff** regarding: _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist** regarding: _____

**Inmate Services**
☐ **Chaplain:**
Religious Preference _____,
Language _____,
☐ **Education Representative**   ☐ **V.A. Representative**

☐ Other:
_____
_____
_____

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.
☐ Becoming an inmate station worker.

☐ Attending school while in custody.
☐ Attending substance abuse treatment while in custody.

☐ Other: _____
☐ Voter Information

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☐ Other: _____

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☐ Other: _____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:

(If this is a complaint, include dates, times, and names of persons involved. Attach additional pages if needed.)

Jail Staff in 141 A POD Are HINDERING TTY use and NOT
Allowing DEAF AND HEARING Impaired Inmates Access to
the TTY Phones in the A.M. Shift the DOOR Remain
Locked AND Access is denied to the TTY phone. HEARING
inmates in A-POD Are given sceduled time out of cell
Program time AND DEAF AND HEARING Impaired Are
NOT given equel Access to the TTY and able to communicate
with Courts, family, and public At large.

*1st Amendment...*

-------------------------FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE-------------------------

Assigned To:   ☐ Medical Services   ☐ Dental   ☐ Mental Health   ☐ Food Services   ☐ Inmate Services   ☐ CTU

| Name Of Individual Receiving Request / Complaint | Employee # | Date |
|---|---|---|
| | | |

000677

4pm - 6pm     DEAF HEARING IMPAIRED

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM

### Instructions:

Fill out the portion below as completely as possible.  Place an "X" in the appropriate box.  Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box.  Some of the choices may or may not apply to you or your facility.

## Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| Twara, Paul | 2899165 | TTCF | 141-A-160 | 6-23-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff** regarding: _____

☐ **Mental Health** (Circle all that apply)
Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist** regarding: _____

☐ **Release Planner from the Community Transition Unit** (Circle all that apply).
Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

**Inmate Services**
☐ **Chaplain:** _____
Religious Preference _____

Language _____

☐ **Education Representative**   ☐ **V.A. Representative**

☒ **Other:**
Lieutenant
Program
Sgt Parson

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.
☐ Becoming an inmate station worker.
☐ Attending school while in custody.
☐ Attending substance abuse treatment while in custody.
☒ Other: TTY Phone
☐ Voter Information

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☒ Other: TTY use time and location

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☒ Other: TTY use and date
_____ Specify

☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms
_____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:

(If this is a complaint, include dates, times, and names of persons involved.  Attach additional pages if needed.)

ON 6/23/11 OFFICER J. LITTLE DENIED ME ACCESS TO THE TTY PHONE FOR THE DEAF, OFFICER J. LITTLE WROTE THAT INMATES ARE ALLOWED ONLY 6 MINUTES OF MY PHONE AND AM I THUS INDEEDED MY ALLOWED TIME IN DIRECT VIOLATION OF ADA COMPLIANCE IN CONTRAVENTION OF REASONABLE ACCESS TO PHONES WF CCR TITLE 15 WRITTEN IN CDM 4-11/050.00 5-13/020.00. OFFICER J. LITTLE HAS WITHHELD REASONABLE ACCESS TO TELEPHONE TTY FOR DEAF INMATES.

-----------------------**FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE**-----------------------

☐ _____   ☐ _____   ☐ _____   ☐ _____   ☐ OTH

*Paul Irwa* (signature)

000678

COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## INMATE COMPLAINT / SERVICES REQUEST FORM
### Instructions:

Fill out the portion below as completely as possible.  Place an "X" in the appropriate box.  Once completed, tear off the last copy for yourself and then place the original and the second copy into the "Request / Complaint Form" box.  Some of the choices may or may not apply to you or your facility.

## Only one request per form.

| INMATE NAME | BOOKING # | FACILITY | HOUSING LOC. | DATE |
|---|---|---|---|---|
| Tijuana Paul | 2399165 | ITCF | 141-A-16" | 6-27-11 |

### I WOULD LIKE TO SPEAK WITH A:

☐ **Medical Staff** regarding:

☐ **Mental Health** (Circle all that apply) Speak to a clinician, inquire about medication, or other: _____

☐ **Dentist** regarding:

**Inmate Services**

☐ **Chaplain:** Religious Preference _____
Language _____

☐ **Education Representative**   ☐ **V.A. Representative**

☒ **Other:** MAIL Room

☐ **Release Planner from the Community Transition Unit** (Circle all that apply). Information on any court ordered classes (domestic violence, parenting, substance abuse assistance), education programs, job training, housing, medical health, mental health, transportation to a shelter or drug rehab programs, social security benefits, or religious services.

### REQUEST TO SPEAK WITH THE APPROPRIATE PERSON REGARDING:

☐ Becoming an inmate worker.       ☐ Attending school while in custody.               ☐ Other: _____
☐ Becoming an inmate station worker. ☐ Attending substance abuse treatment while in custody. ☐ Voter Information

### REQUEST FOR INFORMATION:

☐ When is my release date?   ☐ When is my next court date?   ☐ What is my account balance?   ☐ Other: _____

### I WOULD LIKE TO RECEIVE:

☐ Haircut (Indigent / No Funds)   ☐ Writing materials (Indigent / No Funds)   ☐ Commissary   ☐ Shoes   ☐ Other: _____ Specify
☐ Library time (May or may not apply to your facility)   ☐ Law Library time   ☐ Legal forms _____ Specify

### I HAVE THE FOLLOWING REQUEST / COMPLAINT:
(If this is a complaint, include dates, times, and names of persons involved. Attach additional pages if needed.)

All of my mail is being returned to sender and INFF will not allow mail delivery. Several letters have been already in the mail and not returned to sender per policy it is now unopened. Christmas cards and VALCH that over 20 letters have NOT been delivered. Over the last 3 weeks June 3 - June 27th which have been sent to me from town now dates and still have not been delivered home. (would like this to _____) Thank you.

--------------------------FOR DEPARTMENT USE ONLY – DO NOT WRITE BELOW THIS LINE--------------------

Assigned To:   ☐ Medical Services   ☐ Dental   ☐ Mental Health   ☐ Food Services   ☐ Inmate Services   ☐ CTU

| Name Of Individual Receiving Request / Complaint | Employee # | Date |
|---|---|---|
| | | |

000679

# DECLARATION OF CURRENT PRISONER MR. LLL MICHAEL TOPETE

)0680

1

**Declaration of Michael Topete**

2      I, Michael Topete, hereby declare:

3      1.      I make this declaration based on my own personal knowledge and if called to

4  testify I could and would do so competently as follows:

5      2.      I am 32 years old.  I am housed at Men's Central Jail ("MCJ") in Module 3700,

6  Row B, Cell 26.  My booking number is 2438716.

7      3.      Around the end of February 2011, I was in my cell.  I don't remember what time it

8  was.

9      4.      I heard Senior Deputy Gilbert from Operation Safe Jail ("OSJ") yelling at an

10  inmate named, Frederick Bruno, who was housed on the row above me, Row B.

11      5.      I heard Senior Deputy Gilbert saying to Bruno, "You need to stop writing up my

12  deputies for all your shit.  It's bad enough that you're making us White people look bad.  Keep

13  this shit up and I'm going to throw you to the mainline.  You know what, I am going to throw

14  you to the mainline.  I'm tired of moving my deputies.  I don't move deputies.  I move inmates.

15  If you want to write me up, write my name down, G-I-L-B-E-R-T."

16      I declare under penalty of perjury of the laws of the State of California and the United

17  States that the foregoing is true and correct.  Executed this _10th m5t_ day of _May_, 2011 in Los

18  Angeles, California.

19                                        _Michael Topete_

20                                        Michael Topete

21

22

23

24

25

26

27

28

000681

**Declaration of Michael Topete**

I, Michael Topete, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 32 years old.  I am housed at Men's Central Jail ("MCJ") in Module 3700, Row B, Cell 26.  My booking number is 2438716.

3.      Around the end of February 2011, I was in my cell.  I don't remember what time it was.

4.      I heard Senior Deputy Gilbert from Operation Safe Jail ("OSJ") yelling at an inmate named, Frederick Bruno, who was housed on the row above me, Row B.

5.      I heard Senior Deputy Gilbert saying to Bruno, "You need to stop writing up my deputies for all your shit.  It's bad enough that you're making us White people look bad.  Keep this shit up and I'm going to throw you to the mainline.  You know what, I am going to throw you to the mainline.  I'm tired of moving my deputies.  I don't move deputies.  I move inmates.  If you want to write me up, write my name down, G-I-L-B-E-R-T."

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 18th day of May, 2011 in Los Angeles, California.

_____/s/_____

Michael Topete

000682

# DECLARATION OF CURRENT PRISONER MR. MMM ARTHUR TOWNSEND

000683

**Declaration of Arthur Townsend**

I, Arthur Townsend, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 26 years old.  I am currently housed at Men's Central Jail ("MCJ") in the "hole" or the disciplinary unit on Module 2400, Row D, Cell 12.  My booking number is 2765265.

3.      On July 20, 2011 I was housed at MCJ, Module 3400, Row B, Cell 10.  At approximately 6 p.m., our row was called out for evening pill call.  Our cell doors were opened, I stepped out and walked out of the entrance gate that leads in and out of my row to go out to the main hallway on the 3000 floor to the pill call area, which is located outside of the module. *Attached is a diagram of the 3000 floor hallway labeled as Exhibit*

4.      As I walked out of the entrance gate, a trustee "mad dogged" or looked at me in an aggressive way.  I don't know the name of the trustee, but he is Hispanic, around 5'4"-5'5".  I asked him, "What are you looking at?"  The trustee didn't respond, so I walked towards the door that leads out to the 3000 floor hallway.  As I walked out, I passed by the deputies' booth and heard one of the deputies say to another deputy, "What did he say?"

5.      I walked out of the module and stood in the pill call line to get my inhaler for my asthma.  *My position is labeled as "T1"* I saw Deputy Ramirez walk out of the module towards me.  He told me to get out of line *move towards the wall,* and to interlace my fingers behind my back.  *My position is marked as "T2"* I complied.  Deputy Ramirez then proceeded to search me.  He asked me who I was talking to and I told him that I had been talking to the trustee because he was "mad dogging" me.  Deputy Ramirez said to me," Don't fuck with my trustees."

6.      Deputy Ramirez then announced to all the inmates who were standing in line for pill call, "Look, all the Blacks!  I've been having a lot of problems with the Blacks and all my Hispanic trustees.  If you mess with my trustees, I'm going to shut down you guys' program and toss your cell."  I took that comment to mean that Deputy Ramirez was not going to allow us to take showers or go to the Outdoor Recreation Area and that he was going to search our cells.

7.      After Deputy Ramirez made this comment, he had me face the wall.  He then told me to strip out of my clothes.  After I stripped out of my clothes, I turned to hand them to him.  I

000684

1    thought this was the protocol because when I was in prison, this is the what the correctional

2    officers told me to do.

3          8.     Deputy Ramirez barked for me to turn back around, which I did.  Deputy Ramirez

4    then struck me on my left kneecap with his flashlight.  The pain from the flashlight hitting my

5    kneecap felt like *I was getting hit with a big pole and it felt like a*.  He then pepper sprayed me.  When the pepper

6    spray hit my eyes, I felt an instant burning sensation.  Deputy Ramirez hit my leg again with the

7    flashlight.

8          9.     I then heard Deputy Ramirez yell out "415", which is a code for an inmate

9    fighting with staff.  Deputy Ramirez then told me to get on the ground, which I did.

10         10.    When I got on the ground, Deputy Ramirez handcuffed me from behind.  After I

11   was handcuffed, he punched me in my face.  I heard several other deputies running over towards

12   me.  I don't know who they are, but all of them were Hispanic, except one, who was White.

13   There was also a Custody Assistant ("CA") who was Hispanic.  I think there might have been 5-6

14   deputies.

15         11.    All I felt were the deputies kicking, punching and hitting me all over my body and

16   legs.  The deputies also hit my legs with their flashlights.  I was in so much pain from all these

17   blows that were hitting me one after the other.  It felt like *all those deputies were* I

18   *trying to smash my bones with their blows and flashlights*

     heard the deputies cussing at me and calling me "nigger".  I also heard an African American

19   deputy, who must have been nearby, tell the deputies, "That's enough.  Sergeant is coming."  I

20   don't know if a Sergeant was coming or not, but the deputies continued beating me.

21         12.    The last thing I remember is the Hispanic CA holding up his flashlight and hitting

22   me on the right side of my face with it.  At this point, I must have blacked out from the pain

23   because the next thing I remember is waking up at the Los Angeles Medical Center + USC

24   ("LCMC").

25         13.    My arms were handcuffed to the side of the hospital bed and I was confused to

26   where I was and what had happened to me.  A deputy told me that I was at LCMC and said to

27   me, "You were fucked up.  They tried to interview you, but you were unresponsive.  Are you

28   okay?  I know what happened, but I don't want to jeopardize my job."  I don't know this deputy's

2

1  name, but he is Hispanic, dark-skinned and about 5'4"-5'5".

2         14.    The medical staff told me that I had a fractured face.

3         15.    When I was able to see myself, I saw that I had bruises all over my back, legs and

4  face.  I had large abrasions and cuts on both of my legs.  I also had bruises under my eyes, my

5  face were swollen and I had a blood clot in my right eye.  I also suffered from double vision.

