1  MARK D. ROSENBAUM, SBN 59940
   mrosenbaum@aclu-sc.org
2  PETER ELIASBERG, SBN 189110
   peliasberg@aclu-sc.org
3  JESSICA PRICE, SBN 263241
   jprice@aclu-sc.org
4  ACLU Foundation of Southern California
   1313 W. 8th Street
5  Los Angeles, California 90017
   Telephone:  (213) 977-9500
6  Facsimile:  (213) 977-5297

7  MARGARET WINTER*
   mwinter@npp-aclu.org
8  ERIC G. BALABAN*
   ebalaban@npp-aclu.org
9  National Prison Project of the ACLU
   915 15th Street NW, 7th Floor
10 Washington, D.C. 20005
   Telephone:  (202) 393-4930
11 Facsimile:  (202) 393-4931
   *Not admitted in D.C.; practice limited to federal courts

12 Attorneys for Plaintiffs
13 (continued on next page)

14

15

16

17           UNITED STATES DISTRICT COURT

18           CENTRAL DISTRICT OF CALIFORNIA

19

20 DENNIS RUTHERFORD, et al,          )  Case No.  Civ. 75-04111-DDP
                                      )
21              Plaintiffs,           )  **DECLARATION OF PETER
                                      )  ELIASBERG IN SUPPORT OF
22                                    )  PLAINTIFFS' NOTICE OF FILING
        v.                            )  OF REPORT CONCERNING LOS
                                      )  ANGELES COUNTY JAILS; CITED
23 LEROY BACA, et al.,                )  DECLARATIONS**
                                      )
24              Defendants.           )
                                      )
25 _____   )

26

27

28

1   MELINDA BIRD, SBN 102236
melinda.bird@disabilityrightsca.org
2   Disability Rights California
3580 Wilshire Blvd., Suite 902
3   Los Angeles, California 90010
Telephone:  (213) 355-3605
4   Facsimile:  (213) 427-8767

5   Bingham McCutchen LLP
STEPHEN D. ALEXANDER (SBN 141099)
6   stephen.alexander@bingham.com
JENNIFER B. MIKOLEVINE (SBN 236745)
7   jennifer.mikolevine@bingham.com
355 South Grand Avenue, Suite 4400
8   Los Angeles, California  90071-1560
Telephone:  (213) 680-6400
9   Facsimile:  (213) 680-6499

10   Bingham McCutchen LLP
STACY W. HARRISON, SBN 175028
11   stacy.harrison@bingham.com
1620 26th Street
12   4th Floor, Main Tower
Santa Monica, California 90404
13   Telephone: (310) 907-1000
Facsimile: (310) 907-2000

**Declaration of Peter J. Eliasberg**

I, Peter J. Eliasberg, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    Attached as Exhibit 1 is an undated copy of a letter from Isabel Katz Pinzler, Acting Assistant Attorney General, Civil Rights Division, U.S. Department of Justice, to Ms. Joanne Sturges, Los Angeles County Executive, Los Angeles, California, captioned, "CRIPA Investigation of Mental Health Services in the Los Angeles County Jail."  Attached as part of the same exhibit is a Memorandum of Agreement between the United States and the County of Los Angeles, the first page of which shows that the letter from Ms. Pinzler to Ms. Sturges was dated September 5, 1997 (agreement available at http://www.justice.gov/crt/about/spl/documents/lacountyjail_mh.php).

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed September 27, 2011 in Los Angeles, California.


Peter J. Eliasberg

000902

# EXHIBIT

# 1

000903

IKP:LK:SHR:MHN:MM:CEL:cmw
DJ 168-12C-43


Ms. Joanne Sturges
Los Angeles County Executive
500 W. Temple Street, Room 383
Los Angeles, CA  90012

      Re: CRIPA Investigation of Mental Health
          Services in the Los Angeles County Jail

Dear Ms. Sturges:

    On June 6, 1996, we notified you of our intent to
investigate conditions in the Los Angeles County Jail system
(Jail) to determine whether those conditions violate inmates'
constitutional rights.  The investigation was conducted pursuant
to the Civil Rights of Institutionalized Persons Act (CRIPA),
42 U.S.C. §§ 1997 et seq., and focused on allegations of
inadequate mental health care, including but not limited
to:  inadequate facilities and staffing, improper use of
physical restraints, inadequate suicide prevention, and the
abuse of mentally ill inmates by sheriff's deputies working in
the Jail.  Having concluded our investigation, we are writing to
advise you of our findings, supporting facts, and recommended
remedial measures, as required by CRIPA.

    The Los Angeles Sheriff's Department (LASD) operates eight
primary detention facilities.  At the time of our tour, the
total inmate population was approximately 18,500 inmates.  The
average length of stay at the Jail is 36 days.  For inmates held
under California's three-strikes law, the average length of stay
is 187 days for second-strike inmates and 127 days for third-
strike inmates.  At the time of our tour, the Jail system was
nominally providing mental health services to approximately 1700
of these inmates.  Our experts found the number of inmates in
need of mental health care was significantly higher than 1700,
and because the inmate population has risen significantly since
the time of our tour, it is likely that the current number of
inmates needing mental health services is also higher.  Mentally
ill inmates are housed primarily at Men's Central Jail (MCJ),
the Sybil Brand Institute for Women (SBI), and North County
Correctional Facility (NCCF).

    We thank Frederick Bennett, Assistant County Counsel, Barry
King, Chief of the Sheriff's Department's Custody Division,
Areta Crowell, Director of the Los Angeles County Department of

000904

-2-

Mental Health (DMH), which provides mental health services to inmates in

the Jail, and the Sheriff's and Department of Mental Health's staff at the Jail for their cooperation and assistance during our investigation.  We appreciate that this is an especially challenging time for the Jail, and that even under ideal conditions, operating a system such as the Los Angeles County Jail is difficult.  The County has so far shown a professionalism and willingness to confront the serious problems at the Jail that make us optimistic that we will be able to resolve the issues raised in this letter in an amicable and efficient manner.

We would also like to thank the County for its March 15, 1997, response to our expert consultants' report.  We found the County's response informative and constructive, and are encouraged that the County acknowledges many of the problems with the Jail's provision of mental health services and is already taking positive steps in response to several of the problems raised by our expert consultants.  We have taken the County's response into consideration in completing our findings.  When we do not agree with the County's assessment of what the conditions in the Jail are or should be, we have attempted to explain the reasoning behind our disagreement.

I.   **LEGAL FRAMEWORK**

It is well settled that, with respect to inmates who have been convicted of criminal offenses, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993).  Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  Further, with respect to pretrial detainees, the Fourteenth Amendment prohibits punishment of these persons and restrictive conditions or practices that are not reasonably related to the legitimate governmental objectives of safety, order and security.  Id. at 535-37.

The Jail has a duty to ensure that inmates receive adequate medical care, including mental health care.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Deliberate indifference to inmates' serious medical needs violates the Eighth Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency.  Helling v. McKinney, 509 U.S. 25, 32 (1993); Estelle v. Gamble, 429 U.S. 97, 104 (1976).  It is firmly established in the Ninth Circuit

- 3 -

that "medical needs" include mental health needs as well as
physical health needs.  See, e.g., Hoptowit v. Ray, 682 F.2d
1237, 1253 (9th Cir. 1982); Madrid v. Gomez, 889 F. Supp. 1146,
1255 (N.D. Cal. 1995);  Balla v. Idaho State Board of
Corrections, 595 F. Supp. 1558, 1576-77 (D. Idaho 1984).

    The Eighth Amendment protects prisoners not only from
present and continuing harm, but from future harm as well.
Helling at 33.  Thus, deliberate indifference to inmates'
serious mental health needs violates the Constitution even if
that indifference has not yet resulted in injury.

## II.   FINDINGS AND SUPPORTING FACTS REGARDING MENTAL HEALTH CARE

    Based upon our investigation, we have concluded that
unconstitutional conditions exist at the Los Angeles County
Jail, including a deliberate indifference to inmates' serious
mental health needs.  This conclusion and our recommendations
for remedial measures described in Section III, are based in
significant part on the opinions of our four expert consultants
whom we retained to advise us in this matter.  We already have
provided your counsel with the joint report of our consultants
and you have had the opportunity to respond.

## A.        Summary

    We believe that the Jail's provision of mental health care
is constitutionally inadequate in numerous aspects.  The Jail
fails to identify adequately inmates with serious mental
illnesses and does not adequately treat those inmates it has
identified as mentally ill.  Some inmates with mental illnesses
enter the Jail without their illness being discovered; others
report their mental illness, but are then "lost" in the Jail
system, misclassified and placed in unsafe housing, or
transferred repeatedly between facilities.  For many mentally
ill inmates who are properly identified, the treatment they
receive is below constitutional minimum standards.  They too
often wait dangerously long periods before being evaluated or
prescribed medication, have their illnesses misdiagnosed and
their medications improperly administered.  Mentally ill inmates
are housed in conditions that often exacerbate their condition
and they are not permitted to participate in the same programs
as other inmates, even where their mental illness would allow
such participation.  They are the victims of predatory behavior
at the hands of other inmates and have been abused by
correctional staff.  Clinical response to suicidal inmates is
delayed, on occasion with tragic results, and suicidal inmates
are placed in housing that permits them to act on their suicidal
ideation.

- 4 -

The reasons for the poor state of mental health care in the Jail are manifold.  The number of inmates in need of mental health care overwhelms available staff resources.  The Jail's systems of medical record keeping and inmate tracking and classification are deficient to the point that custody and mental health staff cannot adequately access information necessary to provide appropriate care.  The Jail does not adequately prevent abuse of mentally ill inmates and does not adequately investigate allegations of such abuse when it occurs. Many current custody policies are obstacles to the provision of adequate mental health care.  A lack of adequate training of custody staff in dealing with inmates with mental illnesses negatively impacts the provision of mental health care.  The chronic overpopulation in the Jail results in insufficient housing and treatment space, further exacerbating the Jail's inadequate system of mental health care.

Our findings are based upon several sources, including: (a) the February 10, 1997, Report by Department of Justice Expert Consultants Mr. Ray Coleman, Dr. Joel Dvoskin, Dr. Dennis Koson, and Dr. Jeffrey Metzner, (Expert Report) previously provided to your counsel; (b) interviews with Sheriff's Department and Department of Mental Health staff; (c) interviews with inmates conducted by personnel from the Department of Justice and their consultants; (d) documents provided by the Jail; (e) written communications sent directly to us by inmates, former inmates, families of former inmates, and advocates; and, (f) the County's March 15, 1997, response (Response) to our expert consultants' report.

