# DECLARATION OF NANCY BRISENO

**DECLARATION OF NANCY BRISENO**

I, Nancy Briseno, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 37 years old. I am five feet, two inches tall and I weigh 154 pounds. I have been an inmate in the Los Angeles County Jail System since November 8, 2011. I am currently housed at Twin Towers Correctional Facility ("TTCF"), 251 E Pod, Room 10. My booking number is 2935097.

3. I arrived at Twin Towers Correctional Facility directly from Century Regional Detention Facility ("CRDF") in Lynwood on February 24, 2012. I arrived with a busload of 50 women, and two other busloads arrived that day with women also being transferred from CRDF.

4. I am housed, along with all of the other women from CRDF, on the Fifth Floor of Tower 2 at TTCF. We are above capacity in every pod, so that in addition to cells, there are four bunk beds in the day rooms where some of the women have to sleep, and where they also keep their personal belongings. I know that the day rooms are set up this way in every pod because we can walk between pods sometimes, and I also talk with the women in the other pods.

5. On approximately March 7 or 8, 2012 I requested to see a grief counselor because of the recent death of my son. I made this request by filling out an Inmate Request Form and, after removing the pink receipt from the form, placing the white and yellow pages into a box that is meant to collect Inmate Request Forms.

6. I could tell the box was already full, because it was difficult to put my request form into the box. As of two weeks later, on March 23, the box had still not been emptied. I know that nobody checked the box or emptied it because it is right in front of my cell door, and I could see the forms sticking out. I would know if it had been emptied and I would notice if it looked like I could put forms in again.

7. I was concerned that the request form that I had filled out would be lost or would never be read because of the overstuffed box, so I made sure to keep the pink receipt in my cell. However, on Wednesday, March 14, after what felt like at least an hour-long search of our cells as well as a strip-search, my receipt was no longer in my cell. During the search, female deputies brought all of us to an outside recreation area for a strip search in the cold, and while we were there, approximately 25 or 30 male deputies searched our cells. When I returned to my cell, which I share with one other woman, our mattresses were on the floor, our personal property was scattered around in a mess, and in addition to the missing Inmate Request Form receipt and other documents that I had kept in a pile with it, I was missing two other items of personal property that I had purchased for my personal use. Those were a bottle of shampoo and a container of baby powder.

8. I filled out a new Inmate Request Form to request the return of my personal property, including the pink receipt from my previous request (the request for grief counseling). I also helped other women fill out Inmate Request Forms to request the return of their own personal property items that they found missing when they returned to their own cells after the search.

9. We could not put our Request Forms into the box, because it was filled, so we began putting our request forms into the outgoing postal mail mailbox. We have not received any responses from those request forms, so we have no way of knowing whether they go to the proper offices when we place them in the postal mailbox, but we don't know what else to do with our completed Inmate Request Forms.

10. I first spoke with a volunteer from the American Civil Liberties Union on Friday, March 23, 2012 about my concerns over Inmate Request Forms and my inability to submit one with any confidence that it would be received and read. The next evening, on Saturday, March 24, 2012, an African American female sergeant, approximately fifty years old, came to collect the Request Forms that had

accumulated in the submissions box that was so full that no more forms could be crammed into it. I saw her unlock the box, remove the forms, and then lock the box again. There were so many that she had to hold them in both hands. She brought them to the Day room, where she looked through them and called out several women by name right away. I think she was addressing certain issues that these women raised in the request forms, because she was showing them the form and seemed to be speaking about what the women had written. My own request for grief counseling was not dealt with at that point, and at this point nobody has spoken with me about it. I do not think that the sergeant addressed every single inmate request form at that time, because she did not address mine.

11. Since then, every night a senior or a sergeant comes to the box to unlock it and collect the forms that have been submitted during the day. Usually, whoever collects the forms will bring them to the Day room and call out at least a few women to address their concerns. I submitted a request about a job and was called out that evening.

12. Although the boxes are being emptied daily at this point, I still have not received any response to the original request I made for counseling, nor have I received any response to any of the requests that I made and submitted by placing them in the outgoing mail box. I am aware of other women receiving responses to request forms that they submitted when the box was not being emptied regularly, but I have no way of knowing whether my own request will be answered.

13. I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 13th day of April, 2012 in Los Angeles, California.

Nancy Briseno

# DECLARATION OF DAVID EILER

## DECLARATION OF DAVID EILER

I, David Eiler, hereby declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

1. I was housed in Men's Central Jail ("MCJ") from January 3, 2011 to March 5, 2011. On March 5, 2011 I was transferred to North County Correctional Facility ("NCCF"), and I was released from custody on August 12, 2011. I am married and currently live in Los Angeles with my wife. Before my incarceration I worked as a contractor for both the United States Marshals Service and for Immigration and Customs Enforcement.

2. During my time in jail, I was assaulted by a deputy, witnessed deputies assault numerous other inmates, and was threatened and retaliated against for filing complaints and sending complaints by letter to the ACLU.

**A. Assault by a Deputy**

3. In February 2011, I was a Trustee in the 1750 Unit at MCJ. As a Trustee, I placed food on carts and delivered it to inmates in that unit. The 1750 Unit in MCJ contains high-profile, high-power inmates kept in single-man cells. I worked with six other Trustees, and we shared a room with three bunk-beds and no shower.

4. On the afternoon of February 26, 2011, I was asleep in my bunk. The night before I had worked the night shift. I awoke to the sound of the nurse screaming my name in the hallway to come for my medication. I stood up and put my pants on, because I thought it would be disrespectful to go into the hall in my underwear in front of the nurse. I heard the nurse call my name three or four times before I reached her, and I had also heard a deputy screaming "Get the Fuck out here!" while I was putting my pants on.

5. Once my pants were on, I walked to the hallway to get my medication. The nurse, who was an African-American woman, gave me my medication and then she left the area.

6. As I turned to return to my bunk, a short Asian deputy (approximately 5"6 and 180 pounds) confronted me and asked me "what the fuck took you so long?" After telling him that I had just woken up, the Asian deputy said, "are you fucking talking back to me? What the fuck is wrong with you, you stupid motherfucker?" and told me to face the wall. While I was facing the wall, he struck me in the back of the head. Because of the force of the punch, my chin smashed into the wall. After my chin bounced off the wall, I saw blood from my chin splattered on the wall. I also noticed blood dripping onto the floor. The deputy then grabbed me by my arms pulled them behind me and forced me into the wall again and then slammed me to the floor, telling me that "you need to do what you're told or I'm really going to fuck you up," and that the deputies "don't put up with that shit in 1750." Chuck Gilbert and Chris Woodruff (two Trustees in the 1750 Unit) witnessed the attack, and they later told me that the deputy used his fist and punched me when he struck the back of my head.

6. The deputy left me on the floor bleeding. The other Trustees told me that I had a gash on my chin. I looked in the mirror and saw the gash. The skin on my chin had split open so that the gash was oval-shaped and slightly larger than a quarter.

7. I did not know what to do and waited for twenty minutes before going to the deputy control booth and asking for medical assistance. The deputies in the booth told me to go back and wait in the Trustee room. After another twenty minutes of waiting, I was called out by two deputies. Deputy Chavez (approximately 6'5", 250 pounds) and a deputy who I believe was

Deputy Martinez (approximately 6"0, 200 pounds) inspected the gash and told me that I had to write a statement and sign a piece of paper to be taken to receive medical assistance. After I signed the form, Deputy Martinez told me to write that "I fell and hit my chin" causing the gash. I wrote the statement and signed the form because they told me it was the only way I could get medical assistance.

