# DECLARATION OF CIVILIAN WITNESS
# SCOTT BUDNICK

## DECLARATION OF SCOTT BUDNICK

I, Scott Budnick, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.    I work in film production at Warner Bros. Studio.

3.    I am writing this declaration to describe numerous incidents I witnessed in Men's Central Jail ("MCJ") between 2007-2010 during which one or more Los Angeles County Sheriff's ("LASD") personnel physically abused inmates who did nothing to provoke the abuse or where deputies continued to taser, kick or beat inmates when they were not threatening or resisting the deputies.

4.    In 2004, I became involved as a writing teacher for a non-profit organization which provides writing classes to the youth who are in the Los Angeles County Juvenile Hall system.

5.    Through this teaching opportunity, I mentored and taught many youth who later transitioned into the Los Angeles County Jail System ("LACJS") upon the youth's turning eighteen years old.

6.    Zev Yaroslavsky of the Los Angeles County Board of Supervisors awarded me with the Los Angeles Volunteer Award in his district, District 3, for the work I had done with youth in, I believe, 2006.   That same year, I approached Zev's justice deputy, Joseph Charney, and asked if he could help me gain access to the jails so I could continue to mentor and teach the youth who were now in the LACJS.  He agreed to help me, and I was approved to be a non-escort volunteer with the LACJS.  As a non-escort volunteer, I was able to move around most of the jail without having LASD personnel escort me.

7.    During my orientation in what I believe to have been late in 2006, I was in a room with approximately forty volunteers.  The deputies conducting the orientation told us that we were going to hear the deputies cursing at the inmates

Page 47

1  and that we were going to hear and see things that we were not accustomed to

2  hearing and seeing, such as deputies using force against the inmates.  They told us

3  that deputies sometimes needed to speak and act this way with inmates because

4  this was the only way that the inmates could be taught to comply with jail rules.

5       8.    During my time at MCJ from late 2006-2010, I have seen

6  approximately five incidents of deputies abusing inmates and heard one incident

7  of an inmate being beaten by deputies.  I have been at MCJ approximately twice a

8  month between 2006 and 2008.

9       9.    I have gone into MCJ much less frequently since 2008 because I

10  became so disgusted with what I saw there and have primarily tried to work with

11  juveniles who are in Twin Towers or other jail facilities outside MCJ.

12       10.    The first time I observed abuse in MCJ was sometime in 2007 -- I

13  believe it was fairly early in the year.  I was going up to what is now the Hospital

14  Ward; it used to be the floor that housed minors.  When the elevator doors opened,

15  I saw approximately seven deputies directly in front of the elevator doors.  I

16  believe one of them was a sergeant because he had stripes on his shirt.  I saw two

17  of the deputies tasering a big, African-American inmate who was lying on the

18  ground motionless, approximately three to five times.

19       11.    I did not report this incident because I saw that a sergeant was

20  present, so I assumed that the sergeant was or would handle the matter

21  appropriately.  I was also new to the jail and didn't know the ramifications of

22  reporting an incident like this.

23       12.    Shortly thereafter, I did talk to a young white deputy in one of the

24  modules that housed minors and told him what I saw.  This deputy said to me,

25  "Yeah, we fuck these guys up all the time."

26       13.    The second time I witnessed abuse in MCJ was in or about November

27  2008.  I was teaching a writing class in MCJ and was standing next to the door of

28  the classroom waiting for the youth to come to class.  The classroom is the first

1   room you see once you get off the escalator and enter the main hallway to get to

2   all the modules on the floor.

3       14.    While I was standing there, I saw a group of inmates walking in a

4   straight line with approximately 6-7 deputies around them.  I saw one of the

5   deputies, a big, White deputy stop an older, African-American inmate.  He ordered

6   the inmate get out of the line and then strip searched him naked in the middle of

7   the hallway in the view of me and others who were in the hallway.  I'm not sure

8   why he was pulled out of the line.  I think it might have been because he didn't

9   have his hands in his pockets, but I am certain that the inmate did not attack or

10  threaten the deputies.

11      15.    I then saw the White deputy grab the inmate's head and smash his

12  head into the wall, hard.  It was so hard that I could hear an audible crack when the

13  deputy slammed his head against the wall.

14      16.    At no point did I see the inmate do anything to any of the other

15  prisoners or the deputy; in fact, the inmate was very respectful to the deputy.

16      17.    After I saw this, I quickly went back inside the classroom.

