PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO-CHEUNG
(264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
ERIC BALABAN (*pro hac vice*)*
ebalaban@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930
Fax: (202) 393-4931

*Not admitted in D.C., practice limited
to federal courts

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>ALEX VILLANUEVA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES,<br><br>　　　　Defendants. | Case No. CV 75-04111 DDP<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUCTION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Assigned to Hon. Dean D. Pregerson |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

PROCEDURAL HISTORY ............................................................................... 3

STATEMENT OF FACTS .................................................................................. 6

    A.   The Increase in the Incarceration of People with Serious
          Mental Illness ........................................................................... 6

    B.   Failure to Reduce the Number of People with Mental Illness in
          the Jail .................................................................................... 7

          1.   The Specialized Mental Health Beds in the Jail Are Full. ......... 7

          2.   The Failure to Divert People With Mental Illness From
               the Jail ........................................................................... 8

          3.   The Sheriff Has Available Options to Release People
               from the Jail to Eliminate the Overcrowding Crisis in
               IRC But Has Not Taken Them. ................................... 12

    C.   Increasing Numbers of People Are Spending Multiple Days
          in the IRC .............................................................................. 14

          1.   Backups into IRC from 2019 - 2021 ......................................... 14

          2.   IRC Clinic Wait Times Have Spiraled Out of Control. ........... 16

    D.   People Spend Days Chained to Chairs on the IRC Clinic
          Front Bench ........................................................................... 17

    E.   Current Conditions of Confinement in the IRC ................................. 19

          1.   Floor Sleeping / Overcrowding ................................................. 20

          2.   Lack of Adequate Healthcare, Including Medications ............. 20

          3.   Denial of Adequate Food and Water ......................................... 22

4.    Lack of Ventilation and Basic Sanitation / Nonfunctioning
       Toilets…………………………………………………....23

5.    Denial of Showers/Hygiene Products/Clothing.......................24

6.    Overcrowding and Sleep Deprivation in Inhumane
       Living Conditions Increases Risk of Fights, Uses of
       Force, and Death ........................................................25

ARGUMENT ..................................................................................25

I.     PLAINTIFFS HAVE MADE THE REQUISITE SHOWING FOR
       THE ISSUANCE OF A PRELIMINARY INJUNCTION AND TRO ........25

II.    THE FACTS AND LAW CLEARLY FAVOR PLAINTIFFS ....................26

       A.    Plaintiffs Will Prevail on the Merits Because This Court Has
             the Power to Enforce Past Orders, and the IRC Conditions
             Violate Plaintiffs' Constitutional Rights..............................26

             1.    Floor Sleeping / Overcrowding ................................29

             2.    Lack of Adequate Healthcare, Including Medications............30

             3.    Denial of Adequate Food and Water .......................31

             4.    Lack of Ventilation or Basic Sanitation / Nonfunctioning
                    Toilets ....................................................32

             5.    Denial of Showers / Personal Hygiene Products / Clothing.....33

             6.    Chaining People to Fixed Objects for Hours and
                    Days on End.................................................33

       B.    Plaintiffs Will Suffer Irreparable Harm if a TRO and Preliminary
             Injunction Do Not Issue. ..................................................34

       C.    The Balance of Equities Tip Overwhelmingly in Plaintiffs' Favor....34

D.      An Injunction is in the Public Interest ................................................35

CONCLUSION.........................................................................................................35

PLFS' MOT. FOR PRELIM INJ. & TRO; MEM. OF PTS. & AUTH.

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Akhtar v. Mesa,*
   698 F.3d 1202 (9th Cir. 2012) ............................................................... 30

*Arc of California v. Douglas,*
   757 F.3d 975 (9th Cir. 2014) ................................................................. 34

*Armstrong v. Brown,*
   768 F.3d 975 (9th Cir. 2014) ................................................................. 27

*Armstrong v. Brown,*
   939 F. Supp. 2d 1012 (N.D. Cal. 2013) ................................................ 35

*Bell v. Wolfish,*
   441 U.S. 520 (1979) .............................................................................. 28

*Brown v. Plata,*
   563 U.S. 493 (2011) ...........................................................27, 29, 30, 35

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ................................................................. 26

*Castro v. Cnty. of Los Angeles,*
   833 F.3d 1060 (9th Cir. 2016) ............................................................... 29

*Coleman v. Brown,*
   960 F. Supp. 2d 1057 (E.D. Cal. & N.D. Cal. 2013) ........................... 35

*Coleman v. Schwarzenegger,*
   922 F. Supp. 2d 882 (E.D. Cal. & N.D. Cal. 2009) ............................. 29

*Demery v. Arpaio,*
   378 F.3d 1020 (9th Cir. 2004) ............................................................... 28

*DeSpain v. Uphoff,*
   264 F.3d 965 (10th Cir. 2001) ............................................................... 32

*Doty v. Cnty. of Lassen,*
   37 F.3d 540 (9th Cir. 1994) ................................................................... 31

*Farmer v. Brennan,*
   511 U.S. 825 (1994) .............................................................................. 28

*Fischer v. Winter*,
   564 F. Supp. 281 (N.D. Cal. 1983)...............................................................32

*Foelker v. Outagamie Cnty.*,
   394 F.3d 510 (7th Cir. 2005)....................................................................31

*Frew v. Hawkins*,
   540 U.S. 431 (2004) ................................................................................27

*Frost v. Agnos*,
   152 F.3d 1124 (9th Cir. 1998)................................................................28

*Gonzalez v. Cecil Cnty., Md.*,
   221 F. Supp. 2d 611 (D. Md. 2002) ......................................................31

*Gordon v. Cnty. of Orange*,
   888 F.3d 1118 (9th Cir. 2018), *cert denied sub nom. Cnty. of Orange,*
   *Cal. v. Gordon*, 139 S.Ct. 794 (2019) .................................................28

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck*
   *Drivers Local No. 70 of Alameda Cnty.*,
   415 U.S. 423 (1974) ................................................................................26

*Hearns v. Terhune*,
   413 F.3d 1036 (9th Cir. 2005).................................................................32

*Helling v. McKinney*,
   509 U.S. 25 (1993) ..................................................................................29

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ..................................................................27, 32, 33

*Hoptowit v. Ray*,
   682 F.2d 1237 (9th Cir. 1982), *overruled in part on other grounds*
   *by Sandin v. Conner*, 515 U.S. 472 (1995)...........................................31

*Jackson v. State of Arizona*,
   885 F.2d 639 (9th Cir. 1989)...................................................................32

*Johnson v. Lewis*,
   217 F.3d 726 (9th Cir. 2000)...................................................................32

Case No. CV 75-04111 DDP

*Keenan v. Hall*,
  83 F.3d 1083 (9th Cir. 1996), *amended on other grounds*, 135 F.3d
  1318 (9th Cir. 1998) ............................................................................31, 32, 33

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ......................................................................................28

*LeMaire v. Maass*,
  12 F.3d 1444 (9th Cir. 1993) ........................................................................32

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983) ......................................................................35

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ......................................................................31

*Madrid v. Gomez*,
  889 F.Supp. 1146 (N.D. Cal. 1995)...............................................................34

*McGuckin v. Smith*,
  974 F.2d 1050 (9th Cir. 1992) ......................................................................31

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...................................................................34, 35

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
  828 F.2d 536 (9th Cir. 1987) ........................................................................28

*Parsons v. Ryan*,
  912 F.3d 486 (9th Cir. 2018) ...................................................................27, 28

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020) ........................................................................27

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) (en banc)......................................................35

*Reno Air Racing Ass'n v. McCord*,
  452 F.3d 1126 (9th Cir. 2006).......................................................................26

*Roadway Exp., Inc. v. Piper*,
  447 U.S. 752 (1980) ......................................................................................27

*Rutherford v. Baca*,
  2006 WL 3065781 (C.D. Cal. Oct. 27, 2006) ..........................................*passim*

*Rutherford v. Block*,
    2005 WL 3388141 (C.D. Cal. Nov. 18, 2005) ................................................ 5, 29

*Rutherford v. Pitchess*,
    457 F. Supp. 104 (C.D. Cal. 1978), *rev'd in part on other grounds*
    *sub nom. Block v. Rutherford*, 468 U.S. 576 (1984) ........................... 3, 4, 18, 30

*Rutherford v. Pitchess*,
    710 F.2d 572 (9th Cir. 1983), *rev'd in part on other grounds sub*
    *nom. Block v. Rutherford*, 468 U.S. 576 (1984) .................................................... 4

*Rutherford v. Pitchess*,
    713 F.3d 1416 (9th Cir. 1983) .............................................................................. 4

*Thompson v. City of L.A.*,
    885 F.2d 1439 (9th Cir. 1989) ......................................................................... 4, 29

*Toussaint v. McCarthy*,
    801 F.2d 1080 (9th Cir. 1986) ............................................................................ 33

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ............................................................................................ 28

*Vazquez v. Cnty. of Kern*,
    949 F.3d 1153 (9th Cir. 2020) ............................................................................ 28

*Wall v. Cnty. of Orange*,
    364 F.3d 1107 (9th Cir. 2004) ............................................................................ 33

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) .......................................................................................... 26, 27

**Constitutional Provisions**

U.S Const. amend. VIII ................................................................................... *passim*

U.S. Const. amend. XIV ..................................................................... 4, 28, 29, 31

**Statutes**

18 U.S.C. § 3626(a)(1)(A) .................................................................................. 27

18 U.S.C. § 3626(a)(2) ....................................................................................... 27

28 U.S.C. § 1651(a) ........................................................................................... 28

California Government Code § 8658 ................................................................... 12, 13

California Penal Code § 4024.1(a), (b) .................................................................. 13

**Regulations**

California Code of Regulations Title 15 ............................................................ 5, 29

California Code of Regulations Title 24 ............................................................ 5, 29

**Rules**

Fed. R. Civ. P. 65(b) ............................................................................................ 26

Local Rule 65.1 ..................................................................................................... 26

**Other Authorities**

Hon. James Bianco, *Op-Ed: An L.A. program helps people get mental health care instead of jail time. Why not expand it?*, L.A. Times (July 18, 2022), https://www.latimes.com/opinion/story/2022-07-18/jails-mental-health-los-angeles-county-diversion ......................................................................................... 10

Stephanie Brooks Holliday *et al.*, *Estimating the Size of the Los Angeles County Jail Mental Health Population Appropriate for Release into Community Services*, RAND Corp., (2020), https://www.rand.org/pubs/research_reports/RR4328.html ................................. 9

Cal. Dep't of Justice, *COVID-19 and Statutory Authority Under Government Code Section 8658* (April 14, 2020), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/ 2020-dle-05.pdf ................................................................................................ 12-13

Cal. Dep't of State Hospitals, *The Case for Early Access to Treatment,* https://www.chhs.ca.gov/wp-content/uploads/2021/09/DSH-Early-Access.pdf ......................................................................................................... 10

