Declarations in Support of Plaintiffs' Ex Parte Application for a Temporary Restraining Order

Index

| Incarcerated Persons' Declarations | Exhibit No. |
| --- | --- |
| Chuck Bethel 6441286 | 1 |
| Diego Bolton 6440156 | 2 |
| Jerome Dubose 6449211 | 3 |
| Daniel Gonzalez 64522365 | 4 |
| Curtis Howard 6450654 | 5 |
| Tony Jones 6440194 | 6 |
| Damian Payan 6435838 | 7 |
| Gilberto Perez 6442809 | 8 |
| Ira Porter 6440363 | 9 |
| Giovanni Reese 6441248 | 10 |
| George Ruiz 6449491 | 11 |
| Bryan Salinas 6434820 | 12 |

| Attorney and Expert Declarations | Exhibit No. |
| --- | --- |
| Peter Eliasberg | 13, Sub-Exhibits A-F |
| Summer Lacey | 14 |
| Corene Kendrick | 15, Sub-Exhibits A-B |
| Terry Kupers | 16, Sub Exhibits A-D |

# Exhibit 1

**Declaration of Chuck Bethel 6441286**

I, Chuck Bethel, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been in IRC since Friday about 6pm. I came from court in Compton after being arrested in LA and spending time in station jail.

3.      I am bipolar schizophrenic and have been taking meds since I was a child. I currently take Buspar, Risperdal, Zyprexa, and Abilify for my mental health. But since I have been in IRC I have not gotten psych meds. I am hearing voices and feel like I am falling apart. I saw the psychiatrist who told me I can't get my meds until I am housed. I have been crying on and off since I have been here.

4.      It is crowded filthy and inhumane to be here. I have had no shower and no change of clothes as of Monday at 11am.

5.      The only food is peanut butter sandwiches, bananas and cookies but I am afraid to eat because voices say to me it is poisoned.

6.      My first night I was in a holding cell with about 40-50 other people. It's triangle-shaped and about 15x15x15. It was awfully crowded. Everyone was lying cramped up without blankets or mattresses and it was cold.

7.      The last two nights I have laid down in open clinic area on the floor. It is disgusting with food cartons, peanut butter. Some people come in drunk or high and lie down and pee on the floor while they sleep.

8.      I was thinking about suicide but don't want to tell anyone because if I do they will chain me to chair. I have seen lots of people chained up who get hit by other inmates because they can't defend themselves.

9.      The toilets are overflowing. Water trickles out of the sinks, which are full of dirt and food scraps and people pee in them.

10.      Deputies treat us terribly. When I ask for anything they say "this is

jail" or tell me to sit down and wait my turn.

11.   They only started cleaning up when people from the ACLU come.


I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2022 in Los Angeles, California.


Chuck Bethel


I, Peter Eliasberg, interviewed Mr Bethel in the IRC on August 22nd, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.

Peter Eliasberg

**Declaration of** Chuck Bethel 6441286

I, CHUCK BETHEL , hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in IRC since Friday about 6pm. I came from Court in Compton after being arrested in LA + spending time in station jail.

3) I am bi polar schizophrenic + have been taking meds since I was a child I currently take Buspar, Risperadol/Cyprexa + Abilify for my mental health. But since I have been in IRC I have not gotten Psych meds. I am hearing voices + feel like I am falling apart. I saw the psychiatrist who told me I can't get my meds until I am housed I have been crying on + off since I have been here.

4) It is crowded filthy + inhumane to be here. I have had no shower + no change of clothes as of Monday at 11am.

5) The only food is peanut butter sand- wiches hard fits + cookies but I am afraid to eat because voices tell to me it is poisoned

6) my first night I was in a holding cell with about 40-50 other people It's triangle shaped + about 15 x 15 x 15





1  It was awfully crowded. Everyone was
2  lying cramped up without blankets
3  or mattresses + it was cold
4  6) The last two nights I have slept in
5  open clinic area on the floor. It
6  is disgusting with food coating, peanut
7  butter. Some people come in drunk or
8  high + lie down + pee on the floor
9  while they sleep.
10  7) I was thinking about suicide but don't
11  want to tell anyone because if I
12  do they will chain me to a chair
13  I have seen lots of people chained
14  up who get hurt by other inmates
15  because they can't defend themselves
16  8) The toilets are overflowing. Water overflows
17  out of the sinks, which are full of
18  dirt + food scraps + people pee in them
19  9) Deputies treat us terribly. When I ask
20  for anything they say "this is jail" or
21  tell me to sit down + wait my turn.

22  I declare under penalty of perjury of the laws of the State of California and the United
23  States that the foregoing is true and correct.  Executed this 22 day of August 2022 in Los
24  Angeles, California.

25  CHUCK BETHEL
26  X Chuck Bethel
27  [Printed Name]

28  9) They only started cleaning up
    when people from the ACLU came

# Exhibit 2

**Declaration of Diego Bolton 6440156**

I, Diego Bolton, hereby declare:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.     I have been in the inmate reception center since last Tuesday after I turned myself in at the Lancaster courthouse.

3.     When I first came in I got the only shower I have had since I came. We also got left in the shower room for 4 hours.

4.     Since I came in I have not had a change of clothes and my clothes are filthy.

5.     My first night I slept in the cage in the clinic area which is about 25x50 feet. There were about 300 people in the cage trying to sleep on the floor or on metal benches. We had no mattresses, no blankets and it was very very cold.

6.     Other nights I have been herded into holding cells.

7.     In the holding cells there have been 13-15 people. Again we had no blankets, mattresses and it was very cold.

8.     The whole area is filthy with food and food cartons all over the floor. The place smells of urine and excrement because some toilets don't work and people who are chained to chairs sometimes pee on the floor because the deputies won't unchain them.

9.     I am allergic to peanut butter but almost the only food they give us is peanut butter sandwiches, 1 or 2 cartons of OJ a day and some cookies, plus a few burrito. I am very hungry.

10.     The water fountains don't work. There are 8 phones in the cage and usually 7 or 8 are broken.

11.     Everyone is on edge because it is crowded, we can't sleep, deputies treat us like we are subhuman.

12.     Everywhere in the area there is blood and pee on the floor and people

1

have to sleep on the floor.

13.    I am afraid that deputies will punish me for talking to you.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2022 in Los Angeles, California.


Diego Bolton


I, Peter Eliasberg, interviewed Mr Bolton in the IRC on August 22nd, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.

Peter Eliasberg

1         **Declaration of** Diego Bolton BN 6440156

2     I, DIEGO Bolton _____ , hereby declare:

3      1.    I make this declaration based on my own personal knowledge and if called to

4 testify I could and would do so competently as follows:

5      2.   I have been in the inmate

6 reception center for since last

7 Tuesday when after I turned myself

8 in at the Lancaster courthouse.

9 3. When I first came in I got

10 the only shower I have had since

11 I came. We also got left in the

12 shower room for 4 hours.

13 4) Since I came in I have not

14 had a change of clothes + my

15 clothes are filthy.

16 5) my first night I slept in the.

17 cage in the clinic area which is

18 about 25 x 50 feet. There were

19 about 300 people in the cage trying

20 to sleep on the floor or on metal

21 benches. We had no mattresses, no

22 blankets + it was very, very cold

23 2) other night I have been hordled

24 into holding cells.

25 6) In the holding cells there have

26 been 13-15 people. Again we had

27 no blankets mattresses + it was

28 very cold.

7) The whole area is filthy with food, +
food cartons all over the floor
The place smells of urine + excrement
because some toilets don't work
+ people who are chained to chairs
sometimes pee on the floor because
the deputies won't unchain them.
8) I am allergic to peanut butter
but almost the only food they
give us in peanut butter sandwiches
1 or 2 cartons of OJ a day +
some coffees. I am very hungry
9) The water fountains don't work
There are 8 phones in the cage
+ usually 7 or 8 are broken
(10) Everyone is on edge because it
is crowded, we can't sleep
Deputies treat us like we are
subhuman
11) Everywhere in the area there is
blood or pee on the floor + people
have to sleep on the floor.

I declare under penalty of perjury of the laws of the State of California and the United

States that the foregoing is true and correct.  Executed this 22 day of Aug 2022 in Los

Angeles, California.

DIEGO BOLTON

Diego Bolton

[Printed Name]

✳ plus a few burrito
12) I am afraid that deputies
will punish me for talking to you

# Exhibit 3

1    **Declaration of** _Jerome Dubose 6449211_

2    I, _Jerome Dubose_ , hereby declare:

3        1.    I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5        2.  I believe I was Arrested on Monday,

6    August 22, 2022. I was initially kept at a police

7    Station in Downtown Los Angeles where I had a

8    mattress and 3 hot meals.

9       3. On Wednesday Afternoon, I was taken to

10       IRC. I believe I Am being held on a

11       Parole violation.

12      4. I was not provided with a shower when

13       I came to IRC.

14      5. Since coming to IRC, I have had to

15       Sleep on the floor without a mattress or blanket.

16     6. I have received medical Attention for An

17      infection in my left leg. Specifically, I

18      was given Antibiotics and a wheelchair

19      However, the wheelchair was taken

20      from me on Sunday. I Asked to be Able

21      to keep the wheelchair, but was told

22      I no longer needed it. I still need the

23      wheelchair. I have pain in both legs

24      when I walk and intense pain in

25      the lower portion of my left leg @ the

26      Site of the infection.

27

28

7. Since entering IRC, I have been given a peanut butter + jelly sandwich, cookies and orange juice for breakfast and lunch and a burrito for dinner. I am allergic to peanut butter and cannot eat the sandwiches. On occasion the deputies have given me an extra burrito at dinner.

8. In addition to being allergic to the peanut butter, I am concerned about the harmful health effects from the food. I was formerly diagnosed with Diabetes and was insulin dependent. Through diet control, I have been able to go off diabetes meds and am now considered pre-diabetic. I fear that the food will make me diabetic again.

9. On Sunday, I started experiencing sudden stomach pains and defecated on myself. I asked to take a shower to clean myself after the accident. I was not provided with a shower. I was given a change of clothes + a towel to clean myself with.

10. I have been diagnosed with Depression. I take zoloft to manage the depression. I have also been diagnosed with paranoid schizophrenia. I take trazodone to manage the paranoid schizophrenia.

I have been feeling
JD
1   11. ~~The~~ very depressed and emotional Throughout
2   the day since entering IRC. Throughout
3   the day, I will break out into tears.
4   12. I have repeatedly asked to speak to a mental
5   health specialist. My requests have all
6   been denied. I have been told that I
7   have to wait until I have housing. When
8   I ask when I will be moved, I have been
9   told that I am "waiting for a bed"
10  13. I have not received psychiatric medication
11  since my arrival at IRC.
12  14. On thursday (8/25) another incarcerated person
13  got upset at me, threw water in my face, and threatened
14  to harm me. Other incarcerated people calmed that
15  individual down.
16  15. The conditions in IRC are horrible. It is
17  especially difficult for me because I am
18  (61) years old.
19  16. I was last released from LA Jails about 2 months ago.
20  I was not provided with a release plan.
21
22      I declare under penalty of perjury of the laws of the State of California and the United
23  States that the foregoing is true and correct. Executed this 29 day of August 2022 in Los
24  Angeles, California.
25
26                                      Printed name: Jerome Deebose
27                                                    Jerome Dubose
28

# Exhibit 4

1     **Declaration of** Daniel Gonzalez 6452236 5

2     I, Daniel Gonzalez _____, hereby declare:

3     1.    I make this declaration based on my own personal knowledge and if called to

4     testify I could and would do so competently as follows:

5     2. I believe that I was arrested on

6     Friday, August 26, 2022. I have been in

7     IRC since Saturday. I came from the

8     Police station in Lakewood. I have not

9     been to court.

10     3. I have not been offered housing since

11     Arriving at IRC. I have only slept

12     5 hours since being brought to

13     IRC. When I did sleep, I slept on

14     The floor. I did not have a mattress

15     nor a blanket to sleep on.

16     4. I believe I was moved to the front

17     bench on Sunday, August 28th. Both

18     of my hands have been handcuffed

19     Since I was moved to the front bench.

20     ~~5. My left and my right wrist~~

21     ~~from the handcuffs~~

22     6. I suffer from schizophrenia, I

23     take Seroquel on the outside. I have

24     not ~~had~~ my medication since I entered

25     IRC.

26     7. I have been feeling Anxious.

27     8. I have not slept since ~~I was~~ being

28     moved to the front bench and being

    handcuffed to The chair.

9. I was previously released from LA Jails about one year ago. I do not know if I was provided with a release plan at the time of my release.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      I declare under penalty of perjury of the laws of the State of California and the United

23  States that the foregoing is true and correct. Executed this 29th day of August , 2022 in Los

24  Angeles, California.

25

26                                  Printed name: Gonzalez

27                                                 Daniel

28

# Exhibit 5

### Declaration of Curtis Howard 6450654

I, Curtis Howard, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I live in Long Beach. I was arrested in Long Beach for driving a vehicle without the owner's consent. I spent the night in a Long Beach police station and  came to IRC on Thursday about 5 pm. It is now Monday at 5:45 pm so I have been in IRC continuously for 4 days.

3.      I have chronic PTSD and severe depression. On the outside I take Trazodone, Abilify, Wellbutrin and one other psych med, but I don't remember what it is called. When I came to IRC I did talk to a psychiatrist and told him the meds I was taking. But I have not gotten them since I have been here.

4.      Since being without meds my anxiety is skyrocketing and I feel like I am on the verge of a panic attack.

5.      When I came to IRC they put me in a wheelchair and rushed me up here because I was in terrible stomach pain. But I never got a full medical exam. Because they rushed me up here, I did not get a shower and I have not had one since I have been here.

6.      The conditions here are miserable. We have no mattresses beds or blankets. So I have to sleep upright in a chair or on the cold, hard concrete floor. I feel like the concrete is sucking the like out of my body. I ache all over. It is so uncomfortable I only sleep an hour or two at a time.

7.      The IRC clinic area is filthy. There is trash all over the floor and I have seen lots of people on the front benches, who are the guys with serious mental illness, urinate on the floor. They yell for the deputies to unchain them so they can go to the bathroom.  But the deputies ignore them, so they urinate on the floor. One time I saw someone on the front bench call for the deputies. When they ignored him he stood up and was able to reach the trash can, where he defecated in the

1

trash can. The whole area stank. But no one emptied the trash can for a few hours. Even though the guy was chained to the bench the chain was long enough for him to reach the trash can.

8.      The only time they did a decent cleaning was about an hour before the ACLU came today.

9.      They regularly herd everyone in the clinic area into the cage, up to 100 people, where we are packed like sardines. I had to spend at least one night in that cage.  Tensions are high in the cage and there have been multiple fights.

10.      One night when I was sleeping on the floor a deputy yelled at me to move so could subdue an inmate. The deputy stepped on my toe hard. I heard it pop and I got cut. I asked for medical care because I think it's broken. Eventually they gave me some hydrogen peroxide.

11.      The sinks are filthy, there are no water fountains and I feel really dehydrated.

12.      A deputy told me I am stuck here because I need Moderate Observation Housing, but none is available.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.


Curtis Howard


I, Peter Eliasberg, interviewed Mr Howard in the IRC on August 29th, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word

1   processed version of this declaration and declare that it accurately reflects the
2   content of the handwritten, signed version.

3          I declare under penalty of perjury of the laws of the State of California and
4   the United States that the foregoing is true and correct. Executed September 5,
5   2022 in Los Angeles, California.

Peter Eliasberg

Declaration of CURTIS HOWARD 6450654

1

2   I, _____ CURTIS HOWARD _____, hereby declare:

3      1.   I make this declaration based on my own personal knowledge and if called to

4   testify I could and would do so competently as follows:

5      2.   I live in Long Beach. I was

6   arrested in Long Beach for driving

7   a vehicle without the owner's consent

8   I spent the night in a Long Beach

9   police station and came to IRC

10  on Thursday about 5 pm. It is

11  now Monday at 5:45 pm so I have

12  been in IRC continuously for 4 days.

13  3) I have chronic PTSD and severe

14  depression. On the outside I take

15  Trazodone, Abilify, wellbutrin and

16  one other psych med, but I don't

17  remember what is called. When

18  I came to IRC I did talk to

19  a psychiatrist + told him the meds

20  I was taking. But I have not

21  gotten them since I have been here

22  4) Since being without meds my

23  anxiety is skyrocketing + I feel

24  like I am on the verge of a

25  panic attack

26  5) When I came to IRC they put

27  me in a wheelchair + rushed

28  me up here because I was

in terrible stomach pain. But I

Created with Scanner Pro



1  I never got a full medical
2  exam. Because they rushed
3  me up here, I did not get
4  a shower + I have not had
5  one since I have been here
6  6) The conditions here are
7  miserable. We have no mattresses
8  beds or blankets. So I have to
9  sleep upright in a chair or on
10 the cold, hard concrete floor. I
11 feel like the concrete is sucking
12 the life out of my body, I ache
13 all over. It is so uncomfortable
14 I only sleep an hour or two
15 at a time
16 7) The IRC clinic area is filthy.
17 There is trash all over the floor
18 I have seen lots of people on
19 the front benches, who are the
20 guys with serious mental illness,
21 urinate on the floor. They yell
22 for the deputies to unchain them
23 so they can go to the bathroom.
24 But the deputies ignore them, so
25 they urinate on the floor. One
26 time I saw someone on the front
27 bench call for the deputies. When
28 they ignored him he stood up
   and was able to reach the trash
   can, where he to defecated in

Created with Scanner Pro

11) The banks are filthy, there are no water fountains + I feel really dehydrated.

1. the trash can. The whole area stank.
2. But no one emptied the trash can
3. for a few hours. Even though the
4. guy was chained to the bench the
5. chain was long enough for him to reach
6. the trash can.
7. 8) The only time they did a decent cleaning
8. was about an hour before the ACLU
9. came today
10. 9) They regularly herd everyone in the
11. chair area into the cage, up too
12. 100 people, where we are packed like
13. sardines. I had to spend at least one
14. night in that cage. Tensions are
15. high in the cage + there have been
16. multiple fights
17. 10) One night when I was sleeping on the
18. floor a deputy yelled at me to move
19. so they could subdue an inmate. The
20. deputy stepped on my toe hard. I
21. heard it pop + I got out. I asked

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 29 day of August 2022 in Los Angeles, California.

X _____

Printed name: CURTIS HOWARD

for medical care because I think
it's broken. At Eventually they
gave me some hydrogen peroxide.
(over)



12) A deputy told me I am stuck here because I need Moderate Observation Housing, but none is available.

Created with Scanner Pro

12) A deputy told me I am stuck here because I need Moderate Observation Housing, but none is available.

# Exhibit 6

**Declaration of Tony Jones 6440197**

I, Tony Jones, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      My name is Tony Jones and my booking number is 6440197.  I was brought to IRC on Thursday August 18 from court. After around 3 hours of processing, I was taken to the showers and left in the showers with around 60 people. We stayed in the shower for around 6 hours. It was horrific. I didn't know what was going on. It was stuffy, and I felt like I couldn't breathe.

3.      After the shower area, I was taken with the large group to the IRC clinic. In the clinic I finally got a meal of peanut butter and jelly and 2 juices.

4.      On Friday I was frustrated because the phones weren't working. I asked deputies and a supervisor about getting the phones to work. Deputies then put me in handcuffs and chained to the front bench. I was on the front bench, chained in handcuffs until Monday Morning August 22.

5.      When I was on the front bench the man chained to the chair next to me pulled his pants down and pooped on the floor. The feces stayed on the floor for two days. No one comes to clean the front bench area. I saw people pee into orange juice boxes. The area stank from the feces and pee.

6.      I was allowed back in the clinic area Monday morning. My left wrist is sore and has a mark from the handcuffs. I have no access to fresh water. The sink is disgusting. The toilet is stuffed with feces and makes the place smell.

7.      When I first arrived in the clinic on Friday, I was feeling dizzy and nauseous form alcohol withdrawals. I asked deputies for help, but they disregarded me.  I had a panic attack on Friday but could not take the Xanax I would normally take.

8.      I was supposed to go to court today.  I believe I might have been released as a DA reject or to time served.  I told the deputies I had court, but no

1

1    one took me to court.

2       9.     The conditions in IRC are inhumane.

3       I declare under penalty of perjury of the laws of the State of California and

4 the United States that the foregoing is true and correct. Executed this 22nd day of

5 August, 2022 in Los Angeles, California.

6

7                         Tony Jones

8

9       I, Melissa L. Camacho-Cheung, interviewed Mr. Jones in the IRC on August

10 22, 2002, took notes and then wrote up his declaration while in the IRC, which is

11 attached. I read Mr. Howard the declaration, he approved its contents and signed it.

12 I have reviewed this word processed version of this declaration and declare that it

13 accurately reflects the content of the handwritten, signed version.

14       I declare under penalty of perjury of the laws of the State of California and

15 the United States that the foregoing is true and correct. Executed September 6,

16 2022 in Culver City, California.

17

18

19                    */s/ Melissa L. Camacho-Cheung*

20                    Melissa L. Camacho-Cheung

21

22

23

24

25

26

27

28

1    **Declaration of** ___Tony Jones___

2    I, ___Tony Jones___, hereby declare:

3    1.    I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5    2.    My name is Tony Jones and my booking number is

6    6440197. I was brought to IRC on Thursday August 18 from

7    court. After around 3 hours of processing, I was taken to

8    the showers and left in the showers with around 60 people.

9    We stayed in the shower for around 6 hours. It was horrific.

10   ~~the~~ I didn't know what was going on. It was stuffy, and I felt

11   like I couldn't breathe.

12   After the shower area, I was taken with the large group

13   to the IRC Clinic. In the Clinic I finally got a meal of

14   peanut butter and jelly and 2 juices.

15   On Friday I was frustrated because the phones weren't

16   working. I asked deputies and a supervisor about getting the

17   phones to work. Deputies then put me in handcuffs and

18   chained me to the front bench. I was on the front bench,

19   chained in handcuffs until Monday morning August 22.

20   When I was on the front bench the man chained to the

21   chair next to me pulled his pants down and pooped on the

22   floor. The feces stayed on the floor for two days. No one

23   comes to clean the front bench area. I saw people pee

24   into orange juice boxes. The area stank from the feces

25   and pee.

26   I was allowed back in the Clinic area Monday morning.

27   My left wrist is sore and has a mark from the handcuffs.

28   I have no access to fresh water. The sink is disgusting.

1  The toilet is stuffed with feces and makes the place smell.
2     When I first arrived in the Clinic on Friday, I was feeling dizzy
3  and nauseous from alcohol withdrawals. I asked deputies for
4  help, but they disregarded me. I had a panic attack on
5  Friday but could not take the Xanax I would normally take.
6     I was supposed to go to court today. I believe I might
7  have been released as a DA reject or to time served.
8  I told the deputies I had court, but no one took me to
9  court.
10    The conditions in IRC are inhumane.
11
12
13
14
15
16
17
18
19
20
21
22     I declare under penalty of perjury of the laws of the State of California and the United
23  States that the foregoing is true and correct.  Executed this 22 day of August 2022 in Los
24  Angeles, California.
25
26                                        Tony Jones
27                                        [Printed Name]
28

                                        2

# Exhibit 7

**Declaration of Damian Payan 6435838**

I, Damian Payan, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been in IRC for about four days. I came to IRC from the Norwalk courthouse. I am homeless and have been for about five years.

3.      On August 10 the prisoner transport I was in stopped short and I slammed my head, chipped a tooth, hurt my shoulder and the waist chain made a bump across my waist where I was already dealing with an infection.

4.      Since I have been here I have had to sleep on the floor. It is cold. I have no mattress or blankets and it is incredibly uncomfortable and painful because of my shoulder and stomach pain. I am sleeping only about two hours a night.

5.      It is also hard to sleep because the floor is filthy. There are food wrappers and OJ containers. I have seen people pee on the floor. The other day I lay down on the floor and did not see a puddle of liquid and it got all over my shirt. I have asked for clean clothes but the deputies tell me I won't get them till I get housing.

6.      The toilets are filthy, I can't get the sinks to work and there is no soap anywhere.

7.      The only time the clinic area has been properly cleaned with liquid and some kind of machine to clean the floors was today before the people from the ACLU came.

8.      We get the same food every day – peanut butter sandwiches and burritos.

9.      At one point, I was locked in the cage in the back. We were packed in like sardines. I only got released because I started vomiting.

10.      It is horrible in here. In fact it is worse than being homeless. Even when I sleep on the streets there is some room to stretch out. But in here there are

1

so many people walking by you or sleeping next to you that I'd rather be on the streets.

11.    No one tells me when I am going to get out of IRC. They just tell me I will be going to Twin Towers but there is no housing available.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 29th day of August, 2022 in Los Angeles, California.

<div align="center">Damian Payan</div>

I, Peter Eliasberg, interviewed Mr Payan in the IRC on August 29th, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.

Peter Eliasberg



Declaration of Damian Payan 6435838

I, Damian Payan, hereby declare:

1.    I make this declaration based on my own personal knowledge and if called to

testify I could and would do so competently as follows:

2.  I have been in IRC for about four days. I came to IRC from the Norwalk courthouse. I am homeless and have been for about five years.

3) On August 10 the prisoner transport I was in stopped short + I slammed my head, chipped a tooth, hurt my shoulder + the waist chain made a lump across my waist where I was already dealing with an infection.

4) Since I have been here I have had to sleep on the floor. It is cold. I have NO mattress or blankets + it is incredibly uncomfortable + painful because of my shoulder + stomach pain. I am sleeping only about two hours a night.

5) It is also hard to sleep because the floor is filthy. There are food wrappers + OJ containers. I have seen people pee on the floor. The other day I lay down on the floor + did not see a puddle of liquid + it got all wet

my shirt. I have asked for clean clothes but the deputies tell me I won't get them till I get housing

6) The toilets are filthy, I can't get the sinks to work + there is no soap anywhere.

7) The only time the dorm area has been properly cleaned with liquid + some kind of machine to clean the floors was today before the people from the ACLU came.

8) We get the same food every day — peanut butter sandwiches + burritos

9) At one point, I was locked in the cage in the back. We were packed in like sardines. I only got released because I started vomiting

10) It is horrible in here. In fact it is worse than being homeless Even when I sleep on the streets there is some room to stretch out. But in here there are so many people walking by you or sleeping next to you that I'd rather be on the streets.

Created with Scanner Pro

(1) No one tells me when I am going to get out of IRC. They just tell me I will be going to Twin Towers but there is no housing available.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 29 day of August 2022 in Los Angeles, California.

