OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
Acting County Counsel
  dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
  dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:   (213) 974-1807/(213) 974-1811
Facsimile:    (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  rdugdale@kbkfirm.com
Michael J. McCarthy (334829)
  mmccarthy@kbkfirm.com
Katelyn A. Kuwata (319370)
  kkuwata@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 272-7904
Facsimile:   (310) 556-2705

*Attorneys for Defendants Los Angeles County Sheriff Alex Villanueva and the County of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ALEX VILLANUEVA, Sheriff of Los Angeles County, in his official capacity, and the COUNTY OF LOS ANGELES, <br><br> Defendants. | Case No. 75-cv-04111-DDP <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................... 1

II. FACTUAL BACKGROUND AND RESPONSE ............................................ 3

    A. Functions of the Inmate Reception Center .............................................. 3

    B. The Backlog in the IRC Due to the Influx of Mentally Ill Individuals Into the LACJ and the Lack of Immediately Available HOH and MOH Housing for Those Individuals ..................... 6

    C. Emergency Measures Taken by the County and the LASD to Alleviate the IRC Backlog ....................................................................... 7

        1. Optimizing Existing LACJ Bedspace to Create New HOH and MOH Availability ................................................................. 7

            a. Immediately Transferring MOH Inmates to PDC North ............. 8

            b. Opening Additional Dorms in MCJ to House MOH Inmates .................................................................................. 9

            c. Making TTCF Largely Exclusive to HOH Inmates ................... 10

        2. Updates in Practice to Address Overcrowding in the IRC ......... 11

            a. Release of Medical Holds ........................................................... 11

            b. Double Celling of HOH Inmates ................................................ 11

            c. Current Release Strategies and the Opportunity for Court Guidance ......................................................................... 12

    D. The Emergency Measures the County and the LASD Undertook Prior to Filing the Instant Ex Parte Application Have Led to Recent Improvements in the IRC .......................... 13

    E. The County and the LASD Request that the Court Adopt Their Proposed Alternative Temporary Restraining Order, Which Varies Only Slightly From What Plaintiffs Recommended, for Various Justifiable Reasons ................................................................. 14

        1. The Parties' Two Proposals Mostly Align With Each Other .............................................................................................. 14

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

2. Slight Variances to Each Proposed Restraint Are
Necessary to Ensure Successful Implementation ........................ 14

III. CONCLUSION ........................................................................................ 17

2.       Slight Variances to Each Proposed Restraint Are Necessary to Ensure Successful Implementation ........................ 14

III.   CONCLUSION ........................................................................................ 17

ii

DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## I. INTRODUCTION

Lamentably, Plaintiffs are largely correct that conditions inside the Inmate Reception Center ("IRC") of the Los Angeles County Jail ("LACJ") have deteriorated dramatically in past months.[1] Accordingly, as discussed more fully below, the County of Los Angeles (the "County") and the Los Angeles County Sheriff's Department (the "LASD") (collectively "Defendants") agree that the relief sought by Plaintiffs should be granted—though, the County will seek certain additional orders to assist the County with compliance and a few variances from the orders sought by Plaintiffs to account for the relief that can be feasibly accomplished with immediacy while still observing Constitutional obligations.

Due to a number of factors—including a skyrocketing number of inmates with serious mental health conditions, the cessation of an Emergency Bail Schedule ("EBS") that suppressed the number of detained inmates generally during the COVID pandemic, the California Department of Public Health COVID-19 Orders, a higher number of misdemeanants who are currently being detained than in recent times, the Sheriff's belief that he is not able to release more inmates than he is currently releasing, and an overall higher number of arrests in the County during the hot summer months when criminal activity seems to spike annually—the IRC has been overwhelmed with new inmates entering the LACJ. This has led to periods of time when inmates in the IRC, a space intended to temporarily hold and evaluate the mental and physical health of newly-arrived inmates, have been held in that space for well beyond 24 hours while waiting to be assigned to housing designed to accommodate their needs.

---

[1] The County does take issue with some of what Plaintiffs allege, such as the allegation that conditions in the IRC have become "life-threatening" and contributed to the two deaths. The County does not, however, dispute Plaintiffs' central point that in the past few months many inmates have spent excessive amounts of time in the IRC and this situation needs to be remedied.

