PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930

*Not admitted in D.C., practice limited
to federal courts

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al*., <br><br> Plaintiffs, <br><br> vs. <br><br> ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES, in their official capacities, *et al.* <br><br> Defendants. | Case No. CV 75-04111 DDP <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **ORAL ARGUMENT REQUESTED** <br><br> Date: March 20, 2023 <br> Time: 10:00 a.m. <br> Judge: Hon. Dean D. Pregerson <br> Crtrm: Courtroom 9C |

i

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

## NOTICE OF MOTION AND MOTION FOR ORDER TO SHOW CAUSE

### TO ALL PARTIES AND ATTORNEYS OF RECORD HEREIN:

**PLEASE TAKE NOTICE** that on **March 20, 2023 at 10:00 a.m.**, or as soon thereafter as this matter may be heard,[1] in Courtroom 9C of the U.S. Courthouse, 350 West First Street, Los Angeles, CA 90012, Plaintiffs will, and hereby do, move for the entry of an Order to Show Cause ("OSC") why Defendants Sheriff Robert Luna, the County of Los Angeles, and Supervisors Barger, Hahn, Horvath, Mitchell, and Solis (collectively, "Defendants") should not be adjudged in civil contempt, and setting forth prospective sanctions for future noncompliance with:

- Preliminary Injunction ("PI"), Sept. 27, 2022, Doc. 351, prohibiting and enjoining Defendants from holding an incarcerated person:
  - "in the Inmate Reception Center (IRC) for more than 24 hours." *Id.* ¶ 1.
  - "on the IRC Clinic Front Bench, handcuffed, chained, or tethered to a chair or any other object, for more than four hours." *Id.*, ¶ 2.
  - "in a[n] IRC holding cell for more than 12 hours total." *Id.*, ¶ 4.
  - "in the IRC clinic area, cage, or any cell in the IRC when that location is not in a clean and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles." *Id.*, ¶ 6.
  - "in the IRC clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care, including but not limited to regular pill call." *Id.*, ¶ 7.
- Stipulation and Order, Nov. 18, 2005:
  - "Every inmate kept overnight in the jail will be accorded a mattress and

---

[1] In accordance with the Court's standing orders, Plaintiffs noticed the Motion for Monday, March 20, 2023. However, the Court has set status hearings in *Rosas v. Luna*, No. CV 12-00428-DDP, for Tuesday, March 21, 2023, and for the convenience of all parties, Plaintiffs have no objection to the Court calendaring this Motion on March 21, 2023.

ii

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

a bunk upon which to sleep. . . . All bunks shall be supplied with full bedding." Doc. 64, ¶¶ 1, 3.

- Judgment, Feb. 16, 1979:
  - o "Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep." Doc. 318-2 at 127, ¶ 1.[2]

This motion is made after the conference of counsel on February 17, 2023, as required by Local Rule 7-3. *See* Declaration of Peter J. Eliasberg ¶ 15. The motion is based on this notice of motion, the supporting memorandum of points and authorities contained herein, all evidence and declarations filed in support of the motion, the records and files in this action, and upon such argument as may be presented at the hearing on the motion.

Respectfully submitted,

DATED: Feb. 27, 2023

By: */s/ Corene T. Kendrick*

Peter J. Eliasberg
Melissa Camacho
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**

David C. Fathi
Corene T. Kendrick
Marisol Dominguez-Ruiz
**ACLU NATIONAL PRISON PROJECT**

Attorneys for Plaintiffs Dennis Rutherford, *et al.*

---

[2]      Docket citations are to the page numbers assigned by the Court's Electronic Case Filing system.

iii

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PROCEDURAL AND FACTUAL BACKGROUND ............................................ 3

    A.    Procedural History ............................................................................. 3

    B.    Evidence of Defendants' Current Non-Compliance With the PI and Past Orders ....................................................................................... 4

        1.  Defendants are noncompliant with the PI's time limits for the IRC and holding cells, and basic hygiene requirements ......................... 4

        2.  Defendants are defying the four-hour limit on chaining people with mental illness to fixed objects at the Front Bench while they await mental health intake screenings or permanent beds ..................... 10

        3.  Defendants are not providing access to medical and mental health case, including medications, in the IRC ........................................ 14

    C.    Defendants' Failure to Take Serious Action Has Resulted in Widespread and Flagrant Violations of the PI ................................... 18

ARGUMENT....................................................................................................... 20

    I.    THE COURT HAS THE AUTHORITY AND INHERENT POWER TO HOLD DEFENDANTS IN CONTEMPT ................................... 20

    II.   THE COURT SHOULD FIND DEFENDANTS IN CIVIL CONTEMPT AND SANCTION THEIR FUTURE NONCOMPLIANCE................................................................................. 21

        A. A Finding of Contempt and an Order Setting Forth Prospective Sanctions for Future Noncompliance Are Warranted ................... 22

        B. Proposed Civil Contempt Sanctions, And Plaintiffs' Proposed Use of Financial Sanctions................................................................. 23

CONCLUSION................................................................................................... 24

iv

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) ...................................................................... 21

*Armstrong v. Brown*,
   939 F. Supp. 2d 1012 (N.D. Cal. 2013) ...................................................... 20

*Brown v. Plata*,
   563 U.S. 493 (2011) .............................................................................. 3, 21

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ......................................................................... 4

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ....................................................................................... 2

*Idaho Dep't of Corrs. v. Edmo*,
   141 S. Ct. 610 (2020) ..................................................................................... 4

*Jensen v. Pratt*,
   No. CV-12-00601-PHX-ROS, 2021 WL 3828502
   (D. Ariz. July 16, 2021) ............................................................................... 14

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ..................................................................... 20

*Kelly v. Wengler*,
   979 F. Supp. 2d 1104 (D. Idaho 2013) ..................................... 14, 22, 23, 24

*Maness v. Meyers*,
   419 U.S. 449 (1975) ....................................................................................... 2

*Mayweathers v. Newland*,
   258 F.3d 930 (9th Cir. 2001) ......................................................................... 4

*N.L.R.B. v. Trans Ocean Exp. Packing, Inc.*,
   473 F.2d 612 (9th Cir. 1973) ....................................................................... 20

v

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

*Parsons v. Ryan*,
912 F.3d 486 (9th Cir. 2018) ..................................................................... 20

*Parsons v. Ryan*,
949 F.3d 443 (9th Cir. 2020) ........................................... 20, 22, 23, 24

*Parsons v. Shinn*,
No. CV-12-0601-PHX-ROS, 2021 WL 718102
(D. Ariz. Feb. 24, 2021) ............................................................................ 24

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) .................................................................. 21

*Plata v. Schwarzenegger*,
No. C01-1351 TEH, 2005 WL 2932253
(N.D. Cal. Oct. 3, 2005) .............................................................................. 3

*Rutherford v. Baca*,
2006 WL 3065781 (C.D. Cal. Oct. 27, 2006) ...................................... 3

*Rutherford v. Pitchess*,
457 F. Supp. 104 (C.D. Cal. 1978), .......................................... 3, 4, 5

*S.E.C. v. Hickey*,
322 F.3d 1123 (9th Cir. 2003) .................................................................. 22

*Shell Offshore Inc. v. Greenpeace, Inc.*,
815 F.3d 623 (9th Cir. 2016) ..................................................................... 22

*Spallone v. United States*,
493 U.S. 265 (1990) ...................................................................................... 20

*Stone v. City & Cnty. of S.F.*,
968 F.2d 850 (9th Cir. 1992) .............................................................. 20, 21

*Trueblood v. Wash. Dep't of Soc. & Health Servs.*,
No. C14-1178-MJP, 2017 WL 4700326
(W.D. Wash. Oct. 19, 2017) ......................................................... 23, 24, 25

*United States v. Asay*,
614 F.2d 655 (9th Cir. 1980) ..................................................................... 21

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) ...................................................................................... 22

vi

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

**Statutes**

18 U.S.C. § 3626(a)(1) ............................................................................................. 4

18 U.S.C. § 3626(a)(2) ............................................................................................. 4

vii

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs respectfully request that the Court issue an Order to Show Cause ("OSC") why Defendants should not be adjudged in contempt and prospectively sanctioned for ongoing failures to comply with the Court's orders related to the Los Angeles County Jail system's Inmate Reception Center ("IRC"). Specifically, the Court should issue an order (1) finding Defendants in civil contempt for noncompliance with the Court's past orders, and (2) imposing prospective sanctions for each future instance of noncompliance.

