OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
  dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
  dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:   (213) 974-1807/(213) 974-1811
Facsimile:    (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  rdugdale@kbkfirm.com
Michael J. McCarthy (334829)
  mmccarthy@kbkfirm.com
Katelyn A. Kuwata (319370)
  kkuwata@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 272-7904
Facsimile:   (310) 556-2705

*Attorneys for Defendants Los Angeles County Sheriff Robert Luna, in his official capacity and the County of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, et al.,<br><br>           Plaintiffs,<br><br>     v.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and the COUNTY OF LOS ANGELES,<br><br>           Defendants. | Case No. 75-cv-04111-DDP<br><br>**DEFENDANTS' FILING OF REPORTS REQUIRED TO RESPOND TO ORDER TO SHOW CAUSE**<br><br>Courtroom 9C<br>Honorable Dean D. Pregerson |

# REPORTS PROVIDED IN RESPONSE TO ORDER TO SHOW CAUSE

On November 9, 2022, as stipulated to by the Plaintiffs, on one hand, and the Los Angeles County Sheriff (the "Sheriff") and the County of Los Angeles (the "County") (collectively, the "Defendants") on the other hand, Defendants were ordered to create a written report addressing the following matters:

1.  A written report detailing the number of people with mental illness who would need to be diverted from the jail either pre-trial or subject to a probationary plea and placed in the community with appropriate mental health care and other services to reduce the backlog in the IRC so people booked into the jail can be placed in permanent housing in 24 hours or less. The report shall address the likely effect on the population of people with mental illness in the jail caused by both reductions in length of stay resulting from pre-trial diversion or placement in community as a result of a probationary plea and reductions of recidivism for people with mental illness in programs like the Office of Diversion and Reentry's ODR Housing Program. The report shall also address, to the extent it can be reasonably measured, the likely cost of funding sufficient diversion to reduce the backlog in IRC so people booked into jail can be placed in permanent housing in 24 hours or less, the available sources of funding, and the cost savings resulting from reducing the population of people with mental illness in the jail, reductions in recidivism, and any other relevant savings resulting from increases in diversion.

2.  A detailed written explanation of what steps Defendants plan to take to reduce the population of people with severe mental illness in the jail in the next year and in the next three years by a sufficient amount to reduce the backlog in IRC so people booked into the jail can be placed in permanent housing in 24 hours or less. The explanation shall include specific timelines, amounts and sources of funding, and, to the extent it can be reasonably measured, the cost savings resulting from Defendants' one and three-year plans to reduce the population of people with mental

illness in the jails.

There are a number of root causes for why a small percentage of inmates spend more than 24 hours in the IRC before receiving permanent housing and why there have been periodic episodes over time where conditions in the IRC have deteriorated due to large numbers of inmates who have remained in the IRC in excess of 24 hours. They include the following:

1. On days when the IRC has been inundated with large numbers of new inmates remanded into custody, Defendants have not had the capacity to process those large numbers of new inmates and move them into permanent housing within 24 hours. These recent failures have been exacerbated by (a) delays in processing new inmates who exhibit current or emerging mental health conditions through the use of enhanced mental health screenings Defendants have agreed to conduct as part of their ongoing obligations stemming from the September 2015 settlement agreement with the United States Department of Justice; (b) staffing shortages of clinicians and other mental health staff in the IRC caused by concurrent absences of several staff members on leave; and (c) the recent introduction of newly-hired staff members in the IRC whose efficiency in screening individuals for mental health conditions has been low as a result of their inexperience as new hires. Notably, when these days occur in which the volume of new inmates being introduced into the IRC overwhelm the staff working in the IRC to process them, that often creates a cascading effect in which it may take days to catch up with the processing of new inmates;

2. There have been additional inefficiencies detected in the manner in which inmates have been processed through the IRC, including occasions when inmates without severe mental health conditions have not been promptly moved out of the IRC and into available permanent housing and occasions when clinicians have not conducted mental health screenings at an appropriate pace; and

3. Lastly, bottlenecks have occurred in the IRC as a result of the lack of

immediately available High Observation Housing ("HOH") for inmates diagnosed as P3 and P4 inmates.[1] Unlike inmates without mental health conditions, or with less acute mental health conditions, P3 and P4 inmates cannot be housed in dormitory settings; and, in the wide majority of circumstances, P3 and P4 inmate are housed alone in double-man cells. As a result of these housing restrictions, the only two locations where HOH inmates are housed on a permanent basis in the LACJ are the Twin Towers Correctional Facility ("TTCF")—where all P3 and P4 men are housed—and the Century Regional Detention Facility ("CRDF")—where all P3 and P4 women are housed. Available permanent HOH at these two facilities is limited, and, at this point, is substantially less than the number of P3 and P4 inmates in custody in the LACJ.[2]

While County departments are implementing corrective actions to address each of these root causes, the reports Defendants are required to produce pursuant to

---

[1] P4 inmates are inmates who have a severely debilitating mental health condition and meet the Lanterman Petris ("LPS") criteria for commitment based on the danger they pose to themselves or others or a grave disability they have. Common traits of P4 inmates include: (1) a refusal to take medication; (2) an imminent risk of harm they pose to themselves and others which is secondary to their mental illness; (3) an impairment in their ability to take care of themselves; (4) an on-going refusal to engage in any form of treatment or intervention; (5) severely disorganized thinking and behavior; and (6) other displays of severe mental illness that require in-patient treatment.

