# **EXHIBIT A**

| **BOARD OF SUPERVISORS** | Hilda L. Solis<br>First District | Holly J. Mitchell<br>Second District | Lindsey P. Horvath<br>Third District | Janice Hahn<br>Fourth District | Kathryn Barger<br>Fifth District |



**COUNTY OF LOS ANGELES**

Kenneth Hahn Hall of Administration
500 West Temple Street, Room 100
Los Angeles, CA 90012
Website: jcod.lacounty.gov

**INTERIM DIRECTOR**

Judge Songhai Armstead, *ret.*

March 8, 2023

To:     Supervisor Janice Hahn, Chair
        Supervisor Hilda L. Solis
        Supervisor Holly J. Mitchell
        Supervisor Lindsey P. Horvath
        Supervisor Kathryn Barger

From:   Songhai Armstead, Interim Director
        Justice, Care and Opportunities Department

**ADDRESSING THE MENTAL HEALTH CRISIS IN LOS ANGELES COUNTY: DEVELOPING MENTAL HEALTH CARE FACILITIES TO DEPOPULATE THE JAIL (ITEM NO. 16, AGENDA OF SEPTEMBER 27, 2022)**

On September 27, 2022, The Board of Supervisors (Board) directed the County of Los Angeles (County) Jail Closure Implementation Team (JCIT) and the Alternatives to Incarceration (ATI), now the Justice, Care and Opportunities Department (JCOD), along with the Departments of Mental Health (DMH), Health Services (DHS) Correctional Health Services (CHS) and Office of Diversion and Reentry (ODR), Public Health (DPH), Alliance for Health Integration (AHI), County Counsel, District Attorney, Public Defender, Alternate Public Defender, and the Los Angeles County Superior Court to develop a set of recommendations regarding the composition and number of secured, non-correctional mental health care facility beds needed to safely and appropriately transition from jail custody those incarcerated at the P3 and P4 levels of care (collectively the "P3/4 population") (Directive No. 1).  JCOD was further tasked with:

a)  Conducting a literature review and synthesizing all prior relevant studies that could inform the work to provide non-carceral alternatives and locked clinical settings to address the P3/4 population;

b)  Identifying one-time and ongoing revenues sources that could potentially fund such an effort; and

c)  Developing an inventory of Los Angeles (LA) County, State-owned, and private property for lease or purchase, which could meet the siting requirements for beds and programs serving the P3/4 population.

In Directive No. 2, County Counsel was directed to craft a legal opinion of all applicable penal and Welfare Institution Codes, and any other applicable regulations, that permit the transition of the P3/4 population

Each Supervisor
March 8, 2023

out of jail custody and into secure mental health care facilities.  In Directive No. 3, DMH and DHS were
instructed to develop a holistic plan for serving the P3/4 population inclusive of:

a) The recommended design of secured, non-correctional mental health care facility beds and
programs to meet the behavioral health care needs of the population, as well as considering
patient and staff safety, and measures to ensure that patients receive appropriate levels of care
in accordance with State and federal regulations; and

b) With the Chief Executive Office (CEO), estimating one-time and ongoing funding needed
leveraging all eligible local, State, and federal funding to execute such a plan.

The department leads were directed to report back in 90-days with their recommendations.  Due to the
holidays, the report was extended to March 7, 2023, and JCOD was tasked with consolidating the
respective sections into one report.

### <ins>Directive No. 1:  Analysis of Secured Bed Needs for the P3/4 Population (JCOD)</ins>

**Background: P3/4 Population**
DHS, Correctional Health Services division (DHS-CHS), which provides all health care services in the
LA County jail system, assigns each incarcerated individual referred to them for mental health care
a "P-Level" according to their mental health needs.  These include the following:

| P-Level | Description |
|---|---|
| No P-Level | No referral to Correctional Health Services for mental health care during period of incarceration; No mental health needs identified at intake or during period of incarceration, suggesting no serious or imminent mental health needs; and/or not part of jail mental health population |
| P0 | No persistent impairment |
| P1 | Emotional and behavioral impairment that does not prevent daily functioning or ability to follow directions; not at significant risk of self-harm |
| P2 | Recurrent episodes of mood instability; Psychotic symptoms maintained by medication and frequent reliance on crisis stabilization services |
| P3 | Unstable due to significant mental illness; persistent danger of hurting self in less acute care setting; or recurrent violence due to emotional instability |
| P4 | Severe debilitating symptoms; Meets Lanterman-Petris-Short (LPS) 5150 criteria for danger to self, others, or grave disability |

*Table 1: P-Levels in the LA County Jail System*

Those incarcerated individuals with a P3 or P4 designation are the individuals with the most serious
mental health needs in the jail and are the focus of this report.

**Exhibit A**
**Page 11**

Each Supervisor
March 8, 2023

As of January 30, 2023, there were 1,544 individuals at the P3 level of care and 172 at the P4 level of care in LA County jails.  With a total jail population of 14,331 (also as of January 30, 2023), this means that the P3/4 population was about 12% of the total.

Based on a more detailed snapshot of the LASD jail population from May 4, 2022 (the most recent snapshot JCOD has access to), we conducted an analysis of the P3/4 population, at the time of that snapshot, in comparison to the rest of the jail population.  See Table 2 below.

| Category | Criteria | P3/4 Only | All Others | Total |
|---|---|---|---|---|
| Total | Total Count | 1,262 | 11,568 | 12,830 |
| Sentence Status (Count) | Pretrial | 589 | 5,389 | 5,978 |
| | Partially Sentenced | 247 | 2,712 | 2,959 |
| | Fully Sentenced | 426 | 3,467 | 3,893 |
| Bail[1] | Bail Eligible Count | 490 | 3,909 | 4,399 |
| | Avg Bail Amount | $401,041 | $1,150,538 | $1,067,052 |
| | Med Bail Amount | $75,000 | $280,000 | $235,000 |
| Charge | % Felony | 85.2% | 92.1% | 91.4% |
| | % Non-Felony | 14.8% | 7.9% | 8.6% |
| Length of Stay to Date[2] | Average (Days) | 121 | 275 | 260 |
| | Median (Days) | 59 | 106 | 99 |
| Race | % Hispanic | 35.7% | 56.0% | 54.0% |
| | % Black | 38.1% | 28.0% | 29.0% |
| | % White | 20.4% | 12.1% | 12.9% |
| Facility | % Placed in TTCF | 78.1% | 16.4% | 22.5% |
| | % Placed in CRDF | 15.5% | 9.8% | 10.3% |

*Table 2: Analysis of the P3/4 Population in the LA County Jail System on May 4, 2022*

Based on this May 4, 2022, snapshot, compared to the rest of the jail population the P3/4 population is/has:

- More likely to be black or white, and less likely to be Hispanic
- Less likely to be in jail on a felony charge
- Been in jail about half as long, on average
- A similar proportion of individuals in pretrial status (46.7% of the P3/4 population are pretrial, compared to 46.6% of the rest of the jail population); but those who are bail eligible are held on less than half as much bail

**Background: The System of Care**
For vulnerable individuals with serious mental illness, including, but not limited to, those who are justice-impacted, LA County operates a broad community-based system of care.  This system of care

---

1 This data is on individuals in the May 4, 2022 LASD jail snapshot who were: 1) in pretrial status; 2) had a bail amount set; and 3) had no holds.
2 As this data is from a point-in-time snapshot, we can't report on total length of stay, but can at least note length of stay to date at the time of the snapshot

Each Supervisor
March 8, 2023

includes treatment programs for varying levels of need, as well as a wide variety of housing programs. Most of this system of care serves the general population regardless of their history of justice involvement, but some programs have been specifically designed to serve justice-impacted (also sometimes called forensic) individuals.

Thanks to recent efforts by a workgroup including CEO, JCOD, and the County health departments, the County has developed a framework for organizing its system of care for vulnerable individuals according to standardized, cross-departmental levels of care and housing.  It includes:

- **L0-L2:** Three levels of inpatient/residential treatment, primarily for behavioral health care needs. Clients served by these programs have the highest care needs and require 24/7 clinical monitoring in a licensed care setting which, for the duration of their stay, serves as their temporary residence. Notably, LA County's existing secure mental health care facilities primarily fall into L0 and L1, while L2 includes a wide variety of open residential behavioral health treatment programs.
- **L3-L5:** Three levels of outpatient treatment.  Clients served by these programs may still have high care needs but generally do not require 24/7 clinical monitoring in a licensed care setting.  Clients may live at home, with family, or in a supportive housing program (including those in the H1-H3 housing levels as follows).  Though their care is considered outpatient, they may receive this care in their home/housing setting or at a nearby outpatient clinic.
- **H1-H3:** Three levels of supportive housing.  Clients served by these programs are all in need of housing support and typically also receive outpatient treatment (L3-L5) depending on their health care needs.  Many of these programs provide significant outpatient support and services on-site and may serve as an alternative to the open residential behavioral health treatment programs in L2.  Additionally, these supportive housing programs include the majority of the programs in LA County's system of care which have been specifically designed for justice-impacted individuals, including almost all the programs operated by the DHS's ODR.

**Background: Secure Mental Health Care Facilities**
LA County's existing secure mental health care facilities primarily fall into the L0 and L1 levels of care noted above. These include:

- **L0: Crisis Stabilization[3].** Up to 23-hour observation for emergent behavioral health presentations that can be rapidly assessed and stabilized before discharge to a less or more intensive level of care.  Care at this level is provided in two types of State-licensed settings in the LA County network:
  - Three General Acute Care Hospitals (GACH) operated by DHS (Harbor-UCLA, LAC+USC, and Olive View-UCLA) which each include a specialized Psychiatric Emergency Room
  - Crisis Stabilization Units (CSU), also known in LA County as Mental Health Urgent Care Centers (UCC)
- **L1(a): Acute Inpatient[4].** Acute, short-term, 24/7 behavioral health treatment in a secured (locked) acute care or psychiatric hospital inpatient unit for individuals who are acutely at-risk of harm to themselves or others due to mental illness.  The average length of stay in LA County is about eight days but can vary significantly (if an individual ultimately needs subacute care, current waitlists

---

3 L0 in LA County also includes sobering center beds, which are unlocked (not included in Table 3)
4 L1(a) in LA County also includes a small number of inpatient withdrawal management beds, which are unlocked (not included in Table 3)

Each Supervisor
March 8, 2023

can force them to remain in an acute inpatient facility for months awaiting a subacute placement). Care at this level is provided in three types of State-licensed settings in the LA County network:
- o GACH (includes all the DHS-operated acute inpatient psychiatric programs)
- o Acute Psychiatric Hospitals (APH) (also known as "freestanding" acute inpatient psychiatric programs)
- o Psychiatric Health Facilities (PHF)

- **L1(b): Subacute[5].** Sub-acute, extended, 24/7 behavioral health treatment in a secured (locked) facility for individuals who are chronically at-risk of harm to themselves or others due to mental illness. The average length of stay in LA County is about 22 months. Care at this level is provided in four types of State-licensed settings in the LA County network:
- o CA State Hospital facilities (beds are licensed in a variety of ways, but most commonly as APH
- o Skilled Nursing Facilities certified with a Special Treatment Program (SNF-STP)
- o Mental Health Rehabilitation Centers (MHRC)
- o Community Treatment Facilities – these are very limited and specific to youth

