OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
*dharrison@counsel.lacounty.gov*
Dylan Ford (228699)
Deputy County Counsel
*dford@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone: (213) 974-1807/(213) 974-1811
Facsimile: (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
*rdugdale@kbkfirm.com*
Michael J. McCarthy (334829)
*mmccarthy@kbkfirm.com*
Katelyn A. Kuwata (319370)
*kkuwata@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 272-7904
Facsimile: (310) 556-2705

*Attorneys for Defendants Los Angeles County Sheriff Robert Luna, in his Official Capacity, and the County of Los Angeles*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

DENNIS RUTHERFORD, et al.,

Plaintiffs,

v.

ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and the COUNTY OF LOS ANGELES,

Defendants.

Case No. 75-cv-04111-DDP

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CONTEMPT**

Date: April 3, 2023
Time: 10:00 a.m.

Hon. Dean D. Pregerson
Courtroom 9C

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 4

A. The Temporary Restraining Order and Preliminary Injunction Entered by This Court in September 2022 ..... 4

B. Defendants' Alleged Violations of Certain Facets of the Preliminary Injunction ..... 6

1. Defendants Consistently Processed an Overwhelming Percentage of Inmates Through the IRC Within 24 Hours Until a Period in February 2023 When Unanticipated Staffing Issues, Which Have Since Been Corrected, Resulted in Inmate Processing Delays ..... 6

2. Defendants Did Not Respond to the February Processing Delays by Violating This Court's Orders and Moving Inmates "Into the Shadows"; They Responded by Taking Steps To Ensure Inmates Whose Stays Approached 24 Hours in the IRC Received Temporary Housing Akin to That Offered in Module 231 ..... 11

3. Defendants Have Experienced Shortcomings in Moving Inmates in the IRC Off of the Front Bench Within Four Hours, and They Are Implementing Additional Corrective Actions to Address Them ..... 13

4. Plaintiffs' Claims That Defendants Routinely Failed To Provide "Bridge Medication" to Inmates in the IRC Are Largely Inaccurate, and Defendants Have Begun Instituting a New System To Deliver Medications to Inmates Who Need Them but Who Are Ineligible for Bridging ..... 15

III. ARGUMENT ..... 18

A. Defendants Should Not Be Held in Contempt Because They Have Undertaken All Reasonable Efforts Within Their Control to Comply With the Preliminary Injunction's Requirements ..... 18

B. Plaintiffs' Proposal To Sanction Defendants for Future Violations of the Preliminary Injunction's Terms Through an Intricate Fine Scheme Is Not an Effective Way To Ensure Defendants' Future Compliance With This Court's Orders ..... 21

IV. CONCLUSION ..... 25


Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*F.T.C. v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) .......... 18

*Armstrong v. Brown*,
939 F. Supp. 2d. 1012 (N.D. Cal. 2013) .......... 10, 18, 19, 20

*Brown v. Plata*,
563 U.S. 493 (2011) .......... 23, 24

*Castillo v. Cameron Cnty., Tex.*,
238 F.3d 339 (5th Cir. 2001) .......... 23

*Coleman v. Newsom*,
455 F. Supp. 3d 926 (E.D. Cal. 2020) .......... 24

*Coleman v. Schwarzenegger*,
922 F. Supp. 2d 882 (E.D. Cal. 2009) .......... 23

*Food Lion, Inc. v. United Food & Com. Workers Int'l Union*,
103 F.3d 1007 (D.C. Cir. 1997) .......... 18

*Gen. Signal Corp. v. Donallco, Inc.*,
787 F.2d 1376 (9th Cir. 1986) .......... 18

*Roberts v. Cnty. of Mahoning*,
495 F. Supp. 2d 694 (N.D. Ohio 2006) .......... 23

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) .......... 18

*V.L. v. Wanger*,
2009 WL 4282079 (N.D. Cal. Nov. 25, 2009) .......... 22

*Wash. Metro. Area Transit Auth. v. Amalgamated Transit Union*,
531 F.2d 617 (D.C. Cir. 1976) .......... 18

*Welcome Co., Ltd., v. Hattiet Carter Gifts, Inc.*,
1988 WL 1770584 (C.D. Cal. Mar. 26, 1998) .......... 21

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Statutes**

18 U.S.C. § 3626 .......... 22, 23

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## I.

## INTRODUCTION

On a daily basis, the County of Los Angeles ("County") and the Los Angeles County Sheriff ("Sheriff") face staggering challenges in processing the flood of inmates with serious mental health conditions who are introduced into the Los Angeles County Jail ("LACJ") through the Inmate Reception Center ("IRC"). These challenges are not of Defendants' own making, but rather are the result of systematic breakdowns in the modern urban landscape—including homelessness and a broken mental health care system. These enormous and complex societal problems have caused climbing numbers of individuals who are indigent and mentally-ill to enter the LACJ and have turned it into the largest de facto mental health institution in the nation.

Despite these challenges, Defendants have succeeded in making marked improvements in the speed and manner in which inmates are processed through the IRC since the Court entered the Preliminary Injunction (the "PI") on September 27, 2022; and Defendants have been taking all reasonable steps within their control to comply with the PI's requirements. Notably, as Defendants will address, some of the most damning accusations levied in Plaintiffs' Motion for Order to Show Cause Re: Contempt ("Motion") are wrong or overstated. There is, however, no question that a unique set of circumstances last month, and on a handful of other days in recent months, led to instances, and in some cases many instances, when Defendants fell short of some of the demands the PI imposes. As to these instances, Defendants have acted promptly to correct them and, as discussed below, are continuing to make substantial efforts to reach compliance with the corresponding paragraphs of the PI. Defendants are doing everything in their power to comply with the PI in its entirety, and no contempt sanctions could coerce compliance beyond what Defendants are already striving to achieve through the corrective actions they are taking. Accordingly, a contempt finding is not the solution here. What is

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

warranted, as detailed below, is a remedy to address the challenges outside of Defendants' control—namely, the periodic surges of inmates that overwhelm the IRC and continually threaten PI compliance regardless of actions Defendants take.

