PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930

*Not admitted in D.C., practice limited
to federal courts

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al.*,<br><br>    Plaintiffs,<br><br>    vs.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES, in their official capacities, *et al.*<br><br>    Defendants. | Case No. CV 75-04111 DDP<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT (Doc. 375)**<br><br>Date: April 19, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Dean D. Pregerson<br>Crtrm: Courtroom 9C |

i

# **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ..................................................................................................... 1

DISCUSSION .......................................................................................................... 2

   I.  DEFENDANTS ARE IN CONTEMPT OF COURT ................................... 2

      A.  The PI is Specific and Plaintiffs Have Demonstrated
           Noncompliance ....................................................................................... 2

         1.  Defendants' "Overall Compliance" Is Not a Defense and
             Masks Widespread Violations of Paragraph 1 ............................... 3

         2.  Defendants Are Noncompliant With Paragraph 7 .......................... 5

         3.  Defendants Are Noncompliant With Other PI Provisions .............. 9

            a.  Paragraph 2: Front Bench Four Hour Limit .............................. 9

            b.  Paragraph 4: IRC Holding Cells 12-Hour Limit ...................... 9

            c.  Paragraph 6: Access to Toilets, Water, Clean Conditions ...... 10

      B.  Defendants Have Had Notice and an Opportunity to Be Heard ......... 10

      C.  Defendants Did Not Take All Reasonable Steps to Comply .............. 10

         1.  Defendants' Shortages of Mental Health Care Staff
             Pre-Date the PI and Were Foreseeable ......................................... 11

         2.  Defendants Have Failed to Reduce the Number of People
             With Mental Illness in the Jail ....................................................... 12

         3.  Defendants' Remedial Plans Do Not Address
             Broader Crowding Problems or Non-Mentally Ill People
             Waiting in the IRC ......................................................................... 13

1

2

II.  PROSPECTIVE SANCTIONS FOR FUTURE NONCOMPLIANCE
ARE WARRANTED ................................................................. 15

A.  The Proposed Sanctions Are Reasonable and Appropriate ................ 15

B.  Defendants Have The Opportunity to Purge Contempt
and Avoid Prospective Sanctions ....................................... 17

C.  The Court Can Craft Its Own Prospective Sanctions or Timetable
for Compliance If It Finds Plaintiffs' Proposal Unworkable ............. 17

CONCLUSION ....................................................................... 18

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV-75-04111-DDP

PLAINTIFFS' REPLY ISO MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armstrong v. Brown*,
  939 F. Supp. 2d 1012 (N.D. Cal. 2013) ...................................................... 4

*Coleman v. Newsom*,
  No. 2:90-cv-0520 KJM DB P, 2023 WL 2277384
  (E.D. Cal. Feb. 28, 2023)........................................................................ 16

*Coleman v. Schwarzenegger / Plata v. Schwarzenegger*,
  Nos. CIV S-90-0520 LKK JFM P, C01-1351 TEH,
  2007 WL 3020078 (E.D. Cal. / N.D. Cal. Oct. 10, 2007),
  *vacated on reconsideration*, 2008 WL 397295
  (E.D. Cal. / N.D. Cal. Feb. 8, 2008) ..............................................16-17

*Flores v. Sessions*,
  394 F. Supp. 3d 1041 (C.D. Cal. 2017)..................................................... 3

*Food Lion Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*,
  103 F.3d 1007 (D.C. Cir. 1997) ................................................................ 4

*Garcia v. City of L.A.*,
  No. CV 19-6182 DSF (PLAx), 2020 WL 6586305
  (C.D. Cal. Sept. 23, 2020) ........................................................................ 3

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986)................................................................... 3

*Greenawalt v. Ricketts*,
  943 F.2d 1020 (9th Cir. 1991)................................................................. 10

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) .................................................................................... 1

*Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*,
  901 F.2d 311 (3d Cir. 1990) ...................................................................... 3

*Hernandez v. Cnty. of Monterey*,
  110 F. Supp. 3d 929 (N.D. Cal. 2015)....................................................... 5

iv

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994) ........................................................................ 10

*Jensen v. Shinn*,
  609 F. Supp. 3d 789 (D. Ariz. 2022) ................................................. 3

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) ........................................................ 4, 5

*Nat. Res. Def. Council v. Cnty. of L.A.*,
  840 F.3d 1098 (9th Cir. 2016) ........................................................ 11

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020) ......................................................... 4, 17

*Plata v. Schwarzenegger*,
  603 F.3d 1088 (9th Cir. 2010) ........................................................ 15

*Plata v. Schwarzenegger*,
  Nos. CIV S-90-0520 LKK JFM ..................................................... 16

*S.E.C. v. Hickey*,
  322 F.3d 1123, *amended*, 335 F.3d 834 (9th Cir. 2003) ................... 18

*Shell Offshore Inc. v. Greenpeace, Inc.*,
  815 F.3d 623 (9th Cir. 2016) ..................................................... 15, 17

*Stone v. City & Cnty. of S.F.*,
  968 F.2d 850 (9th Cir. 1992) ......................................................... 2, 10

*United States v. Ore. State Med. Soc.*,
  343 U.S. 326 (1952) ...................................................................... 11

*Wash. Metro. Area Transit Auth. v. Amalgamated Transit Union*,
  531 F.2d 617 (D.C. Cir. 1976) ......................................................3-4

*Withrow v. Concannon*,
  942 F.2d 1385 (9th Cir. 1991) .......................................................... 3

**Statutes**

18 U.S.C. § 3626(a)(3) .................................................................... 16

18 U.S.C. § 3626(a)(3)(A)(i) ........................................................... 16

v

1

18 U.S.C. § 3626(a)(3)(F) .................................................................................. 16

2

28 U.S.C. § 2284.............................................................................................. 16

3

California Government Code § 8658 ............................................................ 13, 17

