PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF**
**SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
**ACLU NATIONAL PRISON**
**PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930

*Not admitted in D.C., practice limited
to federal courts

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON**
**PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al*., | Case No. CV 75-04111 DDP |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF TERRY KUPERS, M.D.** |
| vs. | |
| ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES, in their official capacities, *et al.* | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF TERRY KUPERS, M.D.

I, Terry A. Kupers, M.D., M.S.P., declare as follows:

1.     My name is Terry Kupers. I am a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues.

2.     I incorporate by reference my September 5, 2022 Declaration in this matter. (Doc. 318, Ex. 16; ECF Dkt. 318-2 at 146-192). My biographical information and qualifications are outlined in my September 5, 2022 Declaration and in my curriculum vitae, which is attached thereto. As noted in that declaration, I have served as an expert to Plaintiffs' counsel in *Rutherford* since its filing, including testifying at the 1978 trial. *Id*. at ¶ 3. If called as a witness, I could and would testify competently to the following under oath.

## I.     Background

3.     I have been asked by Plaintiffs' counsel to offer supplemental expert opinions about policies and practices at the Los Angeles County Jail (LACJ) for the provision of "Bridge Medications" at the Inmate Reception Center (IRC).  My fees are $350/hour for all work except testimony, and $500/hour for testimony at deposition and trial.

## II.     Preparation

4.     In addition to the documents I have reviewed previously for the *Rutherford* litigation, and the documents I listed in my September 5, 2022 Declaration, I have had the opportunity to review the Declaration of Dr. Karen Siscoe; the declarations of nine prisoners and former prisoners who spent time in the Inmate Reception Center[1], and medical files for the nine prisoners, from LACJ,

---

[1] Quincy Brown, Reggie Candler, Richard Cisneros, Raymond Crowley, Bobby Fernandez, Jaime Garcia Alfaro, Jonah Jones, Erick Scoby, and Kevin Scott.

and if available, from clinical settings in the community (available for seven of the nine prisoners).  I have also reviewed the March 8, 2023 letter from Songhai Armstead to L.A. County Board of Supervisors entitled "Addressing the Mental Health Crisis in Los Angeles County: Developing Mental Health Care Facilities to Depopulate the Jail," which includes a detailed description of the P level definitions for people in the jail as defined by the Los Angeles County Department of Health Services, Correctional Health Services division.

**III.    Policy on Bridge Psychotropic Medications at L.A. County Jail**

5.      Dr. Siscoe, the Mental Health Program Manager at the Los Angeles County Department of Health Services, outlines the policies and practices at LACJ for Bridge Medications.  She declares:

> The County's Bridge Medication Policy, which represents the standard of care in carceral settings, permits the automatic continuation of a person's psychiatric medication in the IRC if it can be verified that the person was provided such medication in the past 30 days. This verification may occur where medical records indicate the medication was provided in the past 30 days; where the person arrives at the IRC as a transfer with paperwork confirming the person had taken the medication within the past 30 days; or where the person informs CHS clinicians of both the medication(s) he or she takes as well as the pharmacy that fills the prescription(s) and the clinician confirms with the pharmacy that the medication was provided in the past 30 days.  If the psychiatric medication cannot be verified or it is determined that more than 30 days have passed since the person took it, then the medication cannot be bridged in the IRC. It would simply not be safe practice to administer any such medication without a psychiatric assessment to determine the appropriateness, safety,

tolerability, and efficacy of the medication for the patient.

Doc. 379-6 ¶ 3.

6.  Los Angeles County's Bridge Medication Policy, as Dr. Siscoe describes it, is entirely inadequate and does not comply with the standard of care in carceral settings in multiple regards. The population of people suffering from serious mental illness and at risk of suicide and self-harm, especially considering the high stress of incarceration, constitutes at least 40% of the jail population in Los Angeles, and the prevalence of suicide in county jails nationwide is stunningly high.  Indeed, Los Angeles County Jail is under a federal consent decree in part because of the high level of suicide among people with mental illness.

7.    Upon admission, it is crucial that people suffering from serious mental illness and/or at risk for suicide be identified and provided urgent mental health assessment and treatment, including timely continuation of the medications they were prescribed prior to their arrest.  "Bridge Medication" consideration is simply one part of the duty of jail staff to identify new admittees who are at risk of suicide or worsening of psychotic or other psychiatric disorders, and providing continuation of their mental health treatment including their medication regimen.  The standard of care in carceral settings includes having staff in the admitting area (IRC at LACJ) make a concerted, good faith effort to verify the prescription of medications that are verbally reported by admittees to jail healthcare staff, and to the extent possible, initiate "bridge medications" for all admittees whose previous prescriptions can be verified.

8.    The duty of staff in the admitting area goes far beyond simply making an attempt to contact the admittee's pharmacy. Calling the pharmacy of record is only the first part of that duty.  Jail mental health staff also need to contact the mental health clinic or physician who prescribed the psychotropic

3

medications. [2]  Finally, if that second step does not confirm a pre-incarceration prescription, the staff should ask the admittee, or family members or individuals who reside with the admittee, to produce paperwork or a bottle of pills verifying medications.  (The medication, prescriber, and date of prescription are listed on pill bottles.)  Often, when phoning the pharmacy of record does not turn up the required verification, contacting the community clinic or the prescribing physician, or asking family to provide a pill container, provides the verification.  This is especially the case when the admittee is being treated at a community mental health center such as a Telecare clinic.  It might be difficult to contact a single prescribing physician in solo practice in the community, for example during evenings or weekends.  But all nine of the cases I reviewed involve treatment at a clinic in the community and not at the office of a solo practitioner.  And I know from prior experience in reviewing LACJ mental health records of jail detainees that contacting a Telecare clinic and providing a proper consent form results in relatively rapid sharing of medical information including assigned diagnoses and prescribed medications.  In fact, in at least three of the nine cases I reviewed in this matter, the admittees were prescribed their psychotropic medications at Telecare clinics in the Los Angeles area, and eventually the Telecare records were obtained by the jail.  Others involved prescriptions at the Augustus Hawkins Mental Health Center, a mental health center operated by Los Angeles County, or the parole mental health provider (POC), and those facilities should be relatively easy to contact and request verification of medications without waiting to hear back from a specific prescriber.  But insufficient efforts were made in the IRC to obtain verification, so there was a long gap in continuity of medications for those admittees.[3]  All nine of the individuals whose declarations and medical charts I reviewed were indeed receiving mental health

---

[2] American Psychiatric Association – Psychiatric Services in Correctional Facilities, p. 30 (3d. Ed. 2016)
[3] Scoby, Candler and Cisneros, see summaries, below.

treatment and medication prescriptions at public clinics in the community, and contacting a public mental health clinic, with the proper consent form, is a very effective way to attain verification of medications for the purpose of bridge medications.  Yet this avenue is not mentioned by Dr. Siscoe in her explication of the Bridge Medication Policy at LA County Jail and was not done with sufficient concerted effort for the IRC to timely obtain the relevant records.  And there seems to have been little effort made by IRC staff to contact family members to see if they could provide pill containers, etc.

