PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Fax: (213) 977-5299

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ (345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930
Fax: (202) 393-4931

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
**ACLU NATIONAL PRISON PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930
Fax: (202) 393-4931

*Not admitted in D.C., practice limited to federal courts

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS RUTHERFORD, <br><br> *Plaintiff*, <br><br> v. <br><br> ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES <br><br> *Defendants*. | No. 75-CV-04111-DDP <br><br> **DECLARATION OF ROHINI KHANNA** |

**Declaration of Rohini Khanna**

I, Rohini Khanna, hereby declare:

1. I make this declaration based on my own personal knowledge, and if called to testify I could and would do so competently.

2. I am an attorney-at-law, duly licensed to practice in the State of California, and in good standing with the California State Bar.

3. From February 2018 until July 2020, I served as the Justice Deputy for Los Angeles County Board of Supervisors (Board) member, Hilda L. Solis. In that role, I was responsible for overseeing the work of all of the Los Angeles County (County) departments involved with the County's criminal legal system, as well as shaping policy development and review for the Supervisor, in all areas related to public safety and the youth and adult justice systems.

4. From August 2020 until June 2022, I served as one of two co-Deputy Directors for the Office of Diversion and Reentry (ODR) within the Los Angeles County Department of Health Services.

5. On June 9, 2020, the Board unanimously approved a motion entitled, "Maintaining a Reduced Jail Population," which requested that the Los Angeles County Sheriff's Department (LASD) and ODR collaborate with justice partners and community stakeholders to provide a report on a plan to maintain a reduced jail population beneath the BSCC rated capacity once the pandemic has subsided while still protecting public safety and ensuring appropriate services for individuals being released.  A true and correct copy of the motion is attached as Exhibit A.

6. In its August 9, 2020 report back to the Board, one success referenced as helping to reduce the jail population was ODR being able to quickly use funding allocated by the CEO to create 211 new beds for COVID-19 emergency housing. This allowed ODR to find ways to open up additional beds elsewhere in their system, screen thousands of eligible individuals for medical vulnerability, and

2

work with LASD to implement coordinated releases.

7. In verbal reports that I attended in approximately May or June of 2020 to the justice deputies representing each of the five members of the Board regarding COVID-19 updates, ODR reported that they were able to open these 211 beds within one month of receiving the funding.

8. On July 7, 2020, the Board passed a motion entitled, "Developing a Plan for Closing Men's Central Jail as Los Angeles County Reduces Its Reliance on Incarceration," (MCJ Closure motion) directing the workgroup convened by the June 9, 2020 "Maintaining a Reduced Jail Population Post-COVID-19" motion, convened by the Sheriff's Department and ODR, to include consultation with the Correctional Health Services division (CHS), community-based stakeholders and service providers, and other relevant partners to provide bi-monthly (every 60 days) reports to the Board on the issues and considerations that must be addressed in order for the County to close MCJ within one year, while continuing to ensure public safety and providing appropriate services for individuals released early or diverted from incarceration. A true and correct copy of the motion and an amendment to the motion is attached as Exhibit B.

9. The MCJ Closure workgroup was first convened on July 30, 2020, charred by then-Assistant Sheriff Bruce Chase and then-ODR Director, Judge Peter Espinoza (retired).

10. When I joined ODR in August of 2020, I assumed responsibility of overseeing the development of responses to MCJ Closure motion, which included working closely with Karen Tamis, the consultant retained by ODR to lead this effort.

11. The MCJ Closure Workgroup submitted its final report entitled *Men's Central Jail Closure Plan: Achieving a Care First Vision* on March 30, 2021.[1] In

---

[1] The report is available at http://file.lacounty.gov/SDSInter/bos/bc/1104568_DEVELO_1.PDF

that report, it clarifies that despite the motion's direction to develop a plan for MCJ's closure within one year, based on the Workgroup's evaluation, realistically, the timeline would require 18-24 months. *Men's Central Jail Closure Plan* at 4.

12. In order to close MCJ within 18-24 months, the MCJ Closure Workgroup recommended adding 3,600 beds for community-based mental health care and approximately 400 beds for individuals with serious medical, SUD and/or housing needs. *Id.* at 55.

