# **<u>EXHIBIT A</u>**

1  OFFICE OF COUNTY COUNSEL
   Dawyn Harrison (173855)
2  County Counsel
     dharrison@counsel.lacounty.gov
3  Dylan Ford (228699)
   Deputy County Counsel
4    dford@counsel.lacounty.gov
   500 West Temple St., Floor 6
5  Los Angeles, California 90012
   Telephone:   (213) 974-1807/(213) 974-1811
6  Facsimile:   (213) 687-8822

7
   KENDALL BRILL & KELLY LLP
8  Robert E. Dugdale (167258)
     rdugdale@kbkfirm.com
9  Michael J. McCarthy (334829)
     mmccarthy@kbkfirm.com
10 Katelyn A. Kuwata (319370)
     kkuwata@kbkfirm.com
11 10100 Santa Monica Blvd., Suite 1725
   Los Angeles, California 90067
12 Telephone: (310) 272-7904
   Facsimile:  (310) 556-2705
13

14 *Attorneys for Defendants Los Angeles*
   *County Sheriff Robert Luna, in his Official*
15 *Capacity, and the County of Los Angeles*

16
                **UNITED STATES DISTRICT COURT**
17
        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
18

19

20 DENNIS RUTHERFORD, et al.,              Case No. 75-cv-04111-DDP

21          Plaintiffs,                    **DEFENDANTS' PRE-HEARING**
                                           **STATUS REPORT**
22     v.
                                           Date:   April 19, 2023
23 ROBERT LUNA, Sheriff of Los             Time:  10:00 a.m.
   Angeles County, in his official capacity,
24 and the COUNTY OF LOS ANGELES,          Hon. Dean D. Pregerson
                                           Courtroom 9C
25          Defendants.

26

27

28

**Exhibit A**
**Page 5**

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ...... 1

II. THE CORRECTIVE ACTIONS TAKEN BY DEFENDANTS TO ENSURE COMPLIANCE WITH THE PRELIMINARY INJUNCTION'S TERMS ...... 3

A. The Sheriff Has Issued Written Orders Which Advise IRC Personnel of the PI's Requirements, and All IRC Personnel Have Been Re-Trained on Those Requirements ...... 3

B. Defendants Are Close To Implementing a More Efficient Automated System To Accurately Track and Report PI Compliance ...... 4

C. Defendants Are Implementing Staffing Changes in the IRC To Meet the Challenges Posed When Surges of Inmates Enter the IRC ...... 6

   1. LASD ...... 6

   2. CHS ...... 7

     (a) *Staffing changes in the IRC* ...... 7

     (b) *Overall CHS Staffing Changes* ...... 8

D. Other Changes in the IRC Relevant to the PI's Requirements ...... 9

   1. Defendants' New Method for Addressing Bridge Medication and Mental Health Care in the IRC ...... 9

   2. Defendants Are Initiating a New Robust Cleaning Schedule in the IRC To Ensure It Is Kept in a Sanitary Condition ...... 10

E. Defendants Are Taking Substantial Steps To Make Scarce Mental Health Housing More Available To End IRC Backlogs Due to Housing Shortages ...... 10

   1. Plaintiffs Improperly Focus on BSCC-Rated Capacity in the LACJ ...... 11

   2. The County Is Taking Substantial Steps to Divert Mental Health Inmates Out of the LACJ as Fast, But as Prudently, as Possible ...... 12

   3. The County Is Currently Engaged in Other Substantial Efforts to Lower the Number of Inmates in the LACJ ...... 15

   4. The LASD Is Taking Steps To Maximize the Number of HOH Beds Within the Twin Towers Correctional Facility ...... 16

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 6   i

F.    The Court Should Explore More Effective Remedies to Address Any Future Alleged Violations of the Court's Orders in the IRC Than the Remedy Plaintiffs Propose ................................................... 17

III. CONCLUSION ................................................................................ 19

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Exhibit A**
**Page 7**    ii

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

6

*Armstrong v. Brown*,
   939 F. Supp. 2d. 1012 (N.D. Cal. 2013)................................................................. 7

7

8

*Brown v. Plata*,
   563 U.S. 493 (2011) ............................................................................................. 11

9

10

*United States v. County of Los Angeles, et al.*,
   Case No. 15-CV-5903-DDP-JEM, ECF No. 243 ............................................... 17

11

**Statutes**

12

California Government Code § 8658 ...................................................................... 18

13

Prison Litigation Reform Act (42 U.S.C. § 1997e) ............................................. 18

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 8   iii
DEFENDANTS' PRE-HEARING STATUS REPORT

# I.

## INTRODUCTION

In anticipation of the upcoming hearing on Plaintiffs' motion for an order to show cause re: contempt (the "Motion"), Los Angeles County Sheriff Robert Luna (the "Sheriff") and the County of Los Angeles (the "County") (collectively "Defendants") wish to update the Court on the myriad corrective actions Defendants have taken, are taking, and continue to take in order to ensure future compliance with the requirements of the preliminary injunction initially entered by this Court on September 27, 2022 (the "PI"). Specifically, as set forth in detail below:

\* The Sheriff has issued written policies which precisely describe the PI's requirements and the steps that must be taken to comply with the PI; and all personnel who work in the Inmate Reception Center (the "IRC") have been re-trained on these requirements and steps, and on the urgency of compliance.

