PETER J. ELIASBERG (189110)
peliasberg@aclusocal.org
MELISSA CAMACHO (264024)
mcamacho@aclusocal.org
**ACLU FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500

DAVID C. FATHI (*pro hac vice*)*
dfathi@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
915 15th St., NW
Washington, D.C. 20005
Phone: (202) 393-4930

*Not admitted in D.C., practice limited
to federal courts

CORENE T. KENDRICK (226642)
ckendrick@aclu.org
MARISOL DOMINGUEZ-RUIZ
(345416)
mdominguez-ruiz@aclu.org
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm St.
San Francisco, CA 94111
Phone: (202) 393-4930

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and COUNTY OF LOS ANGELES, in their official capacities, *et al.*<br><br>Defendants. | Case No. CV 75-04111 DDP<br><br>**PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)**<br><br>Date: June 27, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Dean D. Pregerson<br>Crtrm: Courtroom 9C |

i

1

2

# **TABLE OF CONTENTS**

3   TABLE OF AUTHORITIES ..................................................................................iii

4   INTRODUCTION .............................................................................................. 1

5   DISCUSSION ...................................................................................................3

6   I.    PLAINTIFFS HAVE DEMONSTRATED NONCOMPLIANCE .............3

7        A.    Paragraph 1: 24-Hour Clock....................................................4

8        B.    Paragraph 2: Front Bench Four Hour Limit ...........................6

9        C.    Paragraph 4: IRC Holding Cells 12-Hour Limit ....................7

10       D.    Paragraph 6: Access to Toilets, Water, Clean Conditions .....9

11       E.    Paragraph 7: Access to Health Care and Medications ..........11

12   II.   DEFENDANTS DID NOT TAKE ALL REASONABLE STEPS TO

13         COMPLY .............................................................................................14

14   III.  PROSPECTIVE SANCTIONS FOR FUTURE NONCOMPLIANCE ARE

15         WARRANTED ......................................................................................18

16   CONCLUSION................................................................................................20

17   CERTIFICATE OF SERVICE .........................................................................21

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Brown*,
  939 F.Supp.2d 1012 (N.D. Cal. 2013) ................................................................. 19

*Brock v. Big Bear Market No. 3*,
  825 F.2d 1381 (9th Cir. 1987) ............................................................................. 14

*Buono v. Norton*,
  371 F.3d 543 (9th Cir. 2004) ............................................................................... 14

*Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ................................................................................. 15

*Greenawalt v. Ricketts*,
  943 F.2d 1020 (9th Cir. 1991) .......................................................................... 6, 10

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) ........................................................................................... 1, 14

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ............................................................................................... 6

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994) ............................................................................................... 4

*Jensen v. Pratt*,
  No. CV-12-00601-PHX-ROS, 2021 WL 3828502
  (D. Ariz. July 16, 2021) ....................................................................................... 19

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016) ......................................................... 3, 14, 15, 18

*N.L.R.B. v. Trans Ocean Export Packing, Inc.*,
  473 F.2d 612 (9th Cir. 1973) ............................................................................... 15

*Parsons v. Ryan*,
  912 F.3d 486 (9th Cir. 2018) ............................................................................... 20

*Parsons v. Ryan*,

  949 F.3d 443 (9th Cir. 2020) ........................................................................3, 14

*Rutherford v. Baca*,

  CV 75-04111 DDP, 2006 WL 3065781 (C.D. Cal. Oct. 27, 2006) .....................4

*S.E.C. v. Hickey*,

  322 F.3d 1123 (9th Cir. 2003), *amended*, 335 F.3d 834 (9th Cir. 2003) ...........18

*Sierra Club v. Union Oil Co. of Cal.*,

  853 F.2d 667 (9th Cir. 1988) ........................................................................1, 14

*Stone v. City & Cnty. of S.F.*,

  968 F.2d 850 (9th Cir. 1992) .................................................................4, 14, 15

*United States v. Ore. State Med. Soc.*,

  343 U.S. 326 (1952) ..................................................................................2, 15

## **STATUTES**

California Penal Code § 827.1................................................................................18

## **REGULATIONS**

Cal. Code Regs. Tit. 24, § 1231.2.2 .........................................................................7

## **RULES**

Fed. R. Civ. Proc. 60(b)..........................................................................................19

## **OTHER AUTHORITIES**

KCAL News, *LA jail healthcare workers protest overcrowding and*

  *understaffed conditions*, CBS L.A., May 24, 2023 ............................................11

LASD Daily Briefing, June 2, 2023 ........................................................................18

SEIU 721, *Media Advisory for Wed., May 24, 2023 – Inhumane*

iv

*Conditions Prompt Picket Line and Rally Outside Men's Central Jail* .............11

*Solis Statement on Motion to Depopulate and Decarcerate the*

*Los Angeles County Jails*, April 3, 2023 ...........................................................17

Vera Inst. of Just., *Care First L.A.: Tracking Jail Decarceration* ..........................17

Vera Inst. of Just., *Money bail and the Los Angeles County jail system* ...............18

v

# INTRODUCTION

In the weeks since the April 19, 2023 contempt hearing, and due to remedial efforts put in place in response to Plaintiffs' contempt motion and a Superior Court preliminary injunction reinstating the County's zero-bail order for misdemeanor charges, there has been a dip in violations of some of the provisions of the Preliminary Injunction ("PI"), Doc. 351, in the Inmate Reception Center ("IRC"). Plaintiffs acknowledge these marginal improvements, and certainly hope they continue. But the legal analysis of contempt is not centered on whether there is a marginal improvement after the filing of a contempt motion, whether Defendants are trying in good faith to comply with the PI, or what the flurry of promised actions by Defendants may achieve at some undetermined point in the future. Rather, the question is whether there was a court order that Defendants are not obeying, and whether they took all reasonable steps to comply from the time of its entry nearly nine months ago.

