OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
  *dharrison@counsel.lacounty.gov*
Dylan Ford (228699)
Deputy County Counsel
  *dford@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:   (213) 974-1807/(213) 974-1811
Facsimile:    (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  *rdugdale@kbkfirm.com*
Michael J. McCarthy (334829)
  *mmccarthy@kbkfirm.com*
Katelyn A. Kuwata (319370)
  *kkuwata@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 272-7904
Facsimile:  (310) 556-2705

*Attorneys for Defendants Los Angeles*
*County Sheriff Robert Luna, in his Official*
*Capacity, and the County of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, et al., | Case No. 75-cv-04111-DDP |
| Plaintiffs, | **DEFENDANTS' PREHEARING BRIEF** |
| v. | Date:   June 27, 2023 |
| ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and the COUNTY OF LOS ANGELES, | Time:   9:00 a.m. |
| Defendants. | Hon. Dean D. Pregerson Courtroom 9C |

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 3

    A.    Defendants Have Taken All Reasonable Steps Within Their
        Power to Comply with the Preliminary Injunction ................................. 3

        1.    The County Has Addressed Increased Staffing and
             Supervision to Maintain a Focus on Compliance ........................ 3

        2.    The County Has Created and Implemented an Automated
             Tracking System to Aid Compliance in Real Time ..................... 6

        3.    The County Has Mustered New Focus and Urgency
             Through the Efforts of the New Sheriff and Creation of a
             New DOJ Compliance Office ........................................................ 7

        4.    The County Has Made Other Changes Including Improved
             Sanitation and Above-Standard Psychiatric Care in the
             IRC ................................................................................................ 9

             (a)    Defendants Have Hired Additional Janitorial Staff
                  and Initiated a New Robust Cleaning Schedule in
                  the IRC to Ensure it is Kept in a Sanitary Condition ........ 9

             (b)    The County's New Method for Addressing Bridge
                  Medication and Mental Health Care in the IRC .............. 10

        5.    The County is Also Executing Plans to Reduce Waits for
             Scarce Mental Health Housing, Including by Reducing the
             Number of Inmates in the LACJ .............................................. 11

    B.    As a Result of These Substantial Efforts, Defendants Are in
        Substantial Compliance with the Preliminary Injunction .................... 15

        1.    Data From SIM System Shows Defendants Are in
             Substantial Compliance with the Preliminary Injunction .......... 15

        2.    The Circumstances Underlying the Remaining Causes for
             Violations Are Outside of the LASD's Control ........................ 16

III.  ARGUMENT ......................................................................................... 18

    A.    Defendants Are in Substantial Compliance with the Preliminary
        Injunction, as the Violations Which Are Clearly Defined in the
        Preliminary Injunction Presently Are Negligible to Non-Existent ...... 19

    B.    Defendants Should Not Be Held in Contempt Based on
        Violations Involving Circumstances That Were Not
        Contemplated When the Preliminary Injunction Was Entered ............ 20

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

i

1.       Circumstances Not Contemplated by the Preliminary Injunction Have Impacted Defendants' Compliance ................. 20

2.       When These Circumstances Occur, Defendants Are Unable to Comply With The Preliminary Injunction ................ 21

C.       Defendants Should Not Be Held in Contempt Because They Have Taken All Reasonable Steps Within Their Power to Insure Present and Sustainable Compliance With the Preliminary Injunction ............................................................. 21

D.       A Contempt Finding Will Not Help Defendants Comply with the Preliminary Injunction or Improve Conditions in the IRC ................ 24

IV.     CONCLUSION ............................................................. 25

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*F.T.C. v. Affordable Media, LLC*,
  179 F.3d 1228 (9th Cir. 1999) .................................................................18, 20, 21

*Armstrong v. Brown*,
  939 F. Supp. 2d. 1012 (N.D. Cal. 2013)........................................................*passim*

*Brown v. Plata*,
  563 U.S. 493 (2011) ........................................................................................... 11

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993)................................................................................21

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ........................................................................... 18

*Kelly v. Wengler*,
  822 F.3d 1085 (9th Cir. 2016).....................................................................*passim*

*Kelly v. Wengler*,
  979 F. Supp. 2d 1104 (D. Idaho Sept. 16, 2013)........................................20, 23

*Parsons v. Ryan*,
  2018 WL 3239691 (D. Ariz. June 22, 2018)................................................20, 22

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020) .......................................................................*passim*

*Stone v. City & Cnty. of San Francisco*,
  968 F.2d 850 (9th Cir. 1992) ........................................................................21, 25

*In re Taggart*,
  980 F.3d 1340 (9th Cir. 2020) ........................................................................... 18

*Trueblood v. Wash. State Dep't of Social & Health Servs.*,
  2017 WL 4700326 (W.D. Wash. Oct. 19, 2017) ...................................19, 23, 24

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# I.    INTRODUCTION

The Court should deny Plaintiffs' Motion because the Los Angeles Sheriff's Department (the "LASD") and the County of Los Angeles (the "County") (collectively, "Defendants") are in substantial compliance with the preliminary injunction in this case (the "PI").  Defendants have undertaken significant remedial actions to ensure they are currently meeting and will continue to meet the PI's requirements.  These corrective actions have included the following:

**Increased Staffing and Supervision in the Inmate Reception Center ("IRC"):**  Over the past few months, both the LASD and Correctional Health Services ("CHS") have substantially boosted their staffing levels in the IRC, and, more significantly, have increased the presence of managers in the IRC specifically tasked with monitoring and ensuring compliance with the PI's requirements.

**Introduction of an Automated Tracking System in the IRC:**  This Spring, the LASD introduced an automated tracking tool in the IRC—the Shared Intake Management ("SIM") System—which tracks, in real time, the PI's requirements for every inmate in the IRC; warns LASD and CHS staff when any violation of the PI's time limits is approaching in the case of any inmate; and provides data concerning inmate movement that can show if potential violations of the PI were justifiable.

**New Leadership Focused on Urgently Addressing Issues in the IRC:**  The County has mustered new focus and urgency on the issues which have plagued the IRC in the past through the efforts of a new Sheriff, who has made addressing unacceptable conditions in the Los Angeles County Jail ("LACJ") a focus of his administration.  The County also created a DOJ Compliance Office, empowered to cut through red tape and quickly coordinate efforts of disparate County departments.

**Systemic Changes to Enhance Mental Health Care in the IRC and Ensure Sanitary Conditions in the IRC:**  CHS has recently embedded a team of psychiatrists and nurse practitioners in the IRC, who assess inmates with mental health conditions when they arrive at the IRC and prescribe medication based on an

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1

inmate's current mental state, a standard of care which exceeds what normally occurs in a jail intake setting.  To keep the IRC in a sanitary condition, Defendants have hired new cleaning staff and instituted new protocols that require frequent inspections to confirm every area of the IRC is clean and well-stocked with supplies.

