OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
County Counsel
 dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
 dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:  (213) 974-1807/(213) 974-1811
Facsimile:   (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
 rdugdale@kbkfirm.com
Michael J. McCarthy (334829)
 mmccarthy@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 272-7904
Facsimile:  (310) 556-2705

*Attorneys for Defendants Los Angeles County Sheriff Robert Luna, in his Official Capacity, and the County of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DENNIS RUTHERFORD, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT LUNA, Sheriff of Los Angeles County, in his official capacity, and the COUNTY OF LOS ANGELES, <br><br> Defendants. | Case No. 75-cv-04111-DDP <br><br> **DEFENDANTS' QUARTERLY REPORT PURSUANT TO ORDER GRANTING JOINT STIPULATION [DKT. NO. 402]** <br><br> Hon. Dean D. Pregerson <br> Courtroom 9C |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ..................... 2

    A.    Background ................................................................................................ 2

    B.    The Stipulated Order ................................................................................. 4

    C.    Defendants Provided Plaintiffs With Timely Monthly Status Reports Reflecting Substantial Compliance in Every Regard Called for Under the Stipulated Order in July and August ...................... 9

    D.    Defendants Achieved Compliance With Every Provision of the Stipulated Order Other Than One in September 2023, and This One Failing Involved a Single Individual Subject to a Computer Glitch That Has Been Rectified ............................................................ 11

    E.    The Data Conclusively Confirms There Has Been Dramatic Improvement in the Conditions Inmates Currently Face in the IRC When Compared to Last Year ....................................................... 13

III. THE COUNTY CONTINUES TO ADD NEW NON-CARCERAL BEDS ...... 14

IV. NEW NON-CARCERAL BEDS AND OTHER POPULATION ...................... 16

VII. CONCLUSION ................................................................................................ 17

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# I.

# INTRODUCTION

Just last summer the Inmate Reception Center ("IRC") at the Los Angeles County Jail ("LACJ") was experiencing a crisis. The Emergency Bail Schedule, which had helped suppress the numbers of new inmates entering the LACJ, had recently been lifted; surges of inmates flooded the IRC and its overwhelmed staff as a result; and, as a consequence, inmates numbering in the hundreds were stranded in the IRC for unacceptable amounts of time, without access to a bed and in conditions that were made unsanitary by the unceasing flood of inmates entering and exiting the LACJ. The County of Los Angeles (the "County") and Los Angeles Sheriff's Department ("LASD") (collectively, the "Defendants") are proud to report that one year later conditions in the IRC have dramatically improved, and, over the past three months, Defendants have achieved a near perfect record in avoiding delays in processing individuals through the IRC in a timely manner, in limiting the time inmates requiring intense observation upon entering the IRC spend on the IRC's "front bench," in minimizing time inmates are locked in cells in the IRC, and in maintaining the IRC in a sanitary condition.

As reported in detail below, Defendants achieved this dramatic shift in the state of affairs in the IRC by working intensely to identify the root causes that have contributed to overcrowding and poor conditions in the IRC in the past, by initiating and maintaining a broad range of corrective actions designed to address those root causes, and by taking a variety of steps to keep the jail population at far more manageable levels than the LACJ has experienced in recent times. As a result of these efforts, the Defendants have dutifully adhered to, and in almost every sense exceeded, their obligations under the Stipulated Order they entered by this Court in June and currently operate the IRC in a manner that presents little chance the problematic issues that have plagued the IRC in the past will resurface.

# II.

# RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

## A. Background

On July 1, 2022, the Emergency Bail Schedule lapsed. Shortly thereafter continuous surges of new inmates— a high proportion of whom were suffering from serious mental health conditions— pushed the IRC and its staff to the brink, resulting in days when hundreds of inmates spent more than 24 hours waiting to be cleared from the IRC and transported to permanent housing, or at least, a location where they would have access to a bed.[1] Sanitary conditions suffered and medical and mental health clearances in the IRC stalled as the backlog of inmates caused ripple effects through the LACJ and overwhelmed the facility.