6         16.    I was at LCMC for a day then I was transferred to the Correctional Treatment

7  Center ("CTC"), which is the medical unit at the jails,  where I was there for 2-3 weeks.

8         17.    On August 15, I found out that I was charged with resisting an officer and

9  obstructing justice because I went to court for it.  When I went to court, I found that a deputy was

10 saying that he had a bruise in the inside of his lip because of the incident.

11        18.    On August 18, I was given paperwork saying that I was going to the "hole" for 29

12 days and have been here ever since.

13        19.    Ever since I was at LCMC, I have been trying to submit a complaint form about

14 the deputies beating me.  Whenever I ask for a complaint form, the deputies have either told me

15 that I can't have one or they tell me that they don't have any.  I was a properia persona ("pro

16 per") inmate before so I know I'm supposed to exhaust administrative remedies, but I don't know

17 how you're going to be able to if the deputies won't give you complaint forms.

18        I declare under penalty of perjury of the laws of the State of California and the United

19 States that the foregoing is true and correct.  Executed this 22nd day of August 2011 in Los

20 Angeles, California.

21

22                                                 Arthur Townsend

23

24

25

26

27

28

3



000687

## Declaration of Arthur Townsend

I, Arthur Townsend, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am 26 years old.  I am currently housed at Men's Central Jail ("MCJ") in the "hole" or the disciplinary unit on Module 2400, Row D, Cell 12.  My booking number is 2765265.

3.     On July 20, 2011 I was housed at MCJ, Module 3400, Row B, Cell 10.  At approximately 6 p.m., our row was called out for evening pill call.  Our cell doors were opened, I stepped out and walked out of the entrance gate that leads in and out of my row to go out to the main hallway on the 3000 floor to the pill call area, which is located outside of the module.  Attached is a diagram of the 3000 floor hallway labeled as Exhibit 1.

4.     As I walked out of the entrance gate, a trustee "mad dogged" or looked at me in an aggressive way.  I don't know the name of the trustee, but he is Hispanic, around 5'4"-5'5".  I asked him, "What are you looking at?"  The trustee didn't respond, so I walked towards the door that leads out to the 3000 floor hallway.  As I walked out, I passed by the deputies' booth and heard one of the deputies say to another deputy, "What did he say?"

5.     I walked out of the module and stood in the pill call line to get my inhaler for my asthma.  My position is labeled as "T1."  I saw Deputy Ramirez walk out of the module towards me.  He told me to get out of line, move towards the wall and to interlace my fingers behind my back.  My position is marked as "T2."  I complied.  Deputy Ramirez then proceeded to search me.  He asked me who I was talking to and I told him that I had been talking to the trustee because he was "mad dogging" me.  Deputy Ramirez said to me," Don't fuck with my trustees."

6.     Deputy Ramirez then announced to all the inmates who were standing in line for pill call, "Look, all the Blacks!  I've been having a lot of problems with the Blacks and all my Hispanic trustees.  If you mess with my trustees, I'm going to shut down you guys' program and toss your cell."  I took that comment to mean that Deputy Ramirez was not going to allow us to take showers or go to the Outdoor Recreation Area and that he was going to search our cells.

000688

7.    After Deputy Ramirez made this comment, he had me face the wall. He then told me to strip out of my clothes. After I stripped out of my clothes, I turned to hand them to him. I thought this was the protocol because when I was in prison, this is the what the correctional officers told me to do.

8.    Deputy Ramirez barked for me to turn back around, which I did. Deputy Ramirez then struck me on my left kneecap with his flashlight. The pain from the flashlight hitting my kneecap felt like I was getting hit with a big pole and it felt like a painful thump to my kneecap. He then pepper sprayed me. When the pepper spray hit my eyes, I felt an instant burning sensation. Deputy Ramirez hit my leg again with the flashlight.

9.    I then heard Deputy Ramirez yell out "415", which is a code for an inmate fighting with staff. Deputy Ramirez then told me to get on the ground, which I did.

10.    When I got on the ground, Deputy Ramirez handcuffed me from behind. After I was handcuffed, he punched me in my face. I heard several other deputies running over towards me. I don't know who they are, but all of them were Hispanic, except one, who was White. There was also a Custody Assistant ("CA") who was Hispanic. I think there might have been 5-6 deputies.

11.    All I felt were the deputies kicking, punching and hitting me all over my body and legs. The deputies also hit my legs with their flashlights. I was in so much pain from all these blows that were hitting me one after the other. It felt like all these deputies were trying to smash my bones with their blows and flashlights. I heard the deputies cussing at me and calling me "nigger". I also heard an African American deputy, who must have been nearby, tell the deputies, "That's enough. Sergeant is coming." I don't know if a Sergeant was coming or not, but the deputies continued beating me.

12.    The last thing I remember is the Hispanic CA holding up his flashlight and hitting me on the right side of my face with it. At this point, I must have blacked out from the pain because the next thing I remember is waking up at the Los Angeles Medical Center + USC ("LCMC").

13.    My arms were handcuffed to the side of the hospital bed and I was confused to

where I was and what had happened to me.  A deputy told me that I was at LCMC and said to me, "You were fucked up.  They tried to interview you, but you were unresponsive.  Are you okay?  I know what happened, but I don't want to jeopardize my job."  I don't know this deputy's name, but he is Hispanic, dark-skinned and about 5'4"-5'5".

14.   The medical staff told me that I had a fractured face.

15.   When I was able to see myself, I saw that I had bruises all over my back, legs and face.  I had large abrasions and cuts on both of my legs.  I also had bruises under my eyes, my face were swollen and I had a blood clot in my right eye.  I also suffered from double vision.

16.   I was at LCMC for a day then I was transferred to the Correctional Treatment Center ("CTC"), which is the medical unit at the jails,  where I was there for 2-3 weeks.

17.   On August 15, I found out that I was charged with resisting an officer and obstructing justice because I went to court for it.  When I went to court, I found that a deputy was saying that he had a bruise in the inside of his lip because of the incident.

18.   On August 18, I was given paperwork saying that I was going to the "hole" for 29 days and have been here ever since.

19.   Ever since I was at LCMC, I have been trying to submit a complaint form about the deputies beating me.  Whenever I ask for a complaint form, the deputies have either told me that I can't have one or they tell me that they don't have any.  I was a properia persona ("pro per") inmate before so I know I'm supposed to exhaust administrative remedies, but I don't know how you're going to be able to if the deputies won't give you complaint forms.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed this 22nd day of August, 2011 in Los Angeles, California.

_____/s/_____

Arthur Townsend

3



000691

# DECLARATION OF CURRENT PRISONER MR. OOO EDUARDO VILLAREAL

000692

1             **Declaration of Eduardo Villareal**

2        I, Eduardo Villareal, hereby declare:

3        1.      I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5        2.      I am 22 years old and have been incarcerated at Men's Central Jail (MCJ) since

6    December 1, 2010. I am currently housed in Module ~~3500,~~ E.V. 2100  E.V. A, Row ~~C,~~ E.V.9 Cell ~~15.~~ My booking

7    number is 2532769. Prior to my transfer to MCJ, I was at Twin Towers Correctional Facility

8    (TTCF). In November 2010.  E.V.

9        3.      I was transferred to MCJ by Operation Safe Jail (OSJ) because I requested to be

10   placed in protective custody.

11       4.      While I was at TTCF, on November 12, 2010, I asked one of the module officers,

12   who is short and White, for a blanket. He said to me, "I don't give them to murderers."

13       5.      Again while at TTCF, on November 24, 2010, before I got on the bus to go to

14   court, I was approached by a tall, Hispanic deputy. I don't know his name. He must have

15   overheard someone call out my name to board the bus because he said to me, "oh, so you're

16   Eduardo Villareal. I can't wait until you get to my floor." I took this statement as a threat due to

17   the large amount of negative media coverage on my case.

18       6.      On November 24, 2010, Esther Lim from the ACLU came to visit me. Before the

19   visit, one of the module deputies approached me and said, "Oh, you've been writing to the

20   ACLU?" I told him I had not and he said to me, "All right then."

21       7.      On December 1, 2010, when I was moved to MCJ, I was escorted to my Row, C

22   by three deputies; a tall, Hispanic deputy who had threatened me on November 24, 2010, Deputy

23   Ibarra and a tall, White deputy.

24       8.      The tall, Hispanic deputy said to me, "Christmas came early today."

25       9.      Deputy Ibarra asked me, "what are you here for?" I told him that I didn't want to

26   talk about it and if he wanted to know to ask my lawyer. Ibarra then said, "I'm not gonna ask you

27   again. What are you here for?" I answered him the same way. Deputy Ibarra then punched me

28   on my right side area on my ribs. A tall, White deputy then socked the back of my head two

1   times.

2       10.     Deputy Ibarra then asked me the same question again and punched me on my right

3   side area for the second time.  After he hit me, I told him, "187."  He then said to me, "that

4   wasn't so hard."

5       11.     Deputy Ibarra and the tall, White deputy then yelled at me saying, "you're a piece

6   of shit.  We're not going to give you any showers, blankets, food, and canteen."  They also said

7   to me, "we're going to turn you over to the Southsiders."  I took that threat to mean that they

8   were going to take to me the gang so that they can kill me.

9       12.     While Deputy Ibarra was hitting me, he saw me look at his name tag.  He then

10  said to me, "you looked at my name?  If you put in a complaint I'm going to go in your cell and

11  beat you up personally."

12      13.     I wasn't given a mattress or a blanket and had to sleep on the metal bed.  The

13  deputies also took away my Bible.  I didn't receive a mattress and a blanket until the next day.

14      I declare under penalty of perjury of the laws of the State of California and the United

15  States that the foregoing is true and correct.  Executed this ⁽ᴱ·ⱽ·⁾ 11th ⁽ᴱ·ⱽ·⁾ of April ⁽ᴱ·ⱽ·⁾ 2011, 2010 in Los

16  Angeles, California.

17  _____
                                        Eduardo Villareal

18                          Eduardo Villareal

19

20

21

22

23

24

25

26

27

28

000694

**Declaration of Eduardo Villareal**

I, Eduardo Villareal, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am 22 years old and have been incarcerated at Men's Central Jail (MCJ) since December 1, 2010. I am currently housed in Module 3100, Row A, Cell 9. My booking number is 2532769. Prior to my transfer to MCJ, I was at Twin Towers Correctional Facility (TTCF) in November 2010.

3.     I was transferred to MCJ by Operation Safe Jail (OSJ) because I requested to be placed in protective custody.

4.     While I was at TTCF, on November 12, 2010, I asked one of the module officers, who is short and White, for a blanket. He said to me, "I don't give them to murderers."

5.     Again while at TTCF, on November 24, 2010, before I got on the bus to go to court, I was approached by a tall, Hispanic deputy. I don't know his name. He must have overheard someone call out my name to board the bus because he said to me, "oh, so you're Eduardo Villareal. I can't wait until you get to my floor." I took this statement as a threat due to the large amount of negative media coverage on my case.

6.     On November 24, 2010, Esther Lim from the ACLU came to visit me. Before the visit, one of the module deputies approached me and said, "Oh, you've been writing to the ACLU?" I told him I had not and he said to me, "All right then."

7.     On December 1, 2010, when I was moved to MCJ, I was escorted to my Row, C by three deputies; a tall, Hispanic deputy who had threatened me on November 24, 2010, Deputy Ibarra and a tall, White deputy.

8.     The tall, Hispanic deputy said to me, "Christmas came early today."

9.     Deputy Ibarra asked me, "what are you here for?" I told him that I didn't want to talk about it and if he wanted to know to ask my lawyer. Ibarra then said, "I'm not gonna ask you again. What are you here for?" I answered him the same way. Deputy Ibarra then punched me on my right side area on my ribs. A tall, White deputy then socked the back of my head two

1    times.

2        10.     Deputy Ibarra then asked me the same question again and punched me on my right

3    side area for the second time.  After he hit me, I told him, "187."  He then said to me, "that

4    wasn't so hard."

5        11.     Deputy Ibarra and the tall, White deputy then yelled at me saying, "you're a piece

6    of shit.  We're not going to give you any showers, blankets, food, and canteen."  They also said

7    to me, "we're going to turn you over to the Southsiders."  I took that threat to mean that they

8    were going to take to me the gang so that they can kill me.

9        12.     While Deputy Ibarra was hitting me, he saw me look at his name tag.  He then

10    said to me, "you looked at my name?  If you put in a complaint I'm going to go in your cell and

11    beat you up personally."

12        13.     I wasn't given a mattress or a blanket and had to sleep on the metal bed.  The

13    deputies also took away my Bible.  I didn't receive a mattress and a blanket until the next day.

14         I declare under penalty of perjury of the laws of the State of California and the United

15    States that the foregoing is true and correct.  Executed this 11th of April, 2010 in Los Angeles,

16    California.

17

18                               /s/
                                     Eduardo Villareal

19

20

21

22

23

24

25

26

27

28

000696

# DECLARATION OF CURRENT PRISONER MR. PPP PHILIP WESTBY

000697

# DECLARATION OF PHILIP WESTBY

I, Philip Westby, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I am twenty-four years old and African American.  I was placed in Module 141, Pod E, Cell 8 of Twin Towers Correctional Facility ("TTCF") on July 18, 2009 ∧ *and released on November 18, 2009.* ~~As of~~ April 18, 2011 I was ~~moved~~ to Module 141, Pod C, Cell 4 *On the* *placed in the* and was still there on Tuesday, July 5, 2011.  My booking number is 2711368.