**B.   Inadequate Screening/Intake And Evaluation**

Whether at the Inmate Reception Center (IRC) at MCJ or Twin Towers, inmates entering the Jail system are not adequately screened for mental illness.  Based on interviews with staff, information provided by the Jail, and our observations during our tour of MCJ's IRC and SBI's intake area, we believe that the Jail fails to question each inmate privately and individually regarding the inmate's medical or mental health, but instead relies on a group videotape orientation that instructs each incoming inmate to inform medical personnel if he or she has medical or mental health problems.[1] Only if an inmate tells

---

[1]  The County states in its March 15 response that the Jail's "screening methodology meets the California legal requirements as set forth in Title 15." Response at 33.  However, whether the Jail's policies are deemed to comport with California law is not dispositive of whether the actual conditions at the Jail comply with minimum standards required by the Constitution.  Moreover, the Jail's stated and observed practice of completing a medical screening form only for inmates who self-identify as having medical or mental problems does not appear to comply with Title

- 5 -

medical personnel during intake that he or she has medical or
mental health problems will medical services ask an individual
inmate appropriate screening questions about his or her medical
and mental health, recording this information on the Jail's
"medical services data base form."2When this form is created by
nursing staff for patients who self-identify as mentally ill at
intake, there is no medical examination.  The database is thus
not an adequate medical screening instrument because it is not
completed for every inmate, and it is not an adequate medical
assessment because it does not include a medical examination.

    The system relies on inmates self-reporting mental health
problems, a method which is likely to result in a significant
number of inmates entering the Jail with undetected mental
illnesses.  Many mentally ill inmates will fail to self-report
their illness to the Jail unless they are independently and
privately questioned by trained personnel.  Our consultants
found that there are strong disincentives for mentally ill
inmates to self-report.  Those who have been in the system
before will have learned that identifying oneself as mentally
ill may lead to being put in lock-down housing, and an increased
likelihood of abuse.  In addition, according to the September
1996 report of Merrick Bobb, the Special Counsel retained by the
County to advise the Board of Supervisors regarding progress by
the LASD, deputies report that because inmates in holding cells
are sometimes not fed, "savvy" inmates will wait to report
medical problems until they are in permanent housing.  Los
Angeles Sheriff's Department 6th Semiannual Report by Special
Counsel Merrick J. Bobb & Staff at 12 (September 1996).

    As discussed below, the Sheriff's deputies' lack of
training in identification of mentally ill inmates, and the Jail
Mental Health Services policy of targeting only "high impact"
seriously mentally ill inmates, also results in an under-
identification of inmates who may be just as mentally ill as the
"high impact" inmates, only more quiet.  The Jail also appears
to fail to make use of "special handling" cards.  We were told
by an IRC Lieutenant that special handling cards are the method
by which IRC staff are informed that an incoming inmate has been
previously identified as having a mental health problem.
However, it appears that these cards are not consistently filled
out or passed on.  We understand that the Jail is now reviewing
the special handling card procedures in its custody facilities.

---

15's requirement that the Jail's health authority maintain "individual, complete, and dated health
records which shall include . . . receiving screening form/history."  Cal. Code Regs. Tit. 15, §
1205 (1996).
2/  We found that the question on the Spanish-language version of the medical announcement
regarding suicide was not as comprehensive as the question on the English-language version.
We are told this problem has been corrected.  Response at 12-13.

- 6 -

Response at 12.

Intake mental health referrals are assigned to a
clinician, who evaluates the inmate "as soon as possible."
Response at 11.  Due to delays in this process, many inmates who
are screened positive for mental illness do not receive an
evaluation for days.  This delay is unacceptable and dangerous.
In one case noted by our consultants, an inmate was screened
positive for mental illness and a mental health assessment was
ordered at that time.  By the time a mental health worker was
able to get to that inmate's evaluation two days later, it was
too late—the inmate had killed himself earlier that day.
Further, it appears that the mental health worker was not even
aware that the inmate killed himself, as the notation in the
inmate's chart states "discharged."  We agree with the County
that it would be appropriate to have mental health staff
immediately evaluate inmates who are identified as requiring
mental health services, Response at 28; however, as the County
acknowledges, unless an inmate is having a mental health crisis,
an inmate is not immediately evaluated.  Response at 11.

The intake mental health evaluation is inadequately
documented.  The documentation consists only of a check on the
inmate's screening form with no mention of diagnosis or level of
impairment.  Another troublesome aspect of intake is that when
inmates enter the Jail with properly prescribed psychotropic
medications, these medications are taken from them upon arrival.
They receive no mediation until assessed.  Such inmates are thus
placed in danger of decompensating to crisis level immediately
upon entering the Jail system.  We are encouraged by the
County's statement that physicians at the Jail can prescribe
certain psychotropic medications to such inmates for a limited
period of time, Response at 28, and encourage the County to
ensure that this practice is implemented to avoid unnecessary
and dangerous decompensation.  The Jail has had similar problems
with inmates returning to the Jail from outside facilities, such
as Patton or Metropolitan State Hospitals.  These inmates are
sometimes placed in general population where they may wait weeks
to see a psychiatrist or receive the medications they were
previously prescribed, needlessly and dangerously decompensating
as they wait to be reevaluated.

An additional deficiency in the Jail's screening process is
its policy of "screening" male inmates (i.e. asking inmates to
self-report) upon intake into the IRC and re-"screening" them
each time they are transferred to or from any of the Jail's
facilities.  While this practice may have the effect of serving
as a "back-up system to the initial screening at IRC," Response
at 29, this practice increases the inefficiency and
inconsistency of the screening process and would not be

- 7 -

necessary if the Jail's initial screening process and referral system were adequate.  Many inmates are transferred numerous times during their incarceration.  By not adequately screening each inmate at the IRC and then providing this information with the inmate upon transfer, the Jail causes unnecessary duplication of work, delay in providing mental health services, and an increased likelihood that an inmate will be inconsistently classified.  Although the development of the County's Jail Hospital Information System is still in its nascent stages, Response at 3, such a system has the potential to solve the Jail's problems with maintaining consistent, accessible medical records for every inmate.  However, the Jail is unable to provide even a "ballpark" estimate for when this system might be implemented, and there are indications that it may take years.  Thus, we encourage the County to take interim steps to improve medical records and screening, as it stated in its response it is currently considering.  Response at 29.

C.   **Inadequate Referral System**

Because the Jail's screening and evaluation process misses many mentally ill inmates at intake, it is especially important that the Jail maintain an effective system for referring general population inmates who may be mentally ill to a mental health professional.  The Jail's referral process fails to adequately identify and obtain services for mentally ill inmates.  The referral system is deficient in several respects.  The primary problem with the referral process is that the Jail has set too high a threshold for what is referable.  Jail Mental Health Services has an explicit, written policy of limiting mental health services to "high impact" seriously mentally ill inmates.  An inmate must be actively and observably suicidal or psychotic, or in the words of one deputy "bouncing off the walls," before he or she has a chance of being referred to mental health for treatment.  This policy not only excludes the entire subset of seriously mentally ill inmates whose mental illness may not manifest itself through outward aggression or bizarre behavior, but increases the likelihood that no inmate's mental illness will be treated until the inmate decompensates to an acute crisis.  Treating inmates' serious mental illness only when they reach crisis level is not only inadequate from a mental health care perspective, but also wastes the Jail's scarce mental health resources, as providing crisis care requires far greater resources per inmate than providing non-crisis mental health care.

Another deficiency in the Jail's referral process is that the mental health staff tours the Jail's housing units too infrequently.  When they do tour they do not ask the deputies on duty if there is anyone in need of mental health services, but

- 8 -

rather rely on deputies to refer such cases to mental health
staff unprompted.  Finally, the Jail's use of different colored
jumpsuits for mentally ill inmates decreases the efficacy of the
referral system because it indicates to deputies that all
mentally ill inmates already have been identified, encouraging
them to attribute aberrant behavior of general population
inmates (i.e., those not in special clothing) to other causes
(e.g., manipulation or defiance) rather than possible mental
illness.


D.     **Inadequate Treatment**

1.                  Summary

     Treatment available to mentally ill inmates is inadequate
at all of the Jail's facilities.  Other than psychotropic
medications, treatment of the Jail's mentally ill inmates
consists of:  a day treatment program at MCJ for approximately
fifty inmates; inpatient mental health care at MCJ's Forensic
Inpatient Unit (FIP) for thirty-five male and female inmates;
and an attempt at therapy for some of the women with mental
illnesses at SBI.  The rest of the approximately 1700 identified
mentally ill inmates in the Jail receive no mental health
treatment other than perhaps psychotropic medications.3̲We
commend the County for its establishment of the day treatment
program at MCJ; however, the program is far too small to treat
the number of people who are in serious need of non-psychotropic
treatment.  In addition, FIP is inadequate as a forensic
inpatient unit.  It lacks an adequate number of rooms, clinical
staff, auxiliary services such as occupational therapy and
education, and sufficient aides to observe ambulatory patients,
which increases reliance on physical restraints.

     As LASD and DMH staff (including management) have
explicitly stated, the Jail currently lacks the staffing
resources necessary to provide adequate treatment for inmates
with serious mental illness.  For example, there are only eight
nurses providing mental health nursing care to over 800 mentally
ill inmates at MCJ, and there is a severe shortage of
psychiatrists.  Our expert consultants found that the majority
of problems in the Jail's provision of mental health care are
the direct and predictable result of inadequate staffing.  The
Jail's staffing shortage is due not only to an inadequate number

---

3̲/ The County has informed us that since our site visit in August 1996, Jail Mental Health
Services has begun daily visits to the acute units at MCJ.  Response at 4.  These visits appear to
be in the nature of monitoring inmates' mental health condition.  While such visits are important,
they do not constitute treatment unless they involve actual treatment, such as counseling.

- 9 -

of budgeted positions; the Jail also has problems filling
positions already budgeted.  In all types of mental health
staffing (e.g., psychiatrists, psychologists, therapists,
nurses, psychiatric technicians, and administrative staff) there
were many more positions budgeted than filled at the time of our
tour.  In addition, supervisory staff at MCJ stated that many
current staff members are not working to their full potential.
Others are being asked to perform tasks, such as mental health
evaluations or crisis

- 10 -

intervention, for which they are not properly trained and
educated.  There is also a shortage of Spanish-speaking mental
health staff.4

2.           Sybil Brand Institute

     At Sybil Brand, the mental health staff appeared strongly
committed to providing mental health care other than
psychotropic medications to the Jail's female mentally ill
inmates.  But their attempts at programming and therapy were
overwhelmed by a lack of office and treatment space and
inadequate staffing.  The County reports that since June 21,
1997, Sybil Brand has been closed and all female inmates have
been moved to Twin Towers.  At the time of our tour, the Jail
did not plan to move SBI's female inmates to Twin Towers, so we
could not assess whether Twin Towers provided adequate office
and treatment space for female inmates with mental illness.  At
Sybil Brand, treatment and office space was clearly inadequate.
SBI's psychiatrist did not have adequate space to see inmates
housed in the Correctional Treatment Center (CTC) or brought
into the clinic area for examination.  Nor was there adequate
private or quiet space to conduct individual or group therapy.
Individual counseling of mentally ill inmates at Sybil Brand was
generally done cellside, between either one or two sets of bars.
At the time of our SBI visit, no group therapy was being
conducted because of the lack of space.  Recreational therapy
was also compromised by the lack of treatment space.  Although
the lack of treatment space was exacerbated by the use of the
only dayroom in mental health housing as an 18-bed suicide
observation dorm, a dorm-setting should be maintained in housing
for suicidal inmates, as the benefits of a dorm setting for such
inmates outweigh the loss in treatment space.  Nevertheless, a
Jail's mental health program should not be forced to choose
between providing two services as important as treatment and
appropriate housing for suicidal inmates because of a lack of
space.
     SBI's medical area, including its CTC, was also inadequate
for mental health treatment.  The Director of LASD's Medical
Services agreed with us that CTC rooms were generally unsafe for
mental health purposes.  Only one CTC room had a bed affixed to
the ground.  There were hazards such as horizontal bars on the
windows, peeling drywall, and protruding boxes.  Still, this was
where all actively suicidal (those who have recently attempted
suicide) or psychotic inmates were housed, unless the Jail was

4/ The County has recently informed us that approximately seventeen new mental health staff
members have been hired since June 30, 1996.  It is unclear how many of these seventeen staff
members were hired since our tour, nor have we been informed what positions these staff
members have filled.  Given the severity of mental health staffing shortages at the time of our
tour, the retirement of MCJ's chief psychiatrist, and the County's recent statement that it is
currently reviewing staffing strategies to implement a plan to provide "appropriate staffing levels
for service delivery at the Twin Towers Correctional Facility and elsewhere in the system,"
Response at 7, it appears that mental health staffing continues to be inadequate.