8. The deputy who I believe was Deputy Martinez took me to get medical assistance. When the nurse asked me how the injury had happened, I said that I slipped and fell because I was afraid to tell her the truth in front of Deputy Martinez.

9. The nurse said I needed to see a doctor so I was escorted somewhere else, which I believe was in Twin Towers. There I saw a doctor who was African-American and appeared to be in his mid-fifties. He stitched my chin up and told me he had given me eight stitches. He then covered the open wound with a bandage that I wore for one week. Deputy Martinez walked me back to the Trustee room.

10. That evening, I fulfilled my duties as a Trustee. While working and placing food on carts to be sent to other inmates, a tall white deputy (approximately 6"3, 230 pounds) saw the bandage on my face and began calling me "chinstrap." Deputies and inmates nearby began mocking me by calling me "chinstrap."

11. The next day, I received a visit from my wife. I told her what happened and asked her to notify someone outside of the 1750 Unit. Later that day, two Sergeants, Sergeant Price and another Sergeant (overweight, 40-50 years old, approximately 5'10", 260 pounds) met with me in the shower area to talk about what happened. When I told them about the incident, Sergeant Price told me that "it wasn't that big of a deal." I insisted that I wanted to file a complaint and was taken to a bench just outside a

small room. While I was waiting on the bench, Sergeant Price told me that this kind of thing "happens all the time" and that I should "forget about it, let it go," and that "things would be a lot better for me if I did not file a complaint." Other deputies walking by overheard our conversation and also tried to tell me not to file a complaint. I repeated that I wanted to file a complaint.

12. I was then taken into a small room with Sergeant Price, the other Sergeant, and a deputy (who was white, bald, and approximately 6'7", 280 pounds). The enormous deputy held the camera and the other Sergeant asked me what happened. I described what happened. The entire interview lasted about three minutes. The interview was not thorough at all. Even though I told the sergeant before the interview that there were witnesses who had seen me get my head smashed into the wall, the Sergeant did not ask me about that on camera. After the camera was off, Sergeant Price was really hostile to me and said things like "how do you know you were punched, do you have eyes in the back of your head?"

13. After the interview the other sergeant and the deputy escorted me to the medical facility. While walking there the deputy repeatedly called me a "huge pussy" and a "cry baby." At medical, the deputy took off the bandage, looked at the wound, and took a picture of it. No one had previously photographed the wound.

14. The sergeant and the deputy walked me back to the Trustee room. The sergeant left, and the deputy took me to a hallway on the 3000 floor. He forced me to strip in the hallway, and told me to bend over, cough, and spread my butt-cheeks. The strip search lasted more than five minutes, during which time I was naked, bent over, and coughing in the middle of the hallway. The deputy performing the search commanded me to repeat the above movements multiple

times. He laughed repeatedly during the strip search. Other deputies and inmates passed by and laughed as I did what the deputy ordered me to do. During my seven months of incarceration, I was strip searched numerous times. I was never before or afterwards strip searched in the middle of the hallway, and I was never strip searched for more than five minutes except on this occasion.

15. After the strip search, I was taken to a large room. Another deputy interviewed me and asked if I felt like my life was in danger. I said yes, both because a deputy had assaulted me and because I had worked for law enforcement. He asked who I was afraid of. I told him I was afraid of the deputies. During the interview he was playing with his taser, and I could see the taser beam going off.

16. I do not know why he interviewed me about placement in protective custody, but I later found out my wife had come to the jails and made quite a fuss about my being beaten by a deputy, so that may be the reason they gave me the interview.

17. I was then sent to protective custody, where I was housed for three days until I was re-interviewed. I again said I was afraid of the deputies. The deputy who interviewed me told me "too bad" and that I could not stay in protective custody. I was then sent to a unit in 5550.

18. During this time I was informed that my security classification had been changed from a 4 to a 7 (higher numbers are supposed to indicate that an inmate is a greater risk for violence or other problems). When I asked a Custody Assistant why my security level had gone up, he told me that it was because I had accused a deputy of assaulting me.

19. After a few days in 5550, I was transferred to NCCF, were I remained until I was released in August 2011.

**B. Assaults by Deputies Against Other Inmates**

20. While I was in the Los Angeles County jails, I was not only assaulted by a deputy, but I also witnessed deputies assault other inmates, or attempt to arrange to have inmates assaulted.

21. A couple of days before I was assaulted in MCJ in February 2011, Deputy Chavez and Custody Assistant ("CA") Contreras approached me and asked me to beat up a high profile inmate for them. They told me that it would be "fun" to have a trustee beat up a high profile inmate. I told them that I had only about six months to serve and that I did not want to get into any trouble. Deputy Chavez and CA Contreras then said to me that I did not need to worry because they would write the incident up to say that the other inmate had assaulted me and that as a result, I would not get into any trouble. They also told me "we do it all the time." Needless to say, I refused their request.

22. The evening of the day I was assaulted, I saw a deputy rough up Chris Woodruff, one of the other trustees on the module. Chris had been saying for a while that he did not want to stay a trustee. I understood why he felt that way, because the deputies regularly harassed us, threw food at our heads, and verbally abused us.

23. I gather that Chris's request to be moved off trustee duty and back to general population angered the deputies on the module, because other trustees told me that the deputies had asked them to "rough Chris up to get him to stop trying to get out of being a trustee."

24. On the evening of the day I was assaulted, I was standing in the kitchen, which was directly across from the Trustee sleeping area. I saw a Latino deputy, who was about 5'11" maybe 190 pounds, bald and 25 to 30 years old, dragging Chris Woodruff in a chokehold to our sleeping area and then twist his arm behind his back and throw him towards his bunk. After that I could no longer see what the deputy was doing. I did not see Chris fighting or resisting

the deputy in any way.

25. Chris later told me that he had approached the control booth and again asked to be relieved of his trustee duty and moved back to general population, and that the Latino deputy had come out of the booth and assaulted him. Woodruff also said the deputy told him to stop asking to quit being a Trustee because it was not going to happen and that deputy also threatened to break Chris's arm while he was pulling it back behind Chris's back.

26. When I was at NCCF, I also witnessed a CA assault an inmate, and then about 20 more deputies raced over and began beating on him. The beating took place in the last week of July or early August 2011.

27. In the dorms at NCCF, there was an unwritten rule that each dorm had a "bar man." The inmates selected the bar man, and only the bar man was supposed to go to the bars and talk to the deputies who were in the central control area in the midst of the four dorms that encircled the control area.

28. One time there was a new inmate in the dorm, who was African-American and seemed about 25. He probably did not know the rules. He was constantly going to the bars and talking to the deputies in the control booth. After he had done that a few times, the CA screamed at him "what the fuck are you doing, get back from the bars." Then the CA came and pulled the inmate out of the dorm. I don't remember the CA's name – but he was about 5'10," 175 pounds with short black hair, and looked young, also about 25. I believe he was a light skinned Latino because he had a Latino last name.

29. As the CA pulled the African-American inmate out of the dorm, I saw the CA slam him against the wall and then grab him around the neck in a chokehold. At first the inmate was not resisting, but then it looked like he was starting to struggle for breath, and he began to fight back. The next thing I knew, I saw the CA throw him to the floor and almost immediately a whole pack of

deputies – it seemed like as many as 20 – raced over and began beating the inmate as he lay on the ground. Some deputies were hitting him with flashlights, and others were punching him.