17      18.    The third time I observed deputy on inmate abuse was, I believe, in

18  December 2008.  Again I was right outside the classroom where I taught my

19  writing class in MCJ waiting for students to come to the class and I saw an inmate,

20  who was young and Hispanic walking down the hallway.  There were

21  approximately three deputies who stopped him and strip searched him.  I saw one

22  of the deputies, who was young and also appeared Hispanic, grab the inmate's

23  hand and arm and twist his arm up behind his back, forcefully.  I then saw the

24  deputy push the inmate to the ground.  I could not see any reason why the deputies

25  were doing this because the inmate did not do anything to the deputies, did not

26  threaten them or break any rules.

27      19.    After I saw this, I went inside the Chaplains' office and mentioned it

28  to some of the chaplains who were there.  The group of chaplains in the office,

3

1  who were from various denominations, advised me against reporting this incident.

2  They said the LASD had a practice of kicking people out of the jails and if I

3  reported the incident then I wouldn't be able to work with the students any longer.

4  They also told me that they were scared to report any of the incidents of abuse that

5  they had seen because they were afraid to lose their jobs.

6      20.    I was also hesitant to report what I had observed to LASD because I

7  had personally spoken with another jails chaplain.  He told me that he had been

8  kicked out of the LACJS because he was a "whistleblower" who had reported to

9  LASD and others incidents of abuse that he had seen in the jails.

10      21.    The fourth incident that I witnessed was in or about July 2009 on the

11  4000 floor of MCJ.  It was similar to the incident that I observed taking place in or

12  about November 2008.  I was going to visit a module when  I saw a Hispanic

13  inmate who appeared to be in his late 30's to early 40's getting off the escalator.

14  He seemed to be confused about where he was supposed to go and asked one of

15  the deputies where Module 4600 was.  There were approximately four deputies

16  near the inmate.  The deputies started to poke fun at him and asked him if he had

17  mental issues since he did not seem to know how to find his module.  I then saw

18  two of the deputies grab the inmate's hand and arm and forcefully twist the

19  inmate's arm up behind his back.  I then saw the deputies grab the inmate's head,

20  place it on the wall and twist the inmate's face hard up against the wall.

21      21.    The inmate was not fighting with the deputies, but was compliant.

22      22.    I reported this incident to Sergeant Renfro when I walked into his

23  office.  The conversation was brief, in which I told Sergeant Renfro what I had

24  seen and heard.  Sergeant Renfro was attentive and respectful and said that he

25  "would get into this immediately."  However, I have never heard from Sergeant

26  Renfro about the outcome of his investigation, nor did any LASD personnel ever

27  contact me to interview me or otherwise speak with me about the incident that I

28  had reported.

4

23.    The fifth incident that I witnessed occurred in late 2009. I was going to Module 3600 to see one of my students and saw that the module door was cracked opened. Usually the door is closed and I have to be buzzed in to enter. I opened the door and when I turned to the "chow hall", I saw three deputies, one who was White and two who appeared Latino, kicking, punching and beating up an inmate, who was skinny and African-American. When I first saw the deputies punching the inmate he was standing. He quickly fell to the ground due to the blows. I then saw the deputies kicking and beating the inmate when he was on the ground. I could hear the deputies yelling, "Stop resisting!" over and over again, yet I could see from the inmate's legs that he was not moving or resisting. There was no one in the chow hall except the three deputies and the inmate who was getting beat up by the deputies.

24.    I have repeatedly had chaplains of all faiths who work in the jails tell me that it is common practice for deputies to yell, "Stop fighting!" and "Stop resisting!" at inmates who are not fighting or resisting while the deputies are beating them. They have also told me that deputies think they can continue to abuse inmates as long as they yell, "Stop fighting!" and "Stop resisting!"

25.    In the beginning of 2010, I was in Module 1750 and as I was talking to an inmate, who was handcuffed in the shower area, I could hear another inmate getting beat up in the adjacent row. I could clearly hear the sounds of boots and flashlights hitting a body repeatedly. I could also hear the inmate screaming, "Get off of me!"

\ \ \

\ \ \

\ \ \

\ \ \

5

26.     The inmate with whom I had been talking told me that two deputies and one sergeant on Module 1750 were the ones doing the beating. It is my understanding that one of the deputies was later disciplined for what he did in another incident and that the other deputy is on a medical leave. I also understand that the sergeant now works in the Courts.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed March 30, 2011 in Los Angeles, California.