Emily Dugdale, *Flooding Shuts Down Elevators in LA Jail, Delays Court Hearings And Visitation*, LAist (Sept. 6, 2022), https://laist.com/news/criminal-justice/lasd-sheriff-jail-incarceration-twin-towers ............................................. 14

Emily Dugdale, *This LA Jail Program Is A Huge Success. So Why Can't It Take On More People?*, LAist (April 27, 2022), https://laist.com/news/criminal-justice/this-la-jail-program-is-a-huge-success-so-why-cant-it-take-on-more-people ............................................................................................................... 12

Sarah B. Hunter *et al.*, *Los Angeles County Office of Diversion and Reentry's Supportive Housing Program, A Study of Participants' Housing Stability and New Felony Convictions,* RAND Corp., (2019), https://www.rand.org/pubs/research_reports/RR3232.html................................9

Los Angeles County Dep't of Auditor-Controller, *Estimated Services and Supplies Cost Impact From Maintaining A Reduced Jail Population Post Covid-19* (Feb. 25, 2021), http://file.lacounty.gov/SDSInter/auditor/audit_reports/1103288_2021-02-25Sheriff_sDepartment-EstimatedServicesandSuppliesCostImpactfromMaintainingaReducedJailPopulationPost-COVID-19-BoardAgendaItem2_June9_2020.pdf..............................13

Los Angeles County Chief Executive Office, *Detailed CEO Recommended Care First Community Investment Year 2 Spending Plan*, (Sept. 6, 2022) http://file.lacounty.gov/SDSInter/ceo/ati/1129063_CFCIYear2SpendingPlanBLAttachment1_Final_.pdf....................................................................................12

Los Angeles County Chief Executive Office, *Jail Closure Implentation Team – First Report Back* (Nov. 16, 2021), https://ceo.lacounty.gov/wp-content/uploads/2022/06/JCIT-First-60-Day-Report_November-16-2021.pdf.15

Los Angeles County Chief Executive Office, *Jails Last: Addressing the Overcrowding Concerns in the IRC* (Aug. 3, 2022), http://file.lacounty.gov/SDSInter/bos/supdocs/170774.pdf ................................7

Los Angeles County Dep't of Health Services, Office of Diversion and Reentry, *Clinical Programs Dashboard* (July 2022), http://file.lacounty.gov/SDSInter/dhs/1119711_ClinicalProgramsDashboard.pdf ......................................................................10

Los Angeles County Dep't of Health Services, Office of Diversion and Reentry, *Who We Are* (Aug. 31, 2021) https://www.chhs.ca.gov/wp-content/uploads/2021/08/ODR_CBR_Presentation_08312021_Accessible.pdf.........................................................................................10

Los Angeles County Dep't of Health Services, *Developing A Plan For Closing Men's Central Jail As Los Angeles County Reduces Its Reliance on Incarceration,* (Mar. 30, 2021), http://file.lacounty.gov/SDSInter/bos/bc/1104568_DEVELO_1.PDF .............14

Los Angeles County Dep't of Probation, *Office of Diversion & Reentry Housing*, https://probation.lacounty.gov/office-of-diversion-reentry-housing/ .................9

Los Angeles County Office of Inspector General, *Reform and Oversight Efforts:
    Los Angeles County Sheriff's Department* (April to June 2022),
    https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-
    b43e949b70a2/f9ffb501-8dc9-4d89-a4cf-
    4d55c894ea0c/Reform%20and%20Oversight%20Efforts%20-
    %20Los%20Angeles%20County%20Sheriff%27s%20Department%20-
    %20April%20to%20June%20%202022.Protected.pdf..............................13, 25

Los Angeles County Office of Inspector General, *Review of the Inmate Reception
    Center Intake Evaluation Process* (Nov. 2019),
    https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-
    b43e949b70a2/c2463bac-4aab-43b6-9824-
    7e8c9c10fdb8/Review%20of%20IRC%20Intake%20Evaluation
    %20Process.pdf ...............................................................................7, 9, 14, 17

Los Angeles County Sheriff Civilian Oversight Commission, *Efforts to Reduce
    Los Angeles County Jail Population* (Oct. 21, 2021),
    http://file.lacounty.gov/SDSInter/bos/supdocs/StaffMemo-
    2dEffortstoReduceJailPopulation10.21.2021.pdf.................................15

Los Angeles County Sheriff's Dep't, *Population Management Bureau Daily
    Inmate Statistics* (Aug. 21, 2021), https://lasd.org/wp-
    content/uploads/2021/08/Transparency_Custody_ADP_082121.pdf...............15

Los Angeles County Sheriff's Dep't, *Population Management Bureau Daily
    Inmate Statistics*, (Jan. 3, 2022), https://lasd.org/wp-
    content/uploads/2022/01/Transparency_Custody_ADP_010322.pdf  ..............15

Los Angeles County Sheriff's Dep't, *Population Management Bureau Daily
    Inmate Statistics*, (Sept. 2, 2022), https://lasd.org/wp-
    content/uploads/2022/09/Transparency_Custody_ADP_090222.pdf..........13, 16

Mark Ridley-Thomas *et. al.*, *Expanding the Office of Diversion and Reentry's
    Work to Reduce Incarceration and Invest in the Health and Well-Being of
    Communities* (July 7, 2020),
    http://file.lacounty.gov/SDSInter/bos/supdocs/146940.pdf ...............................11

Travis Schlepp, *LA deputies under fire for video that appears to show detainee
    being beaten*, KTLA (July 12, 2022), https://ktla.com/news/nexstar-media-
    wire/la-deputies-under-fire-for-video-that-appears-to-show-detainee-being-
    beaten/.................................................................................................25

Hon. Terry Smerling, *Op-Ed: The mentally ill defendants in my courtroom need treatment, not jail,* L.A. Times (May 20, 2022), https://www.latimes.com/opinion/story/2022-05-20/mentally-illness-treatment-defendants-los-angeles-county-courts ................................................................. 10

Spectrum News 1, *The Future of Men's Central Jail* (Aug. 29, 2022), https://spectrumlocalnews.com/tx/san-antonio/inside-the-issues/2022/08/30/the-future-of-men-s-central-jail .......................................... 12

*United States v. Cnty. of L.A.*, CV No. 15-05903 DDP, Doc. 174-1 (Monitor's Corrected Twelfth Report) (C.D. Cal. Oct. 6, 2021) ................................. 6-7, 7-8

*United States v. Cnty. of L.A.*, CV 15-05903 DDP, Doc. 186 (Monitor's 13th Report) (C.D. Cal. Mar. 3, 2022) ......................................................................... 8

Taylor Walker, *LA County Motion Aimed At Expanding Diversion Is Gutted, Then Put on Hold*, WitnessLA (June 17, 2022), https://witnessla.com/la-county-motion-aimed-at-expanding-diversion ..................................................... 11

Taylor Walker, *LA County Supervisors Pass Diluted Motion To Expand ODR With No Set Deadline*, WitnessLA (June 30, 2022), https://witnessla.com/la-county-supervisors-pass-diluted-motion-to-expand-odr-with-no-set-deadline/.. 11

## <u>INTRODUCTION</u>

Los Angeles County Jail System ("Jail") is the largest jail system in the U.S. and the world, currently incarcerating upwards of 14,600 human beings. Its Inmate Reception Center ("IRC"), the Jail processing hub, has thousands of people pass through it weekly. For five decades, the Court has overseen lawsuits—including this one—aimed at, among other things, closing antiquated, barbaric facilities; ending widespread violence and uses of force; and for people awaiting processing in the IRC, ensuring humane conditions such as medical and mental health care, and access to basic necessities of life such as food, water, toilets, mattresses, and clothing.

The Court must get involved again. The IRC's current conditions are a gross deviation from prior Court orders, constitutional and statutory requirements, professional correctional standards, and the most basic standards of human values and dignity. The abysmal state of the IRC poses a substantial risk of serious harm to class members. Detainees—many with profound mental illnesses, chronic medical conditions, and physical impairments—endure unconscionable hardships, such as:

- People with the most severe mental illness are chained to benches and chairs in the IRC for days at a time;
- People sleep for days on the floor head-to-foot with one another, or while sitting upright in chairs with no mattresses or blankets;
- Overcrowded, filthy, and unhygienic conditions, such as people defecating in garbage cans and urinating on the floor or in empty juice boxes;
- Untimely or no access to medical and mental health care, including the abrupt discontinuation of critical psychotropic and chronic care medications, and a failure to provide health care to people detoxing from drugs or alcohol;
- Broken toilets, sinks used as urinals, no showers or hygiene products; and,
- Inadequate nutrition and access to clean drinking water.

The crisis at IRC is life-threatening. People are dying. In April, a man was found unresponsive there, and died despite emergency aid. In June, a 72-year-old man held at IRC for two days without medical evaluation, collapsed and died.

In recent years, the number and proportion of people with mental illness booked into the Jail has grown considerably, and their psychiatric illnesses are more acute than in the past. This is due in large part to the County's willful refusal to properly fund and develop community alternatives to incarceration that can safely divert and treat seriously mentally ill people. Instead, the County relies on a limited number of High Observation Housing ("HOH") and Medium Observation Housing ("MOH") beds in the Jail for people with acute mental illness. As a result, a huge backlog of hundreds of people—arrested or arraigned, but not convicted of any offense—spend days in intolerable and shocking conditions in the IRC, waiting for HOH and MOH beds to open up, including being chained for days to chairs:





Declaration of Melissa Camacho-Cheung ("Camacho Decl.") Ex. Q at 4-5.

The County committed years ago to a "Care First, Jail Last" diversion approach to the treatment of people with mental illness who become entangled in the criminal legal system. County officials have commissioned reports and studies, held countless community and stakeholder hearings, and reiterated their belief in a vision that treats people with mental illness in the community, instead of warehousing them in the barbaric Jail. Plaintiffs agree with such a vision. But critically, County leaders fail to put their money where their mouths are, and fund community alternatives to incarceration at a level necessary to meaningfully alleviate the crush of people with acute mental illness in the Jail.

The County's failure to take serious action creates intolerable bottlenecks in the IRC, in flagrant violation of this Court's past orders and of detainees' basic constitutional and statutory rights. Accordingly, a Temporary Restraining Order (TRO) and Preliminary Injunction (PI) are warranted under the law, and supported by the factual record detailed below and the evidence filed in support of this motion.

## PROCEDURAL HISTORY

As this case dates from the Ford Administration, Plaintiffs will focus on key inflection points relevant to the motion at hand. This case was filed in 1975 as a class action on behalf of all present and future persons incarcerated at the Jail. After more than three weeks of trial, and two unannounced visits to the Jail, including the IRC, District Judge William P. Gray, Jr. held in 1978 that its conditions "present poor examples of the civilized standards and concepts of dignity, humanity and decency," and found IRC conditions "constitutionally intolerable." *Rutherford v. Pitchess*, 457 F. Supp. 104, 109, 114 (C.D. Cal. 1978), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576 (1984). Judge Gray's order observed that:

> The sight of from twenty to fifty-four men being crammed into a fourteen-foot cell is a repelling experience in any society that takes pride in its high concepts of human dignity. The closest comparison that I can draw to such a spectacle is that of an overcrowded pig pen. If the defendants find it necessary to detain a detainee in a holding cell before

placing him on a bus, or after his return, ***they must at least give him a place to sit on a bench or a chair***.