Printed name: X _Damian Payan_
DAMIAN PAYAN

# Exhibit 8

**Declaration of Gilberto Perez 6442809**

I, Gilberto Perez, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      My name is Gilberto Perez and my booking number is 6442809. I was remanded to IRC from court on Friday, August 19.

3.      I was taken to the IRC booking front and after 8-10 hours of processing arrived in the IRC clinic. In the clinic, I was locked in the back cage with 60-70 other people. The clinic cage was locked until late Sunday.

4.      I have a painful rash on my left leg. Medical staff prescribed me antibiotic, which I took Friday and again Sunday. The rash is spreading and is on my chest. My left foot is very swollen and painful. The antibiotics are not working.

5.      There is no place to sleep. I have slept a total of 3-4 hours since Friday but not at one time.  I sleep on chairs or on the floor, but it is hard to get up because of the be pain in my leg. I have no mattress or blanket.

6.      It is a living hell in here. People who are handcuffed to the chair are pooping and peeing on the floor. We are fed peanut butter and jelly and a cookie with 2 juices for 3 meals a day.

7.      There is no drinking water. The sinks are disgusting. I wouldn't drink from that ever. Toilets are bad. I have to hover over the bowl. I had a five minute shower on Friday. Since then I have not had a shower. I do not have toothbrush or toothpaste.  The deputies treat us like animals and don't give two shits about us.

8.      I have asthma. I told the medical staff, but they did not give me medication.  I have a prescription albuterol, but I do not have any albuterol. I usually take it 3-4 times a day. The last time I took albuterol was Friday before court. My breathing feels labored. I took a Covid-19 test, but I never was told the result.

9.      There is no cleanliness. There are trash bags and juice boxes

1

everywhere. Every other day people will sweep the trash to the corners. No one cleans.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2022 in Los Angeles, California.

Gilberto Perez

I, Melissa L. Camacho-Cheung, interviewed Mr. Perez in the IRC on August 22, 2002, took notes and then wrote up his declaration while in the IRC, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it. I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 6, 2022 in Culver City, California.

*/s/ Melissa L. Camacho-Cheung*
Melissa L. Camacho-Cheung

2

1    **Declaration of** _Gilberto Perez_

2    I, _Gilbert Perez_____, hereby declare:

3         1.    I make this declaration based on my own personal knowledge and if called to

4    testify I could and would do so competently as follows:

5         2.    My name is Gilbert Perez, booking number 6442809.

6    I was remanded to IRC from court on Friday, August 19.

7    I was taken to the IRC booking front and after 8-10 hours

8    of processing arrived in the IRC Clinic. In the clinic, I

9    was locked in the back cage with 60-70 other people.

10   The clinic cage was locked until late Sunday.

11        I have a painful rash on my left leg. Medical staff

12   prescribed me antibiotic, which I took Friday and again Sunday.

13   The rash is spreading and is on my chest. My left foot is

14   very swollen and painful. The antibiotics are not working.

15        There is no place to sleep. I have slept a total of 3-4

16   hours since Friday but not at one time. I sleep on chairs

17   or on the floor, but it is hard to get up because of the pain

18   in my leg. I have no mattress or blanket.

19        It is a living hell in here. People who are handcuffed

20   to the chair are pooping and peeing on the floor. We are

21   fed peanut butter and jelly with 2 juices _and a cookie_ for 3 meals a day.

22   There is no drinking water. The sinks are disgusting. I

23   wouldn't drink from that ever. Toilets are bad. I have to hover

24   over the bowl. I had a five minute shower on Friday. Since

25   then I have not had a shower. I do not have a toothbrush or

26   toothpaste. The deputies treat us like animals and don't

27   give two shits about us.

28

1  I have asthma. I told the medical staff, but they did not
2  give me medication. I have a prescription for albuterol, but I
3  do not have any albuterol. I usually take it 3-4 times a
4  day. The last time I took albuterol was Friday before
5  Court. My breathing feels labored. I took a COVID-19
6  test, but I never was told the result.
7      There is no cleanliness. There are trash bags and juice
8  boxes everywhere. Every other day people will sweep the
9  trash to the corners. No one cleans
10
11
12
13
14
15
16
17
18
19
20
21
22      I declare under penalty of perjury of the laws of the State of California and the United
23  States that the foregoing is true and correct. Executed this 22 day of Aug., 2022 in Los
24  Angeles, California.
25
26  _Gilberto Perez_
27  [Printed Name]
28

2

# Exhibit 9

**Declaration of Ira Porter 6440363**

I, Ira Porter, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. My name is Ira Porter and my booking number is 6440363. I was arrested on Tuesday, August 16, 2022 and taken to the Van Nuys station jail. I stayed there for 3 days. I was brought to IRC around Friday morning.

3. I am suffering from deteriorating mental health issues and withdrawal from heroin and crystal meth. I have been diagnosed with extreme depression with psychotic side effects. Since I have been at IRC I have not been evaluated by a mental health professional.

4. Before I was arrested I was taking three prescribed medications: Romeron, Zoloft, and Xiprexa. I take them every day, but I have not received any medication since my arrest. I feel sick, like I'm about to lose it. I feel like I'm about to snap any moment. I am on SSI and disabled due to my mental health issues.

5. I am detoxing. I feel withdrawal symptoms including sweats, shaking, and vomiting. I have vomited in the toilet. At my medical evaluation I was given Motrin but nothing for withdrawals or mental health.

6. Since I have been at IRC I have slept only about 10 hours total, about a couple of hours a day. I try to sleep on the floor or on a chair. It is very cold on the floor and that wakes me up.

7. I do not have a mattress or a blanket. I asked for a blanket, and the deputy said they did not have to give me a blanket because this is not permanent housing. They said it is a loophole.

8. All I eat is peanut butter and jelly, orange juice and cookies. There is no water. The sink is nasty and smells like and feces and stuff is floating in the water. The buttons on the sink are dirty. It's like they've never been cleaned. The

1

toilets are disgusting, clogged with feces. The floor is wet from urine and toilet water.

9.  People only sweep the dry stuff, but no one cleanse the wet stuff. The wet stuff stays on the floor.  I've seen fights break out very day. I do not have hand sanitizer or fish kit. I don't have a toothbrush or toothpaste.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2022 in Los Angeles, California.


Ira Porter


I, Melissa L. Camacho-Cheung, interviewed Mr. Porter in the IRC on August 22, 2002, took notes and then wrote up his declaration while in the IRC, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 6, 2022 in Culver City, California.



*/s/ Melissa L. Camacho-Cheung*
Melissa L. Camacho-Cheung

**Declaration of** _Ira Porter_

I, _Ira Porter_, hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. My name is Ira Porter and my booking number is 6440363. I was arrested on ~~Thursday~~ Tuesday, August 16, 2022 and taken to the Van Nuys station jail. I stayed there for 3 days. I was brought to IRC around Friday morning.

I am suffering from deteriorating mental health issues and withdrawal from heroin and crystal meth. I have been diagnosed with extreme depression with psychotic side effects. Since I have been at IRC I have not been evaluated by a mental health professional.

Before I was arrested I was taking three prescribed medications: Remeron, Zoloft, and Ziprexa. I take them every day, but I have not received any medication since my arrest. I feel sick, like I'm about to lose it. I feel like I'm about to snap at any moment. I am on SSI and disabled due to my mental health issues.

I am detoxing. I feel withdrawal symptoms including sweats, shaking, and vomiting. I have vomited in the toilet. At my medical evaluation I was given Motrin but nothing for withdrawals or mental health.

Since I have been at IRC I have slept only about 10 hours total, about a couple hours a day. I try to sleep on the floor or on a chair. It is very cold on the floor and that wakes me up.

I do not have a mattress or a blanket. I asked for a

1   blanket, and the deputy said they did not have to give me a blanket
2   because this is not permanent housing. They said it is a loophole.
3    All I eat is peanut butter and jelly, orange juice and cookies.
4   There is no water. The sink is nasty and smells like urine and feces
5   and stuff is floating in the water. The buttons on the sink are dirty.
6   It's like they've never been cleaned. The toilets are disgusting,
7   clogged with feces. The floor is wet from urine and toilet water.
8    People only sweep the dry stuff, but no one cleans the
9   wet stuff. The wet stuff stays on the floor.
10    I've seen fights break out every day.
11    I do not have hand sanitizer or a fish kit. I don't have a
12   toothbrush or toothpaste.

22      I declare under penalty of perjury of the laws of the State of California and the United

23   States that the foregoing is true and correct. Executed this 22 day of August 2022 in Los

24   Angeles, California.

26                    Ira Porter

27                  [Printed Name]

2

Toilets, and the shower [illegible]
[illegible] This is not [illegible]
[illegible]
There is no soap. The sink is rusty and [illegible]
and [illegible] in the water. The buttons on the sink are [illegible]
[illegible] The toilets are disgusting
clogged with [illegible]. The floor is wet [illegible]
People [illegible]
with [illegible]
[illegible]
I do not [illegible] hand sanitizer [illegible]
[illegible]

[illegible]

[illegible signature]

[illegible]

# Exhibit 10

### Declaration of Giovanni Reese 6441248

I, Giovanni Reese, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I have been in IRC since Friday about 6pm. I came from court in Long Beach for a probation violation. I work in LA for a shelter run by Chrysalis.

3.      When I arrived I was processed and got a shower where we were locked in for about 2-3 hours. I have not had another shower or change of clothes since, and it is Monday about noon.

4.      My first night about 40 or 50 of us were herded into a holding cell which is triangle shaped and 12-15 feet on each side. There were about 40 or 50 of us like sardines for about 15 or more hours. We had no blankets or mattresses. It was hell. We only got out when we started screaming, kicking the windows and threatening not to eat.

5.      I suffer from depression, take Paxil on the outside. I have not had my meds since I came in. I finally saw a psychiatrist on Sunday night about 11 pm after I begged a nurse for help. But he said I cannot get my meds till I am permanently housed. I ask but no one will tell me when I will be housed.

6.      I have had no mattress, no clothing change, soap, toothbrush or toothpaste since I came here.

7.      I feel deep despair being off my Paxil.

8.      The last two night I have slept on the floor in the clinic area. It is filthy with food, food cartons on the floor. Lots of people pee on the floor including people with mental problems, who are chained to chairs and pee on the floor because they can't go to the toilets.

9.      The phones don't work and when the inmates rig them to work I can't use them because they won't give me a pin.

10.     The deputies yell at us every time we ask for things like fish kits or to

1

have the phones fixed.

   11.   This is cruel and inhumane. No human should be treated this way.

   I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 22nd day of August, 2022 in Los Angeles, California.

Giovanni Reese

   I, Peter Eliasberg, interviewed Mr Howard in the IRC on August 22nd, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

   I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.

Peter Eliasberg



**Declaration of** Giovani Reese 6441248

1. I, GIOVANNI REESE , hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I have been in IRC since Friday about 6pm. I came from court in Long Beach for a probation violation. I work in LA for a shelter running Chrysalis

3) when I arrived I was processed + got a shower where we were locked in for about 2-3 hours. I have not had another shower or change of clothes since, + it is Monday around noon.

4) My first night about 40 or 50 of us were herded into a holding cell which is triangle shaped and 12-15 feet on each side. There were about 40 or 50 of us like sardines for about 15 or more hours. We had no blankets or mattresses It was hell We only got out when we started screaming kicking the windows + threatening not to eat.

5) I suffer from depression, take Paxil on the outside. I have not had my meds since I came in I finally saw a psychiatrist on Sunday night about 11pm after I begged

Created with Scanner Pro



111. This is cruel + inhuman. No human should be treated this way.

1  a nurse for help. But he said I can't
2  get my meds till I am permanently
3  housed. I ask, but no one will tell
4  me when I will be housed
5  6) I have had no mattress, no clothes
6  change, soap, toothbrush or toothpaste
7  since I came here.
8  7) I feel deep despair being off my
9  Paxil.
10  8) The last two night I have slept on
11  the floor in the clinic area. It is
12  filthy with food, food cartons on the
13  floor. Lots of people pee on the
14  floor including people with mental
15  problems who are chained to chairs
16  + pee on the floor because they
17  can't go + the toilets.
18  9) The phones don't work + when the
19  inmates rig them to work I can't
20  use them because they won't give
21  me a PIN

22     I declare under penalty of perjury of the laws of the State of California and the United
23  States that the foregoing is true and correct.  Executed this 22 day of August, 2022 in Los
24  Angeles, California.

25                                          X Giovanni Reese
26                                          GIOVANNI REESE
27                                          [Printed Name]
28  10) The deputies yell at us every time
    we ask for things, like fresh kits or
    to have the phones fixed

# Exhibit 11

### Declaration of George Ruiz 6449491

I, George Ruiz, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I came to IRC from Patton State Hospital. I was in Patton because I was found incompetent to stand trial about 3.5 months ago. They sent me back here to have the court determine if I am now competent. I got to IRC last Tuesday. I have been here almost a week.

3.      Since I have been here I have been stuck in a holding cell with no bed, no mattress, no sheets or blankets. I have no choice but to sleep on the cold hard floor. It is hell to live like this.

4.      I have been here almost a week and have not had a shower or a change of clothing.

5.      I have asked for a mattress and blanket but they won't give me one. No one here has a blanket or mattress. So people sleep on the floor or on the metal benches.

6.      The only food we get is peanut butter sandwiches and burritos plus containers of orange juice. We have nowhere to put the empty containers and wrappers so we have to throw them on the floor of our cell.

7.      I keep asking staff when I am going to get housing and a bed. But no one can answer me. The other day a sergeant told me I was stuck here because I need to be in Moderate Observation Housing and there is none available.

8.      I really want to get out of here and into housing so I can get a bed, a mattress, and some blankets.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed this 23rd day of August, 2022 in Los Angeles, California.


George Ruiz


I, Peter Eliasberg, interviewed Mr Howard in the IRC on August 29th, 2002, took notes and then wrote up his declaration, which is attached. I read Mr. Howard the declaration, he approved its contents and signed it.  I have reviewed this word processed version of this declaration and declare that it accurately reflects the content of the handwritten, signed version.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed September 5, 2022 in Los Angeles, California.


Peter Eliasberg

**Declaration of** George Ruiz  6449491

I, George Ruiz , hereby declare:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2. I came to IRC from Patton State Hospital   I was in Patton because I was found incompetent to stand trial about 3.5 months ago. They sent me back here to have the court determine if I am now competent. ~~To the court~~ I got to IRC last Tuesday I have been here almost a week. 1) Since I have been here I have been stuck in a holding cell with no bed, no mattress, no sheets or blankets. I have no choice but to sleep on the cold hard floor   It is hell to live like this. 2) I have been here almost a week and have not had a shower or a change of clothing 4) I have asked for a mattress + blanket but they won't give me one. No one here has a blanket or mattress. So people sleep on the floor or on the metal benches. 4) The only food we get is peanut butter sandwiches

Created with Scanner Pro

and burritos. plus containers of
orange juice. We have no
where to put the empty containers
+ wrappers so they we have to
throw them on the floor of our
cell

5) I keep asking staff when I am
going to get housing + a bed.
But no one can answer me
The other day a sergeant told me
I was stuck here because I
need to be in moderate observation
housing + there is none avail-
able.

6) I really want to get out of
here and into housing so I
can get a bed, a mattress +
some blankets

    I declare under penalty of
perjury of the laws of the state
of California that the foregoing
is true + correct, Executed August
23, 2022

                    X 
                    George Ruiz

# Exhibit 12

1   **Declaration of** Bryan Salinas 6434820

2   I, Bryan Salinas _____, hereby declare:

3      1.   I make this declaration based on my own personal knowledge and if called to

4   testify I could and would do so competently as follows:

5      2.  I believe that I was Arrested 3

6   days ago. I came from court.

7   3. I was taken to IRC and later

8   placed at the front bench.

9   My hands were handcuffed when I

10   was placed at the front bench.

11   4. I have had to Sleep in a chair

12   at the front bench with both of

13   My wrists handcuffed.

14   5. I have not been given a mattress

15   or a blanket.

16   6. I have not seen a nurse or

17   medical staff.

18   7. I suffer from schizophrenia. I

19   put a piece of paper in my ear

20   to help me focus

21   8. I have slept about 5 hours since

22   entering IRC.

23   9. I have not been given medication

24   Since entering IRC.

25   10. I would rather be moved to a room with

26   a bed than continue to be handcuffed to

27   A Chair.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      I declare under penalty of perjury of the laws of the State of California and the United

23   States that the foregoing is true and correct. Executed this 29th day of August, 2022 in Los

24   Angeles, California.

25

26                          Printed name:

27                                          Bryan Salinas

28

# Exhibit 13

**Declaration of Peter J Eliasberg**

I, Peter J Eliasberg, hereby declare:

1.      I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.      I am Chief Counsel at the ACLU Foundation of Southern California and am admitted to practice law in the State of California. I am one of the lawyers who represent the plaintiff class in this action.

3.      The purpose of this declaration is to set forth what I observed when I visited the Inmate Reception Center (IRC) at the Los Angeles County Jails downtown on Monday August 22, 2022 between about 9:30 am and noon.  While I was there I spent substantial time in the so-called clinic area, where I spoke with numerous incarcerated people as well as walking down the hallway upstairs and viewing the custody line holding cells and talking to people in a number of those cells.

4.      The conditions I observed in the "clinic" were appalling.  It was filthy, there was trash all over the floor – primarily empty orange juice containers, plastic bags and paper wrapping used for the peanut butter sandwiches I observed being given to the people in the clinic.   I do not remember seeing any available garbage cans, so it appeared that people had no choice but to leave their empty containers and bags on the floor.  There were so many separate piles of garbage scattered throughout the clinic I could not count them all.   When I walked around the area, I saw the toilets were filthy and smeared with feces.  I saw puddles on the floor, including puddles that I knew were from people I observed urinating on the floor. I did not observe the puddles being mopped up in the time I was in the clinic area.

5.      After my colleague, Melissa Camacho-Cheung had been there for about 20 minutes, I saw trustees come in with brooms and start to sweep up.  When they did a bunch of the people housed in the area yelled out "they never come when you are not around, they only came to clean up because the ACLU is here."

1

6.      The area smelled strongly of urine.  While I was there I saw people who were chained to the benches in the front area, whom I understand have serious mental illness, stand up attempt to pee into the orange juice containers but missing with some of the pee ending up on the floor.  I saw one man who was chained to a bench attempt to attract the attention of a deputy on the floor by yelling "bathroom."  But when the deputy either ignored him or did not see him he stood up and peed on the floor.

7.      While I was in the clinic area, I did not observe a single nurse or doctor. I saw no medical equipment. Nor did I observe anything that looked like medical care occurring in the area.  The only medical care I am aware of is in offices that are at the back of the clinic area behind the deputies desk (depicted in the diagram attached hereto as Exhibit A)

8.      The clinic area consists of a raised desk where deputies and custody assistants are stationed.  Behind the desk are a number of medical offices, which are walled off from the rest of the area.  In front of the desk is an area called the front bench, which seems to have room for about 15-20 people. When I first arrived there were about 12 people on the front bench, all of whom were chained to the bench.  It is my understanding that the people on the front bench have all been identified as having serious mental illness and may be at risk of harming themselves or others.  Behind the front bench is a wall with plexiglass of some other kind of windows across the upper part.  Behind that wall are three or four long rows of chairs right next to each other.  There are about 20-30 chairs in each row.  Behind those rows of benches is an open area with two toilets with a wall around each of them that are only about 3 feet high.  Behind the open area is "cage" that is consists of wire walls. The cage looks to be about 20 feet by 30 feet with two rows of metal benches in it.  Also, to the right of deputies' desk are a couple of metal benches, about five or six windows.   I saw a few incarcerated people sitting on one side of the window, with county personnel on the other side

1    conducting what I understand to be screening interviews of some kind.

2        9.    It was difficult to count the total number of people in the clinic area in

3    part because some people were moving around. But I would estimate that there

4    were about 12 people chained to the front benches.  Some other people, whom I

5    assume had serious mental illness were chained to other benches.  I estimate there

6    were 40-50 people in the chairs behind the partial wall that separates the front

7    benches from the three rows of chairs.  Then were there at least 30 or so people

8    lying on the floor either behind or in between the rows of chairs. None of them had

9    mattresses, blankets or other bedding.  Many of the people in the chairs had their

10   shirts pulled over their heads, apparently in an attempt to sleep despite the glaring

11   fluorescent lights.  There were about 15-20 people in the area to the right of the

12   deputies desk on the metal benches or milling around.  One or two incarcerated

13   people were being screened, and at least one person was curled up around one of

14   the stools that people sit on when they are having their screening interview, trying

15   to sleep.

16       10.    I estimate that there were about 20-30 people in the cage area when I

17   was there with about 3-5 more people directly outside the cage lying on the floor

18   trying to sleep.

19       11.    When people became aware that we were from the ACLU they

20   crowded around us telling us that they had been in IRC for days at a time without

21   mattresses, bedding, change of clothing, or a shower except on the day they were

22   admitted.  They complained about how cold it was, how filthy it was, and how the

23   phones did not work. Others said that they were allergic to peanuts but that the

24   principal food they were given daily was peanut butter sandwiches.

25       12.    The level of despair and desperation was palpable.  It felt very tense to

26   have large numbers of people crowded together in filthy conditions with no decent

27   place to sleep.  Not surprisingly after I had been there about 1.5 hours, I heard loud

28   shouting and what sounded like a physical fight.  But I was unable to see exactly

what was going on.

13.    After spending about two hours in the clinic area Melissa and I went upstairs and walked down the hallway of the custody line holding cells.  There were varying numbers of people in the holding cells. There were only one or two in some, seven or eight in others.  The ones that had more than a few people were all filthy with juice cartons, paper wrappers and plastic bags scattered on the floor or on the metal benches. Some people were stretched out on the benches, other people were sleeping on the floor. There were no mattresses or bedding in any of the holding cells.

14.    When we stopped to look into the windows of some of the cells people inside would crowd to the window and start asking for help, telling us they had been stuck in IRC for multiple days without mattresses, bedding, change of clothing or decent food.

15.    I stopped outside one holding cell, #217, and spoke with and obtained booking numbers for some of the people in the cell.  I subsequently checked their names and booking numbers against the IRC reports that the Sheriff's Department provides us, which list among other things the names, booking numbers and number of hours people have spent at IRC.

| Booking Number | Name | Hours Spent in IRC as of 8/22/22 at 9:29 AM |
|---|---|---|
| 6440137 | Jose Pena | 113.7 (4 days 19.7 hours) |
| 6440667 | Peter Tunstall | 65.5 (2 days 17.5 hours) |
| 6440809 | David Madrid | 54.5 (2 days 6.5 hours) |
| 6429708 | Juan Diego | 54.5 (2 days 6.5 hours) |

IRC Processing Reports for August 22, 2002 attached hereto as Exhibit B.

16.    Attached hereto as Exhibit C is a true and correct copy of a Motion introduced by Supervisor Holly Mitchell on the agenda for the June 14, 2022

meeting of the Los Angeles County Board of Supervisors entitled "Expanding Office of Diversion and Reentry Housing."

17.     Attached hereto as Exhibit D is a true and correct copy of a Motion introduced by Supervisor Holly Mitchell on the agenda for the June 28, 2022 meeting of the Los Angeles County Board of Supervisors entitled "Expanding Office of Diversion and Reentry Housing."

18.     Attached hereto as Exhibit E is a true and correct copy of  an Amendment by Supervisor Sheila Kuehl to the Motion introduced by Supervisor Holly Mitchell on the agenda for the June 28, 2022 meeting of the Los Angeles County Board of Supervisors entitled "Amendment by Supervisor Kuehl to the Motion by Supervisor Holly J. Mitchell: Expanding Office of Diversion and Reentry Housing."

19.     Attached hereto as Exhibit F is a true and correct copy of a memorandum dated November 17, 2020 from the Los Angeles County CEO, Feisa Davenport to the Los Angeles County Board of Supervisors.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct.  Executed September 5, 2022 in Los Angeles, California.