Unlike previous instances in 2006 and 2008 when this Court considered delays in processing new inmates through the IRC and issued orders to address those delays, the current backlog in the IRC is not a product of general overcrowding in the LACJ.  There are currently thousands fewer inmates in the LACJ than the number of inmates held at the LACJ in years' past.[2]  Indeed, according to the LASD, more than one thousand beds in the LACJ currently sit empty.  The issue causing the current IRC backlog is that more new arrestees—to a higher degree and in higher overall numbers—have a serious mental health condition and require Moderate Observation Housing ("MOH") or High Observation Housing ("HOH"), both of which have been in short supply.

Recognizing the grave issues in the IRC highlighted in Plaintiffs' ex parte application, as well as their obligation to detain people in a manner consistent with what the Constitution requires, the County and the LASD initiated a number of emergency measures to address problems in the IRC <u>before</u> Plaintiffs' counsel provided notice of an intention to file the instant ex parte application.  These corrective actions taken by Defendants included, among other steps:  (1) relocating inmates to create additional HOH and MOH space that can be more immediately made available to new inmates who arrive in the IRC and require specialized housing to account for their mental health needs; (2) changing practices to open up new housing opportunities for inmates requiring HOH and MOH, including a practice that will allow the LASD to better utilize existing HOH space by increasing the instances when an HOH inmate can be safely housed with a cellmate in a two-man cell rather than occupy a two-man cell alone, if deemed safe and appropriate to do so; and (3) even closing the IRC at times to new arrestees when the backlog of inmates in the IRC becomes particularly unmanageable.

---

[2] For instance, in 2006, the average daily population ("ADP") in the LACJ ranged from 15,860 to 19,484 inmates, and in 2008, the ADP ranged from 18,348 to 19,989 inmates.  Today, there are roughly 14,819 inmates in the LACJ system.

1    These emergency remedial actions being taken to mitigate the backlog in the IRC have been underway for just over two and one-half weeks and are now starting to bear fruit, as the number of inmates who have been in the IRC for longer than 24 hours has decreased in recent days when compared to days just a few weeks ago. As a result, with a few minor tweaks designed to address instances where the relief requested by Plaintiffs exceeds what is necessary and proper to provide Constitutionally-required housing and services to inmates held in the IRC, and where Defendants require a short period of time to provide the relief Plaintiffs have requested, the County and the LASD agree that the relief sought by Plaintiffs, in the modified form requested by the County and the LASD, should be granted.

Below, the County and the LASD address (1) the function and purpose of the IRC and how it is designed to operate; (2) how the influx of mentally ill individuals in the LACJ, as well as other factors, have led to the backlogs in the IRC that are the subject of Plaintiffs' ex parte application; (3) the remedial steps the County and the LASD have undertaken in recent weeks, and continue to undertake, to address the conditions in the IRC that are the subject of Plaintiffs' ex parte application; (4) the reduction in the IRC backlogs achieved due to the recent remedial actions taken by the County and the LASD; and (5) the few variances between the relief requested by Plaintiffs through their ex parte application and the relief the County and LASD can deliver to detain those in their care in a manner consistent with the Constitution.

## II. FACTUAL BACKGROUND AND RESPONSE

### A. Functions of the Inmate Reception Center

The IRC is the arrival point for men entering the LACJ system. Women are received into the system at the Century Regional Detention Facility ("CRDF"). The facility receives recent arrestees, people transferred from law-enforcement agency station jails, and those whom the courts have remanded to the custody of the Sheriff. The IRC also processes those returned to the LACJ from state prison and state hospitals. In 2019, prior to the pandemic and the issuance of the EBS, the IRC

processed a total of 86,061 people. In 2021, while the EBS was in effect, 45,691 (or 47% fewer) people went through the IRC. While exact numbers are not available for the year-to-date, the current rate of intake since June 30, 2022, when the EBS was lifted, approximates the pre-pandemic 2019 pace.

The IRC consists of several discrete areas, each with a specific function. New arrivals first go to an area of the IRC called "Booking Front," where the booking process takes place and where people are searched and scanned. There is also a medical screening that takes place at Booking Front to ensure each person is well enough to book. Those who are too ill to withstand the booking process are transported to a hospital. Others are expedited to the IRC Clinic, bypassing the routine booking process described below.

Once through Booking Front, people are taken to a classification area to identify optimal housing based on security and safety concerns. Once classification is complete, people are provided showers and issued standard jail clothing. Once showered and dressed, the inmates proceed to the IRC Clinic. Once there, they are interviewed at a nurse triage station, answering questions designed to identify the person's urgent and historical medical and mental health needs. If the nursing staff determines that a person requires urgent care or is at risk of serious drug or alcohol withdrawal effects, that person is diverted for immediate medical or mental health attention.