As this Court is aware from its oversight of three different systemic reform cases about the conditions in the jails, and as Defendants do not and cannot dispute, the jails are in crisis. After the Court granted the PI in late September 2022, the number of people held in the IRC outside of the PI's timeframes briefly dipped from the highs seen during the summer. Yet the evidence indisputably shows the IRC yet again has long delays in processing and intake of detainees, and people continue to suffer serious deprivations while in appalling conditions. Defendants' own records (which, as described at Part B.1, understate the extent of violations of the PI) show systemic failures to comply with the PI. Plaintiffs also submit 23 class members' declarations about noncompliance; declarations from Plaintiffs' counsel of their observations on visits to the jails; and a declaration from a defense attorney detailing her clients' mental decompensation due to failures in the IRC intake process.

The situation is all the more urgent because less than two weeks ago — days after February 13 hearings in *Rosas v. Luna* and *United States v. Cnty. of L.A.* — Plaintiffs' counsel learned from jail visits and from public statements of various County officials that (1) there are new "IRC overflow" units sprinkled throughout the Men's Central Jail (MCJ), where conditions are nearly as dismal as in the IRC, but people languishing there do not show up in data reports required by the PI; and

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

(2) rather than chaining people with mental illness to the IRC Clinic's Front Bench (which is strictly limited by the PI to fewer than four hours), jail staff "for months" have been restraining people with serious mental illness awaiting mental health care and screenings to gurneys in a MCJ hallway. As detailed at pages 12-14, on February 16, 2023, Inspector General Max Huntsman told the Los Angeles Civilian Oversight Commission (COC) that "***The problem that used to exist in IRC in view of the court has now been moved into the shadows***." Eliasberg Dec. ¶ 3, Ex. A (2/16/23 Tran.) at 3 (emphasis added) ([9:15-9:22] video at https://www.facebook.com/watch/live/?ref=watch_permalink&v=2167591540094823 ).

The bottom line is that Defendants are massively out of compliance with the PI and previous orders. Plaintiffs acknowledge that Defendants and their counsel — no doubt due to the pressure of the three cases, and recent attention from four U.S. Senators — are trying to address profound, longstanding problems within the jails.[3] But the law is clear that "trying" is not enough, nor is it a license to ignore valid court orders. After almost five decades of an endless cycle of promises followed by excuses and failures, and generations of class members enduring abysmal conditions, the time for talk is over. The Court must exercise its inherent authority to enforce compliance with its orders through the imposition of sanctions. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance."); *Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly."). That class members are in

---

[3] *See* Eliasberg Dec. Ex. G (Oct. 25, 2022 Letter to U.S. Atty. Gen. Garland from Senators Booker, Feinstein, Gillibrand, and Padilla, describing a "failure to correct or prevent the constitutional and human rights violations in facilities that are under [DOJ] consent decrees," including the Los Angeles County Jail, as "undermin[ing] the Department's broader efforts, as well as the public's faith and confidence in our legal system") *at* https://tinyurl.com/j9b78n3h; Keri Blakinger, *Senators fault Department of Justice for 'appalling' conditions in Los Angeles jails*, L.A. TIMES (Feb. 13, 2023), https://www.latimes.com/california/story/2023-02-13/senators-fault-doj-for-appalling-conditions-in-los-angeles-jails

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

jail does not negate their human dignity or rights. *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts . . . must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners." (internal quotation marks and citation omitted); *see also Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, *18-19, *26-32 (N.D. Cal. Oct. 3, 2005) (appointing a receiver to run the California prison health care system due to state officials' "trained incapacity," failure to comply with past orders, "serious and chronic abnegation" of responsibility, a lack of political will "to protect a disenfranchised, stigmatized, and unpopular subgroup of the population" and the court describing itself as "simply at the end of the road with nowhere else to turn.").

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    Procedural History

Plaintiffs' September 8, 2022, Memorandum details the relevant procedural history of this case, and Plaintiffs incorporate it here. Doc. 318-1 at 15-18. In sum, there are many orders spanning 45 years that set forth basic standards in the IRC. *See id.*; *Rutherford v. Pitchess*, 457 F. Supp. 104, 109-10, 113-14 (C.D. Cal. 1978), *rev'd in part on other grounds sub nom. Block v. Rutherford*, 468 U.S. 576 (1984); Feb. 16, 1979 Judgment [Doc. 318-2 at 126-131]; Aug. 27, 1992 Stipulation and Order [Doc. 318-2 at 133-144]; Nov. 18, 2005 Stipulation and Order [Doc. 64]; *Rutherford v. Baca*, 2006 WL 3065781, at *3-4 (C.D. Cal. Oct. 27, 2006) (Order to Show Cause) [Docs. 102, 121]; Sept. 27, 2022 PI [Doc. 351].

Most recently, on September 27, 2022, the Court issued a PI, to which the parties stipulated, that addressed overcrowding, delays in processing and moving people to permanent housing, the provision of adequate medical and mental health care to people in the IRC awaiting permanent housing, and general living conditions within the IRC; it also directed Defendants to log and provide reports on people detained beyond timeframes in the PI. *See generally* Doc. 351. The Court extended

3

the PI another 90 days on December 20, 2022. *See* Doc. 371; *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001) ("Nothing in the [Prison Litigation Reform Act] limits the number of times a court may enter preliminary relief. If anything, the provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted.").[4]

## B. Evidence of Defendants' Current Non-Compliance With the PI and Past Orders

Despite repeated efforts of the Court and Plaintiffs to hold the County accountable, current conditions in the IRC "present poor examples of the civilized standards and concepts of dignity, humanity and decency" and are "a repelling experience in any society that takes pride in its high concepts of human dignity," as Judge Gray described it in 1978. *Rutherford v. Pitchess*, 457 F. Supp. at 109, 114; *see also* Doc. 102 at 6 (this Court holding in 2006 that "pre-trial detainees who are imbued with a presumption of innocence, deserve better than to be housed in a system which has defaulted to the lowest permissible standard of care.").

### 1. Defendants are noncompliant with the PI's time limits for the IRC and holding cells, and basic hygiene requirements.

**Paragraph 1** of the PI enjoins Defendants from holding people in the IRC for more than 24 hours. Doc. 351 ¶ 1.[5] The IRC is defined as "a reception and booking area; a classification area; a bath area; the IRC Clinic (which includes the IRC Clinic Front Bench); a series of holding cells, and Module 231, an overflow module in

---

[4] This extension will expire on March 20, 2023 unless the Court makes findings required under 18 U.S.C. § 3626(a)(1) for the entry of prospective relief, and makes the order final. *See* 18 U.S.C. § 3626(a)(2); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 783 (9th Cir. 2019) (holding injunction was final when court granted preliminary injunction and also held that plaintiff was entitled to a permanent injunction), *cert. denied sub nom. Idaho Dep't of Corrs. v. Edmo*, 141 S. Ct. 610 (2020). Defendants have stipulated to another 90-day extension of the PI, and the parties will submit a proposed stipulation prior to March 20, 2023.