P3 inmates are inmates who have a significant mental health impairment. Common traits of P3 inmates include: (1) a persistent danger of self-harm if in a less acute setting; (2) recurrent violent behavior due to their mental illness; (4) an inability to maintain minimal personal hygiene; (5) a gross impairment in their ability to communicate; and (6) an inability to be safely and adequately treated in a setting that requires independent behavioral control.

[2] There have also been a number of recent instances when inmates who have suffered mental health crises while in non-HOH permanent housing have been relocated to HOH permanent housing at TTCF, placing further a further strain in moving inmates through the IRC and into available HOH in a timely manner.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3
DEFENDANTS' FILING OF REPORTS REQUIRED TO RESPOND TO ORDER TO SHOW CAUSE

the Order to Show Cause specifically obligate Defendants to provide information regarding the scope of diversion of people with mental illness necessary to prevent future backlogs in the IRC and Defendants' plans over the next year and three years to divert people with mental illness.  These topics are largely covered in the attached report-back produced on March 8, 2023 to the Los Angeles County Board of Supervisors (the "Report Back") by a number of County agencies, including the Department of Mental Health ("DMH"), the Department of Health Services ("DHS"), the Jail Closure Implementation Team ("JCIT"), Alternatives to Incarceration ("ATI"), and the Office of Diversion and Reentry ("ODR");[3] and, to the extent the required information is not addressed in the Report Back, it is included below.

In summary:

\*   Insofar as how the diversion of inmates from the LACJ, either pre-trial or subject to a probationary plea, can be utilized to reduce the backlog in the IRC so people booked into the jail can be placed in permanent housing in 24 hours or less, Defendants believe that lowering the number of P3 and P4 inmates from their current level of approximately 1,750 P3 and P4 inmates to approximately 1,050 P3 and P4 inmates will create a situation where there is consistently immediately-available permanent HOH in the LACJ, and that will eliminate bottlenecks in the IRC that periodically contribute to situations in which inmates remain in the IRC for periods of longer than 24 hours.  To achieve this reduced level of the P3 and P4 inmates in the LACJ, County departments believe Defendants will need to divert approximately 1,500 P3 and P4 inmates out of the LACJ through programs run or overseen by DMH and DHS/ODR, while taking all steps within their control to minimize the influx of large numbers of new inmates with severe mental illnesses into the LACJ and to otherwise de-populate the LACJ.

---

[3]   The Report Back is attached hereto at Exhibit A.

\*  As detailed in the Report Back, County departments have formulated a plan to move the sickest subset of individuals with serious mental health conditions in the LACJ into more appropriate treatment settings by diverting large numbers of P3 and P4 inmates into community-settings, as well as secured acute and subacute non-carceral facilities. This plan, which is subject to further Board approvals and additional funding that has yet to be allocated, divides P3 and P4 inmate into four groups—(1) inmates who are non-conserved and the types of P3/P4 inmates ODR has had historical success in diverting; (2) inmates who are non-conserved and who have been designated as Felony Incompetent to Stand Trial (or "FIST"); (3) LPS-conserved inmates; and (4) inmates who are not FIST, LPS-conserved, or the type of P3/P4 inmates ODR has had historical success in diverting—and lays out a proposed schedule in which the County would build out a continuum of secured (i.e., locked) and non-secured (i.e., unlocked) beds to which P3 and P4 inmates from each of these four groups will be diverted. This schedule calls for DHS/ODR to divert the first two groups of inmates identified above and for DMH to divert the second two groups pursuant to the following five-year timeline:

**New Beds Added by Year: Department of Health Services/Office of Diversion & Reentry**

| P3/P4 Population | Bed Type | New Beds Added Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| P3/P4 Inmates Who Are Divertible | Acute | 20 | 0 | 0 | 0 | 0 |
| | Subacute | 50 | 0 | 0 | 0 | 0 |
| | Specialty Interim Housing | 234 | 0 | 0 | 0 | 0 |
| | PSH | 0 | 140 | 140 | 105 | 79 |
| P3/P4 Inmates Who Are FIST | Acute | 10 | 15 | 5 | 0 | TBD |
| | Subacute | 50 | 50 | 0 | 0 | TBD |

5
DEFENDANTS' FILING OF REPORTS REQUIRED TO RESPOND TO ORDER TO SHOW CAUSE

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

|  | Specialty Interim Housing | 210 | 150 | 164 | 105 | TBD |

**New Beds Added by Year: Department of Mental Health**

| P3/P4 Population | Bed Type | New Beds Added Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| P3/P4 Inmates Who Are Conserved/ Conservable | Acute | 15 | 20 | 15 | 0 | 0 |
| | Subacute | 32 | 16 | 16 | 128 | 16 |
| | Enriched Residential Services | 15 | 30 | 35 | 35 | 35 |
| | Skilled Nursing Facility | 10 | 0 | 0 | 0 | 0 |
| P3/P4 Inmates Who Are Non-divertible / non-FIST / non-LPS conserved/ conservable | Acute | 0 | 0 | 0 | 0 | 0 |
| | Subacute | 0 | 16 | 16 | 0 | 16 |
| | Skilled Nursing Facility | 0 | 10 | 10 | 10 | 4 |