Below we have summarized LA County's current network of secured mental health care facilities, according to levels of care and program types. This includes the total number of beds potentially available to LA County in this network, as well as the current average length of stay for LA County clients.

| Secured MH Care Facilities in the LA County Network (by Level of Care and Program Type) | Total Beds in LAC Network | Average Length of Stay (Days) |
|---|---|---|
| L0: Crisis Stabilization | | |
| DHS Psychiatric Emergency Rooms | 73 | 3 |
| DMH-contracted Crisis Stabilization Units or CSUs (aka Urgent Care Centers or UCCs) | 162 | 0.70 |
| Subtotal: L0 Crisis Stabilization | 235 | < 1 |
| L1(a): Acute Inpatient | | |
| DHS Acute Inpatient Psychiatric[6] | 128 | 75 |
| DHS Acute Inpatient Psychiatric (Forensic) | 18 | 22 |
| DMH-contracted Freestanding Acute Inpatient Psychiatric | 1,197 | 8 |
| DMH-contracted General Acute Inpatient Psychiatric | 1,174 | 8 |
| DMH-contracted Short Doyle (Safety Net) Acute Inpatient Psychiatric | 127 | 17 |
| DMH-contracted PHF | 48 | 27 |
| Subtotal: L1(a) Acute Inpatient | 2,538 | 9 |
| L1(b): Subacute | | |
| DMH-contracted CA State Hospital beds | 326 | Varies |
| DMH-contracted Psychiatric Subacute | 1,125 | 788 |
| DMH-contracted Psychiatric Subacute (Forensic) | 50 | 670 |

5 L1(b) in LA County also includes skilled nursing facility (SNF) beds for medically-complex clients, which are unlocked (not included in Table 3)
6 DHS Acute Inpatient Psychiatric programs serve a high % of clients with serious mental illness who are waiting to step down to locked Subacute care, and have significantly longer average lengths of stay for this reason

**Exhibit A**
**Page 14**

Each Supervisor
March 8, 2023

| Secured MH Care Facilities in the LA County Network (by Level of Care and Program Type) | Total Beds in LAC Network | Average Length of Stay (Days) |
|---|---|---|
| DMH-contracted Community Treatment Facilities (Youth-Specific) | 68 | 352 |
| Subtotal: L1(b) Subacute | 1,569 | 596 |
| Total Beds | 4,342 | |
| Total Forensic-Specific Beds | 68 | |

*Table 3: Secured Mental Health Care Facilities in the LA County System of Care*

Note that there are 4,342 secured mental health care beds available to LA County in its system of care. Which 2,538 are for short-term acute inpatient care; 18 of these are operated by DHS exclusively for forensic clients identified by ODR. The remaining 1,569 secured beds provide longer-term subacute care; 50 of these are contracted by DMH exclusively for forensic clients.

In addition, DMH notes that there are 32 psychiatric health facility (PHF) beds currently in development, which will increase the County's capacity of L1(a) secured short-term acute inpatient care. Further, there are 73 psychiatric subacute beds currently in development, which will increase LA County's capacity of L1(b) longer-term secured subacute care. These beds in development are not reflected in Table 3.

**Directive 1a:  Prior Relevant Reports**
In considering LA County's needs for secure mental health care facilities to help depopulate the jail and provide appropriate alternatives to incarceration for the P3/4 jail population, there have been several relevant reports from LA County departments, consultants, and partners released within the last few years. The full list of these reports and relevant conclusions can be found in the Attachment (Appendix A).

There is consensus across these reports that LA County's greatest needs for secure mental health care facilities are within the subacute L1(b) level of care specifically. Prior reports estimate that the County needs between 500 (RAND/CalMHSA) and 1,500 (DMH/Mercer) of these subacute beds to meet the general community need, and another 800 (JFA[7]) to 1,400 (DHS) if we are to divert those in the jail who are theoretically divertible and would require this level of care upon release (because these conclusions draw from multiple independent reports, there may be overlap in these estimates).

**Directive 1b:  Funding Sources**
Attachment, Appendix B, contains a table summarizing potential funding sources which LA County could look to braid together to support the acquisition or development of secure mental health beds. This list is not exhaustive but is a starting point for beginning to inventory all applicable revenue that could support the development of these facilities.

It is important to note that much of the funding from these revenue streams may already be programmed/ budgeted for the near future, and so the Board would likely have to work with the CEO and the

---

7 The recommended number of beds from the JFA Institute report is for the entire medium observation housing (MOH) and high observation housing (HOH) population in the jail, not just individuals at the P3/4 level of care, and it also isn't specific to secured beds, so the needed number of secured mental health beds implied by the JFA report may be lower than 800

**Exhibit A**
**Page 15**

Each Supervisor
March 8, 2023

departments managing these funding streams to allocate necessary funding toward the development of secured mental health care facilities in future years, as funding is available and allows.

Finally, Section 1905(a) of the Social Security Act generally prohibits Medicaid payment for any individual under age 65 who resides in an Institution of Mental Disease (IMD), which is any facility larger than 16 beds which primarily provides inpatient/residential mental health care.  This is commonly known as the "IMD Exclusion."  Note that the IMD Exclusion is not specific to secured mental health facilities, and in fact it applies to any inpatient/residential care facility that fits this description (including unlocked open residential care facilities).  The Exclusion is also not specific to behavioral health services; payment for any and all services (i.e., including physical health) is similarly prohibited for such individuals.  While Congress and CMS have recently relaxed some restrictions, the availability of Medicaid for patients in these kinds of facilities remains limited to a narrow set of services (e.g., SUD treatment) and populations (e.g., pregnant people).

Nevertheless, the majority of secured subacute facilities in the LA County network are larger than 16 beds and thus are classified as Medicaid IMDs.  DMH recently received funding to construct a Behavioral Health Center (BHC) at the Martin Luther King campus.  The BHC includes 3 MHRC's, each 16 beds.  DMH is currently soliciting for 3 providers to run these MHRC's.  DMH continues to look for other possibilities to develop additional 16 bed subacute facilities, though there are practical challenges to this as detailed in the DMH/DHS report back to Directive No. 3.  But if DMH is successful, this would open up the ability for LA County to braid in federal Medicaid matching funds to help pay for secured mental health care (including for P3/4 individuals transitioned to such facilities out of the jail).

**Directive 1c:  Real Estate Inventory**
JCOD worked with CEO Real Estate to conduct a landscape analysis of potential properties available for acquisition in LA County that could meet the siting requirements for secured facilities serving the P3/4 population.

**<u>Conclusion</u>**

It is clear from the review of prior reports that LA County needs additional beds at the L1(b) subacute level of care in order to facilitate the transition of more P3/4 individuals out of the jail and into non-carceral care settings.  Though LA County obtains some beds in this level of care from the CA State Hospital system, as noted in Table 3, these State Hospital beds have only become scarcer over time and their availability is expected to continue to diminish (wait times for placement in these CA State Hospital beds frequently exceed a year).

Thus, LA County needs to increase its network of other (non-State Hospital) subacute psychiatric beds for adult clients. Currently, this network consists entirely of private facilities contracted by DMH. These existing 1,175 beds are always full and currently have waitlists that exceed 6 months. And only 50 of these beds are dedicated to forensic clients. So, LA County will have to expand this existing network of beds, either via contract and/or direct operation, if it is to have the additional capacity of these beds necessary to divert P3/4 individuals in the jail who cannot be placed in any other kind of community care setting.

Each Supervisor
March 8, 2023

The estimates from prior reports of total subacute beds needed vary widely, however. Each report uses different methods to reach its conclusions, and there are a lot of inherent uncertainties in the numbers, including:

- The rate of turnover / throughput of the P3/4 population, if transitioned to secured mental health beds from the jail in high numbers, is uncertain. If turnover ends up being lower than anticipated, this could greatly increase the number of secured beds needed. Some individuals, for reasons often beyond the County's control, get stuck in specific beds/programs indefinitely, preventing these beds from being readily available to serve new P3/4 individuals in the jail.
- The County's success in securing the transfer of a significant portion of the P3/4 population, in particular those who don't qualify under felony incompetent to stand trial (FIST), traditional diversion, and/or conservatorship, depends on judicial and/or LASD buy-in and authorization, which is uncertain.
- The ability and willingness of community-based providers to accept and care for large numbers of the P3/4 population is uncertain, which may also necessitate new kinds of contractual agreements to ensure these beds are reliably available to transfer P3/4 individuals out of the jail.

Developing better projections of our bed needs in the County (including, but not limited to, our needs for secured mental health care beds to help depopulate P3/4 individuals from the jail) will require formal modeling of the County system of care. Such modeling would need to take into consideration the current County supply of beds across the system (including the breakdown by various types), the current demand for these beds (including unmet demand indicated by waitlists), and the utilization of these beds by County clients (including the average length of stay or turnover).

Further, projecting the community bed needs of individuals in the jail (including but not limited to P3/4 individuals) will also require formal modeling of the justice system and jail population, as recommended in the JFA Institute report we reviewed. Such modeling would need to take into consideration the differential rates of inflow of individuals into the jail (including those at the P3/4 level of care) and be able to project the potential impact of reforms, such as increased community mental health programs and potential changes in booking and detention policies by our justice system partners, which are aimed at reducing this inflow. It would also need to account for the outflow of individuals in the jail, including but not limited to diversion to the clinical system of care, which determines how long individuals remain in the jail and can be impacted by numerous factors (including the length of pretrial and sentencing proceedings, wait times for prison, bail practices, and various Court and Sheriff release authorities and policies).

To be truly useful, this modeling would have to be done in a cross-departmental manner, since no one department oversees all of the relevant beds in the system. It would also have to be a dynamic model that is updated over time (not a one-off consultant analysis). The County system of care is a very dynamic system that is changing constantly, so our modeling of it needs to allow the County to make up-to-date projections of bed needs based on current (and expected future conditions). Ideally, this modeling should also allow the County to ask, "what if?" questions, testing various health and justice-related scenarios and interventions to see their impact on addressing the County's unmet needs for beds and services.

**Exhibit A**
**Page 17**

Each Supervisor
March 8, 2023

Finally, it is important to note that the County has limited control over this system, and especially over the population in the jail. There are constantly new individuals entering the jail, including new individuals at the P3/4 levels of care. The County has little to no ability to prevent this; authorization to place individuals in the jail, or conversely to allow them to be released, ultimately rests with law enforcement agencies and the Superior Court.

As an example, for P3 and P4 individuals in custody who cannot post bail and do not qualify for: Misdemeanor Incompetent to Stand Trial; FIST; Mental Health Diversion (Pen. Code, § 1001.36); or compassionate release, the below chart highlights the **_potential_** pathways that could be explored for releasing P3/4s from custody.[8] However, these pathways will rely on either a judicial or law enforcement determination. Most likely, the question of release will turn on an assessment of individual characteristics and will not be easy to predict.

| Pathway | Stage in Case | Who Determines Release | Considerations |
|---|---|---|---|
| Own Recognizance Release | Arraignment up until sentencing | Judicial determination. However, the prosecutor's[9] position on release would be important as well. | For P3s or P4s with serious charges or a history of failures to appear, it may be difficult for judges to release without a specific secured program designed for this population. The court can order a conditional release to a secured program. |
| Condition of Probation | Sentencing | Judicial determination. However, the prosecutor's position on release would be important as well. | Currently the County contracts with a provider that provides secured psychiatric beds for the forensic population. Bed space is limited and often there is a waiting list. |
| Split Sentence[10] | Sentencing | Judicial determination. However, the prosecutor's position on release would be important as well. | Most likely very few P3s and P4s would be receiving a Split Sentence requiring mandatory supervision by the Probation Department.[11] |

---

8 Implementation of these options may require additional legal analysis.
9 For purposes of this table, prosecutor refers to the District Attorney and City Attorney.
10 A prison sentence served locally.  It is a combination of jail time and supervision.
11 Since split sentences are provided to those who have been found guilty of crimes that are non-sexual, non-violent, and non-serious, someone who is a P3 or P4 would most likely have been found suitable for Mental Health Diversion.