As a threshold matter, Defendants address a number of Plaintiffs' claims that lack critical context, incorrectly question the motivations behind some of Defendants' corrective actions, and rest heavily on stories of inmate-declarants whose experiences in the IRC did not, in fact, contravene the PI.

First, some of the assertions Plaintiffs make in support of their contempt claim lack important context because they fail to provide the fuller picture, which shows that Defendants have substantially complied with the PI in critical ways. For instance, while it is true that there were a number of instances in February 2023 when individuals were not processed through the IRC within 24 hours, as required under the PI, these problems occurred due to unanticipated and severe staffing shortages that have since been rectified. Furthermore, since the Court entered the PI on September 27, 2022, the percentage of inmates processed through the IRC who have spent more than 24 hours in the IRC has been extremely low. Over this five and one-half month span, 94.76% of the inmates processed through the IRC were held in the IRC for less than 24 hours, which speaks to the tremendous efforts Defendants have made to comply with the most central demand of the PI, which is to provide inmates who enter the LACJ through the IRC, within a 24 hour-window, an appropriate place to sleep, shower, and have access to other basic amenities available to the inmates with permanent LACJ housing.

The Motion also incorrectly questions Defendants' motives for implementing certain corrective actions Defendants have taken to address the challenges of operating the IRC and the demands placed on Defendants due to the PI. For instance, it is not true, as Plaintiffs allege, that Defendants nefariously attempted to "operate in the shadows" and hide instances when individuals remained in the IRC for more than 24 hours by surreptitiously diverting inmates from the IRC to other

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

locations in the LACJ. Instead, when the numbers of inmates who flooded the IRC in February 2023 overwhelmed the ability of an abnormally-depleted mental health staff in the IRC to process these inmates, the LASD moved inmates from the IRC to temporary housing units to provide those inmates with access to a bed and a shower so they would not be deprived of these amenities for longer than 24 hours. These overflow areas were not created for a sinister purpose; they were created to provide amenities and services akin to those received by inmates in Module 231 within the Twin Towers Correctional Facility ("TTCF"), an IRC "overflow" area excluded from the time limits governing inmate stays in the IRC. Far from hiding the existence of these new IRC overflow areas "in the shadows," the LASD reported its intention to use them in exactly the manner it did to the Office of the Los Angeles County Inspector General when it identified the need for these overflow spaces.

Lastly, after investigating the accusations made by the inmate-declarants relied upon by Plaintiffs, Defendants have determined that many of these inmates proceeded through the IRC without contravention of the PI. For instance, seven of the eight inmate-declarants who claimed they were improperly denied the "bridge medications" they need to address their mental health conditions were not actually eligible to receive those medications. Moreover, regardless of Defendants' past success or failure in providing bridge medications to inmates in the IRC, Defendants have recently changed the staffing in the IRC to include additional psychiatric providers who can provide psychiatric assessments and prescribe appropriate medication for all inmates with mental health conditions in the IRC, thereby speeding up treatment even to those not eligible for bridging.

While these points place Plaintiffs' accusations in a fairer context and correct some accusations in the Motion which are mistaken or overstated, Defendants nonetheless acknowledge that their ability to abide by the PI's terms has been hampered by numerous circumstances beyond their control—especially on days when the IRC has been inundated with high numbers of inmates remanded into

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

custody, many with acute mental health conditions that need to be immediately identified and handled. However, if the Court is looking to prevent future deviations from the PI's requirements, imposing the elaborate system of fines for future non-compliance advocated by Plaintiffs is not the answer because Plaintiffs' proposed remedy will not fix the systemic issues that periodically cause Defendants to struggle to meet the PI's terms. The primary causes for the bottlenecks in the IRC that threaten to cause future violations of the PI's provisions are that the number of inmates with acute mental health conditions who can surge into the IRC on some days can overwhelm any structure that Defendants could put into place to process inmates through the IRC in a timely manner, and, even once processed through the IRC, permanent housing for these individuals is not immediately available in the LACJ because the number of inmates requiring High Observation Housing ("HOH") currently far outpaces available HOH in the LACJ. Accordingly, the remedy that may be most appropriate to address the periodic crises in the IRC, and, indeed, the only remedy that can immediately address the fixable root causes of these periodic crises, is to update the jail population control measures which have been in place in this case for close to 40 years, and to clarify the Sheriff's authority to address unconstitutional conditions in the LACJ by restricting the flow of inmates into the IRC and the outflow of inmates with acute mental health conditions.

## II.

## FACTUAL BACKGROUND

### A. The Temporary Restraining Order and Preliminary Injunction Entered by This Court in September 2022

In the summer of 2022, the LACJ experienced a crisis in the IRC, as surges of inmates, including a high percentage of new inmates with serious mental health conditions, cycled into the IRC once the Emergency Bail Schedule (the "EBS") put in place during the pandemic lapsed on July 1, 2022. With the EBS no longer in place to control the stream of new inmates into the LACJ, it was common to see

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

days when dozens, if not hundreds, of inmates waited in the IRC for more than 24 hours, because Defendants were not equipped to process and immediately house the large number of inmates suddenly entering the IRC. In response to this crisis, Defendants initiated a number of aggressive corrective actions to improve conditions in the IRC, and, concurrently, Plaintiffs filed a temporary restraining order seeking to enjoin Defendants from holding individuals in the IRC for longer than 24 hours, preventing Defendants from tethering individuals to the IRC Front Bench area for longer than four hours, and other relief governing conduct in the IRC.