4

**Other Authorities**

5

Keri Blakinger & Connor Sheets, *Sheriff Robert Luna: 'I'm going to*
   *be recognized as a sheriff who follows the law'*, L.A. TIMES
   (Mar. 24, 2023) ..................................................................................................2

6

7

8

Calif. Bd. of State & Community Corrections, *Rated Capacities of*
   *Type II, III, & IV Local Adult Detention Facilities* (Feb. 15, 2023) ................. 13

9

10

Robert Garrova & Emily Elena Dugdale*, A Daily 'Human Rights*
   *Disaster': LA Jail Medical Staff Outraged by Jail Conditions and*
   *the Doctor in Charge*, LAIST (May 2, 2022),...................................................... 12

11

12

Nikie Johnson, *Los Angeles County: World's largest jail system*
   *getting a healthcare overhaul*, L.A. DAILY NEWS (Aug. 22, 2019)................... 12

13

14

L.A. Cnty. Chief Exec. Office, *Fiscal Year 2022-23 Supplemental*
   *Budget at a Glance* ............................................................................................ 15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

We have all been here before, too many times. More than four decades of monitoring and litigation has resulted in an endless nightmare game of whack-a-mole: conditions in LA County Jails' Inmate Reception Center (IRC) marginally improve; then stuff hits the fan; everything falls apart; and it's a disaster in the IRC. Plaintiffs seek the Court's help; Defendants unveil plans to improve things; IRC conditions briefly get better; then a new problem arises or an old problem revives; things hit the fan again, and it all falls apart; conditions are dreadful again; and back to court we go—rinse and repeat, *ad nauseum*.[1] "A good or lucky day is not a state of compliance. Nor is the dubious state in which a past . . . problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc*., 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and concurring in the judgment).

The stipulated Preliminary Injunction (PI) is unambiguous. It addresses IRC overcrowding, delays in moving people to permanent jail beds, the need for adequate health care, and general living conditions. *See generally* Doc. 351. Defendants admit "challenges persist in the IRC which create the real possibility of a significant backlog if unusual events occur in unison, such as unexpected staffing shortages combined with a surge of large numbers of inmates into the IRC with mental health conditions who cannot be processed quickly." Doc. 379 at 17. Staffing shortages or an inability to quickly process people with mental illnesses *are* foreseeable events Defendants repeatedly experience, and a "real possibility" of recurrence is, on its face, an admission they have not taken all reasonable efforts to comply with the PI.

---

[1]    To illustrate, Plaintiffs sought contempt in April 2007 after more than 900 people were held in IRC over 24 hours in a two-month period, violating a past order. *See* Docs. 130-132. Plaintiffs withdrew the motion after the parties agreed to a remedial plan, Doc. 134. *See* Doc. 318-1 at 15-18. Plaintiffs have returned to the Court for assistance for recurrent problems. Doc. 375 at 25-27; Doc. 318-1 at 18-37. Docket citations are to page numbers assigned by the ECF system.

(cont'd)

PLAINTIFFS' REPLY ISO MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT

Sheriff Luna said recently, "the ACLU is taking the court action, and I don't blame them for doing it. There are some unacceptable conditions [in IRC]."[2] Plaintiffs are glad he doesn't minimize or ignore IRC problems, and he says he will be a sheriff who follows the law. But the law he promises to follow is clear that good faith is no defense to contempt.

It is time for Defendants to end four decades of noncompliance and address the root cause of abysmal conditions: their failure to develop community-based alternatives to incarceration to end overcrowding. It is time for the Court to find them in contempt and sanction them for future noncompliance. *See Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856-57 (9th Cir. 1992) (holding jail officials' long history of noncompliance was "highly relevant" to contempt finding).

## DISCUSSION

## I.   DEENDANTS ARE IN CONTEMPT OF COURT

Plaintiffs' Motion sets forth the Court's legal authority to enforce past orders and to find Defendants in contempt, and Plaintiffs incorporate it herein. *See* Doc. 375 at 8-10, 27-28. Plaintiffs incorporate all facts previously submitted, and address here issues raised by Defendants, Doc. 379.

### A. The PI is Specific and Plaintiffs Have Demonstrated Noncompliance

"The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Stone*, 968 F.2d at 856 n.9. Plaintiffs showed the widespread noncompliance with PI requirements enjoining Defendants from holding a detainee: in IRC for more than 24 hours (Doc. 351 ¶ 1); on the Clinic Front Bench, handcuffed, chained, or tethered to any fixed object for more than four hours (*id.* ¶ 2); in an IRC holding cell for more than 12 hours (*id.* ¶ 4); in any IRC clinic area, cage, or cell when it is not in a clean

---

[2]   Keri Blakinger & Connor Sheets, *Sheriff Robert Luna: 'I'm going to be recognized as a sheriff who follows the law'*, L.A. Times (Mar. 24, 2023) at https://www.latimes.com/california/story/2023-03-24/sheriff-robert-luna-im-going-to-be-recognized-as-a-sheriff-who-follows-the-law.

and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles (*id.* ¶ 6); or in any IRC clinic area, cage, or cell without providing access to adequate medical and mental health care, including medications (*id.* ¶ 7). *See generally* Doc. 375 at 11-25.