9.    In cases where the admittee reports a mental illness diagnosis, or symptoms of mental illness, and/or a need for psychotropic medications, and the medications cannot be immediately verified, the admittee should be seen by a psychiatrist on an expedited basis to provide a timely evaluation and medication prescription, as indicated.  It is clear, from the nine cases I was able to review, that when the admittee does not have medications verified and bridge medication orders written while in the IRC, weeks or months can go by after transfer to jail housing before verification is completed and medications are re-started by a prescribing psychiatrist.  LACJ's policy does not include — but should include — a provision that, in cases where immediate verification of medications is unsuccessful in the IRC, an evaluation by the psychiatrist or other mental health prescriber must take place within a designated time period -- I recommend 24 hours during weekdays or 48 hours on weekends for this group of seriously mentally ill admittees. This recommendation is consistent with the policies that exist in many jails and prisons that I am familiar with. That way, the inability or failure of IRC staff to verify the admittee's medications will be resolved by the current psychiatric examination in the jail.  After all, the purpose of bridge medications is to prevent a suicide or psychotic episode or other psychiatric crisis, as incarceration in jail tends to increase the risk of suicide attempts or psychiatric crisis.  If this is done, then the resolution is prompt verification and re-starting of

medications in the IRC (the Bridge Medication provision) **or** an urgent evaluation by a prescribing mental health clinician at the jail so there will be continuity of the psychotropic medication regimen.  This alternative method of guaranteeing timely attention to medication needs should be clearly written into LACJ's policies on Bridge Medications and on Intake Assessment.  Another possible remedy in this context involves cases where the admittee is only in the IRC for a day or two, and that is not quite sufficient time to verify prescriptions from the community; the verification responsibility can be passed on to the mental health staff responsible for the housing unit where the admittee is transferred; and that would involve mental health staff in the post-IRC housing unit prioritizing the verification and making a concerted effort to complete the verification process in as short a time as possible.

## IV.    Practices at the Inmate Reception Center

10.    Dr. Siscoe testifies in her Declaration:

> …. four of the individuals who submitted declarations in support of Plaintiffs' Motion - Mr. Cisneros, Mr. Jones, Mr. Garcia Alfaro, and Mr. Brown - could not have had their psychiatric medication bridged in the IRC because they had not taken their medication in the 30 days prior to their arrival in the IRC; two of the individuals - Mr. Scott and Mr. Scoby - could not have had their psychiatric medication bridged in the IRC because their medications could not be verified; and two of the individuals - Mr. Crowley and Mr. Fernandez - denied taking psychiatric medication during their mental health evaluation in the IRC. Further, there was no medical record at all of prior psychiatric medications taken by Mr. Fernandez.

Doc. 379-6 at ¶ 5.

I have reviewed the declarations of the nine class members as well as their medical records at LACJ and (for seven out of nine) their medical records from community clinics and arrived at very different conclusions.[4]  Dr. Siscoe, in her explication of the jail's Bridge Medication policy, testifies, "This verification may occur where medical records indicate the medication was provided in the past 30 days…" This is an acceptable approach. But then, in her review of individual cases she questions whether the individuals actually ingested prescribed medications in the month prior to admission to the IRC.  Whether or not they actually ingested their medications is not a proper consideration in regard to a Bridge Medication Policy.  Non-adherence[5]  with medication prescriptions is a huge problem in public mental health, especially with patients who are unhoused. While individuals are in the community, as long as they are not on a "medication-over-objection" order, they may or may not adhere conscientiously to their medication regimen.  In many cases, prescribers in the community do not track adherence with medication regimens and do not know their patient is non-adherent until their next clinical encounter.  Medication adherence is something clinicians work on with patients who suffer from serious mental illness.  But for the purpose of providing Bridge Medications, the crucial issue is whether the individual has been recently prescribed psychotropic medications, and not whether he or she adheres perfectly to the regimen.  The reason is that, in jail, the patient is in a "total institution" – i.e., an institution that controls almost all aspects of the lives of the people in it.  In LACJ, CHS are the only clinicians they have contact

---

[4] I do not attach the entire medical records that I reviewed to this declaration, but if the Court wishes to review them, Plaintiffs' counsel can submit them under seal.
[5] The term "non-compliance" has gone out of favor because consumers of public mental health services, represented by groups like NAMI, complained that "compliance" connotes a certain passivity.  The term "non-adherence" thus came into vogue.

with, and therefore there is a duty for mental health clinicians to follow through with the patient in the jail regarding adherence with medication regimens.  Again, the stress of incarceration is all too likely to trigger a psychiatric crisis, especially for people with a history of mental illness.   So it is incumbent on clinicians to make every effort to treat their patients, including medication treatment, so that they will not experience psychotic or depressive or suicidal crises under the stress and duress of jail incarceration.  Almost all nine of the people whose cases I reviewed were clearly motivated to take medications while in the jail and were clearly stating while in the IRC that they needed medications. To invalidate their very legitimate request that the medications they were prescribed in the community be re-started, simply because they did not always adhere to their medication prescriptions in the community, is an abrogation of clinicians' duty to provide treatment that serves to reduce the risk of decompensation or suicide in the jail setting.

11.    Mr. Quincy Brown testified in his declaration (Doc. 375-1, Ex. 3) that he was in the IRC and IRC 231 for ten days beginning on October 10, 2022; that he suffers from Bipolar Disorder and Schizophrenia; and he had been prescribed Abilify (new generation anti-psychotic medication) and Trazadone (antidepressant with strong sedative effect, prescribed off-label to help with sleep). He also testified that he did not receive his medications the entire ten days he was in the IRC and IRC 231.  In addition, the jail medical record shows that he told the medical screener in IRC that he received mental health services in prison and that he received Trazodone and Abilify through the parole mental health provider.

Dr. Siscoe stated in her declaration that CHS did not immediately provide him psychiatric medication under their Bridge Policy because he had not taken his medication in the thirty days before he came into IRC.  I did not see anything in Mr. Brown's medical record that demonstrated that he had not taken his medications for thirty days before coming into IRC.  But even if he had not, in my

medical opinion that was inadequate justification for denying him the Abilify and Trazodone he had been prescribed in the community for a number of reasons.

First, as I explained above, an appropriate bridge medication policy would provide that someone who has a prescription for psychiatric medications should have those medications prescribed upon entry in IRC even if it appears he has not adhered to his prescription in the community.  The jail medical records reveal that Mr Brown told the medical screener in IRC that "he received Trazodone and Abilify from POC" which is the parole mental health provider, whom jail staff could easily have contacted.  In addition, the jail medical record contains documentation of prior visits to community mental health agencies, including an Emergency Provider Note at the Providence St. John's Health Center on 9/24/2022 for "Weakness," wherein it is noted that he has a "Psychiatric Disturbance" and is prescribed Abilify, 10 mg., indication: "Psychosis."  Another note in the jail medical chart, titled "Outside Records – Auth (Verified)," documents another visit to the Providence St. John's Health Center on 9/18/2022, contains a diagnosis of "Psychiatric Disturbance" and notes the prescription of Abilify, 10 mg. and Trazadone 100 mg. per day.  Mr. Brown's statement to the screener and these records should have prompted him to be promptly prescribed Abilify and Trazodone under a proper Bridge Medication policy.