13. The Workgroup found that with the appropriate investments, "the following [already existing] programs were ready to be scaled up immediately to serve individuals who could be diverted out of jail custody and have serious mental health, SUD [substance use disorders] and/or medical needs.": ODR, DHS Housing for Health, Department of Mental Health Justice-Involved Mental Health beds, Los Angeles Homeless Services Authority Interim/Bridge Housing beds for people leaving institutions, and Department of Public Health-Substance Abuse Prevention and Control Recovery Bridge Housing beds for people leaving residential SUD programs. *Id.* The Report recommended that beds for individuals with serious mental health needs should be prioritized, in order to move people who are likely eligible for diversion out of the Twin Towers jail facility. *Id.*

14. The report proposed that, if appropriate investments in necessary community-based care and services were made, the 18-24 month timeline for MCJ closure projected jail population could be achieved through specific population reductions on a set timetable: 800 people in the first 6 months, an additional 1,250 in months 9-12, 1,500 in months 12-18, and 950 more in months 18-24, with an emphasis on prioritizing people with serious mental illness transitioning out of the jail into community-based care. *Id.* at 50-55. We recognized that a large percentage of the diverted population would need residential placements, but not everyone. The Report also broke down the acuity of level of the population (e.g., P3 or P4) to be diverted and the type of services they would need. *See id.* at 144-

45 (Appendix 8).

15. Prior to submission of the final MCJ Closure Workgroup report, the lead consultant and members of the ODR team, including me, met with the leadership of each of the named and involved County departments, to ensure that they were aware of the developed plan and how it could impact their respective departments or what their role would be in implementing this plan, and each department signed on in support of this plan.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and in my personal knowledge.

Executed April 5, 2023 in Los Angeles, California.

_Rohini Khanna_ / with permission by PJE

Rohini Khanna

5

# Exhibit A

AGN. NO.____

MOTION BY SUPERVISORS JANICE HAHN AND
MARK RIDLEY-THOMAS                                                                June 9, 2020

**<u>Maintaining a Reduced Jail Population Post-COVID-19</u>**

The Los Angeles County Sheriff's Department (LASD) oversees the largest local jail population in the nation. Seven different facilities house those who are incarcerated under LASD jurisdiction: Men's Central Jail, Twin Towers Correctional Facility, Century Regional Detention Facility, Pitchess Detention Center, Pitchess North, Pitchess South, Pitchess East, and North County Correctional Facility.

Prior to the COVID-19 pandemic, the average daily population across all four facilities totaled slightly more than 17,000 individuals. This number vastly surpassed the Board of State and Community Corrections (BSCC) rated capacity for the facilities, which is only a total of 12,404 persons. This means that before the pandemic, Los Angeles County (County) jails were overcrowded by an average of 4,596 individuals on any given day, according to BSCC standards. These overcrowding conditions have contributed to various lawsuits and consent decrees against the County; in 2012, the Citizen's Commission on Jail Violence identified overcrowding as a serious problem, and the Office of Inspector General has continued to raise this as a key issue impacting the jails.

<u>MOTION</u>

SOLIS                    _____

RIDLEY-THOMAS_____

KUEHL                   _____

HAHN                    _____

BARGER               _____

Since the COVID-19 pandemic began, the justice partners, including LASD, the courts, the Public Defender, and the District Attorney, have worked diligently to quickly reduce the jail population without endangering public safety.  Since March, the population of incarcerated persons has decreased by around 5,000, bringing the total incarcerated population down to 12,026 as of June 2, 2020, and was as low as 11,765 on May 1.  For the first time in decades, this number is lower than the total BSCC rated capacity for the County jails.  This reduction in jail population has been achieved with great consideration for public safety, and the County has experienced an overall decrease in crime since the crisis began.

In a pandemic, it is important to reduce the numbers of incarcerated persons to well below the rated capacity in order to have enough space to effectively implement social distancing protocols and provide necessary isolation and treatment. To this end, LASD and County justice partners are still working to further reduce the jail population.  While addressing the current pandemic through jail population reductions is vital, we must also consider what will happen when the threat of COVID-19 has been reduced and the County begins to return to its pre-COVID-19 functions.  This crisis has demonstrated that prior to the epidemic, there were thousands of individuals in overcrowded jails who could be released from jail without endangering public safety.