\* To better and more efficiently track Defendants' compliance with the PI's requirements and provide Defendants with real-time access to data to help avoid violations, the Los Angeles County Sheriff's Department (the "LASD") has developed a new computer program for use in the IRC which tracks PI compliance for each inmate in real time and alerts the IRC staff when relevant time limits are approaching.

\* The Sheriff has created a new supervisory position in the IRC which is filled by a sergeant on each shift responsible for monitoring compliance with the PI's provisions 24 hours a day, seven days a week.

\* To prevent a reoccurrence of the unanticipated staffing shortages experienced by Correctional Health Services ("CHS") in February 2023, which led to delays in processing inmates through the IRC that month, CHS has replenished its IRC staff, and also established a group of 10 mental health workers from elsewhere in the Los Angeles County Jail ("LACJ") who are cross-trained in the complex work demanded of CHS staff in the IRC and who can provide overtime hours when

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 9     1

DEFENDANTS' PRE-HEARING STATUS REPORT

needed to process surges of new inmates.

      *     To ensure that all inmates with mental health conditions who enter the LACJ through the IRC receive a psychiatric assessment upon their arrival, which is greater than the standard of care typically offered in a carceral environment, CHS has set up a psychiatric treatment team in the IRC to, among other things, prescribe medication to inmates before they are transferred to permanent housing, thus eliminating concerns that these inmates will not have medication they require "bridged" in a timely manner.

      *     As a result of its persistent efforts to hire qualified mental health professionals, even facing the headwinds those efforts have encountered due to the severe national, regional, and local shortage of such professionals, CHS has experienced recent success in hiring new personnel and will have onboarded 83 new employees between March 1, 2023 and May 8, 2023, an increase in CHS' ranks which will directly and indirectly benefit IRC processing.

      *     To attract even more professionals to fill CHS' remaining vacancies, and to retain CHS' current workforce, the County has instituted 20% pay increases to mental health staff and key support staff working in the LACJ or willing to take a job in the LACJ.

      *     Defendants have confronted the difficult task of attempting to keep the IRC space clean and sanitary by bulking up the custodians necessary to maintain the cleanliness of a space that sees thousands of inmates pass through it each week, and by instituting a regular cleaning schedule, which will ensure the IRC is thoroughly cleaned during each eight-hour shift.

      *     Finally, Defendants have taken and will continue to take many steps to ensure that the unavailability of permanent housing is not a bottleneck that causes inmates to remain for more than 24 hours in the IRC. This includes and will continue to include efforts to depopulate the LACJ by diverting inmates, particularly those who occupy scarce High Observation Housing ("HOH"), out of custody; to

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 10  2

DEFENDANTS' PRE-HEARING STATUS REPORT

1   more rapidly transfer inmates in the LACJ who have been sentenced to state prison;

2   and to transfer inmates found to be incompetent to stand trial to state hospitals.

3        Defendants' short and long-term corrective actions to address issues in the

4   IRC strike at the root causes of delays in timely processing inmates out of the IRC,

5   and they should yield sustainable fixes related to issue-tracking in the IRC, staffing

6   shortages, and specialty housing deficits. Contrary to Plaintiffs' assertion, this is not

7   a "rinse and repeat" moment, but rather a moment when Defendants are taking all

8   reasonable steps within their control to fully comply with this Court's orders.

9        For this reason, as more fully described below, the Court should decline to

10  hold Defendants in contempt, or, at a minimum, should require additional

11  submissions or evidence from the parties and/or hold an evidentiary hearing

12  regarding the scope of any violations of the PI; whether any violations which did

13  occur were excusable; whether any violations have been remedied through effective

14  corrective actions taken by Defendants; and, if a finding of contempt is merited,

15  what remedies the Court can impose which can promptly and effectively address

16  any unconstitutional conditions that arise in the IRC due to forces that may not be

17  within Defendants' control.

18  ## II.

19
20  ### THE CORRECTIVE ACTIONS TAKEN BY DEFENDANTS TO ENSURE COMPLIANCE WITH THE PRELIMINARY INJUNCTION'S TERMS

21  **A.**    **The Sheriff Has Issued Written Orders Which Advise IRC Personnel of the PI's Requirements, and All IRC Personnel Have Been Re-Trained on Those Requirements**
22

23       To ensure that all personnel in the IRC are aware of the PI's precise

24  requirements, how to fulfill those requirements, and how to document accurately

25  Defendants' compliance or non-compliance with this Court's orders, the Sheriff has

26  issued Unit Orders putting all IRC personnel on clear notice of these issues. Suppl.

27  Decl. of Paula Tokar ("Suppl. Tokar Decl.") ¶ 4. All LASD personnel who work in

28  the IRC have been re-trained on these issues through training bulletins each worker

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Exhibit A**
**Page 11** 3
DEFENDANTS' PRE-HEARING STATUS REPORT

1  was required to review as part of their regular shift briefings, and CHS personnel
2  working in the IRC have similarly been briefed on the PI's requirements and the
3  importance of meeting them.  *Id.*  This message from the top has reaffirmed the
4  urgency IRC personnel must act with to comply with the PI's requirements.