It is undisputed that Defendants have violated provisions of the PI thousands of times since it was entered and continue to repeatedly violate it, including to the current day. And the changes bringing Defendants closer to compliance are almost certainly provisional and short-lived; as the very long history of this case has repeatedly shown, problems in the jails are cyclical and some of Defendants' attempted fixes are unsustainable. Notably, a short-term improvement is inadequate under the law: "[a] good or lucky day is not a state of compliance. Nor is the dubious state in which a past . . . problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and in the judgment); *see Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 671 (9th Cir. 1988) ("Intermittent or sporadic violations do not cease to be ongoing until the date when there is *no real likelihood of repetition*.") (citation and quotation marks omitted; emphasis in original).

Since the PI's entry in September 2022 and up to a few days ago, Defendants' own reports (many of which underestimate the extent of problems) document **thousands** of violations of the PI's maximum time requirements of no more than 24 hours in the IRC, no more than 12 hours in a holding cell, and no more than four hours chained to the front bench. Incarcerated people continue to report that they are in the IRC without critical medications, in unhygienic and inhumane conditions. Plaintiffs have demonstrated – and in some cases Defendants have conceded – that they are not in compliance with the PI. *See* Part I.

Next, the burden shifts to Defendants. They have offered the Court a flurry of promises and proposals as to how they aspire to comply with the PI in the future. *See, e.g.* Docs. 378, 379, 384, and declarations filed therein. This litany of promises largely fails to address what Defendants have (not) done to comply since September 2022; their submissions primarily describe what they put in place only after Plaintiffs filed for contempt, or what Defendants plan to do in the future, which is irrelevant to a finding of contempt. They have not met the legal requirement to show that they took all reasonable steps to comply with the Court's order.

But more importantly, mere promises do not ensure that Defendants will actually live up to them. As seen too many times, including as recently as April 2023, Defendants— especially the Board of Supervisors— have broken past promises to divert people from the jails, close Men's Central Jail, and ensure that IRC and jail conditions are characterized by a modicum of humanity and dignity. *See* Part II. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Ore. State Med. Soc.*, 343 U.S. 326, 333 (1952).

Finally, Defendants previously argued that Plaintiffs' proposed prospective fine schedule, if imposed as a contempt sanction, would be unwieldy or unworkable.

PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)

Doc. 379 at 25.[1] At the April 19 hearing, the Court articulated a concern about the fines that Plaintiffs proposed as possibly insufficient to spur compliance. If that is the Court's concern, then, as detailed in Part III, courts have broad latitude to craft civil contempt sanctions that are either compensatory or coercive, or both. *Parsons v. Ryan*, 949 F.3d 443, 455-56 (9th Cir. 2020). The Court is not limited solely to monetary sanctions; it also can modify previous orders, or issue new injunctive relief as a compensatory contempt sanction. *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (extending a settlement agreement by two years as a contempt sanction). As noted previously, Defendants' fate as to whether fines are assessed is entirely in their hands, and Plaintiffs continue to believe that their proposed sanctions are reasonable and effective, *see* Doc. 382 at 21-22.

To address the Court's concerns, Plaintiffs propose that in addition to issuing a fine schedule for future noncompliance, the Court issue injunctive relief directing Defendants to put their money where their mouth is: to include in a binding order the remedial measures that they and their counsel submitted under penalty of perjury in Court filings and arguments. There is no reason for Defendants to object to being ordered to do what they already promised do. A revised Proposed Order is attached.

## DISCUSSION

## I.    PLAINTIFFS HAVE DEMONSTRATED NONCOMPLIANCE

Plaintiffs' Motion and Reply set forth the Court's legal authority to enforce past orders and to find Defendants in contempt, and Plaintiffs incorporate it herein. *See* Doc. 375 at 8-10, 27-28; Doc. 382. Plaintiffs incorporate all facts previously submitted to the Court related to the motions for the TRO, PI, and contempt, as well as those submitted with this brief. *See* Docs. 318, 319, 337, 338, 347, 351, 355, 357, 365, 375, 378, 379, 382, 383, and documents filed therein.[2]

---

[1] Docket citations are to page numbers assigned by the Court's ECF system.

[2] Defendants had notice of the PI and stipulated to it. They had notice of Plaintiffs' contempt motion, submitted filings to the Court, were heard at April 19, 2023 hearing, and given an opportunity to provide further briefing and to call

<span style="text-align:right">(cont'd)</span>

3

"The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). Plaintiffs have shown widespread noncompliance with PI requirements enjoining Defendants from holding a detainee: in IRC for more than 24 hours (Doc. 351 ¶ 1); on the Clinic Front Bench, handcuffed, chained, or tethered to any fixed object for more than four hours (*id.* ¶ 2); in an IRC holding cell for more than 12 hours (*id.* ¶ 4); or in any IRC clinic area, cage, or cell when it is not in a clean and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles (*id.* ¶ 6). Plaintiffs have shown violations of Paragraph 7 of the PI. *See generally* Doc. 375 at 11-25; Doc. 382 at 9-16.[3]

## A. Paragraph 1: 24-Hour Clock

Exhibit A to the Eliasberg Declaration filed with this brief is a table logging all 24-hour clock violations reported by Defendants from November 17, 2022, through June 1, 2023. The 24-hour reports before Defendants switched to the new Shared Intake Document Management System (SIMS) underreported the number of 24-hour violations. Doc 375 at 13-14, 14-15 n.8; Doc. 382-1 ¶ 29 (50-60 people missing from Feb. 26, 2023 24-Hour report, and 79 people missing from Feb. 24,