**Reducing Waits in the IRC for Specialty Mental Health Housing:**  The County has also worked diligently to eliminate any bottlenecks due to mental health housing shortages in the LACJ.  These efforts have included accelerating the transfers of inmates sentenced to state prison; surging transfers of inmates found incompetent to stand trial to state hospitals; and more efficiently and therapeutically using High Observation Housing ("HOH") space.  Combined with the County's ongoing work to create community placements to safely divert individuals out of the LACJ, these efforts will reduce the population that needs mental health housing in the LACJ.  At the same time, a recent state court order reinstating the Emergency Bail Schedule ("EBS") for Defendants will likely reduce the flow of inmates into the LACJ because more arrestees will remain out of jail while pending trial. Accordingly, it is reasonable to expect the overall population of the LACJ—which has fallen by almost 7% in the past three months alone—will continue to fall.

As a result of these remedial actions and others described below, Defendants have achieved substantial compliance with the PI's requirements, that compliance is current, and it is sustainable.  Specifically, as explained in detail below:

- While there were over 3,611 inmates processed through the IRC between May 7, 2023 and May 31, 2023, there was only **one** occasion, for which defendants have no compelling justification, when an inmate spent more than 24 hours in the IRC.  Every other instance when an inmate was recorded as being in the IRC for more than 24 hours during this time period occurred under circumstances that were never contemplated under the PI or where a violation could not be avoided;

- During this same time period, there were only **eight** 12-hour cell violations involving inmates entering the IRC, while every other circumstance when an inmate spent more than 12 hours in an IRC cell occurred when an inmate was *leaving* the LACJ, another circumstance

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

not contemplated under the PI; and

- Between May 7, 2023 and May 31, 2023, there were **zero** inmates tethered to the IRC Front Bench for longer than four hours.

This dramatic improvement is sustainable because the SIM system will continue to provide real-time feedback that will allow the County to refine its actions to comply with the PI and because the impact of the County's other strategic actions will increase over time:  LASD and CHS staffing numbers will grow through their sustained focus on hiring; determined County actors, including Sheriff Robert Luna and Chief DOJ Compliance Officer Maggie Carter, will have additional time to tackle problems in the IRC; and the County's efforts to divert inmates from the LACJ will ramp up.

In short, the County has heeded this Court's admonishment to act with urgency by taking the corrective actions described above.  Although many problems persist in the LACJ, ongoing non-compliance with the PI's requirements is now not one of them.  As a result, the County should not be held in civil contempt, which Plaintiffs have rightly framed as a remedy designed to coerce <u>future</u> compliance. This remedy is not currently warranted.  Defendants are currently in compliance with the PI; they have reached that state by taking all reasonable steps within their power to ensure present and sustainable compliance with this Court's orders; and their approach in this case does not at all mirror the level of wanton disregard for court orders shown in cases cited by Plaintiffs where courts have imposed contempt sanctions.  Accordingly, Plaintiffs' Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Defendants Have Taken All Reasonable Steps Within Their Power to Comply with the Preliminary Injunction

#### 1.    The County Has Addressed Increased Staffing and Supervision to Maintain a Focus on Compliance

As part of a significant move to ensure greater accountability in the IRC, in February 2023 Sheriff Luna and the LASD instituted a new IRC compliance

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3

sergeant position that is staffed 24 hours a day, 7 days a week.  Supp. Decl. of Paula Tokar ("Supp. Tokar Decl.") ¶ 7.  This sergeant's sole assignment is to ensure compliance with the PI's provisions.  Specifically, this sergeant has been tasked with tracking SIM system alerts so action can be taken to avoid potential violations; closely monitoring the PI's holding cell provision; overseeing the documentation of all potential violations; and backing up the Custody Assistant assigned to monitor the Front Bench.  *Id.*  This level of oversight, aided by the SIM system, has led to a steep decline in violations of the PI.  This position is also bolstered by the installation of a new Commander over the IRC, John Gannon, who comes to the IRC with 35 years of experience in the LASD working in numerous capacities.  Decl. of Commander John Gannon ("Gannon Decl.") ¶ 2.

The County has also responded to the need for increased manpower in the LASD's ranks.  New funding has permitted the LASD to add four additional academy classes in the 2022-2023 fiscal year, bringing the total number of classes this year to eight.  Supp. Decl. of Paula Tokar, Dated 4/13/23, ¶ 12.  As of June 6, 2023, there have been 373 graduates in the 2022-2023 fiscal year, which is already more than the entire 2021-2022 fiscal year, and three more planned classes remain.  Supp. Tokar Decl. ¶ 8.

CHS has made two critical improvements in IRC staffing:  first, it rebounded its managerial and clinical staff following its February 2023 staffing crisis, and second, it embedded a robust psychiatric team in the IRC.  As Defendants have explained, in February 2023, CHS experienced significant and sudden attrition of its staff, and particularly its leadership.  Response at 8-9.  In just a few weeks, the IRC lost its manager, four psychiatric social workers ("PSWs"), and five mental health staff supervisors.  *Id.*  Although certain staffing issues can be anticipated, the staffing crisis that transpired in February was not—indeed, it was one of the worst periods for attrition in the IRC's recent history.  Decl. of Joan Hubbell ISO Response ¶ 6.  Courts have acknowledged that even a staff member's unexpected

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4

illness may reasonably lead to noncompliance with a court order.  *See, e.g.*, *Armstrong v. Brown*, 939 F. Supp. 2d. 1012, 1025 (N.D. Cal. 2013).  The unanticipated staffing shortfalls in February 2023 were much worse.

Defendants have since remedied these staffing deficits, and the IRC is now staffed with two managers, four supervisors (with one more supervisor currently onboarding), and twenty-four clinicians (including PSWs, psychologists, and mental health nurses).  Supp. Decl. of Joan Hubbell ("Supp. Hubbell Decl.") ¶ 2.  This has had a measurable impact.  *Id.* ¶ 3.  For instance, CHS completed 262 more mental health evaluations in the IRC in May 2023 compared to February 2023.  *Id.*

Additionally, the County now has a robust psychiatric staff stationed in the IRC consisting of full-time equivalents of 2.75 psychiatrists and 6.25 psychiatric nurse practitioners, with two additional nurse practitioners currently onboarding. Supp. Decl. of Dr. DeSilva ("Supp. Dr. DeSilva Decl.") ¶ 2.  This program has ensured that most individuals with mental health conditions receive a psychiatric assessment for medication in the IRC before transferring to permanent housing.  *Id.* ¶ 3; Response at 16-17.  This added staff has also improved compliance with Paragraph 2, as psychiatrists have prioritized assessments of inmates on the Front Bench, which allows them to move faster out of the IRC.  Decl. of Dr. DeSilva Decl. ISO Response ("Dr. DeSilva Decl.") ¶ 5.