This crisis served as the backdrop for Plaintiff's Motions for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, both of which were granted without opposition from the County in September 2022. (Dkt. Nos. 345, 351). Notably, Plaintiffs and Defendants jointly agreed, and this Court entered an order stating, that Defendants should be preliminarily restrained and enjoined from: (a) holding an inmate in the IRC for more than 24 hours; (b) holding an inmate on the IRC Front Bench while handcuffed, chained, or tethered to a chair or any other object for more than four hours; (c) generally holding more people in locked holding cells and cages located

---

[1] A deeper explanation of the root causes of this surge and resulting backlogs in the IRC has been stated before, but, for brief reference to the relevant data, Defendants' prior analyses concluded that there were at least 2,771 occasions in August 2022 when inmates spent in excess of 24 hours in the IRC prior to being moved to a location where they were given access to a bed. Plaintiffs cited similar data showing days in August 2022 when hundreds of inmates were held in the IRC for more than 24 hours and, with unfortunate frequency, for periods approaching 48 hours. (Pls.' Mot. for a Temporary Restraining Order, Dkt. No. 318-1 at 28).

in the IRC beyond the capacity established by the Board of State and Community Corrections ("BSCC") and beyond certain periods of time; (d) holding inmates in the IRC clinic area, cage, or any cell in the IRC when that location is not in a clean and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles; and (e) failing to provide inmates in the IRC with ongoing access to medical and mental health care, including, but not limited to, regular pill call. (Dkt. No. 351 at 2-5).

In February 2023, the IRC experienced a wave of unprecedented, severe staff shortages that impacted Defendants' ability to conduct mental health evaluations and provide other related services, which affected the flow of the inmates through the IRC. For reference, Correctional Health Services ("CHS") began 2023 with 25 staff members in the IRC: one manager, five mental health staff supervisors, two psychologists, one registry psychologist, 13 psychiatric social workers ("PSWs"), and three mental health nurses. Within one month, three PSWs, three mental health staff supervisors, and the manager of the IRC's mental health staff were on or initiated medical leave; one PSW who worked in the IRC resigned; another supervisor who worked in the IRC was removed from her position; and still another supervisor who worked in the IRC transferred to a new position in the Department of Mental Health ("DMH"). To make matters worse, at the same time these sudden and unanticipated staff shortages occurred in the IRC in February 2023, four PSWs onboarded, each of whom required training from supervisors and other CHS staff, which, in turn, took time away from other work in the IRC, such as performing mental health evaluations. And to round out this confluence of unfortunate circumstances besetting the IRC, during this time there was no way to adjust quickly to fill the vacancies left by the attrition in CHS personnel that had occurred, as not all CHS staff in the jails are cross-trained to work in the IRC and the overtime accepted by CHS staff who are eligible and equipped to work in the IRC was insufficient to cover the February 2023 shortages. The corresponding data that

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1 Defendants have previously presented to this Court showed the outcome of this
2 perfect storm of events, as the IRC's worst days between September 2022 and May
3 2023 were in February 2023 at the time of this staffing crisis.

4       Responding to these events, Plaintiffs filed a Motion for an Order to Show
5 Cause Re: Contempt on February 27, 2023, arguing that Defendants had engaged in
6 serial violations of the Preliminary Injunction and should be held in contempt for
7 doing so (the "Motion for Contempt").  (Dkt. No. 375).  This Court eventually set an
8 evidentiary hearing on the Motion for Contempt for June 26, 2023.

9       In the backdrop of this litigation, Defendants diligently worked to identify the
10 root causes responsible for the reoccurring problems in the IRC and instituted a
11 number of immediate corrective actions designed to address those problems.  These
12 corrective actions included rapidly developing a new, automated inmate tracking
13 system called the Shared Intake Management System ("SIMS"), which provides
14 LASD and CHS personnel working in the IRC with contemporaneous visibility into,
15 among other data, how long each inmate has been present in the IRC, has been
16 tethered to the IRC Front Beach, or has been locked in a cell in the IRC, and
17 provides warnings to CHS and LASD personnel when any inmate approaches a time
18 limitation implicated by the Preliminary Injunction.