**Deputies on Inmate violence**

3.    I arrived at TTCF on July 18, 2009 and was placed in Module 141, Pod E, Cell 8. Attached is Exhibit A, which is a diagram of Module 141, where my cell #8 is marked with an "X." The odd numbered cells are on the second floor and the even numbered cells are on the first floor. On July 19, 2009 in the daytime, I was taking a nap in my cell. This was during program time when our cell doors are left unlocked between 4:30 pm and 8:00 pm. I heard another inmate come into my cell and start talking loudly with my cellmate. I don't know who opened the cell door because I was sleeping.  I don't remember what my cellmate looked like, or if he said anything. The inmate who came in was Mexican, possibly 5'9", a bit on the heavy side. I do not know his name.

4.    I asked the inmate who came in to respect that this was my cell too, and told him I was trying to sleep. He told me it wasn't just my cell, and we got into a loud argument for about ten minutes, and I tried to push the inmate out of my cell door. At this point, Deputy Diana came into my cell with Deputy O'Hardy and Deputy Sandoval. Deputy Diana was Hispanic, thin, had greenish brown eyes, and wore her brown hair in a bun. I know her name because the next day five inmates from my pod told me her name, and told me she was known for letting

000698

1  inmates get abused by deputies. I didn't know Deputy O'Hardy and Deputy

2  Sandoval's names at the time, but found out a few days later when I heard other

3  inmates call them by name, and I've seen their nametags. Deputy O'Hardy is

4  Hispanic, 5'9", skinny with short brown hair. Deputy Sandoval is Hispanic, 5'10",

5  heavy set with short black hair, and a mustache.

6      5.    Deputy Diana was holding a taser and told me and the other inmate

7  who came in to stop fighting and get down on the floor. We both immediately got

8  down on the floor. Then, she said, "You, you, get out" to the other inmates, and

9  told me to stay down.

10      6.    Deputy O'Hardy then pulled me out of the cell and slammed my head

11  pretty hard against the wall to the left of my cell door. Then, he held my head

12  against the wall and handcuffed my hands behind my back.

13      7.    He slammed my head against the wall two more times.  I started

14  crying because the pain in my head hurt so badly, and I was in shock. I didn't

15  know why this was happening.

16      8.    He told me to keep my head against the wall. I looked around, and

17  then he slammed my head against the wall two more times, and it hurt pretty

18  badly. It was a seven out of ten on the level of pain.

19      9.    Then, each deputy grabbed one of my arms and took me to the door

20  where you leave the pod. This door is marked on Exhibit A with a "Y." There,

21  they slammed me on the ground and told me three times to "Stop resisting."

22      10.    I said to them, "I'm not resisting. Y'all are doing this to me."

23      11.    The deputies picked me up, took me to the wall by the glass, right by

24  the door to leave Pod E, and shoved me against it. One of them, I can't remember

25  which, yelled at me, "Stop moving!" and slammed my head against the wall.

26      12.    I said, "I'm not moving," and then he slammed my head against the

27  wall again.   It was hard to tell who did what because my back was towards them.

28      13.    They took me to the Outdoor Recreation area, where Deputy

000699

O'Hardy punched me three to four times on the back of my head. Attached is Exhibit B where this area is marked with an "X." Meanwhile, he was saying, "You messed up. You come into my housing thinking you can beat on my race? We're going to press charges on you. Wait and see what he has to say."  I understood the deputy to mean that he wasn't going to protect me as an African-American; he was going to protect the Hispanic inmate because the deputies were Hispanic too.

14.    Deputy O'Hardy left for about five minutes while Deputy Sandoval stood by guarding me. When Deputy O'Hardy returned, he said the inmate did not want to press charges and that I "got away with it this time."

15.    Still handcuffed, both deputies punched me in the head, neck and back about seven times, and then threw me on the ground.

16.    Deputy O'Hardy asked me if I wanted to fight either one of the deputies. I said, "No."

17.    He said, "Yeah, you're a bitch." Then they picked me up and took me back to my cell, where I just stayed in my bed and continued to cry.

18.    My back was hurting badly from being thrown to the ground repeatedly. I thought that maybe the deputies had broken my ribs. My head also hurt and my arms hurt from when they picked me up while in handcuffs and it twisted my arms.

19.    My injuries took about two weeks to heal. My back was bruised, my face was sore and a little swollen, and the back of my head was bruised. I did not ask for any medical help because I didn't want any further contact with the deputies. I was scared that if I asked for anything, the deputies would hurt me again.

**Trustees on Inmate violence**

20.    In October 2009 in Module 141, Pod E, Cell 5, I was bedridden with

000700

1    pneumonia. On attached Exhibit A, my cell #5 is marked with a "Z." On about

2    the seventh day of being bedridden, a deputy from the control booth opened my

3    cell door to let a trustee come in to pick up my food tray. My door was locked

4    because I was on lockdown due to having pneumonia. I knew that it was a female

5    deputy working at the time because I heard her voice over the speakers to

6    announce dinner about 15 minutes prior, and I had seen that it was Deputy Diana

7    earlier in the day. As I mentioned previously, fellow inmates had told me she was

8    Deputy Diana, and I saw her name badge a couple of weeks ~~ago.~~ after the incident.

9        21.   The trustee was African-American, 6'1", medium build with short

10   black hair and brown eyes. He rushed me while I was in bed and tried to punch

11   my face, but I blocked him with my arms.

12       22.   Then I heard someone run up the stairs, and he came through my cell

13   door that was still open. At this point I saw that it was a second trustee, who

14   looked Iranian, 5'9", heavy build with short blondish brown hair and possibly had

15   hazel eyes.

16       23.   The second trustee held my shoulders and pinned me on my back

17   while the first trustee repeatedly punched my face. I tried to block the punches

18   with my arms, but he got some hits in. He gave me a black eye on my left eye and

19   my face was bleeding.

20       24.   The first trustee also busted my lip and loosened my front tooth, and

21   both my lip and gums were bleeding. I saw some of my own blood on the floor.

22   The incident lasted about 30 seconds, and then they picked up my food tray and

23   left. I couldn't see any deputies but they must have seen what happened to me

24   because they can see everything from the control room.

25       25.   I immediately got up, pressed the intercom button about 40 times,

26   and banged on the door yelling, "I need medical help! This isn't right! You guys

27   fucked up!"

28       26.   An hour later, I heard the Sergeant come out of his office and yell to

4

000701

1    the deputies, "What's wrong with him? Why is he banging on the doors?" I can't

2    identify the sergeant because I didn't see him, but I knew where his office was and

3    heard him come out. The sergeant's office is indicated on Exhibit B.

4        27.    After I kept yelling and pressing the intercom button about 40 times,

5    the deputy came up into my cell and told me to sit on the bed. At this point I saw

6    that he was about 6'2", stocky build with blond hair and blue eyes.  I had never

7    seen this deputy before and I've never seen him again. He said, "Get back on your

8    fuckin' bed or we'll come fuck you up!"

9        28.    I told him, "I need to see a nurse because you let the trustees beat me

10   up." The deputy said, "You're not going to see a nurse. Sign your name on the

11   list." There is a list posted next to the door to leave the pod where inmates can

12   sign up to see the nurse. I said I couldn't put my name on the list because I'm on

13   lockdown since being sick with pneumonia. The deputy joked that I had the swine

14   flu, and left.

15       29.    When the deputy closed the door, I got up and banged on the door

16   three more times.

17       30.    He came in again and slammed my head on the bed, then pressed me

18   face down with his knee on my back.  It was painful because my face had just

19   been beaten, and the deputy was on me with his whole body weight – and he

20   wasn't a small guy. He said, "Don't get up again or I'll send you to the hole."  The

21   deputy then left and closed my cell door.

22       31.    I got up and kept banging on the door.  The deputy yelled to the

23   entire pod that if I kept banging, he would shut the whole program down, meaning

24   he would lock everyone down in their cells. I kept banging on the door for about

25   two hours and no one responded except another inmate, who asked me to stop.

26       32.    This incident was traumatizing for me.  I felt like the deputies were

27   supposed to protect me, not beat me up, let other inmates beat me up and then

28   deny me medical help.  Now I feel like the deputies can do whatever they want,

000702

1  like I don't have any rights. I try not to say anything to them and I don't complain
2  about anything.

3      33.    The bruises on my face and back took two weeks to heal. Today, I
4  have a scar on my bottom lip and a 1.5 cm scar above my left eye from the
5  beating. I am still terrified of the deputies. I am terrified that they can do whatever
6  they want, that they would retaliate against me if they knew what I was telling
7  you.  I still don't feel safe.

8      I declare under penalty of perjury of the laws of the State of California and
9  the United States that the foregoing is true and correct to the best of my
10  knowledge and belief.  Executed this 5th day of July, 2011 in Los Angeles,
11  California.

Philip Westby



Exhibit A
Module 141

S = showers
V = vending machines
C = computer
▨▨▨ = door



Exhibit B

Entrance to pods D, E, F.

Staging Area - Module 141

Stairway to 2nd Floor

Office

Sergeant's Office

Outdoor Recreation Area

X

Attorney Room - Inmates

Attorney Room - Visitors

000705

# DECLARATION OF PHILIP WESTBY

I, Philip Westby, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am twenty-four years old and African American.  I was placed in Module 141, Pod E, Cell 8 of Twin Towers Correctional Facility ("TTCF") on July 18, 2009 and released on November 18, 2009. On April 18, 2011 I was placed in Module 141, Pod C, Cell 4 and was still there on Tuesday, July 5, 2011. My booking number is 2711368.


**Deputies on Inmate violence**

3.     I arrived at TTCF on July 18, 2009 and was placed in Module 141, Pod E, Cell 8. Attached is Exhibit A, which is a diagram of Module 141, where my cell #8 is marked with an "X." The odd numbered cells are on the second floor and the even numbered cells are on the first floor. On July 19, 2009 in the daytime, I was taking a nap in my cell. This was during program time when our cell doors are left unlocked between 4:30 pm and 8:00 pm. I heard another inmate come into my cell and start talking loudly with my cellmate. I don't know who opened the cell door because I was sleeping.  I don't remember what my cellmate looked like, or if he said anything. The inmate who came in was Mexican, possibly 5'9", a bit on the heavy side. I do not know his name.

4.     I asked the inmate who came in to respect that this was my cell too, and told him I was trying to sleep. He told me it wasn't just my cell, and we got into a loud argument for about ten minutes, and I tried to push the inmate out of my cell door. At this point, Deputy Diana came into my cell with Deputy O'Hardy and Deputy Sandoval. Deputy Diana was Hispanic, thin, had greenish brown eyes, and wore her brown hair in a bun. I know her name because the next day five

000706

1   inmates from my pod told me her name, and told me she was known for letting
2   inmates get abused by deputies. I didn't know Deputy O'Hardy and Deputy
3   Sandoval's names at the time, but found out a few days later when I heard other
4   inmates call them by name, and I've seen their nametags. Deputy O'Hardy is
5   Hispanic, 5'9", skinny with short brown hair. Deputy Sandoval is Hispanic, 5'10",
6   heavy set with short black hair, and a mustache.

7        5.      Deputy Diana was holding a taser and told me and the other inmate
8   who came in to stop fighting and get down on the floor. We both immediately got
9   down on the floor. Then, she said, "You, you, get out" to the other inmates, and
10  told me to stay down.

11       6.      Deputy O'Hardy then pulled me out of the cell and slammed my head
12  pretty hard against the wall to the left of my cell door. Then, he held my head
13  against the wall and handcuffed my hands behind my back.

14       7.      He slammed my head against the wall two more times.  I started
15  crying because the pain in my head hurt so badly, and I was in shock. I didn't
16  know why this was happening.

17       8.      He told me to keep my head against the wall. I looked around, and
18  then he slammed my head against the wall two more times, and it hurt pretty
19  badly. It was a seven out of ten on the level of pain.

20       9.      Then, each deputy grabbed one of my arms and took me to the door
21  where you leave the pod. This door is marked on Exhibit A with a "Y." There,
22  they slammed me on the ground and told me three times to "Stop resisting."

23       10.     I said to them, "I'm not resisting. Y'all are doing this to me."

24       11.     The deputies picked me up, took me to the wall by the glass, right by
25  the door to leave Pod E, and shoved me against it. One of them, I can't remember
26  which, yelled at me, "Stop moving!" and slammed my head against the wall.

27       12.     I said, "I'm not moving," and then he slammed my head against the
28  wall again.   It was hard to tell who did what because my back was towards them.

13.     They took me to the Outdoor Recreation area, where Deputy O'Hardy punched me three to four times on the back of my head. Attached is Exhibit B where this area is marked with an "X." Meanwhile, he was saying, "You messed up. You come into my housing thinking you can beat on my race? We're going to press charges on you. Wait and see what he has to say." I understood the deputy to mean that he wasn't going to protect me as an African-American; he was going to protect the Hispanic inmate because the deputies were Hispanic too.