- 11 -

able to place them in Metropolitan State Hospital, Patton, or MCJ's FIP.  There are usually more inmates who need beds at one of these facilities outside the Jail than there are beds available.

If more treatment and office space becomes available at Twin Towers, the housing of female inmates at Twin Towers is almost certain to result in improved mental health care for the Jail's female inmates.  However, this potential for improvement in mental health care can only be realized if the additional treatment space is combined with procedures and staffing adequate to provide minimally acceptable care.

### 3.   Pitchess Detention Center

The Pitchess Detention Center (PDC), which includes the East, North, South, and North County Correctional Facilities, houses the majority of the Jail's inmates.  However, there is no mental health treatment available at any of these four facilities other than the administration of psychotropic medications and crisis intervention.  Inmates with serious mental illnesses at any of the PDC facilities other than NCCF have an especially difficult time accessing the treatment that is available at PDC.

### 4.   Administration Of Medication And Diagnosis

Our expert consultants found that, throughout the Jail, medications were improperly prescribed, their effects improperly monitored, and documentation of their use and effect incomplete, inaccurate, and often illegible.  Mental health staff also appear to be misdiagnosing some inmates.  For example, at NCCF, all of the inmates our expert consultants interviewed had been diagnosed by Jail psychiatrists as having a bipolar disorder. Our expert consultants talked with a number of inmates who, despite having been diagnosed as having a bipolar disorder, appeared to our experts not to have this disorder.  They found that based on the sample of inmates they interviewed, "it is likely that the bipolar disorder diagnosis is being overused." Expert Report at 45.

The poor treatment received by one seriously mentally ill inmate illustrates the deficiencies in the administration of medications and diagnosis, as well as other deficiencies in the Jail's mental health services system.  Records indicate that the inmate, a woman with a history of serious mental health problems, was doing well when transferred from Patton State Hospital to SBI in June 1996, pending release from the Jail system.  However, after only three days this inmate decompensated while at SBI and had to be transferred to FIP. Two days later after the transfer she was observed having a seizure, and a few days later the inmate died.

- 12 -

From our expert consultants' review of available medical records, there appear to have been numerous serious problems with the mental health care this inmate received. It appears that the inmate did not receive the proper dosage of prescribed medications. An improper medication may have resulted in the inmate's dangerous decompensation and the use of restraints. According to the coroner's report, the inmate appears to have died of a pulmonary embolism. It also appears that the inmate may have had a medical illness, in addition to her mental health problems, that was not treated. In addition, it appears that a diagnosis of neuroleptic malignant syndrome was considered and testing was ordered to determine the proper diagnosis, but the testing does not appear to have been carried out. It is unclear whether this was due to a lack of adequate staffing, poor communication, and/or some other problem. The inmate's mental health records from Patton appear to have not arrived at the Jail until four days after her admission. Charting also was haphazard. For example, the inmate's medical chart indicates that the inmate was pronounced dead at 2035 hours, but also indicates that CPR was begun and doctors called to her cell at 2100 hours.

The deficiencies in the administration of medications and diagnosis of mental illnesses appears directly linked to the Jail's severe shortage of psychiatrists. Based on their collective experience, our expert consultants believe that the maximum caseload for a typical Jail psychiatrist should be approximately 75-100 inmates. Due to the high volume of inmates coming through the County's jail system, they believe that Los Angeles County Jail psychiatrists should have a caseload at the lowest end of that range. This ratio would allow a psychiatrist to prescribe medication, adequately monitor and document its administration, and evaluate inmates to determine whether they need medication or other mental health services. These functions currently are not adequately performed by the psychiatrists in the Jail because of their overwhelming caseloads. By the Jail's own estimate, there are approximately 1200 male inmates receiving psychiatric services, but only seven full-time-equivalent (FTE) psychiatrists, one of whom is also in an administrative role -- a ratio of one psychiatrist for every 171 identified mentally ill male inmates. At SBI, there is, at most, one FTE psychiatrist available, with an average caseload of 415 women, including more than 300 inmates on psychotropic medications, and many more who, in the view of our expert consultants, "desperately need to be seen and likely medicated." Expert Report at 40.

Our expert consultants found that at MCJ inmate visits with the psychiatrist were "grossly inadequate in length and frequency," Expert Report at 40, and that at SBI, there were women who had been identified upon reception as having serious psychiatric needs, but who had not seen a psychiatrist after up to three weeks in the Jail. Many of these women had been on

- 13 -

strong anti-psychotic medications prior to Jail.  At PDC there
is insufficient psychiatric staffing to provide consistent back-
up to the one psychiatrist based at NCCF.  In addition, the
psychiatrist's caseload, which was over 150 inmates when we were
at NCCF, is too high to permit adequate psychiatric evaluation,
or adequate administration and monitoring of psychotropic
medications.  Although the County states that backup is provided
for psychiatrists on vacation or sick leave, Response at 13, 26,
it also attempts to excuse the long wait for psychiatric care at
SBI on the fact that the "psychiatrist was on vacation at the
time of the review."  Response at 18.

     5.   <u>Treatment Plans</u>

    The vast majority of mentally ill inmates in the Jail do
not have a treatment plan.  The County states that a treatment
plan is created for mentally ill women at SBI, Response at 22,
but we are unable to confirm this as we were told during our
tour that no treatment plans were created and we did not observe
any plans.  It appears to be undisputed that male inmates, other
than those in MCJ's Day Treatment Program, do not have treatment
plans.

     6.   <u>Environmental Conditions</u>

    One of the most troubling aspects of the Jail's lack of
treatment for mentally ill inmates is that the Jail in many ways
exacerbates an inmate's mental illness by placing the inmate in
twenty-three hour (or more) lockdown in environmentally
inadequate housing, without access to many of the activities and
services available to general population inmates.  At MCJ and
SBI, mental health housing is insufficient and is in poor
repair.  The isolation cells at East, in which mentally ill
inmates may be held if they act out, reduce auditory and visual
stimulation to such an extremely low level that they could
severely exacerbate existing mental illness.  Mental health
modules at MCJ are dirty and dark; inmates are housed in crowded
four to six person cells in which some inmates must sleep on
mattresses on the floor.  Inmates may also be housed in shower
rooms and day rooms, where they sleep on the tables.  In a
November 1996, audit conducted by LASD personnel, auditors found
that "some entire floors were in dire need of cleaning,
specifically the 4000 [mental health housing] floor" and that
"[t]he unpopular or unsettling areas (<u>i.e.</u>, Modules 4400 and
4600) were filthy and in need of attention."  Audit Team Report-
MCJ at 13, 15.  At all facilities, access to day room time,
exercise time, inmate work, and educational/vocational programs
is decreased or unavailable to inmates in mental health housing.
It also appears that an inmate in mental health housing cannot
be classified pro se, and that without this classification the
inmate does not have access to the Jail's law library.  The
County, itself, has acknowledged that staffing levels and
physical plant factors, "do in fact, challenge the provision of

- l4 -

the minimal [California Code of Regulations] Title 15 requirements for the inmates," and that audits of recreation, out-of-cell time and Title 15 compliance at all Jail facilities have been completed.  We are encouraged by the County's statement that "[c]orrective action is being taken to ensure that compliance is achieved and that neither staffing nor so-called 'deputy attitude' preclude mandatory compliance and service provision to inmates."  Response at 5-6.

The County agrees that "the high volume of inmate movement and jail crowding exacerbates conditions in the jails designed for housing less inmates," Response at 29-30, and responds to our expert consultants' assessment of current treatment inadequacies largely by noting anticipated staffing increases and the anticipated full opening of Twin Towers.  The County states that Twin Towers "should help improve conditions by providing treatment and office space and improved housing conditions," Response at 30, and explains that the Twin Towers design is more conducive to management of special housing inmates, that the inmates will be more likely to get exercise, recreation, and showers because these areas are adjacent to or easily accessible from inmate housing areas, and that no inmates will supervise other inmates.  Response at 14.

Although we agree that the opening of Twin Towers could have a beneficial impact on treatment for the Jail's seriously mentally ill, it is uncertain whether this potential will be realized.  First, it is our understanding that there is no set date for opening the medical tower at Twin Towers.  Thus, although some areas of Twin Towers are open, the Twin Towers Correctional Treatment Center, including the much-needed increase in number of inpatient beds for mentally ill inmates, is reportedly currently unavailable.  Second, many of the potential treatment benefits in opening Twin Towers' medical areas (increased treatment space, inpatient beds, etc.) can only be realized if combined with staffing adequate to provide minimally acceptable treatment.  While touring NCCF we observed that its large, relatively new infirmary was empty except for one inmate.  This is an unfortunate waste of needed health care beds that may be repeated at Twin Towers without adequate staffing.  Finally, the County's intention "to move the most severely impaired mentally ill inmates to the Twin Towers in the next few months," Response at 14, does not address the needs of those inmates whose needs are only slightly less acute.

The County's plans regarding who will be housed at Twin Towers remain fluid.  For example, although we were told throughout our tour that no female inmates would be housed at Twin Towers (with the exception of female inpatients of the facility's CTC), as of June 21, 1997, all female inmates were moved to Twin Towers.  We understand and appreciate that there are numerous factors to consider when deciding who to house at Twin Towers, e.g., the security benefits of housing inmates currently housed in dorms at East in smaller cell settings.

000917

- 15 -

However, regardless of whether and under what conditions Twin
Towers is fully occupied, the County must provide adequate
treatment to inmates with serious mental illness.  Moreover,
many of the treatment inadequacies can be remedied without
waiting for mentally ill inmates to be housed at Twin Towers.