30. The force they were using was totally unnecessary and not at all designed to bring the situation under control. I am a member of the American Correctional Officers Association. As a contractor with the Marshal's Service, I have received at least 120 hours of training – about 80 hours when I was working with one company, and about 40 with another. Much of that training concerned the proper use of force, including how to subdue someone who was acting violently or appeared to be a threat. I also worked as a contractor at an Immigration Detention Center in San Pedro under supervision of the Immigration and Customs Enforcement Agency (ICE) for two years before the facility was closed down in 2008. For that job, I received two weeks of training during my first year and one week of training during my second year. Part of that training was on restraint procedures and the appropriate use of force.

31. Based on what I learned in my training for my contract work with ICE and the Marshal's Service, it was clear to me that the deputies used completely unnecessary force. Even if the inmate had been resisting -- and I never saw him resist except when it appeared that he was being choked and struggling for breath -- the deputies were still out of control. Most of the deputies made no effort to hold the inmate's limbs, or put him in handcuffs, which is the first thing we were trained to do as the appropriate response to an inmate who is resisting or poses a threat. Instead the deputies hit him with flashlights and punched him, which served no purpose other than to inflict pain. In the training I received for my work as a contractor for ICE and the Marshal's service, we were trained never to hit inmates, but to use force only to restrain them. We were also trained never to use weapons, like flashlights, to strike

inmates, except perhaps in the highly unusual situation where our lives were in danger, or the inmate posed a real threat to someone else's life and the only way to protect ourselves or someone else was by using a blow. In the situation I witnessed, deputies and CAs brought the inmate's arms behind his back and cuffed him only after they had beaten him severely, which was completely inconsistent with all the training I received on appropriate restraints technique and use of force.

32. The follow up on the incident was a joke. LASD personnel came into our dorm with a camera and asked us if any of us saw anything and wanted to speak with them. There is a terrible reluctance among inmates to be seen cooperating with LASD personnel, even if another inmate was a victim. So, it was not surprising that not one person spoke with the officers.

33. If LASD personnel had really been serious about getting inmates to come forward and talk about the beating, they would have had to set up a system where each inmate was called into a separate room to be interviewed. That way, other inmates would not know whether you had cooperated or not. If LASD personnel had pulled me into a private room in a way that it would not have been obvious to other inmates whether I was talking or not, I would have given a statement. But it seemed to me they set up the process to minimize the possibility that any inmate would testify about the beating that a number of us, including me, were in a position to observe.

34. On another occasion, when I was in MCJ module 1750, I heard what sounded like deputies inflicting an awful beating on another inmate. I was in my cell on the top tier on 1750 and I heard deputies telling an inmate on the tier beneath me that he had to leave his cell because he was being transferred to general population. I heard the inmate refusing to go and pleading with the deputies not to move him, saying he'd be killed if he moved back to general

population. Shortly thereafter I heard the sound of scuffling and then loud cracking sounds that sounded like heavy sticks or metal rods hitting bone. The inmate was screaming "I am sorry" repeatedly and asking the deputies to stop. Then I heard someone else – I believe it was a supervisor -- say 'that's enough," but the sounds continued for a few seconds longer. Next I heard a sound like a pepper spray canister being used and heard the inmate who was being beaten scream. No LASD personnel ever asked me if I had any knowledge of the incident or asked to interview me about it.

**C. Deputies' Intimidating Inmates to Prevent them From Filing Complaints, Including with the ACLU**

35. As I explained above, Sergeant Price and a group of deputies tried very hard to coerce me into not filing a complaint about the deputy who assaulted me in MCJ. Moreover, a Custody Assistant told me my security level had been raised because I had reported that an officer assaulted me. This was not, however, the only time deputies tried to prevent me from complaining about issues in the jails that I thought were wrong.

36. When I was in MCJ, I sent two complaint letters to the ACLU. One was to request help obtaining books I knew that my wife had sent to me, but which I had never received. The other letter concerned a number of different issues, including temperatures (during the winter the dorms were terribly cold); laundry (on several occasions we had to wait two to three weeks for clean underwear; in addition, clean laundry was always delivered at the time we had yard. So, if you chose to go to yard, you did not get clean laundry); mail (I regularly saw the graveyard officer opening up our mail, reading it, and looking at any pictures); and denial of basic services as punishment (for example, deputies regularly told us that if we talked to loud, they'd deny us use of the phone, or not pass out our mail, and they delivered on their threats on numerous

occasions).

37. After I was transferred to NCCF, I received two letters from the ACLU responding to my letters. The letters from the ACLU said that my complaints had passed to the Sheriff's Department. Not long thereafter a sergeant came to see me about my complaint about the temperatures and other issues at MCJ. But it did not really seem relevant because I had not been in MCJ for a while.

38. Around the same time, a male sergeant, white, about 6'1" and about 40 years old came to see me about my complaint about not receiving books my wife had sent me. Later that day, the deputy or CA who was working the desk that is in the center of our four dorms came to give me a pass to go to the mailroom. When I went to the mailroom, I saw a woman who was working there who was in her 40's, blonde, and I believe a CA. She was very angry and starting yelling at me saying "why didn't you come to us about this?" and "don't send stuff to the ACLU, fill out an inmate request form." When I asked her for a form however, she refused to give me one. So, I found one somewhere else and filled it out explaining how I had not received some books that my wife had sent a long time ago.

39. The next morning Sergeant Shrout – who was about 5'8 with long hair in a ponytail and appeared to be a dark-skinned Latina -- came to see me in my dorm. She threw the inmate request form that I had filled out regarding books that had not been delivered to me in my face. Then she told me they were not going to help me and that I should stop filling out complaint forms.

40. That afternoon, I saw the white representative and the "homie" representative in my dorm get called to the bars by CA West, a white female custody assistant who worked the control booth that monitored our dorm and the three others that were circled around the booth (dorms 611, 612, 613, and 614). I

saw the three of them talking at the bars for a while, then a few minutes later the white representative and the homie representative came to talk to me. (There is a "representative" for each race/ethnicity in each dorm, and the homie rep is the representative for the Latino inmates who belong to a gang). I knew the homie rep by the name "Pelon," but do not know if that is his real name, and the white rep was known by the name "Porky," which I am pretty sure is not his real name. They told me that CA West had asked them to "fuck me up" because she was angry that I had been complaining to the ACLU and that sergeants had come to speak to her about my complaints. Porky and Pelon told me that while they knew I was trying to help the inmates, I needed to cut out the complaining. They also said that CA West wanted me to know that not everyone leaves County jail alive.

41. Then that night, CA West approached me after evening count and told me I was being transferred to 727, she also said that I wasn't going to be coming back. The dorm I had been in had low level offenders, while 727 was full of guys charged with serious violent crimes. I had not been sent to the hole or otherwise disciplined prior to the transfer, so I am quite sure that CA West had me transferred as punishment for complaining to the ACLU.

42. After I was in 727 for a while, I was transferred to a medical dorm because I had developed a staph infection. I spent about a week or ten days in the medical dorm.

43. After I was released from the medical dorm, I was sent to be housed in 612, which was one of the four dorms around the control booth where CA West was assigned. As I was sitting in a holding tank close to 612 waiting to be admitted into 612, CA West approached me and starting yelling at me saying "What the fuck are you doing back here? You better not fucking file any complaints anymore. If you have complaints, bring them to me and I will tell

you whether you can file them."

44. I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge. Executed March 29, 2012 in Los Angeles, California.

David A. Eller

# DECLARATION OF ALEX ROSAS

**Declaration of Alex Rosas**

I, Alex Rosas, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 24 years old and am currently housed at Men's Central Jail ("MCJ"), Module 3300, Row B, Cell 17. My booking number is 2598123.