_____

Scott Budnick

6

# DECLARATION OF CIVILIAN WITNESS
# PAULINO JUAREZ

**Declaration of Paulino Juarez**

I, Paulino Juarez, hereby declare:

1.      I am a Deacon in the Catholic Church and a Chaplain of the Office of Restorative Justice for the Archdiocese of Los Angeles.  My ministery consists of visiting inmates at Men's Central Jail ("MCJ") and being their spiritual advisor. I have done this for about 14 years. What follows is my eyewitness account of a cruel, unjust, and horrific beating inflicted on an apparently handcuffed and defenseless inmate by the several Los Angeles Sheriff's deputies. I will also relate how the Los Angeles Sheriff Department ("LASD") failed to conduct a full and thorough investigation of this incident or punish those responsible.

BEATING IN FEBRUARY OF 2009

2.      In the early morning of Wednesday February 11, 2009 I was at MCJ to walk the rows and talk to inmates as I usually do.  I asked Sergeant Barbosa if I could walk the rows in Module 3700 earlier than usual.  I usually walk 3700 and talk with inmates in the afternoon, but I needed to leave the jail early that day.  It was about 10:30 in the morning when I asked him to let me into 3700.   He said it was fine.  So I walked to door marked Y on the diagram attached as Exhibit 1, which depicts the area around Modules 3500 and 3700. I got the attention of the deputy in the booth who opened the doors for me to allow me to enter 3700 Abel row.  As soon as I walked into the row, the door shut behind me. I began talking to one of the inmates, Ernesto Carrillo, whose cell was closest to where I had entered on the Abel row in 3700.

3.      A few minutes after I began my conversation with Mr. Carrillo, I heard thumps and gasps, which sounded like someone being beaten. I stopped talking to Mr. Carrillo, walked to the door marked PJ on the attached diagram, and looked to where I heard the sounds.

4.      What I saw shocked me. I saw three deputies beating up an inmate whom I believe was handcuffed. The inmate was African-American, about 5'11

Page 53

1  tall and of a thin build. He was standing with his back against the wall while three

2  deputies, Ramirez, Aguilar, and another one whose name I do not know, pounded

3  his face and body with punches. At the time, I recognized the deputies, but did not

4  know their names, two of which I later learned.

5      5.     While they were hitting him, the deputies kept shouting "Stop

6  fighting!  Stop resisting!"

7      6.     I believe the inmate was handcuffed, and that the handcuffs were

8  attached to a chain strung around his waist for two reasons.  First, I have never

9  seen inmates from either 3500 or 3700 outside the module without being escorted

10  by deputies and without being handcuffed with their cuffs attached to a waist

11  chain.  Also, I never saw the inmate raise his hands to protect his face, even as the

12  deputies were punching him in the face.  Because it is so natural to try to block

13  your face if you are being punched, I believe he could not raise his hands to

14  protect himself because he was cuffed with the cuffs chained to his waist.

15      7.     The inmate  was not raising his hands to block the punches, nor was

16  he resisting in any way.  He was doing  nothing to avoid the deputies' blows

17  besides turning to his side and letting them hit his back or ribs. At various points, I

18  heard the inmate cry out, "Please stop!" "I am doing nothing wrong, please stop!"

19      8.     The beating occurred between the entrance to the module and the

20  door to the trustee dorm.  The area where the beating was occuring was well-lit.  I

21  was about ten or fifteen  feet away from the site of the beating.  I watched the

22  beating as I was standing inside the module near the door where I had entered.

23  The spot where I was standing watching the deputies beat the inmate is marked

24  with my initials PJ on Exhibit 1.  The spot where the inmate was standing is

25  marked with an X.  The approximate location of the three deputies as they

26  punched the inmate is marked with three black circles.  The door I was standing at

27  is made up of vertical and horizontal of bars that allow you to see clearly through

28  the door, as is the other door I looked through to see the beating, which is marked

2

1   with a Z.    It was dark where I was standing, and the deputies had their backs to
2   me as they were attacking the inmate.

3       9.      Since I witnessed the beating, they have put up plastic sheets over
4   some of the bars that I was looking through to see the beating and increased the
5   amount of light in and around the area where I was standing watching the beating.