*Id*. at 114 (emphasis added).[1] In addition to the 1978 opinion, subsequent orders set out specific minimum requirements for the IRC. These include:

Feb. 16, 1979 Judgment:

Every prisoner kept overnight in the jail shall be accorded a mattress and a bed or bunk upon which to sleep. This order shall not preclude defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only . . .[2]

Declaration of Corene Kendrick (Ex. 15), Ex. 15-A at 2, ¶ 1.

Aug. 27, 1992 Joint Status Report and Proposed Order:

The parties stipulated, and the Court so ordered, that "[e]ach inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those he has been using." Ex. 15-B at 7 ¶ 7. Moreover, Defendants stated that "[t]he Sheriff shall work towards . . . providing constitutionally adequate health care to all inmates in his custody . . . ." *Id.* at 10 ¶ 9.

Nov. 18, 2005 Stipulation and Order Re: Injunction:

The parties stipulated, and the Court ordered, that "[e]very inmate kept overnight in the jail will be accorded a mattress and a bunk upon which to sleep. […]

---

[1] Of note, the findings about IRC conditions were in the context of detainees going to and from court, when they were in the IRC for an hour or two in the morning and evening, before returning to regular housing with mattresses, hot meals, and showers. *Rutherford*, 457 F. Supp. at 114. Today, class members spend days on end in these same abysmal conditions.

[2] These requirements were not reversed or modified by the Ninth Circuit or the U.S. Supreme Court in subsequent appeals. *Rutherford v. Pitchess*, 710 F.2d 572, 575 (9th Cir. 1983), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576, 578 (1984); *Rutherford v. Pitchess*, 713 F.3d 1416 (9th Cir. 1983); *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576, 578 (1984). *See also Thompson v. City of L.A.*, 885 F.2d 1439, 1448 (9th Cir. 1989) (holding that "a jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment"); Cal. Code of Regs., Tit. 24, § 2-1013(a)(2).

All bunks shall be supplied with full bedding. […] Inmates shall not be housed in any area where there is not reasonably close access to toilets." *Rutherford v. Block*, 2005 WL 3388141, at *1 ¶¶ 1-3, 5 (C.D. Cal. Nov. 18, 2005) (citing definitions of "bunk," "bed," "mattresses," and "bedding" as set forth in Titles 15 and 24 of the California Code of Regulations).[3]

Oct. 27, 2006 Order to Show Cause Re Preliminary Injunction and TRO:

Here, the Court enjoined Defendants from:

1. Holding an inmate in the IRC for more than 24 hours, unless any period in excess of 24 hours is because the inmate is being treated at the medical facilities within the IRC;

2. Holding more than 20 inmates in a holding cell without first exhausting every other means to avoid placing more than 20 inmates in a holding cell. [. . .]

3. Holding an inmate in a cell in the IRC which is not maintained in a clean and sanitary condition, including access to a functioning toilet, potable drinking water and clean water to wash;

4. Holding an inmate in the IRC without providing ongoing access to adequate medical care, including but not limited to regular pill call and sick call[.]

*Rutherford v. Baca*, 2006 WL 3065781, at *4 (C.D. Cal. Oct. 27, 2006).[4]

On April 24, 2007, Plaintiffs filed an Application for an Order to Show Cause re Contempt ("OSC Application"), raising concerns yet again about abysmal conditions in the IRC and detailing how LASD's daily IRC processing reports showed more than 900 people had been held in violation of the 2006 order in a two-month period. Doc. 131 at 5. The parties stipulated on May 11, 2007, that Plaintiffs would withdraw the OSC Application if the County expedited intake and triaging. Doc. 134 at 5. Defendants agreed to give hygiene kits (toothbrush and basic toiletries) to men

---

[3] This stipulation is found at Docket 64 of the ECF system for the case.
[4] The order is filed at Docket 102, and was renewed twice at Docket 121 and 148.

in IRC overflow housing. *Id.* at 3, 7. Defendants changed the way they evaluated releases to free up space in IRC and make more beds available in MCJ and Twin Towers Correctional Facility ("TTCF"). *Id.* at 5.

Since the entry of the Stipulation, LASD provides Plaintiffs' counsel two daily IRC reports. The IRC Processing Report ("IRC Report") shows the number of people in the non-Clinic portion of the IRC and how long they have been there. The IRC Clinic Processing Report ("Clinic Report") shows the number of people in the IRC Clinic and how long they have been there. Camacho Decl. ¶¶ 4-8.[5] Between 2007 and 2015, the parties submitted regular status reports to the Court on Jail conditions. *See generally* Docket. On March 17, 2015, while retaining jurisdiction over the action, the Court removed the case from its active caseload until further application by the parties or order of the Court. Doc. 311.

Plaintiffs now ask the Court to reinstate this case to its active caseload and to issue a TRO, PI, and any further relief that it deems necessary.

## STATEMENT OF FACTS

### A. The Increase in the Incarceration of People with Serious Mental Illness

The number and proportion of people with mental illness booked into the Jail is surging. According to the Court monitor in the U.S. Department of Justice's lawsuit challenging the Jail's mental health system, as of June 2021, about 40% of the Jail population has a diagnosed mental illness, a 51% increase from 2015. *See United States v. Cnty. of L.A.*, CV No. 15-05903 DDP, Doc. 174-1 (Monitor's Corrected Twelfth Report) at 8 (C.D. Cal. Oct. 6, 2021) ("DOJ Monitor's 12th Report"). There are at any given time more than 1,200 people with "significant impairment" who are "in persistent danger of hurting self in a less acute care setting," in need of HOH beds;

---

[5] The reports are snapshots taken at a specific time and are timestamped accordingly. Camacho Decl. ¶ 5. LASD does not track total aggregate wait times in IRC. *Id.* For example, the time spent in the Clinic does not carry over to the IRC processing time. *Id.* ¶ 8. The clock restarts upon Clinic entry and exit, if a person moves to another location within IRC after the Clinic. *Id.*

Case No. CV 75-04111 DDP

1   and over 2,500 people with moderate mental health problems with "recurrent episodes
2   of mood instability, psychotic symptoms maintained by medication, pervasive
3   patterns of self-injury (superficial lacerations/scratches), and are non-violent but at
4   risk of victimization by others," in need of MOH beds. *Id*. at 9-10.

### B. Failure to Reduce the Number of People with Mental Illness in the Jail

#### 1. The Specialized Mental Health Beds in the Jail Are Full.

County officials repeatedly admit that a major reason why people spend more than 24 hours in the IRC is that there are not enough housing units for people with mental illness. The Office of Inspector General (OIG) noted in November 2019 that:

> The steadily increasing populations of prisoners with moderate and severe mental illness has led to the MOH and HOH modules often nearing or reaching capacity. When these modules are full, new patients who present with moderate or severe mental illnesses – some of whom are tethered throughout the entire intake process – are required to remain in IRC or Module 231 for several additional hours until appropriate housing becomes available.

Los Angeles County Office of the Inspector General, *Review of the Inmate Reception Center Intake Evaluation Process* (Nov. 2019) at 9 (OIG 2019 Review);[6] *see also* L.A. County CEO, *Jails Last: Addressing the Overcrowding Concerns in the IRC* (Aug. 3, 2022) (shortage of HOH and MOH beds causes IRC overcrowding).[7] In short, the lack of specialized housing available for the large and growing number of people with mental illness processed at the IRC results in their languishing there in squalid conditions for long periods of time in violation of past Orders, the 1979 Judgment, and the Constitution.[8]

---

[6] Available at https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/c2463bac-4aab-43b6-9824-7e8c9c10fdb8/Review%20of%20IRC%20Intake%20Evaluation%20Process.pdf.
[7] Available at http://file.lacounty.gov/SDSInter/bos/supdocs/170774.pdf .
[8] The DOJ Monitor's 12th Report of October 2021 highlighted in stark terms the County's ongoing failure to comply with numerous provisions of the consent decree between the County and the DOJ related to mental health care in the Jail. Provision

People who very recently were in IRC confirm that a shortage of mental health housing is why they were warehoused in IRC for days at a time. For example, George Ruiz came to IRC from Patton State Hospital on August 23, 2022 for a court hearing on whether he had regained competence to stand trial. He was still at the IRC on August 31, eight days later. Declaration of George Ruiz (Ex. 11) ¶ 7; Camacho Decl. ¶ 71. He was told that he was still in IRC because he needed to be in the MOH, but no MOH beds were available. Ex. 11 (Ruiz) ¶ 5. A class member with chronic PTSD and severe depression came to IRC on August 25, at about 5 pm, and was still in the IRC on August 30, five days later. Declaration of Curtis Howard (Ex. 5) ¶ 2-3; Camacho Decl. ¶ 71. An LASD deputy told him that he needed to be in the MOH, but no beds were available. Ex. 5 (Howard) ¶ 12. *See also* Declaration of Jerome Dubose (Ex. 3) ¶ 10, 12 (person with depression and paranoid schizophrenia spending multiple days in IRC "waiting for a bed").[9]

## 2. The Failure to Divert People With Mental Illness From the Jail.

One obvious way to reduce the shortfall of Jail mental health housing, thereby reducing delays and overcrowding in IRC, is to divert people with mental illness out of the Jail and into community treatment programs with appropriate housing, mental health care, and other services. *OIG 2019 Review* at 13 ("Recommendation 7. The

---

63 of the decree requires the Jail to have adequate HOH and MOH housing "sufficient to meet the needs of the jail population with mental illness." Compliance is measured by whether there are MOH and HOH beds immediately available in TTCF (for men) and CRDF (for women) 95% of the time. DOJ Monitor's 12th Report at 11. The Monitor found the County is noncompliant and had been for years. During a sampling period in 2020, TTCF and CRDF had 0% availability of HOH housing. *Id.*. The Monitor's 13th Report to the Court showed continued failures. According to third quarter 2021 self-assessment reports, 45% of men with mental illness waited seven days or more for permanent Jail housing. *United States v. Cnty. of L.A.*, CV 15-05903 DDP, Doc. 186 (Monitor's 13th Report) (C.D. Cal. Mar. 3, 2022).

[9] COVID-19 isolation also puts HOH beds out of commission, placing an additional strain on housing. DOJ Monitor's 13th Report. On September 2, 2022, LASD had 79 people in COVID-19 isolation (*i.e.*, HOH beds) at TTCF. Camacho Decl. Ex. P.