_____
Peter J Eliasberg

# Sub-Exhibit A



Exh. A          IRC "CLINIC" AREA

# Sub-Exhibit B



There are 252 inmates in IRC Clinic Processing over 24 hours

## Inmates In IRCC Between 24 and 48 Hours

| Booking Number | INMATE NAME | MODULE | HOURS | TEMP LOC | AGE | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|
| 6429762 | COLE , ODDIS | IRCC | 47.6 | _ | 66 | ■ | | | ♠ |
| 6443028 | MEZA , DANIEL | IRCC | 47.1 | _ | 38 | ■ | | ■ | ♠ |
| 6442905 | TALAVERA , FELIPE | IRCC | 47.1 | 250 | 58 | ■ | | | ♠ |
| 6429602 | SIMMONS , TRAVIS | IRCC | 45.1 | _ | 35 | ■ | | | ♠ |
| 6443239 | AVALOS , GABRIEL | IRCC | 45.1 | _ | 51 | ■ | | | ♠ |

| Booking | Name | Module | Hours | Temp Loc | Age | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|
| 6443208 | RAMIREZ , JULIO | IRCC | 45.1 | _ | 61 | ■ | | | ♠ |
| 6443120 | JOHNSON , LAVELL | IRCC | 45.1 | 12A | 30 | ■ | | | ♠ |
| 6443097 | CABRERADIAZ , JOSE | IRCC | 45.1 | 12B | 32 | ■ | | | ♠ |
| 6443037 | JACKSON , FRANK | IRCC | 45.1 | _ | 38 | ■ | | | ♠ |
| 6442970 | TORRES , PETER | IRCC | 45.1 | _ | 38 | ■ | | ■ | ♠ |
| 6429715 | HERNANDEZ , FRANCISCO | IRCC | 45.1 | _ | 31 | ■ | | | ♠ |
| 6438716 | SALCIDA , THOMAS | IRCC | 44.9 | _ | 35 | ■ | ■ | | ♠ |
| 6441067 | VAUGH , RONNIE | IRCC | 44.9 | 25 | 57 | ■ | | | ♠ |
| 6429632 | YAYMADZHYAN , TIGRAN | IRCC | 44.6 | _ | 35 | ■ | | ■ | ♠ |
| 6443227 | CARDENAS , DAVID | IRCC | 42.3 | _ | 47 | ■ | | | ♠ |
| 6430520 | CORTESHERNANDEZ, HECTOR | IRCC | 42 | 12A | 39 | ■ | | | ♠ |
| 6436544 | VILLEDA , FELIX | IRCC | 41.5 | _ | 61 | ■ | | | ♠ |

Inmates: **17**

## Inmates In IRCC Between 49 and 100000 Hours

| Booking Number | INMATE NAME | MODULE | HOURS | TEMP LOC | AGE | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|

| 6434140 | SHI , YUANXIONG | IRFB | 166.2 | 12G | 28 | ■ | ■ | | ♠ |
|---|---|---|---|---|---|---|---|---|---|
| 6426434 | WILLS SHABAZZ , ANTHONY | IRFB | 159.8 | 12G | 61 | ■ | ▬ | | ♠ |
| 6437999 | ROUSHDI , ROGER | IRCC | 157.2 | 12H | 65 | ■ | ■ | ■ | ♠ |
| 6426270 | BROWN , ERIC | IRCC | 137.7 | 12H | 55 | ■ | ■ | | ♠ |
| 6438623 | LIBRIZZI , CARL | IRCC | 134.3 | 12H | 45 | ■ | ▬ | ▪ | ♠ |
| 6427513 | GONZALEZ SEBAST, LUIS | IRCC | 133.6 | 12H | 20 | ■ | ■ | | ♠ |
| 6201462 | HELOU , FADI | IRCC | 131.2 | 12D | 41 | ■ | ▬ | ▪ | ♠ |
| 6440156 | BOLTON , DIEGO | IRCC | 130.4 | 12H | 28 | ■ | ■ | | ♠ |
| 6201457 | FRANCIS , BLEIZE | IRFB | 130.4 | 12G | 36 | ■ | ▬ | | ♠ |
| 6423185 | DOE , JOHN | IRFB | 130.4 | – | 37 | ■ | ▬ | | ♠ |
| 6440026 | JONES , LAVAL | IRCC | 127.8 | 12M | 40 | ■ | ■ | ■ | ♠ |
| 6427662 | VARGAS , JACOB | IRCC | 125.2 | 12H | 31 | ■ | ▬ | ▪ | ♠ |
| 6440409 | INIGUEZ , JESUS | IRFB | 121.3 | 12G | 39 | ■ | ▬ | ■ | ♠ |
| 6440182 | ADAMS , JAVON | IRFB | 118.4 | 12H | 27 | ■ | ▬ | | ♠ |
| 6440764 | BRANDON , ANTHONY | IRFB | 115.7 | 12G | 22 | ■ | ▬ | ■ | ♠ |
| 6440137 | PENA , JOSE | IRCC | 113.7 | 12A | 57 | ■ | ■ | ▪ | ♠ |
| 6440848 | ROBINSON , JOSHUA | IRCC | 113.1 | 12H | 39 | ■ | ▬ | ▪ | ♠ |
| 6439957 | MYERS , ROBERT | IRCC | 110.2 | 12H | 42 | ■ | ■ | ▪ | ♠ |

| ID | Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6439683 | SILVAS , PAUL | IRFB | 109.6 | -- | 33 | ■ | ▬ | ■ | ♠ |
| 6201540 | RANGEL , ANTHONY | IRCC | 109.6 | 12D | 25 | ■ | ■ | ■ | ♠ |
| 6427663 | CARTER , DAJEE | IRFB | 109.3 | -- | 24 | ■ | ▬ | | ♠ |
| 6440715 | REYES , REGINALD | IRCC | 109.2 | 12H | 40 | ■ | ■ | | ♠ |
| 6199710 | STEWART , DEON | IRFB | 106.1 | -- | 36 | ■ | ▬ | | ♠ |
| 6440705 | MEZA , ARNULFO | IRCC | 106 | 12E | 31 | ■ | | ■ | ♠ |
| 6440601 | VELEZ , EDDIE | IRCC | 105.9 | 12H | 35 | ■ | ▬ | ▪ | ♠ |
| 6439983 | GALACIA , SILVESTRE | IRCC | 105.9 | 12B | 34 | ■ | ▬ | ▪ | ♠ |
| 6440728 | ALLEN , KEVIN | IRFB | 105.7 | 12G | 25 | ■ | ▬ | | ♠ |
| 6440114 | SANDOVAL , KEVIN | IRCC | 105.7 | 12H | 33 | ■ | ■ | | ♠ |
| 6439883 | DOE , JOHN | IRFB | 105.5 | 12G | 32 | ■ | ▬ | | ♠ |
| 6440730 | HOLMAN , JESSE | IRCC | 103.9 | -- | 51 | ■ | ■ | ▪ | ♠ |
| 6440727 | POLK , DAVION | IRFB | 103.9 | -- | 33 | ■ | ▬ | | ♠ |
| 6428670 | SLAIGHT , ERIC | IRCC | 102.6 | -- | 31 | ■ | | | ♠ |
| 6428731 | MENGISTEAB , MERON | IRFB | 102.6 | 12G | 41 | ■ | ▬ | | ♠ |
| 6438834 | LOPEZ , ALFONSO | IRCC | 101 | 12K | 35 | ■ | | ▪ | ♠ |
| 6428691 | ASENCIO , DANIEL | IRFB | 95.8 | 12G | 22 | ■ | ▬ | | ♠ |
| 6428696 | WILLIAMS , MARCUS | IRCC | 88.8 | -- | 40 | ■ | ▬ | | ♠ |

| ID | Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6440873 | NEWMAN , JAMAL | IRCC | 88.6 | 12H | 33 | ■ | ■■ | ■ | ♠ |
| 6441349 | COLEMAN , TIWAN | IRCC | 88.3 | 12H | 21 | ■ | ■ | ■ | ♠ |
| 6441348 | COOPER , STEVEN | IRCC | 88.3 | 12H | 41 | ■ | ■ | | ♠ |
| 6441347 | TELLOR , VANESSA | IRCC | 88.3 | 12H | 28 | ■ | ■■ | ■ | ♠ |
| 6441352 | RENTERIA , JOSEPH | IRCC | 88.2 | 12H | 30 | ■ | ■ | | ♠ |
| 6441357 | PEREZCRUZ , CARLOS | IRCC | 88.2 | _ | 36 | ■ | ■ | ■ | ♠ |
| 6441346 | WEATHERSPOON , KALYNN | IRCC | 88.2 | 12H | 27 | ■ | ■■ | ■■ | ♠ |
| 6441324 | ARMENDARIZ , PETER | IRCC | 87.9 | 12H | 27 | ■ | ■ | ■ | ♠ |
| 6441042 | PURYEAR , KORY | IRCC | 86.4 | 12B | 24 | ■ | ■ | | ♠ |
| 6441350 | GARCIA VARGAS , GUILLERMO | IRCC | 86.4 | 12H | 19 | ■ | | | ♠ |
| 6428718 | BARNES , MICHAEL | IRCC | 86.3 | 114 | 62 | ■ | ■ | ■■ | ♠ |
| 6442171 | HAWKINS , MARCEO | IRFB | 86.3 | 12G | 44 | ■ | ■■ | | ♠ |
| 6428773 | SANDOVAL , CARLOS | IRCC | 85.1 | 12E | 32 | ■ | ■ | ■ | ♠ |
| 6440159 | VALDEZ , PEDRO | IRFB | 84.6 | 12G | 26 | ■ | ■■ | | ♠ |
| 6428722 | GOMEZ , LEONARDO | IRCC | 84.6 | 12E | 32 | ■ | | | ♠ |
| 6440321 | BOOZE , BRIAN | IRFB | 84.6 | 12G | 47 | ■ | ■■ | | ♠ |
| 6441411 | HAIRSTON , JOHN | IRCC | 84.6 | 12E | 27 | ■ | ■ | | ♠ |
| 6428791 | CISNEROS , BRIAN | IRCC | 84.6 | 12E | 19 | ■ | | | ♠ |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6441342 | TRUEBA , RYAN | IRCC | 84.6 | 12E | 34 | ■ | ■ | | ♠ |
| 6427646 | FANACH , ALI | IRCC | 84.6 | 12H | 30 | ■ | ■ | | ♠ |
| 6428751 | HORNE , HAYWOOD | IRCC | 84.5 | _ | 43 | ■ | ■ | | ♠ |
| 6417999 | REYES , ANDREW | IRFB | 82.4 | 12G | 32 | ■ | ▬ | | ♠ |
| 6417010 | GARCIA , MAURICIO | IRFB | 82.2 | _ | 25 | ■ | | ■ | ♠ |
| 6442210 | BULLOCK , BUDDY | IRFB | 81.9 | 12G | 22 | ■ | ▬ | | ♠ |
| 6440102 | SEGURA , SAMUEL | IRCC | 81.9 | 12E | 22 | ■ | | | ♠ |
| 6440683 | PHAMA , DAVID | IRCC | 81.9 | 12A | 38 | ■ | | | ♠ |
| 6440469 | VIZCAINO , FABIAN | IRCC | 81.9 | 12E | 37 | ■ | | ■ | ♠ |
| 6440363 | PORTER , IRA | IRCC | 81.9 | 12E | 44 | ■ | | | ♠ |
| 6440323 | LIZARRAGA , ANDRES | IRCC | 81.9 | 12A | 30 | ■ | | | ♠ |
| 6440310 | SOSA , JULIAN | IRCC | 81.9 | 12E | 18 | ■ | | | ♠ |
| 6440197 | JONES , TONY | IRFB | 81.9 | 12G | 30 | ■ | | | ♠ |
| 6440238 | KNOWLES , PHILIP | IRCC | 81.9 | 12E | 54 | ■ | | | ♠ |
| 6441422 | SPENCER , AUBREY | IRCC | 81.9 | 12E | 49 | ■ | | | ♠ |
| 6427629 | CAMPOS , MIGUEL | IRCC | 81.8 | 12B | 27 | ■ | | ■ | ♠ |
| 6440753 | HILL , CAMERON | IRCC | 81.8 | 12E | 26 | ■ | | | ♠ |
| 6440341 | HANDCOX , ISSAC | IRCC | 81.8 | 12E | 20 | ■ | | | ♠ |

| ID | Name | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 6439961 | CHAVEZ , CHRISTOPHER | IRCC | 79.3 | 12A | 35 | ■ | ■ | | ▪ | ♠ |
| 6440579 | CRUZLOPEZ , RICARDO | IRCC | 79.1 | 12B | 35 | ■ | | | ■ | ♠ |
| 6441025 | SCHLEUTER , ALEXANDER | IRCC | 79.1 | -- | 33 | ■ | ■ | ▪ | | ♠ |
| 6439260 | SYKES , DAVONTE | IRCC | 78.5 | 12A | 29 | ■ | ■ | ▪ | | ♠ |
| 6440935 | RILEY , CHRISTOPHER | IRCC | 76.7 | 12E | 42 | ■ | | | | ♠ |
| 6442182 | TORREZ , EDUARDO | IRCC | 76.6 | 12A | 26 | ■ | | | ▪ | ♠ |
| 6440455 | BLEICHNER , CODY | IRCC | 76.6 | -- | 34 | ■ | | | | ♠ |
| 6426302 | VANCE , KENNETH | IRCC | 71.3 | 12H | 37 | ■ | ■ | | | ♠ |
| 6441122 | LEONGOMEZ , JAIRO | IRCC | 71 | 12B | 31 | ■ | | | | ♠ |
| 6441343 | MONTIEL , EMILIO | IRCC | 70.3 | 12B | 49 | ■ | | | | ♠ |
| 6442360 | CORONA , DANIEL | IRCC | 70.3 | 12B | 48 | ■ | | | | ♠ |
| 6442451 | SOTO , DOUGLAS | IRCC | 70.3 | 12B | 41 | ■ | | | | ♠ |
| 6441285 | GASTELUM , BRIAN | IRCC | 70.2 | -- | 18 | ■ | | | | ♠ |
| 6441451 | BONILLA , LEONARDO | IRCC | 70.2 | -- | 36 | ■ | | | | ♠ |
| 6441039 | BAIRD , JOSHUA | IRCC | 70.2 | 12B | 28 | ■ | | | | ♠ |
| 6441503 | HERNANDEZ , JUAN | IRCC | 70.1 | 12B | 25 | ■ | | | | ♠ |
| 6441265 | BAEZ , ALEX | IRCC | 69.4 | 12C | 53 | ■ | | | ■ | ♠ |
| 6441136 | ALVAREZ , RUBEN | IRCC | 69.4 | 12E | 37 | ■ | ■ | | ■ | ♠ |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6441366 | BROWN , CORY | IRFB | 68.1 | 12A | 43 | ■ | ▬ | ■ | ♠ |
| 6441257 | CHASE , BRIAN | IRCC | 66.6 | 12E | 53 | ■ | | ■ | ♠ |
| 6440667 | TUNSTALL , PETER | IRCC | 65.5 | 12A | 59 | ■ | ■ | ■ | ♠ |
| 6429638 | TAYLOR , ANTHONY | IRFB | 64.8 | _ | 38 | ■ | ▬ | ■ | ♠ |
| 6442521 | THOMAS , VONTE | IRCC | 64.7 | 114 | 43 | ■ | | | ♠ |
| 6442819 | MATHEWS , IVAN | IRCC | 64.5 | 12E | 33 | ■ | | ■ | ♠ |
| 6428798 | BAILON , ARTEMIO | IRCC | 64.3 | _ | 33 | ■ | | | ♠ |
| 6442424 | DURAN GARCIA , ALEXANDER | IRCC | 64.3 | _ | 29 | ■ | | | ♠ |
| 6442520 | MARTIN , AARON | IRCC | 64.3 | _ | 35 | ■ | | | ♠ |
| 6441419 | MORALES , RUDY | IRCC | 64.3 | _ | 40 | ■ | | | ♠ |
| 6441402 | MIRANDA , LUIS | IRCC | 64.3 | _ | 38 | ■ | | | ♠ |
| 6441246 | DAVISHAMILTON , ANTHONY | IRCC | 64.3 | 12E | 35 | ■ | | | ♠ |
| 6442256 | WINGFIELD , ROBERT | IRCC | 64.3 | 12E | 26 | ■ | | | ♠ |
| 6442800 | SAVTALYAN , HAIG | IRCC | 64.3 | 114 | 24 | ■ | | | ♠ |
| 6440933 | PRICE , PETER | IRFB | 64.2 | 12G | 60 | ■ | ▬ | | ♠ |
| 6442822 | SPARKS , JESSE | IRCC | 63.5 | _ | 19 | ■ | | | ♠ |
| 6428724 | PITTS , KEVIN | IRFB | 63.5 | 12G | 33 | ■ | ▬ | | ♠ |
| 6421852 | CARAVEO , GERALDO | IRCC | 63.4 | 12B | 61 | ■ | | | ♠ |

| ID | Name | Facility | Score | Col1 | Col2 | C3 | C4 | C5 | Suit |
|---|---|---|---|---|---|---|---|---|---|
| 6442284 | RIVERA , CHARLES | IRCC | 63.4 | 12B | 35 | ■ | | | ♠ |
| 6442522 | JENKINS , KENDYL | IRCC | 63.4 | 12E | 27 | ■ | | | ♠ |
| 6429641 | MARCIANO , ANGELO | IRCC | 63.3 | _ | 31 | ■ | | | ♠ |
| 6441951 | COCHARAN , BRANDON | IRCC | 63.3 | 12E | 37 | ■ | | | ♠ |
| 6440818 | SALAMANCA , RIGOBERTO | IRCC | 63.3 | 12B | 42 | ■ | | | ♠ |
| 6442237 | MUNOZ , MICHAEL | IRCC | 63.3 | _ | 28 | ■ | | | ♠ |
| 6429689 | FRYE , JUSTIN | IRCC | 63.3 | _ | 28 | ■ | | | ♠ |
| 6442537 | BELL , WILLIE | IRCC | 63.1 | 12B | 59 | ■ | | | ♠ |
| 6439577 | VALDEZ , MAURICE | IRCC | 63 | 12A | 33 | ■ | | | ♠ |
| 6442488 | JOHNSON , ROBERT | IRCC | 62.9 | 12E | 34 | ■ | | | ♠ |
| 6442275 | ZORAN , ROSINI | IRCC | 62.9 | 12A | 66 | ■ | | | ♠ |
| 6441071 | MUNOZ , FRANK | IRCC | 62.8 | _ | 40 | ■ | ■ | ■ | ♠ |
| 6442805 | WENTWORTH , DANIEL | IRCC | 62.5 | 25 | 26 | ■ | ■ | | ♠ |
| 6442552 | ESPINOZA , FREDI | IRCC | 62.5 | 12G | 34 | ■ | ■■■ | ■ | ♠ |
| 6442564 | LOA , CHRISTOPHER | IRCC | 62.5 | 12B | 43 | ■ | | ■ | ♠ |
| 6440996 | GONZALEZ , HERBERT | IRCC | 61.9 | 12D | 37 | ■ | ■ | ■ | ♠ |
| 6429647 | WINTON , KYLE | IRCC | 61.9 | 12C | 42 | ■ | ■ | ■ | ♠ |
| 6441135 | CUCA , JULIO | IRFB | 61.7 | 12G | 26 | ■ | ■■ | | ♠ |

| ID | Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6441079 | LINDEROTH , CHRISTOPHER | IRCC | 61.4 | – | 39 | ■ | | | ♠ |
| 6441286 | BETHEL , CHUCK | IRCC | 61.4 | 12D | 39 | ■ | | | ♠ |
| 6441939 | HENDERSON , MARK | IRCC | 61.4 | 25 | 57 | ■ | | ■ | ♠ |
| 6442909 | ENRIQUEVASQUEZ , JOSE | IRCC | 61.4 | – | 52 | ■ | | | ♠ |
| 6429646 | SELLAHENNADIGE , SAMEERAMENUK | IRCC | 61.4 | 12B | 32 | ■ | | | ♠ |
| 6442495 | GRAHAM , NICHOLAS | IRCC | 61.4 | – | 40 | ■ | | | ♠ |
| 6442502 | RIOS , CHRISTOPHER | IRCC | 61.4 | – | 29 | ■ | | ■ | ♠ |
| 6442514 | LOPEZ , JONATHAN | IRCC | 61.4 | – | 29 | ■ | ■ | | ♠ |
| 6442532 | ESTRADA , SONNY | IRCC | 61.4 | – | 49 | ■ | | | ♠ |
| 6442874 | GARCIA , JOSE | IRCC | 61.4 | 12A | 46 | ■ | | | ♠ |
| 6441078 | SANTOS , EDWARD | IRCC | 61.4 | 12D | 29 | ■ | | | ♠ |
| 6441045 | BATTLE , ANDRE | IRCC | 61.4 | 12B | 55 | ■ | | | ♠ |
| 6428650 | MARSHALL , AARON | IRCC | 61.4 | – | 27 | ■ | | | ♠ |
| 6442252 | AVANISIAN , ASHOT | IRCC | 61.4 | 12A | 27 | ■ | | | ♠ |
| 6440840 | TRIANA , ISAIAH | IRCC | 60.8 | 12A | 20 | ■ | | | ♠ |
| 6440858 | PALMA , RALPH | IRCC | 60.8 | 12B | 61 | ■ | | | ♠ |
| 6441119 | HOPKINS , ANTONIO | IRCC | 60.4 | – | 36 | ■ | ■ | ■ | ♠ |
| 6428633 | DELGADO , LORENZO | IRCC | 60.4 | – | 31 | ■ | | ■ | ♠ |

| ID | Name | Facility | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6440619 | MARBUERY , JERMAINE | IRCC | 60.4 | – | 44 | ■ | | ■ | ♠ |
| 6440745 | SOLIS , JASON | IRCC | 60.4 | – | 50 | ■ | ■ | ■ | ♠ |
| 6440950 | FLORES , DAVID | IRCC | 60.4 | – | 37 | ■ | | ■ | ♠ |
| 6439944 | FERNANDEZ , HASSAN | IRFB | 60.3 | 12G | 29 | ■ | ▬ | ■ | ♠ |
| 6440696 | CAMPBELL , TYSON | IRCC | 60.3 | 12D | 45 | ■ | | ■ | ♠ |
| 6428705 | ALEXANDER , BILLY | IRCC | 59.9 | 12H | 36 | ■ | ■ | | ♠ |
| 6441024 | HUGHES , HORACE | IRCC | 59.9 | – | 30 | ■ | | | ♠ |
| 6442878 | MOREIRA , JONATHAN | IRCC | 59.2 | – | 39 | ■ | | | ♠ |
| 6442814 | OROZCO , RAUL | IRCC | 59.2 | – | 40 | ■ | | | ♠ |
| 6442823 | JARAMILLO , FABIAN | IRCC | 59.2 | – | 41 | ■ | | | ♠ |
| 6440866 | RAMOS , ATANACIO | IRCC | 59.2 | – | 33 | ■ | | | ♠ |
| 6442368 | CALDERON , EDWIN | IRCC | 59.2 | – | 38 | ■ | ■ | ■ | ♠ |
| 6442240 | TORRES , WILLIAM | IRCC | 59.2 | – | 34 | ■ | | | ♠ |
| 6440426 | HARRIS , DEWAYNE | IRCC | 59.2 | – | 49 | ■ | | | ♠ |
| 6441455 | NUNEZ , EDWARD | IRCC | 59.2 | 12B | 67 | ■ | | | ♠ |
| 6440972 | SKIDMORE , AARON | IRCC | 59.2 | 12B | 35 | ■ | | | ♠ |
| 6440713 | RIVERA , HORACIO | IRCC | 59.2 | – | 44 | ■ | | | ♠ |
| 6441275 | URIBE , BRANDON | IRCC | 59.2 | 12B | 25 | ■ | | | ♠ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6441262 | PEREZ , EDDIE | IRCC | 59.2 | _ | 41 | ■ | | ♠ |
| 6440831 | ROS , DETH | IRCC | 59.2 | _ | 41 | ■ | | ♠ |
| 6441223 | BARBER , WILLIERAY | IRCC | 59.2 | _ | 23 | ■ | | ♠ |
| 6440896 | LEYVA , JOSHUA | IRCC | 59.2 | 12B | 20 | ■ | | ♠ |
| 6442887 | AGUILAR , JOSE | IRCC | 59.2 | _ | 36 | ■ | | ♠ |
| 6442824 | NORRIS , JEWELL | IRCC | 59.2 | _ | 45 | ■ | | ♠ |
| 6441115 | ORDONEZ , CHRISTOPHER | IRCC | 59.2 | 12D | 32 | ■ | | ♠ |
| 6442812 | AVANT , DARRYL | IRCC | 59.2 | 12B | 21 | ■ | | ♠ |
| 6442809 | PEREZ , GILBERTO | IRCC | 59.2 | _ | 36 | ■ | | ♠ |
| 6442587 | BALLESTEROS , JOSE | IRCC | 59.1 | _ | 40 | ■ | | ♠ |
| 6442475 | VILLA , DAVID | IRCC | 59.1 | _ | 38 | ■ | | ♠ |
| 6442179 | SLAUGHTER , ALLEN | IRFB | 59.1 | 12G | 34 | ■ | ▬ | ♠ |
| 6441961 | SCHMERBER , JONATHAN | IRCC | 59.1 | 25 | 28 | ■ | | ♠ |
| 6441404 | HARRISON , LARRY | IRCC | 59.1 | 12B | 20 | ■ | | ♠ |
| 6441301 | NISANI , RYAN | IRCC | 59.1 | _ | 21 | ■ | | ♠ |
| 6441289 | KLINCKE , DILLON | IRCC | 59.1 | _ | 31 | ■ | | ♠ |
| 6441248 | REESE , GIOVANNI | IRCC | 59.1 | 12B | 41 | ■ | | ♠ |
| 6441202 | NEVIASER , NATHAN | IRCC | 59.1 | 12E | 28 | ■ | | ♠ |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6441195 | VILLALPANDO , JOSE | IRCC | 59.1 | _ | 34 | ■ | | | ♠ |
| 6441086 | VERVER , JOSE | IRCC | 59.1 | _ | 28 | ■ | | | ♠ |
| 6441073 | JOHN , STEPHEN | IRCC | 59.1 | _ | 44 | ■ | | | ♠ |
| 6441036 | CEJA , JOAQUIN | IRCC | 59.1 | _ | 44 | ■ | | | ♠ |
| 6440969 | LAWLER , NICHOLAS | IRCC | 59.1 | _ | 29 | ■ | | | ♠ |
| 6440939 | AVELLONE , DEVIN | IRCC | 59.1 | _ | 42 | ■ | | | ♠ |
| 6440893 | ZALDANATERAUDS , IAN | IRCC | 59.1 | _ | 28 | ■ | | | ♠ |
| 6440854 | MORENO , MIGUEL | IRCC | 59.1 | _ | 20 | ■ | | | ♠ |
| 6440841 | HENDRICKS , CODY | IRCC | 59.1 | _ | 30 | ■ | | | ♠ |
| 6440817 | ANDRADE , VICTOR | IRCC | 59.1 | _ | 25 | ■ | | | ♠ |
| 6440802 | CONTRERASRAYAS , HECTOR | IRCC | 59.1 | _ | 35 | ■ | ■ | | ♠ |
| 6440770 | SMITH , WALTER | IRCC | 59.1 | 12B | 35 | ■ | | | ♠ |
| 6429722 | MUNOZ-FUENTES , MARGARITO | IRCC | 59.1 | 12B | 40 | ■ | | | ♠ |
| 6440679 | DIAZ , NESTOR | IRCC | 59.1 | 12B | 24 | ■ | | | ♠ |
| 6442515 | HUERTA , LOUIS | IRCC | 59 | 12B | 28 | ■ | | | ♠ |
| 6441143 | WOODARD , JERRY | IRCC | 59 | _ | 62 | ■ | | | ♠ |
| 6429702 | GONZALEZ , JOSE | IRCC | 59 | 12A | 30 | ■ | | | ♠ |
| 6440882 | AYALA , NICHOLAS | IRCC | 59 | _ | 32 | ■ | | | ♠ |