Those who do not require immediate medical or mental health attention then await more intensive medical and mental health screening in the IRC Clinic area, which consists of rows of chairs and benches in an open central space surrounding a control desk continuously manned by custody staff, as well as a large holding area. There are also cells that line the exterior of the clinic and extend down a connected hallway. The vast majority of people in the IRC Clinic are unrestrained and can move about within the central space. The exceptions are those assigned to the cells and those who are tethered to the IRC Clinic's "Front Bench," a series of cushioned

chairs that flanks the main control desk. The people who are placed in cells are those who need to be separated from the IRC Clinic's general population because of security issues. The people on the Front Bench are those who have been identified as high risks for engaging in a suicide attempt or self-directed violence. The Front Bench is also used for individuals who are acting out due to mental illness or intoxication. The purpose of tethering a person to the Front Bench is to ensure the person's safety, and Front Bench placement is intended to ensure that custody staff are able to continuously, directly observe all those who pose a high risk of self-harm. Placing such high-risk individuals in a cell, where staff observation is intermittent, creates an unacceptable risk of suicide or other self-inflicted injury.[3]

Once a person has been fully screened for medical and mental health issues, CHS and LASD staff can determine that person's appropriate housing assignment and can issue a pass to permanent housing. If a person has been designated for MOH or HOH according to their mental health needs, that person must wait in the clinic until appropriate housing becomes available. Because of increasing volumes and wait times for mental health housing, LASD and CHS created a dedicated clinic-overflow module in Twin Towers Correctional Facility ("TTCF"), Module 231, around 2006-07. Module 231 is not permanent housing, but it offers people beds, showers, and access to CHS clinicians that staff the module around the clock to monitor and address the mental health needs of the individuals in that module. These clinicians also complete mental health screenings for a certain percentage of

---

[3] One of the chief impetuses that led the United States Department of Justice to bring a separate case in 2016 that is pending before this Court against the County and the LASD based on the treatment of inmates with mental health issues in the LACJ was high rates of suicide among that population in the LACJ. Corrective actions taken by the County and the LACJ in connection with that case, including the close monitoring of inmates who pose a high suicide risk in the IRC, have turned that trend around to such a degree that not one inmate with a diagnosed mental health issue in the entire sprawling LACJ system has carried out a successful suicide attempt thus far in 2022.

the population.

### B. The Backlog in the IRC Due to the Influx of Mentally Ill Individuals Into the LACJ and the Lack of Immediately Available HOH and MOH Housing for Those Individuals

Over the past 10 years, there has been a precipitous rise in the number of individuals in the LACJ who have been diagnosed with a mental illness. Since 2012, the percentage of such inmates has increased from 17% of the overall inmate population to approximately 48% of the overall inmate population, and the number of inmates with the most severe mental health profile that the LACJ encounters (*i.e.*, those classified as "P3" and "P4" inmates requiring HOH Housing) has risen from 460 to approximately 1,577 such inmates.

As Plaintiffs' ex parte application describes, the need for additional mental health housing, combined with limited available space, prevents MOH and HOH inmates from expeditiously transferring out of the IRC. For a host of reasons, this situation became even more acute as of early 2021, when community mental health facilities hit capacity, and the State of California became unable to take in inmates charged with felonies and deemed incompetent to stand trial ("FISTs") as required by state law. Another surge occurred even more recently, when the Los Angeles Superior Court lifted the statewide EBS as of June 30, 2022. The EBS had been adopted in response to the pandemic to decrease the rate of COVID-19 transmission and illness in carceral institutions by reducing the jail population, and it had a profound effect on the County's overall jail census, which decreased from 16,791 on January 1, 2020, to 12,085 on July 1, 2020, and which had been hovering between 13,000 to 13,600 into the early part of 2022.

The influx of inmates in the IRC Clinic presenting with mental health conditions, and who require limited MOH and HOH, has a cascading effect that results in space limitations throughout the LACJ. This already untenable situation can quickly become even more dire when infrastructure breakdowns or COVID-19

surges occur, as they have in recent months.