[5] *See also* Nov. 18, 2005 Stipulation and Order (Doc. 64) at ¶ 1, 3 ("Every inmate kept overnight in the jail will be accorded a mattress and a bunk upon which to sleep. . . . All bunks shall be supplied with full bedding."); Judgment, Feb. 16, 1979 (Doc. 318-2 at 127, ¶ 1 ("Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.").

4

1    Twin Towers Correctional Facility. This order shall not apply to Module 231." *Id.*

2    The PI requires the clock to run continuously from time of entry into the IRC until

3    the person leaves IRC, and the clock cannot stop unless a person is out of the IRC

4    for longer than 12 hours for medical care, with access to a bed. *Id.* The clock cannot

5    stop when a person moves from one part of the IRC to another. *Id.*

6         The chart attached as Exhibit C to the declaration of Peter Eliasberg

7    summarizes Defendants' 24-Hour Clock Report covering the 92-day time period

8    from November 17, 2022 through February 23, 2023, of all persons held in the IRC

9    for more than 24 hours.[6] On 73 of those days (or 79% of the time period), Defendants

10   reported that one or more persons was in the IRC for more than 24 hours. Eliasberg

11   Dec. ¶ 11 & Ex. C. On 31 days, ten or more people were in IRC for more than 24

12   hours. *Id.*[7] On ten different days, five or more people were in IRC for more than 36

13   hours. *Id.* The worst day of reported 24-hour violations was February 2, when

14   Defendants' reports showed 85 people had been in IRC over 24 hours; the day with

15   the most people in IRC for more than 36 hours was February 9, 2023, with 29 people

16   whose time exceeded 36 hours. *Id.* Over the three-month period, Defendants' records

17   showed 45 different people spending 48 hours or more in the IRC. *Id.* Ex. C.

18        One example of the delays is John Mayes, who recently (Feb. 15-17, 2023)

19   spent two nights at the IRC clinic, where he slept on the floor or in broken chairs,

20   without a blanket, when it was very cold. Ex. 16 (Mayes) ¶¶ 3-7. He reports that he

21   and others were fed a lunch of peanut butter and jelly sandwiches at 3:20 p.m. on

22   February 16 only after detainees shouted out for food. *Id.* at ¶ 8; *see also* Dominguez-

23

---

24   [6] Plaintiffs offer this chart and others attached to Mr. Eliasberg's declaration
     pursuant to Rule 1006 of the Federal Rules of Evidence, in lieu of submitting the
25   voluminous thousands of pages of paper records. *See* Fed. R. Evid. 1006. His
     declaration details how paralegals and students working under Plaintiffs' counsel's
26   supervision (and spot-checking) compiled the information.
     [7] On February 8, 2023, Jhean Banos was one of 17 people on the IRC 24-Hour Report
27   because he had been in the IRC for 24.9 hours. Camacho Dec. ¶ 13, Ex. C. Mr. Banos
     appeared in the September motion for a temporary restraining order because he had
28   spent over 99 hours on the front bench. Doc. 318-1 at 18.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

Ruiz Dec. ¶¶ 19-21 (ACLU attorneys asked deputies of the status of lunch on that day). Numerous declarants also reported spending multiple days in the IRC, sleeping on the concrete floor or in chairs, without access to a mattress or a blanket, with limited food, and deplorable hygiene. *See also* Ex. 2 (Beck) ¶¶ 2-4, 6, 7, 12, 14, 18, 19, 25 (spent two days in the IRC after four days in the Encino jail, slept on the floor under a bench in the cage area of the IRC, then moved to a temporary holding area where he slept on a foam mattress with only a blanket and no cover, pillow, or sheet); Ex. 14 (Irvin) ¶¶ 8-11, 17 (man with arthritis spent nights of Feb. 15 and 16, 2023 in IRC unable to sleep "scrunched up on chairs and benches" with no blanket, only peanut butter and jelly sandwiches to eat, and detainees getting in fights that required tasers to break them up); Ex. 7 (Escobar) ¶¶ 4-5 (sleeping on chairs for two days Feb. 15-17, 2023 and "there are a couple of people on the floor covering themselves in plastic bags for warmth" and "I asked for blankets but I was told I couldn't have one because there are not enough"); Ex. 12 (Gonzalez) ¶¶ 6, 8, 10, 11 (spent 42 hours in mid-February, could not sleep, was not given a blanket when there was a freeze warning and the IRC was very cold); Ex. 1 (Aguilera) ¶¶ 3, 6, 8, 10 (two days in the IRC and "[t]hey have not provided me with anything to sleep such as a pillow or a blanket. … I just want a place to sleep. I have not been told when they will provide me with a bed."); Ex. 11 (H. Garcia) ¶¶ 4-12 (in IRC for two days as of 2/17/23, has not been provided a blanket, access to showers, or a toothbrush); Ex. 13 (Huerta) ¶¶ 6-8, 16 (in the IRC for over 48 hours, not given access to showers, fed only peanut butter and jelly sandwich, and took turns with others in sleeping on the floor).

While the 24-Hour Clock Reports show an unrelenting pattern of violations of the PI, they significantly undercount the number of violations and total length of stay in the IRC. The PI requires Defendants to provide a list of people who have been kept the IRC for more than 24 hours that includes the date and time they entered the IRC, and the date and time they leave the IRC. Doc. 351 ¶ 1. Defendants,

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

however, maintain they cannot provide such a report. Instead, they provide a list of people in the IRC for more than 24 hours, at three "snapshot" points in time during a day: during the Early Morning (EM), Morning (AM), and Afternoon (PM).

Three snapshots a day is an improvement over the single snapshot Defendants provided before October 2022. These snapshots, however, do not report the total length of time a person spends in the IRC; and, most concerning, Defendants routinely— and impermissibly— stop and restart the 24-hour clock precisely when the IRC is most overwhelmed. According to the PI, the 24-hour clock can stop only if a person leaves the IRC for medical treatment and stays in that location for more than 12 hours with access to a bed. Doc. 351 ¶ 1. In practice, however, Defendants stop the IRC clock whenever someone is sent to IRC overflow areas in MCJ, or spends very short amounts of time in IRC 231. Camacho Dec. ¶ 8.

For example, the 24-hour clock for February 16 at 8:51 pm showed Mr. Webb had been in the IRC for 33.6 hours. Camacho Dec. ¶ 13, Ex. D. He is not on the next 24-clock report on February 17 at 3:33 am, making it appear he had left the IRC. *Id.*, Ex. E. But he was still in the IRC: Defendants had moved him into temporary IRC overflow and then for a short stay in IRC 231. *Id.*, Ex. I. As of 11:00 am on February 17, Mr. Webb had been in the IRC for 50 hours. *Id.*

This is not an anomaly. At 12:54 pm on February 24, Defendants reported 26 people in the IRC for more than 24 hours, and 59 more people in IRC overflow in MCJ. Camacho Dec. ¶ 13, Ex. F. For those 59 people, the clock stopped even though they all likely exceed the 24-hour limit. At 3:45 am on February 25, the snapshot showed 10 people in the IRC more than 24 hours, including one person for over 50 hours. *Id*. ¶ 13, Ex. G. But the same report shows 77 more people in IRC overflow. *Id.* Thus, instead of reporting 87 people in the IRC more than 24 hours, with the total length of stay for each person, Defendants reported only 10.[8]

---

[8] When someone has not reached the 24-hour mark at the time a snapshot is taken,

(cont'd)

7

**Paragraph 4** of the PI enjoins Defendants from locking people in an IRC holding cell for more than 12 hours total. Doc. 351, ¶ 4. Defendants' data show that this continues to be a pervasive problem every month since September. Dominguez-Ruiz Dec. ¶ 40, Exs. A-K. Moreover, the full extent of the violation is unknown due to deficiencies in record-keeping. Reporting has been incomplete and sporadic, with Defendants often providing logs showing the time individuals entered a holding cell but not indicating when they left. *Id.*, Exs. A, C, J, K. Some written logs do not match the computer entries, with discrepancies of up to 10 hours – the written log revealing a longer holding period. *Id.* Exs. H, I.