* The ODR programs the Departments largely depend upon to divert P3 and P4 inmates from custody have a proven track record of drastically decreasing recidivism rates amongst the clients they serve. Indeed, according to the most recent RAND study of inmates with serious mental health conditions diverted to ODR housing programs, only 14% of the inmates who were subject to the study returned to custody within one year of participating in the ODR program. *See* https://www.rand.org/pubs/research_reports/RR3232.html.

* The attached Report Back details the costs Defendants would incur to implement the County Departments' proposed plan to divert the number of P3 and P4 inmates detailed above over the timeline covered by the plan.

  * There is the potential Defendants could realize a significant cost savings by diverting P3 and P4 inmates from the LACJ and into non-carceral facilities where they will receive focused mental health treatment in a setting more conducive to such treatment than jail.  While the cost to divert these individuals out of custody is substantial, there is evidence, in the form of a recent RAND study, which shows that, for the first year, inmates who are diverted to programs that feature permanent supportive housing, when compared to inmates who are released and do not receive such support, are associated with the following cost and service decreases and increases:  (1) a 24-day reduction in jail days, with an estimated cost savings of $16,891 per participant; (2) a 125-day increase in probation supervision, with an estimated cost increase of $672 per participant; (3) reduced use of homeless services, including a 22-percentage point decrease in the portion of individuals receiving temporary housing, with an estimated cost decrease of $1,643 per participant; (4) reduced inpatient service use, as observed by (a) a 2.4-day decrease in care provided by DMH, for an estimated cost savings of $1,275 per participant; (b) a 0.8-day decrease in care provided by DHS, for an estimated cost savings of $3,308 per participant; and (c) a 0.3-visit decrease in emergency care provided by DHS, resulting in an average savings of $691 per participant; and (5) increased outpatient service use, as observed by a 21-visit increase in care provided by DMS, for an estimated cost increase of $2,512 per patient.  See [Just in Reach Pay for Success: Impact Evaluation and Cost Analysis of a Permanent Supportive Housing Program | RAND](#).

  * In addition to the cost savings, on balance, which the County may not realize should Defendants fail to pursue the plan described in the Report Back to divert large numbers of the most seriously mentally ill inmates from the LACJ, the failure to implement this plan, or an alternative plan to divert or depopulate this population, will also (1) prevent the County and the Los Angeles Sheriff's Department from reaching compliance with certain material provisions in the

September 2015 settlement agreement reached with the United States Department of Justice; and (2) keep potentially divertible inmates with serious mental health conditions in an environment where they are less likely to improve and more likely to experience bad outcomes.

\*   Because Defendants believe the periodic bottlenecks experienced in the IRC are caused, in part, by a lack of available permanent HOH for P3 and P4 inmates, the County Defendants have placed a priority on diverting P3 and P4 inmates from the LACJ to the greatest extent possible to free up such housing.[4] However, although a lack of Moderate Observation Housing ("MOH") for P2 inmates has not been a cause for delays in placing inmates in permanent housing from the IRC, the Departments would continue to divert P2 inmates from custody

---

[4] While the overall population of the LACJ has grown considerably since the Los Angeles Superior Court lifted the emergency bail schedule instituted during the pandemic on July 1, 2022, it has leveled off at approximately 14,000 inmates. Indeed, as of March 9, 2023, there were exactly 14,096 inmates (12,645 male inmates and 1,451 female inmates) housed in the LACJ, which is only 778 inmates above the BSCC-rated number of inmates for all LACJ facilities. It was not unusual, prior to the pandemic, for the LACJ to house significantly larger populations of inmates without seeing the types of backlogs experienced periodically over the past seven months in the IRC. Thus, the cause of the current crisis facing the LACJ is not the overall number of inmates in the LACJ (though, to be clear, Defendants intend to reduce that number), but rather the number of inmates with serious mental health conditions who require HOH and other resource-intensive services that are in rare supply in the LACJ, which are causing overcrowding in certain segments of the LACJ.

when (a) they qualify for diversion based on a FIST designation;[5] or (b) a P3 or P4 inmate is not suitable for an available ODR bed that can be filled with a P2 inmate.

DATED: March 9, 2023                Respectfully submitted,

                                KENDALL BRILL & KELLY LLP
                                Robert E. Dugdale

                                OFFICE OF COUNTY COUNSEL
                                Dawyn Harrison
                                Dylan Ford

By:      s/ Robert E. Dugdale
        Robert E. Dugdale
        Attorneys for Defendants Los Angeles County Sheriff Robert Luna, in his official capacity, and the County of Los Angeles

---

[5] Defendants estimate that there are currently approximately 330 such P2 inmates in the LACJ.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9
DEFENDANTS' FILING OF REPORTS REQUIRED TO RESPOND TO ORDER TO SHOW CAUSE