**Exhibit A**
**Page 18**

Each Supervisor
March 8, 2023

| Pathway | Stage in Case | Who Determines Release | Considerations |
|---|---|---|---|
| Pen. Code, § 4011.6[12] | Anytime | Sheriff determination. | This is limited to 72-hour holds. |
| Pen. Code, §4011.8[13] | Anytime | Consent of the Sheriff and County Mental Health Director. However, instead of Sheriff consent, the court can also make a determination. | This affords longer placements than Pen. Code, § 4011.6. However, it does not appear to be a common practice in California. |
| Pen. Code, § 1203.016 | Sentenced | Sheriff | Requires Board approval for an electronic monitoring program. |
| Pen. Code, § 1203.018 | Pre-trial[14] | Sheriff | Requires Board approval for an electronic monitoring program. |
| Pen. Code, § 1170.06 | Sentenced | Sheriff | This allows the Sheriff to implement a voluntary alternative to custody program. |

Despite the uncertainties inherent in the projected bed needs from prior reports, and other challenges (including the lack of formal modeling of our bed needs and the jail population to date), we are still confident that the County needs a significant number of secured mental health care beds, both for the general population and also to help facilitate the transition of P3/4 individuals from the jail.

After discussion with the County Health Departments, JCOD would recommend that the County consider starting with a pilot to develop 500 secured subacute mental health care beds, inclusive of (but not limited to) existing DMH and DHS plans to develop secured beds for LPS conservatees, felony incompetent to stand trial (FIST), and other traditionally divertible populations from the jail. Ideally, these beds should be spread throughout the County and not concentrated in a single facility. Such a plan would allow necessary time for bed development and for development of the referral pathways, which would be necessary to begin significantly depopulating the P3/4 population from the jail (including those P3/4 individuals not eligible for the traditional diversion pathways noted above). If the County is successful in doing so, it could then pursue further secured bed development in later phases.

**Directive No. 3: Plan to Develop Secured Beds (DHS and DMH)**

DHS and DMH have collaborated to develop a report back to Directive #3, which asked them for a holistic plan to develop secured mental health care beds to serve the P3/4 population.

JCOD has attached this DHS/DMH report back, which includes actionable recommendations for the Board, as part of our collective consolidated response.

---

12 This provision allows the Sheriff to involuntarily transfer an individual for 72-hour psychiatric evaluation pursuant to Welfare and Institutions Code section 5150.
13 This provision allows a *voluntary* transfer to mental health treatment outside of the jail for a period longer than 72-hours.
14 Pre-trial denotes the period of time between arrest and the matter being resolved either by diversion, dismissal, plea, or trial.

**Exhibit A**
**Page 19**

Each Supervisor
March 8, 2023


Should you have any questions concerning this matter, please contact me at (213) 974-1664 or JSA@JCOD.lacounty.gov.

SA:GE:JFS:lac

Attachment

c:      Executive Office, Board of Supervisors
        County Counsel
        District Attorney
        Alternate Public Defender
        Chief Executive Office
        Health Services
        Los Angeles County Superior Court
        Mental Health
        Public Defender
        Public Health

**Exhibit A**
**Page 20**

Attachment

## **Appendix A: Relevant Prior Reports**

| | Report (and Link) | Relevant Conclusions |
|---|---|---|
| 1 | <u>Depts.</u>: DHS, DMH, and DPH<br><u>Dated</u>: August 5, 2019<br><u>Subject</u>: Development, Design, Right-Sizing, and Scoping of the Proposed Mental Health Treatment Center.<br><br>Link to report | • The LA County needs more behavioral health beds and services across the board to serve the justice-involved population and divert individuals with serious mental illness out of the jail, including secured mental health care facilities, open residential care facilities, and supportive housing; this report recommended the creation of ~2,400 such beds in the community (community-based facilities are defined as any care facilities that are non-custodial), including a mix of acute, subacute, and residential facilities.<br>• New community-based facilities to serve justice-involved individuals should be geographically dispersed (i.e., several smaller facilities instead of 1-2 large ones).<br>• The lack of community-based beds from which patients can "step-down" from the above beds would result in patients "building up" in the most restrictive level of care, which unfortunately for this population is the jail. |
| 2 | <u>Dept.</u>: DHS<br><u>Dated</u>: September 9, 2019<br><u>Subject</u>: Progress Report on Scaling up Diversion and Reentry for People with Serious Clinical Needs<br><br>Link to report | • Ahead of the RAND study, DHS conducted a preliminary study of the jail mental health population and determined that ~56% were likely appropriate for diversion and release to community-based services.<br>• Based on this percentage of divertible clients, to divert all the divertible clients out of jail and into community-based settings, the County needs ~52 acute beds (primarily for the P4 population), ~1,418 subacute beds (primarily for the P3 population), ~2,579 specialty interim housing beds (including an existing 1,000 ODR interim housing beds), and thousands (and growing) of permanent housing beds (including an existing 1,000 ODR permanent housing beds). |
| 3 | <u>Dept.</u>: DMH<br><u>Dated</u>: October 19, 2019<br><u>Subject</u>: Report Response to Addressing the Shortage of Mental Health Hospital Beds, which includes the Mercer analysis of LA County behavioral health bed gaps across the three health departments.<br><br>Link to report | • There is a need for more behavioral health beds and services (pre- and post-hospital) across the board to improve client flow through and access to beds in the system of care.<br>• There is a need for 1,508 new subacute (secured, longer-term mental health care) beds to serve the general population<br>• This report also includes the data point from DHS-ODR that there is a need for 1,418 new subacute beds to meet the needs of the divertible jail population specifically. |

| | Report (and Link) | Relevant Conclusions |
|---|---|---|
| 4 | Dept.: CEO<br>Dated: July 30, 2020<br>Subject: Developing a Plan for Closing Men's Central Jail as LA County Reduces its Reliance on Incarceration", which includes the Executive Work Group (EWG) report.<br><br>Link to report | • The Executive Work Group (EWG) report proposed a taxonomy for categorizing beds and bed needs, divided into the following: acute inpatient, extended care (which includes, but is not limited to, subacute), interim supportive housing, and permanent supportive housing.<br>• For the divertible jail mental health population, the EWG report noted that the LA County needs: 50-60 acute inpatient beds, 1,400-1,700 extended care beds (including subacute), 2,850-3,440 interim supportive housing beds, and 5,200-5,400 permanent supportive housing beds; these numbers rely heavily on the ODR and RAND analyses of the divertible jail mental health population. |
| 5 | Dept.: DHS<br>Dated: August 9, 2020<br>Subject: Maintaining a Reduced Jail Population Post-COVID-19<br><br>Link to report | • Reiterated the EWG recommendations above for bed development.<br>• Recommended an increased focus on populations with substance use disorder (SUD) and co-occurring SUD and mental health needs, including increased bed capacity to serve these populations.<br>• Recommended several measures to address significant barriers to entry in County-funded housing programs serving formerly justice-involved individuals.<br>• Recommended addressing currently inadequate information systemwide on the availability of beds and services and means by which to refer into those beds/services. |
| 6 | RAND. 2021. "Adult Psychiatric Bed Capacity, Need, and Shortage Estimates in California." Funded by the California Mental Health Services Authority.<br><br>Link to report | • Not including State hospitals, LA County *has* (for the general population of adults with serious mental health needs, not limited to justice-involved) 2,120 acute inpatient beds, 1,429 subacute beds, and 850 licensed community residential treatment beds.<br>• Not including state hospitals, LA County *needs* (for the general population of adults with serious mental health needs, not limited to justice-involved), 2,051 acute inpatient beds, 1,941 subacute beds, and 1,765 licensed community residential treatment beds. This indicates a shortfall (for adults) of 512 subacute beds and 915 licensed community residential treatment beds.<br>• There are specific barriers for justice-involved populations that cause bottlenecks in the system, notably that many subacute facilities and even more licensed community treatment facilities won't take individuals who are justice-involved, especially sex offenders and arsonists.<br>• Their analysis includes calculations with and without factoring existing State hospitals; the numbers above are without. This has several advantages including that these numbers provide |

| | Report (and Link) | Relevant Conclusions |
|---|---|---|
| | | value to the question of how many beds we need to develop to provide better diversion from State hospitals (most state hospital clients are justice-involved).<br>• Their analysis included factoring in individuals waiting in jail for a State hospital placement, and so also accounts for justice-involved demand in that way. |
| 7 | Dept.: DHS<br>Dated: March 30, 2021<br>Subject: Developing a Plan for Closing Men's Central Jail as Los Angeles County Reduces its Reliance on Incarceration.<br><br>Link to report | • This report recommends adding 3,600 beds for community-based mental health care and cites the Executive Workgroup Report which recommended adding ~10,000 beds in total.<br>• Recommends a presumption of diversion/release from jail custody the following target groups: 1) people with serious mental health needs; 2) people charged with misdemeanors; 3) people charged with nonserious or nonviolent (NS/NV) felonies; 4) people in the pretrial population with bail set; 5) people over the age of 50; and 6) cisgender women and LGBQ+/TGI people, particularly at Century Regional Detention Facility (CRDF) and in the K6G units. The report also includes an analysis of the size of some of these target groups based on an August 19, 2020, snapshot of the jail population. |
| 8 | Dept.: CEO<br>Dated: October 6, 2021<br>Subject: JFA Institute Report on COVID-19 and Reduced Jail Population Cost Savings Estimate, Men's Central Jail Closure Fiscal Analysis, and Closure Population Projections".<br><br>Link to report | • Based on an analysis of jail release data, this report estimates that the jail mental health population could be reduced by about 800 individuals if an equivalent number of new community mental health beds were developed.<br>• The jails see the release of about 25,000 individuals per year who were in high observation housing (HOH) or medium observation housing (MOH) (most of the P3/4 population is housed in HOH and some in MOH).<br>• There is a detailed analysis of the jail mental health population and its release patterns on pages 89 to 96.<br>• Recommends that LA County regularly develop its own jail population projections to better identify the most cost-effective reforms and policies to reduce the jail population. |
| 9 | DHCS. January 10, 2022. "Assessing the Continuum of Care for Behavioral Health Services in California".<br><br>Link to report | • This is a very broad report which notes challenges with access to behavioral health care across the continuum in California, including, but not limited to, inpatient/residential behavioral health beds, based on surveys of county behavioral health departments and other relevant organizations across the State.<br>• 71 percent of respondents to the survey of county behavioral health directors identified subacute treatment (including MHRCs and SNFs with special treatment programs) as an urgently needed level of care in their county's adult mental health continuum of care. |

**Exhibit A**
**Page 23**

| Report (and Link) | Relevant Conclusions |
|---|---|
| | • The report includes a long section (starting on page 112) about the justice-involved population in particular and their unmet needs for behavioral health care in California, including in order to better divert this population from jails and prisons. |