Plaintiffs and Defendants thereafter agreed, and this Court ruled, that Defendants should be preliminarily restrained and enjoined from, among other things: (a) holding an inmate in the IRC for more than 24 hours;[1] (b) holding an inmate on the IRC Front Bench while handcuffed, chained, or tethered to a chair or any other object for more than four hours; (c) generally holding more people in locked holding cells and cages located in the IRC beyond the capacity established by the Board of State and Community Corrections and beyond certain periods of time; (d) holding inmates in the IRC clinic area, cage, or any cell in the IRC when that location is not in a clean and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles; and (e) failing to provide inmates in the IRC with ongoing access to medical and mental health care, including, but not limited to, regular pill call. Prelim. Inj. at 2-5 (Sept. 27, 2022), ECF No. 351.

[1] This restriction on holding an inmate in the IRC for more than 24 hours does not apply to holding inmates in Module 231, an IRC overflow module, where inmates have access to beds and showers, mental and medical health providers, and are subject to 15-minute safety checks. Prelim. Inj. at 2 (Sept. 27, 2022), ECF No. 351.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**B. Defendants' Alleged Violations of Certain Facets of the Preliminary Injunction**

In their Motion, Plaintiffs assert that Defendants have violated the terms of the PI by (1) holding inmates in the IRC beyond the 24-hour limit set by the Court; (2) avoiding this 24-hour time limit by "operating in the shadows" and moving inmates out of the IRC and into various other locations in the LACJ before they are assigned permanent housing; (3) tethering inmates to the IRC Front Bench for longer than four hours; and (4) failing to provide adequate mental health care to inmates in the IRC by failing to provide them with "bridge medication" needed to treat their mental health conditions. Each of these claims is addressed below.[2]

**1. Defendants Consistently Processed an Overwhelming Percentage of Inmates Through the IRC Within 24 Hours Until a Period in February 2023 When Unanticipated Staffing Issues, Which Have Since Been Corrected, Resulted in Inmate Processing Delays**

While meeting all aspects of the PI is important, the most fundamental challenge Defendants face is processing inmates through the IRC within 24 hours so that inmates do not lack an appropriate place to sleep and shower, and access to other important amenities, for longer than one day. Since the PI was entered, Defendants have substantially complied with its requirement that inmates spend no

---

[2] Plaintiffs also claim that Defendants may be violating the PI by placing individuals in cells in the IRC beyond the time limits set forth in the PI. Although Defendants vigilantly monitor this issue in the IRC on a daily basis, Defendants concede that their poor record-keeping on this issue does not allow one to confirm whether such violations have occurred. Recognizing this issue, in February 2023, the LASD created a new sergeant position in the IRC, which will be staffed 24 hours each day, seven days each week, and tasked the people assigned to this new position the primary duties of ensuring compliance with the holding cell provisions of the PI and documenting any instances when those provisions are violated. *See* Decl. of Paula Tokar ("Tokar Decl.") ¶ 18. The daily auditing process this new supervisor will bring to this issue should eliminate future deficiencies in this area.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

longer than 24 hours in the IRC.

While both the number and percentage of inmates who were waiting in the IRC during the summer of 2022 were very high by historical standards, those numbers have plummeted dramatically since the PI was entered due to the corrective actions previously described to this Court and other efforts by Defendants to ply additional resources into the IRC. *See* Defs.' Response to Pls.' Ex Parte App. for TRO (Sept. 12, 2022), ECF No. 337. Attached at Exhibit A to the Declaration of Robert Dugdale is a chart prepared by the LASD, which shows the number of new bookings handled by the IRC for each date between the date the PI was entered and February 28, 2022, the number of inmates in the IRC at the times compliance was measured on the dates in question (the "IRC Clock count"), the number of inmates in the IRC at the times in question who had been in the IRC for longer than 24 hours and 36 hours, and the percentage of inmates who were in the IRC for longer than 24 hours at the times compliance was measured for the days in question.[3] Decl. of Robert E. Dugdale ("Dugdale Decl.") ¶ 7, Ex. A.

This data, which is shown in graph below, confirms that Defendants have

---

[3] Plaintiffs offer a chart that purports to show Defendants' non-compliance with the requirement to clear inmates through the IRC within 24 hours. Decl. of Peter Eliasberg, Ex. C. That chart, however, only covers a fraction of the time the PI has been in effect and it does not provide context regarding Defendants' level of success in moving inmates through the IRC because it does not indicate how many inmates moved through the IRC on the dates in question. On any given day, when hundreds of inmates are processed through the IRC, there may be legitimate reasons, completely beyond Defendants' control and not reflective of substantial efforts undertaken by Defendants to comply with the PI, why a small number of inmates spend longer than 24 hours in the IRC. In determining whether Defendants have substantially complied with the PI's requirements, the standard Defendants are required to meet is not perfection. Instead, what this Court should analyze is whether instances when more than marginal numbers of individuals remained in the IRC for longer than 24 hours were anomalies Defendants can justifiably explain or signs of Defendants not using reasonable means within their control to comply with the PI's terms.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

substantially complied with the 24 hour IRC time restriction that is central to the PI, as it shows that (1) **94.74%** of the inmates who passed through the IRC during this five month span spent less than 24 hours in the IRC; (2) on the majority of days, between **98% and 100%** of the inmates who passed through the IRC during this time period spent less than 24 hours in the IRC; and (3) during these five months, it was only on infrequent occasions when the percentage of inmates who spent longer than 24 hours in the IRC fell below **90%**. Dugdale Decl. ¶ 8, Ex. A.