### 1. Defendants' "Overall Compliance" Is Not a Defense and Masks Widespread Violations of Paragraph 1.

Defendants contend they are not in contempt of the PI's 24-hour limit on stays in IRC because 94% of people processed spent fewer than 24 hours there. Doc. 379 at 6, 11-12, 22-23. This argument fails on the facts and law. The PI does not permit 95% compliance with the 24-hour limit (or for any other part of the PI). Defendants' position urges an "inequitable and disconcerting principle" that they can "treat a few . . . class members in any fashion they want so long as they comply with the [PI] with regard to a substantial number of other . . . class members." *Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 324 (3d Cir. 1990); *see Withrow v. Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991) (holding that language stating "a decision 'shall' or 'must' be made within the specified number of days" is "unequivocal"); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 857 (D. Ariz. 2022) ("Even if only 5% of mentally ill prisoners do not have access to care, that is unconstitutional."); *see also Flores v. Sessions*, 394 F. Supp. 3d 1041, 1049 (C.D. Cal. 2017) ("In California, 'a party is deemed to have substantially complied with an obligation only where any deviation is unintentional and so minor or trivial as not substantially to defeat the object which the parties intended to accomplish.'") (quoting *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016)).[3]

---

[3]   To the extent a "technical violation" could excuse contempt, that is only when, additionally, a party took "all reasonable steps to comply with the court order." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986); *see Garcia v. City of L.A.*, No. CV 19-6182 DSF (PLAx), 2020 WL 6586305, at *3 (C.D. Cal. Sept. 23, 2020) (partial finding of contempt, noncompliance occurred four times). Defendants' citation to *Wash. Metro. Area Transit Auth. v. Amalgamated Transit Union*, 531 F.2d 617, 621 (D.C. Cir. 1976) to argue that substantial

(cont'd)

3

As shown in Part I.C., Defendants have not taken all reasonable steps to comply. And their assertion of overall compliance with Paragraph 1 glosses over two critically important facts.

*First*, Defendants elide that their reports show 1,364 people in IRC over 24 hours from September 2022 to February 2023, including 217 people held over 36 hours. *See* Doc. 379-2 at 1-5 (sum of fifth column, "24 Hours + (All)" and sum of seventh column, "36 Hours +"). On only 42 of the 155 days listed were no class members held beyond 24 hours, a daily compliance rate of 27%. *Id.*

*Second*, as previously described, *see* Doc. 375 at 14-15 & n.8; Doc. 375-2 ¶¶ 8, 13, 16-23, Defendants undercount people exceeding the 24-hour limit, due to a practice of moving people to IRC overflow when they approach 24 hours, to stop the clock. Defendants admit the same. *See* Doc. 379-4 ¶ 16 (people moved to IRC overflow once they "spent nearly 24 hours in the IRC"). Defendants' reported compliance numbers are grossly overstated since at least February 3, the date they admit they began this practice. Doc. 379-4 ¶ 7. Defendants did not report overflow numbers until February 23, and never listed them as violations. Camacho Dec., ¶ 4. Between February 23, the first date Defendants reported IRC overflow data, and

---

compliance excuses contempt, Doc. 379 at 22, is not well-taken, as that contempt finding was reversed because a preliminary contempt order was moot, and a final contempt order did not include written or oral findings. 531 F.2d at 620-21. Citation (Doc. 379 at 22) to *Food Lion Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1017-18 (D.C. Cir. 1997) to argue good faith efforts are relevant to determine noncompliance and to mitigate of damages is inapposite, as the court discussed a split of opinion in the D.C. Circuit on this point. *Id.* at 1017-18 & nn.15-18. Finally, reliance (Doc. 379 at 22-23) on the *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013), that contempt is excused if a party is making substantial efforts to comply, is misplaced, given subsequent Ninth Circuit decisions rejecting such excuses. *See Parsons v. Ryan*, 949 F.3d 443, 457-58 (9th Cir. 2020) ("*Parsons III*"); *Kelly v. Wengler*, 822 F.3d 1085, 1096-97 (9th Cir. 2016). Citations to out-of-circuit or outdated sister district court cases ignore precedents set forth in the Motion and here. Doc. 375 at 27-28.

(cont'd)

February 28, 2023, the last date on the chart filed with the Court, there were dozens of people missing from the 24-hour report by this sleight of hand. *Id.* ¶¶ 26-29, Ex. J. For example, they reported one person over 24 hours on February 26, awarding themselves a 99.3% compliance rate. Doc. 379-2 at 5. But that same day, 60 people were in overflow. Camacho Dec. ¶ 28, Ex. J.[4] None of the self-reported February compliance rates account for the many people held in overflow over 24 hours.[5]

### 2. Defendants Are Noncompliant With Paragraph 7.

Defendants cut people off psychiatric medications they were prescribed in the community when they enter IRC, in violation of Paragraph 7. *See* Doc. 375 at 21-24. Often people are cut off for weeks and sometimes months, even after transfer to permanent jail housing. This is extremely dangerous, and can cause serious harm including exacerbation of mental illness, severe physiological changes, seizures, or death by suicide. *See* Doc. 318-2, Ex. 16 (Kupers Dec.) at 151 ¶¶ 13-14.[6] Given the high risks of cutting off psychiatric medications, "all standards in correctional and well as instruction on institutional care require immediate attention to inmates' psychiatric medication when they are arrested and admitted to jail." *Id.* ¶ 16.

The harm that results is illustrated by class member Mr. Candler. He took Seroquel in the community, was cut off when he entered IRC, and experienced

---

[4]   Defendants argue they didn't use IRC overflow to hide PI violations. Doc. 379 at 2-3. While that may not have been their intent, it certainly has that effect. They cannot on one hand argue they're not hiding 24-hour violations, and then rely on a compliance chart grossly overstating compliance when it ignores all the people held in IRC off the clock, in overflow, over 24 hours.