Second, I reviewed his medical chart from the Los Angeles County Sheriff's Department and CHS Correctional Health Services.  That review shows that if the jail had not been able to obtain his community mental health records, which they should easily have been able to do, or otherwise verify his prescription, he should have received a prompt psychiatric assessment after his initial medical screening.  If he had received that prompt evaluation, he would have gotten the medication that he was finally prescribed about two and a half weeks later.  His medical chart is thick, he was well-known at the jail after many prior admissions.  His chart documents a consistent diagnosis of Schizophrenia at

least since 2015.  For example upon his admission to IRC on 10/11/22, he did have a medical screen.  Although the screen focused on his chronic Diabetes and Hypertension, the screener noted that he had a "Hx [history] of bipolar d/o, schizophrenia" and a "history of suicide attempt."  This information alone should have triggered an immediate mental health evaluation that likely would have led to his being provided the Abilify and Trazodone he testified had been prescribed for him in the community.  Indeed, the the screener referred him for a mental health assessment.  But it was not until 10/25/2022, fifteen days after being admitted to IRC, that a note appears in the chart with this Order: "Defendant appears to need a mental health evaluation.  Evaluate, Treat and Medicate as appropriate."  And it was not until October 29, 2023 that jail records show he was prescribed those two medications.

Moreover, there is substantial additional information in his records that should have triggered his being provided these medications promptly upon entry into IRC.   There are notes in the jail medical chart reflecting prior contacts with the Psychiatric Mobile Response Team (PMRT) in the community with assessment for a 5150 civil commitment.  By January, 2023, while he was no longer in IRC but remained in the jail, he was on Inpatient status and prescribed Abilify.  A Psychiatry Review during that admission (p. 534 of 598 in medical chart) documents many visits at various mental health clinics in the community, Diagnoses Paranoid Schizophrenia, and Schizoaffective Disorder, and a visit at the Crisis Homeless Agency on 6/29/2022.

In summary,  Mr. Brown had a long history of Schizophrenia with treatment including Abilify and Trazadone in the community; had seen doctors at community agencies including the St. John's Health Center on 9/18/2022 (3 weeks prior to admission to the jail on 10/11/2022) where the diagnosis and prescription of Abilify were documented; had a history of multiple prior admissions to the jail with documented diagnoses and prescription of Abilify at

the jail.  Nonetheless, he was not provided a "Bridge Prescription" for his medications and was left without psychiatric medications during his ten days in the IRC and IRC 231, was not even provided a mental health evaluation until 10/29/2022 (17 days after his and screening in the IRC). A prescription for Abilify was first written on 10/29/2022; and subsequently he suffered an exacerbation of his psychotic condition and had to be treated as an inpatient at the jail in January, 2023.  It appears quite likely that, had medical staff at IRC tried a little harder to capture records from community agencies where he was being treated, or had he been provided a mental health assessment within days of his admission to the jail, and provided the psychotropic medications he had been taking in the community immediately upon admission to IRC on October 11, along with some individual and group psychotherapy, the January exacerbation of his psychiatric disorder in the jail could have been prevented.

12.    Mr. Reggie Candler testified in his declaration (Doc. 375-1, Ex. 4) that he believed he was admitted to IRC around September 18, 2022;[6] he told the doctor in the IRC that he was diagnosed Bipolar with auditory hallucinations and was taking Seroquel 200 mg./day (a new generation anti-psychotic medication); he also told the doctor that they could call Telecare to confirm his diagnosis and medications.   Nonetheless, he was not prescribed his psychotropic medications for more than a month after he was admitted to IRC. His medical chart at the jail includes an 11/22/2022 IRC evaluation noting a diagnosis of Bipolar with mention of Schizophrenia and multiple prior suicide attempts, medications included Seroquel (a new generation anti-psychotic medication) and Trazadone, and the note asserts "was on meds," and "does not require expedite or priority referral." On 11/23/2022 he informed staff they could call Telecare to verify his medications (so obviously he was not provided a Bridge prescription and was not

---

[6] His medical records shows it was about two months later; he was arrested November 18 and was screened at IRC on November 22 and again the next day.

yet taking medications at the jail).  He was noted to be a "medium risk" for suicide.  He was placed on P2 status[7] (non-emergency mental health needs) after a five-minute assessment in IRC.  He was in IRC for several days.  On 11/26/2022 a mental health crisis response note documents his Telecare prescription for Seroquel, and because of a current decompensation he was changed to P3 status.  He was still not provided his psychotropic medications though he loudly requested them.  His request led to a confrontation with officers, who subdued him (pp. 135-136 of jail medical chart).  By 11/27/2022 he had been admitted to Psych HOH Intake/SAT, and it was documented in the medical chart that he was hearing voices, exhibiting a "different personality," and was "tripping." He was not re-started on Seroquel until 12/25/2022, more than a month after admission to the jail through the IRC.

In summary, Mr. Candler spent a several days in IRC following his arrest, reported to the clinician evaluating him in the IRC that he suffers from Bipolar Disorder or Schizophrenia and takes Seroquel in the community, and that they can verify his prescription with Telecare.  He also had a history of suicide attempts in jail during prior stints.  He spent a few days in IRC and was transferred to housing.  Four days after his screening at IRC, he was still not receiving Seroquel and had an acute decompensation including auditory hallucinations, requiring increasing his level of mental health treatment from P2 to P3, and finally his prescription for

---

[7] Correctional Health Services assigns each prisoner on the mental health caseload a "P-level," reflecting their mental health needs.  P-0 signifies no persistent impairment; P-1 signifies emotional impairment that does not limit functioning, where there is no significant risk of self-harm; P-2 signifies Recurrent episodes of mood instability; Psychotic symptoms maintained by medication and frequent reliance on crisis stabilization services; P-3 signifies Unstable due to significant mental illness; persistent danger of hurting self in less acute care setting; or recurrent violence due to emotional instability; and P-4 signifies Severe debilitating symptoms; Meets Lanterman-Petris-Short (LPS) 5150 criteria for danger to self, others, or grave disability. (See March 8, 2023 letter from Songhai Armstead to L.A. County Supervisors.)

Seroquel at Telecare was confirmed and he was only re-started on Seroquel on 12/25/2022.

It is quite likely, to a reasonable degree of medical certainty, that had the IRC staff doing his evaluation contacted Telecare and verified his prescription, had he not been without his medications at the jail for over a month, and had he been timely prescribed Seroquel, he would not have decompensated in the jail, gotten into a confrontation with custody staff, and suffered exacerbated psychotic symptoms while in the jail.   Moreover, even under CHS's inadequate Bridge Medication Policy as described by Dr. Siscoe, he should have received Seroquel promptly after his screening.  He informed the screener that he was taking the medication and gave the name of his community provider, Telecare, which jail medical staff could easily have contacted.

13.     Mr. Richard Cisneros testified in his declaration (Doc. 375-1, Ex. 5) that he is diagnosed with schizophrenia, depression, and anxiety, and takes Neurontin (a seizure medication prescribed by psychiatrists as a mood stabilizer in Bipolar Disorder and other mood disorders) and another medication (likely Abilify), the medications being prescribed by Telecare Norwalk. He was not re-started on his psychotropic medications for over 30 days in the jail, and consequently he felt lost and anxious.