In many ways, this crisis has demonstrated what the County and community had already been suspecting and what was articulated by the Alternatives to Incarceration Workgroup and the Office of Diversion and Reentry – that thousands of individuals could be safely served in more cost-effective and humane manners in the community or alternate placements rather than custody.  Now that we know this, it is important to not simply revert to pre-COVID-19 overcrowding and over-incarcerating once the pandemic

has ended; we need to take the steps to maintain the collaborative reduction of the County's jail population to below the BSCC rated capacity level.

**WE, THEREFORE MOVE** that the Board of Supervisors:

1. Request the Los Angeles County Sheriff's Department and the Office of Diversion and Reentry, in collaboration with the Office of the Public Defender, Office of the Alternate Public Defender, Probation Department, District Attorney, Chief Executive Office, County Counsel, the Alternatives to Incarceration (ATI) Initiative, and all other relevant departments, and in consultation with the Superior Court, to, in building on the recently submitted ATI Workgroup report and recommendations, provide a report to the Board of Supervisors in 60 days on their plan post-COVID-19 to maintain a reduced jail population beneath the Board of State and Community Corrections rated capacity while continuing to protect public safety and ensuring appropriate services for individuals released early or diverted from incarceration, including, but not limited to:

    a. A protocol for warm hand-offs to post-release placements
    b. Additions and expansions needed to the County's system of care that can provide alternative placements to incarceration – community-based whenever possible – including for individuals experiencing homelessness, individuals with serious mental illness, and individuals suffering from substance abuse
    c. Legislative changes that the County could pursue and advocate for to help maintain a reduced jail population
    d. Plans to reduce the number of inmates admitted on a daily basis

2. Direct the CEO, in consultation with the Sheriff and Auditor Controller, to report back in 60 days with an analysis of any cost savings that have or will be generated in the future through a reduced jail population.

# # #

JH:kc

# Exhibit B

AGN. NO.

MOTION BY SUPERVISORS HILDA L. SOLIS  July 7, 2020
AND SHEILA J. KUEHL

**Developing a Plan for Closing Men's Central Jail as Los Angeles County Reduces Its Reliance on Incarceration**

For years, those working to reform the criminal justice system in Los Angeles County have emphasized the critical need to close Men's Central Jail (MCJ). Built in 1963, MCJ consistently ranks among the ten worst facilities in the country. It has been well-documented over at least the last 25 years, in lawsuits, federal investigations, court monitored settlement agreements, complaints, and grievances that MCJ's flawed design and infrastructure contribute greatly to the county's inability to provide appropriate medical and mental health care, programming, recreation, and humane living conditions. The ongoing structural dilapidation further impedes any county efforts to achieve an improved standard of care for individuals who are incarcerated at MCJ.

Since at least 2015, Los Angeles County, through its Board of Supervisors (Board), has taken remarkable steps to rethink its approach to the criminal justice system, including embracing pioneering approaches to addressing health and service needs in community-based settings, reducing reliance on incarceration, and reinvesting in its communities, with demonstrated improved health and public safety outcomes. In 2019,

MOTION

SOLIS              _____

RIDLEY-THOMAS_____

KUEHL              _____

HAHN               _____

BARGER             _____

the Board rejected longstanding plans to replace MCJ and instead committed to taking an evidenced based "care first, jail last" approach based on experience demonstrating that punitive environments are not only inhumane for those who are suffering from mental illness, but also exacerbate the illnesses faced by the most vulnerable people in our custody, while greatly reducing their likelihood of recovery, upon release.

On August 7, 2019, the Chief Executive Officer (CEO) submitted a memorandum (CEO Report), entitled "Report Back on Developing A Care-First Treatment Model for New Mental Health Treatment Center (MHTC)," in response to this Board's directions. Attachment A to the CEO Report is a memorandum from the Health Departments including a recommendation for creating a decentralized continuum of clinical, trauma-informed care facilities operated by health personnel.