5  **B.  Defendants Are Close To Implementing a More Efficient Automated**
   **System To Accurately Track and Report PI Compliance**
6
7          One of the most pressing issues the LASD faces in fully complying with the
8  PI is tracking the flow of inmates into and out of the IRC.  This task has been
9  difficult because the LASD's current data capture and report capabilities do not
10 adequately alert staff of impending violations, especially when a combination of
11 staffing shortages occur concurrently with a rise in incoming inmates.

12         In February 2023, the LASD Custody Innovation Technology Unit ("CITU")
13 set out to overhaul LASD's inmate tracking capabilities to ensure that staff working
14 in the IRC are notified, with sufficient time to act, of conditions that could result in a
15 violation.  Specifically, CITU is presently testing an automated program (the
16 "Inmate Tracking System"), which has the capability to track, in real time: (1) the
17 length of time an inmate has been in the IRC; (2) the length of time an inmate has
18 been on the Front Bench; and (3) the length of time an inmate has been in a cell.
19 Most importantly, this program will alert IRC personnel when the length of time for
20 any inmate approaches the limits set by the PI for each of the above categories.  *Id.*
21 ¶ 5.  And, with the advent of this alert system, all IRC personnel will be able to more
22 easily review PI-related data in real time to obtain an accurate picture of every
23 inmate at the moment the data is retrieved, rather than the current process of
24 reviewing individual inmate snapshots.  Below is an example of the system's
25 capabilities based on current synthetic data used in the testing stages:

26
27
28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 12    4

DEFENDANTS' PRE-HEARING STATUS REPORT

1

2

3

4

5

6

7



8

9   An example of the interface showing test inmate timers, many of which have exceeded
    the respective PI limits for the Front Bench, Cell, and IRC areas.  Suppl. Tokar Decl. ¶ 10, Ex. A.

10

11

12

13

14

15

16

17

18

19   When a timer is beyond the PI's time limits, supervisors are able to enter the reason.  If the expired
     timer stretches beyond one shift, supervisors for each shift will enter the reason.  *Id.* ¶ 10, Ex. B.

20



21

22

23

24

25

26

27   Additionally, staff members will be able to see inmates broken out into the areas
28   where they are currently (coupled with their unique timers).  *Id.* ¶ 10, Ex. C.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 13   5
DEFENDANTS' PRE-HEARING STATUS REPORT

1    LASD anticipates that the Inmate Tracking System will also correct a flaw in
2  current record-keeping which has caused the LASD to erroneously report instances
3  of an inmate being present in the IRC in violation of the PI when the inmate had
4  actually left the IRC.  For instance, in reviewing records to respond to Plaintiffs'
5  Motion, the LASD noted instances where inmates had been removed from the Front
6  Bench and transferred to permanent housing or had left the jail entirely for state
7  prison, but the IRC clock continued to run until the inmates' arrival at his new
8  location.  These errors appeared to show PI violations, when actually no violation
9  had occurred.  Suppl. Tokar Decl. ¶ 8.

10    The new data tracking procedures have not yet been finalized, but they show
11  promise in the testing stages.  Under the current timeline, the LASD will start
12  piloting this new data tracking system on April 24, 2023.  *Id.* ¶ 9.  The LASD
13  anticipates that the new system will eliminate many of the deficiencies of the current
14  tracking system, and will significantly assist the LASD and CHS with improving
15  and more accurately tracking compliance with the PI's requirements.

16 **C.    Defendants Are Implementing Staffing Changes in the IRC To Meet the**
17 **Challenges Posed When Surges of Inmates Enter the IRC**

18   **1.    LASD**

19    Recognizing the need for additional layers of accountability in the IRC, the
20  LASD moved forward in February 2023 with creating a new sergeant position,
21  staffed 24 hours a day, 7 days a week, with the primary responsibility of ensuring
22  compliance with the PI.  *Id.* ¶ 11.  The position's primary duties include ensuring
23  compliance with the holding cell provisions of the PI and documenting any
24  instances when those provisions are violated.  The sergeant will be the point person
25  for monitoring the new automated tracking system, ensuring that all logs and
26  documentation are complete, and will also provide back-up for the Custody
27  Assistant tasked with monitoring all aspects of Front Bench placements.  *Id.*
28    Furthermore, the County is undertaking steps to ensure more robust staffing

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Exhibit A**
**Page 14**    6

1   in the LACJ.  To this end, the LASD has increased the number of LASD Academy

2   classes—adding four additional classes in the fiscal year 2022-2023 (for a total of

3   eight classes).  *Id.* ¶ 12.  The LASD expects that the deputies added to the Custody

4   Division through these increased classes will improve the conditions and speed of

5   processing inmates through the IRC.  As of the January 23, 2023 LASD Academy

6   class, there were already more expected LASD graduates in 2022-2023 than the

7   prior year, and four planned classes this year have not yet commenced.  *Id.*

8        **2.    CHS**

9             **(a)    *Staffing changes in the IRC***

10            As explained in Defendants' Response, in February 2023, CHS experienced

11  significant and sudden attrition of its staff, and particularly its leadership, in the

12  IRC.  *See* Response at 8-9.  Over this short period, the IRC lost its manager, four

13  psychiatric social workers ("PSWs"), and five mental health staff supervisors.  *See*

14  *id.*  A staffing crisis of this magnitude was not foreseeable, as Plaintiffs assert.