---

witnesses. When asked by the Court at the April 19 hearing if he thought that would be adequate to meet due process requirements, counsel for Defendants answered in the affirmative. Defendants have received the notice and opportunity to be heard required by law. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

[3] The PI was rooted in past court orders. *See* Doc. 318-1 at 15-18; *see also Rutherford v. Baca*, CV 75-04111 DDP, 2006 WL 3065781, * 3-4 (C.D. Cal. Oct. 27, 2006) (enjoining Defendants from holding anyone in the IRC for more than 24 hours, holding anyone in a holding cell "which is not maintained in a clean and sanitary condition, including access to a functioning toilet, potable drinking water, and clean water to wash," or holding a person within the IRC "without providing ongoing access to adequate medical care, including but not limited to regular pill call and sick call"); Nov. 18, 2005 Order (Doc. 64) at ¶ 1 ("Every inmate kept overnight in the jail will be accorded a mattress and a bunk upon which to sleep."); Feb. 16, 1979 Judgment (Doc. 318-2 at 127, ¶ 1) (same).

(cont'd)

4

2023 24-Hour report). Since the hearing on April 19, 2023 and prior to the rollout of the new reporting system on May 7, Plaintiffs continued to find instances of underreporting.[4]

Even Defendants' underreported data shows massive and ongoing violations of the PI and past court orders. November 17, 2022 to June 1, 2023 is a period of 197 days; there were violations of the PI on 138 of the days, or 70% of the period. Eliasberg Dec. Ex. A. Additionally, Defendants previously filed a chart on the docket purporting to show all violations of the 24-hour clock requirement since September 27, 2022 (the date of the injunction). Doc. 379-2. It shows 1 out of 4 days in September with violations; 23 out of 31 days in October with violations; and from Nov. 1-16, 11 of 16 days with violations. *Id.* at 1-2. Combining the data, this equals 173 out of the 248 days, or 70%, with a violation of the PI since its entry (in other words, Defendants were compliant only 30% of the time).[5] The worst day for 24-hour violations was February 2, 2023, when 85 people were held in excess of 24 hours, and in a four day period in February not including February 2, 2023 there were 48, 76, 35, and 62 people held for more than 24 hours. Eliasberg Dec. ¶ 11,

---

[4] For example, Mr. Bernal and Mr. From spent over 24 hours in the IRC on April 26, 2023, but Defendants' 24-hour report did not include them, likely because they reached the 24-hour mark between the morning snapshot and the afternoon snapshot. Camacho Dec. ¶ 35, Exs. D at 1, E at 1. Mr. Thomas's 24-hour clock stopped and re-started from zero due to a 17-minute urgent care visit. Camacho Dec. ¶¶ 49-52, Exs. F at 1, G at 1. Defendants included in a holding cell violation report three people whose IRC stays also exceeded 24 hours but, by Defendants' own admission, "would not have been previously been identified due to breaks in their cell times or them changing locations and returning to IRC." Camacho Dec. ¶ 69, Ex. I at 1. The three people caught in that day's holding cell violation as being in the IRC for over 24 hours, were not included in the 24-hour violation report for that day. Camacho Dec. ¶¶ 69-70, Ex. I at 2, Ex. J at 2.

[5] In an abundance of caution, Plaintiffs' counsel reviewed 24-hour clock reports to identify people flagged as spending some part of the 24 hours in court, adding a second column to the table at Eliasberg Dec., Ex. A. Even removing all of the persons documented as out to court, the degree of noncompliance is still striking: 123 of the 197 days (62.4%) from Nov. 17-June 1 had a 24-hour clock violation (when combined with Defendants' data covering Sept. 27-Nov. 16, 2022, 158 of 248 (63.7%) of days had 24-hour clock violations). *Id.*; Doc. 379-2 at 1-2.

5

Ex. A. There were 53 days (26.3% of the time period) when people were held in excess of 36 hours, and in April 2023, there were two people warehoused in the IRC for more than four-and-a-half days (110.4 hours). *Id.* In total, there were **1,233 reported violations of the PI's 24-hour requirement from Nov. 17, 2022- June 1, 2023**. *Id.*

Defendants may argue that some of these violations could not be avoided because people reached the 24-hour mark while in court. Omitting reports of violations where LASD stated that court was the reason for the violation, the total number of 24-hour violations between November 17, 2022 and June 1, 2023 goes from 1,233 to 1,171. Eliasberg Dec. Ex. 1. Given the undercounting inherent in the system prior to May 7, Defendants must accept that there were at least **1,200 violations** in that time frame, even excluding court-related ones.

### B. Paragraph 2: Front Bench Four Hour Limit

Paragraph 2 of the PI limits the time a class member can be tethered or restrained on the Front Bench to no more than four hours.[6] Defendants have had a difficult time providing reports showing if they were complying, even though the recordkeeping is a separate requirement of the PI. Defendants did not dispute the evidence in Plaintiffs' contempt motion showing widespread violations of Paragraph 2 from January 1-February 20, 2023. *See* Docs. 375 at 17-19, 375-3 at ¶¶ 12-13 & Ex. E (375-3 at 38-45) (Defendants' reports showed 367 people chained to the front bench over four hours); Doc. 379 at 17-18 (Defendants' response not contesting the data and admitting that they "have struggled to consistently move individuals off of the Front Bench within the four-hour time period . . ."). *See Greenawalt v. Ricketts*, 943 F.2d 1020, 1027 (9th Cir. 1991) (failure to argue an issue is a concession).

Plaintiffs' reply showed that Defendants reported 104 people chained to the front bench in excess of four hours in the two-week period of March 1-15, 2023.