The County has also bolstered CHS staffing more broadly throughout the LACJ, despite the considerable headwinds faced in hiring mental health workers. As of May 31, 2023, CHS had onboarded 106 new staff members.  Supp. Hubbell Decl. ¶ 4.  Critically, this included eight new clinicians within Men's Mental Health who will help stabilize and step down inmates, which helps prevent backlogs by making higher acuity beds available for permanent mental health housing.  *Id.*

CHS has also established a group of 10 mental health workers from throughout the LACJ who are cross-trained in the IRC and who are available to provide overtime hours when necessary due to unexpected staffing shortfalls like

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

5

those in February 2023.  *Id.* ¶ 5.   Finally, the County authorized assignment bonuses effective May 1, 2023 for various nursing, mental health, and key support staff who work onsite in the LACJ to incentivize recruiting and retention, and encourage overtime work when required to avoid IRC backlogs.  *Id.* ¶ 6.

**2.  The County Has Created and Implemented an Automated Tracking System to Aid Compliance in Real Time**

Until recently, the lack of a robust tracking system to contemporaneously track inmate movement in the IRC has led to myriad problems in the IRC:  staff lacked sufficient awareness when violations of the PI's timing requirements were about to occur; it was difficult to determine if violations had even occurred; and the LASD had no easy way to determine whether there were explanations for why apparent violations of the PI were occurring or whether patterns could be fixed.

Recognizing these deficiencies, the LASD has expended tremendous effort in recent months to devise a technical solution to track inmates with a level of detail that both alerts IRC staff to potential violations of the PI and provides information regarding their causes.  This work began in February and was completed in record time.  Gannon Decl. ¶ 7.  It took roughly two months to develop the SIM system, ensure it would produce information helpful to track the PI's various time limitations and data essential to clearing inmates from the IRC, test it, and implement it in the IRC.  *Id.* ¶ 8.

The SIM system went into effect in the IRC on May 3, 2023, and within four days the initial system glitches were resolved.  *Id.* ¶ 9.  This system has the following key features:  (a) it tracks the PI's requirements in real time for all inmates in the IRC and makes that information accessible to all personnel in the IRC; (b) it alerts LASD and CHS personnel in advance of when violations of the PI's requirements are scheduled to occur so they can take action to avoid such violations; (c) it provides a status update in real time regarding other criteria that must be met before an inmate can be cleared out of the IRC; (d) it tracks each

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6

inmate's movement from the time they enter the IRC to the time they leave the IRC; and (e) it permits the LASD to determine why any potential violation occurred. *Id*.

As discussed below in part II.B., *supra*, the awareness that the SIM system provides has virtually eliminated most violations within just the first month, and it has provided valuable data to explain remaining potential violations. There is every reason to believe that this important reform will ensure sustained compliance with this Court's orders going forward.

### 3. The County Has Mustered New Focus and Urgency Through the Efforts of the New Sheriff and Creation of a New DOJ Compliance Office

The County also has a new Sheriff and a new Chief DOJ Compliance Officer who are both committed to driving compliance in the IRC with urgency and focus.

Once sworn into office in December 2022, Sheriff Luna familiarized himself with the PI's requirements, and in recent months has taken decisive steps to ensure that LASD personnel in the IRC not only understand them but also are committed to compliance. For example, since Plaintiffs' Motion was filed, Sheriff Luna issued Unit Orders, putting all IRC personnel on clear notice of the issues in this case, and ordered additional re-training through required training bulletins that are reviewed as part of personnel shifting briefings. Suppl. Tokar Decl. ¶ 4. All staff in the IRC have now been retrained, and these messages are reinforced through shift briefings and email reminders. *Id.* ¶ 9. Likewise, the LASD has supported the new SIM system with supervision and alert systems that roll up through the IRC chain of command. If inmates approach clock violations, IRC custody staff know they must inform a Sergeant, then the Watch Commander, and then the IRC Captain to resolve potential violations before they occur.

Sheriff Luna's commitment is also evidenced by the speed with which the SIM system was developed, resulting in a critical new tool that has dramatically improved the LASD's ability to comply with the PI. *See infra* Sec. II.C.2. The Sheriff's message is clear and reinforced by IRC leadership: the LASD must

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7

comply with the PI's requirements.

The County has also designated Maggie Carter to serve as the County's "Chief DOJ Compliance Officer," directly reporting to the County's Chief Executive Officer.  In this role, Ms. Carter is a "point person" to coordinate and drive forward County efforts to comply with the obligations stemming from this lawsuit and the DOJ lawsuit regarding care for the mentally ill within the LACJ. Ms. Carter, who assumed this new position on the day Plaintiffs filed their Motion, brings determination and deep experience to the role.  She is an accomplished former federal prosecutor, Senior Assistant County Counsel in the Office of County Counsel, and former law firm partner.  She is familiar both with the operation of the relevant County agencies tasked with compliance, and also with the legal imperatives facing the County.  As a direct report to the CEO, Ms. Carter is well positioned to assist County agencies to streamline County processes, to bring coordinated policy and budget requests to the CEO and the Board of Supervisors (the "Board"), and to collaborate with State, Superior Court, and justice partners who the County may persuade but does not control.

The County is now seeing the fruit of Sheriff Luna's leadership and focus and the DOJ Compliance Office's efforts to coordinate and fast track compliance efforts. These efforts demonstrate the County's commitment to additional continued, significant, and rapid progress:

- The County has expedited the transfer of inmates out of the LACJ and to State prison once they have been sentenced, reducing the total number pending State transfer from 1,639 to 569 since early March;

- The County has "sprinted" over 470 FIST inmates eligible to be transferred to State hospitals for admission to these facilities;

- The County has secured State approval to open the new Jail Inpatient Care Unit, a new LPS-designated location at TTCF which will provide urgent mental health care to stabilize and improve the mental health classification of the most severely mentally ill individuals in the LACJ;

- The Board approved a plan to transform the physical space of the IRC by replacing the "bath rear" area of the IRC with better clinical space

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

for confidential medical and mental health assessments;

- CHS has seen crucial improvements in its hiring process, as onboarding times for new staff have been cut in half from where they were just six months ago and the DOJ Compliance Office announced bonuses of up to 20% for key CHS employees working in the jails;

- CHS and LASD have expanded efforts to provide safe and therapeutically beneficial ways to house HOH inmates that also better utilize TTCF's limited HOH space;

- The County has authorized and funding has been recommended for a ramp-up of community mental health treatment beds to be onboarded by the Office of Diversion and Re-entry ("ODR"), the Department of Mental Health ("DMH"), and the County's Justice Care and Opportunities Department ("JCOD"); and

- The County has negotiated a contract for nearly $630 million in State funding over five years to ramp up ODR capacity for community-based restoration services for inmates facing felonies who have been declared incompetent to stand trial ("FIST").