19 **B.     The Stipulated Order**

20       Prior to the evidentiary hearing on the Motion for Contempt scheduled for
21 June 26, 2023, counsel for Plaintiffs and counsel for Defendants met and conferred
22 on multiple occasions, and, on the strength and promise of Defendants' corrective
23 actions to date and proposed plans to address re-occurring problems in the IRC,
24 were able to reach a joint stipulation, which the Court granted in the form of an
25 order issued on June 22, 2023.  (Dkt. No. 402 (the "Stipulated Order")).

26       The Stipulated Order permanently restrains and enjoins the Defendants from
27 violating paragraphs 1-6 of the Stipulated Order and memorializes Defendants'
28 planned remedial efforts to address overcrowding, delays in processing, the need to

move inmates into permanent housing, the provision of adequate medical and mental health care, and the general living conditions in the IRC (hereinafter, the "Remedial Actions").[2] In this regard, Paragraphs 1-6 of the Stipulated Order set forth the following limitations and conditions for the processing of inmates through the IRC and requires Defendants to self-report violations of these limitations and conditions:

1. Holding an incarcerated person in the IRC for more than 24 hours.

2. Holding an incarcerated person on the IRC Clinic Front Bench, handcuffed, chained, or tethered to a chair or any other object, for more than four hours.

3. Holding an incarcerated person in an IRC holding cell for more than 12 hours total, or holding more people in a holding cell than its rated capacity by the Board of State and Community Corrections.

4. Holding an incarcerated person in the IRC Clinic cage, when locked, for more than eight (8) hours total.

5. Holding an incarcerated person in the IRC Clinic area, cage, or any cell in the IRC when that location is not in a clean and sanitary condition, with access to functioning toilets, potable drinking water, clean water to wash, and sufficient garbage receptacles.

6. Holding an incarcerated person in the IRC clinic area, cage, or any cell in the IRC without providing ongoing access to adequate medical and mental health care, including but not limited to regular pill call.

(*Id.* ¶¶ 1-6). The Stipulated Order further requires Defendants to document and provide monthly status reports to Plaintiffs and file a quarterly status report with the Court. (*Id.* ¶ 14).

In addition, Paragraph 10 of the Stipulated Order defined the parameters that Defendants must meet each month in order to be considered in "substantial

---

[2] A complete description of these Remedial Actions is included at paragraph 8 of the Stipulated Order. *Id.*

compliance" with their obligations under this agreement. In this regard, Defendants only achieve "substantial compliance" with the Stipulated Order's requirements if:

    (a)    fewer than 25 persons who are processed through the IRC in a calendar month are held in the IRC for more than 24 hours in violation of Paragraph 1 (and no person is held in the IRC in a calendar month for more than 36 hours);

    (b)    there are no more than four (4) days in a calendar month where more than five (5) people are held for more than 24 hours in violation of Paragraph 1;

    (c)    no more than five (5) people in a calendar month are handcuffed, chained, or otherwise tethered to the IRC Clinic Front Bench for more than four (4) hours in violation of Paragraph 2 (and no person is tethered to the IRC Clinic Front Bench for more than six (6) hours); and

    (d)    no more than fifteen (15) persons are kept in an IRC holding cell or the IRC cage in a calendar month in violation of paragraphs 3 and/or 4 (and no person is kept in an IRC holding cell for more than 18 hours or in the IRC cage for more than 12 hours).

(*Id.* ¶ 10).

Pursuant to the Stipulated Order, the County is required, by no later than the 10th of each calendar month, to notify Plaintiffs if it believes Defendants achieved substantial compliance during the previous calendar month. Thereafter, within ten days of when the County provides Plaintiffs with this monthly assessment, Plaintiffs must notify Defendants if they dispute the County's account of Defendants' compliance with the Stipulated Order's requirements. (*Id.* ¶ 11).