14.     Deputy O'Hardy left for about five minutes while Deputy Sandoval stood by guarding me. When Deputy O'Hardy returned, he said the inmate did not want to press charges and that I "got away with it this time."

15.     Still handcuffed, both deputies punched me in the head, neck and back about seven times, and then threw me on the ground.

16.     Deputy O'Hardy asked me if I wanted to fight either one of the deputies. I said, "No."

17.     He said, "Yeah, you're a bitch." Then they picked me up and took me back to my cell, where I just stayed in my bed and continued to cry.

18.     My back was hurting badly from being thrown to the ground repeatedly. I thought that maybe the deputies had broken my ribs. My head also hurt and my arms hurt from when they picked me up while in handcuffs and it twisted my arms.

19.     My injuries took about two weeks to heal. My back was bruised, my face was sore and a little swollen, and the back of my head was bruised. I did not ask for any medical help because I didn't want any further contact with the deputies. I was scared that if I asked for anything, the deputies would hurt me again.

**Trustees on Inmate violence**

3

000708

20.     In October 2009 in Module 141, Pod E, Cell 5, I was bedridden with pneumonia. On attached Exhibit A, my cell #5 is marked with a "Z." On about the seventh day of being bedridden, a deputy from the control booth opened my cell door to let a trustee come in to pick up my food tray. My door was locked because I was on lockdown due to having pneumonia. I knew that it was a female deputy working at the time because I heard her voice over the speakers to announce dinner about 15 minutes prior, and I had seen that it was Deputy Diana earlier in the day. As I mentioned previously, fellow inmates had told me she was Deputy Diana, and I saw her name badge a couple of weeks after the incident.

21.     The trustee was African-American, 6'1", medium build with short black hair and brown eyes. He rushed me while I was in bed and tried to punch my face, but I blocked him with my arms.

22.     Then I heard someone run up the stairs, and he came through my cell door that was still open.  At this point I saw that it was a second trustee, who looked Iranian, 5'9", heavy build with short blondish brown hair and possibly had hazel eyes.

23.     The second trustee held my shoulders and pinned me on my back while the first trustee repeatedly punched my face.  I tried to block the punches with my arms, but he got some hits in.  He gave me a black eye on my left eye and my face was bleeding.

24.     The first trustee also busted my lip and loosened my front tooth, and both my lip and gums were bleeding.  I saw some of my own blood on the floor. The incident lasted about 30 seconds, and then they picked up my food tray and left. I couldn't see any deputies but they must have seen what happened to me because they can see everything from the control room.

25.     I immediately got up, pressed the intercom button about 40 times, and banged on the door yelling, "I need medical help! This isn't right! You guys fucked up!"

000709

26.     An hour later, I heard the Sergeant come out of his office and yell to the deputies, "What's wrong with him? Why is he banging on the doors?" I can't identify the sergeant because I didn't see him, but I knew where his office was and heard him come out.

27.     After I kept yelling and pressing the intercom button about 40 times, the deputy came up into my cell and told me to sit on the bed. At this point I saw that he was about 6'2", stocky build with blond hair and blue eyes.  I had never seen this deputy before and I've never seen him again. He said, "Get back on your fuckin' bed or we'll come fuck you up!"

28.     I told him, "I need to see a nurse because you let the trustees beat me up." The deputy said, "You're not going to see a nurse. Sign your name on the list." There is a list posted next to the door to leave the pod where inmates can sign up to see the nurse. I said I couldn't put my name on the list because I'm on lockdown since being sick with pneumonia. The deputy joked that I had the swine flu, and left.

29.     When the deputy closed the door, I got up and banged on the door three more times.

30.     He came in again and slammed my head on the bed, then pressed me face down with his knee on my back.  It was painful because my face had just been beaten, and the deputy was on me with his whole body weight – and he wasn't a small guy. He said, "Don't get up again or I'll send you to the hole."  The deputy then left and closed my cell door.

31.     I got up and kept banging on the door.  The deputy yelled to the entire pod that if I kept banging, he would shut the whole program down, meaning he would lock everyone down in their cells. I kept banging on the door for about two hours and no one responded except another inmate, who asked me to stop.

32.     This incident was traumatizing for me.  I felt like the deputies were supposed to protect me, not beat me up, let other inmates beat me up and then

000710

1  deny me medical help.  Now I feel like the deputies can do whatever they want,

2  like I don't have any rights. I try not to say anything to them and I don't complain

3  about anything.

4      33.    The bruises on my face and back took two weeks to heal. Today, I

5  have a scar on my bottom lip and a 1.5 cm scar above my left eye from the

6  beating. I am still terrified of the deputies. I am terrified that they can do whatever

7  they want, that they would retaliate against me if they knew what I was telling

8  you.  I still don't feel safe.

9      I declare under penalty of perjury of the laws of the State of California and

10 the United States that the foregoing is true and correct to the best of my

11 knowledge and belief.  Executed this 5th day of July, 2011 in Los Angeles,

12 California.

13

14                                        _____/s/_____

15                                        Philip Westby

16

17

18

19

20

21

22

23

24

25

26

27

28

000711

Exhibit A
Module 141

Phones

Entrance to Staging Area

desk

Desk

C

surveillance booth

S = shower
V = vending machines
C = computer
▨ = door

000712



Exhibit B

Entrance to pods D, E, F.

Staging Area - Module 141

Attorney Room - Inmates

Attorney Room - Visitors

Stairway to 2nd Floor

Office

Sergeant's Office

X

Outdoor Recreation Area

000713

# DECLARATION OF CURRENT PRISONER MR. QQQ JEREMIAH WILKERSON

000714

**Declaration of Jeremiah Wilkerson**

I, Jeremiah Wilkerson, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     On March 12, 2011, sometime between 9AM and 10AM, I was helping another inmate make homemade alcohol (known as "pruno") in his cell.  We were both housed in _3100_ ~~FLOOR~~ CHARLIE _24_ _SW_ . His cell was directly next to mine, so we could hand each other materials through the bars of our cells.  We were preparing to drink the alcohol when a deputy walked by our cells.  The alcohol had a strong scent, so he could probably smell it as he walked by.  He stopped in front of my cell and said, "Give me the pruno." All of the alcohol was in the other inmate's cell, so I said that I didn't have any.

3.     The deputy then told me to "cuff up" and said that he was going to search my cell. I told him that I didn't want to "cuff up" because he was "messing with me."  The deputy then walked to the next cell and asked the other inmate, "Where is the pruno?"  The inmate said that he didn't have any pruno.

4.     The deputy walked back to my cell and told me to "cuff up."  He told me that he was going to come into my cell and that I was going to the "hole."  I did not want to go to the hole.  I said to the deputy, "Let's go to the day room and talk about this."  He said, "You want to go to the day room?  Cuff up and let's go."

5.     The deputy handcuffed my hands behind my back and took me out of my cell. Once I was standing outside the cell, he squeezed the handcuffs against my wrists very forcefully. It felt like he was squeezing as hard as he could.

6.     The deputy then took me towards the hole and stopped in front of the module where I was housed.  The deputy stood me against the wall and told me that he was going to search me.  He told me to spread my legs.  At this point, he kicked the inside of my left leg, near the bottom of my calf.  Because the deputy was shorter than me, I think he wanted my legs spread wider so that I was level with his height.  I was level with him after the first kick, but he kicked me in the same area of my leg several more times.  He kicked me so hard that it left a bruise there

for several weeks.

7. After kicking me several times, he hit the back of my head. *He used JW a closed fist and hit on the right side of my head, above the ear* Because I was standing so close to the wall, my face hit the wall when he hit my head. He hit my head several more times and continued to kick my leg. I wanted him to stop hitting me, so I forced myself to the floor. Once I was on the floor, he put me into a military choke hold. He had his left hand on the back of my head and his right arm wrapped around my neck. He was pushing the back of my head forward with his left hand and pushing my neck and head forward with his right arm. He continued doing this for 10 to 15 seconds, and I could not breathe. I felt like I was about to pass out, but he stopped before I lost consciousness. Then, he picked me up off the floor and walked me towards the hole.

8. On the way to the hole, we passed several inmates in their cells. The deputy said aloud, referring to me, "This is an ~~Ordeno~~ *Norteño JW* (a member of the ~~Ordeno~~ *Norteño JW* gang). If the door's 'racked' (opened) you know what to do." I believe the deputy was trying to rile up the other inmates (who were members of rival gangs) and make me a target for an attack.

9. At first the deputies said that I would be in the hole for 29 days, but they took me out after 21 days. I know the identity of the deputy who hit me and of two witness (another deputy and a custody assistant), but I am afraid that I will be the victim of a reprisal if I name them. *JW*

*✗ I know it was a "military choke hold" because a family member explained that to me when I was a child.*

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 19th day of April, 2011 in Los Angeles, California.

_____

Jeremiah Wilkerson

2

1       **Declaration of Jeremiah Wilkerson**

2       I, Jeremiah Wilkerson, hereby declare:

3       1.      I make this declaration based on my own personal knowledge and if called to

4       testify I could and would do so competently as follows:

5       2.      On March 12, 2011, sometime between 9AM and 10AM, I was helping another

6       inmate make homemade alcohol (known as "pruno") in his cell.  We were both housed in 3100

7       Charlie 24.  His cell was directly next to mine, so we could hand each other materials through the

8       bars of our cells.  We were preparing to drink the alcohol when a deputy walked by our cells.

9       The alcohol had a strong scent, so he could probably smell it as he walked by.  He stopped in

10      front of my cell and said, "Give me the pruno."  All of the alcohol was in the other inmate's cell,

11      so I said that I didn't have any.

12      3.      The deputy then told me to "cuff up" and said that he was going to search my cell.

13      I told him that I didn't want to "cuff up" because he was "messing with me."  The deputy then

14      walked to the next cell and asked the other inmate, "Where is the pruno?"  The inmate said that

15      he didn't have any pruno.

16      4.      The deputy walked back to my cell and told me to "cuff up."  He told me that he

17      was going to come into my cell and that I was going to the "hole."  I didn't want to go to the

18      hole.  I said to the deputy, "Let's go to the day room and talk about this."  He said, "You want to

19      go to the day room?  Cuff up and let's go."

20      5.      The deputy handcuffed my hands behind my back and took me out of my cell.

21      Once I was standing outside the cell, he squeezed the handcuffs against my wrists very forcefully.

22      It felt like he was squeezing as hard as he could.

23      6.      The deputy then took me towards the hole and stopped in front of the module

24      where I was housed.  The deputy stood me against the wall and told me that he was going to

25      search me.  He told me to spread my legs.  At this point, he kicked the inside of left leg, near the

26      bottom of my calf.  Because the deputy was shorter than me, I think he wanted my legs spread

27      wider so that I was level with his height.  I was level with him after the first kick, but he kicked

28      me in the same area of my leg several more times.  He kicked me so hard that it left a bruise there

000717

1   for several weeks.

2         7.      After kicking me several times, he hit the back of my head.  He used a closed fist

3   and hit on the right side of my head, above the ear.  Because he was standing so close to the wall,

4   my face hit the wall when he hit my head.  He hit my head several more times and continued to

5   kick my leg.  I wanted him to stop hitting me, so I forced myself to the floor.  Once I was on the

6   floor, he put me in a military choke hold.  I know it was a "military choke hold" because a family

7   member explained that to me when I was a child.  He had his left hand on the back of my head

8   and his right arm wrapped around my neck.  He was pushing the back of my head forward with

9   his left hand and pushing my neck and head forward with his right arm.  He continued doing this

10   for 10 to 15 seconds, and I could not breathe.  I felt like I was about to pass out, but he stopped

11   before I lost consciousness.  Then, he picked me up off the floor and walked me towards the

12   hole.

13         8.      On the way to the hole, we passed several inmates in their cells.  The deputy said

14   aloud, referring to me, "This is an Norteno (a member of the Norteno gang).  If the door's

15   'racked' (opened) you know what to do."  I believe the deputy was trying to rile up the other

16   inmates (who were members of rival gangs) and make me a target for an attack.

17         9.      At first the deputies said that I would be in the hole for 29 days, but they took me

18   out after 21 days.  I know the identity of the deputy who hit me and of two witness (another

19   deputy and a custody assistant), but I am afraid that I will be the victim of a reprisal if I name

20   them.

21

22         I declare under penalty of perjury of the laws of the State of California and the United

23   States that the foregoing is true and correct.  Executed this 19th day of April, 2011 in Los

24   Angeles, California.

25                                       /s/

26                                Jeremiah Wilkerson

27

28

2

# DECLARATION OF CURRENT PRISONER MR. RRR GARRY CRUMPTON

000719

## DECLARATION OF GARRY CRUMPTON

I, Garry Crumpton, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I was arrested on November 10th of 2010 and was in Los Angeles County Jail from then until March 2011. I was housed in Men's Central Jail, Pod 2500 during the month of January 2011.

3.     On January 18th, 2011 I was woken up early in the morning by a deputy who announced over the intercom that I was on the list of people to go to court. At approximately 5:30 a.m. my cell door was opened and I was directed by a deputy to proceed to the law library where the court inmates meet before they head out to court. Being that I was a pro per inmate, I schedule my own court dates and therefore I knew that I did not actually have court that day and that I must have been being called for court due to a computer error. After we gathered in the law library, we were led to go pick up our breakfasts and then meet the rest of the inmates who were going to court in the court line downstairs. Everybody going to court lines up in a long hallway. I remember hearing a deputy instruct us to make two lines, one for the Criminal Court Building and one for traffic court. Because my paperwork said I was going to the Pasadena Courthouse and the only case I had out of Pasadena was a misdemeanor hit-and-run, I thought I was suppose to line up in the traffic court line.