7.              Non-release Of Inmates With Mental Illnesses

     Despite the Jail's lack of adequate resources for mentally
ill inmates, the Jail currently holds persons it believes to be
mentally ill in custody for violations that would normally
warrant release pending trial, on bond or on their own
recognizance, if not for the fact that they are mentally ill.
The County states that this is because California law permits
the Sheriff's Department to hold a mentally disordered
individual for 72-hour treatment and evaluation.  Response at 9,
34.  However, the statutes cited do not appear to mandate that
the County hold or charge an individual, nor do they indicate
that when an individual is held, he or she should or must be
held in a correctional setting.  Cal. Welf. & Inst. Code § 5150
(West 1996); Cal. Penal Code § 4011.6 (West 1996).  In fact,
California law mandates that a law enforcement officer
transporting a mentally disordered person to a facility for
evaluation cannot be instructed to keep or transport the
individual to a jail solely because there is no acute bed
available in a mental health facility.  Cal. Welf. & Inst. Code
§ 5150.1 (West 1996).  The County has provided no rationale for
its policy of holding individuals with illnesses it cannot
adequately treat, in a facility which is already overwhelmed,
for allegedly committing misdemeanors that normally permit
immediate pretrial release.

8.              Special Clothing

     The practice of clothing inmates identified as mentally ill
in special jumpsuits adversely affects the inmates' treatment.
Our experts had not seen this practice in any other system in
the nation and found that it results in stigmatization and
creates barriers to treatment (e.g., many inmates will not seek
treatment due to the associated stigmatization).  In addition,
special clothing makes inmates in jumpsuits easy targets of
predatory inmates.  Although we agree with the County that
special clothing may assist correctional officers in "exercising
proper judgment," Response at 31, towards differently clothed
inmates when they exhibit improper or bizarre behaviors, there
are other, less therapeutically damaging ways to elicit
appropriate custodial responses.  In addition, because most, but
not all, mentally ill inmates are dressed in special clothing,
the Jail incorrectly implies to staff that anyone who is not in
a special jumpsuit is not in need of mental health services,
increasing the likelihood that deputies will not respond
appropriately toward mentally ill inmates not wearing special
clothing.

- 16 -

9.                                Use Of Restraints

     The County stated in its response that physical restraints
are used in dormitory rooms when no other patients are housed in
the room or when other patients in the room are also in
restraints.  Response at 20.  Our expert consultants believe
that restraints must only be used in an acute care patient
setting and only when a clinician has found that restraints are
therapeutically necessary and that no less restrictive
alternatives are appropriate.  Unless the Jail is able to
provide an acute care setting in the dormitories, inmates in
dormitories should never be placed in restraints.  Several
inmates in the Jail have died while in restraints during the
past several years, and one of the deaths cited earlier in this
letter may have been related to the Jail's use of restraints.
The Jail must ensure that inmates are only placed in restraints
when therapeutically necessary and then only in a clinical
setting appropriate to the high level of care needed by patients
in restraints.

     **E.   Inadequate Suicide Prevention**

     The number of suicides in the Jail has been rising in the
past several years, and it appears that this rise continues.  In
1992 there were two suicides, in 1993 there were three, in 1994
there were four, and in 1995 there were six suicides.  According
to documentation provided by the Jail, during the six-month
period between August 1996 through January 1997, there were at
least five suicides in the Jail.

     The Jail's suicide prevention system is inadequate in
several respects.  Crisis intervention and suicide watch
procedures are inadequate.  The only suicide watch is a fifteen
minute watch.  There is no five minute or one-on-one suicide
watch available in the mental health housing modules, even when
clinical judgment would warrant it.  Housing of suicidal inmates
is also often inadequate.  The Director of LASD Medical Services
acknowledged that the CTC at SBI is not adequate to house
suicidal inmates.  The isolation cells at East are completely
inappropriate for housing suicidal (or any mentally ill) inmates
as they are essentially sensory deprivation chambers that can
facilitate psychological decompensation and psychotic episodes.

     The two recent suicides for which the Jail has provided
substantial information demonstrate the harm that is caused by
an inadequate mental health and suicide prevention system.  In
one case the inmate, who was awaiting court-ordered placement in
a County operated mental health facility, was discharged from
FIP without the medication which had stabilized his severe
depression and suicidal ideation.  Despite repeated requests
over a period of six days, the inmate never received the needed
medications.  At intake, the inmate admitted to a history of

- 17 -

suicide attempts and mental illness, and had been housed in FIP
under suicide watch for an extensive period.  When discharged
from FIP, the inmate was placed in normal mental health housing,
rather than in a suicide observation cell.  According to
progress notes and other jail documentation, a jail social
worker first saw the inmate four days after he had been
discharged from FIP.  The social worker reported that the inmate
stated that he had been in FIP for six weeks where he had been
stabilized by medication.  The social worker noted that the
inmate was anxious because he had not received his medications
since he had been discharged from FIP.  The social worker placed
the inmate's name on the "psychline" list to be seen by the next
day to enable the inmate to receive his medications.  When the
social worker returned two days later to see the inmate, he
still had not received his medications.  The inmate was agitated
and asked the social worker if he could see the bugs crawling
over the inmate's body.  The social worker went to the clinic
and informed the nurse for that area that the inmate had not
received his medications for "4-5 days" and needed his
medications immediately.  The inmate hanged himself that
evening, apparently without ever receiving the needed
medication.  Shortly before the inmate killed himself, he began
shouting, loud enough to awake the inmates in the adjacent cell,
that he had bugs on his body.  If a deputy had responded he
likely would have seen that the inmate was in need of immediate
mental health crisis intervention.  There is no explanation in
the deputy's report, and there appears to have been no follow-up
investigation of why no officer responded to the inmate's shouts
or referred him to Jail Mental Health Services.  According to
the Jail's documentation, the last row safety check was 21
minutes before the inmate was discovered dead and "cold to the
touch."  The deputy that found the inmate hanging had trusties
cut the inmate down and then waited for a second deputy to
arrive to take the inmate's vital signs.

     In the other case, an inmate who had previously attempted
to kill himself succeeded in doing so soon after being removed
from suicide observation for reasons the Jail cannot explain.
Despite repeated statements to staff and inmates that he would
kill himself, the inmate was removed from FIP and placed alone
in a single cell in mental health housing.  This inmate did not
receive his prescribed medication for the two days prior to his
suicide.  According to jail documentation, the nurse did not
give the inmate his medications on one occasion because another
mentally ill inmate was throwing feces, and on the next occasion
because the module was under lock-down.  These are not
acceptable reasons for not providing needed medication.  Such
occurrences are not uncommon in the Jail and mental health staff
must be provided with adequate custody assistance and
supervisory encouragement to enable them to provide necessary
medical care under these difficult conditions.  According to
Jail documentation, the last safety check was almost forty
minutes before the inmate was discovered dead.

- 18 -

The Jail also fails to respond adequately to suicide gestures and other inmate disturbances.  In one instance, in which three inmates slit their wrists and several others tore clothing and flooded toilets, the Watch Commander responded by ordering all the inmates to remove their clothing until the row was mopped and cleaned.  This appears to have lasted for at least several hours and perhaps more than a day.  The County has offered no penological rationale for this response.  In this same incident, the Jail characterized the three inmates slitting their wrists as "an attempt to disrupt operations."  Response at 35.  The Jail is currently investigating an allegation that a deputy challenged inmates to commit suicide.  This challenge reportedly occurred after several inmates in the housing area had made suicide gestures.  The Jail must recognize that suicide gestures are potentially life threatening and that correctional staff may incorrectly assess an inmate's motive for suicidal gestures.  Custody staff should not be required to discern genuine from disingenuous suicide attempts.  The Jail should treat all attempts as serious incidents, requiring at least a mental health consultation.

F.      **Physical Abuse And Mistreatment Of Mentally Ill Inmates**

Inmates who are mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custody staff.  Moreover, the Jail does not adequately investigate allegations of abuse against its inmates.

We have received numerous reports from inmates and advocates regarding serious physical abuse of inmates in mental health housing by other inmates and by Sheriff's deputies, including kicks, punches, beatings, and sexual assaults. Although the Jail claims that it has discounted some of these claims, as discussed later, the investigation of these claims was inadequate and serious questions remain regarding the extent of physical abuse of mentally ill inmates.  We agree with Special Counsel Merrick Bobb's finding that in the Jail "there is callous treatment [of inmates] at times, a problem that LASD management knows about but has not acted sufficiently aggressively to

- 19 -

resolve."  Los Angeles Sheriff's Department 6th Semiannual
Report by Special Counsel Merrick J. Bobb & Staff at 11-13
(September 1996).5

     The treatment received by one inmate indicates that
excessive use of force and physical mistreatment of inmates with
mental illnesses may be in part the result of inadequate
training.  Although we have not been able to review the entire
record regarding this inmate, according to documents provided by
the Jail, in early April 1997, Jail Mental Health Services
requested that an inmate housed in mental health housing be sent
to FIP for treatment as he had decompensated to the point where
he refused to shower or go to court, was sleeping on the floor
in trash and water, and was smearing feces on himself and his
cell.  The inmate had been refusing to take his medications for
several days.  A deputy told the inmate to stand up to be
handcuffed and escorted to FIP, but the inmate refused.  After
various custody officials failed to convince the inmate to allow
himself to be escorted to FIP, custody called for the extraction
team, a team trained to remove non-compliant inmates from their
cells.  Custody also called the mental health unit to inform
them that an extraction was about to be performed and ask that a
mental health staff person observe the extraction.  Less than
ten minutes after the mental health observer arrived at the
inmate's cell, the extraction team arrived.  It is unclear
whether deputies were already in the cell trying to remove the
inmate when mental health staff arrived at the cell.  According
to the mental health observer, the inmate was shot twice in the
legs with rubber bullets and dragged from his cell once he was
subdued.  According to FIP records, the inmate, who weighed
approximately 375 pounds, was then hand-cuffed with his hands
behind his back, placed on his stomach and brought up to FIP on
a stretcher.  There are some reports that he was hog-tied.  He
died later that night.  The Jail did not provide the coroner's
report; therefore, it is not possible for us to state at this
point how the inmate died.  However, according to our expert
consultant, due to the risk of positional asphyxia in such a
large person, it is not a proper tactic to place an obese person
on his stomach with hands tied behind his back.  It is also
unlikely that firing a direct hit with rubber bullets was
appropriate in this situation.  Further, it appears that the
Jail did not attempt to involuntarily administer medication to
the inmate in the cell, which is acceptable in psychiatric
emergencies and which could have eliminated the need for most of
the force used.  According to our expert consultant, the Jail
also should have allowed trained mental health officials
adequate opportunity to persuade the inmate to leave his cell
voluntarily.  Because custody officers called the extraction
team before calling down mental health staff to "observe" the

---

5/  The incidents of abuse and mistreatment by trusties and deputies of inmates in mental health
housing discussed in Special Counsel Merrick Bobb's Semiannual Reports will not be reiterated
here.

- 20 -

extraction, and because the extraction was begun only fifteen minutes after the team's arrival, it appears that the Jail did not allow mental health staff adequate opportunity to persuade the inmate to leave his cell.  According to our experts, there were several alternatives to the amount and type of force used to remove this inmate from his cell.  It appears that the Jail failed to employ any of these tactics.