3. I am writing this declaration to describe the beating of a fellow inmate, Arturo Fernandez, on July 22, 2011 and an incident when deputies attacked and threatened me on August 9, 2011.

4. On July 22, 2011, Deputies Bearer and Luviano were escorting another inmate and me from the visiting area at MCJ to our module. AR Attached is a diagram of the walkway and the module, labeled as Exhibit 4. AR As we were getting closer to the module, I heard the deputies' radio, but didn't hear what it said. My position before entering the module is labeled as "R1". Deputy Luviano is marked as "L" and Deputy Bearer is marked as "B". AR

5. Deputy Bearer left us and ran over to the module and opened the door. I didn't know what was going on. I looked back and I saw what looked like 20-30 deputies running towards my module.

6. Before going through the door to the module, Deputy Luviano told us to go inside the module and face the wall, which we did. AR My position is marked "R2". When I walked in, I saw Mr. Fernandez handcuffed with blood all over his face.

7. Deputy Luviano told me to turn around and to stop looking.

8. I looked over and saw that there were several deputies surrounding Mr. Fernandez and were punching him. Mr. Fernandez is marked as "F". AR I also saw that Deputy Luviano had Mr. Fernandez' neck AR in the crook of his arm, holding him in a headlock and saw him throw Mr. Fernandez to the ground. I recognized Deputies Guerrero, Luviano, Bearer and Ibarra as some of the deputies who were beating up Mr. Fernandez. I knew who all of these deputies were because they work on my module. AR I also heard Mr. Fernandez yelling that he couldn't breathe. AR

9. As I was watching the deputies beat Mr. Fernandez, I didn't see Mr. Fernandez fighting with them. I saw that he was handcuffed from behind and being pummeled by deputies. AR Mr. Fernandez was only wearing his boxers and his shower shoes. AR I heard deputies yelling that he was resisting, but he wasn't. AR

I also saw Deputy Bearer tackle Mr. Fernandez then press with his knee with all his weight onto Mr. Fernandez' back. I then heard Mr. Fernandez yelling out in pain. AR

10. One of the deputies told us to go to our row and we began walking towards our row. As I walked towards my row, I looked back in time to see the deputies dragging Mr. Fernandez out of the door that leads out to the main hallway on the 3000 floor. I didn't see where the deputies took him.

11. A deputy then walked over to us, opened up the gate to our row and I walked to my cell.

12. An hour later, after I had been let inside my cell, Deputies Ibarra and Luviano came to my cell and said to me, "You better not saying anything." I told them that I hadn't seen anything. I was afraid that if I had told them that I had seen the deputies beat up Mr. Fernandez that the deputies were going to do something bad to me or arrange for other inmates to attack me.

13. A few days later, Deputies Ibarra and Luviano again came to my cell and threatened me to not to saying anything. I again told them that I hadn't seen anything. I was very scared that something was going to happen to me.

14. On August 9, 2011, Deputies Bearer and Ibarra came to my cell and told me to "Cuff up", which means to get ready to be handcuffed. I asked them why and they told me, "We're going to search your cell. An inmate told us that you have something in your cell." I told them that I didn't have anything in my cell nor did I have anything to hide. The deputies said, "Tell us where it's at. If you tell us, we won't take you to the 'hole'" I again told them that I didn't have anything. The deputies said, "We're going to toss up your cell." They handcuffed me and escorted me out to the main hallway on the 3000 floor and had me sit outside, facing the wall.

15. ~~5~~ Five minutes AR later, Deputy Luviano told me to move away from the door. I felt like he didn't want me near the door, so that the inmates wouldn't be able to see the deputies do anything to me. I complied and moved.

16. Deputies Ibarra and Bearer then came up to me and said, "Why did you put something in your phone?" I asked them that I didn't put anything in the phone that is in my cell and asked how I was going to be able to put anything in my phone without any tools. The deputies told me that they had found a razor that was made into a "slicer" or a type of weapon. I

again told them that I hadn't done it and the weapon wasn't mine.

17. Deputy Luviano then said to me, "Why are you lying to my deputies?" After he made this comment, he punched the back of my head 4-5 times.

18. I told him, "I'm not lying, sir." I was trying to be extremely polite because I was already scared that the deputies were going to try to do something to me because the deputies had come up to my cell after they beat up Mr. Fernandez.

AR 19. One of the deputies said to me, "You're going to the 'hole' for the 'slicer.'"

20. ~~They escorted me to Module ______ and had me sit outside on the bench.~~ During the course of an hour, the deputies would mockingly ask me, "Are you tired?" several times. An hour later, the deputies came to my cell with the disciplinary paperwork.

21. The deputies said to me, "Look. We're going to make this easier for you. Write that you had the 'slicer' and we won't add on any charges." I took this to mean that if I lied and confessed that the "slicer" was mine that they wouldn't take me to the "hole" and they wouldn't file any assault on deputies charges against me. I have heard from a lot of inmates that the deputies will file false charges against them after the deputies beat up inmates and saying that it was the inmates who assaulted the staff.

22. I refused to sign the paperwork. Deputy Ibarra told Deputy Bearer, "Take him to the 'hole.'"

AR AR AR

23. When I was escorted into the "hole" in Module 3301, Row A, Cell 6, I asked Deputy Reza if I could get a complaint form. Deputy Reza told me, "You don't get complaint forms in the hole." I told him that I'd ask the afternoon shift deputies for a complaint form as Deputy Reza worked in the mornings. Deputy Reza then told me, "I'll talk to the PM shift to make sure you don't get one."

24. Even after Deputy Reza said this to me, I waited until the afternoon shift deputies

\\\

\\\

\\\

\\\

came and asked them for a complaint form. They told me that I couldn't have one.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2011 in Los Angeles, California.

Rosas A.

Alex Rosas


CELLS
CELLS
SHOWER
SHOWER
A DEPUTY BOOTH B
3100
A DEPUTY BOOTH B
3300
DAYROOM
F
20'
HALLWAY
Rosas A. 8-22-11

**Declaration of Alex Rosas**

I, Alex Rosas, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 24 years old and am currently housed at Men's Central Jail ("MCJ"), Module 3300, Row B, Cell 17. My booking number is 2598123.

3. I am writing this declaration to describe the beating of a fellow inmate, Arturo Fernandez, on July 22, 2011 and an incident when deputies attacked and threatened me on August 9, 2011.

4. On July 22, 2011, Deputies Bearer and Luviano were escorting another inmate and me from the visiting area at MCJ to our module. Attached is a diagram of the hallway and the module, labeled as Exhibit 1. As we were getting closer to the module, I heard the deputies' radio, but didn't hear what it said. My position before entering the module is labeled as "R1", Deputy Luviano is marked as "L" and Deputy Bearer is marked as "B."

5. Deputy Bearer left us and ran over to the module and opened the door. I didn't know what was going on. I looked back and I saw what looked like 20-30 deputies running towards my module.

6. Before going through the door to the module, Deputy Luviano told us to go inside the module and face the wall, which we did. When I walked in, I saw Mr. Fernandez handcuffed with blood all over his face.

7. Deputy Luviano told me to turn around and to stop looking.

8. I looked over and saw that there were several deputies surrounding Mr. Fernandez and were punching him. Mr. Fernandez is marked as "F." I also saw that Deputy Luviano had Mr. Fernandez' neck in the crook of his arm, holding him in a headlock and saw him throw Mr. Fernandez to the ground. I recognized Deputies Guerrero, Luviano, Bearer and Ibarra as some of the deputies who were beating up Mr. Fernandez. I knew who all of these deputies were because they work on my module. I also heard Mr. Fernandez yelling that he couldn't breathe.