6       10.     The deputies continued punching the inmate for another minute until
7   he finally collapsed face first onto the floor. I heard a loud thump as his head hit
8   the floor.  The orientation of the inmate's body after he fell is marked with a stick
9   figure drawing on the attached diagram.  After the inmate had fallen to the floor,
10  the deputies showered his body and head with kicks from their boots.  The
11  inmate's body lay limp and merely absorbed their blows.  After the inmate hit the
12  ground, he yelled "stop" one or two more times and then he went silent.  At that
13  point, I thought he was unconscious.  Yet the deputies continued to yell "Stop
14  fighting!"

15      11.     A few seconds after the inmate fell, one deputy knelt down with one
16  knee on the inmate's back, the foot of his other leg on the ground next to the
17  inmate, and began punching the inmate on the back of his head and neck, while
18  the other two deputies stood and watched.

19      12.     After another minute or so, the deputy who was punching the inmate
20  paused for a second, and the other deputies begain kicking him again.  A couple of
21  seconds later, the deputy who was kneeling on the inmate turned his head and
22  noticed me standing at the gate with my hands clutching the bars.  I was frozen
23  with shock from what I had been watching.

24      13.     When we made eye contact, the deputy also froze and had a nervous
25  and surprised look on his face. Then he began making signs to the others with his
26  hands, motioning them to stop the beating.

27      14.     Another deputy who was inside the control booth kept shouting
28  "Code Four! Code Four!" which another deputy later told me is their signal that a

1   deputy is involved in a fight.

2       15.    A few seconds passed before the other two deputies caught on and

3   stopped kicking the inmate.  They froze also.

4       16.    Then almost immediately, two more deputies entered the hallway

5   through the door marked Y on the attached diagram, and one of them started

6   kicking the inmate who was still lying limp on the floor.  The other deputy who

7   had just come in lifted his boot up and stomped the inmate two or three times hard

8   on his back, even though the inmate was not moving or saying anything.  While

9   these two deputies were kicking and stomping the inmate, the three deputies who

10  had started the assault were signaling with their hands, presumably to make the

11  two deputies notice me and stop attacking the inmate.  Then, the two deputies who

12  had just come in froze.

13      17.    Presumably as a result of the Code Four call, Senior Gesky came

14  through the already open  main entrance door marked as Y on Exhibit 1 along with

15  a huge group of deputies who stopped at the entrance.  Gesky opened the door

16  marked Z, then came directly to the door where I was standing and opened it to let

17  me out.

18      18.    I walked slowly out towards the door marked Y, pushing my cart,

19  which had Bibles, books, paper and pencils on it.  As I was walking, I looked over

20  at the inmate – still lying on the ground and not moving – and saw a large pool of

21  blood.  The pool of blood looked to be a about two feet in diameter in the area

22  around his head and shoulders.

23      19.    As I was leaving, Gesky looked very angry and yelled out "Check if

24  he has HIV."

25      20.    From when I started watching until the end, the beating seemed like it

26  lasted about three minutes. I stood there and watched the whole thing, holding on

27  tightly to the bars of the door to the row in utter disbelief of what I was seeing. I

28  didn't know what else to do.  I was completely paralyzed by shock and fear.  I

1  couldn't believe that the deputies, who are supposed to be there to protect the

2  inmates and prevent violence, were acting in such a blatantly criminal manner.

3      21.    As I was leaving the module the group of deputies parted to let me

4  pass.  None of them said anything to me, but a number of them looked at me in a

5  in way that made me feel afraid.   The last person I remember passing in the

6  hallway was Sergeant Barbosa, who was walking towards the module from his

7  office.   I noticed he looked nervous. I told him "Some of your guys are in big

8  trouble," and I walked away.

9      22.    When I saw Mr. Carillo a couple of weeks later when I next walked

10  the 3700 Abel row, he told me that deputies had carried the inmate out on a

11  stretcher.  But, I did not see the body carried away.  Mr. Carillo also told me the

12  inmate looked as if he might have been dead.

13  THE SHAM INVESTIGATION

14      23.    After leaving the module, I walked back to the chaplain's office.  I

15  was shaking because I was overwhelmed with fear and apprehension.  I was very

16  scared that some of the deputies who knew I had seen them would do something

17  bad to me.

18      24.    When I got to the office I told one of my colleagues what I had seen

19  and that I needed to leave the jails as fast as possible.  I went home and tried to

20  calm down, but I was still terribly shaken up.

21      25.    Eventually, I called my supervisor, Father George, and left him a

22  message saying it was an emergency and that I needed to talk with him as soon as

23  possible.  He called me back that night, and I explained to him what I had seen.