County should increase efforts to divert qualified prisoners with mental illnesses to community-based mental health treatment programs in order to alleviate overcrowding in mental health housing locations"). The County hired the RAND Corporation in 2020 to estimate how many people with mental illness in the Jail could be diverted if appropriate community resources were available. The report found that about 60% of the people in the Jail with mental illness, or 3,368 people, could safely be diverted if community programs existed and were funded. *See* Stephanie Brooks Holliday, *et al.*, *Estimating the Size of the L.A. County Jail Mental Health Population Appropriate for Release into Community Services* at 7, RAND Corp. (2020).[10]

Effective community-based programs currently exist that can safely divert significant numbers of people with mental illness out of the Jail. But the County Board of Supervisors repeatedly has refused to fund them adequately. For example, the Office of Diversion and Reentry (ODR) runs a program called ODR Housing serving people who are incarcerated in the Jail, unhoused, and have a mental health or substance abuse disorder. *See* https://probation.lacounty.gov/office-of-diversion-reentry-housing/. It aims to quickly resolve cases through a probationary plea and diversion, and offers permanent supportive housing and intensive case management, including links to services. *Id.* The program is very successful. Among participants, 78% of whom had a mental health disorder, there was a 91% housing stability rate at six months, and 74% at one year; only 14% were convicted of a new felony in the one year after they received housing through ODR. Sarah Hunter et al., *L.A. County Office of Diversion and Reentry's Supportive Housing Program: A Study of Participants' Housing Stability and New Felony Convictions*, at 3 RAND Corp. (2019).[11] Indeed, it is so effective that Superior Court judges publicly endorse it.

> In my experience, what works is the kind of help provided by the L.A. County Office of Diversion and Reentry. ODR has built a track record — supported by data — of moving people with mental health issues out

---

[10] Available at https://www.rand.org/pubs/research_reports/RR4328.html.
[11] Available at https://www.rand.org/pubs/research_reports/RR3232.html.

of jail and onto a path to permanent supportive housing, keeping them off the streets and out of hospitals and incarceration long term.

Hon. James Bianco, *Op-Ed: An L.A. program helps people get mental health care instead of jail time. Why not expand it?* L.A. Times (July 18, 2022)[12]; *see also* Hon. Terry Smerling, *Op-Ed: The mentally ill defendants in my courtroom need treatment, not jail*, L.A. Times, (May 20, 2022) ("The [ODR housing] program is well-respected in the courts because it is effective in providing case management and supportive housing, which address some of the root causes of harm in our communities.").[13]

ODR also runs the only program in California to divert people charged with felonies and found incompetent to stand trial (FISTs) into community-based placements to receive restoration services (FIST-CBR). There are currently more than 600 people in ODR's FIST-CBR program.[14] FIST-CBR participants' re-arrest rate after the end of restoration services is 17%, while in contrast, people with equal levels of acuity found IST committed to state mental hospitals have a re-arrest rate of 70%.[15]

Despite ODR's proven success in moving people with serious mental illness out of the Jail, the County has failed to fund it adequately. On July 7, 2020, the Board of Supervisors passed a motion entitled *Expanding the Office of Diversion and Reentry's Work to Reduce Incarceration and Invest in Health and Well-Being of*

---

[12]   Available at https://www.latimes.com/opinion/story/2022-07-18/jails-mental-health-los-angeles-county-diversion.

[13] Available at https://www.latimes.com/opinion/story/2022-05-20/mentally-illness-treatment-defendants-los-angeles-county-courts.

[14] L.A. County Dep't of Health Servs., Office of Diversion & Reentry, *Clinical Programs Dashboard* (July 2022), at http://file.lacounty.gov/SDSInter/dhs/1119711_ClinicalProgramsDashboard.pdf.

[15] L.A. County Dep't of Health Servs., Office of Diversion & Reentry, *Who We Are*, (Aug. 31, 2021), at https://www.chhs.ca.gov/wp-content/uploads/2021/08/ODR_CBR_Presentation_08312021_Accessible.pdf ; Cal. Dep't of State Hospitals, *The Case for Early Access to Treatment* at 17, at https://www.chhs.ca.gov/wp-content/uploads/2021/09/DSH-Early-Access.pdf.

*Communities*.[16] It called for ODR's expansion, including another $30 million in the supplemental budget to divert at least 500 more people from the Jail, to expand reentry and supportive services, and to develop a sustainability plan to allow ODR to grow to divert all eligible people with serious mental illness from the Jail.[17] The County CEO funded ODR $30 million in the 2020 supplemental budget, but with one-time money that could *not* go to expansion.[18] The Board asked the CEO to report back with funding options for ODR expansion and sustainability; the CEO's November 2020 response refused to make a "recommendation for service expansion." [19]

This summer, the Board of Supervisors considered—but failed to implement—a plan to substantially expand ODR Housing. Supervisor Holly Mitchell proposed in June 2022 to have the CEO find funding to expand ODR Housing by 500 beds by July 1, 2023; an additional 1,000 beds by the end of Fiscal Year 2024; and to ultimately increase the total number of beds to 5,800. Declaration of Peter Eliasberg (Ex. 13), Ex. 13-C. The Board tabled the motion and amendments.[20] Supervisor Mitchell then introduced a motion that only asked the CEO to find funding to expand ODR Housing by 500 beds by July 1, 2023, but this passed with an amendment that did not set a deadline for 500 more spaces in the program. Exs. 13-D & 13-E.[21] As a result of the CEO and the Board's actions and inactions, the size of ODR Housing is capped and has been unable to take on new clients for well over a year.[22] The Board failed to take

---

[16] Motion available at http://file.lacounty.gov/SDSInter/bos/supdocs/146940.pdf.

[17] *See* http://file.lacounty.gov/SDSInter/bos/supdocs/146940.pdf.

[18] *Memo from CEO to LA Board of Supervisors* (11/17/2020), Ex. 13-F.

[19] *Id.*

[20] Taylor Walker, *L.A. County Motion Aimed At Expanding Diversion Is Gutted, Then Put On Hold*, Witness LA (June 17, 2022) at https://witnessla.com/la-county-motion-aimed-at-expanding-diversion.

[21] Taylor Walker, *L.A. County Supervisors Pass Diluted Motion To Expand ODR With No Set Deadline,* Witness LA (June 30, 2022), at https://witnessla.com/la-county-supervisors-pass-diluted-motion-to-expand-odr-with-no-set-deadline/.

[22] Emily Dugdale, *This L.A. Jail Program Is a Huge Success. So Why Can't It Take*

meaningful action even though it is aware of the Front Bench wait times and "deplorable" conditions in IRC.[23] Two days before the filing of this Motion, the Board approved $29.8 million for ODR Housing.[24] While providing these funds is a step in the right direction, less than $30 million in one-time funding for two years will not allow ODR to expand to the point that its reach will meaningfully reduce the current IRC wait times.

### 3. The Sheriff Has Available Options to Release People from the Jail to Eliminate the Overcrowding Crisis in IRC But Has Not Taken Them.

Defendant Villanueva has the authority and ability to reduce the Jail population to alleviate the crisis in the IRC. California Government Code § 8658 provides:

> In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. … Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section.

"[T]here is no requirement in the statute that such removal or transfer of inmates be made pursuant to a court order." Cal. Dep't of Justice, *COVID-19 and Statutory Authority Under Government Code Section 8658* (Apr. 14, 2020).[25] The law is part of the Emergency Services Act of 1970, where the Legislature recognized the authority of the State and political subdivisions to "generally to protect the health and

---

*On More People?* LAist (April 17, 2022), at https://laist.com/news/criminal-justice/this-la-jail-program-is-a-huge-success-so-why-cant-it-take-on-more-people.

[23] Spectrum News 1, *The Future of Men's Central Jail* (Aug. 29, 2022) (Supervisor Holly Mitchell explains that OIG has informed the Board "how many people in the Inmate waiting center are waiting too long or not being housed or held in humane conditions. . . . **Those are all deplorable conditions, and we all agree to that**."), at https://spectrumlocalnews.com/tx/san-antonio/inside-the-issues/2022/08/30/the-future-of-men-s-central-jail, 9:36-10:00 (emphasis added).

[24] L.A. County Chief Executive Office, *Detailed CEO Recommended Care First Community Investment Year 2 Spending Plan* at http://file.lacounty.gov/SDSInter/ceo/ati/1129063_CFCIYear2SpendingPlanBLAttachment1_Final_.pdf

[25] *See* https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/2020-dle-05.pdf

safety and preserve the lives and property of the people of the state." *Id.*

The overcrowding crisis at IRC is life-threatening: in April, a man was found unresponsive in IRC and died despite emergency aid; in June, a 72-year-old man held for two days at IRC without evaluation by a medical provider, collapsed and died. L.A. County OIG, *Reform and Oversight Efforts* (April to June 2022) (OIG Reform), at 15 & n.11.[26] The overcrowding and failures of the County to provide adequate health care at IRC has led to deaths—a sufficient basis for the Sheriff to exercise his authority to make additional releases under Government Code Section 8658.

State law offers other ways to relieve overcrowding. When a jail's population "exceeds the actual bed capacity," a sheriff "may apply to the presiding judge of the superior court to receive general authorization for a period of 30 days to release inmates" up to 30 days early. Cal. Penal C. § 4024.1(a), (b). The Jail population on September 2, 2022, was 14,665,[27] and the maximum capacity set by the Board of State and Community Corrections (BSCC) is 12,404.[28] Defendants are operating their Jail at 18% over capacity. Inspector General Max Huntsman recently accused the Sheriff of keeping the population higher than necessary. "Currently for political reasons, the sheriff maintains an excessive jail population, and deputies and prisoners suffer."[29]

---

[26] Available at https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/f9ffb501-8dc9-4d89-a4cf-4d55c894ea0c/Reform%20and%20Oversight%20Efforts%20-%20Los%20Angeles%20County%20Sheriff%27s%20Department%20-%20April%20to%20June%20202022.Protected.pdf

[27] Population Management Bureau Daily Inmate Statistics, Sept. 2, 2022. Available at https://lasd.org/wp-content/uploads/2022/09/Transparency_Custody_ADP_090222.pdf.

[28] Los Angeles County Dep't of Auditor-Controller, *Estimated Services and Supplies Cost Impact From Maintaining a Reduced Jail Population Post-COVID* at 2 (Feb. 25, 2021), at http://file.lacounty.gov/SDSInter/auditor/audit_reports/1103288_2021-02-25Sheriff_sDepartment-EstimatedServicesandSuppliesCostImpactfromMaintainingaReducedJailPopulationPost-COVID-19-BoardAgendaItem2_June9_2020.pdf.

[29] Emily Dugdale, *Flooding Shuts Down Elevators in LA Jail, Delays Court*

Defendant Villanueva has authority to petition the Superior Court presiding judge to lower the population to address the overcrowding crisis.[30]

Plaintiffs are not at this time asking the Court to order Defendants to fund ODR expansion, increase releases from the jails, or close IRC to all new intakes when it is too crowded. They are simply showing that Defendants have alternative ways available to them to eliminate the crisis at IRC, which they have not exercised.