13

| ID | Name | Facility | Score | Col1 | Col2 | Mark1 | Mark2 | Mark3 | Suit |
|---|---|---|---|---|---|---|---|---|---|
| 6429710 | MORALES , STEVEN | IRCC | 59 | 12B | 38 | ■ | | | ♠ |
| 6428667 | CUMBERLAND , DJUAN | IRCC | 59 | 12E | 33 | ■ | | | ♠ |
| 6429688 | BROWN , DAYVON | IRCC | 59 | _ | 26 | ■ | | | ♠ |
| 6440911 | ATKINS , FRANK | IRCC | 58.5 | _ | 70 | ■ | | | ♠ |
| 6442513 | MONTOYA , RUDY | IRCC | 58.3 | _ | 46 | ■ | ■ | ■ | ♠ |
| 6428810 | ESTEVEZ , HENRY | IRCC | 58.1 | _ | 45 | ■ | | | ♠ |
| 6441159 | FLORES , ANTHONY | IRCC | 58.1 | _ | 19 | ■ | | | ♠ |
| 6441258 | FLORES , ANTONIO | IRCC | 58.1 | _ | 49 | ■ | | | ♠ |
| 6442825 | MARSH , CHARLES | IRCC | 57.8 | _ | 57 | ■ | | | ♠ |
| 6442968 | ARGUELLO , GERARDO | IRCC | 57.2 | _ | 29 | ■ | ■ | | ♠ |
| 6443112 | JIMENEZ REYES , DENNIS | IRCC | 56.9 | _ | 34 | ■ | | ■ | ♠ |
| 6440442 | REYES , SILVESTER | IRCC | 56.5 | _ | 41 | ■ | | | ♠ |
| 6441127 | HATTEN , LEE | IRCC | 56.5 | _ | 65 | ■ | | | ♠ |
| 6442967 | DIAZ , ALEX | IRCC | 55.6 | _ | 50 | ■ | | | ♠ |
| 6440260 | ZUNIGA , ABEL | IRCC | 55.6 | 25 | 30 | ■ | | | ♠ |
| 6440247 | HERNANDEZ , ANDERSON | IRCC | 55.6 | 12A | 35 | ■ | | | ♠ |
| 6440267 | ALVARADO , LOUIE | IRCC | 55.6 | 12A | 29 | ■ | | | ♠ |
| 6440269 | HERNANDEZ , ALVARO | IRCC | 55.6 | _ | 38 | ■ | | | ♠ |

| 6440274 | YOUNG , MICHAEL | IRCC | 55.6 | _ | 67 | ■ | ■ | | ♠ |
| 6440899 | VALDEZ , KEVIN | IRCC | 55.6 | 25 | 25 | ■ | | | ♠ |
| 6440246 | GOMEZ , ANDRES | IRCC | 55.6 | 25 | 38 | ■ | | | ♠ |
| 6442913 | VELA , CARLOS | IRCC | 55.5 | _ | 44 | ■ | | | ♠ |
| 6442590 | MOORE , SHEFNER | IRCC | 55.5 | _ | 28 | ■ | | | ♠ |
| 6443060 | CARDENAS , JUAN | IRCC | 55.5 | 12B | 46 | ■ | | | ♠ |
| 6429673 | MARTINEZ , MARIO | IRCC | 55.5 | 12D | 36 | ■ | | | ♠ |
| 6442979 | GUZMAN , ADAN | IRCC | 55.5 | 12A | 28 | ■ | | | ♠ |
| 6429760 | BELCHER , DOUGLAS | IRCC | 55.5 | _ | 47 | ■ | | | ♠ |
| 6429726 | LEWIS , RYAN | IRCC | 55.1 | _ | 33 | ■ | | | ♠ |
| 6440837 | ESCOBEDO , DANIEL | IRCC | 54.5 | 12M | 40 | ■ | ■ | ■ | ♠ |
| 6438587 | CARR , RONALD | IRCC | 54 | 12K | 56 | ■ | | | ♠ |
| 6429755 | GUTIERREZ , JOVANNY | IRCC | 53.9 | 12B | 34 | ■ | | | ♠ |
| 6443132 | CRUZ , GARY | IRCC | 50.2 | _ | 60 | ■ | | | ♠ |
| 6442454 | WARD , MITCHELL | IRCC | 50.2 | _ | 35 | ■ | | | ♠ |
| 6443193 | PINEDAROBLEDO , ABEL | IRCC | 50.2 | _ | 26 | ■ | | | ♠ |
| 6443182 | BANOS , JHEAN | IRCC | 50.2 | _ | 28 | ■ | | | ♠ |
| 6429783 | ROMAN , JOSE | IRCC | 50.2 | 12C | 28 | ■ | | | ♠ |

| 6201466 | FOREMAN , MICHAEL | IRCC | 50.1 | — | 43 | ■ | ■ | | ♠ |

Inmates: **235**



**There are 83 inmates in IRC Processing over 24 hours**

## Inmates In IRC Between 20 and 24 Hours

| Booking Number | INMATE NAME | MODULE | HOURS | TEMP LOC | AGE | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|
| 6440188 | DOWELL , CHARLES | I231 | 21.7 | 114 | 50 | ■ | ▬ | ■ | ♠ |
| 6438716 | SALCIDA , THOMAS | IRCC | 20.2 | | 35 | ■ | ■ | | ♠ |

Inmates: **2**

## Inmates In IRC Between 24 and 48 Hours

| Booking Number | INMATE NAME | MODULE | HOURS | TEMP LOC | AGE | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|
| 6429631 | MATTHEWS , JAMAL | IRCL | 47.7 | | 35 | ■ | | | ♠ |
| 6443319 | DEMIRCHYAN , GRIGOR | IRCA | 47.4 | | 64 | ■ | ■ | ■ | ♠ |
| 6442226 | MACHUCA , ALAN | IRCL | 47.2 | | 26 | ■ | | ■ | ♠ |
| 6442512 | ADDLEMAN , CLAYTON | IRCL | 47.1 | | 31 | ■ | ■■ | ■■ | ♠ |
| 6438271 | PULIDO , CESAR | IRCL | 46.7 | | 39 | ■ | | | ♠ |
| 6182075 | REYNOLDS , NICHALOUS | IRCL | 46.7 | | 34 | ■ | | ■ | ♠ |
| 6417187 | FLEMING , WILLIAM | IRCL | 46.5 | | 62 | ■ | | | ♠ |
| 6441168 | ROCHA , CHRISTOPHER | IRCL | 45.9 | | 38 | ■ | | | ♠ |
| 6439833 | BUHL , JACOB | IRCL | 45.8 | | 30 | ■ | | | ♠ |
| 6442877 | SIMONYAN , VANIK | IRCL | 45.2 | | 36 | ■ | | | ♠ |
| 5922187 | RESPERT , CALVIN | IRCL | 45.1 | | 43 | ■ | ■■ | | ♠ |
| 6283402 | JONES , MARCUS | IRCL | 45.1 | | 29 | ■ | | ■ | ♠ |
| 6278117 | MORGAN , KEVIN | IRCL | 45.1 | | 25 | ■ | | | ♠ |
| 6441055 | MARTINEZ , MANUEL | IRCL | 45.1 | | 25 | ■ | | | ♠ |
| 6382473 | HARRIS , CHARLY | IRCL | 45.1 | | 42 | ■ | ■ | | ♠ |
| 6428941 | DIAZ , RAUL | IRCL | 45 | | 33 | ■ | | | ♠ |

2

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| [6208388](#) | STEWART , KENDALL | IRCL | 45 | | 19 | ■ | ■ | ■ | ♠ |
| [6441368](#) | ARAGON , RICHARD | IRCL | 44.7 | | 33 | ■ | | ■ | ♠ |
| [6443048](#) | LOPEZ , ANDRES | IRCL | 43.9 | | 42 | ■ | | ■ | ♠ |
| [6441427](#) | ROBBINS , DANIEL | IRCL | 43.9 | | 27 | ■ | | | ♠ |
| [6308853](#) | GONZALEZ , ERIC | IRRA | 43.8 | | 48 | ■ | ■ | | ♠ |
| [6427637](#) | OROZCO , MICHAEL | IRCL | 43.7 | | 27 | ■ | | | ♠ |
| [6443342](#) | BREE , WILLIAM | IRBF | 43.2 | | 42 | ■ | | | ♠ |
| [6359275](#) | MENDEZ , JONATHAN | IRCL | 43.1 | | 20 | ■ | | | ♠ |
| [6400477](#) | WHITE , CHRISTOPHER | IRCL | 43 | | 26 | ■ | | ■ | ♠ |
| [6197830](#) | MARTINEZ , CRISTOPHER | IRCL | 43 | | 29 | ■ | ■ | ■ | ♠ |
| [6388360](#) | GARCIA , CRESCENCIO | IRRA | 42.8 | | 45 | ■ | ■ | | ♠ |
| [6436482](#) | HERNANDEZ , FRANCISCO | IRCL | 42.7 | | 36 | ■ | | | ♠ |
| [6417770](#) | KATES , TYRONE | IRRA | 42.3 | | 66 | ■ | ■ | | ♠ |
| [6273035](#) | LAMB , RUSSELL | IRCL | 42.2 | | 55 | ■ | ■ | | ♠ |
| [6393853](#) | MUNSTARMAN , MICHAEL | IRRA | 42.2 | | 40 | ■ | ■ | | ♠ |
| [6443387](#) | ARRIOLA , ANTHONY | IRCA | 41.7 | | 28 | ■ | | | ♠ |
| [6413734](#) | COOPER , KASUN | IRCL | 41.6 | | 27 | ■ | ■ | | ♠ |

Inmates: **33**

3

## Inmates In IRC Between 49 and 100000 Hours

| Booking Number | INMATE NAME | MODULE | HOURS | TEMP LOC | AGE | Sec Lvl | Spec Hndl | Keep Away | Details |
|---|---|---|---|---|---|---|---|---|---|
| 6433677 | MONTOYA , JEREMY | IRIC | 167.3 | | 32 | ■ | ■ | ■ | ♠ |
| 6273313 | SORCHINI , GIOVANNI | IRIC | 104.7 | | 39 | ■ | | | ♠ |
| 6178318 | WILSON , DAVID | IRIC | 104.7 | | 30 | ■ | ■ | ■ | ♠ |
| 6442564 | LOA , CHRISTOPHER | IRCC | 64.2 | 12B | 43 | ■ | | ■ | ♠ |
| 6422363 | WOLFORD , MICHAEL | IRCL | 59.4 | | 34 | ■ | ■ | ■ | ♠ |
| 6428658 | DURAN , ANGEL | IRCL | 59 | | 26 | ■ | ■ | ■ | ♠ |
| 6442376 | DELATORRE , ANTHONY | IRCL | 59 | | 37 | ■ | ■ | ■ | ♠ |
| 6442559 | GILLESPIE , WILLIAM | IRCA | 58.6 | | 60 | ■ | | | ♠ |
| 6290452 | ORTIZ , GERMAN | IRCL | 58.2 | | 23 | ■ | ■ | ■ | ♠ |
| 6442339 | OKYERE , FRANCIS | IRCL | 57.7 | | 70 | ■ | | | ♠ |
| 6427703 | PYPER , DEREK | IRCL | 56.9 | | 52 | ■ | ■ | ■ | ♠ |
| 6440874 | BROCK , RONALD | IRCL | 55.8 | | 66 | ■ | ■ | ■ | ♠ |
| 6440687 | EREMAN , THOMAS | IRCL | 55.6 | | 59 | ■ | | | ♠ |
| 6439970 | DYMOND , DAVID | IRCL | 55.2 | | 46 | ■ | | | ♠ |
| 6438330 | CASH , DANA | IRCL | 55.1 | | 26 | ■ | | | ♠ |

4

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6384588 | JOVEL , ROSA | IRCL | 54.8 | | 31 | ■ | ■ | | ♠ |
| 6442472 | MEDINA , MISAEL | IRCL | 54.8 | | 27 | ■ | | | ♠ |
| 6429708 | DIEGO JUAN , JUANDIEGO | IRCL | 54.5 | | 25 | ■ | ■ | ■ | ♠ |
| 6440809 | MADRID , DAVID | IRCL | 54.5 | | 57 | ■ | ■ | ■ | ♠ |
| 6439298 | PINEDA , EDIC | IRCL | 53.8 | | 44 | ■ | | | ♠ |
| 6441477 | SALAZAR , MAGDALENO | IRCL | 53.5 | | 44 | ■ | | | ♠ |
| 6440308 | QUIJAS , FRANCISCO | IRCL | 53.4 | | 32 | ■ | ■ | ■ | ♠ |
| 6440268 | COBO , KENNY | IRCL | 53.2 | | 37 | ■ | | | ♠ |
| 6441175 | DOMIO , GEORGE | IRCL | 52.6 | | 65 | ■ | | | ♠ |
| 6426328 | SCHROEDER , SCOTT | IROH | 52.3 | | 41 | ■ | ■ | | ♠ |
| 6442903 | AVILA , ULISES | IRCL | 52.3 | | 36 | ■ | | | ♠ |
| 6442173 | RUIZ , CHRISTOPHER | IRCL | 52.2 | | 22 | ■ | | | ♠ |
| 6441191 | VARGAS , JOVAN | IRCL | 52 | | 36 | ■ | | | ♠ |
| 6441216 | LOZANO , JOSE | IRCL | 52 | | 33 | ■ | | | ♠ |
| 6437946 | ROBERSON , PRESTON | IRCL | 51.9 | | 27 | ■ | | | ♠ |
| 6441276 | ROBINSON , SHANE | IRCL | 51.8 | | 19 | ■ | | | ♠ |
| 6442975 | MCCORD , SHAWN | IRCL | 51.2 | | 19 | ■ | | | ♠ |
| 6442844 | BUSTOS , ABRAHAM | IRCL | 51.2 | | 18 | ■ | | | ♠ |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [6442575](#) | ALEY , GERARDO | IRCL | 51.2 | | 21 | ■ | | | ♠ |
| [6440838](#) | GARZA , JOHNNY | IRCL | 50.9 | | 26 | ■ | | | ♠ |
| [6440632](#) | SALCEDO , ANDREW | IRCL | 50.7 | | 28 | ■ | | | ♠ |
| [6440741](#) | NAVARRO , JAVIER | IRCL | 50.7 | | 36 | ■ | | ■ | ♠ |
| [6442242](#) | MERCADO , JOSE | IRCL | 50.7 | | 21 | ■ | | | ♠ |
| [6441214](#) | ESTRADA , MICHAEL | IRCL | 50.4 | | 31 | ■ | | | ♠ |
| [6440957](#) | HERNANDEZ , JIMMY | IRCL | 50.2 | | 31 | ■ | | | ♠ |
| [6441198](#) | JIMENEZ , JESUS | IRCL | 49.8 | | 48 | ■ | | | ♠ |
| [6440697](#) | ZAVALA , FIDEL | IRCL | 49.6 | | 37 | ■ | ■ | | ♠ |
| [6442285](#) | COLBERT , ROBERT | IRCL | 49.4 | | 33 | ■ | | | ♠ |
| [6429714](#) | AVILA-MARRUFO , RICHARD | IRCL | 49.1 | | 26 | ■ | | | ♠ |
| [6429705](#) | RODRIGUEZ , SERGIO | IRCL | 49.1 | | 39 | ■ | | | ♠ |
| [6440945](#) | MANUEL , DARIUS | IRCL | 49.1 | | 24 | ■ | ■ | | ♠ |
| [6429709](#) | AKINYEMI , BABATUNDE | IRCL | 49.1 | | 43 | ■ | | | ♠ |
| [6440943](#) | MARQUEZLARREYNA, ANDY | IRCL | 49.1 | | 25 | ■ | | | ♠ |

Inmates: **48**

# Sub-Exhibit C

AGN. NO.

**MOTION BY SUPERVISOR HOLLY J. MITCHELL**                    June 14, 2022

**Expanding Office of Diversion and Reentry Housing**

There are nearly 13,000 people in the Los Angeles County (County) jail system. Nearly forty-three percent of the jail's population is suffering due to mental health needs, a 21 percent increase since 2020. Incredibly, six out of ten women in County jails have serious mental illnesses and there are significant racial disparities in who is incarcerated, with mostly Black and Latinx/Hispanic people languishing in jails.

As the County continues to embrace a "Care First" vision, it is essential that we properly address the mental health needs of this population rather than expose them to turbulent and violent conditions that exacerbate their conditions. Urgent action is also necessary to relieve the constant pressure on County jail staff.

The County Department of Health Services' Office of Diversion and Reentry (ODR) has demonstrated success in addressing this crisis, but it's housing program has not been able to expand services beyond its 2,200-bed capacity because of financial constraints. In 2015, the Board of Supervisors created ODR to reduce the number of people incarcerated in County jails with mental health and/or substance use disorders who are at risk of homelessness, to reduce recidivism, and to improve the health outcomes of justice-involved populations who have the most serious underlying health needs.

Since its creation, the County courts have released 7,414 persons from jail and

- MORE -

<u>MOTION</u>

SOLIS          _____

KUEHL          _____

HAHN           _____

BARGER         _____

MITCHELL       _____

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 14, 2022
Page 2

into ODR's care where they have received community-based treatment and various types of supportive housing programs. (See Attachment A).  A 2020 RAND study determined that 61 percent of individuals in County jails – more than 3,600 people – are candidates for diversion.  Another RAND Corporation study of ODR's Supportive Housing Program found that 91 percent of its clients had stable housing after six months; 74 percent had stable housing after twelve months; and 86 percent had no new felony convictions after a year.

Numerous studies have confirmed that ODR's programming is successful at stabilizing persons with serious mental illness so that they can safely live in the community. In turn, by stabilizing people with serious mental illness who so often cycle between jails and homelessness, ODR's housing model provides targeted resources to reduce housing instability for this high needs population. In addition, preliminary results of a study by UCLA of 962 ODR clients show that their medical and mental health hospitalization and emergency department visit rates decreased dramatically after they enrolled in ODR programs (See below).

**Table 2. Medical Health Utilization Rate (per 100,000 clients) in pre and post 12 Months of Enrollment**

| Variable | In pre 12 months | In post 12 months |
|---|---|---|
| **Number of hospitalizations (per 100,000 clients)** | 156,128 | 63,454 |
| **Number of ED visits (per 100,000 clients)** | 313,092 | 116,896 |
| **Number of primary care visits (per 100,000 clients)** | 92,200 | 199,249 |
| **Number of specialty visits (per 100,000 clients)** | 59,888 | 92,490 |

**Table 3. Mental Health Utilization Rate (per 100,000 clients) in pre and post 12 Months of Enrollment**

| Variable | In pre 12 months | In post 12 months |
|---|---|---|
| **Number of hospitalizations (per 100,000 clients)** | 71,587 | 20,775 |
| **Number of ED visits (per 100,000 clients)** | 56,546 | 17,271 |

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 14, 2022
Page 3

ODR recently demonstrated its ability to quickly scale up its programs and services in response to the COVID-19 pandemic. ODR and its community-based partners, with the support of one-time federal COVID-19 response funding, quickly diverted and housed 211 individuals who were released from County jails and provided thousands of individuals with wraparound reentry services. As a result, many vulnerable residents were diverted from homelessness and removed from an environment where they were at high risk of becoming infected with the COVID-19 virus.

Despite the demonstrated efficacy of the ODR model and numerous efforts to develop a funding road map, including motions in May 2019, in July 2020, and in June 2021, sufficient funding has not been identified to scale up diversion efforts to keep pace with the growing need. On April 28, 2022, the Mental Health Commission voted to strongly recommend that the Department of Mental Health (DMH) allocate $25 million a year in Mental Health Services Act (MHSA) funds to support ODR services to MHSA-eligible clients.  DMH Program and Finance staff are still evaluating this proposal.

The Chief Executive Officer (CEO) has previously been tasked with providing recommendations to secure ongoing funding to maintain ODR's work for existing clients and to address the impending "fiscal cliff" it faces when current one-time funds are fully expended. Although the $30 million of funding the CEO recommended for the 2022-23 fiscal year is a great step, it does not address ODR's $29 million deficit and allow ODR to further expand its services.

**I THEREFORE MOVE THAT THE BOARD OF SUPERVISORS:**

1. Instruct the Chief Executive Officer (CEO) to report back in writing during the Fiscal Year (FY) 2022-23 Supplemental Budget to recommend a process for identifying ongoing funding sufficient to expand the County-funded Office of Diversion and Reentry (ODR) Housing program by at least 500 additional beds, increasing the number of ODR Housing program beds to 2,700 (above what is currently feasible with existing ODR resources) by July 1, 2023, with consideration for funding sources including, but not limited to, AB 109 and Net County Cost.

2. Instruct the CEO, in collaboration with the Interim Director of ODR and other

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 14, 2022
Page 4

relevant stakeholders, to report back in writing during FY 2023-24 Recommended Budget with funding recommendations for expanding ODR Housing and expanding community based mental health care, including a discussion of what funding sources are available. This report should:

a. Include funding recommendations for expanding ODR Housing by 1,000 additional beds in FY 2023-24, increasing the total number of ODR Housing program beds to 3,700.

b. Include funding recommendations for increasing capacity by at least 3,600 beds for community-based mental healthcare, increasing the total number of ODR Housing program beds to 5,800; and 400 beds for individuals with serious medical, substance use disorder and/or other housing needs.

<div align="center">#     #     #</div>

(JM/YV/CAS)

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 14, 2022
Page 5

Attachment A:



# Sub-Exhibit D

AGN. NO.

MOTION BY SUPERVISOR HOLLY J. MITCHELL                    June 28, 2022

**Expanding Office of Diversion and Reentry Housing**

There are nearly 13,000 people in the Los Angeles County (County) jail system. Nearly 43 percent of the jail's population is suffering due to mental health needs, a 21 percent increase since 2020. Incredibly, six out of ten women in County jails have serious mental illnesses and there are significant racial disparities in who is incarcerated, with mostly Black and Latinx/Hispanic people languishing in jails.

As the County continues to embrace a "Care First" vision, it is essential that we properly address the mental health needs of this population rather than expose them to turbulent and violent conditions that exacerbate their conditions. Urgent action is also necessary to relieve the constant pressure on County jail staff.

The County Department of Health Services' Office of Diversion and Reentry (ODR) has demonstrated success in addressing this crisis, but it's housing program has not been able to expand services beyond its 2,200-bed capacity because of financial constraints. In 2015, the Board of Supervisors created ODR to reduce the number of people incarcerated in County jails with mental health and/or substance use disorders who are at risk of homelessness, to reduce recidivism, and to improve the health outcomes of justice-involved populations who have the most serious underlying health needs.

Since its creation, the County courts have released 7,414 persons from jail and

- MORE -

<u>MOTION</u>

SOLIS          _____

KUEHL          _____

HAHN           _____

BARGER         _____

MITCHELL       _____

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 28, 2022
Page 2

into ODR's care where they have received community-based treatment and various types of supportive housing programs. (See Attachment A). A 2020 RAND Corporation study determined that 61 percent of individuals in County jails – more than 3,600 people – are candidates for diversion. Another RAND Corporation study of ODR's Supportive Housing Program found that 91 percent of its clients had stable housing after six months; 74 percent had stable housing after twelve months; and 86 percent had no new felony convictions after a year.

Numerous studies have confirmed that ODR's programming is successful at stabilizing persons with serious mental illness so that they can safely live in the community. In turn, by stabilizing people with serious mental illness who so often cycle between jails and homelessness, ODR's housing model provides targeted resources to reduce housing instability for this high need population. In addition, preliminary results of a study by UCLA of 962 ODR clients show that their medical and mental health hospitalization and emergency department visit rates decreased dramatically after they enrolled in ODR programs (See below).

**Table 2. Medical Health Utilization Rate (per 100,000 clients) in pre and post 12 Months of Enrollment**

| Variable | In pre 12 months | In post 12 months |
|---|---|---|
| Number of hospitalizations (per 100,000 clients) | 156,128 | 63,454 |
| Number of ED visits (per 100,000 clients) | 313,092 | 116,896 |
| Number of primary care visits (per 100,000 clients) | 92,200 | 199,249 |
| Number of specialty visits (per 100,000 clients) | 59,888 | 92,490 |

**Table 3. Mental Health Utilization Rate (per 100,000 clients) in pre and post 12 Months of Enrollment**

| Variable | In pre 12 months | In post 12 months |
|---|---|---|
| Number of hospitalizations (per 100,000 clients) | 71,587 | 20,775 |
| Number of ED visits (per 100,000 clients) | 56,546 | 17,271 |

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 28, 2022
Page 3

ODR recently demonstrated its ability to quickly scale up its programs and services in response to the COVID-19 pandemic. ODR and its community-based partners, with the support of one-time federal COVID-19 response funding, quickly diverted and housed 211 individuals who were released from County jails and provided thousands of individuals with wraparound reentry services. As a result, many vulnerable residents were diverted from homelessness and removed from an environment where they were at high risk of becoming infected with the COVID-19 virus.

Despite the demonstrated efficacy of the ODR model and numerous efforts to develop a funding road map, including motions in May 2019, in July 2020, and in June 2021, sufficient funding has not been identified to scale up diversion efforts to keep pace with the growing need. On April 28, 2022, the County's Mental Health Commission voted to strongly recommend that the Department of Mental Health (DMH) allocate $25 million a year in Mental Health Services Act (MHSA) funds to support ODR services for MHSA-eligible clients.  DMH Program and Finance staff are still evaluating this proposal.

The Chief Executive Officer (CEO) has previously been tasked with providing recommendations to secure ongoing funding to maintain ODR's work for existing clients and to address the impending "fiscal cliff" it faces when current one-time funds are fully expended. Although the $30 million of funding the CEO recommended for the 2022-23 fiscal year is a great step, it does not address ODR's $29 million deficit and allow ODR to further expand its services.

**I THEREFORE MOVE THAT THE BOARD OF SUPERVISORS:**

1. Instruct the Chief Executive Officer (CEO) to report back in writing during the Fiscal Year (FY) 2022-23 Supplemental Budget with an update on the structural deficit of the Office of Diversion and Reentry (ODR), an analysis of the cost required for expansion, and a plan to identify ongoing funding to expand the ODR Housing program by 500 additional beds, increasing the number of ODR Housing program beds to 2,700 (above what is currently feasible with existing ODR resources) by July 1, 2023, and recommendations of potential funding sources, including, AB 109, Net County Cost, and State Medi-Cal funds.

   a. The report should include an update on the status of the Memorandum of

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 28, 2022
Page 4

      Agreement (MOA) between the Department of Health Services and Department of Mental Health (DMH), an analysis of funding that is made available through the MOA, and plans to use those funds to expand ODR Housing program beds and services.

b. The report should also include recommendations from the CEO-Chief Information Officer to formalize a data and outcomes analysis plan for ODR to include, at minimum, the following data points:

   i. The number of clients referred (including those not accepted);

   ii. The number of clients referred to the DMH Intensive Care Division, Lanterman-Petris-Short conservatorship, and Full Service Partnership;

   iii. The number of clients who elope;

   iv. Recidivism rates and rates of refusals to participate (including time of stay between leaving jail and leaving/refusing to participate);

   v. The number of clients who fail due to non-compliance or are engaged in violence, substance use, or other behaviors for which they must be moved to higher levels of care;

   vi. Number of clients who transition into non-ODR long-term housing.