### C. Emergency Measures Taken by the County and the LASD to Alleviate the IRC Backlog

Given the substantial increase in the number of mentally ill inmates within the LACJ generally, and anticipating that the expiration of the EBS would have a direct, negative impact on the LACJ census, the County developed a plan in August 2022 to address, on an emergency basis, the IRC backlog issues that are the subject of Plaintiffs' ex parte application. These emergency measures include optimizing existing mental health housing and adjusting practices to create additional HOH and MOH bedspace where feasible to relieve the bottlenecks in the IRC which have caused inmates to spend more than 24 hours there prior to receiving housing.

#### 1. Optimizing Existing LACJ Bedspace to Create New HOH and MOH Availability

The bottlenecks which cause inmates to be held in the IRC Clinic for more than 24 hours are due, in overwhelming measure, to severe housing shortages for mentally ill inmates mandated by the 2016 settlement agreement entered into between the County, the LASD, and the United States Department of Justice, *U.S.A. v. County of Los Angeles*, Case No. 2:15-cv-05903-DDP, as inmates who require MOH or HOH cannot be expeditiously provided with such permanent housing. To address the need for this housing and alleviate backlogs in the IRC, the County has been working over the past several weeks to increase and maximize MOH and HOH bedspace on an expedited basis by: (1) immediately transferring several hundred MOH inmates to bedspace at Pitchess Detention Center North ("PDC North") that had previously not been utilized as MOH bedspace; (2) creating additional new MOH bedspace by opening two additional dorms in the MCJ to house MOH inmates; (3) and transferring all non-HOH inmates out of TTCF, with the limited exception of inmates housed in what is currently being used as COVID quarantine space at TTCF, to create significant new bedspace at TTCF that had previously not

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7
DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO

been used as HOH bedspace. These steps, which are discussed below, will result in approximately 762 additional MOH beds the LASD will have available for MOH inmates, including new inmates who require MOH upon being processed through the IRC. Furthermore, transforming TTCF into a facility that exclusively houses HOH inmates will immediately provide hundreds of additional HOH beds that can be utilized by new inmates who require HOH housing upon being processed through the IRC, and it will ultimately make between 2,000 and 4,000 beds in TTCF available for HOH inmates (a population that has hovered between approximately 1,300 and 1,600 inmates in the past few years). Since the lack of MOH and HOH housing has been the primary driver of the backlog in the IRC, this newly-available MOH and HOH space should drastically lower, if not altogether eliminate, stays in the IRC Clinic of longer than 24 hours by inmates requiring MOH or HOH housing.

### a. Immediately Transferring MOH Inmates to PDC North

Traditionally, the male mental health population has been housed primarily at TTCF, with the exception of a small contingency of MOH inmates currently housed at MCJ and a further small contingency of MOH inmates who have been medically-cleared to be housed at PDC North.

Long-term plans are underway to increase the bedspace used to house MOH inmates by utilizing PDC North as permanent housing space for significantly more MOH inmates than that facility has traditionally accommodated. *See U.S.A. v. County of Los Angeles*, Case No. 2:15-cv-05903, ECF 190. This will require: (1) allocating new permanent staffing resources to address the nursing, medicine, and mental health needs that would accompany the larger size of the MOH population at that facility; (2) hiring and deploying additional deputies to meet the security needs of this relocated group of inmates; and (3) renovating clinical space to ensure staff have a location to conduct necessary patient assessments and counseling.

Given the emergency need to alleviate overcrowding at the IRC through the

creation of more MOH in existing LACJ space, the County and LASD have accelerated the timeline on this project and, on August 25 and 26, 2022, the LASD transferred approximately 320 MOH inmates from locations inside TTCF and MCJ to newly-available MOH bedspace at PDC North. This expansion of newly-repurposed MOH bedspace at PDC North is continuing, as there are six additional dorms located in Modules 3 and 4 of PDC North which can be utilized as MOH housing. Once alternative housing can be located for the inmates in those dorms who do not suffer from mental health issues, this bedspace will be converted to allow for an additional 542 MOH inmates to be housed at PDC North.