Even this incomplete reporting, however, shows widespread violations of Paragraph 4. For example, sample logs from September 2022 show at least 29 people kept in holding cells more than 12 hours. Dominguez-Ruiz Dec. ¶ 40, Exs. A, B. Records show multiple violations in October and missing data. *Id.* Ex. C. Samples from November and December 2022 show consistent violations, including at least one time where a person was in a holding cell for more than 27 hours. *Id.* Exs. D-F. January and February 2023 records show a continued pattern of violations, and samples reveal at least 20 violations in the last seven weeks. *Id.* Exs. G-K. Even accepting these deficient records at face value, they reveal numerous times over the past six months when class members were in holding cells for more than 12 hours.

Class members report being kept in IRC holding cells for long periods of time without access to showers, hygiene products, blankets, mattresses, or phones. *See, e.g.*, Ex. 23 (Webb) ¶¶ 2-8, 12-13, 17-19 (detained in the same holding cell for more than 24 hours, with no blanket in a very cold cell, no mattresses, and no functioning

---

and the clock stops when they are moved to an overflow area, they escape reporting entirely. Lester Evans was in the IRC from October 17, 2022 at 3:39 pm to at least 1:00 pm on October 19, when Plaintiffs' counsel interviewed him in a holding cell. Camacho Dec. ¶¶ 16-23, Ex. I. Mr. Evans, however, never appeared on the relevant 24-Hour Reports for October 18-19, 2022 because of a short 12-hour stay in IRC 231. *Id.* ¶ 21, Ex. I; Ex. 8 (Evans) ¶ 11. He also spent 24 hours in a holding cell, but Defendants failed to produce any holding cell logs for October 17-19, 2022. Camacho Dec. ¶¶ 21-23, Ex. I.

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

1  intercom to call officers in cases of emergencies); Ex. 22 (Vasquez) ¶¶ 2-5, 10 (in

2  holding cells at the IRC clinic for two days at the time of his declaration, with nine

3  other men who had to sleep on the floor or on a bench because of no mattresses);

4  Ex. 9 (Fernandez) ¶¶ 10-15 (kept in one holding cell for a day and a half, and a

5  second holding cell for more than 12 hours, where the toilet did not work); Ex. 1

6  (Aguilera) ¶ 3 (in IRC holding cell in mid-October for more than 12 hours – and for

7  two days at the time of his October 19 declaration); Ex. 8 (Evans) ¶ 8 (placed in

8  holding cell with about 18 people, "packed in and sleeping on the benches, under the

9  benches, and laying next to each other on the ground"); Ex. 11 (H. Garcia) ¶¶ 2-3,

10  14 (unable to sleep in holding cell due to conditions, noise, and cold); Ex. 19 (Scott)

11  ¶¶ 9-11 (in an IRC holding cell alone for about two days in late January, without a

12  mattress or blanket); Dominguez-Ruiz Dec. ¶¶ 4, 25-29 (man in holding cell 120 on

13  February 16 pounding on cell door and asking to be let out).

14       **Paragraph 6** of the PI enjoins Defendants from holding a person "in the IRC

15  clinic area, cage, or any cell in the IRC when that location is not in a clean and

16  sanitary condition, with access to functioning toilets, potable drinking water, clean

17  water to wash, and sufficient garbage receptacles." Doc. 351, ¶ 6. Class members

18  report unhygienic conditions and a failure to provide basic hygiene items such as

19  toilet paper, soap, or toothbrushes in the IRC and overflow units. Ex. 7 (Escobar)

20  ¶¶ 5, 7, 10 (not enough toilet paper in the IRC on 2/16/23, clogged toilets, and "[a]t

21  one point I had a plastic bag so I could sit on it while I sat on the floor because the

22  floor is dirty. They took the plastic bag away."); Ex. 1 (Aguilera) ¶ 7 ("They did not

23  provide toilet paper until the ACLU representatives said something about it."); Ex. 2

24  (Beck) ¶¶ 4, 11, 21, 23 (no soap at the IRC, no toothbrush or towel available in IRC

25  or temporary overflow unit, "on the floor around the toilet in the IRC there was pee

26  and feces and trash and toilet paper"); Ex. 12 (Gonzalez) ¶¶ 16-17, 20 (no shower

27  for multiple days, had to get boxer shorts from another detainee, floor was dirty);

28

Ex. 14 (Irvin) ¶ 7 (no soap available); Ex. 11 (H. Garcia) ¶¶ 7-8 (no shower access since arrival to IRC two days earlier, no toothbrush or hygiene materials given despite requests); Ex. 8 (Evans) ¶¶ 6, 12-14 (holding cell was dirty and detainees asking for cleaning and trash disposal, urine in the cell, and no toilet paper available: "I did a 37 year prison sentence. This is worse. It's filthy. People shouldn't live like this. Animals live like this.").

Plaintiffs' counsel observed overcrowded and filthy conditions during recent visits. Donavan Dec. ¶¶ 4, 6, 9 (trash covering the ground, broken chairs, not enough chairs for 40-50 people to sit, frigid temperatures); Camacho Dec. ¶¶ 24-33 (Feb. 16, 2023 visit found thin foam mattresses in IRC overflow unit with no cover and no bedding, unusable TVs, no visible supervision, makeshift vent covers of plastic and spoons; people sleeping on the ground in the IRC using trash bags as a blanket; holding cells piled with trash, and no toilet paper available); *id.* ¶¶ 16-18 (people in holding cell on Oct. 19, 2022 banging on windows, asking her for toilet paper); *id.* ¶¶ 32, 37-40 (Feb. 17, 2023 visit to holding cell 210 piled with trash, and no mops available to clean the floor); Dominguez-Ruiz Dec. ¶¶ 4, 10-22 (Feb. 16, 2023 "overwhelming and shocking" visit to IRC, which "smelled strongly of body odor and feces," had dirty toilets, no blankets, class members reporting they were hungry and chanting "WE WANT FOOD" at 2:45 pm because no lunch had been delivered).

### 2. Defendants are defying the four-hour limit on chaining people with mental illness to fixed objects at the Front Bench while they await mental health intake screenings or permanent beds.

**Paragraph 2** of the PI limits the practice of chaining or restraining people to fixed objects and chairs at the IRC Clinic's so-called Front Bench, while they await mental health intake screenings or movement out of IRC into Module 231 or permanent housing. Doc. 351 ¶ 2. This limit was imposed due to uncontroverted evidence, including County reports dating back to 2019, detailing a dangerous practice of chaining people with serious mental illness for hours and days at a time.

10

*See* Doc. 318-1 at 29-31 (citing OIG 2019 Review, 2022 Clinic Reports, and declarations of counsel, class members, and psychiatric expert Dr. Terry Kupers).