**Exhibit A**
**Page 24**

## Appendix B: Potential Revenue Streams

| | Funding Stream Information | General Uses and Restrictions |
|---|---|---|
| 1 | AB 900/AB 178 Treatment Facilities for Justice Involved Individuals<br><br>Type: State Grant<br><br>Eligible Departments: Department of Health Services (DHS), Department of Mental Health (DMH), Justice, Care and Opportunities Department (JCOD), Probation<br><br>Disbursement: One-time<br><br>Reporting: To be determined | Provides grant funding to Los Angeles (LA) County to support and expand access to treatment for individuals with behavioral health disorders that are involved in the justice system.<br><br>Provides $100 million in grant funding, $50 million of which shall support individuals charged with a misdemeanor and found incompetent to stand trial.    Up to 75% shall be allocated for capital costs to construct, acquire, or rehabilitate assets for non-correctional treatment and housing facilities to serve the target population. Up to 25% may be allocated for rental subsidies to support placement of the target population within qualified residential settings.<br><br>As determined by the State Department of Health Care Services (DHCS), LA County shall meet all of the following conditions: (1) provide qualifying matching funds or real property, that is equal to at least 10% of the grant funding; (2) expend grant funding to supplement and not supplant existing funding; (3) report data to DHCS for the first 5 years of implementation; and (4) for capital costs, commit to providing health care treatment or housing, or both, for the target population in the financed facility or facilities for a minimum of 30 years. |
| 2 | AB 109, Public Safety Realignment<br><br>Type: State<br><br>Eligible Departments: Alternate Public Defender (APD), Auditor-Controller (AC), Board of Supervisors (BOS), Chief Executive Office (CEO), District Attorney (DA), DHS, DMH, DPH, Fire, Probation, Public Defender (PD), Sheriff, Los Angeles Superior Court,  Department of Economic Opportunity (formerly the County's Workforce Development, Aging, and Community Services)<br><br>Disbursement: Ongoing, funding allocations updated yearly by the Public Safety Realignment Team (PSRT) in coordination with Board priorities | California enacted Public Safety Realignment in 2011, a major criminal justice reform effort to reduce State prison overcrowding as ordered by a Federal Court. AB 109 and AB 117 transferred various responsibilities from the State to counties.  General provisions consist of:<br><br>- Local Custody – Custody responsibility was transferred from the State to counties for individuals convicted and sentenced for non-violent, non-serious, non-sex (N3) felony offenses.<br>- Post-Release Community Supervision – Community supervision of eligible individuals released from State prison was transferred from State parole to a new, County-implemented Post-Release Community Supervision (PRCS) program.<br>- Local Revocation Process – Revocation processes for State parole (and for the newly created PRCS) were transferred to the counties and a local Court process. In addition, custody terms that result from parole (or PRCS) revocations were shifted to local county jail.<br><br>The Board created the PSRT to facilitate ongoing coordination and implementation of alignment funds among County departments, external stakeholder agencies, and community advocates. |

| | Funding Stream Information | General Uses and Restrictions |
|---|---|---|
| | Reporting: Varied, Auditor Controller claims disbursement | |
| 3 | 1991 Realignment<br><br>Type: State<br><br>Eligible Departments: DHS, Department of Public Health (DPH), DMH<br><br>Disbursement: Ongoing<br><br>Reporting: WIC 14705 Complex reporting requirements | Both 1991 and 2011 realignment were enacted in the midst of significant recessions and helped the State address its budget shortfalls. Specifically, realignments generally shifted a greater share of program costs from the State to counties and provided counties with a new dedicated revenue stream outside of the State General Fund to pay for these increased costs. In essence, it changed the way State and county costs are shared for certain social services programs; transferred health and mental health service responsibilities and costs to the counties: and increased the sales tax and vehicle license fee (VLF) and dedicated these increased revenues to the new financial obligations of counties for realigned programs and responsibilities. The local revenue fund and within it a series of "subaccounts" funds respective program services by category. Mental health programs realigned consisted of:<br><br>• Community-based mental health<br>• State hospital services for civil commitments<br>• Institutions for Mental Disease (IMDs) excluding Medi-Cal beneficiaries<br><br>The realignment structure allows counties to shift up to 10 percent of revenues between the Health and Mental Health Subaccounts on a one-time basis annually. Most counties must receive permission from their Board of Supervisors to make this shift. The amount of realignment revenues allocated to counties for health and mental health responsibilities is determined by a formula, not actual costs. Counties largely receive allocations of revenue growth funds in the proportion they did in 1991 based on prior expenditures for that time period. |
| 4 | 2011 Realignment Behavioral Health Subaccount<br><br>Type: State<br><br>Eligible Departments: DMH<br><br>Disbursement: Ongoing<br><br>Reporting: WIC 14705 Complex reporting requirements | The 2011 realignment, which shifted significant revenues and responsibility for a range of public safety and health and human service programs from the State to the counties into two distinct funding and service activities:<br>• A Law Enforcement Services Account: comprised of a series of subaccounts focused on trial court security, law enforcement services, community corrections, DA/PD, and juvenile justice.<br>• Support Services Account comprised of the following: |

| | Funding Stream Information | General Uses and Restrictions |
|---|---|---|
| | | o  A Protective Services Subaccount comprised of foster care and child welfare services, along with adult protective services.<br>o  A Behavioral Health Subaccount focused on<br> ▪  Residential perinatal drug services and treatment;<br> ▪  Drug court operations and services;<br> ▪  Nondrug Medi-Cal substance use disorder (SUD) programs; and<br> ▪  Drug/Medi-Cal, and specialty mental health Medi-Cal, i.e., Early Periodic Screening Diagnostic and Testing (EPSDT) for children and youth. |
| 5 | Prop. 47<br><br>Type: State Grant<br><br>Eligible Departments: All<br><br>Disbursement: Ongoing<br><br>Reporting: Local evaluation and financial audit | Prop. 47 was a State ballot measure passed by California in 2014 that made non-violent property crimes and simple drug possession into misdemeanors.  Supportive services such as SUD, diversion, mental health, civil-legal services, and work force development services are provided. Services are funded through competitive grant awards to cities, counties, etc., of which, 50% of grant award must be passed onto community-based providers. |
| 6 | SB 678<br><br>Type: Legislative<br><br>Eligible Departments: Probation<br><br>Disbursement: Ongoing – budget formula measures State baseline performance against individual county performance for returns to State prison<br><br>Reporting: Performance-based | Senate Bill 678, also known as the California Community Corrections Performance Incentives Act of 2009, had two principal objectives: 1) to reduce State prison overcrowding; and 2) to reduce State general fund costs for the State prison population without compromising public safety by reducing the number of individuals on felony supervision (i.e., felony probation, mandatory supervision, post release community supervision) who are sent to State prison. The program is also designed to encourage county probation departments to use evidence-based (EB) supervision and innovative treatment programs to accomplish these goals and provides a dedicated revenue stream for probation to fund EB programs and services to the adult felony supervised population.  Services provide comprehensive mental health, substance use, and supportive housing service for felony probationers with the goal of successful reintegration and reduced recidivism. |
| 7 | MHSA Capital Facilities and Technological Needs<br><br>Type: State<br><br>Eligible Departments: DMH<br><br>Disbursement: Ongoing within 3-year plan timeframe | Facilitates the acquisition, construction, and/or renovation of facilities that provide mental health services to SMI populations with the goal of improving access to and delivery of mental health treatment/services.  Capital Facilities and Technology Needs (CFTN) also funds technology needs. |

**Exhibit A**
**Page 27**

| | Funding Stream Information | General Uses and Restrictions |
|---|---|---|
| | Reporting: Three-year plan/prior year outcomes, annual plan updates (if any), and annual reporting of revenues and expenditures to state. | CFTN is funded by a transfer of no more than 20% of the Community Services and Supports allocation of MHSA funds. Funds must be spent within 10 years of transfer. |
| 8 | Specialty Mental Health Medi-Cal (Medicaid)<br><br>Type: Federal<br><br>Eligible Departments: DMH (primary) and DHS<br><br>Disbursement: Ongoing federal matching funds for eligible mental health care services provided; the match amount varies from 50% to 90% depending on the population served and must be matched with non-federal funds. Primarily administered by DMH as the Mental Health Plan (MHP) for LA County.<br><br>Reporting: Standard health claims submission to the State; system reviews every 3 years | Except for facilities and individuals subject to the Medicaid IMD Exclusion (see note in the Funding Sources section in the main body of this report), the services provided in secured mental health care facilities are health care services and are reimbursable by Medi-Cal (Medicaid) insurance for eligible beneficiaries. In California, specialty mental health services like these are "carved out" from the normal Medi-Cal program and are administered by County Mental Health Plans (MHPs) instead of the Medi-Cal Managed Care Plans (MCPs).   In LA County, DMH is the County MHP and administrator of the specialty mental health Medi-Cal services benefit. Thus, for eligible beneficiaries and in eligible (i.e., not IMD excluded) facilities/programs, DMH is able to leverage federal matching funds which range from 50% to 90% of the total covered cost (depending on the population served). |
| 9 | Care First Community Investment (CFCI) – Jail Closure Implementation Team (JCIT) Allocation<br><br>Type: County NCC<br><br>Eligible Departments: DMH, DPH, DHS<br><br>Disbursement: One-time<br><br>Reporting: General demographic, enrollment, outcomes, and expenditures | Care First Community Investment Fund allocated $42 million in annual funding (for three years) to JCIT to facilitate jail depopulation and closure of Men's Central Jail (MCJ) through a mix of housing and treatment services, including diversion of individuals with SUD and mental health needs. |
| 10 | Care First Jails Last Capital Project<br><br>Type: County NCC | Creates a capital project fund requiring Board approval to fund the following projects:<br><br>• The demolition of MCJ, partial or whole; |

|    | Funding Stream Information | General Uses and Restrictions |
|----|----------------------------|-------------------------------|
|    | Eligible Departments: All<br><br>Disbursement: One-time<br><br>Reporting: TBD | • Funding the efforts to build out the robust and comprehensive system of care in the communities and the County's Alternatives to Incarceration initiatives;<br>• Modification and renovation of existing jail facilities; and<br>• Any consultant, project management, support services, or efforts needed for the development of costs, timelines, phasing plans and other activities consistent with the funding uses previously defined. |
| 11 | Behavioral Health Continuum Infrastructure Program Rounds 5 and 6<br><br>Type: State Grant<br><br>Eligible Departments: Counties, cities, tribal entities, non-profits, and for-profits<br><br>Disbursement: One-time<br>Reporting: To be determined | State legislation authorized DHCS a total of $2.2 billion to construct, acquire, and expand properties and invest in mobile crisis infrastructure related to behavioral health through a series of targeted funding rounds. Funding Round 5 targets crisis care gaps for mental health and SUD infrastructure. Round 6 is to be determined. |
| 12 | American Rescue Plan (ARP)<br><br>Type: Federal<br><br>Eligible Departments: Aging and Disabilities; Board of Supervisors; CEO; Consumer and Business Affairs; Fire; Health Services; Internal Services; Los Angeles County Office of Education; Justice, Care and Opportunities Department; Library; Mental Health; Parks and Recreation; and Public Works<br><br>Disbursement: All funds must be encumbered by December 31, 2024 and spent by December 31, 2026<br><br>Reporting: Substantial Quantitative and Qualitative reporting, inclusive of EB interventions and community engagement | ARP was enacted in March of 2021 to support pandemic recovery efforts for State, local, and tribal governments to respond to various economic impacts through prescribed categories of eligible uses, including response to the COVID-19 public health emergency, revenue loss, infrastructure, etc. |