Significantly, the infrequent times when Defendants failed to move fewer than 90% of the inmates in the IRC through the IRC in less than 24 hours, predominantly occurred in a cluster in February 2023, when unanticipated severe staff shortages, which have since been addressed, resulted in unavoidable delays in processing inmates through the IRC. Heading into 2023, the active Correctional Health Services ("CHS") staff, which conducts mental health evaluations and provides other mental health-related services to inmates in the IRC, totaled 25 people. Decl. of Joan Hubbell ("Hubbell Decl.") ¶ 2. This included one manager, five mental health staff supervisors, two psychologists, one registry psychologist, 13 psychiatric social workers ("PSWs"), and three mental health nurses. *Id.* In February 2023, CHS experienced significant and sudden attrition of its staff in the IRC. *Id.* ¶ 3. Specifically, three PSWs, three mental health staff supervisors, and

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

the manager of the IRC's mental health staff continued or began medical leave; one PSW who worked in the IRC resigned; another supervisor who worked in the IRC was removed from her position; and still another supervisor who worked in the IRC transferred to a new position in the Department of Mental Health. *Id.* Additionally, at the same time these sudden and unanticipated staff shortages occurred in February 2023, four PSWs onboarded, each of whom required training from supervisors and other CHS staff, which, in turn, took time away from other work in the IRC, such as performing mental health evaluations. *Id.* ¶ 4. During this time, there was no way to quickly adjust to fill the vacancies left by this attrition, as not all CHS staff in the jails are cross-trained to work in the IRC; and the overtime accepted by CHS staff who are eligible and equipped to work in the IRC was insufficient to cover the February 2023 shortages. *Id.* ¶ 5.

The considerable number of managers and supervisors out would have been difficult to overcome even if the other unexpected staffing shortfalls described above had not concurrently occurred. *Id.* ¶ 6. This is because of the critical role IRC leaders play. *Id.* The IRC manager, for instance, is responsible for making sure the IRC runs smoothly, overseeing the quality of care, managing any problems that emerge in the IRC, and ensuring that the IRC schedule is adequate. *Id.* IRC supervisors oversee and are responsible for CHS clinicians—providing clinical feedback, ensuring that necessary tasks are being completed, and confirming that clinicians are performing mental health evaluations timely and properly. *Id.*

The impact of this unexpected staffing crisis on how the IRC functioned in February 2023 was severe. For instance, on February 2, 2023, the IRC had a complement of 16 members of its member health staff scheduled to work, but due to the attrition, three people (almost 20% of the staff) were out that day. *Id.* ¶ 7. Similarly, on February 3, 2023, the IRC had a CHS staff of 17 scheduled to work,

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

but five people (almost 30% of the staff) were out that day. *Id.*[4]

As a result, the IRC experienced unfortunate instances of processing delays in February 2023 that contrasted with Defendants' compliance from September 27, 2022 through the end of January 2023, when the IRC's processing of new inmates under 24 hours was far more successful than Plaintiffs assert: at an overall 96.76% compliance rate, in fact. Unsurprisingly, the four worst days were in February 2023—February 2 (67.2% compliance), February 3 (55.1% compliance), February 9 (65.1% compliance), and February 11 (65.0% compliance). These days in February reflect a significant outlier period in Defendants' otherwise steady 96.76% compliance with the PI's 24-hour requirement.

Staffing in the IRC has since improved from the severe attrition in February 2023. Hubbell Decl. ¶ 8. The IRC now has two managers, including one who returned from medical leave, and both are having a meaningful impact on IRC processing. *Id.* Additionally, there are currently 22 clinicians on staff (including PSWs, psychologists, and mental health RNs), with only one out on medical leave. *Id.* And while the IRC is still short on supervisory staff, with 1.5 supervisors now working, an additional supervisor is transferring to the IRC in April 2023. *Id.* As a result, Defendants believe that the situation that occurred in February is not emblematic of the IRC's operations generally or moving forward, but rather, was the result of a perfect storm of events that caused acute, but anomalous, issues in the IRC in the short term which do not favor holding Defendants in contempt. *See Armstrong v. Brown*, 939 F. Supp. 2d. 1012, 1025 (N.D. Cal. 2013) (acknowledging that noncompliance with a court order to provide sign language interpreters to deaf prisoners may reasonably occur if a sign language interpreter is unavailable due to sudden illness).

---

4 Other days in February, for instance February 24th, were similarly impacted by staffing shortfalls, which could not be immediately rectified.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**2. Defendants Did Not Respond to the February Processing Delays by Violating This Court's Orders and Moving Inmates "Into the Shadows"; They Responded by Taking Steps To Ensure Inmates Whose Stays Approached 24 Hours in the IRC Received Temporary Housing Akin to That Offered in Module 231**

In February 2023, in response to the problems caused by the mental health staffing emergencies in the IRC, the LASD established new IRC overflow spaces that were used to provide inmates who were still being processed in the IRC with temporary housing where they were provided access to a proper place to sleep and shower. On three separate occasions in their Motion, Plaintiffs assert that this corrective action taken by the LASD was an effort to place its non-compliance with the PI's requirements "into the shadows" and to flout those requirements via gamesmanship. This is not true.

The acute nature of the staffing shortages in February 2023 and the resulting impact on IRC processing prompted the LASD's command to develop a plan that called for the LASD to find additional temporary housing for those individuals who faced spending longer than 24 hours in the IRC and who had been found to have no acute mental health conditions after a preliminary screening. Decl. of Paula Tokar ("Tokar Decl.") ¶ 6. Intending to replicate the existing Module 231, though with greater capacity and for a different category of inmate, these overflow housing areas provided inmates waiting in the IRC with beds and access to showers, as well as other sanitary supplies and amenities that would not have been available to them in the IRC. *Id.* ¶ 8.

During the week of January 30, 2023, LASD command recognized it would have to implement this overflow housing plan.[5] *Id.* ¶ 4. On February 3, 2023, the

---

[5] Indeed, this prediction came true, as the IRC faced a number of backlogs in processing inmates in February 2023, a situation which would have been substantially more dire had this overflow plan not been implemented.

LASD began identifying and designating inmates for housing placement in the 6050 Block of Men's Central Jail ("MCJ"). *Id.* ¶ 7. That area had three operational cells, each of which contained beds for twelve people. *Id.* ¶ 9. The plan called for the relocation of inmates from the IRC to this overflow area until IRC staff could complete the routine mental health screening and finalize the processing of these inmates through the IRC. *Id.* ¶ 6. Inmates relocated to the 6050 Block of MCJ were supplied with bedding upon their relocation; they were given access to showers; and deputies were tasked with passing out sanitary supplies to these inmates. *Id.* ¶ 10.