[5]   Defendants' March 2023 reports show they still hold many people past 24 hours, yet the reports understate the problem. Exhibit A to the declaration of Peter Eliasberg summarizes reports given for March 1-April 1, 2023. For 25 of the 32 days (78.1% of the days), there was at least one person held over 24 hours, including 41 people on March 11, and 12 people on March 22. *Id.* A total of 127 people were held more than 24 hours, and 8 were held more than 36 hours. *Id.*

[6]   *See Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 960 (N.D. Cal. 2015) (granting PI related to, *inter alia*, an inadequate bridge medication policy).

(cont'd)

5

paranoia and hearing voices as a result. Doc. 375-1, Ex. 4, ¶¶ 2-5. Dr. Kupers stated that due to the cutoff, Mr. Candler "had an acute decompensation including auditory hallucinations, requiring increasing his level of mental health treatment. . ." Kupers Supp. Dec., filed hereto, ¶ 12. Mr. Candler was not prescribed Seroquel in the jail for more than a month, and Dr. Kupers opined that had "IRC staff doing his evaluation contacted Telecare and verified his prescription, had he not been without his medications at the jail for over a month, and had he been timely prescribed Seroquel, he would not have decompensated in the jail, gotten into a confrontation with custody staff, and suffered exacerbated psychotic symptoms . . ." *Id.* ¶ 12.[7]

Defendants assert their Bridge Medication policy "represents the standard of care in carceral settings" and that discontinuing medications for the declarants upon arrival in IRC was consistent with it. Doc. 379-6 ¶¶ 3, 5. These assertions are misguided: Dr. Kupers explains the policy is "entirely inadequate and does not comply with the standard of care in carceral settings in multiple regards," and he reviewed declarants' medical records and found many should have received medication—even under the inadequate policy. Kupers Supp. Dec. ¶¶ 6, 14. The policy suffers from at least three serious flaws that threaten the health and safety of people with mental illness entering the IRC.

***First***, it does not require robust efforts to verify the medications people were prescribed. Dr. Siscoe states that people can get bridge medication if they "inform[] CHS clinicians of both the medication(s) he or she takes as well as the pharmacy

---

[7]     Similarly, Raymond Crowley took medications including a generic equivalent of Seroquel, and Artane, an antispasmodic, and had a recent prescription with three refills. *Id.* ¶ 14. After Defendants cut off his medication at intake at IRC, and for a month after transfer to a permanent bed, he had severe symptoms such as "hearing voices [and] seeing faces in my food and in the wall." Doc. 375-1, Ex. 6 ¶ 13. Dr. Kupers reviewed his records and found that "during that month he suffered a crisis of EPS (jaw cramping) for lack of Artane, and hallucinations and other psychotic symptoms, likely because he was deprived of his multiple anti-psychotic and mood stabilizing medications." Kupers Supp. Dec. ¶ 14.

6

that fills out the prescription(s) and the clinician confirms with the pharmacy that the medication was provided in the past 30 days." Doc. 379-6 ¶ 3. Dr. Kupers opines:

> The duty of staff in the admitting area goes far beyond simply making an attempt to contact the admittee's pharmacy. Calling the pharmacy of record is only the first part of that duty. Jail mental health staff also need to contact the mental health clinician or physician who prescribed the psychotropic medications. Finally, if that second step does not confirm a pre-incarceration prescription, the staff should ask the admittee, or family members or individuals who reside with the admittee, to produce paperwork or a bottle of pills . . .

Kupers Supp. Dec. ¶ 8 (citing American Psychiatric Association – *Psychiatric Services in Correctional Facilities*, p. 30 (3d Ed. 2016)).

Large community mental health providers where many declarants receive services, such as Telecare, the County-operated Augustus Hawkins Mental Health Center, or POC,[8] "should be relatively easy to contact and request verification of medications without waiting to hear back from a specific prescriber." *Id.* ¶ 8. Kevin Scott's case shows the policy's inadequacy: Dr. Siscoe testified he was cut off medication at IRC because his "medications could not be verified," Doc. 379-6 ¶ 5, yet his 1/25/23 IRC screening intake lists the medications he took in the community, buspirone and fluoxetine, and notes "CURRENTLY TAKING PSYCH MEDS FROM POC VIA MAIL." Kupers Supp. Dec. ¶ 18. Dr. Kupers found "nothing in Mr. Scott's jail medical record to indicate jail staff made any effort to contact his parole mental health provider to verify his prescription. Nor do I see anything in the record indicating why his prescription could not be verified." *Id.*.[9]

---

[8]     POC is the parole mental health provider.

[9]     As noted above, Mr. Candler did not receive medications because it appears nobody contacted his community provider, Telecare. Declarant Erick Scoby also told an IRC screener in October that he was taking medication, and gave jail staff his doctor's name at Telecare. Kupers Supp. Dec. ¶ 17. Dr. Siscoe testified he was not given medication because his prescription could not be verified. Doc. 379-6 ¶ 5. His records show he was prescribed an anti-psychotic and an anti-anxiety medication. Kupers Supp. Dec. ¶ 17. Dr. Kupers found, "nothing in Mr. Scoby's jail
(cont'd)

7

**Second**, Defendants' policy is inadequate because it requires a person have *taken* psychiatric medication within 30 days before arrest, not only that they have a recent prescription. Doc. 379-6 ¶ 5 (stating that Messrs. Cisneros, Jones, Garcia Alfaro, and Brown did not receive bridge medication because "they had not taken the medication in the 30 days prior to their arrival in the IRC"). Dr. Kupers explains that non-adherence to medication in the community is all-too-common, especially among homeless people. But being jailed is a traumatic experience, especially for people with mental illness, who have extremely high levels of suicide in jail.[10] Thus,

> it is incumbent on clinicians to make every effort to treat their patients, including medication treatment, so that they will not experience psychotic or depressive suicidal crises under the stress and duress of jail incarceration. Almost all the nine of the people whose cases I reviewed were clearly motivated to take medications while in the jail and were clearly stating while in the IRC that they needed medications. To invalidate their very legitimate request that the medications they were prescribed in the community be re-started, simply because they did not always adhere to their medication prescriptions in the community, is an abrogation of the clinicians' duty to provide treatment that serves to reduce the risk of decompensation or suicide in the jail setting.