His medical records include two  intakes in IRC both on 1/30/2023. The first intake registered a history of suicide attempt, but no psychiatric diagnosis and states, "Are you taking any medications prescribed by a Physician or Psychiatrist?: No."  An Addendum to the Intake appears to be based at least in part on an interview with Mr. Cisneros because it states that "Reported taking psychotropic medications, inmate believes he's taking Gabapentin and Benadryl.  States he takes medication daily.  Last time he took his medications was two days ago.  Per LASD, record from LAC+USC Olanzipine 10 mg 10/3/22."   Olanzapine is a new generation anti-psychotic medication.  That record also states that he attempted

suicide by overdosing on heroin four or five years earlier. He complains of mood instability, and was evaluated for "danger to self" in the community on 10/3/2022 (approximately 4 months prior to admission to the jail).   Despite the recent assessment that he was a danger to self, the IRC Intake puts him at low risk for suicide, and reflects that he does not know where he has his prescriptions filled. On 2/9/2023 a Psych Brief MD Assessment reflects current meds taken, Gabapentin or Neurontin and Zyprexa (a new generation anti-psychotic medication) 5 mg. twice a day, plus Benadryl.  It is noted he receives prescriptions from Telecare Pomona.

Dr. Siscoe testified that Mr. Cisneros could not be provided psychiatric medication under the jail's Bridge Medication policy because he "had not taken [his] medication in the 30 days prior to [his] arrival in the IRC."   In fact, the jail medical record shows the opposite; it states that he reported taking psychotropic medication and "[l]ast time he took them it was 2 days" before arrival in the IRC. In addition, the IRC screener noted that he had a recent prescription from County USC for an anti-psychotic medication.

In addition, his history of a past suicide attempt and the screener's note that his "last mental health contact was on 10/3/22 due to danger to self" and "recurrent episodes of mood instability" should have triggered a prompt mental health evaluation.  If that had occurred, it is highly likely in my medical opinion that he would have been provided the psychiatric medication that he was not prescribed in the jails until 2/9/23.

In summary, Mr. Cisneros is diagnosed with schizophrenia, and is prescribed medications at Telecare (Norwalk or Pomona, both mentioned in notes).  He did not receive medication promptly – as he should have – causing him to feel "lost and anxious."  Instead his medications were not re-started at the jail for about ten days,

14.     Mr. Raymond Crowley testified in his declaration (Doc. 375-1, Ex. 6) that he was arrested November 10, 2022, has been diagnosed with schizophrenia since age 12, suffers from Tardive Dyskinesia (a neurological condition that is a side effect of certain anti-psychotic mediations), and is prescribed Seroquel 400 mg./day and Artane 5 mgs twice per day. The last day he took his medications was November 9, 2022.  He graduated from the ODR program at Harmony House in August 2022; an Amity Case Manager coordinates his medications and treatment.  He was in IRC for less than a day, but was not provided his psychotropic medications, resulting in exacerbated symptoms of his mental illness.

He began hearing voices, seeing faces in his food and on the wall, and shaking while in the IRC. He was then transferred to Men's Central Jail, where he remained for three weeks and then was transferred to Twin Towers F-Pod.  He was not seen by a psychiatrist until the end of December (after over 1½ months in the jail).  The psychiatrist verified that he was getting his Seroquel, Artane and Welbutrin (an antidepressant) prescriptions through Amity Foundation and after a few weeks of taking his medications again, his symptom of muscle twitching was reduced.

An 11/15/2022 IRC Intake reflects Crowley has mental health problems, has received mental health treatment in prison, takes psychotropic medications, has a psychiatrist at the Amity Foundation, and gets his medications at a CVS pharmacy. There is a medication list including Bupropion, Divalproex, Quetiapine (the generic equivalent of Seroquel) and others, ordered on 9/28/2022 with 3 refills. The IRC intake examination appears to have included only 2 minutes spent with the patient.  On 11/22/2022 he was seen by CHS in urgent care complaining of 7 days of jaw cramping, it seems he had taken Artane in the community to control cramping (extrapyramidal syndrome or EPS, caused by certain anti-psychotic medications), but had not been given Artane for two weeks at the jail.   An

15

11/29/2022 Outpatient Progress Note at the jail notes, "Per last incarceration 10/16 -- well known to the facility, with extensive intervention for psychotic disorder. He presented with symptoms suggestive of psychotic decompensation, receptive to resume his medication."

A 12/13/2022 Psych Brief MD Assessment notes his treatment at Amity Foundation, his medications, notes his anxious mood because "I'm not getting my regular meds: Artane and Seroquel." Seroquel and Artane were ordered on 12/13/2022 (more than a month after admission to the jail through IRC). Medications were subsequently adjusted. A 9/28/2022 Psych Visit note (two weeks prior to jail admission) from Amity Foundation reflects prescription of multiple medications, including Seroquel, Artane, Depakote and Zyprexa (another new generation anti-psychotic medication).

In summary, Mr. Crowley was taking multiple anti-psychotic and mood stabilizing medications in the community, last prescribed two weeks prior to his arrest and admission to the jail. He was in the IRC for a day and reported to staff his diagnosis, symptoms, medications, and that he had a case manager who supervised (but did not prescribe) his medications at the Amity Foundation clinic. Days later he had a crisis of Extrapyramidal Syndrome with jaw clamping, likely a reaction to the anti-psychotic medications still active in his body to some extent while he was not receiving Artane at the jail. He began hearing voices and seeing faces on the wall while in jail and not receiving his psychotropic medications. He was finally seen by a psychiatrist on 12/13/2022 and had some, but not all, of his medications re-started. His medications were prescribed in the community less than two weeks prior to his admission to the jail, they were not re-started in the IRC nor in the jail for a month, and during that month he suffered a crisis of EPS (jaw cramping) for lack of Artane and hallucinations and other psychotic symptoms, likely because he was deprived of his multiple anti-psychotic and mood stabilizing medications.

Dr. Siscoe stated in her declaration that he was not entitled to medication under the Bridge Medication policy because he denied taking psychiatric medication. Her statement is directly contradicted by the jail's own medical record. For example, on page 192 of the record the report of his screening in IRC on November 15, 2022 states "Current mental health problems: Yes; MMH last 2 years mental health services: Yes; MMH mental health treatment in prison: Yes **Are you taking any medication prescribed by a Physician or Psychiatrist: Yes.** Name of Psychiatrist: The Ibony [Amity] Foundation." Name of Pharmacy: CVS." (emphasis added).

15.     Mr. Bobby Fernandez testified in his Declaration (Doc. 375-1, Ex. 9) that he had been taking prescribed Zoloft, Suboxone and Depakote in the community, prescribed at Wesley Health Center and LA CADA (L.A. Center for Drug and Alcohol Abuse, a drug recovery program)  and filled at CVS.  He was arrested on 12/16/2022.  He last took his medications the day of his arrest.  He had been re-started on a seizure medication (Keppra, a different medication than the one he was taking in the community) in the jail but had not received his Zoloft for anxiety nor his Suboxone by the time he signed his Declaration on January 12, 2023.

He was arrested on 12/16/22 and began having seizures on while in court that same day and had to be hospitalized for 5 or 6 days at Norwalk Community Hospital.  He was discharged from the hospital and transported to the IRC at the jail on 12/23/22 and received a medical screening that evening He stayed in IRC for two days.  Then he was moved to Men's Central Jail.  He was moved to a dorm on 12/27/2022, 11 days after his arrest and 3-4 days after being admitted to the IRC.  He was not seen by a mental health provider for many more days and had still not received Zoloft or Suboxone at the jail at the time he wrote his Declaration (January 12, 2023, almost a month after his arrest).  As a result of his medications being discontinued, he reports "I feel agitated, I cannot sleep, I am sweaty, I keep

needing to use the restroom, I am restless."  He testifies that while a seizure medication was eventually prescribed for him at the jail (Keppra), it is not the same as the medication prescribed in the community, "and it gives me headaches and makes me feel like I could still have a seizure."