Additionally, on January 7, 2020, the RAND Corporation released a report which found, consistent with an internal report by the county's Office of Diversion and Reentry (ODR), that if sufficient capacity was available, at least sixty percent of people with serious mental illness in the jails at that time, representing over 3,300 individuals, could safely be released into ODR's existing programs to receive treatment and support in community-based settings..

Three months later, on March 10, 2020, the Alternatives to Incarceration (ATI) Workgroup issued a road map for developing that capacity within the community. The ATI's report details, in 114 recommendations what a "care first, jail last" model for the county would include. The report puts forth 26 recommendations which represent the first steps toward reducing the reliance on law enforcement and incarceration in the county, and moving towards a more humane, healthy, and safe approach to serving its residents'

needs.

The urgent need for dramatic changes in our county's approach to justice and health, coupled with an unexpected moment of opportunity, have come into sharp focus since the beginning of March 2020. Despite its many hardships, the widespread impact of the COVID-19 pandemic revealed that a reduced reliance on incarceration is an achievable goal. Through impressive collaboration by the agencies that comprise the justice system, along with the health departments and community-based service providers, the jail population decreased from over 17,000 to approximately 12,000 people incarcerated daily. This marks the first time in at least 15 years that the number of people incarcerated in the county's jail system has been below the 12,404 capacity for which it is rated by the California Board of State and Community Corrections (BSCC), despite significant decreases in crime in the same period.

Despite this impressive decrease however, the population of people with serious mental illness has gone from about 5,300 people to 4,500 people, only a modest drop since the beginning of March; and they now constitute nearly half of the population of people incarcerated in the jail system. Based on the study by ODR and the RAND Corporation, this number could be decreased significantly, enabling an even larger decrease in the daily population of incarcerated adults in the county. Failing to invest in this achievable decrease flies in the face of important equity concerns, and the larger "care first, jail last" approach adopted by the Board. The process for removing eligible individuals with serious mental illness from the jail setting has been refined over the last several years, such that securing adequate funding to meeting this increased scale, while a considerable hurdle, is the only remaining barrier to achieving this important

transformation in the county's approach to mental illness.

On June 9, 2020, the Board unanimously approved the "Maintaining a Reduced Jail Population Post-COVID-19" motion put forward by Supervisors Hahn and Ridley-Thomas, seeking to develop a plan to maintain the jail populations below the BSCC-rated capacity, after the urgent demands of the pandemic have passed. The Board's adoption of the motion on June 9th reaffirms the Board's commitment to achieving the vision for a "care first, jail last model," as set forth in the reports by the county's health departments, the ATI Workgroup, and the Office of Diversion and Reentry over the past two years. And most recently, the sustained and growing worldwide demonstrations against police violence, demanding racial justice across the country, are asking for bold leadership, a leadership that this county has already begun to undertake, to make changes to improve health and safety outcomes by reinvesting into our most disenfranchised communities. It is time to take the next step to develop pathways to closing MCJ, once and for all.

Closing MCJ will also further the county's fiscal commitment to a "care first, jails last" model. In addition to the budget curtailments facing every county department this year in response to the COVID-19-related economic crisis, the Sheriff's Department faced a budget shortfall of $63 million in the last fiscal year and is facing a shortfall of $89 million again this fiscal year. Population reductions without facility closures often fall short of realizing cost savings. Closure of MCJ, with appropriate planning, would help to address budget shortfalls within the Sheriff's Department while also allowing for additional funds to be redirected into building up the system of care needed to safely divert individuals as well as meeting the primary needs of those who were released early during the pandemic.

A recent survey conducted by the Vera Institute for Justice of Los Angeles County service providers revealed that the primary needs of those who were released early during COVID included basic needs, such as housing, access to identification and public benefits, food, clothing, transportation, and hygiene products, as well as treatment for mental health and substance use disorders. Some also identified needs related to education, training, and employment to promote recovery and reintegration.

In order to meet the needs to support the success of those being released, and to prevent future law enforcement contact, the County must commit costs saved from closing MCJ – including eliminating the need for renovations and the expensive attempts to provide medical and mental health care within a facility that was not designed for such care– to reinvesting into our most disenfranchised communities and increasing access to basic needs and the county's system of care, to further reduce the county's historic reliance on its jail system to meet its residents' health and service-related needs and embrace a new vision for the county's future.