15  Although certain staffing issues are to be expected (e.g., sick calls and reasonable

16  turnover), what transpired in February was not—indeed, it was one of the worst

17  periods for attrition in the IRC's recent history.  *See* Decl. of Joan Hubbell ¶ 6.

18  District courts have acknowledged that even a staff member's unexpected illness

19  may reasonably lead to noncompliance with a court order.  *See, e.g.*, *Armstrong v.*

20  *Brown*, 939 F. Supp. 2d. 1012, 1025 (N.D. Cal. 2013).

21            Defendants have remedied these staffing deficits, and the IRC is now staffed

22  with two managers, four supervisors, and twenty-two clinicians (including PSWs,

23  psychologists, and mental health registered nurses).  Suppl. Decl. of Joan Hubbell

24  ("Suppl. Hubbell Decl.") ¶ 2.  The restoration of CHS's IRC staff, and its leadership

25  in particular, has had a measurable impact on IRC processing.  *Id.* ¶ 3.  Defendants,

26  for instance, completed 427 more mental health evaluations in the IRC in March

27  2023 compared to February 2023.  *Id.*

28            Additionally, Defendants now have a psychiatric staff stationed in the IRC

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 15    7

DEFENDANTS' PRE-HEARING STATUS REPORT

consisting of full-time equivalents of 2.25 psychiatrists and 5.5 psychiatric nurse practitioners, with 5 additional nurse practitioners currently onboarding. *See* Suppl. Decl. of Dr. DeSilva ("Suppl. Dr. DeSilva Decl.") ¶ 3. The goal of this fortified psychiatric staff is to ensure that all individuals in the IRC with mental health conditions receive a psychiatric assessment for medication before transferring to permanent housing. *See* Response at 16-17. This will improve the care and safety of all such individuals in the IRC, as they will be receiving any required medications pursuant to a current assessment by the County's own providers. The move to embed this psychiatric staff in the IRC is already having a significant impact on how mental health care is provided to inmates in the IRC. Since the last week of March 2023, 80% of inmates who entered the IRC with a mental health condition received a psychiatric assessment, and medication as indicated, in the IRC. Suppl. Dr. DeSilva Decl. ¶ 3.

### (b) *Overall CHS Staffing Changes*

More generally, as of the date of this filing, CHS has onboarded 63 new staff since February 2023, and will be onboarding an additional 20 staff by May 8, for a total of 83 new staff members. Suppl. Hubbell Decl. ¶ 4. Critically, this includes seven new clinicians within Men's Mental Health who will improve clinical housing unit coverage and help stabilize and step down inmates, which makes higher acuity beds available for permanent housing for those waiting in the IRC. *Id.*

In addition, CHS established a group of 10 mental health workers from throughout the LACJ who are cross-trained in the IRC and who are available to provide overtime hours when necessary due to unexpected staffing shortfalls like those which occurred in February 2023. *Id.* ¶ 5. Finally, Defendants have introduced 20% pay increases for all mental health staff in the LACJ to incentivize new hires, improve the retention of IRC's current staff, and encourage overtime work when necessary. *Id.* ¶ 6. Defendants believe that these bonuses will encourage qualified staff who currently work in the LACJ to volunteer for overtime

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 16    8
DEFENDANTS' PRE-HEARING STATUS REPORT

hours in the IRC when IRC staffing shortages occur in the future.  *Id.*

**D.  Other Changes in the IRC Relevant to the PI's Requirements**

    **1.  Defendants' New Method for Addressing Bridge Medication and Mental Health Care in the IRC**

Defendants do ***not*** "cut people off psychiatric medications they were prescribed in the community when they enter IRC," as Plaintiffs assert.  Reply at 5.  Defendants bridge psychiatric medications for inmates pursuant to the County's Bridge Medication Policy, which represents the standard of care in carceral institutions.  Response at 15-16; Decl. of Dr. Gayani DeSilva ("Dr. DeSilva Decl.") ¶ 2; Decl. of Dr. Karen Siscoe ¶ 3; Standards for Jail Health Services at J-D-02, Nat'l Comm'n on Correctional Healthcare (2018).