---

[6] *See also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (Eighth Amendment violated when an Alabama prison handcuffed a man to a "hitching post" for hours when there was a "clear lack of an emergency situation.").

Case No. CV-75-04111-DDP
PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)

Doc. 382 at 15, Doc. 382-4 at ¶ 2(f) and Ex. A (382-4 at 7-9). Plaintiffs have now received additional data covering Feb. 21-28, and March 16-June 1, 2023 (except for three days on May 4-6, 2023), and Defendants' reports show that for the five-month period **from January 1–June 1, 2023, 646 people were chained to the Front Bench in excess of four hours**. Kendrick Dec. ¶ 2, Ex. 1. (Some people were chained multiple times in the course of day over four hours, but this number is of unique people, versus incidents. *Id.*) The more recent data since March 15 showed at least one person spending over ten hours chained to the Front Bench (3/31/23), and 12 other people spending over six hours chained to the front bench (three each on 5/1/23; two each on 3/17/23 and 4/18/23; one each on 4/7/23, 4/12/23, 4/13/23, 4/14/23, and 4/24/23). *Id.*

Plaintiffs' Motion explained that data from 2022 for Front Bench violations were incomplete or unavailable, so Plaintiffs used January 1, 2023 as their starting date to show noncompliance, instead of the PI's September 27, 2022 date. Doc. 375 at 18-19. For the 148-day period between January 1 and June 1, 2023 (less May 4-6), there was at least one person held in excess of four hours on the Front Bench for 99 of those days (66.9% noncompliant, or 33.1% compliant). Kendrick Dec. Ex. A.[7]

## C. Paragraph 4: IRC Holding Cells 12-Hour Limit

Paragraph 4's limit of no more than 12 hours in a holding cell is based on the Board of State and Community Corrections (BSCC) and Title 24 limits. *See* Cal. Code Regs. Tit. 24, § 1231.2.2 at 7 ("When located in a temporary holding facility, the cell or room shall be equipped with a bunk if inmates are to be held longer than

---

[7] Plaintiffs' psychiatric expert Dr. Terry Kupers testified that chaining people with mental illness to fixed objects can have very harmful effects. *See* Doc. 318-2 at 158 ¶ 30 ("Severe restraint such as tethering to the front bench or a chair at IRC has very harmful effects on all inmates, but especially on inmates with mental illness. Those who suffer depression are likely made more despairing and, in too many cases, resolve to commit suicide as soon as they are released from restraints and have the opportunity."). Unsurprisingly, the violations of the front bench provision of the PI "violate national standards, including the standards of the American Correctional Association." *Id.* at ¶ 28.

(cont'd)

12 hours.").[8] There is nowhere to lie down except the concrete floor and narrow metal benches, no blankets, no air circulation, no shower, no access to phones, no windows, and the sole illumination is from fluorescent lights. Below are photos taken in August 2022 of Holding Cell 111, (*see* Doc. 319-1 Ex. Q), which is 176 square feet and rated to hold up to 14 people (*see* Doc. 347-2 at 2):



 

The more crowded a holding cell, the more quickly the conditions deteriorate into a squalid public health hazard. As recently as early May 2023 (two weeks before

[8] http://www.bscc.ca.gov/wp-content/uploads/Adult-Title-24-Part-1-Sept-2017-Part-2-July-2018.pdf.

8

the Court's pre-announced visit), Plaintiffs' counsel observed holding cells where people were waiting for close to or more than 12 hours, and the cells were filthy. For example, on May 3, 2023, at about 9:00 am, Plaintiffs' counsel observed a holding cell with about 16 people inside it. *See* Camacho Dec. ¶¶ 53, 61-62; Donavan Dec. ¶¶ 9-12. Plaintiffs' counsel observed garbage strewn across the floors, as well as empty orange juice cartons smeared with feces lined up on the short wall (known as a "pony wall") around the toilet, apparently because there was no toilet paper. *Id.* One person made mimicking gestures and motions that indicated that another person had defecated into the orange juice cartons. Donavan Dec. ¶ 12.

Plaintiffs' motion and reply set forth evidence of noncompliance despite Defendants' incomplete and unreliable reporting. *See* Doc. 375 at 15-16 and declarations cited therein; Doc. 382 at 15-16 and declarations cited therein (showing 358 reported violations from Feb. 28-March 16, 2023). More recent data from **March 16-June 1, 2023 show 359 reported violations**, which is an undercount because data for 18 days are missing or were not provided to Plaintiffs. Dominguez-Ruiz Dec. ¶ 46, Ex. A (showing 312 violations), Ex. B (showing 47 violations). This includes 35 people held more than 12 hours on March 17, and 26 on March 23, 2023. *Id.*, Ex. A. Between May 7 and June 2, 2023, 41 of the 47 violations of the 12-hour clock were people who spent the night in a holding cell without a mattress or bedding, in violation of the PI and past court orders.[9] Camacho Dec. ¶ 81. In sum, the number of holding cell violations Defendants reported from February 28, 2023 through June 1, 2023 (less the 14 days for which there is no data) was **717 violations**.

### D. Paragraph 6: Access to Toilets, Water, Clean Conditions

Defendants have failed to respond to any of the sworn evidence Plaintiffs offered about **Paragraph 6** violations: the requirement to have clean and sanitary IRC facilities with functional toilets, access to water to drink and wash, and

---

[9] See Nov. 18, 2005 Order (Doc. 64) at ¶ 1 ("Every inmate kept overnight in the jail will be accorded a mattress and a bunk upon which to sleep."); Feb. 16, 1979 Judgment (Doc. 318-2 at 127, ¶ 1) (same).

trashcans. *See* Doc. 375 at 12-13, 15-17; *see generally* Doc. 375-1 (Declarations of 23 class members); *see Greenawalt*, 943 F.2d at 1027 (failure to argue an issue is a concession). Since then, people held in the IRC continue to report and suffer similar conditions: they are in the cold IRC clinic and holding cells reeking of human excrement and urine, without a mattress or blanket, and with limited or nonexistent access to toilets, showers, and potable water, and inadequate and innutritious food.