These efforts have already had a clear impact on improving conditions in the IRC and in the LACJ generally, and the County will continue to bring focus and urgency to ensure this progress continues.

### 4. The County Has Made Other Changes Including Improved Sanitation and Above-Standard Psychiatric Care in the IRC

#### (a) Defendants Have Hired Additional Janitorial Staff and Initiated a New Robust Cleaning Schedule in the IRC to Ensure it is Kept in a Sanitary Condition

To comply with Paragraph 6 of the PI, Commander Gannon has brought added emphasis to providing round-the-clock responses to acute issues which arise in any jail facility. Commander Gannon has instituted new, robust and uninterrupted cleaning schedules, which are staffed by newly-hired janitorial crews that overlap both the AM shift (6:00 a.m. to 2:00 p.m.) and PM shift (2:00 p.m. to 10:00 p.m.). Gannon Decl. ¶ 16(a), (g).

In addition, the LASD has created a new IRC TRO Compliance Inspection checklist which personnel must use during their routine walkthroughs of the facility. The checklist requires LASD personnel to note whether each area of the IRC is

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9

occupied or vacant; whether there are concerns with toilet paper, trash, water fountains or toilets; and needed repairs or other notes related to sanitation.  There is also a section for corrective actions taken.  Once completed, the list is filed with the Watch Commander.  Maintenance requests are notated with work orders to ensure that expedited repairs are completed when discovered.  This checklist is completed, at minimum, three times per day by each shift's IRC Sergeant and submitted to the watch commander for review and approval.  *Id.* ¶ 16(b)-(c).

Additionally, the LASD has prioritized repairs for the IRC, Module 231, and HOH modules to ensure continued functionality, and is in the process of procuring new fixtures for older IRC cells to reduce the number of clogged drains.  *Id.* ¶ 16(l).

### (b)   The County's New Method for Addressing Bridge Medication and Mental Health Care in the IRC

Since March 2023, Defendants have been effectuating plans to ***exceed*** the standard of care in carceral institutions for bridging medications, as detailed in Defendants' Response.  Response at 16-17; Dr. DeSilva Decl. ¶¶ 3-7.  Specifically, Defendants have made substantial efforts to hire a full complement of psychiatric staff in the IRC (*supra* Sec. II.A.1.) to ensure every individual with a mental health condition receives a psychiatric assessment for medication before transferring to permanent housing.  Dr. DeSilva Decl. ¶ 3.  Such assessments obviate the need to bridge medications issued prior to a patient's arrival at the IRC because clinicians can determine the appropriate regimen for the patient's present psychiatric state during the new assessment process.  *Id.*  Since the last week of March, roughly 80% of individuals with mental health conditions received a psychiatric assessment and medication as indicated in the IRC.  Suppl. Dr. DeSilva Decl. ¶ 3.  They were therefore provided care above and beyond the carceral settings standard.  The balance of these individuals received treatment in line with the standard of care, per CHS's Bridge Medication Policy.  *Id.*  Thus, the County is in compliance with Paragraph 7 of the PI.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

### 5. The County is Also Executing Plans to Reduce Waits for Scarce Mental Health Housing, Including by Reducing the Number of Inmates in the LACJ

Plaintiffs assert that bottlenecks exist in the IRC because the LACJ facilities are overcrowded. But the LACJ is not overcrowded when compared to historical levels. As of May 31, 2023, there were approximately 13,200 inmates incarcerated in the LACJ. This is several thousand inmates fewer than the number routinely confined in the LACJ prior to the pandemic, and many thousands fewer than the 20,000 plus inmates who often packed the LACJ during many stretches of this long-running litigation, including when this Court toured the LACJ in 2010.[1] The LACJ does, however, have a mismatch between its jail population's need for specialty HOH and the availability of that housing. Accordingly, Defendants are currently working hard to address that mismatch, including by taking the following steps:

---

[1] Plaintiffs' focus on the BSCC-rated capacity of the LACJ's facilities—12,404 as of the time of this filing—as the determinative measure of overcrowding is both factually and legally flawed. First, BSCC ratings do not account for LACJ beds utilized for processing inmates, for disciplining inmates, or for housing inmates with medical issues. The LACJ has 1,178 such beds. Accordingly, when one accounts for these beds, as well as the BSCC-rated capacity of the LACJ's facilities, the number of beds that calculation yields (13,582) is ***above*** the current inmate population in the LACJ. Second, in determining whether a carceral facility is so overcrowded that it raises Constitutional concerns, courts do not look exclusively to whether a carceral facility exceeds its BSCC-rated capacity. Instead, courts examine whether a jail facility exceeds its "design capacity" to determine whether it has hit a level of overcrowding that triggers Constitutional concerns. *See Brown v. Plata*, 563 U.S. 493, 539-40 (2011) (holding that capping a prison facility population at 137.5% of the facility's design capacity is Constitutionally adequate). And here, the "design capacity" of the LACJ's facilities is 20,938, or more than 8,500 beds in excess of the number of inmates currently being detained in the LACJ.[1] Finally, a prior 1985 order in this case noted that "the term 'overcrowding' is subject to several interpretations." Mem. of Understanding (Oct. 4, 1985), approved by Judge Gray on Nov. 5, 1985. For purposes of that order, the Court determined that overcrowding should be defined:

[A]s that point where the inmate population exceeds a number which:

a. Renders it impossible for the Sheriff to comply with the orders in *Rutherford v. Pitchess* as they now provide or as they may be modified by agreement of the parties and approved by the court.

b. Renders it impossible for the Sheriff to exercise his usual discretion and management options to provide adequate security and control.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**Making Scarce Mental Health Housing More Available:**  Defendants are increasing mental health housing by increasing the number of more therapeutic FIP Stepdown/HOH Dorm Modules at TTCF, within which inmates are unrestrained and out of their cells most of the day.  To accomplish this, the LASD has added four unfunded Custody Assistant positions to each new HOH Dorm pod, among other things.  Presently, there are three new HOH Dorm pods, and Defendants anticipate that they will roll out three additional pods by mid-June 2023.  These new housing configurations alone will make up to 192 new HOH beds available.