The Quarterly Report, which covers the preceding three months, requires the County to detail:

    (a)    the status of implementing the Remedial Actions;

    (b)    whether Defendants believe they are in substantial compliance with paragraphs 1-6 [], including data showing performance with paragraphs 1-4 as set forth in Paragraph 10;

    (c)    the County's progress in bringing on-line new non-carceral beds pursuant to the County's Diversion Efforts, as well as its status in funding additional non-carceral beds scheduled to be added to the

                inventories of ODR and DMH after June 30, 2025, pursuant to the County's Diversion Efforts; and,

(d)    the impact the County's progress in adding non-carceral beds to the inventories of ODR and DMH is having on eliminating backlogs in the IRC.

(*Id.* ¶ 14).

## III.

## DEFENDANTS' STATUS IN IMPLEMENTING THE REMEDIAL ACTIONS IDENTIFIED IN THE STIPULATED ORDER

The Stipulated Order required Defendants to complete the Remedial Actions as part of LASD's and CHS's corrective action plans for the IRC by July 22, 2023 (within 30 days of the entry of the Order granting the Stipulated Order). (Dkt. No. 402 ¶ 8). Defendants began instituting many of those corrective actions prior to the entry of the Joint Stipulation, and they have since fully implemented the Remedial Actions in a timely fashion.

In this regard, well before the deadline set in the Stipulated Order, the LASD instituted the following corrective actions to address issues in the IRC, all of which remain in effect to this day:

    \*    LASD Command issued Unit Orders to all IRC personnel explaining the requirements of the Stipulated Order and detailing policies to ensure compliance with its requirements, including an overview of the Stipulated Order presented to all IRC staff on June 27, 2023. Furthermore, all new personnel assigned to the IRC are trained on the requirements of the Stipulated Order, including all unit orders relevant to the IRC, as well as operation of SIMS.

    \*    In late February 2023, the LASD created a new sergeant position specifically dedicated to monitoring compliance with the Preliminary Injunction's requirements in the IRC and issued guidance addressing the role and responsibilities of the position. Today, that sergeant slot remains staffed 24 hours a day, 7 days a

[...]

week and serves the critical function of discovering and alerting IRC supervisors of potential violations related to all aspects of the Stipulated Order.

\*      The SIMS has operated, with refinements designed to improve its performance, since May 2023.  In addition to providing instantly accessible information contemporaneously documenting the movement of inmates into and out of the IRC, the SIMS generates daily reports documenting violations of paragraphs 1-4 of the Stipulated Order and includes detailed movement data— to the minute— for the individual cases when such violations occur.  Those reports are circulated to LASD Command, the County Chief Executive Officer's Office ("County CEO"), County Counsel, outside counsel for Defendants, as well as counsel for the Plaintiffs; and when any violation of the terms of the Stipulated Order is detected by the SIMS, it is investigated by the LASD and, when appropriate, corrective actions are issued to prevent the re-occurrence of a similar type of violation in the future.

\*      The LASD implemented a new, robust cleaning schedule in the IRC and instituted the use of the "IRC TRO Compliance Inspection Checklist."  That checklist is completed twice per shift by deputies and completed in additional instances when LASD supervisors tour the facility.  These steps have helped the Defendants maintain compliance with Paragraph 5 of the Stipulated Order.

In addition to these efforts undertaken by the LASD to maintain compliance with the Stipulated Order's requirements, CHS has fully instituted several corrective actions as well.  Most significantly, Defendants have maintained a CHS staffing plan in the IRC that includes two managers, four supervisors, and 24 clinicians, consisting of psychiatric social workers, psychologists, and mental health nurses, as well as a staff consisting of at least 2.75 full time equivalent ("FTE") psychiatrists and 8.25 FTE psychiatric nurse practitioners in the IRC.  Currently, this staff provides 24-7 psychiatric nurse practitioner coverage, and 10-hour coverage, 6-days-per-week by psychiatrists (approximately 2.25 FTE psychiatrists, plus overtime equivalent to approximately 2.5 FTE, plus 0.5 FTE from a supervising

psychiatrist). This robust staffing has enabled the County to provide fresh psychiatric evaluations for medication for approximately 90% of patients for whom such an evaluation is indicated, as described in paragraph 8(i) of the Stipulated Order. For the remainder of patients, the County continues to implement and maintain a Bridge Medication Policy as set forth in Paragraph 8, subsection (h), of the Stipulated Order. The combined efforts of hiring and retaining CHS staff have greatly contributed to Defendants' substantial compliance with Paragraph 6 of the Stipulated Order.[3]