4.     After I had been standing in the line for approximately two or three minutes, a deputy began to check everybody's papers to ensure that we were all in the correct lines. While I did not know it at the time, the deputy was Deputy Ortiz.

5.     I learned that he was Deputy Ortiz the next time I went to court because when I saw him in the court line I looked at his name badge to find out what his name was.

6.     On January 18, 2011, when Deputy Ortiz got to me, he took my paperwork, put it on his knee and circled where it said Pasadena Courthouse. He then shoved my paperwork in my chest with his right hand and in the same motion shoved me up against the wall. I said to him, "you didn't have to do me like that". At that point, Deputy Ortiz walked to my left side

1

1   and put his right forearm around my neck putting me in a chokehold.  On a scale of 1 to 5, with

2   1 being not too hard and 5 being really painful, I would classify the amount of force that Ortiz

3   used against me while putting me in a chokehold as a 5.  When he put me in the chokehold, I

4   raised my hands in the air to make it clear to any deputies that may have been around that I was

5   not fighting back and was not trying to hit Deputy Ortiz.

6          6.      I remember at least one other deputy coming over from the right of me to assist

7   Deputy Ortiz in restraining me but I cannot remember anything about him other than seeing his

8   figure coming towards me as I began to lose consciousness from the chokehold.  Right as the

9   other officer approached, Deputy Ortiz, still having his arm wrapped around my neck, slammed

10  me to the floor.  I do not remember anything after this point so I must have become

11  unconscious.

12         7.      When I regained consciousness, I was being lifted up by my handcuffs by two

13  officers.  Since my hands were behind my back I did not get a look at them so I am not sure

14  which two officers they were.  I know there were two of them though because one deputy could

15  not have lifted me up by himself in that way.  They took me to a different part of the jail and put

16  me in a wire cage that was located in the area where they strip search inmates coming back from

17  court.

18         8.      After being in the cage for approximately 45 minutes, Deputy Ortiz came over

19  and spoke to me regarding the incident.  Even though I did not think what he was saying was

20  right, I just agreed with everything he said because I did not want him to hurt me anymore.  He

21  then opened the cage and took me to the court holding tank.  I sat there for four to six minutes

22  and then the deputies came with the chains and chained us all up and put us on the bus to the

23  Pasadena Courthouse.

24         9.      Once I got on the bus I started to notice that I had a lot of pain in my neck.  The

25  pain was especially exacerbated when I turned my head to one side or the other.  When I turned

26  my head to the side, I felt a sharp pain in my neck and the muscles cramping up.

27         10.     When I got to the courthouse, I immediately complained to a sergeant and told

28  him that I needed to go to the hospital right away.  He had two bailiffs from the courthouse

000721

1   transport me to the Pasadena Huntington Memorial Hospital.

2         11.    Once I was at the hospital, the doctors took an x-ray of my neck.  I cannot recall

3   the exact medical terminology they used when they were talking about my condition but I do

4   remember them saying something about muscle spasms in my neck.  Upon departing the

5   hospital, doctors handed me my paperwork and the bailiffs took me back to the Pasadena

6   Courthouse.

7         12.    About a week or two later, I got a court order to be checked by the in-house

8   medical unit at Men's Central Jail.  With this court order, I was able to get a cat-scan and x-ray

9   on my neck and a x-rays on my shoulder and my back, which were both bothering me at the

10   time.

11         13. From what I remember, the people in the medical unit talked about me having

12   muscle spasms.  They prescribed me three different medications.  One was a muscle relaxer and

13   I can't remember what exactly the other two were for.

14         14. A week or two after the incident that occurred on January 18th two sergeants came to

15   talk to me about what had happened on that day.  I do not know how they heard about the

16   incident because I did not tell anyone about it.  They took me into a small room on the unit that

17   used to be a laundry room.  They began videotaping me and I was instructed to tell the story in

18   my own words and identify those involved.  I told them exactly what had happened, just as I did

19   above.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

3

15.  I have run into Deputy Ortiz since the incident and when we have seen each other he gives me a hard time and harasses me verbally.  He will say things like "you're the one that got choked and thrown into the ground and wants to sue?" "how's the back?" and "are you going to sue me?".

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief.  Executed June 30, 2011 in Los Angeles, California.

Garry Crumpton

4

000723

# DECLARATION OF GARRY CRUMPTON

I, Garry Crumpton, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I was arrested on November 10th of 2010 and was in Los Angeles County Jail from then until March 2011.  I was housed in Men's Central Jail, Pod 2500 during the month of January 2011.

3.    On January 18th, 2011 I was woken up early in the morning by a deputy who announced over the intercom that I was on the list of people to go to court.  At approximately 5:30 a.m. my cell door was opened and I was directed by a deputy to proceed to the law library where the court inmates meet before they head out to court. Being that I was a pro per inmate, I schedule my own court dates and therefore I knew that I did not actually have court that day and that I must have been being called for court due to a computer error.  After we gathered in the law library, we were led to go pick up our breakfasts and then meet the rest of the inmates who were going to court in the court line downstairs.  Everybody going to court lines up in a long hallway.  I remember hearing a deputy instruct us to make two lines, one for the Criminal Court Building and one for traffic court.  Because my paperwork said I was going to the Pasadena Courthouse and the only case I had out of Pasadena was a misdemeanor hit-and-run, I thought I was suppose to line up in the traffic court line.

4.    After I had been standing in the line for approximately two or three minutes, a deputy began to check everybody's papers to ensure that we were all in the correct lines.  While I did not know it at the time, the deputy was Deputy Ortiz.

5.    I learned that he was Deputy Ortiz the next time I went to court because when I saw him in the court line I looked at his name badge to find out what his name was.

6.    On January 18, 2011, when Deputy Ortiz got to me, he took my paperwork, put it on his knee and circled where it said Pasadena Courthouse.  He then shoved my paperwork in my chest with his right hand and in the same motion shoved me up against the wall.  I said to him, "you didn't have to do me like that".  At that point, Deputy Ortiz walked to my left side

1

and put his right forearm around my neck putting me in a chokehold. On a scale of 1 to 5, with 1 being not too hard and 5 being really painful, I would classify the amount of force that Ortiz used against me while putting me in a chokehold as a 5. When he put me in the chokehold, I raised my hands in the air to make it clear to any deputies that may have been around that I was not fighting back and was not trying to hit Deputy Ortiz.

6.      I remember at least one other deputy coming over from the right of me to assist Deputy Ortiz in restraining me but I cannot remember anything about him other than seeing his figure coming towards me as I began to lose consciousness from the chokehold. Right as the other officer approached, Deputy Ortiz, still having his arm wrapped around my neck, slammed me to the floor. I do not remember anything after this point so I must have become unconscious.

7.      When I regained consciousness, I was being lifted up by my handcuffs by two officers. Since my hands were behind my back I did not get a look at them so I am not sure which two officers they were. I know there were two of them though because one deputy could not have lifted me up by himself in that way. They took me to a different part of the jail and put me in a wire cage that was located in the area where they strip search inmates coming back from court.

8.      After being in the cage for approximately 45 minutes, Deputy Ortiz came over and spoke to me regarding the incident. Even though I did not think what he was saying was right, I just agreed with everything he said because I did not want him to hurt me anymore. He then opened the cage and took me to the court holding tank. I sat there for four to six minutes and then the deputies came with the chains and chained us all up and put us on the bus to the Pasadena Courthouse.

9.      Once I got on the bus I started to notice that I had a lot of pain in my neck. The pain was especially exacerbated when I turned my head to one side or the other. When I turned my head to the side, I felt a sharp pain in my neck and the muscles cramping up.

10.      When I got to the courthouse, I immediately complained to a sergeant and told him that I needed to go to the hospital right away. He had two bailiffs from the courthouse

2

1  transport me to the Pasadena Huntington Memorial Hospital.

2        11.    Once I was at the hospital, the doctors took an x-ray of my neck.  I cannot recall

3  the exact medical terminology they used when they were talking about my condition but I do

4  remember them saying something about muscle spasms in my neck.  Upon departing the

5  hospital, doctors handed me my paperwork and the bailiffs took me back to the Pasadena

6  Courthouse.

7        12.    About a week or two later, I got a court order to be checked by the in-house

8  medical unit at Men's Central Jail.  With this court order, I was able to get a cat-scan and x-ray

9  on my neck and a x-rays on my shoulder and my back, which were both bothering me at the

10  time.

11        13. From what I remember, the people in the medical unit talked about me having

12  muscle spasms.  They prescribed me three different medications.  One was a muscle relaxer and

13  I can't remember what exactly the other two were for.

14        14. A week or two after the incident that occurred on January 18th two sergeants came to

15  talk to me about what had happened on that day.  I do not know how they heard about the

16  incident because I did not tell anyone about it.  They took me into a small room on the unit that

17  used to be a laundry room.  They began videotaping me and I was instructed to tell the story in

18  my own words and identify those involved.  I told them exactly what had happened, just as I did

19  above.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1      15. I have run into Deputy Ortiz since the incident and when we have seen each other he

2 gives me a hard time and harasses me verbally. He will say things like "you're the one that got

3 choked and thrown into the ground and wants to sue?" "how's the back?" and "are you going to

4 sue me?".

5      I declare under penalty of perjury of the laws of the State of California and the United

6 States that the foregoing is true and correct to the best of my knowledge and belief. Executed

7 June 30, 2011 in Los Angeles, California.

8

9                                             /s/

10                                     Garry Crumpton

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000727

# DECLARATION OF CURRENT PRISONER MR. SSS MACARIO GARCIA

000728

**Declaration of Macario Garcia**

I, Macario Garcia, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 42 years old and I am currently housed at Men's Central Jail ("MCJ"), Module 2700, Row A, Cell 11.  My booking number is 2490525.  I am 6'2" and 165 pounds.

3.      On Friday, July 22, 2011 between 8-10 a.m., I was in Module 2700, Row, A, Cell 11.  Deputy Chavez came to the front of my cell and told me to get out because I had an appointment with an eye doctor.  Deputy Chavez then handcuffed me from behind before I stepped out of my cell.  Deputy Chavez escorted me out of my cell towards the main gate at the front of the row.  I saw Deputy Weiner standing inside the gated deputy's control booth, next to the cell door controls.

4.      I knew the names of the deputies because they're the module deputies and I've seen them since I've been on this module for 3 months and a week.  Deputy Chavez looks like 6'2" and weighs approximately 275 pounds, looks White with light brown hair and Deputy Weiner looks like 5'7" and weighs 220 pounds and he's White and bald.

5.      Deputy Weiner then says to me, "Oh, it's you, you piece of shit, punk."  I asked him what his problem was.  I told him that I didn't do anything disrespectful to him and didn't know why he was talking to me like that.  Deputy Weiner said to me, "Shut the fuck up, punk.  You ain't nothing but a coward bitch.  You had your chance to fight me, but you didn't."  I think Deputy Weiner was referring to an incident where he strip searched me after I came back from court a couple of weeks before I got beat up and he took the handcuffs off of me.

6.      I again asked him, "What's your problem?"

7.      Deputy Chavez then looked at me and said, "You're not going to go to your doctor's appointment.  I'm going to take you back to your cell."  He then told me, "Get against the wall."

8.      I complied and faced the wall that was opposite the deputy's control booth.  I heard the locked gate open and close and then both Deputies Chavez and Weiner started

1    attacking me.

2         9.     Deputies Chavez and Weiner punched me several times before I fell to the ground

3 from the blows. When I fell, they continued punching and kicking my head, face, body and legs.

4 I don't even know how many times I was hit; it just felt like I was being bombarded by a stream

5 of blows. The deputies also took out of their flashlights and beat my body and torso with them. I

6 was screaming and yelling trying to get them to stop beating me, but they didn't. The deputies

7 also pulled my hair and slammed my head on the ground. The beating felt like it lasted forever,

8 but my guess is that they were beating me for about five minutes before I blacked out. The last

9 thing I heard before I blacked out was Deputy Weiner who called out radio code, "415", which is

10 an officer involved fight.

11        10.    The first thing I remember when I regained consciousness was seeing a stampede

12 of deputies coming over to where I was lying on the ground. I heard Deputies Chavez and

13 Weiner yell out, "Stop resisting! Stop pulling away!" I wasn't resisting or fighting as it would

14 have been hard for me to do so since I had my hands handcuffed behind me. I didn't hear the

15 deputies saying, "Stop resisting! Stop pulling away!" during the time they were beating me up

16 before I blacked out. I only heard them yell these commands once the backup deputies arrived on

17 scene. I then heard Deputy Chavez yell out to the other deputies, "Spray him! Spray him!"

18        11.    One of the deputies, I don't recall who or what this deputy looked like, sprayed

19 my face with pepper spray. I felt so much pain and stinging in my face, especially my eyes after I

20 was pepper sprayed. I also felt other deputies besides Deputies Chavez and Weiner punching and

21 kicking me.