At the time of our tour the Jail was attempting to compensate for inadequate staffing (both custodial and mental health) by using inmate trusties as assistants in mental health housing.  The practice of using inmate trusties in place of custodial or mental health staff is unacceptably dangerous.  The potential for physical abuse and mistreatment is too high, and we, as well as the Jail, received allegations before our tour in August that this practice had resulted in incidents of serious abuse and injury at the Jail.  In addition to physical abuse, there are reports that trusties deny food to some mentally ill inmates, steal their property, or steal money from them by using their vending machine cards for their own use.  We have been told that as of August 21, 1996, the Jail no longer uses trusties to escort mentally ill inmates or in any way supervise their activities, although they are still used for food distribution and cell cleaning.  Response at 8.

The Jail does not adequately investigate allegations of abuse towards mentally ill inmates. For example, in April 1996, the Jail was informed by the Department of Mental Health of numerous allegations of serious abuse of mentally ill inmates by deputies and trusty inmates.  In August 1996, we were told that the investigation into allegations of abuse had still not been completed, and that we would be provided with the Jail's findings upon completion of the investigation.  After repeated requests for the County's response to these allegations, the County finally provided a partial response in the form of a summary of its investigation in June 1997.  The Sheriff's Department Internal Affairs Bureau investigators did not interview the alleged victims of the abuse, or the Patients' Rights Advocate who had presented the information to the Jail, until
October 1996.  The investigation was completed in May 1997, over one year after the custody division had received the allegations of abuse.  It is clear even from the incomplete information provided that the Jail's response to these allegations was inadequate.  The memorandum requesting inactivation of the investigation states that there was "insufficient information to substantiate any charges or to name any individual as a subject of the investigation."  A review of the investigation summary however, indicates that there was adequate information to act upon.  For example, numerous inmates in mental health housing alleged that they had bleach thrown on them by trusties, or had seen this happen to other inmates.  The Supervising Line Deputy on the mental health housing module reportedly told the

000923

- 21 -

investigators that he "was aware of several bleach throwing
incidents involving inmates and occasionally the suspect was a
trusty."  The Line Deputy reported that when the "incident
involved a trusty, the trusty would be removed from inmate
worker status" and a report would be written.  It thus appears
that the Jail's own supervisors acknowledged that such incidents
had occurred, yet the investigators found these allegations
unsubstantiated.  It appears that investigators did not even
review the Supervising Line Deputy's reports regarding these
incidents.

      Another inmate alleged in an affidavit that he was beaten
in his cell by trusties and deputies.  During an interview by
Sheriff's investigators, the inmate recanted his allegations
that deputies beat him, but repeated that he was beaten by
trusties who escorted him to the showers.  The Department of
Mental Health had earlier provided photographs to investigators
of the inmate's injuries, which had been taken at Metropolitan
State Hospital upon his admission there from the Jail.  Despite
the inmate's statement, the supporting evidence, and the lack of
any
contradictory evidence, the Jail found that the charge that
trusties had beat the inmate could not be substantiated.

      Another inmate told investigators that he was beaten on the
head by two female deputies who escorted him to his cell on his
first day.  Investigators do not appear to have attempted to
identify the deputies through normal investigatory techniques,
such as checking who was on duty in that area on that day, or
showing the victim pictures of female deputies in the jail to
see whether he could identify the individuals he alleged beat
him.   In another incident, an inmate named one deputy that had
allegedly allowed a trusty to beat an inmate in mental health
housing and named another who had allegedly allowed a trusty to
throw water on inmates during the evenings.  Although it appears
that the investigators interviewed the two named deputies, there
is no indication that they interviewed other deputies who were
on duty with these deputies and may have been witnesses, or
checked into the background of the deputies to see whether there
were other reports of similar allegations.

      It also appears that more information would have been
available to Internal Affairs if it had not delayed its
investigation for months and if investigators had not failed to
interview available witnesses.  For example, although the Jail
received these allegations in April of 1996, it appears that
Internal Affairs did not begin its investigation until October
of 1996.  By this time, fourteen of the twenty-one mental health
inmates involved in the allegations could not be located.  It is
likely that if the investigation had begun earlier, more of
these individuals could have been located.

      The inadequacies of Sheriff's Department investigations

- 22 -

into allegations of abuse has negatively affected correctional
and clinical response to such allegations.  Numerous deputies
and medical/mental health staff told Sheriff's Department
investigators that they had heard of abuse against inmates in
mental health housing, including beatings and stealing property.
Still, medical/mental health staff and custody staff rarely
report such incidents.  One mental health worker said that she
had been told by her supervisor that even if allegations of
abuse were true, nothing would be done.  Another stated that she
did not report to custody staff an inmate's allegation that he
had his jaw broken by a trustee because "it's not the thing to
do."  A mental health supervisor stated that he did not follow
up on periodic reports of abuse against inmates because of a
"lack of timeliness in reporting the incidents and the
unavailability of witnesses."  Investigators stated that during
the investigation they "learned that there is no standard
reporting procedure employed by the Department of Mental Health
to document or report allegations of abuse to their patients.
The Department of Mental Health also does not maintain a
tracking system of incidents or reports . . . . It is also
apparent that there is reluctance amongst Mental Health Staff to
report incidents of abuse in a timely fashion to Sheriff's
Personnel so an investigation can be opened immediately."  There
is likewise no indication that the Sheriff's Department tracks
such incidents of abuse of its inmates.  The Jail's failure to
investigate promptly and thoroughly allegations of abuse against
mentally ill
inmates, and its failure to take appropriate action in response
to incidents of abuse, enables the abuse of these inmates to
continue.

### G.    Inadequate Medical Record-keeping/Tracking

The Jail's record system, including the mental health
record system, is inadequate.  It significantly impedes, and
sometimes makes impossible, the provision of mental health
services to inmates.

Jail staff reported that the County's jail and medical
computer systems are wholly inadequate to track and manage the
care of inmates with mental illness and medical needs.  The
County states that it recognizes that "many of the problems in
the Jail medical and mental health delivery system devolve to
the current inability to promptly access a single combined
record throughout the system," and that it has begun the
development of an "automated patient health record."  Response
at 32.  However, according to the April 1997 report of Special
Counsel
Merrick Bobb, "the best estimates are that it will take at least
five to six years and upwards of $6 million to construct what
will be at best a rewrite and update of the current automated
jail information system.  It does not even include an up-to-date
medical tracking system."  Los Angeles Sheriff's Department 7th

- 23 -

Semiannual Report by Special Counsel Merrick J. Bobb & Staff at
23 (April 1997).  We agree with the County's Special Counsel
that "[t]here is too great a risk of erroneous releases,
over-detentions, misclassifications, and grim failures to
provide medical and mental health care.  We cannot stress enough
to the Board of Supervisors and the LASD how critically
deficient is the current [jail information] system for medical
and mental health care."  Id. at 24.

        The County's current practice of maintaining a separate
medical record at each facility for the same inmate has a
serious negative impact on mental health care.  Maintaining
several medical/mental health records for each inmate
exacerbates communication problems, creates unnecessary
duplication of work, and increases the likelihood that important
medical information will be missed.  Each time an inmate is
transferred to a new facility, a new medical chart is created.
Our expert consultants found that it was often necessary to look
in several records in order to find the answer to questions as
basic as why an individual was restrained.  Multiple records
create delays of days or even weeks before information from an
inmate's medical record at one facility can be transferred to
medical staff at another.  In some instances, medical
information is not transferred at all.

        During our tour, we observed problems with the mental
health staff's ability to access an inmate's medical records.
For example, at SBI the psychiatrist sometimes did not have
access to an inmate's mental health chart when he reviewed a
patient's medication, and mental health workers did not always
know what medication an inmate was taking.  We are told that the
Jail is now maintaining integrated inpatient (for CTC/FIP
patients) and outpatient records at the men's facilities and has
integrated mental health and medical charts at SBI.  Response at
32.  This should resolve some of the problems we observed
regarding insufficient access to medical records.

        Medical charting is deficient.  Our expert consultants
reported that they found inadequately documented mental health
charts at every facility.  The charts contained little or no
basic information concerning assessments, treatment planning, or
laboratory assessments of medication use.  Our expert
consultants found that it was sometimes impossible to tell from
charts whether an individual had been properly medicated.  They
attributed the lack of documentation regarding treatment
planning to the lack of treatment services, other than
psychotropic medication use, generally available to inmates.
The County states that the Jail's Medical Services Quality
Assurance Program audits "medical related entries" in inmates'
medical/mental health records for legibility and relevance.
Response at 7.  Our expert consultants' review of medical and
mental health records indicates that these audits thus far have
been unsuccessful at ensuring adequate medical charting.

- 24 -

Deficient medical charting hampers communication of the care an
inmate has or should receive, increasing the chance the inmate
will not receive appropriate care.

## H.   Inadequate Training

The County concurs with our expert consultants' view that
mental health training for deputies working at the Jail is
inadequate, stating that "there is definite agreement that
additional and continual training is needed."  Response at 27.
Deputies report that they are not adequately trained in mental
health issues.

Mental health training for correctional staff may be
improving.  The County reports that the Jail has begun to assign
specific deputy personnel to mental health housing and now
offers in-house training to deputies assigned to work in mental
health housing at MCJ and SBI.  Response at 8, 24.  It is not
clear whether this training is mandatory or optional, and it
appears that no mental health training is being provided to
deputies at PDC.  The County states that the correctional,
medical, and mental health staffs have begun to work together to
train personnel in observation skills and techniques for
handling mentally ill inmates.  The County reports that it has
completed training for all personnel dealing directly with
mentally ill inmates and has begun to train all other personnel
at SBI and MCJ.  Response at 18.  The County's new program in
which deputies assigned to mental health housing at MCJ
participate in weekly "ride-alongs" with the Mental Evaluation
Teams, Response at 18, is an excellent idea.

Mental health staff report that the care mentally ill
inmates receive is sometimes dependant on deputies' familiarity
with mentally ill inmates.  We agree with mental health staff
who expressed the need for regularly assigned deputies in mental
health housing.  Many clinicians, correctional staff, and
inmates told us that inmates with mental illness are often
called "dings" and other derogatory terms by deputies.  We heard
many of these terms used during out tour.  This practice is
detrimental to the mental health of mentally ill inmates,
reflective of the lack of regard for inmates with mental illness
on the part of some deputies, and a signal to other inmates that
inmates with mental illness can be ridiculed and abused with
impunity.

## I.   Deficient Organizational Structure And Communication

There are serious problems with the structural relationship
and communication between the Sheriff's Department and the
Department of Mental Health, between the various facilities,
between the reception center and central Jail, and between
shifts within facilities.  These communication and
organizational deficiencies have a severe negative impact on

000927

- 25 -

mental health services, including discontinuity of health
service, poor coordination of effort, waste, and on occasion,
danger to  inmates.