9. As I was watching the deputies beat Mr. Fernandez, I didn't see Mr. Fernandez

fighting with them. I saw that he was handcuffed from behind and being pummeled by deputies. Mr. Fernandez was only wearing his boxers and his shower shoes. I heard the deputies yelling that he was resisting, but he wasn't. I also saw Deputy Bearer tackle Mr. Fernandez then press with his knee with all his weight onto Mr. Fernandez' back. I then heard Mr. Fernandez yelling out in pain.

10. One of the deputies told us to go to our row and we began walking towards our row. As I walked towards my row, I looked back in time to see the deputies dragging Mr. Fernandez out of the door that leads out to the main hallway on the 3000 floor. I didn't see where the deputies took him.

11. A deputy then walked over to us, opened up the gate to our row and I walked to my cell.

12. An hour later, after I had been let inside my cell, Deputies Ibarra and Luviano came to my cell and said to me, "You better not saying anything." I told them that I hadn't seen anything. I was afraid that if I had told them that I had seen the deputies beat up Mr. Fernandez that the deputies were going to do something bad to me or arrange for other inmates to attack me.

13. A few days later, Deputies Ibarra and Luviano again came to my cell and threatened me to not to saying anything. I again told them that I hadn't seen anything. I was very scared that something was going to happen to me.

14. On August 9, 2011, Deputies Bearer and Ibarra came to my cell and told me to "Cuff up", which means to get ready to be handcuffed. I asked them why and they told me, "We're going to search your cell. An inmate told us that you have something in your cell." I told them that I didn't have anything in my cell nor did I have anything to hide. The deputies said, "Tell us where it's at. If you tell us, we won't take you to the 'hole'" I again told them that I didn't have anything. The deputies said, "We're going to toss up your cell." They handcuffed me and escorted me out to the main hallway on the 3000 floor and had me sit outside, facing the wall.

15. Five minutes later, Deputy Luviano told me to move away from the door. I felt like he didn't want me near the door, so that the inmates wouldn't be able to see the deputies do

anything to me. I complied and moved.

16. Deputies Ibarra and Bearer then came up to me and said, "Why did you put something in your phone?" I asked them that I didn't put anything in the phone that is in my cell and asked how I was going to be able to put anything in my phone without any tools. The deputies told me that they had found a razor that was made into a "slicer" or a type of weapon. I again told them that I hadn't done it and the weapon wasn't mine.

17. Deputy Luviano then said to me, "Why are you lying to my deputies?" After he made this comment, he punched the back of my head 4-5 times.

18. I told him, "I'm not lying, sir." I was trying to be extremely polite because I was already scared that the deputies were going to try to do something to me because the deputies had come up to my cell after they beat up Mr. Fernandez.

19. One of the deputies said to me, "You're going to the 'hole' for the 'slicer.'"

20. During the course of an hour, the deputies would mockingly ask me, "Are you tired?" several times. An hour later, the deputies came to my cell with the disciplinary paperwork.

21. The deputies said to me, "Look. We're going to make this easier for you. Write that you had the 'slicer' and we won't add on any charges." I took this to mean that if I lied and confessed that the "slicer" was mine that they wouldn't take me to the "hole" and they wouldn't file any assault on deputies charges against me. I have heard from a lot of inmates that the deputies will file false charges against them after the deputies beat up inmates and saying that it was the inmates who assaulted the staff.

22. I refused to sign the paperwork. Deputy Ibarra told Deputy Bearer, "Take him to the 'hole.'"

23. When I was escorted into the "hole" in Module 3301, Row A, Cell 6, I asked Deputy Reza if I could get a complaint form. Deputy Reza told me, "You don't get complaint forms in the hole." I told him that I'd ask the afternoon shift deputies for a complaint form as Deputy Reza worked in the mornings. Deputy Reza then told me, "I'll talk to the PM shift to make sure you don't get one."

24. Even after Deputy Reza said this to me, I waited until the afternoon shift deputies came and asked them for a complaint form. They told me that I couldn't have one.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2011 in Los Angeles, California.

/s/

Alex Rosas


CELLS
A DEPUTY BOOTH B
3300
CELLS
SHOWER
SHOWER
A DEPUTY BOOTH B
3100
20'
F
HALLWAY
DAYROOM

# DECLARATION OF MICHAEL SANCHEZ

# DECLARATION OF MICHAEL SANCHEZ

I, Michael Sanchez, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 34 years old and I am currently housed in Men's Central Jail ("MCJ") in Module 3300, Row D, Cell 24. Since September 2010, I have been placed in a high power housing unit because I am a gang dropout. As a result, I have to be waist-chained, and handcuffed from behind before I can leave my cell. Like the other inmates on my unit, I am supposed to be escorted by a deputy everywhere I go. My booking number is 2151592.

3. In the summer of 2011, I was housed at MCJ in Module 3300, Row D, Cell 12.

4. One morning, Deputy Reza announced that there was going to be a cell search. I left my cell with other inmates as the deputies conducted a cell search. We all went to the dayroom as we waited for the deputies to finish.

5. When I returned to my cell after 15-20 minutes, I saw Deputy Reza coming out of my cell. Deputy Reza is pretty short, bald, and medium husky. I also saw him remove his latex gloves and toss them on the ground when he came out. I saw that my cell was in complete disarray. This is typically how our cells look after a search, however, what made me upset after this search was that I saw a photo of my sons, who are 13 and 10 years old, on my bunk, ripped up into pieces. I had my sons' photo under my makeshift pillow and it definitely wasn't ripped before the search.

6. I asked Deputy Reza how he would like it if someone tore up a photo of his kids and he said to me, "You got nothing to say."

7. A couple of days later, in the morning before shift change, Deputy Reza came to my cell and told me to turn around and "cuff up." I remember it

was so early in the morning that the lights in our module hadn't been turned on yet.

8. I did what he said, turned around, Deputy Reza handcuffed me, from behind and I walked out of my cell. He walked behind me and escorted me to the dayroom located on the row above mine.

9. When we got there, he turned me around. As he turned me around to face him, he elbowed the right side of my ribs several times then he whacked my eye with the handle of his flashlight. When Deputy Reza hit me with the flashlight, I fell to my knees because of the pain caused by the blow. The flashlight looked like a mag light and was about 11 inches long.

10. Within a few seconds after I fell to my knees from the blow, Deputy Reza then grabbed me, lifted me up and took me back to my cell. Though he didn't say anything to me, I knew that he had attacked me in retaliation for my being upset about him tearing up my sons' photo.

11. Later in the afternoon, I felt my eye getting swollen and the pain getting worse so I asked the nurse during pill call if I could get some medical attention. I told the nurse that a bug bit my eye, which was why it was so swollen. I was afraid if I told the nurse the truth about my eye, Deputy Reza or some other deputy would try to hurt me, just as how Deputy Reza had just done.

12. The nurse issued me a medical pass and when I got to the medical clinic, the doctor prescribed me antibiotics and Motrin. Photos were not taken of my injuries.

13. The following day during visit, my family asked me what happened to my eye, which was almost swollen shut. I told my family what Deputy Reza had done to me.

14. On December 23, 2011, I was still housed at MCJ, in Module 3300, Row D, but in a different cell -- cell 24. I was coming back from court to my

module in the late afternoon, about 4-4:30 p.m.

15. When the deputy who escorted me and I got to the gate that leads down to my row and cell, he told me to go ahead and walk to my cell. I don't know this deputy's name, but he was Hispanic, had a flat top hairstyle, and was of medium build and about 5'8". I was able to estimate his height because I'm about 5'11". I wrote down this deputy's name along with others on a piece of paper, but the deputies threw it away during a cell search.