24  He told me to write up a report of what I had seen.

25      26.    The day after the beating, I returned to MCJ and spoke with Sergeant

26  Barbosa.  I  told him that I was going to write up a report and give it to both him

27  and the Archdiocese.  Barbosa told me that a deputy had said to him that the

28  beating occurred because the inmate had spit on one of the deputies.  But Barbosa

1  said he did not believe it, and I told him I did not believe it either.  I said I never

2  heard the deputies say anything like "don't spit on me" or "why did you do that to

3  me?"   Barbosa also asked me how many deputies had participated, and I told him

4  that it was originally three but two more had joined in.  I remember telling him

5  that if this incident had occurred on the streets, the perpetrators would have been

6  charged with assault with intent to kill.

7       27.    For days after I remained badly shaken up.  I was having a terrible

8  time sleeping.

9       28.    When I went to the jails over the next few days deputies looked at me

10  in a  manner that made me feel threatened.   Some said things like "Rat" and

11  "Motherfucker" after I had passed by, but never directly to my face.

12       29.    I worked on the report for a number of days. While I was still

13  working on it,  I showed it to a colleague, who urged me to go speak with a

14  psychologist.

15       30.    When I finally finished the report, I brought it to Sergeant Barbosa in

16  his office.  I told him that I hoped the deputies' reports of the incident were

17  similar.  I said that because I was trying to convey that if their reports were

18  different from mine, then they would not be telling the truth.  A copy of the report

19  I gave to Sergeant Barbosa is attached as Exhibit 2.

20       31.    Sergeant Barbosa told me that they would need to do a video

21  interview of me. When he told me I was going to be interviewed, I become even

22  more afraid.  Once I had seen what five deputies would do to a non-resisting and

23  apparently handcuffed and helpless inmate, I was afraid about what they or others

24  in the sheriff's department might do to me.

25       32.    A couple of days after I turned in my report, I received a telephone

26  call from someone in LASD telling me to come to a Lieutenant's office the next

27  day for the interview.  After getting the call, I contacted the Archdiocese to

28  arrange for a lawyer to come to the interview with me.

6

33.     Some time before the interview, a lawyer for the Archdiocese called me to tell me that he had contacted the LASD and that he had been told that I would not be permitted to bring a lawyer.

34.     When I went to the interview, I was interviewed by an African-American lieutenant with a French sounding last name. Sergeant Barbosa was there also, and he filmed the interview.

35.     The lieutenant asked me about the beating, and I told him what I had seen. The lieutenant also asked some other random personal questions such as what country I was from that had nothing to do with the beating. When I asked him why they were asking me such questions, they said it didn't matter.

36.     The interview lasted about 20 minutes. At the end of the interview, the lieutenant assured me that he would contact me to keep me up to date on the investigation.  He also apologized for what I had seen and promised me there would be a thorough investigation.

37.      A few days later, I told Father George that I was worried about the inmate.  Shortly thereafter, Father George told me he had spoken with LASD Lieutenant Daboren, who informed him the inmate had been released a few days after the beating.

38.     It wasn't until more than two years later that I heard anything about the beating from an official of the LASD.  During those two years, no one  from LASD did any kind of follow up interview.  Nor did anyone from Office of Independent Review (OIR) ever interview me.

39.     In the meantime, I kept insisting to my boss, Father George, that something had to be done. I also continued working at MCJ and saw the same deputies who beat up the inmate on a regular basis.  They are still working in MCJ.  From what I can tell, they were not suspended much less terminated.

40.     In June 2011, Father George managed to schedule a meeting with the OIR to discuss the beating.  I met with Michael Gennaco and Walter Katz of OIR

at their offices in Commerce on or about June 24, 2011.  Father George and another colleague from the Archdiocese were also there with me.  During the meeting, Father George told Mr. Gennaco that I wanted to know what happened with  the investigation of the beating.  Mr. Gennaco and Mr. Katz told us that the case had been resolved internally and that Sheriff Baca had not been informed about the beating.

41.     During interview I told Mr. Gennaco and Mr. Katz about another inmate I knew about, Juan Pablo Reyes, who had told me that he had been beaten by the deputies, put in a cell naked, and then raped by inmates in the cell.  Mr. Gennaco appeared to know nothing about incident based on the expression on his face when I mentioned the incident, and he asked me all sorts of questions about it.  He promised that he and OIR would continue doing investigations, and he said he was interested in meeting with us regularly so that we could  keep him informed about what we knew.