## C. Increasing Numbers of People Are Spending Multiple Days in the IRC

### 1. Backups into IRC from 2019 - 2021

In late 2019, the OIG raised concerns about long wait times at IRC, noting that

[o]ver the course of the last two years, the OIG has frequently encountered patients who were required to wait in the IRC Clinic for more than twenty-four hours. On multiple occasions, patients waited for more than forty-eight hours.

*OIG 2019 Review* at 3.

Soon after the OIG released its review, drastic COVID-19-driven population reductions began in March 2020 due to a decrease in arrests and the California Judicial Council's order for zero bail for most misdemeanors and low-level felonies, both of which gave the County a break from IRC and Jail overcrowding. The total Jail population dropped by a fourth in half of a year, from 16,791 on January 1, to a low of 12,085 on July 1, 2020. L.A. County CEO, *Jails Last* at 3.

The break would not last. One year ago, the total Jail population rose above

---

*Hearings and Visitation,* LAist (Sept. 6, 2022), at https://laist.com/news/criminal-justice/lasd-sheriff-jail-incarceration-twin-towers.

[30] While the Sheriff made applications to the Superior Court since the start of COVID, these reductions have not brought the jail population down to the BSCC rated capacity, or by an amount sufficient to eliminate the dangerous backlog in the IRC. L.A. County Dep't of Health Services, *Developing A Plan For Closing Men's Central Jail as the County Reduces its Reliance on Incarceration*, at 135 (Mar. 30, 2021) http://file.lacounty.gov/SDSInter/bos/bc/1104568_DEVELO_1.PDF

15,000. *Population Management Bureau Daily Inmate Statistics*, August 21, 2021.[31] In late August 2021, the OIG sounded the alarm after a week of significant overcrowding left people trapped for days in the IRC. The OIG reported at the Civilian Oversight Commission's September 23, 2021 meeting,

> [t]hat there was an increase in the number of COVID-19 infected incarcerated people and that there were troublesome conditions of confinement, including people sleeping on the floor, people experiencing long wait times, medication was not immediately available, and that the area was excessively dirty and unkept.

L.A. County Sheriff Civilian Oversight Commission, *Efforts to Reduce Los Angeles County Jail Population* at 1 (Oct. 21, 2021).[32] The longest IRC Clinic wait times between August 21, 2021 and September 15, 2021 were 111.5 hours. Camacho Decl. Ex. N at 3. August 21-27, 2021 saw wait times over 69 hours, but then the wait times fell below 24 hours on September 1, 2021 and stayed there. *Id.*

Catie Beltz, Assistant Inspector General, stated the conditions at the time were "grossly inadequate [and] expose many vulnerable … patients to level[s] of suffering that we as a county should neither tolerate nor enable." Camacho Decl. Ex. N. at 4. The OIG recommended immediate releases to get the Jail population below the BSCC's 12,400-person capacity. *Id.* at 4-5. The County instead asked the state prison system to accept people sentenced to prison who had been stuck in the Jail due to COVID-19 transfer restrictions. Los Angeles County CEO, *Jail Closure Implement Team - First Report Back (Nov. 16, 2021)* at 3.[33] Due to large numbers of transfers to state prison, the population dropped to 12,511 on January 3, 2022.[34] IRC Clinic wait

---

[31] *See* https://lasd.org/wp-content/uploads/2021/08/Transparency_Custody_ADP_082121.pdf.

[32] *See* http://file.lacounty.gov/SDSInter/bos/supdocs/StaffMemo-2dEffortstoReduceJailPopulation10.21.2021.pdf

[33] *See* https://ceo.lacounty.gov/wp-content/uploads/2022/06/JCIT-First-60-Day-Report_November-16-2021.pdf

[34] *See* Population Management Bureau Daily Inmate Statistics, January 3, 2022, at

15

Case No. CV 75-04111 DDP
PLFS' MOT. FOR PRELIM INJ. & TRO; MEM. OF PTS. & AUTH.

1    times largely settled below 24 hours and stayed there for the next few months.

2         **2.    IRC Clinic wait times have spiraled out of control.**

3         The respite was brief. The total Jail population has climbed to 14,665,[35] and the

4    wait times in the IRC Clinic have reached a new and terrifying peak. The August 2021

5    emergency and the periodic backlog in the years before the November 2019 OIG

6    report pale in comparison to the current, staggering humanitarian crisis in the IRC. In

7    contrast to August 2021, the County's efforts to alleviate the pressure on IRC have

8    failed to relieve or even slow the crisis.

9         On June 6, 2022, the Clinic Report showed 41 people there for more than 24

10   hours, 28 of whom had been there for more than 49 hours. Camacho Decl. Ex. A at 1.

11   Plaintiffs' counsel visited the Clinic that day and were stunned by the filth and levels

12   of tension and despair encountered. *Id*. ¶¶ 15-22. Counsel initiated discussions with

13   LASD Custodial Staff, Correctional Health Services (CHS), and the OIG in an

14   attempt to address the conditions, overcrowding, and length of stay. *Id*. ¶ 23.

15        Between June 6 and August 11, 2022, Plaintiffs' counsel had numerous

16   conversations with County officials, OIG staff, LASD Custodial Staff, CHS staff, and

17   two Justice Deputies for the Board of Supervisors. Camacho Decl. ¶¶ 23-24, 32-33.

18   These efforts culminated in a meeting on August 11 with the OIG, LASD, CHS,

19   County Counsel, and plaintiffs' counsel. *Id*. ¶ 33. Plaintiffs' counsel determined after

20   this meeting that court intervention was necessary to address the disaster at IRC.

21        Between August 9 and September 2, 2022, the number of people held in the

22   Clinic beyond 24 hours, with no mattress or bedding, and in deplorable conditions,

23   has ranged from a low of 23 to a high of 252 people on August 22, 2022. Camacho

24   Decl. Ex. I. On the day the Clinic held 252 people who had been there for longer than

25   _____

26   https://lasd.org/wp-content/uploads/2022/01/Transparency_Custody_ADP_010322.pdf.

27   [35] *See* Population Management Bureau Daily Inmate Statistics, Sept. 2, 2022, at

28   https://lasd.org/wp-content/uploads/2022/09/Transparency_Custody_ADP_090222.pdf.

24 hours, 235 of them had been in the Clinic longer than 49 hours. *Id*. The number of people held in non-Clinic areas of the IRC for more than 24 hours has ranged from two to 81 for the same date range. *Id*. Ex. M.

It is now common for people to stay in the IRC for more than 49 hours, with wait times frequently peaking between 100-200 hours. Camacho Decl. Exs. I & M. Declarants' length of stay in the IRC Clinic ranged from 36.9 hours to 180.4 hours (seven and a half days), and many of them spent more than four days in the Clinic. *Id*. ¶ 71. Late-summer numbers show a long-standing problem that has spiraled out of control.[36]

### D. People Spend Days Chained to Chairs on the IRC Clinic Front Bench

The people who suffer some of the most inhumane conditions in the IRC Clinic are those who are chained to chairs in the Clinic's so-called Front Bench. The OIG described the plight of the Front Bench in its 2019 report.

> Some of the patients subjected to the worst conditions are those who display the most serious medical or mental health symptoms. Patients who are at risk of or exhibit acute mental health distress are tethered with handcuffs to fixed chairs for the duration of the intake process. Despite the reporting, recommendations, and frequent warnings by the OIG against long-term tethering, patients continue to encounter excessive wait times in unsanitary conditions while tethered to chairs.

*OIG 2019 Review* at 3-4.

The report expressed grave concern that some individuals "remained tethered [with handcuffs] for nearly twenty-four hours." *Id.* at 4. It contained a chart showing hours spent chained to the Front Bench over a period of 15 days. During that time three people were chained for more than 16 hours, and 35 people were chained between four and eight hours. *Id* at 4.

---

[36] People held in the IRC Clinic have no access to diversion (books, magazines, etc.), unless they can see the televisions in the main clinic. Surreally, on an August 26 visit to the IRC, Plaintiffs' counsel observed the movie *Groundhog Day* playing on every TV. Camacho Decl. ¶ 54.

Three people chained for more than 16 hours – considered untenable by the OIG in 2019 – is nothing compared to the present Front Bench wait times. From August 9 to September 2, 2022, the longest wait time for people chained to chairs on the Front Bench ranged from a "low" of 36.3 hours to a high of ***166.2 hours***, or almost seven days. Camacho Decl. Ex. J. The number of people chained to the Front Bench for more than 24 hours has ranged from three to 29 persons. *Id.* On August 22, the Clinic Report showed 22 people on the Front Bench for more than three days. *Id.*

The harmful effects of keeping people with "the most serious medical or mental health issues" chained to a chair for days at a time are obvious. Plaintiffs' counsel observed cuts, swelling, and bruising, consistent with prolonged handcuffing, on the wrists of a man who had been on the Front Bench for 99 hours. Camacho Decl. ¶¶ 66-69. Plaintiffs' counsel saw one person chained to the Front Bench urinating on the floor on August 22 (Ex. 13 ¶ 6) and another person lying on the floor in a puddle of urine on August 26. Camacho Decl. ¶ 52. A class member reported seeing a man on the Front Bench defecate on the floor, and that the feces remained there for two days. Declaration of Tony Jones (Ex. 6) ¶ 5. Another declarant stated that he witnessed a man chained to the Front Bench defecate in a trash can, which was not emptied for several hours. Ex. 5 (Howard) ¶ 7. *See also* Camacho Decl. Ex. Q at 5-6 (photos).

Dr. Terry Kupers, a nationally recognized forensic psychiatric expert who testified in *Rutherford* in 1978 and has visited the Jail for nearly five decades, notes that these "very harsh practices" of chaining people to the Front Bench violate national correctional standards and the LASD's Custody Division Manual. Declaration of Dr. Terry Kupers (Ex. 16) ¶¶ 28-29. Restraints such as these "should be utilized only as a last resort after all less restrictive and harsh interventions have been attempted and failed" and "cannot be used as punishment but rather must be instituted for the shortest time possible to safely control dangerous behavior." *Id.* ¶ 28. Dr. Kupers writes:

[American Correctional Association] standards require that when an

18

inmate is restrained, other inmates are not permitted in the same space and have no access to the restrained inmate, and this requirement is necessary because restrained individuals are at high risk of assault and victimization by unrestrained inmates. Of course, all standards that address this issue, as well as common decency, require that restrained jail inmates be released as needed for bathroom functions. There is also a requirement that each limb of a restrained person be released from restraint at frequent intervals so that circulation will not be cut off, and that there be close medical monitoring. And there is a strong consensus in corrections, as reflected in very many jail policies nationwide, that there must be strict time limits to the use of fixed restraint, that limit is 2 hours in many jurisdictions, 4 hours in some others[.]

…

Severe restraint such as tethering to the front bench or a chair at IRC has very harmful effects on all inmates, but especially on inmates with mental illness. Those who suffer depression are likely made more despairing and, in too many cases, resolve to commit suicide as soon as they are released from restraints and have the opportunity. Many of those suffering from psychosis become agitated and more dysfunctional, for example they are likely to develop paranoid ideas about why they are being treated so harshly. And inmates who are restrained in this fashion tend to lose confidence and trust in custody and mental health staff at the jail, and this makes their subsequent behavioral management and mental health treatment very problematic.