<p style="text-align:center">#    #    #</p>

(JM/YV/CAS)

MOTION BY SUPERVISOR HOLLY J. MITCHELL
June 28, 2022
Page 5

Attachment A:



February, 2022

# Sub-Exhibit E

AGN. NO.

AMENDMENT BY SUPERVISOR KUEHL                                    June 28, 2022

MOTION BY SUPERVISOR HOLLY J. MITCHELL

**Expanding Office of Diversion and Re-Entry Housing**

**I THEREFORE MOVE THAT THE BOARD OF SUPERVISORS:**

1. Instruct the Chief Executive Officer (CEO) to report back in writing during the Fiscal Year (FY) 2022-23 Supplemental Budget with an update on the structural deficit of the Office of Diversion and Reentry (ODR), an analysis of the cost <u>and timeline</u> required for expansion <u>with consideration of other "Care-First Jails Last" Board priorities</u>,, and a plan to identify ongoing funding to expand the ODR Housing program by 500 additional <u>slots</u> ~~beds~~, increasing the number of ODR Housing program <u>slots</u> ~~beds~~ to 2,700 (above what is currently feasible with existing ODR resources) ~~by July 1, 2023~~, and recommendations of potential funding sources, including AB109, Net County Cost, and State Medi-Cal funds.

   a. The report should include an update on the status of the Memorandum of Agreement (MOA) between the Department of Health Services and the Department of Mental Health (DMH), an analysis of funding that is made available through the MOA, and plans to use those funds to expand ODR Housing program beds and services.

   b. The report should also include recommendations from the CEO-Chief Information Officer to formalize a data and outcomes analysis plan for ODR to include, at a minimum, the following data points:

<u>MOTION</u>

Solis          _____

Kuehl          _____

Hahn           _____

Barger         _____

Mitchell       _____

i. The number of clients referred (including those not accepted);

ii. The number of clients referred to the DMH Intensive Care Division, Lanterman-Petris-Short conservatorship, and Full Service Partnership;

iii. The number of clients who elope;

iv. Recidivism rates and rates of refusals to participate (including time of stay between leaving jail and leaving/refusing to participate);

v. The number of clients who fail due to non-compliance or are engaged in violence, substance use, or other behaviors for which they must be moved to higher levels of care;

vi. Number of clients who transition into non-ODR long-term housing.

# Sub-Exhibit F



**County of Los Angeles**
# CHIEF EXECUTIVE OFFICE
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

FESIA A. DAVENPORT
Acting Chief Executive Officer

Board of Supervisors
HILDA L. SOLIS
First District

MARK RIDLEY-THOMAS
Second District

SHEILA KUEHL
Third District

JANICE HAHN
Fourth District

KATHRYN BARGER
Fifth District

November 17, 2020

To:       Supervisor Kathryn Barger, Chair
          Supervisor Hilda L. Solis
          Supervisor Mark Ridley-Thomas
          Supervisor Sheila Kuehl
          Supervisor Janice Hahn

From:     Fesia A. Davenport
          Acting Chief Executive Officer

**ADDRESSING THE OFFICE OF DIVERSION AND RE-ENTRY BUDGET**

On September 29, 2020, the Chief Executive Office (CEO) presented the Board of Supervisors (Board) with its Fiscal Year (FY) 2020-21 Supplemental Budget request. As part of that request, we recommended $30.0 million in one-time funding to sustain existing services for the Office of Diversion and Re-entry (ODR) to be made available in FY 2020-21. We also committed to report back in 45 days with additional information to help address ODR's ongoing budget deficit and possible options for service expansion.

ODR provides services to clients via: 1) the ODR Housing Program (currently budgeted for 2,200 slots) primarily funded by net County cost (NCC); and 2) various community-based treatment and re-entry services and additional housing programs, both funded through a variety of funding sources, including various grants. The majority of ODR clients, whether serviced by NCC or grant-funded programs, generally receive physical and mental health services, as well as housing[1], that includes Intensive Case Management Services (ICMS).

Given the mental health acuity level of the clients served by ODR via the Housing Program, the services and housing are typically expected to continue in perpetuity, this model limits ODR's ability to turnover existing slots and thereby serve additional clients. Based on anticipated program expenditures, ODR has an annual structural imbalance between ongoing costs and ongoing funding of approximately $80.0 million.

---

[1] The goal for ODR is placement of clients in permanent supportive housing; however, given the needs of clients served, clients are often placed in interim housing, which is more costly, until a permanent supportive housing slot is deemed appropriate and found. The 2,200 housing program slots are comprised of costs to support a combination of permanent and interim housing slots, and the mix of these slots fluctuates over time depending on the needs.

*"To Enrich Lives Through Effective And Caring Service"*

Each Supervisor
November 17, 2020
Page 2


On November 3, 2020, Los Angeles County (County) voters approved Measure J by nearly 60 percent, signaling a desire by County voters to invest in social services and jail diversion programs. Measure J amended the County's charter (Charter Amendment) and requires that no less than 10 percent of locally generated unrestricted revenue be earmarked for a variety of services, including social services, housing, mental health treatment, as well as direct community investments. Further, Measure J prohibits the use of these funds for carceral systems and law enforcement agencies. The Charter Amendment becomes effective on July 1, 2021, and allows for implementation of the 10 percent allocation over three years, with the full set-aside in effect by June 30, 2024.

On November 10, 2020, the Board approved a motion by Supervisors Kuehl and Solis to establish a transparent process to allocate Measure J funding. The motion directs the establishment of a 17-member Re-Imagine LA Advisory Committee (Advisory Committee). The motion identifies two distinct investment areas:  1) Direct Community Investments; and 2) investments in Alternatives to Incarceration. Many of the programs and services provided by ODR fall squarely within the investment areas identified in the motion making ODR services a priority for funding in any Board adopted spending plan developed by the Advisory Committee. Additionally, the Board has put forward several other motions over the last three years, directing the identification of funding for additional expansion of ODR's services. Although $20.0 million in ongoing funding was added in FY 2019-20 and $30.0 million in one-time funding is included in FY 2020-21, we have been unable to identify an ongoing funding source to fully address the structural imbalance.

ODR currently has one-time funding which will sustain current operations through FY 2021-22, and be exhausted during FY 2022-23. The options below assume that the Advisory Committee will recommend funding for ODR. However, it is unclear how much funding will be made available until after the Board adopts the Advisory Committee's recommended spending plan. Given the foregoing, the CEO is pursuing additional funding options to complement potential ODR funding recommendations presented by the Advisory Committee. These funding options are summarized below:

1) We are working with County Counsel and ODR to develop a new funding approach that uses State and federal revenues, to either match or fund certain mental health services provided by ODR. These ongoing discussions will likely result in a formal recommendation to the Board for approval in the coming months. While a funding amount has not been determined for this effort, we expect funding to partially mitigate the structural imbalance and ensure that ODR is able to maximize the use of State and federal funding.

2) The Department of Health Services (DHS) is working with the State to identify additional options that may offset ODR costs. These options include, but are not limited to, pursuing funding via the State-led *California Advancing and Innovating Medi-Cal* (CalAIM) Project. Although CalAIM has been delayed due to the

Each Supervisor
November 17, 2020
Page 3

pandemic, it still presents an opportunity to partially offset certain costs, such as those related to ICMS.  The State is currently targeting January 2022 to bring CalAIM online.  CEO will work closely with DHS and the State to track the roll-out of CalAIM and will advocate to maximize the available funding to offset ODR program costs.

3) Our office continues to explore and pursue additional ongoing funding options for the variety of services provided by the different programs within ODR.  This funding may be comprised of a variety of sources, including, but not limited to, Assembly Bill 109, Senate Bill 678, Proposition 47, Mental Health Services Act, Measure H, and/or State Realignment.  Depending on the source of funding identified in any given fiscal year, and whether any additional funding from these sources becomes available, this approach may necessitate sunsetting certain programs/services currently funded with these sources.  Any recommendations in this area will be vetted with your Board.

4) ODR is working closely with CEO Homeless Initiative leadership to identify whether $2.0 billion in Statewide housing and rental subsidy funding may be available to the County for housing.  Although this reflects one-time funding, it could help provide short-term funding relief while other ongoing funding strategies are being explored; and

5) The CEO's Legislative Affairs and Intergovernmental Relations Branch will also continue to advocate for additional support that may offset some housing-related ODR costs.  Although federal housing vouchers are in short supply, ODR will continue to include their clients on wait lists for these limited slots.

Due to unavailability of a new ongoing funding source, this report does not include a recommendation for service expansion; however, within the various options described above, CEO can sustain ODR's existing operations and evaluate opportunities for expansion through the Measure J spending plan recommendations.  For some of the options described above, additional time is needed to assess and provide formal recommendations.  CEO will provide updates to these funding recommendations in the next 90 days and provide further recommendations on a long-term funding plan in future budget phases.

Should you have any questions concerning this matter, please contact me or Mason Matthews at (213) 974-2395 or mmatthews@ceo.lacounty.gov.

FAD:JMN:MM
MM:EB:bjs

c:      Executive Office, Board of Supervisors
        County Counsel

11.17.20 ODR Report Back

# Exhibit 14

**Declaration of Summer Lacey**

I, Summer Lacey, hereby declare:

1.       I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

2.       I am the Criminal Justice Director and a Senior Staff Attorney at the ACLU Foundation of Southern California. I am admitted to practice law in the State of California and before this Court. I make this declaration in support of Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction.

3.       The purpose of this declaration is to set forth what I observed when I visited the Inmate Reception Center (IRC) at the Los Angeles County Jails downtown on Monday, August 29, 2022, between about 3:00 pm and 6:30 pm.  On that date, I was accompanied by my colleagues Melissa Camacho-Cheung and Peter Eliasberg, attorneys of record for Plaintiff class in this matter.

4.       I initially toured the IRC clinic area. Following the tour, I spent the majority of my time speaking with individuals handcuffed to chairs on the "front bench." I also spoke with multiple individuals in the general waiting area outside of the front bench. These individuals were eager to speak to me about the conditions in IRC and their respective experiences.

5.       The conditions I observed in the IRC clinic were disturbing. When my colleagues and I first entered the area, multiple individuals immediately approached us to discuss their experiences in IRC and began forming a line. During the initial tour, I saw individuals lying face down on the ground next to piles of trash and pieces of old food. Some individuals lying on the ground had blankets, but most did not. Some individuals had their shirts pulled over their heads to presumably protect their faces from the ground. No one in the IRC clinic had a mattress. One individual, who was lying on the ground, had what appeared to be fresh bandages along his arm. The clinic area smelled like a mix of old food, urine, and body odor.

6.        The IRC clinic area felt crowded. Most of the chairs within the open area beyond the front bench appeared to be occupied and many people were standing up. There was the distinct feeling of restlessness combined with desperation and frustration within the environment.

1

1  There was trash in between the chairs in the general seating area. Individuals were also lying on

2  the ground in between the chairs and along the walls of the facility.

3        7.    During the tour, an individual named Jerome Dubose approached my colleague

4  Melissa Camacho-Cheung and stated that he recognized her from her visit the prior Friday. Mr.

5  Dubose indicated his desire to speak with us about his experience.

6        8.    Following the tour, I began speaking with individuals on the front bench. It is my

7  understanding that the people on the front bench have all been identified as having serious

8  mental illness and may be at risk of harming themselves or others. I believe there were about 8

9  people on the front bench when I first arrived. Each person on the front bench had both arms

10  handcuffed to their respective chairs. One individual's clothes appeared to be falling off of his

11  body.  Despite being handcuffed, one individual was lying with his face on the ground in front of

12  his chair.

13        9.    I did not observe a single nurse or doctor within the general IRC clinic area or the

14  front bench. I saw no medical equipment, nor did I see anyone receive medication.  Though

15  multiple people appeared incoherent on the front bench, I did not observe the administration of

16  medical or psychiatric care.

17        10.    I spoke with Jerome Dubose before leaving IRC. Mr. Dubose was very emotional

18  during our discussion of his experience. Mr. Dubose cried when describing what he had endured

19  since entering IRC.  He expressed fear that his physical and mental health were being

20  jeopardized by his lengthy placement in IRC.

21        I declare under penalty of perjury of the laws of the State of California and the United

22  States that the foregoing is true and correct.  Executed this 2nd day of September 2022 in Los

23  Angeles, California.

24

25  _____

26              Summer Lacey

27

28

# Exhibit 15

PETER J. ELIASBERG (189110)
peliasberg@aclu-sc.org
MELISSA CAMACHO (264024)
mcamacho@aclu-sc.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone:  (213) 977-9500
Fax:  (213) 977-5299

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
ERIC BALABAN (*pro hac vice*)*
ebalaban@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
915 15th St., NW, 7th Floor
Washington, D.C. 20005
Phone:  (202) 393-4930
Fax:  (202) 393-4931

*Not admitted in D.C., practice limited
to federal courts

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al*,,<br><br>          Plaintiffs,<br><br>     vs.<br><br>ALEX VILLANUEVA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES,<br><br>          Defendants. | Case No. CV 75-04111 DDP<br><br>**DECLARATION OF CORENE T. KENDRICK**<br><br>Assigned to Hon. Dean D. Pregerson |

1       I, Corene T. Kendrick, hereby declare:

2       1.    I am Deputy Director of the American Civil Liberties Union's National

3   Prison Project (NPP), and counsel of record for Plaintiff class in this matter. I am

4   admitted to the State Bar of California and to practice before this Court. I make this

5   declaration in support of Plaintiffs' Application for a Temporary Restraining Order

6   and Preliminary Injunction. The matters set forth herein are true and correct of my

7   own personal knowledge, and, if called as a witness, I could and would testify

8   competently thereto.

9       2.    On the morning of June 14, 2022, I visited the Inmate Reception Center

10   (IRC) with my colleague Melissa Camacho-Cheung from the ACLU of Southern

11   California and the *Rosas* monitors, and observed the conditions and spoke to class

12   member detainees. I took contemporaneous notes recording my impressions and the

13   substance of my interviews, which I referenced in drafting this declaration. This is my

14   usual practice when visiting carceral settings; I have almost 20 years' experience in

15   multiple states and two countries of documenting visits to state prisons and juvenile

16   prisons, youth detention facilities, halfway houses and group homes, county jails and

17   county juvenile halls, and immigration detention centers.

18       3.    According to relevant documentation and the reports of jail staff, that

19   morning more than 100 people were in the IRC medical clinic space that morning.

20       4.    We went to the area of the IRC referred to as "the Front Bench," which

21   is the front row of the clinical space, closest to the correctional and health care staff.

22   I counted 12 chairs / spots for seating on the bench, and counted nine people chained

23   to those chairs. Several of the men were sitting on the concrete floor adjacent to their

24   chair, or had attempted to stretch out on the floor. There were several people chained

25   to the chairs who appeared to be in the process of detoxing from drugs or alcohol, as

26   they were involuntarily jerking around, sweating, and appeared incoherent. There

27   were at least two people who appeared to be floridly psychotic or dissociating,

28   speaking to themselves or to others only they could see.

5.      Beyond the Front Bench, there were several rows of chairs on the left and right sides of the Front Bench for other people awaiting mental health and medical screening. I counted approximately 32 people sitting in chairs or on metal benches to the left of the front bench. It was hard to count accurately because people were wandering around. There were about another ten men in that area spread out laying head-to-foot on the ground. The paths of travel were blocked by people sitting and laying on the ground, and we had to pick our way around them.  There were food wrappers, and juice cartons on the floor throughout the area. There were two large garbage cans in the general area, one of which was full and the other that looked as if it had just been emptied and a new trash bag put in it a few minutes before our arrival.

6.      The clinic itself was quite loud, with televisions blaring, detainees yelling, and announcements being made by staff. It was brightly lit with overhead fluorescent lights, with no windows or natural light. Some detainees had their shirts wrapped around their heads, apparently in an attempt to shield their eyes or muffle the sounds. There was a palpable tension and desperation, especially when the detainees heard us introduce ourselves as attorneys from the ACLU, they started to shout out concerns and gathered around us.

7.      I was wearing a KN-95 mask for COVID-19 protection, but despite the mask I could smell a mixture of body odor, urine, and bleach. It was warm, stuffy, and stale, and I did not feel much air circulation. When some of the detainees learned that I was with the ACLU, they said that there had been an attempt to clean the space in the short time prior to our visit.

8.      Beyond these rows of chairs, there was a large holding cell, numbered 119/120. It was very crowded; I stood at the main window and counted at least 35 people in this holding cell. Several men started banging on the door when I approached it, begging to be let out.

9.      I started speaking to a group of people crowded at the door. They said that the door had been locked since the prior morning, and had only been opened to

1 hand out peanut butter and jelly sandwiches and cartons of orange juice. They also
2 said that only one toilet was working in the holding cell, and the other one was
3 overflowing. They said that their only source of water in the cell was a sink that was
4 trickling out water, and that some men were urinating in the sink.

5      10.    Despite my KN-95 mask, I could smell a mixture of feces, urine, and
6 body odor in Cell 119/120 that was so strong that I had to start chewing gum to prevent
7 myself from vomiting.

8      11.    The crowd said that there were several older men who needed immediate
9 medical attention and we asked that those men come forward to speak to me and/or
10 Ms. Camacho-Cheung.

11      12.    I spoke to a man who said he was an insulin-dependent diabetic and had
12 not received insulin for 36 hours, and that the PB&J sandwich and orange juice was
13 making his blood sugar spike and crash. I immediately asked Commander Plunkett to
14 open the door and have that man taken to see medical staff at the clinic.

15      13.    Ms. Camacho and I also spoke to a man with a fist-sized hernia who was
16 doubled over in obvious pain. We also asked Commander Plunkett and nursing staff
17 to remove him from the cell for medical attention.

18      14.    I walked by a smaller holding cell, cell 122, which held seven men. When
19 they learned I was from the ACLU they yelled "get us out of here."

20      15.    I entered the area where mental health screenings are conducted, with
21 Ms. Camacho. There were five booths side by side with low separating walls between
22 them, providing no privacy for one-on-one mental health screening. There were five
23 mental health staff sitting in the area, but there were no detainees being screened when
24 I walked into the area.

25      16.    As this case was filed in 1975, many of the orders and briefs are not
26 available on the Central District of California's Electronic Case Filing (ECF) system.
27 As part of NPP's case management system, we have maintained scans of the paper
28 copies of many of the key orders and filings that predate the ECF system.

17.    **Attached herein as Exhibit A** is a true and correct copy of an order issued by the Court in this case on February 16, 1979.

18.    **Attached herein as Exhibit B** is a true and correct copy of a Joint Status Report and Proposed Order signed by counsel for the parties and approved by the Court on August 27, 1992.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on September 7, 2022, in San Francisco, California.

*/s/ Corene T. Kendrick*
Corene T. Kendrick

# Sub-Exhibit A

ENTERED

FILED

FEB 16 1979

CLERK, U. S. DISTRICT COURT
TRAL DISTRICT OF CALIFORNIA
DEP'

FEB 15 1979

CLERK, U. S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD,          )
HAROLD TAYLOR, and          )
RICHARD ORR, et al.,        )     CASE NO. CV 75-4111-WPG
                            )
          Plaintiffs,       )
                            )
     v.                     )
                            )
PETER J. PITCHESS,          )         JUDGMENT
et al.,                     )
                            )
          Defendants.       )
_____)

In this action, the plaintiffs, on behalf of inmates
of the Los Angeles County Central Jail, challenge certain
policies and practices of the defendant administrators of the
jail and the living conditions under which the inmates are
maintained.  The matter has been tried and briefed, and the
court has made findings of fact and conclusions of law in the
form of a Memorandum of Decision filed on July 25, 1978, and a
Supplemental Memorandum of Decision that is being filed contem-
poraneously herewith.  In accordance with such findings, the
court renders this judgment.

1097

FEB 15 1979

Docketed
Mld copy Ptys
Mld Notice Ptys
JS-6

MICROFILMED

FEB 22 1979

IT IS ORDERED AS FOLLOWS:

1.  _Beds._  Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.

     This order shall not preclude the defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only, if, in the defendants' judgment, such inmate or inmates require more secure housing than is provided in the available areas and the appropriate housing does not have a sufficient number of bunks.  Further, this order shall not apply in the event of an emergency causing a sudden and unusual intake of prisoners, in which case full bedding shall be provided and the defendants will exercise their best efforts to provide bunks for all inmates as soon as possible.

2.  _Visitation._

     (a)  _Visits By Children Of Prisoners._  Upon prior request from a prisoner, his minor children over the age of twelve (12) years shall be permitted to visit him unaccompanied by an adult.

     (b)  _Contact Visits._  Commencing not more than ninety days following the date of this order, the defendants will make available a contact visit once each week to each pre-trial detainee that has been held in the jail for one month or more, and concerning whom there is no indication of drug or escape propensities; provided, however, that no more than fifteen hundred such visits need be allowed in any one week.  In the event that the number of requested visits in any week exceeds fifteen hundred, or such higher number as the Sheriff voluntarily undertakes to accommodate, a reasonable system of rotation or

1098



1  other priorities may be maintained.  The lengths of such visits
2  shall remain in the discretion of the Sheriff.

3       3.  Outdoor Recreation.  All prisoners except those
4  that are hospitalized, in disciplinary segregation, those under
5  the jurisdiction of the medical staff of the Forensic Mental
6  Health Unit who such medical staff determine are inappropriate
7  for roof recreation, and except for those high security inmates
8  who the Sheriff believes cannot safely be permitted roof recrea-
9  tion shall be allowed not less than two and one-half hours of
10  outdoor exercise or other recreation per week.  Within sixty
11  days following the date of this order, the Sheriff shall report
12  to the court the number of inmates under the jurisdiction of the
13  Forensic Mental Health Unit and the number of high security
14  inmates included in the roof recreation program and the nature
15  of alternative recreation provided for high security inmates not
16  allowed roof recreation.

17       4.  Indoor Recreation.  Television receiving sets
18  shall be installed and reasonably maintained in each day room.

19       5.  Restoration Of Windows.  Within ninety days
20  following the filing of this order, transparent windows shall be
21  restored in each portion of the jail from which they previously
22  have been removed.

23       6.  Processing For Court.  As soon as practical, but
24  not more than four months from the date of this order,

25       (a) each detainee placed in a holding cell will be
26  given a chair or a bench upon which to sit;

27       (b) on each day of trial after the first day a
28  detainee will not be required to leave his bed earlier than



-3-

1099

1   6:00 A.M., and will not be confined in a holding cell for longer

2   than thirty minutes, either before leaving for court or following

3   his return; and his waiting time on a bus at the jail will not

4   exceed thirty minutes; and he will be returned to his cell not

5   later than 8:00 P.M.

6             Within four months from the date of this order,

7   the Sheriff shall report his progress in this regard to the court

8   and the reasons, if any, for his inability to comply in all

9   respects.  At that time, the court will review this portion of

10   this order as to whether there is any justification for modifi-

11   cation thereof.

12           7.  Telephones.  On January 5, 1979, a separate order

13   was filed approving and directing implementation of a plan for

14   the improvement of telephone facilities in the jail.  Accordingly,

15   no further order is indicated on this subject at this time.

16           8.  Cell Searches.  Inmates that are in the general

17   area when a "shakedown" inspection of their cells is undertaken

18   shall be permitted to be sufficiently proximate to their respec-

19   tive cells that they may observe the process and respond to such

20   questions or make such requests as circumstances may indicate.

21           9.  Time For Meals.  An inmate shall be allowed not

22   less than fifteen minutes within which time to complete each meal.

23           10.  Change Of Clothing.  Effective not more than sixty

24   days following the filing of this order, each inmate shall receive

25   at least twice each week clean outer garments, undergarments,

26   socks and a towel in exchange for those that he has been using.

27           11.  Injunctive Relief.  When any inmate has information

28   that he believes to disclose a violation of this order, he may

-4-

1/00

8

1  set forth that information in writing to the Commander of the
2  jail who shall cause an investigation thereof to be made as soon
3  as reasonably practicable, and in any event within ten days
4  following receipt of such written statement.  Promptly following
5  the completion of the investigation the Commander shall deliver
6  a written reply to the inmate indicating the results thereof and
7  what, if any, action has been taken concerning the inmate's
8  complaint and what, if any, action has been taken to prevent
9  violations of this judgment.  Absent unusual circumstances
10 indicating compelling reasons why following this procedure would
11 result in substantial prejudice to the inmate, no petition for
12 a judgment of contempt for violation of this order shall be
13 entertained by the court until the inmate first complies with
14 this administrative procedure.  In considering any petition for
15 contempt for violation of this order, the court shall take into
16 account the appropriateness of any action taken by the jail
17 Commander in response to information provided him in accordance
18 with this procedure.

19          12.  Emergencies.  In the event that the Sheriff or
20 his authorized representatives have reasonable cause to believe
21 that there exist facts showing a serious imminent threat to the
22 security of the jail or the safety of any persons therein that
23 would occur if any of the provisions of this decision were
24 enforced and there is insufficient time to seek a formal modifi-
25 cation or exception to such provisions, the Sheriff may temporarily
26 suspend such of the provisions of this decision as may be
27 necessary to overcome or reduce such threat for a period not
28 exceeding five court days, provided he submits a statement in

-5-

1107

9

1   writing to this court setting forth what he has done and why he

2   has done it.

3        13.  <u>Posting Of This Judgment</u>.  The defendants and

4   their successors in interest shall cause this judgment to be

5   posted permanently and conspicuously in each prisoner housing

6   area in the jail for the period of one year; thereafter, the

7   defendants and their successors in interest shall permanently

8   and conspicuously post this judgment in each of the jail's law

9   libraries.

10       14.  Counsel for the plaintiffs shall recover his costs

11  incurred in this action.

12

13  DATED:  February 15, 1979.

14

15

16                              WILLIAM P. GRAY

16                              United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28                                         1102



-6-                                    10

# Sub-Exhibit B

1    PAUL L. HOFFMAN
    LISE ANDERSON
2    ACLU Foundation of Southern California
    1616 Beverly Boulevard
3    Los Angeles, CA 90026

4    (213) 977-9500

5    Attorneys for Plaintiffs

6    DE WITT W. CLINTON
    County Counsel
7    FREDERICK R. BENNETT
    Assistant County Counsel
8    648 Hall of Administration
    500 W. Temple Street
9    Los Angeles, CA  90012

10    (213) 974-1903
    FAX (213) 626-2105

11

12    Attorneys for Defendants

13             UNITED STATES DISTRICT COURT

14         FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

16    DENNIS RUTHERFORD, *et al.*,       CASE NO. CV-75-4111 WPG

17           Plaintiffs,         Joint Status Report and
                             Proposed Order
18       v.

19    SHERMAN BLOCK, *et al.*,

20           Defendants

21

22

23       The present action was filed by the American Civil Liberties

Union Foundation of Southern California (ACLU) in 1975 invoking
24
jurisdiction under 28 U.S.C. §1343 for a claim under 42 U.S.C.
25
§§1983, 1985, and for injunctive and declaratory relief pursuant
26
to 28 U.S.C. §§2201, 2202, as a class action on behalf of all
27

28                   - 1 -

present and future inmates challenging a wide range of conditions of confinement at the Los Angeles County Men's Central Jail.