This massive repurposing of bedspace at PDC North into MOH housing should allow the LASD to cycle MOH inmates out of the IRC and into permanent housing locations suitable for the level of mental health care they need much faster than has been the case in recent months.[4]

### b. Opening Additional Dorms in MCJ to House MOH Inmates

Although no one believes that the MCJ is an optimal place to house MOH inmates, the current overcrowding in the IRC has also required the County and the LASD to open up two additional dorms of MOH inmates at the MCJ on a short-term basis in order to free up space in TTCF for the expanding HOH population. These

---

[4] The expedited transfer of MOH inmates to PDC North admittedly comes at a price. CHS is shortening hours at clinics in other parts of the County in order to divert clinic staff to PDC North to accommodate the additional MOH inmate population. Additionally, LASD personnel are being utilized to shuttle inmates to specialty care treatments and appointments at greater distances. Both clinical and custody staff risk burnout from working extra and overtime shifts, and it is anticipated that treatment and evaluation times will be extended. In implementing these transfers, the County has endeavored to minimize burden on custody and clinical staff by triaging the MOH inmates it sends to PDC North—for instance by first transferring those inmates who require less intensive care (*i.e.*, those not currently on medications).

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9
DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO

dorms are populated with approximately 170 inmates who have been transferred from TTCF. Consistent with its obligation to safeguard these inmates with mental health issues, the LASD has been performing safety checks every 15 minutes for the inmates housed in cells at the MCJ and every 30 minutes for inmates housed in dorms at that facility.

### c. Making TTCF Largely Exclusive to HOH Inmates

As a result of the movement of MOH inmates out of TTCF to PDC North and MCJ, the LASD has been able to convert nine MOH pods at TTCF into HOH pods and it is working to convert an additional seven MOH pods at this facility into HOH pods. This new HOH space at TTCF will have the capacity to house 512 HOH inmates if the two-man cells in these 16 pods are filled to capacity, or, at a minimum, 256 HOH inmates if each of these two-man cells can only house a single HOH inmate. This newly-created HOH space will allow the LASD to move inmates out of the IRC more quickly who require HOH housing, further reducing the intake bottleneck.

The County and LASD's ultimate plan through the inmate movement described above is to convert all areas in TTCF to areas solely used for HOH housing. Once TTCF is converted to a facility used solely for HOH housing, it will accommodate a total of 3,456 HOH inmates inside double-man cells that are used to hold two inmates or 1,728 HOH inmates inside double-man cells that are used to hold a single inmate. With additional modifications at TTCF, such as using dorm areas at TTCF to house HOH inmates who participate in the FIP Stepdown Program and retrofitting certain existing modules at TTCF so they can be used to house HOH inmates, TTCF would be able to house up to 4,098 HOH inmates in a double-man configuration or 2,049 HOH inmates in a single-man configuration. As the number of inmates in the LACJ system requiring HOH housing has hovered between approximately 1,300 and 1,600 inmates in the past few years, converting TTCF into a facility that exclusively houses HOH inmates should allow the County and the

LASD to provide permanent HOH housing quickly to new inmates who need such housing when they arrive in the IRC.

### 2. Updates in Practice to Address Overcrowding in the IRC

The County has also implemented, on an expedited basis, a number of changes in its practices to relieve overcrowding in the IRC, including: (i) releasing medical holds that were in place for logistical convenience; (ii) double-celling HOH inmates when it is safe and feasible to do so; and (iii) increasing the early release period for inmates from 180 days to 240 days.

#### a. Release of Medical Holds

Medical holds are directives that an inmate be prevented from transferring to another facility due to an impending medical treatment or appointment. For example, medical holds routinely are placed on diabetic inmates who receive dialysis at local outside medical facilities to avoid transferring the inmate away from the appointment location only to bring the inmate back in a matter of weeks. In light of the MOH and HOH shortage, as of August 23, 2022, the County lifted this practice for certain inmate populations with no true medical need for the hold (*i.e.*, because the holds had been placed merely for logistical convenience to avoid transporting inmates long distances for treatment).

This change in practice is anticipated to have a material impact on making additional bedspace available for individuals in the IRC waiting for potential housing that is currently being occupied by individuals with medical holds. As of a few weeks ago, there were approximately 500 inmates on medical holds. The County has removed 150 of these medical holds that were deemed unnecessary, and, as mentioned above, is no longer allowing medical holds to be used simply for logical convenience. This will open up a significant number of MOH and HOH beds at TTCF, MCJ, and PDC North.

#### b. Double Celling of HOH Inmates

Currently, 68% of HOH inmates at the LACJ are being housed alone in

double-man cells, resulting in a tremendously inefficient use of HOH bedspace. Unfilled space will now be reclaimed by placing two inmates in a cell, with the goal of increasing the current 32% double cell rate for HOH inmates, if it is deemed safe and appropriate to do so. Double-celling, combined with the aforementioned other temporary measures, could free up many hundreds of much-needed HOH beds that could be made immediately available to new inmates who enter the IRC and require HOH bedspace.