Given shortcomings of 2022 data related to the Front Bench, Plaintiffs' analysis focuses on the time period of January 1 - February 20, 2023 (the last day for which Plaintiffs had data). Eliasberg Dec. ¶¶ 12-13 & Ex. E. Defendants' logs show that ***in this seven-week period alone, 367 different people*** were chained to the Front Bench for more than four hours. *Id*. The reasons for which a person can be chained to the Front Bench are "suicidal," "odd concerning behavior," and/or "self-injurious behavior," yet logs showed 11 people during this time who spent over four hours chained to the Front Bench, for whom there is no reason given for chaining them. *Id*. The longest documented time a person was chained to the Front Bench was **21 hours and 29 minutes** on January 9-10, 2023 for "odd concerning behavior;" there is no record in the logs that he was ever provided food or water, and the log shows he was escorted to use the toilet only once in those 21 hours. *Id*. The logs show 17 people who spent more than ten hours chained to the Front Bench from January 1 to February 20, 2023, as shown below.

| Booking # | Hours on Front Bench | Start Date | Start Time (24 hr clock) | End Date | End Time (24 Hr Clock) | Reason |
|---|---|---|---|---|---|---|
| 6531055 | 21:29 | 1/9/2023 | 12:13 | 1/10/2023 | 9:42 | Odd Concerning Behavior |
| 6540619 | 19:05 | 2/14/2023 | 14:00 | 2/15/2023 | 9:05 | Suicidal |
| 6528822 | 16:37 | 1/14/2023 | 19:28 | 1/15/2023 | 12:05 | Odd Concerning Behavior |
| 6540573 | 15:55 | 2/12/2023 | 7:25 | 2/12/2023 | 23:20 | Suicidal |
| 6550740 | 15:34 | 2/12/2023 | 7:24 | 2/12/2023 | 22:58 | Odd Concerning Behavior |
| 6550695 | 13:30 | 2/14/2023 | 14:30 | 2/15/2023 | 4:00 | Suicidal |
| 6542237 | 13:06 | 2/4/2023 | 0:09 | 2/4/2023 | 13:15 | Self-Injurious Behavior |
| 6528531 | 12:12 | 1/4/2023 | 19:53 | 1/5/2023 | 8:05 | Suicidal |
| 6528457 | 11:49 | 1/4/2023 | 20:12 | 1/5/2023 | 8:01 | Suicidal |

11

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

| Booking # | Hours on Front Bench | Start Date | Start Time (24 hr clock) | End Date | End Time (24 Hr Clock) | Reason |
|---|---|---|---|---|---|---|
| 6529295 | 11:35 | 1/4/2023 | 21:44 | 1/5/2023 | 9:19 | Suicidal |
| 6551572 | 11:32 | 2/14/2023 | 14:39 | 2/15/2023 | 2:11 | Odd Concerning Behavior |
| 6551133 | 11:15 | 2/14/2023 | 21:41 | 2/15/2023 | 8:56 | Odd Concerning Behavior |
| 6552866 | 11:12 | 2/16/2023 | 12:30 | 2/16/2023 | 23:42 | Suicidal |
| 6528142 | 10:30 | 1/4/2023 | 22:49 | 1/5/2023 | 9:19 | Odd Concerning Behavior |
| 6530381 | 10:20 | 1/7/2023 | 1:00 | 1/7/2023 | 11:20 | Suicidal |
| 6532328 | 10:13 | 1/10/2023 | 14:52 | 1/11/2023 | 1:05 | Suicidal |
| 6535845 | 10:10 | 2/7/2023 | 22:40 | 2/8/2023 | 8:50 | Odd Concerning Behavior |

*Id.* In addition to these 17 people, logs show another **92 people** spent between six and 10 hours chained to the Front Bench from January 1 to February 20, 2023. *Id.*

Having 367 human beings chained to the Front Bench in excess of four hours in less than two months is shocking.[9] But less than two weeks ago, Plaintiffs' counsel learned that for months, jail staff have been "tethering" people with mental illness with restraints to gurneys in MCJ hallways, so that they would not fall under the PI's time limits, nor count as people chained to the Front Bench. Specifically, on February 16, 2023, Inspector General Huntsman spoke at the public COC meeting (which Defendant Luna attended) and stated that,

> When the court ordered that we stop chaining people to benches…when that was ordered by the court, I pointed out that it would be impossible to simply move shelves around and solve this problem. The county set up a procedure whereby we increased mental health housing in other places.
>
> We didn't get more staff, we didn't have more real ability to care for

---

[9] *See* Declaration of Dr. Terry Kupers (Doc. 318-2, Ex. 16) at 158 ¶ 30. ("Severe restraints such as tethering to the front bench or a chair at IRC has very harmful effects on all inmates, but especially on inmates with mental illness."). Dr. Kupers is a noted forensic psychiatrist who first testified in this case in 1978 and continues to advise Plaintiffs on the provision of health care in the jails.

12

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

people. ***All we did was hide the problem, moved it out of IRC*** [. . .] or so I suspected, but we learned this week that that was true. ***We learned that for months, the sheriff's department has been tethering people to gurneys with a fixed restraint in violation of its own policy, it appears***. In some specific instances that we asked about this week when we learned about it, ***we were told there was indeed, no such log as is required by Sheriff's Department policy***.

In one case, my office reviewed video and confirmed what a deputy told us which had been, a particular person who'd been tethered for 24 hours. ***The problem that used to exist in IRC in view of the court has now been moved into the shadows.*** The good news is that management is present, learned about it earlier in the week, gave some orders to stop it, and also initially that appeared to be ineffective. There was a [. . .] order to stop it and [it] continued. We observed it afterwards. As of yesterday, as far as we can tell, the word may have gotten out and it may have stopped . . .

The reason I bring it up isn't just because of what happened. ...[I]t is a symptom that will continue. As long as we have our jails overcrowded, we will see IRC continue to be shut down repeatedly. We will continue to see people's constitutional rights violated, either in the IRC or elsewhere, simply because we lack the capacity to care for the number of people we have in our jails now, particularly the mentally ill.

[. . .] What's happening is we've got a system bursting at the seams because of what we've tried to make it do. The people on the ground are doing their best. They didn't necessarily read the tethering policy five minutes before they did this thing. They were trying to manage, as best they could, in what, to them, is an emergency. To us, we're calmly sitting here talking. There is no feces smeared on us, but down in the jails, it's not a calm situation.

Eliasberg Dec. Ex. A at 3-4, 7 [video at 8:08-10:20, 23:18-24:08] (emphasis added).

Defendant Luna was at the COC meeting and spoke about this practice; neither he nor his staff contradicted Mr. Huntsman's statement that it had been going on "for months." *Id*. at 6-7. Mr. Huntsman and COC members referred to "tethering" people to gurneys instead of chaining them to the Front Bench as a "workaround" to this Court's order. *Id*. One COC commissioner said "we are in a tension between

13

workarounds and acceptable rules and what remedies might get enforced." *Id.* at 7.

Assistant Sheriff Sergio Aloma, who supervises custody operations, described "the tethering issue" as "a bigger issue that we are dealing with as a county and not just as a department." *Id.* at 8. He stated,

> Specifically, to the tethering issue, I don't disagree with a single thing that Mr. Huntsman said. He is spot on in his assessment and characterization of what they saw at Men's Central Jail, within the last couple of days. In fact, I was at all the facilities this past Saturday and saw it for myself. I immediately addressed it with our line staff, our supervisors. I let them know that it was unacceptable. Even though I understood that this is a problem that was created, not just at Central jail but the IRC that we've spoken about, ***the domino effect that it causes the TRO that is in place at IRC, that causes staff, both with correctional health services and the Sheriff's department, to move individuals out of the IRC within 24 hours. Four hours, they're not allowed on the front bench, what's referred to as the front bench, for more than four hours and move them to appropriate housing***.

*Id.* at 9 (emphasis added) [video at 26:50-32:00].

In sum, not only do the Front Bench logs show appalling and widespread violations of the four-hour limit; these damning admissions by County employees indicate that the logs underestimate profoundly the extent of violations, given that Defendants "hid[] the problem" and as a "workaround" "moved into the shadows" the "problem that used to exist in the IRC in view of the court."[10] *Id.* at 3-4, 9.