March 8, 2023

**Los Angeles County
Board of Supervisors**

**Hilda L. Solis**
First District

**Holly J. Mitchell**
Second District

**Lindsey P. Horvath**
Third District

**Janice K. Hahn**
Fourth District

**Kathryn Barger**
Fifth District

**Christina R. Ghaly, M.D.**
Director
Department of Health Services

**Lisa Wong, M.D.**
Director
Department of Mental Health

TO:   Supervisor Janice Hahn, Chair
     Supervisor Hilda L. Solis
     Supervisor Holly J. Mitchell
     Supervisor Lindsey P. Horvath
     Supervisor Kathryn Barger

FROM:  Christina R. Ghaly, M.D.
     Director, Department of Health Services

     Lisa H. Wong, Psy.D.
     Director, Department of Mental Health

SUBJECT: **ADDRESSING THE MENTAL HEALTH CRISIS IN
     LOS ANGELES COUNTY: DEVELOPING MENTAL
     HEALTH CARE FACILITIES TO HELP
     DEPOPULATE THE JAIL**

On September 27, 2022, the Board of Supervisors (Board) instructed the Department of Mental Health (DMH) and the Department of Health Services (DHS) as co-leads, in collaboration with the Jail Closure Implementation Team (JCIT)/Alternatives to Incarceration (ATI), Alliance for Health Integration (AHI), District Attorney, Public Defender, Alternate Public Defender, Correctional Health Services (CHS), Office of Diversion and Reentry (ODR), County Counsel, and Superior Court to: a.) report back, in writing, in 90 days with a holistic plan to develop secured, non-correctional mental health care facilities needed to serve the P3/P4 population, which would rely on both new contracted as well as new Los Angeles County (LA County)-operated bed/program capacity, and b.) with CEO, estimate corresponding one-time and ongoing funding needed to carry out this plan, and define DMH's role as the specialty mental health plan for LA County to leverage all eligible local, state, and federal funding.

In the same motion, the Justice, Care, and Opportunities Department (JCOD) was directed to a) report back on the composition and number secured, non-correctional mental health care facility beds needed to safely and appropriately transition from jail custody those incarcerated at the P3 and P4 levels of care, b) conduct a literature review of prior studies that could inform the goal providing non-carceral alternatives for the P3/P4 population, c) identify one-time and ongoing revenue to fund these efforts, and d) develop an inventory of property options to site the necessary beds and programs.  Further, County Counsel was directed to report back separately on legal options for removing individuals from the jail and placing them in non-carceral settings; that report back was finalized and distributed to the Board on February 1, 2023.

Each Supervisor
March 8, 2023
Page 2

**Background**

This motion lays the foundation for scaling services to the sickest portion of the jail mental health population – persons classified as mental health acuity level P3 and P4 – through the expansion of community-based, secured, non-correctional mental health placements.  Moving as many of those to community placements as possible is a critical step in improving the health of this population, reducing the population with serious mental illness in LA County jails, and meeting LA County's Care First goals.  As we set our sights on rapidly reducing the P3/P4 population in jails, it is important to not lose sight of a large, P2 population that also has high clinical needs and will be critical for depopulating our jails. However, in this report, DMH and DHS/ODR, working with partners, offers a path to expand existing, proven approaches to move individuals classified as P3/P4 in LA County jails into community-based care settings and test new opportunities to expand secured acute and subacute placements in order to accelerate movement of the sickest subset of individuals with serious mental illness into appropriate treatment settings.

A four-tiered P level designation system is used to classify those with mental illness in the jail.  Per DHS' CHS policy, these levels are defined as:

*P 4: Severe debilitating symptoms*

Meets Lanterman Petris Short (LPS) 5150 Criteria for danger to self, others, or grave disability
1. Medication refusal and moderate to severe symptomatology
2. Imminent risk of self-harm or harm to others secondary to mental illness
3. Impairment in ability to care for self poses health risk
4. On-going refusal to engage in any form of treatment or intervention
5. Serious medical illness refusing treatment secondary to untreated mental illness
6. Severely disorganized thinking and behavior
7. Displays symptomology that would require inpatient treatment in a community setting

*P 3: Significant impairment*

1. Persistent danger of hurting self in less acute care setting
2. Recurrent violence due to mental illness
3. Inability to maintain minimal personal hygiene
4. Gross impairment in communication
5. Cannot safely or adequately be treated in a setting that requires independent control of his behavior

*P 2: Moderate impairment*

1. Recurrent episodes of mood instability
2. Psychotic symptoms maintained by medication
3. Delusions that do not interfere with daily routines
4. Frequent reliance on crisis stabilization services
5. Pervasive pattern of self-injury (superficial lacerations/scratches)
6. Nonviolent, but at risk of victimization by others
7. Can function in a dorm setting with moderate support

Each Supervisor
March 8, 2023
Page 3

*P 1: Mild impairment*

1. Emotional and behavioral impairment that does not prevent daily functioning or ability to follow directions
2. Not at significant risk of self-harm
3. Able to manage hygiene and maintain medication compliance
4. Minimal difficulty adjusting to environment and responds to supportive counseling
5. History includes thoughts of self-harm or attempts at self-injurious behavior that have improved with no attempts in the past six months
6. Sporadic need for support following a personal crisis, difficulty in court or the stress of the environment
7. Patient is able to function in General Population in a dorm setting with minimal support

*P 0: No Current impairment*

1. No persistent impairment

The P3/P4 population that is the focus of this motion, can be divided into Four population groups for which DMH and DHS/ODR could develop and/or expand programs:

1. Group 1: Non-Conserved/Conservable Divertible
2. Group 2: Non-Conserved/Conservable Felony Incompetent to Stand Trial (FIST)
3. Group 3: LPS Conserved/Conservable and Assisted Outpatient Treatment (AOT)
4. Group 4: Non-Conserved/Conservable / Non-divertible / non-FIST

Given the magnitude of the population that is anticipated to be suitable for community placement, DMH and DHS recognize the need for both Departments to take on different aspects of the work so that LA County may more promptly realize its Care First vision. In considering roles and responsibilities and target populations to be served by each Department, DMH and DHS agree that DHS would primarily serve the first and second populations above – non-conserved/conservable individuals eligible for diversion and non-conserved/conservable individuals classified as FIST who are eligible for community-based restoration under contract with the Department of State Hospitals. DMH would primarily serve the third and fourth populations – LPS/Murphy conserved clients including clients for whom a conservatorship is in process), clients eligible for AOT, and other individuals who are not eligible for diversion and meet criteria for specialty mental health services.

In serving all four populations, LA County needs to build out sufficient beds and services across the full continuum of secured (i.e., locked) and non-secured (i.e., unlocked) beds to successfully move all eligible P3/P4 individuals in these categories to the community and ensure that they continue to receive the right level of care following release. Investment and expansion in secured acute and subacute placements must be accompanied by significant expansion in Enriched Residential Services (ERS) facilities, residential substance use disorder treatment facilities, nursing facilities and specialty interim housing and Permanent Supportive Housing (PSH) sites to receive individuals that clinically improve and "step down" to lower

Each Supervisor
March 8, 2023
Page 4

levels of care.  The designs and types of settings needed are briefly listed below.  A more comprehensive summary of the types of facilities needed to site various programs is summarized in ODR's September 2019 "Progress Report on Scaling up Diversion and Reentry Efforts for People with Serious Clinical Needs[1]".

- Acute psychiatric inpatient unit located in licensed general acute care or standalone acute psychiatric facilities
- Sub-acute psychiatric facilities
- ERS facilities
- Specialty interim housing
- Skilled nursing facilities for individuals with physical health needs requiring ongoing skilled nursing care needs
- Recuperative care facilities
- Residential substance use disorder treatment facilities
- Permanent supportive housing

## **Opportunities to Remove P3/P4 Populations from the Jail**

This section will cover the four P3/P4 populations noted above, with DHS/ODR taking responsibility for populations one and two and DMH taking responsibility for populations three and four.

**Populations served by DHS/ODR**

**1.  Non-Conserved/Conservable Divertible Population**

DHS/ODR believes that a large number of persons who are P3/P4 can be safely moved from custody, using Penal Code (PC) 1001.36 and post-conviction mechanisms (a group colloquially referred to here as "divertible"), to a range of community placements already utilized by DHS/ODR.  These community placements would need to be scaled up in volume and service intensity to meet the needs of the divertible P3/P4 population.  These community placements include a continuum of secured and non-secured beds as not all divertible P3/P4 clients will require a secured level of care at release or on an indefinite basis.  Importantly, individuals diverted in this fashion can only be placed in locked beds on an involuntary basis if they meet specific clinical criteria (danger to self, danger to others or grave disability) for a Welfare and Institutions Code (WIC) hold.  If the WIC hold expires, any person diverted in this manner would have to sign in voluntarily in order to remain in a locked setting.

To achieve this, DHS/ODR would expand existing, effective programs that divert persons from LA County jails, with prioritization of the P3/P4 population.  DHS/ODR programs that service this population already include the ODR Housing program in the criminal courts and ODR's

---

[1] Progress Report on Scaling Up Diversion and Reentry Efforts for People With Serious Clinical Needs is available at the following link: https://ceo.lacounty.gov/wp-content/uploads/2020/10/Progress-Report-on-Scaling-Up-Diversion-and-Reentry-Efforts-for-People-W....pdf

Each Supervisor
March 8, 2023
Page 5

Misdemeanor Incompetent to Stand Trial (MIST) program in the mental health courts.  MIST individuals are now largely diverted under a new law set forth by SB 317.

Currently, approximately 40% of clients served across ODR programs are P3 or P4 at the time of their release.  Instead of placement into secured facilities many individuals classified as P3 are successfully placed into well-supported, unlocked community-based clinical settings after an initial period of stabilization.  When examining releases into ODR's largest program, ODR Housing, over a month-long period (1/1/2022 to 1/31/2022), twelve percent of persons classified as P3 and six percent of persons classified as P4 entered open residential ODR settings directly from jail at the time of release.  These data demonstrate that significant portions of the P3/P4 population could be diverted to lower levels of care through expansion of existing ODR programs.  In meeting these goals, ODR will continue to work closely with CHS to expand the proportion of P3/P4 individuals diverted into beds at lower levels of care through treatment prior to release.

ODR also currently moves a limited, additional group of individuals to open residential ODR settings after an initial period of stabilization at the one acute inpatient psychiatric unit that serves ODR patients (an eighteen-bed unit at Olive View – UCLA Medical Center (Olive View)) for those individuals who qualify for this level of care with the associated involuntary WIC hold.  This group of P3/P4 clients require locked acute psychiatric inpatient settings at release but can be stepped down to lower levels of care when clinically appropriate.  ODR proposes to expand the number of secured acute beds in ODR's portfolio in order to expand the number of P3/P4 individuals diverted through this approach as well as to add a small number of sub-acute beds so that individuals in the Olive View unit can be discharged when no longer acute but not yet ready for open residential housing arrangements that comprise the majority of ODR's portfolio.