On February 11, 2023, a second temporary housing area, 4800-A Row of MCJ, began receiving inmates from the IRC. *Id.* ¶ 12. At the time, 4800-A Row contained eleven operational cells with beds for up to four people. *Id.* ¶ 9. Due to the strain on IRC resources, these two temporary housing areas were utilized throughout February 2023 to provide inmates delayed for processing in the IRC with an appropriate place to sleep and shower. *Id.* ¶ 13. Inmates were only kept in this temporary housing until the IRC was ready to continue processing them and assign them permanent housing. *Id.* ¶ 16.

The LASD never attempted to conceal its efforts to provide these more suitable housing conditions to inmates nearing the 24-hour limit in the IRC and who could safely be provided temporary overflow housing in either the 6050 Block of MCJ or 4800-A Row. *Id.* ¶ 16. Indeed, immediately after implementing this overflow plan, the LASD notified the Office of Inspector General ("OIG") of the new overflow units out of concern that their use, borne out of necessity, could be misconstrued. *Id*. The OIG not only did not indicate any opposition to this plan; it indicated it was already aware of the plan. *Id*.

Furthermore, to the extent complaints about conditions in these overflow units were raised, they were promptly addressed by the LASD. For example, after being advised that some inmates being temporarily housed in 4800-A Row were not provided with proper bedding in their cells, LASD Acting Chief Paula Tokar toured

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4800-A Row, observed the conditions in this overflow space, spoke with an OIG official about them, and immediately addressed complaints that were raised. *Id.* ¶ 14. Confirming the foregoing, Catharine Wright of the OIG's Office texted Chief Tokar the very next day: "I stopped by CJ overflow. All was good. Several people in custody who were there yesterday told me they appreciated that deputies out [sic] so much effort into improving conditions yesterday." *Id.* ¶ 15.

Clearly, challenges persist in the IRC which create the real possibility of a significant backlog if unusual events occur in unison, such as unexpected staffing shortages combined with a surge of large numbers of inmates into the IRC with mental health conditions who cannot be processed quickly. That possibility became a reality in February 2023. However, the LASD has never tried to move these deeply-rooted issues "into the shadows." Rather, it has worked to undertake the short- and long-term fixes it has implemented to address emerging backlogs in the IRC in full view of critical stakeholders.

### 3. Defendants Have Experienced Shortcomings in Moving Inmates in the IRC Off of the Front Bench Within Four Hours, and They Are Implementing Additional Corrective Actions to Address Them

The Front Bench area of the IRC is reserved for those inmates in the IRC with the most acute mental health conditions. They are tethered to the Front Bench and positioned directly in front of an observation desk, where they are under constant view of deputies, because those measures are necessary to ensure these acutely ill individuals will not engage in acts of self-harm or hurt others in the IRC. While Defendants have substantially complied with the PI's central requirement by processing inmates through the IRC within 24 hours 94.76% of the time since the PI was entered, Defendants have struggled to consistently move individuals off of the Front Bench within the four-hour time period established in the PI, particularly on days when the IRC is inundated with individuals with acute mental health conditions who require the kind of resource-intensive processes needed to place them in

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

appropriate housing.

Recognizing this shortcoming, Defendants are instituting new processes to place greater focus on this issue and achieve better results going forward. For instance, Defendants have hired a second, full-time psychiatrist, who will be stationed in the IRC as of April 2023. Dr. DeSilva Decl. ¶ 5. With two available psychiatrists—providers who exclusively assess the P3 and P4 population that generally occupies the Front Bench—the inmates on the Front Bench will be cleared more quickly. *Id.* Additionally, shortly after the PI was issued, the LASD created a new Custody Assistant position—staffed 24-hours a day—dedicated solely to monitoring the patients on the Front Bench, documenting the time each patient spends there and the various events that occur during that time, and responding to patient needs. Tokar Decl. ¶ 18. In February 2023, recognizing the need to more consistently move individuals off of the Front Bench within four hours, LASD also created a new sergeant's position, similarly staffed at all times in the IRC, whose duties include supervising and providing back-up for the Front Bench Custody Assistant to ensure compliance with the PI's provisions concerning inmates tethered to the Front Bench.[6] *Id.*

---

[6] In their Motion, Plaintiffs' claim that Defendants' shortcomings in cycling inmates from the Front Bench within four hours are even more acute than what Defendants have self-reported because the LASD also had a brief practice of tethering individuals to gurneys in locations near the IRC. Motion at 12. Tethering individuals to gurneys in areas near the IRC was not a practice the LASD employed to avoid the requirements of the PI. Tokar Decl. ¶ 17. No inmate was moved from the Front Bench and tethered to a gurney. *Id.* The individuals whom Plaintiffs report as tethered to gurneys near the IRC were inmates who had previously been assigned to permanent housing and who had experienced a mental health crisis that required their transfer to HOH. *Id.* They were tethered to gurneys and put under watch near the IRC, and the IRC's concentration of mental health professionals, while waiting for HOH to become available. *Id.* They were not inmates being processed through the IRC who were subject to the PI's requirements. *Id.* Moreover, this practice, which was briefly employed to ensure that inmates being

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

### 4. Plaintiffs' Claims That Defendants Routinely Failed To Provide "Bridge Medication" to Inmates in the IRC Are Largely Inaccurate, and Defendants Have Begun Instituting a New System To Deliver Medications to Inmates Who Need Them but Who Are Ineligible for Bridging

As discussed above, factors outside the County's control, such as surges of arrestees awaiting intake in the IRC and unanticipated staffing issues, regrettably have resulted in Defendants' noncompliance with certain portions of the PI at various times, as Plaintiffs describe in their Motion. Plaintiffs are not correct, however, that Defendants repeatedly violate Paragraph 7 of the PI, which requires them to provide people in the IRC with "ongoing access to adequate medical and mental health care, including but not limited to regular pill call." Motion at 5. Plaintiffs' specific allegation regarding Paragraph 7 is that "Defendants repeatedly fail to provide people in the IRC the psychiatric medication they were prescribed prior to entering the jail." *Id*. Defendants' response is twofold.