Kupers Supp. Dec. ¶ 10.

**Third**, Defendants must ensure that people entering IRC reporting a mental health diagnosis, symptoms of mental illness, or a need for psychotropic medication,

---

medical record to indicate jail staff made any effort to contact [his doctor] or determine what medical provider she worked for to verify his prescription until Mr. Scoby had suffered immensely." *Id.* Mr. Scoby testified that when not receiving his psych meds, "I started having visions and hearing voices saying my name. My mind was racing and I could not control my thoughts." Doc. 375-1, Ex. 18 ¶ 7.

[10]    LA County jails have a shockingly high suicide rate compared to other jail systems across the state and country. There were at least 12 suicides in LA jails in 2021, the most recent year for which data is complete information. *See* Kendrick Dec. ¶ 3. This is a rate of **87.9 suicides per 100,000 detainees**, more than double the rate for all California jails as reported by the U.S. Department of Justice's Bureau of Justice Statistics for 2015-19 (42 per 100,000), and almost double the national average for 2015-19, 48 per 100,000. *See id.* ¶¶ 4-5, Ex. C at 12-13 (Table 3).

8

are promptly assessed by a psychiatric prescriber, even if intake staff cannot verify a prescription. "That way, the inability or failure of IRC staff to verify the admittee's medications will be resolved by the current psychiatric examination in the jail. After all, the purpose of bridge medications is to prevent suicide or psychotic episodes or other psychiatric crisis. . . ." *Id.* ¶ 9. Nothing in Dr. Siscoe's declaration suggests Defendants do this, and Dr. Kupers' review of declarants' medical records showed that when IRC staff did not verify or provide medications at intake, weeks or even months went by before they were restarted. *See generally id.* Finally, Dr. Siscoe's explanation why many declarants did not qualify for medication is contradicted by jail medical records. *Id.* ¶¶ 11, 14 (describing Mr. Crowley and Mr. Brown's situations, among others, that violate the inadequate existing policy).

In sum, Defendants' bridge medication policy falls far short of the standard of care, threatening the health of mentally ill people in IRC. Defendants often fail to follow their policy, as shown by how often Dr. Siscoe's stated reasons for denying medication to declarants were contradicted by the jail's own medical records.

### 3. Defendants Are Noncompliant With Other PI Provisions.

Defendants do not dispute noncompliance with Paragraphs 2, 4, and 6; and more recent reports show ongoing noncompliance.

### a. Paragraph 2: Front Bench Four Hour Limit

Defendants provided Front Bench reports through March 15, 2023, listing all people with serious mental illness who spent more than four hours restrained to the Front Bench awaiting mental health evaluation. Exhibit A to the declaration of Corene Kendrick is a chart summarizing reports for March 1-15, 2023. In this ***two-week period, there were 104 people*** who were chained to the Front Bench for over four hours. Kendrick Dec. ¶ 2(f) & Ex. A. From January 1-February 20, 2023, 367 people were shackled at the Front Bench over four hours. Doc. 375 at 18.

### b. Paragraph 4: IRC Holding Cells 12-Hour Limit

Defendants' sole discussion of Paragraph 4 is to concede problems in

recordkeeping and monitoring compliance, Doc. 379 at 10 n.2, but they don't dispute evidence of widespread violations and people held in holding cells well in excess of 12 hours. *See* Doc. 375 at 15-16. There now appear to be ***358 violations*** of Paragraph 4 from February 28-March 16, 2023. *See* Dominguez-Ruiz Dec., filed hereto, ¶¶ 4, 7, Ex. A. Seven people were in a holding cell over 30 hours; two people were in a holding cell over 40 hours. *Id.* The violations are undercounted because they do not account for many records missing release dates and times. *Id.* ¶¶ 6, 10, Exs. C, D.

### c. Paragraph 6: Access to Toilets, Water, Clean Conditions.

Defendants fail to respond to any evidence offered about **Paragraph 6** violations: the requirement to have clean and sanitary IRC facilities with functional toilets, access to water to drink and wash, and trashcans. *See Greenawalt v. Ricketts*, 943 F.2d 1020, 1027 (9th Cir. 1991) (deeming failure to argue an issue is a concession). Thus, there is no reason to doubt the people held in IRC still suffer conditions similar to those observed by Plaintiffs' counsel or described by declarants in recent months: stuffed with others in cold cells, without a mattress or blanket, and with marginal access to toilets, water, and food.

### B. Defendants Have Had Notice and an Opportunity to Be Heard

Defendants had notice of the PI and stipulated to it. They had notice of Plaintiffs' Motion, submitted filings to the Court, and will be heard at the hearing on April 19, 2023. The requirement that a party has notice and an opportunity to be heard about alleged noncompliance before a finding of contempt is met. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

### C. Defendants Did Not Take All Reasonable Steps to Comply

Once a moving party establishes noncompliance with a court order, the burden "shifts to the contemnors" to show "categorically and in detail" that they took all reasonable steps to comply. *Stone*, 968 F.2d at 856 n.9; *N.L.R.B. v. Trans Ocean Export Packing*, Inc., 473 F.2d 612, 616 (9th Cir. 1973). Defendants fail to do so.

Defendants argue they should not be found in contempt because they launched

10

remedial efforts and plans, including since Plaintiffs filed the Motion. Doc. 379 at 10, 14, 20. This is too little too late. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Ore. State Med. Soc.*, 343 U.S. 326, 333 (1952); *see Nat. Res. Def. Council v. Cnty. of L.A.*, 840 F.3d 1098, 1104 (9th Cir. 2016) (same).