A review of Mr. Fernandez's medical records reflects that he did report taking medications when he was arrested because his arrestee medical screening form on page 203 of the jail's record states under the question, "Are you currently taking any medications?", "yes" and that he takes medication "3 Times A Day." This form notes it was completed by the arresting agency at the "Norwalk/Court." Fernandez's IRC Assessment on 12/23/2022 directly contradicts what is clearly noted on his arrestee screening form, stating "Arrestee Medical Screening: No SI indicated/No MH issues noted" on page 88. His IRC Assessment furthermore states "Pt. denies" psychotropic medications, demonstrating he was improperly screened.

The assessment reflects no suicide ideation, no mood disturbance, and no mental health issues, yet Mr. Fernandez's "Problem list" includes Fentanyl, history of suicide attempt, methamphetamine abuse and seizure.  After "no visit" he was rated PO-GP (no mental health needs).  A subsequent Psych Care Assessment on 2/1/2023 elevated his Psych Care Assessment to Level P1, demonstrating the start of Fernandez's decompensation due to not being provided his psychiatric medications.  A Psych Brief MD Assessment on 2/8/2023 notes request for medications including Zoloft because he cannot sleep and is agitated.  He said he had last taken his medications, Seroquel, Remeron, and Zoloft months ago (that matches his Declaration statement that he took his psychotropic medications on the day of his arrest).  Symptoms including severe anxiety and some depression are noted. It appears he was finally re-started on Zoloft and Remeron  for anxiety and depression *seven weeks* after discontinuation of his medications upon arrest on 12/16/2022).  Another Psych Brief MD Assessment on 2/12/2023 increases his

level of care to P2 (so he has been changed from P0 to P1 and then to P2, reflecting *further* incremental decompensation with increased need for mental health services, all while not receiving the medications he had been taking in the community). An increased dosage of Zoloft and Remeron (two antidepressants), Prolixin (anti-psychotic) and Vistaril were finally prescribed. Furthermore, records from LA CADA for 1/20/2022 reflect prior prescription of Suboxone.

Dr. Siscoe stated in her declaration that Mr. Fernandez was not entitled to psychiatric medication under the Bridge Medication policy because he denied taking psychiatric medication in his evaluation and "there was no medical record at all of prior psychiatric medications taken by Mr. Fernandez." Her statements are, again, directly contradicted by the jail's own medical record. Fernandez clearly reported he was taking psychiatric medications on his arrestee medical screening form, which the IRC screener failed to note when prompted .  His report should have prompted a swift call by the IRC to his provider to confirm his prescription, and Fernandez being provided with his psychiatric medication, rather than deprivation for almost two months that further exacerbated his symptoms. Furthermore, records from L.A. CADA confirm Fernandez had a Suboxone prescription. Thus, even under the jail's inadequate Bridge Medication policy, Fernandez was entitled to his psychiatric medications.

In summary, Mr. Fernandez was arrested in December, 2022, had to go to a hospital because he had seizures in court, had a substance abuse problem and was being treated with multiple psychotropic medications including Zoloft for anxiety and Suboxone for drug recovery purposes.  Yet even with his history of seizure and substance abuse, along with his report of anxiety, depression and insomnia, he was denied his psychotropic medications,  until 2/8/2023, nearly two months after his arrest.  Meanwhile, he suffered quite a lot of anxiety, depression, agitation, insomnia and other symptoms while in jail.

16.     Mr. Jaime Garcia Alfaro testified in his declaration (Doc. 375-1, Ex. 10) that he has had mental health issues since age16, and he is now 29. Hee is diagnosed with depression, Bipolar Disorder, Anxiety and Schizophrenia; he receives multiple medications in the community and is conscientious about taking them regularly, though he missed some doses a couple weeks  beforebeing arrested because he was working a lot.

He was arrested on 1/20/2023 and held at the Santa Monica Police Station until the next day.  He told officers he needed his medication but was not provided medications.  According to his jail medical records he entered the IRC on 1/21/2023 and remained there for 24 hours.  He received his medical screening on the 1/21/23 during which he told them he needed his medications. Staff told him someone would come and talk to him about his medication, but nobody did, and he was subsequently transferred to general population.  He went to see medical about his glasses, but out of desperation for his medications, he used the opportunity to talk to medical staff about his psychiatric medications.  He averred being suicidal and anxious and not being able to sleep, but still was not provided with his medications. He was then transferred to Twin Towers and Suicide Observation. One clinician talked to him and offered Remeron, an antidepressant.  He agreed to take it, but was never given any Remeron.  He was transferred again to a cell in Twin Towers, but still, at the time of writing his declaration (2/3/2023, more than two weeks after his arrest), he had not been re-started on his psychotropic medications.

Review of his medical chart at the jail reveals an Arrestee Medical Screening on 1/21/23 at the Santa Monica Police Department reflecting that he suffers from Bipolar Disorder and takes Buspar (minor tranquilizer), Depakote (seizure medication used in psychiatry for mood modulation) and Wellbutrin (anti-depressant) daily.  An IRC Evaluation on 1/21/2023 notes diagnoses of Schizophrenia, Depression, Bipolar Disorder, Anxiety and a history of suicide

attempts.  It is also noted on his IRC evaluation that he gets his medications at the CVS in Culver City and he was hospitalized for a suicide attempt 5 or 6 months earlier.  A medication list includes Buspirone (minor tranquilizer, equivalent of Buspar),  divalproex sodium (mood stabilizer, equivalent of Depakote), and Bupropion (antidepressant, equivalent of Wellbutrin), all documented.  He is deemed low risk of suicide and assigned P1 level of care after a 3-minute visit. Another note on his evaluation reflects he has previously been in GP (general population) at the jail, he had a psychiatric hospitalization in August, 2022, he hears "low voices I can't understand," he experienced *seven* episodes of decompensation and/or hospitalization =, and he was referred to "psychline" to assess for medications.

Subsequent notes reflect that he did not, however, receive his medications, as he went to court on 1/24/2023, and a mental health evaluation had to be ordered. Another evaluation occurred on 1/27/2023, but *still* it does not seem he was prescribed his medications.  On 1/29/2023 he was evaluated because he was considered high risk of suicide, likely due to his lack of his psychiatric medications, with diagnoses acutepsychosis/mania/severe.  And still no medications.  His sister was called to verify medications.  However, even if they could not verify through a family member, Mr. Garcia Alfaro was known to be psychotic, manic and suicidal.  Thus, a psychiatrist should have performed a prompt evaluation and prescribed medications in the absence of verification from the community?). Finally, on 1/29/2023, nine days after arrest, he was prescribed Remeron and Hydroxyzine (a minor tranquilizer).  And finally, the jail receivd records from Culver City Hospital, which Plaintiffs obtained and the jail could easily have obtained,which showed he was previously hospitalized in August, 2022 for a suicide crisis, was prescribed the anti-psychotic Geodon at a relatively high dosage, the mood stabilizer Depakote, plus an anti-anxiety medication and an antidepressant.