**WE, THEREFORE, MOVE** that the Board of Supervisors:

1) a) Direct the workgroup convened by the June 9, 2020 "Maintaining a Reduced Jail Population Post-COVID-19" motion, convened by the Sheriff's Department and the Department of Health Services' Office of Diversion and Reentry, to include consultation with the Correctional Health Services division (CHS), community-based stakeholders and service providers, and any other relevant partners to provide bi-monthly (every 60 days) reports to the Board of Supervisors on the issues and considerations that must be addressed in order for the County to close MCJ within

one year, while continuing to ensure public safety and providing appropriate services for individuals released early or diverted from incarceration. The first such report, to be delivered within 60 days, and each report thereafter, should include analysis of the considerations that would need to be taken into account in order to close MCJ within one year, along with recommended actions to meet that goal, including:

- Plans for redistributing the existing population among the remaining jail facilities such that the capacity in remaining facilities does not exceed the BSCC-rated maximum capacity;
- The potential impact such redistribution would have on the remaining six county jail facilities, including intake and release procedures, as well as transportation processes;
- Plans for re-deploying community-based service providers and other programs from MCJ to other county or community facilities; and
- The status of renovations of Pitchess Detention Center East, and its expected capacity, and timeline for it being suitable for habitation, as well as the status of renovations and maintenance of the other five remaining jail facilities.

b) Authorize the Director of the Department of Health Services, or her designee, to hire an external consultant with relevant expertise to advise and assist the workgroup with fulfilling the objectives and directives outlined above, if the workgroup determines that such support is necessary.

2) Direct the CEO to report back as follows:

a) In collaboration with the Sheriff's Department, the Department of Health Services, Auditor-Controller and other relevant departments with an assessment of cost savings related to closing Men's Central Jail, including:

- Eliminating the need for renovations and maintenance;
- Reducing the cost associated with court-monitored settlement agreements and any other legal or regulatory compliance obligations;
- Reduced food, laundry, transportation and care costs;
- Reduced staffing costs for Sheriff, CHS, and any other county departments; and
- Any other resource needs.

b) An update on Legislative or local policy changes, including those previously proposed by ODR, that the County could pursue to secure necessary funding. The update should include consideration of AB900 funds, as well as any other funding that could be allocated to scale community-based alternatives to incarceration, further reduce the jail population, and otherwise ensure the successful closure of MCJ.

#   #   #

HLS: rk

AGN. NO.__

July 7, 2020

AMENDMENT TO SUPERVISORS HILDA L. SOLIS AND SHEILA KUEHL'S MOTION NO.3

**Amendment to Item 3**

**I, THEREFORE, MOVE THAT** the Board of Supervisors direct the Workgroup to incorporate input from Police Chiefs and Contract Cities in the report and to include data on the following:

1) Specific bed types currently utilized at MCJ and where those beds exist elsewhere in the system to serve current high-need populations;

2) Detailed and anonymized data regarding the population currently in custody at each of the jail facilities, by facility, including offenses by inmate, length of time being served for specified offenses, classifications based on acuity, mental health status, age, ethnicity, gender/gender identity, sexual orientation, pretrial status, those incarcerated on probation or parole violations (technical or otherwise), holds related to findings of ineligibility for diversion or release, those with serious medical conditions including HIV/AIDS, and a breakdown of those recommended for diversion versus those who would remain in custody; and

<u>MOTION</u>

SOLIS              _____

RIDLEY-THOMAS_____

KUEHL              _____

HAHN               _____

BARGER             _____

**I, FURTHER, MOVE THAT** the Board of Supervisors direct CEO to report back in 14 days with a status update on the August 13, 2019 Motion, entitled "Exploring a Decentralized Continuum of Community-Based Services and Care for Los Angeles County" and any other relevant working groups or related information specifically in regards to "detailed data on the anticipated bed/placement types needed in order to account for the decentralized continuum of community-based treatment and residential beds needed to accommodate those who are potentially able to be diverted from the criminal justice system"

<u>MOTION</u>

| | |
|---|---|
| SOLIS | _____ |
| RIDLEY-THOMAS | _____ |
| KUEHL | _____ |
| HAHN | _____ |
| BARGER | _____ |