Plaintiffs claim that an inmate named Mr. Candler, arrested on November 23, 2022, was "cut off [of his Seroquel] when he entered the IRC" and "was not prescribed Seroquel in the jail for more than a month."  Reply at 5-6.  Plaintiffs are wrong.  Mr. Candler was offered Seroquel on November 27, 2022, but he ***refused to take it*** because it was to be administered in crushed form pursuant to County policy.[1]  Suppl. Dr. DeSilva Decl. ¶ 4.  On November 27, 2022, Mr. Candler was also offered Zyprexa, which is a reasonable alternative to Seroquel and may be even more effective, but Mr. Candler refused this medication as well.  *Id.* ¶ 5.  Mr. Candler continued to refuse Seroquel and most doses of Zyprexa until December 25, 2022, when he finally agreed to take Seroquel in crushed form.  *Id.*

Regardless, Defendants are already effectuating plans to ***exceed*** this standard of care, as detailed in Defendants' Response.  *See* Response at 16-17; Dr. DeSilva Decl. ¶¶ 3-7.  Specifically, Defendants have made substantial efforts to hire a full complement of psychiatric staff in the IRC (*see supra*, Sec. II.C.2.a.) to ensure that

---

[1]  Under County policy, all medications that have a high risk of diversion, which includes Seroquel, are administered in crushed form to ensure those medications cannot be abused.  Suppl. Dr. DeSilva Decl. ¶ 4.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

every individual with mental health conditions receives a psychiatric assessment for medication before transferring to permanent housing.  Dr. DeSilva Decl. ¶ 3.  Such assessments obviate the need to bridge medications issued prior to a patient's arrival at the IRC, because clinicians can determine the appropriate regimen for the patient's present psychiatric state during the new assessment process.  *Id.*  Since the last week of March, 80% of individuals in the IRC with mental health conditions received a psychiatric assessment and were provided medication if indicated by the assessment; they therefore were provided care above and beyond the carceral settings standard.  The balance of these individuals received treatment in line with the standard of care, per the Bridge Medication Policy.  *Id.*  Plaintiffs' Reply does not address or even acknowledge these efforts or Dr. DeSilva's declaration detailing them.

**2.     Defendants Are Initiating a New Robust Cleaning Schedule in the IRC To Ensure It Is Kept in a Sanitary Condition**

Keeping the IRC in a sanitary condition is a significant challenge.  The hundreds of inmates who cycle through the IRC on a daily basis regularly discard trash on the floor during frequent group feeding times or fail to flush and otherwise clog the IRC's sinks and toilets.  Recognizing this challenge, the LASD is instituting a more robust cleaning schedule in the IRC, which calls for cleaning three times each day (one time each shift) by an increased staff of newly-hired janitors, trustee workers, and/or contract cleaning staff hired to clean the IRC.  Suppl. Tokar Decl. ¶ 13.  This schedule will ensure that the IRC is kept in the most sanitary condition that reasonable efforts by the LASD will permit, and the County is actively onboarding contract janitorial staff to fill this schedule.

**E.     Defendants Are Taking Substantial Steps To Make Scarce Mental Health Housing More Available To End IRC Backlogs Due to Housing Shortages**

Plaintiffs assert that bottlenecks exist in the IRC because the LACJ facilities are overcrowded.  The LACJ is not overcrowded compared to historical levels, but

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 18     10

does have shortages of specialty housing. As of April 11, 2023, there were 13,894 inmates incarcerated in the LACJ. This is several thousand inmates fewer than the number routinely confined in the LACJ prior to the pandemic, and many thousands fewer than the 20,000 plus inmates who often packed the LACJ jail facilities during many stretches of this long-running litigation. The LACJ does, however, have a mismatch between its jail population's need for specialty MOH and HOH and the availability of that housing. Accordingly, Defendants are currently engaged in substantial efforts to depopulate inmates with serious mental health conditions and to expand the amount of HOH within LACJ's current footprint. Any relief targeted towards this circumstance should therefore be targeted to flexible release authority that would give the Sheriff more flexibility to meet requirements in this litigation that are impacted by the shortage of specialty housing.

### 1.   Plaintiffs Improperly Focus on BSCC-Rated Capacity in the LACJ

Plaintiffs' focus on the BSCC-rated capacity of the LACJ's facilities—12,404 as of the time of this filing—as the determinative measure of overcrowding is both factually and legally flawed. First, BSCC ratings do not account for LACJ beds utilized for processing inmates, for disciplining inmates, or for housing inmates with medical issues. The LACJ has 1,178 such beds. Accordingly, when one accounts for these beds, as well as the BSCC-rated capacity of the LACJ's facilities, the number of beds that calculation yields (13,582) is very close to the current inmate population in the LACJ. Second, in determining whether a carceral facility is so overcrowded that it raises Constitutional concerns, courts do not look exclusively to whether a carceral facility exceeds its BSCC-rated capacity. Instead, courts examine whether a jail facility exceeds its "design capacity" to determine whether it has hit a level of overcrowding that triggers Constitutional concerns. *See e.g.*, *Brown v. Plata*, 563 U.S. 493, 539-40 (2011) (holding that capping a prison facility population at 137.5% of the facility's design capacity is Constitutionally adequate). And here, the "design capacity" of the LACJ's facilities is 20,938, or more than

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 19   11

DEFENDANTS' PRE-HEARING STATUS REPORT

8,500 beds in excess of the number of inmates currently being detained in the LACJ.[2] Finally, a prior 1985 order in this case noted that "the term 'overcrowding' is subject to several interpretations." Mem. of Understanding (Oct. 4, 1985), approved by Judge Gray on Nov. 5, 1985. For purposes of that order, the Court determined that overcrowding should be defined:

> [A]s that point where the inmate population exceeds a number which:
>
> a. Renders it impossible for the Sheriff to comply with the orders in Rutherford v. Pitchess as they now provide or as they may be modified by agreement of the parties and approved by the court.
>
> b. Renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control.