For example, toilets are often dirty with urine on the seats or urine and toilet paper in the surrounding floor area. *See* Martinez Cruz Dec. ¶ 21 ("toilet paper and urine near the toilet"), Valani Dec. ¶ 11 ("toilets are dirty with urine on the seats"). The smell emanating from toilets, whether they are flushed or not, is pungent and people have to breathe this throughout their stay in the IRC. *See* Martinez Cruz Dec. ¶ 21 (smelled urine throughout his stay at the IRC); Camacho Dec. ¶¶ 55-58 (Plaintiffs' counsel smelled through her mask a foul smell while in the hallway and saw urine and soaked toilet paper near toilet area); Dominguez-Ruiz Dec. ¶ 25 (Plaintiffs' counsel could smell feces through mask); Donavan Dec. ¶ 4, 6 (Plaintiffs' counsel could smell human waste all the way from hallway leading up to Clinic area and observed urine, feces, and trash near toilet floor).

Class members are forced to endure the bitter coldness of the clinic area without blankets, and try to sleep on the concrete floor, plastic chairs, or metal benches while in the IRC. *See* Martinez Cruz Dec. ¶¶ 6-7 (slept on the floor in the cold clinic without a blanket); Radford Dec. ¶¶ 14,15 (did not receive a mattress or blanket, slept on cold hard floor, and heard others complaining about the cold); Valani Dec. ¶ 10 ("I didn't have a mattress or a blanket. I tried to sleep sitting up in the chairs but I couldn't."); Camacho Dec. ¶ 38 (Counsel observed a person using a small plastic bag filled with IRC food as a pillow while sleeping on floor); Dominguez-Ruiz Dec. ¶¶ 19, 32 (Plaintiffs' counsel saw multiple people on different days sleeping on the floor and wrapping their arms inside their clothes for body warmth due to the cold temperature). These conditions affect class members' health.

10

*See* Martinez Cruz Dec. ¶ 22 (the cold temperature affects his lungs and triggers his asthma); Bernal Dec. ¶¶ 7-8, 11-12 (attempted to sleep in a chair and on floor while experiencing high level of pain in head and shoulder).

Based upon Plaintiffs' counsel's personal observations and health care staff's statements to the media, it appears that Defendants made a concerted effort to clean the IRC in anticipation of the Court's pre-announced visit on May 18, 2023. *See, e.g.* Camacho Dec. ¶ 76 ("In all of my visits to the IRC Clinic, I have never seen so many mental health staff conducting interviews. I have observed at most two interviews happening at the same time. On most visits, I do not see any interviews happening in that space. Sometimes, I see one or two. I have never before seen all of the stations full. I have also never seen so much toilet paper (two full rolls at every single toilet) or such clean floors throughout the IRC."). On May 24, 2023, jail health care workers staged a protest asking the Court to conduct a "second, unannounced tour" with union members "to see [the] true scale of overcrowding and understaffing crisis in correctional facilities," instead of "an official excursion managed by county officials . . . too orchestrated to be effective."[10] Union members carried signs reading "Union to Judge Pregerson: We'll Take You on a Real Jail Tour" and protested that one in 3 correctional health services positions is vacant (721 of 2,268 positions).[11]

### E. Paragraph 7: Access to Health Care and Medications

As detailed in Plaintiffs' previous filings, Defendants have a policy and practice of cutting people off of psychiatric medications that they were prescribed when they enter IRC. Plaintiffs' psychiatric expert, Dr. Terry Kupers opined that this is an extremely dangerous practice that can place people at serious risk, including

---

[10] *See* SEIU 721, *Media Advisory for Wed., May 24, 2023 – Inhumane Conditions Prompt Picket Line and Rally Outside Men's Central Jail* at https://www.seiu721.org/press-release/media-advisory-for-wed-may-24-2023-inhumane-conditions-prompt-picket-line-and-rally-outside-mens-central-jail.php.

[11] *Id.*; *see also* KCAL News, *LA jail healthcare workers protest overcrowding and understaffed conditions*, CBS L.A., May 24, 2023, at https://www.cbsnews.com/losangeles/news/la-jail-healthcare-workers-protest-overcrowding-and-understaffed-conditions/.

exacerbation of mental illness, severe physiological changes, seizures, and death by suicide. Docs. 318-1 at 32-34 (and declarations cited therein); 318-2, Ex. 16 (Kupers Dec.) at 151-52 ¶¶ 13-14; 375 at 21-25, 382 at 11-15; 382-3 (Kupers Supp. Dec.) at ¶¶ 5-6, 8-10, 12, 14, 17-18. Dr. Kupers stated that Defendants' bridge medication policy is "entirely inadequate and does not comply with the standard of care in multiple regards," including the failure to have staff take more steps beyond calling a pharmacist in the community (if one can be named and identified) to confirm whether a patient has a prescription for psychiatric medications, and the failure to have prompt assessments done at the IRC by psychiatric prescribers. Doc. 382-3 at ¶¶ 6, 8-10.