Defendants have further been working to ensure that existing and future HOH Dorm Modules are more frequently configured to house two inmates per cell, rather than just one, such that the capacity of more HOH pods will reach 32 inmates. These changes allow more HOH availability (with more therapeutic features), and also reduce IRC backlogs due to mental health housing shortages.

**Decreasing Demand for HOH Through Mental Health Treatment and Stabilization:**  Defendants are also working to decrease the demand for HOH by working to stabilize those with severe mental health conditions.  Defendants have opened, as of June 1, 2023, their Jail Inpatient Unit ("JIU"), which will serve as a Lanterman-Petris-Short ("LPS") Act-designated facility inside TTCF used to provide short-term, intensive treatment, including the involuntary administration of psychotropic medication to P4 inmates to stabilize them and potentially move them to a lower level of care.  CHS believes a sizeable number of the inmates currently on the FIP waitlist will benefit from JIU intervention and medication to treat their severe mental health conditions.  The expectation is that an impactful percentage of these P4 inmates, once treated in the JIU, will no longer require HOH.

**Decreasing Demand for HOH By Diverting Mental Health Inmates Out of the LACJ:** The County is also reducing the demand for HOH housing by safely diverting mental health inmates into community mental health treatment settings. ODR has experienced tremendous success in treating individuals with serious

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

mental health conditions who can be safely diverted from custody and currently has capacity to provide housing and services to 2,134 clients diverted through criminal courts, 213 beds for the treatment of misdemeanor defendants found incompetent to stand trial ("MIST"), and 794 beds for the treatment of FIST inmates.  Decl. of Dr. Clemens Hong ("Hong Decl.") ¶ 2.  ODR currently has a number of open beds within that capacity, and is working to fill them with assistance from judges from the criminal and mental health divisions of the Los Angeles Superior Court who may order releases to placements.  *Id.* ¶ 3.  The County is working diligently to expand this capacity, especially for P3 and P4 inmates.  To ramp-up these beds, the Board instructed DMH and DHS to move forward to develop an initial 500 secured mental health care beds which can be used to care for P3 and P4 inmates who would otherwise be housed in the LACJ.

These efforts should soon result in a gradual decline in the number of individuals in the LACJ with serious mental health conditions.  Hong Decl. ¶ 6. This result, however, depends in part on the future flow of such inmates and the capacity of the State courts and the County's justice partners to adjudicate requests to divert inmates.  *Id.*

**Defendants Have Made Other Substantial Efforts to Lower the Number of Inmates in the LACJ:**  Defendants have also made focused efforts to depopulate the LACJ by expediting the transfer of inmates to state prison once they are sentenced and by taking advantage of opportunities to transfer FIST inmates to state hospitals for restoration to competency.  Suppl. Tokar Decl. ¶¶ 11-12.  Both of these efforts to control the inmate population in the LACJ have borne fruit.

As of June 2, 2023, there were 569 inmates awaiting transfer from the LACJ to a CDCR facility, as compared to 1,639 inmates at the beginning of March, and in stark contrast to periods during the pandemic when there were up to 4,000 such inmates awaiting transfer; and during this roughly thirteen-week time period, Defendants have transferred over 2,821 inmates out of the LACJ and into state

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

custody.  *Id.* ¶ 14.  These CDCR transfers include inmates from HOH and MOH; thereby, making beds available to those waiting for permanent specialty housing.

The County has also capitalized on a unique "admissions sprint" opportunity provided by the Department of State Hospitals that has increased the number of state hospital beds available to the County.  The transfer of FIST inmates from the LACJ to state hospitals, whose responsibility is to attempt to restore them to competency, can directly free up FIP and HOH beds.  As a result of a concentrated effort by the LASD to capitalize on this "admissions sprint," there are currently 337 FIST inmates in the LACJ, while over the past year, it was typical to have between 600-650 FIST inmates in the LACJ.  *Id.* ¶ 13.  Approximately 470 FIST inmates were transferred from the LACJ to state hospitals between March 20, 2023 and June 2, 2023 alone (an average of 43 FIST inmates each week), in contrast to earlier periods when FIST inmates trickled out of the LACJ in very small numbers.  *Id.*

**Using PDC-North To Accommodate Additional MOH Inmates:** Another action with positive impact on the IRC and for those with mental health conditions, has been the decision to relocate inmates who require MOH to PDC-North, a facility which presents a far better environment for inmates with mental health conditions than MCJ.  To date, the relocation of MOH inmates to PDC-North has resulted in the movement of approximately 1,000 MOH inmates who now occupy three of its four dormitory units.  By July 31, 2023, the LASD will relocate more than 200 additional MOH inmates from MCJ into the fourth dormitory at PDC-North.

**Reinstated Emergency Bail Schedule:** Another significant new development is the decision issued by Los Angeles Superior Court Judge Lawrence Riff on May 16, 2023, to reinstitute the EBS, which was in effect during much of the pandemic and that allows most people charged with low-level crimes to be released without having to post bail.  Decl. of Robert E. Dugdale, Ex. 1.[2]  Indeed, it was the end of

---

[2]  Judge Riff's decision in *Urquidi* reinstated the EBS as of May 24, 2023 at 12:01

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

14

the EBS on July 1, 2022, that led to skyrocketing numbers of inmates flooding into the IRC last summer that sparked the issuance of the TRO in this case.[3]  Although the reinstated EBS has not been in effect long enough to gauge how it will impact incoming inmates to the IRC, there is data suggesting Judge Riff's decision is likely to help prevent overcrowding in the IRC, lower the overall population in the LACJ, and lessen the flood of individuals with severe mental illnesses into the LACJ.[4]

**B.    As a Result of These Substantial Efforts, Defendants Are in Substantial Compliance with the Preliminary Injunction**

**1.    Data From SIM System Shows Defendants Are in Substantial Compliance with the Preliminary Injunction**

As a result of the reforms described above and with better awareness of potential violations, the LASD has moved even closer toward virtual elimination of violations of Paragraph 1 (24-hour processing time), Paragraph 2 (4 hours on the front bench), and Paragraph 4 (12 hours in a holding cell).  From May 7, 2023 until May 31, 2023, there were only 58 violations of Paragraph 1, 0 violations of Paragraph 2, and only 39 violations of Paragraph 4.  Gannon Decl. ¶ 13, Ex. C.  By

---

a.m., with a slight modification for repeat offenders.  It further ordered the parties in that case to develop "plans and procedures" for the pre-arraignment release of arrestees, and to file a joint report on July 5, 2023, noting their progress.  Judge Riff will hold a hearing on July 10, 2023 to assess the proffered plans and procedures.