## IV.
## BETWEEN JULY 2023 AND SEPTEMBER 2023, DEFENDANTS ACHIEVED SUBSTANTIAL COMPLIANCE WITH THE STIPULATED ORDER'S REQUIREMENTS UNDER PRACTICALLY EVERY MEASURE

**C.  Defendants Provided Plaintiffs With Timely Monthly Status Reports Reflecting Substantial Compliance in Every Regard Called for Under the Stipulated Order in July and August**

As an initial matter, Defendants have fully complied with the Stipulated Order's requirement that they send a monthly status report with respect to paragraphs 1-4 to Plaintiffs no later than the 10th day of the following month. On August 10th, September 8th, and October 10th, Defendants transmitted timely

---

[3] In April 2023, Defendants also enacted 20% bonuses for most mental health staff working in the LACJ to prioritize the hiring of new staff, to help promote the retention of current staff, and to encourage overtime work to address staff shortages on individual shifts when necessary. The impact of this pay raise following its implementation in May 2023 has been immediately felt. Since the bonuses went into effect, new hires, rehires, transfers, promotions, internal transfers, and candidates currently onboarding now represent approximately 12.7% of CHS's authorized FTEs.

monthly status reports to Plaintiffs via e-mail.[4]  For July and August, Defendants reported substantial compliance in all four areas covered by the Stipulated Order. Plaintiffs agreed with Defendants' overall reporting of substantial compliance, though disagreed with Defendants' conclusions regarding whether the circumstances surrounding some individual SIMS entries constituted actual violations of the Stipulated Order.

*For July 2023*, there were **zero** violations of the 24-hour IRC processing limitation (Paragraph 1); **zero** violations of the 4-hour IRC Front Bench limitation (Paragraph 2); and the IRC Cage was not utilized (Paragraph 4).

There were **two** violations of the 12-hour cell-related limitation (Paragraph 3). However, both violations occurred due to a delay by outside agencies in picking up inmates who were departing the IRC.  On July 12, 2023, representatives of the Probation Department caused a violation amounting to only one minute when they filled out paperwork for the inmate to receive an ankle monitor.  On July 27, 2023, the LASD waited for Integrated Recovery Supportive Services to arrive at the IRC in order to take custody of an inmate.  By the time a representative of the agency arrived, the inmate had been held in a cell beyond the 12-hour limitation for approximately 1 hour and 39 minutes.  Regardless of the cause of these two violations, neither resulted in an inmate being continuously held in a cell for more than 18 hours and the aggregate total of cell-related violations was less than 15 in July 2023.  Accordingly, Defendants were in substantial compliance with the Stipulated Order (Paragraph 4), as stated in Paragraph 10, subsection (d).

---

[4]  As explained further above, *supra* Section II, counsel for Plaintiffs receive the daily reports generated by SIMS containing detailed information about inmate movement and causes for any violations, which permit Plaintiffs to track Defendants' progress in meeting their obligations under the Stipulated Order prior to the issuance of these monthly status reports.

*For August 2023*, Defendants believe they achieved <u>perfect</u> compliance with Paragraphs 1-4 of the Stipulated Order. There were **zero** IRC Front Bench violations, **zero** IRC Cell violations of Paragraph 3, and again Paragraph 4 was inapplicable because the IRC Cage was not utilized. The SIMS reported that **one** inmate was held in violation of the 24-hour IRC processing limit. However, upon review of the circumstances of this reported violation, which was approximately 14 minutes over the 24-hour limit set in the Stipulated Order, Defendants determined that the inmate was treated in the IRC's urgent care area and assigned a bed. Since the Stipulated Order provides that the 24-hour clock for an inmate waiting in the IRC "shall be paused" "[i]f a person leaves the IRC for medication treatment at another facility within or outside the Los Angeles County Jail" (*see* dkt. No. 402 ¶ 1), and the urgent care is not a part of the IRC (or defined as such in the Stipulated Order), this instance involving this inmate, who was steered to the urgent care to attend to a medical issue while being processed through the IRC, did not amount to violation under the terms of the Stipulated Order. Moreover, even if this Court were to consider this incident a violation under Paragraph 1 of the Stipulated Order, Defendants still indisputably achieved substantial compliance in August under the order's terms.