22        12.    The deputies finally stopped attacking me and one of them tried to pull me up by

23 my arms, which were handcuffed behind me. When he did, I felt a sharp pain in my collarbone

24 and heard a large crack. I yelled out in pain, but he continued to try to pull me up.

25        13.    As the deputies were dragging me to the elevator, I heard deputies yell out to me,

26 "He got what he got coming."

27        14.    When we finally got into the escalator, I was able to see myself in the security, as I

28 was brought down from the 2000 floor to the 1st floor. I was so scared by what I saw because I

2

1  couldn't even recognize myself. I had so much blood all over my face and it looked like blood

2  was dripping down from everywhere.

3       15.    The deputies dragged me down the escalator because I was unable to walk and

4  took me to the medical clinic on the first floor.

5       16.    I think there was about 10 or more deputies milling around the medical clinic. I

6  recognized three deputies: Esqueda, Juarez and Lowry III. I was able to identify these deputies

7  because I've had separate incidents with each of the deputies harassing me.

8       17.    When the nurses saw me, I heard them tell the deputies that I needed to go to the

9  Los Angeles Medical Center + USC ("LCMC") because I had serious injuries.

10       18.    While I waited to be escorted to LCMC, I heard some of the deputies laughing and

11  heard them say, "You didn't get hit. You fell." A sergeant and two deputies came and

12  interviewed me on video camera. He asked me what happened and I told him that I was

13  assaulted by Deputies Chavez and Weiner.

14       19.    The sergeant looked like either Hispanic or White with brown hair, 5"11", brown

15  eyes and around 250 pounds.

16       20.    When I got to LCMC, I underwent a Cat Scan and 2 MRI's. The medical staff

17  told me that I had a broken collarbone and one of the broken halves were facing inward towards

18  my thoracic region causing my shortness of breath and difficulty breathing. I also received

19  stitches above both of my eyebrows and my eyes were completely red. I am very worried about

20  my eyes because I am completely blind in one eye due to Deputies Ledesma and Gonzalez and

21  other deputies' beating me up in 2010 at the Pasadena Courthouse and I didn't know if the

22  pepper spray would cause an infection in my blind eye or my working eye. I also had a lot of

23  pain in my head and had swelling in the back of my head. I had bruises under each eye and

24  bruises all on the front of my legs. I also have swelling on my lower lip.

25       21.    I am in an incredible amount of pain and I wince every time I move. I can barely

26  move the right side of my body and can barely lift my right hand more than 3-6 inches in an

27  upward direction.

28  \ \ \

1    \ \ \

2    22.    I get very dizzy and sometimes hear a ringing in my ear, which sounds like an

3 alarm is going off inside my head.

4    23.    On 7/26, Esther Lim from the ACLU came to LCMC and saw me

5    24.    On 7/28 or 7/29 in the afternoon, Lt. Wright, another Lieutenant with short,

6 blondish hair and a Sergeant who is Hispanic came to LCMC and took photos of my injuries for

7 the use of force packet. They didn't ask me any questions about what happened to me when I got

8 beaten by Deputies Chavez and Weiner.

9    25.    Either late in July or early August, the orthopedic surgeon told me that my

10 collarbone was broken away from sternum and was found to be 3mm. away from the arteries to

11 my heart.

12    26.    I still am in a lot of pain from these injuries even though it happened on 7/22/11.

13    I declare under penalty of perjury of the laws of the State of California and the United

14 States that the foregoing is true and correct. Executed this 2nd day of August, 2011 in Los

15 Angeles, California.

16

17                    Macario Garcia

18

19

20

21

22

23

24

25

26

27

28

4

# DECLARATION OF CURRENT PRISONER MR. TTT ALVARO LUQUE

000733

# DECLARATION OF ALVARO LUQUE

I, Alvaro Luque, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am sixty-four years old. I am five feet, seven inches tall and I weigh one hundred and fifty pounds. I am currently housed at Twin Towers Correctional Facility ("TTCF") in Module 131, Pod C.

3.     As I describe below, I was attacked and beaten by a fellow inmate while sitting directly in front of a deputy's station less than a minute after the deputy working at that station had threatened me, made fun of me, and loudly claimed that I "liked little girls."

4.     I was arrested in Lancaster, CA on June 30, 2011 and was taken to the Inmate Reception Center ("IRC") for processing on July 1, 2011. Sometime after my arrest, a deputy put a yellow wristband around my wrist. I have since learned that Los Angeles Sheriff's Department place me in administrative segregation and that a yellow wristband indicates such placement. I have also since learned that I am placed in administrative segregation for my own safety because I was accused of a sex crime, which makes me a target of violence among other inmates.

5.     A few hours into the intake process at the IRC, immediately after standing for a photograph, I approached a deputy with a nametag reading "Sanchez" who was distributing uniforms next to the photograph station.

6.     After Deputy Sanchez told me to step forward to receive my uniform, he looked at the yellow bracelet around my wrist, sneered at me, and loudly announced: "You're one of the special ones—I'm going to fuck you up." He then told me to take a seat at the bench in front of his station. I noticed that he seemed about twenty years younger and thirty to forty pounds heavier than me. I was scared and sat down immediately.

1

7.     While Deputy Sanchez crossed the hallway to where the inmate uniforms were stacked, I looked away from him, to my right, and saw another inmate roughly twenty feet away. This inmate was a Hispanic man with a mustache who looked to be six feet, two inches tall and about two hundred and thirty pounds. He was wearing a green uniform. I have since learned that trustees and inmate-workers at Men's County Jail (MCJ) and TTCF wear such shirts.

8.     Deputy Sanchez, still across the hallway, then crumpled an inmate uniform into a ball, threw it into my face, and told me to get dressed. As I bent over to pick the uniform from the floor, he approached me, leaned over so that his face was less than a foot away from my own, and very loudly proclaimed: "You're one of those! You like little girls! Now I know that there is no God, because people like you exist!" It was my impression that the other inmate overheard what Deputy Sanchez had said, because he spoke so loudly. In fact, he was nearly yelling. I was now completely terrified. I started dressing and kept my head down, too scared to look at the deputy or anyone else.

9.     It was and continues to be my belief that Deputy Sanchez meant for the other inmate to hear him. He spoke at a volume much greater than was necessary for me, let alone the other inmate, who stood twenty feet away, to hear him.

10.     Less than a minute later, while I was still sitting on the bench and getting dressed, someone to the right of me slugged me and knocked me to the ground. I did not see the blow coming. I curled into a ball and was punched and kicked all over my body. At some point during the beating I saw that the inmate in the green uniform, the only other person in the hallway, was the attacker. The beating lasted for approximately thirty seconds. I did not see where the inmate went when he finished with me because my face was buried behind my arms.

11.     I remained on the ground after the beating for about a minute until I heard Deputy Sanchez's voice ordering me to move along to the next room. He

000735

1    was standing at his station again. I did not see Deputy Sanchez while I was beaten,

2    but the beating took place directly in front of his station less than one minute after

3    he had proclaimed that I "liked little girls" and ended less than one minute before

4    he told me to move along.

5        12.    After Deputy Sanchez ordered me into the next room, I stood up,

6    feeling numb, and moved into the next room as ordered. Once there, I looked over

7    my body and discovered several wounds. Distinct and competing sensations of

8    pain began to take the place of numbness. There was a half-inch wide bloody gash

9    in my left shin (where a scar has now formed), a two-square inch contusion on my

10   upper left thigh, and immense pain in my lower left back began to throb along the

11   lines of my ribcage.

12       13.    I also noticed a nurse's station in the room where nurses were

13   reviewing inmates. Once I was able, I approached one of the nurses and told her

14   that I had just been beaten and that there were wounds on my leg and that my ribs

15   felt severely damaged. In response, the nurse asked me to sit and wait for

16   attention.

17       14.    After roughly thirty minutes, a nurse briefly looked over my wounds

18   and cleaned and bandaged my shin. She also took my blood pressure, listened to

19   my heartbeat with a stethoscope, and took my temperature. The nurse told me that

20   my blood pressure was abnormally high, handed me several pills, and told me to

21   swallow them and to wait for her to return. She returned three times during a one-

22   hour span to retake my blood pressure. After her last visit she told me that I was

23   free to go. While the nurse never explained what she was doing, I gathered that

24   she had given me medication to reduce my blood pressure and that it had finally

25   taken effect. I have never had on-going problems with my blood pressure and am

26   not regularly prescribed medication for that purpose.

27       15.    A deputy then escorted me from the nurse's station to the sixth floor

28   of TTCF Tower Two, where other deputies ordered me to select and carry bedding

3

000736

1 to my cell. When I lifted the bedding the pain grew unbearable, and I winced and

2 slumped over. The pain was too much. It felt like something was broken and torn

3 inside of me. The deputies mocked me for it, calling me a "faker" and telling me I

4 "wasn't fooling anyone."

5       16.    Once in my cell, I got into my bunk because lying was less painful

6 than standing. For most of the night I could not sleep because I was scared and the

7 pain in my back made it impossible to lie comfortably. After lying awake for

8 hours in the dark, I finally fell asleep.

9       17.    When I awoke the following morning I was in more pain than I have

10 ever experienced before. It was incredibly painful when I breathed, and I could

11 not stand up straight. I only vaguely remember talking to a deputy and requesting

12 medical attention. My memory of this morning remains cloudy. Somehow I was

13 escorted to a single occupant room in Module 4100 at MCJ where I remained for

14 three days. A doctor X-Rayed my chest and prescribed me pain medication. When

15 I was given the medication before I got to Module 4100. I was also given a red

16 wristband. A nurse told me that the red wristband meant that I was on narcotics.

17       18.    The pain subsided but did not entirely go away. I was returned to my

18 permanent cell after three days. I was never given or told about the results of my

19 X-Ray. I am still prescribed medication for the pain and my back remains tender.

20 A one-half inch scar has formed on my shin where the laceration was.

21       I declare under penalty of perjury of the laws of the State of California and

22 the United States that the foregoing is true and correct to the best of my

23 knowledge and belief. Executed this 23rd day of September, 2011 in Los Angeles,

24 California.

25

26                             _____/s/_____

27                             Alvaro Luque

28

000737

# DECLARATION OF ALVARO LUQUE

I, Alvaro Luque, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am sixty-four years old. I am five feet, seven inches tall and I weigh one hundred and fifty pounds. I am currently housed at Twin Towers Correctional Facility ("TTCF") in Module 131, Pod C.

3.     As I describe below, I was attacked and beaten by a fellow inmate while sitting directly in front of a deputy's station less than a minute after the deputy working at that station had threatened me, made fun of me, and loudly claimed that I "liked little girls."

4.     I was arrested in Lancaster, CA on June 30, 2011 and was taken to the Inmate Reception Center ("IRC") for processing on July 1, 2011. Sometime after my arrest, a deputy put a yellow wristband around my wrist. I have since learned that Los Angeles Sheriff's Department place me in administrative segregation and that a yellow wristband indicates such placement. I have also since learned that I am placed in administrative segregation for my own safety because I was accused of a sex crime, which makes me a target of violence among other inmates.

5.     A few hours into the intake process at the IRC, immediately after standing for a photograph, I approached a deputy with a nametag reading "Sanchez" who was distributing uniforms next to the photograph station.

6.     After Deputy Sanchez told me to step forward to receive my uniform, he looked at the yellow bracelet around my wrist, sneered at me, and loudly announced: "You're one of the special ones—I'm going to fuck you up." He then told me to take a seat at the bench in front of his station. I noticed that he seemed about twenty years younger and thirty to forty pounds heavier than me. I was scared and sat down immediately.

000738

7.    While Deputy Sanchez crossed the hallway to where the inmate uniforms were stacked, I looked away from him, to my right, and saw another inmate roughly twenty feet away. This inmate was a Hispanic man with a mustache who looked to be six feet, two inches tall and about two hundred and thirty pounds. He was wearing a green uniform. I have since learned that trustees and inmate-workers at Men's County Jail (MCJ) and TTCF wear such shirts.

8.    Deputy Sanchez, still across the hallway, then crumpled an inmate uniform into a ball, threw it into my face, and told me to get dressed. As I bent over to pick the uniform from the floor, he approached me, leaned over so that his face was less than a foot away from my own, and very loudly proclaimed: "You're one of those! You like little girls! Now I know that there is no God, because people like you exist!" It was my impression that the other inmate overheard what Deputy Sanchez had said, because he spoke so loudly. In fact, he was nearly yelling. I was now completely terrified. I started dressing and kept my head down, too scared to look at the deputy or anyone else.

9.    It was and continues to be my belief that Deputy Sanchez meant for the other inmate to hear him. He spoke at a volume much greater than was necessary for me, let alone the other inmate, who stood twenty feet away, to hear him.

10.    Less than a minute later, while I was still sitting on the bench and getting dressed, someone to the right of me slugged me and knocked me to the ground. I did not see the blow coming. I curled into a ball and was punched and kicked all over my body. At some point during the beating I saw that the inmate in the green uniform, the only other person in the hallway, was the attacker. The beating lasted for approximately thirty seconds. I did not see where the inmate went when he finished with me because my face was buried behind my arms.

11.    I remained on the ground after the beating for about a minute until I heard Deputy Sanchez's voice ordering me to move along to the next room. He

000739

1  was standing at his station again. I did not see Deputy Sanchez while I was beaten,

2  but the beating took place directly in front of his station less than one minute after

3  he had proclaimed that I "liked little girls" and ended less than one minute before

4  he told me to move along.