        Understaffing directly contributes to communication
failures.  Due to staffing shortages, clinicians often must
choose between communicating and documenting important
information, or providing mental health care.  Some
communication problems result from the LASD's inadequate record
keeping system.  The Director of DMH stated that it is often
difficult to find a specific mentally ill person in the Jail,
even if you know the person is somewhere in the system.  Inmates
are transferred frequently and the Jail's record keeping system
is not adequate to keep up with these transfers.  This results
not only in "losing" mentally ill inmates, but also in
inappropriate or unnecessary transfers.  We were told of
numerous incidents of inmates being sent from NCCF to MCJ for
mental health care only to be sent back as soon as they had
completed the long bus ride.

        Communication between facilities is similarly inadequate.
When an inmate who has already been identified as needing
medical or mental health care is transferred to another
facility, medical/mental health services at the new facility is
not made aware that the inmate is on his way or has arrived.
Instead, medical/mental health services at the new facility must
hope that the inmate again self-identifies during intake and
then contact the sending facility to inquire about the medical
history or medication orders for that inmate.  Thus, even if an
inmate does self-identify again at the new facility, he is
placed on the next available physician or psychiatric line to
await re-evaluation, rather than receiving uninterrupted
treatment.  An inmate who does not self-identify will likely not
receive medication or treatment at the new facility even if he
was receiving medication and treatment while at another Jail
facility.  This results in inconsistent treatment and premature
cessation of treatment, which can be dangerous.  We found
numerous instances in which an inmate was classified as mentally
ill at the sending facility and sent to the receiving facility
for treatment, only to be classified as not mentally ill and
immediately returned to the sending facility.

        The Jail does not have a settled mental health caseload
roster or list.  Despite the fact that the County had ample
advance notice of our visit, it took several days after our
arrival for the Jail to create and provide us with a list of the
approximate number of inmates currently housed in mental health
housing or receiving psychotropic medications.  The Jail does
create a daily census of the FIP and day treatment programs.  We
are told the Jail has begun creating a census of MCJ's Forensic
Outpatient program.  However, without a census of all inmates at
every facility who are receiving mental health services, it is
difficult for the Jail to keep track of mentally ill inmates or

000928

- 26 -

ascertain the amount of resources required to treat them.

The LASD and DMH have serious communication problems that significantly hamper the provision of mental health care in the Jail. There is currently no clear understanding of each department's responsibilities, nor does there appear to be a mutually acceptable process for decision making and conflict resolution. In addition, DMH supervisors do not communicate DMH objectives adequately to DMH jail staff, which diminishes DMH's ability to provide adequate mental health care in the Jail.

J.   **Inadequate Mental Health Quality Assurance**

The lack of any quality assurance program for mental health services in the Jail prevents the Jail from making itself aware of problem events and issues, understanding their causes, and developing mechanisms to avoid preventable injury and death. Although the County states that the Jail's Chief Physician "prepares documentation for his [mortality] findings," and that an overview of deaths is completed annually, Response at 33, this written material is not an adequate mortality review. We were told by the Jail's Chief Physician during our tour that written mortality reviews are never completed. Moreover, as the County appears to concede, Response at 9, the mental health documentation necessary to support a quality assurance system does not even exist in at least one facility, SBI.

K.   **Diversion Programs**

The Los Angeles County diversion programs, Systemwide Mental Assessment Response Team (SMART) and Mental Evaluation Team (MET), and the County court/alternative sentencing programs, are effective in diverting mentally ill offenders from the Jail system, decreasing strain on the Jail, and connecting individuals with mental illness to the mental health services in the community. In addition, these programs can provide valuable training to deputies about mentally ill inmates, as exhibited by the Jail's new program of having deputies "ride-along" with MET.

From our review of documents provided by the Jail and from conversations with officers on MET and SMART, it appears that many law enforcement officers may not be aware of MET and SMART. Education for officers regarding how to utilize these programs would increase the programs' value. The Jail's new ride-along policy for deputies working with mentally ill inmates will likely assist in educating officers about how to use the diversion programs.

- 27 -

## III. RECOMMENDED REMEDIAL MEASURES

1. Each inmate entering the Jail should be individually and privately asked questions appropriate to determine whether the inmate has or had a mental illness, has attempted suicide, or has suicidal propensities.  This screening should be completed by an appropriately trained individual and should be documented on the medical services data base form, or comparable medical screening device, for every incoming inmate.  The Jail's screening process should not rely on an inmate self-reporting his or her mental illness in a group setting.

2. An adequate and timely mental health evaluation, including a medical evaluation, should be completed and properly documented by a qualified and appropriately trained professional for each inmate screened positive for possible mental illness. Incoming inmates in need of crisis mental health care should receive it immediately upon intake.  A reasonably quiet and private area should be available for the mental health evaluation at intake.

3. The Jail should ensure continuity of treatment to individuals identified as mentally ill prior to entering the Jail.  Inmates identified as mentally ill at holding facilities or elsewhere, or already receiving psychotropic medications, should have this treatment continued uninterrupted upon entering the Jail.

4. Mental health staff should make rounds in non-mental health housing modules in all facilities on a regular basis to identify inmates who may have been missed during screening or have decompensated while in jail. Mental health rounds should include pre-classification housing, administrative segregation, and other special housing areas, as well as general population housing. The Jail should facilitate and encourage communication between deputies and mental health staff in order to ensure that inmates in need of mental health services are referred to Mental Health.  This referral system should allow and encourage referral of all inmates with apparent mental illness to receive mental health services, regardless of whether the inmate's mental illness is disruptive to the Jail (e.g., severely depressed or withdrawn inmates).  The Jail should institute a confidential self-referral system by which inmates can request mental health care without revealing their request to correctional officers.

5. The County should ensure timely access, including

000930

- 28 -

immediate access where necessary, to psychiatric hospitalization in a safe and appropriate setting within the Jail or at an external hospital for each inmate who needs inpatient mental health care.

6.      Physical restraints should be used only when necessary for mental health therapeutic reasons and when no less restrictive alternative is possible.  Inmates in restraints should be frequently monitored and restraints should be removed when the clinical reasons for the restraints cease.  Inmates in restraints should have their limbs exercised and adequate attention should be given to food, hydration, and bodily functions.  Inmates in physical restraints should be placed only in beds appropriate for use with restraints.  The use of restraints should be thoroughly and accurately documented

7.      An individual, written, mental health treatment plan should be prepared in a timely manner by a qualified and appropriately trained mental health professional for every seriously mentally ill inmate.  Changes to and compliance with the treatment plan should be thoroughly and accurately documented in the inmate's medical/mental health record.

8.      The County should ensure that a full range of appropriate psychotropic medications is available at all Jail facilities, and that psychotropic medications are properly prescribed, monitored and documented by qualified and appropriately trained mental health professionals.

9.      The County should ensure that all medications are appropriately administered and monitored by qualified and appropriately trained medical personnel.

10.     The County should ensure adequate therapy and counseling for all mentally ill inmates who need such care.  This includes adequate space for treatment, adequate staff to provide treatment, as well as adequate therapeutic programming.

11.     The County should ensure a sufficient amount of adequate mental health housing at every appropriate level of care (e.g., outpatient, inpatient, and intermediate care) for every inmate in need of mental health housing.  It is not necessary that every mentally ill inmate be segregated into mental health housing.

12.     The County should ensure a sanitary and humane environment for all mentally ill inmates and all

- 29 -

inmates housed in mental health housing.  This
includes, but is not limited to, seclusion and
isolation units and cells, which may house inmates
with mental illness.

13.     The County should ensure that all inmates with mental
        illness or housed in mental health housing receive
        adequate recreation, exercise, access to courts, and
        shower time.  Inmates with mental illness or housed in
        mental health housing should not be denied access to
        recreation, exercise, showers, privileges, services,
        programs, education, or work, based solely on their
        status as mentally ill or on their placement in mental
        health housing.  The determination that an inmate with
        mental illness poses a clinical risk of dangerousness
        to self or others that precludes the provision of any
        right, service or program normally afforded to a
        general population inmate, should be made by a
              qualified professional on an individual basis and
        should be recorded in the inmate's file.

14.     Inmates with mental illness should not be dressed in
        special clothing identifying them as mentally ill.

15.     Inmate trusties should never be placed in a
        supervisory position or used as escorts for mentally
        ill inmates or inmates in mental health housing.
        Inmate trusties should be carefully selected and
        screened before being assigned trusty positions.
        Where trusties are allowed to work in mental health
        housing, they should be closely monitored.

16.     Staff should not be permitted to use derogatory
        language towards mentally ill inmates.  Allegations of
        derogatory language towards mentally ill inmates
        should be promptly and thoroughly investigated.  Staff
        using derogatory language or otherwise taunting or
        abusing mentally ill inmates should be promptly and
        appropriately disciplined.

17.     Staff should not be permitted to physically or
        mentally abuse inmates with mental illness.
        Allegations of abuse of mentally ill inmates or
        inmates in mental health housing should be promptly
        and thoroughly investigated and staff members found to
        have abused inmates should be promptly and
        appropriately disciplined.

18.     The Jail should create and/or fill staffing positions
        to provide the following care:
a.            Adequate psychiatric care, including:  evaluating
              inmates for mental health services needs;
              admission into inpatient facilities; and

- 30 -

prescribing, monitoring and documenting medication administration. All facilities should have a psychiatrist available, at least by telephone, twenty-four hours per day to evaluate and prescribe psychotropic medications in emergency situations. Psychiatric evaluation of inmates in the Jail requesting mental health care should be completed on a timely basis.

b.      Adequate twenty-four hour medical and mental health screening of all incoming inmates at all intake/reception areas.

c.      Adequate evaluation on a timely basis of inmates who screen positive for possible mental illness, at all intake/reception areas.

d.      Adequate twenty-four hour crisis intervention, including transfer to special medical housing units, administration of psychotropic medications, provision of therapy treatment, and special observation, at all facilities.

e.      Adequate correctional assistance to mentally ill inmates to ensure that they receive adequate exercise/recreation and hygienic care; that trusties are never used to escort or supervise mentally ill inmates; and that adequate suicide/mental health observation is maintained on a twenty-four hour basis.

f.      Adequate mental health treatment to all mentally ill inmates, including therapy, preparation of individual treatment programs, discharge/transfer planning, and administration of medications, seven days per week at all facilities.

g.      Adequate twenty-four hour care in all inpatient units, including, but not limited to, suicide observation and appropriate monitoring and documentation of physical restraints, and exercise at least every two hours for inmates in restraints.

h.      Adequate clerical, supervisory and administrative assistance to support mental health services and assist in ensuring adequate documentation, supervision, coordination and communication of mental health services at all Jail facilities.
All staff should be properly trained and qualified for every function/duty they are expected to perform. Staffing should include sufficient numbers of bilingual clinicians trained to provide mental health

- 31 -

care, including evaluations and therapy, to all
inmates who do not speak sufficient English.

19.   The County should implement mandatory pre- and
continuing in-service training for correctional staff
in the identification and custodial care of mentally
ill inmates, including, but not necessarily limited
to: interpreting and responding to aberrant or
bizarre behaviors, recognizing and responding to
indications of suicidal thoughts, proper suicide
observation, recognizing common side-effects of
psychotropic medications, professional and humane
treatment of mentally ill inmates, and response to
mental health crises, including suicide intervention
and cell extractions. Officers assigned to mental
health modules should receive more advanced training
than those assigned to non-mental health housing.