16. I was extremely puzzled by his allowing me to return to my cell without an escort, as I had stated before I am in a high power housing unit. I am supposed to be escorted to my cell and I was still handcuffed, so I wasn't clear as to why the deputy wasn't following protocol or how I was supposed to get the handcuffs off.

17. I asked the deputy if he was sure I was supposed to go to my cell unescorted, and he again told me to walk to my cell.

18. I walked down to my cell and I passed Cell 18. I noticed that the door of cell 18 was open and found it strange. Typically, only one high power inmate is allowed in and out of their cells at a time to prevent any violence from occurring.

19. I got to the front of my cell and looked over to the gate where the deputy had told me to continue walking to my cell when I saw the inmate from Cell 18 running towards me. I don't know the inmate's name, but he is about 5'9", and he has a tattoo on his chest, which I have seen when I have watched him being escorted down the row to the showers.

20. He socked me in the ribs several times before I lost my balance. Then he grabbed my head as I was falling and slammed it on the corner of the cell door, and I blacked out.

21. When I regained consciousness, one of the deputies yelled at me,

"Stay the fuck down. Don't move." I told him that I was the victim and that I couldn't move because I was still handcuffed.

22. While the deputies handcuffed the other inmate, I saw my blood on the ground and my glasses were off to the side. I also saw blood on my jail uniform.

23. Custody Assistant ("CA") Quintana said to me "Are you alright?" He lifted me up and walked me out of the module to the clinic. When I got to the hallway, I saw several deputies walking towards the module.

24. When I got the clinic, the nurses told the deputies to take me to the Twin Towers Correctional Facility ("TTCF") Urgent Care. The doctor gave me eight stitches on my forehead. He also told the deputies that I needed to be taken to the Los Angeles Medical Center + USC ("LCMC") because when he had checked my ear he had seen blood on my eardrum. He also said that I needed to get a CatScan to make sure I hadn't sustained any other serious injuries.

25. Before I was transported to LCMC, a Sergeant and Deputy Bearer conducted a video interview. I don't know the sergeant's name, but he was White, tall and chubby, with a military style haircut. I told them what happened.

26. After the interview, Deputy Santana escorted me to LCMC. I told him what happened and he told me that that shouldn't have happened to me. I also asked him how I would go about being classified as a Sergeant Escort and he told me I should file a complaint explaining what happened and that I wanted to be a Sergeant's Escort. Sergeant Escort means that a sergeant goes with you anytime you are out of your cell to protect you.

27. The doctor told me that the CatScan showed negative results, but I still suffer from horrible headaches every day, since the inmate in Cell 18 slammed my head against the cell door and I still have a lot of pain on my eye where Deputy Reza hit me with his flashlight.

28. The next day, December 24, 2011, I filed a complaint requesting Sergeant's Escort and gave it to Deputy Rangler while I was housed in the medical unit at MCJ in Module 7100. The LASD reference id number to that complaint is 5100-2011-1225-261.

29. Two to three days later, a sergeant came to speak to me about my wanting to be Sergeant's Escort and he told me that it would take a long time because the Classification division would have to investigate.

30. On December 28, 2011, I was transferred to MCJ, Module 3300, Row D, Cell 24, which is where I am housed to this day.

31. On December 31, 2011, Deputy Bearer came to my cell and took me out of my cell, handcuffed, a little after dinner. He told me that I had a medical pass. I thought maybe it was for a check up.

32. As we were going down the stairs, Deputy Bearer was behind me. He elbowed me hard on my ribs twice and said, "This is for whining and complaining to the sergeant about us." I am pretty sure Deputy Bearer just took me out of my cell to mess with me, because I never saw the medical pass nor did he take me to the medical clinic. After he elbowed me and told me it was because I had complained, he took me back to my cell.

33. On January 15, 2012 in the morning, Deputy Reza came to my cell to escort me out for a visit. He said to me as he handcuffed me, "Are you going to give me a hard time like last time? I heard about the court situation." Deputy Reza was referring to the incident that occurred when I was coming back from court. I told him that I was the victim, and I felt that he was threatening me by suggesting that if I did not stop complaining there could be another incident like that one

34. As we walked to go down the stairs to exit out of the module, Deputy Reza was behind me. He pushed me down the stairs, and though I almost lost my

balance, I was able to ensure I didn't fall by propping my body against the wall.

35. I saw Deputy Moorman at the bottom of the stairs and he laughed.

36. I've had run ins with Deputies Moorman, Rodriguez, Bearer, Guerrero, Sandoval, Rico, Ibarra and Leos since I put in the complaint form. If they needed to take me out of my cell they would press the handcuffs on me really tight to where it pinches my skin on purpose.

37. I was afraid for my safety, as well as my family's, from the deputies and CA's as they might try to hurt me or get an inmate to hurt me like what happened in the summer of 2011. Right after the incident I started asking to be a Sergeant Escort to deter deputies from harming me. If you are a sergeant escort, then a sergeant has to escort you whenever you go out of your cell, and it makes it hard for the deputies on my unit to mess with me

38. A week before 1/20/12, I found out that the inmate who had attacked me was housed in the tier below mine. I heard another inmate ask him where he's been and heard the inmate say that he tried to go back to the tier where I was, but the deputies wouldn't let him because of what happened. If he was sent to the "hole", he wasn't there for 29 days like he should have been.

39. On January 20, 2012, I met with Esther Lim from the ACLU. That same day, after I met with her, Deputy Reza came to my cell. He said to me, "You better not do anything with those people or you're going to bring a lot of trouble to you." I know he was referring to my visit with the ACLU because I had not met with any other people that day.

40. On January24, 2012, after I came back from a visit with my family, Deputy Reza said to me, "We better give him his shower because he might call the ACLU." His tone was very sarcastic and insulting.

41. That same day, Sergeant Zovner came to my cell and asked how I was doing. I told her about the complaint I submitted and about my being a

Sergeant's Escort. She told me that it's going to take awhile and that she would send an email. She also told me that it wasn't that important since accidents happen. I told her that I have a scar now and told her that it was against protocol to have high power inmates walk down the tier unescorted and to have other inmates' cells opened.

42. I met with Ms. Lim from the ACLU in the MCJ Attorney Room again on January 27, 2012. I told her what Sergeant Zovner said to me about the length of time it would take for me to become a Sergeant Escort, so I asked Ms. Lim if she'd be able to assist with this as I was in fear for my life, daily. After the visit with Ms. Lim, as soon as I got back to my cell, Deputy Bearer came to my cell and said to me, "I don't know what you're trying to do, but it's not right. What happened with you—it wasn't a set up."

43. I figured Deputy Bearer knew that I had spoken to the ACLU about what had happened to me. I told him that what had happened to me could have easily been prevented and if he had any questions about it, he could just review the video records, since there were cameras.

44. Deputy Bearer responded and said, "These jails are old. The doors just crack open." I said to him that whether the doors just crack open or not, there were now cameras that will show that the deputy was wrong to let me walk down the row unescorted and to allow another inmate's cell to be opened while I was walking to my cell.

45. Deputy Bearer's response was, "We're short on staff."

46. On January 29, 2012, early in the morning, about 6 a.m., Sergeant Lloyd came to my cell and told me that he needed to talk to me.

47. I was taken out of my cell to the main hallway outside of my module where Sergeant Lloyd asked me about the December 23, 2011 incident. I told him what happened.