42.     Shortly thereafter, a colleague told me that Father George had been contacted by the office of Sheriff Lee Baca.  My colleague told me Sheriff Baca wanted to schedule a meeting with Father George and me.

43.     On or about July 26, 2011,  I met with Sheriff Baca at his office in Monterrey Park.  Also at the meeting were Captain Ornelas, Michael Gennaco and Walter Katz of OIR, Cecil W. Rhambo, the Assistant Sheriff, along with Father George and Patty, another colleague from the Archdiocese who works in the jails.

44.     The first thing Sheriff Baca mentioned was the beating I had witnessed.  He asked for the file of the investigation, and Mr. Gennaco handed a folder to him.  Sheriff Baca asked me what had happened and asked me for the report I had written about the incident.   I told him I did not have it, but said I assumed it was in the file.   Sheriff Baca looked in the folder, which appeared to contain about 10 sheets of paper, and said "your  report is not in here."

45.     Then I explained to him what I had seen of the beating.  When I

1   finished Sheriff Baca began to read from a paper that was in the folder, which

2   sounded liked the findings of the investigation.  He said that it had been

3   determined that the prisoner was schizophrenic and that deputies had to strike him

4   a couple of times with their fists to get him into his cell. He also said, appearing to

5   read from the findings, that the inmate had reported that he had been run over by a

6   truck before coming to MCJ and that his bruises were the result of the accident,

7   not from being beaten.

8       46.    Another part of the paper that Sheriff Baca read from said that the

9   chaplain who had witnessed the incident was "exaggerating." I also remember his

10   reading that after the incident the inmate had been escorted to the clinic by Deputy

11   Cortez.

12       47.    During the meeting Sheriff Baca stated,  "This happened two years

13   ago and I'm only finding out about it now?"

14       48.    Still, all Sheriff Baca said about my account of the beating was that

15   "Punches are allowed but kicks are not allowed in my department." He told

16   Assistant Sheriff Rhambo to "check up on that." Then the meeting went on to

17   discuss other matters.

18       49.    I have lost faith and trust in the LASD. They clearly did not take my

19   testimony seriously, and they attempted to cover up what really happened. I cannot

20   understand why my report of the incident was not in the investigation folder.

21       50.    The conclusions that Sheriff Baca read also make no sense.  First, I

22   never heard the deputies attempt to persuade or even verbally threaten the inmate

23   to get him to go into his cell.  Second, the inmate's cell was in the  upper tier, so

24   the report's claim that they needed to punch him to get him to go into his cell

25   makes no sense because they were not even close to the stairs to the upper tier,

26   much less on the upper tier when they were beating him.  Third, I cannot

27   understand how punching an inmate – much less kicking and stomping on him --

28   could ever be necessary to get him to go into his cell.  Also, if the inmate was

schizophrenic, then why was he in MCJ instead of Twin Towers, where inmates with mental illness are supposed to be housed?  Finally, given how badly the inmate had been beaten, and the fact that he was lying motionless on the floor in a pool of blood when I left, I found the idea that he had been "escorted to the clinic" by Deputy Cortez very hard to believe.

51.     Witnessing that barbaric beating has had a very profound effect on me.  To this day, recalling the beating brings tears to my eyes, and I cannot finish talking about it without taking a few moments to compose myself.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed September 3, 2011 in Los Angeles, California.

_____
Paulino Juarez

10



Catholic Chaplains' Office
Men's Central Jail, Los Angeles, CA
February 18, 2009

My name is Paulino Juarez-Ramirez. I am a Catholic chaplain and a member of
the Office of Restorative Justice of the Archdiocese of Los Angeles. I have been a
chaplain at Men's Central Jail since July of 1998.