Ex. 16 ¶¶ 28, 30 (footnote omitted); *see also* Camacho Decl. Ex. Q at 5-6; Declaration of Chuck Bethel (Ex. 1) ¶ 8 ("I have seen lots of people chained up who get hit by other inmates because they can't defend themselves.").

**E. Current Conditions of Confinement in the IRC**

Plaintiffs' Counsel visited IRC five times this summer. They have submitted declarations about their first-hand observations of the conditions in IRC and attached photographs taken during their visits at their direction. *See generally* Camacho Decl. and *id.,* Ex. Q; Ex. 13 (Eliasberg Decl.), Declaration of Summer Lacey (Ex. 14), Ex. 15 (Kendrick Decl.). Class members recently detained at IRC also have provided declarations in support of this application.

19

### 1.  Floor Sleeping / Overcrowding

ACLU lawyers observed dozens of people chained to the Front Bench attempting to sleep and hundreds of other people sleeping in the clinic area or holding cells in IRC on floors, on metal benches or in chairs. None had blankets or a mattress. Camacho Decl. ¶¶ 17, 22, 27, 35-36, 44, 51-53, 60, 65, Ex. Q at 2-6, 8; Ex. 13 ¶¶ 9, 13; Ex. 14 ¶ 5; Ex. 15 ¶¶ 4-5. *See also* Camacho Decl. Ex Q at 2-5 (photos). Declarants reported that they had no choice but to sleep on the cold hard floor, on metal benches, or in chairs, without access to a mattress or blankets. Ex. 11 (Ruiz) ¶ 3; Ex. 1 (Bethel) ¶¶ 6; Declaration of Diego Bolton (Ex. 2) ¶ 5; Ex. 3 (Dubose) ¶ 5; Declaration of Daniel Gonzalez (Ex. 4) ¶ 3: Ex. 5 (Howard) ¶ 6; Declaration of Damian Payan (Ex. 7) ¶ 4; Declaration of Gilberto Perez (Ex. 8) ¶ 5; Declaration of Ira Porter (Ex. 9) ¶ 6-7; Declaration of Giovanni Reese (Ex. 10) ¶ 6, 8; Declaration of Bryan Salinas (Ex. 12) ¶ 4-5.

Class members reported that conditions in the clinic and the cage at the back of the clinic were dangerously overcrowded. Ex. 7 (Payan) ¶¶ 9-10 ("[I]t is worse than being homeless. Even when I sleep on the streets there is some room to stretch out. But in here there are so many people walking by you or sleeping next to you that I'd rather be on the streets."); Ex. 1 (Bethel) ¶ 6 (spent night in a triangle shaped holding cell about 15'x15' with 40-50 other people); Ex. 5 (Howard) ¶ 9 (spent night "packed like sardines" in the cage with about 100 people); Ex. 2 (Bolton) ¶ 5 (spent night in cage with hundreds of other people); Ex. 10 (Reese) ¶ 4 (spent more than 15 hours in a triangle shaped holding cell about 12-15 feet on each side with 40-50 other people); Ex. 6 (Jones) ¶ 2; Ex. 8 (Perez) ¶ 3. *See also* Camacho Decl. Ex Q at 8 (photo of "cage").

### 2.  Lack of Adequate Healthcare, Including Medications

Class members reported that they regularly take psychiatric medications but did not get them while in the IRC. Ex. 1 (Bethel) ¶ 3 (bipolar, schizophrenia, takes Buspar, Risperdal, Zyprexa and Abilify, but the psychiatrist says he won't get them

until he is permanently housed: "I am hearing voices and I feel like I am falling apart."); Ex. 3 (Dubose) ¶¶ 10, 13 (not receiving Zoloft for depression and Trazodone for paranoid schizophrenia); Ex. 4 (Gonzalez) ¶¶ 4, 6 (chained to Front Bench, not receiving Seroquel for schizophrenia); Ex. 5 (Howard) ¶ 3 (chronic PTSD and severe depression; needs Trazodone, Abilify, Wellbutrin); Ex. 6 (Jones) ¶ 7; Ex. 9 (Porter) ¶ 3-4 (extreme depression with psychotic side effects, not receiving Remeron, Zoloft, and Zyprexa); Ex. 10 (Reese) ¶ 5 (Paxil for depression, psychiatrist says he won't get psych meds until he is permanently housed); Ex. 12 (Salinas) ¶¶ 4, 7, 9 (chained to Front Bench, has schizophrenia but not receiving psych meds since being in IRC).

It is extremely dangerous to abruptly stop psychotropic medications rather than tapering them. Ex. 16 ¶¶ 13-19. Dr. Kupers, the psychiatrist, notes that:

> All standards in community psychiatry and correctional mental health require 'continuity of care,' i.e. a course of psychotropic medications must not be interrupted, and there must be no abrupt discontinuation of the medication regimen, for example when the patient moves from one living situation or institutional setting to another, and this is an especially important consideration in relation to jail admission.
>
> …
>
> The symptoms described by inmates in the Declarations I reviewed— including severe anxiety, severe insomnia, a sense of falling apart, hallucinated voices, panic attacks, deep despair, sweats, shaking, vomiting, and so forth— are unfortunately very expectable sequelae of abrupt discontinuation of psychotropic medications.
>
> Because of the well-known psychiatric sequelae of abrupt discontinuation of psychiatric medications as well as the physiological difficulties and risk of suicide, all standards in correctional mental health as well as instruction on institutional care require immediate attention to inmates' psychiatric medications when they are arrested and admitted to jail.

*Id.* ¶¶ 7, 15, 16.

Additionally, many class members report inadequate or non-existent medical

care for injuries and other medical conditions, including for drug and alcohol withdrawal. Ex. 3 (Dubose) ¶ 6 (his wheelchair was taken away despite difficulty walking due to a painful leg infection); Ex. 5 (Howard) ¶ 10 (asks for medical care for a toe that is cut and that he believes is broken, only given hydrogen peroxide); Ex. 8 (Perez) ¶ 8 (told medical staff he has asthma but does not have Albuterol, which he takes 3-4 times a day outside jail – breathing is labored); Ex. 9 (Porter) ¶ 5 (sweating, shaking and vomiting as a result of withdrawing from heroin and crystal meth but has not received medication assisted treatment or mental health professional evaluation); Ex. 6 (Jones) ¶ 7 (deputies ignore requests for help with alcohol withdrawal). On their June 14, 2022 visit to IRC, Plaintiffs' counsel spoke to people in serious medical distress, including a man who said he was an insulin-dependent diabetic, had not received insulin for 36 hours, and was only fed peanut butter and jelly sandwiches and orange juice that made his blood sugar spike and crash; counsel brought him to Jail staff's immediate attention. Ex. 15 ¶ 12; *see id.* ¶ 13 (man with a fist-sized hernia doubled over in obvious pain); Camacho Decl. ¶¶ 29-30 (bloody open wound in one person's mouth and another with large red and swollen cut on leg). On an August 26, 2022 visit, counsel saw a man in a wheelchair crying while holding up his hands, showing how they were curled up and swollen. Camacho Decl. ¶ 49.

### 3. Denial of Adequate Food and Water

Class members have limited or non-existent access to potable water in IRC as a result of the lack of working water fountains, or sinks that did not work or had almost no water pressure or were so filthy that people could not drink out of them. Ex. 1 (Bethel) ¶ 9 ("Water trickles out of the sinks, which are full of dirt and food scraps and people pee in them."); Ex. 5 (Howard) ¶ 11 ("[S]inks are filthy, there are no water fountains, and I feel really dehydrated."); Ex. 8 (Perez) ¶ 7 ("There is no drinking water. The sinks are disgusting. I would not drink from that ever."); Ex. 9 (Porter) ¶ 8 ("There is no water. The sink is nasty and smells like urine and feces and stuff is floating in the water. The buttons on the sink are dirty. It is like it has never been

cleaned"); Ex. 6 (Jones) ¶ 6; Ex. 7 (Payan) ¶ 6; Ex. 2 (Bolton) ¶ 10. On August 26, 2022, counsel saw medical staff wheel a tray of approximately 40 pixie cup-sized water cups with drinking water and offer it to the crowd of people in the Clinic, but not to people chained to the Front Bench or those in the various holding tanks. Camacho Decl. ¶ 55.

People in IRC are forced to subsist on a nutritionally inadequate diet consisting solely of a peanut butter and jelly sandwich for breakfast and lunch, sometimes a burrito at dinner, cookies, and orange juice. There are no fruit or vegetables, and no other food is available even for those who are allergic to peanuts or diabetic or pre-diabetic. Ex. 2 (Bolton) ¶ 9 ("I am allergic to peanut butter but almost the only food they give us is peanut butter sandwiches 1 or 2 cartons of OJ a day and some cookies. I am very hungry"); Ex. 3 (Dubose) ¶ 8 (allergic to peanut butter, uses diet control to stay off insulin, concerned food in IRC will make him diabetic again); Ex. 15 ¶ 12 (man with diabetes reported that diet made his blood sugar spike and crash); Ex. 1 (Bethel) ¶ 5; Ex. 7 (Payan) ¶ 8; Ex. 8 (Perez) ¶ 6; Ex. 9 (Porter) ¶ 8.

### 4. Lack of Ventilation and Basic Sanitation / Nonfunctioning Toilets

Multiple class members reported a lack of ventilation or sanitation in the IRC. Ex. 6 (Jones) ¶ 2 (left in the showers with about 60 other people for about six hours at first intake, where it was stuffy and he couldn't breathe); *id.* ¶ 5 (while chained to the Front Bench from Friday, August 19 to Monday, August 22, the man chained to the chair next to him pulled his pants down and defecated on the ground, the feces was not cleaned for two days); *id.* (observed men chained to the front bench urinating into empty orange juice boxes); *id.* ¶ 6 (clinic's toilet filled with feces and smelled); Ex. 11 (Ruiz) ¶ 6 (there is nowhere to place wrappers and containers and the floor of the cell he sleeps on is covered in trash); Ex. 7 (Payan) ¶ 5 (floor of the holding cell is filthy with food wrappers and other detainees urinate on the floor); ¶ 6 (toilets are filthy and sinks do not work); ¶ 7 (the only time the clinic area was cleaned was shortly before the arrival of the ACLU); Ex. 5 (Howard) ¶ 7 (has observed the people with

severe mental illness chained to the front bench urinate on the floor because deputies ignore their requests to be unchained to go use a toilet, one man chained to the front bench defecated in a trash can which was not emptied for several hours); *id.* ¶ 8 ("[t]he only time they did a decent cleaning was about an hour before the ACLU came today"); *id.* ¶ 11 (the sinks are filthy, there are no water fountains); Ex. 1 (Bethel) ¶ 7 (floor area of the open clinic "is disgusting" with discarded food and food cartons, and some detainees "come in drunk or high and lie down and pee on the floor while they sleep"); *id.* ¶ 9 (toilets are overflowing and people have to urinate in the sinks). *See also* Camacho Decl. Ex. Q at 1, 7 (photos).