The class was certified and the matter proceeded to trial. After trial, the United States District Court Judge William P. Gray, filed a reported decision, *Rutherford v. Pitchess* (C.D. Cal. 1978) 457 F.Supp. 104 (Attachment 1[1]), and in an unreported supplemental memorandum opinion filed February 15, 1981 (Attachment 2), and a Judgment dated February 15, 1979 (Attachment 3), imposing nine (9) orders at Mens' Central Jail concerning (1) beds, (2) visitation, (3) outdoor recreation, (4) indoor recreation, (5) restoration of windows, (6) processing for court, (7) cell search procedures, (8) time for meals, and (9) changes of clothing.  By order filed January 5, 1979, a separate tenth (10th) order was filed approving and directing implementation of a plan for the improvement of telephone facilities in the jail.

Three of these orders, visitation, restoration of windows, and search procedures, were appealed to the Ninth Circuit, which reversed the order concerning restoration of windows (*Rutherford v. Pitchess* (9th Cir. 1983) 710 F.2d 572) [Attachment 4]), and to the United States Supreme Court, which reversed the visitation order

---

[1]  Referenced opinions are reproduced from the published reports or from the Joint Appendix filed with the United States Supreme Court in *Block v. Rutherford* (1984) 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438.

- 2 -

1    insofar as it required contact visitation, and the search

2    procedures order (*Block v. Rutherford* (1984)   468 U.S. 576, 104 S.Ct.

3    3227, 82 L.Ed.2d 438 [Attachment 5]).

4

5      The Sheriff has never been able to fully comply with one of

6    these orders concerning processing for court, and that provision

7    has been the subject of many motions for modification and

8    enforcement, and on December 16, 1987, District Court Judge Gray

9    approved a plan which ultimately lead to a jail population

10   management order discussed below, which suspended for at least

11   six months the orders concerning processing for court.  The court

12   processing orders remain suspended.

13

14     An unreported memorandum of understanding in other

15   litigation initiated by the ACLU, *ACLU v. Pitchess*, the Sheriff

16   agreed to work toward obtaining state licensure of the jails

17   health care delivery system, which has not yet been accomplished.

18   In 1984 and in 1991 the medical facilities at Men's Central Jail,

19   Sybil Brand Institute, and the Forensic Outpatient Unit (#7200)

20   in Central Jail were inspected by the state licensing agency.  In

21   May 1992 this agency issued reports detailing many areas in need

22   of improvement before licensing could occur.

23

24     Through 1985, none of the orders technically affected any

25   jails in the multi-facility Los Angeles County jail system except

26   Mens' Central Jail, although orders had been issued concerning

27   other jails in the system in litigation brought by the same

28                         - 3 -

1  attorneys representing the class in the Central Jail litigation.

2  Orders concerning the main Women's jail, Sybil Brand Institute,

3  were obtained in a state court proceeding, *Inmates of Sybil Brand v.*

4  *Pitchess* (1982) 130 Cal.App.3d 89, and concerning the Mens Hall of

5  Justice Jail in *Dillard v. Pitchess* (C.D. Cal. 1975) 399 F.Supp. 1225,

6  and by subsequent stipulated agreements approved by District

7  Court Judge William P. Gray.  However, it was the Sheriff's

8  practice to attempt to implement orders directed at any one

9  facility system-wide, and discussions between the parties

10  generally focused on the system rather than on any particular

11  facility.

12

13  Beginning in 1985, the Sheriff began experiencing difficulty

14  in complying with the various jail orders in the context of

15  unprecedented and unexpected increases in the jail population.

16  During the 1980's the jail system population almost tripled from

17  about 8,000 to over 23,000.  As alternatives to contempt

18  proceedings, the parties entered a number of memorandums of

19  understanding, which are summarized in a letter to Los Angeles

20  Municipal Court Judge Richard A. Paez, dated June 15, 1988

21  (attachment 5), and which ultimately lead to United States

22  District Court Judge William P. Gray approved stipulated

23  population limits at each of the jail facilities in the jail

24  system (except the newest facility, the North County Correctional

25  Facility, as to which there is only an understanding of the

26  parties), and a Court imposed jail population management order

27  which directs the Sheriff to "manage the jail system within those

28  - 4 -

capacities by discharging or citing inmates to court upon a
written promise to appear, according to priorities that he shall
establish."  (See Attachment 6).  Using this authority, the
Sheriff has generally managed the jail system within the
stipulated jail facility capacities by using a variety of
criteria for releasing or citing inmates to court as needed.

Since 1985, the ACLU has continued to monitor the Sheriff's
compliance with the various orders, and the parties have met
regularly since 1985.  During this time, the parties have been
able to agree to appropriate attorneys' fees for such monitoring
efforts which are periodically submitted to the District Court to
be ordered without hearing or objection, and to various plans for
dealing with periodic difficulties of compliance which have been
either reported to United States District Court Judge William P.
Gray orally in periodic status conferences, in periodic written
status reports, or submitted to him for modification orders.

Current meetings and discussions have largely centered on
the jail's health care delivery system.

This cooperative process has worked well for almost a
decade, with the parties meeting regularly, providing the court
with periodic status reports, and seeking United States District
Court intervention or approval as necessary.

1   To assist the District Court, the basic framework of

2   existing court orders and modifications is as follows:

3

4   1.  **Beds.**  Every prisoner kept overnight in the jail

5   will be accorded a mattress and a bed or bunk upon which to

6   sleep.  This order shall not preclude the defendants from

7   permitting inmates to be housed with full bedding but

8   without a bunk, for one night only, if, in the defendants'

9   judgment, such inmate or inmates require more secure housing

10   than is provided in the available areas and the appropriate

11   housing does not have a sufficient number of bunks.

12   Further, this order shall not apply in the event of an

13   emergency causing a sudden and unusual intake of prisoners,

14   in which case full bedding shall be provided and the

15   defendants will exercise their best efforts to provide bunks

16   for all inmates as soon as possible.  (Attachment 2,

17   2/15/79 Judgement, para. 1).

18

19   2.  **Visitation by Children of Prisoners.**  Upon prior

20   request from a prisoner, his minor children ̶̶̶̶̶̶̶̶̶̶

21   over the age of twelve (12) years shall be permitted to

22   visit him unaccompanied by an adult.  (*Id.*, para. 2).

23

24   3.  **Outdoor Recreation.**  All prisoners except those

25   that are hospitalized, in disciplinary segregation, those

26   under the jurisdiction of medical staff of the Forensic

27   Mental Health Unit who such medical staff determine are

28   - 6 -

appropriate for roof recreation, and except for those high security inmates who the Sheriff believes cannot safely be permitted roof recreation shall be allowed not less than two and one-half hours of outdoor exercise or other recreation per week. (*Id.*, para. 3).

4. **Indoor Recreation.** Television sets shall be installed and reasonably maintained in each day room. (*Id.*, para. 4).

5. **Telephones.** Primarily collect and some pay telephones shall be installed in each jail facility to permit all inmates reasonable access to telephones. (*Id.*, para. 7, as modified).

6. **Time for Meals.** An inmate shall be allowed not less than fifteen minutes within which time to complete each meal. (*Id.*, para 9).

7. **Change of Clothing.** Each inmate shall receive at least twice each week clean outer garments, undergarments, socks and a towel in exchange for those that he has been using.

8. **Jail Population Management.** The maximum inmate population at each of the listed facilities, subject to modification upon addition of new facilities, is set forth

- 7 -

below and the Sheriff shall "manage the jail system within those capacities by discharging or citing inmates to court upon a written promise to appear, according to priorities that he shall establish" (Attachment 5):

| Jail Facility | Court Approved Capacity |
|---|---|
| Mens' Central Jail Permanent housing | 6,800 Normal - 7500 Emergency[2] |
| Inmate Reception Center | 700 Inmates[3] |
| Los Angeles Medical Center | 50 Inmates |
| Hall of Justice Jail | 1,800 Normal - 2100 Emergency |
| Biscailuz Center | 1,470 Inmates |
| North County Correctional Facility | 3,120 Normal - 3600 Emergency[4] |
| PHR-East | 1,786 Normal - 1800 Emergency |
| PHR-North | 1,600 Normal - 1650 Emergency |
| PHR-South | 1,900 Normal - 1950 Emergency |
| PHR-Ranch | 2,366 Inmates |
| Mira Loma Male Facility | 1,089 Inmates |
| Mira Loma Female Facility | 854 Inmates |

[2]  The normal agreed population limit is 6800 inmates. However, the parties and the Court have approved permitting this jail's population to temporarily exceed 6800 to as much as 7500 on occasion for short periods of time when necessary.  Similar normal and emergency capacities are identified for certain other facilities.

[3]  There is no prior court order concerning this capacity. However, this number reflects the average number of inmates being processed in the Inmate Reception Center at any one time, and the number of inmates in the Inmate Reception Center are reported on  the daily count sheets used by the parties to monitor the jail population.

[4]  Since this facility was built after the original inmate population capacity agreements were adopted, there has been no prior formal approval of these limits.

| | |
|---|---|
| Sybil Brand Institute for Women | 2,064 Normal – 2300 Emergency |
| **Total** | **25,599 Normal – 27,429 Emergency** |

9.   **Health care system.**   The Sheriff shall work towards obtaining State licensure of all jail health care facilities and providing constitutionally adequate health care to all inmates in his custody, and in furtherance of that effort:

    A.   A joint Sheriff/ACLU team, including a mutually acceptable outside expert, will visit mutually acceptable jail medical care facilities such as Cook County (Chicago), Illinois, and Riker's Island (New York), for the purpose of identifying practical and appropriate ways of providing adequate jail medical care, and to provide a baseline for evaluation of the Los Angeles County system.

    B.   After the visit, the team will meet to identify necessary improvements to the Los Angeles County jail medical care system, and to prioritize those improvements to be implemented over time, (assuming that there are insufficient available resources), and to establish a reasonable time frame for implementation.

    C.   During this process the Sheriff will continue efforts to make short term improvements to meet the most serious deficiencies identified in the most recent State licensure inspection report.

- 10 -

10. **Administrative Remedy.** When any inmate has information that he believes to disclose a violation of a jail condition orders order, he may set forth that information in writing to the Commander of the jail who shall cause an investigation thereof to be made as soon as reasonably practicable, and in any event within ten days following receipt of such written statement. Promptly following the completion of the investigation the Commander shall deliver a written reply to the inmate indicating what, if any, action, has been taken concerning the inmate's complaint and what, if any, action has been taken to prevent violations of this judgment. Absent unusual circumstances indicating compelling reasons why following this procedure would result in substantial prejudice to the inmate, no petition for a judgment of contempt for violation of this order shall be entertained by the court until the inmate first complies with this administrative procedure. In considering any petition for contempt for violation of jail condition orders order, the court shall take into account the appropriateness of any action taken by the jail Commander in response to information provided him in accordance with this procedure. (*Id.*, para 11).

11. **Emergencies.** In the event the Sheriff or his authorized representatives have reasonable cause to believe there exists facts showing a serious imminent threat to the security of the jail or the safety of any persons therein

that would occur if any of the provisions of the *Rutherford*
orders were enforced and there is insufficient time to seek
a formal modification or exception to such provisions, the
Sheriff may temporarily suspend such jail condition orders
as may be necessary to overcome or reduce such threat for a
period not exceeding five court days, provided he submits a
statement in writing to this court setting forth what he has
done and why he has done it.  (*Id.*, para. 12).


IT IS SO STIPULATED:

Date: _August 13, 1992_____
                          Frederick R. Bennett
                          Assistant County Counsel
                          Attorney for Defendants

Date: _August 13, 1992_____
                          Paul Hoffman
                          Legal Director
                          ACLU Foundation of Southern Calif.
                          Attorney for the Plaintiff Class


IT IS SO APPROVED AND ORDERED:

Date: _August 27, 1992_____
                          United States District Court Judge


I do hereby certify that on 8-27-92
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# Exhibit 16

1            **Declaration of Terry A. Kupers, M.D., M.S.P.**

2        I, Terry A. Kupers, hereby declare:

3        1.     I make this declaration based on my own personal knowledge and if

4 called to testify I could and would do so competently as follows:

5     **I. Background and Qualifications**

6        2.     I am a board-certified psychiatrist, Institute Professor Emeritus at the

7 Wright Institute, Distinguished Life Fellow of the American Psychiatric

8 Association, and an expert on the psychiatric effects of prison conditions and

9 correctional mental health issues. I have testified more than thirty times in state

10 and federal courts about the psychiatric effects of jail and prison conditions, the

11 quality of correctional management and mental health treatment, and prison sexual

12 assaults. I have served as a consultant to the U.S. Department of Justice, Disability

13 Rights California, and Human Rights Watch. I am author of <u>Solitary: The Inside</u>

14 <u>Story of Supermax Isolation and How We Can Abolish It</u> (University of California

15 Press, 2017) and <u>Prison Madness: The Mental Health Crisis Behind Bars and What</u>

16 <u>We Must Do About It</u> (Jossey-Bass/Wiley, 1998), co-editor of <u>Prison Masculinities</u>

17 (Temple University Press, 2001), and a Contributing Editor of <u>Correctional Mental</u>

18 <u>Health Report</u>. I have authored and co-authored dozens of professional articles and

19 book chapters, including "Posttraumatic Stress Disorder (PTSD) in Prisoners" &

20 "Schizophrenia, its Treatment and Prison Adjustment," both articles in <u>Managing</u>

21 <u>Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic

22 Research Institute, 2005; "Prison and the Decimation of Pro-Social Life Skills," in

23 <u>The Trauma of Psychological Torture</u>, Editor Almerindo E. Ojeda, Vol 5 of

24 <u>Disaster and Trauma Psychology Series</u>, Westport, Connecticut: Praeger, 2008;

25 "Violence in Prisons, Revisited," (with Hans Toch), <u>Journal of Offender</u>

26 <u>Rehabilitation</u>, 45,3/4, 49-54, 2007; "A Community Mental Health Model in

27 Corrections," <u>Stanford Law & Policy Review</u>, 26, 119-158, Spring, 2015; and two

28 entries, "Posttraumatic Stress Disorder in Incarcerated Offenders" and

"Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

3. I testified in *Rutherford v. Pitchess* in 1978 regarding conditions of confinement and mental health services in the Los Angeles County Jail.[1] I submitted a follow-up Report in Rutherford in 2008,[2] and toured the jail again on July 5 & 6, 2017 as part of my investigation preparatory to submitting an Expert Report in *Stiavetti vs. Ahlin* (*Stiavetti v. Ahlin*, Case No. RG15779731) (case challenging constitutionality of lengthy delays between times people charged with felonies are found incompetent to stand trial and when they begin receiving competency restoration treatment).

4. I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing offenders. I was a member of the California Department of Health Task Force to write "Health Standards for Local Detention Facilities" in 1976-77. I served as monitor of the *Presley v. Epps* consent decree in Mississippi, involving prisoners with mental illness in isolated confinement at Mississippi State Penitentiary.[3] I was the recipient of the 2005 Exemplary Psychiatrist Award and the 2020 Gloria Huntley Award from the National Alliance on Mental Illness (NAMI), and the William Rossiter Award for "global contributions made to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California. My *curriculum vitae* and a list of cases in which I have served as an expert in the past four years are attached to this report as Exhibits A &

---

[1] Rutherford v. Pitchess, 626 F. 2d 866, slip op. at 2–3 (9th Cir. 1980).

[2] Kupers Report available at < chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.aclu.org/sites/default/files/pdfs/prison/lacountyjail_kupersreport.pdf>

[3] No. 4:05CV148-JAD (N.D. Mississippi, 2005 & 2007).

B.

5.     I have been retained by plaintiff's counsel to offer opinions about two specific issues regarding mental health services at Los Angeles County Jail involving the Inmate Reception Center.  My fees are $350/hour for all work and travel time except testimony, and $500/hour for testimony at deposition and trial.

## II.  Preparation

6.     I have reviewed Affidavits of 8 inmates[4] in the IRC from late August, 2022; the transcript of Assistant Inspector General for the Office of Inspector General Cathleen Beltz' testimony at the Civilian Oversight Commission Hearing on 9/23/21(start 38:11), transcript attached as Exhibit C; the Office of Inspector General Review of the Inmate Reception Center Intake Evaluation Process, November, 2019;[5] and a chart reflecting "Front Bench Processing Time" from 8/9/2022 through 9/2/2022, chart attached as Exhibit D.

## III.  Continuity of Psychotropic Medications

7.     A large proportion of inmates in the L.A. County Jail, as in all jails today, suffer from mental illness and were prescribed psychotropic medications prior to their arrest.  All standards in community psychiatry and correctional mental health require "continuity of care," i.e. a course of psychotropic medications must not be interrupted, and there must be no abrupt discontinuation of the medication regimen, for example when the patient moves from one living situation or institutional setting to another, and this is an especially important consideration in relation to jail admission.  The documents I reviewed in this matter raise very serious concerns regarding this issue.

---

[4] Declarations of Chuck Bethel, Curtis Howard, Daniel Gonzalez, Giovanni Reese, Ira Porter, Jerome Dubose, Tony Jones, and Bryan Salinas.

[5] Available at https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/c2463bac-4aab-43b6-9824-7e8c9c10fdb8/Review%20of%20IRC%20Intake%20Evaluation%20Process.pdf

8.     Mr. C.B., who suffers from "bipolar schizophrenia," has been taking multiple psychotropic medications since childhood, and was taking Risperdal (an anti-psychotic medication), Zyprexa (another strong anti-psychotic medication) and Abilify (a "major tranquilizer" prescribed for Schizophrenia and/or Bipolar Disorder) when he was arrested.  He had spent 4 days in the I.R.C. when he submitted his Declaration.  In that Declaration he testified that the conditions in the I.R.C. are "crowded, filthy and inhumane."  He testified, "But since I have been in IRC I have not gotten psych meds.  I am hearing voices and feel like I am falling apart.  I saw the psychiatrist who told me I can't get my meds until I am housed.  I have been crying on and off since I have been here."

Mr. C.H. had been in the I.R.C. for four days when he submitted his Declaration. He testified, "I have chronic PTSD and severe depression.  On the outside I take Trazodone (an antidepressant often utilized off label for sleep because of its sedative side effect), Abilify, Wellbutrin (an antidepressant) and one other psych med…. But I have not gotten them since I have been here.  Since being without meds my anxiety is skyrocketing and I feel like I am on the verge of a panic attack."  He also describes filthy and stressful conditions and says he only sleeps for an hour or two at a time.  He continues, "The IRC clinic area is filthy.  There is trash all over the floor….  They regularly herd everyone in the clinic area into the cage, up to 100 people, where we are packed like sardines. I had to spend at least one night in that cage and there have been multiple fights."

Mr. D.G., an inmate who had been in the IRC for over three days and says he suffers from Schizophrenia and takes Seroquel (an anti-psychotic medication) on the outside testifies in his Declaration, "I have not been offered housing since arriving at IRC….  I have not had my medication since I entered IRC."

9.     Mr. G.R. had been in IRC for three days, suffers from depression, takes Paxil (an antidepressant) in the community, reports he has to sleep on the floor with no mattress in the IRC, and testifies in her Declaration: "I have not had

my meds since I came in.  I finally saw a psychiatrist on Sunday night about 11
PM after I begged a nurse for help.  But he said I cannot get my meds till I am
permanently housed.…  I feel deep despair being off my Paxil."

10.     Mr. J.D. had been in the IRC 7 days when he submitted his
Declaration, and testified that he needs a wheelchair because of an illness that
affects his legs, but his wheelchair was taken from him at the IRC.  He is
diagnosed with depression and takes Zoloft (an anti-depressant).  He is also
diagnosed with Paranoid Schizophrenia and thinks he takes Trazadone "to manage
the paranoid schizophrenia."  Actually, Trazodone is an anti-depressant with a
strong sedative side effect, so it is often prescribed as a sleep aide, and in fact help
with sleeping might have a positive effect on Schizophrenia.  But in any case he
continues: "I have not received psychiatric medication since my arrival at IRC."

11.     Mr. I.P. spent four days in the IRC in August prior to providing his
Declaration.  He testifies: "I am suffering from deteriorating mental health issues
and withdrawal from heroin and crystal meth.  I have been diagnosed with extreme
depression with psychotic side effects. Since I have been at IRC I have not been
evaluated by a mental health professional.  Before I was arrested I was taking three
prescribed medications: Remeron (an antidepressant), Zoloft (another
antidepressant), and Zyprexa (an anti-psychotic medication). I take them every
day, but I have not received any medication since my arrest.  I feel sick, like I'm
about to lose it.  I feel like I'm about to snap any moment.  I am on SSI and
disabled due to my mental health issues. I am detoxing. I feel withdrawal
symptoms including sweats, shaking, and vomiting. I have vomited in the toilet. At
my medical evaluation I was given Motrin but nothing for withdrawals or mental
health.  Since I have been at IRC I have slept only about 10 hours total, about a
couple of hours a day. I try to sleep on the floor or on a chair. It is very cold on the
floor and that wakes me up."

12.     Thus inmates consistently report in their Declarations in this matter

5

that inmates newly admitted to Los Angeles County Jail are detained at the Inmate Reception Center (I.R.C.) for 3 to 5 days or longer prior to being housed in the jail. They report that if they were taking psychotropic medications in the community prior to arrest, they are not given their medications while in IRC and are told they will have to wait until they are transferred to more permanent housing to receive their medications. Their reports are internally consistent and these individuals, for the most part, did not know each other prior to their arrest.

13.     Abrupt discontinuation of psychotropic medications causes serious harm. First, when medications are abruptly discontinued rather than being gradually weaned, there is very likely to be a rebound effect where the symptoms and the illness for which the medications had been prescribed is exacerbated. Someone who is prescribed anti-anxiety medications for anxiety is likely to suffer a more severe bout of anxiety than had previously been experienced. Someone who takes antidepressants for depression will rebound upon abrupt discontinuation of the medication with exacerbated depression and will be at high risk of suicide, on average. Someone who takes antipsychotic medications for Schizophrenia or another psychotic condition is very likely to suffer a relapse upon abrupt discontinuation of the antipsychotic medication with severe hallucinations and delusions as well as irrational thinking and bizarre behavior. And someone who suffers from Bipolar Disorder is likely to experience severe mood swings upon abrupt discontinuation of mood stabilizing medications like Lithium or Tegretol. Of course, an experience of abrupt discontinuation of psychotropic medications followed by exacerbated psychiatric decompensation will worsen the ongoing course of the mental illness, worsen the disability, and make the prognosis more dire.

14.     There are also physiological reactions to abrupt discontinuation of psychotropic medications. Discontinuation of a minor tranquilizer such as Ativan or Klonopin, or an antidepressant or anti-psychotic agent with a sedative side

effect, is likely to result in agitation that might be experienced as a resurgence of anxiety or might lead to a seizure or a hypertensive crisis.  Abrupt discontinuation of antidepressants is associated with very uncomfortable and sometimes dangerous physiological changes, and for this reason the current teaching in psychiatry is to always discontinue antidepressant medications in a very gradual, incremental way. The side effects from abrupt discontinuation of psychotropic medications include death – by suicide, seizures, or by physiological reactions to the abrupt biochemical change.

15.    The symptoms described by inmates in the Declarations I reviewed -- including severe anxiety, severe insomnia, a sense of falling apart, hallucinated voices, panic attacks, deep despair, sweats, shaking, vomiting, and so forth – are unfortunately very expectable sequelae of abrupt discontinuation of psychotropic medications.

16.    Because of the well-known psychiatric sequelae of abrupt discontinuation of psychiatric medications as well as the physiological difficulties and risk of suicide, all standards in correctional mental health as well as instruction on institutional care require immediate attention to inmates' psychiatric medications when they are arrested and admitted to jail.  There are mechanisms for corroborating their reported psychiatric medications and there are requirements in the standards and in well-written jail policies that "bridge prescriptions" be written, temporary orders to continue the psychiatric medications individuals were prescribed in the community, until a full psychiatric evaluation can occur and the jail psychiatrist can take responsibility for prescribing.  This is called "continuation" of the psychiatric medication regimen, designed to avoid the severe and dangerous repercussions of abrupt medication withdrawal.

17.    Thus the *Standards for Mental Health Services in Correctional Facilities* published by the National Commission on Correctional Health Care (NCCHC), section MH-E-02 (p. 52), marked "Essential," states "Receiving

screening is performed on all inmates on arrival at the intake facility to ensure that emergent and urgent mental health needs are met."[6]  Further, the Standards require: "Receiving screening is conducted by mental health staff…. Receiving screening takes place for all inmates as soon as possible so that the timeliness of referral mitigates negative mental health consequences…. history of and current use of psychotropic medication(s), including the name of the prescriber and pharmacy, if known…. Prescribed medications are reviewed and appropriately maintained according to the medication schedule the inmate was following before admission, or alternate treatment is initiated and documented" (pp. 52-53).

18.     Likewise, the Standards of the American Psychiatric Association require that a mental health screening evaluation occur within four hours of an individual's arrival at the jail, and that "Referral to nursing staff should be made for inquiry about reported active prescriptions.  Correctional facilities can verify prescriptions by calling the prescribing agency, pharmacy, or sending facility and obtain bridging medication orders for inmates until they can be seen and assessed by an authorized prescriber."[7]

19.     To a reasonable degree of medical certainty I conclude that the failure to provide continuity of psychotropic medications while inmates are in the IRC is grossly substandard correctional mental health care and causes significant pain and suffering as well as worsening mental illness and prognoses.