### c. Current Release Strategies and the Opportunity for Court Guidance

The Sheriff has been utilizing the tools he believes are at his disposal to release inmates early since 2020, in response to the COVID-19 pandemic, and continues to utilize these tools to this day, but the County would like further guidance from the Court to increase the release tools available to the Sheriff. To date, the Sheriff authorized an increase in the early release period for sentenced inmates convicted of misdemeanors from 180 days to 240 days. This means that any newly-sentenced inmate with 240 days or less remaining on his sentence—excluding the AB 109 population—will be released due to rising LACJ census rates exacerbated by the end of the EBS. The Sheriff also used his authority under Penal Code § 4024.1 to accelerate the release of inmates scheduled for release within 30 days, and has declined to accept into custody most arrested misdemeanants with bail set at $50,000 or less. The County would like to do more and further clarify the law in this area, including with respect to the continued applicability (due to the passage of time and changed circumstances) of Court's earlier release authorization orders in this case. The County looks forward to the opportunity to seek the Court's guidance in this area as this case proceeds, including as to whether additional early release strategies are legally permissible to address conditions in the jails, including conditions in the IRC.

### D. The Emergency Measures the County and the LASD Undertook Prior to Filing the Instant Ex Parte Application Have Led to Recent Improvements in the IRC

Many of the remedial actions addressed above were proactively instituted prior to the County and the LASD receiving notice of Plaintiffs' intent to file the instant ex parte application. For instance, the relocation of inmates noted above to create additional MOH and HOH bedspace within the LACJ began on August 23, 2022, as did the release on medical holds. Nevertheless, the impacts of these remedial actions have only had a short time to reveal themselves.

That said, it appears, based on very preliminary data, that the steps the County and the LASD have taken to remediate issues in the IRC have had a positive effect. Specifically, in recent days, as shown in the following data, the number of inmates who have spent more than 24 hours in the IRC has dropped when compared to recent weeks, even on days when the population in the IRC has surged due to significant numbers of new arrests:



This would suggest that the steps recently taken by the County and the LAPD discussed above are starting to have an impact on the IRC backlog and are thus

13
DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO

remedying one of Plaintiffs' chief concerns.

### E. The County and the LASD Request that the Court Adopt Their Proposed Alternative Temporary Restraining Order, Which Varies Only Slightly From What Plaintiffs Recommended, for Various Justifiable Reasons

#### 1. The Parties' Two Proposals Mostly Align With Each Other

Defendants fully agree with Plaintiffs regarding a party's obligations to follow previously-issued Orders of the Court and acknowledge their duty to detain individuals in the IRC Clinic under Constitutional conditions. However, Plaintiffs' Proposed Temporary Restraining Order (the "Plaintiffs' TRO") contains a number of restrictions that are not feasible at this immediate moment, and which in some cases do not reflect the practical realities of IRC's operations. Defendants instead request that the Court adopt their Proposed Temporary Restraining Order (the "Defendants' TRO") should it be inclined to enter any temporary restraining order.

The two proposals are admittedly similar and the changes in the Defendants' TRO will not detract from their ability to address the issues raised in Plaintiffs' ex parte application. Instead it will alleviate the problem's worst aspects immediately while allowing the County and the LASD to continue to seek permanent solutions to the entirety of concerns, which, as set forth above, are complex and require the efforts of many stakeholders.

#### 2. Slight Variances to Each Proposed Restraint Are Necessary to Ensure Successful Implementation

First, Defendants acknowledge that the October 27, 2006 Order of the Court enjoined them from "holding an inmate in the IRC for more than 24 hours, unless any period in excess of 24 hours is because the inmate is being treated at the medical facilities within the IRC." ECF 102 at 7. However, given the significant number of inmates who are now likely to require MOH or HOH housing, and the screening time required to process these individuals, Defendants anticipate a brief initial

period where corrective actions they have begun to implement will not immediately correct the formidable backlogs that have recently plagued the IRC Clinic. In those circumstances, which will hopefully be rare and should shortly be eliminated due to Defendants' ongoing and longer term efforts described above to address the issue in the IRC, Defendants propose that they be required to document certain information that correlates with the documentation requirements in other sections of Plaintiff's TRO. Additionally, Defendants propose that an upper bar of 36 hours be expressly stated in the Order to reflect Defendants' intention that no incarcerated person be held in the IRC Clinic beyond this limit, even in circumstances where a well-grounded and documented explanation exists.