### 3. Defendants are not providing access to medical and mental health care, including medications, in the IRC.

**Paragraph 7** of the PI enjoins Defendants from holding a person "in the IRC

---

[10] Such attempts to evade oversight from the Court are not well-taken. *See, e.g., Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1105, 1110-1113 (D. Idaho 2013) (finding defendant prison officials in contempt after inaccurate and falsified staffing reports provided to the court), *aff'd* 822 F.3d 1085 (9th Cir. 2016); *Jensen v. Pratt*, No. CV-12-00601-PHX-ROS, 2021 WL 3828502, *7-11, *12-14 (D. Ariz. July 16, 2021) (vacating parties' settlement agreement and setting case for trial after sustained noncompliance by prison officials, including documented misrepresentations in data reports provided to the court and Plaintiffs' counsel and a history of unreliable reporting).

clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care, including but not limited to regular pill call." Doc. 351 ¶ 7. Defendants repeatedly fail to provide people in the IRC the psychiatric medication they were prescribed prior to entering the jail. Numerous declarations by people who have been in the IRC since the entry of the PI show that people diagnosed with mental illness, who were prescribed psychiatric medications before they were arrested, and asked for medication at their IRC screening, did not receive their medications in the  IRC — and often for months thereafter.

The experience of Raymond Crowley illustrates the County's failure to provide people in the IRC with psychiatric medications they were prescribed in the community before their arrest, and the harm that results from the jail's failure. He is diagnosed with both schizophrenia and tardive dyskinesia (involuntary movements as a side effect of certain medications). Ex. 6 (Crowley) ¶¶ 2-3. He took Artane, Seroquel, and Wellbutrin before his arrest on November 10, 2022. *Id.* ¶¶ 5, 8. Plaintiffs' counsel reviewed his pre-incarceration medical records; they confirmed his reported diagnoses and that he saw a doctor in September 2022 who prescribed Artane and generic equivalents of Seroquel and Wellbutrin. Eliasberg Dec. ¶ 5.

When Mr. Crowley was in the IRC, he told medical and mental health staff about the medications he was on, but did not receive them. Ex. 6 (Crowley) ¶ 10. He suffered as a result, including "hearing voices, and seeing faces in my food and in the wall" and he began to shake and have numbness in his leg. *Id.* ¶13. He continued to not receive medication and experience symptoms even after he was transferred to MCJ and then to Twin Towers. It was not until ***after Christmas*** that he saw a psychiatrist, was able to tell her about his diagnoses, symptoms, and medication history, and thereafter received his medication. *Id.* ¶¶ 18-19. A week or two later, he stopped hearing voices and his leg twitching became manageable. *Id.* ¶¶ 20-21.

Defendants failed to provide Richard Cisneros the psychotropic medication

15

he was prescribed in the community. He is diagnosed with schizophrenia, depression, and anxiety. Ex. 5 (Cisneros) ¶ 6. He was prescribed a medication for sleep and, he believes, Abilify, when he was arrested on January 30, 2023 and taken to the IRC.[11] *Id*. ¶¶ 6, 9, 12. While at the IRC he received a screening from a mental health professional and told them that he was "taking medication for [his] mental health diagnoses." *Id*. ¶ 5. Nonetheless, he had not received his psychiatric medication as of February 3, 2023. *Id.* ¶7.

What Mr. Crowley and Mr. Cisneros endured is common. *See, e.g.*, Ex. 15 (Jones) ¶¶ 5-7 (diagnosis of schizophrenia and bipolar disorder, told staff at screening he took Haldol and sleep medication, but did not receive them in the IRC); Ex. 10 (Garcia Alfaro) ¶¶ 3-4, 8-13, 16 (diagnosis of schizophrenia, depression, bipolar disorder, and anxiety; told staff he was prescribed Buspar or other medications but had not received them in the IRC or at TTCF as of Feb. 3, eleven days after arrival; had suicidal thoughts and anxiety); Ex. 19 (Scott) ¶¶ 4-6, 8, 13, 21, 23 (diagnosis of depression, anxiety, and agoraphobia; told mental health staff he was prescribed Prozac, Buspar, and Vistaril, but did not receive them in the IRC or IRC 231; hearing voices and "anxiety is going through the roof."); Ex. 9 (Fernandez) ¶¶ 4-6, 9, 20, 25, 27 (had not received Zoloft or Suboxone in IRC or MCJ as of January 12, 22 days after arrival to IRC, despite telling screener about his prescribed medications; cannot sleep, feels agitated and restless); Ex. 18 (Scoby) ¶¶ 3-7, 10-11 (pre-arrest he took Benadryl for insomnia, Buspirone for anxiety, and Seroquel for psychosis, but did not receive medications in the IRC or for a month after transfer to MCJ despite notifying staff; had visions and heard voices until he received medication); Ex. 3 (Brown) ¶¶ 2-3 (diagnosis of bipolar disorder and schizophrenia, did not receive Abilify or Trazodone for 10 days).

These declarants' experiences are consistent with the observations of Deputy

---

[11] Abilify is prescribed for mental health disorders including schizophrenia. *See* https://www.webmd.com/drugs/2/drug-64439/abilify-oral/details

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT; MEM. OF POINTS & AUTHORITIES IN SUPPORT

Public Defender Meredith Gallen, whose declaration is submitted with this motion. A significant number of her clients have mental illness, were unhoused before arrest, are in LA County jail, and are processed in the IRC. Her clients with mental illness "are experiencing significant delays in receiving mental health medications" and "[s]ome of them experience lapses in medication use even when they were regularly taking prescribed medications when living in the community." Gallen Dec. ¶¶ 6-7. She regularly seeks orders from the superior court directing the County to have her clients be evaluated by a psychiatric professional and given medication if appropriate. Yet she has repeatedly found her clients were not evaluated even when the court transmitted a signed medical order to the jail. *Id.* ¶¶ 8-9.

Cutting people off psychiatric medications when they enter jail is dangerous. As Dr. Kupers stated in his September 2022 declaration filed with the Court, the risks of abrupt discontinuation of psychiatric medications include "a rebound effect where the symptoms and the illness for which the medications have been prescribed is exacerbated." Doc. 318-2 at 151 (Ex. 16) ¶ 13. Cutting off anti-anxiety medication can result in "a resurgence of anxiety . . . a seizure or a hypertensive crisis," and cutting off an anti-depressant can result in "very uncomfortable and sometimes dangerous physiological changes." *Id.* ¶ 14. Cutting off psychotropic medications can cause "death – by suicide, seizures, or by physiological reactions to the abrupt biochemical change." *Id.* Dr. Kupers stated:

> Because of the well-known psychiatric sequelae of abrupt discontinuation of psychiatric medications as well as the physiological difficulties and risk of suicide, all standards in correctional mental health as well as instruction on institutional care require immediate attention to inmates' psychiatric medication when they are arrested and admitted to jail.

Doc. 318-2 at 152 (Ex. 16) ¶ 16. Defendants' failure to ensure that people who took psychiatric medication before their arrest continue to get medications in the IRC is

a clear denial of adequate mental health care, in violation of the PI.

### C. Defendants' Failure to Take Serious Action Has Resulted in Widespread and Flagrant Violations of the PI

It didn't have to be this way. County officials have repeatedly confirmed that overcrowding in the jails, the high percentage of the jail population that has severe mental illness, and the lack of specialized housing in the jails are major drivers in the overcrowding and resulting deprivation of constitutional rights of people in IRC. *See, e.g.*, Eliasberg Dec. Ex. A at 3 (Inspector General Huntsman stating that "[a]s long as we have our jails overcrowded, we will see IRC continue to be shut down repeatedly. We will continue to see people's constitutional rights violated, either in the IRC or elsewhere, simply because we lack the capacity to care for the number of people we have in our jails now, particularly the mentally ill."). *See also* L.A. Cnty. OIG, *Review of the Inmate Reception Center Intake Evaluation Process* (Nov. 2019) at 9 (OIG 2019 Review);[12] Fesia A. Davenport, CEO, Cnty. of L.A., *Jails Last: Addressing the Overcrowding Concerns in the Inmate Reception Center*, Attach. at 1 (Aug. 3, 2022) (shortage of HOH and MOH beds causes IRC overcrowding).[13]

As Plaintiffs explained in detail in their September 2022 request for a TRO and PI, one obvious way to reduce the jail population and overcrowding at the IRC is to divert people with mental illness out of the jails and into community treatment programs with appropriate housing, mental health care, and other services. Doc. 318-1 at 19-24. Defendant County Board of Supervisors has funded some of these programs – most notably those run by the Office of Diversion and Reentry (ODR) – which have been very successful as measured by housing retention and recidivism rates. *Id.* But despite the programs' success, and repeated and well-publicized crises

---

[12] *Available at* https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/c2463bac-4aab-43b6-9824-7e8c9c10fdb8/Review%20of%20IRC%20Intake%20Evaluation%20Process.pdf.