ODR has not used secured subacute beds to divert individuals qualifying as P3/P4 (with the exception of individuals classified as FIST – please see below) to date because subacute beds have not been available from a resource standpoint and because such placements would require a person to sign in voluntarily.  ODR believes that a limited number of non-FIST persons who are classified P3/P4 might be divertible into a locked subacute setting voluntarily; however, the fact that they have the right to revoke their own voluntary status and be allowed to leave the facility at any time might limit the number eligible for diversion through this approach.  In year one, ODR proposes to work with justice partners to evaluate the opportunity to diverting P3/P4 populations into secured subacute beds at release.  If proven successful, ODR would expand this approach in subsequent years.  Of note, those individuals who are eligible for involuntary placement in a sub-acute placement would generally fall within the FIST and conserved/conservable category further described in population #2 and #3 below.

## 2.  Non-Conserved/Conservable FIST

The LA County FIST program, operated by ODR and funded by the DSH, actively serves approximately 600 persons found FIST, including those in all P level classifications at the time of release.  Approximately half of the FIST individuals in the LA County jail are P3/P4; the other half are P1/P2.  Individuals removed from custody in the FIST program are committed

Each Supervisor
March 8, 2023
Page 6

to DHS/ODR into community treatment under PC 1370 which does not require a WIC hold to place a person who is FIST into a locked acute or subacute hospital setting.  Persons who are P3/P4 in FIST currently go into both unlocked and locked settings when released from jail.  All of these settings would need to expand in number to allow for an increased number of persons served in the anticipated expansion.

The DSH and DHS/ODR are in discussions regarding a new contract (called "IST Solutions") to continue FIST services for the existing population as well as serve up to 840 additional persons/year at five years.  If supported and approved by the Board, DHS/ODR will work with DSH to finalize the IST solutions contract and begin expansion this year (FY 22-23) with growth in beds and individuals served over five years (through FY 26-27).  Once fully ramped up, we anticipate serving a total of approximately 1400 FISTs in the community at any given time through this program.

In parallel with the steps noted above in which ODR would place FIST individuals in community-based placements, ODR and CHS continue to work (in collaboration with County Counsel) with the State to accelerate and maximize the transfer of non-divertible individuals who are declared FIST to DSH facilities in a timely manner.  Success in this regard would achieve the same end result - reducing the P3/P4 population in the LA County jails and provide them with clinically appropriate, non-custodial mental health services in DSH facilities.

**Populations served by DMH**

**3.  LPS conserved/Conservable Population**

These clients are best served by DMH Public Guardian, who can make decisions regarding their placement.  There are currently ~35 LPS conserved individuals in the LA County jails, the majority of which are P3/P4.  These individuals are placed by the Office of the Public Guardian upon release, though many are "over-detained" by Sheriff and remain in jail after they otherwise would have been released if they were not conserved while the Public Guardian secures an appropriate placement.

The Office of Public Guardian receives an average of 350 court ordered or jail-initiated referrals annually to conduct LPS conservatorship investigations for persons incarcerated.  Most meet criteria for the P3/P4 categories.  The majority of LPS conserved clients exiting custody are clinically determined to need a locked/secure subacute placement and this clinical determination is supported by the LPS court order indicating the appropriate level of care is locked.  As conservatorship is a last resort, individuals referred for conservatorship have been unsuccessful in alternatives, such as diversion, AOT or unlocked treatment settings.  The typical length of stay at a secured facility for the conserved population is nine months.  A subset of the LPS conserved population, commonly referred to Murphy conservatees, are determined by the court to be presently dangerous and a public safety risk.  This population was routinely placed in state hospitals until the FIST population dramatically increased resulting in large waitlists for state hospital beds.  DMH is now responsible for finding suitable locked facilities that can manage this population but locating these alternative facilities has proven difficult.   This population has longer lengths of stay due to the finding of dangerousness.

Each Supervisor
March 8, 2023
Page 7

### 4. Non-Conserved/Conservable Non-divertible / non-FIST / non-LPS conserved/conservable

This P3/P4 population includes individuals in custody with a serious and persistent mental health disorder and meets criteria for specialty mental health services.  This population does not include individuals with primary major neurocognitive disorders or developmental disabilities.  DMH typically places individuals from custody settings who are incompetent to stand trial and gravely disabled.  DMH subacute contracts contain statements of work to review, accept and place the LPS/Murphy conserved population, so DMH lacks experience placing voluntary clients in secure/locked facilities.  DMH will release a Request for Information (RFI) to determine if subacute providers are interested in serving this new population and what operational or financial challenges providers may face in serving this new population.  Current subacute providers may be more likely to express interest in expanding their capacity, but these facilities are IMD excluded facilities, eliminating Medi-Cal reimbursement and significantly increasing the cost of these beds.  Given the extraordinary competing priorities, DMH is committed to the conservable population but is unsure of the extent to which the non-divertible, non-conservable population can be placed or whether the mechanisms that allow this population to move to community-based treatment settings will be feasible to implement.

While DMH believes the most expedient way to expand beds for the conservable P3/P4 population is to solicit for expansion of beds with current providers, DMH will explore the idea of a county run secured facility.  Identifying a vacant building or identifying land that a facility could be built on will be the first challenge to overcome.  Other issues include workforce shortages, the cost of renovating or building a facility and the anticipated high cost of the county running a secure facility.

### Principles and Operational Considerations

*In order to operationalize a practical plan to scale and operationalize the work, DMH and DHS agree on the following principles with respect to clarifying how and with which Department clients would initially engage:*

1. **Placement should be presented to the court by the Department actualizing the diversion:**  For example, if ODR requests conditional release of a client and the court orders conditional release to ODR, ODR would hold the contract and/or provide and maintain responsibility and control over the placement and care of the client.

2. **Department placement is set at the time of referral:** Whether Department or justice partner initiated, the determination of which Department will host and support the client is made prior to the hearing and the hearing will be based upon a specific Department's involvement and offer of service.

3. **To maintain continuity of care, the Department/provider that initiated and formed the relationship should remain the ongoing care and placement provider as much as possible:**  While there may be situations in which it will be necessary for a patient to change providers and the primary Department responsible (e.g., a client cared for by ODR ends up needing a conservatorship), in general both Departments will seek to maintain continuity whenever feasible.

**Exhibit A**
**Page 36**

Each Supervisor
March 8, 2023
Page 8

*If the Board moves forward with providing direction and funding to build out community-based capacity for caring for the P3/P4 population, a number of considerations are helpful to share as they impact the mix of beds that will need to be developed:*

**Placement should be based upon P level at the exact time of jail release:**  Upon initial referral, a person may be P4 or P3, but with a few weeks of treatment, their P level may decrease.  It is important to define and refine, up to the moment of transfer, the appropriate level of care for each individual client.

**Individuals classified as P3 may be able to succeed in unlocked community-based placements.**  Approximately forty percent of clients served in well-supported, unlocked community-based clinical settings across ODR programs are P3 or P4 at the time of their release.

**Client flow:**  Clients should always be placed in the least restrictive setting appropriate for their clinical needs.  In order to maximize releases among those appropriate for diversion/release, lower levels of care must be plentiful and more numerous than locked settings, so clients remain in locked settings for only the time necessary to meet their clinical needs.

**Management of clients in locked settings:** Each entity (DMH and DHS) will manage its own network, i.e., DMH will contract with acute and subacute providers and refers its own clients; DHS/ODR will contract with acute and subacute providers and refers its own clients.  To ensure DHS and DMH are not competing for the same locked beds, both Departments will work together on rate-setting.  While each Department will maintain separate work orders, DHS and DMH will evaluate whether it is more efficient to pursue a joint master agreement in order to limit the burden on the Departments and contractors related to administration and monitoring.

**Need for a PSH solution for justice involved populations, including after their court involvement ends:**  When successful, individuals released through a court order will eventually need a PSH solution that meets their level of need, as only a small percentage of these clients are expected to be able to obtain and maintain stable housing on their own.  To meet the needs of the P3/P4 population and meet Care First goals, LA County needs to not only expand secured acute and subacute beds, but PSH and beds at all levels of care.  Clients cared for by ODR typically complete their court-ordered placement within two to five years.  Currently, there are 141 people in ODR Housing who are in PSH who have completed their ODR court orders.  In addition, ODR currently houses in PSH an additional 322 clients who are cared for by ODR Housing, but who are not and were not previously under a court order (e.g., former MIST clients).  These clients, a combined total of 463, remain in ODR-funded PSH, in order to support their clinical and housing stability as there are currently no viable pathways to transition these individuals into non-ODR funded PSH slots based on the structure and protocols of the Coordinated Entry System (CES).  Without the continuation of ODR-funded housing slots, these individuals would likely transition into homelessness and their mental health would deteriorate.

Because these clients are no longer directly involved with the justice system, their PSH needs should be addressed within LA County's broader role in providing housing to individuals who are homeless or at risk of homelessness.  ODR has typically maintained clients in its "ODR

Each Supervisor
March 8, 2023
Page 9

Housing" program even after their court proceedings are complete because of the importance of stability, of maintaining established mental health services, and because of the absence of alternative care settings to which these clients may be moved (or funding sources to move them onto).   As LA County seeks to build out community-based placements for P3/P4 populations, and as these populations complete their court processes or treatment, LA County will need to consider how it will manage its ongoing PSH obligations for this population, i.e., whether it will prioritize funding for PSH placements from LA County Homelessness Initiative funding streams (including the need for modifications to the CES system), whether it will separately fund these previously justice-involved populations from other pools of funding, or whether it will continue to have ODR fund ongoing PSH needs for those initially engaged by ODR.

**Challenges to Estimating the Size of each Population and the Number of Beds Required**

There are currently approximately 1,600 persons who are clinically classified as P3/P4 in the LA County jail system, all of which can be placed in one of the four populations noted above. Individuals in the first three groups are being released from jail into community care settings by the Courts currently.   Per the Board motion, JCOD is reporting back separately on the "composition and number of secured, non-correctional mental health care facility beds needed to safely and appropriately transition from jail custody those incarcerated at the P3 and P4 levels of care."

That notwithstanding, following are a few comments on critical issues that must be taken into account in determining the optimal bed composition and number.  Previous studies and reports considered the entirety of the jail mental health population (including P1 and P2 classified persons) and did not estimate or define populations in the P3/P4 group or in the four groups used in this report back.  Also, there have been important changes to the jail mental health population that will impact the applicability of previous estimates, most notably the passage of SB317 which requires MIST clients to be rapidly removed from the jail.  Previous estimates indicate that a large proportion (~50-60%) of the total jail mental health population is divertible, including into secured beds, but a portion of these individuals are FIST, a separate population in this document, or MIST, a population that is being more rapidly removed under current State law after the passage of SB317.  The number of individuals who are FIST in LA County jail currently is ~650, with roughly half being P3/P4, and the number of conserved or conservable individuals averages 350 annually.

Importantly, while the present day P3/P4 population is approximately 1,600 persons, more than 1,600 total community beds will be needed to maximally release P3/P4 individuals from custody in an ongoing manner due to the ongoing flow of P3/P4 patients into jail.  It is difficult to estimate the number or mix of community beds (including the number of secured acute or subacute beds) that would be needed to meet the overall need as it is not clear how many would be feasibly released in each of the four groups, what their level of acuity will be at release, or what the typical length of stay of persons in both jail and community beds will be.