*First*, seven of the eight inmates whose declarations form the basis for this allegation were not eligible to safely receive psychiatric medication in the IRC under the Bridge Medication Policy in place when those inmates were arrested. Decl. of Dr. Karen Siscoe ("Dr. Siscoe Decl.") ¶ 2. This policy, which represents the standard of care in carceral settings, permits the automatic continuation of psychiatric medication in the IRC if it can be verified that the person was provided such medication in the past 30 days. *Id.* ¶ 3. This verification may occur where medical records indicate the medication was provided in the past 30 days; where the person arrives at the IRC as a transfer with paperwork confirming the person had taken the medication within the past 30 days; or where the person informs CHS clinicians of both the medication(s) he or she takes as well as the pharmacy that fills the prescription(s) and the clinician confirms with the pharmacy that the medication

---

transferred to HOH could not engage in self-harm, has been discontinued. *Id.*

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

was provided in the past 30 days. *Id.* If the psychiatric medication cannot be verified or it is determined that more than 30 days have passed since the person took it, the medication cannot be bridged in the IRC. *Id.* ¶ 4. It would simply not be a safe practice to administer any such medication without a psychiatric assessment to determine the appropriateness, safety, tolerability, and efficacy of the medication for the patient. *Id.*

Here, four of the inmates who submitted declarations in support of Plaintiffs' claim—Mr. Cisneros, Mr. Jones, Mr. Garcia Alfaro, and Mr. Brown—could not have had their psychiatric medication bridged because they had not taken their medication in the 30 days prior to their arrival in the IRC. *Id.* ¶ 5. Two others—Mr. Scott and Mr. Scoby—could not have had their psychiatric medication bridged because their medications could not be verified. *Id.* And the final two inmates—Mr. Crowley and Mr. Fernandez—denied taking any psychiatric medication during their mental health evaluation in the IRC. *Id.* Further, there was no medical record at all of prior psychiatric medications taken by Mr. Fernandez. *Id.*

*Second*, in addition to bridging medication pursuant to policy, the County has been making substantial efforts to increase the number of providers in the IRC who can perform psychiatric assessments, with the goal of ensuring that all inmates with mental health conditions receive a psychiatric assessment for medication before they are placed in permanent housing. Decl. of Dr. Gayani Desilva ("Dr. Desilva Decl.") ¶ 3. Such assessments obviate the need to bridge prescriptions issued prior to the patient's arrival at the IRC, and are designed to determine the appropriate regimen for the patient's present psychiatric state during the intake process. *Id.* Specifically, the County has hired two full-time employed nurse practitioners ("NPs") and one additional registry NP, each of whom has already begun work in the IRC performing psychiatric assessments for people with a P0-P2 designation. *Id.* ¶ 4. The County has also hired eight additional registry NPs who are currently in the process of onboarding—three of whom will start work in the IRC by the end of March 2023.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

*Id.* The County has further hired a full-time registry psychiatrist, who will begin work alongside the current IRC psychiatrist at the end of March 2023, to perform psychiatric assessments for people with a P3-P4 designation and to provide clinical guidance of NPs in the IRC. *Id.* ¶ 5. Presently, any P3-P4 who does not receive a psychiatric assessment in the IRC is seen by the Supplemental Assessment Team or by a psychiatrist in IRC-231. *Id.*

By ensuring that all people in the IRC with mental health conditions receive a psychiatric assessment before transfer to permanent housing, the County will improve the care and safety of all such people, as they will be treating them according to a current assessment performed by their own providers. *Id.* ¶ 6. Once a psychiatric assessment is completed, the psychiatric provider will submit an order into the electronic medical record, and the patient will receive their medications according to the prescribed schedule for administration (such as that evening or the next day). *Id.* The patients are prioritized to be seen by the psychiatric NP according to their acuity, with P0-P2s being within the scope and practice of the psychiatric NP. *Id.* Higher acuity patients need a higher level of medical and psychiatric expertise, so the P3 and P4 population are prioritized to be seen by the psychiatrist. *Id.* For approximately the past two weeks, the County has been implementing this approach—successfully providing psychiatric evaluations for all P0-P2's in the IRC. *Id.* ¶ 7. Defendants intend to provide the same level of service for all relevant persons in the IRC by June 1, 2023, and are presently on pace to achieve that target. *Id.* For those who have not yet received a psychiatric assessment, the County will continue to provide bridge psychiatric medication to all eligible patients under the policy. *Id.*

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## III.

## ARGUMENT

### A. Defendants Should Not Be Held in Contempt Because They Have Undertaken All Reasonable Efforts Within Their Control to Comply With the Preliminary Injunction's Requirements

To establish a civil contempt claim, "[t]he moving party has the burden of showing by clear and convincing evidence that the [non-moving] party violated a specific and definitive order of the court." *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)). But a finding of contempt is inappropriate if the party charged with contempt demonstrates "substantial compliance" with a court order, or shows an inability to comply with the court's order. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986); *F.T.C.*, 179 F.3d at 1239; *see also Wash. Metro. Area Transit Auth. v. Amalgamated Transit Union*, 531 F.2d 617, 621 (D.C. Cir. 1976) ("Either substantial compliance or inability to comply is . . . a defense in . . . any . . . civil contempt proceeding"). "Substantial compliance" means that the party took all reasonable steps within its power to comply with the order. *Gen. Signal Corp.*, 787 F.2d at 1379; *Stone*, 968 F.2d at 856.