## 1. Defendants' Shortages of Mental Health Care Staff Pre-Date the PI and Were Foreseeable.

Defendants repeatedly blame noncompliance on unanticipated or unexpected shortages of health care staff. *See, e.g.*, Doc. 379 at 6-7, 12-15, 17, 19, 21, 23-24. But staffing deficiencies at IRC—including among mental health care staff—are foreseeable and predictable, especially given documented chronic and historic health care staffing shortages that county officials highlighted for years as a primary driver of IRC problems. In 2017, Supervisor Hahn asked about Correctional Health Services (CHS) vacancies and hiring more staff to "improve the quality of health services for our inmate patients." Dominguez-Ruiz Dec. ¶ 11, Ex. E at 133-34. In response, then-CHS director Dr. Mark Ghaly told the Defendant Board of Supervisors that there were "roughly, currently, 450 vacancies." *Id*. Seven months later, the Board discussed addressing "critical staff shortage" to "properly support medical services within the jails." *Id*. ¶ 12, Ex. F at 96-98. The Board heard about profound deficiencies in CHS staffing in March 2020. *See id*. ¶ 13, Ex. G at 136 (LASD representative testified the IRC backups were due to health care staffing shortages). Defendant BOS members repeatedly heard of the need for and plans to hire more health care staff, and bureaucratic difficulties in hiring. *See*, *e.g.*, *id*. ¶¶ 15-19, Ex. I at 190-91 (11/16/21 hearing, report of problems hiring mental health staff); Ex. J at 152-53 and 161-62 (12/7/21 hearing, Dr. Belavich, CHS director, reported hiring and recruitment problems, and the BOS discussed the need for more staff); Ex. K at 249 (6/28/22 hearing, a shortage of CHS staff contributes to crowding and

11

backups in IRC); Ex. L at 227-31 (9/13/22 hearing, Dr. Belavich described mental health staffing shortages and Supervisor Barger stated the County has "been put on notice [by the ACLU] that we have a situation brewing that we have to get our arms around"); Ex. M at 138 (1/10/23 hearing, Dr. Belavich reported mental health staffing shortages).

Defendants have failed to take reasonable steps to fix a long-standing, well-known staffing problem— nothing about this is unanticipated.[11]

### 2. Defendants Have Failed to Reduce the Number of People With Mental Illness in the Jail.

Defendants conceded in September 2022, "bottlenecks which cause inmates to be housed in the IRC Clinic for more than 24 hours are due, in overwhelming measure, to severe housing shortages for mentally ill inmates . . . , as inmates who require MOH and HOH housing cannot be expeditiously provided with such permanent housing." Doc. 337 at 10. Since then, Defendants made negligible progress to reduce or divert people from the jail needing specialized mental health care. As of March 28, there were only 23 fewer male HOH patients than on September 6, 2022 (1,227 vs. 1,250), and the number of men in MOH beds increased by 98 (2,687 v. 2,785). Camacho Decl. ¶ 35, Ex. O.

Defendants' sluggishness is inexcusable when the OIG and CHS Directors have said for years that IRC problems will not disappear when there are not enough

---

[11]   Reporters have documented jail health care staffing deficiencies for years. *See, e.g.*, Nikie Johnson, *Los Angeles County: World's largest jail system getting a healthcare overhaul*, L.A. DAILY NEWS (Aug. 22, 2019) https://www.dailynews.com/2019/08/02/los-angeles-county-worlds-largest-jail-system-getting-a-health-care-overhaul/ (plans to improve health care in jails include an "ask to hire 120 more mental health clinicians"); Robert Garrova & Emily Elena Dugdale, *A Daily 'Human Rights Disaster': LA Jail Medical Staff Outraged by Jail Conditions and the Doctor in Charge*, LAIST (May 2, 2022), https://laist.com/news/criminal-justice/los-angeles-county-jail-medical-staff-outraged-by-jail-conditions. ("[T]he health care system within the jail is 'critically short-staffed'").

(cont'd)

MOH and HOH beds, and if the jail population stays above the maximum rated capacity set by the Board of State and Community Corrections (BSCC). As of March 28, 2023, the total population was 13,988, or 1,584 people over BSCC rated capacity of 12,404.[12] While the burden is not Plaintiffs' to show all the ways how Defendants could comply, they have detailed how Defendants can address the root problem, from increasing ODR funding to releases under California Government Code § 8658. *See* Doc. 318-1 at 21-25. Defendants have not done this.[13]

### 3. Defendants' Remedial Plans Do Not Address Broader Crowding Problems or Non-Mentally Ill People Waiting in the IRC.

In passing, Defendants point to a long-term plan to divert P3 and P4 patients, those who require HOH beds, into non-carceral facilities. Doc. 379 at 20 n.7. While Plaintiffs support this, the slow rollout is a major reason why there are as many people with HOH/MOH status in the jail now as when the Court issued the PI. *See supra* Part I.C.2. And focusing only on HOH patients will not bring Defendants in compliance with Paragraphs 1, 4, or 6. People held in IRC or holding cells beyond time limits are almost all waiting for MOH or general population beds. Of the 358

---

[12]    Defendants miscalculate the number of people held above the maximum BSCC rating on March 9, 2023. Doc. 378 at 9 n.4. The BSCC rated capacity is 12,404. *See* BSCC, *Rated Capacities of Type II, III, & IV Local Adult Detention Facilities* (Feb. 15, 2023) at https://www.bscc.ca.gov/s_fsojailprofilesurvey/. 14,096 is 1,692 over the maximum, not 788.