Dr. Siscoe stated in her declaration that CHS did not immediately provide Mr. Garcia Alfaro psychiatric medication under their Bridge Policy because he "had not taken [his] medication in the 30 days prior to [his] arrival in the IRC." I did not see anything in Mr. Garcia Alfaro's medical record that demonstrated he had not taken his medications for thirty days before coming to IRC; and he merely stated in his declaration that while he generally is "consistent about taking his medication" he had forgotten to take it e two weeks before his arrest. But, as with Mr. Brown, even if Mr. Garcia Alfaro had not taken his prescribed for thirty day, in my medical opinion, that was inadequate justification for denying him the medications he had been prescribed in the community for many reasons.

First, as explained above, an appropriate bridge medication policy would ensure that someone who has a prescription for psychiatric medications should have those medications prescribed upon entry in IRC even if it appears he has not adhered to his prescription in the community. The jail medical records reveal that Mr. Garcia Alfaro told jail staff in his IRC evaluation that he takes Buspar (equivalent of Buspirone), Depakote (equivalent of divalproex sodium) and Wellbutrin (equivalent of Bupropion). He also told them he receives these medications from a hospital provider in Culver City and picks them up from CVS Pharmacy in Culver City, whom jail staff easily could have contacted. Furthermore, in the record that eventually arrived from Culver City hospital, his psychiatric medication prescriptions are well-documented.

Second, I reviewed his medical chart from the Los Angeles County Sheriff's Department and CHS Correctional Health Services, and that review shows that he should have received a prompt and thorough psychiatric evaluation after his initial medical screening[8] for multiple reasons. In particular, the screener learned that Mr. Garcia Alfaro had been hospitalized for a suicide attempt in the past 5-6

---

[8] His medical screening cannot be deemed a thorough examination. Among other things the screener noted that she spent between 3 to 6 minutes with Mr. Garcia Alfaro.

months and had been diagnosed with a number of severe mental illnesses including bipolar and schizophrenia.  If he had received that prompt and thorough evaluation, he would have been provided with the medication he was not prescribed for more than a week following his arrest and likely would not have suffered worsened symptoms and a suicidal crisis in jail.

In summary, Mr. Garcia Alfaro was admitted to LACJ and the IRC on January 21, 2023, told staff he suffered from serious mental illness, had a history of suicide attempt and was taking several strong anti-psychotic, anti-depressant, tranquilizing and mood stabilizing medications. Furthermore, he told them the pharmacy where he filled his prescriptions.  Staff responded by performing an inadequate psychiatric evaluation, under-valuing his mental state, and down-grading his treatment needs which left him without his medications until January 29, 2023, by which time he had suffered a suicidal crisis in the jail, and subsequently was found to be acutely psychotic, manic and suicidal.  Even then, when they initiated a medication regimen, the medications were not the ones he had told them he needed and they had verified in the IRC, as reflected in the records that finally arrived from Culver City Hospital.

17.    Mr. Erick Scoby testified in his declaration (Doc. 375-1, Ex. 18) that he was admitted to the IRC at the jail on approximately October 6, 2022.  He has been diagnosed with PTSD, Bipolar Disorder, Depression, Schizoaffective Disorder and Anxiety.  He was taking Seroquel for psychosis, Benadryl to help with insomnia and Buspirone for Anxiety.  He told the doctor in IRC that he suffered from these mental illnesses and needed his medications, and was told he had to wait until he was transferred to housing.

In the IRC, he "tried to deal with effect of not taking meds as best I could.  I started having visions and hearing voices saying my name.  My mind was racing and I couldn't control my thoughts."  He stayed in IRC a few days and then was

transferred to MCJ 5300.  He was not prescribed any medications at the jail until November 20, 2022(**more than six weeks** after being admitted to IRC) and then, only because he told a judge he needed his medications, and the judge issued a court order for him to get a medical evaluation.  He writes, "I suffered terribly until I got my meds."

A review of his jail medical records includes an IRC Suicide Risk Assessment, where he was considered low risk; a Medication List that included an emergency-only prescription for Zyprexa for psychiatric emergencies; a 10/7 IRC evaluation note that he had returned from the Emergency Department on 10/5 on account of  a head injury, and it was noted that he had been in mental health treatment and receiving psychotropic medications prior to arrest.  In answer to the question, "Are you taking any medications prescribed by a Physician or Psychiatrist?", "Yes" and the name of his psychiatrist, Dr. Jessica Gonzalez. There is also a note "Unable to recall pharmacy.  10/7/2022."  There is an 11/1/2022 note that he is not receiving his medications, Buspar, Zyprexa and Benadryl.  On 11/1/2022 he was examined by a mental health staff member, a "hallway encounter," where he told her he was "not good," was not getting his medications, and he was filing grievances.  The record also notes that his most recent community provider was Telecare. The writer of the note planned to submit a psychline request for him.  On 11/15/2022 he filed a grievance, writing "I was given a court order for my prescribed medications."  On 11/17/2022 he had a JMET evaluation at MCJ where he was unavailable because he was in court or in the medical department, and mention is made of a court order for him to receive Seroquel, Buspar and Abilify.  He was assigned P2 level of mental health care.

By 11/18/2022, the medical record notes he still he had no psychotropic medications, and he was observed to be engaging in "odd/bizarre/rambling speech" and he claimed to be "seeing shit" due to not being able to take his medications. His level was bumped up to P3, demonstrating further decompensation, and he also

had to be transferred to HOH Housing because he felt unsafe where he had been, demonstrating further neglect of his psychological welfare. On 11/18/2022 he was again in the IRC for a re-evaluation that lasted 4 minutes, and he remained on P3. He was transferred to Twin Towers and the psychiatric unit, finally receiving Seroquel and Buspar on 11/20/2022 (more than a month after admission to IRC the first time.) Records from Telecare are in his jail medical chart, and an 8/16/2022 note from Telecare reflects that he was taking Abilify 30 mg./day, Benadryl 50 mg./day and Buspar. He had a diagnosis of Schizoaffective Disorder, Bipolar Type, and a treatment plan: "continue Abilify for psychosis and moods, Buspar for anxiety, and Benadryl as needed for sleep."

In summary, Mr. Scoby was admitted to IRC on October 6, 2022, told the examiner on October 7, 2022, that he suffered from PTSD, Bipolar Disorder, Depression, Schizoaffective Disorder and Anxiety, and was taking Seroquel, Benadryl and Buspirone. His jail medical record notes that he further complained to staff and filed grievances about not getting medication. Yet by 11/18/2022, he still was not provided his psychotropic medications, and was observed to be engaging in "odd/bizarre/rambling speech" and claimed to be "seeing shit." He was transferred to Twin Towers and the psychiatric unit, finally being prescribed Seroquel and Buspar on 11/20/2022 (almost two months after admission to IRC the first time.) Records from Telecare confirm that he less than months before his incarceration he was suffering from serious mental illness and receiving several powerful psychiatric medications.

Dr. Siscoe stated in her declaration that Mr. Scoby could not have had his psychiatric medications bridged under the Bridge Medication policy because his medication could not be verified. However, her statement is contradicted by the jail's own medical record. Mr. Scoby provided the names of his psychiatric medications and his prescribing psychiatrist, Dr. Jessica Gonzalez, at his initial IRC evaluation. I see nothing in Mr. Scoby's jail medical record to indicate jail

staff made any effort to contact Dr. Gonzalez or determine what medical provider she worked for to verify his prescription until Mr. Scoby had suffered immensely. Nor did I  see anything else in the jail's own medical record indicating why his prescription could not be verified.