Instead of focusing only on BSCC-rated capacity, Defendants submit that the Court should consider instead Defendants' efforts to correct bottlenecks in the IRC that may arise as a result of surges in the number of inmates coming into the LACJ or the unavailability of specialty housing, along with Defendants' ongoing efforts to address that unavailability.

### 2. The County Is Taking Substantial Steps to Divert Mental Health Inmates Out of the LACJ as Fast, But as Prudently, as Possible

One way that Defendants are trying to address the need for MOH and HOH is to divert mental health inmates of the LACJ and into community mental health treatment settings. As Defendants have previously addressed with the Court, the Office of Diversion and Reentry ("ODR") has experienced tremendous success in

---

[2] Even if one were to adopt the position that a carceral facility's BSCC rating is the sole measure that should be used to determine whether a facility is overcrowded, several of the key facilities within the LACJ would meet that test. For instance, the 3,467 inmates currently detained in the Men's Central Jail ("MCJ") is below the BSCC-rated capacity of that facility (3,512). The same is true of the Twin Towers Correctional Facility ("TTCF") (BSCC-rated to hold 2,432 inmates; currently holds 2,356 inmates), and the Century Regional Detention Facility (rated to hold 1,708 inmates; currently holds 1,472 inmates).

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 20   12
DEFENDANTS' PRE-HEARING STATUS REPORT

1   treating individuals with serious mental health conditions who can be safely diverted

2   from custody and receive treatment in a much more appropriate environment.

3   ODR's programs currently have capacity to provide housing and services to 2,134

4   clients diverted through criminal court, 213 beds for the treatment of misdemeanants

5   found incompetent to stand trial ("MIST"), and 794 beds for the treatment of felony

6   defendants found incompetent to stand trial ("FIST").  Decl. of Dr. Clemens Hong

7   ("Dr. Hong Decl.") ¶ 2.  ODR currently has a number of open beds within that

8   capacity, and it is working to fill them with incarcerated individuals diverted from

9   the LACJ with the assistance of Judges from the criminal and mental health division

10  of the Los Angeles Superior Court who oversee that process.[3] *Id.* ¶ 3.

11          The County is working diligently to expand this capacity.  To that end, ODR

12  is scheduled to bring an additional 1,211 new interim housing or permanent

13  supportive housing beds on-line by the end of fiscal year 2024-25 (June 30, 2025),

14  all of which have been funded at a cost of approximately $79 million per year over

15  the next three years.  *Id.* ¶ 4.  In addition, the County is finalizing a contract with the

16  California Department of State Hospitals which will expand its current inventory of

17  794 beds to a total of 1,344 beds that will be used to divert FIST from the LACJ

18  over the next five years, including over one hundred beds that will provide acute and

19  subacute care for such individuals.  *Id.* ¶ 5.  As previously reported to the Court, the

20  Department of Mental Health has also put forward plans to add beds over the next

21  five years for those who would otherwise reside in HOH in the LACJ.[4]  *See* Defs.'

22  Filing of Reports Required to Respond to OSC at 5-6 (Mar. 9, 2023), ECF No. 378.

---

[3]  As of April 13, 2023, these vacancies include approximately 52 ODR interim and permanent housing beds, 40 MIST beds, and 18 FIST beds.  Dr. Hong Decl. ¶ 3.

[4]  Plaintiffs claim that these plans to decrease the number of inmates in the LACJ with serious mental health conditions is scheduled to rollout too slowly and in too small a number of beds, citing to the MCJ Closure Workgroup's plan to close MCJ,

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

The County anticipates these efforts will soon result in a gradual decline in the number of individuals incarcerated in LACJ with serious mental health conditions, as ODR intends to focus its efforts on filling those beds to the greatest extent possible with divertible P3 and P4 who currently occupy HOH in the LACJ. Dr. Hong Decl. ¶ 6. Indeed, currently, the County's most immediate challenge is not the shortage of ODR beds, but rather the ability of the criminal courts and mental health courts to quickly evaluate individuals' cases to order diversion and placement in ODR programs and thus fill ODR's current vacancies. ODR is