While Defendants may assert that they have modified or improved their written policies, the actual practice of not promptly providing medications to people in the IRC continues. For example, class member Carlos Martinez Cruz reported that he was arrested and brought to the IRC on Friday, April 28, 2023, told health care staff at the IRC at intake that he took medications for anxiety and substance use disorder, and told staff who his community doctor is. Martinez Cruz Dec., filed herewith, ¶¶ 3, 5, 8, 9, 18. A nurse in the IRC called Mr. Martinez Cruz's partner and he heard the conversation where his partner gave the nurse the doctor's contact information and the name of the prescription. *Id.* at 18. Mr. Martinez Cruz again told a psychologist on Sunday, April 30, that he needed medication, *id.* ¶ 15, but as of Monday, May 1, he still had not been provided his medication for anxiety and substance use disorder. *Id.* ¶¶ 4, 15. Without the medication, he reported that "I don't feel well. My anxiety is at a high level. I have headaches. I feel like throwing up. It does not help that there's so much noise and it smells bad. […] My neighbor spends all day yelling and that does not help with my anxiety. […] I've barely slept here." *Id.* ¶¶ 10-11, 16.

Dr. Kupers reviewed Messrs Ray and Martinez-Cruz's declarations. Dr. Kupers concluded that it is "clear there are ongoing problems regarding bridge

medications in the IRC and at L.A. County Jail." Second Supp. Declaration of Terry Kupers, M.D., M.S.P. ¶ 5. According to Dr. Kupers, "[t]he fact that precipitous discontinuation of prescribed psychotropic medications continues in the IRC of L.A. County Jail this long after the September 27, 2022 court order in this matter is of great concern." *Id.* ¶ 8.

One possible reason that the dangerously abrupt discontinuation of psychiatric medication is an ongoing problem could be that Defendants are woefully ill-informed about the risks of doing so. Dr. Kupers reviewed the e-mail from Dr. Gayani DeSilva in response to Plaintiffs' counsel's request that Mr. Ray receive the Lexapro he had been prescribed in the community. Dr. DeSilva responded, "There is technically no withdrawal from Lexapro (no tolerance, no dependency). Typically when stopping Lexapro, in the first couple days there may be some flu-like symptoms." Camacho Dec. ¶¶ 78-79, Ex. M, N. According to Dr. Kupers:

> Dr. DeSilva is entirely incorrect here, the harmful effects of rapid cessation of Lexapro (and other antidepressants including Wellbutrin) can be very serious and include significant exacerbation of the condition for which the medication was prescribed and risk of suicide. There has been a lot of attention in psychiatry in recent years to the previously under-valued side effects and negative sequelae to the cessation of these anti-depressants.

Kupers Second Supp. Dec. ¶ 7 (citing Mark Horowitz, *Tapering of SSRI Treatment to Mitigate Withdrawal Symptoms*, THE LANCET, 2019,[12] and Yusuke Murata *et al*., *Effects of the Serotonin 1A, 2A, 2C, 3A, and 3B and Serotonin Transporter Gene Polymorphisms on the Occurrence of Paroxetine Discontinuation Syndrome*, J. of Clin. Psychopharmacology, 2010[13]).

\* \* \* \* \*

---

[12] *See* https://www.thelancet.com/journals/lanpsy/article/PIIS2215-0366(19)30032-X/fulltext.

[13] *See* https://journals.lww.com/psychopharmacology/Abstract/2010/02000/Effects_of_the_Serotonin_1A,_2A,_2C,_3A,_and_3B.3.aspx.

In sum, the evidence clearly shows that Defendants have violated the PI thousands of times since it was entered, and continue to be noncompliant with it. Any slight improvements in levels of compliance in recent weeks does not prevent a finding of contempt. *See Gwaltney,* 484 U.S. at 69 (Scalia, J., concurring in part and in the judgment); *Sierra Club,* 853 F.2d at 671; *Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987) (holding that "current compliance alone . . . is not sufficient ground for denying injunctive relief"); *cf. Stone*, 968 F.2d at 857 (holding that jail officials' long history of noncompliance was "highly relevant" to contempt finding); *Buono v. Norton*, 371 F.3d 543, 544-45 (9th Cir. 2004) (rejecting Defendants' argument that the "*impending* mootness" of the case due to anticipated future government action foreclosed judicial review: "[t]his case is not yet moot and may not be for a significant time, as defendants concede that [their actions] could take as long as two years to complete") (emphasis in original).

The issue before the Court is a narrow and discrete one: if, at any time since the Court issued the PI on September 27, 2022, Defendants have failed to comply with that order. As demonstrated *supra*, Plaintiffs have shown thousands of instances of noncompliance spanning the entire life of the PI. There is no requirement that Plaintiffs show noncompliance continues to the present moment— although in this case, the noncompliance *is* ongoing. *See Parsons*, 949 F.3d at 452-53 (affirming finding of contempt and imposition of monetary sanctions for past violations of prison health care settlement agreement); *Kelly*, 822 F.3d at 1091-93 (affirming finding of contempt, issuance of a prospective fine schedule, and compensatory injunctive relief for past violations of prison staffing settlement agreement).

## II. DEFENDANTS DID NOT TAKE ALL REASONABLE STEPS TO COMPLY

Once a moving party establishes noncompliance with a court order, the burden "shifts to the contemnors." *Stone*, 968 F.2d at 856 n.9. The contemnor must show "categorically and in detail" that they took all reasonable steps to comply. *N.L.R.B.*

14

*v. Trans Ocean Export Packing*, Inc., 473 F.2d 612, 616 (9th Cir. 1973) (citation and quotation marks omitted). Here, Defendants failed to take all reasonable steps to comply with the PI.