[3]  *See* Defs.' Response to Plfs.' Ex Parte App. for TRO (Dkt. 337) (citing "the cessation of the [EBS]" as one of the principle reasons the IRC was "overwhelmed with new inmates entering the LACJ" in the summer of 2022).

[4]  Current data shows that almost half the total number of inmates in the LACJ are being detained pre-trial.  Moreover, data suggests that individuals with severe mental health conditions who would require HOH in the LACJ may particularly benefit from the reinstitution of the EBS, because, while P3/P4 inmates are detained pre-trial in the LACJ at almost the same rate as the rest of the jail population, (a) they are less likely to be in the LACJ on a felony charge when compared to the rest of the LACJ population; and (b) both the average bail amount and median bail amount associated with inmates on pre-trial status in the LACJ, who have a bail amount set, and who have no other custody holds are ***significantly*** lower for the P3/P4 jail population as compared to the rest of the inmate population.  *See* Report Back Addressing the Mental Health Crisis in the County, Dkt. 378-1 (Ex. A at 12).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

way of simple comparison, the ACLU first sought injunctive relief in September 2022 citing *individual days* in August 2022 when the IRC had held more than 200 inmates beyond 24 hours, including August 22, 2022 when it claimed that 235 individuals had been held longer than 49 hours.  Pls.' Mot. for a Temporary Restraining Order, Dkt. No. 318-1 at 28.

The simple aggregate number of violations fails to tell the entire story, however, because the LASD's new data tracking capabilities have enabled it to assess exactly when and why each potential violation occurs.  An analysis of the data post-SIM reveals that, in nearly every occurrence, the reason for the violation was beyond the LASD's control.  Moreover, when violations do occur, they are not of the egregious nature which occurred prior to the TRO.  Below presents a general overview of the progress:

May 7 – May 31
Violations in the IRC[5]

| Provision | Total Violations Logged by SIMS | Court-Related | Medical-Related | Transfer-Related | Erroneous | Unjustified |
|---|---|---|---|---|---|---|
| 24 Hours/Processing (¶ 1) | 58 | 50 | 6 | 1 | 0 | 1[6] |
| 4 Hours/Tethered (¶ 2) | 0 | 0 | 0 | 0 | 0 | 0 |
| 12 Hours/Cell (¶ 4) | 39 | 0 | 0 | 27 | 4 | 8 |

**2.    The Circumstances Underlying the Remaining Causes for Violations Are Outside of the LASD's Control**

Indeed, the SIM system has revealed issues not originally contemplated when the parties stipulated to the PI.  Most potential violations occur for reasons beyond Defendants' control, leaving them at times unable to comply with the PI.

---

[5] For a more detailed breakdown of the SIM system data, see Gannon Decl. ¶ 13, Exs. A-B.

[6] The sole violation within the LASD's control occurred on May 24, 2023, when an individual was held for 2 minutes beyond the 24 hour timer.  *Id.* ¶ 13, Ex. A.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

With respect to Paragraphs 1 and 4, the data shows that inmates exceeding one of the PI's timing provisions are either (1) physically outside of the IRC when the violation occurs; (2) obtaining medical care; (3) or awaiting transportation out of the IRC.  The overall data, as reflected above, confirms that almost all of the violations that currently occur are for these reasons, which were neither contemplated by the PI, nor fall within the heartland of examples the ACLU cited when it sought the TRO.  Pls.' Mot. for TRO, Dkt. No. 318-1 at 27 (citing wait times of "111.5 hours" in August-September 2021); 28 (individuals held "with no mattress or bedding, and in deplorable conditions … ranged from a low of 23 to a high of 252" in August 2022); 29 (noting that wait times frequently peak between 100-200 hours); Dkt. No. 318-1, Exs. 3, 5, 11 (declarations of inmates who spent multiple days in the IRC).

Today, far and away the most common occurrence for a violation of the 24-hour provision in the PI occurs when inmates are in court at the very moment the limitation is reached.  Gannon Decl. ¶ 13, Ex. A.  Currently, the LASD is held responsible for that violation.  Thus, for example, an inmate on May 10, 2023 was logged as a 10 hour and 17 minute violation of the 24-hour clock, although he reached that threshold *only* due to the 12 hours and 44 minutes he spent at court, and he in fact reached the limit when he was outside of the IRC.  *Id.*  Upon return to the IRC, the County was able to finish processing this inmate within <u>47</u> minutes.  *Id.* These lengthy Court appearances are common.  On average, inmates who are listed as beyond the 24-hour limit and have made a court appearance during that time spent thirteen hours outside of the IRC.  Moreover, on average, the County has been able to process these same inmates in under one hour upon their return.  *Id.*

This issue is not unique to the 24-hour processing limitation.  A review of the data associated with the 12-hour cell limitation shows that purported violations of this requirement overwhelmingly occur because an inmate is *leaving* the LACJ and awaiting pick-up from another facility or agency—27 of the 39 violations fit this

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

description.  *Id.*, Ex. B.  For example, one individual was found to have violated the 12-hour limitation by six minutes on May 19, because he had been waiting for a transfer out of the LACJ for 3 hours and 11 minutes.  *Id.*  Removing the wait time for transportation (which LASD cannot control) from the calculation would eliminate this violation.

The above affirms that the present picture in the IRC is far different than in months and years past.  Indeed, Defendants submit that the residual violations occurring require revisiting the PI to amend its timing provisions to exclude times when inmates leave the IRC or are not held under circumstances within the LASD's control.  If that is the standard the LASD is held to, which it should be, the number of violations occurring in the IRC are now negligible or non-existent.[7]

## III.   ARGUMENT

These facts do not meet the high bar for contempt.  "Civil contempt is a 'severe remedy' and, correspondingly, the Supreme Court has set a significantly high hurdle for when it is imposed."  *In re Taggart*, 980 F.3d 1340, 1347 (9th Cir. 2020).  To establish civil contempt, "[t]he moving party has the burden of showing by clear and convincing evidence that the [non-moving] party violated a specific and definite order of the court."  *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).  Substantial compliance with a court order or a party's inability to comply are defenses to civil contempt.  *Id.*; *Gen. Signal Corp. v. Donallco*, *Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).  Furthermore, where a nonmoving party has taken "'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt."  *Id.*

---

[7] With respect to the type of PI violations described above, the County has engaged with the ACLU as to whether the Court should even consider such cases violations of the PI.  As of this filing, the parties have met and conferred regarding the County's proposal.  The County is optimistic that, based on the state of the discussions, the parties may reach consensus on most of these issues.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Civil contempt is not warranted here for at least four reasons.  First, Defendants are in substantial compliance with the PI.  Second, any violations that continue to occur involve circumstances that were not contemplated by the PI, and Defendants are unable to comply with the PI when they do occur.  Third, Defendants have made all reasonable efforts within their control to comply with the PI.  Fourth, a contempt finding, and the fine schedule Plaintiffs propose, will neither improve conditions in the IRC nor help Defendants achieve compliance with the PI.