**D.   Defendants Achieved Compliance With Every Provision of the Stipulated Order Other Than One in September 2023, and This One Failing Involved a Single Individual Subject to a Computer Glitch That Has Been Rectified**

*For September 2023*, Defendants reported substantial compliance with Paragraphs 1, 2 and 4 of the Stipulated Order. There were **three** reported violations of the 24-hour limitation (but only **one** Defendants believe properly counts as a

violation)[5], **zero** violations of the IRC Front Bench limitation, and again the IRC Cage area was not utilized.

There were **three** violations of the 12-hour cell limitation, including one that took Defendants out of overall substantial compliance for the month of September 2023. On September 5, 2023, an individual with a body-lice infestation remained in a cell for 3 hours and 38 minutes beyond the 12-hour limit. That individual was under observation, and, for medical reasons, could not be moved from his cell in the IRC. On September 7, 2023, IRC staff received conflicting paperwork concerning an inmate, which, on one hand, indicated the inmate should be released, and, on the other, that he should remain in custody. The inmate was held in a cell 21 minutes beyond the 12-hour limit to allow IRC staff to resolve these contradictory orders.

Neither one of these two incidents placed Defendants out of substantial compliance with the requirements of the Stipulated Order; however, a third did. In that case, which occurred on September 11, 2023, an inmate stayed in an IRC cell for 17 hours and 23 minutes beyond the 12-hour time limited identified in the Stipulated Order, when a data migration issue failed to upload this inmate's information into the SIMS and caused IRC personnel to overlook his presence in the IRC. When this inmate's circumstances were detected during a manual wristband count in the IRC, he was immediately provided with permanent housing; the LASD launched an immediate inquiry into the technical and operational failure that resulted in the overstay in the IRC of this single individual; and, in the wake of this

---

[5] Two of the three violations of the 24-hour limitation occurred under circumstances where the inmates in question were taken from the IRC to the urgent care in order to receive necessary medical treatment and had access to a bed. In one case, on September 17, 2023, an inmate remained in urgent care for approximately 1 hour and 32 minutes beyond the 24 hour limit. In a second case, which occurred on September 24, 2023, an inmate remained in urgent care for 19 hours beyond the 24 hour limit. For the reasons stated above, Defendants do not believe either of these cases constitutes a violation of the Stipulated Order's terms.

failure, the LASD immediately instituted corrective actions to prevent this type of violation from reoccurring.[6]

### E. The Data Conclusively Confirms There Has Been Dramatic Improvement in the Conditions Inmates Currently Face in the IRC When Compared to Last Year

As shown in the data below comparing 24-hour violations in the IRC in August 2022 with 24-hour violations in the IRC one year later, the crisis that led to the filing of Plaintiff's Motion for a Temporary Restraining Order is a far cry from current conditions in the IRC.

| August 2022 | | August 2023 | |
|---|---|---|---|
| Date | 24+ Hours | Date | 24+ Hours |
| 8/1/2022 | 71 | 8/1/2023 | 0 |
| 8/2/2022 | 34 | 8/2/2023 | 0 |
| 8/3/2022 | 48 | 8/3/2023 | 0 |
| 8/4/2022 | 142 | 8/4/2023 | 0 |
| 8/5/2022 | 123 | 8/5/2023 | 1* |
| 8/6/2022 | No Data | 8/6/2023 | 0 |
| 8/7/2022 | 66 | 8/7/2023 | 0 |
| 8/8/2022 | 25 | 8/8/2023 | 0 |
| 8/9/2022 | 25 | 8/9/2023 | 0 |
| 8/10/2022 | 57 | 8/10/2023 | 0 |
| 8/11/2022 | 142 | 8/11/2023 | 0 |