5      12.    After Deputy Sanchez ordered me into the next room, I stood up,

6  feeling numb, and moved into the next room as ordered. Once there, I looked over

7  my body and discovered several wounds. Distinct and competing sensations of

8  pain began to take the place of numbness. There was a half-inch wide bloody gash

9  in my left shin (where a scar has now formed), a two-square inch contusion on my

10  upper left thigh, and immense pain in my lower left back began to throb along the

11  lines of my ribcage.

12      13.    I also noticed a nurse's station in the room where nurses were

13  reviewing inmates. Once I was able, I approached one of the nurses and told her

14  that I had just been beaten and that there were wounds on my leg and that my ribs

15  felt severely damaged. In response, the nurse asked me to sit and wait for

16  attention.

17      14.    After roughly thirty minutes, a nurse briefly looked over my wounds

18  and cleaned and bandaged my shin. She also took my blood pressure, listened to

19  my heartbeat with a stethoscope, and took my temperature. The nurse told me that

20  my blood pressure was abnormally high, handed me several pills, and told me to

21  swallow them and to wait for her to return. She returned three times during a one-

22  hour span to retake my blood pressure. After her last visit she told me that I was

23  free to go. While the nurse never explained what she was doing, I gathered that

24  she had given me medication to reduce my blood pressure and that it had finally

25  taken effect. I have never had on-going problems with my blood pressure and am

26  not regularly prescribed medication for that purpose.

27      15.    A deputy then escorted me from the nurse's station to the sixth floor

28  of TTCF Tower Two, where other deputies ordered me to select and carry bedding

000740

1  to my cell. When I lifted the bedding the pain grew unbearable, and I winced and

2  slumped over. The pain was too much. It felt like something was broken and torn

3  inside of me. The deputies mocked me for it, calling me a "faker" and telling me I

4  "wasn't fooling anyone."

5       16.    Once in my cell, I got into my bunk because lying was less painful

6  than standing. For most of the night I could not sleep because I was scared and the

7  pain in my back made it impossible to lie comfortably. After lying awake for

8  hours in the dark, I finally fell asleep.

9       17.    When I awoke the following morning I was in more pain than I have

10  ever experienced before. It was incredibly painful when I breathed, and I could

11  not stand up straight. I only vaguely remember talking to a deputy and requesting

12  medical attention. My memory of this morning remains cloudy. Somehow I was

13  escorted to a single occupant room in Module 4100 at MCJ where I remained for

14  three days. ~~While I was there~~ A.L. a doctor X-Rayed my chest and prescribed me pain

15  medication. Before I got to Module 4100. A.L. When I was given the medication I was also given a red wristband. A

16  nurse told me that the red wristband meant that I was on narcotics.

17       18.    The pain subsided but did not entirely go away. I was returned to my

18  permanent cell after three days. I was never given or told about the results of my

19  X-Ray. I am still prescribed medication for the pain and my back remains tender.

20  A one-half inch scar has formed on my shin where the laceration was.

21       I declare under penalty of perjury of the laws of the State of California and

22  the United States that the foregoing is true and correct to the best of my

23  knowledge and belief. Executed this 23rd day of september, 2011 in Los Angeles,

24  California.

25

26                                                          _Alvaro Luque_

27                                                          Alvaro Luque

28

# DECLARATION OF CURRENT PRISONER MR. VVV MICHAEL TOPETE

000742

**Declaration of Michael Topete**

I, Michael Topete, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am 32 years old.  I am currently housed at Men's Central Jail ("MCJ") on Module 3700, Row B, Cell 26.  My booking number is 2438716.

3.      In 2002 through 2003, I was housed in Super Max at the North County Correctional Facility ("NCCF") while I was in court for a burglary case.  I was also charged with rape, but the rape charge was dropped after the victim recanted her accusation.

4.      I plead guilty and was sentenced for the burglary charge and was sent to Soledad State Prison.  While I was there, I was being harassed by other inmates who asked what my crime was.  It was common practice for the inmates, especially those who were gang members to force other inmates to show them their legal documents to prove why they were in prison.  I showed them my documents, which included the rape charge on them, even though the charge was eventually dropped.

5.      In December of ~~2004~~ 2003 *or* MJT, while I was at Soledad State Prison, I was beaten and stabbed by members of the Southsider gang.  I was stabbed in my stomach and the left side of my face was cut.  I still have a long scar that goes from my cheekbone almost down to my chin.  A cut or a scar like that tells other inmates that I was beaten by the Southsiders and I am forever tagged with that label.

6.      I was then sent to New Corcoran State Prison and was placed in their Sensitive Needs Yard ("SNY"), which is equivalent to being in Protective Custody ("PC").  I was there until 2006, when I was released.  *End of 2008 MJT*

7.      ~~In 2009~~, I was sent to Men's Central Jail ("MCJ") for two weeks on a parole violation.  When I went through the Inmate Reception Center ("IRC"), I was classified as an unconfirmed PC inmate, after I told the IRC assessment deputy that I had been a SNY inmate in state prison.  I was housed on Module 2100, Row B for the two weeks I was in MCJ.

8.      On or about August 18, 2010, I was again back at MCJ for another charge and

000743

1    again was placed on the unconfirmed PC module, Module 2100, Row B after I had told the IRC

2    deputy that I had been a SNY inmate in state prison and had been placed on the unconfirmed PC

3    module in 2009.

4         9.     The next day, deputies from Operation Safe Jail ("OSJ") interviewed me.  I told

5    them what I had described above and told them that I can't be placed in general population

6    because I feared for my life and because of the scar I received from the Southsiders.  They told

7    me that they were unable to verify my SNY status and said that Corcoran State Prison had no

8    record of my even being there.  They then told me that I didn't fit the criteria for confirmed

9    protective custody, so I was going to be placed in general population.

10         10.    I was then sent to Module 2700, Row B, Cell 9, right after dinner, along with 6-10

11    inmates who had been with me in the unconfirmed PC module.  As soon we entered the module

12    and row, a deputy yelled out to all the general population inmates on the row, "We got some

13    PC's.  Here come some PC's."  I don't know the deputy's name, but he was White, about 6 feet

14    tall and was bald.  I am pretty certain about the deputy's height because I am about 6 feet tall as

15    well.

16         11.    The next day, I had court.  My name was announced over the public

17    announcement speaker that I had a pass for court.  Two other names were announced as well.

18    My cell door was opened and when I stepped out, I saw two other inmates coming out of their

19    cells as well.  One inmate came out of Cell 6 and the other inmate came out of the last cell on the

20    row, Cell 26.

21         12.    As I was walked down the row towards the deputy's booth, I noticed that the

22    inmate in Cell 6 was waiting for the inmate from Cell 26.  I quickly walked past the Cell 6

23    inmate.

24         13.    When I reached the deputy's control booth, the Custody Assistant ("CA") handed

25    me my court pass.  I don't know his name, but he was really young, about 20-21 years old, about

26    5'7"-5'9" tall and was African-American.  I told him that I was PC, I didn't belong here and I was

27    afraid for my life.

28         14.    As soon as I had finished telling him this, the two inmates, who I later found out

2

1    were active Southsider gang members, pounced on me and started punching and kicking me all

2    over my body.  As the gang members were beating me up, the CA calmly, without any emotion

3    said, "Stop.  Stop fighting."  The CA didn't do anything to try to intervene.

4         15.    I feel like the gang members were beating me for about 30 seconds to a minute

5    before 3-4 deputies came rushing into the module.

6         16.    They then forcibly separated us.  The deputies escorted me to the hallway outside

7    of the module.  I was in so much pain from the beating.  I had blood all over me because the

8    bridge of nose had been cracked open.  When I finally saw myself in the mirror, I saw that I had

9    bumps all over my head and two black eyes.  I still have a scar over the bridge of my nose from

10   the beating.

11        17.    The Asian deputy, who was one of the deputies who broke up the fight, came over

12   and interviewed me and asked what happened.  I told him what happened, that I was PC, that I

13   should have never been placed on the module and that I should be placed in a PC module.  He

14   said, "We'll get to the bottom of this."

15        18.    I then saw the Asian deputy walk into the module.  He came out shortly

16   afterwards and said that he had talked to the CA on duty and that the CA told him that I had

17   started the fight and that I was the aggressor.  I told him that it wasn't true and that I didn't start

18   the fight.

19        19.    I was then taken to Medical where I received a Cat Scan of my head and was

20   given aspirin.

21        20.    An hour or two hours later, a big, 6'4" tall deputy, who appeared to be either

22   White or Hispanic told me that I was going to the "hole" or to the Disciplinary Module.  I asked

23   him why and he said, "You're a troublemaker."  I told him that I didn't start and pleaded with

24   him that I can't go to the "hole" and that I needed to be in a PC module.  He told me, "I don't

25   give a fuck who you are." *When I went to court on May 4th, 2011, I saw him and recognized him. His nametag said Rodriguez.*

26        21.    I was then placed in Module 2400, Row D on August 17, 2010.

27        22.    One of the inmates who had beat me up was also placed in the "hole" or the

28   Disciplinary Module; the same module and row I was in.  He was a few cells down from where I

                                          3

1   was housed.  I didn't know that he was there until an inmate nicknamed "Wicked", who is from a

2   gang called, "South Pedro Young Crowd" approached his cell.  "Wicked"  was known on the

3   module to be the "shot caller" or the inmate who runs the module.  I heard the inmate who had

4   beaten me tell "Wicked" that he was in the Discipline Module because he had beaten up some

5   "greenlighter" or an inmate who is a PC inmate.  In the jails, "greenlighter" means someone who

6   is a PC inmate.  The inmate must not have known that I was on the same module and row as him

7   because he didn't point me out to "Wicked".

8       23.    The following day, when I saw CA Gonzalez doing the security check, I passed

9   him a "kite" or a note and told him that I feared for my life and that I needed to be placed in PC.

10  He read the note then said to me, "Don't do this.  Don't report this to me."  I understood him to

11  mean that he didn't want to get involved and wasn't going to help me.

12      24.    Less than five minutes later, "Wicked" came up to my cell.  He said, "What are

13  you doing in here?  Why are you trying to get out of here?  I should just get your cell racked right

14  now and blast you."  When he said "racked" that meant getting my cell door opened and when he

15  said he'd "blast" me, he meant stab me.  I was so scared.  I thought I was going to get killed.

16      25.    An hour later, CA Gonzalez came up to my cell and said, "Hey, did you talk to the

17  'shot caller'?  Did he get at you?  Did he set you straight?"  I told him that he did.

18      26.    The next day or the day after, right after dinner, a female Custody Assistant

19  approached my cell and said, "I checked your bed card.  What are you doing on the Disciplinary

20  Module?  You're not on discipline.  You're not supposed to be on my module.  I don't know

21  what you're doing here, but I don't want no part in this."  The bed card she was referring to is

22  part of an inmate's file that says what an inmate's classification is and where they are supposed

23  to be housed.

24      27.    I was then escorted and placed back on the same module and row where I had

25  gotten beat up; Module 2700, Row B.  I was there for four days before I was transferred to Super

26  Max at NCCF in Dorm 817, which is a general population dorm.  I was there for approximately

27  five days.

28      28.    While at NCCF, I was harassed by the inmates who kept asking me if I had been

4

1   in jail or prison before, why I was in jail and asked me about my scar.  I was so scared that I was

2   going to get beat up, that I told them that I had never been to jail or prison before and that I was

3   in for murder.  I also told them that I got my scar from a bar fight.  I knew that if I had told them

4   the truth about my scar, I would get beat up.

5       29.    I was then sent to court on or about September 4, 2010.  After I had explained to

6   the judge that I had gotten beat up by the inmates and that I needed to be placed in PC, he issued

7   me a court order to be placed in protective custody.

8       30.    When I got back from court, I went through IRC again and told the IRC deputy

9   that I had a court order to be placed on the PC module.  He told me that OSJ wouldn't honor the

10  court order because OSJ makes the final decision about who goes to PC and who doesn't.

11  Nevertheless, I was sent to Module 2100, which is the confirmed PC module.

12      31.    The next morning, deputies from OSJ said to me, "Topete, roll it up."  This meant

13  that they wanted me to gather my belongings because I was going to be transferred somewhere

14  else.  They told me that I didn't fit the criteria to be a Protective Custody inmate.  They also said,

15  "We don't honor court orders here."

16      32.    I was then transferred back again to the same module and row where I had been

17  beat up, Module 2700, Row B, Cell 26.  I was there for two days before I was transferred again to

18  Super Max at NCCF.

19      33.    I was there for nine days and again, I was harassed by other inmates who wanted

20  to know about my criminal history and about my scar.

21      34.    On or about September 13 or 14, 2010, I was taken to court.  The judge asked me

22  if I was in a PC module and I told him I was not.  He asked me how long I was in PC before I

23  was transferred out and I told him that I was a PC inmate in a PC module for a day before I was

24  sent back to general population.

25      35.    The judge looked really angry and upset and I saw him writing something down in

26  his notes.  I later found out that he wrote something out that had me placed on a K-10 hold,

27  which meant that I was going to be a Keep-away inmate and due to the hold, my status couldn't

28  be changed.