20.   The County should create and implement a management
information system that allows prompt, up-to-date, and
complete access to every inmate's medical/mental
health record at all facilities, twenty-four hours per
day. There should be a single, integrated
medical/mental health record for each inmate rather
than a separate record at each facility.

21.   Documentation in inmates' medical/mental health
records should provide complete, accurate, and legible
information regarding an inmate's mental health,
including but not limited to: assessments, treatment
planning, administration and effect of medications,
requests for and results of laboratory tests, and
inmate progress or decompensation.

22.   The Jail's inmate tracking system should permit mental
health and correctional staff to locate promptly
specific mentally ill inmates. The tracking system
should also permit mental health or correctional
services to ascertain quickly and accurately the total
number of inmates receiving mental health care,
including psychotropic medications, or housed in
mental health housing.

23.   Communication between the Jail's facilities should
allow for consistent classification and treatment of
inmates with mental illness. Sending facilities
should notify receiving facilities when they are
sending an inmate with mental illness. The Jail
should develop a system to classify inmates
consistently between facilities in order to minimize
transfers due to disagreement between facilities
regarding proper classification.

- 32 -

24.     Suicide observation cells and dormitories should be
        maintained in a manner that is safe and will not
        exacerbate a suicidal inmates' mental condition.
        Inmates under suicide observation should be housed
        within sight and sound contact of staff.

25.     Suicide watch procedures should be modified to provide
        for five minute and one-on-one suicide watch as well
        as fifteen minute suicide watch.  Observation should
        be documented.

26.     The County should ensure that an inmate observed to be
        potentially suicidal receives immediate crisis
        intervention, including placement in a safe setting,
        and is evaluated in a timely manner by a qualified
        mental health professional to determine whether and
        what level of suicide observation is required.  An
        inmate under suicide observation should be evaluated
        by a qualified mental health professional prior to
        being removed from mental health observation.

27.     Suicide intervention procedures should permit
        correctional staff to administer appropriate first-aid
        measures immediately.  All correctional officers
        should be trained in first aid and cardiac pulmonary
        resuscitation, cutdown techniques and emergency
        notification procedures in the event of hanging.
        Officers should be permitted to enter cells singly
        under some circumstances and should have cut down
        tools available.

28.     The Jail should implement and document a continuous
        quality improvement program for mental health services
        in the Jail.  This program should monitor the quality
        of mental health care, through, for example, clinical
        review of mental health records and peer review.  The
        program should specify the procedures for medical and
        administrative review in the event of suicides,
        suicide attempts, mutilations, and other critical
        incidents.  Chart reviews, mortality reviews,
        deliberations, and subsequent actions taken, should be
        thoroughly and accurately documented.  The continuous
        quality improvement program should ultimately improve
        all aspects of mental health care in the Jail.

29.     The County should continue its diversion and court
        alternative sentencing programs, and if possible
        expand these programs, to reduce the number of
        mentally ill individuals unnecessarily detained in the
        Jail.  County law enforcement officers should be
        educated regarding the availability of these programs
        and encouraged to use MET and SMART.

- 33 -

## IV.   RESOLUTION OF ISSUES

Pursuant to the Civil Rights of Institutionalized Persons
Act, the Attorney General may initiate a lawsuit to correct
deficiencies at an institution forty-nine days after appropriate
officials are notified of them.  42 U.S.C. § 1997b(a)(1).  We
will, however, seek to resolve the issues raised above in the
same cooperative spirit that has characterized the investigation
to date.  We look forward to your response to these findings and
recommendations and to detailed discussions leading to a final
resolution of these issues.

Sincerely,


Isabelle Katz Pinzler
Acting Assistant Attorney General
Civil Rights Division

cc:  Sheriff Sherman Block
Los Angeles Sheriff's Department

Ms. Areta Crowell
Director
Los Angeles County Department
  of Mental Health

DeWitt Clinton III, Esquire
Los Angeles County Counsel

Chief Barry King
Los Angeles Sheriff's Department

000936





THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *Life* OF THE *People*

SEARCH THE SITE

Home » About DOJ » Agencies » Civil Rights Division » About » Special Litigation

**Memorandum of Agreement**

Civil Rights Division Home

About the Division
- Appellate
- Criminal
- Disability Rights
- Education
- Employment
- Federal Coordination and Compliance
- Housing and Civil Enforcement
- Office of Special Counsel for Immigration-Related Unfair Employment Practices
- Policy and Strategy
- Special Litigation
  - Civil Rights of Institutionalized Persons
  - Conduct of Law Enforcement Agencies
  - Access to Reproductive Health Clinics/Places of Religious Worship
  - Religious Exercise of Institutionalized Persons
  - Cases and Matters
- Voting

Meet the Assistant Attorney General

How to File a Complaint

Press Room

Cases and Matters

Publications

Employment Opportunities

Civil Rights FOIA

Contact the Division

**Between the United States and Los Angeles County, California**

**Regarding Mental Health Services at the Los Angeles County Jail**

TABLE OF CONTENTS

I. INTRODUCTION

II. DEFINITIONS

III. GENERAL PROVISIONS

IV. SUBSTANTIVE PROVISIONS

A. Intake

B. Evaluation

C. Referrals

D. Treatment

E. Medication Administration

F. Environmental Conditions

G. Suicide Prevention

H. Medical Records and Communication

I. Staffing and Training

J. Quality Assurance

K. Abuse and Mistreatment

V. CONSTRUCTION, IMPLEMENTATION, AND MONITORING OF COMPLIANCE

**GENERAL INFORMATION CIVIL RIGHTS DIVISION SPECIAL LITIGATION**

**LEADERSHIP**

Jonathan M. Smith
Chief
**CONTACT**

Special Litigation Section
(202) 514-6255
toll-free at (877) 218-5228

FAX - (202) 514-0212
Alt. FAX - (202) 514-6273
Email - Special.Litigation@usdoj.gov



DEPARTMENT *of* JUSTICE
**ACTION CENTER**

Report a Violation

Get a Job

Contact Us

**STAY CONNECTED**

✉ Sign up for E-Mail Updates
🔖 Subscribe to News Feeds

📘 Facebook          MySpace
📷 Twitter            YouTube

## I. INTRODUCTION

In August of 1996, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq., the United States Department of Justice ("DOJ") toured the Los Angeles County Jail ("the Jail") with experts in the field of correctional mental health services. On September 5, 1997, DOJ issued a letter reporting its findings based on the tour of its experts, the County's response to the tour, and the additional information received. DOJ concluded that mental health care at the Jail violated the inmates' constitutional rights.

In its findings letter, DOJ detailed numerous alleged constitutional deficiencies with regard to mental health care, including inadequate (1) intake screening and evaluation, (2) diagnosis, (3) referral to mental health professionals, (4) treatment plans, (5) administration of medications, (6) suicide prevention, (7) tracking and medical record keeping, (8) staffing, (9) communication, and (10) quality assurance. The report also noted that the County had allegedly mistreated and abused mentally ill inmates, including using excessive force and improper restraint practices.

000937

Since DOJ issued its findings letter, the parties have attempted to work cooperatively to resolve the concerns outlined in the letter. After its initial tour in June of 1996, DOJ has conducted several follow up investigatory inspections of the Jail and has continued to find inadequate mental health services.

The parties to this Memorandum of Agreement ("the Agreement") recognize the constitutional rights of inmates confined at the Jail. After discussions and negotiations, and in order to avoid potential litigation concerning the mental health services at the Jail, the parties have agreed to the provisions set forth in this Agreement. The parties have engaged in good-faith negotiations to reach this Agreement. The parties agree that the provisions of this Agreement will ensure that reasonable and adequate mental health care services are provided at the Jail.

Fulfillment of the terms of this Agreement, voluntarily negotiated and entered into by DOJ and Los Angeles County, is intended to resolve all remaining issues relating to mental health services at the Jail.

## II. DEFINITIONS

1. "The Parties" shall refer to the County and the United States of America.

2. "The County" shall refer to Los Angeles County, the Los Angeles County Sheriff's Department, the Los Angeles County Department of Mental Health, and the agents and employees of the Sheriff's Department and Department of Mental Health.

3. The term inmate(s) shall refer to one or more individuals, male and/or female, sentenced to, incarcerated in, detained at, or otherwise confined at the Jail.

4. "Qualified professional" shall refer to an individual qualified to render the requisite and appropriate care, treatment, judgment(s), training and service, based on credentials recognized in the specific field.

5. "Competency-based training" means training deemed successfully completed by a staff member only when that staff member demonstrates to a trainer his or her ability or competency to perform a specified skill through an active hands-on demonstration of such skill.

## III. GENERAL PROVISIONS

6. The facilities that are at issue in this case are "institutions" as that term is defined in 42 U.S.C. § 1997(1).

7. Los Angeles County owns and funds the operation of the Jail. In their official capacity, the Sheriff of Los Angeles County, and the Los Angeles County Department of Mental Health are responsible for overseeing and/or providing mental health services to the inmates at the Jail.

8. The County is responsible for assuring the fulfillment of the responsibilities and obligations imposed by this Agreement upon County employees, independent contractors, departments or other sub-units of the County government.

## IV. SUBSTANTIVE PROVISIONS

### A. Intake

1. The County will maintain adequate twenty-four hour mental health screening of all inmates at the Inmate Reception Center ("IRC").

2. Each inmate entering IRC shall be individually and privately asked questions appropriate to determine whether the inmate has or had a mental illness, has attempted suicide, or has suicidal propensities.

3. Intake screening at IRC shall be completed by an appropriately trained individual, and shall be documented in the appropriate medical record for incoming inmates.

4. Incoming inmates screened at IRC who are in need of emergency mental health care shall receive such care immediately after intake at IRC.

5. The Jail's screening process for mental illness shall not rely solely on an inmate's report that he or she does not have a mental illness.

6. A reasonably quiet and private area shall be available for the mental health evaluation at IRC.

### B. Evaluation

000938

7. Within 24 hours of admittance to IRC (excluding weekends and legal holidays as long as an urgent evaluation is not indicated), the County shall provide an adequate mental health care evaluation of inmates who screen positive for possible mental illness at IRC. Within 72 hours of admittance to IRC, the County shall provide a mental health care evaluation to inmates admitted to IRC on the weekends or legal holidays (unless an urgent evaluation is indicated). If the evaluation identifies a serious mental illness, the evaluation shall result in a brief initial treatment plan.

8. A qualified and appropriately trained professional shall, within 14 days of admittance to IRC, complete and properly document an adequate mental health evaluation, including a medical evaluation if necessary, for each inmate screened positive for possible mental illness.

C. Referrals

9. The County shall refer general population inmates who may be mentally ill to a mental health professional.

10. Mental health staff shall make weekly rounds in locked down non-mental health housing modules (e.g. administrative segregation, disciplinary segregation) at the Jail to identify inmates who may have been missed during screening or who have decompensated while in the Jail.