48. Sergeant Lloyd asked me if I contacted anyone else about the incident and I told him that I told my family members and that my wife contacted the ACLU. I also told him that I put in a complaint form requesting Sergeant Escort because of the incident. Sergeant Lloyd then told me that he had received some paperwork about my Sergeant Escort status and that despite this status not being in my file, I'd be treated as such.

49. A couple of days later, I saw Deputy Bearer and he was able to see that I was a Sergeant Escort. He then said to me, "So you're on Sergeant Escort. I guess it's going to be like that." I felt very threatened by Deputy Bearer's comment.

50. On February 3, 2012, after a visit, I also saw Deputy Reza, who like Deputy Bearer saw that I was a Sergeant Escort inmate. Deputy Reza said to me, "All of a sudden you're on Sergeant Escort."

51. On February 5, 2012, Deputy Moorman came to my cell and told me I had a pass to go to visiting. I told him that I was a Sergeant Escort and was not supposed to leave my cell without a sergeant escorting me. Deputy Moorman told me it was okay for me to leave my cell without a sergeant's being there, and that he was going to take me off the module where a sergeant would meet us. I refused, and eventually Sergeant Garcia arrived and asked Deputy Moorman why he was trying to take me out of my cell without a sergeant being there.

52. On February 12, 2012, Deputies Bearer and Machado came to get me from visiting. I told them that I was a Sergeant Escort and needed a sergeant to take me back to my cell. Deputy Bearer said to me, "I don't give a fuck what you are. That's your problem." He and Deputy Machado, despite telling them about my status, took me back to my cell.

53. While we were walking back to my cell, a tall, White sergeant asked me if I was Sanchez and I told him that I was. He said he was on his way down to

get me from visiting. He then told Deputies Bearer and Machado that he wanted to talk to them after they dropped me off at my cell.

54. On February 17, 2012, at about 9 a.m., I heard Deputy Moorman over the intercom on my module call out a cell number and mine. I then heard him say, "Don't worry, we got you a sergeant so you don't complain." By saying this over the intercom, everyone on my module heard Deputy Moorman's comment, thus endangering my safety.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 17th day of February 2012 in Los Angeles, California.

_________/s/_________

Michael Sanchez

# DECLARATION OF MICHAEL SANCHEZ

I, Michael Sanchez, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I am 34 years old and I am currently housed in Men's Central Jail ("MCJ") in Module 3300, Row D, Cell 24. Since September 2010, I have been placed in a high power housing unit because I am a gang dropout. As a result, I have to be waist-chained, and handcuffed from behind before I can leave my cell. Like the other inmates on my unit, I am supposed to be escorted by a deputy everywhere I go. My booking number is 2151592.

3. In the summer of 2011, I was housed at MCJ in Module 3300, Row D, Cell 12.

4. One morning, Deputy Reza announced that there was going to be a cell search. I left my cell with other inmates as the deputies conducted a cell search. We all went to the dayroom as we waited for the deputies to finish.

5. When I returned to my cell after 15-20 minutes, I saw Deputy Reza coming out of my cell. Deputy Reza is pretty short, bald, and medium husky. I also saw him remove his latex gloves and toss them on the ground when he came out. I saw that my cell was in complete disarray. This is typically how our cells look after a search, however, what made me upset after this search was that I saw a photo of my sons, who are 13 and 10 years old, on my bunk, ripped up into pieces. I had my sons' photo under my makeshift pillow and it definitely wasn't ripped before the search.

6. I asked Deputy Reza how he would like it if someone tore up a photo of his kids and he said to me, "You got nothing to say."

7. A couple of days later, in the morning before shift change, Deputy Reza came to my cell and told me to turn around and "cuff up." I remember it

was so early in the morning that the lights in our module hadn't been turned on yet.

8. I did what he said, turned around, Deputy Reza handcuffed me, from behind and I walked out of my cell. He walked behind me and escorted me to the dayroom located on the row above mine.

9. When we got there, he turned me around. As he turned me around to face him, he elbowed the right side of my ribs several times then he whacked my eye with the handle of his flashlight. When Deputy Reza hit me with the flashlight, I fell to my knees because of the pain caused by the blow. The flashlight looked like a mag light and was about 11 inches long.

10. Within a few seconds after I fell to my knees from the blow, Deputy Reza then grabbed me, lifted me up and took me back to my cell. Though he didn't say anything to me, I knew that he had attacked me in retaliation for my being upset about him tearing up my sons' photo.

11. Later in the afternoon, I felt my eye getting swollen and the pain getting worse so I asked the nurse during pill call if I could get some medical attention. I told the nurse that a bug bit my eye, which was why it was so swollen. I was afraid if I told the nurse the truth about my eye, Deputy Reza or some other deputy would try to hurt me, just as how Deputy Reza had just done.

12. The nurse issued me a medical pass and when I got to the medical clinic, the doctor prescribed me antibiotics and Motrin. Photos were not taken of my injuries.

13. The following day during visit, my family asked me what happened to my eye, which was almost swollen shut. I told my family what Deputy Reza had done to me.

14. On December 23, 2011, I was still housed at MCJ, in Module 3300, Row D, but in a different cell -- cell 24. I was coming back from court to my

module in the late afternoon, about 4-4:30 p.m.

15. When the deputy who escorted me and I got to the gate that leads down to my row and cell, he told me to go ahead and walk to my cell. I don't know this deputy's name, but he was Hispanic, had a flat top hairstyle, and was of medium build and about 5'8". I was able to estimate his height because I'm about 5'11". I wrote down this deputy's name along with others on a piece of paper, but the deputies threw it away during a cell search.

16. I was extremely puzzled by his allowing me to return to my cell without an escort, as I had stated before I am in a high power housing unit. I am supposed to be escorted to my cell and I was still handcuffed, so I wasn't clear as to why the deputy wasn't following protocol or how I was supposed to get the handcuffs off.

17. I asked the deputy if he was sure I was supposed to go to my cell unescorted, and he again told me to walk to my cell.

18. I walked down to my cell and I passed Cell 18. I noticed that the door of cell 18 was open and found it strange. Typically, only one high power inmate is allowed in and out of their cells at a time to prevent any violence from occurring.

19. I got to the front of my cell and looked over to the gate where the deputy had told me to continue walking to my cell when I saw the inmate from Cell 18 running towards me. I don't know the inmate's name, but he is about 5'9", and he has a tattoo on his chest, which I have seen when I have watched him being escorted down the row to the showers.

20. He socked me in the ribs several times before I lost my balance. Then he grabbed my head as I was falling and slammed it on the corner of the cell door, and I blacked out.

21. When I regained consciousness, one of the deputies yelled at me,

"Stay the fuck down. Don't move." I told him that I was the victim and that I couldn't move because I was still handcuffed.

22. While the deputies handcuffed the other inmate, I saw my blood on the ground and my glasses were off to the side. I also saw blood on my jail uniform.

23. Custody Assistant ("CA") Quintana said to me "Are you alright?" He lifted me up and walked me out of the module to the clinic. When I got to the hallway, I saw several deputies walking towards the module.

24. When I got the clinic, the nurses told the deputies to take me to the Twin Towers Correctional Facility ("TTCF") Urgent Care. The doctor gave me eight stitches on my forehead. He also told the deputies that I needed to be taken to the Los Angeles Medical Center + USC ("LCMC") because when he had checked my ear he had seen blood on my eardrum. He also said that I needed to get a CatScan to make sure I hadn't sustained any other serious injuries.

25. Before I was transported to LCMC, a Sergeant and Deputy Bearer conducted a video interview. I don't know the sergeant's name, but he was White, tall and chubby, with a military style haircut. I told them what happened.