On February 11, 2009, I asked permission of Sergeant Barbosa to visit all of
the rows in the 3700 module. He called the module and they said that I could visit.
I arrived at the module and I entered Able row and began talking with an inmate
housed in A-3. Five minutes later , I could hear someone yelling. I walked to the
gate and from there I observed that someone was being beaten. I observed that at
no time did the inmate fight back or resist. He was thrown to the ground and was
kicked by two deputies. A third one was kneeling on the inmate's back and, with
his fist, was hitting his neck, the back of his head and his jaws beneath his ears.
While they were beating him the deputies kept shouting "stop fighting, stop
fighting". The inmate never did try to fight back, but kept shouting "Please stop;
please stop. I am not fighting." As I continued to observe, I saw that these blows
continued for almost two minutes. Finally, one of the deputies turned and saw me
inside of Able row. He froze. But the others continued kicking the inmate. And
they kept saying, "Stop fighting, stop fighting" while they continued beating him,
until the deputy who had seen me stopped them. They immediately opened the
outside door and a group of deputies came running in (that group had not seen me).
At this point I did not hear anything more from the inmate and assumed he was
unconscious. Two of the deputies in the front of the group then came in and started
kicking the inmate in his ribs, while he was still lying on the floor. One of the
deputies gave him two last blows, stomping on his spinal column.
Finally, the deputy who had seen me stopped them. Then all of them saw me
within the bars and suddenly became totally silent. Senior Geske was part of the
group that entered later, and walked toward me, opened Able gate, and asked me to
leave. I did so slowly; I looked again at the inmate, who was not moving at all. I
could see blood on the floor. I left the module and in the hallway of 3000 I met
approximately 20 deputies coming toward 3700, followed by Sergeant Barbosa.
At that time I felt helpless, sad, upset, angry, and anguished, wondering what
the final and lasting effects would be on that inmate, who had been the victim of
torture so cruel and inhumane. I was thinking of the deputies and I felt that I had
witnessed a crime and I was afraid. When I arrived at the Chaplains' office, I met
one of my fellow chaplains and told this person about what I had seen. That day I

did not want to talk to the Sergeant about the incident. During the night I could hardly sleep. The next day I went to Sergeant Barbosa's office and explained everything that I had witnessed and that, in my opinion, there had been no justification. It was a flagrant injustice against this helpless person and I asked Sergeant Barbosa to put a stop to these kinds of attacks. Sergeant Barbosa asked me how many deputies had participated. I told him that there were three in the beginning and two deputies later joined in - a total of five. He told me that in their report the deputies had admitted participating in the beating, but he did not share any more details of that report. Also, the Sergeant told me that the incident started because the inmate had spit on a deputy, but the Sergeant added that he did not believe it, and neither do I.

Since the inmate was under control at the time, the question for me was, "What was the purpose of the deputies' continuing beating this man without compassion or mercy?" I think that, if a situation of this magnitude had occurred in streets, the perpetrators would without any doubt be charged with assault with intent to kill.

Since that day I have felt afraid while walking the 3000 hallway, because I see the look in the eyes of the deputies, as they know I was a witness to the whole affair. I wonder what they are thinking of me, and especially what they might do about it and what may happen in the future. Sincerely, since I did not do anything wrong, I am afraid of retaliation. I am now seeing a psychotherapist to assist me to process this disagreeable experience. I feel the support of my chaplain colleagues, my spiritual director and my pastor, who all know about the incident. Another point is that in the past I had been informed by various inmates that they had seen other inmates being beaten by deputies without any reason. And now from my own experience I know this to be true.

This atmosphere of violence without justification causes in the minds and hearts of the inmates in this facility, especially those who suffer such unspeakable aggression, to harbor rancor, anger, hatred and resentment. This could play itself out in the streets with acts of aggression toward citizens and especially toward law enforcement officers.

Therefore, my petition as Chaplain in this institution is that this inexplicable and excessive use of force cease and, when restraint is necessary, the deputies adhere to their basic core values of respect, integrity, common sense, human decency and fairness.

# DECLARATION OF CIVILIAN WITNESS ESTHER LIM

**Declaration of Esther Lim**

I, Esther Lim, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am the Jails Project Coordinator for the American Civil Liberties Union Foundation of Southern California ("ACLU/SC").

3.      On Tuesday, July 26, 2011, I went to the Los Angeles Medical Center + USC ("LCMC") at approximately 3:30p.m. to visit Macario Garcia, booking number #2490525 because a family member reported that he was beaten up by deputies at Men's Central Jail ("MCJ").

4.      At about 3:50 p.m., Deputy Torres escorted me to the Jail Ward and had me wait outside before I was allowed in.

5.      At about 3:55 p.m., I was finally able to make contact with Mr. Garcia inside the LCMC Jail Ward.

6.      Lieutenant Wright told me that I would only be able to talk to Mr. Garcia if I was in an enclosed area that had a large, steel door with perforated holes in it, due to security issues. When I went in, it was difficult for me to see Mr. Garcia's injuries, so I requested to be let out, so that I could visually examine Mr. Garcia before I resumed talking to him in the enclosed area. Deputy Guzman opened the door and I came out to the main hallway where I saw Mr. Garcia, unobstructed.