Plaintiffs' counsel also observed a great deal of trash in the IRC clinic area. Ex. 15 ¶ 5 (food wrappers, drink containers on floor throughout the area, with two large garbage cans in the general area, one of which was full and the other that looked as if it had just been emptied and a new trash bag put in it a few minutes before the ACLU's arrival); *id.* ¶¶ 7, 10 (counsel able to smell overwhelming smells of body odor, urine, feces, and bleach despite wearing a KN-95 mask); *see also* Camacho Decl. ¶¶ 51-52, 63 (rancid smells of urine in uncomfortably warm and trash-strewn holding cells); *Id.* Ex. Q at 2, 4, 6-8 (photos); Ex.13 ¶¶ 4, 6, 13; Ex. 14 ¶ 5.

**5.  Denial of Showers/Hygiene Products/Clothing**

Multiple class members reported that while spending days in the IRC, they were not allowed access to showers or clean clothes. *See* Ex. 3 (Dubose) ¶¶ 4, 9, 15 (61-year-old man who uses a wheelchair has not been provided a shower since arrival to the IRC five days earlier, including his request for a shower after having sudden stomach pains and defecating on himself); Ex. 11 (Ruiz) ¶ 4 (has not had a shower or change of clothes in almost a week); Ex. 7 (Payan) ¶ 5 (when he was trying to rest on the floor he accidentally laid in a puddle of liquid, got dirty, asked for clean clothes, but the deputies said he would not get new clothes until he is housed); *id.* ¶ 6 (no soap is available to detainees); Ex. 5 (Howard) ¶ 5 (has not had a shower in the four days since he came to the IRC); Ex. 1 (Bethel) ¶ 4.

**6. Overcrowding and Sleep Deprivation in Inhumane Living Conditions Increases Risk of Fights, Uses of Force, and Death**

With hundreds of people—most of whom are severely sleep deprived and many of whom have mental illness and/or are detoxing from drugs and alcohol—crowded for days in the IRC's deplorable and barbaric conditions, IRC becomes a powder keg. Commissioners from the Sybil Brand Commission for Institutional Inspections (SBC) visited the IRC on June 16, 2022. Camacho Decl. Ex. O. They witnessed a fight during their inspection, and a deputy suffered a hand injury during a use of force incident in the IRC booking area. *Id.* at 1, 4.

The OIG reports that in the second quarter of 2022, "assaults on deputies and uses of force by deputies have occurred in IRC, including the breaking of bones . . ." *OIG Reform* at 17. On July 3, 2022, deputies in the IRC Clinic punched a class member multiple times in the head in the IRC Clinic, and a news report included video appearing to show him trying to protect himself from the punches.[37] ACLU staff witnessed tensions between incarcerated people and custodial staff during their August 22, 2022 visit. Ex. 13 ¶ 12; Camacho Decl. ¶ 42. That day there were 252 people in the Clinic, ***all*** of whom were there more than 24 hours, and 235 of them over 49 hours, with the longest wait time at 166.2 hours. Camacho Decl. Ex. I. Tensions on a day like Thursday, September 1, 2022 are unfathomable, with **310 people crammed in the IRC Clinic**, 174 of whom had been there longer than 24 hours, 47 of those longer than 49 hours, and the longest wait time at a jaw-dropping 186.4 hours, or more than a week straight. *Id*.

## <u>ARGUMENT</u>

**I.   PLAINTIFFS HAVE MADE THE REQUISITE SHOWING FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION AND TRO**

---

[37] Travis Schlepp, *LA deputies under fire for video that appears to show detainee being beaten*, KTLA (July 12, 2022) at https://ktla.com/news/nexstar-media-wire/la-deputies-under-fire-for-video-that-appears-to-show-detainee-being-beaten/.

Case No. CV 75-04111 DDP

Given the dangerous conditions in the Jail, and Defendants' failure to comply with past orders of the Court, immediate injunctive relief is warranted and necessary to protect class members from being placed at substantial risk of serious harm. Plaintiffs meet all of the requirements for injunctive relief and a TRO, because they are (1) likely to succeed on the merits, (2) will suffer irreparable injury in the absence of court-ordered relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is 'the most important' factor . . . ." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citation omitted).

A TRO may be granted when the need for immediate relief is clear and to preserve the status quo pending a hearing on a preliminary injunction. Fed. R. Civ. Pro. 65(b); *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130-31 (9th Cir. 2006). Plaintiffs complied with the Rule 65(b) and Local Rule 65.1's notice requirements for a TRO. *See* Camacho Decl. ¶¶ 76-79 (counsel notified Defendants' counsel on Sept. 2, 2022).

## II.   THE FACTS AND LAW CLEARLY FAVOR PLAINTIFFS

### A.   Plaintiffs Will Prevail on the Merits Because This Court Has the Power to Enforce Past Orders, and the IRC Conditions Violate Plaintiffs' Constitutional Rights.

Plaintiffs clearly meet the *Winter* requirement that they are likely to succeed on the merits of their claims. Defendants cannot dispute that IRC conditions run afoul of multiple past Court orders and judgments, nor can they dispute that courts have the power to issue further enforcement orders to make a party comply with past judgments or settlements. Even if Plaintiffs had to prove a new constitutional violation for the Court to issue a further enforcement order (which they do not under Supreme Court and Ninth Circuit precedent detailed below), the IRC conditions clearly violate their constitutional rights when they are "treated in a way antithetical to human dignity."

1    *Hope v. Pelzer*, 536 U.S. 730, 744-45 (2002).

2       A court has the power to issue further orders and relief to effectuate the purpose
3 of a decree, settlement agreement, injunction, or past orders. *Frew v. Hawkins*, 540
4 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees
5 and hoping for compliance. Once entered, a consent decree may be enforced."); *see*
6 *also Parsons v. Ryan* ("*Parsons III*"), 949 F.3d 443, 454 (9th Cir. 2020) (affirming
7 district court's power to enforce a past order through civil contempt). The Court's
8 authority to issue further orders is at its zenith in situations such as this: long-running
9 cases vindicating basic rights. *See Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir.
10 2014) (citing the "ongoing, intractable nature of this litigation").

11       Moreover, a "district court [i]s not required to make new findings of a
12 constitutional violation before enforcing" past judgments, settlements, or orders, with
13 further orders directed against prison or jail officials. *Parsons v. Ryan* ("*Parsons II*"),
14 912 F.3d 486, 501 (9th Cir. 2018). A court can use "all remedies provided by law."
15 *Id.* at 497-98. "Courts may not allow constitutional violations to continue simply
16 because a remedy would involve intrusion into the realm of prison administration."
17 *Brown v. Plata*, 563 U.S. 493, 511 (2011). [38]

18       This Court retains all powers of an Article III court, and those authorized by
19 case law, statute, and the Federal Rules. *See Roadway Exp., Inc. v. Piper*, 447 U.S.
20 752, 764 (1980) (holding that "[t]he inherent power of federal courts are those which
21 'are necessary to the exercise of all others.'") (quoting *United States v. Hudson*, 7

22

23 [38] The Prison Litigation Reform Act does not change the *Winter* standard for entry of
24 a preliminary injunction; it requires only that any prospective relief is narrowly drawn,
goes no further than necessary, and is the least intrusive remedy. 18 U.S.C. §
25 3626(a)(1)(A); *see also Plata*, 563 U.S. at 526 ("[t]he PLRA should not be interpreted
to place undue restrictions on the authority of federal courts to fashion practical
26 remedies when confronted with complex and intractable constitutional violations.").
27 The only limitation is that the injunction "shall automatically expire on the date that
is 90 days after its entry, unless the court makes the findings under subsection (a)(1)
28 . . . and makes the order final." 18 U.S.C. § 3626(a)(2).

Cranch 32, 34 (1812)). The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also United States v. N.Y. Tel. Co*., 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued . . . ."); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987) (same).

While Plaintiffs do not have to prove new constitutional violations for the Court to issue further enforcement orders, *see Parsons II*, 912 F.3d at 501, the IRC conditions clearly violate their constitutional rights. Class members held there consist overwhelmingly of recent arrestees not yet convicted of any crime. The rights of pretrial detainees "are analyzed under the Fourteenth Amendment Due Process Clause, rather than under the Eighth Amendment." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (*citing Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)). The Fourteenth Amendment is more protective than the Eighth Amendment "because the Fourteenth Amendment prohibits *all* punishment of *pretrial detainees*." *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1163 (9th Cir. 2020) (emphasis in original) (*quoting Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004)).[39] A jailer's conduct

---

[39] The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. This provision is only applicable only to people convicted of crimes and is violated when correctional officials, acting with deliberate indifference, deprive incarcerated people of "the minimal civilized measure of life's necessities" that place them at "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the Fourteenth Amendment, only the objective prong is applicable and plaintiffs do not have to prove subjective deliberate indifference by officials. *Kingsley v. Hendrickson*, 576 U.S. 389, 397-99 (2015); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert denied sub nom. Cnty. of Orange, Cal. v. Gordon*, 139 S.Ct. 794 (2019) (holding this test applies to violations of right to adequate health care in jails). Accordingly, while many of the cases cited herein about conditions in

constitutes punishment if it is either not rationally related to a legitimate, nonpunitive government purpose, or is excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Demery*, 378 F.3d at 1030-33.[40] This requires showing at least reckless disregard by jail officials for detained persons' health or safety. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).

### 1. Floor Sleeping / Overcrowding

 "[A] jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment." *Thompson,* 885 F.2d at 1448. The 1979 Judgment similarly provides that "every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep." Ex. 15-A ¶ 1(a). The 1992 Stipulation and the 2005 Order reiterate this requirement, set out a procedure for recording floor sleepers, and incorporate the State of California's minimum requirements for county jails from Titles 15 and 24 of the California Code of Regulations. *Id*. Ex. B; *Rutherford*, 2005 WL 3388141, at *1 ¶¶ 1-3, 5.

As the Three Judge Panel noted in a decision related to overcrowding in the California state prison system, "A prison system's capacity is not defined by square footage alone; it is also determined by the system's resources and its ability to provide inmates with essential services such as food, air, and temperature and noise control." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 921 (E.D. Cal. & N.D. Cal. 2009) (Three Judge Panel). In its affirmance of the Three Judge Panel's subsequent order directing CDCR to reduce its population, the Supreme Court observed:

> Crowding also creates unsafe and unsanitary living conditions that hamper effective delivery of medical and mental health care. A medical expert described living quarters in converted gymnasiums or dayrooms, where large numbers of prisoners may share just a few toilets and

---

the Jail involve the stricter Eighth Amendment standard, the conditions *a fortiori* violate the Fourteenth Amendment.