**IV. Use of Fixed Restraint in the Inmate Reception Center**

20.     The 2019 Office of Inspector General Review of IRC Intake Evaluation Process includes the following observation: "Patients who exhibit or verbalize suicidal ideation, are in the midst of a mental health crisis, or who require

---

[6] National Commission on Correctional Health Care, Standards for Mental Health Services in Correctional Facilities, Chicago, IL: N.C.C.H.C.2008.
[7] American Psychiatric Association, Psychiatric Services in Correctional Facilities, Third Edition, Arlington, Virginia: APA Publications, 2016, p. 30.

direct observation are identified as "high risk" and are tethered with handcuffs to fixed chairs in the Front Bench Area of the IRC Clinic for the duration of the intake process.  Wait times for patients in the Front Bench Area have regularly exceeded eight hours and at times twelve hours.  In August 2019, at least two tethered patients remained in the Front Bench Area for nearly twenty-four hours.  Although prisoner-workers clean the Front Bench Area, and LASD has installed padded chairs for Front Bench Area patients, OIG personnel have observed unsanitary conditions, including urine and feces, on multiple occasions (pp. 3-4)."

21.     Actually, the number of hours many inmates spend today tethered to the front bench are much longer than the number of hours the OIG reported in 2019.  The "Table Front Bench Processing Time.pdf," where information in the table was drawn from daily reports that the Sheriff's Department provides the ACLU, shows that, using as an example the date 8/15/2022, there were 3 people who had been tethered to the front bench for 24-48 hours, 11 who had been there 49-71 hours, 7 who have been there for more than 72 hours, and the person who had been there the longest had been tethered to the front bench for 122.3 hours[8] (perhaps with a brief period when he was unchained so he could be escorted to the bathroom).  A total of 21 people had been chained to the front bench for more than 24 hours.  "Tethered" means handcuffs and chains are used to restrain the inmate to the bench.

22.     Cathleen Beltz, then the Assistant Inspector General for the Office of Inspector General, describes her visit to the IRC on August 21, 2021[9]: "I arrived at the facility around noon, and when I did the clinic population was approximately 200, which would be high—not the highest—but high nonetheless. The person in custody at that time who had been waiting in the IRC the longest had been there for 111 hours, or just over four and a half days. There were 28 people who are

---

[8] Exhibit D to this Declaration.
[9] Transcript of Cathleen Beltz testimony at Civilian Oversight Commission Hearing, September 23, 2021, starting at 38:11.  Exhibit C to the Declaration

referred to as "front bench patients." These are people who enter the facility in a state of acute psychiatric distress, or perhaps in drug and alcohol intoxication or withdrawal, and they are deemed unsafe. And so they are secured in handcuffs first, that are also affixed at their sides to a waist chain, which is then tethered to a fixed object —usually a steel hook of sorts— [in order] specifically designed in order to limit mobility.  When I got there, there was one patient who had been tethered to the front bench area for 47 hours. There were issues with sanitation and excessive heat…. (38-39).

23.    Inmate testimony is entirely consistent with reports from the OIG and Ms. Beltz.  Mr. C.B. swears in his Declaration in this matter that while in the Inmate Reception Center in August, "I was thinking about suicide but don't want to tell anyone because if I do they will chain me to a chair. I have seen lots of people chained up who get hit by other inmates because they can't defend themselves."

24.    Mr. T.J., who spent four days in IRC in August, reports he was locked in a shower with sixty other inmates and kept there for 6 hours.  He states that on Friday: "Deputies then put me in handcuffs and chained to the front bench.  I was on the front bench, chained in handcuffs until Monday morning, August 22."  Thus he was handcuffed and chained to the bench for over 60 hours.  He says of his ordeal: "When I was on the front bench the man chained to the chair next to me pulled his pants down and pooped on the floor.  The feces stayed on the floor for two days.  No one comes to clean the front bench area.  I saw people pee into orange juice boxes.  The area stank from the feces and pee."

25.    Mr. B.S. testifies: "I believe that I was arrested 3 days ago. I came from court. I was taken to IRC and later placed at the front bench. My hands were handcuffed when I was placed at the front bench. I have had to sleep in a chair at the front bench with both of my wrists handcuffed. I have not been given a mattress or a blanket. I have not seen a nurse or medical staff.  I suffer from

schizophrenia.  I put a piece of paper in my ear to help me focus. I have slept about 5 hours since entering IRC. I have not been given medication since entering IRC. I would rather be moved to a room with a bed than continue to be handcuffed to a chair.

26.     Mr. D.G., whose Declaration I cited in Section III, above, also testified: "I have only slept 5 hours since being brought to IRC.  When I did sleep, I slept on the floor…. I believe I was moved to the front bench on Sunday, August 28th.  Both of my hands have been handcuffed since I was moved to the front bench…."

27.     Mr. C.H., whose Declaration I cited in Section III, above, also wrote: "I have seen lots of people on the front benches, who are the guys with serious mental illness, urinate on the floor.  They yell for the deputies to unchain them so they can go to the bathroom, but the deputies ignore them, so they urinate on the floor. One time I saw someone on the front bench call for the deputies. When they ignored him he stood up and was able to reach the trash can, where he defecated in trash can. The whole area stank. But no one empties the trash can for a few hours. Even though the guy was chained to the bench the chain was long enough for him to reach the trash can.  The only time they did a decent cleaning was about an hour before the ACLU came today."

28.     The very harsh practices at the IRC in regard to tethering inmates to the front bench violate national standards, including the standards of the American Correctional Association, that require restraint be utilized only as a last resort after all less restrictive and harsh interventions have been attempted and failed.[10]  The ACA standards require that when an inmate is restrained, other inmates are not permitted in the same space and have no access to the restrained inmate, and this requirement is necessary because restrained individuals are at high risk of assault

---

[10] American Correctional Association, Performance-Based Standards and Expected Practices for Adult Correctional Institutions, A.C.A., March, 2021.

11

and victimization by unrestrained inmates.  Of course, all standards that address this issue, as well as common decency, require that restrained jail inmates be released as needed for bathroom functions.  There is also a requirement that each limb of a restrained person be released from restraint at frequent intervals so that circulation will not be cut off, and that there be close medical monitoring.  And there is a strong consensus in corrections, as reflected in very many jail policies nationwide, that there must be strict time limits to the use of fixed restraint, that limit is 2 hours in many jurisdictions, 4 hours in some others,[11] and that restraint cannot be used as punishment but rather must be instituted for the shortest time possible to safely control dangerous behavior.

29.     The Los Angeles County Sheriff's Department Custody Division Manual states: "Restraint devices shall only be used when there is a potential threat of physical harm, destruction of property, escape, or to escort or transport inmates…. Inmates shall not be restrained to fixed objects unless the object is designed or is commonly used for that purpose, and only used for the shortest period of time necessary."[12]  Section 7-03/000.05 of the Manual, "Fixed Restraints," states:  "Fixed restraints are the application of any handcuffs, shackles or transportation chain permanently or temporarily affixed to an immovable object (e.g. tables, chairs, benches, stools, rail, ring or bolt, etc.)….Fixed restraints shall never be used as a form of punishment and shall only be used in the least restrictive means and for the shortest period of time necessary to provide safety…. The responsible sergeant shall ensure that a medical evaluation is conducted by medical personnel at least once every two (2) hours…. If an inmate remains in fixed restraints in excess of six (6) hours, notification and consultation shall be made with the facility's unit commander and documented in the Watch

---

[11] See Disability Rights California, The Cruel and Unusual Use of Restraint Chairs in California Jails: A Call to Action, June 8, 2020.
[12] Revised 7/06/2017 [Rosas 2.6, 17.1], 7-03/000.00 General Principles of Security Restraints and Handcuffing Inmates.

Commander's Log."  Thus the policy of the Los Angeles County Jail more closely conforms with the ACA Standards (though the policy still lacks adequate details about restraint practices), but routine practices at IRC are entirely non-compliant with the ACA Standard as well as the policies of the Los Angeles County Jail.

30.     Severe restraint such as tethering to the front bench or a chair at IRC has very harmful effects on all inmates, but especially on inmates with mental illness.  Those who suffer depression are likely made more despairing and, in too many cases, resolve to commit suicide as soon as they are released from restraints and have the opportunity.  Many of those suffering from psychosis become agitated and more dysfunctional, for example they are likely to develop paranoid ideas about why they are being treated so harshly.  And inmates who are restrained in this fashion tend to lose confidence and trust in custody and mental health staff at the jail, and this makes their subsequent behavioral management and mental health treatment very problematic.

**V. Conclusion**

31.     The two routine practices discussed in this Declaration –- abrupt discontinuation of psychotropic medications for the duration of inmates' stay in the IRC, and the days-long fixed restraint with handcuffs and chains attached to a bench –- are both reprehensible practices that violate all standards in psychiatry and corrections and cause damage to the psychiatric condition of the inmates, especially inmates who suffer from mental illness.  Of course, the two practices are connected.  The abrupt discontinuation of prescribed medications causes exacerbation of mental illness with consequent dyscontrol of behavior and increased disability, and then the inmates who are noted to be out of control or disabled, as well as quite a few who are not at all out of control, are restrained in dreadfully harsh fashion.  These are two entirely unacceptable procedures, unacceptable in terms of all standards of medical/mental health care and in terms

of all standards in the field of corrections.  To say there is no valid penological objective in abrupt discontinuation of psychotropic medications and extended fixed restraint is a gross understatement. The actual effect of the two routine practices at the I.R.C., to a reasonable degree of medical certainty, is to worsen mental illness and to alienate incoming inmates from custody and mental health staff.  Since they learn in the IRC they cannot depend on staff to help them with their problems, the two routine practices make their behavioral management and their mental health treatment in the jail much more problematic than otherwise.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed in _____, California on September 5, 2002.

Signed _____

Terry A. Kupers, M.D., M.S.P.

14

1    unacceptable in terms of all standards of medical/mental health care and in terms

2    of all standards in the field of corrections.  To say there is no valid penological

3    objective in abrupt discontinuation of psychotropic medications and extended fixed

4    restraint is a gross understatement. The actual effect of the two routine practices at

5    the I.R.C., to a reasonable degree of medical certainty, is to worsen mental illness

6    and to alienate incoming inmates from custody and mental health staff.  Since they

7    learn in the IRC they cannot depend on staff to help them with their problems, the

8    two routine practices make their behavioral management and their mental health

9    treatment in the jail much more problematic than otherwise.

10

11        I declare under penalty of perjury under the laws of the State of California

12   that the foregoing is true and correct.  Executed in ___Berkeley___, California

13   on September 5, 2002.

14                          Signed ___Terry A. Kupers___

15                          Terry A. Kupers, M.D., M.S.P.

16

17

18

19

20

21

22

23

24

25

26

27

28

# Sub-Exhibit A

Curriculum Vitae

## Terry Allen Kupers, M.D., M.S.P.

Office Address:
*484 Lake Park Ave, #338*, *Oakland, California 94610*
phone: 510-654-8333      email: kupers@igc.org

Institute Professor, Emeritus, Graduate School of Psychology,
        The Wright Institute
          2728 Durant Avenue, Berkeley, California 94704

Born:  October 14, 1943, Philadelphia, Pennsylvania

## Education:

B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

## Training:

Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate Medical
        Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
        1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A. Residency)
        1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-
        1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry, #13387), 1974-

## Honors:

Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who in

California (1995-);  Who's Who in The United States  (1997-);  Who's Who in America (1998-); International Who's Who in  Medicine (1995-);  Who's Who in Medicine and Healthcare (1997-);  The National Registry of Who's Who (2000-); Strathmore's Millenial Edition, Who's Who; American Biographical Institute's International Directory of Distinguished Leadership; Marquis' Who's Who in the World (2004-); Marquis' Who's Who in Science and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-); The Global Directory of Who's Who (2012-); International Association of Healthcare Professionals' The Leading Physicians (2012-).

Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological Association, Affiliate of American Psychological Association, March 30, 2001.

Stephen Donaldson Award, Stop Prisoner Rape (Just Detention, Int'l), 2002.

Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005

William Rossiter Award for "global contributions made to the field of forensic mental health," Annual Meeting, Forensic Mental Health Association of California, March 18,2009, Monterey, California

Albert Nelson Marquis Lifetime Achievement Award, Marquis Who's Who, 2018-

Gloria Huntley Award, National Alliance on Mental Illness (NAMI), presented at annual NAMI meeting in Atlanta via video, July 15, 2020

## Clinical Practice:

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist,  1972-1974

Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles; Staff Psychiatrist and Co-Director, Outpatient Department, 1974-1977.

Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-Director, Partial Hospital, 1977-1981

Private Practice of Psychiatry, Los Angeles and Oakland, 1972 until retirement in 2017

## Teaching:

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate Medical School, Los Angeles,  and Assistant Director, Psychiatry Residency Education, 1974-1977.

Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to present

Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los Angeles), New College Graduate School of Psychology (San Francisco).

## Professional Organizations:

American Psychiatric Association (Distinguished Life Fellow); Northern California
Psychiatric Society; East Bay Psychiatric Association (President, 1998-1999);
American Orthopsychiatric Association (Fellow); American Association of
Community Psychiatrists; Physicians for Social Responsibility; American Academy
of Psychiatry and the Law.

## Committees and Offices:

Task Force on the Study of Violence, Southern  California Psychiatric Society, 1974-1975
Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976
California Department of Health Task Force to write "Health Standards for Local
Detention Facilities," 1976-77
Prison/ Forensic Committee, Northern California Psychiatric Society,  1976-1981; 1994-
Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994
(Chair, Subcommittee to Credential Licensed Clinical Social Workers)
President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999
Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American
Association of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:
Contra Costa County Mental Health Services; Contra Costa County Merrithew Memorial
Hospital Nursing Service; Bay Area Community Services, Oakland; Progress
Foundation, San Francisco; Operation Concern, San Francisco; Marin County
Mental Health Services; Berkeley Psychotherapy Institute; Berkeley Mental Health
Clinic; Oregon Department of Mental Health; Kaiser Permanente Departments of
Psychiatry in Oakland, San Rafael, Martinez and Walnut Creek; Human Rights
Watch, San Francisco Connections collaboration (Jail Psychiatric Services, Court
Pre-Trial Diversion, CJCJ  and Progress Foundation); Contra County Sheriff's
Department Jail Mental Health Program.

Consultant to Protection & Advocacy, Inc. (Disability Rights), re Review of State
Hospital Suicides

National Advisory Panel, The Equitas Project, Denver, CO

## Forensic Psychiatry (partial list):

Testimony in Madrigal v. Quilligan, U.S. District  Court, Los Angeles, regarding informed

3

consent  for surgical sterilization, 1977

Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles County Jail, 1977

Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions and mental health services in San Diego County Jail, 1979

Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Jail, 1981

Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions and mental health services in Los Angeles Police Department Jail, 1982

Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions and mental health services in Marin County Jail, 1982

Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding conditions and mental health services in Santa Clara County Women's Detention Facility, 1982

Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental health services at San Quentin Prison, 1983

Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco, regarding conditions and double-celling in California State Prison security housing units, 1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding

conditions of confinement and treatment prisoners with mental illness on Death
Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed
transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls,
Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in Presley v. Epps, No. 4:05CV148-JAD, N.D., Oxford, Mississippi, 2005 &
2007, involving consitions in Supermax Unit 32 at Mississippi State Penitentiary
and Treatment of Prisoners with Serious Mental Illness.

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,  regarding
mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of
Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial
misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony,
USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care
in prison, April 29, 2008

Testimony in John Doe v. Michigan D.O.C., Detroit, 2014.

Testimony in A.B. v. WA State Dept Soc'l & Health Services, USDistCtWDistWA, No. 14-
cv-011 78-MJP, Seattle, March 17, 2015, regarding Competency Evaluations and
Competency Restoration Treatment

Testimony (deposition) in Ashker v. Governor of California, USDistCtNoDistCA, Oakland,
No. C 09-05796 CW, 2015, regarding confinement in excess of 10 years in
Security Housing Unit at Pelican Bay State Prison.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-
JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary
confinement Unit at Eastern Mississippi Correctional Facility.

Testimony (deposition) in John Doe et al. v. Michigan DOC, et al., Washtenaw County
(MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019,
Oakland, CA, regarding the situation of minors sentenced as adults to the
Michigan D.O.C.

Testimony in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co.
of Marin, May 27, 2021. Case No. SC212933, et al, Case No. SC213244, et al.,
Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San
Quentin Prison.


## Journal Editorial Positions:


Men and Masculinities, Editorial Advisory Panel (in the past)

5

<u>Juvenile Correctional Mental Health Report,</u> Editorial Board (in the past)
<u>Correctional Mental Health Report</u>, Contributing Editor (current)


## Presentations and Lectures (partial list):

"Expert Testimony on Jail and Prison Conditions." American Orthopsychiatric Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137: "How Expert are the Clinical Experts?

"The Termination of Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, February 24, 1989.

"Big Ideas, and Little Ones."  American Psychiatric Association Annual Meeting, San Francisco, April, 1989.

"Men in Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, September 29, 1989.

"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head Conference, Hilton Head Island, South Carolina, March 15, 1991.

Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association Annual Meeting, Annaheim, 1991.

"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of California, San Mateo, March 25, 1992.

Keynote Address:  "Feminism and the Family."  17th National Conference on Men and Masculinity, Chicago, July 10, 1992.

Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual Meeting of the American Orthopsychiatric Association, San Francisco, May 22, 1993.

Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.

"Public Mental Health."  National Council of Community Mental Health Centers Training Conference, San Francisco, June 12, 1993.

Psychiatry Department Grand Rounds:  "Men's Issues in Psychotherapy." California Pacific Medical Center, San Francisco, February 24, 1993.

"The Effect of the Therapist's Gender on Male Clients in Couples and Family Therapy."  Lecture at Center for Psychological Studies, Albany, California, April 15, 1994.

"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand Rounds, Alta Bates Medical Center, June 7, 1993.

Roger Owens Memorial Lecture.  "Prisons and Mental Illness."  Department of        Psychiatry, Alta Bates Medical Center, March 6, 1995.

Keynote Address:  "Understanding Our Audience: How People Identify with Movements

and Organizations."   Annual Conference of the Western Labor Communications Association, San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium, University of California at San Francisco, November 6, 1998.

"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity, Pasadena, July 10, 1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health Treatment in Punitive Segregation."  Staff Training Sessions at New York State Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social Welfare Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the Association of Community Living Agencies in Mental Health of New York State, Bolton Landing, NY, November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justice Population."  Statewide Cultural Competence and Mental Health Summit VII, Oakland, CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium, University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual Symposium, San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health Association of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of  Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising Practices Conference,  Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the Criminal Justice System,"  Annual Conference of the California Association of Social Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis,"
American Psychiatric Association Institute on Psychiatric Services, San Diego,
October 7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital,"
Napa State Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th
Annual Conference, California Psychiatric Association, Huntington Beach, CA,
October 6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George
Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental
Health Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law
Journal Symposium, Los Angeles, April 10, 2009

Panel:  "Solitary Confinement in America's Prisons," Shaking the Foundations
Conference, Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation Ceremony,
October 21, 2009.

Panel:  "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy
Support Center, Protection & Advocacy Annual Conference, Los Angeles, June 8,
2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical
Center, November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland
Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24,
2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta
Bates Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA
Partners UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on
Psychiatric Services, American Psychiatric Association, San Francisco, October 28,
2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice
System?," Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture:  "The Prison System in the U.S.A.: Recent History and Development, Structure,
Special Issues," Conference of the American Bar Association Rule of Law
Initiative, Cross-National Collaboration: Protecting prisoners in the US and
Russia, Moscow, Russia, January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview,"

The Center for Public Service Psychiatry of Western Psychiatric Institute and
Clinic (co-sponsored by the American Association of Community Psychiatrists),
national videoconference originating in Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates
Summit Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences,"
Session: Multi-Year Solitary Confinement in California and the Prisoner Hunger
Strikes of 2011-2012, American Public Health Association Annual Meeting,
Moscone Convention Center, San Francisco, October 29, 2012.

Keynote Address:  "Solitary Confinement and Mental Health," Conference of the
Midwest Coalition for Human Rights, Northeastern Illinois University, Chicago,
November 9, 2012.

Symposium Presentation: "The Experience of Individuals with Mental
Illness in the Criminal Justice System," American Psychiatric Association Annual
Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation:  Incarceration and Racial Inequality in the U.S., Roundtable on the Role of
Race and Ethnicity Among Persons Who Were Formerly Incarcerated, California
Institute for Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated
Confinement, Las Vegas, Nevada, March 5, 2014.

Lecture, "The Death Penalty and Mental Health," General Assembly of the World
Coalition Against the Death Penalty, San Juan, Puerto Rico, June 21, 2014.

Staff Training: "Ethical Care in Managing and Treating the Disturbed/Disruptive
Patient," Napa State Hospital, October 2, 2014.

Lecture: "The Multiple Traumas of Youth in Detention," American Psychiatric
Association Institute on Psychiatric Services, San Francisco, November 1, 2014.

Guest Expert: Community Psychiatry Forum: "The Social, Economic and Political Impact
of Incarceration."; The Center for Public Service Psychiatry at the University of
Pittsburg, and the American Association of Community Psychiatrists, video-
conference from Pittsburg, March 12, 2015.

Lecture: "The Struggles of People with Mental Illness in Jails," The Mental Health Board
of San Francisco, San Francisco Department of Public Health, September 16,
2015.

Lecture: "A Psychoanalytic Response to the Effects of Forced Isolation in the Age of
Mass Incarceration," Northern California Society for Psychoanalytic Psychology,
Scientific Meeting, San Francisco, April 2, 2016.

Panel: "Mental Health, Neuroscience and the Physical Environment," Academy of
Neuroscience for Architecture Conference, September 23, 2016, Salk Institute,
University of California at San Diego.

Paper presentation: "Gender and Domination in Prison," Law Review Symposium on

Gender and Incarceration, Western New England School of Law, Springfield, MA, October 14, 2016.

Presentation, " Working with Experts: An Expert and Lawyer Conversation," with Rachel Higgins, New Mexico Criminal Defense Lawyers' Association, Solitary Confinement & Prisoner Civil Rights, Albuquerque, New Mexico, May 5, 2017.

Keynote Address: "Corrections, Solitary Confinement and Prisoner Mental Health," Conference on Supporting Prisoner Mental Health, Vancouver, British Columbia, June 2, 2017.

Webinar, "The Humane Imperative: Ending Solitary Confinement. SAMHSA & NAMI, July 27,2017.

Lecture, "Masculinity Behind Bars: Violence on the Yards, Terror in Isolation," Center for the Study of Men and Masculinities, SUNY Stony Brook, delivered at Fordham University, Manhattan, October 24, 2017.

Lecture and Panel, "Solitary Confinement," Georgetown University, January 16, 2018

Participant, "National Summit on Mental Health & Criminal Justice Law & Policy," sponsored by the Equitas Project at Georgetown University, Washington, D.C., Jan. 17-18, 2018.

Featured Speaker, "Mental Illness and the Criminal Justice System," NAMI (National Alliance on Mental Illness), Contra Costa County, Feb 21, 2019

Presentation, "The Harm of Solitary Confinement," Washington State House Of Representatives, Public Safety Committee (by video), March 5, 2019.

Panel: "Solitary Confinement," University of California Human Rights Law Student Association and National Lawyers' Guild, University of California School of Law, Boalt Hall, Berkeley, March 5, 2019.

Panel: "Knowledge and Power: Contending with Science in Psychiatry," annual meeting of the American Psychiatric Association, San Francisco, May 19, 2019.

Panel: "Psychologists and Mass Incarceration," Healing Justice: Ending Mass Incarceration Conference, The Wright Institute, Berkeley, November 2, 2019.

Panel: "COVID-19 AND INCARCERATION: Mental Health Implications." UCLA Center for Social Medicine, Zoom Conference, April 18, 2020.

Panel: Solitary Confinement in Queensland, and University of Queensland Law School, Australia, May, 2020, video available at <https://law.uq.edu.au/research/human-rights/solitary-confinement-panel>

Panel: Solitary Confinement: A Public Health Hazard, The Louisiana Stop Solitary Coalition, New Orleans via video, July 15, 2020

Panel: Open MI Door: Ending Segregation in the State of Michigan, Lansing via video https://www.facebook.com/MICitizensforPrisonReform/videos/384069609652610/

Presentation: "The Decimation of Life Skills and the SHU Post-Release Syndrome," International Symposium on Solitary Confinement, Thomas Jefferson University,

Philadelphia, PA (virtual), November 5, 2020.

Panel Moderator & Panelist, "Mass Incarceration in the Pandemic: Health Care Inside & Out," UCLA Center for Social Medicine & UCLA Law COVID-19 Behind Bars Data Project, Los Angeles (virtual), May 8, 2021.

Presentation, "Correctional Psychiatry," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic, Pittsburg, PA via video, October 21, 2021.

Panelist, "Solitary Confinement: Peers Leading a Path Towards Elimination," Annual Conference of the National Association of Peer Supporters, October 21, 2021.

Panelist, "From Baraga to Brazil: A Historic Conversation on Solitary Confinement," Human Rights Watch, HaltSolitary, Open MI Door & Unlock the Box, November 11, 2021, Detroit MI via video.

Participant, Roundtable: "Shifting the Approach: Alternatives to Solitary Confinement for People Suffering From Mental Illness in Prison," from Tel Aviv, Israel via Zoom, January 10, 2022

Panelist, "How Mental Health Information Can Be Used in Resentencing and in Challenging Conditions of Confinement," at Denver virtual conference, Mental Health, Resentencing, and Challenging Conditions of Confinement, April 26, 2022, Sponsored by Equitas Project and Eighth Amendment Project

Panelist, "Securing Mental Health Treatment for People in Custody," Prison Law and Advocacy Conference, Northwestern School of Law, May 21, 2022.

Panelist, "Litigation Efforts to End Solitary," Symposium to End Solitary Confinement, Costa Mesa, California, July 17, 2022.

## Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New York:  Free Press/ MacMillan, 1981.  Re-published as e-Book, 2015, at <http://www.freepsychotherapybooks.org/product/208-public-therapy-the-practice-of-psychotherapy-in-the-public-mental-health-clinic/category_pathway-14>

Ending Therapy: The Meaning of Termination.   New York: New York University Press, 1988. Re-published as e-Book, 2014, at <http://freepsychotherapybooks.org/product/118-ending-therapy-the-meaning-of-termination>

(Editor):  Using Psychodynamic Principles in Public Mental Health.    New Directions for Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, consequenze.  Rome: Casa Editrice Astrolabio, 1992. (trans. of Ending Therapy.)

11

Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford Publications,
    1993.  (trans. into Chinese, 2000; re-published as e-Book, 2014, at <
    https://www.freepsychotherapybooks.org/ebook/revisioning-mens-lives-gender-
    intimacy-and-power/>
Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About
    It.  San Francisco: Jossey-Bass/Wiley, 1999.
(Co-Editor & contributor): Prison Masculinities.  Philadelphia: Temple University Press,
    2001.
Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It.  Berkeley,
    CA: University of California Press, 2017.


## Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps
    Virus," Journal of Pediatrics, 1970, 76, 716-721.
Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry, the
    product of an NIMH Grant to the Department of  Psychiatry and Human
    Behavior, Drew Medical School, 1973.
"Contact Between the Bars  -  A Rationale for Consultation in Prisons," Urban Health,
    Vol. 5, No. 1, February, 1976.
"Schizophrenia and History,"  Free Associations, No. 5, 1986, 79-89.
"The Dual Potential of Brief Psychotherapy,"  Free Associations, No. 6, 1986, pp. 80-99.
"Big Ideas, and Little Ones,"  Guest Editorial in Community Mental Health Journal, 1990,
    26:3, 217-220.
"Feminist Men," Tikkun, July/August, 1990.
"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.
"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The
    Psychiatric Times, 9,2, February, 1992.
"The State of the Sexes: One Man's Viewpoint,"  The Commonwealth, 86,16, April, 1992.
"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood.  Freedom, California: Crossing
    Press, 1993; Univeristy of Wisconsin Press, 1998.
"Menfriends." Tikkun,  March/April, 1993
"Psychotherapy, Neutrality and the Role of Activism."  Community Mental Health
    Journal,1993.
"Review: Treating the Poor by Mathew Dumont."  Community Mental Health Journal,
    30(3),1994, 309-310.
"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional
    Space." Voices, 30(3), 1994, 57-62.
"Soft Males and Mama's Boys: A Critique of Bly."  In Michael Kimmel, Ed., The Politics of

_Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And Mythopoetic Leaders Respond)._  Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy."  _Journal of Couples Therapy,_ 1995.

"Jail and Prison Rape." _TIE-Lines,_ February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." _masculinities,_ 3,2, 1995, reprinted in Mary Roth Walsh, ed., _Women, Men and Gender,_  Yale University Press, 1997.

"What Do Men Want?, review of M. Kimmel's _Manhood in America._" _Readings,_ 10, 4, 1995.

Guest Editor, issue on _Men's Issues in Treatment,_  _Psychiatric Annals,_ 2,1, 1996.

"Men at Work and Out of Work," _Psychiatric Annals,_ 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners."  _American Journal of  Orthopsychiatry_, 66, 2, 1996, 189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies."  Community Psychiatric Practice Section, _Community Mental Health Journal_, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's _Violence: Our Deadly Epidemic and its Causes_," _Readings,_ Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," _Fort/Da,_ 2,2,1996.

"Men, Prison, and the American Dream," _Tikkun,_ Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," _Journal of Couples Therapy,_ 7,1, 1997, 39-47.  Published simultaneously in _When One  Partner is Willing and the Other is Not,_  ed. Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' _Race and Justice_," _Readings,_ December, 1997.

"The SHU Syndrome and Community Mental Health," _The Community Psychiatrist_, Summer, 1998.

"Review of Jerome Miller's _Search and Destroy_," _Men and Masculinities_, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?,"  _Insight_, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," _Harvard Mental Health Letter_, July, 2000.

"Mental Health Police?," _Readings,_ June, 2000.

"The Men's Movement in the U.S.A.,"  in _Nouvelles Approches des Hommes et du Masculine,_ ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," _Voices_, 36, 4, 2000.

"Psychotherapy with Men in Prison," in _A New Handbook of Counseling & Psychotherapy Approaches for Men_,  eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," <u>Correctional Mental Health Report</u>, 5,3, 35-36, Sept./Oct. 2003.

"Review of William Roller's <u>The Dead are Dancing</u>," <u>Psychiatric Services</u>,  54,11,1660-1661, 2003.

"The Future of Correctional Mental Health," <u>Correctional Mental Health Report</u>, 6,1, May/June, 2004.

"Foreword," David Jones (ed.): <u>Working with Dangerous People: The Psychotherapy of Violence</u>, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," <u>Correctional Mental Health Report</u>, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), <u>Men & Masculinities: A Social, Cultural, and Historical Encyclopedia</u>, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," <u>Journal of Clinical Psychology</u>, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan  Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in <u>Managing Special Populations in Jails and Prisons</u>, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue,"  <u>Correctional Mental Health Report</u>, 7,2, July/August, 2005.

"How to Create Madness in Prison," in <u>Humane Prisons</u>, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

 "Conditions on death row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u> (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

 "Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), <u>Writing for their lives: Death Row USA</u>, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison,"  In <u>International Encyclopedia of Men and Masculinities</u>, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, <u>Journal of Offender Rehabilitation</u>, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," <u>Correctional Health Care Report</u>, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological
    Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology
    Series, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated
    Confinement." Criminal Justice and Behavior, Vol. 35 No. 8, August 2008, pp.
    1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking
    Prison Classification and Creating Alternative Mental Health Programs," T.A.
    Kupers, T. Dronet, M. Winter, et al., Criminal Justice and Behavior, October, 2009.

"Introduction." King, R. (2009). From the Bottom of the Heap: The Autobiography of
    Black Panther Robert Hillary King. Oakland: PM Press.

"Mutual Respect and Effective Prison Management," in Transforming Corrections:
    Humanistic Approaches to Corrections and Offender Treatment, Editors David
    Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," Correctional Mental Health Report, 12,1, 2010

"Treating Those Excluded from the SHU," Correctional Mental Health Report, 12,4,
    2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," UCLA Women's Law
    Journal, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax
    Confinement," Correctional Mental Health Report, Vol. 13, No. 1, May/June, 2011

"Preparing an Expert's Report," in Practical Guide to Correctional Mental Health and the
    Law, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute,
    2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model,"
    Correctional Mental Health Report, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly
    Public Safety Committee Regarding Conditions at Pelican Bay State Prison
    Security Housing Units," Correctional Law Reporter, Vol XXIII, No. 4,
    December/January 2012

"A Community Mental Health Model for Corrections," Correctional Mental Health
    Report, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," Correctional Mental Health
    Report, 2012

"Isolated Confinement: Effective Method for Behavior Change or Punishment for
    Punishment's Sake?," The Routledge Handbook of International Crime and
    Justice Studies, Eds. Bruce Arrigo &
    Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen,"
    Correctional Mental Health Report, Vol 15, No. 5, Jan/Feb 2014

"Safety, Yes; Near Total Isolation and Idleness, No," Correctional Law Reporter, XXVI,
No. 1, June/July 2014.

"A Community Mental Health Model in Corrections," Stanford Law & Policy Review, 26,
119-158, Spring, 2015.

Co-signatory, Brief of Amici Curiae, *Alfredo Prieto v. Harold C. Clarke,* Supreme Court of
the U.S.A., No. 15-31, 2015.

Committee Member, Group for the Advancement of Psychiatry (GAP), *People With
Mental Illness in the Criminal Justice System: A Cry for Help,* Washington, D.C.:
American Psychiatric Association Press, 2016.

"How to Create Madness in Prison," in Hell is a Very Small Place, Editors Jean Casella,
James Ridgeway & Sarah Shourd, New Press, 2016, pp. 163-178.

"The SHU Post-Release Syndrome," Correctional Mental Health Report, 17, 6,
March/April, 2016.

"Alternatives to Long-Term Solitary Confinement," *Correctional Law Reporter*, Vol.
XXVIII, No. 3, Oct. – Nov., 2016.

"Gender and Domination in Prison."  *Western New England Law Review,* 39, 2017.

"The Asylum, The Prison and the Future of Community Mental Health," chapter in
*Community Mental Health: Challenges for the 21st Century*, Editors  Jessica
Rosenberg and Samuel J. Rosenberg, New York & London: Taylor &
Francis/Routledge, 2017.

"Waiting Alone to Die,' In *Living on Death Row: The Psychology of Waiting to Die*,
edited by Hans Toch, James Acker and V.M. Bonventre.  American Psychological
Association Press, 2018.

"Posttraumatic Stress Disorder in Incarcerated Offenders, Treatment of," in the *Sage
Encyclopedia of Criminal Psychology*, Sage Publications, 2019.

"Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage
Publications, 2019.

"Prospects for Correctional Mental Health Litigation*," Correctional Mental Health
Report*, 21,4, November/December, 2019.

"ASPD Then and Now," *Correctional Mental Health Report*, 22, 1, May/June, 2020.

"We Need to Talk Nondefensively About Race and Admit Shortcomings," *Psychiatric
News,* American Psychiatric Association, Vol. 55, No. 14, July 17, 2020.

"Supermax Prison Isolation in Pre-Crime Society."   In THE PRE- CRIME SOCIETY: Crime,
Culture and Control in the Ultramodern Age.  Eds. Bruce A. Arrigo & Brian G.
Sellers, Bristol University Press, 2021.

"Review of What We Know: Solutions from our Experiences in the Justice System,"
Editor Jules Lobell, *Rutgers University Criminal Law and Criminal Justice Book
Reviews*, September, 2021.

"Future Prospects for *Correctional Mental Health.*"  *Correctional Mental Health Report*, Vol. 23, No. 2, Fall, 2021, pp. 33-34.

"The Cell-Front Interview.*" Correctional Mental Health Report,* Vo. 24, No. 4, Spring, 2022.

"Foreword," *Way Down in the Hole: Race, Intimacy, and the Reproduction of Racial Ideologies in Solitary Confinement*, A.J. Hattery & E. Smith, Rutgers University Press, 2022 forthcoming.

# Sub-Exhibit B

## Depositions and Court Testimony in Past Four Years
## by Terry A. Kupers, M.D.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-
JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary
confinement Unit at Eastern Mississippi Correctional Facility.

Testimony in State v. Travis Smoot, Bakersfield Superior Court, Case No.
BF164146A, March 20, 2019, criminal trial about murder of
prisoner's cellmate.

Deposition in Jay Vermillion v. Mark Levenhagen, 1:15-cv-605-RLY-TAB,
U.S.Dist.Ct,So.Dist.Indiana, in San Francisco, May 30, 20
about effects of Solitary Confinement at Westville Corr. Facil.

Deposition in William Richards v. County of San Bernadino et al, Case No. 5:17-
cv-00497-SJO-SP, USDistCtCentralDistCA, in Oakland, July 19, 2019, re
exoneration following false conviction.

Deposition in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI)
Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019,
Oakland, CA.  Class action regarding effects on juveniles of incarceration in
adult prison facilities.

Deposition in Luong v. Alameda County, USDistCtNoDistCA No: 3:17-cv-06675-
EMC, September 5, 2019, Oakland, CA, re death in custody at Santa Rita
Jail Facility.

Deposition in Finley v. Huss et al, USDISTCtWestDistMichigan, North Division, No.
2-18-cv-100, October 15, 2019, Oakland, CA, re self-harm in solitary
confinement.

Deposition in Andrew Wilson v. City of Los Angeles, U.S.Dist.Ct.CentralDist.CA,
CASE NO. CV18-05775-KS, April 24, 2020, Berkeley & Los Angeles,
telephonic, re exoneration following false conviction.

Deposition in Atayde vs. Napa State Hospital et al., Case # 1:16-cv-00398-DAD-SAB,
April 29, 2020, Berkeley, CA via video, re death by suicide in jail.

Deposition in Samuel Kolb vs. County of Placer, USDistCtEDistCA Case No. 2:19-cv-
00079-DB, July 8, 2020, Berkeley, CA via video, re police-involved shooting.

Deposition in Gosier/Malone v. Wicomico County, Maryland. USDistCt for the Dist of
Maryland. Case No. 1:19-CV-02412-SAG, March 4, 2021, Maryland/California
via video, re jail suicide.

Testimony at Trial (in person), State of Florida v. William E. Wells, Circuit Court of
the Eighth Judicial Circuit, in and for Bradford County, Florida, Case No.
04-2019-CF-000706-A, April 27 & 28, 2021, Starke, Bradford County,
Florida. Capital Murder Trial.

Deposition in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup.
Ct., Co. of Marin, May 4, 2021. Case No. SC212933, et al, Case No.
SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and
response by CDCR at San Quentin Prison.

Court Testimony (by video) in Michael Hall (SC212933) et.al. & In Re Von Staich
(SC212566), Sup. Ct., Co. of Marin, May 27, 2021. Case No. SC212933, et
al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding
COVID-19 and response by CDCR at San Quentin Prison.

Deposition in Gerald Len Cooley v. William Jeha et. al, USDistCtNoDistCA, Case
No. 4:18-cv-00719-YGR.  Video Deposition.  October 20, 2021.
Regarding effects of 4 month jail confinement following wrongful
arrest.

Testimony at Evidentiary Hearing (by video), Melendez v. Inch et al,
USDistCtMidDistFlorida, Jacksonville, Florida by Video, 3:20-cv-01023-
BJD-JBT.   Regarding Solitary Confinement and Mental Health Issues for
single prisoner.

Deposition in Martinez & M. Martinez v. City of Los Angeles,
USDistCtCentralDistCAWestDiv, October, 2021.  Video Deposition.
Regarding false conviction/exoneration/innocence.

Deposition in Michael Denton v. Karie Rainer, USDistCtWestDistWA,NO. 3:19-cv-
05743-BHS-TLF, April 7, 2022.  Video Deposition.  Regarding long-term
confinement of Prisoner with Mental Illness in Solitary Confinement.

Deposition in State of Florida vs. Keith Hartley Wittemen, Jr., Circuit Court of the
20th Judicial Circuit in and for Charlotte County, Case No. 92-000487CF
– (SHC) (BRB), August 5, 2022, by video.  Re-sentencing consideration
related to conviction for murder.

# Sub-Exhibit C

Catie Beltz  | Civilian Oversight Commission Hearing | 9.23.21

TRANSCRIPT

START: 38:11

CATIE BELTZ: Okay, thank you, good morning everyone. Thank you, Commissioner Rubin. Good morning, Madam Chair and commissioners. Thank you for having us, it's good to see you all. Again, Catie Beltz, she/hers, Assistant Inspector General, and I was asked to speak about overcrowding in IRC as it most recently emerged in the last few weeks. So I will [I'll just] present initially and then obviously Max and I can answer any questions that you all may have. On Saturday morning, August 21, I was contacted by confidential sources who notified me that IRC was extremely overcrowded, among other allegations that it was the worst it had ever been. I arrived at the facility around noon, and when I did the clinic population was approximately 200 which

39:00

would be high—not the highest—but high nonetheless. The person in custody at that time who had been waiting in the IRC the longest had been there for 111 hours, or just over four and a half days. There were 28 people who are referred to as "front bench patients." These are people who enter the facility in a state of acute psychiatric distress, or perhaps in drug and alcohol intoxication or withdrawal, and they are deemed unsafe. And so they are secured in handcuffs first, that are also affixed at their sides to a waist chain, which is then tethered to a fixed object —usually a steel hook of sorts— [in order] specifically designed in order to limit mobility. When I got there, there was one patient who had been tethered to the front bench area for 47 hours. There were issues with sanitation and excessive heat,

40:00

and of course the people in custody were fearful, and understandably angry. Some were pretty seriously lashing out at staff—custody, medical, mental health staff—who also expressed concern for the patients and frankly, also for their own safety. Max and I- the Inspector General and I returned the next morning the 22nd, and the department had largely resolved the major issues: the sanitation issues, they'd reduced the number of people in the clinic from 200 to closer to 50. So it was much better overall, and it was much better for some of the people in custody. But unfortunately, conditions for the front bench patients had actually worsened. So there were 29 total front bench patients, 22 of whom had been tethered for more than 22 hours. And the patient with the longest wait time on Sunday had by then been tethered for fully 62 hours.

41:00

So there are two problems that give rise to these conditions. One—there exists a serious and longstanding housing crisis in the system, particularly for the mentally ill.  And two, COVID, which as you indicated [which has] exacerbated the serious and longstanding housing crisis. I'll leave it to the assistant sheriff to expand on the details of the COVID aspect of the crisis, but I would like to quickly try to illustrate more from a conditions of confinement perspective what the county jail experience looks like for many of the 1000+ patients on any given day with the most severe mental illnesses, who often start their time in custody tethered in that front bench area. Jennifer, if we could please have the slides, starting with the first one, that would be great.

[Slideshow presented, table titled "Longest Wait Time Per Day- Front Bench Area" ranging from August 21, 2021 to September 15, 2021.]

Catie Beltz  | Civilian Oversight Commission Hearing | 9.23.21

## Longest Wait Time Per Day – Front Bench Area

| Date | Longest Wait Time (rounded to nearest .5 hours) |
|------|--------------------------------------------------|
| August 21, 2021 (Sat) | 47.5 |
| August 22, 2021 (Sun) | 62.5 |
| August 25, 2021 (Wed) | 15.5 |
| August 27, 2021 (Fri) | 5.5 |
| September 1, 2021 (Wed) | 12.5 |
| September 2, 2021 (Thurs) | 17 |
| September 3, 2021 (Fri) | 15.5 |
| September 4, 2021 (Sat) | 14 |
| September 5, 2021 (Sun) | 9 |
| September 6, 2021 (Mon) | 19.5 |
| September 7, 2021 (Tue) | 8 |
| September 8, 2021 (Wed) | 9.5 |
| September 9, 2021 (Thu) | 13.5 |
| September 10, 2021 (Fri) | 13 |
| September 11, 2021 (Sat) | 6 |
| September 12, 2021 (Sun) | 9.5 |
| September 13, 2021 (Mon) | 13.5 |
| September 14, 2021 (Tue) | 8 |
| September 15, 2021 (Wed) | 12.5 |

*LASD does not retain aggregate wait time information due to data system limitations. Information presented reflects point-in-time snapshots of wait times that were retrieved each day between 6:30 am and 3:00 pm.

Thank you so much. Okay, we continued to monitor as you indicated [Chair] Commissioner Rubin, to monitor IRC conditions. We continued to monitor them pretty closely for the last few weeks.

42:00

So this first table reflects the longest times that people were tethered in the front bench area for each of a total of 19 days—so we went back to the facility. We concede that the 21st and 22nd were uniquely long wait times, with patients tethered for 47 and half and 62 and a half hours respectively. The remaining 17 days reflect shorter but long nonetheless wait times that range from—let's see—6 hours on the 11th to 19 and a half hours I think [yeah around that] September 6th. Not reflected in this table but over these same 19 days, we counted a total of 37 patients who were tethered for more than 24 hours. Next slide please. Thank you.

[Slide presented, table titled "Longest Wait Time Per Day – IRC Clinic" ranging from August 21, 2021 to September 15, 2021.]

Catie Beltz | Civilian Oversight Commission Hearing | 9.23.21

## Longest Wait Time Per Day – IRC Clinic

| Date | Longest Wait Time (rounded to nearest .5 hours) |
|------|-------------------------------------------------|
| August 21, 2021 (Sat) | 111.5 |
| August 22, 2021 (Sun) | 83 |
| August 25, 2021 (Wed) | 73 |
| August 27, 2021 (Fri) | 69.5 |
| September 1, 2021 (Wed) | 19.5 |
| September 2, 2021 (Thurs) | 21.5 |
| September 3, 2021 (Fri) | 17.5 |
| September 4, 2021 (Sat) | 19 |
| September 5, 2021 (Sun) | 23.5 |
| September 6, 2021 (Mon) | 12 |
| September 7, 2021 (Tue) | 11.5 |
| September 8, 2021 (Wed) | 25 |
| September 9, 2021 (Thu) | 19.5 |
| September 10, 2021 (Fri) | 20.5 |
| September 11, 2021 (Sat) | 15 |
| September 12, 2021 (Sun) | 6.5 |
| September 13, 2021 (Mon) | 14 |
| September 14, 2021 (Tue) | 12.5 |
| September 15, 2021 (Wed) | 18 |

*LASD does not retain aggregate wait time information due to data system limitations. Information presented reflects point-in-time snapshots of wait times that were retrieved each day between 6:30 am and 3:00 pm.

Okay, this slide depicts wait times for the non-front bench folks in custody. So some of these patients

43:00

may absolutely have mental health diagnoses but they're not restrained throughout intake. Again, the worst of the wait times we see through August and then the September wait times range from 6 and a half hours on the 12th of September to 25 hours to the 8th of September. Again, not reflected here over the same 19 day period we counted 144 people who waited more than 24 hours for a bed. Thanks so much, Jennifer, I appreciate it.

[Slideshow is taken down.]

These much higher wait times through the month of August, and to an extent the longer wait times generally, have absolutely been exacerbated by COVID. And unfortunately, you know, it is also true that long wait times in the IRC—especially for the mentally ill—are not new. And though IRC is really the intake unit that marks the beginning of one's period of confinement in the system, the long wait times are actually the end

44:00

result of a much greater backlog that's caused by the mental health housing shortage. For most of these front bench patients, when they're removed from the front bench they're moved through a series of specifically designated temporary housing areas—both in the IRC and Twin Towers—until [they can] a permanent bed can be found for them. Just by way of an example, a recent patient—30 years old, severe mental illness, history of hospitalizations, and a developmental disability—was brought into the IRC, tethered in the front-bench area on August 5th. After 5 and a half hours, he was removed to the IRC module 231—a temporary housing location—where he remained for six days. He was then moved to a high-observation housing intake module—also a temporary housing location—where he remained until yesterday. So this patient spent nearly 50 days in high isolated, temporary housing environments—

Catie Beltz  | Civilian Oversight Commission Hearing | 9.23.21

45:00

naked, under a suicide garment, and without other items or provisions. According to clinical notes, he is only sporadically responsive to what were unfortunately inconsistent mental health care and efforts that were offered only at cell front, behind a locked door. And it's important to note that because these housing areas are designated as temporary, and are not intended stays longer than 2 or 3 days, people do not receive access to purchase items from commissary, to receive visits. They don't have consistent access to a phone or time outside of their cells, outside the exceptions of shower that are offered twice weekly, assuming folks are deemed safe enough to come out of their cells. Documentation on showers and certain other things can be a bit inconsistent, and this patient may be being offered showers, but the clinical notes describe his cell as being

46:00

quote, "unlivable," which suggests that he might not be stable enough to even desire a shower. Not surprisingly, the notes also reflect that this front bench patient has further psychiatrically decompensated since arrival. Also because of the housing crisis, again, exacerbated by COVID, as of Tuesday this week, there were more than 500 medium observation level-of-care patients at Men's Central Jail. Correctional Health Services has clearly and consistently and unequivocally indicated that Men's Central Jail is unsafe for patients, because the physical plant design doesn't allow for adequate supervision or treatment space. There are suggestions that there aren't adequate security personnel to be able to support all the mental health needs of those patients . And some of those patients are in modules that also house people in the general population, and so they're obviously potentially vulnerable to victimization. There are several other examples that

47:00

we can talk about of manifestations of the housing shortage. But I just want to really quickly take one moment to acknowledge the Sherriff's Department for our access. The reason that we have the information that I'm sharing with you today and that I'm even able to share with you today is because we have absolutely unfettered access to the jails and to the people confined in them. We have access, for that matter, to personnel and custody health records and we do work closely with custody leadership and staff. And so, I say this first to thank the Assistant Sheriff and the Custody Division and the Sheriff himself for this access, because it is absolutely imperative to our work. But also, I say it to reiterate what this commission and the Inspector General have indicated which is that if only we had throughout the department the same level of access to information and communication and transparency that we have in the Custody Division, our working relationship with the department as a whole would improve significantly—

48:00

 and so we invite that.

Also, you know, because we talk almost daily, I have communicated to the assistant sheriff and to assistant sheriffs before him our position: that current conditions are grossly inadequate, they expose many vulnerable to patients to level of suffering that we as a county should neither tolerate nor enable. County Counsel can best offer formal opinion, but in our capacity as Special Counsel we opine that these conditions consistently fail to meet the basic human needs of many of the people in custody. And we do not believe that they would withstand a constitutional analysis pursuant to the 8th and 14th Amendments. So we therefore continue to recommend the immediate release of people in custody to an absolute and consistent population cap of the

Catie Beltz  | Civilian Oversight Commission Hearing | 9.23.21

12,400 [twelve thousand four] Board of State and Community Corrections rated capacity for this
system. I understand that the Sherriff's Department briefly suspended intake last weekend, which
is great. We also recommend that. Of course, the county should also continue its most zealous
pursuit of alternatives to incarceration, especially for this population.
END: 49:13

# Sub-Exhibit D

| Front Bench Processing Time | | | | |
|---|---|---|---|---|
| Date | 24-48 hrs. | 49-71 hrs. | 72+ hrs. | Total 24+ hrs. | Longest Time (hrs.) |
| 8/9/2022 | 1 | 1 | 2 | 4 | 109.5 |
| 8/10/2022 | 11 | 0 | 0 | 11 | 44.7 |
| 8/11/2022 | 14 | 0 | 0 | 14 | 41 |
| 8/12/2022 | 4 | 6 | 0 | 10 | 64.2 |
| 8/13/2022 | 7 | 1 | 4 | 12 | 86.1 |
| 8/14/2022 | 12 | 7 | 1 | 20 | 85.7 |
| 8/15/2022 | 3 | 11 | 7 | 21 | 122.3 |
| 8/16/2022 | *no data received from LASD* | | | | |
| 8/17/2022 | 14 | 0 | 0 | 14 | 47.7 |
| 8/18/2022 | 15 | 6 | 0 | 21 | 71.8 |
| 8/19/2022 | 17 | 6 | 3 | 26 | 88.7 |
| 8/20/2022 | 7 | 7 | 5 | 19 | 119.2 |
| 8/21/2022 | 7 | 8 | 14 | 29 | 142.7 |
| 8/22/2022 | 0 | 7 | 22 | 29 | 166.2 |
| 8/23/2022 | 0 | 0 | 10 | 10 | 145.6 |
| 8/24/2022 | 6 | 0 | 3 | 9 | 158.3 |
| 8/25/2022 | 15 | 0 | 0 | 15 | 45.6 |
| 8/26/2022 | 9 | 11 | 0 | 20 | 69.7 |
| 8/27/2022 | 6 | 4 | 4 | 14 | 81 |
| 8/28/2022 | 13 | 3 | 2 | 18 | 105.2 |
| 8/29/2022 | 2 | 3 | 2 | 7 | 80.7 |
| 8/30/2022 | 1 | 0 | 5 | 6 | 109.2 |
| 8/31/2022 | 9 | 0 | 2 | 11 | 131.4 |
| 9/1/2022 | 6 | 4 | 1 | 11 | 133.1 |
| 9/2/2022 | 3 | 0 | 0 | 3 | 36.3 |