Additionally, Defendants note that the use of "IRC" in Paragraph 1 of Plaintiff's TRO is inaccurate, as that term would encompass Module 231, which is a housing area located within the TTCF which essentially has all of the benefits of permanent inmate housing, such as access to a bed, showers, and a communal space, as well as access to a specific staff of clinicians who can attend to the inmate's medical and mental health issues. Rather, the correct term for the location that should be used in Paragraph 1 is "IRC Clinic."

Finally, for clarity sake, Defendants' propose that any order include the language "holding an inmate <u>continuously</u> in the IRC Clinic for more than 24 hours." This addition would more accurately address Plaintiffs' repeatedly-highlighted concerns regarding individuals being held in the IRC Clinic for days at a time under substandard conditions and eliminate those who might spend more than 24 non-consecutive hours in the IRC Clinic due to a necessary detour they take which interrupts their time in the IRC Clinic (*i.e.*, inmates who start at the IRC, are pulled out of the IRC Clinic for some period of time for a legitimate reason, such as to receive medical treatment offsite in the hospital, and then return to the IRC).

With respect to Plaintiff's second proposed restraint—holding an incarcerated person secured to the Front Bench for more than four hours—Defendants are in

agreement in principal to provide the relief Plaintiffs seek. However, to address health and privacy concerns of the inmates in their care, Defendants object to any injunctive relief in this case that requires them to document any incarcerated person's mental health diagnosis. Defendants have not and cannot show that all current and future incarcerated persons have consented to providing confidential medical information for the purposes of adhering to a temporary restraining order connected to this case. Equally as important, Plaintiffs have not shown what relevance any specific diagnosis would have over the information Defendants agree they should produce, namely, the reason why the individual is secured to the Front Bench in the first place.

Turning to Plaintiff's third proposed restraint, which bars Defendants from holding more than 10 persons in a cell, Defendants note that there are a number of cells within the IRC Clinic, some of which have a capacity greater than 10 persons, including some cells rated to hold as many as 50 inmates. This proposed requirement would potentially cause a far worse overcrowding issue since certain cells could that can safely hold a greater number of people would be underutilized. Instead, the Defendants propose an alternative requirement that would enjoin them from detaining more people in any holding cell than the rated capacity of that cell. This restraint would adequately reflect the realities of the current facility while still appropriately addressing overcrowding concerns in any single cell.

Defendants agree with the fourth proposed restraint regarding limits on holding inmates in holding cells in the IRC Clinic with one exception: Defendants see no reason to require documentation of the "name of officer approving the placement" since there is, in fact, no such officer who "approves" the placement of incarcerated persons in a holding cell. Rather, persons are directed into and out of holding cells as needed; for example, when certain areas of the IRC Clinic are being cleaned, deputies will often move inmates into a holding cell for a short time.

Defendants acknowledge their constitutional obligation as stated in the fifth

1  proposed restraint of Plaintiff's TRO, but seek to include additional language that
2  will address the root cause of one of Plaintiffs' largest concerns. Given that nearly
3  all of the trash on the IRC Clinic's floor is caused by continuous waves of inmates
4  discarding their trash throughout the day, it is a difficult proposition for Defendants
5  to maintain a clean and orderly space without assistance by the inmates themselves.
6  Thus, Defendants propose adding wording that essentially requires them to provide
7  the necessary tools, including trash receptacles, that would eliminate the need of
8  inmates to discard their trash on the floor.

9  Finally, Defendants' TRO eliminates the wording of "not limited to sick call"
10 because no "sick call" procedure has been used for some time and incarcerated
11 persons are in the process of being screened for medical and psychological ailments
12 while they are in the clinic. Defendants recognize their constitutional obligation to
13 provide adequate care during this period, and the elimination of "sick call" from the
14 expressly stated procedures will not alter or reduce that obligation.

### III. CONCLUSION

For each of the foregoing reasons, Defendants request that the Court enter the Defendants' Alternative TRO.

DATED: September 12, 2022          KENDALL BRILL & KELLY LLP

By:     s/ Robert E. Dugdale
        Robert E. Dugdale

*Attorneys for Defendants Los Angeles County Sheriff Alex Villanueva and County of Los Angeles*

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

17
DEFENDANTS' RESPONSE TO PLAINTIFFS' EX PARTE APPLICATION FOR TRO