[13] *Available at* http://file.lacounty.gov/SDSInter/bos/supdocs/170774.pdf.

(cont'd)

Case No. CV-75-04111-DDP

at that IRC that the Board is clearly aware of, the Board has failed to fund them adequately.[14] On one occasion, the Board asked the CEO for funding options to sustain and expand ODR, and the CEO responded by refusing to make a "recommendation for service expansion."[15] So the Board did nothing, despite the pattern of repeated crises in the IRC. In the summer of 2022, the Board considered—but failed to implement—a plan to substantially expand ODR Housing proposed by Supervisor Mitchell.[16] Finally, two days before Plaintiffs filed their request for a TRO and PI, the Board approved $29.8 million for ODR Housing.[17]

While providing these funds is a step in the right direction, less than $30 million in one-time funding for two years will not allow ODR to expand to the point that its reach will meaningfully reduce the current IRC wait times. The experience of Public Defender Meredith Gallen and her clients with mental illness illustrates the results of the County's failure to adequately fund diversion efforts, including significantly expanding ODR. In 2022, there was a "months-long waiting list for clients to have an initial screening with ODR because there were not enough ODR beds available to meet the overwhelming need for them." Gallen Dec. ¶ 13. Now ODR has shifted to something akin to a lottery system, but the results are basically the same: defense lawyers desperately try to access to the online application for the screening for placement with ODR with almost no chance of success. *Id.* ¶¶ 13-15.

---

[14] Spectrum News 1, *The Future of Men's Central Jail* (Aug. 29, 2022) (Supervisor Holly Mitchell explains that OIG has informed the Board "how many people in the Inmate waiting center are waiting too long or not being housed or held in humane conditions. . . . Those are all deplorable conditions, and we all agree to that."), at 9:36-10:00, *at* https://spectrumnews1.com/ca/la-west/inside-the-issues/2022/08/30/the-future-of-men-s-central-jail .

[15] *See* Memo from CEO to L.A. Board of Supervisors (11/17/2020), Doc. 318-2 at 115, Ex. 13-F.

[16] Taylor Walker, *L.A. County Motion Aimed At Expanding Diversion Is Gutted, Then Put On Hold*, Witness LA (June 17, 2022) at https://witnessla.com/la-county-motion-aimed-at-expanding-diversion.

[17] L.A. County Chief Executive Office, *Detailed CEO Recommended Care First Community Investment Year 2 Spending Plan*, at https://tinyurl.com/yc3ahkas.

(cont'd)

19

1   And while the Board's inaction means there is a dire shortage of community

2   beds and treatment for people with serious mental illness, there continues to be no

3   shortage of these same people suffering inhumane conditions in IRC day after day.[18]

## ARGUMENT

4

## I.   THE COURT HAS THE AUTHORITY AND INHERENT POWER TO HOLD DEFENDANTS IN CONTEMPT

5

6

7   "[C]ourts have inherent power to enforce compliance with their lawful orders

8   through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990)

9   (quotation marks omitted); *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020)

10  ("*Parsons III*") (affirming contempt order against state prison system); *Stone v. City*

11  *& Cnty. of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992) (affirming contempt order for

12  noncompliance with jail conditions decree).[19] In the Ninth Circuit,

13  The moving party has the burden of showing by clear and convincing
    evidence that the contemnors violated a specific and definite order of
14  the court. The burden then shifts to the contemnors to demonstrate why
    they were unable to comply. They must show how they took every
15  reasonable step to comply.

16

17  *Stone*, 968 F.2d at 856 n.9.

18  A party defending against contempt by arguing inability to comply must show

19  "categorically and in detail" why it could not comply. *N.L.R.B. v. Trans Ocean Exp.*

---

20  [18] As one class member stated, "I feel like I'm losing it. I'm afraid of losing my jobs
    if I don't get out soon . . . I also feel sorry for the circumstances I am in and wish I
21  could have met you, judge, in a different platform." Ex. 2 (Beck) ¶¶ 23, 25.
    [19] "When persons already are subject to the jurisdiction of the court, no new process
22  is required to subject them to contempt charges; thus parties of record to a decree,
    upon appropriate notice of the contempt proceeding, may be held in contempt for
23  noncompliance with the decree . . . since the civil-contempt charges are a
    continuation of the original proceedings." 11A FED. PRAC. & PROC. CIV. § 2960
24  (3d ed.). In an ongoing case governed by the PLRA, the moving party is not required
    to show that the noncompliance with an order, the parties' stipulations, or judgments,
25  creates a new constitutional violation. *See Parsons v. Ryan*, 912 F.3d 486, 501 (9th
    Cir. 2018) ("*Parsons II*") (holding that "the district court was not required to make
26  new findings of a constitutional violation before enforcing the Stipulation" in a
    prison conditions case); *see also Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1022
27  (N.D. Cal. 2013) ("[T]he Court need not wait until a death to require compliance
    with its orders").

28

20

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

*Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973); *see also Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (prison officials must show that they took "*all* reasonable steps to comply with the order") (emphasis in original). Moreover, "[i]ntent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense." *Stone*, 968 F.2d. at 856. And impossibility is not a valid defense if a party is "responsible for the inability to comply." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980). Finally, the fact that compliance will cost money is no reason to disobey an order. *See Stone*, 968 F.2d at 858; *cf. Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations").

Moreover, a court's power to issue further orders is heightened when, as here, it has overseen complex litigation against a recalcitrant public institution for a long time. *Stone*, 968 F.2d at 856-57 (jail officials' history of noncompliance is "highly relevant" in finding them in contempt); *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) ("The ongoing, intractable nature of this [prison] litigation affords the district court considerable discretion in fashioning relief."); *see also Plata*, 563 U.S. at 542 ("A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order.").

## II. THE COURT SHOULD FIND DEFENDANTS IN CIVIL CONTEMPT AND SANCTION THEIR FUTURE NONCOMPLIANCE

Here, the factual record amply supports an Order finding Defendants in civil contempt and issuing a prospective sanction for continued noncompliance with the PI and the Court's past orders. As described above and in their supportive filings, Plaintiffs have collected clear and undisputed evidence – including Defendants' own reports – of Defendants' failure to comply with several key provisions of the PI and previous court orders. The PI (and previous court orders upon which it relied) are

21

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

clear, definite, and specific. There is no ambiguity to them, and in fact, Defendants stipulated to many of these orders. *See*, *e.g.*, Doc. 343-1 (Joint Proposed TRO); Doc. 347-1 (Joint Proposed PI). Defendants have ample knowledge of the PI and timely notice of Plaintiffs' intent to seek a finding of civil contempt, and they will have an opportunity to be heard about their noncompliance and respond to this motion and make their evidentiary presentation.

## A. A Finding of Contempt and an Order Setting Forth Prospective Sanctions for Future Noncompliance Are Warranted

Once a court finds a party in civil contempt, it has broad equitable power to order appropriate prospective relief. *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). When considering a sanction to bring about compliance with a court order, the court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947).