**Phased Implementation Plan**

***DHS/ODR:***  *Non-LPS conserved/ conservable, divertible populations & FIST*

Each Supervisor
March 8, 2023
Page 10

A projected five-year DHS budget to implement the program delineated in this report back is included in Attachment A, including an estimate for personnel needed to ensure timely implementation of this plan.  With full, sustainable funding by the Board, and with CEO and broader LA County support for timely implementation, DHS/ODR can rapidly begin to increase community placements across the continuum of care and the number of eligible P3/P4 classified individuals moved to the community through ODR diversion programs over the next five years (see Table 1).  Further, the possibility of executing an expanded IST solutions contract with DSH could enable ODR to annually add 840 FIST individuals from the jail to the FIST program, following a five-year ramp-up, of which half (~420 FIST individuals) would be projected to be P3/P4 classified.   The combined approach proposed here represents a potential ~1000-bed increase in total beds focused on serving in-custody, divertible and FIST P3/P4 populations.

Importantly, DHS/ODR's ability to achieve success is predicated on allocation of sufficient personnel.  DHS and ODR currently have a significant deficit in personnel infrastructure needed to rapidly implement the proposed program across administrative (contracts and grants, finance, human resources, information technology) and programmatic (clinical personnel, program managers, data and analytics) areas.  Without the addition of new budgeted items, DHS/ODR will not be able to expand on the timelines proposed here.  Furthermore, ODR proposes to add clinical teams to work closely with CHS to expand jail-based screening and support focused around maximizing the proportion of P3/P4 individuals that can be diverted to non-secured beds.

Focusing on the divertible P3/P4 population, DHS/ODR proposes to add 20 acute psychiatric beds and 50 subacute psychiatric beds to serve P3/P4 individuals who are eligible for community placement through diversion in year one.  From past experience with the forensic ward at Olive View, DHS/ODR believes the development of additional acute psychiatric beds will allow ODR to safely move an increased number of P3/P4 individuals to the community.

However, as DHS/ODR has not previously utilized sub-acute beds in its diversion work (in large part due to the challenges of having diverted individuals voluntarily agree to receive care in secured subacute settings), ODR intends to work closely with justice partners and partnered subacute providers to test this opportunity in year one.  Due to uncertainty around the feasibility of the new subacute diversion approach, DHS/ODR did not project expansion of the number of new subacute beds needed in years two through five.  If ODR is successful in identifying paths to diverting P3/P4 individuals to secured subacute beds in year one and funding and support is provided by the Board and CEO for further expansion, DHS/ODR would ramp up subacute beds in years two through five - a move that would be expected to increase the pace of diversion for the P3/P4 population.  As a result, estimates included in Attachment A of this report back assumes new beds in year one only, with a stable number of acute and subacute beds in the remaining four years.

Addition of these acute and subacute beds will require a commensurate expansion in interim and permanent supporting housing placements to ensure that these diverted individuals are able to "step down" to the right level of care thereby freeing up an acute or subacute bed for the next individual leaving jail (See Table 1).  DHS/ODR has been actively leveraging newly allocated funds from the Fiscal Year (FY) 22-23 supplemental budget to quickly expand ODR interim and PSH beds and mental health diversion opportunities.  As of January 2023, the ODR diversion referral portal was reopened after closing in April 2021 due to insufficient

Each Supervisor
March 8, 2023
Page 11

funding needed to expand ODR housing.  ODR has also engaged the courts and justice partners to ramp up services, leveraged available beds to move individuals to the community, and worked to develop and execute contracts to implement a plan to rapidly bring on new beds and service providers.  For individuals able to be served within ODR's unlocked community based interim housing sites, based on current projections, we anticipate ODR has sufficient interim housing funding resources to support mental health diversion activities for the P3 population through FY 24-25.  Starting in year three, DHS anticipates a need for additional funding for ODR interim and PSH beds.

Finally, DHS/ODR will continue to work with the Board and the State to evaluate the DSH IST Solutions opportunity to serve the FIST population.  If the Board approves ODR to proceed with the opportunity, the costs of the FIST expansion would be fully covered by the State. These costs and associated positions are thus not further detailed in this report.  In the meantime, ODR and the State are continuing negotiations on the terms of this contract.  If ultimately a contract is executed, DHS/ODR will add ~700 beds across the continuum of care to serve the FIST population and support the LA County Care First Goals.

**Table 1 – New Beds Added by Year:  Department of Health Services / Office of Diversion & Reentry**

| P3/P4 Population | Bed Type | New Beds Added* Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| Population #1: Divertible Population | Acute[1] | 20 | 0 | 0 | 0 | 0 |
| | Subacute[2] | 50 | 0 | 0 | 0 | 0 |
| | Specialty Interim Housing[3] | 234 | 0 | 0 | 0 | 0 |
| | PSH[4] | 0 | 140 | 140 | 105 | 79 |
| Population #2: FIST[5] | Acute | 10 | 15 | 5 | 0 | TBD |
| | Subacute | 50 | 50 | 0 | 0 | TBD |
| | Specialty Interim Housing | 210 | 150 | 164 | 105 | TBD |

[1] Acute Psychiatric Inpatient beds.  ODR proposes adding 20 beds in year 1 and plans to adjust the number of beds in subsequent years based on prior year experience and funding availability. Budget estimates in Attachment A currently assume stable acute beds in years 2-5.

[2] Subacute IMD beds.  ODR proposes adding 50 beds in year 1 and plans to adjust the number of beds in subsequent years based on prior year experience and funding availability. Budget estimates in Attachment A currently assume stable subacute beds in years 2-5.

[3] Specialty Interim Housing, including Interim Stabilization Housing and Recuperative Care.  ODR proposes adding 234 beds in year 1 and plans to adjust the number of beds in subsequent years based on prior year experience and funding availability. ODR estimates that approximately 80 specialty interim housing beds per year will serve eligible P3/P4 individuals leaving jails directly to Interim Housing level of care.  Budget estimates in Attachment A currently assume stable Specialty Interim Housing beds in years 2-5.

[4] Permanent Supportive Housing – Many P3/P4 individuals and ODR participants will ultimately transition to PSH to maintain their stability. Budget estimates in Attachment A currently assume growth in PSH as noted in the table, on the basis of a stable number of subacute beds; however, increased volume of P3/P4 individuals released will require increases in PSH beds in subsequent years.

[5] These three rows represent the number of secure acute and subacute, and interim housing beds, including Interim Stabilization Housing and Recuperative Care, currently being discussed with the Department of State Hospitals (DSH) in the Incompetent to Stand Trial (IST) Solutions grant. Year 5 estimates are TBD. Though the IST Solutions grant is a 5-year renewable grant, if executed, the contract is retroactive to FY 22-23, therefore year 2 of the ISH Solutions grant corresponds to year 1 of the P3/P4 proposal. Participation in the IST solutions grant depends on Board approval and successful negotiation of rates and a contract with the DSH. These beds and the FIST population are not the fiscal responsibility of the County.

Each Supervisor
March 8, 2023
Page 12

In order to achieve the above bed numbers, DHR/ODR will need ~$31m (plus additional personnel funding – see below) to add a proposed 20 secure acute beds and 50 secure, IMD-excluded subacute beds in year one. ODR will use new, ongoing funding made available in the supplemental budget to support 234 Interim Housing slots for the P3/P4 population in years one and two and 464 PSH slots in years two through five. Budget estimates for years two through five in Attachment A represent no increase in acute and subacute beds. ODR proposes to use 30 subacute beds in year one to test the opportunity to divert individuals who volunteer for subacute services at release. Depending on funding availability and ODR's prior year success moving P3/P4 individuals to secured acute and subacute placements upon release, ODR will reduce or expand secured beds in years two through five. Specialized Interim and PSH slots will need to increase annually to support ongoing releases and step-down from acute and subacute beds. Because of the need to maintain throughput through secured beds, a stable number acute and subacute beds would require expanded specialty interim and permanent supportive housing resources starting in year two with a projected annual budget increase for non-secured beds of $14m/year by year five. Attachment A also contains a budget estimate of $17m/year in year one to $22m in year five for personnel needed to implement and operate these programs, including DHS/ODR/CHS personnel to support program implementation, finance, contracting, human resources, and information systems/data analytics, and personnel for the District Attorney (DA), Public Defender (PD), and Alternative Public Defender (APD) offices to accelerate legal processes.

The DHS/ODR budget does not take into account the potential Medi-Cal revenue offsets that may be realized once ODR becomes a Medi-Cal provider, assuming ODR sites are eligible for Medicaid payments and not subject to the IMD exclusion. DMH and DHS/ODR are working closely to finalize the certification process and are working together to navigate the complexities of Medicaid reimbursement rules for residential sites in which mental health services are provided. DHS/ODR will seek to secure beds in facilities that are not IMD-excluded, whenever possible, in order to take advantage of Medi-Cal reimbursement opportunities; however current estimates assume ODR subacute beds will be IMD-excluded.

**_DMH: LPS conserved/conservable & non-divertible / non-FIST / non-LPS conserved/conservable populations_**

A projected five-year DMH budget to implement the program delineated in this report back is included in Attachment B, including staffing needed to ensure timely implementation of this plan.

Focusing on conserved P3/P4 clients over the next five years, DMH hopes to expand the number of beds to 50 acute beds, 256 subacute beds (including 128 Medi-Cal eligible beds if Behavioral Health Continuum Infrastructure Program (BHCIP) funding is received and 128 IMD excluded beds),150 ERS beds and 44 medical Skilled Nursing Facility (SNF) beds for a total of 500 beds serving conserved and potentially non-divertible, non-conservable populations. DMH anticipates the most efficient way to expand secured acute and subacute beds will be to expand existing sites that will, in most cases, mean they are IMD-excluded and not eligible for Medi-Cal reimbursable. DMH will release a RFI to seek new providers and increase bed capacity. DMH will also seek to secure beds in facilities that are not IMD-excluded, whenever possible, in order to take advantage of Medi-Cal reimbursement opportunities. This includes potentially utilizing the proposed 128 bed subacute facility at LAC+USC Medical Center that DMH is applying for funding under BHCHIP. Construction of

Each Supervisor
March 8, 2023
Page 13

Medi-Cal reimbursable subacute facilities requires building 16 bed or less facilities.  Facilities with multiple stories requires separate and distinct client residences and separate and distinct providers, which increases challenges for siting the facilities and locating sufficient providers. To build capacity of community-based facilities and providers, DMH will need ongoing funding for locked subacute settings because the majority of DMH current contracted subacute facilities are more than 16 beds and subject to the IMD exclusion.  The only funding source for IMD excluded facilities is realignment and DMH utilizes realignment revenues for current contracted acute and subacute beds.  The DMH budget takes into account projected revenue including Medi-Cal for our acute inpatient and the subacute bed facility that may be funded by BHCIP (128 bed facility – six separate 16 bed facilities) and Mental Health Services Act (MHSA) funding for the ERS beds.  DMH will need at least $72m in ongoing funds.  DMH's costs for one-time funds are contingent upon the decision to construct or contract out operation of these levels of care and receipt of BHCIP funding for the Medi-Cal eligible subacute facility.

**Table 2 – New Beds Added by Year:  Department of Mental Health**

| Population | Bed Type | New Beds Added* Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| Population #3: Conserved/ Conservable | Acute | 15 | 20 | 15 | 0 | 0 |
| | Subacute | 32 | 16 | 16 | 128[6] | 16 |
| | Enriched Residential Services | 15 | 30 | 35 | 35 | 35 |
| | Skilled Nursing Facility | 10 | 0 | 0 | 0 | 0 |
| Population #4: Non-divertible / non-FIST / non-LPS conserved/ conservable | Acute | 0 | 0 | 0 | 0 | 0 |
| | Subacute | 0 | 16 | 16 | 0 | 16 |
| | Skilled Nursing Facility | 0 | 10 | 10 | 10 | 4 |

[6] DMH has applied for Behavioral Health Continuum Infrastructure Program (BHCIP) to fund the construction of this sub-acute facility.  If the grant funding is not approved, other funding will need to be identified in order for this project to move forward.