Courts have also held that contempt is not warranted where the alleged contemnor demonstrates they are "presently making substantial efforts to reach compliance with the Court's orders." *Armstrong*, 939 F. Supp. 2d. at 1025-26. And, although a party's "good faith alone is not sufficient to excuse contempt," a party's good faith efforts to comply with a court's orders is relevant "in determining whether substantial compliance occurred, and may be considered in mitigation of damages." *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 103 F.3d 1007, 1017-18 (D.C. Cir. 1997).

A contempt finding is not warranted here because, not only have Defendants substantially complied with the key provision of the PI by processing inmates

through the IRC within 24 hours 94.76% of the time, but also because Defendants are presently making substantial efforts—indeed all required efforts and more—to ensure the issues raised in Plaintiffs' Motion cease. Thus, like the court found in *Armstrong*, no civil contempt sanctions are now necessary to coerce further compliance. *See Armstrong*, 939 F. Supp. 2d. at 1026. There, prisoners brought a class action against the California Department of Corrections and Rehabilitation, among others, seeking to enforce prior court orders, including one that required defendants to provide sign language interpreters ("SLI") to deaf prisoners attending vocational or educational classes at the Substance Abuse Treatment Facility ("SATF"), and to hold defendants in contempt for alleged violations. *Id.* at 1022-23. Although defendants had undoubtedly violated this order, largely due to the lack of adequate staffing, the court did not find them in contempt because defendants had already initiated substantial remedial efforts, including: obtaining "approval to increase the funding for contract SLIs," obtaining "authorization to increase the number of full-time qualified SLIs at SATF," and planning "to begin consistently logging additional information, including if a class was cancelled or if a deaf inmate was absent from a class meeting." *Id.* at 1025. These measures, the court reasoned, obviated the need for a contempt finding. *Id.* at 1026.

Here, Defendants here have substantially complied with key provisions of the PI, most significantly Paragraph 1. As discussed above, **94.76%** of the inmates who passed through the IRC during the five-month span at issue spent fewer than 24 hours in the IRC. And, but for the staffing crisis the IRC experienced in February 2023, Defendants' overall compliance rate likely would have remained at 96.76%, as it had been from the date the PI was entered in September 2022 through January 2023. Similarly, Defendants have substantially complied with Paragraph 7, as Plaintiffs' Motion reveals only one inmate identified by Plaintiffs did not properly receive bridge medications in the IRC.

Of equal importance, Defendants have taken substantial steps, including

several recent corrective actions that mirror the type of remedial actions taken by the defendants in *Armstrong*, which should ensure ongoing compliance with all aspects of the PI to the greatest degree within Defendants' control. Most notably, as explained above, Defendants have increased staffing in the IRC significantly—with a total of 25.5 CHS staff and a total of 13 psychiatric providers either hired or already working and not on leave. *See* Hubbell Decl. ¶ 8; Dr. DeSilva Decl. ¶¶ 4-5. This will enable Defendants to process inmates more quickly through the IRC, and, most critically, ensure the faster clearance of the P3s and P4s who are placed on the Front Bench. This improved staffing will also ensure that the required standard of care for medical and mental health of IRC inmates is provided—but beyond that, Defendants intend to exceed this standard by ensuring all inmates with mental health conditions receive a psychiatric assessment for medication before they are transferred to permanent housing. And, in this same vein, the LASD has also recently added to this expansion of resources and services in the IRC by creating a new permanent supervisor position in the IRC, which will be occupied every hour of the day, and which will have as its primary focus ensuring better performance with those aspects of the PI where Defendants have experienced shortcomings to date, including working with the new CHS staff discussed above to move all inmates off of the Front Bench within four hours and ensuring that accurate record-keeping occurs to confirm Defendants' compliance with all of the PI's provisions. *See* Tokar Decl. ¶ 18.[7]

Taking these efforts into account, along with the increased success

---

[7] And, of course, coupled with these short-term corrective actions which have been taken to improve operations in the IRC, Defendants have provided the Court and Plaintiffs with a long-term plan, which has already been partially-funded and is currently being implemented, to divert P3 and P4 inmates out of the LACJ and into non-carceral facilities—a plan designed to relieve some of the bottlenecks that periodically occur in the IRC due to the unavailability of HOH. *See* Defs.' Filing of Reports Required to Respond to OSC (Mar. 9, 2023), ECF No. 378.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Defendants have seen in moving inmates through the IRC in a timely basis since the PI was entered, Defendants submit that neither a contempt finding nor the fine schedule Plaintiffs have proposed would meaningfully improve Defendants' compliance with the PI beyond the steps Defendants have already undertaken.

**B. Plaintiffs' Proposal To Sanction Defendants for Future Violations of the Preliminary Injunction's Terms Through an Intricate Fine Scheme Is Not an Effective Way To Ensure Defendants' Future Compliance With This Court's Orders**

Since Defendants have undertaken good faith efforts to comply with the Courts' orders, and any lack of compliance with those orders is not the result of a lack of reasonable diligence on Defendants' part, but rather the challenge of addressing intractable, systemic problems that are not within Defendants' full control, this Court should decline to sanction Defendants, even if it finds Defendants in contempt. *See Welcome Co., Ltd.*, *v. Hattiet Carter Gifts, Inc.*, 1988 WL 1770584, at *8 (C.D. Cal. Mar. 26, 1998) (recognizing the defendants' "good faith attempt to comply with the Court's Order" in holding that a sanction was not warranted following a contempt finding).