[13]    In 2019, the OIG recommended diverting people with mental illnesses to reduce IRC wait times. *See* Doc. 318-1 at 26-27. After a September 2021 spike in IRC wait times and overcrowding, *see id.* at 26-29, Mr. Huntsman implored the County to "take the keys, unlock the door and dump people until you get 12,000." Camacho Dec. ¶ 31, Ex. K at 1. In Summer 2022, he reported "grossly overcrowded" jails causing IRC "bottlenecks," and in January 2023 told the Civilian Oversight Commission "[a]s long as we are as substantially above the cap on the BSCC as we are, we will continue to have these problems." *Id.* ¶ 32, 37, Ex. L at 1 & Ex. Q at 2. On January 10, 2023, Dr. Belavich told the Board he "fear[ed]" improvements in IRC wait times "will not last, that this is only temporary" as "47% of the population at this point is enrolled in mental health programs, and that number just continues to climb." Dominguez-Ruiz Dec. ¶ 19, Ex. M at 136.

people in holding cells over 12 hours from Feb. 28-Mar. 16, 2023, only three were awaiting HOH beds. Dominguez-Ruiz Decl. ¶ 7, Ex. A. Of the 89 people in IRC over 24 hours on days for which counsel has data for subsequent housing locations (Feb. 9, Mar. 16, and Mar. 22, 2023), only six awaited a HOH bed; and none in IRC overflow awaited HOH beds. Camacho Dec. ¶¶ 13-14, 21, Ex. D, E, F; Doc. 379-4 ¶ 6 (IRC overflow used for those who do not require HOH).

Defendants argue "a lack of [MOH beds] for P2 inmates has not been a cause for delays in placing inmates in permanent housing from the IRC" and that keeping jails populated above the maximum BSCC rating has no impact on IRC compliance. Doc. 378 at 8 & n.4. This is belied by County officials and the facts.[14] Defendants relieved some, but not all, of the pressure on IRC by increasing MOH beds in MCJ and Pitchess. But the expansion of MOH beds in two jails is not a panacea, as Defendants created two new problems that will ultimately blow back on the IRC.

First, Defendants house MOH patients in MCJ while admitting that "no one believes that the MCJ is an optimal place to house MOH inmates." Doc. 337 at 9. Characterizing the placement of people with mental illness in the crumbling dungeon of MCJ as not "optimal" is an understatement. Dr. Belavich stated, "Men's Central Jail is not a good place to have mentally ill individuals, and I advocate against it, and I know my custody partners advocate against it, but without any other options for housing, we are left with that." Camacho Decl. ¶ 33, Ex. M at 2.

Second, Defendants are putting more MOH patients in Pitchess North jail than the BSCC permits. The MOH units are in a dormitory setting of 80 beds per dorm. *Id*. The BSCC, however, notified Defendant Luna that LASD violates state capacity limits for those dorms, as they are rated for only 48 people. *Id*. ¶ 36, Ex. P at 5, 7.

Stuffing groups of 80 people into 48-person dorms at Pitchess, and housing

---

[14]     Inspector General Huntsman and Dr. Belavich have said as recently as two months ago that IRC problems are traceable to operating the jails in excess of the BSCC capacity and lack of capacity for both MOH and HOH. *See supra* n.13.

14

Case No. CV-75-04111-DDP

PLAINTIFFS' REPLY ISO MOTION FOR AN ORDER TO SHOW CAUSE RE: CONTEMPT

hundreds of people with serious mental health needs in MCJ against the advice of the CHS Director, are not solutions. These experiments ultimately will fail, people with mental illness will suffer in the interim, and once this house of cards falls, overcrowding in IRC will come roaring back with a vengeance.

## II.    PROSPECTIVE SANCTIONS FOR FUTURE NONCOMPLIANCE ARE WARRANTED

Plaintiffs offered clear, convincing, and undisputed evidence— including Defendants' own reports— of the widespread noncompliance with key provisions of the PI, which justifies a finding of contempt. Once a court makes a contempt finding, it turns to what sanctions are appropriate to coerce compliance.

### A.    The Proposed Sanctions Are Reasonable and Appropriate

Defendants complain the "intricate fine scheme" Plaintiffs proposed is ineffective and unworkable. Doc. 379 at 25. They argue that if fines were imposed, "the Court would become a singular county supervisor in this area, essentially granted the powers to control a potentially large portion of the County fiscal resources." *Id.* at 26. This is hyperbolic and untrue. The fines are not complicated. And if Plaintiffs wanted the Court to step into roles the BOS and County departments struggle with, then they would have asked the Court to appoint a Receiver.[15]

Defendants' complaint that the proposal of compounding financial sanctions for future noncompliance "could quickly add up to an unjustified sum," *id*. at 26, is equally unavailing. First, the County's $44.6 billion 2022-23 budget dwarfs any proposed sanction.[16] Second, Defendants control their fate and sanctions amount: if

---

[15]    Plaintiffs reserve the right to seek the appointment of a Receiver under Fed. R. Civ. P. 66, as it available to the Court to ensure compliance with the Constitution and court orders. *See Plata v. Schwarzenegger*, 603 F.3d 1088, 1093 (9th Cir. 2010) (holding that "[c]ertainly nothing in the [Prison Litigation Reform Act] expressly prohibits the appointment of a receiver. Receiverships were far from unknown in prison litigation before the enactment of the PLRA . . .").

[16]    *See* L.A. Cnty. Chief Exec. Office, *Fiscal Year 2022-23 Supplemental Budget at a Glance*, at https://ceo.lacounty.gov/wp-content/uploads/2022/10/FINAL-2022-23-Supplemental-Budget-At-A-Glance-1.pdf.