Mr. Scoby's report of his diagnoses and prescription should have prompted an immediate call by the IRC to Mr. Scoby's provider, rather than deprivation of his medications for almost two months, which caused substantial decompensation, as evidenced above by the jail's own medical record. Furthermore, records that Plaintiffs obtained from Telecare – and which jail medical staff could easily have obtained -- confirm Mr. Scoby had prescriptions for Benadryl, Buspar and Abilify, prescribed by Dr. Jessica Gonzalez, at the time he was arrested.  The Telecare record shows his prescription was current and that his next refill was due on 10/14/22, approximately one week after he was arrested and screened at IRC. Moreover, the record showed that he had previously been prescribed Seroquel. Thus, even under the jail's inadequate Bridge Medication policy, Mr. Scoby was entitled to his psychiatric medications.

18.	Mr. Kevin Scott testified in his declaration on 2/3/23 (Doc. 375-1, Ex. 19) that he was housed in IRC 231 at the time of writing his declaration. He stated he was arrested in late January, 2023 and had been diagnosed with depression, anxiety and agoraphobia in the community. He also testified that he took Prozac 40 mg., Buspar 10 mg. twice a day, and Vistaril 25 mg. three times a day (an antidepressant and two minor tranquilizers). He stated that he took his medications the day before his arrest. He further stated he had not spoken to anyone from mental health while in the IRC 231, he had not received his medications since his arrest, and he wrote, "My anxiety is going through the roof.  Everything is a negative thought.  I feel like I'm not going to be alright. My mind is going a million miles an hour.  I'm hearing voices". He also reported his brother died

three weeks before his declaration was taken and since then he has felt hopeless, more anxious and depressed, and "like everything is going to go wrong."  He had not received any medications either in IRC orin IRC 231.

Yet a review of his medical chart reveals he told staff during his IRC intake that he was in outpatient mental health treatment in the community and received his medications through POC, the parole mental health provider.  His medications included Buspar, Prozac, Benadryl, and all were documented in his jail medical record on 1/25/2023.  Also, the screener noted on 1/25/2023 that Mr. Scott had "a past suicide attempt", as A suicide risk assessment was done and he was considered low risk but given a P2 treatment level. On 2/8/2023, he was finally started on Prozac, Buspar, Depakote, Zyprexa and Vistaril (a minor tranquilizer), the last "as needed for psychotic agitation."  All medications were documented as of 2/8/2023, as prescribed through POC via mail.

Mr. Scott was admitted to IRC in January, 2023; spent at least ten days in IRC and IRC 231, according to his declaration;; told staff of his diagnoses including anxiety, depression and agoraphobia; told staff what medications he took in the community including Prozac, Buspar and Vistaril, and that they were prescribed and he was treated by the parole mental health provider (POC).  Yet he did not have his medications restarted until February 8, and only after he experienced auditory hallucinations, exacerbated anxiety and mounting depression and hopelessness while off of his medications in the jail.  It should be noted that he was taking at least two tranquilizers in the community, and when tranquilizers are discontinued abruptly, the patient experiences much increased anxiety, agitation and racing thoughts, all of which Mr. Scott experienced in the jail prior to the re-starting of his medications on 2/8/2023.

Dr. Siscoe stated in her declaration that Mr. Scott could not have had his psychiatric medication bridged under the Bridge Medication policy because his medications could not be verified. Again, the jail's own medical record contradicts

this statement because Mr. Scott's IRC evaluation completed on 1/25/23 notes the names of Mr. Scott's medications, Buspirone (Buspar), Fluoxetine (Prozac), and Hydroxyzine (Vistaril)and that he was "CURRENTLY TAKING PSYCH MEDS FROM POC VIA MAIL", the parole mental health provider. Jail staff easily could have contacted POC to verify his prescription, and Mr. Scott did not have to suffer for more than two weeks due to deprivation of his psychiatric medications. I see nothing in Mr. Scott's jail medical record to indicate jail staff made any effort to contact his parole mental health provider to verify his prescription. Nor do I see anything in the record indicating why his prescription could not be verified.

In summary, Mr. Scott's report of his diagnoses and prescription should have prompted an immediate call by jail medical staff to the parole mental health provider. Furthermore, POC records confirm Mr. Scott's prescriptions for Buspar, Vistaril and Prozac.

19. Mr. Jonah Jones testified in his declaration on 2/17/23 (Doc. 375-1, Ex. 15) that he was diagnosed with Bipolar Disorder and Schizophrenia and was taking Haldol in the community to keep him "calm," plus another medication for insomnia. According to his declaration, he reported to IRC staff in February 2023 that he gets his medications from Augusta [sic] Hawkins Mental Health Center in Watts.[9] Despite his request for medications, he was told in IRC he would have to wait to see a psychiatrist.

He had previously been in the County jail in 2022 entering through IRC at the end of August and then spending about three months in the Wayside facility. While in jail in 2022 he also was denied his medications and never got to see a psychiatrist while he was in Wayside.

A review of his medical chart includes an ArresteeMedical Screening from LAPD on 8/31/2022, reflecting he reported "mental health issues" and indicating

---

[9] Augustus Hawkins is a mental health center operated by Los Angeles County.
https://locator.lacounty.gov/lac/Location/3181003/augustus-f-hawkins-mental-health-center

he was taking psychiatric medications.  An IRC Intake on 9/1/2022 includes history of Bipolar Disorder, Depression, auditory hallucinations and a sleep disorder.  He provided a medication list including Benadryl (diphenhydramine), Remeron (Mirtazapine), Trazadone, Haldol (older generation anti-psychotic medication), and Risperdal (a new generation anti-psychotic medication). All medications on the list are marked "documented."  He was assigned P2 level of care and low risk of suicide.Yet the jail's own records show that Mr. Jones was not provided with his psychiatric medications,. On  11/9/2022, during a "Psych Care Transition", jails records show Mr. Jones made another effort to obtain mental health treatment. The records state Mr. Jones "reported receiving MH services at Augustus F. Hawkins Mental Health Center and wants to be connected back [there]."[10]  Despite yet another attempt, Mr. Jones still was not provided with his medications.  An 11/10/2022 "Assessment" by Brittney Smith states "Pt denies having medication since being incarcerated."  And nothing in the records through 11/10/22 evidences that Mr. Jones was prescribed the medications he was prescribed in the community.

 A Second IRC Intake performed on 2/17/2023 after Mr. Jones was again arrested provides Mr. Jones with a mental health referral due to his diagnosis of Schizophrenia and his report that he talks to dead people. His medication list for on the intake screening form includes Haldol and Melatonin., Yet, it appears the mental health evaluation he was given following this second IRC Intake was inadequate.   On 2/20/23, in a "Pysch Initial Assessment/COS", there is no mention of his Haldol prescription, Melatonin, or his schizophrenia diagnosis and symptoms., He is assigned P1 status, to be housed in general population-"pill".