---

which set a goal of bringing 3,600 new ODR beds on-line within two years to service incarcerated individuals with mental health conditions and to the fact that ODR was able to bring 200 beds on-line during one select month during the pandemic. These criticisms are not valid. The plan to bring 3,600 new ODR beds on-line was a plan to bring on-line beds that could be used to divert incarcerated individuals experiencing all acuities of mental illness; while the plan described above focuses on diverting individuals classified as P3 and P4. Dr. Hong Decl. ¶ 7. Setting up appropriate beds that can be used to divert P3 and P4 individuals poses a much greater challenge than the challenge the MCJ Closure Workgroup tackled in the report Plaintiffs cite, and it is unrealistic to believe that beds that can be appropriately used to divert P3 and P4 individuals can be established in any greater number and on any faster schedule than what the County is planning. *Id.* Moreover, Plaintiffs' citation to a single month when ODR added 200 beds to its inventory is not representative of a realistic plan to depopulate the most severely mentally ill from the LACJ. *Id.* ¶ 8. That month, ODR was not focused on diverting individuals classified as P3 and P4, and were serving clients, many of whom were facing only low-level charges, who could be served by ODR pretrial because they were released under pandemic pretrial release protocols. *Id.* The same circumstances do not exist today, and the greater focus on sicker populations of individuals with serious mental illness requires ODR to ensure the appropriate high-level services are in place to take good care of the individuals released to the community. *Id.* Moreover, both housing stock and additional clinicians will be increasingly difficult to find as ODR scales up, and is all the more difficult presently because ODR faces greater competition in setting up such housing stock from other initiatives, such as local homelessness initiatives operating under a Countywide emergency, that are working to stand up similar facilities. *Id.* In short, setting up these beds is not a linear process, and ODR's success in bringing a large number of new beds on-line in one particular month under unique circumstances does not indicate that is possible every month or in future months. *Id.*

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

addressing that issue as well, by working with Los Angeles Superior Court leadership to expand court capacity, including the potential to expand hours or open new courtrooms that will be dedicated to adjudicating requests to divert incarcerated individuals. *Id.* The ability of courts to hear an increased volume of such requests will be critical to meeting the goals of the County's plans to safely but steadily lower the number of incarcerated individuals detained at the LACJ who suffer from serious mental health conditions. *Id.*

### 3. The County Is Currently Engaged in Other Substantial Efforts to Lower the Number of Inmates in the LACJ

The efforts to lower the number of inmates with serious mental health conditions in the LACJ are not confined to the efforts to divert inmates from custody described above. They have also included focused efforts to depopulate the LACJ by expediting the transfer of inmates to state prison once they are sentenced and by taking advantage of opportunities to transfer FIST inmates to state hospitals for restoration to competency.

The LASD's ongoing efforts to expedite transfers of sentenced inmates to the California Department of Corrections and Rehabilitation ("CDCR") have included (a) allocating additional resources to its Prisoner Movement Bureau's records unit to expedite the paperwork required for inmates to transfer to the CDCR's custody; (b) requesting a larger number of transfer allocations from the CDCR; (c) improving coordination among all LACJ facilities, including its Court Services Transportation Unit, to ensure the LASD is maximizing its allocated number of state prisoner transfers; (d) establishing better communication with CDCR Command Staff and requesting that the LASD be allowed to transfer inmates into state custody based solely on a certified court minute order, rather than an entire inmate transfer package, which often takes a significant amount of time to assemble; (e) obtaining an agreement from the CDCR to increase the number of specialty transfers it will accept each week (i.e., inmates who have mobility challenges and require a high

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Exhibit A
Page 23    15

DEFENDANTS' PRE-HEARING STATUS REPORT

1    level of medical care); and (f) obtaining an agreement by the CDCR to accept

2    transfers who are medically cleared by CHS, but who have not been tested for

3    COVID, as mandatory COVID testing is no longer required.  Suppl. Tokar Decl.

4    ¶ 15.

5         The LASD has similarly enhanced its efforts to transfer FIST inmates out of

6    the LASD to state hospitals.  Specifically, in recent months the LASD and CHS

7    have engaged in an "admissions sprint," which has resulted in better coordination

8    with state hospital personnel, including weekly meetings with all stakeholders to

9    identify state hospital vacancies when they become available, mitigated delays in

10   transferring FIST inmates, and avoided cancellations of such transfers based on

11   inmate refusals and other issues.  *Id.* ¶ 16.

12        Both of these efforts to control the inmate population in the LACJ have borne

13   fruit.  As of April 11, 2023, there were 1,272 inmates awaiting transfer from the

14   LACJ to a CDCR facility, as compared to 1,639 inmates just four weeks previously,

15   and in stark contrast to periods during the pandemic when there were up to 4,000

16   such inmates awaiting transfer; and the LASD is posed to execute over 800 inmate

17   transfers to CDCR facilities over the next three weeks alone.  *Id.* ¶ 17.  Moreover,

18   due to the surge of FIST transfers as a result of the efforts described above, there are

19   currently 400 FIST inmates in the LACJ, while over the past year, it was typical to

20   have more than 650 FIST inmates detained in the LACJ.  *Id.* ¶ 18.  LACJ also is

21   now regularly transferring 25 FIST inmates out of the LACJ each week, in contrast

22   to earlier periods when FIST inmates trickled out of the LACJ in very small

23   numbers.  *Id.* ¶ 19.

24        **4.    The LASD Is Taking Steps To Maximize the Number of HOH Beds
              Within the Twin Towers Correctional Facility**

25

26        A final corrective action the LASD is currently taking to address HOH

27   shortages is to expand the use of dorm housing for HOH inmates who can be safety

28   housed in a dormitory setting.  Approximately 75% of all HOH inmates are housed

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANTS' PRE-HEARING STATUS REPORT

1    alone in cells equipped to house two inmates—an inefficiency that exacerbates the
2    demand for HOH and creates logistical challenges in providing inmates with out-of-
3    cell time.