As a threshold matter, Defendants cannot escape a finding of contempt because they belatedly launched remedial efforts and plans to achieve compliance after Plaintiffs filed the contempt motion. Doc. 379 at 14, 18, 21. These efforts are too little, too late. *Ore. State Med. Soc.,* 343 U.S. at 333. Defendants' recent remedial measures do not foreclose a finding of contempt. In *Kelly*, the defendant "eventually took a number of steps to ensure compliance with the settlement agreement, but it did so only after there had been an investigation into its staffing and recordkeeping." 822 F.3d at 1093. The district court nevertheless held the defendant in contempt and the Ninth Circuit affirmed; "[t]he district court found [defendant] should have taken these measures before the investigation." *Id.*; *see also Stone*, 968 F.2d at 858 ("Finally, the City argues that it has spent thirty million dollars on programs to cope with the overcrowding program. While this demonstrates that the City has made efforts in the past to comply with the consent decree, it does not render the court's contempt order an abuse of discretion"). Moreover, contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotation marks omitted); *Stone*, 968 F.2d. at 856 ("Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense").[14]

Plaintiffs have already documented the multi-year cycle of crises in the IRC, Doc. 318-1 at 18-24, and Defendants' failure to take all reasonable steps to comply with the PI. Doc. 375 at 25-26; Doc. 382 at 16-21. County officials have repeatedly warned that substantial changes need to be made to ensure that the County does not again face a situation where people— including a high percentage with mental

---

[14] Similarly, the fact that compliance with a court order requires a government defendant to spend money is not a valid reason to disobey it. *Stone*, 968 F.2d at 858.

illness— are warehoused in IRC, sleeping on the floor, stuffed into holding cells for more than 12 hours, or chained to the front bench for more than four hours. For example, in January 2023 Inspector General Max Huntsman told the Civilian Oversight Commission "[a]s long as we are as substantially above the cap on the BSCC as we are, we will continue to have these problems." [15] Doc. 382-1 Ex. L at 1; *see also* Doc. 382 at 19 n.13. Moreover, in October 2022 Defendants themselves admitted to the Court that aggressive remedial efforts were needed to remedy the problems in the IRC that the PI was designed to address. *See* Doc. 355 (Defendants' Response to Order to Show Cause).

Yet in the face of these warnings (which have been repeated for years), Defendant Board of Supervisors has repeatedly initiated and then pulled the plug on efforts to reduce the jail population. *See* Doc. 318-1 at 20-24; Doc. 382 at 19 n.13. Most recently, in the first week of April, 2023, more than six months after the entry of the PI, and five weeks after Plaintiffs filed the contempt motion, Defendant Supervisors Solis and Horvath introduced a Motion entitled "Los Angeles County to Take Actionable Next Steps to Depopulate and Decarcerate the Los Angeles County Jails: Granting Local Authority, Advocating for Court and State Support, and Legislative Changes."[16] While Plaintiffs were concerned that the Motion did not go far enough or quickly enough to address the need to safely reduce jail populations, and relied upon electronic monitoring which has been proven to increase arrests for technical violations of supervision, the Motion contained provisions that would have helped— if approved by the Board— in addressing the crisis in IRC and the jails. The Motion included a directive to have "the Board of Supervisors declare the state of mental health services and overcrowding in the Los Angeles County jails a humanitarian crisis, requiring the County to move with all deliberate speed on

---

[15] The BSCC-rated capacity for all living facilities in LA County Jail is 12,404. Doc. 347-2. IRC is not included in this total because it is not designed to be a housing unit where people sleep overnight. *See supra* Part I.

[16] https://file.lacounty.gov/SDSInter/bos/supdocs/179234.pdf.

16

meaningful solutions." *Id.* at 4-5. The Motion included a total of 28 directives designed to lower the County jail population, including

- Working with "45 municipal law enforcement partners" to expand "the use of cite and release across the County." *Id.* at 5.

- Directing the Interim Directors of the Office of Diversion and Reentry and the Justice, Care and Opportunities Department (JCOD) to coordinate their efforts to plan for the expansion of the "pre-filing diversion" programs they oversee." *Id.*

- Directing county agencies to explore opportunities to "expand diversion and alternative sentencing opportunities throughout the pretrial process." *Id.* at 6.

- Directing the Interim Director of JCOD to collaborate with LASD to "implement[] community services programs at each LASD station . . . to support the expansion of pretrial releases by" the superior courts. *Id.* at 7.

- Directing JCOD to explore opportunities to subsidize transportation to and from court for people released pretrial and assess the likely effect on the jail population. *Id.*

- Directing JCOD to work with the Interim Chief Probation Officer to find alternative ways of responding to Post Release Community Supervision violations that do not result in incarceration. *Id.* at 9.

But instead of moving forward with the Motion for a Board vote, it was withdrawn, although Defendant Solis stated on April 3, 2023, that "getting into compliance [with court orders about the jails] is becoming more challenging as the population becomes more complex; and the conditions in the jails, as we have long known, are horrid and inhumane," and "[t]he intention behind my motion was for the Board of Supervisors to use the limited authority it has to safely depopulate."[17]

The mental health population of the jail totals 5,536 people;[18] 319 men are in the jail for violations of their terms of Post Release Community Supervision

---

[17] *Solis Statement on Motion to Depopulate and Decarcerate the Los Angeles County Jails*, April 3, 2023, at https://hildalsolis.org/solis-statement-on-motion-to-depopulate-and-decarcerate-the-los-angeles-county-jails/.

[18] Vera Inst. of Just., *Care First L.A.: Tracking Jail Decarceration,* https://www.vera.org/care-first-la-tracking-jail-decarceration (visited June 6, 2023). (cont'd)

17

(PRCS);[19] and 6,779 people are in jail pretrial.[20] An October 2022 report showed 275 pretrial detainees in the jail facing misdemeanor charges.[21] Defendants' failure to move forward with efforts to increase diversion of people with mental illness, cite and release to reduce the number of people in the jails charged with misdemeanors,[22] and non-incarceration options for people with PRCS violations, further shows that they have not taken all reasonable steps to comply with the PI.