### A.   Defendants Are in Substantial Compliance with the Preliminary Injunction, as the Violations Which Are Clearly Defined in the Preliminary Injunction Presently Are Negligible to Non-Existent

Plaintiffs repeatedly have pointed to three cases as a basis for this Court to find civil contempt: *Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020) ("*Parsons III*"), *Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016), and *Trueblood v. Wash. State Dep't of Social & Health Servs.*, 2017 WL 4700326 (W.D. Wash. Oct. 19, 2017). Mot. at 20-25; Reply at 4, 17.  The violations in those cases, however, cannot reasonably be compared to the facts here.

In *Trueblood*, the district court issued an order in April 2015 requiring defendants to provide competency evaluations and restoration services to pretrial detainees within fourteen days of a court order.  *Trueblood*, 2017 WL 4700326 at *1.  Following an initial finding of contempt in July 2016, plaintiffs filed a second motion for contempt in July 2017 due to defendants' continued failure to comply.[8] *Id.*  Indeed, as of June 2017, only **46.2%** of the pretrial detainees under defendants' care were receiving timely services.  *Id.* at *2.

In *Kelly*, prisoners brought a class action against a private prison contractor alleging it inadequately staffed a prison in deliberate indifference to the health and safety of prisoners.  *Kelly*, 822 F.3d at 1091.  The parties' settlement agreement

---

[8]  *See* Order of Civil Contempt, *Trueblood*, No. 2:14-cv-01178 (W.D. Wash. July 7, 2016), ECF 289; Second Mot. for Contempt, *Trueblood*, No. 2:14-cv-01178 (W.D. Wash. July 13, 2017), ECF 427.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

required the contractor to comply with minimum staffing levels. *Id.* An investigation revealed the contractor's employees had falsified nearly 4,800 hours of staffing records over a seven-month period to represent that the minimum staffing levels were being met. *Id.* at 1091-92. The district court later found the contractor's "noncompliance was far worse than the report of about 4,800 hours" and "the vacancies extended well beyond the seven month period." *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1108, 1116 (D. Idaho Sept. 16, 2013). Evidence at the contempt hearing indicated that violations of the settlement agreement were "**extensive and ongoing**," and the most recent reports available showed that vacancies in mandatory posts continued to range **from 18 to 40 hours every day**. *Id.* at 1112; Answering Br. at 15, *Kelly*, No. 13-35972 (9th Cir. June 6, 2014), Dkt. 42-1.

Finally, in *Parsons III*, the district court issued an OSC re: contempt in October 2017 for defendants' failure to meet 85% compliance with eleven performance measures aimed at improving healthcare in the state prison system. 949 F.3d at 451-52. In ordering contempt, that court found **1,445** violations from December 2017 to February 2018. *Id.* at 452; *Parsons v. Ryan*, 2018 WL 3239691, at *11 (D. Ariz. June 22, 2018). By contrast, here, Defendants are presently in substantial compliance with the PI. *Supra* Sec. II.B. As discussed above, between May 7-31, 2023, there was only **one** occasion, for which defendants have no compelling justification, when an inmate spent more than 24 hours in the IRC; only **eight** unexplainable 12-hour cell violations involving inmates entering the IRC; and **zero** inmates tethered to the IRC Front Bench for longer than four hours. *Id.*

**B.      Defendants Should Not Be Held in Contempt Based on Violations Involving Circumstances That Were Not Contemplated When the Preliminary Injunction Was Entered**

**1.      Circumstances Not Contemplated by the Preliminary Injunction Have Impacted Defendants' Compliance**

The threshold finding required for civil contempt is that the non-moving party violated "a specific and definite order of the court." *F.T.C.*, 179 F.3d at 1239.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1   Thus, where an order is not specific and definite, or is subject to an reasonable

2   alternative interpretation, a finding of contempt is not appropriate.  *In re Dual-Deck*

3   *Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

4   As discussed *supra* Sec. II.A.2, the SIM system has revealed a number of

5   circumstances that impact compliance which were not contemplated by the parties

6   when they entered the PI, including when individuals are in court or receiving

7   medical care at another facility when the 24-hour limitation is reached.  As a result,

8   these circumstances should not be counted as violations here.

9   **2.     When These Circumstances Occur, Defendants Are Unable to Comply With The Preliminary Injunction**

10

11   As a result of these circumstances, Defendants are left, at times, unable to

12   comply with the PI.  Where the non-moving party shows, "'categorically and in

13   detail,'" why they are unable to comply, a finding of civil contempt is not

14   warranted.  *F.T.C.*, 179 F.3d at 1241.  As set forth in detail above, the SIM system

15   has revealed that certain violations are the result of an inability to comply with the

16   PI that sits beyond Defendants' control.

17   **C.     Defendants Should Not Be Held in Contempt Because They Have Taken All Reasonable Steps Within Their Power to Insure Present and Sustainable Compliance With the Preliminary Injunction**

18

19   "This Circuit's rule with regard to contempt has long been whether the

20   defendants have performed 'all reasonable steps within their power to insure

21   compliance' with the court's orders."  *Stone v. City & Cnty. of San Francisco*, 968

22   F.2d 850, 856 (9th Cir. 1992).  To satisfy this requirement, a party **need not**

23   consider every option that the court could conceive.  *Id.* at 857.  Rather, a failure to

24   take "every reasonable step" exists where "there was 'little conscientious effort'" to

25   comply with the order.  *Id.*  Courts in this Circuit have also held contempt is

26   unwarranted where a party demonstrates they are "presently making substantial

27   efforts to reach compliance."  *Armstrong*, 939 F. Supp. 2d. at 1025-26.

28   In *Armstrong*, prisoners brought a class action lawsuit against the state

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

21

Department of Corrections and Rehabilitation, among others, seeking, in part, to hold defendants in contempt for violating a court order requiring defendants to provide sign language interpreters ("SLIs") to deaf prisoners attending vocational/educational classes. *Id.* at 1022- 23. Although the court found that defendants violated the order by failing to provide SLIs at more than 25% of classes, it did not find contempt because defendants made "substantial efforts" to comply in advance of the contempt hearing by increasing contractor SLI services, obtaining "authorization to increase the number of full-time qualified SLIs," and planning "to begin consistently logging additional information" regarding compliance. *Id.* at 1023, 1025. Defendants also demonstrated that, prior to the contempt hearing, they reduced their violations of the court's order by more than half. *See id.* at 1025. Given these substantial efforts, the court held "no civil contempt sanctions [were] needed at [that] time to coerce [defendants'] compliance." *Id.* at 1026.