---

[6] In this regard, the LASD revised unit order 5-33/000.00 to require a wristband count for each area of the IRC at least once per shift, in which the lead deputy assigned to oversee the count is required to compare the information obtained from SIMS with the wristband count to ensure both data sets are identical. Per this revised order, the IRC sergeant shall be immediately alerted to inmates that are unaccounted for during the count or do not appear on the SIMS report. In addition, the LASD is integrating another data system into SIMS, which will provide a secondary tracking data source from which SIMS will draw its update. This will ensure that SIMS will have two sources of data to rely upon to warn IRC staff of impending violations of the Stipulated Order's terms.

| Date | Count | Date | Count |
|---|---|---|---|
| 8/12/2022 | 45 | 8/12/2023 | 0 |
| 8/13/2022 | 55 | 8/13/2023 | 0 |
| 8/14/2022 | 79 | 8/14/2023 | 0 |
| 8/15/2022 | 43 | 8/15/2023 | 0 |
| 8/16/2022 | 46 | 8/16/2023 | 0 |
| 8/17/2022 | 46 | 8/17/2023 | 0 |
| 8/18/2022 | 93 | 8/18/2023 | 0 |
| 8/19/2022 | 123 | 8/19/2023 | 0 |
| 8/20/2022 | 83 | 8/20/2023 | 0 |
| 8/21/2022 | 237 | 8/21/2023 | 0 |
| 8/22/2022 | 252 | 8/22/2023 | 0 |
| 8/23/2022 | 101 | 8/23/2023 | 0 |
| 8/24/2022 | 23 | 8/24/2023 | 0 |
| 8/25/2022 | 85 | 8/25/2023 | 0 |
| 8/26/2022 | 123 | 8/26/2023 | 0 |
| 8/27/2022 | 175 | 8/27/2023 | 0 |
| 8/28/2022 | 192 | 8/28/2023 | 0 |
| 8/29/2022 | 95 | 8/29/2023 | 0 |
| 8/30/2022 | 51 | 8/30/2023 | 0 |
| 8/31/2022 | 91 | 8/31/2023 | 0 |
| **Total** | **2771** | **Total** | **1** |

\*Inmate detained in IRC urgent care area with access to a bed at the time of the violation. SIMS reported that the 24-hour limitation was exceeded by 14 minutes.

In short, the corrective actions addressed above and the Defendants' diligent efforts to implement them and maintain them has led to sustained periods of time where violations of the Stipulated Order's provisions occur in only exceptional cases; and, in the rare cases when violations do occur, they are seriously scrutinized to make sure they do not reoccur. Accordingly, as the LASD continues to improve the implementation of SIMS and enact unit orders to ensure that its tracking capabilities are optimized, Defendants expect to achieve and maintain lasting substantial compliance with Paragraphs 1-4 of Stipulated Order.

## III.
## THE COUNTY CONTINUES TO ADD NEW NON-CARCERAL BEDS

One of a number of ways in which the County intends to achieve sustained

compliance with its obligations under the Stipulated Order is to lower the jail population as prudently as possible to prevent backlogs from occurring in the IRC. One approach the County is taking to depopulate the LACJ is by creating an inventory of non-carceral beds to which appropriate inmates can be diverted from the LACJ.

In paragraph 9 of the Stipulated Order, the County reported that it plans to add 1,527 additional beds overseen by the Office of Diversion and Re-entry ("ODR") and 164 additional beds overseen by the Department of Mental Health ("DMH") for a total of 1,691 beds, over the next two fiscal years. The County also reported that it was finalizing funding for Fiscal Year 23-24 for the first year of this ramp up (814 total additional beds), and that the County has authorized the Department of Health Services ("DHS") to enter into a contract with the California Department of State Hospitals for approximately $629 million in State funding to increase the number of ODR beds for those accused of felonies found incompetent to stand trial ("FIST") from 794 to 1,344 over five years.[7]

With the first quarter of FY23-24 now at an end, the County is well on its way toward executing on the first fiscal year of this ramp up (814 total additional beds). Specifically, the Board of Supervisors approved funding in June 2023 for the first year of this ramp up and the County executed the $629 million contract with the Department of State Hospitals. ODR and DMH have also begun to execute on ramping up the additional 814 beds expected in the first fiscal year.