5

36.     I was then sent to where I am currently housed now, Module 3700, Row B, Cell 26. The following week, the judge ordered that I come to court every day as this was his way of making sure and checking to see that I was still on K-10 status.

37.     The module and row where I am currently housed is considered an unconfirmed K-10 module. Even though I have a court order that states I should be a confirmed K-10. I am on the unconfirmed K-10 module because OSJ deemed that I don't meet the criteria, I am placed here. I know this because on *January 29, 2011* ᴹᴼᵀ I wrote a complaint on the in-house complaint form about my K-10 status and I received a response to my complaint that stated, ᴹᴼᵀ *on February 3, 2011,* "*I/M [Inmate] was interviewed by OSJ re: A G/L [green lighter]. I/M was moved back to G/P [General Population] because he did not meet G/L criteria. I/M went to court and was given a court order to be housed in P/C [protective*

38.     Due to this unconfirmed status, I am not permitted to make any phone calls or ᴹᴼᵀ have any visitors. In fact, I haven't had a phone call or a visit from my family members in seven months, the entire time I've been on this module and row.

39.     *on February 13, 2011* ᴹᴼᵀ The judge issued a court order saying that I need to have phone calls and visits, but OSJ and the Los Angeles Sheriff's Department ("LASD") has ignored the court order and refuses to allow me phone calls and visits.

ᴹᴼᵀ *also on February 13, 2011*

40.     OSJ told me that if it wasn't for the judge's K-10 hold, I would have already been sent back to general population.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this *10th* ᴹᴼᵀ day of *May*, 2011 in Los Angeles, California.

*Michael Topete*

Michael Topete

ᴹᴼᵀ
*[custody]. I/M does not meet P/C criteria because of this issue and the court order I/M cannot be housed on any other location. This is for the safety and security of the FAC [facility] and other confirmed P/C Inmates.*" *This was signed by Deputy Gilbert, who is the Jail Liaison*
ᴹᴼᵀ

**Declaration of Michael Topete**

I, Michael Topete, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I am 32 years old.  I am currently housed at Men's Central Jail ("MCJ") on Module 3700, Row B, Cell 26.  My booking number is 2438716.

3.     In 2002 through 2003, I was housed in Super Max at the North County Correctional Facility ("NCCF") while I was in court for a burglary case.  I was also charged with rape, but the rape charge was dropped after the victim recanted her accusation.

4.     I plead guilty and was sentenced for the burglary charge and was sent to Soledad State Prison.  While I was there, I was being harassed by other inmates who asked what my crime was.  It was common practice for the inmates, especially those who were gang members to force other inmates to show them their legal documents to prove why they were in prison.  I showed them my documents, which included the rape charge on them, even though the charge was eventually dropped.

5.     In December of 2003, while I was at Soledad State Prison, I was beaten and stabbed by members of the Southsider gang.  I was stabbed in my stomach and the left side of my face was cut.  I still have a long scar that goes from my cheekbone almost down to my chin.  A cut or a scar like that tells other inmates that I was beaten by the Southsiders and I am forever tagged with that label.

6.     I was then sent to New Corcoran State Prison and was placed in their Sensitive Needs Yard ("SNY"), which is equivalent to being in Protective Custody ("PC").  I was there until 2006, when I was released.

7.     End of 2008, I was sent to Men's Central Jail ("MCJ") for two weeks on a parole violation.  When I went through the Inmate Reception Center ("IRC"), I was classified as an unconfirmed PC inmate, after I told the IRC assessment deputy that I had been a SNY inmate in state prison.  I was housed on Module 2100, Row B for the two weeks I was in MCJ.

8.     On or about August 18, 2010, I was again back at MCJ for another charge and

1   again was placed on the unconfirmed PC module, Module 2100, Row B after I had told the IRC

2   deputy that I had been a SNY inmate in state prison and had been placed on the unconfirmed PC

3   module in 2009.

4         9.      The next day, deputies from Operation Safe Jail ("OSJ") interviewed me. I told

5   them what I had described above and told them that I can't be placed in general population

6   because I feared for my life and because of the scar I received from the Southsiders. They told

7   me that they were unable to verify my SNY status and said that Corcoran State Prison had no

8   record of my even being there. They then told me that I didn't fit the criteria for confirmed

9   protective custody, so I was going to be placed in general population.

10        10.     I was then sent to Module 2700, Row B, Cell 9, right after dinner, along with 6-10

11  inmates who had been with me in the unconfirmed PC module. As soon we entered the module

12  and row, a deputy yelled out to all the general population inmates on the row, "We got some

13  PC's. Here come some PC's." I don't know the deputy's name, but he was White, about 6 feet

14  tall and was bald. I am pretty certain about the deputy's height because I am about 6 feet tall as

15  well.

16        11.     The next day, I had court. My name was announced over the public

17  announcement speaker that I had a pass for court. Two other names were announced as well.

18  My cell door was opened and when I stepped out, I saw two other inmates coming out of their

19  cells as well. One inmate came out of Cell 6 and the other inmate came out of the last cell on the

20  row, Cell 26.

21        12.     As I was walked down the row towards the deputy's booth, I noticed that the

22  inmate in Cell 6 was waiting for the inmate from Cell 26. I quickly walked past the Cell 6

23  inmate.

24        13.     When I reached the deputy's control booth, the Custody Assistant ("CA") handed

25  me my court pass. I don't know his name, but he was really young, about 20-21 years old, about

26  5'7"-5'9" tall and was African-American. I told him that I was PC, I didn't belong here and I was

27  afraid for my life.

28        14.     As soon as I had finished telling him this, the two inmates, who I later found out

2

1    were active Southsider gang members, pounced on me and started punching and kicking me all

2    over my body.  As the gang members were beating me up, the CA calmly, without any emotion

3    said, "Stop.  Stop fighting."  The CA didn't do anything to try to intervene.

4         15.    I feel like the gang members were beating me for about 30 seconds to a minute

5    before 3-4 deputies came rushing into the module.

6         16.    They then forcibly separated us.  The deputies escorted me to the hallway outside

7    of the module.  I was in so much pain from the beating.  I had blood all over me because the

8    bridge of nose had been cracked open.  When I finally saw myself in the mirror, I saw that I had

9    bumps all over my head and two black eyes.  I still have a scar over the bridge of my nose from

10   the beating.

11        17.    The Asian deputy, who was one of the deputies who broke up the fight, came over

12   and interviewed me and asked what happened.  I told him what happened, that I was PC, that I

13   should have never been placed on the module and that I should be placed in a PC module.  He

14   said, "We'll get to the bottom of this."

15        18.    I then saw the Asian deputy walk into the module.  He came out shortly

16   afterwards and said that he had talked to the CA on duty and that the CA told him that I had

17   started the fight and that I was the aggressor.  I told him that it wasn't true and that I didn't start

18   the fight.

19        19.    I was then taken to Medical where I received a Cat Scan of my head and was

20   given aspirin.

21        20.    An hour or two hours later, a big, 6'4" tall deputy, who appeared to be either

22   White or Hispanic told me that I was going to the "hole" or to the Disciplinary Module.  I asked

23   him why and he said, "You're a troublemaker."  I told him that I didn't start and pleaded with

24   him that I can't go to the "hole" and that I needed to be in a PC module.  He told me, "I don't

25   give a fuck who you are."  When I went to court on May 4th, 2011, I saw him and recognized

26   him.  His name tag said Rodriguez.

27        21.    I was then placed in Module 2400, Row D on August 17, 2010.

28        22.    One of the inmates who had beat me up was also placed in the "hole" or the

3

000752

1   Disciplinary Module; the same module and row I was in.  He was a few cells down from where I

2   was housed.  I didn't know that he was there until an inmate nicknamed "Wicked", who is from a

3   gang called, "South Pedro Young Crowd" approached his cell.  "Wicked" was known on the

4   module to be the "shot caller" or the inmate who runs the module.  I heard the inmate who had

5   beaten me tell "Wicked" that he was in the Discipline Module because he had beaten up some

6   "greenlighter" or an inmate who is a PC inmate.  In the jails, "greenlighter" means someone who

7   is a PC inmate.  The inmate must not have known that I was on the same module and row as him

8   because he didn't point me out to "Wicked".

9        23.     The following day, when I saw CA Gonzalez doing the security check, I passed

10   him a "kite" or a note and told him that I feared for my life and that I needed to be placed in PC.

11   He read the note then said to me, "Don't do this.  Don't report this to me."  I understood him to

12   mean that he didn't want to get involved and wasn't going to help me.

13        24.     Less than five minutes later, "Wicked" came up to my cell.  He said, "What are

14   you doing in here?  Why are you trying to get out of here?  I should just get your cell racked right

15   now and blast you."  When he said "racked" that meant getting my cell door opened and when he

16   said he'd "blast" me, he meant stab me.  I was so scared.  I thought I was going to get killed.

17        25.     An hour later, CA Gonzalez came up to my cell and said, "Hey, did you talk to the

18   'shot caller'?  Did he get at you?  Did he set you straight?"  I told him that he did.

19        26.     The next day or the day after, right after dinner, a female Custody Assistant

20   approached my cell and said, "I checked your bed card.  What are you doing on the Disciplinary

21   Module?  You're not on discipline.  You're not supposed to be on my module.  I don't know

22   what you're doing here, but I don't want no part in this."  The bed card she was referring to is

23   part of an inmate's file that says what an inmate's classification is and where they are supposed

24   to be housed.

25        27.     I was then escorted and placed back on the same module and row where I had

26   gotten beat up; Module 2700, Row B.  I was there for four days before I was transferred to Super

27   Max at NCCF in Dorm 817, which is a general population dorm.  I was there for approximately

28   five days.

4

000753

28.     While at NCCF, I was harassed by the inmates who kept asking me if I had been in jail or prison before, why I was in jail and asked me about my scar. I was so scared that I was going to get beat up, that I told them that I had never been to jail or prison before and that I was in for murder. I also told them that I got my scar from a bar fight. I knew that if I had told them the truth about my scar, I would get beat up.

29.     I was then sent to court on or about September 4, 2010. After I had explained to the judge that I had gotten beat up by the inmates and that I needed to be placed in PC, he issued me a court order to be placed in protective custody.

30.     When I got back from court, I went through IRC again and told the IRC deputy that I had a court order to be placed on the PC module. He told me that OSJ wouldn't honor the court order because OSJ makes the final decision about who goes to PC and who doesn't. Nevertheless, I was sent to Module 2100, which is the confirmed PC module.

31.     The next morning, deputies from OSJ said to me, "Topete, roll it up." This meant that they wanted me to gather my belongings because I was going to be transferred somewhere else. They told me that I didn't fit the criteria to be a Protective Custody inmate. They also said, "We don't honor court orders here."

32.     I was then transferred back again to the same module and row where I had been beat up, Module 2700, Row B, Cell 26. I was there for two days before I was transferred again to Super Max at NCCF.

33.     I was there for nine days and again, I was harassed by other inmates who wanted to know about my criminal history and about my scar.

34.     On or about September 13 or 14, 2010, I was taken to court. The judge asked me if I was in a PC module and I told him I was not. He asked me how long I was in PC before I was transferred out and I told him that I was a PC inmate in a PC module for a day before I was sent back to general population.

35.     The judge looked really angry and upset and I saw him writing something down in his notes. I later found out that he wrote something out that had me placed on a K-10 hold, which meant that I was going to be a Keep-away inmate and due to the hold, my status couldn't

5

000754

1    be changed.

2        36.    I was then sent to where I am currently housed now, Module 3700, Row B, Cell

3    26. The following week, the judge ordered that I come to court every day as this was his way of

4    making sure and checking to see that I was still on K-10 status.

5        37.    The module and row where I am currently housed is considered an unconfirmed

6    K-10 module. Even though I have a court order that states I should be a confirmed K-10. I am

7    on the unconfirmed K-10 module because OSJ deemed that I don't meet the criteria, I am placed

8    here. I know this because on January 29, 2011 I wrote a complaint on the in-house complaint

9    form about my K-10 status and I received a response to my complaint that stated, "I/M (inmate)

10   was interviewed by OSJ re: A G/L (greenlighter). I/M was moved back to G/P (general

11   population) because he did not meet G/L criteria. I/M went to court and was given a court order

12   to be housed in P/C (protective custody). I/M does not meet P/C criteria. Because of this issue

13   and the court order I/M cannot be housed on any other location. This for the safety and security

14   of the FAC (facility) and other confirmed P/C inmates." This was signed by Deputy Gilbert, who

15   is the Jail Liaison.

16       38.    Due to this unconfirmed status, I am not permitted to make any phone calls or

17   have any visitors. In fact, I haven't had a phone call or a visit from my family members in seven

18   months, the entire time I've been on this module and row.

19       39.    The judge issued a court order on February 13, 2011 saying that I need to have

20   phone calls and visits, but OSJ and the Los Angeles Sheriff's Department ("LASD") has ignored

21   the court order and refuses to allow me phone calls and visits.

22       40.    OSJ told me, also on February 13, 2011, that if it wasn't for the judge's K-10

23   hold, I would have already been sent back to general population.

24       I declare under penalty of perjury of the laws of the State of California and the United

25   States that the foregoing is true and correct. Executed this 18th day of May, 2011 in Los

26   Angeles, California.

27                                                    _____/s/_____

28                                                    Michael Topete

                                            6