11. The Jail will maintain a confidential self-referral system by which inmates can request mental health care without revealing the substance of their request to correctional officers.

D. Treatment

12. The County shall provide adequate mental health treatment to all inmates determined to be mentally ill.

13. The County shall ensure continuity of appropriate medicine to individuals identified as mentally ill who were receiving medicine prior to entering the Jail.

14. An individual, comprehensive, written, mental health treatment plan shall be prepared within 14 days by a qualified and appropriately trained mental health professional for every seriously mentally ill inmate. Changes to and compliance with the treatment plan shall be accurately documented in the inmate's medical/mental health record.

15. The County shall ensure adequate therapy and counseling for all mentally ill inmates who need such care. This includes adequate space for treatment, adequate staff to provide treatment, and adequate therapeutic programming.

16. The County shall provide adequate twenty-four hour crisis intervention for inmates, including transfer to special medical housing units, administration of psychotropic medications, provision of therapy treatment, and special observation, for inmates.

17. Inmates shall have access to appropriate licensed in-patient care when clinically appropriate.

18. Unless contraindicated, the County shall ensure that all inmates with serious mental illness and housed in the most intensive levels of outpatient mental health housing be offered at least 10 hours per week of structured out of cell therapeutic or programmatic activity and 15 hours of recreation per week. Unless clinically contraindicated or the inmate is in administrative segregation, no inmate in the Twin Towers Correctional Facility ("TTCF") with serious mental illness shall be locked down more than 19 hours per day. Inmates with mental illness or housed in mental health housing shall not be denied jail privileges or programs based solely on their status as mentally ill or on their placement in mental health housing.

19. The determination that, as a result of his or her mental illness, an inmate poses a clinical risk of dangerousness to self or others that precludes the provision of any right, service or privilege, shall be made by a qualified professional in consultation with correctional staff on an individual basis and shall be recorded in the inmate's records.

20. Inmate trusties shall never be placed in a supervisory position or used as escorts for mentally ill inmates or inmates in mental health housing. Inmate trusties shall be carefully selected and screened before being assigned trustie positions. Where trusties are allowed to work in mental health housing, they shall be closely monitored.

E. Medication Administration

000939

21. The County shall ensure that a full range of appropriate psychotropic medications is available at the Jail and that psychotropic medications are properly prescribed, monitored and documented by appropriately trained mental health professionals.

22. The County shall ensure that all medications are appropriately administered and monitored by licensed health care professionals.

F. Environmental Conditions

23. The County shall ensure a sanitary and humane environment for all mentally ill inmates and all inmates housed in mental health housing. This includes, but is not limited to, seclusion and isolation units and cells which may house inmates with mental illness.

24. The County shall maintain a sufficient amount of adequate mental health housing at every appropriate level of care for every inmate in need of mental health housing. However, it is not necessary that every mentally ill inmate be segregated into mental health housing.

G. Suicide Prevention

25. The County shall ensure that inmates observed to be potentially suicidal receive appropriate crisis intervention, (including placement in a safe setting and evaluations in a timely manner), by a qualified mental health professional to determine whether and what level of suicide observation is required.

26. An inmate under suicide observation shall be evaluated by a qualified mental health professional prior to being removed from mental health observation.

27. Suicide intervention procedures shall permit correctional staff to administer appropriate first-aid measures immediately. All correctional officers shall be trained in first aid and cardiac pulmonary resuscitation ("CPR") cutdown techniques and emergency notification procedures in the event of hanging. Officers shall have cut down tools available.

28. Suicide watch procedures shall provide for fifteen minute suicide watch and may be modified to provide for five minute suicide watch with the concurrence of custody administration and staff. Suicide watch must be documented.

29. Suicide observation cells and dormitories shall be maintained in a manner that is safe and will not exacerbate a suicidal inmate's mental condition. Inmates under suicide observation should be within sight of staff.

H. Medical Records and Communication

30. Documentation in an inmate's medical/mental health record shall provide complete, accurate, and legible information regarding an inmate's mental health, including but not limited to: assessments, treatment planning, administration and effect of medications, requests for and results of laboratory tests, and inmate progress or decompensation.

31. The County may create and implement a computer system that allows prompt, up-to-date, and reasonable access to every inmate's medical/mental health record who is housed at TTCF, twenty-four hours per day.

32. There may be an electronic integrated medical/mental health record for each inmate.

33. The County shall create and implement a Management Information System adequate to manage the inmates' mental health records.

I. Staffing and Training

34. The County shall provide sufficient mental health staffing to ensure timely access to adequate mental health treatment and meet the obligations and provide the services listed in this Agreement. Except for staffing for the women's case load population and the Forensic Inpatient Program, mental health staffing shall be no lower than one psychiatrist per 100 inmates who require medication. Staffing for the women's case load population shall be enhanced due to higher utilization rates of mental health services. Staffing for the Forensic Inpatient Program shall ensure timely access to adequate treatment and shall minimally meet licensure standards currently governing such program.

35. A psychiatrist shall be available, at least by telephone, twenty-four hours per day to evaluate and prescribe psychotropic medications in emergency situations.

36. Staffing shall include sufficient numbers of bilingual clinicians trained to provide mental health care, including evaluations and therapy, to all inmates who

000940

do not sufficiently speak or understand English.

37. The County shall provide adequate clerical, supervisory and administrative assistance to support mental health services and assist in maintaining adequate documentation, supervision, coordination and communication of mental health services at the Jail.

38. All staff shall be properly trained for every function/duty they are expected to perform.

39. The County shall implement mandatory orientation and continuing competency based in-service training for correctional staff in the identification and custodial care of mentally ill inmates, including, but not necessarily limited to: (a) interpreting and responding to aberrant or bizarre behaviors, (b) recognizing and responding to indications of suicidal thoughts, (c) proper suicide observation, (d) recognizing common side-effects of psychotropic medications, (e) professional and humane treatment of mentally ill inmates, and (f) response to mental health crises, including suicide intervention and cell extractions. The County shall require annual refresher training.

40. The County shall document all training.

**J. Quality Assurance**

41. The County shall implement and document a continuous quality improvement program for mental health services in the Jail. The continuous quality improvement program shall monitor the quality of mental health care.

42. The quality assurance program shall specify the procedures for medical and administrative review in the event of suicides, suicide attempts, mutilations, and other critical incidents.

**K. Abuse and Mistreatment**

43. Staff shall not be permitted to physically, verbally, or mentally abuse inmates with mental illness. Allegations of abuse of mentally ill inmates or inmates in mental health housing shall be promptly and thoroughly investigated and staff members found to have abused inmates shall be appropriately disciplined.

44. Physical restraints used for mental health therapeutic reasons must be consistent with community standards of care.

**V.  CONSTRUCTION, IMPLEMENTATION, AND MONITORING OF COMPLIANCE**

45. This Agreement shall become effective on signature by the parties as a Memorandum of Agreement only and shall not be considered or construed as a Consent Decree.

46. The County may hire an independent expert psychiatrist(s) or consultant(s) as a Monitor(s) to assess compliance with the Agreement. The Monitor(s) shall jointly be selected by the County and DOJ. The County shall provide such Monitor(s) with adequate assistance to make an assessment of compliance, including hiring additional independent expert consultants. Any additional expert consultants must be approved and be acceptable to both the County and DOJ. The County shall pay the Monitor(s) and any additional expert consultants for such monitoring services. The Monitor(s) shall submit a report to DOJ and the County assessing compliance with this Agreement within 45 days of any on-site compliance visit and shall make such on-site assessments and report at least twice annually. The Monitor(s) shall not be replaced without approval of the United States, and any Monitor(s) or additional consultants shall not be selected without the written consent of the United States and the County. In the event the County chooses not to select a Monitor(s) or the County and the United States are unable to agree upon a Monitor(s), the United States shall continue its current investigation of the Jail pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and the County shall continue providing the United States and its expert consultants with full and open access as described in Paragraphs 47-50 of this Agreement.

47. Every ninety (90) days following the signing of this Agreement and until the Agreement is fulfilled, the County shall submit to the Monitor(s) and the United States a status report stating whether the County is complying with each and every term of this Agreement. The report shall include, as appropriate, documentation, certifications, receipts and such other information as requested by the Monitor(s) and/or United States to assist in the evaluation of compliance with the terms of this Agreement.

48. The status reports, at a minimum, shall describe the actions that the County has taken up to and including the current reporting period to implement this Agreement, and shall specifically refer to the provisions of this Agreement upon

000941

which they report.

49. The County shall maintain sufficient records to document their compliance with all terms of this Agreement. The County shall also maintain any and all records required by or developed under this Agreement.

50. The Monitor(s) and/or DOJ shall have access to and, upon request, receive copies of any document and/or any databases directly related to the implementation of this Agreement, except confidential peace officer personnel files. The Monitor(s) and/or United States shall have access to Jail staff, including private interviews with consenting inmates, and staff, as necessary to assess compliance with this Agreement.

51. The County shall implement the terms of this Agreement. This Agreement shall become subject to termination at any time two years subsequent to its signing if the County has substantially complied with all requirements of this Agreement and substantial compliance has been maintained for at least one year.

52. Nothing in this Agreement shall preclude DOJ from initiating a civil action pursuant to 42 U.S.C. § 1997.

53. If the County expands the Jail or outsources any of the services covered under this Agreement, such expanded facility and/or outsourced services shall be covered under this Agreement.

Agreed to by:

For the County

/s/ Leroy D. Baca

LEROY D. BACA
Sheriff
Los Angeles County

/s/ Marvin J. Southard

MARVIN J. SOUTHARD
Director
Department of Mental Health
Los Angeles County

/s/ Kevin C. Brazile

KEVIN C. BRAZILE
Assistant County Counsel
Los Angeles County

For the United States

/s/ Ralph F. Boyd, Jr.

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

/s/ Deborah W. Yang

DEBORAH W. YANG
United States Attorney
Central District of California

/s/ Steven H. Rosenbaum

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

/s/ Mellie H. Nelson

MELLIE H. NELSON
Deputy Chief
Special Litigation Section

/s/ William G. Maddox
/s/ Jim Eichner

WILLIAM G. MADDOX

000942

JIM EICHNER
Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 66400
Washington, DC 20035

**U.S. DEPARTMENT of JUSTICE** 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001          **JUSTICE.GOV**

**ABOUT**
The Attorney General
DOJ Agencies
Budget & Performance
Strategic Plans

**BUSINESS & GRANTS**
Business Opportunities
Small & Disadvantaged
Business
Grants

**RESOURCES**
Forms
Publications
Case Highlights
Legislative Histories

**BRIEFING ROOM**
Justice News
The Justice Blog
Videos
Photo Library

**CAREERS**
Legal Careers
Student Opportunities
Internships

**CONTACT**

Site Map
A to Z Index
Archive
Accessibility
FOIA
No FEAR Act
Information Quality
Privacy Policy
Legal Policies &
Disclaimers

For Employees
Office of the Inspector
General
Government
Resources
USA.gov

000943