26. After the interview, Deputy Santana escorted me to LCMC. I told him what happened and he told me that that shouldn't have happened to me. I also asked him how I would go about being classified as a Sergeant Escort and he told me I should file a complaint explaining what happened and that I wanted to be a Sergeant's Escort. Sergeant Escort means that a sergeant goes with you anytime you are out of your cell to protect you.

27. The doctor told me that the CatScan showed negative results, but I still suffer from horrible headaches every day, since the inmate in Cell 18 slammed my head against the cell door and I still have a lot of pain on my eye where Deputy Reza hit me with his flashlight.

28. The next day, December 24, 2011, I filed a complaint requesting Sergeant's Escort and gave it to Deputy Rangler while I was housed in the medical unit at MCJ in Module 7100. The LASD reference id number to that complaint is 5100-2011-1225-261.

29. Two to three days later, a sergeant came to speak to me about my wanting to be Sergeant's Escort and he told me that it would take a long time because the Classification division would have to investigate.

30. On December 28, 2011, I was transferred to MCJ, Module 3300, Row D, Cell 24, which is where I am housed to this day.

31. On December 31, 2011, Deputy Bearer came to my cell and took me out of my cell, handcuffed, a little after dinner. He told me that I had a medical pass. I thought maybe it was for a check up.

32. As we were going down the stairs, Deputy Bearer was behind me. He elbowed me hard on my ribs twice and said, "This is for whining and complaining to the sergeant about us." I am pretty sure Deputy Bearer just took me out of my cell to mess with me, because I never saw the medical pass nor did he take me to the medical clinic. After he elbowed me and told me it was because I had complained, he took me back to my cell.

33. On January 15, 2012 in the morning, Deputy Reza came to my cell to escort me out for a visit. He said to me as he handcuffed me, "Are you going to give me a hard time like last time? I heard about the court situation." Deputy Reza was referring to the incident that occurred when I was coming back from court. I told him that I was the victim, and I felt that he was threatening me by suggesting that if I did not stop complaining there could be another incident like that one

34. As we walked to go down the stairs to exit out of the module, Deputy Reza was behind me. He pushed me down the stairs, and though I almost lost my

balance, I was able to ensure I didn't fall by propping my body against the wall.

35. I saw Deputy Moorman at the bottom of the stairs and he laughed.

36. I've had run ins with Deputies Moorman, Rodriguez, Bearer, Guerrero, Sandoval, Rico, Ibarra and Leos since I put in the complaint form. If they needed to take me out of my cell they would press the handcuffs on me really tight to where it pinches my skin on purpose.

37. I was afraid for my safety, as well as my family's, from the deputies and CA's as they might try to hurt me or get an inmate to hurt me like what happened in the summer of 2011. Right after the incident I started asking to be a Sergeant Escort to deter deputies from harming me. If you are a sergeant escort, then a sergeant has to escort you whenever you go out of your cell, and it makes it hard for the deputies on my unit to mess with me

38. A week before 1/20/12, I found out that the inmate who had attacked me was housed in the tier below mine. I heard another inmate ask him where he's been and heard the inmate say that he tried to go back to the tier where I was, but the deputies wouldn't let him because of what happened. If he was sent to the "hole", he wasn't there for 29 days like he should have been.

39. On January 20, 2012, I met with Esther Lim from the ACLU. That same day, after I met with her, Deputy Reza came to my cell. He said to me, "You better not do anything with those people or you're going to bring a lot of trouble to you." I know he was referring to my visit with the ACLU because I had not met with any other people that day.

40. On January24, 2012, after I came back from a visit with my family, Deputy Reza said to me, "We better give him his shower because he might call the ACLU." His tone was very sarcastic and insulting.

41. That same day, Sergeant Zovner came to my cell and asked how I was doing. I told her about the complaint I submitted and about my being a

Sergeant's Escort. She told me that it's going to take awhile and that she would send an email. She also told me that it wasn't that important since accidents happen. I told her that I have a scar now and told her that it was against protocol to have high power inmates walk down the tier unescorted and to have other inmates' cells opened.

42. I met with Ms. Lim from the ACLU in the MCJ Attorney Room again on January 27, 2012. I told her what Sergeant Zovner said to me about the length of time it would take for me to become a Sergeant Escort, so I asked Ms. Lim if she'd be able to assist with this as I was in fear for my life, daily. After the visit with Ms. Lim, as soon as I got back to my cell ~~later,~~ ZLS Deputy Bearer ~~again~~ came to my cell and said to me, "I don't know what you're trying to do, but it's not right. What happened with you—it wasn't a set up."

43. I figured Deputy Bearer knew that I had spoken to the ACLU about what had happened to me. I told him that what had happened to me could have easily been prevented and if he had any questions about it, he could just review the video records, since there were cameras.

44. Deputy Bearer responded and said, "These jails are old. The doors just crack open." I said to him that whether the doors just crack open or not, there were now cameras that will show that the deputy was wrong to let me walk down the row unescorted and to allow another inmate's cell to be opened while I was walking to my cell.

45. Deputy Bearer's response was, "We're short on staff."

46. On January 29, 2012, early in the morning, about 6 a.m., Sergeant Lloyd came to my cell and told me that he needed to talk to me.

47. I was taken out of ~~my cell to~~ ZLS the main hallway outside of my module where Sergeant Lloyd asked me about the December 23, 2011 incident. I told him what happened.

48. Sergeant Lloyd asked me if I contacted anyone else about the

incident and I told him that I told my family members and that my wife contacted the ACLU. I also told him that I put in a complaint form requesting Sergeant Escort because of the incident. Sergeant Lloyd then told me that he had received some paperwork about my Sergeant Escort status and that despite this status not being in my file, I'd be treated as such.

49. A couple of days, I saw Deputy Bearer and he was able to see that I was a Sergeant Escort. He then said to me, "So you're on Sergeant Escort. I guess it's going to be like that." I felt very threatened by Deputy Bearer's comment.

50. On ~~January 27,~~ February 3, 2012, after a visit, I also saw Deputy Reza, who like Deputy Bearer saw that I was a Sergeant Escort inmate. Deputy Reza said to me, "All of a sudden you're on Sergeant Escort."

51. On February 5, 2012, Deputy Moorman came to my cell and told me I had a pass to go to visiting. I told him that I was a Sergeant Escort and was not supposed to leave my cell without a sergeant escorting me. Deputy Moorman told me it was okay for me to leave my cell without a sergeant's being there, and that he was going to take me off the module where a sergeant would meet us. I refused, and eventually Sergeant Garcia arrived and asked Deputy Moorman why he was trying to take me out of my cell without a sergeant being there.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed this 17th day of February 2012 in Los Angeles, California.

Michael Sanchez

On February 12, 2012, Deputies Bearer and Machado came to get me from visiting. I told them that I was a Sergeant Escort and needed a sergeant to take me back to my cell. Deputy Bearer said to me, "I don't give a fuck what you are. That's your problem." He and Deputy Machado, despite telling them about my status, took me back to my cell. While we were walking back to my cell, a tall, white sergeant asked me if I was Sanchez and I told him that I was. He said he was on his way down to get me from visiting. He then told Deputies Bearer and Machado that he wanted to talk to them after they dropped me off at my cell. On February 17, 2012 at about 9 a.m. I heard Deputy Moorman over the intercom on my module call out a cell number and then I heard him say, "Don't worry, we got you a sergeant; so you don't complain." By saying this over the intercom, everyone on my module heard Deputy Moorman's comment, thus endangering my safety.