7.      I saw Mr. Garcia in a neck brace because he stated he had a broken collarbone; he had vivid, bright green and yellow bruises up and down both legs, starting from his ankle to his thigh, which covered 70 % of the front of his legs; the sclera in both his eyes was completely red; there was no white in them.  He had dark blue and purple bruises under each eye; he had stitches, which were approximately 2 centimeters each, above each eyebrow; and swelling on his lower lip.  He also complained of swelling on the back of his head and said that he was in a lot of pain, felt dizzy, and heard ringing in his ear and had difficulty breathing.

8.      While Mr. Garcia was explaining what had happened to him, he took very shallow

1   breaths  and would need to stop every so often to adjust his body to make himself more

2   comfortable.  He also told me that he had very limited mobility on the right side of his body and

3   showed that he was only able to move his right hand no more than 3-6 inches from the hospital

4   bed's arm rest.

5       9.      Mr. Garcia also expressed deep concern for his right eye as he is completely blind

6   in this eye from when he was beat up by Deputies Ledesma and Gonzalez and other deputies in

7   2010 at the Pasadena Courthouse.  He said that the deputies sprayed pepper spray into his eyes

8   and he was afraid his eye would get infected.

9       10.     He told me he had been at LCMC since July 22, 2011 and had to be wheeled to

10  our location in his hospital bed.  He said that he had tried to get into a wheelchair, but was unable

11  to because of the injuries and the pain.

12      11.     Though I requested that our conversation take place in a confidential location,

13  there were several deputies who were posted no less than 10 feet away.

14          I declare under penalty of perjury of the laws of the State of California and the United

15  States that the foregoing is true and correct.  Executed this 27th day of July, 2011 in Los Angeles,

16  California.

17

18                                    Esther Lim

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF CIVILIAN WITNESS JESSICA PRICE

**Declaration of Jessica Price**

I, Jessica Price, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      On May 19, 2011, I went to Men's Central Jail to meet with Larry Cleveland. I went to the attorney visiting area, where attorneys can see their clients through  glass and speak to their clients through telephones.

3.      When Mr. Cleveland approached, he was walking slowly and limping. He did not have anything in his hands to help him walk. Unlike most of the other inmates in the visiting area, he was wearing a blue jumpsuit.

4.      There is a corner of the attorney visiting room where clients and attorneys can exchange documents. Mr. Cleveland tried to pass me pink copies of several complaints he had filed in the jail. I wanted to see these complaints, verify whether Mr. Cleveland exhausted his remedies, and make copies of the complaints so that I could keep track of whether they had been adjudicated in a timely manner.  Mr. Cleveland passed several notes to me, but when he tried to hand me the pink copies of the complaints that he has already filed, a deputy whose name tag said "Arriola" looked at the pink copies, took them, and handed them back to Mr. Cleveland. I heard Deputy Arriola tell Mr. Cleveland that he could not pass those sheets to me.

5.      On May 20, 2011, I went to visit Mr. Cleveland again. He approached slowly, walking and limping. This time, he was no longer wearing the blue jumpsuit. He was wearing the tan or brown attire similar to many of the other inmates in the visiting area. He did not have anything in his hands to help him walk.

6.      On June 27, I went to visit Mr. Cleveland again. As before, he approached slowly and walked with a limp.

7.      When he approached, I saw that his face was swollen. His lip was

Page 67A

1  busted on the right side, and it looked like there was dried blood on his lip. His

2  right eye was swollen shut.  As I spoke to him, he never opened his right eye.

3  There appeared to be a jellylike substance under his right eyelid.

4      8.     On July 1, I visited Mr. Cleveland again. When he appeared, I saw

5  that he had a walker.  He leaned on the walker and used it to get to the section of

6  the attorney visiting room where I was seated.

7      9.     On July 5, I visited Mr. Cleveland again. During my other visits, Mr.

8  Cleveland appeared after I waited for approximately half an hour. During this

9  visit, I waited for over an hour for Mr. Cleveland. After 30 minutes, I informed a

10 deputy of how long I had been waiting. The deputy told me he was not sure where

11 Mr. Cleveland was, but that he would make a call in a few minutes.  After an hour,

12 Mr. Cleveland arrived. When he appeared, he was in a wheelchair.

13

14     I declare under penalty of perjury of the laws of the State of California and

15 the United States that the foregoing is true and correct.  Executed this 6th day of

16 July, 2011 in Los Angeles, California.

17

18                                           Jessica Price

19

20

21

22

23

24

25

26

27

28

Page 67B