[40] In an injunctive case, plaintiffs need not show actual physical injury; rather, the Constitution is violated by an unreasonable risk of harm. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)); *see also Plata*, 563 U.S. at 531-32.

showers, as breeding grounds for disease. Cramped conditions promote unrest and violence, making it difficult for prison officials to monitor and control the prison population. . . . Living in crowded, unsafe, and unsanitary conditions can cause prisoners with latent mental illnesses to worsen and develop overt symptoms. Crowding may also impede efforts to improve delivery of care.

*Plata*, 563 U.S. at 519-521 (cleaned up).

Forty-four years ago, the late Judge Gray described the IRC's crowding as "a repelling experience" and "a spectacle" he compared to "an overcrowded pig pen." *Rutherford*, 457 F. Supp. at 114. Here, Defendants' own daily data reports show that dozens, and on occasion hundreds, of people are held at the IRC, night after night, without blankets and a mattress, let alone a bed or bunk. Class members similarly report these exhausting and degrading experiences of going for nights without a bed, bunk, or mattress. *See supra* pages 19-20; *see generally* class member declarations. The fact that hundreds of class members have gone days without a bed, bunk, or mattress unquestionably violates orders of this Court, the 1979 Judgment, and constitutional and statutory requirements. Plaintiffs have shown not only that the number of people in the IRC repeatedly has exceeded capacity, but also that the sheer quantity of class members crammed in the IRC for days on end, creates "toxic" living conditions for both the people detained in the unit as well as the people working in it.

## 2. Lack of Adequate Healthcare, Including Medications

The 1992 stipulation, entered by the Court, held that "[t]he Sheriff shall work towards . . . providing constitutionally adequate health care to all inmates in his custody . . . ." Ex. 15-B at 10 ¶ 9. In the Ninth Circuit, an incarcerated person may show a "serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012).

Health care conditions that significantly affect a person's daily activities or result in chronic and substantial pain are serious medical needs, even if they are not

30

Case No. CV 75-04111 DDP
PLFS' MOT. FOR PRELIM INJ. & TRO; MEM. OF PTS. & AUTH.

immediately life-threatening. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992). Mental health needs are as serious as physical health needs. *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). The failure to provide needed medications, or to properly supervise their prescription, is deliberate indifference to serious health care needs. *See, e.g., Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000).[41]

In 2006, this Court enjoined Defendants from "[h]olding an inmate in the IRC without providing ongoing access to adequate medical care, including but not limited to regular pill call and sick call." *Rutherford*, 2006 WL 3065781 at *4, ¶ 4. Despite being in a "clinic," IRC detainees have erratic access to sick call at best. Many are denied medication they were prescribed and taking prior to arrest, with dangerous effects as documented by psychiatrist Dr. Kupers. Ex. 16 ¶¶ 13-19. Multiple declarants and detainees reported that they were told they would not receive psychotropic medication until they were in permanent housing. *See supra* at 20-21. Many others are detoxing from alcohol, opioids, and other drugs. The overcrowding makes it difficult for deputies to observe people in case of medical emergencies. And as described above, at least two people have died in the IRC since April. These failures meet both the Eighth Amendment standard of deliberate indifference as well as the Fourteenth Amendment standard for pretrial detainees.

### 3. Denial of Adequate Food and Water

Food is a basic necessity of life, guaranteed to incarcerated people by the Constitution. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *amended on other grounds*, 135 F.3d 1318 (9th Cir. 1998); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). While jail food need not be "tasty or aesthetically pleasing," it must be

---

[41] Opiate and heroin withdrawal are serious medical needs to which corrections officials may not be deliberately indifferent. *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005); *Gonzalez v. Cecil Cnty., Md.*, 221 F. Supp. 2d 611, 616 (D. Md. 2002).

"adequate to maintain health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

Incarcerated people also must have adequate, clean, drinking water. *See Hope*, 536 U.S. at 738 ("prolonged thirst" contributed to Eighth Amendment violation); *Hearns v. Terhune*, 413 F.3d 1036, 1043 (9th Cir. 2005) (holding that allegations of a lack of drinkable water is sufficient to state a cause of action); *Jackson v. State of Arizona*, 885 F.2d 639, 641 (9th Cir. 1989), *superseded by statute on other grounds as stated in Lopez*, 203 F.3d at 1130 (reversing dismissal of a claim that prison drinking water was polluted).

For detainees held for more than a few hours in the IRC, the inadequate and nutritionally unbalanced food and erratic access to potable water, described above, violate minimal constitutional standards.

### 4.  Lack of Ventilation or Basic Sanitation / Nonfunctioning Toilets

A necessity of life that is as basic as food and water is adequate and functional toilet facilities. In *Hope*, 536 U.S. at 738, the U.S. Supreme Court understated the obvious when it held that denying a prisoner access to a toilet "created a risk of particular discomfort and humiliation," and led to an Eighth Amendment violation. *See also Johnson v. Lewis*, 217 F.3d 726, 732-33 (9th Cir. 2000) (denying prisoners adequate toilet facilities, and prison conditions that resulted in "prisoners wetting each other with urine," stated a claim for an Eighth Amendment violation); *Fischer v. Winter*, 564 F. Supp. 281, 302 (N.D. Cal. 1983) (failure to increase bathroom facilities while population increased was unconstitutional); *DeSpain v. Uphoff*, 264 F.3d 965, 974-75 (10th Cir. 2001).

"Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary." *Keenan*, 83 F.3d at 1090 (*quoting Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985)). As the Ninth Circuit held in *Keenan*, "[i]f the air was in fact saturated with the fumes of feces, urine, and vomit, it could undermine health and sanitation." *Id.*

Here, the lack of cleanliness in the IRC, inadequate access to functional toilets,

and poor ventilation together create an unhealthy, unsanitary environment which violates minimum Fourteenth and Eighth Amendment constitutional standards.

### 5. Denial of Showers / Personal Hygiene Products / Clothing

Incarcerated people must have reasonable opportunities for personal cleanliness, including regular access to functional showers. *Toussaint v. McCarthy*, 801 F.3d 1080, 1110-11 (9th Cir. 1986). Indigent incarcerated people have the right to personal hygiene supplies such as toothbrushes and soap. *See Keenan*, 83 F.3d at 1091 (citing *Hoptowit*, 682 F.2d at 1246, and *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1411 (N.D. Cal. 1984)), *reversed in part on other grounds in Toussaint*, 801 F.2d 1080 (the Eighth Amendment guarantees personal hygiene)).

In 1992, the parties stipulated, and the Court so ordered, that "[e]ach inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those he has been using." Ex. 15-B at 7 ¶ 7. In 2006, the Court enjoined defendants from "[h]olding an inmate in a cell in the IRC which is not maintained in a clean and sanitary condition, including access to a functioning toilet, potable drinking water and clean water to wash[.]" *Rutherford*, 2006 WL 3065781, at *4. In 2007, the parties stipulated that they would provide hygiene kits to people in IRC overflow housing, and that these people would "have access to showers." Doc. 134 at 3,7. Defendants' current practices in the IRC violate past court orders and run afoul of the constitutional minima.

### 6. Chaining People to Fixed Objects for Hours and Days on End

Defendants chain people with serious mental illness to the Front Bench who are awaiting mental health screening exams. Defendants' own reports show that people spend days in this condition, causing physical and psychological injury. This barbaric practice violates all basic norms of human decency and the Constitution. *See Hope*, 536 U.S. at 736 (Eighth Amendment violated when Alabama prison handcuffed a man to a "hitching post" when there was a "clear lack of an emergency situation"); *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) (overly tight handcuffs);

*Madrid v. Gomez*, 889 F.Supp. 1146, 1168-71, 1254-55 (N.D. Cal. 1995) (chaining prisoners to toilets or other objects); *see also* Ex. 16 (Dr. Kupers) ¶¶ 28-30.

### B. Plaintiffs Will Suffer Irreparable Harm if a TRO and Preliminary Injunction Do Not Issue.

Class members are at risk of suffering irreparable harm, including death, if they remain incarcerated in the IRC in these abysmal conditions. Courts "evaluate these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citations omitted).

The risk of harm is profound. Class members are locked in an unsafe, unhygienic, and barbaric environment, with many denied essential medications. People have died recently while detained in the IRC. Defendants' refusal to undertake measures to divert significantly more people from the Jail, or reduce the Jail's overall population, are causing an interacting and cascading set of failures that make it impossible for the Jail to process arrestees through the IRC or to provide them the modicum of basic human needs. Where, as here, a violation of constitutionally protected rights is shown, no further showing of irreparable injury is required. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (holding that the deprivation of constitutional rights "unquestionably constitutes irreparable injury.").

### C. The Balance of Equities Tip Overwhelmingly in Plaintiffs' Favor

As demonstrated above, and in the declarations, Plaintiffs are likely to prevail on their legal claims, and the risk of harm is profound. The threatened injury to class members outweighs any theoretical injury posed by the requested injunction.

While Defendants may argue that diverting class members to community-based resources somehow will impact public safety, any such impact pales in comparison to the potential human cost of continuing to detain human beings in these medieval

conditions, and is purely speculative. These alternatives to incarceration have low recidivism rates, *see supra* pages 9-10, and the County has failed to properly fund them. Defendant Villanueva has broad authority under state law to move or release people. Any fearmongering that a person might commit a crime if not incarcerated in the IRC must be weighed against the clear evidence that the longer the problems at the IRC go unaddressed, the greater the risk to class members. And a "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (citations omitted).

**D. An Injunction is in the Public Interest**

"[T]he public interest is a factor to be strongly considered" in granting a preliminary injunction. *Lopez v. Heckler*, 713 F.2d 1432, 1435-36 (9th Cir. 1983). It is clearly in the public interest for Los Angeles County's jails to provide constitutionally adequate conditions of confinement to the people detained within it. *Melendres*, 695 F.3d at 1002 (holding that "it is always in the public interest to prevent the violation of a party's constitutional rights"); *see also Coleman v. Brown*, 960 F. Supp. 2d 1057, 1073 (E.D. Cal. & N.D. Cal. 2013) (Three Judge Panel); *cf. Plata*, 563 U.S. at 510-11; *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1022 (N.D. Cal. 2013) ("the Court need not wait until a death to require compliance with its orders").[42]

## CONCLUSION

For the aforementioned reasons, and all evidence submitted in support of this motion, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction. A proposed order is attached.

---

[42] Plaintiffs should not be required to post a bond. This action has been brought by a class of indigent plaintiffs, and this Court did not previously require the posting of a bond. *See Rutherford*, 2006 WL 3065781, at *5.

Respectfully submitted,

DATED: September 8, 2022          By:  */s/ Corene T. Kendrick*

Peter J. Eliasberg
Melissa Camacho-Cheung
**ACLU FOUNDATION OF SOUTHERN**
**CALIFORNIA**

David C. Fathi
Corene T. Kendrick
Eric Balaban
**ACLU NATIONAL PRISON PROJECT**

Attorneys for Plaintiffs Dennis Rutherford,
*et al.*

PLFS' MOT. FOR PRELIM INJ. & TRO; MEM. OF PTS. & AUTH.