A sanction of monetary fines is deemed civil if its purpose is to "coerce[] compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses" while a criminal sanction, in contrast, "generally seeks to punish a completed act of disobedience." *Parsons III*, 949 F.3d at 455 (citations and quotation marks omitted); *id.* at 456-57 (holding that "[p]rospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy"). "[C]oercive civil sanctions, intended to deter, generally take the form of conditional fines" because any future accrual of the threatened fines can be avoided by a party by simply complying with the past orders. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629, 630 (9th Cir. 2016); *see also Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 & n.27 (D. Idaho 2013) (holding that a prospective fine schedule against prison officials of a $100 per hour fine for

each vacant mandatory staff post is not punitive because "the amount of fine, if it succeeds in making them comply, should prevent the fine from reaching millions because Defendants will fix their behavior and begin living up to their promise in the Settlement Agreement. If a *prospective* fine leads to $2.4 million in penalties, [the party] has no one to blame but itself.") (emphasis in original), *aff'd*, 822 F.3d 1085 (9th Cir. 2016).

## B. Proposed Civil Contempt Sanctions, And Plaintiffs' Proposed Use of Financial Sanctions.

Prospective per diem penalties are an appropriate civil contempt sanction. In *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, the court revised a contempt order first issued in April 2015 requiring the state to provide competency evaluation and restoration services to people with mental illness who were incarcerated within seven days of a state court order to do so, or face a fine for each day a person did not receive services. No. C14-1178-MJP, 2017 WL 4700326, at *1-2 (W.D. Wash. Oct. 19, 2017).[20] In its 2017 order, the court increased the daily monetary contempt fine payable to the court treasury to $750 per person for each of the first six days of delay, and $1500 starting the seventh day a person languished in the jail. *Id.* at *7.[21] These contempt fines were used to fund programs for the benefit of the class. *Id. See also Parsons III*, 949 F.3d at 452, 456, 459 (affirming district court's civil contempt fine of more than $1.4 million for state prison system's continuing failure to comply with

---

[20] Similar to this case, the *Trueblood* court's 2015 sanction order held that "[o]ur jails are not suitable places for the mentally ill to be warehoused while they wait for services. Jails are not hospitals, they are not designed as therapeutic environments, and they are not equipped to manage mental illness or keep those with mental illness from being victimized by the general population of inmates. Punitive settings and isolation for twenty-three hours each day exacerbate mental illness and increase the likelihood that the individual will never recover." *Trueblood*, 2017 WL 4700326, at *1 (quoting Dkt. No. 131 at 2).

[21] The *Trueblood* court held, "[o]ur most vulnerable population, those with mental health needs, deserve the protection of the Constitution and the provision of services to which they are entitled, not the ongoing foot-dragging and rationalizing which Defendants have exhibited to date. The question of why [the State] prefers to pay millions of dollars to the court treasury rather than honor the constitutional rights of the mentally ill population it is mandated to serve remains unanswered." *Id.* at *2.

23

the parties' consent decree and remedial district court orders; the fine was designated for class-wide benefit); *Parsons v. Shinn*, No. CV-12-0601-PHX-ROS, 2021 WL 718102, *2-3 (D. Ariz. Feb. 24, 2021) (contempt sanctions of $1.1 million).

Here, Plaintiffs do not seek retroactive sanctions for Defendants' recent noncompliance, but rather seek civil contempt via a prospective fine schedule similar to those imposed in *Parsons*, *Kelly*, and *Trueblood*. This is paradigmatic civil contempt: Defendants will have the opportunity to purge any contempt findings and avoid any financial sanctions by finally complying with the Court's orders, simply by providing minimally adequate conditions of confinement to people in the IRC and by abiding by the Court's time limits. Accordingly, any future sanctions will be self-inflicted due to their failure to comply.

Plaintiffs' proposed order filed with this Notice and Motion details the civil contempt sanction schedule that the Court should order to go into effect against the Defendants for all instances of noncompliance that occur 60 days or more after the issuance of the order. Plaintiffs' proposed schedule of fines is as follows:

| **Violations of the 24-hour IRC requirement (Paragraph 1)** |
| --- |
| • $250 per person who exceeds 24 hours in IRC (housed 24-48 hours) |
| • $500 per person who exceeds 48 hours (housed 48-72 hours) |
| • $1,000 per person who exceeds 72 hours, and $1,000 for each 24 hours thereafter |
| **Violations of the 4-hour Front Bench requirement (Paragraph 2)** |
| • $250 per person for the first hour beyond the 4-hour limit |
| • $500 per person for first two hours beyond the 4-hour limit |
| • $1,000 per person for the first three hours beyond the 4-hour limit |
| • $2,500 per person for the first four hours beyond the 4-hour limit |
| • $5,000 per person for the first eight hours beyond the 4-hour limit |
| • $7,500 per person for the first 12 hours beyond the 4-hour limit |
| • $10,000 per person for the first 24 hours beyond the 4-hour limit, $10,000 for every portion of 24 hours thereafter |
| **Violation of the holding cell 12-hour limit (Paragraph 4)** |
| • $250 per person for the first 12 hours beyond the 12-hour limit |
| • $500 per person for the first 24 hours beyond the 12-hour limit |

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

| |
|---|
| • $1,000 per person for the first 36 hours beyond the 12-hour limit, and $1,000 for every 24 hours thereafter |
| **Violations of the medication/health care requirements (Paragraph 7)** |
| • $250 per person for each first missed dose of each medication that the person had been taking prior to incarceration that was not prescribed as a bridge medication; |
| • $500 per person for each second missed dose of each medication that the person had been taking prior to incarceration that was not prescribed as a bridge medication; |
| • $1,000 per person for each third missed dose of each medication that the person had been taking prior to incarceration that was not prescribed as a bridge medication, and for each missed dose of each medication after the third missed dose. |

*See* Proposed Order.[22] The Court should require the funds be deposited with the Registry of the Court on a monthly basis, as was done in *Trueblood*, 2017 WL 4700326, at *7. The Court should allocate the funds to pay for increased beds in evidence-based alternatives to incarceration such as the ODR program, and/or as the Court sees fit to best benefit class members.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully move this Court to issue an OSC why Defendants should not be adjudged in civil contempt and prospectively sanctioned for any continued failure to comply with the Court's orders. A proposed order is attached.

//
//
//
//

---

[22] The fines would be cumulative. For example, a person chained to the Front Bench between 7 and 8 hours (in other words between three and four hours beyond the four hour limit) would result in a sanction of $1,750 ($250 for the first hour beyond the limit, an additional $500 for the second hour, and an additional $1,000 for exceeding the limit by three hours). Plaintiffs also propose that every 60 days after the final order, that the amount of each per diem sanction be doubled.

25

Respectfully submitted,

DATED: Feb. 27, 2023          By:  */s/ Corene T. Kendrick*
                                   Peter J. Eliasberg
                                   Melissa Camacho
                                   **ACLU FOUNDATION OF SOUTHERN
                                   CALIFORNIA**

                                   David C. Fathi
                                   Corene T. Kendrick
                                   Marisol Dominguez-Ruiz
                                   **ACLU NATIONAL PRISON PROJECT**

                                   Attorneys for Plaintiffs Dennis Rutherford,
                                   *et al.*

26

Case No. CV-75-04111-DDP

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT;
MEM. OF POINTS & AUTHORITIES IN SUPPORT

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on February 27, 2023, I electronically transmitted the

3   above document to the Clerk's Office using the CM/ECF system for filing and

4   transmittal of a Notice of Electronic Filing to Counsel for Defendants who are

5   registered CM/ECF users.

6

7   DATED:     February 27, 2023          */s/ Corene T. Kendrick*

8                                        Corene T. Kendrick
                                         ACLU National Prison Project
9
                                         *Attorneys for Plaintiffs*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28