DMH has constructed a Behavioral Health Center which can house two Mental Health Rehabilitation Centers – locked subacute facilities – that will be dedicated to justice involved populations.  DMH is releasing the solicitation for providers to run these two 16 bed subacute facilities.  DMH plans to have these facilities open and operational, if licensing and staff hiring are not delayed, by the end of December 2023.  These 32 beds would be used for placement of individuals from the jail.   By June of 2024 DMH plans to add 15 acute psychiatric beds, 15 ERS beds and 10 medical SNF beds.  As stated previously, if the RFI is successful in identifying additional providers and if funding is available, DMH will seek to contract for additional beds.

## Factors for Success

Numerous anticipated barriers and facilitators will determine the pace of implementation and ultimate success of this work.  Funding, LA County infrastructure, and strong support from

Each Supervisor
March 8, 2023
Page 14

community-based and justice providers are needed to overcome significant environmental threats to success. A number of the more salient issues are described in further detail below.

*Funding:* DMH and DHS/ODR require sufficient funding for administrative and clinical functions needed to implement the proposed programs, particularly for groups 1, 2, and 4 (as funding for FIST clients would be provided through a contract with DSH if the parties come to mutual agreement on terms and the Board provides approval to execute). The timeline along which these funds are made available will naturally have an impact on whether the phased implementation plan can be achieved. The amount of funding that is made available will also determine, in part, whether the Departments are able to attract high performing staff and contractors that are resourced to deliver services that ensure optimal health outcomes and reduce recidivism. The amount of funding required will depend in large part on a determination of whether the capacity developed is subject to the IMD exclusion or whether services can be provided in a manner in which the IMD exclusion does not apply, as further described above.

*Departmental programmatic and clinical capacity:* Additional DMH and DHS/ODR staff are needed to design and implement program expansion, perform screening and manage referrals, manage the flow of clients through the justice system and through clinical levels of care, oversee and provide technical assistance to contracted community-based providers, optimize data collection, reporting, and performance management, perform quality oversight roles, and ensure compliance with all regulatory requirements. New items will need to be rapidly added in order to serve these functions that are vital to launching new programs and scaling existing ones. Workforce challenges are a major barrier to rapid implementation at both the contracted provider and county level. Increased workforce and workforce development at all levels of care are critical to meeting the increased staffing required to expand the P3/P4 community care continuum. In order to keep pace with staffing needs, LA County will need to consider enhanced recruitment and salary incentives for students and professionals in the healthcare, social work and case management professions and build a strong pipeline for these workers. To allow for rapid hiring of qualified staff, the Departments would benefit from enhanced delegated authority to establish special step placements to recruit qualified individuals, consideration of special salary incentives, as well as other flexibilities (e.g., ordinance position authority, specialty recruitments, emergency appointment authority etc.).

*Departmental administrative capacity:* DMH and DHS/ODR enter this period of necessary expansion with already significant personnel gaps in administrative areas that are critical to implementation and expansion of programs. Finance, contract and grants, contract monitoring, human resources, information technology and data/analytics support will be needed to manage increased workload from expanded contracts and relationships with community-based providers. The Departments require additional administrative staff in order to be able to rapidly hire and onboard qualified staff, expedite execution of solicitations and contracting, and build information technology and data analytics infrastructure. With respect to executing contracts rapidly, the Departments would also benefit from delegated authority to enter into and/or modify existing contracts with community providers with notification to the Board and subject to review as to form by County Counsel.

*Enhanced capacity of contracted community providers:* DMH and DHS/ODR would secure community-based placements for their respective clients via providers identified and contracted through a Request for Applications/solicitation process. Both existing and new

Each Supervisor
March 8, 2023
Page 15

providers could participate. At all levels of care, mental health facilities and programs necessary to address the needs of this population currently exist in both the DMH and DHS/ODR networks but in insufficient quantity. We would need to grow and right size the levels of care to meet the needs of this population. This will include enhancing staffing levels compared to those in existing contracted arrangements, especially adding higher-level clinical staff to teams as they care for the more clinically complex individuals that comprise the P3/P4 population. We expect, with appropriate payment rates, that providers will come forward, although we anticipate a degree of uncertainty on the rates and timelines needed to ramp this up given the growing demand for locked beds, interim housing, and PSH in LA County. In many cases the Departments will need to build capability and capacity of our community-based partners to ensure they are able to serve a more complex population. Adequate training, staffing and oversight will be important in maintaining safety of the clients, staff and community.

In ramping up this work, DMH and DHS/ODR anticipate significant systematic challenges to increasing community subacute capacity within the continuum of care. There are a limited number of providers that deliver acute and subacute level care in California today. It will be necessary to build the capacity of these organizations to serve a larger population with more complex mental health and substance use disorders and also develop new organizations capable of providing acute and subacute level services to justice-involved populations. Leveraging existing contracts, facilities and space will allow some near-term expansion of acute and subacute capacity. However, larger scale expansion will require development of new units and facilities.

In addition to the above issues, DMH also faces a significant challenge that could threaten their ability to expand beds for the P3/P4 population. WIC section 4147, which established the IST Solutions Workgroup, provides that if insufficient progress is made in addressing the FIST waitlist for a state hospital bed, the California Health and Human Services Agency may discontinue the admission of new LPS patients, establish LPS reduction targets for counties, and charge counties that do not achieve reductions 150% of the current bed rate for LPS patients. This trigger would require DMH to redirect bed expansion to state hospital conserved clients who would need placement in subacute beds further straining capacity to serve the P3/P4 population existing the jails.

*Justice partner capacity:* Justice partners must also expand their capacity in step with LA County's goals in order to maximize our collective ability to move P3/P4 individuals to the community. The Courts must expand their capacity to process cases eligible for mental health diversion and other types of releases to community care. In order to keep pace with diversion, the DA, Probation Department (PD), and APD indicate a need for additional staff (including attorneys and paralegals). It has been particularly helpful for DHS/ODR to work specifically with defense and prosecution-appointed liaisons who understand and can help effectuate diversions and other interventions, especially in complex cases. Additionally, as programs for those charged with and convicted of felonies grow, there will be an increased need for both pre-trial and formal probation and associated probation staffing costs. Taking advantage of potential opportunities available through PC 4011.6 will require engagement and buy-in from the Sheriff and continued engagement and buy-in from the Courts to ensure sufficient capacity will be a major facilitator to success and not serve as an impediment to it.

Each Supervisor
March 8, 2023
Page 16

Overcoming the above challenges is possible but will require buy-in and a strong commitment from all stakeholders.  With focused effort on identifying (Please see JCOD response to their directive to "identify one-time and ongoing revenue to fund these efforts") and allocating funding, streamlining county processes, ensuring timely availability of staff and funding, and providing delegated authority where feasible, the Departments can make more rapid progress than is typically possible within existing LA County structures and processes.

## CEO Input Related to the Budget

CEO Budget met with JCOD, DHS/ODR, and DMH to discuss the proposed plans and reviewed the schedules attached to this report.  CEO noted that the proposed plans, which include summary level information for operating expenses for justice partners and for bed expansion costs through contracted providers for DHS/ODR and DMH, generally seem reasonable given the assumptions made by the departments and the level of detail available to review.  CEO recognizes these plans will develop over time or require additional information.  Should the Board direct the departments to pursue implementation of the proposed plans, each impacted department should coordinate with their partners to submit a joint request.  In addition to the opportunity to leverage existing funding and allocate new funding, DMH and DHS/ODR should evaluate other one-time and/or ongoing funding allocated and/or earmarked by the Board for a variety of programming in support of Care First.

## Next Steps

Additional funding and actions from the Board will enable DMH and DHS to support Care First goals and help towards the closure of Men's Central jail by diverting and addressing the needs of the P3/P4 population. To effectuate the development of the community-based (non-custodial) capacity described above, DMH and DHS recommend that the Board consider an additional motion with the following directives to accomplish DMH's and DHS's stated goals in this report back:

1. Direct DHS/ODR and DMH as well as DA, PD and APD to work with CEO to finalize budget needs and sources of staffing and other funding needed to implement the proposed programming.  The budgets included here are estimates and Departments should report back at least biannually to the CEO and the Board with revised out-year estimates of budgetary needs to support continued progress in achieving the goals of removing as many P3/P4 individuals from the jail as possible.

2. Direct CEO to work with DMH and DHS to finalize and allocate the necessary clinical, administrative and programmatic items, and with the DA, PD, and APD to allocate the necessary justice-related items needed to complete the work described here, including taking any steps needed to allow the Departments to immediately and successfully recruit and hire for these positions. This may include, but not limited to approval of specialty exams that recognize relevant expertise and lived experience; providing delegated authority to DHS and DMH for ordinance position authority and special step placements for all necessary clinical, and programmatic, and administrative support items for a period to be determined by the CEO to the Board's directives in the February 7, 2023 Declaration of Local Health Emergency for Homelessness;  and extending any

Each Supervisor
March 8, 2023
Page 17

relevant incentives, special pay practices and pipeline programs established within LA County to these items.

3. Direct the Department of Human Resources (DHR) to take any recruitment, examination and appointment steps necessary in order to allow the Departments to immediately and successfully recruit and hire for the necessary staffing model, including the approval of specialty recruitments, and recognition of the relevant expertise and lived experience needed for successful program operations to serve the P3/P4 population.

4. Delegate authority to the Directors of DMH and DHS, or their designees, to negotiate and execute new agreements and/or amendments to agreements with qualified providers, including revisions to statements of work, extension to agreement terms and/or increase contract sums, provided such actions do not exceed Board approved funding to deliver services to the P3/P4 populations, as proposed in this report back, subject to review and approval as to form by County Counsel with notification to the Board and the CEO. The foregoing delegated authority includes authority to negotiate on a case-by-case basis appropriate changes to the standard LA County insurance and indemnification provisions, and other standard LA County contract terms, subject to the reasonable approval of County Counsel and CEO Risk Management.

5. Consider delegating authority to the Director of DHS to execute an IST Solutions contract, with advanced notification to the Board, to extend payments for current FIST clients and expand the program to serve up to 840 additional people annually by year five.

6. Direct the County Homelessness Initiative, in collaboration with LAHSA, the City of LA, DMH, and DHS to report back on how individuals who complete their mandated justice system engagement can be moved to other housing funding streams (e.g., Measures H, DMH) from ODR housing funding streams, including the feasibility of changing the CES so that ODR and DMH justice involved populations qualify for permanent supportive housing through the CES.

The above actions from the Board will enable DMH and DHS to support Care First Goals by diverting and addressing the needs of the P3/P4 population delineated in this report.

If you have any questions, you may contact us or your staff may contact Connie D. Draxler, Acting Chief Deputy Director at the Department of Mental Health at cdraxler@dmh.lacounty.gov or Clemens Hong, M.D., Director of Community Programs at the Department of Health Services at chong@dhs.lacounty.gov.

CRG:LHW:co

**Exhibit A**
**Page 46**