However, if the Court is inclined to grant Plaintiffs' Motion and impose some form of remedy, Defendants request that the Court's contempt order be held in abeyance and that the parties be given additional time to meet and confer regarding the form and scope of relief this Court can impose to best remedy the problems which periodically plague the IRC. Plaintiffs have moved this Court to impose a prospective fine system to sanction Defendants for future non-compliance with this Court's orders, a form of relief that would see the Court step into the role of the Los Angeles County Board of Supervisors and County Departments and allocate the sanctions accrued specifically toward "increased beds in evidence-based alternatives to incarceration such as the ODR program, and/or as the Court sees fit to best benefit class members." Motion at 25. This plan, while well-intentioned, suffers from several serious flaws. *First*, the prospective fine system Plaintiffs propose

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

features elevated sanctions that could quickly add up to an unjustified sum should the IRC face unusual acute problems, such as the staffing crisis addressed above, which Defendants cannot avoid, predict, control, or immediately correct.[8] *Second*, earmarking sanctions to bolster the County's efforts to create additional beds that can be used to divert inmates out of custody—efforts that are already being funded through tens of millions of dollars budgeted by the County[9]—will not provide a prompt solution to any future overcrowding issue in the IRC. *Third*, as indicated above, under the remedy proposed by Plaintiffs, the Court would become a singular county supervisor in this area, essentially granted the powers to control a potentially large portion of the County fiscal resources, and once it exercises this authority, the Court would be tasked with resolving political questions on the precise allocation of the funding at its disposal.

Instead, Defendants suggest employing the meet and confer mechanism in which the Parties in this case previously engaged nearly forty years ago to explore the possibility of seeking additional inmate release authority for the Sheriff pursuant to 18 U.S.C. § 3626.[10] Under that statute, amended as part of the Prison Litigation

---

[8] Defendants submit that it would be particularly inappropriate under such circumstances to impose monetary sanctions against a local government that is currently under tremendous financial strain as a result of the lingering effects of the pandemic. *See e.g. V.L. v. Wanger*, 2009 WL 4282079, at *6 (N.D. Cal. Nov. 25, 2009) (declining to impose fines based on "reprehensible" actions attributable to the State of California in light of the budget crisis facing the State at the time).

[9] "FY 2022-23 Supplemental Budget Fact Sheet," Chief Executive Office (Oct. 2022), https://ceo.lacounty.gov/wp-content/uploads/2022/10/2022-23-Supplemental-Budget-Fact-Sheet_rev.pdf.

[10] Judge William Gray previously entered a 1988 Jail Population Management Plan and Order (pre-PLRA) in this case, which provided the Sheriff with release authority related to six categories of inmates. However, that existing authority does not specifically address the unique nature of the circumstances that could cause backlogs in the IRC, and any new release-authority order would require the PLRA's

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Reform Act ("PLRA"), prisoner release orders in civil actions related to prison conditions, such as the instant matter, are governed by clearly delineated standards and processes pursuant to which a prisoner release order may be entered. Specifically, under Section 3626(g)(4), a "prisoner release order" includes any order that "has the purpose or effect of reducing or limiting the prison population," and may only be entered by a three-judge district court. 18 U.S.C. § 3626(a)(3)(B). In order to convene this three-judge court, the district court overseeing the action must find that it has issued a previous order "for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order" and that the "defendant has had a reasonable amount of time to comply" with that order. *Id.* § 3626(a)(3)(A), (D); *see Roberts v. Cnty. of Mahoning*, 495 F. Supp. 2d 694, 697 (N.D. Ohio 2006) (referring matter to three-judge court where staffing issues led to an inability to control an inmate population).

The three-judge court may only enter the release order if, by clear and convincing evidence, it finds that overcrowding is the primary cause of a federal rights violation and that no other relief will remedy the violation. 18 U.S.C. § 3626(a)(3)(E). Relief in the form of exercising prisoner release authority does not need to be shown to be the complete and total solution to the constitutional violation, only a "necessary part of any successful remedy." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 951 (E.D. Cal. 2009) (concluding deficiencies in medical and mental health care provided in state prisons could not be resolved without a release order). The court must determine whether the relief is narrowly drawn, extends no further than necessary and is the least intrusive means to address the violation, and it must also give substantial weight to the impact on public safety. 18 U.S.C. § 3626(a); *See Brown v. Plata*, 563 U.S. 493, 530-38

---

standards to be met. *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 356 (5th Cir. 2001) (PLRA applies to injunctions existing at the time of its enactment).

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

(2011).

At any time after a release order is entered, either party may move the three-judge court to amend that order to more effectively address the constitutional violation or allow the Defendants more latitude in meeting challenges that arise during the remedial process. *Plata*, 563 U.S. at 542, 544. However, such an amendment must be designed to target the original constitutional violation, not an additional issue. *Coleman v. Newsom*, 455 F. Supp. 3d 926, 932-33 (E.D. Cal. 2020) (denying modification to prisoner release order because issues stemming from COVID were rooted in a different cause than before the three-judge court).

Defendants believe it is clear that the principle causes of reoccurring problems in the IRC which are the subject of Plaintiffs' complaints are: (1) surges of new inmates into the IRC, and most particularly new inmates with acute mental health conditions who overwhelm any structure Defendants could realistically put into place to process inmates through the IRC quickly; and (2) the lack of available HOH for new inmates who arrive in the IRC and need such housing. Defendants further believe that the best, if not only, method to immediately and effectively address these population control issues is to update the inmate release authority previously provided in this very case, this time through the procedures required under the PLRA. Accordingly, if this Court is inclined to find Defendants in contempt despite the good-faith efforts they have made to comply with the Court's orders, the progress they have made in the past five months improving how the IRC operates, and their efforts to implement meaningful corrective actions when problems in the IRC have arisen, Defendants request that the Court allow the parties to explore population reduction tools as an effective way to provide timely relief for the inmate overcrowding issues that periodically arise in the IRC.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## IV.

## CONCLUSION

For each of the foregoing reasons, this Court should decline to hold Defendants in contempt.

DATED: March 13, 2023 KENDALL BRILL & KELLY LLP

By: s/Robert E. Dugdale
Robert E. Dugdale

*Attorneys for Defendants Los Angeles County Sheriff Robert Luna, in his Official Capacity, and the County of Los Angeles*

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067