15

they comply, they won't accrue fines. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 630 (9th Cir. 2016) (holding that a party can avoid future accrual of threatened fines by complying). Third, the proposed schedule is akin to coercive civil contempt sanctions other courts have used. *See* Doc. 375 at 30-31. In addition to cases cited in the Motion, the day after Plaintiffs filed it, the Eastern District of California issued an order to show cause against state officials in long-running litigation about mental health care in state prisons, imposing prospective fines to start March 31, 2023 for mental health staff vacancies. *See Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB P, 2023 WL 2277384, *2-3 (E.D. Cal. Feb. 28, 2023).[17]

Defendants ask that if the Court finds them in contempt, it hold the order in abeyance, and sanction them by referring the parties to meet to create a population release order compliant with the Prison Litigation Reform Act (PLRA). Doc. 379 at 26-28. This request is premature because the Court has not "entered an order for less intrusive relief that has failed to remedy the deprivation" of rights, as required by the PLRA. 18 U.S.C. § 3626(a)(3)(A)(i). The Court has not yet issued a contempt order, nor considered appointing a Receiver, to remedy the deprivation of rights.[18]

---

[17]    Judge Mueller held:

> Defendants also argue their "efforts are robust" and they are at the mercy of nationwide labor markets. This argument acknowledges the ongoing constitutional violations in mental health staffing but misses the essential issue: tight labor markets do not relieve defendants of their constitutional obligations. . . . Defendants must increase the size of their mental health staff, decrease the size of the plaintiff class, or effect some combination of each approach to comply with the Eighth Amendment.

2023 WL 2277384 at *3 (citations omitted).

[18]    The PLRA spells out a process to create a three-judge panel to consider release orders. *See* 18 U.S.C. § 3626(a)(3); 28 U.S.C. § 2284. It permits intervention-as-of-right, which allows state and local officials to participate in three-judge panel proceedings for a release order. 18 U.S.C. § 3626(a)(3)(F); *Coleman v.*

(cont'd)

16

While Plaintiffs' counsel is willing to meet with Defendants on any topic—including a stipulated PLRA-compliant release order— the IRC situation is dire and requires a finding of contempt now. One would hope that a finding of contempt from a federal court will finally motivate County leaders to make their promise of "Care First, Jail Last" a reality. Given the number of jail-related cases they're juggling before this Court, and the problems besetting the jails, Defendants need to keep their eyes on the proverbial ball right now and not create another court proceeding.[19]

The Sheriff has authority under state law to release people to eliminate overcrowding, but he and his predecessor refuse to do so. Doc. 318-1 at 24-26. The state Attorney General issued an opinion three years ago reiterating that under California Government Code § 8658, a sheriff may remove people from carceral settings in cases of emergencies, and "there is no requirement in the statute that such removal or transfer of inmates be made pursuant to a court order." *Id.*

### B. Defendants Have The Opportunity to Purge Contempt and Avoid Prospective Sanctions

"[C]oercive civil sanctions, intended to deter, generally take the form of conditional fines" because future fines are avoidable by complying with the court's orders. *Shell Offshore Inc.*, 815 F.3d at 629, 630; *see also Parsons III*, 949 F.3d at 456 ("[p]rospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy"). Defendants just need to live up to what they promised to do when they stipulated to the PI in September 2022 to avoid sanctions.

---

*Schwarzenegger / Plata v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P, C01-1351 TEH, 2007 WL 3020078, *1 (E.D. Cal. / N.D. Cal. Oct. 10, 2007) (three-judge order permitting intervenors), *vacated on reconsideration*, 2008 WL 397295 (E.D. Cal. / N.D. Cal. Feb. 8, 2008). The vacatur was on case management grounds and did not reflect a change in the panel's legal analysis. 2008 WL 397295, *1-2.

[19]    It is troubling, to say the least, that Defendants already are declaring defeat, asserting that "neither a contempt finding nor the fine schedule Plaintiffs have proposed would meaningfully improve Defendants' compliance with the PI beyond the steps Defendants have already undertaken." Doc. 379 at 25.

17

### C. The Court Can Craft Its Own Prospective Sanctions or Timetable for Compliance If It Finds Plaintiffs' Proposal Unworkable.

Once a court finds a party in civil contempt, it has broad equitable power to order appropriate prospective relief. *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128, *amended*, 335 F.3d 834 (9th Cir. 2003). Plaintiffs' proposed order set out a fine schedule and timeframes they believed were workable, *see* Doc. 375-7, but it is within the Court's discretion to develop its own prospective fine schedule and deadlines. For example, if the Court agrees with Defendants that a daily schedule of fines will be difficult to track, then it could craft a monthly schedule. Or the Court may decide the proposal of 60 days before fines start is too long or too short. Plaintiffs proposed the Court allocate any accumulated fines to pay for increased beds in alternatives to incarceration such as the ODR program, Doc. 375 at 32, but the Court can hold fines in escrow with the Registry of the Court, and ask for proposals on how they should be allocated.

### CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a finding of contempt and order the proposed sanctions.

Respectfully submitted,

DATED: April 5, 2023          By:  */s/ Corene T. Kendrick*
                                   Peter J. Eliasberg
                                   Melissa Camacho
                                   **ACLU FOUNDATION OF SOUTHERN CALIFORNIA**

                                   David C. Fathi
                                   Corene T. Kendrick
                                   Marisol Dominguez-Ruiz
                                   **ACLU NATIONAL PRISON PROJECT**

                                   Attorneys for Plaintiffs Dennis Rutherford, *et al.*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2023, I electronically transmitted the above document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to Counsel for Defendants who are registered CM/ECF users.

DATED:      April 5, 2023                      */s/ Corene T. Kendrick*
                                               Corene T. Kendrick
                                               ACLU National Prison Project

                                               *Attorneys for Plaintiffs*

19