Records from Augustus Hawkins Mental Health Center further confirm Mr. Jones' prescriptions for psychiatric medications. These records include a 6/15/2020 "Full Assessment" that lists his prescribed medications Risperdal (2017 – present),

[10]

Hydroxyzine (also known as Vistaril) and Haldol (2017-present).  During this assessment, Mr. Jonese reported symptoms including nightmares, crying spells, , "hear[ing] voices," "seeing demons, people's faces," and "feel[ing]others are doing things behind his back."  Impaired social and vocational functioning is noted.  The records also note hee had a psychiatric hospitalization in prison, attempted suicide in 2017 and was abused by his parents.  Also noted among his symptoms are intellectual and memory impairment; perceptual disturbance; hallucinations; disturbed thought process; impaired associations, insights and judgement; and paranoid delusions.  Diagnosis was Psychotic Disorder NOS and he was referred to Exodus Urgent Care for medication.

Mr. Jones was admitted to IRC for the first time on approximately 9/1/2022, was known to suffer from Bipolar Disorder and/or Schizophrenia, and was taking multiple medications in the community including anti-psychotic medications.- Anti-psychotic medications were documented in both of his IRC evaluations and his medical records from Augustus Hawkins Mental Health Center, but he seems not to have been re-started on his medications at least through 2/17/23, when his declaration was taken and it is unclear whether he has been provided them to this day.

Dr. Siscoe stated in her declaration that CHS did not immediately provide Mr. Jones his psychiatric medications under the jails Bridge policy because he "had not taken [his] medication in the 30 days prior to [his] arrival in the IRC." First, Dr. Siscoe does not specify which IRC arrival she is referring to for Mr. Jones. Second, there is nothing I see in the record to suggest he had not taken his medication in the 30 days prior to either of his arrivals in the IRC. But even if he had not taken his medications in the 30 days prior to either of his arrivals in the IRC, in my medical opinion, that was inadequate justification for denying him his psychiatric medications he was prescribed in the community for a number of reasons.

First, as described above, an appropriate bridge medication policy would ensure that someone who has a prescription for psychiatric medications should have those medications prescribed upon entry in IRC even if it appears he has not adhered to his prescription in the community. The jail medical records reveal that Mr. Jones told the medical screener in his first IRC intake on 9/1/22 that he was currently taking Benadryl (diphenhydramine), (Mirtazapine), Trazadone, Haldol (older generation anti-psychotic medication), and Risperdal and his medical provider, Augustus Hawkins Mental Health Center, was later documented on 11/9/22 and 11/10/22. Mr. Jones also told jail staff in his second IRC intake on 2/17/23 that he was taking Haldol and again his medical provider, Augustus Hawkins Mental Health Center is documented on 2/20/23.

Moreover, records from Augustus Hawkins Mental Health Center further confirm his diagnosis of psychosis, and his current prescriptions for anti-psychotic medications, including Risperdal (2017-present), Hydroxyzine (also known as Vistaril) and Haldol (2017-present).The jail easily could have contacted Augustus Hawkins to verify Mr. Jones' active prescriptions. Thus, Mr. Jones' statements to the IRC screeners and these records should have prompted him to be prescribed his psychiatric medications under a proper Bridge Medication policy.

Second, I reviewed his medical chart from the Los Angeles County Sheriff's Department and Correctional Health Services (CHS), which showed that he was suffered from serious mental illness and took multiple medications.  That review shows that he should have received a prompt psychiatric assessment after his initial medical screening. If he had received that prompt assessment, he would have gotten the psychiatric medications he needed and would not have had to suffer months of deprivation during two periods of incarceration that further exacerbated his symptoms. Mr. Jones' medical chart is thick and documents a consistent diagnosis of psychosis from at least June 2020. Upon both admissions to the IRC, Mr. Jones reported his diagnoses and psychiatric medication prescriptions to IRC

medical screeners. The information he provided in each of these medical screens should have triggered immediate mental health evaluations that likely would have led to him being provided the psychiatric medications he testified had been prescribed for him in the community. Indeed, in each of his IRC medical screens, he was referred for mental health assessments. But jail records do not show when, if ever, he was re-started on his psychiatric medications during either period of incarceration.

It is quite likely that, had medical staff at IRC tried a bit harder to capture Mr. Jones' records from Augustus Hawkins Mental Health Center, or had he been provided a proper mental health assessment within days of his admission to the jail, he would have been provided the psychiatric medications he had been taking in the community and not had to suffer months of deprivation and exacerbated symptoms.

20.    A review of nine cases provides adequate empirical evidence to support a number of conclusions.  Thus, to a reasonable degree of medical certainty, the following opinions are supported:

> ❖ All nine of the patients reviewed suffer from serious mental illness and were prescribed psychotropic medications in the community prior to arrest.
>
> ❖ Many were prescribed medications at a public mental health clinic, where rapid verification of medications should have been relatively available, compared to the availability of a solo prescribing physician; (Brown, Candler, Cisneros, Crowley, Jones).
>
> ❖ All nine provided to IRC staff reliable histories of their mental illness, their disability and their psychotropic medications, as validated by records that plaintiffs obtained from community mental health agencies (Brown, Candler,

Cisneros, Crowley and Jones), which CHS could easily have obtained, and by their psychiatric decompensation after their transfer from IRC to jail housing (Brown, Candler, Scott, Alfaro, Scoby & Fernandez), or by subsequent evaluations by clinicians at the jail who ordered psychotropic medications (Brown, Candler).  The declarants sometimes got details wrong, for example precisely which diagnoses had been assigned and which medications prescribed, but they accurately reported that they suffered from Serious Mental Illness and took psychotropic medications in the community (and/or that they had prior suicide attempts, were admitted to psychiatric hospitals, and so forth).

❖ All nine were not provided bridge medications in the IRC, even though for at least one of them medications were successfully verified by his community mental health records (Jones).

❖ Several of them subsequently decompensated or became suicidal during their tenure at L.A. County Jail (Brown, Candler, Scott, Alfaro, Scoby & Fernandez), and some of them would eventually be prescribed the relevant medications while in the jail, even in the absence of verification of medications at community agencies (Brown, Candler).

❖ In cases where Plaintiffs obtained records from community agencies, the records generally verified the admittees' reports of their mental illness,  their psychotropic medications, or both (Scott, Garcia Alfaro & Scoby).

21.     In conclusion, the LACJ policy for Bridge Medications, as described by Dr. Siscoe in her declaration, is incomplete, inadequate, and does not comply with standards in the field of correctional mental health.  In addition, the practices at the IRC at LACJ, as reflected in the nine cases I reviewed, are entirely substandard regarding Bridge Medications and effective jail mental health services.  I provided in Sections II.6 and II.7, above, recommendations for bringing the Bridge Medication Policy into compliance with standards in the field. Practices in the IRC must be brought up to the level of standard-driven effective mental health care, and that will require an examination of staffing levels in the IRC (a proper quest to verify medications in the community would require a little more staff time than is currently applied), training (about the harms of abrupt discontinuation of psychotropic medications in the jail population, and about effective methods to verify medications or schedule a timely psychiatric evaluation in the jail), and peer review (for example, if an admittee who reports medication needs while in the IRC is not provided bridge medications and subsequently decompensates or attempts suicide in the jail while not receiving the appropriate medications, a thorough case review should occur where one of the outcomes is consideration of a change in practices in the IRC that played a part in the admittee's lack of medication continuity).

Respectfully submitted,


_____        Date _March 30, 2023_

Terry A. Kupers, M.D., M.S.P.