4           The LACJ recently implemented one such dormitory-style housing module
5    (where inmates are not confined to cells) for HOH inmates who have demonstrated
6    an ability to socialize with other inmates and show no indication they pose a threat
7    of harm to themselves or others.  By the end of this month, the LASD will be adding
8    two more of these modules in the TTCF.  These new housing configurations alone
9    will add 78 new HOH beds to LACJ's inventory; and, should this model prove
10   effective, the LASD intends to replicate it for other similar HOH inmates.  By
11   expanding the availability of HOH in this manner, at the same time Defendants are
12   diligently working to divert HOH inmates from the LACJ and into non-carceral
13   settings, Defendants are confident that problems in the IRC, to the extent they are
14   caused by the lack of available mental health housing, will not reoccur.

15
16   **F.    The Court Should Explore More Effective Remedies to Address Any
        Future Alleged Violations of the Court's Orders in the IRC Than the
17      Remedy Plaintiffs Propose**

18          Plaintiffs' proposal to create an intricate fine system to fund diversion
19   programs, triggered by future violations of the PI, may be well-intentioned.
20   However, this is not a remedy that will prevent future problems from arising in the
21   IRC.  As discussed above, the diversion programs the County is putting in place are
22   already being robustly funded.  Moreover, due to the months involved in setting up
23   appropriate facilities with outside service providers that can be used to safely divert
24   inmates from custody, there is no practical way fines deposited in some form of
25   court fund can be used to remedy conditions in the IRC in a timely and effective
26   way.  *See* Defs.' Reply to Gov't Response to Defs.' Alternative Timelines to Come
27   Into Compliance with Provisions 63, 64, and 80 of the Settlement Agreement at 7-9
28   (Mar. 6, 2023), *United States v. County of Los Angeles, et al.*, Case No. 15-CV-

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Exhibit A
Page 25** 17

DEFENDANTS' PRE-HEARING STATUS REPORT

1  5903-DDP-JEM, ECF No. 243 (explaining the time commitment involved in setting

2  up a facility that can be used to divert an individual with serious mental health

3  conditions).

4      The root of the problems in the IRC is two-fold.  First, surges of inmates into

5  the IRC with mental health conditions who must undergo the rigorous and time-

6  consuming evaluation process mandated by the United States Department of Justice

7  occasionally overwhelm any system Defendants can put into place to process them

8  through the IRC within the time limits allowed under the PI.  And second, the

9  skyrocketing number of inmates with severe mental health conditions in the LACJ

10 has created a shortage of the type of specialty housing where inmates with severe

11 mental health conditions can be permanently housed upon being processed through

12 the IRC.  The most effective way to address these root causes may be to update the

13 Sheriff's authority, previously granted in this very case, to release inmates in the

14 event unconstitutional conditions in the IRC cannot be remedied any other way.

15 Such a remedy would likely need to be imposed consistent with the requirements of

16 the Prison Litigation Reform Act (42 U.S.C. § 1997e), and, as Plaintiffs have

17 correctly noted, those requirements are arduous.  However, granting the Sheriff the

18 legal authority to authorize release inmates who pose a low risk of danger to the

19 community if otherwise unsolvable conditions in the IRC trigger such drastic action

20 may be the only remedy that can promptly and effectively ensure compliance with

21 the PI's requirements;[5] and it is a potential solution this Court should explore with

22

23 _____

24 [5] Plaintiffs assert that the Sheriff already possesses the authority to release inmates

25 en masse to remedy conditions in the IRC pursuant to California Government Code
   § 8658, which provides that "[i]n any case in which an emergency endangering the

26 lives of inmates of a state, county, or city penal or correctional institution has
   occurred or is imminent, the person in charge of the institution may remove the

27 inmates from the institution."  Reply at 17.  If this Court agrees with Plaintiffs,
   Defendants request that the Court make a clarifying ruling to that effect.

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

the parties in lieu of a fine system that will not impact Defendants' ability to comply
with the PI's requirements in any way.

### III.

### CONCLUSION

As demonstrated by the foregoing, Defendants are taking all reasonable steps
in their control to comply with the PI's requirements, and, if the Court questions
whether that is the case, it should request additional submissions from the parties
and/or hold an evidentiary hearing on that issue prior to making any finding of
contempt.  Moreover, the Court should consider alternative remedies to Plaintiffs'
proposed fine system, which could have a more direct and timely impact on
resolving the very issues in the IRC Plaintiffs' complain of, including clarifying the
Sheriff's authority to release inmates if conditions in the IRC or elsewhere in the
LACJ require such action to avoid Constitutional violations.

DATED:  April 14, 2023          KENDALL BRILL & KELLY LLP


By:        s/ Robert E. Dugdale
Robert E. Dugdale

*Attorneys for Defendants Los Angeles
County Sheriff Robert Luna, in his Official
Capacity, and the County of Los Angeles*

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Exhibit A
Page 27** 19
DEFENDANTS' PRE-HEARING STATUS REPORT