## III. PROSPECTIVE SANCTIONS FOR FUTURE NONCOMPLIANCE ARE WARRANTED

Once a court finds a party in civil contempt, it has broad equitable power to order appropriate relief. *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003), *amended*, 335 F.3d 834 (9th Cir. 2003). A court is not limited solely to monetary sanctions – it can also modify previous orders, or issue new injunctive relief as a compensatory contempt sanction. *See Kelly*, 822 F3d at 1097.

Plaintiffs' proposed financial sanctions are workable and would coerce Defendants to comply with the PI in the future. *See* Doc. 375-7, Doc. 382 at 21-22. As noted in Plaintiffs' reply and by Counsel at the April 19, 2023 hearing, if the Court believes the proposed hourly or daily fine scheme is unwieldy, it can craft a monthly schedule; if the Court finds Plaintiffs' proposed abeyance period before fines commence to be too long or too short, it can adjust that period; and to the extent it concludes the size of the fines is inadequate to spur compliance, it can always make the fines greater than the amounts proposed by Plaintiffs.

---

[19]  LASD Daily Briefing, June 2, 2023 at https://lasd.org/wp-content/uploads/2023/06/Transparency_Custody_Division_Daily_Briefing_060223.pdf.

[20]  Vera Inst. of Just., *supra* n.18.

[21]  Vera Inst. of Just., *Money bail and the Los Angeles County jail system,* at 3 Oct. 2022, at https://vera-advocacy-and-partnerships.s3.amazonaws.com/Money%20Bail%20and%20the%20Los%20Angeles%20County%20Jail%20System%20-%20Vera%20Summary%20for%20JPRC%20-%2010.10.2022.pdf.

[22]  Plaintiffs are unaware of data showing the potential decrease in jail population from increasing cite and release under Cal. Penal C. § 827.1.

(cont'd)

18

Moreover, to the extent that the Court believes that fines alone will not address the root causes of the problems in the IRC and Defendants' noncompliance with the PI (and with past court orders), the Court can also grant injunctive relief ordering Defendants to implement the remedial measures that they themselves told the Court they were going to undertake.[23] Defendants cannot object to being told to do the very same tasks that they represented to the Court that they were already doing or were planning to do to comply with the PI.[24]

In the alternative, if the Court decides that a finding of contempt for noncompliance with the PI would be fruitless or is now unwarranted, it still has the power to take other remedial actions for Defendants' noncompliance without a predicate finding of contempt.[25] In *Armstrong v. Brown*, 939 F.Supp.2d 1012, 1025-26 (N.D. Cal. 2013), the district court found defendant prison officials' remedial efforts taken after the filing of a contempt motion were enough to prevent the issuance of contempt sanctions to coerce future compliance with the parties' stipulated remedial plan, but that their noncompliance did necessitate an order enforcing prior orders and directing defendants to actually implement remedial efforts, including those set forth in their filings. In *Jensen v. Pratt*, No. CV-12-00601-PHX-ROS, 2021 WL 3828502, *10-19 (D. Ariz. July 16, 2021), the district court determined that defendant prison officials met the legal standard for contempt (and potentially tens of millions of dollars in contempt fines), but concluded that, because two previous findings of contempt and monetary sanctions had not changed

---

[23] To the extent Defendants are concerned that unforeseen events could make meeting an order's requirements impossible, they can always come back to Plaintiffs and the Court and seek a stipulation to modify the order, or move the Court to modify it under Rule 60(b)(5) of the Federal Rules of Civil Procedure.

[24] Some of these remedial measures were also in the Defendant Supervisors Solis and Horvath's Motion that was submitted to the Board on April 2, 2023, and then withdrawn. *See supra* Part II and n.16.

[25] Additionally, as detailed in Plaintiffs' Notice of Motion and Motion and above, Defendants are not only noncompliant with the PI, but also with past court orders. *See supra* n.3; Doc. 375 at 2-3, 11 n.5.

19

1   their behavior, the court would instead take the remedial action of setting aside the

2   parties' settlement agreement and setting the case for trial. This Court's power to

3   issue further injunctive relief to enforce its previous orders (set forth at n.3, *supra*)

4   is beyond dispute. *See Parsons v. Ryan*, 912 F.3d 486, 499-501 (9th Cir. 2018)

5   (affirming grant of additional injunctive relief to enforce settlement agreement).

6   ## CONCLUSION

7          For the foregoing reasons, Plaintiffs request that the Court enter a finding of

8   contempt and order the proposed sanctions.

9                              Respectfully submitted,

10  DATED: June 6, 2023          By:  */s/ Corene T. Kendrick*

11                                    Peter J. Eliasberg
                                      Melissa Camacho
12                                    **ACLU FOUNDATION OF SOUTHERN**
                                      **CALIFORNIA**
13
                                      David C. Fathi
14                                    Corene T. Kendrick
                                      Marisol Dominguez-Ruiz
15                                    **ACLU NATIONAL PRISON PROJECT**

16                                    Attorneys for Plaintiffs Dennis Rutherford,
                                      *et al.*

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV-75-04111-DDP

PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on June 6, 2023, I electronically transmitted the above

3 document to the Clerk's Office using the CM/ECF system for filing and transmittal

4 of a Notice of Electronic Filing to Counsel for Defendants who are registered

5 CM/ECF users.

6

7 DATED:     June 6, 2023                    */s/ Corene T. Kendrick*

                                                      Corene T. Kendrick

8                                                       ACLU National Prison Project

9

10                                                       *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV-75-04111-DDP

PLAINTIFFS' ADDITIONAL BRIEFING RE: MOTION FOR AN OSC RE: CONTEMPT (Doc. 375)