Plaintiffs contend that subsequent Ninth Circuit decisions, such as *Parsons III* and *Kelly*, have rejected the rationale employed by the court in *Armstrong*. Reply at n.3. Plaintiffs are incorrect. As a threshold matter, the issue of whether defendants made "substantial efforts," or took "all reasonable steps," was not even before the Ninth Circuit in *Parsons III*. *See* 949 F.3d at 453-54 (appeal of contempt order based on five other grounds, A-E). Moreover, in *Parsons III*, the court below found that defendants had made little conscientious effort to comply because defendants failed to introduce **any** evidence about specific efforts to bring eight of the eleven performance measures at issue into compliance. *Parsons*, 2018 WL 3239691 at *10. The district court further found that defendants only presented generic or inapplicable evidence regarding steps to comply with a ninth performance measure. *Id.* Accordingly, *Parsons III* is not properly characterized as rejecting the rationale in *Armstrong*, and is certainly not controlling here, where the County has presented ample evidence regarding the substantial efforts made and the compliance that already has resulted.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1     Although the Ninth Circuit in *Kelly* does confront an "all reasonable steps"

2 argument, the underlying facts of that case again make a comparison inapt.  There,

3 as discussed above, the court below found the defendant contractor in contempt

4 where there were "extensive and ongoing" violations of the order mandating

5 minimum staffing levels in the prison.  *Kelly*, 979 F. Supp. 2d at 1112.  Although

6 the contractor had implemented a compliance plan, neither the Ninth Circuit nor the

7 district court found the plan sufficient.  *Kelly*, 822 F.3d at 1097 (stating the district

8 court found the plan "inadequate"); *Kelly*, 979 F. Supp. 2d at 1114 (noting the plan

9 included "planning to hire more staff, training existing staff to prevent falsifying

10 records, and finally improving their recordkeeping," which was "not a particularly

11 speedy response").  Further, it was clear that this plan had not produced results, let

12 alone substantial compliance, given that the staffing vacancies continued to range

13 from 18 to 40 hours every day.  *Id.* at 1112.  Thus, unlike in *Armstrong* and unlike

14 here, there were neither substantial efforts ongoing to comply with the court order

15 nor any actual progress.  As a result, there was a clear need in *Kelly* for coerced

16 compliance and the severe remedy of civil contempt.

17     In addition to *Parsons* and *Kelly*, Plaintiffs point to *Trueblood* as a basis for

18 this Court to find contempt.  Mot. at 23-25.  There too, defendants took minimal

19 steps to comply while rampant violations occurred leading up to the contempt

20 hearing.  *See supra* Sec. III.A., 2017 WL 4700326 at *2.  Specifically, the court

21 reasoned that, despite being given "every opportunity to adopt steps that would

22 ameliorate this crisis," defendants failed to make certain basic efforts, including

23 "[u]tilizing newly-hired staff to meet the demand" and "[d]eveloping programs to

24 divert class members out of the criminal justice system."  *Id.*  Accordingly, in

25 *Trueblood*, as in *Parsons* and *Kelly*, there was a significant need for contempt

26 sanctions to coerce compliance with a court order.  But these situations, where

27 defendants took few steps, if any, to comply, are different from the facts here.

28

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

As shown above, Defendants have taken steps far beyond what occurred in *Parsons*, *Kelly*, and *Trueblood*, as well as beyond the "substantial efforts" described in *Armstrong*.  *Supra* Sec. II.A.  All of Defendants' efforts are sustainable—because of the SIMS system, newly instituted leadership, and their commitment to improving IRC conditions and to continued compliance with the PI.  *Supra* Sec. II.A.3.

### D.    A Contempt Finding Will Not Help Defendants Comply with the Preliminary Injunction or Improve Conditions in the IRC

For the reasons set forth above, a contempt finding is not warranted here. However, even if this Court believes otherwise, the remedy proposed by Plaintiffs—the imposition of a complex system of fines funded with taxpayer dollars—would not be appropriate, because it presents both an unworkable system, and more importantly, will not improve conditions in the IRC beyond the improvement Defendants can ensure through the substantial remedial measures they are already taking.

First, it is difficult to see how the taxpayer-funded fine system Plaintiffs' propose can be fairly and practically implemented.  As shown above, there are any number of circumstances when a purported violation of the PI's terms may be justifiable, and it would be unfair to sanction Defendants for those occurrences.  Yet Plaintiffs have not proposed any system to ensure that fines which occur under its complicated rubric are imposed in a fair manner, and it is easy to see how such a system would be unwieldy and how the focus in this case could unproductively turn to the appropriateness of contempt fines rather than fixing issues in the IRC.

Second, and more importantly, a contempt finding and requiring County taxpayers to pay fines for any non-compliance with the PI's requirements will do nothing to improve conditions in the IRC.  Such rulings from this Court will not improve patient care in the IRC; they will not help the LASD and CHS process inmates any faster through the IRC; they will not change practices in the IRC that

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

24

have been put in place to protect inmates from harming themselves and others; and, as well-meaning as the ACLU's proposal to use the fines to fund diversion programs may be, that proposal will not yield a ruling that makes any practical sense, as there is no logistically feasible way for such funding to occur and these programs have already received new funding, including nearly $630 million from the State.

What would help coerce Defendants' compliance with the PI's requirements is continued oversight from this Court in the form of quarterly status conferences to ensure Defendants' remedial measures, which have led to drastically improved conditions in the IRC in a short amount of time, continue to yield the positive results they have to date. *Stone*, 968 F.2d at 853 ("The district court held hearings in April, July, and October of 1988 on the pending motion for contempt, but each time it continued the hearing to allow the City the opportunity to meet the population limits").[9]  That is the type of order that would be most helpful in guaranteeing that constitutional conditions in the IRC are achieved and maintained, which should be Plaintiffs and Defendants' shared goal.

## IV.   CONCLUSION

For each of the foregoing reasons, and the reasons that will be shown during the evidentiary hearing held in this matter, Plaintiffs' request to hold Defendants in contempt should be denied.

DATED:  June 6, 2023                    Respectfully submitted,

By: _____/s/  Robert E. Dugdale_____
Robert E. Dugdale
Attorneys for Defendants Los Angeles
County Sheriff Robert Luna, in his Official
Capacity, and the County of Los Angeles

---

[9]  A proposed order to this effect has been submitted in conjunction with this brief.

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067