Specifically, as of October 1, 2023, ODR has added a net total of 111 beds or

---

[7] The growth of FIST beds funded by this contract for the period up to June 30, 2025, is included in the County's anticipated growth of diversion beds through June 30, 2025. Specifically, the County's anticipated growth of 1,691 beds through June 30, 2025, will include 316 added FIST beds funded by this contract by June 30, 2025.

slots out of the 741 that it expects to add to its inventory during this fiscal year. The net increase is primarily due to expansion of the ODR housing program ("ODRH"), but also reflects a shift of some beds/slots between ODRH, ODR's program for the treatment of misdemeanants found incompetent to stand trial ("MIST"), and ODR's program for the treatment of felony defendants found incompetent to stand trial ("FIST"). The resulting allocation of beds/slots between the programs gives ODR the capacity to provide 2,232 treatment slots for those in the ODRH program, 203 beds for the treatment of MIST inmates, and 817 beds for the treatment of FIST inmates.

DMH expected to add 72 beds this fiscal year to meet the ramp-up plans described in paragraph 9 of the Stipulated Order and has already added more than that—a total of 79 beds specifically to decarcerate the LPS conserved from the LACJ. These new beds include 57 acute beds, 10 beds for subacute care, and 12 beds in the Enriched Residential Services program.

These new net additions to ODR's and DMH's inventory show steady progress towards meeting the ramp-up goals set forth in paragraph 9 of the Stipulated Order, and toward creating additional community placement options that will ultimately end bottlenecks in the IRC by depopulating the LACJ through the placement of incarcerated persons (especially those with serious mental illness) into noncarceral settings.

## IV.

## NEW NON-CARCERAL BEDS AND OTHER POPULATION REDUCTION METHODS EMPLOYED BY THE COUNTY IN RECENT MONTHS HAVE HELPED ALLEVIATE IRC BACKLOGS

Over the past several months, the County has employed a number of methods that have had a dramatic impact on lowering the inmate population in the LACJ, including (1) expediting the transfers of inmates to serve state prison sentences; (2) surging the flow of inmates ordered to undergo restorative treatment in state

hospitals when those opportunities arise; and (3) taking advantage of the state court's new bail regime to slow the flow of inmates into the LACJ.  Indeed, due to these efforts, in the past 10 months alone, the number of inmates in the LACJ has fallen from approximately 14,500 inmates to approximately 12,500 inmates, a drop of nearly 14%.  The County anticipates that the build-up of non-carceral beds described above and increased efforts to divert suitable inmates from the LACJ into those beds will lead to further drops in these figures and thus alleviate the future likelihood the IRC will face the type of bottlenecks that have plagued it in the past.

## VII.
## CONCLUSION

As demonstrated by the foregoing, Defendants have taken substantial steps which have nearly brought them into perfect compliance with requirements of the Stipulated Order over the past three months.  Though there remains work to be done in addressing more singular issues within the IRC, the sweeping patterns that emerged in the late Summer of 2022 and during the staffing crisis of February 2023 have been addressed.  As a result, Defendants remain confident that the LASD and CHS will continue to make improvements to their corrective action plans as needed to maintain the positive momentum built up over the last several months in replacing past failures in the IRC with current successes, and that the LASD and CHS will ably respond to singular, acute issues that arise in the complex management of the country's largest jail system.

DATED:  October 13, 2023                KENDALL BRILL & KELLY LLP

By:       /s/ Robert E. Dugdale
          Robert E. Dugdale

*Attorneys for Defendants Los Angeles County Sheriff Robert Luna. in his Official Capacity, and the County of Los Angeles*